**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **IN RE:  ALEXANDER E. JONES** | § | **CASE NO. 22-33553 (CML)** |
| | § | |
| Debtor | § | **Chapter 7** |
| | § | |

**OBJECTION TO EMERGENCY RELIEF IN THE SANDY HOOK FAMILIES'
EMERGENCY JOINT MOTION FOR ENTRY OF AN ORDER CONFIRMING
THAT FSS ASSETS ARE NOT SUBJECT TO THE AUTOMATIC STAY
[RELATED DKT #1241]**

TO THE HONORABLE CHRIS LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

Debtor Alexander E. Jones ("Jones") and Judgment Debtor Free Speech Systems, LLC

("FSS") (collectively "Movants") jointly files this Objection to the Plaintiff's "Emergency Joint

Motion for Entry of an Order Confirming That FSS Assets are Not Subject to the Automatic Stay"

(as assets of the Chapter 7 Estate of Alexander E. Jones administered by Trustee Chris Murray)

(the "Joint Emergency Motion"), and would show that there is no basis for scheduling an

emergency hearing.

**I.**
**PRELIMINARY STATEMENT**

1.      The Connecticut and Texas Plaintiffs ("Plaintiffs") have filed a Joint Emergency

Motion on Friday, September 26, 2025, seeking an order of this court *Confirming* The FSS Assets

are not Subject to the Automatic Stay [Dkt #1241].  The basis of the Motion is that these Plaintiffs

allege this Court voided the Supplemental Order entered September 24, 2024 (FSS Dkt #1021)

[the "Supplemental Order"][1] on February 5, 2025, *while the Texas Plaintiffs' appeal of the*

---

[1]      Upon the conversion of the Jones Chapter 11 to Chapter 7, and the dismissal of FSS from its Chapter 11 case, this Court entered two Orders – the Initial Cash Order [FSS Dkt #956] and Supplemental Order [FSS Dkt #1021] (herein the "Supplemental Order"), vesting all FSS assets and records which were and remain within the exclusive jurisdiction of this Court.

004728

*Supplemental Order was pending at the District Court.*[2]

2.    According to these Plaintiffs, the Chapter 7 Trustee no longer has any interest in the assets this Court "vested" in the Chapter 7 Trustee's Estate of Alexander E. Jones by that Supplemental Order.  Movants vigorously disagree.

3.    ***THERE IS NO EMERGENCY FOR THIS REQUESTED DECLARATORY RELIEF***.   This is the first occasion that Plaintiffs have alleged <u>to this Court</u> that the Court actually voided the Supplemental Order on February 5, 2025, *while the Supplemental Order was on appeal*.  Movants believe this alleged "Emergency" is tactical, inasmuch as the Appellants' Brief to the Austin Court of Appeals on the Merits of the Jones and FSS appeal of the Turnover Order and Receivership Order is due on Thursday, October 2, 2025, the day after the requested "Emergency Hearing."

4.    Over the past 8 months from February 5, 2025 the Plaintiffs have had no restriction that would have prevented them seeking months ago the declaration they now seek.  In fact, this issue was raised and the Court clarified and clearly ruled on June 5, 2025 that it had not voided the Supplemental Order. [*See, infra* Note 3].  Plaintiffs have made no objection until now to that clarifying order and, importantly, the Emergency Motion does not even mention this Court's clear

---

[2]    Of course, precisely the opposite occurred on February 5, 2025. Although this Bankruptcy Court did indicate, out of expressed frustration with the manner in which the auctions and then a "settlement" was conducted, that the Court would void the Supplemental Order, this Court, after those remarks, clarified *in the same hearing on February 5, 2025*, that the Bankruptcy Court did not have jurisdiction to void the Supplemental Order because it was on appeal:

….                No, I should back up and mention that the supplemental order was appealed by the Texas families.  I think that matter is still pending.
    Mr. JORDAN:   It is, Judge.
    THE COURT:  *I lose jurisdiction over that immediately*.

004729

statements that none of its comments voided of the Supplemental Order. [3]

5.    Nothing in the Emergency Motion suggests that any true emergency exists. The fact that the Austin Court of Appeals may continue the stay it granted in favor of Movants in their appeal is certainly not a legitimate emergency relief.

6.    Movants request that this Emergency Motion be placed on this Court normal docket affording Movants a full opportunity to respond to the Plaintiffs' numerous conflated, confusing,

---

[3]    This Court made clear in the June 5, 2025 hearing that the Court had not modified, much less revoked or voided, the Supplemental Order. This was reiterated in the record on several occasions where the Court stated the following:

> THE COURT:  I don't think I modify the order --
>
> MR. JORDAN:  You didn't.
>
> THE COURT:  -- back in February.
>
> MR. JORDAN:  No.
>
> THE COURT:  The question is, do I do it now?  It's the question you're telling me.

June 5, 2025 Tr., p. 47, lines 8-13.  This Court repeated the fact that it did not have jurisdictional authority to nullify the Supplemental Order, not once but several times, including:

> The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I
>
> that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another

June 5, 2025 Tr. p. 40, l: 5-8, 23-24. There is no ambiguity in the Court's ruling. The Supplemental Order remains valid, acknowledging that all he denied was the Plaintiffs attempt to control the auction of the FSS assets:

> THE COURT:  No, I agree.  I don't know how people are construing it.  Maybe I can provide some clarity there.  There is an order out there.  That order, there was a sale, a proposed sale under that order.  He didn't -- I denied it.

June 5, 2025 Tr., p. 48:10-13.

and misleading allegations of this Court's rulings and comments.

WHEREFORE, Alexander E. Jones and Free Speech Systems, LLC, request that the Emergency Motion be continued on this Court normal docket, and for such other and further relief to which the Movants may be justly entitled, both at law and in equity.

Dated: September 29, 2025

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
        aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and FSS**

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@brookslawfirm.com
**CO-COUNSEL FOR ALEX JONES And FSS**

004731

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on September 29, 2025.

*/s/ Shelby A. Jordan*

Shelby A. Jordan

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE:  ALEXANDER E. JONES | § |
| | §    CASE NO. 22-33553 (CML) |
| | § |
| Debtor. | §    Chapter 7 |

---

**ALEXANDER E. JONES EXHIBIT AND WITNESS LIST**

Alexander E. Jones ("Debtor") files this Witness and Exhibit List for the hearing to be held on Wednesday, October 1, 2025, at 1:00 p.m. (prevailing Central Time) before the Honorable Christopher Lopez at the United States Bankruptcy Court for the Southern District of Texas, Courtroom 401, 515 Rusk Street, Houston, Texas 77002.

**EXHIBITS**

| No. | Description | Offered | Objection | Admitted/Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1. | 9/24/24 Transcript [Docket #861] | | | | |
| 2. | 2/5/25 Transcript [Docket #1072] | | | | |
| 3. | 6/5/25 Transcript [Docket #1193] | | | | |
| 4. | Application for Post-Judgment Turnover Order and Appointment of Receiver as to Judgment Debtors' Alexander E. Jones and FSS (D-1-GN-18-001835; Travis Co) | | | | |
| 5. | Order Granting Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor FSS (D-1-GN-18-001835; Travis Co) | | | | |
| 6. | Plaintiffs Heslin and Lewis Challenge to Net Worth Declaration and Motion for Sanctions for False and Frivolous Pleading (D-1-GN-18-001835; Travis Co) | | | | |
| 7. | FSS Response to Plaintiffs Heslin and Lewis Challenge to Net Worth Declaration and | | | | |

Page 1 of 4

004733

| No. | Description | Offered | Objection | Admitted/Not Admitted | Disposition |
|---|---|---|---|---|---|
|  | Motion for Sanctions for False and Frivolous Pleading (D-1-GN-18-001835; Travis Co) |  |  |  |  |
| 8. | Plaintiffs Heslin and Lewis Reply in Support of Challenge to Net Worth Declaration and Motion for Sanctions for False and Frivolous Pleading (D-1-GN-18-001835; Travis Co) |  |  |  |  |
| 9. | USDC Connecticut Families Motion to Intervene (24-03882) |  |  |  |  |
| 10. | Texas Plaintiffs Notice of Appeal (24-03882) |  |  |  |  |
| 11. | Texas Plaintiffs' Statement of Issues on Appeal (24-03882) |  |  |  |  |
| 12. | Appellant's Emergency Motion for Immediate Stay (03-25-00617-CV; Court of Appeals, 3rd District) |  |  |  |  |
| 13. | Order Temporarily Granting Stay of Turnover Order (03-25-00617-CV; Court of Appeals, 3rd District) |  |  |  |  |
| 14. | Appellee's Response to Appellant's Emergency Motion for Immediate Stay (03-25-00617-CV; Court of Appeals, 3rd District) |  |  |  |  |
| 15. | Appellant's Reply in Support of Emergency Motion for Immediate Stay (03-25-00617-CV; Court of Appeals, 3rd District) |  |  |  |  |
| 16. | Motion for Reconsideration of this Court's Determination that No Auction of FSS Assets Will be Conducted by the Jones Chapter 7 Estate (Docket #1131) |  |  |  |  |
| 17. |  |  |  |  |  |
| 18. |  |  |  |  |  |
| 19. |  |  |  |  |  |
| 20. |  |  |  |  |  |
| 21. | Any pleading or other document filed with the Court on the docket |  |  |  |  |

Page 2 of 4

004734

| No. | Description | Offered | Objection | Admitted/Not Admitted | Disposition |
|---|---|---|---|---|---|
| | of the above-captioned chapter 7 case | | | | |
| 22. | Any exhibit necessary to rebut the evidence or testimony of any witness offered or designated by any other party | | | | |
| 7. | Any exhibit listed by any other party | | | | |

## **WITNESSES**

1. Any witness and rebuttal witnesses listed by any other party.

Debtor reserves the right to amend and/or supplement this Witness and Exhibit List as necessary in advance of the Hearing. Jones Parties also reserve the right to use any exhibits presented by any other party and to ask the Court to take judicial notice of any document. Finally, Debtor reserves the right to introduce any previously admitted exhibit.

Dated: September 30, 2025

*/s/ Shelby A. Jordan*
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
***Jordan & Ortiz, P.C.***
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
        aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES**

*/s/ Ben Broocks*
Ben C Broocks
State Bar No. 03058800
Federal Bar No. 94507
William A. Broocks
St. Bar No. 24107577

004735

Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on September 30, 2025 as well as the following parties.

*/s/ Shelby A. Jordan*
Shelby A. Jordan

004736

EXHIBIT

1

Alexander E. Jones; 22-33553

exhibitsticker.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES and        )   CASE NO: 22-33553-cml
OFFICIAL COMMITTEE of         )
UNSECURED CREDITORS,          )   Houston, Texas
                              )
        Debtor.              )   Tuesday, September 24, 2024
                              )   2:31 PM to 3:06 PM
------------------------------)
                              HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Chapter 7           CHRISTOPHER R. MURRAY
Trustee:                Jones Murray LLP
                        602 Sawyer Street, Suite 400
                        Houston, TX 77007
                        832-529-1999

For Christopher         ERIN JONES
Murray, Chapter 7       Jones Murray LLP
Trustee:                602 Sawyer Street, Suite 400
                        Houston, TX 77007
                        832-529-1999

                        JOSHUA WOLFSHOHL
                        Porter Hedges LLP
                        1000 Main Street, 36th Floor
                        Houston, TX 77002
                        713-226-6000

For U.S. Trustee:       HA MIN NGUYEN
                        Office of the United States Trustee
                        515 Rusk Street, Suite 3516
                        Houston, TX 77002
                        202-590-7962

For Free Speech         ANNIE E. CATMULL
Systems, LLC:           O'Connor Wechsler PLLC
                        4400 Post Oak Parkway, Suite 2360
                        Houston, TX 77027
                        281-814-5977

| | |
|---|---|
| For Texas Plaintiffs | AVI MOSHENBERG<br>Lawson & Moshenberg PLLC<br>801 Travis Street, Suite 2101, #838<br>Houston, TX 77002<br>903-316-9155 |
| | JARROD MARTIN<br>Chamberlain Hrdlicka<br>1200 Smith Street, Suite 1400<br>Houston, TX 77002<br>713-356-1280 |
| For PQPR Holdings<br>Limited, LLC: | RHONDA MATES<br>Streusand Landon Ozburn Lemmon LLP<br>1801 S. Mopac Expressway, Suite 320<br>Austin, TX 78746<br>512-236-9900 |
| For Connecticut<br>Plaintiffs: | KYLE KIMPLER<br>ALAN HALPERIN<br>Paul Weiss<br>1285 Avenue of the Americas<br>New York, NY 10019<br>212-373-3253 |
| | RYAN CHAPPLE<br>Cain & Skarnulis PLLC<br>303 Colorado Street, Suite 2850<br>Austin, TX 78701 |
| For BlackBriar<br>Advisors, LLC: | VICKIE L. DRIVER<br>Crow & Dunlevy, P.C.<br>2525 McKinnon Street, Suite 245<br>Dallas, TX 75201<br>214-420-2142 |
| Court Reporter: | ROSARIO SALDANA |
| Courtroom Deputy: | ZILDE MARTINEZ |
| Transcribed by: | Veritext Legal Solutions<br>330 Old Country Road, Suite 300<br>Mineola, NY 11501<br>Tel: 800-727-6396 |

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

004738

INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| PLAINTIFFS' EXHIBITS | | | RECEIVED |
|---|---|---|---|

| GOVERNMENT'S EXHIBITS | | | RECEIVED |
|---|---|---|---|

004739

HOUSTON, TEXAS; TUESDAY, SEPTEMBER 24, 2024; 2:31 P.M.

(Call to Order)

THE COURT:  Afternoon, everyone.  This is Judge Lopez.  I thank everyone for patience today.  I'm going to call the -- what is the 2:00 p.m. case?  23-33553, the Alex Jones case here in connection with a motion to sell.

Why don't I take appearances in the courtroom and then I'll take appearances from folks online.  If you wish to make an appearance, I would ask that you please hit five-star.  Okay.

MR. MURRAY:  Good afternoon, Judge.  Chris Murray, Chapter 7 Trustee.

THE COURT:  Okay.  Good afternoon.  Mr. Nguyen, good afternoon.

MR. NGUYEN:  Good afternoon, Your Honor.  Ha Nguyen for the U.S. Trustee.

THE COURT:  Okay.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.

THE COURT:  Okay.  Good afternoon.

MR. WOLFSHOHL:  Good afternoon, Your Honor.  Joshua Wolfshohl for Christopher Murray, Chapter 7 Trustee.

THE COURT:  Okay.

MS. CATMULL:  Good afternoon, Your Honor.  Annie Catmull, C-A-T-M-U-L-L, here on behalf of O'Connor Wechsler

PLLC.  Thank you.

MR. MOSHENBERG:  Good afternoon, Your Honor.  Avi Moshenberg here on behalf of the Texas plaintiffs.

THE COURT:  Okay.  On the line I've got a 512 number.  Ms. Mates, you may have muted yourself.

MS. MATES:  I did.  Thank you.  Rhonda Mates on behalf of PQPR.

THE COURT:  Okay.  There's a 214 number.

MS. DRIVER:  Good afternoon, Your Honor.  Vickie Driver on behalf of Alex Jones.

THE COURT:  Good afternoon.  There's an 832 number.

MR. MARTIN:  Good afternoon, Your Honor.  Jarrod Martin also with Avi Moshenberg for the Texas families.

THE COURT:  Okay.  And a 212 number.

MR. KIMPLER:  Good afternoon, Your Honor.  Kyle Kimpler on behalf of the Connecticut Plaintiffs.  I am joined with my co-counsel, Ryan Chapple and (indiscernible).

THE COURT:  Okay, good afternoon.  Anyone else who wishes to make an appearance?  I would ask that you just please hit five-star, and I will unmute your line.  Other than that, I will turn to Mr. Murray.  Good afternoon.

MR. MURRAY:  Good afternoon, Judge.  We've got two things on for today.  We have a status in the PQPR adversary, and then we also have a hearing on my motion to

004741

wind down FSS.  And unless Your Honor prefers a different course, Mr. Wolfshohl was going to handle the sale motion hearing first, and then Ms. Jones could handle the status update on PQPR.

THE COURT:  Okay with me.

MR. WOLFSHOHL:  And, Your Honor, I think while this is probably largely legal in nature, the objection that the U.S. Trustee filed, the way I would suggest we proceed, unless there is any issue with this, is that I simply proffer the Trustee's testimony.  Most of what I think he is going to say through the proffer is my argument.  Happy to proceed that way.  Happy to make opening arguments.  It doesn't matter to me.  I want to just move the thing along.

THE COURT:  Mr. Nguyen?

MR. NGUYEN:  No objection to Mr. Wolfshohl's suggestion.

THE COURT:  Okay.  Mr. Wolfshohl, you're going to proffer the testimony of Mr. Murray.

Mr. Murray, why don't you stand up.  Raise your right hand.  Do you swear to tell the truth, the whole truth, and nothing but the truth?

MR. MURRAY:  I do.

THE COURT:  Okay.  We will proceed by proffer. Counsel is going to make statements.  I'm going to ask you if they are true and correct, if there's any corrections you

would make.  You would be adopting the proffer as your testimony.  Do you understand that?

MR. MURRAY:  I do.

THE COURT:  Okay.  Mr. Wolfshohl, you may proceed.

MR. WOLFSHOHL:  Thank you, Your Honor.  First off, can we -- the Trustee would like to move to admit Exhibits 1 through 16.  They were filed on the docket at Docket Number 847.

THE COURT:  Any objection to the admission of 1 through 16 at 847?

Okay, they are admitted.

(Exhibits 1 through 16 admitted into evidence)

MR. WOLFSHOHL:  Thank you, Your Honor.  If called to testify, the Trustee would testify that when he was appointed, shortly after he was appointed, Your Honor entered a dismissal order for FSS.  Referring to FSS, Your Honor understands that that's Free Speech Systems.

Upon that dismissal order getting entered, the Trustee analyzed the dismissal order, understood that from the dismissal order, the Court was retaining jurisdiction over certain matters and was also specifically delineating certain things that the Trustee was to do, including taking control over cash of the estate.  And the Trustee believed at the time and still believes that that was within the Court's authority to do that.

004743

The Trustee immediately upon his appointment began discussions with the various parties in the case to primarily focus on how to deal with the FSS entity and how to essentially wind the company down. Those parties included the Texas and the Connecticut plaintiffs. The Debtor and the Debtor's representatives -- and when I say the Debtor, I am talking about Alex Jones specifically. The FSS professionals, PQPR, which Your Honor I think -- I believe you understand that they assert a lien on certain assets of FSS -- as well as numerous prospective buyers and bidders.

The Trustee also consulted with Tranzon and 360, the entities that he has gotten the Court to enter an order approving the retention of in connection with the sale process. He visited the FSS studios with Tranzon and he communicated with Tranzon about various things that they needed in order to basically put a bid package together. Information gathering, diligence, creating marketing materials. Like I said, putting together bid packages and also setting up a process for communicating with parties who had inquiries about the assets and were interested in potentially participating in an auction process.

That was an iterative process. There were continuous over the course of several weeks communications with Tranzon about how that process would look. The trustee

004744

also analyzed the various information that he was getting from the various parties as well as from prospective bidders to determine what the highest and best -- what the process that would yield the highest and best result for creditors.

The Trustee is asking the Court for authority to winddown FSS through an orderly auction and sale process. The Trustee believes that's consistent with the FSS LLC agreement, Your Honor. The operating agreement is at Exhibit 3. He also believes it's consistent with state law as well as the Court's prior order and statements made by the Court on the record.

The auction process that the Trustee is asking for approval to proceed with is multi-phase. It starts with a sealed bid process for the IP assets. And then depending on what the result of that is, there might be an actual auction process with the IP assets.

THE COURT: Can you make a distinction between the IP assets that you're describing? And I know that Mr. Jones wanted a clarification about certain other IP assets. I just want to make sure that there's clarity what I'm being asked. I know that there's some language in the order that kind of clarifies it, but perhaps you can clarify it now.

MR. WOLFSHOHL: Sure, Your Honor. And if I don't clarify it correctly, I will let Mr. Murray correct me.

But the idea is that we are selling in this

004745

process -- and it's not that we won't come back to Your Honor to discuss selling intellectual property assets of Alex Jones --

THE COURT: For purposes of what I'm being asked for today.

MR. WOLFSHOHL: Today it would be intellectual property of FSS.

THE COURT: Okay.

MR. WOLFSHOHL: And so that is the clarification. I think that's what we included in the redline that we uploaded today, Your Honor. I don't know if Mr. Murray has anything different to say about that.

THE COURT: I just want to make sure that there's clarity that -- I'm reading the proposed order. It says that you're not going to sell or purport to sell any personal IP of Mr. Jones. So I'm understanding if it comes to the point where there's someone disagreeing that someone would then come to me and then I can sort out whether this is -- what bucket it goes. But it's not your intention I think to sell personal IP.

Go ahead, Mr. Murray.

What I'm trying to do is just make sure to anticipate, provide some level of clarity so that we have a level playing field.

MR. MURRAY: So for today I am seeking authority

004746

to sell the IP that FSS owns.  There is some concern from Mr. Jones that he is asserting rights to personal IP that are not alienable in his view.  I am not today seeking authority to sell any IP owned in the Chapter 7 estate directly.  I anticipate filing a motion soon to add potentially IP from the individual estate to the sale process.  And that's in response to some requests I've gotten from potential bidders.  I don't think that's for today.

It's also my intention when we do that to reserve all of Mr. Jones' rights, whatever they are.  I don't intend to litigate ownership of the IP as part of this process; I'm simply trying to sell what I have.

THE COURT:  Understood.  Thank you.

MR. WOLFSHOHL:  Thank you, Your Honor.  And the process would then, after the actual auction of the IP assets, there would be what we were referring to in the motion as remaining assets auction, which would include certain things like hard assets as well as other assets that are -- personal property that's located at the FSS studios.

Your Honor, the Trustee is also asking for permission to pay fees and commission out of the FSS cash so that the FSS cash -- because this process obviously is being done for the benefit of FSS and its creditors that the costs of that be allocated to FSS.  That includes the 326 trustee

fee. And in our reply brief we tried to address what we believe is the law that supports a 326 fee based on that disbursement.

THE COURT: I think you all are looking at this wrong, at least the way you just described it. And let me tell you. And I'll just put it out there.

When I converted this -- when I dismissed FSS, I did a couple of things. I explicitly told Mr. Murray that he was in charge of the bank account and that he had control of the equity of FSS. He's in charge. And that's -- and I said it on the record, and I remember Ms. Catmull was sitting in the same -- right around there. And I said -- because I didn't want dual seven trustees being around. All this can be done with one trustee. He's in charge of the equity of FSS and he can do what he wants with it.

I know folks are -- I've heard that some folks may take issue with that. And that's fine. And I know that the Texas plaintiffs tried to argue that they were in charge of the -- the Chapter 7 trustee, before I dismissed this case, which I had authority to do unless the court orders otherwise under 349, I gave Murray the bank account and the equity, made sure that he had the equity in FSS.

The creditors of FSS are one and the same of the creditors of Mr. Jones. They are the same. So this is not being done for the benefit of FSS creditors. This is being

004748

done for the benefit of the Jones creditors who sued FSS and Jones. And now the Trustee holds the equity for them. Everything is going to them through this estate. But there's cash there, and you're just using a particular portion of the cash that's available through FSS to then liquidate the FSS stuff. But ultimately it will be distributed through the Jones Chapter 7 case for the benefit of the same creditors who have been appearing. They're in one and the same. And the families here and PQPR, they're all standing here in the same -- that case is gone. But what was left was Murray being in control of FSS and having the equity.

So the Trustee is going to try to convince me that somehow being in control of FSS equity means that all you can do is sell it. And he's going to have to point to a provision in the Bankruptcy Code that says that. Because if not, then you step into the shoes. And there's plenty -- you step into the shoes as the equity holder, and you can do whatever you want. If you want to wind it down, you can wind it down. There's some clarity about you can't -- you're not today seeking to sell assets that belong solely to Mr. Jones. But I got it. But there's different buckets of the stuff that Mr. Murray holds in his capacity as Chapter 7 trustee. One of them, before I dismiss this case, is what goes there. Because that was to address the very

concern that Kyle Kimpler, who is looking at me, was afraid to, of rush to the courthouse.  And I still remember him holding up the pistol in his hands and saying, you know, we're going to go off to the races.

This was intended to -- it wasn't going to happen because he was in charge of the bank account.  There wasn't going to be a run.  And he has the equity of FSS.  This is being distributed for the benefit of Jones' creditors.  It just happened to be the same.

And so I got it, but I just want to make sure everybody is really clear that your exercise of business judgement, if that's what you're telling me, these are for -- this is going to go -- you can call them the Texas families and the Connecticut -- they're still the same people here.  They may go to pay bills of orders that I entered.  You know, towards professionals.  And that's cash that went out that was FSS cash.  But I just want to make really, really, really clear.  And this is -- I'm just telling you the way I construed my orders when I converted this case that he wasn't doing stuff for FSS; he was doing -- he held FSS, and he was going to distribute it in this estate for the benefit.

I'm just telling everybody the way I've construed these orders the entire time, which is why I took issue when someone tried to then go, from what I heard, tried to go

004750

seize cash from professionals which they were paid and were trying to go after the professional.  You know, wait for me to issue an order.  Then the order gets paid, and now the professional has to hold it in an escrow or in an IOLTA account because they're -- I'm just telling you that's the way I've always seen this.  If I need to clarify my order or add sentences, that's consistent with what I said today.  And I was there.  And it's consistent with what I said where Mr. Murray asked me to clarify exactly what his role was.  There's been no change in what that is.  He holds the stuff.  He can distribute it, or he can do what he wants.  And there's no -- you can do a couple of different things.  If you own the equity or if you hold the equity, you step into the shoes, you can do it.  Just as if he owned the business or any other Chapter 7 trustee.

This case gets more attention because of what the equity interest is.  It's a really simple case.  If this was just a guy named Alex Jones who owned a business called Free Speech that no one had ever heard of, this would be a really simple dispute.  We wouldn't even be here today.  But we are where we are.  And let's just go through it.  But I just -- anyway.

Go ahead and continue your proffer.

MR. WOLFSHOHL:  So I appreciate that, Your Honor.

THE COURT:  I understand that -- I'm just saying

that's the way I view -- that's always been what I have been saying.  And so I got it.  I just want to make sure that we're really precise on the language that we're using and what Mr. Murray understands where the distribution is going to go.  He's the Chapter 7 Trustee.  He makes distributions in Chapter 7 cases in which he is administering.  It just so happens it's going to go to the same people, but that was always the plan.

MR. WOLFSHOHL:  Your Honor's comments are very helpful.  I hope -- and I actually think by what you just said it's consistent with what we thought that you wanted us to do.  I hope Your Honor appreciates that part of why we felt the need to come in here and get the order that we're asking for -- and I do think that there's reason under 363 to get this order even though maybe the actual assets we're selling are not property of the Alex Jones estate, part of why we have felt the need to do this is because of --

THE COURT:  It is property of the Alex Jones estate, because Alex Jones owned the equity interest in FSS. 541, all legal or equitable interests.  All.  And all has got to mean all.

MR. WOLFSHOHL:  Okay.  And I prefer that interpretation.

THE COURT:  No, no, it's not my interpretation. It's Congress.  Congress used the word all.  All legal and

004752

equitable interests of the debtor become property of the estate. All means all. And we can't shortchange what all means. And -- and upon conversion unless otherwise ordered. I know what I said on the record there. And if I need to amend the seven order, I'm happy to do it. If you want me to bring FSS back up here, I'll do that, too. It's just going to cost a lot of money. And we're spending a lot of money today, I think. I'm concerned because -- but no one disputes that Alex Jones owned a hundred percent of the equity interest in FSS. And all has got to mean all. And we don't get to kind of pick and choose what all means. I just -- I am just calling it like I see it. And that's been consistent with my rulings in Envision as well. Envision Healthcare. I said all legal and equitable interest comes in. Any smidgeon of it comes in. And if you own the equity interest in FSS, then it is property of his estate. It would be property of his estate if he just filed Chapter 7. He'd have to list it on his schedules.

I'm just a little confused about what we're doing here today. And again, I'm -- well, I don't know what's different than any other bankruptcy case in which someone who filed Chapter 7 and they owned the business and what you're asking me for today.

MR. WOLFSHOHL: Well, Your Honor, a turnover order is the reason we feel like we need the protection of your

additional order.  Yeah.

THE COURT:  I know what you're asking.  I understand what you're asking me for today.  But what I'm saying is it's already there.  What you're asking for is belt and suspenders.  Let's not act like it's not already there.

MR. WOLFSHOHL:  I would prefer to --

THE COURT:  If a Chapter 7 debtor owned equity interest of a donut shop, he would have to list it on his schedule.  Right?  Owning a hundred percent interest in a donut shop, right?  People can go sue a donut shop if they want to.  But that doesn't mean, you know, the Chapter 7 trustee of a debtor, depending on how they claim the exemptions or not, wouldn't own a hundred percent interest.  Because it's property of the estate until it gets exempted out.  That's all.  Right?

I understand the concerns today and I understand the need to be clear.  I understand what you're asking for.  But what you're asking me for really is belt and suspenders.

MR. WOLFSHOHL:  I think that's right.

THE COURT:  And I've got it.  I just...

MR. WOLFSHOHL:  And, Your Honor, we may not be here if we didn't have sort of the overhang of this turnover order that's still out there.  We removed that case to the Western District of Texas.  But frankly everybody at this

point is wanting Your Honor to issue orders to make sure --

and I appreciate what you're saying, and we've always

approached it --

THE COURT:  I had a case yesterday -- and I don't want to get into -- I think it's before Judge Bradley, isn't it?

MR. WOLFSHOHL:  That is correct, Your Honor.

THE COURT:  I'm going to -- stayed out of Jersey business yesterday.  I'll stay out of Austin business today. You know, I'm not going to do that.

But I'm just telling you I know what I did.  I'll create the -- happy to go through the expense.  Not me. Doing it, I'll do it.  I don't want to -- I'm not going to get in the way of what Judge Bradley is going to do.  I'm not going to tell another bankruptcy judge on what timetable to go or what to do.  I'm going to allow Judge Bradley to (indiscernible).  I've got it.

So for purposes of selling today, tell me what you all want.

MR. WOLFSHOHL:  Your Honor, we want you to enter the order that was uploaded in the redline -- well, reflecting the redline changes obviously that we uploaded today.  We're asking -- we think that the Code authorizes it.  We think Your Honor's prior order authorizes it.  We think it's authorized under state law.  We think it's

authorized under the FSS operating agreement. WE have overwhelming support from the vast majority of the creditors that the plaintiff's PQPR I understand supports the sale process. Their liens are being preserved so that we can resolve those through the adversary proceeding. It also has a status conference set today.

We also just think that this sale is in the best interest of the estate because it's going to yield the highest potential recovery. And even if you think of these creditors as being part of different estates, it's better for their creditor claims to get more money even if you're looking at it as the FSS versus Alex Jones. I agree with Your Honor. They are all the same creditors essentially. And we think this is in the best interest of the estate.

And I can address Mr. Nguyen's arguments after he makes them in his closing, but I just think that this is within the Trustee's business judgement. I think it's appropriate for a number of the reasons Your Honor has mentioned today. And the Trustee would ask that the sale be approved or the winddown process be approved pursuant to the order.

THE COURT: Let me make sure I'm clear about what the process is. You're going to hold and just kind of follow Texas law. Hire someone, a professional to go out there and just help wind the process down.

004756

Mr. Murray, do I understand that you believe this is going to yield the highest amount of return for creditors?

MR. MURRAY:  Yes, I do.  And even aside from the authority issue --

THE COURT:  Tell me why.

MR. MURRAY:  Well, the conclusion that this would be the best interest of the estate is based on in large part input from Tranzon and the professionals who auction business assets and IP in particular in other cases.  They have a national reputation.  I've worked with them in other cases.  They are the ones who proposed sort of a two-stage auction process.  Start with the IP and then sell the rest of it later.  Because who ends up buying the IP will have a lot to do -- will inform very much how we sell the rest of it.  So that's sort of the basis for splitting it up.

But in addition to this Court's authority, which I've always thought was clear and I think it always has been and I think the jurisdiction has always been there, I do need a sale order.  I would need that to sell anything else. And I do want and would appreciate the Court's order because it also sets out for the parties sort of what the process is and sort of sets expectations, so people know how to engage the sale process.

THE COURT:  Do I understand it right that Mr.

Jones doesn't -- subject to this resolves the objection?

MR. WOLFSHOHL: It does.

THE COURT: It does, right? For purposes of this order, right?

MR. WOLFSHOHL: His limited objection related to his --

THE COURT: Yes.

MR. WOLFSHOHL: Yes. That is resolved by what we put in the redline and the new order.

THE COURT: The relief requested today.

MR. WOLFSHOHL: That's right. His objection is resolved is my understanding.

THE COURT: Texas and Connecticut have filed statements in support.

MR. WOLFSHOHL: That's correct, yes.

THE COURT: No party has objected to this other than the Office of the United States Trustee. Is that correct?

MR. WOLFSHOHL: That's right.

THE COURT: Everybody with an economic interest has not objected to this relief requested, right?

MR. WOLFSHOHL: Yes.

THE COURT: Okay. Well, the Office of the United States has standing to be heard. Any proceeding? Do we have a watchdog? Let me hear what they have to say. .

004758

MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for the U.S. Trustee.

Your Honor, I just wanted to start out by saying I really do appreciate the Chapter 7 Trustee and his effort. I remember the day the Cout was considering conversation of this case.  I called Mr. Murray and Mr. Murray agreed to take on a very difficult case.  Not all of our panel trustee was willing to do it.  Mr. Murray was there.  You know, we just have differences in opinion in terms of the legality and the statute and the Code.  There's (indiscernible) between Mr. Murray.  We have good relationship.  We work well together, and we work on many cases, Your Honor.

But we filed this objection to the winddown motion particularly because of our reading of the statute and our understanding.  I know Your Honor says under 541 all means all.  But there are basic tenets of American corporation laws that the U.S. Supreme Court has said that -- you know, just because you own a hundred percent of the equity, you don't own a hundred -- the estate itself doesn't own the assets.

So over the ten years I've been doing this, I've examined individual debtors that own businesses like Your Honor have seen.  And when we examine them, for example --

THE COURT:  Is it easier if I just amended my order?  Because everybody knows that's what I intended to

004759

do.  Would it just make it easier for you if I just amended the order?

MR. NGUYEN:  That would be, Your Honor.  Under 349 if you bring those assets in.  But it's a little bit --

THE COURT:  That was always the intent.  Right?  And we can disagree about that.  But I'm just saying that was always the intent.  Everybody knew.  Everybody understood that at the time.  If that wasn't clear or -- no one raised it to me then when winddown was being discussed.  If you want me to do that, I am more than happy -- because it sounds like everybody needs it anyway -- I'm more than happy to clarify in my order that all the assets -- if it didn't include it in the assets, that's why he has the cash, right?  That's why he's got the cash and that's why he's got the equity interest.  He's got everything.  That was always the intent as to what was going on.  But if that makes this easy, I'm happy to do it.  Because I think you and I actually agree a lot here.  I just think we're getting in the technicalities here.  But that certainly was what I ordered at the time.

MR. NGUYEN:  Your Honor, it's not the technicality.  It's actually what the Code says.  And in reading your order, there was two retention of jurisdiction.  One was the PQPR litigation and two was the bank account --

THE COURT:  And then they came back and asked me

004760

for clarification.  I'm just saying I'm happy to do it.  And no one is going to dispute it.  I'm happy to do it.  If that makes everybody's life happier, I'm happy to do it.

MR. NGUYEN:  It would make things easier, Your Honor.  But it's a little bit unusual to dismiss a case but retain all of the assets with --

THE COURT:  Unless otherwise ordered by the Court. We don't have to get into what's unusual or not.  Everything is case specific.  That's why the -- I think that's why Congress gave everyone flexibility, because you just don't know what you don't know.  And this case is certainly different than any other case out there.  I shouldn't say that.  There are some others that resemble it.

MR. NGUYEN:  Your Honor, I understand amending the order.  And I think it would be very helpful in terms of actually clarifying what Mr. Murray has the actual -- because in everyday cases where you have owners that come in here that have an equity interest, I don't ask them -- for example, Debtor Nguyen owns a donut shop, you know, and the donut shop is a corporation, all Debtor Nguyen has to do is list the hundred percent.  I don't ask for the mixing bowls and the chairs and stuff like that.

THE COURT:  No, no, I understand that.  And I think my statements were a little different.  But I think clarifying on the record -- I don't think anybody is going

to --

MR. NGUYEN:  But I think there's an issue with that too in terms of the allocation.  Because the creditor bodies are the same, but they are two different entities.  And I think there's certain creditors when you upstream it, there's going to be issues of allocations.

THE COURT:  I'm just authorizing a sale.  Where the money goes people can fight about.  But I'm just authorizing a winddown here.  I think everybody's rights are reserved as to where the money goes.  I'm just -- this is more bidding procedures to me.

MR. NGUYEN:  Your Honor, if you clarify the order to include all of FSS hard assets as property of the estate, the U.S. Trustee won't have any objection.  I think you are able -- you have discretion under 349 to order otherwise.  As long as that order is clear, we're fine with that.

THE COURT:  Mr. Wolfshohl, what about that?  And I think you can work with Ms. Driver just to make sure that I don't -- anything that we were to write to amend the order just doesn't run afoul the deal that you all agreed to today, or reserves rights, or does something.  I just don't want -- I'm going to give you all the assets of FSS.  I'm going to clarify that that's what you always had, the assets of FSS.  And I just want to make sure that other people look at it so that no one then -- I sign something and then

004762

somebody comes in and asks me to reamend the order.

MR. WOLFSHOHL: Maybe we could chat about that. Because I think that's largely where the proposed order gets us. But it would be even more clear if -- you're talking about amending the dismissal order, to clarify that? That would help -- I think it would help. We could propose some language.

THE COURT: I'm just saying just run it by the trustee, run it by folks. You know who needs to look at it. Just upload the order. And I'm telling you, I will do it -- if folks can't agree with it, I will go back and read what I did. And I feel like it's a clarifying order. It's not really amending the order. Well, it's more -- I don't want to come up with bankruptcy terms for orders, but you know what I mean. It's more of a -- whether you can call it -- you can call it -- I don't care what you call it. You can call it amended order or modified order, a clarifying order.

MR. WOLFSHOHL: An order in furtherance.

THE COURT: Just make -- what I want to do is just have Mr. Nguyen take a look at the language and just make sure that everybody's comfortable with the terms so that no one then comes back and gets it here. But if that's the case -- we're in agreement. And I think you all need the clarity anyway one way or the other.

So I'll sign -- get me that language. I'll sign

004763

that, and then I'll sign this.

MR. WOLFSHOHL:  Okay.  We can do that, Your Honor.

THE COURT:  Okay.

MR. NGUYEN:  Thank you, Your Honor.

THE COURT:  All right, folks.  Status conference, PQPR, and then I'll turn to Stewart.

MS. JONES:  Thank you, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.  And I think everybody else is on the line.

THE COURT:  I just want to know briefly just kind of where we are.

MS. JONES:  The Trustee has been in discussions with the parties in this litigation, PQPR and the Connecticut families regarding potential resolution to this, as obviously the resolution of the PQPR issue is going to ultimately impact how funds get distributed.  And so we have to get to this point, a decision point in order to sort of move forward.

However, we haven't quite gotten there yet.  We continue to have conversations.  I think it is important to have a trajectory forward towards a resolution.  And we'll run parallel tracks, as we always do, trying to reach a business solution.  But I do think it would make sense.  And I will let the other parties speak as well.  But there are pending MSJs that are full briefed.  I don't know whether

004764

Your Honor wants to hear argument on that at some point.

THE COURT: No.

MS. JONES: Not today, obviously.

THE COURT: No, no, no, no. What I'm saying is if they're fully briefed MSJs, I'm just going to turn to them, and I'll get working on them.

MS. JONES: Okay. And then otherwise, if that doesn't resolve everything, maybe come in for a scheduling conference to discuss the scheduling order to maybe just kind of get a path towards trial.

THE COURT: So what I'll do is then just rule on the MSJs and then after I rule on the MSJs, I'll give parties a few days and then everybody can kind of give everyone kind of an opportunity to read it and think about it. And then I'll call the parties maybe four or five days later and we'll talk scheduling at that point.

MS. JONES: That would work for the trustee.

THE COURT: Okay. All right, folks.

(Whereupon these proceedings were concluded at 3:06 PM)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  September 26, 2024

004766

**EXHIBIT**

**2**

Alexander E. Jones; 22-33553

exhibitsticker.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES AND          )  CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF       )
UNSECURED CREDITORS,            )  Houston, Texas
                                )
        Debtors.               )  Wednesday, February 5, 2025
                                )
                                )  9:00 AM to 9:26 AM
-----------------------------)

HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Alexander E. Jones:  SHELBY JORDAN
                         ANTONIO ORTIZ
                         Jordan & Ortiz, PC
                         500 N. Shoreline Blvd.
                         Corpus Christi, TX 78401

                         BEN BROOCKS
                         WILLIAM BROOCKS
                         Broocks Law Firm PLLC
                         6207 Bee Cave Road, Suite 120
                         Austin, TX 78746

For Chapter 7 Trustee:   JOSHUA WOLFSHOHL
                         KENESHA STARLING
                         JORDAN STEVENS
                         Porter Hedges LLP
                         1000 Main Street
                         Houston, TX 77002

                         CHRISTOPHER R. MURRAY
                         ERIN JONES
                         Jones Murray LLP
                         602 Sawyer Street
                         Houston, TX 77007

004767

| | |
|---|---|
| For Connecticut Families: | KYLE KIMPLER<br>PAUL PATERSON<br>Paul Weiss Rifkind Wharton &<br>Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019 |
| | RYAN CHAPPLE<br>Cain & Skarnulis PLLC<br>303 Colorado Street<br>Austin, TX 78701 |
| For Texas Plaintiffs: | AVI MOSHENBERG<br>Lawson & Moshenberg PLLC<br>801 Travis Street<br>Houston, TX 77002 |
| | JARROD MARTIN<br>Chamberlain Hrdlicka White Williams<br>& Aughtry, P.C.<br>1200 Smith Street, Suite 1400<br>Houston, TX 77002 |
| | JENNIFER HARDY<br>Willkie Farr Gallagher LLP<br>600 Travis Street, Suite 2310<br>Houston, TX 77002 |
| Court Reporter: | UNKNOWN |
| Courtroom Deputy: | UNKNOWN |
| Transcribed by: | Veritext Legal Solutions<br>330 Old Country Road, Suite 300<br>Mineola, NY 11501<br>Tel: 800-727-6396 |

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

004768

HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 5, 2025; 9:00 AM

(Call to Order)

THE COURT: -- 9:00 a.m. case, Alex Jones. Why don't I take appearances in the courtroom and then we'll get started.

MR. WOLFSHOHL: Good morning, Your Honor. Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens from Porter Hedges, for the Trustee. And Mr. Murray is here as well --

THE COURT: Okay. Good morning.

MR. WOLFSHOHL: -- as well as co-counsel --

MS. JONES: (indiscernible)

MR. WOLFSHOHL: -- Erin Jones.

THE COURT: Good morning.

MR. JORDAN: Your Honor, Shelby Jordan and Antonio Ortiz, co-counsel, along with Mr. Ben Broocks and Mr. William Broocks, here in the courtroom today.

THE COURT: Good morning.

MR. JORDAN: And that's -- I'm sorry -- co-counsel for Mr. Jones.

THE COURT: Yes, thank you.

MR. KIMPLER: Good morning, Your Honor. Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families. I'm joined by my partner, Mr. Paterson, and on the screen, Mr. Ryan Chapple.

THE COURT: Good morning. Oh, I should turn my

004769

camera on. I apologize.

MR. MOSHENBERG: Good morning, Judge. Avi Moshenberg, here on behalf of the Texas Plaintiffs. Also with me is Jarrod Martin and Jennifer Hardy, Your Honor.

THE COURT: Good morning. Anyone else wish to make an appearance? Okay. Here on the 9019 settlement, and I know that there are some related motions that we should talk about.

MR. JORDAN: Your Honor, if I might?

THE COURT: Sure.

MR. JORDAN: Shelby Jordan. We have made -- we being the Alex Jones team of lawyers, two firms and lawyers that have been very, very busy -- we've made every effort we possibly could to get a grasp on what has turned out to be a very, very complex matter that could, if we are not careful, be a case dispositive motion. We could walk out today and have nothing to show for the values of the appeal or for other matters that --

THE COURT: Let me -- let me stop. I've studied this 9019 over the past several days very carefully. I know we had a status conference and I knew that there were some discovery-related issues.

The Free Speech case originally started as a Subchapter IV -- was originally a lawyer and CRO. I find professionals -- I thought there was a conflict between

004770

those professionals and the Jones estate, so I didn't approve them.  Then came in another set of lawyers and another CRO.  The two cases, the Jones case, the Free Speech case, proceeded on a track, side-by-side track basis.

We held the hearings on the non-dischargeability claims in the Jones case.  Non-dischargeability claims were put in abeyance in the Free Speech case because the Fifth Circuit had agreed to take up the issue.  The Fifth Circuit ruled.  They got it exactly right.  It's exactly what I would have ruled.  But theirs is more important.  So we were left with the summary judgment in the Jones case.  Never really took it up in Free Speech.

There were a couple of other adversary proceedings, some related Texas parties who never had their day in front of me.  Parties, Texas families, a group of them, and Connecticut families were in mediation with other parties.  I know the Jones folks were there.  I know Free Speech was there a while, about a year.  Nothing came of it.  There was a 9019.  But then it was contingent upon approval of a plan that never happened for the 90 -- that went away.  But I was prepared to approve that.

The case had been going on for about two years.  Then they went to mediation again before another judge in another district.  That was unsuccessful.  Mediation sometimes work; they don't.  My point is that people have

004771

been trying to consensually resolve these issues for two years, and it didn't happen. And the Free Speech case could have either converted or been dismissed. But it couldn't hang out in Chapter 11 because there was no way it was going to be able to confirm a plan.

And to say that they stretched -- and I allowed it to happen -- stretched the limits of Subchapter V and what it was intended to do is an understatement in terms of timing; not in terms of ruling, but in terms of timing to get a plan on. But people were mediating. And I thought it made sense that if people were going to try to reach a deal, if you were going to put together a plan and this all worked out, then I didn't want to put my thumb on the scale. So, ultimately, I made a decision to dismiss the Free Speech case.

We were left with the Jones case. But I retained -- I told Murray he could keep -- Mr. Murray, the Chapter 7 Trustee appointed then in the Jones case, because the Jones case converted as well -- keep the cash from Free Speech in the bank accounts, and kept two adversary proceedings, one involving PQPR, another one involving Elevated Solutions Group. No professionals started coming to me. I don't know if it's true or not, but anyway.

But Texas families were able to try to collect on their judgment against Free Speech. They had rights given

004772

by a Texas court, I think even going after some of the Free Speech professionals who were working to preserve the estate.

When it came time to potentially sell assets, Mr. Murray and his counsel told me that they think that the real way to maximize value is to sell stuff, and not just the equity. They wanted the opportunity to go do this, and they thought they could do this by an auction.

They had, over an objection of the United States Trustee, told me just let them sell the equity. I entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets. That's what that order was intended to do. The supplemental dismissal order was just to make sure, because that was the request.

We had the auction process. I won't recount what happened, but I didn't approve the proposed sale. I had a -- I think the evidence is clear -- a backup bidder at the beginning. We didn't even know what the winning bid was. I had an auctioneer who got on the stand and didn't even know what he was going to get paid, or under what terms he was going to get paid.

I had a winning bid that was clearly based on a contingency. There was a sliding scale in the agreement. The proposed order submitted originally had the very language showing it was a contingency. And the Trustee was

004773

telling me that it wasn't a contingency. That was his understanding.

So I was asked to approve a sale that had a contingency clearly in it, but was told to act like there wasn't a contingency, upon a sale price that no one really could articulate, because depending on how you took it as a contingency or not a contingency. And we couldn't figure out exactly what the auctioneer was even going to get paid, because I don't even think he knew.

I then denied that auction. We were here until, what, 10:30 that night? So I didn't want -- and then I asked -- this case has been going on, I said -- I gave some (indiscernible) speech, told them it's been going on for like three years, and let's just get this back on track, get back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families. I think that matter is still pending.

MR. JORDAN: It is, Judge.

THE COURT: I lose jurisdiction over that immediately.

MR. JORDAN: It's still -- it is still pending.

THE COURT: But I think the appeal was something like, Judge, you can't do that, was the basis of the appeal. I don't have authority to go vest the property of the estate.

Case 4:25-cv-05553 Document 102-25 Filed 01/26/26 02/02 in TXSD Page 48 of 691

So the sale didn't happen, and I said, I don't want any more contingencies. If there's going to be a sale of assets, then cash will be king. But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

I also said the sale price was low. Turns out there's been an offer made since that day, which almost doubles the amount that was -- increased the offer by a week. A week, like it was there. That's fine. Then if things get -- I told folks, if you want to sell it, cash will be king. Get back to doing just -- you want to sell the equity? Sell the equity, but cash will be king.

I took up the motion for reconsideration filed by the Connecticut families. I know that the Jones side has a motion for reconsideration pending that will run its own course. But as things sit today, as I see them -- I could be wrong -- no, I'm not wrong on this, and maybe just slightly off on the numbers -- but I know that the Connecticut court has -- in Appellate Connecticut court, a second level of revision has taken some of the (indiscernible) amounts. And now that's subject to further appeal, and parties will appeal.

I haven't denied anyone any ability to pursue. Jones was able to hire his own lawyers. Connecticut family

was able to pursue those judgments. My non-dischargeability order in the Jones case kind of has a mechanism saying, this is what I found based on summary judgment, based on the collateral estoppel of the findings made in the Connecticut court. The Connecticut court ultimately finds that X is the number, will then kind of compare it to what I did, and there's a kind of an adjustment so that I'm not allowing any more than a Connecticut court would have allowed.

Same thing for Texas. I think there was a portion that I didn't approve for Texas, I know, and for Connecticut as well, that I didn't find -- I didn't think there were basis for collateral estoppel findings, and appellate courts will review what I did, and that's the way the process works. I've got no issues with that.

So that's where things stand. I don't know, around a billion dollars for Connecticut right now, subject to further appeal, non-dischargeable. Around $50 million for Texas, subject to further appeals. The numbers could stay the same, numbers could be zero, numbers could go up. I don't know. It's all subject to state court appeals now.

But FSS, that estate is closed. That case is closed. That case is closed. Which means that someone has a contract dispute with FSS. You don't come to me. You have whatever rights you have outside the bankruptcy. The bankruptcy doesn't affect your claims one way or the other.

There were several individuals who had a case. They were suing Jones in Texas state courts. They can continue their trials in state courts. There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have.

I already said, multiple years to try to reach a settlement, and they didn't. And I'm not saying anybody should have settled. I don't get into why people settle and don't settle. Not my purview. I'm there to evaluate settlements and determine whether they're in the best interest of the estate. That's my job.

So, kind of where we are. Several years of negotiating, no settlement, no plan. FSS gets dismissed. Failed auction. Now there's a 9019. The 9019 now wants me to allow claims against FSS. And I don't -- and I can't do that. And all bankruptcy lawyers know that I can't do that. Because there's no estate. There's no bankruptcy estate to allow a claim against. People can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me.

So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech. And now the Texas families are saying that the matter that they very much appealed, they're now embracing. The supplemental order is now embraced.

The Trustee who asked me for a specific order for a specific purpose is now using that order. But it was only for one purpose, to see if he could sell the assets. To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it. Ha Nguyen was here. The U.S. Trustee was sitting right there telling me.

So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed. I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

And here we are again. Before we would pit the families against each other, where Connecticut and Texas would disagree on whether the form of relief being requested was appropriate. Happened during the auction too, where Texas said, I don't understand what we're doing here and I don't understand how this is going to work.

So, now I'm told we're all aligned and you just -- Lopez, just have to allow a claim against an entity in a case that's been dismissed. I can't do that. I cannot do that. I don't have authority to do it. And I'm not going

004778

to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone. I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore. Pure sale of the equity.

We're going to -- I've got to -- this case keeps taking twists and turns and trying to come up with really masterful and creative lawyering. But at its core, it's something I can't approve. Would come -- you know...

And so, I know... I read the revised settlement. Read the revised order. Bankruptcy lawyers know I can't do this unless we get really, really, really creative. And I think on a case like this, we've got -- with multiple appeal, any party, regardless of what I do, people have their rights.

So, before everyone gets started, let me just tell you, I can't do this. I'm going to again turn to Mr. Moshenberg and tell him, you'd better -- I need you to tell me what you want to do on your -- this non-dischargeability action.

I know that there's a pending motion in the other one. I've now approved the two matters in which there's 9019s and the two settlement matters. Money's going to go out the door. You don't have to tell me now. I want you to file something and tell me exactly what you all are going to

do.

MR. MOSHENBERG: Understood, Your Honor.

THE COURT: And just play it down the line, in other words. People have rights and I'm not telling you to put you on the spot or anything, I just know.

Mr. Murray, if you want to sell the equity, go sell the equity. This case -- people have rights and they've been... If you want to go pursue claims against Jones in state court against Free Speech, I don't -- I dismissed the case and I know what comes along with that. Those arguments were made to me and I know what they are.

No, you don't have to say anything. I know what the rights are. And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore. I don't trust the process. I would have to do it -- me, myself -- and I'm not overseeing it.

So kind of get comfortable with the process so that we don't kind of do the same thing. We've already did it really long and complicated and brought in auctioneers and had lots and -- enough has been -- and I think what this Debtor needs and what these families need is finality of the bankruptcy process so that they can pursue whatever it is that they want in judgments in state court, which is where they started in the 1st place; Connecticut, Texas, for the

004780

most part.  I know that there's some other litigation pending out there.

I just -- I don't have the ability to allow a claim against an entity.  And in a case that has been dismissed in which I literally gave specific authori- -- you keep the cash; we're going to keep these two adversaries.  I'm going to settle these.  I'm going to keep jurisdiction over these two things and this one.  And I'm not going to do it for anything else.

I can't use the supplemental order to then go -- for a purpose in which it was never intended.  And I get to construe my own orders and I retain jurisdiction over them.  This case will be highly simplified.  And I know Mr. Wolfshohl said he's been listening to these transcripts carefully.  I made it super simple for you this time.

There will be -- I don't know.  Someone has a case, bring it.  There have been multiple years of investigations.  No lawsuits have been (indiscernible) in front of me.  Maybe one is coming.  I don't know.  If it does, we'll take it up and I'll rule.

I'm not sure anybody's ever been happy about -- completely set in my rulings.  I'm not sure Mr. Jones has been entirely happy to know that I found on summary judgment that he's liable for over a billion dollars in non-dischargeable debt and over $49 million dollars.  I'm sure

004781

he -- appealing -- he is appealing. And that's his right.

So, I'm sure the Connecticut and the Texas family -- I'm sure the Connecticut families weren't too happy about my decision about the auction. Sure Global Tetrahedron wasn't too happy about it. But I'm really trying to do what I think is my duty and my job upon careful analysis of the law.

And so I'm not approving. I cannot on its face. You don't have to put on any evidence. I can't approve this sale. I can't allow $480 million dollars. And I don't want folks to put it up. And we don't need to take up TROs and Connecticut and Texas.

Texas, you have whatever rights you have. Connecticut, you have whatever rights you have against Free Speech, case against Jones. If you want to have another -- if you want to settle with the Trustee on Jones related matters, do it. Tee it up. We'll take it up. But these things are inextricably linked and multiple appeals going on. Well, I don't know if they're still going on. They probably will on the non-dischargeability front, by the way. You have whatever rights you have on the supplemental order.

MAN 1: Judge, if I could comment --

THE COURT: Won't be used again. No, no, no. I don't need you to comment on anything. I don't -- because it's going to open the door. I just wish everyone a good

004782

day.  Thank you.

CLERK:  All rise.

(Whereupon these proceedings were concluded at 9:26 AM)

                            I N D E X


                           RULINGS

                                              Page        Line

Motion to Approve Sale, Denied                 16          8

004784

CERTIFICATION

I certify that the foregoing is a correct transcript from

the electronic sound recording of the proceedings in the

above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  February 6, 2025

004785

EXHIBIT

**3**

Alexander E. Jones; 22-33553

exhibitsticker.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES,              )  CASE NO: 22-33553
                                 )
                                 )  Corpus Christi, Texas
                                 )
            Debtor.              )  Thursday, June 5, 2025
                                 )
                                 )  1:00 p.m. to 2:32 p.m.
--------------------------------)


                         HEARING

       BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
            UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:                 BEN C. BROOCKS
                            Broocks Law Firm PLLC
                            6207 Bee Cave Road, Suite 120
                            Austin, TX 78746

                            SHELBY JORDAN
                            Jordan & Ortiz, PC
                            500 North Shoreline Blvd.,
                            Suite 804
                            Corpus Christi, TX 78401

For Chrsitopher R.          ERIN ELIZABETH JONES
Murray:                     Jones Murray LLP
                            602 Sawyer, Suite 400
                            Houston, TX 7007

                            JOSHUA WOLFSHOHL
                            Porter Hedges LLP
                            1000 Main, 36th Floor
                            Houston, TX 77002

For First United            WALTER J. CICACK
American Companies, LLC:     Hawash Cicack & Gaston LLP
                            711 W. Alabama Street, Suite 200
                            Houston, TX 77006


004786

For Veronique          AVI MOSHENBERG
De La Rosa:            Lawson & Moshenberg PLLC
                       801 Travis Street, Suite 2101, #838
                       Houston, TX 77002

For William            KYLE KIMPLER
Aldenberg:             Paul, Weiss
                       1285 Avenue of the Americas
                       New York, NY 10019


For the U.S. Trustee:  HA MINH NGUYEN
                       Office of the United States Trustee
                       515 Rusk Street, Suite 3516
                       Houston, TX 77002

Court Reporter:        YESENIA LILA

Courtroom Deputy:      YESENIA LILA

Transcribed by:        Veritext Legal Solutions
                       330 Old Country Road, Suite 300
                       Mineola, NY 11501
                       Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

004787

CORPUS CHRISTI, TEXAS; THURSDAY, JUNE 5, 2025; 1:00 PM

(Call to Order)

CLERK: All rise.

THE COURT: Please be seated. Good afternoon. This is Judge Lopez. Today is June 5th. I'm going to call the 1 p.m. status conference in the Jones case. I'll be calling, just so we have a clean record, 22-33553, 23-03035, 23-03037, 24-03279 or some combination of one or more of those cases.

I will take appearances in the courtroom, and then if anyone wishes to make an appearance on the phone, please hit five star and I will unmute your line.

MR. JORDAN: Good morning, Your Honor, afternoon, I guess.

THE COURT: Good afternoon.

MS. JORDAN: Shelby Jordan, Ben Broocks, and Antonio Ortiz for Alex Jones and FSS.

THE COURT: Okay. Good afternoon.

MR. JORDAN: Good afternoon.

MS. JONES: Good afternoon, Your Honor. Erin Jones for Christopher Murray, Chapter 7 Trustee. Mr. Murray is also here in the courtroom. And I think my colleagues will announce themselves on the phone.

THE COURT: Okay. Good afternoon.

MR. CICACK: Your Honor, Walter Cicack on behalf of First United American Companies.

004788

THE COURT: Good afternoon.

MR. MOSHENBURG: Good afternoon, Your Honor. Avi Moshenberg, on behalf of the Texas plaintiffs. Also remotely is Jarrod Martin attending.

THE COURT: Okay. Good afternoon.

MS. NGUYEN: Good afternoon, Ha Nguyen for the US Trustee.

THE COURT: Good afternoon. Okay. Let me turn on the line. Here's a -- I'm just going to go in the order in which I see them, a 713-226 number.

MR. WOLFSHOHL: Good afternoon, Your Honor, Joshua Wolfshohl for the trustee.

THE COURT: Okay. Good afternoon. And a 212 number.

MR. KIMPLER: Good afternoon, Your Honor. It's Kyle Kimpler from Paul Weiss on behalf of the Connecticut families. On the line with me today is my cocounsel Ryan Chapple.

THE COURT: Okay. Good afternoon. Anyone else wish to make an appearance, please hit five star, and I will unmute your line.

Okay. The purpose for today was a status conference on where we are and where we're headed, just try to get some more information in the middle of 2025. I'll turn things over to trustee's counsel. Ms. Jones, you can just proceed however you see fit.

MS. JONES: All right, thank you. I'll proceed with

an update in the main Chapter 7 case, the 22-33553.

THE COURT: Okay. If you can just get the mic a little closer to you, I just want to make sure we can all hear you.

MS. JONES: Yes, I'll get a little bit closer. We have right now one pending contested motion and that is the motion filed by the debtor, Mr. Jones, asking this Court to reconsider whether to hold an auction of FSS assets in this case. There were two reply, two responses filed, one jointly by the Sandy Hook families and one response by the trustee and reply filed by the Debtor. So that's the one currently pending contested letter that is before Your Honor.

There is likely going to be another contested matter, but the time hasn't, it's not ripe yet. There's a pending motion to stay these bankruptcy proceedings pending appeal.

THE COURT: Is that Mr. Nguyen's?

MS. JONES: Yes.

THE COURT: I'm going to rule on that today.

MS. JONES: Oh, okay. Well then that's not ripe, but we, the trustee would have opposed it, but -- a complete stay, of course, of the proceedings, but I just wanted to flag that as something that could come up.

But as far as uncontested, there are, there are some pending fee applications of Chapter 11 professionals that are

-- have not been objected to and are ready for --

THE COURT:  Do you have the ECF numbers for them?

MS. JONES:  I do.  And so there's -- I'll give you the application -- okay.  So the application for Teneo Capital, which was financial advisor to the Committee, was filed at Docket 707.  And I've just uploaded revised proposed orders. I'm only missing one, and theirs was just filed at, I believe it's Docket, I have to see it really quick, 1160, I believe.

THE COURT:  Oh, I did see this.  So I see Teneo, BlackBriar, and --

MS. JONES:  Kennerly.

THE COURT:  -- Kennerly.

MS. JONES:  Yes. And I've tied those to the ECFs there.  So BlackBriar Advisor's app is at 743, and then the revised proposed order has just been uploaded.  Rachel Kennerly's application is at 745 and the proposed order's just been uploaded.  And then Crowe and Dunlevy is, the application is at 746 and I just haven't had time to upload the order yet. I'm waiting.  They've agreed to the form of the order.  I just, I added their signature and I always wait for people to respond and tell me I can do that.

THE COURT:  Is there any difference between --

MS. JONES:  There is.

THE COURT:  Okay.  I'll just wait on it.

THE COURT:  But those proposed orders just

generally.  And then Mr. Jordan also uploaded a revised proposed order for his application.

THE COURT:  Proposed final, right?

MS. JONES:  I'm sorry?

THE COURT:  I saw it.  It's a revised proposed final, is that right, Ms. Jones.

MS. JONES:  Yes, these are all final fee applications for the Chapter 11 professionals.  His app was at Docket 747.

THE COURT:  Oh, it's through the 11.  I was going to say, Jordan, you can't go anywhere.

MS. JONES:  And the only issue -- there were no objections substantively to the applications.  The issue was that there was not an authority to pay provision for the trustee, which we really need for him to be able to make the disbursement.

THE COURT:  Oh.

MS. JONES:  And so we added language with the specific remaining unpaid portion.  So it specifically references the amount.  And everybody has signed off on the form of the order.  I just need one more person to let me know that I can add their signature, and then I'll have that uploaded.  So those are ready to go if Your Honor wants to sign those or if you need a hearing, they're --

THE COURT:  Let me do something just so I'm procedurally in the right posture.  There is currently a

004792

request for me to stay. The entire case is pending an appeal. And I want to -- why don't I take that up right now? I thought rather than we're just having a status conference today, but I thought there was an active request and then also a request for a direct certification of an appeal to the Third Circuit. So I kind of wrote something out very shortly just to make sure that I addressed that. And I can take that certainly without a hearing. It was a request before me, so. And it relates to ECF Numbers 1144 and 1153, Robert Wyn Young has requested that I grant certification for a direct appeal to the Fifth Circuit at ECF 1144. And he's appealing my order denying his motion to intervene in this case. And I signed that order at ECF Number 1129.

Bankruptcy Rule 8006(f) allows the Court to certify a direct appeal to the Court upon request by a party, 28 U.S.C. 158(d)(2)(B). You can see why I wrote this out. I wanted to make sure I got these right.

A bankruptcy court must certify direct appeal to the Court of Appeals in two instances. One is where the request for certification is made by a majority of the appellants or a majority of the appellees. Here, only the, only the appellant has made a request for direct certification. Trustee has indicated they would oppose that, but I only had one request anyway. And I now have verbal confirmation that there's not a majority here. So that wouldn't apply. So, and

004793

therefore, that subsection doesn't apply.

The second instance is where the judgment order or decree involves a question of law as to which there's no controlling decision of the Court of Appeals for the Circuit, or the Supreme Court of the United States, or involves a matter of public importance.

Two, the judgment order or decree involves a question of law requiring resolution of conflicting decisions.

Three, an immediate appeal from the judgment order or decree may materially advance the progress of the case or proceeding in which the appeal is taken and if the Court of Appeals authorizes the direct appeal of the judgment order or decree, that is 28 U.S.C. 158(d)(2)(A)(i) through (iii).

157(d)(2)(B)(ii) mandates that if any of the four conditions are met, I make the certification, but none of them apply here. It would involve a permissive motion to intervene in both the text and Bankruptcy Rule 2018. And the law in this district is clear that intervention is permissive.

And so I rely on the cases that I cited in the order denying, but I would cite in, for example, in In Re CIS Capital Management, 604 B.R. 484, 513, Northern District of Texas 2019 case. So Subsection 1 doesn't support certification. Subsection 2 also doesn't support certification. There's no conflicting decisions for the standards. And finally, an immediate appeal would not advance the progress of this case,

which has been pending since 2022.

There have been multiple adversary proceedings. I would note Mr. Jones has been ably represented at every stage in this case by really smart lawyers who have made arguments on his behalf. He's been adequately represented and I wouldn't stray from any word that I put in that order. I think allowing intervention would impede the progress of this case, quite frankly, it would have shut down, potentially shut down this hearing. So I don't think Subsection 3 supports certification, because neither instance requires the Court to grant certification here.

I'm going to decline to grant certification for direct appeal to the Fifth Circuit. I believe the matter is already set for an appeal before a district court, I believe Judge -- so there is no, I'm not setting this up for a direct appeal.

MS. JONES: I think it's been assigned to Judge Rosenthal.

THE COURT: That's what I understood. So, and they don't come any smarter --

MS. JONES: That's correct.

THE COURT: -- than Judge Rosenthal.

MS. JONES: I agree 100 percent.

THE COURT: So and I just, again, I'm relying on the text here. Textualism is always, in my opinion, the right

004795

answer.

Permissive intervention: After hearing and on such notice as the Court directs and for cause shown, the Court may permit an interested entity to intervene generally or with respect to a specified matter, right? It's permissive by statute.

So, I'm going to deny the direct appeal to the Fifth Circuit. The statute is clear. The cases interpreting the statute are clear. There's no, there's no conflict, no conflict in law here. So, I'm going to deny that, but I did note in the order that I've read everything that was submitted as well. So it's not like I turned a blind eye to anything that came my way. I read it.

So, Mr. Young has also moved to stay all proceedings in this case pending an appeal under Bankruptcy Rule 8007. While the decision to grant a stay pending appeals is within the Court's discretion, the Fifth Circuit in cases like In Re First South Savings Association, 820 F.2d. 700, 709, Fifth Circuit, 1987 case provided factors for the Court to consider, right, whether the movant has made a showing of likelihood of success on the merits. I strongly disagree with that for the reasons stated there in the order itself.

Whether the movant has made a showing of irreparable injury if the stay is not granted. No, there's been no showing of irreparable injury.

004796

Whether the granting of a stay would substantially harm the other parties. The answer is no. I think quite frankly it would be harming the trustee's ability to function throughout this case and quite frankly, Mr. Jones' ability to proceed as a Chapter 7 debtor.

And for whether the granting of the stay would serve the public interest. I don't, have no -- nothing showing the public interest, and I've read all the papers. Quite frankly, I think the public interest is better served for a case that's been pending for three years to continue to move and not come to a screeching halt because the party, three years later, seeks to intervene in a case to provide evidence that the Court has reviewed and other matters.

And again, I rely on the order itself. It speaks for itself. So I've carefully reviewed all the filings, including the attached exhibits and the legal arguments that Mr. Young makes.

I'm going to decline to grant the stay pending appeal. So I'm going to deny both, and I'll enter short orders denying them for the reasons that I have stated on the record. So I can now -- I just feel more comfortable that I didn't take something up on the front end, agree to sign, for example, orders, and then consider a stay. I think there was an emergency request for a stay. I'm going to deny those. So I'll take a look at these orders and sign them on the docket.

004797

MS. JONES:  Thank you, Your Honor.  And I expect one more this afternoon.  I'm just waiting for it.

THE COURT:  Got it.  Just let me know and Ms. Saldana know better.

MS. JONES:  I will.  And then there are two --

THE COURT:  Let me ask you.  With respect to the uncontested matter, I don't need to know what it is.  Do you have a sense of timing as to when something may get filed or not filed?  I won't hold you to it.  I'm just trying to get a sense of you said --

MS. JONES:  Uncontested.

THE COURT:  Oh, not uncontested matter.  You said there could be one more contested matter that may or may not be coming.

MS. JONES:  Yeah, excuse me for interrupting.  We intended to oppose the motion for the stay pending appeal of the proceedings.

THE COURT:  Oh.

MS. JONES:  And so I didn't want to jump the gun. I wanted to let you know that we anticipated another contested matter on the horizon --

THE COURT:  Oh, that's what you were talking about.

MS. JONES:  -- because we would have opposed the --

THE COURT:  So now that I've ruled on that, I've got the reconsideration of the order and I'll speak to that today.

What else is there from your perspective in the main case?

MS. JONES: In the main case, the trustee continues to administer some non-exempt assets. There's some, there's some real property, and some, just some personal properties and watches, some details that we're still working through, just getting those sold. So we're continuing to work on that.

There have not been any offers, or any actual offers, really any discussion about anyone purchasing the equity of FSS has kind of died down entirely. We don't have any at this point. And so we're just continuing to administer the non-exempt assets that we can and trying to move all of that forward to get those to a point of sale. With respect to the --

THE COURT: What's the status of pursuing the real property? I'm less concerned about you selling a watch. I'm more concerned about real big-ticket items.

MS. JONES: Sure, there's, an auctioneer has been approved by this Court to list that property and to sell it

THE COURT: Oh, okay.

W1: And I believe they've been out. They've looked at the property and they're taking steps to get it listed or to set a time for when --

THE COURT: When do you think the process could, I don't want to hold you to it, just trying to get a sense of if he's going to list property, I'd rather him list it within

the next 30 days and just see what's out there.

MS. JONES: I can --

THE COURT: There's a, there's a theme that I'll be pushing which is there's a lot of legal expenses that are getting incurred in connection with this case. And I'm not saying people aren't doing the work because a lot of this, it's a big -- a lot of complexities here. But the longer this goes, the more people are going to have to spend time, and I want to, I think keeping things progressing at a, not at a rapid pace, but at a steady pace where there's constant movement is in the best interest of all parties because there's stuff pending in front of me. There are matters pending in other state courts. I'm assuming that's continuing in Texas and in Connecticut.

And there's a lot of moving pieces, and I'd rather to the extent there's non-exempt assets, that's, you know, I'm not telling you what to do, but you will exercise your business judgment as to what you intend to sell or not sell, but, you know, come September, October, if something is planning on being sold in terms of an asset, I'd like it at least on the market, if that makes sense.

MR. BROOCKS: That's entirely doable.

THE COURT: Okay.

MS. JONES: And I don't know if you'd like to address timing or if you --

THE COURT: Yeah, just get close to the microphone so we can hear you.

MR. BROOCKS: Yeah, I think by the third quarter we'll have everything either teed up with a motion to sell. It'll certainly be listed by then. It hasn't been yet because in the case of the real estate, it's a residential home and it has a tenant, so we're negotiating the exit of that individual.

THE COURT: I got it.

MR. BROOCKS: And --

THE COURT: Okay.

MR. BROOCKS: But I think by the end of the year, we should be closed with all of those.

THE COURT: Okay. Thank you.

MS. JONES: But with respect to our, with the approval of the settlements in the, in the adversaries that were pending in the FSS, under the FSS umbrella, the PQPR and the (Indiscernible) adversary, with those settlements and then Your Honor's decision regarding admin -- not doing a sale of the assets, the FSS assets in the --this Chapter 7 case, you know, we've pared our focus down to, you know, the essential things we need to do to get this case moving forward and closer to being done.

THE COURT: So assuming those assets are teed up and some coming up, I don't -- I hate hypotheticals, but let's

just assume there's a buyer, willing buyer for estate assets, what -- after that, what's left, putting aside the adversaries?

MS. JONES: There is some litigation, a couple of matters we do expect to file those by next week. And I think those are pretty straightforward, but just a couple of litigation matters that need to be dealt with.

THE COURT: The adversaries or?

MS. JONES: Yes.

THE COURT: Okay. Once they're -- obviously nothing is, nothing is final until you file it, but once, assuming you file it, let my case manager know I want to set up a status conference whenever, as soon as it makes sense to do so. I don't want it to fall through the cracks. That's where I'm going.

MS. JONES: And depending on -- as well, depending on the steps that the families take, if any, whatever they decide to do in state court, you know, we may be back here with motions to really to give instructions about what the Court wants us to do. And so we may have some motions related to any enforcement efforts that are made in the state court just to ensure that the trustee has clear authority and instruction to move forward. He's not going to do anything without the Court giving authority to do it.

THE COURT: Okay. I intentionally like don't read what's happening in other cases of, you know, like something

shows up on the news. I don't click on it to read the news or I'd rather just deal with the information that's given to me in front in the Court here and people make arguments. So I honestly have no idea what's happening in the, in the Connecticut or the, or what the current status is in the Connecticut or the Texas matter. So me having status conferences like this is really where I try to get the real information.

MS. JONES: And I would just defer to Mr. Moshenburg or, and Mr. Kimpler to update you if you'd like to hear from them about the status of their cases. But with respect to what the trustee needs to do, this is, this is where we are. And then with respect to the FSS case, we're essentially, either all those adversaries are either settled, dismissed, or closed. So I think that case, for the most part, it's done. I don't expect anything else in that case, at this point.

THE COURT: Okay. Thank you. Mr. Moshenburg, you're in the courtroom, and then I'll turn to Mr. Kimpler. From the Texas family's perspective, I'll let you, where do things stand, both main case or adversary? Just walk me through it, just specifically so I know which one you're talking about.

MR. MOSHENBURG: 100 percent, Your Honor. Let me start with the state court cases. Right now, we appreciate the Court's remand order with the turnover action back in

state court.  We've been working very hard behind the scenes with the Connecticut families to explore our state court options for state court remedies.

In terms of the merits of the underlying state court litigation, there was just an oral argument in front of the Austin Court of Appeals last week, Your Honor, on the Heslin Lewis judgment, Your Honor.  My co-counsel was leading the state court fight.  Your Honor is also getting ready to prepare a status conference on the Pozner, De La Rosa case.  A lot of the case, there's some pending discovery issues that are going to get resolved.  But also, that case is going to be influenced naturally by what happens in Heslin Lewis, and so there's a little bit of a pace to kind of be aware of whatever guidance comes from the appellate courts about what -- how to proceed in those cases and so that's affecting the timeline of the Pozner De La Rosa case, Your Honor.

THE COURT:  If it is oral argument, if I'm asking you to speculate, don't.  But do you have a sense of when the -- you may hear back from the appellate court, the state appellate court?

MR. MOSHENBURG:  I don't, Your Honor.  I've done a lot of state court of appeals; sometimes it's short, sometimes it's very long.  I just don't know, Your Honor.

THE COURT:  Okay.  And what was, what was argued was the kind of the appeal of the judgment rendered by the state

court --

MR. MOSHENBURG:  That's exactly right, Your Honor. I didn't mean to talk over you --

THE COURT:  No, no.  Go ahead.

MR. MOSHENBURG:  At the oral argument, the appellate court seemed to focus on two things.  One was the default judgment, and then also the cap busting of the punitive damages cap.  Hard to glean if that's where the opinion is going to be going, but that's where the two areas that court wanted to focus on.

THE COURT:  No, that's just fine.  I just didn't get a sense of timing.  If -- and I would ask anyone if there is something that is written, entered by the court, can someone just file it?  No spin on the first page, just notice of filing of state court really and just file it so that there's public knowledge, at least on my end in terms of what the state court did -- in the, you can file it in the main docket in the main case, just so it just helps me.

MR. MOSHENBURG:  100 percent, Your Honor, we'll do that.  And that really goes to the adversaries as well.  Let me turn to that on the dischargeability action, Your Honor. We've been working procedurally.  We were in the -- previously we talked about filing a motion to reconsider.  In doing that, what we realized is there's other evidence that we want to attach and the Court, when it denied our summary judgment

004805

motion on the punitive damages in particular, there were things that the Court spotted that there wasn't enough in the record to find that we had met our burden on summary judgment.

So then we've dug back, found some transcripts, found some other briefing that sort of highlights the issue on the summary judgment. So we'll be moving for an additional summary judgment, but the idea will be that the court, the trial court found that Jones had intentionally acted. And so when the court denied the summary judgment --

THE COURT: But shouldn't we wait then if something is already briefed for the state appellate court, won't the -- in other words, do I need to wait to see what the state appellate court does before? In other words, I'll make something up. If the court affirms the punitive judgment, right, that's one thing. If the state, if the appellate court rules against you, your clients on the appellate, then what I don't want you doing is moving for summary judgment on something that could potentially be a thumbs up or a thumb down by the appellate court.

Maybe it makes sense to wait on that. I'll hear from Mr. Jordan or Mr. Broocks on kind of not getting ahead of one or the other, but I don't want to rule when there's something that's already on appeal. I think that the state court needs to take the lead on its own judgment if there were arguments raised there and then I can then -- because

004806

essentially, I'm taking up summary judgment based upon what they're arguing so.

MR. MOSHENBURG: Right. Judge, I think that's a great idea. We fully --

THE COURT: I don't know if it's a great one, but it's an idea. Someone will let me know if it's a -- if it makes sense or not, but I'll wait for others to think about it.

MR. MOSHENBURG: Sure. And just from the Texas family's perspective, Your Honor, I want to make sure the Court understands we have worked out our differences with Connecticut. We've reached a settlement on going forward. And from, and from our vantage point -- and I think Mr. Kimpler will talk more about it -- getting finality on the dischargeability decision of the Connecticut summary judgment that the Court granted, I think that will be helpful for Connecticut and for Texas, Your Honor. So in terms of priorities and what is teed up for the Court to move forward on, I'll let Mr. Kempler elaborate. But I think getting a, getting to a final judgment on the Connecticut dischargeability action makes the most sense in terms of spending judicial resources.

THE COURT: And so, but I don't want -- well, Let me hear from others. What I don't want is for us to be sitting here having this conversation in 2027.

MR. MOSHENBURG: I agree, Your Honor, and I think the fastest path to that is through the Connecticut Avenue to avoid that.

THE COURT: Okay. Thank you.

MR. MOSHENBURG: Thank you, Your Honor.

THE COURT: Mr. Kimpler, I'll hear, if you have anything you wish to add, I'll certainly hear from you. If not, I will turn it over to Mr. Jordan, Mr. Broocks, and others.

MR. KIMPLER: Thank you, Your Honor. I have a couple of points, but it should be pretty quick. Let me first just give you two factual updates.

First of all, for what's going on in the Connecticut appeal, I think you know, because we filed it in December, but in December, the appellate court affirmed 1.3 billion of the judgment and overturned 150 million of the judgment. I think that was before you when we were last --

THE COURT: I saw that.

MR. KIMPLER: Mr. Jones then sought review from the Connecticut Supreme Court, which is the highest court in Connecticut. The Connecticut Supreme Court denied that review. It's discretionary, so you have to make a cert petition. The Connecticut Supreme Court denied that review on April 8th. So as of April 8th, as a matter of Connecticut law, the judgments were final and enforceable. Prior to that,

004808

Connecticut law was that judgments were stayed pending appeal.

Mr. Jones then filed in Connecticut a motion to stay enforceability of the Connecticut judgment while he pursues an appeal to the United States Supreme Court. That was denied by the Connecticut court on May 13th.

So where we are right now is that all appellate processes in the state of Connecticut are over. The judgment and an aggregate amount of 1.3 billion is enforceable. And I believe Mr. Jones has another, I think he had 90 days from the prior. So I think he has another month or so to file a petition for cert review from the U.S. Supreme Court. We expect that he will do that. And so that will be the last portion of the appellate process for Connecticut.

THE COURT: Okay. And in terms of the just -- and this may sound repetitive -- but just from your, from your perspective, where do things you think sit with respect to the adversary proceeding that is pending before me?

MR. KIMPLER: Yeah, so, just one other update which Mr. Moshenburg already said. We have reached a settlement agreement with the Texas plaintiffs, and so there are no more open disputes between us.

There are two adversary proceedings, Your Honor, that the Connecticut plaintiffs are party to. The first one is the non-dischargeability proceeding that is Case Number 23-03037. Your Honor, just to recall there, there are three

parts of our judgment. There was the $965 million of compensatory damages. You ruled that those were non-dischargeable. Those judgments have been affirmed on appeal.

There was the $150 million of Connecticut unfair trade practice tax claims. You had ruled those were non-dischargeable, but the Connecticut appeal had reversed that claim. So that claim no longer exists.

And then there was the $323 million of common law punitive damages, which were affirmed on appeal, but you did not issue summary judgment on it. So where we are at in that adversary proceeding now is there are $965 million of compensatory damages that have been held by you to be nondischargeable and been affirmed on appeal. And then there is $323 million of punitive damages, common law, affirmed on appeal but not non-dischargeable, and we have filed a motion for reconsideration that was denied.

I think, given where we are at, my clients are prepared to abandon that claim. At least as to the non-dischargeability, and that would enable us to enter a final order that would resolve the non-dischargeability action before you and would allow Mr. Jones presumably to take an appeal of that as a final order up to the district court.

I want to be very clear, we're not waiving the claim in the bankruptcy, but the argument that that portion of the claim is non-dischargeable. We are, if it suits the Court,

prepared to abandon that just to streamline the litigation and allow it to go up for review at the district court level.

THE COURT: Oh, Mr. Kimpler, I don't want to tell you what your client should -- what I am going to ask is that one way or the other that, you know, within the next 30, 45 days, I kind of get a decision as to whether we're proceeding with respect to the 323 or if you file something, then I'll know that you, you're going to not proceed with respect to the 323 with respect to the non-dischargeability, but obviously maintain the claim portion of it.

MR. KIMPLER: Yeah.

THE COURT: And the 955 that you say was affirmed on appeal, that's by the Connecticut courts, right? Just to make sure that I'm clear.

MR. KIMPLER: Correct. So to be, to be clear, there, Mr. Jones has one last shot at the U.S. Supreme Court.

THE COURT: Okay. Okay. Thank you.

MR. KIMPLER: The other adversary proceeding that we're a party to, Your Honor, is Wheeler v. Jones. That is Case Number 24-03279. That is what we call the enforcement action, and let me just give you the background because I don't think we've actually ever had a status conference or hearing before you on it. So let me explain what it is and why it's before you.

That was last August. We moved to domesticate our

004811

judgments in Texas under the Uniform Judgment Enforcement Act. And so we filed a complaint in state court that basically seeks recognition of a foreign judgment, the Connecticut judgment. There was a 30-day objection period on that complaint. Nothing was filed in October, but Mr. Jones removed that action. We think he removed it in an untimely basis. We also think it procedurally is not an action that can be removed. It's really a procedural, you know, case, but he removed it. He also filed counterclaims in that action, which, you know, are various types of attacks on the Connecticut judgment and some other claims. That action was then removed to the Western District of Texas, and then it was transferred to you.

So I think it probably showed up on your docket, sometime mid to late January. On that docket, there is a fully briefed motion for remand back to the state court. There is also a fully briefed motion to dismiss on the counterclaims.

In our view, all of this can be pretty easily decided on the papers. We would urge Your Honor, although we know you have an exceedingly busy docket, to rule on those when you are able, whether you want to first rule on the motion to dismiss and then the remand, or you want to remand and leave the motion to dismiss to the state court, assuming that, you know, you did decide to remand.

It is obviously your prerogative, Your Honor. You

know, from our perspective, these are pretty procedural issues as far as the timeliness and the appropriateness of the remand and the counterclaim.

I have exhausted everything I know about that action because it has been handled by Mr. Chapple. So if you have any other questions, I would, I would call for a lifeline.

THE COURT: No, no, this was very helpful. I remember Judge Pittman said something to me in about January, mid-January, January 16th or January 17th, and we hadn't taken it up and I didn't want to do anything without talking to the parties to understand kind of where all the pieces fit before -- and heard from everybody before I decided to kind of take it, take the issues up on the, on the merits one way or the other so .

MR. KIMPLER: The last thing I would offer, Your Honor, is, you know, we have heard you that some collection activity should be proceeding in state court. We are trying to do that. We're trying to work with the Texas plaintiffs on that front, obviously, having domesticated judgments in state court is important to that effort.

THE COURT: Thank you. Great. Yeah, I guess I don't know, Mr. Chapple, if you can give me a thumbs up or thumbs down or hit five star if there's anything else you wish to add before I turn to a 512 number.

MR. CHAPPLE: That's correct, Your Honor.

004813

THE COURT: Okay.

MR. CHAPPLE: Can you hear me now?

THE COURT: Just fine. Anything, is there anything to add? I'm just giving you the opportunity.

MR. CHAPPLE: No, Your Honor. I appreciate the opportunity. I think Mr. Kimpler did a thorough job of explaining the situation and our perspective on both the motion to remand and the motion to dismiss the counterclaim.

THE COURT: Thank you. Okay. Mr. Jordan, Mr. Broocks, anything you wish to say? Good afternoon.

MR. JORDAN: And sorry for all the shuffling, but there's a, there's kind of a number of things that are going on. And there's some moving targets that we, on the way from Austin to here today, found out about. So I want to be able to sort of better organize. I don't want to come across too confusing, but I guess I start with --

THE COURT: Take as much time as you need.

MR. JORDAN: -- with I guess the most interesting thing that I think the Court should be aware of simply because this has been leaving these matters on the docket. If you recall, the Texas plaintiffs asked for over a year's worth of extensions while the Chapter 11 was going on. And of course, we would assume that they were in good faith and Ms. Driver was in good faith granting extensions over and over again. So we lost a year when we discovered that there was nobody that

004814

was going to support the plan through the Texas plaintiffs.

So the briefing started last Tuesday, Tuesday week. The arguments were held at the Court of Appeals, and you ask about what do you think they're going to rule. Something happened at those arguments. Now I've done most of my appellate work in the federal system, but I've done quite a bit in the state court and something happened that never happened before that I think the Court needs to know about because it affects the adversary that's pending and it affects the answer that we all have to give to you and guessing. I don't think the Court of Appeals is going to take a long time in ruling, and I, and I don't because -- if I may --

THE COURT:: Mm hmm.

MR. JORDAN: I mean. And to Mr. -- the responses and information Mr. Moshenburg gave you, he didn't attend the argument, so I don't think he probably -- but I don't know if he knows about the position that the plaintiffs took, but I had it blown up because we didn't have time to get the cameras and stuff, I mean the audio. But I'd like to -- for the Court to read what Mr. Bankston told the Court of Appeals, and I've got a copy of that here. It can help to, help for you to see it, whatever.

Mr. Bankston told the Court of Appeals when he concluded his arguments --

THE COURT: Mr. Bankston represents the plaintiffs,

004815

the Texas plaintiffs, is that correct?

MR. JORDAN:  Yes.

THE COURT:  Okay.

MAN 1: (Indiscernible)

THE COURT:  No, no, no, just want to make sure there's a, there's a reference to Mr. Bankston  He represents the Texas plaintiffs if I remember.  Okay.

MR. JORDAN:  And so, here's what he told the court when he concluded his arguments, which he was, he was, I'll just say this, it was peppered a whole lot about how you're going to keep these punitive damages with this elder abuse that was not submitted to the jury and it was all not pled and pled afterwards.  But those are all questions which they, which they had a lot to say about and there's been a lot written about what the people think the court's going to do.

But more important was this, Mr. Bankston told the court when he finished his arguments, he said, "So I, so what, with that said, Your Honor, again, I return to this idea that I would love to be here before you on a case that matters.  And the reason I say this is I'm certain you probably are aware at this point, there are over a billion dollars of non-dischargeable debt against Jones approved by the Connecticut Supreme Court, by my plaintiff, excuse me, by my plaintiffs that are all collecting together with 19 other family members."  I'm going to stop there for one second because I couldn't, I

004816

couldn't figure out why, what his plaintiffs were doing arguing about the billion dollar award, but it made it clear because now we know that there is some agreement that is between the Texas plaintiffs and the, and the Connecticut plaintiffs that has something to do with, no matter what happens in this case, and so let me finish just reading this. "And now we have an appellant, of course, that's Mr. Jones and FSS, who's trying to remove $50 million for what purpose when there's already over a billion dollars in dischargeable debt that's coming in part to my plaintiffs, right?" Now, I'll stop there for just a second. I think he's referencing to the deal he made.

They cut a deal where apparently if you were to find everything was dischargeable, they're still going to claim we've carved out from the plaintiff's non-dischargeable portion that claim, and we're going to assert it. I think that's what it is, but let me, let me finish and then maybe the Court can analyze it itself. "What is, what is accomplished by this appeal? The result of this Court's decision, I hate to say, is pretty worthless in terms of what's going to happen to the parties." And then, Your Honor, this, this second page, I don't, I think that's all we've got. I've got a -- he introduced in the beginning of the argument, he introduced, he's going to tell them why what they were doing was worthless, and that's what he did. So that's okay. I'm not willing to do that. And, and so I want to point that out

to you to in this respect.  I've never seen a litigant tell the panel in an appellate proceeding that what they're doing is meaningless.  There's no effect to it.  It's nothing because we made another deal with somebody else and no matter what you do.  Now, I was not surprised that they took that position because the panel was pretty direct on how this case was tried and how in the world you were able to get elder abuse after the jury had left and you replead it and the Court gave it to you and all that stuff.  The appellate court was very focused on what was going on here.  And so I think what -- and I, and I want to say this because I think what Mr. Bankston accomplished was probably a very speedy opinion, that's my best guess.  The Courts had no response.  They had no emotion, they had no response.  They were very active during the arguments, but with that comment, they simply excused the parties and got up and left.

So I, so to answer the question as best as an appellate lawyer as I can and Mr. Broocks did the argument so he may have something to spin to put on it, but I don't think we're going to be waiting a long time.  The dilemma I see is, is that -- my concern is that I think Mr. Bankston has made a deal and critically a deal that would -- because I think he contemplated it before he made these remarks to this panel. I mean no lawyer would say that to a panel unless he knew what was going to happen and the panel had made it pretty clear in

004818

the arguments. But I want to emphasize to you and I have a, we're supposed to have another blow up, but I know that, I know this is not trial on the merits of anything, but I, but I want to be able to sort of encapsulate to the Court what's happening here and what's happening in circumstances we don't know about and that's going to lead me to ask you for some, some relief in connection with the motions that you just want to status conference on today.

I'm not going to argue the motions, of course, or the merits of the motions, but I do want to let the Court understand why I'm asking for some of this relief.

But here's an email. It was written by Paul Weiss, Leslie Lieberman, November 16th, 2024, at 1:16 p.m. addressed to Jarrod Martin, Josh Wolfshohl, Chris Murray, Avi Moshenburg and others. And they were working on a deal. And this was produced in the, in the discovery that we had with Mr. Murray.

And here's what they, here's what they say in the email that I, that I think is very critical for the Court to allow me to emphasize. The email's text says "We attach an updated term sheet. We have increased the settlement amount to three million." That is the settlement between Texas and Connecticut to cut some deal. "In our view, this represents a significant premium over the Texas family, over what the Texas families are entitled to on a pro rata basis, a premium that we are only willing to pay for assurances that the FSS

004819

assets will not be sold to Jones' family and friends given that it is clear that Jones will use the assets to continue harming our client." Whatever, whatever that means.

But we do know because we have other emails, again, not to develop any of the facts without having the witnesses to proof up these. What we do know is that there has been a continual -- and you've seen it in two, in two series of transactions in auctions. They were, they were trying to conduct an auction only if they had these arrangements in these particular problems made.

And so what has occurred, what we believe has occurred is something that is completely contrary to bankruptcy policy of what a creditor is entitled to obtain and do in a bankruptcy proceeding. And we've made those arguments in the, in the motion for the auction. Very briefly, we simply say that -- we go through a number of pages of the evidence that we have and the things that we've discovered in the last six months that the government, the DOJ, the plaintiffs' foundations, Paul Weiss and other players had been doing in connection with these Jones claims.

So our argument is couched in terms of what has happened is the, excuse me, your Chapter 11 case was never prosecuted in Chapter 11 by the two dominant creditors. They had their controversy. One was -- and I would, I would use this example. They were identical twins. One was Texas and

one was Connecticut. No difference. No, I mean they were the, the events were the same, the people that came to the events were the same, the people that committed the events were the same, the conversations about the events were the same. Everything was identical. One of them got 2 percent recovery, and one of them got almost 3 percent, and one of them got 97 percent recovery. And of course, that skews everything from the standpoint of how can that happen and what can you do about that?

We know that there are things that, remedies that can be done. And we know that the Texas plaintiffs know what they are. And so we assume that that is what's been pushing these negotiations from before November all the way through the last time you heard and saw a written effort. And that was the 9019 settlement in which they were saying, you know, we're going to give you 25 percent and you're going to get $4 million. It had gone from the email of 3 million to 4 million. All those things are transpiring without us having any idea of the background of the trustee's involvement. We've now discovered the trustee was very involved in the, in the decision making and in the implementation of all the process.

What it has done for us though is it, it has finally coalesced the process that is going on here and that is that the dominant creditor who doesn't want money -- now, by the way, the motion that we filed I footnoted to the YouTubes and

004821

to the, to the public statements and I think you heard some of the Onion statements where they don't want the assets so they can make money because their dilemma is this. Where they, for instance, to go to an auction that had an $8 million purchase price and they won by $8 million and one.

They normally would have then a balance sheet that says, I just, I just put out $8 million but I got assets worth $8 million. So the balance sheet doesn't change and that's where you, that's where you make your auction decisions. But that's not what's at play here.

What the play is here is that look, we can't pay much money because we're going to destroy the assets. The reason we want the assets -- and they say that -- the reason we want the assets is so Alex Jones cannot use them. We want to destroy his brand. Onion said that in the, in the newspaper. We want to destroy the brand and parody it so that we can further our gun control political position and other stuff.

So what has happened to us in this case is the dominant creditor, which has been represented by Paul Weiss, the dominant Connecticut creditor doesn't want money. What they want to do is destroy Alex Jones, and they have -- and as the Courts, I know the Court's aware that they didn't utilize the first proposed mediator. They did then eventually agree to a mediation and zero happened. So this is not a case

004822

in which they have ever made an effort to deal with and try to resolve the case with dollars because it's always been destroy the brand, get him off the air -- and you'll see the videos if you ever get a chance to look at them -- is that they told the jury in Connecticut, punish him with such a verdict that he can never be part of the public discourse again.

So what's happening in this process, and I emphasize this because the auction is going to bring it to a head, they don't want, they don't want an auction.  And so --

THE COURT:  Why don't you buy the equity?

MR. JORDAN:  I'm sorry, Judge.

THE COURT:  Why doesn't someone just buy the equity?

MR. JORDAN:  Well, if you buy the equity, you buy whatever debt and other things that go along with it.

THE COURT:  So what's wrong with that?  That's what Chapter 7 normally does.  What's different?

MR. JORDAN:  Well, because I don't think anybody would buy the equity.  Buying the equity so that you can --

THE COURT:  First United can put up the money and buy the equity right now if it wanted to.

MR. CICAK:  (Indiscernible)

MR. JORDAN:  Maybe I'm not following you.  If you --

THE COURT:  The trustee has said no one's put up an

offer for the equity.

MR. JORDAN:  Correct.

THE COURT:  So, First United, put up an order for the equity.

MR CICACK:  (Indiscernible)

MR. JORDAN:  Well --

THE COURT:  In other words, I don't -- what people want is a sale of the assets.  And let me just remind people what happened when there was a sale of the assets, it was me that expressed the concern about the sale.  There was a sale on the table.  I denied it and then I denied another motion to approve a settlement.  Right?  Those assets are incredibly complicated and they raised huge property of the estate issues.  X ended up doing a deal at the very last minute in connection with the proposed sale to Global Tetrahedron, which I didn't approve.

To conduct such a sale, one would have to -- and I said this on the record back then -- you'd have to address all property of the estate issues up front so that you have a clean understanding as to what could be sold and what could not be sold.  And the IP issues to me remained largely unsettled and really complicated as to what FSS owned, what Jones owned, what it didn't own, what he didn't own.

To do that again, there would have to be such a process, and I'm not comfortable proceeding that way.  But if

004824

somebody wants to buy the equity, which someone can always do in Chapter 7.  I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction.  The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets.  And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me.  It would have to be cash only and we'd have to sort out all the intellectual property issues.  So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

004825

expensive.

And I get it.  Maybe they don't want to buy the asset to make money.  But I'd, I flip it to you.

MR. JORDAN:  I'd like to, I'd like to comment on that because this is, this has really troubled you.  I know since the beginning you made clear that if the IP was going to be sold, that the parties had to come to the Court and raise the issue and then you would decide whether it could be sold or not.

Now so the two offers that we brought to you, I say that we brought to you, that were brought to you that dealt with buying the assets all said we take as is.  So that sale would never have been a problematic sale on that basis.

THE COURT:  Take the equity.  I've got two sides.  There's no question Jones supports FUAC buying it.

MR. JORDAN:  Of course, yeah.

THE COURT:  No one said that.  There is no question about that.

MR. JORDAN:  The questions would go away.

THE COURT:  There's no question.  There's no question, but whether it stays or goes away is largely irrelevant for me, right, from a bankruptcy perspective.  Now, obviously, it's got incredible importance to Mr. Jones and I don't, I got that.  But from a, from a bankruptcy perspective, the real question is what's in the best interest of the estate,

right?  And so to me, the amount of money Mr. Murray would have to spend to get me comfortable that there would be a sale of assets, it would be incredibly expensive and incredibly time consuming.  And I'm wondering if the amount of money that it would take to spend plus potential issues that come along with it that's why I said to you, if you want, somebody can put up the equity.

This case has been pending since 2022.  And folks, it just needs to, it needs to end.  Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable.  Let the state courts, or the Supreme Court of the United States rule on the issue.  Parties can then appeal any orders of mine to the district court or the Fifth Circuit.  We got to get there. I'm not moving.

The issues that are still there are there.  And I've heard your concerns.  And I didn't approve of the sale to Global Tetrahedron.  And I'm not saying anybody did anything wrong.  I just did not get comfortable with that sale.  I didn't get comfortable with the settlement.  Someone was asking me to allow a claim against an entity that's not in bankruptcy anymore.

MR. JORDAN:  And believe me, we didn't ignore you when you said --

THE COURT:  I know you didn't.  I know you didn't

it.

MR. JORDAN: -- on the sale of the equity. We've tried to figure a way that we could sell it without the buyer buying $1.3 billion in debt.

THE COURT: And that's the problem is that you can't figure it out.

MR. JORDAN: If you got a hand on it.

THE COURT: It's not, it's the trustee's call. That's what I'm saying.

MR. JORDAN: Well, it's the trustee's call if he can find a buyer. We couldn't figure out how to find one. It would have been --

THE COURT: May the trustee abandoned the issue. And maybe the trustee abandons the asset. I don't know. You all are going to have to figure it out. That's what I'm saying. The trustee needs to make decisions.

MR. JORDAN: But let me also mention to the Court, and I'm not sure that you processed this, the way I'm, the way I tried to present it because I didn't, I'm not sure I wrote it the way you --

THE COURT: You're saying there's stuff going on behind the scenes and you should be well aware of it.

MR. JORDAN: That's not up for today, and I don't, and I --

THE COURT: But it could be.

004828

MR. JORDAN:  I'm saying it is a, it is we want the ability with limited discovery to explain that with facts and documents.  Now we've got them.  But we've got to verify them. We've had to have them authenticated.  I mean things have happened in the last six months since this regime change.

THE COURT:  I'm sure.  I'm sure.

MR. JORDAN:  But that's not what I was referring to. Here's what I think you might consider.  When you ruled on the 25th of February, and then you said, and then after that, the FUMC filed a  request for a status conference because they wanted, they made this offer that wouldn't be -- for three months and not been responded to, an $8 million offer subject to the conditions that I mentioned.  We won't --  the trustee doesn't have to warrant anything to us just because we know what is there.  We know what is involved, so, so we're ready to sell.

At that time you were incredibly frustrated with the, with all the parties and you commented that you were going to void and terminate the order.

THE COURT:  I did say that and I agree.

MR. JORDAN:  And quite frankly, but for, but for the fact that the appeal was pending, that's probably what you would have done at the time.

Now, the appeal now, I filed my motion pointing out that I've pointed out to the, to the  plaintiff, the appellant,

004829

there's no jurisdiction to do anything except enforce the order or construe the order if they keep their appeal going. They kept it going. But I think when I filed this motion -- and I really emphasized it maybe more or better than I, than I had before -- they have now dismissed the appeal. That dismissal was, is now 34 days old, and that's important.

They said in their reply, which, by the way, the reply to all these --

THE COURT: The reply to which docket?

MR. JORDAN: I'm sorry, to my motion.

THE COURT: Oh, yes, yes.

MR. JORDAN: When they filed their response, I misspoke, when they filed their response to my motion, they said the appeal is dismissed, the matter is moot, the judge has ruled, and so it's all in state court. That's their response. And of course my reply then was wait a minute. That is not how it works. If the Judge had made oral release from the bench, and the last one he wrote down that it was, that it was void, but the Judge also said, I mean, on his own, not because we pointed it out, but you said on the, on the 25th of -- on the 5th of February '25 that if it's on appeal, I can't modify it, I can't change it, I can't withdraw it. Now, I can, I can enforce it or I can interpret it, but I can't do any of that cause it's on appeal. That was all correct. Now it's not. So now what's the effect of that?

004830

The effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked. It is a final order that permits the trustee, because remember your supplemental order did two things. You gave the trustee the assets and then you said, "And I'm giving him the authority to operate until he can sell." Now that's what it, I mean, you basically laid out the purpose of it.

The plaintiffs are now saying, oh, that supplemental order doesn't order a sale, so there's no way that just because the supplemental order is in place, it'll be ordered. I think that's foolish, but that's their argument. But the other argument is that in some fashion, your final judgment that now -- that people can't attack -- well, the one exception. Your final judgment is a final judgment on the law. That is, can I, could I authorize to do that in the state of Texas? Yes, I can. I have a final order. Everybody knew about it. Even the person that complained about it withdrew his appeal. So it's fine.

THE COURT: The question is, do we do round two?

MR. JORDAN: I'm sorry, Judge?

THE COURT: There's already been a round one. The question is do we open it up for a round two. That's the real question, right?

MR. JORDAN: Well, yes, it is the real question in

004831

the sense, but let me tell you how that works, but the answer to your question is yes, but here's how it works.  Rule 59(e) could give relief by which you could, within 28 days of the entry of the final order, even the Court within that period of time could have sua sponte said, wait a minute, I don't, I made a mistake.  I don't like what I did or things have changed.

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

MR. JORDAN:  Well, I'm saying now --

THE COURT:  You probably couldn't do it before then, but I'm asking you to reconsider if that's what you're planning on doing now is how I read your motion or to the extent I thought I did something, reconsider it.

MR. JORDAN:  Yes, because I can say this.  And look, I'm old enough to know better than to tell a federal judge he can't do something.  Okay.

THE COURT:  I'm not one of those judges.  You can tell me that I can't, I can't.

MR. JORDAN:  What I want, but what I want you to hear is that Federal Rule 59(e) is gone; 28 days have passed.

004832

Nobody filed a motion and you didn't pick it up and decide you wanted to do something.

60(b) provides for a reasonable time to do something. That reasonable time probably hadn't passed or maybe it has, who knows, but it's only on motion. It's not on sua sponte of the Court.

THE COURT: Oh, I agree with that.

MR. JORDAN: Okay. So no one has asked you to do anything. They've said, oh, it's all moot --

THE COURT: No, I agree. I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it.

I've told the trustee, if you're going to try to do this again, here's the mountain of stuff you're going to have to get over before I get comfortable approving a process by which those assets could be sold, and it's really hard. The trustee can move if he wants. I know you can sell the equity. And that's an easy process to get through.

The other one, it's going to be really hard to get me comfortable approving the sale on the merits based upon all the issues before. But I don't, I'm not in the business of ordering trustees to go order and nor is anyone asking me to. Truste's got an offer. Trustee will weigh. Trustee will exercise business judgment as to what the trustee wants to do

004833

and parties can file stuff asking me to do things or not.  But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it.  He tried to sell assets under those orders.

The question is do we do another sale?  That's the real question.  Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS.  And how do I weigh now state court remedies that people have as opposed to -- do I stay then state court remedies against non-debtor parties, against the non-debtor?  It's more complicated now than it was six or seven months ago.

MR. JORDAN:  Well, I agree.  I think that the issue in state court has become extremely favorable to the goal and policy I mean and decision making of the plaintiffs.  They know that a state court auction by a constable is worthless to value.  They're going to, somebody's going to credit bid and now their deal is, it's going to be, they're going to create a bid.  Nobody gets any cash.  There's no change.  They get the assets for nothing and the people that are injured, of course, are the other creditors of this estate who are, who are not active at all.  There's not a whole lot of them, but

004834

there's, but they're there. And, of course, then the Debtor who has obviously an interest in getting a maximum value for a credit against his judgment.

So you, they're weighing this. They're weighing a state court constable's auction for nothing by which they get the assets for nothing and they destroy them like they say they're going to. And they, and $4 million goes to, they pay $4 million to the, to the Texas plaintiffs, or we go to an auction and we have to compete against $8 million with someone who says you don't need to guarantee title, you don't, yeah, I mean, here's my bid, I'm ready to go.

And now here's, and here's the third comparison that I, that I really think is important. And I think you may have just said it, but if, but if I didn't -- not sure I picked it up exactly, is that people have relied on your order. I mean the trustee has paid himself over a million dollars from those funds. The trustee's lawyer has gotten $800 million too pursuing these auctions. I mean, there's been almost $2 million spent pursuing the auctions and pursuing the reliefs and doing the settlement agreements and all the things they were doing. Instead of just auctioning it off, they got into this process that somehow the trustee bought into. And so the -- how do we unwind this because for the last six months now, Alex Jones has been operating under the auspices of the trustee, so he, I mean, he's added like $2 million into the

004835

estate from him running the company and keeping the assets going earning money.

What happens to the earnings, I mean so --

THE COURT: Where does the -- let me ask you a question. It's a good question to ask. FSS, well, let's assume FSS generates -- I'm making something up here, so just as a hypothetical. We'll just use X dollars in July of 2025 or through August, or the first six months of this year. Right? Where does that money go?

MR. JORDAN: It goes to the account of the trustee 50 percent and the account of Alex Jones, 50 percent. So they have -- so he didn't get a salary, he gets, that's how they, that's how they run the operations. So and that has generated about $2 million and that's not just since this month, but it's --

THE COURT: Are you asking me to, in consideration of that, to potentially end that arrangement, give it all to Jones? If I reverse the order, wouldn't that, isn't that the effect?

MR. JORDAN: See that's the dilemma. If you reverse the order, everybody has done a lot of things in reliance on the order.

THE COURT: No, no. I got it. I got it.

MR. JORDAN: Okay.

THE COURT: It's an -- I understand the point.

004836

Right?  I understand the point.  There's money coming in and there's only one person generating that money that's coming into FSS.  Let me think about it.  I don't want to rule today.  I want to think about everything and think about this.  This is kind of why I want to have a status.

MR. JORDAN:  And may I --

THE COURT:  Go ahead.

MR. KIMPER:  May I --

MR. JORDAN:  And may I, may I add to my confusion --

THE COURT:  Just a second, Mr. Kimpler.  I just want Mr. Jordan to finish.  Go ahead, Mr. Jordan.  I think Mr. Kimpler wanted to speak, but I'll give him an opportunity or Mr. Broocks.  Yeah, go ahead, you finish.

MR. JORDAN:  What's that?

MR. KIMPLER:  Your speech.

THE COURT:  Go ahead.  Finish your point.  You've got the floor.

MR. JORDAN:  Mr. Kimpler.  Okay.  My other thought is this.  It's kind of a different direction.  There have been four orders entered, I'm sorry, there have been, I think, three orders entered.  There may have been four.  I'm referring to Docket Number 24-03228, 229, 331, and they're called "Stipulations of the Parties."

THE COURT  Yes.

MR. JORDAN: And they purport to -- and we only found these this morning. We weren't, we weren't ever served any notice, but we weren't parties to these adversaries. These are ones I think that Ms. Driver was a party and she hadn't withdrawn and one of the trial lawyers, Chris Martin was a part of, but we didn't know about these. And my question, if I may ask the question, I'm not asking for an advisory opinion. I just, this is the Court's order. It says the Court retains exclusive jurisdiction over property of the estate and any other property or interest under the control of the trustee, including 100 percent equity interest in FSS. And it's entered in the, or at least styled in the FSS Systems Chapter 11 that is no longer.

And my, I guess my only concern is that it's sent back to state court something, but I, but I can't, I don't understand what it sent back to state court. These were remand motions that I think they're, they're not the ones that we're involved in that's up for today. But if those are remand motions and they don't, and they're not sending property back to the estate, I guess, I guess from my perspective, we probably don't have a problem. We still are within the time to file a motion and reconsider if there, if we find a problem, but can the Court, did the Court intend to send the assets back to the estate or --

THE COURT: No.

004838

MR. JORDAN: No. Okay. Well, I'm asking for a ruling, and I don't, and I ought to tee it up differently, I guess, but --

THE COURT: I'll set up a short status. I don't know when. Give me a little time to think about everything that I've heard today, one way or the other. Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other. I don't think anyone should plan on an auction today, but I may change my mind, but I don't -- in terms of going forward with respect to the cash generated by FSS, it's something to think about.

MR. JORDAN: And, Your Honor, then just to finish so that Mr. Kimpler can ask his question.

THE COURT: I think Mr. Broocks will go and then I'll, then I'll turn to Mr. Kimpler and then I've got another hearing, folks and I don't --

MR BROOCKS: I'm going to go next.

MR. JORDAN: All right, so the one other issue that I wanted to cover, and let me see where I put it. Your Honor, for the sake of the, of the topics I've covered, if it's all right, I'm going to sit down. If Mr. Broocks had something --

THE COURT: If you, if you think about it, just let me know.

MR. JORDAN: Okay.

004839

THE COURT: Mr. Broocks, good afternoon.

MR. BROOCKS: I'll be very brief, Your Honor. Thank you so much for entertaining this. I did the oral argument in the Austin Court of Appeals, and I wanted to bring to your attention some different facets of this.

The Connecticut first in Austin, in Connecticut, we asked the Supreme Court of Connecticut to do this discretionary review. They could. There's a specific doctrine there under a whole lot of cases called the Golden cases. It says even if you didn't raise a constitutional issue below, you can raise it here. So we asked them to do so. The opposition to our petition in Connecticut said no, they didn't raise it in the Court of Appeals. They didn't even use, I'll say the "C" word, Constitution. That was their argument. It's been waived, we said, but the Golden case is intended for that exact purpose, (Indiscernible) line did not.

And he's right, whoever said it. We are going to go to the U.S. Supreme Court. We have the ability to ask Justice Sotomayor, I think she's assigned to the, to the Second Circuit District, wherever this case is, for a stay. And the moment they start any aggressive action; we're going to do that. We have a petition we're working on right now. That's Connecticut.

Now in the Texas appeal, the argument was threefold. It was a lot of sub issues, but the arguments looked to the

justices you have, Your Honor, has an independent duty, constitutional duty to review the constitutional issues. As painful as it may sound, you've got to take these videos and you've got to watch them and I had them transcribed. So the Court didn't have to just go watch them. I said, here are the transcripts. They objected to that, but I said, I'm just trying to help. And they were, they were hyperlinked where you could listen to it and read the transcript and go to the particular spot.

I said so you got an independent duty and nothing anybody can do can take that away. And nobody, no court in America has yet ruled on the constitutional issues we raised. Nobody. And so, and so they said, well, they were, they were facing the task and they realize that's their duty. And that may take a while.

Now, the second issue was we said there is a constitutional prohibition, prohibition on entering a liability default judgment against a media defendant in a matter of public concern in the case brought by a public figure. We think we satisfied all three of those. We said and the justices, the Chief Justice said, wait a minute, are you telling me that the trial court is helpless? I said, absolutely not. She's got a lot of remedies available to her, but the one thing she can't do is put a gun to the head and say I am going to bypass all these cases and I'm going to say

004841

I'm going to find you, as a matter of judicial decree, to have committed malice that it's false, that you intended it to be false, you knew it was false, and instead of clear and convincing evidence, I'm going to say there was. I said they just can't do that in that context. And so she asked Bankston, she said, Well, what do you say about that? And Bankston, well of course, he says we disagree, but he didn't have any cases because he doesn't have any cases.

Now the third issue, so we said, we said the constitutional review is going to be required. The default judgment was inappropriate, and we said well when punitive damages are concerned, you have an independent duty to look and see what the grounds are. And to see if, in fact, under Texas law, and which is similar to a lot of states, did they put on the proper evidence to show that, you know, that the default damages that all remedies that had been available to the trial court were tried and failed. The justice says, what could she have done? I said, she, if they weren't having success in getting documents from Jones, you got weekly hold, you can get his, they've done computers, you can do the searches yourself. There's a lot of things.

So anyway, so the Court of Appeals is going to come back potentially and do something very interesting because you've got a Texas case and you've got a Connecticut case. Now this is like Shelby said it was identical twins. That's

004842

a really interesting analogy because it was the Sandy Hook crisis, same one, the same parties, families and family members, the same broadcasts that are allegedly defamatory. A default judgment on liability, so there was no liability trial. The only differentiating factor was the damages. Now in Connecticut, it's $965 billion divided by 15 is roughly $63 million of actual damages to the family. Pretty close.

In Texas, it was $2 million 2 for Heslin, 2 for Lewis. So how do you get on the identical facts, the identical arguments, the identical, there's no liability issue. You now have 63 million to the Connecticut people and 2 million to the Texas plaintiffs. Now if the Texas Court of Appeals comes back and says that we're going to say that -- they could come back and say there's no defamation because I showed them the articles that they were taking snippets out and claiming Jones says this, but he said very clearly, I believe children died. So, you know, there could be no defamation involved. We said convincingly, I think, that there was no intention of fiction, but the Court of Appeals could come back and say wait a minute, we don't think this satisfies constitutional muster.

Now what is the Supreme Court of America going to do? What are you going to do when you've got identical facts, identical facts, identical liability, and one court says it violates the Constitution and another court says they didn't say no. They said we're not going to address it.

004843

Now I think that creates an opportunity, a question for the Supreme Court.  Not only is there a disproportionate recovery, 63 versus 2, you have one court saying on the same facts, no.  Another court saying on the same facts, we're not going to address it, but maybe.  That creates an interesting dilemma, I think, for this Court.  Because you're being asked to find non-dischargeable something that a Texas court would if it comes out this way, if I'm right, that the Texas Court of Appeals says it doesn't pass constitutional muster, well, you're in a dilemma.  And that's why I think your comment about shouldn't we wait till the Texas Court of Appeals rules is very prescient because they very well may come back and say that and I think that is an issue that this Court should take into consideration as it considers its dischargeability because I think that the plaintiffs here --

THE COURT:  Dischargeability with respect to Texas, Connecticut or both?

MR. BROOCKS:  Both, both.

THE COURT:  Okay.

MR. BROOCKS:  And I'll tell you why.  It is because in issuing your original non-dischargeability order, you were led to believe that Connecticut was basically ironclad just, you know, if it was fairly tried and all that.  That's not Connecticut law.  It's just not.

THE COURT:  Shouldn't an appellate court in

Connecticut tell me that? I wasn't, I don't think I was led to believe anything. I think I was given documents that led to a conclusion under the law.

MR. BROOCKS: These are collateral estoppel issues. The Connecticut court can tell you what they did, but you have to decide what is the collateral estoppel effect. And we said that the Lighthouse case and others, the Supreme Court of Connecticut in multiple cases has said that there are three steps in a collateral estoppel, but there's a critical fourth which gets into equity, fairness, justice.

You know, we get to look behind the scenes and then there was another case where a default judgment was entered. Those were just regular collateral estoppel cases.

There was another Connecticut Supreme Court case that is the bellwether case that says, wait a minute, if you have a default judgment entered, they go, they follow the restatement of torts. And they say if a default judgment, then you can't say it was fairly --

THE COURT: Aren't those matters for an appellate court at some point?

MR. BROOCKS: No, those are matters for you. These are, these are questions because if the question of collateral estoppel comes in, these are the issues.

THE COURT: You're saying collateral estoppel on something I've already ruled on?

004845

MR. BROOCKS: I'm saying you haven't, it's not -- you at all times, this is not a final order, Your Honor.

THE COURT: Oh, you mean, you mean in connection with the final order.

MR. BROOCKS: I'm saying as you approach the issue of finality, and I may, I have --

THE COURT: No, no, no. I got the point. I get the point.

MR. BROOCKS: So I'm going to say that as you, as Mr. Kimpler said a minute ago, they're going to come back -- and I suspect they will. I would be shocked if they didn't -- saying we're going to forgo the $331 million. That would be Bankston saying that he's got a deal. Now we believe this is a, we believe this is, I'm going to say an illegal deal. We believe these are two creditors working behind the scenes because I think that because Connecticut has always said we have 97 percent of the judgment, but Texas has said, well, wait a minute, it should be 5 Texas plaintiffs, 15, that's, that's 75, 25, 75 percent. Connecticut was held hostage by Texas until they cut that deal, and that's what I think we need to discover. And that's an abuse of process. That's creditors manipulating the system. And what's happened here is that that's going to be another complicating factor because we're going to file an adversary on that.

THE COURT: Okay.

MR. BROOCKS: And so at any rate, my point to this Court is that there has been a massive, and I'm going to conclude with this, and a massive, a massive abuse of process here. They have taken legitimate processes and they have abused them, using them for an illicit purpose, which is to put Jones out of the air. That is not a legitimate purpose. And that is going to be, so that's the essence of our, of our 1983 claim. Our 1983 claim says this, from the moment that trial judge in Delaware -- in Connecticut issued a default judgment and then struck our constitutional defenses, that is state action. The New York Times versus Sullivan says that's a state action. The cases we cite in our briefs, the Fifth Circuit says that is, that's not just a plaintiff bringing a lawsuit. That is a judge entering an order that now tips the scale, and that is state action. Again, New York Times versus Sullivan said that.

So we believe, Your Honor, that we have asserted valid 1983 claims. We believe we're going to assert an amended petition or complaint for abuse of process. And we would urge you to wait and see what the Texas Court of Appeals does because that may change your judgment.

THE COURT: Thank you very much. Mr. Kimpler, I think you wanted to have a word.

MR. KIMPLER: I would, Your Honor. I'll be brief, but there was a lot of stuff said. I think one thing I hope

004847

you're seeing that as Mr. Jones continues to lose his appeals in Connecticut, increasingly it is hoping that you will be in appellate court. I think you've already appropriately decided that collateral tax on the Connecticut judgment won't stand. The Supreme Court will either take up review of this or it will not. We are confident that the judgment will stand. I don't believe the Supreme Court will even take review. As Mr. Broocks just noted, they actually don't raise constitutional issues in the underlying appeal. So when you ask what's the federal issue for the Supreme Court to look at? It's a pretty good question. Mr. Broocks won't agree with any of that. I don't need to convince you of any of that. The Supreme Court will do what it will or won't.

I'll just remind you that for the last two years, they've told you that Connecticut judgments are going to be overturned, and they weren't. They were affirmed and the Supreme Court of Connecticut said they didn't want to look at it.

I'm not going to respond, Your Honor, to all of the mischaracterizations about my clients. I will point out that the email they quote from my colleague, Ms. Lieberman, was taken out of context. It specifically said we're tired of being hurt on air. If we want to have an evidentiary hearing, I'm happy to show you since January or since December, the number of times Mr. Jones has continued to harass and threaten

004848

my clients on air.  I don't think it's relevant, but I'm happy to do it.

The statement that we at closing in Connecticut said "put a huge punitive damages to take this guy off air," the only problem with that?  I think that was what was said in Texas.  So if we're going to throw around a whole bunch of factual accusations, we should at least have some credibility when we do it and not make misstatements.

I'm a little bit surprised to entertain the notion of another auction in the bankruptcy court.  I think you should see today all the issues.  Then I'll file another adversary complaint.  They're going to assert Section 1983 claims against my client.  Having an option in this court is going to be extremely expensive.  It's going to cost a lot of money, and I can tell you that neither the Connecticut or the Texas plaintiffs support it.

I think we should keep in mind here that Mr. Jones is an equity owner of a business and is massively out of the money.  This is not significantly different from any other cases where a company has creditors, it can't repay the creditors, the management may get replaced, the board may get replaced.  Yeah, they don't get to dictate the terms on what creditors do with the business.

The thing that I think Your Honor was focused on is what is happening with the business now?  Mr. Jordan said that

004849

FSS has created $2 million in the last couple of months. I'd like to see proof of that. I don't think we should take the things they say at face value. I can tell you for the last year, Mr. Jones goes on his air and he says, don't buy stuff from Infowars. Buy it from this other website I just created. We believe First United is behind that in funding it.

THE COURT: Well, I believe, I believe, --

MR. KIMPLER: I believe (Indiscernible) also.

MR. COURT: I don't, I don't want to, I don't want to get into it. I get the point. I don't want to get into what one is doing and the others are doing, I've got big, big, big billboards here and like finding stuff on the other side. I'm really just trying to stay within the four corners of this wall, but I get the point and I think everyone is hearing me. I'm not inclined to open up another auction process or I think the trustee, if that's what the trustee wants to do, has heard what I said back then, and I don't think I've changed my mind here. But it sounds like no one wants to buy the equity either. That was one of my questions in my notes here, so.

But I do, there are some things I do want to think about, maybe understand what's going on with the business, how much money the business has, maybe understand kind of where things are going with respect to the business. I kind of what the trustee views is the right thing to do, what the business is at some point. I just think we got to figure out what to

do with FSS over the next, I don't know, 60 days and just make the call one way or the other as to what you want to do and move on. I think --

MR. KIMPLER: Your Honor --

THE COURT: There could be other lawsuits. There could be other matters that are coming, and I will take them up at face value. I'll read them and we'll take them up and rule on him. Mr. Kimpler.

KIM: Yeah, I was just going to say, Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies. We've been working with the Texas plaintiffs towards that end. You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive. I think it will have wasted several months of efforts. I think it'll be extremely expensive. I'm worried about the estate becoming administratively insolvent. Again, if FSS is throwing out $2 million of cash a month, that's news to me. The idea that 50 percent of it's going directly to Jones and an account that maybe is not controlled by the trustee, that's also news to me. I'm very concerned about where that money is going.

THE COURT: I know. I got it. I think everyone should leave on the motion for reconsideration thinking, well, there's really technically nothing for me to reconsider

004851

because there's nothing, I haven't done anything.  But I don't think my position has changed in terms of what I said in February.   I want this case to continue to move .  Maybe we meet in another 60 days and see where things are and I'll see what gets filed and we'll take them up and we'll schedule them.

This case has been around for three years.  And it's been in a number of iterations and the positions of the parties hasn't changed and that's fine, but at some point, the Chapter 7 process has to work.  So I want to know, the trustee is going to tee up some non-exempt assets.  We'll take those up in the ordinary course.  We'll come back and figure it out.  In a couple of months, we'll figure out what the trustee wants to do with respect to FSS, but I'm not opening up any doors today.  But if there's a lot of money sitting somewhere, then maybe we can think about that.  But if courts rule, I'd like to know about them.  We'll see where things go.  Mr. Moshenburg, I'll give you 30 seconds and then I've got some other folks who have been here for a while and deserving of a hearing.  Yes, sir.

MR. MOSHENBURG:  Makes total sense, Your Honor.  I completely echo what Mr. Kimpler just said.  I just wanted to make sure the Court understood.  I don't agree with their characterization.  If any of that sticks, I'm happy to answer any questions about it.

004852

THE COURT: They don't agree with yours, so I think no one agrees with that -- so we're right where we started.

MR. MOSHENBURG: I totally agree. I just wanted to be clear on the record about that.

THE COURT: No.

MR. MOSHENBURG: Lastly, Your Honor, I know you're talking about 60 days from now. From our vantage point, the Court has told us to go pursue our state court remedies. That's what we're going to do. I want to be open and honest about that unless you're telling us otherwise.

THE COURT: I'm not, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up. We can continue to talk. I just want to keep; I don't want to meet again in the Jones case in December and then talk about asset sales and what's going on.

And I'm going to -- well, somebody's asked me to think about some issues. And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens. I may issue something in writing in short, just kind of addressing the issue without any need for another hearing. We'll see where things go. I think the trustee's instructions for now are keep selling non-exempt assets and

004853

whatever you were planning on doing, what you said you were going to do, then just keep doing that.  I don't think you need to do anything different, but if anything changes, I'll let you know.

MR. MOSHENBURG:  Thank you, Judge.

THE COURT:  All right, folks, thank you very much. I very much appreciate your time.

(Proceedings adjourned at 2:32 p.m.)

004854

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 17, 2025

004855

EXHIBIT

4

Alexander E. Jones; 22-33553

7/7/2025 1:50 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Max Hernandez

NO. D-1-GN-18-001835

| NEIL HESLIN and SCARLETT LEWIS, | § | IN THE DISTRICT COURT |
| Plaintiffs | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| Defendants | § | 261st JUDICIAL DISTRICT |

## APPLICATION FOR POST-JUDGMENT TURNOVER ORDER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTORS' ALEXANDER E. JONES AND FREE SPEECH SYSTEMS, LLC

Plaintiffs Neil Heslin and Scarlett Lewis (the Texas Families) and Intervenors David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (the Connecticut Families and, collectively with the Texas Families, the Judgment Creditors) respectfully request that the Court grant this Application for Turnover Relief and Appointment of a Receiver as to Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC (the Application) against Alexander E. Jones and Free Speech Systems, LLC (the Judgment Debtors). Judgment Creditors would respectfully show the Court the following:

1. **Connecticut Families' Judgment**. The Connecticut Families own a judgment against the Judgment Debtors. Judgment Debtors are obligated to the Connecticut Families in the amount of $1,288,139,555.94 under the judgment rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut, Docket No. CV-18-6046437 (the Connecticut Families' Judgment) and as affirmed and amended by the Connecticut Appellate Court. The Connecticut Supreme Court has

004856

denied further review. *See* **Exhibit B, Denial of Certification of Review**. The Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. *See* **Exhibit A, Declaration of Alinor C. Sterling**. The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act, Chapter 35 of the Texas Civil Practice and Remedies Code. Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under Chapter 11 of the Bankruptcy Code on July 29, 2022 (the Free Speech Systems, LLC Chapter 11 Case) in the United States Bankruptcy Court for the Southern District of Texas (Bankruptcy Court); and its Chapter 11 case was dismissed on June 21, 2024. Judgment Debtor Alex Jones filed for bankruptcy under Chapter 11 of the Bankruptcy Code on December 2, 2022, and his Chapter 11 case was converted to a case under Chapter 7 on June 14, 2024 (the Jones Chapter 7 Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Families' Judgment was non-dischargeable in bankruptcy and, therefore, unaffected by the bankruptcy proceedings.[1] *See* **Exhibit C, Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones**. Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. Judgment Debtors have since filed a motion

---

[1] On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 23, 2023 Memorandum Decision granting the Connecticut Families Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable.

with the Connecticut Appellate Court to stay collection proceedings pending review by petition for certiorari to the United States Supreme Court, though no such petition has been filed. The Connecticut Appellate Court denied that motion on May 13, 2025. *See* **Exhibit D, Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073**. The deadline for Judgment Debtors to file a petition for certiorari to the United States Supreme Court is July 7, 2025.

2.    In the Free Speech Systems, LLC Chapter 11 Case, the Bankruptcy Court for the Southern District of Texas issued an order dismissing the case and vesting authority in the Trustee in the Jones Chapter 7 Case (the Trustee) to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024). Accordingly, this Application only seeks relief relating to Judgment Debtor Free Speech Systems, LLC if approved by the Trustee in the Jones Chapter 7 Case.

3.    **Texas Families' Judgment**. The Texas Families own a judgment against the Judgment Debtors. Judgment Debtors are obligated to the Texas Families in the amount of $50,043,923.80 under the judgment rendered before the 261st Judicial District Court of Travis County, Texas (the Texas Families' Judgment). *See* **Exhibit E, Declaration of Avi Moshenberg**. The Connecticut Families' Judgment and the Texas Families' Judgment are collectively referred to as the Judgments.

4.    The Judgment Creditors have agreed to divide the proceeds derived from the Receiver's collection efforts pursuant to the terms of a binding settlement agreement (the Judgment Creditors' Settlement Agreement).

5.    For the avoidance of doubt, the Judgment Creditors are **not** seeking any relief that would be inconsistent with the pending Jones Chapter 7 Case, including seeking any relief with respect to assets that Judgment Debtor Alex Jones owned on or before

004858

June 14, 2024, as such assets constitute property of the Jones Chapter 7 Bankruptcy Estate.

6.      However, any assets acquired by Judgment Debtor Alex Jones after his case was converted to a Chapter 7 on June 14, 2024, do not constitute property of the Jones Chapter 7 Bankruptcy Estate and are thus available to satisfy the Judgments.  Further, any assets of Free Speech Systems, LLC, subject to the approval of the Trustee are available to satisfy the Judgments.

7.      Accordingly, Judgment Creditors seek to **only** execute upon the following categories of assets, and, in each case, solely to the extent necessary to satisfy the Judgments (collectively, the Receivership Assets):

(a)      any non-exempt assets Judgment Debtor Alex Jones has acquired post-conversion or may acquire in the future;

(b)      any pre-conversion assets of Judgment Debtor Alex Jones which are expressly abandoned by the Trustee such that they no longer are property of the Chapter 7 bankruptcy Estate;

(c)      any post-conversion payments Judgment Debtor Alex Jones is contractually entitled to; and,

(d)      subject to the approval of the Trustee, any assets of Judgment Debtor Free Speech Systems, LLC.

8.      Judgment Creditors reserve all rights they may have to execute upon the Judgments in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtors.  A courtesy copy of this Application is being served on the Trustee.

9.      Judgment Creditors file this Application pursuant to pursuant to Texas Civil Practice and Remedies Code section 31.002(d) that provides: "The judgment creditor may move for the court's assistance under this section in the same proceeding in which the

judgment is rendered or in an independent proceeding." The proposed receiver, Gregory S. Milligan, resides in Travis County.

10. **Turnover and Appointment of Receiver**. Chapter 31 of the Texas Civil Practice and Remedies Code provides that: "A judgment creditor is entitled to aid from a court of appropriate jurisdiction . . . through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that is not exempt from attachment, execution, or seizure for the satisfaction of liabilities." TEX. CIV. PRAC. & REM. CODE § 31.002(a) (as amended Acts 2017, 85th Leg., R.S., Ch. 996 (H.B. 1066), Sec. 1, eff. June 15, 2017).

11. The court may "appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment." *Id.* § 31.002(b). Appointment of a receiver is prudent to provide for an orderly distribution of assets given Judgment Debtors have multiple creditors as detailed herein and given the attention that must be given to delineate the Jones Chapter 7 Bankruptcy Estate.

12. **Property**. Pursuant to Judgment Debtor Jones's sworn discovery responses attached to this application, he has non-exempt property. *See* **Exhibit A**, **Declaration of Alinor C. Sterling**. Pursuant to Judgment Debtor Free Speech Systems, LLC's sworn discovery responses attached to this application, it has non-exempt property can be used to satisfy the Judgments. *Id.*

13. **Turnover and Receiver**. Judgment Creditors request that Judgment Debtors be ordered to turn over all non-exempt, non-bankruptcy estate property and appoint Gregory S. Milligan, CTP, whose address is 8911 North Capital of Texas Highway

Suite 2120 Austin, Texas 78759, (512) 892-0803, milligan@harneypartners.com, as Receiver over such non-exempt, non-bankruptcy estate property. Mr. Milligan has served as post-judgment turnover receiver in numerous cases before courts of the State of Texas and federal courts; he is a certified turnaround professional; and he is qualified to serve. Judgment Creditors request no bond be required. *Childre v. Great Sw. Life Ins. Co.*, 700 S.W. 2d 284, 289 (Tex. App.—Dallas 1985, no writ).

14.     **Notice to Judgment Debtor**.   Notice and a hearing are not required before issuance of a turnover order.  *See Thomas v. Thomas*, 917 S.W.2d 425, 433-34 (Tex. App.—Waco 1996, no writ).

15.     **Attorney's Fees**.   Pursuant to Texas Civil Practice and Remedies Code section 31.002, Judgment Creditors are entitled to recover their reasonable costs and attorney's fees incurred in attempting to collect their judgment.

16.     **Prayer**.   Judgment Creditors pray that the Court grant this Application, order turnover of Judgment Debtors' non-exempt property that is not part of the Chapter 7 bankruptcy Estate, appoint Gregory S. Milligan as Receiver, award Judgment Creditors reasonable attorney's fees and expenses, and grant all further relief to which Judgment Creditors may be entitled.

Respectfully submitted this 7th day of July 2025.

/s/ Ryan E. Chapple
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
Benjamin D. Evans
State Bar No. 24081285
bevans@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile
**ATTORNEYS FOR
THE CONNECTICUT FAMILIES**


/s/ Avi Moshenberg
Avi Moshenberg
State Bar No. 24083532
**LAWSON & MOSHENBERG PLLC**
2301 Commerce Street, Suite 200
Houston, TX 77002
Telephone: (713) 449-9644
Email: avi.moshenberg@lmbusinesslaw.com
**ATTORNEYS FOR
THE TEXAS FAMILIES**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Application for Post-Judgment Turnover and Appointment of Receiver has been forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on this 7th day of July, as follows:

| Method of Service | Party(ies) | Counsel |
|---|---|---|
| *Electronic Service and/or Email* | Chapter 7 Trustee | Christopher R. Murray<br>chris@jonesmurray.com<br>crm@trustesolutions.net<br><br>Erin Jones<br>erin.jones@jonesmurray.com<br><br>Joshua Wolfshohl<br>jwolfshohl@porterhedges.com |
| *Electronic Service and/or Email* | Proposed Receiver Gregory S. Milligan | Gregory S. Milligan<br>milligan@harneypartners.com |

_/s/ Ryan E. Chapple_
Ryan E. Chapple

# EXHIBIT A

004864

## DECLARATION OF ALINOR C. STERLING

| | |
|---|---|
| THE STATE OF CONNECTICUT | § |
| | § |
| COUNTY OF FAIRFIELD | § |

1. "My name is Alinor C. Sterling. I am over the age of twenty-one years and am fully competent to make this Declaration. I have personal knowledge of the facts stated in this Declaration, which are true and correct.

2. "I am an attorney in the law firm of Koskoff Koskoff & Bieder PC and licensed to practice law in the State of Connecticut. I am one of the attorneys of record for David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (collectively, the Connecticut Sandy Hook Families or the Judgment Creditors). I am authorized to make this Declaration on behalf of the Judgment Creditors.

3. "Judgment Creditors own a judgment against Alexander Emric Jones and Free Speech Systems, LLC (the Judgment Debtors). The last known address of Alexander Emric Jones is: Alexander Emric Jones c/o Vickie L. Driver, 2525 McKinnon St., Suite 425, Dallas, Texas 75201; Alexander Emric Jones c/o Shelby A. Jordan, Jordan & Ortiz, P.C., 500 North Shoreline Blvd., Suite 900, Corpus Christi, Texas 78401. The last known address of Free Speech Systems, LLC and the address currently registered with the Texas Secretary of State is: Free Speech Systems, LLC, ATTN: Alex Jones or Authorized Agent, P.O. Box 19549, Austin, Texas 78760. The post office address of the Judgment Creditors is the Connecticut Sandy Hook Families c/o Alinor C. Sterling, Koskoff Koskoff & Bieder PC, 350 Fairfield Avenue, Bridgeport, Connecticut 06604.

1

004865

4.    "Judgment Debtors owe $1,288,139,555.94 under the judgment rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut, Docket No. CV-18-6046437 (the Connecticut Families' Judgment) and as affirmed and amended by the Connecticut Appellate Court.  The Connecticut Supreme Court has denied further review.  The Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. True and correct copies of these documents are being filed contemporaneously with this Declaration.

5.    "Pursuant to the Uniform Enforcement of Foreign Judgments Act, Chapter 35 of the Texas Civil Practice and Remedies Code, domestication papers related to the Connecticut Families' Judgment were filed on August 1, 2024. Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under Chapter 11 of the Bankruptcy Code on July 29, 2022 (the Free Speech Systems, LLC Chapter 11 Case) in the United States Bankruptcy Court for the Southern District of Texas (Bankruptcy Court); and its Chapter 11 case was dismissed on June 21, 2024. Judgment Debtor Alex Jones filed for bankruptcy under Chapter 11 of the Bankruptcy Code on December 2, 2022, and his Chapter 11 case was converted to a case under Chapter 7 on June 14, 2024 (the Jones Chapter 7 Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Families' Judgment was non-dischargeable in

004866

2

bankruptcy and, therefore, unaffected by the bankruptcy proceedings.[1]  Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. Judgment Debtors have since filed a motion with the Connecticut Appellate Court to stay collection proceedings pending review by petition for certiorari to the United States Supreme Court, though no such petition has been filed. The Connecticut Appellate Court denied that motion on May 13, 2025. The deadline for Judgment Debtors to file a petition for certiorari to the United States Supreme Court is July 7, 2025.

6.    "The Judgment Creditors have counsel in the State of Texas.  Their counsel is Ryan E. Chapple of Cain & Skarnulis PLLC, 303 Colorado Street, Suite 2850, Austin, Texas 78701."

### OATH

My date of birth is May 16, 1967.  My business address is 350 Fairfield Avenue, Bridgeport, Connecticut 06604.  I have read the foregoing Declaration, and I declare under penalty of perjury that the foregoing Declaration is true and correct.

Executed in Fairfield County, Connecticut on June 23rd, 2025.

Alinor C. Sterling

---

[1] On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 23, 2023 Memorandum Decision granting the Connecticut Families Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable.

3

# EXHIBIT 1

004868

# VERDICT

WE THE JURY HAVE REACHED OUR VERDICT AS TO DAMAGES IN THIS CASE.

WE AWARD DAMAGES TO EACH PLAINTIFF AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS, LLC AS FOLLOWS:

## I.    COMPENSATORY DAMAGES

Instructions: Fill in both numbers for each plaintiff. Then go to Section II.

Please enter your damages assessments for each plaintiff on the lines below.

1

004869

**TO PLAINTIFF ROBERT PARKER:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                    $ 60,000,000.00

B. EMOTIONAL DISTRESS DAMAGES        $ 60,000,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ROBERT
PARKER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$ 120,000,000.00

2

004870

**TO PLAINTIFF DAVID WHEELER:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                               $ 25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                      $ 30,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF DAVID
   WHEELER AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**

                                                   $ 55,000,000.00

3

004871

TO PLAINTIFF FRANCINE WHEELER:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                    $ 24,000,000.00

B. EMOTIONAL DISTRESS DAMAGES       $ 30,000,000.00
· (PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF FRANCINE
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)
                                    $ 54,000,000.00

4

LM

004872

**TO PLAINTIFF JACQUELINE BARDEN:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                              $ 10,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                     $ 18,800,000.00
   (PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JACQUELINE
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$ 28,800,000.00

5

004873

**TO PLAINTIFF MARK BARDEN:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                           $ 25,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                  $ 32,600,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF MARK
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 57,600,000.00

6

LM

004874

**TO PLAINTIFF NICOLE HOCKLEY:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                    $ 32,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES          $ 41,600,000.00
    (PAST AND FUTURE)

    **TOTAL FAIR, JUST AND REASONABLE
    DAMAGES TO PLAINTIFF NICOLE
    HOCKLEY AND AGAINST ALEX JONES
    AND FREE SPEECH SYSTEMS
    (ADD LINE A AND LINE B)**

                                        $ 73,600,000.00

7

004875

**TO PLAINTIFF IAN HOCKLEY:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $38,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $43,600,000.00
   (PAST AND FUTURE)

       **TOTAL FAIR, JUST AND REASONABLE
       DAMAGES TO PLAINTIFF IAN
       HOCKLEYAND AGAINST ALEX JONES
       AND FREE SPEECH SYSTEMS
       (ADD LINE A AND LINE B)**

                        $81,600,000.00.

8

004876

**TO PLAINTIFF JENNIFER HENSEL:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                     $21,000,600.00

B. EMOTIONAL DISTRESS DAMAGES       $31,000,000.00
   (PAST AND FUTURE)

                **TOTAL FAIR, JUST AND REASONABLE**
                **DAMAGES TO PLAINTIFF JENNIFER**
                **HENSEL AND AGAINST ALEX JONES**
                **AND FREE SPEECH SYSTEMS**
                **(ADD LINE A AND LINE B)**

                           $52,000,000.00

9

004877

**TO PLAINTIFF DONNA SOTO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                      $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES            $30,000,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DONNA
SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                         $48,000,000.00

10

004878

**TO PLAINTIFF CARLEE SOTO PARISI:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $30,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $36,000,000.00
    (PAST AND FUTURE)

        **TOTAL FAIR, JUST AND REASONABLE
        DAMAGES TO PLAINTIFF CARLEE
        SOTO PARISI AND AGAINST ALEX JONES
        AND FREE SPEECH SYSTEMS
        (ADD LINE A AND LINE B)**

                                               $ 66,000,000.00

11

004879

**TO PLAINTIFF CARLOS MATHEW SOTO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                                     $18,600,000.00

B. EMOTIONAL DISTRESS DAMAGES                            $39,000,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLOS
MATHEW SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 57,600,000.00

12

004880

TO PLAINTIFF JILLIAN SOTO-MARINO:

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                      $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES            $38,800,000.00
   (PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JILLIAN
SOTO-MARINO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

                                          $ 68,800,000.00

13

004881

**TO PLAINTIFF WILLIAM ALDENBERG:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                           $45,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                  $45,000,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
ALDENBERG AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$90,000,000.00

14

LM

004882

**TO PLAINTIFF ERICA LAFFERTY:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $58,000,000,00
   (PAST AND FUTURE)

   TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF ERICA
   LAFFERTY AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)             $76,000,000.00

15

004883

TO PLAINTIFF WILLIAM SHERLACH:

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                                    $ 9,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                           $ 27,000,000.00
   (PAST AND FUTURE)

         TOTAL FAIR, JUST AND REASONABLE
         DAMAGES TO PLAINTIFF WILLIAM
         SHERLACH AND AGAINST ALEX JONES
         AND FREE SPEECH SYSTEMS
         (ADD LINE A AND LINE B)
                                                        $ 36,000,000.00

16

LM
004884

## II.    AWARD OF ATTORNEY'S FEES AND COSTS

Instructions: check YES or NO.

If you check YES, the judge will determine the amount due to the plaintiffs for reasonable attorney's fees and costs and will then award the plaintiffs that amount at a later date.

If you check NO, the judge will award $1 to the plaintiffs for their attorney's fees and costs.

## WE THE JURY FIND THAT THE STANDARD CHARGED FOR THE ASSESSMENT OF ATTORNEY'S FEES AND COSTS HAS BEEN MET.

☒ **YES**    (reasonable attorney's fees and costs to be awarded by the judge at a later date)

☐ **NO**    (judge will award $1)

17

004885

FOREPERSON SIGNATURE

10/12/2022

DATE

18

004886

# EXHIBIT 2

004887

```
NO: X06-UWY-CV18-6046436-S       : SUPERIOR COURT

ERICA LAFFERTY                   : COMPLEX LITIGATION DOCKET

V.                               : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                 : November 10, 2022
. . . . . . . . . . . . . . .  . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046437-S       : SUPERIOR COURT

WILLIAM SHERLACH                 : COMPLEX LITIGATION DOCKET

V.                               : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                 : November 10, 2022
. . . . . . . . . . . . . . .  . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046438-S       : SUPERIOR COURT

WILLIAM SHERLACH                 : COMPLEX LITIGATION DOCKET

V.                               : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                 : November 10, 2022
```

In these three consolidated cases, the plaintiffs,[1] various immediate family members of victims and a first responder to

---

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the current named plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto and William Aldenberg. Each of the first eleven of these individuals are either a parent of a student or a close relative of a school employee who died in the Sandy Hook tragedy.

004888

the December 14, 2012 Sandy Hook school shooting, have brought suit against the defendants, Alex Emric Jones and Free Speech Systems, LLC.[2]  In the operative complaints,[3] the plaintiffs allege the following relevant facts against the defendants. Jones is a radio and internet personality who resides in Austin, Texas.  He is the host of "The Alex Jones Show" and he owns and operates the websites Inforwars.com and PrisonPlanet.com. Infowars, LLC is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars.  Free Speech Systems, LLC is a Texas limited liability company that owns Infowars.com.

---

Aldenberg is a first responder who responded to the scene on the date of the shooting.  Additionally, the original plaintiff Erica Lafferty was replaced as a plaintiff by her bankruptcy trustee Richard Coan on October 20, 2021. In both *Sherlach v. Jones* cases, docket numbers X06-CV-18-6046437-S and X06-CV-18-6046438-S, the named plaintiffs are William Sherlach and Robert Parker.  Sherlach is the spouse of a school psychologist and Parker is the parent of a student who were murdered by Adam Lanza during the Sandy Hook incident.

[2] Although there were many additional defendants when these cases were originally brought, the only remaining defendants at this juncture are Alex Emric Jones and Free Speech Systems, LLC.

[3] As the operative complaints in the three cases allege largely the same facts, they will be discussed simultaneously.

2

004889

Similarly, Infowars Health, LLC and Prison Planet TV, LLC are also Texas-based companies. All of the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by the defendant Alex Jones and are employed to hold and generate revenue for him. The Alex Jones Show is syndicated on more than sixty radio stations and it has an audience of two million people. Jones and Infowars have an audience of millions more, including 2.3 million subscribers to Jones' YouTube channel.

The plaintiffs allege that following the 2012 Sandy Hook shooting, "Jones and the rest of the Jones defendants acted together to develop, disseminate and propagate . . . false statements" regarding the incident. According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has." The plaintiffs assert that Jones has developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary

3

004890

gain.     In fact, by May, 2013, Jones was alleged to make approximately $10 million annually.  Specifically, Jones began telling his audience that the Sandy Hook shooting was "a government-sponsored hoax designed to lead to gun control . . . ."     In furtherance of this objective, Jones began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs. For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." Jones appeared in the video and commented that: "evidence is beginning to come out that points more and more in [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."     In that video, Jones stated that plaintiff Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card.  Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors

4

004891

playing different parts of people. I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show. Jones commented: "I mean it's fake . . . it's fake . . . you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was

5

004892

actually closed the year before. They don't know that they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screens, green screens, they got caught using." On July 7, 2015, Jones stated: "[b]ut what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids. . . . [I]t's like the same P.R. company is running this." Additionally, on November 17, 2016, Jones told his audience that he's seen "weird videos of reported parents of kids laughing and then all of sudden they do the hyperventilating to cry and go on TV." Jones has also repeatedly asked his listeners to "investigate" the events surrounding the Sandy Hook shooting and that has led to individuals such as the plaintiffs being subjected to "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

Throughout their complaints in each of the three cases, the plaintiffs allege many more examples of comments made by

6

004893

Jones and his associates where they questioned if the shooting occurred and whether the plaintiffs' relatives actually died. The plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5) count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Each of the plaintiffs' first four causes of action affix the additional label "civil conspiracy."[4]

On October 6, 2021, the plaintiffs moved for a disciplinary default against the defendants claiming litigation misconduct on the part of the defendants. Essentially, the plaintiffs argued that liability should be conclusively established against the defendants because of their repeated discovery violations

---

[4] On November 18, 2021, this court denied the defendants' motion to strike all counts of the plaintiffs' complaint.

7

004894

throughout the course of the litigation.  The defendants filed a memorandum of law in opposition, and following a hearing conducted on November 15, 2021, the court entered a default against the defendants, ruling "(T)he case will proceed as a hearing in damages as to the defendants.  The court notes Mr. Jones is the sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly.  And all of the defendants have failed to fully and fairly comply with their discovery obligations."[5]

Evidence commenced in a hearing in damages before a jury commenced on September 13, 2022..  On October 12, 2022, the jury reached its verdict as to the various plaintiffs.  Specifically, the jury awarded the following damages: (1) as to Robert Parker,

---

[5] The defendants in these cases have repeatedly engaged in conduct designed to thwart their discovery obligations or otherwise avoid the administration of justice.  For example, the Supreme Court previously upheld this court's decision to revoke the defendants' opportunity to file a motion to dismiss under the anti-SLAPP statute, General Statutes § 52-196a, because the defendants "had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei."  *Lafferty* v. *Jones*, 336 Conn. 332, 337-38, 246 A.3d 429 (2020).

8

$120 million; (2) as to David Wheeler, $55 million; (3) as to Francine Wheeler, $54 million; (4) as to Jacqueline Barden, $28.8 million; (5) as to Mark Barden, $57.6 million; (6) as to Nicole Hockley, $73.6 million; (7) as to Ian Hockley, $81.6 million; (8) as to Jennifer Hensel, $52 million; (9) as to Donna Soto, $48 million; (10) as to Carlee Soto Parisi, $66 million; (11) as to Carlos Matthew Soto, $57.6 million; (12) as to Jillian Soto-Marino, $68.8 million; (13) as to William Aldenberg, $90 million; (14) as to Erica Lafferty, $76 million and (15) as to William Sherlach, $36 million. Additionally, the jury awarded reasonable attorney's fees and costs, in an amount to be determined by the court at a later date.

Following the jury's verdict, on October 21, 2022, the plaintiffs filed a brief regarding CUTPA punitive damages. Thereafter, on October 28, 2022, the defendants submitted a memorandum of law in opposition to an award of punitive damages. The plaintiffs filed a bench brief on attorneys' fees and costs on November 3, 2022, and a reply brief to the defendants'

9

004896

memorandum of law in opposition to the award of punitive damages on November 4, 2022. The court heard oral argument on the issue of punitive damages on November 7, 2022.

### Common Law Punitive Damages

The Connecticut Supreme Court has most recently described the well-settled common law rule followed in Connecticut pertaining to punitive damages in *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 447-49, 152 A.3d 1183 (2016): "In *Waterbury Petroleum Products, Inc. v. Canaan Oil & Fuel Co.*, [193 Conn. 208, 235, 477 A.2d 988 (1984)], this court declined to reconsider limits that it had placed on the recovery of punitive damages. In doing so, the court explained: 'Long ago, in *Hanna* v. *Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of [common-law] punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical [common-law] rule the jury was permitted to exercise a virtually unchecked discretion to

10

004897

award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"'The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of

11

such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"'In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award.  Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim.  Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' . . . *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193

12

Conn. 236-38." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 447-49.

"In Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature. See *Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (in Connecticut, common-law punitive damages 'are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive'); see also *Hylton* v. *Gunter*, 313 Conn. 472, 493, 97 A.3d 970 (2014) (*McDonald, J.*, dissenting) (common-law punitive damages are compensatory in nature, but also serve 'a punitive and deterrent function'). 'To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. . . . *If awarded, [common-law] punitive damages are limited to the costs of litigation less*

13

004900

*taxable costs, but, within that limitation, the extent to which they are awarded is in the sole discretion of the trier.* . . . Limiting punitive damages to litigation expenses, including attorney's fees, fulfills the salutary purpose of fully compensating a victim for the harm inflicted . . . while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury. . . . We have long held that in a claim for damages, proof of the expenses paid or incurred affords some evidence of the value of the services . . . . *Label Systems Corp.* v. *Aghamohammadi,* 270 Conn. 291, 335-36, 852 A.2d 703 (2004); but cf. *Berry* v. *Loiseau,* [223 Conn. 786, 827, 614 A.2d 414 (1992)] (common-law punitive damages, when viewed in the light of the increasing costs of litigation, also [serve] to punish and deter wrongful conduct).' . . . *Hylton* v. *Gunter,* supra, 313 Conn. 486 n.14.

"Juries in Connecticut have been awarding punitive damages for 'wanton or malicious injuries' for more than two hundred years. See, e.g., *Linsley* v. *Bushnell,* 15 Conn. 225, 235 (1842),

14

and cases cited therein. More recently, in *Bifolck* v. *Philip Morris, Inc.*, [supra, 324 Conn. 451], our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue. As our Supreme Court explained: 'Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses.' Id.    In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded. Id., 449-51.

"The [purpose] of awarding [common law] punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as

15

to torts is that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 166, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).

As an example, the court in *Bridgeport Harbour Place I, LLC*, upheld an award of common law punitive damages, explaining its reasoning as follows: "On the basis of the jury's finding against [the defendant] on the plaintiff's fraudulent misrepresentation claim, the [trial] court was satisfied that the plaintiff had proven a reckless indifference to its contractual and business interests to warrant an award of

16

punitive damages against [the defendant]. The [trial] court further found that the plaintiff's fee agreement with counsel was 30 percent of the first $6 million recovered and therefore the plaintiff was seeking $54,600 in attorney's fees. The [trial] court agreed with the plaintiff that it could consider its fee agreement with counsel to determine its award of attorney's fees. [The Appellate Court] conclude[d] that the [trial] court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court." (Footnote omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 168, citing *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268-70, 828 A.2d 64 (2003), and *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 773-77, 717 A.2d 150(1998).

As set forth above, the court is tasked with determining the amount of attorneys fees and costs to be awarded as common law punitive damages, following the jury's award of attorneys fees and costs. Awarding attorneys fees under the terms of a

17

reasonable retainer agreement "protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney." *Schoonmaker* v. *Brunoli*, 265 Conn. at 210, 271 n.77 (2003). Based upon the court's review of the affidavit of Attorney James Horwitz and the agreement of the parties, the court finds that the terms of the plaintiffs' retainer agreements are reasonable.

"A trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Schoonmaker 265 Conn. at 270 (quoting Sorrentino, 245 Conn. at 776). The defendants here urge the court to engage in such departure by awarding only nominal damages, essentially arguing that the size of the jury verdicts is punitive and serves to deter, and that the verdict already reflects the default sanction and is punishment enough. The court finds this argument unpersuasive. The law presumes that

18

the jury followed the law set forth in their instructions. See, e.g., Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 44 (1998) ("Absent clear evidence to the contrary, we assume that the jury acted in accordance with the charge."). The defendants also take the position that awarding more than nominal damages would serve a hardship on the defendants, including Free Speech Systems, LLC., which has filed for bankruptcy. The record does not support this conclusory claim of hardship with respect to Alex Jones, and the mere fact that Free Speech Systems, LLC. has filed for bankruptcy does not justify a nominal award of common law punitive damages. Thus, to the extent that the defendants argue that enforcing the retainer agreements would result in substantial unfairness to the defendants, the court is not persuaded. Additionally, the court rejects the defendants' due process argument for an award of nominal damages only, as on these facts, a common law punitive damages award limited to attorneys fees and costs pursuant to the terms of a reasonable retainer agreement

19

004906

comports with due process. Simply put, there is no sound reason for the court not to fully compensate the plaintiffs for their financial obligations under their reasonable retainer agreements.

For the foregoing reasons, the court awards common law punitive damages as follows: As to Robert Parker, $40 million; as to David Wheeler, $18.33 million; as to Francine Wheeler, $18 million;  as to Jacqueline Barden, $9.6 million; as to Mark Barden, $19.2 million;  as to Nicole Hockley, $24.53 million; as to Ian Hockley, $27.2 million;  as to Jennifer Hensel, $17.33 million;  as to Donna Soto, $16 million;  as to Carlee Soto Parisi, $22 million; as to Carlos Matthew Soto, $19.2 million;  as to Jillian Soto-Marino, $22.93 million;  as to William Aldenberg, $30 million;  as to Erica Lafferty, $25.33 million; and as to William Sherlach, $12 million.   Non-taxable costs are awarded to each plaintiff in the amount of $99,303.73, representing 1/15th of the plaintiffs' total claimed non-taxable costs of $1,489,555.94.

004907

<u>Punitive Damages Pursuant to the Connecticut Trade Practices
Act (CUTPA), General Statutes § 42-110a et seq.</u>

General Statutes § 42-110g provides in relevant part: "(a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . *The court may, in its discretion, award punitive damages* and may provide such equitable relief as it deems necessary or proper." (Emphasis added.)  "The language is clear and unambiguous; the awarding of punitive damages is within the discretion of the trial court."  (Internal quotation marks omitted.)  *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 139, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal

21

withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).[6]

For various policy reasons, punitive damages under CUTPA are determined by the court, not the jury. "It is reasonable to conclude that the legislature provided that a claim for punitive damages under CUTPA should be submitted to the trial court, and not the jury, because it believed that the court would be aware of the range of punitive damages that have been

---

[6] The Supreme Court has held that punitive damages awarded pursuant to CUTPA are separate and distinct from awards of attorney's fees. "[T]he legislature did not intend to limit punitive damages awards pursuant to § 42-110g (d) to 'the expenses of bringing the legal action, including attorney's fees, less taxable costs. . . . Section 42-110g (a) expressly authorizes the trial court to award punitive damages in addition to the award of attorney's fees authorized by § 42-110g (d). Nothing in the language of the statute suggests that punitive damages are the same as attorney's fees, consistent with the common-law rule. If the legislature had intended to impose such a limitation, it presumably would have done so either by authorizing the trial court to award double attorney's fees or by authorizing it to award double punitive damages. The fact that the legislature enacted two distinct provisions indicates that it contemplated two distinct types of awards. . . . Moreover, as we have indicated, both this court and the Appellate Court have repeatedly, over the course of many years, upheld multiple damages under the punitive damages provision of CUTPA . . . and the legislature has never amended the statute to provide otherwise." (Citations omitted; footnote omitted; internal quotation marks omitted.) Ulbrich v. Groth, 310 Conn. 375, 449-50, 78 A.3d 76 (2013).

22

awarded for similar CUTPA violations, that it would be less likely to be swayed by appeals to emotion and prejudice, and, therefore, it would be less likely to render an award that was an outlier.  Cf. *Gill* v. *Petrazzuoli Bros., Inc.*, [10 Conn. App. 22, 34, 521 A.2d 212 (1987)] ("[t]o foreclose the possibility of prejudice entering the decision-making process, the award of attorney's fees [under CUTPA] has been placed in the hands of the court" instead of jury); see also *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, [273 Conn. 634, 673-74, 872 A.2d 423] (*Zarella, J.*, dissenting) (legislature vested authority to make punitive damages award under CUTPA in court instead of in jury to safeguard against risk of excessive awards) [cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005)]. Accordingly, the concerns that underlie the common-law limitation on punitive damages have far less weight when the claim is submitted to the trial court instead of the jury." *Ulbrich* v. *Groth*, 310 Conn. 375, 451-52, 78 A.3d 76 (2013).

23

"Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation.  See *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998) [overruled on other grounds by *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014)]; *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages)." *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 140.

24

004911

"Punitive damages [under CUTPA] must be proven by a preponderance of the evidence." Id., 141. "[W]hen considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss." Id., 143 (rejecting plaintiff's argument that court should have considered evidence of misconduct unrelated to plaintiff's damages in calculating punitive damages award under CUTPA). "[T]he nature of the [defendants'] conduct, the actual harm to the plaintiff and the harm the [defendants] intended to inflict are all relevant considerations." (Internal quotation marks omitted.) Id., 144. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) Ulbrich v. Groth, supra, 310 Conn. 446. "As compared to punitive damages under

25

Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. . . . Consequently, the defendants' financial condition is a relevant consideration. Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 144.

Our appellate courts have discussed several specific approaches to the calculation of appropriate punitive damages awards pursuant to CUTPA. "[T]he Appellate Court has observed that awarding an amount equal to the plaintiff's actual damages is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages. . . . [C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages. . . . Indeed, it

26

004913

appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award." (Citations omitted; internal quotation marks omitted.) Id., 144-45.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53, the Supreme Court discussed considerations applicable to common law awards of punitive damages before turning to a discussion of appropriate considerations pertaining to such awards under CUTPA. It explained: "In [*Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)], the defendant challenged the size of a punitive damages award that the jury had rendered against it under maritime law. Id., 489. The court concluded that the limits on such awards fell 'within a federal court's jurisdiction to decide in the manner of a common law court . . . .' Id., 489-90. After reviewing the history of punitive damages under the common law and the standards and limitations that various jurisdictions have applied to them, the court in *Exxon Shipping Co.* observed that several studies

27

had been done to determine 'the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards.' Id., 512.   'These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions.  The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . meaning that the compensatory award exceeds the punitive award in most cases.  In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases . . . without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable

28

outlier cases that call the fairness of the system into question are above the median . . . . Accordingly, given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases.' . . . Id., 512-13." *Ulbrich v. Groth*, supra, 310 Conn. 452-53.

In light of the differences between punitive damages claims under CUTPA and the punitive damages claims under maritime law at issue in *Exxon Shipping Co.*, the court in *Ulbrich* declined to adopt the same a one-to-one ratio of punitive damages to compensatory damages as an upper limit for punitive damages in CUTPA cases. Id., 453-54. Nevertheless, the court adopted the factors that were considered by the United States Supreme Court in *Exxon Shipping Co.* in determining whether the amount of punitive damages awarded pursuant to CUTPA is excessive. The court explained that "in determining whether a punitive damages

29

award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, the court should consider the factors that the court in *Exxon Shipping Co*. discussed.  These include the 'degrees of relative blameworthiness,' i.e., whether the defendant's conduct was reckless, intentional or malicious; *Exxon Shipping Co*. v. *Baker*, supra, 554 U.S. 493; whether the defendant's '[a]ction [was] taken or omitted in order to augment profit'; id., 494; see also id., 503 (some courts consider whether wrongful conduct was profitable to defendant); whether the wrongdoing was hard to detect; id., 494; whether the injury and compensatory damages were small, providing a low incentive to bring the action; id.; and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant.  .  .  .  Of these factors, reprehensibility of a defendant's conduct is the most important. .  .  . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

30

004917

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."    (Citations omitted; footnotes omitted; internal quotation marks omitted.)    *Ulbrich* v. *Groth*, supra, 310 Conn. 454-56.

"[I]n determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen high punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's

31

004918

discretion to award punitive damages that are rational, predictable and consistent." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 146.

In awarding punitive damage awards that exceed the normative range, the court should, therefore, identify "the factors that militate in favor of a high, rather than a low, award of punitive damages . . . ." See id. (noting that trial court, as directed by *Exxon Shipping Co.*, had identified such factors and concluding that court had not abused its discretion in awarding punitive damages in amount six times that of compensatory damage award). The court also may consider "the actual loss suffered by the [plaintiffs] and [whether] the compensatory damages awarded the [plaintiffs] militates against a high punitive damage award." Id., 146-47.

In *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49, the Appellate Court explained that the trial court "found that among the more vexing, competing

32

004919

considerations presented to the court in determining the amount of the punitive award in this case is, on one hand, the issue of deterrence, particularly in light of the [defendants'] financial net worth, and on the other hand, the issue of the overall reasonableness and rationality of a high punitive award in light of the amount of the plaintiff's actual recovery and the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 471] . . . [and] note[d] that because neither compensation nor enrichment is a valid purpose of punitive damages, an award should not be so large as to constitute a windfall to the individual litigant. . . .

"The court also was mindful that, in addition to statutory factors bearing on its discretion, a broader, threshold consideration is that high punitive awards may implicate constitutional concerns. In *Bristol Technology, Inc.* v. *Microsoft Corp.*, 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court stated 'the United States Constitution imposes a substantive

33

004920

limit on the size of punitive damages awards. . . . This is because [p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Still, [i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. . . . Only when an award [of punitive damages] can fairly be categorized as grossly excessive in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process].' . . . Id., 86.

"To satisfy federal due process concerns, the United States Supreme Court has 'instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties

34

004921

authorized or imposed in comparable cases.' *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 418. . . .

"The United States Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pacific Mutual Life Ins. Co.* v. *Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in [*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)]. The Court further

35

004922

referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. . . . While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . .

"'Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. . . . The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the fact[s] and circumstances of the defendant's conduct and the

36

004923

harm to the plaintiff.' . . . *State Farm Mutual Ins. Co. v. Campbell*, supra, 538 U.S. 424-25." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC v. Ganim*, supra, 131 Conn. App. 147-49.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 446-47, the Supreme Court held that the trial court's award of punitive damages under CUTPA was not an abuse of discretion where the trial court reasonably could have found that the defendant's conduct was reckless. Id. (jury reasonably could have found that defendant bank's failure to inform plaintiffs that personal property located at property at time of auction was not included in sale "was not merely negligent, but involved a conscious decision to disregard acknowledged business norms" and gave rise to "substantial and unjustifiable" risk that plaintiffs would act on misleading information). Specifically, the court explained that "the trial court concluded that the best characterization of the bank's conduct . . . is that it proceeded with reckless or wilful ignorance and indifference to the risks that its

37

004924

conduct posed to prospective bidders; that its conduct was inherently deceptive to bidders; that its effort to maximize the bids by including the business property as part of the auction was beneficial to the bank's interests; and that the bank had a high net worth. On the other hand, the court also recognized that the jury's compensatory damages award was not small, that the bank's conduct was not of a criminal nature and that the punitive damages award should not constitute a windfall to the plaintiffs. In addition, we note that there was no evidence that the bank's conduct constituted anything other than an isolated incident." (Internal quotation marks omitted.) Id., 456.

"Although the trial court's punitive damages award in [*Ulbrich*] undoubtedly was a large one, especially in light of the large size of the compensatory damages award, [the Supreme Court could not] conclude that the award constituted a manifest abuse of discretion or that an injustice was done. . . . Rather, [the Supreme Court concluded] that the trial court reasonably

38

004925

could have concluded that the bank's reckless and deceptive conduct, together with the fact that the motive for the conduct was to increase the profitability of the auction to the bank, the fact that the bank has a very high net worth and the fact that there is an established practice in this state of awarding multiple damages for CUTPA violations, warranted the amount of the award. Accordingly, [the Supreme Court concluded] that the size of the trial court's punitive damages award [which was three times the compensatory award] did not constitute an abuse of discretion." (Citation omitted; footnote omitted.)  Id., 456-57.

Here, the material allegations of the complaints, which have been established by virtue of the defaults, entitle the plaintiffs to an award of CUPTA punitive damages. In support of their claim for CUTPA punitive damages, the plaintiffs, in their briefs, support each Ulbrich factor with specific citations to the record. The defendants, in taking the position that there should be either no award of CUTPA punitive damages, or only a

39

004926

nominal award, advance some of the same arguments raised in their opposition to a common law punitive damages award, arguing that the verdict reflects the nature of the plaintiffs' arguments at trial, that the future deterrent value of the verdict overlaps with the function of a punitive damages award under CUPTA, that any award beyond a 1:1 ration violates due process, that any award in excess of $1.3 billion serves no lawful purpose, and that the record is devoid of evidence regarding the defendants' financial resources such that the court cannot properly determine an amount of punitive damages necessary for deterrence.

In considering whether the defendants' actions were taken in order to augment profits, the court finds that despite the defendants' abject failure to meet their obligations to fully and fairly comply with discovery—and despite the defendants' failure to produce a knowledgeable corporate representative armed with sufficient information-the plaintiffs clearly established that the defendants' conduct was motivated by

40

004927

profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.

With respect to whether the wrongdoing was hard to detect, the defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

In addressing the size of the injuries and compensatory damages awards, and low incentive to bring the action, the court

41

004928

concludes that despite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this. The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court. Moreover, the trial record establishes that the defendants remain in the unique position of having-and continuing to utilize-an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected. It is, quite simply, unprecedented in American jurisprudence, and the court reaches the inescapable conclusion that despite the magnitude of the harms caused to the plaintiffs, there is little incentive to bring an action like this against defendants such as these defendants, who have continued to use their platform to attack.

With respect to deterrence, the defendants' financial resources, and whether the award would financially destroy the

42

004929

defendants, the court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.

Finally, the court turns to the most important consideration--the degrees or relative blameworthiness, that is, whether the defendants' conduct was reckless, intentional, or malicious. The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the

43

004930

plaintiffs. This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

The court recognizes that generally speaking, an award of punitive damages under CUTPA is equal to or double the amount of the compensatory award. Here, the court, having considered all the pertinent factors under the law as well as the substantial nature of the compensatory damages award, finds that a lesser ratio is appropriate. Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.

### Conclusion

In conclusion, the court awards common law punitive damages for attorneys fees in the total amount of $321,650,000.00 and

44

004931

costs in the total amount of $1,489,555.94, and awards CUTPA punitive damages in the amount of $150,000,000.00.

421277

Barbara N. Bellis

45

004932

004933

# EXHIBIT 3

004934

| AC 46131 | : | STATE OF CONNECTICUT |
| ERICA LAFFERTY, ET AL. | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

| AC 46132 | : | STATE OF CONNECTICUT |
| WILLIAM SHERLACH | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

| AC 46133 | : | STATE OF CONNECTICUT |
| WILLIAM SHERLACH, ET AL. | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

## PLAINTIFFS-APPELLEES' MOTION FOR RECTIFICATION

Pursuant to Rule of Appellate Procedure § 66-5, the plaintiffs-appellees hereby move the trial court to rectify the record in conformity with the verdict and judgment entered thereon.

Throughout the case, by agreement, the parties referred to Erica Lafferty, rather than the trustee of her bankruptcy estate, Richard Coan, as a plaintiff. Judgment entered in the total amount of $111,429,303.73 ($76,000,000.00 in compensatories plus $35,429,303.73 in punitives) in favor of Mr. Coan as Trustee of the Bankruptcy Estate of Ms. Lafferty. However, the verdict form and parts of the punitive damages Memorandum of Decision refer to Ms. Lafferty rather than Mr. Coan. To make the record crystal clear for the

1

004935

reviewing court, plaintiffs seek rectification. The requested relief does not alter the amount or character of the judgment. It simply clarifies the record for a reviewing court.

## I.    BRIEF HISTORY OF THE CASE

The plaintiffs in this case are members of eight families who lost loved ones in the Sandy Hook Elementary School Shooting and one first responder. The plaintiffs brought suit against defendants Alex Jones and Free Speech Systems, LLC (collectively, "the Jones defendants") alleging invasion of privacy by false light; defamation per se; intentional infliction of emotional distress; and violation of the Connecticut Unfair Trade Practices Act. On June 18, 2019, the trial court (Bellis, J.) sanctioned the Jones defendants for discovery non-compliance and because Alex Jones threatened plaintiffs' counsel on his show. Reviewing pursuant to General Statutes § 52-265a, this Supreme Court affirmed. *Lafferty I*, 336 Conn. 332 (2020).

Following the affirmance of the sanction, the Jones defendants continued their obstruction of discovery. The trial court entered a default against the defendants and subsequently struck their notice of defenses. DN 574, 11/15/21 Default Ruling; Ex. B, DN 620.20, 12/24/21 Order Striking Notice of Defenses. The case proceeded as a hearing in damages before a jury, with evidence commencing September 13, 2022. The jury rendered a verdict in favor of the plaintiffs on October 12, 2022, awarding a total of $965,000,000.00 in compensatory damages and determining that common law punitive damages were warranted. The trial court assessed $323,139,555.94 in common law punitive damages and $150,000,000.00 in CUTPA punitive damages, for a total of $473,139,555.94. DN 1026, 11/10/22 Punitives MOD (Ex. A hereto). Final judgment entered on December 22, 2022,

2

when the defendants' motions for remittitur and to set aside were denied. DN 1043, 12/22/22 MOD Denying New Trial and Remittitur.

Jones appealed that judgment on December 29, 2022: AC 46131, *Erica Lafferty, et al. v. Alex Emric Jones, et al.*; AC 46132, *William Sherlach v. Alex Emric Jones, et al.*; and AC 46133, *William Sherlach, et al. v. Alex Emric Jones, et al.* On December 30, 2022, the three appeals were consolidated. On January 6, 2023, the Jones defendants filed a Corrected Appeal Form, adding FSS to the appeal.[1] On February 23, 2023, the plaintiffs-appellees filed a motion to transfer the consolidated appeals to the Supreme Court. That motion, Mot SC 220201, is pending.

## II.    SPECIFIC FACTS RELIED ON

On October 20, 2021, Erica Lafferty was removed as a party plaintiff and Richard Coan, Chapter 7 Trustee of the Bankruptcy Estate of Erica Garbatini a/k/a Erica Lafferty, was substituted in as a party plaintiff to prosecute the interests of Ms. Lafferty's bankruptcy

---

[1] FSS filed bankruptcy on July 29, 2022 in the United States Bankruptcy Court for the Southern District of Texas. On August 29, 2022, the Bankruptcy Court (Lopez, J.) lifted the automatic stay to allow trial and any subsequent appeal to proceed. See Order Modifying Automatic Stay, *In re Free Speech Systems, LLC*, Case No. 22-60043, (Bankr. S.D. Tex.), ECF No. 117. On December 2, 2022, Alex Jones filed bankruptcy in the same court. On December 19, 2022, the Bankruptcy Court lifted the automatic stay so that this appeal could proceed. See Order Modifying Automatic Stay, *In re Alexander E. Jones*, Case No. 22-33553, (Bankr. S.D. Tex.), ECF No. 58.

3

004937

estate. DN 459.20, Substitution Order.[2] Throughout the proceedings at trial, however, the parties agreed to refer to Erica Lafferty as a plaintiff, rather than referring to Mr. Coan. *E.g.* Ex. B, 10/4/22 Tr. Vol. III at 36:21-37:7. This agreement also applied to the jury interrogatories and verdict, which referred to Ms. Lafferty as a plaintiff, rather than to Mr. Coan. *Id.* The resulting verdict thus reads as an award in favor of Ms. Lafferty of $76,000,000, but is in fact in favor of Mr. Coan, as representative of Ms. Lafferty's bankruptcy estate. *See* DN 1010, Jury Verdict (attached as Ex. C).

In order to make it clear to a reviewing court that the compensatory damages verdict and punitive damages assessment that comprise the total damages award are in favor of Mr. Coan in his capacity as trustee for Ms. Lafferty's bankruptcy estate, the plaintiffs seek rectification of two references to Ms. Lafferty in the Memorandum of Decision on punitive damages, DN 1026 (Ex. B). These requested rectifications are:

(1) Page 9: after "(14) as to Erica Lafferty, $76 million" add "(pursuant to the parties' agreement that references to Ms. Lafferty on the jury verdict and interrogatories are to be treated as references to Mr. Coan in his capacity as trustee of Ms. Lafferty's bankruptcy estate, this verdict amount enters in favor of Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty)"

---

[2] Erica Lafferty has also been known as Erica Garbatini. *See* DN 459, E. Lafferty's Mot. to Substitute Party at ¶1; DN 460, E. Lafferty's Memo. ISO Mot. to Substitute Party at ¶1. On December 5, 2018, Erica Lafferty a/k/a Erica Garbatini filed a voluntary petition under Chapter 7 of the Bankruptcy Code. *See In re Erica L. Garbatini*, Case No. 18-51587, Ch. 7 Petition (Bankr. D. Conn. Dec. 5, 2018) (ECF No. 1). On September 16, 2021, plaintiff Erica Lafferty filed a Motion to Substitute Richard Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty, for Individual Plaintiff Erica Lafferty in *Lafferty v. Jones* (DN 459). The court granted Ms. Lafferty's Motion to Substitute on October 20, 2021 (DN 459.20).

4

004938

(2) Page 20: change "as to Erica Lafferty, $25.33 million;" to "as to Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty, $25.33 million."[3]

Rectification of these references will ensure that the terms of the judgment are crystal clear to a reviewing court.

## III.    LEGAL GROUNDS ON WHICH MOVING PARTY RELIES

The plaintiffs rely on Rule § 66-5, which authorizes clarification of the trial court record via a motion for rectification.

## IV.    CONCLUSION

For these reasons, the plaintiffs request that the relief sought be granted.

THE PLAINTIFFS-APPELLEES,

By:    /s/ Alinor C. Sterling
       **ALINOR C. STERLING**
       **CHRISTOPHER M. MATTEI**
       **JOSHUA D. KOSKOFF**
       **KOSKOFF KOSKOFF & BIEDER**
       350 FAIRFIELD AVENUE
       BRIDGEPORT, CT 06604
       asterling@koskoff.com
       cmattei@koskoff.com
       jkoskoff@koskoff.com
       Telephone: (203) 336-4421
       Fax: (203) 368-3244
       JURIS #32250

---

[3] Other references in the Memorandum of Decision require no alteration because they refer to "plaintiffs."

5

004939

## CERTIFICATION

Pursuant to Rule of Appellate Procedure § 62-7, I hereby certify that on this date, a

true and correct copy of the foregoing has been delivered electronically to the last known

email addresses of each counsel of record for whom an e-mail has been provided, as

indicated below; that the foregoing document has been redacted or does not contain any

names or other personal identifying information that is prohibited from disclosure by rule,

statute, court order or case law; and that the foregoing document complies with all

applicable rules of appellate procedure.

**For Alex Emric Jones & Free Speech Systems, LLC:**
Norman Pattis, Esq.
Kevin Smith, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT 06511
Telephone: 203-393-3017
npattis@pattisandsmith.com
ksmith@pattisandsmith.com


/s/ Alinor C. Sterling
**ALINOR C. STERLING**
**CHRISTOPHER M. MATTEI**
**JOSHUA D. KOSKOFF**

6

004940

# EXHIBIT 4

004941

ORDER   421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
  V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
  AT WATERBURY

3/31/2023

## ORDER

The following order is entered in the above matter:

ORDER:

The motion for rectification, filed by the plaintiffs on March 29, 2023, is granted, without objection.

Judicial Notice (JDNO) was sent regarding this order.

421277
_____

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

004942

# EXHIBIT 5

004943

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

004944

---

Lafferty *v.* Jones

---

## ERICA LAFFERTY ET AL. *v.* ALEX EMRIC JONES ET AL.
### (AC 46131)

## WILLIAM SHERLACH *v.* ALEX JONES ET AL.
### (AC 46132)

## WILLIAM SHERLACH ET AL. *v.* ALEX EMRIC JONES ET AL.
### (AC 46133)

Moll, Clark and Eveleigh, Js.

*Syllabus*

The defendants, J and his company, F Co., appealed from the judgments of the trial court rendered following jury verdicts for the plaintiffs in three underlying consolidated actions that arose out of the 2012 mass shooting at the Sandy Hook Elementary School in Newtown. The court had defaulted the defendants as a sanction for their repeated, wilful failure to fully and fairly comply with the plaintiffs' discovery requests and for violating a protective order. The cases then proceeded to a hearing in damages, after which the plaintiffs were awarded compensatory damages, attorney's fees and costs and, pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., punitive damages. On appeal, the defendants claimed, inter alia, that the court incorrectly concluded that the plaintiffs' allegations were sufficient to support a legally viable CUTPA claim. *Held*:

The trial court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and a protective order.

The trial court's default order was a sanction that was proportional to the defendants' wilful noncompliance and misconduct in repeatedly failing to produce critical documents that the plaintiffs needed to prosecute their case and in making highly confidential information about the plaintiffs available on the Internet.

The plaintiffs had no responsibility, as the defendants claimed, to prove the cause of the harm they suffered, as the effect of the trial court's default order was to conclusively establish the defendants' liability, thereby leaving the plaintiffs with only the burden of establishing their damages.

The defendants' inadequately briefed claim that the trial court improperly limited the scope of J's testimony was deemed abandoned.

004945

---

Lafferty *v.* Jones

---

The trial court did not abuse its discretion in denying the defendants' motion for remittitur, as the evidence was sufficient to support the jury's damages award, which did not shock the sense of justice in light of testimony by all of the plaintiffs about the mental anguish and emotional harm they suffered as a result of death threats and harassment conveyed to them through social media, by mail and in person that stemmed from the defendants' lies that the Sandy Hook massacre was a hoax.

The conduct forming the basis of the plaintiffs' CUTPA claim, namely, the defendants' dissemination of lies about the school shooting, did not constitute the conduct of any trade or commerce within the meaning of CUTPA, as the underlying motivation of the defendants' speech was to generate profit through the sale of products to their audience, and the plaintiffs did not allege that they were harmed by the defendants' advertising, marketing or sale of those products; accordingly, the judgments were reversed as to the plaintiffs' CUTPA claim.

Argued February 8—officially released December 10, 2024

*Procedural History*

Action, in the first case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the second case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the third case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the cases were consolidated and transferred to the judicial district of Waterbury, Complex Litigation Docket; thereafter, in the first case, Jennifer Hensel, executrix of the estate of Jeremy Richman, was substituted as a plaintiff and withdrew her claims against the named defendant et al.; subsequently, in the first case, Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini, was substituted as a plaintiff; thereafter, the court, *Bellis, J.*, defaulted the named defendant et al. in each case for violations of certain discovery orders and a protective order; subsequently, the court denied the motions by the named defendant et al. in each case to set aside the defaults; thereafter,

004946

Lafferty *v.* Jones

the issue of damages was tried to the jury before *Bellis, J.*; subsequently, in each case, the named plaintiff et al. filed an amended complaint; verdict in each case for the named plaintiff et al.; thereafter, in each case, the court denied the motions filed by the named defendant et al. to set aside the verdict and for remittitur, and rendered judgment in each case for the named plaintiff et al., from which the named defendant et al. in each case filed separate appeals with this court; subsequently, Erica L. Ash was substituted as a party plaintiff for Richard M. Coan, trustee of the bankruptcy estate of Erica L. Garbatini; thereafter, the appeals were consolidated. *Reversed in part; judgment directed in part.*

*Norman A. Pattis*, for the appellants in each case (named defendant et al.).

*Alinor C. Sterling*, with whom, on the brief, were *Christopher M. Mattei* and *Joshua D. Koskoff*, for the appellees in each case (named plaintiff et al.).

*Opinion*

MOLL, J. In these consolidated appeals, the defendants Alex Emric Jones and Free Speech Systems, LLC,[1] appeal from the judgments of the trial court rendered following jury verdicts returned in favor of the plaintiffs[2]

---

[1] Several additional defendants were named in the underlying consolidated actions, namely, Infowars, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc. Jones and Free Speech Systems, LLC, however, were the only remaining defendants at the time of the judgments rendered following the jury verdicts returned in the underlying consolidated actions. We refer in this opinion to (1) Jones and Free Speech Systems, LLC, collectively, as the defendants, and (2) Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, collectively, as the Jones defendants.

[2] "There are three underlying actions. In the first action, the plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg. On November 29, 2018, the plaintiffs moved to consolidate the second and third cases . . . with their action pursuant to Practice Book § 9-5. William Sherlach is a plaintiff in the second and third cases and Robert

Lafferty *v.* Jones

in the underlying consolidated tort actions[3] arising out of the 2012 mass shooting at Sandy Hook Elementary School in Newtown. On appeal, the defendants claim that the court improperly (1) defaulted them as a sanction for violating certain discovery orders and a protective order, (2) construed the effect of the default to relieve the plaintiffs of the burden to prove the extent of their damages, (3) restricted the scope of Jones' testimony at the hearing in damages, (4) denied their motion for a remittitur, and (5) concluded that the plaintiffs' claim asserting a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., was legally sufficient. For the reasons that follow, we disagree with the defendants' first, second, and fourth claims, and deem the defendants' third claim to be abandoned as inadequately briefed. We agree, however, with the defendants' fifth claim. Accordingly, we reverse in part the judgments of the trial court.

Parker is a plaintiff in the third case. On December 17, 2018, the court granted the motion to consolidate the cases. Jeremy Richman died while this action was pending, and, on June 7, 2021, the court granted the plaintiffs' motion to substitute Jennifer Hensel, executrix of the estate of Jeremy Richman, as a plaintiff in his place; however, on June 8, 2021, Jennifer Hensel, in her capacity as executrix of the estate of Jeremy Richman, withdrew her claims against the defendants. On October 20, 2021, the court granted Erica Lafferty's motion to substitute Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini [also known as Erica Lafferty], in her place as a plaintiff in this case." (Citations omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 858 n.1, 307 A.3d 923 (2023). On December 14, 2023, the court granted a motion to substitute Erica L. Ash, also known as Erica Lafferty, as a plaintiff in place of Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini. All references in this opinion to the plaintiffs are to the remaining plaintiffs and do not include Jeremy Richman, Jennifer Hensel, as executrix of the estate of Jeremy Richman, or Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini.

[3] The motions and pleadings filed in each of the underlying consolidated actions were largely identical, and the jury verdict returned in each action was the same. In the interest of simplicity, unless otherwise deemed necessary, we refer to the motions, pleadings, and other documents filed in the controlling action. See *Lafferty* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046436-S.

Lafferty *v.* Jones

The following facts and procedural history, as set forth previously by this court or as were undisputed in the record, are relevant to our resolution of these appeals. "On December 14, 2012, Adam Lanza entered Sandy Hook Elementary School (Sandy Hook), and thereafter shot and killed twenty first-grade children and six adults, in addition to wounding two other victims who survived the attack. In the underlying consolidated actions, the plaintiffs, consisting of a first responder, who was not a victim of the Sandy Hook shooting but was depicted in the media following the shooting, and the immediate family members of five of the children, one educator, the principal of Sandy Hook, and a school psychologist who were killed in the shooting, brought these separate actions . . . .

"In the complaints, the plaintiffs alleged that [Jones] hosts a nationally syndicated radio program and owns and operates multiple Internet websites that hold themselves out as news and journalism platforms. The plaintiffs further alleged that [Jones] began publishing content related to the Sandy Hook shooting on his radio and Internet platforms and circulated videos on his YouTube channel. Specifically, the plaintiffs alleged that, between December 19, 2012, and June 26, 2017, [Jones] used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and subscribers. The complaints each consisted of five counts, including causes of action sounding in invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, negligent infliction of emotional distress, and a violation of [CUTPA]." (Citation omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 859–60, 307 A.3d 923 (2023).

On November 15, 2021, the trial court, *Bellis, J.*, defaulted the defendants as a sanction for violating (1) certain discovery orders and (2) a protective order.

004949

Lafferty *v.* Jones

Thereafter, the issue of damages was tried to a jury. In the midst of the hearing in damages, with the defendants' consent, the plaintiffs filed an amended complaint asserting four counts, each of which was accompanied by a claim of civil conspiracy: (1) invasion of privacy by false light; (2) defamation and defamation per se; (3) intentional infliction of emotional distress; and (4) a violation of CUTPA.[4] On October 12, 2022, the jury returned a verdict in favor of the plaintiffs, awarding them a total of $965,000,000 in compensatory damages. The jury further awarded the plaintiffs reasonable attorney's fees and costs, with the amounts to be determined by the court at a later date. On November 10, 2022, the court awarded the plaintiffs a total of (1) $321,650,000 in common-law punitive damages in the form of attorney's fees, (2) $1,489,555.94 in costs, and (3) $150,000,000 in statutory punitive damages pursuant to CUTPA. The defendants filed motions to set aside the verdict and for a remittitur, which the court denied on December 22, 2022. These consolidated appeals followed. Additional facts and procedural history will be set forth as necessary.

Before turning to the defendants' claims, we note that the plaintiffs argue that "[a]lmost all of [the defendants'] claims of error are so general or so inadequately briefed that they are waived." We iterate that we deem claims on appeal to be abandoned if they are inadequately briefed. See, e.g., *Lafferty* v. *Jones*, 336 Conn. 332, 375 n.30, 246 A.3d 429 (2020) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere

---

[4] In an accompanying request for leave to amend their complaint, the plaintiffs represented that the amended complaint (1) removed the negligent infliction of emotional distress count previously alleged, (2) removed former defendants, and (3) "simplifie[d] the pleadings by providing a single, uniform complaint for the hearing in damages of the [underlying] consolidated cases . . . ."

004950

Lafferty *v.* Jones

abstract assertion, is required in order to avoid aban-
doning an issue by failure to brief the issue properly.
. . . [F]or this court judiciously and efficiently to con-
sider claims of error raised on appeal . . . the parties
must clearly and fully set forth their arguments in their
briefs. . . . The parties may not merely cite a legal
principle without analyzing the relationship between
the facts of the case and the law cited." (Internal quota-
tion marks omitted.)), cert. denied,      U.S.    , 141
S. Ct. 2467, 209 L. Ed. 2d 529 (2021). As we explain
throughout this opinion, we decline to review any
claims that the defendants have abandoned as a result
of inadequate briefing.

I

The defendants first claim that the trial court improp-
erly defaulted them as a sanction for violating certain
discovery orders, as well as a discovery related protec-
tive order. We disagree.

The following additional facts and procedural history
are relevant to our resolution of this claim. Shortly after
the underlying consolidated actions had been com-
menced, the Jones defendants filed special motions to
dismiss the actions pursuant to Connecticut's anti-
SLAPP[5] statute. See General Statutes § 52-196a (b).[6] The
plaintiffs moved for limited discovery vis-à-vis the spe-
cial motions to dismiss; see General Statutes § 52-196a
(d); which the court granted on December 17, 2018.

On January 10, 2019, the court overruled objections
raised by the Jones defendants to the plaintiffs' requests
for production seeking, inter alia, marketing data, sales
analytics, and web analytics that the Jones defendants

---

[5] "SLAPP is an acronym for 'strategic lawsuit against public participation'
. . . ." *Lafferty* v. *Jones*, supra, 336 Conn. 337 n.4.

[6] Section 52-196a was amended by No. 19-64, § 17, of the 2019 Public Acts,
which made changes to the statute that are not relevant to these appeals.
Accordingly, we refer to the current revision of the statute.

*Lafferty v. Jones*

"own[ed] and/or control[led]." On May 7, 2019, in an objection addressing various discovery issues, the Jones defendants represented that they had "provided all of the analytics, business and marketing plans that they have." On May 29, 2019, the plaintiffs moved to compel compliance with the court's discovery orders, asserting in part that the Jones defendants had failed to produce responsive marketing and analytics information. The plaintiffs referred, in particular, to marketing data generated by Google Analytics[7] in the custody and control of the Jones defendants, and argued that a thirty-five page Google Analytics document provided by the Jones defendants was inadequate.

On June 10, 2019, the court issued an order stating that (1) testimony elicited during certain depositions confirmed that a "Google Analytics account is accessed and utilized by some employees of the [Jones] defendants," (2) the Google Analytics document that the Jones defendants had produced did not constitute full and fair compliance with the court's discovery orders, and (3) the plaintiffs were "entitled to the [Google Analytics] data pursuant to the court's discovery orders." The court further ordered that it would "consider appropriate sanctions for the [Jones] defendants' failure to fully and fairly comply should they not produce the data within one week." Subsequently, the Jones defendants represented that, on June 17, 2019, Google Analytics data purportedly had been emailed to the plaintiffs' counsel; however, the plaintiffs' counsel represented that the email was never received.

On June 17, 2019, the plaintiffs moved for the court to review a June 14, 2019 broadcast of Jones' radio

---

[7] In their principal appellate brief, the defendants represent that "Google Analytics is proprietary data made available to subscribers on a server maintained by Google. It is described thus on Google's webpage: 'Google Analytics is a web analytics service offered by Google that tracks and reports website traffic and also the mobile app traffic [and] events, currently inside a platform inside the Google Marketing Platform brand.'"

004952

*Lafferty v. Jones*

program, during which Jones made threatening comments with respect to one of the plaintiffs' counsel. See *Lafferty* v. *Jones*, supra, 336 Conn. 342–46, 370. On June 18, 2019, after finding that (1) the Jones defendants were noncompliant with the court's discovery orders concerning, inter alia, the Google Analytics data, and (2) Jones had harassed, intimidated, and threatened one of the plaintiffs' counsel during the June 14, 2019 broadcast, the court sanctioned the Jones defendants by depriving them of the opportunity to pursue their special motions to dismiss. Id., 346–47, 374. At the outset of its decision, the court also stated: "[T]he discovery in this case has been marked with obfuscation and delay on the part of the [Jones] defendants, who, despite several court-ordered deadlines . . . [have] continue[d] . . . to object to having to, what they call affirmatively gather and produce documents which might help the plaintiffs make their case. Despite over approximately a dozen discovery status conferences and several court-ordered discovery deadlines, the Jones defendants have still not fully and fairly complied with their discovery obligations. . . . The [court has] entered discovery deadlines, extended discovery deadlines, and discovery deadlines have been disregarded by the Jones defendants, who continue to object to their discovery and [have] failed to produce that which is within their knowledge, possession, or power to obtain." Later, the court further stated: "At this point, I decline to default the . . . Jones defendants, but I will—I don't know how clearly I can say this. . . . As the discovery in this case progresses, if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the . . . Jones defendants if they, from this point forward, continue with their behavior with respect to discovery." On July 10, 2020, following Chief Justice Richard A. Robinson's grant of the Jones defendants' petition for an expedited public interest appeal

Lafferty *v.* Jones

pursuant to General Statutes § 52-265a, our Supreme Court affirmed the trial court's sanction orders. *Lafferty* v. *Jones*, supra, 336 n.3, 385.

On November 12, 2020, the plaintiffs moved to again compel compliance with court-ordered discovery.[8] On May 5, 2021, the Jones defendants filed an objection, arguing in part that the plaintiffs' prior discovery requests had been rendered moot as a result of the court's June 18, 2019 sanction orders precluding the Jones defendants from pursuing their special motions to dismiss.[9] On May 14, 2021, the court issued an order stating that "the obligation of the [Jones] defendants to fully and fairly comply with the discovery requests at issue was not extinguished by the fact that the [Jones] defendants have been precluded from pursuing special motions to dismiss."

On June 1, 2021, the Jones defendants filed an emergency motion for a protective order requesting that the court (1) extend an upcoming discovery production deadline by forty-five days and (2) narrow the scope of discovery regarding, inter alia, the Google Analytics data, which, they represented, required them to review nearly 300,000 emails for privileged information. On June 2, 2021, the court issued an order stating: "The court previously entered numerous orders with respect to this discovery request and the Jones defendants' objections thereto. The court declines the Jones defendants' invitation to address, again, the scope of appropriate discovery. With respect to the timeframe for compliance, the outstanding discovery responses were due

---

[8] The proceedings in the underlying consolidated actions were stayed pending our Supreme Court's resolution of the public interest appeal, and, on October 27, 2020, the trial court denied a request by the Jones defendants to stay discovery further.

[9] On November 18, 2020, the Jones defendants filed a notice that the underlying consolidated actions had been removed to the United States District Court for the District of Connecticut. The actions were remanded from the District Court on March 5, 2021.

004954

Lafferty *v.* Jones

over two years ago. At no point in time following the decision [in *Lafferty* v. *Jones*, supra, 336 Conn. 332] did the Jones defendants seek clarification from the court as to their discovery obligations. According to emails produced by the plaintiffs . . . the Jones defendants, in February and March of 2020, while their case was pending before [our] Supreme Court and a court-ordered stay of discovery was in effect, asked the plaintiffs' counsel for a complete set of discovery requests to date and continued to discuss the outstanding discovery that was owed by the Jones defendants. Nowhere in the email chain did counsel for the Jones defendants indicate that they were compiling their discovery only if they prevailed on their appeal. The plaintiffs filed a motion with the court seeking the overdue compliance on November 12, 2020, and the Jones defendants did not even file an objection until May 5, 2021. The court's ruling of May 14, 2021, confirmed that the outstanding discovery from the Jones defendants was overdue. At this point, the [Jones] defendants are not in compliance with their obligation to produce that discovery which is in their knowledge, possession, or power. To the extent that [the Jones defendants'] motion seeks, at this late date, a further extension of time to produce the already overdue supplemental compliance, it is granted as follows: complete, final supplemental compliance must be made by June 28, 2021, with compliance to begin immediately on a rolling basis. Failure to comply with this order may result in sanctions including but not limited to a default."

On June 28, 2021, the Jones defendants filed a notice of compliance indicating that (1) the defendants had provided "complete, final supplemental compliance," and (2) Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, previously had satisfied their discovery obligations. With regard to the Google Analytics data, the Jones defendants represented that (1) only Free

Speech Systems, LLC, used Google Analytics, (2) Free Speech Systems, LLC, did not possess, control, or have custody of Google Analytics data in a manner allowing the data to be exported,[10] and (3) the only reasonable method of sharing the Google Analytics data would be to permit the plaintiffs' counsel to access it via a " 'sandbox.' "[11]

On July 1, 2021, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, through one of their counsel, Attorney Norman A. Pattis of Pattis & Smith, LLC,[12] filed a motion for a commission to take an out-of-state deposition of Hillary Clinton (motion to depose Clinton).[13] These defendants asserted in relevant part that, (1) during one of the plaintiffs' depositions, (a) on the advice of counsel, the deponent refused to answer how the plaintiffs "all ended up represented by the same [law] firm" in the underlying consolidated actions and (b) claimed to be unaware of how her legal fees were being paid, (2) the lead plaintiff in the underlying consolidated actions was invited to speak at the Democratic National Convention in 2016, and thereafter was "praised" by Clinton, and (3) they "believe[d] that [the underlying consolidated actions

---

[10] The Jones defendants further represented that, to export the Google Analytics data, Free Speech Systems, LLC, would be required to purchase an upgraded membership account at a cost of $150,000.

[11] The Jones defendants defined " '[s]andboxing' " as " 'a computer security term referring to when a program is set aside from other programs in a separate environment so that if errors or security issues occur, those issues will not spread to other areas on the computer. Programs are enabled in their own sequestered area, where they can be worked on without posing any threat to other programs.' "

[12] On July 1, 2021, all of the Jones defendants, except for Jones, were represented by both Attorney Jay Marshall Wolman and Pattis & Smith, LLC. At that time, Jones was represented by Wolman only.

[13] Jones did not join the motion to depose Clinton, and Infowars, LLC, was not listed as one of the movants. In subsequent filings, including an August 3, 2021 reply brief vis-à-vis the motion to depose Clinton, Infowars, LLC, was treated as an additional movant.

Lafferty *v.* Jones

were] filed six years after the shootings at Sandy Hook as part of a vendetta inspired, orchestrated and directed in whole or in part by . . . Clinton as part of a vendetta to silence . . . Jones after . . . Clinton lost the presidential race to Donald J. Trump."

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating a protective order entered on February 22, 2019, as amended on June 16, 2021 (protective order),[14] which originally had been proposed by the Jones defendants and which, inter alia, protected confidential information produced by the plaintiffs during discovery.[15] The plaintiffs maintained that the motion to depose Clinton, filed by the Jones defendants[16] in the middle of a deposition, (1) was frivolous and (2) improperly published information obtained from the deponent's testimony that was designated as "Highly Confidential-Attorneys Eyes Only" in violation of the protective order. On July 19, 2021, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, filed an objection, and the plaintiffs filed a reply brief the next day.

---

[14] The protective order was twice amended further in 2022.

[15] The protective order limited access to materials designated as "Confidential Information" or "Highly Confidential-Attorneys Eyes Only" to certain categories of persons. The protective order further provided in relevant part: "Depositions involving Confidential Information shall be treated, as follows:

"a. Portions of a deposition or depositions in their entirety may be designated Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY by counsel for the deponent or the Designating Party [as defined in the protective order], with respect to documents or information that it has produced, by requesting such treatment on the record at the deposition or in writing no later than thirty (30) days after the date of the deposition.

"b. This Protective Order shall permit temporary designation of an entire transcript as Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY where less than all of the testimony in that transcript would fall into those categories, subject to [a procedure detailed in the protective order]. . . . The designations shall remain effective until and unless an objection is made and finally resolved."

[16] The plaintiffs contended that the motion to depose Clinton should be treated as having been filed by all of the Jones defendants. See footnote 13 of this opinion.

004957

Lafferty *v.* Jones

On August 5, 2021, the court issued an order stating in relevant part: "In the midst of taking the first deposition of a plaintiff . . . Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC (Infowars), filed a motion to depose . . . Clinton, using deposition testimony that had just been designated as '[Highly] Confidential-Attorneys Eyes Only,' and completely disregarding the court-ordered procedures. At no point prior to filing the Clinton motion did Infowars profess ignorance of the procedures they had proposed and which were court-ordered to be followed, nor have they since taken any steps to correct their improper filing. If Infowars was of the opinion that the plaintiffs' designation was unreasonable and not made in good faith, the solution was to follow the court-ordered procedure to challenge the designation, not to blatantly disregard it and make the confidential information available on the Internet by filing it in the court file. The court rejects Infowars' baseless argument that there was no good cause to issue the protective [order] . . . . Infowars . . . now takes the absurd position that the court-ordered protective order circumvents the good cause requirements of Practice Book § 13-5, did not need to be complied with, and should not be enforced by the court. This argument is frightening. Given the cavalier actions and wilful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public. The court will address sanctions at a future hearing."[17]

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for failing to produce certain

[17] On August 4, 2021, the court denied the motion to depose Clinton. That ruling is not at issue in these consolidated appeals.

Lafferty *v.* Jones

accounting documents. The plaintiffs asserted in relevant part that, (1) in connection with a noticed deposition of Melinda Flores, Free Speech System, LLC's accounting manager, Flores was directed to produce documents, including (a) Free Speech System, LLC's trial balances from 2012 to 2019, and (b) " '[a]ny and all subsidiary ledgers for each account listed in the [t]rial balances produced,' "[18] (2) the court ordered the requested records to be produced by the close of business on May 14, 2021,[19] (3) on May 14, 2021, the Jones defendants produced documents that they described to be trial balances "incorporating the [s]ubsidiary [l]edgers," (4) notwithstanding the Jones defendants' representation, they failed to produce any subsidiary ledgers, and (5) Flores testified during her deposition that (a) she assisted in assembling the documents produced on May 14, 2021, (b) Free Speech Systems, LLC, maintained subsidiary ledger information that was accessible, and (c) the documents produced did not contain subsidiary

---

[18] Attached as an exhibit to the July 6, 2021 motion was an affidavit of Brian W. Merrill, a certified fraud examiner and a certified analytics professional, who averred in relevant part that "[a] trial balance is a standard accounting report listing a company's general ledger accounts. A debit or credit balance is presented for each general ledger account. The purpose of a trial balance is to prove that the value of all debit balances equals the value of all credit balances. Subsidiary ledgers ('[s]ubledgers') contain the transactional detail that support the trial balance details for all general ledger accounts in an accounting system. Subledgers allow for the interpretation and analysis of the financial activity that is recorded in the books and records that ultimately represent the financial statement of the organization."

On November 6, 2020, the Jones defendants objected to the production request seeking the trial balances and subsidiary ledgers on the grounds that the request was, inter alia, overbroad, irrelevant, and unduly burdensome. The court overruled the objection.

[19] On May 5, 2021, the Jones defendants filed an emergency motion for a protective order requesting in part that Flores' deposition, scheduled for May 7, 2021, be rescheduled for medical reasons. On May 6, 2021, the court ordered Flores' deposition to be rescheduled but further directed that "[t]he records requested in the request to produce are ordered to be produced by the close of business on [May 14, 2021]. Failure to comply with this order may result in sanctions."

Lafferty *v.* Jones

ledgers. (Emphasis omitted.) On July 27, 2021, the Jones defendants filed an objection, arguing in relevant part that Free Speech Systems, LLC, did not possess or maintain subsidiary ledgers. In support of their objection, the Jones defendants submitted a personal affidavit of Robert Roe (Roe affidavit), a certified public accountant and a certified forensic accountant, who averred that Free Speech Systems, LLC, did not maintain or utilize subsidiary ledgers. On August 3, 2021, the plaintiffs filed a reply brief.

On August 6, 2021, the court issued an order stating in relevant part: "The subsidiary ledger information . . . was easily accessible to Flores . . . . Despite the court orders, and although the information exists, is maintained by [Free Speech Systems, LLC], and could have been produced by Flores as was required by the court orders, the documents were not produced. The court rejects [Roe's] statement . . . that [Free Speech Systems, LLC] does not 'maintain or utilize' subsidiary ledgers as not credible in light of the circumstances. There is no excuse for the [Jones] defendants' disregard of not only their discovery obligations, but the . . . court orders. The court finds that the failure to comply with the production request has prejudiced the plaintiffs [in] their ability to both prosecute their claims and conduct further depositions in a meaningful manner." The court further ordered (1) Flores' deposition to resume, with Flores directed to produce the subsidiary ledger information, and (2) that sanctions would be addressed at a future hearing. During subsequent hearings before the court, the plaintiffs' counsel represented that, on August 24, 2021, the Jones defendants produced alleged subsidiary ledgers; however, the plaintiffs' counsel further represented that "it is not clear whether [the documents produced were], in fact, subsidiary ledgers . . . ."

004960

Lafferty *v.* Jones

On August 24, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating the court's discovery orders requiring them to produce, inter alia, the Google Analytics data. The plaintiffs refuted the Jones defendants' contention in their June 28, 2021 notice of compliance that Free Speech Systems, LLC, did not possess, control, or have custody of the Google Analytics data in a manner that could be exported, asserting that such "representations were inaccurate and misleading." On September 14, 2021, the Jones defendants filed an objection, arguing, inter alia, that (1) on June 17, 2019, via email, they had produced the Google Analytics data requested by the plaintiffs, and (2) the "sandbox mechanism" previously suggested by them would allow the plaintiffs to access all of the "raw data." On September 23, 2021, the plaintiffs filed a reply brief, and on September 25, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On September 30, 2021 the court issued an order stating in relevant part: "There is no dispute here that the Jones defendants failed to follow the rules [of practice] as they relate to discovery. . . . The purported June 17, 2019 email transmission of zip files . . . containing Google Analytics reports that the plaintiffs' counsel indicates was never received was not sent to [certain other defendants] nor did the purported transmission otherwise comply with the rules of practice. As such, it is not necessary for the court to resolve the issue of whether the purported transmission was actually sent, as it cannot be considered proper compliance under our rules. In short, after protracted objections and arguments by the Jones defendants over whether they had the ability to produce ANY Google Analytics data, to date they have still failed to comply. . . . In light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the plaintiffs, the court will address the

Lafferty *v.* Jones

appropriate sanctions at the next status conference." Subsequently, by way of a notice of compliance dated October 8, 2021, the Jones defendants represented that they had provided supplemental responses to the plaintiffs' discovery requests.

On September 9, 2021, the plaintiffs moved to sanction the Jones defendants for producing "manufactured" documents in discovery. The plaintiffs contended that the trial balances that had been produced were not the originals but, rather, constituted altered trial balances that Roe had manipulated prior to production. On October 7, 2021, the Jones defendants filed an objection. On October 18, 2021, the plaintiffs filed a reply brief, and on October 20, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On November 15, 2021, after hearing argument from the parties over the course of three days between October 20 and November 15, 2021, the court issued an oral decision defaulting the Jones defendants as a sanction for violating (1) the protective order and (2) its discovery orders.[20] With regard to the protective order, the court found in relevant part that (1) the Jones defendants acknowledged that the motion to depose Clinton contained information obtained from a deposition that was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order, (2) the Jones defendants argued that the protective order did not preclude them from publishing such confidential information so long as they did not identify the witness from whom the information was obtained, which position "did nothing but reinforce the court's August 5, 2021 order and findings that the [Jones defendants'] cavalier actions constituted wilful misconduct and violated the

---

[20] On October 7, 2021, the plaintiffs filed a memorandum of law in favor of the court defaulting the Jones defendants for their misconduct. On October 20, 2021, the Jones defendants filed a memorandum of law in opposition to a default order.

004962

court's clear and unambiguous protective order,"[21] and (3) there was a "transparent attempt to cloud the issues" by counsel who had filed the motion to depose Clinton, Pattis, as well as one of the Jones defendants' former counsel, Attorney Jay Marshall Wolman, stemming from inconsistent representations as to whether Infowars, LLC, was one of the movants of the motion to depose Clinton.[22]

With respect to the subsidiary ledgers, the court summarized its findings in its August 6, 2021 order regarding the subsidiary ledgers and commented that "it is still unclear as to what documents have been produced." The court then determined that sanctions were "appropriate in light of the [Jones] defendants' failure to fully and fairly comply with the plaintiffs' discovery request and the court's orders . . . ."

Regarding the trial balances, the court determined that the trial balances produced by the Jones defendants did not comply with its discovery orders. The court stated that (1) Flores testified at her deposition that she had generated the trial balances, which she believed had been produced to the plaintiffs, but (2) Roe later altered those trial balances before they had been provided to the plaintiffs. The court rejected an argument asserted by the Jones defendants that Flores had "provided flawed information to the [Jones] defendants that

---

[21] The court further observed that the Jones defendants previously had asserted a different argument, namely, that the inclusion of the "Highly Confidential-Attorneys Eyes Only" information in the motion to depose Clinton was justified because the plaintiffs lacked a good faith basis to designate the deposition at issue as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. The court rejected that argument.

[22] As the court explained, (1) the motion to depose Clinton, filed by Pattis, listed Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, as the movants, (2) in the July 19, 2021 objection to the plaintiffs' July 6, 2021 motion for sanctions, also filed by Pattis, Infowars, LLC, was treated as an additional movant, and (3) during argument, Wolman represented that Infowars, LLC, had no involvement in the motion to depose Clinton because its name was not listed in the motion.

004963

Lafferty *v.* Jones

the [Jones] defendants, through Roe, had to correct." The court further stated: "The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by [Roe] were the records that were produced. But these records that removed accounts and consolidated accounts altered the information in the reports that [Flores] had produced, and they contain trial balances that did not balance. These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiffs' request or to the court's order."

The court next addressed the Google Analytics data requested by the plaintiffs, stating: "With respect to analytics, including Google Analytics . . . the [Jones] defendants on May 7, 2019, represented that they had provided all the analytics that they had. They stated with respect to Google Analytics that they had access to Google Analytics reports but did not regularly use them. . . . The [Jones] defendants also claim that, on June 17, 2019, they informally emailed zip files containing Google Analytics reports to the plaintiffs, but not [to] the codefendants, an email the plaintiffs state they did not receive and that the court found would not have been in compliance with our rules of practice. On June 28, 2021, the Jones defendants filed a notice of compliance stating that complete, final supplemental compliance was made by . . . [Jones] and Free Speech Systems, LLC, and that Infowars, LLC, Infowars Health, LLC, and Prison Planet [TV], LLC, quote: 'Had previously produced all documents required to be produced,' . . . representing that with respect to the Google Analytics documents, Free Speech Systems, LLC, could not export the dataset and that the only way they could comply was through the sandbox approach. Then on

004964

Lafferty *v.* Jones

[October] 8, 2021,[23] the Jones defendants for the first time formally produced Excel spreadsheets limited to Google Analytics apparently for [Infowars.com] and not for any of the other websites such as Prison Planet TV or Infowars Health." (Footnote added.) The court also found that (1) the Jones defendants had failed to produce analytics data for other platforms, such as Alexa and Criteo, and (2) the Jones defendants' production of certain social media analytics data "has . . . been insubstantial and . . . has fallen far short both procedurally and substantively . . . ."[24] As the court summarized, "[t]he court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims. This callous disregard of their obligations to fully and fairly comply with discovery and court orders on its own merits a default against the Jones defendants."

The court then stated: "Neither the court nor the parties can expect perfection when it comes to the discovery process. What is required, however, and what all parties are entitled to, is fundamental fairness that the other side produces that information which is within [its] knowledge, possession and power, and that the other side meet[s] its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

---

[23] The court referred to August 8, 2021, as the date of the production of the spreadsheets; however, (1) during argument preceding the court's sanctions order, the plaintiffs' counsel represented that the spreadsheets had been produced on October 8, 2021, and (2) the record reflects that the Jones defendants filed a notice of compliance dated October 8, 2021.

[24] The defendants make a passing reference to these other analytics in their principal appellate brief. Insofar as the defendants attempt to raise a claim of error specifically as to these other analytics, they have not adequately briefed any such claim. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Thus, we do not set forth additional context vis-à-vis these other analytics.

Lafferty *v.* Jones

"Here, the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

"The court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous court orders, and they have not.

"In addressing the sanctions that should enter here, the court is not punishing the [Jones] defendants. The court also recognizes that a sanction of default is one of last resort. This court previously sanctioned the [Jones] defendants not by entering a default, but by a lesser sanction, the preclusion of the [Jones] defendants' special motions to dismiss. At this point, entering other lesser sanctions such as monetary sanctions, the preclusion of evidence, or the establishment of facts is inadequate given the scope and extent of the discovery material that the [Jones] defendants have failed to produce.

"As pointed out by the plaintiffs, they are attempting to conduct discovery on what the [Jones] defendants publish and the [Jones] defendants' revenue. And the failure of the [Jones] defendants to produce the analytics impacts the ability of the plaintiffs to address what is published, and the [Jones] defendants' failure to produce the financial records such as subledgers and trial balances affects the ability of the plaintiffs to address the [Jones] defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims, again was caused by the Jones defendants' wilful noncompliance, that is, the Jones defendants'

Lafferty *v.* Jones

failure to produce critical material information that the plaintiff[s] needed to prove their claims.

"For these reasons, the court is entering a default against the [Jones] defendants . . . . The case will proceed as a hearing in damages as to the [Jones] defendants. The court notes [that] . . . Jones is [the] sole controlling authority of all the [Jones] defendants, and that the [Jones] defendants filed motions and signed off on their discovery issues jointly. And all the [Jones] defendants have failed to fully and fairly comply with their discovery obligations."

On appeal, the defendants assert that (1) the court incorrectly (a) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (b) attributed the violation of the protective order to them rather than to their counsel,[25] (2) the court incorrectly determined that their noncompliance with its discovery orders was wilful, and (3) the court's sanction order defaulting them was disproportionate.[26] These contentions are unavailing.

---

[25] As we explained in footnote 13 of this opinion, although Free Speech Systems, LLC, was one of the movants of the motion to depose Clinton, Jones did not join the motion. The defendants on appeal do not claim that Jones was sanctioned improperly vis-à-vis the protective order; on the contrary, both defendants—Jones and Free Speech Systems, LLC—claim error as to the court's ruling regarding the violation of the protective order and assert that the court attributed the violation to them rather than to their counsel. Accordingly, for purposes of our resolution of the defendants' claims in part I of this opinion and notwithstanding the convoluted background concerning the identity of the movants of the motion to depose Clinton, we do not differentiate between Jones and Free Speech Systems, LLC, with regard to the motion to depose Clinton and the court's rulings concerning the protective order.

[26] The defendants raise a number of additional claims, which we decline to review. First, in their reply brief, the defendants contend for the first time that, as a matter of law, "there should be an outer limit on a trial court's authority to enter a default in civil cases. Failure adequately or substantially to comply with discovery should never result in a default." We decline to consider this discrete legal issue raised for the first time in the defendants' reply brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023) ("[i]t [is] axiomatic that arguments cannot be raised for the first time in a reply brief"). Even if some semblance of

Lafferty *v.* Jones

"A trial court's power to sanction a litigant or counsel stems from two different sources of authority, its inherent powers and the rules of practice. . . . [T]his inherent authority permits sanctions for dilatory, bad faith and harassing litigation conduct . . . ." (Citations omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 373.

"Additionally, under Practice Book [Rev. to 2021]

this claim can be gleaned from the defendants' principal appellate brief, we conclude that the defendants have abandoned the claim as a result of their failure to brief it adequately in their main brief and notwithstanding their attempt to expound on it in their reply brief. See *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915 ("[T]he plaintiff cannot use his reply brief to resurrect a claim that he has abandoned by failing to adequately brief it in his principal appellate brief. See *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010) (declining to consider claim when appellant raised 'vague assertion' of claim in principal appellate brief and later 'amplified her discussion of the issue considerably in her reply brief')."), cert. denied, 338 Conn. 911, 259 A.3d 654 (2021). Accordingly, insofar as the defendants claim that the default entered against them was a disproportionate sanction, we limit our analysis to the parameters of the claim adequately briefed by the defendants, namely, that the sanction constituted an abuse of the court's discretion on the basis of the record.

Second, in their principal appellate brief, the defendants claim that "[a] liability default is never appropriate in a case involving speech, given the importance the Connecticut constitution places on speech." The defendants cite article first, § 6, of the Connecticut constitution, which, as they concede, applies only to criminal prosecutions; see *Gray* v. *Mossman*, 91 Conn. 430, 442–43, 99 A. 1062 (1917); and which provides: "In all prosecutions or indictments for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and the facts, under the direction of the court." Conn. Const., art. I, § 6. The defendants' principal appellate brief is bereft of any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Third, in their principal appellate brief, the defendants assert that the court, in its August 6, 2021 order addressing the subsidiary ledgers issue, improperly discredited the Roe affidavit without an evidentiary hearing. The defendants contend that "[t]he absence of a meaningful evidentiary record to support this finding as to . . . Roe, a finding that bore such fatal consequences for the defendants, constitutes an abuse of discretion . . . ." The defendants have abandoned this claim by failing to provide any substantive legal analysis to support it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Last, in their principal appellate brief, the defendants assert that "the trial court never set forth just what it thought Google Analytics was. As such, the order [regarding Google Analytics] was not so clear and unambiguous as to warrant a default if, in fact, the order was violated at all." We deem this claim to be inadequately briefed and, therefore, the defendants have abandoned it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Lafferty *v.* Jones

§ 13-14,[27] a court may sanction a party for noncompliance with the court's discovery orders. Among the permissible sanctions is foreclosing judgment on the merits for a party, such as by rendering a default judgment against a defendant . . . ." (Footnote added.) Id.

We consider three factors in determining whether "a trial court properly exercises its discretion in imposing a sanction for a violation of a court order . . . ." *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 71, 176 A.3d 1167 (2018); see also *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 17–18, 776 A.2d 1115 (2001). "First, the order to be complied with must be reasonably clear. In this connection, however, we also state that even an order that does not meet this standard may form the basis of a sanction if the record establishes that, notwithstanding the lack of such clarity, the party sanctioned in fact understood the trial court's intended meaning. This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review.[28] Third, the sanction imposed must be

---

[27] Practice Book (Rev. to 2021) § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof, or has failed to submit to a physical or mental examination, or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply with the provisions of Section 13-15, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following:

"(1) The entry of a nonsuit or default against the party failing to comply . . . ."

[28] "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

proportional to the violation. This requirement poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Footnote added; internal quotation marks omitted.) *Lafferty* v. *Jones,* supra, 336 Conn. 373–74.

## A

The defendants contend that the court improperly (1) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (2) attributed the violation of the protective order to them, as opposed to their counsel. We are not persuaded.

As to the court's determination that the filing of the motion to depose Clinton violated the protective order, the defendants maintain that, in the motion, they "represented that at a deposition a witness was instructed by counsel not to answer questions about choice of counsel or who was financing the litigation. The name and gender of the deponent were not mentioned; the deposition was characterized, not quoted. . . . The de minimis recitation of facts in the motion . . . did not violate a court order . . . ." (Citations omitted; footnote omitted.) As the court correctly determined, however, the clear and unambiguous language of the protective order limited access to depositions, or portions thereof, designated as "Highly Confidential-Attorneys Eyes Only." The defendants acknowledge that the motion to depose Clinton contained information drawn from the transcript of one of the plaintiffs' depositions, which, as the court found, was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. Thus, in filing the motion to depose Clinton and making the confidential information set forth therein available

conviction that a mistake has been committed." (Internal quotation marks omitted.) *Fernwood Realty, LLC* v. *AeroCision, LLC,* 166 Conn. App. 345, 356, 141 A.3d 965, cert. denied, 323 Conn. 912, 149 A.3d 981 (2016).

004970

Lafferty *v.* Jones

to the public, the defendants plainly violated the protective order.

Moreover, the defendants' position on appeal is further undermined by the fact that, during argument preceding the court's sanctions order, one of the defendants' former counsel, Wolman, conceded that the defendants' actions violated the protective order. The following colloquy occurred between the court and Wolman:

"[Wolman]: . . . We do take the [protective] order very seriously and have endeavored to abide it. There was during a deposition this motion [to depose Clinton] filed. And at the end of the day it comes down to simply one sentence. That the witness claims not to know how her legal fees were being paid. That's the only information that I can see in that motion that gives rise to the court's order. And you know, it was erroneously believed that that was not subject to the [protective] order. The witness herself was not identified. *And while it may be a technical violation,* and it was not realized to be so at the time—

"The Court: So, do you admit now that it was a violation, whether it's a technical violation or not?

"[Wolman]: *I would say it probably fits within the language of what is protected.* We had concerns as to whether or not it truly was protected. The court has weighed in." (Emphasis added.)

Accordingly, we reject the defendants' assertion that the court incorrectly determined that they violated the protective order in filing the motion to depose Clinton.

The defendants, in the alternative, contend that the court improperly ascribed the violation of the protective order to them rather than to their counsel. The defendants posit that, rather than referring counsel for disciplinary action, the court "attributed counsel's alleged

004971

Lafferty *v.* Jones

failure to [the defendants], justifying a default on conduct over which the defendants themselves had no control, and about which, the record reflects, they knew nothing." The defendants fail to cite any portion of the record supporting their assertion that they were unaware of counsel's actions. Without any such evidence, we cannot countenance the defendants' reasoning that they were absolved of any discipline stemming from counsel's conduct. See *MacCalla* v. *American Medical Response of Connecticut, Inc.*, 188 Conn. App. 228, 240, 204 A.3d 753 (2019) ("Although in some circumstances it may be unduly harsh to impute counsel's transgressions to his client, 'our adversarial system [also] requires that the client be responsible for acts of the attorney-agent whom [he] has freely chosen . . . .' *Thode* v. *Thode*, 190 Conn. 694, 698, 462 A.2d 4 (1983); see *Sousa* v. *Sousa*, 173 Conn. App. 755, 773 n.6, 164 A.3d 702 ('[a]n attorney is the client's agent and his knowledge is imputed to the client' . . .), cert. denied, 327 Conn. 906, 170 A.3d 2 (2017)."); see also *MacCalla* v. *American Medical Response of Connecticut, Inc.*, supra, 239–40 (concluding that court did not abuse its discretion in dismissing claims of certain plaintiffs on basis of counsel's actions); cf. *Herrick* v. *Monkey Farm Cafe, LLC*, 163 Conn. App. 45, 52–53, 134 A.3d 643 (2016) (reversing trial court's judgment of nonsuit rendered on basis of counsel's actions).

B

The defendants next claim that the court erred in finding that they wilfully violated its discovery orders. As to the discovery orders in general, the defendants maintain that "the failure to provide answers was not an example of wilful misconduct. Rather, it was the result of a shocking degree of disorganization. The plaintiffs persuaded the trial judge that the plaintiffs' expectations of how the defendants should operate their business and keep records was the standard the

Lafferty *v.* Jones

defendants must meet. The default prevented a jury from learning the truth about the defendants' corporate organization—it is a haphazard warren of people drawn together by . . . Jones' charisma and generosity, but almost altogether devoid of institutional structure or normal corporate governance." We are unpersuaded.

Whether a party wilfully violates a court order "is a factual question committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 222 Conn. App. 867. The court's finding that the defendants' noncompliance with its discovery orders was wilful was supported by its subordinate findings that (1) the subsidiary ledgers requested by the plaintiffs were "easily accessible" and "available" to Flores, (2) Flores generated the trial balances sought by the plaintiffs, but those trial balances later were altered by Roe prior to production to the plaintiffs, and (3) the defendants withheld analytics materials and exhibited a "callous disregard of their obligations to fully and fairly comply with discovery . . . ." Rather than adequately contesting the factual underpinnings of these findings, the defendants propound the argument that their failure to comply with the court's discovery orders stemmed from their purported institutional disorganization. The defendants fail to cite to any portion of the record that supports this assertion. Moreover, the defendants' argument is belied by their own statement in their principal appellate brief that, notwithstanding their purported disorganized corporate structure, they "tendered tens of thousands of documents, sat for scores of depositions, provided answers to requests to admit, and otherwise made efforts to comply with discovery." Thus, the defendants' claim regarding the wilfulness of their noncompliance with the court's discovery orders in general is untenable.

The defendants also assert that the court incorrectly determined that they had wilfully violated its discovery

004973

*Lafferty v. Jones*

orders specifically concerning the Google Analytics data. The defendants maintain that they (1) made "limited and sporadic use of Google Analytics data," (2) "did not keep [any] reports, did not generally or systematically rely on them, and consulted Google Analytics only haphazardly," and (3) did not possess the Google Analytics data, but, rather, "access[ed] the information on Google servers," such that they did not wilfully fail to comply with the court's orders regarding the Google Analytics data. We reject this assertion. The frequency of the defendants' use and reliance on the Google Analytics data has no bearing on their obligation to abide by the court's discovery orders requiring them to provide the data to the plaintiffs. Further, whether the defendants were in possession of the Google Analytics data is immaterial because the plaintiffs' production request sought analytics that the defendants "own[ed] *and/or control*[*led*]." (Emphasis added.) See Practice Book § 13-9 (a)[29] ("[i]n any civil action, in any probate appeal, or in any administrative appeal where the judicial authority finds it reasonably probable that evidence outside the record will be required, any party may serve . . . upon any other party a request to afford the party submitting the request the opportunity to inspect, copy, photograph or otherwise reproduce designated documents or to inspect and copy, test or sample any tangible things *in the possession, custody or control* of the party upon whom the request is served" (emphasis added)). As the court found, the defendants (1) had access to the Google Analytics data and (2) produced some Google Analytics data to the plaintiffs, albeit not in full and fair compliance with the court's discovery orders. Accordingly, we conclude that the court properly found that the defendants wilfully violated the court's discovery orders as to the Google Analytics data.

[29] An amendment to Practice Book § 13-9, effective January 1, 2022, made changes to the provision that are not relevant to these appeals. Accordingly, we refer to the current revision of this provision.

004974

---

Lafferty *v.* Jones

### C

The defendants next claim that the court's order defaulting them as a sanction for their violations of its discovery orders and the protective order was disproportionate. The defendants maintain that, although they "resisted discovery by every lawful means possible in lengthy proceedings . . . [t]heir compliance was substantial," and they did not "[fail] to answer the complaint, [fail] to respond to discovery or otherwise [fail] to participate in the proceedings."[30] We conclude that the court did not abuse its discretion in defaulting the defendants.

As we set forth previously in this opinion, whether the court's sanction defaulting the defendants was proportional to their violations of the court's orders "poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 374. "As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue for us is whether the trial court could have reasonably

---

[30] The defendants also argue that, as a less severe alternative to a default, the plaintiffs could have asserted a cause of action for intentional spoliation of evidence or the court could have provided a spoliation charge to the jury. See *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 243, 905 A.2d 1165 (2006) (recognizing independent cause of action for intentional spoliation of evidence, defined as " 'the intentional destruction, mutilation, or significant alteration of potential evidence for the purpose of defeating another person's recovery in a civil action' "). The plaintiffs counter that the law of spoliation is inapplicable because "there is no question that [the defendants] had—and simply withheld—financial and analytics compliance. Moreover, a spoliation charge would not have remedied the prejudice to the plaintiffs from [the defendants'] misrepresentations regarding the existence of discovery, prolonged delays in providing the compliance [they] did provide, and complete refusal to provide other compliance, or from [the defendants'] wilful violation of the protective order." We agree with the plaintiffs that the law of spoliation did not provide a reasonable alternative to the court's default order.

Lafferty *v.* Jones

concluded as it did. . . . In reviewing a claim that the court has abused this discretion, great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . . The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented. . . . Under an abuse of discretion standard, a court's decision must be legally sound and [the court] must [have] honest[ly] attempt[ed] . . . to do what is right and equitable under the circumstances of the law, without the dictates of whim or caprice." (Citation omitted; internal quotation marks omitted.) *Gianetti* v. *Neigher*, 214 Conn. App. 394, 437–38, 280 A.3d 555, cert. denied, 345 Conn. 963, 285 A.3d 390 (2022). With regard to discovery orders in particular, "[n]ever will the case on appeal look as it does to a [trial court] . . . faced with the need to impose reasonable bounds and order on discovery. . . . Trial court judges face great difficulties in controlling discovery procedures which all too often are abused by one side or the other and this court should support the trial judges' reasonable use of sanctions to control discovery." (Citation omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 374.

"[I]n assessing proportionality, a trial court must consider the totality of the circumstances, including, most importantly, the nature of the conduct itself. . . . [A] trial court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure. . . . Therefore, although dismissal of an action is not an abuse of discretion where a party shows

Lafferty *v.* Jones

deliberate, contumacious or unwarranted disregard for the court's authority . . . the court should be reluctant to employ the sanction of dismissal except as a last resort. . . . [T]he sanction of dismissal should be imposed only as a last resort, and where it would be the only reasonable remedy available to vindicate the legitimate interests of the other party and the court. . . . Like a dismissal, a default judgment is also one of the more severe sanctions that a court may impose . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Gutierrez* v. *Mosor*, 206 Conn. App. 818, 827–28, 261 A.3d 850, cert. denied, 340 Conn. 913, 265 A.3d 926 (2021).

In determining whether the sanction of default was proportional to the defendants' violations of the court's orders, "we are guided by the factors [our Supreme Court] . . . ha[s] employed when reviewing the reasonableness of a trial court's imposition of sanctions: (1) the cause of the [party's] failure to [comply with the orders], that is, whether it [was] due to inability rather than the [wilfulness], bad faith or fault of the [party] . . . (2) the degree of prejudice suffered by the opposing party . . . and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Internal quotation marks omitted.) *Gianetti* v. *Neigher*, supra, 214 Conn. App. 439.

Remaining mindful, as the trial court recognized, that a default is a sanction of last resort, we conclude that the court's default order was a proportional sanction under the circumstances presented. As to the wilfulness factor, the court found that the defendants' failure to produce "critical material information" to the plaintiffs, as well as the defendants' "cavalier actions" in filing the motion to depose Clinton, constituted wilful noncompliance and misconduct. The court further found that "the Jones defendants were not just careless. Their

failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct . . . ."[31] Thus, this factor militates in favor of the court's default order.

With regard to the prejudice factor, the court found that the purpose of the plaintiffs' discovery requests was to determine (1) what the defendants published and (2) the defendants' revenue, which purpose was thwarted by the defendants' failure to produce the analytics data, the subsidiary ledgers, and the trial balances requested by the plaintiffs. The court further found that the defendants' conduct "interfere[d] with the ability of the plaintiffs to conduct meaningful discovery and prevent[ed] the plaintiffs from properly prosecuting their claims." See *Krahel* v. *Czoch*, 186 Conn. App. 22, 35–36, 198 A.3d 103 (discussing importance of unproduced discovery and its effect as to plaintiff's case when examining prejudice), cert. denied, 330 Conn. 958, 198 A.3d 584 (2018); see also *Lafferty* v. *Jones*, supra, 336 Conn. 378 (citing *Krahel* in analyzing prejudice factor).

Additionally, with regard to the protective order, the court stated in its August 5, 2021 order addressing the filing of the motion to depose Clinton that (1) the defendants, in filing the motion to depose Clinton, made information designated as "Highly Confidential-Attorneys Eyes Only" under the protective order available on the Internet, (2) the defendants took no corrective action thereafter, and (3) it had "grave concerns" that there would be "a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the

---

[31] As we concluded in part I B of this opinion, we reject the defendants' claim that the court's finding that they wilfully violated the discovery orders was clearly erroneous.

004978

Lafferty *v.* Jones

public." The court iterated these concerns during argument preceding its sanction order, stating in relevant part: "So, I do intend to impose sanctions [for the violation of the protective order]. . . . I think the [defendants'] behavior really is unconscionable. . . . And I am concerned about a chilling effect on the testimony of other witnesses." In light of these concerns, this factor weighs in favor of the court's default order.

Finally, the court determined that imposing a lesser sanction would be "inadequate . . . ." In 2019, following the defendants' noncompliance with discovery vis-à-vis the special motions to dismiss and Jones' comments during his June 14, 2019 radio broadcast, the court sanctioned the defendants by precluding them from pursuing the special motions to dismiss; however, the court cautioned that it would consider defaulting them in the future if "they, from th[at] point forward, continue[d] with their behavior with respect to discovery." Later, the court also warned the defendants that they risked being defaulted if they failed to comply with its June 2, 2021 order directing the production of complete, final supplemental compliance. See *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, supra, 328 Conn. 74 ("[i]n instances in which our appellate courts have upheld the sanction of a nonsuit, a significant factor has been that the trial court put the plaintiff on notice that noncompliance would result in a nonsuit"). Nevertheless, as the court found, the defendants continued to engage in "a pattern of obstructive conduct" in "callous[ly]" disregarding their discovery obligations. This conduct was not isolated; rather, as the various orders entered by the court demonstrate, notwithstanding being given ample opportunities to comply, the defendants repeatedly failed to produce adequate, responsive materials. The court reasonably determined that a lesser sanction

004979

Lafferty *v.* Jones

would not suffice under such circumstances. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 829 ("[t]he appellate courts of this state consistently have upheld nonsuits, defaults or other sanctions imposed for discovery violations where the noncomplying party has exhibited a pattern of violations or discovery abuse demonstrating a disregard for the court's authority").

Moreover, in the midst of the defendants' ongoing discovery noncompliance, the defendants filed the motion to depose Clinton, which contained information designated as "Highly Confidential-Attorneys Eyes Only" subject to the protective order. As the court determined, the defendants, in a "cavalier" fashion, violated the protective order, which they originally had proposed, by releasing the confidential information to the public, thereby creating a palpable risk of a "chilling effect" on the testimony of witnesses in the future. Against this backdrop, we cannot discern an abuse of discretion by the court in defaulting the defendants as a sanction. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 827 ("dismissal of an action is not an abuse of discretion where a party shows deliberate, contumacious or unwarranted disregard for the court's authority" (emphasis omitted; internal quotation marks omitted)).

In sum, we conclude that the court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and the protective order.

II

The defendants next claim that the trial court improperly construed the effect of the defendants' default to relieve the plaintiffs of the burden to establish the extent of their damages. This claim warrants little discussion.

004980

Lafferty *v.* Jones

Initially, we observe that the defendants assert that the court "never made a principled and intelligible ruling about causation in this case" but, rather, treated causation as having been established following the defendants' default. The defendants do not brief any substantive claims as to any particular rulings of the court[32] but, rather, take issue with the court's rulings as a whole insofar as the court purportedly "eviscerated the concept of causation and relieved the plaintiffs of any responsibility to prove, or even to attempt to prove, a linkage to the various and diffuse harms they suffered and the conduct of the [defendants]."[33] We exercise

---

[32] The defendants refer to the court's jury charge, wherein the court instructed the jury in relevant part: "I hereby charge you that causation of the plaintiffs' damages is already established. . . . Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law. That is, it has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly behind the Sandy Hook hoax, resulting in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard in the evidence in this case. In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described. The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress. The extent of the harm is what you will be measuring in your verdict. The cause of the harm is not in question."

[33] In their principal appellate brief, the defendants make vague references to (1) "a series of bizarre evidentiary rulings" by the court that "eviscerated the requirement that [the] plaintiffs prove the extent of their damages," (2) the court's improper admission of evidence, (3) the court failing to determine which of the plaintiffs' allegations were "material," (4) the court instructing the jury that liability had been " 'established,' " and (5) the court denying a motion in limine filed by the defendants requesting that the transcript of its November 15, 2021 ruling defaulting the defendants be admissible at the hearing in damages. Insofar as the defendants attempt to raise claims of error with respect to these discrete issues, they have failed to brief such claims adequately and, therefore, we deem any such claims to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Additionally, in their principal appellate brief, the defendants repeatedly state that the jury was unaware that liability was established against the defendants as the result of a disciplinary default. In their reply brief, the defendants assert for the first time that the court committed error in failing

Lafferty *v.* Jones

plenary review over this claim, which presents a question of law. See *Williams* v. *Mansfield*, 215 Conn. App. 1, 10, 281 A.3d 1263 (2022) ("[w]hen . . . a court's decision is challenged on the basis of a question of law, our review is plenary").

It is axiomatic that "[a] default admits the material facts that constitute a cause of action . . . and entry of default, when appropriately made, conclusively determines the liability of a defendant. . . . If the allegations of the plaintiff's complaint are sufficient on their face to make out a valid claim for the relief requested, the plaintiff, on the entry of a default against the defendant, need not offer evidence to support those allegations. . . . Therefore, the only issue . . . following a default is the determination of damages. . . . A plaintiff ordinarily is entitled to at least nominal damages following an entry of default against a defendant in a legal action. . . .

"In an action at law, the rule is that the entry of a default operates as a confession by the defaulted defendant of the truth of the material facts alleged in the complaint which are essential to entitle the plaintiff to some of the relief prayed. It is not the equivalent of an admission of all of the facts pleaded. The limit of its effect is to preclude the defaulted defendant from making any further defense and to permit the entry of a judgment against him on the theory that he has admitted such of the facts alleged in the complaint as are essential to such a judgment. It does not follow that the plaintiff

---

to notify the jury that the defendants were defaulted as a disciplinary sanction. We decline to review this claim, as it is (1) improperly raised for the first time in the defendants' reply brief or (2) inadequately briefed, even if cognizably raised in the defendants' principal appellate brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023); *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915, cert. denied, 338 Conn. 911, 259 A.3d 654 (2021); see also footnote 26 of this opinion.

Lafferty *v.* Jones

is entitled to a judgment for the full amount of the relief claimed. The plaintiff must still prove how much of the judgment prayed for in the complaint he is entitled to receive."[34] (Emphasis omitted; internal quotation marks omitted.) *Whitaker* v. *Taylor*, 99 Conn. App. 719, 725–26, 916 A.2d 834 (2007).

As these legal principles elucidate, after the court had defaulted the defendants, the plaintiffs were not required to demonstrate that the defendants' conduct caused their harm. Instead, following the defendants' default, the only burden carried by the plaintiffs was to prove the amount of their damages. See *Murray* v. *Taylor*, 65 Conn. App. 300, 335, 782 A.2d 702 (This court, in reversing the trial court's grant of the defaulted defendant's motion to set aside the verdict following the hearing in damages, explained that "[t]he [trial] court determined that there was no evidence from which the jury reasonably could have found that the plaintiff's damages were proximately caused by the conduct alleged and ruled against the plaintiff on that basis. Yet, in an action at law, as here, the liability of a defaulted defendant is established and the plaintiff's burden at a hearing in damages is limited to proving

---

[34] We note that, "[a]fter a default, a defendant may still contest liability. Practice Book §§ 17-34, 17-35 and 17-37 delineate a defendant's right to contest liability in a hearing in damages after default. Unless the defendant provides the plaintiff written notice of any defenses, the defendant is foreclosed from contesting liability. . . . If written notice is furnished to the plaintiff, the defendant may offer evidence contradicting any allegation of the complaint and may challenge the right of the plaintiff to maintain the action or prove any matter of defense. . . . This approximates what the defendant would have been able to do if he had filed an answer and special defenses." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Schwartz* v. *Milazzo*, 84 Conn. App. 175, 178–79, 852 A.2d 847, cert. denied, 271 Conn. 942, 861 A.2d 515 (2004). On November 24, 2021, following the entry of the default against them, the defendants filed a notice of defenses, which was stricken by the court on December 24, 2021. The defendants on appeal do not challenge the propriety of the court's order striking the notice of defenses.

Lafferty *v.* Jones

that the amount of damages claimed is derived from the injuries suffered and is properly supported by the evidence. . . . We, therefore, cannot agree with the court's conclusion that the plaintiff's claim must fail because he did not provide evidence that [the defaulted defendant's] negligent conduct proximately caused his injuries . . . ." (Citation omitted.)), cert. denied, 258 Conn. 928, 783 A.2d 1029 (2001).[35] Accordingly, the defendants' claim fails.

### III

The defendants also claim that the trial court improperly restricted the scope of Jones' testimony at the hearing in damages. We conclude that the defendants have abandoned this claim by failing to brief it adequately.

The following additional procedural history is relevant. On September 6, 2022, the court granted motions in limine filed by the plaintiffs seeking to preclude evidence or argument at the hearing in damages concerning, inter alia, (1) the defendants' "maximum total amount of Sandy Hook coverage or percentage or proportion of Sandy Hook coverage" and (2) the court's ruling defaulting the defendants. Additionally, on September 13, 2022, the court granted a motion for sanctions filed by the plaintiffs on the basis of additional discovery misconduct by the defendants. The court sanctioned the defendants by prohibiting them from presenting evidence or argument "that they did not profit from their Sandy Hook coverage."

On September 22, 2022, during the hearing in damages, the plaintiffs called Jones as a witness. Outside

---

[35] The defendants cite the following language in *Murray* to support their claim: " '[E]ven in a hearing in damages . . . a plaintiff must still prove that the damages claimed were caused by the conduct alleged.' " *Murray* v. *Taylor*, supra, 65 Conn. App. 333. The source of that language, however, is the trial court decision that this court reversed on appeal. See id., 332–35, 340. The defendants' reliance on that language, therefore, is untenable.

004984

*Lafferty v. Jones*

of the jury's presence, the court canvassed Jones with regard to the various topics about which (1) counsel were prohibited from asking him and (2) he was precluded from testifying. Jones indicated that he understood which topics his testimony could not address. During the course of Jones' direct examination, the court and counsel engaged in multiple sidebars, and the jury was excused several times, in order to address whether certain questions asked by the plaintiffs' counsel and testimony by Jones were proper in light of the court's orders. The next day, the defendants' counsel informed the court that, for "strategic" reasons, the defendants were forfeiting the right to cross-examine Jones, intending instead to call him as a witness during their case-in-chief. On October 5, 2022, outside of the jury's presence, the defendants' counsel notified the court that Jones had decided not to testify during the defendants' case-in-chief, explaining that Jones was "boycotting [the] proceedings because he [felt] that [he was] on the horns of a trilemma. If he testifie[d] in accord with the court's orders [restricting his testimony], [he would] be committing perjury; if he violate[d] the court orders, [it would be] criminal contempt; if he [took] the fifth [amendment to the United States constitution], he [would get an] adverse inference."

The defendants claim on appeal that the court committed error in restricting the scope of Jones' testimony. The majority of the defendants' briefing of this claim focuses on reciting and commenting on the relevant procedural history, iterating the "trilemma" that Jones purportedly faced, and detailing how Jones would have testified but for the court's orders limiting his testimony. The defendants, however, provide no substantive legal analysis examining the propriety of the court's orders imposing limits on Jones' testimony, such as the court's September 13, 2022 order sanctioning the

Lafferty *v.* Jones

defendants for additional discovery violations. Accordingly, we conclude that the defendants have abandoned this claim as a result of their failure to adequately brief it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

IV

The defendants next claim that the trial court improperly denied their motion for a remittitur. We disagree.

The following additional procedural history is relevant to our resolution of this claim. The evidentiary portion of the hearing in damages transpired over the course of several weeks, commencing on September 13, 2022, and concluding on October 5, 2022. The following witnesses testified during the plaintiffs' case-in-chief: (1) the plaintiffs; (2) Alissa Parker, a spouse of one of the plaintiffs; (3) Brittany Paz, a Connecticut attorney who served as a corporate representative of Free Speech Systems, LLC; (4) Clinton Watts, an expert in the field of "identifying analytics and analysis around social media, the Internet, and how it influences people's behavior"; and (5) Jones. The court admitted in full numerous exhibits offered by the plaintiffs, including video clips of Jones' broadcasts. The defendants rested without calling any witnesses or offering any exhibits, except for one exhibit that was marked for identification only.

In its verdict, the jury awarded the plaintiffs a total of $965,000,000 in compensatory damages, which was split into two categories for each plaintiff: (1) "defamation/slander" damages, past and future; and (2) emotional distress damages, past and future. The jury did not divide the $965,000,000 amount evenly among the plaintiffs; rather, other than two plaintiffs who were each awarded $57,600,000, each plaintiff was awarded a distinct amount of compensatory damages.

In moving for a remittitur, the defendants asserted that the jury's verdict was "exorbitant, shock[ed] the

004986

Lafferty *v.* Jones

sense of justice and was influenced by partiality and prejudice." The defendants argued that (1) the plaintiffs failed to submit evidence to aid the jury in calculating compensatory damages, such as medical evidence or expert testimony on the extent of their emotional distress, such that the jury's verdict was predicated on speculation and was motivated by prejudice and passion, (2) the jury, in essence, awarded the plaintiffs punitive damages rather than compensatory damages, and (3) the defendants' right to due process was violated as a result of the plaintiffs' failure to submit evidence estimating their damages. The plaintiffs filed a memorandum of law in opposition to the motion for a remittitur, refuting the defendants' arguments.

In denying the defendants' motion for a remittitur, the court stated: "The defendants take the position, in a conclusory manner unsupported by any evidence or case law, that the verdict was 'exorbitant' and the result of 'passion and prejudice.' They argue—again, unsupported by any law—that due process requires that the plaintiffs are responsible for establishing what they think would make them whole—that is, that the plaintiffs should have been required to offer evidence as to the amount they sought in compensatory damages. As the plaintiffs point out, the defendants cite no transcript, exhibits, or case law to even begin to carry their burden of showing manifest injustice.[36] Here, the overwhelming evidence of the plaintiffs' injuries and damages, in conjunction with the court's instructions on the law, which the jury is presumed to have followed, clearly support[s] the [verdict] rendered by the jury. The size of the [verdict], while substantial, does not so shock the sense of justice as to compel the conclusion

---

[36] In footnotes, the court (1) observed that, in contrast to the defendants' "conclusory motion," the plaintiffs "in their objection painstakingly and accurately highlight[ed] the evidence submitted" and (2) iterated that it was not obligated to consider inadequately briefed claims.

Lafferty *v.* Jones

that the jury was influenced by partiality, prejudice, mistake or corruption, but instead falls within the necessarily uncertain limits of just damages to be determined by the jury. This jury discharged its obligations conscientiously, dutifully, and according to the court's instructions on the law to be applied. This jury was a careful jury whose behavior was beyond reproach; [its] attention to the evidence and instructions from the court is evident from the specific questions [it] asked regarding both the charge and the evidence.[37] In reviewing the evidence in a light most favorable to sustaining the [verdict], the court finds that the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform[s] to spread lies to a massive audience clearly supports the [verdict], and that the [verdict was] within the limits of a fair and just award of damages." (Footnotes added; footnotes omitted.)

Before addressing the defendants' claim, we set forth the following applicable legal principles and standard of review. General Statutes § 52-216a provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

"[I]n determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test [that] must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages

---

[37] The jury submitted several notes during its deliberations.

004988

Lafferty *v.* Jones

or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has awarded damages that] are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. . . . Accordingly, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances . . . and [when] the court can articulate very clear, definite and satisfactory reasons . . . for such interference." (Citation omitted; internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, 331 Conn. 777, 782–83, 208 A.3d 256 (2019). The inquiry into whether a damages award shocks the sense of justice "is not intended to detect the kind of shock that arises from a moral outrage but, instead, refers to the distress that may be felt when the requirement of reasonableness has been abandoned in a setting in which reason is a necessary element of any legitimate outcome. If the verdict cannot be explained rationally, then the trial court may presume that it is tainted by improper considerations." *Maldonado* v. *Flannery*, 343 Conn. 150, 166–67, 272 A.3d 1089 (2022).

"[O]ur review of the trial court's decision [to grant or deny remittitur] requires careful balancing. . . . [T]he decision whether to reduce a jury verdict because it is excessive as a matter of law . . . rests solely within the discretion of the trial court. . . . [T]he same general principles apply to a trial court's decision to order a remittitur. [Consequently], the proper standard of review . . . is that of an abuse of discretion. . . . [T]he ruling of the trial court . . . is entitled to great weight and every reasonable presumption should be

004989

Lafferty *v.* Jones

given in favor of its correctness. . . . The chief ratio-
nale that has been articulated in support of this deferen-
tial standard of review is that the trial court, having
observed the trial and evaluated the testimony first-
hand, is better positioned than a reviewing court to
assess both the aptness of the award and whether the
jury may have been motivated by improper sympathy,
partiality, or prejudice."[38] (Citations omitted; internal
quotation marks omitted.) *Ashmore* v. *Hartford Hospi-
tal*, supra, 331 Conn. 783.

"[A]lthough the trial court has a broad legal discretion
in this area, it is not without its limits. . . . Litigants
have a constitutional right to have factual issues
resolved by the jury. . . . This right embraces the
determination of damages when there is room for a
reasonable difference of opinion among fair-minded
persons as to the amount that should be awarded. . . .
Furthermore, [t]he size of the verdict alone does not
determine whether it is excessive. . . . Thus, [i]n rul-
ing on the motion for remittitur, the trial court [is]
obliged to view the evidence in the light most favorable
to the plaintiff in determining whether the verdict
returned [is] reasonably supported thereby. . . . A
conclusion that the jury exercised merely poor judg-
ment is an insufficient basis for ordering a remittitur.
. . . A generous award of noneconomic damages
should be sustained if it does not shock the sense of
justice. . . . The fact that the jury returns a verdict in
excess of what the trial judge would have awarded does
not alone establish that the verdict was excessive. . . .
[T]he court should not act as the seventh juror with
absolute veto power. Whether the court would have

---

[38] The defendants assert that we should exercise plenary review over their
claim because the jury's verdict "shocks the sense of justice" in violation
of their due process rights. The defendants provide no legal authority in
support of this assertion. We, instead, apply the well settled standard of
review and examine the court's decision for an abuse of discretion.

Lafferty *v.* Jones

reached a different [result] is not in itself decisive. . . . The court's proper function is to determine whether the evidence, reviewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict. . . . In determining whether the court abused its discretion, therefore, we must examine the evidential basis of the verdict itself . . . . [T]he court's action cannot be reviewed in a vacuum. The evidential underpinnings of the verdict itself must be examined." (Internal quotation marks omitted.) *Gois* v. *Asaro*, 150 Conn. App. 442, 457–58, 91 A.3d 513 (2014).

Moreover, "[p]roper compensation for noneconomic damages cannot be computed by a mathematical formula, and there is no precise rule for the assessment of damages. . . . The plaintiff need not prove damages with mathematical exactitude; rather, the plaintiff must provide sufficient evidence for the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) Id., 457; see also *Commission on Human Rights & Opportunities* v. *Cantillon*, 347 Conn. 58, 68–69, 295 A.3d 919 (2023) ("Noneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, this court has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.)).

The defendants assert that a remittitur of the jury's verdict was necessary because the plaintiffs failed to submit sufficient evidence to establish their damages, such as medical evidence or expert testimony concerning their emotional distress, leaving the jury without a means to determine damages other than relying on passion, prejudice, and speculation. The defendants maintain that, rather than prove their damages, the plaintiffs "focus[ed] . . . on arousing sympathy,

Lafferty *v.* Jones

directing anger, and anchoring a large number before the jury[39] with the hope that [the] jurors would do what they did in this case—award a fortune." (Footnote added.) We disagree.[40]

Our review of the record reveals that there was sufficient evidence to support the $965,000,000 in compensatory damages awarded by the jury. All of the plaintiffs

[39] The defendants reference the plaintiffs' closing argument, during which the plaintiffs' counsel, in addressing damages for defamation and slander, proposed that the jury consider (1) picking a number representing a reasonable amount to award to one individual, assuming that a lie about that individual had been told to one person, and (2) multiplying that number first by 550 million, which, according to testimony elicited from Watts, represented the minimum audience that the defendants' lies about Sandy Hook reached between 2012 and 2018, and then by fifteen, or the number of plaintiffs in the underlying consolidated actions.

[40] The defendants raise two additional assertions that we discuss briefly. First, the defendants contend that, to comport with due process, the plaintiffs were required to present evidence that estimated their damages so as to provide "some notice as to the magnitude of [the] harm" suffered. As before the trial court, the defendants have failed to provide any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Moreover, we iterate our Supreme Court's recent statement that "[n]oneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, [our Supreme Court] has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 347 Conn. 68–69. We also observe that, under Connecticut law, in civil actions seeking the recovery of damages resulting from personal injury, counsel is entitled, but not required, to present argument on the amount of past and future noneconomic damages. See General Statutes § 52-216b (a) ("[i]n any civil action to recover damages resulting from personal injury or wrongful death, counsel for any party to the action shall be entitled to specifically articulate to the trier of fact during closing arguments, in lump sums or by mathematical formulae, the amount of past and future economic and noneconomic damages claimed to be recoverable"); see also Practice Book § 16-19 ("In any action seeking damages for injury to the person, the amount demanded in the complaint shall not be disclosed to the jury. In the event that the jury shall return a verdict which exceeds the amount demanded, the judicial authority shall reduce the award to, and render judgment in, the amount demanded. Counsel for any party to the action may

Lafferty *v.* Jones

testified that, in the aftermath of the Sandy Hook massacre, they endured traumatic threats and harassment, conveyed, inter alia, through social media, by mail, or in person, stemming from the lies, as propagated by the defendants, that the Sandy Hook massacre was a hoax. Examples of such threats and harassment included death threats, claims that the plaintiffs were actors, and accusations that the deceased victims of the Sandy Hook massacre were not real or were still alive. Additionally, all of the plaintiffs testified to the mental anguish and emotional harm that they suffered as a result of the harrowing threats and harassment they experienced.[41] The extent of the plaintiffs' damages

articulate to the jury during closing argument a lump sum or mathematical formula as to damages claimed to be recoverable.").

Second, the defendants assert that the jury awarded the plaintiffs punitive, rather than compensatory, damages. The record does not support this assertion. Our review of the court's jury charge reflects that the court instructed the jury that its task was to determine compensatory damages, and the court expressly instructed the jury that, "[u]nder the rule [of] compensatory damages, the purpose of an award of damages is not to punish or penalize the defendants for their wrongdoing but to compensate the plaintiffs for the resulting harms and losses." Moreover, the court separately instructed the jury that (1) the plaintiffs were seeking punitive damages in the form of attorney's fees and costs, and (2) the jury was to determine whether punitive damages were to be awarded, with the court to determine the amount thereof if awarded. In a section of the verdict form titled "Compensatory Damages," the jury awarded the plaintiffs a total of $965,000,000 in damages, comprising past and future "defamation/slander" and emotional distress damages. In a separate section of the verdict form, the jury determined that the plaintiffs were entitled to attorney's fees and costs. The defendants do not challenge the propriety of the jury instructions, and, "in the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that the jury followed them." *Audibert* v. *Halle*, 198 Conn. App. 472, 482, 233 A.3d 1237 (2020). Thus, we reject the defendants' contention that the $965,000,000 awarded by the jury to the plaintiffs constituted punitive, rather than compensatory, damages.

[41] Insofar as the defendants argue that the plaintiffs were required to produce medical or expert testimony to corroborate their testimony concerning their emotional distress, the defendants provide no legal support for this assertion. Cf. *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 707 n.25, 41 A.3d 1013 (2012) (rejecting defendant's argument that plaintiff's testimony regarding emotional distress was insufficient without corroboration by medical or expert testimony).

Lafferty *v.* Jones

was established further by the testimony of Watts, the plaintiffs' social media expert, who testified that, on the basis of data that he reviewed from three social media platforms, namely, YouTube, Facebook, and Twitter, the defendants' lies about the Sandy Hook massacre reached a minimum audience of 550 million people between 2012 and 2018.

In sum, we agree with the court that the evidence supported the jury's verdict and, although substantial, the verdict did not "so [shock] the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, supra, 331 Conn. 782. Accordingly, we conclude that the court did not abuse its discretion in denying the defendants' motion for a remittitur.

V

The defendants' final claim is that the trial court improperly concluded that the plaintiffs asserted a legally viable CUTPA claim. For the reasons that follow, we agree.

We begin with a brief overview of CUTPA. "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . To give effect to its provisions, [General Statutes] § 42-110g (a)[42] of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment

---

[42] General Statutes § 42-110g (a) provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . ."

004994

Lafferty *v.* Jones

of a method, act or practice prohibited by [General Statutes §] 42-110b . . . ." (Footnote added; internal quotation marks omitted.) *Cenatiempo* v. *Bank of America, N.A.*, 333 Conn. 769, 788, 219 A.3d 767 (2019). Section 42-110b (a), in turn, provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 42-110a (4) defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."[43]

The following additional procedural history is relevant to our resolution of this claim. To support their CUTPA claim in their original complaint, in addition to incorporating the allegations of the other claims that they asserted, the plaintiffs alleged, inter alia, that (1) the defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit,"[44] (2) the defendants engaged in a "campaign

---

[43] CUTPA "refers to 'trade or commerce' in the substantive provision, § 42-110b (a), but contains a definition of ' "trade" ' and ' "commerce" ' in the definitions provision, § 42-110a (4). The definition seems to equate the disjunctive with the conjunctive relationship of the two terms and interpret the two terms as having a single meaning or a combined inclusive meaning." R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 n.2.

[44] The plaintiffs further alleged, for instance, that, "[o]nce he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In [Jones'] [I]nternet based and broadcast radio shows, the . . . defendants hawk 'open currency' precious metals, prepackaged food and dietary supplements, 'male enhancement' elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 'lower receivers' (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle). . . . [T]he . . . defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager

of lies, abuse, and harassment, [which constituted] a deceptive practice and offended public policy," (3) the defendants' "reprehensible conduct caused substantial injury to the plaintiffs and other consumers that [was] not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided," (4) the defendants' "conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury," and (5) the defendants "broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false and with reckless disregard as to whether or not they were true."[45]

On October 9, 2020, the Jones defendants filed a motion to strike, asserting in relevant part that the plaintiffs' CUTPA claim was insufficiently pleaded. On April 29, 2021, the plaintiffs filed an objection, and, on June 4, 2021, the Jones defendants filed a reply brief. On November 18, 2021, the court denied the motion to strike. With respect to the plaintiffs' CUTPA claim, the court determined that "[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful to formulate the underlying basis of a CUTPA cause of action. . . . As the court is not striking the plaintiffs' defamation claim, the plaintiffs' [original] complaint sets forth allegations of violations of public policy or otherwise immoral, unethical, oppressive or unscrupulous conduct such that the plaintiffs allege a legally sufficient CUTPA cause of action." (Citations omitted.) The court further determined that the plaintiffs had standing to maintain their CUTPA claim, stating that

to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate[s] those listeners to buy their products." (Footnote omitted.)

[45] The allegations in support of the plaintiffs' CUTPA claim were substantively identical in the plaintiffs' respective original complaints, as well as in their September, 2022 amended complaint.

Lafferty *v.* Jones

"the plaintiffs allege that the [Jones] defendants 'broadcast . . . outrageous, cruel and malicious lies about the plaintiffs' and that '[t]hese acts of the [Jones] defendants resulted in damage to the plaintiffs.' Therefore, the plaintiffs have set forth a colorable claim of direct injury such that they have standing to maintain their CUTPA cause of action."

On October 5, 2022, after the plaintiffs had rested their case-in-chief at the hearing in damages, the defendants' counsel orally moved for a directed verdict and/or to dismiss the plaintiffs' CUTPA claim.[46] The defendants' counsel argued in relevant part that the plaintiffs were asserting a "novel application" of CUTPA because "there is no representation whatsoever that the plaintiffs were harmed in any respect by . . . Jones' commercial activities with respect to the sale of dietary supplements. . . . There is no evidence that anyone was harmed by his commercial activity. . . . [N]othing in [his] speech, or the consequences of that speech, addresses what CUTPA is intended to address . . . and that is whether consumers were harmed by . . . the commercial activity [affecting] trade or commerce. . . . [W]hat we have here is a novel attempt to use CUTPA to silence unpopular speech. . . . So, we think that CUTPA is being used for inappropriate grounds and that the plaintiffs lack standing to bring the action because they cannot establish that they were harmed by . . . Jones' commercial activity. . . . [T]here is no case . . . that supports what the plaintiffs intend to do in this case, and that is [to] use . . . a statute that is designed to protect consumers against unscrupulous trade and commercial practices to attack speech. . . . [N]othing in our law supports an application of CUTPA on the fact[s] as pled and proven in this case." In response, the plaintiffs' counsel argued in relevant part:

---

[46] On October 6, 2022, the defendants filed a written version of their oral motion.

Lafferty *v.* Jones

"With regard to the idea that the CUTPA claim is only about statements, it's not. What it describes is a commercial course of conduct that is built on targeting and victimizing these families by lying about them. So, certainly lies are in the mix, but what the court heard was not just the occasional lie, it's the use of lies to sell products to fuel a business. . . . There is a business plan to hurt these families and to sell things by hurting them. And that has to be . . . remediable under CUTPA . . . ." In rebuttal, the defendants' counsel argued that there was no precedent providing that CUTPA applies when (1) "a person engages in extreme comments and relies on the sale of products to produce that platform" and (2) there is no evidence of harm stemming from the products sold. The court rejected the defendants' claims without additional comment.

Subsequently, in their motion to set aside the jury's verdict, the defendants, in essence, reasserted their prior contention that the plaintiffs' CUTPA claim was legally insufficient. In denying that motion, the court determined in relevant part that "CUTPA serves to deter predatory commercial conduct such as [the conduct alleged by the plaintiffs]. This court, in ruling on the defendants' motion to strike, already determined that '[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful conduct to formulate the basis of a CUTPA cause of action.' The [verdict] rendered by [the] jury [is] not against the law or the evidence."[47]

We construe the crux of the defendants' claim on appeal to be that the conduct at issue alleged by the plaintiffs and admitted by operation of the defendants' default, namely, the defendants' dissemination of lies

_____

[47] The defendants raised additional claims directed to the plaintiffs' CUTPA claim, including that the plaintiffs failed to plead the ascertainable loss element of a CUTPA claim. The court rejected these claims, and the defendants do not pursue these issues on appeal.

004998

Lafferty *v.* Jones

about the Sandy Hook massacre, was insufficient to support a viable CUTPA claim because their actions were not performed "in the conduct of any trade or commerce." General Statutes § 42-110b (a). The defendants posit that no CUTPA claim arises here when (1) they did not lie about or unscrupulously advertise the products that they sold and (2) their actions led to *indirect* commercial gains through product sales. In short, the defendants contend that they engaged in non-commercial speech outside of the scope of CUTPA. The plaintiffs respond that, "[w]hen using lies about [the] plaintiffs to sell supplements, [the defendants were] engaged in 'unfair' and 'deceptive' acts and practices 'in the conduct of' [their] 'trade or commerce.' " We conclude that, as a matter of law, the acts in which the defendants engaged were not "in the conduct of any trade or commerce" as required pursuant to CUTPA. See General Statutes § 42-110b (a).

"The interpretation of pleadings is an issue of law. . . . We conduct a plenary review of the pleadings to determine whether they are sufficient to establish a cause of action upon default." (Citation omitted; internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, 149 Conn. App. 267, 276, 89 A.3d 373 (2014). Moreover, "[w]hether a defendant is subject to CUTPA is a question of law that is subject to plenary review." *NRT New England, LLC* v. *Longo*, 207 Conn. App. 588, 610–11, 263 A.3d 870, cert. denied, 340 Conn. 906, 263 A.3d 821 (2021).

Before turning to the merits of the defendants' claim, we note that the default entered against the defendants does not limit our review of this claim. "An appellate court . . . may examine the allegations of a complaint to ascertain whether they are sufficient on their face to establish a valid claim for the relief requested. . . . Although the failure of a party to deny the material allegations of a pleading operates so as to impliedly

Lafferty *v.* Jones

admit the allegations, a default does not automatically trigger judgment for, or the relief requested by, the pleader. The pleader is entitled to an entry of judgment or a grant of relief as a function of the nonresponsive party's default and the attendant implied admission only when the allegations in the well pleaded filing are sufficient on their face to make out a claim for judgment or relief. . . . While an admission carries with it all reasonable implications of fact and legal conclusions . . . the admission cannot traverse beyond the bounds of the underlying pleading and admit allegations not made by the pleader; the pleading is, unless leave is granted to modify, the ceiling." (Internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, supra, 149 Conn. App. 274–75. "As such, while a default admits the material allegations of the underlying pleading, the question as to whether the default requires judgment in favor of the pleader is to be determined by reference to the sufficiency of the pleading itself." *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 737, 830 A.2d 228 (2003). "Put another way, in both equitable and legal actions, the plaintiff must establish his right to relief to the court's satisfaction, even though some issues may have been laid at rest by the default." (Internal quotation marks omitted.) *Moran* v. *Morneau*, 140 Conn. App. 219, 226, 57 A.3d 872 (2013); see also id., 225 ("[a] default may settle many issues, but it does not operate to insulate a mistaken legal proposition from judicial review").

For CUTPA to apply, there must be an unfair or deceptive act or practice committed "in the conduct of any trade or commerce." General Statutes § 42-110b (a); see also *Cenatiempo* v. *Bank of America, N.A.*, supra, 333 Conn. 789 ("[t]o successfully state a claim for a CUTPA violation, the plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce"); *Pellet* v. *Keller Williams Realty Corp.*,

005000

Lafferty *v.* Jones

177 Conn. App. 42, 62, 172 A.3d 283 (2017) ("[t]he essential elements to pleading a cause of action under CUTPA are: (1) the defendant committed an unfair or deceptive act or practice; (2) *the act complained of was performed in the conduct of trade or commerce*; and (3) the prohibited act was the proximate cause of harm to the plaintiff" (emphasis added)). CUTPA defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4).

"Despite th[e] broad language [of § 42-110a (4)], the definition of trade and commerce is not unlimited and has been used to restrict the application of CUTPA." *Stearns & Wheeler, LLC* v. *Kowalsky Bros., Inc.*, 289 Conn. 1, 11 n.13, 955 A.2d 538 (2008); see also R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 ("[b]ecause CUTPA applies only to acts 'in the conduct of any trade or commerce,' there is a significant limitation on the reach of [CUTPA]" (footnote omitted)); see, e.g., *Sempey* v. *Stamford Hospital*, 194 Conn. App. 505, 518, 221 A.3d 839 (2019) (trial court properly struck CUTPA count predicated on allegations that former employer made false statements to State of Connecticut Unemployment Commission regarding former employee's reliability and integrity because, inter alia, employee failed to allege that employer committed any acts in " 'conduct of any trade or commerce' ").

Exercising our plenary review, we conclude that the facts alleged by the plaintiffs and admitted by the defendants are legally insufficient to satisfy the "trade or commerce" prong of CUTPA. As we have explained, the conduct forming the basis of the plaintiffs' CUTPA

Lafferty *v.* Jones

claim was the defendants' propagation of lies that the Sandy Hook massacre was a hoax. Applying the statutory definition of " '[t]rade' and 'commerce' " set forth in § 42-110a (4) (i.e., "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state"), we cannot conclude that the defendants violated CUTPA in disseminating their lies about the Sandy Hook massacre. That the defendants' speech was motivated by a desire to generate profit through sales of products that the defendants marketed is not adequate to satisfy the "trade or commerce" prong of CUTPA. Indeed, nothing in the defendants' speech, in and of itself, concerning the Sandy Hook massacre made any mention of their products.

In their respective appellate briefs, the plaintiffs and the defendants address our Supreme Court's decision in *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019). In *Soto*, several plaintiffs, acting as the administrators of the estates of nine of the victims of the Sandy Hook massacre; id., 65, 66 n.2; commenced an action against several defendants who were alleged to have manufactured, distributed, and sold (to Lanza's mother) the weapon used by Lanza at Sandy Hook—a Bushmaster XM15-E2S semiautomatic rifle. Id., 65–66. The plaintiffs asserted a number of legal theories seeking to hold the defendants liable in part for the Sandy Hook massacre, most of which our Supreme Court determined to be precluded by Connecticut law and/or the Protection of Lawful Commerce in Arms Act (PLCAA), Pub. L. No. 109-92, 119 Stat. 2095 (2005), codified at 15 U.S.C. §§ 7901 through 7903 (2012). Id., 65.

Lafferty *v.* Jones

Our Supreme Court concluded, however, that the plaintiffs "offered one narrow legal theory" that was recognized pursuant to Connecticut law and not precluded by PLCAA. Id. Specifically, the plaintiffs alleged that "the defendants violated CUTPA[48] by advertising and marketing the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner that promoted illegal offensive use of the rifle" and "that such promotional tactics were causally related to some or all of the injuries that were inflicted during the Sandy Hook massacre." (Footnote added.) Id., 86–87. The trial court struck this CUTPA claim, along with a distinct claim by the plaintiffs alleging that the sale of the XM15-E2S to the civilian market, ipso facto, constituted an unfair trade practice, on the ground that the plaintiffs lacked standing stemming from their status as "third-party victims who did not have a direct consumer, commercial, or competitor relationship . . . with the defendants." Id., 88. Our Supreme Court determined that the trial court erred in striking the plaintiffs' CUTPA claims, reasoning: "Because the principal evils associated with unscrupulous and illegal advertising are not ones that necessarily arise from or infect the relationship between an advertiser and its customers, competitors, or business associates, we hold that a party directly injured by conduct resulting from such advertising can bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant." Id. Our Supreme Court further clarified that it did not "need [to] decide today whether there are other contexts or situations in which parties who do not share a consumer, commercial, or competitor relationship with an alleged wrongdoer may be barred, for prudential or policy reasons, from bringing a CUTPA action. What is

[48] The plaintiffs in *Soto* brought their claims pursuant to Connecticut's wrongful death statute, General Statutes § 52-555, predicated in part on alleged CUTPA violations. *Soto* v. *Bushmaster Firearms International, LLC,* supra, 331 Conn. 67.

005003

Lafferty *v.* Jones

clear is that none of the rationales that underlie the standing doctrine, either generally or in the specific context of unfair trade practice litigation, supports the denial of standing to the plaintiffs in this case." Id., 96. Thus, the court held that the plaintiffs had standing with respect to their "narrow legal theory" under CUTPA because they alleged direct injuries from conduct resulting from wrongful advertising. Id., 65, 99–100.

The allegations underlying the CUTPA claim deemed viable in *Soto* are, however, materially distinguishable from the allegations in the underlying consolidated actions and do not lend the plaintiffs support with respect to their allegation that the defendants acted "in the conduct of any trade or commerce" for purposes of CUTPA. As in *Soto*, the plaintiffs in this case did not allege that they were consumers, competitors, or otherwise in a business or commercial relationship with the defendants. Unlike the plaintiffs in *Soto*, however, the plaintiffs in this case did not allege that they were "directly injured by conduct resulting from" the defendants' advertising or sale of the defendants' products, such that they could "bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant[s]." *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 88. Thus, notwithstanding *Soto*'s elimination of the commercial relationship test, the plaintiffs did not allege direct injury from the defendants' *advertising* or *sale* of the defendants' products and, thus, did not fall within the expansion of CUTPA liability established in *Soto*. Rather, they alleged injuries from the defendants' *false speech* about the Sandy Hook massacre—speech that itself was silent with regard to the defendants' products. Stated differently, the plaintiffs did not allege direct injury from commercial speech relating to the advertising, marketing, or sale of goods, as in *Soto*. To extend CUTPA's reach to provide a remedy (in addition to the torts of

---

Lafferty *v.* Jones

---

invasion of privacy by false light, defamation, defamation per se, and intentional infliction of emotional distress) for content of speech unrelated to the advertising, marketing, or sale of products is simply a bridge too far.

In sum, we conclude that the plaintiffs failed to assert a legally viable CUTPA claim. As a result, the judgments rendered with respect to the plaintiffs' CUTPA claim must be reversed and the attendant award entered pursuant to CUTPA, namely, the $150,000,000 in punitive damages awarded by the court, must be vacated.

The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.

---

# EXHIBIT 6

005006

STATE OF CONNECTICUT
**APPELLATE COURT**

Date: Hartford, December 10, 2024

*To the Chief Clerk of the Appellate Court.*
The Appellate Court has decided the following case:

ERICA LAFFERTY ET AL.
*v.*                                                                    *Opinion by Moll, J.*
ALEX EMRIC JONES ET AL.

WILLIAM SHERLACH
*v.*
ALEX JONES ET AL.

WILLIAM SHERLACH ET AL.
*v.*
ALEX EMRIC JONES ET AL.

Docket Nos. AC 46131 /AC 46132 /AC 46133
Trial Court Docket Nos. UWYCV186046436S /UWYCV186046437S /UWYCV186046438S

   The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

                      Chief Judge

Rescript

# EXHIBITS 7-8

005008

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

  v.

ALEX EMRIC JONES ET AL.

## CORRECTED[1] ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

      Decided April 8, 2025

        By the Court,

         /s/
        Carl D. Cicchetti
        Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S, UWYCV186046437S, UWYCV186046438S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

---

[1] Corrected order issued to include all three trial court docket numbers.

005009

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

### ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

_____/s/_____
Carl D. Cicchetti
Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

005010

# EXHIBIT B

005011

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

## CORRECTED[1] ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

_____/s/_____
Carl D. Cicchetti
Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S, UWYCV186046437S, UWYCV186046438S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

---

[1] Corrected order issued to include all three trial court docket numbers.

005012

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

## ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.


ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

_____/s/_____
Carl D. Cicchetti
Chief Clerk


Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

005013

# EXHIBIT C

005014

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 19, 2023

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 22-33553** |
| ALEXANDER E. JONES, | § | |
| | § | **CHAPTER 11** |
| Debtor. | § | |
| | § | |
| DAVID WHEELER, *et al.*, | § | |
| | § | |
| v. | § | **ADVERSARY NO. 23-03037** |
| | § | |
| ALEXANDER E. JONES, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM DECISION ON CONNECTICUT PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT AGAINST JONES**

Plaintiffs are parents of children murdered in the Sandy Hook Elementary School tragedy and a first responder. Before this bankruptcy case started, the Plaintiffs sued Alexander E. Jones and other defendants in a Connecticut state court. Three years into the litigation, the state court entered a default judgment against Jones based on repeated violations of discovery orders. The default judgment made Jones liable for the defamation and emotional distress claims. And, under Connecticut law, deemed Jones to have admitted all allegations in the Plaintiffs' state court petition. A jury awarded about $1.4 billion in compensatory and punitive damages for defamation, intentional infliction of emotional distress, and the Connecticut Unfair Trade Practices Act claims.

Jones and an entity he owns named Free Speech Systems, LLC filed separate bankruptcy cases in 2022. Free Speech elected to proceed under Subchapter V of the Bankruptcy Code. Jones is in a traditional chapter 11 case, not Subchapter V. This decision involves Jones's case only.

The Bankruptcy Code provides that some debts are excepted from a bankruptcy "discharge" and remain enforceable against the debtor even after a bankruptcy case ends. Plaintiffs started this adversary proceeding seeking an order stating that the debts related to the state court action are excepted from discharge under § 523(a)(6) of the Bankruptcy Code. They also believe that the state court record, including court orders and jury awards, prove that there are no material

1 / 18

005015

issues of disputed fact and that summary judgment is warranted as a matter of law. Jones disagrees.

After careful consideration, and for the reasons explained in detail below, the Court grants summary judgment on all claims, except common-law punitive damages.

## Background

In May 2018, thirteen of the Plaintiffs started the lawsuit captioned *Lafferty, et al. v. Jones, et al.*, UWY-CV-18-6046436-S, in the Judicial District of Fairfield at Bridgeport in Connecticut Superior Court.[1] Then in December 2018 and January 2019, two substantively similar complaints—captioned *Sherlach, et al. v. Jones, et al.*, UWY-CV-18-6046437-S and *Sherlach, et al. v. Jones, et al.*, UWY-CV-18-6046438-S—were consolidated with the *Lafferty* complaint (the "**Connecticut Action**").[2] Plaintiffs alleged the defendants were liable for, among other things, (i) invasion of privacy, (ii) defamation and defamation per se, and (iii) intentional infliction of emotional distress.[3] They also alleged the defendants violated the Connecticut Unfair Trade Practices Act ("**CUTPA**").[4]

In November 2021, the state court entered a default judgment against the defendants for repeated violation of discovery orders.[5] The court stated on the record that the Jones defendants withheld analytics and information that were "critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims."[6] That the "callous disregard of their obligations to fully and fairly comply with discovery and Court orders on its own merits a default against the Jones defendants."[7] And that "the Jones defendants were not just careless" but "their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders" was a "consistent pattern of obstructive conduct."[8]

---

[1] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 1, ECF No. 57-4.

[2] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 2, 3, ECF Nos. 57-5, 57-6.

[3] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶¶ 336–84, 2 at ¶¶ 329–77, and 3 at ¶¶ 416–64, ECF Nos. 57-4, 57-5, 57-6.

[4] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶¶ 385–94, 2 at ¶¶ 378–87, and 3 at ¶¶ 465–74, ECF Nos. 57-4, 57-5, 57-6.

[5] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74, ECF No. 59-24.

[6] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 14:12–15, ECF No. 59-24.

[7] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 14:15–18, ECF No. 59-24.

[8] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 15:1–4, ECF No. 59-24.

2 / 18

The Connecticut Action proceeded to a jury trial on damages for intentional infliction of emotional distress, defamation/defamation per se, invasion of privacy, and CUTPA claims against Jones and Free Speech.[9]

The state court issued lengthy jury instructions. The court instructed jurors that under applicable law, each defendant was responsible for the other's conduct and the entirety of the harm to the Plaintiffs.[10] Here are some of the jury instructions for defamation and intentional infliction of emotional distress:[11]

| Defamation | Intentional Infliction of Emotional Distress |
|---|---|
| Certain defamatory statements, whether orally or in writing, are considered to be so harmful in and of themselves that the person to whom they relate is entitled to recover general damages . . . | The defendants intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of their conduct. |
| The defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large. | The conduct was extreme and outrageous. The conduct was the cause of emotional distress experienced by the plaintiffs. The emotional distress sustained by the plaintiff was severe. |
| The law conclusively presumes that there is injury to the plaintiff's reputation. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover as general damages for the injury to his or her reputation and for the humiliation and mental suffering caused. | It is established that the defendants inflicted such emotional distress on the plaintiffs. |
| [D]efendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public | The court has determined that the defendants are liable for having invaded the privacy of each plaintiff by placing him or her in a false light before the public by publicizing material about him or her that is false and is such a major misrepresentation of his or her |

---

[9] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 6, 11–12, ECF No. 57-21.

[10] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 6, ECF No. 57-21. Thus, any argument that findings about the defendants' conduct do not apply to Jones individually is wrong.

[11] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 12, 14, 15, 23, ECF No. 57-21.

005017

| to investigate and look into the plaintiffs and to the stop the people supposedly being the Sandy Hook hoax. | character, history, activities or beliefs that a reasonable person in the plaintiff's position would either be expected to take serious offense or be justified in feeling offended and aggrieved. |
|---|---|

The state court also instructed the jury it could award common law punitive damages if the defendants' actions were willful, wanton, or malicious.[12] A "willful and malicious" harm was one inflicted intentionally, and "wanton" was "reckless misconduct."[13]

The state court also determined that the defendants were liable for violating CUTPA because "their business conduct was predicated on damaging the plaintiffs and was immoral, unethical, oppressive, or unscrupulous."[14] The jury charge states that the CUTPA claim would be assessed separately by the state court.[15]

In October 2022, the jury awarded the Plaintiffs a total of $965 million in compensatory damages for defamation and emotional distress.[16] The award consisted of $403.6 million in defamation damages and $561.4 million in emotional distress damages. They also awarded common-law punitive damages in an amount left for the state court to award separately.

The Plaintiffs also moved for an award of punitive damages under CUTPA, which Jones opposed.[17] Under Connecticut law, CUTPA claims are determined by a court, not a jury. In November 2022, the state court issued a memorandum opinion setting the jury's award of common-law punitive damages for attorney's fees at $321.65 million and costs of about $1.5 million and awarding CUTPA punitive damages of $150 million.[18] The court found that the defendants (including Jones) engaged in intentional and malicious conduct certain to harm the Plaintiffs:[19]

---

[12] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23–24, ECF No. 57-21.

[13] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[14] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23, ECF No. 57-21.

[15] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23, ECF No. 57-21.

[16] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 19, ECF No. 57-22. The emotional distress damages consisted of damages for invasion of privacy and damages "for other emotional distressed suffered." *See* Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 21, ECF No. 57-21.

[17] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 20, ECF No. 57-23.

[18] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 45–46, ECF No. 58-2.

[19] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 43–44, ECF No. 58-2.

005018

> The defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.
>
> The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience.
>
> The record also establishes that the defendants repeated the conduct and attacks on plaintiffs for nearly a decade, including the trial, wanton, malicious, and heinous conduct that caused harm to the plaintiffs.
>
> This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.[20]

In December 2022, Jones filed his chapter 11 bankruptcy petition.[21] Soon after, this Court entered an agreed order involving Jones, Free Speech, and the Plaintiffs.[22] The agreed order modified the automatic stay to allow the state court to rule on post-trial motions and for any appeals by the defendants to proceed.[23] The Plaintiffs also agreed not to object to an application by Jones and Free Speech to employ their requested appellate counsel.[24] With the automatic stay modified, the state court denied a motion for new trial and Jones appealed the judgments to a Connecticut appellate court.[25]

The Plaintiffs started this adversary proceeding to determine the nondischargeability of the judgment debts against Jones.[26] They seek summary judgment mainly on the theory that the damages opinion, jury verdict, and admitted allegations from the Connecticut Action satisfy the requirements of

---

[20] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 41–44, ECF No. 58-2.

[21] *See* Voluntary Ch. 11 Pet. of Alexander E. Jones, Case No. 22-33553, ECF No. 1.

[22] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[23] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[24] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[25] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 23, 24, ECF No. 58-3, 58-4.

[26] Brief in Supp. of Mot. for Summ. J. at 1, ECF No. 60.

005019

collateral estoppel on the issue of willful and malicious injury under § 523(a)(6).[27] In the alternative, they believe that the state court record establishes willful and malicious injury.[28]

Jones argues that summary judgment is not appropriate because (i) the issue of "willful and malicious injury" was not essential to the judgment in the Connecticut Action, (ii) federal law does not require federal courts to grant full faith and credit to allegedly unconstitutional state court judgments, (iii) public policy concerns about fairness, quality, and extent of the Connecticut Action outweigh any convenience afforded by the finality of judgment, (iv) collateral estoppel should not be applied when it appears the prior proceeding was skewed with the intent to obtain a non-dischargeable judgment in anticipation of bankruptcy, and (v) the record evidence produced by the Plaintiffs does not independently establish that they are entitled to judgment as a matter of law on a § 523(a)(6) claim.[29]

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction under 28 U.S.C. § 1334. The parties' express and implied consent also provides this Court constitutional authority to enter a final judgment under *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–83 (2015) and *Kingdom Fresh Produce, Inc. v. Stokes Law Off., L.L.P. (In re Delta Produce, L.P.)*, 845 F.3d 609, 617 (5th Cir. 2016).

## Legal Standard

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment, "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 in adversary proceedings. FED. R. BANKR. P. 7056. A movant is entitled to summary judgment by showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A material fact is one that might affect the outcome of the suit under governing law." *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018).

Plaintiffs, as the movants here, bear the burden of proof at trial. So they must show the lack of a genuine issue of disputed fact that entitles them to judgment as a matter of law. If successful, the burden shifts to the nonmovant, Jones, to identify specific record evidence and articulate precisely how the evidence

---

[27] Brief in Supp. of Mot. for Summ. J. at 2–3, ECF No. 60.

[28] Brief in Supp. of Mot. for Summ. J. at 3, ECF No. 60.

[29] Def.'s Resp. to Mot. for Summ. J. at 10–12, ECF No. 61.

6 / 18

purports to defeat summary judgment. *See Matson v. Sanderson Farms, Inc.*, 388 F. Supp. 3d 853, 869 (S.D. Tex. 2019) (citing *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014)). In determining whether summary judgment is appropriate, all inferences are drawn in Jones's favor. *See Harville v. City of Houston, Mississippi,* 945 F.3d 870, 874 (5th Cir. 2019).

<u>Analysis</u>

Interpreting the Bankruptcy Code begins with analyzing the text. *See Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha."); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

## I.      Section 523(a)(6) and Collateral Estoppel

A creditor must prove nondischargeability of a debt by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991). Section 523(a) of the Bankruptcy Code excepts certain debts from discharge against an individual debtor. The Bankruptcy Code defines a "debt" as a "liability on a claim." 11 U.S.C. § 101(12). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed . . . ." § 101(5).

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity. . . ." The Bankruptcy Code does not define "willful" or "malicious." In *Kawaauhau v. Geiger*, the U.S. Supreme Court held that a "willful and malicious injury" means a "deliberate or intentional injury." 523 U.S. 57, 61 (1998). This means that there must be intent to cause the injury, not just the act which leads to the injury. *Id.* at 61–62. In the Fifth Circuit, intent to cause injury exists "where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *In re Shcolnik*, 670 F.3d 624, 629 (5th Cir. 2012) (quoting *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998)). The objective standard requires a court to analyze from a reasonable person's perspective "whether the defendant's actions were substantially certain to cause harm, [and] are such that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the plaintiff." *Chowdary v. Ozcelebi (In re Ozcelebi),* 640 B.R. 884, 905 (Bankr. S.D. Tex. 2022) (citing *Berry v. Vollbracht (In re Vollbracht),* 276 Fed. App'x. 360, 361–62 (5th Cir. 2007)). Substantial certainty does not mean absolute certainty, but it must be something more than a high probability. *See Mahadevan v. Bikkina (In re Mahadevan)*, 617 F.

005021

Supp. 3d 654, 660 (S.D. Tex. 2022) (citing *In re D'Amico*, 509 B.R. 550, 561 (S.D. Tex. 2014)).[30]

Because of this intent requirement, debts arising from reckless or negligently inflicted injuries are not excepted under § 523(a)(6). *Geiger*, 523 U.S. at 64. For example, debts related to a debtor's act of intentionally driving a car into a crowded bar and killing a creditor's relatives were found to be based on willful and malicious injuries. *See Mahadevan*, 617 F. Supp. 3d at 660 (citing *Red v. Baum (In re Red)*, 96 F. App'x 229, 230 (5th Cir. 2004)). But debts related to a debtor's act of illegally selling a rifle to an individual, who years later shot people, were not based on a willful and malicious injury. *See Leyva et al. v. Braziel (In re Braziel)*, 653 B.R. 537, 558 (Bankr. N.D. Tex. 2023). The debtor intended to sell the rifle to the third party. *Id.* at 557. And while the sale itself was an intentional illegal act, it was not an act intended to harm the victims under either an objective or subjective standard. *Id.*

Plaintiffs can invoke collateral estoppel to establish that a debt is nondischargeable. *See Grogan v. Garner,* 498 U.S. 279, 284 n.11 (1991) ("We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)."). Collateral estoppel prevents parties from relitigating issues of fact that were already "determined by a valid and final judgment" in a prior lawsuit in any future lawsuit involving the same parties. *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Federal courts must give full faith and credit to state-court judgments. *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986) ("[U]nder the Full Faith and Credit Act a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give."); *Shimon v. Sewerage & Water Bd. Of New Orleans,* 565 F.3d 195, 199 (5th Cir. 2009) (quoting *Parsons Steel*).

The laws of the state in which the judgments were entered determine whether collateral estoppel applies. *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1201 (5th Cir. 1996). A Connecticut state court entered the judgment, so the Connecticut rules of issue preclusion apply here. Under Connecticut law, collateral estoppel "prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim." *Lighthouse Landings, Inc. v. Conn. Light & Power Co.*, 15 A.3d 601, 613 (Conn. 2011). Plaintiffs must establish that: "[1] [t]he issue must have been fully and fairly litigated in the first action, [2] it must have been actually decided, and [3] the decision must have been necessary to the judgment." *Wiacek Farms,*

---

[30] The plain meaning of willful and malicious tracks the objective and subjective tests under *Shcolnik* and *Miller*. Willful means "done deliberately: intentional." *Willful*, Merriam-Webster Online Dictionary (https://www.merriam-webster.com/dictionary/willful) (last visited Oct. 17, 2023). And malicious means "having or shown a desire to cause harm to someone" Malicious, Merriam-Webster Online Dictionary (https://www.merriam webster.com/dictionary/malicious) (last visited Oct. 17, 2023).

*LLC v. City of Shelton*, 30 A.3d 27, 32 (Conn. 2011) (quoting *Busconi v. Dighello*, 668 A.2d 716, 723 (Conn. App. Ct. 1995)).

An issue is actually litigated if it was "properly raised in the pleadings or otherwise, submitted for determination, and in fact determined." *See Solon v. Slater*, 287 A.3d 574, 586 (Conn. 2023). Fully and fairly litigated means that the party to be estopped "had an adequate opportunity to litigate the matter in the earlier proceeding." *Custom Pools v. Underwriters Inc.*, No. CV 940135908, 1996 WL 66264, at *2 (Conn. Super. Ct. Jan. 19, 1996); *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993). To be necessary to the judgment, the determination of the issue must have been central to the judgment rendered (i.e., the judgment could not have been rendered without the determination). *See Wiacek Farms*, 30 A.3d at 32. In other words, "an issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered." *Cumberland Farms, Inc. v. Town of Groton*, 808 A.2d 1107, 1116 n.17 (Conn. 2002) (internal citations omitted). It is not enough that a fact could have been determined by the prior court but was not. *World Wrestling Entm't, Inc. v. THQ, Inc.*, No. X05CV065002512S, 2008 WL 4307568, at *6 (Conn. Super. Ct. Aug. 29, 2008) (citing *State v. Aparo*, 614 A.2d 401, 412 (Conn. 1992)).

Connecticut courts also note that there must be an identity of issues between the state court action and the issues to be decided here before collateral estoppel applies. *See, e.g.*, *Peterson v. iCare Mgmt., LLC*, 250 A.3d 720, 729 (Conn. 2021). This requires a court to assess the facts underlying a plaintiff's claim in the first proceeding. *See Solon*, 287 A.3d at 587. A court should determine "what facts were necessarily determined in the first trial, and must then assess whether the [party] is attempting to relitigate those facts in the second proceeding." *Id.* (quoting *Aetna Casualty & Sur. Co. v. Jones*, 596 A.2d 414, 421 (Conn. 1991)). Plaintiffs bear the burden of showing collateral estoppel applies here.

A bankruptcy court does not necessarily need a full state court record to apply collateral estoppel. *See Fielder v. King (In re King)*, 103 F.3d 17, 19 n.1 (5th Cir. 1997). But a state court record devoid of factual findings to support a dischargeability determination is not entitled to summary judgment. *See Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir. 1997) (denying application of collateral estoppel where state court record lacked findings of fact).

## II.    Summary Judgment is Granted on Compensatory Damages

### A.    The issues were "fully and fairly litigated" and "actually decided"

Under Connecticut law, the allegations in a petition are deemed admitted, and the defendant's liability is established if a default judgment is entered against a defendant based on discovery abuse. *Smith v. Snyder*, 839 A.2d 589, 598 (Conn. 2004). "[A] default judgment is a decision on the merits and has the same preclusive

005023

effect as any other judgment decided on its merits, so long as the party who is precluded had an 'adequate opportunity to litigate the matter in the earlier proceeding.'" *Leblanc-Jones v. Massie (In re Massie)*, No. 14-50579, 2018 WL 3218847, at *3 (Bankr. D. Conn. June 29, 2018) (quoting *State v. Ellis*, 497 A.2d 974, 989 n.22 (Conn. 1985)).

As noted above, the fully and fairly litigated prong is satisfied under Connecticut law where there is opportunity to litigate the matter, whether or not the defendant benefits from it. *Custom Pools*, 1996 WL 66264, at *2. Jones had the opportunity to participate in the state court litigation for three years before the default judgment was entered. He then participated in the damages trial and presented evidence on that issue. He also submitted argument before the state court ruled on common-law and CUTPA punitive damages. Thus, finding that the state court default judgment order and the resulting damages awards have the effect of fully and fairly adjudicating the issues decided in connection with the defamation, intentional infliction of emotional distress, and CUTPA claims is consistent the reasoning and holdings in Connecticut cases.

Jones argues that the precise issue of "willful and malicious injury" was not litigated in the Connecticut Action and that he did not have a chance to present certain defenses at trial. Neither argument changes the outcome here. Remember that Connecticut law focuses on the facts underlying the claims to determine identity of issues, and here those facts show identical issues. *See Solon*, 287 A.3d at 587. Federal courts focus on whether a state court made specific findings about an injury to a plaintiff that meets the test for willful and maliciousness under § 523(a)(6), and not the specific label of "willful and malicious." *See, e.g.*, *Mahadevan*, 617 F. Supp. 3d at 660 (analyzing collateral estoppel principles on defamation and intentional infliction of emotional distress claims); *In re Scarbrough*, 516 B.R. 897 (Bankr. W.D. Tex. 2014) (same); *Guion v. Sims (In re Sims)*, 479 B.R. 415, 421 (Bankr. S.D. Tex. 2012) (same).

The Plaintiffs' complaints contain multiple well pleaded allegations about Jones's intent to cause the Plaintiffs harm or substantial certainty that Jones's actions would cause harm, all of which are deemed admitted as a result of the default judgment. They, along with the jury award, also constitute fully and fairly adjudicated issues (and actually decided ones) for purposes of collateral estoppel.

- "Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse."[31]

---

[31] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ₧ 7, 3 at ₧ 7, ECF Nos. 57-4, 57-6.

005024

- "Jones . . . has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence."[32]

- "Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax — and he never has."[33]

- "Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year."[34]

- "As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people."[35]

- "On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."[36]

- "Jones and Infowars purposefully sought to direct their message and spur 'investigation' of the Sandy Hook families."[37]

- "Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners . . ."[38]

---

[32] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 8, 3 at ¶ 8, ECF Nos. 57-4, 57-6.

[33] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 9, 3 at ¶ 9, ECF Nos. 57-4, 57-6.

[34] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 11, 3 at ¶ 11, ECF Nos. 57-4, 57-6.

[35] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 13, 3 at ¶ 13, ECF Nos. 57-4, 57-6.

[36] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 14, 3 at ¶ 14, ECF Nos. 57-4, 57-6.

[37] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 83, 3 at ¶ 89, ECF Nos. 57-4, 57-6.

[38] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 97, 3 at ¶ 103, ECF Nos. 57-4, 57-6.

11 / 18

005025

- "The defendants' outrageous, cruel and malicious conduct was the cause of the plaintiff's distress."[39]

- "The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs. . ."[40]

- "The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[41]

- "The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages."[42]

Jones tries to argue that these issues were not fully and fairly litigated because there was never a trial on liability. But the argument lacks merit because of the legal effect of the default judgment. Jones also claims he was deprived of certain constitutional rights by the state court. This Court cleared the runway for Jones to appeal the Connecticut judgment, including the amount of punitive damages, and nothing in this bankruptcy case affects that appellate right. He may raise complaints about not being permitted the right to argue certain defenses at the damages trial or his constitutional arguments with the appropriate state appellate forum. It is not, however, a basis for this Court to ignore the plain language of the state court's default judgment or the damages awards. A right to appeal the state court's decision aside, the fully and fairly litigated and actually decided prongs are satisfied. *See, e.g.*, *Sims*, 479 B.R. at 421 (citing *Prager v. El Paso Nat. Bank,* 417 F.2d 1111, 1112 (5th Cir. 1969)); *In re Dahlin*, No. 16-36169, 2018 WL 2670501, at *4 (Bankr. S.D. Tex. May 16, 2018) (finding that, under full faith and credit, defendant could not argue against nondischargeability because death penalty sanctions were improperly ordered). The Court rejects Jones's argument that it does not have to give full faith and credit to the state court default judgment order or the resulting damages awards.

---

[39] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 377, 3 at ¶ 457, ECF Nos. 57-4, 57-6.

[40] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 337, 3 at ¶ 417, ECF Nos. 57-4, 57-6.

[41] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 365, 3 at ¶ 445, ECF Nos. 57-4, 57-6.

[42] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 14, 3 at ¶ 433, ECF Nos. 57-4, 57-6.

005026

This Court also agrees with the reasoning in cases like *Herbstein v. Bretman*, 266 B.R. 676, 685 (N.D. Ill. 2001), which held:

> [W]here [a litigant] participated extensively then failed to comply with an express court order issued multiple times at a risk of incurring default, [then] we agree with the Bankruptcy Court . . . that [the litigant] should not now be able to sidestep the collateral estoppel doctrine and litigate an issue in this forum that was forestalled in [another court] due solely to [the litigant's] decisions. [The litigant] is not entitled to a second bite at the apple. The issue underlying the … default judgment were "actually litigated" for purposes of the collateral estoppel doctrine.

## B. The issues were necessary to the judgment, including the jury award of damages

The findings about Jones's willful and malicious injury to the Plaintiffs' were also necessary to the judgment and the jury award of damages.

A defamatory statement is "a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Hopkins v. O'Connor,* 925 A.2d 1030, 1042 (Conn. 2007). To establish a prima facie case of defamation in Connecticut, the plaintiff must show that the defendant published a defamatory statement, which identified the plaintiff to a third person, and that the plaintiff's reputation suffered because of the statement. *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759, 763–64 (Conn. 2004).

As noted earlier, the jury was instructed, among other things, that "the defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large."[43] The jury was also instructed that the Jones defendants proximately harmed the Plaintiffs by spreading lies about them to their audience and the public by urging people to investigate the Plaintiffs about the alleged "Sandy Hook hoax."[44]

To establish intentional infliction of emotional distress under Connecticut law, a plaintiff must show: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the

---

[43] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 14, ECF No. 57-21.

[44] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 15, ECF No. 57-21.

13 / 18

005027

emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Educ.,* 757 A.2d 1059, 1062 (Conn. 2000) (internal quotation marks omitted) (quoting *Petyan v. Ellis*, 510 A.2d 1337, 1342 (Conn. 1986)).

The jury was instructed, among other things, that the defendants were liable for intentional infliction of emotional distress:

> These four elements thus have been established. One, the defendants intended to inflict emotional distress or the defendants knew or should have known that emotional distress was the likely result of their conduct. Two, that the conduct was extreme and outrageous. Three, that the conduct was the cause of emotional distress experienced by the plaintiff; and four, that the emotional distress sustained by the plaintiff was severe.

Thus, there are specific findings about an objective certainty of harm and a subjective motive to cause harm in connection with the defamation and intentional infliction of emotional distress claims. These are findings about a deliberate and intentional act meant to cause injury, not just a deliberate act that leads to injury. The jury considered damages in a multi-day trial and awarded damages based on these findings.

Nothing in the jury instruction for defamation or intentional infliction of emotional distress contemplates that a lesser standard of intent should apply to Jones's knowledge of the injury. Therefore, the damages for defamation and intentional infliction of emotional distress were necessarily awarded based on the finding that Jones intended to harm the Plaintiffs. On compensatory damages, the jury charge contains specific findings premised on the default judgment—not a broad general charge lacking in detail. This Court focuses on what the jury charge actually says, and not what it *could* say or *could* imply.

This case is like the bankruptcy court decision in *In re Scarbrough*. In *Scarbrough*, state court findings about a debtor's actions supported a finding that the debtor acted with a subjective motive to cause harm, so the debt was nondischargeable under § 523(a)(6). *Scarbrough*, 516 B.R. at 912. The state court findings included, for example, that the debtor damaged another's reputation and failed to turn over evidence for the express purpose of causing that party harm so the debtor could win his case. *Id.* at 905. The defamation jury instruction was that the debtor made statements he "knew were false or which he made with a high degree of awareness that were probably false, to an extent that he in fact had serious doubts as to the truth of the statement(s)." *Id.* at 912. That instruction mirrors the defamation instruction in this case.

14 / 18

005028

The Fifth Circuit Court of Appeals later affirmed the bankruptcy court's holding. *Scarbrough v. Purser (In re Scarbrough)*, 836 F.3d 447, 456 (5th Cir. 2016). The Fifth Circuit held that the jury's finding of damages for defamation independently supported the judgment, was binding, and precluded relitigating that issue in another case. *Id.* Therefore, in Jones's case, the language of the jury instruction confirms that the damages awarded flow from the allegation of intent to harm the Plaintiffs—not allegations of recklessness. *See Caton v. Trudeau (In re Caton)*, 157 F.3d 1026, 1029 (5th Cir. 1998), *as amended on reh'g* (Nov. 3, 1998) (finding that the factual allegations on which liability was based in a state court proceeding showed that the defendant acted with intent to cause injury). Summary judgment on the nondischargeability of the jury awards for compensatory damages is granted.[45]

### III.    Summary Judgment is Granted on CUTPA Punitive Damages

For the reasons explained above, the issue of willful and malicious injury was also fully and fairly (and finally) litigated in relation to the CUTPA punitive damages award. Jones had the opportunity to participate in the state court litigation, and he did so. He also submitted argument about CUTPA punitive damages.

The findings on willful and maliciousness were also necessary to the judgment. These findings were actually litigated and determined. There is no question that the issues to be estopped are identical. The state court issued a 45-page opinion on the CUTPA and common law punitive damages.[46] The court determined that the material allegations in the Plaintiffs' complaints, "which have been established by virtue of the defaults" entitled them to an award of CUTPA punitive damages. On CUTPA punitive damages, the court stated it assessed factors such as (i) the degree of the defendants' relative blameworthiness— whether it was reckless, intentional, or malicious; (ii) whether the defendant's action was taken or omitted to augment profit; (iii) whether the wrongdoing was hard to detect; (iv) whether the injury and compensatory damages were small, providing a low incentive to bring the action; and (v) whether the award will deter the defendant and others from similar conduct.[47]

The court considered the degree of blameworthiness the most important consideration and found that Jones's actions were intentional and malicious, and

---

[45] The ultimate amount of this nondischargeable debt could change if Jones succeeds on his state court appeal.

[46] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 39, ECF No. 58-2.

[47] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 29–30, ECF No. 58-2 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 418 (2003)).

15 / 18

005029

awarded punitive damages based on these findings.[48] The state court did not base any of the CUTPA punitive damages on recklessness:

> The record clearly supports the plaintiffs' argument that *the defendants' conduct was intentional and malicious, and certain to cause harm* by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." . . . This depravity, and cruel, persistent course of conduct by the defendants establishes *the highest degree of reprehensibility and blameworthiness.* . . Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.[49]

These are specific findings about an objective certainty of harm and a subjective motive to cause harm in connection with the defamation and intentional infliction of emotional distress claims. They are not, as Jones argues, superfluous findings about intent related to the Plaintiffs' harm. It is irrelevant that the state court could have awarded damages on reckless acts. What is important is what the court actually did. Here there are findings about a deliberate and intentional act meant to cause injury, not just a deliberate act that leads to injury. The state court also considered the additional factors listed above, but the focus remained on willful and intentional acts, and not on a lesser standard like recklessness.

In sum, the state court made specific findings that went directly to the amount of punitive damages. They were necessary to the judgment. So summary judgment is granted on the debt for CUTPA punitive damages.

## IV. Summary Judgment is Denied on Common-law Punitive Damages

In Connecticut, common-law punitive damages are limited to the expense of litigation (attorneys' fees and costs) less taxable costs. *See, e.g.*, *Bifolck v. Philip Morris, Inc.*, 152 A.3d 1183, 1213 (Conn. 2016). The jury charge instructed that common-law punitive damages could be awarded if the defendants' actions were willful, wanton, or malicious.[50] A willful and malicious harm is based on an intent without just cause or excuse.[51] And "the intentional injury aspect may be satisfied if

---

[48] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 43, ECF No. 58-2.

[49] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 44–45, ECF No. 58-2.

[50] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[51] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

16 / 18

005030

the resultant harm was the direct and natural consequence of the intended act."[52] But wanton misconduct is defined as "reckless misconduct."[53]

There are bankruptcy cases holding that punitive damages should be found nondischargeable based on findings of willful and malicious injury when the compensatory damages and punitive damages flow from the same conduct. *See, e.g.*, *Macris v. Saxton (In re Saxton)*, No. 10-44412, 2011 WL 2293320, at *8 (Bankr. N.D. Tex. June 8, 2011). In *Gober*, the Fifth Circuit held that "the status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt. When the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable." *Gober*, 100 F.3d at 1208.

It is logical to presume that the findings of willful and malicious injuries based on defamation and intentional infliction of emotional distress were necessary to the award of common-law punitive damages. But unlike the instructions for defamation and intentional infliction of emotional distress, the jury had a right to award common-law punitive damages based on reckless actions *or* actual intent to cause harm. This proves fatal on summary judgment.

Under Fifth Circuit law, recklessness does not meet the standard for willful and malicious injury under § 523(a)(6). *Miller*, 156 F.3d at 603. And there must be intent to cause the injury, not just an act which leads to the injury. *Kawaauhau*, 523 U.S. at 61–62. The record is not expressly clear on whether the damages were solely based on willfulness and maliciousness. Thus, summary judgment is denied on the debt for common-law punitive damages.

## V.    Summary Judgment does not Violate Policy or Jones's Constitutional Rights

Finally, Jones argues that the Court should not grant summary judgment because the state court judgment was entered in anticipation of this bankruptcy proceeding. But there is no evidence of manipulation that even remotely warrants serious consideration of this argument based on the record before the Court. This ancillary argument, and related arguments by Jones about his disagreements with the state court default judgment order and damages awards do not change the

---

[52] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[53] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

17 / 18

005031

outcome.[54] Again, he can make such argument to the appropriate state appellate court.

### Conclusion

For the reasons stated above:

1. Summary judgment is granted on the $965 million debt for compensatory damages awarded in the Connecticut Action for defamation and intentional infliction of emotional distress.

2. Summary judgment is granted on the $150 million debt for CUTPA punitive damages.

3. Summary judgment is denied on the $321.65 million in attorneys' fees and $1,489,555.94 in costs awarded as common law punitive damages.

4. All other objections raised by Jones not specifically addressed above are denied.

Signed: October 19, 2023

_____
Christopher Lopez
United States Bankruptcy Judge

---

[54] Jones also makes several arguments best described as grounds for appeal which this Court declines to address (for example, Jones argues that the CUTPA award was improper based on the allegations in the complaints). Def.'s Resp. to Mot. for Summ. J. at 43, ECF No. 61. These arguments are rejected.

18 / 18

005032

# EXHIBIT D

005033

# Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073

Docket Number: AC46131
Issue Date: 5/13/2025
Sent By: Supreme/Appellate

---

**Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073**

AC46131    ERICA LAFFERTY ET AL. v. ALEX EMRIC JONES ET AL.

Notice Issued: 5/13/2025 9:08:23 AM

**Notice Content:**

**Motion Filed: 4/28/2025**
**Motion Filed By: Alex E Jones**
                **Free Speech Systems, Llc**

**Order Date: 05/13/2025**

**Order: Denied**

By the Court
Notice sent to Counsel of Record

005034

# EXHIBIT E

005035

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, | § | IN THE DISTRICT COURT |
| Plaintiffs | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| Defendants | § | 261st JUDICIAL DISTRICT |

**DECLARATION OF AVI MOSHENBERG**

1. "My name is Avi Moshenberg. I am over the age of twenty-one years and am fully competent to make this Declaration. I have personal knowledge of the facts stated in this Declaration, which are true and correct.

2. "I am an attorney in the law firm of Lawson & Moshenberg PLLC and licensed to practice law in the State of Texas. I am one of the attorneys of record for Neil Heslin and Scarlett Lewis (collectively, the Texas Families or the Judgment Creditors). I am authorized to make this Declaration on behalf of the Judgment Creditors.

3. "Judgment Creditors own judgments against Alexander Emric Jones and Free Speech Systems, LLC (the Judgment Debtors). The last known address of Alexander Emric Jones is: Alexander Emric Jones c/o Shelby A. Jordan, Jordan & Ortiz, P.C., 500 North Shoreline Blvd., Suite 804, Corpus Christi, Texas 78401; Alexander Emric Jones c/o Ben C. Broocks, Broocks Law Firm PLLC, 248 Addie Roy Road, Suite B301, Austin, Texas 78746. The last known address of Free Speech Systems, LLC and the address currently registered with the Texas Secretary of State is: Free Speech Systems, LLC, ATTN: Alex Jones or Authorized Agent, P.O. Box 19549, Austin, Texas 78760. The post office address of the

005036

- 2 -

Judgment Creditors is the Texas Families c/o Avi Moshenberg, 2301 Commerce Street, Houston, Texas 77002.

4. "Judgment Debtors owe $50,043,923.80 under the Judgments rendered before the 261st District Court of Travis County, Docket No. D-1-GN-18-001835 (the Texas Judgments).  The Texas Judgments are comprised of two documents:  the jury verdict and final judgment.  Authenticated copies that are sealed and signed are being filed contemporaneously with this Declaration.

**Oath**

My date of birth is March 16, 1986 and my business address is 2301 Commerce Street, Suite 200, Houston, Texas, 77002, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on July 1, 2025.

_____
Avi Moshenberg

- 2 -

005037

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, Plaintiffs | § § § | IN THE DISTRICT COURT |
| vs. | § § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and FREE SPEECH SYSTEMS, LLC, Defendants | § § § § | 261st JUDICIAL DISTRICT |

## ORDER GRANTING APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTORS ALEXANDER E. JONES AND FREE SPEECH SYSTEMS, LLC

The Court has considered Judgment Creditors' Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC (the Application) and the record properly before it.

**The Court FINDS that** it has jurisdiction over this proceeding and can proceed in granting the relief set forth herein immediately. *See* TEX. CIV. PRAC. & REM. CODE 31.002.

**The Court also FINDS that** the judgment in Cause No. CV-18-6046437 rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut (the Connecticut Families' Judgment) and that the judgment rendered in Cause No. D-1-GN-18-001835 before the 261st Judicial District Court of Travis County, Texas (the Texas Families' Judgment) (collectively, the Judgments, held by, collectively, the Judgment Creditors) are valid, final, and payable. Judgment Debtor Alexander E. Jones and Judgment Debtor Free Speech Systems, LLC (together, the Judgment Debtors and each a Judgment Debtor) owe, jointly and severally, $1,288,139,555.94 under the Connecticut Families' Judgment and $50,043,923.80 under the Texas Families' Judgment. There have been no applicable credits, payments, or offsets.

005038

**The Court also FINDS that** the Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act.

**The Court also FINDS that** Judgment Debtor Alexander E. Jones (also referred to in this Order as Alex E. Jones and Alex Jones) filed for bankruptcy under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) on December 2, 2022 (the Jones Petition Date) in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) pending as case no. 22-33553 (the Jones Bankruptcy Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy. Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 19, 2023 Memorandum Decision granting the Connecticut Families' Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable. Following a hearing on June 14, 2024, the Bankruptcy Court converted the Jones Bankruptcy Case from chapter 11 to chapter 7 and appointed Christopher R. Murray as chapter 7 trustee (the Trustee) for the applicable chapter 7 bankruptcy estate (the Chapter 7 Estate).

**The Court also FINDS that** the Judgments remain unsatisfied; that Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC own property that is not

exempt from attachment, execution, or seizure for the satisfaction of the Judgments; and that Judgment Creditors are entitled to the Court's aid in reaching Judgment Debtors' nonexempt property to satisfy the Judgments.

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

(i)     as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee), and

(ii)    as to Judgment Debtor Alex Jones:

    a.  all non-exempt assets, including assets he may acquire in the future, that are not property of the Chapter 7 Estate;

    b.  any assets of his Chapter 7 Estate that the Trustee expressly abandons; and

    c.  any payments Judgment Debtor Alex Jones is contractually entitled to that are not property of the Chapter 7 Estate, including any payable after June 14, 2024, the date the Bankruptcy Court converted the Jones Bankruptcy Case to chapter 7 (the Conversion Date).

In this Order, the definition of "Turnover Property" also includes all additional and specific property or assets of any kind covered by the ordering paragraphs below. Judgment Creditors reserve all rights they may have to execute upon the Judgments in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtors.

**The Court also FINDS that** the Judgments are final and remain unpaid. Based on the entire record, including the Application and evidence attached that is admitted in support of the Application, **the Court FINDS that** the Application should be granted.

It is therefore **ORDERED** that the Application is **GRANTED**, and Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (Receiver) is appointed under Texas Civil Practice and Remedies Code § 31.002 with authority to take possession of all the Turnover Property, sell the Turnover Property, and pay the proceeds to Judgment Creditors to the extent required to satisfy the Judgments. The Turnover Property may include but is not limited to financial accounts, certificates of deposit, cryptocurrency accounts, and money-market accounts held by a third party. Notwithstanding anything in this Order to the contrary, nothing in this Order shall authorize any party, including the Receiver or Judgment Creditors, to take any action that would be inconsistent with the pending Jones Bankruptcy Case, including seeking any relief with respect to assets that constitute property of the Chapter 7 Estate unless approved by the Bankruptcy Court.

1.    **Receiver's Information**.

> Name: Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (HMP)
>
> Address: 8911 North Capital of Texas Highway Suite 2120 Austin, Texas 78759
>
> Telephone Number: (512) 892-0803
>
> Email Address: gmilligan@harneypartners.com

2.    **Custodia Legis**.  The entry of this Order creates a receivership estate wherein all of Judgment Debtors' respective Turnover Property shall be held in *custodia legis* by the receivership as of the date of this Order.  The receivership owns all Turnover Property regardless of whether Receiver takes actual possession of the property. The Receiver may decline to collect or abandon any Turnover Property the Receiver determines, in his sole discretion, to be burdensome, cumbersome, or of *de minimis* value. The Receiver is authorized to raise any issue with the Court, to request and to meet *in camera* with the Court without notice, and to file any motion (in this Court, the Bankruptcy Court, or any other applicable court) the Receiver deems appropriate.

3.    **Turnover**. The Judgment Debtors shall turnover to Receiver all Turnover Property, including all documents related to such property, **within five days** of the Judgment Creditors service of a copy of this Order on the Judgment Debtors or their counsel.  All third parties in possession of any Turnover Property that is subject to any Judgment Debtors' control shall turnover such property to Receiver within five days of being served notice of this Order.  The turnover by Judgment Debtors shall include at least the following documents (for the period of at least the preceding 48 months from the date of this Order, except where otherwise indicated): (1) canceled checks; (2) bank

statements, pass books, and other bank or financial institution records; (3) federal income and state franchise tax returns; (4) life insurance policies (regardless of date); (5) all motor vehicle Certificates of Title (regardless of date); (6) stock certificates and bonds (regardless of date); (7) promissory notes (regardless of date); (8) bills of sale (regardless of date); (9) real property deeds and deeds of trust (regardless of date); (10) business journals, ledgers, accounts payable and receivable files; (11) pledges, security agreements and copies of financial statements; (12) state sales tax reports; (13) any other record or document evidencing any ownership to real or personal property or to any debt owed or money had (regardless of date); (14) trust documents for which the Judgment Debtors are a beneficiary (regardless of date); (15) all personal property returns filed with any taxing authority, including but not limited to any central appraisal district or tax assessor/collector; and, (16) credit applications and other documents stating the Judgment Debtor's financial condition; (17) cryptocurrency wallets, records, and access codes (regardless of date); and (18) all documents listing or summarizing property owned by the Judgment Debtors (regardless of date).

4. **Continuing Effect of Order**. Judgment Debtors and all others holding Turnover Property shall continue to immediately turnover to Receiver such property when received, until all amounts due under the Judgments and this Order are paid in full.

5. **Receiver's Powers**. Receiver has the authority to take possession of all of Judgment Debtors' Turnover Property, sell such property, and pay the proceeds to the Judgment Creditors to the extent required to satisfy the Judgments. Receiver's authority applies, but is not limited, to all Turnover Property including: (1) all documents or records, including financial records, related to property that is in the actual or constructive possession or control of the Judgment Debtors; (2) all financial accounts

(bank account), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; (10) shares, stock and membership interests; (11) trusts, (12) domains, (13) accounts receivable; and (14) cryptocurrency accounts or wallets. Receiver is not required, but may in his sole discretion and is hereby empowered, to defend or prosecute any litigation regarding the Judgment Debtors that is not property of the Trustee, including, without limitation, claims to recover assets fraudulently transferred, conveyed, or assigned that would increase the size of the receivership estate. Receiver's powers include the following, although he has no requirement to necessarily exercise such powers as to the Turnover Property: (1) collect all accounts receivable of the Judgment Debtors; (2) change locks to all premises at which any property is situated; (3) endorse and cash all checks and negotiable instruments payable to the Judgment Debtors, except paychecks for current wages; (4) hire a real estate broker to sell any real property and mineral interest belonging to the Judgment Debtors; (5) hire any person or company to move and store the property of the Judgment Debtors; (6) insure any property belonging to the Judgment Debtors; (7) obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Judgment Debtors; (8) obtain local, state and federal tax records of the Judgment Debtors; (9) obtain from any landlord, building owner or building manager where the Judgment Debtors or the Judgment Debtors' business is a tenant copies of such Judgment Debtors' lease, lease application, credit application, payment history and copies of such Judgment Debtors' checks for rent or other payments; (10) hire any person or company

necessary to accomplish any right or power under this Order; (11) take all actions necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of the Judgment Debtors may be situated, and to review and obtain copies of all documents related to same; (12) obtain all records of ownership of real properties, personal properties or motor vehicles of the Judgment Debtors in the possession of any County Tax Assessor/Collector or Central Appraisal District, including any records of payments made or correspondence; (13) obtain  all records pertaining to the Judgment Debtors from any provider of utilities, telephone service, cell phone service; (14) obtain credit reports on the Judgment Debtors from any Consumer Reporting Agency as defined by Fair Credit Report Act pursuant to 16 USC § 1681B(a)(1); (15) exercise control over any website of the Judgment Debtors and direct the administrator or web server to allow Receiver full access to the management of the website; (16) obtain from any creditor of the Judgment Debtors (including mortgage companies) copies of such Judgment Debtors' credit application, payment history and copies of each such Judgment Debtor's checks for payments; (17) obtain from any person or entity that compensates the Judgment Debtors, including commissions, an itemization of all such compensation for the past 12 months from the date of Receiver's request and as well as any compensation anticipated in the forthcoming six month period from the date of Receiver's request; and (18) certify copies of this Order.  The Receiver shall not reduce or eliminate by agreement with the Judgment Debtors or otherwise compromise or settle the outstanding balance owed to Judgment Creditors by Judgment Debtor under the Judgments without the written consent of Judgment Creditors.

6. **Injunction**. The Judgment Debtors, an all their directors, officers, managers, members, investment advisors, accountants, attorneys, professionals, trustees

(other than the Trustee) and other agents, successors, or assigns, and any third party with notice of this Order are hereby ordered and enjoined not to take any action to sell, encumber, dispose of, transfer, waste, retain, or in any way exercise control over the Turnover Assets except as expressly provided by this Order or upon instructions in writing from the Receiver.

7.      **Duties of Law Enforcement**.  Any Sheriff, Constable or Officer of the Peace shall assist the Receiver in carrying out his duties and exercising his powers under this Order and prevent any person from interfering with Receiver in taking control and possession of the Turnover Assets.

8.      **Sales of Real Property Require Notice**.  Any sale of real property by Receiver requires the approval of this Court, after notice and opportunity for hearing being provided to Judgment Debtors and any lien holder on such real property.

9.      **Receiver's Bond**.  No bond is required of Receiver.

10.      **Receiver's Oath**.  Receiver must file an oath to perform his duties faithfully before acting under this Order and this Order is not effective until such an oath is filed.

11.      **Receiver's Fee**. Without further application, notice, or order of the Court, the Receiver shall pay himself as receiver's fees an amount equal to 20% of all gross proceeds coming into his possession from any source (before deducting expenses) which the Court finds is a customary and usual fee for a post-judgment turnover receiver. Within five days of the entry of this Order, the Judgment Creditors shall pay the sum of $10,000 to the Receiver as an advance on his fees.  The advance is fully earned and the Receiver may take it into income, and will repay the advance to the Judgment Creditors

from the first $10,000 of Receiver's fees earned from the collection of Turnover Property. Receiver's fees and expenses are taxed as costs against Judgment Debtors, and as costs, such fees and expenses are in addition to amounts owed under Judgments. Receiver shall distribute the remaining net proceeds from Turnover Property coming into his possession, after paying in full the Receiver's fees and all expenses and reserving from distribution any funds the Receiver determines in his sole discretion are needed to pay potential future expenses, to the Judgment Creditors at the Judgment Creditors' direction and in an amount and proportion pursuant to agreement between the Texas Families and the Connecticut Families. No receiver's fees exceeding 20% of all proceeds coming into Receiver's possession shall be paid to Receiver unless an application is filed with and ruled by the Court.

12.     **Receiver's Expenses**. Without further application, notice, or order of the Court, the Receiver may incur and shall pay from the proceeds of Turnover Property all reasonable and necessary expenses of the Receiver and the receivership estate up to the amount of $20,000.00 (the Expense Cap). The Receiver may raise the Expense Cap either (1) without further order of the Court upon the written agreement of the Judgment Creditors, including by email with counsel, or (ii) upon application to the Court with notice to the Judgment Creditors. The Receiver must provide an accounting or receipts of any reasonable and necessary expenses to the Court upon request. The Receiver's and receivership estates' reasonable and necessary expenses will be taxed as costs against Judgment Debtors, and Receiver may collect those expenses from Judgment Debtors in addition to the amount collected to satisfy the Judgment.

13.     **Employ Professionals**. Without further application or order of the Court, the Receiver may retain and reasonably compensate, in Receiver's sole discretion,

collection agents, counsel, financial advisors, accountants, brokers, auctioneers, independent contractors, technical specialists, and other professionals and agents to assist in his duties as Receiver on such terms as the Receiver deems appropriate without Court approval (the Receiver Personnel). For avoidance of doubt, the Court hereby approves the Receiver's retention of HMP as Receiver Personnel with the compensation for HMP provided Receiver Personnel already included in the Receiver's fee provided in paragraph 11 of this Order; *provided however*, the Receiver may, upon separate application and order of the Court, employ HMP provide Receiver Personnel on different compensation terms.

14.    **Limitation on Liability**. The Receiver, HMP, and Receiver Personnel, and their officers, members, managers, directors, partners, employees, agents, and professionals (together, the Protected Personnel) shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver and Receiver Personnel are entitled to rely, in good faith, on the advice of employed professionals, the Judgment Creditors' counsel, and on information provided by the Judgment Debtors and their books, records, and their past and present officers, directors, agents, members, managers, trustees, accountants, and employees and Judgment Debtors' counsel without audit. The Receiver and Receiver Personnel are entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Protected Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Receiver Personnel, including compliance with applicable law governing the

collection of debt, nor shall the Protected Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of gross negligence, willful misconduct, malicious acts, and the failure to comply with this Court's orders.

15.    **Indemnity**. The Protected Personnel are hereby indemnified by the Turnover Property to the fullest extent permitted under the law from any cause of action or claim related to any act or omission in connection with, relating to, or arising out of the Receiver's or Receiver Personnels' duties as Receiver, except for claims related to any act or omission that is determined in a final order to have constituted gross negligence, willful misconduct, or malicious acts. The Protected Personnel are entitled to advances from the Receiver and Turnover Property, including from any reserved funds, to cover actual and reasonably anticipated expenses of defending any action threatened against or brought against the any Protected Personnel as a result of any act or omission, actual or alleged, in their capacity as such, or in any way related to or arising from the Judgment Debtors, Judgment Debtors' property, Turnover Property, or the Judgments. A Protected Personnel must return specific advances under this paragraph upon a final order by the Court finding that the Protected Personnel is not entitled to indemnification under this Order.

16.    **Attorney's Fees**. Judgment Creditors' reasonable attorney's fees will be taxed as costs against Judgment Debtors. In carrying out his duties under this Order, the Receiver may use the Judgment Creditors' counsel and rely on legal advice and representation provided to him by the Judgment Creditors' counsel.

17.    **Exempt Property**. Nothing in this Order shall be construed to apply to exempt property, if any, of any Judgment Debtor, or any property of the Chapter 7 Estate

---

(expect up approval of the Trustee or Bankruptcy Court). For avoidance of doubt, (i) the Bankruptcy Court has jurisdiction to decide any dispute as to what constitutes property of the Chapter 7 Estate; and (ii) this Court has jurisdiction to decide any claim by the Judgment Debtors that property should be treated as exempt under this Order and any claim by the Receiver or Judgment Creditors that any property is Turnover Property and not protected by any exemption asserted by a Judgment Debtor.

18.　　**Retention of Jurisdiction**. This Court shall have and retain exclusive jurisdiction over: (i) the implementation and enforcement of this Order; (ii) the acts and conduct of the Receiver and any actions brought against the Protected Personnel by any person or entity in connection with this Order.

19.　　**Rule 679a Ordering Provisions Against Individual Judgment Debtor**.　**Personal Property Rights of Individual Judgment Debtor Alex Jones:** Receiver must comply with Texas Rule of Civil Procedure 679b.　**Receiver to Hold Property**: Receiver must not disburse funds to Judgment Creditors or sell property within 14 days after serving Judgment Debtor Alex Jones with the Notice of Protected Property Rights, the Instructions for Protected Property Claim Form, and the Protected Property Claim Form approved by the Supreme Court of Texas, or within 17 days if service was by mail.　If the Judgment Debtor Alex Jones asserts an exemption, Receiver may only disburse funds to Judgment Creditors or sell property otherwise belonging to Judgment Debtor Alex Jones with Judgment Debtor Alex Jones's written consent or a court order.

ISSUED AND SIGNED on _____.


                                         _____

                                         JUDGE PRESIDING

005051

03:31:55 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835

NO. D-1-GN-18-001835

**EXHIBIT**

**5**

Alexander E. Jones; 22-33553

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, Plaintiffs | § § § § | IN THE DISTRICT COURT |
| vs. | § § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and FREE SPEECH SYSTEMS, LLC, Defendants | § § § | 261st JUDICIAL DISTRICT |

### ORDER GRANTING APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTOR FREE SPEECH SYSTEMS, LLC

The Court has considered Judgment Creditors' Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Free Speech Systems, LLC (the Application) and the record properly before it.

**The Court FINDS that** it has jurisdiction over this proceeding and can proceed in granting the relief set forth herein immediately. *See* TEX. CIV. PRAC. & REM. CODE 31.002.

**The Court also FINDS that** the judgment in Cause No. CV-18-6046437 rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut (the Connecticut Families' Judgment) is valid, final, and payable. Judgment Debtor Free Speech Systems, LLC owes, jointly and severally, $1,288,139,555.94 under the Connecticut Families' Judgment. There have been no applicable credits, payments, or offsets.

**The Court also FINDS that** the Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's

005052

opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act.

**The Court also FINDS that** Judgment Debtor Alexander E. Jones (also referred to in this Order as Alex E. Jones and Alex Jones) filed for bankruptcy under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) on December 2, 2022 (the Jones Petition Date) in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) pending as case no. 22-33553 (the Jones Bankruptcy Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy. Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 19, 2023 Memorandum Decision granting the Connecticut Families' Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable. Following a hearing on June 14, 2024, the Bankruptcy Court converted the Jones Bankruptcy Case from chapter 11 to chapter 7 and appointed Christopher R. Murray as chapter 7 trustee (the Trustee) for the applicable chapter 7 bankruptcy estate (the Chapter 7 Estate).

**The Court also FINDS that** the Judgment remain unsatisfied; that Judgment Debtor Free Speech Systems, LLC owns property that is not exempt from attachment, execution, or seizure for the satisfaction of the Judgment; and that Judgment Creditors are entitled to the Court's aid in reaching Judgment Debtor's nonexempt property to satisfy the Judgment.

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

(i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

In this Order, the definition of "Turnover Property" also includes all additional and specific property or assets of any kind covered by the ordering paragraphs below. Judgment Creditors reserve all rights they may have to execute upon the Judgment in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtor.

**The Court also FINDS that** the Judgment is final and remain unpaid. Based on the entire record, including the Application and evidence attached that is admitted in support of the Application, **the Court FINDS that** the Application should be granted.

It is therefore **ORDERED** that the Application is **GRANTED,** and Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (Receiver) is appointed under Texas Civil Practice and Remedies Code § 31.002 with authority to take possession of all the Turnover Property, sell the Turnover Property, and pay the proceeds to Judgment Creditors to the extent required to satisfy the Judgment. The Turnover

Property may include but is not limited to financial accounts, certificates of deposit, cryptocurrency accounts, and money-market accounts held by a third party. Notwithstanding anything in this Order to the contrary, nothing in this Order shall authorize any party, including the Receiver or Judgment Creditors, to take any action that would be inconsistent with the pending Jones Bankruptcy Case, including seeking any relief with respect to assets that constitute property of the Chapter 7 Estate unless approved by the Bankruptcy Court.

1.     **Receiver's Information.**

Name: Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (HMP)

Address: 8911 North Capital of Texas Highway Suite 2120 Austin, Texas 78759

Telephone Number: (512) 892-0803

Email Address: gmilligan@harneypartners.com

2.     **Custodia Legis.** The entry of this Order creates a receivership estate wherein all of Judgment Debtor's respective Turnover Property shall be held in *custodia legis* by the receivership as of the date of this Order. The receivership owns all Turnover Property regardless of whether Receiver takes actual possession of the property. The Receiver may decline to collect or abandon any Turnover Property the Receiver determines, in his sole discretion, to be burdensome, cumbersome, or of *de minimis* value. The Receiver is authorized to raise any issue with the Court, to request and to meet *in camera* with the Court without notice, and to file any motion (in this Court, the Bankruptcy Court, or any other applicable court) the Receiver deems appropriate.

3.    **Turnover**. The Judgment Debtor shall turnover to Receiver all Turnover Property, including all documents related to such property, **within five days** of the Judgment Creditors service of a copy of this Order on the Judgment Debtor or its counsel. All third parties in possession of any Turnover Property that is subject to any Judgment Debtor's control shall turnover such property to Receiver within five days of being served notice of this Order.  The turnover by Judgment Debtor shall include at least the following documents (for the period of at least the preceding 48 months from the date of this Order, except where otherwise indicated): (1) canceled checks; (2) bank statements, pass books, and other bank or financial institution records; (3) federal income and state franchise tax returns; (4) life insurance policies (regardless of date); (5) all motor vehicle Certificates of Title (regardless of date); (6) stock certificates and bonds (regardless of date); (7) promissory notes (regardless of date); (8) bills of sale (regardless of date); (9) real property deeds and deeds of trust (regardless of date); (10) business journals, ledgers, accounts payable and receivable files; (11) pledges, security agreements and copies of financial statements; (12) state sales tax reports; (13) any other record or document evidencing any ownership to real or personal property or to any debt owed or money had (regardless of date); (14) trust documents for which the Judgment Debtors are a beneficiary (regardless of date); (15) all personal property returns filed with any taxing authority, including but not limited to any central appraisal district or tax assessor/collector; and, (16) credit applications and other documents stating the Judgment Debtor's financial condition; (17) cryptocurrency wallets, records, and access codes (regardless of date); and (18) all documents listing or summarizing property owned by the Judgment Debtor (regardless of date).

4.      **Continuing Effect of Order.** Judgment Debtor and all others holding Turnover Property shall continue to immediately turnover to Receiver such property when received, until all amounts due under the Judgment and this Order are paid in full.

5.      **Receiver's Powers.** Receiver has the authority to take possession of all of Judgment Debtor's Turnover Property, sell such property, and pay the proceeds to the Judgment Creditors to the extent required to satisfy the Judgment. Receiver's authority applies, but is not limited, to all Turnover Property including: (1) all documents or records, including financial records, related to property that is in the actual or constructive possession or control of the Judgment Debtor; (2) all financial accounts (bank account), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; (10) shares, stock and membership interests; (11) trusts, (12) domains, (13) accounts receivable; and (14) cryptocurrency accounts or wallets. Receiver is not required, but may in his sole discretion and is hereby empowered, to defend or prosecute any litigation regarding the Judgment Debtor that is not property of the Trustee, including, without limitation, claims to recover assets fraudulently transferred, conveyed, or assigned that would increase the size of the receivership estate. Receiver's powers include the following, although he has no requirement to necessarily exercise such powers as to the Turnover Property: (1) collect all accounts receivable of the Judgment Debtor; (2) change locks to all premises at which any property is situated; (3) endorse and cash all checks and negotiable instruments payable to the Judgment Debtor, except paychecks for current wages; (4) hire a real estate broker to sell any real

property and mineral interest belonging to the Judgment Debtor; (5) hire any person or company to move and store the property of the Judgment Debtor; (6) insure any property belonging to the Judgment Debtor; (7) obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Judgment Debtor; (8) obtain local, state and federal tax records of the Judgment Debtor; (9) obtain from any landlord, building owner or building manager where the Judgment Debtor or the Judgment Debtor's business is a tenant copies of such Judgment Debtor's lease, lease application, credit application, payment history and copies of such Judgment Debtor's checks for rent or other payments; (10) hire any person or company necessary to accomplish any right or power under this Order; (11) take all actions necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of the Judgment Debtor may be situated, and to review and obtain copies of all documents related to same; (12) obtain all records of ownership of real properties, personal properties or motor vehicles of the Judgment Debtor in the possession of any County Tax Assessor/Collector or Central Appraisal District, including any records of payments made or correspondence; (13) obtain all records pertaining to the Judgment Debtor from any provider of utilities, telephone service, cell phone service; (14) obtain credit reports on the Judgment Debtor from any Consumer Reporting Agency as defined by Fair Credit Report Act pursuant to 16 USC § 1681B(a)(1); (15) exercise control over any website of the Judgment Debtor and direct the administrator or web server to allow Receiver full access to the management of the website; (16) obtain from any creditor of the Judgment Debtor (including mortgage companies) copies of such Judgment Debtor's credit application, payment history and copies of each such Judgment Debtor's checks for payments; (17) obtain from any person or entity that compensates the

---

Judgment Debtor, including commissions, an itemization of all such compensation for the past 12 months from the date of Receiver's request and as well as any compensation anticipated in the forthcoming six month period from the date of Receiver's request; and (18) certify copies of this Order. The Receiver shall not reduce or eliminate by agreement with the Judgment Debtor or otherwise compromise or settle the outstanding balance owed to Judgment Creditors by Judgment Debtor under the Judgment without the written consent of Judgment Creditors.

6. **Injunction**. The Judgment Debtor, and all its directors, officers, managers, members, investment advisors, accountants, attorneys, professionals, trustees (other than the Trustee) and other agents, successors, or assigns, and any third party with notice of this Order are hereby ordered and enjoined not to take any action to sell, encumber, dispose of, transfer, waste, retain, or in any way exercise control over the Turnover Assets except as expressly provided by this Order or upon instructions in writing from the Receiver.

7. **Duties of Law Enforcement**. Any Sheriff, Constable or Officer of the Peace shall assist the Receiver in carrying out his duties and exercising his powers under this Order and prevent any person from interfering with Receiver in taking control and possession of the Turnover Assets.

8. **Sales of Real Property Require Notice**. Any sale of real property by Receiver requires the approval of this Court, after notice and opportunity for hearing being provided to Judgment Debtor and any lien holder on such real property.

9. **Receiver's Bond**. The Receiver shall pay a $500.00 bond.

10. **Receiver's Oath.** Receiver must file an oath to perform his duties faithfully before acting under this Order and this Order is not effective until such an oath is filed.

11. **Receiver's Fee.** Without further application, notice, or order of the Court, the Receiver shall set aside as potential receiver's fees an amount equal to 25% of all gross proceeds coming into his possession from any source (before deducting expenses) which the Court finds is a customary and usual fee for a post-judgment turnover receiver. Within five days of the entry of this Order, the Judgment Creditors shall pay the sum of $10,000 to the Receiver as an advance on his fees. The advance is fully earned and the Receiver may take it into income, and will repay the advance to the Judgment Creditors from the first $10,000 of Receiver's fees earned from the collection of Turnover Property. Receiver's fees and expenses are taxed as costs against Judgment Debtor, and as costs, such fees and expenses are in addition to amounts owed under the Judgment. Receiver shall distribute the remaining net proceeds from Turnover Property coming into his possession, after withholding 25% in possible Receiver's fees and all expenses and reserving from distribution any funds the Receiver determines in his sole discretion are needed to pay potential future expenses, to the Judgment Creditors at the Judgment Creditors' direction. No receiver's fees shall be paid to Receiver unless an application is filed with and ruled by the Court.

12. **Receiver's Expenses.** Without further application, notice, or order of the Court, the Receiver may incur and shall pay from the proceeds of Turnover Property all reasonable and necessary expenses of the Receiver and the receivership estate up to the amount of $20,000.00 (the Expense Cap). The Receiver may raise the Expense Cap either (1) without further order of the Court upon the written agreement of the Judgment

Creditors, including by email with counsel, or (ii) with Court approval after application to the Court with notice to the Judgment Creditors. The Receiver must provide an accounting or receipts of any reasonable and necessary expenses to the Court upon request. The Receiver's and receivership estates' reasonable and necessary expenses will be taxed as costs against Judgment Debtor, and Receiver may collect those expenses from Judgment Debtor in addition to the amount collected to satisfy the Judgment.

13.    **Employ Professionals**. With Court approval, the Receiver may retain and reasonably compensate, in Receiver's collection agents, counsel, financial advisors, accountants, brokers, auctioneers, independent contractors, technical specialists, and other professionals and agents to assist in his duties as Receiver on such terms as the Receiver deems appropriate (the Receiver Personnel). For avoidance of doubt, the Court hereby approves the Receiver's retention of HMP as Receiver Personnel with the compensation for HMP provided Receiver Personnel already included in the Receiver's fee provided in paragraph 11 of this Order; *provided however*, the Receiver may, upon separate application and order of the Court, employ HMP provide Receiver Personnel on different compensation terms.

14.    **Limitation on Liability**. The Receiver, HMP, and Receiver Personnel, and their officers, members, managers, directors, partners, employees, agents, and professionals (together, the Protected Personnel) shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver and Receiver Personnel are entitled to rely, in good faith, on the advice of employed professionals, the Judgment Creditors' counsel, and on information provided by the Judgment Debtor and its books,

005061

records, and its past and present officers, directors, agents, members, managers, trustees, accountants, and employees and Judgment Debtor's counsel without audit. The Receiver and Receiver Personnel are entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Protected Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Receiver Personnel, including compliance with applicable law governing the collection of debt, nor shall the Protected Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of gross negligence, willful misconduct, malicious acts, and the failure to comply with this Court's orders.

15.     **Indemnity**. The Protected Personnel are hereby indemnified by the Turnover Property to the fullest extent permitted under the law from any cause of action or claim related to any act or omission in connection with, relating to, or arising out of the Receiver's or Receiver Personnels' duties as Receiver, except for claims related to any act or omission that is determined in a final order to have constituted gross negligence, willful misconduct, or malicious acts. The Protected Personnel are entitled to advances from the Receiver and Turnover Property, including from any reserved funds, to cover actual and reasonably anticipated expenses of defending any action threatened against or brought against the any Protected Personnel as a result of any act or omission, actual or alleged, in their capacity as such, or in any way related to or arising from the Judgment Debtor, Judgment Debtor's property, Turnover Property, or the Judgment. A Protected Personnel must return specific advances under this paragraph upon a final order by the Court finding that the Protected Personnel is not entitled to indemnification under this Order.

005062

16.    **Attorney's Fees**. Judgment Creditors' reasonable attorney's fees will be taxed as costs against Judgment Debtor. In carrying out his duties under this Order, the Receiver may use the Judgment Creditors' counsel and rely on legal advice and representation provided to him by the Judgment Creditors' counsel.

17.    **Exempt Property**. Nothing in this Order shall be construed to apply to exempt property, if any, of Judgment Debtor, or any property of the Chapter 7 Estate (expect up approval of the Trustee or Bankruptcy Court). For avoidance of doubt, (i) the Bankruptcy Court has jurisdiction to decide any dispute as to what constitutes property of the Chapter 7 Estate; and (ii) this Court has jurisdiction to decide any claim by the Judgment Debtor that property should be treated as exempt under this Order and any claim by the Receiver or Judgment Creditors that any property is Turnover Property and not protected by any exemption asserted by Judgment Debtor.

18.    **Retention of Jurisdiction**. This Court shall have and retain exclusive jurisdiction over: (i) the implementation and enforcement of this Order; (ii) the acts and conduct of the Receiver and any actions brought against the Protected Personnel by any person or entity in connection with this Order.

ISSUED AND SIGNED on ___August 13, 2025.___

_____
JUDGE PRESIDING

**EXHIBIT**

**6**

Alexander E. Jones; 22-33553

exhibitsticker.com

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## PLAINTIFFS' CHALLENGE TO NET WORTH DECLARATION AND MOTION FOR SANCTIONS FOR FALSE AND FRIVOLOUS PLEADING

Plaintiffs Neil Heslin and Scarlett Lewis challenge the Declaration of Alex Jones filed by Defendant Free Speech Systems, LLC ("FSS") as insufficient to act as alternative security for an appellate bond. Plaintiffs also seek sanctions against FSS's counsel for the false statements and frivolous arguments made in their notice filed with the Court.

### SUMMARY

FSS has attempted to file a pauper's check of $10 to act as a bond preventing the collection of this Court's final judgment. FSS purports to provide a deposit under TRAP 24.1, which allows a debtor to supersede a judgment by providing a deposit not to exceed 50% of the debtor's net worth. In doing so, FSS provided a declaration from Alex Jones claiming that FSS has no assets due to an order of the bankruptcy court. In addition, Jones avers that FSS's liabilities exceed any possible assets since it faces over $1 billion in contingent liability from lawsuit judgments.

The first averment regarding the bankruptcy order is factually untrue. The second averment regarding the company's lawsuit liabilities is legally frivolous. For the reasons

1

005064

shown below, Plaintiffs ask the Court to enter an order finding that FSS has failed to provide information sufficient to determine its net worth, and Plaintiffs also ask the Court to enter sanctions against FSS's attorneys under TRCP 13, TCPRC Chapter 10, and/or the Court's inherent powers.

## LEGAL STANDARD

A judgment debtor who provides security based on the debtor's net worth must simultaneously file an affidavit that states the debtor's net worth and states complete, detailed information concerning the debtor's assets and liabilities from which net worth can be ascertained. Tex. R. App. P. 24.2(c)(1). A judgment creditor may then file a challenge to the debtor's affidavit of net worth. Tex. R. App. P. 24.2(c)(2). "When a judgment creditor files a contest to the judgment debtor's affidavit of net worth, the trial court must hold a hearing and 'issue an order that states the debtor's net worth and states with particularity the factual basis for that determination.'" *In re Smith,* 192 S.W.3d 564, 568 (Tex. 2006) (quoting Tex. R. App. P. 24.2(c)(3)).

"Net worth is calculated as the difference between total assets and total liabilities as determined by generally accepted accounting principles." *G.M. Houser, Inc. v. Rodgers,* 204 S.W.3d 836, 840 (Tex.App.-Dallas 2006, no pet.). The judgment debtor has the burden of proving net worth. *See* Tex. Civ. Prac. Rem. Code Ann. 52.006(c); Tex. R. App. P. 24.2(c)(3). "[T]o show the trial court abused its discretion based on the legally insufficient evidence, the judgment debtor must show the evidence conclusively establishes, as a matter of law, all vital facts in support of its position." *LMC Complete Auto., Inc. v. Burke,* 229 S.W.3d 469, 483 (Tex. App.—Houston [1st Dist.] 2007, pet. denied), citing *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex. 2001).

005065

## JONES' DECLARATION

On August 8, Defendants' new counsel filed a notice stating that "FSS has a negative net worth as substantiated in the attached Declaration of Alex Jones." (Ex. 1, Def. Notice, ¶ 5). Jones' declaration averred that FSS has no assets due to a judicial order that vested FSS assets in Christopher Murray as bankruptcy trustee. In relevant part, Jones averred:

> On June 21, 2024, Bankruptcy Judge Lopez entered an order in the FSS Bankruptcy case (herein called the "June Order," in Docket entry 956 in Case No. 22-60043) that both (a) dismissed the FSS bankruptcy and (b) at the same time transferred control and signing authority with respect to all FSS's bank accounts to the Chapter 7 Trustee of my personal bankruptcy [Case No. 22-33553], namely Christopher Murray in his capacity as the Chapter 7 Trustee for the bankruptcy estate of Alexander E. Jones.

> On September 25, 2024, Bankruptcy Judge Lopez entered another order supplementing his June Order, stating that as of the date of his first order above all property of FSS was judicially deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and was under the control of the Trustee, whom the Bankruptcy Court also authorized to operate the business of FSS absent further order of Judge Lopez in the Bankruptcy Court (herein called the "September Order or "Supplemental Order," in Docket entry 1021 in Case No. 22-60043).

> Given the fact that Bankruptcy Judge Lopez's June Order and September Orders vested ownership of all FSS cash and property of the Estate in my bankruptcy as assets in the Trustee for my personal bankruptcy, as of the date hereof, FSS has no assets. Hence it does not have a positive net worth for that reason alone.

(Ex. 2, Jones Declaration).

In addition to these statements about the purported effect of a judicial order, Jones also averred that his company has negative net worth because it faces over $1 billion in judgment liabilities. Jones stated:

3

005066

> As to liabilities, the Texas Judgment in the amount of $56,725,304.33 and the Connecticut Judgement in the amount of $1,288,139,546, means that FSS has a significantly negative net worth even if the assets of FSS now vested with the bankruptcy Trustee were to be considered as belonging to FSS. (*Id.,* ¶ 11).

As shown below, the first position taken in Jones' declaration is untrue, while the second position is legally frivolous.

## ARGUMENT

### I.     Defendants' Counsel Misrepresented the Status of a Nullified Order.

While Jones' declaration asserts that the supplemental order vested FSS assets in a bankruptcy trustee, Judge Lopez later ruled that the supplemental order had been nullified by the failure of the auction which he had ordered. The supplemental order existed solely as a "supplement" to that auction order. As shown below, Judge Lopez repeatedly and unequivocally ruled that the supplemental order had been nullified, and multiple unsuccessful attempts were made to change that ruling. Rather than acknowledge these failures, Defendants' counsel pretended Judge Lopez's subsequent rulings never happened.

### A.     The February 5th bankruptcy hearing resulted in the nullification of the supplemental order.

Judge Lopez had ordered a plan to liquidate FSS assets by placing them in the custody of Christopher Murray, the Chapter 7 Trustee, who would then conduct an auction. Judge Lopez entered the September 2024 supplemental order to aid in accomplishing that specific purpose. However, Judge Lopez ultimately rejected the result of the sale, which he later held nullified the supplemental order as well.

4

005067

In the February 5, 2025 bankruptcy hearing, Judge Lopez explained that he "entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets. That's what that order was intended to do." (Ex. 3, February 5th Hearing, 7:10-14). Judge Lopez noted, "The Trustee asked me for a specific order ... But it was only for one purpose, to see if he could sell the assets." (*Id.* at 12:6-8). As a result, Judge Lopez concluded it would be improper "to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone." (*Id.* at 13:1-3).

For this reason, Lopez stated, "I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore." (*Id.* at 13:3-5). Judge Lopez ultimately ruled that "you can consider **any use of the supplemental order null and void**, because the purpose for which it served was the auction of the assets, and we're not doing that anymore." (*Id.* at 14:13-16) (emphasis added). Judge Lopez noted that it would be improper to "use the supplemental order ... for a purpose in which it was never intended. And I get to construe my own orders and I retain jurisdiction over them." (*Id.* at 15:10-12). In other words, Judge Lopez construed his orders and found that because the sale failed, the supplemental order tied to that sale also necessarily became null and void.

In making these rulings, Judge Lopez sought to promote the "finality of the bankruptcy process so that [the families] can pursue whatever it is that they want in judgments in state court." (*Id.* at 14:22-24). Judge Lopez stated, "There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have." (*Id.* at 11:3-8). Judge Lopez emphasized that "[p]eople can go to state court right now. If FSS Free Speech doesn't pay someone's bills,

5

005068

you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me." (*Id.* at 11:17-25).

At that point in February 2025, Judge Lopez had made it clear to Defendants and their counsel that the supplemental order was no longer in force. But lest there be any doubt, there were two subsequent attempts at reconsideration.

**B.    FUAC sought a new sale under the supplemental order, but Judge Lopez confirmed that it had been nullified.**

Following the hearing in which Judge Lopez found that the supplemental order had been nullified by the failure of the sale, an entity known as FUAC, a Jones-allied company seeking to purchase InfoWars, sought reconsideration by filing a "Motion Approving the Sale of FSS Assets." That motion attempted to revive the supplemental order and force a new sale. However, in an order on March 19, 2025, Judge Lopez denied the motion, and he reiterated that the supplemental order was no longer in effect, writing: "This Court said at a hearing on February 6, 2025 ... that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed." (Ex. 4, Bankruptcy Order, March 19, 2025, p. 1). That order is shown below:

> This Court said at a hearing on February 6, 2025 that it would not allow a sale of FSS assets, and that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed. The Court won't require the Chapter 7 Trustee to conduct another auction for the FSS assets. FUAC also does not have standing to seek a sale of FSS assets under Section 363 of the Bankruptcy Code. The motion is denied.
>
> Signed on March 19, 2025
>
> Christopher Lopez
> United States Bankruptcy Judge

6

005069

### C. Jones and FSS moved for reconsideration.

After the order in March, Jones and FSS moved to reconsider Judge Lopez's finding that the supplemental order had been nullified by the failed auction for which it had been created. In their Motion, Jones and FSS recognized that the supplemental order was no longer in effect, noting that "in a subsequent Order entered on February 5, 2025, this Court declared that the Supplemental Order was 'null and void.' This Motion requests the reconsideration of that declaration." (Ex. 5, FSS Mt. to Reconsider, p. 3). Defendants asked Judge Lopez to reverse course, and they argued that "[h]olding to the position that the Supplemental Order is void will create past, present and future chaos." (*Id.*, p. 5). Thus, the Defendants "request[ed] this Court reconsider its prior rulings." (*Id.,* p. 9). Implicit in this filing is the acknowledgement that the February rulings are in effect.

### D. In a June 5th hearing, Judge Lopez declined to grant reconsideration and again blessed the families' intention to pursue state court remedies.

In a hearing on June 5th, counsel for Jones and FSS presented their arguments for reconsideration. The thrust of Defendants' argument was that Judge Lopez lacked authority to issue his rulings in February because the supplemental order had been under appeal at that time.[1] According to Defendants, federal courts can continue to construe their orders or take steps in aid of their enforcement during an appeal, but they cannot revoke or modify those orders. But the counter-side to that argument was that Judge Lopez did not "revoke" or "modify" anything, but instead, he construed and enforced his original sale orders to find that the supplemental order was necessarily nullified following the unsuccessful auction. These issues were discussed during the first part of the hearing. (*See* Exhibit 6, June 5th

---

[1] The supplemental order was appealed prior to the failed auction. By the time of the June 5th hearing, that appeal had been voluntarily dismissed.

7

Hearing, 40:5-7) (The court asking FSS counsel, "That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?"); (*see also* 45:22-23) (FSS counsel acknowledging that "[the court] can't modify it, [the court] can't change it," but "[the court] enforce it or [the court] can interpret it.")

Towards the middle of the hearing, Judge Lopez indicated he was disinclined to grant any relief to Jones and FSS, and that parties could appeal his rulings if they were unhappy:

> This case has been pending since 2022. And folks, it just needs to, it needs to end. Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable. Let the state courts, or the Supreme Court of the United States rule on the issue. Parties can then appeal any orders of mine to the district court or the Fifth Circuit. We got to get there. I'm not moving. (*Id.* at 42:8-15).

Nonetheless, FSS counsel Shelby Jordan continued to argue that Judge Lopez lacked authority to find that the supplemental order had been nullified, and that "[t]he effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked. (*Id.* at 46:1-3). Judge Lopez entertained Defendants' argument, and he agreed that an appeal prevented him from revoking or modifying his orders. But he also noted that it did not prevent him from enforcing or construing his orders. Judge Lopez stated:

> I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it ... But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it. He tried to sell assets under those orders. The question is do we do another sale? That's the real question. Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis

8

005071

would be to get me comfortable that those assets are actually owned by FSS. (*Id.* at 48:13 – 49:5).

Judge Lopez appeared to believe he was within his authority to find that supplemental order was nullified and no longer in effect since he had ruled that the sale which it had "supplemented" had been attempted and was unsuccessful, and the order only existed for that purpose. Any future sale would require its own supplemental order, which had become nullified after the first sale. Under this interpretation, Judge Lopez was within his authority to construe the supplemental order as nullified as a necessity of enforcing the original order and its purpose. Thus, according to this view being discussed by Judge Lopez, he hadn't revoked anything, and there was nothing to reconsider. He was merely enforcing the purpose and construing the effect of his original orders. Yet regardless of how one interprets Judge Lopez's musings at the hearing, Judge Lopez clearly stated, "Let me think about it. **I don't want to rule today**. I want to think about everything and think about this." (*Id.* at 52:3-5).

A few minutes later, Judge Lopez again emphasized that he was not making any ruling, stating, "Give me a little time to think about everything that I've heard today, one way or the other. Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other." (*Id.* at 54:5-8).

As the hearing came to a close, Kyle Kimpler, attorney for the Connecticut families, made sure Judge Lopez knew the families would be pursuing state court collections as Judge Lopez had authorized back in February when finding the supplemental order nullified, and Mr. Kimpler pointed out that the reconsideration sought by FSS would be disruptive to those efforts:

> Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies. We've been working with the

9

005072

Texas plaintiffs towards that end. You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive. (*Id.* at 66:9-15).

In response, Judge Lopez assured Mr. Kimpler regarding the motion to reconsider, "I don't think my position has changed in terms of what I said in February." (*Id.* at 66:23-67:1-3). Finally, Judge Lopez heard from Avi Moshenberg, counsel for the Texas families, who again made sure Judge Lopez understood that the families would be pursuing collection in state court, which Judge Lopez blessed:

> MR. MOSHENBERG: Lastly, Your Honor, I know you're talking about 60 days from now. From our vantage point, the Court has told us to go pursue our state court remedies. That's what we're going to do. I want to be open and honest about that unless you're telling us otherwise.
>
> THE COURT: **I'm not**, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up. We can continue to talk. ..." (*Id.* at 68:6-13).

Regarding the Defendants' motion for reconsideration seeking to overturn the February rulings finding the supplemental order nullified, Judge Lopez told Mr. Moshenberg:

> [W]ell, somebody's asked me to think about some issues. And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens. I may issue something in writing in short, just kind of addressing the issue without any need for another hearing. We'll see where things go. ..." (*Id.* at 68:17-24).

Judge Lopez concluded the hearing by telling Mr. Moshenberg, "I don't think you need to do anything different, but if anything changes, I'll let you know." (*Id.* at 69:3). In the following two and a half months, Judge Lopez made no further orders on the issue.

10

**E.**    **No reasonable attorney could conclude that Judge Lopez had granted FSS's motion for reconsideration.**

Following this hearing, no reasonable attorney could believe that Judge Lopez had reversed his February 5 ruling and his March 19 written order, or that the earlier supplemental order had been reinstated. Yet having not found success in convincing Judge Lopez to reverse his February rulings or revive his supplemental order, Defendants' counsel made a troubling decision. They decided to file a pleading in this Court pretending the nullification never happened.

The closest case on point located by Plaintiffs' counsel is *In re Lerma* from the El Paso court. In *Lerma,* the trial court had signed a dismissal order, but it declared the order was void at a later hearing, where the trial court "specifically informed those present at the hearing that the copy of the Rule 165a dismissal order which had been sent to them was void." *In re Lerma*, 144 S.W.3d 21, 23 (Tex. App.—El Paso 2004, no pet.). On appeal, "Relator included in his appendix the Rule 165a dismissal order." *Id.* at 26. "Relator respond[ed] that he inadvertently included the August 13, 2003 dismissal order in the appendix." *Id.* at 27. But the El Paso court was skeptical, since "[d]espite being present and personally hearing Judge Martinez' admonishment that the copy of the order in his possession was void, Relator thereafter attempted to use the void dismissal order [in motions to the trial court]." *Id.* Indeed, the El Paso court noted that at the trial court, "Relator [had] engaged in a pattern of attempting to utilize the dismissal order for his own benefit in the face of repeated admonishments that the document is void." *Id.* at 29. However, the court concluded that on appeal, "the inclusion of Exhibit 1 may have been an inadvertent mistake." *Id.* Thus, "[g]iving Relator the benefit of the doubt," and noting that it was "a decidedly close question," the court "declin[ed] to impose sanctions." *Id.*

11

Here, there is no "close question." The failure to inform this Court about the nullification of the order was not a mistake. Counsel did not inadvertently include the void order in an appendix, as in *Lerma*. They purposely submitted a void order, without disclosing material facts, and used it as substantive evidence to prevent collections. The duty of candor required that Defendants disclose all material facts, as the 14th District explained:

> While a lawyer may challenge  the legal effect of unfavorable facts, he may not misrepresent them to the court. Where the record contains unfavorable facts, the appellate advocate should fairly disclose and portray them in his brief. Of course, having done so, he may then zealously and vigorously challenge their impact on the case or argue for the application of law which would minimize or eliminate the court's valid consideration of them. Failure to observe these very basic standards of appellate practice erodes the ethical standards on which the legal profession and the appellate process are based.

*Schlafly v. Schlafly*, 33 S.W.3d 863, 873-74 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see also Am. Paging of Tex., Inc. v. El Paso Paging, Inc.*, 9 S.W.3d 237, 241 (Tex. App.—El Paso 1999, pet. denied) (Noting the duty of candor includes "omissions of material fact.").

Defendants' counsel will likely respond by quoting excerpts from discussions in the hearing on their motion to reconsider where it appeared Judge Lopez was sympathetic to their positions. Yet after the hearing, any reasonable advocate would understand that Judge Lopez made no rulings. Indeed, any reasonable advocate would understand that the situation had not changed from the situation as it existed prior to the hearing, in which Defendants' counsel understood Judge Lopez has interpreted the supplemental order as nullified and asked him to reconsider that ruling. And even if the status of the order was somehow ambiguous -- which it certainly is not -- that would still not justify a sworn statement by Jones that the supplemental order was in effect.

12

Perhaps Defendants' counsel will acknowledge that Judge Lopez's February rulings were not reversed, and they will instead ask this Court to disregard his rulings by arguing that Judge Lopez lacked jurisdictional authority to issue those decisions while the sale order was pending on appeal. But indulging that argument would mean this Court would need to adjudicate the issue of whether Judge Lopez was construing the effect of his own orders and acting in enforcement thereof, or whether he made an impermissible modification as contemplated by federal jurisdictional law. Resolving that question is something this Court cannot do. Federal district courts have exclusive original jurisdiction over all cases under the Bankruptcy Code pursuant to 28 USCS § 1334, and errors in their rulings must be vindicated through the federal court system. But most importantly, even if this Court could resolve this question, it has not been asked to do so, because Defendants' counsel deliberately withheld the material facts to even raise the question, much less answer it.

Now, this Court is faced with an unequivocal ruling on February 5th that the supplemental order was nullified, followed by an unequivocal order on March 19th repeating and confirming the same, followed by a June motion to reconsider that resulted in no further ruling or order of the court, but did result in a blessing to pursue state court remedies. If Defendants' counsel have some arcane interpretation under these facts in which they believe the supplemental order is not actually nullified, they were obligated to inform the Court of those facts and fully discuss the alleged ambiguity, not merely have their client assert under penalty of perjury that the order is in force. For instance, counsel could have said:

> There was an order of the bankruptcy court vesting FSS assets in a trustee. That order was later held to have been nullified. We moved for reconsideration, but the bankruptcy court never entered any other order and did not grant us relief. However, we believe this Court should conclude that the supplemental order has actually been reinstated for the following reasons…"

13

005076

While such an argument would be unlikely to be meritorious, it would have the value of being honest and forthright. Instead, Defendants' counsel made the deliberate decision to omit material facts.

In sum, lawyers have a professional obligation to provide fair and forthright statements to the court, particularly when it comes to the status of court orders. Here, Defendants' counsel did not fairly portray the record. *See, e.g., In re City of Lancaster*, 228 S.W.3d 437, 440 (Tex. App.—Dallas 2007, no pet.) (Noting "the duty of honesty and candor … includes fairly portraying the record …"). It is clear that this Court's previous sanctions against attorneys have not been effective, and the Court need not tolerate further misconduct of this type. Given the unusual history of this case, severe sanctions are appropriate.

## II.    Defendants' Counsel Pursued a Frivolous Argument Regarding Lawsuit Liabilities which has Already Been Unsuccessful in Front of this Court.

When assessing counsel's decision to file this latest frivolous attempt to prevent collection, it is important to consider that this is not the first time FSS has sought relief from the appeal bond. As part of their post-judgment motions, Defendants argued that "[t]he Court should modify the appeal bond." (Def. Brief, Feb. 13, 2023, p. 50). At that time, Defendants made the same averment about liabilities being made now – that Defendants had negative net worth because of the liabilities created by the judgments in Connecticut and in this Court. At the time, Plaintiffs explained in their response brief why this argument was frivolous:

> Defendants' counsel seek to post no appeal bond by arguing that "Defendants [sic] net worth is negative based on known liabilities." As such, Defendants ask the Court to modify the appeal bond, allowing them to post the "alternate security ordered by the court" contemplated under Tex.R.App. P. 24.1(a).

14

005077

This is not the first time Defendants have attempted to have this Court find they are insolvent[2] ...

The only new argument advanced by Defendants in support of their insolvency position is this garbled statement: "Because of the well-publicized Sandy Hook [sic?] and the Connecticut verdict, Defendants [sic] true and [sic?] net worth is negative billion-plus dollars." (Motion, p. 50). Defendants' new argument is frivolous. The Connecticut judgment is a contingent liability, and contingent money judgments are not to be considered by the Court. The appeal bond statute "specifically refers to the judgment debtor's current net worth, which by definition does not include contingent assets or liabilities." *McCullough v. Scarbrough, Medlin & Associates, Inc.,* 362 S.W.3d 847, 849 (Tex. App.—Dallas 2012, no pet.).

As Texas courts have universally stated, "the plain language of the statute does not include a contingent money judgment in calculating net worth." *Id.,* quoting *Anderton v. Cawley,* 326 S.W.3d 725, 726 (Tex.App.-Dallas 2010, no pet.); *see also Business Staffing, Inc. v. Jackson Hot Oil Serv.,* 392 S.W.3d 183, 187–88 (Tex. App.—El Paso 2012, orig. proceeding [mand. denied]) (per curiam) ("The trial court properly determined that because the judgment is a contingent liability it would not be included in the net worth calculation."). In fact, "there is no reported decision in which a trial court has concluded that a judgment liability should go onto a balance sheet so as to lessen overall net worth. All published decisions, rather, have allowed the trial court to keep the judgment liability off of the balance sheet." James Holmes, *Superseding Money Judgments in Texas: Four Proposed Reforms to Help the Business Litigant and to Further Improve the Texas Civil Justice System*, 51 ST. MARY'S L.J. 69, 98-99 (2020). Counsel's argument had no basis in law.

Defendants' counsel must clear a heavy burden to establish a right to pay no bond, and they did not even attempt to meet that burden. Indeed, they produced no evidence at all and made a frivolous legal argument.

(Pltf. Brief, Feb. 27, 2023, p. 43-44).

---

[2] FSS had also previously sought a *Braden* hearing in 2022 shortly before trial when it claimed that a sanctions order would have a preclusive effect on trial due to a purported negative net worth. In an order on June 27, 2022, this Court held Defendants "failed to meet their burden to show the Court's April 15th sanctions have a preclusive effect under *Braden*."

15

In 2023, the First District once again emphasized that "for the purposes of setting a supersedeas bond, Texas courts have held that the amount of a money judgment is a contingent liability and should not be included in the net worth calculation." *Senior Care Living VI, LLC v. Preston Hollow Capital, LLC*, 695 S.W.3d 446, 456 (Tex. App.—Houston [1st Dist.] 2023, no pet.). In short, even the most cursory legal research on this issue would have revealed the frivolous nature of this argument, but lest there be any doubt, the frivolous nature of this argument was already brought to the attention of FSS by Plaintiffs in their post-trial briefing. Despite this fact, Defendants' counsel have again used this frivolous averment in yet another attempt to delay collection of a valid judgment.

### III.   The Court Should Declare the Declaration Insufficient and Assess Sanctions.

As an initial matter, this Court should rule that Jones' declaration is insufficient under TRAP 24.1. With respect to the averment that that FSS has no assets due to judicial order, FSS has plainly failed to show "the evidence conclusively establishes, as a matter of law, all vital facts in support of its position." *LMC Complete Auto.,* 229 S.W.3d at 483. Indeed, the converse is true, and Defendants' counsel have violated their duty of candor regarding events in the bankruptcy court. With respect to the averment that the families' judgments create liabilities exceeding the company's assets, the argument is legally frivolous, as Defendants' counsel should (or did) know.

#### A.   Rule 13 sanctions

Rule 13 of the Texas Rules of Civil Procedure provides that the signatures of attorneys or parties constitute a certificate by them: (1) that they have read the pleading, motion, or other paper; and (2) that to the best of their knowledge, information, and belief (formed after reasonable inquiry), the instrument is neither groundless and brought in bad faith nor

16

005079

groundless and brought for the purpose of harassment. *See* TRCP 13. "To determine if a pleading was groundless, that is, filed for an improper purpose, the trial court must objectively ask whether the party and counsel made a reasonable inquiry into the legal and factual basis of the claim." *Lake Travis Indep. Sch. Dist. v. Lovelace,* 243 S.W.3d 244, 254 (Tex. App.—Austin 2007, no pet.). "Rule 13 authorizes the imposition of the sanctions listed in Rule 215.2(b)." *Matter of Marriage of Pratz,* No. 12-20-00187-CV, 2021 WL 6061779, at *8 (Tex. App.—Tyler Dec. 21, 2021, pet. denied). Here, the totality of the circumstances and the evidence presented by Plaintiffs shows that counsel violated the Rule not by merely failing to make reasonable into the legal and factual basis of the claim, but by misrepresenting the legal and factual basis of the claim.

### B.     Chapter 10 sanctions

Under Chapter 10 of the Texas Civil Practice & Remedies Code, attorneys certify by their signature that:

(1)     the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2)     each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3)     each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

An attorney who files an offending pleading is subject to sanctions if "[a] reasonable inquiry into the allegations would have proven otherwise." *Low v. Henry*, 221 S.W.3d 609, 616 (Tex. 2007). The moving party is "not required to specifically show bad faith or malicious

005080

intent, just that [counsel] certified he made a reasonable inquiry into all of the allegations when he did not and that he certified that all the allegations in the petition had evidentiary support, or were likely to have evidentiary support, when some allegations did not." *Id.* at 617. If the Court finds an attorney has violated Chapter 10, the Court can impose a variety of sanctions, including "an order to pay a penalty into court," or "an order to pay to the other party the amount of the reasonable expenses incurred by the other party because of the filing of the pleading or motion, including reasonable attorney's fees." TCPRC 10.004(c).

Here, the totality of the circumstances and the evidence presented by Plaintiffs shows that the pleading was presented for an improper purpose, that the legal contentions were not warranted by existing law, and that factual contentions were not accurate. Because reasonable inquiry would have exposed these deficiencies, the filing attorneys are subject to sanctions.

### C.    Inherent authority sanctions.

In addition to the above rules, the Court is also authorized to issue sanctions under its inherent authority to control its proceedings. Such sanctions can be issued when "the conduct complained of significantly interfered with the court's legitimate exercise of its core functions." *Cullum v. White*, 399 S.W.3d 173, 189 (Tex. App.—San Antonio 2011, pet. denied). While a finding of "bad faith is required to support sanctions imposed under a court's inherent authority," it is important to note that "bad faith can exist without explicitly violating a rule, statute, or ethical code of conduct," and "direct evidence of bad faith is not required." *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 716 (Tex. 2020).

In response to Plaintiffs' motion for sanctions, the Court "must hold an evidentiary hearing to make the necessary factual determinations about the party's or attorney's motives

18

and credibility." *R.M. Dudley Const. Co., Inc. v. Dawson*, 258 S.W.3d 694, 709 (Tex. App. — Waco 2008, pet. denied). Here, Plaintiffs submit that a hearing would establish that the conduct of Defendants' counsel is sanctionable under any of these three authorities.

## CONCLUSION

Because the averments in the Jones declaration are untrue and legally frivolous, and because the conduct of Defendants' counsel has frustrated the judicial process, Plaintiffs ask this Court to hold a hearing and enter an order that 1) finds FSS failed to provide sufficient evidence to demonstrate its net worth under TRAP 24.1, and 2) assess sanctions against Defendants' counsel under TRCP 13, TCPRC Chapter 10, and/or the Court's inherent authority.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax
mark@fbtrial.com
bill@fbtrial.com

19

005082

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2025, the forgoing document was served upon all counsel of record via electronic service.

_____

MARK D. BANKSTON

20

005083

# Exhibit 1

005084

8/8/2025 8:01 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

### NO. D-1-GN-18-001835

| | | |
|---|---|---|
| **NEIL HESLIN and SCARLETT LEWIS,** | § | **IN THE DISTRICT COURT** |
| *Plaintiffs,* | § | |
| | § | |
| | § | |
| **v.** | § | **459th JUDICIAL DISTRICT** |
| | § | |
| **ALEX JONES and FREE SPEECH** | § | |
| **SYSTEMS, LLC,** | § | |
| *Defendants.* | § | **TRAVIS COUNTY, TEXAS** |

### DEFENDANT FSS' NOTICE OF DEPOSIT OF CASHIER'S CHECK PAYABLE TO THE CLERK IN LIEU OF BOND UNDER TRAP 24.1

Free Speech Systems, LLC ("FSS") files this Notice of Deposit of Cashier's Check in Lieu of Bond under Texas Rule of Appellate Procedure §24.1.

1. On January 12, 2023, this Court entered a Final Judgment against Alex Jones and FSS, jointly and severally, in the amount of $50,043,923.80.

2. On April 4, 2023, Alex Jones and FSS, collectively, filed a Notice of Appeal from the Final Judgment. Oral argument on that appeal occurred on May 28, 2025 and the Third Court of Appeals has yet to issue its decision.

3. Pursuant to TRAP 24.1, a Judgment-Debtor may supersede a judgment by filing a deposit in lieu of a bond. *See* Tex. R. App. P. 24.1(a)(3). The amount of the deposit must not exceed the lesser of (a) 50% of the judgment debtor's current net worth, or (b) 25 million dollars. *See* Tex. R. App. P. 24.2(a)(1).

4. A party's net worth is calculated as "the difference between the party's total assets and total liabilities as determined by GAAP." *O.C.T.G., LLP v. Laguna Tubular Products Corp.*, 525 S.W.3d 822, 830 (Tex. App.—Houston [14th Dist.] 2017, no pet.). See also *EnviroPower, LLC v. Bear, Stearns & Co., Inc.*, 265 S.W.3d 1 Tex. App.—Houston [1st Dist.] 2008, pet. denied) (en banc), which defined "net worth" for purposes of setting a supersedeas bond as "the difference between

1

005085

total assets and total liabilities" [Id. at *3] at the time of the bond, and not the fair market value of the entity upon sale, including projected revenues from a possible sale.

5. FSS has a negative net worth as substantiated in the attached Declaration of Alex Jones.

6. As a result, FSS has made a deposit payable to the Clerk of the Court in the amount of ten dollars ($10.00), which pursuant to the Texas Rules of Appellate Procedure, is sufficient to supersede the Final Judgment, as a Judgment-Debtor with a negative net worth.

Respectfully submitted,

Ben C Broocks
State Bar No. 03058800
William A. Broocks
State Bar No. 24107577
**BROOCKS LAW FIRM P.L.L.C.**
248 Addie Roy Rd., Suite B301
Austin, Texas 78746
Phone: (512) 201-2002
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
wbroocks@broockslawfirm.com


Shelby A. Jordan
State Bar No. 11016700
Antonio Ortiz
State Bar No. 24074839
**JORDAN & ORTIZ, P.C.**
500 N. Shoreline Blvd., Suite 804
Corpus Christi, Texas 78401
Phone: (361) 884-5678
Fax: (361) 888-5555
Email: sjordan@jhwclaw.com
aortiz@jhwclaw.com
copy to: cmadden@jhwclaw.com

**ATTORNEYS FOR ALEX JONES AND FSS**

2

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2025, a true and correct copy of the foregoing document was sent to all counsel of record in accordance with the Texas Rules of Civil Procedure.

_____
Ben Broocks

3

005087

# Exhibit 2

005088

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS,<br>    *Plaintiffs,* | §<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | 459th JUDICIAL DISTRICT |
| ALEX JONES and FREE SPEECH<br>SYSTEMS, LLC,<br>    *Defendants.* | §<br>§<br>§<br>§ | TRAVIS COUNTY, TEXAS |

## DECLARATION OF NET WORTH OF JUDGMENT DEBTOR FREE SPEECH SYSTEMS, LLC
## FOR SUPERSEDEAS UNDER TEX. R. CIV. P. 24.2(c)

Pursuant to Tex. Civ. Prac. & Rem. Code § 132.001, Alexander E. Jones provides the following declaration in support the Notice of Deposit of Cashier's Check in Lieu of Bond of Free Speech System, LLC ("FSS").

1.       My name is Alexander E. Jones. My date of birth is February 11, 1974, and my address is 3019 Alvin DeVane Blvd., Suite 230, Austin Texas.  I declare under penalty of perjury the facts stated herein are within my personal knowledge and are true and correct.

2.       I am the sole manager of Free Speech Systems, LLC, a Texas limited liability company (previously, "FSS").   I make this declaration of net worth of FSS under Tex. R. App. P. 24.2(c)(1) in my capacity as manager for FSS.

**3.       Based on the facts hereafter set forth, FSS has no assets and liabilities that exceed $1,344,864,850.33.  FSS has a negative net worth.**

4.       On January 12, 2023, a Travis County Jury entered awards against me in this case [*Neil Heslin and Scarlett Lewis, Plaintiffs, v. Alex Jones and Free Speech Systems, LLC*, Case No., D-1-GN-18-001835in the 459th Judicial District Court Travis County, Texas (the "Texas Case)] in the amount of $4,110,000 in compensatory damages [**Exhibit A**] and $45,200,000 in punitive

1

005089

damages [**Exhibit B**] for a total final judgment of $50,043,923.80 including prejudgment interest [**Exhibit C**] see which has been bearing interest at 5% per annum compounded annually from that date and currently equals $56,725,304.33 (herein called the "Texas Judgment").   The Texas judgment has been appealed and oral arguments on that appeal occurred on May 28, 2025.

5.      On November 10, 2022 a trial court in Connecticut entered a final judgment against FSS and me (Alex Jones) jointly and severally in the total amount of $1,436,650,000.  **Exhibit D**. In December 2024, the Connecticut Court of Appeals reversed the trial court's award of damages under Connecticut Unfair Trade Practices Act ("CUTPA") which had the effect of reversing $150,000,000 in CUTPA punitive damages, bringing the total amount of the Connecticut Judgment to $1,288,139,546 which has born interest since that date (herein called the "Connecticut Judgment").

6.      On December 2, 2022, I declared personal bankruptcy and on June 14, 2024, my bankruptcy was converted into a Chapter 7 liquidation and Christopher Murray was appointed as the Chapter 7 Trustee (herein referred to as the "Trustee") of all my assets, excluding those that were exempt.  My personal bankruptcy is still pending in Bankruptcy Court in Houston, Texas, in the case styled *In re Alexander E. Jones, Debtor*, Case No. 22-33553, In the United States Bankruptcy Court for the Southern District of Texas, the Honorable Judge Christopher Lopez presiding.

7.      On July 29, 2022, I caused FSS to file bankruptcy in Bankruptcy Court in Victoria, Texas, in the case styled *In Free Systems, LLC, Debtor*, Case No. 22-60043, in the United States Bankruptcy Court for the Southern District of Texas, which was transferred to the Houston Division and continued with the Honorable Judge Christopher Lopez presiding.

005090

8. On June 21, 2024, Bankruptcy Judge Lopez entered an order in the FSS Bankruptcy case (herein called the "June Order," in Docket entry 956 in Case No. 22-60043) that both (a) dismissed the FSS bankruptcy and (b) at the same time transferred control and signing authority with respect to all FSS's bank accounts to the Chapter 7 Trustee of my personal bankruptcy [Case No. 22-33553], namely Christopher Murray in his capacity as the Chapter 7 Trustee for the bankruptcy estate of Alexander E. Jones. **Exhibit E**.

9. On September 25, 2024, Bankruptcy Judge Lopez entered another order supplementing his June Order, stating that as of the date of his first order above all property of FSS was judicially deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and was under the control of the Trustee, whom the Bankruptcy Court also authorized to operate the business of FSS absent further order of Judge Lopez in the Bankruptcy Court (herein called the "*September Order* or "*Supplemental Order*," in Docket entry 1021 in Case No. 22-60043). **Exhibit F**.

10. Given the fact that Bankruptcy Judge Lopez's June Order and September Orders vested ownership of all FSS cash and property of the Estate in my bankruptcy as assets in the Trustee for my personal bankruptcy, as of the date hereof, FSS has no assets. Hence it does not have a positive net worth for that reason alone.

11. As to liabilities, the Texas Judgment in the amount of $56,725,304.33 and the Connecticut Judgement in the amount of $1,288,139,546, means that FSS has a significantly negative net worth even if the assets of FSS now vested with the bankruptcy Trustee were to be considered as belonging to FSS.

12. I provide this declaration of net worth by stating the current assets and liabilities of FSS under the standard provided by *EnviroPower, LLC v. Bear, Stearns & Co., Inc.,* 265 S.W.3d 1

3

Tex. App.—Houston [1st Dist.] 2008, pet. denied) (en banc), which defined "net worth" for purposes of setting a supersedeas bond as only "the difference between total assets and total liabilities" [Id. at *3] at the time of the bond, and not the fair market value of the entity upon sale, including projected revenues from such a sale.

FURTHER DECLARANT SAYETH NOT

EXECUTED on August _Y_, 2025 in Travis County, Texas.

Alexander E. Jones

4

# Exhibit 3

005093

                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
                          HOUSTON DIVISION

ALEXANDER E. JONES AND          )  CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF        )
UNSECURED CREDITORS,             )  Houston, Texas
                                 )
          Debtors.               )  Wednesday, February 5, 2025
                                 )
                                 )  9:00 AM to 9:26 AM
-----------------------------)


                              HEARING

          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones:  SHELBY JORDAN
                         ANTONIO ORTIZ
                         Jordan & Ortiz, PC
                         500 N. Shoreline Blvd.
                         Corpus Christi, TX 78401

                         BEN BROOCKS
                         WILLIAM BROOCKS
                         Broocks Law Firm PLLC
                         6207 Bee Cave Road, Suite 120
                         Austin, TX 78746

For Chapter 7 Trustee:   JOSHUA WOLFSHOHL
                         KENESHA STARLING
                         JORDAN STEVENS
                         Porter Hedges LLP
                         1000 Main Street
                         Houston, TX 77002

                         CHRISTOPHER R. MURRAY
                         ERIN JONES
                         Jones Murray LLP
                         602 Sawyer Street
                         Houston, TX 77007

005094

For Connecticut Families:   KYLE KIMPLER
                            PAUL PATERSON
                            Paul Weiss Rifkind Wharton &
                            Garrison LLP
                            1285 Avenue of the Americas
                            New York, NY 10019

                            RYAN CHAPPLE
                            Cain & Skarnulis PLLC
                            303 Colorado Street
                            Austin, TX 78701

For Texas Plaintiffs:       AVI MOSHENBERG
                            Lawson & Moshenberg PLLC
                            801 Travis Street
                            Houston, TX 77002

                            JARROD MARTIN
                            Chamberlain Hrdlicka White Williams
                            & Aughtry, P.C.
                            1200 Smith Street, Suite 1400
                            Houston, TX 77002

                            JENNIFER HARDY
                            Willkie Farr Gallagher LLP
                            600 Travis Street, Suite 2310
                            Houston, TX 77002

Court Reporter:             UNKNOWN

Courtroom Deputy:           UNKNOWN

Transcribed by:             Veritext Legal Solutions
                            330 Old Country Road, Suite 300
                            Mineola, NY 11501
                            Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

005095

HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 5, 2025; 9:00 AM

(Call to Order)

THE COURT: -- 9:00 a.m. case, Alex Jones.  Why don't I take appearances in the courtroom and then we'll get started.

MR. WOLFSHOHL:  Good morning, Your Honor.  Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens from Porter Hedges, for the Trustee.  And Mr. Murray is here as well --

THE COURT:  Okay.  Good morning.

MR. WOLFSHOHL:  -- as well as co-counsel --

MS. JONES:  (indiscernible)

MR. WOLFSHOHL:  -- Erin Jones.

THE COURT:  Good morning.

MR. JORDAN:  Your Honor, Shelby Jordan and Antonio Ortiz, co-counsel, along with Mr. Ben Broocks and Mr. William Broocks, here in the courtroom today.

THE COURT:  Good morning.

MR. JORDAN:  And that's -- I'm sorry -- co-counsel for Mr. Jones.

THE COURT:  Yes, thank you.

MR. KIMPLER:  Good morning, Your Honor.  Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families.  I'm joined by my partner, Mr. Paterson, and on the screen, Mr. Ryan Chapple.

THE COURT:  Good morning.  Oh, I should turn my

005096

camera on.  I apologize.

MR. MOSHENBERG:  Good morning, Judge.  Avi Moshenberg, here on behalf of the Texas Plaintiffs.  Also with me is Jarrod Martin and Jennifer Hardy, Your Honor.

THE COURT:  Good morning.  Anyone else wish to make an appearance?  Okay.  Here on the 9019 settlement, and I know that there are some related motions that we should talk about.

MR. JORDAN:  Your Honor, if I might?

THE COURT:  Sure.

MR. JORDAN:  Shelby Jordan.  We have made -- we being the Alex Jones team of lawyers, two firms and lawyers that have been very, very busy -- we've made every effort we possibly could to get a grasp on what has turned out to be a very, very complex matter that could, if we are not careful, be a case dispositive motion.  We could walk out today and have nothing to show for the values of the appeal or for other matters that --

THE COURT:  Let me -- let me stop.  I've studied this 9019 over the past several days very carefully.  I know we had a status conference and I knew that there were some discovery-related issues.

The Free Speech case originally started as a Subchapter IV -- was originally a lawyer and CRO.  I find professionals -- I thought there was a conflict between

005097

those professionals and the Jones estate, so I didn't approve them.  Then came in another set of lawyers and another CRO.  The two cases, the Jones case, the Free Speech case, proceeded on a track, side-by-side track basis.

We held the hearings on the non-dischargeability claims in the Jones case.  Non-dischargeability claims were put in abeyance in the Free Speech case because the Fifth Circuit had agreed to take up the issue.  The Fifth Circuit ruled.  They got it exactly right.  It's exactly what I would have ruled.  But theirs is more important.  So we were left with the summary judgment in the Jones case.  Never really took it up in Free Speech.

There were a couple of other adversary proceedings, some related Texas parties who never had their day in front of me.  Parties, Texas families, a group of them, and Connecticut families were in mediation with other parties.  I know the Jones folks were there.  I know Free Speech was there a while, about a year.  Nothing came of it. There was a 9019.  But then it was contingent upon approval of a plan that never happened for the 90 -- that went away. But I was prepared to approve that.

The case had been going on for about two years. Then they went to mediation again before another judge in another district.  That was unsuccessful.  Mediation sometimes work; they don't.  My point is that people have

005098

been trying to consensually resolve these issues for two years, and it didn't happen.  And the Free Speech case could have either converted or been dismissed.  But it couldn't hang out in Chapter 11 because there was no way it was going to be able to confirm a plan.

And to say that they stretched -- and I allowed it to happen -- stretched the limits of Subchapter V and what it was intended to do is an understatement in terms of timing; not in terms of ruling, but in terms of timing to get a plan on.  But people were mediating.  And I thought it made sense that if people were going to try to reach a deal, if you were going to put together a plan and this all worked out, then I didn't want to put my thumb on the scale.  So, ultimately, I made a decision to dismiss the Free Speech case.

We were left with the Jones case.  But I retained -- I told Murray he could keep -- Mr. Murray, the Chapter 7 Trustee appointed then in the Jones case, because the Jones case converted as well -- keep the cash from Free Speech in the bank accounts, and kept two adversary proceedings, one involving PQPR, another one involving Elevated Solutions Group.  No professionals started coming to me.  I don't know if it's true or not, but anyway.

But Texas families were able to try to collect on their judgment against Free Speech.  They had rights given

005099

by a Texas court, I think even going after some of the Free Speech professionals who were working to preserve the estate.

When it came time to potentially sell assets, Mr. Murray and his counsel told me that they think that the real way to maximize value is to sell stuff, and not just the equity.  They wanted the opportunity to go do this, and they thought they could do this by an auction.

They had, over an objection of the United States Trustee, told me just let them sell the equity.  I entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets.  That's what that order was intended to do.  The supplemental dismissal order was just to make sure, because that was the request.

We had the auction process.  I won't recount what happened, but I didn't approve the proposed sale.  I had a – – I think the evidence is clear -- a backup bidder at the beginning.  We didn't even know what the winning bid was.  I had an auctioneer who got on the stand and didn't even know what he was going to get paid, or under what terms he was going to get paid.

I had a winning bid that was clearly based on a contingency.  There was a sliding scale in the agreement.  The proposed order submitted originally had the very language showing it was a contingency.  And the Trustee was

telling me that it wasn't a contingency.  That was his understanding.

So I was asked to approve a sale that had a contingency clearly in it, but was told to act like there wasn't a contingency, upon a sale price that no one really could articulate, because depending on how you took it as a contingency or not a contingency.  And we couldn't figure out exactly what the auctioneer was even going to get paid, because I don't even think he knew.

I then denied that auction.  We were here until, what, 10:30 that night?  So I didn't want -- and then I asked -- this case has been going on, I said -- I gave some (indiscernible) speech, told them it's been going on for like three years, and let's just get this back on track, get back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families.  I think that matter is still pending.

MR. JORDAN:  It is, Judge.

THE COURT:  I lose jurisdiction over that immediately.

MR. JORDAN:  It's still -- it is still pending.

THE COURT:  But I think the appeal was something like, Judge, you can't do that, was the basis of the appeal. I don't have authority to go vest the property of the estate.

005101

So the sale didn't happen, and I said, I don't want any more contingencies.  If there's going to be a sale of assets, then cash will be king.  But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

I also said the sale price was low.  Turns out there's been an offer made since that day, which almost doubles the amount that was -- increased the offer by a week.  A week, like it was there.  That's fine.  Then if things get -- I told folks, if you want to sell it, cash will be king.  Get back to doing just -- you want to sell the equity?  Sell the equity, but cash will be king.

I took up the motion for reconsideration filed by the Connecticut families.  I know that the Jones side has a motion for reconsideration pending that will run its own course.  But as things sit today, as I see them -- I could be wrong -- no, I'm not wrong on this, and maybe just slightly off on the numbers -- but I know that the Connecticut court has -- in Appellate Connecticut court, a second level of revision has taken some of the (indiscernible) amounts.  And now that's subject to further appeal, and parties will appeal.

I haven't denied anyone any ability to pursue.  Jones was able to hire his own lawyers.  Connecticut family

005102

was able to pursue those judgments.  My non-dischargeability order in the Jones case kind of has a mechanism saying, this is what I found based on summary judgment, based on the collateral estoppel of the findings made in the Connecticut court.  The Connecticut court ultimately finds that X is the number, will then kind of compare it to what I did, and there's a kind of an adjustment so that I'm not allowing any more than a Connecticut court would have allowed.

Same thing for Texas.  I think there was a portion that I didn't approve for Texas, I know, and for Connecticut as well, that I didn't find -- I didn't think there were basis for collateral estoppel findings, and appellate courts will review what I did, and that's the way the process works.  I've got no issues with that.

So that's where things stand.  I don't know, around a billion dollars for Connecticut right now, subject to further appeal, non-dischargeable.  Around $50 million for Texas, subject to further appeals.  The numbers could stay the same, numbers could be zero, numbers could go up. I don't know.  It's all subject to state court appeals now.

But FSS, that estate is closed.  That case is closed.  That case is closed.  Which means that someone has a contract dispute with FSS.  You don't come to me.  You have whatever rights you have outside the bankruptcy.  The bankruptcy doesn't affect your claims one way or the other.

005103

There were several individuals who had a case. They were suing Jones in Texas state courts. They can continue their trials in state courts. There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have.

I already said, multiple years to try to reach a settlement, and they didn't. And I'm not saying anybody should have settled. I don't get into why people settle and don't settle. Not my purview. I'm there to evaluate settlements and determine whether they're in the best interest of the estate. That's my job.

So, kind of where we are. Several years of negotiating, no settlement, no plan. FSS gets dismissed. Failed auction. Now there's a 9019. The 9019 now wants me to allow claims against FSS. And I don't -- and I can't do that. And all bankruptcy lawyers know that I can't do that. Because there's no estate. There's no bankruptcy estate to allow a claim against. People can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me.

So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech.  And now the Texas families are saying that the matter that they very much appealed, they're now embracing.  The supplemental order is now embraced.

The Trustee who asked me for a specific order for a specific purpose is now using that order.  But it was only for one purpose, to see if he could sell the assets.  To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it.  Ha Nguyen was here.  The U.S. Trustee was sitting right there telling me.

So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed.  I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

And here we are again.  Before we would pit the families against each other, where Connecticut and Texas would disagree on whether the form of relief being requested was appropriate.  Happened during the auction too, where Texas said, I don't understand what we're doing here and I don't understand how this is going to work.

So, now I'm told we're all aligned and you just -- Lopez, just have to allow a claim against an entity in a case that's been dismissed.  I can't do that.  I cannot do that.  I don't have authority to do it.  And I'm not going

to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone. I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore. Pure sale of the equity.

We're going to -- I've got to -- this case keeps taking twists and turns and trying to come up with really masterful and creative lawyering. But at its core, it's something I can't approve. Would come -- you know...

And so, I know... I read the revised settlement. Read the revised order. Bankruptcy lawyers know I can't do this unless we get really, really, really creative. And I think on a case like this, we've got -- with multiple appeal, any party, regardless of what I do, people have their rights.

So, before everyone gets started, let me just tell you, I can't do this. I'm going to again turn to Mr. Moshenberg and tell him, you'd better -- I need you to tell me what you want to do on your -- this non-dischargeability action.

I know that there's a pending motion in the other one. I've now approved the two matters in which there's 9019s and the two settlement matters. Money's going to go out the door. You don't have to tell me now. I want you to file something and tell me exactly what you all are going to

005106

do.

MR. MOSHENBERG:  Understood, Your Honor.

THE COURT:  And just play it down the line, in other words.  People have rights and I'm not telling you to put you on the spot or anything, I just know.

Mr. Murray, if you want to sell the equity, go sell the equity.  This case -- people have rights and they've been...  If you want to go pursue claims against Jones in state court against Free Speech, I don't -- I dismissed the case and I know what comes along with that.  Those arguments were made to me and I know what they are.

No, you don't have to say anything.  I know what the rights are.  And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  I don't trust the process.  I would have to do it -- me, myself -- and I'm not overseeing it.

So kind of get comfortable with the process so that we don't kind of do the same thing.  We've already did it really long and complicated and brought in auctioneers and had lots and -- enough has been -- and I think what this Debtor needs and what these families need is finality of the bankruptcy process so that they can pursue whatever it is that they want in judgments in state court, which is where they started in the 1st place; Connecticut, Texas, for the

005107

most part.  I know that there's some other litigation pending out there.

I just -- I don't have the ability to allow a claim against an entity.  And in a case that has been dismissed in which I literally gave specific authori- -- you keep the cash; we're going to keep these two adversaries.  I'm going to settle these.  I'm going to keep jurisdiction over these two things and this one.  And I'm not going to do it for anything else.

I can't use the supplemental order to then go -- for a purpose in which it was never intended.  And I get to construe my own orders and I retain jurisdiction over them.  This case will be highly simplified.  And I know Mr. Wolfshohl said he's been listening to these transcripts carefully.  I made it super simple for you this time.

There will be -- I don't know.  Someone has a case, bring it.  There have been multiple years of investigations.  No lawsuits have been (indiscernible) in front of me.  Maybe one is coming.  I don't know.  If it does, we'll take it up and I'll rule.

I'm not sure anybody's ever been happy about -- completely set in my rulings.  I'm not sure Mr. Jones has been entirely happy to know that I found on summary judgment that he's liable for over a billion dollars in non-dischargeable debt and over $49 million dollars.  I'm sure

005108

he -- appealing -- he is appealing.  And that's his right.

So, I'm sure the Connecticut and the Texas family -- I'm sure the Connecticut families weren't too happy about my decision about the auction.  Sure Global Tetrahedron wasn't too happy about it.  But I'm really trying to do what I think is my duty and my job upon careful analysis of the law.

And so I'm not approving.  I cannot on its face.  You don't have to put on any evidence.  I can't approve this sale.  I can't allow $480 million dollars.  And I don't want folks to put it up.  And we don't need to take up TROs and Connecticut and Texas.

Texas, you have whatever rights you have.  Connecticut, you have whatever rights you have against Free Speech, case against Jones.  If you want to have another -- if you want to settle with the Trustee on Jones related matters, do it.  Tee it up.  We'll take it up.  But these things are inextricably linked and multiple appeals going on.  Well, I don't know if they're still going on.  They probably will on the non-dischargeability front, by the way.  You have whatever rights you have on the supplemental order.

MAN 1:  Judge, if I could comment --

THE COURT:  Won't be used again.  No, no, no.  I don't need you to comment on anything.  I don't -- because it's going to open the door.  I just wish everyone a good

005109

day.  Thank you.

CLERK:  All rise.

(Whereupon these proceedings were concluded at 9:26 AM)

I N D E X

RULINGS

|                                  | Page | Line |
|----------------------------------|------|------|
| Motion to Approve Sale, Denied   | 16   | 8    |

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  February 6, 2025

005112

# Exhibit 4

005113

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

March 19, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 22-33553 |
| ALEXANDER E. JONES, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | CHAPTER 7 |

**ORDER DENYING FUAC'S MOTION SEEKING LEAVE TO FILE A MOTION
APPROVING THE SALE OF FSS ASSETS AND REQUEST FOR STATUS CONFERENCE
(RE: ECF NO. 1089)**

This Court said at a hearing on February 6, 2025 that it would not allow a sale of FSS assets, and that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed. The Court won't require the Chapter 7 Trustee to conduct another auction for the FSS assets. FUAC also does not have standing to seek a sale of FSS assets under Section 363 of the Bankruptcy Code. The motion is denied.

Signed on March 19, 2025

Christopher Lopez
United States Bankruptcy Judge

005114

# Exhibit 5

005115

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| IN RE: ALEXANDER E. JONES | § | CASE NO. 22-33553 (CML) |
| | § | |
| Debtor | § | **Chapter 7** |

**MOTION FOR RECONSIDERATION OF THIS COURT'S**
**DETERMINATION THAT NO AUCTION OF FREE SPEECH SYSTEMS**
**ASSETS WILL BE CONDUCTED BY THE JONES CHAPTER 7 ESTRATE**

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

This Motion For Reconsideration of This Court's Determination That No Auction of Free Speech Systems Assets Will Be Conducted By the Jones Chapter 7 Estate (the "Jones Estate) which is which currently administered by its Chapter 7 Trustee Christopher R. Murray (the "Trustee") and is filed by Alexander E. Jones ("Jones") for himself and as manager of the non-debtor company, Free Speech Systems, LLC ("FSS") [Collectively Jones and FSS are sometimes referred to as "Jones"].

**I.**
**PRELIMINARY STATEMENT**

1.        Jones has the statutory and common law authority to represent Free Speech Systems, LLC ("FSS") as manager and in the common interest of preservation of value of the FSS assets including (i) preservation of the ongoing appellate proceedings; (ii) defense of the pending

005116

dischargeability proceedings, and (iii) matters before this Court, including this Motion seeking reconsideration of the Order of this Court bench order of February 5, 2025, to the extent that:

(a)    this Court has exercised jurisdiction to enter, then "void," its order that is now on appeal; and

(b)    Jones' desire to be heard involves his personal and financial rights and pecuniary interests in such orders and assets, giving Jones standing to assert these matters;  and

(c) Jons responds to the Plaintiffs' misstatement and misrepresentations in their recent opposition to FUAC's request for an auction of the FSS assets.

2.    Jones seeks reconsideration of the status of the "Supplemental Order" of this Court [FSS Dkt. 1021, September 25, 2024], that has twice previously been the basis of the Trustee's proposed auction of the FSS assets and twice manipulated and improperly orchestrated by the two largest creditors (herein collectively the "Plaintiffs" and separately the "Connecticut Plaintiffs" or the "Texas Plaintiffs") in coordination with this Court's Trustee to accomplish an illegitimate purpose and intent of the Supplemental Order.   The cost to the Jones Estate of these two improper efforts was almost $2+ million in attorney's and professional fees.

3.    Importantly, this Motion raises issues not considered by this Court, or at least not expressed in the record of its ruling and the most recent denial of the proposed continuation of an FSS asset auction raised by FUAC, LLC.  Court determined FUAC had no standing to seek that relief.

4.    Although this Motion points out that the total chaos caused by the Trustee and Plaintiffs in their now well-documented manipulations of an otherwise simple bankruptcy auction process, that is not the basis of this Motion.  That wasteful chaos caused by a tortured attempt to manipulate this Court's Supplemental Order to accomplish a purpose never intended by this Court, should not result in the punishment of the other creditors or the Jones and FSS interests, as the

005117

case may be.  Jones summarizes this Motion and Jones' arguments as follows:

      a.      **THIS MOTION SEEKS RECONSIDERATION OF THE COURT'S IMPROPER DECLARING THE SUPPLEMENTAL ORDER "NULL AND VOID."**      On June 21, 2024 this Court entered its Order giving the Trustee control of FSS bank accounts and cash (the "Cash Order")(FSS Dkt. 956).  Then on September 25,  2024 this Court entered its so-called Supplemental Order which *supplemented* the prior Cash Order and gave the Trustee control of and supervisory powers over FSS's assets that were generating the new cash in addition to the Cash Order (Dkt. 1021).  At a hearing on February 5, 2025 this Court discussed its lack of jurisdiction to void the Supplemental Order.  However, in a subsequent Order entered on February 5, 2025[1] this Court declared that the Supplemental Order was "null and void."   This Motion requests the reconsideration of that declaration as the Supplemental Order, now on appeal, cannot be declared null and void, as a matter of law, as previously stated by this Couret.[2]  This Court, in making its most recent ruling from the bench (that the Supplement Order is now considered "null and void") does not consider its earlier acknowledgment that the Supplemental Order is on appeal and, as this Court previously stated that because *such Supplemental Order is on appeal, this Court lacked jurisdiction to void the order*:

>     15.    *-- no, I should back up and mention that the*
>     16.    *supplemental order was appealed by the Texas families. I*
>     17.    *think that matter is still pending.*
>     18.    *MR. JORDAN: It is, Judge.*
>     19.    *THE COURT: I lose jurisdiction over that*

---

[1]    This second order noted that First United America Company ("FUAC") lacked standing to request reconsideration.  As will be explained infra, there is no question of Jones's standing given his personal and financial rights and pecuniary interests which unquestionably give Jones standing to assert these matters.

[2]    *Avery v. Gonzalez (In re Gonzalez),* Nos. 2:15-bk-25283-RK, 2:16-ap-01037-RK, 2024 Bankr. LEXIS 1038, at *9 (Bankr. C.D. Cal. May 1, 2024) (the court lacked jurisdiction to consider a Rule 60(b)(1) motion for relief from judgment during the appeal).

005118

*immediately.*

[*See*, **Exhibit "1"** Hearing transcript, February 5, 2025, pg. 8, lines 15-19.]. The Court was clear that although it would likely set aside the Supplemental Order (out of pure frustration over the efforts to pervert the purpose of its entry), it had no jurisdiction to do so. The Court's observation was correct when first made and remains correct now.[3] However, the non-stayed appeal does not prevent this Court from enforcing its unstayed orders even if on appeal:

> "In addition to its remaining jurisdiction on matters unrelated to the appeal, a *bankruptcy court retains substantial jurisdiction as to the order that is the subject of the interlocutory appeal*." *Id.* 'T*he appeal only deprives the bankruptcy court of the power to alter, expand or vacate the order at issue.*' *Id.* (citing *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1190 (9th Cir. 2000)). "*The [lower] court retains jurisdiction over [\*7] all other matters that it must undertake to implement or enforce the judgment or order* [that is on appeal]." *Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 967 (9th Cir. 2007).

*In re M & C P'ship*, No. 19-11529, 2021 Bankr. LEXIS 1135, at *5-7 (Bankr. E.D. La. Apr. 28, 2021). [Emphasis Added] [*See*, Note 3 *Supra*]. This appeal is active, and no stay has been sought or entered.[4] Accordingly, this Court may implement and enforce the Supplemental Order, which is the relief sought by this Motion.

The Court's act of voiding the Supplemental Order was imminently justified, borne from frustration of the combined machinations of the Trustee with the assistance of the 15 Connecticut Plaintiffs and the two Texas Plaintiffs (collectively, the "Plaintiffs") who thwarted this Court's clear instruction for the Trustee to conduct a simple bankruptcy

---

[3] *See, e.g., Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at *20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] citing *In re Port Neches Fuels, LLC*, No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, *12 (D. Del. Mar. 27, 2024).

[4] *See*, pending *Case No. 22-60043* - Judge Charles Eskridge, U.S District Court, SD-TX.

005119

auction. However justified the Court's frustration, the remedy of declaring the Supplemental Order void, was (i) legally impermissible, (ii) inequitable, (iii) creates virtually insurmountable complications and chaos of undoing events of the past 7 months; and (iv) overlooks the much more practical remedy of simply Ordering the auction, even if required to replace the disobedient and compromised Trustee. Holding to the position that the Supplemental Order is void will create past, present and future chaos. It would mean that for now, everything previously done under the authority of that Supplemental Order was invalid and must be reversed. In the present sense, it makes the companion Cash Order currently in place meaningless and makes the Trustee an intentional tortfeasor in retaining property he seized that belongs to FSS and has not returned. But perhaps the most pernicious is the fact that the Plaintiffs will act as though it is void and begin collections only to find that it is not void, and their actions violated the automatic stay or the discharge injunction, and thus themselves are void. The ripple effects from this one improvident act, will reverberate in numerous directions.

b. Second, Jones is continuing his appeals of the Plaintiffs judgments, the reversal in whole or in any substantial part, will likely render Jones Estate solvent. Jones, as the sole manager of FSS, is also continuing the appeals on behalf of FSS, at no expense to the Jones Estate, likewise if reversed on appeal will render FSS solvent. For this and several other reasons and recent Supreme Court authority discussed below, Jones has standing to seek the relief requested herein and this Court has the jurisdiction to order the relief sought.

c. Third, this Motion seeks to inform the Court of not only the need pursue its prior-ordered auction, considered ordinary in most every Chapter 7 case (specifically, the Chapter 7 Trustee's conducting of a public, non-collusive, auction of assets to the highest

005120

bidder for cash) but also a matter *now opposed* by the Plaintiffs *and silently ignored by the Jones Estate Trustee* in furtherance of the same history of manipulation.  This Court may take judicial notice that  (i) a § 363 Sale with title vesting free and clear of all liens, claims and encumbrances, greatly enhances the public's participation in an auction and thus, a bankruptcy Trustee's public sale to the highest bidder is generally considered the premier way to recover the highest return for creditors and the bankruptcy Estate.  This is true primarily because it is promoted, advertised, and conducted only by professionals in such process, (including the professional Trustee, his legal counsel and retained auction professionals, all supervised by a business Bankruptcy Judge).[5]  Contrast this professional approach to the Texas state ordered Writ of Execution and auction by a Sheriff's or Constable's sale, where the officer's only participation is to levy the property and at the auction read the contents of the writ of execution before asking for offers, that is if anyone shows up other than the judgment holder planning on making only a "credit bid."

d.      Fourth, in addition to the gross disparity in auction results, contrast that process to (i)  the fact that the Connecticut Plaintiffs were stayed from all collection efforts by both Connecticut Statute and recent ruling of the Connecticut Court of Appeals during the two prior Ordered auctions the Plaintiffs attempted to manipulate;[6] and (ii) the likelihood that both judgments will be stayed because Texas, by statute, *mandates a stay*

---

[5]      The bankruptcy bidding process is neither complex nor out of the ordinary.  It is a mainstay of bankruptcy estates' ability to satisfy the maximum recovery, of critical importance in circumstances that likely will not pay 100% of the creditors' claims.  And as Jones argues, it is a matter of judicial notice that a State law Constable's or Sheriff's sale is conducted exclusively by a deputy sheriff or constable with no obligation to advertise or otherwise maximize the sale price, and where other bidders must compete with credit-bidding of the judgment holder that significantly chills the bidding, the price obtained never reflects, much less reaches anywhere near the fair market value.

[6]      The stay of the Connecticut Judgment is problematic at this point since the Connecticut Supreme Court denied certification of the Jones and FSS appeal, and a stay is limited in duration until, and if, the Connecticut Court of Appeals agrees to extend the stay, or the US Supreme Court grants a stay pending *certiorari* or pending a ruling if *certiorari*. is granted.

005121

when a money-judgment debtor posts a bond or collateral equivalent to 50% of the judgment debtor's **_net worth_** (the "net worth" of FSS is a negative multi-millions of dollars);[7] and the fact that neither Judgment is supported by a final order of non-dischargebility, thus, no execution is appropriate (which did not stop the Connecticut Plaintiffs form seeking to violate the Connecticut Stay by making false claims to the State Court *of this Court's orders*, including the claim that this Court had entered a *final order* determining the Judgment to be nondischargeable.[8] Instead of this chaos,[9] this Court should simply and clearly order the bankruptcy auction to liquidate all assets of the Chapter 7 estate and thereby (i) stop all of the extravagant legal and Trustee's fees from continuing to support Plaintiffs' manipulation of the bankruptcy process; and (ii) allow the appellate processes to conclude.   The Estate, at that point, needs no further "administration" and

---

[7]         Fifth, with both judgments stayed, both Jones and FSS will then be entitled to remain in possession of their assets (with, as to FSS, only "ordinary course operations allowed") until the appellate stays are lifted by final orders of the Connecticut and Texas courts, *and* only if these judgments are not reversed on appeal.  This totally re-adjusts **_back to this Court's expressed intention_** to conduct a bankruptcy auction and to not allow the manipulation of its orders to frustrate the auction process and send the auction (writ of execution) process to State Court to deal with any sale.  Instead of this Court sending matters back to State Court where (i) a stay of all collection will be in place for potentially both judgment holders; (ii) this Court's jurisdiction is lacking to void the Supplement Order while on appeal (an unstayed appeal), and (iii) the Trustee remains in possession of all of those operating assets which Jones continued efforts have protected and increased.

[8]         Although the Connecticut Plaintiffs Judgment has always been subject to a stay of any execution or effort to recover on the non-final Connecticut Judgment, as this Court may note, the Connecticut Plaintiffs nevertheless attempted to have an Austin State District Court appoint a receiver pursuant to, and execute on the Connecticut Judgment over Jones' assets, falsely telling the Austin District Court that this Court had entered a "final order" finding the Connecticut Judgment non-dischargeable **_and_** not mentioning to the Austin District Court that their collection efforts were stayed by the State of Connecticut's statutory stay of money judgment.  That case was removed to the Federal Court and referred to this Court by the District Court, Western District of Texas (Austin Division).  [*See, also infra*, Note 23].

[9]         As discussed below, the Connecticut Plaintiffs previously ignored the stay of collection and filed in the State District Courts an action to seize Jones property and appoint a receiver over Jones property, (i) telling the State district court that this Court bankruptcy court ruled the Connecticut Judgment non-dischargeable *by final order*; and (ii) telling the State district court **_nothing_** about the Connecticut statutory stay from execution, as also ordered in Connecticut by the appellate courts.   As a result, the action was timely removed to Federal District Court where a counterclaim was filed based on diversity and bankruptcy jurisdiction against the Connecticut Plaintiffs.  That case was transferred to the US District Court for the Houston Division and referred to this bankruptcy court.   It is now pending a Motion to Dismiss pursuant to Federal Rule 12(b)(6) incorporated into the Bankruptcy Rules of Procedure.

Page 7 of 34

because it has been liquidated, simply remains open until the judgments are reversed or affirmed in whole or in part.

e.   Fifth:  The Obvious Abuse of Process Must Be Eliminated:  Ultimately, to the extent that any part of these two Plaintiffs' Judgments is rendered final on appeal, the rights of Jones to *a reasonable effort to achieve a maximum credit against those Judgments* should include the Debtor's right to actually achieve the highest value reasonably obtainable from the sale process most reliably capable of achieving that result – a bankruptcy auction.  It is the sale proceeds that must then be applied to those Judgments as credits of the sale proceeds, and depending on the outcome of the appeals, may allow payment in full of one or both of these judgments.  Allowing the operation and protection of these assets has and will continue to be for the benefit of the creditors and the Jones Estate until the auction concludes, which will not be the result if a State law execution sale is conducted or if the Connecticut Plaintiffs acquire the assets in other than a fair, non-collusive § 363 Auction.[10]  Although Connecticut Plaintiffs have been consistent in their demand *to destroy Jones' ability to earn an income from his exclusively-owned "persona" (his image, name, voice, etc.)* to silence his free expression of political and other opinions as an "on air" news media, not only that position is irrelevant to the economic interest of the bankruptcy system itself   but also when it rises to the level of abuse of process that uses the bankruptcy system to accomplish an unconstitutional political goal (to take away Jones First Amendment right).[11]  In fact, abuse of process conduct it is contrary to the

---

[10]   Although the Plaintiffs are free to acquire the FSS assets through a fair bidding process for cash, the stated purpose of the purchase is to destroy the value of the "Infowars" or "Alex Jones" brand.  This perverted motive is addressed below, and its impact on the claims allowance process.

[11]   *See, e.g.* the Fifth Circuit opinion in *Ridgeway v. Stryker Corp. (In re Ridgeway), 973 F.3d 421, 427-28 (5th Cir. 2020):*

bankruptcy fresh start, even where a claim is found non-dischargeable. If the demands of Connecticut are to have its debt declared nondischargeable then it cannot, under any good faith application of ay bankruptcy policy approved by the Supreme Court or Congressional intent, be consistent with destroying the Debtor's ability to earn an income to pay its non-dischargeable debts. This counter-intuitive position is the definition of "abuse of process" or its modern counter-part, "lawfare" - when a political agenda, as here, is the ulterior motive, defined as taking a lawful legal position only to advance a contrary political agenda.[12] Bankruptcy Courts have the jurisdiction to remedy and sanction abuse of process and lawfare, and do so.[13]

5.      For the reasons set out above and below, Jones request this Court reconsider its prior rulings and order what this Court originally ordered. This Court should order the Trustee or the Trustee's replacement (without manipulation or interference by the Plaintiffs or their affiliates) to do what the Trustee and Plaintiffs have thus far have refused to accomplish without abusive manipulations of the simple bankruptcy auction process. Although this Court has made clear its

---

The Bankruptcy Code 'provides equitable powers for the bankruptcy court to use at its discretion.' *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party. *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ('[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages.'). *Id.* at 428.

[12]     "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy. The term "lawfare" is also a clever play on words, a pun, and a neologism that needs to be deconstructed in order to explain the linguistic and political power of the term. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448

[13]     *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020). Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423. … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party. *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages."). *Id.* at 427-428.

005124

frustration and distrust "of the process" conducted by the current Trustee, the injury to the other

creditors, admittedly small (but only in comparison to the Plaintiffs *non final Judgments*) and to

Jones' and FSS's rights to a fair process, compels this result.

## II.
## JURISDICITON

6.　　This is a core proceeding pursuant 28 U.S.C. § 157, 1334 over which this Court has

exclusive jurisdiction. *See, also Stern v. Marshall*, 564 U.S. 462, 494 (2011); *Pacor, Inc. v.*

*Higgins*, 743 F.2d 984 (3rd Cir. 1984). Here the basis for reconsideration is the injustice to the

parties and bankruptcy system itself. Fed.R.Civ.P. 60(b)(6) can be invoked "in extraordinary

circumstances" that include cases where the order to be reconsidered involves "***the risk of injustice***

***to the parties' and the risk of undermining the public's confidence in the judicial process***."

*Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs.*

*Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis

Added). Such is the case here.

## III.
## STANDING OF JONES TO SEEK THIS RELIEF

7.　　Plaintiffs, through Paul Weiss, wrongly assert that Jones and FUAC are parties that

have no economic standing in the case— [*See*, Connecticut Plaintiff's Response to FUAC's request

for status conference, pg. 2, ¶1, Dkt. 1113]:

> The Families no longer see any benefit to pursuing a costly and litigious sale process
> in this Court. [*See*, pg. ¶ Response to FUAC Auction Motion]; …. Another contested
> sale process would significantly harm creditors' recoveries—which have already been
> delayed by years, *while millions of dollars are paid to estate professionals*. Counsel to
> the Trustee alone has incurred over $1.4 million in fees through January 31, 2025.
> Nearly $800,000 of such fees were incurred between November 2024 and January
> 2025, the period of time during which the first contested sale hearing took place. *See*
> Interim Fee Application. [*See*, pg. 6, ¶ 9 Response to FUAC Auction Motion].

005125

8.      This Court, however, has previously recognized Jones standing regarding the auction orders.  In fact, Jones, as the Chapter 7 Debtor and FSS as a party in interest, has constitutional and bankruptcy code standing to bring this request for relief,[14] and for the purpose of both of the appeals of the Plaintiff Creditors' Judgments (and objections to their claims) and the enforcement of this Courts Supplemental Order to conduct a public auction. In both instances, standing is individually and as the sole managing member of FSS, a party in interest.

9.      Additionally, the standing doctrine is required by the Constitution's text including the due process clause of the Fifth and Fourteenth Amendments.  The Due Process clause prohibit courts from depriving a person of "life, liberty, or property without due process of law."  As Justice Amy Coney Barrett has explained, *stare decisis* can often function similarly to preclusion, and

---

[14]     Jones has standing as the Chapter 7 Debtor pursuant to Section [§1109(b)] that provides "[a] party in interest . . . may appear and be heard on any issue in a case under this chapter." The section goes on to say that parties in interest include:

> "*the debtor*, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."

•. *Truck Ins. Exch. v. Kaiser Gypsum Co*., 22-1079 (Sup. Ct. June 6, 2024) [standing extends "*to entities that are potentially concerned with or affected by a proceeding*."];  *See, also In re Team Sys. Int'l, LLC*, Nos. 22-10066 (CTG), 561, 2024 Bankr. LEXIS 2573 (Bankr. D. Del. Oct. 21, 2024) [*citing Truck Insurance Exchange* as defining the scope of a party in interest right to participate].

;  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A*., 530 U. S. 1, 7 (2000);

•.  *Willard v. O'Neil (In re Willard)*, 240 B.R. 664, 669 (Bankr. D. Conn. 1999). As the court explained in In re Toms, 229 B.R. 646, 651 (Bankr. E.D. Pa. 1999):

> [I]f there were a claim asserted in a chapter 7 case which would not be discharged, and which is not likely to be paid in full by the trustee, then the chapter 7 debtor will be legally responsible for payment of any remaining claim after the bankruptcy case is concluded. Due to this continuing obligation, the debtor has a pecuniary interest in the disallowance of the claim. Were the claim disallowed or reduced in amount, the debtor's continuing liability after bankruptcy could be affected.

•. *In re Morgan*, No. 05-34981-SGJ-7, 2007 WL 2669341, at *4 (Bankr. N.D. Tex. Sept. 6, 2007) [after considering the claims register, the trustee's report of assets, and the fact that the trustee hired accountants to investigate the assets of the debtor, concluded that given the uncertainty of total assets and claims, the debtor had a pecuniary interest in the outcome of the claim objection];  *See, also, In re Curry*, 409 B.R. 831, 838 (Bankr. N.D. Tex. 2009)the debtor has a pecuniary interest in the outcome of any claims objection and so standing to object if there might be a surplus to be returned to the debtor after satisfying all debts.  Additionally, a debtor may be afforded standing to object to an excessive dischargeable claim whose holder would receive distributions that otherwise would be made to the holder of a nondischargeable claim. The debtor certainly wants to maximize the distribution to the holder of a nondischargeable claim, because to the extent that this claim is satisfied, the debtor is relieved from some or all of the claim of that creditor which would survive the bankruptcy case. See 4 Collier on Bankruptcy § 502.02[c] at 502-13 (Resnick & Sommers ed. 15th ed. rev. 2009).

005126

consequently the application of *stare decisis* can deprive litigants of their life, liberty, or property rights without due process of law.[15]

10.     Jones Standing in this case is supported not only by the recent instruction of the Supreme Court in *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 22-1079 (Sup. Ct. June 6, 2024) [standing extends "… *to entities that are <u>potentially concerned with or affected by</u> a proceeding*."], but also on the merits and nature of the constitutional rights of Jones set out in *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S. Ct. 1519 (1987), *citing with approval Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (5th Cir. 1979).   The Fifth Circuit in *Henry* v. *First National Bank of Clarksdale* dealt with collection of a judgment and non-final appeals and the avoidance of irreparable harm for particular constitutionally driven appealed cases such as the Judgments against the NAACP and here, Alex Jones dealing with "*fundamental constitutional rights.*" *Id. Pennzoil at* U.S. 23. as discussed in *Pennzoil* dealing precisely with the issues before this Court (in rejecting Texaco's argument to avoid its own bankruptcy).  *Pennzoil*, however, made two critical distinctions in its holdings significant to this case.  In contrasting to a case involving a politically sensitive defendant (the NAACP [or here, Alex Jones]) efforts to appeal a judgment it could not pay nor afford the appeal bond:

> First, relevant to this Court's consideration, is the holding that "[w]hile 'a cost requirement, *valid on its face*, may offend due process because it operates to foreclose a particular party's opportunity to be heard,' [citing *Boddie* v. *Connecticut*, 401 U.S. 371, 380 (1971)]…." *Id. Pennzoil at* U.S. 22.

Next, the Supreme Court made specific reference to the reason Texaco was note entitled to relief because of the size of the required bond, noting the distinction where relief would be appropriate:

> the claim [of Pennzoil] that the Texas bond and lien provisions violated the due process and equal protection clauses was without merit, because (a) the New York company could exercise its right to appeal even if it were forced to file for

---

[15]     Stare Decisis and Due Process, https://scholarship.law.nd.edu/lawfacultyscholarship/450/

005127

bankruptcy, and (b) *the underlying issues in the case--arising out of a commercial contract dispute--**did not involve fundamental constitutional rights.***

*Id. Pennzoil,* 107 S. Ct. at 1535 [Brennan, J., joined by Marshall, J., concurring] (Emphasis Added). The Supreme Court, in rejecting Texaco's right to receive relief from an un-affordable appeal bond, cited the Fifth Circuit case where special relief was justified:

> "in the more troublesome situation where a particular corporate litigant has such special attributes as an organization that a trustee in bankruptcy, in its stead, *could not effectively advance the organization's interests on an appeal*"[16]

*Id. Pennzoil,* 107 S. Ct. at 1529 [Justice Scalia, with whom Justice O'Connor joins, concurring], *citing* with approval, the Fifth Circuit opinion in *Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (CA5 1979) that did, in fact, deal with the deprivation of "*fundamental constitutional rights*":

> (bankruptcy of NAACP would make state appellate review of First Amendment claims "so difficult" to obtain that federal injunction justified), cert. denied *sub nom. Claiborne Hardware Co.* v. *Henry*, 444 U.S. 1074 (1980).

11. The Supreme Court, in recognizing that the rights to seize a judgment debtors assets by State law execution and order a sale of the judgment debtor's assets, held that notwithstanding the state statute that required a cost bond that would bankrupt the NAACP, the exception recited in *Henry v. First National Bank* "… involved fundamental constitutional rights" that would be lost if the execution went forward. In *Henry v. First National Bank*, because "…the underlying issues *did involve fundamental constitutional rights*" to boycott, and having suffered a $3 million

---

[16] Here the Chapter 7 Trustee of Jones, in his campaign to damage Jones, was willing to allow Jones' Connecticut Appeal to lapse by not permitting Jones to file, at his own cost, his and the Free Speech Systems, LLC appeal brief for certification to the Connecticut Supreme Court. Further, the Trustee proposed to this Court a "settlement agreement" among only the Jones Estate and the Plaintiffs that provided that the Trustee could dismiss the appeals or could ***sell to Plaintiffs*** as assignees the Jones and FSS right to appeal and they could dismiss, or cause the dismissal of, the appeals to satisfy the appellees' desire to have an allowed claim *untested by the due process rights to a full appeal*. This Court denied that relief.

005128

judgment in Mississippi state court for supporting a boycott of certain white-owned businesses, federal injunctive relief (to permit an unbonded appeal) was appropriate.[17]

12. This is precisely the standing Jones relies, and the fundamental First Amendment constitutional rights of Jones as a media defendant his free speech rights, that must be protected until the opportunity for Supreme Court review.

## IV.
## RELEVANT BACKGROUND FACTS TO THE RELIEF REQUESTED AND THE PLANTIFFS RESPONSIVE MISSTATEMENTS

13. This Court previously ordered the dismissal of the Chapter 7 Free Speech Systems, LLC, ("FSS") Chapter 11 case (the Debtor-Jones 100% owned limited liability company) but included in such order the transfer all of the "cash" account assets of FSS to the Trustee's Chapter 7 estate of Jones (the "**Initial Cash Transfer Order**"). That cash was significant (in excess of $4 million, and through Jones' continued service to the Trustee, the cash has grown to more than $7 million, less $3 million paid by the Trustee to the Trustee's law firm and the Trustee's special counsel and retained professionals, and other costs of administration.

14. At the request of the Trustee of the Jones Estate for a clarifying order as to the ownership of the Debtor-Jones' company FSS *non-cash assets*, this Court entered an order clarifying that all FSS assets would be transferred to the Jones Estate (the "**Supplemental Order**").

15. The Texas Plaintiffs' did not appeal the Initial Cash Transfer Order which is a final order. The Texas Plaintiffs' (after attempting a state court Turnover of the FSS assets and that proceeding's removal by the Trustee to this Court) appealed the Supplemental Order and the

---

[17] The Fifth Circuit upheld the District Court's injunction prohibiting the execution on the judgment involving all of the Mississippi NAACP assets including the name NAACP owned by the Mississippi Chapter, and all the confusion that would have caused, until the NAACP could prosecute its appeal of the Constitutional right to boycott. Ultimately, the Supreme Court decided the case on the merits and reversed the state court judgment as constitutionally infirm. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S. Ct. 3409 (1982).

005129

appeal is ongoing. [*See, supra* Note 3].[18]   The Texas Plaintiffs did not seek a stay pending that appeal of the Supplemental Order and accordingly, this Court has unfettered jurisdiction to *enforce* that order, it cannot vacate the order.  *In re M & C P'ship*, No. 19-11529, 2021 Bankr. LEXIS 1135, at *5-7 (Bankr. E.D. La. Apr. 28, 2021). [Emphasis Added].   This principal has been affirmed time and again.[19]   As such this Court's pronouncement that the Supplemental Order is void, is itself void.  The Supplemental Order still exists and is enforceable in accordance with its terms.[20]   Both the Jones Estate through its Trustee and/or Jones have consented to the sale of substantially all of the assets of FSS now in the Court-ordered possession of the Jones Estate Trustee.  If sold at a bankruptcy Auction as sought herein, the estate could be administratively closed until the Plaintiffs claims are allowed and distributions of those proceeds are made.  If this is not done, and both Judgments are stayed, the assets may simply remain idle.   If ultimately the State Courts become the arbiter of the method and manner of the writs of execution or otherwise there will be no prompt sale of those assets remaining in the possession of the Trustee. The auction sale, already ordered by this Court is the only prompt solution to this dilemma.

16.      And active participants are awaiting a fair sale auction.  The Trustee has *never initiated any bidding procedures as an ordinary course asset auction, nor has the Trustee even attempted  to deal the outstanding $8 million cash offer*.  In the prior two Trustee attempts at an auction driven by the Plaintiffs, neither the cash bidders nor the Debtor, nor FSS did anything to

---

[18]      Judge Charles Eskridge, U.S District Court, SD-TX, *Case No. 22-60043.*

[19]      *See e.g., Avery v. Gonzalez (In re Gonzalez),* Nos. 2:15-bk-25283-RK, 2:16-ap-01037-RK, 2024 Bankr. LEXIS 1038, at *9 (Bankr. C.D. Cal. May 1, 2024) (the court lacked jurisdiction to consider a Rule 60(b)(1) motion for relief from judgment during the appeal); *Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at *20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] *citing In re Port Neches Fuels, LLC,* No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, *12 (D. Del. Mar. 27, 2024).

[20] Even the Texas Plaintiffs successfully moved to dismiss their appeal, this would not retroactively affect the invalidity of the initial voiding or remedy the consequences herein stated.

005130

interfere with the bidding process – only the Plaintiffs and their partner the Global Tetrahedron (the "Onion") and their acting agent, the Trustee.  Thus, because there is no stay pending the appeal of the Supplemental Order and enforcement of the Supplemental Order is what this Motion seeks, by ordering a simple auction for sale at the highest cash price obtained through the sales effort and sale by the current Trustee or his successor replacement.[21]

## V.
## "THE RISK OF INJUSTICE TO THE PARTIES' AND THE RISK OF UNDERMINING THE PUBLIC'S CONFIDENCE IN THE JUDICIAL PROCESS."[22]
------------------------------------------------------------------------------
## ALL EQUITIES FAVOR ORDERING AN AUCTION

A.  **Equity Abhors Manipulation and Loss of Rights or Property by Forfeiture or Loss of Basic Constitutional Rights - Equity will not allow a trust to fail for want of a trustee.[23]  Equity delights to do justice, and not by halves[24]**

17.  The auction process has been manipulated by the Plaintiffs and the Trustee to assure the Plaintiffs win.  Each time the Trustee initiated the out-of-the-ordinary process and each time this Court refused to approve the Plaintiffs-driven process adopted by the Trustee.  If the State Court is to auction FSS assets, that will not occur until the Texas State Judgment is final on appeal

---

[21]     **THERE IS A SIMPLE SOLUTION:  REPLACE THE TRUSTEE AND CONDUCT AN AUCTION:**  There is no question that the Court's declaration that the Supplemental Order was void was precipitated by the Trustee's stubborn and persistent unwillingness to obey the Court's stated purposes to affect a sale of FSS assets for the benefit of all creditors.  It was for this purpose the current Trustee himself prevailed on this Court to issue the Supplemental Order in the first place.  The remedy for such recalcitrance is, among other remedies, the replacement of the Trustee, not a legally improper declaration the Supplemental Order is void.

The simple solution is to appoint a replacement Trustee who will obey the Court and conduct an auction.  Any creditor looking to get paid, would welcome this as it assures the highest recovery.  The Plaintiffs DO NOT want this because they don't want money; they want Alex Jones and his business as a trophy they can display at their political fund raisers and social events where their abuse of the legal system to achieve ridiculous and indefensible judgments is worn as a badge of honor.  This Court should not countenance that unmasked, naked hatred.

[22]     Proof of which is grounds for amending or altering a decision of a court.  *See*, *Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added).

[23]     *See, e.g., Fulk & Needham, Inc. v. U.S.*, 288 F. Supp. 39, 44 (M.D.N.C. 1968).

[24]     *Jeffers v. Clinton*, 756 F. Supp. 1195 (E.D. Ark. 1990).

005131

and there is final or unstayed judgments ruling the Plaintiffs' proofs of claims non-dischargeable in whole or in part. If reversed as anticipated, an auction will not happen until a retrial. The Connecticut Appellate Court and Connecticut Statute stayed the Connecticut Judgment. However, the Connecticut Supreme Court has denied Jones' and FSS's Motion for Certification and both Jones and FSS are seeking a continuation of that stay pending their Petition for *Certioraria* with the U.S. Supreme Court pursuant to the Connecticut statutory provision allowing for a discretionary stay.

### B. Even If This Court Could Declare the Supplemental Order Void, To Do So Is Facially Inequitable And Rewards The Wrongdoers

18. The Trustee's negotiations on their illicit "settlement agreement" took several months, during which Trustee *never initiated any bidding procedures ordered by this Court* to deal with the outstanding $8 million cash offer. When they finally reached the terms of the "settlement agreement" the Court again rejected the Trustee's proposed Settlement Agreements and for good reason and the Trustee has gone silent on holding the ordered auction.

19. While the second round of misconduct is referenced above, a few more details shed light on the radical inequities perpetrated as the tip of the tension among the Plaintiffs that was revealed in the first farcical auction, primarily revolving around how to split the FSS carcass the Plaintiffs hoped their non-final judgments would recognize. Anxious not to wait for any appellate outcome, the Texas Plaintiffs were adamant that the split should be 75/25 and threatened to disrupt the Connecticut Plaintiffs collection efforts if agreement were not reached. According to the fifteen Connecticut Plaintiffs, they had collective judgments totaling approximately $1,500,000,000, whereas on the other hand, two Texas Plaintiffs (Heslin and Lewis) claimed judgments totaling only approximately $50,000,000. Thus, the split should have been 97% Connecticut and 3% Texas. However, the Texas Plaintiffs flipped that argument putting the

005132

Connecticut Plaintiffs' ridiculous judgment at risk. They argued that the same Sandy Hook events had occurred *to all plaintiffs* and their damages should have been the same but for the prejudice of the Connecticut plaintiffs trying the case approximately 28 miles from the murder site, since liability was judicially decreed in both Texas and Connecticut and only damages were to be tried. *Yet for the same event* the fifteen Connecticut Plaintiffs received as non-punitive damages, at total of $965,000,000 – or approximately $65,000,000 each – *whereas for the same event the Texas plaintiffs received only $2,000,000 each*, or 3.5% of the Connecticut non-punitive damage amount. The Texas plaintiffs' receipt of only 3% of what the Connecticut Plaintiffs got, was unfair and only explainable as the result of local prejudice.[25] Instead, the Texas Plaintiffs proposed a different view simply "counting heads" as that was the only rational way to divide FSS up given that other means based on the sizes of the respective judgments was indefensible. And as there are three other Texas Plaintiffs who have not even proceeded to trial and thus had and have no judgments, counting them resulted in 15 Connecticut Plaintiffs and 5 Texas Plaintiffs – or a compromise division of 75/25.

20.     The problem with this was that (a) judgment creditors are counted by the dollar amounts of their claims, not on a "per capita" basis which if pursued by Connecticut risked exposure by Texas and (b) the prospect that either or both judgments were very likely to be

---

[25] While this Court has declared most aspects of the Connecticut and Texas judgments non-dischargeable, making that interlocutory ruling final will require this Court to explain how the same event – Sandy Hook – where liability was judicially decreed in both Connecticut and Texas, resulted in "victims" who sued in Connecticut receiving awards 32 times greater than "victims" who sued in Texas. While this fact will be difficult for the Court to explain, so will its disregard of the requirements of the Connecticut Supreme Court stated in *Lighthouse Landings, Inc. v. Conn. Light & Power Co.,* 15 A.3d 601, 613 (Conn. 2011) that collateral estoppel rules were  not to be applied mechanically as the Connecticut plaintiffs convinced this Court to do,  but were to be viewed flexibly with equity in mind and are particularly inapplicable when to do so would "work an injustice" or "frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *Id*. Equally difficult for the Court will be its explanation of its disregard of *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993), which in the context of collateral estoppel involving default judgments, re-emphasized the Restatement of Torts' comments that where the prior action was a default, the matter was not actually litigated, creating yet another basis for finding dischargeability which this Court ignored.

005133

radically reduced if not eliminated on appeal, would throw their respective division of the financial body of Jones and FSS into complete jeopardy. Thus, instead of continuing the auction, the Trustee and the Plaintiffs devoted their time and FSS's treasure to reaching a completely illegal arrangement where in summary, (a) the two Texas Plaintiffs' $50,000,000 judgment would be deemed fully "allowed"; (b) the fifteen Connecticut Plaintiffs claims of $1,438,139,546 would be deemed fully "allowed," even though the Connecticut Court of Appeals had reversed $150,000,000 of that related to CUTPA punitive damages; (c) *the three Texas plaintiffs* whose cases had yet to be tried would be given deemed "allowed" claims of more than $375 million, which coupled with the $50,000,000 held by the other Texas Plaintiffs would yield a dollar amount as between Connecticut and Texas equal to 75/25; (d) the Texas Plaintiffs would drop their appeal of the Supplemental Order; and (e) since the Texas claims had not yet been bonded and the Connecticut Plaintiffs were statutorily precluded from collection, the Texas Plaintiffs would assign their new allowed claim of $425 million to Connecticut. Plaintiffs would then proceed to collect *in this Court* on the Texas judgement and the Trustee would pay the Texas Plaintiffs $4,000,000 from cash he held belonging to the Jones Estate (including mainly FSS money). The fact that the claims were deemed "allowed" would mean, critically, that nothing that occurred on appeal would disturb their rights. And importantly, among other things, the Connecticut Plaintiffs proceeding to collect on the Texas judgment would effectively mean there would be nothing left to auction. Hence once again the Court's intentions of the Supplemental Order were intentionally and unfairly thwarted.

21. On both occasions denying the proposed auction procedure, this Court expressed at length its concerns and displeasure with the proposals that did not come close to resembling a normal bankruptcy public bid process. Exhibit "1" illustrates again this Court's frustration over the Trustees continued efforts to "arrange" matters to encumber a simple bidding procedure and

005134

auction to favor Plaintiffs. Neither the cash bidder nor the Debtor nor FSS had anything to do with these manipulated bidding process – only the Plaintiffs and their agent-Trustee.

## C. The Manipulation Continues As the Abuse of Process Continues

22. When FUAC filed its motion seeking a status conference based on its outstanding $8 million non-responded-to cash bid, an interesting response from the Trustee and the Plaintiffs resulted. Notably, the *Trustee responded by silence*, likely fearing the rath of the Plaintiffs as their position has done a 180-degree change to not wanting an auction that they could not control.

23. Even though twice before the Plaintiffs and Trustee were actively pursuing his version of an auction process, not so this time– *it is now the Connecticut Plaintiffs and the Texas Plaintiffs that do not want a bankruptcy auction – in truth, not an auction **that they cannot control*** and win. [*See*, Plaintiffs' objection to FUAC's Request for Status Conference (and notice of its bid, Dkt. 1113]. And whatever the Plaintiffs demand the Trustee follows. Even with the opportunity to re-establish the Court's and the public's confidence in the Trustee's supervision of a fair bankruptcy auction process, the Trustee stands down, to not conflict with the Plaintiffs new position of no auction.

24. The impact of the Creditors' manipulations and overt efforts to ignore the economics of this bankruptcy and to seek only a political goal of removing Jones from the airways and destroying the "InfoWars" brand, is all designed to prevent news media-Jones' First Amendment rights by censoring his ability to exercise those rights.[26] This ulterior motive has not

---

[26] Set out below are only a few of the many examples of the Connecticut Plaintiffs and the Texas Plaintiffs declared purpose in bringing and prosecuting the suits against Jones and FSS was political and sought to deny Jones his right to freedom of the press and free speech. Motivating this litigation is not, and never has been, the recovery of a monetary damages for an actual and legally recognized injury (which has yet to be fairly determined), or even allowing punitive damages reflecting any reasonable application of punitive or exemplary damages law or statutes, but is the political activism and political motive to accomplish the goal to taking Alex Jones and incredibly popular "The Alex Jones Show" of the air and "out of the public discourse" by demanding exaggerated and illegal recoveries of punitive damages:

005135

only thwarted Jones efforts at a legitimate bankruptcy resolution (including Plaintiffs rejection of multiple proposals to resolve these claims *by payments to these Plaintiffs in the high 8-figures*) but reflects manipulation that goes well beyond this Court's limits in protection of creditors and imposes risks on debtors and the bankruptcy process that is repugnant to any bankruptcy right or policy.

25.     Even if, however, the prospect of a resolution with these Plaintiffs is not available because of the political agenda of the Plaintiffs, the bankruptcy code and bankruptcy policy still require this Court to consider the *economics <u>and motives</u>* of creditors, including these Plaintiffs, as an element of most every decision the Court has, and is, to make.  Just as a non-creditor claims-purchaser cannot acquire a creditor's claim (for the purpose of obtaining standing), then file the claim, and then assert the claim in bankruptcy to block a reorganization, *if there is an alternative motive to the mandated "open and honest" economics of claims recovery* the bankruptcy code will impose a remedy.[27]  In this case of such high stakes and profiled, the issue of "motive" permeates

---

> **"Berkowitz said his clients may be willing to settle with Jones for less money if it means *Jones would end his broadcasting career*." "If he wants to agree to some sort of terms that hold him accountable for all he's done, we'll be open to listening.  Whether that means *walking away from public life*, to paying Sandy Hook families *in full* …."**
> https://www.washingtonpost.com/investigations/2022/11/21/alex-jones-sandy-hook-lawsuit/

> ***Damages "should be awarded in an amount that assures Alex Jones is off any platform … taken out of this discourse* ….."***
>
> Quotes from *Texas Plaintiffs' closing arguments; See, also Connecticut Plaintiffs opening statement YouTube* https://www.youtube.com/watch?v=xFaxgchQczg  "take Alex Jones platform … away … and make certain he cannot rebuild the platform.  Take him Jones out of this discourse … that is punishment.)

[27]     The law is clear that an ulterior motive and purpose, and malice to cause damage to an estate bars the right to purchase a claim and utilize the claim in a bankruptcy case.  *In re Lichtin/Wade, LLC,* No. 12-00845-8-RDD, 2012 Bankr. LEXIS 5785, at *10-11 (Bankr. E.D.N.C. Dec. 17, 2012) explains the prohibited process, citing the Ninth Circuit, noted:

> If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster. ***On the other hand, pure malice, "strikes" and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a***

005136

every aspect of the Plaintiffs counter-intuitive, abnormal demand to *destroy the value of the Jones Estate and FSS assets* and destroy the ability of Jones to earn a living so as to pay the Plaintiffs claims, while at the same time demanding their debt be both allowed and found nondischargeable. This abuse of process conduct, or "lawfare" in more current political terms, should not go unaddressed, when Plaintiffs make economic demand of this Court for their creditor rights and treatment of their claims, yet motivated to impede the entire bankruptcy case by destruction of the real value of the Estate's assets and thereby destruction of the Debtors' ability to earn an income by the exercise of their First Amendment rights to uncensored media and free speech. Those constitutional rights are valued in the millions yet in this case the Plaintiffs want that value to be as near as zero as they can possibly manipulate to take Jones "off the air" and out of the public discourse (reciting opening and closing jury arguments in the Plaintiffs' respective trials).

26. This bankruptcy "lawfare" has not, however, gone unnoticed. The Paul Weiss law firm as purported "*pro bono*" counsel to the Sandy Hook Plaintiffs (all of whom have received multi-million-dollar settlement funds from the Remington $70+ million-dollar settlement payment), has recently settled its similar "lawfare" litigation after being sued by President Trump for their participation with prosecutor Alvan Bragg in the New York City prosecution of the victimless crime of real estate valuations by the affiliated entities owned by President Trump. Paul Weiss agreed with President Trump to settle his claims by Paul Weiss performing $40 million of "*pro bono*" *non-political*, legal work in exchange for a release of the damages claims made by the

---

*competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior*.
*Figter Ltd. v. Teachers Ins. and Annuity Assoc. of Am.* (*In re Figter Ltd.*), 118 F.3d 635, 638-639 (9th Cir. 1997) (citing *In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 671 (E.D.Pa. 1942)); *In re Lichtin/Wade, LLC*, No. 12-00845-8-RDD, 2012 Bankr. LEXIS 5785, at *10 (Bankr. E.D.N.C. Dec. 17, 2012) ("The test is "whether a creditor has cast his vote with an 'ulterior purpose' aimed at gaining some advantage to which he would not otherwise be entitled in his position." *In re Gilbert*, 104 B.R. 206, 216 (Bankr. W.D. Mo. 1989) (citing *In re A.D.W., Inc.*, 90 B.R. 645, 649 (Bankr. D.N.J. 1988); *In re MacLeod Co., Inc.*, 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986)).

005137

President.  Upon information and belief, there is a written settlement agreement, but Jones does not have a copy.

27.     In this reorganization case and later in the Chapter 7 case, it has been Paul Weiss that has directed that Plaintiffs actions throughout these two bankruptcies.  Paul Weiss has directed the same lawfare conduct that its firm admittedly attempted against President Trump.  Apparently unknown to the President, Paul Weiss considers *pro bono* representation of millionaires in this bankruptcy (the Connecticut Plaintiffs shared in the $70+ million settlement of the gun manufacturer litigation).  The Connecticut Plaintiffs and their espousing their ideological political agenda of gun control by partnering with the Onion, was all designed to acquire "InfoWars" brand and IP and *remove Alex Jones from his career as a news media and champion of free speech and freedom of the press*, and according to Paul Weiss' webpage, it considers these Plaintiffs to be as "pro bono" work (hardly in compliance with its settlement of the President's claims.)[28]

28.     In truth, Plaintiffs' counsel, including Paul Weiss, have adopted and pursued lawfare[29] in the handling of the Plaintiffs' purported judgment claims "as if" the Plaintiffs were creditors holding claims that were being pursued for the economic recovery of those claimants.  Nothing is further from the truth in this case.   As the Fort Worth Court of Appeals recently noted:

> Lawfare is an ugly tool by which to seek the … policy changes the California Parties desire, *enlisting the judiciary to do the work that the other two branches of government cannot or will not do. …*"

---

[28]     On the Paul Weiss web site, the firm continues to claim that the Connecticut Plaintiffs representation is *pro bono*, although *pro bono* legal work is generally not considered representing politically aligned millionaires to destroy someone's constitutional Free Speech rights.  It is believed that this position by Paul Weiss is being investigated as a breach of their settlement agreement.

[29]     "Lawfare" has been defined in *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 U.S. Dist. LEXIS 249912, at *1 n.1 (E.D. Pa. Dec. 10, 2021):
> The term "Lawfare" is a play on litigation and warfare. The term itself is often used to describe the act of using litigation to harass people. Here, Plaintiff motions to prohibit Defendant Barbounis from using Lawfare under Rule 402 and 403, alleging that it is unduly prejudicial and irrelevant.

005138

*City of S.F. v. Exxon Mobil Corp.,* No. 02-18-00106-CV, 2020 Tex. App. LEXIS 5226 at 58-59 (Tex. App. June 18, 2020).[30] More to the specifics, "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448. And these Jones and FSS Bankruptcy cases have been the textbook example of "lawfare," as here:

    a.     a creditor obtains a judgment that it brings to the bankruptcy court, files both the claims ***and*** an objection to the dischargeability of that claim (*i.e.*, wanting to appear to be legally seeking to be paid notwithstanding all other creditors discharge in the bankruptcy);

    b.     yet these participants with an ulterior motive, using the claims "standing" and with the help of third party "partners" (in one instance, the Trustee, and another, the Onion, indirectly affiliated with Bloomberg, a well-known advocate of gun control) seek to acquire all of Jones' and FSS's assets, not for their economic value, but *for the express purpose of destroying the InfoWar brand's value and thereby Jones ability to earn an income*; and

    c.     done all in the pursuit, not of a financial return on their claim, but implementation of an ulterior motive and purpose in the claims filing and objection to dischargeability *to further a political agenda of depriving Jones and FSS of their Constitutional rights to the free exercise of the First Amendment through freedom of the press and freedom of speech by which both earned their individual and corporate living.*

29.     It is not only the bad faith that ulterior motives in filing the claims are pursued (*e.g.*, refusing to mediate in good faith, and seeking to control the bankruptcy process so as to acquire the Jones and FSS assets as cheaply as possible and for the purpose of destruction of those assets

---

[30]    More generically "Lawfare" is defined in *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 U.S. Dist. LEXIS 249912, at *1 n.1 (E.D. Pa. Dec. 10, 2021) as follows:
        The term 'Lawfare' is a play on litigation and warfare. The term itself is often used to describe the act of using litigation to harass people.

005139

value, only to further their ulterior motive to destroy these debtors ability to exercise their

"fundamental constitutional rights". *Id. Pennzoil,* 107 S. Ct. at 1535 [*See, Supra*, pg. 12]. The

intention and goal of using a claim in bankruptcy for the purpose of depriving a debtor of its rights

to free speech and freedom of the press, and to earn a living, makes this case and the conduct of

the Connecticut Plaintiffs and the Texas Plaintiffs repugnant to every bankruptcy policy approved

by the Supreme Court of the United States. Once this Court refused to allow the Plaintiffs to

manipulate the auction process, they simply pivoted to opposing *any* bankruptcy auction. Now

the agenda is to use the State Court system to continue the same unlawful abuse of process.

**30.** Below Jones will address the most egregious misstatements set out in the Plaintiffs'

Response to the FUAC auction motion, in which they now oppose any bankruptcy auction sale, in

favor of a state court action *that they are prohibited from participating pursuant to the stay (and*

*expected stay) pending the appeal of their Judgment.*[31]

**VI.**
**THE CONNECTICUT PLAINTIFFS' LAWFARE IN PURSUIT OF THE**
**ULTERIOR MOTIVES AND PURPOSES**

**"The Sandy Hook Families have not yet received—and are no closer to receiving—*a single***
***dollar in distributions* from either Jones or FSS through the bankruptcy cases**
**[Plaintiffs' *Joint Objection to an Auction* Pg. 1, ¶1]**

31. It is important to recognize that this statement on behalf of the Plaintiffs in support

of their sudden reversal of their position on an auction, is intended to mislead and obfuscate the

Plaintiffs' ulterior motive - that these bankruptcy cases *are not about distributions or money*, but

about taking Alex Jones out of the public discourse and off the air, and the motive is shared by

other significant players in the political arena. Below Jones will address the misstatements set out

---

[31] As pointed out herein several times, simply because Paul Weiss is prohibited by a court and a statute from taking an action does not mean Paul Weiss will not take the action (*e.g.* the WD-TX removed case now in this Court where Paul Weiss attempted to obtain a receiver over all of Alex Jones assets by false representations to the State Courts. Paul Weiss simply ignores this Courts stays and likely its injunctions.

005140

in the Plaintiffs Response to the FUAC auction motion in which they now oppose any bankruptcy auction sale, in favor of a state court action they are prohibited from participating pursuant to the stay pending or prospective stays of the appeal of their Judgment, or the automatic say or the discharge injunction.

### A. Alex Jones Estate Received approximately $6 Million From FSS and Post-Conversion Alex Jones Services During These Bankruptcies, That Has Now Been Reduced to $4 Million as a Result of Administrative Costs Pursuing Auctions and Plaintiffs Claimed Settlements

32.     Plaintiffs, in obtaining the grossly unfair and unconstitutional Judgments, were permitted to argue to the jury that Alex Jones should be punished by an award *that assured he could never continue in his profession*. [*See, supra*, Note 18].  The Connecticut Plaintiffs and their announced partner, the Onion, told the public that the purpose of acquisition of the FSS assets was to destroy the InfoWars brand and business and use the customer data to further a parody of the InfoWars brand to its customers.[32]  All during this process Alex Jones continued to broadcast his show and, in the process, allowed FSS to amass more than $6 million in cash (net of the over $2 million the Trustee's lawyer and professionals have spent on fees).  The order placing that cash in the Jones Estate is a final order.

33.     Just like the auction orders, and although ordered twice by this Court, the Plaintiffs refused to mediate, first of all, at all with Hon. Judge Isgur, and the second time, not in good faith, conduct wholly consistent with the goals of the Plaintiffs.  And all during this time Jones continued to profitably render his services to FSS or through FSS, InfoWars and its brand, for the Estate.

### B. The Jones/FSS Litigation and This Bankruptcy Has Increased the Sandy Hook Foundations by Hundreds of Millions of Dollars

---

[32]     Although nothing would have prevented the Connecticut Plaintiffs from bidding at any Jones Estate auction for assets, that is not what the Connecticut Plaintiffs did.  In addition to other manipulations the Connecticut Plaintiffs attempted to use their *non-final stayed judgment as if some sort of cash equivalent* for the purpose of that bidding – in other words, to "collect" on their judgment in violation of the Connecticut Statute, and currently, the Connecticut Court of Appeals, stay of all collections.

005141

34.     After having negotiated a $70+ million settlement with the gun manufacturers and sellers, several of the Connecticut Plaintiffs formed charitable foundations in support of gun control (Jones does not yet know how many have been formed, but at least three are known.  Those foundations received public donations to further their purpose. However, with modest contributions through five years after the Sandy Hook tragedy, the Connecticut Plaintiffs finally decided to sue Jones and FSS along with an immediate, well-financed, public campaign of adverse public-relations "news releases" all raising the claims and allegations of these plaintiffs in the post-suit public press.  On information and belief, the PR firms used later became the same PR firms used in the New York suit against President Trump, bragging at the time that it worked against Jones as a test of its success.

35.     Thus, when Jones and FSS were sued in 2018 for defamation in 2018 and the news releases began flooding the news, not surprisingly and almost immediately the funds began to increase.  However, the major increases were leading up to the trials, including (shortly before *each trial was to begin*) grants from the United States Department of Justice, and other governmental agencies that reached a highpoint at the beginning of the Connecticut trial.  This multi-million government funding allowed, for example, one foundation's founding member and Sandy Hook parent, to earn in excess of $240,000.00 plus in her annual salary from the foundation that, according to published records, used 46% of all donations for salaries.

36.     Jones has reviewed the ".gov" public records of at least three (3) Sandy Hook foundations whose contributions were flat for the several (up to 4+ years prior to the litigation), and that upon suit and publicity of the trial, doubled or tripled or more, through among other things, **DOJ grants**, and public contributions in excess of $100,000,000.00 to these three Connecticut Plaintiffs' charitable foundations – increases almost singularly driven by the Alex Jones suit and

005142

the professional publicity of public relations firms that have bragged about their success in the Jones case.

**C.** **The Going Concern Value of FSS and Alex Jones Operations Could Gross $50 Million or More a Year, Yet Plaintiffs Want All Operations to Cease – and Retain Their Non-Dischargeable Debt**

37. Since his appointment, and at the suggestion of Jones, Trustee Murray has never stopped production work through the use of the FSS assets and leasehold estate, work headed by Jones and aided by the Supplemental Order, which work has earned the Estate several million dollars and preserved the assets intact, such that the bid price with all assets intact has risen from $4m to $8m. This success has been after all of the adverse publicity of the Plaintiffs' bankruptcy.

38. However, as the Court recalls, immediately upon "announcing" (without Court review or approval) that the Onion was the winning bidder based on judgment credits, the Trustee shut down and took "dark" the InfoWars production and web presence. This was accompanied by the Onion publicly announced its intention to only use the Website and IP for parody of Jones and to support gun control. In other words, a business enterprise valued in the multi-million dollars was to be acquired for parody, in fact designed to destroy the brand and destroy the income that the InfoWars brand earned up to the date the Trustee claimed to have sold it the Onion.

39. In face of the continued monetary success of Jones continuing FSS's operations, Trustee Murray has continually reflected an attitude that is impossible to explain. For instance, when he would not agree that FSS and Jones Connecticut appeals were authorized to be filed, and claimed he intended to allow the appeals to expire for lack of briefing (and actually criticized Jones and threatened the lawyers that timely filed those briefs). Other examples include the Trustee's unconventional conduct in pursuing two failed auctions and joining in a settlement with the Plaintiffs that at a minimum would have violated the law. Finally, after ignoring the $8 million second offer of FUAC for two months in favor of those failed "settlement agreement" negotiations,

005143

when FUAC wanted to participate in an auction as the Court had instructed the Trustee to do, the Trustee remained silent and refused to take a position (or even seek to initiate bid procedures) on the FUAC's second $8 million cash bid.

40. To be clear, Christopher Murray is a capable and competent Trustee but has at best "frozen at the wheel" in both his logic and capabilities because, insofar as Jones believes, and capitulated to the Plaintiffs' demands on, and possibly expressed or implied threats made to, the Trustee, with repercussions if the Trustee did not do as the Plaintiffs' demand to permit them to dictate the auction process that both times was rejected by this Court. This belief would explain the following:

    i. Why the Trustee arranged the terms of the first sale process so randomly and incompletely, simply because that was the extent to which the Plaintiffs wanted to be bound, and it guaranteed their success.

    ii. Why the Trustee would need to drive at 5:00 AM from Houston to Austin on the day of his intended announced selection of the Plaintiff's & Onion joint partnership bid, to order the "shut down" of FSS operations and require the FSS broadcast crew take the Alex Jones Show "dark" (dropping weekly sales from an average of more than $80,000 to less $20,000.00 when re-started 48 hours later) while at the same time the Onion announced to the public through news interviews and redirection of the FSS URL to the Onion new URL – falsely <u>announcing that it had purchased "InfoWars.</u>

    iii. Why the Trustee, after what is reported as over $12 million spent on accounting investigations and fraud auditing of FSS and Alex Jones by the Chapter 11 Committee and professionals, there were no assets or transactions (save a single vehicle) omitted from the FSS and Jones schedules and disclosures, he decided to retain in the Chapter 7 case additional professionals to investigate Jones Chapter 7 FSS business conduct and spent $2 Million in

005144

administrative costs pursuing two Trustee-driven failed auctions.

iv. Why, when the Trustee received on December 19, 2024 an $8 million offer to acquire the assets of FSS, the Trustee never initiated a sale process but for some reason substituted his "negotiations" for the next six-weeks *with the Plaintiffs* to ultimately propose giving the Texas Plaintiffs an allowed claim more than 10 times the amount of their judgment, and giving an "allowed" claim in the full amount of the Connecticut Plaintiffs Claims even though no Plaintiffs' claims was allowed because both were, and are, still on appeal and stayed by the Connecticut statutes and Connecticut Court of Appeals Order and the automatic stay. This belief is also based on the announced motives of the Plaintiffs, to take Alex Jones off the air and destroy his ability to continue in the public discourse. This motive, stated by both the Connecticut and Texas Plaintiffs in the opening and closing jury arguments, explains why the Onion announced after it claimed it won the bid, that it would shut down all FSS operations and use Infowars for Alex Jones parody – by utilizing his database of customers and followers.

41. This conduct clearly evidences the ulterior motives using and driving these bankruptcy cases to accomplish a political agenda, initiated by Plaintiffs' trial counsel and continued by Plaintiffs' bankruptcy counsel. This Court has the jurisdiction and power to prevent such unfair and unlawful conduct which should not be simply sent to the State Courts to repeat the injury. The Fifth Circuit instructs on this Court's ability to control this conduct:

> Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423. … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party. *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages."). *Id.* at 427-428.

*Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020).

Page 30 of 34

005145

**D.     This Court Should Not Reward These Abuses of the Bankruptcy Process to Continue the Lawfare of the Plaintiffs**

42.     As remarkable as it sounds, the multiple large international law firms including Paul Weiss and Akin Gump, see nothing wrong with announcing a strategy to deprive Alex Jones of his freedom of the press and his right to free speech.   It was Paul Weiss that settled the lawfare suit against President Trump, by acknowledged the wrongdoing of its former partner Mark Pomerantz in the New York Alvin Bragg litigation and agreed to dedicate the equivalent of $40 million in non-political "*pro bono legal services*".   Contrast Paul Weiss' settlement with President Trump to the Paul Weiss current web page claiming that its current partner Kyle Kempler:

> "maintains a significant pro bono practice. *He is currently representing a group of families of the victims of the Sand Hook Elementary School Shooting in the bankruptcy proceeding of ... Alex Jones and Jones' wholly owned Company Free Speech Systems ....*"

It is generally accepted that Lawyer "pro bono" work means free legal representation to those who cannot afford the legal fees or by representing non-political public interest groups without funds to advance their public cause.  Pro Bono work is not claiming to be doing free work for rich people pursuing a political agenda or doing free work to pursue the censoring of an individual's freedom of the press and free speech.

43.     In fact, all of the Plaintiffs' lawyers and the purported *pro bono* law firms, have repeatedly claimed that they are not interested in the money, but in taking Alex Jones off the air and out of the public discourse forever.  This is the ultimate form of censorship by abuse of process – to be allowed to argue to a jury that they the jury has the power through an award of punitive damages, to take away a person's constitutional right to freedom of the press and free speech, then use that success to force a bankruptcy and then intentionally destroy the debtor's ability to earn a living.  These lawyers have argued this ulterior motive repeatedly over and over and even including the Onion (that their partnership with the Connecticut Plaintiffs  was to acquire the FSS assets and

005146

the name and brand "Infowars" so that it can be destroyed by their use of it to parody Alex Jones and his right to freedom of the press and free speech (certainly not to realize its brand value).

44.     This is exactly what President Trump experienced and exactly what President Trump thought he was ending by the terms of this settlement. Not so - Paul Weiss simply "repackaged" their definition of "pro bono" into representing rich individuals for free if the political message is correct. Notwithstanding that the families are neither poor nor, according to their lawyers, interested in money damage (not only have many of the Connecticut Plaintiffs shared the $70+ million payment by Remington and other gun manufacturers, but the several foundations that many of the families have set up or participate in, have received over $100 million in DOJ grants, loans from the US Government and public donations) according to the governmental databased ".gov."

## VII.
## CONCLUSION

45.     Notwithstanding the above, Plaintiffs, through "Pro Bono Paul Weiss", assert that Jones and FUAC are parties that have no economic standing in the case to complain of their conduct. — [*See*, Supra, ¶ 7, pg. 10]. This Court has previously recognized Jones standing regarding the auction orders.

46.     This Court should exercise its jurisdiction to enforce all of its prior auction-related orders, including the Orders authorizing an auction as well as the Supplemental Order. This Court should enter its order for the Trustee, or a replacement Trustee if requiring replacement [*See, supra* Note 21] to conduct a sale that is not controlled or driven by the Plaintiffs and simply allow the process to conclude. All parties in interest, even the Plaintiffs as bidders, and the public, will have a fair opportunity and right to participate in a fair and honest outcome if not controlled by Plaintiffs. All other matters arising from the lawfare conduct of the Connecticut Plaintiffs will be left to other

005147

Courts or other proceedings to determine, but as to this Court and its clear jurisdiction to accomplish fairness in the auction process, and the public policy of having its orders observed and not manipulated, this Court should order the auction of the assets covered by the Supplemental Order.

WHEREFORE, Movant Alexander E. Jones individually, and a manager of Free Speech Systems, LLC, seek an order as above requested, and for such other and further relief to which Movants may be justly entitled, at law and in equity.

Dated: April 28, 2025

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com
 aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and FSS**

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES And FSS**

005148

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on April 28, 2025.

/s/ Shelby A. Jordan
Shelby A. Jordan

005149

# Exhibit 6

005150

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES,            )  CASE NO: 22-33553
                              )
                              )  Corpus Christi, Texas
                              )
        Debtor.               )  Thursday, June 5, 2025
                              )
                              )  1:00 p.m. to 2:32 p.m.
------------------------------)


HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:                BEN C. BROOCKS
                           Broocks Law Firm PLLC
                           6207 Bee Cave Road, Suite 120
                           Austin, TX 78746

                           SHELBY JORDAN
                           Jordan & Ortiz, PC
                           500 North Shoreline Blvd.,
                           Suite 804
                           Corpus Christi, TX 78401

For Chrsitopher R.         ERIN ELIZABETH JONES
Murray:                    Jones Murray LLP
                           602 Sawyer, Suite 400
                           Houston, TX 7007

                           JOSHUA WOLFSHOHL
                           Porter Hedges LLP
                           1000 Main, 36th Floor
                           Houston, TX 77002

For First United           WALTER J. CICACK
American Companies, LLC:    Hawash Cicack & Gaston LLP
                           711 W. Alabama Street, Suite 200
                           Houston, TX 77006


005151

For Veronique            AVI MOSHENBERG
De La Rosa:              Lawson & Moshenberg PLLC
                         801 Travis Street, Suite 2101, #838
                         Houston, TX 77002

For William              KYLE KIMPLER
Aldenberg:               Paul, Weiss
                         1285 Avenue of the Americas
                         New York, NY 10019

For the U.S. Trustee:    HA MINH NGUYEN
                         Office of the United States Trustee
                         515 Rusk Street, Suite 3516
                         Houston, TX 77002

Court Reporter:          YESENIA LILA

Courtroom Deputy:        YESENIA LILA

Transcribed by:          Veritext Legal Solutions
                         330 Old Country Road, Suite 300
                         Mineola, NY 11501
                         Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

005152

CORPUS CHRISTI, TEXAS; THURSDAY, JUNE 5, 2025; 1:00 PM

(Call to Order)

CLERK:  All rise.

THE COURT:  Please be seated.  Good afternoon.  This is Judge Lopez.  Today is June 5th.  I'm going to call the 1 p.m. status conference in the Jones case.  I'll be calling, just so we have a clean record, 22-33553, 23-03035, 23-03037, 24-03279 or some combination of one or more of those cases.

I will take appearances in the courtroom, and then if anyone wishes to make an appearance on the phone, please hit five star and I will unmute your line.

MR. JORDAN:  Good morning, Your Honor, afternoon, I guess.

THE COURT:  Good afternoon.

MS. JORDAN:  Shelby Jordan, Ben Broocks, and Antonio Ortiz for Alex Jones and FSS.

THE COURT:  Okay.  Good afternoon.

MR. JORDAN:  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.  Mr. Murray is also here in the courtroom.  And I think my colleagues will announce themselves on the phone.

THE COURT:  Okay.  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack on behalf of First United American Companies.

005153

THE COURT:  Good afternoon.

MR. MOSHENBURG:  Good afternoon, Your Honor.  Avi Moshenberg, on behalf of the Texas plaintiffs.  Also remotely is Jarrod Martin attending.

THE COURT:  Okay.  Good afternoon.

MS. NGUYEN:  Good afternoon, Ha Nguyen for the US Trustee.

THE COURT:  Good afternoon.  Okay.  Let me turn on the line.  Here's a -- I'm just going to go in the order in which I see them, a 713-226 number.

MR. WOLFSHOHL:  Good afternoon, Your Honor, Joshua Wolfshohl for the trustee.

THE COURT:  Okay.  Good afternoon.  And a 212 number.

MR. KIMPLER:  Good afternoon, Your Honor.  It's Kyle Kimpler from Paul Weiss on behalf of the Connecticut families.  On the line with me today is my cocounsel Ryan Chapple.

THE COURT:  Okay.  Good afternoon.  Anyone else wish to make an appearance, please hit five star, and I will unmute your line.

Okay.  The purpose for today was a status conference on where we are and where we're headed, just try to get some more information in the middle of 2025.  I'll turn things over to trustee's counsel.  Ms. Jones, you can just proceed however you see fit.

MS. JONES:  All right, thank you.  I'll proceed with

an update in the main Chapter 7 case, the 22-33553.

THE COURT:  Okay.  If you can just get the mic a little closer to you, I just want to make sure we can all hear you.

MS. JONES:  Yes, I'll get a little bit closer.  We have right now one pending contested motion and that is the motion filed by the debtor, Mr. Jones, asking this Court to reconsider whether to hold an auction of FSS assets in this case.  There were two reply, two responses filed, one jointly by the Sandy Hook families and one response by the trustee and reply filed by the Debtor.  So that's the one currently pending contested letter that is before Your Honor.

There is likely going to be another contested matter, but the time hasn't, it's not ripe yet.  There's a pending motion to stay these bankruptcy proceedings pending appeal.

THE COURT:  Is that Mr. Nguyen's?

MS. JONES:  Yes.

THE COURT:  I'm going to rule on that today.

MS. JONES:  Oh, okay.  Well then that's not ripe, but we, the trustee would have opposed it, but -- a complete stay, of course, of the proceedings, but I just wanted to flag that as something that could come up.

But as far as uncontested, there are, there are some pending fee applications of Chapter 11 professionals that are

005155

-- have not been objected to and are ready for --

THE COURT:  Do you have the ECF numbers for them?

MS. JONES:  I do.  And so there's -- I'll give you the application -- okay.  So the application for Teneo Capital, which was financial advisor to the Committee, was filed at Docket 707.  And I've just uploaded revised proposed orders. I'm only missing one, and theirs was just filed at, I believe it's Docket, I have to see it really quick, 1160, I believe.

THE COURT:  Oh, I did see this.  So I see Teneo, BlackBriar, and --

MS. JONES:  Kennerly.

THE COURT:  -- Kennerly.

MS. JONES:  Yes. And I've tied those to the ECFs there.  So BlackBriar Advisor's app is at 743, and then the revised proposed order has just been uploaded.  Rachel Kennerly's application is at 745 and the proposed order's just been uploaded.  And then Crowe and Dunlevy is, the application is at 746 and I just haven't had time to upload the order yet. I'm waiting.  They've agreed to the form of the order.  I just, I added their signature and I always wait for people to respond and tell me I can do that.

THE COURT:  Is there any difference between --

MS. JONES:  There is.

THE COURT:  Okay.  I'll just wait on it.

THE COURT:  But those proposed orders just

generally.  And then Mr. Jordan also uploaded a revised proposed order for his application.

THE COURT:  Proposed final, right?

MS. JONES:  I'm sorry?

THE COURT:  I saw it.  It's a revised proposed final, is that right, Ms. Jones.

MS. JONES:  Yes, these are all final fee applications for the Chapter 11 professionals.  His app was at Docket 747.

THE COURT:  Oh, it's through the 11.  I was going to say, Jordan, you can't go anywhere.

MS. JONES:  And the only issue -- there were no objections substantively to the applications.  The issue was that there was not an authority to pay provision for the trustee, which we really need for him to be able to make the disbursement.

THE COURT:  Oh.

MS. JONES:  And so we added language with the specific remaining unpaid portion.  So it specifically references the amount.  And everybody has signed off on the form of the order.  I just need one more person to let me know that I can add their signature, and then I'll have that uploaded.  So those are ready to go if Your Honor wants to sign those or if you need a hearing, they're --

THE COURT:  Let me do something just so I'm procedurally in the right posture.  There is currently a

005157

request for me to stay. The entire case is pending an appeal. And I want to -- why don't I take that up right now? I thought rather than we're just having a status conference today, but I thought there was an active request and then also a request for a direct certification of an appeal to the Third Circuit. So I kind of wrote something out very shortly just to make sure that I addressed that. And I can take that certainly without a hearing. It was a request before me, so. And it relates to ECF Numbers 1144 and 1153, Robert Wyn Young has requested that I grant certification for a direct appeal to the Fifth Circuit at ECF 1144. And he's appealing my order denying his motion to intervene in this case. And I signed that order at ECF Number 1129.

Bankruptcy Rule 8006(f) allows the Court to certify a direct appeal to the Court upon request by a party, 28 U.S.C. 158(d)(2)(B). You can see why I wrote this out. I wanted to make sure I got these right.

A bankruptcy court must certify direct appeal to the Court of Appeals in two instances. One is where the request for certification is made by a majority of the appellants or a majority of the appellees. Here, only the, only the appellant has made a request for direct certification. Trustee has indicated they would oppose that, but I only had one request anyway. And I now have verbal confirmation that there's not a majority here. So that wouldn't apply. So, and

005158

therefore, that subsection doesn't apply.

The second instance is where the judgment order or decree involves a question of law as to which there's no controlling decision of the Court of Appeals for the Circuit, or the Supreme Court of the United States, or involves a matter of public importance.

Two, the judgment order or decree involves a question of law requiring resolution of conflicting decisions.

Three, an immediate appeal from the judgment order or decree may materially advance the progress of the case or proceeding in which the appeal is taken and if the Court of Appeals authorizes the direct appeal of the judgment order or decree, that is 28 U.S.C. 158(d)(2)(A)(i) through (iii).

157(d)(2)(B)(ii) mandates that if any of the four conditions are met, I make the certification, but none of them apply here.  It would involve a permissive motion to intervene in both the text and Bankruptcy Rule 2018.  And the law in this district is clear that intervention is permissive.

And so I rely on the cases that I cited in the order denying, but I would cite in, for example, in In Re CIS Capital Management, 604 B.R. 484, 513, Northern District of Texas 2019 case.  So Subsection 1 doesn't support certification.  Subsection 2 also doesn't support certification.  There's no conflicting decisions for the standards.  And finally, an immediate appeal would not advance the progress of this case,

which has been pending since 2022.

There have been multiple adversary proceedings. I would note Mr. Jones has been ably represented at every stage in this case by really smart lawyers who have made arguments on his behalf. He's been adequately represented and I wouldn't stray from any word that I put in that order. I think allowing intervention would impede the progress of this case, quite frankly, it would have shut down, potentially shut down this hearing. So I don't think Subsection 3 supports certification, because neither instance requires the Court to grant certification here.

I'm going to decline to grant certification for direct appeal to the Fifth Circuit. I believe the matter is already set for an appeal before a district court, I believe Judge -- so there is no, I'm not setting this up for a direct appeal.

MS. JONES: I think it's been assigned to Judge Rosenthal.

THE COURT: That's what I understood. So, and they don't come any smarter --

MS. JONES: That's correct.

THE COURT: -- than Judge Rosenthal.

MS. JONES: I agree 100 percent.

THE COURT: So and I just, again, I'm relying on the text here. Textualism is always, in my opinion, the right

005160

answer.

Permissive intervention: After hearing and on such notice as the Court directs and for cause shown, the Court may permit an interested entity to intervene generally or with respect to a specified matter, right? It's permissive by statute.

So, I'm going to deny the direct appeal to the Fifth Circuit. The statute is clear. The cases interpreting the statute are clear. There's no, there's no conflict, no conflict in law here. So, I'm going to deny that, but I did note in the order that I've read everything that was submitted as well. So it's not like I turned a blind eye to anything that came my way. I read it.

So, Mr. Young has also moved to stay all proceedings in this case pending an appeal under Bankruptcy Rule 8007. While the decision to grant a stay pending appeals is within the Court's discretion, the Fifth Circuit in cases like In Re First South Savings Association, 820 F.2d. 700, 709, Fifth Circuit, 1987 case provided factors for the Court to consider, right, whether the movant has made a showing of likelihood of success on the merits. I strongly disagree with that for the reasons stated there in the order itself.

Whether the movant has made a showing of irreparable injury if the stay is not granted. No, there's been no showing of irreparable injury.

005161

Whether the granting of a stay would substantially harm the other parties. The answer is no. I think quite frankly it would be harming the trustee's ability to function throughout this case and quite frankly, Mr. Jones' ability to proceed as a Chapter 7 debtor.

And for whether the granting of the stay would serve the public interest. I don't, have no -- nothing showing the public interest, and I've read all the papers. Quite frankly, I think the public interest is better served for a case that's been pending for three years to continue to move and not come to a screeching halt because the party, three years later, seeks to intervene in a case to provide evidence that the Court has reviewed and other matters.

And again, I rely on the order itself. It speaks for itself. So I've carefully reviewed all the filings, including the attached exhibits and the legal arguments that Mr. Young makes.

I'm going to decline to grant the stay pending appeal. So I'm going to deny both, and I'll enter short orders denying them for the reasons that I have stated on the record. So I can now -- I just feel more comfortable that I didn't take something up on the front end, agree to sign, for example, orders, and then consider a stay. I think there was an emergency request for a stay. I'm going to deny those. So I'll take a look at these orders and sign them on the docket.

005162

MS. JONES:  Thank you, Your Honor.  And I expect one more this afternoon.  I'm just waiting for it.

THE COURT:  Got it.  Just let me know and Ms. Saldana know better.

MS. JONES:  I will.  And then there are two --

THE COURT:  Let me ask you.  With respect to the uncontested matter, I don't need to know what it is.  Do you have a sense of timing as to when something may get filed or not filed?  I won't hold you to it.  I'm just trying to get a sense of you said --

MS. JONES:  Uncontested.

THE COURT:  Oh, not uncontested matter.  You said there could be one more contested matter that may or may not be coming.

MS. JONES:  Yeah, excuse me for interrupting.  We intended to oppose the motion for the stay pending appeal of the proceedings.

THE COURT:  Oh.

MS. JONES:  And so I didn't want to jump the gun. I wanted to let you know that we anticipated another contested matter on the horizon --

THE COURT:  Oh, that's what you were talking about.

MS. JONES:  -- because we would have opposed the --

THE COURT:  So now that I've ruled on that, I've got the reconsideration of the order and I'll speak to that today.

005163

What else is there from your perspective in the main case?

MS. JONES:  In the main case, the trustee continues to administer some non-exempt assets.  There's some, there's some real property, and some, just some personal properties and watches, some details that we're still working through, just getting those sold.  So we're continuing to work on that.

There have not been any offers, or any actual offers, really any discussion about anyone purchasing the equity of FSS has kind of died down entirely.  We don't have any at this point.  And so we're just continuing to administer the non-exempt assets that we can and trying to move all of that forward to get those to a point of sale.  With respect to the --

THE COURT:  What's the status of pursuing the real property?  I'm less concerned about you selling a watch.  I'm more concerned about real big-ticket items.

MS. JONES:  Sure, there's, an auctioneer has been approved by this Court to list that property and to sell it

THE COURT:  Oh, okay.

W1:  And I believe they've been out.  They've looked at the property and they're taking steps to get it listed or to set a time for when --

THE COURT:  When do you think the process could, I don't want to hold you to it, just trying to get a sense of if he's going to list property, I'd rather him list it within

the next 30 days and just see what's out there.

MS. JONES:  I can --

THE COURT:  There's a, there's a theme that I'll be pushing which is there's a lot of legal expenses that are getting incurred in connection with this case.  And I'm not saying people aren't doing the work because a lot of this, it's a big -- a lot of complexities here.  But the longer this goes, the more people are going to have to spend time, and I want to, I think keeping things progressing at a, not at a rapid pace, but at a steady pace where there's constant movement is in the best interest of all parties because there's stuff pending in front of me.  There are matters pending in other state courts.  I'm assuming that's continuing in Texas and in Connecticut.

And there's a lot of moving pieces, and I'd rather to the extent there's non-exempt assets, that's, you know, I'm not telling you what to do, but you will exercise your business judgment as to what you intend to sell or not sell, but, you know, come September, October, if something is planning on being sold in terms of an asset, I'd like it at least on the market, if that makes sense.

MR. BROOCKS:  That's entirely doable.

THE COURT:  Okay.

MS. JONES:  And I don't know if you'd like to address timing or if you --

005165

THE COURT: Yeah, just get close to the microphone so we can hear you.

MR. BROOCKS: Yeah, I think by the third quarter we'll have everything either teed up with a motion to sell. It'll certainly be listed by then. It hasn't been yet because in the case of the real estate, it's a residential home and it has a tenant, so we're negotiating the exit of that individual.

THE COURT: I got it.

MR. BROOCKS: And --

THE COURT: Okay.

MR. BROOCKS: But I think by the end of the year, we should be closed with all of those.

THE COURT: Okay. Thank you.

MS. JONES: But with respect to our, with the approval of the settlements in the, in the adversaries that were pending in the FSS, under the FSS umbrella, the PQPR and the (Indiscernible) adversary, with those settlements and then Your Honor's decision regarding admin -- not doing a sale of the assets, the FSS assets in the --this Chapter 7 case, you know, we've pared our focus down to, you know, the essential things we need to do to get this case moving forward and closer to being done.

THE COURT: So assuming those assets are teed up and some coming up, I don't -- I hate hypotheticals, but let's

just assume there's a buyer, willing buyer for estate assets, what -- after that, what's left, putting aside the adversaries?

MS. JONES:  There is some litigation, a couple of matters we do expect to file those by next week.  And I think those are pretty straightforward, but just a couple of litigation matters that need to be dealt with.

THE COURT:  The adversaries or?

MS. JONES:  Yes.

THE COURT:  Okay.  Once they're -- obviously nothing is, nothing is final until you file it, but once, assuming you file it, let my case manager know I want to set up a status conference whenever, as soon as it makes sense to do so.  I don't want it to fall through the cracks.  That's where I'm going.

MS. JONES:  And depending on --  as well, depending on the steps that the families take, if any, whatever they decide to do in state court, you know, we may be back here with motions to really to give instructions about what the Court wants us to do.  And so we may have some motions related to any enforcement efforts that are made in the state court just to ensure that the trustee has clear authority and instruction to move forward.  He's not going to do anything without the Court giving authority to do it.

THE COURT:  Okay.  I intentionally like don't read what's happening in other cases of, you know, like something

shows up on the news. I don't click on it to read the news or I'd rather just deal with the information that's given to me in front in the Court here and people make arguments. So I honestly have no idea what's happening in the, in the Connecticut or the, or what the current status is in the Connecticut or the Texas matter. So me having status conferences like this is really where I try to get the real information.

MS. JONES: And I would just defer to Mr. Moshenburg or, and Mr. Kimpler to update you if you'd like to hear from them about the status of their cases. But with respect to what the trustee needs to do, this is, this is where we are. And then with respect to the FSS case, we're essentially, either all those adversaries are either settled, dismissed, or closed. So I think that case, for the most part, it's done. I don't expect anything else in that case, at this point.

THE COURT: Okay. Thank you. Mr. Moshenburg, you're in the courtroom, and then I'll turn to Mr. Kimpler. From the Texas family's perspective, I'll let you, where do things stand, both main case or adversary? Just walk me through it, just specifically so I know which one you're talking about.

MR. MOSHENBURG: 100 percent, Your Honor. Let me start with the state court cases. Right now, we appreciate the Court's remand order with the turnover action back in

state court.  We've been working very hard behind the scenes with the Connecticut families to explore our state court options for state court remedies.

In terms of the merits of the underlying state court litigation, there was just an oral argument in front of the Austin Court of Appeals last week, Your Honor, on the Heslin Lewis judgment, Your Honor.  My co-counsel was leading the state court fight.  Your Honor is also getting ready to prepare a status conference on the Pozner, De La Rosa case.  A lot of the case, there's some pending discovery issues that are going to get resolved.  But also, that case is going to be influenced naturally by what happens in Heslin Lewis, and so there's a little bit of a pace to kind of be aware of whatever guidance comes from the appellate courts about what -- how to proceed in those cases and so that's affecting the timeline of the Pozner De La Rosa case, Your Honor.

THE COURT:  If it is oral argument, if I'm asking you to speculate, don't.  But do you have a sense of when the -- you may hear back from the appellate court, the state appellate court?

MR. MOSHENBURG:  I don't, Your Honor.  I've done a lot of state court of appeals; sometimes it's short, sometimes it's very long.  I just don't know, Your Honor.

THE COURT:  Okay.  And what was, what was argued was the kind of the appeal of the judgment rendered by the state

court --

MR. MOSHENBURG: That's exactly right, Your Honor. I didn't mean to talk over you --

THE COURT: No, no. Go ahead.

MR. MOSHENBURG: At the oral argument, the appellate court seemed to focus on two things. One was the default judgment, and then also the cap busting of the punitive damages cap. Hard to glean if that's where the opinion is going to be going, but that's where the two areas that court wanted to focus on.

THE COURT: No, that's just fine. I just didn't get a sense of timing. If -- and I would ask anyone if there is something that is written, entered by the court, can someone just file it? No spin on the first page, just notice of filing of state court really and just file it so that there's public knowledge, at least on my end in terms of what the state court did -- in the, you can file it in the main docket in the main case, just so it just helps me.

MR. MOSHENBURG: 100 percent, Your Honor, we'll do that. And that really goes to the adversaries as well. Let me turn to that on the dischargeability action, Your Honor. We've been working procedurally. We were in the -- previously we talked about filing a motion to reconsider. In doing that, what we realized is there's other evidence that we want to attach and the Court, when it denied our summary judgment

005170

motion on the punitive damages in particular, there were things that the Court spotted that there wasn't enough in the record to find that we had met our burden on summary judgment.

So then we've dug back, found some transcripts, found some other briefing that sort of highlights the issue on the summary judgment. So we'll be moving for an additional summary judgment, but the idea will be that the court, the trial court found that Jones had intentionally acted. And so when the court denied the summary judgment --

THE COURT: But shouldn't we wait then if something is already briefed for the state appellate court, won't the -- in other words, do I need to wait to see what the state appellate court does before? In other words, I'll make something up. If the court affirms the punitive judgment, right, that's one thing. If the state, if the appellate court rules against you, your clients on the appellate, then what I don't want you doing is moving for summary judgment on something that could potentially be a thumbs up or a thumb down by the appellate court.

Maybe it makes sense to wait on that. I'll hear from Mr. Jordan or Mr. Broocks on kind of not getting ahead of one or the other, but I don't want to rule when there's something that's already on appeal. I think that the state court needs to take the lead on its own judgment if there were arguments raised there and then I can then -- because

essentially, I'm taking up summary judgment based upon what they're arguing so.

MR. MOSHENBURG: Right. Judge, I think that's a great idea. We fully --

THE COURT: I don't know if it's a great one, but it's an idea. Someone will let me know if it's a -- if it makes sense or not, but I'll wait for others to think about it.

MR. MOSHENBURG: Sure. And just from the Texas family's perspective, Your Honor, I want to make sure the Court understands we have worked out our differences with Connecticut. We've reached a settlement on going forward. And from, and from our vantage point -- and I think Mr. Kimpler will talk more about it -- getting finality on the dischargeability decision of the Connecticut summary judgment that the Court granted, I think that will be helpful for Connecticut and for Texas, Your Honor. So in terms of priorities and what is teed up for the Court to move forward on, I'll let Mr. Kempler elaborate. But I think getting a, getting to a final judgment on the Connecticut dischargeability action makes the most sense in terms of spending judicial resources.

THE COURT: And so, but I don't want -- well, Let me hear from others. What I don't want is for us to be sitting here having this conversation in 2027.

005172

MR. MOSHENBURG:  I agree, Your Honor, and I think the fastest path to that is through the Connecticut Avenue to avoid that.

THE COURT: Okay.  Thank you.

MR. MOSHENBURG:  Thank you, Your Honor.

THE COURT:  Mr. Kimpler, I'll hear, if you have anything you wish to add, I'll certainly hear from you.  If not, I will turn it over to Mr. Jordan, Mr. Broocks, and others.

MR. KIMPLER: Thank you, Your Honor.  I have a couple of points, but it should be pretty quick.  Let me first just give you two factual updates.

First of all, for what's going on in the Connecticut appeal, I think you know, because we filed it in December, but in December, the appellate court affirmed 1.3 billion of the judgment and overturned 150 million of the judgment.  I think that was before you when we were last --

THE COURT:  I saw that.

MR. KIMPLER:  Mr. Jones then sought review from the Connecticut Supreme Court, which is the highest court in Connecticut.  The Connecticut Supreme Court denied that review.  It's discretionary, so you have to make a cert petition.  The Connecticut Supreme Court denied that review on April 8th.  So as of April 8th, as a matter of Connecticut law, the judgments were final and enforceable.  Prior to that,

005173

Connecticut law was that judgments were stayed pending appeal.

Mr. Jones then filed in Connecticut a motion to stay enforceability of the Connecticut judgment while he pursues an appeal to the United States Supreme Court.  That was denied by the Connecticut court on May 13th.

So where we are right now is that all appellate processes in the state of Connecticut are over.  The judgment and an aggregate amount of 1.3 billion is enforceable.  And I believe Mr. Jones has another, I think he had 90 days from the prior.  So I think he has another month or so to file a petition for cert review from the U.S. Supreme Court.  We expect that he will do that.  And so that will be the last portion of the appellate process for Connecticut.

THE COURT:  Okay.  And in terms of the just -- and this may sound repetitive -- but just from your, from your perspective, where do things you think sit with respect to the adversary proceeding that is pending before me?

MR. KIMPLER:  Yeah, so, just one other update which Mr. Moshenburg already said.  We have reached a settlement agreement with the Texas plaintiffs, and so there are no more open disputes between us.

There are two adversary proceedings, Your Honor, that the Connecticut plaintiffs are party to.  The first one is the non-dischargeability proceeding that is Case Number 23-03037.  Your Honor, just to recall there, there are three

parts of our judgment. There was the $965 million of compensatory damages. You ruled that those were non-dischargeable. Those judgments have been affirmed on appeal.

There was the $150 million of Connecticut unfair trade practice tax claims. You had ruled those were non-dischargeable, but the Connecticut appeal had reversed that claim. So that claim no longer exists.

And then there was the $323 million of common law punitive damages, which were affirmed on appeal, but you did not issue summary judgment on it. So where we are at in that adversary proceeding now is there are $965 million of compensatory damages that have been held by you to be nondischargeable and been affirmed on appeal. And then there is $323 million of punitive damages, common law, affirmed on appeal but not non-dischargeable, and we have filed a motion for reconsideration that was denied.

I think, given where we are at, my clients are prepared to abandon that claim. At least as to the non-dischargeability, and that would enable us to enter a final order that would resolve the non-dischargeability action before you and would allow Mr. Jones presumably to take an appeal of that as a final order up to the district court.

I want to be very clear, we're not waiving the claim in the bankruptcy, but the argument that that portion of the claim is non-dischargeable. We are, if it suits the Court,

005175

prepared to abandon that just to streamline the litigation and allow it to go up for review at the district court level.

THE COURT:  Oh, Mr. Kimpler, I don't want to tell you what your client should -- what I am going to ask is that one way or the other that, you know, within the next 30, 45 days, I kind of get a decision as to whether we're proceeding with respect to the 323 or if you file something, then I'll know that you, you're going to not proceed with respect to the 323 with respect to the non-dischargeability, but obviously maintain the claim portion of it.

MR. KIMPLER:  Yeah.

THE COURT:  And the 955 that you say was affirmed on appeal, that's by the Connecticut courts, right?  Just to make sure that I'm clear.

MR. KIMPLER:  Correct.  So to be, to be clear, there, Mr. Jones has one last shot at the U.S. Supreme Court.

THE COURT:  Okay.  Okay.  Thank you.

MR. KIMPLER:  The other adversary proceeding that we're a party to, Your Honor, is Wheeler v. Jones.  That is Case Number 24-03279.  That is what we call the enforcement action, and let me just give you the background because I don't think we've actually ever had a status conference or hearing before you on it.  So let me explain what it is and why it's before you.

That was last August.  We moved to domesticate our

judgments in Texas under the Uniform Judgment Enforcement Act. And so we filed a complaint in state court that basically seeks recognition of a foreign judgment, the Connecticut judgment. There was a 30-day objection period on that complaint. Nothing was filed in October, but Mr. Jones removed that action. We think he removed it in an untimely basis. We also think it procedurally is not an action that can be removed. It's really a procedural, you know, case, but he removed it. He also filed counterclaims in that action, which, you know, are various types of attacks on the Connecticut judgment and some other claims. That action was then removed to the Western District of Texas, and then it was transferred to you.

So I think it probably showed up on your docket, sometime mid to late January. On that docket, there is a fully briefed motion for remand back to the state court. There is also a fully briefed motion to dismiss on the counterclaims.

In our view, all of this can be pretty easily decided on the papers. We would urge Your Honor, although we know you have an exceedingly busy docket, to rule on those when you are able, whether you want to first rule on the motion to dismiss and then the remand, or you want to remand and leave the motion to dismiss to the state court, assuming that, you know, you did decide to remand.

It is obviously your prerogative, Your Honor. You

005177

know, from our perspective, these are pretty procedural issues as far as the timeliness and the appropriateness of the remand and the counterclaim.

I have exhausted everything I know about that action because it has been handled by Mr. Chapple.  So if you have any other questions, I would, I would call for a lifeline.

THE COURT:  No, no, this was very helpful.  I remember Judge Pittman said something to me in about January, mid-January, January 16th or January 17th, and we hadn't taken it up and I didn't want to do anything without talking to the parties to understand kind of where all the pieces fit before -- and heard from everybody before I decided to kind of take it, take the issues up on the, on the merits one way or the other so .

MR. KIMPLER:  The last thing I would offer, Your Honor, is, you know, we have heard you that some collection activity should be proceeding in state court.  We are trying to do that.  We're trying to work with the Texas plaintiffs on that front, obviously, having domesticated judgments in state court is important to that effort.

THE COURT:  Thank you.  Great.  Yeah, I guess I don't know, Mr. Chapple, if you can give me a thumbs up or thumbs down or hit five star if there's anything else you wish to add before I turn to a 512 number.

MR. CHAPPLE:  That's correct, Your Honor.

005178

THE COURT:  Okay.

MR. CHAPPLE:  Can you hear me now?

THE COURT:  Just fine.  Anything, is there anything to add?  I'm just giving you the opportunity.

MR. CHAPPLE:  No, Your Honor.  I appreciate the opportunity.  I think Mr. Kimpler did a thorough job of explaining the situation and our perspective on both the motion to remand and the motion to dismiss the counterclaim.

THE COURT:  Thank you.  Okay.  Mr. Jordan, Mr. Broocks, anything you wish to say?  Good afternoon.

MR. JORDAN:  And sorry for all the shuffling, but there's a, there's kind of a number of things that are going on.  And there's some moving targets that we, on the way from Austin to here today, found out about.  So I want to be able to sort of better organize.  I don't want to come across too confusing, but I guess I start with --

THE COURT:  Take as much time as you need.

MR. JORDAN:  -- with I guess the most interesting thing that I think the Court should be aware of simply because this has been leaving these matters on the docket.  If you recall, the Texas plaintiffs asked for over a year's worth of extensions while the Chapter 11 was going on.  And of course, we would assume that they were in good faith and Ms. Driver was in good faith granting extensions over and over again.  So we lost a year when we discovered that there was nobody that

was going to support the plan through the Texas plaintiffs.

So the briefing started last Tuesday, Tuesday week. The arguments were held at the Court of Appeals, and you ask about what do you think they're going to rule.  Something happened at those arguments.  Now I've done most of my appellate work in the federal system, but I've done quite a bit in the state court and something happened that never happened before that I think the Court needs to know about because it affects the adversary that's pending and it affects the answer that we all have to give to you and guessing.  I don't think the Court of Appeals is going to take a long time in ruling, and I, and I don't because -- if I may --

THE COURT::  Mm hmm.

MR. JORDAN:  I mean.  And to Mr. -- the responses and information Mr. Moshenburg gave you, he didn't attend the argument, so I don't think he probably -- but I don't know if he knows about the position that the plaintiffs took, but I had it blown up because we didn't have  time to get the cameras and stuff, I mean the audio.  But I'd like to -- for the Court to read what Mr. Bankston told the Court of Appeals, and I've got a copy of that here.  It can help to, help for you to see it, whatever.

Mr. Bankston told the Court of Appeals when he concluded his arguments --

THE COURT:  Mr. Bankston represents the plaintiffs,

005180

the Texas plaintiffs, is that correct?

MR. JORDAN:  Yes.

THE COURT:  Okay.

MAN 1: (Indiscernible)

THE COURT:  No, no, no, just want to make sure there's a, there's a reference to Mr. Bankston  He represents the Texas plaintiffs if I remember.  Okay.

MR. JORDAN:  And so, here's what he told the court when he concluded his arguments, which he was, he was, I'll just say this, it was peppered a whole lot about how you're going to keep these punitive damages with this elder abuse that was not submitted to the jury and it was all not pled and pled afterwards.  But those are all questions which they, which they had a lot to say about and there's been a lot written about what the people think the court's going to do.

But more important was this, Mr. Bankston told the court when he finished his arguments, he said, "So I, so what, with that said, Your Honor, again, I return to this idea that I would love to be here before you on a case that matters. And the reason I say this is I'm certain you probably are aware at this point, there are over a billion dollars of non-dischargeable debt against Jones approved by the Connecticut Supreme Court, by my plaintiff, excuse me, by my plaintiffs that are all collecting together with 19 other family members." I'm going to stop there for one second because I couldn't, I

005181

couldn't figure out why, what his plaintiffs were doing arguing about the billion dollar award, but it made it clear because now we know that there is some agreement that is between the Texas plaintiffs and the, and the Connecticut plaintiffs that has something to do with, no matter what happens in this case, and so let me finish just reading this. "And now we have an appellant, of course, that's Mr. Jones and FSS, who's trying to remove $50 million for what purpose when there's already over a billion dollars in dischargeable debt that's coming in part to my plaintiffs, right?" Now, I'll stop there for just a second. I think he's referencing to the deal he made.

They cut a deal where apparently if you were to find everything was dischargeable, they're still going to claim we've carved out from the plaintiff's non-dischargeable portion that claim, and we're going to assert it. I think that's what it is, but let me, let me finish and then maybe the Court can analyze it itself. "What is, what is accomplished by this appeal? The result of this Court's decision, I hate to say, is pretty worthless in terms of what's going to happen to the parties." And then, Your Honor, this, this second page, I don't, I think that's all we've got. I've got a -- he introduced in the beginning of the argument, he introduced, he's going to tell them why what they were doing was worthless, and that's what he did. So that's okay. I'm not willing to do that. And, and so I want to point that out

to you to in this respect. I've never seen a litigant tell the panel in an appellate proceeding that what they're doing is meaningless. There's no effect to it. It's nothing because we made another deal with somebody else and no matter what you do. Now, I was not surprised that they took that position because the panel was pretty direct on how this case was tried and how in the world you were able to get elder abuse after the jury had left and you replead it and the Court gave it to you and all that stuff. The appellate court was very focused on what was going on here. And so I think what -- and I, and I want to say this because I think what Mr. Bankston accomplished was probably a very speedy opinion, that's my best guess. The Courts had no response. They had no emotion, they had no response. They were very active during the arguments, but with that comment, they simply excused the parties and got up and left.

So I, so to answer the question as best as an appellate lawyer as I can and Mr. Broocks did the argument so he may have something to spin to put on it, but I don't think we're going to be waiting a long time. The dilemma I see is, is that -- my concern is that I think Mr. Bankston has made a deal and critically a deal that would -- because I think he contemplated it before he made these remarks to this panel. I mean no lawyer would say that to a panel unless he knew what was going to happen and the panel had made it pretty clear in

005183

the arguments.  But I want to emphasize to you and I have a, we're supposed to have another blow up, but I know that, I know this is not trial on the merits of anything, but I, but I want to be able to sort of encapsulate to the Court what's happening here and what's happening in circumstances we don't know about and that's going to lead me to ask you for some, some relief in connection with the motions that you just want to status conference on today.

I'm not going to argue the motions, of course, or the merits of the motions, but I do want to let the Court understand why I'm asking for some of this relief.

But here's an email.  It was written by Paul Weiss, Leslie Lieberman, November 16th, 2024, at 1:16 p.m. addressed to Jarrod Martin, Josh Wolfshohl, Chris Murray, Avi Moshenburg and others.  And they were working on a deal.  And this was produced in the, in the discovery that we had with Mr. Murray.

And here's what they, here's what they say in the email that I, that I think is very critical for the Court to allow me to emphasize.  The email's text says "We attach an updated term sheet.  We have increased the settlement amount to three million."  That is the settlement between Texas and Connecticut to cut some deal.  "In our view, this represents a significant premium over the Texas family, over what the Texas families are entitled to on a pro rata basis, a premium that we are only willing to pay for assurances that the FSS

assets will not be sold to Jones' family and friends given that it is clear that Jones will use the assets to continue harming our client."  Whatever, whatever that means.

But we do know because we have other emails, again, not to develop any of the facts without having the witnesses to proof up these.  What we do know is that there has been a continual -- and you've seen it in two, in two series of transactions in auctions.  They were, they were trying to conduct an auction only if they had these arrangements in these particular problems made.

And so what has occurred, what we believe has occurred is something that is completely contrary to bankruptcy policy of what a creditor is entitled to obtain and do in a bankruptcy proceeding.  And we've made those arguments in the, in the motion for the auction. Very briefly, we simply say that -- we go through a number of pages of the evidence that we have and the things that we've discovered in the last six months that the government, the DOJ, the plaintiffs' foundations, Paul Weiss and other players had been doing in connection with these Jones claims.

So our argument is couched in terms of what has happened is the, excuse me, your Chapter 11 case was never prosecuted in Chapter 11 by the two dominant creditors.  They had their controversy.  One was -- and I would, I would use this example.  They were identical twins.  One was Texas and

one was Connecticut.  No difference.  No, I mean they were the, the events were the same, the people that came to the events were the same, the people that committed the events were the same, the conversations about the events were the same.  Everything was identical.  One of them got 2 percent recovery, and one of them got almost 3 percent, and one of them got 97 percent recovery.  And of course, that skews everything from the standpoint of how can that happen and what can you do about that?

We know that there are things that, remedies that can be done.  And we know that the Texas plaintiffs know what they are.  And so we assume that that is what's been pushing these negotiations from before November all the way through the last time you heard and saw a written effort.  And that was the 9019 settlement in which they were saying, you know, we're going to give you 25 percent and you're going to get $4 million.  It had gone from the email of 3 million to 4 million.  All those things are transpiring without us having any idea of the background of the trustee's involvement.  We've now discovered the trustee was very involved in the, in the decision making and in the implementation of all the process.

What it has done for us though is it, it has finally coalesced the process that is going on here and that is that the dominant creditor who doesn't want money -- now, by the way, the motion that we filed I footnoted to the YouTubes and

005186

to the, to the public statements and I think you heard some of the Onion statements where they don't want the assets so they can make money because their dilemma is this.  Where they, for instance, to go to an auction that had an $8 million purchase price and they won by $8 million and one.

They normally would have then a balance sheet that says, I just, I just put out $8 million but I got assets worth $8 million.  So the balance sheet doesn't change and that's where you, that's where you make your auction decisions.  But that's not what's at play here.

What the play is here is that look, we can't pay much money because we're going to destroy the assets.  The reason we want the assets -- and they say that -- the reason we want the assets is so Alex Jones cannot use them.  We want to destroy his brand.  Onion said that in the, in the newspaper.  We want to destroy the brand and parody it so that we can further our gun control political position and other stuff.

So what has happened to us in this case is the dominant creditor, which has been represented by Paul Weiss, the dominant Connecticut creditor doesn't want money.  What they want to do is destroy Alex Jones, and they have -- and as the Courts, I know the Court's aware that they didn't utilize the first proposed mediator.  They did then eventually agree to a mediation and zero happened.  So this is not a case

005187

in which they have ever made an effort to deal with and try to resolve the case with dollars because it's always been destroy the brand, get him off the air -- and you'll see the videos if you ever get a chance to look at them -- is that they told the jury in Connecticut, punish him with such a verdict that he can never be part of the public discourse again.

So what's happening in this process, and I emphasize this because the auction is going to bring it to a head, they don't want, they don't want an auction. And so --

THE COURT: Why don't you buy the equity?

MR. JORDAN: I'm sorry, Judge.

THE COURT: Why doesn't someone just buy the equity?

MR. JORDAN: Well, if you buy the equity, you buy whatever debt and other things that go along with it.

THE COURT: So what's wrong with that? That's what Chapter 7 normally does. What's different?

MR. JORDAN: Well, because I don't think anybody would buy the equity. Buying the equity so that you can --

THE COURT: First United can put up the money and buy the equity right now if it wanted to.

MR. CICAK: (Indiscernible)

MR. JORDAN: Maybe I'm not following you. If you --

THE COURT: The trustee has said no one's put up an

005188

offer for the equity.

MR. JORDAN:  Correct.

THE COURT:  So, First United, put up an order for the equity.

MR CICACK:  (Indiscernible)

MR. JORDAN:  Well --

THE COURT:  In other words, I don't -- what people want is a sale of the assets.  And let me just remind people what happened when there was a sale of the assets, it was me that expressed the concern about the sale.  There was a sale on the table.  I denied it and then I denied another motion to approve a settlement.  Right?  Those assets are incredibly complicated and they raised huge property of the estate issues.  X ended up doing a deal at the very last minute in connection with the proposed sale to Global Tetrahedron, which I didn't approve.

To conduct such a sale, one would have to -- and I said this on the record back then -- you'd have to address all property of the estate issues up front so that you have a clean understanding as to what could be sold and what could not be sold.  And the IP issues to me remained largely unsettled and really complicated as to what FSS owned, what Jones owned, what it didn't own, what he didn't own.

To do that again, there would have to be such a process, and I'm not comfortable proceeding that way.  But if

005189

somebody wants to buy the equity, which someone can always do in Chapter 7. I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending. That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right? Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that. What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction. The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets. And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me. It would have to be cash only and we'd have to sort out all the intellectual property issues. So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything. I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

expensive.

And I get it. Maybe they don't want to buy the asset to make money. But I'd, I flip it to you.

MR. JORDAN: I'd like to, I'd like to comment on that because this is, this has really troubled you. I know since the beginning you made clear that if the IP was going to be sold, that the parties had to come to the Court and raise the issue and then you would decide whether it could be sold or not.

Now so the two offers that we brought to you, I say that we brought to you, that were brought to you that dealt with buying the assets all said we take as is. So that sale would never have been a problematic sale on that basis.

THE COURT: Take the equity. I've got two sides. There's no question Jones supports FUAC buying it.

MR. JORDAN: Of course, yeah.

THE COURT: No one said that. There is no question about that.

MR. JORDAN: The questions would go away.

THE COURT: There's no question. There's no question, but whether it stays or goes away is largely irrelevant for me, right, from a bankruptcy perspective. Now, obviously, it's got incredible importance to Mr. Jones and I don't, I got that. But from a, from a bankruptcy perspective, the real question is what's in the best interest of the estate,

right?  And so to me, the amount of money Mr. Murray would have to spend to get me comfortable that there would be a sale of assets, it would be incredibly expensive and incredibly time consuming.  And I'm wondering if the amount of money that it would take to spend plus potential issues that come along with it that's why I said to you, if you want, somebody can put up the equity.

This case has been pending since 2022.  And folks, it just needs to, it needs to end.  Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable.  Let the state courts, or the Supreme Court of the United States rule on the issue.  Parties can then appeal any orders of mine to the district court or the Fifth Circuit.  We got to get there.  I'm not moving.

The issues that are still there are there.  And I've heard your concerns.  And I didn't approve of the sale to Global Tetrahedron.  And I'm not saying anybody did anything wrong.  I just did not get comfortable with that sale.  I didn't get comfortable with the settlement.  Someone was asking me to allow a claim against an entity that's not in bankruptcy anymore.

MR. JORDAN:  And believe me, we didn't ignore you when you said --

THE COURT:  I know you didn't.  I know you didn't

005192

it.

MR. JORDAN:  -- on the sale of the equity.  We've tried to figure a way that we could sell it without the buyer buying $1.3 billion in debt.

THE COURT:  And that's the problem is that you can't figure it out.

MR. JORDAN:  If you got a hand on it.

THE COURT:  It's not, it's the trustee's call. That's what I'm saying.

MR. JORDAN:  Well, it's the trustee's call if he can find a buyer.  We couldn't figure out how to find one.  It would have been --

THE COURT:  May the trustee abandoned the issue. And maybe the trustee abandons the asset.  I don't know.  You all are going to have to figure it out.  That's what I'm saying.  The trustee needs to make decisions.

MR. JORDAN:  But let me also mention to the Court, and I'm not sure that you processed this, the way I'm, the way I tried to present it because I didn't, I'm not sure I wrote it the way you --

THE COURT:  You're saying there's stuff going on behind the scenes and you should be well aware of it.

MR. JORDAN:  That's not up for today, and I don't, and I --

THE COURT:  But it could be.

005193

MR. JORDAN:  I'm saying it is a, it is we want the ability with limited discovery to explain that with facts and documents.  Now we've got them.  But we've got to verify them. We've had to have them authenticated.  I mean things have happened in the last six months since this regime change.

THE COURT:  I'm sure.  I'm sure.

MR. JORDAN:  But that's not what I was referring to. Here's what I think you might consider.  When you ruled on the 25th of February, and then you said, and then after that, the FUMC filed a  request for a status conference because they wanted, they made this offer that wouldn't be -- for three months and not been responded to, an $8 million offer subject to the conditions that I mentioned.  We won't --  the trustee doesn't have to warrant anything to us just because we know what is there.  We know what is involved, so, so we're ready to sell.

At that time you were incredibly frustrated with the, with all the parties and you commented that you were going to void and terminate the order.

THE COURT:  I did say that and I agree.

MR. JORDAN:  And quite frankly, but for, but for the fact that the appeal was pending, that's probably what you would have done at the time.

Now, the appeal now, I filed my motion pointing out that I've pointed out to the, to the  plaintiff, the appellant,

005194

there's no jurisdiction to do anything except enforce the order or construe the order if they keep their appeal going. They kept it going. But I think when I filed this motion -- and I really emphasized it maybe more or better than I, than I had before -- they have now dismissed the appeal. That dismissal was, is now 34 days old, and that's important.

They said in their reply, which, by the way, the reply to all these --

THE COURT: The reply to which docket?

MR. JORDAN: I'm sorry, to my motion.

THE COURT: Oh, yes, yes.

MR. JORDAN: When they filed their response, I misspoke, when they filed their response to my motion, they said the appeal is dismissed, the matter is moot, the judge has ruled, and so it's all in state court. That's their response. And of course my reply then was wait a minute. That is not how it works. If the Judge had made oral release from the bench, and the last one he wrote down that it was, that it was void, but the Judge also said, I mean, on his own, not because we pointed it out, but you said on the, on the 25th of -- on the 5th of February '25 that if it's on appeal, I can't modify it, I can't change it, I can't withdraw it. Now, I can, I can enforce it or I can interpret it, but I can't do any of that cause it's on appeal. That was all correct. Now it's not. So now what's the effect of that?

005195

The effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked.  It is a final order that permits the trustee, because remember your supplemental order did two things.  You gave the trustee the assets and then you said, "And I'm giving him the authority to operate until he can sell."  Now that's what it, I mean, you basically laid out the purpose of it.

The plaintiffs are now saying, oh, that supplemental order doesn't order a sale, so there's no way that just because the supplemental order is in place, it'll be ordered.  I think that's foolish, but that's their argument.  But the other argument is that in some fashion, your final judgment that now -- that people can't attack -- well, the one exception.  Your final judgment is a final judgment on the law.  That is, can I, could I authorize to do that in the state of Texas?  Yes, I can.  I have a final order.  Everybody knew about it.  Even the person that complained about it withdrew his appeal.  So it's fine.

THE COURT:  The question is, do we do round two?

MR. JORDAN:  I'm sorry, Judge?

THE COURT:  There's already been a round one.  The question is do we open it up for a round two.  That's the real question, right?

MR. JORDAN:  Well, yes, it is the real question in

the sense, but let me tell you how that works, but the answer to your question is yes, but here's how it works.  Rule 59(e) could give relief by which you could, within 28 days of the entry of the final order, even the Court within that period of time could have sua sponte said, wait a minute, I don't, I made a mistake.  I don't like what I did or things have changed.

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

MR. JORDAN:  Well, I'm saying now --

THE COURT:  You probably couldn't do it before then, but I'm asking you to reconsider if that's what you're planning on doing now is how I read your motion or to the extent I thought I did something, reconsider it.

MR. JORDAN:  Yes, because I can say this.  And look, I'm old enough to know better than to tell a federal judge he can't do something.  Okay.

THE COURT:  I'm not one of those judges.  You can tell me that I can't, I can't.

MR. JORDAN:  What I want, but what I want you to hear is that Federal Rule 59(e) is gone; 28 days have passed.

005197

Nobody filed a motion and you didn't pick it up and decide you wanted to do something.

60(b) provides for a reasonable time to do something. That reasonable time probably hadn't passed or maybe it has, who knows, but it's only on motion. It's not on sua sponte of the Court.

THE COURT: Oh, I agree with that.

MR. JORDAN: Okay. So no one has asked you to do anything. They've said, oh, it's all moot --

THE COURT: No, I agree. I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it.

I've told the trustee, if you're going to try to do this again, here's the mountain of stuff you're going to have to get over before I get comfortable approving a process by which those assets could be sold, and it's really hard. The trustee can move if he wants. I know you can sell the equity. And that's an easy process to get through.

The other one, it's going to be really hard to get me comfortable approving the sale on the merits based upon all the issues before. But I don't, I'm not in the business of ordering trustees to go order and nor is anyone asking me to. Truste's got an offer. Trustee will weigh. Trustee will exercise business judgment as to what the trustee wants to do

and parties can file stuff asking me to do things or not. But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it. He tried to sell assets under those orders.

The question is do we do another sale? That's the real question. Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS. And how do I weigh now state court remedies that people have as opposed to -- do I stay then state court remedies against non-debtor parties, against the non-debtor? It's more complicated now than it was six or seven months ago.

MR. JORDAN: Well, I agree. I think that the issue in state court has become extremely favorable to the goal and policy I mean and decision making of the plaintiffs. They know that a state court auction by a constable is worthless to value. They're going to, somebody's going to credit bid and now their deal is, it's going to be, they're going to create a bid. Nobody gets any cash. There's no change. They get the assets for nothing and the people that are injured, of course, are the other creditors of this estate who are, who are not active at all. There's not a whole lot of them, but

there's, but they're there.  And, of course, then the Debtor who has obviously an interest in getting a maximum value for a credit against his judgment.

So you, they're weighing this.  They're weighing a state court constable's auction for nothing by which they get the assets for nothing and they destroy them like they say they're going to.  And they, and $4 million goes to, they pay $4 million to the, to the Texas plaintiffs, or we go to an auction and we have to compete against $8 million with someone who says you don't need to guarantee title, you don't, yeah, I mean, here's my bid, I'm ready to go.

And now here's, and here's the third comparison that I, that I really think is important.  And I think you may have just said it, but if, but if I didn't -- not sure I picked it up exactly, is that people have relied on your order.  I mean the trustee has paid himself over a million dollars from those funds.  The trustee's lawyer has gotten $800 million too pursuing these auctions.  I mean, there's been almost $2 million spent pursuing the auctions and pursuing the reliefs and doing the settlement agreements and all the things they were doing.  Instead of just auctioning it off, they got into this process that somehow the trustee bought into.  And so the -- how do we unwind this because for the last six months now, Alex Jones has been operating under the auspices of the trustee, so he, I mean, he's added like $2 million into the

005200

estate from him running the company and keeping the assets going earning money.

What happens to the earnings, I mean so --

THE COURT: Where does the -- let me ask you a question. It's a good question to ask. FSS, well, let's assume FSS generates -- I'm making something up here, so just as a hypothetical. We'll just use X dollars in July of 2025 or through August, or the first six months of this year. Right? Where does that money go?

MR. JORDAN: It goes to the account of the trustee 50 percent and the account of Alex Jones, 50 percent. So they have -- so he didn't get a salary, he gets, that's how they, that's how they run the operations. So and that has generated about $2 million and that's not just since this month, but it's --

THE COURT: Are you asking me to, in consideration of that, to potentially end that arrangement, give it all to Jones? If I reverse the order, wouldn't that, isn't that the effect?

MR. JORDAN: See that's the dilemma. If you reverse the order, everybody has done a lot of things in reliance on the order.

THE COURT: No, no. I got it. I got it.

MR. JORDAN: Okay.

THE COURT: It's an -- I understand the point.

005201

Right?  I understand the point.  There's money coming in and there's only one person generating that money that's coming into FSS.  Let me think about it.  I don't want to rule today. I want to think about everything and think about this.  This is kind of why I want to have a status.

MR. JORDAN:  And may I --

THE COURT:  Go ahead.

MR. KIMPER:  May I --

MR. JORDAN:  And may I, may I add to my confusion --

THE COURT:  Just a second, Mr. Kimpler.  I just want Mr. Jordan to finish.  Go ahead, Mr. Jordan.  I think Mr. Kimpler wanted to speak, but I'll give him an opportunity or Mr. Broocks.  Yeah, go ahead, you finish.

MR. JORDAN:  What's that?

MR. KIMPLER:  Your speech.

THE COURT:  Go ahead.  Finish your point.  You've got the floor.

MR. JORDAN:  Mr. Kimpler.  Okay.  My other thought is this.  It's kind of a different direction.  There have been four orders entered, I'm sorry, there have been, I think, three orders entered.  There may have been four.  I'm referring to Docket Number 24-03228, 229, 331, and they're called "Stipulations of the Parties."

THE COURT  Yes.

MR. JORDAN: And they purport to -- and we only found these this morning. We weren't, we weren't ever served any notice, but we weren't parties to these adversaries. These are ones I think that Ms. Driver was a party and she hadn't withdrawn and one of the trial lawyers, Chris Martin was a part of, but we didn't know about these. And my question, if I may ask the question, I'm not asking for an advisory opinion. I just, this is the Court's order. It says the Court retains exclusive jurisdiction over property of the estate and any other property or interest under the control of the trustee, including 100 percent equity interest in FSS. And it's entered in the, or at least styled in the FSS Systems Chapter 11 that is no longer.

And my, I guess my only concern is that it's sent back to state court something, but I, but I can't, I don't understand what it sent back to state court. These were remand motions that I think they're, they're not the ones that we're involved in that's up for today. But if those are remand motions and they don't, and they're not sending property back to the estate, I guess, I guess from my perspective, we probably don't have a problem. We still are within the time to file a motion and reconsider if there, if we find a problem, but can the Court, did the Court intend to send the assets back to the estate or --

THE COURT: No.

005203

MR. JORDAN: No. Okay. Well, I'm asking for a ruling, and I don't, and I ought to tee it up differently, I guess, but --

THE COURT: I'll set up a short status. I don't know when. Give me a little time to think about everything that I've heard today, one way or the other. Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other. I don't think anyone should plan on an auction today, but I may change my mind, but I don't -- in terms of going forward with respect to the cash generated by FSS, it's something to think about.

MR. JORDAN: And, Your Honor, then just to finish so that Mr. Kimpler can ask his question.

THE COURT: I think Mr. Broocks will go and then I'll, then I'll turn to Mr. Kimpler and then I've got another hearing, folks and I don't --

MR BROOCKS: I'm going to go next.

MR. JORDAN: All right, so the one other issue that I wanted to cover, and let me see where I put it. Your Honor, for the sake of the, of the topics I've covered, if it's all right, I'm going to sit down. If Mr. Broocks had something --

THE COURT: If you, if you think about it, just let me know.

MR. JORDAN: Okay.

005204

THE COURT:  Mr. Broocks, good afternoon.

MR. BROOCKS:  I'll be very brief, Your Honor.  Thank you so much for entertaining this.  I did the oral argument in the Austin Court of Appeals, and I wanted to bring to your attention some different facets of this.

The Connecticut first in Austin, in Connecticut, we asked the Supreme Court of Connecticut to do this discretionary review.  They could.  There's a specific doctrine there under a whole lot of cases called the Golden cases.  It says even if you didn't raise a constitutional issue below, you can raise it here.  So we asked them to do so.  The opposition to our petition in Connecticut said no, they didn't raise it in the Court of Appeals.  They didn't even use, I'll say the "C" word, Constitution.  That was their argument.  It's been waived, we said, but the Golden case is intended for that exact purpose, (Indiscernible) line did not.

And he's right, whoever said it.  We are going to go to the U.S. Supreme Court.  We have the ability to ask Justice Sotomayor, I think she's assigned to the, to the Second Circuit District, wherever this case is, for a stay.  And the moment they start any aggressive action; we're going to do that.  We have a petition we're working on right now.  That's Connecticut.

Now in the Texas appeal, the argument was threefold.  It was a lot of sub issues, but the arguments looked to the

justices you have, Your Honor, has an independent duty, constitutional duty to review the constitutional issues. As painful as it may sound, you've got to take these videos and you've got to watch them and I had them transcribed. So the Court didn't have to just go watch them. I said, here are the transcripts. They objected to that, but I said, I'm just trying to help. And they were, they were hyperlinked where you could listen to it and read the transcript and go to the particular spot.

I said so you got an independent duty and nothing anybody can do can take that away. And nobody, no court in America has yet ruled on the constitutional issues we raised. Nobody. And so, and so they said, well, they were, they were facing the task and they realize that's their duty. And that may take a while.

Now, the second issue was we said there is a constitutional prohibition, prohibition on entering a liability default judgment against a media defendant in a matter of public concern in the case brought by a public figure. We think we satisfied all three of those. We said and the justices, the Chief Justice said, wait a minute, are you telling me that the trial court is helpless? I said, absolutely not. She's got a lot of remedies available to her, but the one thing she can't do is put a gun to the head and say I am going to bypass all these cases and I'm going to say

005206

I'm going to find you, as a matter of judicial decree, to have committed malice that it's false, that you intended it to be false, you knew it was false, and instead of clear and convincing evidence, I'm going to say there was. I said they just can't do that in that context. And so she asked Bankston, she said, Well, what do you say about that? And Bankston, well of course, he says we disagree, but he didn't have any cases because he doesn't have any cases.

Now the third issue, so we said, we said the constitutional review is going to be required. The default judgment was inappropriate, and we said well when punitive damages are concerned, you have an independent duty to look and see what the grounds are. And to see if, in fact, under Texas law, and which is similar to a lot of states, did they put on the proper evidence to show that, you know, that the default damages that all remedies that had been available to the trial court were tried and failed. The justice says, what could she have done? I said, she, if they weren't having success in getting documents from Jones, you got weekly hold, you can get his, they've done computers, you can do the searches yourself. There's a lot of things.

So anyway, so the Court of Appeals is going to come back potentially and do something very interesting because you've got a Texas case and you've got a Connecticut case. Now this is like Shelby said it was identical twins. That's

005207

a really interesting analogy because it was the Sandy Hook crisis, same one, the same parties, families and family members, the same broadcasts that are allegedly defamatory. A default judgment on liability, so there was no liability trial. The only differentiating factor was the damages. Now in Connecticut, it's $965 billion divided by 15 is roughly $63 million of actual damages to the family. Pretty close.

In Texas, it was $2 million 2 for Heslin, 2 for Lewis. So how do you get on the identical facts, the identical arguments, the identical, there's no liability issue. You now have 63 million to the Connecticut people and 2 million to the Texas plaintiffs. Now if the Texas Court of Appeals comes back and says that we're going to say that -- they could come back and say there's no defamation because I showed them the articles that they were taking snippets out and claiming Jones says this, but he said very clearly, I believe children died. So, you know, there could be no defamation involved. We said convincingly, I think, that there was no intention of fiction, but the Court of Appeals could come back and say wait a minute, we don't think this satisfies constitutional muster.

Now what is the Supreme Court of America going to do? What are you going to do when you've got identical facts, identical facts, identical liability, and one court says it violates the Constitution and another court says they didn't say no. They said we're not going to address it.

005208

Now I think that creates an opportunity, a question for the Supreme Court. Not only is there a disproportionate recovery, 63 versus 2, you have one court saying on the same facts, no. Another court saying on the same facts, we're not going to address it, but maybe. That creates an interesting dilemma, I think, for this Court. Because you're being asked to find non-dischargeable something that a Texas court would if it comes out this way, if I'm right, that the Texas Court of Appeals says it doesn't pass constitutional muster, well, you're in a dilemma. And that's why I think your comment about shouldn't we wait till the Texas Court of Appeals rules is very prescient because they very well may come back and say that and I think that is an issue that this Court should take into consideration as it considers its dischargeability because I think that the plaintiffs here --

THE COURT: Dischargeability with respect to Texas, Connecticut or both?

MR. BROOCKS: Both, both.

THE COURT: Okay.

MR. BROOCKS: And I'll tell you why. It is because in issuing your original non-dischargeability order, you were led to believe that Connecticut was basically ironclad just, you know, if it was fairly tried and all that. That's not Connecticut law. It's just not.

THE COURT: Shouldn't an appellate court in

Connecticut tell me that?  I wasn't, I don't think I was led to believe anything.  I think I was given documents that led to a conclusion under the law.

MR. BROOCKS:  These are collateral estoppel issues. The Connecticut court can tell you what they did, but you have to decide what is the collateral estoppel effect.  And we said that the Lighthouse case and others, the Supreme Court of Connecticut in multiple cases has said that there are three steps in a collateral estoppel, but there's a critical fourth which gets into equity, fairness, justice.

You know, we get to look behind the scenes and then there was another case where a default judgment was entered. Those were just regular collateral estoppel cases.

There was another Connecticut Supreme Court case that is the bellwether case that says, wait a minute, if you have a default judgment entered, they go, they follow the restatement of torts.  And they say if a default judgment, then you can't say it was fairly --

THE COURT:  Aren't those matters for an appellate court at some point?

MR. BROOCKS:  No, those are matters for you.  These are, these are questions because if the question of collateral estoppel comes in, these are the issues.

THE COURT:  You're saying collateral estoppel on something I've already ruled on?

MR. BROOCKS:  I'm saying you haven't, it's not -- you at all times, this is not a final order, Your Honor.

THE COURT:  Oh, you mean, you mean in connection with the final order.

MR. BROOCKS:  I'm saying as you approach the issue of finality, and I may, I have --

THE COURT:  No, no, no.  I got the point.  I get the point.

MR. BROOCKS:  So I'm going to say that as you, as Mr. Kimpler said a minute ago, they're going to come back -- and I suspect they will.  I would be shocked if they didn't -- saying we're going to forgo the $331 million.  That would be Bankston saying that he's got a deal.  Now we believe this is a, we believe this is, I'm going to say an illegal deal.  We believe these are two creditors working behind the scenes because I think that because Connecticut has always said we have 97 percent of the judgment, but Texas has said, well, wait a minute, it should be 5 Texas plaintiffs, 15, that's, that's 75, 25, 75 percent.  Connecticut was held hostage by Texas until they cut that deal, and that's what I think we need to discover.  And that's an abuse of process.  That's creditors manipulating the system.  And what's happened here is that that's going to be another complicating factor because we're going to file an adversary on that.

THE COURT:  Okay.

MR. BROOCKS: And so at any rate, my point to this Court is that there has been a massive, and I'm going to conclude with this, and a massive, a massive abuse of process here. They have taken legitimate processes and they have abused them, using them for an illicit purpose, which is to put Jones out of the air. That is not a legitimate purpose. And that is going to be, so that's the essence of our, of our 1983 claim. Our 1983 claim says this, from the moment that trial judge in Delaware -- in Connecticut issued a default judgment and then struck our constitutional defenses, that is state action. The New York Times versus Sullivan says that's a state action. The cases we cite in our briefs, the Fifth Circuit says that is, that's not just a plaintiff bringing a lawsuit. That is a judge entering an order that now tips the scale, and that is state action. Again, New York Times versus Sullivan said that.

So we believe, Your Honor, that we have asserted valid 1983 claims. We believe we're going to assert an amended petition or complaint for abuse of process. And we would urge you to wait and see what the Texas Court of Appeals does because that may change your judgment.

THE COURT: Thank you very much. Mr. Kimpler, I think you wanted to have a word.

MR. KIMPLER: I would, Your Honor. I'll be brief, but there was a lot of stuff said. I think one thing I hope

you're seeing that as Mr. Jones continues to lose his appeals in Connecticut, increasingly it is hoping that you will be in appellate court. I think you've already appropriately decided that collateral tax on the Connecticut judgment won't stand. The Supreme Court will either take up review of this or it will not. We are confident that the judgment will stand. I don't believe the Supreme Court will even take review. As Mr. Broocks just noted, they actually don't raise constitutional issues in the underlying appeal. So when you ask what's the federal issue for the Supreme Court to look at? It's a pretty good question. Mr. Broocks won't agree with any of that. I don't need to convince you of any of that. The Supreme Court will do what it will or won't.

I'll just remind you that for the last two years, they've told you that Connecticut judgments are going to be overturned, and they weren't. They were affirmed and the Supreme Court of Connecticut said they didn't want to look at it.

I'm not going to respond, Your Honor, to all of the mischaracterizations about my clients. I will point out that the email they quote from my colleague, Ms. Lieberman, was taken out of context. It specifically said we're tired of being hurt on air. If we want to have an evidentiary hearing, I'm happy to show you since January or since December, the number of times Mr. Jones has continued to harass and threaten

005213

my clients on air.  I don't think it's relevant, but I'm happy to do it.

The statement that we at closing in Connecticut said "put a huge punitive damages to take this guy off air," the only problem with that?  I think that was what was said in Texas.  So if we're going to throw around a whole bunch of factual accusations, we should at least have some credibility when we do it and not make misstatements.

I'm a little bit surprised to entertain the notion of another auction in the bankruptcy court.  I think you should see today all the issues.  Then I'll file another adversary complaint.  They're going to assert Section 1983 claims against my client.  Having an option in this court is going to be extremely expensive.  It's going to cost a lot of money, and I can tell you that neither the Connecticut or the Texas plaintiffs support it.

I think we should keep in mind here that Mr. Jones is an equity owner of a business and is massively out of the money.  This is not significantly different from any other cases where a company has creditors, it can't repay the creditors, the management may get replaced, the board may get replaced.  Yeah, they don't get to dictate the terms on what creditors do with the business.

The thing that I think Your Honor was focused on is what is happening with the business now?  Mr. Jordan said that

FSS has created $2 million in the last couple of months.  I'd like to see proof of that.  I don't think we should take the things they say at face value.  I can tell you for the last year, Mr. Jones goes on his air and he says, don't buy stuff from Infowars.  Buy it from this other website I just created.  We believe First United is behind that in funding it.

THE COURT:  Well, I believe, I believe, --

MR. KIMPLER:  I believe (Indiscernible) also.

MR. COURT:  I don't, I don't want to, I don't want to get into it.  I get the point.  I don't want to get into what one is doing and the others are doing, I've got big, big, big billboards here and like finding stuff on the other side.  I'm really just trying to stay within the four corners of this wall, but I get the point and I think everyone is hearing me.  I'm not inclined to open up another auction process or I think the trustee, if that's what the trustee wants to do, has heard what I said back then, and I don't think I've changed my mind here.  But it sounds like no one wants to buy the equity either.  That was one of my questions in my notes here, so.

But I do, there are some things I do want to think about, maybe understand what's going on with the business, how much money the business has, maybe understand kind of where things are going with respect to the business.  I kind of what the trustee views is the right thing to do, what the business is at some point.  I just think we got to figure out what to

005215

do with FSS over the next, I don't know, 60 days and just make the call one way or the other as to what you want to do and move on.  I think --

MR. KIMPLER:  Your Honor --

THE COURT:  There could be other lawsuits.  There could be other matters that are coming, and I will take them up at face value.  I'll read them and we'll take them up and rule on him.  Mr. Kimpler.

KIM:  Yeah, I was just going to say, Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies.  We've been working with the Texas plaintiffs towards that end.  You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive.  I think it will have wasted several months of efforts.  I think it'll be extremely expensive.  I'm worried about the estate becoming administratively insolvent.  Again, if FSS is throwing out $2 million of cash a month, that's news to me.  The idea that 50 percent of it's going directly to Jones and an account that maybe is not controlled by the trustee, that's also news to me.  I'm very concerned about where that money is going.

THE COURT:  I know.  I got it.  I think everyone should leave on the motion for reconsideration thinking, well, there's really technically nothing for me to reconsider

because there's nothing, I haven't done anything.  But I don't think my position has changed in terms of what I said in February.   I want this case to continue to move .  Maybe we meet in another 60 days and see where things are and I'll see what gets filed and we'll take them up and we'll schedule them.

This case has been around for three years.  And it's been in a number of iterations and the positions of the parties hasn't changed and that's fine, but at some point, the Chapter 7 process has to work.  So I want to know, the trustee is going to tee up some non-exempt assets.  We'll take those up in the ordinary course.  We'll come back and figure it out.  In a couple of months, we'll figure out what the trustee wants to do with respect to FSS, but I'm not opening up any doors today.  But if there's a lot of money sitting somewhere, then maybe we can think about that.  But if courts rule, I'd like to know about them.  We'll see where things go.  Mr. Moshenburg, I'll give you 30 seconds and then I've got some other folks who have been here for a while and deserving of a hearing.  Yes, sir.

MR. MOSHENBURG:  Makes total sense, Your Honor.  I completely echo what Mr. Kimpler just said.  I just wanted to make sure the Court understood.  I don't agree with their characterization.  If any of that sticks, I'm happy to answer any questions about it.

005217

Page 68

THE COURT: They don't agree with yours, so I think no one agrees with that -- so we're right where we started.

MR. MOSHENBURG: I totally agree. I just wanted to be clear on the record about that.

THE COURT: No.

MR. MOSHENBURG: Lastly, Your Honor, I know you're talking about 60 days from now. From our vantage point, the Court has told us to go pursue our state court remedies. That's what we're going to do. I want to be open and honest about that unless you're telling us otherwise.

THE COURT: I'm not, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up. We can continue to talk. I just want to keep; I don't want to meet again in the Jones case in December and then talk about asset sales and what's going on.

And I'm going to -- well, somebody's asked me to think about some issues. And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens. I may issue something in writing in short, just kind of addressing the issue without any need for another hearing. We'll see where things go. I think the trustee's instructions for now are keep selling non-exempt assets and

005218

whatever you were planning on doing, what you said you were going to do, then just keep doing that. I don't think you need to do anything different, but if anything changes, I'll let you know.

MR. MOSHENBURG:  Thank you, Judge.

THE COURT:  All right, folks, thank you very much. I very much appreciate your time.

(Proceedings adjourned at 2:32 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 17, 2025

005220

**EXHIBIT**

**7**

Alexander E. Jones; 22-33553

exhibitsticker.com

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| **NEIL HESLIN and SCARLETT LEWIS,** | § | **IN THE DISTRICT COURT** |
| *Plaintiffs,* | § | |
| | § | |
| **and** | § | |
| | § | |
| **DAVID WHEELER, FRANCINE** | § | |
| **WHEELER, JACQUELINE BARDEN,** | § | |
| **MARK BARDEN, NICOLE HOCKLEY,** | § | |
| **IAN HOCKLEY, JENNIFER HENSEL,** | § | |
| **DONNA SOTO, CARLEE SOTO** | § | |
| **PARISI, CARLOS M. SOTO, JILLIAN** | § | |
| **SOTO-MARINO, WILLIAM** | § | |
| **ALDENBERG, WILLIAM SHERLACH,** | § | |
| **ROBERT PARKER, AND ERICA ASH** | § | |
| *Intervening Plaintiffs,* | § | |
| | § | |
| **v.** | § | **459th JUDICIAL DISTRICT** |
| | § | |
| **ALEX JONES and FREE SPEECH** | § | |
| **SYSTEMS, LLC,** | § | |
| *Defendants.* | § | **TRAVIS COUNTY, TEXAS** |

## <u>RESPONSE TO PLAINTIFFS' CHALLENGE TO NET WORTH DECLARATION AND MOTION FOR SANCTIONS FOR FALSE AND FRIVOLOUS PLEADING</u>

This is the Response of Free Speech Systems, LLC ("FSS") to Plaintiffs' Challenge to Net

Worth Declaration and Motion for Sanctions for False and Frivolous Pleading (the "Motion") filed

by Plaintiffs Neil Heslin and Scarlett Lewis (the "Texas Plaintiffs"). This Response is supported

by the Declaration of Ben Broocks, which is attached hereto as **Exhibit A**. FSS would respectfully

show the Court as follows:

### I.
### <u>INTRODUCTION</u>

Plaintiffs ask the Court to rule that the Jones Declaration is insufficient under TRAP 24.1

for two reasons.

005221

**As to FSS assets**, they claim that Mr. Jones's statement that FSS has no assets because the Bankruptcy Court 's Supplemental Order vested those assets in the Bankruptcy Estate of Jones, is false. This claim also serves as the basis on which Plaintiffs ask this Court for sanctions.

**As to FSS liabilities**, they claim FSS improperly included BOTH the judgments in Connecticut in favor of fifteen Plaintiffs there for approximately $1.3B (the "Connecticut Judgment") and this Court's separate judgment in favor of two separate plaintiffs (Heslin and Lewis) in the amount of $50M (the "Texas Judgment") as liabilities in its calculation of net worth and that neither the Connecticut Judgment nor the Texas Judgment can be considered as a true liability.

Neither of these contentions has any basis in law or the facts. Both requests should be denied.

## II.
## FSS' ASSETS HAVE BEEN TRANSFERRED TO THE BANKRUPTCY ESTATE OF ALEX JONES

The Motion asks the Court to find the Jones Declaration insufficient because FSS failed to establish that FSS has no assets, however this is entirely premised on their claim that the Supplemental Order was "nullified" by the Bankruptcy Court. The Texas Plaintiffs' claim is demonstrably false for numerous reasons.

### A. THIS COURT'S OWN TURNOVER ORDER RECITES THAT THE BANKRUPTCY COURT'S SUPPLEMENTAL ORDER IS VALID AND IN EFFECT

The Texas Plaintiffs' claim that the Supplemental Order was declared void or nullified is conclusively established as false because the very order this Court entered on August 13, 2025 (the "Turnover Order") specifically recites the Supplemental Order as having continued viability. **Exhibit A-9**. Below is an excerpt of the Turnover Order this Court was wrongly induced to enter

005222

that references both the Initial Cash Order (sometimes called the "June Order") and Supplemental

Order that by its terms supplements the June Order (sometimes called the "September Order"):

> The Court also **FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):
>
> (i) as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

**Exhibit A-9**, p. 3. Notably, referring to the Initial Cash Order (or June Order) and Supplemental

Order (or September Order), the Turnover Order this Court signed, states that they "...vested

authority in the [bankruptcy] Trustee to take control of....[FSS], including its assets and bank

accounts."  And further, orders turnover "subject only to the approval of the [Bankruptcy]

Trustee…". The Plaintiffs would never have included such a recitation of the September Order as

vesting FSS assets in the Jones Bankruptcy Estate if they actually believed it was void or had been

nullified.  The fact that they did not proves that it is the Plaintiffs themselves who have committed

dishonesty in this Court.

Furthermore, the very paragraph referenced above was also included in the form of order

submitted in the original Application for Turnover, submitted jointly by the two Texas Plaintiffs

and the 15 Connecticut Plaintiffs.  It was no mistake.

005223

While no more is needed to refute Plaintiffs' bogus claim that the Supplemental Order was declared void or nullified, this Court's Turnover Order further specified that all relief related to FSS's assets was "subject only to approval of the Trustee":

> 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):
>
> (i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

**Exhibit A-9**, p. 3. There is no logical explanation for the inclusion of this caveat other than to demonstrate Plaintiffs' knowledge of the continuing viability of the Supplemental Order.[1]

Yet it is virtually the **<u>exact</u>** statement in the Jones Declaration that the Texas Plaintiffs now allege is false and worthy of sanctions, even referred to as "litigation misconduct" and "disturbing" by Plaintiffs' counsel, Mark Bankston, during the hearing on August 13, 2025. The motive behind this gamesmanship is to seek sanctions against Defendants at every turn to distract from the substantive issues.  The Texas Plaintiffs' hypocrisy should not be tolerated and certainly could not be a basis for sanctions.   Any question of the continued viability of the Supplemental Order should end there.  But there is more.

### B. THE BANKRUPTCY COURT HAD NO JURISDICTION TO NULLIFY THE SUPPLEMENTAL ORDER

According to the Texas Plaintiffs, (a) the Supplemental Order referenced above was "nullified" by Judge Lopez during a bankruptcy hearing that occurred on February 5, 2025, and thus (b) the statements in the Jones Declaration misrepresent the status of the "nullified order."

---

[1] Limiting the turnover "subject only to the approval of the [bankruptcy] Trustee" is meaningless; it is the Bankruptcy Court that must approve.

005224

[Motion, p. 4]. Additionally, the Texas Plaintiffs' basis for requesting sanctions is that FSS's counsel "decided to file a pleading in this Court pretending the nullification never happened." [Motion, p. 11]. In addition to the fact that this Court's own order cites the September Order, nullification of the September Order did not occur because it could not legally occur because the Supplemental Order was at that time on appeal and the Bankruptcy Court was without jurisdiction to nullify or void that order.

As the United States Supreme Court has explained, the "filing of a notice appeal is an event of jurisdictional significance." *Griggs v. Provident Consumer Disc. Co*., 459 U.S. 56, 58 (1982). Such an appeal confers exclusive jurisdiction on the appellate court while divesting the lower court "of its control over those aspects of the case involved in the appeal." *Id*. The doctrine of exclusive appellate jurisdiction evolved as a judicially created doctrine designed to maintain the integrity of the appellate process. *See e.g.*, *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 757 (B.A.P. 1st Cir. 2007). "This rule applies with equal force to bankruptcy cases" as it does to civil litigation. *In re Transtexas Gas Corp*., 303 F.3d 571, 579 (5th Cir. 2002). Thus, the Texas Plaintiffs' claims that the February 2025 bankruptcy hearing resulted in the nullification of the Supplemental Order, is an impossibility under the law. *See e.g.*, *Sherman v. SEC (In re Sherman),* 491 F.3d 948, 967 (9th Cir. 2007)[2] and state law is the same. *In re Martinez*, 478 S.W.3d 123, 126 (Tex. App.— Houston [14th Dist.] 2015, no pet.) ("After a trial court's plenary power over a final judgment has expired, the trial court generally cannot sign an order in the same case in which the court sets aside, vacates, modifies, corrects, or reforms its judgment, and an order in which the trial court does so

---

[2] *See, e.g., Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at *20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] citing *In re Port Neches Fuels, LLC*, No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, *12 (D. Del. Mar. 27, 2024).

005225

generally is void.") (citing *In re Sw. Bell Tel. Co.,* 35 S.W.3d 602, 605 (Tex. 2000)). The Bankruptcy Court lacked jurisdiction and was without power to void the Supplemental Order, even if that is what it desired.  Although the Texas Plaintiffs understand this fully, their Motion does not substantively address this other than to sheepishly acknowledge that there may have been a question on this issue.  But the claim "there may have been a question" is without citation to authority and inexplicable in that if they truly believed that, why didn't Plaintiffs themselves note the "question"?

### C. BANKRUPTCY JUDGE LOPEZ HIMSELF STATED HE DID NOT AND COULD NOT DECLARE THE SEPTEMBER ORDER VOID

As to what happened in February 2025, after the Bankruptcy Trustee's repeated disobedience of the Bankruptcy Court's order to sell FSS assets, an exasperated Bankruptcy Court did state in February 2025 that he was rescinding the Supplemental Order. While the Bankruptcy Court's exasperation was well justified, after it was pointed out to the Bankruptcy Court that the Texas Plaintiffs' perfected appeal of the Supplemental Order removed his jurisdiction to alter, expand or vacate an order while on appeal,  the Bankruptcy Court quickly corrected course and acknowledged that based on the pending appeal by the Texas Plaintiffs, it lacked jurisdiction to void the Supplemental Order, the Bankruptcy Court stating:

> THE COURT…I should back up and mention that the supplemental order was appealed by the Texas families. I think that matter is still pending.
>
> MR. JORDAN: It is, Judge.
>
> THE COURT: I lose jurisdiction over that immediately.

**Exhibit A-8, p. 8, l: 15 – 19.**   This is a statement the Texas Plaintiffs curiously -- or not -- do not address.  And Judge Lopez again reiterated this in the June 5, 2025 hearing where he said so on several occasions:

005226

> THE COURT:  I don't think I modify the order --
>
> MR. JORDAN:  You didn't.
>
> THE COURT:  -- back in February.
>
> MR. JORDAN:  No.
>
> THE COURT:  The question is, do I do it now?  It's the question you're telling me.

**Exhibit A-1**, p. 47, lines 8-13. Judge Lopez repeated the fact that he did not have authority to nullify the Supplemental Order several times, including:

> The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I
>
> …
>
> that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another

**Exhibit A-1**, p. 40, l: 5-8, 23-24. There is no ambiguity in Judge Lopez's ruling.

Judge Lopez elaborated and confirmed, yet again, that the Supplemental Order remains valid, acknowledging that all he denied was the Connecticut and Texas Plaintiffs attempt to control the auction of the FSS assets:

> THE COURT:  No, I agree.  I don't know how people are construing it.  Maybe I can provide some clarity there. There is an order out there.  That order, there was a sale, a proposed sale under that order.  He didn't -- I denied it.

005227

**Exhibit A-1**, p. 48:10-13. If there was any doubt about the continuing viability of the Supplemental Order, Judge Lopez's statements confirming it is still out there should remove any such doubts notwithstanding that Judge Lopez denied the first and second effort to conduct an auction and compromise claims in that auction process by the Connecticut and Texas Plaintiffs.

### D. NEITHER DID BANKRUPTCY JUDGE LOPEZ "NULLIFY" THE SEPTEMBER ORDER

The Texas Plaintiffs seem to make some kind of argument that while Judge Lopez may not have voided his September Order, he "construed and enforced his original sale order to find that the supplemental order was necessarily nullified following the unsuccessful auction." Motion, p. 7. But this, too, is spurious.

First, nowhere do the Texas Plaintiffs cite to Judge Lopez saying he was "construing" the Supplemental Order as being nullified. To the contrary, Judge Lopez himself stated in the June 5 hearing he had not even modified it:

```
THE COURT:  I don't think I modify the order --
MR. JORDAN:  You didn't.
THE COURT:  -- back in February.
MR. JORDAN:  No.
THE COURT:  The question is, do I do it now?  It's
the question you're telling me.
```

**Exhibit A-1**, p. 47:8-13. If nothing else, from the above excerpt asking rhetorically in June "do I do it now?" demonstrates the Supplemental Order's continuing viability.

The Texas Plaintiffs desperate and unsubstantiated attempt to argue Judge Lopez was simply "interpreting" the Supplemental Order as being "nullified" is nonsense, as if "interpreting" the Supplement Order as being nullified is different from actually nullifying it. This is nothing more than a feeble attempt at misdirection.

005228

And while nothing else is needed to show the absurdity of this argument, they do not answer the question of why they themselves (a) included the Supplemental Order in the form of Order they asked this Court to sign, (b) did not note their "interpreted as nullified" in any form of disclosure, and (c) why they included "subject to the approval of the bankruptcy trustee," whose "approval" would only be an issue if the Supplemental Order had viability. The law is clear that one cannot do by "interpretation," what the law prohibits.

It is undisputed that the Supplemental Order transferred all the assets of FSS into the Bankruptcy Estate. It is this fact that undisputedly results in FSS having no positive net worth. Thus, the real issue here is not simply whether the Supplemental Order was "nullified" (it was not) or the legally nonsensical position the Supplemental Order was not nullified but interpreted as being "nullified," but whether Judge Lopez revoked or modified the Supplemental Order in a manner that one could reasonably interpret as effectively transferring the assets out of the Bankruptcy Estate and back to FSS.

The issue in the appeal brought by the Texas Plaintiffs was "[d]id the Bankruptcy Court err when ... it entered [the Supplemental Order]...that … vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones" and the filing of the appeal divested the Bankruptcy Court of its control over any aspects of the case involved in the appeal or covered by the notice. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 74 L. Ed. 2d 225 (1982) ("The filing of a notice of appeal … divests the district court of its control over those aspects of the case involved in the appeal."); *Evans v. Synopsys, Inc.*, 34 F.4th 762, 776 (9th Cir. 2022) (same). Although the rule does not completely divest the lower court of subject-matter jurisdiction, it does bar a lower court from issuing or modifying orders involved in the appeal. *Pro Sales, Inc. v. Texaco, U.S.A., Div. of Texaco, Inc.*, 792 F.2d 1394 (9th Cir. 1986). This

Page 9 of 22

bar extends to "proceedings that relate to any aspect of the case involved in the appeal." *Coinbase, Inc. v. Bielski,* 599 U.S. 736, 143 S. Ct. 1915 (2023).

Interpreting the Supplemental Order in a manner that actually transfers the assets from the Bankruptcy Estate to FSS is therefore impermissible under the law. The Texas Plaintiffs cannot overcome the fact that the Supplemental Order results in FSS having no assets, irrespective of how the liabilities are calculated

### E. The September Order Cannot Now Be Voided Or Modified Even Should Bankruptcy Judge Lopez Want To

Not only was the September Order not voided -- or nullified -- such could not occur now even if Judge Lopez were inclined to do so, because the September Order is now a final, non-appealable order -- it cannot be appealed or changed.

The Supplemental Order was issued in September 2024.  On October 11, 2024, the Texas Plaintiffs appealed the Supplemental Order to the United States District Court but did not seek a stay of the Supplemental Order. **Exhibit A-4**. And on December 18, 2024, the Texas Plaintiffs filed a notice with the District Court stating that the issue in that appeal was "Did the Bankruptcy Court err when ... it entered [the Supplemental Order]...that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones."  **Exhibit A-5**. Importantly and unaddressed by the Texas Plaintiffs is the argument that upon appealing the Supplemental Order, the Bankruptcy Court immediately lost jurisdiction to alter the Supplemental Order, which is unquestionably the law.

On November 11, 2024, the Connecticut Plaintiffs, who have convinced this Court to enter the current Turnover order stayed by the Austin Court of Appeals, intervened in the appeal acknowledging that at the hearing on September 24, 2024 that produced the Supplemental Order "the Bankruptcy Court stated that it would [enter] a supplemental order holding that control of all

005230

FSS assets vests with the Jones Chapter 7 Trustee—which the Bankruptcy Court said was the entire basis on which it had dismissed the FSS bankruptcy..." and went on to say that the Supplemental Order "clarified that... all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee." **Exhibit A-6**, pp. 7-8.

On May 6, 2025, the Texas Plaintiffs here who had appealed the Supplemental Order and the fifteen Connecticut Plaintiffs and the Bankruptcy Trustee who had adamantly supported the Supplemental Order, voluntarily dismissed the appeal. **Exhibit A-7**. Thus, at the very latest by June 5, 2025 – i.e., 30 days after dismissal of the appeal – the Supplemental Order became a final unappealable judgment. ***It cannot now be changed, modified or challenged***.

F. **DEFENDANTS' MOTION FOR RECONSIDERATION SOUGHT A RECONSIDERATION OF THE AUCTION, NOT THE SUPPLEMENTAL ORDER**

The Texas Plaintiffs claim that the Bankruptcy Court's not ruling on the Motions to Reconsider filed by First United America Company and FSS establishes that Judge Lopez was declining to reconsider his ruling in February "that the supplemental order was nullified." [Motion, p. 13]. However, in both reconsideration requests, the parties sought reconsideration of the Court's decision to not conduct a sale of FSS's assets. During the June 5th hearing, in again confirming his lack of authority to void the Supplemental Order, Judge Lopez confirmed what he intended to communicate back in February:

005231

The matter was currently pending. That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right? Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that. What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction. The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets. And here's a laundry list of issues that I've got.

**Exhibit A-1**, p. 40:5-15.

And Judge Lopez made very clear he was even in June deliberating whether to order another sale of FSS assets -- something impossible if the Supplemental Order had been declared void or nullified:

The question is do we do another sale? That's the real question. Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS. And

**Exhibit A-1**, p. 49:6-11. This would be impermissible under Plaintiffs' interpretation of what occurred.

It is without question, that FSS has no assets. Apart from consideration of liabilities

005232

addressed infra, this in itself is sufficient to support the bond amount.

### III.
### FSS' LIABILITIES INCLUDE THE CONNECTICUT JUDGMENT -- AND WHILE UNNECCESARY SHOULD ALSO INCLUDE THE TEXAS JUDGMENT

In setting forth detailed information concerning FSS's assets and liabilities from which net worth can be ascertained, the Jones Declaration describes that the effect of the Supplemental Order vesting ownership of all FSS's assets in the property of the Bankruptcy Estate was that FSS has no assets and therefore "does not have a positive net worth for that reason alone." *See* Jones Declaration, ¶10.   Even excluding both of these two Judgments, it is undisputed that there is no "net worth" because there are no assets titled in FSS – the net worth is at best zero assets, if not negative.   And fifty percent of zero in calculating the bond amount equals zero. Thus, for that reason alone the Texas Plaintiffs' request that the Court declare it insufficient under TRAP 24.1 should be denied.

However, turning to liabilities, the Texas Plaintiffs ask the Court to rule that the Jones Declaration is insufficient under TRAP 24.1 claiming that FSS improperly included judgments as liabilities in its calculation of net worth.  But again, the Texas Plaintiffs play fast and loose with the law and the facts, intentionally conflating the $1.3B Connecticut Judgment as a liability -- which unquestionably must occur -- with the $50M Texas Judgment.   A reading of their Motion leaves it unclear whether Plaintiffs are saying neither judgment can be included.  If so, they cite no authority and are badly mistaken.

As to the calculation of liabilities, the Texas Plaintiffs have argued that FSS has pursued a frivolous argument by classifying a money judgment as a liability in a net worth calculation, which, according to the Texas Plaintiffs, is yet another mechanism whereby the Court should impose

005233

sanctions. Motion, p. 15. But they do not say which judgment should not be considered: the Texas Judgment? the Connecticut Judgment? Both?

Jones's Declaration lists the liabilities arising from both the $50M Texas Judgment and $1.3B Connecticut Judgment, setting forth detailed information as to both. While the Texas Plaintiffs complain that the judgments should not be included in the net worth calculation, which one? If they are referring to the Connecticut Judgment, It is important to note first that the Texas Plaintiffs cite no legal authority for the contention that the Connecticut Judgment should not be included as a liability.

Second, it is also important to remember that this Court's August 13, 2025 Turnover Order in favor of the Connecticut Plaintiffs has found that the Connecticut Judgment is: "valid, final, and payable," and "final and [remains] unpaid." **Exhibit A-9**, pp. 1, 3. While Defendants do not concede this position, it is the law of the case and it is not possible to argue anything short of the fact that this Court has found the Connecticut Judgment is "final".

Third, the Texas Plaintiffs appear to conflate whether it is proper to include the Texas Judgment with the analysis on inclusion of the separate Connecticut Judgment. All authority the Texas Plaintiffs, cite deals with inclusion of the Texas Judgment and does not address the Connecticut Judgment.

For example, Texas Plaintiffs rely on *Senior Care Living VI, LLC v. Preston Hollow Capital, LLC*, 695 S.W.3d 446, 456 (Tex. App.—Houston [1st Dist.] 2023, no pet.) for the proposition that "for the purposes of setting a supersedeas bond, Texas courts have held that the amount of a money judgment is a contingent liability and should not be included in the net worth calculation." Motion, p. 16. The Texas Plaintiffs' analysis of the holding of *Preston Hollow* is intentionally misleading, as it only even arguably addresses whether the Texas Judgment should

be included in the bond analysis, not the Connecticut Judgment. Moreover, *Preston Hollow* involved a bond financing structure to construct a senior living facility in Fort Bend, Texas and the $45 million construction loan Senior Care received. When Senior Care defaulted on its loan obligations, it sought a declaration from the trial court, confirming that it was not in default. The trial court entered a final judgment against Senior Care and Mark Bouldin (as guarantor on the note) and determined that Senior Care and Bouldin were jointly and severally liable in the amount of $52.5 million.

Senior Living filed a $10 bond, asserting that it had a negative net worth. Important to the issue here, Senior Hollow's listed liabilities included the original $42.6 million in bonds payable, which remained unpaid and outstanding as a liability. In challenging the negative net worth declaration, Preston Hollow made the same argument Plaintiffs attempt here, which is to argue: the money judgment is a contingent liability and should not be included in the net worth calculation. The Houston court made it clear that Senior Care's total liabilities are largely made up of the $42.6 million *in bonds payable*, which is distinct from the underlying money judgment:

> While it is certainly true that those bond obligations form the basis of the underlying litigation—specifically, the dispute over whether Senior Care defaulted on the terms of the bond obligations, or whether Appellees breached the terms of the agreements—and the trial court's final judgment, the "money judgment of $52,847,040.86" was not identified as a liability in Bouldin's supplemental declaration, nor by Jordan at the June 9, 2022 hearing.
>
> …
>
> The liability created by the bonds and notes existed prior to the underlying litigation, and Appellees have not presented this Court with any precedent suggesting that this pre-existing liability transformed into a contingent liability because of the trial court's final judgment.

*Senior Care Living VI, LLC*, 695 S.W.3d at 457 – 58. Here, it is undisputed that Jones and FSS are, jointly and severally, subject to a $1.3 billion judgment issued in Connecticut, which this Court

005235

has already found to be "final."   This liability has nothing to do with this Court's $50 million final judgment, which has been bonded as to FSS.

And it is not even clear that the Texas Judgment itself should be excluded in liabilities, as including the Texas Judgment so is within the court's discretion. *Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*, 171 S.W.3d 905, 914 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Thus, while the Connecticut Judgment provides more than adequate "liability" to offset whatever FSS assets may or may not be valued at, the Texas Judgment itself is includable at this Court's discretion.[3]   The declaration of Jones makes clear that:  "Based on the facts hereinafter set forth, FSS has no assets and liabilities that exceed $1,344,864,850.33. FSS has a negative net worth." Jones Dec., ¶1.  The Connecticut Judgment, on its own, demonstrates that FSS has a negative net worth. As such, the Court should deny the Texas Plaintiffs' request that the Court declare the Jones Declaration insufficient under TRAP 24.1.

## IV.
## SANCTIONS ARE NOT WARRANTED

The Motion requests sanctions under Rule 13 and Chapter 10 of Tex. Civ. Prac. & Rem. Code § 10.001. In essence, the Texas Plaintiffs make two separate arguments as to why sanctions should be assessed: (1) the Texas Plaintiffs' claim that Defendants' counsel "violated their duty of candor regarding events in the bankruptcy court" by misrepresenting the status of the Supplemental

---

[3] In true irony, the Texas Plaintiffs' prior briefing, which is incorporated into their present challenge, relied on *James Holmes, Superseding Money Judgments in Texas: Four Proposed Reforms to Help the Business Litigant and to Further Improve the Texas Civil Justice System,* 51 ST. MARY'S L.J. 69 (2020) and selectively quoted that: "there is no reported decision in which a trial court has concluded that a judgment liability should go onto a balance sheet so as to lessen overall net worth. All published decisions, rather, have allowed the trial court to keep the judgment liability off of the balance sheet." Motion, p. 15; *Id*. at 98-99.  Clearly the author is referring to the judgment in the case itself, i.e. the Texas Judgment, and not the Connecticut Judgment.  However this author goes forward and suggests that the judgment in the underlying case itself -- here the Texas Judgment -- should be included, arguing "First and foremost, Texas law should recognize a judgment liability as a balance-sheet liability for the judgment debtor Under GAAP accounting, a judgment liability is as inevitable and ascertainable as a liability can be…Texas law should adopt the GAAP accounting viewpoint on judgment liability." *Id*. at 101. Thus, their own authority, albeit a law review, argues this does not apply to the Connecticut Judgment but only the Texas Judgment.

005236

Order; and (2) "[w]ith respect to the averment that the families' judgments create liabilities exceeding the company's assets, the argument is legally frivolous, as Defendant's counsel should (or did) know." [Motion, p. 16]. This Response establishes legal and factual support for all the allegations contained in the Jones Declaration making sanctions entirely improper.

Chapter 10 allows sanctions for pleadings filed with an improper purpose or that lack legal or factual support. *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 362 (Tex. 2014). It provides that upon signing a pleading or motion, a signatory attests that:

> (1) the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and]
>
> (3) each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Tex. Civ. Prac. & Rem. Code § 10.001.  Pleadings that violate these Chapter 10 requirements are sanctionable. *Id*. § 10.004(a). ***But a court may not sanction a represented party under section 10.001 for unfounded legal contentions***. *Id*. § 10.004(d).

Rule 13 provides that pleadings that are groundless and in bad faith, intended to harass, or false when made are also sanctionable:

> The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Attorneys or parties who . . . make statements in pleading which they know to be groundless and false, for the purpose of securing a delay of the trial of the cause, shall be held guilty of a contempt . . . .

005237

> Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law . . . .

Tex. R. Civ. P. 13. Importantly, Rule 13 does not permit sanctions on the issue of groundlessness alone. Rather, the filing in question must be groundless and also either brought in bad faith, brought for the purpose of harassment, or false when made. *Id*. "Groundless" for purpose of this rule means ***no basis in law or fact* and** not warranted by good faith argument for the extension, modification, or reversal of existing law. *Emmons v. Purser*, 973 S.W.2d 696 (Tex. App. 1998).

Courts should presume parties and their counsel filed all papers in good faith, and the party seeking sanctions must overcome that presumption. See Tex. R. Civ. P. 13; *GTE Communications Sys. Corp. v. Tanner*, 856 S.W.2d. 725, 731 (Tex. 1993). The party seeking sanctions has the burden of showing its right to relief. *Id*. at 731.

First and foremost, sanctions are entirely improper and not warranted due to the simple fact that there was no misrepresentation of the status of the Supplemental Order as the Texas Plaintiffs argue in support for their request for sanctions (argued *supra*). Ample evidentiary support exists for Defendants' allegations about the status of the Supplemental Order, far exceeding the minimum standard of having "some basis in law or fact" (*i.e.,* not groundless) required by the Court.

As for the claim that "the averment that the families' judgments create liabilities exceeding the company's assets," if FSS has no assets, its net worth can be no more than zero. But as demonstrated, there is no legal basis for not considering the Connecticut Judgment as a true liability.

Far from meeting their burden, the Texas Plaintiffs simply reference their prior briefing arguments as support for the contention that the claim is "legally frivolous" and worthy of

005238

sanctions. The Texas Plaintiffs' arguments fail for multiple reasons. First, under Chapter 10, a court may not sanction a represented party under section 10.001 for unfounded legal contentions. Tex. Civ. Prac. & Rem. Code § 10.004(d). As to the substance of the Texas Plaintiffs' arguments referenced in their prior briefing that argues that "a money judgment is a contingent liability and should not be included in the net worth calculation". As argued in more detail above, the Texas Plaintiffs' argument was wrong at the time it was originally made, and it is equally wrong today. And not only that, the caselaw cited by the Texas Plaintiffs only states that the underlying judgment that is being appealed cannot be listed as a liability. No case holds that other judgments found to be final must be excluded from the calculation of net worth. Thus, it cannot be said that the averments completely lack any legal or factual basis. "A trial court has no 'discretion' in determining what the law is or applying the law to facts." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). What the Texas Plaintiffs are attempting to do is utilize the frustration this Court has previously expressed towards Jones and FSS and continue the pattern to argue that any argument advanced by Jones and FSS is a lie and made in bad faith.  This is entirely improper and is itself bad faith.

The Texas Plaintiffs have not, and cannot, overcome this burden to establish that Defendants' pleadings were groundless, much less have they proved the additional element that they were brought either in bad faith or for the purpose of harassment. *GTE Communications Sys. Corp. v. Tanner*, 856 S.W.2d. 725, 731 (Tex. 1993); *see also New York Underwriters Ins. Co.*, 856 S.W.2d at 205 (trial court must find that pleadings are in fact groundless and brought in bad faith or to harass). While sanctions under Chapter 10 allows sanctions for pleadings filed without any evidentiary support, this Response establishes in substantial detail the legal and factual support for the pleading filed by Defendants. This is because the record clearly establishes the continuing

005239

viability of the Supplemental Order. One cannot reasonably argue that there is no evidentiary support for the factual allegations contained in the Jones Declaration. Furthermore, this Response also establishes the legal support for Defendants' calculation of liabilities that result in either FSS's negative net worth or FSS's zero net worth, either of which fully justify the bond and the Jones Declaration of no positive net worth.  As such, this Court should deny the Texas Plaintiffs' request for sanctions.

## V.
## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Court should overrule the Texas Plaintiffs' challenge to the net worth of FSS and deny their request for sanctions.

Respectfully Submitted,

*/s/ Ben C Broocks*
Ben C Broocks
State Bar No. 03058800
William A. Broocks
State Bar No. 24107577
**Broocks Law Firm, PLLC**
248 Addie Roy Rd, Suite B301
Austin, Texas 78746
(512) 201-2002 - Telephone
(512) 201-2034 - Fax
bbroocks@broockslawfirm.com
wbroocks@broockslawfirm.com

Shelby A. Jordan
State Bar No. 11016700
Antonio Ortiz
State Bar No. 24074839
**JORDAN & ORTIZ, P.C.**
500 N. Shoreline Blvd., Suite 804
Corpus Christi, Texas 78401
Phone: (361) 884-5678
Fax: (361) 888-5555
Email:  sjordan@jhwclaw.com

005240

aortiz@jhwclaw.com
copy to: cmadden@jhwclaw.com

Alan B. Daughtry
State Bar No: 00793583
alan@alandaughtrylaw.com
3355 West Alabama, Suite 444
Houston, Texas 77098
Telephone:      (281) 300-5202
Facsimile:      (281) 404-4478

**ATTORNEYS FOR FSS**

005241

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2025, I served a copy of the above filing on all counsel of record via the Court's e-filing server in accordance with the Texas Rules of Civil Procedure.

*/s/ William Broocks*
William Broocks

005242

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS,<br>   *Plaintiffs,*<br><br>and<br><br>DAVID WHEELER, FRANCINE<br>WHEELER, JACQUELINE BARDEN,<br>MARK BARDEN, NICOLE HOCKLEY,<br>IAN HOCKLEY, JENNIFER HENSEL,<br>DONNA SOTO, CARLEE SOTO<br>PARISI, CARLOS M. SOTO, JILLIAN<br>SOTO-MARINO, WILLIAM<br>ALDENBERG, WILLIAM SHERLACH,<br>ROBERT PARKER, AND ERICA ASH<br>   *Intervening Plaintiffs,*<br><br>v.<br><br>ALEX JONES and FREE SPEECH<br>SYSTEMS, LLC,<br>   *Defendants.* | § § § § § § § § § § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT<br><br><br><br><br><br><br><br><br><br><br><br>459th JUDICIAL DISTRICT<br><br><br><br><br>TRAVIS COUNTY, TEXAS |

## DECLARATION OF BEN BROOCKS

Pursuant to TEX. CIV. PRAC. & REM. CODE §132.001, I provide the following declaration in support of Defendant's Response to Plaintiffs' Challenge to Net Worth Declaration and Motion for Sanctions for False and Frivolous Pleading.

1.  My name is Ben C Broocks. My date of birth is June 28, 1953, and my address is 248 Addie Roy Rd., Suite B-301 Austin, Texas 78746. I declare under penalty of perjury the facts stated herein are within my personal knowledge and are true and correct.

2.  I am an attorney of record for Free Speech Systems, LLC in this matter, accordingly, the facts as set forth herein are within my personal knowledge.

3.  Attached hereto as **Exhibit 1** is a true and correct copy of the Hearing transcript in Southern District of Texas, Bankruptcy Case No. 22-33553 on June 5, 2025.

Page 1 of 2

005243

4.  Attached hereto as **Exhibit 2** is a true and correct copy of an order enter on June 21, 2024 in Southern District of Texas, Bankruptcy Case No. 22-60043, Docket No. 956.

5.  Attached hereto as **Exhibit 3** is a true and correct copy of an order enter on September 25, 2024 in Southern District of Texas, Bankruptcy Case No. 22-60043, Docket No. 1021.

6.  Attached hereto as **Exhibit 4** is a true and correct copy of the Notice of Appeal of Supplemental Order filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 1.

7.  Attached hereto as **Exhibit 5** is a true and correct copy of the Statement of Issues on Appeal filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 14-1.

8.  Attached hereto as **Exhibit 6** is a true and correct copy of the Intervention in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 8.

9.  Attached hereto as **Exhibit 7** is a true and correct copy of the Nonsuit filed in Cause No. 4:24-CV-03882 in the Southern District of Texas, Dkt. 22.

10. Attached hereto as **Exhibit 8** is a true and correct copy of the Hearing transcript in Bankruptcy Case No. 22-33553 on February 5, 2025.

11. Attached hereto as **Exhibit 9** is a true and correct copy of an August 13, 2025 Turnover Order entered in Cause No. D-1-GN-18-001835.

FURTHER DECLARANT SAYETH NOT

EXECUTED on September 2, 2025 in Travis County, Texas.

Ben C Broocks

005244

Exhibit 1

                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
                         HOUSTON DIVISION

ALEXANDER E. JONES,                ) CASE NO: 22-33553
                                   )
                                   ) Corpus Christi, Texas
                                   )
              Debtor.              ) Thursday, June 5, 2025
                                   )
                                   ) 1:00 p.m. to 2:32 p.m.
------------------------------)


                             HEARING

          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
               UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:                   BEN C. BROOCKS
                              Broocks Law Firm PLLC
                              6207 Bee Cave Road, Suite 120
                              Austin, TX 78746

                              SHELBY JORDAN
                              Jordan & Ortiz, PC
                              500 North Shoreline Blvd.,
                              Suite 804
                              Corpus Christi, TX 78401

For Chrsitopher R.            ERIN ELIZABETH JONES
Murray:                       Jones Murray LLP
                              602 Sawyer, Suite 400
                              Houston, TX 7007

                              JOSHUA WOLFSHOHL
                              Porter Hedges LLP
                              1000 Main, 36th Floor
                              Houston, TX 77002

For First United             WALTER J. CICACK
American Companies, LLC: Hawash Cicack & Gaston LLP
                              711 W. Alabama Street, Suite 200
                              Houston, TX 77006

005245

Exhibit 1

For Veronique                      AVI MOSHENBERG
De La Rosa:                        Lawson & Moshenberg PLLC
                                   801 Travis Street, Suite 2101, #838
                                   Houston, TX 77002


For William                        KYLE KIMPLER
Aldenberg:                         Paul, Weiss
                                   1285 Avenue of the Americas
                                   New York, NY 10019


For the U.S. Trustee:              HA MINH NGUYEN
                                   Office of the United States Trustee
                                   515 Rusk Street, Suite 3516
                                   Houston, TX 77002

Court Reporter:                    YESENIA LILA

Courtroom Deputy:                  YESENIA LILA

Transcribed by:                    Veritext Legal Solutions
                                   330 Old Country Road, Suite 300
                                   Mineola, NY 11501
                                   Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

005246

Exhibit 1

CORPUS CHRISTI, TEXAS; THURSDAY, JUNE 5, 2025; 1:00 PM

(Call to Order)

CLERK:  All rise.

THE COURT:  Please be seated.  Good afternoon.  This is Judge Lopez.  Today is June 5th.  I'm going to call the 1 p.m. status conference in the Jones case.  I'll be calling, just so we have a clean record, 22-33553, 23-03035, 23-03037, 24-03279 or some combination of one or more of those cases.

I will take appearances in the courtroom, and then if anyone wishes to make an appearance on the phone, please hit five star and I will unmute your line.

MR. JORDAN:  Good morning, Your Honor, afternoon, I guess.

THE COURT:  Good afternoon.

MS. JORDAN:  Shelby Jordan, Ben Broocks, and Antonio Ortiz for Alex Jones and FSS.

THE COURT:  Okay.  Good afternoon.

MR. JORDAN:  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.  Mr. Murray is also here in the courtroom.  And I think my colleagues will announce themselves on the phone.

THE COURT:  Okay.  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack on behalf of First United American Companies.

Exhibit 1

THE COURT:  Good afternoon.

MR. MOSHENBURG:  Good afternoon, Your Honor.  Avi Moshenberg, on behalf of the Texas plaintiffs.  Also remotely is Jarrod Martin attending.

THE COURT:  Okay.  Good afternoon.

MS. NGUYEN:  Good afternoon, Ha Nguyen for the US Trustee.

THE COURT:  Good afternoon.  Okay.  Let me turn on the line.  Here's a -- I'm just going to go in the order in which I see them, a 713-226 number.

MR. WOLFSHOHL:  Good afternoon, Your Honor, Joshua Wolfshohl for the trustee.

THE COURT:  Okay.  Good afternoon.  And a 212 number.

MR. KIMPLER:  Good afternoon, Your Honor.  It's Kyle Kimpler from Paul Weiss on behalf of the Connecticut families.  On the line with me today is my cocounsel Ryan Chapple.

THE COURT:  Okay.  Good afternoon.  Anyone else wish to make an appearance, please hit five star, and I will unmute your line.

Okay.  The purpose for today was a status conference on where we are and where we're headed, just try to get some more information in the middle of 2025.  I'll turn things over to trustee's counsel.  Ms. Jones, you can just proceed however you see fit.

MS. JONES:  All right, thank you.  I'll proceed with

an update in the main Chapter 7 case, the 22-33553.

THE COURT:  Okay.  If you can just get the mic a little closer to you, I just want to make sure we can all hear you.

MS. JONES:  Yes, I'll get a little bit closer.  We have right now one pending contested motion and that is the motion filed by the debtor, Mr. Jones, asking this Court to reconsider whether to hold an auction of FSS assets in this case.  There were two reply, two responses filed, one jointly by the Sandy Hook families and one response by the trustee and reply filed by the Debtor.  So that's the one currently pending contested letter that is before Your Honor.

There is likely going to be another contested matter, but the time hasn't, it's not ripe yet.  There's a pending motion to stay these bankruptcy proceedings pending appeal.

THE COURT:  Is that Mr. Nguyen's?

MS. JONES:  Yes.

THE COURT:  I'm going to rule on that today.

MS. JONES:  Oh, okay.  Well then that's not ripe, but we, the trustee would have opposed it, but -- a complete stay, of course, of the proceedings, but I just wanted to flag that as something that could come up.

But as far as uncontested, there are, there are some pending fee applications of Chapter 11 professionals that are

005249

Exhibit 1

-- have not been objected to and are ready for --

THE COURT:  Do you have the ECF numbers for them?

MS. JONES:  I do.  And so there's -- I'll give you the application -- okay.  So the application for Teneo Capital, which was financial advisor to the Committee, was filed at Docket 707.  And I've just uploaded revised proposed orders. I'm only missing one, and theirs was just filed at, I believe it's Docket, I have to see it really quick, 1160, I believe.

THE COURT:  Oh, I did see this.  So I see Teneo, BlackBriar, and --

MS. JONES:  Kennerly.

THE COURT:  -- Kennerly.

MS. JONES:  Yes. And I've tied those to the ECFs there.  So BlackBriar Advisor's app is at 743, and then the revised proposed order has just been uploaded.  Rachel Kennerly's application is at 745 and the proposed order's just been uploaded.  And then Crowe and Dunlevy is, the application is at 746 and I just haven't had time to upload the order yet. I'm waiting.  They've agreed to the form of the order.  I just, I added their signature and I always wait for people to respond and tell me I can do that.

THE COURT:  Is there any difference between --

MS. JONES:  There is.

THE COURT:  Okay.  I'll just wait on it.

THE COURT:  But those proposed orders just

Exhibit 1

generally.  And then Mr. Jordan also uploaded a revised proposed order for his application.

THE COURT:  Proposed final, right?

MS. JONES:  I'm sorry?

THE COURT: I saw it.  It's a revised proposed final, is that right, Ms. Jones.

MS. JONES: Yes, these are all final fee applications for the Chapter 11 professionals.  His app was at Docket 747.

THE COURT:  Oh, it's through the 11.  I was going to say, Jordan, you can't go anywhere.

MS. JONES:  And the only issue -- there were no objections substantively to the applications.  The issue was that there was not an authority to pay provision for the trustee, which we really need for him to be able to make the disbursement.

THE COURT:  Oh.

MS. JONES:  And so we added language with the specific remaining unpaid portion.  So it specifically references the amount.  And everybody has signed off on the form of the order.  I just need one more person to let me know that I can add their signature, and then I'll have that uploaded.  So those are ready to go if Your Honor wants to sign those or if you need a hearing, they're --

THE COURT:  Let me do something just so I'm procedurally in the right posture.  There is currently a

005251

Exhibit 1

request for me to stay.  The entire case is pending an appeal.

And I want to -- why don't I take that up right now?  I thought

rather than we're just having a status conference today, but

I thought there was an active request and then also a request

for a direct certification of an appeal to the Third Circuit.

So I kind of wrote something out very shortly just to make

sure that I addressed that.  And I can take that certainly

without a hearing.  It was a request before me, so.  And it

relates to ECF Numbers 1144 and 1153, Robert Wyn Young has

requested that I grant certification for a direct appeal to

the Fifth Circuit at ECF 1144.  And he's appealing my order

denying his motion to intervene in this case.  And I signed

that order at ECF Number 1129.

Bankruptcy Rule 8006(f) allows the Court to certify

a direct appeal to the Court upon request by a party, 28 U.S.C.

158(d)(2)(B).  You can see why I wrote this out.  I wanted to

make sure I got these right.

A bankruptcy court must certify direct appeal to the

Court of Appeals in two instances.  One is where the request

for certification is made by a majority of the appellants or

a majority of the appellees.  Here, only the, only the

appellant has made a request for direct certification.  Trustee

has indicated they would oppose that, but I only had one

request anyway.  And I now have verbal confirmation that

there's not a majority here.  So that wouldn't apply.  So, and

005252

Exhibit 1

therefore, that subsection doesn't apply.

The second instance is where the judgment order or decree involves a question of law as to which there's no controlling decision of the Court of Appeals for the Circuit, or the Supreme Court of the United States, or involves a matter of public importance.

Two, the judgment order or decree involves a question of law requiring resolution of conflicting decisions.

Three, an immediate appeal from the judgment order or decree may materially advance the progress of the case or proceeding in which the appeal is taken and if the Court of Appeals authorizes the direct appeal of the judgment order or decree, that is 28 U.S.C. 158(d)(2)(A)(i) through (iii).

157(d)(2)(B)(ii) mandates that if any of the four conditions are met, I make the certification, but none of them apply here.  It would involve a permissive motion to intervene in both the text and Bankruptcy Rule 2018.  And the law in this district is clear that intervention is permissive.

And so I rely on the cases that I cited in the order denying, but I would cite in, for example, in In Re CIS Capital Management, 604 B.R. 484, 513, Northern District of Texas 2019 case.  So Subsection 1 doesn't support certification.  Subsection 2 also doesn't support certification.  There's no conflicting decisions for the standards.  And finally, an immediate appeal would not advance the progress of this case,

005253

which has been pending since 2022.

There have been multiple adversary proceedings.  I would note Mr. Jones has been ably represented at every stage in this case by really smart lawyers who have made arguments on his behalf.  He's been adequately represented and I wouldn't stray from any word that I put in that order.  I think allowing intervention would impede the progress of this case, quite frankly, it would have shut down, potentially shut down this hearing.  So I don't think Subsection 3 supports certification, because neither instance requires the Court to grant certification here.

I'm going to decline to grant certification for direct appeal to the Fifth Circuit.  I believe the matter is already set for an appeal before a district court, I believe Judge -- so there is no, I'm not setting this up for a direct appeal.

MS. JONES:  I think it's been assigned to Judge Rosenthal.

THE COURT:  That's what I understood.  So, and they don't come any smarter --

MS. JONES:  That's correct.

THE COURT:  -- than Judge Rosenthal.

MS. JONES:  I agree 100 percent.

THE COURT:  So and I just, again, I'm relying on the text here.  Textualism is always, in my opinion, the right

answer.

Permissive intervention:  After hearing and on such notice as the Court directs and for cause shown, the Court may permit an interested entity to intervene generally or with respect to a specified matter, right?  It's permissive by statute.

So, I'm going to deny the direct appeal to the Fifth Circuit.  The statute is clear.  The cases interpreting the statute are clear.  There's no, there's no conflict, no conflict in law here.  So, I'm going to deny that, but I did note in the order that I've read everything that was submitted as well.  So it's not like I turned a blind eye to anything that came my way.  I read it.

So, Mr. Young has also moved to stay all proceedings in this case pending an appeal under Bankruptcy Rule 8007. While the decision to grant a stay pending appeals is within the Court's discretion, the Fifth Circuit in cases like In Re First South Savings Association, 820 F.2d. 700, 709, Fifth Circuit, 1987 case provided factors for the Court to consider, right, whether the movant has made a showing of likelihood of success on the merits.  I strongly disagree with that for the reasons stated there in the order itself.

Whether the movant has made a showing of irreparable injury if the stay is not granted.  No, there's been no showing of irreparable injury.

005255

Whether the granting of a stay would substantially harm the other parties.  The answer is no.  I think quite frankly it would be harming the trustee's ability to function throughout this case and quite frankly, Mr. Jones' ability to proceed as a Chapter 7 debtor.

And for whether the granting of the stay would serve the public interest.  I don't, have no -- nothing showing the public interest, and I've read all the papers.  Quite frankly, I think the public interest is better served for a case that's been pending for three years to continue to move and not come to a screeching halt because the party, three years later, seeks to intervene in a case to provide evidence that the Court has reviewed and other matters.

And again, I rely on the order itself.  It speaks for itself.  So I've carefully reviewed all the filings, including the attached exhibits and the legal arguments that Mr. Young makes.

I'm going to decline to grant the stay pending appeal.  So I'm going to deny both, and I'll enter short orders denying them for the reasons that I have stated on the record.  So I can now -- I just feel more comfortable that I didn't take something up on the front end, agree to sign, for example, orders, and then consider a stay.  I think there was an emergency request for a stay.  I'm going to deny those.  So I'll take a look at these orders and sign them on the docket.

005256

Exhibit 1

MS. JONES:  Thank you, Your Honor.  And I expect one more this afternoon.  I'm just waiting for it.

THE COURT:  Got it.  Just let me know and Ms. Saldana know better.

MS. JONES:  I will.  And then there are two --

THE COURT:  Let me ask you.  With respect to the uncontested matter, I don't need to know what it is.  Do you have a sense of timing as to when something may get filed or not filed?  I won't hold you to it.  I'm just trying to get a sense of you said --

MS. JONES:  Uncontested.

THE COURT:  Oh, not uncontested matter.  You said there could be one more contested matter that may or may not be coming.

MS. JONES:  Yeah, excuse me for interrupting.  We intended to oppose the motion for the stay pending appeal of the proceedings.

THE COURT:  Oh.

MS. JONES:  And so I didn't want to jump the gun. I wanted to let you know that we anticipated another contested matter on the horizon --

THE COURT:  Oh, that's what you were talking about.

MS. JONES:  -- because we would have opposed the --

THE COURT:  So now that I've ruled on that, I've got the reconsideration of the order and I'll speak to that today.

005257

Exhibit 1

What else is there from your perspective in the main case?

MS. JONES:  In the main case, the trustee continues to administer some non-exempt assets.  There's some, there's some real property, and some, just some personal properties and watches, some details that we're still working through, just getting those sold.  So we're continuing to work on that.

There have not been any offers, or any actual offers, really any discussion about anyone purchasing the equity of FSS has kind of died down entirely.  We don't have any at this point.  And so we're just continuing to administer the non-exempt assets that we can and trying to move all of that forward to get those to a point of sale.  With respect to the --

THE COURT:  What's the status of pursuing the real property?  I'm less concerned about you selling a watch.  I'm more concerned about real big-ticket items.

MS. JONES:  Sure, there's, an auctioneer has been approved by this Court to list that property and to sell it

THE COURT:  Oh, okay.

W1:  And I believe they've been out.  They've looked at the property and they're taking steps to get it listed or to set a time for when --

THE COURT:  When do you think the process could, I don't want to hold you to it, just trying to get a sense of if he's going to list property, I'd rather him list it within

005258

the next 30 days and just see what's out there.

MS. JONES:  I can --

THE COURT:  There's a, there's a theme that I'll be pushing which is there's a lot of legal expenses that are getting incurred in connection with this case.  And I'm not saying people aren't doing the work because a lot of this, it's a big -- a lot of complexities here.  But the longer this goes, the more people are going to have to spend time, and I want to, I think keeping things progressing at a, not at a rapid pace, but at a steady pace where there's constant movement is in the best interest of all parties because there's stuff pending in front of me.  There are matters pending in other state courts.  I'm assuming that's continuing in Texas and in Connecticut.

And there's a lot of moving pieces, and I'd rather to the extent there's non-exempt assets, that's, you know, I'm not telling you what to do, but you will exercise your business judgment as to what you intend to sell or not sell, but, you know, come September, October, if something is planning on being sold in terms of an asset, I'd like it at least on the market, if that makes sense.

MR. BROOCKS:  That's entirely doable.

THE COURT:  Okay.

MS. JONES: And I don't know if you'd like to address timing or if you --

THE COURT:  Yeah, just get close to the microphone so we can hear you.

MR. BROOCKS:  Yeah, I think by the third quarter we'll have everything either teed up with a motion to sell. It'll certainly be listed by then.  It hasn't been yet because in the case of the real estate, it's a residential home and it has a tenant, so we're negotiating the exit of that individual.

THE COURT:  I got it.

MR. BROOCKS:  And --

THE COURT:  Okay.

MR. BROOCKS:  But I think by the end of the year, we should be closed with all of those.

THE COURT:  Okay.  Thank you.

MS. JONES:  But with respect to our, with the approval of the settlements in the, in the adversaries that were pending in the FSS, under the FSS umbrella, the PQPR and the (Indiscernible) adversary, with those settlements and then Your Honor's decision regarding admin -- not doing a sale of the assets, the FSS assets in the --this Chapter 7 case, you know, we've pared our focus down to, you know, the essential things we need to do to get this case moving forward and closer to being done.

THE COURT:  So assuming those assets are teed up and some coming up, I don't -- I hate hypotheticals, but let's

005260

just assume there's a buyer, willing buyer for estate assets, what -- after that, what's left, putting aside the adversaries?

MS. JONES: There is some litigation, a couple of matters we do expect to file those by next week. And I think those are pretty straightforward, but just a couple of litigation matters that need to be dealt with.

THE COURT: The adversaries or?

MS. JONES: Yes.

THE COURT: Okay. Once they're -- obviously nothing is, nothing is final until you file it, but once, assuming you file it, let my case manager know I want to set up a status conference whenever, as soon as it makes sense to do so. I don't want it to fall through the cracks. That's where I'm going.

MS. JONES: And depending on -- as well, depending on the steps that the families take, if any, whatever they decide to do in state court, you know, we may be back here with motions to really to give instructions about what the Court wants us to do. And so we may have some motions related to any enforcement efforts that are made in the state court just to ensure that the trustee has clear authority and instruction to move forward. He's not going to do anything without the Court giving authority to do it.

THE COURT: Okay. I intentionally like don't read what's happening in other cases of, you know, like something

Exhibit 1

shows up on the news. I don't click on it to read the news or I'd rather just deal with the information that's given to me in front in the Court here and people make arguments. So I honestly have no idea what's happening in the, in the Connecticut or the, or what the current status is in the Connecticut or the Texas matter. So me having status conferences like this is really where I try to get the real information.

MS. JONES: And I would just defer to Mr. Moshenburg or, and Mr. Kimpler to update you if you'd like to hear from them about the status of their cases. But with respect to what the trustee needs to do, this is, this is where we are. And then with respect to the FSS case, we're essentially, either all those adversaries are either settled, dismissed, or closed. So I think that case, for the most part, it's done. I don't expect anything else in that case, at this point.

THE COURT: Okay. Thank you. Mr. Moshenburg, you're in the courtroom, and then I'll turn to Mr. Kimpler. From the Texas family's perspective, I'll let you, where do things stand, both main case or adversary? Just walk me through it, just specifically so I know which one you're talking about.

MR. MOSHENBURG: 100 percent, Your Honor. Let me start with the state court cases. Right now, we appreciate the Court's remand order with the turnover action back in

005262

state court.  We've been working very hard behind the scenes with the Connecticut families to explore our state court options for state court remedies.

In terms of the merits of the underlying state court litigation, there was just an oral argument in front of the Austin Court of Appeals last week, Your Honor, on the Heslin Lewis judgment, Your Honor.  My co-counsel was leading the state court fight.  Your Honor is also getting ready to prepare a status conference on the Pozner, De La Rosa case.  A lot of the case, there's some pending discovery issues that are going to get resolved.  But also, that case is going to be influenced naturally by what happens in Heslin Lewis, and so there's a little bit of a pace to kind of be aware of whatever guidance comes from the appellate courts about what -- how to proceed in those cases and so that's affecting the timeline of the Pozner De La Rosa case, Your Honor.

THE COURT:  If it is oral argument, if I'm asking you to speculate, don't.  But do you have a sense of when the -- you may hear back from the appellate court, the state appellate court?

MR. MOSHENBURG:  I don't, Your Honor.  I've done a lot of state court of appeals; sometimes it's short, sometimes it's very long.  I just don't know, Your Honor.

THE COURT:  Okay.  And what was, what was argued was the kind of the appeal of the judgment rendered by the state

court --

MR. MOSHENBURG:  That's exactly right, Your Honor. I didn't mean to talk over you --

THE COURT:  No, no.  Go ahead.

MR. MOSHENBURG:  At the oral argument, the appellate court seemed to focus on two things.  One was the default judgment, and then also the cap busting of the punitive damages cap.  Hard to glean if that's where the opinion is going to be going, but that's where the two areas that court wanted to focus on.

THE COURT:  No, that's just fine.  I just didn't get a sense of timing.  If -- and I would ask anyone if there is something that is written, entered by the court, can someone just file it?  No spin on the first page, just notice of filing of state court really and just file it so that there's public knowledge, at least on my end in terms of what the state court did -- in the, you can file it in the main docket in the main case, just so it just helps me.

MR. MOSHENBURG:  100 percent, Your Honor, we'll do that.  And that really goes to the adversaries as well.  Let me turn to that on the dischargeability action, Your Honor. We've been working procedurally.  We were in the -- previously we talked about filing a motion to reconsider.  In doing that, what we realized is there's other evidence that we want to attach and the Court, when it denied our summary judgment

005264

Exhibit 1

motion on the punitive damages in particular, there were things that the Court spotted that there wasn't enough in the record to find that we had met our burden on summary judgment.

So then we've dug back, found some transcripts, found some other briefing that sort of highlights the issue on the summary judgment.  So we'll be moving for an additional summary judgment, but the idea will be that the court, the trial court found that Jones had intentionally acted.  And so when the court denied the summary judgment --

THE COURT:  But shouldn't we wait then if something is already briefed for the state appellate court, won't the -- in other words, do I need to wait to see what the state appellate court does before?  In other words, I'll make something up.  If the court affirms the punitive judgment, right, that's one thing.  If the state, if the appellate court rules against you, your clients on the appellate, then what I don't want you doing is moving for summary judgment on something that could potentially be a thumbs up or a thumb down by the appellate court.

Maybe it makes sense to wait on that.  I'll hear from Mr. Jordan or Mr. Broocks on kind of not getting ahead of one or the other, but I don't want to rule when there's something that's already on appeal.  I think that the state court needs to take the lead on its own judgment if there were arguments raised there and then I can then -- because

005265

Exhibit 1

essentially, I'm taking up summary judgment based upon what they're arguing so.

MR. MOSHENBURG:  Right.  Judge, I think that's a great idea.  We fully --

THE COURT:  I don't know if it's a great one, but it's an idea.  Someone will let me know if it's a -- if it makes sense or not, but I'll wait for others to think about it.

MR. MOSHENBURG:  Sure.  And just from the Texas family's perspective, Your Honor, I want to make sure the Court understands we have worked out our differences with Connecticut.  We've reached a settlement on going forward. And from, and from our vantage point -- and I think Mr. Kimpler will talk more about it -- getting finality on the dischargeability decision of the Connecticut summary judgment that the Court granted, I think that will be helpful for Connecticut and for Texas, Your Honor.  So in terms of priorities and what is teed up for the Court to move forward on, I'll let Mr. Kempler elaborate.  But I think getting a, getting to a final judgment on the Connecticut dischargeability action makes the most sense in terms of spending judicial resources.

THE COURT:  And so, but I don't want -- well, Let me hear from others.  What I don't want is for us to be sitting here having this conversation in 2027.

005266

Exhibit 1

MR. MOSHENBURG:  I agree, Your Honor, and I think the fastest path to that is through the Connecticut Avenue to avoid that.

THE COURT:  Okay.  Thank you.

MR. MOSHENBURG:  Thank you, Your Honor.

THE COURT:  Mr. Kimpler, I'll hear, if you have anything you wish to add, I'll certainly hear from you.  If not, I will turn it over to Mr. Jordan, Mr. Broocks, and others.

MR. KIMPLER:  Thank you, Your Honor.  I have a couple of points, but it should be pretty quick.  Let me first just give you two factual updates.

First of all, for what's going on in the Connecticut appeal, I think you know, because we filed it in December, but in December, the appellate court affirmed 1.3 billion of the judgment and overturned 150 million of the judgment.  I think that was before you when we were last --

THE COURT:  I saw that.

MR. KIMPLER:  Mr. Jones then sought review from the Connecticut Supreme Court, which is the highest court in Connecticut.  The Connecticut Supreme Court denied that review.  It's discretionary, so you have to make a cert petition.  The Connecticut Supreme Court denied that review on April 8th.  So as of April 8th, as a matter of Connecticut law, the judgments were final and enforceable.  Prior to that,

005267

Exhibit 1

Connecticut law was that judgments were stayed pending appeal.

Mr. Jones then filed in Connecticut a motion to stay enforceability of the Connecticut judgment while he pursues an appeal to the United States Supreme Court.  That was denied by the Connecticut court on May 13th.

So where we are right now is that all appellate processes in the state of Connecticut are over.  The judgment and an aggregate amount of 1.3 billion is enforceable.  And I believe Mr. Jones has another, I think he had 90 days from the prior.  So I think he has another month or so to file a petition for cert review from the U.S. Supreme Court.  We expect that he will do that.  And so that will be the last portion of the appellate process for Connecticut.

THE COURT:  Okay.  And in terms of the just -- and this may sound repetitive -- but just from your, from your perspective, where do things you think sit with respect to the adversary proceeding that is pending before me?

MR. KIMPLER:  Yeah, so, just one other update which Mr. Moshenburg already said.  We have reached a settlement agreement with the Texas plaintiffs, and so there are no more open disputes between us.

There are two adversary proceedings, Your Honor, that the Connecticut plaintiffs are party to.  The first one is the non-dischargeability proceeding that is Case Number 23-03037.  Your Honor, just to recall there, there are three

005268

parts of our judgment. There was the $965 million of compensatory damages. You ruled that those were non-dischargeable. Those judgments have been affirmed on appeal.

There was the $150 million of Connecticut unfair trade practice tax claims. You had ruled those were non-dischargeable, but the Connecticut appeal had reversed that claim. So that claim no longer exists.

And then there was the $323 million of common law punitive damages, which were affirmed on appeal, but you did not issue summary judgment on it. So where we are at in that adversary proceeding now is there are $965 million of compensatory damages that have been held by you to be nondischargeable and been affirmed on appeal. And then there is $323 million of punitive damages, common law, affirmed on appeal but not non-dischargeable, and we have filed a motion for reconsideration that was denied.

I think, given where we are at, my clients are prepared to abandon that claim. At least as to the non-dischargeability, and that would enable us to enter a final order that would resolve the non-dischargeability action before you and would allow Mr. Jones presumably to take an appeal of that as a final order up to the district court.

I want to be very clear, we're not waiving the claim in the bankruptcy, but the argument that that portion of the claim is non-dischargeable. We are, if it suits the Court,

005269

Exhibit 1

prepared to abandon that just to streamline the litigation and allow it to go up for review at the district court level.

THE COURT:  Oh, Mr. Kimpler, I don't want to tell you what your client should -- what I am going to ask is that one way or the other that, you know, within the next 30, 45 days, I kind of get a decision as to whether we're proceeding with respect to the 323 or if you file something, then I'll know that you, you're going to not proceed with respect to the 323 with respect to the non-dischargeability, but obviously maintain the claim portion of it.

MR. KIMPLER:  Yeah.

THE COURT:  And the 955 that you say was affirmed on appeal, that's by the Connecticut courts, right?  Just to make sure that I'm clear.

MR. KIMPLER: Correct.  So to be, to be clear, there, Mr. Jones has one last shot at the U.S. Supreme Court.

THE COURT:  Okay.  Okay.  Thank you.

MR. KIMPLER:  The other adversary proceeding that we're a party to, Your Honor, is Wheeler v. Jones.  That is Case Number 24-03279.  That is what we call the enforcement action, and let me just give you the background because I don't think we've actually ever had a status conference or hearing before you on it.  So let me explain what it is and why it's before you.

That was last August.  We moved to domesticate our

005270

judgments in Texas under the Uniform Judgment Enforcement Act. And so we filed a complaint in state court that basically seeks recognition of a foreign judgment, the Connecticut judgment. There was a 30-day objection period on that complaint. Nothing was filed in October, but Mr. Jones removed that action. We think he removed it in an untimely basis. We also think it procedurally is not an action that can be removed. It's really a procedural, you know, case, but he removed it. He also filed counterclaims in that action, which, you know, are various types of attacks on the Connecticut judgment and some other claims. That action was then removed to the Western District of Texas, and then it was transferred to you.

So I think it probably showed up on your docket, sometime mid to late January. On that docket, there is a fully briefed motion for remand back to the state court. There is also a fully briefed motion to dismiss on the counterclaims.

In our view, all of this can be pretty easily decided on the papers. We would urge Your Honor, although we know you have an exceedingly busy docket, to rule on those when you are able, whether you want to first rule on the motion to dismiss and then the remand, or you want to remand and leave the motion to dismiss to the state court, assuming that, you know, you did decide to remand.

It is obviously your prerogative, Your Honor. You

Exhibit 1

know, from our perspective, these are pretty procedural issues as far as the timeliness and the appropriateness of the remand and the counterclaim.

I have exhausted everything I know about that action because it has been handled by Mr. Chapple.  So if you have any other questions, I would, I would call for a lifeline.

THE COURT:  No, no, this was very helpful.  I remember Judge Pittman said something to me in about January, mid-January, January 16th or January 17th, and we hadn't taken it up and I didn't want to do anything without talking to the parties to understand kind of where all the pieces fit before -- and heard from everybody before I decided to kind of take it, take the issues up on the, on the merits one way or the other so .

MR. KIMPLER:  The last thing I would offer, Your Honor, is, you know, we have heard you that some collection activity should be proceeding in state court.  We are trying to do that.  We're trying to work with the Texas plaintiffs on that front, obviously, having domesticated judgments in state court is important to that effort.

THE COURT:  Thank you.  Great.  Yeah, I guess I don't know, Mr. Chapple, if you can give me a thumbs up or thumbs down or hit five star if there's anything else you wish to add before I turn to a 512 number.

MR. CHAPPLE:  That's correct, Your Honor.

005272

Exhibit 1

THE COURT:  Okay.

MR. CHAPPLE:  Can you hear me now?

THE COURT:  Just fine.  Anything, is there anything to add?  I'm just giving you the opportunity.

MR. CHAPPLE:  No, Your Honor.  I appreciate the opportunity.  I think Mr. Kimpler did a thorough job of explaining the situation and our perspective on both the motion to remand and the motion to dismiss the counterclaim.

THE COURT:  Thank you.  Okay.  Mr. Jordan, Mr. Broocks, anything you wish to say?  Good afternoon.

MR. JORDAN:  And sorry for all the shuffling, but there's a, there's kind of a number of things that are going on.  And there's some moving targets that we, on the way from Austin to here today, found out about.  So I want to be able to sort of better organize.  I don't want to come across too confusing, but I guess I start with --

THE COURT:  Take as much time as you need.

MR. JORDAN:  -- with I guess the most interesting thing that I think the Court should be aware of simply because this has been leaving these matters on the docket.  If you recall, the Texas plaintiffs asked for over a year's worth of extensions while the Chapter 11 was going on.  And of course, we would assume that they were in good faith and Ms. Driver was in good faith granting extensions over and over again.  So we lost a year when we discovered that there was nobody that

was going to support the plan through the Texas plaintiffs.

So the briefing started last Tuesday, Tuesday week. The arguments were held at the Court of Appeals, and you ask about what do you think they're going to rule. Something happened at those arguments. Now I've done most of my appellate work in the federal system, but I've done quite a bit in the state court and something happened that never happened before that I think the Court needs to know about because it affects the adversary that's pending and it affects the answer that we all have to give to you and guessing. I don't think the Court of Appeals is going to take a long time in ruling, and I, and I don't because -- if I may --

THE COURT:: Mm hmm.

MR. JORDAN: I mean. And to Mr. -- the responses and information Mr. Moshenburg gave you, he didn't attend the argument, so I don't think he probably -- but I don't know if he knows about the position that the plaintiffs took, but I had it blown up because we didn't have time to get the cameras and stuff, I mean the audio. But I'd like to -- for the Court to read what Mr. Bankston told the Court of Appeals, and I've got a copy of that here. It can help to, help for you to see it, whatever.

Mr. Bankston told the Court of Appeals when he concluded his arguments --

THE COURT: Mr. Bankston represents the plaintiffs,

005274

Exhibit 1

the Texas plaintiffs, is that correct?

MR. JORDAN:  Yes.

THE COURT:  Okay.

MAN 1: (Indiscernible)

THE COURT:  No, no, no, just want to make sure there's a, there's a reference to Mr. Bankston  He represents the Texas plaintiffs if I remember.  Okay.

MR. JORDAN:  And so, here's what he told the court when he concluded his arguments, which he was, he was, I'll just say this, it was peppered a whole lot about how you're going to keep these punitive damages with this elder abuse that was not submitted to the jury and it was all not pled and pled afterwards.  But those are all questions which they, which they had a lot to say about and there's been a lot written about what the people think the court's going to do.

But more important was this, Mr. Bankston told the court when he finished his arguments, he said, "So I, so what, with that said, Your Honor, again, I return to this idea that I would love to be here before you on a case that matters. And the reason I say this is I'm certain you probably are aware at this point, there are over a billion dollars of non-dischargeable debt against Jones approved by the Connecticut Supreme Court, by my plaintiff, excuse me, by my plaintiffs that are all collecting together with 19 other family members." I'm going to stop there for one second because I couldn't, I

005275

Exhibit 1

couldn't figure out why, what his plaintiffs were doing arguing about the billion dollar award, but it made it clear because now we know that there is some agreement that is between the Texas plaintiffs and the, and the Connecticut plaintiffs that has something to do with, no matter what happens in this case, and so let me finish just reading this.  "And now we have an appellant, of course, that's Mr. Jones and FSS, who's trying to remove $50 million for what purpose when there's already over a billion dollars in dischargeable debt that's coming in part to my plaintiffs, right?"  Now, I'll stop there for just a second.  I think he's referencing to the deal he made.

They cut a deal where apparently if you were to find everything was dischargeable, they're still going to claim we've carved out from the plaintiff's non-dischargeable portion that claim, and we're going to assert it.  I think that's what it is, but let me, let me finish and then maybe the Court can analyze it itself.  "What is, what is accomplished by this appeal?  The result of this Court's decision, I hate to say, is pretty worthless in terms of what's going to happen to the parties."  And then, Your Honor, this, this second page, I don't, I think that's all we've got.  I've got a -- he introduced in the beginning of the argument, he introduced, he's going to tell them why what they were doing was worthless, and that's what he did.  So that's okay.  I'm not willing to do that.  And, and so I want to point that out

005276

Exhibit 1

to you to in this respect.  I've never seen a litigant tell the panel in an appellate proceeding that what they're doing is meaningless.  There's no effect to it.  It's nothing because we made another deal with somebody else and no matter what you do.  Now, I was not surprised that they took that position because the panel was pretty direct on how this case was tried and how in the world you were able to get elder abuse after the jury had left and you replead it and the Court gave it to you and all that stuff.  The appellate court was very focused on what was going on here.  And so I think what -- and I, and I want to say this because I think what Mr. Bankston accomplished was probably a very speedy opinion, that's my best guess.  The Courts had no response.  They had no emotion, they had no response.  They were very active during the arguments, but with that comment, they simply excused the parties and got up and left.

So I, so to answer the question as best as an appellate lawyer as I can and Mr. Broocks did the argument so he may have something to spin to put on it, but I don't think we're going to be waiting a long time.  The dilemma I see is, is that -- my concern is that I think Mr. Bankston has made a deal and critically a deal that would -- because I think he contemplated it before he made these remarks to this panel. I mean no lawyer would say that to a panel unless he knew what was going to happen and the panel had made it pretty clear in

the arguments.  But I want to emphasize to you and I have a, we're supposed to have another blow up, but I know that, I know this is not trial on the merits of anything, but I, but I want to be able to sort of encapsulate to the Court what's happening here and what's happening in circumstances we don't know about and that's going to lead me to ask you for some, some relief in connection with the motions that you just want to status conference on today.

I'm not going to argue the motions, of course, or the merits of the motions, but I do want to let the Court understand why I'm asking for some of this relief.

But here's an email.  It was written by Paul Weiss, Leslie Lieberman, November 16th, 2024, at 1:16 p.m. addressed to Jarrod Martin, Josh Wolfshohl, Chris Murray, Avi Moshenburg and others.  And they were working on a deal.  And this was produced in the, in the discovery that we had with Mr. Murray.

And here's what they, here's what they say in the email that I, that I think is very critical for the Court to allow me to emphasize.  The email's text says "We attach an updated term sheet.  We have increased the settlement amount to three million."  That is the settlement between Texas and Connecticut to cut some deal.  "In our view, this represents a significant premium over the Texas family, over what the Texas families are entitled to on a pro rata basis, a premium that we are only willing to pay for assurances that the FSS

005278

Exhibit 1

assets will not be sold to Jones' family and friends given that it is clear that Jones will use the assets to continue harming our client."  Whatever, whatever that means.

But we do know because we have other emails, again, not to develop any of the facts without having the witnesses to proof up these.  What we do know is that there has been a continual -- and you've seen it in two, in two series of transactions in auctions.  They were, they were trying to conduct an auction only if they had these arrangements in these particular problems made.

And so what has occurred, what we believe has occurred is something that is completely contrary to bankruptcy policy of what a creditor is entitled to obtain and do in a bankruptcy proceeding.  And we've made those arguments in the, in the motion for the auction. Very briefly, we simply say that -- we go through a number of pages of the evidence that we have and the things that we've discovered in the last six months that the government, the DOJ, the plaintiffs' foundations, Paul Weiss and other players had been doing in connection with these Jones claims.

So our argument is couched in terms of what has happened is the, excuse me, your Chapter 11 case was never prosecuted in Chapter 11 by the two dominant creditors.  They had their controversy.  One was -- and I would, I would use this example.  They were identical twins.  One was Texas and

Exhibit 1

one was Connecticut.  No difference.  No, I mean they were the, the events were the same, the people that came to the events were the same, the people that committed the events were the same, the conversations about the events were the same.  Everything was identical.  One of them got 2 percent recovery, and one of them got almost 3 percent, and one of them got 97 percent recovery.  And of course, that skews everything from the standpoint of how can that happen and what can you do about that?

We know that there are things that, remedies that can be done.  And we know that the Texas plaintiffs know what they are.  And so we assume that that is what's been pushing these negotiations from before November all the way through the last time you heard and saw a written effort.  And that was the 9019 settlement in which they were saying, you know, we're going to give you 25 percent and you're going to get $4 million.  It had gone from the email of 3 million to 4 million.  All those things are transpiring without us having any idea of the background of the trustee's involvement.  We've now discovered the trustee was very involved in the, in the decision making and in the implementation of all the process.

What it has done for us though is it, it has finally coalesced the process that is going on here and that is that the dominant creditor who doesn't want money -- now, by the way, the motion that we filed I footnoted to the YouTubes and

005280

Exhibit 1

to the, to the public statements and I think you heard some of the Onion statements where they don't want the assets so they can make money because their dilemma is this.  Where they, for instance, to go to an auction that had an $8 million purchase price and they won by $8 million and one.

They normally would have then a balance sheet that says, I just, I just put out $8 million but I got assets worth $8 million.  So the balance sheet doesn't change and that's where you, that's where you make your auction decisions.  But that's not what's at play here.

What the play is here is that look, we can't pay much money because we're going to destroy the assets.  The reason we want the assets -- and they say that -- the reason we want the assets is so Alex Jones cannot use them.  We want to destroy his brand.  Onion said that in the, in the newspaper.  We want to destroy the brand and parody it so that we can further our gun control political position and other stuff.

So what has happened to us in this case is the dominant creditor, which has been represented by Paul Weiss, the dominant Connecticut creditor doesn't want money.  What they want to do is destroy Alex Jones, and they have -- and as the Courts, I know the Court's aware that they didn't utilize the first proposed mediator.  They did then eventually agree to a mediation and zero happened.  So this is not a case

005281

in which they have ever made an effort to deal with and try to resolve the case with dollars because it's always been destroy the brand, get him off the air -- and you'll see the videos if you ever get a chance to look at them -- is that they told the jury in Connecticut, punish him with such a verdict that he can never be part of the public discourse again.

So what's happening in this process, and I emphasize this because the auction is going to bring it to a head, they don't want, they don't want an auction.  And so --

THE COURT:  Why don't you buy the equity?

MR. JORDAN:  I'm sorry, Judge.

THE COURT:  Why doesn't someone just buy the equity?

MR. JORDAN:  Well, if you buy the equity, you buy whatever debt and other things that go along with it.

THE COURT:  So what's wrong with that?  That's what Chapter 7 normally does.  What's different?

MR. JORDAN:  Well, because I don't think anybody would buy the equity.  Buying the equity so that you can --

THE COURT:  First United can put up the money and buy the equity right now if it wanted to.

MR. CICAK:  (Indiscernible)

MR. JORDAN:  Maybe I'm not following you.  If you --

THE COURT:  The trustee has said no one's put up an

005282

offer for the equity.

MR. JORDAN:  Correct.

THE COURT:  So, First United, put up an order for the equity.

MR CICACK:  (Indiscernible)

MR. JORDAN:  Well --

THE COURT:  In other words, I don't -- what people want is a sale of the assets.  And let me just remind people what happened when there was a sale of the assets, it was me that expressed the concern about the sale.  There was a sale on the table.  I denied it and then I denied another motion to approve a settlement.  Right?  Those assets are incredibly complicated and they raised huge property of the estate issues.  X ended up doing a deal at the very last minute in connection with the proposed sale to Global Tetrahedron, which I didn't approve.

To conduct such a sale, one would have to -- and I said this on the record back then -- you'd have to address all property of the estate issues up front so that you have a clean understanding as to what could be sold and what could not be sold.  And the IP issues to me remained largely unsettled and really complicated as to what FSS owned, what Jones owned, what it didn't own, what he didn't own.

To do that again, there would have to be such a process, and I'm not comfortable proceeding that way.  But if

Exhibit 1

somebody wants to buy the equity, which someone can always do in Chapter 7.  I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction.  The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets.  And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me.  It would have to be cash only and we'd have to sort out all the intellectual property issues.  So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

005284

Exhibit 1

expensive.

And I get it.  Maybe they don't want to buy the asset to make money.  But I'd, I flip it to you.

MR. JORDAN:  I'd like to, I'd like to comment on that because this is, this has really troubled you.  I know since the beginning you made clear that if the IP was going to be sold, that the parties had to come to the Court and raise the issue and then you would decide whether it could be sold or not.

Now so the two offers that we brought to you, I say that we brought to you, that were brought to you that dealt with buying the assets all said we take as is.  So that sale would never have been a problematic sale on that basis.

THE COURT:  Take the equity.  I've got two sides.  There's no question Jones supports FUAC buying it.

MR. JORDAN:  Of course, yeah.

THE COURT:  No one said that.  There is no question about that.

MR. JORDAN:  The questions would go away.

THE COURT:  There's no question.  There's no question, but whether it stays or goes away is largely irrelevant for me, right, from a bankruptcy perspective.  Now, obviously, it's got incredible importance to Mr. Jones and I don't, I got that.  But from a, from a bankruptcy perspective, the real question is what's in the best interest of the estate,

005285

Exhibit 1

right?  And so to me, the amount of money Mr. Murray would have to spend to get me comfortable that there would be a sale of assets, it would be incredibly expensive and incredibly time consuming.  And I'm wondering if the amount of money that it would take to spend plus potential issues that come along with it that's why I said to you, if you want, somebody can put up the equity.

This case has been pending since 2022.  And folks, it just needs to, it needs to end.  Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable.  Let the state courts, or the Supreme Court of the United States rule on the issue.  Parties can then appeal any orders of mine to the district court or the Fifth Circuit.  We got to get there. I'm not moving.

The issues that are still there are there.  And I've heard your concerns.  And I didn't approve of the sale to Global Tetrahedron.  And I'm not saying anybody did anything wrong.  I just did not get comfortable with that sale.  I didn't get comfortable with the settlement.  Someone was asking me to allow a claim against an entity that's not in bankruptcy anymore.

MR. JORDAN:  And believe me, we didn't ignore you when you said --

THE COURT:  I know you didn't.  I know you didn't

005286

Exhibit 1

it.

MR. JORDAN:  -- on the sale of the equity.  We've tried to figure a way that we could sell it without the buyer buying $1.3 billion in debt.

THE COURT:  And that's the problem is that you can't figure it out.

MR. JORDAN:  If you got a hand on it.

THE COURT:  It's not, it's the trustee's call.  That's what I'm saying.

MR. JORDAN:  Well, it's the trustee's call if he can find a buyer.  We couldn't figure out how to find one.  It would have been --

THE COURT:  May the trustee abandoned the issue.  And maybe the trustee abandons the asset.  I don't know.  You all are going to have to figure it out.  That's what I'm saying.  The trustee needs to make decisions.

MR. JORDAN:  But let me also mention to the Court, and I'm not sure that you processed this, the way I'm, the way I tried to present it because I didn't, I'm not sure I wrote it the way you --

THE COURT:  You're saying there's stuff going on behind the scenes and you should be well aware of it.

MR. JORDAN:  That's not up for today, and I don't, and I --

THE COURT:  But it could be.

005287

Exhibit 1

MR. JORDAN:  I'm saying it is a, it is we want the ability with limited discovery to explain that with facts and documents.  Now we've got them.  But we've got to verify them. We've had to have them authenticated.  I mean things have happened in the last six months since this regime change.

THE COURT:  I'm sure.  I'm sure.

MR. JORDAN:  But that's not what I was referring to. Here's what I think you might consider.  When you ruled on the 25th of February, and then you said, and then after that, the FUMC filed a  request for a status conference because they wanted, they made this offer that wouldn't be -- for three months and not been responded to, an $8 million offer subject to the conditions that I mentioned.  We won't --  the trustee doesn't have to warrant anything to us just because we know what is there.  We know what is involved, so, so we're ready to sell.

At that time you were incredibly frustrated with the, with all the parties and you commented that you were going to void and terminate the order.

THE COURT:  I did say that and I agree.

MR. JORDAN:  And quite frankly, but for, but for the fact that the appeal was pending, that's probably what you would have done at the time.

Now, the appeal now, I filed my motion pointing out that I've pointed out to the, to the  plaintiff, the appellant,

005288

there's no jurisdiction to do anything except enforce the order or construe the order if they keep their appeal going. They kept it going. But I think when I filed this motion -- and I really emphasized it maybe more or better than I, than I had before -- they have now dismissed the appeal. That dismissal was, is now 34 days old, and that's important.

They said in their reply, which, by the way, the reply to all these --

THE COURT: The reply to which docket?

MR. JORDAN: I'm sorry, to my motion.

THE COURT: Oh, yes, yes.

MR. JORDAN: When they filed their response, I misspoke, when they filed their response to my motion, they said the appeal is dismissed, the matter is moot, the judge has ruled, and so it's all in state court. That's their response. And of course my reply then was wait a minute. That is not how it works. If the Judge had made oral release from the bench, and the last one he wrote down that it was, that it was void, but the Judge also said, I mean, on his own, not because we pointed it out, but you said on the, on the 25th of -- on the 5th of February '25 that if it's on appeal, I can't modify it, I can't change it, I can't withdraw it. Now, I can, I can enforce it or I can interpret it, but I can't do any of that cause it's on appeal. That was all correct. Now it's not. So now what's the effect of that?

Exhibit 1

The effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked.  It is a final order that permits the trustee, because remember your supplemental order did two things.  You gave the trustee the assets and then you said, "And I'm giving him the authority to operate until he can sell."  Now that's what it, I mean, you basically laid out the purpose of it.

The plaintiffs are now saying, oh, that supplemental order doesn't order a sale, so there's no way that just because the supplemental order is in place, it'll be ordered.  I think that's foolish, but that's their argument.  But the other argument is that in some fashion, your final judgment that now -- that people can't attack -- well, the one exception.  Your final judgment is a final judgment on the law.  That is, can I, could I authorize to do that in the state of Texas?  Yes, I can.  I have a final order.  Everybody knew about it.  Even the person that complained about it withdrew his appeal.  So it's fine.

THE COURT:  The question is, do we do round two?

MR. JORDAN:  I'm sorry, Judge?

THE COURT:  There's already been a round one.  The question is do we open it up for a round two.  That's the real question, right?

MR. JORDAN:  Well, yes, it is the real question in

005290

the sense, but let me tell you how that works, but the answer to your question is yes, but here's how it works.  Rule 59(e) could give relief by which you could, within 28 days of the entry of the final order, even the Court within that period of time could have sua sponte said, wait a minute, I don't, I made a mistake.  I don't like what I did or things have changed.

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

MR. JORDAN:  Well, I'm saying now --

THE COURT:  You probably couldn't do it before then, but I'm asking you to reconsider if that's what you're planning on doing now is how I read your motion or to the extent I thought I did something, reconsider it.

MR. JORDAN:  Yes, because I can say this.  And look, I'm old enough to know better than to tell a federal judge he can't do something.  Okay.

THE COURT:  I'm not one of those judges.  You can tell me that I can't, I can't.

MR. JORDAN:  What I want, but what I want you to hear is that Federal Rule 59(e) is gone; 28 days have passed.

Exhibit 1

Nobody filed a motion and you didn't pick it up and decide you wanted to do something.

60(b) provides for a reasonable time to do something. That reasonable time probably hadn't passed or maybe it has, who knows, but it's only on motion. It's not on sua sponte of the Court.

THE COURT: Oh, I agree with that.

MR. JORDAN: Okay. So no one has asked you to do anything. They've said, oh, it's all moot --

THE COURT: No, I agree. I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it.

I've told the trustee, if you're going to try to do this again, here's the mountain of stuff you're going to have to get over before I get comfortable approving a process by which those assets could be sold, and it's really hard. The trustee can move if he wants. I know you can sell the equity. And that's an easy process to get through.

The other one, it's going to be really hard to get me comfortable approving the sale on the merits based upon all the issues before. But I don't, I'm not in the business of ordering trustees to go order and nor is anyone asking me to. Truste's got an offer. Trustee will weigh. Trustee will exercise business judgment as to what the trustee wants to do

and parties can file stuff asking me to do things or not.  But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it.  He tried to sell assets under those orders.

The question is do we do another sale?  That's the real question.  Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS.  And how do I weigh now state court remedies that people have as opposed to -- do I stay then state court remedies against non-debtor parties, against the non-debtor?  It's more complicated now than it was six or seven months ago.

MR. JORDAN:  Well, I agree.  I think that the issue in state court has become extremely favorable to the goal and policy I mean and decision making of the plaintiffs.  They know that a state court auction by a constable is worthless to value.  They're going to, somebody's going to credit bid and now their deal is, it's going to be, they're going to create a bid.  Nobody gets any cash.  There's no change.  They get the assets for nothing and the people that are injured, of course, are the other creditors of this estate who are, who are not active at all.  There's not a whole lot of them, but

005293

Exhibit 1

there's, but they're there.  And, of course, then the Debtor who has obviously an interest in getting a maximum value for a credit against his judgment.

So you, they're weighing this.  They're weighing a state court constable's auction for nothing by which they get the assets for nothing and they destroy them like they say they're going to.  And they, and $4 million goes to, they pay $4 million to the, to the Texas plaintiffs, or we go to an auction and we have to compete against $8 million with someone who says you don't need to guarantee title, you don't, yeah, I mean, here's my bid, I'm ready to go.

And now here's, and here's the third comparison that I, that I really think is important.  And I think you may have just said it, but if, but if I didn't -- not sure I picked it up exactly, is that people have relied on your order.  I mean the trustee has paid himself over a million dollars from those funds.  The trustee's lawyer has gotten $800 million too pursuing these auctions.  I mean, there's been almost $2 million spent pursuing the auctions and pursuing the reliefs and doing the settlement agreements and all the things they were doing.  Instead of just auctioning it off, they got into this process that somehow the trustee bought into.  And so the -- how do we unwind this because for the last six months now, Alex Jones has been operating under the auspices of the trustee, so he, I mean, he's added like $2 million into the

005294

estate from him running the company and keeping the assets going earning money.

What happens to the earnings, I mean so --

THE COURT:  Where does the -- let me ask you a question.  It's a good question to ask.  FSS, well, let's assume FSS generates -- I'm making something up here, so just as a hypothetical.  We'll just use X dollars in July of 2025 or through August, or the first six months of this year.  Right?  Where does that money go?

MR. JORDAN:  It goes to the account of the trustee 50 percent and the account of Alex Jones, 50 percent.  So they have -- so he didn't get a salary, he gets, that's how they, that's how they run the operations.  So and that has generated about $2 million and that's not just since this month, but it's --

THE COURT:  Are you asking me to, in consideration of that, to potentially end that arrangement, give it all to Jones?  If I reverse the order, wouldn't that, isn't that the effect?

MR. JORDAN:  See that's the dilemma.  If you reverse the order, everybody has done a lot of things in reliance on the order.

THE COURT:  No, no.  I got it.  I got it.

MR. JORDAN:  Okay.

THE COURT:  It's an -- I understand the point.

Exhibit 1

Right?  I understand the point.  There's money coming in and there's only one person generating that money that's coming into FSS.  Let me think about it.  I don't want to rule today.  I want to think about everything and think about this.  This is kind of why I want to have a status.

MR. JORDAN:  And may I --

THE COURT:  Go ahead.

MR. KIMPER:  May I --

MR. JORDAN:  And may I, may I add to my confusion --

THE COURT:  Just a second, Mr. Kimpler.  I just want Mr. Jordan to finish.  Go ahead, Mr. Jordan.  I think Mr. Kimpler wanted to speak, but I'll give him an opportunity or Mr. Broocks.  Yeah, go ahead, you finish.

MR. JORDAN:  What's that?

MR. KIMPLER:  Your speech.

THE COURT:  Go ahead.  Finish your point.  You've got the floor.

MR. JORDAN:  Mr. Kimpler.  Okay.  My other thought is this.  It's kind of a different direction.  There have been four orders entered, I'm sorry, there have been, I think, three orders entered.  There may have been four.  I'm referring to Docket Number 24-03228, 229, 331, and they're called "Stipulations of the Parties."

THE COURT  Yes.

005296

Exhibit 1

MR. JORDAN: And they purport to -- and we only found these this morning. We weren't, we weren't ever served any notice, but we weren't parties to these adversaries. These are ones I think that Ms. Driver was a party and she hadn't withdrawn and one of the trial lawyers, Chris Martin was a part of, but we didn't know about these. And my question, if I may ask the question, I'm not asking for an advisory opinion. I just, this is the Court's order. It says the Court retains exclusive jurisdiction over property of the estate and any other property or interest under the control of the trustee, including 100 percent equity interest in FSS. And it's entered in the, or at least styled in the FSS Systems Chapter 11 that is no longer.

And my, I guess my only concern is that it's sent back to state court something, but I, but I can't, I don't understand what it sent back to state court. These were remand motions that I think they're, they're not the ones that we're involved in that's up for today. But if those are remand motions and they don't, and they're not sending property back to the estate, I guess, I guess from my perspective, we probably don't have a problem. We still are within the time to file a motion and reconsider if there, if we find a problem, but can the Court, did the Court intend to send the assets back to the estate or --

THE COURT: No.

005297

Exhibit 1

MR. JORDAN:  No.  Okay.  Well, I'm asking for a ruling, and I don't, and I ought to tee it up differently, I guess, but --

THE COURT:  I'll set up a short status.  I don't know when.  Give me a little time to think about everything that I've heard today, one way or the other.  Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other.  I don't think anyone should plan on an auction today, but I may change my mind, but I don't -- in terms of going forward with respect to the cash generated by FSS, it's something to think about.

MR. JORDAN:  And, Your Honor, then just to finish so that Mr. Kimpler can ask his question.

THE COURT:  I think Mr. Broocks will go and then I'll, then I'll turn to Mr. Kimpler and then I've got another hearing, folks and I don't --

MR BROOCKS:  I'm going to go next.

MR. JORDAN:  All right, so the one other issue that I wanted to cover, and let me see where I put it.  Your Honor, for the sake of the, of the topics I've covered, if it's all right, I'm going to sit down.  If Mr. Broocks had something --

THE COURT:  If you, if you think about it, just let me know.

MR. JORDAN:  Okay.

005298

Exhibit 1

THE COURT:  Mr. Broocks, good afternoon.

MR. BROOCKS:  I'll be very brief, Your Honor.  Thank you so much for entertaining this.  I did the oral argument in the Austin Court of Appeals, and I wanted to bring to your attention some different facets of this.

The Connecticut first in Austin, in Connecticut, we asked the Supreme Court of Connecticut to do this discretionary review.  They could.  There's a specific doctrine there under a whole lot of cases called the Golden cases.  It says even if you didn't raise a constitutional issue below, you can raise it here.  So we asked them to do so.  The opposition to our petition in Connecticut said no, they didn't raise it in the Court of Appeals.  They didn't even use, I'll say the "C" word, Constitution.  That was their argument.  It's been waived, we said, but the Golden case is intended for that exact purpose, (Indiscernible) line did not.

And he's right, whoever said it.  We are going to go to the U.S. Supreme Court.  We have the ability to ask Justice Sotomayor, I think she's assigned to the, to the Second Circuit District, wherever this case is, for a stay.  And the moment they start any aggressive action; we're going to do that.  We have a petition we're working on right now.  That's Connecticut.

Now in the Texas appeal, the argument was threefold.  It was a lot of sub issues, but the arguments looked to the

005299

justices you have, Your Honor, has an independent duty, constitutional duty to review the constitutional issues. As painful as it may sound, you've got to take these videos and you've got to watch them and I had them transcribed. So the Court didn't have to just go watch them. I said, here are the transcripts. They objected to that, but I said, I'm just trying to help. And they were, they were hyperlinked where you could listen to it and read the transcript and go to the particular spot.

I said so you got an independent duty and nothing anybody can do can take that away. And nobody, no court in America has yet ruled on the constitutional issues we raised. Nobody. And so, and so they said, well, they were, they were facing the task and they realize that's their duty. And that may take a while.

Now, the second issue was we said there is a constitutional prohibition, prohibition on entering a liability default judgment against a media defendant in a matter of public concern in the case brought by a public figure. We think we satisfied all three of those. We said and the justices, the Chief Justice said, wait a minute, are you telling me that the trial court is helpless? I said, absolutely not. She's got a lot of remedies available to her, but the one thing she can't do is put a gun to the head and say I am going to bypass all these cases and I'm going to say

Exhibit 1

I'm going to find you, as a matter of judicial decree, to have committed malice that it's false, that you intended it to be false, you knew it was false, and instead of clear and convincing evidence, I'm going to say there was.  I said they just can't do that in that context. And so she asked Bankston, she said, Well, what do you say about that?  And Bankston, well of course, he says we disagree, but he didn't have any cases because he doesn't have any cases.

Now the third issue, so we said, we said the constitutional review is going to be required.  The default judgment was inappropriate, and we said well when punitive damages are concerned, you have an independent duty to look and see what the grounds are.  And to see if, in fact, under Texas law, and which is similar to a lot of states, did they put on the proper evidence to show that, you know, that the default damages that all remedies that had been available to the trial court were tried and failed.  The justice says, what could she have done?  I said, she, if they weren't having success in getting documents from Jones, you got weekly hold, you can get his, they've done computers, you can do the searches yourself.  There's a lot of things.

So anyway, so the Court of Appeals is going to come back potentially and do something very interesting because you've got a Texas case and you've got a Connecticut case. Now this is like Shelby said it was identical twins.  That's

Exhibit 1

a really interesting analogy because it was the Sandy Hook crisis, same one, the same parties, families and family members, the same broadcasts that are allegedly defamatory. A default judgment on liability, so there was no liability trial. The only differentiating factor was the damages. Now in Connecticut, it's $965 billion divided by 15 is roughly $63 million of actual damages to the family. Pretty close.

In Texas, it was $2 million 2 for Heslin, 2 for Lewis. So how do you get on the identical facts, the identical arguments, the identical, there's no liability issue. You now have 63 million to the Connecticut people and 2 million to the Texas plaintiffs. Now if the Texas Court of Appeals comes back and says that we're going to say that -- they could come back and say there's no defamation because I showed them the articles that they were taking snippets out and claiming Jones says this, but he said very clearly, I believe children died. So, you know, there could be no defamation involved. We said convincingly, I think, that there was no intention of fiction, but the Court of Appeals could come back and say wait a minute, we don't think this satisfies constitutional muster.

Now what is the Supreme Court of America going to do? What are you going to do when you've got identical facts, identical facts, identical liability, and one court says it violates the Constitution and another court says they didn't say no. They said we're not going to address it.

Now I think that creates an opportunity, a question for the Supreme Court.  Not only is there a disproportionate recovery, 63 versus 2, you have one court saying on the same facts, no.  Another court saying on the same facts, we're not going to address it, but maybe.  That creates an interesting dilemma, I think, for this Court.  Because you're being asked to find non-dischargeable something that a Texas court would if it comes out this way, if I'm right, that the Texas Court of Appeals says it doesn't pass constitutional muster, well, you're in a dilemma.  And that's why I think your comment about shouldn't we wait till the Texas Court of Appeals rules is very prescient because they very well may come back and say that and I think that is an issue that this Court should take into consideration as it considers its dischargeability because I think that the plaintiffs here --

THE COURT:  Dischargeability with respect to Texas, Connecticut or both?

MR. BROOCKS:  Both, both.

THE COURT:  Okay.

MR. BROOCKS:  And I'll tell you why.  It is because in issuing your original non-dischargeability order, you were led to believe that Connecticut was basically ironclad just, you know, if it was fairly tried and all that.  That's not Connecticut law.  It's just not.

THE COURT:  Shouldn't an appellate court in

005303

Connecticut tell me that?  I wasn't, I don't think I was led to believe anything.  I think I was given documents that led to a conclusion under the law.

MR. BROOCKS:  These are collateral estoppel issues. The Connecticut court can tell you what they did, but you have to decide what is the collateral estoppel effect.  And we said that the Lighthouse case and others, the Supreme Court of Connecticut in multiple cases has said that there are three steps in a collateral estoppel, but there's a critical fourth which gets into equity, fairness, justice.

You know, we get to look behind the scenes and then there was another case where a default judgment was entered. Those were just regular collateral estoppel cases.

There was another Connecticut Supreme Court case that is the bellwether case that says, wait a minute, if you have a default judgment entered, they go, they follow the restatement of torts.  And they say if a default judgment, then you can't say it was fairly --

THE COURT:  Aren't those matters for an appellate court at some point?

MR. BROOCKS:  No, those are matters for you.  These are, these are questions because if the question of collateral estoppel comes in, these are the issues.

THE COURT:  You're saying collateral estoppel on something I've already ruled on?

MR. BROOCKS:  I'm saying you haven't, it's not -- you at all times, this is not a final order, Your Honor.

THE COURT:  Oh, you mean, you mean in connection with the final order.

MR. BROOCKS:  I'm saying as you approach the issue of finality, and I may, I have --

THE COURT:  No, no, no.  I got the point.  I get the point.

MR. BROOCKS:  So I'm going to say that as you, as Mr. Kimpler said a minute ago, they're going to come back -- and I suspect they will.  I would be shocked if they didn't -- saying we're going to forgo the $331 million.  That would be Bankston saying that he's got a deal.  Now we believe this is a, we believe this is, I'm going to say an illegal deal.  We believe these are two creditors working behind the scenes because I think that because Connecticut has always said we have 97 percent of the judgment, but Texas has said, well, wait a minute, it should be 5 Texas plaintiffs, 15, that's, that's 75, 25, 75 percent.  Connecticut was held hostage by Texas until they cut that deal, and that's what I think we need to discover.  And that's an abuse of process.  That's creditors manipulating the system.  And what's happened here is that that's going to be another complicating factor because we're going to file an adversary on that.

THE COURT:  Okay.

005305

Exhibit 1

MR. BROOCKS:  And so at any rate, my point to this Court is that there has been a massive, and I'm going to conclude with this, and a massive, a massive abuse of process here.  They have taken legitimate processes and they have abused them, using them for an illicit purpose, which is to put Jones out of the air.  That is not a legitimate purpose. And that is going to be, so that's the essence of our, of our 1983 claim.  Our 1983 claim says this, from the moment that trial judge in Delaware -- in Connecticut issued a default judgment and then struck our constitutional defenses, that is state action.  The New York Times versus Sullivan says that's a state action.  The cases we cite in our briefs, the Fifth Circuit says that is, that's not just a plaintiff bringing a lawsuit.  That is a judge entering an order that now tips the scale, and that is state action.  Again, New York Times versus Sullivan said that.

So we believe, Your Honor, that we have asserted valid 1983 claims.  We believe we're going to assert an amended petition or complaint for abuse of process.  And we would urge you to wait and see what the Texas Court of Appeals does because that may change your judgment.

THE COURT:  Thank you very much.  Mr. Kimpler, I think you wanted to have a word.

MR. KIMPLER:  I would, Your Honor.  I'll be brief, but there was a lot of stuff said.  I think one thing I hope

005306

Exhibit 1

you're seeing that as Mr. Jones continues to lose his appeals in Connecticut, increasingly it is hoping that you will be in appellate court.  I think you've already appropriately decided that collateral tax on the Connecticut judgment won't stand.  The Supreme Court will either take up review of this or it will not.  We are confident that the judgment will stand.  I don't believe the Supreme Court will even take review.  As Mr. Broocks just noted, they actually don't raise constitutional issues in the underlying appeal.  So when you ask what's the federal issue for the Supreme Court to look at?  It's a pretty good question.  Mr. Broocks won't agree with any of that.  I don't need to convince you of any of that.  The Supreme Court will do what it will or won't.

I'll just remind you that for the last two years, they've told you that Connecticut judgments are going to be overturned, and they weren't.  They were affirmed and the Supreme Court of Connecticut said they didn't want to look at it.

I'm not going to respond, Your Honor, to all of the mischaracterizations about my clients.  I will point out that the email they quote from my colleague, Ms. Lieberman, was taken out of context.  It specifically said we're tired of being hurt on air.  If we want to have an evidentiary hearing, I'm happy to show you since January or since December, the number of times Mr. Jones has continued to harass and threaten

Exhibit 1

my clients on air.  I don't think it's relevant, but I'm happy to do it.

The statement that we at closing in Connecticut said "put a huge punitive damages to take this guy off air," the only problem with that?  I think that was what was said in Texas.  So if we're going to throw around a whole bunch of factual accusations, we should at least have some credibility when we do it and not make misstatements.

I'm a little bit surprised to entertain the notion of another auction in the bankruptcy court.  I think you should see today all the issues.  Then I'll file another adversary complaint.  They're going to assert Section 1983 claims against my client.  Having an option in this court is going to be extremely expensive.  It's going to cost a lot of money, and I can tell you that neither the Connecticut or the Texas plaintiffs support it.

I think we should keep in mind here that Mr. Jones is an equity owner of a business and is massively out of the money.  This is not significantly different from any other cases where a company has creditors, it can't repay the creditors, the management may get replaced, the board may get replaced.  Yeah, they don't get to dictate the terms on what creditors do with the business.

The thing that I think Your Honor was focused on is what is happening with the business now?  Mr. Jordan said that

FSS has created $2 million in the last couple of months.  I'd like to see proof of that.  I don't think we should take the things they say at face value.  I can tell you for the last year, Mr. Jones goes on his air and he says, don't buy stuff from Infowars.  Buy it from this other website I just created.  We believe First United is behind that in funding it.

THE COURT:  Well, I believe, I believe, --

MR. KIMPLER:  I believe (Indiscernible) also.

MR. COURT:  I don't, I don't want to, I don't want to get into it.  I get the point.  I don't want to get into what one is doing and the others are doing, I've got big, big, big billboards here and like finding stuff on the other side.  I'm really just trying to stay within the four corners of this wall, but I get the point and I think everyone is hearing me.  I'm not inclined to open up another auction process or I think the trustee, if that's what the trustee wants to do, has heard what I said back then, and I don't think I've changed my mind here.  But it sounds like no one wants to buy the equity either.  That was one of my questions in my notes here, so.

But I do, there are some things I do want to think about, maybe understand what's going on with the business, how much money the business has, maybe understand kind of where things are going with respect to the business.  I kind of what the trustee views is the right thing to do, what the business is at some point.  I just think we got to figure out what to

005309

do with FSS over the next, I don't know, 60 days and just make the call one way or the other as to what you want to do and move on.  I think --

MR. KIMPLER:  Your Honor --

THE COURT:  There could be other lawsuits.  There could be other matters that are coming, and I will take them up at face value.  I'll read them and we'll take them up and rule on him.  Mr. Kimpler.

KIM:  Yeah, I was just going to say, Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies.  We've been working with the Texas plaintiffs towards that end.  You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive.  I think it will have wasted several months of efforts.  I think it'll be extremely expensive.  I'm worried about the estate becoming administratively insolvent.  Again, if FSS is throwing out $2 million of cash a month, that's news to me.  The idea that 50 percent of it's going directly to Jones and an account that maybe is not controlled by the trustee, that's also news to me.  I'm very concerned about where that money is going.

THE COURT:  I know.  I got it.  I think everyone should leave on the motion for reconsideration thinking, well, there's  really  technically  nothing  for  me  to  reconsider

005310

Exhibit 1

because there's nothing, I haven't done anything.  But I don't think my position has changed in terms of what I said in February.   I want this case to continue to move .  Maybe we meet in another 60 days and see where things are and I'll see what gets filed and we'll take them up and we'll schedule them.

This case has been around for three years.  And it's been in a number of iterations and the positions of the parties hasn't changed and that's fine, but at some point, the Chapter 7 process has to work.  So I want to know, the trustee is going to tee up some non-exempt assets.  We'll take those up in the ordinary course.  We'll come back and figure it out.  In a couple of months, we'll figure out what the trustee wants to do with respect to FSS, but I'm not opening up any doors today.  But if there's a lot of money sitting somewhere, then maybe we can think about that.  But if courts rule, I'd like to know about them.  We'll see where things go.   Mr. Moshenburg, I'll give you 30 seconds and then I've got some other folks who have been here for a while and deserving of a hearing.  Yes, sir.

MR. MOSHENBURG:  Makes total sense, Your Honor.  I completely echo what Mr. Kimpler just said.  I just wanted to make sure the Court understood.  I don't agree with their characterization.  If any of that sticks, I'm happy to answer any questions about it.

005311

THE COURT: They don't agree with yours, so I think no one agrees with that --  so we're right where we started.

MR. MOSHENBURG: I totally agree.  I just wanted to be clear on the record about that.

THE COURT:  No.

MR. MOSHENBURG:  Lastly, Your Honor, I know you're talking about 60 days from now.  From our vantage point, the Court has told us to go pursue our state court remedies.  That's what we're going to do.  I want to be open and honest about that unless you're telling us otherwise.

THE COURT:  I'm not, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up.  We can continue to talk.  I just want to keep; I don't want to meet again in the Jones case in December and then talk about asset sales and what's going on.

And I'm going to -- well, somebody's asked me to think about some issues.  And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens.  I may issue something in writing in short, just kind of addressing the issue without any need for another hearing.  We'll see where things go.  I think the trustee's instructions for now are keep selling non-exempt assets and

Exhibit 1

whatever you were planning on doing, what you said you were going to do, then just keep doing that.  I don't think you need to do anything different, but if anything changes, I'll let you know.

MR. MOSHENBURG:  Thank you, Judge.

THE COURT:  All right, folks, thank you very much. I very much appreciate your time.

(Proceedings adjourned at 2:32 p.m.)

005313

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 17, 2025

005314

Exhibit 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 22-60043 |
| FREE SPEECH SYSTEMS LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | CHAPTER 11 |

### ORDER DISMISSING CASE

For the reasons stated on the record at the hearing held on June 14, 2024, this case is dismissed. It is further ORDERED:

1. The employment of all professionals retained in these chapter 11 cases and the Subchapter V Trustee's service is terminated. Except as otherwise set forth below, the Debtor's CRO shall have no further responsibilities with respect to the Debtor's operations.

2. The CRO is authorized to transfer control and signing authority with respect to the Debtor's bank accounts to Christopher R. Murray in his capacity as the Chapter 7 Trustee for the bankruptcy estate of Alexander Jones, Case No. 22-33553.

3. Final applications for compensation shall be filed no later than 14 days after entry of this Order.

4. This Court shall retain exclusive jurisdiction over the following matters:

   a. Adversary Proceeding No. 24-3038, *Elevated Solutions Group, LLC v. Free Speech Systems LLC, et al.*;

   b. Adversary Proceeding No. 23-3127, *Free Speech Systems LLC v. PQPR, Limited Holdings LLC, et al.*;

   c. Adversary Proceeding No. 22-3331, *Neil Heslin, et al. v. Alex E. Jones, et al.*; and

   d. Applications for approval of professional fees and expenses.

5. The Court retains jurisdiction to interpret and enforce this Order.

Signed: June 21, 2024

Christopher Lopez
United States Bankruptcy Judge

005315

Exhibit 3

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 25, 2024

Nathan Ochsner, Clerk

| | |
|---|---|
| **In re:** | § |
| | §   **Chapter 11** |
| | § |
| **FREE SPEECH SYSTEMS, LLC,** | §   **Case No. 22-60043 (CML)** |
| | § |
| **Debtor.** | § |
| | § |
| | § |

### ORDER SUPPLEMENTING ORDER DISMISSING CASE
**[Related to Docket No. 956]**

1.      Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

2.      The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

**Signed:** September 25, 2024

_____

Christopher Lopez
United States Bankruptcy Judge

005316

Exhibit 4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| **In re:** | ) Chapter 11 (Subchapter V) |
| | ) |
| **FREE SPEECH SYSTEMS LLC,** | ) Case No. 22-60043 |
| | ) |
| **Debtor.** | ) |
| | ) |

**NOTICE OF APPEAL**

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (collectively, the "Texas Plaintiffs"), pursuant to 28 U.S.C. § 158(a)(1) and Rules 8002(a)(1) and 8003 of the Federal Rules of Bankruptcy Procedure, appeal to the United States District Court for the Southern District of Texas this Court's *Order Supplementing Order Dismissing Case* [Docket No. 1021] (the "Supplemental Dismissal Order"), entered in the above-captioned Chapter 11 case on September 25, 2024. A copy of the Supplemental Dismissal Order is attached hereto as **Exhibit A**.

The parties to the Supplemental Dismissal Order and the names, addresses, and telephone numbers of their respective attorneys, are as follows:

| Party | Party's Attorneys |
|---|---|
| **Appellants**<br><br>Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine | **WILLKIE FARR & GALLAGHER LLP**<br>Jennifer J. Hardy<br>State Bar No. 24096068<br>600 Travis Street<br>Houston, TX 77002<br>Telephone: (713) 510-1766<br>Fax: (713) 510-1799<br>Email: jhardy2@willkie.com<br><br>**WILLKIE FARR & GALLAGHER LLP**<br>Stuart R. Lombardi (admitted *pro hac vice*)<br>Ciara A. Sisco (admitted *pro hac vice*) |

Exhibit 4

| | |
|---|---|
| | 787 Seventh Avenue<br>New York, NY 10019<br>Telephone: (212) 728-8000<br>Fax: (212) 728-8111<br>E-mail: slombardi@willkie.com<br>E-mail: csisco@willkie.com<br><br>**LAWSON & MOSHENBERG PLLC**<br>Avi Moshenberg<br>State Bar No. 24083532<br>801 Travis Street, Suite 2101, #838<br>Houston, TX 77002<br>Telephone:  (713) 449-9644<br>E-mail:  avi.moshenberg@lmbusinesslaw.com<br><br>**CHAMBERLAIN, HRDLICKA,**<br>**WHITE, WILLIAMS & AUGHTRY, PC**<br>Jarrod B. Martin<br>State Bar No. 24070221<br>1200 Smith Street, Suite 1400<br>Houston, TX 77002<br>Telephone:  (713) 356-1280<br>Fax:  (713) 658-2553<br>E-mail:  jarrod.martin@chamberlainlaw.com |
| **Appellee**<br><br>Free Speech Systems, LLC | **O'CONNORWECHSLER PLLC**[1]<br>Annie E. Catmull (Texas Bar No. 00794932)<br>4400 Post Oak Parkway, Suite 2360<br>Houston, Texas 77027<br>Telephone: (281) 814-5977<br>E-mail: aecatmull@o-w-law.com |

---

[1] O'ConnorWechsler PLLC is Appellee's last known counsel.

2

Dated:  October 8, 2024

Respectfully submitted,

*/s/ Jennifer J. Hardy*
**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

**LAWSON & MOSHENBERG PLLC**
Avi Moshenberg
State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone:  (713) 449-9644
E-mail:  avi.moshenberg@lmbusinesslaw.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

***Co-Counsel to the Texas Plaintiffs***

3

Exhibit 4

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all parties registered to receive electronic notice through the Court's CM/ECF system on October 8, 2024.

*/s/ Jennifer J. Hardy*

4

Case 4:24-cv-05538 Document 1-25 Filed 01/26/24 in TXSD Page 594 of 691

Exhibit 4

# Exhibit A

005321

Exhibit 4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| **In re:** | § Chapter 11 |
| | § |
| **FREE SPEECH SYSTEMS, LLC,** | § Case No. 22-60043 (CML) |
| | § |
| **Debtor.** | § |
| | § |
| | § |

## ORDER SUPPLEMENTING ORDER DISMISSING CASE
**[Related to Docket No. 956]**

1.      Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

2.      The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

**Signed:** September 25, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

15564076

005322

Exhibit 5

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 (Subchapter V) |
| | ) |
| FREE SPEECH SYSTEMS LLC, | ) Case No. 22-60043 |
| | ) |
| Debtor. | ) |
| | ) |

## THE TEXAS PLAINTIFFS' STATEMENT OF ISSUES
## AND DESIGNATION OF RECORD TO BE PRESENTED ON APPEAL

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (collectively, the "Texas Plaintiffs"), under Rule 8009 of the Federal Rules of Bankruptcy Procedure, submit the following statement of issues and designation of items to be included in the record on appeal with respect to the Texas Plaintiffs' appeal of this Court's *Order Supplementing Order Dismissing Case* [Docket No. 1021] (the "Supplemental Dismissal Order"), entered in the above-captioned Chapter 11 case on September 25, 2024.

## STATEMENT OF ISSUES

1.     Did the Bankruptcy Court err when, without notice, it entered an order [Docket No. 1021]—three months after dismissing the Free Speech Systems, LLC bankruptcy [Docket No. 956]—that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones?

## DESIGNATION OF ITEMS FOR RECORD ON APPEAL

The Texas Plaintiffs designate the following items to include in the record on appeal.  Each designated item shall also include all filed exhibits attached to such item. Because the appeal of the Supplemental Dismissal Order relates in part to the companion bankruptcy action captioned *In*

005323

Exhibit 5

*re Alexander E. Jones*, Case No. 22-33533, currently pending before the Bankruptcy Court of the

Southern District of Texas ("Jones Action"), the Texas Plaintiffs also designate items from that

docket in addition to the docket of the immediate Chapter 11 case ("FSS Action"). The Texas

Plaintiffs also designate this *Statement of Issues and Designation of Record on Appeal* for

inclusion in the record on appeal.

| ITEM NO. | DOCKET NO. | FILING DATE | DESCRIPTION |
|---|---|---|---|
| 1. | 707 (FSS) | 8/29/2023 | Debtor's Joint Motion to Approve Employment Contract Pursuant to 11 U.S.C. §§ 105 and 363(b) |
| 2. | 740 (FSS) | 10/11/2023 | Joint Objection of the Sandy Hook Families to Debtors' Motion to Approve Employment Contract Pursuant to 11 U.S.C. Sections 105 and 363(b) |
| 3. | 741 (FSS) | 10/11/2023 | The Official Committee of Unsecured Creditors' (I) Reservation of Rights in Respect of Alexander Jones's Motion for Allowance and Payment of Administrative Expenses Pursuant to 11 U.S.C. § 503(b)(1) to the Extent Such Motion Is Not Withdrawn and (II) Limited Objection and Joinder in Respect of Joint Motion to Approve Employment Contract Pursuant to 11 U.S.C. §§ 105 and 363(b) |
| 4. | 823 (FSS) | 2/23/2024 | Joint Notice Regarding Agreed Order on Debtors' Motion for Approval of Compromise and Settlement Under Federal Rule of Bankruptcy Procedure 9019 |
| 5. | 914 (FSS) | 5/28/2024 | Transcript of Hearing held on May 21, 2024 |
| 6. | 921 (FSS) | 6/2/2024 | Emergency Motion of the Connecticut Families for an Order Pursuant to Bankruptcy Code Sections 105(a) and 1112(b) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 7. | 684 (Jones) | 6/5/2024 | Emergency Motion for Entry of an Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 8. | 928 (FSS) | 6/7/2024 | Transcript of Hearing held on June 3, 2024 |
| 9. | 933 (FSS) | 6/11/2024 | Debtor's Emergency Motion for Court Instructions Regarding (1) Disposition of Debtors Property, and (2) Clarity as to the Chief Restructuring Officers Responsibilities and |

2

005324

Exhibit 5

| | | | |
|---|---|---|---|
| | | | Authority, in the Event of Either a Dismissal of This Case or Conversion to Chapter 7 |
| 10. | 693 (Jones) | 6/12/2024 | Official Committee of Unsecured Creditors' Witness and Exhibit List for Hearing on June 14, 2024 |
| 11. | 937 (FSS) / 695 (Jones) | 6/12/2024 | Jones's Witness and Exhibit List for Hearing on June 14, 2024 |
| 12. | 939 (FSS) / 696 (Jones) | 6/12/2024 | Additional Attachments to Alex Jones's Witness List and Exhibit List for Hearing on June 14, 2024 |
| 13. | 942 (FSS) / 697 (Jones) | 6/12/2024 | The Texas Plaintiffs' Witness and Exhibit List for Hearing on June 14, 2024 |
| 14. | 698 (Jones) | 6/12/2024 | The Official Committee of Unsecured Creditors' Notice of Filing of Supporting Parties' Conversion Order |
| 15. | 944 (FSS) / 699 (Jones) | 6/12/2024 | Connecticut Families' Consolidated Witness and Exhibit List for Hearing on June 14, 2024 |
| 16. | 702 (Jones) | 6/12/2024 | Statement of the Connecticut Families in Support of Conversion of Jones's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 17. | 703 (Jones) | 6/12/2024 | Statement of the Texas Families in Support of Conversion of Jones's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code (Amended) |
| 18. | 935 (FSS) | 6/12/2024 | FSS's Witness and Exhibit List for Hearing on June 14, 2024 |
| 19. | 936 (FSS) | 6/12/2024 | PQPR Holdings' Witness and Exhibit List for Hearing on June 14, 2024 |
| 20. | 941 (FSS) | 6/12/2024 | Additional Attachments to PQPR Holdings' Witness and Exhibit List for Hearing on June 14, 2024 |
| 21. | 938 (FSS) | 6/12/2024 | Melissa A. Haselden's Witness and Exhibit List for Hearing on June 14, 2024 |
| 22. | 943 (FSS) | 6/12/2024 | Jones's Response and Objection to Debtor's Emergency Motion for Court Instructions and Motion to Convert |
| 23. | 945 (FSS) | 6/12/2024 | The Texas Plaintiffs' Statement Supporting Dismissal of the Chapter 11 Case and Objecting to Conversion |
| 24. | 950 (FSS) / 706 (Jones) | 6/13/2024 | Connecticut Families' Updated Consolidated Witness and Exhibit List for Hearing on June 14, 2024 |
| 25. | 948 (FSS) | 6/13/2024 | Subchapter V Trustee's Report and Recommendation of Case Disposition |
| 26. | 951 (FSS) | 6/14/2024 | Debtor's Response to Motion to Convert |

3

| 27. | 953 (FSS) | 6/14/2024 | FSS's Revised Witness and Exhibit List |
|---|---|---|---|
| 28. | 955 (FSS) / 714 (Jones) | 6/14/2024 | Courtroom Minutes of June 14, 2024 Hearing |
| 29. | 708 (Jones) | 6/14/2024 | Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 30. | 709 (Jones) | 6/14/2024 | United States Trustee's Notice of Appointment of Chapter 7 Trustee |
| 31. | 956 (FSS) | 6/21/2024 | Order Dismissing Case |
| 32. | 957 (FSS) / 720 (Jones) | 6/23/2024 | Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) For an Order Extending Automatic Stay in the Alex Jones Case to Free Speech System LLC, and (3) Related Relief |
| 33. | 721(Jones) | 6/24/2024 | Transcript of Hearing held on June 14, 2024 |
| 34. | 959 (FSS) / 725 (Jones) | 6/24/2024 | Connecticut Families' Statement in Support of Trustee's Emergency Motion |
| 35. | 960 (FSS) / 726 (Jones) | 6/24/2024 | The Texas Plaintiffs' Response to the Jones Chapter 7 Trustee's Emergency Motion |
| 36. | 961 (FSS) | 6/26/2024 | O'ConnorWechsler's Response to Chapter 7 Trustee's Emergency Motion |
| 37. | 732 (Jones) | 6/26/2024 | Chapter 7 Trustee's Witness and Exhibit List for Hearing on June 27, 2024 |
| 38. | 734 (Jones) | 6/26/2024 | Connecticut Families' Exhibit List for Hearing on June 27, 2024 |
| 39. | 758 (Jones) | 7/3/2024 | Transcript of Hearing held on June 27, 2024 |
| 40. | 829 (Jones) | 8/22/2024 | Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 41. | 845 (Jones) | 9/17/2024 | United States Trustee's Omnibus Objection to the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC, and Application to Employ Tranzon and Tranzon360 As Sale Broker |
| 42. | 847 (Jones) | 9/19/2024 | Trustee's Witness and Exhibit List for Hearing on September 24, 2024 |
| 43. | 848 (Jones) | 9/19/2024 | United States Trustee's Witness and Exhibit List for Hearing on September 24, 2024 |
| 44. | 849 (Jones) | 9/20/2024 | Jones's Limited Objection to Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 45. | 850  (Jones) | 9/20/2024 | Statement of the Texas Plaintiffs in Support of the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |

4

Exhibit 5

| 46. | 851 (Jones) | 9/20/2024 | Statement of the Connecticut Families in Support of the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
|---|---|---|---|
| 47. | 853 (Jones) | 9/23/2024 | Reply of the Trustee in Further Support of Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 48. | 854 (Jones) | 9/24/2024 | Proposed Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 49. | 859 (Jones) | 9/25/2024 | Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 50. | 861 (Jones) | 9/26/2024 | Transcript of Hearing held on September 24, 2024 |
| 51. | 1020 (FSS) | 9/24/2024 | Trustee's Proposed Order Supplementing Dismissal Order |
| 52. | 1021 (FSS) | 9/25/2024 | Order Supplementing Order Dismissing Case |
| 53. | 1028 (FSS) | 10/8/2024 | Notice of Appeal |
| 54. | 1029 (FSS) | 10/11/2024 | Election to Appeal District Court |
| 55. | 1030 (FSS) | 10/11/2024 | Clerk's Notice of Filing of an Appeal |
| 56. | 880 (Jones) | 10/15/2024 | Transcript of Status Conference held on September 11, 2024 |

## CERTIFICATION REGARDING TRANSCRIPTS

The Texas Plaintiffs hereby certify, pursuant to Federal Rule of Bankruptcy Procedure 8009(b)(1), that they are not ordering any transcripts. All transcripts have been prepared, are on the docket, and are designated in the foregoing designation of record.

## RESERVATION OF RIGHTS

The Texas Plaintiffs expressly reserve the right to (i) withdraw, supplement, amend or modify this Statement of Issues and (ii) move to strike any items included by Appellee in a designation of additional items. This filing is made expressly subject to, and without waiver of any and all rights, remedies, challenges, and objections.

5

Dated:  October 22, 2024

Respectfully submitted,

/s/ Jennifer J. Hardy
**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

**LAWSON & MOSHENBERG PLLC**
Avi Moshenberg
State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone:  (713) 449-9644
E-mail:  avi.moshenberg@lmbusinesslaw.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

*Co-Counsel to the Texas Plaintiffs*

6

005328

Exhibit 5

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all parties registered to receive electronic notice through the Court's CM/ECF system on October 22, 2024.

*/s/ Jennifer J. Hardy*

005329

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re | |
| Free Speech Systems LLC, | Case No. 4:24-cv-03882 |
|       Debtor, | (Appeal from Bankr. Case No. 22-60043) |
| | |
| Neil Heslin, et al, | |
|       Appellants. | |

## MOTION OF THE CONNECTICUT FAMILIES TO INTERVENE PURSUANT TO RULE 8013 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

The Connecticut Families[1], as creditors and parties in interest in the above-captioned Chapter 11 case, by and through their undersigned counsel, file this motion (the "Motion") for entry of an order granting the Connecticut Families' motion to intervene as Appellees pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 8013(g) in the appeal from the Bankruptcy Court's September 25, 2024 *Order Supplementing Order Dismissing Case* (the "Supplemental Dismissal Order," Bankr. Dkt. 1021[2]). In support of the Motion, the Connecticut Families respectfully state as follows:

---

[1] The "Connecticut Families" are Erica Ash, Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker.

[2] Citations to "Bankr. Dkt." refer to the Chapter 11 docket of FSS, Bankr. Case No. 22-60043 (Bankr. S.D. Tex.), while citations to "Jones Bankr. Dkt." refer to the Chapter 11 (now Chapter 7) docket of Alexander E. Jones, Bankr. Case No. 22-33553 (Bankr. S.D. Tex.).

005330

## PRELIMINARY STATEMENT

1.      The Connecticut Families are, by far, the largest creditors of Free Speech Systems LLC ("FSS")—the subject of this appeal—and Alexander E. Jones ("Jones"), a now-Chapter 7 debtor who used to own and control FSS.

2.      The Connecticut Families have a strong interest in this appeal.  The appeal is an attempt by Appellants to secure the assets of FSS entirely for themselves, rather than through a fair and orderly liquidation process overseen by Jones's bankruptcy trustee.  Such a result would come at the direct expense of the Connecticut Families, who Appellants suggest should recover nothing.  The Connecticut Families actively participated in the briefing and hearing leading to the Supplemental Dismissal Order under appeal, in which the Bankruptcy Court rightly rejected Appellants' efforts.  The Connecticut Families seek intervention in this appeal of the order so they can continue to protect their interests.  Neither FSS nor Appellants would be prejudiced by the Connecticut Families' intervention.  Briefing on the appeal has not yet been scheduled.

3.      Accordingly, and as set forth in more detail below, the Connecticut Families respectfully request that the Court grant this motion to intervene.

## BACKGROUND

4.      FSS, was formed on November 16, 2007 as a limited liability company. Jones was its sole owner.  The Jones Chapter 7 estate, now administered by a bankruptcy trustee, holds FSS's equity interests.

5.      On July 29, 2022, FSS filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

005331

Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). (FSS Chapter 11 Subchapter V Voluntary Petition, Bankr. Dkt. 1.) Jones subsequently filed a voluntary petition for relief under Chapter 11 in the Bankruptcy Court on December 2, 2022. (Voluntary Petition of Alexander E. Jones, Jones Bankr. Dkt. 1.)

6.      The Connecticut Families are the surviving relatives of victims murdered in the Sandy Hook Elementary School shooting and one first responder. For years following the shooting, Jones lied to his legions of followers by telling them that the Connecticut Families were "crisis actors" who faked their loved ones' deaths, and urged his followers to "investigate" the Connecticut Families and the Sandy Hook shooting. Jones's followers responded by stalking, harassing, and threatening the Connecticut Families, who suffered severe emotional and reputational harm, for which they ultimately sued and secured judgments against Jones and FSS. As a result, the Connecticut Families are the largest creditors of FSS and of Jones.

7.      Specifically, the Connecticut Families hold claims totaling $1.4 billion against FSS and Jones arising from Connecticut state court judgments.[3] (Claims No. 13–16, 19–26, 32, 34–35, Bankr. Case No. 22-60043; Claims No. 7–21, Bankr. Case No. 22-33553.) While Appellants have also filed claims against FSS and Jones arising from claims they asserted in Texas state court,[4] those claims total $49.3 million in liquidated amounts to date. (Claims No. 28–31, 33, Bankr. Case No. 22-60043; Claims No. 23–25,

---

[3] *See Lafferty* v. *Jones*, Case No. UWY-CV18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court, Judgment on Verdict for Plaintiffs (Bankr. (Dkt. 509, Ex. A) (Oct. 12, 2022) and Memorandum Decision on Punitive Damages (Bankr. Dkt. 509, Ex. B) (Nov. 10, 2022).

[4] *See Heslin* v. *Jones*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas, Notice of Final Judgment (Bankr. Dkt. 382, Ex. 1) (Jan. 13, 2023) and *Pozner* v. *Jones*, Cause No. D-1-GN-18-001842, in the 261st District Court of Travis County, Texas, Amended Order on Plaintiffs' Motion to Compel and Motion for Sanctions (Oct. 15, 2021). Two of Appellants' claims have yet to be liquidated.

3

27–28; Bankr. Case No. 22-33553.)  In other words, the Connecticut Families hold 96.7% of all liquidated claims against FSS and Jones, whereas Appellants hold 3.3% of liquidated claims.

8.     Of those amounts, at least $1.115 billion of the Connecticut Families' claims are non-dischargeable claims against FSS and Jones.  (Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones, Adv. Proc. No. 23-03037, Dkt. 76.)  In contrast, $4.3 million of Appellants' claims are non-dischargeable claims against FSS and Jones.[5] (Memorandum Decision on Texas Plaintiffs' Motion for Summary Judgment Against Jones, Adv. Proc. No. 23-03035, Dkt. 46).

9.     On June 14, 2024, the Bankruptcy Court entered an order converting the Jones Chapter 11 case to a Chapter 7 case, (Jones Bankr. Dkt. 708), in which all of Jones' personal assets—including his 100% ownership of FSS—would be liquidated by a Chapter 7 trustee.  Because FSS would be an asset of the Jones Chapter 7 estate, the Bankruptcy Court entered an order dismissing FSS's Chapter 11 case on June 21, 2024.  (Bankr. Dkt. 956).  However, because the Connecticut Families raised concerns that, unless FSS's case was also converted to one under Chapter 7, a dismissal could result in a "race to the courthouse" among FSS's creditors and inequitable distributions, the Bankruptcy Court specifically authorized the transfer of control and signing authority over the FSS bank accounts to the Jones Chapter 7 Trustee (the "Dismissal Order"), so

---

[5] Jones previously moved this Court for leave to appeal the Bankruptcy Court's interlocutory decisions on summary judgment regarding non-dischargeability.  Finding that Jones did not meet the requirements for interlocutory appeal, this Court denied those motions.  *See* Minute Entry and Order, *In re Alexander E. Jones*, Case Nos. 4:23-cv-04238, 4:23-cv-04240 (S.D. Tex. June 18, 2024).

4

that they could be administered as part of Jones's Chapter 7 bankruptcy estate and through a fair and orderly process. (Bankr. Dkt. 956).

10.    At the hearing leading to the Dismissal Order, Appellants had represented to the Bankruptcy Court that they were "surprised" by the Connecticut Families' concern about a race to the courthouse, and that they intended to work cooperatively with the Connecticut Families in collecting from FSS. (Jones Dkt. 721 at 178:15–16.) Yet within *two hours* of the Dismissal Order being entered, Appellants secretly filed (i.e., without notice to the Chapter 7 Trustee or the Connecticut Families) an Application for Turnover Order and an Application for Post-Judgment Writ of Garnishment in Texas state court. (Bankr. Dkt. 957, Exs. A [the "Turnover Application"] and C [the "Garnishment Application"].)  Appellants immediately "ask[ed] that the [Texas state court] order Free Speech Systems to turn over all its nonexempt property," including money in its bank accounts, to them alone, so that Appellants—holders of 3.3% of liquidated claims against FSS—could recover 100% of FSS's assets, while the Connecticut Families—holders of 96.7% of liquidated claims against FSS—would recover *nothing*. (Turnover Application at 3, 5).    Appellants sought this turnover notwithstanding the Bankruptcy Court's Dismissal Order—entered two hours earlier—vesting control of FSS bank accounts in the Jones Chapter 7 Trustee (Dismissal Order, attached to Appellants' Turnover Application at 13).    The Texas state court granted the application and issued a turnover over approximately an hour later. (Bankr. Dkt. 957, Ex. B [the "Turnover Order"].)  If the Turnover Order were enforced, it would have resulted in Appellants recovering all of FSS's assets for their own sake, to the exclusion of the Connecticut Families.  Indeed,

5

Exhibit 6

that was the very purpose of Appellants seeking the Turnover Order and failing to give notice to the Connecticut Families.

11.     Seeking to preserve the intended framework of the Dismissal Order and ensure that FSS's assets were fairly distributed to creditors, on June 23, 2024, the Jones Chapter 7 Trustee filed an Emergency Motion in the Bankruptcy Court to, among other things, clarify the transfer of control and signing authority with respect to FSS bank accounts and for an order extending the Chapter 7 automatic stay in the case of Alexander Jones—whose estate owned and controlled FSS, through the Chapter 7 Trustee—to FSS.  (Bankr. Dkt. No. 957.)  The Connecticut Families filed a statement in support of motion, emphasizing that an orderly winddown of the FSS estate was essential for the benefit of all creditors.  (Bankr. Dkt. 959.)

12.     At a hearing on June 27, 2024, the Bankruptcy Court observed that Appellants' seeking of the turnover over clearly violated the intent of the Bankruptcy Court's Dismissal Order.  (*Id.* at 7:24–8:4 ["[I]t appears there's a conflict between what you asked for and got . . . and what I wrote in the order and what we talked about in the hearing.  And I read your motion, and I don't think you explained any of that to the state court judge."], 8:17–21 ["So I write an order turning something over to the trustee in his capacity to then determine, and for the reasons I state on the record, and then you file something on the record several hours later for the trustee to turn that over, right? Did I just get that right?"], 9:7–11 ["Because now you're requiring a Chapter 7 trustee [to turn over FSS bank accounts].  You didn't come to me.  You went to a state court who, quite frankly, had, you know – and you want a Chapter 7 trustee to comply with your – with

6

orders that potentially conflict with orders that I wrote."])   The Bankruptcy Court reiterated that the FSS bank accounts were under the control of the Jones Chapter 7 Trustee as of the original Dismissal Order.  (Jones Bankr. Dkt. 758 at 5:1–10, 17:18–23, 19:16–24.)

13.     On August 22, 2024, the Jones Chapter 7 Trustee moved the Bankruptcy Court for entry of an order authorizing the Chapter 7 Trustee to winddown FSS and sell its assets—including FSS's non-cash assets—pursuant to an auction process under Section 363 of the Bankruptcy Code.  (Bankr. Dkt. 829.)   Rather than challenge the Chapter 7 Trustee's authority to sell FSS's assets pursuant to Section 363 of the Bankruptcy Code, Appellants submitted a statement *in support* of the Jones Chapter 7 Trustee's winddown motion on September 20, 2024.  (Jones Bankr. Dkt. 850).   On September 23, 2024, the Connecticut Families submitted a statement of support as well (although noting that the pending turnover action in Texas state court was still an issue). (Jones Bankr. Dkt. 851.)   The U.S. Trustee, however, objected to the motion to authorize the winddown of FSS, interpreting the Bankruptcy Code to mean that the Jones Chapter 7 Trustee held only the equity interests in FSS, not the intellectual property or other non-cash assets to be sold through the winddown process, and not the ability to sell that property through a Bankruptcy Court-approved sale.  (Jones Bankr. Dkt. 845.)   At a September 24, 2024 hearing in connection with the winddown motion, the Bankruptcy Court stated that it would clarify its Dismissal Order by entering a supplemental order holding that control of all FSS assets vests with the Jones Chapter 7 Trustee—which the Bankruptcy Court said was the entire basis on which it had dismissed the FSS bankruptcy

7

Exhibit 6

case, rather than converting such case to one under Chapter 7. (Jones Bankr. Dkt. 861, Sept. 24, 2024 Hr'g Tr. 12:7–13:12, 26:12–28:1.)  Appellants, who appeared at that hearing, raised no objection to the Bankruptcy Court entering such an order.

14.    On September 25, 2024, the Bankruptcy Court entered the Supplemental Dismissal Order on the FSS docket.  (Bankr. Dkt. 1021).  This Supplemental Dismissal Order clarified that as of the entry of the original Dismissal Order, all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee.  *Id.*

15.    Appellants filed a notice of appeal of the Bankruptcy Court's Supplemental Dismissal Order on October 8, 2024 (Bankr. Dkt. 1028).

**ARGUMENT**

**I.    Intervention of the Connecticut Families Is Warranted**

16.    Section 1109(b) of the Bankruptcy Code provides: "A party in interest, including the debtor . . . may raise and may appear and be heard on any issue in a case under [Chapter 11]."  11 U.S.C. § 1109(b).  Federal Rule of Bankruptcy Procedure 8013(g) provides that a motion to intervene in a bankruptcy appeal "must be filed within 30 days after the appeal is docketed" and must "concisely state the movant's interest, the grounds for intervention, whether intervention was sought in the bankruptcy court, why intervention is being sought at this stage of the proceeding, and why participating as an amicus curiae would not be adequate."  Fed. R. Bankr. P. 8013(g).  The Connecticut Families submit that intervention is warranted and appropriate under Bankruptcy Rule 8013(g) for the reasons set forth below.

8

005337

17.    *Filing Within 30 Days.*    Appellants filed the Notice of Appeal in the Bankruptcy Court on October 8, 2024, which was docketed in this Court on October 11, 2024.  (Bankr. Dkt. 1028; ECF No. 1.)  This Motion is being filed timely within 30 days of docketing under Bankruptcy Rules 8013(g) and 9006 and Federal Rule of Civil Procedure 6.

18.    *Movant's Interest.*    There can be no credible dispute that the Connecticut Families have substantial legal and economic interests in the outcome of the Appeal.  As the largest unsecured creditors of FSS and of FSS's sole owner, Alex Jones, the Connecticut Families have a significant interest in the fair and orderly distribution of FSS's assets.  The Supplemental Dismissal Order was necessitated by Appellants' actions of seeking a turnover order and writ of garnishment mere hours after the entry of the original Dismissal Order in an attempt to secure all of FSS's assets for themselves, as opposed to a fair and equitable distribution to all creditors in their proportionate interests.  The reversal of the Supplemental Dismissal Order would jeopardize this process by potentially allowing Appellants to seek to arrogate FSS's assets entirely for themselves, to the exclusion of the Connecticut Families.

19.    *Grounds for Intervention.*    The Connecticut Families seek to intervene to preserve the opportunity to participate in this appeal, including filing briefs and being heard at any argument.  As the largest creditors of FSS (and of Jones), the Connecticut Families are parties in interest in the underlying bankruptcy cases pursuant to Section 1109(b) of the Bankruptcy Code.  FSS is wholly owned by the Jones bankruptcy estate, whose Chapter 7 Trustee is defending the appeal on behalf of FSS.  (Bankr. Dkt. 1035.)

9

005338

However, this appeal challenges the authority of the Jones Chapter 7 Trustee with respect to FSS's assets, and it is therefore essential for the Connecticut Families to be represented in addition to the Chapter 7 Trustee. Moreover, the Connecticut Families are one of two major creditor groups in the underlying bankruptcy proceedings. With FSS (via the Jones Chapter 7 Trustee, the sole equity owner of FSS) and the other major group (Appellants) separately represented in this appeal, the Connecticut Families should be afforded the opportunity to participate in the appeal too to preserve their interests.

20.    *Whether Intervention Was Sought in the Bankruptcy Court.* The Connecticut Families appeared and actively participated in the FSS Chapter 11 proceedings and the related bankruptcy proceedings of Jones in the Bankruptcy Court below. The Connecticut Families did not need to seek to intervene in the Bankruptcy Court because, as creditors, they were parties in interest to the proceedings with standing to participate. The Connecticut Families participated fully in all briefing and hearings leading to June 27, 2024 Dismissal Order and the September 25, 2024 Supplemental Dismissal Order at issue in this appeal, including by presenting argument and evidence at the hearing leading to the Dismissal Order.

21.    *Intervening at the Current Stage.* The Connecticut Families respectfully move to intervene at this time to preserve the opportunity to participate in all aspects of the appeal, with standing to be heard and defend their rights as significant creditors of FSS. Although the primary purpose of this appeal is to overturn the Supplemental Dismissal Order and thereby revive Appellant's effort to enforce the Turnover Order for their sole benefit (and at the exclusion of any recovery to the Connecticut Families), the

005339

Appellants somehow failed to identify the Connecticut Families as relevant parties in this appeal, and no other parties to date have sought intervention. Further, the intervention of the Connecticut Families would prejudice neither FSS nor the Appellants, as the record on appeal has not yet been transmitted to this Court, and no briefing schedule has been set.[6]

22.    *Participation as Amici Curie is Inadequate.*    Finally, it would not be adequate for the Connecticut Families to participate as *amici curiae*. The Connecticut Families have significant interests in these appeals, which would not be fully protected by participation as non-parties. Bankruptcy Rule 8017 requires leave of the court or consent of all parties for a non-party to file an *amicus curiae* brief, with such briefs facing a more restrictive page limitation (half of those allotted to parties), as well as leave of the court to be heard on oral argument. Further, *amici* do not have standing should they wish to appeal any dispositions by the Court. Given their ongoing and significant involvement in the underlying proceedings, the Connecticut Families should be permitted to participate in all aspects of this appeal as parties without the restrictions imposed on non-parties.

23.    Based on the foregoing, the Connecticut Families respectfully request that this Court grant leave for the Connecticut Families to intervene in the instant Appeal and be treated as "Appellees" for all purposes, as if originally named as such in the Notice of Appeal.

---

[6] On November 5, 2024, a notice of deficiency was issued on this docket indicating that Appellants had not yet designated the record, which had been due on October 22, 2024. (Dkt. 2.)

11

Exhibit 6

WHEREFORE, the Connecticut Plaintiffs respectfully request that the Court enter the Proposed Order permitting the Connecticut Families to intervene as Appellees in this matter.


Dated:  November 11, 2024

Respectfully submitted,

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*_____
Ryan E. Chapple (Attorney-in-Charge)
State Bar No. 24036354
SDTX Bar No. 33327
303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011

*Counsel to the Connecticut Families*


**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (*pro hac vice* pending*)*
Paul A. Paterson (*pro hac vice* pending*)*
Daniel A. Negless (*pro hac vice* pending*)*
Vida Robinson (*pro hac vice* pending*)*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990

*Counsel to the Connecticut Families*

**KOSKOFF KOSKOFF &
BIEDER PC**
Alinor C. Sterling (*pro hac vice* pending)
350 Fairfield Avenue
Bridgeport, Connecticut 06604
Telephone: (203) 336-4421

*Counsel to the Connecticut
Families*

12

005341

Exhibit 6

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on November 11, 2024.

*/s/ Ryan E. Chapple*_____
Ryan E. Chapple

005342

Exhibit 6

## CERTIFICATE OF WORD COUNT

This document complies with the word limitation set forth in the Court Procedures of the Hon. Charles R. Eskridge III because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 2,831 words

/s/ Ryan E. Chapple
Ryan E. Chapple

005343

Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re | |
| Free Speech Systems, LLC, | Case No. 4:24-CV-03882 |
| Debtor, | (Appeal in Bankr. Case No. 22-60043 (CML)) |
| Neil Heslin, et al, | |
| Appellants. | |

## STIPULATION OF VOLUNTARY DISMISSAL OF APPEAL
## PURSUANT TO FED. R. BANKR. P. 8023(a)

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (the "Appellants") and Appellees Christopher R. Murray solely in his capacity as chapter 7 trustee of the bankruptcy estate of Alexander E. Jones and sole owner of Free Speech Systems LLC, William Aldenberg, Erica Ash, Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Robert Parker, William Sherlach, Carlos M. Soto, Donna Soto, Carlee Soto Parisi, Jillian Soto-Marino, David Wheeler, and Francine Wheeler (collectively, the "Appellees," together with the Appellants referred to herein as the "Parties") hereby enter into this Stipulation and agree as follows:

1. Appellants wish to voluntarily dismiss this Appeal pursuant to Federal Rule of Bankruptcy Procedure 8023(a).

005344

Exhibit 7

2.      Appellees do not oppose dismissal of this Appeal.

3.      The Parties agree that each shall bear their own respective costs, fees, and expenses, including all attorneys' fees, incurred in connection with this Appeal.

4.      Federal Rule of Bankruptcy Procedure 8023(a) provides that "[t]he clerk of the district court . . . must dismiss an appeal if the parties file a signed dismissal agreement specifying how costs are to be paid and pay any fees that are due."

5.      Pursuant to Federal Rule of Bankruptcy Procedure 8023(a), the Parties submit this Stipulation requesting the voluntary dismissal of the above-captioned appeal.

Respectfully submitted this 6th day of May 2025.

| | |
|---|---|
| */s/ Erin E. Jones* | */s/ Jennifer J. Hardy* |
| **JONES MURRAY LLP** | **WILLKIE FARR & GALLAGHER LLP** |
| Erin E. Jones (TX 24032478) | Jennifer J. Hardy |
| 602 Sawyer St., Suite 400 | State Bar No. 24096068 |
| Houston, TX 77007 | 600 Travis Street |
| Telephone: (832) 529-1999 | Houston, TX 77002 |
| Fax: (832) 529-3393 | Telephone: (713) 510-1766 |
| E-mail: erin@jonesmurray.com | Fax: (713) 510-1799 |
| | E-mail: jhardy2@willkie.com |
| **PORTER HEDGES LLP** | |
| Joshua W. Wolfshohl (TX 24038592) | **WILLKIE FARR & GALLAGHER LLP** |
| 1000 Main Street, 36th Floor | Stuart R. Lombardi (*pro hac vice* forthcoming) |
| Houston, Texas 77002 | 787 Seventh Avenue |
| Telephone: (713) 226-6000 | New York, NY 10019 |
| Fax: (713) 228-1331 | Telephone: (212) 728-8000 |
| E-mail: jwolfshohl@porterhedges.com | Fax: (212) 728-8111 |
| | E-mail: slombardi@willkie.com |
| ***Co-Counsel for Christopher R. Murray, Chapter 7 Trustee*** | |
| | |
| */s/ Ryan E. Chapple* | **LAWSON & MOSHENBERG PLLC** |
| **CAIN & SKARNULIUS PLC** | Avi Moshenberg |
| Ryan E. Chapple (TX 24036354) | |

- 2 -

005345

Exhibit 7

303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011
E-mail: rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER PC**
Alison C. Stirling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail: asterling@koskoff.com

**PAUL WEISS, RIFKIND WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Paul A. Paterson (admitted *pro hac vice*)
Daniel Negless (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: kkimpler@paulweiss.com
E-mail: ppaterson@paulweiss.com
E-mail: dnegless@paulweiss.com
E-mail: vrobinson@paulweiss.com

*Co-Counsel to the Connecticut Plaintiffs*

State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone: (713) 449-9644
E-mail:
avi.moshenberg@lmbusinesslaw.com

**BRADLEY ARANT BOULT CUMMINGS LLP**
Jarrod B. Martin
State Bar No. 24070221
600 Travis Street, Suite 5600
Houston, TX 77002
Telephone: (713) 576-0388
Fax: (713) 576-0301
E-mail: jbmartin@bradley.com

*Co-Counsel to the Texas Plaintiffs*

- 3 -

005346

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on May 6, 2025.

/s/ Jennifer J. Hardy
Jennifer J. Hardy

005347

Exhibit 8

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES AND          )  CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF       )
UNSECURED CREDITORS,            )  Houston, Texas
                                )
         Debtors.               )  Wednesday, February 5, 2025
                                )
                                )  9:00 AM to 9:26 AM
--------------------------------)


                             HEARING

         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones:  SHELBY JORDAN
                         ANTONIO ORTIZ
                         Jordan & Ortiz, PC
                         500 N. Shoreline Blvd.
                         Corpus Christi, TX 78401

                         BEN BROOCKS
                         WILLIAM BROOCKS
                         Broocks Law Firm PLLC
                         6207 Bee Cave Road, Suite 120
                         Austin, TX 78746

For Chapter 7 Trustee:   JOSHUA WOLFSHOHL
                         KENESHA STARLING
                         JORDAN STEVENS
                         Porter Hedges LLP
                         1000 Main Street
                         Houston, TX 77002

                         CHRISTOPHER R. MURRAY
                         ERIN JONES
                         Jones Murray LLP
                         602 Sawyer Street
                         Houston, TX 77007

Exhibit 8

For Connecticut
Families:                 KYLE KIMPLER
                          PAUL PATERSON
                          Paul Weiss Rifkind Wharton &
                          Garrison LLP
                          1285 Avenue of the Americas
                          New York, NY 10019

                          RYAN CHAPPLE
                          Cain & Skarnulis PLLC
                          303 Colorado Street
                          Austin, TX 78701

For Texas Plaintiffs:     AVI MOSHENBERG
                          Lawson & Moshenberg PLLC
                          801 Travis Street
                          Houston, TX 77002

                          JARROD MARTIN
                          Chamberlain Hrdlicka White Williams
                          & Aughtry, P.C.
                          1200 Smith Street, Suite 1400
                          Houston, TX 77002

                          JENNIFER HARDY
                          Willkie Farr Gallagher LLP
                          600 Travis Street, Suite 2310
                          Houston, TX 77002

Court Reporter:           UNKNOWN

Courtroom Deputy:         UNKNOWN

Transcribed by:           Veritext Legal Solutions
                          330 Old Country Road, Suite 300
                          Mineola, NY 11501
                          Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

005349

HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 5, 2025; 9:00 AM

(Call to Order)

THE COURT:  -- 9:00 a.m. case, Alex Jones.  Why don't I take appearances in the courtroom and then we'll get started.

MR. WOLFSHOHL:  Good morning, Your Honor.  Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens from Porter Hedges, for the Trustee.  And Mr. Murray is here as well --

THE COURT:  Okay.  Good morning.

MR. WOLFSHOHL:  -- as well as co-counsel --

MS. JONES:  (indiscernible)

MR. WOLFSHOHL:  -- Erin Jones.

THE COURT:  Good morning.

MR. JORDAN:  Your Honor, Shelby Jordan and Antonio Ortiz, co-counsel, along with Mr. Ben Broocks and Mr. William Broocks, here in the courtroom today.

THE COURT:  Good morning.

MR. JORDAN:  And that's -- I'm sorry -- co-counsel for Mr. Jones.

THE COURT:  Yes, thank you.

MR. KIMPLER:  Good morning, Your Honor.  Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families.  I'm joined by my partner, Mr. Paterson, and on the screen, Mr. Ryan Chapple.

THE COURT:  Good morning.  Oh, I should turn my

005350

Exhibit 8

camera on.  I apologize.

MR. MOSHENBERG:  Good morning, Judge.  Avi Moshenberg, here on behalf of the Texas Plaintiffs.  Also with me is Jarrod Martin and Jennifer Hardy, Your Honor.

THE COURT:  Good morning.  Anyone else wish to make an appearance?  Okay.  Here on the 9019 settlement, and I know that there are some related motions that we should talk about.

MR. JORDAN:  Your Honor, if I might?

THE COURT:  Sure.

MR. JORDAN:  Shelby Jordan.  We have made -- we being the Alex Jones team of lawyers, two firms and lawyers that have been very, very busy -- we've made every effort we possibly could to get a grasp on what has turned out to be a very, very complex matter that could, if we are not careful, be a case dispositive motion.  We could walk out today and have nothing to show for the values of the appeal or for other matters that --

THE COURT:  Let me -- let me stop.  I've studied this 9019 over the past several days very carefully.  I know we had a status conference and I knew that there were some discovery-related issues.

The Free Speech case originally started as a Subchapter IV -- was originally a lawyer and CRO.  I find professionals -- I thought there was a conflict between

005351

Exhibit 8

those professionals and the Jones estate, so I didn't approve them.  Then came in another set of lawyers and another CRO.  The two cases, the Jones case, the Free Speech case, proceeded on a track, side-by-side track basis.

We held the hearings on the non-dischargeability claims in the Jones case.  Non-dischargeability claims were put in abeyance in the Free Speech case because the Fifth Circuit had agreed to take up the issue.  The Fifth Circuit ruled.  They got it exactly right.  It's exactly what I would have ruled.  But theirs is more important.  So we were left with the summary judgment in the Jones case.  Never really took it up in Free Speech.

There were a couple of other adversary proceedings, some related Texas parties who never had their day in front of me.  Parties, Texas families, a group of them, and Connecticut families were in mediation with other parties.  I know the Jones folks were there.  I know Free Speech was there a while, about a year.  Nothing came of it.  There was a 9019.  But then it was contingent upon approval of a plan that never happened for the 90 -- that went away.  But I was prepared to approve that.

The case had been going on for about two years.  Then they went to mediation again before another judge in another district.  That was unsuccessful.  Mediation sometimes work; they don't.  My point is that people have

005352

Exhibit 8

been trying to consensually resolve these issues for two years, and it didn't happen.  And the Free Speech case could have either converted or been dismissed.  But it couldn't hang out in Chapter 11 because there was no way it was going to be able to confirm a plan.

And to say that they stretched -- and I allowed it to happen -- stretched the limits of Subchapter V and what it was intended to do is an understatement in terms of timing; not in terms of ruling, but in terms of timing to get a plan on.  But people were mediating.  And I thought it made sense that if people were going to try to reach a deal, if you were going to put together a plan and this all worked out, then I didn't want to put my thumb on the scale.  So, ultimately, I made a decision to dismiss the Free Speech case.

We were left with the Jones case.  But I retained -- I told Murray he could keep -- Mr. Murray, the Chapter 7 Trustee appointed then in the Jones case, because the Jones case converted as well -- keep the cash from Free Speech in the bank accounts, and kept two adversary proceedings, one involving PQPR, another one involving Elevated Solutions Group.  No professionals started coming to me.  I don't know if it's true or not, but anyway.

But Texas families were able to try to collect on their judgment against Free Speech.  They had rights given

Exhibit 8

by a Texas court, I think even going after some of the Free Speech professionals who were working to preserve the estate.

When it came time to potentially sell assets, Mr. Murray and his counsel told me that they think that the real way to maximize value is to sell stuff, and not just the equity. They wanted the opportunity to go do this, and they thought they could do this by an auction.

They had, over an objection of the United States Trustee, told me just let them sell the equity. I entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets. That's what that order was intended to do. The supplemental dismissal order was just to make sure, because that was the request.

We had the auction process. I won't recount what happened, but I didn't approve the proposed sale. I had a – – I think the evidence is clear -- a backup bidder at the beginning. We didn't even know what the winning bid was. I had an auctioneer who got on the stand and didn't even know what he was going to get paid, or under what terms he was going to get paid.

I had a winning bid that was clearly based on a contingency. There was a sliding scale in the agreement. The proposed order submitted originally had the very language showing it was a contingency. And the Trustee was

Exhibit 8

telling me that it wasn't a contingency.  That was his understanding.

So I was asked to approve a sale that had a contingency clearly in it, but was told to act like there wasn't a contingency, upon a sale price that no one really could articulate, because depending on how you took it as a contingency or not a contingency.  And we couldn't figure out exactly what the auctioneer was even going to get paid, because I don't even think he knew.

I then denied that auction.  We were here until, what, 10:30 that night?  So I didn't want -- and then I asked -- this case has been going on, I said -- I gave some (indiscernible) speech, told them it's been going on for like three years, and let's just get this back on track, get back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families.  I think that matter is still pending.

MR. JORDAN:  It is, Judge.

THE COURT:  I lose jurisdiction over that immediately.

MR. JORDAN:  It's still -- it is still pending.

THE COURT:  But I think the appeal was something like, Judge, you can't do that, was the basis of the appeal. I don't have authority to go vest the property of the estate.

005355

Exhibit 8

So the sale didn't happen, and I said, I don't want any more contingencies.  If there's going to be a sale of assets, then cash will be king.  But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

I also said the sale price was low.  Turns out there's been an offer made since that day, which almost doubles the amount that was -- increased the offer by a week.  A week, like it was there.  That's fine.  Then if things get -- I told folks, if you want to sell it, cash will be king.  Get back to doing just -- you want to sell the equity?  Sell the equity, but cash will be king.

I took up the motion for reconsideration filed by the Connecticut families.  I know that the Jones side has a motion for reconsideration pending that will run its own course.  But as things sit today, as I see them -- I could be wrong -- no, I'm not wrong on this, and maybe just slightly off on the numbers -- but I know that the Connecticut court has -- in Appellate Connecticut court, a second level of revision has taken some of the (indiscernible) amounts.  And now that's subject to further appeal, and parties will appeal.

I haven't denied anyone any ability to pursue. Jones was able to hire his own lawyers.  Connecticut family

005356

was able to pursue those judgments.  My non-dischargeability order in the Jones case kind of has a mechanism saying, this is what I found based on summary judgment, based on the collateral estoppel of the findings made in the Connecticut court.  The Connecticut court ultimately finds that X is the number, will then kind of compare it to what I did, and there's a kind of an adjustment so that I'm not allowing any more than a Connecticut court would have allowed.

Same thing for Texas.  I think there was a portion that I didn't approve for Texas, I know, and for Connecticut as well, that I didn't find -- I didn't think there were basis for collateral estoppel findings, and appellate courts will review what I did, and that's the way the process works.  I've got no issues with that.

So that's where things stand.  I don't know, around a billion dollars for Connecticut right now, subject to further appeal, non-dischargeable.  Around $50 million for Texas, subject to further appeals.  The numbers could stay the same, numbers could be zero, numbers could go up. I don't know.  It's all subject to state court appeals now.

But FSS, that estate is closed.  That case is closed.  That case is closed.  Which means that someone has a contract dispute with FSS.  You don't come to me.  You have whatever rights you have outside the bankruptcy.  The bankruptcy doesn't affect your claims one way or the other.

005357

Exhibit 8

There were several individuals who had a case. They were suing Jones in Texas state courts. They can continue their trials in state courts. There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have.

I already said, multiple years to try to reach a settlement, and they didn't. And I'm not saying anybody should have settled. I don't get into why people settle and don't settle. Not my purview. I'm there to evaluate settlements and determine whether they're in the best interest of the estate. That's my job.

So, kind of where we are. Several years of negotiating, no settlement, no plan. FSS gets dismissed. Failed auction. Now there's a 9019. The 9019 now wants me to allow claims against FSS. And I don't -- and I can't do that. And all bankruptcy lawyers know that I can't do that. Because there's no estate. There's no bankruptcy estate to allow a claim against. People can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me.

005358

Exhibit 8

So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech.  And now the Texas families are saying that the matter that they very much appealed, they're now embracing.  The supplemental order is now embraced.

The Trustee who asked me for a specific order for a specific purpose is now using that order.  But it was only for one purpose, to see if he could sell the assets.  To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it.  Ha Nguyen was here.  The U.S. Trustee was sitting right there telling me.

So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed.  I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

And here we are again.  Before we would pit the families against each other, where Connecticut and Texas would disagree on whether the form of relief being requested was appropriate.  Happened during the auction too, where Texas said, I don't understand what we're doing here and I don't understand how this is going to work.

So, now I'm told we're all aligned and you just -- Lopez, just have to allow a claim against an entity in a case that's been dismissed.  I can't do that.  I cannot do that.  I don't have authority to do it.  And I'm not going

005359

Exhibit 8

to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone.  I'm very much inclined to vacate that order because it serves no purpose.  I'm not allowing a sale of the assets anymore.  Pure sale of the equity.

We're going to -- I've got to -- this case keeps taking twists and turns and trying to come up with really masterful and creative lawyering.  But at its core, it's something I can't approve.  Would come -- you know...

And so, I know...  I read the revised settlement. Read the revised order.  Bankruptcy lawyers know I can't do this unless we get really, really, really creative.  And I think on a case like this, we've got -- with multiple appeal, any party, regardless of what I do, people have their rights.

So, before everyone gets started, let me just tell you, I can't do this.  I'm going to again turn to Mr. Moshenberg and tell him, you'd better -- I need you to tell me what you want to do on your -- this non-dischargeability action.

I know that there's a pending motion in the other one.  I've now approved the two matters in which there's 9019s and the two settlement matters.  Money's going to go out the door.  You don't have to tell me now.  I want you to file something and tell me exactly what you all are going to

005360

do.

MR. MOSHENBERG:  Understood, Your Honor.

THE COURT:  And just play it down the line, in other words.  People have rights and I'm not telling you to put you on the spot or anything, I just know.

Mr. Murray, if you want to sell the equity, go sell the equity.  This case -- people have rights and they've been...  If you want to go pursue claims against Jones in state court against Free Speech, I don't -- I dismissed the case and I know what comes along with that.  Those arguments were made to me and I know what they are.

No, you don't have to say anything.  I know what the rights are.  And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  I don't trust the process.  I would have to do it -- me, myself -- and I'm not overseeing it.

So kind of get comfortable with the process so that we don't kind of do the same thing.  We've already did it really long and complicated and brought in auctioneers and had lots and -- enough has been -- and I think what this Debtor needs and what these families need is finality of the bankruptcy process so that they can pursue whatever it is that they want in judgments in state court, which is where they started in the 1st place; Connecticut, Texas, for the

005361

Exhibit 8

most part.  I know that there's some other litigation pending out there.

I just -- I don't have the ability to allow a claim against an entity.  And in a case that has been dismissed in which I literally gave specific authori- -- you keep the cash; we're going to keep these two adversaries.  I'm going to settle these.  I'm going to keep jurisdiction over these two things and this one.  And I'm not going to do it for anything else.

I can't use the supplemental order to then go -- for a purpose in which it was never intended.  And I get to construe my own orders and I retain jurisdiction over them.  This case will be highly simplified.  And I know Mr. Wolfshohl said he's been listening to these transcripts carefully.  I made it super simple for you this time.

There will be -- I don't know.  Someone has a case, bring it.  There have been multiple years of investigations.  No lawsuits have been (indiscernible) in front of me.  Maybe one is coming.  I don't know.  If it does, we'll take it up and I'll rule.

I'm not sure anybody's ever been happy about -- completely set in my rulings.  I'm not sure Mr. Jones has been entirely happy to know that I found on summary judgment that he's liable for over a billion dollars in non-dischargeable debt and over $49 million dollars.  I'm sure

he -- appealing -- he is appealing.  And that's his right.

So, I'm sure the Connecticut and the Texas family -- I'm sure the Connecticut families weren't too happy about my decision about the auction.  Sure Global Tetrahedron wasn't too happy about it.  But I'm really trying to do what I think is my duty and my job upon careful analysis of the law.

And so I'm not approving.  I cannot on its face.  You don't have to put on any evidence.  I can't approve this sale.  I can't allow $480 million dollars.  And I don't want folks to put it up.  And we don't need to take up TROs and Connecticut and Texas.

Texas, you have whatever rights you have.  Connecticut, you have whatever rights you have against Free Speech, case against Jones.  If you want to have another -- if you want to settle with the Trustee on Jones related matters, do it.  Tee it up.  We'll take it up.  But these things are inextricably linked and multiple appeals going on.  Well, I don't know if they're still going on.  They probably will on the non-dischargeability front, by the way.  You have whatever rights you have on the supplemental order.

MAN 1:  Judge, if I could comment --

THE COURT:  Won't be used again.  No, no, no.  I don't need you to comment on anything.  I don't -- because it's going to open the door.  I just wish everyone a good

005363

Exhibit 8

day.  Thank you.

CLERK:  All rise.

(Whereupon these proceedings were concluded at 9:26 AM)

I N D E X

RULINGS

|  | Page | Line |
|---|---|---|
| Motion to Approve Sale, Denied | 16 | 8 |

I N D E X

005365

Exhibit 8

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  February 6, 2025

005366

08/13/2025 03:31:55 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835

Exhibit 9

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS,<br>Plaintiffs | § <br> § <br> § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| Defendants | § | 261st JUDICIAL DISTRICT |

## ORDER GRANTING APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTOR FREE SPEECH SYSTEMS, LLC

The Court has considered Judgment Creditors' Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Free Speech Systems, LLC (the Application) and the record properly before it.

**The Court FINDS that** it has jurisdiction over this proceeding and can proceed in granting the relief set forth herein immediately. *See* TEX. CIV. PRAC. & REM. CODE 31.002.

**The Court also FINDS that** the judgment in Cause No. CV-18-6046437 rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut (the Connecticut Families' Judgment) is valid, final, and payable. Judgment Debtor Free Speech Systems, LLC owes, jointly and severally, $1,288,139,555.94 under the Connecticut Families' Judgment. There have been no applicable credits, payments, or offsets.

**The Court also FINDS that** the Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's

005367

opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act.

**The Court also FINDS that** Judgment Debtor Alexander E. Jones (also referred to in this Order as Alex E. Jones and Alex Jones) filed for bankruptcy under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) on December 2, 2022 (the Jones Petition Date) in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) pending as case no. 22-33553 (the Jones Bankruptcy Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy. Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 19, 2023 Memorandum Decision granting the Connecticut Families' Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable. Following a hearing on June 14, 2024, the Bankruptcy Court converted the Jones Bankruptcy Case from chapter 11 to chapter 7 and appointed Christopher R. Murray as chapter 7 trustee (the Trustee) for the applicable chapter 7 bankruptcy estate (the Chapter 7 Estate).

**The Court also FINDS that** the Judgment remain unsatisfied; that Judgment Debtor Free Speech Systems, LLC owns property that is not exempt from attachment, execution, or seizure for the satisfaction of the Judgment; and that Judgment Creditors are entitled to the Court's aid in reaching Judgment Debtor's nonexempt property to satisfy the Judgment.

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

    (i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

In this Order, the definition of "Turnover Property" also includes all additional and specific property or assets of any kind covered by the ordering paragraphs below. Judgment Creditors reserve all rights they may have to execute upon the Judgment in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtor.

**The Court also FINDS that** the Judgment is final and remain unpaid. Based on the entire record, including the Application and evidence attached that is admitted in support of the Application, **the Court FINDS that** the Application should be granted.

It is therefore **ORDERED** that the Application is **GRANTED**, and Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (Receiver) is appointed under Texas Civil Practice and Remedies Code § 31.002 with authority to take possession of all the Turnover Property, sell the Turnover Property, and pay the proceeds to Judgment Creditors to the extent required to satisfy the Judgment. The Turnover

Property may include but is not limited to financial accounts, certificates of deposit, cryptocurrency accounts, and money-market accounts held by a third party. Notwithstanding anything in this Order to the contrary, nothing in this Order shall authorize any party, including the Receiver or Judgment Creditors, to take any action that would be inconsistent with the pending Jones Bankruptcy Case, including seeking any relief with respect to assets that constitute property of the Chapter 7 Estate unless approved by the Bankruptcy Court.

1. **Receiver's Information.**

    Name: Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (HMP)

    Address: 8911 North Capital of Texas Highway Suite 2120 Austin, Texas 78759

    Telephone Number: (512) 892-0803

    Email Address: gmilligan@harneypartners.com

2. **Custodia Legis**. The entry of this Order creates a receivership estate wherein all of Judgment Debtor's respective Turnover Property shall be held in *custodia legis* by the receivership as of the date of this Order. The receivership owns all Turnover Property regardless of whether Receiver takes actual possession of the property. The Receiver may decline to collect or abandon any Turnover Property the Receiver determines, in his sole discretion, to be burdensome, cumbersome, or of *de minimis* value. The Receiver is authorized to raise any issue with the Court, to request and to meet *in camera* with the Court without notice, and to file any motion (in this Court, the Bankruptcy Court, or any other applicable court) the Receiver deems appropriate.

Exhibit 9

3.    **Turnover**. The Judgment Debtor shall turnover to Receiver all Turnover Property, including all documents related to such property, **within five days** of the Judgment Creditors service of a copy of this Order on the Judgment Debtor or its counsel. All third parties in possession of any Turnover Property that is subject to any Judgment Debtor's control shall turnover such property to Receiver within five days of being served notice of this Order.  The turnover by Judgment Debtor shall include at least the following documents (for the period of at least the preceding 48 months from the date of this Order, except where otherwise indicated): (1) canceled checks; (2) bank statements, pass books, and other bank or financial institution records; (3) federal income and state franchise tax returns; (4) life insurance policies (regardless of date); (5) all motor vehicle Certificates of Title (regardless of date); (6) stock certificates and bonds (regardless of date); (7) promissory notes (regardless of date); (8) bills of sale (regardless of date); (9) real property deeds and deeds of trust (regardless of date); (10) business journals, ledgers, accounts payable and receivable files; (11) pledges, security agreements and copies of financial statements; (12) state sales tax reports; (13) any other record or document evidencing any ownership to real or personal property or to any debt owed or money had (regardless of date); (14) trust documents for which the Judgment Debtors are a beneficiary (regardless of date); (15) all personal property returns filed with any taxing authority, including but not limited to any central appraisal district or tax assessor/collector; and, (16) credit applications and other documents stating the Judgment Debtor's financial condition; (17) cryptocurrency wallets, records, and access codes (regardless of date); and (18) all documents listing or summarizing property owned by the Judgment Debtor (regardless of date).

4.      **Continuing Effect of Order.** Judgment Debtor and all others holding Turnover Property shall continue to immediately turnover to Receiver such property when received, until all amounts due under the Judgment and this Order are paid in full.

5.      **Receiver's Powers.** Receiver has the authority to take possession of all of Judgment Debtor's Turnover Property, sell such property, and pay the proceeds to the Judgment Creditors to the extent required to satisfy the Judgment. Receiver's authority applies, but is not limited, to all Turnover Property including: (1) all documents or records, including financial records, related to property that is in the actual or constructive possession or control of the Judgment Debtor; (2) all financial accounts (bank account), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; (10) shares, stock and membership interests; (11) trusts, (12) domains, (13) accounts receivable; and (14) cryptocurrency accounts or wallets. Receiver is not required, but may in his sole discretion and is hereby empowered, to defend or prosecute any litigation regarding the Judgment Debtor that is not property of the Trustee, including, without limitation, claims to recover assets fraudulently transferred, conveyed, or assigned that would increase the size of the receivership estate. Receiver's powers include the following, although he has no requirement to necessarily exercise such powers as to the Turnover Property: (1) collect all accounts receivable of the Judgment Debtor; (2) change locks to all premises at which any property is situated; (3) endorse and cash all checks and negotiable instruments payable to the Judgment Debtor, except paychecks for current wages; (4) hire a real estate broker to sell any real

Exhibit 9

property and mineral interest belonging to the Judgment Debtor; (5) hire any person or company to move and store the property of the Judgment Debtor; (6) insure any property belonging to the Judgment Debtor; (7) obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Judgment Debtor; (8) obtain local, state and federal tax records of the Judgment Debtor; (9) obtain from any landlord, building owner or building manager where the Judgment Debtor or the Judgment Debtor's business is a tenant copies of such Judgment Debtor's lease, lease application, credit application, payment history and copies of such Judgment Debtor's checks for rent or other payments; (10) hire any person or company necessary to accomplish any right or power under this Order; (11) take all actions necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of the Judgment Debtor may be situated, and to review and obtain copies of all documents related to same; (12) obtain all records of ownership of real properties, personal properties or motor vehicles of the Judgment Debtor in the possession of any County Tax Assessor/Collector or Central Appraisal District, including any records of payments made or correspondence; (13) obtain all records pertaining to the Judgment Debtor from any provider of utilities, telephone service, cell phone service; (14) obtain credit reports on the Judgment Debtor from any Consumer Reporting Agency as defined by Fair Credit Report Act pursuant to 16 USC § 1681B(a)(1); (15) exercise control over any website of the Judgment Debtor and direct the administrator or web server to allow Receiver full access to the management of the website; (16) obtain from any creditor of the Judgment Debtor (including mortgage companies) copies of such Judgment Debtor's credit application, payment history and copies of each such Judgment Debtor's checks for payments; (17) obtain from any person or entity that compensates the

005373

Judgment Debtor, including commissions, an itemization of all such compensation for the past 12 months from the date of Receiver's request and as well as any compensation anticipated in the forthcoming six month period from the date of Receiver's request; and (18) certify copies of this Order. The Receiver shall not reduce or eliminate by agreement with the Judgment Debtor or otherwise compromise or settle the outstanding balance owed to Judgment Creditors by Judgment Debtor under the Judgment without the written consent of Judgment Creditors.

6.   **Injunction**. The Judgment Debtor, and all its directors, officers, managers, members, investment advisors, accountants, attorneys, professionals, trustees (other than the Trustee) and other agents, successors, or assigns, and any third party with notice of this Order are hereby ordered and enjoined not to take any action to sell, encumber, dispose of, transfer, waste, retain, or in any way exercise control over the Turnover Assets except as expressly provided by this Order or upon instructions in writing from the Receiver.

7.   **Duties of Law Enforcement**. Any Sheriff, Constable or Officer of the Peace shall assist the Receiver in carrying out his duties and exercising his powers under this Order and prevent any person from interfering with Receiver in taking control and possession of the Turnover Assets.

8.   **Sales of Real Property Require Notice**. Any sale of real property by Receiver requires the approval of this Court, after notice and opportunity for hearing being provided to Judgment Debtor and any lien holder on such real property.

9.   **Receiver's Bond**. The Receiver shall pay a $500.00 bond.

---

ORDER REQUIRING TURNOVER AND APPOINTING RECEIVER                                    PAGE 8 OF 12

005374

10.    **Receiver's Oath.** Receiver must file an oath to perform his duties faithfully before acting under this Order and this Order is not effective until such an oath is filed.

11.    **Receiver's Fee.** Without further application, notice, or order of the Court, the Receiver shall set aside as potential receiver's fees an amount equal to 25% of all gross proceeds coming into his possession from any source (before deducting expenses) which the Court finds is a customary and usual fee for a post-judgment turnover receiver. Within five days of the entry of this Order, the Judgment Creditors shall pay the sum of $10,000 to the Receiver as an advance on his fees. The advance is fully earned and the Receiver may take it into income, and will repay the advance to the Judgment Creditors from the first $10,000 of Receiver's fees earned from the collection of Turnover Property. Receiver's fees and expenses are taxed as costs against Judgment Debtor, and as costs, such fees and expenses are in addition to amounts owed under the Judgment. Receiver shall distribute the remaining net proceeds from Turnover Property coming into his possession, after withholding 25% in possible Receiver's fees and all expenses and reserving from distribution any funds the Receiver determines in his sole discretion are needed to pay potential future expenses, to the Judgment Creditors at the Judgment Creditors' direction. No receiver's fees shall be paid to Receiver unless an application is filed with and ruled by the Court.

12.    **Receiver's Expenses.** Without further application, notice, or order of the Court, the Receiver may incur and shall pay from the proceeds of Turnover Property all reasonable and necessary expenses of the Receiver and the receivership estate up to the amount of $20,000.00 (the Expense Cap). The Receiver may raise the Expense Cap either (1) without further order of the Court upon the written agreement of the Judgment

Exhibit 9

Creditors, including by email with counsel, or (ii) with Court approval after application to the Court with notice to the Judgment Creditors. The Receiver must provide an accounting or receipts of any reasonable and necessary expenses to the Court upon request. The Receiver's and receivership estates' reasonable and necessary expenses will be taxed as costs against Judgment Debtor, and Receiver may collect those expenses from Judgment Debtor in addition to the amount collected to satisfy the Judgment.

13. **Employ Professionals**. With Court approval, the Receiver may retain and reasonably compensate, in Receiver's collection agents, counsel, financial advisors, accountants, brokers, auctioneers, independent contractors, technical specialists, and other professionals and agents to assist in his duties as Receiver on such terms as the Receiver deems appropriate (the Receiver Personnel). For avoidance of doubt, the Court hereby approves the Receiver's retention of HMP as Receiver Personnel with the compensation for HMP provided Receiver Personnel already included in the Receiver's fee provided in paragraph 11 of this Order; *provided however*, the Receiver may, upon separate application and order of the Court, employ HMP provide Receiver Personnel on different compensation terms.

14. **Limitation on Liability**. The Receiver, HMP, and Receiver Personnel, and their officers, members, managers, directors, partners, employees, agents, and professionals (together, the Protected Personnel) shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver and Receiver Personnel are entitled to rely, in good faith, on the advice of employed professionals, the Judgment Creditors' counsel, and on information provided by the Judgment Debtor and its books,

005376

records, and its past and present officers, directors, agents, members, managers, trustees, accountants, and employees and Judgment Debtor's counsel without audit. The Receiver and Receiver Personnel are entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Protected Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Receiver Personnel, including compliance with applicable law governing the collection of debt, nor shall the Protected Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of gross negligence, willful misconduct, malicious acts, and the failure to comply with this Court's orders.

15.    **Indemnity**. The Protected Personnel are hereby indemnified by the Turnover Property to the fullest extent permitted under the law from any cause of action or claim related to any act or omission in connection with, relating to, or arising out of the Receiver's or Receiver Personnels' duties as Receiver, except for claims related to any act or omission that is determined in a final order to have constituted gross negligence, willful misconduct, or malicious acts. The Protected Personnel are entitled to advances from the Receiver and Turnover Property, including from any reserved funds, to cover actual and reasonably anticipated expenses of defending any action threatened against or brought against the any Protected Personnel as a result of any act or omission, actual or alleged, in their capacity as such, or in any way related to or arising from the Judgment Debtor, Judgment Debtor's property, Turnover Property, or the Judgment. A Protected Personnel must return specific advances under this paragraph upon a final order by the Court finding that the Protected Personnel is not entitled to indemnification under this Order.

Exhibit 9

16.     **Attorney's Fees**. Judgment Creditors' reasonable attorney's fees will be taxed as costs against Judgment Debtor. In carrying out his duties under this Order, the Receiver may use the Judgment Creditors' counsel and rely on legal advice and representation provided to him by the Judgment Creditors' counsel.

17.     **Exempt Property**.  Nothing in this Order shall be construed to apply to exempt property, if any, of Judgment Debtor, or any property of the Chapter 7 Estate (expect up approval of the Trustee or Bankruptcy Court). For avoidance of doubt, (i) the Bankruptcy Court has jurisdiction to decide any dispute as to what constitutes property of the Chapter 7 Estate; and (ii) this Court has jurisdiction to decide any claim by the Judgment Debtor that property should be treated as exempt under this Order and any claim by the Receiver or Judgment Creditors that any property is Turnover Property and not protected by any exemption asserted by Judgment Debtor.

18.     **Retention of Jurisdiction**. This Court shall have and retain exclusive jurisdiction over: (i) the implementation and enforcement of this Order; (ii) the acts and conduct of the Receiver and any actions brought against the Protected Personnel by any person or entity in connection with this Order.

ISSUED AND SIGNED on __August 13, 2025__.


_____
JUDGE PRESIDING

**EXHIBIT**

**8**

Alexander E. Jones; 22-33553

exhibitsticker.com

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

---

**PLAINTIFFS' REPLY IN SUPPORT OF CHALLENGE TO NET WORTH DECLARATION AND MOTION FOR SANCTIONS FOR FALSE AND FRIVOLOUS PLEADING**

---

Defendants' counsel seek to convince the Court to ignore a bankruptcy ruling by alleging a lack of jurisdiction, or alternatively, convince the Court that Judge Lopez actually granted their request for reconsideration, or alternatively, convince the Court that an error in editing the proposed turnover order has now revived Judge Lopez's supplemental order. As shown below, each of these arguments is frivolous and made in bad faith.

**ARGUMENT**

**I.    An Errant Citation in the Proposed Order does not Revive Judge Lopez's Supplemental Order.**

Defendants' counsel claims that the Supplemental Order is in force because the order submitted by Plaintiffs and Intervenors "specifically recites the Supplemental Order." (Def. Resp., p. 2). Defendants' counsel seek to exploit what they know is a citation error in editing the order. Some background is useful.

When dismissing the FSS bankruptcy case in June 2024, Judge Lopez included an order -- which everyone agrees is still in force -- giving the Chapter 7 trustee signing authority

005379

over FSS' bank accounts and the power to dispose of its assets for the benefit of creditors.[1] This order was made at the request of the Texas and Connecticut families, who were concerned that Alex Jones may dissipate FSS assets before those assets could be liquidated.

A few months later, in September 2024, Judge Lopez issued his Supplemental Order for the sale of assets. The Trustee retained his authority, and in addition, the assets were then vested in the trustee for the purposes of an auction. As the Court is aware, the Supplemental Order was later found to be nullified, while the June 2024 order remained in effect.

The turnover order proposed by Plaintiffs and Intervenors contained a statement noting that the Bankruptcy Court took action in "dismissing the FSS Bankruptcy Case and vesting authority in the Trustee to take control of the Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts." (*See* Proposed Order, p. 3). This statement is accurate, but there was an error in not updating the citation. The statement cites "Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024)." At the time of early drafting, that citation was also accurate, since the June 2024 order gave the trustee signing authority over FSS accounts and the September 2024 Supplemental Order carried that authority forward in preparation for an auction. The proposed order was originally drafted using a procedural history paragraph describing this period when both orders were in force.

However, because the bankruptcy court later ruled that the Supplemental Order had been nullified, the entry for "Dkt. 1021 (September 25, 2024)" on the proposed turnover

---

[1] Jones' counsel agree on this point, as they had Jones state in his affidavit:

"On June 21, 2024, Bankruptcy Judge Lopez entered an order in the FSS Bankruptcy case (herein called the "June Order," in Docket entry 956 in Case No. 22-60043) that both (a) dismissed the FSS bankruptcy and (b) at the same time transferred control and signing authority with respect to all FSS's bank accounts to the Chapter 7 Trustee."

order should have been removed from the citation prior to its filing, leaving only "Dkt. 956 (June 21, 2024)." Unfortunately, by error, it was not. Nor was this mistake caught in the courtroom at the recent hearing. However, the mistake in not removing "Dkt. 1021" from the citation is made evident from the clear position of Intervenors and Plaintiffs when seeking turnover: that the Supplemental Order was nullified and that the assets of FSS are not judicially vested in the Trustee. Nonetheless, pursuant to the June 2024 order, the Trustee still has authority and control to distribute FSS assets for the benefit of creditors. In other words, the statement in this Court's turnover order -- that Judge Lopez placed "authority in the Trustee to control of Judgment Debtor Free Speech Systems, including its assets and bank accounts" -- is a correct statement accompanied by an inaccurate citation that should have been updated.

Defendants now seek to turn this oversight into a "gotcha" moment, but it has no consequence. While the citation was in error, and this Court ultimately entered an order with an inaccurate citation in its procedural recitation, that citation in the Court's order does not magically breathe life back into Judge Lopez's Supplemental Order. Indeed, the stark difference between the mistake of not removing the citation to the nullified order compared to Defendants' intentional use of the nullified order illustrates the sanctionable nature of their conduct. *See, e.g., In re Lerma*, 144 S.W.3d 21, 23 (Tex. App.—El Paso 2004, no pet.) (Finding that inclusion of a voided order in an appendix through mistake is not sanctionable, while intentionally using that voided order to obtain benefit is sanctionable.)

Finally, Defendants' counsel claims that Plaintiffs must know the Supplemental Order is in force because Plaintiffs' proposed order required the turnover of FSS assets "subject only to approval of the Trustee." (Def. Resp., p. 4). Defendants' counsel claims "[t]here is no

005381

logical explanation for the inclusion of this caveat other than to demonstrate Plaintiffs' knowledge of the continuing viability of the Supplemental Order." (*Id.*). In truth, that statement demonstrates the continuing viability of the **June 2024 order**, known as the "Initial Cash Order," which is the order that gave signing authority to the Trustee and permitted him to dispense assets for the benefit of creditors.

Thus, Defendants' counsel are wrong when claiming that the Trustee's approval "would only be an issue if the Supplemental Order had viability." (Def. Resp., p. 9). The Trustee's approval is an issue not because the Supplemental Order has continued viability, but because the June 2024 order giving him signing authority has continued viability. Defendants' counsel know and understand this reality, just as they know the inclusion of a citation to the September order was in error by Plaintiffs and Intervenors. Their attempt to capitalize on that error is cynical and disingenuous.

## II.     This Court Cannot Ignore a Bankruptcy Court's Order Based on an Alleged Lack of Jurisdiction.

In their Motion, Plaintiffs predicted that Defendants' counsel would "ask this Court to disregard [Judge Lopez's] rulings by arguing that [he] lacked jurisdictional authority to issue those decisions." (Pltf. Mot., p. 13). Defendants' counsel have done exactly that, and they have ignored the warnings in Plaintiffs' Motion that such an argument would be frivolous.

Defendants' allegations that Judge Lopez lacked jurisdiction to act are foreclosed by the U.S. Supreme Court's 1938 decision in *Stoll* and the long legacy of cases that have applied its mandates. The Fifth Circuit explained *Stoll* as follows:

> In *Stoll v. Gottlieb*, 305 U.S. 165, 59 S. Ct. 134, 83 L. Ed. 104 (1938), a bankruptcy court had previously confirmed a debtor's reorganization plan that provided for the discharge of certain gold bonds and the cancellation of the guaranty ... over the objection of creditors ... Following confirmation, Gottlieb [one of

the creditors] brought an action in a state municipal court to enforce the guaranty of Stoll.

After he brought the state court action, Gottlieb moved the bankruptcy court to modify its plan on the ground that the bankruptcy court lacked the power and authority to cancel Stoll's guaranty. This petition was denied and no appeal was taken. The state court case was thereafter appealed to the Supreme Court of Illinois which held that Gottlieb was entitled to enforce Stoll's guaranty and rejected Stoll's defense of res judicata.

On petition for writ of certiorari, the United States Supreme Court assumed, without deciding, that the bankruptcy court lacked jurisdiction of the subject matter and addressed the question of the conclusiveness of the bankruptcy order. The Court held that a court by necessity has the authority to determine its own jurisdiction over the parties and subject matter, and does so either tacitly or expressly, by rendering a judgment. Consequently, to allow a party to collaterally attack a court's jurisdiction is to allow retrial of issues already decided.

Therefore, after a Federal court has decided the question of the jurisdiction over the parties as a contested issue, the court in which the plea of res judicata is made has not the power to inquire again into that jurisdictional fact. We see no reason why a court, in the absence of an allegation of fraud in obtaining the judgment, should examine again the question whether the court making the earlier determination on an actual contest over jurisdiction between the parties, did have jurisdiction of the subject matter of the litigation.

*Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1052 (5th Cir. 1987). Here, the principles of res judicata likewise prevent this Court from inquiring into jurisdictional matters.

In *Republic Supply,* the defendant "attempt[ed] to distinguish *Stoll* on its facts" by claiming that the "the question of jurisdiction was neither 'determined [nor] raised' by the bankruptcy judge here." *Id.* Yet the Fifth Circuit noted that "the question of the authority of the bankruptcy judge to act was clearly placed before the bankruptcy court by Republic's counsel." *Id.* Regardless, the Fifth Circuit noted that "*Stoll* answers Republic's contention that

005383

'the question of jurisdiction was not determined' by the bankruptcy court: 'Every court in rendering a judgment tacitly, if not expressly, determines its jurisdiction over the parties and the subject matter.'" *Id.* Moreover, the Fifth Circuit pointed out that "later cases have made clear that the parties need only have had the opportunity to raise the question of jurisdiction." *Id.* at 1053.

In the years after *Republic Supply,* the U.S. Supreme Court has consistently applied its opinion in *Stoll* when holding that parties may not collaterally attack a bankruptcy court's ruling by arguing that the court lacked jurisdiction if they had the opportunity to make that argument in the bankruptcy court. *See, e.g., Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153 (2009) ("So long as respondents or those in privity with them were parties to the Manville bankruptcy proceeding, and were given a fair chance to challenge the Bankruptcy Court's subject-matter jurisdiction, they cannot challenge it now by resisting enforcement of the 1986 Orders."), citing *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, n. 9 (1982) ("A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not ... reopen that question in a collateral attack upon an adverse judgment.").

Texas state courts dutifully follow *Stoll* and *Republic Supply.* For instance, in *Tanguy v. West,* the appellant argued to the First District Court of Appeals that a "Bankruptcy Judge signed a judgment ... over which that Judge had no Article III jurisdiction under the United States Constitution." *Tanguy v. West*, 516 S.W.3d 13, 16-17 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). However, the appellant had "raised this jurisdictional argument" in the federal court. *Id.* Applying *Stoll* and *Republic Supply,* the court held that "the issue cannot be retried here." *Id.; see also Taylor Drilling Co. v. Amend*, 438 S.W.2d 144, 149 (Tex. Civ. App.—

Amarillo 1969, writ ref'd n.r.e.) (refusing to address issue of federal court's jurisdiction when that issue had been raised in federal court). And as Texas courts have long acknowledged, even if the bankruptcy court "did commit some error of law … , the erroneous action should have been promptly challenged and the correctness of the decision tested by appeal in the time and manner provided by law, instead of … raising the question … in a collateral proceeding in the State court." *Wheat v. Tex. Land & Mortg. Co.*, 163 S.W.2d 880, 884 (Tex. Civ. App.—Eastland 1942, writ ref'd w.o.m.).

As such, it is improper to raise the question of the bankruptcy court's jurisdiction in this Court. Yet here, Defendants' counsel did not even do that, as they did not even "raise the question." Defendants' counsel skipped the question entirely. Instead, they had their client attest under oath that the nullified order was actually in force. As pointed out in Plaintiffs' Motion, "Defendants' counsel deliberately withheld the material facts to even raise the question, much less answer it." (Pltf. Mot., p. 13).

III.     **Attempts by Defendants' Counsel to Parse Judge Lopez's Words are Meaningless.**

Plaintiffs' Motion predicted that "Defendants' counsel will likely respond by quoting excerpts from discussions in the hearing on their motion to reconsider where it appeared Judge Lopez was sympathetic to their positions." (Pltf. Mot., p. 12). Again, this prediction proved accurate. Yet in reality, these excerpts merely highlight Judge Lopez's awareness of the substantive argument made in Defendants' Motion to Reconsider. Judge Lopez clearly understood that while an order is under appeal, the district court's jurisdiction to act on the order is constrained, and the district court can only take steps to construe those orders or act in furtherance thereof, but it cannot revoke or modify those orders. And it is equally clear that Judge Lopez was of the opinion that he did not "revoke" or "modify" anything in his

February ruling. (Pltf. Mot., Ex. 3, 47:8-13) Defendants' counsel clearly disagrees with the idea that Judge Lopez construed and acted in furtherance his original sale orders to find that the supplemental order was nullified following the unsuccessful auction. Yet whether that position is ultimately meritorious is of no consequence. As noted above, the exclusive venue for resolving that question is a federal appellate court.

Here, there is no amount of parsing which can explain away the facts and outcome, nor any basis for believing the February ruling or the March order confirming the same had been withdrawn or superseded, or that any reconsideration had been granted. And interestingly, both Plaintiffs and Defendants' briefs quote many of the same statements by Judge Lopez while reaching very different conclusions about what is being said. This is exactly why we do not treat excerpts of colloquy between judges and lawyers in oral hearing as rulings. What judges say during hearings can be helpful in understanding the judge's thought process behind a certain order or ruling, but it is not dispositive of how judges ultimately rule or do not rule. This is especially true when a judge repeatedly emphasizes that they are not making any rulings.

Indeed, the most troubling aspect of counsel's response brief is the lengths it goes to parse innuendo in excerpts from the early portion of the hearing while completely ignoring the clear and unequivocal statements made by Judge Lopez in the latter portions of the hearing. The brief cites excerpts from pages 40–49 of the transcript, but it fails to even address Judge Lopez's statements shortly thereafter:

- "Let me think about it. I don't want to rule today. I want to think about everything and think about this." (*Id.* at 52:3–5).

- Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other." (*Id.* at 54:5–8).

005386

Further, as the hearing neared its conclusion, Judge Lopez stated, "I don't think my position has changed in terms of what I said in February." (*Id.* at 66:23-67:1-3). This is a reference to the February ruling in which Judge Lopez declared the Supplemental Order had been nullified by the failed auction, which is the ruling Defendants sought Judge Lopez to reconsider. Yet in the face of these statements, Defendants' counsel now tell this Court that Judge Lopez actually agreed with them and reconsidered his February ruling. On top of this, the brief also ignores the fact that Judge Lopez gave his blessing to Plaintiffs' counsel request for permission to "pursue our state court remedies." (*Id.* at 68:6–13).

## IV.    Defendants' Counsel Continue to Make Dishonest Statements

Alternatively, Defendants' counsel argues that this Court should pay no mind to the failure of the motion for reconsideration filed with Judge Lopez. In an act of dishonesty that would be stunning in any other context, Defendants' counsel tell this Court that "Defendants' Motion for Reconsideration sought a reconsideration of the auction, not the Supplemental Order." (Def. Resp., p. 11).

An honest witness against this lie is the motion itself, which began by stating in bold-face type:

> a.    THIS MOTION SEEKS RECONSIDERATION OF THE COURT'S IMPROPER DECLARING THE SUPPLEMENTAL ORDER "NULL AND VOID."    On June 21, 2024 this

The motion for reconsideration also stated:

> However, in a subsequent Order entered on February 5, 2025, this Court declared that the Supplemental Order was "null and void." This Motion **requests the reconsideration of that declaration.**

005387

(*See* Pltf. Mot., Ex. 5, FSS Mt. to Reconsider, p. 3) (emphasis added). The motion argued that "[h]olding to the position that the Supplemental Order is void will create past, present and future chaos." (*Id.*, p. 5). Thus, the Defendants "request[ed] this Court reconsider its prior rulings." (*Id.,* p. 9). There is no way square these statements with the statement made by counsel to this Court: "Defendants' Motion for Reconsideration sought a reconsideration of the auction, not the Supplemental Order." (Def. Resp., p. 11). Importantly, the counsel who strenuously argued for Judge Lopez to reconsider the nullification of the Supplemental Order are the same counsel now telling this Court that their motion did not seek reconsideration of the nullification of the Supplemental Order. This is not a matter of advocacy or interpretation. This is a matter of up is down and east is west. This kind of conduct should be considered in determining an appropriate sanction.

**V.      Counsel's Arguments Regarding Money Judgments have no Support.**

While seemingly now acknowledging that the *Heslin* judgment should not be considered as a liability, Defendants' counsel insists that the Connecticut judgment is somehow different. The brief never explains why the Connecticut judgment is different. Presumably, because it was incurred in an out-of-state court and not in the instant case? Yet it remains a money judgment, and as Texas courts have repeatedly noted, "the plain language of the statute does not include a contingent money judgment in calculating net worth." *Bus. Staffing, Inc. v. Jackson Hot Oil Serv.*, 392 S.W.3d 183, 187 (Tex. App.—El Paso 2012, no pet.).

Next, Defendants' counsel makes the argument that one of the cases cited by Plaintiffs, *Senior Care Living,* involved liabilities consisting of bonds payable which ultimately resulted in a judgment, "which is distinct from the underlying money judgment." (Def. Resp., p. 15). As a result, the bond liabilities were permitted, because "this pre-existing liability [was not]

transformed into a contingent liability because of the trial court's final judgment." *Id.* That holding is irrelevant here. The Connecticut judgment did not transform a pre-existing liability.

Finally, Defendants' counsel argues that including a money judgment as a liability "is within the court's discretion." (Def. Resp. 16). The brief cites the 14th District's decision in *Ramco Oil,* but it provides no elaboration. In *Ramco Oil,* the dispute centered on whether a court must consider assets versus liabilities to determine net worth, or whether it may consider market capitalization as a measure of net worth. The 14th District concluded the trial courts do not have the discretion to consider market capitalization. Importantly, [a]lthough trial courts have discretion under section 52.006 to determine the *amount* of a judgment debtor's net worth, they have no discretion to alter the meaning of the term "net worth." *Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*, 171 S.W.3d 905, 914 (Tex. App.— Houston [14th Dist.] 2005, no pet.) (emphasis in original). Further, "even if the legislative history stated that the trial court has unbridled discretion to determine the judgment debtor's net worth or that 'net worth' has no fixed meaning or definition whatsoever, we would not be able to give effect to this legislative history because it would contradict the unambiguous language of the statute." *Id.* at 915. As noted above, Texas courts have repeatedly emphasized that "the plain language of the statute does not include a contingent money judgment in calculating net worth." *Bus. Staffing, Inc. v. Jackson Hot Oil Serv.*, 392 S.W.3d 183, 187 (Tex. App.—El Paso 2012, no pet.); *see also McCullough v. Scarbrough, Medlin & Associates, Inc.*, 362 S.W.3d 847, 2012 Tex. App. LEXIS 1975 (Tex.App.--Dallas 2012, no pet.) (same); *Anderton v. Cawley*, 326 S.W.3d 725, 726 (Tex.App.--Dallas 2010, no pet.) (same).

Most importantly, Defendants' counsel did not cite any case which has ever considered a money judgment when determining net worth under TRAP 24.1. This is because, as Plaintiffs first pointed out nearly three years ago when Defendants filed their first frivolous appellate bond request, "there is no reported decision in which a trial court has concluded that a judgment liability should go onto a balance sheet so as to lessen overall net worth." James Holmes, *Superseding Money Judgments in Texas: Four Proposed Reforms to Help the Business Litigant and to Further Improve the Texas Civil Justice System*, 51 ST. MARY'S L.J. 69, 98-99 (2020).

## CONCLUSION

For all these reasons, Plaintiffs ask this Court to hold a hearing and assess sanctions against Defendants' counsel under TRCP 13, TCPRC Chapter 10, and/or the Court's inherent authority.

Respectfully submitted,

**FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax
mark@fbtrial.com
bill@fbtrial.com

005390

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2025, the forgoing document was served upon all counsel of record via electronic service.

_____

MARK D. BANKSTON

005391

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**



**EXHIBIT**

**9**

Alexander E. Jones; 22-33553

exhibitsticker.com

In re

Free Speech Systems LLC,

        Debtor,


Neil Heslin, et al,

        Appellants.

Case No. 4:24-cv-03882

(Appeal from Bankr. Case No. 22-60043)

**MOTION OF THE CONNECTICUT FAMILIES TO INTERVENE
PURSUANT TO RULE 8013 OF THE FEDERAL RULES
<u>OF BANKRUPTCY PROCEDURE</u>**

The Connecticut Families[1], as creditors and parties in interest in the above-captioned Chapter 11 case, by and through their undersigned counsel, file this motion (the "<u>Motion</u>") for entry of an order granting the Connecticut Families' motion to intervene as Appellees pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 8013(g) in the appeal from the Bankruptcy Court's September 25, 2024 *Order Supplementing Order Dismissing Case* (the "Supplemental Dismissal Order," Bankr. Dkt. 1021[2]).  In support of the Motion, the Connecticut Families respectfully state as follows:

---

[1] The "Connecticut Families" are Erica Ash, Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker.

[2] Citations to "Bankr. Dkt." refer to the Chapter 11 docket of FSS, Bankr. Case No. 22-60043 (Bankr. S.D. Tex.), while citations to "Jones Bankr. Dkt." refer to the Chapter 11 (now Chapter 7) docket of Alexander E. Jones, Bankr. Case No. 22-33553 (Bankr. S.D. Tex.).

005392

## PRELIMINARY STATEMENT

1.      The Connecticut Families are, by far, the largest creditors of Free Speech Systems LLC ("FSS")—the subject of this appeal—and Alexander E. Jones ("Jones"), a now-Chapter 7 debtor who used to own and control FSS.

2.      The Connecticut Families have a strong interest in this appeal.  The appeal is an attempt by Appellants to secure the assets of FSS entirely for themselves, rather than through a fair and orderly liquidation process overseen by Jones's bankruptcy trustee.  Such a result would come at the direct expense of the Connecticut Families, who Appellants suggest should recover nothing.  The Connecticut Families actively participated in the briefing and hearing leading to the Supplemental Dismissal Order under appeal, in which the Bankruptcy Court rightly rejected Appellants' efforts.  The Connecticut Families seek intervention in this appeal of the order so they can continue to protect their interests.  Neither FSS nor Appellants would be prejudiced by the Connecticut Families' intervention.  Briefing on the appeal has not yet been scheduled.

3.      Accordingly, and as set forth in more detail below, the Connecticut Families respectfully request that the Court grant this motion to intervene.

## BACKGROUND

4.      FSS, was formed on November 16, 2007 as a limited liability company. Jones was its sole owner.  The Jones Chapter 7 estate, now administered by a bankruptcy trustee, holds FSS's equity interests.

5.      On July 29, 2022, FSS filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

2

005393

Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). (FSS Chapter 11 Subchapter V Voluntary Petition, Bankr. Dkt. 1.) Jones subsequently filed a voluntary petition for relief under Chapter 11 in the Bankruptcy Court on December 2, 2022. (Voluntary Petition of Alexander E. Jones, Jones Bankr. Dkt. 1.)

6. The Connecticut Families are the surviving relatives of victims murdered in the Sandy Hook Elementary School shooting and one first responder. For years following the shooting, Jones lied to his legions of followers by telling them that the Connecticut Families were "crisis actors" who faked their loved ones' deaths, and urged his followers to "investigate" the Connecticut Families and the Sandy Hook shooting. Jones's followers responded by stalking, harassing, and threatening the Connecticut Families, who suffered severe emotional and reputational harm, for which they ultimately sued and secured judgments against Jones and FSS. As a result, the Connecticut Families are the largest creditors of FSS and of Jones.

7. Specifically, the Connecticut Families hold claims totaling $1.4 billion against FSS and Jones arising from Connecticut state court judgments.[3] (Claims No. 13–16, 19–26, 32, 34–35, Bankr. Case No. 22-60043; Claims No. 7–21, Bankr. Case No. 22-33553.) While Appellants have also filed claims against FSS and Jones arising from claims they asserted in Texas state court,[4] those claims total $49.3 million in liquidated amounts to date. (Claims No. 28–31, 33, Bankr. Case No. 22-60043; Claims No. 23–25,

---

[3] *See Lafferty* v. *Jones*, Case No. UWY-CV18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court, Judgment on Verdict for Plaintiffs (Bankr. (Dkt. 509, Ex. A) (Oct. 12, 2022) and Memorandum Decision on Punitive Damages (Bankr. Dkt. 509, Ex. B) (Nov. 10, 2022).

[4] *See Heslin* v. *Jones*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas, Notice of Final Judgment (Bankr. Dkt. 382, Ex. 1) (Jan. 13, 2023) and *Pozner* v. *Jones*, Cause No. D-1-GN-18-001842, in the 261st District Court of Travis County, Texas, Amended Order on Plaintiffs' Motion to Compel and Motion for Sanctions (Oct. 15, 2021). Two of Appellants' claims have yet to be liquidated.

3

27–28; Bankr. Case No. 22-33553.)  In other words, the Connecticut Families hold 96.7% of all liquidated claims against FSS and Jones, whereas Appellants hold 3.3% of liquidated claims.

8.      Of those amounts, at least $1.115 billion of the Connecticut Families' claims are non-dischargeable claims against FSS and Jones.  (Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones, Adv. Proc. No. 23-03037, Dkt. 76.)  In contrast, $4.3 million of Appellants' claims are non-dischargeable claims against FSS and Jones.[5] (Memorandum Decision on Texas Plaintiffs' Motion for Summary Judgment Against Jones, Adv. Proc. No. 23-03035, Dkt. 46).

9.      On June 14, 2024, the Bankruptcy Court entered an order converting the Jones Chapter 11 case to a Chapter 7 case, (Jones Bankr. Dkt. 708), in which all of Jones' personal assets—including his 100% ownership of FSS—would be liquidated by a Chapter 7 trustee.  Because FSS would be an asset of the Jones Chapter 7 estate, the Bankruptcy Court entered an order dismissing FSS's Chapter 11 case on June 21, 2024. (Bankr. Dkt. 956).  However, because the Connecticut Families raised concerns that, unless FSS's case was also converted to one under Chapter 7, a dismissal could result in a "race to the courthouse" among FSS's creditors and inequitable distributions, the Bankruptcy Court specifically authorized the transfer of control and signing authority over the FSS bank accounts to the Jones Chapter 7 Trustee (the "Dismissal Order"), so

---

[5] Jones previously moved this Court for leave to appeal the Bankruptcy Court's interlocutory decisions on summary judgment regarding non-dischargeability.  Finding that Jones did not meet the requirements for interlocutory appeal, this Court denied those motions.  *See* Minute Entry and Order, *In re Alexander E. Jones*, Case Nos. 4:23-cv-04238, 4:23-cv-04240 (S.D. Tex. June 18, 2024).

4

that they could be administered as part of Jones's Chapter 7 bankruptcy estate and through a fair and orderly process. (Bankr. Dkt. 956).

10.    At the hearing leading to the Dismissal Order, Appellants had represented to the Bankruptcy Court that they were "surprised" by the Connecticut Families' concern about a race to the courthouse, and that they intended to work cooperatively with the Connecticut Families in collecting from FSS. (Jones Dkt. 721 at 178:15–16.) Yet within *two hours* of the Dismissal Order being entered, Appellants secretly filed (i.e., without notice to the Chapter 7 Trustee or the Connecticut Families) an Application for Turnover Order and an Application for Post-Judgment Writ of Garnishment in Texas state court. (Bankr. Dkt. 957, Exs. A [the "Turnover Application"] and C [the "Garnishment Application"].)  Appellants immediately "ask[ed] that the [Texas state court] order Free Speech Systems to turn over all its nonexempt property," including money in its bank accounts, to them alone, so that Appellants—holders of 3.3% of liquidated claims against FSS—could recover 100% of FSS's assets, while the Connecticut Families—holders of 96.7% of liquidated claims against FSS—would recover *nothing*. (Turnover Application at 3, 5).  Appellants sought this turnover notwithstanding the Bankruptcy Court's Dismissal Order—entered two hours earlier—vesting control of FSS bank accounts in the Jones Chapter 7 Trustee (Dismissal Order, attached to Appellants' Turnover Application at 13).  The Texas state court granted the application and issued a turnover over approximately an hour later. (Bankr. Dkt. 957, Ex. B [the "Turnover Order"].)  If the Turnover Order were enforced, it would have resulted in Appellants recovering all of FSS's assets for their own sake, to the exclusion of the Connecticut Families.  Indeed,

5

005396

that was the very purpose of Appellants seeking the Turnover Order and failing to give notice to the Connecticut Families.

11.     Seeking to preserve the intended framework of the Dismissal Order and ensure that FSS's assets were fairly distributed to creditors, on June 23, 2024, the Jones Chapter 7 Trustee filed an Emergency Motion in the Bankruptcy Court to, among other things, clarify the transfer of control and signing authority with respect to FSS bank accounts and for an order extending the Chapter 7 automatic stay in the case of Alexander Jones—whose estate owned and controlled FSS, through the Chapter 7 Trustee—to FSS.  (Bankr. Dkt. No. 957.)  The Connecticut Families filed a statement in support of motion, emphasizing that an orderly winddown of the FSS estate was essential for the benefit of all creditors.  (Bankr. Dkt. 959.)

12.     At a hearing on June 27, 2024, the Bankruptcy Court observed that Appellants' seeking of the turnover over clearly violated the intent of the Bankruptcy Court's Dismissal Order.  (*Id.* at 7:24–8:4 ["[I]t appears there's a conflict between what you asked for and got . . . and what I wrote in the order and what we talked about in the hearing.  And I read your motion, and I don't think you explained any of that to the state court judge."], 8:17–21 ["So I write an order turning something over to the trustee in his capacity to then determine, and for the reasons I state on the record, and then you file something on the record several hours later for the trustee to turn that over, right? Did I just get that right?"], 9:7–11 ["Because now you're requiring a Chapter 7 trustee [to turn over FSS bank accounts].  You didn't come to me.  You went to a state court who, quite frankly, had, you know – and you want a Chapter 7 trustee to comply with your – with

6

005397

orders that potentially conflict with orders that I wrote."])   The Bankruptcy Court reiterated that the FSS bank accounts were under the control of the Jones Chapter 7 Trustee as of the original Dismissal Order.  (Jones Bankr. Dkt. 758 at 5:1–10, 17:18–23, 19:16–24.)

13.    On August 22, 2024, the Jones Chapter 7 Trustee moved the Bankruptcy Court for entry of an order authorizing the Chapter 7 Trustee to winddown FSS and sell its assets—including FSS's non-cash assets—pursuant to an auction process under Section 363 of the Bankruptcy Code.  (Bankr. Dkt. 829.)   Rather than challenge the Chapter 7 Trustee's authority to sell FSS's assets pursuant to Section 363 of the Bankruptcy Code, Appellants submitted a statement *in support* of the Jones Chapter 7 Trustee's winddown motion on September 20, 2024.   (Jones Bankr. Dkt. 850).   On September 23, 2024, the Connecticut Families submitted a statement of support as well (although noting that the pending turnover action in Texas state court was still an issue). (Jones Bankr. Dkt. 851.)   The U.S. Trustee, however, objected to the motion to authorize the winddown of FSS, interpreting the Bankruptcy Code to mean that the Jones Chapter 7 Trustee held only the equity interests in FSS, not the intellectual property or other non-cash assets to be sold through the winddown process, and not the ability to sell that property through a Bankruptcy Court-approved sale.  (Jones Bankr. Dkt. 845.)   At a September 24, 2024 hearing in connection with the winddown motion, the Bankruptcy Court stated that it would clarify its Dismissal Order by entering a supplemental order holding that control of all FSS assets vests with the Jones Chapter 7 Trustee—which the Bankruptcy Court said was the entire basis on which it had dismissed the FSS bankruptcy

7

case, rather than converting such case to one under Chapter 7. (Jones Bankr. Dkt. 861, Sept. 24, 2024 Hr'g Tr. 12:7–13:12, 26:12–28:1.)  Appellants, who appeared at that hearing, raised no objection to the Bankruptcy Court entering such an order.

14.    On September 25, 2024, the Bankruptcy Court entered the Supplemental Dismissal Order on the FSS docket.  (Bankr. Dkt. 1021).  This Supplemental Dismissal Order clarified that as of the entry of the original Dismissal Order, all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee.  *Id.*

15.    Appellants filed a notice of appeal of the Bankruptcy Court's Supplemental Dismissal Order on October 8, 2024 (Bankr. Dkt. 1028).

**ARGUMENT**

**I.    Intervention of the Connecticut Families Is Warranted**

16.    Section 1109(b) of the Bankruptcy Code provides: "A party in interest, including the debtor . . . may raise and may appear and be heard on any issue in a case under [Chapter 11]."  11 U.S.C. § 1109(b).  Federal Rule of Bankruptcy Procedure 8013(g) provides that a motion to intervene in a bankruptcy appeal "must be filed within 30 days after the appeal is docketed" and must "concisely state the movant's interest, the grounds for intervention, whether intervention was sought in the bankruptcy court, why intervention is being sought at this stage of the proceeding, and why participating as an amicus curiae would not be adequate."  Fed. R. Bankr. P. 8013(g).  The Connecticut Families submit that intervention is warranted and appropriate under Bankruptcy Rule 8013(g) for the reasons set forth below.

8

17.    *Filing Within 30 Days.*    Appellants filed the Notice of Appeal in the Bankruptcy Court on October 8, 2024, which was docketed in this Court on October 11, 2024.  (Bankr. Dkt. 1028; ECF No. 1.)  This Motion is being filed timely within 30 days of docketing under Bankruptcy Rules 8013(g) and 9006 and Federal Rule of Civil Procedure 6.

18.    *Movant's Interest.*    There can be no credible dispute that the Connecticut Families have substantial legal and economic interests in the outcome of the Appeal.  As the largest unsecured creditors of FSS and of FSS's sole owner, Alex Jones, the Connecticut Families have a significant interest in the fair and orderly distribution of FSS's assets.  The Supplemental Dismissal Order was necessitated by Appellants' actions of seeking a turnover order and writ of garnishment mere hours after the entry of the original Dismissal Order in an attempt to secure all of FSS's assets for themselves, as opposed to a fair and equitable distribution to all creditors in their proportionate interests. The reversal of the Supplemental Dismissal Order would jeopardize this process by potentially allowing Appellants to seek to arrogate FSS's assets entirely for themselves, to the exclusion of the Connecticut Families.

19.    *Grounds for Intervention.*    The Connecticut Families seek to intervene to preserve the opportunity to participate in this appeal, including filing briefs and being heard at any argument.  As the largest creditors of FSS (and of Jones), the Connecticut Families are parties in interest in the underlying bankruptcy cases pursuant to Section 1109(b) of the Bankruptcy Code.  FSS is wholly owned by the Jones bankruptcy estate, whose Chapter 7 Trustee is defending the appeal on behalf of FSS.  (Bankr. Dkt. 1035.)

005400

However, this appeal challenges the authority of the Jones Chapter 7 Trustee with respect to FSS's assets, and it is therefore essential for the Connecticut Families to be represented in addition to the Chapter 7 Trustee.  Moreover, the Connecticut Families are one of two major creditor groups in the underlying bankruptcy proceedings.  With FSS (via the Jones Chapter 7 Trustee, the sole equity owner of FSS) and the other major group (Appellants) separately represented in this appeal, the Connecticut Families should be afforded the opportunity to participate in the appeal too to preserve their interests.

20.    *Whether Intervention Was Sought in the Bankruptcy Court.*    The Connecticut Families appeared and actively participated in the FSS Chapter 11 proceedings and the related bankruptcy proceedings of Jones in the Bankruptcy Court below.  The Connecticut Families did not need to seek to intervene in the Bankruptcy Court because, as creditors, they were parties in interest to the proceedings with standing to participate.  The Connecticut Families participated fully in all briefing and hearings leading to June 27, 2024 Dismissal Order and the September 25, 2024 Supplemental Dismissal Order at issue in this appeal, including by presenting argument and evidence at the hearing leading to the Dismissal Order.

21.    *Intervening at the Current Stage.*  The Connecticut Families respectfully move to intervene at this time to preserve the opportunity to participate in all aspects of the appeal, with standing to be heard and defend their rights as significant creditors of FSS.  Although the primary purpose of this appeal is to overturn the Supplemental Dismissal Order and thereby revive Appellant's effort to enforce the Turnover Order for their sole benefit (and at the exclusion of any recovery to the Connecticut Families), the

10

005401

Appellants somehow failed to identify the Connecticut Families as relevant parties in this appeal, and no other parties to date have sought intervention. Further, the intervention of the Connecticut Families would prejudice neither FSS nor the Appellants, as the record on appeal has not yet been transmitted to this Court, and no briefing schedule has been set.[6]

22.    *Participation as Amici Curie is Inadequate.*    Finally, it would not be adequate for the Connecticut Families to participate as *amici curiae*. The Connecticut Families have significant interests in these appeals, which would not be fully protected by participation as non-parties. Bankruptcy Rule 8017 requires leave of the court or consent of all parties for a non-party to file an *amicus curiae* brief, with such briefs facing a more restrictive page limitation (half of those allotted to parties), as well as leave of the court to be heard on oral argument. Further, *amici* do not have standing should they wish to appeal any dispositions by the Court. Given their ongoing and significant involvement in the underlying proceedings, the Connecticut Families should be permitted to participate in all aspects of this appeal as parties without the restrictions imposed on non-parties.

23.    Based on the foregoing, the Connecticut Families respectfully request that this Court grant leave for the Connecticut Families to intervene in the instant Appeal and be treated as "Appellees" for all purposes, as if originally named as such in the Notice of Appeal.

---

[6] On November 5, 2024, a notice of deficiency was issued on this docket indicating that Appellants had not yet designated the record, which had been due on October 22, 2024. (Dkt. 2.)

11

WHEREFORE, the Connecticut Plaintiffs respectfully request that the Court enter the Proposed Order permitting the Connecticut Families to intervene as Appellees in this matter.

Dated:  November 11, 2024

Respectfully submitted,

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*_____
Ryan E. Chapple (Attorney-in-Charge)
State Bar No. 24036354
SDTX Bar No. 33327
303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011

*Counsel to the Connecticut Families*

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (*pro hac vice* pending*)*
Paul A. Paterson (*pro hac vice* pending*)*
Daniel A. Negless (*pro hac vice* pending*)*
Vida Robinson (*pro hac vice* pending*)*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990

*Counsel to the Connecticut Families*

**KOSKOFF KOSKOFF &
BIEDER PC**
Alinor C. Sterling (*pro hac vice* pending)
350 Fairfield Avenue
Bridgeport, Connecticut 06604
Telephone: (203) 336-4421

*Counsel to the Connecticut Families*

12

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on November 11, 2024.

*/s/ Ryan E. Chapple*_____
Ryan E. Chapple

## <u>CERTIFICATE OF WORD COUNT</u>

This document complies with the word limitation set forth in the Court Procedures of the Hon. Charles R. Eskridge III because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 2,831 words

*/s/ Ryan E. Chapple*
Ryan E. Chapple

005405

**EXHIBIT**

**10**

Alexander E. Jones; 22-33553

exhibitsticker.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:** | ) |
| | ) **Chapter 11 (Subchapter V)** |
| **FREE SPEECH SYSTEMS LLC,** | ) |
| | ) **Case No. 22-60043** |
| **Debtor.** | ) |
| | ) |
| | ) |

## NOTICE OF APPEAL

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (collectively, the "Texas Plaintiffs"), pursuant to 28 U.S.C. § 158(a)(1) and Rules 8002(a)(1) and 8003 of the Federal Rules of Bankruptcy Procedure, appeal to the United States District Court for the Southern District of Texas this Court's *Order Supplementing Order Dismissing Case* [Docket No. 1021] (the "Supplemental Dismissal Order"), entered in the above-captioned Chapter 11 case on September 25, 2024. A copy of the Supplemental Dismissal Order is attached hereto as **Exhibit A**.

The parties to the Supplemental Dismissal Order and the names, addresses, and telephone numbers of their respective attorneys, are as follows:

| Party | Party's Attorneys |
|---|---|
| **Appellants**<br><br>Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine | **WILLKIE FARR & GALLAGHER LLP**<br>Jennifer J. Hardy<br>State Bar No. 24096068<br>600 Travis Street<br>Houston, TX 77002<br>Telephone: (713) 510-1766<br>Fax: (713) 510-1799<br>Email: jhardy2@willkie.com<br><br>**WILLKIE FARR & GALLAGHER LLP**<br>Stuart R. Lombardi (admitted *pro hac vice*)<br>Ciara A. Sisco (admitted *pro hac vice*) |

| | 787 Seventh Avenue<br>New York, NY 10019<br>Telephone: (212) 728-8000<br>Fax: (212) 728-8111<br>E-mail: slombardi@willkie.com<br>E-mail: csisco@willkie.com<br><br>**LAWSON & MOSHENBERG PLLC**<br>Avi Moshenberg<br>State Bar No. 24083532<br>801 Travis Street, Suite 2101, #838<br>Houston, TX 77002<br>Telephone: (713) 449-9644<br>E-mail: avi.moshenberg@lmbusinesslaw.com<br><br>**CHAMBERLAIN, HRDLICKA,**<br>**WHITE, WILLIAMS & AUGHTRY, PC**<br>Jarrod B. Martin<br>State Bar No. 24070221<br>1200 Smith Street, Suite 1400<br>Houston, TX 77002<br>Telephone: (713) 356-1280<br>Fax: (713) 658-2553<br>E-mail: jarrod.martin@chamberlainlaw.com |
| **Appellee**<br><br>Free Speech Systems, LLC | **O'CONNORWECHSLER PLLC**[1]<br>Annie E. Catmull (Texas Bar No. 00794932)<br>4400 Post Oak Parkway, Suite 2360<br>Houston, Texas 77027<br>Telephone: (281) 814-5977<br>E-mail: aecatmull@o-w-law.com |

---

[1] O'ConnorWechsler PLLC is Appellee's last known counsel.

2

005407

Dated:  October 8, 2024

Respectfully submitted,

*/s/ Jennifer J. Hardy*
**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

**LAWSON & MOSHENBERG PLLC**
Avi Moshenberg
State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone:  (713) 449-9644
E-mail:  avi.moshenberg@lmbusinesslaw.com

**CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

***Co-Counsel to the Texas Plaintiffs***

3

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all parties registered to receive electronic notice through the Court's CM/ECF system on October 8, 2024.

*/s/ Jennifer J. Hardy*

4

# Exhibit A

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
September 25, 2024
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| **In re:** | § |
| | § Chapter 11 |
| | § |
| **FREE SPEECH SYSTEMS, LLC,** | § Case No. 22-60043 (CML) |
| | § |
| **Debtor.** | § |
| | § |
| | § |

## ORDER SUPPLEMENTING ORDER DISMISSING CASE
**[Related to Docket No. 956]**

1.      Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

2.      The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

Signed: September 25, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

15564076

005411

**EXHIBIT**

**11**

Alexander E. Jones; 22-33553

exhibitsticker.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| **In re:** | ) |
| | ) **Chapter 11 (Subchapter V)** |
| **FREE SPEECH SYSTEMS LLC,** | ) |
| | ) **Case No. 22-60043** |
| **Debtor.** | ) |
| | ) |
| | ) |

**THE TEXAS PLAINTIFFS' STATEMENT OF ISSUES
AND DESIGNATION OF RECORD TO BE PRESENTED ON APPEAL**

Appellants Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine (collectively, the "Texas Plaintiffs"), under Rule 8009 of the Federal Rules of Bankruptcy Procedure, submit the following statement of issues and designation of items to be included in the record on appeal with respect to the Texas Plaintiffs' appeal of this Court's *Order Supplementing Order Dismissing Case* [Docket No. 1021] (the "Supplemental Dismissal Order"), entered in the above-captioned Chapter 11 case on September 25, 2024.

**STATEMENT OF ISSUES**

1.       Did the Bankruptcy Court err when, without notice, it entered an order [Docket No. 1021]—three months after dismissing the Free Speech Systems, LLC bankruptcy [Docket No. 956]—that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones?

**DESIGNATION OF ITEMS FOR RECORD ON APPEAL**

The Texas Plaintiffs designate the following items to include in the record on appeal.  Each designated item shall also include all filed exhibits attached to such item. Because the appeal of the Supplemental Dismissal Order relates in part to the companion bankruptcy action captioned *In*

005412

*re Alexander E. Jones*, Case No. 22-33533, currently pending before the Bankruptcy Court of the Southern District of Texas ("Jones Action"), the Texas Plaintiffs also designate items from that docket in addition to the docket of the immediate Chapter 11 case ("FSS Action"). The Texas Plaintiffs also designate this *Statement of Issues and Designation of Record on Appeal* for inclusion in the record on appeal.

| ITEM NO. | DOCKET NO. | FILING DATE | DESCRIPTION |
|---|---|---|---|
| 1. | 707 (FSS) | 8/29/2023 | Debtor's Joint Motion to Approve Employment Contract Pursuant to 11 U.S.C. §§ 105 and 363(b) |
| 2. | 740 (FSS) | 10/11/2023 | Joint Objection of the Sandy Hook Families to Debtors' Motion to Approve Employment Contract Pursuant to 11 U.S.C. Sections 105 and 363(b) |
| 3. | 741 (FSS) | 10/11/2023 | The Official Committee of Unsecured Creditors' (I) Reservation of Rights in Respect of Alexander Jones's Motion for Allowance and Payment of Administrative Expenses Pursuant to 11 U.S.C. § 503(b)(1) to the Extent Such Motion Is Not Withdrawn and (II) Limited Objection and Joinder in Respect of Joint Motion to Approve Employment Contract Pursuant to 11 U.S.C. §§ 105 and 363(b) |
| 4. | 823 (FSS) | 2/23/2024 | Joint Notice Regarding Agreed Order on Debtors' Motion for Approval of Compromise and Settlement Under Federal Rule of Bankruptcy Procedure 9019 |
| 5. | 914 (FSS) | 5/28/2024 | Transcript of Hearing held on May 21, 2024 |
| 6. | 921 (FSS) | 6/2/2024 | Emergency Motion of the Connecticut Families for an Order Pursuant to Bankruptcy Code Sections 105(a) and 1112(b) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 7. | 684 (Jones) | 6/5/2024 | Emergency Motion for Entry of an Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 8. | 928 (FSS) | 6/7/2024 | Transcript of Hearing held on June 3, 2024 |
| 9. | 933 (FSS) | 6/11/2024 | Debtor's Emergency Motion for Court Instructions Regarding (1) Disposition of Debtors Property, and (2) Clarity as to the Chief Restructuring Officers Responsibilities and |

2

| | | | Authority, in the Event of Either a Dismissal of This Case or Conversion to Chapter 7 |
|---|---|---|---|
| 10. | 693 (Jones) | 6/12/2024 | Official Committee of Unsecured Creditors' Witness and Exhibit List for Hearing on June 14, 2024 |
| 11. | 937 (FSS) / 695 (Jones) | 6/12/2024 | Jones's Witness and Exhibit List for Hearing on June 14, 2024 |
| 12. | 939 (FSS) / 696 (Jones) | 6/12/2024 | Additional Attachments to Alex Jones's Witness List and Exhibit List for Hearing on June 14, 2024 |
| 13. | 942 (FSS) / 697 (Jones) | 6/12/2024 | The Texas Plaintiffs' Witness and Exhibit List for Hearing on June 14, 2024 |
| 14. | 698 (Jones) | 6/12/2024 | The Official Committee of Unsecured Creditors' Notice of Filing of Supporting Parties' Conversion Order |
| 15. | 944 (FSS) / 699 (Jones) | 6/12/2024 | Connecticut Families' Consolidated Witness and Exhibit List for Hearing on June 14, 2024 |
| 16. | 702 (Jones) | 6/12/2024 | Statement of the Connecticut Families in Support of Conversion of Jones's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 17. | 703 (Jones) | 6/12/2024 | Statement of the Texas Families in Support of Conversion of Jones's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code (Amended) |
| 18. | 935 (FSS) | 6/12/2024 | FSS's Witness and Exhibit List for Hearing on June 14, 2024 |
| 19. | 936 (FSS) | 6/12/2024 | PQPR Holdings' Witness and Exhibit List for Hearing on June 14, 2024 |
| 20. | 941 (FSS) | 6/12/2024 | Additional Attachments to PQPR Holdings' Witness and Exhibit List for Hearing on June 14, 2024 |
| 21. | 938 (FSS) | 6/12/2024 | Melissa A. Haselden's Witness and Exhibit List for Hearing on June 14, 2024 |
| 22. | 943 (FSS) | 6/12/2024 | Jones's Response and Objection to Debtor's Emergency Motion for Court Instructions and Motion to Convert |
| 23. | 945 (FSS) | 6/12/2024 | The Texas Plaintiffs' Statement Supporting Dismissal of the Chapter 11 Case and Objecting to Conversion |
| 24. | 950 (FSS) / 706 (Jones) | 6/13/2024 | Connecticut Families' Updated Consolidated Witness and Exhibit List for Hearing on June 14, 2024 |
| 25. | 948 (FSS) | 6/13/2024 | Subchapter V Trustee's Report and Recommendation of Case Disposition |
| 26. | 951 (FSS) | 6/14/2024 | Debtor's Response to Motion to Convert |

005414

| 27. | 953 (FSS) | 6/14/2024 | FSS's Revised Witness and Exhibit List |
|---|---|---|---|
| 28. | 955 (FSS) / 714 (Jones) | 6/14/2024 | Courtroom Minutes of June 14, 2024 Hearing |
| 29. | 708 (Jones) | 6/14/2024 | Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code |
| 30. | 709 (Jones) | 6/14/2024 | United States Trustee's Notice of Appointment of Chapter 7 Trustee |
| 31. | 956 (FSS) | 6/21/2024 | Order Dismissing Case |
| 32. | 957 (FSS) / 720 (Jones) | 6/23/2024 | Trustee's Emergency Motion to (1) Clarify Transfer of Control and Signing Authority with Respect to Debtor's Bank Accounts, (2) For an Order Extending Automatic Stay in the Alex Jones Case to Free Speech System LLC, and (3) Related Relief |
| 33. | 721(Jones) | 6/24/2024 | Transcript of Hearing held on June 14, 2024 |
| 34. | 959 (FSS) / 725 (Jones) | 6/24/2024 | Connecticut Families' Statement in Support of Trustee's Emergency Motion |
| 35. | 960 (FSS) / 726 (Jones) | 6/24/2024 | The Texas Plaintiffs' Response to the Jones Chapter 7 Trustee's Emergency Motion |
| 36. | 961 (FSS) | 6/26/2024 | O'ConnorWechsler's Response to Chapter 7 Trustee's Emergency Motion |
| 37. | 732 (Jones) | 6/26/2024 | Chapter 7 Trustee's Witness and Exhibit List for Hearing on June 27, 2024 |
| 38. | 734 (Jones) | 6/26/2024 | Connecticut Families' Exhibit List for Hearing on June 27, 2024 |
| 39. | 758 (Jones) | 7/3/2024 | Transcript of Hearing held on June 27, 2024 |
| 40. | 829 (Jones) | 8/22/2024 | Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 41. | 845 (Jones) | 9/17/2024 | United States Trustee's Omnibus Objection to the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC, and Application to Employ Tranzon and Tranzon360 As Sale Broker |
| 42. | 847 (Jones) | 9/19/2024 | Trustee's Witness and Exhibit List for Hearing on September 24, 2024 |
| 43. | 848 (Jones) | 9/19/2024 | United States Trustee's Witness and Exhibit List for Hearing on September 24, 2024 |
| 44. | 849 (Jones) | 9/20/2024 | Jones's Limited Objection to Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 45. | 850 (Jones) | 9/20/2024 | Statement of the Texas Plaintiffs in Support of the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |

4

005415

| 46. | 851 (Jones) | 9/20/2024 | Statement of the Connecticut Families in Support of the Chapter 7 Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 47. | 853 (Jones) | 9/23/2024 | Reply of the Trustee in Further Support of Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 48. | 854 (Jones) | 9/24/2024 | Proposed Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 49. | 859 (Jones) | 9/25/2024 | Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC |
| 50. | 861 (Jones) | 9/26/2024 | Transcript of Hearing held on September 24, 2024 |
| 51. | 1020 (FSS) | 9/24/2024 | Trustee's Proposed Order Supplementing Dismissal Order |
| 52. | 1021 (FSS) | 9/25/2024 | Order Supplementing Order Dismissing Case |
| 53. | 1028 (FSS) | 10/8/2024 | Notice of Appeal |
| 54. | 1029 (FSS) | 10/11/2024 | Election to Appeal District Court |
| 55. | 1030 (FSS) | 10/11/2024 | Clerk's Notice of Filing of an Appeal |
| 56. | 880 (Jones) | 10/15/2024 | Transcript of Status Conference held on September 11, 2024 |

## CERTIFICATION REGARDING TRANSCRIPTS

The Texas Plaintiffs hereby certify, pursuant to Federal Rule of Bankruptcy Procedure 8009(b)(1), that they are not ordering any transcripts. All transcripts have been prepared, are on the docket, and are designated in the foregoing designation of record.

## RESERVATION OF RIGHTS

The Texas Plaintiffs expressly reserve the right to (i) withdraw, supplement, amend or modify this Statement of Issues and (ii) move to strike any items included by Appellee in a designation of additional items. This filing is made expressly subject to, and without waiver of any and all rights, remedies, challenges, and objections.

005416

Dated: October 22, 2024

Respectfully submitted,

*/s/ Jennifer J. Hardy*
**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone: (713) 510-1766
Fax: (713) 510-1799
E-mail: jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Fax: (212) 728-8111
E-mail: slombardi@willkie.com
E-mail: csisco@willkie.com

**LAWSON & MOSHENBERG PLLC**
Avi Moshenberg
State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone: (713) 449-9644
E-mail: avi.moshenberg@lmbusinesslaw.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone: (713) 356-1280
Fax: (713) 658-2553
E-mail: jarrod.martin@chamberlainlaw.com

***Co-Counsel to the Texas Plaintiffs***

6

005417

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all parties registered to receive electronic notice through the Court's CM/ECF system on October 22, 2024.

*/s/ Jennifer J. Hardy*

7

005418