# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

**EXHIBIT**

**13**

Alexander E. Jones; 22-33553

exhibitsticker.com

## NO. 03-25-00617-CV

**Free Speech Systems, LLC, Appellant**

v.

**Neil Heslin, Scarlett Lewis, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, Robert Parker, and Erica Ash, Appellees**

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-001835, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

## O R D E R

**PER CURIAM**

Appellant Free Speech Systems, LLC appealed from the trial court's August 13, 2025 Order Granting Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Free Speech Systems, LLC (Turnover Order). Appellant has filed Appellant's Emergency Motion for Immediate Stay of Void Turnover Order Issued in Violation of the Bankruptcy Automatic Stay (Motion).

Appellees may file a response to the Motion on or before September 15, 2025. We temporarily stay the Turnover Order until further order of this Court pending our review of the Motion and any response.

It is ORDERED August 28, 2025.

Before Chief Justice Byrne, Justices Kelly and Ellis

005971

NO. 03-25-00617

**EXHIBIT**

**14**

Alexander E. Jones; 22-33553

exhibitsticker.com

_____

# IN THE COURT OF APPEALS
# FOR THE THIRD DISTRICT OF TEXAS

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

On Appeal from the 459th District Court of Travis County, Texas
Trial Cause No. D-1-GN-18-001835

_____

*APPELLEES' RESPONSE TO THE APPELLANT'S EMERGENCY MOTION
FOR IMMEDIATE STAY OF VOID TURNOVER ORDER ISSUED IN
VIOLATION OF THE BANKRUPTCY AUTOMATIC STAY*

_____

TO THE HONORABLE THIRD COURT OF APPEALS:

Appellees Neil Heslin and Scarlett Lewis (the Texas Plaintiffs) David

Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole

Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi,

Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach,

005972

Robert Parker, and Erica Ash (formerly Erica Lafferty) (the Connecticut Plaintiffs, and together with the Texas Plaintiffs, the Plaintffs) respectfully submit this Response to the Appellant's Emergency Motion for Immediate Stay of Void Turnover Order Issued in Violation of the Bankruptcy Automatic Stay. The Plaintiffs would respectfully show the Court the following:

## BACKGROUND

The dispute underlying this appeal involves judgment debts that Alexander E. Jones and Free Speech Systems, LLC (the Judgment Debtors) owe to the Plaintiffs. Those judgments[1] establish liability and liquidate damages for Judgment Debtors' repeated, malicious defamation of the Plaintiffs in which Judgment Debtors, among other things, asserted that the Plaintiffs faked their own children's deaths at Sandy Hook Elementary. Since the entry of those underlying judgments, Judgment Debtors have unsuccessfully sought to stay the execution of those judgments by filing bankruptcy, serially removing collection efforts, and posting patently insufficient bond amounts.

---

[1] There are two underlying judgments. The Texas Judgment, which was entered by the 261st Judicial District Court of Travis County, Texas, No. D-1-GN-18-001835. And the Connecticut Judgment, which was first entered by the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut, Docket No. CV-18-6046437 and was later domesticated in Texas under the Uniform Enforcement of Foreign Judgments Acts.

The appeal itself involves Free Speech System, LLC's (FSS) most recent attempt to delay the Plaintiffs' satisfaction of their judgments. Two and a half years after the underlying Texas Judgment was entered, FSS filed a check of $10 to act as a bond preventing the collection of the Texas Judgment immediately before a hearing on a request for a Turnover Order by Plaintiffs and Intervenors. FSS purported to provide a deposit under TRAP 24.1, which allows a debtor to supersede a judgment by providing a deposit not to exceed 50% of the debtor's net worth. On August 8, 2025, Judgment Debtors filed a notice stating that "FSS has a negative net worth as substantiated in the attached Declaration of Alex Jones." (Ex. 1, Def. Notice, ¶ 5). Jones' declaration averred that FSS has no assets due to an order that judicially vested FSS assets in the Chapter 7 bankruptcy trustee, Christopher Murray. Jones averred that "[o]n September 25, 2024, Bankruptcy Judge Lopez entered another order supplementing his June Order, stating that as of the date of his first order above all property of FSS was judicially deemed to have vested in the bankruptcy estate of Alexander E. Jones…" (Ex. 2, Jones Declaration). Judgment Debtors' counsel made these averments to Judge Maya Guerra Gamble in a hearing on August 13, 2025. However, Judge Guerra Gamble was also informed by Plaintiffs' counsel that the order vesting assets in the trustee had actually been nullified, and that the

bankruptcy court specifically ruled that the bankruptcy stay was not in effect. Judge Guerra Gamble signed the Turnover Order. Having been unable to obtain a stay in the trial court, this Emergency Motion for Stay followed.

FSS's attempt to enlist this Court to effectuate its latest delay tactic should also fail. The Turnover Order is a final order that FSS must, but has not, supersede in the trial court under Rule 24. Even were the Court to consider the motion for stay under Rules 29 or 52, those inquiries must balance the merits of the parties' respective, substantive rights against the harm that may befall each party if relief is or is not granted. Here, FSS is not only unlikely to prevail on the merits of its appeal, but it will undoubtedly lose. The Court should deny the Emergency Motion for Stay.

## ARGUMENT IN RESPONSE

### I. The Turnover Order is a final order that FSS has not superseded under Rule 24.

In its typical haphazard fashion, Free Speech Systems LLC (FSS) has not stated which statute, rule, or other body of law grants the Court authority to stay the Turnover Order pending appeal. Given the underlying facts, the granting authority is determinative of whether the Court must deny the stay.

The methods to stay the execution of a trial court order pending appeal are established by rule. Final judgments and orders must first be superseded in the trial court under TEX. R. APP. P. 24. Appellate courts may in the first

instance stay interlocutory orders subject to an interlocutory appeal may under TEX. R. APP. P. 29. And an appellate court exercising its original jurisdiction in a mandamus proceeding may issue stays under TEX. R. APP. P. 52. Therefore, whether and how FSS may stay the Turnover Order depends on the character of the Turnover Order and the type of appeal FSS has filed. Because the Turnover Order is a final order and because FSS has not superseded the Turnover Order under Rule 24, the Court cannot itself issue a stay.

FSS does not contend the Turnover Order is an interlocutory order and has not filed a petition for writ of mandamus. The substance of the Turnover Order also confirms that it is a final order. Generally, turnover orders may be either a final order subject to a traditional appeal or an interlocutory order that is unappealable. *See Alexander Dubose Jefferson & Townsend LLP v. Chevron Phillips Chem. Co., L.P.*, 540 S.W.3d 577, 587 (Tex. 2018) ("[P]ortions of an order can be injunctive in nature and, thus, final and appealable, while other provisions of the same order can be interlocutory and unreviewable because they do not resemble injunctive relief."). A turnover order is final when it is injunctive in nature; it is interlocutory when it leaves unresolved substantive disputes, such as requiring the posting of a bond

005976

while the Court determines who owns the property subject to the turnover order. *Id.*

Here, the Turnover Order contains mandatory injunctions requiring the turnover of property owned by FSS. *See* FSS's App. A, ¶¶ 3, 6. And the Turnover Order does not acknowledge any adverse claims made against the property subject to the Turnover Order, nor has a third party made such a claim.[2] The Turnover Order is thus a final order that may only be suspended under Rule 24.

FSS has not complied with the requirements of Rule 24 regarding the Turnover Order. Specifically, it has not sought to supersede the Turnover Order itself, which would first require Judge Gamble to "set the amount and type of security that the judgment debtor must post." TEX. R. APP. P. 24.2(a)(3).

The only efforts FSS has undertaken to suspend the underlying judgments were either unsuccessful or have not yet been completed. Regarding the underlying Connecticut Judgment, the Connecticut courts denied FSS a stay, and FSS has not sought any additional suspensive bond.

---

[2] FSS disclaimed *it* owns any property, claiming that such property has vested in the bankruptcy estate of Alexander E. Jones and is, therefore, subject to the Trustee's control. Notably, the Trustee has not asserted ownership of FSS's property in this or any other proceeding. And, as will be discussed below, Bankruptcy Judge Lopez voided the order vesting FSS's property in Jones' estate.

*See* FSS's App. C, ¶ 1. Regarding the underlying Texas Judgment (which was issued in January 2023), Judge Gamble has not yet expressly ruled on FSS's August 8, 2025 attempt to supersede the $50,000,000 judgment with a $10 bond. The Texas Plaintiffs timely challenged FSS's bond by noting deficiencies in the supporting evidence, including that such evidence was both contrary to applicable law and demonstrably false. Rather than give credence to FSS's unsupported delay tactics, Judge Gamble signed the Turnover Order.

The Court should thus deny FSS's Emergency Motion to Stay.

## II.    FSS is unlikely to succeed on the merits of its appeal, and the Plaintiffs will be irreparably harmed should the Court adopt FSS's delay tactics.

Because FSS has not suspended the Turnover Order as required by Rule 24, the Court need not further analyze FSS's request for a stay. Should the Court nonetheless choose to do so under Rules 29 or 52, a stay is not warranted.

Rule 29, governing interlocutory appeals, and Rule 52, governing mandamus proceedings, are close analogues. *See In re State*, 711 S.W.3d 641, 644 (Tex. 2024). Stays under either are "a kind of injunction" to which "the familiar considerations governing injunctive relief in other contexts will generally apply." *Id.* A fundamental consideration of an appellate stay is to

"preserve the parties' rights pending appeal" by making "a preliminary inquiry into what those rights are." *Id.* "There is little justice in allowing a party who will very likely lose on the merits to interfere with the legal rights of the opposing party during the appeal." *Id.* The parties' respective rights are then balanced with "the injury that will befall either party depending on the court's decision." *Id.* To be entitled to a stay, the applicant must "show that he will suffer ***irreparable*** harm if relief is not granted." *Id.* (emphasis added).

In this instance, an overriding consideration is that there exist final judgments that have already established the merits of the parties' respective, substantive rights. Unlike an interlocutory appeal or mandamus proceeding, the Court need not guess at what those rights are. Both the Texas Judgment and the Connecticut Judgments established that FSS is liable in tort and liquidated the Plaintiffs' damages. And the bankruptcy court has repeatedly issued orders that the bankruptcy stay does not apply and blessed the pursuit of state court collection remedies. FSS is thus unable to show that it is likely to prevail on the merits or that it will be irreparably harmed in the absence of the stay.

### a. FSS will not prevail on its argument that the automatic stay applies because no bankruptcy stay exists, and FSS has misrepresented the status of a nullified order.

While FSS asserts that an order of the bankruptcy court vested FSS assets in the bankruptcy trustee, the bankruptcy court later ruled that the order been nullified by the failure of the auction for which it had been ordered, and the court also ruled that the bankruptcy stay was no longer in effect. As shown below, Judge Christopher Lopez of the Southern District of Texas Bankruptcy Court repeatedly and unequivocally ruled that the order had been nullified, and multiple attempts were made to change that ruling. After those efforts were unsuccessful, Judge Lopez gave his blessing for the creditors to pursue their state court collection remedies.

### i. The February 5th bankruptcy hearing resulted in the nullification of the "Supplemental Order."

Judge Lopez had ordered a plan to liquidate FSS assets by vesting them in Christopher Murray, the Chapter 7 Trustee, who would then conduct an auction. Judge Lopez entered the September 2024 "Supplemental Order" to accomplish that specific purpose. However, Judge Lopez ultimately rejected the result of the sale, which he later held nullified the Supplemental Order as well.

In the February 5, 2025 bankruptcy hearing, Judge Lopez explained that he "entered a Supplemental Order so that to ensure you have the Trustee cover that he could sell the assets. That's what that order was intended to do." (Ex. 3, February 5th Hearing, 7:10-14). Judge Lopez noted, "The Trustee asked me for a specific order … But it was only for one purpose, to see if he could sell the assets." (*Id.* at 12:6-8). As a result, Judge Lopez concluded it would be improper "to use the Supplemental Order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone." (*Id.* at 13:1-3).

For this reason, Lopez stated, "I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore." (*Id.* at 13:3-5). Judge Lopez then formally ruled that "you can consider **<u>any use of the Supplemental Order null and void</u>**, because the purpose for which it served was the auction of the assets, and we're not doing that anymore." (*Id.* at 14:13-16) (emphasis added). Judge Lopez noted that it would be improper to "use the Supplemental Order … for a purpose in which it was never intended. And I get to construe my own orders and I retain jurisdiction over them." (*Id.* at 15:10-12). In other words, Judge Lopez construed his orders and found that because the sale failed, the Supplemental Order tied to that sale also necessarily became null and void.

In making these rulings, Judge Lopez sought to promote the "finality of the bankruptcy process so that [the families] can pursue whatever it is that they want in judgments in state court." (*Id.* at 14:22-24). Judge Lopez stated, "There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, **<u>there's no automatic stay</u>** stopping -- no one has to come ask me for permission. You have whatever rights you have." (*Id.* at 11:3-8) (emphasis added). Judge Lopez made clear that "[p]eople can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me." (*Id.* at 11:17-25).

At that point in February 2025, Judge Lopez had made it clear to Judgment Debtors and their counsel that the Supplemental Order was no longer in force, and that the automatic stay did not apply. But lest there be any doubt, there were two subsequent attempts at reconsideration.

### ii. FUAC sought a new sale under the Supplemental Order, but Judge Lopez confirmed that it had been nullified.

Following the hearing in which Judge Lopez found that the Supplemental Order had been nullified by the failure of the sale, an entity

known as FUAC, a Jones-allied company seeking to purchase InfoWars, sought reconsideration by filing a "Motion Approving the Sale of FSS Assets." That motion attempted to revive the Supplemental Order and force a new sale. However, in an order on March 19, 2025, Judge Lopez denied the motion, and he reiterated that the Supplemental Order was no longer in effect, writing: "This Court said at a hearing on February 6, 2025 … that parties should consider the Court's Supplemental Order null and void for the reasons stated at the hearing. Nothing has changed." (Ex. 4, Bankruptcy Order, March 19, 2025, p. 1). That order is shown below:

> This Court said at a hearing on February 6, 2025 that it would not allow a sale of FSS assets, and that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed. The Court won't require the Chapter 7 Trustee to conduct another auction for the FSS assets. FUAC also does not have standing to seek a sale of FSS assets under Section 363 of the Bankruptcy Code. The motion is denied.
>
> Signed on March 19, 2025
>
> Christopher Lopez
> United States Bankruptcy Judge

### iii.  Jones and FSS moved for reconsideration.

After the order in March, Jones and FSS moved to reconsider Judge Lopez's finding that the Supplemental Order had been nullified by the failed auction for which it had been created. In their Motion, Jones and FSS recognized that the Supplemental Order was no longer in effect, noting that

"in a subsequent Order entered on February 5, 2025, this Court declared that the Supplemental Order was 'null and void.' This Motion requests the reconsideration of that declaration." (Ex. 5, FSS Mt. to Reconsider, p. 3). Judgment Debtors asked Judge Lopez to reverse course, and they argued that "[h]olding to the position that the Supplemental Order is void will create past, present and future chaos." (*Id.*, p. 5). Thus, the Judgment Debtors "request[ed] this Court reconsider its prior rulings." (*Id.*, p. 9). Implicit in this filing is the acknowledgement that the February rulings are in effect.

### iv. In a June 5th hearing, Judge Lopez declined to grant reconsideration and again blessed the families' intention to pursue state court remedies.

In a hearing on June 5th, counsel for Jones and FSS presented their arguments for reconsideration. The thrust of Judgment Debtors' argument was that Judge Lopez lacked authority to issue his rulings in February because the Supplemental Order had been under appeal at that time.[3] According to Judgment Debtors, federal courts can continue to construe their orders or take steps in aid of their enforcement during an appeal, but they cannot revoke or modify those orders. But the counter-side to that argument was that Judge Lopez did not "revoke" or "modify" anything, but instead, he construed and enforced his original sale orders to find that the

---

[3] The Supplemental Order was appealed prior to the failed auction. By the time of the June 5th hearing, that appeal had been voluntarily dismissed.

Supplemental Order was necessarily nullified following the unsuccessful auction. These issues were discussed during the first part of the hearing. (*See* Exhibit 6, June 5th Hearing, 40:5-7) (The court asking FSS counsel, "That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?"); (*see also* 45:22-23) (FSS counsel acknowledging that "[the court] can't modify it, [the court] can't change it," but "[the court] enforce it or [the court] can interpret it.")

Towards the middle of the hearing, Judge Lopez indicated he was disinclined to grant any relief to Jones and FSS, and that parties could appeal his rulings if they were unhappy:

> This case has been pending since 2022. And folks, it just needs to, it needs to end. Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable. Let the state courts, or the Supreme Court of the United States rule on the issue. Parties can then appeal any orders of mine to the district court or the Fifth Circuit. We got to get there. I'm not moving. (*Id.* at 42:8-15).

Nonetheless, FSS's counsel continued to argue that Judge Lopez lacked authority to find that the Supplemental Order had been nullified, and that "[t]he effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked. (*Id.* at 46:1-3). Judge Lopez entertained Judgment Debtors'

argument, and he agreed that an appeal prevented him from revoking or modifying his orders. But he also noted that it did not prevent him from enforcing or construing his orders. Judge Lopez stated:

> I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it … But that order has been complied with in the sense that the trustee tried to move under authorization under that Supplemental Order, no question about it. He tried to sell assets under those orders. The question is do we do another sale? That's the real question. Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS. (*Id.* at 48:13 – 49:5).

Judge Lopez appeared to believe he was within his authority to find that Supplemental Order was nullified and no longer in effect since he had ruled that the sale which it had "supplemented" had been attempted and was unsuccessful, and the order only existed for that purpose. Any future sale would require its own Supplemental Order, which had become nullified after the first sale. Under this interpretation, Judge Lopez was within his authority to construe the Supplemental Order as nullified as a necessity of enforcing the original order and its purpose. Thus, according to this view being discussed by Judge Lopez, he hadn't revoked anything, and there was

nothing to reconsider. He was merely enforcing the purpose and construing the effect of his original orders. Yet regardless of how one interprets Judge Lopez's musings at the hearing, Judge Lopez clearly stated, "Let me think about it. **I don't want to rule today**. I want to think about everything and think about this." (*Id.* at 52:3-5).

A few minutes later, Judge Lopez again emphasized that he was not making any ruling on the reconsideration, stating, "Give me a little time to think about everything that I've heard today, one way or the other. Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other." (*Id.* at 54:5-8).

As the hearing came to a close, counsel for the Connecticut Plaintiffs made sure Judge Lopez knew the families would be pursuing state court collections as Judge Lopez had authorized back in February when finding the Supplemental Order nullified, and counsel pointed out that the reconsideration sought by FSS would be disruptive to those efforts:

> Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies. We've been working with the Texas plaintiffs towards that end. You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive. (*Id.* at 66:9-15).

In response, Judge Lopez assured counsel regarding the motion to reconsider, "I don't think my position has changed in terms of what I said in February." (*Id.* at 66:23-67:1-3). Finally, Judge Lopez heard from counsel for the Texas families, who again made sure Judge Lopez understood that the families would be pursuing collection in state court, which Judge Lopez blessed:

> MR. MOSHENBERG: Lastly, Your Honor, I know you're talking about 60 days from now. From our vantage point, the Court has told us to go pursue our state court remedies. That's what we're going to do. I want to be open and honest about that unless you're telling us otherwise.
>
> THE COURT: **I'm not**, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up. We can continue to talk. ..." (*Id.* at 68:6-13).

Regarding the Judgment Debtors' motion for reconsideration seeking to overturn the February rulings finding the Supplemental Order nullified, Judge Lopez told Mr. Moshenberg:

> [W]ell, somebody's asked me to think about some issues. And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens. I may issue something in writing in short, just kind of addressing the issue without any need for another hearing. We'll see where things go. ..." (*Id.* at 68:17-24).

005988

Judge Lopez concluded the hearing by telling counsel for the Texas families, "I don't think you need to do anything different, but if anything changes, I'll let you know." (*Id.* at 69:3). Three and a half months after the June 5th hearing, Judge Lopez has made no further orders on the issue.

### v. No reasonable attorney could conclude that Judge Lopez had granted FSS's motion for reconsideration.

Following this hearing, no reasonable attorney could believe that Judge Lopez had reversed his February 5 ruling and his March 19 written order, or that the earlier Supplemental Order had been reinstated, or that the automatic stay was in force. Nonetheless, Judgment Debtors' brief quotes excerpts from discussions in the hearing on their motion to reconsider where they believe Judge Lopez appeared sympathetic to their positions. Yet after the hearing, any reasonable advocate would understand that Judge Lopez made no such rulings. Indeed, any reasonable advocate would understand that the situation had not changed from the situation as it existed prior to the hearing, in which Judgment Debtors' counsel understood Judge Lopez had ruled that the Supplemental Order was nullified.

Further, the excerpts cited by Judgment Debtors merely highlight Judge Lopez's awareness of the substantive argument made in Judgment Debtors' Motion to Reconsider. Judge Lopez clearly understood that while

005989

an order is under appeal, the district court's jurisdiction to act on the order is constrained, and the district court can only take steps to construe those orders or act in furtherance thereof, but it cannot revoke or modify those orders. And it is equally clear that Judge Lopez believed he did not "revoke" or "modify" anything in his February ruling. (Ex. 3, 47:8-13) Judgment Debtors clearly disagree with the idea that Judge Lopez construed and acted in furtherance of his original sale orders to find that the Supplemental Order was nullified following the unsuccessful auction. Yet whether that position is ultimately meritorious is of no consequence here. The exclusive venue for resolving that question is a federal appellate court.[4]

Here, there is no amount of parsing which can explain away the facts and outcome, nor any basis for believing the February ruling or the March order confirming the same had been withdrawn or superseded, or that any reconsideration had been granted. And interestingly, both Plaintiffs and Judgment Debtors' briefs quote some of the same statements by Judge Lopez while reaching very different conclusions about what is being said. This is

---

[4] Judgment Debtors may argue, as they have at the trial court, that this Court can ignore Judge Lopez's nullification of the Supplemental Order on the basis that Judge Lopez lacked jurisdiction. Yet parties may not collaterally attack a bankruptcy court's ruling by arguing that the court lacked jurisdiction if they had the opportunity to make that argument in the bankruptcy court. *See, e.g.*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153 (2009) ("So long as respondents or those in privity with them were parties to the Manville bankruptcy proceeding, and were given a fair chance to challenge the Bankruptcy Court's subject-matter jurisdiction, they cannot challenge it now by resisting enforcement of the 1986 Orders.").

exactly why the judiciary does not treat excerpts of colloquy between judges and lawyers in oral hearing as rulings. What judges say during hearings can be helpful in understanding the judge's thought process behind a certain order or ruling, but it is not dispositive of how judges ultimately rule or do not rule. This is especially true when a judge repeatedly emphasizes that they are not making any rulings.

Indeed, the most troubling aspect of Judgment Debtors' brief is the lengths it goes to parse innuendo in excerpts from the early portion of the hearing while completely ignoring the clear and unequivocal statements made by Judge Lopez in the latter portions of the hearing. The brief cites excerpts from pages 40–49 of the transcript, but it fails to even address Judge Lopez's statements shortly thereafter:

- "Let me think about it. I don't want to rule today. I want to think about everything and think about this." (*Id.* at 52:3–5).

- Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other." (*Id.* at 54:5–8).

Further, as the hearing neared its conclusion, Judge Lopez stated, "I don't think my position has changed in terms of what I said in February." (*Id.* at 66:23-67:1-3). This is a reference to the February ruling in which Judge Lopez declared the Supplemental Order had been nullified by the failed

auction, which is the ruling Judgment Debtors sought Judge Lopez to reconsider. Yet in the face of these statements, Judgment Debtors now tell this Court that Judge Lopez actually agreed with them and reconsidered his February ruling. On top of this, the brief also ignores the fact that Judge Lopez gave his blessing to Plaintiffs' counsel request for permission to "pursue our state court remedies." (*Id*. at 68:6–13).

In sum, this Court is faced with an unequivocal ruling from Judge Lopez on February 5th that the Supplemental Order was nullified, followed by an unequivocal written order on March 19th repeating and confirming the same, followed by a June motion to reconsider that resulted in no further ruling or order of the court, but did result in a blessing to pursue state court remedies. There is no arcane interpretation under these facts in which a reasonable advocate could believe that the Supplemental Order had been revived or that the automatic stay was in place.

### vi. An errant citation in the Turnover Order does not revive Judge Lopez's Supplemental Order.

Judgment Debtors claim that the Supplemental Order must be in in force because the order submitted by Plaintiffs and Intervenors contains a citation referencing the Supplemental Order. Judgment Debtors seek to exploit what they know is a citation error in editing the order. Some background is useful.

When dismissing the FSS bankruptcy case in June 2024, Judge Lopez included an order -- which everyone agrees is still in force -- giving the Chapter 7 trustee signing authority over FSS' bank accounts and the power to dispose of its assets for the benefit of creditors, though those assets remained the property of FSS.[5] This order was made at the request of the Texas and Connecticut Plaintiffs, who were concerned that Alex Jones may dissipate FSS assets before those assets could be liquidated.

A few months later, in September 2024, Judge Lopez issued his Supplemental Order for the sale of assets. The Trustee retained his authority, and in addition, the assets were then vested in the trustee for the purposes of an auction. As the Court is aware, the Supplemental Order was later found to be nullified when the auction failed, while the June 2024 order remained in effect.

The Turnover Order proposed by Plaintiffs and Intervenors contained a statement noting that the Bankruptcy Court took action in "dismissing the FSS Bankruptcy Case and vesting authority in the Trustee to take control of

---

[5] Judgment Debtors agree on this point, as they had Jones state in his affidavit:

> On June 21, 2024, Bankruptcy Judge Lopez entered an order in the FSS Bankruptcy case (herein called the "June Order," in Docket entry 956 in Case No. 22-60043) that both (a) dismissed the FSS bankruptcy and (b) at the same time transferred control and signing authority with respect to all FSS's bank accounts to the Chapter 7 Trustee.

the Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts." (*See* Proposed Order, p. 3). This statement is accurate, but there was an error in not updating the citation. The statement cites "Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024)." At the time of early drafting, that citation was also accurate, since the June 2024 order gave the trustee signing authority over FSS accounts and the September 2024 Supplemental Order carried that authority forward in preparation for an auction. The proposed order was originally drafted using a procedural history paragraph describing this period when both orders were in force.

However, because the bankruptcy court later ruled that the Supplemental Order had been nullified, the entry for "Dkt. 1021 (September 25, 2024)" on the proposed Turnover Order should have been removed from the citation prior to its filing, leaving only "Dkt. 956 (June 21, 2024)." Unfortunately, by error, it was not. However, the mistake in not removing "Dkt. 1021" from the citation is made evident from the clear position of Intervenors and Plaintiffs when seeking turnover: that the Supplemental Order was nullified and that the assets of FSS are not judicially vested in the Trustee. Nonetheless, pursuant to the June 2024 order, the Trustee still has authority to distribute FSS assets for the benefit of creditors. In other words, the statement in the Turnover Order -- that Judge Lopez placed "authority

in the Trustee to control of Judgment Debtor Free Speech Systems, including its assets and bank accounts" -- is a correct statement accompanied by an inaccurate citation that should have been updated.

Judgment Debtors now seek to turn this oversight into a "gotcha" moment, but it has no consequence. While the citation was in error, and the trial court ultimately entered an order with an inaccurate citation in its procedural recitation, that citation in the trial court's order does not magically breathe life back into Judge Lopez's Supplemental Order or create a bankruptcy stay where none existed.

Notably, Plaintiffs and Intervenors proposed an order that required the turnover of FSS assets "subject only to approval of the Trustee." Judgment Debtors' counsel claims this provision shows that Plaintiffs and Intervenors know the Supplemental Order is in effect. In truth, that statement demonstrates the continuing viability of the **June 2024 order**, known as the "Initial Cash Order," which is the order that gave signing authority to the Trustee and permitted him to dispense assets for the benefit of creditors. Thus, Judgment Debtors' counsel are wrong when claiming that the Trustee's approval would only be an issue if the Supplemental Order had viability. The Trustee's approval is an issue not because the Supplemental Order has continued viability, but because the June 2024 order giving him

signing authority has continued viability. Judgment Debtors know and understand this reality, just as they know the inclusion of a citation to the September order was in error by Plaintiffs and Intervenors. Their attempt to capitalize on that error is cynical and disingenuous.

Here, Judgment Debtors' assertion of a bankruptcy stay is frivolous, and it is for that reason that they have not raised the issue in the bankruptcy court itself. Judgment Debtors know their arguments would not be well-received by Judge Lopez, who has already made it clear that "there's no automatic stay" and "nothing stopping anyone from pursuing any claims in Texas state court." (Ex. 3, 11:3-8).

### b. FSS will not prevail on its argument that the Connecticut Plaintiffs could not intervene.

The Connecticut Plaintiffs filed a motion to intervene in this lawsuit in 2024 and ultimately opted to jointly pursue a receivership with the Texas Plaintiffs. FSS argues that this post-judgment intervention was improper and untimely moved to strike the intervention.[6] FSS's argument on this issue has many facets, including that the Connecticut Plaintiffs have no interest in the Texas Judgment, that the Connecticut Plaintiffs seek to establish substantive rights to collect on the Texas Judgment, and that the trial court's

---

[6] Though FSS did not obtain a ruling on its motion to strike the intervention, Judge Gamble signed the Turnover Order after FSS filed its motion to strike.

plenary power had expired. None of these arguments are correct.

To intervene in a turnover and receivership action does not require an interest in the underlying judgment. Rather, it merely requires the intervenor to have an "interest . . . in the judgment debtor's property." *See Breazeale v. Casteel*, 4 S.W.3d 434, 437 (Tex. App.—Austin 1999, pet. denied). Requiring more would result in a procedural windfall for a judgment debtor. *Id.* This Court clearly wrote on the subject when it allowed a third-party intervention in similar circumstances: "There is no justification for precluding intervention in a post-judgment proceeding on the basis of the cause number under which the motion is brought." *Id.* Indeed, the Court continued, "it would not be possible to intervene *before* rendition of judgment." *Id.* Ultimately, this Court affirmed the intervention even though the plenary power had expired at least six years before. *Id.* at 435 (noting the judgment was dated in 1992, the turnover application was filed in 1988, and the intervention occurred after that).

Other courts have also allowed third parties to intervene in receivership actions after plenary power has expired. *See Lerma v. Forbes*, 166 S.W.3d 889, 893 (Tex. App.—El Paso 2005, pet. denied) ("We agree with the Austin Court of Appeals in *Breazeale,* and recognize the unique situation created by the intervenor that has no complaint with the merits of the

005997

judgment obtained in the underlying lawsuit, but only seeks to protect his or her own interest in the post-judgment proceedings. We believe that post-judgment intervention is allowed where such is the case."). In *Lerma*, the El Paso Court of Appeals explicitly authorized intervention after the trial court's plenary power expired. *Id.* ("Here, the issue of the trial court's plenary jurisdiction is irrelevant to our determination of whether the trial court should have granted Appellant's motion to strike Appellee's intervention."). The reason courts may take these actions so long after plenary power expires "is that a trial court's post-judgment enforcement powers can last until the judgment is satisfied." *Alexander Dubose Jefferson & Townsend LLP*, 540 S.W.3d at 581 (quotations omitted).

FSS does not reference *Breazeale* or *Lerma* on this issue nor does it apply their reasoning. The primary case it cites is *Donalson v. City of Canton*, which does not address the turnover statute. In that case, Donaldson sought to intervene in a long dormant lawsuit, the final judgment of which determined ownership of real property and issued permanent injunctions against its owners. *See Donalson v. City of Canton*, No. 12-25-00059-CV, 2025 WL 2354740, at *1 (Tex. App.—Tyler Aug. 13, 2025, no pet. h.). Donaldson, who was initially a party to the lawsuit but had obtained his dismissal on the grounds that he was not an owner, sought to intervene four

005998

years after judgment. In substance, Donaldson sought through his intervention an order declaring himself the owner of the real property and sought relief from the injunctions. Unsurprisingly, the court held that "to the extent Donalson sought to have the trial court take any action inconsistent with its final judgment, such as his pleadings seeking relief from or modification of the permanent injunction, the trial court lacked jurisdiction to so act." *Id.* at *4.

Against this background, FSS's argument that the Connecticut Plaintiffs have untimely intervened and the Plaintiffs are seeking to establishing substantive rights and must, therefore, bifurcate their collection efforts is exposed for the wasteful, obstructionist ploy that it is.  The joint application does not create competing claims among the Plaintiffs regarding the underlying judgments or the judgment debtor's property that need to be resolved before the Court can act. *See Alexander Dubose Jefferson & Townsend LLP*, 540 S.W.3d at 583. Any such issues have been resolved, as is evidenced by the Plaintiffs' agreement to join in collection efforts. Nor are the Connecticut Plaintiffs seeking in this proceeding to establish their rights under the Connecticut Judgment—that has already happened.

In this case, the Plaintiffs do not contest the merits of the other's underlying judgment. Rather, they merely seek to further their shared

interest in the orderly disposition of the judgment debtor's property to satisfy those judgments. In these circumstances and under this Court's precedent, post-judgment intervention is inherently proper.

### c. FSS will not prevail on its argument that no evidence exists regarding FSS's assets.

FSS complains that there is no record evidence establishing FSS's ownership of non-exempt property. This argument is wrong. The application for the Turnover Order attached affidavits swearing to FSS's ownership of non-exempt property and citing FSS's own discovery responses as support. *See* FSS's App. C, ¶ 12. Further, the record includes bankruptcy court orders, transcripts, and declarations that generally discuss FSS's assets and their proposed sale. *E.g.* (Ex. 2, Jones Declaration); (Ex. 4, Bankruptcy Order, March 19, 2025, p. 1); (*See* Ex. 6, June 5th Hearing, 48:13 – 49:5]. Finally, in its motion, FSS concedes that it owns property, it merely incorrectly argues that it "all has been conveyed to the Estate of Alex Jones."

### d. FSS has adequate legal remedies if a stay is not entered, while the Plaintiffs do not.

FSS does not argue that it will suffer irreparable harm should the Court not grant relief. *See In re State*, 711 S.W.3d 641, 645 (Tex. 2024) (requiring showing of irreparable harm). To the contrary, FSS possesses statutory and other remedies.

FSS could file a motion in Jones' bankruptcy asking that court to enforce the automatic stay regarding its assets. But FSS has not done so. FSS presumably has not sought this relief because Judge Lopez already ruled against it on this point in both February and March of this year and did not grant reconsideration in June, and instead expressly allowing the Plaintiffs to pursue the turnover order.

FSS also has statutory remedies in the event the underlying judgments are overturned. FSS can recover either its property or the sales proceeds. *See* TEX. CIV. PRAC. & REM. CODE §§ 34.021, 022.

The Plaintiffs, on the other hand, have no adequate legal remedies if a stay is granted. This appeal concerns the Plaintiffs' use of the Texas Turnover Statute to satisfy two final judgments that have not been superseded. At its core, that statute provides that "[a] judgment creditor is entitled to aid from a court of appropriate jurisdiction . . . to obtain satisfaction on the judgment." FSS, through this Emergency Motion to Stay, perverts this purpose by using the statute as an additional, unauthorized means to delay the Plaintiffs' collection efforts and without posting sufficient bond. The Plaintiffs are entitled to immediately satisfy their judgments; anything less is inadequate.

## CONCLUSION AND PRAYER

The Court need not endorse FSS's unauthorized and factually unsupported efforts to delay the Plaintiffs' satisfaction of their final judgments. The Court must deny the Emergency Motion to Stay and grant Plaintiffs any further relief to which they are entitled.

Respectfully submitted this 11th day of September 2025.

/s/ Ryan E. Chapple
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
Benjamin D. Evans
State Bar No. 24081285
bevans@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile
**ATTORNEYS FOR APPELLEES**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Response- has been forwarded to all counsel of record in accordance with the Texas Rules of Appellate Procedure on this 11th day of September 2025, as follows:

| Method of Service | Party(ies) | Counsel |
|---|---|---|
| *Electronic Service and/or Email* | Proposed Receiver Gregory S. Milligan | Gregory S. Milligan milligan@harneypartners.com |
| *Electronic Service and/or Email* | Counsel for Proposed Receiver | William R. "Trip" Nix tnix@krcl.com KANE RUSSELL COLEMAN & LOGAN, PC 401 Congress Ave., Suite 2100 Austin, Texas 78701 |
| *Electronic Service and/or Email* | Counsel to Neil Heslin and Scarlett Lewis | Mark D. Bankston mark@fbtrial.com KASTER LYNCH FARRAR & BALL LLP 1117 Herkimer Houston, Texas 77008 713-221-8300 713-221-8301—Facsimile |
| *Electronic Service and/or Email* | Counsel to Appellants | Ben C Broocks William A. Broocks BROOCKS LAW FIRM, PLLC 248 Addie Roy Rd, Suite B301 Austin, Texas 78746 (512) 201-2002 - Telephone (512) 201-2034 - Fax bbroocks@broockslawfirm.com wbroocks@broockslawfirm.com

Alan B. Daughtry alan@alandaughtrylaw.com 3355 West Alabama, Suite 444 Houston, Texas 77098 Telephone: (281) 300-5202 Facsimile: (281) 404-4478

Shelby A. Jordan Antonio Ortiz JORDAN & ORTIZ, P.C. 500 North Shoreline Blvd., Suite 804 Corpus Christi, TX 78401 Telephone: (361) 884-5678 Facsimile: (361) 888-5555 Email: sjordan@jhwclaw.com

aortiz@jhwclaw.com Copy to: cmadden@jhwclaw.com |

*/s/ Ryan E. Chapple*
Ryan E. Chapple

NO. 03-25-00617

## IN THE COURT OF APPEALS
## FOR THE THIRD DISTRICT OF TEXAS

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN, MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO, JILLIAN SOTO-MARINO, WILLIAMS ALDENBERG, WILLIAM SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT LEWIS, AND GREGORY S. MILLIGAN
Appellees.

## DECLARATION OF MARK BANKSTON

I, Mark Bankston, declare under penalty of perjury the following is true and correct and based on my personal knowledge. I am over 18 years of age and competent to make this declaration. My business address is 1117 Herkimer, Houston, TX 77008.

1. The following exhibits are attached to Appellees' Response to the Appellant's Emergency Motion for Immediate Stay of Void Turnover Order Issued in Violation of the Bankruptcy Automatic Stay:

2. Exhibit 1 is a true and correct copy of FSS' Notice of Deposit of Cashier's Check Payable to the Clerk in Lieu of Bond under TRAP 24.1.

3. Exhibit 2 is a true and correct copy of Declaration of Net Worth of Judgment Debtor Free Speech Systems, LLC for Supersedeas under Tex. R. Civ. P. 24.2(c).

4. Exhibit 3 is a true and correct copy of the transcript of proceedings in *In Re: Alexander E. Jones* before Judge Christopher Lopez, US. Bankruptcy Court for the Southern District of Texas, on February 5, 2025.

006005

5.     Exhibit 4 is a true and correct copy of Judge Lopez's March 19, 2025 order entered in *In Re: Alexander E. Jones.*

6.     Exhibit 5 is a true and correct copy of Defendants' Motion for Reconsideration filed on April 28, 2025 in *In Re: Alexander E. Jones.*

7.     Exhibit 6 is a true and correct copy of the transcript of proceedings in *In Re: Alexander E. Jones* before Judge Lopez on June 5, 2025.

Executed on September 10, 2025 in Harris County, Texas.

/s/ Mark Bankston
Mark Bankston

006006

NO. 03-25-00617

_____

## IN THE COURT OF APPEALS
## FOR THE THIRD DISTRICT OF TEXAS

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 1

_____

006007

8/8/2025 8:01 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, | § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § | |
| | § | |
| | § | |
| **v.** | § | 459ᵗʰ JUDICIAL DISTRICT |
| | § | |
| ALEX JONES and FREE SPEECH | § | |
| SYSTEMS, LLC, | § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

## DEFENDANT FSS' NOTICE OF DEPOSIT OF CASHIER'S CHECK PAYABLE TO THE CLERK IN LIEU OF BOND UNDER TRAP 24.1

Free Speech Systems, LLC ("FSS") files this Notice of Deposit of Cashier's Check in Lieu of Bond under Texas Rule of Appellate Procedure §24.1.

1. On January 12, 2023, this Court entered a Final Judgment against Alex Jones and FSS, jointly and severally, in the amount of $50,043,923.80.

2. On April 4, 2023, Alex Jones and FSS, collectively, filed a Notice of Appeal from the Final Judgment. Oral argument on that appeal occurred on May 28, 2025 and the Third Court of Appeals has yet to issue its decision.

3. Pursuant to TRAP 24.1, a Judgment-Debtor may supersede a judgment by filing a deposit in lieu of a bond. *See* Tex. R. App. P. 24.1(a)(3). The amount of the deposit must not exceed the lesser of (a) 50% of the judgment debtor's current net worth, or (b) 25 million dollars. *See* Tex. R. App. P. 24.2(a)(1).

4. A party's net worth is calculated as "the difference between the party's total assets and total liabilities as determined by GAAP." *O.C.T.G., LLP v. Laguna Tubular Products Corp.*, 525 S.W.3d 822, 830 (Tex. App.—Houston [14th Dist.] 2017, no pet.). See also *EnviroPower, LLC v. Bear, Stearns & Co., Inc.*, 265 S.W.3d 1 Tex. App.—Houston [1st Dist.] 2008, pet. denied) (en banc), which defined "net worth" for purposes of setting a supersedeas bond as "the difference between

1

total assets and total liabilities" [Id. at *3] at the time of the bond, and not the fair market value of the entity upon sale, including projected revenues from a possible sale.

5. FSS has a negative net worth as substantiated in the attached Declaration of Alex Jones.

6. As a result, FSS has made a deposit payable to the Clerk of the Court in the amount of ten dollars ($10.00), which pursuant to the Texas Rules of Appellate Procedure, is sufficient to supersede the Final Judgment, as a Judgment-Debtor with a negative net worth.

Respectfully submitted,

Ben C Broocks
State Bar No. 03058800
William A. Broocks
State Bar No. 24107577
**BROOCKS LAW FIRM P.L.L.C.**
248 Addie Roy Rd., Suite B301
Austin, Texas 78746
Phone: (512) 201-2002
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
wbroocks@broockslawfirm.com


Shelby A. Jordan
State Bar No. 11016700
Antonio Ortiz
State Bar No. 24074839
**JORDAN & ORTIZ, P.C.**
500 N. Shoreline Blvd., Suite 804
Corpus Christi, Texas 78401
Phone: (361) 884-5678
Fax: (361) 888-5555
Email: sjordan@jhwclaw.com
aortiz@jhwclaw.com
copy to: cmadden@jhwclaw.com

**ATTORNEYS FOR ALEX JONES AND FSS**

2

006009

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2025, a true and correct copy of the foregoing document was sent to all counsel of record in accordance with the Texas Rules of Civil Procedure.

_____
Ben Broocks

3

006010

NO. 03-25-00617

_____

## IN THE COURT OF APPEALS
## FOR THE THIRD DISTRICT OF TEXAS

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 2

_____

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, | § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § | |
| | § | |
| | § | |
| v. | § | 459th JUDICIAL DISTRICT |
| | § | |
| ALEX JONES and FREE SPEECH | § | |
| SYSTEMS, LLC, | § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

## DECLARATION OF NET WORTH OF JUDGMENT DEBTOR FREE SPEECH SYSTEMS, LLC
## FOR SUPERSEDEAS UNDER TEX. R. CIV. P. 24.2(c)

Pursuant to Tex. Civ. Prac. & Rem. Code § 132.001, Alexander E. Jones provides the following declaration in support the Notice of Deposit of Cashier's Check in Lieu of Bond of Free Speech System, LLC ("FSS").

1.      My name is Alexander E. Jones. My date of birth is February 11, 1974, and my address is 3019 Alvin DeVane Blvd., Suite 230, Austin Texas.  I declare under penalty of perjury the facts stated herein are within my personal knowledge and are true and correct.

2.      I am the sole manager of Free Speech Systems, LLC, a Texas limited liability company (previously, "FSS").   I make this declaration of net worth of FSS under Tex. R. App. P. 24.2(c)(1) in my capacity as manager for FSS.

**3.      Based on the facts hereafter set forth, FSS has no assets and liabilities that exceed $1,344,864,850.33.  FSS has a negative net worth.**

4.      On January 12, 2023, a Travis County Jury entered awards against me in this case [*Neil Heslin and Scarlett Lewis, Plaintiffs, v. Alex Jones and Free Speech Systems, LLC*, Case No., D-1-GN-18-001835in the 459th Judicial District Court Travis County, Texas (the "Texas Case)] in the amount of $4,110,000 in compensatory damages [**Exhibit A**] and $45,200,000 in punitive

1

006012

damages [**Exhibit B**] for a total final judgment of $50,043,923.80 including prejudgment interest [**Exhibit C**] see which has been bearing interest at 5% per annum compounded annually from that date and currently equals $56,725,304.33 (herein called the "Texas Judgment").  The Texas judgment has been appealed and oral arguments on that appeal occurred on May 28, 2025.

5.      On November 10, 2022 a trial court in Connecticut entered a final judgment against FSS and me (Alex Jones) jointly and severally in the total amount of $1,436,650,000.  **Exhibit D**. In December 2024, the Connecticut Court of Appeals reversed the trial court's award of damages under Connecticut Unfair Trade Practices Act ("CUTPA") which had the effect of reversing $150,000,000 in CUTPA punitive damages, bringing the total amount of the Connecticut Judgment to $1,288,139,546 which has born interest since that date (herein called the "Connecticut Judgment").

6.      On December 2, 2022, I declared personal bankruptcy and on June 14, 2024, my bankruptcy was converted into a Chapter 7 liquidation and Christopher Murray was appointed as the Chapter 7 Trustee (herein referred to as the "Trustee") of all my assets, excluding those that were exempt.  My personal bankruptcy is still pending in Bankruptcy Court in Houston, Texas, in the case styled *In re Alexander E. Jones, Debtor*, Case No. 22-33553, In the United States Bankruptcy Court for the Southern District of Texas, the Honorable Judge Christopher Lopez presiding.

7.      On July 29, 2022, I caused FSS to file bankruptcy in Bankruptcy Court in Victoria, Texas, in the case styled *In Free Systems, LLC, Debtor*, Case No. 22-60043, in the United States Bankruptcy Court for the Southern District of Texas, which was transferred to the Houston Division and continued with the Honorable Judge Christopher Lopez presiding.

006013

8.      On June 21, 2024, Bankruptcy Judge Lopez entered an order in the FSS Bankruptcy case (herein called the "June Order," in Docket entry 956 in Case No. 22-60043) that both (a) dismissed the FSS bankruptcy and (b) at the same time transferred control and signing authority with respect to all FSS's bank accounts to the Chapter 7 Trustee of my personal bankruptcy [Case No. 22-33553], namely Christopher Murray in his capacity as the Chapter 7 Trustee for the bankruptcy estate of Alexander E. Jones.  **Exhibit E**.

9.      On September 25, 2024, Bankruptcy Judge Lopez entered another order supplementing his June Order, stating that as of the date of his first order above all property of FSS was judicially deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and was under the control of the Trustee, whom the Bankruptcy Court also authorized to operate the business of FSS absent further order of Judge Lopez in the Bankruptcy Court (herein called the "*September Order* or "*Supplemental Order*," in Docket entry 1021 in Case No. 22-60043).  **Exhibit F**.

10.      Given the fact that Bankruptcy Judge Lopez's June Order and September Orders vested ownership of all FSS cash and property of the Estate in my bankruptcy as assets in the Trustee for my personal bankruptcy, as of the date hereof, FSS has no assets.  Hence it does not have a positive net worth for that reason alone.

11.      As to liabilities, the Texas Judgment in the amount of $56,725,304.33 and the Connecticut Judgement in the amount of $1,288,139,546, means that FSS has a significantly negative net worth even if the assets of FSS now vested with the bankruptcy Trustee were to be considered as belonging to FSS.

12.      I provide this declaration of net worth by stating the current assets and liabilities of FSS under the standard provided by *EnviroPower, LLC v. Bear, Stearns & Co., Inc.,* 265 S.W.3d 1

006014

Tex. App.—Houston [1st Dist.] 2008, pet. denied) (en banc), which defined "net worth" for purposes of setting a supersedeas bond as only "the difference between total assets and total liabilities" [Id. at *3] at the time of the bond, and not the fair market value of the entity upon sale, including projected revenues from such a sale.

FURTHER DECLARANT SAYETH NOT

EXECUTED on August $\underline{9}$, 2025 in Travis County, Texas.

_____
Alexander E. Jones

4

NO. 03-25-00617

_____

**IN THE COURT OF APPEALS**
**FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 3

_____

006016

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES AND                ) CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF             )
UNSECURED CREDITORS,                  ) Houston, Texas
                                      )
        Debtors.                      ) Wednesday, February 5, 2025
                                      )
                                      ) 9:00 AM to 9:26 AM
-----------------------------)


                                   HEARING

            BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones:   SHELBY JORDAN
                          ANTONIO ORTIZ
                          Jordan & Ortiz, PC
                          500 N. Shoreline Blvd.
                          Corpus Christi, TX 78401

                          BEN BROOCKS
                          WILLIAM BROOCKS
                          Broocks Law Firm PLLC
                          6207 Bee Cave Road, Suite 120
                          Austin, TX 78746

For Chapter 7 Trustee:    JOSHUA WOLFSHOHL
                          KENESHA STARLING
                          JORDAN STEVENS
                          Porter Hedges LLP
                          1000 Main Street
                          Houston, TX 77002

                          CHRISTOPHER R. MURRAY
                          ERIN JONES
                          Jones Murray LLP
                          602 Sawyer Street
                          Houston, TX 77007

006017

For Connecticut Families:    KYLE KIMPLER
                             PAUL PATERSON
                             Paul Weiss Rifkind Wharton &
                             Garrison LLP
                             1285 Avenue of the Americas
                             New York, NY 10019

                             RYAN CHAPPLE
                             Cain & Skarnulis PLLC
                             303 Colorado Street
                             Austin, TX 78701

For Texas Plaintiffs:        AVI MOSHENBERG
                             Lawson & Moshenberg PLLC
                             801 Travis Street
                             Houston, TX 77002

                             JARROD MARTIN
                             Chamberlain Hrdlicka White Williams
                             & Aughtry, P.C.
                             1200 Smith Street, Suite 1400
                             Houston, TX 77002

                             JENNIFER HARDY
                             Willkie Farr Gallagher LLP
                             600 Travis Street, Suite 2310
                             Houston, TX 77002

Court Reporter:              UNKNOWN

Courtroom Deputy:            UNKNOWN

Transcribed by:              Veritext Legal Solutions
                             330 Old Country Road, Suite 300
                             Mineola, NY 11501
                             Tel: 800-727-6396


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

006018

HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 5, 2025; 9:00 AM

(Call to Order)

THE COURT:  -- 9:00 a.m. case, Alex Jones.  Why don't I take appearances in the courtroom and then we'll get started.

MR. WOLFSHOHL:  Good morning, Your Honor.  Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens from Porter Hedges, for the Trustee.  And Mr. Murray is here as well --

THE COURT:  Okay.  Good morning.

MR. WOLFSHOHL:  -- as well as co-counsel --

MS. JONES:  (indiscernible)

MR. WOLFSHOHL:  -- Erin Jones.

THE COURT:  Good morning.

MR. JORDAN:  Your Honor, Shelby Jordan and Antonio Ortiz, co-counsel, along with Mr. Ben Broocks and Mr. William Broocks, here in the courtroom today.

THE COURT:  Good morning.

MR. JORDAN:  And that's -- I'm sorry -- co-counsel for Mr. Jones.

THE COURT:  Yes, thank you.

MR. KIMPLER:  Good morning, Your Honor.  Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families.  I'm joined by my partner, Mr. Paterson, and on the screen, Mr. Ryan Chapple.

THE COURT:  Good morning.  Oh, I should turn my

006019

camera on.  I apologize.

MR. MOSHENBERG:  Good morning, Judge.  Avi Moshenberg, here on behalf of the Texas Plaintiffs.  Also with me is Jarrod Martin and Jennifer Hardy, Your Honor.

THE COURT:  Good morning.  Anyone else wish to make an appearance?  Okay.  Here on the 9019 settlement, and I know that there are some related motions that we should talk about.

MR. JORDAN:  Your Honor, if I might?

THE COURT:  Sure.

MR. JORDAN:  Shelby Jordan.  We have made -- we being the Alex Jones team of lawyers, two firms and lawyers that have been very, very busy -- we've made every effort we possibly could to get a grasp on what has turned out to be a very, very complex matter that could, if we are not careful, be a case dispositive motion.  We could walk out today and have nothing to show for the values of the appeal or for other matters that --

THE COURT:  Let me -- let me stop.  I've studied this 9019 over the past several days very carefully.  I know we had a status conference and I knew that there were some discovery-related issues.

The Free Speech case originally started as a Subchapter IV -- was originally a lawyer and CRO.  I find professionals -- I thought there was a conflict between

006020

those professionals and the Jones estate, so I didn't approve them.  Then came in another set of lawyers and another CRO.  The two cases, the Jones case, the Free Speech case, proceeded on a track, side-by-side track basis.

We held the hearings on the non-dischargeability claims in the Jones case.  Non-dischargeability claims were put in abeyance in the Free Speech case because the Fifth Circuit had agreed to take up the issue.  The Fifth Circuit ruled.  They got it exactly right.  It's exactly what I would have ruled.  But theirs is more important.  So we were left with the summary judgment in the Jones case.  Never really took it up in Free Speech.

There were a couple of other adversary proceedings, some related Texas parties who never had their day in front of me.  Parties, Texas families, a group of them, and Connecticut families were in mediation with other parties.  I know the Jones folks were there.  I know Free Speech was there a while, about a year.  Nothing came of it.  There was a 9019.  But then it was contingent upon approval of a plan that never happened for the 90 -- that went away.  But I was prepared to approve that.

The case had been going on for about two years.  Then they went to mediation again before another judge in another district.  That was unsuccessful.  Mediation sometimes work; they don't.  My point is that people have

006021

been trying to consensually resolve these issues for two years, and it didn't happen.  And the Free Speech case could have either converted or been dismissed.  But it couldn't hang out in Chapter 11 because there was no way it was going to be able to confirm a plan.

And to say that they stretched -- and I allowed it to happen -- stretched the limits of Subchapter V and what it was intended to do is an understatement in terms of timing; not in terms of ruling, but in terms of timing to get a plan on.  But people were mediating.  And I thought it made sense that if people were going to try to reach a deal, if you were going to put together a plan and this all worked out, then I didn't want to put my thumb on the scale.  So, ultimately, I made a decision to dismiss the Free Speech case.

We were left with the Jones case.  But I retained -- I told Murray he could keep -- Mr. Murray, the Chapter 7 Trustee appointed then in the Jones case, because the Jones case converted as well -- keep the cash from Free Speech in the bank accounts, and kept two adversary proceedings, one involving PQPR, another one involving Elevated Solutions Group.  No professionals started coming to me.  I don't know if it's true or not, but anyway.

But Texas families were able to try to collect on their judgment against Free Speech.  They had rights given

006022

by a Texas court, I think even going after some of the Free Speech professionals who were working to preserve the estate.

When it came time to potentially sell assets, Mr. Murray and his counsel told me that they think that the real way to maximize value is to sell stuff, and not just the equity. They wanted the opportunity to go do this, and they thought they could do this by an auction.

They had, over an objection of the United States Trustee, told me just let them sell the equity. I entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets. That's what that order was intended to do. The supplemental dismissal order was just to make sure, because that was the request.

We had the auction process. I won't recount what happened, but I didn't approve the proposed sale. I had a -- I think the evidence is clear -- a backup bidder at the beginning. We didn't even know what the winning bid was. I had an auctioneer who got on the stand and didn't even know what he was going to get paid, or under what terms he was going to get paid.

I had a winning bid that was clearly based on a contingency. There was a sliding scale in the agreement. The proposed order submitted originally had the very language showing it was a contingency. And the Trustee was

006023

telling me that it wasn't a contingency.  That was his understanding.

So I was asked to approve a sale that had a contingency clearly in it, but was told to act like there wasn't a contingency, upon a sale price that no one really could articulate, because depending on how you took it as a contingency or not a contingency.  And we couldn't figure out exactly what the auctioneer was even going to get paid, because I don't even think he knew.

I then denied that auction.  We were here until, what, 10:30 that night?  So I didn't want -- and then I asked -- this case has been going on, I said -- I gave some (indiscernible) speech, told them it's been going on for like three years, and let's just get this back on track, get back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families.  I think that matter is still pending.

MR. JORDAN:  It is, Judge.

THE COURT:  I lose jurisdiction over that immediately.

MR. JORDAN:  It's still -- it is still pending.

THE COURT:  But I think the appeal was something like, Judge, you can't do that, was the basis of the appeal. I don't have authority to go vest the property of the estate.

006024

So the sale didn't happen, and I said, I don't want any more contingencies. If there's going to be a sale of assets, then cash will be king. But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

I also said the sale price was low. Turns out there's been an offer made since that day, which almost doubles the amount that was -- increased the offer by a week. A week, like it was there. That's fine. Then if things get -- I told folks, if you want to sell it, cash will be king. Get back to doing just -- you want to sell the equity? Sell the equity, but cash will be king.

I took up the motion for reconsideration filed by the Connecticut families. I know that the Jones side has a motion for reconsideration pending that will run its own course. But as things sit today, as I see them -- I could be wrong -- no, I'm not wrong on this, and maybe just slightly off on the numbers -- but I know that the Connecticut court has -- in Appellate Connecticut court, a second level of revision has taken some of the (indiscernible) amounts. And now that's subject to further appeal, and parties will appeal.

I haven't denied anyone any ability to pursue. Jones was able to hire his own lawyers. Connecticut family

was able to pursue those judgments.  My non-dischargeability order in the Jones case kind of has a mechanism saying, this is what I found based on summary judgment, based on the collateral estoppel of the findings made in the Connecticut court.  The Connecticut court ultimately finds that X is the number, will then kind of compare it to what I did, and there's a kind of an adjustment so that I'm not allowing any more than a Connecticut court would have allowed.

Same thing for Texas.  I think there was a portion that I didn't approve for Texas, I know, and for Connecticut as well, that I didn't find -- I didn't think there were basis for collateral estoppel findings, and appellate courts will review what I did, and that's the way the process works.  I've got no issues with that.

So that's where things stand.  I don't know, around a billion dollars for Connecticut right now, subject to further appeal, non-dischargeable.  Around $50 million for Texas, subject to further appeals.  The numbers could stay the same, numbers could be zero, numbers could go up.  I don't know.  It's all subject to state court appeals now.

But FSS, that estate is closed.  That case is closed.  That case is closed.  Which means that someone has a contract dispute with FSS.  You don't come to me.  You have whatever rights you have outside the bankruptcy.  The bankruptcy doesn't affect your claims one way or the other.

006026

There were several individuals who had a case. They were suing Jones in Texas state courts. They can continue their trials in state courts. There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have.

I already said, multiple years to try to reach a settlement, and they didn't. And I'm not saying anybody should have settled. I don't get into why people settle and don't settle. Not my purview. I'm there to evaluate settlements and determine whether they're in the best interest of the estate. That's my job.

So, kind of where we are. Several years of negotiating, no settlement, no plan. FSS gets dismissed. Failed auction. Now there's a 9019. The 9019 now wants me to allow claims against FSS. And I don't -- and I can't do that. And all bankruptcy lawyers know that I can't do that. Because there's no estate. There's no bankruptcy estate to allow a claim against. People can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me.

006027

So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech. And now the Texas families are saying that the matter that they very much appealed, they're now embracing. The supplemental order is now embraced.

The Trustee who asked me for a specific order for a specific purpose is now using that order. But it was only for one purpose, to see if he could sell the assets. To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it. Ha Nguyen was here. The U.S. Trustee was sitting right there telling me.

So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed. I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

And here we are again. Before we would pit the families against each other, where Connecticut and Texas would disagree on whether the form of relief being requested was appropriate. Happened during the auction too, where Texas said, I don't understand what we're doing here and I don't understand how this is going to work.

So, now I'm told we're all aligned and you just -- Lopez, just have to allow a claim against an entity in a case that's been dismissed. I can't do that. I cannot do that. I don't have authority to do it. And I'm not going

006028

to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone. I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore. Pure sale of the equity.

We're going to -- I've got to -- this case keeps taking twists and turns and trying to come up with really masterful and creative lawyering. But at its core, it's something I can't approve. Would come -- you know...

And so, I know... I read the revised settlement. Read the revised order. Bankruptcy lawyers know I can't do this unless we get really, really, really creative. And I think on a case like this, we've got -- with multiple appeal, any party, regardless of what I do, people have their rights.

So, before everyone gets started, let me just tell you, I can't do this. I'm going to again turn to Mr. Moshenberg and tell him, you'd better -- I need you to tell me what you want to do on your -- this non-dischargeability action.

I know that there's a pending motion in the other one. I've now approved the two matters in which there's 9019s and the two settlement matters. Money's going to go out the door. You don't have to tell me now. I want you to file something and tell me exactly what you all are going to

do.

MR. MOSHENBERG:  Understood, Your Honor.

THE COURT:  And just play it down the line, in other words.  People have rights and I'm not telling you to put you on the spot or anything, I just know.

Mr. Murray, if you want to sell the equity, go sell the equity.  This case -- people have rights and they've been...  If you want to go pursue claims against Jones in state court against Free Speech, I don't -- I dismissed the case and I know what comes along with that.  Those arguments were made to me and I know what they are.

No, you don't have to say anything.  I know what the rights are.  And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  I don't trust the process.  I would have to do it -- me, myself -- and I'm not overseeing it.

So kind of get comfortable with the process so that we don't kind of do the same thing.  We've already did it really long and complicated and brought in auctioneers and had lots and -- enough has been -- and I think what this Debtor needs and what these families need is finality of the bankruptcy process so that they can pursue whatever it is that they want in judgments in state court, which is where they started in the 1st place; Connecticut, Texas, for the

most part.  I know that there's some other litigation pending out there.

I just -- I don't have the ability to allow a claim against an entity.  And in a case that has been dismissed in which I literally gave specific authori- -- you keep the cash; we're going to keep these two adversaries. I'm going to settle these.  I'm going to keep jurisdiction over these two things and this one.  And I'm not going to do it for anything else.

I can't use the supplemental order to then go -- for a purpose in which it was never intended.  And I get to construe my own orders and I retain jurisdiction over them. This case will be highly simplified.  And I know Mr. Wolfshohl said he's been listening to these transcripts carefully.  I made it super simple for you this time.

There will be -- I don't know.  Someone has a case, bring it.  There have been multiple years of investigations.  No lawsuits have been (indiscernible) in front of me.  Maybe one is coming.  I don't know.  If it does, we'll take it up and I'll rule.

I'm not sure anybody's ever been happy about -- completely set in my rulings.  I'm not sure Mr. Jones has been entirely happy to know that I found on summary judgment that he's liable for over a billion dollars in non-dischargeable debt and over $49 million dollars.  I'm sure

006031

he -- appealing -- he is appealing.  And that's his right.

So, I'm sure the Connecticut and the Texas family -- I'm sure the Connecticut families weren't too happy about my decision about the auction.  Sure Global Tetrahedron wasn't too happy about it.  But I'm really trying to do what I think is my duty and my job upon careful analysis of the law.

And so I'm not approving.  I cannot on its face.  You don't have to put on any evidence.  I can't approve this sale.  I can't allow $480 million dollars.  And I don't want folks to put it up.  And we don't need to take up TROs and Connecticut and Texas.

Texas, you have whatever rights you have.  Connecticut, you have whatever rights you have against Free Speech, case against Jones.  If you want to have another -- if you want to settle with the Trustee on Jones related matters, do it.  Tee it up.  We'll take it up.  But these things are inextricably linked and multiple appeals going on.  Well, I don't know if they're still going on.  They probably will on the non-dischargeability front, by the way.  You have whatever rights you have on the supplemental order.

MAN 1:  Judge, if I could comment --

THE COURT:  Won't be used again.  No, no, no.  I don't need you to comment on anything.  I don't -- because it's going to open the door.  I just wish everyone a good

006032

day.  Thank you.

CLERK:  All rise.

(Whereupon these proceedings were concluded at 9:26 AM)

006033

I N D E X


RULINGS

|                                  | Page | Line |
|----------------------------------|------|------|
| Motion to Approve Sale, Denied   | 16   | 8    |

006034

CERTIFICATION

I certify that the foregoing is a correct transcript from

the electronic sound recording of the proceedings in the

above-entitled matter.

matter..

Sonya M. Ledanski Hyde

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  February 6, 2025

006035

NO. 03-25-00617

_____

**IN THE COURT OF APPEALS**
**FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 4

_____

006036

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

March 19, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 22-33553 |
| ALEXANDER E. JONES, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | CHAPTER 7 |
| | § | |

**ORDER DENYING FUAC'S MOTION SEEKING LEAVE TO FILE A MOTION
APPROVING THE SALE OF FSS ASSETS AND REQUEST FOR STATUS CONFERENCE**
**(RE: ECF NO. 1089)**

This Court said at a hearing on February 6, 2025 that it would not allow a sale of FSS assets, and that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed. The Court won't require the Chapter 7 Trustee to conduct another auction for the FSS assets. FUAC also does not have standing to seek a sale of FSS assets under Section 363 of the Bankruptcy Code. The motion is denied.

Signed on March 19, 2025

Christopher Lopez
United States Bankruptcy Judge

006037

NO. 03-25-00617

_____

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 5

_____

006038

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:  ALEXANDER E. JONES** | §<br>§<br>§<br>§ | **CASE NO. 22-33553 (CML)** |
| Debtor | § | **Chapter 7** |

**MOTION FOR RECONSIDERATION OF THIS COURT'S**
**DETERMINATION THAT NO AUCTION OF FREE SPEECH SYSTEMS**
**ASSETS WILL BE CONDUCTED BY THE JONES CHAPTER 7 ESTRATE**

**This motion seeks an order that may adversely affect you.  If you oppose the motion, you should immediately contact the moving party to resolve the dispute.  If you and the moving party cannot agree, you must file a response and send a copy to the moving party.  You must file and serve your response within 21 days of the date this was served on you.  Your response must state why the motion should not be granted.  If you do not file a timely response, the relief may be granted without further notice to you.  If you oppose the motion and have not reached an agreement, you must attend the hearing.  Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

This Motion For Reconsideration of This Court's Determination That No Auction of Free Speech Systems Assets Will Be Conducted By the Jones Chapter 7 Estate (the "Jones Estate) which is which currently administered by its Chapter 7 Trustee Christopher R. Murray (the "Trustee") and is filed by Alexander E. Jones ("Jones") for himself and as manager of the non-debtor company, Free Speech Systems, LLC ("FSS") [Collectively Jones and FSS are sometimes referred to as "Jones"].

**I.**
**PRELIMINARY STATEMENT**

1.    Jones has the statutory and common law authority to represent Free Speech Systems, LLC ("FSS") as manager and in the common interest of preservation of value of the FSS assets including (i) preservation of the ongoing appellate proceedings; (ii) defense of the pending

006039

dischargeability proceedings, and (iii) matters before this Court, including this Motion seeking reconsideration of the Order of this Court bench order of February 5, 2025, to the extent that:

    (a)    this Court has exercised jurisdiction to enter, then "void," its order that is now on appeal; and

    (b)    Jones' desire to be heard involves his personal and financial rights and pecuniary interests in such orders and assets, giving Jones standing to assert these matters; and

    (c) Jons responds to the Plaintiffs' misstatement and misrepresentations in their recent opposition to FUAC's request for an auction of the FSS assets.

    2.    Jones seeks reconsideration of the status of the "Supplemental Order" of this Court [FSS Dkt. 1021, September 25, 2024], that has twice previously been the basis of the Trustee's proposed auction of the FSS assets and twice manipulated and improperly orchestrated by the two largest creditors (herein collectively the "Plaintiffs" and separately the "Connecticut Plaintiffs" or the "Texas Plaintiffs") in coordination with this Court's Trustee to accomplish an illegitimate purpose and intent of the Supplemental Order. The cost to the Jones Estate of these two improper efforts was almost $2+ million in attorney's and professional fees.

    3.    Importantly, this Motion raises issues not considered by this Court, or at least not expressed in the record of its ruling and the most recent denial of the proposed continuation of an FSS asset auction raised by FUAC, LLC. Court determined FUAC had no standing to seek that relief.

    4.    Although this Motion points out that the total chaos caused by the Trustee and Plaintiffs in their now well-documented manipulations of an otherwise simple bankruptcy auction process, that is not the basis of this Motion. That wasteful chaos caused by a tortured attempt to manipulate this Court's Supplemental Order to accomplish a purpose never intended by this Court, should not result in the punishment of the other creditors or the Jones and FSS interests, as the

006040

case may be.  Jones summarizes this Motion and Jones' arguments as follows:

a.        **THIS MOTION SEEKS RECONSIDERATION OF THE COURT'S IMPROPER DECLARING THE SUPPLEMENTAL ORDER "NULL AND VOID."**        On June 21, 2024 this Court entered its Order giving the Trustee control of FSS bank accounts and cash (the "Cash Order")(FSS Dkt. 956).  Then on September 25,  2024 this Court entered its so-called Supplemental Order which _supplemented_ the prior Cash Order and gave the Trustee control of and supervisory powers over FSS's assets that were generating the new cash in addition to the Cash Order (Dkt. 1021).  At a hearing on February 5, 2025 this Court discussed its lack of jurisdiction to void the Supplemental Order.  However, in a subsequent Order entered on February 5, 2025[1] this Court declared that the Supplemental Order was "null and void."   This Motion requests the reconsideration of that declaration as the Supplemental Order, now on appeal, cannot be declared null and void, as a matter of law, as previously stated by this Couret.[2]  This Court, in making its most recent ruling from the bench (that the Supplement Order is now considered "null and void") does not consider its earlier acknowledgment that the Supplemental Order is on appeal and, as this Court previously stated that because _such Supplemental Order is on appeal, this Court lacked jurisdiction to void the order_:

> _-- no, I should back up and mention that the_
> _supplemental order was appealed by the Texas families. I_
> _think that matter is still pending._
> _MR. JORDAN: It is, Judge._
> _THE COURT: I lose jurisdiction over that_

---

[1]        This second order noted that First United America Company ("FUAC") lacked standing to request reconsideration.  As will be explained infra, there is no question of Jones's standing given his personal and financial rights and pecuniary interests which unquestionably give Jones standing to assert these matters.

[2]        _Avery v. Gonzalez (In re Gonzalez),_ Nos. 2:15-bk-25283-RK, 2:16-ap-01037-RK, 2024 Bankr. LEXIS 1038, at *9 (Bankr. C.D. Cal. May 1, 2024) (the court lacked jurisdiction to consider a Rule 60(b)(1) motion for relief from judgment during the appeal).

006041

*immediately.*

[*See*, **Exhibit "1"** Hearing transcript, February 5, 2025, pg. 8, lines 15-19.].   The Court was clear that although it would likely set aside the Supplemental Order (out of pure frustration over the efforts to pervert the purpose of its entry), it had no jurisdiction to do so. The Court's observation was correct when first made and remains correct now.[3] However, the non-stayed appeal does not prevent this Court from enforcing its unstayed orders even if on appeal:

> "In addition to its remaining jurisdiction on matters unrelated to the appeal, a *bankruptcy court retains substantial jurisdiction as to the order that is the subject of the interlocutory appeal*." *Id.* 'T*he appeal only deprives the bankruptcy court of the power to alter, expand or vacate the order at issue.*' *Id.* (citing *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1190 (9th Cir. 2000)). "*The [lower] court retains jurisdiction over [\*7] all other matters that it must undertake to implement or enforce the judgment or order* [that is on appeal]." *Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 967 (9th Cir. 2007).

*In re M & C P'ship*, No. 19-11529, 2021 Bankr. LEXIS 1135, at \*5-7 (Bankr. E.D. La. Apr. 28, 2021). [Emphasis Added] [*See*, Note 3 *Supra*].   This appeal is active, and no stay has been sought or entered.[4]   Accordingly, this Court may implement and enforce the Supplemental Order, which is the relief sought by this Motion.

The Court's act of voiding the Supplemental Order was imminently justified, borne from frustration of the combined machinations of the Trustee with the assistance of the 15 Connecticut Plaintiffs and the two Texas Plaintiffs (collectively, the "Plaintiffs") who thwarted this Court's clear instruction for the Trustee to conduct a simple bankruptcy

---

[3]   *See, e.g., Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at \*20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] citing *In re Port Neches Fuels, LLC*, No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, \*12 (D. Del. Mar. 27, 2024).

[4]   *See*, pending *Case No. 22-60043* - Judge Charles Eskridge, U.S District Court, SD-TX.

006042

auction. However justified the Court's frustration, the remedy of declaring the Supplemental Order void, was (i) legally impermissible, (ii) inequitable, (iii) creates virtually insurmountable complications and chaos of undoing events of the past 7 months; and (iv) overlooks the much more practical remedy of simply Ordering the auction, even if required to replace the disobedient and compromised Trustee. Holding to the position that the Supplemental Order is void will create past, present and future chaos. It would mean that for now, everything previously done under the authority of that Supplemental Order was invalid and must be reversed. In the present sense, it makes the companion Cash Order currently in place meaningless and makes the Trustee an intentional tortfeasor in retaining property he seized that belongs to FSS and has not returned. But perhaps the most pernicious is the fact that the Plaintiffs will act as though it is void and begin collections only to find that it is not void, and their actions violated the automatic stay or the discharge injunction, and thus themselves are void. The ripple effects from this one improvident act, will reverberate in numerous directions.

b. Second, Jones is continuing his appeals of the Plaintiffs judgments, the reversal in whole or in any substantial part, will likely render Jones Estate solvent. Jones, as the sole manager of FSS, is also continuing the appeals on behalf of FSS, at no expense to the Jones Estate, likewise if reversed on appeal will render FSS solvent. For this and several other reasons and recent Supreme Court authority discussed below, Jones has standing to seek the relief requested herein and this Court has the jurisdiction to order the relief sought.

c. Third, this Motion seeks to inform the Court of not only the need pursue its prior-ordered auction, considered ordinary in most every Chapter 7 case (specifically, the Chapter 7 Trustee's conducting of a public, non-collusive, auction of assets to the highest

006043

bidder for cash) but also a matter *now opposed* by the Plaintiffs *and silently ignored by the Jones Estate Trustee* in furtherance of the same history of manipulation. This Court may take judicial notice that (i) a § 363 Sale with title vesting free and clear of all liens, claims and encumbrances, greatly enhances the public's participation in an auction and thus, a bankruptcy Trustee's public sale to the highest bidder is generally considered the premier way to recover the highest return for creditors and the bankruptcy Estate. This is true primarily because it is promoted, advertised, and conducted only by professionals in such process, (including the professional Trustee, his legal counsel and retained auction professionals, all supervised by a business Bankruptcy Judge).[5] Contrast this professional approach to the Texas state ordered Writ of Execution and auction by a Sheriff's or Constable's sale, where the officer's only participation is to levy the property and at the auction read the contents of the writ of execution before asking for offers, that is if anyone shows up other than the judgment holder planning on making only a "credit bid."

  d.  Fourth, in addition to the gross disparity in auction results, contrast that process to (i) the fact that the Connecticut Plaintiffs were stayed from all collection efforts by both Connecticut Statute and recent ruling of the Connecticut Court of Appeals during the two prior Ordered auctions the Plaintiffs attempted to manipulate;[6] and (ii) the likelihood that both judgments will be stayed because Texas, by statute, *mandates a stay*

---

[5] The bankruptcy bidding process is neither complex nor out of the ordinary. It is a mainstay of bankruptcy estates' ability to satisfy the maximum recovery, of critical importance in circumstances that likely will not pay 100% of the creditors' claims. And as Jones argues, it is a matter of judicial notice that a State law Constable's or Sheriff's sale is conducted exclusively by a deputy sheriff or constable with no obligation to advertise or otherwise maximize the sale price, and where other bidders must compete with credit-bidding of the judgment holder that significantly chills the bidding, the price obtained never reflects, much less reaches anywhere near the fair market value.

[6] The stay of the Connecticut Judgment is problematic at this point since the Connecticut Supreme Court denied certification of the Jones and FSS appeal, and a stay is limited in duration until, and if, the Connecticut Court of Appeals agrees to extend the stay, or the US Supreme Court grants a stay pending *certiorari* or pending a ruling if *certiorari*. is granted.

006044

when a money-judgment debtor posts a bond or collateral equivalent to 50% of the judgment debtor's **net worth** (the "net worth" of FSS is a negative multi-millions of dollars);[7] and the fact that neither Judgment is supported by a final order of non-dischargebility, thus, no execution is appropriate (which did not stop the Connecticut Plaintiffs form seeking to violate the Connecticut Stay by making false claims to the State Court *of this Court's orders*, including the claim that this Court had entered a *final order* determining the Judgment to be nondischargeable.[8] Instead of this chaos,[9] this Court should simply and clearly order the bankruptcy auction to liquidate all assets of the Chapter 7 estate and thereby (i) stop all of the extravagant legal and Trustee's fees from continuing to support Plaintiffs' manipulation of the bankruptcy process; and (ii) allow the appellate processes to conclude. The Estate, at that point, needs no further "administration" and

---

[7]  Fifth, with both judgments stayed, both Jones and FSS will then be entitled to remain in possession of their assets (with, as to FSS, only "ordinary course operations allowed") until the appellate stays are lifted by final orders of the Connecticut and Texas courts, *and* only if these judgments are not reversed on appeal. This totally re-adjusts **back to this Court's expressed intention** to conduct a bankruptcy auction and to not allow the manipulation of its orders to frustrate the auction process and send the auction (writ of execution) process to State Court to deal with any sale. Instead of this Court sending matters back to State Court where (i) a stay of all collection will be in place for potentially both judgment holders; (ii) this Court's jurisdiction is lacking to void the Supplement Order while on appeal (an unstayed appeal), and (iii) the Trustee remains in possession of all of those operating assets which Jones continued efforts have protected and increased.

[8]  Although the Connecticut Plaintiffs Judgment has always been subject to a stay of any execution or effort to recover on the non-final Connecticut Judgment, as this Court may note, the Connecticut Plaintiffs nevertheless attempted to have an Austin State District Court appoint a receiver pursuant to, and execute on the Connecticut Judgment over Jones' assets, falsely telling the Austin District Court that this Court had entered a "final order" finding the Connecticut Judgment non-dischargeable **and** not mentioning to the Austin District Court that their collection efforts were stayed by the State of Connecticut's statutory stay of money judgment. That case was removed to the Federal Court and referred to this Court by the District Court, Western District of Texas (Austin Division). [*See, also infra*, Note 23].

[9]  As discussed below, the Connecticut Plaintiffs previously ignored the stay of collection and filed in the State District Courts an action to seize Jones property and appoint a receiver over Jones property, (i) telling the State district court that this Court bankruptcy court ruled the Connecticut Judgment non-dischargeable *by final order*; and (ii) telling the State district court **nothing** about the Connecticut statutory stay from execution, as also ordered in Connecticut by the appellate courts. As a result, the action was timely removed to Federal District Court where a counterclaim was filed based on diversity and bankruptcy jurisdiction against the Connecticut Plaintiffs. That case was transferred to the US District Court for the Houston Division and referred to this bankruptcy court. It is now pending a Motion to Dismiss pursuant to Federal Rule 12(b)(6) incorporated into the Bankruptcy Rules of Procedure.

006045

because it has been liquidated, simply remains open until the judgments are reversed or affirmed in whole or in part.

       e.      Fifth:  The Obvious Abuse of Process Must Be Eliminated:  Ultimately, to the extent that any part of these two Plaintiffs' Judgments is rendered final on appeal, the rights of Jones to *a reasonable effort to achieve a maximum credit against those Judgments* should include the Debtor's right to actually achieve the highest value reasonably obtainable from the sale process most reliably capable of achieving that result – a bankruptcy auction.  It is the sale proceeds that must then be applied to those Judgments as credits of the sale proceeds, and depending on the outcome of the appeals, may allow payment in full of one or both of these judgments.  Allowing the operation and protection of these assets has and will continue to be for the benefit of the creditors and the Jones Estate until the auction concludes, which will not be the result if a State law execution sale is conducted or if the Connecticut Plaintiffs acquire the assets in other than a fair, non-collusive § 363 Auction.[10]  Although Connecticut Plaintiffs have been consistent in their demand *to destroy Jones' ability to earn an income from his exclusively-owned "persona" (his image, name, voice, etc.)* to silence his free expression of political and other opinions as an "on air" news media, not only that position is irrelevant to the economic interest of the bankruptcy system itself   but also when it rises to the level of abuse of process that uses the bankruptcy system to accomplish an unconstitutional political goal (to take away Jones First Amendment right).[11]  In fact, abuse of process conduct it is contrary to the

---

[10]    Although the Plaintiffs are free to acquire the FSS assets through a fair bidding process for cash, the stated purpose of the purchase is to destroy the value of the "Infowars" or "Alex Jones" brand.  This perverted motive is addressed below, and its impact on the claims allowance process.

[11]    *See, e.g.* the Fifth Circuit opinion in *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020):

006046

bankruptcy fresh start, even where a claim is found non-dischargeable. If the demands of Connecticut are to have its debt declared nondischargeable then it cannot, under any good faith application of ay bankruptcy policy approved by the Supreme Court or Congressional intent, be consistent with destroying the Debtor's ability to earn an income to pay its non-dischargeable debts.  This counter-intuitive position is the definition of "abuse of process" or its modern counter-part, "lawfare" - when a political agenda, as here, is the ulterior motive, defined as taking a lawful legal position only to advance a contrary political agenda.[12]  Bankruptcy Courts have the jurisdiction to remedy and sanction abuse of process and lawfare, and do so.[13]

5.     For the reasons set out above and below, Jones request this Court reconsider its prior rulings and order what this Court originally ordered.  This Court should order the Trustee or the Trustee's replacement (without manipulation or interference by the Plaintiffs or their affiliates) to do what the Trustee and Plaintiffs have thus far have refused to accomplish without abusive manipulations of the simple bankruptcy auction process.  Although this Court has made clear its

---

The Bankruptcy Code 'provides equitable powers for the bankruptcy court to use at its discretion.' *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This  [*428]  includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ('[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages.').  *Id.* at 428.

[12]     "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy. The term "lawfare" is also a clever play on words, a pun, and a neologism that needs to be deconstructed in order to explain the linguistic and political power of the term. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448

[13]     *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020).
Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423.  … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This  [*428]  includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages."). *Id.* at 427-428.

006047

frustration and distrust "of the process" conducted by the current Trustee, the injury to the other creditors, admittedly small (but only in comparison to the Plaintiffs *non final Judgments*) and to Jones' and FSS's rights to a fair process, compels this result.

## II.
## JURISDICITON

6.      This is a core proceeding pursuant 28 U.S.C. § 157, 1334 over which this Court has exclusive jurisdiction. *See, also Stern v. Marshall*, 564 U.S. 462, 494 (2011); *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984).  Here the basis for reconsideration is the injustice to the parties and bankruptcy system itself. Fed.R.Civ.P. 60(b)(6) can be invoked "in extraordinary circumstances" that include cases where the order to be reconsidered involves "***the risk of injustice to the parties' and the risk of undermining the public's confidence in the judicial process***." *Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added).   Such is the case here.

## III.
## STANDING OF JONES TO SEEK THIS RELIEF

7.      Plaintiffs, through Paul Weiss, wrongly assert that Jones and FUAC are parties that have no economic standing in the case— [*See*, Connecticut Plaintiff's Response to FUAC's request for status conference, pg. 2, ¶1, Dkt. 1113]:

> The Families no longer see any benefit to pursuing a costly and litigious sale process in this Court. [*See*, pg. ¶ Response to FUAC Auction Motion]; …. Another contested sale process would significantly harm creditors' recoveries—which have already been delayed by years, *while millions of dollars are paid to estate professionals*. Counsel to the Trustee alone has incurred over $1.4 million in fees through January 31, 2025. Nearly $800,000 of such fees were incurred between November 2024 and January 2025, the period of time during which the first contested sale hearing took place. *See* Interim Fee Application.  [*See*, pg. 6, ¶ 9 Response to FUAC Auction Motion].

006048

8.      This Court, however, has previously recognized Jones standing regarding the auction orders.  In fact, Jones, as the Chapter 7 Debtor and FSS as a party in interest, has constitutional and bankruptcy code standing to bring this request for relief,[14] and for the purpose of both of the appeals of the Plaintiff Creditors' Judgments (and objections to their claims) and the enforcement of this Courts Supplemental Order to conduct a public auction. In both instances, standing is individually and as the sole managing member of FSS, a party in interest.

9.      Additionally, the standing doctrine is required by the Constitution's text including the due process clause of the Fifth and Fourteenth Amendments.  The Due Process clause prohibit courts from depriving a person of "life, liberty, or property without due process of law."  As Justice Amy Coney Barrett has explained, *stare decisis* can often function similarly to preclusion, and

---

[14]      Jones has standing as the Chapter 7 Debtor pursuant to Section [§1109(b)] that provides "[a] party in interest . . . may appear and be heard on any issue in a case under this chapter." The section goes on to say that parties in interest include:

"*the debtor*, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."

•. *Truck Ins. Exch. v. Kaiser Gypsum Co*., 22-1079 (Sup. Ct. June 6, 2024) [standing extends "*to entities that are potentially concerned with or affected by a proceeding*."];  *See, also In re Team Sys. Int'l, LLC*, Nos. 22-10066 (CTG), 561, 2024 Bankr. LEXIS 2573 (Bankr. D. Del. Oct. 21, 2024) [*citing Truck Insurance Exchange* as defining the scope of a party in interest right to participate].

;  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A*., 530 U. S. 1, 7 (2000);

•.  *Willard v. O'Neil (In re Willard)*, 240 B.R. 664, 669 (Bankr. D. Conn. 1999). As the court explained in In re Toms, 229 B.R. 646, 651 (Bankr. E.D. Pa. 1999):

[I]f there were a claim asserted in a chapter 7 case which would not be discharged, and which is not likely to be paid in full by the trustee, then the chapter 7 debtor will be legally responsible for payment of any remaining claim after the bankruptcy case is concluded. Due to this continuing obligation, the debtor has a pecuniary interest in the disallowance of the claim. Were the claim disallowed or reduced in amount, the debtor's continuing liability after bankruptcy could be affected.

•. *In re Morgan*, No. 05-34981-SGJ-7, 2007 WL 2669341, at *4 (Bankr. N.D. Tex. Sept. 6, 2007) [after considering the claims register, the trustee's report of assets, and the fact that the trustee hired accountants to investigate the assets of the debtor, concluded that given the uncertainty of total assets and claims, the debtor had a pecuniary interest in the outcome of the claim objection];  *See, also,  In re Curry*, 409 B.R. 831, 838 (Bankr. N.D. Tex. 2009)the debtor has a pecuniary interest in the outcome of any claims objection and so standing to object if there might be a surplus to be returned to the debtor after satisfying all debts.  Additionally, a debtor may be afforded standing to object to an excessive dischargeable claim whose holder would receive distributions that otherwise would be made to the holder of a nondischargeable claim. The debtor certainly wants to maximize the distribution to the holder of a nondischargeable claim, because to the extent that this claim is satisfied, the debtor is relieved from some or all of the claim of that creditor which would survive the bankruptcy case. See 4 Collier on Bankruptcy § 502.02[c] at 502-13 (Resnick & Sommers ed. 15th ed. rev. 2009).

---

006049

consequently the application of *stare decisis* can deprive litigants of their life, liberty, or property rights without due process of law.[15]

10.    Jones Standing in this case is supported not only by the recent instruction of the Supreme Court in *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 22-1079 (Sup. Ct. June 6, 2024) [standing extends "… *to entities that are potentially concerned with or affected by a proceeding*."], but also on the merits and nature of the constitutional rights of Jones set out in *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S. Ct. 1519 (1987), *citing with approval Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (5th Cir. 1979).   The Fifth Circuit in *Henry* v. *First National Bank of Clarksdale* dealt with collection of a judgment and non-final appeals and the avoidance of irreparable harm for particular constitutionally driven appealed cases such as the Judgments against the NAACP and here, Alex Jones dealing with "*fundamental constitutional rights.*" *Id. Pennzoil at* U.S. 23. as discussed in *Pennzoil* dealing precisely with the issues before this Court (in rejecting Texaco's argument to avoid its own bankruptcy).  *Pennzoil*, however, made two critical distinctions in its holdings significant to this case.  In contrasting to a case involving a politically sensitive defendant (the NAACP [or here, Alex Jones]) efforts to appeal a judgment it could not pay nor afford the appeal bond:

> First, relevant to this Court's consideration, is the holding that "[w]hile 'a cost requirement, *valid on its face*, may offend due process because it operates to foreclose a particular party's opportunity to be heard,' [citing *Boddie* v. *Connecticut*, 401 U.S. 371, 380 (1971)]…." *Id. Pennzoil at* U.S. 22.

Next, the Supreme Court made specific reference to the reason Texaco was note entitled to relief because of the size of the required bond, noting the distinction where relief would be appropriate:

> the claim [of Pennzoil] that the Texas bond and lien provisions violated the due process and equal protection clauses was without merit, because (a) the New York company could exercise its right to appeal even if it were forced to file for

---

[15]    Stare Decisis and Due Process, https://scholarship.law.nd.edu/lawfacultyscholarship/450/

006050

bankruptcy, and (b) *the underlying issues in the case--arising out of a commercial contract dispute--did not involve fundamental constitutional rights.*

*Id. Pennzoil,* 107 S. Ct. at 1535 [Brennan, J., joined by Marshall, J., concurring] (Emphasis Added). The Supreme Court, in rejecting Texaco's right to receive relief from an un-affordable appeal bond, cited the Fifth Circuit case where special relief was justified:

> "in the more troublesome situation where a particular corporate litigant has such special attributes as an organization that a trustee in bankruptcy, in its stead, *could not effectively advance the organization's interests on an appeal*"[16]

*Id. Pennzoil,* 107 S. Ct. at 1529 [Justice Scalia, with whom Justice O'Connor joins, concurring], *citing* with approval, the Fifth Circuit opinion in *Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (CA5 1979) that did, in fact, deal with the deprivation of "*fundamental constitutional rights*":

> (bankruptcy of NAACP would make state appellate review of First Amendment claims "so difficult" to obtain that federal injunction justified), cert. denied *sub nom. Claiborne Hardware Co.* v. *Henry*, 444 U.S. 1074 (1980).

11. The Supreme Court, in recognizing that the rights to seize a judgment debtors assets by State law execution and order a sale of the judgment debtor's assets, held that notwithstanding the state statute that required a cost bond that would bankrupt the NAACP, the exception recited in *Henry v. First National Bank* "… involved fundamental constitutional rights" that would be lost if the execution went forward. In *Henry v. First National Bank*, because "…the underlying issues *did involve fundamental constitutional rights*" to boycott, and having suffered a $3 million

---

[16] Here the Chapter 7 Trustee of Jones, in his campaign to damage Jones, was willing to allow Jones' Connecticut Appeal to lapse by not permitting Jones to file, at his own cost, his and the Free Speech Systems, LLC appeal brief for certification to the Connecticut Supreme Court. Further, the Trustee proposed to this Court a "settlement agreement" among only the Jones Estate and the Plaintiffs that provided that the Trustee could dismiss the appeals or could *sell to Plaintiffs* as assignees the Jones and FSS right to appeal and they could dismiss, or cause the dismissal of, the appeals to satisfy the appellees' desire to have an allowed claim *untested by the due process rights to a full appeal*. This Court denied that relief.

006051

judgment in Mississippi state court for supporting a boycott of certain white-owned businesses, federal injunctive relief (to permit an unbonded appeal) was appropriate.[17]

12.     This is precisely the standing Jones relies, and the fundamental First Amendment constitutional rights of Jones as a media defendant his free speech rights, that must be protected until the opportunity for Supreme Court review.

**IV.**
**RELEVANT BACKGROUND FACTS TO THE RELIEF REQUESTED**
**AND THE PLANTIFFS RESPONSIVE MISSTATEMENTS**

13.     This Court previously ordered the dismissal of the Chapter 7 Free Speech Systems, LLC, ("FSS") Chapter 11 case (the Debtor-Jones 100% owned limited liability company) but included in such order the transfer all of the "cash" account assets of FSS to the Trustee's Chapter 7 estate of Jones (the "**Initial Cash Transfer Order**").  That cash was significant (in excess of $4 million, and through Jones' continued service to the Trustee, the cash has grown to more than $7 million, less $3 million paid by the Trustee to the Trustee's law firm and the Trustee's special counsel and retained professionals, and other costs of administration.

14.     At the request of the Trustee of the Jones Estate for a clarifying order as to the ownership of the Debtor-Jones' company FSS *non-cash assets*, this Court entered an order clarifying that all FSS assets would be transferred to the Jones Estate (the "**Supplemental Order**").

15.     The Texas Plaintiffs' did not appeal the Initial Cash Transfer Order which is a final order.   The Texas Plaintiffs' (after attempting a state court Turnover of the FSS assets and that proceeding's removal by the Trustee to this Court) appealed the Supplemental Order and the

---

[17]     The Fifth Circuit upheld the District Court's injunction prohibiting the execution on the judgment involving all of the Mississippi NAACP assets including the name NAACP owned by the Mississippi Chapter, and all the confusion that would have caused, until the NAACP could prosecute its appeal of the Constitutional right to boycott. Ultimately, the Supreme Court decided the case on the merits and reversed the state court judgment as constitutionally infirm. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S. Ct. 3409 (1982).

006052

appeal is ongoing. [*See, supra* Note 3].[18] The Texas Plaintiffs did not seek a stay pending that appeal of the Supplemental Order and accordingly, this Court has unfettered jurisdiction to *enforce* that order, it cannot vacate the order. *In re M & C P'ship*, No. 19-11529, 2021 Bankr. LEXIS 1135, at *5-7 (Bankr. E.D. La. Apr. 28, 2021). [Emphasis Added]. This principal has been affirmed time and again.[19] As such this Court's pronouncement that the Supplemental Order is void, is itself void. The Supplemental Order still exists and is enforceable in accordance with its terms.[20] Both the Jones Estate through its Trustee and/or Jones have consented to the sale of substantially all of the assets of FSS now in the Court-ordered possession of the Jones Estate Trustee. If sold at a bankruptcy Auction as sought herein, the estate could be administratively closed until the Plaintiffs claims are allowed and distributions of those proceeds are made. If this is not done, and both Judgments are stayed, the assets may simply remain idle. If ultimately the State Courts become the arbiter of the method and manner of the writs of execution or otherwise there will be no prompt sale of those assets remaining in the possession of the Trustee. The auction sale, already ordered by this Court is the only prompt solution to this dilemma.

16. And active participants are awaiting a fair sale auction. The Trustee has *never initiated any bidding procedures as an ordinary course asset auction, nor has the Trustee even attempted to deal the outstanding $8 million cash offer*. In the prior two Trustee attempts at an auction driven by the Plaintiffs, neither the cash bidders nor the Debtor, nor FSS did anything to

---

[18] Judge Charles Eskridge, U.S District Court, SD-TX, *Case No. 22-60043.*

[19] *See e.g., Avery v. Gonzalez (In re Gonzalez),* Nos. 2:15-bk-25283-RK, 2:16-ap-01037-RK, 2024 Bankr. LEXIS 1038, at *9 (Bankr. C.D. Cal. May 1, 2024) (the court lacked jurisdiction to consider a Rule 60(b)(1) motion for relief from judgment during the appeal); *Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at *20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] *citing In re Port Neches Fuels, LLC,* No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, *12 (D. Del. Mar. 27, 2024).

[20] Even the Texas Plaintiffs successfully moved to dismiss their appeal, this would not retroactively affect the invalidity of the initial voiding or remedy the consequences herein stated.

006053

interfere with the bidding process – only the Plaintiffs and their partner the Global Tetrahedron (the "Onion") and their acting agent, the Trustee. Thus, because there is no stay pending the appeal of the Supplemental Order and enforcement of the Supplemental Order is what this Motion seeks, by ordering a simple auction for sale at the highest cash price obtained through the sales effort and sale by the current Trustee or his successor replacement.[21]

## V.
## "THE RISK OF INJUSTICE TO THE PARTIES' AND THE RISK OF UNDERMINING THE PUBLIC'S CONFIDENCE IN THE JUDICIAL PROCESS."[22]
-------------------------------------------------------------------------------
### ALL EQUITIES FAVOR ORDERING AN AUCTION

A.      **Equity Abhors Manipulation and Loss of Rights or Property by Forfeiture or Loss of Basic Constitutional Rights - Equity will not allow a trust to fail for want of a trustee.[23] Equity delights to do justice, and not by halves[24]**

17.     The auction process has been manipulated by the Plaintiffs and the Trustee to assure the Plaintiffs win. Each time the Trustee initiated the out-of-the-ordinary process and each time this Court refused to approve the Plaintiffs-driven process adopted by the Trustee. If the State Court is to auction FSS assets, that will not occur until the Texas State Judgment is final on appeal

---

[21]     **THERE IS A SIMPLE SOLUTION: REPLACE THE TRUSTEE AND CONDUCT AN AUCTION:** There is no question that the Court's declaration that the Supplemental Order was void was precipitated by the Trustee's stubborn and persistent unwillingness to obey the Court's stated purposes to affect a sale of FSS assets for the benefit of all creditors. It was for this purpose the current Trustee himself prevailed on this Court to issue the Supplemental Order in the first place. The remedy for such recalcitrance is, among other remedies, the replacement of the Trustee, not a legally improper declaration the Supplemental Order is void.

The simple solution is to appoint a replacement Trustee who will obey the Court and conduct an auction. Any creditor looking to get paid, would welcome this as it assures the highest recovery. The Plaintiffs DO NOT want this because they don't want money; they want Alex Jones and his business as a trophy they can display at their political fund raisers and social events where their abuse of the legal system to achieve ridiculous and indefensible judgments is worn as a badge of honor. This Court should not countenance that unmasked, naked hatred.

[22]     Proof of which is grounds for amending or altering a decision of a court. *See*, *Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added).

[23]     *See, e.g., Fulk & Needham, Inc. v. U.S.*, 288 F. Supp. 39, 44 (M.D.N.C. 1968).

[24]     *Jeffers v. Clinton*, 756 F. Supp. 1195 (E.D. Ark. 1990).

006054

and there is final or unstayed judgments ruling the Plaintiffs' proofs of claims non-dischargeable in whole or in part. If reversed as anticipated, an auction will not happen until a retrial. The Connecticut Appellate Court and Connecticut Statute stayed the Connecticut Judgment. However, the Connecticut Supreme Court has denied Jones' and FSS's Motion for Certification and both Jones and FSS are seeking a continuation of that stay pending their Petition for *Certioraria* with the U.S. Supreme Court pursuant to the Connecticut statutory provision allowing for a discretionary stay.

**B.      Even If This Court Could Declare the Supplemental Order Void, To Do So Is Facially Inequitable And Rewards The Wrongdoers**

18.      The Trustee's negotiations on their illicit "settlement agreement" took several months, during which Trustee *never initiated any bidding procedures ordered by this Court* to deal with the outstanding $8 million cash offer. When they finally reached the terms of the "settlement agreement" the Court again rejected the Trustee's proposed Settlement Agreements and for good reason and the Trustee has gone silent on holding the ordered auction.

19.      While the second round of misconduct is referenced above, a few more details shed light on the radical inequities perpetrated as the tip of the tension among the Plaintiffs that was revealed in the first farcical auction, primarily revolving around how to split the FSS carcass the Plaintiffs hoped their non-final judgments would recognize. Anxious not to wait for any appellate outcome, the Texas Plaintiffs were adamant that the split should be 75/25 and threatened to disrupt the Connecticut Plaintiffs collection efforts if agreement were not reached. According to the fifteen Connecticut Plaintiffs, they had collective judgments totaling approximately $1,500,000,000, whereas on the other hand, two Texas Plaintiffs (Heslin and Lewis) claimed judgments totaling only approximately $50,000,000. Thus, the split should have been 97% Connecticut and 3% Texas. However, the Texas Plaintiffs flipped that argument putting the

006055

Connecticut Plaintiffs' ridiculous judgment at risk. They argued that the same Sandy Hook events had occurred *to all plaintiffs* and their damages should have been the same but for the prejudice of the Connecticut plaintiffs trying the case approximately 28 miles from the murder site, since liability was judicially decreed in both Texas and Connecticut and only damages were to be tried. *Yet for the same event* the fifteen Connecticut Plaintiffs received as non-punitive damages, at total of $965,000,000 – or approximately $65,000,000 each – *whereas for the same event the Texas plaintiffs received only $2,000,000 each*, or 3.5% of the Connecticut non-punitive damage amount. The Texas plaintiffs' receipt of only 3% of what the Connecticut Plaintiffs got, was unfair and only explainable as the result of local prejudice.[25] Instead, the Texas Plaintiffs proposed a different view simply "counting heads" as that was the only rational way to divide FSS up given that other means based on the sizes of the respective judgments was indefensible. And as there are three other Texas Plaintiffs who have not even proceeded to trial and thus had and have no judgments, counting them resulted in 15 Connecticut Plaintiffs and 5 Texas Plaintiffs – or a compromise division of 75/25.

20.      The problem with this was that (a) judgment creditors are counted by the dollar amounts of their claims, not on a "per capita" basis which if pursued by Connecticut risked exposure by Texas and (b) the prospect that either or both judgments were very likely to be

---

[25] While this Court has declared most aspects of the Connecticut and Texas judgments non-dischargeable, making that interlocutory ruling final will require this Court to explain how the same event – Sandy Hook – where liability was judicially decreed in both Connecticut and Texas, resulted in "victims" who sued in Connecticut receiving awards 32 times greater than "victims" who sued in Texas. While this fact will be difficult for the Court to explain, so will its disregard of the requirements of the Connecticut Supreme Court stated in *Lighthouse Landings, Inc. v. Conn. Light & Power Co.,* 15 A.3d 601, 613 (Conn. 2011) that collateral estoppel rules were not to be applied mechanically as the Connecticut plaintiffs convinced this Court to do, but were to be viewed flexibly with equity in mind and are particularly inapplicable when to do so would "work an injustice" or "frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *Id*. Equally difficult for the Court will be its explanation of its disregard of *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993), which in the context of collateral estoppel involving default judgments, re-emphasized the Restatement of Torts' comments that where the prior action was a default, the matter was not actually litigated, creating yet another basis for finding dischargeability which this Court ignored.

006056

radically reduced if not eliminated on appeal, would throw their respective division of the financial body of Jones and FSS into complete jeopardy. Thus, instead of continuing the auction, the Trustee and the Plaintiffs devoted their time and FSS's treasure to reaching a completely illegal arrangement where in summary, (a) the two Texas Plaintiffs' $50,000,000 judgment would be deemed fully "allowed"; (b) the fifteen Connecticut Plaintiffs claims of $1,438,139,546 would be deemed fully "allowed," even though the Connecticut Court of Appeals had reversed $150,000,000 of that related to CUTPA punitive damages; (c) *the three Texas plaintiffs* whose cases had yet to be tried would be given deemed "allowed" claims of more than $375 million, which coupled with the $50,000,000 held by the other Texas Plaintiffs would yield a dollar amount as between Connecticut and Texas equal to 75/25; (d) the Texas Plaintiffs would drop their appeal of the Supplemental Order; and (e) since the Texas claims had not yet been bonded and the Connecticut Plaintiffs were statutorily precluded from collection, the Texas Plaintiffs would assign their new allowed claim of $425 million to Connecticut. Plaintiffs would then proceed to collect *in this Court* on the Texas judgement and the Trustee would pay the Texas Plaintiffs $4,000,000 from cash he held belonging to the Jones Estate (including mainly FSS money). The fact that the claims were deemed "allowed" would mean, critically, that nothing that occurred on appeal would disturb their rights. And importantly, among other things, the Connecticut Plaintiffs proceeding to collect on the Texas judgment would effectively mean there would be nothing left to auction. Hence once again the Court's intentions of the Supplemental Order were intentionally and unfairly thwarted.

21.     On both occasions denying the proposed auction procedure, this Court expressed at length its concerns and displeasure with the proposals that did not come close to resembling a normal bankruptcy public bid process. Exhibit "1" illustrates again this Court's frustration over the Trustees continued efforts to "arrange" matters to encumber a simple bidding procedure and

006057

auction to favor Plaintiffs. Neither the cash bidder nor the Debtor nor FSS had anything to do with these manipulated bidding process – only the Plaintiffs and their agent-Trustee.

### C. The Manipulation Continues As the Abuse of Process Continues

22. When FUAC filed its motion seeking a status conference based on its outstanding $8 million non-responded-to cash bid, an interesting response from the Trustee and the Plaintiffs resulted. Notably, the *Trustee responded by silence*, likely fearing the rath of the Plaintiffs as their position has done a 180-degree change to not wanting an auction that they could not control.

23. Even though twice before the Plaintiffs and Trustee were actively pursuing his version of an auction process, not so this time– *it is now the Connecticut Plaintiffs and the Texas Plaintiffs that do not want a bankruptcy auction – in truth, not an auction **that they cannot control*** and win. [*See*, Plaintiffs' objection to FUAC's Request for Status Conference (and notice of its bid, Dkt. 1113]. And whatever the Plaintiffs demand the Trustee follows. Even with the opportunity to re-establish the Court's and the public's confidence in the Trustee's supervision of a fair bankruptcy auction process, the Trustee stands down, to not conflict with the Plaintiffs new position of no auction.

24. The impact of the Creditors' manipulations and overt efforts to ignore the economics of this bankruptcy and to seek only a political goal of removing Jones from the airways and destroying the "InfoWars" brand, is all designed to prevent news media-Jones' First Amendment rights by censoring his ability to exercise those rights.[26] This ulterior motive has not

---

[26] Set out below are only a few of the many examples of the Connecticut Plaintiffs and the Texas Plaintiffs declared purpose in bringing and prosecuting the suits against Jones and FSS was political and sought to deny Jones his right to freedom of the press and free speech. Motivating this litigation is not, and never has been, the recovery of a monetary damages for an actual and legally recognized injury (which has yet to be fairly determined), or even allowing punitive damages reflecting any reasonable application of punitive or exemplary damages law or statutes, but is the political activism and political motive to accomplish the goal to taking Alex Jones and incredibly popular "The Alex Jones Show" of the air and "out of the public discourse" by demanding exaggerated and illegal recoveries of punitive damages:

006058

only thwarted Jones efforts at a legitimate bankruptcy resolution (including Plaintiffs rejection of multiple proposals to resolve these claims *by payments to these Plaintiffs in the high 8-figures*) but reflects manipulation that goes well beyond this Court's limits in protection of creditors and imposes risks on debtors and the bankruptcy process that is repugnant to any bankruptcy right or policy.

25.     Even if, however, the prospect of a resolution with these Plaintiffs is not available because of the political agenda of the Plaintiffs, the bankruptcy code and bankruptcy policy still require this Court to consider the *economics and motives* of creditors, including these Plaintiffs, as an element of most every decision the Court has, and is, to make.  Just as a non-creditor claims-purchaser cannot acquire a creditor's claim (for the purpose of obtaining standing), then file the claim, and then assert the claim in bankruptcy to block a reorganization, *if there is an alternative motive to the mandated "open and honest" economics of claims recovery* the bankruptcy code will impose a remedy.[27]  In this case of such high stakes and profiled, the issue of "motive" permeates

---

**"Berkowitz said his clients may be willing to settle with Jones for less money if it means *Jones would end his broadcasting career*." "If he wants to agree to some sort of terms that hold him accountable for all he's done, we'll be open to listening.   Whether that means *walking away from public life*, to paying Sandy Hook families *in full ….*"**
https://www.washingtonpost.com/investigations/2022/11/21/alex-jones-sandy-hook-lawsuit/

*Damages "should be awarded in an amount that assures Alex Jones is off any platform … taken out of this discourse* …."

Quotes from *Texas Plaintiffs' closing arguments; See, also Connecticut Plaintiffs opening statement YouTube* https://www.youtube.com/watch?v=xFaxgchQczg "take Alex Jones platform … away … and make certain he cannot rebuild the platform.  Take him Jones out of this discourse … that is punishment.)

[27]     The law is clear that an ulterior motive and purpose, and malice to cause damage to an estate bars the right to purchase a claim and utilize the claim in a bankruptcy case.  *In re Lichtin/Wade, LLC,* No. 12-00845-8-RDD, 2012 Bankr. LEXIS 5785, at *10-11 (Bankr. E.D.N.C. Dec. 17, 2012) explains the prohibited process, citing the Ninth Circuit, noted:

If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster. **On the other hand, pure malice, "strikes" and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a**

006059

every aspect of the Plaintiffs counter-intuitive, abnormal demand to *destroy the value of the Jones Estate and FSS assets* and destroy the ability of Jones to earn a living so as to pay the Plaintiffs claims, while at the same time demanding their debt be both allowed and found nondischargeable. This abuse of process conduct, or "lawfare" in more current political terms, should not go unaddressed, when Plaintiffs make economic demand of this Court for their creditor rights and treatment of their claims, yet motivated to impede the entire bankruptcy case by destruction of the real value of the Estate's assets and thereby destruction of the Debtors' ability to earn an income by the exercise of their First Amendment rights to uncensored media and free speech. Those constitutional rights are valued in the millions yet in this case the Plaintiffs want that value to be as near as zero as they can possibly manipulate to take Jones "off the air" and out of the public discourse (reciting opening and closing jury arguments in the Plaintiffs' respective trials).

26.     This bankruptcy "lawfare" has not, however, gone unnoticed. The Paul Weiss law firm as purported "*pro bono*" counsel to the Sandy Hook Plaintiffs (all of whom have received multi-million-dollar settlement funds from the Remington $70+ million-dollar settlement payment), has recently settled its similar "lawfare" litigation after being sued by President Trump for their participation with prosecutor Alvan Bragg in the New York City prosecution of the victimless crime of real estate valuations by the affiliated entities owned by President Trump. Paul Weiss agreed with President Trump to settle his claims by Paul Weiss performing $40 million of "*pro bono*" *non-political*, legal work in exchange for a release of the damages claims made by the

---

    *competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior*.
Figter Ltd. v. Teachers Ins. and Annuity Assoc. of Am. (*In re Figter Ltd.*), 118 F.3d 635, 638-639 (9th Cir. 1997) (citing *In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 671 (E.D.Pa. 1942)); *In re Lichtin/Wade, LLC*, No. 12-00845-8-RDD, 2012 Bankr. LEXIS 5785, at *10 (Bankr. E.D.N.C. Dec. 17, 2012) ("The test is "whether a creditor has cast his vote with an 'ulterior purpose' aimed at gaining some advantage to which he would not otherwise be entitled in his position." *In re Gilbert*, 104 B.R. 206, 216 (Bankr. W.D. Mo. 1989) (citing *In re A.D.W., Inc.*, 90 B.R. 645, 649 (Bankr. D.N.J. 1988); *In re MacLeod Co., Inc.*, 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986)).

006060

President.  Upon information and belief, there is a written settlement agreement, but Jones does not have a copy.

27.     In this reorganization case and later in the Chapter 7 case, it has been Paul Weiss that has directed that Plaintiffs actions throughout these two bankruptcies.  Paul Weiss has directed the same lawfare conduct that its firm admittedly attempted against President Trump.  Apparently unknown to the President, Paul Weiss considers *pro bono* representation of millionaires in this bankruptcy (the Connecticut Plaintiffs shared in the $70+ million settlement of the gun manufacturer litigation).  The Connecticut Plaintiffs and their espousing their ideological political agenda of gun control by partnering with the Onion, was all designed to acquire "InfoWars" brand and IP and *remove Alex Jones from his career as a news media and champion of free speech and freedom of the press*, and according to Paul Weiss' webpage, it considers these Plaintiffs to be as "pro bono" work (hardly in compliance with its settlement of the President's claims.)[28]

28.     In truth, Plaintiffs' counsel, including Paul Weiss, have adopted and pursued lawfare[29] in the handling of the Plaintiffs' purported judgment claims "as if" the Plaintiffs were creditors holding claims that were being pursued for the economic recovery of those claimants.  Nothing is further from the truth in this case.   As the Fort Worth Court of Appeals recently noted:

> Lawfare is an ugly tool by which to seek the … policy changes the California Parties desire, *enlisting the judiciary to do the work that the other two branches of government cannot or will not do. …*"

---

[28]     On the Paul Weiss web site, the firm continues to claim that the Connecticut Plaintiffs representation is *pro bono*, although *pro bono* legal work is generally not considered representing politically aligned millionaires to destroy someone's constitutional Free Speech rights.  It is believed that this position by Paul Weiss is being investigated as a breach of their settlement agreement.

[29]     "Lawfare" has been defined in *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 U.S. Dist. LEXIS 249912, at *1 n.1 (E.D. Pa. Dec. 10, 2021):
> The term "Lawfare" is a play on litigation and warfare. The term itself is often used to describe the act of using litigation to harass people. Here, Plaintiff motions to prohibit Defendant Barbounis from using Lawfare under Rule 402 and 403, alleging that it is unduly prejudicial and irrelevant.

006061

*City of S.F. v. Exxon Mobil Corp.,* No. 02-18-00106-CV, 2020 Tex. App. LEXIS 5226 at 58-59 (Tex. App. June 18, 2020).[30]  More to the specifics, "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy.  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448.  And these Jones and FSS Bankruptcy cases have been the textbook example of "lawfare," as here:

a.      a creditor obtains a judgment that it brings to the bankruptcy court, files both the claims ***and*** an objection to the dischargeability of that claim (*i.e.*, wanting to appear to be legally seeking to be paid notwithstanding all other creditors discharge in the bankruptcy);

b.      yet these participants with an ulterior motive, using the claims "standing" and with the help of third party "partners" (in one instance, the Trustee, and another, the Onion, indirectly affiliated with Bloomberg, a well-known advocate of gun control) seek to acquire all of Jones' and FSS's assets, not for their economic value, but *for the express purpose of destroying the InfoWar brand's value and thereby Jones ability to earn an income*; and

c.      done all in the pursuit, not of a financial return on their claim, but implementation of an ulterior motive and purpose in the claims filing and objection to dischargeability *to further a political agenda of depriving Jones and FSS of their Constitutional rights to the free exercise of the First Amendment through freedom of the press and freedom of speech by which both earned their individual and corporate living.*

29.      It is not only the bad faith that ulterior motives in filing the claims are pursued (*e.g.*, refusing to mediate in good faith, and seeking to control the bankruptcy process so as to acquire the Jones and FSS assets as cheaply as possible and for the purpose of destruction of those assets

---

[30]      More generically "Lawfare" is defined in *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 U.S. Dist. LEXIS 249912, at *1 n.1 (E.D. Pa. Dec. 10, 2021) as follows:

The term 'Lawfare' is a play on litigation and warfare. The term itself is often used to describe the act of using litigation to harass people.

006062

value, only to further their ulterior motive to destroy these debtors ability to exercise their "fundamental constitutional rights". *Id. Pennzoil,* 107 S. Ct. at 1535 [*See, Supra*, pg. 12]. The intention and goal of using a claim in bankruptcy for the purpose of depriving a debtor of its rights to free speech and freedom of the press, and to earn a living, makes this case and the conduct of the Connecticut Plaintiffs and the Texas Plaintiffs repugnant to every bankruptcy policy approved by the Supreme Court of the United States. Once this Court refused to allow the Plaintiffs to manipulate the auction process, they simply pivoted to opposing *any* bankruptcy auction. Now the agenda is to use the State Court system to continue the same unlawful abuse of process.

30. Below Jones will address the most egregious misstatements set out in the Plaintiffs' Response to the FUAC auction motion, in which they now oppose any bankruptcy auction sale, in favor of a state court action *that they are prohibited from participating pursuant to the stay (and expected stay) pending the appeal of their Judgment.*[31]

### VI.
### THE CONNECTICUT PLAINTIFFS' LAWFARE IN PURSUIT OF THE ULTERIOR MOTIVES AND PURPOSES

**"The Sandy Hook Families have not yet received—and are no closer to receiving—*a single dollar in distributions* from either Jones or FSS through the bankruptcy cases [Plaintiffs'** *Joint Objection to an Auction* **Pg. 1, ¶1]**

31. It is important to recognize that this statement on behalf of the Plaintiffs in support of their sudden reversal of their position on an auction, is intended to mislead and obfuscate the Plaintiffs' ulterior motive - that these bankruptcy cases *are not about distributions or money*, but about taking Alex Jones out of the public discourse and off the air, and the motive is shared by other significant players in the political arena. Below Jones will address the misstatements set out

---

[31] As pointed out herein several times, simply because Paul Weiss is prohibited by a court and a statute from taking an action does not mean Paul Weiss will not take the action (*e.g.* the WD-TX removed case now in this Court where Paul Weiss attempted to obtain a receiver over all of Alex Jones assets by false representations to the State Courts. Paul Weiss simply ignores this Courts stays and likely its injunctions.

006063

in the Plaintiffs Response to the FUAC auction motion in which they now oppose any bankruptcy auction sale, in favor of a state court action they are prohibited from participating pursuant to the stay pending or prospective stays of the appeal of their Judgment, or the automatic say or the discharge injunction.

### A. Alex Jones Estate Received approximately $6 Million From FSS and Post-Conversion Alex Jones Services During These Bankruptcies, That Has Now Been Reduced to $4 Million as a Result of Administrative Costs Pursuing Auctions and Plaintiffs Claimed Settlements

32. Plaintiffs, in obtaining the grossly unfair and unconstitutional Judgments, were permitted to argue to the jury that Alex Jones should be punished by an award *that assured he could never continue in his profession*. [*See, supra*, Note 18]. The Connecticut Plaintiffs and their announced partner, the Onion, told the public that the purpose of acquisition of the FSS assets was to destroy the InfoWars brand and business and use the customer data to further a parody of the InfoWars brand to its customers.[32] All during this process Alex Jones continued to broadcast his show and, in the process, allowed FSS to amass more than $6 million in cash (net of the over $2 million the Trustee's lawyer and professionals have spent on fees). The order placing that cash in the Jones Estate is a final order.

33. Just like the auction orders, and although ordered twice by this Court, the Plaintiffs refused to mediate, first of all, at all with Hon. Judge Isgur, and the second time, not in good faith, conduct wholly consistent with the goals of the Plaintiffs. And all during this time Jones continued to profitably render his services to FSS or through FSS, InfoWars and its brand, for the Estate.

### B. The Jones/FSS Litigation and This Bankruptcy Has Increased the Sandy Hook Foundations by Hundreds of Millions of Dollars

---

[32] Although nothing would have prevented the Connecticut Plaintiffs from bidding at any Jones Estate auction for assets, that is not what the Connecticut Plaintiffs did. In addition to other manipulations the Connecticut Plaintiffs attempted to use their *non-final stayed judgment as if some sort of cash equivalent* for the purpose of that bidding – in other words, to "collect" on their judgment in violation of the Connecticut Statute, and currently, the Connecticut Court of Appeals, stay of all collections.

006064

34.    After having negotiated a $70+ million settlement with the gun manufacturers and sellers, several of the Connecticut Plaintiffs formed charitable foundations in support of gun control (Jones does not yet know how many have been formed, but at least three are known. Those foundations received public donations to further their purpose. However, with modest contributions through five years after the Sandy Hook tragedy, the Connecticut Plaintiffs finally decided to sue Jones and FSS along with an immediate, well-financed, public campaign of adverse public-relations "news releases" all raising the claims and allegations of these plaintiffs in the post-suit public press. On information and belief, the PR firms used later became the same PR firms used in the New York suit against President Trump, bragging at the time that it worked against Jones as a test of its success.

35.    Thus, when Jones and FSS were sued in 2018 for defamation in 2018 and the news releases began flooding the news, not surprisingly and almost immediately the funds began to increase. However, the major increases were leading up to the trials, including (shortly before *each trial was to begin*) grants from the United States Department of Justice, and other governmental agencies that reached a highpoint at the beginning of the Connecticut trial. This multi-million government funding allowed, for example, one foundation's founding member and Sandy Hook parent, to earn in excess of $240,000.00 plus in her annual salary from the foundation that, according to published records, used 46% of all donations for salaries.

36.    Jones has reviewed the ".gov" public records of at least three (3) Sandy Hook foundations whose contributions were flat for the several (up to 4+ years prior to the litigation), and that upon suit and publicity of the trial, doubled or tripled or more, through among other things, **DOJ grants**, and public contributions in excess of $100,000,000.00 to these three Connecticut Plaintiffs' charitable foundations – increases almost singularly driven by the Alex Jones suit and

006065

the professional publicity of public relations firms that have bragged about their success in the Jones case.

C.     **The Going Concern Value of FSS and Alex Jones Operations Could Gross $50 Million or More a Year, Yet Plaintiffs Want All Operations to Cease – and Retain Their Non-Dischargeable Debt**

37.     Since his appointment, and at the suggestion of Jones, Trustee Murray has never stopped production work through the use of the FSS assets and leasehold estate, work headed by Jones and aided by the Supplemental Order, which work has earned the Estate several million dollars and preserved the assets intact, such that the bid price with all assets intact has risen from $4m to $8m.  This success has been after all of the adverse publicity of the Plaintiffs' bankruptcy.

38.     However, as the Court recalls, immediately upon "announcing" (without Court review or approval) that the Onion was the winning bidder based on judgment credits, the Trustee shut down and took "dark" the InfoWars production and web presence.  This was accompanied by the Onion publicly announced its intention to only use the Website and IP for parody of Jones and to support gun control.  In other words, a business enterprise valued in the multi-million dollars was to be acquired for parody, in fact designed to destroy the brand and destroy the income that the InfoWars brand earned up to the date the Trustee claimed to have sold it the Onion.

39.     In face of the continued monetary success of Jones continuing FSS's operations, Trustee Murray has continually reflected an attitude that is impossible to explain.  For instance, when he would not agree that FSS and Jones Connecticut appeals were authorized to be filed, and claimed he intended to allow the appeals to expire for lack of briefing (and actually criticized Jones and threatened the lawyers that timely filed those briefs).  Other examples include the Trustee's unconventional conduct in pursuing two failed auctions and joining in a settlement with the Plaintiffs that at a minimum would have violated the law.  Finally, after ignoring the $8 million second offer of FUAC for two months in favor of those failed "settlement agreement" negotiations,

Page 28 of 34

006066

when FUAC wanted to participate in an auction as the Court had instructed the Trustee to do, the Trustee remained silent and refused to take a position (or even seek to initiate bid procedures) on the FUAC's second $8 million cash bid.

40. To be clear, Christopher Murray is a capable and competent Trustee but has at best "frozen at the wheel" in both his logic and capabilities because, insofar as Jones believes, and capitulated to the Plaintiffs' demands on, and possibly expressed or implied threats made to, the Trustee, with repercussions if the Trustee did not do as the Plaintiffs' demand to permit them to dictate the auction process that both times was rejected by this Court. This belief would explain the following:

i. Why the Trustee arranged the terms of the first sale process so randomly and incompletely, simply because that was the extent to which the Plaintiffs wanted to be bound, and it guaranteed their success.

ii. Why the Trustee would need to drive at 5:00 AM from Houston to Austin on the day of his intended announced selection of the Plaintiff's & Onion joint partnership bid, to order the "shut down" of FSS operations and require the FSS broadcast crew take the Alex Jones Show "dark" (dropping weekly sales from an average of more than $80,000 to less $20,000.00 when re-started 48 hours later) while at the same time the Onion announced to the public through news interviews and redirection of the FSS URL to the Onion new URL – falsely <u>announcing that it had purchased "InfoWars.</u>

iii. Why the Trustee, after what is reported as over $12 million spent on accounting investigations and fraud auditing of FSS and Alex Jones by the Chapter 11 Committee and professionals, there were no assets or transactions (save a single vehicle) omitted from the FSS and Jones schedules and disclosures, he decided to retain in the Chapter 7 case additional professionals to investigate Jones Chapter 7 FSS business conduct and spent $2 Million in

006067

administrative costs pursuing two Trustee-driven failed auctions.

iv.     Why, when the Trustee received on December 19, 2024 an $8 million offer to acquire the assets of FSS, the Trustee never initiated a sale process but for some reason substituted his "negotiations" for the next six-weeks *with the Plaintiffs* to ultimately propose giving the Texas Plaintiffs an allowed claim more than 10 times the amount of their judgment, and giving an "allowed" claim in the full amount of the Connecticut Plaintiffs Claims even though no Plaintiffs' claims was allowed because both were, and are, still on appeal and stayed by the Connecticut statutes and Connecticut Court of Appeals Order and the automatic stay.  This belief is also based on the announced motives of the Plaintiffs, to take Alex Jones off the air and destroy his ability to continue in the public discourse.  This motive, stated by both the Connecticut and Texas Plaintiffs in the opening and closing jury arguments, explains why the Onion announced after it claimed it won the bid, that it would shut down all FSS operations and use Infowars for Alex Jones parody – by utilizing his database of customers and followers.

41.     This conduct clearly evidences the ulterior motives using and driving these bankruptcy cases to accomplish a political agenda, initiated by Plaintiffs' trial counsel and continued by Plaintiffs' bankruptcy counsel.  This Court has the jurisdiction and power to prevent such unfair and unlawful conduct which should not be simply sent to the State Courts to repeat the injury.  The Fifth Circuit instructs on this Court's ability to control this conduct:

> Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423.  … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This  [*428]  includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages.").  *Id.* at 427-428.

*Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020).

006068

**D.      This Court Should Not Reward These Abuses of the Bankruptcy Process to Continue the Lawfare of the Plaintiffs**

42.      As remarkable as it sounds, the multiple large international law firms including Paul Weiss and Akin Gump, see nothing wrong with announcing a strategy to deprive Alex Jones of his freedom of the press and his right to free speech.   It was Paul Weiss that settled the lawfare suit against President Trump, by acknowledged the wrongdoing of its former partner Mark Pomerantz in the New York Alvin Bragg litigation and agreed to dedicate the equivalent of $40 million in non-political "*pro bono legal services*".   Contrast Paul Weiss' settlement with President Trump to the Paul Weiss current web page claiming that its current partner Kyle Kempler:

> "maintains a significant pro bono practice. *He is currently representing a group of families of the victims of the Sand Hook Elementary School Shooting in the bankruptcy proceeding of ... Alex Jones and Jones' wholly owned Company Free Speech Systems* …."

It is generally accepted that Lawyer "pro bono" work means free legal representation to those who cannot afford the legal fees or by representing non-political public interest groups without funds to advance their public cause.  Pro Bono work is not claiming to be doing free work for rich people pursuing a political agenda or doing free work to pursue the censoring of an individual's freedom of the press and free speech.

43.      In fact, all of the Plaintiffs' lawyers and the purported *pro bono* law firms, have repeatedly claimed that they are not interested in the money, but in taking Alex Jones off the air and out of the public discourse forever.  This is the ultimate form of censorship by abuse of process – to be allowed to argue to a jury that they the jury has the power through an award of punitive damages, to take away a person's constitutional right to freedom of the press and free speech, then use that success to force a bankruptcy and then intentionally destroy the debtor's ability to earn a living.  These lawyers have argued this ulterior motive repeatedly over and over and even including the Onion (that their partnership with the Connecticut Plaintiffs  was to acquire the FSS assets and

006069

the name and brand "Infowars" so that it can be destroyed by their use of it to parody Alex Jones and his right to freedom of the press and free speech (certainly not to realize its brand value).

44. This is exactly what President Trump experienced and exactly what President Trump thought he was ending by the terms of this settlement. Not so - Paul Weiss simply "repackaged" their definition of "pro bono" into representing rich individuals for free if the political message is correct. Notwithstanding that the families are neither poor nor, according to their lawyers, interested in money damage (not only have many of the Connecticut Plaintiffs shared the $70+ million payment by Remington and other gun manufacturers, but the several foundations that many of the families have set up or participate in, have received over $100 million in DOJ grants, loans from the US Government and public donations) according to the governmental databased ".gov."

## VII.
## CONCLUSION

45. Notwithstanding the above, Plaintiffs, through "Pro Bono Paul Weiss", assert that Jones and FUAC are parties that have no economic standing in the case to complain of their conduct. — [*See*, Supra, ¶ 7, pg. 10]. This Court has previously recognized Jones standing regarding the auction orders.

46. This Court should exercise its jurisdiction to enforce all of its prior auction-related orders, including the Orders authorizing an auction as well as the Supplemental Order. This Court should enter its order for the Trustee, or a replacement Trustee if requiring replacement [*See, supra* Note 21] to conduct a sale that is not controlled or driven by the Plaintiffs and simply allow the process to conclude. All parties in interest, even the Plaintiffs as bidders, and the public, will have a fair opportunity and right to participate in a fair and honest outcome if not controlled by Plaintiffs. All other matters arising from the lawfare conduct of the Connecticut Plaintiffs will be left to other

006070

Courts or other proceedings to determine, but as to this Court and its clear jurisdiction to accomplish fairness in the auction process, and the public policy of having its orders observed and not manipulated, this Court should order the auction of the assets covered by the Supplemental Order.

WHEREFORE, Movant Alexander E. Jones individually, and a manager of Free Speech Systems, LLC, seek an order as above requested, and for such other and further relief to which Movants may be justly entitled, at law and in equity.

Dated: April 28, 2025

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com
   aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and FSS**

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES And FSS**

006071

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on April 28, 2025.

*/s/ Shelby A. Jordan*
Shelby A. Jordan

006072

NO. 03-25-00617

_____

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
Appellant,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN,
MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER
HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO,
JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM
SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT
LEWIS, AND GREGORY S. MILLIGAN
Appellees.

_____

# EXHIBIT 6

_____

006073

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES,                    )  CASE NO: 22-33553
                                       )
                                       )  Corpus Christi, Texas
                                       )
            Debtor.                    )  Thursday, June 5, 2025
                                       )
                                       )  1:00 p.m. to 2:32 p.m.
-------------------------------)


                              HEARING

          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:                   BEN C. BROOCKS
                              Broocks Law Firm PLLC
                              6207 Bee Cave Road, Suite 120
                              Austin, TX 78746

                              SHELBY JORDAN
                              Jordan & Ortiz, PC
                              500 North Shoreline Blvd.,
                              Suite 804
                              Corpus Christi, TX 78401

For Chrsitopher R.            ERIN ELIZABETH JONES
Murray:                       Jones Murray LLP
                              602 Sawyer, Suite 400
                              Houston, TX 7007

                              JOSHUA WOLFSHOHL
                              Porter Hedges LLP
                              1000 Main, 36th Floor
                              Houston, TX 77002

For First United             WALTER J. CICACK
American Companies, LLC:      Hawash Cicack & Gaston LLP
                              711 W. Alabama Street, Suite 200
                              Houston, TX 77006


006074

For Veronique        AVI MOSHENBERG
De La Rosa:          Lawson & Moshenberg PLLC
                     801 Travis Street, Suite 2101, #838
                     Houston, TX 77002

For William          KYLE KIMPLER
Aldenberg:           Paul, Weiss
                     1285 Avenue of the Americas
                     New York, NY 10019

For the U.S. Trustee:    HA MINH NGUYEN
                         Office of the United States Trustee
                         515 Rusk Street, Suite 3516
                         Houston, TX 77002

Court Reporter:      YESENIA LILA

Courtroom Deputy:    YESENIA LILA

Transcribed by:      Veritext Legal Solutions
                     330 Old Country Road, Suite 300
                     Mineola, NY 11501
                     Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

CORPUS CHRISTI, TEXAS; THURSDAY, JUNE 5, 2025; 1:00 PM

(Call to Order)

CLERK:  All rise.

THE COURT:  Please be seated.  Good afternoon.  This is Judge Lopez.  Today is June 5th.  I'm going to call the 1 p.m. status conference in the Jones case.  I'll be calling, just so we have a clean record, 22-33553, 23-03035, 23-03037, 24-03279 or some combination of one or more of those cases.

I will take appearances in the courtroom, and then if anyone wishes to make an appearance on the phone, please hit five star and I will unmute your line.

MR. JORDAN:  Good morning, Your Honor, afternoon, I guess.

THE COURT:  Good afternoon.

MS. JORDAN:  Shelby Jordan, Ben Broocks, and Antonio Ortiz for Alex Jones and FSS.

THE COURT:  Okay.  Good afternoon.

MR. JORDAN:  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.  Mr. Murray is also here in the courtroom.  And I think my colleagues will announce themselves on the phone.

THE COURT:  Okay.  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack on behalf of First United American Companies.

006076

THE COURT:  Good afternoon.

MR. MOSHENBURG:  Good afternoon, Your Honor.  Avi Moshenberg, on behalf of the Texas plaintiffs.  Also remotely is Jarrod Martin attending.

THE COURT:  Okay.  Good afternoon.

MS. NGUYEN:  Good afternoon, Ha Nguyen for the US Trustee.

THE COURT:  Good afternoon.  Okay.  Let me turn on the line.  Here's a -- I'm just going to go in the order in which I see them, a 713-226 number.

MR. WOLFSHOHL:  Good afternoon, Your Honor, Joshua Wolfshohl for the trustee.

THE COURT:  Okay.  Good afternoon.  And a 212 number.

MR. KIMPLER:  Good afternoon, Your Honor.  It's Kyle Kimpler from Paul Weiss on behalf of the Connecticut families.  On the line with me today is my cocounsel Ryan Chapple.

THE COURT:  Okay.  Good afternoon.  Anyone else wish to make an appearance, please hit five star, and I will unmute your line.

Okay.  The purpose for today was a status conference on where we are and where we're headed, just try to get some more information in the middle of 2025.  I'll turn things over to trustee's counsel.  Ms. Jones, you can just proceed however you see fit.

MS. JONES:  All right, thank you.  I'll proceed with

an update in the main Chapter 7 case, the 22-33553.

THE COURT:  Okay.  If you can just get the mic a little closer to you, I just want to make sure we can all hear you.

MS. JONES:  Yes, I'll get a little bit closer.  We have right now one pending contested motion and that is the motion filed by the debtor, Mr. Jones, asking this Court to reconsider whether to hold an auction of FSS assets in this case.  There were two reply, two responses filed, one jointly by the Sandy Hook families and one response by the trustee and reply filed by the Debtor.  So that's the one currently pending contested letter that is before Your Honor.

There is likely going to be another contested matter, but the time hasn't, it's not ripe yet.  There's a pending motion to stay these bankruptcy proceedings pending appeal.

THE COURT:  Is that Mr. Nguyen's?

MS. JONES:  Yes.

THE COURT:  I'm going to rule on that today.

MS. JONES:  Oh, okay.  Well then that's not ripe, but we, the trustee would have opposed it, but -- a complete stay, of course, of the proceedings, but I just wanted to flag that as something that could come up.

But as far as uncontested, there are, there are some pending fee applications of Chapter 11 professionals that are

006078

-- have not been objected to and are ready for --

THE COURT:  Do you have the ECF numbers for them?

MS. JONES:  I do.  And so there's -- I'll give you the application -- okay.  So the application for Teneo Capital, which was financial advisor to the Committee, was filed at Docket 707.  And I've just uploaded revised proposed orders.  I'm only missing one, and theirs was just filed at, I believe it's Docket, I have to see it really quick, 1160, I believe.

THE COURT:  Oh, I did see this.  So I see Teneo, BlackBriar, and --

MS. JONES:  Kennerly.

THE COURT:  -- Kennerly.

MS. JONES:  Yes. And I've tied those to the ECFs there.  So BlackBriar Advisor's app is at 743, and then the revised proposed order has just been uploaded.  Rachel Kennerly's application is at 745 and the proposed order's just been uploaded.  And then Crowe and Dunlevy is, the application is at 746 and I just haven't had time to upload the order yet.  I'm waiting.  They've agreed to the form of the order.  I just, I added their signature and I always wait for people to respond and tell me I can do that.

THE COURT:  Is there any difference between --

MS. JONES:  There is.

THE COURT:  Okay.  I'll just wait on it.

THE COURT:  But those proposed orders just

generally.  And then Mr. Jordan also uploaded a revised proposed order for his application.

THE COURT:  Proposed final, right?

MS. JONES:  I'm sorry?

THE COURT:  I saw it.  It's a revised proposed final, is that right, Ms. Jones.

MS. JONES:  Yes, these are all final fee applications for the Chapter 11 professionals.  His app was at Docket 747.

THE COURT:  Oh, it's through the 11.  I was going to say, Jordan, you can't go anywhere.

MS. JONES:  And the only issue -- there were no objections substantively to the applications.  The issue was that there was not an authority to pay provision for the trustee, which we really need for him to be able to make the disbursement.

THE COURT:  Oh.

MS. JONES:  And so we added language with the specific remaining unpaid portion.  So it specifically references the amount.  And everybody has signed off on the form of the order.  I just need one more person to let me know that I can add their signature, and then I'll have that uploaded.  So those are ready to go if Your Honor wants to sign those or if you need a hearing, they're --

THE COURT:  Let me do something just so I'm procedurally in the right posture.  There is currently a

006080

request for me to stay.  The entire case is pending an appeal. And I want to -- why don't I take that up right now?  I thought rather than we're just having a status conference today, but I thought there was an active request and then also a request for a direct certification of an appeal to the Third Circuit. So I kind of wrote something out very shortly just to make sure that I addressed that.  And I can take that certainly without a hearing.  It was a request before me, so.  And it relates to ECF Numbers 1144 and 1153, Robert Wyn Young has requested that I grant certification for a direct appeal to the Fifth Circuit at ECF 1144.  And he's appealing my order denying his motion to intervene in this case.  And I signed that order at ECF Number 1129.

Bankruptcy Rule 8006(f) allows the Court to certify a direct appeal to the Court upon request by a party, 28 U.S.C. 158(d)(2)(B).  You can see why I wrote this out.  I wanted to make sure I got these right.

A bankruptcy court must certify direct appeal to the Court of Appeals in two instances.  One is where the request for certification is made by a majority of the appellants or a majority of the appellees.  Here, only the, only the appellant has made a request for direct certification.  Trustee has indicated they would oppose that, but I only had one request anyway.  And I now have verbal confirmation that there's not a majority here.  So that wouldn't apply.  So, and

therefore, that subsection doesn't apply.

The second instance is where the judgment order or decree involves a question of law as to which there's no controlling decision of the Court of Appeals for the Circuit, or the Supreme Court of the United States, or involves a matter of public importance.

Two, the judgment order or decree involves a question of law requiring resolution of conflicting decisions.

Three, an immediate appeal from the judgment order or decree may materially advance the progress of the case or proceeding in which the appeal is taken and if the Court of Appeals authorizes the direct appeal of the judgment order or decree, that is 28 U.S.C. 158(d)(2)(A)(i) through (iii).

157(d)(2)(B)(ii) mandates that if any of the four conditions are met, I make the certification, but none of them apply here.  It would involve a permissive motion to intervene in both the text and Bankruptcy Rule 2018.  And the law in this district is clear that intervention is permissive.

And so I rely on the cases that I cited in the order denying, but I would cite in, for example, in In Re CIS Capital Management, 604 B.R. 484, 513, Northern District of Texas 2019 case.  So Subsection 1 doesn't support certification.  Subsection 2 also doesn't support certification.  There's no conflicting decisions for the standards.  And finally, an immediate appeal would not advance the progress of this case,

which has been pending since 2022.

There have been multiple adversary proceedings.  I would note Mr. Jones has been ably represented at every stage in this case by really smart lawyers who have made arguments on his behalf.  He's been adequately represented and I wouldn't stray from any word that I put in that order.  I think allowing intervention would impede the progress of this case, quite frankly, it would have shut down, potentially shut down this hearing.  So I don't think Subsection 3 supports certification, because neither instance requires the Court to grant certification here.

I'm going to decline to grant certification for direct appeal to the Fifth Circuit.  I believe the matter is already set for an appeal before a district court, I believe Judge -- so there is no, I'm not setting this up for a direct appeal.

MS. JONES:  I think it's been assigned to Judge Rosenthal.

THE COURT:  That's what I understood.  So, and they don't come any smarter --

MS. JONES:  That's correct.

THE COURT:  -- than Judge Rosenthal.

MS. JONES:  I agree 100 percent.

THE COURT:  So and I just, again, I'm relying on the text here.  Textualism is always, in my opinion, the right

006083

answer.

Permissive intervention:  After hearing and on such notice as the Court directs and for cause shown, the Court may permit an interested entity to intervene generally or with respect to a specified matter, right?  It's permissive by statute.

So, I'm going to deny the direct appeal to the Fifth Circuit.  The statute is clear.  The cases interpreting the statute are clear.  There's no, there's no conflict, no conflict in law here.  So, I'm going to deny that, but I did note in the order that I've read everything that was submitted as well.  So it's not like I turned a blind eye to anything that came my way.  I read it.

So, Mr. Young has also moved to stay all proceedings in this case pending an appeal under Bankruptcy Rule 8007.  While the decision to grant a stay pending appeals is within the Court's discretion, the Fifth Circuit in cases like In Re First South Savings Association, 820 F.2d. 700, 709, Fifth Circuit, 1987 case provided factors for the Court to consider, right, whether the movant has made a showing of likelihood of success on the merits.  I strongly disagree with that for the reasons stated there in the order itself.

Whether the movant has made a showing of irreparable injury if the stay is not granted.  No, there's been no showing of irreparable injury.

006084

Whether the granting of a stay would substantially harm the other parties. The answer is no. I think quite frankly it would be harming the trustee's ability to function throughout this case and quite frankly, Mr. Jones' ability to proceed as a Chapter 7 debtor.

And for whether the granting of the stay would serve the public interest. I don't, have no -- nothing showing the public interest, and I've read all the papers. Quite frankly, I think the public interest is better served for a case that's been pending for three years to continue to move and not come to a screeching halt because the party, three years later, seeks to intervene in a case to provide evidence that the Court has reviewed and other matters.

And again, I rely on the order itself. It speaks for itself. So I've carefully reviewed all the filings, including the attached exhibits and the legal arguments that Mr. Young makes.

I'm going to decline to grant the stay pending appeal. So I'm going to deny both, and I'll enter short orders denying them for the reasons that I have stated on the record. So I can now -- I just feel more comfortable that I didn't take something up on the front end, agree to sign, for example, orders, and then consider a stay. I think there was an emergency request for a stay. I'm going to deny those. So I'll take a look at these orders and sign them on the docket.

MS. JONES:  Thank you, Your Honor.  And I expect one more this afternoon.  I'm just waiting for it.

THE COURT:  Got it.  Just let me know and Ms. Saldana know better.

MS. JONES:  I will.  And then there are two --

THE COURT:  Let me ask you.  With respect to the uncontested matter, I don't need to know what it is.  Do you have a sense of timing as to when something may get filed or not filed?  I won't hold you to it.  I'm just trying to get a sense of you said --

MS. JONES:  Uncontested.

THE COURT:  Oh, not uncontested matter.  You said there could be one more contested matter that may or may not be coming.

MS. JONES:  Yeah, excuse me for interrupting.  We intended to oppose the motion for the stay pending appeal of the proceedings.

THE COURT:  Oh.

MS. JONES:  And so I didn't want to jump the gun. I wanted to let you know that we anticipated another contested matter on the horizon --

THE COURT:  Oh, that's what you were talking about.

MS. JONES:  -- because we would have opposed the --

THE COURT:  So now that I've ruled on that, I've got the reconsideration of the order and I'll speak to that today.

006086

What else is there from your perspective in the main case?

MS. JONES:  In the main case, the trustee continues to administer some non-exempt assets.  There's some, there's some real property, and some, just some personal properties and watches, some details that we're still working through, just getting those sold.  So we're continuing to work on that.

There have not been any offers, or any actual offers, really any discussion about anyone purchasing the equity of FSS has kind of died down entirely.  We don't have any at this point.  And so we're just continuing to administer the non-exempt assets that we can and trying to move all of that forward to get those to a point of sale.  With respect to the --

THE COURT:  What's the status of pursuing the real property?  I'm less concerned about you selling a watch.  I'm more concerned about real big-ticket items.

MS. JONES:  Sure, there's, an auctioneer has been approved by this Court to list that property and to sell it

THE COURT:  Oh, okay.

W1:  And I believe they've been out.  They've looked at the property and they're taking steps to get it listed or to set a time for when --

THE COURT:  When do you think the process could, I don't want to hold you to it, just trying to get a sense of if he's going to list property, I'd rather him list it within

006087

the next 30 days and just see what's out there.

MS. JONES:  I can --

THE COURT:  There's a, there's a theme that I'll be pushing which is there's a lot of legal expenses that are getting incurred in connection with this case.  And I'm not saying people aren't doing the work because a lot of this, it's a big -- a lot of complexities here.  But the longer this goes, the more people are going to have to spend time, and I want to, I think keeping things progressing at a, not at a rapid pace, but at a steady pace where there's constant movement is in the best interest of all parties because there's stuff pending in front of me.  There are matters pending in other state courts.  I'm assuming that's continuing in Texas and in Connecticut.

And there's a lot of moving pieces, and I'd rather to the extent there's non-exempt assets, that's, you know, I'm not telling you what to do, but you will exercise your business judgment as to what you intend to sell or not sell, but, you know, come September, October, if something is planning on being sold in terms of an asset, I'd like it at least on the market, if that makes sense.

MR. BROOCKS:  That's entirely doable.

THE COURT:  Okay.

MS. JONES:  And I don't know if you'd like to address timing or if you --

006088

THE COURT:  Yeah, just get close to the microphone so we can hear you.

MR. BROOCKS:  Yeah, I think by the third quarter we'll have everything either teed up with a motion to sell.  It'll certainly be listed by then.  It hasn't been yet because in the case of the real estate, it's a residential home and it has a tenant, so we're negotiating the exit of that individual.

THE COURT:  I got it.

MR. BROOCKS:  And --

THE COURT:  Okay.

MR. BROOCKS:  But I think by the end of the year, we should be closed with all of those.

THE COURT:  Okay.  Thank you.

MS. JONES:  But with respect to our, with the approval of the settlements in the, in the adversaries that were pending in the FSS, under the FSS umbrella, the PQPR and the (Indiscernible) adversary, with those settlements and then Your Honor's decision regarding admin -- not doing a sale of the assets, the FSS assets in the --this Chapter 7 case, you know, we've pared our focus down to, you know, the essential things we need to do to get this case moving forward and closer to being done.

THE COURT:  So assuming those assets are teed up and some coming up, I don't -- I hate hypotheticals, but let's

just assume there's a buyer, willing buyer for estate assets, what -- after that, what's left, putting aside the adversaries?

MS. JONES:  There is some litigation, a couple of matters we do expect to file those by next week.  And I think those are pretty straightforward, but just a couple of litigation matters that need to be dealt with.

THE COURT:  The adversaries or?

MS. JONES:  Yes.

THE COURT:  Okay.  Once they're -- obviously nothing is, nothing is final until you file it, but once, assuming you file it, let my case manager know I want to set up a status conference whenever, as soon as it makes sense to do so.  I don't want it to fall through the cracks.  That's where I'm going.

MS. JONES:  And depending on --  as well, depending on the steps that the families take, if any, whatever they decide to do in state court, you know, we may be back here with motions to really to give instructions about what the Court wants us to do.  And so we may have some motions related to any enforcement efforts that are made in the state court just to ensure that the trustee has clear authority and instruction to move forward.  He's not going to do anything without the Court giving authority to do it.

THE COURT:  Okay.  I intentionally like don't read what's happening in other cases of, you know, like something

006090

shows up on the news. I don't click on it to read the news or I'd rather just deal with the information that's given to me in front in the Court here and people make arguments. So I honestly have no idea what's happening in the, in the Connecticut or the, or what the current status is in the Connecticut or the Texas matter. So me having status conferences like this is really where I try to get the real information.

MS. JONES: And I would just defer to Mr. Moshenburg or, and Mr. Kimpler to update you if you'd like to hear from them about the status of their cases. But with respect to what the trustee needs to do, this is, this is where we are. And then with respect to the FSS case, we're essentially, either all those adversaries are either settled, dismissed, or closed. So I think that case, for the most part, it's done. I don't expect anything else in that case, at this point.

THE COURT: Okay. Thank you. Mr. Moshenburg, you're in the courtroom, and then I'll turn to Mr. Kimpler. From the Texas family's perspective, I'll let you, where do things stand, both main case or adversary? Just walk me through it, just specifically so I know which one you're talking about.

MR. MOSHENBURG: 100 percent, Your Honor. Let me start with the state court cases. Right now, we appreciate the Court's remand order with the turnover action back in

state court.  We've been working very hard behind the scenes with the Connecticut families to explore our state court options for state court remedies.

In terms of the merits of the underlying state court litigation, there was just an oral argument in front of the Austin Court of Appeals last week, Your Honor, on the Heslin Lewis judgment, Your Honor.  My co-counsel was leading the state court fight.  Your Honor is also getting ready to prepare a status conference on the Pozner, De La Rosa case.  A lot of the case, there's some pending discovery issues that are going to get resolved.  But also, that case is going to be influenced naturally by what happens in Heslin Lewis, and so there's a little bit of a pace to kind of be aware of whatever guidance comes from the appellate courts about what -- how to proceed in those cases and so that's affecting the timeline of the Pozner De La Rosa case, Your Honor.

THE COURT:  If it is oral argument, if I'm asking you to speculate, don't.  But do you have a sense of when the -- you may hear back from the appellate court, the state appellate court?

MR. MOSHENBURG:  I don't, Your Honor.  I've done a lot of state court of appeals; sometimes it's short, sometimes it's very long.  I just don't know, Your Honor.

THE COURT:  Okay.  And what was, what was argued was the kind of the appeal of the judgment rendered by the state

court --

MR. MOSHENBURG:  That's exactly right, Your Honor. I didn't mean to talk over you --

THE COURT:  No, no.  Go ahead.

MR. MOSHENBURG:  At the oral argument, the appellate court seemed to focus on two things.  One was the default judgment, and then also the cap busting of the punitive damages cap.  Hard to glean if that's where the opinion is going to be going, but that's where the two areas that court wanted to focus on.

THE COURT:  No, that's just fine.  I just didn't get a sense of timing.  If -- and I would ask anyone if there is something that is written, entered by the court, can someone just file it?  No spin on the first page, just notice of filing of state court really and just file it so that there's public knowledge, at least on my end in terms of what the state court did -- in the, you can file it in the main docket in the main case, just so it just helps me.

MR. MOSHENBURG:  100 percent, Your Honor, we'll do that.  And that really goes to the adversaries as well.  Let me turn to that on the dischargeability action, Your Honor. We've been working procedurally.  We were in the -- previously we talked about filing a motion to reconsider.  In doing that, what we realized is there's other evidence that we want to attach and the Court, when it denied our summary judgment

motion on the punitive damages in particular, there were things that the Court spotted that there wasn't enough in the record to find that we had met our burden on summary judgment.

So then we've dug back, found some transcripts, found some other briefing that sort of highlights the issue on the summary judgment. So we'll be moving for an additional summary judgment, but the idea will be that the court, the trial court found that Jones had intentionally acted. And so when the court denied the summary judgment --

THE COURT: But shouldn't we wait then if something is already briefed for the state appellate court, won't the -- in other words, do I need to wait to see what the state appellate court does before? In other words, I'll make something up. If the court affirms the punitive judgment, right, that's one thing. If the state, if the appellate court rules against you, your clients on the appellate, then what I don't want you doing is moving for summary judgment on something that could potentially be a thumbs up or a thumb down by the appellate court.

Maybe it makes sense to wait on that. I'll hear from Mr. Jordan or Mr. Broocks on kind of not getting ahead of one or the other, but I don't want to rule when there's something that's already on appeal. I think that the state court needs to take the lead on its own judgment if there were arguments raised there and then I can then -- because

006094

essentially, I'm taking up summary judgment based upon what they're arguing so.

MR. MOSHENBURG: Right. Judge, I think that's a great idea. We fully --

THE COURT: I don't know if it's a great one, but it's an idea. Someone will let me know if it's a -- if it makes sense or not, but I'll wait for others to think about it.

MR. MOSHENBURG: Sure. And just from the Texas family's perspective, Your Honor, I want to make sure the Court understands we have worked out our differences with Connecticut. We've reached a settlement on going forward. And from, and from our vantage point -- and I think Mr. Kimpler will talk more about it -- getting finality on the dischargeability decision of the Connecticut summary judgment that the Court granted, I think that will be helpful for Connecticut and for Texas, Your Honor. So in terms of priorities and what is teed up for the Court to move forward on, I'll let Mr. Kempler elaborate. But I think getting a, getting to a final judgment on the Connecticut dischargeability action makes the most sense in terms of spending judicial resources.

THE COURT: And so, but I don't want -- well, Let me hear from others. What I don't want is for us to be sitting here having this conversation in 2027.

006095

MR. MOSHENBURG:  I agree, Your Honor, and I think the fastest path to that is through the Connecticut Avenue to avoid that.

THE COURT:  Okay.  Thank you.

MR. MOSHENBURG:  Thank you, Your Honor.

THE COURT:  Mr. Kimpler, I'll hear, if you have anything you wish to add, I'll certainly hear from you.  If not, I will turn it over to Mr. Jordan, Mr. Broocks, and others.

MR. KIMPLER: Thank you, Your Honor.  I have a couple of points, but it should be pretty quick.  Let me first just give you two factual updates.

First of all, for what's going on in the Connecticut appeal, I think you know, because we filed it in December, but in December, the appellate court affirmed 1.3 billion of the judgment and overturned 150 million of the judgment.  I think that was before you when we were last --

THE COURT:  I saw that.

MR. KIMPLER:  Mr. Jones then sought review from the Connecticut Supreme Court, which is the highest court in Connecticut.   The Connecticut Supreme Court denied that review.   It's discretionary, so you have to make a cert petition.   The Connecticut Supreme Court denied that review on April 8th.  So as of April 8th, as a matter of Connecticut law, the judgments were final and enforceable.  Prior to that,

006096

Connecticut law was that judgments were stayed pending appeal.

Mr. Jones then filed in Connecticut a motion to stay enforceability of the Connecticut judgment while he pursues an appeal to the United States Supreme Court.  That was denied by the Connecticut court on May 13th.

So where we are right now is that all appellate processes in the state of Connecticut are over.  The judgment and an aggregate amount of 1.3 billion is enforceable.  And I believe Mr. Jones has another, I think he had 90 days from the prior.  So I think he has another month or so to file a petition for cert review from the U.S. Supreme Court.  We expect that he will do that.  And so that will be the last portion of the appellate process for Connecticut.

THE COURT:  Okay.  And in terms of the just -- and this may sound repetitive -- but just from your, from your perspective, where do things you think sit with respect to the adversary proceeding that is pending before me?

MR. KIMPLER:  Yeah, so, just one other update which Mr. Moshenburg already said.  We have reached a settlement agreement with the Texas plaintiffs, and so there are no more open disputes between us.

There are two adversary proceedings, Your Honor, that the Connecticut plaintiffs are party to.  The first one is the non-dischargeability proceeding that is Case Number 23-03037.  Your Honor, just to recall there, there are three

006097

parts of our judgment. There was the $965 million of compensatory damages. You ruled that those were non-dischargeable. Those judgments have been affirmed on appeal.

There was the $150 million of Connecticut unfair trade practice tax claims. You had ruled those were non-dischargeable, but the Connecticut appeal had reversed that claim. So that claim no longer exists.

And then there was the $323 million of common law punitive damages, which were affirmed on appeal, but you did not issue summary judgment on it. So where we are at in that adversary proceeding now is there are $965 million of compensatory damages that have been held by you to be nondischargeable and been affirmed on appeal. And then there is $323 million of punitive damages, common law, affirmed on appeal but not non-dischargeable, and we have filed a motion for reconsideration that was denied.

I think, given where we are at, my clients are prepared to abandon that claim. At least as to the non-dischargeability, and that would enable us to enter a final order that would resolve the non-dischargeability action before you and would allow Mr. Jones presumably to take an appeal of that as a final order up to the district court.

I want to be very clear, we're not waiving the claim in the bankruptcy, but the argument that that portion of the claim is non-dischargeable. We are, if it suits the Court,

006098

prepared to abandon that just to streamline the litigation and allow it to go up for review at the district court level.

THE COURT: Oh, Mr. Kimpler, I don't want to tell you what your client should -- what I am going to ask is that one way or the other that, you know, within the next 30, 45 days, I kind of get a decision as to whether we're proceeding with respect to the 323 or if you file something, then I'll know that you, you're going to not proceed with respect to the 323 with respect to the non-dischargeability, but obviously maintain the claim portion of it.

MR. KIMPLER: Yeah.

THE COURT: And the 955 that you say was affirmed on appeal, that's by the Connecticut courts, right? Just to make sure that I'm clear.

MR. KIMPLER: Correct. So to be, to be clear, there, Mr. Jones has one last shot at the U.S. Supreme Court.

THE COURT: Okay. Okay. Thank you.

MR. KIMPLER: The other adversary proceeding that we're a party to, Your Honor, is Wheeler v. Jones. That is Case Number 24-03279. That is what we call the enforcement action, and let me just give you the background because I don't think we've actually ever had a status conference or hearing before you on it. So let me explain what it is and why it's before you.

That was last August. We moved to domesticate our

judgments in Texas under the Uniform Judgment Enforcement Act. And so we filed a complaint in state court that basically seeks recognition of a foreign judgment, the Connecticut judgment. There was a 30-day objection period on that complaint. Nothing was filed in October, but Mr. Jones removed that action. We think he removed it in an untimely basis. We also think it procedurally is not an action that can be removed. It's really a procedural, you know, case, but he removed it. He also filed counterclaims in that action, which, you know, are various types of attacks on the Connecticut judgment and some other claims. That action was then removed to the Western District of Texas, and then it was transferred to you.

So I think it probably showed up on your docket, sometime mid to late January. On that docket, there is a fully briefed motion for remand back to the state court. There is also a fully briefed motion to dismiss on the counterclaims.

In our view, all of this can be pretty easily decided on the papers. We would urge Your Honor, although we know you have an exceedingly busy docket, to rule on those when you are able, whether you want to first rule on the motion to dismiss and then the remand, or you want to remand and leave the motion to dismiss to the state court, assuming that, you know, you did decide to remand.

It is obviously your prerogative, Your Honor. You

006100

know, from our perspective, these are pretty procedural issues as far as the timeliness and the appropriateness of the remand and the counterclaim.

I have exhausted everything I know about that action because it has been handled by Mr. Chapple.  So if you have any other questions, I would, I would call for a lifeline.

THE COURT:  No, no, this was very helpful.  I remember Judge Pittman said something to me in about January, mid-January, January 16th or January 17th, and we hadn't taken it up and I didn't want to do anything without talking to the parties to understand kind of where all the pieces fit before -- and heard from everybody before I decided to kind of take it, take the issues up on the, on the merits one way or the other so .

MR. KIMPLER:  The last thing I would offer, Your Honor, is, you know, we have heard you that some collection activity should be proceeding in state court.  We are trying to do that.  We're trying to work with the Texas plaintiffs on that front, obviously, having domesticated judgments in state court is important to that effort.

THE COURT:  Thank you.  Great.  Yeah, I guess I don't know, Mr. Chapple, if you can give me a thumbs up or thumbs down or hit five star if there's anything else you wish to add before I turn to a 512 number.

MR. CHAPPLE:  That's correct, Your Honor.

THE COURT:  Okay.

MR. CHAPPLE:  Can you hear me now?

THE COURT:  Just fine.  Anything, is there anything to add?  I'm just giving you the opportunity.

MR. CHAPPLE:  No, Your Honor.  I appreciate the opportunity.  I think Mr. Kimpler did a thorough job of explaining the situation and our perspective on both the motion to remand and the motion to dismiss the counterclaim.

THE COURT:  Thank you.  Okay.  Mr. Jordan, Mr. Broocks, anything you wish to say?  Good afternoon.

MR. JORDAN:  And sorry for all the shuffling, but there's a, there's kind of a number of things that are going on.  And there's some moving targets that we, on the way from Austin to here today, found out about.  So I want to be able to sort of better organize.  I don't want to come across too confusing, but I guess I start with --

THE COURT:  Take as much time as you need.

MR. JORDAN:  -- with I guess the most interesting thing that I think the Court should be aware of simply because this has been leaving these matters on the docket.  If you recall, the Texas plaintiffs asked for over a year's worth of extensions while the Chapter 11 was going on.  And of course, we would assume that they were in good faith and Ms. Driver was in good faith granting extensions over and over again.  So we lost a year when we discovered that there was nobody that

was going to support the plan through the Texas plaintiffs.

So the briefing started last Tuesday, Tuesday week. The arguments were held at the Court of Appeals, and you ask about what do you think they're going to rule. Something happened at those arguments. Now I've done most of my appellate work in the federal system, but I've done quite a bit in the state court and something happened that never happened before that I think the Court needs to know about because it affects the adversary that's pending and it affects the answer that we all have to give to you and guessing. I don't think the Court of Appeals is going to take a long time in ruling, and I, and I don't because -- if I may --

THE COURT:: Mm hmm.

MR. JORDAN: I mean. And to Mr. -- the responses and information Mr. Moshenburg gave you, he didn't attend the argument, so I don't think he probably -- but I don't know if he knows about the position that the plaintiffs took, but I had it blown up because we didn't have time to get the cameras and stuff, I mean the audio. But I'd like to -- for the Court to read what Mr. Bankston told the Court of Appeals, and I've got a copy of that here. It can help to, help for you to see it, whatever.

Mr. Bankston told the Court of Appeals when he concluded his arguments --

THE COURT: Mr. Bankston represents the plaintiffs,

the Texas plaintiffs, is that correct?

MR. JORDAN:  Yes.

THE COURT:  Okay.

MAN 1: (Indiscernible)

THE COURT:  No, no, no, just want to make sure there's a, there's a reference to Mr. Bankston  He represents the Texas plaintiffs if I remember.  Okay.

MR. JORDAN:  And so, here's what he told the court when he concluded his arguments, which he was, he was, I'll just say this, it was peppered a whole lot about how you're going to keep these punitive damages with this elder abuse that was not submitted to the jury and it was all not pled and pled afterwards.  But those are all questions which they, which they had a lot to say about and there's been a lot written about what the people think the court's going to do.

But more important was this, Mr. Bankston told the court when he finished his arguments, he said, "So I, so what, with that said, Your Honor, again, I return to this idea that I would love to be here before you on a case that matters.  And the reason I say this is I'm certain you probably are aware at this point, there are over a billion dollars of non-dischargeable debt against Jones approved by the Connecticut Supreme Court, by my plaintiff, excuse me, by my plaintiffs that are all collecting together with 19 other family members."  I'm going to stop there for one second because I couldn't, I

006104

couldn't figure out why, what his plaintiffs were doing arguing about the billion dollar award, but it made it clear because now we know that there is some agreement that is between the Texas plaintiffs and the, and the Connecticut plaintiffs that has something to do with, no matter what happens in this case, and so let me finish just reading this. "And now we have an appellant, of course, that's Mr. Jones and FSS, who's trying to remove $50 million for what purpose when there's already over a billion dollars in dischargeable debt that's coming in part to my plaintiffs, right?" Now, I'll stop there for just a second. I think he's referencing to the deal he made.

They cut a deal where apparently if you were to find everything was dischargeable, they're still going to claim we've carved out from the plaintiff's non-dischargeable portion that claim, and we're going to assert it. I think that's what it is, but let me, let me finish and then maybe the Court can analyze it itself. "What is, what is accomplished by this appeal? The result of this Court's decision, I hate to say, is pretty worthless in terms of what's going to happen to the parties." And then, Your Honor, this, this second page, I don't, I think that's all we've got. I've got a -- he introduced in the beginning of the argument, he introduced, he's going to tell them why what they were doing was worthless, and that's what he did. So that's okay. I'm not willing to do that. And, and so I want to point that out

006105

to you to in this respect.  I've never seen a litigant tell the panel in an appellate proceeding that what they're doing is meaningless.  There's no effect to it.  It's nothing because we made another deal with somebody else and no matter what you do.  Now, I was not surprised that they took that position because the panel was pretty direct on how this case was tried and how in the world you were able to get elder abuse after the jury had left and you replead it and the Court gave it to you and all that stuff.  The appellate court was very focused on what was going on here.  And so I think what -- and I, and I want to say this because I think what Mr. Bankston accomplished was probably a very speedy opinion, that's my best guess.  The Courts had no response.  They had no emotion, they had no response.  They were very active during the arguments, but with that comment, they simply excused the parties and got up and left.

So I, so to answer the question as best as an appellate lawyer as I can and Mr. Broocks did the argument so he may have something to spin to put on it, but I don't think we're going to be waiting a long time.  The dilemma I see is, is that -- my concern is that I think Mr. Bankston has made a deal and critically a deal that would -- because I think he contemplated it before he made these remarks to this panel. I mean no lawyer would say that to a panel unless he knew what was going to happen and the panel had made it pretty clear in

006106

the arguments.  But I want to emphasize to you and I have a, we're supposed to have another blow up, but I know that, I know this is not trial on the merits of anything, but I, but I want to be able to sort of encapsulate to the Court what's happening here and what's happening in circumstances we don't know about and that's going to lead me to ask you for some, some relief in connection with the motions that you just want to status conference on today.

I'm not going to argue the motions, of course, or the merits of the motions, but I do want to let the Court understand why I'm asking for some of this relief.

But here's an email.  It was written by Paul Weiss, Leslie Lieberman, November 16th, 2024, at 1:16 p.m. addressed to Jarrod Martin, Josh Wolfshohl, Chris Murray, Avi Moshenburg and others.  And they were working on a deal.  And this was produced in the, in the discovery that we had with Mr. Murray.

And here's what they, here's what they say in the email that I, that I think is very critical for the Court to allow me to emphasize.  The email's text says "We attach an updated term sheet.  We have increased the settlement amount to three million."  That is the settlement between Texas and Connecticut to cut some deal.  "In our view, this represents a significant premium over the Texas family, over what the Texas families are entitled to on a pro rata basis, a premium that we are only willing to pay for assurances that the FSS

assets will not be sold to Jones' family and friends given that it is clear that Jones will use the assets to continue harming our client."  Whatever, whatever that means.

But we do know because we have other emails, again, not to develop any of the facts without having the witnesses to proof up these.  What we do know is that there has been a continual -- and you've seen it in two, in two series of transactions in auctions.  They were, they were trying to conduct an auction only if they had these arrangements in these particular problems made.

And so what has occurred, what we believe has occurred is something that is completely contrary to bankruptcy policy of what a creditor is entitled to obtain and do in a bankruptcy proceeding.  And we've made those arguments in the, in the motion for the auction. Very briefly, we simply say that -- we go through a number of pages of the evidence that we have and the things that we've discovered in the last six months that the government, the DOJ, the plaintiffs' foundations, Paul Weiss and other players had been doing in connection with these Jones claims.

So our argument is couched in terms of what has happened is the, excuse me, your Chapter 11 case was never prosecuted in Chapter 11 by the two dominant creditors.  They had their controversy.  One was -- and I would, I would use this example.  They were identical twins.  One was Texas and

006108

one was Connecticut.  No difference.  No, I mean they were the, the events were the same, the people that came to the events were the same, the people that committed the events were the same, the conversations about the events were the same.  Everything was identical.  One of them got 2 percent recovery, and one of them got almost 3 percent, and one of them got 97 percent recovery.  And of course, that skews everything from the standpoint of how can that happen and what can you do about that?

We know that there are things that, remedies that can be done.  And we know that the Texas plaintiffs know what they are.  And so we assume that that is what's been pushing these negotiations from before November all the way through the last time you heard and saw a written effort.  And that was the 9019 settlement in which they were saying, you know, we're going to give you 25 percent and you're going to get $4 million.  It had gone from the email of 3 million to 4 million.  All those things are transpiring without us having any idea of the background of the trustee's involvement.  We've now discovered the trustee was very involved in the, in the decision making and in the implementation of all the process.

What it has done for us though is it, it has finally coalesced the process that is going on here and that is that the dominant creditor who doesn't want money -- now, by the way, the motion that we filed I footnoted to the YouTubes and

006109

to the, to the public statements and I think you heard some of the Onion statements where they don't want the assets so they can make money because their dilemma is this.  Where they, for instance, to go to an auction that had an $8 million purchase price and they won by $8 million and one.

They normally would have then a balance sheet that says, I just, I just put out $8 million but I got assets worth $8 million.  So the balance sheet doesn't change and that's where you, that's where you make your auction decisions.  But that's not what's at play here.

What the play is here is that look, we can't pay much money because we're going to destroy the assets.  The reason we want the assets -- and they say that -- the reason we want the assets is so Alex Jones cannot use them.  We want to destroy his brand.  Onion said that in the, in the newspaper. We want to destroy the brand and parody it so that we can further our gun control political position and other stuff.

So what has happened to us in this case is the dominant creditor, which has been represented by Paul Weiss, the dominant Connecticut creditor doesn't want money.  What they want to do is destroy Alex Jones, and they have -- and as the Courts, I know the Court's aware that they didn't utilize the first proposed mediator.  They did then eventually agree to a mediation and zero happened.  So this is not a case

in which they have ever made an effort to deal with and try to resolve the case with dollars because it's always been destroy the brand, get him off the air -- and you'll see the videos if you ever get a chance to look at them -- is that they told the jury in Connecticut, punish him with such a verdict that he can never be part of the public discourse again.

So what's happening in this process, and I emphasize this because the auction is going to bring it to a head, they don't want, they don't want an auction.  And so --

THE COURT:  Why don't you buy the equity?

MR. JORDAN:  I'm sorry, Judge.

THE COURT:  Why doesn't someone just buy the equity?

MR. JORDAN:  Well, if you buy the equity, you buy whatever debt and other things that go along with it.

THE COURT:  So what's wrong with that?  That's what Chapter 7 normally does.  What's different?

MR. JORDAN:  Well, because I don't think anybody would buy the equity.  Buying the equity so that you can --

THE COURT:  First United can put up the money and buy the equity right now if it wanted to.

MR. CICAK:  (Indiscernible)

MR. JORDAN:  Maybe I'm not following you.  If you --

THE COURT:  The trustee has said no one's put up an

006111

offer for the equity.

MR. JORDAN:  Correct.

THE COURT:  So, First United, put up an order for the equity.

MR CICACK:  (Indiscernible)

MR. JORDAN:  Well --

THE COURT:  In other words, I don't -- what people want is a sale of the assets.  And let me just remind people what happened when there was a sale of the assets, it was me that expressed the concern about the sale.  There was a sale on the table.  I denied it and then I denied another motion to approve a settlement.  Right?  Those assets are incredibly complicated and they raised huge property of the estate issues.  X ended up doing a deal at the very last minute in connection with the proposed sale to Global Tetrahedron, which I didn't approve.

To conduct such a sale, one would have to -- and I said this on the record back then -- you'd have to address all property of the estate issues up front so that you have a clean understanding as to what could be sold and what could not be sold.  And the IP issues to me remained largely unsettled and really complicated as to what FSS owned, what Jones owned, what it didn't own, what he didn't own.

To do that again, there would have to be such a process, and I'm not comfortable proceeding that way.  But if

006112

somebody wants to buy the equity, which someone can always do in Chapter 7. I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending. That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right? Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that. What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction. The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets. And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me. It would have to be cash only and we'd have to sort out all the intellectual property issues. So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything. I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

expensive.

And I get it.  Maybe they don't want to buy the asset to make money.  But I'd, I flip it to you.

MR. JORDAN:  I'd like to, I'd like to comment on that because this is, this has really troubled you.  I know since the beginning you made clear that if the IP was going to be sold, that the parties had to come to the Court and raise the issue and then you would decide whether it could be sold or not.

Now so the two offers that we brought to you, I say that we brought to you, that were brought to you that dealt with buying the assets all said we take as is.  So that sale would never have been a problematic sale on that basis.

THE COURT:  Take the equity.  I've got two sides.  There's no question Jones supports FUAC buying it.

MR. JORDAN:  Of course, yeah.

THE COURT:  No one said that.  There is no question about that.

MR. JORDAN:  The questions would go away.

THE COURT:  There's no question.  There's no question, but whether it stays or goes away is largely irrelevant for me, right, from a bankruptcy perspective.  Now, obviously, it's got incredible importance to Mr. Jones and I don't, I got that.  But from a, from a bankruptcy perspective, the real question is what's in the best interest of the estate,

006114

right?  And so to me, the amount of money Mr. Murray would have to spend to get me comfortable that there would be a sale of assets, it would be incredibly expensive and incredibly time consuming.  And I'm wondering if the amount of money that it would take to spend plus potential issues that come along with it that's why I said to you, if you want, somebody can put up the equity.

This case has been pending since 2022.  And folks, it just needs to, it needs to end.  Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable.  Let the state courts, or the Supreme Court of the United States rule on the issue.  Parties can then appeal any orders of mine to the district court or the Fifth Circuit.  We got to get there. I'm not moving.

The issues that are still there are there.  And I've heard your concerns.  And I didn't approve of the sale to Global Tetrahedron.  And I'm not saying anybody did anything wrong.  I just did not get comfortable with that sale.  I didn't get comfortable with the settlement.  Someone was asking me to allow a claim against an entity that's not in bankruptcy anymore.

MR. JORDAN:  And believe me, we didn't ignore you when you said --

THE COURT:  I know you didn't.  I know you didn't

it.

MR. JORDAN:  -- on the sale of the equity.  We've tried to figure a way that we could sell it without the buyer buying $1.3 billion in debt.

THE COURT:  And that's the problem is that you can't figure it out.

MR. JORDAN:  If you got a hand on it.

THE COURT:  It's not, it's the trustee's call.  That's what I'm saying.

MR. JORDAN:  Well, it's the trustee's call if he can find a buyer.  We couldn't figure out how to find one.  It would have been --

THE COURT:  May the trustee abandoned the issue.  And maybe the trustee abandons the asset.  I don't know.  You all are going to have to figure it out.  That's what I'm saying.  The trustee needs to make decisions.

MR. JORDAN:  But let me also mention to the Court, and I'm not sure that you processed this, the way I'm, the way I tried to present it because I didn't, I'm not sure I wrote it the way you --

THE COURT:  You're saying there's stuff going on behind the scenes and you should be well aware of it.

MR. JORDAN:  That's not up for today, and I don't, and I --

THE COURT:  But it could be.

006116

MR. JORDAN:  I'm saying it is a, it is we want the ability with limited discovery to explain that with facts and documents.  Now we've got them.  But we've got to verify them. We've had to have them authenticated.  I mean things have happened in the last six months since this regime change.

THE COURT:  I'm sure.  I'm sure.

MR. JORDAN:  But that's not what I was referring to. Here's what I think you might consider.  When you ruled on the 25th of February, and then you said, and then after that, the FUMC filed a  request for a status conference because they wanted, they made this offer that wouldn't be -- for three months and not been responded to, an $8 million offer subject to the conditions that I mentioned.  We won't --  the trustee doesn't have to warrant anything to us just because we know what is there.  We know what is involved, so, so we're ready to sell.

At that time you were incredibly frustrated with the, with all the parties and you commented that you were going to void and terminate the order.

THE COURT:  I did say that and I agree.

MR. JORDAN:  And quite frankly, but for, but for the fact that the appeal was pending, that's probably what you would have done at the time.

Now, the appeal now, I filed my motion pointing out that I've pointed out to the, to the  plaintiff, the appellant,

006117

there's no jurisdiction to do anything except enforce the order or construe the order if they keep their appeal going. They kept it going. But I think when I filed this motion -- and I really emphasized it maybe more or better than I, than I had before -- they have now dismissed the appeal. That dismissal was, is now 34 days old, and that's important.

They said in their reply, which, by the way, the reply to all these --

THE COURT: The reply to which docket?

MR. JORDAN: I'm sorry, to my motion.

THE COURT: Oh, yes, yes.

MR. JORDAN: When they filed their response, I misspoke, when they filed their response to my motion, they said the appeal is dismissed, the matter is moot, the judge has ruled, and so it's all in state court. That's their response. And of course my reply then was wait a minute. That is not how it works. If the Judge had made oral release from the bench, and the last one he wrote down that it was, that it was void, but the Judge also said, I mean, on his own, not because we pointed it out, but you said on the, on the 25th of -- on the 5th of February '25 that if it's on appeal, I can't modify it, I can't change it, I can't withdraw it. Now, I can, I can enforce it or I can interpret it, but I can't do any of that cause it's on appeal. That was all correct. Now it's not. So now what's the effect of that?

The effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked.  It is a final order that permits the trustee, because remember your supplemental order did two things.  You gave the trustee the assets and then you said, "And I'm giving him the authority to operate until he can sell."  Now that's what it, I mean, you basically laid out the purpose of it.

The plaintiffs are now saying, oh, that supplemental order doesn't order a sale, so there's no way that just because the supplemental order is in place, it'll be ordered.  I think that's foolish, but that's their argument.  But the other argument is that in some fashion, your final judgment that now -- that people can't attack -- well, the one exception.  Your final judgment is a final judgment on the law.  That is, can I, could I authorize to do that in the state of Texas?  Yes, I can.  I have a final order.  Everybody knew about it.  Even the person that complained about it withdrew his appeal.  So it's fine.

THE COURT:  The question is, do we do round two?

MR. JORDAN:  I'm sorry, Judge?

THE COURT:  There's already been a round one.  The question is do we open it up for a round two.  That's the real question, right?

MR. JORDAN:  Well, yes, it is the real question in

the sense, but let me tell you how that works, but the answer to your question is yes, but here's how it works.  Rule 59(e) could give relief by which you could, within 28 days of the entry of the final order, even the Court within that period of time could have sua sponte said, wait a minute, I don't, I made a mistake.  I don't like what I did or things have changed.

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

MR. JORDAN:  Well, I'm saying now --

THE COURT:  You probably couldn't do it before then, but I'm asking you to reconsider if that's what you're planning on doing now is how I read your motion or to the extent I thought I did something, reconsider it.

MR. JORDAN:  Yes, because I can say this.  And look, I'm old enough to know better than to tell a federal judge he can't do something.  Okay.

THE COURT:  I'm not one of those judges.  You can tell me that I can't, I can't.

MR. JORDAN:  What I want, but what I want you to hear is that Federal Rule 59(e) is gone; 28 days have passed.

006120

Nobody filed a motion and you didn't pick it up and decide you wanted to do something.

60(b) provides for a reasonable time to do something. That reasonable time probably hadn't passed or maybe it has, who knows, but it's only on motion. It's not on sua sponte of the Court.

THE COURT: Oh, I agree with that.

MR. JORDAN: Okay. So no one has asked you to do anything. They've said, oh, it's all moot --

THE COURT: No, I agree. I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it.

I've told the trustee, if you're going to try to do this again, here's the mountain of stuff you're going to have to get over before I get comfortable approving a process by which those assets could be sold, and it's really hard. The trustee can move if he wants. I know you can sell the equity. And that's an easy process to get through.

The other one, it's going to be really hard to get me comfortable approving the sale on the merits based upon all the issues before. But I don't, I'm not in the business of ordering trustees to go order and nor is anyone asking me to. Truste's got an offer. Trustee will weigh. Trustee will exercise business judgment as to what the trustee wants to do

and parties can file stuff asking me to do things or not.  But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it.  He tried to sell assets under those orders.

The question is do we do another sale?  That's the real question.  Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS.  And how do I weigh now state court remedies that people have as opposed to -- do I stay then state court remedies against non-debtor parties, against the non-debtor?  It's more complicated now than it was six or seven months ago.

MR. JORDAN:  Well, I agree.  I think that the issue in state court has become extremely favorable to the goal and policy I mean and decision making of the plaintiffs.  They know that a state court auction by a constable is worthless to value.  They're going to, somebody's going to credit bid and now their deal is, it's going to be, they're going to create a bid.  Nobody gets any cash.  There's no change.  They get the assets for nothing and the people that are injured, of course, are the other creditors of this estate who are, who are not active at all.  There's not a whole lot of them, but

006122

there's, but they're there.  And, of course, then the Debtor who has obviously an interest in getting a maximum value for a credit against his judgment.

So you, they're weighing this.  They're weighing a state court constable's auction for nothing by which they get the assets for nothing and they destroy them like they say they're going to.  And they, and $4 million goes to, they pay $4 million to the, to the Texas plaintiffs, or we go to an auction and we have to compete against $8 million with someone who says you don't need to guarantee title, you don't, yeah, I mean, here's my bid, I'm ready to go.

And now here's, and here's the third comparison that I, that I really think is important.  And I think you may have just said it, but if, but if I didn't -- not sure I picked it up exactly, is that people have relied on your order.  I mean the trustee has paid himself over a million dollars from those funds.  The trustee's lawyer has gotten $800 million too pursuing these auctions.  I mean, there's been almost $2 million spent pursuing the auctions and pursuing the reliefs and doing the settlement agreements and all the things they were doing.  Instead of just auctioning it off, they got into this process that somehow the trustee bought into.  And so the -- how do we unwind this because for the last six months now, Alex Jones has been operating under the auspices of the trustee, so he, I mean, he's added like $2 million into the

006123

estate from him running the company and keeping the assets going earning money.

What happens to the earnings, I mean so --

THE COURT: Where does the -- let me ask you a question. It's a good question to ask. FSS, well, let's assume FSS generates -- I'm making something up here, so just as a hypothetical. We'll just use X dollars in July of 2025 or through August, or the first six months of this year. Right? Where does that money go?

MR. JORDAN: It goes to the account of the trustee 50 percent and the account of Alex Jones, 50 percent. So they have -- so he didn't get a salary, he gets, that's how they, that's how they run the operations. So and that has generated about $2 million and that's not just since this month, but it's --

THE COURT: Are you asking me to, in consideration of that, to potentially end that arrangement, give it all to Jones? If I reverse the order, wouldn't that, isn't that the effect?

MR. JORDAN: See that's the dilemma. If you reverse the order, everybody has done a lot of things in reliance on the order.

THE COURT: No, no. I got it. I got it.

MR. JORDAN: Okay.

THE COURT: It's an -- I understand the point.

Right?  I understand the point.  There's money coming in and there's only one person generating that money that's coming into FSS.  Let me think about it.  I don't want to rule today.  I want to think about everything and think about this.  This is kind of why I want to have a status.

MR. JORDAN:  And may I --

THE COURT:  Go ahead.

MR. KIMPER:  May I --

MR. JORDAN:  And may I, may I add to my confusion --

THE COURT:  Just a second, Mr. Kimpler.  I just want Mr. Jordan to finish.  Go ahead, Mr. Jordan.  I think Mr. Kimpler wanted to speak, but I'll give him an opportunity or Mr. Broocks.  Yeah, go ahead, you finish.

MR. JORDAN:  What's that?

MR. KIMPLER:  Your speech.

THE COURT:  Go ahead.  Finish your point.  You've got the floor.

MR. JORDAN:  Mr. Kimpler.  Okay.  My other thought is this.  It's kind of a different direction.  There have been four orders entered, I'm sorry, there have been, I think, three orders entered.  There may have been four.  I'm referring to Docket Number 24-03228, 229, 331, and they're called "Stipulations of the Parties."

THE COURT  Yes.

006125

MR. JORDAN:  And they purport to -- and we only found these this morning.  We weren't, we weren't ever served any notice, but we weren't parties to these adversaries.  These are ones I think that Ms. Driver was a party and she hadn't withdrawn and one of the trial lawyers, Chris Martin was a part of, but we didn't know about these.  And my question, if I may ask the question, I'm not asking for an advisory opinion.  I just, this is the Court's order.  It says the Court retains exclusive jurisdiction over property of the estate and any other property or interest under the control of the trustee, including 100 percent equity interest in FSS.  And it's entered in the, or at least styled in the FSS Systems Chapter 11 that is no longer.

And my, I guess my only concern is that it's sent back to state court something, but I, but I can't, I don't understand what it sent back to state court.  These were remand motions that I think they're, they're not the ones that we're involved in that's up for today.  But if those are remand motions and they don't, and they're not sending property back to the estate, I guess, I guess from my perspective, we probably don't have a problem.  We still are within the time to file a motion and reconsider if there, if we find a problem, but can the Court, did the Court intend to send the assets back to the estate or --

THE COURT:  No.

MR. JORDAN:  No.  Okay.  Well, I'm asking for a ruling, and I don't, and I ought to tee it up differently, I guess, but --

THE COURT:  I'll set up a short status.  I don't know when.  Give me a little time to think about everything that I've heard today, one way or the other.  Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other.  I don't think anyone should plan on an auction today, but I may change my mind, but I don't -- in terms of going forward with respect to the cash generated by FSS, it's something to think about.

MR. JORDAN:  And, Your Honor, then just to finish so that Mr. Kimpler can ask his question.

THE COURT:  I think Mr. Broocks will go and then I'll, then I'll turn to Mr. Kimpler and then I've got another hearing, folks and I don't --

MR BROOCKS:  I'm going to go next.

MR. JORDAN:  All right, so the one other issue that I wanted to cover, and let me see where I put it.  Your Honor, for the sake of the, of the topics I've covered, if it's all right, I'm going to sit down.  If Mr. Broocks had something --

THE COURT:  If you, if you think about it, just let me know.

MR. JORDAN:  Okay.

006127

THE COURT: Mr. Broocks, good afternoon.

MR. BROOCKS: I'll be very brief, Your Honor. Thank you so much for entertaining this. I did the oral argument in the Austin Court of Appeals, and I wanted to bring to your attention some different facets of this.

The Connecticut first in Austin, in Connecticut, we asked the Supreme Court of Connecticut to do this discretionary review. They could. There's a specific doctrine there under a whole lot of cases called the Golden cases. It says even if you didn't raise a constitutional issue below, you can raise it here. So we asked them to do so. The opposition to our petition in Connecticut said no, they didn't raise it in the Court of Appeals. They didn't even use, I'll say the "C" word, Constitution. That was their argument. It's been waived, we said, but the Golden case is intended for that exact purpose, (Indiscernible) line did not.

And he's right, whoever said it. We are going to go to the U.S. Supreme Court. We have the ability to ask Justice Sotomayor, I think she's assigned to the, to the Second Circuit District, wherever this case is, for a stay. And the moment they start any aggressive action; we're going to do that. We have a petition we're working on right now. That's Connecticut.

Now in the Texas appeal, the argument was threefold. It was a lot of sub issues, but the arguments looked to the

justices you have, Your Honor, has an independent duty, constitutional duty to review the constitutional issues. As painful as it may sound, you've got to take these videos and you've got to watch them and I had them transcribed. So the Court didn't have to just go watch them. I said, here are the transcripts. They objected to that, but I said, I'm just trying to help. And they were, they were hyperlinked where you could listen to it and read the transcript and go to the particular spot.

I said so you got an independent duty and nothing anybody can do can take that away. And nobody, no court in America has yet ruled on the constitutional issues we raised. Nobody. And so, and so they said, well, they were, they were facing the task and they realize that's their duty. And that may take a while.

Now, the second issue was we said there is a constitutional prohibition, prohibition on entering a liability default judgment against a media defendant in a matter of public concern in the case brought by a public figure. We think we satisfied all three of those. We said and the justices, the Chief Justice said, wait a minute, are you telling me that the trial court is helpless? I said, absolutely not. She's got a lot of remedies available to her, but the one thing she can't do is put a gun to the head and say I am going to bypass all these cases and I'm going to say

I'm going to find you, as a matter of judicial decree, to have committed malice that it's false, that you intended it to be false, you knew it was false, and instead of clear and convincing evidence, I'm going to say there was.  I said they just can't do that in that context. And so she asked Bankston, she said, Well, what do you say about that?  And Bankston, well of course, he says we disagree, but he didn't have any cases because he doesn't have any cases.

Now the third issue, so we said, we said the constitutional review is going to be required.  The default judgment was inappropriate, and we said well when punitive damages are concerned, you have an independent duty to look and see what the grounds are.  And to see if, in fact, under Texas law, and which is similar to a lot of states, did they put on the proper evidence to show that, you know, that the default damages that all remedies that had been available to the trial court were tried and failed.  The justice says, what could she have done?  I said, she, if they weren't having success in getting documents from Jones, you got weekly hold, you can get his, they've done computers, you can do the searches yourself.  There's a lot of things.

So anyway, so the Court of Appeals is going to come back potentially and do something very interesting because you've got a Texas case and you've got a Connecticut case. Now this is like Shelby said it was identical twins.  That's

006130

a really interesting analogy because it was the Sandy Hook crisis, same one, the same parties, families and family members, the same broadcasts that are allegedly defamatory. A default judgment on liability, so there was no liability trial. The only differentiating factor was the damages. Now in Connecticut, it's $965 billion divided by 15 is roughly $63 million of actual damages to the family. Pretty close.

In Texas, it was $2 million 2 for Heslin, 2 for Lewis. So how do you get on the identical facts, the identical arguments, the identical, there's no liability issue. You now have 63 million to the Connecticut people and 2 million to the Texas plaintiffs. Now if the Texas Court of Appeals comes back and says that we're going to say that -- they could come back and say there's no defamation because I showed them the articles that they were taking snippets out and claiming Jones says this, but he said very clearly, I believe children died. So, you know, there could be no defamation involved. We said convincingly, I think, that there was no intention of fiction, but the Court of Appeals could come back and say wait a minute, we don't think this satisfies constitutional muster.

Now what is the Supreme Court of America going to do? What are you going to do when you've got identical facts, identical facts, identical liability, and one court says it violates the Constitution and another court says they didn't say no. They said we're not going to address it.

006131

Now I think that creates an opportunity, a question for the Supreme Court.  Not only is there a disproportionate recovery, 63 versus 2, you have one court saying on the same facts, no.  Another court saying on the same facts, we're not going to address it, but maybe.  That creates an interesting dilemma, I think, for this Court.  Because you're being asked to find non-dischargeable something that a Texas court would if it comes out this way, if I'm right, that the Texas Court of Appeals says it doesn't pass constitutional muster, well, you're in a dilemma.  And that's why I think your comment about shouldn't we wait till the Texas Court of Appeals rules is very prescient because they very well may come back and say that and I think that is an issue that this Court should take into consideration as it considers its dischargeability because I think that the plaintiffs here --

THE COURT:  Dischargeability with respect to Texas, Connecticut or both?

MR. BROOCKS:  Both, both.

THE COURT:  Okay.

MR. BROOCKS:  And I'll tell you why.  It is because in issuing your original non-dischargeability order, you were led to believe that Connecticut was basically ironclad just, you know, if it was fairly tried and all that.  That's not Connecticut law.  It's just not.

THE COURT:  Shouldn't an appellate court in

Connecticut tell me that?  I wasn't, I don't think I was led to believe anything.  I think I was given documents that led to a conclusion under the law.

MR. BROOCKS:  These are collateral estoppel issues. The Connecticut court can tell you what they did, but you have to decide what is the collateral estoppel effect.  And we said that the Lighthouse case and others, the Supreme Court of Connecticut in multiple cases has said that there are three steps in a collateral estoppel, but there's a critical fourth which gets into equity, fairness, justice.

You know, we get to look behind the scenes and then there was another case where a default judgment was entered. Those were just regular collateral estoppel cases.

There was another Connecticut Supreme Court case that is the bellwether case that says, wait a minute, if you have a default judgment entered, they go, they follow the restatement of torts.  And they say if a default judgment, then you can't say it was fairly --

THE COURT:  Aren't those matters for an appellate court at some point?

MR. BROOCKS:  No, those are matters for you.  These are, these are questions because if the question of collateral estoppel comes in, these are the issues.

THE COURT:  You're saying collateral estoppel on something I've already ruled on?

006133

MR. BROOCKS:  I'm saying you haven't, it's not -- you at all times, this is not a final order, Your Honor.

THE COURT:  Oh, you mean, you mean in connection with the final order.

MR. BROOCKS:  I'm saying as you approach the issue of finality, and I may, I have --

THE COURT:  No, no, no.  I got the point.  I get the point.

MR. BROOCKS:  So I'm going to say that as you, as Mr. Kimpler said a minute ago, they're going to come back -- and I suspect they will.  I would be shocked if they didn't -- saying we're going to forgo the $331 million.  That would be Bankston saying that he's got a deal.  Now we believe this is a, we believe this is, I'm going to say an illegal deal.  We believe these are two creditors working behind the scenes because I think that because Connecticut has always said we have 97 percent of the judgment, but Texas has said, well, wait a minute, it should be 5 Texas plaintiffs, 15, that's, that's 75, 25, 75 percent.  Connecticut was held hostage by Texas until they cut that deal, and that's what I think we need to discover.  And that's an abuse of process.  That's creditors manipulating the system.  And what's happened here is that that's going to be another complicating factor because we're going to file an adversary on that.

THE COURT:  Okay.

006134

MR. BROOCKS: And so at any rate, my point to this Court is that there has been a massive, and I'm going to conclude with this, and a massive, a massive abuse of process here. They have taken legitimate processes and they have abused them, using them for an illicit purpose, which is to put Jones out of the air. That is not a legitimate purpose. And that is going to be, so that's the essence of our, of our 1983 claim. Our 1983 claim says this, from the moment that trial judge in Delaware -- in Connecticut issued a default judgment and then struck our constitutional defenses, that is state action. The New York Times versus Sullivan says that's a state action. The cases we cite in our briefs, the Fifth Circuit says that is, that's not just a plaintiff bringing a lawsuit. That is a judge entering an order that now tips the scale, and that is state action. Again, New York Times versus Sullivan said that.

So we believe, Your Honor, that we have asserted valid 1983 claims. We believe we're going to assert an amended petition or complaint for abuse of process. And we would urge you to wait and see what the Texas Court of Appeals does because that may change your judgment.

THE COURT: Thank you very much. Mr. Kimpler, I think you wanted to have a word.

MR. KIMPLER: I would, Your Honor. I'll be brief, but there was a lot of stuff said. I think one thing I hope

you're seeing that as Mr. Jones continues to lose his appeals in Connecticut, increasingly it is hoping that you will be in appellate court. I think you've already appropriately decided that collateral tax on the Connecticut judgment won't stand. The Supreme Court will either take up review of this or it will not. We are confident that the judgment will stand. I don't believe the Supreme Court will even take review. As Mr. Broocks just noted, they actually don't raise constitutional issues in the underlying appeal. So when you ask what's the federal issue for the Supreme Court to look at? It's a pretty good question. Mr. Broocks won't agree with any of that. I don't need to convince you of any of that. The Supreme Court will do what it will or won't.

I'll just remind you that for the last two years, they've told you that Connecticut judgments are going to be overturned, and they weren't. They were affirmed and the Supreme Court of Connecticut said they didn't want to look at it.

I'm not going to respond, Your Honor, to all of the mischaracterizations about my clients. I will point out that the email they quote from my colleague, Ms. Lieberman, was taken out of context. It specifically said we're tired of being hurt on air. If we want to have an evidentiary hearing, I'm happy to show you since January or since December, the number of times Mr. Jones has continued to harass and threaten

006136

my clients on air.  I don't think it's relevant, but I'm happy to do it.

The statement that we at closing in Connecticut said "put a huge punitive damages to take this guy off air," the only problem with that?  I think that was what was said in Texas.  So if we're going to throw around a whole bunch of factual accusations, we should at least have some credibility when we do it and not make misstatements.

I'm a little bit surprised to entertain the notion of another auction in the bankruptcy court.  I think you should see today all the issues.  Then I'll file another adversary complaint.  They're going to assert Section 1983 claims against my client.  Having an option in this court is going to be extremely expensive.  It's going to cost a lot of money, and I can tell you that neither the Connecticut or the Texas plaintiffs support it.

I think we should keep in mind here that Mr. Jones is an equity owner of a business and is massively out of the money.  This is not significantly different from any other cases where a company has creditors, it can't repay the creditors, the management may get replaced, the board may get replaced.  Yeah, they don't get to dictate the terms on what creditors do with the business.

The thing that I think Your Honor was focused on is what is happening with the business now?  Mr. Jordan said that

006137

FSS has created $2 million in the last couple of months.  I'd like to see proof of that.  I don't think we should take the things they say at face value.  I can tell you for the last year, Mr. Jones goes on his air and he says, don't buy stuff from Infowars.  Buy it from this other website I just created.  We believe First United is behind that in funding it.

THE COURT:  Well, I believe, I believe, --

MR. KIMPLER:  I believe (Indiscernible) also.

MR. COURT:  I don't, I don't want to, I don't want to get into it.  I get the point.  I don't want to get into what one is doing and the others are doing, I've got big, big, big billboards here and like finding stuff on the other side.  I'm really just trying to stay within the four corners of this wall, but I get the point and I think everyone is hearing me.  I'm not inclined to open up another auction process or I think the trustee, if that's what the trustee wants to do, has heard what I said back then, and I don't think I've changed my mind here.  But it sounds like no one wants to buy the equity either.  That was one of my questions in my notes here, so.

But I do, there are some things I do want to think about, maybe understand what's going on with the business, how much money the business has, maybe understand kind of where things are going with respect to the business.  I kind of what the trustee views is the right thing to do, what the business is at some point.  I just think we got to figure out what to

006138

do with FSS over the next, I don't know, 60 days and just make the call one way or the other as to what you want to do and move on. I think --

MR. KIMPLER: Your Honor --

THE COURT: There could be other lawsuits. There could be other matters that are coming, and I will take them up at face value. I'll read them and we'll take them up and rule on him. Mr. Kimpler.

KIM: Yeah, I was just going to say, Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies. We've been working with the Texas plaintiffs towards that end. You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive. I think it will have wasted several months of efforts. I think it'll be extremely expensive. I'm worried about the estate becoming administratively insolvent. Again, if FSS is throwing out $2 million of cash a month, that's news to me. The idea that 50 percent of it's going directly to Jones and an account that maybe is not controlled by the trustee, that's also news to me. I'm very concerned about where that money is going.

THE COURT: I know. I got it. I think everyone should leave on the motion for reconsideration thinking, well, there's really technically nothing for me to reconsider

006139

because there's nothing, I haven't done anything.  But I don't think my position has changed in terms of what I said in February.   I want this case to continue to move .  Maybe we meet in another 60 days and see where things are and I'll see what gets filed and we'll take them up and we'll schedule them.

This case has been around for three years.  And it's been in a number of iterations and the positions of the parties hasn't changed and that's fine, but at some point, the Chapter 7 process has to work.  So I want to know, the trustee is going to tee up some non-exempt assets.  We'll take those up in the ordinary course.  We'll come back and figure it out.  In a couple of months, we'll figure out what the trustee wants to do with respect to FSS, but I'm not opening up any doors today.  But if there's a lot of money sitting somewhere, then maybe we can think about that.  But if courts rule, I'd like to know about them.  We'll see where things go.  Mr. Moshenburg, I'll give you 30 seconds and then I've got some other folks who have been here for a while and deserving of a hearing.  Yes, sir.

MR. MOSHENBURG:  Makes total sense, Your Honor.  I completely echo what Mr. Kimpler just said.  I just wanted to make sure the Court understood.  I don't agree with their characterization.  If any of that sticks, I'm happy to answer any questions about it.

THE COURT:  They don't agree with yours, so I think no one agrees with that --  so we're right where we started.

MR. MOSHENBURG: I totally agree.  I just wanted to be clear on the record about that.

THE COURT:  No.

MR. MOSHENBURG:  Lastly, Your Honor, I know you're talking about 60 days from now.  From our vantage point, the Court has told us to go pursue our state court remedies.  That's what we're going to do.  I want to be open and honest about that unless you're telling us otherwise.

THE COURT:  I'm not, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up.  We can continue to talk.  I just want to keep; I don't want to meet again in the Jones case in December and then talk about asset sales and what's going on.

And I'm going to -- well, somebody's asked me to think about some issues.  And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently.  We'll see what happens.  I may issue something in writing in short, just kind of addressing the issue without any need for another hearing.  We'll see where things go.  I think the trustee's instructions for now are keep selling non-exempt assets and

whatever you were planning on doing, what you said you were going to do, then just keep doing that.  I don't think you need to do anything different, but if anything changes, I'll let you know.

MR. MOSHENBURG:  Thank you, Judge.

THE COURT:  All right, folks, thank you very much. I very much appreciate your time.

(Proceedings adjourned at 2:32 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
above-entitled matter.
matter..

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 17, 2025

006143

ACCEPTED
03-25-00617-cv
105912861
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/22/2025 2:52 PM
JEFFREY D. KYLE
CLERK

No. 03-25-00617-CV

_____

**EXHIBIT**

**15**

Alexander E. Jones; 22-33553

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS

_____

FREE SPEECH SYSTEMS, LLC
*Appellant*,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN, MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO, JILLIAN SOTO- MARINO, WILLIAM ALDENBERG, WILLIAM SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT LEWIS, AND GREGORY S. MILLIGAN
*Appellees*.

_____

On Appeal from the 459th District Court of Travis County, Texas
Trial Cause No. D-1-GN-18-001835

_____

**APPELLANT'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR IMMEDIATE STAY OF VOID TURNOVER ORDER ISSUED IN VIOLATION OF THE BANKRUPTCY AUTOMATIC STAY**

_____

TO THE HONORABLE THIRD COURT OF APPEALS:

On August 13, 2025, Appellees induced the trial court to enter a Turnover Order [**Appendix A**][1], which has precipitated this appeal. On August 27, 2025,

---

[1] FSS incorporates by reference the arguments, authorities, defined terms, and appendices included in the Motion.

Appellant filed an Emergency Motion for Immediate Stay (the "Motion"). On August 28, 2025, this Court "temporarily [stayed] the Turnover Order until further order of this Court pending our review of the Motion and any response." On September 11, 2025, Appellees filed their Response to the Appellant's Emergency Motion for Immediate Stay (the "Response"). Appellant submits this reply in support of the Motion and to address arguments raised in the Response:

## A.    THIS COURT HAS THE POWER TO PROTECT ITS JURISDICTION TO AFFORD EFFECTIVE RELIEF ON APPEAL, INCLUDING TEMPORARY RELIEF

Appellees' very first argument is suggestive that this Court does not have the power to issue temporary relief on appeal—

> In its typical haphazard fashion, Free Speech Systems LLC (FSS) has not stated which statute, rule, or other body of law grants the Court authority to stay the Turnover Order pending appeal. Given the underlying facts, the granting authority is determinative of whether the Court must deny the stay.

Response, p. 4. Of course, part of FSS's complaint is that the trial court has not given effect to its cost bond in lieu of supersedeas, and temporary relief is therefore permitted under TEX. R. APP. P. 24.4(c). As the Court will learn through motion practice in the related appeal in Cause No. 03-23-00209-CV under TEX. R. APP. P. 24.4(a), the trial court has sustained objections to FSS's cost bond in lieu of supersedeas, and now will no longer give credence to its efforts to stay execution.

2

Thus, temporary relief is available relating the trial court's failure to give credence to the cost bond filed by FSS.

But the more fundamental issue informs this Court's consideration of its temporary relief powers?  Can, and should, a court of appeals act to preserve the relief that it can afford on appeal, to prevent some of the relief being sought on appeal from being lost or rendered moot?  That answer is surely "Yes."

The Texas Supreme Court has reasoned that "[t]he power of the courts of appeals to protect their jurisdiction is essential for the orderly administration of justice." *Dallas Morning News v. Fifth Court of Appeals*, 842 S.W.2d 655, 658 (Tex. 1992).  Under this rationale, the Texas Supreme Court has held that a court of appeals had the duty to issue temporary relief to preserve its power to grant effective appellate relief, to ensure that the issues raised before it do not become moot pending appeal.  *See H&R Block, Inc. v. Haese*, 992 S.W.3d 437 (Tex. 1999) (court of appeals required to issue temporary orders to prevent portion of relief requested on appeal from becoming moot).[2]  Indeed, in *Haese*, the Texas Supreme Court issued mandamus relief as to a court of appeals' failure to grant temporary relief to preserve the issues on appeal.

---

[2] *See also Parsons v. Galveston County Employees Credit Union*, 576 S.W.2d 99, 99 (Tex. Civ. App.—Houston [1st Dist.] 1978, no writ) ("Such transactions will change or destroy the subject matter of this appeal, making it likely to become at least partially moot by the time its final disposition is reached. Therefore, we grant the stay to preserve the jurisdiction of this court.").

3

The *Haese* case not only justifies but compels this Court to consider the issuance of temporary orders to prevent some of the effective relief sought in this Court from becoming moot pending review. 992 S.W.3d at 439. In *Haese*, the trial court issued an order that prohibited defendants from taking action in certain new transactions pending appeal, although the validity of this order and requirement were some of the bases for appeal. The Texas Supreme Court noted that, if the defendants were to comply with this order pending appeal, some of the relief that defendants were seeking on appeal would be moot: "Were defendants forced to comply with the order pending appeal, they would forever lose their right to obtain agreements from repeat customers to arbitrate disputes in connection with new loans. *Id.* As to those rights, defendants' appeal would be mooted." Thus, the Texas Supreme Court observed that the court of appeals had erred in failing to issue temporary orders to protect its ability to fashion effective appellate relief on disposition of the appeal: "Accordingly, the court of appeals should have stayed the order pending its review to prevent a portion of the appeal from becoming moot." *Id.*

A similar justification for temporary relief was discussed in *In re Verizon Wireless Personal Communications, LP*, 2024 WL 4544922, *1-2 (Tex. App.— Waco Oct. 22, 2024) (order). There, the appellant filed both and motion for temporary relief as well as seeking an injunction from the court of appeals to protect its jurisdiction pending appeal: "Verizon filed its motion for temporary relief and

4

006147

petition for writ of injunction to protect the subject matter of the receivership during the appeal as well as this Court's jurisdiction." 2024 WL 4544922 at *1. The court of appeals explained that it could issues relief to preserve the relief that was being sought pending appeal—

> An appellate court may issue a writ of injunction if necessary to protect the Court's jurisdiction over the subject matter of a pending appeal, or to prevent an unlawful interference with the enforcement of its judgments and decrees. *See* Tex. Gov't Code Ann. § 22.221(a); *In re Alamo Defs. Descendants Ass'n*, 619 S.W.3d 363, 367 (Tex. App.—El Paso 2021, orig. proceeding). Thus, we are authorized to protect our jurisdiction by preserving the subject matter of the appeal in order to make our decrees effective. *In re Alamo Defs. Descendants Ass'n*, 619 S.W.3d at 367. Because the patents are subject to the turnover order, and the receivership and turnover order are the subjects of pending appeal Cause Number 10-23-00081-CV, we grant the petition for writ of injunction to preserve this Court's jurisdiction over the appeal.

2024 WL 4544922, *1-2. In granting injunctive relief on appeal—a stay just as would be in an order for temporary relief—the court was concerned that some of the rights sought on appeal would be lost or impaired without a stay pending appeal. Notably, this injunctive relief issued on appeal from a turnover order, the very same situation as is facing the Court here.

**B.    ABSENT A TEMPORARY RELIEF, FSS WILL SUFFER IRREPARABLE HARM, LOSING SOME OF THE RIGHTS THAT WOULD HAVE BEEN PRESERVED BY THIS APPEAL**

In granting a stay pending appeal, the Texas Supreme Court has focused on the potential impairment of rights pending appeal. *In re State of Texas*, 711 S.W.3d

5

006148

641 (Tex. 2024). In that decision, the Texas Supreme Court granted what it referred to as an "administrative stay," preserving the court of appeals' ability to address the appeal on the merits, while granting temporary relief so that the appellant's rights would not be permanently impaired along the way. *Id.* at 646 n. 2. There will be harm here, rights lost, assets divested, and a business destroyed, absent temporary relief here.

Pursuant to the terms of the Turnover Order, FSS is obligated to comply with the Turnover Order and within five (5) days to begin turning over all "Turnover Property" to the Court appointed receiver, Gregory S. Milligan. If allowed to be enforced, FSS must immediately turn over to the Receiver: bank statements, pass books, and other back or financial institution records, real property deeds and deeds of trust, any other record or document, evidencing any ownership to real of personal property or to any debt owed or money had, and all documents listing or summarizing property owned by FSS. Pursuant to the terms of the Turnover Order, the Receiver has the express authority to: collect all accounts receivable of FSS, change the locks at all premises at which any property is situated, and exercise control over any website of FSS and direct the administrator or web server to allow Receiver full access1to the management of the website. If the Receiver is permitted to proceed, as intended, his actions to enforce the Turnover Order will have devastating and irreversible effects on business of FSS.

6

The Turnover Order, a post-judgment enforcement order, gives the Receiver the ability to control assets of FSS. Rule 24.2(d) of the Texas Rules of Appellate Procedure provides that a "trial court may not make any order that interferes with the judgment debtor's use, transfer, conveyance, or dissipation of assets in the normal course of business." The Turnover Order violates Rule 24.2(d) because it interferes with FSS's use, transfer, conveyance, or dissipation of assets in the normal course of business. *See Nelson v. Vernco Constr., Inc*. 367 S.W.3d 516, 523 (Tex. App.—El Paso 2012, no pet.). While it is not required to do so in order to be entitled to a stay, FSS can demonstrate that absent a stay, the Turnover Order would interfere with FSS's ongoing business.

Absent a stay of the turnover order, the Receiver may impair or divest assets that should have been protected by a bankruptcy stay, and that should have been protected by a supersedeas. The turnover order is not likely to stand up on direct appeal of that turnover order itself. And what of the appeal of the judgment under D-1-GN-18-001835, which at a minimum stands to be substantially reduced? Shouldn't that have an effect of a turnover order issued under a Cause Number that may be reversed on appeal? Nor will restitution under *Miga v. Jenson*, 299 S.W.3d 98 (Tex. 2009) cure things, especially where the harm to FSS may exceed the net worth of the plaintiffs, where the amounts could not be recovered back from them, where it could not be determined whether execution was done by

7

the Texas Plaintiffs or the Connecticut plaintiffs under their undisclosed settlement deal, and especially where FSS should have been subject to execution in the first place. Under these circumstances, where rights of FSS to avoid a turnover order (that should not have issued) would lead to irreparable harm, temporary relief is authorized and indeed required.

**C.   APPELLEES' RESPONSE TO THE AUTOMATIC STAY IS UNAVAILING.**

A crucial part of the appeal and the pending Motion to Stay, involves what is called the "Supplemental Order" of the bankruptcy court that (a) transferred all of FSS assets to the bankruptcy estate of Alex Jones, Christopher Murray Trustee and (b) consequently made the automatic stay provisions of 11 U.S.C. §362(a) applicable to those assets and thus making void any state court order entered with respect to those assets. There are several preliminary points on which either the parties agree and/or the case law is crystal clear.

*First* Texas law is crystal clear that a turnover order directed at assets covered by the automatic stay is void -- not voidable. *York v. State*, 373 S.W.3d 32, 39-40 (Tex. 2012). Appellees do not contest this because it is an ironclad fact.

*Second* it is undisputed and unchallenged, that even in the event of uncertainty as to whether assets are part of a bankruptcy estate, the automatic stay applies, and the Turnover Order is void. *See Brown v. Chesnut (In re Chesnut),* 422 F.3d 298, 300 (5th Cir. 2005). *See also Bonneville Power Admin. v. Mirant Corp. (In re Mirant*

8

006151

*Corp.)*, 440 F.3d 238, 251 (5th Cir. 2006) ("...this Court has recognized the automatic stay's broad application and noted that such breadth reflects a congressional intent that courts will presume protection of property when faced with uncertainty or ambiguity.").

*Third*, it is not in dispute that while the Supplemental Order was on appeal to the United States District Court, it could not be modified or vacated. The authorities for this proposition are set forth in our Opening Brief and will be repeated here but are incorporated by reference. Further, Appellees do not disagree with this legal fact.

*Fourth*, there is no dispute that the so-called Supplemental Order entered by the bankruptcy court transferred FSS assets to the Bankruptcy Estate of Jones. No dispute on this is possible as the wording of the Supplemental Order is crystal clear:

9

United States Bankruptcy (
Southern District of Texa

**ENTERED**

September 25, 202

Nathan Ochsner, Clerl

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | § |
|  | §  Chapter 11 |
| FREE SPEECH SYSTEMS, LLC, | §  Case No. 22-60043 (CML) |
|  | § |
| Debtor. | § |
|  | § |

**ORDER SUPPLEMENTING ORDER DISMISSING CASE**
[Related to Docket No. 956]

1.      Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

2.      The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

Signed: September 25, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

Rather Appellees' sole argument is that (a) in a hearing on February 5, 2025, the bankruptcy court "nullified" the Supplemental Order, (b) it reaffirmed that nullification in March, 2025, and (c) at a hearing on June 5, 2025 when Appellees claim Appellants asked Judge Lopez to "reconsider" his nullification, Judge Lopez both reaffirmed his previous nullification but said he may "reconsider" that nullification which the bankruptcy court has yet to do.

Appellees contend these points are so clear that "No reasonable attorney could conclude that Judge Lopez had granted FSS's motion to reconsider," [Resp., p. 18]

10

and thus the Supplemental Order is still nullified.   There is no charitable way to say it, but this is pure nonsense. Appellees know full well that the Supplemental Order is in full force and effect and have built an argument on a house of cards by asserting these points as an after-the-fact argument to avoid the inescapable. Appellants will address each of these points but in a slightly different order.

1. *THE TURNOVER ORDER SPECIFICALLY STATES THAT THE SUPPLEMENTAL ORDER IS VALID AND BINDING AS A FINDING OF THE COURT*

For convenience, the relevant portion of Judge Gamble's Order is restated:

> **The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):
>
> (i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

First, it must be noted that the Order signed by Judge Gamble references the Supplemental Order as a "finding of fact" made by the Court included at Appellees' hands.

11

006154

Plaintiffs refer to this multiple times as an "errant citation error"[Resp., p. 21 heading] or a "citation error in editing the order" [Resp., p. 21], a simple error made because an early draft of the Order tendered for signature "was originally drafted using a procedural history paragraph describing this period when both orders were in force" [Resp., p. 23] and that FSS is turning this ""inaccurate citation" into a "gotcha moment" that "magically breathe[s] life back into Judge Lopez' Supplemental Order..." [p. 24].

While none of that is correct, Judge Gamble lost plenary power to alter her Order on or around March 28, 2023 and it cannot now be changed. *See* TEX. R. CIV. P. 329b; *Custom Corporates, Inc. v. Sec. Storage, Inc*., 207 S.W.3d 835, 838 (Tex. App.—Houston [14th Dist.] 2006, no pet.). It is law of the case. And as this matter is on appeal to this Court, Judge Gamble could not change her Turnover Order if she wanted to.

Moreover, as to it being an errant vestige of an earlier draft, it is notable that that alleged earlier draft is neither dated nor attached; it is impossible to conceive how a definitive finding of fact, could have been errantly included.

But even more fundamentally, Appellees' characterizations of the two operative orders -- the June Order [Dkt. 956] and the Supplemental Order [Dkt.1021] -- are just plain bogus.

2. *THE JUNE ORDER DID NOT GIVE THE TRUSTEE POWER OVER FSS ASSETS*

12

006155

Appellees contend that the June Order gave the Chapter 7 trustee dual powers including "signing authority over FSS' bank accounts and the power to dispose of its assets for the benefit of creditors, though those assets remained the property of FSS." [Resp., p. 23]. They even claim FSS filings agree, misquoting Jones' Declaration on this point. *Id.* n. 5.[3]

But the June Order **DID NOT** give the Trustee power or authority over FSS assets, only its bank accounts and that is why the Supplemental Order was necessary, the June Order being clear as to the scope of its coverage:

### ORDER DISMISSING CASE

For the reasons stated on the record at the hearing held on June 14, 2024, this case is dismissed. It is further ORDERED:

1.     The employment of all professionals retained in these chapter 11 cases and the Subchapter V Trustee's service is terminated. Except as otherwise set forth below, the Debtor's CRO shall have no further responsibilities with respect to the Debtor's operations.

2.     The CRO is authorized to transfer control and signing authority with respect to the Debtor's bank accounts to Christopher R. Murray in his capacity as the Chapter 7 Trustee for the bankruptcy estate of Alexander Jones, Case No. 22-33553.

As the June Order by its terms only covers FSS bank accounts and nothing else, it is inexplicable that the Appellees would repeatedly characterize this June

---

[3] Jones' Declaration merely refers to the June Order as having "transferred control and signing authority with respect to FSS 's bank accounts..." not FSS assets.

006156

Order as transferring *both* FSS cash and its assets,[4] when the words of the June Order say no such thing and specifically dealt only with FSS cash.

3. *THE APPEAL OF THE SUPPLEMENTAL ORDER BY THE TEXAS PLAINTIFFS AND INTERVENTION BY THE CONNECTICUT PLAINTIFFS DEMONSTRATES PLAINTIFFS' DISHONESTY*

As noted in Appellants' Motion to Stay, the Texas Plaintiffs appealed the bankruptcy court's entry of the Supplemental Order to the District Court for the Southern District of Texas and did so for the very reason that FSS assets were transferred. **Appendix G**. In their statement of the issues on appeal, the Texas Plaintiffs stated to the United States District Court to whom bankruptcy appeals first go, precisely what the Supplemental Order did:

---

**STATEMENT OF ISSUES**

1. Did the Bankruptcy Court err when, without notice, it entered an order [Docket No. 1021]—three months after dismissing the Free Speech Systems, LLC bankruptcy [Docket No. 956]—that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones?

---

[4] **Resp. p. 23** ("Nonetheless, pursuant to the June 2024 order, the Trustee still has authority to distribute FSS assets for the benefit of creditors."); **Resp. p. 23-24** ("Judge Lopez placed 'authority in the Trustee to control of Judgment Debtor Free Speech Systems, including its assets and bank accounts' -- is a correct statement accompanied by an inaccurate citation that should have been updated."); **Resp. p. 24** ("... the June 2024 order, known as the "Initial Cash Order," which is the order that gave signing authority to the Trustee and permitted him to dispense assets for the benefit of creditors.")

006157

The Texas Plaintiffs' Statement Of Issues And Designation Of Record To Be Presented On Appeal, Case No. 4:24-cv-03882, Dkt No. 14-1, in the United States Bankruptcy Court for the Southern District of Texas. **Appendix H**.

The Connecticut Plaintiffs here intervened in that appeal. **Appendix J**. In that intervention, contrary to what is argued here, the Connecticut Plaintiffs stated that in the June Order they themselves sought "the Bankruptcy Court specifically authorized the transfer of control and signing authority over the FSS bank accounts to the Jones Chapter 7 Trustee (the 'Dismissal Order')..." [**Appendix J,** p. 4.]  and then assert that the Texas Plaintiffs acquired a state court turn over from Judge Gamble and did so "notwithstanding the Bankruptcy Court's Dismissal Order—entered two hours earlier—vesting control of FSS bank accounts in the Jones Chapter 7 Trustee."  **Appendix J,** p. 5.  The Connecticut Plaintiffs went on to characterize the Supplement Order

> 14.    On September 25, 2024, the Bankruptcy Court entered the Supplemental Dismissal Order on the FSS docket. (Bankr. Dkt. 1021).  This Supplemental Dismissal Order clarified that as of the entry of the original Dismissal Order, all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee. *Id.*

006158

**Appendix J,** p. 8. For Connecticut Plaintiffs to now claim the June Order gave the Trustee FSS's assets and the Supplemental Order was solely to allow their auction, is not true.

4. *THE TURNOVER ORDER REQUIREMENT FOR TRUSTEE APPROVAL SHOWS THE SUPPLEMENTAL ORDER STILL IN EFFECT*

The Connecticut Plaintiffs are forced into this prevarication because they also included in the Turnover Order, the proviso that the turnover of FSS assets required approval of the Bankruptcy Trustee, Judge Gamble's Order stating: "as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to the approval of the Trustee.").

FSS has argued that the inclusion in Plaintiffs Turnover Order of a proviso that seizure and sale of FSS assets requires approval of the bankruptcy Trustee (Murray), is an acknowledge that including Trustee approval could only be done if the Trustee had control over FSS assets which he got from the Supplemental Order. Because of that reality, Connecticut Plaintiffs were forced to re-write the history of the June Order arguing to this Court that the June Order gave the Trustee some control over FSS assets, notwithstanding its clear indication it dealt only with bank accounts. But the argument that the June Order conveyed control over assets to the Trustee when it doesn't, is not sustainable.

As the transcript of the bankruptcy hearing on September 24, 2024 demonstrates, when Judge Lopez entered the Supplemental Order, he stated first as

16

006159

to the June Order, that the bankruptcy Trustee (Murray) over the estate of Jones, held

the equity in FSS and had control of FSS bank accounts, the Court stating:

> "I explicitly told Mr. Murray [the bankruptcy Trustee] that he was in charge of
> the bank account and that he had control of the equity of FSS. He's in charge."
> BK Transcript September 24 hearing, p. 12, lines 8-10.

And again:

> "...it wasn't going to happen because he was in charge of the bank account.
> There wasn't going to be a run. And he has the equity of FSS."  Id. at p. 14,
> line 5-7.

But the purpose of the September 2024 hearing that resulted in the

Supplemental Order, was to convince Judge Lopez that that something more was

needed and that simply because Trustee Murray held the FSS equity did not mean

he could sell FSS assets:

> "THE COURT:  So the [US] Trustee is going to try to convince me that
> somehow being in control of FSS equity means that['s] all you can do is sell
> it."  BK Transcript September 24 hearing, p. 13, lines 13--15.

And that is what US Trustee Ha Min Nguyen (not to be confused with bankruptcy

trustee Murray) did, explaining to the bankruptcy court that holding and selling the

equity of a company was not the same thing as holding and selling the assets of an

entity:

> "But there are basic tenets of American corporation laws that the U.S.
> Supreme Court has said that -- you know, just because you own a hundred
> percent of the equity, you don't own a hundred -- the estate itself doesn't own
> the assets."

006160

*Id*. at p. 23, line 16-20.  Following this, the Supplemental Order was then signed to vest FSS assets in the trustee to allow their sale of FSS assets; and it was denominated a "Supplemental Order" because that is what Judge Lopez said he had intended to accomplish in June but recognized the need to now clarify by the Supplemental Order:

> THE COURT: That was always the intent. Right? And we can disagree about that. But I'm just saying that was always the intent. Everybody knew. Everybody understood that at the time. If that wasn't clear or -- no one raised it to me then when winddown was being discussed. If you want me to do that, I am more than happy -- because it sounds like everybody needs it anyway -- I'm more than happy to clarify in my order that all the assets -- if it didn't include it in the assets, that's why he has the cash, right? That's why he's got the cash and that's why he's got the equity interest. He's got everything. That was always the intent as to what was going on. But if that makes this easy, I'm happy to do it. Because I think you and I actually agree a lot here. I just think we're getting in the technicalities here. But that certainly was what I ordered at the time.
>
> MR. NGUYEN [US Trustee]: Your Honor, it's not the technicality. It's actually what the Code says.

*Id*. p. 24, lines 5-22.   Therefore, precisely because the Bankruptcy Court's June Order was not clear as to the status of FSS assets, the Supplemental Order -- i.e., supplementing the June Order -- was entered.

In summary, Appellees' argument is that the wording of the Turnover Order that it "only seeks relief .... as to Judgment Debtor Free Speech Systems, LLC [of] all its assets (subject only to approval of the Trustee)" was included because the June

006161

Order conveyed FSS assets to the Trustee, is not credible. Rather, their conveyance was accomplished by the Supplemental Order.

And apart from all this, even if Appellees were correct that the June Order gave control over FSS assets to the Trustee of Jones' bankruptcy estate such that his consent to their sale would be required, this is tantamount to an admission that the automatic stay provisions are in force and the Turnover Order violates them.

5. *PLAINTIFFS ARGUMENTS THAT THE BANKRUPTCY COURT'S ACKNOWLEDGEMENT OF ITS INABILITY TO MODIFY OR VACATE ITS SUPPLEMENTAL ORDER WHILE IT WAS ON APPEAL DID NOT PREVENT IT FROM NULLIFYING IT MAKE NO SENSE*

Appellees concede as they must that as the Texas Plaintiffs had appealed the entry of the Supplemental Order, the bankruptcy court had no authority to modify or vacate it. They do not quibble with the Court's own words, stating precisely that:[5]

---

[5] Plaintiffs oddly assert FSS is collaterally attacking the bankruptcy court orders which they claim cannot be done if FSS "had the opportunity to make that argument in the bankruptcy court." Resp. p. 19, n. 4. Clearly FSS did bring this to J. Lopez's attention, and he corrected his errors. Furthermore, a void judgment can always be collaterally attacked. *York*, 373 S.W.3d 32 (Tex. 2012).

006162

> somebody wants to buy the equity, which someone can always do in Chapter 7. I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.
>
> The matter was currently pending. That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right? Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that. What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to| force the trustee to put up another sale, put on auction. The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring

**Appendix M**, p. 40.  And also

> someone suing them because they really didn't own something that I sold and so I haven't revoked anything. I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

Appellees' argument, however, is that while the Bankruptcy Court admittedly could not modify or vacate and any effort to do so was a legal nullity, it nevertheless "interpreted" the Supplemental Order as being a nullity.  Said differently, the Appellees appear to argue that while the bankruptcy court could not nullify its Supplemental Order, it could interpret that order to be a nullity, which of course makes no sense.

Aside from the facial absurdity of this, further revealing it as a pure canard is the Bankruptcy Court's own statements at the June 2025 hearing where it said it had

20

006163

not modified the Supplemental Order in February because it could not, but asked if it should do so now:

```
            THE COURT:  I don't think I modify the order --

            MR. JORDAN:  You didn't.

            THE COURT:  -- back in February.

            MR. JORDAN:  No.

            THE COURT:  The question is, do I do it now?  It's
      the question you're telling me.
```

**Appendix M**, p. 47.  Asking "do I do it now" would be an absurd question had the Court already interpreted the Supplemental Order as a nullity.

> 6. *THE FACT THAT THE TRANSCRIPT OF THE JUNE 2025 HEARING DISCUSSES WHETHER THE BANKRUPTCY COURT WOULD CONSIDER AUTHORIZING ANOTHER SALE EFFORT OF FSS ASSETS SHOWS THE CONTINUED VIABILITY OF THE SUPPLEMENTAL ORDER*

And while nothing else is needed to thoroughly debunk Appellees' frantic, "Hail Mary" effort to re-write history, the fact that the Bankruptcy Court repeatedly asked at the June 2025 hearing whether it should allow the Trustee to again attempt to sell FSS assets, only makes sense if the Trustee still has control of them.

21

The matter was currently pending. That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right? Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that. What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction. The trustee can exercise business judgment, but here are the matters, here are

another motion for the sale of the assets. And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me. It would have to be cash only and we'd have to sort out all the intellectual property issues. So I don't want someone buying something -- and I expressed this a while back

There is simply no way the bankruptcy court would be thinking about authorizing another sale of FSS assets if they were not in the Trustee's control via the Supplemental Order. The Appellees even quote one of the June 2025 transcript exchanges where Judge Lopez again ruminates on another sale effort:

006165

> The question is do we do another sale? That's the real question. Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS. And

And Appellees' response to the question of how these matters could be even on the discussion table if the Supplemental Order had been nullified, is to assert with no basis whatsoever, that "Any future sale would require its own Supplemental Order, which had become nullified after the first sale." Resp. p. 15. This is just as nonsensical as the remainder of their arguments, as Plaintiffs never explain how the bankruptcy court could enter a new order conveying FSS assets when FSS has now been dismissed from bankruptcy court over a year.

**D.    TURNOVER PROCEEDING IS PROCEDURAL DEVICE AND DOES NOT ADJUDICATE SUBSTANTIVE RIGHTS.**

Appellees' argument that their request for the trial court to enter a turnover order in favor of non-parties to the underlying litigation is substantively baseless and contrary to applicable law.

It is well settled law that the standard by which a party is permitted to intervene in a lawsuit is measured by whether the intervenor has a "justiciable interest" in a pending suit. *In re Union Carbide Corp.*, 273 S.W.3d 152, 154 (Tex.

006166

2008) (citing *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990)). As the Supreme Court has phrased it, the "justiciable interest" requirement protects pending cases from having interlopers disrupt the proceedings. *Id*. To constitute a justiciable interest, "[t]he intervenor's interest must be such that if the original action had never been commenced, and he had first brought it as the sole plaintiff, he would have been entitled to recover in his own name to the extent at least of a part of the relief sought" in the original suit. *Id*. at 155.

FSS does not contend that courts, including this one, have found that intervention after a final judgment has been determined is procedurally improper. However, the timeliness of Appellees' intervention does not dispense with the requirement that Appellees must nonetheless have a justiciable interest in the lawsuit they have sought to intervene in. This requirement of demonstrating an interest in the underlying judgment has also been applied by this Court in the turnover proceeding context where this Court has determined that the turnover statute should "...not be applied by Texas courts to non-judgment debtors, and ... being merely a "procedural device," it may not be used to determine the "substantive rights" of judgment debtors—not to mention non-judgment debtors—when there is a dispute over ownership of assets that are the subject of collection efforts." *WC 4th v. Colo. Third St., LLC*, No. 03-22-00781-CV, 2024 Tex. App. LEXIS 5923, at *13-14 (Tex. App.—Austin Aug. 15, 2024, pet. denied). Appellees reliance on *Breazeale v.*

006167

*Casteel*, which was distinguished by the Supreme Court in *Alexander Dubose Jefferson & Townsend LLP v. Chevron Phillips Chem. Co., L.P.*, 540 S.W.3d 577, 585 n.38 (Tex. 2018), focuses on the timeliness of the intervention and accepts, without challenge, the prerequisite justiciable interest that must be determined to exist. Appellees' argument misses the mark.

Additionally, the fact that a turnover proceeding is a purely procedural device, which does not adjudicate substantive rights is well settled. *Id*. As the Supreme Court has phrased the standard, "While some opinions view intervention as a proper method for a third party to protect its rights in a turnover proceeding, none go as far as holding that intervention enables a court to adjudicate third party rights in what is otherwise a purely procedural device." *Id*. This Court has interpreted the nature and scope of a trial court's ability to enter a turnover order as follows: A turnover order is a statutory procedural device that permits a trial court to order a judgment debtor to turn over nonexempt property that is in the judgment debtor's possession or control. *In re Raggio-2204 Jesse Owens, LLC*, No. 03-18-00213-CV, 2018 Tex. App. LEXIS 5252, at *4 (Tex. App.—Austin July 12, 2018, no pet.). The Supreme Court's opinion in *Alexander Dubose* makes clear that a party seeking to intervene in a pending matter must assert a cause of action, which is an assertion of a substantive right and not properly adjudicated in a turnover proceeding. Incredibly, Appellees claim in the Response:

006168

"Any such issues have been resolved, as is evidenced by the Plaintiffs' agreement to join in collection efforts. Nor are the Connecticut Plaintiffs seeking in this proceeding to establish their rights under the Connecticut Judgment – that has already happened."

Response, p. 28. First, there has never been *any* evidence of an agreement that has been reached by Appellees, either before any state or federal court. There have been numerous references to such an agreement, but no such agreement has ever been corroborated by any evidence. Yet most alarming is the assertion that any rights under the Connecticut Judgment have been established. The only possible time when any rights under the Connecticut Judgment could have been established is when the trial court granted the Turnover Application. If this Court needed any further demonstration that the trial court's granting of the Turnover Order was a determination of substantive rights, it needs to look no farther than Appellees own admission.

Accordingly, the Connecticut Plaintiffs have sought to intervene in a controversy for which they have failed to establish they have a justiciable interest, and instead they have asked the trial court to determine the substantive rights of non-parties in a turnover proceeding. It was clear error for the trial court to permit such activity against the backdrop of clearly established precedent.

**E.    AN EXAMINATION OF THE TURNOVER APPLICATION DEMONSTRATES IT IS NOT SUPPORTED BY NECESSARY EVIDENCE.**

26

Finally, the Response argues that contrary to the lack of evidence that supports the Turnover Application, Appellees maintain "[t]he application for the Turnover Order attached affidavits swearing to FSS's ownership of non-exempt property and citing FSS's own discovery responses as support." Response, p. 29. Citing to "FSS's App. C, ¶12," which is the Turnover Application, paragraph 12 does reference non-exempt property, but the Declaration of Alinor C. Sterling does not attest to any non-exempt property and certainly does not attach any such evidence. FSS does not intend to spend significant time responding to this argument as this Court can readily determine for itself by examining the record that no such evidence exists and certainly none was received by the trial court.

## **REQUEST FOR RELIEF**

Free Speech Systems, LLC respectfully requests that this Court continue to the temporary stay that has already been entered and continue to stay the enforcement of the Turnover Order and all collection and judgment enforcement activities undertaken in connection therewith, until this Court rules on FSS's motion on the merits of the Turnover Order. FSS further requests all other relief to which it may be entitled.

Respectfully Submitted,

*/s/ Ben C Broocks*
Ben C Broocks
State Bar No. 03058800
William A. Broocks

27

State Bar No. 24107577
**BROOCKS LAW FIRM, PLLC**
248 Addie Roy Rd, Suite B301
Austin, Texas 78746
(512) 201-2002 - Telephone
(512) 201-2034 - Fax
bbroocks@broockslawfirm.com
wbroocks@broockslawfirm.com

Alan B. Daughtry
State Bar No: 00793583
alan@alandaughtrylaw.com
3355 West Alabama, Suite 444
Houston, Texas 77098
Telephone:  (281) 300-5202
Facsimile:   (281) 404-4478

Shelby A. Jordan
State Bar No. 11016700
Antonio Ortiz
State Bar No. 24074839
**JORDAN & ORTIZ, P.C.**
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com
aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com

**ATTORNEYS FOR APPELLANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of September, 2025, a true and correct copy of the foregoing was served upon the following counsel of record in accordance with the Texas Rules of Appellate Procedure.

28

006171

Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
Benjamin D. Evans
State Bar No. 24081285
bevans@cstrial.com
**CAIN & SKARNULIS, PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

Mark D. Bankston
State Bar No. 24071066
mark@fbtrial.com
**KASTER LYNCH FARRAR & BALL LLP**
1117 Herkimer
Houston, Texas 77008
713-221-8300
713-221-8301—Facsimile

**ATTORNEYS FOR APPELLEES**

William R. "Trip" Nix
State Bar No. 24092902
tnix@krcl.com
**KANE RUSSELL COLEMAN & LOGAN, PC**
401 Congress Ave., Suite 2100
Austin, Texas 78701
512-487-6650

**ATTORNEY FOR GREGORY S. MILLIGAN**

/s/ Ben C Broocks
Ben C Broocks

29

006172

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kay Smith on behalf of Ben Broocks
Bar No. 03058800
ksmith@broockslawfirm.com
Envelope ID: 105912861
Filing Code Description: Response
Filing Description: Reply ISO Stay
Status as of 9/22/2025 3:48 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ryan Chapple | 24036354 | rchapple@cstrial.com | 9/22/2025 2:52:46 PM | SENT |
| Mark Bankston | 24071066 | mark@fbtrial.com | 9/22/2025 2:52:46 PM | SENT |
| William Nix | 24092902 | tnix@krcl.com | 9/22/2025 2:52:46 PM | SENT |
| Shelby Jordan | | sjordan@jhwclaw.com | 9/22/2025 2:52:46 PM | SENT |
| Ben  Broocks | | bbroocks@broockslawfirm.com | 9/22/2025 2:52:46 PM | SENT |
| William Broocks | | wbroocks@broockslawfirm.com | 9/22/2025 2:52:46 PM | SENT |
| Antonio Ortiz | | aortiz@jhwclaw.com | 9/22/2025 2:52:46 PM | SENT |
| Chrystal Madden | | cmadden@jhwclaw.com | 9/22/2025 2:52:46 PM | SENT |
| Alan Daughtry | | alan@alandaughtrylaw.com | 9/22/2025 2:52:46 PM | SENT |

006173

**EXHIBIT**

**16**

Alexander E. Jones; 22-33553

exhibitsticker.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

IN RE: ALEXANDER E. JONES §  CASE NO. 22-33553 (CML)
§
§
Debtor §  **Chapter 7**

**MOTION FOR RECONSIDERATION OF THIS COURT'S
DETERMINATION THAT NO AUCTION OF FREE SPEECH SYSTEMS
ASSETS WILL BE CONDUCTED BY THE JONES CHAPTER 7 ESTRATE**

**This motion seeks an order that may adversely affect you. If you oppose the
motion, you should immediately contact the moving party to resolve the
dispute. If you and the moving party cannot agree, you must file a response
and send a copy to the moving party. You must file and serve your response
within 21 days of the date this was served on you. Your response must state
why the motion should not be granted. If you do not file a timely response, the
relief may be granted without further notice to you. If you oppose the motion
and have not reached an agreement, you must attend the hearing. Unless the
parties agree otherwise, the court may consider evidence at the hearing and
may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

This Motion For Reconsideration of This Court's Determination That No Auction of Free
Speech Systems Assets Will Be Conducted By the Jones Chapter 7 Estate (the "Jones Estate)
which is which currently administered by its Chapter 7 Trustee Christopher R. Murray (the
"Trustee") and is filed by Alexander E. Jones ("Jones") for himself and as manager of the non-
debtor company, Free Speech Systems, LLC ("FSS") [Collectively Jones and FSS are sometimes
referred to as "Jones"].

**I.
PRELIMINARY STATEMENT**

1.      Jones has the statutory and common law authority to represent Free Speech
Systems, LLC ("FSS") as manager and in the common interest of preservation of value of the FSS
assets including (i) preservation of the ongoing appellate proceedings; (ii) defense of the pending

006174

dischargeability proceedings, and (iii) matters before this Court, including this Motion seeking reconsideration of the Order of this Court bench order of February 5, 2025, to the extent that:

(a) this Court has exercised jurisdiction to enter, then "void," its order that is now on appeal; and

(b) Jones' desire to be heard involves his personal and financial rights and pecuniary interests in such orders and assets, giving Jones standing to assert these matters; and

(c) Jons responds to the Plaintiffs' misstatement and misrepresentations in their recent opposition to FUAC's request for an auction of the FSS assets.

2. Jones seeks reconsideration of the status of the "Supplemental Order" of this Court [FSS Dkt. 1021, September 25, 2024], that has twice previously been the basis of the Trustee's proposed auction of the FSS assets and twice manipulated and improperly orchestrated by the two largest creditors (herein collectively the "Plaintiffs" and separately the "Connecticut Plaintiffs" or the "Texas Plaintiffs") in coordination with this Court's Trustee to accomplish an illegitimate purpose and intent of the Supplemental Order. The cost to the Jones Estate of these two improper efforts was almost $2+ million in attorney's and professional fees.

3. Importantly, this Motion raises issues not considered by this Court, or at least not expressed in the record of its ruling and the most recent denial of the proposed continuation of an FSS asset auction raised by FUAC, LLC. Court determined FUAC had no standing to seek that relief.

4. Although this Motion points out that the total chaos caused by the Trustee and Plaintiffs in their now well-documented manipulations of an otherwise simple bankruptcy auction process, that is not the basis of this Motion. That wasteful chaos caused by a tortured attempt to manipulate this Court's Supplemental Order to accomplish a purpose never intended by this Court, should not result in the punishment of the other creditors or the Jones and FSS interests, as the

006175

case may be.  Jones summarizes this Motion and Jones' arguments as follows:

a. **THIS MOTION SEEKS RECONSIDERATION OF THE COURT'S IMPROPER DECLARING THE SUPPLEMENTAL ORDER "NULL AND VOID."** On June 21, 2024 this Court entered its Order giving the Trustee control of FSS bank accounts and cash (the "Cash Order")(FSS Dkt. 956).  Then on September 25,  2024 this Court entered its so-called Supplemental Order which *supplemented* the prior Cash Order and gave the Trustee control of and supervisory powers over FSS's assets that were generating the new cash in addition to the Cash Order (Dkt. 1021).  At a hearing on February 5, 2025 this Court discussed its lack of jurisdiction to void the Supplemental Order.  However, in a subsequent Order entered on February 5, 2025[1] this Court declared that the Supplemental Order was "null and void."   This Motion requests the reconsideration of that declaration as the Supplemental Order, now on appeal, cannot be declared null and void, as a matter of law, as previously stated by this Couret.[2]  This Court, in making its most recent ruling from the bench (that the Supplement Order is now considered "null and void") does not consider its earlier acknowledgment that the Supplemental Order is on appeal and, as this Court previously stated that because *such Supplemental Order is on appeal, this Court lacked jurisdiction to void the order*:

> *-- no, I should back up and mention that the*
> *supplemental order was appealed by the Texas families. I*
> *think that matter is still pending.*
> *MR. JORDAN: It is, Judge.*
> *THE COURT: I lose jurisdiction over that*

---

[1]     This second order noted that First United America Company ("FUAC") lacked standing to request reconsideration.  As will be explained infra, there is no question of Jones's standing given his personal and financial rights and pecuniary interests which unquestionably give Jones standing to assert these matters.

[2]     *Avery v. Gonzalez (In re Gonzalez),* Nos. 2:15-bk-25283-RK, 2:16-ap-01037-RK, 2024 Bankr. LEXIS 1038, at *9 (Bankr. C.D. Cal. May 1, 2024) (the court lacked jurisdiction to consider a Rule 60(b)(1) motion for relief from judgment during the appeal).

006176

*immediately.*

[*See*, **Exhibit "1"** Hearing transcript, February 5, 2025, pg. 8, lines 15-19.]. The Court was clear that although it would likely set aside the Supplemental Order (out of pure frustration over the efforts to pervert the purpose of its entry), it had no jurisdiction to do so. The Court's observation was correct when first made and remains correct now.[3] However, the non-stayed appeal does not prevent this Court from enforcing its unstayed orders even if on appeal:

> "In addition to its remaining jurisdiction on matters unrelated to the appeal, a *bankruptcy court retains substantial jurisdiction as to the order that is the subject of the interlocutory appeal*." *Id.* 'T*he appeal only deprives the bankruptcy court of the power to alter, expand or vacate the order at issue.*' *Id.* (citing *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1190 (9th Cir. 2000)). "*The [lower] court retains jurisdiction over [\*7] all other matters that it must undertake to implement or enforce the judgment or order* [that is on appeal]." *Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 967 (9th Cir. 2007).

*In re M & C P'ship*, No. 19-11529, 2021 Bankr. LEXIS 1135, at \*5-7 (Bankr. E.D. La. Apr. 28, 2021). [Emphasis Added] [*See*, Note 3 *Supra*]. This appeal is active, and no stay has been sought or entered.[4] Accordingly, this Court may implement and enforce the Supplemental Order, which is the relief sought by this Motion.

The Court's act of voiding the Supplemental Order was imminently justified, borne from frustration of the combined machinations of the Trustee with the assistance of the 15 Connecticut Plaintiffs and the two Texas Plaintiffs (collectively, the "Plaintiffs") who thwarted this Court's clear instruction for the Trustee to conduct a simple bankruptcy

---

[3]     *See, e.g., Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at \*20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] citing *In re Port Neches Fuels, LLC*, No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, \*12 (D. Del. Mar. 27, 2024).

[4]     *See*, pending *Case No. 22-60043* - Judge Charles Eskridge, U.S District Court, SD-TX.

Page 4 of 34

auction. However justified the Court's frustration, the remedy of declaring the Supplemental Order void, was (i) legally impermissible, (ii) inequitable, (iii) creates virtually insurmountable complications and chaos of undoing events of the past 7 months; and (iv) overlooks the much more practical remedy of simply Ordering the auction, even if required to replace the disobedient and compromised Trustee.  Holding to the position that the Supplemental Order is void will create past, present and future chaos.  It would mean that for now, everything previously done under the authority of that Supplemental Order was invalid and must be reversed.  In the present sense, it makes the companion Cash Order currently in place meaningless and makes the Trustee an intentional tortfeasor in retaining property he seized that belongs to FSS and has not returned. But perhaps the most pernicious is the fact that the Plaintiffs will act as though it is void and begin collections only to find that it is not void, and their actions violated the automatic stay or the discharge injunction, and thus themselves are void.  The ripple effects from this one improvident act, will reverberate in numerous directions.

b.      Second, Jones is continuing his appeals of the Plaintiffs judgments, the reversal in whole or in any substantial part, will likely render Jones Estate solvent.  Jones, as the sole manager of FSS, is also continuing the appeals on behalf of FSS, at no expense to the Jones Estate, likewise if reversed on appeal will render FSS solvent.  For this and several other reasons and recent Supreme Court authority discussed below, Jones has standing to seek the relief requested herein and this Court has the jurisdiction to order the relief sought.

c.      Third, this Motion seeks to inform the Court of not only the need pursue its prior-ordered auction, considered ordinary in most every Chapter 7 case (specifically, the Chapter 7 Trustee's conducting of a public, non-collusive, auction of assets to the highest

006178

bidder for cash) but also a matter *now opposed* by the Plaintiffs *and silently ignored by the Jones Estate Trustee* in furtherance of the same history of manipulation. This Court may take judicial notice that (i) a § 363 Sale with title vesting free and clear of all liens, claims and encumbrances, greatly enhances the public's participation in an auction and thus, a bankruptcy Trustee's public sale to the highest bidder is generally considered the premier way to recover the highest return for creditors and the bankruptcy Estate. This is true primarily because it is promoted, advertised, and conducted only by professionals in such process, (including the professional Trustee, his legal counsel and retained auction professionals, all supervised by a business Bankruptcy Judge).[5] Contrast this professional approach to the Texas state ordered Writ of Execution and auction by a Sheriff's or Constable's sale, where the officer's only participation is to levy the property and at the auction read the contents of the writ of execution before asking for offers, that is if anyone shows up other than the judgment holder planning on making only a "credit bid."

d. Fourth, in addition to the gross disparity in auction results, contrast that process to (i) the fact that the Connecticut Plaintiffs were stayed from all collection efforts by both Connecticut Statute and recent ruling of the Connecticut Court of Appeals during the two prior Ordered auctions the Plaintiffs attempted to manipulate;[6] and (ii) the likelihood that both judgments will be stayed because Texas, by statute, *mandates a stay*

---

[5] The bankruptcy bidding process is neither complex nor out of the ordinary. It is a mainstay of bankruptcy estates' ability to satisfy the maximum recovery, of critical importance in circumstances that likely will not pay 100% of the creditors' claims. And as Jones argues, it is a matter of judicial notice that a State law Constable's or Sheriff's sale is conducted exclusively by a deputy sheriff or constable with no obligation to advertise or otherwise maximize the sale price, and where other bidders must compete with credit-bidding of the judgment holder that significantly chills the bidding, the price obtained never reflects, much less reaches anywhere near the fair market value.

[6] The stay of the Connecticut Judgment is problematic at this point since the Connecticut Supreme Court denied certification of the Jones and FSS appeal, and a stay is limited in duration until, and if, the Connecticut Court of Appeals agrees to extend the stay, or the US Supreme Court grants a stay pending *certiorari* or pending a ruling if *certiorari*. is granted.

006179

when a money-judgment debtor posts a bond or collateral equivalent to 50% of the judgment debtor's **_net worth_** (the "net worth" of FSS is a negative multi-millions of dollars);[7] and the fact that neither Judgment is supported by a final order of non-dischargebility, thus, no execution is appropriate (which did not stop the Connecticut Plaintiffs form seeking to violate the Connecticut Stay by making false claims to the State Court *of this Court's orders*, including the claim that this Court had entered a *final order* determining the Judgment to be nondischargeable.[8] Instead of this chaos,[9] this Court should simply and clearly order the bankruptcy auction to liquidate all assets of the Chapter 7 estate and thereby (i) stop all of the extravagant legal and Trustee's fees from continuing to support Plaintiffs' manipulation of the bankruptcy process; and (ii) allow the appellate processes to conclude.  The Estate, at that point, needs no further "administration" and

---

[7]       Fifth, with both judgments stayed, both Jones and FSS will then be entitled to remain in possession of their assets (with, as to FSS, only "ordinary course operations allowed") until the appellate stays are lifted by final orders of the Connecticut and Texas courts, *and* only if these judgments are not reversed on appeal.  This totally re-adjusts **_back to this Court's expressed intention_** to conduct a bankruptcy auction and to not allow the manipulation of its orders to frustrate the auction process and send the auction (writ of execution) process to State Court to deal with any sale.  Instead of this Court sending matters back to State Court where (i) a stay of all collection will be in place for potentially both judgment holders; (ii) this Court's jurisdiction is lacking to void the Supplement Order while on appeal (an unstayed appeal), and (iii) the Trustee remains in possession of all of those operating assets which Jones continued efforts have protected and increased.

[8]       Although the Connecticut Plaintiffs Judgment has always been subject to a stay of any execution or effort to recover on the non-final Connecticut Judgment, as this Court may note, the Connecticut Plaintiffs nevertheless attempted to have an Austin State District Court appoint a receiver pursuant to, and execute on the Connecticut Judgment over Jones' assets, falsely telling the Austin District Court that this Court had entered a "final order" finding the Connecticut Judgment non-dischargeable **_and_** not mentioning to the Austin District Court that their collection efforts were stayed by the State of Connecticut's statutory stay of money judgment.  That case was removed to the Federal Court and referred to this Court by the District Court, Western District of Texas (Austin Division).  [*See, also infra*, Note 23].

[9]       As discussed below, the Connecticut Plaintiffs previously ignored the stay of collection and filed in the State District Courts an action to seize Jones property and appoint a receiver over Jones property, (i) telling the State district court that this Court bankruptcy court ruled the Connecticut Judgment non-dischargeable *by final order*; and (ii) telling the State district court **_nothing_** about the Connecticut statutory stay from execution, as also ordered in Connecticut by the appellate courts.   As a result, the action was timely removed to Federal District Court where a counterclaim was filed based on diversity and bankruptcy jurisdiction against the Connecticut Plaintiffs.  That case was transferred to the US District Court for the Houston Division and referred to this bankruptcy court.   It is now pending a Motion to Dismiss pursuant to Federal Rule 12(b)(6) incorporated into the Bankruptcy Rules of Procedure.

006180

because it has been liquidated, simply remains open until the judgments are reversed or affirmed in whole or in part.

      e.     Fifth: The Obvious Abuse of Process Must Be Eliminated: Ultimately, to the extent that any part of these two Plaintiffs' Judgments is rendered final on appeal, the rights of Jones to *a reasonable effort to achieve a maximum credit against those Judgments* should include the Debtor's right to actually achieve the highest value reasonably obtainable from the sale process most reliably capable of achieving that result – a bankruptcy auction. It is the sale proceeds that must then be applied to those Judgments as credits of the sale proceeds, and depending on the outcome of the appeals, may allow payment in full of one or both of these judgments. Allowing the operation and protection of these assets has and will continue to be for the benefit of the creditors and the Jones Estate until the auction concludes, which will not be the result if a State law execution sale is conducted or if the Connecticut Plaintiffs acquire the assets in other than a fair, non-collusive § 363 Auction.[10] Although Connecticut Plaintiffs have been consistent in their demand *to destroy Jones' ability to earn an income from his exclusively-owned "persona" (his image, name, voice, etc.)* to silence his free expression of political and other opinions as an "on air" news media, not only that position is irrelevant to the economic interest of the bankruptcy system itself but also when it rises to the level of abuse of process that uses the bankruptcy system to accomplish an unconstitutional political goal (to take away Jones First Amendment right).[11] In fact, abuse of process conduct it is contrary to the

---

[10] Although the Plaintiffs are free to acquire the FSS assets through a fair bidding process for cash, the stated purpose of the purchase is to destroy the value of the "Infowars" or "Alex Jones" brand. This perverted motive is addressed below, and its impact on the claims allowance process.

[11] *See, e.g.* the Fifth Circuit opinion in *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020):

006181

bankruptcy fresh start, even where a claim is found non-dischargeable. If the demands of Connecticut are to have its debt declared nondischargeable then it cannot, under any good faith application of ay bankruptcy policy approved by the Supreme Court or Congressional intent, be consistent with destroying the Debtor's ability to earn an income to pay its non-dischargeable debts. This counter-intuitive position is the definition of "abuse of process" or its modern counter-part, "lawfare" - when a political agenda, as here, is the ulterior motive, defined as taking a lawful legal position only to advance a contrary political agenda.[12] Bankruptcy Courts have the jurisdiction to remedy and sanction abuse of process and lawfare, and do so.[13]

5.    For the reasons set out above and below, Jones request this Court reconsider its prior rulings and order what this Court originally ordered. This Court should order the Trustee or the Trustee's replacement (without manipulation or interference by the Plaintiffs or their affiliates) to do what the Trustee and Plaintiffs have thus far have refused to accomplish without abusive manipulations of the simple bankruptcy auction process. Although this Court has made clear its

---

The Bankruptcy Code 'provides equitable powers for the bankruptcy court to use at its discretion.' *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party. *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ('[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages.'). *Id.* at 428.

[12]    "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy. The term "lawfare" is also a clever play on words, a pun, and a neologism that needs to be deconstructed in order to explain the linguistic and political power of the term. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448

[13]    *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020). Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423. … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party. *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages."). *Id.* at 427-428.

006182

frustration and distrust "of the process" conducted by the current Trustee, the injury to the other creditors, admittedly small (but only in comparison to the Plaintiffs *non final Judgments*) and to Jones' and FSS's rights to a fair process, compels this result.

## II.
## JURISDICITON

6.      This is a core proceeding pursuant 28 U.S.C. § 157, 1334 over which this Court has exclusive jurisdiction. *See, also Stern v. Marshall*, 564 U.S. 462, 494 (2011); *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984). Here the basis for reconsideration is the injustice to the parties and bankruptcy system itself. Fed.R.Civ.P. 60(b)(6) can be invoked "in extraordinary circumstances" that include cases where the order to be reconsidered involves "***the risk of injustice to the parties' and the risk of undermining the public's confidence in the judicial process***." *Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added). Such is the case here.

## III.
## STANDING OF JONES TO SEEK THIS RELIEF

7.      Plaintiffs, through Paul Weiss, wrongly assert that Jones and FUAC are parties that have no economic standing in the case— [*See*, Connecticut Plaintiff's Response to FUAC's request for status conference, pg. 2, ¶1, Dkt. 1113]:

> The Families no longer see any benefit to pursuing a costly and litigious sale process in this Court. [*See*, pg. ¶ Response to FUAC Auction Motion]; …. Another contested sale process would significantly harm creditors' recoveries—which have already been delayed by years, *while millions of dollars are paid to estate professionals*. Counsel to the Trustee alone has incurred over $1.4 million in fees through January 31, 2025. Nearly $800,000 of such fees were incurred between November 2024 and January 2025, the period of time during which the first contested sale hearing took place. *See* Interim Fee Application. [*See*, pg. 6, ¶ 9 Response to FUAC Auction Motion].

006183

8. This Court, however, has previously recognized Jones standing regarding the auction orders. In fact, Jones, as the Chapter 7 Debtor and FSS as a party in interest, has constitutional and bankruptcy code standing to bring this request for relief,[14] and for the purpose of both of the appeals of the Plaintiff Creditors' Judgments (and objections to their claims) and the enforcement of this Courts Supplemental Order to conduct a public auction. In both instances, standing is individually and as the sole managing member of FSS, a party in interest.

9. Additionally, the standing doctrine is required by the Constitution's text including the due process clause of the Fifth and Fourteenth Amendments. The Due Process clause prohibit courts from depriving a person of "life, liberty, or property without due process of law." As Justice Amy Coney Barrett has explained, *stare decisis* can often function similarly to preclusion, and

---

[14] Jones has standing as the Chapter 7 Debtor pursuant to Section [§1109(b)] that provides "[a] party in interest . . . may appear and be heard on any issue in a case under this chapter." The section goes on to say that parties in interest include:

"*the debtor*, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."

•. *Truck Ins. Exch. v. Kaiser Gypsum Co*., 22-1079 (Sup. Ct. June 6, 2024) [standing extends "*to entities that are potentially concerned with or affected by a proceeding*."]; *See, also In re Team Sys. Int'l, LLC*, Nos. 22-10066 (CTG), 561, 2024 Bankr. LEXIS 2573 (Bankr. D. Del. Oct. 21, 2024) [*citing Truck Insurance Exchange* as defining the scope of a party in interest right to participate].

; *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A*., 530 U. S. 1, 7 (2000);

•. *Willard v. O'Neil (In re Willard)*, 240 B.R. 664, 669 (Bankr. D. Conn. 1999). As the court explained in In re Toms, 229 B.R. 646, 651 (Bankr. E.D. Pa. 1999):

[I]f there were a claim asserted in a chapter 7 case which would not be discharged, and which is not likely to be paid in full by the trustee, then the chapter 7 debtor will be legally responsible for payment of any remaining claim after the bankruptcy case is concluded. Due to this continuing obligation, the debtor has a pecuniary interest in the disallowance of the claim. Were the claim disallowed or reduced in amount, the debtor's continuing liability after bankruptcy could be affected.

•. *In re Morgan*, No. 05-34981-SGJ-7, 2007 WL 2669341, at *4 (Bankr. N.D. Tex. Sept. 6, 2007) [after considering the claims register, the trustee's report of assets, and the fact that the trustee hired accountants to investigate the assets of the debtor, concluded that given the uncertainty of total assets and claims, the debtor had a pecuniary interest in the outcome of the claim objection]; *See, also, In re Curry*, 409 B.R. 831, 838 (Bankr. N.D. Tex. 2009)the debtor has a pecuniary interest in the outcome of any claims objection and so standing to object if there might be a surplus to be returned to the debtor after satisfying all debts. Additionally, a debtor may be afforded standing to object to an excessive dischargeable claim whose holder would receive distributions that otherwise would be made to the holder of a nondischargeable claim. The debtor certainly wants to maximize the distribution to the holder of a nondischargeable claim, because to the extent that this claim is satisfied, the debtor is relieved from some or all of the claim of that creditor which would survive the bankruptcy case. See 4 Collier on Bankruptcy § 502.02[c] at 502-13 (Resnick & Sommers ed. 15th ed. rev. 2009).

006184

consequently the application of *stare decisis* can deprive litigants of their life, liberty, or property rights without due process of law.**15**

10.      Jones Standing in this case is supported not only by the recent instruction of the Supreme Court in *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 22-1079 (Sup. Ct. June 6, 2024) [standing extends "… *to entities that are* <u>*potentially concerned with or affected by*</u> *a proceeding.*"], but also on the merits and nature of the constitutional rights of Jones set out in *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S. Ct. 1519 (1987), *citing with approval Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (5th Cir. 1979).   The Fifth Circuit in *Henry* v. *First National Bank of Clarksdale* dealt with collection of a judgment and non-final appeals and the avoidance of irreparable harm for particular constitutionally driven appealed cases such as the Judgments against the NAACP and here, Alex Jones dealing with "*fundamental constitutional rights.*" *Id. Pennzoil at* U.S. 23. as discussed in *Pennzoil* dealing precisely with the issues before this Court (in rejecting Texaco's argument to avoid its own bankruptcy).  *Pennzoil*, however, made two critical distinctions in its holdings significant to this case.  In contrasting to a case involving a politically sensitive defendant (the NAACP [or here, Alex Jones]) efforts to appeal a judgment it could not pay nor afford the appeal bond:

> First, relevant to this Court's consideration, is the holding that "[w]hile 'a cost requirement, *valid on its face*, may offend due process because it operates to foreclose a particular party's opportunity to be heard,' [citing *Boddie* v. *Connecticut*, 401 U.S. 371, 380 (1971)]…." *Id. Pennzoil at* U.S. 22.

Next, the Supreme Court made specific reference to the reason Texaco was note entitled to relief because of the size of the required bond, noting the distinction where relief would be appropriate:

> the claim [of Pennzoil] that the Texas bond and lien provisions violated the due process and equal protection clauses was without merit, because (a) the New York company could exercise its right to appeal even if it were forced to file for

---

15          Stare Decisis and Due Process, https://scholarship.law.nd.edu/lawfacultyscholarship/450/

006185

bankruptcy, and (b) *the underlying issues in the case--arising out of a commercial contract dispute--**did not involve fundamental constitutional rights.***

*Id. Pennzoil,* 107 S. Ct. at 1535 [Brennan, J., joined by Marshall, J., concurring] (Emphasis Added). The Supreme Court, in rejecting Texaco's right to receive relief from an un-affordable appeal bond, cited the Fifth Circuit case where special relief was justified:

> "in the more troublesome situation where a particular corporate litigant has such special attributes as an organization that a trustee in bankruptcy, in its stead, *could not effectively advance the organization's interests on an appeal*"[16]

*Id. Pennzoil,* 107 S. Ct. at 1529 [Justice Scalia, with whom Justice O'Connor joins, concurring], *citing* with approval, the Fifth Circuit opinion in *Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (CA5 1979) that did, in fact, deal with the deprivation of "*fundamental constitutional rights*":

> (bankruptcy of NAACP would make state appellate review of First Amendment claims "so difficult" to obtain that federal injunction justified), cert. denied *sub nom. Claiborne Hardware Co.* v. *Henry*, 444 U.S. 1074 (1980).

11.     The Supreme Court, in recognizing that the rights to seize a judgment debtors assets by State law execution and order a sale of the judgment debtor's assets, held that notwithstanding the state statute that required a cost bond that would bankrupt the NAACP, the exception recited in *Henry v. First National Bank* "… involved fundamental constitutional rights" that would be lost if the execution went forward. In *Henry v. First National Bank*, because "…the underlying issues *did involve fundamental constitutional rights*" to boycott, and having suffered a $3 million

---

[16]     Here the Chapter 7 Trustee of Jones, in his campaign to damage Jones, was willing to allow Jones' Connecticut Appeal to lapse by not permitting Jones to file, at his own cost, his and the Free Speech Systems, LLC appeal brief for certification to the Connecticut Supreme Court. Further, the Trustee proposed to this Court a "settlement agreement" among only the Jones Estate and the Plaintiffs that provided that the Trustee could dismiss the appeals or could ***sell to Plaintiffs*** as assignees the Jones and FSS right to appeal and they could dismiss, or cause the dismissal of, the appeals to satisfy the appellees' desire to have an allowed claim *untested by the due process rights to a full appeal*. This Court denied that relief.

006186

judgment in Mississippi state court for supporting a boycott of certain white-owned businesses, federal injunctive relief (to permit an unbonded appeal) was appropriate.[17]

12. This is precisely the standing Jones relies, and the fundamental First Amendment constitutional rights of Jones as a media defendant his free speech rights, that must be protected until the opportunity for Supreme Court review.

## IV.
## RELEVANT BACKGROUND FACTS TO THE RELIEF REQUESTED AND THE PLANTIFFS RESPONSIVE MISSTATEMENTS

13. This Court previously ordered the dismissal of the Chapter 7 Free Speech Systems, LLC, ("FSS") Chapter 11 case (the Debtor-Jones 100% owned limited liability company) but included in such order the transfer all of the "cash" account assets of FSS to the Trustee's Chapter 7 estate of Jones (the "**Initial Cash Transfer Order**"). That cash was significant (in excess of $4 million, and through Jones' continued service to the Trustee, the cash has grown to more than $7 million, less $3 million paid by the Trustee to the Trustee's law firm and the Trustee's special counsel and retained professionals, and other costs of administration.

14. At the request of the Trustee of the Jones Estate for a clarifying order as to the ownership of the Debtor-Jones' company FSS *non-cash assets*, this Court entered an order clarifying that all FSS assets would be transferred to the Jones Estate (the "**Supplemental Order**").

15. The Texas Plaintiffs' did not appeal the Initial Cash Transfer Order which is a final order. The Texas Plaintiffs' (after attempting a state court Turnover of the FSS assets and that proceeding's removal by the Trustee to this Court) appealed the Supplemental Order and the

---

[17] The Fifth Circuit upheld the District Court's injunction prohibiting the execution on the judgment involving all of the Mississippi NAACP assets including the name NAACP owned by the Mississippi Chapter, and all the confusion that would have caused, until the NAACP could prosecute its appeal of the Constitutional right to boycott. Ultimately, the Supreme Court decided the case on the merits and reversed the state court judgment as constitutionally infirm. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S. Ct. 3409 (1982).

006187

appeal is ongoing. [*See, supra* Note 3].[18] The Texas Plaintiffs did not seek a stay pending that appeal of the Supplemental Order and accordingly, this Court has unfettered jurisdiction to *enforce* that order, it cannot vacate the order. *In re M & C P'ship*, No. 19-11529, 2021 Bankr. LEXIS 1135, at *5-7 (Bankr. E.D. La. Apr. 28, 2021). [Emphasis Added]. This principal has been affirmed time and again.[19] As such this Court's pronouncement that the Supplemental Order is void, is itself void. The Supplemental Order still exists and is enforceable in accordance with its terms.[20] Both the Jones Estate through its Trustee and/or Jones have consented to the sale of substantially all of the assets of FSS now in the Court-ordered possession of the Jones Estate Trustee. If sold at a bankruptcy Auction as sought herein, the estate could be administratively closed until the Plaintiffs claims are allowed and distributions of those proceeds are made. If this is not done, and both Judgments are stayed, the assets may simply remain idle. If ultimately the State Courts become the arbiter of the method and manner of the writs of execution or otherwise there will be no prompt sale of those assets remaining in the possession of the Trustee. The auction sale, already ordered by this Court is the only prompt solution to this dilemma.

16. And active participants are awaiting a fair sale auction. The Trustee has *never initiated any bidding procedures as an ordinary course asset auction, nor has the Trustee even attempted to deal the outstanding $8 million cash offer*. In the prior two Trustee attempts at an auction driven by the Plaintiffs, neither the cash bidders nor the Debtor, nor FSS did anything to

---

[18] Judge Charles Eskridge, U.S District Court, SD-TX, *Case No. 22-60043.*

[19] *See e.g., Avery v. Gonzalez (In re Gonzalez),* Nos. 2:15-bk-25283-RK, 2:16-ap-01037-RK, 2024 Bankr. LEXIS 1038, at *9 (Bankr. C.D. Cal. May 1, 2024) (the court lacked jurisdiction to consider a Rule 60(b)(1) motion for relief from judgment during the appeal); *Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at *20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] *citing In re Port Neches Fuels, LLC,* No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, *12 (D. Del. Mar. 27, 2024).

[20] Even the Texas Plaintiffs successfully moved to dismiss their appeal, this would not retroactively affect the invalidity of the initial voiding or remedy the consequences herein stated.

006188

interfere with the bidding process – only the Plaintiffs and their partner the Global Tetrahedron (the "Onion") and their acting agent, the Trustee. Thus, because there is no stay pending the appeal of the Supplemental Order and enforcement of the Supplemental Order is what this Motion seeks, by ordering a simple auction for sale at the highest cash price obtained through the sales effort and sale by the current Trustee or his successor replacement.[21]

## V.
## "THE RISK OF INJUSTICE TO THE PARTIES' AND THE RISK OF UNDERMINING THE PUBLIC'S CONFIDENCE IN THE JUDICIAL PROCESS."[22]
-------------------------------------------------------------------------
### ALL EQUITIES FAVOR ORDERING AN AUCTION

A. **Equity Abhors Manipulation and Loss of Rights or Property by Forfeiture or Loss of Basic Constitutional Rights - Equity will not allow a trust to fail for want of a trustee.[23] Equity delights to do justice, and not by halves[24]**

17. The auction process has been manipulated by the Plaintiffs and the Trustee to assure the Plaintiffs win. Each time the Trustee initiated the out-of-the-ordinary process and each time this Court refused to approve the Plaintiffs-driven process adopted by the Trustee. If the State Court is to auction FSS assets, that will not occur until the Texas State Judgment is final on appeal

---

[21] **THERE IS A SIMPLE SOLUTION: REPLACE THE TRUSTEE AND CONDUCT AN AUCTION:** There is no question that the Court's declaration that the Supplemental Order was void was precipitated by the Trustee's stubborn and persistent unwillingness to obey the Court's stated purposes to affect a sale of FSS assets for the benefit of all creditors. It was for this purpose the current Trustee himself prevailed on this Court to issue the Supplemental Order in the first place. The remedy for such recalcitrance is, among other remedies, the replacement of the Trustee, not a legally improper declaration the Supplemental Order is void.

 The simple solution is to appoint a replacement Trustee who will obey the Court and conduct an auction. Any creditor looking to get paid, would welcome this as it assures the highest recovery. The Plaintiffs DO NOT want this because they don't want money; they want Alex Jones and his business as a trophy they can display at their political fund raisers and social events where their abuse of the legal system to achieve ridiculous and indefensible judgments is worn as a badge of honor. This Court should not countenance that unmasked, naked hatred.

[22] Proof of which is grounds for amending or altering a decision of a court. *See, Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added).

[23] *See, e.g., Fulk & Needham, Inc. v. U.S.*, 288 F. Supp. 39, 44 (M.D.N.C. 1968).

[24] *Jeffers v. Clinton*, 756 F. Supp. 1195 (E.D. Ark. 1990).

006189

and there is final or unstayed judgments ruling the Plaintiffs' proofs of claims non-dischargeable in whole or in part. If reversed as anticipated, an auction will not happen until a retrial. The Connecticut Appellate Court and Connecticut Statute stayed the Connecticut Judgment. However, the Connecticut Supreme Court has denied Jones' and FSS's Motion for Certification and both Jones and FSS are seeking a continuation of that stay pending their Petition for *Certioraria* with the U.S. Supreme Court pursuant to the Connecticut statutory provision allowing for a discretionary stay.

**B.      Even If This Court Could Declare the Supplemental Order Void, To Do So Is Facially Inequitable And Rewards The Wrongdoers**

18.      The Trustee's negotiations on their illicit "settlement agreement" took several months, during which Trustee *never initiated any bidding procedures ordered by this Court* to deal with the outstanding $8 million cash offer. When they finally reached the terms of the "settlement agreement" the Court again rejected the Trustee's proposed Settlement Agreements and for good reason and the Trustee has gone silent on holding the ordered auction.

19.      While the second round of misconduct is referenced above, a few more details shed light on the radical inequities perpetrated as the tip of the tension among the Plaintiffs that was revealed in the first farcical auction, primarily revolving around how to split the FSS carcass the Plaintiffs hoped their non-final judgments would recognize. Anxious not to wait for any appellate outcome, the Texas Plaintiffs were adamant that the split should be 75/25 and threatened to disrupt the Connecticut Plaintiffs collection efforts if agreement were not reached. According to the fifteen Connecticut Plaintiffs, they had collective judgments totaling approximately $1,500,000,000, whereas on the other hand, two Texas Plaintiffs (Heslin and Lewis) claimed judgments totaling only approximately $50,000,000. Thus, the split should have been 97% Connecticut and 3% Texas. However, the Texas Plaintiffs flipped that argument putting the

006190

Connecticut Plaintiffs' ridiculous judgment at risk. They argued that the same Sandy Hook events had occurred *to all plaintiffs* and their damages should have been the same but for the prejudice of the Connecticut plaintiffs trying the case approximately 28 miles from the murder site, since liability was judicially decreed in both Texas and Connecticut and only damages were to be tried. *Yet for the same event* the fifteen Connecticut Plaintiffs received as non-punitive damages, at total of $965,000,000 – or approximately $65,000,000 each – *whereas for the same event the Texas plaintiffs received only $2,000,000 each*, or 3.5% of the Connecticut non-punitive damage amount. The Texas plaintiffs' receipt of only 3% of what the Connecticut Plaintiffs got, was unfair and only explainable as the result of local prejudice.[25] Instead, the Texas Plaintiffs proposed a different view simply "counting heads" as that was the only rational way to divide FSS up given that other means based on the sizes of the respective judgments was indefensible. And as there are three other Texas Plaintiffs who have not even proceeded to trial and thus had and have no judgments, counting them resulted in 15 Connecticut Plaintiffs and 5 Texas Plaintiffs – or a compromise division of 75/25.

20. The problem with this was that (a) judgment creditors are counted by the dollar amounts of their claims, not on a "per capita" basis which if pursued by Connecticut risked exposure by Texas and (b) the prospect that either or both judgments were very likely to be

---

[25] While this Court has declared most aspects of the Connecticut and Texas judgments non-dischargeable, making that interlocutory ruling final will require this Court to explain how the same event – Sandy Hook – where liability was judicially decreed in both Connecticut and Texas, resulted in "victims" who sued in Connecticut receiving awards 32 times greater than "victims" who sued in Texas. While this fact will be difficult for the Court to explain, so will its disregard of the requirements of the Connecticut Supreme Court stated in *Lighthouse Landings, Inc. v. Conn. Light & Power Co.,* 15 A.3d 601, 613 (Conn. 2011) that collateral estoppel rules were not to be applied mechanically as the Connecticut plaintiffs convinced this Court to do, but were to be viewed flexibly with equity in mind and are particularly inapplicable when to do so would "work an injustice" or "frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *Id.* Equally difficult for the Court will be its explanation of its disregard of *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993), which in the context of collateral estoppel involving default judgments, re-emphasized the Restatement of Torts' comments that where the prior action was a default, the matter was not actually litigated, creating yet another basis for finding dischargeability which this Court ignored.

006191

radically reduced if not eliminated on appeal, would throw their respective division of the financial body of Jones and FSS into complete jeopardy. Thus, instead of continuing the auction, the Trustee and the Plaintiffs devoted their time and FSS's treasure to reaching a completely illegal arrangement where in summary, (a) the two Texas Plaintiffs' $50,000,000 judgment would be deemed fully "allowed"; (b) the fifteen Connecticut Plaintiffs claims of $1,438,139,546 would be deemed fully "allowed," even though the Connecticut Court of Appeals had reversed $150,000,000 of that related to CUTPA punitive damages; (c) *the three Texas plaintiffs* whose cases had yet to be tried would be given deemed "allowed" claims of more than $375 million, which coupled with the $50,000,000 held by the other Texas Plaintiffs would yield a dollar amount as between Connecticut and Texas equal to 75/25; (d) the Texas Plaintiffs would drop their appeal of the Supplemental Order; and (e) since the Texas claims had not yet been bonded and the Connecticut Plaintiffs were statutorily precluded from collection, the Texas Plaintiffs would assign their new allowed claim of $425 million to Connecticut. Plaintiffs would then proceed to collect *in this Court* on the Texas judgement and the Trustee would pay the Texas Plaintiffs $4,000,000 from cash he held belonging to the Jones Estate (including mainly FSS money). The fact that the claims were deemed "allowed" would mean, critically, that nothing that occurred on appeal would disturb their rights. And importantly, among other things, the Connecticut Plaintiffs proceeding to collect on the Texas judgment would effectively mean there would be nothing left to auction. Hence once again the Court's intentions of the Supplemental Order were intentionally and unfairly thwarted.

21.     On both occasions denying the proposed auction procedure, this Court expressed at length its concerns and displeasure with the proposals that did not come close to resembling a normal bankruptcy public bid process. Exhibit "1" illustrates again this Court's frustration over the Trustees continued efforts to "arrange" matters to encumber a simple bidding procedure and

006192

auction to favor Plaintiffs. Neither the cash bidder nor the Debtor nor FSS had anything to do with these manipulated bidding process – only the Plaintiffs and their agent-Trustee.

### C. The Manipulation Continues As the Abuse of Process Continues

22. When FUAC filed its motion seeking a status conference based on its outstanding $8 million non-responded-to cash bid, an interesting response from the Trustee and the Plaintiffs resulted. Notably, the *Trustee responded by silence*, likely fearing the rath of the Plaintiffs as their position has done a 180-degree change to not wanting an auction that they could not control.

23. Even though twice before the Plaintiffs and Trustee were actively pursuing his version of an auction process, not so this time– *it is now the Connecticut Plaintiffs and the Texas Plaintiffs that do not want a bankruptcy auction – in truth, not an auction **that they cannot control*** and win. [*See*, Plaintiffs' objection to FUAC's Request for Status Conference (and notice of its bid, Dkt. 1113]. And whatever the Plaintiffs demand the Trustee follows. Even with the opportunity to re-establish the Court's and the public's confidence in the Trustee's supervision of a fair bankruptcy auction process, the Trustee stands down, to not conflict with the Plaintiffs new position of no auction.

24. The impact of the Creditors' manipulations and overt efforts to ignore the economics of this bankruptcy and to seek only a political goal of removing Jones from the airways and destroying the "InfoWars" brand, is all designed to prevent news media-Jones' First Amendment rights by censoring his ability to exercise those rights.[26] This ulterior motive has not

---

[26] Set out below are only a few of the many examples of the Connecticut Plaintiffs and the Texas Plaintiffs declared purpose in bringing and prosecuting the suits against Jones and FSS was political and sought to deny Jones his right to freedom of the press and free speech. Motivating this litigation is not, and never has been, the recovery of a monetary damages for an actual and legally recognized injury (which has yet to be fairly determined), or even allowing punitive damages reflecting any reasonable application of punitive or exemplary damages law or statutes, but is the political activism and political motive to accomplish the goal to taking Alex Jones and incredibly popular "The Alex Jones Show" of the air and "out of the public discourse" by demanding exaggerated and illegal recoveries of punitive damages:

006193

only thwarted Jones efforts at a legitimate bankruptcy resolution (including Plaintiffs rejection of multiple proposals to resolve these claims *by payments to these Plaintiffs in the high 8-figures*) but reflects manipulation that goes well beyond this Court's limits in protection of creditors and imposes risks on debtors and the bankruptcy process that is repugnant to any bankruptcy right or policy.

25. Even if, however, the prospect of a resolution with these Plaintiffs is not available because of the political agenda of the Plaintiffs, the bankruptcy code and bankruptcy policy still require this Court to consider the *economics and motives* of creditors, including these Plaintiffs, as an element of most every decision the Court has, and is, to make. Just as a non-creditor claims-purchaser cannot acquire a creditor's claim (for the purpose of obtaining standing), then file the claim, and then assert the claim in bankruptcy to block a reorganization, *if there is an alternative motive to the mandated "open and honest" economics of claims recovery* the bankruptcy code will impose a remedy.[27] In this case of such high stakes and profiled, the issue of "motive" permeates

---

"**Berkowitz said his clients may be willing to settle with Jones for less money if it means *Jones would end his broadcasting career*.**" "**If he wants to agree to some sort of terms that hold him accountable for all he's done, we'll be open to listening. Whether that means *walking away from public life*, to paying Sandy Hook families *in full* ….**"
https://www.washingtonpost.com/investigations/2022/11/21/alex-jones-sandy-hook-lawsuit/

*Damages* "*should be awarded in an amount that assures Alex Jones is off any platform … taken out of this discourse* …."

Quotes from *Texas Plaintiffs' closing arguments; See, also Connecticut Plaintiffs opening statement YouTube* https://www.youtube.com/watch?v=xFaxgchQczg "take Alex Jones platform … away … and make certain he cannot rebuild the platform. Take him Jones out of this discourse … that is punishment.)

[27] The law is clear that an ulterior motive and purpose, and malice to cause damage to an estate bars the right to purchase a claim and utilize the claim in a bankruptcy case. *In re Lichtin/Wade, LLC,* No. 12-00845-8-RDD, 2012 Bankr. LEXIS 5785, at *10-11 (Bankr. E.D.N.C. Dec. 17, 2012) explains the prohibited process, citing the Ninth Circuit, noted:

If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster. ***On the other hand, pure malice, "strikes" and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a***

006194

every aspect of the Plaintiffs counter-intuitive, abnormal demand to *destroy the value of the Jones Estate and FSS assets* and destroy the ability of Jones to earn a living so as to pay the Plaintiffs claims, while at the same time demanding their debt be both allowed and found nondischargeable. This abuse of process conduct, or "lawfare" in more current political terms, should not go unaddressed, when Plaintiffs make economic demand of this Court for their creditor rights and treatment of their claims, yet motivated to impede the entire bankruptcy case by destruction of the real value of the Estate's assets and thereby destruction of the Debtors' ability to earn an income by the exercise of their First Amendment rights to uncensored media and free speech. Those constitutional rights are valued in the millions yet in this case the Plaintiffs want that value to be as near as zero as they can possibly manipulate to take Jones "off the air" and out of the public discourse (reciting opening and closing jury arguments in the Plaintiffs' respective trials).

26.     This bankruptcy "lawfare" has not, however, gone unnoticed. The Paul Weiss law firm as purported "*pro bono*" counsel to the Sandy Hook Plaintiffs (all of whom have received multi-million-dollar settlement funds from the Remington $70+ million-dollar settlement payment), has recently settled its similar "lawfare" litigation after being sued by President Trump for their participation with prosecutor Alvan Bragg in the New York City prosecution of the victimless crime of real estate valuations by the affiliated entities owned by President Trump. Paul Weiss agreed with President Trump to settle his claims by Paul Weiss performing $40 million of "*pro bono*" *non-political*, legal work in exchange for a release of the damages claims made by the

---

*competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior*.
*Figter Ltd. v. Teachers Ins. and Annuity Assoc. of Am.* (*In re Figter Ltd.*), 118 F.3d 635, 638-639 (9th Cir. 1997) (citing *In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 671 (E.D.Pa. 1942)); *In re Lichtin/Wade, LLC*, No. 12-00845-8-RDD, 2012 Bankr. LEXIS 5785, at *10 (Bankr. E.D.N.C. Dec. 17, 2012) ("The test is "whether a creditor has cast his vote with an 'ulterior purpose' aimed at gaining some advantage to which he would not otherwise be entitled in his position." *In re Gilbert*, 104 B.R. 206, 216 (Bankr. W.D. Mo. 1989) (citing *In re A.D.W., Inc.*, 90 B.R. 645, 649 (Bankr. D.N.J. 1988); *In re MacLeod Co., Inc.*, 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986)).

006195

President.  Upon information and belief, there is a written settlement agreement, but Jones does not have a copy.

27.     In this reorganization case and later in the Chapter 7 case, it has been Paul Weiss that has directed that Plaintiffs actions throughout these two bankruptcies.  Paul Weiss has directed the same lawfare conduct that its firm admittedly attempted against President Trump.  Apparently unknown to the President, Paul Weiss considers *pro bono* representation of millionaires in this bankruptcy (the Connecticut Plaintiffs shared in the $70+ million settlement of the gun manufacturer litigation).  The Connecticut Plaintiffs and their espousing their ideological political agenda of gun control by partnering with the Onion, was all designed to acquire "InfoWars" brand and IP and *remove Alex Jones from his career as a news media and champion of free speech and freedom of the press*, and according to Paul Weiss' webpage, it considers these Plaintiffs to be as "pro bono" work (hardly in compliance with its settlement of the President's claims.)[28]

28.     In truth, Plaintiffs' counsel, including Paul Weiss, have adopted and pursued lawfare[29] in the handling of the Plaintiffs' purported judgment claims "as if" the Plaintiffs were creditors holding claims that were being pursued for the economic recovery of those claimants.  Nothing is further from the truth in this case.   As the Fort Worth Court of Appeals recently noted:

> Lawfare is an ugly tool by which to seek the … policy changes the California Parties desire, *enlisting the judiciary to do the work that the other two branches of government cannot or will not do. …*"

---

[28]     On the Paul Weiss web site, the firm continues to claim that the Connecticut Plaintiffs representation is *pro bono*, although *pro bono* legal work is generally not considered representing politically aligned millionaires to destroy someone's constitutional Free Speech rights.  It is believed that this position by Paul Weiss is being investigated as a breach of their settlement agreement.

[29]     "Lawfare" has been defined in *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 U.S. Dist. LEXIS 249912, at *1 n.1 (E.D. Pa. Dec. 10, 2021):
> The term "Lawfare" is a play on litigation and warfare. The term itself is often used to describe the act of using litigation to harass people. Here, Plaintiff motions to prohibit Defendant Barbounis from using Lawfare under Rule 402 and 403, alleging that it is unduly prejudicial and irrelevant.

006196

*City of S.F. v. Exxon Mobil Corp.,* No. 02-18-00106-CV, 2020 Tex. App. LEXIS 5226 at 58-59 (Tex. App. June 18, 2020).[30] More to the specifics, "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448. And these Jones and FSS Bankruptcy cases have been the textbook example of "lawfare," as here:

    a.    a creditor obtains a judgment that it brings to the bankruptcy court, files both the claims ***and*** an objection to the dischargeability of that claim (*i.e.*, wanting to appear to be legally seeking to be paid notwithstanding all other creditors discharge in the bankruptcy);

    b.    yet these participants with an ulterior motive, using the claims "standing" and with the help of third party "partners" (in one instance, the Trustee, and another, the Onion, indirectly affiliated with Bloomberg, a well-known advocate of gun control) seek to acquire all of Jones' and FSS's assets, not for their economic value, but *for the express purpose of destroying the InfoWar brand's value and thereby Jones ability to earn an income*; and

    c.    done all in the pursuit, not of a financial return on their claim, but implementation of an ulterior motive and purpose in the claims filing and objection to dischargeability *to further a political agenda of depriving Jones and FSS of their Constitutional rights to the free exercise of the First Amendment through freedom of the press and freedom of speech by which both earned their individual and corporate living*.

29.    It is not only the bad faith that ulterior motives in filing the claims are pursued (*e.g.*, refusing to mediate in good faith, and seeking to control the bankruptcy process so as to acquire the Jones and FSS assets as cheaply as possible and for the purpose of destruction of those assets

---

[30]    More generically "Lawfare" is defined in *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 U.S. Dist. LEXIS 249912, at *1 n.1 (E.D. Pa. Dec. 10, 2021) as follows:
        The term 'Lawfare' is a play on litigation and warfare. The term itself is often used to describe the act of using litigation to harass people.

006197

value, only to further their ulterior motive to destroy these debtors ability to exercise their "fundamental constitutional rights". *Id. Pennzoil,* 107 S. Ct. at 1535 [*See, Supra*, pg. 12]. The intention and goal of using a claim in bankruptcy for the purpose of depriving a debtor of its rights to free speech and freedom of the press, and to earn a living, makes this case and the conduct of the Connecticut Plaintiffs and the Texas Plaintiffs repugnant to every bankruptcy policy approved by the Supreme Court of the United States. Once this Court refused to allow the Plaintiffs to manipulate the auction process, they simply pivoted to opposing *any* bankruptcy auction. Now the agenda is to use the State Court system to continue the same unlawful abuse of process.

30. Below Jones will address the most egregious misstatements set out in the Plaintiffs' Response to the FUAC auction motion, in which they now oppose any bankruptcy auction sale, in favor of a state court action *that they are prohibited from participating pursuant to the stay (and expected stay) pending the appeal of their Judgment.*[31]

**VI.**
**THE CONNECTICUT PLAINTIFFS' LAWFARE IN PURSUIT OF THE**
**ULTERIOR MOTIVES AND PURPOSES**

**"The Sandy Hook Families have not yet received—and are no closer to receiving—*a single dollar in distributions* from either Jones or FSS through the bankruptcy cases**
**[Plaintiffs'** *Joint Objection to an Auction* **Pg. 1, ¶1]**

31. It is important to recognize that this statement on behalf of the Plaintiffs in support of their sudden reversal of their position on an auction, is intended to mislead and obfuscate the Plaintiffs' ulterior motive - that these bankruptcy cases *are not about distributions or money*, but about taking Alex Jones out of the public discourse and off the air, and the motive is shared by other significant players in the political arena. Below Jones will address the misstatements set out

---

[31] As pointed out herein several times, simply because Paul Weiss is prohibited by a court and a statute from taking an action does not mean Paul Weiss will not take the action (*e.g.* the WD-TX removed case now in this Court where Paul Weiss attempted to obtain a receiver over all of Alex Jones assets by false representations to the State Courts. Paul Weiss simply ignores this Courts stays and likely its injunctions.

006198

in the Plaintiffs Response to the FUAC auction motion in which they now oppose any bankruptcy auction sale, in favor of a state court action they are prohibited from participating pursuant to the stay pending or prospective stays of the appeal of their Judgment, or the automatic say or the discharge injunction.

    A.    **Alex Jones Estate Received approximately $6 Million From FSS and Post-Conversion Alex Jones Services During These Bankruptcies, That Has Now Been Reduced to $4 Million as a Result of Administrative Costs Pursuing Auctions and Plaintiffs Claimed Settlements**

32.    Plaintiffs, in obtaining the grossly unfair and unconstitutional Judgments, were permitted to argue to the jury that Alex Jones should be punished by an award *that assured he could never continue in his profession*. [*See, supra*, Note 18]. The Connecticut Plaintiffs and their announced partner, the Onion, told the public that the purpose of acquisition of the FSS assets was to destroy the InfoWars brand and business and use the customer data to further a parody of the InfoWars brand to its customers.[32] All during this process Alex Jones continued to broadcast his show and, in the process, allowed FSS to amass more than $6 million in cash (net of the over $2 million the Trustee's lawyer and professionals have spent on fees). The order placing that cash in the Jones Estate is a final order.

33.    Just like the auction orders, and although ordered twice by this Court, the Plaintiffs refused to mediate, first of all, at all with Hon. Judge Isgur, and the second time, not in good faith, conduct wholly consistent with the goals of the Plaintiffs. And all during this time Jones continued to profitably render his services to FSS or through FSS, InfoWars and its brand, for the Estate.

    B.    **The Jones/FSS Litigation and This Bankruptcy Has Increased the Sandy Hook Foundations by Hundreds of Millions of Dollars**

---

[32]    Although nothing would have prevented the Connecticut Plaintiffs from bidding at any Jones Estate auction for assets, that is not what the Connecticut Plaintiffs did. In addition to other manipulations the Connecticut Plaintiffs attempted to use their *non-final stayed judgment as if some sort of cash equivalent* for the purpose of that bidding – in other words, to "collect" on their judgment in violation of the Connecticut Statute, and currently, the Connecticut Court of Appeals, stay of all collections.

006199

34.     After having negotiated a $70+ million settlement with the gun manufacturers and sellers, several of the Connecticut Plaintiffs formed charitable foundations in support of gun control (Jones does not yet know how many have been formed, but at least three are known. Those foundations received public donations to further their purpose. However, with modest contributions through five years after the Sandy Hook tragedy, the Connecticut Plaintiffs finally decided to sue Jones and FSS along with an immediate, well-financed, public campaign of adverse public-relations "news releases" all raising the claims and allegations of these plaintiffs in the post-suit public press. On information and belief, the PR firms used later became the same PR firms used in the New York suit against President Trump, bragging at the time that it worked against Jones as a test of its success.

35.     Thus, when Jones and FSS were sued in 2018 for defamation in 2018 and the news releases began flooding the news, not surprisingly and almost immediately the funds began to increase. However, the major increases were leading up to the trials, including (shortly before *each trial was to begin*) grants from the United States Department of Justice, and other governmental agencies that reached a highpoint at the beginning of the Connecticut trial. This multi-million government funding allowed, for example, one foundation's founding member and Sandy Hook parent, to earn in excess of $240,000.00 plus in her annual salary from the foundation that, according to published records, used 46% of all donations for salaries.

36.     Jones has reviewed the ".gov" public records of at least three (3) Sandy Hook foundations whose contributions were flat for the several (up to 4+ years prior to the litigation), and that upon suit and publicity of the trial, doubled or tripled or more, through among other things, **<u>DOJ grants</u>**, and public contributions in excess of $100,000,000.00 to these three Connecticut Plaintiffs' charitable foundations – increases almost singularly driven by the Alex Jones suit and

006200

the professional publicity of public relations firms that have bragged about their success in the Jones case.

### C. The Going Concern Value of FSS and Alex Jones Operations Could Gross $50 Million or More a Year, Yet Plaintiffs Want All Operations to Cease – and Retain Their Non-Dischargeable Debt

37.     Since his appointment, and at the suggestion of Jones, Trustee Murray has never stopped production work through the use of the FSS assets and leasehold estate, work headed by Jones and aided by the Supplemental Order, which work has earned the Estate several million dollars and preserved the assets intact, such that the bid price with all assets intact has risen from $4m to $8m.   This success has been after all of the adverse publicity of the Plaintiffs' bankruptcy.

38.     However, as the Court recalls, immediately upon "announcing" (without Court review or approval) that the Onion was the winning bidder based on judgment credits, the Trustee shut down and took "dark" the InfoWars production and web presence.  This was accompanied by the Onion publicly announced its intention to only use the Website and IP for parody of Jones and to support gun control.  In other words, a business enterprise valued in the multi-million dollars was to be acquired for parody, in fact designed to destroy the brand and destroy the income that the InfoWars brand earned up to the date the Trustee claimed to have sold it the Onion.

39.     In face of the continued monetary success of Jones continuing FSS's operations, Trustee Murray has continually reflected an attitude that is impossible to explain.  For instance, when he would not agree that FSS and Jones Connecticut appeals were authorized to be filed, and claimed he intended to allow the appeals to expire for lack of briefing (and actually criticized Jones and threatened the lawyers that timely filed those briefs).  Other examples include the Trustee's unconventional conduct in pursuing two failed auctions and joining in a settlement with the Plaintiffs that at a minimum would have violated the law.  Finally, after ignoring the $8 million second offer of FUAC for two months in favor of those failed "settlement agreement" negotiations,

006201

when FUAC wanted to participate in an auction as the Court had instructed the Trustee to do, the Trustee remained silent and refused to take a position (or even seek to initiate bid procedures) on the FUAC's second $8 million cash bid.

40. To be clear, Christopher Murray is a capable and competent Trustee but has at best "frozen at the wheel" in both his logic and capabilities because, insofar as Jones believes, and capitulated to the Plaintiffs' demands on, and possibly expressed or implied threats made to, the Trustee, with repercussions if the Trustee did not do as the Plaintiffs' demand to permit them to dictate the auction process that both times was rejected by this Court. This belief would explain the following:

i. Why the Trustee arranged the terms of the first sale process so randomly and incompletely, simply because that was the extent to which the Plaintiffs wanted to be bound, and it guaranteed their success.

ii. Why the Trustee would need to drive at 5:00 AM from Houston to Austin on the day of his intended announced selection of the Plaintiff's & Onion joint partnership bid, to order the "shut down" of FSS operations and require the FSS broadcast crew take the Alex Jones Show "dark" (dropping weekly sales from an average of more than $80,000 to less $20,000.00 when re-started 48 hours later) while at the same time the Onion announced to the public through news interviews and redirection of the FSS URL to the Onion new URL – falsely <u>announcing that it had purchased "InfoWars.</u>

iii. Why the Trustee, after what is reported as over $12 million spent on accounting investigations and fraud auditing of FSS and Alex Jones by the Chapter 11 Committee and professionals, there were no assets or transactions (save a single vehicle) omitted from the FSS and Jones schedules and disclosures, he decided to retain in the Chapter 7 case additional professionals to investigate Jones Chapter 7 FSS business conduct and spent $2 Million in

006202

administrative costs pursuing two Trustee-driven failed auctions.

       iv.      Why, when the Trustee received on December 19, 2024 an $8 million offer to acquire the assets of FSS, the Trustee never initiated a sale process but for some reason substituted his "negotiations" for the next six-weeks *with the Plaintiffs* to ultimately propose giving the Texas Plaintiffs an allowed claim more than 10 times the amount of their judgment, and giving an "allowed" claim in the full amount of the Connecticut Plaintiffs Claims even though no Plaintiffs' claims was allowed because both were, and are, still on appeal and stayed by the Connecticut statutes and Connecticut Court of Appeals Order and the automatic stay. This belief is also based on the announced motives of the Plaintiffs, to take Alex Jones off the air and destroy his ability to continue in the public discourse. This motive, stated by both the Connecticut and Texas Plaintiffs in the opening and closing jury arguments, explains why the Onion announced after it claimed it won the bid, that it would shut down all FSS operations and use Infowars for Alex Jones parody – by utilizing his database of customers and followers.

41.     This conduct clearly evidences the ulterior motives using and driving these bankruptcy cases to accomplish a political agenda, initiated by Plaintiffs' trial counsel and continued by Plaintiffs' bankruptcy counsel. This Court has the jurisdiction and power to prevent such unfair and unlawful conduct which should not be simply sent to the State Courts to repeat the injury. The Fifth Circuit instructs on this Court's ability to control this conduct:

> Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423. … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party. *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages."). *Id.* at 427-428.

*Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020).

006203

**D.** **This Court Should Not Reward These Abuses of the Bankruptcy Process to Continue the Lawfare of the Plaintiffs**

42.  As remarkable as it sounds, the multiple large international law firms including Paul Weiss and Akin Gump, see nothing wrong with announcing a strategy to deprive Alex Jones of his freedom of the press and his right to free speech.  It was Paul Weiss that settled the lawfare suit against President Trump, by acknowledged the wrongdoing of its former partner Mark Pomerantz in the New York Alvin Bragg litigation and agreed to dedicate the equivalent of $40 million in non-political "*pro bono legal services*".  Contrast Paul Weiss' settlement with President Trump to the Paul Weiss current web page claiming that its current partner Kyle Kempler:

> "maintains a significant pro bono practice. *He is currently representing a group of families of the victims of the Sand Hook Elementary School Shooting in the bankruptcy proceeding of ... Alex Jones and Jones' wholly owned Company Free Speech Systems ....*"

It is generally accepted that Lawyer "pro bono" work means free legal representation to those who cannot afford the legal fees or by representing non-political public interest groups without funds to advance their public cause.  Pro Bono work is not claiming to be doing free work for rich people pursuing a political agenda or doing free work to pursue the censoring of an individual's freedom of the press and free speech.

43.  In fact, all of the Plaintiffs' lawyers and the purported *pro bono* law firms, have repeatedly claimed that they are not interested in the money, but in taking Alex Jones off the air and out of the public discourse forever.  This is the ultimate form of censorship by abuse of process – to be allowed to argue to a jury that they the jury has the power through an award of punitive damages, to take away a person's constitutional right to freedom of the press and free speech, then use that success to force a bankruptcy and then intentionally destroy the debtor's ability to earn a living.  These lawyers have argued this ulterior motive repeatedly over and over and even including the Onion (that their partnership with the Connecticut Plaintiffs  was to acquire the FSS assets and

006204

the name and brand "Infowars" so that it can be destroyed by their use of it to parody Alex Jones and his right to freedom of the press and free speech (certainly not to realize its brand value).

44. This is exactly what President Trump experienced and exactly what President Trump thought he was ending by the terms of this settlement. Not so - Paul Weiss simply "repackaged" their definition of "pro bono" into representing rich individuals for free if the political message is correct. Notwithstanding that the families are neither poor nor, according to their lawyers, interested in money damage (not only have many of the Connecticut Plaintiffs shared the $70+ million payment by Remington and other gun manufacturers, but the several foundations that many of the families have set up or participate in, have received over $100 million in DOJ grants, loans from the US Government and public donations) according to the governmental databased ".gov."

## VII.
## CONCLUSION

45. Notwithstanding the above, Plaintiffs, through "Pro Bono Paul Weiss", assert that Jones and FUAC are parties that have no economic standing in the case to complain of their conduct. — [*See*, Supra, ¶ 7, pg. 10]. This Court has previously recognized Jones standing regarding the auction orders.

46. This Court should exercise its jurisdiction to enforce all of its prior auction-related orders, including the Orders authorizing an auction as well as the Supplemental Order. This Court should enter its order for the Trustee, or a replacement Trustee if requiring replacement [*See, supra* Note 21] to conduct a sale that is not controlled or driven by the Plaintiffs and simply allow the process to conclude. All parties in interest, even the Plaintiffs as bidders, and the public, will have a fair opportunity and right to participate in a fair and honest outcome if not controlled by Plaintiffs. All other matters arising from the lawfare conduct of the Connecticut Plaintiffs will be left to other

006205

Courts or other proceedings to determine, but as to this Court and its clear jurisdiction to accomplish fairness in the auction process, and the public policy of having its orders observed and not manipulated, this Court should order the auction of the assets covered by the Supplemental Order.

WHEREFORE, Movant Alexander E. Jones individually, and a manager of Free Speech Systems, LLC, seek an order as above requested, and for such other and further relief to which Movants may be justly entitled, at law and in equity.

Dated: April 28, 2025

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com
          aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and FSS**

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES And FSS**

006206

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on April 28, 2025.

*/s/ Shelby A. Jordan*
Shelby A. Jordan

006207

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

**EXHIBIT 1**

ALEXANDER E. JONES AND            )  CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF         )
UNSECURED CREDITORS,              )  Houston, Texas
                                  )
              Debtors.            )  Wednesday, February 5, 2025
                                  )
                                  )  9:00 AM to 9:26 AM
------------------------------)


                              HEARING

           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones:   SHELBY JORDAN
                          ANTONIO ORTIZ
                          Jordan & Ortiz, PC
                          500 N. Shoreline Blvd.
                          Corpus Christi, TX 78401

                          BEN BROOCKS
                          WILLIAM BROOCKS
                          Broocks Law Firm PLLC
                          6207 Bee Cave Road, Suite 120
                          Austin, TX 78746

For Chapter 7 Trustee:    JOSHUA WOLFSHOHL
                          KENESHA STARLING
                          JORDAN STEVENS
                          Porter Hedges LLP
                          1000 Main Street
                          Houston, TX 77002

                          CHRISTOPHER R. MURRAY
                          ERIN JONES
                          Jones Murray LLP
                          602 Sawyer Street
                          Houston, TX 77007

006208

For Connecticut         KYLE KIMPLER
Families:               PAUL PATERSON
                        Paul Weiss Rifkind Wharton &
                        Garrison LLP
                        1285 Avenue of the Americas
                        New York, NY 10019

                        RYAN CHAPPLE
                        Cain & Skarnulis PLLC
                        303 Colorado Street
                        Austin, TX 78701

For Texas Plaintiffs:   AVI MOSHENBERG
                        Lawson & Moshenberg PLLC
                        801 Travis Street
                        Houston, TX 77002

                        JARROD MARTIN
                        Chamberlain Hrdlicka White Williams
                        & Aughtry, P.C.
                        1200 Smith Street, Suite 1400
                        Houston, TX 77002

                        JENNIFER HARDY
                        Willkie Farr Gallagher LLP
                        600 Travis Street, Suite 2310
                        Houston, TX 77002

Court Reporter:         UNKNOWN

Courtroom Deputy:       UNKNOWN

Transcribed by:         Veritext Legal Solutions
                        330 Old Country Road, Suite 300
                        Mineola, NY 11501
                        Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

006209

HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 5, 2025; 9:00 AM

(Call to Order)

THE COURT: -- 9:00 a.m. case, Alex Jones. Why don't I take appearances in the courtroom and then we'll get started.

MR. WOLFSHOHL: Good morning, Your Honor. Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens from Porter Hedges, for the Trustee. And Mr. Murray is here as well --

THE COURT: Okay. Good morning.

MR. WOLFSHOHL: -- as well as co-counsel --

MS. JONES: (indiscernible)

MR. WOLFSHOHL: -- Erin Jones.

THE COURT: Good morning.

MR. JORDAN: Your Honor, Shelby Jordan and Antonio Ortiz, co-counsel, along with Mr. Ben Broocks and Mr. William Broocks, here in the courtroom today.

THE COURT: Good morning.

MR. JORDAN: And that's -- I'm sorry -- co-counsel for Mr. Jones.

THE COURT: Yes, thank you.

MR. KIMPLER: Good morning, Your Honor. Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families. I'm joined by my partner, Mr. Paterson, and on the screen, Mr. Ryan Chapple.

THE COURT: Good morning. Oh, I should turn my

006210

camera on.  I apologize.

MR. MOSHENBERG:  Good morning, Judge.  Avi Moshenberg, here on behalf of the Texas Plaintiffs.  Also with me is Jarrod Martin and Jennifer Hardy, Your Honor.

THE COURT:  Good morning.  Anyone else wish to make an appearance?  Okay.  Here on the 9019 settlement, and I know that there are some related motions that we should talk about.

MR. JORDAN:  Your Honor, if I might?

THE COURT:  Sure.

MR. JORDAN:  Shelby Jordan.  We have made -- we being the Alex Jones team of lawyers, two firms and lawyers that have been very, very busy -- we've made every effort we possibly could to get a grasp on what has turned out to be a very, very complex matter that could, if we are not careful, be a case dispositive motion.  We could walk out today and have nothing to show for the values of the appeal or for other matters that --

THE COURT:  Let me -- let me stop.  I've studied this 9019 over the past several days very carefully.  I know we had a status conference and I knew that there were some discovery-related issues.

The Free Speech case originally started as a Subchapter IV -- was originally a lawyer and CRO.  I find professionals -- I thought there was a conflict between

those professionals and the Jones estate, so I didn't approve them. Then came in another set of lawyers and another CRO. The two cases, the Jones case, the Free Speech case, proceeded on a track, side-by-side track basis.

We held the hearings on the non-dischargeability claims in the Jones case. Non-dischargeability claims were put in abeyance in the Free Speech case because the Fifth Circuit had agreed to take up the issue. The Fifth Circuit ruled. They got it exactly right. It's exactly what I would have ruled. But theirs is more important. So we were left with the summary judgment in the Jones case. Never really took it up in Free Speech.

There were a couple of other adversary proceedings, some related Texas parties who never had their day in front of me. Parties, Texas families, a group of them, and Connecticut families were in mediation with other parties. I know the Jones folks were there. I know Free Speech was there a while, about a year. Nothing came of it. There was a 9019. But then it was contingent upon approval of a plan that never happened for the 90 -- that went away. But I was prepared to approve that.

The case had been going on for about two years. Then they went to mediation again before another judge in another district. That was unsuccessful. Mediation sometimes work; they don't. My point is that people have

been trying to consensually resolve these issues for two years, and it didn't happen.  And the Free Speech case could have either converted or been dismissed.  But it couldn't hang out in Chapter 11 because there was no way it was going to be able to confirm a plan.

And to say that they stretched -- and I allowed it to happen -- stretched the limits of Subchapter V and what it was intended to do is an understatement in terms of timing; not in terms of ruling, but in terms of timing to get a plan on.  But people were mediating.  And I thought it made sense that if people were going to try to reach a deal, if you were going to put together a plan and this all worked out, then I didn't want to put my thumb on the scale.  So, ultimately, I made a decision to dismiss the Free Speech case.

We were left with the Jones case.  But I retained -- I told Murray he could keep -- Mr. Murray, the Chapter 7 Trustee appointed then in the Jones case, because the Jones case converted as well -- keep the cash from Free Speech in the bank accounts, and kept two adversary proceedings, one involving PQPR, another one involving Elevated Solutions Group.  No professionals started coming to me.  I don't know if it's true or not, but anyway.

But Texas families were able to try to collect on their judgment against Free Speech.  They had rights given

by a Texas court, I think even going after some of the Free Speech professionals who were working to preserve the estate.

When it came time to potentially sell assets, Mr. Murray and his counsel told me that they think that the real way to maximize value is to sell stuff, and not just the equity. They wanted the opportunity to go do this, and they thought they could do this by an auction.

They had, over an objection of the United States Trustee, told me just let them sell the equity. I entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets. That's what that order was intended to do. The supplemental dismissal order was just to make sure, because that was the request.

We had the auction process. I won't recount what happened, but I didn't approve the proposed sale. I had a - - I think the evidence is clear -- a backup bidder at the beginning. We didn't even know what the winning bid was. I had an auctioneer who got on the stand and didn't even know what he was going to get paid, or under what terms he was going to get paid.

I had a winning bid that was clearly based on a contingency. There was a sliding scale in the agreement. The proposed order submitted originally had the very language showing it was a contingency. And the Trustee was

006214

telling me that it wasn't a contingency. That was his understanding.

So I was asked to approve a sale that had a contingency clearly in it, but was told to act like there wasn't a contingency, upon a sale price that no one really could articulate, because depending on how you took it as a contingency or not a contingency. And we couldn't figure out exactly what the auctioneer was even going to get paid, because I don't even think he knew.

I then denied that auction. We were here until, what, 10:30 that night? So I didn't want -- and then I asked -- this case has been going on, I said -- I gave some (indiscernible) speech, told them it's been going on for like three years, and let's just get this back on track, get back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families. I think that matter is still pending.

MR. JORDAN: It is, Judge.

THE COURT: I lose jurisdiction over that immediately.

MR. JORDAN: It's still -- it is still pending.

THE COURT: But I think the appeal was something like, Judge, you can't do that, was the basis of the appeal. I don't have authority to go vest the property of the estate.

006215

So the sale didn't happen, and I said, I don't want any more contingencies.  If there's going to be a sale of assets, then cash will be king.  But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

I also said the sale price was low.  Turns out there's been an offer made since that day, which almost doubles the amount that was -- increased the offer by a week.  A week, like it was there.  That's fine.  Then if things get -- I told folks, if you want to sell it, cash will be king.  Get back to doing just -- you want to sell the equity?  Sell the equity, but cash will be king.

I took up the motion for reconsideration filed by the Connecticut families.  I know that the Jones side has a motion for reconsideration pending that will run its own course.  But as things sit today, as I see them -- I could be wrong -- no, I'm not wrong on this, and maybe just slightly off on the numbers -- but I know that the Connecticut court has -- in Appellate Connecticut court, a second level of revision has taken some of the (indiscernible) amounts.  And now that's subject to further appeal, and parties will appeal.

I haven't denied anyone any ability to pursue. Jones was able to hire his own lawyers.  Connecticut family

was able to pursue those judgments. My non-dischargeability order in the Jones case kind of has a mechanism saying, this is what I found based on summary judgment, based on the collateral estoppel of the findings made in the Connecticut court. The Connecticut court ultimately finds that X is the number, will then kind of compare it to what I did, and there's a kind of an adjustment so that I'm not allowing any more than a Connecticut court would have allowed.

Same thing for Texas. I think there was a portion that I didn't approve for Texas, I know, and for Connecticut as well, that I didn't find -- I didn't think there were basis for collateral estoppel findings, and appellate courts will review what I did, and that's the way the process works. I've got no issues with that.

So that's where things stand. I don't know, around a billion dollars for Connecticut right now, subject to further appeal, non-dischargeable. Around $50 million for Texas, subject to further appeals. The numbers could stay the same, numbers could be zero, numbers could go up. I don't know. It's all subject to state court appeals now.

But FSS, that estate is closed. That case is closed. That case is closed. Which means that someone has a contract dispute with FSS. You don't come to me. You have whatever rights you have outside the bankruptcy. The bankruptcy doesn't affect your claims one way or the other.

006217

There were several individuals who had a case. They were suing Jones in Texas state courts. They can continue their trials in state courts. There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have.

I already said, multiple years to try to reach a settlement, and they didn't. And I'm not saying anybody should have settled. I don't get into why people settle and don't settle. Not my purview. I'm there to evaluate settlements and determine whether they're in the best interest of the estate. That's my job.

So, kind of where we are. Several years of negotiating, no settlement, no plan. FSS gets dismissed. Failed auction. Now there's a 9019. The 9019 now wants me to allow claims against FSS. And I don't -- and I can't do that. And all bankruptcy lawyers know that I can't do that. Because there's no estate. There's no bankruptcy estate to allow a claim against. People can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me.

006218

So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech. And now the Texas families are saying that the matter that they very much appealed, they're now embracing. The supplemental order is now embraced.

The Trustee who asked me for a specific order for a specific purpose is now using that order. But it was only for one purpose, to see if he could sell the assets. To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it. Ha Nguyen was here. The U.S. Trustee was sitting right there telling me.

So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed. I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

And here we are again. Before we would pit the families against each other, where Connecticut and Texas would disagree on whether the form of relief being requested was appropriate. Happened during the auction too, where Texas said, I don't understand what we're doing here and I don't understand how this is going to work.

So, now I'm told we're all aligned and you just -- Lopez, just have to allow a claim against an entity in a case that's been dismissed. I can't do that. I cannot do that. I don't have authority to do it. And I'm not going

006219

to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone. I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore. Pure sale of the equity.

We're going to -- I've got to -- this case keeps taking twists and turns and trying to come up with really masterful and creative lawyering. But at its core, it's something I can't approve. Would come -- you know...

And so, I know... I read the revised settlement. Read the revised order. Bankruptcy lawyers know I can't do this unless we get really, really, really creative. And I think on a case like this, we've got -- with multiple appeal, any party, regardless of what I do, people have their rights.

So, before everyone gets started, let me just tell you, I can't do this. I'm going to again turn to Mr. Moshenberg and tell him, you'd better -- I need you to tell me what you want to do on your -- this non-dischargeability action.

I know that there's a pending motion in the other one. I've now approved the two matters in which there's 9019s and the two settlement matters. Money's going to go out the door. You don't have to tell me now. I want you to file something and tell me exactly what you all are going to

006220

do.

MR. MOSHENBERG:  Understood, Your Honor.

THE COURT:  And just play it down the line, in other words.  People have rights and I'm not telling you to put you on the spot or anything, I just know.

Mr. Murray, if you want to sell the equity, go sell the equity.  This case -- people have rights and they've been...  If you want to go pursue claims against Jones in state court against Free Speech, I don't -- I dismissed the case and I know what comes along with that.  Those arguments were made to me and I know what they are.

No, you don't have to say anything.  I know what the rights are.  And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  I don't trust the process.  I would have to do it -- me, myself -- and I'm not overseeing it.

So kind of get comfortable with the process so that we don't kind of do the same thing.  We've already did it really long and complicated and brought in auctioneers and had lots and -- enough has been -- and I think what this Debtor needs and what these families need is finality of the bankruptcy process so that they can pursue whatever it is that they want in judgments in state court, which is where they started in the 1st place; Connecticut, Texas, for the

006221

most part. I know that there's some other litigation pending out there.

I just -- I don't have the ability to allow a claim against an entity. And in a case that has been dismissed in which I literally gave specific authori- -- you keep the cash; we're going to keep these two adversaries. I'm going to settle these. I'm going to keep jurisdiction over these two things and this one. And I'm not going to do it for anything else.

I can't use the supplemental order to then go -- for a purpose in which it was never intended. And I get to construe my own orders and I retain jurisdiction over them. This case will be highly simplified. And I know Mr. Wolfshohl said he's been listening to these transcripts carefully. I made it super simple for you this time.

There will be -- I don't know. Someone has a case, bring it. There have been multiple years of investigations. No lawsuits have been (indiscernible) in front of me. Maybe one is coming. I don't know. If it does, we'll take it up and I'll rule.

I'm not sure anybody's ever been happy about -- completely set in my rulings. I'm not sure Mr. Jones has been entirely happy to know that I found on summary judgment that he's liable for over a billion dollars in non-dischargeable debt and over $49 million dollars. I'm sure

he -- appealing -- he is appealing. And that's his right.

So, I'm sure the Connecticut and the Texas family -- I'm sure the Connecticut families weren't too happy about my decision about the auction. Sure Global Tetrahedron wasn't too happy about it. But I'm really trying to do what I think is my duty and my job upon careful analysis of the law.

And so I'm not approving. I cannot on its face. You don't have to put on any evidence. I can't approve this sale. I can't allow $480 million dollars. And I don't want folks to put it up. And we don't need to take up TROs and Connecticut and Texas.

Texas, you have whatever rights you have. Connecticut, you have whatever rights you have against Free Speech, case against Jones. If you want to have another -- if you want to settle with the Trustee on Jones related matters, do it. Tee it up. We'll take it up. But these things are inextricably linked and multiple appeals going on. Well, I don't know if they're still going on. They probably will on the non-dischargeability front, by the way. You have whatever rights you have on the supplemental order.

MAN 1: Judge, if I could comment --

THE COURT: Won't be used again. No, no, no. I don't need you to comment on anything. I don't -- because it's going to open the door. I just wish everyone a good

006223

day.  Thank you.

CLERK:  All rise.

(Whereupon these proceedings were concluded at 9:26 AM)

006224

Case 4:25-cv-03553 Document 132-29 Filed 01/26/26 in TXSD Page 255 of 777

I N D E X


RULINGS

|  | Page | Line |
|---|---|---|
| Motion to Approve Sale, Denied | 16 | 8 |

006225

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  February 6, 2025

006226

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE:  ALEXANDER E. JONES          §
                                    §     CASE NO. 22-33553 (CML)
                                    §
          Debtor.                   §     Chapter 7

---

**ORDER GRANTING MOTION FOR RECONSIDERATION OF THIS COURT'S**
**DETERMINATION THAT NO AUCTION OF FREE SPEECH SYSTEMS**
**ASSETS WILL BE CONDUCTED BY THE JONES CHAPTER 7 ESTRATE**

Upon consideration of the Motion For Reconsideration of This Court's Determination That No Auction of Free Speech Systems Assets Will Be Conducted By the Jones Chapter 7 Estate (the "Jones Estate) which is which currently administered by its Chapter 7 Trustee Christopher R. Murray (the "Trustee") and is filed by Alexander E. Jones ("Jones") for himself and as manager of the non-debtor company, Free Speech Systems, LLC ("FSS") (the "Motion") the record of this case, and the proceedings before the Court related to the Motion, if any, the Court finds that: (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Motion is in full compliance with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules of the Southern District of Texas, and orders and procedures of this Court; (v) there was proper and adequate notice of the Motion and no other or further notice is necessary under the circumstances; (vi) the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and (vii) the relief sought in the Motion is in the best interest of the Debtor, the Estate, and its creditors; and (viii) that the relief requested in Motion should be granted.

It is **ORDERED** that:

1. The Motion For Reconsideration of This Court's Determination That No Auction of Free Speech Systems Assets Will Be Conducted By the Jones Chapter 7 Estate (the

006227

"Jones Estate) which is which currently administered by its Chapter 7 Trustee Christopher R. Murray and is filed by Alexander E. Jones for himself and as manager of the non-debtor company, Free Speech Systems, LLC is GRANTED.

Signed: _____        _____

                                            Christopher Lopez
                                            United States Bankruptcy Judge

006228

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Case No. 22-33553 (CML) |
| **ALEXANDER E. JONES**, Debtor. | Chapter 7 |

**THE CONNECTICUT FAMILIES' WITNESS AND EXHIBIT LIST**

| | |
|---|---|
| Judge | Hon. Christopher M. Lopez |
| Hearing Date | Wednesday, October 1, 2025 |
| Hearing Time | 1:00 p.m. (CST) |
| Party's Name | Connecticut Families |
| Attorney's Names | Ryan Chapple and Kyle Kimpler (co-counsel to the Connecticut Families) |
| Attorney's Phone | 512-477-5000 (Ryan Chapple) |
| Nature of Proceeding | The Sandy Hook Families' Emergency Joint Motion for Entry of an Order Confirming that FSS Assets are not Subject to the Automatic Stay [Dkt. No. 1241] |

The Connecticut Families [1] hereby submit this Witness and Exhibit List in connection with the hearing on *The Sandy Hook Families' Emergency Joint Motion for Entry of an Order Confirming that FSS Assets are not Subject to the Automatic Stay* (the "Joint Motion") [Dkt. No. 1241], to be held on Wednesday, October 1, 2025 at 1:00 p.m. (prevailing Central Standard Time).

The Connecticut Families reserve the right to supplement, amend, or revise this Witness and Exhibit List at any time prior to the hearing. The Connecticut Families

---

[1] The "Connecticut Families" are Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash.

---

reserve the right to supplement this Witness and Exhibit List with new witnesses and additional exhibits.  Further, the Connecticut Families reserve the right to use any exhibits presented by any other party and to ask the Court to take judicial notice of any document. The Connecticut Families further reserve the right to introduce exhibits previously admitted.

## WITNESS LIST

The Connecticut Families may call the following witnesses at the Motion Hearing:

1.  Any witness necessary to rebut the testimony of any witness called or designated by any other parties;

2.  Any witness listed or called by any other party.

## EXHIBIT LIST

The Connecticut Families may offer for admission into evidence any of the following exhibits at the Motion Hearing:

| No. | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1. | Order Granting Joint Application for Post-Judgment Turnover Order and Appointment of Receiver (Travis County District Court, Cause No. D-1-GN-18-001835) | | | | |
| 2. | Appellant Free Speech Systems, LLC's Emergency Motion for Immediate Stay of Void Turnover Order Issued in Violation of the Bankruptcy Automatic Stay (Court of Appeals, Third District of Texas, Case No. 03-25-00617-CV) | | | | |

006230

| | | | | | |
|---|---|---|---|---|---|
| 3. | Order issued August 28, 2025 (Court of Appeals, Third District of Texas, Case No. 03-25-00617-CV) | | | | |
| 4. | Supplemental Order issued September 25, 2024 (SDTX Bankruptcy Case No. 22-60043) | | | | |
| 5. | Hearing Transcript of February 5, 2025 (SDTX Bankruptcy Case No. 22-33553) | | | | |
| 6. | FUAC Denial Order issued March 19, 2025 (SDTX Bankruptcy Case No. 22-33553) | | | | |
| 7. | Hearing Transcript of June 5, 2025 (SDTX Bankruptcy Case No. 22-33553) | | | | |
| | All filings in the Bankruptcy Case [reserved for seeking admission or requesting judicial notice] | | | | |
| | Any exhibits listed, designated, or offered by any other party | | | | |
| | Any exhibits necessary for impeachment and/or for rebuttal purposes | | | | |

Dated: September 30, 2025

Respectfully submitted,

**CAIN & SKARNULIS PLLC**
By: *Ryan E. Chapple*
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
E-mail:  rchapple@cstrial.com

006231

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail: asterling@koskoff.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Paul Paterson (admitted *pro hac vice*)
Leslie Liberman (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: kkimpler@paulweiss.com
E-mail: ppaterson@paulweiss.com
E-mail: lliberman@paulweiss.com
E-mail: virobinson@paulweiss.com

*Co-Counsel to the Connecticut Families*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Witness and Exhibit List has been served on counsel for the Trustee, Debtor, the Debtor's Counsel, and all parties receiving or entitled to notice through CM/ECF on this 30th day of September 2025.

*Ryan E. Chapple*
Ryan E. Chapple

006232

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Case No. 22-33553 (CML) |
| **ALEXANDER E. JONES**, Debtor. | Chapter 7 |

# EXHIBIT 1

006233

08/13/2025 03:31:55 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, | § | IN THE DISTRICT COURT |
|  Plaintiffs | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
|  Defendants | § | 261st JUDICIAL DISTRICT |

## ORDER GRANTING APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTOR FREE SPEECH SYSTEMS, LLC

The Court has considered Judgment Creditors' Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Free Speech Systems, LLC (the Application) and the record properly before it.

**The Court FINDS that** it has jurisdiction over this proceeding and can proceed in granting the relief set forth herein immediately. *See* TEX. CIV. PRAC. & REM. CODE 31.002.

**The Court also FINDS that** the judgment in Cause No. CV-18-6046437 rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut (the Connecticut Families' Judgment) is valid, final, and payable. Judgment Debtor Free Speech Systems, LLC owes, jointly and severally, $1,288,139,555.94 under the Connecticut Families' Judgment. There have been no applicable credits, payments, or offsets.

**The Court also FINDS that** the Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's

006234

opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act.

**The Court also FINDS that** Judgment Debtor Alexander E. Jones (also referred to in this Order as Alex E. Jones and Alex Jones) filed for bankruptcy under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) on December 2, 2022 (the Jones Petition Date) in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) pending as case no. 22-33553 (the Jones Bankruptcy Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy. Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 19, 2023 Memorandum Decision granting the Connecticut Families' Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable. Following a hearing on June 14, 2024, the Bankruptcy Court converted the Jones Bankruptcy Case from chapter 11 to chapter 7 and appointed Christopher R. Murray as chapter 7 trustee (the Trustee) for the applicable chapter 7 bankruptcy estate (the Chapter 7 Estate).

**The Court also FINDS that** the Judgment remain unsatisfied; that Judgment Debtor Free Speech Systems, LLC owns property that is not exempt from attachment, execution, or seizure for the satisfaction of the Judgment; and that Judgment Creditors are entitled to the Court's aid in reaching Judgment Debtor's nonexempt property to satisfy the Judgment.

---

ORDER REQUIRING TURNOVER AND APPOINTING RECEIVER                          PAGE 2 OF 12

006235

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

(i)     as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

In this Order, the definition of "Turnover Property" also includes all additional and specific property or assets of any kind covered by the ordering paragraphs below. Judgment Creditors reserve all rights they may have to execute upon the Judgment in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtor.

**The Court also FINDS that** the Judgment is final and remain unpaid. Based on the entire record, including the Application and evidence attached that is admitted in support of the Application, **the Court FINDS that** the Application should be granted.

It is therefore **ORDERED** that the Application is **GRANTED**, and Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (Receiver) is appointed under Texas Civil Practice and Remedies Code § 31.002 with authority to take possession of all the Turnover Property, sell the Turnover Property, and pay the proceeds to Judgment Creditors to the extent required to satisfy the Judgment. The Turnover

---

006236

Property may include but is not limited to financial accounts, certificates of deposit, cryptocurrency accounts, and money-market accounts held by a third party. Notwithstanding anything in this Order to the contrary, nothing in this Order shall authorize any party, including the Receiver or Judgment Creditors, to take any action that would be inconsistent with the pending Jones Bankruptcy Case, including seeking any relief with respect to assets that constitute property of the Chapter 7 Estate unless approved by the Bankruptcy Court.

1.    **Receiver's Information**.

Name: Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney
    Partners (HMP)

Address: 8911 North Capital of Texas Highway Suite 2120 Austin, Texas
    78759

Telephone Number: (512) 892-0803

Email Address: gmilligan@harneypartners.com

2.    **Custodia Legis**.  The entry of this Order creates a receivership estate wherein all of Judgment Debtor's respective Turnover Property shall be held in *custodia legis* by the receivership as of the date of this Order.  The receivership owns all Turnover Property regardless of whether Receiver takes actual possession of the property. The Receiver may decline to collect or abandon any Turnover Property the Receiver determines, in his sole discretion, to be burdensome, cumbersome, or of *de minimis* value. The Receiver is authorized to raise any issue with the Court, to request and to meet *in camera* with the Court without notice, and to file any motion (in this Court, the Bankruptcy Court, or any other applicable court) the Receiver deems appropriate.

---

ORDER REQUIRING TURNOVER AND APPOINTING RECEIVER                    PAGE 4 OF 12

3.    **Turnover**. The Judgment Debtor shall turnover to Receiver all Turnover Property, including all documents related to such property, **within five days** of the Judgment Creditors service of a copy of this Order on the Judgment Debtor or its counsel. All third parties in possession of any Turnover Property that is subject to any Judgment Debtor's control shall turnover such property to Receiver within five days of being served notice of this Order.  The turnover by Judgment Debtor shall include at least the following documents (for the period of at least the preceding 48 months from the date of this Order, except where otherwise indicated): (1) canceled checks; (2) bank statements, pass books, and other bank or financial institution records; (3) federal income and state franchise tax returns; (4) life insurance policies (regardless of date); (5) all motor vehicle Certificates of Title (regardless of date); (6) stock certificates and bonds (regardless of date); (7) promissory notes (regardless of date); (8) bills of sale (regardless of date); (9) real property deeds and deeds of trust (regardless of date); (10) business journals, ledgers, accounts payable and receivable files; (11) pledges, security agreements and copies of financial statements; (12) state sales tax reports; (13) any other record or document evidencing any ownership to real or personal property or to any debt owed or money had (regardless of date); (14) trust documents for which the Judgment Debtors are a beneficiary (regardless of date); (15) all personal property returns filed with any taxing authority, including but not limited to any central appraisal district or tax assessor/collector; and, (16) credit applications and other documents stating the Judgment Debtor's financial condition; (17) cryptocurrency wallets, records, and access codes (regardless of date); and (18) all documents listing or summarizing property owned by the Judgment Debtor (regardless of date).

---

4.    **Continuing Effect of Order.** Judgment Debtor and all others holding Turnover Property shall continue to immediately turnover to Receiver such property when received, until all amounts due under the Judgment and this Order are paid in full.

5.    **Receiver's Powers.** Receiver has the authority to take possession of all of Judgment Debtor's Turnover Property, sell such property, and pay the proceeds to the Judgment Creditors to the extent required to satisfy the Judgment. Receiver's authority applies, but is not limited, to all Turnover Property including: (1) all documents or records, including financial records, related to property that is in the actual or constructive possession or control of the Judgment Debtor; (2) all financial accounts (bank account), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; (10) shares, stock and membership interests; (11) trusts, (12) domains, (13) accounts receivable; and (14) cryptocurrency accounts or wallets. Receiver is not required, but may in his sole discretion and is hereby empowered, to defend or prosecute any litigation regarding the Judgment Debtor that is not property of the Trustee, including, without limitation, claims to recover assets fraudulently transferred, conveyed, or assigned that would increase the size of the receivership estate. Receiver's powers include the following, although he has no requirement to necessarily exercise such powers as to the Turnover Property: (1) collect all accounts receivable of the Judgment Debtor; (2) change locks to all premises at which any property is situated; (3) endorse and cash all checks and negotiable instruments payable to the Judgment Debtor, except paychecks for current wages; (4) hire a real estate broker to sell any real

property and mineral interest belonging to the Judgment Debtor; (5) hire any person or company to move and store the property of the Judgment Debtor; (6) insure any property belonging to the Judgment Debtor; (7) obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Judgment Debtor; (8) obtain local, state and federal tax records of the Judgment Debtor; (9) obtain from any landlord, building owner or building manager where the Judgment Debtor or the Judgment Debtor's business is a tenant copies of such Judgment Debtor's lease, lease application, credit application, payment history and copies of such Judgment Debtor's checks for rent or other payments; (10) hire any person or company necessary to accomplish any right or power under this Order; (11) take all actions necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of the Judgment Debtor may be situated, and to review and obtain copies of all documents related to same; (12) obtain all records of ownership of real properties, personal properties or motor vehicles of the Judgment Debtor in the possession of any County Tax Assessor/Collector or Central Appraisal District, including any records of payments made or correspondence; (13) obtain all records pertaining to the Judgment Debtor from any provider of utilities, telephone service, cell phone service; (14) obtain credit reports on the Judgment Debtor from any Consumer Reporting Agency as defined by Fair Credit Report Act pursuant to 16 USC § 1681B(a)(1); (15) exercise control over any website of the Judgment Debtor and direct the administrator or web server to allow Receiver full access to the management of the website; (16) obtain from any creditor of the Judgment Debtor (including mortgage companies) copies of such Judgment Debtor's credit application, payment history and copies of each such Judgment Debtor's checks for payments; (17) obtain from any person or entity that compensates the

---

006240

Judgment Debtor, including commissions, an itemization of all such compensation for the past 12 months from the date of Receiver's request and as well as any compensation anticipated in the forthcoming six month period from the date of Receiver's request; and (18) certify copies of this Order. The Receiver shall not reduce or eliminate by agreement with the Judgment Debtor or otherwise compromise or settle the outstanding balance owed to Judgment Creditors by Judgment Debtor under the Judgment without the written consent of Judgment Creditors.

6. **Injunction**. The Judgment Debtor, and all its directors, officers, managers, members, investment advisors, accountants, attorneys, professionals, trustees (other than the Trustee) and other agents, successors, or assigns, and any third party with notice of this Order are hereby ordered and enjoined not to take any action to sell, encumber, dispose of, transfer, waste, retain, or in any way exercise control over the Turnover Assets except as expressly provided by this Order or upon instructions in writing from the Receiver.

7. **Duties of Law Enforcement**. Any Sheriff, Constable or Officer of the Peace shall assist the Receiver in carrying out his duties and exercising his powers under this Order and prevent any person from interfering with Receiver in taking control and possession of the Turnover Assets.

8. **Sales of Real Property Require Notice**. Any sale of real property by Receiver requires the approval of this Court, after notice and opportunity for hearing being provided to Judgment Debtor and any lien holder on such real property.

9. **Receiver's Bond**. The Receiver shall pay a $500.00 bond.

10.    **Receiver's Oath**.  Receiver must file an oath to perform his duties faithfully before acting under this Order and this Order is not effective until such an oath is filed.

11.    **Receiver's Fee**. Without further application, notice, or order of the Court, the Receiver shall set aside as potential receiver's fees an amount equal to 25% of all gross proceeds coming into his possession from any source (before deducting expenses) which the Court finds is a customary and usual fee for a post-judgment turnover receiver. Within five days of the entry of this Order, the Judgment Creditors shall pay the sum of $10,000 to the Receiver as an advance on his fees. The advance is fully earned and the Receiver may take it into income, and will repay the advance to the Judgment Creditors from the first $10,000 of Receiver's fees earned from the collection of Turnover Property. Receiver's fees and expenses are taxed as costs against Judgment Debtor, and as costs, such fees and expenses are in addition to amounts owed under the Judgment. Receiver shall distribute the remaining net proceeds from Turnover Property coming into his possession, after withholding 25% in possible Receiver's fees and all expenses and reserving from distribution any funds the Receiver determines in his sole discretion are needed to pay potential future expenses, to the Judgment Creditors at the Judgment Creditors' direction. No receiver's fees shall be paid to Receiver unless an application is filed with and ruled by the Court.

12.    **Receiver's Expenses**. Without further application, notice, or order of the Court, the Receiver may incur and shall pay from the proceeds of Turnover Property all reasonable and necessary expenses of the Receiver and the receivership estate up to the amount of $20,000.00 (the Expense Cap). The Receiver may raise the Expense Cap either (1) without further order of the Court upon the written agreement of the Judgment

Creditors, including by email with counsel, or (ii) with Court approval after application to the Court with notice to the Judgment Creditors. The Receiver must provide an accounting or receipts of any reasonable and necessary expenses to the Court upon request. The Receiver's and receivership estates' reasonable and necessary expenses will be taxed as costs against Judgment Debtor, and Receiver may collect those expenses from Judgment Debtor in addition to the amount collected to satisfy the Judgment.

13. **Employ Professionals**. With Court approval, the Receiver may retain and reasonably compensate, in Receiver's collection agents, counsel, financial advisors, accountants, brokers, auctioneers, independent contractors, technical specialists, and other professionals and agents to assist in his duties as Receiver on such terms as the Receiver deems appropriate (the Receiver Personnel). For avoidance of doubt, the Court hereby approves the Receiver's retention of HMP as Receiver Personnel with the compensation for HMP provided Receiver Personnel already included in the Receiver's fee provided in paragraph 11 of this Order; *provided however*, the Receiver may, upon separate application and order of the Court, employ HMP provide Receiver Personnel on different compensation terms.

14. **Limitation on Liability**. The Receiver, HMP, and Receiver Personnel, and their officers, members, managers, directors, partners, employees, agents, and professionals (together, the Protected Personnel) shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver and Receiver Personnel are entitled to rely, in good faith, on the advice of employed professionals, the Judgment Creditors' counsel, and on information provided by the Judgment Debtor and its books,

records, and its past and present officers, directors, agents, members, managers, trustees, accountants, and employees and Judgment Debtor's counsel without audit. The Receiver and Receiver Personnel are entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Protected Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Receiver Personnel, including compliance with applicable law governing the collection of debt, nor shall the Protected Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of gross negligence, willful misconduct, malicious acts, and the failure to comply with this Court's orders.

15.    **Indemnity**. The Protected Personnel are hereby indemnified by the Turnover Property to the fullest extent permitted under the law from any cause of action or claim related to any act or omission in connection with, relating to, or arising out of the Receiver's or Receiver Personnels' duties as Receiver, except for claims related to any act or omission that is determined in a final order to have constituted gross negligence, willful misconduct, or malicious acts. The Protected Personnel are entitled to advances from the Receiver and Turnover Property, including from any reserved funds, to cover actual and reasonably anticipated expenses of defending any action threatened against or brought against the any Protected Personnel as a result of any act or omission, actual or alleged, in their capacity as such, or in any way related to or arising from the Judgment Debtor, Judgment Debtor's property, Turnover Property, or the Judgment. A Protected Personnel must return specific advances under this paragraph upon a final order by the Court finding that the Protected Personnel is not entitled to indemnification under this Order.

16.    **Attorney's Fees**. Judgment Creditors' reasonable attorney's fees will be taxed as costs against Judgment Debtor. In carrying out his duties under this Order, the Receiver may use the Judgment Creditors' counsel and rely on legal advice and representation provided to him by the Judgment Creditors' counsel.

17.    **Exempt Property**.  Nothing in this Order shall be construed to apply to exempt property, if any, of Judgment Debtor, or any property of the Chapter 7 Estate (expect up approval of the Trustee or Bankruptcy Court). For avoidance of doubt, (i) the Bankruptcy Court has jurisdiction to decide any dispute as to what constitutes property of the Chapter 7 Estate; and (ii) this Court has jurisdiction to decide any claim by the Judgment Debtor that property should be treated as exempt under this Order and any claim by the Receiver or Judgment Creditors that any property is Turnover Property and not protected by any exemption asserted by Judgment Debtor.

18.    **Retention of Jurisdiction**. This Court shall have and retain exclusive jurisdiction over: (i) the implementation and enforcement of this Order; (ii) the acts and conduct of the Receiver and any actions brought against the Protected Personnel by any person or entity in connection with this Order.

ISSUED AND SIGNED on _August 13, 2025._

_____
JUDGE PRESIDING

006245

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

In re:

**ALEXANDER E. JONES**,
Debtor.

Case No. 22-33553 (CML)

Chapter 7

# EXHIBIT 2

ACCEPTED
03-25-00617-cv
104941748
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/27/2025 5:38 PM
JEFFREY D. KYLE
CLERK

No. 03-25-00617-CV

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/27/2025 5:38:53 PM
JEFFREY D. KYLE
Clerk

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS**

_____

FREE SPEECH SYSTEMS, LLC
*Appellant*,

v.

DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN, MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO, JILLIAN SOTO- MARINO, WILLIAMS ALDENBERG, WILLIAM SHERLACH, ROBERT PARKER, ERICA ASH, NEIL HESLIN, SCARLETT LEWIS, AND GREGORY S. MILLIGAN
*Appellees*.

_____

On Appeal from the 459th District Court of Travis County, Texas
Trial Cause No. D-1-GN-18-001835

_____

**APPELLANT'S EMERGENCY MOTION FOR IMMEDIATE STAY OF VOID TURNOVER ORDER ISSUED IN VIOLATION OF THE BANKRUPTCY AUTOMATIC STAY**

_____

TO THE HONORABLE THIRD COURT OF APPEALS:

This is yet another case involving Alex Jones and his company, Free Speech

Systems, LLC ("FSS") where attorney Mark Bankston has yet again led the

006247

Honorable Judge Maya Gamble into significant error, this time the error requiring emergency relief which this Motion requests pending the appeal in this matter.[1]

Specifically Judge Gambe has now entered a void turnover order as to FSS assets and compounded this error by appointing a receiver over those assets. (Dec. Broocks, **Appendix A**).  That turnover/receivership order is void, not voidable, for a number of reasons and Defendant has filed a notice of appeal on this order, or in the alternative a motion for writ of mandamus, with respect thereto, although briefing has yet to occur.  Nevertheless, for a number of reasons Defendant asks this Court to stay the effectiveness of that Order until Defendant's appeal on the merits of this matter (or mandamus if appropriate) can be determined.

## I.    SUMMARY OF ARGUMENTS

### A. THE TURNOVER/RECEIVER ORDER IS VOID BECAUSE IT VIOLATES THE AUTOMATIC STAY.

First, the turnover/receiver order is void as it violates the automatic stay of 11 U.S.C. §362(a).  The assets of FSS have been judicially transferred to and vested in the Chapter 7 bankruptcy estate of Alex Jones, where Christopher Murray has been appointed as Trustee, which Judge Gamble's turnover/receiver order acknowledges. As such FSS's assets are thus encompassed within the automatic stay provisions of

---

[1] This application is supported by the attached declaration of Shelby Jordan.  It is also supported by the attached declaration of Ben Broocks to which the referenced Appendix are attached by the indicated numbers.

006248

§362(a) and cannot be made the subject of a turnover order.  As this Court itself has confirmed: If "... a party or state court takes action in violation of the bankruptcy stay, such action is void." *S. Cal. Sunbelt Developers, Inc. v. Grammer,* No. 03-19-00192-CV, 2019 Tex. App. LEXIS 11185, at \*36 (Tex. App.—Austin 2019, pet. denied) (*citing York v. State*, 373 S.W.3d 32, 37-40 (Tex. 2012) and *Thuesen v. Amerisure Ins*., 487 S.W.3d 291, 297 (Tex. App.—Houston [14th Dist.] 2016, no pet.)). Although apprised of this fact, Judge Gamble proceeded with entry of the turnover/receiver order notwithstanding, commenting: "So, I'm going to sign it. [Bankruptcy] Judge Lopez can scold everyone, including me, all the way from Houston, it's happened before, it can happen again." August 13, 2025, Transcript, p. 46, l: 6 – 9. (Dec. Broocks**, Appendix B**).   It is not about getting a "scolding" from a bankruptcy judge. It is about honoring the rule of law and not intentionally disregarding it.  Granting a turnover and allowing a receiver to take control of and make decisions under a void turnover order runs the risks of unnecessary but extreme prejudice and confusion.  This reason alone mandates the effectiveness of that Order be stayed until this Court can rule on the appeal.

### B. THE TURNOVER/RECEIVER ORDER IS VOID BECAUSE IT WAS ENTERED IN FAVOR OF FIFTEEN STRANGERS TO THIS CASE -- NOT THE NAMED PLAINTIFFS -- AND THESE STRANGERS HAVE NO STANDING.

Second, the turnover/receiver ordered was not entered in favor of the two Texas plaintiffs who received a judgment in Judge Gamble's court (i.e., Neil Heslin

3

006249

and his former spouse Scarlett Lewis). Rather it was issued in favor of fifteen people who received a different judgment in Connecticut and now have brought their Connecticut judgment directly into a case that has nothing to do with them via intervention and they have done so after Judge Gamble lost plenary power. They have done this because they want Judge Gamble's judicial assistance in collecting their Connecticut Judgment. The fifteen Connecticut Plaintiffs, however, were not parties to the Texas case and thus are strangers to that action. Moreover, these strangers were actually at one time opposed to the Texas plaintiffs (Heslin/Lewis) but now -- without evidence -- claim in their joint motion to enter the turnover order [Dec. Broocks**, Appendix C, p. 3**] that resulted in the Connecticut Plaintiffs' receipt of the Order, that the groups have worked out some kind of agreement among themselves:

> 4.     The Judgment Creditors have agreed to divide the proceeds derived from the Receiver's collection efforts pursuant to the terms of a binding settlement agreement (the Judgment Creditors' Settlement Agreement).

This unsubstantiated agreement seems to include their selection of Judge Gamble as the one they want to assist them in their now-joint collection efforts. But these fifteen strangers with their Connecticut Judgment have no justiciable interest in the Texas Judgment of Heslin/Lewis and therefore lack standing to request a turnover/receiver in a Texas case in which they were not involved to collect their

4

006250

Connecticut judgment and which smacks of transparent forum shopping. The turnover/receiver order was thus issued to strangers who lacking standing, which makes that order entered in their favor void.

C. **THE TURNOVER/RECEIVER ORDER IS VOID BECAUSE THE TWO TEXAS JUDGMENT PLAINTIFFS AND FIFTEEN CONNECTICUT JUDGMENT PLAINTIFFS CANNOT USE A PROCEDURAL TURNOVER ORDER AS A DEVICE TO DEAL WITH SUBSTANTIVE ISSUES AMONG THEMSELVES VERSUS PURELY PROCEDURAL ONES**

A third and related reason is the Texas Supreme Court has made crystal clear that a turnover proceeding is purely procedural. *Alexander Dubose Jefferson & Townsend LLP v. Chevron Phillips Chem. Co., L.P.*, 540 S.W.3d 577 (Tex. 2018) Yet here with the improper intervention of the fifteen strangers to the Texas Judgment of Heslin/Lewis, they have sought to interject Judge Gamble into the role of the arbiter of the collection agreement they claim to have independently reached, which role Judge Gamble has willingly accepted given her demonstrated antipathy towards Defendants.[2] On information and belief, the two Texas Plaintiffs and the

---

[2] Judge Gamble's animosity towards Jones is apparent. For example, all at the urging of attorney Mark Bankston, Judge Gamble (i) entered a liability default judgment against media defendants Jones and FSS in violation of a host of United States Supreme Court cases that required the two Texas Plaintiffs to prove falsity of specific statements made by Jones and FSS, and also prove Jones/FSS's malice, with the Supreme Court mandating that plaintiffs prove malice by clear and convincing evidence; (ii) granted the two Texas Plaintiffs a post-trial pleading amendment to assert a punitive-damages cap busting claim asserting that the two Texas Plaintiffs were disabled; (iii) ruled that these two plaintiffs were disabled -- a determination to made by the Jury, and (iv) sanctioned Defendants and their attorneys at virtually every possible opportunity.

At the turnover hearing at which Defendants' counsel was not permitted to speak until Judge Gamble had already approved the turnover and sent it for typing, she said of Bankston. *See* App. B, pp.5, 20.

5

Fifteen Connecticut Plaintiffs are not the only parties to this unsubstantiated "agreement." Rather, the turnover order itself recites that actions the receiver may take are "subject to the approval of the bankruptcy trustee" so that person is somehow a party although not named or joined. Additionally, on information and belief, at least three other people who are plaintiffs in cases in Texas that have yet to try, are believed parties to the agreement the Texas and Connecticut Plaintiffs reference but do not substantiate.[3] The turnover/receiver order is not a procedural turnover but a union of formerly adverse parties who now have selected Judge Gamble instead of the bankruptcy court, as the court they want to administer their collection agreement and adjudicate their internal disputes. But that kind of forum shopping is not permitted as it wrongly turns a "purely procedural" device into a substantive matter, forbidden by the Texas Supreme Court.

The balance of this Motion elaborates on these points and raises other issues, all of which justify this Court entering a Stay of the effectiveness of the turnover/receiver order until this Court hears the appeal of this matter.

## II.   THE TURNOVER/RECEIVER ORDER IS VOID AS IT VIOLATES THE AUTOMATIC STAY

The order at issue here (sometimes, "Order") is formally entitled "*Order Granting Application for Post-Judgment Turnover and Appointment of Receiver as*

---

[3] Marcel Fontaine, Leonard Pozner, and Veronica De La Rosa.

6

*to Judgment Debtor Free Speech Systems, LLC."* A copy is attached as **Appendix A**. It was signed by Judge Gamble on August 13, 2025. The Order effects a turnover of all assets of FSS to a receiver, Greg Milligan, who was appointed by Judge Gamble.

The Order was originally sought by both the Texas Plaintiffs and the Connecticut Plaintiffs against both Alex Jones and his company FSS. [Dec. Broocks, Appendix C]. Jones is currently in bankruptcy court and matters related to turnover as to Jones were removed to the Bankruptcy Court where his bankruptcy case is currently pending. [Dec. Broocks, Appendix D]. Additionally, collection actions asserted against FSS have been stayed given the deposit of cash in lieu of a bond, which precludes collection of any portion of the Order on any assets of FSS. See TEX. R. APP. P. 24.1(f). [Dec. Broocks, Appendix E].

Given the removal to the bankruptcy court of claims pertaining to Jones and the deposit of cash in lieu of a bond, at the turnover hearing on August 13, 2025, after allowing Bankston to make a speech accusing FSS and its counsel of misleading the court with respect to the very matters herein addressed, Judge Gamble allowed the intervening Connecticut plaintiffs to press on for turnover and appointment of a receiver with respect to their Connecticut judgment. Allowing the intervening Connecticut Plaintiffs to proceed and then granting them turnover relief, was a willful violation of the automatic stay provisions of 11 U.S.C.A. §362(a).

7

The applicability of §362(a) to the Order, which addresses assets of FSS, turns on two orders issued by the United States Bankruptcy Court for the Southern District of Texas, both of which are referenced Judge Gamble's Order itself, namely an order entered by the bankruptcy court on June 21, 2024 (the "*June Order*") and another order entered on September 25, 2024 that supplements the June Order the "*September Order*").[4] Here is the portion of Judge Gamble's Order referencing both the June and September Orders entered by the bankruptcy court that specifically state that FSS assets have been transferred to the Bankruptcy Estate of Jones and are thus protected by §362(a):

---

[4] At the start of the August 13, 2025 hearing Judge Gamble allowed Mark Bankson to make an impassioned and largely false claim that the September Order had been declared void by the bankruptcy judge who entered it in the first place and refused to let FSS counsel address this vastly false statement before she entered the Order. [Appendix B, pp.5 - 17]. When FSS's counsel was finally allowed to speak after Judge Gamble had granted the Order it was first pointed out that this while Bankston claimed the September Order was void, the very form of the order tendered asking her to sign recited the September Order and its effectiveness and that recitation remained even in the revised order the Connecticut Plaintiffs asked be entered. [Appendix B, pp. 37 - 39]. Judge Gamble did not care.

8

> The Court also **FINDS** that Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):
>
>     (i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

Appendix A, p. 3. Notably, referring to the June and September Orders, Judge Gamble's Order states that they "...vested authority in the [bankruptcy] Trustee to take control of ...[FSS], including its assets and bank accounts." And further, orders turnover "subject only to the approval of the [Bankruptcy] Trustee," which clearly shows knowledge of the continuing viability of the September Order.[5]

That recitation is sufficient to demonstrate that FSS assets sought to be turned over were then and are now in the control of the Trustee of the Bankruptcy Estate of Alex Jones and protected by §362(a). But the September Order actually goes further and not just *gives* the FSS assets but vests the assets themselves in bankruptcy estate of Alex Jones – i.e. a transfer. Here is what the September Order actually says:

---

[5] Limiting the turnover "subject only to the approval of the [bankruptcy] Trustee" is meaningless; it is the Bankruptcy Court that must approve.

9

006255

> 1.    Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") ==shall be deemed to have vested== in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, ==as property of that estate pursuant to Section 541== and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

Dec. Broocks, Appendix F.

Indeed, Heslin/Lewis actually appealed the validity of the September Order to the United States District Court on October 11, 2024. *See* Dec. Broocks, Appendix G, Dkt. 1. And on December 18, 2024, filed a notice with the District Court stating that the issue in that appeal was " Did the Bankruptcy Court err when ... it entered an order [Docket No. 1021...that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones." *See* Dec. Broocks, Appendix H, Dkt. 14-1. The Bankruptcy Trustee –who has not been made a party to this turnover/receiver order -- was designated as the appellee. *See* Dec. Broocks, Appendix I, Dkt. 14-2.

On November 11, 2024 the fifteen Connecticut parties who convinced Judge Gamble to enter the void turnover order actually intervened in the appeal acknowledging that at the hearing on September 24, 2024 that produced the September Order " the Bankruptcy Court stated that it would [enter] a supplemental order holding that control of all FSS assets vests with the Jones Chapter 7 Trustee—

10

006256

which the Bankruptcy Court said was the entire basis on which it had dismissed the FSS bankruptcy..." and went on to say that the Supplemental Order "clarified that... all property of FSS was deemed to have vested in the bankruptcy estate of its 100% equity owner, Alex Jones, as property of that estate under the control of the Chapter 7 Trustee."  Dec. Broocks, Appendix J, pp. 7-8.

On May 6, 2025, the two Texas plaintiffs here who had appealed the September Order and the fifteen Connecticut Plaintiffs and the Bankruptcy Trustee who had adamantly supported the September Order, voluntarily dismissed the appeal.  Dec. Broocks, Appendix K, Dkt. 22.  Thus, at the very latest by June 5, 2025 –30 days after dismissal of the appeal – the September Order became a final unappealable judgment.  It cannot be challenged.

Based on the arguments Texas and Connecticut made at the August 13, 2025 hearing and assuming they will be re-raised here, particularly those of Mark Bankston, it is expected the false argument will be made to this Court that in a hearing on February 5, 2025, the Bankruptcy Judge declared the Order void. At the very best, this is a false "half-truth."

First, the fact that the September Order has not been voided is established because the very order the Texas and Connecticut Plaintiffs asked Judge Gamble to sign [Appendix C, proposed order p. 3] -- and the one she did sign [Appendix A] -- specifically recites the September Order as having continued viability.  The relevant

11

006257

portion of her Order is quoted verbatim *supra*.  Any question of the continued viability of the September Order should end there.  But there is more.

By way of brief background, after the Bankruptcy Trustee's repeated disobedience of the Bankruptcy Court's order to sell FSS assets, an exasperated Bankruptcy Court did state in February 2025 that he was rescinding the September Order. While the Bankruptcy Court's exasperation with the Texas and Connecticut parties was well justified, after it was pointed out to the Bankruptcy Court that a perfected appeal removed his jurisdiction to alter, expand or vacate an order while on appeal,[6] the Bankruptcy Court quickly corrected course and acknowledged that based on the pending appeal by the Texas Plaintiffs, it lacked jurisdiction to void the Supplemental Order, the Bankruptcy Court stating:

> THE COURT…I should back up and mention that the supplemental order was appealed by the Texas families. I think that matter is still pending.
>
> MR. JORDAN: It is, Judge.
>
> THE COURT: I lose jurisdiction over that immediately.

Dec. Broocks, Appendix L, p: 8, l: 15 – 19.  And this lack of authority was again repeated several times by the Bankruptcy Court at a June 5, 2025 hearing where the Bankruptcy Court stated:

---

[6] *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379 (1985) ("In general, filing of a notice of appeal confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal."); *Sherman v. SEC (In re Sherman),* 491 F.3d 948, 967 (9th Cir. 2007); *Robertson v. Ranger Ins. Co.*, 689 S.W.2d (Tex. 1985).

12

THE COURT "... That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right? Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that."

\*\*\*\*\*

"... so I haven't revoked anything. I didn't have authority to do it anyway..."

Dec. Broocks, Appendix M, p: 40, l: 5 – 11 & 23-24.

As a last point on this, while it is a certainty that all FSS assets are part of the Jones Bankruptcy estate and thus protected by the automatic stay, the law is crystal clear that certainty of ownership is not required; the automatic stay applies if a bankruptcy estate has even an arguable interest.  In *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 300 (5th Cir. 2005) the Fifth Circuit clearly so held, stating:

"Here, we face the question whether the creditor violates the stay if, without permission of the bankruptcy court, he forecloses on an asset to which the debtor has only an arguable claim of right (hereafter, 'arguable property'). We answer in the affirmative, reverse the district court, affirm the judgment of the bankruptcy court, and remand to that court for further proceedings."

And this holding has been re-affirmed.  *See Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 251 (5th Cir. 2006) *(citing Brown v. Chesnut* ("...this Court has recognized the automatic stay's broad application and noted that such breadth reflects a congressional intent that courts will presume protection of property when faced with uncertainty or ambiguity.")

## III.   THE TURNOVER IS VOID AS IT WAS ISSUED FOR 15 STRANGERS TO THIS LAWSUIT

13

006259

A turnover order may only be issued against a judgment debtor **in that case** and in favor of a judgment creditor **in that case**. Clearly, a turnover order cannot be used to levy on property in the possession of strangers to that judgment. *Parks v. Parker*, 957 S.W.2d 666, 668 (Tex. App.—Austin 1997, no pet.). Similarly, a judgment creditor from a different matter is no less a stranger to the underlying judgment in a different case and thus has no standing to utilize the turnover machinery for his benefit in collecting a second, unrelated judgment. And "agreement" of the actual creditor cannot overcome these barriers set by the constitution, statutes, and/or case law, even if satisfactory evidence of such "agreement" were adduced which it has not been here.

### A. THE CONNECTICUT PARTIES ARE STRANGERS TO THE TEXAS CASE WITH NO STANDING

This lawsuit – the Texas lawsuit – was initiated by two plaintiffs, Neil Heslin and his former spouse, Scarlett Lewis. After entry of a liability-default judgment,[7] in the later damages-only trial, Heslin was awarded $110,000.00 for his defamation compensatory damages based on claims he was defamed (a) by a reporter on one of Jones's shows (Owen Shroyer) who, in light of statements made by the official

---

[7] The liability default judgment was requested and entered in spite of the fact it violated a host of US Supreme Court mandates that plaintiffs - Heslin and Lewis -- must plead and prove specific statements made were false, in the context in which they were made and that they were published when the speaker knew they were false. *See e.g., Phila. Newspapers v. Hepps,* 475 U.S. 767, 775-76 (1986). And the plaintiffs were required to prove knowledge of falsity by clear and convincing evidence. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342 (1974).

14

coroner, on June 26, 2017 disputed the accuracy of Heslin's claims to have held his son's body and personally observed a bullet hole in his son's head and[8] (b) by Jones who allegedly echoed Shroyer's claims even though Jones actually said the opposite, Jones stating:

> "...NBC needs to clarify because the coroner said none of the parents were allowed to touch the kids or see the kids and maybe they mean[t] at the school, **I'm sure later maybe the parents saw their children**. The point is, is that because the media lies so much, you can't blame the public asking question and you can't ban free speech of people that are asking questions…" (emphasis added) [Dec. Broocks, Appendix O]

Heslin was also awarded $4,200,000 in defamation punitive damages. Scarlett Lewis did not sue for defamation.

Heslin and Lewis both asserted claims for intentional infliction of emotional distress ("IIED"), referencing in their petition nine broadcasts alleged to have indiscriminately inflicted such distress, two of which were the June and July broadcasts that were the basis of Heslin's defamation claim [Dec. Broocks, Appendix N]:[9]

---

[8] Heslin's own petition contained a URL, still live, to the coroners statements as reported in Connecticut media, where the coroner's statements, as reported were corroborated. Dec. Broocks, Appendix N.

[9] In listing the broadcasts that were the basis of their IIED claims, Heslin and Lewis included two Heslin had claimed to be defamatory, thus violating this Court's precedent that an IIED claim based on the same conduct as a defamation claim is not permitted. *Warner Bros. Entm't, Inc. v. Jones,* 538 S.W.3d 781, 814–15 (Tex. App.—Austin 2017), aff'd, 611 S.W.3d 1 (Tex. 2020).

006261



For these IIED claims, Heslin and Lewis were each awarded $2,000,000 in compensatory damages and $20,500,000 in punitive damages for a total final judgment award of $49,310,000. Dec. Broocks, **Appendix P**. Judge Gamble entered her final judgment for the Texas Plaintiffs in the Texas Case on January 12, 2023[10] and lost plenary power on or around March 28, 2023.

In an unrelated suit in Connecticut, Jones and his FSS, were sued by the fifteen Connecticut Plaintiffs, one of whom was an FBI agent and others were sisters, parents or spouses of some of the Sandy Hook victims. As in Texas, the Connecticut trial court entered a default judgment as to liability, judicially decreeing Jones to have knowingly made false and defamatory statements with the Connecticut

---

[10] After post-trial motions Jones/FSS appealed to this Court where oral argument occurred on May 28, 2025.

006262

Plaintiffs being judicially spared of having to prove anything but damages. In the ensuing damages only trial, the fifteen Connecticut Plaintiffs were awarded roughly $1,400,000,000.00 in compensatory and punitive damages, which was later reduced by $150,000,000.00.[11]

## B. JUDGE GAMBLE LOST PLENARY POWER TO DO ANYTHING BUT ENFORCE HER TEXAS JUDGMENT

A turnover order may only be issued in favor of a judgment creditor in that case against a judgment debtor in that case. A turnover order cannot be used to levy on property in the possession of strangers to that judgment. *Parks v. Parker*, 957 S.W.2d 666, 668 (Tex. App.—Austin 1997, no pet.). A judgment creditor from a different matter is no less a stranger to the underlying judgment and thus has no standing to utilize the turnover machinery associated with collecting one judgment for his benefit in collecting a second judgment. Indeed, this Court has held that the Turnover Statute should

> "...not be applied by Texas courts to non-judgment debtors, and ... being merely a "procedural device," it may not be used to determine the "substantive rights" of judgment debtors—not to mention non-judgment debtors—when

---

[11] The Connecticut Court of Appeals refused to consider arguments involving the US Constitution, stating those issues had not been adequately briefed by Jones's separate counsel there, not the undersigned. *Lafferty v. Jones*, 327 A.3d 941, 961-62, n. 26 (Conn. App. 2024). And the Connecticut Supreme Court refused to review the case even though they could have under-established Connecticut precedent allowing the Connecticut Supreme Court to review cases involving unbriefed Constitutional arguments. *Gleason v. Smolinski*, 319 Conn. 394, 396, 125 A.3d 920, 927 (2015); *State v. Golding*, 213 Conn. 233, 239-40, 567 A.2d 823 (1989); *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). U.S. Supreme Court Justice Sotomayor has granted the request of Jones and FSS to extend their time for filing a petition for cert review by the US Supreme Court.

006263

there is a dispute over ownership of assets that are the subject of collection efforts."

*WC 4th v. Colo. Third St., LLC*, No. 03-22-00781-CV, 2024 Tex. App. LEXIS 5923, at *13-14 (Tex. App.—Austin Aug. 15, 2024, pet. denied). Even more so it cannot be used by nonjudgment creditors who had nothing to do with the underlying judgment.

The fifteen Connecticut strangers to the Texas action intervened in Heslin/Lewis's Texas action[12] asserting they have reached an agreement to share proceeds of their respective judgments. Dec. Broocks, Appendix C. While it is believed they have done so to by-pass the normal Central Docket rules of Travis County and improperly insert themselves before Judge Gamble, the "agreement" of the actual creditor in the original case cannot overcome these barriers set by the constitution, statutes, and/or case law, even if satisfactory evidence of such "agreement" were adduced -- which it has not been here -- as jurisdiction cannot be conferred by agreement.[13]

After plenary power expired, the only power Judge Gamble retained was the power to enforce her orders and judgments for Heslin and Lewis. And even then,

---

[12] A motion to strike that intervention has been filed but not yet heard.

[13] As further evidence of this, Heslin/Lewis along with the fifteen parties from Connecticut filed their motion for turnover and the parties were advised that they were assigned to Judge Lyttle and it so appeared on the Central Docket postings. Moments before the hearing a paralegal somehow found out that the hearing had been switched to Judge Gamble. Defendants have no idea how that transfer from one court to Judge Gamble occurred, but intend to find out. Appendix Q.

18

her ability to do so cannot be inconsistent with the original judgment for Heslin/Lewis and must not constitute a material change in substantially-adjudicated portions of the judgment. *Donalson v. City of Canton*, 2025 Tex. App. LEXIS 6101, at *8 (Tex. App.—Tyler Aug. 13, 2025, no pet. h.).   As the Court in *Donalson* explained:

> "Upon the expiration of the trial court's plenary power, the trial court permanently loses jurisdiction substantially to modify the final judgment, and any judicial action taken after a trial court's plenary power has expired is void."

*Id*. at 9 (*citing Cook v. Stallcup*, 170 S.W.3d 916, 920 (Tex. App.—Dallas 2005, no pet.).  That has been improperly done here.

Although the recently-rendered *Donalson* case (decided in August 2025), is technically an improper intervention case (discussed in the next section, *infra*) its teachings are relevant here.  There, the City of Canton (City) sued Donalson over violations of the Health and Safety Code. Donalson claimed he had no ownership in the property and was dropped from the suit and new defendants were inserted who settled with the City, that judgment becoming final on July 5, 2020.  On December 31, 2024, Donalson intervened in the case claiming he had later purchased some interest from a foreclosing lender.  The City argued Donalson lacked standing -- and thus the trial court lacked jurisdiction -- because he had no legal interest in the property. Of initial relevance, the Tyler Court of Appeals held that an intervening party -- here the 15 Connecticut strangers -- have "... the burden to demonstrate a

19

justiciable interest in the suit." *Donalson* at \*5.  The Tyler court noted that when the trial court lost plenary power it, it "permanently lost jurisdiction" and the trial court lacked jurisdiction to "take any action inconsistent with its final judgment..." *Donalson* at \*9.   Hence any action other than strictly enforcing its judgment -- such as allowing an intervention as here --   is void: "...any judicial action taken after a trial court's plenary power has expired is void."  *Donalson* at \*8.

The Tyler Court went further, however, and stated that to the extent Donalson was trying to enforce the existing judgment, he still had to demonstrate by evidence that he had taken an actual assignment of an interest of an interest in the case.  *Id* at 9 ("To the extent Donalson's plea in intervention sought enforcement of the judgment, Donalson still was required to plead that he had a justiciable interest in the cause.").  Here the 15 Connecticut parties claim to have reached some agreement with the Texas plaintiffs [Dec. Broocks, Appendix C] but the record is devoid of any evidence other than a conclusory, self-serving statement.[14]

## IV.    THE CONNECTICUT PLAINTIFFS HAVE NO STANDING TO BRING THEIR CONNECTICUT JUDGMENT TO JUDGE GAMBLE

As courts have held on a number of occasions, a turnover order is a procedural device that empowers a trial court to assist a judgment creditor in reaching a

---

[14] Even were the claims of the fifteen Connecticut plaintiffs being asserted solely as assignees of interests from the Texas Plaintiffs, issuance of a turnover order on that basis would be void as the Texas judgment has been the deposit of cash in lieu of a bond, which precludes collection of any portion of the Order on any assets of FSS.  See TEX. R. APP. P. 24.1(f). [Dec. Broocks, Appendix E].

20

judgment debtor's property that under traditional remedies was beyond a creditor's reach. *Kennedy v. Hudnall*, 249 S.W.3d 520, 524 (Tex. App.—Texarkana 2008, no pet.). As the Supreme Court has instructed that turnover proceedings are "....limited to their purely procedural nature, and thus, bars use of the turnover statute to determined parties' and non-judgment debtors' substantive rights." *Alexander Dubose Jefferson & Townsend LLP v. Chevron Phillips Chem. Co., L.P.*, 540 S.W.3d 577, 583 (Tex. 2018) *Alexander*, 540 S.W.3d 577 at 583 (Tex. 2018). The Supreme Court went on to find that "[i]f trial courts are in fact precluded from ruling upon the substantive rights of parties to the judgment sought to be enforced, it defies logic to hold the same court is empowered to determine the rights of complete strangers to the underlying judgment it is enforcing in that very proceeding. *Id*. In distinguishing substantive versus non-substantive claims, and also this Court's decision in *Breazeale v. Casteel*, 4 S.W.3d 434 (Tex. App.—Austin 1999, pet. denied), the Supreme Court stated:

> "Although some opinions view intervention as a proper method for a third party to protect its rights in a turnover proceeding, none go as far as holding that intervention enables a court to adjudicate third-party rights in what is otherwise a purely procedural device…And the turnover statute has no provision conferring authority on trial courts to decide the substantive rights of the parties properly before it in a turnover proceeding, let alone the rights of strangers to the underlying judgment."

*Id*. at 585. In the Texas Case here, the Connecticut Plaintiffs had no justiciable interest in the Texas Judgment. They are clearly strangers to the Texas Judgment by

21

any definition, yet they have been permitted free rein to plunder the assets of FSS despite clear prohibitions against doing so.

**V.     AS FSS ASSETS HAVE BEEN CONVEYED TO THE BANKRUPTCY TRUSTEE, FSS HAS NO ASSETS; THIS FAILURE TO LIST ASSETS IS FATAL TO THE ORDER AS OWNERSHIP OF SOME NAMED ASSETS IS REQUIRED**.

Under the turnover statute, a judgment creditor may seek turnover relief against a judgment debtor if the judgment debtor owns property that is not exempt from attachment, execution, or seizure for the satisfaction of liabilities. TEX. CIV. PRAC. & REM. CODE § 31.002(a). While the trial court is not required to identify the specific property subject to turnover in the order, there must be some evidence that the judgment debtor has nonexempt property. *See Gillet v. ZUPT, LLC*, 523 S.W.3d 749, 754 (Tex. App.—Houston [14th Dist.] 2017, no pet.).  The record that will be presented to this Court will demonstrate that no evidence was admitted by the trial court in entering the Turnover Application, and none showing FSS actually owned any assets.

Section 31.002(a) specifies that a judgment creditor may receive aid from a court under its provisions "if" the judgment debtor owns property that is nonexempt and that could not readily be attached or levied on by ordinary legal process. TEX. CIV. PRAC. & REM. CODE § 31.002(a). Conversely then, a judgment creditor may not receive aid from the court under the provisions of section 31.002 if the judgment debtor does not own property that is nonexempt and that could not readily be

22

attached or levied on by ordinary legal process. *Id*. The relief allowed by section 31.002(b), therefore, may be granted only when the conditions in section 31.002(a) exist.

The language of subsection (h), which permits a trial court to enter or to enforce an order requiring turnover without identifying the specific property subject to turnover in the order, does not eliminate the fundamental, preliminary requirement of subsection (a). *Tanner v. McCarthy*, 274 S.W.3d 311, 322 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Section 31.002 does not specify, or restrict, the manner in which evidence may be received in order for a trial court to determine whether the conditions of section 31.002(a) exist, nor does it require that such evidence be in any particular form, that it be at any particular level of specificity, or that it reach any particular quantum before the court may grant aid under section 31.002. However, a trial court must nonetheless determine that the request for aid pending before the court falls within the scope of section 31.002 before it enters an order granting relief under that section. *Tanner*, 274 S.W.3d at 322. *See also Gillet*, 523 S.W.3d at 754.

In this instance, not only was no evidence admitted whereby this Court could review the sufficiency of the record in the Turnover Application but the Turnover Application itself does not attach any evidence that the judgment debtor has non-exempt property, as all has been conveyed to the Estate of Alex Jones. This is

23

demonstrative of itself that the trial court abused its discretion in entering the turnover application.

## REQUEST FOR RELIEF

Free Speech Systems, LLC respectfully requests that this Court enter a Temporary Order, staying the enforcement of the Turnover Order and all collection and judgment enforcement activities undertaken in connection therewith, until this Court rules on FSS's motion on the merits of the Turnover Order. FSS further requests all other relief to which it may be entitled.

006270

Respectfully Submitted,

*/s/ Ben C Broocks*
Ben C Broocks
State Bar No. 03058800
William A. Broocks
State Bar No. 24107577
**BROOCKS LAW FIRM, PLLC**
248 Addie Roy Rd, Suite B301
Austin, Texas 78746
(512) 201-2002 - Telephone
(512) 201-2034 - Fax
bbroocks@broockslawfirm.com
wbroocks@broockslawfirm.com

Alan B. Daughtry
State Bar No: 00793583
alan@alandaughtrylaw.com
3355 West Alabama, Suite 444
Houston, Texas 77098
Telephone:   (281) 300-5202
Facsimile:   (281) 404-4478

Shelby A. Jordan
State Bar No. 11016700
Antonio Ortiz
State Bar No. 24074839
**JORDAN & ORTIZ, P.C.**
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com
aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com

**ATTORNEYS FOR APPELLANT**

25

006271

## CERTIFICATION OF APPENDIX MATERIALS

I certify, as counsel for Appellant, that I have reviewed the factual statements contained in this Emergency Motion for Immediate Stay of Void Turnover Order Issued In Violation of the Bankruptcy Automatic Stay and have concluded that every factual statement in the Motion is true and correct and is supported by competent evidence included in the Appendix or Record. I further certify that the materials attached hereto as appendices are true and correct copies of what they purport to be, and that a Clerk's Record containing these materials has been requested in this matter.

*/s/ Ben C Broocks*
Ben C Broocks

## CERTIFICATE OF CONFERENCE AND COMPLIANCE WITH EXPEDITED NOTICE REQUIREMENTS

I certify that, prior to filing this motion, I contacted counsel for Appellees, to inquire whether Appellees are opposed to the relief sought in this motion. Appellees' counsel did not indicate whether they were opposed to the relief sought; accordingly, the Court should consider Appellees opposed. I further certify that, on the August 27, 2025, I notified Appellees' counsel that a motion for temporary relief was being filed.

*/s/ Ben C Broocks*
Ben C Broocks

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of August, 2025, a true and correct copy of the foregoing was served upon the following counsel of record in accordance with the Texas Rules of Appellate Procedure.

Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
Benjamin D. Evans
State Bar No. 24081285
bevans@cstrial.com
**CAIN & SKARNULIS, PLLC**

26

006272

303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

Mark D. Bankston
State Bar No. 24071066
mark@fbtrial.com
**KASTER LYNCH FARRAR & BALL LLP**
1117 Herkimer
Houston, Texas 77008
713-221-8300
713-221-8301—Facsimile

**ATTORNEYS FOR APPELLEES**

William R. "Trip" Nix
State Bar No. 24092902
tnix@krcl.com
**KANE RUSSELL COLEMAN & LOGAN, PC**
401 Congress Ave., Suite 2100
Austin, Texas 78701
512-487-6650

**ATTORNEY FOR GREGORY S. MILLIGAN**


*/s/ Ben C Broocks*
Ben C Broocks

27

006273

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

In re:

**ALEXANDER E. JONES**,
Debtor.

Case No. 22-33553 (CML)

Chapter 7

# EXHIBIT 3

006274

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO.  03-25-00617-CV

### Free Speech Systems, LLC, Appellant

v.

### Neil Heslin, Scarlett Lewis, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, Robert Parker, and Erica Ash, Appellees

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-001835, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

## O R D E R

**PER CURIAM**

Appellant Free Speech Systems, LLC appealed from the trial court's August 13, 2025 Order Granting Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Free Speech Systems, LLC (Turnover Order).  Appellant has filed Appellant's Emergency Motion for Immediate Stay of Void Turnover Order Issued in Violation of the Bankruptcy Automatic Stay (Motion).

Appellees may file a response to the Motion on or before September 15, 2025. We temporarily stay the Turnover Order until further order of this Court pending our review of the Motion and any response.

It is ORDERED August 28, 2025.

Before Chief Justice Byrne, Justices Kelly and Ellis

006275

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

In re:

**ALEXANDER E. JONES**,
Debtor.

Case No. 22-33553 (CML)

Chapter 7

# EXHIBIT 4

006276

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043 (CML)** |
| | § | |
| **Debtor.** | § | |
| | § | |
| | § | |

**ORDER SUPPLEMENTING ORDER DISMISSING CASE**
**[Related to Docket No. 956]**

1. Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

2. The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

**Signed: _____, 2024.**

Signed: September 25, 2024

_____

**HONORABLE CHRISTOPHER M. LOPEZ**
**UNITED STATES BANKRUPTCY JUDGE**

Christopher Lopez
United States Bankruptcy Judge

15564076

006277

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

In re:

**ALEXANDER E. JONES**,
Debtor.

Case No. 22-33553 (CML)

Chapter 7

# EXHIBIT 5

006278

                        UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF TEXAS
                          HOUSTON DIVISION

ALEXANDER E. JONES AND        )  CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF     )
UNSECURED CREDITORS,          )  Houston, Texas
                              )
         Debtors.             )  Wednesday, February 5, 2025
                              )
                              )  9:00 AM to 9:26 AM
-----------------------------)


                              HEARING

           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones:   SHELBY JORDAN
                          ANTONIO ORTIZ
                          Jordan & Ortiz, PC
                          500 N. Shoreline Blvd.
                          Corpus Christi, TX 78401

                          BEN BROOCKS
                          WILLIAM BROOCKS
                          Broocks Law Firm PLLC
                          6207 Bee Cave Road, Suite 120
                          Austin, TX 78746

For Chapter 7 Trustee:    JOSHUA WOLFSHOHL
                          KENESHA STARLING
                          JORDAN STEVENS
                          Porter Hedges LLP
                          1000 Main Street
                          Houston, TX 77002

                          CHRISTOPHER R. MURRAY
                          ERIN JONES
                          Jones Murray LLP
                          602 Sawyer Street
                          Houston, TX 77007

006279

For Connecticut       KYLE KIMPLER
Families:             PAUL PATERSON
                      Paul Weiss Rifkind Wharton &
                      Garrison LLP
                      1285 Avenue of the Americas
                      New York, NY 10019

                      RYAN CHAPPLE
                      Cain & Skarnulis PLLC
                      303 Colorado Street
                      Austin, TX 78701

For Texas Plaintiffs:  AVI MOSHENBERG
                       Lawson & Moshenberg PLLC
                       801 Travis Street
                       Houston, TX 77002

                       JARROD MARTIN
                       Chamberlain Hrdlicka White Williams
                       & Aughtry, P.C.
                       1200 Smith Street, Suite 1400
                       Houston, TX 77002

                       JENNIFER HARDY
                       Willkie Farr Gallagher LLP
                       600 Travis Street, Suite 2310
                       Houston, TX 77002

Court Reporter:        UNKNOWN

Courtroom Deputy:      UNKNOWN

Transcribed by:        Veritext Legal Solutions
                       330 Old Country Road, Suite 300
                       Mineola, NY 11501
                       Tel: 800-727-6396


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

006280

HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 5, 2025; 9:00 AM

(Call to Order)

THE COURT: -- 9:00 a.m. case, Alex Jones. Why don't I take appearances in the courtroom and then we'll get started.

MR. WOLFSHOHL: Good morning, Your Honor. Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens from Porter Hedges, for the Trustee. And Mr. Murray is here as well --

THE COURT: Okay. Good morning.

MR. WOLFSHOHL: -- as well as co-counsel --

MS. JONES: (indiscernible)

MR. WOLFSHOHL: -- Erin Jones.

THE COURT: Good morning.

MR. JORDAN: Your Honor, Shelby Jordan and Antonio Ortiz, co-counsel, along with Mr. Ben Broocks and Mr. William Broocks, here in the courtroom today.

THE COURT: Good morning.

MR. JORDAN: And that's -- I'm sorry -- co-counsel for Mr. Jones.

THE COURT: Yes, thank you.

MR. KIMPLER: Good morning, Your Honor. Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families. I'm joined by my partner, Mr. Paterson, and on the screen, Mr. Ryan Chapple.

THE COURT: Good morning. Oh, I should turn my

006281

camera on.  I apologize.

MR. MOSHENBERG:  Good morning, Judge.  Avi Moshenberg, here on behalf of the Texas Plaintiffs.  Also with me is Jarrod Martin and Jennifer Hardy, Your Honor.

THE COURT:  Good morning.  Anyone else wish to make an appearance?  Okay.  Here on the 9019 settlement, and I know that there are some related motions that we should talk about.

MR. JORDAN:  Your Honor, if I might?

THE COURT:  Sure.

MR. JORDAN:  Shelby Jordan.  We have made -- we being the Alex Jones team of lawyers, two firms and lawyers that have been very, very busy -- we've made every effort we possibly could to get a grasp on what has turned out to be a very, very complex matter that could, if we are not careful, be a case dispositive motion.  We could walk out today and have nothing to show for the values of the appeal or for other matters that --

THE COURT:  Let me -- let me stop.  I've studied this 9019 over the past several days very carefully.  I know we had a status conference and I knew that there were some discovery-related issues.

The Free Speech case originally started as a Subchapter IV -- was originally a lawyer and CRO.  I find professionals -- I thought there was a conflict between

those professionals and the Jones estate, so I didn't approve them.  Then came in another set of lawyers and another CRO.  The two cases, the Jones case, the Free Speech case, proceeded on a track, side-by-side track basis.

We held the hearings on the non-dischargeability claims in the Jones case.  Non-dischargeability claims were put in abeyance in the Free Speech case because the Fifth Circuit had agreed to take up the issue.  The Fifth Circuit ruled.  They got it exactly right.  It's exactly what I would have ruled.  But theirs is more important.  So we were left with the summary judgment in the Jones case.  Never really took it up in Free Speech.

There were a couple of other adversary proceedings, some related Texas parties who never had their day in front of me.  Parties, Texas families, a group of them, and Connecticut families were in mediation with other parties.  I know the Jones folks were there.  I know Free Speech was there a while, about a year.  Nothing came of it.  There was a 9019.  But then it was contingent upon approval of a plan that never happened for the 90 -- that went away.  But I was prepared to approve that.

The case had been going on for about two years.  Then they went to mediation again before another judge in another district.  That was unsuccessful.  Mediation sometimes work; they don't.  My point is that people have

been trying to consensually resolve these issues for two years, and it didn't happen.  And the Free Speech case could have either converted or been dismissed.  But it couldn't hang out in Chapter 11 because there was no way it was going to be able to confirm a plan.

And to say that they stretched -- and I allowed it to happen -- stretched the limits of Subchapter V and what it was intended to do is an understatement in terms of timing; not in terms of ruling, but in terms of timing to get a plan on.  But people were mediating.  And I thought it made sense that if people were going to try to reach a deal, if you were going to put together a plan and this all worked out, then I didn't want to put my thumb on the scale.  So, ultimately, I made a decision to dismiss the Free Speech case.

We were left with the Jones case.  But I retained -- I told Murray he could keep -- Mr. Murray, the Chapter 7 Trustee appointed then in the Jones case, because the Jones case converted as well -- keep the cash from Free Speech in the bank accounts, and kept two adversary proceedings, one involving PQPR, another one involving Elevated Solutions Group.  No professionals started coming to me.  I don't know if it's true or not, but anyway.

But Texas families were able to try to collect on their judgment against Free Speech.  They had rights given

006284

by a Texas court, I think even going after some of the Free Speech professionals who were working to preserve the estate.

When it came time to potentially sell assets, Mr. Murray and his counsel told me that they think that the real way to maximize value is to sell stuff, and not just the equity.  They wanted the opportunity to go do this, and they thought they could do this by an auction.

They had, over an objection of the United States Trustee, told me just let them sell the equity.  I entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets.  That's what that order was intended to do.  The supplemental dismissal order was just to make sure, because that was the request.

We had the auction process.  I won't recount what happened, but I didn't approve the proposed sale.  I had a – – I think the evidence is clear -- a backup bidder at the beginning.  We didn't even know what the winning bid was.  I had an auctioneer who got on the stand and didn't even know what he was going to get paid, or under what terms he was going to get paid.

I had a winning bid that was clearly based on a contingency.  There was a sliding scale in the agreement. The proposed order submitted originally had the very language showing it was a contingency.  And the Trustee was

006285

telling me that it wasn't a contingency. That was his understanding.

So I was asked to approve a sale that had a contingency clearly in it, but was told to act like there wasn't a contingency, upon a sale price that no one really could articulate, because depending on how you took it as a contingency or not a contingency. And we couldn't figure out exactly what the auctioneer was even going to get paid, because I don't even think he knew.

I then denied that auction. We were here until, what, 10:30 that night? So I didn't want -- and then I asked -- this case has been going on, I said -- I gave some (indiscernible) speech, told them it's been going on for like three years, and let's just get this back on track, get back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families. I think that matter is still pending.

MR. JORDAN: It is, Judge.

THE COURT: I lose jurisdiction over that immediately.

MR. JORDAN: It's still -- it is still pending.

THE COURT: But I think the appeal was something like, Judge, you can't do that, was the basis of the appeal. I don't have authority to go vest the property of the estate.

006286

So the sale didn't happen, and I said, I don't want any more contingencies.  If there's going to be a sale of assets, then cash will be king.  But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

I also said the sale price was low.  Turns out there's been an offer made since that day, which almost doubles the amount that was -- increased the offer by a week.  A week, like it was there.  That's fine.  Then if things get -- I told folks, if you want to sell it, cash will be king.  Get back to doing just -- you want to sell the equity?  Sell the equity, but cash will be king.

I took up the motion for reconsideration filed by the Connecticut families.  I know that the Jones side has a motion for reconsideration pending that will run its own course.  But as things sit today, as I see them -- I could be wrong -- no, I'm not wrong on this, and maybe just slightly off on the numbers -- but I know that the Connecticut court has -- in Appellate Connecticut court, a second level of revision has taken some of the (indiscernible) amounts.  And now that's subject to further appeal, and parties will appeal.

I haven't denied anyone any ability to pursue. Jones was able to hire his own lawyers.  Connecticut family

006287

was able to pursue those judgments.  My non-dischargeability order in the Jones case kind of has a mechanism saying, this is what I found based on summary judgment, based on the collateral estoppel of the findings made in the Connecticut court.  The Connecticut court ultimately finds that X is the number, will then kind of compare it to what I did, and there's a kind of an adjustment so that I'm not allowing any more than a Connecticut court would have allowed.

Same thing for Texas.  I think there was a portion that I didn't approve for Texas, I know, and for Connecticut as well, that I didn't find -- I didn't think there were basis for collateral estoppel findings, and appellate courts will review what I did, and that's the way the process works.  I've got no issues with that.

So that's where things stand.  I don't know, around a billion dollars for Connecticut right now, subject to further appeal, non-dischargeable.  Around $50 million for Texas, subject to further appeals.  The numbers could stay the same, numbers could be zero, numbers could go up. I don't know.  It's all subject to state court appeals now.

But FSS, that estate is closed.  That case is closed.  That case is closed.  Which means that someone has a contract dispute with FSS.  You don't come to me.  You have whatever rights you have outside the bankruptcy.  The bankruptcy doesn't affect your claims one way or the other.

006288

There were several individuals who had a case. They were suing Jones in Texas state courts. They can continue their trials in state courts. There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have.

I already said, multiple years to try to reach a settlement, and they didn't. And I'm not saying anybody should have settled. I don't get into why people settle and don't settle. Not my purview. I'm there to evaluate settlements and determine whether they're in the best interest of the estate. That's my job.

So, kind of where we are. Several years of negotiating, no settlement, no plan. FSS gets dismissed. Failed auction. Now there's a 9019. The 9019 now wants me to allow claims against FSS. And I don't -- and I can't do that. And all bankruptcy lawyers know that I can't do that. Because there's no estate. There's no bankruptcy estate to allow a claim against. People can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me.

So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech.  And now the Texas families are saying that the matter that they very much appealed, they're now embracing.  The supplemental order is now embraced.

The Trustee who asked me for a specific order for a specific purpose is now using that order.  But it was only for one purpose, to see if he could sell the assets.  To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it.  Ha Nguyen was here.  The U.S. Trustee was sitting right there telling me.

So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed.  I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

And here we are again.  Before we would pit the families against each other, where Connecticut and Texas would disagree on whether the form of relief being requested was appropriate.  Happened during the auction too, where Texas said, I don't understand what we're doing here and I don't understand how this is going to work.

So, now I'm told we're all aligned and you just -- Lopez, just have to allow a claim against an entity in a case that's been dismissed.  I can't do that.  I cannot do that.  I don't have authority to do it.  And I'm not going

006290

to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone. I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore. Pure sale of the equity.

We're going to -- I've got to -- this case keeps taking twists and turns and trying to come up with really masterful and creative lawyering. But at its core, it's something I can't approve. Would come -- you know...

And so, I know... I read the revised settlement. Read the revised order. Bankruptcy lawyers know I can't do this unless we get really, really, really creative. And I think on a case like this, we've got -- with multiple appeal, any party, regardless of what I do, people have their rights.

So, before everyone gets started, let me just tell you, I can't do this. I'm going to again turn to Mr. Moshenberg and tell him, you'd better -- I need you to tell me what you want to do on your -- this non-dischargeability action.

I know that there's a pending motion in the other one. I've now approved the two matters in which there's 9019s and the two settlement matters. Money's going to go out the door. You don't have to tell me now. I want you to file something and tell me exactly what you all are going to

do.

MR. MOSHENBERG:  Understood, Your Honor.

THE COURT:  And just play it down the line, in other words.  People have rights and I'm not telling you to put you on the spot or anything, I just know.

Mr. Murray, if you want to sell the equity, go sell the equity.  This case -- people have rights and they've been...  If you want to go pursue claims against Jones in state court against Free Speech, I don't -- I dismissed the case and I know what comes along with that.  Those arguments were made to me and I know what they are.

No, you don't have to say anything.  I know what the rights are.  And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  I don't trust the process.  I would have to do it -- me, myself -- and I'm not overseeing it.

So kind of get comfortable with the process so that we don't kind of do the same thing.  We've already did it really long and complicated and brought in auctioneers and had lots and -- enough has been -- and I think what this Debtor needs and what these families need is finality of the bankruptcy process so that they can pursue whatever it is that they want in judgments in state court, which is where they started in the 1st place; Connecticut, Texas, for the

most part.  I know that there's some other litigation pending out there.

I just -- I don't have the ability to allow a claim against an entity.  And in a case that has been dismissed in which I literally gave specific authori- -- you keep the cash; we're going to keep these two adversaries.  I'm going to settle these.  I'm going to keep jurisdiction over these two things and this one.  And I'm not going to do it for anything else.

I can't use the supplemental order to then go -- for a purpose in which it was never intended.  And I get to construe my own orders and I retain jurisdiction over them.  This case will be highly simplified.  And I know Mr. Wolfshohl said he's been listening to these transcripts carefully.  I made it super simple for you this time.

There will be -- I don't know.  Someone has a case, bring it.  There have been multiple years of investigations.  No lawsuits have been (indiscernible) in front of me.  Maybe one is coming.  I don't know.  If it does, we'll take it up and I'll rule.

I'm not sure anybody's ever been happy about -- completely set in my rulings.  I'm not sure Mr. Jones has been entirely happy to know that I found on summary judgment that he's liable for over a billion dollars in non-dischargeable debt and over $49 million dollars.  I'm sure

he -- appealing -- he is appealing.  And that's his right.

So, I'm sure the Connecticut and the Texas family -- I'm sure the Connecticut families weren't too happy about my decision about the auction.  Sure Global Tetrahedron wasn't too happy about it.  But I'm really trying to do what I think is my duty and my job upon careful analysis of the law.

And so I'm not approving.  I cannot on its face.  You don't have to put on any evidence.  I can't approve this sale.  I can't allow $480 million dollars.  And I don't want folks to put it up.  And we don't need to take up TROs and Connecticut and Texas.

Texas, you have whatever rights you have.  Connecticut, you have whatever rights you have against Free Speech, case against Jones.  If you want to have another -- if you want to settle with the Trustee on Jones related matters, do it.  Tee it up.  We'll take it up.  But these things are inextricably linked and multiple appeals going on.  Well, I don't know if they're still going on.  They probably will on the non-dischargeability front, by the way.  You have whatever rights you have on the supplemental order.

MAN 1:  Judge, if I could comment --

THE COURT:  Won't be used again.  No, no, no.  I don't need you to comment on anything.  I don't -- because it's going to open the door.  I just wish everyone a good

day.  Thank you.

CLERK:  All rise.

(Whereupon these proceedings were concluded at 9:26 AM)

INDEX


RULINGS

|                                  | Page | Line |
|----------------------------------|------|------|
| Motion to Approve Sale, Denied   | 16   | 8    |

INDEX

006296

CERTIFICATION

I certify that the foregoing is a correct transcript from

the electronic sound recording of the proceedings in the

above-entitled matter.

matter..

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  February 6, 2025

006297

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

In re:

**ALEXANDER E. JONES**,
Debtor.

Case No. 22-33553 (CML)

Chapter 7

# EXHIBIT 6

006298

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

March 19, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 22-33553 |
| ALEXANDER E. JONES, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | CHAPTER 7 |

**ORDER DENYING FUAC'S MOTION SEEKING LEAVE TO FILE A MOTION
APPROVING THE SALE OF FSS ASSETS AND REQUEST FOR STATUS CONFERENCE**
**(RE: ECF NO. 1089)**

This Court said at a hearing on February 6, 2025 that it would not allow a sale of FSS assets, and that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed. The Court won't require the Chapter 7 Trustee to conduct another auction for the FSS assets. FUAC also does not have standing to seek a sale of FSS assets under Section 363 of the Bankruptcy Code. The motion is denied.

Signed on March 19, 2025

Christopher Lopez
United States Bankruptcy Judge

006299

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Case No. 22-33553 (CML) |
| **ALEXANDER E. JONES**, Debtor. | Chapter 7 |

# EXHIBIT 7

006300

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES,              )  CASE NO: 22-33553
                                 )
                                 )  Corpus Christi, Texas
                                 )
         Debtor.                 )  Thursday, June 5, 2025
                                 )
                                 )  1:00 p.m. to 2:32 p.m.
------------------------------)


                         HEARING

     BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
           UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:                 BEN C. BROOCKS
                            Broocks Law Firm PLLC
                            6207 Bee Cave Road, Suite 120
                            Austin, TX 78746

                            SHELBY JORDAN
                            Jordan & Ortiz, PC
                            500 North Shoreline Blvd.,
                            Suite 804
                            Corpus Christi, TX 78401

For Chrsitopher R.          ERIN ELIZABETH JONES
Murray:                     Jones Murray LLP
                            602 Sawyer, Suite 400
                            Houston, TX 7007

                            JOSHUA WOLFSHOHL
                            Porter Hedges LLP
                            1000 Main, 36th Floor
                            Houston, TX 77002

For First United           WALTER J. CICACK
American Companies, LLC:    Hawash Cicack & Gaston LLP
                            711 W. Alabama Street, Suite 200
                            Houston, TX 77006

006301

For Veronique          AVI MOSHENBERG
De La Rosa:            Lawson & Moshenberg PLLC
                      801 Travis Street, Suite 2101, #838
                      Houston, TX 77002

For William            KYLE KIMPLER
Aldenberg:            Paul, Weiss
                      1285 Avenue of the Americas
                      New York, NY 10019


For the U.S. Trustee:  HA MINH NGUYEN
                      Office of the United States Trustee
                      515 Rusk Street, Suite 3516
                      Houston, TX 77002

Court Reporter:        YESENIA LILA

Courtroom Deputy:      YESENIA LILA

Transcribed by:        Veritext Legal Solutions
                      330 Old Country Road, Suite 300
                      Mineola, NY 11501
                      Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

006302

CORPUS CHRISTI, TEXAS; THURSDAY, JUNE 5, 2025; 1:00 PM

(Call to Order)

CLERK:  All rise.

THE COURT:  Please be seated.  Good afternoon.  This is Judge Lopez.  Today is June 5th.  I'm going to call the 1 p.m. status conference in the Jones case.  I'll be calling, just so we have a clean record, 22-33553, 23-03035, 23-03037, 24-03279 or some combination of one or more of those cases.

I will take appearances in the courtroom, and then if anyone wishes to make an appearance on the phone, please hit five star and I will unmute your line.

MR. JORDAN:  Good morning, Your Honor, afternoon, I guess.

THE COURT:  Good afternoon.

MS. JORDAN:  Shelby Jordan, Ben Broocks, and Antonio Ortiz for Alex Jones and FSS.

THE COURT:  Okay.  Good afternoon.

MR. JORDAN:  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.  Mr. Murray is also here in the courtroom.  And I think my colleagues will announce themselves on the phone.

THE COURT:  Okay.  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack on behalf of First United American Companies.

THE COURT:  Good afternoon.

MR. MOSHENBURG:  Good afternoon, Your Honor.  Avi Moshenberg, on behalf of the Texas plaintiffs.  Also remotely is Jarrod Martin attending.

THE COURT:  Okay.  Good afternoon.

MS. NGUYEN:  Good afternoon, Ha Nguyen for the US Trustee.

THE COURT:  Good afternoon.  Okay.  Let me turn on the line.  Here's a -- I'm just going to go in the order in which I see them, a 713-226 number.

MR. WOLFSHOHL:  Good afternoon, Your Honor, Joshua Wolfshohl for the trustee.

THE COURT:  Okay.  Good afternoon.  And a 212 number.

MR. KIMPLER:  Good afternoon, Your Honor.  It's Kyle Kimpler from Paul Weiss on behalf of the Connecticut families.  On the line with me today is my cocounsel Ryan Chapple.

THE COURT:  Okay.  Good afternoon.  Anyone else wish to make an appearance, please hit five star, and I will unmute your line.

Okay.  The purpose for today was a status conference on where we are and where we're headed, just try to get some more information in the middle of 2025.  I'll turn things over to trustee's counsel.  Ms. Jones, you can just proceed however you see fit.

MS. JONES:  All right, thank you.  I'll proceed with

an update in the main Chapter 7 case, the 22-33553.

THE COURT:  Okay.  If you can just get the mic a little closer to you, I just want to make sure we can all hear you.

MS. JONES:  Yes, I'll get a little bit closer.  We have right now one pending contested motion and that is the motion filed by the debtor, Mr. Jones, asking this Court to reconsider whether to hold an auction of FSS assets in this case.  There were two reply, two responses filed, one jointly by the Sandy Hook families and one response by the trustee and reply filed by the Debtor.  So that's the one currently pending contested letter that is before Your Honor.

There is likely going to be another contested matter, but the time hasn't, it's not ripe yet.  There's a pending motion to stay these bankruptcy proceedings pending appeal.

THE COURT:  Is that Mr. Nguyen's?

MS. JONES:  Yes.

THE COURT:  I'm going to rule on that today.

MS. JONES:  Oh, okay.  Well then that's not ripe, but we, the trustee would have opposed it, but -- a complete stay, of course, of the proceedings, but I just wanted to flag that as something that could come up.

But as far as uncontested, there are, there are some pending fee applications of Chapter 11 professionals that are

006305

-- have not been objected to and are ready for --

THE COURT:  Do you have the ECF numbers for them?

MS. JONES:  I do.  And so there's -- I'll give you the application -- okay.  So the application for Teneo Capital, which was financial advisor to the Committee, was filed at Docket 707.  And I've just uploaded revised proposed orders. I'm only missing one, and theirs was just filed at, I believe it's Docket, I have to see it really quick, 1160, I believe.

THE COURT:  Oh, I did see this.  So I see Teneo, BlackBriar, and --

MS. JONES:  Kennerly.

THE COURT:  -- Kennerly.

MS. JONES:  Yes. And I've tied those to the ECFs there.  So BlackBriar Advisor's app is at 743, and then the revised proposed order has just been uploaded.  Rachel Kennerly's application is at 745 and the proposed order's just been uploaded.  And then Crowe and Dunlevy is, the application is at 746 and I just haven't had time to upload the order yet. I'm waiting.  They've agreed to the form of the order.  I just, I added their signature and I always wait for people to respond and tell me I can do that.

THE COURT:  Is there any difference between --

MS. JONES:  There is.

THE COURT:  Okay.  I'll just wait on it.

THE COURT:  But those proposed orders just

generally. And then Mr. Jordan also uploaded a revised proposed order for his application.

THE COURT: Proposed final, right?

MS. JONES: I'm sorry?

THE COURT: I saw it. It's a revised proposed final, is that right, Ms. Jones.

MS. JONES: Yes, these are all final fee applications for the Chapter 11 professionals. His app was at Docket 747.

THE COURT: Oh, it's through the 11. I was going to say, Jordan, you can't go anywhere.

MS. JONES: And the only issue -- there were no objections substantively to the applications. The issue was that there was not an authority to pay provision for the trustee, which we really need for him to be able to make the disbursement.

THE COURT: Oh.

MS. JONES: And so we added language with the specific remaining unpaid portion. So it specifically references the amount. And everybody has signed off on the form of the order. I just need one more person to let me know that I can add their signature, and then I'll have that uploaded. So those are ready to go if Your Honor wants to sign those or if you need a hearing, they're --

THE COURT: Let me do something just so I'm procedurally in the right posture. There is currently a

request for me to stay.  The entire case is pending an appeal. And I want to -- why don't I take that up right now?  I thought rather than we're just having a status conference today, but I thought there was an active request and then also a request for a direct certification of an appeal to the Third Circuit. So I kind of wrote something out very shortly just to make sure that I addressed that.  And I can take that certainly without a hearing.  It was a request before me, so.  And it relates to ECF Numbers 1144 and 1153, Robert Wyn Young has requested that I grant certification for a direct appeal to the Fifth Circuit at ECF 1144.  And he's appealing my order denying his motion to intervene in this case.  And I signed that order at ECF Number 1129.

Bankruptcy Rule 8006(f) allows the Court to certify a direct appeal to the Court upon request by a party, 28 U.S.C. 158(d)(2)(B).  You can see why I wrote this out.  I wanted to make sure I got these right.

A bankruptcy court must certify direct appeal to the Court of Appeals in two instances.  One is where the request for certification is made by a majority of the appellants or a majority of the appellees.  Here, only the, only the appellant has made a request for direct certification.  Trustee has indicated they would oppose that, but I only had one request anyway.  And I now have verbal confirmation that there's not a majority here.  So that wouldn't apply.  So, and

therefore, that subsection doesn't apply.

The second instance is where the judgment order or decree involves a question of law as to which there's no controlling decision of the Court of Appeals for the Circuit, or the Supreme Court of the United States, or involves a matter of public importance.

Two, the judgment order or decree involves a question of law requiring resolution of conflicting decisions.

Three, an immediate appeal from the judgment order or decree may materially advance the progress of the case or proceeding in which the appeal is taken and if the Court of Appeals authorizes the direct appeal of the judgment order or decree, that is 28 U.S.C. 158(d)(2)(A)(i) through (iii).

157(d)(2)(B)(ii) mandates that if any of the four conditions are met, I make the certification, but none of them apply here. It would involve a permissive motion to intervene in both the text and Bankruptcy Rule 2018. And the law in this district is clear that intervention is permissive.

And so I rely on the cases that I cited in the order denying, but I would cite in, for example, in In Re CIS Capital Management, 604 B.R. 484, 513, Northern District of Texas 2019 case. So Subsection 1 doesn't support certification. Subsection 2 also doesn't support certification. There's no conflicting decisions for the standards. And finally, an immediate appeal would not advance the progress of this case,

006309

which has been pending since 2022.

There have been multiple adversary proceedings. I would note Mr. Jones has been ably represented at every stage in this case by really smart lawyers who have made arguments on his behalf. He's been adequately represented and I wouldn't stray from any word that I put in that order. I think allowing intervention would impede the progress of this case, quite frankly, it would have shut down, potentially shut down this hearing. So I don't think Subsection 3 supports certification, because neither instance requires the Court to grant certification here.

I'm going to decline to grant certification for direct appeal to the Fifth Circuit. I believe the matter is already set for an appeal before a district court, I believe Judge -- so there is no, I'm not setting this up for a direct appeal.

MS. JONES:  I think it's been assigned to Judge Rosenthal.

THE COURT:  That's what I understood. So, and they don't come any smarter --

MS. JONES:  That's correct.

THE COURT:  -- than Judge Rosenthal.

MS. JONES:  I agree 100 percent.

THE COURT:  So and I just, again, I'm relying on the text here.  Textualism is always, in my opinion, the right

answer.

Permissive intervention:  After hearing and on such notice as the Court directs and for cause shown, the Court may permit an interested entity to intervene generally or with respect to a specified matter, right?  It's permissive by statute.

So, I'm going to deny the direct appeal to the Fifth Circuit.  The statute is clear.  The cases interpreting the statute are clear.  There's no, there's no conflict, no conflict in law here.  So, I'm going to deny that, but I did note in the order that I've read everything that was submitted as well.  So it's not like I turned a blind eye to anything that came my way.  I read it.

So, Mr. Young has also moved to stay all proceedings in this case pending an appeal under Bankruptcy Rule 8007.  While the decision to grant a stay pending appeals is within the Court's discretion, the Fifth Circuit in cases like In Re First South Savings Association, 820 F.2d. 700, 709, Fifth Circuit, 1987 case provided factors for the Court to consider, right, whether the movant has made a showing of likelihood of success on the merits.  I strongly disagree with that for the reasons stated there in the order itself.

Whether the movant has made a showing of irreparable injury if the stay is not granted.  No, there's been no showing of irreparable injury.

006311

Whether the granting of a stay would substantially harm the other parties. The answer is no. I think quite frankly it would be harming the trustee's ability to function throughout this case and quite frankly, Mr. Jones' ability to proceed as a Chapter 7 debtor.

And for whether the granting of the stay would serve the public interest. I don't, have no -- nothing showing the public interest, and I've read all the papers. Quite frankly, I think the public interest is better served for a case that's been pending for three years to continue to move and not come to a screeching halt because the party, three years later, seeks to intervene in a case to provide evidence that the Court has reviewed and other matters.

And again, I rely on the order itself. It speaks for itself. So I've carefully reviewed all the filings, including the attached exhibits and the legal arguments that Mr. Young makes.

I'm going to decline to grant the stay pending appeal. So I'm going to deny both, and I'll enter short orders denying them for the reasons that I have stated on the record. So I can now -- I just feel more comfortable that I didn't take something up on the front end, agree to sign, for example, orders, and then consider a stay. I think there was an emergency request for a stay. I'm going to deny those. So I'll take a look at these orders and sign them on the docket.

006312

MS. JONES:  Thank you, Your Honor.  And I expect one more this afternoon.  I'm just waiting for it.

THE COURT:  Got it.  Just let me know and Ms. Saldana know better.

MS. JONES:  I will.  And then there are two --

THE COURT:  Let me ask you.  With respect to the uncontested matter, I don't need to know what it is.  Do you have a sense of timing as to when something may get filed or not filed?  I won't hold you to it.  I'm just trying to get a sense of you said --

MS. JONES:  Uncontested.

THE COURT:  Oh, not uncontested matter.  You said there could be one more contested matter that may or may not be coming.

MS. JONES:  Yeah, excuse me for interrupting.  We intended to oppose the motion for the stay pending appeal of the proceedings.

THE COURT:  Oh.

MS. JONES:  And so I didn't want to jump the gun. I wanted to let you know that we anticipated another contested matter on the horizon --

THE COURT:  Oh, that's what you were talking about.

MS. JONES:  -- because we would have opposed the --

THE COURT:  So now that I've ruled on that, I've got the reconsideration of the order and I'll speak to that today.

006313

What else is there from your perspective in the main case?

MS. JONES: In the main case, the trustee continues to administer some non-exempt assets. There's some, there's some real property, and some, just some personal properties and watches, some details that we're still working through, just getting those sold. So we're continuing to work on that.

There have not been any offers, or any actual offers, really any discussion about anyone purchasing the equity of FSS has kind of died down entirely. We don't have any at this point. And so we're just continuing to administer the non-exempt assets that we can and trying to move all of that forward to get those to a point of sale. With respect to the --

THE COURT: What's the status of pursuing the real property? I'm less concerned about you selling a watch. I'm more concerned about real big-ticket items.

MS. JONES: Sure, there's, an auctioneer has been approved by this Court to list that property and to sell it

THE COURT: Oh, okay.

W1: And I believe they've been out. They've looked at the property and they're taking steps to get it listed or to set a time for when --

THE COURT: When do you think the process could, I don't want to hold you to it, just trying to get a sense of if he's going to list property, I'd rather him list it within

006314

the next 30 days and just see what's out there.

MS. JONES:  I can --

THE COURT:  There's a, there's a theme that I'll be pushing which is there's a lot of legal expenses that are getting incurred in connection with this case.  And I'm not saying people aren't doing the work because a lot of this, it's a big -- a lot of complexities here.  But the longer this goes, the more people are going to have to spend time, and I want to, I think keeping things progressing at a, not at a rapid pace, but at a steady pace where there's constant movement is in the best interest of all parties because there's stuff pending in front of me.  There are matters pending in other state courts.  I'm assuming that's continuing in Texas and in Connecticut.

And there's a lot of moving pieces, and I'd rather to the extent there's non-exempt assets, that's, you know, I'm not telling you what to do, but you will exercise your business judgment as to what you intend to sell or not sell, but, you know, come September, October, if something is planning on being sold in terms of an asset, I'd like it at least on the market, if that makes sense.

MR. BROOCKS:  That's entirely doable.

THE COURT:  Okay.

MS. JONES:  And I don't know if you'd like to address timing or if you --

THE COURT: Yeah, just get close to the microphone so we can hear you.

MR. BROOCKS: Yeah, I think by the third quarter we'll have everything either teed up with a motion to sell. It'll certainly be listed by then. It hasn't been yet because in the case of the real estate, it's a residential home and it has a tenant, so we're negotiating the exit of that individual.

THE COURT: I got it.

MR. BROOCKS: And --

THE COURT: Okay.

MR. BROOCKS: But I think by the end of the year, we should be closed with all of those.

THE COURT: Okay. Thank you.

MS. JONES: But with respect to our, with the approval of the settlements in the, in the adversaries that were pending in the FSS, under the FSS umbrella, the PQPR and the (Indiscernible) adversary, with those settlements and then Your Honor's decision regarding admin -- not doing a sale of the assets, the FSS assets in the --this Chapter 7 case, you know, we've pared our focus down to, you know, the essential things we need to do to get this case moving forward and closer to being done.

THE COURT: So assuming those assets are teed up and some coming up, I don't -- I hate hypotheticals, but let's

006316

just assume there's a buyer, willing buyer for estate assets, what -- after that, what's left, putting aside the adversaries?

MS. JONES:  There is some litigation, a couple of matters we do expect to file those by next week.  And I think those are pretty straightforward, but just a couple of litigation matters that need to be dealt with.

THE COURT:  The adversaries or?

MS. JONES:  Yes.

THE COURT:  Okay.  Once they're -- obviously nothing is, nothing is final until you file it, but once, assuming you file it, let my case manager know I want to set up a status conference whenever, as soon as it makes sense to do so.  I don't want it to fall through the cracks.  That's where I'm going.

MS. JONES:  And depending on --  as well, depending on the steps that the families take, if any, whatever they decide to do in state court, you know, we may be back here with motions to really to give instructions about what the Court wants us to do.  And so we may have some motions related to any enforcement efforts that are made in the state court just to ensure that the trustee has clear authority and instruction to move forward.  He's not going to do anything without the Court giving authority to do it.

THE COURT:  Okay.  I intentionally like don't read what's happening in other cases of, you know, like something

shows up on the news. I don't click on it to read the news or I'd rather just deal with the information that's given to me in front in the Court here and people make arguments. So I honestly have no idea what's happening in the, in the Connecticut or the, or what the current status is in the Connecticut or the Texas matter. So me having status conferences like this is really where I try to get the real information.

MS. JONES: And I would just defer to Mr. Moshenburg or, and Mr. Kimpler to update you if you'd like to hear from them about the status of their cases. But with respect to what the trustee needs to do, this is, this is where we are. And then with respect to the FSS case, we're essentially, either all those adversaries are either settled, dismissed, or closed. So I think that case, for the most part, it's done. I don't expect anything else in that case, at this point.

THE COURT: Okay. Thank you. Mr. Moshenburg, you're in the courtroom, and then I'll turn to Mr. Kimpler. From the Texas family's perspective, I'll let you, where do things stand, both main case or adversary? Just walk me through it, just specifically so I know which one you're talking about.

MR. MOSHENBURG: 100 percent, Your Honor. Let me start with the state court cases. Right now, we appreciate the Court's remand order with the turnover action back in

state court.  We've been working very hard behind the scenes with the Connecticut families to explore our state court options for state court remedies.

In terms of the merits of the underlying state court litigation, there was just an oral argument in front of the Austin Court of Appeals last week, Your Honor, on the Heslin Lewis judgment, Your Honor.  My co-counsel was leading the state court fight.  Your Honor is also getting ready to prepare a status conference on the Pozner, De La Rosa case.  A lot of the case, there's some pending discovery issues that are going to get resolved.  But also, that case is going to be influenced naturally by what happens in Heslin Lewis, and so there's a little bit of a pace to kind of be aware of whatever guidance comes from the appellate courts about what -- how to proceed in those cases and so that's affecting the timeline of the Pozner De La Rosa case, Your Honor.

THE COURT:  If it is oral argument, if I'm asking you to speculate, don't.  But do you have a sense of when the -- you may hear back from the appellate court, the state appellate court?

MR. MOSHENBURG:  I don't, Your Honor.  I've done a lot of state court of appeals; sometimes it's short, sometimes it's very long.  I just don't know, Your Honor.

THE COURT:  Okay.  And what was, what was argued was the kind of the appeal of the judgment rendered by the state

006319

court --

MR. MOSHENBURG:  That's exactly right, Your Honor. I didn't mean to talk over you --

THE COURT:  No, no.  Go ahead.

MR. MOSHENBURG:  At the oral argument, the appellate court seemed to focus on two things.  One was the default judgment, and then also the cap busting of the punitive damages cap.  Hard to glean if that's where the opinion is going to be going, but that's where the two areas that court wanted to focus on.

THE COURT:  No, that's just fine.  I just didn't get a sense of timing.  If -- and I would ask anyone if there is something that is written, entered by the court, can someone just file it?  No spin on the first page, just notice of filing of state court really and just file it so that there's public knowledge, at least on my end in terms of what the state court did -- in the, you can file it in the main docket in the main case, just so it just helps me.

MR. MOSHENBURG:  100 percent, Your Honor, we'll do that.  And that really goes to the adversaries as well.  Let me turn to that on the dischargeability action, Your Honor. We've been working procedurally.  We were in the -- previously we talked about filing a motion to reconsider.  In doing that, what we realized is there's other evidence that we want to attach and the Court, when it denied our summary judgment

006320

motion on the punitive damages in particular, there were things that the Court spotted that there wasn't enough in the record to find that we had met our burden on summary judgment.

So then we've dug back, found some transcripts, found some other briefing that sort of highlights the issue on the summary judgment. So we'll be moving for an additional summary judgment, but the idea will be that the court, the trial court found that Jones had intentionally acted. And so when the court denied the summary judgment --

THE COURT: But shouldn't we wait then if something is already briefed for the state appellate court, won't the -- in other words, do I need to wait to see what the state appellate court does before? In other words, I'll make something up. If the court affirms the punitive judgment, right, that's one thing. If the state, if the appellate court rules against you, your clients on the appellate, then what I don't want you doing is moving for summary judgment on something that could potentially be a thumbs up or a thumb down by the appellate court.

Maybe it makes sense to wait on that. I'll hear from Mr. Jordan or Mr. Broocks on kind of not getting ahead of one or the other, but I don't want to rule when there's something that's already on appeal. I think that the state court needs to take the lead on its own judgment if there were arguments raised there and then I can then -- because

essentially, I'm taking up summary judgment based upon what they're arguing so.

MR. MOSHENBURG: Right. Judge, I think that's a great idea. We fully --

THE COURT: I don't know if it's a great one, but it's an idea. Someone will let me know if it's a -- if it makes sense or not, but I'll wait for others to think about it.

MR. MOSHENBURG: Sure. And just from the Texas family's perspective, Your Honor, I want to make sure the Court understands we have worked out our differences with Connecticut. We've reached a settlement on going forward. And from, and from our vantage point -- and I think Mr. Kimpler will talk more about it -- getting finality on the dischargeability decision of the Connecticut summary judgment that the Court granted, I think that will be helpful for Connecticut and for Texas, Your Honor. So in terms of priorities and what is teed up for the Court to move forward on, I'll let Mr. Kempler elaborate. But I think getting a, getting to a final judgment on the Connecticut dischargeability action makes the most sense in terms of spending judicial resources.

THE COURT: And so, but I don't want -- well, Let me hear from others. What I don't want is for us to be sitting here having this conversation in 2027.

MR. MOSHENBURG:  I agree, Your Honor, and I think the fastest path to that is through the Connecticut Avenue to avoid that.

THE COURT:  Okay.  Thank you.

MR. MOSHENBURG:  Thank you, Your Honor.

THE COURT:  Mr. Kimpler, I'll hear, if you have anything you wish to add, I'll certainly hear from you.  If not, I will turn it over to Mr. Jordan, Mr. Broocks, and others.

MR. KIMPLER:  Thank you, Your Honor.  I have a couple of points, but it should be pretty quick.  Let me first just give you two factual updates.

First of all, for what's going on in the Connecticut appeal, I think you know, because we filed it in December, but in December, the appellate court affirmed 1.3 billion of the judgment and overturned 150 million of the judgment.  I think that was before you when we were last --

THE COURT:  I saw that.

MR. KIMPLER:  Mr. Jones then sought review from the Connecticut Supreme Court, which is the highest court in Connecticut.  The Connecticut Supreme Court denied that review.  It's discretionary, so you have to make a cert petition.  The Connecticut Supreme Court denied that review on April 8th.  So as of April 8th, as a matter of Connecticut law, the judgments were final and enforceable.  Prior to that,

006323

Connecticut law was that judgments were stayed pending appeal.

Mr. Jones then filed in Connecticut a motion to stay enforceability of the Connecticut judgment while he pursues an appeal to the United States Supreme Court. That was denied by the Connecticut court on May 13th.

So where we are right now is that all appellate processes in the state of Connecticut are over. The judgment and an aggregate amount of 1.3 billion is enforceable. And I believe Mr. Jones has another, I think he had 90 days from the prior. So I think he has another month or so to file a petition for cert review from the U.S. Supreme Court. We expect that he will do that. And so that will be the last portion of the appellate process for Connecticut.

THE COURT: Okay. And in terms of the just -- and this may sound repetitive -- but just from your, from your perspective, where do things you think sit with respect to the adversary proceeding that is pending before me?

MR. KIMPLER: Yeah, so, just one other update which Mr. Moshenburg already said. We have reached a settlement agreement with the Texas plaintiffs, and so there are no more open disputes between us.

There are two adversary proceedings, Your Honor, that the Connecticut plaintiffs are party to. The first one is the non-dischargeability proceeding that is Case Number 23-03037. Your Honor, just to recall there, there are three

006324

parts of our judgment. There was the $965 million of compensatory damages. You ruled that those were non-dischargeable. Those judgments have been affirmed on appeal.

There was the $150 million of Connecticut unfair trade practice tax claims. You had ruled those were non-dischargeable, but the Connecticut appeal had reversed that claim. So that claim no longer exists.

And then there was the $323 million of common law punitive damages, which were affirmed on appeal, but you did not issue summary judgment on it. So where we are at in that adversary proceeding now is there are $965 million of compensatory damages that have been held by you to be nondischargeable and been affirmed on appeal. And then there is $323 million of punitive damages, common law, affirmed on appeal but not non-dischargeable, and we have filed a motion for reconsideration that was denied.

I think, given where we are at, my clients are prepared to abandon that claim. At least as to the non-dischargeability, and that would enable us to enter a final order that would resolve the non-dischargeability action before you and would allow Mr. Jones presumably to take an appeal of that as a final order up to the district court.

I want to be very clear, we're not waiving the claim in the bankruptcy, but the argument that that portion of the claim is non-dischargeable. We are, if it suits the Court,

006325

prepared to abandon that just to streamline the litigation and allow it to go up for review at the district court level.

THE COURT: Oh, Mr. Kimpler, I don't want to tell you what your client should -- what I am going to ask is that one way or the other that, you know, within the next 30, 45 days, I kind of get a decision as to whether we're proceeding with respect to the 323 or if you file something, then I'll know that you, you're going to not proceed with respect to the 323 with respect to the non-dischargeability, but obviously maintain the claim portion of it.

MR. KIMPLER: Yeah.

THE COURT: And the 955 that you say was affirmed on appeal, that's by the Connecticut courts, right? Just to make sure that I'm clear.

MR. KIMPLER: Correct. So to be, to be clear, there, Mr. Jones has one last shot at the U.S. Supreme Court.

THE COURT: Okay. Okay. Thank you.

MR. KIMPLER: The other adversary proceeding that we're a party to, Your Honor, is Wheeler v. Jones. That is Case Number 24-03279. That is what we call the enforcement action, and let me just give you the background because I don't think we've actually ever had a status conference or hearing before you on it. So let me explain what it is and why it's before you.

That was last August. We moved to domesticate our

judgments in Texas under the Uniform Judgment Enforcement Act. And so we filed a complaint in state court that basically seeks recognition of a foreign judgment, the Connecticut judgment. There was a 30-day objection period on that complaint. Nothing was filed in October, but Mr. Jones removed that action. We think he removed it in an untimely basis. We also think it procedurally is not an action that can be removed. It's really a procedural, you know, case, but he removed it. He also filed counterclaims in that action, which, you know, are various types of attacks on the Connecticut judgment and some other claims. That action was then removed to the Western District of Texas, and then it was transferred to you.

So I think it probably showed up on your docket, sometime mid to late January. On that docket, there is a fully briefed motion for remand back to the state court. There is also a fully briefed motion to dismiss on the counterclaims.

In our view, all of this can be pretty easily decided on the papers. We would urge Your Honor, although we know you have an exceedingly busy docket, to rule on those when you are able, whether you want to first rule on the motion to dismiss and then the remand, or you want to remand and leave the motion to dismiss to the state court, assuming that, you know, you did decide to remand.

It is obviously your prerogative, Your Honor. You

006327

know, from our perspective, these are pretty procedural issues as far as the timeliness and the appropriateness of the remand and the counterclaim.

I have exhausted everything I know about that action because it has been handled by Mr. Chapple.  So if you have any other questions, I would, I would call for a lifeline.

THE COURT:  No, no, this was very helpful.  I remember Judge Pittman said something to me in about January, mid-January, January 16th or January 17th, and we hadn't taken it up and I didn't want to do anything without talking to the parties to understand kind of where all the pieces fit before -- and heard from everybody before I decided to kind of take it, take the issues up on the, on the merits one way or the other so .

MR. KIMPLER:  The last thing I would offer, Your Honor, is, you know, we have heard you that some collection activity should be proceeding in state court.  We are trying to do that.  We're trying to work with the Texas plaintiffs on that front, obviously, having domesticated judgments in state court is important to that effort.

THE COURT:  Thank you.  Great.  Yeah, I guess I don't know, Mr. Chapple, if you can give me a thumbs up or thumbs down or hit five star if there's anything else you wish to add before I turn to a 512 number.

MR. CHAPPLE:  That's correct, Your Honor.

THE COURT:  Okay.

MR. CHAPPLE:  Can you hear me now?

THE COURT:  Just fine.  Anything, is there anything to add?  I'm just giving you the opportunity.

MR. CHAPPLE:  No, Your Honor.  I appreciate the opportunity.  I think Mr. Kimpler did a thorough job of explaining the situation and our perspective on both the motion to remand and the motion to dismiss the counterclaim.

THE COURT:  Thank you.  Okay.  Mr. Jordan, Mr. Broocks, anything you wish to say?  Good afternoon.

MR. JORDAN:  And sorry for all the shuffling, but there's a, there's kind of a number of things that are going on.  And there's some moving targets that we, on the way from Austin to here today, found out about.  So I want to be able to sort of better organize.  I don't want to come across too confusing, but I guess I start with --

THE COURT:  Take as much time as you need.

MR. JORDAN:  -- with I guess the most interesting thing that I think the Court should be aware of simply because this has been leaving these matters on the docket.  If you recall, the Texas plaintiffs asked for over a year's worth of extensions while the Chapter 11 was going on.  And of course, we would assume that they were in good faith and Ms. Driver was in good faith granting extensions over and over again.  So we lost a year when we discovered that there was nobody that

was going to support the plan through the Texas plaintiffs.

So the briefing started last Tuesday, Tuesday week. The arguments were held at the Court of Appeals, and you ask about what do you think they're going to rule.  Something happened at those arguments.  Now I've done most of my appellate work in the federal system, but I've done quite a bit in the state court and something happened that never happened before that I think the Court needs to know about because it affects the adversary that's pending and it affects the answer that we all have to give to you and guessing.  I don't think the Court of Appeals is going to take a long time in ruling, and I, and I don't because -- if I may --

THE COURT::  Mm hmm.

MR. JORDAN:  I mean.  And to Mr. -- the responses and information Mr. Moshenburg gave you, he didn't attend the argument, so I don't think he probably -- but I don't know if he knows about the position that the plaintiffs took, but I had it blown up because we didn't have  time to get the cameras and stuff, I mean the audio.  But I'd like to -- for the Court to read what Mr. Bankston told the Court of Appeals, and I've got a copy of that here.  It can help to, help for you to see it, whatever.

Mr. Bankston told the Court of Appeals when he concluded his arguments --

THE COURT:  Mr. Bankston represents the plaintiffs,

006330

the Texas plaintiffs, is that correct?

MR. JORDAN: Yes.

THE COURT: Okay.

MAN 1: (Indiscernible)

THE COURT: No, no, no, just want to make sure there's a, there's a reference to Mr. Bankston  He represents the Texas plaintiffs if I remember.  Okay.

MR. JORDAN: And so, here's what he told the court when he concluded his arguments, which he was, he was, I'll just say this, it was peppered a whole lot about how you're going to keep these punitive damages with this elder abuse that was not submitted to the jury and it was all not pled and pled afterwards.  But those are all questions which they, which they had a lot to say about and there's been a lot written about what the people think the court's going to do.

But more important was this, Mr. Bankston told the court when he finished his arguments, he said, "So I, so what, with that said, Your Honor, again, I return to this idea that I would love to be here before you on a case that matters. And the reason I say this is I'm certain you probably are aware at this point, there are over a billion dollars of non-dischargeable debt against Jones approved by the Connecticut Supreme Court, by my plaintiff, excuse me, by my plaintiffs that are all collecting together with 19 other family members." I'm going to stop there for one second because I couldn't, I

couldn't figure out why, what his plaintiffs were doing arguing about the billion dollar award, but it made it clear because now we know that there is some agreement that is between the Texas plaintiffs and the, and the Connecticut plaintiffs that has something to do with, no matter what happens in this case, and so let me finish just reading this.  "And now we have an appellant, of course, that's Mr. Jones and FSS, who's trying to remove $50 million for what purpose when there's already over a billion dollars in dischargeable debt that's coming in part to my plaintiffs, right?"  Now, I'll stop there for just a second.  I think he's referencing to the deal he made.

They cut a deal where apparently if you were to find everything was dischargeable, they're still going to claim we've carved out from the plaintiff's non-dischargeable portion that claim, and we're going to assert it.  I think that's what it is, but let me, let me finish and then maybe the Court can analyze it itself.  "What is, what is accomplished by this appeal?  The result of this Court's decision, I hate to say, is pretty worthless in terms of what's going to happen to the parties."  And then, Your Honor, this, this second page, I don't, I think that's all we've got.  I've got a -- he introduced in the beginning of the argument, he introduced, he's going to tell them why what they were doing was worthless, and that's what he did.  So that's okay.  I'm not willing to do that.  And, and so I want to point that out

to you to in this respect.  I've never seen a litigant tell the panel in an appellate proceeding that what they're doing is meaningless.  There's no effect to it.  It's nothing because we made another deal with somebody else and no matter what you do.  Now, I was not surprised that they took that position because the panel was pretty direct on how this case was tried and how in the world you were able to get elder abuse after the jury had left and you replead it and the Court gave it to you and all that stuff.  The appellate court was very focused on what was going on here.  And so I think what -- and I, and I want to say this because I think what Mr. Bankston accomplished was probably a very speedy opinion, that's my best guess.  The Courts had no response.  They had no emotion, they had no response.  They were very active during the arguments, but with that comment, they simply excused the parties and got up and left.

So I, so to answer the question as best as an appellate lawyer as I can and Mr. Broocks did the argument so he may have something to spin to put on it, but I don't think we're going to be waiting a long time.  The dilemma I see is, is that -- my concern is that I think Mr. Bankston has made a deal and critically a deal that would -- because I think he contemplated it before he made these remarks to this panel. I mean no lawyer would say that to a panel unless he knew what was going to happen and the panel had made it pretty clear in

the arguments.  But I want to emphasize to you and I have a, we're supposed to have another blow up, but I know that, I know this is not trial on the merits of anything, but I, but I want to be able to sort of encapsulate to the Court what's happening here and what's happening in circumstances we don't know about and that's going to lead me to ask you for some, some relief in connection with the motions that you just want to status conference on today.

I'm not going to argue the motions, of course, or the merits of the motions, but I do want to let the Court understand why I'm asking for some of this relief.

But here's an email.  It was written by Paul Weiss, Leslie Lieberman, November 16th, 2024, at 1:16 p.m. addressed to Jarrod Martin, Josh Wolfshohl, Chris Murray, Avi Moshenburg and others.  And they were working on a deal.  And this was produced in the, in the discovery that we had with Mr. Murray.

And here's what they, here's what they say in the email that I, that I think is very critical for the Court to allow me to emphasize.  The email's text says "We attach an updated term sheet.  We have increased the settlement amount to three million."  That is the settlement between Texas and Connecticut to cut some deal.  "In our view, this represents a significant premium over the Texas family, over what the Texas families are entitled to on a pro rata basis, a premium that we are only willing to pay for assurances that the FSS

assets will not be sold to Jones' family and friends given that it is clear that Jones will use the assets to continue harming our client." Whatever, whatever that means.

But we do know because we have other emails, again, not to develop any of the facts without having the witnesses to proof up these. What we do know is that there has been a continual -- and you've seen it in two, in two series of transactions in auctions. They were, they were trying to conduct an auction only if they had these arrangements in these particular problems made.

And so what has occurred, what we believe has occurred is something that is completely contrary to bankruptcy policy of what a creditor is entitled to obtain and do in a bankruptcy proceeding. And we've made those arguments in the, in the motion for the auction. Very briefly, we simply say that -- we go through a number of pages of the evidence that we have and the things that we've discovered in the last six months that the government, the DOJ, the plaintiffs' foundations, Paul Weiss and other players had been doing in connection with these Jones claims.

So our argument is couched in terms of what has happened is the, excuse me, your Chapter 11 case was never prosecuted in Chapter 11 by the two dominant creditors. They had their controversy. One was -- and I would, I would use this example. They were identical twins. One was Texas and

006335

one was Connecticut.  No difference.  No, I mean they were the, the events were the same, the people that came to the events were the same, the people that committed the events were the same, the conversations about the events were the same.  Everything was identical.  One of them got 2 percent recovery, and one of them got almost 3 percent, and one of them got 97 percent recovery.  And of course, that skews everything from the standpoint of how can that happen and what can you do about that?

We know that there are things that, remedies that can be done.  And we know that the Texas plaintiffs know what they are.  And so we assume that that is what's been pushing these negotiations from before November all the way through the last time you heard and saw a written effort.  And that was the 9019 settlement in which they were saying, you know, we're going to give you 25 percent and you're going to get $4 million.  It had gone from the email of 3 million to 4 million.  All those things are transpiring without us having any idea of the background of the trustee's involvement.  We've now discovered the trustee was very involved in the, in the decision making and in the implementation of all the process.

What it has done for us though is it, it has finally coalesced the process that is going on here and that is that the dominant creditor who doesn't want money -- now, by the way, the motion that we filed I footnoted to the YouTubes and

to the, to the public statements and I think you heard some of the Onion statements where they don't want the assets so they can make money because their dilemma is this. Where they, for instance, to go to an auction that had an $8 million purchase price and they won by $8 million and one.

They normally would have then a balance sheet that says, I just, I just put out $8 million but I got assets worth $8 million. So the balance sheet doesn't change and that's where you, that's where you make your auction decisions. But that's not what's at play here.

What the play is here is that look, we can't pay much money because we're going to destroy the assets. The reason we want the assets -- and they say that -- the reason we want the assets is so Alex Jones cannot use them. We want to destroy his brand. Onion said that in the, in the newspaper. We want to destroy the brand and parody it so that we can further our gun control political position and other stuff.

So what has happened to us in this case is the dominant creditor, which has been represented by Paul Weiss, the dominant Connecticut creditor doesn't want money. What they want to do is destroy Alex Jones, and they have -- and as the Courts, I know the Court's aware that they didn't utilize the first proposed mediator. They did then eventually agree to a mediation and zero happened. So this is not a case

006337

in which they have ever made an effort to deal with and try to resolve the case with dollars because it's always been destroy the brand, get him off the air -- and you'll see the videos if you ever get a chance to look at them -- is that they told the jury in Connecticut, punish him with such a verdict that he can never be part of the public discourse again.

So what's happening in this process, and I emphasize this because the auction is going to bring it to a head, they don't want, they don't want an auction. And so --

THE COURT:  Why don't you buy the equity?

MR. JORDAN:  I'm sorry, Judge.

THE COURT:  Why doesn't someone just buy the equity?

MR. JORDAN:  Well, if you buy the equity, you buy whatever debt and other things that go along with it.

THE COURT:  So what's wrong with that?  That's what Chapter 7 normally does.  What's different?

MR. JORDAN:  Well, because I don't think anybody would buy the equity.  Buying the equity so that you can --

THE COURT:  First United can put up the money and buy the equity right now if it wanted to.

MR. CICAK:  (Indiscernible)

MR. JORDAN:  Maybe I'm not following you.  If you --

THE COURT:  The trustee has said no one's put up an

offer for the equity.

MR. JORDAN:  Correct.

THE COURT:  So, First United, put up an order for the equity.

MR CICACK:  (Indiscernible)

MR. JORDAN:  Well --

THE COURT:  In other words, I don't -- what people want is a sale of the assets.  And let me just remind people what happened when there was a sale of the assets, it was me that expressed the concern about the sale.  There was a sale on the table.  I denied it and then I denied another motion to approve a settlement.  Right?  Those assets are incredibly complicated and they raised huge property of the estate issues.  X ended up doing a deal at the very last minute in connection with the proposed sale to Global Tetrahedron, which I didn't approve.

To conduct such a sale, one would have to -- and I said this on the record back then -- you'd have to address all property of the estate issues up front so that you have a clean understanding as to what could be sold and what could not be sold.  And the IP issues to me remained largely unsettled and really complicated as to what FSS owned, what Jones owned, what it didn't own, what he didn't own.

To do that again, there would have to be such a process, and I'm not comfortable proceeding that way.  But if

006339

somebody wants to buy the equity, which someone can always do in Chapter 7.  I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction.  The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets.  And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me.  It would have to be cash only and we'd have to sort out all the intellectual property issues.  So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

006340

expensive.

And I get it.  Maybe they don't want to buy the asset to make money.  But I'd, I flip it to you.

MR. JORDAN:  I'd like to, I'd like to comment on that because this is, this has really troubled you.  I know since the beginning you made clear that if the IP was going to be sold, that the parties had to come to the Court and raise the issue and then you would decide whether it could be sold or not.

Now so the two offers that we brought to you, I say that we brought to you, that were brought to you that dealt with buying the assets all said we take as is.  So that sale would never have been a problematic sale on that basis.

THE COURT:  Take the equity.  I've got two sides. There's no question Jones supports FUAC buying it.

MR. JORDAN:  Of course, yeah.

THE COURT:  No one said that.  There is no question about that.

MR. JORDAN:  The questions would go away.

THE COURT:  There's no question.  There's no question, but whether it stays or goes away is largely irrelevant for me, right, from a bankruptcy perspective.  Now, obviously, it's got incredible importance to Mr. Jones and I don't, I got that.  But from a, from a bankruptcy perspective, the real question is what's in the best interest of the estate,

006341

right?  And so to me, the amount of money Mr. Murray would have to spend to get me comfortable that there would be a sale of assets, it would be incredibly expensive and incredibly time consuming.  And I'm wondering if the amount of money that it would take to spend plus potential issues that come along with it that's why I said to you, if you want, somebody can put up the equity.

This case has been pending since 2022.  And folks, it just needs to, it needs to end.  Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable.  Let the state courts, or the Supreme Court of the United States rule on the issue.  Parties can then appeal any orders of mine to the district court or the Fifth Circuit.  We got to get there. I'm not moving.

The issues that are still there are there.  And I've heard your concerns.  And I didn't approve of the sale to Global Tetrahedron.  And I'm not saying anybody did anything wrong.  I just did not get comfortable with that sale.  I didn't get comfortable with the settlement.  Someone was asking me to allow a claim against an entity that's not in bankruptcy anymore.

MR. JORDAN:  And believe me, we didn't ignore you when you said --

THE COURT:  I know you didn't.  I know you didn't

006342

it.

MR. JORDAN:  -- on the sale of the equity.  We've tried to figure a way that we could sell it without the buyer buying $1.3 billion in debt.

THE COURT:  And that's the problem is that you can't figure it out.

MR. JORDAN:  If you got a hand on it.

THE COURT:  It's not, it's the trustee's call.  That's what I'm saying.

MR. JORDAN:  Well, it's the trustee's call if he can find a buyer.  We couldn't figure out how to find one.  It would have been --

THE COURT:  May the trustee abandoned the issue.  And maybe the trustee abandons the asset.  I don't know.  You all are going to have to figure it out.  That's what I'm saying.  The trustee needs to make decisions.

MR. JORDAN:  But let me also mention to the Court, and I'm not sure that you processed this, the way I'm, the way I tried to present it because I didn't, I'm not sure I wrote it the way you --

THE COURT:  You're saying there's stuff going on behind the scenes and you should be well aware of it.

MR. JORDAN:  That's not up for today, and I don't, and I --

THE COURT:  But it could be.

006343

MR. JORDAN:  I'm saying it is a, it is we want the ability with limited discovery to explain that with facts and documents.  Now we've got them.  But we've got to verify them.  We've had to have them authenticated.  I mean things have happened in the last six months since this regime change.

THE COURT:  I'm sure.  I'm sure.

MR. JORDAN:  But that's not what I was referring to.  Here's what I think you might consider.  When you ruled on the 25th of February, and then you said, and then after that, the FUMC filed a  request for a status conference because they wanted, they made this offer that wouldn't be -- for three months and not been responded to, an $8 million offer subject to the conditions that I mentioned.  We won't --  the trustee doesn't have to warrant anything to us just because we know what is there.  We know what is involved, so, so we're ready to sell.

At that time you were incredibly frustrated with the, with all the parties and you commented that you were going to void and terminate the order.

THE COURT:  I did say that and I agree.

MR. JORDAN:  And quite frankly, but for, but for the fact that the appeal was pending, that's probably what you would have done at the time.

Now, the appeal now, I filed my motion pointing out that I've pointed out to the, to the  plaintiff, the appellant,

006344

there's no jurisdiction to do anything except enforce the order or construe the order if they keep their appeal going. They kept it going.  But I think when I filed this motion -- and I really emphasized it maybe more or better than I, than I had before -- they have now dismissed the appeal.  That dismissal was, is now 34 days old, and that's important.

They said in their reply, which, by the way, the reply to all these --

THE COURT:  The reply to which docket?

MR. JORDAN:  I'm sorry, to my motion.

THE COURT:  Oh, yes, yes.

MR. JORDAN:  When they filed their response, I misspoke, when they filed their response to my motion, they said the appeal is dismissed, the matter is moot, the judge has ruled, and so it's all in state court.  That's their response. And of course my reply then was wait a minute.  That is not how it works.  If the Judge had made oral release from the bench, and the last one he wrote down that it was, that it was void, but the Judge also said, I mean, on his own, not because we pointed it out, but you said on the, on the 25th of -- on the 5th of February '25 that if it's on appeal, I can't modify it, I can't change it, I can't withdraw it.  Now, I can, I can enforce it or I can interpret it, but I can't do any of that cause it's on appeal.  That was all correct.  Now it's not.  So now what's the effect of that?

006345

The effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked.  It is a final order that permits the trustee, because remember your supplemental order did two things.  You gave the trustee the assets and then you said, "And I'm giving him the authority to operate until he can sell."  Now that's what it, I mean, you basically laid out the purpose of it.

The plaintiffs are now saying, oh, that supplemental order doesn't order a sale, so there's no way that just because the supplemental order is in place, it'll be ordered.  I think that's foolish, but that's their argument.  But the other argument is that in some fashion, your final judgment that now -- that people can't attack -- well, the one exception.  Your final judgment is a final judgment on the law.  That is, can I, could I authorize to do that in the state of Texas?  Yes, I can.  I have a final order.  Everybody knew about it.  Even the person that complained about it withdrew his appeal.  So it's fine.

THE COURT:  The question is, do we do round two?

MR. JORDAN:  I'm sorry, Judge?

THE COURT:  There's already been a round one.  The question is do we open it up for a round two.  That's the real question, right?

MR. JORDAN:  Well, yes, it is the real question in

the sense, but let me tell you how that works, but the answer to your question is yes, but here's how it works.  Rule 59(e) could give relief by which you could, within 28 days of the entry of the final order, even the Court within that period of time could have sua sponte said, wait a minute, I don't, I made a mistake.  I don't like what I did or things have changed.

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

MR. JORDAN:  Well, I'm saying now --

THE COURT:  You probably couldn't do it before then, but I'm asking you to reconsider if that's what you're planning on doing now is how I read your motion or to the extent I thought I did something, reconsider it.

MR. JORDAN:  Yes, because I can say this.  And look, I'm old enough to know better than to tell a federal judge he can't do something.  Okay.

THE COURT:  I'm not one of those judges.  You can tell me that I can't, I can't.

MR. JORDAN:  What I want, but what I want you to hear is that Federal Rule 59(e) is gone; 28 days have passed.

Nobody filed a motion and you didn't pick it up and decide you wanted to do something.

60(b) provides for a reasonable time to do something. That reasonable time probably hadn't passed or maybe it has, who knows, but it's only on motion. It's not on sua sponte of the Court.

THE COURT: Oh, I agree with that.

MR. JORDAN: Okay. So no one has asked you to do anything. They've said, oh, it's all moot --

THE COURT: No, I agree. I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it.

I've told the trustee, if you're going to try to do this again, here's the mountain of stuff you're going to have to get over before I get comfortable approving a process by which those assets could be sold, and it's really hard. The trustee can move if he wants. I know you can sell the equity. And that's an easy process to get through.

The other one, it's going to be really hard to get me comfortable approving the sale on the merits based upon all the issues before. But I don't, I'm not in the business of ordering trustees to go order and nor is anyone asking me to. Truste's got an offer. Trustee will weigh. Trustee will exercise business judgment as to what the trustee wants to do

006348

and parties can file stuff asking me to do things or not.  But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it.  He tried to sell assets under those orders.

The question is do we do another sale?  That's the real question.  Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS.  And how do I weigh now state court remedies that people have as opposed to -- do I stay then state court remedies against non-debtor parties, against the non-debtor?  It's more complicated now than it was six or seven months ago.

MR. JORDAN:  Well, I agree.  I think that the issue in state court has become extremely favorable to the goal and policy I mean and decision making of the plaintiffs.  They know that a state court auction by a constable is worthless to value.  They're going to, somebody's going to credit bid and now their deal is, it's going to be, they're going to create a bid.  Nobody gets any cash.  There's no change.  They get the assets for nothing and the people that are injured, of course, are the other creditors of this estate who are, who are not active at all.  There's not a whole lot of them, but

006349

there's, but they're there.  And, of course, then the Debtor who has obviously an interest in getting a maximum value for a credit against his judgment.

So you, they're weighing this.  They're weighing a state court constable's auction for nothing by which they get the assets for nothing and they destroy them like they say they're going to.  And they, and $4 million goes to, they pay $4 million to the, to the Texas plaintiffs, or we go to an auction and we have to compete against $8 million with someone who says you don't need to guarantee title, you don't, yeah, I mean, here's my bid, I'm ready to go.

And now here's, and here's the third comparison that I, that I really think is important.  And I think you may have just said it, but if, but if I didn't -- not sure I picked it up exactly, is that people have relied on your order.  I mean the trustee has paid himself over a million dollars from those funds.  The trustee's lawyer has gotten $800 million too pursuing these auctions.  I mean, there's been almost $2 million spent pursuing the auctions and pursuing the reliefs and doing the settlement agreements and all the things they were doing.  Instead of just auctioning it off, they got into this process that somehow the trustee bought into.  And so the -- how do we unwind this because for the last six months now, Alex Jones has been operating under the auspices of the trustee, so he, I mean, he's added like $2 million into the

006350

estate from him running the company and keeping the assets going earning money.

What happens to the earnings, I mean so --

THE COURT: Where does the -- let me ask you a question. It's a good question to ask. FSS, well, let's assume FSS generates -- I'm making something up here, so just as a hypothetical. We'll just use X dollars in July of 2025 or through August, or the first six months of this year. Right? Where does that money go?

MR. JORDAN: It goes to the account of the trustee 50 percent and the account of Alex Jones, 50 percent. So they have -- so he didn't get a salary, he gets, that's how they, that's how they run the operations. So and that has generated about $2 million and that's not just since this month, but it's --

THE COURT: Are you asking me to, in consideration of that, to potentially end that arrangement, give it all to Jones? If I reverse the order, wouldn't that, isn't that the effect?

MR. JORDAN: See that's the dilemma. If you reverse the order, everybody has done a lot of things in reliance on the order.

THE COURT: No, no. I got it. I got it.

MR. JORDAN: Okay.

THE COURT: It's an -- I understand the point.

006351

Right?  I understand the point.  There's money coming in and there's only one person generating that money that's coming into FSS.  Let me think about it.  I don't want to rule today. I want to think about everything and think about this.  This is kind of why I want to have a status.

MR. JORDAN:  And may I --

THE COURT:  Go ahead.

MR. KIMPER:  May I --

MR. JORDAN:  And may I, may I add to my confusion --

THE COURT:  Just a second, Mr. Kimpler.  I just want Mr. Jordan to finish.  Go ahead, Mr. Jordan.  I think Mr. Kimpler wanted to speak, but I'll give him an opportunity or Mr. Broocks.  Yeah, go ahead, you finish.

MR. JORDAN:  What's that?

MR. KIMPLER:  Your speech.

THE COURT:  Go ahead.  Finish your point.  You've got the floor.

MR. JORDAN:  Mr. Kimpler.  Okay.  My other thought is this.  It's kind of a different direction.  There have been four orders entered, I'm sorry, there have been, I think, three orders entered.  There may have been four.  I'm referring to Docket Number 24-03228, 229, 331, and they're called "Stipulations of the Parties."

THE COURT  Yes.

MR. JORDAN:  And they purport to -- and we only found these this morning.  We weren't, we weren't ever served any notice, but we weren't parties to these adversaries.  These are ones I think that Ms. Driver was a party and she hadn't withdrawn and one of the trial lawyers, Chris Martin was a part of, but we didn't know about these.  And my question, if I may ask the question, I'm not asking for an advisory opinion.  I just, this is the Court's order.  It says the Court retains exclusive jurisdiction over property of the estate and any other property or interest under the control of the trustee, including 100 percent equity interest in FSS.  And it's entered in the, or at least styled in the FSS Systems Chapter 11 that is no longer.

And my, I guess my only concern is that it's sent back to state court something, but I, but I can't, I don't understand what it sent back to state court.  These were remand motions that I think they're, they're not the ones that we're involved in that's up for today.  But if those are remand motions and they don't, and they're not sending property back to the estate, I guess, I guess from my perspective, we probably don't have a problem.  We still are within the time to file a motion and reconsider if there, if we find a problem, but can the Court, did the Court intend to send the assets back to the estate or --

THE COURT:  No.

006353

MR. JORDAN:  No.  Okay.  Well, I'm asking for a ruling, and I don't, and I ought to tee it up differently, I guess, but --

THE COURT:  I'll set up a short status.  I don't know when.  Give me a little time to think about everything that I've heard today, one way or the other.  Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other.  I don't think anyone should plan on an auction today, but I may change my mind, but I don't -- in terms of going forward with respect to the cash generated by FSS, it's something to think about.

MR. JORDAN:  And, Your Honor, then just to finish so that Mr. Kimpler can ask his question.

THE COURT:  I think Mr. Broocks will go and then I'll, then I'll turn to Mr. Kimpler and then I've got another hearing, folks and I don't --

MR BROOCKS:  I'm going to go next.

MR. JORDAN:  All right, so the one other issue that I wanted to cover, and let me see where I put it.  Your Honor, for the sake of the, of the topics I've covered, if it's all right, I'm going to sit down.  If Mr. Broocks had something --

THE COURT:  If you, if you think about it, just let me know.

MR. JORDAN:  Okay.

THE COURT:  Mr. Broocks, good afternoon.

MR. BROOCKS:  I'll be very brief, Your Honor.  Thank you so much for entertaining this.  I did the oral argument in the Austin Court of Appeals, and I wanted to bring to your attention some different facets of this.

The Connecticut first in Austin, in Connecticut, we asked the Supreme Court of Connecticut to do this discretionary review.  They could.  There's a specific doctrine there under a whole lot of cases called the Golden cases.  It says even if you didn't raise a constitutional issue below, you can raise it here.  So we asked them to do so.  The opposition to our petition in Connecticut said no, they didn't raise it in the Court of Appeals.  They didn't even use, I'll say the "C" word, Constitution.  That was their argument.  It's been waived, we said, but the Golden case is intended for that exact purpose, (Indiscernible) line did not.

And he's right, whoever said it.  We are going to go to the U.S. Supreme Court.  We have the ability to ask Justice Sotomayor, I think she's assigned to the, to the Second Circuit District, wherever this case is, for a stay.  And the moment they start any aggressive action; we're going to do that.  We have a petition we're working on right now.  That's Connecticut.

Now in the Texas appeal, the argument was threefold.  It was a lot of sub issues, but the arguments looked to the

justices you have, Your Honor, has an independent duty, constitutional duty to review the constitutional issues.  As painful as it may sound, you've got to take these videos and you've got to watch them and I had them transcribed.  So the Court didn't have to just go watch them.  I said, here are the transcripts.  They objected to that, but I said, I'm just trying to help.  And they were, they were hyperlinked where you could listen to it and read the transcript and go to the particular spot.

I said so you got an independent duty and nothing anybody can do can take that away.  And nobody, no court in America has yet ruled on the constitutional issues we raised.  Nobody.  And so, and so they said, well, they were, they were facing the task and they realize that's their duty.  And that may take a while.

Now, the second issue was we said there is a constitutional prohibition, prohibition on entering a liability default judgment against a media defendant in a matter of public concern in the case brought by a public figure.  We think we satisfied all three of those.  We said and the justices, the Chief Justice said, wait a minute, are you telling me that the trial court is helpless?  I said, absolutely not.  She's got a lot of remedies available to her, but the one thing she can't do is put a gun to the head and say I am going to bypass all these cases and I'm going to say

006356

I'm going to find you, as a matter of judicial decree, to have committed malice that it's false, that you intended it to be false, you knew it was false, and instead of clear and convincing evidence, I'm going to say there was.  I said they just can't do that in that context. And so she asked Bankston, she said, Well, what do you say about that?  And Bankston, well of course, he says we disagree, but he didn't have any cases because he doesn't have any cases.

Now the third issue, so we said, we said the constitutional review is going to be required.  The default judgment was inappropriate, and we said well when punitive damages are concerned, you have an independent duty to look and see what the grounds are.  And to see if, in fact, under Texas law, and which is similar to a lot of states, did they put on the proper evidence to show that, you know, that the default damages that all remedies that had been available to the trial court were tried and failed.  The justice says, what could she have done?  I said, she, if they weren't having success in getting documents from Jones, you got weekly hold, you can get his, they've done computers, you can do the searches yourself.  There's a lot of things.

So anyway, so the Court of Appeals is going to come back potentially and do something very interesting because you've got a Texas case and you've got a Connecticut case.  Now this is like Shelby said it was identical twins.  That's

006357

a really interesting analogy because it was the Sandy Hook crisis, same one, the same parties, families and family members, the same broadcasts that are allegedly defamatory. A default judgment on liability, so there was no liability trial. The only differentiating factor was the damages. Now in Connecticut, it's $965 billion divided by 15 is roughly $63 million of actual damages to the family. Pretty close.

In Texas, it was $2 million 2 for Heslin, 2 for Lewis. So how do you get on the identical facts, the identical arguments, the identical, there's no liability issue. You now have 63 million to the Connecticut people and 2 million to the Texas plaintiffs. Now if the Texas Court of Appeals comes back and says that we're going to say that -- they could come back and say there's no defamation because I showed them the articles that they were taking snippets out and claiming Jones says this, but he said very clearly, I believe children died. So, you know, there could be no defamation involved. We said convincingly, I think, that there was no intention of fiction, but the Court of Appeals could come back and say wait a minute, we don't think this satisfies constitutional muster.

Now what is the Supreme Court of America going to do? What are you going to do when you've got identical facts, identical facts, identical liability, and one court says it violates the Constitution and another court says they didn't say no. They said we're not going to address it.

006358

Now I think that creates an opportunity, a question for the Supreme Court.  Not only is there a disproportionate recovery, 63 versus 2, you have one court saying on the same facts, no.  Another court saying on the same facts, we're not going to address it, but maybe.  That creates an interesting dilemma, I think, for this Court.  Because you're being asked to find non-dischargeable something that a Texas court would if it comes out this way, if I'm right, that the Texas Court of Appeals says it doesn't pass constitutional muster, well, you're in a dilemma.  And that's why I think your comment about shouldn't we wait till the Texas Court of Appeals rules is very prescient because they very well may come back and say that and I think that is an issue that this Court should take into  consideration  as  it  considers  its  dischargeability because I think that the plaintiffs here --

THE COURT:  Dischargeability with respect to Texas, Connecticut or both?

MR. BROOCKS:  Both, both.

THE COURT:  Okay.

MR. BROOCKS:  And I'll tell you why.  It is because in issuing your original non-dischargeability order, you were led to believe that Connecticut was basically ironclad just, you know, if it was fairly tried and all that.  That's not Connecticut law.  It's just not.

THE  COURT:  Shouldn't  an  appellate  court  in

Connecticut tell me that? I wasn't, I don't think I was led to believe anything. I think I was given documents that led to a conclusion under the law.

MR. BROOCKS: These are collateral estoppel issues. The Connecticut court can tell you what they did, but you have to decide what is the collateral estoppel effect. And we said that the Lighthouse case and others, the Supreme Court of Connecticut in multiple cases has said that there are three steps in a collateral estoppel, but there's a critical fourth which gets into equity, fairness, justice.

You know, we get to look behind the scenes and then there was another case where a default judgment was entered. Those were just regular collateral estoppel cases.

There was another Connecticut Supreme Court case that is the bellwether case that says, wait a minute, if you have a default judgment entered, they go, they follow the restatement of torts. And they say if a default judgment, then you can't say it was fairly --

THE COURT: Aren't those matters for an appellate court at some point?

MR. BROOCKS: No, those are matters for you. These are, these are questions because if the question of collateral estoppel comes in, these are the issues.

THE COURT: You're saying collateral estoppel on something I've already ruled on?

006360

MR. BROOCKS:  I'm saying you haven't, it's not -- you at all times, this is not a final order, Your Honor.

THE COURT:  Oh, you mean, you mean in connection with the final order.

MR. BROOCKS:  I'm saying as you approach the issue of finality, and I may, I have --

THE COURT:  No, no, no.  I got the point.  I get the point.

MR. BROOCKS:  So I'm going to say that as you, as Mr. Kimpler said a minute ago, they're going to come back -- and I suspect they will.  I would be shocked if they didn't -- saying we're going to forgo the $331 million.  That would be Bankston saying that he's got a deal.  Now we believe this is a, we believe this is, I'm going to say an illegal deal. We believe these are two creditors working behind the scenes because I think that because Connecticut has always said we have 97 percent of the judgment, but Texas has said, well, wait a minute, it should be 5 Texas plaintiffs, 15, that's, that's 75, 25, 75 percent.  Connecticut was held hostage by Texas until they cut that deal, and that's what I think we need to discover.  And that's an abuse of process.  That's creditors manipulating the system.  And what's happened here is that that's going to be another complicating factor because we're going to file an adversary on that.

THE COURT:  Okay.

006361

MR. BROOCKS: And so at any rate, my point to this Court is that there has been a massive, and I'm going to conclude with this, and a massive, a massive abuse of process here. They have taken legitimate processes and they have abused them, using them for an illicit purpose, which is to put Jones out of the air. That is not a legitimate purpose. And that is going to be, so that's the essence of our, of our 1983 claim. Our 1983 claim says this, from the moment that trial judge in Delaware -- in Connecticut issued a default judgment and then struck our constitutional defenses, that is state action. The New York Times versus Sullivan says that's a state action. The cases we cite in our briefs, the Fifth Circuit says that is, that's not just a plaintiff bringing a lawsuit. That is a judge entering an order that now tips the scale, and that is state action. Again, New York Times versus Sullivan said that.

So we believe, Your Honor, that we have asserted valid 1983 claims. We believe we're going to assert an amended petition or complaint for abuse of process. And we would urge you to wait and see what the Texas Court of Appeals does because that may change your judgment.

THE COURT: Thank you very much. Mr. Kimpler, I think you wanted to have a word.

MR. KIMPLER: I would, Your Honor. I'll be brief, but there was a lot of stuff said. I think one thing I hope

you're seeing that as Mr. Jones continues to lose his appeals in Connecticut, increasingly it is hoping that you will be in appellate court. I think you've already appropriately decided that collateral tax on the Connecticut judgment won't stand. The Supreme Court will either take up review of this or it will not. We are confident that the judgment will stand. I don't believe the Supreme Court will even take review. As Mr. Broocks just noted, they actually don't raise constitutional issues in the underlying appeal. So when you ask what's the federal issue for the Supreme Court to look at? It's a pretty good question. Mr. Broocks won't agree with any of that. I don't need to convince you of any of that. The Supreme Court will do what it will or won't.

I'll just remind you that for the last two years, they've told you that Connecticut judgments are going to be overturned, and they weren't. They were affirmed and the Supreme Court of Connecticut said they didn't want to look at it.

I'm not going to respond, Your Honor, to all of the mischaracterizations about my clients. I will point out that the email they quote from my colleague, Ms. Lieberman, was taken out of context. It specifically said we're tired of being hurt on air. If we want to have an evidentiary hearing, I'm happy to show you since January or since December, the number of times Mr. Jones has continued to harass and threaten

my clients on air. I don't think it's relevant, but I'm happy to do it.

The statement that we at closing in Connecticut said "put a huge punitive damages to take this guy off air," the only problem with that? I think that was what was said in Texas. So if we're going to throw around a whole bunch of factual accusations, we should at least have some credibility when we do it and not make misstatements.

I'm a little bit surprised to entertain the notion of another auction in the bankruptcy court. I think you should see today all the issues. Then I'll file another adversary complaint. They're going to assert Section 1983 claims against my client. Having an option in this court is going to be extremely expensive. It's going to cost a lot of money, and I can tell you that neither the Connecticut or the Texas plaintiffs support it.

I think we should keep in mind here that Mr. Jones is an equity owner of a business and is massively out of the money. This is not significantly different from any other cases where a company has creditors, it can't repay the creditors, the management may get replaced, the board may get replaced. Yeah, they don't get to dictate the terms on what creditors do with the business.

The thing that I think Your Honor was focused on is what is happening with the business now? Mr. Jordan said that

FSS has created $2 million in the last couple of months. I'd like to see proof of that. I don't think we should take the things they say at face value. I can tell you for the last year, Mr. Jones goes on his air and he says, don't buy stuff from Infowars. Buy it from this other website I just created. We believe First United is behind that in funding it.

THE COURT: Well, I believe, I believe, --

MR. KIMPLER: I believe (Indiscernible) also.

MR. COURT: I don't, I don't want to, I don't want to get into it. I get the point. I don't want to get into what one is doing and the others are doing, I've got big, big, big billboards here and like finding stuff on the other side. I'm really just trying to stay within the four corners of this wall, but I get the point and I think everyone is hearing me. I'm not inclined to open up another auction process or I think the trustee, if that's what the trustee wants to do, has heard what I said back then, and I don't think I've changed my mind here. But it sounds like no one wants to buy the equity either. That was one of my questions in my notes here, so.

But I do, there are some things I do want to think about, maybe understand what's going on with the business, how much money the business has, maybe understand kind of where things are going with respect to the business. I kind of what the trustee views is the right thing to do, what the business is at some point. I just think we got to figure out what to

do with FSS over the next, I don't know, 60 days and just make the call one way or the other as to what you want to do and move on.  I think --

MR. KIMPLER:  Your Honor --

THE COURT:  There could be other lawsuits.  There could be other matters that are coming, and I will take them up at face value.  I'll read them and we'll take them up and rule on him.  Mr. Kimpler.

KIM:  Yeah, I was just going to say, Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies.  We've been working with the Texas plaintiffs towards that end.  You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive.  I think it will have wasted several months of efforts.  I think it'll be extremely expensive.  I'm worried about the estate becoming administratively insolvent.  Again, if FSS is throwing out $2 million of cash a month, that's news to me.  The idea that 50 percent of it's going directly to Jones and an account that maybe is not controlled by the trustee, that's also news to me.  I'm very concerned about where that money is going.

THE COURT:  I know.  I got it.  I think everyone should leave on the motion for reconsideration thinking, well, there's really technically nothing for me to reconsider

006366

because there's nothing, I haven't done anything.  But I don't think my position has changed in terms of what I said in February.    I want this case to continue to move .  Maybe we meet in another 60 days and see where things are and I'll see what gets filed and we'll take them up and we'll schedule them.

This case has been around for three years.  And it's been in a number of iterations and the positions of the parties hasn't changed and that's fine, but at some point, the Chapter 7 process has to work.  So I want to know, the trustee is going to tee up some non-exempt assets.  We'll take those up in the ordinary course.  We'll come back and figure it out.  In a couple of months, we'll figure out what the trustee wants to do with respect to FSS, but I'm not opening up any doors today.  But if there's a lot of money sitting somewhere, then maybe we can think about that.  But if courts rule, I'd like to know about them.  We'll see where things go.  Mr. Moshenburg, I'll give you 30 seconds and then I've got some other folks who have been here for a while and deserving of a hearing.  Yes, sir.

MR. MOSHENBURG:  Makes total sense, Your Honor.  I completely echo what Mr. Kimpler just said.  I just wanted to make sure the Court understood.  I don't agree with their characterization.  If any of that sticks, I'm happy to answer any questions about it.

006367

THE COURT: They don't agree with yours, so I think no one agrees with that -- so we're right where we started.

MR. MOSHENBURG: I totally agree. I just wanted to be clear on the record about that.

THE COURT: No.

MR. MOSHENBURG: Lastly, Your Honor, I know you're talking about 60 days from now. From our vantage point, the Court has told us to go pursue our state court remedies. That's what we're going to do. I want to be open and honest about that unless you're telling us otherwise.

THE COURT: I'm not, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up. We can continue to talk. I just want to keep; I don't want to meet again in the Jones case in December and then talk about asset sales and what's going on.

And I'm going to -- well, somebody's asked me to think about some issues. And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens. I may issue something in writing in short, just kind of addressing the issue without any need for another hearing. We'll see where things go. I think the trustee's instructions for now are keep selling non-exempt assets and

006368

whatever you were planning on doing, what you said you were going to do, then just keep doing that.  I don't think you need to do anything different, but if anything changes, I'll let you know.

MR. MOSHENBURG:  Thank you, Judge.

THE COURT:  All right, folks, thank you very much. I very much appreciate your time.

(Proceedings adjourned at 2:32 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

matter..

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 17, 2025

006370

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

§
IN RE:  ALEXANDER E. JONES            §    CASE NO. 22-33553 (CML)
§
Debtor                               §         Chapter 7
§

RESPONSE TO THE SANDY HOOK FAMILIES' EMERGENCY JOINT MOTION FOR
ENTRY OF AN ORDER CONFIRMING THAT FSS ASSETS ARE NOT SUBJECT TO
THE AUTOMATIC STAY (AS PROPERTY OF THE ALEXANDER E. JONES
CHAPTER 7 ESTATE)
[Dkt. 1241]

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

Alexander E. Jones, Chapter 7 Debtor and party-in-interest (herein "Jones") files this

Response and Objection to The Sandy Hook Families' (herein "Plaintiffs") "Emergency Joint

Motion for Entry of an Order Confirming That FSS Assets are Not Subject to the Automatic Stay"

(the "Joint Emergency Motion"), and would show the Court as follows:

I.
PRELIMINARY STATEMENT

1.      First, this Court should know that oral argument took place before the Third Court

of Appeals in Austin on the Texas Judgment in May, 2025.  A petition for writ of certiorari has

been filed with the United States Supreme Court on the Connecticut Judgment.  See **Exhibit A**

attached hereto.  The Jones Parties are optimistic about their chances in both.  Neither of these

important facts is even mentioned in the so-called "emergency motion."

2.      As to their Emergency Motion itself, procedurally, this is not an emergency.  While

the Plaintiffs have known about these issues for literally months they waited until 3:35 p.m. [Friday

September 26] to file their Emergency Motion and at first set it for hearing on Friday October 3,

only to then re-set their "Emergency" Motion for hearing for Wednesday October 1, giving the

Page 1 of 27

006371

Jones Parties literally 1 1/2 business days to respond. In addition to the fact that this is not an emergency, this is a denial of due process.

3.      Substantively, were the Jones Parties being charitable, we would say the Plaintiffs' Motion borders on the fraudulent. In truth it so badly misstates the record in this Court and other courts that the border between truth and prevarication is nowhere in sight. The pivotal issues here revolve around two orders entered by this Court and two hearings. As to the two orders, one was entered in June 2024 [FSS Dkt. 956] herein called the "June Order" or the "Initial Cash Order", and the other was entered in September 2024 [FSS Dkt. 1021] herein called the "September Order" or the "Supplemental Order." As to the hearings, one occurred in February 2025 (the transcript is **Exhibit B**, Dkt. 1072) and the other in June 2025 (the transcript is **Exhibit C** Dkt. 1193).

4.      For starters, the Plaintiffs repeatedly claim that in the February 2025 hearing this Court held the Supplemental Order "null and void," and they cite the transcript of the February 5 hearing no less than eleven (11) times. But the Jones Parties ask with tongue firmly in cheek, have the Plaintiffs forgotten the Jones Parties filed a Motion to Reconsider [Dkt. 1131] that resulted in a June 5 hearing, the transcript of which [**Exhibit C** Dkt. 1193] shows this very Court repeatedly acknowledging, first in the February 5, 2025 hearing,[1] and later on June 5, 2025, that is because the Supplemental Order had been appealed, this Court could do nothing and had done nothing, i.e. any declaration of voidness in February was itself void?

5.      The Plaintiffs must have forgotten this inconvenient fact because the June 5 hearing is not referenced one single time in their Motion. In their desperation to mislead -- which they have done in every court in which they have appeared on this issue -- they don't even mention let alone address the June 5 hearing or the Court's own words that there stated precisely that:

---

[1]      February 5, 2025 Tr. p. 8, l: 15 – 19; See, *infra* full quote.

006372

> somebody wants to buy the equity, which someone can always do in Chapter 7. I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.
>
> The matter was currently pending. That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right? Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that. What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction. The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring

And did so not once but multiple times.

> someone suing them because they really didn't own something that I sold and so I haven't revoked anything. I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

**Exhibit C** Dkt. 1193 BK Hearing June 2025, p. 40. That Plaintiffs do not even mention the June 5 hearing or this Court's statements that it had taken no action is inexplicable.

6.      And some relevant introductory background is in order. At the February 5 hearing, Plaintiffs and Trustee presented a settlement which involved in part "allowing" over $400,000,000 of claims of three persons who have not even tried a case. Frustration because of the continued disobedience to this Court's instructions resulted in the Court's use of the words "null and void" in February, but also that the pending appeal prevent that result.

7.      Even though this Court clearly recognized again in June on the record that it could not have done so because of the pending appeal, Plaintiffs' response is to ignore this -- like the ostrich. Then Plaintiffs take the position that in February this Court merely "enter[ed] a 'clarifying

006373

order' interpreting the Supplemental Order," citing bromide cases on a court's authority to interpret its orders in the injunction context. But in no defensible way can a nullification be called an interpretation. See *Weight Watchers Int'l v. Luigino's, Inc.*, 423 F.3d 137, 141-42 (2d Cir. 2005) ("Whether an order interprets or modifies an injunction is determined by its actual effect. An interpretation does not change the status of the parties, while a modification alters the legal relationship between the parties, or substantially changes the terms and force of the injunction. We therefore consider the effect of each order and its relationship to the other."). See also *Anderson v. Hutson*, 114 F.4th 408, 415 (5th Cir. 2024) (Emphasis Added). "Interpretation, then, is not modification. Taking a practical view of modification, we look beyond the terms used by the parties and the district court to the substance of the action.'") (in both, cleaned up; internal cites and quotes omitted).

8.      So, this Court could not nullify the September Order, did not nullify the September Order and neither could it "interpret" it as a nullity.

9.      Knowing these problems, in a last-ditch effort, in the last two pages they raise FRCP 60(b)(6) improperly and without proper evidence ask the Court to do so now. In so doing, however, Plaintiffs ignore current United States Supreme Court cases, some decided in 2025 like *BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612 (2025), that clarify just how difficult establishing entitlement to a FRCP 60(b)(6) motion is: "The text and structure of Rule 60 make clear that relief under Rule 60(b)(6) is available only in narrow circumstances" and making clear that 60(b)(6) is applicable only in "extraordinary circumstances." Id. at 161. The Fifth Circuit has recently emphasized this April 2025 holding "...also we have also narrowly circumscribed its availability, holding that Rule 60(b)(6) relief will be granted only if extraordinary circumstances are present." *In re Westcott*, 135 F.4th 243, 248 (5th Cir. 2025). In no conceivable way, have Plaintiffs established their entitlement to Rule 60(b)6) relief.

006374

10.     In light of this recent authority, it should not go unnoticed that when the Plaintiffs decided to abandon the Supplemental Order appeal, they did nothing to avoid finality (e.g., Motions under Rule 59(e) or 60(b)(6)) but simply sat by and waited until one year had passed before filing this "Emergency" Motion.   The "emergency" was upon their dismissal of the appeal – not four months later after Plaintiffs allowed the Supplemental Order to become a final order.

11.     Perhaps most troubling of all is the radically inconsistent positions the Plaintiffs have taken before the Texas state courts, in stark contrast to what they are advising this Court. Before this Court, Plaintiffs argued that the Supplemental Order is null, and void and the Trustee has no interest in FSS assets.  However, in the state courts Plaintiffs have also taken a radically different position, claiming that this Court's June Initial Cash Order 2024 Order gave the Chapter 7 trustee dual powers including both "signing authority over FSS' bank accounts and the power to dispose of its assets for the benefit of creditors, though those assets remained the property of FSS." [Resp., p. 23].

12.     Plaintiffs were forced to take this position because they had induced the Texas trial judge -- who literally despises Alex Jones --  to sign a Turnover Order that referenced both the June Order and the September Order and qualified both with the notation that FSS assets would be seized only with the approval of the Bankruptcy Trustee and the Bankruptcy Court,[2] the turnover order finding reading:

---

[2]     17. Exempt Property. Nothing in this Order shall be construed to apply to exempt property, if any, of Judgment Debtor, *or any property of the Chapter 7 Estate* (expect up approval of the Trustee or Bankruptcy Court). See, **Exhibit E,** Dkt. 1246-5, Order Granting Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Free Speech Systems, LLC (Emphasis Added).

006375

> **The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):
>
> (i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

13.    Forced to explain why they would include a reference to the Supplemental Order if it had been truly declared void, Plaintiffs claimed their reference to the September Supplemental Order was a mere clerical error.  Laughable.

14.    But Plaintiffs still had to explain their inclusion of the "subject to the approval of the Trustee" (and later "subject to the approval of the Bankruptcy Court) which would only make sense if the Trustee had FSS assets via the Supplemental Order.  Thus, to explain the inconsistency of their positions, the Plaintiffs were forced to prevaricate, articulating a position they have hidden here from this Court.  Specifically, Plaintiffs there argued that this Court's June 2024 Order gave the Chapter 7 trustee dual powers including both "signing authority over FSS' bank accounts and the power to dispose of its assets for the benefit of creditors, though those assets remained the property of FSS." [Resp., p. 23].  Notably, Plaintiffs ask for no relief or interpretational assistance on the June Order.

15.    Thus, given this position, the relief they seek here will do nothing as they are still

006376

stuck with their claims that the June Order -- on which they seek no relief -- conveyed the assets to the Trustee.

16.     At the June 5 hearing, and even before in the filings of the Jones Parties, the Plaintiffs were advised that after the Texas Plaintiffs dropped their appeal this Court lost plenary power to sua sponte nullify the Supplemental Order 20 days after the appeal was dismissed and the Supplemental Order became final.   They were further advised on the record, that the Supplemental Order having become a final judgment, FRCP 60 was their only hope of relief -- yet they did nothing for almost 4 months, waiting until their turnover efforts were in danger.

17.     Here, referencing the February 5 hearing, they ask this Court to now "confirm" what it did not and could not do:  nullify or modify the final, unappealable Supplemental Order. And the Court should not nullify the Supplemental Order even if it could. Nullification means void ab initio.  The Trustee will be forced to return all money and assets he has received.  All settlements will be called into jeopardy.  The bankruptcy trustee will have misappropriated millions of dollars from a company that is not in bankruptcy and whose assets are not part of the bankruptcy estate. Nullification could be a catastrophe.  This Court should decline the invitation to be the catalyst for such reckless endangerment.  But the Plaintiffs do not care.

18.     To the contrary, Plaintiffs' motives are to acquire the FSS assets in order to destroy the Jones and FSS/InfoWars brand and prevent Jones from exercising his constitutional right to freedom of the press and freedom of speech.  The relief sought by Plaintiffs is an abuse of the bankruptcy process disapproved by the Fifth Circuit rejecting a creditor's demands motivated not by recovery on a just debt, but by the ulterior motive of destroying a debtor ability to earn an income and apply his trade by destroying his constitutional rights to freedom of the press and free speech – all for a political ulterior motive of taking a conservative off the air-ways and out of the public discourse.  This abuse of the bankruptcy process, particularly when it has been made known

006377

to this Court and thus is not an open question, should not be ignored, especially when important constitutional rights will be destroyed.

19.    As a final point in this preliminary statement, Plaintiffs have doubled down on their horrific claims in state court, not only ridiculing Jones' counsel for relying on this Court's Orders and its candid statements that the Order could not have been vacated but also seeking to have counsel sanctioned over $100,000 in fees and repeatedly questioning counsel's ethics.  The high stakes created by Plaintiffs do not justify the disregard of law they presume from this Court.  The motion should be denied.

## II.
## RESPONSE TO PLAINTIFFS MOTION

### A.    Plaintiffs' Motion Seeks the "Confirmation" of That Which Did Not Happen

20.    The Connecticut and Texas Plaintiffs (the "Plaintiffs") have filed an Emergency Motion on Friday, September 26, 2025, seeking an order of this court "*confirming" that* the FSS assets vested in the Bankruptcy Estate of Jones by virtue of the Supplemental Order entered on September 24, 2024 (FSS Dkt. 1021) [the "Supplemental Order"] are not subject to the automatic stay imposed by11 U.S.C.A. §362(a). The Emergency Motion asks the Court to "confirm that the Supplemental Dismissal Order has no force or effect, that FSS's assets are not property of Jones' bankruptcy estate, and confirming that FSS's assets are not subject to the automatic stay and may be turned over to the receiver." [See, Emergency Motion, ¶4]. The basis of the Motion is that, according to the Plaintiffs, on February 5, 2025, *while the Texas Plaintiffs' appeal of the Supplemental Order was pending at the District Court*, this Court voided the Supplemental Order and made clear that FSS's assets are not property of the Chapter 7 Estate [and] not protected by the automatic stay." *Id.* at ¶6.

21.    There is no dispute that the Supplemental Order entered by this Court transferred

006378

FSS assets to the Bankruptcy Estate of Jones.  No dispute on this is possible as the wording of the Supplemental Order is crystal clear. It is also not in dispute that while the Supplemental Order was on appeal to the United States District Court, it could not be modified or vacated. Thus, on February 5th, the Court was without the power to nullify the Supplemental Order even if he had desired to do so. As the United States Supreme Court has explained, the "filing of a notice appeal is an event of jurisdictional significance." *Griggs v. Provident Consumer Disc. Co*., 459 U.S. 56, 58 (1982). Such an appeal confers exclusive jurisdiction on the appellate court while divesting the lower court "of its control over those aspects of the case involved in the appeal." *Id*. What the Plaintiffs claim occurred – that the February hearing resulted in the nullification of the Supplemental Order – is an absolute impossibility under the law.[3]

22.　　There can be only one result: the FSS assets vested into the Jones estate are protected by the automatic stay. It is undisputed and unchallenged, that even in the event of uncertainty as to whether assets are part of a bankruptcy estate, the automatic stay applies, and the Turnover Order is void.  *See Brown v. Chesnut (In re Chesnut),* 422 F.3d 298, 300 (5th Cir. 2005). *See also Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 251 (5th Cir. 2006) ("...this Court has recognized the automatic stay's broad application and noted that such breadth reflects a congressional intent that courts will presume protection of property when faced with uncertainty or ambiguity.").

23.　　Remarkably, in making its arguments that the Court rescinded the Supplemental Order by cherry picking quotes from the February 5, 2025 transcript, not once do the Plaintiffs

---

[3]　　*See e.g. Sherman v. SEC (In re Sherman),* 491 F.3d 948, 967 (9th Cir. 2007); *See, e.g., Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at *20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] citing *In re Port Neches Fuels, LLC*, No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, *12 (D. Del. Mar. 27, 2024).

006379

mention the June 5, 2025 hearing wherein the Court repeatedly clarified its statements made in February 2025. And not once do the Plaintiffs mention to the other tribunals or the Austin court of appeals that during the June 2025 hearing the Court expressed several times it would consider allowing another auction of the FSS assets in the Jones bankruptcy. This was not mentioned because Plaintiffs are attempting to violate the automatic stay by seeking a turnover of those assets.

24.    Yet, amazingly, Plaintiffs claim that it is Jones and FSS that "have sown chaos and confusion regarding Your Honor's rulings regarding the scope of the automatic stay in Jones' bankruptcy … [because] they argue to other tribunals that FSS's assets are subject to that stay and that the Sandy Hook Families cannot enforce remedies, including pursuing a turnover and receivership order, against FSS's assets in state court." [Motion, ¶3]. What's amazing about Plaintiffs' claim is that not only are Plaintiffs the ones who have sown chaos and confusion by twisting this Court's words in any manner that fits their agenda, but they have even used their falsehoods as a basis to seek sanctions against counsel for Jones and FSS for the simple reason that counsel for Jones and FSS referenced the Supplemental Order being a valid order that vested the assets of FSS in the Jones Estate.

25.    Rather Plaintiffs' sole argument is that (a) in a hearing on February 5, 2025, the Bankruptcy Court "nullified" the Supplemental Order, (b) it reaffirmed that nullification in March, 2025, and (c) Jones and FSS filed a Motion for Reconsideration which "acknowledged that the Supplemental Dismissal Order was no longer in effect." [See, Motion, ¶24].

26.    Plaintiffs then claim that "all of the chaos related to the Supplemental Order stems solely from the Debtor's conduct in willfully misrepresenting orders in Texas state courts. Plaintiffs know full well that the Supplemental Order is in full force and effect and have built an argument on a house of cards by asserting these points as an after-the-fact argument to avoid the inescapable.  Movants will address all of these arguments but in a slightly different order.

006380

27.     While this Court did express during the February 5, 2025, hearing a desire to "void" the Supplemental Order after expressing (justified) frustration with the Bankruptcy Trustee's repeated attempts to use the Supplemental Order for various purposes for which it was never intended, this Court acknowledged that based on the pending appeal by the Texas Plaintiffs, it lacked jurisdiction to void the Supplemental Order.[4]  However, it is this February 5 hearing that Plaintiffs' argued to the State District Court and the Court of Appeals *that this Court set aside the Supplemental Order – while the case was on appeal to the District Court* by the Texas Plaintiffs. Yet in all of Plaintiffs' arguments Plaintiffs did not cite or discuss this Court's statement of jurisdiction while the Texas Plaintiffs appeal was pending.

**B.     The Court Had No Jurisdiction to Nullify the Supplemental Order – A Fact Acknowledged by the Court During the February and June Hearings**

28.     As this Court is aware, the Texas Plaintiffs appealed the bankruptcy court's entry of the Supplemental Order to the District Court for the Southern District of Texas and did so for the very reason that FSS assets were transferred.  In their statement of the issues on appeal, the Texas Plaintiffs stated to the United States District Court to whom bankruptcy appeals first go, precisely what the Supplemental Order did:

---

[4]     February 5, 2025, Hearing Transcript:

….               No, I should back up and mention that the supplemental order was appealed by the Texas families.  I think that matter is still pending.
     Mr. JORDAN:  It is, Judge.
     THE COURT:  *I lose jurisdiction over that immediately*.

p. 8: 15-20.

006381

**STATEMENT OF ISSUES**

1.    Did the Bankruptcy Court err when, without notice, it entered an order [Docket No. 1021]—three months after dismissing the Free Speech Systems, LLC bankruptcy [Docket No. 956]—that retroactively vested all property of former debtor Free Speech Systems, LLC into the bankruptcy estate of Alex Jones?

[See, Texas Plaintiffs' Statement of Issues and Designation of Record to be Presented on Appeal, Case No. 4:24-cv-03882 Dkt. 14-1, in the United States Bankruptcy Court for the Southern District of Texas (Dkt. 1246-11)]. Importantly and unaddressed by the Plaintiffs is the argument that upon appealing the Supplemental Order, the Bankruptcy Court immediately lost jurisdiction to alter the Supplemental Order, which is unquestionably the law.[5]

### C.    The Court Repeatedly Clarified that it Had Not Modified the Supplemental Order

29.    However, what is most revealing about Plaintiffs' argument is the fact that it wholly ignores the Court's numerous statements during the **June 5, 2025**, hearing when it clarified that it absolutely did not modify the Supplemental Order during the February hearing:

```
THE COURT:  I don't think I modify the order --
MR. JORDAN:  You didn't.
THE COURT:  -- back in February.
MR. JORDAN:  No.
THE COURT:  The question is, do I do it now?  It's
the question you're telling me.
```

---

[5]    As the United States Supreme Court has explained, the "filing of a notice appeal is an event of jurisdictional significance." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). Such an appeal confers exclusive jurisdiction on the appellate court while divesting the lower court "of its control over those aspects of the case involved in the appeal." *Id.*

006382

June 5, 2025 Tr., p. 47, lines 8-13. The Court repeated the fact that it did not have authority to nullify the Supplemental Order several times, including:

> The matter was currently pending. That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right? Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that. What I
>
> …
>
> that I sold and so I haven't revoked anything. I didn't have authority to do it anyway, but to me, putting up another

June 5, 2025, p. 40, l: 5-8, 23-24. There is no ambiguity in the Court's ruling. In short, the Bankruptcy Court did not nullify the Supplemental Order.

30.     The Court elaborated and confirmed, yet again, that the Supplemental Order remains valid, acknowledging that all that was denied was the proposed sale attempted by the Trustee under the Supplemental Order:

> THE COURT: No, I agree. I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it.

June 5, 2025, p. 48:10-13. If there was any doubt about the continuing viability of the Supplemental Order the Court's statements confirming it is still out there should remove any such doubts notwithstanding that the Court denied the first and second effort to conduct an auction and compromise claims in that auction process, including an attempt to authorize claims against FSS, which is not in bankruptcy.

006383

The Plaintiffs do not cite either of this Court's June 5, 2025 express pronouncements of *no jurisdiction to void an order of the Court while it is pending appeal* in this Emergency Motion and did not do so in their pleadings filed in the Austin Court of Appeals. It is as if no such statements of fact and law exist to these Plaintiffs.  And except for Alex Jones and FSS, these critical statements would not even be discussed. It is not in dispute that while the Supplemental Order was on appeal to the United States District Court, it could not be modified or vacated.

**D.     Plaintiffs Failed to Seek a Reconsideration of the Supplemental Order**

31.     During the June 5, 2025 hearing the Plaintiffs announced that they had dismissed their appeal on May 5, 2025, and argued that the Jones-FSS Motion had been "mooted" by the dismissal and thus the jurisdictional obstacle to voiding the Supplemental Judgment had been removed.  Jones and FSS counsel pointed out that pursuant to Fed. R.Civ.P. 59(e) after 14 days (or the latest 30 days) after an order or judgment becomes final after appeal, the trial court (here the Bankruptcy Court) could not *sua sponte* overturn the final judgment thereafter.  It could only be done by Motion under FRCP 60(b)(1)-(5) [not longer than one year from entry] or FRCP 60(b)(6) brought within a reasonable time.  The Court agreed.

```
          MR. JORDAN:  What I want, but what I want you to
hear is that Federal Rule 59(e) is gone; 28 days have passed.
Nobody filed a motion and you didn't pick it up and decide you
wanted to do something.
          60(b)  provides  for  a  reasonable  time  to  do
something.  That reasonable time probably hadn't passed or
maybe it has, who knows, but it's only on motion.  It's not
on sua sponte of the Court.
          THE COURT:  Oh, I agree with that.
```

June 5, 2025 Tr. pp. 47:24-48:7.  For the first time, and now in the Emergency Motion filed after

006384

one (1) year from entry of the Supplemental Order, Plaintiffs have discussed FRCP 60(b)(6) for the very first time. That Motion has not been set for hearing. However, the relief sought by Plaintiffs pursuant to FRCP 60(b)(6) is clearly an admission that they are well aware of the fact that this Court did not previously rescind the Supplemental Order as Plaintiffs claimed to the Travis County District Court (which was also used as a basis for seeking sanctions) and the Austin Court of Appeals.

### E. This Court Further Notified the Parties That it Would Consider a Sale of the Assets by the Court

32. In the continued recognition of the Supplemental Order this Court announced at the June 5, 2025 hearing that it would consider having another auction for the sale of FSS's assets:

> The question is do we do another sale? That's the real question. Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS. And

June 5, 2025 Tr. p. 49:6-11. And also:

> another motion for the sale of the assets. And here's a laundry list of issues that I've got.
> Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me. It would have to be cash only and we'd have to sort out all the intellectual property issues. So I don't want someone buying something -- and I expressed this a while back

006385

June 5, 2025 Tr. p. 40:16-19. The fact that the Bankruptcy Court repeatedly asked at the June 2025 hearing whether it should allow the Trustee to again attempt to sell FSS assets, only makes sense if the Trustee still has control of them. There is simply no way the bankruptcy court would be thinking about authorizing another sale of FSS assets if they were not in the Trustee's control via the Supplemental Order.

**F.    There Has Been No Attempt to Seek Any Reconsideration By Plaintiffs From The Bankruptcy Court's Unequivocal Rulings of February 5 and June 5, 2025 – Until Now**

33.    Over the past 8 months from February 5, 2025, the Plaintiffs have had no restriction that would have prevented them seeking months ago the declaration they now seek.  In fact, as noted this issue was raised and the Court clarified and clearly ruled on June 5, 2025 [*See*, footnote 6 *infra*] that it had not voided the Supplemental Order. [*See, infra* Note 3].  Plaintiffs made no objection to the Court's June 5, 2025, rulings until now and the Motion does not even acknowledge this Court's clear statements that none of its comments amount to voiding the Supplemental Order.

34.    In fact, the conduct of Plaintiffs reflects that the Plaintiffs knew that this Court had not voided or set aside the Supplemental Order.  When the Plaintiffs' filed their new 2025 Turnover and Receivership Application the Motion and the Proposed Order contemplated and admitted the continued viability of the Supplemental Order.  The Motion (**Exhibit D** attached hereto) and the Proposed Order (**Exhibit E** attached hereto) both intentionally specified that all relief related to FSS's assets was "subject only to approval of the Trustee."

> 2024), No. 22-60043 (Bankr. S.D. Tex.).  Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):
>     (i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

006386

See, Application for Turnover. There is no other logical explanation for the inclusion of this caveat.

**G.**    **Plaintiffs Even Went So Far As To Attempt to Have FSS's Counsel Sanctioned in State Court for Representing the Supplemental Order Had Not Been Rescinded by the Bankruptcy Court**

35.    At the turnover hearing on August 13, 2025, Plaintiffs' counsel, Mark Bankston made an impassioned and largely false claim that the Supplemental Order had been declared void by the Bankruptcy Court.  He then repeatedly accused FSS and its counsel of intentionally lying to the court by claiming in the Jones Declaration that "[o]n September 25, 2024, Bankruptcy Judge Lopez entered another order supplementing his June Order, stating that as the date of his first order above all property of FSS was judicially deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541." He also proceeded to proclaim that he would be seeking to have FSS's counsel sanction, even referring to it as "litigation misconduct"[6], "disturbing"[7], and "disgusting"[8].

36.    Once the Proposed Order was entered, counsel for FSS was permitted a brief response that included a response to the Plaintiffs' sanctions argument for representing that the Supplemental Order was in place and a response that the sanctions motion conflicted with the Order just entered that acknowledged the continuing jurisdiction of the bankruptcy court over the FSS assets.

**H.**    **Plaintiffs Filed a Motion to Sanction Alex Jones and FSS Counsel for "Lying" to the Court That the Supplemental Order Was Still In Place**

37.    On August 18, 2025, Texas Plaintiffs filed "Plaintiffs' Challenge to Net Worth

---

[6]    August 13, 2025 Transcript, p. 6:3-4 (Bankston: "…I'm about to reveal to you litigation misconduct that you don't know anything about yet.").

[7]    August 13, 2025 Transcript, p. 6:10-12 (Bankston: "…And I'm going to reveal some things to you today that, again, I'm very disturbed about.").

[8]    August 13, 2025 Transcript, p. 15: 16-21 (Bankston: "To tell the Court, here is an order it's in force, this prevents judgment, that's ridiculous. That's disgusting. And it's being profited off of. We can't do much about this today except that you can conclude today, you can conclude that that statement is false.").

006387

Declaration and Motion for Sanctions for False and Frivolous Pleading" (the "Motion for Sanctions"). Amazingly, just as Plaintiffs' counsel Mark Bankston proclaimed during the prior hearing, Texas Plaintiffs doubled down on their absurd claims that the Supplemental Order was "nullified" and that FSS's counsel was making misrepresentations to the court, and actually sought sanctions against counsel for Jones and FSS claiming that counsel misrepresented the status of the Bankruptcy Court's final, non-appealable Supplemental Order referenced in the Jones Declaration filed in the Travis County Suit.

38. During the hearing on September 16, 2025, before Judge Maya Gamble Plaintiffs were permitted to argue for and sought sanctions against Jones and FSS lawyers for this claimed gross misrepresentation. Plaintiffs suggested sanctions of $100,000.00 or more might be appropriate but after the Court characterized Jones and FSS counsel in an unfavorable light, no sanctions were imposed.

**I. If the Supplemental Order Was Set Aside in February 2025, the Trustee Has Been Operating Assets Without Authority and With Full Notice of Plaintiffs Who Have Remained Silent**

39. The Trustee has been operating the FSS assets of FSS with full authority of the Court. It is Plaintiffs introduction of chaos by not going to the Court when it decided that the assets of FSS no longer were owned by the Trustee but making no complaint, filing motions and pleadings that supported the continuation of the Supplemental Order through August 2025, and taking actions and conduct wholly inconsistent with their now purported beliefs. If Plaintiffs truly believed that the Supplemental Order was voided on February 5, 2025 how could that be squared by their opposite positions taken and their failure to assert their position.

**J. No Party To the Bankruptcy Proceeding Has Ever Sought, By Any Motion or Pleading, To Have the Bankruptcy Court Set Aside The Supplemental Order**

40. It was announced by the Bankruptcy Rule on February 5, 2025 that the pending

006388

appeal prevented setting aside the Supplemental Order. No action was taken by Plaintiffs. In May 2025 the Texas Plaintiffs dismissed their appeal of the Supplemental Order. No action was taken by Plaintiffs. In June 2025 the same issue came before the Court and the Court reaffirmed its past ruling, but no action was taken. Remaining silent, even for strategic reasons, has consequences. As this Bankruptcy Court noted, because Federal Rule 59(e) only allows *sua sponte* avoidance of an order of a federal court for 28 days, there is no longer jurisdiction of the Bankruptcy Court to do so *on its own*.[9]

K. **There are No Extraordinary Circumstances Justifying Relief Under FRCP Rule 60(b)(6)**

41. Plaintiffs relief under Federal Rule of Civil Procedure 60(b)(6) is unwarranted. Courts have long held that this particular provision can only be satisfied by the presence of "extraordinary circumstances." Certainly not the "extraordinary circumstances" these Plaintiffs created themselves.[10] The very high bar standard was addressed by the Supreme Court in *BLOM SAL v. Honickman*, 605 U.S. 204 (2025) in a decision issued on June 5, 2025. In *BLOM*, plaintiffs declined several opportunities to amend their complaint. Instead, they opted to stand on their original pleadings and then appeal after the district court dismissed their complaint with prejudice for failing to plead facts sufficient to support their aiding and abetting claim. The Second Circuit affirmed the dismissal, holding that the district court imposed too high a foreseeability requirement in dismissing the aiding-and-abetting claim, but concluding that the claim failed under the correct, less exacting standard. Returning to the district court, plaintiffs moved under Rule 60(b)(6) to

---

[9] *See*, June 5, 2025 Tr. pp. 47:24-48:7.

[10] It was the Plaintiffs that dismissed their appeal and then did nothing. Even after the June 5, 2025 hearing where the Court confirmed that the Supplemental Order was not voided, they did not seek any relief from the Court by any means – no FRCP Motion under Rule 59(e); no FRCP Motion under Rule 60(b)(6) before the dismissed appeal was a final order after dismissal – nothing until 4 months after they dismissed their appeal did they make a half-hearted suggestion that the final order they allowed to occur was "extraordinary circumstances" allowing reconsideration – it is not.

006389

vacate the already-affirmed final judgment, arguing that the district court should grant them an opportunity to file an amended complaint under the correct standard. The district court denied the motion, holding that the Second Circuit's clarification of the standard did not constitute "extraordinary circumstances" necessary to justify relief under Rule 60(b)(6). Plaintiffs again appealed, and the Second Circuit reversed, holding that the district court must balance Rule 60(b)'s finality principles and Rule 15(a)'s liberal amendment policy. The Supreme Court rejected the Second Circuit's approach, holding that "a party seeking to reopen his case and replead must first satisfy Rule 60(b) on its own terms and obtain Rule 60(b) relief before Rule 15(a)'s liberal amendment standard can apply." Relief under Rule 60(b)(6) requires extraordinary circumstances, and this "standard does not change when a party seeks to reopen his case to amend his complaint." Here, just as the Plaintiffs with full knowledge of the Court's position that the order had not been voided did nothing, the plaintiff in *BLOM* refused to amend and lost the right to do so.

42.    The Court emphasized the importance of Rule 60(b)'s finality principles, especially since there is no time bar for bringing a Rule 60(b)(6) motion. Too broad an interpretation of this catchall provision would circumvent the time limitations of Rule 60(b)(1)-(3). Litigation must end at some point, and "free, calculated, deliberate choices," such as plaintiffs' decision not to amend their complaint when given the opportunity, "are not to be relieved from." A strict interpretation of Rule 60(b)(6) is "essential to preserve the finality of judgments."

43.    Jones and FSS argue that assets "vested" in the Chapter 7 Estate of Alex Jones constitutes "property of the estate" or "arguable" property of the estate to which the automatic stay from seizures or attachment, and the like is prohibited.  11 U.S.C. §362(a).  Texas law is crystal clear that a turnover order directed at assets covered by the automatic stay is void -- not voidable. *York v. State*, 373 S.W.3d 32, 39-40 (Tex. 2012).  Even in the event of uncertainty as to whether assets are part of a bankruptcy estate, the automatic stay applies, and the Turnover Order is void.

006390

*See Brown v. Chesnut (In re Chesnut),* 422 F.3d 298, 300 (5th Cir. 2005). *See also Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 251 (5th Cir. 2006) ("...this Court has recognized the automatic stay's broad application and noted that such breadth reflects a congressional intent that courts will presume protection of property when faced with uncertainty or ambiguity.").

**III**.
**THE BASIS FOR JONES AND FSS NEW REQUEST FOR AN ORDER PROVIDING FOR A PUBLIC SALE OF THE FSS ASSETS BY CASH-ONLY,  SEALED BID-ONLY, AND SOLD ONLY AND TO THE HIGHEST CASH BIDDER**

**A.**    **The Texas and Connecticut Plaintiffs' Bad Faith and Bad Acts Caused Loss of This Court's Confidence in an Auction Sale By the Trustee and a Seven (7) Month Delay in Resolving the Sale of the FSS Assets**

44.    The Connecticut Plaintiffs are not interested in achieving a sale of the FSS assets at the highest value, but only a sale that results in the destruction of the Alex Jones "brand" of InfoWars (*e.g.*, The Onion attempted purchase).  The Connecticut and Texas Plaintiffs (and the Onion) have announced to the trial Courts, to the media, and to this Bankruptcy Court through their conduct and their frequent statements, that their true motive is not to obtain the highest value, so that their just debt may be repaid, but to destroy the value of the Debtor and his assets and obtain a non-dischargeable debt that will prevent Alex Jones from exercising his freedom of the press and free speech rights.

45.    This Court is the gatekeeper on issues of ulterior motives and bad faith.  *Cont'l Ins. Co. v. La. Oil Ref. Corp.,* 89 F.2d 333, 337 (5th Cir. 1937).[11]  A creditor may not cast his vote for an ulterior purpose and expect to have it counted.  Ulterior motives have been held to include 'pure

---

[11]    "The judge in acting on a plan must investigate the good faith and purity of the acceptance, and the time of acquiring the claims so voting. Paragraphs (e), (f) (6), of section 77B, 11 U.S.C.A. § 207(e), (f) (6); Texas Hotel Securities Corporation v. Waco Development Co. (C.C.A.) 87 F.(2d) 395, 396."

006391

malice, strikes and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business.'" *In re Save Our Springs (S.O.S.) All., Inc.,* 388 B.R. 202, 230 (Bankr. W.D. Tex. 2008). [12]

46.     The destruction of the InfoWars brand and Alex Jones ability to exercise his freedom of the press and free speech is an abusive ulterior motive:

> Ulterior motives which can constitute bad faith include "pure malice, 'strikes', blackmail, and ***the [destruction of an entity]*** in order to advance the interests of a competing business."

*In re Landing Assocs., Ltd.,* 157 B.R. 791, 802 (Bankr. W.D. Tex. 1993) citing *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir. 1988).[13]   The Law in the Fifth Circuit is the same as In re Landing Assoc:

> *See Town of Belleair, Fla. v. Groves*, 132 F.2d 542, 543 (5th Cir. 1942). In *Groves*, a plan of reorganization was denied confirmation on the grounds that "special inducements" had been used to secure the acceptance of the plan by a group of creditors who were also bondholders of the debtor corporation. *See Groves*, 132 F.2d 542-43. The court found that the creditor-bondholders had been principally motivated by the existence of the "special benefits" which benefitted their bondholder interests rather than their interests as creditors, and that such ulterior motives breached the requirement of good faith. *Id.* at 543.[14]

---

[12]     citing *Insinger Mach. Co. v. Fed. Support Co. (In re Fed. Support Co.),* 859 F.2d 17, 19 (4th Cir. 1988), *citing In re Pine Hill Collieries Co.,* 46 F.Supp. 669, 671 (E.D. Pa. 1942), and *In re MacLeod Co., Inc.,* 63 B.R. 654 (Bankr. S.D. Ohio 1986).

[13]     Also citing *In re MacLeod Co., Inc.*, 63 Bankr. at 655 *and In re Featherworks Corp.*, 36 Bankr. at 463 (both citing *P-R Holding Corp.* with approval). In *P-R Holding Corp.*, the court stated that "when the [questioned activity] is in aid of an interest other than an interest *as a creditor*, [it] may amount to bad faith. . . ."

[14]     *In re Mangia Pizza Invs., LP,* 480 B.R. 669, 681 (Bankr. W.D. Tex. 2012): *citing In re Landing Assocs., Ltd.,* 157 B.R. 791, 807 (Bankr. . W.D. Tex. 1993) ("[W]hen the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and only incidentally related to the creditor's status *qua* creditor, section 1126(e) is rightly invoked.").   *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 682 (Bankr. W.D. Tex. 2012) cited I*n re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990), noted that the creditor in that case had purchased its claims only after the debtor's disclosure statement was approved, and then "almost exactly in the amount required to block the plan of reorganization." *Id.* at 289-90. In addition, in determining that the creditor's true motive was to "take over and control the debtor," the court noted that the two classes in which the creditor had purchased claims had "directly opposite interests with respect to the . . . litigation." *Id.*

006392

*In re Dernick*, 624 B.R. 799, 808 (Bankr. S.D. Tex. 2020) instructs that "… a court must assess "the true interest being benefitted by the questioned activity" to determine whether the creditor is seeking to benefit itself in some way other than as a creditor acting on its claim. Here, the determination is simple. The "creditors" Plaintiffs are seeking a political "gun control" victory which Plaintiffs define as the destruction of the Alex Jones "brand" of InfoWars. This is a the "ulterior motive" that is not permitted in the process of bankruptcy, whether reorganization or liquidation (at both stages, the Plaintiffs acted in bad faith on their ulterior motive).

47.    This conduct is not an allowed motive of a creditor, it is the motive of a political view bent on destruction of an opposed political view (*i.e.*, the conservative voice of Alex Jones by his political opponents, the far-left progressive movement seeking gun control, financed by such organization as Bloomberg and its supported foundations Every Town and The Onion) (the "Political Motive"). This Political Motive is not recognized in bankruptcy and cannot be rewarded by a federal court where the goal is wholly inconsistent with the rights of a legitimate creditor and the constitutional rights of the debtor.

48.    Because this Bankruptcy Court refused to permit the Connecticut and Texas Plaintiffs control of the bankruptcy auction and Trustee, the Plaintiffs *now oppose any auction* of the FSS assets. The Plaintiffs have not sought a fair and equitable distribution of bankruptcy proceeds, but to control the bankruptcy assets to accomplish an abuse of the bankruptcy process. Most critically, that abuse involves the prevention of a debtor of the right to future exercise constitutional rights – freedom of the press and free speech

49.    It is the sale proceeds that must then be applied to those Judgments as credits of the sale process, and depending on the outcome of the appeals, may even allow payment in full of one or both of these judgments. Allowing the operation and protection of these assets has and will continue to be for the benefit of the creditors and the Jones Estate until the sale concludes, which

006393

will not be the result if a State law execution sale is conducted or if the Connecticut Plaintiffs acquire the assets in other than through a fair, non-collusive process.[15]

50.     Although Connecticut Plaintiffs have been consistent in their demand *to destroy Jones' ability to earn an income from his exclusively-owned "persona" (his image, name, voice, etc.)* to silence his free expression of political and other opinions as an "on air" news media, not only that position is irrelevant to the economic interest of the bankruptcy system itself but also when it rises to the level of abuse of process that uses the bankruptcy system to accomplish an unconstitutional political goal (to take away Jones First Amendment rights).[16]  In fact, abuse of process conduct it is contrary to the bankruptcy fresh start, even where a claim is found non-dischargeable.  If the demands of Connecticut are to have its debt declared nondischargeable then it cannot, under any good faith application of ay bankruptcy policy approved by the Supreme Court or Congressional intent, be consistent with destroying the Debtor's ability to earn an income to pay its non-dischargeable debts.  This counter-intuitive position is the definition of "abuse of process" or its modern counterpart, "lawfare" - when a political agenda, as here, is the ulterior motive, defined as taking a lawful legal position only to advance a contrary political agenda.[17]

---

[15]     Although the Plaintiffs are free to acquire the FSS assets through a fair bidding process for cash, the stated purpose of the purchase is to destroy the value of the "Infowars" or "Alex Jones" brand.  This perverted motive is addressed below, and its impact on the claims allowance process.

[16]     *See, e.g.* the Fifth Circuit opinion in *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020):

> The Bankruptcy Code 'provides equitable powers for the bankruptcy court to use at its discretion.' *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This  [*428]  includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ('[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages.').  *Id.* at 428.

[17]     "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy. The term "lawfare" is also a clever play on words, a pun, and a neologism that needs to be deconstructed in order to explain the linguistic and political power of the term. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448

006394

Bankruptcy Courts have the jurisdiction to remedy and sanction abuse of process and lawfare, and do so.[18]

51.    Ultimately, to the extent that any part of these two Plaintiffs' Judgments is rendered final on appeal, the rights of Jones to *a reasonable effort to achieve a maximum credit against those Judgments* should include the Debtor's right to actually achieve the highest value reasonably obtainable from the sale process most reliably capable of achieving that result – a bankruptcy sale – uncontrolled by any outside source other than this Bankruptcy Court enforcing its own orders to sell.  A private cash only one time offer that goes to the highest bidder.  That simply private sale will assure the motives of Plaintiffs to destroy Alex Jones brand will not be rewarded.

## IV.
## CONCLUSION

**WHEREFORE, PREMISES CONSIDERED,** the Court should deny Plaintiffs their request for an order finding that the FSS assets are not property of the Chapter 7 Estate, and for such other relief which Movants shall be justly entitled.

Dated: September 30, 2025

*/s/ Shelby A. Jordan*
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401

---

[18]    *Ridgeway v. Stryker Corp. (In re Ridgeway), 973 F.3d 421, 427-28 (5th Cir. 2020).* Christopher Martin Ridgeway and his former employer have waged scorched earth lawfare against one another… *Id.* at 423.  … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428]  includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages."). *Id.* at 427-428.

006395

Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
        aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and FSS**

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES And FSS**

006396

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on September 30, 2025.

/s/ Shelby A. Jordan
Shelby A. Jordan

006397

No. 25-

IN THE

# Supreme Court of the United States

ALEXANDER E. JONES;
FREE SPEECH SYSTEMS, LLC,

*Petitioners,*

*v.*

ERICA LAFFERTY, *et al.,*

*Respondents.*

ON PETITION FOR A WRIT OF CERTIORARI TO THE
SUPREME COURT OF CONNECTICUT

## PETITION FOR A WRIT OF CERTIORARI

BEN C. BROOCKS
  *Counsel of Record*
BROOCKS LAW FIRM, PLLC
248 Addie Roy Rd., Suite B301
Austin, TX 78746
(512) 201-2000
bbroocks@broockslawfirm.com

ALAN B. DAUGHTRY
ALAN DAUGHTRY LAW FIRM
3355 West Alabama, Suite 444
Houston, TX 77098

SHELBY A. JORDAN
JORDAN & ORTIZ, P.C.
500 North Shoreline,
  Suite 804
Corpus Christi, TX 78401

*Counsel for Petitioners*

382896



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

**EXHIBIT**

**A**

Alexander E. Jones; 22-33553

006398

*i*

## QUESTIONS PRESENTED

This case presents multiple constitutional questions of first impression involving the use of a punitive administrative Death Penalty Sanction for small discovery errors to impose liability, bypass burdens of proof, and award punitive damages against a media defendant reporting on a matter of public concern in a suit brought by public figures. The trial court's entry of a liability-decreeing administrative Death Penalty Sanction eliminated the Plaintiffs' requirement to prove falsity, fault, or actual malice, and resulted in an award of over $1.4 billion in damages without meaningful appellate review. The questions presented are

1. In actions brought by public figures against media defendants reporting on matters of undeniable public concern, may a state court through an administrative Death Penalty Sanction: (a) judicially decree liability, thereby relieving plaintiffs of their constitutional burdens to prove fault, falsity, and actual malice under the proper evidentiary standards; (b) impose liability on a media defendant for the acts of unrelated third parties; and/or (c) permit the award of punitive damages premised solely on such sanctions. And if so, whether the standards for so doing require a showing of a serious threat to the administration of justice and that no lesser sanctions would suffice.

2. Whether this Court is constitutionally required to independently review the trial record to ensure that constitutional facts were proven—and whether such review is even possible where the record was curtailed by a liability-decreeing administrative Death Penalty Sanction.

*ii*

3.  Can a liability-decreeing administrative Death Penalty Sanction judicially decree the validity of a plaintiff's complaint making the following actionable solely because they were alleged and judicially deemed admitted: (i) opinions otherwise not actionable; (ii) statements alleged to be defamatory that are not in fact defamatory; (iii) causes of action not legally cognizable; (iv) conduct of unrelated third parties; and (v) statements allegedly defamatory but grossly taken out of context.

006400

*iii*

## PARTIES TO THE PROCEEDINGS

Petitioners Alexander E. Jones and Free Speech Systems, LLC were Defendants in the trial court and Appellants before the Court of Appeal.

Respondents, Erica Lafferty, William Aldenberg, William Sherlach, Donna Soto, Jillian Soto-Martino, Carlee Soto-Parisi, Carlos Soto, Ian Hockley, Nicole Hockley, Matt Barden, Jacqueline Barden, David Wheeler, Francine Wheeler, Robbie Parker, and Jennifer Hensel were Plaintiffs in the trial court and Appellees before the Court of Appeal.

006401

*iv*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Court Rule 29.6, Petitioner, Free Speech Systems, LLC ("FSS") states that it has no parent corporation and that no publicly held company owns 10% or more of Applicant's stock.  FSS is owned by Alex Jones.  Jones has filed for bankruptcy protection in the Southern District of Texas.  Although a Trustee has been appointed over his and FSS's assets, Jones is the manager of FSS.

006402

*v*

## RELATED PROCEEDINGS

Bankruptcy Court for the United States District Court for the Southern District of Texas, Houston Division, which are pending:

- Cause No. 22-33553, *In re: Alexander E. Jones*
- Adversary No. 23-03037, *Wheeler, et al. v. Jones, et al.*
- Adversary No. 24-03228, *Jones v. Chris Murray, et al.*
- Adversary No. 22-03034, *Wheeler, et al. v. FSS*
- Adversary No. 23-03036, *Wheeler, et al. v. FSS*

Connecticut State Court Proceedings:

- Superior Court, Complex Litigation Docket at Waterbury, Connecticut, Docket No. UWY-CV-18-604636-S/6046437-S/6046438-S, *Erica Lafferty, et al. v. Alex E. Jones, et al.*, judgment entered on verdict on December 22, 2022;
- Appellate Court of Connecticut, AC 46131/46132/46133, *Erica Lafferty, et al. v. Alex E. Jones, et al.*, opinion issued December 10, 2024; and
- Supreme Court for the State of Connecticut, PSC-240253, Erica Lafferty, et al. v. Alex E. Jones, et al., petition for certification denied on April 8, 2025.

006403

*vi*

Texas State Court Proceedings:

- Travis County District Court, Cause No. D-1-GN-18-001605, *Marcel Fontaine v. Alex E. Jones, et al.*, matter pending;
- Travis County District Court, Cause No. D-1-GN-18-001835, *Neil Heslin v. Alex E. Jones, et. al.*, final judgment entered on January 12, 2023;
- Travis County District Court, Cause No. D-1-GN-18-001842, *Leonard Pozner, et al. v. Alex E. Jones, et al.*, matter pending; and
- Third Court of Appeals at Austin, Texas, Cause No. 03-23-00209-CV, *Alex E. Jones, et al. v. Neil Heslin, et al.*, matter argued to the on May 28, 2025.
- Third Court of Appeals at Austin, Texas, Cause No. 03-25-00617-CV, Free Speech Systems, LLC v. David Wheeler, et al., matter pending.

*vii*

## TABLE OF CONTENTS

*Page*

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . .i

PARTIES TO THE PROCEEDINGS . . . . . . . . . . . . . .iii

CORPORATE DISCLOSURE STATEMENT . . . . . . iv

RELATED PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . .v

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . vii

TABLE OF APPENDICES . . . . . . . . . . . . . . . . . . . . . .xi

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . xiii

PETITION FOR A WRIT OF CERTIORARI . . . . . . . .1

OPINIONS BELOW . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

CONSTITUTIONAL AND STATUTORY
    PROVISIONS INVOLVED . . . . . . . . . . . . . . . . . . . . .8

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . .8

   A.  The Sandy Hook Tragedy And Its Very
       Public Aftermath Were Matters Of
       Public Concern . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

   B.  The Plaintiffs Were Public Figures . . . . . . . . . . .8

006405

*viii*

## *Table of Contents*

*Page*

C.  Alex Jones Is A Media Defendant Entitled
To All First Amendment Freedom Of The
Press Protections . . . . . . . . . . . . . . . . . . . . . . . . .11

D.  Alex Jones Goes On Megyn Kelly Show In
June 2017 Which Prompts Suit . . . . . . . . . . . . . .11

E.  The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

F.  The Administrative "Death Penalty"
Default Sanction Was Unjust And
Disproportionate . . . . . . . . . . . . . . . . . . . . . . . . . .12

G.  Trial Court Strikes Jones's Notice Of
Constitutional Defenses . . . . . . . . . . . . . . . . . . . .15

H.  Trial Court Conducts A "Damages-Only"
Trial Where Jury Was Told Liability Had
Been Established. . . . . . . . . . . . . . . . . . . . . . . . . .15

I.  Appeals Process . . . . . . . . . . . . . . . . . . . . . . . . . .16

REASONS FOR GRANTING THE PETITION . . . . .17

A.  While *Sullivan* Is Still The Law And This
Case Is Its Identical Twin, The Administrative
Default Judgment Discarded It. . . . . . . . . . . . . . .17

B.  This Court Has Issued No Jurisprudential
Teaching On State Court Administrative
Default Judgments . . . . . . . . . . . . . . . . . . . . . . . .19

006406

*ix*

*Table of Contents*

*Page*

C.  Independent Review Is Mandated Here As In All First Amendment Cases . . . . . . . . . . . . . . .21

D.  The Complaint Itself Demonstrates There Is No Defamation . . . . . . . . . . . . . . . . . . . . . . . . .22

E.  Liability Default Judgments Against Media Defendants Are Constitutionally Impermissible . . . . . . . . . . . . . . . . . . . . . . . . . . .31

   1.  Falsity—Death Penalty Default Unconstitutionally Allowed Liability Without The Plaintiffs Having Proved Falsity Of Specific Statements By Clear And Convincing Evidence . . . . . . . . .31

   2.  Fault—The Death Penalty Sanction Unconstitutionally Allowed Liability Without The Plaintiffs Having Proved Fault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

   3.  The Death Penalty Sanction Unconstitutionally Allowed IIED Claims To Be Submitted On The Wrong Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . .33

   4.  Death Penalty Sanction Unconstitutionally Decreed Liability For Jones For Acts Of Third Parties . . . . .34

006407

*x*

## *Table of Contents*

*Page*

5.  Death Penalty Sanction
    Unconstitutionally Allowed Profit
    Motive To Factor In When It Is
    Irrelevant In Media Libel . . . . . . . . . . . . . .35

F.  Punitive Damages Cannot Be Based
    On A Death Penalty Sanction . . . . . . . . . . . . . .36

G.  If A Death Penalty Sanction Is Permitted,
    The Punishment Must Fit The Crime . . . . . . . .36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

006408

*xi*

## TABLE OF APPENDICES

*Page*

APPENDIX A — ORDER OF THE SUPREME COURT FOR THE STATE OF CONNECTICUT, DECIDED APRIL 8, 2025.....1a

APPENDIX B — OPINION OF THE APPELLATE COURT OF CONNECTICUT, FILED DECEMBER 10, 2024.................3a

APPENDIX C — OPINION OF THE SUPERIOR COURT, COMPLEX LITIGATION DOCKET AT WATERBURY, CONNECTICUT, FILED NOVEMBER 10, 2022 .......................75a

APPENDIX D — ORDER OF THE SUPERIOR COURT FOR THE JUDICIAL DISTRICT OF WATERBURY, DATED DECEMBER 24, 2021...105a

APPENDIX E — OPINION OF THE SUPERIOR COURT FOR THE JUDICIAL DISTRICT OF WATERBURY, CONNECTICUT, FILED NOVEMBER 15, 2021 ......................107a

APPENDIX F — TRIAL COURT ORDER OF THE SUPERIOR COURT OF THE JUDICIAL DISTRICT OF WATERBURY AT WATERBURY, CONNECTICUT, DATED AUGUST 5, 2021...........................121a

APPENDIX G — RELEVANT CONSTITUTIONAL PROVISIONS INVOLVED...................126a

006409

*xii*

*Table of Appendices*

*Page*

APPENDIX H—PETITION FOR CERTIFICATION OF THE SUPREME COURT, STATE OF CONNECTICUT, FILED JANUARY 21, 2025 . . .128a

APPENDIX I—TRANSCRIPT—JURY CHARGE, FILED OCTOBER 6, 2022 . . . . . . . . . . . . . . . . . . . .147a

APPENDIX J — VERDICT, DATED OCTOBER 12, 2022 . . . . . . . . . . . . . . . . . . . . . . . .172a

APPENDIX K — NOTICE OF DEFENSES OF THE SUPERIOR COURT, COMPLEX LITIGATION DOCKET AT WATERBURY, FILED NOVEMBER 24, 2021 . . . . . . . . . . . . . . . .189a

006410

*xiii*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases**

*Berisha v. Lawson,*
   141 S. Ct. 2424 (2021). . . . . . . . . . . . . . . . . . . . . . . . . .32

*Bose Corp. v. Consumers Union,*
   466 U.S. 485 (1984). . . . . . . . . . . . . . . . . . . . . . .3, 21, 22

*Bridges v. California,*
   314 U.S. 252 (1941) . . . . . . . . . . . . . . . . . . . . . . . .19, 20

*Counterman v. Colorado,*
   600 U.S. 66, 143 S. Ct. 2106 (2023). . . . . . . . . . . . .6, 35

*De Blasio v. Aetna Life & Cas. Co.,*
   186 Conn. 398, 441 A.2d 838 (1982) . . . . . . . . . . . . . .15

*Gertz v. Robert Welch,*
   418 U.S. 323 (1974) . . . . . . . . . . . . . . . . . . . . . . . .11, 32

*Harte-Hanks Commc'ns v. Connaughton,*
   491 U.S. 657 (1989). . . . . . . . . . . . . . . . . . . . . . .4, 14, 35

*Herbert v. Lando,*
   441 U.S. 153 (1979). . . . . . . . . . . . . . . . . . . . . . . . . .36

*Hustler Magazine v. Falwell,*
   485 U.S. 46 (1988). . . . . . . . . . . . . . . . . . . . . . . . .33, 35

006411

*xiv*

*Cited Authorities*

*Page*

*In re Yasiel R.,*
    317 Conn. 773, 120 A.3d 1188 (2015) . . . . . . . . . . . . . .16

*Lafferty v. Jones,*
    229 Conn. App. 487 (2024). . . . . . . . . . . . . . . 12, 22, 33

*Mckesson v. Doe,*
    144 S. Ct. 913 (2024). . . . . . . . . . . . . . . . . . . . . . . . . .34

*Milkovich v. Lorain Journal Co.,*
    497 U.S. 1 (1990). . . . . . . . . . . . . . . . . . . . . . . . . .17, 32

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982). . . . . . . . . . . . . . . . . . . . . . . .34, 35

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964). . . . . . . . . . . . . . . .5-7, 17-19, 33, 35

*Phila. Newspapers v. Hepps,*
    475 U.S. 767 (1986) . . . . . . . . . . . . . . . . . . . . . . . . .17, 32

*Rosenbloom v. Metromedia,*
    403 U.S. 29 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Snyder v. Phelps,*
    562 U.S. 443 (2011). . . . . . . . . . . . . . . . . . . . 16, 17, 21-33

*Soto v. Bushmaster Firearms Int'l, LLC,*
    331 Conn. 53, 202 A.3d 262 (2019) . . . . . . . . . . . . . . .10

006412

*xv*

*Cited Authorities*

*Page*

*St. Amant v. Thompson,*
  390 U.S. 727 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . .8, 9

*State v. Golding,*
  213 Conn. 233, 567 A.2d 823 (1989) . . . . . . . . . . . . . .16

*Time, Inc. v. Firestone,*
  424 U.S. 448 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . .22

**Statute**

28 U.S.C. §1257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

006413

1

## PETITION FOR A WRIT OF CERTIORARI

In this case controversial conservative media defendants Alex Jones and his company Free Speech Systems, LLC (collectively, "Jones") were sued in rural Connecticut over Jones's coverage of the 2012 Connecticut-based Sandy Hook Elementary School murders, which were the subject of reporting and debate worldwide. Jones received no trial on liability as his liability was "judicially decreed" as a result of a liability-decreeing administrative Death Penalty Sanction. Based on liability imposed by judicial fiat, the ensuing damages-only trial produced a $1,436,650,000 judgment—believed to be the largest in American libel history. It is an amount that can never be paid, and which based on the trial court's findings may not be dischargeable in bankruptcy. The result is a financial death penalty by fiat imposed on a media defendant whose broadcasts reach millions.

The fifteen Plaintiffs were relatives—mothers, fathers, spouses, and siblings—of six of the twenty victims, along with one unrelated FBI agent. They filed suit after Jones was interviewed in 2017 by NBC's Megyn Kelly, their Complaint claiming in general that from 2012 to 2017 (a) Jones denied there were any murders at Sandy Hook; (b) the Plaintiffs were participants in deceiving the public; and (c) Jones's listeners had in some instances harassed the Plaintiffs for which Plaintiffs claimed Jones was liable. The causes of action sounded primarily in defamation and intentional infliction of emotional distress (IIED), even though virtually none of the Plaintiffs were named in any of Jones's broadcasts, and every IIED claim rested on the allegedly defamatory broadcasts.

2

The administrative Death Penalty Sanction declared Jones liable for everything alleged in Plaintiffs' Complaint, which attached none of the purportedly defamatory broadcasts, instead including only snippets and phrases lifted out of context from a handful of Jones's shows.

As a conservative media figure, Jones's opinions—and those expressed by some of his guests—focused largely on exposing what he believed were efforts by the mainstream media and the Obama Administration to convert the tragedy into a mass theatrical production in service of anti-gun legislation. He also highlighted inconsistencies and oddities in the official narrative, which in turn had fueled public concerns that the public was being given false or incomplete information, and which ultimately gave rise to broader conspiracy theories about the event. Jones urged his listeners to investigate for themselves rather than rely on the politically motivated mainstream media. In his coverage, after pointing to specifics, Jones expressed opinions of media excesses with terms such as "hoax" and "staged," generally directed at the media circus, while often in the same broadcasts acknowledging that murders had in fact occurred. Yet Plaintiffs' Complaint on which Jones was decreed liable by default, repeatedly referenced only selected portions of broadcasts, omitting clarifying language.

One example is illustrative. Plaintiffs' Complaint alleged that in a January 27, 2013 broadcast, Jones stated:

> "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction. . . ."

006415

3

Plaintiffs seized on the single word "staged" to claim that Jones was accusing the Plaintiffs—who were not named—of falsifying the murders. But the Complaint deliberately omitted what Jones said in the same broadcast:

> "I clearly believe from the evidence children are really killed in Sandy Hook and it's a real tragedy."

Viewed in full context, Jones expressly affirmed that deaths occurred, while using the phrases "staged" or "hoax" to characterize media and governmental scripting. It is therefore contextually impossible to construe his remarks as denying deaths, as the Complaint did by selective editing. Precisely to guard against such distortions, this Court has required independent judicial review of the entire record in First Amendment cases. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499, 104 S. Ct. 1949, 1958 (1984) ("*Bose*"). No such review has occurred here at any level by any court.

Here the trial judge explicitly stated on the record that the Death Penalty Sanction was entered for three reasons, all trivial at best. **Strike One** against Jones was that his lawyers filed a motion to obtain a commission for an out-of-state deposition of Hillary Clinton, thought to be behind the suit because of her friendship with plaintiff Erica Lafferty and Jones' prior public support of Trump in the 2016 election. The trial court found Jones's motion for a deposition commission violated a protective order because it recited that the motion's genesis was an unnamed Plaintiff's refusal to testify in a deposition how her legal fees were being paid and how all 15 Plaintiffs had come together to be represented by the same law firm.

006416

4

The second reason was because Jones's lawyers could not retrieve in satisfactory form, never-used Google Analytics data that the Plaintiffs alleged would show the number of vitamin supplement sales Jones made during broadcasts mentioning Sandy Hook—**Strike Two**. Jones's lawyers also could not retrieve in a form and format to the liking of the Plaintiffs, accounting "subaccounts" from FSS's accounting journal entries to determine supplement sales—**Strike Three**. By these, the Plaintiffs hoped to demonstrate Jones's profit motive even though this Court has plainly stated a profit motive is irrelevant in libel cases and causes based on First Amendment speech issues. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989). Even though these infractions (a) were trivial and unrelated to the merits of the case and (b) the information sought could have been obtained by other means, the trial court used these as the basis to discard the First Amendment, decreeing Jones liable for everything alleged.

Having been stripped of his Constitutional rights, in the ensuing "damages-only" trial, the six-person jury sitting 28 miles from the murder site awarded the fifteen plaintiffs a total of $965,000,000 in compensatory damages, to which the trial court added $471,650,000 in CUTPA and punitive damages amounting to an award of approximately $95,776,667 per plaintiff.

This record-breaking award was possible only because the Death Penalty Sanction that judicially decreed—without any proof whatsoever, much less clear and convincing evidence—that: (i) Jones made every statement Plaintiffs alleged, though their Complaint contained only excerpts; (ii) every such statement was false; and (iii)

006417

5

Jones subjectively knew they were false. The same fiat further declared Jones liable for all acts and statements of unrelated third parties, deemed to be his "listeners," for whom he was held responsible. No proof was required that Jones had any connection to those individuals or their actions or that they were even his listeners.

This case presents the Court with an opportunity to clarify that in actions brought by public figures against media defendants reporting on matters of undeniable public concern, a state court may not, through procedural sanctions: (a) judicially decree liability, thereby relieving plaintiffs of their constitutional burdens to prove falsity, fault, and actual malice under the proper evidentiary standards; (b) impose liability on a media defendant for the acts of unrelated third parties; or (c) permit the award of punitive damages premised solely on such sanctions. If there are circumstances in which such a Death Penalty Sanction may override the First Amendment, this Court should articulate the constitutional guardrails necessary to prevent abuse.

In *New York Times v. Sullivan*, 376 U.S. 254 (1964) ("*Sullivan*") this Court stated:

> "Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker."

006418

6

*Sullivan*, 376 U.S. at 271. That constitutional command was discarded here by judicial fiat. With this case left undisturbed, all broadcasters are now at risk because of a new and easy means of bypassing *Sullivan* and its progeny through a Death Penalty Sanction that sidesteps core First Amendment protections. And the threat is to all media broadcasters including *legacy newspapers and broadcasters* (New York Times, Wall Street Journal, ABC, NBC, CNN), *digital-native outlets* (Politico, Axios, Vox), *nonprofit investigative groups* (ProPublica, The Intercept), *independent podcasters* (Joe Rogan, Pod Save America, Ben Shapiro), *social media platforms* (TikTok, Twitter/X, Reddit), *algorithmic aggregators* (Google News, Apple News, Morning Brew), and *state-sponsored players* (BBC, Al Jazeera, RT, Xinhua). Reporting from all of these sources will result in self-censoring fear of suits especially in small locales, where any of these news sources may be targeted for locally unpopular speech.

The result will chill the reporting of news. *Counterman v. Colorado*, 600 U.S. 66, 75-76, 143 S. Ct. 2106, 2114-15 (2023) ("*Counterman*") (J. Kagan) ("Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system. The result is 'self-censorship' of speech that could not be proscribed . . . ").

It will also flood state and federal courts with demands for default judgments. Faced with the precedent of this very case, courts will be left without guidance on whether

006419

7

constitutional pronouncements of this Court can be discarded by a Death Penalty Sanction—and, if so, how offensive must the alleged discovery abuse be to justify replacing trial by jury with trial by sanction.

*Sullivan* remains controlling law. Should this Court decide to revisit *Sullivan*—and Jones does not contend it should—this case would present the occasion. What the Court should not do, however, is nothing, thereby allowing First Amendment jurisprudence to descend into uncharted waters of greater uncertainty.

## OPINIONS BELOW

The decision of the Supreme Court for the State of Connecticut (App. A, 1a-2a) is reported at 333 A.3d 105. The Opinion of the Appellate Court of Connecticut (App. B, 3a-74a) is reported at 229 Conn. App. 487. The opinion of the Superior Court (App. C, 75a-104a) is reported at 2022 Conn. Super. LEXIS 2813.

The orders and opinions of the Superior Court (App. D, 105a-106a) (App. E, 107a-120a) (App. F, 121a-125a) have not been published.

## JURISDICTION

The Supreme Court of Connecticut denied certification for their review of this case on April 8, 2025. This Court granted Petitioners' Application to Extend Time to File Petition (25A7) until September 5, 2025. The jurisdiction of this Court is based on 28 U.S.C. §1257.

006420

8

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The First Amendment, the Fifth Amendment and the Fourteenth Amendment. App. G, 126a-127a.

## STATEMENT OF THE CASE

### A. The Sandy Hook Tragedy And Its Very Public Aftermath Were Matters Of Public Concern

The tragic Sandy Hook murders took place in December of 2012 in Newtown, Connecticut, a small town with a population of under 30,000 and captivated the entire world. In the United States alone, major news outlets such as The New York Times, The Washington Post, CNN, and NBC News, alongside numerous local papers and online publications, produced extensive coverage immediately following the incident and, in the years, since. The Sandy Hook tragedy triggered widespread public debate over gun control and generated extensive public commentary concerning inconsistencies in media coverage. This, in turn, led to a broad array of public opinions, including claims that certain aspects may have been a "hoax" which to Jones meant media propaganda. These were undeniably matters of public concern.

### B. The Plaintiffs Were Public Figures

Plaintiff William Aldenberg was/is a law enforcement official with the FBI who was on site at Sandy Hook leading the investigation there. Complaint, ¶28. As a federal law enforcement official, Aldenberg was unquestionably a public figure. *St. Amant v. Thompson*, 390 U.S. 727

006421

9

(1968) (deputy sheriff). The Sandy Hook tragedy quickly morphed any of the Plaintiffs who were not before, into significant public figures as driving forces for gun control.

At the 2016 Democratic National Convention Plaintiff Erica Lafferty (her maiden name) gave a five-minute speech on gun control and Hillary Clinton and was shown in close support of Secretary Clinton given her positions on gun control.



Some of the Plaintiffs were invited to attend President Barack Obama's 2013 State of the Union address as guests, a gesture that highlighted their very public gun control advocacy. There President Obama advocated for gun reform following the tragedy, where President Obama after paying tribute to the Plaintiffs called for Congress to act on gun violence prevention. Based on public records and media coverage, David and Francine Wheeler were even asked to substitute for President Obama in his weekly, nationally televised address to publicly advocate these issues.

006422

10



Nicole Hockley and Ian Hockley were active in the media and Mark Barden and Jacqueline Barden frequently gave interviews and public statements. William Sherlach joined in public advocacy for changes in gun laws and mental health reform. Mark and Jackie Barden, Nicole Hockley, and William Sherlach co-founded Sandy Hook Promise, which holds itself out on its publicly accessible web site. https://www.sandyhookpromise.org/who-we-are/about-us.

Their status as public figures increased when they sued Remington Arms, the manufacturer of the weapon used by the murderer in a highly publicized suit. *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 64, 202 A.3d 262, 271 (2019). That case and its settlement for $73,000,000 was publicized world-wide, referring to the Plaintiffs as the "Sandy Hook Families."

All Plaintiffs were public and vocal advocates for gun reform, school safety, mental health awareness (and it's connection to violence) and participated in marches and public forums. There is thus no question that the Plaintiffs were "public figures," which has Constitutional

11

significance [*Gertz v. Robert Welch*, 418 U.S. 323, 336-37 (1974)] which the Death Penalty Sanction ignored.

## C. Alex Jones Is A Media Defendant Entitled To All First Amendment Freedom Of The Press Protections

Jones is a media defendant and the Plaintiffs readily admitted this. Complaint, ¶7, 30-35 & 40. Recognized by both supporters and critics, Jones has been at the forefront of media for nearly three decades, with his career spanning radio, online broadcasting, film, and commentary. Though some controversies have followed him, Jones has maintained his dedication to free speech, individual rights, and against gun control, positioning himself as a steadfast proponent of questioning mainstream narratives. Currently, he hosts The Alex Jones Show from Austin, Texas, which is the longest-running online news and politics talk show today and was previously broadcast by the Genesis Communications Network across the United States via syndicated and internet radio. As such he was entitled to, but denied, all the Constitutional protections afforded media defendants.

## D. Alex Jones Goes On Megyn Kelly Show In June 2017 Which Prompts Suit

In June 2017, NBC talk show host and political commentator Megyn Kelly hosted Alex Jones on a live broadcast on NBC. The interview covered many subjects and lasted approximately 17.5 minutes in its entirety. Approximately 4.5 minutes of that airtime involved (a) Kelly talking about Sandy Hook, which included her own comments and commentary, (b) Kelly asking question

12

of and making allegations against Jones; and (c) Kelly interviewing Neil Heslin, a parent of one of the murdered children who sued Jones in Texas.

## E.  The Complaint

In May 2018—five years after the tragedy—Plaintiffs sued Jones and others [CR 64], asserting claims for (i) invasion of privacy, (ii) defamation and defamation per se, (iii) intentional infliction of emotional distress, and (iv) Connecticut Unfair Trade Practices Act ("CUTPA") violations. Initially, Jones filed a motion to dismiss pursuant to the Connecticut anti-Slapp statute. As a sanction, the trial court dismissed that motion which was upheld by the Connecticut Supreme Court. *Lafferty v. Jones*, 336 Conn. 332 (2020).

## F.  The Administrative "Death Penalty" Default Sanction Was Unjust And Disproportionate

Shortly after the case was returned to the trial court, on November 14, 2021, that court entered a Death Penalty Sanction. A transcript of its ruling recites the three reasons for entry. As to the first ground, Jones's lawyers filed a motion for leave to depose Hillary Clinton [App. E, 108a]. A protective order had been entered in the case that provided that information covered in depositions could be (a) designated as "confidential" but also (b) used for the preparation and trial of the case. Trial Dkt. No. 185.10, p. 4, ¶9. As the deposition of one of the plaintiffs began, it became apparent that plaintiffs' counsel would resist any testimony about how all 15 plaintiffs happened to find themselves in the same law office six years after the Sandy Hook shootings. It was the collective belief on Jones's side,

13

that the prosecution of Jones was orchestrated by those motivated to have their revenge on him for his support of Donald Trump's successful campaign against Hillary Clinton in 2016. To that end, counsel for Jones sought a commission to take the deposition of Clinton in New York, explaining why Clinton's deposition was being sought using the following two sentences:

> "On advice of counsel, at least one plaintiff has refused to answer how so many of the clients all ended up represented by the same firm. The witness claimed not to know how her legal fees were being paid."

[Trial Dkt. No. 385].

Although the two offending sentences did not disclose testimony but only a refusal to answer, the trial judge denied the request for commission [Trial Dkt. No. 385.10] and used this as the first of the three grounds for the Death Penalty Sanction.

The second ground was that Jones's lawyers could not retrieve in satisfactory form, never-used Google Analytics data showing sales ("Analytics Data"), i.e., the same issues presented earlier that resulted in the denial of Jones's anti-SLAPP motion. 336 Conn. at 378, n.35. Given that the "failure" regarding analytics was one of the reasons the trial court there had initially denied Jones's statutory rights to an anti-Slapp motion, the Connecticut Supreme Court had a reason for addressing it earlier and did so demonstrating its sole relevance was to Plaintiffs' CUTPA claim—which would later be dismissed on appeal—explaining Plaintiffs' claimed need involved showing

006426

14

Jones's profit motive relevant to Plaintiffs' CUTPA claim. After the Connecticut Supreme Court returned the case to the trial court, the Plaintiffs again explained that the "critical importance" of this was tied to their now-dismissed CUTPA claim. Dkt. 450, pp. 14-15.

The third ground was because Jones's lawyers could not retrieve accounting "subaccounts" from Jones's accounting journal entries also sought for sales information to determine profits [App. E, 110a] ("Subledger Data"), the trial court concluded Jones had failed to provide "full and fair compliance" with a request for the data, thus "willfully withholding information" that was of "critical importance" to the plaintiffs in pursuing their CUTPA claims. In the Death Penalty Sanction order itself, the trial judge cited this. App. E, 119a. Thus, both the Analytics and Subledger grounds were tied directly to the now-reversed CUTPA claim, as Plaintiffs admitted stating: "These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims." Dkt. 450, pp. 14-15.

Notably, none of the three stated bases for the Death Penalty Sanction has anything to do with defamation or intentional infliction, and that is particularly true as to the Analytics and Subledgers, as this Court has plainly stated a profit motive is irrelevant in libel cases and causes based on First Amendment speech issues. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989).

The effect of this Death Penalty Sanction was for the trial court to judicially decree that everything Plaintiffs' Complaint alleged was true without the need for proof.

006427

15

### G. Trial Court Strikes Jones's Notice Of Constitutional Defenses

After entry of the Death Penalty Sanction, Jones filed a Notice of Defenses specifically stating the Constitutional defenses referenced herein, which would have allowed Jones to offer evidence contradicting any allegation of the Complaint and challenged the right of the Plaintiffs to maintain the action. App. K 189a. *De Blasio v. Aetna Life & Cas. Co.*, 186 Conn. 398, 401, 441 A.2d 838, 839 (1982). The trial court, however, struck this because of the Death Penalty Sanction.

### H. Trial Court Conducts A "Damages-Only" Trial Where Jury Was Told Liability Had Been Established

As a direct result of the Death Penalty Sanction, in the ensuing "damages-only" trial, the trial court made it abundantly clear that "fault" was not at issue. The charge simply lifted quotes from the Plaintiffs' complaint on which the Death Penalty Sanction had been granted and repeatedly instructed the jury that that they were to assume as "facts" that alleged statements were actually statements made by Jones, they were defamatory, they were false, and they were made with legal malice. App. I, 148a, 157a. The trial court even instructed the damages-only jury that the court itself had found Jones's conduct extreme and outrageous, instructing the jury: " . . . you may consider that it is already established that the defendants' conduct was extreme and outrageous." App. I, 163a.

Also because of the Death Penalty Sanction, the "damages-only" jury was repeatedly instructed by the

006428

16

trial court that damages were presumed—their task was only to figure out how much those presumed damages were. App. I, 161a. See also App. I, 159a, 160a, & 165a.

This Court, however, has repeatedly emphasized that it is an absolute constitutional requirement that each alleged defamatory statement be precisely identified in context, focusing particularly on "what was said, where it was said, and how it was said" and that it is "necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder v. Phelps*, 562 U.S. 443, at 453-54 (2011) ("*Snyder*"). This it did not occur given the Death Penalty Sanction.

## I.    Appeals Process

Jones appealed to the Connecticut Court of Appeals which upheld the Death Penalty Sanction, refused to consider the Constitutional issues Jones raised and refused to consider the inappropriate denial of Jones's Notice of Defenses (holding them to have been inadequately briefed and not having been raised, respectively). However, it did determine CUTPA was not a valid claim but did not address what the effect of that finding was on the Death Penalty Sanction that were tied to the CUTPA claims it found invalid.

Jones requested review by the Connecticut Supreme Court [App. H, 128a] which was bound to accept the case for review given it's long-standing policies to review cases involving the denial constitutional rights even if not previously raised. *State v. Golding*, 213 Conn. 233, 239-40, 567 A.2d 823 (1989) and *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Yet breaking its own requirements,

006429

17

however, the Connecticut Supreme Court denied review. App. A, 1a.

## REASONS FOR GRANTING THE PETITION

### A.  While *Sullivan* Is Still The Law And This Case Is Its Identical Twin, The Administrative Default Judgment Discarded It

In *Sullivan*, this Court stated applicable Constitutional rules that cannot be set aside for any reason in a Freedom of the Press case and certiorari should be granted here because these teachings were ignored. This Court has stated:

> "The First Amendment 'guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker." 376 U.S. at 271.

Labelled preempting "federal rules" that "place limits on the application of the state law. . . ." [*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 15-17 (1990) ("*Milkovich*")] this Court has proclaimed these as unalterable "constitutional rules." *Phila. Newspapers v. Hepps*, 475 U.S. 767, 775-76 (1986) ("*Hepps*"). These Constitutional rules apply to both defamation and IIED claims asserted against media defendants. *Snyder v. Phelps*, 562 U.S. 443 (2011).

The administrative default ignored these constitutional rules. While *Sullivan* is not without its critics, until overruled, it remains the law and state courts are not at

006430

18

liberty to ignore this Court's instructions. That *Sullivan* is controlling here is certain as this case is virtually identical factually to *Sullivan* making the jurisprudence of that case and its progeny fully applicable here. Therefore, a state court administrative default judgment against a media defendant violates the teachings of *Sullivan* and cannot stand.

As stated, this case is a virtual mirror image of *Sullivan*. Here, suit was filed in a small Connecticut community twenty-eight miles from the site of the murders and presided over by a judge elected by that community—just as *Sullivan* was filed in a small Alabama community and presided over by a locally elected judge. In *Sullivan*, the political motivation was racism; here, it was prejudice against a conservative media figure who stood firmly against gun control. Among other errors, in *Sullivan* the trial court instructed the jury that "falsity and malice were presumed," prompting this Court to announce its effective preemption of state law that has been consistently repeated.

Hence the unquestioned teaching of *Sullivan* and its progeny is that particularly in cases where public plaintiffs sue a media defendant for its coverage and opinions on matters of public concern, among the key requirements, the plaintiffs must prove the falsity of claimed defamations, that the media defendant acted with actual malice, and that showing of malice must be made by clear and convincing evidence. Malice by clear and convincing evidence must also be shown for punitive damages. None of that was required here. For this reason, Certiorari should be granted to clearly confirm that state courts may not issue administrative default judgments against media defendants.

006431

19

### B. This Court Has Issued No Jurisprudential Teaching On State Court Administrative Default Judgments

This Court's jurisprudence has not specifically addressed the intersection between *Sullivan's* constitutional rules and a state court's entry of an administrative liability-decreeing default judgment. Certiorari should be granted to reaffirm the Constitutional rules that this Court has pronounced, or to announce that these Constitutional rules allow an exception for a state court default, stating the specific grounds.

The authority believed to be most relevant from this Court is *Bridges v. California*, 314 U.S. 252 (1941) ("*Bridges*") and it does not support finding such a carve out. In *Bridges*, the petitioners were found in contempt for publishing reports of court proceedings; the court claimed to have the power to punish by contempt publications "if they tend to interfere with the fair and orderly administration of justice in a pending case." *Bridges*, 314 at 259. There Justice Black stated "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." *Id*. at 260. Jones here has been deprived of both.

The then-prevailing view was contempt was justified when a court was faced with a clear and present danger of the obstruction to the "orderly and fair administration of justice." *Id*. at 263. This Court did not fully embrace that view to uphold contempt, noting it did "no more than recognize a minimum compulsion of the Bill of Rights" which contained the "sweeping constitutional mandate against any law 'abridging the freedom of speech or of

20

the press' . . . necessarily [requiring] measuring a power of all American courts, both state and federal, including this one." *Id.* at 260. Analyzing the allegedly contemptuous conduct there, the Court found nothing that "sidetracked the course of justice."

The *Bridges* test is inapplicable, however, as it involved contempt of court, whereas here the Death Penalty Sanction was merely based on alleged discovery abuse. But even if it were the test, the three trivial bases given for denying Jones his twin rights of "free speech and fair trial" cannot conceivably be argued to significantly obstruct the administration of justice. Hence, this Court must make clear that a Death Penalty Sanction of a state trial court for alleged discovery abuse, cannot veto or disregard the constitutional safeguards put in place by this Court.

Furthermore, allowing a trial court to grant a Death Penalty Sanction against a media defendant—thereby accepting as proved and accurate everything a defamation plaintiff has alleged—opens the door to abuse. As demonstrated *infra*, once such a default judgment declares a media defendant liable for every allegation in the complaint, the following become actionable solely because they were pleaded and deemed admitted: (i) opinions otherwise not actionable; (ii) statements alleged to be defamatory that are not in fact defamatory; (iii) causes of action not legally cognizable; (iv) conduct of unrelated third parties; and (v) statements allegedly defamatory but grossly taken out of context. Surely this cannot be this Court's intention.

006433

21

Jones respectfully states that if this Court determines that a trial court can impose a Death Penalty Sanction, then two concomitant things must occur. First, this Court must announce guidelines to guide state and federal courts as they circumnavigate the above-stated constitutional safeguards.

Second, this Court must issue guidance so that simply because a Death Penalty Sanction judicially decrees the validity of a plaintiff's complaint: (i) opinions otherwise not actionable do not become actionable; (ii) nondefamatory statements do not become defamatory; (iii) context of alleged defamatory statements does not become irrelevant; (iv) invalid causes of action do not become valid; and (v) actions of unrelated third parties do not become the responsibility of the media defendant.

## C.  Independent Review Is Mandated Here As In All First Amendment Cases

This Court requires that appellate courts independently review the factual record in cases implicating the First Amendment to ensure constitutional conformity. *Bose*, 466 U.S. at 499. This review assesses whether the requisite constitutional facts have been proved by "clear and convincing evidence." *Rosenbloom v. Metromedia*, 403 U.S. 29, 55 (1971). It also requires the independent judicial review of the speech's context, content, form, and setting. *Snyder*, 562 U.S. at 453-54. No such review has been conducted by any court and it is incumbent on this Court to do so here and now.

Such review is not limited to whether a trial court recited constitutional principles, which did not occur, but

006434

22

requires a conscious determination of the existence or nonexistence of critical facts. *Time, Inc. v. Firestone*, 424 U.S. 448, 463 (1976). That determination must examine the "content, form, and context" of each challenged statement, as revealed by the entire record. *Snyder*, 562 U.S. at 453.

Here, the record is barren of factual determinations on constitutional issues because of the Death Penalty Sanction. [App. K]. Because no fact finder made the determinations the Constitution requires, and because no record exists from which this Court can conduct the de novo review mandated by *Bose* and its progeny, the judgment must be reversed.

The Connecticut Court of Appeals exacerbated the problem by refusing to conduct the required constitutional analysis, dismissing briefing on the issue as "bereft of any substantive legal analysis" and thus deemed abandoned. *Lafferty*, 229 Conn. App. at 510 n.26. Yet this Court holds that appellate courts have a duty to conduct de novo review when constitutional rights are implicated. *Bose*, 466 U.S. at 506 n.24. Independent review is thus not an optional task but a constitutional mandate.

**D. The Complaint Itself Demonstrates There Is No Defamation**

As a result of the Death Penalty Sanction, the only "what, where and how" of alleged defamatory statements was in the Complaint. See CR 64. Even in the face of a default, a complaint must still articulate valid claims. And even a cursory review of the Complaint shows the allegations made do not pass Constitutional muster. Moreover, phrases such as "hoax" and "fake as a three-

006435

23

dollar-bill," cited out of context in the Complaint, are plainly hyperbolic opinions about events, lacking any specific "what, where, or how" to explain or support them. They are opinions about events, specific news accounts or news conferences, made in a broader social context. Moreover, it is not even clear what the references to "hoax" in the Complaint pertain to; a press conference? a specific news coverage segment?

The media landscape is rife with groups challenging various events, including Holocaust denial, moon landing skepticism, 9/11 conspiracy theories, and even flat Earth claims. However, such statements critique or dismiss the events themselves, not the character, conduct, or reputation of those associated with them. Referring to an event as a "hoax" targets the nature of the event, not any specific individual. An unnamed Plaintiff cannot have been "defamed" by statements directed at generalized events.

Further fatal, none of the Plaintiffs (with one exception) were identified, named, singled out, or directly referenced in any way. No statement complained of alleged misconduct, dishonesty, or moral failing on the part of any Plaintiff.

Additionally, the Complaint inserts its own summaries of meanings, interspersed with article headlines, surrounding factual anomalies, leaving a reviewing court to have to guess to determine precisely what was the defamatory "statement" and more importantly, why it was defamatory.

In other places, statements are made that convey no possible defamatory meaning. As one example of

006436

24

numerous, in several places, the Complaint purports to quote someone saying that CNN reporter Anderson Cooper was operating behind a greenscreen as his nose would disappear when he would move.



See e.g., Complaint. See e.g., CR 64-102. Was this defamatory? Was it true? The jury was told it was maliciously defamatory without explanation.

In another example, the Complaint at ¶111-17 [CR 76] complains of a 1.27.2013 video as follows (focusing particularly on ¶112):

112.  Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've

25

been coached, people who have been given cue cards, people who are behaving like actors."

But what the Complaint intentionally omits is what Jones said immediately before this where he said: "**<u>I clearly believe from the evidence children are really killed in Sandy Hook and it's a real tragedy.</u>**" Trial Ex. 1 (video). It was only after Jones stated the deaths were real that he stated things were being "staged."

Hence, plainly stating he believes the tragic murders occurred in the same video he used the term "staged" demonstrates it is contextually impossible to claim the use of the word "staged" (or Jones's equivalent term, "hoax") meant there were no deaths. Rather, those terms criticized media and government scripting, not the reality of the tragedy. No reasonable viewer could interpret Jones's comments as a denial of the murders when viewed in context. Rather the clear focus was on media manipulation and the political exploitation of the tragedy.

In another example, the Complaint turned to Plaintiff Robbie Parker, the only one of two Plaintiffs named and states the following:

113. Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama' s meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks

006438

26

> like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, breaking down and crying.

[CR 76]. In the video at issue, Robby Parker does in fact approach the microphone laughing, then visibly changes his demeanor to become serious.



This moment, widely circulated and debated online, was interpreted by some commentators, including Jones's guests, as evidence of staging or inauthenticity. The commentary focused on this video clip itself—not on private facts about Parker—illustrating how the challenged speech concerned the public narrative around the event. The Complaint then pleads:

> 116. As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious. . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

27

117. Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns. . . . Something though, really, is starting to get suspicious here. . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

[CR 76]. What Jones was referring to was Robbie Parker's "staged" performance in a press conference when he referenced Parker actually laughing at the news conference and clutching in his hands what clearly appeared to be "cue cards." It was not suggesting his child had not died.

Moreover, Jones's comments are not defamatory statements of fact, but expressions of constitutionally protected opinion. Yet for these, Robbie Parker was awarded $120,000,000 in compensatory damage consisting of $60M in "Defamation Damages" and another $60M in Emotional Distress Damages [App. J, 173a] to which the trial court appended $50,000,000 in punitive damages for a total award of $170,000,000.

Plaintiff William Aldenberg, an FBI agent who was listed as a "first responder," testified at the "damages-only" trial and made no accusations that Alex Jones ever spoke about him, aired information about him, or directed harassment toward him. When asked, "Did Mr. Jones direct his audience to Mr. Halbig's website (Halbig being a show-guest)?" Aldenberg responded, "To be honest, certain, I just don't recall that. I don't." (Pg. 54: 22–25).

006440

28

In fact, Aldenberg testified he only learned of Jones through his conversations with an FBI counselor. (Pg. 46: 16-17, 20). As to how it affected him, he said:

> "You can say whatever you want about me. I don't care; just say whatever you want. I'm a big boy, I can take it. But they want to make profits; they want to make millions and millions of dollars." (Pg. 50: 13-17, 23-26).

And for this testimony which the trial court instructed the jury was false, defamatory and made with malice, the jury awarded him $45M in "Defamation Damages" and another $45M in Emotional Distress Damages [App. J, 185a] to which the trial court appended another $40,000,000 in punitive damages for a total award of $130,000,000. And Mr. Jones was powerless to refute the any of the allegations given the Death Penalty Sanctions rendered against him.

In another example of the travesty that occurred in not requiring the full context of broadcasts and publications to be scrutinized, Complaint ¶¶ 171- 179 reference a call-in exchange Jones is alleged to have had on December 28, 2014. Of particular relevance are Complaints paragraphs 176 and 177 (emphasis added):

176. Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. **I knew they jumped on it, used the crisis, hyped it**

29

**up**. But then I did deep research-and my gosh, it just pretty much didn't happen."

177. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

Notably, in ¶ 176 Jones is quoted as saying " I knew they jumped on it, used the crisis, hyped it up" which obviously means that there was a crisis and it had been made into a media and governmental circus. But ignoring that, ¶ 177 is the summary accusation that "plaintiffs fabricated the deaths of their loved ones." It is not possible for Jones to have spoken of people "using the crisis" if there was no crises—i.e. deaths. And if this in itself is not abundantly clear, Jones broadcast that occurred the day before (i.e., December 27, 2014) removed any doubt that Jones did not say children had not been killed, but the crisis was being propagandized: "I said, they may have killed real kids, but they're practicing how to propagandize and how to control the press and how to put out a product that is a fraud."

In yet another example, Complaint ¶¶ 326-335 detail the June 18, 2017 "profile" of Jones done by Megyn Kelly. The Complaint references Kelly's interview with Neil Heslin, a father of one of the slain children who elected to file suit on virtually identical allegations in Texas. The Complaint quotes Heslin as saying "I lost my son. I buried my son. I held my son with a bullet hole through his head." Complaint ¶326. The Complaint then goes on to reference a June 26, 2017 broadcast by reporter Owen Shroyer, stating in a most deceptive manner, that Shroyer

006442

30

"claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes." Complaint ¶ 327.

What the Complaint does not state and was never presented because of the Death Penalty Sanction, was (a) the entirety of what Helsin said; (b) what Shroyer actually said and why; and (c) what Jones himself said about this. As to Heslin, after his statement above, he said in the Megyn Kelly interview which was designed to attack Jones for sloppy reporting: "I dropped him off at 9:04 . . . at school with his book bag [and] hours later, I was picking him up in a body bag." The problem with Heslin's statements was that Shroyer was simply stating what the coroner said, which was, that did not happen. While the Complaint references video footage Shroyer played, it does not quote the coroner, who actually said: "We did not bring the bodies and families into contact. We took pictures of them, of their facial features. It's easier on the families when you do that." Clearly the coroner's statement that he did not bring the families and bodies into contact, contradicts Heslin's statements. Then Heslin's own petition in Texas continues to quote the coroner as saying "All bodies were removed from the school before dawn Saturday and transported to the medical examiner's base in Farmington—about 40 miles away. The children's autopsies were performed first so that their bodies could be made available to funeral directors 'for obvious reasons.'"

31

Clearly, given the coroner's own statements Shroyer's comments were accurate. At worst, the broadcasts suggested Heslin may have exaggerated for dramatic effect—especially to support a narrative attacking Jones. And amplifying that is what Jones himself said about this on July 20, 2017 when Jones first referenced what the coroner had said and then stated: "**I'm sure later maybe the parents saw their children.** The point is that the media lies so much, you can't blame the public asking questions. . . ." (emphasis added). The entire context shows on its face there is no defamation.

## E. Liability Default Judgments Against Media Defendants Are Constitutionally Impermissible

Plaintiffs concede that Jones is a media defendant. [CR 64-69]. As such, he was entitled to but denied the full protections afforded media defendants under the U.S. Constitution because of the Default Judgment Sanction. But depriving Jones of these protections is not constitutional.

### 1. Falsity—Death Penalty Default Unconstitutionally Allowed Liability Without The Plaintiffs Having Proved Falsity Of Specific Statements By Clear And Convincing Evidence

This Court's long-standing mandate is that "a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation. . . . We believe that the common law's rule on falsity—that the defendant must bear the burden of proving truth–must similarly fall here to a constitutional requirement that

006444

32

the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Hepps*, 475 U.S. at 775-76. This was not done. The trial court determined these issues by judicial fiat on grounds that had nothing to do with the merits. This Court must make clear that a Death Penalty Sanction cannot replace the requirements that a defamation plaintiff must prove the falsity of specific statements of a media defendant. Factual falsity cannot be judicially decreed.

### 2.   Fault—The Death Penalty Sanction Unconstitutionally Allowed Liability Without The Plaintiffs Having Proved Fault

Another ignored black-letter Constitutional requirement is that liability of a media defendant cannot be entered without a finding of fault and that fault cannot be negligence. *Gertz*, 418 U.S. at 347; *see also Milkovich*, 497 U.S. at 15-16. Rather, fault must be proven to rise to the level of intentional or recklessness, which the Plaintiffs had the burden to prove by clear and convincing evidence as to each and every alleged libelous statement Jones was accused of making. *Berisha v. Lawson*, 141 S. Ct. 2424, 2424 (2021). Here there was no finding of fault, except by Death Penalty Sanction. In the ensuing "damages-only" trial, the trial court repeatedly instructed the jury that fault was not at issue. See App. I, 148a; see also [App. I, 157a, 158a, 163a). In fact, as a result of the Death Penalty Sanction, the trial court even instructed the jury that it had found Jones's conduct extreme and outrageous, instructing the jury: " . . . you may consider that it is already established that the defendants' conduct was extreme and outrageous." App. I, 164a.

006445

33

And topping off the improprieties in the subsequent "damages-only" trial, Jones's testimony was deeply restricted—an issue the Court of Appeals refused to consider. *Lafferty*, 229 Conn. App. at 491. This Court must make clear that a Death Penalty Sanction cannot replace the requirements that a defamation plaintiff must prove a media defendant's malice by clear and convincing evidence as was done here. Subjective malice cannot be simply judicially decreed.

### 3. The Death Penalty Sanction Unconstitutionally Allowed IIED Claims To Be Submitted On The Wrong Standard.

Another constitutional error predicated on the Death Penalty Sanction involves the emotional distress damages which total $561,000,400. App. H, 133a. In *Hustler Magazine v. Falwell*, 485 U.S. 46, 56-57 (1988), this Court clearly stated that the "actual malice by clear and convincing evidence" standards articulated in *New York Times Co. v. Sullivan* applies to claims of intentional infliction of emotional distress. This has been repeatedly reaffirmed. *Snyder*, 562 U.S. at 451. Yet the trial court's jury charge, because of the Death Penalty Sanction, used a negligence standard: "The defendants intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of their conduct." App. I, 157a. The standard of "knew or should have known" is the legal standard of negligence.

34

### 4. Death Penalty Sanction Unconstitutionally Decreed Liability For Jones For Acts Of Third Parties

The jury charge, informed the jury that "[D]efendants proximately caused harm to the plaintiffs by . . . urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly [behind] the Sandy Hook hoax." App. I, 160a. The actual charge itself goes on to state that this "result[ed] in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard the evidence in this case." App. I, 160a. Further, the Complaint is replete with acts of third parties in allegedly stalking some of the Plaintiffs, with no evidentiary tie to Jones. CR 65, ¶ 14; CR 65, ¶15 ("They have confronted strange individuals videotaping them and their children."); CR 65, ¶16; CR 69, ¶55 ("In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.) With no allegation and certainly no evidence, all of these acts were simply laid at the feet of Alex Jones and the jury was told Mr. Jones was maliciously responsible for these acts.

This is blatantly unconstitutional. Justice Sotomayor in her recent concurrence in *Mckesson v. Doe*, 144 S. Ct. 913, 914 (2024) summarized the law forbidding liability for "incitement" of third parties to act (*citing NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). In *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, (1982), cited in *McKesson*, the Supreme Court went so far as to acknowledge that even advocacy of the use of force or violence is protected by the First Amendment when acts of violence are alleged to have been encouraged and

006447

35

committed. *See also*, *Counterman*, 600 U.S. at 76, ("That rule helps prevent a law from deterring 'mere advocacy' of illegal acts—a kind of speech falling within the First Amendment's core."). Here, telling viewers to "investigate" for themselves, even if true, is purely protected by the Constitution which was ignored. The case of *NAACP v. Claiborne Hardware Co.*, dealt with civil rights activist Medgar Evers, whose urgings to his listeners to employ violence was not actionable even though vastly more inflammatory than Jones's encouragement of his listeners to simply investigate for themselves, this Court stating, "An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech." Here, by virtue of the Death Penalty Sanction, Jones was decreed liable for everything any Plaintiff complained happened to them by strangers—a preposterous proposition by itself and certainly unconstitutional in its effect.

## 5. Death Penalty Sanction Unconstitutionally Allowed Profit Motive To Factor In When It Is Irrelevant In Media Libel

A media defendant's profit motive is constitutionally irrelevant in a media libel case. *Harte-Hanks*, 491 U.S. at 667.

> "If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."

006448

36

Notwithstanding this, two of the three grounds for the "death penalty" sanctions were tied to Jones's alleged profit motive. Also, in the "damages-only" trial, particularly in the Plaintiffs' closing argument, Jones's "profit motive" was repeatedly emphasized. And this argument was allowed because the Complaint on which the Death Penalty Sanction had been granted, pleaded Jones's profit motive. This Court must make clear that administrative default judgments cannot allow a defamation plaintiff to argue the "profit motive" of a media defendant, as was done here.

### F. Punitive Damages Cannot Be Based On A Death Penalty Sanction

Even if Plaintiffs were not public figures, an award of punitive damages required plaintiffs themselves to prove malice and do so by clear and convincing evidence. *Herbert v. Lando*, 441 U.S. 153 (1979); *Gertz*, 418 U.S. at 349. Here the administrative Death Penalty Sanction removed this burden and punitive damages in the hundreds of millions were awarded without this showing. This Court must make clear that administrative default judgments cannot allow a defamation plaintiff to receive punitive damages.

### G. If A Death Penalty Sanction Is Permitted, The Punishment Must Fit The Crime

The Death Penalty Sanction was based on three trivial matters, none of which related to the integrity of the trial court. Furthermore, Jones appeared in the case, substantially complied with discovery, engaged in motion practice, attended endless "status" conferences, sat for dozens of depositions and provided tens of thousands of pages of documents to the Plaintiffs. Imposing a financial

37

life-ending Death Penalty Sanction was a denial of constitutional Due Process.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Dated: September 5, 2025

Respectfully submitted,

BEN C. BROOCKS
  *Counsel of Record*
BROOCKS LAW FIRM, PLLC
248 Addie Roy Rd., Suite B301
Austin, TX 78746
(512) 201-2000
bbroocks@broockslawfirm.com

SHELBY A. JORDAN
JORDAN & ORTIZ, P.C.
500 North Shoreline,
  Suite 804
Corpus Christi, TX 78401

*Counsel for Petitioners*

ALAN B. DAUGHTRY
ALAN DAUGHTRY LAW FIRM
3355 West Alabama, Suite 444
Houston, TX 77098

006450

**EXHIBIT**

**B**

Alexander E. Jones; 22-33553

exhibitsticker.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES AND            )   CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF         )
UNSECURED CREDITORS,              )   Houston, Texas
                                  )
        Debtors.                  )   Wednesday, February 5, 2025
                                  )
                                  )   9:00 AM to 9:26 AM
------------------------------)


HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones:   SHELBY JORDAN
                          ANTONIO ORTIZ
                          Jordan & Ortiz, PC
                          500 N. Shoreline Blvd.
                          Corpus Christi, TX 78401

                          BEN BROOCKS
                          WILLIAM BROOCKS
                          Broocks Law Firm PLLC
                          6207 Bee Cave Road, Suite 120
                          Austin, TX 78746

For Chapter 7 Trustee:    JOSHUA WOLFSHOHL
                          KENESHA STARLING
                          JORDAN STEVENS
                          Porter Hedges LLP
                          1000 Main Street
                          Houston, TX 77002

                          CHRISTOPHER R. MURRAY
                          ERIN JONES
                          Jones Murray LLP
                          602 Sawyer Street
                          Houston, TX 77007

For Connecticut          KYLE KIMPLER
Families:                PAUL PATERSON
                         Paul Weiss Rifkind Wharton &
                         Garrison LLP
                         1285 Avenue of the Americas
                         New York, NY 10019

                         RYAN CHAPPLE
                         Cain & Skarnulis PLLC
                         303 Colorado Street
                         Austin, TX 78701

For Texas Plaintiffs:    AVI MOSHENBERG
                         Lawson & Moshenberg PLLC
                         801 Travis Street
                         Houston, TX 77002

                         JARROD MARTIN
                         Chamberlain Hrdlicka White Williams
                         & Aughtry, P.C.
                         1200 Smith Street, Suite 1400
                         Houston, TX 77002

                         JENNIFER HARDY
                         Willkie Farr Gallagher LLP
                         600 Travis Street, Suite 2310
                         Houston, TX 77002

Court Reporter:          UNKNOWN

Courtroom Deputy:        UNKNOWN

Transcribed by:          Veritext Legal Solutions
                         330 Old Country Road, Suite 300
                         Mineola, NY 11501
                         Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

006452

HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 5, 2025; 9:00 AM

(Call to Order)

THE COURT:  -- 9:00 a.m. case, Alex Jones.  Why don't I take appearances in the courtroom and then we'll get started.

MR. WOLFSHOHL:  Good morning, Your Honor.  Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens from Porter Hedges, for the Trustee.  And Mr. Murray is here as well --

THE COURT:  Okay.  Good morning.

MR. WOLFSHOHL:  -- as well as co-counsel --

MS. JONES:  (indiscernible)

MR. WOLFSHOHL:  -- Erin Jones.

THE COURT:  Good morning.

MR. JORDAN:  Your Honor, Shelby Jordan and Antonio Ortiz, co-counsel, along with Mr. Ben Broocks and Mr. William Broocks, here in the courtroom today.

THE COURT:  Good morning.

MR. JORDAN:  And that's -- I'm sorry -- co-counsel for Mr. Jones.

THE COURT:  Yes, thank you.

MR. KIMPLER:  Good morning, Your Honor.  Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families.  I'm joined by my partner, Mr. Paterson, and on the screen, Mr. Ryan Chapple.

THE COURT:  Good morning.  Oh, I should turn my

camera on. I apologize.

MR. MOSHENBERG: Good morning, Judge. Avi Moshenberg, here on behalf of the Texas Plaintiffs. Also with me is Jarrod Martin and Jennifer Hardy, Your Honor.

THE COURT: Good morning. Anyone else wish to make an appearance? Okay. Here on the 9019 settlement, and I know that there are some related motions that we should talk about.

MR. JORDAN: Your Honor, if I might?

THE COURT: Sure.

MR. JORDAN: Shelby Jordan. We have made -- we being the Alex Jones team of lawyers, two firms and lawyers that have been very, very busy -- we've made every effort we possibly could to get a grasp on what has turned out to be a very, very complex matter that could, if we are not careful, be a case dispositive motion. We could walk out today and have nothing to show for the values of the appeal or for other matters that --

THE COURT: Let me -- let me stop. I've studied this 9019 over the past several days very carefully. I know we had a status conference and I knew that there were some discovery-related issues.

The Free Speech case originally started as a Subchapter IV -- was originally a lawyer and CRO. I find professionals -- I thought there was a conflict between

006454

those professionals and the Jones estate, so I didn't approve them. Then came in another set of lawyers and another CRO. The two cases, the Jones case, the Free Speech case, proceeded on a track, side-by-side track basis.

We held the hearings on the non-dischargeability claims in the Jones case. Non-dischargeability claims were put in abeyance in the Free Speech case because the Fifth Circuit had agreed to take up the issue. The Fifth Circuit ruled. They got it exactly right. It's exactly what I would have ruled. But theirs is more important. So we were left with the summary judgment in the Jones case. Never really took it up in Free Speech.

There were a couple of other adversary proceedings, some related Texas parties who never had their day in front of me. Parties, Texas families, a group of them, and Connecticut families were in mediation with other parties. I know the Jones folks were there. I know Free Speech was there a while, about a year. Nothing came of it. There was a 9019. But then it was contingent upon approval of a plan that never happened for the 90 -- that went away. But I was prepared to approve that.

The case had been going on for about two years. Then they went to mediation again before another judge in another district. That was unsuccessful. Mediation sometimes work; they don't. My point is that people have

been trying to consensually resolve these issues for two years, and it didn't happen.  And the Free Speech case could have either converted or been dismissed.  But it couldn't hang out in Chapter 11 because there was no way it was going to be able to confirm a plan.

And to say that they stretched -- and I allowed it to happen -- stretched the limits of Subchapter V and what it was intended to do is an understatement in terms of timing; not in terms of ruling, but in terms of timing to get a plan on.  But people were mediating.  And I thought it made sense that if people were going to try to reach a deal, if you were going to put together a plan and this all worked out, then I didn't want to put my thumb on the scale.  So, ultimately, I made a decision to dismiss the Free Speech case.

We were left with the Jones case.  But I retained -- I told Murray he could keep -- Mr. Murray, the Chapter 7 Trustee appointed then in the Jones case, because the Jones case converted as well -- keep the cash from Free Speech in the bank accounts, and kept two adversary proceedings, one involving PQPR, another one involving Elevated Solutions Group.  No professionals started coming to me.  I don't know if it's true or not, but anyway.

But Texas families were able to try to collect on their judgment against Free Speech.  They had rights given

006456

by a Texas court, I think even going after some of the Free Speech professionals who were working to preserve the estate.

When it came time to potentially sell assets, Mr. Murray and his counsel told me that they think that the real way to maximize value is to sell stuff, and not just the equity. They wanted the opportunity to go do this, and they thought they could do this by an auction.

They had, over an objection of the United States Trustee, told me just let them sell the equity. I entered a supplemental order so that to ensure you have the Trustee cover that he could sell the assets. That's what that order was intended to do. The supplemental dismissal order was just to make sure, because that was the request.

We had the auction process. I won't recount what happened, but I didn't approve the proposed sale. I had a – – I think the evidence is clear -- a backup bidder at the beginning. We didn't even know what the winning bid was. I had an auctioneer who got on the stand and didn't even know what he was going to get paid, or under what terms he was going to get paid.

I had a winning bid that was clearly based on a contingency. There was a sliding scale in the agreement. The proposed order submitted originally had the very language showing it was a contingency. And the Trustee was

006457

telling me that it wasn't a contingency.  That was his understanding.

So I was asked to approve a sale that had a contingency clearly in it, but was told to act like there wasn't a contingency, upon a sale price that no one really could articulate, because depending on how you took it as a contingency or not a contingency.  And we couldn't figure out exactly what the auctioneer was even going to get paid, because I don't even think he knew.

I then denied that auction.  We were here until, what, 10:30 that night?  So I didn't want -- and then I asked -- this case has been going on, I said -- I gave some (indiscernible) speech, told them it's been going on for like three years, and let's just get this back on track, get back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families.  I think that matter is still pending.

MR. JORDAN:  It is, Judge.

THE COURT:  I lose jurisdiction over that immediately.

MR. JORDAN:  It's still -- it is still pending.

THE COURT:  But I think the appeal was something like, Judge, you can't do that, was the basis of the appeal. I don't have authority to go vest the property of the estate.

006458

So the sale didn't happen, and I said, I don't want any more contingencies. If there's going to be a sale of assets, then cash will be king. But if there's confu- -- if there's -- gets complicated, like it was last time, where you had IP assets, and people weren't bidding against each other.

I also said the sale price was low. Turns out there's been an offer made since that day, which almost doubles the amount that was -- increased the offer by a week. A week, like it was there. That's fine. Then if things get -- I told folks, if you want to sell it, cash will be king. Get back to doing just -- you want to sell the equity? Sell the equity, but cash will be king.

I took up the motion for reconsideration filed by the Connecticut families. I know that the Jones side has a motion for reconsideration pending that will run its own course. But as things sit today, as I see them -- I could be wrong -- no, I'm not wrong on this, and maybe just slightly off on the numbers -- but I know that the Connecticut court has -- in Appellate Connecticut court, a second level of revision has taken some of the (indiscernible) amounts. And now that's subject to further appeal, and parties will appeal.

I haven't denied anyone any ability to pursue. Jones was able to hire his own lawyers. Connecticut family

006459

was able to pursue those judgments.  My non-dischargeability order in the Jones case kind of has a mechanism saying, this is what I found based on summary judgment, based on the collateral estoppel of the findings made in the Connecticut court.  The Connecticut court ultimately finds that X is the number, will then kind of compare it to what I did, and there's a kind of an adjustment so that I'm not allowing any more than a Connecticut court would have allowed.

Same thing for Texas.  I think there was a portion that I didn't approve for Texas, I know, and for Connecticut as well, that I didn't find -- I didn't think there were basis for collateral estoppel findings, and appellate courts will review what I did, and that's the way the process works.  I've got no issues with that.

So that's where things stand.  I don't know, around a billion dollars for Connecticut right now, subject to further appeal, non-dischargeable.  Around $50 million for Texas, subject to further appeals.  The numbers could stay the same, numbers could be zero, numbers could go up. I don't know.  It's all subject to state court appeals now.

But FSS, that estate is closed.  That case is closed.  That case is closed.  Which means that someone has a contract dispute with FSS.  You don't come to me.  You have whatever rights you have outside the bankruptcy.  The bankruptcy doesn't affect your claims one way or the other.

There were several individuals who had a case. They were suing Jones in Texas state courts. They can continue their trials in state courts. There's nothing stopping anyone from pursuing any claims in Texas state court. The bankruptcy has no impact. In other words, the bankruptcy itself, the estate, there's no automatic stay stopping -- no one has to come ask me for permission. You have whatever rights you have.

I already said, multiple years to try to reach a settlement, and they didn't. And I'm not saying anybody should have settled. I don't get into why people settle and don't settle. Not my purview. I'm there to evaluate settlements and determine whether they're in the best interest of the estate. That's my job.

So, kind of where we are. Several years of negotiating, no settlement, no plan. FSS gets dismissed. Failed auction. Now there's a 9019. The 9019 now wants me to allow claims against FSS. And I don't -- and I can't do that. And all bankruptcy lawyers know that I can't do that. Because there's no estate. There's no bankruptcy estate to allow a claim against. People can go to state court right now. If FSS Free Speech doesn't pay someone's bills, you don't come to me and ask for an admin claim. You go to state court. You go to court where you can go to court, but you don't have to come to me.

006461

So, now the Trustee is asking me to approve a 9019 settlement where I'm allowing over $400 million of claims against Free Speech. And now the Texas families are saying that the matter that they very much appealed, they're now embracing. The supplemental order is now embraced.

The Trustee who asked me for a specific order for a specific purpose is now using that order. But it was only for one purpose, to see if he could sell the assets. To now use those words, knowing what we did and why we did it, and everybody was in the room when we did it. Ha Nguyen was here. The U.S. Trustee was sitting right there telling me.

So, now it's going to be expanded to then allow $480 million worth of claims against an entity in a case that I dismissed. I'm being asked to allow claims -- allow -- and allow is bankruptcy buzzword 101.

And here we are again. Before we would pit the families against each other, where Connecticut and Texas would disagree on whether the form of relief being requested was appropriate. Happened during the auction too, where Texas said, I don't understand what we're doing here and I don't understand how this is going to work.

So, now I'm told we're all aligned and you just -- Lopez, just have to allow a claim against an entity in a case that's been dismissed. I can't do that. I cannot do that. I don't have authority to do it. And I'm not going

to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. Gone. I'm very much inclined to vacate that order because it serves no purpose. I'm not allowing a sale of the assets anymore. Pure sale of the equity.

We're going to -- I've got to -- this case keeps taking twists and turns and trying to come up with really masterful and creative lawyering. But at its core, it's something I can't approve. Would come -- you know...

And so, I know... I read the revised settlement. Read the revised order. Bankruptcy lawyers know I can't do this unless we get really, really, really creative. And I think on a case like this, we've got -- with multiple appeal, any party, regardless of what I do, people have their rights.

So, before everyone gets started, let me just tell you, I can't do this. I'm going to again turn to Mr. Moshenberg and tell him, you'd better -- I need you to tell me what you want to do on your -- this non-dischargeability action.

I know that there's a pending motion in the other one. I've now approved the two matters in which there's 9019s and the two settlement matters. Money's going to go out the door. You don't have to tell me now. I want you to file something and tell me exactly what you all are going to

006463

do.

MR. MOSHENBERG:  Understood, Your Honor.

THE COURT:  And just play it down the line, in other words.  People have rights and I'm not telling you to put you on the spot or anything, I just know.

Mr. Murray, if you want to sell the equity, go sell the equity.  This case -- people have rights and they've been...  If you want to go pursue claims against Jones in state court against Free Speech, I don't -- I dismissed the case and I know what comes along with that.  Those arguments were made to me and I know what they are.

No, you don't have to say anything.  I know what the rights are.  And I'm not -- so you can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore.  I don't trust the process.  I would have to do it -- me, myself -- and I'm not overseeing it.

So kind of get comfortable with the process so that we don't kind of do the same thing.  We've already did it really long and complicated and brought in auctioneers and had lots and -- enough has been -- and I think what this Debtor needs and what these families need is finality of the bankruptcy process so that they can pursue whatever it is that they want in judgments in state court, which is where they started in the 1st place; Connecticut, Texas, for the

006464

most part.  I know that there's some other litigation pending out there.

I just -- I don't have the ability to allow a claim against an entity.  And in a case that has been dismissed in which I literally gave specific authori- -- you keep the cash; we're going to keep these two adversaries.  I'm going to settle these.  I'm going to keep jurisdiction over these two things and this one.  And I'm not going to do it for anything else.

I can't use the supplemental order to then go -- for a purpose in which it was never intended.  And I get to construe my own orders and I retain jurisdiction over them.  This case will be highly simplified.  And I know Mr. Wolfshohl said he's been listening to these transcripts carefully.  I made it super simple for you this time.

There will be -- I don't know.  Someone has a case, bring it.  There have been multiple years of investigations.  No lawsuits have been (indiscernible) in front of me.  Maybe one is coming.  I don't know.  If it does, we'll take it up and I'll rule.

I'm not sure anybody's ever been happy about -- completely set in my rulings.  I'm not sure Mr. Jones has been entirely happy to know that I found on summary judgment that he's liable for over a billion dollars in non-dischargeable debt and over $49 million dollars.  I'm sure

006465

he -- appealing -- he is appealing.  And that's his right.

So, I'm sure the Connecticut and the Texas family -- I'm sure the Connecticut families weren't too happy about my decision about the auction.  Sure Global Tetrahedron wasn't too happy about it.  But I'm really trying to do what I think is my duty and my job upon careful analysis of the law.

And so I'm not approving.  I cannot on its face.  You don't have to put on any evidence.  I can't approve this sale.  I can't allow $480 million dollars.  And I don't want folks to put it up.  And we don't need to take up TROs and Connecticut and Texas.

Texas, you have whatever rights you have.  Connecticut, you have whatever rights you have against Free Speech, case against Jones.  If you want to have another -- if you want to settle with the Trustee on Jones related matters, do it.  Tee it up.  We'll take it up.  But these things are inextricably linked and multiple appeals going on.  Well, I don't know if they're still going on.  They probably will on the non-dischargeability front, by the way.  You have whatever rights you have on the supplemental order.

MAN 1:  Judge, if I could comment --

THE COURT:  Won't be used again.  No, no, no.  I don't need you to comment on anything.  I don't -- because it's going to open the door.  I just wish everyone a good

006466

day.  Thank you.

CLERK:  All rise.

(Whereupon these proceedings were concluded at 9:26 AM)

006467

                              I N D E X


                              RULINGS

                                              Page      Line

Motion to Approve Sale, Denied                 16        8

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  February 6, 2025

006469

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EXHIBIT

C

Alexander E. Jones; 22-33553

exhibitsticker.com

ALEXANDER E. JONES,              )   CASE NO: 22-33553
                                 )
                                 )   Corpus Christi, Texas
                                 )
            Debtor.              )   Thursday, June 5, 2025
                                 )
                                 )   1:00 p.m. to 2:32 p.m.
-------------------------------)

HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtor:              BEN C. BROOCKS
                         Broocks Law Firm PLLC
                         6207 Bee Cave Road, Suite 120
                         Austin, TX 78746

                         SHELBY JORDAN
                         Jordan & Ortiz, PC
                         500 North Shoreline Blvd.,
                         Suite 804
                         Corpus Christi, TX 78401

For Chrsitopher R.       ERIN ELIZABETH JONES
Murray:                  Jones Murray LLP
                         602 Sawyer, Suite 400
                         Houston, TX 7007

                         JOSHUA WOLFSHOHL
                         Porter Hedges LLP
                         1000 Main, 36th Floor
                         Houston, TX 77002

For First United         WALTER J. CICACK
American Companies, LLC: Hawash Cicack & Gaston LLP
                         711 W. Alabama Street, Suite 200
                         Houston, TX 77006

006470

For Veronique        AVI MOSHENBERG
De La Rosa:          Lawson & Moshenberg PLLC
                     801 Travis Street, Suite 2101, #838
                     Houston, TX 77002

For William          KYLE KIMPLER
Aldenberg:           Paul, Weiss
                     1285 Avenue of the Americas
                     New York, NY 10019

For the U.S. Trustee:    HA MINH NGUYEN
                         Office of the United States Trustee
                         515 Rusk Street, Suite 3516
                         Houston, TX 77002

Court Reporter:      YESENIA LILA

Courtroom Deputy:    YESENIA LILA

Transcribed by:      Veritext Legal Solutions
                     330 Old Country Road, Suite 300
                     Mineola, NY 11501
                     Tel: 800-727-6396

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

CORPUS CHRISTI, TEXAS; THURSDAY, JUNE 5, 2025; 1:00 PM

(Call to Order)

CLERK:  All rise.

THE COURT:  Please be seated.  Good afternoon.  This is Judge Lopez.  Today is June 5th.  I'm going to call the 1 p.m. status conference in the Jones case.  I'll be calling, just so we have a clean record, 22-33553, 23-03035, 23-03037, 24-03279 or some combination of one or more of those cases.

I will take appearances in the courtroom, and then if anyone wishes to make an appearance on the phone, please hit five star and I will unmute your line.

MR. JORDAN:  Good morning, Your Honor, afternoon, I guess.

THE COURT:  Good afternoon.

MS. JORDAN:  Shelby Jordan, Ben Broocks, and Antonio Ortiz for Alex Jones and FSS.

THE COURT:  Okay.  Good afternoon.

MR. JORDAN:  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.  Mr. Murray is also here in the courtroom.  And I think my colleagues will announce themselves on the phone.

THE COURT:  Okay.  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack on behalf of First United American Companies.

006472

THE COURT: Good afternoon.

MR. MOSHENBURG: Good afternoon, Your Honor. Avi Moshenberg, on behalf of the Texas plaintiffs. Also remotely is Jarrod Martin attending.

THE COURT: Okay. Good afternoon.

MS. NGUYEN: Good afternoon, Ha Nguyen for the US Trustee.

THE COURT: Good afternoon. Okay. Let me turn on the line. Here's a -- I'm just going to go in the order in which I see them, a 713-226 number.

MR. WOLFSHOHL: Good afternoon, Your Honor, Joshua Wolfshohl for the trustee.

THE COURT: Okay. Good afternoon. And a 212 number.

MR. KIMPLER: Good afternoon, Your Honor. It's Kyle Kimpler from Paul Weiss on behalf of the Connecticut families. On the line with me today is my cocounsel Ryan Chapple.

THE COURT: Okay. Good afternoon. Anyone else wish to make an appearance, please hit five star, and I will unmute your line.

Okay. The purpose for today was a status conference on where we are and where we're headed, just try to get some more information in the middle of 2025. I'll turn things over to trustee's counsel. Ms. Jones, you can just proceed however you see fit.

MS. JONES: All right, thank you. I'll proceed with

an update in the main Chapter 7 case, the 22-33553.

THE COURT: Okay. If you can just get the mic a little closer to you, I just want to make sure we can all hear you.

MS. JONES: Yes, I'll get a little bit closer. We have right now one pending contested motion and that is the motion filed by the debtor, Mr. Jones, asking this Court to reconsider whether to hold an auction of FSS assets in this case. There were two reply, two responses filed, one jointly by the Sandy Hook families and one response by the trustee and reply filed by the Debtor. So that's the one currently pending contested letter that is before Your Honor.

There is likely going to be another contested matter, but the time hasn't, it's not ripe yet. There's a pending motion to stay these bankruptcy proceedings pending appeal.

THE COURT: Is that Mr. Nguyen's?

MS. JONES: Yes.

THE COURT: I'm going to rule on that today.

MS. JONES: Oh, okay. Well then that's not ripe, but we, the trustee would have opposed it, but -- a complete stay, of course, of the proceedings, but I just wanted to flag that as something that could come up.

But as far as uncontested, there are, there are some pending fee applications of Chapter 11 professionals that are

006474

-- have not been objected to and are ready for --

THE COURT:  Do you have the ECF numbers for them?

MS. JONES:  I do.  And so there's -- I'll give you the application -- okay.  So the application for Teneo Capital, which was financial advisor to the Committee, was filed at Docket 707.  And I've just uploaded revised proposed orders. I'm only missing one, and theirs was just filed at, I believe it's Docket, I have to see it really quick, 1160, I believe.

THE COURT:  Oh, I did see this.  So I see Teneo, BlackBriar, and --

MS. JONES:  Kennerly.

THE COURT:  -- Kennerly.

MS. JONES:  Yes. And I've tied those to the ECFs there.  So BlackBriar Advisor's app is at 743, and then the revised proposed order has just been uploaded.  Rachel Kennerly's application is at 745 and the proposed order's just been uploaded.  And then Crowe and Dunlevy is, the application is at 746 and I just haven't had time to upload the order yet. I'm waiting.  They've agreed to the form of the order.  I just, I added their signature and I always wait for people to respond and tell me I can do that.

THE COURT:  Is there any difference between --

MS. JONES:  There is.

THE COURT:  Okay.  I'll just wait on it.

THE COURT:  But those proposed orders just

006475

generally. And then Mr. Jordan also uploaded a revised proposed order for his application.

THE COURT: Proposed final, right?

MS. JONES: I'm sorry?

THE COURT: I saw it. It's a revised proposed final, is that right, Ms. Jones.

MS. JONES: Yes, these are all final fee applications for the Chapter 11 professionals. His app was at Docket 747.

THE COURT: Oh, it's through the 11. I was going to say, Jordan, you can't go anywhere.

MS. JONES: And the only issue -- there were no objections substantively to the applications. The issue was that there was not an authority to pay provision for the trustee, which we really need for him to be able to make the disbursement.

THE COURT: Oh.

MS. JONES: And so we added language with the specific remaining unpaid portion. So it specifically references the amount. And everybody has signed off on the form of the order. I just need one more person to let me know that I can add their signature, and then I'll have that uploaded. So those are ready to go if Your Honor wants to sign those or if you need a hearing, they're --

THE COURT: Let me do something just so I'm procedurally in the right posture. There is currently a

request for me to stay.  The entire case is pending an appeal. And I want to -- why don't I take that up right now?  I thought rather than we're just having a status conference today, but I thought there was an active request and then also a request for a direct certification of an appeal to the Third Circuit. So I kind of wrote something out very shortly just to make sure that I addressed that.  And I can take that certainly without a hearing.  It was a request before me, so.  And it relates to ECF Numbers 1144 and 1153, Robert Wyn Young has requested that I grant certification for a direct appeal to the Fifth Circuit at ECF 1144.  And he's appealing my order denying his motion to intervene in this case.  And I signed that order at ECF Number 1129.

Bankruptcy Rule 8006(f) allows the Court to certify a direct appeal to the Court upon request by a party, 28 U.S.C. 158(d)(2)(B).  You can see why I wrote this out.  I wanted to make sure I got these right.

A bankruptcy court must certify direct appeal to the Court of Appeals in two instances.  One is where the request for certification is made by a majority of the appellants or a majority of the appellees.  Here, only the, only the appellant has made a request for direct certification.  Trustee has indicated they would oppose that, but I only had one request anyway.  And I now have verbal confirmation that there's not a majority here.  So that wouldn't apply.  So, and

therefore, that subsection doesn't apply.

The second instance is where the judgment order or decree involves a question of law as to which there's no controlling decision of the Court of Appeals for the Circuit, or the Supreme Court of the United States, or involves a matter of public importance.

Two, the judgment order or decree involves a question of law requiring resolution of conflicting decisions.

Three, an immediate appeal from the judgment order or decree may materially advance the progress of the case or proceeding in which the appeal is taken and if the Court of Appeals authorizes the direct appeal of the judgment order or decree, that is 28 U.S.C. 158(d)(2)(A)(i) through (iii).

157(d)(2)(B)(ii) mandates that if any of the four conditions are met, I make the certification, but none of them apply here. It would involve a permissive motion to intervene in both the text and Bankruptcy Rule 2018. And the law in this district is clear that intervention is permissive.

And so I rely on the cases that I cited in the order denying, but I would cite in, for example, in In Re CIS Capital Management, 604 B.R. 484, 513, Northern District of Texas 2019 case. So Subsection 1 doesn't support certification. Subsection 2 also doesn't support certification. There's no conflicting decisions for the standards. And finally, an immediate appeal would not advance the progress of this case,

006478

which has been pending since 2022.

There have been multiple adversary proceedings. I would note Mr. Jones has been ably represented at every stage in this case by really smart lawyers who have made arguments on his behalf. He's been adequately represented and I wouldn't stray from any word that I put in that order. I think allowing intervention would impede the progress of this case, quite frankly, it would have shut down, potentially shut down this hearing. So I don't think Subsection 3 supports certification, because neither instance requires the Court to grant certification here.

I'm going to decline to grant certification for direct appeal to the Fifth Circuit. I believe the matter is already set for an appeal before a district court, I believe Judge -- so there is no, I'm not setting this up for a direct appeal.

MS. JONES: I think it's been assigned to Judge Rosenthal.

THE COURT: That's what I understood. So, and they don't come any smarter --

MS. JONES: That's correct.

THE COURT: -- than Judge Rosenthal.

MS. JONES: I agree 100 percent.

THE COURT: So and I just, again, I'm relying on the text here. Textualism is always, in my opinion, the right

006479

answer.

Permissive intervention: After hearing and on such notice as the Court directs and for cause shown, the Court may permit an interested entity to intervene generally or with respect to a specified matter, right? It's permissive by statute.

So, I'm going to deny the direct appeal to the Fifth Circuit. The statute is clear. The cases interpreting the statute are clear. There's no, there's no conflict, no conflict in law here. So, I'm going to deny that, but I did note in the order that I've read everything that was submitted as well. So it's not like I turned a blind eye to anything that came my way. I read it.

So, Mr. Young has also moved to stay all proceedings in this case pending an appeal under Bankruptcy Rule 8007. While the decision to grant a stay pending appeals is within the Court's discretion, the Fifth Circuit in cases like In Re First South Savings Association, 820 F.2d. 700, 709, Fifth Circuit, 1987 case provided factors for the Court to consider, right, whether the movant has made a showing of likelihood of success on the merits. I strongly disagree with that for the reasons stated there in the order itself.

Whether the movant has made a showing of irreparable injury if the stay is not granted. No, there's been no showing of irreparable injury.

006480

Whether the granting of a stay would substantially harm the other parties. The answer is no. I think quite frankly it would be harming the trustee's ability to function throughout this case and quite frankly, Mr. Jones' ability to proceed as a Chapter 7 debtor.

And for whether the granting of the stay would serve the public interest. I don't, have no -- nothing showing the public interest, and I've read all the papers. Quite frankly, I think the public interest is better served for a case that's been pending for three years to continue to move and not come to a screeching halt because the party, three years later, seeks to intervene in a case to provide evidence that the Court has reviewed and other matters.

And again, I rely on the order itself. It speaks for itself. So I've carefully reviewed all the filings, including the attached exhibits and the legal arguments that Mr. Young makes.

I'm going to decline to grant the stay pending appeal. So I'm going to deny both, and I'll enter short orders denying them for the reasons that I have stated on the record. So I can now -- I just feel more comfortable that I didn't take something up on the front end, agree to sign, for example, orders, and then consider a stay. I think there was an emergency request for a stay. I'm going to deny those. So I'll take a look at these orders and sign them on the docket.

MS. JONES:  Thank you, Your Honor.  And I expect one more this afternoon.  I'm just waiting for it.

THE COURT:  Got it.  Just let me know and Ms. Saldana know better.

MS. JONES:  I will.  And then there are two --

THE COURT:  Let me ask you.  With respect to the uncontested matter, I don't need to know what it is.  Do you have a sense of timing as to when something may get filed or not filed?  I won't hold you to it.  I'm just trying to get a sense of you said --

MS. JONES:  Uncontested.

THE COURT:  Oh, not uncontested matter.  You said there could be one more contested matter that may or may not be coming.

MS. JONES:  Yeah, excuse me for interrupting.  We intended to oppose the motion for the stay pending appeal of the proceedings.

THE COURT:  Oh.

MS. JONES:  And so I didn't want to jump the gun.  I wanted to let you know that we anticipated another contested matter on the horizon --

THE COURT:  Oh, that's what you were talking about.

MS. JONES:  -- because we would have opposed the --

THE COURT:  So now that I've ruled on that, I've got the reconsideration of the order and I'll speak to that today.

006482

What else is there from your perspective in the main case?

MS. JONES: In the main case, the trustee continues to administer some non-exempt assets. There's some, there's some real property, and some, just some personal properties and watches, some details that we're still working through, just getting those sold. So we're continuing to work on that.

There have not been any offers, or any actual offers, really any discussion about anyone purchasing the equity of FSS has kind of died down entirely. We don't have any at this point. And so we're just continuing to administer the non-exempt assets that we can and trying to move all of that forward to get those to a point of sale. With respect to the --

THE COURT: What's the status of pursuing the real property? I'm less concerned about you selling a watch. I'm more concerned about real big-ticket items.

MS. JONES: Sure, there's, an auctioneer has been approved by this Court to list that property and to sell it

THE COURT: Oh, okay.

W1: And I believe they've been out. They've looked at the property and they're taking steps to get it listed or to set a time for when --

THE COURT: When do you think the process could, I don't want to hold you to it, just trying to get a sense of if he's going to list property, I'd rather him list it within

the next 30 days and just see what's out there.

MS. JONES:  I can --

THE COURT:  There's a, there's a theme that I'll be pushing which is there's a lot of legal expenses that are getting incurred in connection with this case.  And I'm not saying people aren't doing the work because a lot of this, it's a big -- a lot of complexities here.  But the longer this goes, the more people are going to have to spend time, and I want to, I think keeping things progressing at a, not at a rapid pace, but at a steady pace where there's constant movement is in the best interest of all parties because there's stuff pending in front of me.  There are matters pending in other state courts.  I'm assuming that's continuing in Texas and in Connecticut.

And there's a lot of moving pieces, and I'd rather to the extent there's non-exempt assets, that's, you know, I'm not telling you what to do, but you will exercise your business judgment as to what you intend to sell or not sell, but, you know, come September, October, if something is planning on being sold in terms of an asset, I'd like it at least on the market, if that makes sense.

MR. BROOCKS:  That's entirely doable.

THE COURT:  Okay.

MS. JONES: And I don't know if you'd like to address timing or if you --

006484

THE COURT:  Yeah, just get close to the microphone so we can hear you.

MR. BROOCKS:  Yeah, I think by the third quarter we'll have everything either teed up with a motion to sell. It'll certainly be listed by then.  It hasn't been yet because in the case of the real estate, it's a residential home and it has a tenant, so we're negotiating the exit of that individual.

THE COURT:  I got it.

MR. BROOCKS:  And --

THE COURT:  Okay.

MR. BROOCKS:  But I think by the end of the year, we should be closed with all of those.

THE COURT:  Okay.  Thank you.

MS. JONES:  But with respect to our, with the approval of the settlements in the, in the adversaries that were pending in the FSS, under the FSS umbrella, the PQPR and the (Indiscernible) adversary, with those settlements and then Your Honor's decision regarding admin -- not doing a sale of the assets, the FSS assets in the --this Chapter 7 case, you know, we've pared our focus down to, you know, the essential things we need to do to get this case moving forward and closer to being done.

THE COURT: So assuming those assets are teed up and some coming up, I don't -- I hate hypotheticals, but let's

just assume there's a buyer, willing buyer for estate assets, what -- after that, what's left, putting aside the adversaries?

MS. JONES:  There is some litigation, a couple of matters we do expect to file those by next week.  And I think those are pretty straightforward, but just a couple of litigation matters that need to be dealt with.

THE COURT:  The adversaries or?

MS. JONES:  Yes.

THE COURT:  Okay.  Once they're -- obviously nothing is, nothing is final until you file it, but once, assuming you file it, let my case manager know I want to set up a status conference whenever, as soon as it makes sense to do so.  I don't want it to fall through the cracks.  That's where I'm going.

MS. JONES:  And depending on --  as well, depending on the steps that the families take, if any, whatever they decide to do in state court, you know, we may be back here with motions to really to give instructions about what the Court wants us to do.  And so we may have some motions related to any enforcement efforts that are made in the state court just to ensure that the trustee has clear authority and instruction to move forward.  He's not going to do anything without the Court giving authority to do it.

THE COURT:  Okay.  I intentionally like don't read what's happening in other cases of, you know, like something

006486

shows up on the news. I don't click on it to read the news or I'd rather just deal with the information that's given to me in front in the Court here and people make arguments. So I honestly have no idea what's happening in the, in the Connecticut or the, or what the current status is in the Connecticut or the Texas matter. So me having status conferences like this is really where I try to get the real information.

MS. JONES: And I would just defer to Mr. Moshenburg or, and Mr. Kimpler to update you if you'd like to hear from them about the status of their cases. But with respect to what the trustee needs to do, this is, this is where we are. And then with respect to the FSS case, we're essentially, either all those adversaries are either settled, dismissed, or closed. So I think that case, for the most part, it's done. I don't expect anything else in that case, at this point.

THE COURT: Okay. Thank you. Mr. Moshenburg, you're in the courtroom, and then I'll turn to Mr. Kimpler. From the Texas family's perspective, I'll let you, where do things stand, both main case or adversary? Just walk me through it, just specifically so I know which one you're talking about.

MR. MOSHENBURG: 100 percent, Your Honor. Let me start with the state court cases. Right now, we appreciate the Court's remand order with the turnover action back in

state court.  We've been working very hard behind the scenes with the Connecticut families to explore our state court options for state court remedies.

In terms of the merits of the underlying state court litigation, there was just an oral argument in front of the Austin Court of Appeals last week, Your Honor, on the Heslin Lewis judgment, Your Honor.  My co-counsel was leading the state court fight.  Your Honor is also getting ready to prepare a status conference on the Pozner, De La Rosa case.  A lot of the case, there's some pending discovery issues that are going to get resolved.  But also, that case is going to be influenced naturally by what happens in Heslin Lewis, and so there's a little bit of a pace to kind of be aware of whatever guidance comes from the appellate courts about what -- how to proceed in those cases and so that's affecting the timeline of the Pozner De La Rosa case, Your Honor.

THE COURT:  If it is oral argument, if I'm asking you to speculate, don't.  But do you have a sense of when the -- you may hear back from the appellate court, the state appellate court?

MR. MOSHENBURG:  I don't, Your Honor.  I've done a lot of state court of appeals; sometimes it's short, sometimes it's very long.  I just don't know, Your Honor.

THE COURT:  Okay.  And what was, what was argued was the kind of the appeal of the judgment rendered by the state

court --

MR. MOSHENBURG: That's exactly right, Your Honor. I didn't mean to talk over you --

THE COURT: No, no. Go ahead.

MR. MOSHENBURG: At the oral argument, the appellate court seemed to focus on two things. One was the default judgment, and then also the cap busting of the punitive damages cap. Hard to glean if that's where the opinion is going to be going, but that's where the two areas that court wanted to focus on.

THE COURT: No, that's just fine. I just didn't get a sense of timing. If -- and I would ask anyone if there is something that is written, entered by the court, can someone just file it? No spin on the first page, just notice of filing of state court really and just file it so that there's public knowledge, at least on my end in terms of what the state court did -- in the, you can file it in the main docket in the main case, just so it just helps me.

MR. MOSHENBURG: 100 percent, Your Honor, we'll do that. And that really goes to the adversaries as well. Let me turn to that on the dischargeability action, Your Honor. We've been working procedurally. We were in the -- previously we talked about filing a motion to reconsider. In doing that, what we realized is there's other evidence that we want to attach and the Court, when it denied our summary judgment

006489

motion on the punitive damages in particular, there were things that the Court spotted that there wasn't enough in the record to find that we had met our burden on summary judgment.

So then we've dug back, found some transcripts, found some other briefing that sort of highlights the issue on the summary judgment. So we'll be moving for an additional summary judgment, but the idea will be that the court, the trial court found that Jones had intentionally acted. And so when the court denied the summary judgment --

THE COURT: But shouldn't we wait then if something is already briefed for the state appellate court, won't the -- in other words, do I need to wait to see what the state appellate court does before? In other words, I'll make something up. If the court affirms the punitive judgment, right, that's one thing. If the state, if the appellate court rules against you, your clients on the appellate, then what I don't want you doing is moving for summary judgment on something that could potentially be a thumbs up or a thumb down by the appellate court.

Maybe it makes sense to wait on that. I'll hear from Mr. Jordan or Mr. Broocks on kind of not getting ahead of one or the other, but I don't want to rule when there's something that's already on appeal. I think that the state court needs to take the lead on its own judgment if there were arguments raised there and then I can then -- because

essentially, I'm taking up summary judgment based upon what they're arguing so.

MR. MOSHENBURG: Right. Judge, I think that's a great idea. We fully --

THE COURT: I don't know if it's a great one, but it's an idea. Someone will let me know if it's a -- if it makes sense or not, but I'll wait for others to think about it.

MR. MOSHENBURG: Sure. And just from the Texas family's perspective, Your Honor, I want to make sure the Court understands we have worked out our differences with Connecticut. We've reached a settlement on going forward. And from, and from our vantage point -- and I think Mr. Kimpler will talk more about it -- getting finality on the dischargeability decision of the Connecticut summary judgment that the Court granted, I think that will be helpful for Connecticut and for Texas, Your Honor. So in terms of priorities and what is teed up for the Court to move forward on, I'll let Mr. Kempler elaborate. But I think getting a, getting to a final judgment on the Connecticut dischargeability action makes the most sense in terms of spending judicial resources.

THE COURT: And so, but I don't want -- well, Let me hear from others. What I don't want is for us to be sitting here having this conversation in 2027.

MR. MOSHENBURG:  I agree, Your Honor, and I think the fastest path to that is through the Connecticut Avenue to avoid that.

THE COURT:  Okay.  Thank you.

MR. MOSHENBURG:  Thank you, Your Honor.

THE COURT:  Mr. Kimpler, I'll hear, if you have anything you wish to add, I'll certainly hear from you.  If not, I will turn it over to Mr. Jordan, Mr. Broocks, and others.

MR. KIMPLER: Thank you, Your Honor.  I have a couple of points, but it should be pretty quick.  Let me first just give you two factual updates.

First of all, for what's going on in the Connecticut appeal, I think you know, because we filed it in December, but in December, the appellate court affirmed 1.3 billion of the judgment and overturned 150 million of the judgment.  I think that was before you when we were last --

THE COURT:  I saw that.

MR. KIMPLER:  Mr. Jones then sought review from the Connecticut Supreme Court, which is the highest court in Connecticut.   The Connecticut Supreme Court denied that review.   It's discretionary, so you have to make a cert petition.  The Connecticut Supreme Court denied that review on April 8th.  So as of April 8th, as a matter of Connecticut law, the judgments were final and enforceable.  Prior to that,

Connecticut law was that judgments were stayed pending appeal.

Mr. Jones then filed in Connecticut a motion to stay enforceability of the Connecticut judgment while he pursues an appeal to the United States Supreme Court. That was denied by the Connecticut court on May 13th.

So where we are right now is that all appellate processes in the state of Connecticut are over. The judgment and an aggregate amount of 1.3 billion is enforceable. And I believe Mr. Jones has another, I think he had 90 days from the prior. So I think he has another month or so to file a petition for cert review from the U.S. Supreme Court. We expect that he will do that. And so that will be the last portion of the appellate process for Connecticut.

THE COURT: Okay. And in terms of the just -- and this may sound repetitive -- but just from your, from your perspective, where do things you think sit with respect to the adversary proceeding that is pending before me?

MR. KIMPLER: Yeah, so, just one other update which Mr. Moshenburg already said. We have reached a settlement agreement with the Texas plaintiffs, and so there are no more open disputes between us.

There are two adversary proceedings, Your Honor, that the Connecticut plaintiffs are party to. The first one is the non-dischargeability proceeding that is Case Number 23-03037. Your Honor, just to recall there, there are three

006493

parts of our judgment. There was the $965 million of compensatory damages. You ruled that those were non-dischargeable. Those judgments have been affirmed on appeal.

There was the $150 million of Connecticut unfair trade practice tax claims. You had ruled those were non-dischargeable, but the Connecticut appeal had reversed that claim. So that claim no longer exists.

And then there was the $323 million of common law punitive damages, which were affirmed on appeal, but you did not issue summary judgment on it. So where we are at in that adversary proceeding now is there are $965 million of compensatory damages that have been held by you to be nondischargeable and been affirmed on appeal. And then there is $323 million of punitive damages, common law, affirmed on appeal but not non-dischargeable, and we have filed a motion for reconsideration that was denied.

I think, given where we are at, my clients are prepared to abandon that claim. At least as to the non-dischargeability, and that would enable us to enter a final order that would resolve the non-dischargeability action before you and would allow Mr. Jones presumably to take an appeal of that as a final order up to the district court.

I want to be very clear, we're not waiving the claim in the bankruptcy, but the argument that that portion of the claim is non-dischargeable. We are, if it suits the Court,

006494

prepared to abandon that just to streamline the litigation and allow it to go up for review at the district court level.

THE COURT: Oh, Mr. Kimpler, I don't want to tell you what your client should -- what I am going to ask is that one way or the other that, you know, within the next 30, 45 days, I kind of get a decision as to whether we're proceeding with respect to the 323 or if you file something, then I'll know that you, you're going to not proceed with respect to the 323 with respect to the non-dischargeability, but obviously maintain the claim portion of it.

MR. KIMPLER: Yeah.

THE COURT: And the 955 that you say was affirmed on appeal, that's by the Connecticut courts, right? Just to make sure that I'm clear.

MR. KIMPLER: Correct. So to be, to be clear, there, Mr. Jones has one last shot at the U.S. Supreme Court.

THE COURT: Okay. Okay. Thank you.

MR. KIMPLER: The other adversary proceeding that we're a party to, Your Honor, is Wheeler v. Jones. That is Case Number 24-03279. That is what we call the enforcement action, and let me just give you the background because I don't think we've actually ever had a status conference or hearing before you on it. So let me explain what it is and why it's before you.

That was last August. We moved to domesticate our

judgments in Texas under the Uniform Judgment Enforcement Act. And so we filed a complaint in state court that basically seeks recognition of a foreign judgment, the Connecticut judgment. There was a 30-day objection period on that complaint. Nothing was filed in October, but Mr. Jones removed that action. We think he removed it in an untimely basis. We also think it procedurally is not an action that can be removed. It's really a procedural, you know, case, but he removed it. He also filed counterclaims in that action, which, you know, are various types of attacks on the Connecticut judgment and some other claims. That action was then removed to the Western District of Texas, and then it was transferred to you.

So I think it probably showed up on your docket, sometime mid to late January. On that docket, there is a fully briefed motion for remand back to the state court. There is also a fully briefed motion to dismiss on the counterclaims.

In our view, all of this can be pretty easily decided on the papers. We would urge Your Honor, although we know you have an exceedingly busy docket, to rule on those when you are able, whether you want to first rule on the motion to dismiss and then the remand, or you want to remand and leave the motion to dismiss to the state court, assuming that, you know, you did decide to remand.

It is obviously your prerogative, Your Honor. You

006496

know, from our perspective, these are pretty procedural issues as far as the timeliness and the appropriateness of the remand and the counterclaim.

I have exhausted everything I know about that action because it has been handled by Mr. Chapple. So if you have any other questions, I would, I would call for a lifeline.

THE COURT: No, no, this was very helpful. I remember Judge Pittman said something to me in about January, mid-January, January 16th or January 17th, and we hadn't taken it up and I didn't want to do anything without talking to the parties to understand kind of where all the pieces fit before -- and heard from everybody before I decided to kind of take it, take the issues up on the, on the merits one way or the other so .

MR. KIMPLER: The last thing I would offer, Your Honor, is, you know, we have heard you that some collection activity should be proceeding in state court. We are trying to do that. We're trying to work with the Texas plaintiffs on that front, obviously, having domesticated judgments in state court is important to that effort.

THE COURT: Thank you. Great. Yeah, I guess I don't know, Mr. Chapple, if you can give me a thumbs up or thumbs down or hit five star if there's anything else you wish to add before I turn to a 512 number.

MR. CHAPPLE: That's correct, Your Honor.

THE COURT: Okay.

MR. CHAPPLE: Can you hear me now?

THE COURT: Just fine. Anything, is there anything to add? I'm just giving you the opportunity.

MR. CHAPPLE: No, Your Honor. I appreciate the opportunity. I think Mr. Kimpler did a thorough job of explaining the situation and our perspective on both the motion to remand and the motion to dismiss the counterclaim.

THE COURT: Thank you. Okay. Mr. Jordan, Mr. Broocks, anything you wish to say? Good afternoon.

MR. JORDAN: And sorry for all the shuffling, but there's a, there's kind of a number of things that are going on. And there's some moving targets that we, on the way from Austin to here today, found out about. So I want to be able to sort of better organize. I don't want to come across too confusing, but I guess I start with --

THE COURT: Take as much time as you need.

MR. JORDAN: -- with I guess the most interesting thing that I think the Court should be aware of simply because this has been leaving these matters on the docket. If you recall, the Texas plaintiffs asked for over a year's worth of extensions while the Chapter 11 was going on. And of course, we would assume that they were in good faith and Ms. Driver was in good faith granting extensions over and over again. So we lost a year when we discovered that there was nobody that

was going to support the plan through the Texas plaintiffs.

So the briefing started last Tuesday, Tuesday week. The arguments were held at the Court of Appeals, and you ask about what do you think they're going to rule. Something happened at those arguments. Now I've done most of my appellate work in the federal system, but I've done quite a bit in the state court and something happened that never happened before that I think the Court needs to know about because it affects the adversary that's pending and it affects the answer that we all have to give to you and guessing. I don't think the Court of Appeals is going to take a long time in ruling, and I, and I don't because -- if I may --

THE COURT:: Mm hmm.

MR. JORDAN: I mean. And to Mr. -- the responses and information Mr. Moshenburg gave you, he didn't attend the argument, so I don't think he probably -- but I don't know if he knows about the position that the plaintiffs took, but I had it blown up because we didn't have time to get the cameras and stuff, I mean the audio. But I'd like to -- for the Court to read what Mr. Bankston told the Court of Appeals, and I've got a copy of that here. It can help to, help for you to see it, whatever.

Mr. Bankston told the Court of Appeals when he concluded his arguments --

THE COURT: Mr. Bankston represents the plaintiffs,

the Texas plaintiffs, is that correct?

MR. JORDAN:  Yes.

THE COURT:  Okay.

MAN 1: (Indiscernible)

THE COURT:  No, no, no, just want to make sure there's a, there's a reference to Mr. Bankston  He represents the Texas plaintiffs if I remember.  Okay.

MR. JORDAN:  And so, here's what he told the court when he concluded his arguments, which he was, he was, I'll just say this, it was peppered a whole lot about how you're going to keep these punitive damages with this elder abuse that was not submitted to the jury and it was all not pled and pled afterwards.  But those are all questions which they, which they had a lot to say about and there's been a lot written about what the people think the court's going to do.

But more important was this, Mr. Bankston told the court when he finished his arguments, he said, "So I, so what, with that said, Your Honor, again, I return to this idea that I would love to be here before you on a case that matters.  And the reason I say this is I'm certain you probably are aware at this point, there are over a billion dollars of non-dischargeable debt against Jones approved by the Connecticut Supreme Court, by my plaintiff, excuse me, by my plaintiffs that are all collecting together with 19 other family members."  I'm going to stop there for one second because I couldn't, I

006500

couldn't figure out why, what his plaintiffs were doing arguing about the billion dollar award, but it made it clear because now we know that there is some agreement that is between the Texas plaintiffs and the, and the Connecticut plaintiffs that has something to do with, no matter what happens in this case, and so let me finish just reading this. "And now we have an appellant, of course, that's Mr. Jones and FSS, who's trying to remove $50 million for what purpose when there's already over a billion dollars in dischargeable debt that's coming in part to my plaintiffs, right?" Now, I'll stop there for just a second. I think he's referencing to the deal he made.

They cut a deal where apparently if you were to find everything was dischargeable, they're still going to claim we've carved out from the plaintiff's non-dischargeable portion that claim, and we're going to assert it. I think that's what it is, but let me, let me finish and then maybe the Court can analyze it itself. "What is, what is accomplished by this appeal? The result of this Court's decision, I hate to say, is pretty worthless in terms of what's going to happen to the parties." And then, Your Honor, this, this second page, I don't, I think that's all we've got. I've got a -- he introduced in the beginning of the argument, he introduced, he's going to tell them why what they were doing was worthless, and that's what he did. So that's okay. I'm not willing to do that. And, and so I want to point that out

006501

to you to in this respect.  I've never seen a litigant tell the panel in an appellate proceeding that what they're doing is meaningless.  There's no effect to it.  It's nothing because we made another deal with somebody else and no matter what you do.  Now, I was not surprised that they took that position because the panel was pretty direct on how this case was tried and how in the world you were able to get elder abuse after the jury had left and you replead it and the Court gave it to you and all that stuff.  The appellate court was very focused on what was going on here.  And so I think what -- and I, and I want to say this because I think what Mr. Bankston accomplished was probably a very speedy opinion, that's my best guess.  The Courts had no response.  They had no emotion, they had no response.  They were very active during the arguments, but with that comment, they simply excused the parties and got up and left.

So I, so to answer the question as best as an appellate lawyer as I can and Mr. Broocks did the argument so he may have something to spin to put on it, but I don't think we're going to be waiting a long time.  The dilemma I see is, is that -- my concern is that I think Mr. Bankston has made a deal and critically a deal that would -- because I think he contemplated it before he made these remarks to this panel. I mean no lawyer would say that to a panel unless he knew what was going to happen and the panel had made it pretty clear in

the arguments.  But I want to emphasize to you and I have a, we're supposed to have another blow up, but I know that, I know this is not trial on the merits of anything, but I, but I want to be able to sort of encapsulate to the Court what's happening here and what's happening in circumstances we don't know about and that's going to lead me to ask you for some, some relief in connection with the motions that you just want to status conference on today.

I'm not going to argue the motions, of course, or the merits of the motions, but I do want to let the Court understand why I'm asking for some of this relief.

But here's an email.  It was written by Paul Weiss, Leslie Lieberman, November 16th, 2024, at 1:16 p.m. addressed to Jarrod Martin, Josh Wolfshohl, Chris Murray, Avi Moshenburg and others.  And they were working on a deal.  And this was produced in the, in the discovery that we had with Mr. Murray.

And here's what they, here's what they say in the email that I, that I think is very critical for the Court to allow me to emphasize.  The email's text says "We attach an updated term sheet.  We have increased the settlement amount to three million."  That is the settlement between Texas and Connecticut to cut some deal.  "In our view, this represents a significant premium over the Texas family, over what the Texas families are entitled to on a pro rata basis, a premium that we are only willing to pay for assurances that the FSS

assets will not be sold to Jones' family and friends given that it is clear that Jones will use the assets to continue harming our client." Whatever, whatever that means.

But we do know because we have other emails, again, not to develop any of the facts without having the witnesses to proof up these. What we do know is that there has been a continual -- and you've seen it in two, in two series of transactions in auctions. They were, they were trying to conduct an auction only if they had these arrangements in these particular problems made.

And so what has occurred, what we believe has occurred is something that is completely contrary to bankruptcy policy of what a creditor is entitled to obtain and do in a bankruptcy proceeding. And we've made those arguments in the, in the motion for the auction. Very briefly, we simply say that -- we go through a number of pages of the evidence that we have and the things that we've discovered in the last six months that the government, the DOJ, the plaintiffs' foundations, Paul Weiss and other players had been doing in connection with these Jones claims.

So our argument is couched in terms of what has happened is the, excuse me, your Chapter 11 case was never prosecuted in Chapter 11 by the two dominant creditors. They had their controversy. One was -- and I would, I would use this example. They were identical twins. One was Texas and

006504

one was Connecticut.  No difference.  No, I mean they were the, the events were the same, the people that came to the events were the same, the people that committed the events were the same, the conversations about the events were the same.  Everything was identical.  One of them got 2 percent recovery, and one of them got almost 3 percent, and one of them got 97 percent recovery.  And of course, that skews everything from the standpoint of how can that happen and what can you do about that?

We know that there are things that, remedies that can be done.  And we know that the Texas plaintiffs know what they are.  And so we assume that that is what's been pushing these negotiations from before November all the way through the last time you heard and saw a written effort.  And that was the 9019 settlement in which they were saying, you know, we're going to give you 25 percent and you're going to get $4 million.  It had gone from the email of 3 million to 4 million.  All those things are transpiring without us having any idea of the background of the trustee's involvement.  We've now discovered the trustee was very involved in the, in the decision making and in the implementation of all the process.

What it has done for us though is it, it has finally coalesced the process that is going on here and that is that the dominant creditor who doesn't want money -- now, by the way, the motion that we filed I footnoted to the YouTubes and

006505

to the, to the public statements and I think you heard some of the Onion statements where they don't want the assets so they can make money because their dilemma is this. Where they, for instance, to go to an auction that had an $8 million purchase price and they won by $8 million and one.

They normally would have then a balance sheet that says, I just, I just put out $8 million but I got assets worth $8 million. So the balance sheet doesn't change and that's where you, that's where you make your auction decisions. But that's not what's at play here.

What the play is here is that look, we can't pay much money because we're going to destroy the assets. The reason we want the assets -- and they say that -- the reason we want the assets is so Alex Jones cannot use them. We want to destroy his brand. Onion said that in the, in the newspaper. We want to destroy the brand and parody it so that we can further our gun control political position and other stuff.

So what has happened to us in this case is the dominant creditor, which has been represented by Paul Weiss, the dominant Connecticut creditor doesn't want money. What they want to do is destroy Alex Jones, and they have -- and as the Courts, I know the Court's aware that they didn't utilize the first proposed mediator. They did then eventually agree to a mediation and zero happened. So this is not a case

006506

in which they have ever made an effort to deal with and try to resolve the case with dollars because it's always been destroy the brand, get him off the air -- and you'll see the videos if you ever get a chance to look at them -- is that they told the jury in Connecticut, punish him with such a verdict that he can never be part of the public discourse again.

So what's happening in this process, and I emphasize this because the auction is going to bring it to a head, they don't want, they don't want an auction. And so --

THE COURT: Why don't you buy the equity?

MR. JORDAN: I'm sorry, Judge.

THE COURT: Why doesn't someone just buy the equity?

MR. JORDAN: Well, if you buy the equity, you buy whatever debt and other things that go along with it.

THE COURT: So what's wrong with that? That's what Chapter 7 normally does. What's different?

MR. JORDAN: Well, because I don't think anybody would buy the equity. Buying the equity so that you can --

THE COURT: First United can put up the money and buy the equity right now if it wanted to.

MR. CICAK: (Indiscernible)

MR. JORDAN: Maybe I'm not following you. If you --

THE COURT: The trustee has said no one's put up an

offer for the equity.

MR. JORDAN:  Correct.

THE COURT:  So, First United, put up an order for the equity.

MR CICACK:  (Indiscernible)

MR. JORDAN:  Well --

THE COURT:  In other words, I don't -- what people want is a sale of the assets.  And let me just remind people what happened when there was a sale of the assets, it was me that expressed the concern about the sale.  There was a sale on the table.  I denied it and then I denied another motion to approve a settlement.  Right?  Those assets are incredibly complicated and they raised huge property of the estate issues.  X ended up doing a deal at the very last minute in connection with the proposed sale to Global Tetrahedron, which I didn't approve.

To conduct such a sale, one would have to -- and I said this on the record back then -- you'd have to address all property of the estate issues up front so that you have a clean understanding as to what could be sold and what could not be sold.  And the IP issues to me remained largely unsettled and really complicated as to what FSS owned, what Jones owned, what it didn't own, what he didn't own.

To do that again, there would have to be such a process, and I'm not comfortable proceeding that way.  But if

somebody wants to buy the equity, which someone can always do in Chapter 7.  I read your pleadings and I think -- I went back and listened to it, and I'll take the blame for not being incredibly as precise as I should have been.

The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I intended to say and certainly communicate to the parties is conducting -- well, I can't, I'm not going to force the trustee to put up another sale, put on auction.  The trustee can exercise business judgment, but here are the matters, here are the things the trustee needs to think about before we bring another motion for the sale of the assets.  And here's a laundry list of issues that I've got.

Trustee is going to have to think about whether I approve any sale process because it would have to be conducted by me.  It would have to be cash only and we'd have to sort out all the intellectual property issues.  So I don't want someone buying something -- and I expressed this a while back -- and then showing up six months later in state court and someone suing them because they really didn't own something that I sold and so I haven't revoked anything.  I didn't have authority to do it anyway, but to me, putting up another auction process would be incredibly complicated, incredibly

expensive.

And I get it.  Maybe they don't want to buy the asset to make money.  But I'd, I flip it to you.

MR. JORDAN:  I'd like to, I'd like to comment on that because this is, this has really troubled you.  I know since the beginning you made clear that if the IP was going to be sold, that the parties had to come to the Court and raise the issue and then you would decide whether it could be sold or not.

Now so the two offers that we brought to you, I say that we brought to you, that were brought to you that dealt with buying the assets all said we take as is.  So that sale would never have been a problematic sale on that basis.

THE COURT:  Take the equity.  I've got two sides.  There's no question Jones supports FUAC buying it.

MR. JORDAN:  Of course, yeah.

THE COURT:  No one said that.  There is no question about that.

MR. JORDAN:  The questions would go away.

THE COURT:  There's no question.  There's no question, but whether it stays or goes away is largely irrelevant for me, right, from a bankruptcy perspective.  Now, obviously, it's got incredible importance to Mr. Jones and I don't, I got that.  But from a, from a bankruptcy perspective, the real question is what's in the best interest of the estate,

006510

right?  And so to me, the amount of money Mr. Murray would have to spend to get me comfortable that there would be a sale of assets, it would be incredibly expensive and incredibly time consuming.  And I'm wondering if the amount of money that it would take to spend plus potential issues that come along with it that's why I said to you, if you want, somebody can put up the equity.

This case has been pending since 2022.  And folks, it just needs to, it needs to end.  Mr. Jones would be entitled to a discharge at some point, and parties can argue about what's dischargeable, non-dischargeable.  Let the state courts, or the Supreme Court of the United States rule on the issue.  Parties can then appeal any orders of mine to the district court or the Fifth Circuit.  We got to get there. I'm not moving.

The issues that are still there are there.  And I've heard your concerns.  And I didn't approve of the sale to Global Tetrahedron.  And I'm not saying anybody did anything wrong.  I just did not get comfortable with that sale.  I didn't get comfortable with the settlement.  Someone was asking me to allow a claim against an entity that's not in bankruptcy anymore.

MR. JORDAN:  And believe me, we didn't ignore you when you said --

THE COURT:  I know you didn't.  I know you didn't

it.

MR. JORDAN:  -- on the sale of the equity.  We've tried to figure a way that we could sell it without the buyer buying $1.3 billion in debt.

THE COURT:  And that's the problem is that you can't figure it out.

MR. JORDAN:  If you got a hand on it.

THE COURT:  It's not, it's the trustee's call.  That's what I'm saying.

MR. JORDAN:  Well, it's the trustee's call if he can find a buyer.  We couldn't figure out how to find one.  It would have been --

THE COURT:  May the trustee abandoned the issue.  And maybe the trustee abandons the asset.  I don't know.  You all are going to have to figure it out.  That's what I'm saying.  The trustee needs to make decisions.

MR. JORDAN:  But let me also mention to the Court, and I'm not sure that you processed this, the way I'm, the way I tried to present it because I didn't, I'm not sure I wrote it the way you --

THE COURT:  You're saying there's stuff going on behind the scenes and you should be well aware of it.

MR. JORDAN:  That's not up for today, and I don't, and I --

THE COURT:  But it could be.

006512

MR. JORDAN: I'm saying it is a, it is we want the ability with limited discovery to explain that with facts and documents. Now we've got them. But we've got to verify them. We've had to have them authenticated. I mean things have happened in the last six months since this regime change.

THE COURT: I'm sure. I'm sure.

MR. JORDAN: But that's not what I was referring to. Here's what I think you might consider. When you ruled on the 25th of February, and then you said, and then after that, the FUMC filed a request for a status conference because they wanted, they made this offer that wouldn't be -- for three months and not been responded to, an $8 million offer subject to the conditions that I mentioned. We won't -- the trustee doesn't have to warrant anything to us just because we know what is there. We know what is involved, so, so we're ready to sell.

At that time you were incredibly frustrated with the, with all the parties and you commented that you were going to void and terminate the order.

THE COURT: I did say that and I agree.

MR. JORDAN: And quite frankly, but for, but for the fact that the appeal was pending, that's probably what you would have done at the time.

Now, the appeal now, I filed my motion pointing out that I've pointed out to the, to the plaintiff, the appellant,

006513

there's no jurisdiction to do anything except enforce the order or construe the order if they keep their appeal going. They kept it going. But I think when I filed this motion -- and I really emphasized it maybe more or better than I, than I had before -- they have now dismissed the appeal. That dismissal was, is now 34 days old, and that's important.

They said in their reply, which, by the way, the reply to all these --

THE COURT: The reply to which docket?

MR. JORDAN: I'm sorry, to my motion.

THE COURT: Oh, yes, yes.

MR. JORDAN: When they filed their response, I misspoke, when they filed their response to my motion, they said the appeal is dismissed, the matter is moot, the judge has ruled, and so it's all in state court. That's their response. And of course my reply then was wait a minute. That is not how it works. If the Judge had made oral release from the bench, and the last one he wrote down that it was, that it was void, but the Judge also said, I mean, on his own, not because we pointed it out, but you said on the, on the 25th of -- on the 5th of February '25 that if it's on appeal, I can't modify it, I can't change it, I can't withdraw it. Now, I can, I can enforce it or I can interpret it, but I can't do any of that cause it's on appeal. That was all correct. Now it's not. So now what's the effect of that?

006514

The effect of that is that your order giving it to the estate is now a final order that is, I mean it can't be collaterally attacked; it can't otherwise be attacked.  It is a final order that permits the trustee, because remember your supplemental order did two things.  You gave the trustee the assets and then you said, "And I'm giving him the authority to operate until he can sell."  Now that's what it, I mean, you basically laid out the purpose of it.

The plaintiffs are now saying, oh, that supplemental order doesn't order a sale, so there's no way that just because the supplemental order is in place, it'll be ordered.  I think that's foolish, but that's their argument.  But the other argument is that in some fashion, your final judgment that now -- that people can't attack -- well, the one exception.  Your final judgment is a final judgment on the law.  That is, can I, could I authorize to do that in the state of Texas?  Yes, I can.  I have a final order.  Everybody knew about it.  Even the person that complained about it withdrew his appeal.  So it's fine.

THE COURT:  The question is, do we do round two?

MR. JORDAN:  I'm sorry, Judge?

THE COURT:  There's already been a round one.  The question is do we open it up for a round two.  That's the real question, right?

MR. JORDAN:  Well, yes, it is the real question in

the sense, but let me tell you how that works, but the answer to your question is yes, but here's how it works.  Rule 59(e) could give relief by which you could, within 28 days of the entry of the final order, even the Court within that period of time could have sua sponte said, wait a minute, I don't, I made a mistake.  I don't like what I did or things have changed.

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

MR. JORDAN:  Well, I'm saying now --

THE COURT:  You probably couldn't do it before then, but I'm asking you to reconsider if that's what you're planning on doing now is how I read your motion or to the extent I thought I did something, reconsider it.

MR. JORDAN:  Yes, because I can say this.  And look, I'm old enough to know better than to tell a federal judge he can't do something.  Okay.

THE COURT:  I'm not one of those judges.  You can tell me that I can't, I can't.

MR. JORDAN:  What I want, but what I want you to hear is that Federal Rule 59(e) is gone; 28 days have passed.

006516

Nobody filed a motion and you didn't pick it up and decide you wanted to do something.

60(b) provides for a reasonable time to do something. That reasonable time probably hadn't passed or maybe it has, who knows, but it's only on motion. It's not on sua sponte of the Court.

THE COURT: Oh, I agree with that.

MR. JORDAN: Okay. So no one has asked you to do anything. They've said, oh, it's all moot --

THE COURT: No, I agree. I don't know how people are construing it. Maybe I can provide some clarity there. There is an order out there. That order, there was a sale, a proposed sale under that order. He didn't -- I denied it.

I've told the trustee, if you're going to try to do this again, here's the mountain of stuff you're going to have to get over before I get comfortable approving a process by which those assets could be sold, and it's really hard. The trustee can move if he wants. I know you can sell the equity. And that's an easy process to get through.

The other one, it's going to be really hard to get me comfortable approving the sale on the merits based upon all the issues before. But I don't, I'm not in the business of ordering trustees to go order and nor is anyone asking me to. Truste's got an offer. Trustee will weigh. Trustee will exercise business judgment as to what the trustee wants to do

006517

and parties can file stuff asking me to do things or not. But that order has been complied with in the sense that the trustee tried to move under authorization under that supplemental order, no question about it. He tried to sell assets under those orders.

The question is do we do another sale? That's the real question. Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS. And how do I weigh now state court remedies that people have as opposed to -- do I stay then state court remedies against non-debtor parties, against the non-debtor? It's more complicated now than it was six or seven months ago.

MR. JORDAN: Well, I agree. I think that the issue in state court has become extremely favorable to the goal and policy I mean and decision making of the plaintiffs. They know that a state court auction by a constable is worthless to value. They're going to, somebody's going to credit bid and now their deal is, it's going to be, they're going to create a bid. Nobody gets any cash. There's no change. They get the assets for nothing and the people that are injured, of course, are the other creditors of this estate who are, who are not active at all. There's not a whole lot of them, but

006518

there's, but they're there.  And, of course, then the Debtor who has obviously an interest in getting a maximum value for a credit against his judgment.

So you, they're weighing this.  They're weighing a state court constable's auction for nothing by which they get the assets for nothing and they destroy them like they say they're going to.  And they, and $4 million goes to, they pay $4 million to the, to the Texas plaintiffs, or we go to an auction and we have to compete against $8 million with someone who says you don't need to guarantee title, you don't, yeah, I mean, here's my bid, I'm ready to go.

And now here's, and here's the third comparison that I, that I really think is important.  And I think you may have just said it, but if, but if I didn't -- not sure I picked it up exactly, is that people have relied on your order.  I mean the trustee has paid himself over a million dollars from those funds.  The trustee's lawyer has gotten $800 million too pursuing these auctions.  I mean, there's been almost $2 million spent pursuing the auctions and pursuing the reliefs and doing the settlement agreements and all the things they were doing.  Instead of just auctioning it off, they got into this process that somehow the trustee bought into.  And so the -- how do we unwind this because for the last six months now, Alex Jones has been operating under the auspices of the trustee, so he, I mean, he's added like $2 million into the

006519

estate from him running the company and keeping the assets going earning money.

What happens to the earnings, I mean so --

THE COURT: Where does the -- let me ask you a question. It's a good question to ask. FSS, well, let's assume FSS generates -- I'm making something up here, so just as a hypothetical. We'll just use X dollars in July of 2025 or through August, or the first six months of this year. Right? Where does that money go?

MR. JORDAN: It goes to the account of the trustee 50 percent and the account of Alex Jones, 50 percent. So they have -- so he didn't get a salary, he gets, that's how they, that's how they run the operations. So and that has generated about $2 million and that's not just since this month, but it's --

THE COURT: Are you asking me to, in consideration of that, to potentially end that arrangement, give it all to Jones? If I reverse the order, wouldn't that, isn't that the effect?

MR. JORDAN: See that's the dilemma. If you reverse the order, everybody has done a lot of things in reliance on the order.

THE COURT: No, no. I got it. I got it.

MR. JORDAN: Okay.

THE COURT: It's an -- I understand the point.

006520

Right?  I understand the point.  There's money coming in and there's only one person generating that money that's coming into FSS.  Let me think about it.  I don't want to rule today.  I want to think about everything and think about this.  This is kind of why I want to have a status.

MR. JORDAN:  And may I --

THE COURT:  Go ahead.

MR. KIMPER:  May I --

MR. JORDAN:  And may I, may I add to my confusion --

THE COURT:  Just a second, Mr. Kimpler.  I just want Mr. Jordan to finish.  Go ahead, Mr. Jordan.  I think Mr. Kimpler wanted to speak, but I'll give him an opportunity or Mr. Broocks.  Yeah, go ahead, you finish.

MR. JORDAN:  What's that?

MR. KIMPLER:  Your speech.

THE COURT:  Go ahead.  Finish your point.  You've got the floor.

MR. JORDAN:  Mr. Kimpler.  Okay.  My other thought is this.  It's kind of a different direction.  There have been four orders entered, I'm sorry, there have been, I think, three orders entered.  There may have been four.  I'm referring to Docket Number 24-03228, 229, 331, and they're called "Stipulations of the Parties."

THE COURT  Yes.

006521

MR. JORDAN: And they purport to -- and we only found these this morning. We weren't, we weren't ever served any notice, but we weren't parties to these adversaries. These are ones I think that Ms. Driver was a party and she hadn't withdrawn and one of the trial lawyers, Chris Martin was a part of, but we didn't know about these. And my question, if I may ask the question, I'm not asking for an advisory opinion. I just, this is the Court's order. It says the Court retains exclusive jurisdiction over property of the estate and any other property or interest under the control of the trustee, including 100 percent equity interest in FSS. And it's entered in the, or at least styled in the FSS Systems Chapter 11 that is no longer.

And my, I guess my only concern is that it's sent back to state court something, but I, but I can't, I don't understand what it sent back to state court. These were remand motions that I think they're, they're not the ones that we're involved in that's up for today. But if those are remand motions and they don't, and they're not sending property back to the estate, I guess, I guess from my perspective, we probably don't have a problem. We still are within the time to file a motion and reconsider if there, if we find a problem, but can the Court, did the Court intend to send the assets back to the estate or --

THE COURT: No.

006522

MR. JORDAN:  No.  Okay.  Well, I'm asking for a ruling, and I don't, and I ought to tee it up differently, I guess, but --

THE COURT:  I'll set up a short status.  I don't know when.  Give me a little time to think about everything that I've heard today, one way or the other.  Mr. Broocks, I'm certainly going to give you the opportunity to speak, but I don't want to rule one way or the other.  I don't think anyone should plan on an auction today, but I may change my mind, but I don't -- in terms of going forward with respect to the cash generated by FSS, it's something to think about.

MR. JORDAN:  And, Your Honor, then just to finish so that Mr. Kimpler can ask his question.

THE COURT:  I think Mr. Broocks will go and then I'll, then I'll turn to Mr. Kimpler and then I've got another hearing, folks and I don't --

MR BROOCKS:  I'm going to go next.

MR. JORDAN:  All right, so the one other issue that I wanted to cover, and let me see where I put it.  Your Honor, for the sake of the, of the topics I've covered, if it's all right, I'm going to sit down.  If Mr. Broocks had something --

THE COURT:  If you, if you think about it, just let me know.

MR. JORDAN:  Okay.

006523

THE COURT: Mr. Broocks, good afternoon.

MR. BROOCKS: I'll be very brief, Your Honor. Thank you so much for entertaining this. I did the oral argument in the Austin Court of Appeals, and I wanted to bring to your attention some different facets of this.

The Connecticut first in Austin, in Connecticut, we asked the Supreme Court of Connecticut to do this discretionary review. They could. There's a specific doctrine there under a whole lot of cases called the Golden cases. It says even if you didn't raise a constitutional issue below, you can raise it here. So we asked them to do so. The opposition to our petition in Connecticut said no, they didn't raise it in the Court of Appeals. They didn't even use, I'll say the "C" word, Constitution. That was their argument. It's been waived, we said, but the Golden case is intended for that exact purpose, (Indiscernible) line did not.

And he's right, whoever said it. We are going to go to the U.S. Supreme Court. We have the ability to ask Justice Sotomayor, I think she's assigned to the, to the Second Circuit District, wherever this case is, for a stay. And the moment they start any aggressive action; we're going to do that. We have a petition we're working on right now. That's Connecticut.

Now in the Texas appeal, the argument was threefold. It was a lot of sub issues, but the arguments looked to the

006524

justices you have, Your Honor, has an independent duty, constitutional duty to review the constitutional issues. As painful as it may sound, you've got to take these videos and you've got to watch them and I had them transcribed. So the Court didn't have to just go watch them. I said, here are the transcripts. They objected to that, but I said, I'm just trying to help. And they were, they were hyperlinked where you could listen to it and read the transcript and go to the particular spot.

I said so you got an independent duty and nothing anybody can do can take that away. And nobody, no court in America has yet ruled on the constitutional issues we raised. Nobody. And so, and so they said, well, they were, they were facing the task and they realize that's their duty. And that may take a while.

Now, the second issue was we said there is a constitutional prohibition, prohibition on entering a liability default judgment against a media defendant in a matter of public concern in the case brought by a public figure. We think we satisfied all three of those. We said and the justices, the Chief Justice said, wait a minute, are you telling me that the trial court is helpless? I said, absolutely not. She's got a lot of remedies available to her, but the one thing she can't do is put a gun to the head and say I am going to bypass all these cases and I'm going to say

006525

I'm going to find you, as a matter of judicial decree, to have committed malice that it's false, that you intended it to be false, you knew it was false, and instead of clear and convincing evidence, I'm going to say there was. I said they just can't do that in that context. And so she asked Bankston, she said, Well, what do you say about that? And Bankston, well of course, he says we disagree, but he didn't have any cases because he doesn't have any cases.

Now the third issue, so we said, we said the constitutional review is going to be required. The default judgment was inappropriate, and we said well when punitive damages are concerned, you have an independent duty to look and see what the grounds are. And to see if, in fact, under Texas law, and which is similar to a lot of states, did they put on the proper evidence to show that, you know, that the default damages that all remedies that had been available to the trial court were tried and failed. The justice says, what could she have done? I said, she, if they weren't having success in getting documents from Jones, you got weekly hold, you can get his, they've done computers, you can do the searches yourself. There's a lot of things.

So anyway, so the Court of Appeals is going to come back potentially and do something very interesting because you've got a Texas case and you've got a Connecticut case. Now this is like Shelby said it was identical twins. That's

a really interesting analogy because it was the Sandy Hook crisis, same one, the same parties, families and family members, the same broadcasts that are allegedly defamatory. A default judgment on liability, so there was no liability trial. The only differentiating factor was the damages. Now in Connecticut, it's $965 billion divided by 15 is roughly $63 million of actual damages to the family. Pretty close.

In Texas, it was $2 million 2 for Heslin, 2 for Lewis. So how do you get on the identical facts, the identical arguments, the identical, there's no liability issue. You now have 63 million to the Connecticut people and 2 million to the Texas plaintiffs. Now if the Texas Court of Appeals comes back and says that we're going to say that -- they could come back and say there's no defamation because I showed them the articles that they were taking snippets out and claiming Jones says this, but he said very clearly, I believe children died. So, you know, there could be no defamation involved. We said convincingly, I think, that there was no intention of fiction, but the Court of Appeals could come back and say wait a minute, we don't think this satisfies constitutional muster.

Now what is the Supreme Court of America going to do? What are you going to do when you've got identical facts, identical facts, identical liability, and one court says it violates the Constitution and another court says they didn't say no. They said we're not going to address it.

006527

Now I think that creates an opportunity, a question for the Supreme Court. Not only is there a disproportionate recovery, 63 versus 2, you have one court saying on the same facts, no. Another court saying on the same facts, we're not going to address it, but maybe. That creates an interesting dilemma, I think, for this Court. Because you're being asked to find non-dischargeable something that a Texas court would if it comes out this way, if I'm right, that the Texas Court of Appeals says it doesn't pass constitutional muster, well, you're in a dilemma. And that's why I think your comment about shouldn't we wait till the Texas Court of Appeals rules is very prescient because they very well may come back and say that and I think that is an issue that this Court should take into consideration as it considers its dischargeability because I think that the plaintiffs here --

THE COURT: Dischargeability with respect to Texas, Connecticut or both?

MR. BROOCKS: Both, both.

THE COURT: Okay.

MR. BROOCKS: And I'll tell you why. It is because in issuing your original non-dischargeability order, you were led to believe that Connecticut was basically ironclad just, you know, if it was fairly tried and all that. That's not Connecticut law. It's just not.

THE COURT: Shouldn't an appellate court in

006528

Connecticut tell me that?  I wasn't, I don't think I was led to believe anything.  I think I was given documents that led to a conclusion under the law.

MR. BROOCKS:  These are collateral estoppel issues. The Connecticut court can tell you what they did, but you have to decide what is the collateral estoppel effect.  And we said that the Lighthouse case and others, the Supreme Court of Connecticut in multiple cases has said that there are three steps in a collateral estoppel, but there's a critical fourth which gets into equity, fairness, justice.

You know, we get to look behind the scenes and then there was another case where a default judgment was entered. Those were just regular collateral estoppel cases.

There was another Connecticut Supreme Court case that is the bellwether case that says, wait a minute, if you have a default judgment entered, they go, they follow the restatement of torts.  And they say if a default judgment, then you can't say it was fairly --

THE COURT:  Aren't those matters for an appellate court at some point?

MR. BROOCKS:  No, those are matters for you.  These are, these are questions because if the question of collateral estoppel comes in, these are the issues.

THE COURT:  You're saying collateral estoppel on something I've already ruled on?

006529

MR. BROOCKS:  I'm saying you haven't, it's not -- you at all times, this is not a final order, Your Honor.

THE COURT:  Oh, you mean, you mean in connection with the final order.

MR. BROOCKS:  I'm saying as you approach the issue of finality, and I may, I have --

THE COURT:  No, no, no.  I got the point.  I get the point.

MR. BROOCKS:  So I'm going to say that as you, as Mr. Kimpler said a minute ago, they're going to come back -- and I suspect they will.  I would be shocked if they didn't -- saying we're going to forgo the $331 million.  That would be Bankston saying that he's got a deal.  Now we believe this is a, we believe this is, I'm going to say an illegal deal.  We believe these are two creditors working behind the scenes because I think that because Connecticut has always said we have 97 percent of the judgment, but Texas has said, well, wait a minute, it should be 5 Texas plaintiffs, 15, that's, that's 75, 25, 75 percent.  Connecticut was held hostage by Texas until they cut that deal, and that's what I think we need to discover.  And that's an abuse of process.  That's creditors manipulating the system.  And what's happened here is that that's going to be another complicating factor because we're going to file an adversary on that.

THE COURT:  Okay.

MR. BROOCKS: And so at any rate, my point to this Court is that there has been a massive, and I'm going to conclude with this, and a massive, a massive abuse of process here. They have taken legitimate processes and they have abused them, using them for an illicit purpose, which is to put Jones out of the air. That is not a legitimate purpose. And that is going to be, so that's the essence of our, of our 1983 claim. Our 1983 claim says this, from the moment that trial judge in Delaware -- in Connecticut issued a default judgment and then struck our constitutional defenses, that is state action. The New York Times versus Sullivan says that's a state action. The cases we cite in our briefs, the Fifth Circuit says that is, that's not just a plaintiff bringing a lawsuit. That is a judge entering an order that now tips the scale, and that is state action. Again, New York Times versus Sullivan said that.

So we believe, Your Honor, that we have asserted valid 1983 claims. We believe we're going to assert an amended petition or complaint for abuse of process. And we would urge you to wait and see what the Texas Court of Appeals does because that may change your judgment.

THE COURT: Thank you very much. Mr. Kimpler, I think you wanted to have a word.

MR. KIMPLER: I would, Your Honor. I'll be brief, but there was a lot of stuff said. I think one thing I hope

006531

you're seeing that as Mr. Jones continues to lose his appeals in Connecticut, increasingly it is hoping that you will be in appellate court. I think you've already appropriately decided that collateral tax on the Connecticut judgment won't stand. The Supreme Court will either take up review of this or it will not. We are confident that the judgment will stand. I don't believe the Supreme Court will even take review. As Mr. Broocks just noted, they actually don't raise constitutional issues in the underlying appeal. So when you ask what's the federal issue for the Supreme Court to look at? It's a pretty good question. Mr. Broocks won't agree with any of that. I don't need to convince you of any of that. The Supreme Court will do what it will or won't.

I'll just remind you that for the last two years, they've told you that Connecticut judgments are going to be overturned, and they weren't. They were affirmed and the Supreme Court of Connecticut said they didn't want to look at it.

I'm not going to respond, Your Honor, to all of the mischaracterizations about my clients. I will point out that the email they quote from my colleague, Ms. Lieberman, was taken out of context. It specifically said we're tired of being hurt on air. If we want to have an evidentiary hearing, I'm happy to show you since January or since December, the number of times Mr. Jones has continued to harass and threaten

my clients on air.  I don't think it's relevant, but I'm happy to do it.

The statement that we at closing in Connecticut said "put a huge punitive damages to take this guy off air," the only problem with that?  I think that was what was said in Texas.  So if we're going to throw around a whole bunch of factual accusations, we should at least have some credibility when we do it and not make misstatements.

I'm a little bit surprised to entertain the notion of another auction in the bankruptcy court.  I think you should see today all the issues.  Then I'll file another adversary complaint.  They're going to assert Section 1983 claims against my client.  Having an option in this court is going to be extremely expensive.  It's going to cost a lot of money, and I can tell you that neither the Connecticut or the Texas plaintiffs support it.

I think we should keep in mind here that Mr. Jones is an equity owner of a business and is massively out of the money.  This is not significantly different from any other cases where a company has creditors, it can't repay the creditors, the management may get replaced, the board may get replaced.  Yeah, they don't get to dictate the terms on what creditors do with the business.

The thing that I think Your Honor was focused on is what is happening with the business now?  Mr. Jordan said that

006533

FSS has created $2 million in the last couple of months.  I'd like to see proof of that.  I don't think we should take the things they say at face value.  I can tell you for the last year, Mr. Jones goes on his air and he says, don't buy stuff from Infowars.  Buy it from this other website I just created.  We believe First United is behind that in funding it.

THE COURT:  Well, I believe, I believe, --

MR. KIMPLER:  I believe (Indiscernible) also.

MR. COURT:  I don't, I don't want to, I don't want to get into it.  I get the point.  I don't want to get into what one is doing and the others are doing, I've got big, big, big billboards here and like finding stuff on the other side.  I'm really just trying to stay within the four corners of this wall, but I get the point and I think everyone is hearing me.  I'm not inclined to open up another auction process or I think the trustee, if that's what the trustee wants to do, has heard what I said back then, and I don't think I've changed my mind here.  But it sounds like no one wants to buy the equity either.  That was one of my questions in my notes here, so.

But I do, there are some things I do want to think about, maybe understand what's going on with the business, how much money the business has, maybe understand kind of where things are going with respect to the business.  I kind of what the trustee views is the right thing to do, what the business is at some point.  I just think we got to figure out what to

do with FSS over the next, I don't know, 60 days and just make the call one way or the other as to what you want to do and move on.  I think --

MR. KIMPLER:  Your Honor --

THE COURT:  There could be other lawsuits.  There could be other matters that are coming, and I will take them up at face value.  I'll read them and we'll take them up and rule on him.  Mr. Kimpler.

KIM:  Yeah, I was just going to say, Your Honor, we heard you loud and clear, at least we thought we heard you loud and clear in January and February about pursuing state court remedies.  We've been working with the Texas plaintiffs towards that end.  You know, I think to now say, well, actually we're going to have another redo in the bankruptcy court would be terribly disruptive.  I think it will have wasted several months of efforts.  I think it'll be extremely expensive.  I'm worried about the estate becoming administratively insolvent.  Again, if FSS is throwing out $2 million of cash a month, that's news to me.  The idea that 50 percent of it's going directly to Jones and an account that maybe is not controlled by the trustee, that's also news to me.  I'm very concerned about where that money is going.

THE COURT:  I know.  I got it.  I think everyone should leave on the motion for reconsideration thinking, well, there's really technically nothing for me to reconsider

because there's nothing, I haven't done anything.  But I don't think my position has changed in terms of what I said in February.   I want this case to continue to move .  Maybe we meet in another 60 days and see where things are and I'll see what gets filed and we'll take them up and we'll schedule them.

This case has been around for three years.  And it's been in a number of iterations and the positions of the parties hasn't changed and that's fine, but at some point, the Chapter 7 process has to work.  So I want to know, the trustee is going to tee up some non-exempt assets.  We'll take those up in the ordinary course.  We'll come back and figure it out.  In a couple of months, we'll figure out what the trustee wants to do with respect to FSS, but I'm not opening up any doors today.  But if there's a lot of money sitting somewhere, then maybe we can think about that.  But if courts rule, I'd like to know about them.   We'll see where things go.   Mr. Moshenburg, I'll give you 30 seconds and then I've got some other folks who have been here for a while and deserving of a hearing.  Yes, sir.

MR. MOSHENBURG:  Makes total sense, Your Honor.  I completely echo what Mr. Kimpler just said.  I just wanted to make sure the Court understood.  I don't agree with their characterization.  If any of that sticks, I'm happy to answer any questions about it.

THE COURT: They don't agree with yours, so I think no one agrees with that -- so we're right where we started.

MR. MOSHENBURG: I totally agree. I just wanted to be clear on the record about that.

THE COURT: No.

MR. MOSHENBURG: Lastly, Your Honor, I know you're talking about 60 days from now. From our vantage point, the Court has told us to go pursue our state court remedies. That's what we're going to do. I want to be open and honest about that unless you're telling us otherwise.

THE COURT: I'm not, I'm telling you we may meet in 60 days to figure out what's going on with these sales and other issues and there are matters that need to get teed up. We can continue to talk. I just want to keep; I don't want to meet again in the Jones case in December and then talk about asset sales and what's going on.

And I'm going to -- well, somebody's asked me to think about some issues. And I'm not inclined to do it, but someone's asking me to think about some things, and they've mentioned some things to me and so I'll think about them, but I don't think anyone needs to file anything differently. We'll see what happens. I may issue something in writing in short, just kind of addressing the issue without any need for another hearing. We'll see where things go. I think the trustee's instructions for now are keep selling non-exempt assets and

006537

whatever you were planning on doing, what you said you were going to do, then just keep doing that. I don't think you need to do anything different, but if anything changes, I'll let you know.

MR. MOSHENBURG: Thank you, Judge.

THE COURT: All right, folks, thank you very much. I very much appreciate your time.

(Proceedings adjourned at 2:32 p.m.)

006538

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 17, 2025

006539



EXHIBIT

**D**

Alexander E. Jones; 22-33553

7/7/2025 1:50 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Max Hernandez

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, | § | IN THE DISTRICT COURT |
| Plaintiffs | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| Defendants | § | 261st JUDICIAL DISTRICT |

### APPLICATION FOR POST-JUDGMENT TURNOVER ORDER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTORS' ALEXANDER E. JONES AND FREE SPEECH SYSTEMS, LLC

Plaintiffs Neil Heslin and Scarlett Lewis (the Texas Families) and Intervenors David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (the Connecticut Families and, collectively with the Texas Families, the Judgment Creditors) respectfully request that the Court grant this Application for Turnover Relief and Appointment of a Receiver as to Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC (the Application) against Alexander E. Jones and Free Speech Systems, LLC (the Judgment Debtors). Judgment Creditors would respectfully show the Court the following:

1. **Connecticut Families' Judgment**. The Connecticut Families own a judgment against the Judgment Debtors. Judgment Debtors are obligated to the Connecticut Families in the amount of $1,288,139,555.94 under the judgment rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut, Docket No. CV-18-6046437 (the Connecticut Families' Judgment) and as affirmed and amended by the Connecticut Appellate Court. The Connecticut Supreme Court has

006540

denied further review. *See* **Exhibit B, Denial of Certification of Review**. The Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. *See* **Exhibit A, Declaration of Alinor C. Sterling**. The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act, Chapter 35 of the Texas Civil Practice and Remedies Code. Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under Chapter 11 of the Bankruptcy Code on July 29, 2022 (the Free Speech Systems, LLC Chapter 11 Case) in the United States Bankruptcy Court for the Southern District of Texas (Bankruptcy Court); and its Chapter 11 case was dismissed on June 21, 2024. Judgment Debtor Alex Jones filed for bankruptcy under Chapter 11 of the Bankruptcy Code on December 2, 2022, and his Chapter 11 case was converted to a case under Chapter 7 on June 14, 2024 (the Jones Chapter 7 Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Families' Judgment was non-dischargeable in bankruptcy and, therefore, unaffected by the bankruptcy proceedings.[1] *See* **Exhibit C, Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones**. Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. Judgment Debtors have since filed a motion

---

[1] On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 23, 2023 Memorandum Decision granting the Connecticut Families Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable.

006541

with the Connecticut Appellate Court to stay collection proceedings pending review by petition for certiorari to the United States Supreme Court, though no such petition has been filed. The Connecticut Appellate Court denied that motion on May 13, 2025. *See* **Exhibit D, Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073**. The deadline for Judgment Debtors to file a petition for certiorari to the United States Supreme Court is July 7, 2025.

2. In the Free Speech Systems, LLC Chapter 11 Case, the Bankruptcy Court for the Southern District of Texas issued an order dismissing the case and vesting authority in the Trustee in the Jones Chapter 7 Case (the Trustee) to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024). Accordingly, this Application only seeks relief relating to Judgment Debtor Free Speech Systems, LLC if approved by the Trustee in the Jones Chapter 7 Case.

3. **Texas Families' Judgment**. The Texas Families own a judgment against the Judgment Debtors. Judgment Debtors are obligated to the Texas Families in the amount of $50,043,923.80 under the judgment rendered before the 261st Judicial District Court of Travis County, Texas (the Texas Families' Judgment). *See* **Exhibit E, Declaration of Avi Moshenberg**. The Connecticut Families' Judgment and the Texas Families' Judgment are collectively referred to as the Judgments.

4. The Judgment Creditors have agreed to divide the proceeds derived from the Receiver's collection efforts pursuant to the terms of a binding settlement agreement (the Judgment Creditors' Settlement Agreement).

5. For the avoidance of doubt, the Judgment Creditors are **not** seeking any relief that would be inconsistent with the pending Jones Chapter 7 Case, including seeking any relief with respect to assets that Judgment Debtor Alex Jones owned on or before

June 14, 2024, as such assets constitute property of the Jones Chapter 7 Bankruptcy Estate.

6. However, any assets acquired by Judgment Debtor Alex Jones after his case was converted to a Chapter 7 on June 14, 2024, do not constitute property of the Jones Chapter 7 Bankruptcy Estate and are thus available to satisfy the Judgments. Further, any assets of Free Speech Systems, LLC, subject to the approval of the Trustee are available to satisfy the Judgments.

7. Accordingly, Judgment Creditors seek to **only** execute upon the following categories of assets, and, in each case, solely to the extent necessary to satisfy the Judgments (collectively, the Receivership Assets):

(a) any non-exempt assets Judgment Debtor Alex Jones has acquired post-conversion or may acquire in the future;

(b) any pre-conversion assets of Judgment Debtor Alex Jones which are expressly abandoned by the Trustee such that they no longer are property of the Chapter 7 bankruptcy Estate;

(c) any post-conversion payments Judgment Debtor Alex Jones is contractually entitled to; and,

(d) subject to the approval of the Trustee, any assets of Judgment Debtor Free Speech Systems, LLC.

8. Judgment Creditors reserve all rights they may have to execute upon the Judgments in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtors. A courtesy copy of this Application is being served on the Trustee.

9. Judgment Creditors file this Application pursuant to pursuant to Texas Civil Practice and Remedies Code section 31.002(d) that provides: "The judgment creditor may move for the court's assistance under this section in the same proceeding in which the

006543

judgment is rendered or in an independent proceeding." The proposed receiver, Gregory S. Milligan, resides in Travis County.

10. **Turnover and Appointment of Receiver**. Chapter 31 of the Texas Civil Practice and Remedies Code provides that: "A judgment creditor is entitled to aid from a court of appropriate jurisdiction . . . through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that is not exempt from attachment, execution, or seizure for the satisfaction of liabilities." TEX. CIV. PRAC. & REM. CODE § 31.002(a) (as amended Acts 2017, 85th Leg., R.S., Ch. 996 (H.B. 1066), Sec. 1, eff. June 15, 2017).

11. The court may "appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment." *Id.* § 31.002(b). Appointment of a receiver is prudent to provide for an orderly distribution of assets given Judgment Debtors have multiple creditors as detailed herein and given the attention that must be given to delineate the Jones Chapter 7 Bankruptcy Estate.

12. **Property**. Pursuant to Judgment Debtor Jones's sworn discovery responses attached to this application, he has non-exempt property. *See* **Exhibit A, Declaration of Alinor C. Sterling**. Pursuant to Judgment Debtor Free Speech Systems, LLC's sworn discovery responses attached to this application, it has non-exempt property can be used to satisfy the Judgments. *Id.*

13. **Turnover and Receiver**. Judgment Creditors request that Judgment Debtors be ordered to turn over all non-exempt, non-bankruptcy estate property and appoint Gregory S. Milligan, CTP, whose address is 8911 North Capital of Texas Highway

---

JOINT APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER PAGE 5

Suite 2120 Austin, Texas 78759, (512) 892-0803, milligan@harneypartners.com, as Receiver over such non-exempt, non-bankruptcy estate property. Mr. Milligan has served as post-judgment turnover receiver in numerous cases before courts of the State of Texas and federal courts; he is a certified turnaround professional; and he is qualified to serve. Judgment Creditors request no bond be required. *Childre v. Great Sw. Life Ins. Co.*, 700 S.W. 2d 284, 289 (Tex. App.—Dallas 1985, no writ).

14. **Notice to Judgment Debtor**. Notice and a hearing are not required before issuance of a turnover order. *See Thomas v. Thomas*, 917 S.W.2d 425, 433-34 (Tex. App.—Waco 1996, no writ).

15. **Attorney's Fees**. Pursuant to Texas Civil Practice and Remedies Code section 31.002, Judgment Creditors are entitled to recover their reasonable costs and attorney's fees incurred in attempting to collect their judgment.

16. **Prayer**. Judgment Creditors pray that the Court grant this Application, order turnover of Judgment Debtors' non-exempt property that is not part of the Chapter 7 bankruptcy Estate, appoint Gregory S. Milligan as Receiver, award Judgment Creditors reasonable attorney's fees and expenses, and grant all further relief to which Judgment Creditors may be entitled.

006545

Respectfully submitted this 7th day of July 2025.

                              /s/ Ryan E. Chapple
                              Ryan E. Chapple
                              State Bar No. 24036354
                              rchapple@cstrial.com
                              Benjamin D. Evans
                              State Bar No. 24081285
                              bevans@cstrial.com
                              **CAIN & SKARNULIS PLLC**
                              303 Colorado Street, Suite 2850
                              Austin, Texas 78701
                              512-477-5000
                              512-477-5011—Facsimile
                              **ATTORNEYS FOR
                              THE CONNECTICUT FAMILIES**


                              /s/ Avi Moshenberg
                              Avi Moshenberg
                              State Bar No. 24083532
                              **LAWSON & MOSHENBERG PLLC**
                              2301 Commerce Street, Suite 200
                              Houston, TX 77002
                              Telephone: (713) 449-9644
                              Email: avi.moshenberg@lmbusinesslaw.com
                              **ATTORNEYS FOR
                              THE TEXAS FAMILIES**

006546

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Application for Post-Judgment Turnover and Appointment of Receiver has been forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on this 7th day of July, as follows:

| Method of Service | Party(ies) | Counsel |
|---|---|---|
| *Electronic Service and/or Email* | Chapter 7 Trustee | Christopher R. Murray<br>chris@jonesmurray.com<br>crm@trustesolutions.net<br><br>Erin Jones<br>erin.jones@jonesmurray.com<br><br>Joshua Wolfshohl<br>jwolfshohl@porterhedges.com |
| *Electronic Service and/or Email* | Proposed Receiver Gregory S. Milligan | Gregory S. Milligan<br>milligan@harneypartners.com |

_/s/ Ryan E. Chapple_
Ryan E. Chapple

006547

# EXHIBIT A

006548

## DECLARATION OF ALINOR C. STERLING

THE STATE OF CONNECTICUT §
§
COUNTY OF FAIRFIELD §

1.  "My name is Alinor C. Sterling. I am over the age of twenty-one years and am fully competent to make this Declaration. I have personal knowledge of the facts stated in this Declaration, which are true and correct.

2.  "I am an attorney in the law firm of Koskoff Koskoff & Bieder PC and licensed to practice law in the State of Connecticut. I am one of the attorneys of record for David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (collectively, the Connecticut Sandy Hook Families or the Judgment Creditors). I am authorized to make this Declaration on behalf of the Judgment Creditors.

3.  "Judgment Creditors own a judgment against Alexander Emric Jones and Free Speech Systems, LLC (the Judgment Debtors). The last known address of Alexander Emric Jones is: Alexander Emric Jones c/o Vickie L. Driver, 2525 McKinnon St., Suite 425, Dallas, Texas 75201; Alexander Emric Jones c/o Shelby A. Jordan, Jordan & Ortiz, P.C., 500 North Shoreline Blvd., Suite 900, Corpus Christi, Texas 78401. The last known address of Free Speech Systems, LLC and the address currently registered with the Texas Secretary of State is: Free Speech Systems, LLC, ATTN: Alex Jones or Authorized Agent, P.O. Box 19549, Austin, Texas 78760. The post office address of the Judgment Creditors is the Connecticut Sandy Hook Families c/o Alinor C. Sterling, Koskoff Koskoff & Bieder PC, 350 Fairfield Avenue, Bridgeport, Connecticut 06604.

1

006549

4. "Judgment Debtors owe $1,288,139,555.94 under the judgment rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut, Docket No. CV-18-6046437 (the Connecticut Families' Judgment) and as affirmed and amended by the Connecticut Appellate Court. The Connecticut Supreme Court has denied further review. The Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. True and correct copies of these documents are being filed contemporaneously with this Declaration.

5. "Pursuant to the Uniform Enforcement of Foreign Judgments Act, Chapter 35 of the Texas Civil Practice and Remedies Code, domestication papers related to the Connecticut Families' Judgment were filed on August 1, 2024. Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under Chapter 11 of the Bankruptcy Code on July 29, 2022 (the Free Speech Systems, LLC Chapter 11 Case) in the United States Bankruptcy Court for the Southern District of Texas (Bankruptcy Court); and its Chapter 11 case was dismissed on June 21, 2024. Judgment Debtor Alex Jones filed for bankruptcy under Chapter 11 of the Bankruptcy Code on December 2, 2022, and his Chapter 11 case was converted to a case under Chapter 7 on June 14, 2024 (the Jones Chapter 7 Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Families' Judgment was non-dischargeable in

2

006550

bankruptcy and, therefore, unaffected by the bankruptcy proceedings.[1] Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. Judgment Debtors have since filed a motion with the Connecticut Appellate Court to stay collection proceedings pending review by petition for certiorari to the United States Supreme Court, though no such petition has been filed. The Connecticut Appellate Court denied that motion on May 13, 2025. The deadline for Judgment Debtors to file a petition for certiorari to the United States Supreme Court is July 7, 2025.

6.   "The Judgment Creditors have counsel in the State of Texas. Their counsel is Ryan E. Chapple of Cain & Skarnulis PLLC, 303 Colorado Street, Suite 2850, Austin, Texas 78701."

### OATH

My date of birth is May 16, 1967. My business address is 350 Fairfield Avenue, Bridgeport, Connecticut 06604. I have read the foregoing Declaration, and I declare under penalty of perjury that the foregoing Declaration is true and correct.

Executed in Fairfield County, Connecticut on June 23rd, 2025.

Alinor C. Sterling

---

[1] On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 23, 2023 Memorandum Decision granting the Connecticut Families Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable.

3

006551

# EXHIBIT 1

# VERDICT

WE THE JURY HAVE REACHED OUR VERDICT AS TO DAMAGES IN THIS CASE.

WE AWARD DAMAGES TO EACH PLAINTIFF AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS, LLC AS FOLLOWS:

## I.   COMPENSATORY DAMAGES

Instructions: Fill in both numbers for each plaintiff. Then go to Section II.

Please enter your damages assessments for each plaintiff on the lines below.

1

006553

**TO PLAINTIFF ROBERT PARKER:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                              $60,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                  $60,000,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ROBERT
PARKER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)
                                              $120,000,000.00

2

006554

**TO PLAINTIFF DAVID WHEELER:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                       $ 25,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES             $ 30,000,000.00
    (PAST AND FUTURE)

    **TOTAL FAIR, JUST AND REASONABLE
    DAMAGES TO PLAINTIFF DAVID
    WHEELER AND AGAINST ALEX JONES
    AND FREE SPEECH SYSTEMS
    (ADD LINE A AND LINE B)**

                                          $ 55,000,000.00

3

006555

TO PLAINTIFF FRANCINE WHEELER:

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                      $ 24,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES           $ 30,000,000.00
    · (PAST AND FUTURE)

            TOTAL FAIR, JUST AND REASONABLE
            DAMAGES TO PLAINTIFF FRANCINE
            WHEELER AND AGAINST ALEX JONES
            AND FREE SPEECH SYSTEMS
            (ADD LINE A AND LINE B)
                                          $ 54,000,000.00

4

LM

006556

TO PLAINTIFF JACQUELINE BARDEN:

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                          $10,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                 $18,800,000.00
   (PAST AND FUTURE)

   TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF JACQUELINE
   BARDEN AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)

                                              $ 28,800,000.00

5

006557

**TO PLAINTIFF MARK BARDEN:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                                   $ 25,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                          $ 32,600,000.00
    (PAST AND FUTURE)

        TOTAL FAIR, JUST AND REASONABLE
        DAMAGES TO PLAINTIFF MARK
        BARDEN AND AGAINST ALEX JONES
        AND FREE SPEECH SYSTEMS
        (ADD LINE A AND LINE B)
                                                        $ 57,600,000.00

6

LM

006558

TO PLAINTIFF NICOLE HOCKLEY:

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                           $ 32,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                  $ 41,600,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF NICOLE
HOCKLEY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**              $ 73,600,000.00

7

LM
006559

TO PLAINTIFF IAN HOCKLEY:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                                   $38,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                       $43,600,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF IAN
HOCKLEY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$81,600,000.00

8

LM

006560

**TO PLAINTIFF JENNIFER HENSEL:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)

$21,000,600.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)

$31,000,000.00

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JENNIFER
HENSEL AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$52,000,000.00

9



006561

TO PLAINTIFF DONNA SOTO:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)  $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES  $30,000,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DONNA
SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$48,000,000.00

10

LM

006562

TO PLAINTIFF CARLEE SOTO PARISI:

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                       $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES             $36,000,000.00
   (PAST AND FUTURE)

        **TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLEE
SOTO PARISI AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

        $ 66,000,000.00

11

JM

006563

**TO PLAINTIFF CARLOS MATHEW SOTO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $18,600,000.00

B. EMOTIONAL DISTRESS DAMAGES          $39,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF CARLOS
   MATHEW SOTO AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**

                                        $57,600,000.00

12

006564

TO PLAINTIFF JILLIAN SOTO-MARINO:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                                    $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                        $38,800,000.00
(PAST AND FUTURE)


TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JILLIAN
SOTO-MARINO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$ 68,800,000.00

13

006565

TO PLAINTIFF WILLIAM ALDENBERG:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                    $ 45,000,000.00

B. EMOTIONAL DISTRESS DAMAGES        $ 45,000,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
ALDENBERG AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$ 90,000,000.00

14

LM

006566

TO PLAINTIFF ERICA LAFFERTY:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                             $ 18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                 $ 58,000,000.00
(PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ERICA
LAFFERTY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)
                                              $ 76,000,000.00

15

006567

TO PLAINTIFF WILLIAM SHERLACH:

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 9,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 27,000,000.00
   (PAST AND FUTURE)

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
SHERLACH AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)

$ 36,000,000.00

16

006568

## II. AWARD OF ATTORNEY'S FEES AND COSTS

Instructions: check YES or NO.

> If you check YES, the judge will determine the amount due to the plaintiffs for reasonable attorney's fees and costs and will then award the plaintiffs that amount at a later date.
>
> If you check NO, the judge will award $1 to the plaintiffs for their attorney's fees and costs.

**WE THE JURY FIND THAT THE STANDARD CHARGED FOR THE ASSESSMENT OF ATTORNEY'S FEES AND COSTS HAS BEEN MET.**

☒ **YES**    (reasonable attorney's fees and costs to be awarded by the judge at a later date)

☐ **NO**    (judge will award $1)

17



006569

FOREPERSON SIGNATURE

10/12/2022

DATE

18

006570

# EXHIBIT 2

006571

NO: X06-UWY-CV18-6046436-S    : SUPERIOR COURT

ERICA LAFFERTY                : COMPLEX LITIGATION DOCKET

v.                            : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES              : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046437-S    : SUPERIOR COURT

WILLIAM SHERLACH              : COMPLEX LITIGATION DOCKET

v.                            : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES              : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046438-S    : SUPERIOR COURT

WILLIAM SHERLACH              : COMPLEX LITIGATION DOCKET

v.                            : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES              : November 10, 2022


In these three consolidated cases, the plaintiffs,[1] various immediate family members of victims and a first responder to

---

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the current named plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto and William Aldenberg. Each of the first eleven of these individuals are either a parent of a student or a close relative of a school employee who died in the Sandy Hook tragedy.

the December 14, 2012 Sandy Hook school shooting, have brought suit against the defendants, Alex Emric Jones and Free Speech Systems, LLC.[2]  In the operative complaints,[3] the plaintiffs allege the following relevant facts against the defendants. Jones is a radio and internet personality who resides in Austin, Texas.  He is the host of "The Alex Jones Show" and he owns and operates the websites Inforwars.com and PrisonPlanet.com. Infowars, LLC is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars.  Free Speech Systems, LLC is a Texas limited liability company that owns Infowars.com.

---

Aldenberg is a first responder who responded to the scene on the date of the shooting.  Additionally, the original plaintiff Erica Lafferty was replaced as a plaintiff by her bankruptcy trustee Richard Coan on October 20, 2021. In both *Sherlach v. Jones* cases, docket numbers X06-CV-18-6046437-S and X06-CV-18-6046438-S, the named plaintiffs are William Sherlach and Robert Parker.  Sherlach is the spouse of a school psychologist and Parker is the parent of a student who were murdered by Adam Lanza during the Sandy Hook incident.

[2] Although there were many additional defendants when these cases were originally brought, the only remaining defendants at this juncture are Alex Emric Jones and Free Speech Systems, LLC.

[3] As the operative complaints in the three cases allege largely the same facts, they will be discussed simultaneously.

2

Similarly, Infowars Health, LLC and Prison Planet TV, LLC are also Texas-based companies. All of the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by the defendant Alex Jones and are employed to hold and generate revenue for him. The Alex Jones Show is syndicated on more than sixty radio stations and it has an audience of two million people. Jones and Infowars have an audience of millions more, including 2.3 million subscribers to Jones' YouTube channel.

The plaintiffs allege that following the 2012 Sandy Hook shooting, "Jones and the rest of the Jones defendants acted together to develop, disseminate and propagate . . . false statements" regarding the incident. According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has." The plaintiffs assert that Jones has developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary

3

006574

gain. In fact, by May, 2013, Jones was alleged to make approximately $10 million annually. Specifically, Jones began telling his audience that the Sandy Hook shooting was "a government-sponsored hoax designed to lead to gun control . . . ." In furtherance of this objective, Jones began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs. For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." Jones appeared in the video and commented that: "evidence is beginning to come out that points more and more in [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors." In that video, Jones stated that plaintiff Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card. Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors

4

006575

playing different parts of people. I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show. Jones commented: "I mean it's fake . . . it's fake . . . you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was

006576

actually closed the year before. They don't know that they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screens, green screens, they got caught using." On July 7, 2015, Jones stated: "[b]ut what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids. . . . [I]t's like the same P.R. company is running this." Additionally, on November 17, 2016, Jones told his audience that he's seen "weird videos of reported parents of kids laughing and then all of sudden they do the hyperventilating to cry and go on TV." Jones has also repeatedly asked his listeners to "investigate" the events surrounding the Sandy Hook shooting and that has led to individuals such as the plaintiffs being subjected to "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

Throughout their complaints in each of the three cases, the plaintiffs allege many more examples of comments made by

6

006577

Jones and his associates where they questioned if the shooting occurred and whether the plaintiffs' relatives actually died. The plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5) count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Each of the plaintiffs' first four causes of action affix the additional label "civil conspiracy."[4]

On October 6, 2021, the plaintiffs moved for a disciplinary default against the defendants claiming litigation misconduct on the part of the defendants. Essentially, the plaintiffs argued that liability should be conclusively established against the defendants because of their repeated discovery violations

_____

[4] On November 18, 2021, this court denied the defendants' motion to strike all counts of the plaintiffs' complaint.

7

throughout the course of the litigation. The defendants filed a memorandum of law in opposition, and following a hearing conducted on November 15, 2021, the court entered a default against the defendants, ruling "(T)he case will proceed as a hearing in damages as to the defendants. The court notes Mr. Jones is the sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly. And all of the defendants have failed to fully and fairly comply with their discovery obligations."[5]

Evidence commenced in a hearing in damages before a jury commenced on September 13, 2022.. On October 12, 2022, the jury reached its verdict as to the various plaintiffs. Specifically, the jury awarded the following damages: (1) as to Robert Parker,

---

[5] The defendants in these cases have repeatedly engaged in conduct designed to thwart their discovery obligations or otherwise avoid the administration of justice. For example, the Supreme Court previously upheld this court's decision to revoke the defendants' opportunity to file a motion to dismiss under the anti-SLAPP statute, General Statutes § 52-196a, because the defendants "had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei." *Lafferty* v. *Jones*, 336 Conn. 332, 337-38, 246 A.3d 429 (2020).

006579

$120 million; (2) as to David Wheeler, $55 million; (3) as to Francine Wheeler, $54 million; (4) as to Jacqueline Barden, $28.8 million; (5) as to Mark Barden, $57.6 million; (6) as to Nicole Hockley, $73.6 million; (7) as to Ian Hockley, $81.6 million; (8) as to Jennifer Hensel, $52 million; (9) as to Donna Soto, $48 million; (10) as to Carlee Soto Parisi, $66 million; (11) as to Carlos Matthew Soto, $57.6 million; (12) as to Jillian Soto-Marino, $68.8 million; (13) as to William Aldenberg, $90 million; (14) as to Erica Lafferty, $76 million and (15) as to William Sherlach, $36 million. Additionally, the jury awarded reasonable attorney's fees and costs, in an amount to be determined by the court at a later date.

Following the jury's verdict, on October 21, 2022, the plaintiffs filed a brief regarding CUTPA punitive damages. Thereafter, on October 28, 2022, the defendants submitted a memorandum of law in opposition to an award of punitive damages. The plaintiffs filed a bench brief on attorneys' fees and costs on November 3, 2022, and a reply brief to the defendants'

9

006580

memorandum of law in opposition to the award of punitive damages on November 4, 2022. The court heard oral argument on the issue of punitive damages on November 7, 2022.

Common Law Punitive Damages

The Connecticut Supreme Court has most recently described the well-settled common law rule followed in Connecticut pertaining to punitive damages in *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 447-49, 152 A.3d 1183 (2016): "In *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 235, 477 A.2d 988 (1984)], this court declined to reconsider limits that it had placed on the recovery of punitive damages. In doing so, the court explained: 'Long ago, in *Hanna* v. *Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of [common-law] punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical [common-law] rule the jury was permitted to exercise a virtually unchecked discretion to

10

award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"'The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of

11

such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"'In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award. Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim. Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' . . . *Waterbury Petroleum Products, Inc. v. Canaan Oil & Fuel Co.*, supra, 193

12

006583

Conn. 236-38." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 447-49.

"In Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature. See *Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (in Connecticut, common-law punitive damages 'are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive'); see also *Hylton* v. *Gunter*, 313 Conn. 472, 493, 97 A.3d 970 (2014) (*McDonald, J.*, dissenting) (common-law punitive damages are compensatory in nature, but also serve 'a punitive and deterrent function'). 'To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. . . . *If awarded, [common-law] punitive damages are limited to the costs of litigation less*

13

006584

*taxable costs, but, within that limitation, the extent to which they are awarded is in the sole discretion of the trier. . . .* Limiting punitive damages to litigation expenses, including attorney's fees, fulfills the salutary purpose of fully compensating a victim for the harm inflicted . . . while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury. . . . We have long held that in a claim for damages, proof of the expenses paid or incurred affords some evidence of the value of the services . . . . *Label Systems Corp.* v. *Aghamohammadi,* 270 Conn. 291, 335-36, 852 A.2d 703 (2004); but cf. *Berry* v. *Loiseau,* [223 Conn. 786, 827, 614 A.2d 414 (1992)] (common-law punitive damages, when viewed in the light of the increasing costs of litigation, also [serve] to punish and deter wrongful conduct).' . . . *Hylton* v. *Gunter,* supra, 313 Conn. 486 n.14.

"Juries in Connecticut have been awarding punitive damages for 'wanton or malicious injuries' for more than two hundred years. See, e.g., *Linsley* v. *Bushnell,* 15 Conn. 225, 235 (1842),

14

006585

and cases cited therein. More recently, in *Bifolck* v. *Philip Morris, Inc.*, [supra, 324 Conn. 451], our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue. As our Supreme Court explained: 'Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses.' Id. In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded. Id., 449-51.

"The [purpose] of awarding [common law] punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as

15

006586

to torts is that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 166, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).

As an example, the court in *Bridgeport Harbour Place I, LLC*, upheld an award of common law punitive damages, explaining its reasoning as follows: "On the basis of the jury's finding against [the defendant] on the plaintiff's fraudulent misrepresentation claim, the [trial] court was satisfied that the plaintiff had proven a reckless indifference to its contractual and business interests to warrant an award of

16

006587

punitive damages against [the defendant]. The [trial] court further found that the plaintiff's fee agreement with counsel was 30 percent of the first $6 million recovered and therefore the plaintiff was seeking $54,600 in attorney's fees. The [trial] court agreed with the plaintiff that it could consider its fee agreement with counsel to determine its award of attorney's fees. [The Appellate Court] conclude[d] that the [trial] court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court." (Footnote omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 168, citing *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268-70, 828 A.2d 64 (2003), and *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 773-77, 717 A.2d 150(1998).

As set forth above, the court is tasked with determining the amount of attorneys fees and costs to be awarded as common law punitive damages, following the jury's award of attorneys fees and costs. Awarding attorneys fees under the terms of a

17

006588

reasonable retainer agreement "protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney." *Schoonmaker* v. *Brunoli*, 265 Conn. at 210, 271 n.77 (2003). Based upon the court's review of the affidavit of Attorney James Horwitz and the agreement of the parties, the court finds that the terms of the plaintiffs' retainer agreements are reasonable.

"A trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Schoonmaker 265 Conn. at 270 (quoting Sorrentino, 245 Conn. at 776). The defendants here urge the court to engage in such departure by awarding only nominal damages, essentially arguing that the size of the jury verdicts is punitive and serves to deter, and that the verdict already reflects the default sanction and is punishment enough. The court finds this argument unpersuasive. The law presumes that

18

006589

the jury followed the law set forth in their instructions. See, e.g., Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 44 (1998) ("Absent clear evidence to the contrary, we assume that the jury acted in accordance with the charge."). The defendants also take the position that awarding more than nominal damages would serve a hardship on the defendants, including Free Speech Systems, LLC., which has filed for bankruptcy. The record does not support this conclusory claim of hardship with respect to Alex Jones, and the mere fact that Free Speech Systems, LLC. has filed for bankruptcy does not justify a nominal award of common law punitive damages. Thus, to the extent that the defendants argue that enforcing the retainer agreements would result in substantial unfairness to the defendants, the court is not persuaded. Additionally, the court rejects the defendants' due process argument for an award of nominal damages only, as on these facts, a common law punitive damages award limited to attorneys fees and costs pursuant to the terms of a reasonable retainer agreement

19

006590

comports with due process. Simply put, there is no sound reason for the court not to fully compensate the plaintiffs for their financial obligations under their reasonable retainer agreements.

For the foregoing reasons, the court awards common law punitive damages as follows: As to Robert Parker, $40 million; as to David Wheeler, $18.33 million; as to Francine Wheeler, $18 million; as to Jacqueline Barden, $9.6 million; as to Mark Barden, $19.2 million; as to Nicole Hockley, $24.53 million; as to Ian Hockley, $27.2 million; as to Jennifer Hensel, $17.33 million; as to Donna Soto, $16 million; as to Carlee Soto Parisi, $22 million; as to Carlos Matthew Soto, $19.2 million; as to Jillian Soto-Marino, $22.93 million; as to William Aldenberg, $30 million; as to Erica Lafferty, $25.33 million; and as to William Sherlach, $12 million. Non-taxable costs are awarded to each plaintiff in the amount of $99,303.73, representing 1/15th of the plaintiffs' total claimed non-taxable costs of $1,489,555.94.

20

006591

Punitive Damages Pursuant to the Connecticut Trade Practices
Act (CUTPA), General Statutes § 42-110a et seq.

General Statutes § 42-110g provides in relevant part: "(a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . *The court may, in its discretion, award punitive damages* and may provide such equitable relief as it deems necessary or proper." (Emphasis added.) "The language is clear and unambiguous; the awarding of punitive damages is within the discretion of the trial court." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 139, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal

21

006592

withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).[6]

For various policy reasons, punitive damages under CUTPA are determined by the court, not the jury. "It is reasonable to conclude that the legislature provided that a claim for punitive damages under CUTPA should be submitted to the trial court, and not the jury, because it believed that the court would be aware of the range of punitive damages that have been

---

[6] The Supreme Court has held that punitive damages awarded pursuant to CUTPA are separate and distinct from awards of attorney's fees. "[T]he legislature did not intend to limit punitive damages awards pursuant to § 42-110g (d) to 'the expenses of bringing the legal action, including attorney's fees, less taxable costs. . . . Section 42-110g (a) expressly authorizes the trial court to award punitive damages in addition to the award of attorney's fees authorized by § 42-110g (d). Nothing in the language of the statute suggests that punitive damages are the same as attorney's fees, consistent with the common-law rule. If the legislature had intended to impose such a limitation, it presumably would have done so either by authorizing the trial court to award double attorney's fees or by authorizing it to award double punitive damages. The fact that the legislature enacted two distinct provisions indicates that it contemplated two distinct types of awards. . . . Moreover, as we have indicated, both this court and the Appellate Court have repeatedly, over the course of many years, upheld multiple damages under the punitive damages provision of CUTPA . . . and the legislature has never amended the statute to provide otherwise." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 449-50, 78 A.3d 76 (2013).

22

006593

awarded for similar CUTPA violations, that it would be less likely to be swayed by appeals to emotion and prejudice, and, therefore, it would be less likely to render an award that was an outlier. Cf. *Gill* v. *Petrazzuoli Bros., Inc.*, [10 Conn. App. 22, 34, 521 A.2d 212 (1987)] ("[t]o foreclose the possibility of prejudice entering the decision-making process, the award of attorney's fees [under CUTPA] has been placed in the hands of the court" instead of jury); see also *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, [273 Conn. 634, 673-74, 872 A.2d 423] (*Zarella, J.*, dissenting) (legislature vested authority to make punitive damages award under CUTPA in court instead of in jury to safeguard against risk of excessive awards) [cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005)]. Accordingly, the concerns that underlie the common-law limitation on punitive damages have far less weight when the claim is submitted to the trial court instead of the jury." *Ulbrich* v. *Groth*, 310 Conn. 375, 451-52, 78 A.3d 76 (2013).

23

006594

"Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. See *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998) [overruled on other grounds by *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014)]; *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages)." *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 140.

006595

"Punitive damages [under CUTPA] must be proven by a preponderance of the evidence." Id., 141. "[W]hen considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss." Id., 143 (rejecting plaintiff's argument that court should have considered evidence of misconduct unrelated to plaintiff's damages in calculating punitive damages award under CUTPA). "[T]he nature of the [defendants'] conduct, the actual harm to the plaintiff and the harm the [defendants] intended to inflict are all relevant considerations." (Internal quotation marks omitted.) Id., 144. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 446. "As compared to punitive damages under

25

006596

Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. . . . Consequently, the defendants' financial condition is a relevant consideration. Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 144.

Our appellate courts have discussed several specific approaches to the calculation of appropriate punitive damages awards pursuant to CUTPA. "[T]he Appellate Court has observed that awarding an amount equal to the plaintiff's actual damages is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages. . . . [C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages. . . . Indeed, it

26

006597

appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award." (Citations omitted; internal quotation marks omitted.) Id., 144-45.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53, the Supreme Court discussed considerations applicable to common law awards of punitive damages before turning to a discussion of appropriate considerations pertaining to such awards under CUTPA. It explained: "In [*Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)], the defendant challenged the size of a punitive damages award that the jury had rendered against it under maritime law. Id., 489. The court concluded that the limits on such awards fell 'within a federal court's jurisdiction to decide in the manner of a common law court . . . .' Id., 489-90. After reviewing the history of punitive damages under the common law and the standards and limitations that various jurisdictions have applied to them, the court in *Exxon Shipping Co.* observed that several studies

27

006598

had been done to determine 'the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards.' Id., 512. 'These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases . . . without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable

28

006599

outlier cases that call the fairness of the system into question are above the median . . . . Accordingly, given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases.' . . . Id., 512-13." *Ulbrich v. Groth*, supra, 310 Conn. 452-53.

In light of the differences between punitive damages claims under CUTPA and the punitive damages claims under maritime law at issue in *Exxon Shipping Co.*, the court in *Ulbrich* declined to adopt the same a one-to-one ratio of punitive damages to compensatory damages as an upper limit for punitive damages in CUTPA cases. Id., 453-54. Nevertheless, the court adopted the factors that were considered by the United States Supreme Court in *Exxon Shipping Co.* in determining whether the amount of punitive damages awarded pursuant to CUTPA is excessive. The court explained that "in determining whether a punitive damages

29

006600

award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, the court should consider the factors that the court in *Exxon Shipping Co*. discussed.  These include the 'degrees of relative blameworthiness,' i.e., whether the defendant's conduct was reckless, intentional or malicious; *Exxon Shipping Co*. v. *Baker*, supra, 554 U.S. 493; whether the defendant's '[a]ction [was] taken or omitted in order to augment profit'; id., 494; see also id., 503 (some courts consider whether wrongful conduct was profitable to defendant); whether the wrongdoing was hard to detect; id., 494; whether the injury and compensatory damages were small, providing a low incentive to bring the action; id.; and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant.  .   .   .  Of these factors, reprehensibility of a defendant's conduct is the most important. .  .  . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

30

006601

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 454-56.

"[I]n determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen high punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's

31

discretion to award punitive damages that are rational, predictable and consistent." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 146.

In awarding punitive damage awards that exceed the normative range, the court should, therefore, identify "the factors that militate in favor of a high, rather than a low, award of punitive damages . . . ." See id. (noting that trial court, as directed by *Exxon Shipping Co.*, had identified such factors and concluding that court had not abused its discretion in awarding punitive damages in amount six times that of compensatory damage award). The court also may consider "the actual loss suffered by the [plaintiffs] and [whether] the compensatory damages awarded the [plaintiffs] militates against a high punitive damage award." Id., 146-47.

In *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49, the Appellate Court explained that the trial court "found that among the more vexing, competing

32

considerations presented to the court in determining the amount of the punitive award in this case is, on one hand, the issue of deterrence, particularly in light of the [defendants'] financial net worth, and on the other hand, the issue of the overall reasonableness and rationality of a high punitive award in light of the amount of the plaintiff's actual recovery and the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 471] . . . [and] note[d] that because neither compensation nor enrichment is a valid purpose of punitive damages, an award should not be so large as to constitute a windfall to the individual litigant. . . .

"The court also was mindful that, in addition to statutory factors bearing on its discretion, a broader, threshold consideration is that high punitive awards may implicate constitutional concerns. In *Bristol Technology, Inc.* v. *Microsoft Corp.*, 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court stated 'the United States Constitution imposes a substantive

33

limit on the size of punitive damages awards. . . . This is because [p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Still, [i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. . . . Only when an award [of punitive damages] can fairly be categorized as grossly excessive in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process].' . . . Id., 86.

"To satisfy federal due process concerns, the United States Supreme Court has 'instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties

34

006605

authorized or imposed in comparable cases.' *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 418. . . .

"The United States Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pacific Mutual Life Ins. Co.* v. *Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in [*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)]. The Court further

35

006606

referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. . . . While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . .

"'Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. . . . The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the fact[s] and circumstances of the defendant's conduct and the

36

harm to the plaintiff.' . . . *State Farm Mutual Ins. Co. v. Campbell*, supra, 538 U.S. 424-25." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC v. Ganim*, supra, 131 Conn. App. 147-49.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 446-47, the Supreme Court held that the trial court's award of punitive damages under CUTPA was not an abuse of discretion where the trial court reasonably could have found that the defendant's conduct was reckless. Id. (jury reasonably could have found that defendant bank's failure to inform plaintiffs that personal property located at property at time of auction was not included in sale "was not merely negligent, but involved a conscious decision to disregard acknowledged business norms" and gave rise to "substantial and unjustifiable" risk that plaintiffs would act on misleading information). Specifically, the court explained that "the trial court concluded that the best characterization of the bank's conduct . . . is that it proceeded with reckless or wilful ignorance and indifference to the risks that its

37

006608

conduct posed to prospective bidders; that its conduct was inherently deceptive to bidders; that its effort to maximize the bids by including the business property as part of the auction was beneficial to the bank's interests; and that the bank had a high net worth. On the other hand, the court also recognized that the jury's compensatory damages award was not small, that the bank's conduct was not of a criminal nature and that the punitive damages award should not constitute a windfall to the plaintiffs. In addition, we note that there was no evidence that the bank's conduct constituted anything other than an isolated incident." (Internal quotation marks omitted.) Id., 456.

"Although the trial court's punitive damages award in [*Ulbrich*] undoubtedly was a large one, especially in light of the large size of the compensatory damages award, [the Supreme Court could not] conclude that the award constituted a manifest abuse of discretion or that an injustice was done. . . . Rather, [the Supreme Court concluded] that the trial court reasonably

38

006609

could have concluded that the bank's reckless and deceptive conduct, together with the fact that the motive for the conduct was to increase the profitability of the auction to the bank, the fact that the bank has a very high net worth and the fact that there is an established practice in this state of awarding multiple damages for CUTPA violations, warranted the amount of the award. Accordingly, [the Supreme Court concluded] that the size of the trial court's punitive damages award [which was three times the compensatory award] did not constitute an abuse of discretion."  (Citation omitted; footnote omitted.)  Id., 456-57.

Here, the material allegations of the complaints, which have been established by virtue of the defaults, entitle the plaintiffs to an award of CUPTA punitive damages. In support of their claim for CUTPA punitive damages, the plaintiffs, in their briefs, support each Ulbrich factor with specific citations to the record. The defendants, in taking the position that there should be either no award of CUTPA punitive damages, or only a

39

006610

nominal award, advance some of the same arguments raised in their opposition to a common law punitive damages award, arguing that the verdict reflects the nature of the plaintiffs' arguments at trial, that the future deterrent value of the verdict overlaps with the function of a punitive damages award under CUPTA, that any award beyond a 1:1 ration violates due process, that any award in excess of $1.3 billion serves no lawful purpose, and that the record is devoid of evidence regarding the defendants' financial resources such that the court cannot properly determine an amount of punitive damages necessary for deterrence.

In considering whether the defendants' actions were taken in order to augment profits, the court finds that despite the defendants' abject failure to meet their obligations to fully and fairly comply with discovery—and despite the defendants' failure to produce a knowledgeable corporate representative armed with sufficient information-the plaintiffs clearly established that the defendants' conduct was motivated by

40

006611

profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.

With respect to whether the wrongdoing was hard to detect, the defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

In addressing the size of the injuries and compensatory damages awards, and low incentive to bring the action, the court

41

006612

concludes that despite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this. The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court. Moreover, the trial record establishes that the defendants remain in the unique position of having—and continuing to utilize—an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected. It is, quite simply, unprecedented in American jurisprudence, and the court reaches the inescapable conclusion that despite the magnitude of the harms caused to the plaintiffs, there is little incentive to bring an action like this against defendants such as these defendants, who have continued to use their platform to attack.

With respect to deterrence, the defendants' financial resources, and whether the award would financially destroy the

42

006613

defendants, the court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.

Finally, the court turns to the most important consideration--the degrees or relative blameworthiness, that is, whether the defendants' conduct was reckless, intentional, or malicious. The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the

43

006614

plaintiffs. This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

The court recognizes that generally speaking, an award of punitive damages under CUTPA is equal to or double the amount of the compensatory award. Here, the court, having considered all the pertinent factors under the law as well as the substantial nature of the compensatory damages award, finds that a lesser ratio is appropriate. Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.

### Conclusion

In conclusion, the court awards common law punitive damages for attorneys fees in the total amount of $321,650,000.00 and

44

006615

costs in the total amount of $1,489,555.94, and awards CUTPA punitive damages in the amount of $150,000,000.00.

421277

Barbara N. Bellis

45

006616

Case 4:25-cv-05553 Document 24-29 Filed on 01/26/26 in TXSD Page 647 of 977

006617

# EXHIBIT 3

006618

| AC 46131 | : | STATE OF CONNECTICUT |
|---|---|---|
| ERICA LAFFERTY, ET AL. | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

| AC 46132 | : | STATE OF CONNECTICUT |
|---|---|---|
| WILLIAM SHERLACH | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

| AC 46133 | : | STATE OF CONNECTICUT |
|---|---|---|
| WILLIAM SHERLACH, ET AL. | : | APPELLATE COURT |
| V. | : | |
| ALEX EMRIC JONES, ET AL. | : | MARCH 29, 2023 |

## PLAINTIFFS-APPELLEES' MOTION FOR RECTIFICATION

Pursuant to Rule of Appellate Procedure § 66-5, the plaintiffs-appellees hereby move the trial court to rectify the record in conformity with the verdict and judgment entered thereon.

Throughout the case, by agreement, the parties referred to Erica Lafferty, rather than the trustee of her bankruptcy estate, Richard Coan, as a plaintiff. Judgment entered in the total amount of $111,429,303.73 ($76,000,000.00 in compensatories plus $35,429,303.73 in punitives) in favor of Mr. Coan as Trustee of the Bankruptcy Estate of Ms. Lafferty. However, the verdict form and parts of the punitive damages Memorandum of Decision refer to Ms. Lafferty rather than Mr. Coan. To make the record crystal clear for the

1

006619

reviewing court, plaintiffs seek rectification. The requested relief does not alter the amount
or character of the judgment. It simply clarifies the record for a reviewing court.

## I.    BRIEF HISTORY OF THE CASE

The plaintiffs in this case are members of eight families who lost loved ones in the
Sandy Hook Elementary School Shooting and one first responder. The plaintiffs brought
suit against defendants Alex Jones and Free Speech Systems, LLC (collectively, "the
Jones defendants") alleging invasion of privacy by false light; defamation per se; intentional
infliction of emotional distress; and violation of the Connecticut Unfair Trade Practices Act.
On June 18, 2019, the trial court (Bellis, J.) sanctioned the Jones defendants for discovery
non-compliance and because Alex Jones threatened plaintiffs' counsel on his show.
Reviewing pursuant to General Statutes § 52-265a, this Supreme Court affirmed. *Lafferty I*,
336 Conn. 332 (2020).

Following the affirmance of the sanction, the Jones defendants continued their
obstruction of discovery. The trial court entered a default against the defendants and
subsequently struck their notice of defenses. DN 574, 11/15/21 Default Ruling; Ex. B, DN
620.20, 12/24/21 Order Striking Notice of Defenses. The case proceeded as a hearing in
damages before a jury, with evidence commencing September 13, 2022. The jury rendered
a verdict in favor of the plaintiffs on October 12, 2022, awarding a total of $965,000,000.00
in compensatory damages and determining that common law punitive damages were
warranted. The trial court assessed $323,139,555.94 in common law punitive damages and
$150,000,000.00 in CUTPA punitive damages, for a total of $473,139,555.94. DN 1026,
11/10/22 Punitives MOD (Ex. A hereto). Final judgment entered on December 22, 2022,

2

006620

when the defendants' motions for remittitur and to set aside were denied. DN 1043,

12/22/22 MOD Denying New Trial and Remittitur.

Jones appealed that judgment on December 29, 2022: AC 46131, *Erica Lafferty, et*

*al. v. Alex Emric Jones, et al.*; AC 46132, *William Sherlach v. Alex Emric Jones, et al.*; and

AC 46133, *William Sherlach, et al. v. Alex Emric Jones, et al.* On December 30, 2022, the

three appeals were consolidated. On January 6, 2023, the Jones defendants filed a

Corrected Appeal Form, adding FSS to the appeal.[1] On February 23, 2023, the plaintiffs-

appellees filed a motion to transfer the consolidated appeals to the Supreme Court. That

motion, Mot SC 220201, is pending.

## II.    SPECIFIC FACTS RELIED ON

On October 20, 2021, Erica Lafferty was removed as a party plaintiff and Richard

Coan, Chapter 7 Trustee of the Bankruptcy Estate of Erica Garbatini a/k/a Erica Lafferty,

was substituted in as a party plaintiff to prosecute the interests of Ms. Lafferty's bankruptcy

---

[1] FSS filed bankruptcy on July 29, 2022 in the United States Bankruptcy Court for the Southern District of Texas. On August 29, 2022, the Bankruptcy Court (Lopez, J.) lifted the automatic stay to allow trial and any subsequent appeal to proceed. See Order Modifying Automatic Stay, *In re Free Speech Systems, LLC*, Case No. 22-60043, (Bankr. S.D. Tex.), ECF No. 117. On December 2, 2022, Alex Jones filed bankruptcy in the same court. On December 19, 2022, the Bankruptcy Court lifted the automatic stay so that this appeal could proceed. See Order Modifying Automatic Stay, *In re Alexander E. Jones*, Case No. 22-33553, (Bankr. S.D. Tex.), ECF No. 58.

006621

estate. DN 459.20, Substitution Order.[2] Throughout the proceedings at trial, however, the parties agreed to refer to Erica Lafferty as a plaintiff, rather than referring to Mr. Coan. *E.g.* Ex. B, 10/4/22 Tr. Vol. III at 36:21-37:7. This agreement also applied to the jury interrogatories and verdict, which referred to Ms. Lafferty as a plaintiff, rather than to Mr. Coan. *Id.* The resulting verdict thus reads as an award in favor of Ms. Lafferty of $76,000,000, but is in fact in favor of Mr. Coan, as representative of Ms. Lafferty's bankruptcy estate. *See* DN 1010, Jury Verdict (attached as Ex. C).

In order to make it clear to a reviewing court that the compensatory damages verdict and punitive damages assessment that comprise the total damages award are in favor of Mr. Coan in his capacity as trustee for Ms. Lafferty's bankruptcy estate, the plaintiffs seek rectification of two references to Ms. Lafferty in the Memorandum of Decision on punitive damages, DN 1026 (Ex. B). These requested rectifications are:

(1) Page 9: after "(14) as to Erica Lafferty, $76 million" add "(pursuant to the parties' agreement that references to Ms. Lafferty on the jury verdict and interrogatories are to be treated as references to Mr. Coan in his capacity as trustee of Ms. Lafferty's bankruptcy estate, this verdict amount enters in favor of Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty)"

---

[2] Erica Lafferty has also been known as Erica Garbatini. *See* DN 459, E. Lafferty's Mot. to Substitute Party at ¶1; DN 460, E. Lafferty's Memo. ISO Mot. to Substitute Party at ¶1. On December 5, 2018, Erica Lafferty a/k/a Erica Garbatini filed a voluntary petition under Chapter 7 of the Bankruptcy Code. *See In re Erica L. Garbatini*, Case No. 18-51587, Ch. 7 Petition (Bankr. D. Conn. Dec. 5, 2018) (ECF No. 1). On September 16, 2021, plaintiff Erica Lafferty filed a Motion to Substitute Richard Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty, for Individual Plaintiff Erica Lafferty in *Lafferty v. Jones* (DN 459). The court granted Ms. Lafferty's Motion to Substitute on October 20, 2021 (DN 459.20).

4

(2) Page 20: change "as to Erica Lafferty, \$25.33 million;" to "as to Richard M. Coan,

Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty, \$25.33

million."[3]

Rectification of these references will ensure that the terms of the judgment are

crystal clear to a reviewing court.

## III.    LEGAL GROUNDS ON WHICH MOVING PARTY RELIES

The plaintiffs rely on Rule § 66-5, which authorizes clarification of the trial court record

via a motion for rectification.

## IV.    CONCLUSION

For these reasons, the plaintiffs request that the relief sought be granted.

**THE PLAINTIFFS-APPELLEES,**

By:    *Isl Alinor C. Sterling*
       **ALINOR C. STERLING**
       **CHRISTOPHER M. MATTEI**
       **JOSHUA D. KOSKOFF**
       **KOSKOFF KOSKOFF & BIEDER**
       350 FAIRFIELD AVENUE
       BRIDGEPORT, CT  06604
       asterling@koskoff.com
       cmattei@koskoff.com
       jkoskoff@koskoff.com
       Telephone: (203) 336-4421
       Fax: (203) 368-3244
       JURIS #32250

---

[3] Other references in the Memorandum of Decision require no alteration because they refer to "plaintiffs."

5

006623

## CERTIFICATION

Pursuant to Rule of Appellate Procedure § 62-7, I hereby certify that on this date, a

true and correct copy of the foregoing has been delivered electronically to the last known

email addresses of each counsel of record for whom an e-mail has been provided, as

indicated below; that the foregoing document has been redacted or does not contain any

names or other personal identifying information that is prohibited from disclosure by rule,

statute, court order or case law; and that the foregoing document complies with all

applicable rules of appellate procedure.

***For Alex Emric Jones & Free Speech Systems, LLC:***
Norman Pattis, Esq.
Kevin Smith, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT 06511
Telephone: 203-393-3017
npattis@pattisandsmith.com
ksmith@pattisandsmith.com

*/s/ Alinor C. Sterling*
**ALINOR C. STERLING**
**CHRISTOPHER M. MATTEI**
**JOSHUA D. KOSKOFF**

6

006624

# EXHIBIT 4

006625

ORDER   421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
  V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
  AT WATERBURY

3/31/2023

ORDER

The following order is entered in the above matter:

ORDER:

The motion for rectification, filed by the plaintiffs on March 29, 2023, is granted, without objection.

Judicial Notice (JDNO) was sent regarding this order.

421277
_____

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

006626

# EXHIBIT 5

006627

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

Lafferty *v.* Jones

---

ERICA LAFFERTY ET AL. *v.* ALEX
EMRIC JONES ET AL.
(AC 46131)

WILLIAM SHERLACH *v.*
ALEX JONES ET AL.
(AC 46132)

WILLIAM SHERLACH ET AL. *v.* ALEX
EMRIC JONES ET AL.
(AC 46133)

Moll, Clark and Eveleigh, Js.

*Syllabus*

The defendants, J and his company, F Co., appealed from the judgments of
the trial court rendered following jury verdicts for the plaintiffs in three
underlying consolidated actions that arose out of the 2012 mass shooting
at the Sandy Hook Elementary School in Newtown. The court had defaulted
the defendants as a sanction for their repeated, wilful failure to fully and
fairly comply with the plaintiffs' discovery requests and for violating a
protective order. The cases then proceeded to a hearing in damages, after
which the plaintiffs were awarded compensatory damages, attorney's fees
and costs and, pursuant to the Connecticut Unfair Trade Practices Act
(CUTPA), General Statutes § 42-110a et seq., punitive damages. On appeal,
the defendants claimed, inter alia, that the court incorrectly concluded that
the plaintiffs' allegations were sufficient to support a legally viable CUTPA
claim. *Held*:

The trial court properly exercised its discretion in defaulting the defendants
as a sanction for their violations of its discovery orders and a protective
order.

The trial court's default order was a sanction that was proportional to the
defendants' wilful noncompliance and misconduct in repeatedly failing to
produce critical documents that the plaintiffs needed to prosecute their
case and in making highly confidential information about the plaintiffs available on the Internet.

The plaintiffs had no responsibility, as the defendants claimed, to prove the
cause of the harm they suffered, as the effect of the trial court's default
order was to conclusively establish the defendants' liability, thereby leaving
the plaintiffs with only the burden of establishing their damages.

The defendants' inadequately briefed claim that the trial court improperly
limited the scope of J's testimony was deemed abandoned.

006629

---

Lafferty *v.* Jones

---

The trial court did not abuse its discretion in denying the defendants' motion for remittitur, as the evidence was sufficient to support the jury's damages award, which did not shock the sense of justice in light of testimony by all of the plaintiffs about the mental anguish and emotional harm they suffered as a result of death threats and harassment conveyed to them through social media, by mail and in person that stemmed from the defendants' lies that the Sandy Hook massacre was a hoax.

The conduct forming the basis of the plaintiffs' CUTPA claim, namely, the defendants' dissemination of lies about the school shooting, did not constitute the conduct of any trade or commerce within the meaning of CUTPA, as the underlying motivation of the defendants' speech was to generate profit through the sale of products to their audience, and the plaintiffs did not allege that they were harmed by the defendants' advertising, marketing or sale of those products; accordingly, the judgments were reversed as to the plaintiffs' CUTPA claim.

Argued February 8—officially released December 10, 2024

*Procedural History*

Action, in the first case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the second case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the third case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the cases were consolidated and transferred to the judicial district of Waterbury, Complex Litigation Docket; thereafter, in the first case, Jennifer Hensel, executrix of the estate of Jeremy Richman, was substituted as a plaintiff and withdrew her claims against the named defendant et al.; subsequently, in the first case, Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini, was substituted as a plaintiff; thereafter, the court, *Bellis, J.*, defaulted the named defendant et al. in each case for violations of certain discovery orders and a protective order; subsequently, the court denied the motions by the named defendant et al. in each case to set aside the defaults; thereafter,

006630

Lafferty *v.* Jones

the issue of damages was tried to the jury before *Bellis, J.*; subsequently, in each case, the named plaintiff et al. filed an amended complaint; verdict in each case for the named plaintiff et al.; thereafter, in each case, the court denied the motions filed by the named defendant et al. to set aside the verdict and for remittitur, and rendered judgment in each case for the named plaintiff et al., from which the named defendant et al. in each case filed separate appeals with this court; subsequently, Erica L. Ash was substituted as a party plaintiff for Richard M. Coan, trustee of the bankruptcy estate of Erica L. Garbatini; thereafter, the appeals were consolidated. *Reversed in part; judgment directed in part.*

*Norman A. Pattis*, for the appellants in each case (named defendant et al.).

*Alinor C. Sterling*, with whom, on the brief, were *Christopher M. Mattei* and *Joshua D. Koskoff*, for the appellees in each case (named plaintiff et al.).

*Opinion*

MOLL, J. In these consolidated appeals, the defendants Alex Emric Jones and Free Speech Systems, LLC,[1] appeal from the judgments of the trial court rendered following jury verdicts returned in favor of the plaintiffs[2]

---

[1] Several additional defendants were named in the underlying consolidated actions, namely, Infowars, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc. Jones and Free Speech Systems, LLC, however, were the only remaining defendants at the time of the judgments rendered following the jury verdicts returned in the underlying consolidated actions. We refer in this opinion to (1) Jones and Free Speech Systems, LLC, collectively, as the defendants, and (2) Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, collectively, as the Jones defendants.

[2] "There are three underlying actions. In the first action, the plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg. On November 29, 2018, the plaintiffs moved to consolidate the second and third cases . . . with their action pursuant to Practice Book § 9-5. William Sherlach is a plaintiff in the second and third cases and Robert

---

Lafferty *v.* Jones

---

in the underlying consolidated tort actions[3] arising out of the 2012 mass shooting at Sandy Hook Elementary School in Newtown. On appeal, the defendants claim that the court improperly (1) defaulted them as a sanction for violating certain discovery orders and a protective order, (2) construed the effect of the default to relieve the plaintiffs of the burden to prove the extent of their damages, (3) restricted the scope of Jones' testimony at the hearing in damages, (4) denied their motion for a remittitur, and (5) concluded that the plaintiffs' claim asserting a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., was legally sufficient. For the reasons that follow, we disagree with the defendants' first, second, and fourth claims, and deem the defendants' third claim to be abandoned as inadequately briefed. We agree, however, with the defendants' fifth claim. Accordingly, we reverse in part the judgments of the trial court.

---

Parker is a plaintiff in the third case. On December 17, 2018, the court granted the motion to consolidate the cases. Jeremy Richman died while this action was pending, and, on June 7, 2021, the court granted the plaintiffs' motion to substitute Jennifer Hensel, executrix of the estate of Jeremy Richman, as a plaintiff in his place; however, on June 8, 2021, Jennifer Hensel, in her capacity as executrix of the estate of Jeremy Richman, withdrew her claims against the defendants. On October 20, 2021, the court granted Erica Lafferty's motion to substitute Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini [also known as Erica Lafferty], in her place as a plaintiff in this case." (Citations omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 858 n.1, 307 A.3d 923 (2023). On December 14, 2023, the court granted a motion to substitute Erica L. Ash, also known as Erica Lafferty, as a plaintiff in place of Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini. All references in this opinion to the plaintiffs are to the remaining plaintiffs and do not include Jeremy Richman, Jennifer Hensel, as executrix of the estate of Jeremy Richman, or Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini.

[3] The motions and pleadings filed in each of the underlying consolidated actions were largely identical, and the jury verdict returned in each action was the same. In the interest of simplicity, unless otherwise deemed necessary, we refer to the motions, pleadings, and other documents filed in the controlling action. See *Lafferty* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046436-S.

Lafferty *v.* Jones

The following facts and procedural history, as set forth previously by this court or as were undisputed in the record, are relevant to our resolution of these appeals. "On December 14, 2012, Adam Lanza entered Sandy Hook Elementary School (Sandy Hook), and thereafter shot and killed twenty first-grade children and six adults, in addition to wounding two other victims who survived the attack. In the underlying consolidated actions, the plaintiffs, consisting of a first responder, who was not a victim of the Sandy Hook shooting but was depicted in the media following the shooting, and the immediate family members of five of the children, one educator, the principal of Sandy Hook, and a school psychologist who were killed in the shooting, brought these separate actions . . . .

"In the complaints, the plaintiffs alleged that [Jones] hosts a nationally syndicated radio program and owns and operates multiple Internet websites that hold themselves out as news and journalism platforms. The plaintiffs further alleged that [Jones] began publishing content related to the Sandy Hook shooting on his radio and Internet platforms and circulated videos on his YouTube channel. Specifically, the plaintiffs alleged that, between December 19, 2012, and June 26, 2017, [Jones] used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and subscribers. The complaints each consisted of five counts, including causes of action sounding in invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, negligent infliction of emotional distress, and a violation of [CUTPA]." (Citation omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 859–60, 307 A.3d 923 (2023).

On November 15, 2021, the trial court, *Bellis*, *J.*, defaulted the defendants as a sanction for violating (1) certain discovery orders and (2) a protective order.

006633

Thereafter, the issue of damages was tried to a jury. In the midst of the hearing in damages, with the defendants' consent, the plaintiffs filed an amended complaint asserting four counts, each of which was accompanied by a claim of civil conspiracy: (1) invasion of privacy by false light; (2) defamation and defamation per se; (3) intentional infliction of emotional distress; and (4) a violation of CUTPA.[4] On October 12, 2022, the jury returned a verdict in favor of the plaintiffs, awarding them a total of $965,000,000 in compensatory damages. The jury further awarded the plaintiffs reasonable attorney's fees and costs, with the amounts to be determined by the court at a later date. On November 10, 2022, the court awarded the plaintiffs a total of (1) $321,650,000 in common-law punitive damages in the form of attorney's fees, (2) $1,489,555.94 in costs, and (3) $150,000,000 in statutory punitive damages pursuant to CUTPA. The defendants filed motions to set aside the verdict and for a remittitur, which the court denied on December 22, 2022. These consolidated appeals followed. Additional facts and procedural history will be set forth as necessary.

Before turning to the defendants' claims, we note that the plaintiffs argue that "[a]lmost all of [the defendants'] claims of error are so general or so inadequately briefed that they are waived." We iterate that we deem claims on appeal to be abandoned if they are inadequately briefed. See, e.g., *Lafferty* v. *Jones*, 336 Conn. 332, 375 n.30, 246 A.3d 429 (2020) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere

---

[4] In an accompanying request for leave to amend their complaint, the plaintiffs represented that the amended complaint (1) removed the negligent infliction of emotional distress count previously alleged, (2) removed former defendants, and (3) "simplifie[d] the pleadings by providing a single, uniform complaint for the hearing in damages of the [underlying] consolidated cases . . . ."

006634

abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.)), cert. denied,     U.S.    , 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021). As we explain throughout this opinion, we decline to review any claims that the defendants have abandoned as a result of inadequate briefing.

I

The defendants first claim that the trial court improperly defaulted them as a sanction for violating certain discovery orders, as well as a discovery related protective order. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. Shortly after the underlying consolidated actions had been commenced, the Jones defendants filed special motions to dismiss the actions pursuant to Connecticut's anti-SLAPP[5] statute. See General Statutes § 52-196a (b).[6] The plaintiffs moved for limited discovery vis-à-vis the special motions to dismiss; see General Statutes § 52-196a (d); which the court granted on December 17, 2018.

On January 10, 2019, the court overruled objections raised by the Jones defendants to the plaintiffs' requests for production seeking, inter alia, marketing data, sales analytics, and web analytics that the Jones defendants

---

[5] "SLAPP is an acronym for 'strategic lawsuit against public participation' . . . ." *Lafferty* v. *Jones*, supra, 336 Conn. 337 n.4.

[6] Section 52-196a was amended by No. 19-64, § 17, of the 2019 Public Acts, which made changes to the statute that are not relevant to these appeals. Accordingly, we refer to the current revision of the statute.

"own[ed] and/or control[led]." On May 7, 2019, in an objection addressing various discovery issues, the Jones defendants represented that they had "provided all of the analytics, business and marketing plans that they have." On May 29, 2019, the plaintiffs moved to compel compliance with the court's discovery orders, asserting in part that the Jones defendants had failed to produce responsive marketing and analytics information. The plaintiffs referred, in particular, to marketing data generated by Google Analytics[7] in the custody and control of the Jones defendants, and argued that a thirty-five page Google Analytics document provided by the Jones defendants was inadequate.

On June 10, 2019, the court issued an order stating that (1) testimony elicited during certain depositions confirmed that a "Google Analytics account is accessed and utilized by some employees of the [Jones] defendants," (2) the Google Analytics document that the Jones defendants had produced did not constitute full and fair compliance with the court's discovery orders, and (3) the plaintiffs were "entitled to the [Google Analytics] data pursuant to the court's discovery orders." The court further ordered that it would "consider appropriate sanctions for the [Jones] defendants' failure to fully and fairly comply should they not produce the data within one week." Subsequently, the Jones defendants represented that, on June 17, 2019, Google Analytics data purportedly had been emailed to the plaintiffs' counsel; however, the plaintiffs' counsel represented that the email was never received.

On June 17, 2019, the plaintiffs moved for the court to review a June 14, 2019 broadcast of Jones' radio

---

[7] In their principal appellate brief, the defendants represent that "Google Analytics is proprietary data made available to subscribers on a server maintained by Google. It is described thus on Google's webpage: 'Google Analytics is a web analytics service offered by Google that tracks and reports website traffic and also the mobile app traffic [and] events, currently inside a platform inside the Google Marketing Platform brand.' "

006636

program, during which Jones made threatening comments with respect to one of the plaintiffs' counsel. See *Lafferty* v. *Jones*, supra, 336 Conn. 342–46, 370. On June 18, 2019, after finding that (1) the Jones defendants were noncompliant with the court's discovery orders concerning, inter alia, the Google Analytics data, and (2) Jones had harassed, intimidated, and threatened one of the plaintiffs' counsel during the June 14, 2019 broadcast, the court sanctioned the Jones defendants by depriving them of the opportunity to pursue their special motions to dismiss. Id., 346–47, 374. At the outset of its decision, the court also stated: "[T]he discovery in this case has been marked with obfuscation and delay on the part of the [Jones] defendants, who, despite several court-ordered deadlines . . . [have] continue[d] . . . to object to having to, what they call affirmatively gather and produce documents which might help the plaintiffs make their case. Despite over approximately a dozen discovery status conferences and several court-ordered discovery deadlines, the Jones defendants have still not fully and fairly complied with their discovery obligations. . . . The [court has] entered discovery deadlines, extended discovery deadlines, and discovery deadlines have been disregarded by the Jones defendants, who continue to object to their discovery and [have] failed to produce that which is within their knowledge, possession, or power to obtain." Later, the court further stated: "At this point, I decline to default the . . . Jones defendants, but I will—I don't know how clearly I can say this. . . . As the discovery in this case progresses, if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the . . . Jones defendants if they, from this point forward, continue with their behavior with respect to discovery." On July 10, 2020, following Chief Justice Richard A. Robinson's grant of the Jones defendants' petition for an expedited public interest appeal

Lafferty *v.* Jones

pursuant to General Statutes § 52-265a, our Supreme Court affirmed the trial court's sanction orders. *Lafferty* v. *Jones*, supra, 336 n.3, 385.

On November 12, 2020, the plaintiffs moved to again compel compliance with court-ordered discovery.[8] On May 5, 2021, the Jones defendants filed an objection, arguing in part that the plaintiffs' prior discovery requests had been rendered moot as a result of the court's June 18, 2019 sanction orders precluding the Jones defendants from pursuing their special motions to dismiss.[9] On May 14, 2021, the court issued an order stating that "the obligation of the [Jones] defendants to fully and fairly comply with the discovery requests at issue was not extinguished by the fact that the [Jones] defendants have been precluded from pursuing special motions to dismiss."

On June 1, 2021, the Jones defendants filed an emergency motion for a protective order requesting that the court (1) extend an upcoming discovery production deadline by forty-five days and (2) narrow the scope of discovery regarding, inter alia, the Google Analytics data, which, they represented, required them to review nearly 300,000 emails for privileged information. On June 2, 2021, the court issued an order stating: "The court previously entered numerous orders with respect to this discovery request and the Jones defendants' objections thereto. The court declines the Jones defendants' invitation to address, again, the scope of appropriate discovery. With respect to the timeframe for compliance, the outstanding discovery responses were due

---

[8] The proceedings in the underlying consolidated actions were stayed pending our Supreme Court's resolution of the public interest appeal, and, on October 27, 2020, the trial court denied a request by the Jones defendants to stay discovery further.

[9] On November 18, 2020, the Jones defendants filed a notice that the underlying consolidated actions had been removed to the United States District Court for the District of Connecticut. The actions were remanded from the District Court on March 5, 2021.

006638

Lafferty *v.* Jones

over two years ago. At no point in time following the decision [in *Lafferty* v. *Jones*, supra, 336 Conn. 332] did the Jones defendants seek clarification from the court as to their discovery obligations. According to emails produced by the plaintiffs . . . the Jones defendants, in February and March of 2020, while their case was pending before [our] Supreme Court and a court-ordered stay of discovery was in effect, asked the plaintiffs' counsel for a complete set of discovery requests to date and continued to discuss the outstanding discovery that was owed by the Jones defendants. Nowhere in the email chain did counsel for the Jones defendants indicate that they were compiling their discovery only if they prevailed on their appeal. The plaintiffs filed a motion with the court seeking the overdue compliance on November 12, 2020, and the Jones defendants did not even file an objection until May 5, 2021. The court's ruling of May 14, 2021, confirmed that the outstanding discovery from the Jones defendants was overdue. At this point, the [Jones] defendants are not in compliance with their obligation to produce that discovery which is in their knowledge, possession, or power. To the extent that [the Jones defendants'] motion seeks, at this late date, a further extension of time to produce the already overdue supplemental compliance, it is granted as follows: complete, final supplemental compliance must be made by June 28, 2021, with compliance to begin immediately on a rolling basis. Failure to comply with this order may result in sanctions including but not limited to a default.''

On June 28, 2021, the Jones defendants filed a notice of compliance indicating that (1) the defendants had provided "complete, final supplemental compliance,'' and (2) Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, previously had satisfied their discovery obligations. With regard to the Google Analytics data, the Jones defendants represented that (1) only Free

*Lafferty v. Jones*

Speech Systems, LLC, used Google Analytics, (2) Free Speech Systems, LLC, did not possess, control, or have custody of Google Analytics data in a manner allowing the data to be exported,[10] and (3) the only reasonable method of sharing the Google Analytics data would be to permit the plaintiffs' counsel to access it via a " 'sandbox.' "[11]

On July 1, 2021, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, through one of their counsel, Attorney Norman A. Pattis of Pattis & Smith, LLC,[12] filed a motion for a commission to take an out-of-state deposition of Hillary Clinton (motion to depose Clinton).[13] These defendants asserted in relevant part that, (1) during one of the plaintiffs' depositions, (a) on the advice of counsel, the deponent refused to answer how the plaintiffs "all ended up represented by the same [law] firm" in the underlying consolidated actions and (b) claimed to be unaware of how her legal fees were being paid, (2) the lead plaintiff in the underlying consolidated actions was invited to speak at the Democratic National Convention in 2016, and thereafter was "praised" by Clinton, and (3) they "believe[d] that [the underlying consolidated actions

---

[10] The Jones defendants further represented that, to export the Google Analytics data, Free Speech Systems, LLC, would be required to purchase an upgraded membership account at a cost of $150,000.

[11] The Jones defendants defined " '[s]andboxing' " as " 'a computer security term referring to when a program is set aside from other programs in a separate environment so that if errors or security issues occur, those issues will not spread to other areas on the computer. Programs are enabled in their own sequestered area, where they can be worked on without posing any threat to other programs.' "

[12] On July 1, 2021, all of the Jones defendants, except for Jones, were represented by both Attorney Jay Marshall Wolman and Pattis & Smith, LLC. At that time, Jones was represented by Wolman only.

[13] Jones did not join the motion to depose Clinton, and Infowars, LLC, was not listed as one of the movants. In subsequent filings, including an August 3, 2021 reply brief vis-à-vis the motion to depose Clinton, Infowars, LLC, was treated as an additional movant.

were] filed six years after the shootings at Sandy Hook as part of a vendetta inspired, orchestrated and directed in whole or in part by . . . Clinton as part of a vendetta to silence . . . Jones after . . . Clinton lost the presidential race to Donald J. Trump."

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating a protective order entered on February 22, 2019, as amended on June 16, 2021 (protective order),[14] which originally had been proposed by the Jones defendants and which, inter alia, protected confidential information produced by the plaintiffs during discovery.[15] The plaintiffs maintained that the motion to depose Clinton, filed by the Jones defendants[16] in the middle of a deposition, (1) was frivolous and (2) improperly published information obtained from the deponent's testimony that was designated as "Highly Confidential-Attorneys Eyes Only" in violation of the protective order. On July 19, 2021, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, filed an objection, and the plaintiffs filed a reply brief the next day.

[14] The protective order was twice amended further in 2022.

[15] The protective order limited access to materials designated as "Confidential Information" or "Highly Confidential-Attorneys Eyes Only" to certain categories of persons. The protective order further provided in relevant part: "Depositions involving Confidential Information shall be treated, as follows:

"a. Portions of a deposition or depositions in their entirety may be designated Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY by counsel for the deponent or the Designating Party [as defined in the protective order], with respect to documents or information that it has produced, by requesting such treatment on the record at the deposition or in writing no later than thirty (30) days after the date of the deposition.

"b. This Protective Order shall permit temporary designation of an entire transcript as Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY where less than all of the testimony in that transcript would fall into those categories, subject to [a procedure detailed in the protective order]. . . . The designations shall remain effective until and unless an objection is made and finally resolved."

[16] The plaintiffs contended that the motion to depose Clinton should be treated as having been filed by all of the Jones defendants. See footnote 13 of this opinion.

---

Lafferty *v.* Jones

---

On August 5, 2021, the court issued an order stating in relevant part: "In the midst of taking the first deposition of a plaintiff . . . Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC (Infowars), filed a motion to depose . . . Clinton, using deposition testimony that had just been designated as '[Highly] Confidential-Attorneys Eyes Only,' and completely disregarding the court-ordered procedures. At no point prior to filing the Clinton motion did Infowars profess ignorance of the procedures they had proposed and which were court-ordered to be followed, nor have they since taken any steps to correct their improper filing. If Infowars was of the opinion that the plaintiffs' designation was unreasonable and not made in good faith, the solution was to follow the court-ordered procedure to challenge the designation, not to blatantly disregard it and make the confidential information available on the Internet by filing it in the court file. The court rejects Infowars' baseless argument that there was no good cause to issue the protective [order] . . . . Infowars . . . now takes the absurd position that the court-ordered protective order circumvents the good cause requirements of Practice Book § 13-5, did not need to be complied with, and should not be enforced by the court. This argument is frightening. Given the cavalier actions and wilful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public. The court will address sanctions at a future hearing."[17]

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for failing to produce certain

---

[17] On August 4, 2021, the court denied the motion to depose Clinton. That ruling is not at issue in these consolidated appeals.

---

Lafferty *v.* Jones

---

accounting documents. The plaintiffs asserted in relevant part that, (1) in connection with a noticed deposition of Melinda Flores, Free Speech System, LLC's accounting manager, Flores was directed to produce documents, including (a) Free Speech System, LLC's trial balances from 2012 to 2019, and (b) " '[a]ny and all subsidiary ledgers for each account listed in the [t]rial balances produced,' "[18] (2) the court ordered the requested records to be produced by the close of business on May 14, 2021,[19] (3) on May 14, 2021, the Jones defendants produced documents that they described to be trial balances "incorporating the [s]ubsidiary [l]edgers," (4) notwithstanding the Jones defendants' representation, they failed to produce any subsidiary ledgers, and (5) Flores testified during her deposition that (a) she assisted in assembling the documents produced on May 14, 2021, (b) Free Speech Systems, LLC, maintained subsidiary ledger information that was accessible, and (c) the documents produced did not contain subsidiary

---

[18] Attached as an exhibit to the July 6, 2021 motion was an affidavit of Brian W. Merrill, a certified fraud examiner and a certified analytics professional, who averred in relevant part that "[a] trial balance is a standard accounting report listing a company's general ledger accounts. A debit or credit balance is presented for each general ledger account. The purpose of a trial balance is to prove that the value of all debit balances equals the value of all credit balances. Subsidiary ledgers ('[s]ubledgers') contain the transactional detail that support the trial balance details for all general ledger accounts in an accounting system. Subledgers allow for the interpretation and analysis of the financial activity that is recorded in the books and records that ultimately represent the financial statement of the organization."

On November 6, 2020, the Jones defendants objected to the production request seeking the trial balances and subsidiary ledgers on the grounds that the request was, inter alia, overbroad, irrelevant, and unduly burdensome. The court overruled the objection.

[19] On May 5, 2021, the Jones defendants filed an emergency motion for a protective order requesting in part that Flores' deposition, scheduled for May 7, 2021, be rescheduled for medical reasons. On May 6, 2021, the court ordered Flores' deposition to be rescheduled but further directed that "[t]he records requested in the request to produce are ordered to be produced by the close of business on [May 14, 2021]. Failure to comply with this order may result in sanctions."

Lafferty *v.* Jones

ledgers. (Emphasis omitted.) On July 27, 2021, the Jones defendants filed an objection, arguing in relevant part that Free Speech Systems, LLC, did not possess or maintain subsidiary ledgers. In support of their objection, the Jones defendants submitted a personal affidavit of Robert Roe (Roe affidavit), a certified public accountant and a certified forensic accountant, who averred that Free Speech Systems, LLC, did not maintain or utilize subsidiary ledgers. On August 3, 2021, the plaintiffs filed a reply brief.

On August 6, 2021, the court issued an order stating in relevant part: "The subsidiary ledger information . . . was easily accessible to Flores . . . . Despite the court orders, and although the information exists, is maintained by [Free Speech Systems, LLC], and could have been produced by Flores as was required by the court orders, the documents were not produced. The court rejects [Roe's] statement . . . that [Free Speech Systems, LLC] does not 'maintain or utilize' subsidiary ledgers as not credible in light of the circumstances. There is no excuse for the [Jones] defendants' disregard of not only their discovery obligations, but the . . . court orders. The court finds that the failure to comply with the production request has prejudiced the plaintiffs [in] their ability to both prosecute their claims and conduct further depositions in a meaningful manner." The court further ordered (1) Flores' deposition to resume, with Flores directed to produce the subsidiary ledger information, and (2) that sanctions would be addressed at a future hearing. During subsequent hearings before the court, the plaintiffs' counsel represented that, on August 24, 2021, the Jones defendants produced alleged subsidiary ledgers; however, the plaintiffs' counsel further represented that "it is not clear whether [the documents produced were], in fact, subsidiary ledgers . . . ."

006644

---

Lafferty *v.* Jones

---

On August 24, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating the court's discovery orders requiring them to produce, inter alia, the Google Analytics data. The plaintiffs refuted the Jones defendants' contention in their June 28, 2021 notice of compliance that Free Speech Systems, LLC, did not possess, control, or have custody of the Google Analytics data in a manner that could be exported, asserting that such "representations were inaccurate and misleading." On September 14, 2021, the Jones defendants filed an objection, arguing, inter alia, that (1) on June 17, 2019, via email, they had produced the Google Analytics data requested by the plaintiffs, and (2) the "sandbox mechanism" previously suggested by them would allow the plaintiffs to access all of the "raw data." On September 23, 2021, the plaintiffs filed a reply brief, and on September 25, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On September 30, 2021 the court issued an order stating in relevant part: "There is no dispute here that the Jones defendants failed to follow the rules [of practice] as they relate to discovery. . . . The purported June 17, 2019 email transmission of zip files . . . containing Google Analytics reports that the plaintiffs' counsel indicates was never received was not sent to [certain other defendants] nor did the purported transmission otherwise comply with the rules of practice. As such, it is not necessary for the court to resolve the issue of whether the purported transmission was actually sent, as it cannot be considered proper compliance under our rules. In short, after protracted objections and arguments by the Jones defendants over whether they had the ability to produce ANY Google Analytics data, to date they have still failed to comply. . . . In light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the plaintiffs, the court will address the

006645

appropriate sanctions at the next status conference." Subsequently, by way of a notice of compliance dated October 8, 2021, the Jones defendants represented that they had provided supplemental responses to the plaintiffs' discovery requests.

On September 9, 2021, the plaintiffs moved to sanction the Jones defendants for producing "manufactured" documents in discovery. The plaintiffs contended that the trial balances that had been produced were not the originals but, rather, constituted altered trial balances that Roe had manipulated prior to production. On October 7, 2021, the Jones defendants filed an objection. On October 18, 2021, the plaintiffs filed a reply brief, and on October 20, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On November 15, 2021, after hearing argument from the parties over the course of three days between October 20 and November 15, 2021, the court issued an oral decision defaulting the Jones defendants as a sanction for violating (1) the protective order and (2) its discovery orders.[20] With regard to the protective order, the court found in relevant part that (1) the Jones defendants acknowledged that the motion to depose Clinton contained information obtained from a deposition that was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order, (2) the Jones defendants argued that the protective order did not preclude them from publishing such confidential information so long as they did not identify the witness from whom the information was obtained, which position "did nothing but reinforce the court's August 5, 2021 order and findings that the [Jones defendants'] cavalier actions constituted wilful misconduct and violated the

---

[20] On October 7, 2021, the plaintiffs filed a memorandum of law in favor of the court defaulting the Jones defendants for their misconduct. On October 20, 2021, the Jones defendants filed a memorandum of law in opposition to a default order.

006646

Lafferty *v.* Jones

court's clear and unambiguous protective order,"[21] and (3) there was a "transparent attempt to cloud the issues" by counsel who had filed the motion to depose Clinton, Pattis, as well as one of the Jones defendants' former counsel, Attorney Jay Marshall Wolman, stemming from inconsistent representations as to whether Infowars, LLC, was one of the movants of the motion to depose Clinton.[22]

With respect to the subsidiary ledgers, the court summarized its findings in its August 6, 2021 order regarding the subsidiary ledgers and commented that "it is still unclear as to what documents have been produced." The court then determined that sanctions were "appropriate in light of the [Jones] defendants' failure to fully and fairly comply with the plaintiffs' discovery request and the court's orders  . . . ."

Regarding the trial balances, the court determined that the trial balances produced by the Jones defendants did not comply with its discovery orders. The court stated that (1) Flores testified at her deposition that she had generated the trial balances, which she believed had been produced to the plaintiffs, but (2) Roe later altered those trial balances before they had been provided to the plaintiffs. The court rejected an argument asserted by the Jones defendants that Flores had "provided flawed information to the [Jones] defendants that

---

[21] The court further observed that the Jones defendants previously had asserted a different argument, namely, that the inclusion of the "Highly Confidential-Attorneys Eyes Only" information in the motion to depose Clinton was justified because the plaintiffs lacked a good faith basis to designate the deposition at issue as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. The court rejected that argument.

[22] As the court explained, (1) the motion to depose Clinton, filed by Pattis, listed Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, as the movants, (2) in the July 19, 2021 objection to the plaintiffs' July 6, 2021 motion for sanctions, also filed by Pattis, Infowars, LLC, was treated as an additional movant, and (3) during argument, Wolman represented that Infowars, LLC, had no involvement in the motion to depose Clinton because its name was not listed in the motion.

006647

the [Jones] defendants, through Roe, had to correct." The court further stated: "The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by [Roe] were the records that were produced. But these records that removed accounts and consolidated accounts altered the information in the reports that [Flores] had produced, and they contain trial balances that did not balance. These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiffs' request or to the court's order."

The court next addressed the Google Analytics data requested by the plaintiffs, stating: "With respect to analytics, including Google Analytics . . . the [Jones] defendants on May 7, 2019, represented that they had provided all the analytics that they had. They stated with respect to Google Analytics that they had access to Google Analytics reports but did not regularly use them. . . . The [Jones] defendants also claim that, on June 17, 2019, they informally emailed zip files containing Google Analytics reports to the plaintiffs, but not [to] the codefendants, an email the plaintiffs state they did not receive and that the court found would not have been in compliance with our rules of practice. On June 28, 2021, the Jones defendants filed a notice of compliance stating that complete, final supplemental compliance was made by . . . [Jones] and Free Speech Systems, LLC, and that Infowars, LLC, Infowars Health, LLC, and Prison Planet [TV], LLC, quote: 'Had previously produced all documents required to be produced,' . . . representing that with respect to the Google Analytics documents, Free Speech Systems, LLC, could not export the dataset and that the only way they could comply was through the sandbox approach. Then on

006648

[October] 8, 2021,[23] the Jones defendants for the first time formally produced Excel spreadsheets limited to Google Analytics apparently for [Infowars.com] and not for any of the other websites such as Prison Planet TV or Infowars Health." (Footnote added.) The court also found that (1) the Jones defendants had failed to produce analytics data for other platforms, such as Alexa and Criteo, and (2) the Jones defendants' production of certain social media analytics data "has . . . been insubstantial and . . . has fallen far short both procedurally and substantively . . . ."[24] As the court summarized, "[t]he court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims. This callous disregard of their obligations to fully and fairly comply with discovery and court orders on its own merits a default against the Jones defendants."

The court then stated: "Neither the court nor the parties can expect perfection when it comes to the discovery process. What is required, however, and what all parties are entitled to, is fundamental fairness that the other side produces that information which is within [its] knowledge, possession and power, and that the other side meet[s] its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

---

[23] The court referred to August 8, 2021, as the date of the production of the spreadsheets; however, (1) during argument preceding the court's sanctions order, the plaintiffs' counsel represented that the spreadsheets had been produced on October 8, 2021, and (2) the record reflects that the Jones defendants filed a notice of compliance dated October 8, 2021.

[24] The defendants make a passing reference to these other analytics in their principal appellate brief. Insofar as the defendants attempt to raise a claim of error specifically as to these other analytics, they have not adequately briefed any such claim. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Thus, we do not set forth additional context vis-à-vis these other analytics.

---

Lafferty *v.* Jones

---

"Here, the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

"The court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous court orders, and they have not.

"In addressing the sanctions that should enter here, the court is not punishing the [Jones] defendants. The court also recognizes that a sanction of default is one of last resort. This court previously sanctioned the [Jones] defendants not by entering a default, but by a lesser sanction, the preclusion of the [Jones] defendants' special motions to dismiss. At this point, entering other lesser sanctions such as monetary sanctions, the preclusion of evidence, or the establishment of facts is inadequate given the scope and extent of the discovery material that the [Jones] defendants have failed to produce.

"As pointed out by the plaintiffs, they are attempting to conduct discovery on what the [Jones] defendants publish and the [Jones] defendants' revenue. And the failure of the [Jones] defendants to produce the analytics impacts the ability of the plaintiffs to address what is published, and the [Jones] defendants' failure to produce the financial records such as subledgers and trial balances affects the ability of the plaintiffs to address the [Jones] defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims, again was caused by the Jones defendants' wilful noncompliance, that is, the Jones defendants'

Lafferty *v.* Jones

failure to produce critical material information that the plaintiff[s] needed to prove their claims.

"For these reasons, the court is entering a default against the [Jones] defendants . . . . The case will proceed as a hearing in damages as to the [Jones] defendants. The court notes [that] . . . Jones is [the] sole controlling authority of all the [Jones] defendants, and that the [Jones] defendants filed motions and signed off on their discovery issues jointly. And all the [Jones] defendants have failed to fully and fairly comply with their discovery obligations."

On appeal, the defendants assert that (1) the court incorrectly (a) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (b) attributed the violation of the protective order to them rather than to their counsel,[25] (2) the court incorrectly determined that their noncompliance with its discovery orders was wilful, and (3) the court's sanction order defaulting them was disproportionate.[26] These contentions are unavailing.

---

[25] As we explained in footnote 13 of this opinion, although Free Speech Systems, LLC, was one of the movants of the motion to depose Clinton, Jones did not join the motion. The defendants on appeal do not claim that Jones was sanctioned improperly vis-à-vis the protective order; on the contrary, both defendants—Jones and Free Speech Systems, LLC—claim error as to the court's ruling regarding the violation of the protective order and assert that the court attributed the violation to them rather than to their counsel. Accordingly, for purposes of our resolution of the defendants' claims in part I of this opinion and notwithstanding the convoluted background concerning the identity of the movants of the motion to depose Clinton, we do not differentiate between Jones and Free Speech Systems, LLC, with regard to the motion to depose Clinton and the court's rulings concerning the protective order.

[26] The defendants raise a number of additional claims, which we decline to review. First, in their reply brief, the defendants contend for the first time that, as a matter of law, "there should be an outer limit on a trial court's authority to enter a default in civil cases. Failure adequately or substantially to comply with discovery should never result in a default." We decline to consider this discrete legal issue raised for the first time in the defendants' reply brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023) ("[i]t [is] axiomatic that arguments cannot be raised for the first time in a reply brief"). Even if some semblance of

006651

---

Lafferty *v.* Jones

---

"A trial court's power to sanction a litigant or counsel stems from two different sources of authority, its inherent powers and the rules of practice. . . . [T]his inherent authority permits sanctions for dilatory, bad faith and harassing litigation conduct . . . ." (Citations omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 373.

"Additionally, under Practice Book [Rev. to 2021]

this claim can be gleaned from the defendants' principal appellate brief, we conclude that the defendants have abandoned the claim as a result of their failure to brief it adequately in their main brief and notwithstanding their attempt to expound on it in their reply brief. See *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915 ("[T]he plaintiff cannot use his reply brief to resurrect a claim that he has abandoned by failing to adequately brief it in his principal appellate brief. See *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010) (declining to consider claim when appellant raised 'vague assertion' of claim in principal appellate brief and later 'amplified her discussion of the issue considerably in her reply brief')."), cert. denied, 338 Conn. 911, 259 A.3d 654 (2021). Accordingly, insofar as the defendants claim that the default entered against them was a disproportionate sanction, we limit our analysis to the parameters of the claim adequately briefed by the defendants, namely, that the sanction constituted an abuse of the court's discretion on the basis of the record.

Second, in their principal appellate brief, the defendants claim that "[a] liability default is never appropriate in a case involving speech, given the importance the Connecticut constitution places on speech." The defendants cite article first, § 6, of the Connecticut constitution, which, as they concede, applies only to criminal prosecutions; see *Gray* v. *Mossman*, 91 Conn. 430, 442–43, 99 A. 1062 (1917); and which provides: "In all prosecutions or indictments for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and the facts, under the direction of the court." Conn. Const., art. I, § 6. The defendants' principal appellate brief is bereft of any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Third, in their principal appellate brief, the defendants assert that the court, in its August 6, 2021 order addressing the subsidiary ledgers issue, improperly discredited the Roe affidavit without an evidentiary hearing. The defendants contend that "[t]he absence of a meaningful evidentiary record to support this finding as to . . . Roe, a finding that bore such fatal consequences for the defendants, constitutes an abuse of discretion . . . ." The defendants have abandoned this claim by failing to provide any substantive legal analysis to support it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Last, in their principal appellate brief, the defendants assert that "the trial court never set forth just what it thought Google Analytics was. As such, the order [regarding Google Analytics] was not so clear and unambiguous as to warrant a default if, in fact, the order was violated at all." We deem this claim to be inadequately briefed and, therefore, the defendants have abandoned it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

§ 13-14,[27] a court may sanction a party for noncompliance with the court's discovery orders. Among the permissible sanctions is foreclosing judgment on the merits for a party, such as by rendering a default judgment against a defendant . . . ." (Footnote added.) Id.

We consider three factors in determining whether "a trial court properly exercises its discretion in imposing a sanction for a violation of a court order . . . ." *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 71, 176 A.3d 1167 (2018); see also *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 17–18, 776 A.2d 1115 (2001). "First, the order to be complied with must be reasonably clear. In this connection, however, we also state that even an order that does not meet this standard may form the basis of a sanction if the record establishes that, notwithstanding the lack of such clarity, the party sanctioned in fact understood the trial court's intended meaning. This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review.[28] Third, the sanction imposed must be

---

[27] Practice Book (Rev. to 2021) § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof, or has failed to submit to a physical or mental examination, or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply with the provisions of Section 13-15, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following:

"(1) The entry of a nonsuit or default against the party failing to comply . . . ."

[28] "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

Lafferty *v.* Jones

proportional to the violation. This requirement poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Footnote added; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 373–74.

## A

The defendants contend that the court improperly (1) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (2) attributed the violation of the protective order to them, as opposed to their counsel. We are not persuaded.

As to the court's determination that the filing of the motion to depose Clinton violated the protective order, the defendants maintain that, in the motion, they "represented that at a deposition a witness was instructed by counsel not to answer questions about choice of counsel or who was financing the litigation. The name and gender of the deponent were not mentioned; the deposition was characterized, not quoted. . . . The de minimis recitation of facts in the motion . . . did not violate a court order . . . ." (Citations omitted; footnote omitted.) As the court correctly determined, however, the clear and unambiguous language of the protective order limited access to depositions, or portions thereof, designated as "Highly Confidential-Attorneys Eyes Only." The defendants acknowledge that the motion to depose Clinton contained information drawn from the transcript of one of the plaintiffs' depositions, which, as the court found, was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. Thus, in filing the motion to depose Clinton and making the confidential information set forth therein available

conviction that a mistake has been committed." (Internal quotation marks omitted.) *Fernwood Realty, LLC* v. *AeroCision, LLC*, 166 Conn. App. 345, 356, 141 A.3d 965, cert. denied, 323 Conn. 912, 149 A.3d 981 (2016).

006654

Lafferty *v.* Jones

to the public, the defendants plainly violated the protective order.

Moreover, the defendants' position on appeal is further undermined by the fact that, during argument preceding the court's sanctions order, one of the defendants' former counsel, Wolman, conceded that the defendants' actions violated the protective order. The following colloquy occurred between the court and Wolman:

"[Wolman]: . . . We do take the [protective] order very seriously and have endeavored to abide it. There was during a deposition this motion [to depose Clinton] filed. And at the end of the day it comes down to simply one sentence. That the witness claims not to know how her legal fees were being paid. That's the only information that I can see in that motion that gives rise to the court's order. And you know, it was erroneously believed that that was not subject to the [protective] order. The witness herself was not identified. *And while it may be a technical violation,* and it was not realized to be so at the time—

"The Court: So, do you admit now that it was a violation, whether it's a technical violation or not?

"[Wolman]: *I would say it probably fits within the language of what is protected.* We had concerns as to whether or not it truly was protected. The court has weighed in." (Emphasis added.)

Accordingly, we reject the defendants' assertion that the court incorrectly determined that they violated the protective order in filing the motion to depose Clinton.

The defendants, in the alternative, contend that the court improperly ascribed the violation of the protective order to them rather than to their counsel. The defendants posit that, rather than referring counsel for disciplinary action, the court "attributed counsel's alleged

006655

failure to [the defendants], justifying a default on conduct over which the defendants themselves had no control, and about which, the record reflects, they knew nothing." The defendants fail to cite any portion of the record supporting their assertion that they were unaware of counsel's actions. Without any such evidence, we cannot countenance the defendants' reasoning that they were absolved of any discipline stemming from counsel's conduct. See *MacCalla* v. *American Medical Response of Connecticut, Inc.*, 188 Conn. App. 228, 240, 204 A.3d 753 (2019) ("Although in some circumstances it may be unduly harsh to impute counsel's transgressions to his client, 'our adversarial system [also] requires that the client be responsible for acts of the attorney-agent whom [he] has freely chosen . . . .' *Thode* v. *Thode*, 190 Conn. 694, 698, 462 A.2d 4 (1983); see *Sousa* v. *Sousa*, 173 Conn. App. 755, 773 n.6, 164 A.3d 702 ('[a]n attorney is the client's agent and his knowledge is imputed to the client' . . .), cert. denied, 327 Conn. 906, 170 A.3d 2 (2017)."); see also *MacCalla* v. *American Medical Response of Connecticut, Inc.*, supra, 239–40 (concluding that court did not abuse its discretion in dismissing claims of certain plaintiffs on basis of counsel's actions); cf. *Herrick* v. *Monkey Farm Cafe, LLC*, 163 Conn. App. 45, 52–53, 134 A.3d 643 (2016) (reversing trial court's judgment of nonsuit rendered on basis of counsel's actions).

## B

The defendants next claim that the court erred in finding that they wilfully violated its discovery orders. As to the discovery orders in general, the defendants maintain that "the failure to provide answers was not an example of wilful misconduct. Rather, it was the result of a shocking degree of disorganization. The plaintiffs persuaded the trial judge that the plaintiffs' expectations of how the defendants should operate their business and keep records was the standard the

Lafferty *v.* Jones

defendants must meet. The default prevented a jury from learning the truth about the defendants' corporate organization—it is a haphazard warren of people drawn together by . . . Jones' charisma and generosity, but almost altogether devoid of institutional structure or normal corporate governance." We are unpersuaded.

Whether a party wilfully violates a court order "is a factual question committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 222 Conn. App. 867. The court's finding that the defendants' noncompliance with its discovery orders was wilful was supported by its subordinate findings that (1) the subsidiary ledgers requested by the plaintiffs were "easily accessible" and "available" to Flores, (2) Flores generated the trial balances sought by the plaintiffs, but those trial balances later were altered by Roe prior to production to the plaintiffs, and (3) the defendants withheld analytics materials and exhibited a "callous disregard of their obligations to fully and fairly comply with discovery . . . ." Rather than adequately contesting the factual underpinnings of these findings, the defendants propound the argument that their failure to comply with the court's discovery orders stemmed from their purported institutional disorganization. The defendants fail to cite to any portion of the record that supports this assertion. Moreover, the defendants' argument is belied by their own statement in their principal appellate brief that, notwithstanding their purported disorganized corporate structure, they "tendered tens of thousands of documents, sat for scores of depositions, provided answers to requests to admit, and otherwise made efforts to comply with discovery." Thus, the defendants' claim regarding the wilfulness of their noncompliance with the court's discovery orders in general is untenable.

The defendants also assert that the court incorrectly determined that they had wilfully violated its discovery

006657

Lafferty *v.* Jones

orders specifically concerning the Google Analytics data. The defendants maintain that they (1) made "limited and sporadic use of Google Analytics data," (2) "did not keep [any] reports, did not generally or systematically rely on them, and consulted Google Analytics only haphazardly," and (3) did not possess the Google Analytics data, but, rather, "access[ed] the information on Google servers," such that they did not wilfully fail to comply with the court's orders regarding the Google Analytics data. We reject this assertion. The frequency of the defendants' use and reliance on the Google Analytics data has no bearing on their obligation to abide by the court's discovery orders requiring them to provide the data to the plaintiffs. Further, whether the defendants were in possession of the Google Analytics data is immaterial because the plaintiffs' production request sought analytics that the defendants "own[ed] *and/or control*[*led*]." (Emphasis added.) See Practice Book § 13-9 (a)[29] ("[i]n any civil action, in any probate appeal, or in any administrative appeal where the judicial authority finds it reasonably probable that evidence outside the record will be required, any party may serve . . . upon any other party a request to afford the party submitting the request the opportunity to inspect, copy, photograph or otherwise reproduce designated documents or to inspect and copy, test or sample any tangible things *in the possession, custody or control* of the party upon whom the request is served" (emphasis added)). As the court found, the defendants (1) had access to the Google Analytics data and (2) produced some Google Analytics data to the plaintiffs, albeit not in full and fair compliance with the court's discovery orders. Accordingly, we conclude that the court properly found that the defendants wilfully violated the court's discovery orders as to the Google Analytics data.

[29] An amendment to Practice Book § 13-9, effective January 1, 2022, made changes to the provision that are not relevant to these appeals. Accordingly, we refer to the current revision of this provision.

Case 4:25-cv-09553 Document 12-29 Filed 11/26/2016 in TXSD Page 689 of 777

---

Lafferty *v.* Jones

### C

The defendants next claim that the court's order defaulting them as a sanction for their violations of its discovery orders and the protective order was disproportionate. The defendants maintain that, although they "resisted discovery by every lawful means possible in lengthy proceedings . . . [t]heir compliance was substantial," and they did not "[fail] to answer the complaint, [fail] to respond to discovery or otherwise [fail] to participate in the proceedings."[30] We conclude that the court did not abuse its discretion in defaulting the defendants.

As we set forth previously in this opinion, whether the court's sanction defaulting the defendants was proportional to their violations of the court's orders "poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 374. "As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue for us is whether the trial court could have reasonably

---

[30] The defendants also argue that, as a less severe alternative to a default, the plaintiffs could have asserted a cause of action for intentional spoliation of evidence or the court could have provided a spoliation charge to the jury. See *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 243, 905 A.2d 1165 (2006) (recognizing independent cause of action for intentional spoliation of evidence, defined as " 'the intentional destruction, mutilation, or significant alteration of potential evidence for the purpose of defeating another person's recovery in a civil action' "). The plaintiffs counter that the law of spoliation is inapplicable because "there is no question that [the defendants] had—and simply withheld—financial and analytics compliance. Moreover, a spoliation charge would not have remedied the prejudice to the plaintiffs from [the defendants'] misrepresentations regarding the existence of discovery, prolonged delays in providing the compliance [they] did provide, and complete refusal to provide other compliance, or from [the defendants'] wilful violation of the protective order." We agree with the plaintiffs that the law of spoliation did not provide a reasonable alternative to the court's default order.

006659

Lafferty *v.* Jones

concluded as it did. . . . In reviewing a claim that the court has abused this discretion, great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . . The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented. . . . Under an abuse of discretion standard, a court's decision must be legally sound and [the court] must [have] honest[ly] attempt[ed] . . . to do what is right and equitable under the circumstances of the law, without the dictates of whim or caprice." (Citation omitted; internal quotation marks omitted.) *Gianetti* v. *Neigher*, 214 Conn. App. 394, 437–38, 280 A.3d 555, cert. denied, 345 Conn. 963, 285 A.3d 390 (2022). With regard to discovery orders in particular, "[n]ever will the case on appeal look as it does to a [trial court] . . . faced with the need to impose reasonable bounds and order on discovery. . . . Trial court judges face great difficulties in controlling discovery procedures which all too often are abused by one side or the other and this court should support the trial judges' reasonable use of sanctions to control discovery." (Citation omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 374.

"[I]n assessing proportionality, a trial court must consider the totality of the circumstances, including, most importantly, the nature of the conduct itself. . . . [A] trial court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure. . . . Therefore, although dismissal of an action is not an abuse of discretion where a party shows

006660

Lafferty *v.* Jones

deliberate, contumacious or unwarranted disregard for the court's authority . . . the court should be reluctant to employ the sanction of dismissal except as a last resort. . . . [T]he sanction of dismissal should be imposed only as a last resort, and where it would be the only reasonable remedy available to vindicate the legitimate interests of the other party and the court. . . . Like a dismissal, a default judgment is also one of the more severe sanctions that a court may impose . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Gutierrez* v. *Mosor*, 206 Conn. App. 818, 827–28, 261 A.3d 850, cert. denied, 340 Conn. 913, 265 A.3d 926 (2021).

In determining whether the sanction of default was proportional to the defendants' violations of the court's orders, "we are guided by the factors [our Supreme Court] . . . ha[s] employed when reviewing the reasonableness of a trial court's imposition of sanctions: (1) the cause of the [party's] failure to [comply with the orders], that is, whether it [was] due to inability rather than the [wilfulness], bad faith or fault of the [party] . . . (2) the degree of prejudice suffered by the opposing party . . . and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Internal quotation marks omitted.) *Gianetti* v. *Neigher*, supra, 214 Conn. App. 439.

Remaining mindful, as the trial court recognized, that a default is a sanction of last resort, we conclude that the court's default order was a proportional sanction under the circumstances presented. As to the wilfulness factor, the court found that the defendants' failure to produce "critical material information" to the plaintiffs, as well as the defendants' "cavalier actions" in filing the motion to depose Clinton, constituted wilful noncompliance and misconduct. The court further found that "the Jones defendants were not just careless. Their

006661

Lafferty *v.* Jones

failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct . . . ."[31] Thus, this factor militates in favor of the court's default order.

With regard to the prejudice factor, the court found that the purpose of the plaintiffs' discovery requests was to determine (1) what the defendants published and (2) the defendants' revenue, which purpose was thwarted by the defendants' failure to produce the analytics data, the subsidiary ledgers, and the trial balances requested by the plaintiffs. The court further found that the defendants' conduct "interfere[d] with the ability of the plaintiffs to conduct meaningful discovery and prevent[ed] the plaintiffs from properly prosecuting their claims." See *Krahel* v. *Czoch*, 186 Conn. App. 22, 35–36, 198 A.3d 103 (discussing importance of unproduced discovery and its effect as to plaintiff's case when examining prejudice), cert. denied, 330 Conn. 958, 198 A.3d 584 (2018); see also *Lafferty* v. *Jones*, supra, 336 Conn. 378 (citing *Krahel* in analyzing prejudice factor).

Additionally, with regard to the protective order, the court stated in its August 5, 2021 order addressing the filing of the motion to depose Clinton that (1) the defendants, in filing the motion to depose Clinton, made information designated as "Highly Confidential-Attorneys Eyes Only" under the protective order available on the Internet, (2) the defendants took no corrective action thereafter, and (3) it had "grave concerns" that there would be "a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the

---

[31] As we concluded in part I B of this opinion, we reject the defendants' claim that the court's finding that they wilfully violated the discovery orders was clearly erroneous.

Lafferty *v.* Jones

public." The court iterated these concerns during argument preceding its sanction order, stating in relevant part: "So, I do intend to impose sanctions [for the violation of the protective order]. . . . I think the [defendants'] behavior really is unconscionable. . . . And I am concerned about a chilling effect on the testimony of other witnesses." In light of these concerns, this factor weighs in favor of the court's default order.

Finally, the court determined that imposing a lesser sanction would be "inadequate . . . ." In 2019, following the defendants' noncompliance with discovery vis-à-vis the special motions to dismiss and Jones' comments during his June 14, 2019 radio broadcast, the court sanctioned the defendants by precluding them from pursuing the special motions to dismiss; however, the court cautioned that it would consider defaulting them in the future if "they, from th[at] point forward, continue[d] with their behavior with respect to discovery." Later, the court also warned the defendants that they risked being defaulted if they failed to comply with its June 2, 2021 order directing the production of complete, final supplemental compliance. See *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, supra, 328 Conn. 74 ("[i]n instances in which our appellate courts have upheld the sanction of a nonsuit, a significant factor has been that the trial court put the plaintiff on notice that noncompliance would result in a nonsuit"). Nevertheless, as the court found, the defendants continued to engage in "a pattern of obstructive conduct" in "callous[ly]" disregarding their discovery obligations. This conduct was not isolated; rather, as the various orders entered by the court demonstrate, notwithstanding being given ample opportunities to comply, the defendants repeatedly failed to produce adequate, responsive materials. The court reasonably determined that a lesser sanction

006663

Lafferty *v.* Jones

would not suffice under such circumstances. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 829 ("[t]he appellate courts of this state consistently have upheld nonsuits, defaults or other sanctions imposed for discovery violations where the noncomplying party has exhibited a pattern of violations or discovery abuse demonstrating a disregard for the court's authority").

Moreover, in the midst of the defendants' ongoing discovery noncompliance, the defendants filed the motion to depose Clinton, which contained information designated as "Highly Confidential-Attorneys Eyes Only" subject to the protective order. As the court determined, the defendants, in a "cavalier" fashion, violated the protective order, which they originally had proposed, by releasing the confidential information to the public, thereby creating a palpable risk of a "chilling effect" on the testimony of witnesses in the future. Against this backdrop, we cannot discern an abuse of discretion by the court in defaulting the defendants as a sanction. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 827 ("dismissal of an action is not an abuse of discretion where a party shows deliberate, contumacious or unwarranted disregard for the court's authority" (emphasis omitted; internal quotation marks omitted)).

In sum, we conclude that the court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and the protective order.

II

The defendants next claim that the trial court improperly construed the effect of the defendants' default to relieve the plaintiffs of the burden to establish the extent of their damages. This claim warrants little discussion.

Lafferty *v.* Jones

Initially, we observe that the defendants assert that the court "never made a principled and intelligible ruling about causation in this case" but, rather, treated causation as having been established following the defendants' default. The defendants do not brief any substantive claims as to any particular rulings of the court[32] but, rather, take issue with the court's rulings as a whole insofar as the court purportedly "eviscerated the concept of causation and relieved the plaintiffs of any responsibility to prove, or even to attempt to prove, a linkage to the various and diffuse harms they suffered and the conduct of the [defendants]."[33] We exercise

[32] The defendants refer to the court's jury charge, wherein the court instructed the jury in relevant part: "I hereby charge you that causation of the plaintiffs' damages is already established. . . . Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law. That is, it has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly behind the Sandy Hook hoax, resulting in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard in the evidence in this case. In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described. The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress. The extent of the harm is what you will be measuring in your verdict. The cause of the harm is not in question."

[33] In their principal appellate brief, the defendants make vague references to (1) "a series of bizarre evidentiary rulings" by the court that "eviscerated the requirement that [the] plaintiffs prove the extent of their damages," (2) the court's improper admission of evidence, (3) the court failing to determine which of the plaintiffs' allegations were "material," (4) the court instructing the jury that liability had been " 'established,' " and (5) the court denying a motion in limine filed by the defendants requesting that the transcript of its November 15, 2021 ruling defaulting the defendants be admissible at the hearing in damages. Insofar as the defendants attempt to raise claims of error with respect to these discrete issues, they have failed to brief such claims adequately and, therefore, we deem any such claims to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Additionally, in their principal appellate brief, the defendants repeatedly state that the jury was unaware that liability was established against the defendants as the result of a disciplinary default. In their reply brief, the defendants assert for the first time that the court committed error in failing

plenary review over this claim, which presents a question of law. See *Williams* v. *Mansfield*, 215 Conn. App. 1, 10, 281 A.3d 1263 (2022) ("[w]hen . . . a court's decision is challenged on the basis of a question of law, our review is plenary").

It is axiomatic that "[a] default admits the material facts that constitute a cause of action . . . and entry of default, when appropriately made, conclusively determines the liability of a defendant. . . . If the allegations of the plaintiff's complaint are sufficient on their face to make out a valid claim for the relief requested, the plaintiff, on the entry of a default against the defendant, need not offer evidence to support those allegations. . . . Therefore, the only issue . . . following a default is the determination of damages. . . . A plaintiff ordinarily is entitled to at least nominal damages following an entry of default against a defendant in a legal action. . . .

"In an action at law, the rule is that the entry of a default operates as a confession by the defaulted defendant of the truth of the material facts alleged in the complaint which are essential to entitle the plaintiff to some of the relief prayed. It is not the equivalent of an admission of all of the facts pleaded. The limit of its effect is to preclude the defaulted defendant from making any further defense and to permit the entry of a judgment against him on the theory that he has admitted such of the facts alleged in the complaint as are essential to such a judgment. It does not follow that the plaintiff

to notify the jury that the defendants were defaulted as a disciplinary sanction. We decline to review this claim, as it is (1) improperly raised for the first time in the defendants' reply brief or (2) inadequately briefed, even if cognizably raised in the defendants' principal appellate brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023); *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915, cert. denied, 338 Conn. 911, 259 A.3d 654 (2021); see also footnote 26 of this opinion.

---

Lafferty *v.* Jones

---

is entitled to a judgment for the full amount of the relief claimed. The plaintiff must still prove how much of the judgment prayed for in the complaint he is entitled to receive."[34] (Emphasis omitted; internal quotation marks omitted.) *Whitaker* v. *Taylor*, 99 Conn. App. 719, 725–26, 916 A.2d 834 (2007).

As these legal principles elucidate, after the court had defaulted the defendants, the plaintiffs were not required to demonstrate that the defendants' conduct caused their harm. Instead, following the defendants' default, the only burden carried by the plaintiffs was to prove the amount of their damages. See *Murray* v. *Taylor*, 65 Conn. App. 300, 335, 782 A.2d 702 (This court, in reversing the trial court's grant of the defaulted defendant's motion to set aside the verdict following the hearing in damages, explained that "[t]he [trial] court determined that there was no evidence from which the jury reasonably could have found that the plaintiff's damages were proximately caused by the conduct alleged and ruled against the plaintiff on that basis. Yet, in an action at law, as here, the liability of a defaulted defendant is established and the plaintiff's burden at a hearing in damages is limited to proving

---

[34] We note that, "[a]fter a default, a defendant may still contest liability. Practice Book §§ 17-34, 17-35 and 17-37 delineate a defendant's right to contest liability in a hearing in damages after default. Unless the defendant provides the plaintiff written notice of any defenses, the defendant is foreclosed from contesting liability. . . . If written notice is furnished to the plaintiff, the defendant may offer evidence contradicting any allegation of the complaint and may challenge the right of the plaintiff to maintain the action or prove any matter of defense. . . . This approximates what the defendant would have been able to do if he had filed an answer and special defenses." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Schwartz* v. *Milazzo*, 84 Conn. App. 175, 178–79, 852 A.2d 847, cert. denied, 271 Conn. 942, 861 A.2d 515 (2004). On November 24, 2021, following the entry of the default against them, the defendants filed a notice of defenses, which was stricken by the court on December 24, 2021. The defendants on appeal do not challenge the propriety of the court's order striking the notice of defenses.

006667

that the amount of damages claimed is derived from the injuries suffered and is properly supported by the evidence. . . . We, therefore, cannot agree with the court's conclusion that the plaintiff's claim must fail because he did not provide evidence that [the defaulted defendant's] negligent conduct proximately caused his injuries . . . ." (Citation omitted.)), cert. denied, 258 Conn. 928, 783 A.2d 1029 (2001).[35] Accordingly, the defendants' claim fails.

III

The defendants also claim that the trial court improperly restricted the scope of Jones' testimony at the hearing in damages. We conclude that the defendants have abandoned this claim by failing to brief it adequately.

The following additional procedural history is relevant. On September 6, 2022, the court granted motions in limine filed by the plaintiffs seeking to preclude evidence or argument at the hearing in damages concerning, inter alia, (1) the defendants' "maximum total amount of Sandy Hook coverage or percentage or proportion of Sandy Hook coverage" and (2) the court's ruling defaulting the defendants. Additionally, on September 13, 2022, the court granted a motion for sanctions filed by the plaintiffs on the basis of additional discovery misconduct by the defendants. The court sanctioned the defendants by prohibiting them from presenting evidence or argument "that they did not profit from their Sandy Hook coverage."

On September 22, 2022, during the hearing in damages, the plaintiffs called Jones as a witness. Outside

---

[35] The defendants cite the following language in *Murray* to support their claim: " '[E]ven in a hearing in damages . . . a plaintiff must still prove that the damages claimed were caused by the conduct alleged.' " *Murray* v. *Taylor*, supra, 65 Conn. App. 333. The source of that language, however, is the trial court decision that this court reversed on appeal. See id., 332–35, 340. The defendants' reliance on that language, therefore, is untenable.

006668

Lafferty *v.* Jones

of the jury's presence, the court canvassed Jones with regard to the various topics about which (1) counsel were prohibited from asking him and (2) he was precluded from testifying. Jones indicated that he understood which topics his testimony could not address. During the course of Jones' direct examination, the court and counsel engaged in multiple sidebars, and the jury was excused several times, in order to address whether certain questions asked by the plaintiffs' counsel and testimony by Jones were proper in light of the court's orders. The next day, the defendants' counsel informed the court that, for "strategic" reasons, the defendants were forfeiting the right to cross-examine Jones, intending instead to call him as a witness during their case-in-chief. On October 5, 2022, outside of the jury's presence, the defendants' counsel notified the court that Jones had decided not to testify during the defendants' case-in-chief, explaining that Jones was "boycotting [the] proceedings because he [felt] that [he was] on the horns of a trilemma. If he testifie[d] in accord with the court's orders [restricting his testimony], [he would] be committing perjury; if he violate[d] the court orders, [it would be] criminal contempt; if he [took] the fifth [amendment to the United States constitution], he [would get an] adverse inference."

The defendants claim on appeal that the court committed error in restricting the scope of Jones' testimony. The majority of the defendants' briefing of this claim focuses on reciting and commenting on the relevant procedural history, iterating the "trilemma" that Jones purportedly faced, and detailing how Jones would have testified but for the court's orders limiting his testimony. The defendants, however, provide no substantive legal analysis examining the propriety of the court's orders imposing limits on Jones' testimony, such as the court's September 13, 2022 order sanctioning the

006669

---
Lafferty *v.* Jones
---

defendants for additional discovery violations. Accordingly, we conclude that the defendants have abandoned this claim as a result of their failure to adequately brief it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

IV

The defendants next claim that the trial court improperly denied their motion for a remittitur. We disagree.

The following additional procedural history is relevant to our resolution of this claim. The evidentiary portion of the hearing in damages transpired over the course of several weeks, commencing on September 13, 2022, and concluding on October 5, 2022. The following witnesses testified during the plaintiffs' case-in-chief: (1) the plaintiffs; (2) Alissa Parker, a spouse of one of the plaintiffs; (3) Brittany Paz, a Connecticut attorney who served as a corporate representative of Free Speech Systems, LLC; (4) Clinton Watts, an expert in the field of "identifying analytics and analysis around social media, the Internet, and how it influences people's behavior"; and (5) Jones. The court admitted in full numerous exhibits offered by the plaintiffs, including video clips of Jones' broadcasts. The defendants rested without calling any witnesses or offering any exhibits, except for one exhibit that was marked for identification only.

In its verdict, the jury awarded the plaintiffs a total of $965,000,000 in compensatory damages, which was split into two categories for each plaintiff: (1) "defamation/slander" damages, past and future; and (2) emotional distress damages, past and future. The jury did not divide the $965,000,000 amount evenly among the plaintiffs; rather, other than two plaintiffs who were each awarded $57,600,000, each plaintiff was awarded a distinct amount of compensatory damages.

In moving for a remittitur, the defendants asserted that the jury's verdict was "exorbitant, shock[ed] the

sense of justice and was influenced by partiality and prejudice." The defendants argued that (1) the plaintiffs failed to submit evidence to aid the jury in calculating compensatory damages, such as medical evidence or expert testimony on the extent of their emotional distress, such that the jury's verdict was predicated on speculation and was motivated by prejudice and passion, (2) the jury, in essence, awarded the plaintiffs punitive damages rather than compensatory damages, and (3) the defendants' right to due process was violated as a result of the plaintiffs' failure to submit evidence estimating their damages. The plaintiffs filed a memorandum of law in opposition to the motion for a remittitur, refuting the defendants' arguments.

In denying the defendants' motion for a remittitur, the court stated: "The defendants take the position, in a conclusory manner unsupported by any evidence or case law, that the verdict was 'exorbitant' and the result of 'passion and prejudice.' They argue—again, unsupported by any law—that due process requires that the plaintiffs are responsible for establishing what they think would make them whole—that is, that the plaintiffs should have been required to offer evidence as to the amount they sought in compensatory damages. As the plaintiffs point out, the defendants cite no transcript, exhibits, or case law to even begin to carry their burden of showing manifest injustice.[36] Here, the overwhelming evidence of the plaintiffs' injuries and damages, in conjunction with the court's instructions on the law, which the jury is presumed to have followed, clearly support[s] the [verdict] rendered by the jury. The size of the [verdict], while substantial, does not so shock the sense of justice as to compel the conclusion

---

[36] In footnotes, the court (1) observed that, in contrast to the defendants' "conclusory motion," the plaintiffs "in their objection painstakingly and accurately highlight[ed] the evidence submitted" and (2) iterated that it was not obligated to consider inadequately briefed claims.

Lafferty *v.* Jones

that the jury was influenced by partiality, prejudice, mistake or corruption, but instead falls within the necessarily uncertain limits of just damages to be determined by the jury. This jury discharged its obligations conscientiously, dutifully, and according to the court's instructions on the law to be applied. This jury was a careful jury whose behavior was beyond reproach; [its] attention to the evidence and instructions from the court is evident from the specific questions [it] asked regarding both the charge and the evidence.[37] In reviewing the evidence in a light most favorable to sustaining the [verdict], the court finds that the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform[s] to spread lies to a massive audience clearly supports the [verdict], and that the [verdict was] within the limits of a fair and just award of damages." (Footnotes added; footnotes omitted.)

Before addressing the defendants' claim, we set forth the following applicable legal principles and standard of review. General Statutes § 52-216a provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

"[I]n determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test [that] must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages

---

[37] The jury submitted several notes during its deliberations.

or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has awarded damages that] are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. . . . Accordingly, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances . . . and [when] the court can articulate very clear, definite and satisfactory reasons . . . for such interference." (Citation omitted; internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, 331 Conn. 777, 782–83, 208 A.3d 256 (2019). The inquiry into whether a damages award shocks the sense of justice "is not intended to detect the kind of shock that arises from a moral outrage but, instead, refers to the distress that may be felt when the requirement of reasonableness has been abandoned in a setting in which reason is a necessary element of any legitimate outcome. If the verdict cannot be explained rationally, then the trial court may presume that it is tainted by improper considerations." *Maldonado* v. *Flannery*, 343 Conn. 150, 166–67, 272 A.3d 1089 (2022).

"[O]ur review of the trial court's decision [to grant or deny remittitur] requires careful balancing. . . . [T]he decision whether to reduce a jury verdict because it is excessive as a matter of law . . . rests solely within the discretion of the trial court. . . . [T]he same general principles apply to a trial court's decision to order a remittitur. [Consequently], the proper standard of review . . . is that of an abuse of discretion. . . . [T]he ruling of the trial court . . . is entitled to great weight and every reasonable presumption should be

given in favor of its correctness. . . . The chief ratio-
nale that has been articulated in support of this deferen-
tial standard of review is that the trial court, having
observed the trial and evaluated the testimony first-
hand, is better positioned than a reviewing court to
assess both the aptness of the award and whether the
jury may have been motivated by improper sympathy,
partiality, or prejudice."[38] (Citations omitted; internal
quotation marks omitted.) *Ashmore* v. *Hartford Hospi-
tal*, supra, 331 Conn. 783.

"[A]lthough the trial court has a broad legal discretion
in this area, it is not without its limits. . . . Litigants
have a constitutional right to have factual issues
resolved by the jury. . . . This right embraces the
determination of damages when there is room for a
reasonable difference of opinion among fair-minded
persons as to the amount that should be awarded. . . .
Furthermore, [t]he size of the verdict alone does not
determine whether it is excessive. . . . Thus, [i]n rul-
ing on the motion for remittitur, the trial court [is]
obliged to view the evidence in the light most favorable
to the plaintiff in determining whether the verdict
returned [is] reasonably supported thereby. . . . A
conclusion that the jury exercised merely poor judg-
ment is an insufficient basis for ordering a remittitur.
. . . A generous award of noneconomic damages
should be sustained if it does not shock the sense of
justice. . . . The fact that the jury returns a verdict in
excess of what the trial judge would have awarded does
not alone establish that the verdict was excessive. . . .
[T]he court should not act as the seventh juror with
absolute veto power. Whether the court would have

---

[38] The defendants assert that we should exercise plenary review over their
claim because the jury's verdict "shocks the sense of justice" in violation
of their due process rights. The defendants provide no legal authority in
support of this assertion. We, instead, apply the well settled standard of
review and examine the court's decision for an abuse of discretion.

Lafferty *v.* Jones

reached a different [result] is not in itself decisive. . . .
The court's proper function is to determine whether
the evidence, reviewed in a light most favorable to the
prevailing party, reasonably supports the jury's verdict.
. . . In determining whether the court abused its dis-
cretion, therefore, we must examine the evidential basis
of the verdict itself . . . . [T]he court's action cannot
be reviewed in a vacuum. The evidential underpinnings
of the verdict itself must be examined." (Internal quota-
tion marks omitted.) *Gois* v. *Asaro*, 150 Conn. App. 442,
457–58, 91 A.3d 513 (2014).

Moreover, "[p]roper compensation for noneconomic
damages cannot be computed by a mathematical for-
mula, and there is no precise rule for the assessment
of damages. . . . The plaintiff need not prove damages
with mathematical exactitude; rather, the plaintiff must
provide sufficient evidence for the trier to make a fair
and reasonable estimate." (Internal quotation marks
omitted.) Id., 457; see also *Commission on Human
Rights & Opportunities* v. *Cantillon*, 347 Conn. 58,
68–69, 295 A.3d 919 (2023) ("Noneconomic damages,
such as emotional distress, pain and suffering, are, at
best, rather indefinite and speculative in nature. . . .
For more than fifty years, this court has rejected the
idea that any specific yardstick can be applied to cabin
the discretion of the trier of fact when calculating a
fair and appropriate award of noneconomic damages."
(Citation omitted; internal quotation marks omitted.)).

The defendants assert that a remittitur of the jury's
verdict was necessary because the plaintiffs failed to
submit sufficient evidence to establish their damages,
such as medical evidence or expert testimony concern-
ing their emotional distress, leaving the jury without
a means to determine damages other than relying on
passion, prejudice, and speculation. The defendants
maintain that, rather than prove their damages, the
plaintiffs "focus[ed] . . . on arousing sympathy,

Lafferty *v.* Jones

directing anger, and anchoring a large number before the jury[39] with the hope that [the] jurors would do what they did in this case—award a fortune." (Footnote added.) We disagree.[40]

Our review of the record reveals that there was sufficient evidence to support the $965,000,000 in compensatory damages awarded by the jury. All of the plaintiffs

---

[39] The defendants reference the plaintiffs' closing argument, during which the plaintiffs' counsel, in addressing damages for defamation and slander, proposed that the jury consider (1) picking a number representing a reasonable amount to award to one individual, assuming that a lie about that individual had been told to one person, and (2) multiplying that number first by 550 million, which, according to testimony elicited from Watts, represented the minimum audience that the defendants' lies about Sandy Hook reached between 2012 and 2018, and then by fifteen, or the number of plaintiffs in the underlying consolidated actions.

[40] The defendants raise two additional assertions that we discuss briefly. First, the defendants contend that, to comport with due process, the plaintiffs were required to present evidence that estimated their damages so as to provide "some notice as to the magnitude of [the] harm" suffered. As before the trial court, the defendants have failed to provide any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Moreover, we iterate our Supreme Court's recent statement that "[n]oneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, [our Supreme Court] has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 347 Conn. 68–69. We also observe that, under Connecticut law, in civil actions seeking the recovery of damages resulting from personal injury, counsel is entitled, but not required, to present argument on the amount of past and future noneconomic damages. See General Statutes § 52-216b (a) ("[i]n any civil action to recover damages resulting from personal injury or wrongful death, counsel for any party to the action shall be entitled to specifically articulate to the trier of fact during closing arguments, in lump sums or by mathematical formulae, the amount of past and future economic and noneconomic damages claimed to be recoverable"); see also Practice Book § 16-19 ("In any action seeking damages for injury to the person, the amount demanded in the complaint shall not be disclosed to the jury. In the event that the jury shall return a verdict which exceeds the amount demanded, the judicial authority shall reduce the award to, and render judgment in, the amount demanded. Counsel for any party to the action may

006676

Lafferty *v.* Jones

testified that, in the aftermath of the Sandy Hook massacre, they endured traumatic threats and harassment, conveyed, inter alia, through social media, by mail, or in person, stemming from the lies, as propagated by the defendants, that the Sandy Hook massacre was a hoax. Examples of such threats and harassment included death threats, claims that the plaintiffs were actors, and accusations that the deceased victims of the Sandy Hook massacre were not real or were still alive. Additionally, all of the plaintiffs testified to the mental anguish and emotional harm that they suffered as a result of the harrowing threats and harassment they experienced.[41] The extent of the plaintiffs' damages

---

articulate to the jury during closing argument a lump sum or mathematical formula as to damages claimed to be recoverable.").

Second, the defendants assert that the jury awarded the plaintiffs punitive, rather than compensatory, damages. The record does not support this assertion. Our review of the court's jury charge reflects that the court instructed the jury that its task was to determine compensatory damages, and the court expressly instructed the jury that, "[u]nder the rule [of] compensatory damages, the purpose of an award of damages is not to punish or penalize the defendants for their wrongdoing but to compensate the plaintiffs for the resulting harms and losses." Moreover, the court separately instructed the jury that (1) the plaintiffs were seeking punitive damages in the form of attorney's fees and costs, and (2) the jury was to determine whether punitive damages were to be awarded, with the court to determine the amount thereof if awarded. In a section of the verdict form titled "Compensatory Damages," the jury awarded the plaintiffs a total of $965,000,000 in damages, comprising past and future "defamation/slander" and emotional distress damages. In a separate section of the verdict form, the jury determined that the plaintiffs were entitled to attorney's fees and costs. The defendants do not challenge the propriety of the jury instructions, and, "in the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that the jury followed them." *Audibert* v. *Halle*, 198 Conn. App. 472, 482, 233 A.3d 1237 (2020). Thus, we reject the defendants' contention that the $965,000,000 awarded by the jury to the plaintiffs constituted punitive, rather than compensatory, damages.

[41] Insofar as the defendants argue that the plaintiffs were required to produce medical or expert testimony to corroborate their testimony concerning their emotional distress, the defendants provide no legal support for this assertion. Cf. *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 707 n.25, 41 A.3d 1013 (2012) (rejecting defendant's argument that plaintiff's testimony regarding emotional distress was insufficient without corroboration by medical or expert testimony).

006677

Lafferty *v.* Jones

was established further by the testimony of Watts, the plaintiffs' social media expert, who testified that, on the basis of data that he reviewed from three social media platforms, namely, YouTube, Facebook, and Twitter, the defendants' lies about the Sandy Hook massacre reached a minimum audience of 550 million people between 2012 and 2018.

In sum, we agree with the court that the evidence supported the jury's verdict and, although substantial, the verdict did not "so [shock] the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, supra, 331 Conn. 782. Accordingly, we conclude that the court did not abuse its discretion in denying the defendants' motion for a remittitur.

V

The defendants' final claim is that the trial court improperly concluded that the plaintiffs asserted a legally viable CUTPA claim. For the reasons that follow, we agree.

We begin with a brief overview of CUTPA. "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . To give effect to its provisions, [General Statutes] § 42-110g (a)[42] of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment

_____

[42] General Statutes § 42-110g (a) provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . ."

Lafferty *v.* Jones

of a method, act or practice prohibited by [General Statutes §] 42-110b . . . ." (Footnote added; internal quotation marks omitted.) *Cenatiempo* v. *Bank of America, N.A.*, 333 Conn. 769, 788, 219 A.3d 767 (2019). Section 42-110b (a), in turn, provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 42-110a (4) defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."[43]

The following additional procedural history is relevant to our resolution of this claim. To support their CUTPA claim in their original complaint, in addition to incorporating the allegations of the other claims that they asserted, the plaintiffs alleged, inter alia, that (1) the defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit,"[44] (2) the defendants engaged in a "campaign

---

[43] CUTPA "refers to 'trade or commerce' in the substantive provision, § 42-110b (a), but contains a definition of ' "trade" ' and ' "commerce" ' in the definitions provision, § 42-110a (4). The definition seems to equate the disjunctive with the conjunctive relationship of the two terms and interpret the two terms as having a single meaning or a combined inclusive meaning." R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 n.2.

[44] The plaintiffs further alleged, for instance, that, "[o]nce he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In [Jones'] [I]nternet based and broadcast radio shows, the . . . defendants hawk 'open currency' precious metals, prepackaged food and dietary supplements, 'male enhancement' elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 'lower receivers' (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle). . . . [T]he . . . defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager

006679

of lies, abuse, and harassment, [which constituted] a deceptive practice and offended public policy," (3) the defendants' "reprehensible conduct caused substantial injury to the plaintiffs and other consumers that [was] not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided," (4) the defendants' "conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury," and (5) the defendants "broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false and with reckless disregard as to whether or not they were true."[45]

On October 9, 2020, the Jones defendants filed a motion to strike, asserting in relevant part that the plaintiffs' CUTPA claim was insufficiently pleaded. On April 29, 2021, the plaintiffs filed an objection, and, on June 4, 2021, the Jones defendants filed a reply brief. On November 18, 2021, the court denied the motion to strike. With respect to the plaintiffs' CUTPA claim, the court determined that "[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful to formulate the underlying basis of a CUTPA cause of action. . . . As the court is not striking the plaintiffs' defamation claim, the plaintiffs' [original] complaint sets forth allegations of violations of public policy or otherwise immoral, unethical, oppressive or unscrupulous conduct such that the plaintiffs allege a legally sufficient CUTPA cause of action." (Citations omitted.) The court further determined that the plaintiffs had standing to maintain their CUTPA claim, stating that

to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate[s] those listeners to buy their products." (Footnote omitted.)

[45] The allegations in support of the plaintiffs' CUTPA claim were substantively identical in the plaintiffs' respective original complaints, as well as in their September, 2022 amended complaint.

006680

---

Lafferty *v.* Jones

---

"the plaintiffs allege that the [Jones] defendants 'broadcast . . . outrageous, cruel and malicious lies about the plaintiffs' and that '[t]hese acts of the [Jones] defendants resulted in damage to the plaintiffs.' Therefore, the plaintiffs have set forth a colorable claim of direct injury such that they have standing to maintain their CUTPA cause of action."

On October 5, 2022, after the plaintiffs had rested their case-in-chief at the hearing in damages, the defendants' counsel orally moved for a directed verdict and/or to dismiss the plaintiffs' CUTPA claim.[46] The defendants' counsel argued in relevant part that the plaintiffs were asserting a "novel application" of CUTPA because "there is no representation whatsoever that the plaintiffs were harmed in any respect by . . . Jones' commercial activities with respect to the sale of dietary supplements. . . . There is no evidence that anyone was harmed by his commercial activity. . . . [N]othing in [his] speech, or the consequences of that speech, addresses what CUTPA is intended to address . . . and that is whether consumers were harmed by . . . the commercial activity [affecting] trade or commerce. . . . [W]hat we have here is a novel attempt to use CUTPA to silence unpopular speech. . . . So, we think that CUTPA is being used for inappropriate grounds and that the plaintiffs lack standing to bring the action because they cannot establish that they were harmed by . . . Jones' commercial activity. . . . [T]here is no case . . . that supports what the plaintiffs intend to do in this case, and that is [to] use . . . a statute that is designed to protect consumers against unscrupulous trade and commercial practices to attack speech. . . . [N]othing in our law supports an application of CUTPA on the fact[s] as pled and proven in this case." In response, the plaintiffs' counsel argued in relevant part:

---

[46] On October 6, 2022, the defendants filed a written version of their oral motion.

006681

"With regard to the idea that the CUTPA claim is only about statements, it's not. What it describes is a commercial course of conduct that is built on targeting and victimizing these families by lying about them. So, certainly lies are in the mix, but what the court heard was not just the occasional lie, it's the use of lies to sell products to fuel a business. . . . There is a business plan to hurt these families and to sell things by hurting them. And that has to be . . . remediable under CUTPA . . . ." In rebuttal, the defendants' counsel argued that there was no precedent providing that CUTPA applies when (1) "a person engages in extreme comments and relies on the sale of products to produce that platform" and (2) there is no evidence of harm stemming from the products sold. The court rejected the defendants' claims without additional comment.

Subsequently, in their motion to set aside the jury's verdict, the defendants, in essence, reasserted their prior contention that the plaintiffs' CUTPA claim was legally insufficient. In denying that motion, the court determined in relevant part that "CUTPA serves to deter predatory commercial conduct such as [the conduct alleged by the plaintiffs]. This court, in ruling on the defendants' motion to strike, already determined that '[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful conduct to formulate the basis of a CUTPA cause of action.' The [verdict] rendered by [the] jury [is] not against the law or the evidence."[47]

We construe the crux of the defendants' claim on appeal to be that the conduct at issue alleged by the plaintiffs and admitted by operation of the defendants' default, namely, the defendants' dissemination of lies

---

[47] The defendants raised additional claims directed to the plaintiffs' CUTPA claim, including that the plaintiffs failed to plead the ascertainable loss element of a CUTPA claim. The court rejected these claims, and the defendants do not pursue these issues on appeal.

Lafferty *v.* Jones

about the Sandy Hook massacre, was insufficient to support a viable CUTPA claim because their actions were not performed "in the conduct of any trade or commerce." General Statutes § 42-110b (a). The defendants posit that no CUTPA claim arises here when (1) they did not lie about or unscrupulously advertise the products that they sold and (2) their actions led to *indirect* commercial gains through product sales. In short, the defendants contend that they engaged in non-commercial speech outside of the scope of CUTPA. The plaintiffs respond that, "[w]hen using lies about [the] plaintiffs to sell supplements, [the defendants were] engaged in 'unfair' and 'deceptive' acts and practices 'in the conduct of' [their] 'trade or commerce.' " We conclude that, as a matter of law, the acts in which the defendants engaged were not "in the conduct of any trade or commerce" as required pursuant to CUTPA. See General Statutes § 42-110b (a).

"The interpretation of pleadings is an issue of law. . . . We conduct a plenary review of the pleadings to determine whether they are sufficient to establish a cause of action upon default." (Citation omitted; internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, 149 Conn. App. 267, 276, 89 A.3d 373 (2014). Moreover, "[w]hether a defendant is subject to CUTPA is a question of law that is subject to plenary review." *NRT New England, LLC* v. *Longo*, 207 Conn. App. 588, 610–11, 263 A.3d 870, cert. denied, 340 Conn. 906, 263 A.3d 821 (2021).

Before turning to the merits of the defendants' claim, we note that the default entered against the defendants does not limit our review of this claim. "An appellate court . . . may examine the allegations of a complaint to ascertain whether they are sufficient on their face to establish a valid claim for the relief requested. . . . Although the failure of a party to deny the material allegations of a pleading operates so as to impliedly

006683

Lafferty *v.* Jones

admit the allegations, a default does not automatically trigger judgment for, or the relief requested by, the pleader. The pleader is entitled to an entry of judgment or a grant of relief as a function of the nonresponsive party's default and the attendant implied admission only when the allegations in the well pleaded filing are sufficient on their face to make out a claim for judgment or relief. . . . While an admission carries with it all reasonable implications of fact and legal conclusions . . . the admission cannot traverse beyond the bounds of the underlying pleading and admit allegations not made by the pleader; the pleading is, unless leave is granted to modify, the ceiling." (Internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, supra, 149 Conn. App. 274–75. "As such, while a default admits the material allegations of the underlying pleading, the question as to whether the default requires judgment in favor of the pleader is to be determined by reference to the sufficiency of the pleading itself." *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 737, 830 A.2d 228 (2003). "Put another way, in both equitable and legal actions, the plaintiff must establish his right to relief to the court's satisfaction, even though some issues may have been laid at rest by the default." (Internal quotation marks omitted.) *Moran* v. *Morneau*, 140 Conn. App. 219, 226, 57 A.3d 872 (2013); see also id., 225 ("[a] default may settle many issues, but it does not operate to insulate a mistaken legal proposition from judicial review").

For CUTPA to apply, there must be an unfair or deceptive act or practice committed "in the conduct of any trade or commerce." General Statutes § 42-110b (a); see also *Cenatiempo* v. *Bank of America, N.A.*, supra, 333 Conn. 789 ("[t]o successfully state a claim for a CUTPA violation, the plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce"); *Pellet* v. *Keller Williams Realty Corp.*,

Lafferty *v.* Jones

177 Conn. App. 42, 62, 172 A.3d 283 (2017) ("[t]he essential elements to pleading a cause of action under CUTPA are: (1) the defendant committed an unfair or deceptive act or practice; (2) *the act complained of was performed in the conduct of trade or commerce*; and (3) the prohibited act was the proximate cause of harm to the plaintiff" (emphasis added)). CUTPA defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4).

"Despite th[e] broad language [of § 42-110a (4)], the definition of trade and commerce is not unlimited and has been used to restrict the application of CUTPA." *Stearns & Wheeler, LLC* v. *Kowalsky Bros., Inc.*, 289 Conn. 1, 11 n.13, 955 A.2d 538 (2008); see also R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 ("[b]ecause CUTPA applies only to acts 'in the conduct of any trade or commerce,' there is a significant limitation on the reach of [CUTPA]" (footnote omitted)); see, e.g., *Sempey* v. *Stamford Hospital*, 194 Conn. App. 505, 518, 221 A.3d 839 (2019) (trial court properly struck CUTPA count predicated on allegations that former employer made false statements to State of Connecticut Unemployment Commission regarding former employee's reliability and integrity because, inter alia, employee failed to allege that employer committed any acts in " 'conduct of any trade or commerce' ").

Exercising our plenary review, we conclude that the facts alleged by the plaintiffs and admitted by the defendants are legally insufficient to satisfy the "trade or commerce" prong of CUTPA. As we have explained, the conduct forming the basis of the plaintiffs' CUTPA

006685

---

Lafferty *v.* Jones

---

claim was the defendants' propagation of lies that the Sandy Hook massacre was a hoax. Applying the statutory definition of " '[t]rade' and 'commerce' " set forth in § 42-110a (4) (i.e., "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state"), we cannot conclude that the defendants violated CUTPA in disseminating their lies about the Sandy Hook massacre. That the defendants' speech was motivated by a desire to generate profit through sales of products that the defendants marketed is not adequate to satisfy the "trade or commerce" prong of CUTPA. Indeed, nothing in the defendants' speech, in and of itself, concerning the Sandy Hook massacre made any mention of their products.

In their respective appellate briefs, the plaintiffs and the defendants address our Supreme Court's decision in *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019). In *Soto*, several plaintiffs, acting as the administrators of the estates of nine of the victims of the Sandy Hook massacre; id., 65, 66 n.2; commenced an action against several defendants who were alleged to have manufactured, distributed, and sold (to Lanza's mother) the weapon used by Lanza at Sandy Hook—a Bushmaster XM15-E2S semiautomatic rifle. Id., 65–66. The plaintiffs asserted a number of legal theories seeking to hold the defendants liable in part for the Sandy Hook massacre, most of which our Supreme Court determined to be precluded by Connecticut law and/or the Protection of Lawful Commerce in Arms Act (PLCAA), Pub. L. No. 109-92, 119 Stat. 2095 (2005), codified at 15 U.S.C. §§ 7901 through 7903 (2012). Id., 65.

Lafferty *v.* Jones

Our Supreme Court concluded, however, that the plaintiffs "offered one narrow legal theory" that was recognized pursuant to Connecticut law and not precluded by PLCAA. Id. Specifically, the plaintiffs alleged that "the defendants violated CUTPA[48] by advertising and marketing the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner that promoted illegal offensive use of the rifle" and "that such promotional tactics were causally related to some or all of the injuries that were inflicted during the Sandy Hook massacre." (Footnote added.) Id., 86–87. The trial court struck this CUTPA claim, along with a distinct claim by the plaintiffs alleging that the sale of the XM15-E2S to the civilian market, ipso facto, constituted an unfair trade practice, on the ground that the plaintiffs lacked standing stemming from their status as "third-party victims who did not have a direct consumer, commercial, or competitor relationship . . . with the defendants." Id., 88. Our Supreme Court determined that the trial court erred in striking the plaintiffs' CUTPA claims, reasoning: "Because the principal evils associated with unscrupulous and illegal advertising are not ones that necessarily arise from or infect the relationship between an advertiser and its customers, competitors, or business associates, we hold that a party directly injured by conduct resulting from such advertising can bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant." Id. Our Supreme Court further clarified that it did not "need [to] decide today whether there are other contexts or situations in which parties who do not share a consumer, commercial, or competitor relationship with an alleged wrongdoer may be barred, for prudential or policy reasons, from bringing a CUTPA action. What is

---

[48] The plaintiffs in *Soto* brought their claims pursuant to Connecticut's wrongful death statute, General Statutes § 52-555, predicated in part on alleged CUTPA violations. *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 67.

Lafferty *v.* Jones

clear is that none of the rationales that underlie the standing doctrine, either generally or in the specific context of unfair trade practice litigation, supports the denial of standing to the plaintiffs in this case." Id., 96. Thus, the court held that the plaintiffs had standing with respect to their "narrow legal theory" under CUTPA because they alleged direct injuries from conduct resulting from wrongful advertising. Id., 65, 99–100.

The allegations underlying the CUTPA claim deemed viable in *Soto* are, however, materially distinguishable from the allegations in the underlying consolidated actions and do not lend the plaintiffs support with respect to their allegation that the defendants acted "in the conduct of any trade or commerce" for purposes of CUTPA. As in *Soto*, the plaintiffs in this case did not allege that they were consumers, competitors, or otherwise in a business or commercial relationship with the defendants. Unlike the plaintiffs in *Soto*, however, the plaintiffs in this case did not allege that they were "directly injured by conduct resulting from" the defendants' advertising or sale of the defendants' products, such that they could "bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant[s]." *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 88. Thus, notwithstanding *Soto*'s elimination of the commercial relationship test, the plaintiffs did not allege direct injury from the defendants' *advertising* or *sale* of the defendants' products and, thus, did not fall within the expansion of CUTPA liability established in *Soto*. Rather, they alleged injuries from the defendants' *false speech* about the Sandy Hook massacre—speech that itself was silent with regard to the defendants' products. Stated differently, the plaintiffs did not allege direct injury from commercial speech relating to the advertising, marketing, or sale of goods, as in *Soto*. To extend CUTPA's reach to provide a remedy (in addition to the torts of

006688

---
Lafferty *v.* Jones
---

invasion of privacy by false light, defamation, defamation per se, and intentional infliction of emotional distress) for content of speech unrelated to the advertising, marketing, or sale of products is simply a bridge too far.

In sum, we conclude that the plaintiffs failed to assert a legally viable CUTPA claim. As a result, the judgments rendered with respect to the plaintiffs' CUTPA claim must be reversed and the attendant award entered pursuant to CUTPA, namely, the $150,000,000 in punitive damages awarded by the court, must be vacated.

The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.

---

006689

# EXHIBIT 6

006690

STATE OF CONNECTICUT
**APPELLATE COURT**

Date: Hartford, December 10, 2024

*To the Chief Clerk of the Appellate Court.*
The Appellate Court has decided the following case:

ERICA LAFFERTY ET AL.
*v.*
ALEX EMRIC JONES ET AL.

*Opinion by Moll, J.*

WILLIAM SHERLACH
*v.*
ALEX JONES ET AL.

WILLIAM SHERLACH ET AL.
*v.*
ALEX EMRIC JONES ET AL.

Docket Nos. AC 46131 /AC 46132 /AC 46133
Trial Court Docket Nos. UWYCV186046436S /UWYCV186046437S /UWYCV186046438S

The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

Chief Judge

Rescript

006691

# EXHIBITS 7-8

006692

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

### CORRECTED[1] ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

_____/s/_____
Carl D. Cicchetti
Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S, UWYCV186046437S, UWYCV186046438S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

---

[1] Corrected order issued to include all three trial court docket numbers.

006693

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

## ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

_____/s/_____
Carl D. Cicchetti
Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

006694

# EXHIBIT B

006695

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

     v.

ALEX EMRIC JONES ET AL.

## CORRECTED[1] ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

                      /s/
                Carl D. Cicchetti
                Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S, UWYCV186046437S, UWYCV186046438S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

---

[1] Corrected order issued to include all three trial court docket numbers.

# SUPREME COURT

# STATE OF CONNECTICUT

PSC-240253

ERICA LAFFERTY ET AL.

v.

ALEX EMRIC JONES ET AL.

## ORDER ON PETITION FOR CERTIFICATION TO APPEAL

The defendants' petition for certification to appeal from the Appellate Court, 229 Conn. App. 487 (AC 46131), is denied.

ECKER, J. would grant the petition for certification.

*Jay M. Wolman and Ben C. Broocks*, in support of the petition.
*Alinor C. Sterling, Christopher M. Mattei, Joshua D. Koskoff, and Matthew S. Blumenthal* in opposition.

Decided April 8, 2025

By the Court,

_____/s/_____
Carl D. Cicchetti
Chief Clerk

Notice Sent: April 8, 2025
Petition Filed: January 21, 2025
Clerk, Superior Court, UWYCV186046436S
Hon. Barbara N. Bellis
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

006697

# EXHIBIT C

006698

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 19, 2023

Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 22-33553** |
| ALEXANDER E. JONES, | § | |
| | § | **CHAPTER 11** |
| Debtor. | § | |
| | § | |
| DAVID WHEELER, *et al.*, | § | |
| | § | |
| v. | § | **ADVERSARY NO. 23-03037** |
| | § | |
| ALEXANDER E. JONES, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM DECISION ON CONNECTICUT PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST JONES

Plaintiffs are parents of children murdered in the Sandy Hook Elementary School tragedy and a first responder. Before this bankruptcy case started, the Plaintiffs sued Alexander E. Jones and other defendants in a Connecticut state court. Three years into the litigation, the state court entered a default judgment against Jones based on repeated violations of discovery orders. The default judgment made Jones liable for the defamation and emotional distress claims. And, under Connecticut law, deemed Jones to have admitted all allegations in the Plaintiffs' state court petition. A jury awarded about $1.4 billion in compensatory and punitive damages for defamation, intentional infliction of emotional distress, and the Connecticut Unfair Trade Practices Act claims.

Jones and an entity he owns named Free Speech Systems, LLC filed separate bankruptcy cases in 2022. Free Speech elected to proceed under Subchapter V of the Bankruptcy Code. Jones is in a traditional chapter 11 case, not Subchapter V. This decision involves Jones's case only.

The Bankruptcy Code provides that some debts are excepted from a bankruptcy "discharge" and remain enforceable against the debtor even after a bankruptcy case ends. Plaintiffs started this adversary proceeding seeking an order stating that the debts related to the state court action are excepted from discharge under § 523(a)(6) of the Bankruptcy Code. They also believe that the state court record, including court orders and jury awards, prove that there are no material

1 / 18

006699

issues of disputed fact and that summary judgment is warranted as a matter of law. Jones disagrees.

After careful consideration, and for the reasons explained in detail below, the Court grants summary judgment on all claims, except common-law punitive damages.

## Background

In May 2018, thirteen of the Plaintiffs started the lawsuit captioned *Lafferty, et al. v. Jones, et al.*, UWY-CV-18-6046436-S, in the Judicial District of Fairfield at Bridgeport in Connecticut Superior Court.[1] Then in December 2018 and January 2019, two substantively similar complaints—captioned *Sherlach, et al. v. Jones, et al.*, UWY-CV-18-6046437-S and *Sherlach, et al. v. Jones, et al.*, UWY-CV-18-6046438-S—were consolidated with the *Lafferty* complaint (the "**Connecticut Action**").[2] Plaintiffs alleged the defendants were liable for, among other things, (i) invasion of privacy, (ii) defamation and defamation per se, and (iii) intentional infliction of emotional distress.[3] They also alleged the defendants violated the Connecticut Unfair Trade Practices Act ("**CUTPA**").[4]

In November 2021, the state court entered a default judgment against the defendants for repeated violation of discovery orders.[5] The court stated on the record that the Jones defendants withheld analytics and information that were "critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims."[6] That the "callous disregard of their obligations to fully and fairly comply with discovery and Court orders on its own merits a default against the Jones defendants."[7] And that "the Jones defendants were not just careless" but "their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders" was a "consistent pattern of obstructive conduct."[8]

---

[1] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 1, ECF No. 57-4.

[2] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 2, 3, ECF Nos. 57-5, 57-6.

[3] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶¶ 336–84, 2 at ¶¶ 329–77, and 3 at ¶¶ 416–64, ECF Nos. 57-4, 57-5, 57-6.

[4] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶¶ 385–94, 2 at ¶¶ 378–87, and 3 at ¶¶ 465–74, ECF Nos. 57-4, 57-5, 57-6.

[5] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74, ECF No. 59-24.

[6] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 14:12–15, ECF No. 59-24.

[7] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 14:15–18, ECF No. 59-24.

[8] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 74 at 15:1–4, ECF No. 59-24.

006700

The Connecticut Action proceeded to a jury trial on damages for intentional infliction of emotional distress, defamation/defamation per se, invasion of privacy, and CUTPA claims against Jones and Free Speech.[9]

The state court issued lengthy jury instructions. The court instructed jurors that under applicable law, each defendant was responsible for the other's conduct and the entirety of the harm to the Plaintiffs.[10] Here are some of the jury instructions for defamation and intentional infliction of emotional distress:[11]

| Defamation | Intentional Infliction of Emotional Distress |
|---|---|
| Certain defamatory statements, whether orally or in writing, are considered to be so harmful in and of themselves that the person to whom they relate is entitled to recover general damages . . . | The defendants intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of their conduct. |
| The defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large. | The conduct was extreme and outrageous. The conduct was the cause of emotional distress experienced by the plaintiffs. The emotional distress sustained by the plaintiff was severe. |
| The law conclusively presumes that there is injury to the plaintiff's reputation. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover as general damages for the injury to his or her reputation and for the humiliation and mental suffering caused. | It is established that the defendants inflicted such emotional distress on the plaintiffs. |
| [D]efendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public | The court has determined that the defendants are liable for having invaded the privacy of each plaintiff by placing him or her in a false light before the public by publicizing material about him or her that is false and is such a major misrepresentation of his or her |

---

[9] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 6, 11–12, ECF No. 57-21.

[10] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 6, ECF No. 57-21. Thus, any argument that findings about the defendants' conduct do not apply to Jones individually is wrong.

[11] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 12, 14, 15, 23, ECF No. 57-21.

006701

| to investigate and look into the plaintiffs and to the stop the people supposedly being the Sandy Hook hoax. | character, history, activities or beliefs that a reasonable person in the plaintiff's position would either be expected to take serious offense or be justified in feeling offended and aggrieved. |
|---|---|

The state court also instructed the jury it could award common law punitive damages if the defendants' actions were willful, wanton, or malicious.[12] A "willful and malicious" harm was one inflicted intentionally, and "wanton" was "reckless misconduct."[13]

The state court also determined that the defendants were liable for violating CUTPA because "their business conduct was predicated on damaging the plaintiffs and was immoral, unethical, oppressive, or unscrupulous."[14] The jury charge states that the CUTPA claim would be assessed separately by the state court.[15]

In October 2022, the jury awarded the Plaintiffs a total of $965 million in compensatory damages for defamation and emotional distress.[16] The award consisted of $403.6 million in defamation damages and $561.4 million in emotional distress damages. They also awarded common-law punitive damages in an amount left for the state court to award separately.

The Plaintiffs also moved for an award of punitive damages under CUTPA, which Jones opposed.[17] Under Connecticut law, CUTPA claims are determined by a court, not a jury. In November 2022, the state court issued a memorandum opinion setting the jury's award of common-law punitive damages for attorney's fees at $321.65 million and costs of about $1.5 million and awarding CUTPA punitive damages of $150 million.[18] The court found that the defendants (including Jones) engaged in intentional and malicious conduct certain to harm the Plaintiffs:[19]

---

[12] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23–24, ECF No. 57-21.

[13] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[14] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23, ECF No. 57-21.

[15] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 23, ECF No. 57-21.

[16] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 19, ECF No. 57-22. The emotional distress damages consisted of damages for invasion of privacy and damages "for other emotional distressed suffered." *See* Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 21, ECF No. 57-21.

[17] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 20, ECF No. 57-23.

[18] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 45–46, ECF No. 58-2.

[19] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 43–44, ECF No. 58-2.

006702

The defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience.

The record also establishes that the defendants repeated the conduct and attacks on plaintiffs for nearly a decade, including the trial, wanton, malicious, and heinous conduct that caused harm to the plaintiffs.

This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.[20]

In December 2022, Jones filed his chapter 11 bankruptcy petition.[21] Soon after, this Court entered an agreed order involving Jones, Free Speech, and the Plaintiffs.[22] The agreed order modified the automatic stay to allow the state court to rule on post-trial motions and for any appeals by the defendants to proceed.[23] The Plaintiffs also agreed not to object to an application by Jones and Free Speech to employ their requested appellate counsel.[24] With the automatic stay modified, the state court denied a motion for new trial and Jones appealed the judgments to a Connecticut appellate court.[25]

The Plaintiffs started this adversary proceeding to determine the nondischargeability of the judgment debts against Jones.[26] They seek summary judgment mainly on the theory that the damages opinion, jury verdict, and admitted allegations from the Connecticut Action satisfy the requirements of

---

[20] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 41–44, ECF No. 58-2.

[21] *See* Voluntary Ch. 11 Pet. of Alexander E. Jones, Case No. 22-33553, ECF No. 1.

[22] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[23] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[24] *See* Agreed Order Modifying the Automatic Stay, Case No. 22-33553, ECF No. 58.

[25] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 23, 24, ECF No. 58-3, 58-4.

[26] Brief in Supp. of Mot. for Summ. J. at 1, ECF No. 60.

5 / 18

006703

collateral estoppel on the issue of willful and malicious injury under § 523(a)(6).[27] In the alternative, they believe that the state court record establishes willful and malicious injury.[28]

Jones argues that summary judgment is not appropriate because (i) the issue of "willful and malicious injury" was not essential to the judgment in the Connecticut Action, (ii) federal law does not require federal courts to grant full faith and credit to allegedly unconstitutional state court judgments, (iii) public policy concerns about fairness, quality, and extent of the Connecticut Action outweigh any convenience afforded by the finality of judgment, (iv) collateral estoppel should not be applied when it appears the prior proceeding was skewed with the intent to obtain a non-dischargeable judgment in anticipation of bankruptcy, and (v) the record evidence produced by the Plaintiffs does not independently establish that they are entitled to judgment as a matter of law on a § 523(a)(6) claim.[29]

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction under 28 U.S.C. § 1334. The parties' express and implied consent also provides this Court constitutional authority to enter a final judgment under *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–83 (2015) and *Kingdom Fresh Produce, Inc. v. Stokes Law Off., L.L.P. (In re Delta Produce, L.P.)*, 845 F.3d 609, 617 (5th Cir. 2016).

## Legal Standard

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment, "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 in adversary proceedings. FED. R. BANKR. P. 7056. A movant is entitled to summary judgment by showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A material fact is one that might affect the outcome of the suit under governing law." *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018).

Plaintiffs, as the movants here, bear the burden of proof at trial. So they must show the lack of a genuine issue of disputed fact that entitles them to judgment as a matter of law. If successful, the burden shifts to the nonmovant, Jones, to identify specific record evidence and articulate precisely how the evidence

---

[27] Brief in Supp. of Mot. for Summ. J. at 2–3, ECF No. 60.

[28] Brief in Supp. of Mot. for Summ. J. at 3, ECF No. 60.

[29] Def.'s Resp. to Mot. for Summ. J. at 10–12, ECF No. 61.

6 / 18

006704

purports to defeat summary judgment. *See Matson v. Sanderson Farms, Inc.*, 388 F. Supp. 3d 853, 869 (S.D. Tex. 2019) (citing *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014)). In determining whether summary judgment is appropriate, all inferences are drawn in Jones's favor. *See Harville v. City of Houston, Mississippi,* 945 F.3d 870, 874 (5th Cir. 2019).

<u>Analysis</u>

Interpreting the Bankruptcy Code begins with analyzing the text. *See Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha."); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

## I.    Section 523(a)(6) and Collateral Estoppel

A creditor must prove nondischargeability of a debt by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991). Section 523(a) of the Bankruptcy Code excepts certain debts from discharge against an individual debtor. The Bankruptcy Code defines a "debt" as a "liability on a claim." 11 U.S.C. § 101(12). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed . . . ." § 101(5).

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity. . . ." The Bankruptcy Code does not define "willful" or "malicious." In *Kawaauhau v. Geiger*, the U.S. Supreme Court held that a "willful and malicious injury" means a "deliberate or intentional injury." 523 U.S. 57, 61 (1998). This means that there must be intent to cause the injury, not just the act which leads to the injury. *Id.* at 61–62. In the Fifth Circuit, intent to cause injury exists "where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *In re Shcolnik*, 670 F.3d 624, 629 (5th Cir. 2012) (quoting *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998)). The objective standard requires a court to analyze from a reasonable person's perspective "whether the defendant's actions were substantially certain to cause harm, [and] are such that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the plaintiff." *Chowdary v. Ozcelebi (In re Ozcelebi)*, 640 B.R. 884, 905 (Bankr. S.D. Tex. 2022) (citing *Berry v. Vollbracht (In re Vollbracht)*, 276 Fed. App'x. 360, 361–62 (5th Cir. 2007)). Substantial certainty does not mean absolute certainty, but it must be something more than a high probability. *See Mahadevan v. Bikkina (In re Mahadevan)*, 617 F.

7 / 18

006705

Supp. 3d 654, 660 (S.D. Tex. 2022) (citing *In re D'Amico*, 509 B.R. 550, 561 (S.D. Tex. 2014)).[30]

Because of this intent requirement, debts arising from reckless or negligently inflicted injuries are not excepted under § 523(a)(6). *Geiger*, 523 U.S. at 64. For example, debts related to a debtor's act of intentionally driving a car into a crowded bar and killing a creditor's relatives were found to be based on willful and malicious injuries. *See Mahadevan*, 617 F. Supp. 3d at 660 (citing *Red v. Baum* (*In re Red*), 96 F. App'x 229, 230 (5th Cir. 2004)). But debts related to a debtor's act of illegally selling a rifle to an individual, who years later shot people, were not based on a willful and malicious injury. *See Leyva et al. v. Braziel (In re Braziel)*, 653 B.R. 537, 558 (Bankr. N.D. Tex. 2023). The debtor intended to sell the rifle to the third party. *Id.* at 557. And while the sale itself was an intentional illegal act, it was not an act intended to harm the victims under either an objective or subjective standard. *Id.*

Plaintiffs can invoke collateral estoppel to establish that a debt is nondischargeable. *See Grogan v. Garner,* 498 U.S. 279, 284 n.11 (1991) ("We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)."). Collateral estoppel prevents parties from relitigating issues of fact that were already "determined by a valid and final judgment" in a prior lawsuit in any future lawsuit involving the same parties. *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Federal courts must give full faith and credit to state-court judgments. *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986) ("[U]nder the Full Faith and Credit Act a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give."); *Shimon v. Sewerage & Water Bd. Of New Orleans,* 565 F.3d 195, 199 (5th Cir. 2009) (quoting *Parsons Steel*).

The laws of the state in which the judgments were entered determine whether collateral estoppel applies. *Gober v. Terra + Corp.* (*In re Gober*), 100 F.3d 1195, 1201 (5th Cir. 1996). A Connecticut state court entered the judgment, so the Connecticut rules of issue preclusion apply here. Under Connecticut law, collateral estoppel "prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim." *Lighthouse Landings, Inc. v. Conn. Light & Power Co.*, 15 A.3d 601, 613 (Conn. 2011). Plaintiffs must establish that: "[1] [t]he issue must have been fully and fairly litigated in the first action, [2] it must have been actually decided, and [3] the decision must have been necessary to the judgment." *Wiacek Farms,*

---

[30] The plain meaning of willful and malicious tracks the objective and subjective tests under *Shcolnik* and *Miller*. Willful means "done deliberately: intentional." *Willful*, Merriam-Webster Online Dictionary (https://www.merriam-webster.com/dictionary/willful) (last visited Oct. 17, 2023). And malicious means "having or shown a desire to cause harm to someone" Malicious, Merriam-Webster Online Dictionary (https://www.merriam webster.com/dictionary/malicious) (last visited Oct. 17, 2023).

8 / 18

006706

*LLC v. City of Shelton*, 30 A.3d 27, 32 (Conn. 2011) (quoting *Busconi v. Dighello*, 668 A.2d 716, 723 (Conn. App. Ct. 1995)).

An issue is actually litigated if it was "properly raised in the pleadings or otherwise, submitted for determination, and in fact determined." *See Solon v. Slater*, 287 A.3d 574, 586 (Conn. 2023). Fully and fairly litigated means that the party to be estopped "had an adequate opportunity to litigate the matter in the earlier proceeding." *Custom Pools v. Underwriters Inc.*, No. CV 940135908, 1996 WL 66264, at *2 (Conn. Super. Ct. Jan. 19, 1996); *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993). To be necessary to the judgment, the determination of the issue must have been central to the judgment rendered (i.e., the judgment could not have been rendered without the determination). *See Wiacek Farms*, 30 A.3d at 32. In other words, "an issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered." *Cumberland Farms, Inc. v. Town of Groton*, 808 A.2d 1107, 1116 n.17 (Conn. 2002) (internal citations omitted). It is not enough that a fact could have been determined by the prior court but was not. *World Wrestling Entm't, Inc. v. THQ, Inc.*, No. X05CV065002512S, 2008 WL 4307568, at *6 (Conn. Super. Ct. Aug. 29, 2008) (citing *State v. Aparo*, 614 A.2d 401, 412 (Conn. 1992)).

Connecticut courts also note that there must be an identity of issues between the state court action and the issues to be decided here before collateral estoppel applies. *See, e.g.*, *Peterson v. iCare Mgmt., LLC*, 250 A.3d 720, 729 (Conn. 2021). This requires a court to assess the facts underlying a plaintiff's claim in the first proceeding. *See Solon*, 287 A.3d at 587. A court should determine "what facts were necessarily determined in the first trial, and must then assess whether the [party] is attempting to relitigate those facts in the second proceeding." *Id.* (quoting *Aetna Casualty & Sur. Co. v. Jones*, 596 A.2d 414, 421 (Conn. 1991)). Plaintiffs bear the burden of showing collateral estoppel applies here.

A bankruptcy court does not necessarily need a full state court record to apply collateral estoppel. *See Fielder v. King (In re King)*, 103 F.3d 17, 19 n.1 (5th Cir. 1997). But a state court record devoid of factual findings to support a dischargeability determination is not entitled to summary judgment. *See Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir. 1997) (denying application of collateral estoppel where state court record lacked findings of fact).

## II.  Summary Judgment is Granted on Compensatory Damages

### A.  The issues were "fully and fairly litigated" and "actually decided"

Under Connecticut law, the allegations in a petition are deemed admitted, and the defendant's liability is established if a default judgment is entered against a defendant based on discovery abuse. *Smith v. Snyder*, 839 A.2d 589, 598 (Conn. 2004). "[A] default judgment is a decision on the merits and has the same preclusive

9 / 18

effect as any other judgment decided on its merits, so long as the party who is precluded had an 'adequate opportunity to litigate the matter in the earlier proceeding.'" *Leblanc-Jones v. Massie (In re Massie)*, No. 14-50579, 2018 WL 3218847, at *3 (Bankr. D. Conn. June 29, 2018) (quoting *State v. Ellis*, 497 A.2d 974, 989 n.22 (Conn. 1985)).

As noted above, the fully and fairly litigated prong is satisfied under Connecticut law where there is opportunity to litigate the matter, whether or not the defendant benefits from it. *Custom Pools*, 1996 WL 66264, at *2. Jones had the opportunity to participate in the state court litigation for three years before the default judgment was entered. He then participated in the damages trial and presented evidence on that issue. He also submitted argument before the state court ruled on common-law and CUTPA punitive damages. Thus, finding that the state court default judgment order and the resulting damages awards have the effect of fully and fairly adjudicating the issues decided in connection with the defamation, intentional infliction of emotional distress, and CUTPA claims is consistent the reasoning and holdings in Connecticut cases.

Jones argues that the precise issue of "willful and malicious injury" was not litigated in the Connecticut Action and that he did not have a chance to present certain defenses at trial. Neither argument changes the outcome here. Remember that Connecticut law focuses on the facts underlying the claims to determine identity of issues, and here those facts show identical issues. *See Solon*, 287 A.3d at 587. Federal courts focus on whether a state court made specific findings about an injury to a plaintiff that meets the test for willful and maliciousness under § 523(a)(6), and not the specific label of "willful and malicious." *See, e.g.*, *Mahadevan*, 617 F. Supp. 3d at 660 (analyzing collateral estoppel principles on defamation and intentional infliction of emotional distress claims); *In re Scarbrough*, 516 B.R. 897 (Bankr. W.D. Tex. 2014) (same); *Guion v. Sims (In re Sims)*, 479 B.R. 415, 421 (Bankr. S.D. Tex. 2012) (same).

The Plaintiffs' complaints contain multiple well pleaded allegations about Jones's intent to cause the Plaintiffs harm or substantial certainty that Jones's actions would cause harm, all of which are deemed admitted as a result of the default judgment. They, along with the jury award, also constitute fully and fairly adjudicated issues (and actually decided ones) for purposes of collateral estoppel.

- "Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse."[31]

---

[31] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ‖ 7, 3 at ‖ 7, ECF Nos. 57-4, 57-6.

10 / 18

- "Jones . . . has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence."[32]

- "Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax — and he never has."[33]

- "Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year."[34]

- "As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people."[35]

- "On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."[36]

- "Jones and Infowars purposefully sought to direct their message and spur 'investigation' of the Sandy Hook families."[37]

- "Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners . . ."[38]

---

[32] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 8, 3 at ⁋ 8, ECF Nos. 57-4, 57-6.

[33] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 9, 3 at ⁋ 9, ECF Nos. 57-4, 57-6.

[34] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 11, 3 at ⁋ 11, ECF Nos. 57-4, 57-6.

[35] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 13, 3 at ⁋ 13, ECF Nos. 57-4, 57-6.

[36] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 14, 3 at ⁋ 14, ECF Nos. 57-4, 57-6.

[37] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 83, 3 at ⁋ 89, ECF Nos. 57-4, 57-6.

[38] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ⁋ 97, 3 at ⁋ 103, ECF Nos. 57-4, 57-6.

11 / 18

006709

- "The defendants' outrageous, cruel and malicious conduct was the cause of the plaintiff's distress."[39]

- "The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs. . ."[40]

- "The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[41]

- "The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages."[42]

Jones tries to argue that these issues were not fully and fairly litigated because there was never a trial on liability. But the argument lacks merit because of the legal effect of the default judgment. Jones also claims he was deprived of certain constitutional rights by the state court. This Court cleared the runway for Jones to appeal the Connecticut judgment, including the amount of punitive damages, and nothing in this bankruptcy case affects that appellate right. He may raise complaints about not being permitted the right to argue certain defenses at the damages trial or his constitutional arguments with the appropriate state appellate forum. It is not, however, a basis for this Court to ignore the plain language of the state court's default judgment or the damages awards. A right to appeal the state court's decision aside, the fully and fairly litigated and actually decided prongs are satisfied. *See, e.g.*, *Sims*, 479 B.R. at 421 (citing *Prager v. El Paso Nat. Bank,* 417 F.2d 1111, 1112 (5th Cir. 1969)); *In re Dahlin*, No. 16-36169, 2018 WL 2670501, at *4 (Bankr. S.D. Tex. May 16, 2018) (finding that, under full faith and credit, defendant could not argue against nondischargeability because death penalty sanctions were improperly ordered). The Court rejects Jones's argument that it does not have to give full faith and credit to the state court default judgment order or the resulting damages awards.

---

[39] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 377, 3 at ¶ 457, ECF Nos. 57-4, 57-6.

[40] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 337, 3 at ¶ 417, ECF Nos. 57-4, 57-6.

[41] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 365, 3 at ¶ 445, ECF Nos. 57-4, 57-6.

[42] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Exs. 1 at ¶ 14, 3 at ¶ 433, ECF Nos. 57-4, 57-6.

12 / 18

006710

This Court also agrees with the reasoning in cases like *Herbstein v. Bretman*, 266 B.R. 676, 685 (N.D. Ill. 2001), which held:

> [W]here [a litigant] participated extensively then failed to comply with an express court order issued multiple times at a risk of incurring default, [then] we agree with the Bankruptcy Court . . . that [the litigant] should not now be able to sidestep the collateral estoppel doctrine and litigate an issue in this forum that was forestalled in [another court] due solely to [the litigant's] decisions. [The litigant] is not entitled to a second bite at the apple. The issue underlying the … default judgment were "actually litigated" for purposes of the collateral estoppel doctrine.

### B.    The issues were necessary to the judgment, including the jury award of damages

The findings about Jones's willful and malicious injury to the Plaintiffs' were also necessary to the judgment and the jury award of damages.

A defamatory statement is "a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Hopkins v. O'Connor,* 925 A.2d 1030, 1042 (Conn. 2007). To establish a prima facie case of defamation in Connecticut, the plaintiff must show that the defendant published a defamatory statement, which identified the plaintiff to a third person, and that the plaintiff's reputation suffered because of the statement. *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759, 763–64 (Conn. 2004).

As noted earlier, the jury was instructed, among other things, that "the defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large."[43] The jury was also instructed that the Jones defendants proximately harmed the Plaintiffs by spreading lies about them to their audience and the public by urging people to investigate the Plaintiffs about the alleged "Sandy Hook hoax."[44]

To establish intentional infliction of emotional distress under Connecticut law, a plaintiff must show: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the

---

[43] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 14, ECF No. 57-21.

[44] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 15, ECF No. 57-21.

13 / 18

006711

emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Educ.,* 757 A.2d 1059, 1062 (Conn. 2000) (internal quotation marks omitted) (quoting *Petyan v. Ellis*, 510 A.2d 1337, 1342 (Conn. 1986)).

The jury was instructed, among other things, that the defendants were liable for intentional infliction of emotional distress:

> These four elements thus have been established. One, the defendants intended to inflict emotional distress or the defendants knew or should have known that emotional distress was the likely result of their conduct. Two, that the conduct was extreme and outrageous. Three, that the conduct was the cause of emotional distress experienced by the plaintiff; and four, that the emotional distress sustained by the plaintiff was severe.

Thus, there are specific findings about an objective certainty of harm and a subjective motive to cause harm in connection with the defamation and intentional infliction of emotional distress claims. These are findings about a deliberate and intentional act meant to cause injury, not just a deliberate act that leads to injury. The jury considered damages in a multi-day trial and awarded damages based on these findings.

Nothing in the jury instruction for defamation or intentional infliction of emotional distress contemplates that a lesser standard of intent should apply to Jones's knowledge of the injury. Therefore, the damages for defamation and intentional infliction of emotional distress were necessarily awarded based on the finding that Jones intended to harm the Plaintiffs. On compensatory damages, the jury charge contains specific findings premised on the default judgment—not a broad general charge lacking in detail. This Court focuses on what the jury charge actually says, and not what it *could* say or *could* imply.

This case is like the bankruptcy court decision in *In re Scarbrough*. In *Scarbrough*, state court findings about a debtor's actions supported a finding that the debtor acted with a subjective motive to cause harm, so the debt was nondischargeable under § 523(a)(6). *Scarbrough*, 516 B.R. at 912. The state court findings included, for example, that the debtor damaged another's reputation and failed to turn over evidence for the express purpose of causing that party harm so the debtor could win his case. *Id.* at 905. The defamation jury instruction was that the debtor made statements he "knew were false or which he made with a high degree of awareness that were probably false, to an extent that he in fact had serious doubts as to the truth of the statement(s)." *Id.* at 912. That instruction mirrors the defamation instruction in this case.

14 / 18

The Fifth Circuit Court of Appeals later affirmed the bankruptcy court's holding. *Scarbrough v. Purser (In re Scarbrough)*, 836 F.3d 447, 456 (5th Cir. 2016). The Fifth Circuit held that the jury's finding of damages for defamation independently supported the judgment, was binding, and precluded relitigating that issue in another case. *Id.* Therefore, in Jones's case, the language of the jury instruction confirms that the damages awarded flow from the allegation of intent to harm the Plaintiffs—not allegations of recklessness. *See Caton v. Trudeau (In re Caton)*, 157 F.3d 1026, 1029 (5th Cir. 1998), *as amended on reh'g* (Nov. 3, 1998) (finding that the factual allegations on which liability was based in a state court proceeding showed that the defendant acted with intent to cause injury). Summary judgment on the nondischargeability of the jury awards for compensatory damages is granted.[45]

## III.    Summary Judgment is Granted on CUTPA Punitive Damages

For the reasons explained above, the issue of willful and malicious injury was also fully and fairly (and finally) litigated in relation to the CUTPA punitive damages award. Jones had the opportunity to participate in the state court litigation, and he did so. He also submitted argument about CUTPA punitive damages.

The findings on willful and maliciousness were also necessary to the judgment. These findings were actually litigated and determined. There is no question that the issues to be estopped are identical. The state court issued a 45-page opinion on the CUTPA and common law punitive damages.[46] The court determined that the material allegations in the Plaintiffs' complaints, "which have been established by virtue of the defaults" entitled them to an award of CUTPA punitive damages. On CUTPA punitive damages, the court stated it assessed factors such as (i) the degree of the defendants' relative blameworthiness— whether it was reckless, intentional, or malicious; (ii) whether the defendant's action was taken or omitted to augment profit; (iii) whether the wrongdoing was hard to detect; (iv) whether the injury and compensatory damages were small, providing a low incentive to bring the action; and (v) whether the award will deter the defendant and others from similar conduct.[47]

The court considered the degree of blameworthiness the most important consideration and found that Jones's actions were intentional and malicious, and

---

[45] The ultimate amount of this nondischargeable debt could change if Jones succeeds on his state court appeal.

[46] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 39, ECF No. 58-2.

[47] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 29–30, ECF No. 58-2 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 418 (2003)).

15 / 18

006713

awarded punitive damages based on these findings.[48] The state court did not base any of the CUTPA punitive damages on recklessness:

> The record clearly supports the plaintiffs' argument that *the defendants' conduct was intentional and malicious, and certain to cause harm* by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." . . . This depravity, and cruel, persistent course of conduct by the defendants establishes *the highest degree of reprehensibility and blameworthiness*. . . Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.[49]

These are specific findings about an objective certainty of harm and a subjective motive to cause harm in connection with the defamation and intentional infliction of emotional distress claims. They are not, as Jones argues, superfluous findings about intent related to the Plaintiffs' harm. It is irrelevant that the state court could have awarded damages on reckless acts. What is important is what the court actually did. Here there are findings about a deliberate and intentional act meant to cause injury, not just a deliberate act that leads to injury. The state court also considered the additional factors listed above, but the focus remained on willful and intentional acts, and not on a lesser standard like recklessness.

In sum, the state court made specific findings that went directly to the amount of punitive damages. They were necessary to the judgment. So summary judgment is granted on the debt for CUTPA punitive damages.

## IV. Summary Judgment is Denied on Common-law Punitive Damages

In Connecticut, common-law punitive damages are limited to the expense of litigation (attorneys' fees and costs) less taxable costs. *See, e.g.*, *Bifolck v. Philip Morris, Inc.*, 152 A.3d 1183, 1213 (Conn. 2016). The jury charge instructed that common-law punitive damages could be awarded if the defendants' actions were willful, wanton, or malicious.[50] A willful and malicious harm is based on an intent without just cause or excuse.[51] And "the intentional injury aspect may be satisfied if

---

[48] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 43, ECF No. 58-2.

[49] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 22 at 44–45, ECF No. 58-2.

[50] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[51] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

006714

the resultant harm was the direct and natural consequence of the intended act."[52] But wanton misconduct is defined as "reckless misconduct."[53]

There are bankruptcy cases holding that punitive damages should be found nondischargeable based on findings of willful and malicious injury when the compensatory damages and punitive damages flow from the same conduct. *See, e.g.*, *Macris v. Saxton (In re Saxton)*, No. 10-44412, 2011 WL 2293320, at *8 (Bankr. N.D. Tex. June 8, 2011). In *Gober*, the Fifth Circuit held that "the status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt. When the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable." *Gober*, 100 F.3d at 1208.

It is logical to presume that the findings of willful and malicious injuries based on defamation and intentional infliction of emotional distress were necessary to the award of common-law punitive damages. But unlike the instructions for defamation and intentional infliction of emotional distress, the jury had a right to award common-law punitive damages based on reckless actions *or* actual intent to cause harm. This proves fatal on summary judgment.

Under Fifth Circuit law, recklessness does not meet the standard for willful and malicious injury under § 523(a)(6). *Miller*, 156 F.3d at 603. And there must be intent to cause the injury, not just an act which leads to the injury. *Kawaauhau*, 523 U.S. at 61–62. The record is not expressly clear on whether the damages were solely based on willfulness and maliciousness. Thus, summary judgment is denied on the debt for common-law punitive damages.

## V. Summary Judgment does not Violate Policy or Jones's Constitutional Rights

Finally, Jones argues that the Court should not grant summary judgment because the state court judgment was entered in anticipation of this bankruptcy proceeding. But there is no evidence of manipulation that even remotely warrants serious consideration of this argument based on the record before the Court. This ancillary argument, and related arguments by Jones about his disagreements with the state court default judgment order and damages awards do not change the

---

[52] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

[53] Decl. of Alinor C. Sterling in Supp. of Pls.' Mot. for Summ. J. Ex. 18 at 24, ECF No. 57-21.

17 / 18

outcome.[54] Again, he can make such argument to the appropriate state appellate court.

## Conclusion

For the reasons stated above:

1. Summary judgment is granted on the $965 million debt for compensatory damages awarded in the Connecticut Action for defamation and intentional infliction of emotional distress.

2. Summary judgment is granted on the $150 million debt for CUTPA punitive damages.

3. Summary judgment is denied on the $321.65 million in attorneys' fees and $1,489,555.94 in costs awarded as common law punitive damages.

4. All other objections raised by Jones not specifically addressed above are denied.

Signed: October 19, 2023

Christopher Lopez
United States Bankruptcy Judge

---

[54] Jones also makes several arguments best described as grounds for appeal which this Court declines to address (for example, Jones argues that the CUTPA award was improper based on the allegations in the complaints). Def.'s Resp. to Mot. for Summ. J. at 43, ECF No. 61. These arguments are rejected.

006716

# EXHIBIT D

006717

# Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073

Docket Number: AC46131
Issue Date: 5/13/2025
Sent By: Supreme/Appellate

---

### Order On Motion to Stay Pending Decision by U.S. Supreme Court (P.B. § 71-7) AC 244073

AC46131    ERICA LAFFERTY ET AL. v. ALEX EMRIC JONES ET AL.

Notice Issued: 5/13/2025 9:08:23 AM

**Notice Content:**

**Motion Filed: 4/28/2025**
**Motion Filed By: Alex E Jones**
              **Free Speech Systems, Llc**

**Order Date: 05/13/2025**

**Order: Denied**

By the Court
Notice sent to Counsel of Record

006718

# EXHIBIT E

006719

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, | § | IN THE DISTRICT COURT |
|     Plaintiffs | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
|     Defendants | § | 261st JUDICIAL DISTRICT |

**DECLARATION OF AVI MOSHENBERG**

1. "My name is Avi Moshenberg. I am over the age of twenty-one years and am fully competent to make this Declaration. I have personal knowledge of the facts stated in this Declaration, which are true and correct.

2. "I am an attorney in the law firm of Lawson & Moshenberg PLLC and licensed to practice law in the State of Texas. I am one of the attorneys of record for Neil Heslin and Scarlett Lewis (collectively, the Texas Families or the Judgment Creditors). I am authorized to make this Declaration on behalf of the Judgment Creditors.

3. "Judgment Creditors own judgments against Alexander Emric Jones and Free Speech Systems, LLC (the Judgment Debtors). The last known address of Alexander Emric Jones is: Alexander Emric Jones c/o Shelby A. Jordan, Jordan & Ortiz, P.C., 500 North Shoreline Blvd., Suite 804, Corpus Christi, Texas 78401; Alexander Emric Jones c/o Ben C. Broocks, Broocks Law Firm PLLC, 248 Addie Roy Road, Suite B301, Austin, Texas 78746. The last known address of Free Speech Systems, LLC and the address currently registered with the Texas Secretary of State is: Free Speech Systems, LLC, ATTN: Alex Jones or Authorized Agent, P.O. Box 19549, Austin, Texas 78760. The post office address of the

006720

- 2 -

Judgment Creditors is the Texas Families c/o Avi Moshenberg, 2301 Commerce Street, Houston, Texas 77002.

4. "Judgment Debtors owe $50,043,923.80 under the Judgments rendered before the 261st District Court of Travis County, Docket No. D-1-GN-18-001835 (the Texas Judgments). The Texas Judgments are comprised of two documents: the jury verdict and final judgment. Authenticated copies that are sealed and signed are being filed contemporaneously with this Declaration.

**Oath**

My date of birth is March 16, 1986 and my business address is 2301 Commerce Street, Suite 200, Houston, Texas, 77002, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on July 1, 2025.

_____
Avi Moshenberg

- 2 -

006721

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, Plaintiffs | § § § | IN THE DISTRICT COURT |
| vs. | § § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and FREE SPEECH SYSTEMS, LLC, Defendants | § § § § | 261st JUDICIAL DISTRICT |

### ORDER GRANTING APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTORS ALEXANDER E. JONES AND FREE SPEECH SYSTEMS, LLC

The Court has considered Judgment Creditors' Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC (the Application) and the record properly before it.

**The Court FINDS that** it has jurisdiction over this proceeding and can proceed in granting the relief set forth herein immediately. *See* TEX. CIV. PRAC. & REM. CODE 31.002.

**The Court also FINDS that** the judgment in Cause No. CV-18-6046437 rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut (the Connecticut Families' Judgment) and that the judgment rendered in Cause No. D-1-GN-18-001835 before the 261st Judicial District Court of Travis County, Texas (the Texas Families' Judgment) (collectively, the Judgments, held by, collectively, the Judgment Creditors) are valid, final, and payable. Judgment Debtor Alexander E. Jones and Judgment Debtor Free Speech Systems, LLC (together, the Judgment Debtors and each a Judgment Debtor) owe, jointly and severally, $1,288,139,555.94 under the Connecticut Families' Judgment and $50,043,923.80 under the Texas Families' Judgment. There have been no applicable credits, payments, or offsets.

006722

**The Court also FINDS that** the Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act.

**The Court also FINDS that** Judgment Debtor Alexander E. Jones (also referred to in this Order as Alex E. Jones and Alex Jones) filed for bankruptcy under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) on December 2, 2022 (the Jones Petition Date) in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) pending as case no. 22-33553 (the Jones Bankruptcy Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy. Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 19, 2023 Memorandum Decision granting the Connecticut Families' Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable. Following a hearing on June 14, 2024, the Bankruptcy Court converted the Jones Bankruptcy Case from chapter 11 to chapter 7 and appointed Christopher R. Murray as chapter 7 trustee (the Trustee) for the applicable chapter 7 bankruptcy estate (the Chapter 7 Estate).

**The Court also FINDS that** the Judgments remain unsatisfied; that Judgment Debtors Alexander E. Jones and Free Speech Systems, LLC own property that is not

exempt from attachment, execution, or seizure for the satisfaction of the Judgments; and that Judgment Creditors are entitled to the Court's aid in reaching Judgment Debtors' nonexempt property to satisfy the Judgments.

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

(i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee), and

(ii)    as to Judgment Debtor Alex Jones:

    a.  all non-exempt assets, including assets he may acquire in the future, that are not property of the Chapter 7 Estate;

    b.  any assets of his Chapter 7 Estate that the Trustee expressly abandons; and

    c.  any payments Judgment Debtor Alex Jones is contractually entitled to that are not property of the Chapter 7 Estate, including any payable after June 14, 2024, the date the Bankruptcy Court converted the Jones Bankruptcy Case to chapter 7 (the Conversion Date).

In this Order, the definition of "Turnover Property" also includes all additional and specific property or assets of any kind covered by the ordering paragraphs below. Judgment Creditors reserve all rights they may have to execute upon the Judgments in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtors.

**The Court also FINDS that** the Judgments are final and remain unpaid. Based on the entire record, including the Application and evidence attached that is admitted in support of the Application, **the Court FINDS that** the Application should be granted.

It is therefore **ORDERED** that the Application is **GRANTED**, and Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (Receiver) is appointed under Texas Civil Practice and Remedies Code § 31.002 with authority to take possession of all the Turnover Property, sell the Turnover Property, and pay the proceeds to Judgment Creditors to the extent required to satisfy the Judgments. The Turnover Property may include but is not limited to financial accounts, certificates of deposit, cryptocurrency accounts, and money-market accounts held by a third party. Notwithstanding anything in this Order to the contrary, nothing in this Order shall authorize any party, including the Receiver or Judgment Creditors, to take any action that would be inconsistent with the pending Jones Bankruptcy Case, including seeking any relief with respect to assets that constitute property of the Chapter 7 Estate unless approved by the Bankruptcy Court.

006725

1. **Receiver's Information**.

   Name: Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (HMP)

   Address: 8911 North Capital of Texas Highway Suite 2120 Austin, Texas 78759

   Telephone Number: (512) 892-0803

   Email Address: gmilligan@harneypartners.com

2. **Custodia Legis**. The entry of this Order creates a receivership estate wherein all of Judgment Debtors' respective Turnover Property shall be held in *custodia legis* by the receivership as of the date of this Order. The receivership owns all Turnover Property regardless of whether Receiver takes actual possession of the property. The Receiver may decline to collect or abandon any Turnover Property the Receiver determines, in his sole discretion, to be burdensome, cumbersome, or of *de minimis* value. The Receiver is authorized to raise any issue with the Court, to request and to meet *in camera* with the Court without notice, and to file any motion (in this Court, the Bankruptcy Court, or any other applicable court) the Receiver deems appropriate.

3. **Turnover**. The Judgment Debtors shall turnover to Receiver all Turnover Property, including all documents related to such property, **within five days** of the Judgment Creditors service of a copy of this Order on the Judgment Debtors or their counsel. All third parties in possession of any Turnover Property that is subject to any Judgment Debtors' control shall turnover such property to Receiver within five days of being served notice of this Order. The turnover by Judgment Debtors shall include at least the following documents (for the period of at least the preceding 48 months from the date of this Order, except where otherwise indicated): (1) canceled checks; (2) bank

statements, pass books, and other bank or financial institution records; (3) federal income and state franchise tax returns; (4) life insurance policies (regardless of date); (5) all motor vehicle Certificates of Title (regardless of date); (6) stock certificates and bonds (regardless of date); (7) promissory notes (regardless of date); (8) bills of sale (regardless of date); (9) real property deeds and deeds of trust (regardless of date); (10) business journals, ledgers, accounts payable and receivable files; (11) pledges, security agreements and copies of financial statements; (12) state sales tax reports; (13) any other record or document evidencing any ownership to real or personal property or to any debt owed or money had (regardless of date); (14) trust documents for which the Judgment Debtors are a beneficiary (regardless of date); (15) all personal property returns filed with any taxing authority, including but not limited to any central appraisal district or tax assessor/collector; and, (16) credit applications and other documents stating the Judgment Debtor's financial condition; (17) cryptocurrency wallets, records, and access codes (regardless of date); and (18) all documents listing or summarizing property owned by the Judgment Debtors (regardless of date).

4. **Continuing Effect of Order**. Judgment Debtors and all others holding Turnover Property shall continue to immediately turnover to Receiver such property when received, until all amounts due under the Judgments and this Order are paid in full.

5. **Receiver's Powers**. Receiver has the authority to take possession of all of Judgment Debtors' Turnover Property, sell such property, and pay the proceeds to the Judgment Creditors to the extent required to satisfy the Judgments. Receiver's authority applies, but is not limited, to all Turnover Property including: (1) all documents or records, including financial records, related to property that is in the actual or constructive possession or control of the Judgment Debtors; (2) all financial accounts

(bank account), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; (10) shares, stock and membership interests; (11) trusts, (12) domains, (13) accounts receivable; and (14) cryptocurrency accounts or wallets. Receiver is not required, but may in his sole discretion and is hereby empowered, to defend or prosecute any litigation regarding the Judgment Debtors that is not property of the Trustee, including, without limitation, claims to recover assets fraudulently transferred, conveyed, or assigned that would increase the size of the receivership estate. Receiver's powers include the following, although he has no requirement to necessarily exercise such powers as to the Turnover Property: (1) collect all accounts receivable of the Judgment Debtors; (2) change locks to all premises at which any property is situated; (3) endorse and cash all checks and negotiable instruments payable to the Judgment Debtors, except paychecks for current wages; (4) hire a real estate broker to sell any real property and mineral interest belonging to the Judgment Debtors; (5) hire any person or company to move and store the property of the Judgment Debtors; (6) insure any property belonging to the Judgment Debtors; (7) obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Judgment Debtors; (8) obtain local, state and federal tax records of the Judgment Debtors; (9) obtain from any landlord, building owner or building manager where the Judgment Debtors or the Judgment Debtors' business is a tenant copies of such Judgment Debtors' lease, lease application, credit application, payment history and copies of such Judgment Debtors' checks for rent or other payments; (10) hire any person or company

006728

necessary to accomplish any right or power under this Order; (11) take all actions necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of the Judgment Debtors may be situated, and to review and obtain copies of all documents related to same; (12) obtain all records of ownership of real properties, personal properties or motor vehicles of the Judgment Debtors in the possession of any County Tax Assessor/Collector or Central Appraisal District, including any records of payments made or correspondence; (13) obtain all records pertaining to the Judgment Debtors from any provider of utilities, telephone service, cell phone service; (14) obtain credit reports on the Judgment Debtors from any Consumer Reporting Agency as defined by Fair Credit Report Act pursuant to 16 USC § 1681B(a)(1); (15) exercise control over any website of the Judgment Debtors and direct the administrator or web server to allow Receiver full access to the management of the website; (16) obtain from any creditor of the Judgment Debtors (including mortgage companies) copies of such Judgment Debtors' credit application, payment history and copies of each such Judgment Debtor's checks for payments; (17) obtain from any person or entity that compensates the Judgment Debtors, including commissions, an itemization of all such compensation for the past 12 months from the date of Receiver's request and as well as any compensation anticipated in the forthcoming six month period from the date of Receiver's request; and (18) certify copies of this Order. The Receiver shall not reduce or eliminate by agreement with the Judgment Debtors or otherwise compromise or settle the outstanding balance owed to Judgment Creditors by Judgment Debtor under the Judgments without the written consent of Judgment Creditors.

6. **Injunction**. The Judgment Debtors, an all their directors, officers, managers, members, investment advisors, accountants, attorneys, professionals, trustees

(other than the Trustee) and other agents, successors, or assigns, and any third party with notice of this Order are hereby ordered and enjoined not to take any action to sell, encumber, dispose of, transfer, waste, retain, or in any way exercise control over the Turnover Assets except as expressly provided by this Order or upon instructions in writing from the Receiver.

7. **Duties of Law Enforcement**. Any Sheriff, Constable or Officer of the Peace shall assist the Receiver in carrying out his duties and exercising his powers under this Order and prevent any person from interfering with Receiver in taking control and possession of the Turnover Assets.

8. **Sales of Real Property Require Notice**. Any sale of real property by Receiver requires the approval of this Court, after notice and opportunity for hearing being provided to Judgment Debtors and any lien holder on such real property.

9. **Receiver's Bond**. No bond is required of Receiver.

10. **Receiver's Oath**. Receiver must file an oath to perform his duties faithfully before acting under this Order and this Order is not effective until such an oath is filed.

11. **Receiver's Fee**. Without further application, notice, or order of the Court, the Receiver shall pay himself as receiver's fees an amount equal to 20% of all gross proceeds coming into his possession from any source (before deducting expenses) which the Court finds is a customary and usual fee for a post-judgment turnover receiver. Within five days of the entry of this Order, the Judgment Creditors shall pay the sum of $10,000 to the Receiver as an advance on his fees. The advance is fully earned and the Receiver may take it into income, and will repay the advance to the Judgment Creditors

from the first $10,000 of Receiver's fees earned from the collection of Turnover Property. Receiver's fees and expenses are taxed as costs against Judgment Debtors, and as costs, such fees and expenses are in addition to amounts owed under Judgments. Receiver shall distribute the remaining net proceeds from Turnover Property coming into his possession, after paying in full the Receiver's fees and all expenses and reserving from distribution any funds the Receiver determines in his sole discretion are needed to pay potential future expenses, to the Judgment Creditors at the Judgment Creditors' direction and in an amount and proportion pursuant to agreement between the Texas Families and the Connecticut Families. No receiver's fees exceeding 20% of all proceeds coming into Receiver's possession shall be paid to Receiver unless an application is filed with and ruled by the Court.

12. **Receiver's Expenses**. Without further application, notice, or order of the Court, the Receiver may incur and shall pay from the proceeds of Turnover Property all reasonable and necessary expenses of the Receiver and the receivership estate up to the amount of $20,000.00 (the Expense Cap). The Receiver may raise the Expense Cap either (1) without further order of the Court upon the written agreement of the Judgment Creditors, including by email with counsel, or (ii) upon application to the Court with notice to the Judgment Creditors. The Receiver must provide an accounting or receipts of any reasonable and necessary expenses to the Court upon request. The Receiver's and receivership estates' reasonable and necessary expenses will be taxed as costs against Judgment Debtors, and Receiver may collect those expenses from Judgment Debtors in addition to the amount collected to satisfy the Judgment.

13. **Employ Professionals**. Without further application or order of the Court, the Receiver may retain and reasonably compensate, in Receiver's sole discretion,

collection agents, counsel, financial advisors, accountants, brokers, auctioneers, independent contractors, technical specialists, and other professionals and agents to assist in his duties as Receiver on such terms as the Receiver deems appropriate without Court approval (the Receiver Personnel). For avoidance of doubt, the Court hereby approves the Receiver's retention of HMP as Receiver Personnel with the compensation for HMP provided Receiver Personnel already included in the Receiver's fee provided in paragraph 11 of this Order; *provided however*, the Receiver may, upon separate application and order of the Court, employ HMP provide Receiver Personnel on different compensation terms.

14. **Limitation on Liability**. The Receiver, HMP, and Receiver Personnel, and their officers, members, managers, directors, partners, employees, agents, and professionals (together, the Protected Personnel) shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver and Receiver Personnel are entitled to rely, in good faith, on the advice of employed professionals, the Judgment Creditors' counsel, and on information provided by the Judgment Debtors and their books, records, and their past and present officers, directors, agents, members, managers, trustees, accountants, and employees and Judgment Debtors' counsel without audit. The Receiver and Receiver Personnel are entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Protected Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Receiver Personnel, including compliance with applicable law governing the

collection of debt, nor shall the Protected Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of gross negligence, willful misconduct, malicious acts, and the failure to comply with this Court's orders.

15. **Indemnity**. The Protected Personnel are hereby indemnified by the Turnover Property to the fullest extent permitted under the law from any cause of action or claim related to any act or omission in connection with, relating to, or arising out of the Receiver's or Receiver Personnels' duties as Receiver, except for claims related to any act or omission that is determined in a final order to have constituted gross negligence, willful misconduct, or malicious acts. The Protected Personnel are entitled to advances from the Receiver and Turnover Property, including from any reserved funds, to cover actual and reasonably anticipated expenses of defending any action threatened against or brought against the any Protected Personnel as a result of any act or omission, actual or alleged, in their capacity as such, or in any way related to or arising from the Judgment Debtors, Judgment Debtors' property, Turnover Property, or the Judgments. A Protected Personnel must return specific advances under this paragraph upon a final order by the Court finding that the Protected Personnel is not entitled to indemnification under this Order.

16. **Attorney's Fees**. Judgment Creditors' reasonable attorney's fees will be taxed as costs against Judgment Debtors. In carrying out his duties under this Order, the Receiver may use the Judgment Creditors' counsel and rely on legal advice and representation provided to him by the Judgment Creditors' counsel.

17. **Exempt Property**. Nothing in this Order shall be construed to apply to exempt property, if any, of any Judgment Debtor, or any property of the Chapter 7 Estate

---

006733

(expect up approval of the Trustee or Bankruptcy Court). For avoidance of doubt, (i) the Bankruptcy Court has jurisdiction to decide any dispute as to what constitutes property of the Chapter 7 Estate; and (ii) this Court has jurisdiction to decide any claim by the Judgment Debtors that property should be treated as exempt under this Order and any claim by the Receiver or Judgment Creditors that any property is Turnover Property and not protected by any exemption asserted by a Judgment Debtor.

18.     **Retention of Jurisdiction**. This Court shall have and retain exclusive jurisdiction over: (i) the implementation and enforcement of this Order; (ii) the acts and conduct of the Receiver and any actions brought against the Protected Personnel by any person or entity in connection with this Order.

19.     **Rule 679a Ordering Provisions Against Individual Judgment Debtor**. **Personal Property Rights of Individual Judgment Debtor Alex Jones:** Receiver must comply with Texas Rule of Civil Procedure 679b. **Receiver to Hold Property**: Receiver must not disburse funds to Judgment Creditors or sell property within 14 days after serving Judgment Debtor Alex Jones with the Notice of Protected Property Rights, the Instructions for Protected Property Claim Form, and the Protected Property Claim Form approved by the Supreme Court of Texas, or within 17 days if service was by mail. If the Judgment Debtor Alex Jones asserts an exemption, Receiver may only disburse funds to Judgment Creditors or sell property otherwise belonging to Judgment Debtor Alex Jones with Judgment Debtor Alex Jones's written consent or a court order.

006734

ISSUED AND SIGNED on _____.


                            _____
                            JUDGE PRESIDING

006735

08/18/2026 03:31:55 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835

NO. D-1-GN-18-001835

**EXHIBIT**

**E**

Alexander E. Jones; 22-33553

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, Plaintiffs | § § § § | IN THE DISTRICT COURT |
| vs. | § § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and FREE SPEECH SYSTEMS, LLC, Defendants | § § § | 261st JUDICIAL DISTRICT |

## ORDER GRANTING APPLICATION FOR POST-JUDGMENT TURNOVER AND APPOINTMENT OF RECEIVER AS TO JUDGMENT DEBTOR FREE SPEECH SYSTEMS, LLC

The Court has considered Judgment Creditors' Application for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Free Speech Systems, LLC (the Application) and the record properly before it.

**The Court FINDS that** it has jurisdiction over this proceeding and can proceed in granting the relief set forth herein immediately. *See* TEX. CIV. PRAC. & REM. CODE 31.002.

**The Court also FINDS that** the judgment in Cause No. CV-18-6046437 rendered before the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut (the Connecticut Families' Judgment) is valid, final, and payable. Judgment Debtor Free Speech Systems, LLC owes, jointly and severally, $1,288,139,555.94 under the Connecticut Families' Judgment. There have been no applicable credits, payments, or offsets.

**The Court also FINDS that** the Connecticut Families' Judgment is comprised of seven documents: (1) the jury verdict, (2) the trial court's ruling on punitive damages, (3) the Connecticut Sandy Hook Families' Motion for Rectification, (4) the March 31, 2023 Order granting the Motion for Rectification, (5) the Connecticut Appellate Court's

006736

opinion, (6) the Connecticut Appellate Court's Rescript, and (7) the Connecticut Supreme Court's denial of certification of review. The Connecticut Families' Judgment has been domesticated under the Uniform Enforcement of Foreign Judgments Act.

**The Court also FINDS that** Judgment Debtor Alexander E. Jones (also referred to in this Order as Alex E. Jones and Alex Jones) filed for bankruptcy under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) on December 2, 2022 (the Jones Petition Date) in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) pending as case no. 22-33553 (the Jones Bankruptcy Case). On October 19, 2023, the Bankruptcy Court entered a final order determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy. Of this amount and pursuant to the Connecticut Appellate Court's opinion that partially amended the original judgment, $965,000,000 would be non-dischargeable. On March 20, 2025, the Bankruptcy Court denied Jones's Motion to Reconsider its October 19, 2023 Memorandum Decision granting the Connecticut Families' Motion for Summary Judgment that held the Connecticut Families' Judgment is non-dischargeable. Following a hearing on June 14, 2024, the Bankruptcy Court converted the Jones Bankruptcy Case from chapter 11 to chapter 7 and appointed Christopher R. Murray as chapter 7 trustee (the Trustee) for the applicable chapter 7 bankruptcy estate (the Chapter 7 Estate).

**The Court also FINDS that** the Judgment remain unsatisfied; that Judgment Debtor Free Speech Systems, LLC owns property that is not exempt from attachment, execution, or seizure for the satisfaction of the Judgment; and that Judgment Creditors are entitled to the Court's aid in reaching Judgment Debtor's nonexempt property to satisfy the Judgment.

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

> (i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

In this Order, the definition of "Turnover Property" also includes all additional and specific property or assets of any kind covered by the ordering paragraphs below. Judgment Creditors reserve all rights they may have to execute upon the Judgment in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtor.

**The Court also FINDS that** the Judgment is final and remain unpaid. Based on the entire record, including the Application and evidence attached that is admitted in support of the Application, **the Court FINDS that** the Application should be granted.

It is therefore **ORDERED** that the Application is **GRANTED,** and Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (Receiver) is appointed under Texas Civil Practice and Remedies Code § 31.002 with authority to take possession of all the Turnover Property, sell the Turnover Property, and pay the proceeds to Judgment Creditors to the extent required to satisfy the Judgment. The Turnover

Property may include but is not limited to financial accounts, certificates of deposit, cryptocurrency accounts, and money-market accounts held by a third party. Notwithstanding anything in this Order to the contrary, nothing in this Order shall authorize any party, including the Receiver or Judgment Creditors, to take any action that would be inconsistent with the pending Jones Bankruptcy Case, including seeking any relief with respect to assets that constitute property of the Chapter 7 Estate unless approved by the Bankruptcy Court.

1.    **Receiver's Information.**

Name: Gregory S. Milligan of HMP Advisory Holdings, LLC dba Harney Partners (HMP)

Address: 8911 North Capital of Texas Highway Suite 2120 Austin, Texas 78759

Telephone Number: (512) 892-0803

Email Address: gmilligan@harneypartners.com

2.    **Custodia Legis.** The entry of this Order creates a receivership estate wherein all of Judgment Debtor's respective Turnover Property shall be held in *custodia legis* by the receivership as of the date of this Order. The receivership owns all Turnover Property regardless of whether Receiver takes actual possession of the property. The Receiver may decline to collect or abandon any Turnover Property the Receiver determines, in his sole discretion, to be burdensome, cumbersome, or of *de minimis* value. The Receiver is authorized to raise any issue with the Court, to request and to meet *in camera* with the Court without notice, and to file any motion (in this Court, the Bankruptcy Court, or any other applicable court) the Receiver deems appropriate.

3.    **Turnover**. The Judgment Debtor shall turnover to Receiver all Turnover Property, including all documents related to such property, **within five days** of the Judgment Creditors service of a copy of this Order on the Judgment Debtor or its counsel. All third parties in possession of any Turnover Property that is subject to any Judgment Debtor's control shall turnover such property to Receiver within five days of being served notice of this Order. The turnover by Judgment Debtor shall include at least the following documents (for the period of at least the preceding 48 months from the date of this Order, except where otherwise indicated): (1) canceled checks; (2) bank statements, pass books, and other bank or financial institution records; (3) federal income and state franchise tax returns; (4) life insurance policies (regardless of date); (5) all motor vehicle Certificates of Title (regardless of date); (6) stock certificates and bonds (regardless of date); (7) promissory notes (regardless of date); (8) bills of sale (regardless of date); (9) real property deeds and deeds of trust (regardless of date); (10) business journals, ledgers, accounts payable and receivable files; (11) pledges, security agreements and copies of financial statements; (12) state sales tax reports; (13) any other record or document evidencing any ownership to real or personal property or to any debt owed or money had (regardless of date); (14) trust documents for which the Judgment Debtors are a beneficiary (regardless of date); (15) all personal property returns filed with any taxing authority, including but not limited to any central appraisal district or tax assessor/collector; and, (16) credit applications and other documents stating the Judgment Debtor's financial condition; (17) cryptocurrency wallets, records, and access codes (regardless of date); and (18) all documents listing or summarizing property owned by the Judgment Debtor (regardless of date).

4.    **Continuing Effect of Order.**  Judgment Debtor and all others holding Turnover Property shall continue to immediately turnover to Receiver such property when received, until all amounts due under the Judgment and this Order are paid in full.

5.    **Receiver's Powers.**  Receiver has the authority to take possession of all of Judgment Debtor's Turnover Property, sell such property, and pay the proceeds to the Judgment Creditors to the extent required to satisfy the Judgment.  Receiver's authority applies, but is not limited, to all Turnover Property including: (1) all documents or records, including financial records, related to property that is in the actual or constructive possession or control of the Judgment Debtor; (2) all financial accounts (bank account), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; (10) shares, stock and membership interests; (11) trusts, (12) domains, (13) accounts receivable; and (14) cryptocurrency accounts or wallets. Receiver is not required, but may in his sole discretion and is hereby empowered, to defend or prosecute any litigation regarding the Judgment Debtor that is not property of the Trustee, including, without limitation, claims to recover assets fraudulently transferred, conveyed, or assigned that would increase the size of the receivership estate. Receiver's powers include the following, although he has no requirement to necessarily exercise such powers as to the Turnover Property: (1) collect all accounts receivable of the Judgment Debtor; (2) change locks to all premises at which any property is situated; (3) endorse and cash all checks and negotiable instruments payable to the Judgment Debtor, except paychecks for current wages; (4) hire a real estate broker to sell any real

property and mineral interest belonging to the Judgment Debtor; (5) hire any person or company to move and store the property of the Judgment Debtor; (6) insure any property belonging to the Judgment Debtor; (7) obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Judgment Debtor; (8) obtain local, state and federal tax records of the Judgment Debtor; (9) obtain from any landlord, building owner or building manager where the Judgment Debtor or the Judgment Debtor's business is a tenant copies of such Judgment Debtor's lease, lease application, credit application, payment history and copies of such Judgment Debtor's checks for rent or other payments; (10) hire any person or company necessary to accomplish any right or power under this Order; (11) take all actions necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of the Judgment Debtor may be situated, and to review and obtain copies of all documents related to same; (12) obtain all records of ownership of real properties, personal properties or motor vehicles of the Judgment Debtor in the possession of any County Tax Assessor/Collector or Central Appraisal District, including any records of payments made or correspondence; (13) obtain all records pertaining to the Judgment Debtor from any provider of utilities, telephone service, cell phone service; (14) obtain credit reports on the Judgment Debtor from any Consumer Reporting Agency as defined by Fair Credit Report Act pursuant to 16 USC § 1681B(a)(1); (15) exercise control over any website of the Judgment Debtor and direct the administrator or web server to allow Receiver full access to the management of the website; (16) obtain from any creditor of the Judgment Debtor (including mortgage companies) copies of such Judgment Debtor's credit application, payment history and copies of each such Judgment Debtor's checks for payments; (17) obtain from any person or entity that compensates the

Judgment Debtor, including commissions, an itemization of all such compensation for the past 12 months from the date of Receiver's request and as well as any compensation anticipated in the forthcoming six month period from the date of Receiver's request; and (18) certify copies of this Order. The Receiver shall not reduce or eliminate by agreement with the Judgment Debtor or otherwise compromise or settle the outstanding balance owed to Judgment Creditors by Judgment Debtor under the Judgment without the written consent of Judgment Creditors.

6. **Injunction**. The Judgment Debtor, and all its directors, officers, managers, members, investment advisors, accountants, attorneys, professionals, trustees (other than the Trustee) and other agents, successors, or assigns, and any third party with notice of this Order are hereby ordered and enjoined not to take any action to sell, encumber, dispose of, transfer, waste, retain, or in any way exercise control over the Turnover Assets except as expressly provided by this Order or upon instructions in writing from the Receiver.

7. **Duties of Law Enforcement**. Any Sheriff, Constable or Officer of the Peace shall assist the Receiver in carrying out his duties and exercising his powers under this Order and prevent any person from interfering with Receiver in taking control and possession of the Turnover Assets.

8. **Sales of Real Property Require Notice**. Any sale of real property by Receiver requires the approval of this Court, after notice and opportunity for hearing being provided to Judgment Debtor and any lien holder on such real property.

9. **Receiver's Bond**. The Receiver shall pay a $500.00 bond.

10.    **Receiver's Oath.** Receiver must file an oath to perform his duties faithfully before acting under this Order and this Order is not effective until such an oath is filed.

11.    **Receiver's Fee.** Without further application, notice, or order of the Court, the Receiver shall set aside as potential receiver's fees an amount equal to 25% of all gross proceeds coming into his possession from any source (before deducting expenses) which the Court finds is a customary and usual fee for a post-judgment turnover receiver. Within five days of the entry of this Order, the Judgment Creditors shall pay the sum of $10,000 to the Receiver as an advance on his fees. The advance is fully earned and the Receiver may take it into income, and will repay the advance to the Judgment Creditors from the first $10,000 of Receiver's fees earned from the collection of Turnover Property. Receiver's fees and expenses are taxed as costs against Judgment Debtor, and as costs, such fees and expenses are in addition to amounts owed under the Judgment. Receiver shall distribute the remaining net proceeds from Turnover Property coming into his possession, after withholding 25% in possible Receiver's fees and all expenses and reserving from distribution any funds the Receiver determines in his sole discretion are needed to pay potential future expenses, to the Judgment Creditors at the Judgment Creditors' direction. No receiver's fees shall be paid to Receiver unless an application is filed with and ruled by the Court.

12.    **Receiver's Expenses.** Without further application, notice, or order of the Court, the Receiver may incur and shall pay from the proceeds of Turnover Property all reasonable and necessary expenses of the Receiver and the receivership estate up to the amount of $20,000.00 (the Expense Cap). The Receiver may raise the Expense Cap either (1) without further order of the Court upon the written agreement of the Judgment

Creditors, including by email with counsel, or (ii) with Court approval after application to the Court with notice to the Judgment Creditors. The Receiver must provide an accounting or receipts of any reasonable and necessary expenses to the Court upon request. The Receiver's and receivership estates' reasonable and necessary expenses will be taxed as costs against Judgment Debtor, and Receiver may collect those expenses from Judgment Debtor in addition to the amount collected to satisfy the Judgment.

13.    **Employ Professionals**. With Court approval, the Receiver may retain and reasonably compensate, in Receiver's collection agents, counsel, financial advisors, accountants, brokers, auctioneers, independent contractors, technical specialists, and other professionals and agents to assist in his duties as Receiver on such terms as the Receiver deems appropriate (the Receiver Personnel). For avoidance of doubt, the Court hereby approves the Receiver's retention of HMP as Receiver Personnel with the compensation for HMP provided Receiver Personnel already included in the Receiver's fee provided in paragraph 11 of this Order; *provided however*, the Receiver may, upon separate application and order of the Court, employ HMP provide Receiver Personnel on different compensation terms.

14.    **Limitation on Liability**. The Receiver, HMP, and Receiver Personnel, and their officers, members, managers, directors, partners, employees, agents, and professionals (together, the Protected Personnel) shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver and Receiver Personnel are entitled to rely, in good faith, on the advice of employed professionals, the Judgment Creditors' counsel, and on information provided by the Judgment Debtor and its books,

records, and its past and present officers, directors, agents, members, managers, trustees, accountants, and employees and Judgment Debtor's counsel without audit. The Receiver and Receiver Personnel are entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Protected Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Receiver Personnel, including compliance with applicable law governing the collection of debt, nor shall the Protected Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of gross negligence, willful misconduct, malicious acts, and the failure to comply with this Court's orders.

15.    **Indemnity**. The Protected Personnel are hereby indemnified by the Turnover Property to the fullest extent permitted under the law from any cause of action or claim related to any act or omission in connection with, relating to, or arising out of the Receiver's or Receiver Personnels' duties as Receiver, except for claims related to any act or omission that is determined in a final order to have constituted gross negligence, willful misconduct, or malicious acts. The Protected Personnel are entitled to advances from the Receiver and Turnover Property, including from any reserved funds, to cover actual and reasonably anticipated expenses of defending any action threatened against or brought against the any Protected Personnel as a result of any act or omission, actual or alleged, in their capacity as such, or in any way related to or arising from the Judgment Debtor, Judgment Debtor's property, Turnover Property, or the Judgment. A Protected Personnel must return specific advances under this paragraph upon a final order by the Court finding that the Protected Personnel is not entitled to indemnification under this Order.

16.    **Attorney's Fees.** Judgment Creditors' reasonable attorney's fees will be taxed as costs against Judgment Debtor. In carrying out his duties under this Order, the Receiver may use the Judgment Creditors' counsel and rely on legal advice and representation provided to him by the Judgment Creditors' counsel.

17.    **Exempt Property.** Nothing in this Order shall be construed to apply to exempt property, if any, of Judgment Debtor, or any property of the Chapter 7 Estate (expect up approval of the Trustee or Bankruptcy Court). For avoidance of doubt, (i) the Bankruptcy Court has jurisdiction to decide any dispute as to what constitutes property of the Chapter 7 Estate; and (ii) this Court has jurisdiction to decide any claim by the Judgment Debtor that property should be treated as exempt under this Order and any claim by the Receiver or Judgment Creditors that any property is Turnover Property and not protected by any exemption asserted by Judgment Debtor.

18.    **Retention of Jurisdiction.** This Court shall have and retain exclusive jurisdiction over: (i) the implementation and enforcement of this Order; (ii) the acts and conduct of the Receiver and any actions brought against the Protected Personnel by any person or entity in connection with this Order.

ISSUED AND SIGNED on ___August 13, 2025.___

_____
JUDGE PRESIDING