United States Bankruptcy Court
Southern District of Texas
**ENTERED**
October 01, 2025
Nathan Ochsner, Clerk

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § § | Chapter 7 |
| ALEXANDER E. JONES, | § § | Case No. 22-33553 (CML) |
| Debtor. | § § § | |

**ORDER CONFIRMING THAT FSS ASSETS ARE**
**NOT SUBJECT TO THE AUTOMATIC STAY**
**[Related to ECF No. 1241]**

Upon consideration of the motion (the "Motion") of the Sandy Hook Families, pursuant to sections 105(a), 362(d), and 541 of title 11 of the United States Code (the "Bankruptcy Code"), seeking the entry of this order (i) reconfirming that the Supplemental Dismissal Order is null and void and is of no force or effect, (ii) confirming that FSS's assets are not property of the Chapter 7 Estate, and (iii) confirming that any automatic stay applicable in the Jones Bankruptcy Case does not apply to FSS or its assets; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. § 1408; and this Court having found that the relief requested in the Motion is appropriate; and this Court having found that the Sandy Hook Families' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the

006748

statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and upon all of the proceedings had before this Court; and it appearing, upon due deliberation, that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief requested in the Motion, it is **HEREBY ORDERED THAT FOR ALL THE REASONS STATED ON THE RECORD AT THE OCTOBER 1, 2025 HEARING**:

1. The automatic stay imposed under Section 362(a) of the Bankruptcy Code in the Jones Bankruptcy Case does not apply to FSS or any of FSS's assets because these assets are not property of the Jones bankruptcy estate under Section 541 of the Bankruptcy Code.

Signed:  October 01, 2025

_____

Christopher Lopez
United States Bankruptcy Judge

006749

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| In re: | |
|---|---|
| ALEXANDER E. JONES, | Case No. 22-33553 |
| Debtor. | Chapter 7 |

**TRUSTEE'S NOTICE OF PROPOSED ABANDONMENT**

**THE TRUSTEE PROPOSES TO ABANDON CERTAIN SCHEDULED ASSETS OF THE ESTATE. IF YOU OPPOSE THE ABANDONMENT, YOU MUST FILE AN OBJECTION WITHIN 14 DAYS AS SET FORTH IN RULE 6007(A) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.**

1. The Debtor listed on his post-conversion amended Schedule A/B a 100.00% ownership interest in Free Speech Systems, LLC. DE 749 at 18.

2. The Trustee hereby gives notice of his intent to abandon this ownership interest because it is burdensome to the estate and is of inconsequential value and benefit to the estate. *See* 11 U.S.C. § 554(a); FRBP 6007(a).

3. The Trustee reserves the right to withdraw this notice prior to its becoming effective upon receiving additional information that might bear upon the value of the asset.

Respectfully submitted,

*/s/ Christopher Murray*
602 Sawyer, Suite 400
Houston, TX 77007
Tel. 832-529-3027
chris@jonesmurray.com
*Chapter 7 Trustee*

006750

```
                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
                          HOUSTON DIVISION

ALEXANDER E. JONES AND        )  CASE NO: 22-33553-cml
OFFICIAL COMMITTEE OF         )
UNSECURED CREDITORS,          )  Houston, Texas
                              )
         Debtors.            )  Wednesday, October 1, 2025
                              )
                              )  1:03 PM to 1:59 PM
-----------------------------)


                             HEARING

         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
              UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones    SHELBY A. JORDAN
and Free Speech Systems:  ANTONIO ORTIZ
                          Jordan & Ortiz, PC
                          500 N Shoreline Blvd.
                          Corpus Christi, TX 78401

For Alexander E. Jones:   BEN C. BROOCKS
                          Broocks Law Firm PLLC
                          6207 Bee Cave Road
                          Austin, TX 78746

For Christopher R.        JOSHUA W. WOLFSHOHL
Murray:                   Porter Hedges LLP
                          1000 Main Street
                          Houston, TX 77002

                          ERIN ELIZABETH JONES
                          CHRISTOPHER R. MURRAY
                          Jones Murray LLP
                          602 Sawyer Street
                          Houston, TX 77007

For Connecticut           KYLE J. KIMPLER
Families:                 Paul, Weiss, Rifkind, Wharton &
                          Garrison
                          1285 Avenue of the Americas
                          New York, NY 10019
```

Page 2

For United States          HA MINH NGUYEN
Trustee:                   Office of the United States Trustee
                           515 Rusk Street
                           Houston, TX 77002

Court Reporter:            UNKNOWN

Courtroom Deputy:          UNKNOWN

Transcribed by:            Veritext Legal Solutions
                           330 Old Country Road, Suite 300
                           Mineola, NY 11501
                           Tel: 800-727-6396

Proceedings recorded by electronic sound recording;

Transcript produced by transcription service.

006752

HOUSTON, TEXAS; WEDNESDAY, OCTOBER 1, 2025; 1:03 PM

(Call to Order)

THE COURT:  Okay.  Good afternoon.  This is Judge Lopez.  Today is October the 1st.  I'll call the 1:00 p.m. case in the Alex Jones matter in connection with an emergency motion to confirm that the automatic stay does not apply to assets related to Free Speech.  Why don't I take appearances in the courtroom and then somebody can tell me why we're here?

MR. JORDAN:  Your Honor, Shelby Jordan, and my partner Alex -- I'm sorry, my partner Antonio Ortiz on behalf of Alex Jones, Debtor, and non-debtor FSS, Free Speech Systems and Mr. Ben Broocks.

THE COURT:  Okay.  Good afternoon.  Good to see everyone.

MR. WOLFSHOHL:  Good afternoon, Your Honor. Joshua Wolfshohl and Erin Jones on behalf of Christopher Murray, the Trustee who's also here.

THE COURT:  Thank you.

MR. NGUYEN:  Good afternoon, Your Honor.  Ha Nguyen for the U.S. Trustee.

THE COURT:  Thank you for being here, Mr. Nguyen. Anyone else wish to make an appearance?  Okay.  Somebody tell me why we're still asking these questions about whether -- what is -- what's going on here.  I thought I was clear

006753

the last time, but it clearly -- Mr. Murray, your side filed a motion, so, maybe you can tell me what's going on.  And Mr. Kimpler, I can hit five star.  Oh, I'm sorry, I forgot.

MR. MURRAY:  It was not filed by the Trustee, Your Honor, just to be clear.

THE COURT:  No, I know, but I'm just -- maybe y'all can tell me.  Mr. Kimpler?

MR. KIMPLER:  Yes.  Hi, Your Honor.  It's Kyle Kimpler from Paul, Weiss on behalf of the Connecticut families.  The motion was filed jointly by the Connecticut and the Texas families, and I'm happy to take the lead in explaining why it was filed and why we're here today.

THE COURT:  Well, I read the papers.  The question is, what's unclear?  What remains unclear?

MR. KIMPLER:  Well, from our perspective, Your Honor, nothing remains unclear.  We think that you have very clearly told us on two occasions in February and in June, that the families were, in fact, authorized to pursue whatever rights they may have in state court.  Both myself and Mr. Rosenberg, when we were here in June, told you we intended to do exactly that.  At no point in time did the Court or Mr. Jones raise the problem that actually state courts have no jurisdiction over FSS assets, that the automatic stay applies to FSS assets, or that we would be violating the automatic stay.  All of those arguments are

006754

now being raised by Mr. Jones.

THE COURT:  Right.

MR. KIMPLER:  These are fringe arguments.  These are the core arguments he's raising in state court.  And so, we are here today to, one, get clarity on that.  And part of that is because I don't take the accusation that I'm violating the stay lightly.  That's an issue I obviously feel incumbent to come to the Court and get clarity right away.  You know, I do think it's telling that these accusations are being made in state court and that the Debtor who has a conviction that the stay is being violated has not come to Your Honor.  So, we don't really believe there is anything unclear.  I'd rather not have to be here today, Your Honor, seeking this, but unfortunately --

THE COURT:  It is what it is.  I'm okay.  I just want to make sure that crystallized the issue.  Just since we've been here for a while, Mr. Murray, have you made a determination on the equity yet, and what you're going to do with it?

MR. MURRAY:  Not yet, but we're leaning toward abandonment.  We've gotten minor indications of interest, but no one's made an offer.

THE COURT:  Can you lean in October?

MR. MURRAY:  Yes, sir.

THE COURT:  Okay.  Thank you.  I just want to --

we've just got to get to an answer on that.  Okay.  Why don't I ask the Jones side to tell me how the automatic stay applies in this case, and we're just talking bankruptcy law, facts won't matter.  We're just talking law.

MR. BROOCKS:  Your Honor, to be more precise about why we're here, as you remember, in February of this year we had a hearing.  They asked you to approve the settlement and you did not approve the settlement.

THE COURT:  I did not approve the settlement.

MR. BROOCKS:  And lots of words were exchanged, and I think there was frustration about the failure to actually move the process along.  And then in June we filed, or May, end of May, we filed, our side filed, a motion to reconsider, which we told you that the -- let me put this up on the screen if I may, Your Honor.

THE COURT:  It's okay.  Let's just talk.

MR. BROOCKS:  Is that okay?

THE COURT:  You're asking me to reconsider an order?  Well, we -- no, not necessarily.  We wanted to bring to your attention that what you had done was not proper, that the Supreme Court of America said that when --

THE COURT:  Can you get close to a mic?

MR. BROOCKS:  -- when the matter is on appeal, the district court, as the Texas Plaintiffs said, appeals your supplemental September judgment.

THE COURT:  Right.

MR. BROOCKS:  It divests this Court of any authority to do anything with that judgment, and you agreed with that.

THE COURT:  I agree with that.

MR. BROOCKS:  Yeah, but so when --

THE COURT:  What does the order say?

MR. BROOCKS:  Well, I'll show -- that's what I was going to show you.

THE COURT:  Well, let's just read it.  It says, "Effective as of the date of this pursuant to 349(b), all property of the estate shall be deemed to have vested in the estate as property of the estate."  So, it's deemed as property of the estate, but that doesn't mean it's property of the estate.

MR. BROOCKS:  Well, it's -- well, the order that you signed said, "All property of the estate shall be vested."

THE COURT:  "Shall be deemed to have vested."

MR. BROOCKS:  Well, that was the whole point.  That's when the Texas Plaintiffs went back to the Texas court.

THE COURT:  I know, but let's just -- I'm just saying that's what the words say, "Shall be deemed to have vested."  I can't -- I don't have authority, nor does any

bankruptcy judge in America, to make something property of the estate.  Not one.  It is what it is.  The code says what it is.  It is what it is.  "Shall be deemed to have been vested as property of the estate and shall be under the control of the trustee," so -- and then Paragraph 2 says, "The trustee is authorized to operate the business for a period not to exceed a year," right?

And that order was signed on September 25, 2024. Let me just tell you the way I read my order because I know exactly what I was thinking, and maybe it's helpful if I just provide clarity.  Section -- upon the filing of a bankruptcy case, property of the estate is determined, right?  You can also take a look sometimes upon conversion, but it's whatever interest the debtor had, and that interest is determined as a matter of state law.  The automatic stay under Section 362 protects any act you take to go against or to collect or to exercise control over property of the estate.

So, something has to be property of the estate, but 541 says what it is, right?  So, what was happening in this order, and if everybody remembers back when this was happening -- well, I don't want to get into that, but it was -- there were a lot of moving pieces there.  In terms of what -- somebody could go into it or not.  "This put the property of Free Speech, and it shall be deemed to have

006758

vested."  That's the most that I could do.  I cannot convert something into property of the estate, so the automatic stay can never go into effect with respect to that.

Normally what happens in bankruptcy, and Mr. Shelby knows this, is that the bankruptcy judge sometimes can extend the stay, or do 105, or use some combination of 362 and 105 over that, but that usually works.  You've got to get a motion on that, and the Court would issue a temporary -- essentially a preliminary injunction or an injunction enjoining any actions against a non-debtor, because sometimes the actions against the non-debtor essentially impact property of the estate.  I never signed any of those orders.

Technically, the Trustee was authorized to operate for a period of a year, until September 25th.  That has expired, so the Trustee can't even operate under my order.  This has never been property of the estate.  It was treated as if it was, and it was done for a specific purpose.  Mr. Broocks, you weren't here during that time, and I don't hold it against you, and I got what the words are, but the, "Shall be deemed to have vested," right?  It doesn't make it 541, and I don't have authority.  No one does under 541 to convert something into property.  It's the only way the automatic stay would apply, and the automatic stay would only apply if I issued -- well, it just never applies.

Normally, what you would be looking for is an injunction over assets -- over non-debtor assets.  This is an easy answer, and it's for that same reason, quite frankly, that when the settlement came across my way where the -- I believe it was the Texas families and the Connecticut families reached a deal, and they wanted an allowed claim against FSS in the bankruptcy case, I said I don't have authority to do that.  I don't have authority to settle any claims because I don't have jurisdiction over that.  And so, this was very specifically to try to see if one could, quite frankly, stabilize things that were going on at that time in September 2024, which were -- there were a lot of kind of moving pieces and allegations that were being made about stuff that was happening outside the court, to stabilize this, see if you could get to a sale.  Maybe parties could agree to maximize value.  This order was entered.  But at a max, you can read 541.

So, it's -- this is just an easy answer.  The code provides the answer, and unless somebody is going to point to me to a section under 541, this gets really easy.  I can deem something to be treated as property of the estate, so Mr. Murray has the authority to go exercise it and try to go sell it.  But what I said in the last hearing was I'm not authorizing any sales anymore.  So, the effect of this order was to void it because I'm not approving any sales.  And so

-- but now, we're well beyond September 25, 2025, so Mr. Murray has nothing to do with Free Speech anymore. I mean, he still owns the equity. Well, holds it, you know, in terms of his rights as the Trustee, I should say.

And I've asked multiple times if anybody wants to buy that. They can. It's not going to be free and clear, but you can buy it. This is -- I went back and read the order because I was confused about what we were doing here. I don't know what is said in the state courts, and I really don't want to get into that. I can just tell you as a matter of pure bankruptcy law, that 541 does not apply to any assets that are owned by Free Speech, and I don't want to get into what Free Speech actually owns, what's happening in the state courts, what is said one way or the other. I can just tell you this order was supplemented a dismissal of a debtor.

So, Free Speech is a non-debtor. And I said at the time, Mr. Kimpler came to me, Your Honor, we're just going to start the clock and people are going to start to have their collection remedies. We all knew that was going to happen. Connecticut families weren't too happy about the decision I made to dismiss the case because they knew that the Texas courts had issued some orders that arguably gave the Texas parties some rights. But there's nothing in here that makes it 541. And there's no case that anybody can

006761

cite to me.  There's no law that anyone can cite to me that converts a speaker or a microphone or a camera that is in the name and is owned by Free Speech into property of the estate.  Not one.  No one can cite to that.  And that's what I'm being asked to confirm today.  And if that's what I'm being asked to confirm today, that's the answer it's always been.  This order never changed that.  The words were used carefully here.  I don't know what law anyone is citing to me.

MR. BROOCKS:  I'm going to -- may I respond?

THE COURT:  Please.

MR. BROOCKS:  Yes.  So, Your Honor, I think that my memory and understanding is different from reading the transcripts.  But when you issued your June order called the cash order, the question became what happens to the assets. You said you gave -- I don't know whether you deemed, I'm not sure I follow the distinction between deemed and doing.

THE COURT:  I can't deem anything under 541. That's what I mean.  I can't do it.  I can't convert something into 541.

MR. BROOCKS:  But, Your Honor, I'm not arguing --

THE COURT:  That's what I mean.

MR. BROOCKS:  -- with you.  I'm simply telling you what you did.

THE COURT:  No, no, no.  But my point is you're

006762

asking me, you didn't understand the distinction.  And then I -- that's the distinction.  If somebody is going to ask me whether the automatic stay applies, I've never issued an injunction.  I've never said the stay.  I don't recall ever saying the automatic stay would apply to that, and I've never issued an injunction over any non-debtor assets.  Nor has anyone ever asked me to that I can recall.

I understand, and that's why I'm trying to just stay in my lane and not get into what is being argued in state court.  I can just tell you I don't think this order, quite frankly, even applies anymore because one goes with two.  And two says it's not to exceed for a year absent further order of the Court.  And I know there's no way I do that.  I'm just telling you where it is.  Free Speech has whatever rights it has, Mr. Broocks.  And you can -- I know you've mentioned to me that you've had First Amendment arguments.  I've never blocked Free Speech from the opportunity to go make whatever arguments they wanted.  Wanted to go to the Supreme Court of the United States, never, never, never prohibited any lawyers that Free Speech wanted to hire, Alex Jones wanted to hire.

I've never prevented any arguments from anyone in any court, whether in Connecticut or in Texas.  And I have no idea where things stand now.  So, I don't want to get into what was said to some court versus another court.  I

006763

can just tell you what this order does.  And there's nothing in this order that could make the automatic stay apply.  And if this is the basis for the automatic stay applying, I can assure you the automatic stay doesn't apply.

MR. BROOCKS:  Your Honor, and I accept that, but I just would like to explain why we got here from our perspective.  If could you just give me two minutes?

THE COURT:  Oh, yeah, absolutely.  I'll stay quiet.

MR. BROOCKS:  But when you entered the June order, the September order, I'm going to put this up on the screen if I can, because it's much more helpful to talk about it. How do I do that?  Do I have permission to?

THE COURT:  Yeah, sure.  Rosario, can we give -- which form of tech are you using?

MR. BROOCKS:  I've got PowerPoint.

THE COURT:  Are you using -- no, I'm saying are you using GoTo Meeting or what?  Wait.

MAN 1:  We have both up.

MR. BROOCKS:  Yeah, GoTo Meet.  We have GoTo Meet.

THE COURT:  Okay.  Just tell me where you are. Which parson you are, because I going to have to give you the presenter.

MR. BROOCKS:  Oh, Ben Broocks.

THE COURT:  Huh?

MR. BROOCKS:  Ben Broocks.

THE COURT:  Oh, Ben Broocks.  You got it.

MR. BROOCKS:  Let me see right here.  So, how do I get it up on the screen?

THE COURT:  There's a William Broocks and a Ben Broocks.  I've got Ben Broocks.

MR. BROOCKS:  Yeah.

THE COURT:  Okay.

MR. BROOCKS:  While he's doing that, Your Honor, what I'm going to show you is the -- from a history standpoint, the June order of 2024 that you signed gave the cash to the Trustee.

THE COURT:  Mm hmm.

MR. BROOCKS:  The Plaintiffs, the Connecticut Plaintiffs and the Texas Plaintiffs, were not aligned at that time.  They were opposing one another.

THE COURT:  That's correct.

MR. BROOCKS:  And the Connecticut Plaintiffs came in with the Trustee and said -- and basically said to Your Honor, well, Your Honor, you give them the cash, the Trustee, but Alex Jones can still run the assets.  And I've got your June or September of 2024 transcript where you said, listen, my intention all along, and I've got it, I can show it in a minute, was to put everything in the estate of Alex Jones under the control of the Trustee.

THE COURT:  Mm hmm.

MR. BROOCKS:  That is why the Texas Plaintiffs appealed.  They appealed because you --

THE COURT:  Yeah.  They didn't give me a chance to

MR. BROOCKS:  Sorry?

THE COURT:  Yeah.

MR. BROOCKS:  So, now we come to the September order, which you entered, and I'm -- I don't know.  Let me see.

THE COURT:  I agree with you 100 percent.

MR. BROOCKS:  But the point, though, is that the Texas Plaintiffs appealed your September order and to the district court.  What were they appealing?

THE COURT:  I have no idea.  That's what I'm saying, I don't get to talk about those things.

MR. BROOCKS:  Well, I'm going to show you what they were appealing.  They were appealing -- the notice of appeal that they filed.

THE COURT:  Okay.

MR. BROOCKS:  It says -- it specifically says -- I've got to put this up on the screen.  Drag it to the right?  I'm going to drag this up there.  You do it for me, please.  That document right there up on that screen.  I'm just going to walk over here.

So, their notice of appeal -- where's the cursor?

006766

I apologize.  I wasn't expecting to do this, but this is something different.  So, let me -- bear with  me to get to it.  I want to scroll that down until I say stop.

THE COURT:  What document is this?

MR. BROOCKS:  This is just simply -- I filed in a different court, but I quoted what you said in the -- what they said in their notice of appeal.  Keep going, keep going, keep going, keep going.  Going, going, going, going.  Go ahead.

THE COURT:  Yeah.

MR. BROOCKS:  More, more, more.  More.  Go.  Keep going.  Keep going -- you're going to -- Ben, you're going to the top of the document.  So, we're going to go to the top.  Okay, stop right there.  Go a little bit.  You went too far.  I'll tell you when to stop.  Keep going.  Go to Page 9.  Right there.  Up there, it's in black.  There's such a lag on there, I can't tell.

MAN 1:  Yeah, sorry.

MR. BROOCKS:  This is the question that the Texas Plaintiffs posed to the district court.  "Did the bankruptcy court err, and without notice it entered in Docket Number 121, pretty much after dismissing, that retroactively vested all property of former Debtors', Free Speech, into the bankruptcy papers."  I don't see the word deemed; it says vested.  Now, the --

THE COURT:  I didn't write that one.

MR. BROOCKS:  No, I know that.  I know that.

THE COURT:  Okay.

MR. BROOCKS:  But that's what the understanding was because if you --

THE COURT:  No, no.  That wasn't my understanding.  That -- I don't have control of it.  No one filed a motion for reconsideration on that.  I would have been more than happy to explain what that meant at that time.  But once things get appealed, I don't touch them anymore, and I don't read them anymore.  I lose jurisdiction immediately, and so I don't comment on -- I don't comment.  It would be highly improper for me to comment on what was happening.

MR. BROOCKS:  But, Your Honor, the point, though, was that if you did not transfer the assets, that was the whole purpose of the U.S. Trustee's making comments to you.  How can Mr. Murray have spent since September trying to sell assets he didn't own?  How can he do it?  You can't sell assets you don't own, and the distinction between, I deem these to have been vested, versus they are actually vested is a distinction that I'm not familiar with.  You can't sell something that you don't own.

THE COURT:  No, I think Alex Jones owns Free Speech.  Alex Jones can go tell somebody to go sell assets in Free Speech.  That's the point that I've been trying to

006768

make -- well, I would have made it years ago.  Of course he can, he owns the business.  He owns Free Speech.  If he wants to go sell assets of Free Speech, he can -- the Trustee now sits there in the shoes.  The Trustee can always go tell Alex Jones -- Alex Jones can, in his capacity as trustee over the Jones estate, he owns the business.  He wants to go sell something; he can tell somebody to go sell it.  That's the point that I was trying to, by the deemed, to make.

But it doesn't make it property of the estate.  And I can't comment on what people said, nor am I going to ask them what they did.  They certainly had the right to go file what they wanted, but I think there's an easy answer to that question.

MR. BROOCKS:  Your Honor, but if I may just continue because I'm deeply confused now because for the last -- you know, since September of last year, Mr. Murray has been running FSS trying to sell it, and in the hearing we had in June of this last year, just June, the discussion and colloquy back and forth was, what about a future sale?  What are we going to do?  And you -- and not just to the equity.  You were talking about the assets, and I can show you a chapter and verse.  How do you sell assets under an order that doesn't give Mr. Murray the ability to actually sell because you said, and I can show you where you said it,

006769

if we do it again.  I don't want to do an auction, but I'm going to have to be involved.  There's going to be cash and lots of complications and things.  This is -- I'm bewildered that you would say --

THE COURT:  How are you bewildered?  I'm just explaining it to you.  No one has -- I don't think anybody -- have I said anything inconsistent with what I've said before?

MR. BROOCKS:  I believe you have.

THE COURT:  I don't -- we'll just agree to disagree.  I don't want to get into the back and forth about this, but maybe we'll just agree to disagree, but none of what I'm saying is inconsistent.  Christopher Murray is the Trustee over Alex Jones' estate.  Alex Jones owns FSS.  If he wants to go sell the assets, he can.  I tried to create a forum which would maximize value for everyone and to create a stable environment because there were concerns at the time, before you got involved, Mr. Broocks, where there was concerns about people coming in and raiding the place and raiding the cash, and then there were concerns about the government taking over.

There were allegations.  This is all stuff that was said in the hearing, so we created -- I created a forum in which it was deemed to have vested in the estate.  Mr. Murray controlled the cash so that we can stabilize this,

006770

and folks can get paid and get to where it goes.  But it's never property of the estate.  I don't have the authority to go do that under the bankruptcy bill.

MR. BROOCKS:  Judge, if you --

THE COURT:  And they did -- they thought.

MR. BROOCKS:  -- weren't protecting them by that, then how -- if you were concerned about people coming in and grabbing assets, the only mechanism that you would have had to protect that was an automatic stay.

THE COURT:  No, that's not bankruptcy 101.  I can't do that.

MR. BROOCKS:  But you did it.

THE COURT:  No.  It doesn't make it subject to the automatic stay anyway.

MR. BROOCKS:  But, Your Honor, that's the only way one could protect the assets for other people, the creditors and the government, the litany of people who --

THE COURT:  That's what I'm saying.  You're just not versed in bankruptcy law.

MR. BROOCKS:  I'm versed enough to know that --

THE COURT:  No, you're not because people issue injunctions all the time in bankruptcy that have nothing to do with the automatic stay.  Look --

MR. BROOCKS:  Yes, sir.

THE COURT:  -- you can disagree with that, but

none of what everybody is saying makes law. And I'm not trying to stay law. I'm trying to stay consistent with what I have said, and those words mattered. And we can't read out, "Shall be deemed," out of the order. And we can't also read that he's authorized to operate the business of FSS at a time which we have removed the CRO and there was uncertainty that he could operate for a year, and that has lapsed. Mr. Jordan, what can you tell me?

MR. JORDAN: Your Honor, well, first of all, I can tell you --

THE COURT: I don't mean to sound disrespectful that someone isn't versed in bankruptcy law, but I can't make the automatic stay apply. It either does or it doesn't. And I understand there was a statement of issue on appeal. It's the first time -- it is literally the first time that I have read it. No one took this issue up. I don't recall. If I do, someone will correct me. I don't recall someone filing a motion for reconsideration where we had a colloquy on this point. It was appealed to which I stopped reading at that point.

MR. JORDAN: Your Honor, if I might address. First of all, this is a focus that I've never had in this case, and it's not your fault. It says what it says. But let me just address it from the standpoint of what kind of practice I've been involved with. First of all, if you

recall, as soon as you entered the order, it was overlapping with an attempt to get a turnover order and a turnover in state court.  That was removed to this Court and effectively stayed those actions.  At that point, no one raised the fact that, no, there's no automatic stay.  Anybody can go get any of the property they want.  Nobody said that, and I'm only saying it because that was not the approach.  And then --

THE COURT:  I'm not -- that's what I'm saying. I'm not trying to get into why people did things and why they didn't do it.  I'm not mad that you're arguing that you thought it applied.  I understand that, and I'm not upset at anyone.  What I am saying is it's not property of the estate, and it's not subject to the automatic stay.  It's just not, and this is a non-debtor asset.

And again, I don't want to get into specifics about what assets are specifically held by the non-debtor, but whatever assets are held by Free Speech are -- people have rights under state law, but then parties, I think you all have the right to go appeal as well.  And I have no idea where those matters are, but they're not subject to the automatic stay.  I don't mean to come across as anything other than just stressing -- I understand, you read transcripts.  They read matters on appeal.  I can't convert something that's not property of the estate into property of the estate, nor can I say the automatic stay applies to

006773

something where it doesn't, and I haven't issued kind of a 105, what we would call a 105 extension to non-debtor that you normally would see in these instances to protect assets against the non-debtor.

I won't do it either, but no one has asked that. So, it's the only kind of wrinkle.  Then I go back, and I realize, well, maybe Murray still has the authority to go operate and Murray doesn't.  Then I said, Murray, I don't even want you selling this stuff anymore.  Tell me what you want to do with the equity.  I don't -- again, I'm not -- I don't want to change -- I got it, people write transcripts and maybe we need to just ask me what to construe the order, but that's --

MR. JORDAN:  Well, Your Honor, if I might just -- let me say one thing about the conduct of the parties with respect to that order.

THE COURT:  Sure.

MR. JORDAN:  Everybody treated that order respectfully.  Everybody did not believe they had a right to go grab assets that were in the exclusive jurisdiction of the bankruptcy court.  I would read -- let me read this to the Court, the Supreme Court of the United States.

THE COURT:  Mm hmm.

MR. JORDAN:  "The temporal line of demarcation is not impervious, and a legal claim that accrues post-petition

006774

can be deemed property of estate if it is sufficiently rooted in the pre-petition past."  And I'm only reading -- quoting the Court from Segal v. Rochelle, 382 U.S. 375.  And so, the concept that you are -- and here's the dilemma if I might say.  I don't doubt at all that exactly what you said you intended was that you were not creating property of estate.  I'm not arguing with that at all because you're the author.  You know what you intended.  You did it.

And within the process that was employed subsequent to that, the process being parties all had to deal with the Trustee.  The Trustee has spent over $2 million trying to sell the property.  The thing that was created, the parties to this estate, all treated it as the property was transferred and vested, and I know the word is deemed vested, as property of estate.  So, my first request is this, I -- quite honestly, I'm caught a little flat-footed.  I didn't -- I never focused on that word being something that was -- I mean, this is the first time I think the Court has said this, and it's clear that you recall what you meant, but --

THE COURT:  It's also what I said, right?  I think there's a difference.  Textualism would tell me.  Sometimes you just look at the words, and the words mean what they mean.  In other words, I'm enforcing the order as written.  You know, it's -- my recollection is consistent with what I

wrote, and there's a lapse in time.  Like Murray has -- you cannot -- there's no operation of the business anymore. That business -- I don't know this for sure, but I suspect Alex Jones himself is now -- whoever is in charge of FSS will operate FSS.

MR. JORDAN:  Well, of course, it has been treated as both the ownership and as the assets vested in the estate.  So, everything has been done through the Trustee and through the estate since the order was entered.  And what I'm suggesting is that, it's not that your memory is not correct.  What I'm suggesting is that there has been a process in place that everyone involved with these assets has appreciated, that it was deemed property of the estate, and that's what it would be.

Because that -- the case law, when you read the phrase, deemed property of the estate, they all deal with whether or not it has a close relationship with the Debtor --

THE COURT:  Mm hmm.

MR. JORDAN:  -- whether it is rooted in the Debtor.  And we're talking about a single-member LLC being in bankruptcy with the single member.  And so, it fits the other things.  What I would -- what I'd ask the Court to do, only because this revelation is going to create the existence of the property of the estate that was deemed by

006776

the supplemental order, has been a major topic of whether or not you had set the supplemental order aside.  In your February rulings, the state court has been told that you voided it while it was on appeal.  And they said that that --

THE COURT:  Oh, I have no idea what they said.

MR. JORDAN:  Well, but I say -- here's the important --

THE COURT:  No, no, I got it.  I got it.  It could cut both ways, in other words.  People are making statements to state courts that may or may not be accurate both ways.

MR. JORDAN:  But the problem was that when we told the state court that you did not, for instance in the order of February of this year, that you did not void the supplemental order.  In fact, you found in that February 5th transcript, you say, wait a minute, let me go back, this is on appeal.  And I said, yes, sir, it is.

THE COURT:  Mm hmm.

MR. JORDAN:  Yes, Judge, it is.  And you said, well, I have no jurisdiction.  I can't do this.  Now, you also repeated that in June --

THE COURT:  Mm hmm.

MR. JORDAN:  -- in great detail.  The problem that is happening right now is that we were -- that sanctions were sought against us for saying that, no, on February 5th,

the Court didn't -- they claimed a $100,000 sanction for us telling the state court judge that you didn't void it on February 5th, showing the quoted language. So, all I can suggest right now today is that as a result of now I hear what your focus was, I would appreciate, and we need some time to address this single issue. Because you're correct that the proper operations expire.

THE COURT: What do you mean by the single issue? Just so I'm clear.

MR. JORDAN: Well, the effect of your order now saying it was never a property of the estate, it was never subject to an automatic stay, it was always subject to any creditor wanting to come grab it and lien with it, that's so contrary to the practice that we have spent.

In fact, I don't know how we undo that because the estate, I would assume, will owe for the attorney's fees and all the expenses they pay. I'm not sure what happens if that's --

THE COURT: But again, I'm being really clear. I signed an order authorizing the trust to operate FSS, and I've also said that the Trustee had ownership of the asset, of the equity, and you could always tell the equity to go sell, right? And so, I don't know -- what I have in front of me is a motion to confirm that the automatic stay doesn't apply. That's the only matter that's before me. I don't

006778

have any other request for relief before me, and that relief is granted.  I'm just confirming it, but I'm providing some additional reasoning behind it, because I always thought that was the answer, and when I said the voiding of the order, we were always talking about selling assets, like, you know, the extent that people are seeing within this order that you could go sell stuff.

THE COURT:  I don't want another sales order.  If somebody puts up a lot of money and cash is king, and we're not talking about contingencies or allowed claims, I think it benefited everybody to see if you could sell that asset. It would benefit Jones' estate, quite frankly.  That was --

MR. JORDAN:  Well, Your Honor, at the June hearing where all the parties were present --

THE COURT:  Mm hmm.

MR. JORDAN:  -- including the Trustee and counsel --

THE COURT:  Mm hmm.

MR. JORDAN:  -- this issue was raised about the viability of the supplemental order.

THE COURT:  Mm hmm.

MR. JORDAN:  And the reason it was being raised was that they were seeking access to the assets, and the issue that we asked to address, and the Court did address for us was that the supplemental order was not voided in

February, and you confirmed that in detail.  You said, I didn't do anything in February, and I can't do it.  I can't do it when the appeal is in process.

THE COURT:  I think that's right.

MR. JORDAN:  And so, the supplemental order itself has continued through today.  Now, back to my -- my suggestion is that I think the parties have treated your supplemental order as written, and that is that where an asset is rooted in the pre-petition Debtor, and the Court orders that it will be deemed --

THE COURT:  No, no, don't put words in there.  I'm not talking about rooted in there.  I just wrote what I wrote.  You're trying to -- you're using case law.

MR. JORDAN:  Yes, no, all I was referencing was case law, not this Court, because I'm now confronted with something I may have not even considered.

THE COURT:  Mr. Shelby, you thought -- you're telling me -- no, let me not go there.  Let me not go there. Tell me what you're asking.

MR. JORDAN:  Well, at this point, I'm asking for some additional time to brief this issue in this position.

THE COURT:  I don't have a request for relief.

MR. JORDAN:  And then --

THE COURT:  In other words, you can file a motion. I can take something up, but I need something.  All I have

is a motion confirming that it does not apply to FSS assets, and that's what I can say.  That's what I can confirm.  In other words, I'm just confirming that the automatic stay doesn't apply to FSS assets.  That's the requested relief before me.  I don't need -- if there's somebody that wants me to do something else, you've got to ask for the relief requested, and I'll take it up in due course.  But I don't want to --

MR. JORDAN:  Well, you know, I think the Court's confirmed that the supplemental order is still in effect.  You've never set it aside, that's number one.

THE COURT:  I don't think it's in effect anymore, now that we sit here today on October 1st, when you have a September 25th order.

MR. JORDAN:  Operationally, it may not be in effect.  I mean, you're precisely correct that the provisions were for a one-year operation.

THE COURT:  But I -- again, I'm -- well, I don't want to confuse dates.  I know that there was a period -- well, I can't remember.  I thought we had a hearing after the appeal was over.

MR. JORDAN:  We did.  That's the June 5th hearing.

THE COURT:  And I think at that hearing, I said -- well, I don't remember.  Tell me what you're asking, though, Mr. Jordan?

MR. JORDAN:  Well, at that -- what we were asking at that hearing --

THE COURT:  No, no, no.  I'm saying, what are you asking for today?  In other words, you're asking for supplemental briefing on something.

MR. JORDAN:  Well, actually, that's new, because the issue has not -- I have not even considered the issue, and as a result of the Court's --

THE COURT:  I'm surprised by that, to be honest with you, to hear.

MR. JORDAN:  Yeah.

THE COURT:  Seriously, I'm surprised, because it's 362 is 362, and 105 is 105 over non-debtor assets.  I'm -- what I can do is enter an order saying the motion is granted, period; the automatic stay imposed in respect that the Jones case does not apply to FSS or any of its assets.  Like, I don't want to -- that's the request.  That's what I'm comfortable --

MR. JORDAN:  Well, actually the --

THE COURT:  -- entering an order for.

MR. JORDAN:  -- request was -- in our response, the request was to allow a private sale, cash sale, to individuals on a bid basis, one bid only, and the highest bidder wins.  That's the request that we had, because we know that there are substantial bidders in the wings, and we

006782

know that those will not be even considered if the matter is turned over to the Plaintiffs who have -- they've announced multiple times their intention to acquire the assets, which, as the Court recognizes, there was an effort to do it at the lowest price possible with the highest claims possible, and then to destroy the assets.

In fact, recently, Mr. Moshenberg is quoted as saying that, "Based upon the appointment of the receiver, it's time to shut it down," and that's what's going to happen.  The value of these assets, the ability of the assets to have value to be applied to even a billion-dollar judgment, a debtor has the right to have a reasonable treatment of his collateral to be applied to the debt that, in both cases, are not yet even final.  The Supreme Court has the writ of cert.  We'll know as a result of the 10th.

THE COURT:  Okay.  No.  No, I didn't know.

MR. JORDAN:  Oh, okay.  Well, the Supreme Court has a writ of cert.  It'll be heard to the full panel. We've made past the first little obstacle, and the full panel is going to consider it on the 10th.  They project for us that it comes out the following Monday or Tuesday, which ought to be the 14th, so the Supreme Court's going to either make our day or make the argument moot.  So, that is going forward, and with respect then to what we asked for.

THE COURT:  Is it going with respect to the

Connecticut judgment or the Texas judgment or both?

MR. JORDAN:  The Connecticut judgment.  The Court of Appeals has the Texas judgment and --

THE COURT:  The Texas Court of Appeals has that judgment?

MR. JORDAN:  They have the Texas judgment.

THE COURT:  Okay.

MR. JORDAN:  And that's the one we discussed in the last hearing where the Plaintiffs appeared and said they wished there was a meaningful appeal, but it didn't mean anything because they'd made a deal with the Connecticut Plaintiffs.  So, those two --

THE COURT:  Oh, okay.  Yeah, I remember that.

MR. JORDAN:  So, those two matters are still pending, and what I'm asking for in connection with this issue is that we not turn loose, open the gate, as of now, on the supplemental order or on the language deemed until we've had a chance to report back to the Court very promptly.  I mean, I only looked on the Supreme Court's docket to find a case that says that assets that are not property of the estate on the petition date can be deemed property of the estate if it's sufficiently rooted.  Now, my dilemma is this.  I do want time.  This is a total surprise and --

THE COURT:  You can't be surprised that I've said

006784

that an asset against a dismissed debtor is not property of the estate.

MR. JORDAN:  Well, you're giving me a lot more credit than I deserve then, Judge, because quite frankly, you know, like I said, I have in the past dealt with the issues of we're going to deem this property of the estate. Even --

THE COURT:  I've also said that parties would be entitled to their collection remedies.  I know I've said that on several occasions.

MAN 1:  A lot.

THE COURT:  On several occasions, that parties will be able to revert rights, as well as you'd be able to file whatever you wanted in the state court.  Whatever the state court did, the state court did.  I recall, you know, it's --

MR. JORDAN:  Well, Judge, you said that, and your memory is good, but the --

THE COURT:  Well --

MR. JORDAN:  -- language you used was that you can go to state court and exercise whatever rights you have. But I didn't hear that, but I did hear it, because that's been often said by bankruptcy courts, which is, look, this property is in this estate.  You can go to state court and exercise whatever rights you've got, but you don't get to

006785

exercise bankruptcy rights in state court.  Just, you can go do what you want to do in state court.  FSS is not in bankruptcy.  You may pursue whatever remedies that you have.

THE COURT:  How could someone pursue a remedy if the automatic stay was in effect?

MR. JORDAN:  That's right, and that's what I'm arguing.

THE COURT:  In other words --

MR. JORDAN:  You know, they could pursue a remedy --

THE COURT:  But you would have come to me.  That's what I'm saying, you would have come to me, right?  If somebody would have filed anything, any kind of collection action in state court, you would have come to me immediately and said, Your Honor, violation of the automatic stay, and a matter of fact --

MR. JORDAN:  We did.

THE COURT:  Huh?

MR. JORDAN:  We did do that.  The first time that they came back, we were -- first of all, the first time they did it in 2024, we removed the case, and that's in your Court.  The second time they did it, we filed our motion and removed only Alex Jones.  He's the only Debtor.  We left FSS alone.

THE COURT:  Why?

006786

MR. JORDAN: Because there's other -- because there are other things that maybe they claim FSS has or does or is entitled to. So, we were never arguing that of any of the language you made. You did -- you repeated that the order is in place, and you repeated that. You said it in February and repeated it in June. And for the sake of it being in place, we were operating under that order, and I think everyone else was because --

THE COURT: I don't think these folks ever agreed that the automatic stay was in effect, right? There was just a disagreement about the very issue. The Connecticut families, I'm sure Mr. Kimpler filed a motion to confirm that it wasn't in effect.

MR. JORDAN: Well, in effect, they did agree. There are two exhibits that we have for our presentation today in which it's the motion that they filed for turnover. It all recognized, made findings of the supplemental order, and it provided that the receiver couldn't go get assets unless he got the consent of the Trustee in the bankruptcy court. And we cited to you the page and line where that is. So, that -- now that has changed. Subsequent to that, that order is on appeal. The order appointing the receiver is on appeal.

THE COURT: Texas?

MR. JORDAN: Texas. Yeah, to the Court of

Appeals, where the same panel where the other appeal is pending. And there is then a to-be-entered supplemental order finding that non-pro-tem, that that was a mistake. That's what they claim. It was in their motion, in the order they proposed, in the order that was entered, that it was subject to the Trustees.

And here is the dilemma that I'm having. I'm trying to figure out how I'm going to brief this. I've -- you know, I've missed things before, so I'm not putting that on the Court. I --

THE COURT: What is the briefing that you're asking for? I guess that's what I'm --

MR. JORDAN: Well, this issue is because here's what's happened. As a result of that language and the case law that will support it, saying, yes, that can be property of the estate, and I've only started the Supreme Court, there has been things that have happened, including our position at risk, that we represented that the supplemental order was still in place, only with the implication that the automatic stay was involved because it was deemed property of the estate.

THE COURT: And that's why I'm trying to avoid anyone saying, in state court. I don't know what has been said or not said, but I certainly don't want anyone to leave this Court today thinking that I am endorsing in any way any

006788

finding that people did anything improperly in a state court.  I mean this as it respects anything you or Mr. Broocks or anybody has said.  It's why I'm purposely not asking those questions, and people cite transcripts, and then they cite portions of transcripts.  I'm just answering a legal question that is presented to me today as to whether the automatic stay applies, and it does not.

MR. JORDAN:  Well, actually, what you're being asked to do, which is --

MR. KIMPLER:  Your Honor, just one point?

THE COURT:  Yeah.

MR. KIMPLER:  Thank you.

THE COURT:  I will.  And then, folks, I've got a 2 o'clock, but go ahead.  Go ahead, Mr. Jordan, and then I'll turn to Mr. Kimpler.

MR. JORDAN:  What's being asked today is for you to make a finding that you voided the supplemental order back in February.

THE COURT:  I'm just saying I'm entering an order saying the relief requested in this motion is granted to the extent provided herein.  The automatic stay imposed under Section 362 does not apply to FSS or any of FSS assets.  That's what I can confirm.

MR. JORDAN:  Okay.  Well, I've got 14 days to come back and ask.  If I can come up with an issue that I am

hoping the Court hadn't thought of what will help further our position, because what we're really concerned about, have always been concerned about with respect to these assets, is that you -- and we know you -- I mean, you've always said, look, follow the purpose of my order.  Follow what I told you to do.  Well, that never happened.  It didn't happen in the first attempt at an auction, and it didn't happen in the second group of things, including a settlement agreement that gave them -- that they asked for an approved, allowed claim in the Jones estate.  Not just that -- I know FSS, you couldn't do it.  They wanted a $400 million allowed claim in the Jones estate for the Texas Plaintiffs.  Allowed claim --

THE COURT:  And I couldn't do that.

MR. JORDAN:  -- in a settlement.  And you didn't do that.  But what I'm suggesting is that the status and the things that we might have done, had I focused on your intention that deemed  --

THE COURT:  It's not my intentions.  It's my words.

MR. JORDAN:  It's your words, of course.  Well -- yes.  And I did not perceive that deemed property of the estate could never be property of the estate, because at this point I don't quite agree with that conclusion.  I'm not arguing with the Court at all.

THE COURT: Again, I'm just saying, if someone can point to me to something in 541 that works, I'm more than happy to -- you can.

MR. BROOCKS: I think -- again, I can quote you. In September, when Mr. Wolfshohl asked you for this September order, he said, we need it because these assets aren't assets of the estate of Alex Jones. And you said, no, it is property of the estate of assets of Alex Jones. Alex Jones owns the equity interest in FSS, 541, all legal and equitable interest. All has to mean all. And you said, that's not my interpretation, that's Congress. Congress uses the word all. All means all legal and equitable interest. And then you said it again. You said --

THE COURT: That's why I remember that, Mr. Broocks. I remember that conversation. I had it with Mr. Wentz.

MR. BROOCKS: But I didn't really give him to you. I just deemed him given to you.

THE COURT: It's what I wrote, Mr. Broocks. Now, you can argue about that -- well, I'm done arguing about what I wrote.

MR. BROOCKS: Okay. I'm just saying you said all the assets.

THE COURT: All right. Okay. What else are we talking about here? What else are we talking about?

006791

MR. JORDAN:  Your Honor, I think that at this stage, that's probably the -- that is probably the conclusion of the hearing.  Again, subject to going back and --

THE COURT:  I'm just you whether the automatic stay applies to the Jones asset, to the FSS assets?  The answer is no.  That's what I'm saying today.  I did say before -- I did say, I remember saying, I can't do it because it's on appeal.  But if it comes back to me, I'm going to void the order; that's what I said.  That's what I said.  I was going to void the order because I wanted to make sure that we were clear that I was kind of done with the efforts to try to go sell FSS and all that stuff.

I just went back and looked.  It's kind of done on its own.  I don't need to void anything.  I said I would. You asked me, Judge, can you think about it before you do it?  That's the last I remember.  It's kind of just done on its own.  I don't see any legal effect that this order has. This order, one went with two.  Two is gone.  Two expired on September 25, 2025.  I don't -- so, I can't void anything. I can't void an order that I think is already, on its own terms, void.  So, I can't -- so, what I can do is confirm that the automatic stay doesn't apply.

And I can tell Mr. Murray to make a decision in October as to what he -- which I asked him to do earlier.  I

006792

want an answer on the equity of FSS because, quite frankly, if he wants to sell the equity in FSS, that takes it out of the estate whether he abandons it or not.  It takes it out of the estate one way or the other.  Like, FSS will be middle of November one way or the other.  It's either going to be sold or likely abandoned.  So, we're going to move on with the Jones case.  And I'm trying to find and be as fair as possible to everyone, fair and equitable, not just a fair textual reading of where we are.  Mr. Kimpler, I promise you a word, and then I'm just going to sign the order.

MR. KIMPLER:  Your Honor, I'll be --

THE COURT:  Go ahead.

MR. KIMPLER:  (indiscernible), I disagree with that part.  I just want to cut to the chase.  We think that what you said, what you outlined as an order that you'd be willing to enter today, that is simple, that the automatic stay doesn't apply.  We would recommend that it says that the FSS assets are not property of the estate; nothing more.  That's all we need.  I've seen this movie before.  There are -- we have 45-minute colloquies and then people take those transcripts, and they cite them to other Courts.  I think what we really need, what both parties need here is a very simple order.  What you have outlined is completely acceptable to us, and we'd very much appreciate it if you would enter that order.

006793

MR. JORDAN:  And, Your Honor, I understand you have a 2 o'clock.  Could we have a five- or 10-minute recess to allow counsel to discuss quickly this development, and --

THE COURT:  What is this development?

MR. JORDAN:  Well, should I say my memory lapse?

THE COURT:  No, no, no, no.  I don't want you to be sorry.  I'm just going to enter an order.  I'll enter my own order.  I got a proposed order, I'll sign it.  I'm not -- I'm not voiding -- in other words, I'm not voiding an order.  I'm being asked -- I was asked to void an order.  When I went back and looked at the order, I think the order is on its own as expired on its own terms.  You know, you can't operate the business of FSS anymore, okay.  And I think I've said multiple times, sell the equity if you want.  Cash will be king.  I don't want you trying to sell assets anymore.  I've now come back -- before I've asked you to make a determination on the equity, whether you -- what you want to do or abandon it.

I'm now asking that there be an answer for purposes of where we are.  And the reason I'm saying that, and I want to be really clear is that this case is a 2022 case; it converted to a 7.  But I think in fairness to all parties involved, and that goes to Mr. Jones as well, it is time we do whatever bankruptcy work needs to get done and allow the process to play out in whatever state, federal

appellate courts may have jurisdiction to hear those matters. I think every order that I've written has said that to the extent that nothing that I have signed in any way locks in any amount.

State Connecticut courts come back and change the judgment. That number, nothing in here changes it. The dischargeability order that I entered, you know, it's easy to track if that portion got knocked out. Then it's easy to figure out what portion would be non-dischargeable. State court orders, federal Supreme Court says something. It just gets really simple. I'm just -- and I'm not trying to push the issue. What I'm trying to do is just, folks, it's Free Speech was a '22 Subchapter 5. And it's a dismissed case, right?

It just -- I don't know what rights people have outside of my jurisdiction. I don't because I don't track it. And I don't know what people are alleging or saying, and that's kind of -- I shouldn't be in the business of tracking it. What I can do is just answer the questions that are before me.

Mr. Kimpler, you're asking for confirmation that the assets are not property of the estate. I think I've answered that question, and I said why.

MR. JORDAN: Your Honor, with respect to any order that you're going to enter, I'm assuming that the 14-day

006795

stay rule is going to be in place?  You're not going to enter some order that creates an effectiveness before --

THE COURT:  I don't think the 14-day rule would even, to my knowledge, even apply, like, for a waiver of what I'm asking for.  I don't even think it comes into play.  There's no -- it's just an order confirming that the stay doesn't apply.

In other words, this isn't like a sale where -- to answer your question in the affirmative, I'm not -- nothing I'm doing today, you know, kind of changes any deadlines to seek appellate review.

MR. JORDAN:  All right.

THE COURT:  Okay?  All right, folks, thank you very much.  We're adjourned.  I'll come back for the 2 o'clock in about two minutes.

(Proceedings adjourned at 1:59 p.m.)

006796

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  October 3, 2025

006797

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

In Re:   Alexander E. Jones and Official Committee          Case No.: 22−33553
         Of Unsecured Creditors
         Debtor                                            Chapter: 7

## NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E-Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at https://www.txs.uscourts.gov/.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at https://www.txs.uscourts.gov/ or by calling (713) 250−5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

                                        Nathan Ochsner
                                        Clerk of Court

006798

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | § | |
|---|---|---|
| IN RE:  ALEXANDER E. JONES | § | CASE NO. 22-33553 (CML) |
| | § | |
| Debtor | § | Chapter 7 |

**MOTION FOR RECONSIDERATION AND REHEARING OF THIS COURT'S**
**ORDER CONFIRMING THAT FSS ASSETS ARE NOT PROPERTY**
**OF THE ESTATE OF ALEXANDER E. JONES AND**
**NOT SUBJECT TO THE AUTOMATIC STAY**
**[Dkt. No. 1251]**
**AND RENEWED REQUEST FOR THE PENDING RELIEF OF A PRIVATE**
**SALE OF THE FSS ASSETS FOR CASH**
**[Dkt. No. 1131, 1248[1]]**

**This motion seeks an order that may adversely affect you.  If you oppose the motion, you should immediately contact the moving party to resolve the dispute.  If you and the moving party cannot agree, you must file a response and send a copy to the moving party.  You must file and serve your response within 21 days of the date this was served on you.  Your response must state why the motion should not be granted.  If you do not file a timely response, the relief may be granted without further notice to you.  If you oppose the motion and have not reached an agreement, you must attend the hearing.  Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:**

This Motion is filed by Alexander E. Jones ("Jones") for himself and his wholly owned company, Free Speech Systems, LLC ("FSS").  Collectively they are referred to as "Jones", and the bankruptcy estate of Jones is called the "Jones Chapter 7 Estate".  Jones asks this Court to reconsider and rehear this Court's Order entered on October 1, 2025 [Dkt. No. 1251] (the "Order") wherein the Court determined that:

---

[1]    *See*, p. 51, p. 25 of Dkt. No. 1248.

006799

"…for all the reasons stated on the record at the October 1, 2025, hearing: The Automatic Stay imposed under Section 362(a) of the Bankruptcy Code in the Jones Bankruptcy Case does not apply to FSS or any of FSS's assets because these assets are not property of the Jones Bankruptcy Estate under Section 541 of the Bankruptcy Code."

and further seeks the relief Jones has been seeking by Motion filed May 28, 2025 (Dkt. No. 1131) as requested again on September 30, 2024 (Dkt No. 1248) and would show the court as follows:

**I.**
**PRELIMINARY STATEMENT**
**AND RELEVANT BACKGROUND FACTS**

A.    **Summary of Motion**

1.    Jones respectfully moves for reconsideration under Federal Rule of Civil Procedure 54(b) of this Court's October 1, 2025 Order confirming that the FSS assets are not subject to the automatic stay.

2.    This Motion arises out of two bankruptcy cases; one filed by Jones and the other filed by "consent" of Jones of the 100% owned affiliate LLC FSS. This Bankruptcy Court entered an Oder (the "Order") **Exhibit 1** (Dkt. No. 1251). Accordingly, this Motion is timely filed.

3.    Jones was originally in a Chapter 11 case, filed after his affiliate FSS filing of its Subchapter V case but the case was converted to a liquidating Chapter 7 case after Jones was unable to confirm a Chapter 11 Plan of Reorganization. FSS is no longer in any bankruptcy case, after its failed attempt to confirm a plan of reorganization as a Subchapter V Debtor and its case was dismissed. Both bankruptcies arose out of the litigation over broadcasts by Jones and FSS involving the Sandy Hook school murders by Adam Lanza.

4.    Importantly, on May 28, 2025 (Dkt. No. 1131) Jones sought to have this Bankruptcy Court reconsider its decision that no auction would be conducted and upon hearing on June 5, 2025, this Court announced that it may consider a private sale of the FSS Assets but

006800

announced it would take all matters under consideration for at least 60 days [Dkt. No. 1193, p. 65-66: 9-3]. Jones's Motion requesting the Court allow the private sale of the FSS assets in this bankruptcy case (just as this Court originally intended) is still pending and was at the time the Court entered its order on October 1, 2025. Jones re-urges his request for further hearing and a ruling from the Court on this requested relief.

5.      On October 1, 2025, this Court held a hearing on *The Sandy Hook Families' Emergency Joint Motion for Entry of an Order Confirming that FSS Assets are not Subject to the Automatic Stay* (the "Emergency Motion") [Dkt. No. 1241].  The Emergency Motion asked this Court to *confirm* that on February 5, 2025, the Court found that the Supplemental Order was "null and void," and that FSS's assets were not property of the Chapter 7 Estate.  This Court found that it did not do so on February 5, 2025.

6.      The Emergency Motion also sought an order stating that Jones's continued efforts to rely on the automatic stay to prohibit the Sandy Hook Families from proceeding with collection efforts in Texas state court must be curtailed since the automatic stay went away after being voided on February 5, 2025.

7.      At the hearing, the Court held that February 5, 2025, had nothing to do with the lack of the automatic stay because the automatic stay *indeed had never applied to the FSS Assets* because entering the Supplemental Order, the Bankruptcy Court did not transfer any title to the FSS Assets to the Estate of Jones.  Instead, the Court explained that the Supplemental Order only "deemed" FSS's Assets were vested in the Estate of Jones, which the Court distinguished from the property actually being "property of the (Chapter 7) estate" of Jones.[2]  According to the Court, "I

---

[2]      It says 'Effective as of the date of this pursuant to 349(b), all property of the estate shall be deemed to have vested in the estate as property of the estate.' So, it's deemed as property of the estate, but that doesn't mean it's property of the estate." [**Exhibit 2,** October 1, 2025, Transcript, p. 7:10-15].

006801

cannot convert something into property of the estate, so the automatic stay can never go into effect with respect to that." [*See*, October 1, 2025, Transcript (**Exhibit 2**), 8 - 9:24, 1 – 3].

### B.    The Court as a Textualist[3]

8.    The court emphasized that, as a textualist, the Order was clear:

"It says 'Effective as of the date of this ***pursuant to 349(b),*** all property of the estate shall be deemed to have vested in the estate as property of the estate.' So, it's deemed as property of the estate, but that doesn't mean it's property of the estate." *See*, Supplemental Order (Emphasis Added).

[*See,* **Exhibit 2,** October 1, 2025, Transcript, p. 7:10-15] (*See*, Supplemental Order FSS Dkt. No. 1021).  Nonetheless, the Court did not reference on October 1, 2025, or in the Order of that date, that § 349(b)(3), as recited in the *text* of the Supplemental Order, provides that ***"[u]nless the court, for cause, orders otherwise***, a dismissal of a case . . . revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case . . . ."  (11 U.S.C. § 349(b)(3) [Emphasis Added]). [*See*, Tr. Nguyen and Court pg. 24 to 28 line 4].

9.    In addition to September 24, 2024, the Court expressly discussed "the cause" on several other occasions – protecting the FSS Assets from dissipation, avoiding a race to the courthouse, and to protect the assets.   And § 341(b)(3), just as discussed on September 24, 2024, with the U.S. Trustee,

"… applies to all property of the estate, ***not just property that was in existence as of the date the … petition was filed.*** Fulfilling the 'basic purpose' of § 349(b)(3), 'to undo the bankruptcy case, as far as practicable,' as described in *Jevic*, 137 S. Ct. at 984,[4] requires return of *all* property of the estate — regardless of whether such property became property of the estate on the day the petition was filed under § 541(a)(1), ***or whether such property became property of the estate post-petition***…," (Emphasis Added)

---

3    See, **Exhibit 2,** Tr. 10-1-25 pg. 43, 7-9.
4    *In re Haddad*, 572 B.R. 661, 663 (Bankr. E.D. Mich. 2017).  11 U.S.C.S. § 349(b)(3) applies to all property of the estate, not just property that was in existence as of the date a Chapter 13 petition was filed.

006802

*See, e.g. In re Haddad*, 572 B.R. 661, 675 (Bankr. E.D. Mich. 2017).[5]

10.     Although contrary to the understanding of all parties,[6] the Court's rationale for determining that the automatic stay did not apply to the assets of FSS was, first that when FSS was dismissed from bankruptcy in June 2024 [FSS Dkt. No. 956], pursuant to section 541 of the Bankruptcy Code, the Court did not have the authority to convert non-debtor assets into assets of the Estate of Jones.  **Exhibit 2**, 9: 21 – 23.  Jones argues that § 349(b)(3) permits just such a result.

### C.     The June 2024 Dismissal Order

11.     It is the conversion of the Jones case and dismissal of the FSS case that gives rise to the issues sought to be reconsidered.  The Jones case was converted on June 14, 2024 [Dkt. No. 708] (the "Conversion Date") to Chapter 7 with Chris Murray appointed as its Trustee.  FSS (the Jones 100% owned LLC holding the production assets necessary to air The Alex Jones Show) was not converted to Chapter 7 but dismissed by Order of the Bankruptcy Court [FSS Dkt. No. 956], but subject to the Dismissal Order (that included a transfer of sorts of all signatory authority and bank accounts of FSS funds to the Jones Chapter 7 Estate). Importantly, those funds have been used and in large part exhausted by the Jones Chapter 7 Estate but replaced with new post-dismissal operations of the Jones Chapter 7 Estate.  *See, infra* **Exhibit 3** attached hereto (the "Initial Cash Order" or the "FSS Dismissal Order").

12.     At that time, the Sandy Hook Families were not in agreement as to the fate of FSS. The Connecticut Plaintiffs opposed dismissal and filed an Emergency Motion for an Order Converting the Chapter 11 Case to a Chapter 7 Case.  [FSS Dkt. No. 921]. The Texas Plaintiffs

---

[5]     See, also *In re Walter*, 199 B.R. 390, 392 (Bankr. C.D. Ill. 1996) ["Judge Ginsburg concluded that, while § 349(b)(3) deals only with property that was property of the estate pre-petition, the same logic should apply to post-petition property of the estate…."]

[6]     In the Emergency Motion, Plaintiffs' sole basis for their position that the automatic stay did not apply is that the Court "voided" the Supplemental Order during the February 5, 2025, hearing.

006803

supported dismissal. [FSS Dkt. No. 945] (Texas had the Turnover Order and Garnishment in the wings).

13.     On the Conversion Date the FSS Dismissal Order included a provision that the signatory authority and all FSS bank accounts were transferred to the Jones Chapter 7 estate. *See*, **Exhibit 3** attached hereto.  There was no *"deemed vested"* language regarding the bank accounts in the FSS Dismissal Order, distinct from the language of the second order to follow on September 24, 2025, involving FSS non-cash assets as described below (the "Supplemental Order" **Exhibit 4** attached hereto).

14.     In arguing in support of conversion and recognizing that the underlying case had recently converted to Chapter 7 proceeding, the Connecticut Plaintiffs argued to this Court that the primary concern they had in opposition to dismissal of FSS from bankruptcy was the equity of distribution of FSS Assets between the Sandy Hook Families.  In communicating their concerns to this Court during a June 14, 2024, hearing, the Connecticut Plaintiffs argued that ensuring that a Chapter 7 trustee had complete control of FSS's assets would provide the requisite security:

006804

> MR. KIMPLER: It could help if there is a Chapter 7 trustee that has complete control over the distribution of FSS assets and it's all getting distributed through the Jones case, yes, but it's not a complete solution.
>
> THE COURT: No. I agree.
>
> MR. KIMPLER: There's not a stay that would be protecting FSS. Nothing would stop one of the families from going in and collecting a judgment against FSS. You'd be at the same point where you'd be saying does the stay in the Jones Chapter 7 case prevent a collection effort against FSS.

[*See*, June 14, 2024, Transcript (Dkt. No. 721), 66: 9 – 19]. Protecting FSS's assets from a race to collection among creditors was crucial to an equitable distribution and the Connecticut Plaintiffs were behind in the courthouse race.

### D. Texas Plaintiffs Immediately Obtain Turnover Order After FSS's Dismissal Order

15.     Of course, the most significant bankruptcy policy recognized by the Supreme Court is "fair and equitable distributions" among creditors of the asset value of the debtor's available property. The Connecticut Plaintiffs were concerned that the Texas Plaintiffs would win the race. Their fear was well founded. On the same day of the FSS Dismissal Order, the Texas Plaintiffs attacked the cash transferred to the Jones Chapter 7 Case through a post-Dismissal Turnover Order issued by the State District Court). In response to the Emergency Motion brought by the Trustee (the recipient of the FSS cash) the Bankruptcy Court *immediately protected the cash from the State Turnover Order* (which confirmed to Jones and likely all, that those assets were property of the

006805

Jones Chapter 7 Estate and would be entitled to protection).[7] On June 27, 2024, a hearing was held on the Texas Plaintiffs' Turnover Order they obtained, at which the Court questioned the Texas Plaintiffs' lawyer, Avi Moshenberg (Moshenberg), about his State Court Turnover and Garnishment Order. Moshenberg admitted to the Court his actual knowledge of the FSS Dismissal Order and its transfer of the FSS bank accounts and cash to the Jones Chapter 7 Estate. The Court then issued a bench ruling:

> [Dkt. No. 758, Tr. Pg. 19]
> …　　　　　　　　　　So what I'm going to do is enter an
> amended order that makes it really clear that I'm aware that
> there was an order entered by the state court.
>    *In my view*, ***it conflicts with my order,*** *and so* ***you're***
> ***not to turn over any amounts of bank accounts and you'll stay***
> ***any directive to -- you're under no compulsion to turn anything***
> ***over or abandon***, because, quite frankly, it's more abandonment,
> I think, in terms of what you may decide to do or not do. But
> we'll take those issues out.

June 27, 2024, Tr. 19:15-23 [Dkt. No. 758]. (Emphasis added). The Court dealt with the bank accounts in this bench order by *prohibiting the Trustee* from turning over any "amounts" of bank accounts. Shortly after this hearing the Trustee removed the State Court Turnover and Garnishment to the Bankruptcy Court. [24-01034; Dkt. No. 1]. The removal acknowledged that Jones's 100% membership interest in FSS constitutes non-exempt property under applicable non-bankruptcy law and is property of the Estate in the Jones Bankruptcy Case pursuant to 11 U.S.C. §541. On June 27, 2024, the Court discussed the "cause" under § 349(b)(3) of protecting the assets from just such inequitable results. The removal also acknowledged that the State Court Turnover and

---

[7]　　Important here, as discussed below, the Texas Plaintiffs appealed the transfers of cash and the transfer of assets, claiming that the Bankruptcy Court had no authority to transfer title to the FSS assets to the Jones Chapter 7 Estate or authorize the § 363 sale of those assets. Later the Texas Plaintiffs dismissed this appeal and these orders became final, non-appealable orders *and law of the case*.

006806

Garnishment action has a clear and direct impact on the interests and property of the Debtor's estate under 11 U.S.C. § 541, also a clear statement of "cause" under § 349(b)(3).

### E.    The Pre-petition Relationship of Jones and the FSS Assets and Operations

16.    Significant to the pre-petition relationship of Jones and the FSS operations and physical assets, was that

- Only Jones generated income for FSS; that is FSS did not have any other income generator other than Jones promotions; and

- Only the Jones' generated income purchased the FSS assets; and

- Jones' income was derived from Jones utilizing the FSS assets to produce income from promotion of health supplements that were purchased by FSS from income generated by Jones.

- FSS had no other investors or owners, no lenders nor secured debt,[8] no bonds holders, and only monthly trade credit that was generally paid when due.

This symbiotic relationship, although clothed in the LLC-entity cloak, made distinguishing of these two functions impractical, if not impossible.  It was this "relationship" that made Jones and FSS "jointly and severally liable" for the Connecticut Judgment and the Texas Judgment. This relationship was also noted by the Court:

---

[8]    The one exception was Jones father's business PQPR that was owned 79% by Jones, but that FSS owed approximately $50 million for the purchase of supplements sold by FSS over a multiple-year credit facility between FSS (Jones) and his father.  This was a family business of sorts, but not in the traditional sense of family-owned enterprises.  It was more akin to the Country Western Star riding around in his tour bus with no other band members, only a roadie crew.

006807

When I converted this -- when I dismissed FSS, I did a couple of things. I explicitly told Mr. Murray that he was in charge of the bank account and that he had control of the equity of FSS. He's in charge. And that's -- and I said it on the record, and I remember Ms. Catmull was sitting in the same -- right around there. And I said -- because I didn't want dual seven trustees being around. All this can be done with one trustee. He's in charge of the equity of FSS and he can do what he wants with it.

September 24, 2024, Tr. 12:7-15 [Dkt. No. 861].

The creditors of FSS are one and the same of the creditors of Mr. Jones. They are the same. So this is not being done for the benefit of FSS creditors. This is being done for the benefit of the Jones creditors who sued FSS and Jones. And now the Trustee holds the equity for them. Everything is going to them through this estate. But there's cash there, and you're just using a particular portion of the cash that's available through FSS to then liquidate the FSS stuff. But ultimately it will be distributed through the Jones Chapter 7 case for the benefit of the same creditors who have been appearing. They're in one and the same. And the families here and PQPR, they're

September 24, 2024, Tr. 12:23-13:9 [Dkt. No. 861]. These clear findings, all undisputed, certainly constitute § 349(b)(3) "cause" to treat the FSS Assets as property of the Jones Chapter 7 Estate.

17.    This special relationship continued throughout the trials in Texas and Connecticut, and through the two Chapter 11 bankruptcies. And, when the FSS Dismissal Order was entered using the text "deemed vested" in the Jones Chapter 7 Estate, it simply continued the same relationship, to use the FSS cash and replenish that cash with newly generated income from Jones continued promotions (as the Supplemental Order allowing operations appeared to contemplate).

006808

Importantly here, if the cash ordered to be transferred to the Jones Chapter 7 Estate were not "property of that estate" (under § 541) then the use of that cash was not authorized by any order and wholly unprotected.

### F.    September 24, 2024, Hearing

18.    On September 24, 2024, this Court entered its Supplemental Order [FSS Dkt. No. 1021] that "deemed vested" pursuant to § 349(b)(3) "all" he FFS Assets in the Jones Chapter 7 Estate.  If such assets were not transferred and owned by the Jones Chapter 7 Estate, then those assets could not be sold free and clear of liens, claims, and encumbrances under the bankruptcy code, which was the Bankruptcy Court's announced purpose in protecting and transferring those assets to the Chapter 7 Estate.

19.    In seeking this authority from this Court to winddown FSS through an orderly auction and sales process the Trustee argued that:

> "Upon that dismissal order getting entered, the Trustee analyzed the dismissal order, understood that from the dismissal order, the Court was retaining jurisdiction over certain matters and was also specifically delineating certain things that the Trustee was to do, including taking control over all of the estate."

[*See*, September 24, 2024, Transcript [Dkt. No. 861, p. 7:18 – 23].  The Court explained that "[t]he creditors of FSS are one and the same of the creditors of Mr. Jones… you're just using a particular portion of the cash that's available through FSS to then liquidate the FSS stuff." [Dkt. No. 861, p. 12: 23–13:6].  Accordingly, the Court was attempting to facilitate a mechanism whereby the Trustee would be able to distribute the equity that the Trustee held in FSS and additionally liquidate FSS's assets in an orderly, fair and equitable sales process, and not a race to the Courthouse.  The Bankruptcy Court determined that pursuant to § 349(b)(3), this should be done "through the Jones Chapter 7 case for the benefit of the same creditors who have been appearing." [Dkt. No. 861, p. 13: 6–8].

006809

20.    In the following exchange between the Trustee's counsel, Joshua Wolfshohl, and the Court, the Court corrected Wolfshohl's statement to make it absolutely clear that the FSS assets are property of the Estate of Jones:

> asking for -- and I do think that there's reason under 363 to get this order even though maybe the actual assets we're selling are not property of the Alex Jones estate, part of why we have felt the need to do this is because of --
>
> THE COURT:  It is property of the Alex Jones estate, because Alex Jones owned the equity interest in FSS 541, all legal or equitable interests.  All.  And all has got to mean all.
>
> MR. WOLFSHOHL:  Okay.  And I prefer that interpretation.
>
> THE COURT:  No, no, it's not my interpretation. It's Congress.  Congress used the word all.  All legal and equitable interests of the debtor become property of the estate.  All means all.  And we can't shortchange what all means.  And -- and upon conversion unless otherwise ordered.

[Dkt. No. 861, p. 16:14-17:3] [*reciting the language of § 349(b)(3)*].  The Court further stressed that this was not subject to more than one interpretation. [Dkt. No. 861, p. 17:10-11] ("And all has got to mean all. And we don't get to kind of pick and choose what all means.").  It was during the same hearing that the U.S. Trustee argued their objection to the Court's proposed Supplemental Order.  The US Trustee voiced concerns that the ownership of 100% of the equity *alone* would not make the FSS assets property of the Jones Estate but stated those concerns would be resolved if the Court clarified the order "to include all of the FSS hard assets *as property of the estate*."

006810

> MR. NGUYEN: Your Honor, if you clarify the order to include all of FSS hard assets as property of the estate, the U.S. Trustee won't have any objection. I think you are able -- you have discretion under 349 to order otherwise. As long as that order is clear, we're fine with that.

[Dkt. No. 861, p. 26:12-16]. Therefore, in order to address any possible concerns, the Court agreed it would enter an order (which would become known colloquially as the "Supplemental Order"), as part of what the Court referred to as "belt and suspenders", providing clarity that the FSS assets *were property of the Jones Estate* and therefore could be sold by the Trustee through the Jones Estate:

> it sounds like everybody needs it anyway -- I'm more than happy to clarify in my order that all the assets -- if it didn't include it in the assets, that's why he has the cash, right? That's why he's got the cash and that's why he's got the equity interest. He's got everything. That was always the intent as to what was going on. But if that makes this

[Dkt. No. 861, p. 24:11-16].

> want -- I'm going to give you all the assets of FSS. I'm going to clarify that that's what you always had, the assets of FSS. And I just want to make sure that other people look

[Dkt. No. 861, p. 26:22-24]. The concern expressed by the U.S. Trustee was one of the contributing factors that led the Court to enter its Supplemental Order "pursuant to § 349(b)(3). As it was apparent that this Court was communicating to the parties that the intent it had in dismissing FSS from bankruptcy was to protect those assets by vesting all of FSS's assets into the

006811

Estate of Jones, which were to be protected, controlled, administered, and sold by the Trustee free and clear of all liens.

21.    As a result of the issues discussed during the September 24, 2024, hearing (as set out above), the Court entered the "Supplemental Order" dated September 24, 2024, ordering that "pursuant to § 349(b)(3)", *all assets* of FSS shall be "deemed vested" in the Alex Jones Chapter 7 estate.  *See*, **Exhibit 4**.  Additionally, the Supplemental Order authorized the Trustee to operate FSS and the FSS Assets that had previously simply continued operating by  the Trustee from and after the Jones Estate Conversion Date.  As noted by the Court, this Supplemental Order included "all" assets of FSS [*See*, Dkt. No. 861, Tr 9-24-25, p. 24].

22.    However, even before the entry of the Supplemental Order, the Court had determined that the actual assets that were being transferred to Estate of Jones included assets of FSS.  [Dkt. No. 861, p. 16: 18–21]:

> "It is property of the Alex Jones estate, because Alex Jones owned the equity interest in FSS. [Section] 541, all legal or equitable interests of the Debtor become property of the estate.  All means all."); [Dkt. No. 861, p. 17: 1–17] … "I'm concerned because – but no one disputes that Alex Jones owned a hundred percent of the equity interest in FSS. And all has got to mean all.  And if you own the equity interest in FSS, ***then it is property of his estate.  It would be property of his estate if he just filed Chapter 7***." (Emphasis added.)

23.    Based first on the FSS Dismissal Order (without "deemed vested" language, and next on the Supplemental Order reciting § 349(b)(3), the Trustee and Jones simply continued the operations utilizing those assets "*as if*" the Trustee, (the successor owner of the Jones 100% ownership in the *equity in FSS*) was the 100% owner of *the FSS Assets* pursuant to the Supplemental Order and note the lessee, or receiver, or temporary holder, of those FSS Assets, or in possession by any other status, except §§ 541 and 349(b)(3).  Thereafter *all parties* to the Jones

006812

Chapter 7 case except the Texas Plaintiffs in their appeal, treated the assets as owned by the Jones Estate as property of the estate and subject to the automatic stay.  .

24. The Court made it abundantly clear in the September 24, 2024, hearing that resulted in the Supplemental Order that the assets that "deemed vested" in the Jones Chapter 7 Estate were *actually* vested in that Estate.  The transcript contains numerous references where the Court made clear it always intended to actually transfer "all" FSS assets to the bankruptcy trustee, who was stepping in and selling FSS's assets when the Trustee previously only held the membership interest in FSS.

### G. Other References to the FSS Assets Being Transferred

25. In a hearing that took place on December 10, 2024 [Dkt. No. 992] before this Court, where the Trustee sought permission from this Court for an order permitting a sale of the FSS Assets free and clear of all liens, claims and encumbrances pursuant to § 363, the Trustee testified:

Q: What's the relation of [FSS] to Alex Jones Estate?

A: So, there's two. The estate owns 100 percent of the membership interest in FSS, but it owns the assets of the FSS Chapter 11 estate.

Q: And what do you base that on, that statement?

A: So, FSS filed for bankruptcy on its own. Its assets went into a Chapter 11 estate. Upon dismissal of that case, or as of the dismissal of that case, those assets were vested in the Chapter 7 individual estate of which I'm the trustee.

The Bankruptcy Court hearing this testimony did not correct the Trustee, nor suggest that the Jones Chapter 7 Estate could not utilize § 363 to sell the FSS Assets free and clear of liens, clams, and encumbrances.  [*See*, Dkt. No. 992, December 10, 2024, Tr., 7:18-8:3].  Although the bankruptcy Court did not approve the sale, it was denied on entirely different grounds than lack of jurisdiction to sell pursuant to § 363 as the Sale Motion sought.

006813

26.     On November 18, 2024, in asking this Court to enter an order in furtherance of the sale of the FSS Assets, the Trustee argued that pursuant to the terms of the Supplemental Order, property rights that are owned by FSS are vested in the Estate of Jones and therefore subject to the control of the Trustee. [Dkt. No. 915], ¶55, n. 4 ("The Trustee is not prosecuting appeals of those judgments on behalf of FSS, and such appellate rights are property of FSS, which are vested in the bankruptcy estate of the Debtor as property of his estate to be administered by the Trustee pursuant to the Supplemental Dismissal Order."). Thus, it is clear that the Trustee had the understanding that the FSS assets had become property of the Jones Chapter 7 Estate as a result of the Supplemental Order. It is highly unlikely the Trustee would have spent almost two millions of dollars of the Estate of Jones in his pursuit to sell the FSS assets if the FSS assets were not protected by § 363 sale provisions and § 362 the automatic stay but could be seized by one of FSS's creditors at any time. And, if those assets were not property of the Estate, a § 363 Sale could not utilize the bankruptcy code to accomplish such sale.

### H.     Texas Plaintiffs' Appeal of Supplemental Order

27.     Important to consideration of this Supplemental Order is the appeal by the Texas Plaintiffs of the Supplemental Order (which that had obtained, *just after to the FSS Dismissal Order,* a Turnover and Garnishment of the FSS assets). The appeal sought to overturn the Supplemental Order. In contrast, the Connecticut Plaintiffs supported the entry of the Supplemental Order.[9] The Connecticut Plaintiffs even intervened in the appeal. The Texas

---

[9]     The Texas Plaintiffs, as noted above, did not support the Dismissal Order (in part) or the Supplemental Order and appealed the Orders to the District Court. The Connecticut Plaintiffs supported those Order, as noted in their Motion to Intervene in the  District Court appeal:

> 11. Seeking to preserve the intended framework of the Dismissal Order and ensure that FSS's assets were fairly distributed to creditors, on June 23, 2024, the Jones Chapter 7 Trustee filed an Emergency Motion in the Bankruptcy Court to, among other things, clarify the transfer of control and signing authority with respect to FSS bank accounts and for an order extending the Chapter 7 automatic stay in the case of Alexander Jones—whose estate owned and controlled FSS, through the Chapter 7 Trustee—to FSS. (Dkt. No. 957) The Connecticut Families filed a statement in support

006814

Plaintiffs did not attempt to get a stay of the Supplemental Order that formalized what had been occurring since the entry of the FSS Dismissal Order.

## I.    Conduct and Operations Over the Following Year After the Supplemental Order

### i.    The Trustee's Attempt to Sell to The Onion Pursuant to § 363 of the Bankruptcy Code

28.    Over the following year, acting on the authority of the Initial Cash Order and the Supplemental Order, the Trustee first attempted to hold, and advertised a § 363 auction sale. Under the premise that one cannot sell what is not owned, and a non-debtor cannot utilize the bankruptcy code for sale of its own property, Jones was comfortable that a bankruptcy sale would net the best price for all of FSS Assets. However, the Trustee's process in conducting was not ordinary, and could be described as extraordinary in its terms favoring what was ultimately a "Joint Bid" by the Connecticut Plaintiffs and The Onion,[10] that resulted in the Trustee announcing that The Onion was a successful bidder. The Joint Bid was part cash and the majority a contribution of Connecticut Plaintiffs' non-final judgment's future dividends. After a lengthy hearing, the Court rejected the sale process and refused to approve The Onion as the successful bidder in light of a cash bidder that had greatly exceeded The Onion's cash bid. The Court ordered a second bidding process to be considered by the Trustee.

### ii.    The Court Orders a Second Bidding Process

29.    Next, in contemplation of the Trustee's second bidding process ordered by the Bankruptcy Court, the cash bidder in the original failed auction made an unsolicited cash bid of

---

of motion, emphasizing that an orderly winddown of the FSS estate was essential for the benefit of all creditors. (Dkt. No. 959.)

[10]    The Onion is an internet blog supported through Bloomberg and "Every Town", a gun control non-profit foundation.   The Connecticut Plaintiffs, individually, partnered with The Onion to make a joint bid of cash and judgment dividend credits with the express intention of acquiring the FSS assets for destruction or to be used as parody after gaining access to FSS's supporter and credit card purchase records.

006815

$8 million in December 2024. [Dkt. No. 1089] The Trustee did not initiate a new auction, but instead participated in negotiations with the Connecticut and Texas Plaintiffs, reaching a "Rule 9019 Settlement Motion (although it is unclear what the controversy was between the Trustee and the two Plaintiffs that needed settling) providing, among many other terms, that

(i)    the Connecticut Plaintiffs judgment and proof of claim (that had been objected to and was on appeal in Connecticut) would be ordered as an "Allowed Claim" in the Jones Chapter 7 case without trial of the pending objection, and allowed as to FSS even "as if" FSS was still in a bankruptcy case, though FSS was no longer in bankruptcy;  and

(ii)    as to the Jones Chapter 7 case, the "settlement" provided that the Texas Plaintiffs, only two of the five having gone to trial resulting in two judgments each a $24 million judgments and proof of claim that was then, and continues now, on appeal in Texas.   The Settlement provided that all five Plaintiffs would receive as "Allowed Claims" in the Jones Chapter 7 Estate of approximately $480 million, allegedly to "equalize" the dividend distributions between the two Plaintiff groups at 75% Connecticut Plaintiffs and 25% Texas Plaintiffs.   The 9019 Settlement Motion was firmly denied.

### iii.    The February 5, 2025, Hearing On the Trustee's Settlement for the Plaintiffs

30.    At the hearing held on February 5, 2025, the Bankruptcy Court, expressing great frustration about the settlement, denied the 9019 Settlement Motion and announced the Court's intention to "void" the Supplemental Order, but also then noted that because of the appeal by the Texas Plaintiffs, the Bankruptcy Court had lost jurisdiction to void the order and could not do so. *See*, February 5, 2025, Tr., p. 8:15-20 [Dkt. No. 1072]. This is the law – thus even had the Court not stated on the record that it could not void the Supplemental Order, the law provides that it

006816

could not.[11]  Thus, with the Court's acknowledgment of appellate law (that a trial court loses plenary power and jurisdiction over an order on appeal from that court) Jones and FSS continued to believe that the FFS Assets were protected by the bankruptcy code.

### iv.    The March 19th Order Denying FUAC's Request for a New Auction

31.    On March 19, 2025, the Bankruptcy Court entered an Order on the Motion of the unsuccessful cash bidder, FUAC, LLC ("FUAC") seeking an order for a new auction based on its' new December 2024 $*8 million cash bid* [Dkt. No. 1121] that had not been responded to by the Jones Chapter 7 Estate Trustee Murray. The confusing order provided the following language regarding the February 5, 2025:

> This Court said at a hearing on February 6, 2025 that it would not allow a sale of FSS assets, and that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed. The Court won't require the Chapter 7 Trustee to conduct another auction for the FSS assets. FUAC also does not have standing to seek a sale of FSS assets under Section 363 of the Bankruptcy Code. The motion is denied.

32.    However, the second paragraph denied the FUAC Motion but not because the February 5, 2025 had voided the Supplemental Order and would have made the FUAC Motion moot (moot because the Trustee no longer owned or had rights in the FSS assets if the Supplemental Order was no longer effective) but because FUAC was found to have no standing to bring the Motion to compel a new auction as an unsuccessful bidder of the first auction.

### v.    The June 5, 2025, Hearing on Jones Motion To Reconsider the Court Determination of No New Auction

---

[11]    Jones incorporates herein its summary set out in the Response to the Emergency Motion to Find the Automatic Stay did not apply to the FSS Assets including the Plaintiffs seeking sanctions against the Plaintiffs' counsel for pleading in the State Court that the Bankruptcy Court recognized the appellate law, recognized that it did not have jurisdiction to void the Supplemental Order, and did not void the Supplemental Order. The State Court after considering the record, decided that the Bankruptcy Court did void the Supplemental Order on February 5, 2025, notwithstanding the furnished transcript of June 5, 2025, where the Bankruptcy Court repeated that it did not void the Supplemental Order. Jones and FSS will furnish to the State District Court the October 1, 2025, transcript wherein the Bankruptcy Court repeated that it did not void the Supplemental Order.

006817

33.    The confusing result of the March 19 Order denying the FUAC Motion for a new auction resulted in Jones filing his Motion to Reconsider the March Order and Jones' Motion to order a second auction. [Dkt. No. 1131] and on the Motion of Jones to reconsider Judge Lopez's February 5, 2025, decision not to order a new auction on June 5, 2024.

34.    As to voiding the Supplemental Order, at the October 1 hearing the Bankruptcy Court noted that the Court had not voided or set aside the Supplemental Order, recalling both his February 5 remarks on the record about the loss of jurisdiction because of the pending Texas Plaintiffs appeal, and later on June 5 recalling making a lengthier analysis of the Bankruptcy Court's inability to have voided the Supplemental Order while on appeal.  Importantly, no party to the October 1 hearing argued that the Supplemental Order that "deemed vested" (the FSS Assets) in the Jones Chapter 7 Estate a property of that Estate actually did not transfer any title or protected rights (protected by, for example, the automatic stay that protects all bankruptcy estate property from seizure or any self-help collection activities).  The only arguments made were that the automatic stay existed but went away as a result of the February 5, 2025, voiding by J. Lopez of the Supplemental Order.

35.    In fact, the Turnover Order Judge Gamble signed (the form of which was submitted by jointly by both the Connecticut and Texas Plaintiffs Motion and Proposed Order) reads that the assets of FSS were transferred to the bankruptcy estate by means of two orders:

006818

**The Court also FINDS that** Judgment Debtor Free Speech Systems, LLC filed for bankruptcy under chapter 11 of the Bankruptcy Code on July 29, 2022 (the FSS Petition Date) in the Bankruptcy Court as case no. 22-60043 (the FSS Bankruptcy Case). Following a hearing on June 14, 2024, the Bankruptcy Court issued two orders in the FFS Bankruptcy Case dismissing the FFS Bankruptcy Case and vesting authority in the Trustee to take control of Judgment Debtor Free Speech Systems, LLC, including its assets and bank accounts. *See* Dkt. 956 (June 21, 2024) and Dkt. 1021 (September 25, 2024), No. 22-60043 (Bankr. S.D. Tex.). Accordingly, the Application only seeks relief relating to the following (cumulatively, the Turnover Property):

(i)    as to Judgment Debtor Free Speech Systems, LLC, all its assets (subject only to approval of the Trustee).

And during the June 5, 2025 hearing, the Court made clear that the Supplemental Order had not been set aside:

THE COURT:  I don't think I modify the order --

MR. JORDAN:  You didn't.

THE COURT:  -- back in February.

MR. JORDAN:  No.

THE COURT:  The question is, do I do it now?  It's the question you're telling me.

Dkt. No. 1193, June 5, 2025 Tr., p. 47, lines 8-13. The Court repeated the fact that it did not have authority to nullify the Supplemental Order several times, including:

The matter was currently pending.  That order was currently pending on appeal at the time, so I couldn't revoke one way or the other, right?  Once bankruptcy, once an appeal is filed, the Court loses jurisdiction over that.  What I

…

Page 21 of 43

006819

Dkt. No. 1193, June 5, 2025, p. 40, l: 5-8, 23-24.

> vi. **The Plaintiffs' Motion Seeking the Court to Re-affirm That the Supplemental Order Had Been Voided On February 5, 2025, and as a Result the "Automatic Stay" Protecting Property of the Jones Chapter 7 Estate Did Not Apply To the FSS Assets. [Dkt. No. 1241]**

36. On September 26, 2025, the Plaintiffs filed an Emergency Motion that was set and heard on October 1, 2025, giving Jones less than 3 days to prepare for this claimed "Emergency")[Dkt. No. 1241].

37. The Plaintiff's Emergency Motion argued that the automatic stay went away when the Supplemental Order was voided *on February 5, 2025* (which itself illustrates that all parties believed the FSS Assets were property of the Jones Chapter 7 Estate).

38. Although the Connecticut Plaintiffs arguments have changed over time, they ultimately contended that the June 2024 Dismissal Order gave the Chapter 7 Trustee *dual powers* including "signing authority over FSS' bank accounts *and the power to dispose of its assets for the benefit of creditors*, though those assets remained the property of FSS." [Pls Resp. to Motion to Stay, p. 23]. They even claimed FSS' filings agreed, *albeit* misquoting Jones. *Id*. n. 5. The Connecticut Plaintiffs further claimed in their Emergency Motion that the September 2024 Supplemental Order did so as well but then claimed the bankruptcy judge nullified that order in February 2025. No party took the position announced by Judge Lopez at the October 1st hearing. The Bankruptcy Court then made a startling pronouncement. Jones and FSS *think* Judge Lopez said the Supplemental Order *had not transferred ownership* of any of FSS's assets - Judge Lopez saying the Supplemental Order never *vested* FSS Assets in the Jones Bankruptcy Estate, the assets

006820

were merely "*deemed vested*".   Judge Lopez seemed insistent that there is a significant difference between the two phrases – vested and deemed vested.

39.    According to Judge Lopez, the Supplemental Order that "deemed vested" all FSS assets in the Jones Chapter 7 Estate, did not actually transfer any "Property of the Estate" but only "deemed" the property vested in the Chapter 7 Estate.  When asked if what the Court was saying was that the automatic stay never protected the FSS assets and that at any time any creditor could have seized those assets from the Trustee - Judge Lopez did not respond.  However, when Judge Lopez dealt earlier with the Texas Plaintiffs turnover order, recall that J. Lopez entered an order that the Jones Chapter 7 Trustee not turnover pursuant to the State Court Turnover and Garnishment Order any of the assets of cash or assets held by FSS.

40.    In fact, sale of the FSS assets by the Trustee was never prohibited by the Bankruptcy Court, and up to June 5, 2025, the Bankruptcy Court commented that it continued to be an option the court said would be considered:

> The question is do we do another sale?  That's the real question.  Or another proposed sale with another proposed hearing and determining what the assets are there and then who will conduct the sale and who would do the auction and whether you do some cash or and what the analysis would be to get me comfortable that those assets are actually owned by FSS.  And

Dkt. No. 1193, June 5, 2025, Tr. 49:6-11.

**J.    First Ever Claim Made to This Bankruptcy Court That the FSS Assets Were Not Protected by the Automatic Stay**

41.    The first occasion for any dispute raised in this Bankruptcy Court that the FSS assets were not property of the Jones Chapter 7 Estate was on September 25, 2025, five months

006821

after February 5, 2025, when the Texas and Connecticut Plaintiffs claimed in their Emergency Motion to Confirm (that the Automatic Stay terminated on February 5, 2025) that this Bankruptcy Court "voided" the Supplemental Order on February 5, 2025. Although in that hearing the Court did say it was voiding that order, until an "on the record conversation" with Jones counsel, the Bankruptcy Court recognized he did not have the jurisdiction to void an order that was pending on appeal at the District Court:

> back to doing -- no, I should back up and mention that the supplemental order was appealed by the Texas families. I think that matter is still pending.
>
>             MR. JORDAN: It is, Judge.
>
>             THE COURT: I lose jurisdiction over that immediately.

[*See*, Dkt. No. 1072, Tr. February 5, 2025, Tr., 8:15-20]. This same position was echoed by this Court in the June 5, 2025, hearing, and repeated in the October 1, 2025, hearing (although in October the Court

## II.
## JURISDICTION FOR CONSIDERATION
## OF THIS MOTION AND THE REQUEST FOR RELIEF

42.    Additionally, under Federal Rule of Civil Procedure 54(b) and Bankruptcy Rule 7054, this Court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Puga v. About Tyme Transp., Inc.*, 2017 WL 6049244, at *1 (S.D. Tex. Feb. 21, 2017). Jones Motion is directed to a non-final and therefore interlocutory order to be reconsidered.

43.    The Court has complete discretion "to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or

006822

clarification of the substantive law." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017). The Court's discretion is "not cabined by the heightened standards for reconsideration governing final orders." *Id*. at 337 (internal quotations and citations omitted).

44.     Where a party timely files a motion seeking reconsideration such as a motion to alter or amend the judgment under Fed.R.Civ.P. 59, a motion for new trial under Rule 59, or a motion for relief under Fed.R.Civ.P. 60(b), the 14-day bankruptcy deadline for filing a notice of appeal will be tolled so that it runs from the entry of the order disposing of the last of these motions, as provided in Federal Rule of Appellate Procedure 4(a)(4).  Here, Jones seeks a new trial, or to alter or amend the October 1, 2025, Order.  Jones also seeks reconsideration pursuant to Fed.R.Civ.P. 60(b)(6) incorporated in the Rules of Bankruptcy Procedure.

45.     Here basis for reconsideration of this interlocutory order is the injustice to the parties and bankruptcy system itself from:

(i). the interpretation of the Bankruptcy Court order that reaches an unjust result;

(ii). the failure to grant a hearing on the pending relief of a sale of the FSS Assets by a cash auction, secret bidding, awarded to the highest cash bidder; and

(iii).  the abuse of process and wrongful conduct of the Connecticut and Texas Plaintiffs set out in Jones Motion to Reconsider the auction process, and this Motion.

46.     A motion to reconsider (including non-final or final orders) can be invoked "in extraordinary circumstances" that include cases where the order to be reconsidered involves "*the risk of injustice to the parties' and the risk of undermining the public's confidence in the judicial process*." *Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added);  Fed.R.Civ.P. 60(b)(6).   Such is the case here.

006823

47.    This is a core proceeding pursuant 28 U.S.C. § 157, 1334 over which this Court has exclusive jurisdiction. *See, also Stern v. Marshall*, 564 U.S. 462, 494 (2011); *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984).

### III.
### STANDING OF JONES TO
### SEEK THIS RELIEF

48.    Jones as the Chapter 7 Debtor has constitutional and bankruptcy code standing to bring this request for relief,[12] and for the purpose of both the appeals of the Plaintiff Creditors' Claims and the Courts prior order to conduct a public auction. Jones's standing also arises out of his position as the sole managing member of FSS.  [*See*, note 12, *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 22-1079 (Sup. Ct. June 6, 2024)].

---

[12]    Jones has standing as the Chapter 7 Debtor pursuant to Section [§1109(b)] that provides "[a] party in interest . . . may appear and be heard on any issue in a case under this chapter." The section goes on to say that parties in interest include:

"*the debtor*, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."

• *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 22-1079 (Sup. Ct. June 6, 2024) [standing extends "*to entities that are potentially concerned with or affected by a proceeding.*"];  *See, also In re Team Sys. Int'l, LLC*, Nos. 22-10066 (CTG), 561, 2024 Bankr. LEXIS 2573 (Bankr. D. Del. Oct. 21, 2024) [*citing Truck Insurance Exchange* as defining the scope of a party in interest right to participate].

- *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U. S. 1, 7 (2000);
- *Willard v. O'Neil (In re Willard)*, 240 B.R. 664, 669 (Bankr. D. Conn. 1999). As the

court explained in In re Toms, 229 B.R. 646, 651 (Bankr. E.D. Pa. 1999):

[I]f there were a claim asserted in a chapter 7 case which would not be discharged, and which is not likely to be paid in full by the trustee, then the chapter 7 debtor will be legally responsible for payment of any remaining claim after the bankruptcy case is concluded. Due to this continuing obligation, the debtor has a pecuniary interest in the disallowance of the claim. Were the claim disallowed or reduced in amount, the debtor's continuing liability after bankruptcy could be affected.

• *In re Morgan*, No. 05-34981-SGJ-7, 2007 WL 2669341, at *4 (Bankr. N.D. Tex. Sept. 6, 2007) [after considering the claims register, the trustee's report of assets, and the fact that the trustee hired accountants to investigate the assets of the debtor, concluded that given the uncertainty of total assets and claims, the debtor had a pecuniary interest in the outcome of the claim objection];  *See, also, In re Curry*, 409 B.R. 831, 838 (Bankr. N.D. Tex. 2009)the debtor has a pecuniary interest in the outcome of any claims objection and so standing to object if there might be a surplus to be returned to the debtor after satisfying all debts.  Additionally, a debtor may be afforded standing to object to an excessive dischargeable claim whose holder would receive distributions that otherwise would be made to the holder of a nondischargeable claim. The debtor certainly wants to maximize the distribution to the holder of a nondischargeable claim, because to the extent that this claim is satisfied, the debtor is relieved from some or all of the claim of that creditor which would survive the bankruptcy case. See 4 Collier on Bankruptcy § 502.02[c] at 502-13 (Resnick & Sommers ed. 15th ed. rev. 2009).

006824

**IV.**
**ARGUMENTS AND AUTHORITIES**
**One Chapter 7 Debtor LLC can Transfer Its Assets to the**
**Affiliated Chapter 7 Debtor-Sole Owner of the LLC Since**
**It is the Sole Manager/Member Permitted Authority**

A.    **The Court's Recognition of Additional *Postpetition* Property**

49.    Section 541 of the Bankruptcy Code defines property of the estate of a debtor (*e.g.* Alex Jones) to be broadly construed as "all legal and equitable rights and interest" of a debtor on the Petition Date.  Section 349 authorizes the Bankruptcy Court to "otherwise" the broad scope to accomplish the purposes of § 541.  Very generally speaking, property that is acquired *after a bankruptcy petition date* is not included in "property of the estate" by § 541, with the statutory and common law exceptions, first, "for cause" pursuant to § 349(b)(3).  Additional statutory and bankruptcy law exceptions to this rule and a substantial body of law regarding "deemed" property of the estate, begins with the test set out in *Segal v. Rochelle* 82 U.S. 375, 380, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966) and continuing through the  passage of the Bankruptcy Code and § 541's test expanding the *Segal* test to "all legal and equitable interests" in property, to the current status of law in the Fifth Circuit that holds "all legal and equitable interests" is broader then "if sufficiently rooted in the pre-bankruptcy past" test.

50.    First, *In re Vasquez*, 581 B.R. 59, 66-67 (Bankr. D. Vt. 2018) observed that 'the temporal line of demarcation (of property of the estate as of the Petition Date) is not impervious and a legal claim that accrues postpetition can be deemed property of the estate' if it is 'sufficiently rooted in the pre-bankruptcy past.'" Quoting *Chartschlaa*, 538 F.3d at 122 (*quoting Segal v. Rochelle*, 382 U.S. 375, 380, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966)) [decided under the Bankruptcy Act];  *see , also Sikirica v. Harber (In re Harber)*, 553 B.R. 522, 528 (Bankr. W.D. Pa. 2016) [decided under the Bankruptcy Code].  Vasquez (also decided under the Bankruptcy Code analyzes

006825

the status of the law on recognizing "postpetition" property interests as property of the estate under

*Segal*:

> In *Segal*, the Supreme Court considered the scope of "property of the estate" under the Bankruptcy Act. The Court found even though the debtors, a partnership and its individual partners, could not collect a tax refund until after they filed their bankruptcy cases, the tax refund "existed at the time [the] bankruptcy petitions were filed." Segal, 382 U.S. at 380. Although the debtor's refund was received postpetition, the Court ruled the debtor's right to that asset was nevertheless "*sufficiently rooted in the pre-bankruptcy past* and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property'" of the estate as of the date of petition. *Id* at 71.
>
> …
>
> Segal's analysis of the meaning of "property" under the now superseded Bankruptcy Act retains "continued vitality" in the Second Circuit and in 'most other Circuits.'[13] *Id*. In re Vasquez, at 71-72.
>
> …

### B.     The Fifth Circuit Agrees With the Applicability of the *Segal* Test But Considers § 541 More Broad Than the *Segal* Test

51.     The Fifth Circuit in *Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 525 n. 52 (5th Cir. 2014), cites *Segal v. Rochelle* as good law:

> *Note 52.   In re Trinity Gas Corp. (Reorganized)*, 242 B.R. 344, 350 (Bankr. N.D. Tex. 1999) ("[T]he obvious purpose of § 541(a)(7) is to include property and rights which are acquired in the estate's normal course of business in property of the estate."); *In re Doemling*, 116 B.R. 48, 50 (Bankr. W.D. Pa. 1990) ("Relatively few courts have been called upon to determine whether a property interest which was acquired postpetition in a Chapter 11 case qualifies as property of the estate pursuant to § 541(a)(7).  The following principle can, however, be extracted from certain of those cases: a property interest acquired postpetition during the pendency of a Chapter 11 case qualifies as property of the estate, *for purposes of § 541(a)(7),* only if said property interest is traceable to (or arises out of) some prepetition property interest which already is included in the bankruptcy estate."); *see also Segal v. Rochelle*, 382 U.S. 375, 380, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966) (holding that *whether property is included in an estate depends on whether it "is sufficiently rooted in the pre-bankruptcy past* and so little entangled with the

---

[13]     *In re Ross*, 548 B.R. 632, 638 (Bankr. E.D.N.Y. 2016); *see, e.g., TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 525 n. 52 (5th Cir. 2014); Underhill v. Huntington Nat'l Bank (In re Underhill), 579 F. App'x 480, 481 (6th Cir. 2014); Cook v. Baca, 512 F. App'x 810, 820 (10th Cir. 2013); Martinez v. Lincoln Gen. Ins. Co., 417 F. App'x 711, 712 (9th Cir. 2011); Fix v. First State Bank of Roscoe, 559 F.3d 803, 809 (8th Cir. 2009); Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008); In re Alvarez, 224 F.3d 1273, 1278-79 (11th Cir. 2000); Beaman v. Shearin (In re Shearin), 224 F.3d 346, 351 (4th Cir. 2000).

006826

bankrupts' ability to make an unencumbered fresh start"). *In re TMT Procurement Corp.* at 525 n.52 (5th Cir. 2014)

So, being the sole owner and sole manager of an LLC when the sole owner files bankruptcy may be viewed in the Fifth Circuit both under §541 broader test "all legal and equitable interests" or under the "sufficiently rooted in the pre-bankruptcy past" – and in both examples the assets of such single member LLC and the Jones/FSS symbiotic relationship can be deemed property of the estate in the individual's bankruptcy.  It cannot be argued that the sole owner, sole manager, with discretionary powers over all assets of the co-debtor LLC, including the right to liquidate those assets, and where the LLC is wholly dependent on the activities of the sole owner for all of its income, is not directly and materially "rooted in the pre-bankruptcy past and capable of § 349(b(3) "for cause" inclusion in the Jones Chapter 7 Estate.

52.    Eight years before *TMT* the Fifth Circuit explained in *Burgess v. Sikes (In re Burgess)*, 438 F.3d 493, 498-99 (5th Cir. 2006) that the Code created a broader scope of "property of the estate" than contained in the old and replaced  Bankruptcy Act:

> "Section 541 now governs what is considered property of the estate, and unlike former § 70(a)(5) of the Bankruptcy Act, § 541 expressly defines property . . . [and] under current law, a debtor's interest in property may be contingent—*or enjoyment of the interest may be postponed*—until after bankruptcy, *but the debtor must have had a prepetition legal interest nonetheless.*[14]
>
> …
>
> The Bankruptcy Code was *intended to create a more uniform and comprehensive scope to "property of the estate"* which is subject to the reach of debtors' creditors than had previously existed under the old Bankruptcy Act. Under Section 70(a) of the earlier Act, the inclusion of an asset within the estate varied in accordance with (1) an individual examination of the legal nature of the asset (2) in light of the purposes of the Bankruptcy Act. This two-part test reflected the dual and often conflicting policies woven into the Act.[15]  These policies were to secure for the

---

[14]    Note *Burgess* also notes that "although Congress has specifically approved of *Segal's* result, [its] 'sufficiently rooted' test did not survive enactment of the Bankruptcy Code" (because the Code is broader). *In re Bolton*, at 53 n.8

[15]    Thus, although Congress has specifically approved of *Segal's* result, [note **6].**  However, the Fifth Circuit holds that the *Segal's* "sufficiently rooted" test under the old Bankruptcy Act did not survive the enactment of the

benefit of creditors everything of value the bankrupt might possess in alienable or leviable form, but to permit a bankrupt to accumulate new wealth after the date of his petition and to allow him an unencumbered [*499] fresh start. Relying upon these competing considerations, the Supreme Court developed a rule that where property "is sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start . . . it should be regarded as 'property' [of the estate]."

> *The enactment of the Bankruptcy Code undertook to obviate this analytical conundrum. Under Section 541 of the Code, all property in which the debtor has a "legal or equitable interest" at the time of bankruptcy comes into the estate.*

706 F.2d 574, 578 (5th Cir. 1983) (internal citations and footnotes omitted) (emphasis added), *overruled on other grounds by Patterson v. Shumate*, 504 U.S. 753, 112 S. Ct. 2242, 119 L. Ed. 2d 519 (1992). Section 541 now governs what is considered property of the bankruptcy estate, and unlike former 70a(5) of the Bankruptcy Act, 541 expressly defines property: "All legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. 541. *Thus, under current law, a debtor's interest in property may be contingent or enjoyment of the interest may be postponed until after bankruptcy, but the debtor must have had a prepetition legal interest nonetheless*. *Id. Burgess* at 498-499.

In this case, the Debtor Alex Jones has at least a significant equitable interest in the sole member, manager managed as the sole owner of FSS and FSS assets and financial survival are wholly dependent and inextricably intertwined with the Jones Chapter 7 Estate as to be considered a single entity. As this Bankruptcy Court noted, the two were almost indistinguishable. FSS, without the promotion of Jones, would have no income and only debt.

53.    In numerous cases throughout the Circuits, upon filing a bankruptcy by an individual that is the sole owner of an LLC he manages, the *law merges the ownership interest with the manager interest* such that the Trustee in bankruptcy is not only the owner of the LLC,

---

Bankruptcy Code. As this court previously explained in *Goff v. Taylor*.The majority opinion cites only dictum in a case from this court that the Supreme Court overruled. *In re Goff*, 706 F.2d 574, 578 (5th Cir. 1983), overruled by *Patterson v. Shumate*, 504 U.S. 753, 112 S. Ct. 2242, 119 L. Ed. 2d 519 (1992). *In re Goff* concluded that the Bankruptcy Code **broadened any pre-existing test for property of the debtor's estate**. ("The Bankruptcy Code was intended to create a more uniform and comprehensive scope to 'property of the estate' which is subject to the reach of debtors' creditors than had previously existed under the old Bankruptcy Act. . . . The sweeping scope of [the § 541(a)(1)] automatic inclusion was intended to remedy most of the old Act's perceived deficiencies."). *Burgess* at 512 n.18.

006828

but the sole manager.[16]  The FSS sole member/manager is Alex Jones who as " *the Managers, shall have full, complete and exclusive power to manage and control the Company, and shall have the authority to take any action they deem to be necessary, convenient or advisable in connection with the management of the Company.*  *See*, Exhibit 5, § 802 of the FSS Company Agreement.

54.    Also, consider here where the LLC was in its own bankruptcy case and its assets were subject to the claims of many of the same creditor (the two largest of which were jointly and severally liable with its 100% sole owner).  The language above, coupled with the fact the LLC itself was in bankruptcy, and its assets were liable for the joint and several debts and its own debts – which was the status of the "transferor" accomplished by this Court when it ordered the Jones Chapter 7 Estate was "deemed vest(ed)" with FSS Assets.

55.    This result comes also from a different source.  One of the consequences of allowing the bankruptcy trustee to exercise management powers over the LLC is that the trustee will be able to dissolve the LLC and distribute its assets to the bankruptcy estate and make the assets available to pay creditors.  When that happens, however, there is zero asset protection for the bankrupt member and the race to judgment or the Courthouse ensues.  This Bankruptcy Court expressly wanted to avoid this and avoid the administration of two Chapter 7 Trustees for an owner and entity that was for all practical purposes, combined.  But to do so in a fashion that gave the FSS assets no protection is counterintuitive to the purpose and goal announced several times by the Bankruptcy Court.

56.    Finally, Alex Jones had far more than a legal interest in FSS as the sole owner and as the sole manager with the "authority to take any action (he) deemed necessary, convenient or advisable in connection with the management of the Company."  *See,* Company Agreement

---

[16]    *A-Z Electronics, LLC*, 350 B.R. 886 (Bkrtcy. D. Idaho 2006);  *In re: Ashley Albright*, 291 B.R. 538 (Bkr. D Colo. 2003);  *In re Modanlo*, 2006 WL 4486537 (D. Md. 2006).

006829

[**Exhibit** 5. At the time of the "deemed vesting" of FSS Assets into the Jones Chapter 7 Estate the manager was the Trustee for the Jones Chapter 7 Estate that managed the FSS Assets upon termination of the FSS bankruptcy. Burgess notes the following distinction:

> Second, *Segal* is distinguishable *because the debtor did have a prepetition legal interest in that case.* At the time of bankruptcy, 172 of the Internal Revenue Code gave the debtor a *claim* for a tax refund if certain conditions were met. *It was the combination of the law and the conditions made legally relevant by the law that conferred on the debtor a prepetition legal interest*: the claim for a refund. In that way, the *Segal* debtors' claim for a refund is similar to the prepetition accrual of a cause of action that results in a postpetition judgment in the debtor's favor. In such cases, the debtor's cause of action is a prepetition legal interest 541(a)(1) property *that brings the postpetition judgment into the estate* as proceeds under 541(a)(6). *See, e.g.*, *Wieburg v. GTE Southwest Inc.*, 272 F.3d 302, 306 (5th Cir. 2001) [holding that causes of action for age and sex discrimination that arose prepetition (but brought only post-petition )were  property of the bankruptcy estate]. *Burgess* at 498-99 . Id., Burgess at 499.[17]

*See, also In re PS On Tap, Ltd. Liab. Co.*, 669 B.R. 56, 66 (Bankr. C.D. Cal. 2025).

> ("To decide whether to treat post-petition claims as estate property, the Supreme Court has instructed us to determine whether such claims are 'sufficiently rooted in the pre-bankruptcy past'") (quoting *Segal v. Rochelle*, 382 U.S. 375, 380, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966)). *Id. In re PS On Tap*, at 66. … But here, it does not. Faithful application of the Supreme Court's holding in *Segal v. Rochelle* under the circumstances presented here, requires the Court to look beyond the closing date of the tax period, and instead examine the basis for the ERCs, even though they may have been inchoate obligations as of the Petition Date. *Id.* at 69.[18]

These cases illustrate the significance of this Bankruptcy Court's Dismissal Order. Protecting the

---

[17]     Burgess noted the distinction that although the crop was grown pre-petition and had it been existing insurance or claims for the loss that had accrued, the claim in Burgess was not of that nature:

> Here, by contrast, Burgess suffered the crop loss before filing for bankruptcy, but he did not have a prepetition claim to, or interest in, the disaster-relief payment *because the legislation authorizing the payment had not yet been enacted.* If Burgess had no right or interest that constituted property within the meaning of 541(a)(1) at the commencement of the case, then the payment he later received cannot be proceeds of property of the estate under 541(a)(6). Two other courts have recently reached the same conclusion in the context of federal disaster-relief payments to farmers. *Burgess* at 499.

[18]     *Also citing*:

> *United States v. Carey (In re Wade Cook Fin. Corp.),* 375 B.R. 597, 580 (B.A.P. 9th Cir. 2007) ["Though *Segal* was decided under the prior Bankruptcy Act, it remains good law under the Bankruptcy Code applicable to the instant case. *United States v. Sims (In re Feiler),* 218 F.3d 948, 955 (9th Cir. 2000); *Chappel v. Proctor (In re Chappel),* 189 B.R. 489, 493 (9th Cir. BAP 1995). *Id.* 596-597].

006830

value of the FFS Assets could only be done by Alex Jones, which is precisely what was accomplished by this Court Dismissal Order and Supplemental Order.   This Court's insistence that the Trustee's version of a § 363 sale arranged by the demands of the Plaintiffs did not fulfill the demands of the Code or the Court because it attempted to sell for non-cash and at a far too low price.   And, because of the nature of the auction process produced by the Plaintiffs (not the Trustee), there was no true competitive bidding – the Plaintiffs effectively controlled the bidding and did not want to compete with cash bidding.

## V.
### THE IMPORTANCE OF A LEGITIMATE § 363 SALE IN THIS CASE TO PREVENT A POLITICAL ULTERIOR MOTIVE FROM ABUSING THE  LEGITIMATE BANKRUPTCY PROCESS

A.      **The Texas and Connecticut Plaintiffs' Bad Faith and Bad Acts Caused Loss of This Court's Confidence in An Auction Sale By the Trustee and A Seven (7) Month Delay In Resolving the Sale of the FSS Assets**

57.      The Connecticut Plaintiffs are not interested in achieving a sale of the FSS assets at the highest value, but only a sale that results in the destruction of the Alex Jones "brand" of InfoWars (*e.g.*, The Onion attempted purchase).  The Connecticut and Texas Plaintiffs (and the Onion) have announced to the trial Courts, to the media, and to this Bankruptcy Court through their conduct and their frequent statements, that their true motive is not to obtain the highest value, so that their just debt may be repaid, but to destroy the value of the Debtor and his assets and obtain a non-dischargeable debt that will prevent Alex Jones from exercising his freedom of the press and free speech rights.

58.      This Court is the gatekeeper on issues of ulterior motives and bad faith.  *Cont'l Ins. Co. v. La. Oil Ref. Corp.,* 89 F.2d 333, 337 (5th Cir. 1937).[19]  A creditor may not cast his vote for

---

[19]      "The judge in acting on a plan must investigate the good faith and purity of the acceptance, and the time of acquiring the claims so voting. Paragraphs (e), (f) (6), of section 77B, 11 U.S.C.A. § 207(e), (f) (6); Texas Hotel Securities Corporation v. Waco Development Co. (C.C.A.) 87 F.(2d) 395, 396."

006831

an ulterior purpose and expect to have it counted.  Ulterior motives have been held to include 'pure malice, strikes and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business.'"  *In re Save Our Springs (S.O.S.) All., Inc.,* 388 B.R. 202, 230 (Bankr. W.D. Tex. 2008). [20]

59.    The destruction of the InfoWars brand and Alex Jones ability to exercise his freedom of the press and free speech is an abusive ulterior motive:

> Ulterior motives which can constitute bad faith include "pure malice, 'strikes', blackmail, and ***the [destruction of an entity]*** in order to advance the interests of a competing business."

*In re Landing Assocs., Ltd.*, 157 B.R. 791, 802 (Bankr. W.D. Tex. 1993) citing *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir. 1988). [21]  The Law in the Fifth Circuit is the same as In re Landing Assoc:

> *See Town of Belleair, Fla. v. Groves*, 132 F.2d 542, 543 (5th Cir. 1942). In *Groves*, a plan of reorganization was denied confirmation on the grounds that "special inducements" had been used to secure the acceptance of the plan by a group of creditors who were also bondholders of the debtor corporation. *See Groves*, 132 F.2d 542-43. The court found that the creditor-bondholders had been principally motivated by the existence of the "special benefits" which benefitted their bondholder interests rather than their interests as creditors, and that such ulterior motives breached the requirement of good faith. *Id.* at 543. [22]

---

[20]    citing *Insinger Mach. Co. v. Fed. Support Co. (In re Fed. Support Co.),* 859 F.2d 17, 19 (4th Cir. 1988), *citing In re Pine Hill Collieries Co.,* 46 F.Supp. 669, 671 (E.D. Pa. 1942), and *In re MacLeod Co., Inc.,* 63 B.R. 654 (Bankr. S.D. Ohio 1986).

[21]    Also citing *In re MacLeod Co., Inc.*, 63 Bankr. at 655 *and In re Featherworks Corp.*, 36 Bankr. at 463 (both citing *P-R Holding Corp.* with approval). In *P-R Holding Corp.*, the court stated that "when the [questioned activity] is in aid of an interest other than an interest *as a creditor*, [it] may amount to bad faith. . . ."

[22]    *In re Mangia Pizza Invs., LP,* 480 B.R. 669, 681 (Bankr. W.D. Tex. 2012): *citing In re Landing Assocs., Ltd.,* 157 B.R. 791, 807 (Bankr. . W.D. Tex. 1993) ("[W]hen the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and only incidentally related to the creditor's status *qua* creditor, section 1126(e) is rightly invoked.").  *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 682 (Bankr. W.D. Tex. 2012) cited I*n re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990), noted that the creditor in that case had purchased its claims only after the debtor's disclosure statement was approved, and then "almost exactly in the amount required to block the plan of reorganization." *Id.* at 289-90. In addition, in determining that the creditor's true motive was to "take over and control the debtor," the court noted that the two classes in which the creditor had purchased claims had "directly opposite interests with respect to the . . . litigation." *Id.*

006832

*In re Dernick*, 624 B.R. 799, 808 (Bankr. S.D. Tex. 2020) instructs that "… a court must assess "the true interest being benefitted by the questioned activity" to determine whether the creditor is seeking to benefit itself in some way other than as a creditor acting on its claim. Here, the determination is simple. The "creditors" Plaintiffs are seeking a political "gun control" victory which Plaintiffs define as the destruction of the Alex Jones "brand" of InfoWars. This is a the "ulterior motive" that is not permitted in the process of bankruptcy, whether reorganization or liquidation (at both stages, the Plaintiffs acted in bad faith on their ulterior motive).

60. This conduct is not an allowed motive of a creditor, it is the motive of a political view bent on destruction of an opposed political view (*i.e.*, the conservative voice of Alex Jones by his political opponents, the far-left progressive movement seeking gun control, financed by such organization as Bloomberg and its supported foundations Every Town and The Onion) (the "Political Motive"). This Political Motive is not recognized in bankruptcy and cannot be rewarded by a federal court where the goal is wholly inconsistent with the rights of a legitimate creditor and the constitutional rights of the debtor.

61. Because this Bankruptcy Court refused to permit the Connecticut and Texas Plaintiffs control of the bankruptcy auction and Trustee, the Plaintiffs *now oppose any auction* of the FSS assets. The Plaintiffs have not sought a fair and equitable distribution of bankruptcy proceeds, but to control the bankruptcy assets to accomplish an abuse of the bankruptcy process. Most critically, that abuse involves the prevention of a debtor of the right to future exercise constitutional rights – freedom of the press and free speech.

62. It is the sale proceeds that must then be applied to those Judgments as credits of the sale process, and depending on the outcome of the appeals, may even allow payment in full of one or both of these judgments. Allowing the operation and protection of these assets has and will

006833

continue to be for the benefit of the creditors and the Jones Estate until the sale concludes, which will not be the result if a State law execution sale is conducted or if the Connecticut Plaintiffs acquire the assets in other than through a fair, non-collusive process.[23]

63.    Although Connecticut Plaintiffs have been consistent in their demand *to destroy Jones' ability to earn an income from his exclusively-owned "persona" (his image, name, voice, etc.)* to silence his free expression of political and other opinions as an "on air" news media, not only that position is irrelevant to the economic interest of the bankruptcy system itself but also when it rises to the level of abuse of process that uses the bankruptcy system to accomplish an unconstitutional political goal (to take away Jones First Amendment rights).[24]  In fact, abuse of process conduct it is contrary to the bankruptcy fresh start, even where a claim is found non-dischargeable.  If the demands of Connecticut are to have its debt declared nondischargeable then it cannot, under any good faith application of ay bankruptcy policy approved by the Supreme Court or Congressional intent, be consistent with destroying the Debtor's ability to earn an income to pay its non-dischargeable debts.  This counter-intuitive position is the definition of "abuse of process" or its modern counter-part, "lawfare" - when a political agenda, as here, is the ulterior motive, defined as taking a lawful legal position only to advance a contrary political agenda.[25]

---

[23]    Although the Plaintiffs are free to acquire the FSS assets through a fair bidding process for cash, the stated purpose of the purchase is to destroy the value of the "Infowars" or "Alex Jones" brand.  This perverted motive is addressed below, and its impact on the claims allowance process.

[24]    *See, e.g.* the Fifth Circuit opinion in *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020):
> The Bankruptcy Code 'provides equitable powers for the bankruptcy court to use at its discretion.' *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party. *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ('[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages.'). *Id.* at 428.

[25]    "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy. The term "lawfare" is also a clever play on words, a pun, and a neologism that needs to be deconstructed in order to explain the linguistic and political power of the term.

006834

Bankruptcy Courts have the jurisdiction to remedy and sanction abuse of process and lawfare, and do so.[26]

64.     This obvious abuse of process must be eliminated from controlling this bankruptcy. Ultimately, to the extent that any part of these two Plaintiffs' Judgments is rendered final on appeal, the rights of Jones to *a reasonable effort to achieve a maximum credit against those Judgments* should include the Debtor's right to actually achieve the highest value reasonably obtainable from the sale process most reliably capable of achieving that result – a bankruptcy auction – uncontrolled by any outside source other than this Bankruptcy Court enforcing its own orders to sell.

**B.      The Connecticut and Texas Plaintiffs Abuse of Process Goes Far Beyond the Efforts to Destroy Jones and FSS Assets in This Bankruptcy by Jones and FSS**

65.     As noted above, Jones and FSS have filed on September 5, 2025, their writ of *certiorari* with the Supreme Court of the United States. *See*, **Exhibit "6"** attached hereto. It has been placed on the agenda for the Justices' private conference on October 10, 2025. The text of the Writ discloses many of the abuses of the Connecticut Plaintiffs in the Connecticut jury trial, including their opening and closing statements that Jones should be punished so severely that he can never be part of the public discourse in the future. This is exactly the plan that motivated this Bankruptcy Court's frustration with the two auctions and an absurd settlement pushed by the Plaintiffs and adopted by the Trustee. The efforts of these Plaintiffs are pre-dated by the federal

---

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448

[26]     *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020). Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423. … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party. *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages."). *Id.* at 427-428.

006835

government's efforts to stop Alex Jones from continuing his broadcasts, long before Sandy Hook. The following facts have meticulously been explored and only discovered within the past months.

66.     The Conduct of the Plaintiffs Admit Their Intention To Destroy the InfoWars Brand and the Ability of the Debtor and FSS to Conduct Their Constitutionally Protected Free Press and Speech.   This is made clear by the simple fact that five (5) years after 2012 and the Sandy Hook murders the first client to seek to file a suit was the FBI Agent and first responder William Aldenberg.  The seven (of the more than 24 murder victims) families were willing to participate in the suit Aldenberg wanted filed, as an FBI Agent.  His story as to why he waited almost five years defies credulity. Preliminarily, from December 2012 to early 2018 when FBI agent Aldenberg's suit was filed against Alex Jones and his broadcast company Free Speech Systems, LLC ("FSS") not a single demand was made to Jones or FSS about his purported claims of fake murders by Aldenberg or any of the Plaintiffs (except one), including no demand for a retraction or even public threats of claims and suits.   This silence was mirrored by the absence of media attention to the topic (since no claims were made by parents) and was not "news".  With what was to come, the silence was deafening.

67.     In fact, the Veritas secret video of CIA and FBI Contractor who was secretly taped bragging about his efforts on behalf of the FBI to find ways to financially destroy Jones ("Chop his [financial] legs off").[27] Gavin O'Blennis ("O'Blennis") claims to have been an active contractor with the CIA who also worked with Homeland Security and the FBI.  He claimed that he had confidential financial information given to him on Alex Jones because the FBI was looking to charge Jones with criminal conduct but could not find any basis.

68.     O'Blennis also establishes that the FBI was directly involved in Aldenberg's efforts

---

[27]     https://www.youtube.com/watch?v=M5nRqWzBX-o

006836

to get a suit filed against Alex Jones and FSS. O'Blennis bragged in the undercover video/audios made on March 23rd and March 28th, 2024, that "they" (likely referencing Aldenberg and the FBI) were able to "educate" the Sandy Hook families that the families had a civil lawsuit case against Jones and FSS. Of course, and notwithstanding that 15 of the children-victims' families refused to participate,[28] that is exactly what Aldenberg, the FBI, DOJ, and selected law firms were able to confuse through literally over 1,000 news articles referencing the "Sandy Hook families" Plaintiffs, *as if all of the 20 families agreed to participate.* Also undisclosed was the fact that a majority of these Plaintiff-Parents were involved in foundations dedicated to gun control and *financed in part by DOJ grants*.

69.    On information and belief Aldenberg worked closely with Chris Mattei when he served as a DOJ attorney while both officed in Connecticut.[29] Aldenberg's testimony and his dramatically "sad story" at trial was that it took almost five years of enduring multiple threats of personal harm and harassment, during which the FBI "refused all help" him in his efforts to sue Alex Jones. According to Aldenberg, Aldenberg claims he finally found Chris Mattei after a 4-year search for help, who he claims immediately agreed to take his case. Hardly a credible statement about what Aldenberg was doing during this time to accomplish the "hit" on Jones and FSS, but Aldenberg's statements were made under oath. Remarkably during this time, Aldenberg never directly talked with Jones or anyone on Jones' behalf or ever made a public complaint about

---

[28]    The Plaintiffs are the parents of five children killed at Sandy Hook — Jacqueline and Mark Barden, Nicole and Ian Hockley, Francine and David Wheeler, Jennifer Hensel and Jeremy Richman, and Robert Parker — as well as relatives Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto, the mother and three siblings (respectively) of first-grade teacher Victoria Leigh Soto; Erica Lafferty-Garbatini, the daughter of Sandy Hook Elementary School Principal Dawn Hochsprung; and Bill Sherlach, the husband of Mary Sherlach., and finally William "Bill" Aldenberg, the FBI agent and first responder to the scene.

[29]    According to Chris Mattei's personal profile on his firm's Web site, "That trial culminated in a $1.4 billion jury verdict, *the largest defamation verdict in American history* …." And his Instagram account "Former corruption prosecutor, worked with Aldenberg's investigation of a 2012 FBI corruption probe in Connecticut's 5th District, where future Senator Chris Murphy was a former representative.

006837

Jones. [*See*, trial testimony Aldenberg, pg. 6-7, *infra*. summary of Aldenberg's trial testimony].

**C.    It Is Only This Court That Can Protect The Bankruptcy System from Abuses And Ulterior Motives Designed To Deprive a Debtor of His Right To Earn A Living By Exercising His Constitutional Rights**

70.    The Plaintiffs' are frequently heard claiming that they will destroy the InfoWars Brand and keep Alex Jones out of the public discourse.  Those examples have been quoted to this Court on multiple occasions and continue through recent weeks.  Avi Moshenberg is a current example of the continued announcements of the ulterior motives of these Plaintiffs, not to collect a just debt but to destroy an individual with whom they politically disagree:

> "Now that there's a receiver in place, Alex Jones is no longer going to control the Infowars brand. ***It's time to shut it down***," said Avi Moshenberg, one of several attorneys for the families.

Previously Moshenberg has been vocal about ending Alex Jones career as a broadcaster:

> Moshenberg said "his clients may be willing to settle with Jones for less money if it means *Jones would end his broadcasting career*." "If he wants to agree to some sort of terms that hold him accountable for all he's done, we'll be open to listening. Whether that means *walking away from public life*, to paying Sandy Hook families *in full* …."[30]

As previously cited to this Court, the Connecticut Plaintiffs have made the same public statements reflecting their ulterior non-creditor motive to destroy the InfoWars brand and Alex Jones access to the public discourse.   As the Jones/FSS Motion for Cert. pending at the U.S. Supreme Court

---

[30]    https://www.washingtonpost.com/investigations/2022/11/21/alex-jones-sandy-hook-lawsuit/.  *See, also* The Onion: Here's Why I Decided To Buy 'InfoWars' - The Onion.pdf:

> "What's next for InfoWars remains a live issue. The excess funds initially allocated for the purchase will be reinvested into our philanthropic efforts that include business school scholarships for promising cult leaders, a charity that donates elections to at-risk third world dictators, and a new pro bono program pairing orphans with stable factory jobs at no cost to the factories.
>
> As for the vitamins and supplements, we are halting their sale immediately. Utilitarian logic dictates that if we can extend even one CEO's life by 10 minutes, diluting these miracle elixirs for public consumption is an unethical waste. Instead, we plan to collect the entire stock of the InfoWars warehouses into a large vat and boil the contents down into a single candy bar–sized omnivitamin that one executive (I will not name names) may eat in order to increase his power and perhaps become immortal.

006838

illustrates, there was no trial on defenses of freedom of the press or free speech, all being eliminated by a default judgment and a subsequent "hearsay" trial.

71.    The Plaintiffs' demand to set aside the Supplemental Order and allow an unsupervised State Court sale intended to result in the destruction of the "brand" and the debtor's constitutional rights.  That ulterior motive goes to the heart of what this Bankruptcy Court must protect.  It is of note that the Trustee refuses to conduct a sale or auction with an $8 million bid from a capable and responsible bidder, *in hand*.  The Trustee simply refuses to act for fear of the reprisal by the Connecticut and Texas Plaintiffs.   Those Plaintiffs seek a sale that guarantees the destruction of the FSS assets that will net the Plaintiffs far less than $8 million, and that is their intention.  No one will buy assets for value if their goal is to destroy the assets.   That is what is happening in this Court.

## VI.
## CONCLUSION

72.    The continued efforts of Jones and FSS have been to provide a method that gives creditors of their respective estates the highest possible dividend from any inevitable sale of the FSS Assets to creditors exercising their rights as creditors to collect on a just debt.  Jones has illustrated and argued that the refusal of the Connecticut and Texas Plaintiffs to participate in this Bankruptcy Court's process is motivated by bad faith and a political motive that seeks the destruction of the value of the FSS Assets to accomplish the denial of Jones to exercise is fundamental right to freedom of the press and speech.  There is no explanation otherwise – the Plaintiffs have announced repeatedly, and joint bid with a political organization The Onion, on the basis of the purchase and destruction of the value of Jones Assets.

73.    This Court is the gatekeeper of the policies of the Bankruptcy Code, including the paramount policy of fair and equitable distributions among creditors.   The conduct of these

006839

Plaintiffs illustrates exactly the opposite of that policy.   The goal is to take Alex Jones out of the public discourse and off the air by destruction of his ability to earn an income by accessing his 30 million daily listeners, a goal they often brag about.

74.    Were the goal payment of a just debt, no sane creditor would destroy the engine that generates the repayment power in order to collect their debt.  All that Jones and FSS have sought in this case is a fair, honest, public auction of the FSS Assets that may be preserved so that Jones is able to make reasonable efforts at repayment, with a desire to ultimate reach an overall resolution of the debt.

**WHEREFORE, PREMISES CONSIDERED,** the Court should deny Plaintiffs their request for an order finding that the FSS assets are not property of the Chapter 7 Estate, and for such other relief which Movants shall be justly entitled.

Dated: October 8, 2025                              Respectfully Submitted,

*/s/ Shelby A. Jordan*
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
            aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and FSS**

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577

006840

Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES And FSS**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on October 8, 2025.

> */s/ Shelby A. Jordan*
> Shelby A. Jordan

006841

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 01, 2025

Nathan Ochsner, Clerk

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

<table>
<tr><td rowspan="6">In re:<br><br>ALEXANDER E. JONES,<br><br>Debtor.</td><td>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§</td><td>Chapter 7<br><br>Case No. 22-33553 (CML)</td></tr>
</table>

**EXHIBIT**

**1**

Alexander E. Jones; 22-33553

exhibitsticker.com

**ORDER CONFIRMING THAT FSS ASSETS ARE**
**NOT SUBJECT TO THE AUTOMATIC STAY**
[Related to ECF No. 1241]

Upon consideration of the motion (the "Motion") of the Sandy Hook Families, pursuant to sections 105(a), 362(d), and 541 of title 11 of the United States Code (the "Bankruptcy Code"), seeking the entry of this order (i) reconfirming that the Supplemental Dismissal Order is null and void and is of no force or effect, (ii) confirming that FSS's assets are not property of the Chapter 7 Estate, and (iii) confirming that any automatic stay applicable in the Jones Bankruptcy Case does not apply to FSS or its assets; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; and this Court having found that this is a core proceeding pursuant to 28 U.S.C.§ 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. § 1408; and this Court having found that the relief requested in the Motion is appropriate; and this Court having found that the Sandy Hook Families' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the

006842

statements in support of the relief requested therein at a hearing before this Court (the "Hearing");

and upon all of the proceedings had before this Court; and it appearing, upon due deliberation,

that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for

the relief requested in the Motion, it is **HEREBY ORDERED THAT FOR ALL THE**

**REASONS STATED ON THE RECORD AT THE OCTOBER 1, 2025 HEARING**:

1. The automatic stay imposed under Section 362(a) of the Bankruptcy Code in the Jones Bankruptcy Case does not apply to FSS or any of FSS's assets because these assets are not property of the Jones bankruptcy estate under Section 541 of the Bankruptcy Code.

Signed: October 01, 2025

_____
Christopher Lopez
United States Bankruptcy Judge

006843

2

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALEXANDER E. JONES AND        )  CASE NO: 22-33553-cml
OFFICIAL COMMITTEE OF         )
UNSECURED CREDITORS,          )  Houston, Texas
                              )
         Debtors.             )  Wednesday, October 1, 2025
                              )
                              )  1:03 PM to 1:59 PM
------------------------------)

HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Alexander E. Jones    SHELBY A. JORDAN
and Free Speech Systems:  ANTONIO ORTIZ
                          Jordan & Ortiz, PC
                          500 N Shoreline Blvd.
                          Corpus Christi, TX 78401

For Alexander E. Jones:   BEN C. BROOCKS
                          Broocks Law Firm PLLC
                          6207 Bee Cave Road
                          Austin, TX 78746

For Christopher R.        JOSHUA W. WOLFSHOHL
Murray:                   Porter Hedges LLP
                          1000 Main Street
                          Houston, TX 77002

                          ERIN ELIZABETH JONES
                          CHRISTOPHER R. MURRAY
                          Jones Murray LLP
                          602 Sawyer Street
                          Houston, TX 77007

For Connecticut           KYLE J. KIMPLER
Families:                 Paul, Weiss, Rifkind, Wharton &
                          Garrison
                          1285 Avenue of the Americas
                          New York, NY 10019

EXHIBIT

2

Alexander E. Jones; 22-33553

exhibitsticker.com

006844

For United States          HA MINH NGUYEN
Trustee:                   Office of the United States Trustee
                           515 Rusk Street
                           Houston, TX 77002

Court Reporter:            UNKNOWN

Courtroom Deputy:          UNKNOWN

Transcribed by:            Veritext Legal Solutions
                           330 Old Country Road, Suite 300
                           Mineola, NY 11501
                           Tel: 800-727-6396

Proceedings recorded by electronic sound recording;

Transcript produced by transcription service.

006845

HOUSTON, TEXAS; WEDNESDAY, OCTOBER 1, 2025; 1:03 PM

(Call to Order)

THE COURT:  Okay.  Good afternoon.  This is Judge Lopez.  Today is October the 1st.  I'll call the 1:00 p.m. case in the Alex Jones matter in connection with an emergency motion to confirm that the automatic stay does not apply to assets related to Free Speech.  Why don't I take appearances in the courtroom and then somebody can tell me why we're here?

MR. JORDAN:  Your Honor, Shelby Jordan, and my partner Alex -- I'm sorry, my partner Antonio Ortiz on behalf of Alex Jones, Debtor, and non-debtor FSS, Free Speech Systems and Mr. Ben Broocks.

THE COURT:  Okay.  Good afternoon.  Good to see everyone.

MR. WOLFSHOHL:  Good afternoon, Your Honor. Joshua Wolfshohl and Erin Jones on behalf of Christopher Murray, the Trustee who's also here.

THE COURT:  Thank you.

MR. NGUYEN:  Good afternoon, Your Honor.  Ha Nguyen for the U.S. Trustee.

THE COURT:  Thank you for being here, Mr. Nguyen. Anyone else wish to make an appearance?  Okay.  Somebody tell me why we're still asking these questions about whether -- what is -- what's going on here.  I thought I was clear

the last time, but it clearly -- Mr. Murray, your side filed a motion, so, maybe you can tell me what's going on. And Mr. Kimpler, I can hit five star. Oh, I'm sorry, I forgot.

MR. MURRAY: It was not filed by the Trustee, Your Honor, just to be clear.

THE COURT: No, I know, but I'm just -- maybe y'all can tell me. Mr. Kimpler?

MR. KIMPLER: Yes. Hi, Your Honor. It's Kyle Kimpler from Paul, Weiss on behalf of the Connecticut families. The motion was filed jointly by the Connecticut and the Texas families, and I'm happy to take the lead in explaining why it was filed and why we're here today.

THE COURT: Well, I read the papers. The question is, what's unclear? What remains unclear?

MR. KIMPLER: Well, from our perspective, Your Honor, nothing remains unclear. We think that you have very clearly told us on two occasions in February and in June, that the families were, in fact, authorized to pursue whatever rights they may have in state court. Both myself and Mr. Rosenberg, when we were here in June, told you we intended to do exactly that. At no point in time did the Court or Mr. Jones raise the problem that actually state courts have no jurisdiction over FSS assets, that the automatic stay applies to FSS assets, or that we would be violating the automatic stay. All of those arguments are

006847

now being raised by Mr. Jones.

THE COURT:  Right.

MR. KIMPLER:  These are fringe arguments.  These are the core arguments he's raising in state court.  And so, we are here today to, one, get clarity on that.  And part of that is because I don't take the accusation that I'm violating the stay lightly.  That's an issue I obviously feel incumbent to come to the Court and get clarity right away.  You know, I do think it's telling that these accusations are being made in state court and that the Debtor who has a conviction that the stay is being violated has not come to Your Honor.  So, we don't really believe there is anything unclear.  I'd rather not have to be here today, Your Honor, seeking this, but unfortunately --

THE COURT:  It is what it is.  I'm okay.  I just want to make sure that crystallized the issue.  Just since we've been here for a while, Mr. Murray, have you made a determination on the equity yet, and what you're going to do with it?

MR. MURRAY:  Not yet, but we're leaning toward abandonment.  We've gotten minor indications of interest, but no one's made an offer.

THE COURT:  Can you lean in October?

MR. MURRAY:  Yes, sir.

THE COURT:  Okay.  Thank you.  I just want to --

we've just got to get to an answer on that.  Okay.  Why don't I ask the Jones side to tell me how the automatic stay applies in this case, and we're just talking bankruptcy law, facts won't matter.  We're just talking law.

MR. BROOCKS:  Your Honor, to be more precise about why we're here, as you remember, in February of this year we had a hearing.  They asked you to approve the settlement and you did not approve the settlement.

THE COURT:  I did not approve the settlement.

MR. BROOCKS:  And lots of words were exchanged, and I think there was frustration about the failure to actually move the process along.  And then in June we filed, or May, end of May, we filed, our side filed, a motion to reconsider, which we told you that the -- let me put this up on the screen if I may, Your Honor.

THE COURT:  It's okay.  Let's just talk.

MR. BROOCKS:  Is that okay?

THE COURT:  You're asking me to reconsider an order?  Well, we -- no, not necessarily.  We wanted to bring to your attention that what you had done was not proper, that the Supreme Court of America said that when --

THE COURT:  Can you get close to a mic?

MR. BROOCKS:  -- when the matter is on appeal, the district court, as the Texas Plaintiffs said, appeals your supplemental September judgment.

THE COURT:  Right.

MR. BROOCKS:  It divests this Court of any authority to do anything with that judgment, and you agreed with that.

THE COURT:  I agree with that.

MR. BROOCKS:  Yeah, but so when --

THE COURT:  What does the order say?

MR. BROOCKS:  Well, I'll show -- that's what I was going to show you.

THE COURT:  Well, let's just read it.  It says, "Effective as of the date of this pursuant to 349(b), all property of the estate shall be deemed to have vested in the estate as property of the estate."  So, it's deemed as property of the estate, but that doesn't mean it's property of the estate.

MR. BROOCKS:  Well, it's -- well, the order that you signed said, "All property of the estate shall be vested."

THE COURT:  "Shall be deemed to have vested."

MR. BROOCKS:  Well, that was the whole point. That's when the Texas Plaintiffs went back to the Texas court.

THE COURT:  I know, but let's just -- I'm just saying that's what the words say, "Shall be deemed to have vested."  I can't -- I don't have authority, nor does any

bankruptcy judge in America, to make something property of the estate.  Not one.  It is what it is.  The code says what it is.  It is what it is.  "Shall be deemed to have been vested as property of the estate and shall be under the control of the trustee," so -- and then Paragraph 2 says, "The trustee is authorized to operate the business for a period not to exceed a year," right?

And that order was signed on September 25, 2024.  Let me just tell you the way I read my order because I know exactly what I was thinking, and maybe it's helpful if I just provide clarity.  Section -- upon the filing of a bankruptcy case, property of the estate is determined, right?  You can also take a look sometimes upon conversion, but it's whatever interest the debtor had, and that interest is determined as a matter of state law.  The automatic stay under Section 362 protects any act you take to go against or to collect or to exercise control over property of the estate.

So, something has to be property of the estate, but 541 says what it is, right?  So, what was happening in this order, and if everybody remembers back when this was happening -- well, I don't want to get into that, but it was -- there were a lot of moving pieces there.  In terms of what -- somebody could go into it or not.  "This put the property of Free Speech, and it shall be deemed to have

006851

vested." That's the most that I could do. I cannot convert something into property of the estate, so the automatic stay can never go into effect with respect to that.

Normally what happens in bankruptcy, and Mr. Shelby knows this, is that the bankruptcy judge sometimes can extend the stay, or do 105, or use some combination of 362 and 105 over that, but that usually works. You've got to get a motion on that, and the Court would issue a temporary -- essentially a preliminary injunction or an injunction enjoining any actions against a non-debtor, because sometimes the actions against the non-debtor essentially impact property of the estate. I never signed any of those orders.

Technically, the Trustee was authorized to operate for a period of a year, until September 25th. That has expired, so the Trustee can't even operate under my order. This has never been property of the estate. It was treated as if it was, and it was done for a specific purpose. Mr. Broocks, you weren't here during that time, and I don't hold it against you, and I got what the words are, but the, "Shall be deemed to have vested," right? It doesn't make it 541, and I don't have authority. No one does under 541 to convert something into property. It's the only way the automatic stay would apply, and the automatic stay would only apply if I issued -- well, it just never applies.

006852

Normally, what you would be looking for is an injunction over assets -- over non-debtor assets.  This is an easy answer, and it's for that same reason, quite frankly, that when the settlement came across my way where the -- I believe it was the Texas families and the Connecticut families reached a deal, and they wanted an allowed claim against FSS in the bankruptcy case, I said I don't have authority to do that.  I don't have authority to settle any claims because I don't have jurisdiction over that.  And so, this was very specifically to try to see if one could, quite frankly, stabilize things that were going on at that time in September 2024, which were -- there were a lot of kind of moving pieces and allegations that were being made about stuff that was happening outside the court, to stabilize this, see if you could get to a sale.  Maybe parties could agree to maximize value.  This order was entered.  But at a max, you can read 541.

So, it's -- this is just an easy answer.  The code provides the answer, and unless somebody is going to point to me to a section under 541, this gets really easy.  I can deem something to be treated as property of the estate, so Mr. Murray has the authority to go exercise it and try to go sell it.  But what I said in the last hearing was I'm not authorizing any sales anymore.  So, the effect of this order was to void it because I'm not approving any sales.  And so

-- but now, we're well beyond September 25, 2025, so Mr. Murray has nothing to do with Free Speech anymore. I mean, he still owns the equity. Well, holds it, you know, in terms of his rights as the Trustee, I should say.

And I've asked multiple times if anybody wants to buy that. They can. It's not going to be free and clear, but you can buy it. This is -- I went back and read the order because I was confused about what we were doing here. I don't know what is said in the state courts, and I really don't want to get into that. I can just tell you as a matter of pure bankruptcy law, that 541 does not apply to any assets that are owned by Free Speech, and I don't want to get into what Free Speech actually owns, what's happening in the state courts, what is said one way or the other. I can just tell you this order was supplemented a dismissal of a debtor.

So, Free Speech is a non-debtor. And I said at the time, Mr. Kimpler came to me, Your Honor, we're just going to start the clock and people are going to start to have their collection remedies. We all knew that was going to happen. Connecticut families weren't too happy about the decision I made to dismiss the case because they knew that the Texas courts had issued some orders that arguably gave the Texas parties some rights. But there's nothing in here that makes it 541. And there's no case that anybody can

006854

cite to me. There's no law that anyone can cite to me that converts a speaker or a microphone or a camera that is in the name and is owned by Free Speech into property of the estate. Not one. No one can cite to that. And that's what I'm being asked to confirm today. And if that's what I'm being asked to confirm today, that's the answer it's always been. This order never changed that. The words were used carefully here. I don't know what law anyone is citing to me.

MR. BROOCKS: I'm going to -- may I respond?

THE COURT: Please.

MR. BROOCKS: Yes. So, Your Honor, I think that my memory and understanding is different from reading the transcripts. But when you issued your June order called the cash order, the question became what happens to the assets. You said you gave -- I don't know whether you deemed, I'm not sure I follow the distinction between deemed and doing.

THE COURT: I can't deem anything under 541. That's what I mean. I can't do it. I can't convert something into 541.

MR. BROOCKS: But, Your Honor, I'm not arguing --

THE COURT: That's what I mean.

MR. BROOCKS: -- with you. I'm simply telling you what you did.

THE COURT: No, no, no. But my point is you're

006855

asking me, you didn't understand the distinction. And then I -- that's the distinction. If somebody is going to ask me whether the automatic stay applies, I've never issued an injunction. I've never said the stay. I don't recall ever saying the automatic stay would apply to that, and I've never issued an injunction over any non-debtor assets. Nor has anyone ever asked me to that I can recall.

I understand, and that's why I'm trying to just stay in my lane and not get into what is being argued in state court. I can just tell you I don't think this order, quite frankly, even applies anymore because one goes with two. And two says it's not to exceed for a year absent further order of the Court. And I know there's no way I do that. I'm just telling you where it is. Free Speech has whatever rights it has, Mr. Broocks. And you can -- I know you've mentioned to me that you've had First Amendment arguments. I've never blocked Free Speech from the opportunity to go make whatever arguments they wanted. Wanted to go to the Supreme Court of the United States, never, never, never prohibited any lawyers that Free Speech wanted to hire, Alex Jones wanted to hire.

I've never prevented any arguments from anyone in any court, whether in Connecticut or in Texas. And I have no idea where things stand now. So, I don't want to get into what was said to some court versus another court. I

can just tell you what this order does.  And there's nothing in this order that could make the automatic stay apply.  And if this is the basis for the automatic stay applying, I can assure you the automatic stay doesn't apply.

MR. BROOCKS:  Your Honor, and I accept that, but I just would like to explain why we got here from our perspective.  If could you just give me two minutes?

THE COURT:  Oh, yeah, absolutely.  I'll stay quiet.

MR. BROOCKS:  But when you entered the June order, the September order, I'm going to put this up on the screen if I can, because it's much more helpful to talk about it.  How do I do that?  Do I have permission to?

THE COURT:  Yeah, sure.  Rosario, can we give -- which form of tech are you using?

MR. BROOCKS:  I've got PowerPoint.

THE COURT:  Are you using -- no, I'm saying are you using GoTo Meeting or what?  Wait.

MAN 1:  We have both up.

MR. BROOCKS:  Yeah, GoTo Meet.  We have GoTo Meet.

THE COURT:  Okay.  Just tell me where you are.  Which parson you are, because I going to have to give you the presenter.

MR. BROOCKS:  Oh, Ben Broocks.

THE COURT:  Huh?

006857

MR. BROOCKS:  Ben Broocks.

THE COURT:  Oh, Ben Broocks.  You got it.

MR. BROOCKS:  Let me see right here.  So, how do I get it up on the screen?

THE COURT:  There's a William Broocks and a Ben Broocks.  I've got Ben Broocks.

MR. BROOCKS:  Yeah.

THE COURT:  Okay.

MR. BROOCKS:  While he's doing that, Your Honor, what I'm going to show you is the -- from a history standpoint, the June order of 2024 that you signed gave the cash to the Trustee.

THE COURT:  Mm hmm.

MR. BROOCKS:  The Plaintiffs, the Connecticut Plaintiffs and the Texas Plaintiffs, were not aligned at that time.  They were opposing one another.

THE COURT:  That's correct.

MR. BROOCKS:  And the Connecticut Plaintiffs came in with the Trustee and said -- and basically said to Your Honor, well, Your Honor, you give them the cash, the Trustee, but Alex Jones can still run the assets.  And I've got your June or September of 2024 transcript where you said, listen, my intention all along, and I've got it, I can show it in a minute, was to put everything in the estate of Alex Jones under the control of the Trustee.

006858

THE COURT:  Mm hmm.

MR. BROOCKS:  That is why the Texas Plaintiffs appealed.  They appealed because you --

THE COURT:  Yeah.  They didn't give me a chance to

MR. BROOCKS:  Sorry?

THE COURT:  Yeah.

MR. BROOCKS:  So, now we come to the September order, which you entered, and I'm -- I don't know.  Let me see.

THE COURT:  I agree with you 100 percent.

MR. BROOCKS:  But the point, though, is that the Texas Plaintiffs appealed your September order and to the district court.  What were they appealing?

THE COURT:  I have no idea.  That's what I'm saying, I don't get to talk about those things.

MR. BROOCKS:  Well, I'm going to show you what they were appealing.  They were appealing -- the notice of appeal that they filed.

THE COURT:  Okay.

MR. BROOCKS:  It says -- it specifically says -- I've got to put this up on the screen.  Drag it to the right?  I'm going to drag this up there.  You do it for me, please.  That document right there up on that screen.  I'm just going to walk over here.

So, their notice of appeal -- where's the cursor?

006859

I apologize.  I wasn't expecting to do this, but this is something different.  So, let me -- bear with  me to get to it.  I want to scroll that down until I say stop.

THE COURT:  What document is this?

MR. BROOCKS:  This is just simply -- I filed in a different court, but I quoted what you said in the -- what they said in their notice of appeal.  Keep going, keep going, keep going, keep going.  Going, going, going, going.  Go ahead.

THE COURT:  Yeah.

MR. BROOCKS:  More, more, more.  More.  Go.  Keep going.  Keep going -- you're going to -- Ben, you're going to the top of the document.  So, we're going to go to the top.  Okay, stop right there.  Go a little bit.  You went too far.  I'll tell you when to stop.  Keep going.  Go to Page 9.  Right there.  Up there, it's in black.  There's such a lag on there, I can't tell.

MAN 1:  Yeah, sorry.

MR. BROOCKS:  This is the question that the Texas Plaintiffs posed to the district court.  "Did the bankruptcy court err, and without notice it entered in Docket Number 121, pretty much after dismissing, that retroactively vested all property of former Debtors', Free Speech, into the bankruptcy papers."  I don't see the word deemed; it says vested.  Now, the --

006860

THE COURT: I didn't write that one.

MR. BROOCKS: No, I know that. I know that.

THE COURT: Okay.

MR. BROOCKS: But that's what the understanding was because if you --

THE COURT: No, no. That wasn't my understanding. That -- I don't have control of it. No one filed a motion for reconsideration on that. I would have been more than happy to explain what that meant at that time. But once things get appealed, I don't touch them anymore, and I don't read them anymore. I lose jurisdiction immediately, and so I don't comment on -- I don't comment. It would be highly improper for me to comment on what was happening.

MR. BROOCKS: But, Your Honor, the point, though, was that if you did not transfer the assets, that was the whole purpose of the U.S. Trustee's making comments to you. How can Mr. Murray have spent since September trying to sell assets he didn't own? How can he do it? You can't sell assets you don't own, and the distinction between, I deem these to have been vested, versus they are actually vested is a distinction that I'm not familiar with. You can't sell something that you don't own.

THE COURT: No, I think Alex Jones owns Free Speech. Alex Jones can go tell somebody to go sell assets in Free Speech. That's the point that I've been trying to

make -- well, I would have made it years ago.  Of course he can, he owns the business.  He owns Free Speech.  If he wants to go sell assets of Free Speech, he can -- the Trustee now sits there in the shoes.  The Trustee can always go tell Alex Jones -- Alex Jones can, in his capacity as trustee over the Jones estate, he owns the business.  He wants to go sell something; he can tell somebody to go sell it.  That's the point that I was trying to, by the deemed, to make.

But it doesn't make it property of the estate.  And I can't comment on what people said, nor am I going to ask them what they did.  They certainly had the right to go file what they wanted, but I think there's an easy answer to that question.

MR. BROOCKS:  Your Honor, but if I may just continue because I'm deeply confused now because for the last -- you know, since September of last year, Mr. Murray has been running FSS trying to sell it, and in the hearing we had in June of this last year, just June, the discussion and colloquy back and forth was, what about a future sale?  What are we going to do?  And you -- and not just to the equity.  You were talking about the assets, and I can show you a chapter and verse.  How do you sell assets under an order that doesn't give Mr. Murray the ability to actually sell because you said, and I can show you where you said it,

006862

if we do it again.  I don't want to do an auction, but I'm going to have to be involved.  There's going to be cash and lots of complications and things.  This is -- I'm bewildered that you would say --

THE COURT:  How are you bewildered?  I'm just explaining it to you.  No one has -- I don't think anybody -- have I said anything inconsistent with what I've said before?

MR. BROOCKS:  I believe you have.

THE COURT:  I don't -- we'll just agree to disagree.  I don't want to get into the back and forth about this, but maybe we'll just agree to disagree, but none of what I'm saying is inconsistent.  Christopher Murray is the Trustee over Alex Jones' estate.  Alex Jones owns FSS.  If he wants to go sell the assets, he can.  I tried to create a forum which would maximize value for everyone and to create a stable environment because there were concerns at the time, before you got involved, Mr. Broocks, where there was concerns about people coming in and raiding the place and raiding the cash, and then there were concerns about the government taking over.

There were allegations.  This is all stuff that was said in the hearing, so we created -- I created a forum in which it was deemed to have vested in the estate.  Mr. Murray controlled the cash so that we can stabilize this,

and folks can get paid and get to where it goes.  But it's never property of the estate.  I don't have the authority to go do that under the bankruptcy bill.

MR. BROOCKS:  Judge, if you --

THE COURT:  And they did -- they thought.

MR. BROOCKS:  -- weren't protecting them by that, then how -- if you were concerned about people coming in and grabbing assets, the only mechanism that you would have had to protect that was an automatic stay.

THE COURT:  No, that's not bankruptcy 101.  I can't do that.

MR. BROOCKS:  But you did it.

THE COURT:  No.  It doesn't make it subject to the automatic stay anyway.

MR. BROOCKS:  But, Your Honor, that's the only way one could protect the assets for other people, the creditors and the government, the litany of people who --

THE COURT:  That's what I'm saying.  You're just not versed in bankruptcy law.

MR. BROOCKS:  I'm versed enough to know that --

THE COURT:  No, you're not because people issue injunctions all the time in bankruptcy that have nothing to do with the automatic stay.  Look --

MR. BROOCKS:  Yes, sir.

THE COURT:  -- you can disagree with that, but

006864

none of what everybody is saying makes law.  And I'm not trying to stay law.  I'm trying to stay consistent with what I have said, and those words mattered.  And we can't read out, "Shall be deemed," out of the order.  And we can't also read that he's authorized to operate the business of FSS at a time which we have removed the CRO and there was uncertainty that he could operate for a year, and that has lapsed.  Mr. Jordan, what can you tell me?

MR. JORDAN:  Your Honor, well, first of all, I can tell you --

THE COURT:  I don't mean to sound disrespectful that someone isn't versed in bankruptcy law, but I can't make the automatic stay apply.  It either does or it doesn't.  And I understand there was a statement of issue on appeal.  It's the first time -- it is literally the first time that I have read it.  No one took this issue up.  I don't recall.  If I do, someone will correct me.  I don't recall someone filing a motion for reconsideration where we had a colloquy on this point.  It was appealed to which I stopped reading at that point.

MR. JORDAN:  Your Honor, if I might address. First of all, this is a focus that I've never had in this case, and it's not your fault.  It says what it says.  But let me just address it from the standpoint of what kind of practice I've been involved with.  First of all, if you

006865

recall, as soon as you entered the order, it was overlapping with an attempt to get a turnover order and a turnover in state court.  That was removed to this Court and effectively stayed those actions.  At that point, no one raised the fact that, no, there's no automatic stay.  Anybody can go get any of the property they want.  Nobody said that, and I'm only saying it because that was not the approach.  And then --

THE COURT:  I'm not -- that's what I'm saying. I'm not trying to get into why people did things and why they didn't do it.  I'm not mad that you're arguing that you thought it applied.  I understand that, and I'm not upset at anyone.  What I am saying is it's not property of the estate, and it's not subject to the automatic stay.  It's just not, and this is a non-debtor asset.

And again, I don't want to get into specifics about what assets are specifically held by the non-debtor, but whatever assets are held by Free Speech are -- people have rights under state law, but then parties, I think you all have the right to go appeal as well.  And I have no idea where those matters are, but they're not subject to the automatic stay.  I don't mean to come across as anything other than just stressing -- I understand, you read transcripts.  They read matters on appeal.  I can't convert something that's not property of the estate into property of the estate, nor can I say the automatic stay applies to

006866

something where it doesn't, and I haven't issued kind of a 105, what we would call a 105 extension to non-debtor that you normally would see in these instances to protect assets against the non-debtor.

I won't do it either, but no one has asked that. So, it's the only kind of wrinkle. Then I go back, and I realize, well, maybe Murray still has the authority to go operate and Murray doesn't. Then I said, Murray, I don't even want you selling this stuff anymore. Tell me what you want to do with the equity. I don't -- again, I'm not -- I don't want to change -- I got it, people write transcripts and maybe we need to just ask me what to construe the order, but that's --

MR. JORDAN: Well, Your Honor, if I might just -- let me say one thing about the conduct of the parties with respect to that order.

THE COURT: Sure.

MR. JORDAN: Everybody treated that order respectfully. Everybody did not believe they had a right to go grab assets that were in the exclusive jurisdiction of the bankruptcy court. I would read -- let me read this to the Court, the Supreme Court of the United States.

THE COURT: Mm hmm.

MR. JORDAN: "The temporal line of demarcation is not impervious, and a legal claim that accrues post-petition

006867

can be deemed property of estate if it is sufficiently rooted in the pre-petition past."  And I'm only reading -- quoting the Court from Segal v. Rochelle, 382 U.S. 375.  And so, the concept that you are -- and here's the dilemma if I might say.  I don't doubt at all that exactly what you said you intended was that you were not creating property of estate.  I'm not arguing with that at all because you're the author.  You know what you intended.  You did it.

And within the process that was employed subsequent to that, the process being parties all had to deal with the Trustee.  The Trustee has spent over $2 million trying to sell the property.  The thing that was created, the parties to this estate, all treated it as the property was transferred and vested, and I know the word is deemed vested, as property of estate.  So, my first request is this, I -- quite honestly, I'm caught a little flat-footed.  I didn't -- I never focused on that word being something that was -- I mean, this is the first time I think the Court has said this, and it's clear that you recall what you meant, but --

THE COURT:  It's also what I said, right?  I think there's a difference.  Textualism would tell me.  Sometimes you just look at the words, and the words mean what they mean.  In other words, I'm enforcing the order as written.  You know, it's -- my recollection is consistent with what I

006868

wrote, and there's a lapse in time. Like Murray has -- you cannot -- there's no operation of the business anymore. That business -- I don't know this for sure, but I suspect Alex Jones himself is now -- whoever is in charge of FSS will operate FSS.

MR. JORDAN: Well, of course, it has been treated as both the ownership and as the assets vested in the estate. So, everything has been done through the Trustee and through the estate since the order was entered. And what I'm suggesting is that, it's not that your memory is not correct. What I'm suggesting is that there has been a process in place that everyone involved with these assets has appreciated, that it was deemed property of the estate, and that's what it would be.

Because that -- the case law, when you read the phrase, deemed property of the estate, they all deal with whether or not it has a close relationship with the Debtor --

THE COURT: Mm hmm.

MR. JORDAN: -- whether it is rooted in the Debtor. And we're talking about a single-member LLC being in bankruptcy with the single member. And so, it fits the other things. What I would -- what I'd ask the Court to do, only because this revelation is going to create the existence of the property of the estate that was deemed by

006869

the supplemental order, has been a major topic of whether or not you had set the supplemental order aside.  In your February rulings, the state court has been told that you voided it while it was on appeal.  And they said that that --

THE COURT:  Oh, I have no idea what they said.

MR. JORDAN:  Well, but I say -- here's the important --

THE COURT:  No, no, I got it.  I got it.  It could cut both ways, in other words.  People are making statements to state courts that may or may not be accurate both ways.

MR. JORDAN:  But the problem was that when we told the state court that you did not, for instance in the order of February of this year, that you did not void the supplemental order.  In fact, you found in that February 5th transcript, you say, wait a minute, let me go back, this is on appeal.  And I said, yes, sir, it is.

THE COURT:  Mm hmm.

MR. JORDAN:  Yes, Judge, it is.  And you said, well, I have no jurisdiction.  I can't do this.  Now, you also repeated that in June --

THE COURT:  Mm hmm.

MR. JORDAN:  -- in great detail.  The problem that is happening right now is that we were -- that sanctions were sought against us for saying that, no, on February 5th,

the Court didn't -- they claimed a $100,000 sanction for us telling the state court judge that you didn't void it on February 5th, showing the quoted language.  So, all I can suggest right now today is that as a result of now I hear what your focus was, I would appreciate, and we need some time to address this single issue.  Because you're correct that the proper operations expire.

THE COURT:  What do you mean by the single issue? Just so I'm clear.

MR. JORDAN:  Well, the effect of your order now saying it was never a property of the estate, it was never subject to an automatic stay, it was always subject to any creditor wanting to come grab it and lien with it, that's so contrary to the practice that we have spent.

In fact, I don't know how we undo that because the estate, I would assume, will owe for the attorney's fees and all the expenses they pay.  I'm not sure what happens if that's --

THE COURT:  But again, I'm being really clear.  I signed an order authorizing the trust to operate FSS, and I've also said that the Trustee had ownership of the asset, of the equity, and you could always tell the equity to go sell, right?  And so, I don't know -- what I have in front of me is a motion to confirm that the automatic stay doesn't apply.  That's the only matter that's before me.  I don't

have any other request for relief before me, and that relief is granted. I'm just confirming it, but I'm providing some additional reasoning behind it, because I always thought that was the answer, and when I said the voiding of the order, we were always talking about selling assets, like, you know, the extent that people are seeing within this order that you could go sell stuff.

I don't want another sales order. If somebody puts up a lot of money and cash is king, and we're not talking about contingencies or allowed claims, I think it benefited everybody to see if you could sell that asset. It would benefit Jones' estate, quite frankly. That was --

MR. JORDAN: Well, Your Honor, at the June hearing where all the parties were present --

THE COURT: Mm hmm.

MR. JORDAN: -- including the Trustee and counsel --

THE COURT: Mm hmm.

MR. JORDAN: -- this issue was raised about the viability of the supplemental order.

THE COURT: Mm hmm.

MR. JORDAN: And the reason it was being raised was that they were seeking access to the assets, and the issue that we asked to address, and the Court did address for us was that the supplemental order was not voided in

006872

February, and you confirmed that in detail.  You said, I didn't do anything in February, and I can't do it.  I can't do it when the appeal is in process.

THE COURT:  I think that's right.

MR. JORDAN:  And so, the supplemental order itself has continued through today.  Now, back to my -- my suggestion is that I think the parties have treated your supplemental order as written, and that is that where an asset is rooted in the pre-petition Debtor, and the Court orders that it will be deemed --

THE COURT:  No, no, don't put words in there.  I'm not talking about rooted in there.  I just wrote what I wrote.  You're trying to -- you're using case law.

MR. JORDAN:  Yes, no, all I was referencing was case law, not this Court, because I'm now confronted with something I may have not even considered.

THE COURT:  Mr. Shelby, you thought -- you're telling me -- no, let me not go there.  Let me not go there.  Tell me what you're asking.

MR. JORDAN:  Well, at this point, I'm asking for some additional time to brief this issue in this position.

THE COURT:  I don't have a request for relief.

MR. JORDAN:  And then --

THE COURT:  In other words, you can file a motion.  I can take something up, but I need something.  All I have

is a motion confirming that it does not apply to FSS assets, and that's what I can say. That's what I can confirm. In other words, I'm just confirming that the automatic stay doesn't apply to FSS assets. That's the requested relief before me. I don't need -- if there's somebody that wants me to do something else, you've got to ask for the relief requested, and I'll take it up in due course. But I don't want to --

MR. JORDAN: Well, you know, I think the Court's confirmed that the supplemental order is still in effect. You've never set it aside, that's number one.

THE COURT: I don't think it's in effect anymore, now that we sit here today on October 1st, when you have a September 25th order.

MR. JORDAN: Operationally, it may not be in effect. I mean, you're precisely correct that the provisions were for a one-year operation.

THE COURT: But I -- again, I'm -- well, I don't want to confuse dates. I know that there was a period -- well, I can't remember. I thought we had a hearing after the appeal was over.

MR. JORDAN: We did. That's the June 5th hearing.

THE COURT: And I think at that hearing, I said -- well, I don't remember. Tell me what you're asking, though, Mr. Jordan?

MR. JORDAN:  Well, at that -- what we were asking at that hearing --

THE COURT:  No, no, no.  I'm saying, what are you asking for today?  In other words, you're asking for supplemental briefing on something.

MR. JORDAN:  Well, actually, that's new, because the issue has not -- I have not even considered the issue, and as a result of the Court's --

THE COURT:  I'm surprised by that, to be honest with you, to hear.

MR. JORDAN:  Yeah.

THE COURT:  Seriously, I'm surprised, because it's 362 is 362, and 105 is 105 over non-debtor assets.  I'm -- what I can do is enter an order saying the motion is granted, period; the automatic stay imposed in respect that the Jones case does not apply to FSS or any of its assets. Like, I don't want to -- that's the request.  That's what I'm comfortable --

MR. JORDAN:  Well, actually the --

THE COURT:  -- entering an order for.

MR. JORDAN:  -- request was -- in our response, the request was to allow a private sale, cash sale, to individuals on a bid basis, one bid only, and the highest bidder wins.  That's the request that we had, because we know that there are substantial bidders in the wings, and we

006875

know that those will not be even considered if the matter is turned over to the Plaintiffs who have -- they've announced multiple times their intention to acquire the assets, which, as the Court recognizes, there was an effort to do it at the lowest price possible with the highest claims possible, and then to destroy the assets.

In fact, recently, Mr. Moshenberg is quoted as saying that, "Based upon the appointment of the receiver, it's time to shut it down," and that's what's going to happen.  The value of these assets, the ability of the assets to have value to be applied to even a billion-dollar judgment, a debtor has the right to have a reasonable treatment of his collateral to be applied to the debt that, in both cases, are not yet even final.  The Supreme Court has the writ of cert.  We'll know as a result of the 10th.

THE COURT:  Okay.  No.  No, I didn't know.

MR. JORDAN:  Oh, okay.  Well, the Supreme Court has a writ of cert.  It'll be heard to the full panel. We've made past the first little obstacle, and the full panel is going to consider it on the 10th.  They project for us that it comes out the following Monday or Tuesday, which ought to be the 14th, so the Supreme Court's going to either make our day or make the argument moot.  So, that is going forward, and with respect then to what we asked for.

THE COURT:  Is it going with respect to the

Connecticut judgment or the Texas judgment or both?

MR. JORDAN:  The Connecticut judgment.  The Court of Appeals has the Texas judgment and --

THE COURT:  The Texas Court of Appeals has that judgment?

MR. JORDAN:  They have the Texas judgment.

THE COURT:  Okay.

MR. JORDAN:  And that's the one we discussed in the last hearing where the Plaintiffs appeared and said they wished there was a meaningful appeal, but it didn't mean anything because they'd made a deal with the Connecticut Plaintiffs.  So, those two --

THE COURT:  Oh, okay.  Yeah, I remember that.

MR. JORDAN:  So, those two matters are still pending, and what I'm asking for in connection with this issue is that we not turn loose, open the gate, as of now, on the supplemental order or on the language deemed until we've had a chance to report back to the Court very promptly.  I mean, I only looked on the Supreme Court's docket to find a case that says that assets that are not property of the estate on the petition date can be deemed property of the estate if it's sufficiently rooted.  Now, my dilemma is this.  I do want time.  This is a total surprise and --

THE COURT:  You can't be surprised that I've said

006877

that an asset against a dismissed debtor is not property of the estate.

MR. JORDAN:  Well, you're giving me a lot more credit than I deserve then, Judge, because quite frankly, you know, like I said, I have in the past dealt with the issues of we're going to deem this property of the estate. Even --

THE COURT:  I've also said that parties would be entitled to their collection remedies.  I know I've said that on several occasions.

MAN 1:  A lot.

THE COURT:  On several occasions, that parties will be able to revert rights, as well as you'd be able to file whatever you wanted in the state court.  Whatever the state court did, the state court did.  I recall, you know, it's --

MR. JORDAN:  Well, Judge, you said that, and your memory is good, but the --

THE COURT:  Well --

MR. JORDAN:  -- language you used was that you can go to state court and exercise whatever rights you have. But I didn't hear that, but I did hear it, because that's been often said by bankruptcy courts, which is, look, this property is in this estate.  You can go to state court and exercise whatever rights you've got, but you don't get to

006878

exercise bankruptcy rights in state court.  Just, you can go do what you want to do in state court.  FSS is not in bankruptcy.  You may pursue whatever remedies that you have.

THE COURT:  How could someone pursue a remedy if the automatic stay was in effect?

MR. JORDAN:  That's right, and that's what I'm arguing.

THE COURT:  In other words --

MR. JORDAN:  You know, they could pursue a remedy --

THE COURT:  But you would have come to me.  That's what I'm saying, you would have come to me, right?  If somebody would have filed anything, any kind of collection action in state court, you would have come to me immediately and said, Your Honor, violation of the automatic stay, and a matter of fact --

MR. JORDAN:  We did.

THE COURT:  Huh?

MR. JORDAN:  We did do that.  The first time that they came back, we were -- first of all, the first time they did it in 2024, we removed the case, and that's in your Court.  The second time they did it, we filed our motion and removed only Alex Jones.  He's the only Debtor.  We left FSS alone.

THE COURT:  Why?

MR. JORDAN:  Because there's other -- because there are other things that maybe they claim FSS has or does or is entitled to.  So, we were never arguing that of any of the language you made.  You did -- you repeated that the order is in place, and you repeated that.  You said it in February and repeated it in June.  And for the sake of it being in place, we were operating under that order, and I think everyone else was because --

THE COURT:  I don't think these folks ever agreed that the automatic stay was in effect, right?  There was just a disagreement about the very issue.  The Connecticut families, I'm sure Mr. Kimpler filed a motion to confirm that it wasn't in effect.

MR. JORDAN:  Well, in effect, they did agree. There are two exhibits that we have for our presentation today in which it's the motion that they filed for turnover. It all recognized, made findings of the supplemental order, and it provided that the receiver couldn't go get assets unless he got the consent of the Trustee in the bankruptcy court.  And we cited to you the page and line where that is. So, that -- now that has changed.  Subsequent to that, that order is on appeal.  The order appointing the receiver is on appeal.

THE COURT:  Texas?

MR. JORDAN:  Texas.  Yeah, to the Court of

Appeals, where the same panel where the other appeal is pending. And there is then a to-be-entered supplemental order finding that non-pro-tem, that that was a mistake. That's what they claim. It was in their motion, in the order they proposed, in the order that was entered, that it was subject to the Trustees.

And here is the dilemma that I'm having. I'm trying to figure out how I'm going to brief this. I've -- you know, I've missed things before, so I'm not putting that on the Court. I --

THE COURT: What is the briefing that you're asking for? I guess that's what I'm --

MR. JORDAN: Well, this issue is because here's what's happened. As a result of that language and the case law that will support it, saying, yes, that can be property of the estate, and I've only started the Supreme Court, there has been things that have happened, including our position at risk, that we represented that the supplemental order was still in place, only with the implication that the automatic stay was involved because it was deemed property of the estate.

THE COURT: And that's why I'm trying to avoid anyone saying, in state court. I don't know what has been said or not said, but I certainly don't want anyone to leave this Court today thinking that I am endorsing in any way any

finding that people did anything improperly in a state court. I mean this as it respects anything you or Mr. Broocks or anybody has said. It's why I'm purposely not asking those questions, and people cite transcripts, and then they cite portions of transcripts. I'm just answering a legal question that is presented to me today as to whether the automatic stay applies, and it does not.

MR. JORDAN: Well, actually, what you're being asked to do, which is --

MR. KIMPLER: Your Honor, just one point?

THE COURT: Yeah.

MR. KIMPLER: Thank you.

THE COURT: I will. And then, folks, I've got a 2 o'clock, but go ahead. Go ahead, Mr. Jordan, and then I'll turn to Mr. Kimpler.

MR. JORDAN: What's being asked today is for you to make a finding that you voided the supplemental order back in February.

THE COURT: I'm just saying I'm entering an order saying the relief requested in this motion is granted to the extent provided herein. The automatic stay imposed under Section 362 does not apply to FSS or any of FSS assets. That's what I can confirm.

MR. JORDAN: Okay. Well, I've got 14 days to come back and ask. If I can come up with an issue that I am

hoping the Court hadn't thought of what will help further our position, because what we're really concerned about, have always been concerned about with respect to these assets, is that you -- and we know you -- I mean, you've always said, look, follow the purpose of my order.  Follow what I told you to do.  Well, that never happened.  It didn't happen in the first attempt at an auction, and it didn't happen in the second group of things, including a settlement agreement that gave them -- that they asked for an approved, allowed claim in the Jones estate.  Not just that -- I know FSS, you couldn't do it.  They wanted a $400 million allowed claim in the Jones estate for the Texas Plaintiffs.  Allowed claim --

THE COURT:  And I couldn't do that.

MR. JORDAN:  -- in a settlement.  And you didn't do that.  But what I'm suggesting is that the status and the things that we might have done, had I focused on your intention that deemed  --

THE COURT:  It's not my intentions.  It's my words.

MR. JORDAN:  It's your words, of course.  Well -- yes.  And I did not perceive that deemed property of the estate could never be property of the estate, because at this point I don't quite agree with that conclusion.  I'm not arguing with the Court at all.

006883

THE COURT: Again, I'm just saying, if someone can point to me to something in 541 that works, I'm more than happy to -- you can.

MR. BROOCKS: I think -- again, I can quote you. In September, when Mr. Wolfshohl asked you for this September order, he said, we need it because these assets aren't assets of the estate of Alex Jones. And you said, no, it is property of the estate of assets of Alex Jones. Alex Jones owns the equity interest in FSS, 541, all legal and equitable interest. All has to mean all. And you said, that's not my interpretation, that's Congress. Congress uses the word all. All means all legal and equitable interest. And then you said it again. You said --

THE COURT: That's why I remember that, Mr. Broocks. I remember that conversation. I had it with Mr. Wentz.

MR. BROOCKS: But I didn't really give him to you. I just deemed him given to you.

THE COURT: It's what I wrote, Mr. Broocks. Now, you can argue about that -- well, I'm done arguing about what I wrote.

MR. BROOCKS: Okay. I'm just saying you said all the assets.

THE COURT: All right. Okay. What else are we talking about here? What else are we talking about?

MR. JORDAN: Your Honor, I think that at this stage, that's probably the -- that is probably the conclusion of the hearing. Again, subject to going back and --

THE COURT: I'm just you whether the automatic stay applies to the Jones asset, to the FSS assets? The answer is no. That's what I'm saying today. I did say before -- I did say, I remember saying, I can't do it because it's on appeal. But if it comes back to me, I'm going to void the order; that's what I said. That's what I said. I was going to void the order because I wanted to make sure that we were clear that I was kind of done with the efforts to try to go sell FSS and all that stuff.

I just went back and looked. It's kind of done on its own. I don't need to void anything. I said I would. You asked me, Judge, can you think about it before you do it? That's the last I remember. It's kind of just done on its own. I don't see any legal effect that this order has. This order, one went with two. Two is gone. Two expired on September 25, 2025. I don't -- so, I can't void anything. I can't void an order that I think is already, on its own terms, void. So, I can't -- so, what I can do is confirm that the automatic stay doesn't apply.

And I can tell Mr. Murray to make a decision in October as to what he -- which I asked him to do earlier. I

006885

want an answer on the equity of FSS because, quite frankly, if he wants to sell the equity in FSS, that takes it out of the estate whether he abandons it or not. It takes it out of the estate one way or the other. Like, FSS will be middle of November one way or the other. It's either going to be sold or likely abandoned. So, we're going to move on with the Jones case. And I'm trying to find and be as fair as possible to everyone, fair and equitable, not just a fair textual reading of where we are. Mr. Kimpler, I promise you a word, and then I'm just going to sign the order.

MR. KIMPLER: Your Honor, I'll be --

THE COURT: Go ahead.

MR. KIMPLER: (indiscernible), I disagree with that part. I just want to cut to the chase. We think that what you said, what you outlined as an order that you'd be willing to enter today, that is simple, that the automatic stay doesn't apply. We would recommend that it says that the FSS assets are not property of the estate; nothing more. That's all we need. I've seen this movie before. There are -- we have 45-minute colloquies and then people take those transcripts, and they cite them to other Courts. I think what we really need, what both parties need here is a very simple order. What you have outlined is completely acceptable to us, and we'd very much appreciate it if you would enter that order.

006886

MR. JORDAN:  And, Your Honor, I understand you have a 2 o'clock.  Could we have a five- or 10-minute recess to allow counsel to discuss quickly this development, and --

THE COURT:  What is this development?

MR. JORDAN:  Well, should I say my memory lapse?

THE COURT:  No, no, no, no.  I don't want you to be sorry.  I'm just going to enter an order.  I'll enter my own order.  I got a proposed order, I'll sign it.  I'm not -- I'm not voiding -- in other words, I'm not voiding an order.  I'm being asked -- I was asked to void an order.  When I went back and looked at the order, I think the order is on its own as expired on its own terms.  You know, you can't operate the business of FSS anymore, okay.  And I think I've said multiple times, sell the equity if you want.  Cash will be king.  I don't want you trying to sell assets anymore.  I've now come back -- before I've asked you to make a determination on the equity, whether you -- what you want to do or abandon it.

I'm now asking that there be an answer for purposes of where we are.  And the reason I'm saying that, and I want to be really clear is that this case is a 2022 case; it converted to a 7.  But I think in fairness to all parties involved, and that goes to Mr. Jones as well, it is time we do whatever bankruptcy work needs to get done and allow the process to play out in whatever state, federal

appellate courts may have jurisdiction to hear those matters. I think every order that I've written has said that to the extent that nothing that I have signed in any way locks in any amount.

State Connecticut courts come back and change the judgment. That number, nothing in here changes it. The dischargeability order that I entered, you know, it's easy to track if that portion got knocked out. Then it's easy to figure out what portion would be non-dischargeable. State court orders, federal Supreme Court says something. It just gets really simple. I'm just -- and I'm not trying to push the issue. What I'm trying to do is just, folks, it's Free Speech was a '22 Subchapter 5. And it's a dismissed case, right?

It just -- I don't know what rights people have outside of my jurisdiction. I don't because I don't track it. And I don't know what people are alleging or saying, and that's kind of -- I shouldn't be in the business of tracking it. What I can do is just answer the questions that are before me.

Mr. Kimpler, you're asking for confirmation that the assets are not property of the estate. I think I've answered that question, and I said why.

MR. JORDAN: Your Honor, with respect to any order that you're going to enter, I'm assuming that the 14-day

stay rule is going to be in place?  You're not going to enter some order that creates an effectiveness before --

THE COURT:  I don't think the 14-day rule would even, to my knowledge, even apply, like, for a waiver of what I'm asking for.  I don't even think it comes into play.  There's no -- it's just an order confirming that the stay doesn't apply.

In other words, this isn't like a sale where -- to answer your question in the affirmative, I'm not -- nothing I'm doing today, you know, kind of changes any deadlines to seek appellate review.

MR. JORDAN:  All right.

THE COURT:  Okay?  All right, folks, thank you very much.  We're adjourned.  I'll come back for the 2 o'clock in about two minutes.

(Proceedings adjourned at 1:59 p.m.)

006889

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  October 3, 2025

006890

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 21, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 22-60043 |
| FREE SPEECH SYSTEMS LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | CHAPTER 11 |

**EXHIBIT**

**3**

Alexander E. Jones; 22-33553

exhibitsticker.com

**ORDER DISMISSING CASE**

For the reasons stated on the record at the hearing held on June 14, 2024, this case is dismissed. It is further ORDERED:

1.      The employment of all professionals retained in these chapter 11 cases and the Subchapter V Trustee's service is terminated. Except as otherwise set forth below, the Debtor's CRO shall have no further responsibilities with respect to the Debtor's operations.

2.      The CRO is authorized to transfer control and signing authority with respect to the Debtor's bank accounts to Christopher R. Murray in his capacity as the Chapter 7 Trustee for the bankruptcy estate of Alexander Jones, Case No. 22-33553.

3.      Final applications for compensation shall be filed no later than 14 days after entry of this Order.

4.      This Court shall retain exclusive jurisdiction over the following matters:

   a. Adversary Proceeding No. 24-3038, *Elevated Solutions Group, LLC v. Free Speech Systems LLC, et al.*;

   b. Adversary Proceeding No. 23-3127, *Free Speech Systems LLC v. PQPR, Limited Holdings LLC, et al.*;

   c. Adversary Proceeding No. 22-3331, *Neil Heslin, et al. v. Alex E. Jones, et al.*; and

   d. Applications for approval of professional fees and expenses.

5.      The Court retains jurisdiction to interpret and enforce this Order.

Signed:  June 21, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

006891

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 25, 2024

Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| **In re:** | § |
| | §  **Chapter 11** |
| **FREE SPEECH SYSTEMS, LLC,** | § |
| | §  **Case No. 22-60043 (CML)** |
| **Debtor.** | § |
| | § |
| | § |

> **EXHIBIT**
>
> **4**
>
> Alexander E. Jones; 22-33553

### ORDER SUPPLEMENTING ORDER DISMISSING CASE
**[Related to Docket No. 956]**

1.  Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

2.  The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

**Signed:** September 25, 2024

_____

Christopher Lopez
United States Bankruptcy Judge

15564076

006892

COMPANY AGREEMENT OF
FREE SPEECH SYSTEMS, LLC

EXHIBIT

5

Alexander E. Jones; 22-33553

exhibitsticker.com

THIS COMPANY AGREEMENT OF FREE SPEECH SYSTEMS, LLC, a Texas limited liability company (this "Agreement"), is dated effective November 16, 2007 (the "Effective Date"), by the undersigned initial Members (defined herein) and Managers (defined herein) of the Company.

1.      Formation of the Company.

        1.01    Filing of Certificate of Formation. The Certificate of Formation for the Company was filed with, and a certificate evidencing filing was issued by, the Secretary of State of the State of Texas on the Effective Date.

        1.02    Initial and Additional Members. The names and addresses of the initial Members of the Company are as set forth on Schedule A of this Agreement.  At the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership or management of the Company. Additional Members of the Company shall be admitted only upon the approval of a Required Interest.

        1.03    Term of the Company. The Company shall exist for the duration specified in the Certificate of Formation (which may be perpetual), unless sooner terminated in accordance with this Agreement.  No provision of this Agreement (including, without limitation, the provisions of Section 10) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other member or Manager, for any purposes other than federal and state tax purposes.

2.      Organization of the Company.

        2.01    Name of the Company. The name of the Company is "Free Speech Systems, LLC."  The Managers may cause the Company to do business under one or more assumed names.

        2.02    Registered Office. The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.

        2.03    Principal Office. The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 101.501 of the TBOC.  The Company may have such other offices as the Managers may designate from time to time.

006893

2.04    **Purpose.** The sole purpose of the Company shall be to operate such businesses as the Members choose from time to time and shall have all the specified rights, powers, and duties set forth in the TBOC.

3.    **Definitions.**

3.01    **Certain Defined Terms.** The capitalized terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Section 3.01.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"**Agreement**" means this Agreement, including Schedule A, as originally executed and as subsequently amended from time to time.

"**Capital Account**" means the Capital Account maintained for each Member pursuant to Section 4.04 of this Agreement.

"**Capital Contribution**" means, as to any Member, the sum of the following: (i) the Member's Initial Capital Contribution; plus (ii) the Member's Additional Capital Contributions, if any. "Initial Capital Contributions" means, as to any Member, the contributions described in Section 4.01. "Additional Capital Contributions" means, as to any Member, the contributions described in Section 4.02.

"**Certificate of Formation**" means the Certificate of Formation of the Company described in Section 1 of this Agreement, as may be amended from time to time by appropriate filing with the Secretary of State of Texas.

"**Code**" means to the Internal Revenue Code of 1986, as it has been and may be amended.

"**Company**" means Free Speech Systems, LLC, a Texas limited liability company, as such limited liability company may from time to time be constituted.

"**Company Minimum Gain**" shall have the meaning of "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"**Company Property**" or "**Company Properties**" means all interests, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

-2-

"**Default Interest Rate**" means the rate per annum equal to the lesser of (i) the most recent prime rate as quoted in the Wall Street Journal, and (ii) the maximum rate permitted by applicable law.

"**Managers**" means, as of any date, the Person or Persons who are then managing the business of the Company in accordance with Section 8 of this Agreement.

"**Member Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"**Member Nonrecourse Deductions**" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"**Members**" means, as of any date, to the Persons who then own Percentage Interests in the Company. The current Members are listed on Schedule A.

"**Membership Interest**" means, as of any date, a Member's share of the Company's income, gain, loss, deduction and credits and the right to receive distributions from the Company expressed by such Member's Percentage Interest, but does not include (i) the right of the holder thereof to participate in the management of the business or affairs of the Company, (ii) the right of the holder thereof to consent, approve, reject or disapprove any act of the Company, or (iii) the right of the holder thereof to be a Member.

"**Net Cash From Operations**" means the gross cash proceeds from the operations of the Company less the portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers. "Net Cash From Operations" shall not be reduced by depreciation, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition and the definition of "Net Cash from Sales or Refinancings."

"**Net Cash from Sales or Refinancings**" means the net cash proceeds of the Company from all sales and other dispositions of Company Property other than in the ordinary course of business (such as the sale or condemnation of all or a portion of the Property, a refinancing of all or a portion of the Property pursuant to a refinancing transaction or the receipt of casualty, litigation proceeds, or accelerated lease payments), less any portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers, and shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with such a capital transaction.

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

- 3 -

"**Nonrecourse Liability**" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"**Percentage Interest**" means the interest of each Member in the Company as set forth opposite the Member's name on the attached Schedule A, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"**Permitted Transferee**" means any of the following:

(1)     Alex Jones, Kelly Jones, and any of their descendants;

(2)     Any corporation, partnership, limited liability company, or other entity 100% of the beneficial ownership of which is owned by Permitted Transferees;

(3)     Any charitable foundation established by an individual referenced in (1) above; or

(4)     Any trust set up for the primary benefit of one or more of the individuals referenced in (1) above or for the benefit of a charitable foundation referenced in (3) above.

"**Person**" means any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, business trust, real estate investment trust, cooperative, association, trust, estate or other entity or organization.

"**Profits**" and "**Losses**" means the net book income or net book loss, as the case may be, of the Company determined in accordance with the principles for computing "book" income and "book" loss under Section 1.704-1(b)(2)(iv) of the Treasury Regulations; provided, however, that items of income, gain, loss, deduction and credit specially allocated pursuant to the provisions of Section 5.03 shall be excluded from the computation of Profits and Losses.

"**Required Interest**" means Members holding in aggregate fifty-one percent (51.00%) or more of the Percentage Interests then held by all Members.

"**Standard Rate**" means a per annum rate of interest equal to ten percent (10%), compounded annually.

"**Tax Distribution**" with respect to any Member for any taxable year of the Company, means an amount of cash equal to the product of (i) the Profit and items of income and gain (reduced by Losses plus any items of loss and deduction) allocated to such Member for such taxable year pursuant to Section 5 and (ii) the highest marginal effective federal income tax rate applicable to an individual in effect from time to time during such taxable year.

"**TBOC**" means the Texas Business Organizations Code, as it may be amended from time to time.

- 4 -

"**Treasury Regulations**" means those regulations promulgated under the Code.

"**Unrecovered Capital Contribution**" means, as of any day, a Member's Capital Contribution adjusted as follows: (i) increased by the amount of any Company liabilities which, in connection with distributions pursuant to Sections 6.02(b) and 10.04(b), are assumed by such Member or are secured by any Company Property distributed to such Member; and (ii) reduced by the amount of cash and the fair market value (as determined by the Managers) of any Company Property distributed to such Member pursuant to Sections 6.02(b) and 10.04(b) and the amount of any liabilities of such Member assumed by the Company or which are secured by any Company Property contributed by such Member to the Company. In the event any Person transfers all or any portion of his Membership Interest, the transferee shall succeed to the Unrecovered Capital Contribution of the transferor to the extent it relates to the transferred Membership Interest.

3.02    **Other Defined Terms.** Other capitalized terms not defined in Section 3.01 shall have the meanings specified in the other sections of this Agreement.

4.    **Capital of the Company.**

4.01    **Initial Capital Contributions.** Each Member shall contribute to the capital of the Company the amount set forth as such Member's "Initial Capital Contribution" on Schedule A.

4.02    **Additional Capital Contributions.** The Managers may from time to time call upon the Members to make additional contributions to the capital of the Company pursuant to such terms and conditions as are specified by the Managers. The Members may (but shall not be required to) make Additional Capital Contributions to the Company. All Additional Capital Contributions shall be made within thirty (30) days after the Members have received notice thereof from the Managers. For purposes of this Agreement, "Additional Capital Contribution" means, as to any Member, such Member's pro rata share, based upon such Member's Percentage Interest, of the additional sums determined by the Managers to be required for the operation of the Company.

4.03    **Failure to Make Additional Capital Contributions.** If any Member fails to pay all or any portion of an additional assessment after due notice, then the Managers may recoup any deficiency by arranging for additional advances to be made by those Members that are willing to fund some portion of the deficiency, in such proportions as the Managers and the participating Members agree. In any event, if any funds are advanced hereunder on other than a pro rata basis, all such advances made by any Member hereunder (including each Member's pro rata advance) shall be considered loans to the Company and shall accrue interest at a per annum rate equal to the Standard Rate.

4.04    **Capital Accounts.** A Capital Account shall be established and maintained for each Member. It is the intention of the Members that the Capital Accounts be maintained in accordance with Section 1.704-1(b) of the Regulations. In that regard, each Member's Capital Account shall be:

(a)    Increased by:

- 5 -

**Page 5 of 22**
006897

(i)      The amount of money contributed by that Member to the Company;

(ii)      The fair market value of property or services contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to within the meaning of Section 752 of the Code); and

(iii)      Allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax, and

(b)      Decreased by:

(i)      The amount of money distributed to that Member by the Company;

(ii)      The fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to within the meaning of Section 752 of the Code);

(iii)      Allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code; and

(iv)      Allocations of Company loss and deduction (or items thereof).

A Member's Capital Account also shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(e) to reflect the distribution of property to a Member, and otherwise adjusted as required by Treas. Reg. § 1.704-1(b)(2)(iv) or 1.704-1(b)(4). On the transfer of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(l).

**4.05   Return of Capital Contributions; Company Property.** Except as otherwise provided herein or in the TBOC, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution. No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts. Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Managers may determine.  All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

**5.      Allocations.**

**5.01   Allocation of Profits.** After giving effect to the special allocations set forth in Section 5.03, Profits for each taxable year shall be allocated in the following order and priority:

**Page 6 of 22**
006898

(a)    First, to the Members in an amount equal to the excess, if any, of (i) the cumulative Losses allocated pursuant to Section 5.02(a)(ii) for all prior taxable years, over (ii) the cumulative Profits allocated pursuant to this Section 5.01(a) for all prior taxable years; and

(b)    Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

5.02    **Allocation of Losses.** After giving effect to the special allocations set forth in Section 5.03, Losses for any taxable year shall be allocated as set forth in Section 5.02(a), subject to the limitations in Section 5.02(b).

(a)    Losses for any taxable year shall be allocated in the following order and priority;

(i)    First, to the Members in accordance with their respective Percentage Interests in an amount equal to the excess, if any, of (A) the cumulative Profits allocated pursuant to Section 5.01(b) for all prior taxable years, over (B) the cumulative Losses allocated pursuant to this Section 5.02(a)(i) for all prior taxable years; and

(ii)    Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

(b)    The Losses allocated pursuant to Section 5.02(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.02(a), the limitation set forth in this Section 5.02(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.03    **Special Allocations.** The following special allocations shall be made in the following order:

(a)    **Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)    **Member Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each

- 7 -

**Page 7 of 22**
006899

Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Person's share of the net decrease in Company Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 5.03(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 5 have been tentatively made as if this Section 5.03(c) were not in this Agreement.

(d)    Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any taxable year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 5.03(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 5 have been tentatively made as if Section 5.03(c) and this Section 5.03(d) were not in this Agreement.

(e)    Nonrecourse Deductions. All Nonrecourse Deductions for any taxable year shall be specially allocated among the Members in proportion to their Percentage Interests.

(f)    Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(g)    Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his Membership Interest, the

- 8 -

amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their respective Percentage Interests in the event that Section 1.704-1(b)(2)(iv)(m)(2) of the Treasury Regulations applies, or to the Member to whom such distribution was made in the event that Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations applies.

5.04    **Curative Allocations.** The allocations required by Section 5.03 and this Section 5.04 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income gain, loss, or deduction pursuant to this Section 5.04.  Therefore, notwithstanding any other provision of this Section 5 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 5.01.

5.05    **Section 704(c) Allocations.** In accordance with Section 704(c) of the Code, income, gain, loss and deduction concerning any property contributed to the Company shall, solely for tax purposes, be allocated among the Members to take account of any variation between the adjusted tax basis of such property and the agreed fair market value of such property upon contribution. If the agreed fair market value of any Company asset is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its adjusted fair market value in the same manner as under Section 704(c) of the Code. Allocations under this Section 5.05 are solely for purposes of federal income taxes and shall not affect or be taken into account in computing any Member's Capital Account.

5.06    **Other Allocation Rules.** In the event Members are admitted to the Company on different dates, the Profits or Losses allocated to the Members for each such taxable year during which Members are so admitted shall be allocated among the Members in proportion to the number and class of Interests each holds from time to time during such taxable year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers. Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities" within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, and solely for such purpose, the Member's Percentage Interest is specified to be his applicable Interest. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

5.07    **Allocations on Transfer.** Income, gain, loss, deduction or credit attributable to any Company interest which has been transferred shall be allocated between the assignor and the assignee as follows:

(a)    For the months prior to the transfer, to the assignor;

(b)    For the months subsequent to the transfer, to the assignee; and

- 9 -

(c)     For the month of the transfer, to the assignee if the transfer occurs on or before the 15th day of such month and to the assignor if occurring thereafter.

For purposes of the above allocation, income, gains, losses, deductions and credits shall be allocated equally among the months of the taxable year without regard to Company operations during such months.

6.     Distributions.

6.01   **Distributions of Net Cash from Operations.** Except as otherwise provided in Section 10, Net Cash from Operations, if any, shall be distributed to the Members within thirty (30) days after the end of each taxable year, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Operations distributed to a Member under this Section 6.01(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c) of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.01(a), and (ii) no such distribution of Net Cash from Operations shall be made pursuant to this Section 6.01(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business; and

(b)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

6.02   **Distributions of Net Cash from Sales or Refinancings.** Except as otherwise provided in Section 10, Net Cash from Sales or Refinancings shall be distributed, within thirty (30) days following the receipt thereof, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Sales or Refinancings distributed to a Member under this Section 6.02(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c) of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.02(a), and (ii) no such distribution of Net Cash from Sales or Refinancings shall be made pursuant to this Section 6.02(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business;

(b)     Then, to the Members in an amount equal to their Unrecovered Capital Contributions, payable in proportion to the unpaid amounts thereof; and

(c)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

6.03   **Amounts Withheld.** All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company, the Members and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in

- 10 -

respect of any Member or any Person owning an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to this Section 6.03 for all purposes under this Agreement. The Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

7. **Fiscal Matters; Books and Records.**

7.01 **Bank Accounts; Investments.** Capital Contributions, revenues and any other Company funds shall be deposited by the Managers in a bank account established in the name of the Company, or shall be invested by the Managers in furtherance of the purpose of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company purpose, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

7.02 **Records Required by TBOC; Right of Inspection.** During the term of the Company and for a period of four (4) years thereafter, the Managers, at the expense of the Company, shall maintain in the Company's principal office in the United States specified in Section 2 all records required to be kept pursuant to the TBOC. On written request stating the purpose, a Member or an assignee of a Member's Percentage Interest may examine and copy in person or by such Person's representative, at any reasonable time, for any proper purpose, and at such Person's expense, records required to be maintained under the TBOC.

7.03 **Books and Records of Account.** The Managers, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on the method of accounting selected by the Managers and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

7.04 **Tax Returns and Information.** The Members intend for the Company to be treated as a partnership for tax purposes. The Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within the shorter of: (a) such period as may be required by applicable law or regulation; or (b) seventy-five (75) days after the end of each calendar year, the Managers shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

7.05 **Tax Elections.** The Company shall be treated as a partnership for federal income tax purposes and neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law.

7.06 **"Tax Matters Member."** The Managers designate Alex Jones as the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. The tax matters partner shall inform each other Member of all significant matters that may come to his attention in his capacity as "tax matters partner" by giving notice thereof on or before the fifth day after

- 11 -

becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.

8.    **Management of the Company.**

8.01    **Management.** The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managers. The Managers shall have authority to cause the Company to do business in jurisdictions other than the State of Texas. Pursuant to the TBOC, the existence of the Company began upon the effective date of the Certificate of Formation. The initial Manager of the Company shall be Alex Jones, and he shall serve in such capacity until such time as his successor or successors have been duly elected by the approval of a Required Interest.

8.02    **Powers of Managers/Delegation of Authority.** The Managers shall have no power to cause the Company to do any act outside the purpose of the Company as set forth in Section 2.04.    Subject to the foregoing limitation and all other limitations in this Agreement, the Managers, shall have full, complete and exclusive power to manage and control the Company, and shall have the authority to take any action they deem to be necessary, convenient or advisable in connection with the management of the Company.

8.03    **Action by Managers.** Unless otherwise expressly provided in this Agreement, at any meeting of the Managers, a majority (by number) of the Managers shall constitute a quorum for the transaction of business, and an act of a majority (by number) of the Managers who are present at such a meeting at which a quorum is present shall be the act of the Managers. A meeting of the Managers shall be held at the principal office of the Company upon five (5) days' notice. Any action that may be taken at a meeting of the Managers or any committee of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of those Persons entitled to vote at that meeting on the particular action, and such consent shall have the same force and effect as a unanimous vote of the Managers or such committee or designated group of Managers at a meeting duly called and held.  No notice shall be required in connection with the use of a written consent pursuant to this Section 8.

9.    **Membership in the Company.**

9.01    **Rights, Powers and Obligations of Members.** No Member (other than a Manager or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.  No Member (including any Member who is a Manager or officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

9.02    **Action by Members.** Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members shall be held on the first Thursday of January at 10:00 a.m., local time. Special meetings of the Members may be called by resolution of a Required Interest upon five (5) days' notice, for the purpose of addressing any matter upon which the Members may vote under this Agreement. A Required Interest shall constitute (i) a quorum for the transaction of business, and (ii) the act of the Members. All meetings of Members shall be held at the principal office of the Company as provided in Section 2. Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by

- 12 -

a Required Interest or Members holding in aggregate the Percentage Interests required to approve such action under the TBOC, the Certificate of Formation or this Agreement.

## 10.    Restrictions Upon Membership Interests.

**10.01 Generally.**    The ownership and transferability of Interests in the Company are substantially restricted. Neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred or encumbered except as otherwise set forth in this Agreement. Capital is material to the business and investment objectives of the Company and its federal tax status. An unauthorized transfer of a Member's Membership Interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure. These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and the Company's capital and its financial ability to continue its business. Except as provided in this Agreement, neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred without the prior written approval of a Required Interest.

**10.02 Authorized Transfers at Death.**    An individual Member may transfer all or any part of his Membership Interest at his death to a Permitted Transferee without obtaining the approval of a Required Interest. In addition, a trust with an individual beneficiary who has a limited or unlimited testamentary power of appointment may transfer all or any part of its Membership Interest at the death of such individual to a Permitted Transferee without obtaining the approval of a Required Interest. A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.02, shall become a Substituted Member without the approval of a Required Interest.

The transfer may be accomplished pursuant to (1) the terms of the properly probated last will and testament of a Member; (2) the exercise of a limited or unlimited testamentary power of appointment; (3) the terms of any trust set up for the primary benefit of one or more Permitted Transferees; or (4) pursuant to an acknowledged assignment instrument, effective as of the date of the Member's death, delivered to and signed by the Manager prior to the death of the Member.

If there has been no pre-arranged transfer as provided above, the executor, administrator, guardian, conservator, or legal representative of a deceased or incompetent Member may exercise all the deceased or incompetent Member's rights and powers necessary to settle the Member's estate or administer the Member's property. However, the estate of a deceased or incompetent Member shall not have the right to become a Substituted Member without the approval of a Required Interest.

**10.03 Authorized Estate Planning Transfers.**    An individual Member may make transfers of all or any part of his Membership Interest, with or without consideration, to a Permitted Transferee without obtaining the approval of a Required Interest. In addition, a trust with an individual beneficiary who has a limited or unlimited right to make a disposition of all or any part of his interest in the trust during his lifetime may transfer all or any part of its Membership Interest to a Permitted Transferee with or without consideration, without obtaining the approval of a Required Interest. A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.03, shall become a Substituted Member without the approval of a Required Interest.

- 13 -

**Page 13 of 22**
006905

**10.04  Nonrecognition of an Unauthorized Transfer.** The Company will not be required to recognize the interest of any transferee or assignee who has obtained a purported Membership Interest as the result of a transfer or assignment that is not authorized by this Agreement (an "Unauthorized Transfer").  If there is doubt as to who owns a Membership Interest or who is entitled to distributions or to the proceeds upon liquidation of the Company, the Manager may accumulate such distributions or liquidation proceeds until the issue is resolved.

**10.05  Effect of Unauthorized Transfers.** If a Member makes an Unauthorized Transfer of all or any part of a Membership Interest, the Company will have the unilateral option to acquire the interest of the transferee or assignee, or any fraction or part thereof (referred to in this Section 10.05 as the "Unauthorized Interest"), upon the following terms and conditions.

(a)    The Company will have the option to acquire the Unauthorized Interest by giving written notice to the transferee or assignee of its intent to purchase the Unauthorized Interest within ninety (90) days from the date it is finally determined that the Company is required to recognize the transfer or assignment of the Unauthorized Interest.

(b)    The valuation date for the determination of the purchase price of the Unauthorized Interest will be the first day of the month following the month in which such written notice is delivered.

(c)    Unless the Company and the transferee or assignee agree otherwise, the purchase price for the Unauthorized Interest shall be its fair market value as determined in the manner provided in Schedule B.

(d)    Closing of the sale will occur at the principal office of the Company at 10 o'clock a.m. on the first Tuesday of the month following the month in which the fair market value was finally determined in accordance with the provisions of Schedule B.

(e)    In order to reduce the burden upon the resources of the Company, the Company will have the option, to be exercised in writing delivered at closing, to pay its purchase money obligation in fifteen (15) equal annual installments (or in annual installments for the remaining term of the Company if less than fifteen (15) years) with interest at the Default Interest Rate.  The first installment of principal, with interest, will be due and payable on the first day of the calendar year following closing, and subsequent annual installments, with accrued interest, will be due and payable on the first day of each succeeding calendar year until the entire amount of the obligation is paid.  The Company will have the right to prepay all or any part of the purchase money obligation at any time without penalty.

(f)    Upon the approval of a Required Interest, other than the Member whose interest is to be acquired, the Manager may assign the Company's option to purchase to one or more of the remaining Members and when done, any rights or obligations imposed upon the Company will instead become, by substitution, the rights and obligations of such Members.

(g)    Neither the transferee or assignee of an Unauthorized Interest or the Member causing the transfer or assignment, will have the right to vote on Company matters during the prescribed option period.

**10.06  Deemed Unauthorized Transfers.** In the event that any of the following events occur with respect to a Member, such Member will be deemed to have made an

- 14 -

Unauthorized Transfer of his Membership Interest, and the provisions of Section 10.05 will apply:

(a) the assignment of all or any part of a Member's Membership Interest for the benefit of creditors;

(b) the Bankruptcy of a Member;

(c) the appointment of a receiver for all or substantially all of the assets of a Member;

(d) the levy of an attachment, sequestration, garnishment, or charging order against all or any part of a Member's Membership Interest; or

(e) a purported transfer or encumbrance by operation of law or otherwise of all or any part of a Member's Membership Interest, except as expressly permitted under this Agreement.

### 10.07 Admission of Substituted Members.

(a) Except as otherwise provided in Sections 10.02 and 10.03 of this Agreement, no assignee of all or any part of a Membership Interest shall have the right to become a Substituted Member except with the approval of a Required Interest, the granting or denying of which consent shall be in the sole discretion of those constituting the approval of a Required Interest, and, if granted, may be granted subject to whatever conditions, if any, those constituting the approval of a Required Interest may require. Notwithstanding any other provision of this Agreement, in no event may an assignor of all or any part of a Membership Interest make or enter into an agreement, oral or written, with an assignee or potential assignee of such interest under which the assignor agrees to exercise its residual rights in the Company at the discretion or instruction of any assignee of such interest, and any such purported agreement shall be null and void.

(b) Notwithstanding any granting of the approval of a Required Interest under paragraph (a) of this Section 10.07, and notwithstanding the provisions of Sections 10.02 and 10.03, the admission of an assignee as a Substituted Member shall be further conditioned as follows:

(i) the assignment instrument and such other instruments as the Managers may deem necessary or desirable to effect the admission of the assignee as a Substituted Member being in form and substance satisfactory to the Managers;

(ii) the assignor and assignee executing such other instrument or instruments as the Managers may deem necessary or desirable to effectuate such admission;

(iii) the assignee and the assignee's spouse (if any) accepting and adopting in writing all the terms and provisions of this Agreement, as the same may have been amended;

- 15 -

(iv)   the assignee and/or the assignor paying or obligating themselves to pay all reasonable expenses connected with such admission (as determined by the Managers, but which the Managers shall have the right to waive), including, but not limited to, the cost of the preparation, filing, and publishing of any appropriate documents; and

(v)   such other conditions as the Managers may reasonably impose.

(c)   In the event that an assignee seeking to become a Substituted Member under this Section 10.07 is an assignee of all or any part of a Membership Interest of a Manager, then all decisions in this Section 10.07 are to be made by the other Manager(s), if any, or if there is no other Manager, then by a Unanimity of Interest of the Members.

**10.08 Status of a Substituted Member.** A "Substituted Member" is an assignee of all or any part of a Membership Interest admitted to all the rights and subject to all of the obligations of a Member in the Company. Any such Substituted Member shall be treated as a Member. In the event an assignee becomes a Substituted Member, such Substituted Member shall be deemed to have received its interest in the Company from the Member who assigned such interest, and will have the same rights to receive distributions and to be allocated tax items as the Member with respect to which such assignee is becoming a Substituted Member.

**10.09 Assignee of a Membership Interest.** Any person or entity who acquires all or any part of a Membership Interest and who has not been admitted as a Substituted Member shall be entitled to receive Company distributions attributable to such Interest, but shall have no voting or managerial rights.

**10.10 Membership Interest Pledge or Encumbrance.** No Member may grant a security interest in or otherwise pledge, hypothecate, or encumber all or any part of his Membership Interest or such Member's distributions without obtaining the approval of a Required Interest. It is understood that the Members are under no obligation to give consent nor are they subject to liability for withholding consent.

11.   **Dissolution and Winding Up.**

**11.01 Events Causing Dissolution.** The Company shall be dissolved upon the first of the following events to occur: (a) the expiration of the term of duration of the Company, if any, set forth in the Certificate of Formation; (b) the written consent of a Required Interest at any time to dissolve and wind up the affairs of the Company; or (c) the occurrence of any other event that causes the dissolution of a limited liability company under the TBOC.

**11.02 Winding Up.** If the Company is dissolved pursuant to Section 11.01, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)   Appointment of Liquidator. The winding up of the Company's affairs shall be supervised by a Liquidator. The Liquidator shall be the Managers or, if the Members prefer, a liquidator or liquidating committee selected by a Required Interest.

(b)   Powers of Liquidator. In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, for and on behalf of the Company: (i)

- 16 -

to prosecute and defend civil, criminal or administrative suits; (ii) to collect Company assets, including obligations owed to the Company; (iii) to settle and close the Company's business; (iv) to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions; (v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property; (vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; (vii) to distribute any remaining proceeds from the sale of Company Property to the Members; (viii) to prepare, execute, acknowledge and file articles of dissolution under the TBOC and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and (ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managers under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The Liquidator (if not the Managers) shall not be liable as a Manager to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in the Certificate of Formation.

**11.03  Compensation of Liquidator.** The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Required Interest.

**11.04  Liquidation.** Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(a)    First, to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions), of the Company, whether by payment or establishment of reserves; and

(b)    Then, to the Members, in accordance with, and in the ratio of, the positive balances in their respective Capital Accounts.

The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group. If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Percentage Interests of each Member in such group.

**11.05  Final Report.** Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 11.04.

**11.06  Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, and notwithstanding that the deficit, if any, in the Capital Account of any Member results from or is

- 17 -

attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

### 12.    Miscellaneous.

**12.01  Notices.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, registered or certified with return receipt requested, or (ii) hand delivered to the intended addressee. Notice so mailed shall be effective upon the expiration of three (3) days after its deposit and notice given by hand delivery shall be effective upon actual receipt by the addressee. For purposes of notice, the addresses of the Members shall be as set forth under their respective names on the attached Schedule A; provided, however, that each Member shall have the right to change his address for purposes of notice hereunder to any other physical address by the giving of thirty (30) days' notice to the other Members in the manner set forth above.

**12.02  Governing Law.** This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, this Agreement is intended to comply with the requirements of the TBOC and the Certificate of Formation. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the TBOC or any provision of the Certificate of Formation, the TBOC and the Certificate of Formation, in that order of priority, will control.

**12.03  Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**12.04  Amendment.** Except as expressly provided herein, this Agreement may be amended only by action of a Required Interest.

**12.05  Construction; Headings.** The Article and Section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section. Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

**12.06  Creditors Not Benefited.** Nothing in this Agreement is intended to benefit any creditor of the Company or a Member. No creditor of the Company or a Member will be entitled to require the Managers to solicit or accept any loan or additional capital contribution for the Company or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

**12.07  Arbitration.** Any controversy, claim or dispute arising out of or relating to this Agreement or any other agreements referred to herein, shall be settled by binding arbitration in Austin, Travis County, Texas. Such arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association

("AAA"), with the following exceptions if in conflict: (a) one arbitrator shall be chosen by AAA; (b) each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any party if written notice (pursuant to the AAA's rules and regulations) of the proceedings has been given to such party. The parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief or other equitable relief. The arbitrator shall not have the right to award punitive damages or speculative damages to either party and shall not have the power to amend this Agreement. The arbitrator shall be required to follow applicable law. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

        12.08 **Entire Agreement.** This Agreement (including the heading on the first page hereof), the schedules and exhibits attached hereto and specifically referenced herein, collectively contain the entire agreement among the Members relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.

        This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.

**[Signature Page Follows]**

- 19 -

EXECUTED to be effective as of the Effective Date.

**Members:**

_____
Kelly Jones

_____
Alex Jones

**Managers:**

_____
Alex Jones

SIGNATURE PAGE

**Page 20 of 22**
006912

## SCHEDULE A

### Names, Addresses, Initial Capital Contributions and Percentage Interests

| Members: | Initial Capital Contributions: | Percentage Interest: |
|---|---|---|
| Kelly Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas  78746 | $51.00 | 51% |
| Alex Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas  78746 | $49.00 | 49% |
| Totals: | $100.00 | 100.00% |

SCHEDULE A

**Page 21 of 22**
006913

## SCHEDULE B

### DETERMINATION OF FAIR MARKET VALUE
### OF MEMBERSHIP INTEREST

In the event a determination of the fair market value of all or any part of a Membership Interest is required pursuant to the terms of this Agreement, the following provisions shall apply.

A. The fair market value of all or any part of a Membership Interest shall be the price at which the interest would change hands between a willing seller and a willing buyer, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts, including, but not limited to, all facts relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held entity interests which may not be withdrawn before the end of the term of the Company.

B. Purchaser and Seller shall first attempt to determine the fair market value of the affected Membership Interest or any part thereof (the "Affected Interest") by agreement. If Seller and Membership are unable to agree on the fair market value of the Affected Interest within fifteen (15) days after Purchaser has notified Seller of its intent to purchase the Affected Interest, each of Seller and Purchaser shall, within the period of an additional fifteen (15) days, name a qualified appraiser and supply the name of such appraiser to the other party. If either Seller or Purchaser fails to appoint an appraiser, the determination of the fair market value of the Affected Interest shall be made by the sole appraiser appointed. Within the period of thirty (30) days after the appointment of the second appraiser, the two appraisers shall separately determine the fair market value of the Affected Interest and shall provide copies of their written reports to each of Seller and Purchaser. If the difference between the two appraisal reports is ten percent (10%) or less (the higher report being less than the lower report multiplied by 1.01) the average of the appraisals shall conclusively determine the fair market value of the Affected Interest. If the difference between the two appraisal reports is greater than ten percent (10%), the two appraisers shall appoint a third appraiser who shall select between the two appraisal reports as to the fair market value of the Affected Interest, and the opinion of the third appraiser shall be conclusive of the fair market value of the Affected Interest.

C. For purposes hereof, an appraiser shall be "qualified" if he would be considered an expert for purposes of giving testimony as to the fair market value per Interest in the Company in a judicial or similar proceeding. The costs and expenses of the appraiser selected by Seller or Purchaser shall be borne by the party selecting the appraiser. The costs and expenses of a common appraiser shall be borne equally by the Seller and Purchaser.

D. During the period of time that a determination of the fair market value of the Affected Interest is being conducted pursuant to the procedures set forth in this Schedule B, all time periods for notice or exercise of any rights related to the purchase shall be suspended. Upon the final determination of fair market value, all time limits shall automatically commence.

No. 25-

**EXHIBIT**

**6**

Alexander E. Jones; 22-33553

exhibitsticker.com

IN THE

# Supreme Court of the United States

---

ALEXANDER E. JONES;
FREE SPEECH SYSTEMS, LLC,

*Petitioners,*

*v.*

ERICA LAFFERTY, *et al.,*

*Respondents.*

---

**ON PETITION FOR A WRIT OF CERTIORARI TO THE
SUPREME COURT OF CONNECTICUT**

---

# PETITION FOR A WRIT OF CERTIORARI

---

BEN C. BROOCKS
  *Counsel of Record*
BROOCKS LAW FIRM, PLLC
248 Addie Roy Rd., Suite B301
Austin, TX 78746
(512) 201-2000
bbroocks@broockslawfirm.com

ALAN B. DAUGHTRY
ALAN DAUGHTRY LAW FIRM
3355 West Alabama, Suite 444
Houston, TX 77098

SHELBY A. JORDAN
JORDAN & ORTIZ, P.C.
500 North Shoreline,
  Suite 804
Corpus Christi, TX 78401

*Counsel for Petitioners*

---

382896



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

*i*

## QUESTIONS PRESENTED

This case presents multiple constitutional questions of first impression involving the use of a punitive administrative Death Penalty Sanction for small discovery errors to impose liability, bypass burdens of proof, and award punitive damages against a media defendant reporting on a matter of public concern in a suit brought by public figures. The trial court's entry of a liability-decreeing administrative Death Penalty Sanction eliminated the Plaintiffs' requirement to prove falsity, fault, or actual malice, and resulted in an award of over $1.4 billion in damages without meaningful appellate review. The questions presented are

1.  In actions brought by public figures against media defendants reporting on matters of undeniable public concern, may a state court through an administrative Death Penalty Sanction: (a) judicially decree liability, thereby relieving plaintiffs of their constitutional burdens to prove fault, falsity, and actual malice under the proper evidentiary standards; (b) impose liability on a media defendant for the acts of unrelated third parties; and/or (c) permit the award of punitive damages premised solely on such sanctions. And if so, whether the standards for so doing require a showing of a serious threat to the administration of justice and that no lesser sanctions would suffice.

2.  Whether this Court is constitutionally required to independently review the trial record to ensure that constitutional facts were proven—and whether such review is even possible where the record was curtailed by a liability-decreeing administrative Death Penalty Sanction.

*ii*

3.  Can a liability-decreeing administrative Death Penalty Sanction judicially decree the validity of a plaintiff's complaint making the following actionable solely because they were alleged and judicially deemed admitted: (i) opinions otherwise not actionable; (ii) statements alleged to be defamatory that are not in fact defamatory; (iii) causes of action not legally cognizable; (iv) conduct of unrelated third parties; and (v) statements allegedly defamatory but grossly taken out of context.

*iii*

## PARTIES TO THE PROCEEDINGS

Petitioners Alexander E. Jones and Free Speech Systems, LLC were Defendants in the trial court and Appellants before the Court of Appeal.

Respondents, Erica Lafferty, William Aldenberg, William Sherlach, Donna Soto, Jillian Soto-Martino, Carlee Soto-Parisi, Carlos Soto, Ian Hockley, Nicole Hockley, Matt Barden, Jacqueline Barden, David Wheeler, Francine Wheeler, Robbie Parker, and Jennifer Hensel were Plaintiffs in the trial court and Appellees before the Court of Appeal.

*iv*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Court Rule 29.6, Petitioner, Free Speech Systems, LLC ("FSS") states that it has no parent corporation and that no publicly held company owns 10% or more of Applicant's stock. FSS is owned by Alex Jones. Jones has filed for bankruptcy protection in the Southern District of Texas. Although a Trustee has been appointed over his and FSS's assets, Jones is the manager of FSS.

*v*

## RELATED PROCEEDINGS

Bankruptcy Court for the United States District Court for the Southern District of Texas, Houston Division, which are pending:

- Cause No. 22-33553, *In re: Alexander E. Jones*
- Adversary No. 23-03037, *Wheeler, et al. v. Jones, et al.*
- Adversary No. 24-03228, *Jones v. Chris Murray, et al.*
- Adversary No. 22-03034, *Wheeler, et al. v. FSS*
- Adversary No. 23-03036, *Wheeler, et al. v. FSS*

Connecticut State Court Proceedings:

- Superior Court, Complex Litigation Docket at Waterbury, Connecticut, Docket No. UWY-CV-18-604636-S/6046437-S/6046438-S, *Erica Lafferty, et al. v. Alex E. Jones, et al.*, judgment entered on verdict on December 22, 2022;
- Appellate Court of Connecticut, AC 46131/46132/46133, *Erica Lafferty, et al. v. Alex E. Jones, et al.*, opinion issued December 10, 2024; and
- Supreme Court for the State of Connecticut, PSC-240253, Erica Lafferty, et al. v. Alex E. Jones, et al., petition for certification denied on April 8, 2025.

*vi*

Texas State Court Proceedings:

- Travis County District Court, Cause No. D-1-GN-18-001605, *Marcel Fontaine v. Alex E. Jones, et al.*, matter pending;
- Travis County District Court, Cause No. D-1-GN-18-001835, *Neil Heslin v. Alex E. Jones, et. al.*, final judgment entered on January 12, 2023;
- Travis County District Court, Cause No. D-1-GN-18-001842, *Leonard Pozner, et al. v. Alex E. Jones, et al.*, matter pending; and
- Third Court of Appeals at Austin, Texas, Cause No. 03-23-00209-CV, *Alex E. Jones, et al. v. Neil Heslin, et al.*, matter argued to the on May 28, 2025.
- Third Court of Appeals at Austin, Texas, Cause No. 03-25-00617-CV, Free Speech Systems, LLC v. David Wheeler, et al., matter pending.

*vii*

## TABLE OF CONTENTS

*Page*

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . .i

PARTIES TO THE PROCEEDINGS. . . . . . . . . . . . . . .iii

CORPORATE DISCLOSURE STATEMENT . . . . . . iv

RELATED PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . .v

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . vii

TABLE OF APPENDICES . . . . . . . . . . . . . . . . . . . . . .xi

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . .xiii

PETITION FOR A WRIT OF CERTIORARI. . . . . . . .1

OPINIONS BELOW. . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

CONSTITUTIONAL AND STATUTORY
    PROVISIONS INVOLVED . . . . . . . . . . . . . . . . . . . .8

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . .8

  A.  The Sandy Hook Tragedy And Its Very
      Public Aftermath Were Matters Of
      Public Concern. . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

  B.  The Plaintiffs Were Public Figures . . . . . . . . . . .8

*viii*

## Table of Contents

|  |  | Page |
|---|---|---|
| C. | Alex Jones Is A Media Defendant Entitled To All First Amendment Freedom Of The Press Protections | 11 |
| D. | Alex Jones Goes On Megyn Kelly Show In June 2017 Which Prompts Suit | 11 |
| E. | The Complaint | 12 |
| F. | The Administrative "Death Penalty" Default Sanction Was Unjust And Disproportionate | 12 |
| G. | Trial Court Strikes Jones's Notice Of Constitutional Defenses | 15 |
| H. | Trial Court Conducts A "Damages-Only" Trial Where Jury Was Told Liability Had Been Established. | 15 |
| I. | Appeals Process | 16 |
| REASONS FOR GRANTING THE PETITION | | 17 |
| A. | While *Sullivan* Is Still The Law And This Case Is Its Identical Twin, The Administrative Default Judgment Discarded It. | 17 |
| B. | This Court Has Issued No Jurisprudential Teaching On State Court Administrative Default Judgments | 19 |

*ix*

## Table of Contents

*Page*

C.  Independent Review Is Mandated Here As In All First Amendment Cases . . . . . . . . . . . . . . .21

D.  The Complaint Itself Demonstrates There Is No Defamation . . . . . . . . . . . . . . . . . . . . . . . . .22

E.  Liability Default Judgments Against Media Defendants Are Constitutionally Impermissible . . . . . . . . . . . . . . . . . . . . . . . . . . .31

    1.  Falsity—Death Penalty Default Unconstitutionally Allowed Liability Without The Plaintiffs Having Proved Falsity Of Specific Statements By Clear And Convincing Evidence . . . . . . . . .31

    2.  Fault—The Death Penalty Sanction Unconstitutionally Allowed Liability Without The Plaintiffs Having Proved Fault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

    3.  The Death Penalty Sanction Unconstitutionally Allowed IIED Claims To Be Submitted On The Wrong Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

    4.  Death Penalty Sanction Unconstitutionally Decreed Liability For Jones For Acts Of Third Parties . . . . .34

*x*

*Table of Contents*

*Page*

5. Death Penalty Sanction Unconstitutionally Allowed Profit Motive To Factor In When It Is Irrelevant In Media Libel . . . . . . . . . . . . . .35

F. Punitive Damages Cannot Be Based On A Death Penalty Sanction . . . . . . . . . . . . . . .36

G. If A Death Penalty Sanction Is Permitted, The Punishment Must Fit The Crime . . . . . . . .36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

*xi*

## TABLE OF APPENDICES

*Page*

APPENDIX A — ORDER OF THE SUPREME COURT FOR THE STATE OF CONNECTICUT, DECIDED APRIL 8, 2025.....1a

APPENDIX B — OPINION OF THE APPELLATE COURT OF CONNECTICUT, FILED DECEMBER 10, 2024.................3a

APPENDIX C — OPINION OF THE SUPERIOR COURT, COMPLEX LITIGATION DOCKET AT WATERBURY, CONNECTICUT, FILED NOVEMBER 10, 2022 .......................75a

APPENDIX D — ORDER OF THE SUPERIOR COURT FOR THE JUDICIAL DISTRICT OF WATERBURY, DATED DECEMBER 24, 2021...105a

APPENDIX E — OPINION OF THE SUPERIOR COURT FOR THE JUDICIAL DISTRICT OF WATERBURY, CONNECTICUT, FILED NOVEMBER 15, 2021 ......................107a

APPENDIX F — TRIAL COURT ORDER OF THE SUPERIOR COURT OF THE JUDICIAL DISTRICT OF WATERBURY AT WATERBURY, CONNECTICUT, DATED AUGUST 5, 2021...........................121a

APPENDIX G — RELEVANT CONSTITUTIONAL PROVISIONS INVOLVED...................126a

*xii*

### Table of Appendices

*Page*

APPENDIX H—PETITION FOR CERTIFICATION OF THE SUPREME COURT, STATE OF CONNECTICUT, FILED JANUARY 21, 2025 . . .128a

APPENDIX I—TRANSCRIPT—JURY CHARGE, FILED OCTOBER 6, 2022 . . . . . . . . . . . . . . . . . . .147a

APPENDIX J — VERDICT, DATED OCTOBER 12, 2022 . . . . . . . . . . . . . . . . . . . . . . . .172a

APPENDIX K — NOTICE OF DEFENSES OF THE SUPERIOR COURT, COMPLEX LITIGATION DOCKET AT WATERBURY, FILED NOVEMBER 24, 2021 . . . . . . . . . . . . . . . .189a

*xiii*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases**

*Berisha v. Lawson,*
141 S. Ct. 2424 (2021). . . . . . . . . . . . . . . . . . . . . . . . . .32

*Bose Corp. v. Consumers Union,*
466 U.S. 485 (1984). . . . . . . . . . . . . . . . . . . . . . .3, 21, 22

*Bridges v. California,*
314 U.S. 252 (1941) . . . . . . . . . . . . . . . . . . . . . . . .19, 20

*Counterman v. Colorado,*
600 U.S. 66, 143 S. Ct. 2106 (2023). . . . . . . . . . . . .6, 35

*De Blasio v. Aetna Life & Cas. Co.,*
186 Conn. 398, 441 A.2d 838 (1982) . . . . . . . . . . . . . .15

*Gertz v. Robert Welch,*
418 U.S. 323 (1974) . . . . . . . . . . . . . . . . . . . . . . . .11, 32

*Harte-Hanks Commc'ns v. Connaughton,*
491 U.S. 657 (1989). . . . . . . . . . . . . . . . . . . . . .4, 14, 35

*Herbert v. Lando,*
441 U.S. 153 (1979). . . . . . . . . . . . . . . . . . . . . . . . . .36

*Hustler Magazine v. Falwell,*
485 U.S. 46 (1988). . . . . . . . . . . . . . . . . . . . . . . .33, 35

xiv

## Cited Authorities

*Page*

*In re Yasiel R.,*
    317 Conn. 773, 120 A.3d 1188 (2015) . . . . . . . . . . . . . 16

*Lafferty v. Jones,*
    229 Conn. App. 487 (2024). . . . . . . . . . . . . . . 12, 22, 33

*Mckesson v. Doe,*
    144 S. Ct. 913 (2024). . . . . . . . . . . . . . . . . . . . . . . . . .34

*Milkovich v. Lorain Journal Co.,*
    497 U.S. 1 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . .17, 32

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982). . . . . . . . . . . . . . . . . . . . . . . . .34, 35

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964). . . . . . . . . . . . . . . .5-7, 17-19, 33, 35

*Phila. Newspapers v. Hepps,*
    475 U.S. 767 (1986) . . . . . . . . . . . . . . . . . . . . . . . . .17, 32

*Rosenbloom v. Metromedia,*
    403 U.S. 29 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Snyder v. Phelps,*
    562 U.S. 443 (2011). . . . . . . . . . . . . . . . . . . 16, 17, 21-33

*Soto v. Bushmaster Firearms Int'l, LLC,*
    331 Conn. 53, 202 A.3d 262 (2019) . . . . . . . . . . . . . . .10

*xv*

*Cited Authorities*

*Page*

*St. Amant v. Thompson,*
    390 U.S. 727 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . .8, 9

*State v. Golding,*
    213 Conn. 233, 567 A.2d 823 (1989) . . . . . . . . . . . . . .16

*Time, Inc. v. Firestone,*
    424 U.S. 448 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . .22

**Statute**

28 U.S.C. §1257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

1

## PETITION FOR A WRIT OF CERTIORARI

In this case controversial conservative media defendants Alex Jones and his company Free Speech Systems, LLC (collectively, "Jones") were sued in rural Connecticut over Jones's coverage of the 2012 Connecticut-based Sandy Hook Elementary School murders, which were the subject of reporting and debate worldwide. Jones received no trial on liability as his liability was "judicially decreed" as a result of a liability-decreeing administrative Death Penalty Sanction. Based on liability imposed by judicial fiat, the ensuing damages-only trial produced a $1,436,650,000 judgment—believed to be the largest in American libel history. It is an amount that can never be paid, and which based on the trial court's findings may not be dischargeable in bankruptcy. The result is a financial death penalty by fiat imposed on a media defendant whose broadcasts reach millions.

The fifteen Plaintiffs were relatives—mothers, fathers, spouses, and siblings—of six of the twenty victims, along with one unrelated FBI agent. They filed suit after Jones was interviewed in 2017 by NBC's Megyn Kelly, their Complaint claiming in general that from 2012 to 2017 (a) Jones denied there were any murders at Sandy Hook; (b) the Plaintiffs were participants in deceiving the public; and (c) Jones's listeners had in some instances harassed the Plaintiffs for which Plaintiffs claimed Jones was liable. The causes of action sounded primarily in defamation and intentional infliction of emotional distress (IIED), even though virtually none of the Plaintiffs were named in any of Jones's broadcasts, and every IIED claim rested on the allegedly defamatory broadcasts.

2

The administrative Death Penalty Sanction declared Jones liable for everything alleged in Plaintiffs' Complaint, which attached none of the purportedly defamatory broadcasts, instead including only snippets and phrases lifted out of context from a handful of Jones's shows.

As a conservative media figure, Jones's opinions—and those expressed by some of his guests—focused largely on exposing what he believed were efforts by the mainstream media and the Obama Administration to convert the tragedy into a mass theatrical production in service of anti-gun legislation. He also highlighted inconsistencies and oddities in the official narrative, which in turn had fueled public concerns that the public was being given false or incomplete information, and which ultimately gave rise to broader conspiracy theories about the event. Jones urged his listeners to investigate for themselves rather than rely on the politically motivated mainstream media. In his coverage, after pointing to specifics, Jones expressed opinions of media excesses with terms such as "hoax" and "staged," generally directed at the media circus, while often in the same broadcasts acknowledging that murders had in fact occurred. Yet Plaintiffs' Complaint on which Jones was decreed liable by default, repeatedly referenced only selected portions of broadcasts, omitting clarifying language.

One example is illustrative. Plaintiffs' Complaint alleged that in a January 27, 2013 broadcast, Jones stated:

> "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction. . . ."

3

Plaintiffs seized on the single word "staged" to claim that Jones was accusing the Plaintiffs—who were not named—of falsifying the murders. But the Complaint deliberately omitted what Jones said in the same broadcast:

> "I clearly believe from the evidence children are really killed in Sandy Hook and it's a real tragedy."

Viewed in full context, Jones expressly affirmed that deaths occurred, while using the phrases "staged" or "hoax" to characterize media and governmental scripting. It is therefore contextually impossible to construe his remarks as denying deaths, as the Complaint did by selective editing. Precisely to guard against such distortions, this Court has required independent judicial review of the entire record in First Amendment cases. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499, 104 S. Ct. 1949, 1958 (1984) ("*Bose*"). No such review has occurred here at any level by any court.

Here the trial judge explicitly stated on the record that the Death Penalty Sanction was entered for three reasons, all trivial at best. **Strike One** against Jones was that his lawyers filed a motion to obtain a commission for an out-of-state deposition of Hillary Clinton, thought to be behind the suit because of her friendship with plaintiff Erica Lafferty and Jones' prior public support of Trump in the 2016 election. The trial court found Jones's motion for a deposition commission violated a protective order because it recited that the motion's genesis was an unnamed Plaintiff's refusal to testify in a deposition how her legal fees were being paid and how all 15 Plaintiffs had come together to be represented by the same law firm.

4

The second reason was because Jones's lawyers could not retrieve in satisfactory form, never-used Google Analytics data that the Plaintiffs alleged would show the number of vitamin supplement sales Jones made during broadcasts mentioning Sandy Hook—**Strike Two**. Jones's lawyers also could not retrieve in a form and format to the liking of the Plaintiffs, accounting "subaccounts" from FSS's accounting journal entries to determine supplement sales—**Strike Three**. By these, the Plaintiffs hoped to demonstrate Jones's profit motive even though this Court has plainly stated a profit motive is irrelevant in libel cases and causes based on First Amendment speech issues. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989). Even though these infractions (a) were trivial and unrelated to the merits of the case and (b) the information sought could have been obtained by other means, the trial court used these as the basis to discard the First Amendment, decreeing Jones liable for everything alleged.

Having been stripped of his Constitutional rights, in the ensuing "damages-only" trial, the six-person jury sitting 28 miles from the murder site awarded the fifteen plaintiffs a total of $965,000,000 in compensatory damages, to which the trial court added $471,650,000 in CUTPA and punitive damages amounting to an award of approximately $95,776,667 per plaintiff.

This record-breaking award was possible only because the Death Penalty Sanction that judicially decreed—without any proof whatsoever, much less clear and convincing evidence—that: (i) Jones made every statement Plaintiffs alleged, though their Complaint contained only excerpts; (ii) every such statement was false; and (iii)

5

Jones subjectively knew they were false. The same fiat further declared Jones liable for all acts and statements of unrelated third parties, deemed to be his "listeners," for whom he was held responsible. No proof was required that Jones had any connection to those individuals or their actions or that they were even his listeners.

This case presents the Court with an opportunity to clarify that in actions brought by public figures against media defendants reporting on matters of undeniable public concern, a state court may not, through procedural sanctions: (a) judicially decree liability, thereby relieving plaintiffs of their constitutional burdens to prove falsity, fault, and actual malice under the proper evidentiary standards; (b) impose liability on a media defendant for the acts of unrelated third parties; or (c) permit the award of punitive damages premised solely on such sanctions. If there are circumstances in which such a Death Penalty Sanction may override the First Amendment, this Court should articulate the constitutional guardrails necessary to prevent abuse.

In *New York Times v. Sullivan*, 376 U.S. 254 (1964) ("*Sullivan*") this Court stated:

> "Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker."

6

*Sullivan*, 376 U.S. at 271. That constitutional command was discarded here by judicial fiat. With this case left undisturbed, all broadcasters are now at risk because of a new and easy means of bypassing *Sullivan* and its progeny through a Death Penalty Sanction that sidesteps core First Amendment protections. And the threat is to all media broadcasters including *legacy newspapers and broadcasters* (New York Times, Wall Street Journal, ABC, NBC, CNN), *digital-native outlets* (Politico, Axios, Vox), *nonprofit investigative groups* (ProPublica, The Intercept), *independent podcasters* (Joe Rogan, Pod Save America, Ben Shapiro), *social media platforms* (TikTok, Twitter/X, Reddit), *algorithmic aggregators* (Google News, Apple News, Morning Brew), and *state-sponsored players* (BBC, Al Jazeera, RT, Xinhua). Reporting from all of these sources will result in self-censoring fear of suits especially in small locales, where any of these news sources may be targeted for locally unpopular speech.

The result will chill the reporting of news. *Counterman v. Colorado*, 600 U.S. 66, 75-76, 143 S. Ct. 2106, 2114-15 (2023) ("*Counterman*") (J. Kagan) ("Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system. The result is 'self-censorship' of speech that could not be proscribed . . . ").

It will also flood state and federal courts with demands for default judgments. Faced with the precedent of this very case, courts will be left without guidance on whether

7

constitutional pronouncements of this Court can be discarded by a Death Penalty Sanction—and, if so, how offensive must the alleged discovery abuse be to justify replacing trial by jury with trial by sanction.

*Sullivan* remains controlling law. Should this Court decide to revisit *Sullivan*—and Jones does not contend it should—this case would present the occasion. What the Court should not do, however, is nothing, thereby allowing First Amendment jurisprudence to descend into uncharted waters of greater uncertainty.

## OPINIONS BELOW

The decision of the Supreme Court for the State of Connecticut (App. A, 1a-2a) is reported at 333 A.3d 105. The Opinion of the Appellate Court of Connecticut (App. B, 3a-74a) is reported at 229 Conn. App. 487. The opinion of the Superior Court (App. C, 75a-104a) is reported at 2022 Conn. Super. LEXIS 2813.

The orders and opinions of the Superior Court (App. D, 105a-106a) (App. E, 107a-120a) (App. F, 121a-125a) have not been published.

## JURISDICTION

The Supreme Court of Connecticut denied certification for their review of this case on April 8, 2025. This Court granted Petitioners' Application to Extend Time to File Petition (25A7) until September 5, 2025. The jurisdiction of this Court is based on 28 U.S.C. §1257.

8

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The First Amendment, the Fifth Amendment and the Fourteenth Amendment. App. G, 126a-127a.

## STATEMENT OF THE CASE

### A. The Sandy Hook Tragedy And Its Very Public Aftermath Were Matters Of Public Concern

The tragic Sandy Hook murders took place in December of 2012 in Newtown, Connecticut, a small town with a population of under 30,000 and captivated the entire world. In the United States alone, major news outlets such as The New York Times, The Washington Post, CNN, and NBC News, alongside numerous local papers and online publications, produced extensive coverage immediately following the incident and, in the years, since. The Sandy Hook tragedy triggered widespread public debate over gun control and generated extensive public commentary concerning inconsistencies in media coverage. This, in turn, led to a broad array of public opinions, including claims that certain aspects may have been a "hoax" which to Jones meant media propaganda. These were undeniably matters of public concern.

### B. The Plaintiffs Were Public Figures

Plaintiff William Aldenberg was/is a law enforcement official with the FBI who was on site at Sandy Hook leading the investigation there. Complaint, ¶28. As a federal law enforcement official, Aldenberg was unquestionably a public figure. *St. Amant v. Thompson*, 390 U.S. 727

9

(1968) (deputy sheriff). The Sandy Hook tragedy quickly morphed any of the Plaintiffs who were not before, into significant public figures as driving forces for gun control.

At the 2016 Democratic National Convention Plaintiff Erica Lafferty (her maiden name) gave a five-minute speech on gun control and Hillary Clinton and was shown in close support of Secretary Clinton given her positions on gun control.



Some of the Plaintiffs were invited to attend President Barack Obama's 2013 State of the Union address as guests, a gesture that highlighted their very public gun control advocacy. There President Obama advocated for gun reform following the tragedy, where President Obama after paying tribute to the Plaintiffs called for Congress to act on gun violence prevention. Based on public records and media coverage, David and Francine Wheeler were even asked to substitute for President Obama in his weekly, nationally televised address to publicly advocate these issues.

10



Nicole Hockley and Ian Hockley were active in the media and Mark Barden and Jacqueline Barden frequently gave interviews and public statements. William Sherlach joined in public advocacy for changes in gun laws and mental health reform. Mark and Jackie Barden, Nicole Hockley, and William Sherlach co-founded Sandy Hook Promise, which holds itself out on its publicly accessible web site. https://www.sandyhookpromise.org/who-we-are/about-us.

Their status as public figures increased when they sued Remington Arms, the manufacturer of the weapon used by the murderer in a highly publicized suit. *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 64, 202 A.3d 262, 271 (2019). That case and its settlement for $73,000,000 was publicized world-wide, referring to the Plaintiffs as the "Sandy Hook Families."

All Plaintiffs were public and vocal advocates for gun reform, school safety, mental health awareness (and it's connection to violence) and participated in marches and public forums. There is thus no question that the Plaintiffs were "public figures," which has Constitutional

11

significance [*Gertz v. Robert Welch*, 418 U.S. 323, 336-37 (1974)] which the Death Penalty Sanction ignored.

## C. Alex Jones Is A Media Defendant Entitled To All First Amendment Freedom Of The Press Protections

Jones is a media defendant and the Plaintiffs readily admitted this. Complaint, ¶7, 30-35 & 40. Recognized by both supporters and critics, Jones has been at the forefront of media for nearly three decades, with his career spanning radio, online broadcasting, film, and commentary. Though some controversies have followed him, Jones has maintained his dedication to free speech, individual rights, and against gun control, positioning himself as a steadfast proponent of questioning mainstream narratives. Currently, he hosts The Alex Jones Show from Austin, Texas, which is the longest-running online news and politics talk show today and was previously broadcast by the Genesis Communications Network across the United States via syndicated and internet radio. As such he was entitled to, but denied, all the Constitutional protections afforded media defendants.

## D. Alex Jones Goes On Megyn Kelly Show In June 2017 Which Prompts Suit

In June 2017, NBC talk show host and political commentator Megyn Kelly hosted Alex Jones on a live broadcast on NBC. The interview covered many subjects and lasted approximately 17.5 minutes in its entirety. Approximately 4.5 minutes of that airtime involved (a) Kelly talking about Sandy Hook, which included her own comments and commentary, (b) Kelly asking question

006941

12

of and making allegations against Jones; and (c) Kelly interviewing Neil Heslin, a parent of one of the murdered children who sued Jones in Texas.

### E.  The Complaint

In May 2018—five years after the tragedy—Plaintiffs sued Jones and others [CR 64], asserting claims for (i) invasion of privacy, (ii) defamation and defamation per se, (iii) intentional infliction of emotional distress, and (iv) Connecticut Unfair Trade Practices Act ("CUTPA") violations. Initially, Jones filed a motion to dismiss pursuant to the Connecticut anti-Slapp statute. As a sanction, the trial court dismissed that motion which was upheld by the Connecticut Supreme Court. *Lafferty v. Jones*, 336 Conn. 332 (2020).

### F.  The Administrative "Death Penalty" Default Sanction Was Unjust And Disproportionate

Shortly after the case was returned to the trial court, on November 14, 2021, that court entered a Death Penalty Sanction. A transcript of its ruling recites the three reasons for entry. As to the first ground, Jones's lawyers filed a motion for leave to depose Hillary Clinton [App. E, 108a]. A protective order had been entered in the case that provided that information covered in depositions could be (a) designated as "confidential" but also (b) used for the preparation and trial of the case. Trial Dkt. No. 185.10, p. 4, ¶9. As the deposition of one of the plaintiffs began, it became apparent that plaintiffs' counsel would resist any testimony about how all 15 plaintiffs happened to find themselves in the same law office six years after the Sandy Hook shootings. It was the collective belief on Jones's side,

13

that the prosecution of Jones was orchestrated by those motivated to have their revenge on him for his support of Donald Trump's successful campaign against Hillary Clinton in 2016. To that end, counsel for Jones sought a commission to take the deposition of Clinton in New York, explaining why Clinton's deposition was being sought using the following two sentences:

> "On advice of counsel, at least one plaintiff has refused to answer how so many of the clients all ended up represented by the same firm. The witness claimed not to know how her legal fees were being paid."

[Trial Dkt. No. 385].

Although the two offending sentences did not disclose testimony but only a refusal to answer, the trial judge denied the request for commission [Trial Dkt. No. 385.10] and used this as the first of the three grounds for the Death Penalty Sanction.

The second ground was that Jones's lawyers could not retrieve in satisfactory form, never-used Google Analytics data showing sales ("Analytics Data"), i.e., the same issues presented earlier that resulted in the denial of Jones's anti-SLAPP motion. 336 Conn. at 378, n.35. Given that the "failure" regarding analytics was one of the reasons the trial court there had initially denied Jones's statutory rights to an anti-Slapp motion, the Connecticut Supreme Court had a reason for addressing it earlier and did so demonstrating its sole relevance was to Plaintiffs' CUTPA claim—which would later be dismissed on appeal—explaining Plaintiffs' claimed need involved showing

14

Jones's profit motive relevant to Plaintiffs' CUTPA claim. After the Connecticut Supreme Court returned the case to the trial court, the Plaintiffs again explained that the "critical importance" of this was tied to their now-dismissed CUTPA claim. Dkt. 450, pp. 14-15.

The third ground was because Jones's lawyers could not retrieve accounting "subaccounts" from Jones's accounting journal entries also sought for sales information to determine profits [App. E, 110a] ("Sub-ledger Data"), the trial court concluded Jones had failed to provide "full and fair compliance" with a request for the data, thus "willfully withholding information" that was of "critical importance" to the plaintiffs in pursuing their CUTPA claims. In the Death Penalty Sanction order itself, the trial judge cited this. App. E, 119a. Thus, both the Analytics and Subledger grounds were tied directly to the now-reversed CUTPA claim, as Plaintiffs admitted stating: "These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims." Dkt. 450, pp. 14-15.

Notably, none of the three stated bases for the Death Penalty Sanction has anything to do with defamation or intentional infliction, and that is particularly true as to the Analytics and Subledgers, as this Court has plainly stated a profit motive is irrelevant in libel cases and causes based on First Amendment speech issues. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989).

The effect of this Death Penalty Sanction was for the trial court to judicially decree that everything Plaintiffs' Complaint alleged was true without the need for proof.

15

### G. Trial Court Strikes Jones's Notice Of Constitutional Defenses

After entry of the Death Penalty Sanction, Jones filed a Notice of Defenses specifically stating the Constitutional defenses referenced herein, which would have allowed Jones to offer evidence contradicting any allegation of the Complaint and challenged the right of the Plaintiffs to maintain the action. App. K 189a. *De Blasio v. Aetna Life & Cas. Co.*, 186 Conn. 398, 401, 441 A.2d 838, 839 (1982). The trial court, however, struck this because of the Death Penalty Sanction.

### H. Trial Court Conducts A "Damages-Only" Trial Where Jury Was Told Liability Had Been Established

As a direct result of the Death Penalty Sanction, in the ensuing "damages-only" trial, the trial court made it abundantly clear that "fault" was not at issue. The charge simply lifted quotes from the Plaintiffs' complaint on which the Death Penalty Sanction had been granted and repeatedly instructed the jury that that they were to assume as "facts" that alleged statements were actually statements made by Jones, they were defamatory, they were false, and they were made with legal malice. App. I, 148a, 157a. The trial court even instructed the damages-only jury that the court itself had found Jones's conduct extreme and outrageous, instructing the jury: " . . . you may consider that it is already established that the defendants' conduct was extreme and outrageous." App. I, 163a.

Also because of the Death Penalty Sanction, the "damages-only" jury was repeatedly instructed by the

16

trial court that damages were presumed—their task was only to figure out how much those presumed damages were. App. I, 161a. See also App. I, 159a, 160a, & 165a.

This Court, however, has repeatedly emphasized that it is an absolute constitutional requirement that each alleged defamatory statement be precisely identified in context, focusing particularly on "what was said, where it was said, and how it was said" and that it is "necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder v. Phelps*, 562 U.S. 443, at 453-54 (2011) ("*Snyder*"). This it did not occur given the Death Penalty Sanction.

## I.   Appeals Process

Jones appealed to the Connecticut Court of Appeals which upheld the Death Penalty Sanction, refused to consider the Constitutional issues Jones raised and refused to consider the inappropriate denial of Jones's Notice of Defenses (holding them to have been inadequately briefed and not having been raised, respectively). However, it did determine CUTPA was not a valid claim but did not address what the effect of that finding was on the Death Penalty Sanction that were tied to the CUTPA claims it found invalid.

Jones requested review by the Connecticut Supreme Court [App. H, 128a] which was bound to accept the case for review given it's long-standing policies to review cases involving the denial constitutional rights even if not previously raised. *State v. Golding*, 213 Conn. 233, 239-40, 567 A.2d 823 (1989) and *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Yet breaking its own requirements,

17

however, the Connecticut Supreme Court denied review. App. A, 1a.

## REASONS FOR GRANTING THE PETITION

**A.  While *Sullivan* Is Still The Law And This Case Is Its Identical Twin, The Administrative Default Judgment Discarded It**

In *Sullivan*, this Court stated applicable Constitutional rules that cannot be set aside for any reason in a Freedom of the Press case and certiorari should be granted here because these teachings were ignored. This Court has stated:

> "The First Amendment 'guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker." 376 U.S. at 271.

Labelled preempting "federal rules" that "place limits on the application of the state law. . . ." [*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 15-17 (1990) ("*Milkovich*")] this Court has proclaimed these as unalterable "constitutional rules." *Phila. Newspapers v. Hepps*, 475 U.S. 767, 775-76 (1986) ("*Hepps*"). These Constitutional rules apply to both defamation and IIED claims asserted against media defendants. *Snyder v. Phelps*, 562 U.S. 443 (2011).

The administrative default ignored these constitutional rules. While *Sullivan* is not without its critics, until overruled, it remains the law and state courts are not at

18

liberty to ignore this Court's instructions. That *Sullivan* is controlling here is certain as this case is virtually identical factually to *Sullivan* making the jurisprudence of that case and its progeny fully applicable here. Therefore, a state court administrative default judgment against a media defendant violates the teachings of *Sullivan* and cannot stand.

As stated, this case is a virtual mirror image of *Sullivan*. Here, suit was filed in a small Connecticut community twenty-eight miles from the site of the murders and presided over by a judge elected by that community—just as *Sullivan* was filed in a small Alabama community and presided over by a locally elected judge. In *Sullivan*, the political motivation was racism; here, it was prejudice against a conservative media figure who stood firmly against gun control. Among other errors, in *Sullivan* the trial court instructed the jury that "falsity and malice were presumed," prompting this Court to announce its effective preemption of state law that has been consistently repeated.

Hence the unquestioned teaching of *Sullivan* and its progeny is that particularly in cases where public plaintiffs sue a media defendant for its coverage and opinions on matters of public concern, among the key requirements, the plaintiffs must prove the falsity of claimed defamations, that the media defendant acted with actual malice, and that showing of malice must be made by clear and convincing evidence. Malice by clear and convincing evidence must also be shown for punitive damages. None of that was required here. For this reason, Certiorari should be granted to clearly confirm that state courts may not issue administrative default judgments against media defendants.

19

### B.  This Court Has Issued No Jurisprudential Teaching On State Court Administrative Default Judgments

This Court's jurisprudence has not specifically addressed the intersection between *Sullivan's* constitutional rules and a state court's entry of an administrative liability-decreeing default judgment. Certiorari should be granted to reaffirm the Constitutional rules that this Court has pronounced, or to announce that these Constitutional rules allow an exception for a state court default, stating the specific grounds.

The authority believed to be most relevant from this Court is *Bridges v. California*, 314 U.S. 252 (1941) ("*Bridges*") and it does not support finding such a carve out. In *Bridges*, the petitioners were found in contempt for publishing reports of court proceedings; the court claimed to have the power to punish by contempt publications "if they tend to interfere with the fair and orderly administration of justice in a pending case." *Bridges*, 314 at 259. There Justice Black stated "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." *Id*. at 260. Jones here has been deprived of both.

The then-prevailing view was contempt was justified when a court was faced with a clear and present danger of the obstruction to the "orderly and fair administration of justice." *Id*. at 263. This Court did not fully embrace that view to uphold contempt, noting it did "no more than recognize a minimum compulsion of the Bill of Rights" which contained the "sweeping constitutional mandate against any law 'abridging the freedom of speech or of

006949

20

the press' . . . necessarily [requiring] measuring a power of all American courts, both state and federal, including this one." *Id.* at 260. Analyzing the allegedly contemptuous conduct there, the Court found nothing that "sidetracked the course of justice."

The *Bridges* test is inapplicable, however, as it involved contempt of court, whereas here the Death Penalty Sanction was merely based on alleged discovery abuse. But even if it were the test, the three trivial bases given for denying Jones his twin rights of "free speech and fair trial" cannot conceivably be argued to significantly obstruct the administration of justice. Hence, this Court must make clear that a Death Penalty Sanction of a state trial court for alleged discovery abuse, cannot veto or disregard the constitutional safeguards put in place by this Court.

Furthermore, allowing a trial court to grant a Death Penalty Sanction against a media defendant—thereby accepting as proved and accurate everything a defamation plaintiff has alleged—opens the door to abuse. As demonstrated *infra*, once such a default judgment declares a media defendant liable for every allegation in the complaint, the following become actionable solely because they were pleaded and deemed admitted: (i) opinions otherwise not actionable; (ii) statements alleged to be defamatory that are not in fact defamatory; (iii) causes of action not legally cognizable; (iv) conduct of unrelated third parties; and (v) statements allegedly defamatory but grossly taken out of context. Surely this cannot be this Court's intention.

21

Jones respectfully states that if this Court determines that a trial court can impose a Death Penalty Sanction, then two concomitant things must occur. First, this Court must announce guidelines to guide state and federal courts as they circumnavigate the above-stated constitutional safeguards.

Second, this Court must issue guidance so that simply because a Death Penalty Sanction judicially decrees the validity of a plaintiff's complaint: (i) opinions otherwise not actionable do not become actionable; (ii) nondefamatory statements do not become defamatory; (iii) context of alleged defamatory statements does not become irrelevant; (iv) invalid causes of action do not become valid; and (v) actions of unrelated third parties do not become the responsibility of the media defendant.

## C.  Independent Review Is Mandated Here As In All First Amendment Cases

This Court requires that appellate courts independently review the factual record in cases implicating the First Amendment to ensure constitutional conformity. *Bose*, 466 U.S. at 499. This review assesses whether the requisite constitutional facts have been proved by "clear and convincing evidence." *Rosenbloom v. Metromedia*, 403 U.S. 29, 55 (1971). It also requires the independent judicial review of the speech's context, content, form, and setting. *Snyder*, 562 U.S. at 453-54. No such review has been conducted by any court and it is incumbent on this Court to do so here and now.

Such review is not limited to whether a trial court recited constitutional principles, which did not occur, but

22

requires a conscious determination of the existence or nonexistence of critical facts. *Time, Inc. v. Firestone*, 424 U.S. 448, 463 (1976). That determination must examine the "content, form, and context" of each challenged statement, as revealed by the entire record. *Snyder*, 562 U.S. at 453.

Here, the record is barren of factual determinations on constitutional issues because of the Death Penalty Sanction. [App. K]. Because no fact finder made the determinations the Constitution requires, and because no record exists from which this Court can conduct the de novo review mandated by *Bose* and its progeny, the judgment must be reversed.

The Connecticut Court of Appeals exacerbated the problem by refusing to conduct the required constitutional analysis, dismissing briefing on the issue as "bereft of any substantive legal analysis" and thus deemed abandoned. *Lafferty*, 229 Conn. App. at 510 n.26. Yet this Court holds that appellate courts have a duty to conduct de novo review when constitutional rights are implicated. *Bose*, 466 U.S. at 506 n.24. Independent review is thus not an optional task but a constitutional mandate.

## D. The Complaint Itself Demonstrates There Is No Defamation

As a result of the Death Penalty Sanction, the only "what, where and how" of alleged defamatory statements was in the Complaint. See CR 64. Even in the face of a default, a complaint must still articulate valid claims. And even a cursory review of the Complaint shows the allegations made do not pass Constitutional muster. Moreover, phrases such as "hoax" and "fake as a three-

23

dollar-bill," cited out of context in the Complaint, are plainly hyperbolic opinions about events, lacking any specific "what, where, or how" to explain or support them. They are opinions about events, specific news accounts or news conferences, made in a broader social context. Moreover, it is not even clear what the references to "hoax" in the Complaint pertain to; a press conference? a specific news coverage segment?

The media landscape is rife with groups challenging various events, including Holocaust denial, moon landing skepticism, 9/11 conspiracy theories, and even flat Earth claims. However, such statements critique or dismiss the events themselves, not the character, conduct, or reputation of those associated with them. Referring to an event as a "hoax" targets the nature of the event, not any specific individual. An unnamed Plaintiff cannot have been "defamed" by statements directed at generalized events.

Further fatal, none of the Plaintiffs (with one exception) were identified, named, singled out, or directly referenced in any way. No statement complained of alleged misconduct, dishonesty, or moral failing on the part of any Plaintiff.

Additionally, the Complaint inserts its own summaries of meanings, interspersed with article headlines, surrounding factual anomalies, leaving a reviewing court to have to guess to determine precisely what was the defamatory "statement" and more importantly, why it was defamatory.

In other places, statements are made that convey no possible defamatory meaning. As one example of

24

numerous, in several places, the Complaint purports to quote someone saying that CNN reporter Anderson Cooper was operating behind a greenscreen as his nose would disappear when he would move.



See e.g., Complaint. See e.g., CR 64-102. Was this defamatory? Was it true? The jury was told it was maliciously defamatory without explanation.

In another example, the Complaint at ¶111-17 [CR 76] complains of a 1.27.2013 video as follows (focusing particularly on ¶112):

> 112. Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've

006954

25

been coached, people who have been given cue cards, people who are behaving like actors."

But what the Complaint intentionally omits is what Jones said immediately before this where he said: "**I clearly believe from the evidence children are really killed in Sandy Hook and it's a real tragedy.**" Trial Ex. 1 (video). It was only after Jones stated the deaths were real that he stated things were being "staged."

Hence, plainly stating he believes the tragic murders occurred in the same video he used the term "staged" demonstrates it is contextually impossible to claim the use of the word "staged" (or Jones's equivalent term, "hoax") meant there were no deaths. Rather, those terms criticized media and government scripting, not the reality of the tragedy. No reasonable viewer could interpret Jones's comments as a denial of the murders when viewed in context. Rather the clear focus was on media manipulation and the political exploitation of the tragedy.

In another example, the Complaint turned to Plaintiff Robbie Parker, the only one of two Plaintiffs named and states the following:

113. Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks

26

> like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, breaking down and crying.

[CR 76]. In the video at issue, Robby Parker does in fact approach the microphone laughing, then visibly changes his demeanor to become serious.



This moment, widely circulated and debated online, was interpreted by some commentators, including Jones's guests, as evidence of staging or inauthenticity. The commentary focused on this video clip itself—not on private facts about Parker—illustrating how the challenged speech concerned the public narrative around the event. The Complaint then pleads:

116. As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious. . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

27

117. Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns. . . . Something though, really, is starting to get suspicious here. . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

[CR 76]. What Jones was referring to was Robbie Parker's "staged" performance in a press conference when he referenced Parker actually laughing at the news conference and clutching in his hands what clearly appeared to be "cue cards." It was not suggesting his child had not died.

Moreover, Jones's comments are not defamatory statements of fact, but expressions of constitutionally protected opinion. Yet for these, Robbie Parker was awarded $120,000,000 in compensatory damage consisting of $60M in "Defamation Damages" and another $60M in Emotional Distress Damages [App. J, 173a] to which the trial court appended $50,000,000 in punitive damages for a total award of $170,000,000.

Plaintiff William Aldenberg, an FBI agent who was listed as a "first responder," testified at the "damages-only" trial and made no accusations that Alex Jones ever spoke about him, aired information about him, or directed harassment toward him. When asked, "Did Mr. Jones direct his audience to Mr. Halbig's website (Halbig being a show-guest)?" Aldenberg responded, "To be honest, certain, I just don't recall that. I don't." (Pg. 54: 22–25).

28

In fact, Aldenberg testified he only learned of Jones through his conversations with an FBI counselor. (Pg. 46: 16-17, 20). As to how it affected him, he said:

> "You can say whatever you want about me. I don't care; just say whatever you want. I'm a big boy, I can take it. But they want to make profits; they want to make millions and millions of dollars." (Pg. 50: 13-17, 23-26).

And for this testimony which the trial court instructed the jury was false, defamatory and made with malice, the jury awarded him $45M in "Defamation Damages" and another $45M in Emotional Distress Damages [App. J, 185a] to which the trial court appended another $40,000,000 in punitive damages for a total award of $130,000,000. And Mr. Jones was powerless to refute the any of the allegations given the Death Penalty Sanctions rendered against him.

In another example of the travesty that occurred in not requiring the full context of broadcasts and publications to be scrutinized, Complaint ¶¶ 171- 179 reference a call-in exchange Jones is alleged to have had on December 28, 2014. Of particular relevance are Complaints paragraphs 176 and 177 (emphasis added):

> 176. Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. **I knew they jumped on it, used the crisis, hyped it**

29

**up**. But then I did deep research-and my gosh, it just pretty much didn't happen."

177. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

Notably, in ¶ 176 Jones is quoted as saying " I knew they jumped on it, used the crisis, hyped it up" which obviously means that there was a crisis and it had been made into a media and governmental circus. But ignoring that, ¶ 177 is the summary accusation that "plaintiffs fabricated the deaths of their loved ones." It is not possible for Jones to have spoken of people "using the crisis" if there was no crises—i.e. deaths. And if this in itself is not abundantly clear, Jones broadcast that occurred the day before (i.e., December 27, 2014) removed any doubt that Jones did not say children had not been killed, but the crisis was being propagandized: "I said, they may have killed real kids, but they're practicing how to propagandize and how to control the press and how to put out a product that is a fraud."

In yet another example, Complaint ¶¶ 326-335 detail the June 18, 2017 "profile" of Jones done by Megyn Kelly. The Complaint references Kelly's interview with Neil Heslin, a father of one of the slain children who elected to file suit on virtually identical allegations in Texas. The Complaint quotes Heslin as saying "I lost my son. I buried my son. I held my son with a bullet hole through his head." Complaint ¶326. The Complaint then goes on to reference a June 26, 2017 broadcast by reporter Owen Shroyer, stating in a most deceptive manner, that Shroyer

30

"claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes." Complaint ¶ 327.

What the Complaint does not state and was never presented because of the Death Penalty Sanction, was (a) the entirety of what Helsin said; (b) what Shroyer actually said and why; and (c) what Jones himself said about this. As to Heslin, after his statement above, he said in the Megyn Kelly interview which was designed to attack Jones for sloppy reporting: "I dropped him off at 9:04 . . . at school with his book bag [and] hours later, I was picking him up in a body bag." The problem with Heslin's statements was that Shroyer was simply stating what the coroner said, which was, that did not happen. While the Complaint references video footage Shroyer played, it does not quote the coroner, who actually said: "We did not bring the bodies and families into contact. We took pictures of them, of their facial features. It's easier on the families when you do that." Clearly the coroner's statement that he did not bring the families and bodies into contact, contradicts Heslin's statements. Then Heslin's own petition in Texas continues to quote the coroner as saying "All bodies were removed from the school before dawn Saturday and transported to the medical examiner's base in Farmington—about 40 miles away. The children's autopsies were performed first so that their bodies could be made available to funeral directors 'for obvious reasons.'"

31

Clearly, given the coroner's own statements Shroyer's comments were accurate. At worst, the broadcasts suggested Heslin may have exaggerated for dramatic effect—especially to support a narrative attacking Jones. And amplifying that is what Jones himself said about this on July 20, 2017 when Jones first referenced what the coroner had said and then stated: "**I'm sure later maybe the parents saw their children.** The point is that the media lies so much, you can't blame the public asking questions. . . ." (emphasis added). The entire context shows on its face there is no defamation.

### E. Liability Default Judgments Against Media Defendants Are Constitutionally Impermissible

Plaintiffs concede that Jones is a media defendant. [CR 64-69]. As such, he was entitled to but denied the full protections afforded media defendants under the U.S. Constitution because of the Default Judgment Sanction. But depriving Jones of these protections is not constitutional.

#### 1. Falsity—Death Penalty Default Unconstitutionally Allowed Liability Without The Plaintiffs Having Proved Falsity Of Specific Statements By Clear And Convincing Evidence

This Court's long-standing mandate is that "a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation. . . . We believe that the common law's rule on falsity—that the defendant must bear the burden of proving truth–must similarly fall here to a constitutional requirement that

32

the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Hepps*, 475 U.S. at 775-76. This was not done. The trial court determined these issues by judicial fiat on grounds that had nothing to do with the merits. This Court must make clear that a Death Penalty Sanction cannot replace the requirements that a defamation plaintiff must prove the falsity of specific statements of a media defendant. Factual falsity cannot be judicially decreed.

> **2. Fault—The Death Penalty Sanction Unconstitutionally Allowed Liability Without The Plaintiffs Having Proved Fault**

Another ignored black-letter Constitutional requirement is that liability of a media defendant cannot be entered without a finding of fault and that fault cannot be negligence. *Gertz*, 418 U.S. at 347; *see also Milkovich*, 497 U.S. at 15-16. Rather, fault must be proven to rise to the level of intentional or recklessness, which the Plaintiffs had the burden to prove by clear and convincing evidence as to each and every alleged libelous statement Jones was accused of making. *Berisha v. Lawson*, 141 S. Ct. 2424, 2424 (2021). Here there was no finding of fault, except by Death Penalty Sanction. In the ensuing "damages-only" trial, the trial court repeatedly instructed the jury that fault was not at issue. See App. I, 148a; see also [App. I, 157a, 158a, 163a). In fact, as a result of the Death Penalty Sanction, the trial court even instructed the jury that it had found Jones's conduct extreme and outrageous, instructing the jury: " . . . you may consider that it is already established that the defendants' conduct was extreme and outrageous." App. I, 164a.

33

And topping off the improprieties in the subsequent "damages-only" trial, Jones's testimony was deeply restricted—an issue the Court of Appeals refused to consider. *Lafferty*, 229 Conn. App. at 491. This Court must make clear that a Death Penalty Sanction cannot replace the requirements that a defamation plaintiff must prove a media defendant's malice by clear and convincing evidence as was done here. Subjective malice cannot be simply judicially decreed.

### 3. The Death Penalty Sanction Unconstitutionally Allowed IIED Claims To Be Submitted On The Wrong Standard.

Another constitutional error predicated on the Death Penalty Sanction involves the emotional distress damages which total $561,000,400. App. H, 133a. In *Hustler Magazine v. Falwell*, 485 U.S. 46, 56-57 (1988), this Court clearly stated that the "actual malice by clear and convincing evidence" standards articulated in *New York Times Co. v. Sullivan* applies to claims of intentional infliction of emotional distress. This has been repeatedly reaffirmed. *Snyder*, 562 U.S. at 451. Yet the trial court's jury charge, because of the Death Penalty Sanction, used a negligence standard: "The defendants intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of their conduct." App. I, 157a. The standard of "knew or should have known" is the legal standard of negligence.

34

### 4. Death Penalty Sanction Unconstitutionally Decreed Liability For Jones For Acts Of Third Parties

The jury charge, informed the jury that "[D]efendants proximately caused harm to the plaintiffs by . . . urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly [behind] the Sandy Hook hoax." App. I, 160a. The actual charge itself goes on to state that this "result[ed] in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard the evidence in this case." App. I, 160a. Further, the Complaint is replete with acts of third parties in allegedly stalking some of the Plaintiffs, with no evidentiary tie to Jones. CR 65, ¶ 14; CR 65, ¶15 ("They have confronted strange individuals videotaping them and their children."); CR 65, ¶16; CR 69, ¶55 ("In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.) With no allegation and certainly no evidence, all of these acts were simply laid at the feet of Alex Jones and the jury was told Mr. Jones was maliciously responsible for these acts.

This is blatantly unconstitutional. Justice Sotomayor in her recent concurrence in *Mckesson v. Doe*, 144 S. Ct. 913, 914 (2024) summarized the law forbidding liability for "incitement" of third parties to act (*citing NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). In *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, (1982), cited in *McKesson*, the Supreme Court went so far as to acknowledge that even advocacy of the use of force or violence is protected by the First Amendment when acts of violence are alleged to have been encouraged and

35

committed. *See also*, *Counterman*, 600 U.S. at 76, ("That rule helps prevent a law from deterring 'mere advocacy' of illegal acts—a kind of speech falling within the First Amendment's core."). Here, telling viewers to "investigate" for themselves, even if true, is purely protected by the Constitution which was ignored. The case of *NAACP v. Claiborne Hardware Co.*, dealt with civil rights activist Medgar Evers, whose urgings to his listeners to employ violence was not actionable even though vastly more inflammatory than Jones's encouragement of his listeners to simply investigate for themselves, this Court stating, "An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech." Here, by virtue of the Death Penalty Sanction, Jones was decreed liable for everything any Plaintiff complained happened to them by strangers—a preposterous proposition by itself and certainly unconstitutional in its effect.

**5.    Death Penalty Sanction Unconstitutionally Allowed Profit Motive To Factor In When It Is Irrelevant In Media Libel**

A media defendant's profit motive is constitutionally irrelevant in a media libel case. *Harte-Hanks*, 491 U.S. at 667.

> "If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."

36

Notwithstanding this, two of the three grounds for the "death penalty" sanctions were tied to Jones's alleged profit motive. Also, in the "damages-only" trial, particularly in the Plaintiffs' closing argument, Jones's "profit motive" was repeatedly emphasized. And this argument was allowed because the Complaint on which the Death Penalty Sanction had been granted, pleaded Jones's profit motive. This Court must make clear that administrative default judgments cannot allow a defamation plaintiff to argue the "profit motive" of a media defendant, as was done here.

## F. Punitive Damages Cannot Be Based On A Death Penalty Sanction

Even if Plaintiffs were not public figures, an award of punitive damages required plaintiffs themselves to prove malice and do so by clear and convincing evidence. *Herbert v. Lando*, 441 U.S. 153 (1979); *Gertz*, 418 U.S. at 349. Here the administrative Death Penalty Sanction removed this burden and punitive damages in the hundreds of millions were awarded without this showing. This Court must make clear that administrative default judgments cannot allow a defamation plaintiff to receive punitive damages.

## G. If A Death Penalty Sanction Is Permitted, The Punishment Must Fit The Crime

The Death Penalty Sanction was based on three trivial matters, none of which related to the integrity of the trial court. Furthermore, Jones appeared in the case, substantially complied with discovery, engaged in motion practice, attended endless "status" conferences, sat for dozens of depositions and provided tens of thousands of pages of documents to the Plaintiffs. Imposing a financial

37

life-ending Death Penalty Sanction was a denial of constitutional Due Process.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Dated: September 5, 2025

Respectfully submitted,

BEN C. BROOCKS
  *Counsel of Record*
BROOCKS LAW FIRM, PLLC
248 Addie Roy Rd., Suite B301
Austin, TX 78746
(512) 201-2000
bbroocks@broockslawfirm.com

SHELBY A. JORDAN
JORDAN & ORTIZ, P.C.
500 North Shoreline,
  Suite 804
Corpus Christi, TX 78401

*Counsel for Petitioners*

ALAN B. DAUGHTRY
ALAN DAUGHTRY LAW FIRM
3355 West Alabama, Suite 444
Houston, TX 77098

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE:  ALEXANDER E. JONES        §
                                  §    CASE NO. 22-33553 (CML)
                                  §
         Debtor.                  §    Chapter 7

**ORDER GRANTING MOTION FOR RECONSIDERATION AND REHEARING OF
THIS COURT'S ORDER CONFIRMING THAT FSS ASSETS ARE NOT PROPERTY
OF THE ESTATE OF ALEXANDER E. JONES AND
NOT SUBJECT TO THE AUTOMATIC STAY
[Dkt. No. 1251]
AND RENEWED REQUEST FOR THE PENDING RELIEF OF A PRIVATE
SALE OF THE FSS ASSETS FOR CASH
[Dkt. No. 1131, 1248[1]]**

Upon consideration of the Motion for Reconsideration and Rehearing of This Court's Order

Confirming That FSS Assets are not Property of the Estate of Alexander E. Jones and Not Subject

to the Automatic Stay [Dkt. No. 1251] and Renewed Request for the Pending Relief of a Private

Sale of the FSS Assets for Cash [Dkt. No. 1131, 1248] (the "Motion") the record of this case, and

the proceedings before the Court related to the Motion, if any, the Court finds that: (i) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding

pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and

1409; (iv) the Motion is in full compliance with all applicable provisions of the Bankruptcy Code,

Bankruptcy Rules, Local Bankruptcy Rules of the Southern District of Texas, and orders and

procedures of this Court; (v) there was proper and adequate notice of the Motion and no other or further

notice is necessary under the circumstances; (vi) the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and (vii) the relief sought in the Motion is in the best

---

[1]    *See*, p. 51, p. 25 of Dkt. No. 1248.

006968

interest of the Debtor, the Estate, and its creditors; and (viii) that the relief requested in Motion should

be granted.

It is **ORDERED** that:

1. Motion for Reconsideration and Rehearing of This Court's Order Confirming That FSS Assets are not Property of the Estate of Alexander E. Jones and Not Subject to the Automatic Stay [Dkt. No. 1251] and Renewed Request for the Pending Relief of a Private Sale of the FSS Assets for Cash [Dkt. No. 1131, 1248] is GRANTED.

Signed: _____

_____
Christopher Lopez
United States Bankruptcy Judge

006969

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____ )
                                         )
                                         )
In re:                                   )    Chapter 7
                                         )
ALEXANDER E. JONES,                      )    Case No. 22-33553
                                         )
         Debtor.                         )    Judge Christopher M. Lopez
_____ )

**JOINT OBJECTION OF
THE SANDY HOOK FAMILIES TO ALEXANDER E. JONES'S
MOTION FOR RECONSIDERATION AND REHEARING OF THIS
COURT'S ORDER CONFIRMING THAT FSS ASSETS ARE NOT PROPERTY
OF THE ESTATE OF ALEXANDER E. JONES AND NOT SUBJECT TO THE
AUTOMATIC STAY [Dkt. No. 1251] AND RENEWED REQUEST FOR THE PENDING
RELIEF OF A PRIVATE SALE OF THE FSS ASSETS FOR CASH [Dkt. No. 1131, 1248]**

The Connecticut Families[1] and the Texas Families[2] (together the "Sandy Hook Families"),

as creditors and parties in interest in the above-captioned case, file this opposition in response to

the *Motion for Reconsideration and Rehearing of This Court's Order Confirming That FSS Assets

Are Not Property of the Estate of Alexander E. Jones and Not Subject to the Automatic Stay

[Dkt. No. 1251] and Renewed Request for the Pending Relief of a Private Sale of the FSS Assets

for Cash [Dkt. No. 1131, 1248]* [Docket No. 1259] (the "Motion"), filed by Alexander E. Jones

("Jones").

---

[1] The "Connecticut Families" are Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash.
[2] The "Texas Families" are Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine.

006970

The Sandy Hook Families oppose the relief requested by Jones for the reasons set forth in their prior pleadings[3] and for the reasons articulated by the Court on at least four occasions. As with prior pleadings, the Sandy Hook Families will not respond to the factual mischaracterizations made in the Motion as they are not relevant to the Court's determination on the merits. Needless to say, the Sandy Hook Families disagree with Jones's misrepresentations of the facts in the Motion.

A motion for reconsideration[4] "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet* v. *HydroChem Inc*., 367 F.3d 473, 479 (5th Cir. 2004) (internal citations omitted). Yet, that is all Jones offers through his Motion. The Fifth Circuit has warned that altering, amending, or reconsidering a judgment under FRCP 59(e) is "an extraordinary remedy" that "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* Jones fails to identify any intervening change in controlling law, any

---

[3] *See Joint Objection of the Sandy Hook Families to Alexander E. Jones's Motion for Reconsideration of This Court's Determination That No Auction of Free Speech Systems' Assets Will Be Conducted By the Jones Chapter 7 Estate* [Docket No. 1150]; *The Sandy Hook Families' Emergency Joint Motion For Entry of an Order Confirming That FSS Assets Are Not Subject to the Automatic Stay* [Docket No. 1241].

[4] The Federal Rules of Civil Procedure (the "FRCP") do not specifically provide authority for a motion for reconsideration. *See Hamilton* v. *Williams*, 147 F.3d 367, 371 n.10 (5th Cir. 1998). However, reconsideration may be sought as a motion to alter or amend judgment under FRCP 59(e) or for relief from judgment or order under FRCP 60(b). *See Osterneck* v. *Ernst & Whinney*, 489 U.S. 169, 174 (1989). Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") incorporates FRCP 59, and Bankruptcy Rule 9024 incorporates FRCP 60. *Id.* Jones elected to proceed under both FRCP Rules 59(e) and 60. (Motion, ¶¶ 44-47). Under FRCP 59(e), "[a] motion to alter or amend the judgment under [FRCP] 59(e) 'must clearly establish either a manifest error of law or fact or must present newly discovered evidence' and 'cannot be used to raise arguments which could, and should, have been made before the judgment issued.'" *Rosenzweig* v. *Azurix Corp*., 332 F.3d 854, 863–64 (5th Cir. 2003) (quoting *Simon* v. *United State*s, 891 F.2d 1154, 1159 (5th Cir. 1990)). Under FRCP 60(b), a party may seek relief from a final judgment where, among other reasons, there was: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that could not have been discovered in time to file a motion under Rule 59; or (3) fraud, misrepresentation, or misconduct by the opposing party. FRCP 60(b)(6) allows for relief for "any other reason that justifies relief" and is "a catch-all provision, meant to encompass circumstances not covered by Rule 60(b)'s other enumerated provisions." *Hess* v. *Cockrell*, 281 F.3d 212, 216 (5th Cir. 2002). The movant must show extraordinary circumstances for relief to be granted under Rule 60(b)(6). *Id.*

clear error in the ruling, or manifest injustice caused thereby.  Further, Jones does not come close to identifying extraordinary circumstances that warrant review under FRCP 60(b)(6).

Rather, Jones again seeks relief that this Court has denied multiple times, including at the most recent hearing held by this Court on October 1, 2025 and the subsequent order entered by the Court confirming that the assets of Free Speech Systems, LLC ("FSS") are not part of Jones's chapter 7 estate and not subject to the automatic stay.[5]  At that hearing, the Court explained that "[Jones] can't be surprised that I've said that an asset against a dismissed debtor is not property of the estate. . . . I've also said that parties would be entitled to their collection remedies. I know I've said that on several occasions."  Oct. 1, 2025 Hr'g Tr. 34:25–35:10.  Since early February 2025, the Court has explicitly told the parties that they "can consider any use of the supplemental order null and void, because the purpose for which it served was the auction of the assets, and we're not doing that anymore."  *See* Feb. 5, 2025 Hr'g Tr. 14:14–15; *see id.* 12:23–13:5 (explaining that the Court did not enter an allowed claim against FSS after dismissal of the case because "I can't do that. I cannot do that. I don't have authority to do it. And I'm not going to use the supplemental order, which was used for one purpose and one purpose alone, and that purpose is now gone. . . . I'm not allowing a sale of the assets anymore.").  The Court denied subsequent efforts to sell the assets of FSS through this case. *See Order Denying FUAC's Motion Seeking Leave to File a Motion Approving the Sale of FSS Assets and Request for Status Conference* [Docket No. 1121] ("This Court said at a hearing on February 6, 2025 that it would not allow a sale of FSS assets, and that parties should consider the Court's supplemental order null and void for the reasons stated at the hearing. Nothing has changed.").

---

[5] *Order Confirming That FSS Assets Are Not Subject to the Automatic Stay* [Docket No. 1251] (the "Order").

Once again, nothing has changed.  On October 1, 2025, the Court confirmed that FSS's assets are "not property of the estate, and it's not subject to the automatic stay. It's just not, and this is a non-debtor asset."  Oct. 1, 2025 Hr'g Tr. 23:12–14; *see also* Order at 2 ("The automatic stay does not apply to FSS or any of FSS's assets because these assets are not property of the Jones bankruptcy estate under Section 541 of the Bankruptcy Code.").  With respect to the Supplemental Order,[6] the Court reiterated that it "can deem something to be treated as property of the estate, so Mr. Murray has the authority to go exercise it and try to go sell it.  But what I said in the last hearing was I'm not authorizing any sales anymore.  So the effect of this order was to void it because I'm not approving any sales."  Oct. 1, 2025 Hr'g Tr. 10:20–25.  The Supplemental Order served one purpose—facilitating a sale the Court has since disallowed.  As the Court has repeatedly explained, the purpose of the Supplemental Order is moot and the parties can no longer rely on the Supplemental Order to seek any relief, including a sale of FSS's assets.

Jones's claims that the Court has taken a new stance regarding the Supplemental Order ring hollow in light of the record dating back to at least February of this year.  In addition, Jones fails to identify any legal arguments warranting reversal of the Court's decision on the merits.  His arguments revolve around the application of *Segal v. Rochelle*, 382 U.S. 375, 380, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966).  Jones already raised *Segal* at the October 1, 2025 hearing prior to entry of the Order and the Court rejected his arguments.  Oct. 1, 2025 Hr'g Tr. 24:24–25:3.  Jones also had an opportunity to raise these arguments in opposition to the Sandy Hook Families' *Emergency Joint Motion for Entry of an Order Confirming that FSS Assets Are Not Subject to the Automatic*

---

[6] "Supplemental Order" means the *Order Supplementing Order Dismissing Case*, Case No. 22-60043 [Docket No. 1021].

*Stay* [Docket No. 1241]. He failed to do so and should not be allowed to get a second bite at the apple through a motion for reconsideration.[7]

Given the repeated presentation of arguments the Court has already rejected and Jones's failure to raise any extraordinary circumstances or case law warranting reconsideration, the Sandy Hook Families respectfully request that the Court deny the Motion with prejudice.[8]

[*Signature Page Follows*]

---

[7] In any event, Jones's reliance on *Segal* is misplaced. *Segal* addresses whether certain post-petition entitlements flowing from claims "sufficiently rooted in the pre-bankruptcy past" should be regarded as property which forms part of a bankruptcy estate; it does not transform a non-debtor's assets into property of a debtor's estate under section 541 of the Bankruptcy Code, nor does it extend the automatic stay to non-debtor property.

[8] A denial of reconsideration necessarily forecloses any further request premised on treating FSS's assets as property of the Jones estate —including Jones's renewed request to sell FSS's assets pursuant to this Court's authority.

006974

Dated: October 29, 2025

/s/ Jennifer J. Hardy

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone: (713) 510-1766
Fax: (713) 510-1799
E-mail: jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi (admitted *pro hac vice*)
Deanna Drenga (admitted *pro hac vice*)
787 Seventh Avenue New York, NY 10019
Telephone: (212) 728-8000
Fax: (212) 728-8111
E-mail: slombardi@willkie.com
ddrenga@willkie.com

**LAWSON & MOSHENBERG PLLC**
Avi Moshenberg
State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone: (713) 449-9644
E-mail:
avi.moshenberg@lmbusinesslaw.com

**BRADLEY ARANT BOULT CUMMINGS LLP**
Jarrod B. Martin
State Bar No. 24070221
600 Travis Street, Suite 5600
Houston, TX 77002
Telephone: (713) 576-0388
Fax: (713) 576-0301
E-mail: jbmartin@bradley.com

*Co-Counsel to the Texas Families*

/s/ Ryan E. Chapple

**CAIN & SKARNULIS PLLC**
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011
E-mail: rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail: asterling@koskoff.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Paul Paterson (admitted *pro hac vice*)
Daniel S. Sinnreich (admitted *pro hac vice*)
Vida J. Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: kkimpler@paulweiss.com
ppaterson@paulweiss.com
dsinnreich@paulweiss.com
virobinson@paulweiss.com

*Co-Counsel to the Connecticut Families*

006975

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing objection has been served on counsel for the Debtor, the Debtor, and all parties receiving or entitled to notice through CM/ECF on this 29th day of October, 2025.

/s/ Ryan E. Chapple
Ryan E. Chapple

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
November 04, 2025
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE:  ALEXANDER E. JONES | § | |
| | § | **CASE NO. 22-33553 (CML)** |
| | § | |
| Debtor. | § | **Chapter 7** |

**ORDER DENYING MOTION FOR RECONSIDERATION AND REHEARING OF THIS COURT'S ORDER CONFIRMING THAT FSS ASSETS ARE NOT PROPERTY OF THE ESTATE OF ALEXANDER E. JONES AND NOT SUBJECT TO THE AUTOMATIC STAY
[Dkt. No. 1251]
AND RENEWED REQUEST FOR THE PENDING RELIEF OF A PRIVATE SALE OF THE FSS ASSETS FOR CASH
[Dkt. No. 1131, 1248[1]]**

Upon consideration of the Motion for Reconsideration and Rehearing of This Court's Order Confirming That FSS Assets are not Property of the Estate of Alexander E. Jones and Not Subject to the Automatic Stay [Dkt. No. 1251] and Renewed Request for the Pending Relief of a Private Sale of the FSS Assets for Cash [Dkt. No. 1131, 1248] (the "Motion") the record of this case, and the proceedings before the Court related to the Motion, if any, the Court finds that: (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Motion is in full compliance with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules of the Southern District of Texas, and orders and procedures of this Court; (v) there was proper and adequate notice of the Motion and no other or further notice is necessary under the circumstances; (vi) the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and (vii) the relief sought in the Motion is in the best

---

[1]     *See*, p. 51, p. 25 of Dkt. No. 1248.

006977

interest of the Debtor, the Estate, and its creditors; and (viii) that the relief requested in Motion should be denied.

It is **ORDERED** that:

The   Motion for Reconsideration and Rehearing of This Court's Order Confirming That FSS Assets are not Property of the Estate of Alexander E. Jones and Not Subject to the Automatic Stay [Dkt. No. 1251] and Renewed Request for the Pending Relief of a Private Sale of the FSS Assets for Cash [Dkt. No. 1131, 1248] is DENIED.

Jones provides nothing satisfying any prong of Rules 59 or 60(b). There are no facts or case law overlooked by this Court in ruling. There is no newly discovered evidence. There is no substantive mistake in law or fact that this Court made in rendering its decision. There is no extraordinary circumstance present or manifest injustice.

**Signed:** November 04, 2025

_____
Christopher Lopez
United States Bankruptcy Judge

006978

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
|  | § |  |
| **IN RE:  ALEXANDER E. JONES** | § | **CASE NO. 22-33553 (CML)** |
|  | § |  |
| **Debtor** | § | **Chapter 7** |

**NOTICE OF APPEAL**

Alexander E. Jones for himself and his wholly owned company, Free Speech Systems, LLC (the "Appellant") file this Notice of Appeal hereby appealing to the United States District Court for the Southern District of Texas the Bankruptcy Court's Order signed on November 4, 2025 [Dkt No. 1271] (the "Subject Order").

**Name of Appellants:**        Alexander E. Jones. ("Jones")
                                            Free Speech Systems, LLC  ("FSS")

**Position in Case:**  Movants in Motion [Dkt. No.1259] and Jones as Chapter 7 Debtor

**Order Appealed from and Date:** Order Denying Motion for Reconsideration and Rehearing of This Court's Order Confirming That FSS Assets Are Not Property of the Estate of Alexander E. Jones and Not Subject to the Automatic Stay [Dkt. No. 1251] and Renewed Request for the Pending Relief of a Private Sale of the FSS Assets for Cash [Dkt. No. 1131, 1248], a copy of which is attached as **Exhibit A**, entered November 4, 2025 [Dkt. No. 1271].

The parties to the appeal, and their counsel are as follows:

**Appellants:**  Jones and FSS

**Counsel:**      SHELBY A. JORDAN
                      State Bar No. 11016700
                      S.D. No. 2195
                      ANTONIO ORTIZ
                      State Bar No. 24074839
                      S.D. No. 1127322
                      Jordan & Ortiz, P.C.
                      500 North Shoreline Blvd., Suite 804

Page 1 of 5

006979

Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
           aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com

**Appelle**es:    The Texas Plaintiffs and the Connecticut Plaintiffs (the "Sandy Hook Plaintiffs")

**Position in Case**:    Creditors

**Counsel to Texas Plaintiffs**:

Jennifer J. Hardy
State Bar No. 24096068
WILLKIE FARR & GALLAGHER LLP
600 Travis Street
Houston, TX 77002
Telephone: (713) 510-1766
Fax: (713) 510-1799
E-mail: jhardy2@willkie.com
Co-Counsel to the Texas Plaintiffs

WILLKIE FARR & GALLAGHER LLP
Stuart R. Lombardi (admitted pro hac vice)
Deanna Drenga (admitted pro hac vice)
787 Seventh Avenue New York, NY 10019
Telephone: (212) 728-8000
Fax: (212) 728-8111
E-mail: slombardi@willkie.com
ddrenga@willkie.com

Page 2 of 5

Co-Counsel to the Texas Plaintiffs

LAWSON & MOSHENBERG PLLC
Avi Moshenberg
State Bar No. 24083532
801 Travis Street, Suite 2101, #838
Houston, TX 77002
Telephone: (713) 449-9644
E-mail: avi.moshenberg@lmbusinesslaw.com
Co-Counsel to the Texas Plaintiffs

BRADLEY ARANT BOULT CUMMINGS LLP
Jarrod B. Martin
State Bar No. 24070221
600 Travis Street, Suite 5600
Houston, TX 77002
Telephone: (713) 576-0388
Fax: (713) 576-0301
E-mail: jbmartin@bradley.com
Co-Counsel to the Texas Plaintiffs

**Counsel to Connecticut Plaintiffs**:

CAIN & SKARNULIS PLLC
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011
E-mail: rchapple@cstrial.com
Co-Counsel to the Connecticut Plaintiffs

KOSKOFF KOSKOFF & BIEDER, PC
Alinor C. Sterling (admitted pro hac vice)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail: asterling@koskoff.com
Co-Counsel to the Connecticut Plaintiffs

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Kyle J. Kimpler (admitted pro hac vice)
Paul Paterson (admitted pro hac vice)
Daniel S. Sinnreich (admitted pro hac vice)

Page 3 of 5

006981

Vida J. Robinson (admitted pro hac vice)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: kkimpler@paulweiss.com
ppaterson@paulweiss.com
dsinnreich@paulweiss.com
virobinson@paulweiss.com
Co-Counsel to the Connecticut Plaintiffs

Dated: November 17, 2025

Respectfully Submitted,

*/s/ Shelby A. Jordan*
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and
FREE SPEECH SYSTEMS, LLC**

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES And
FREE SPEECH SYSTEMS, LLC**

Page 4 of 5

006982

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on November 17, 2025.

*/s/ Shelby A. Jordan*
Shelby A. Jordan

006983

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
November 04, 2025
Nathan Ochsner, Clerk

Exhibit

A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: ALEXANDER E. JONES | § | |
| | § | CASE NO. 22-33553 (CML) |
| | § | |
| Debtor. | § | Chapter 7 |

**ORDER DENYING MOTION FOR RECONSIDERATION AND REHEARING OF THIS COURT'S ORDER CONFIRMING THAT FSS ASSETS ARE NOT PROPERTY OF THE ESTATE OF ALEXANDER E. JONES AND NOT SUBJECT TO THE AUTOMATIC STAY [Dkt. No. 1251] AND RENEWED REQUEST FOR THE PENDING RELIEF OF A PRIVATE SALE OF THE FSS ASSETS FOR CASH [Dkt. No. 1131, 1248[1]]**

Upon consideration of the Motion for Reconsideration and Rehearing of This Court's Order Confirming That FSS Assets are not Property of the Estate of Alexander E. Jones and Not Subject to the Automatic Stay [Dkt. No. 1251] and Renewed Request for the Pending Relief of a Private Sale of the FSS Assets for Cash [Dkt. No. 1131, 1248] (the "Motion") the record of this case, and the proceedings before the Court related to the Motion, if any, the Court finds that: (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Motion is in full compliance with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules of the Southern District of Texas, and orders and procedures of this Court; (v) there was proper and adequate notice of the Motion and no other or further notice is necessary under the circumstances; (vi) the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and (vii) the relief sought in the Motion is in the best

---

[1] *See*, p. 51, p. 25 of Dkt. No. 1248.

006984

interest of the Debtor, the Estate, and its creditors; and (viii) that the relief requested in Motion should be denied.

It is **ORDERED** that:

The   Motion for Reconsideration and Rehearing of This Court's Order Confirming That FSS Assets are not Property of the Estate of Alexander E. Jones and Not Subject to the Automatic Stay [Dkt. No. 1251] and Renewed Request for the Pending Relief of a Private Sale of the FSS Assets for Cash [Dkt. No. 1131, 1248] is DENIED.

Jones provides nothing satisfying any prong of Rules 59 or 60(b). There are no facts or case law overlooked by this Court in ruling. There is no newly discovered evidence. There is no substantive mistake in law or fact that this Court made in rendering its decision. There is no extraordinary circumstance present or manifest injustice.

Signed: November 04, 2025

Christopher Lopez
United States Bankruptcy Judge

Page 2 of 2