**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Civil Action No. 4:21-cv-02473<br><br>CLASS ACTION |

**DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS


Statement of Nature and Stage of Proceedings ....... 1

Statement of the Issues ....... 1

Introduction and Summary of the Argument ....... 1

Background ....... 4

- I. In 2017, Concho shifts its focus to large-scale development as the next "inflection point" in the E&P industry ....... 4
- II. In 2018, Concho progresses its large-scale developments to continue testing optimal well-spacing and project size. ....... 5
- III. The Dominator project was the "most aggressive" of these spacing tests, designed to push the limits of concentrated development and reveal any inefficiencies. ....... 7
- IV. Concho continues advancing large-scale development in 2019, but the Dominator spacing test reveals inefficiencies, and Concho revises its outlook going forward. ....... 8
- V. This 10b-5 suit predictably follows. ....... 9

Standard of Review ....... 9

- I. General pleading and dismissal standards. ....... 9
- II. Standards under the Exchange Act and the PSLRA. ....... 10

Argument and Authorities ....... 12

- I. The CC fails to plead an actionably false or misleading statement. ....... 12
  - A. The CC fails to plead falsity as to any factual statement with particularity. ....... 12
  - B. The CC's concealed-risk theory ignores Concho's disclosures and amounts to a duty-to-predict-failure allegation that courts unanimously reject. ....... 16
  - C. Many Challenged Statements are forward-looking statements protected by the PSLRA's safe harbor ....... 18
  - D. The remaining Challenged Statements are non-actionable opinions. ....... 19

1. The CC fails to satisfy *Omnicare*'s subjective-disbelief prong. ....20

2. The CC fails to satisfy *Omnicare*'s embedded-facts prong. ....21

3. The CC fails to satisfy *Omnicare*'s omission prong. ....21

E. Schroer and Wright are unconnected to nearly every Challenged Statement. ....23

II. The CC fails to establish the requisite strong inference of scienter. ....24

A. Motive and opportunity are wholly lacking. ....24

B. The CC's circumstantial scienter allegations are similarly deficient. ....25

1. The CC and its FE accounts do not raise a strong inference of scienter. ....26

i. Confidential-witness allegations must be heavily discounted and require a threshold level of personal knowledge. ....26

ii. The FEs add nothing to an inference of scienter. ....27

2. The CC resorts to a handful of boilerplate scienter allegations. ....30

C. The non-culpable inferences plainly outweigh the culpable ones. ....32

III. The Section 20(a) claims necessarily fail without a cognizable primary claim. ....34

Conclusion ....34

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
291 F.3d 336 (5th Cir. 2002) ....................11

*Abrams v. Baker Hughes*,
292 F.3d 424 (5th Cir. 2002) ....................25, 31

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
915 F.3d 975 (5th Cir. 2019) ....................24

*Alaska Electrical Pension Fund v. Asar*,
268 F. App'x 175 (5th Cir. 2019) ....................31

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ....................33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................10

*Callinan v. Lexicon Pharms., Inc.*,
858 F. App'x 162 (5th Cir. 2021) (per curiam) ....................24

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ....................18, 19

*City of Bristol Pension Fund v. Vertex Pharm. Inc.*,
12 F. Supp. 3d 225 (D. Mass. 2014) ....................16

*City of Miami Fire Fighters' v. CVS Health Corp.*,
519 F. Supp. 3d 80 (D.R.I. 2021) ....................23

*Coates v. Heartland Wireless Commc'ns, Inc.*,
100 F. Supp. 2d 417 (N.D. Tex. 2000) ....................25

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
504 F. Supp. 2d 151 (N.D. Tex. 2007) ....................33

*Cozzarelli v. Inspire Pharm. Inc.*,
549 F.3d 618 (4th Cir. 2008) ....................33

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
2022 WL 112029 (S.D. Tex. Jan. 12, 2022)....................28, 29, 32

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)....................10

*Fin. Acquisition Partners, LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ....................2

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
147 F. Supp. 3d 493 (E.D. La. 2015), *aff'd*, 854 F.3d 741 (5th Cir. 2017) ................18, 22, 29

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd*, 779 F. App'x 69 (2d Cir. 2019)....................22

*Gissin v. Endres*,
739 F. Supp. 2d 488 (S.D.N.Y. 2010)....................18

*Goldstein v. MCI Worldcom*,
340 F.3d 238 (5th Cir. 2003) ....................31

*Grupo Verzatec S.A. de C.V. v. RFE Inv. Partners*,
2019 WL 1437617 (S.D.N.Y. Mar. 29, 2019) ....................23

*Heck v. Orion Grp.*,
468 F. Supp. 3d 828 (S.D. Tex. 2020) ....................32

*Hershey v. Energy Transfer Partners, L.P.*,
610 F.3d 239 (5th Cir. 2010) ....................10

*In re Anadarko Petroleum Corp. Class Action Litig.*,
957 F. Supp. 2d 806 (S.D. Tex. 2013) ....................13

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. Aug. 18, 2020),
*appeal docketed*, No. 21-02698 (2d Cir. Oct. 27, 2021)....................34

*In re Baker Hughes Sec. Litig.*,
136 F. Supp. 2d 630 (S.D. Tex. 2001) ....................33

*In re BP p.l.c. Sec. Litig.*,
2016 WL 3090779 (S.D. Tex. May 31, 2016)....................20

*In re Browning-Ferris Indus. Inc. Sec. Litig.*,
876 F. Supp. 870 (S.D. Tex. 1995) ....................15

*In re Craftmatic Sec. Litig.*,
890 F.2d 628 (3d Cir. 1990)....................17

*In re DXC Tech. Co. Sec. Litig.*,
2020 WL 3456129 (E.D. Va. June 6, 2020) ....................17

*In re Enron Corp. Sec. Deriv. & "ERISA" Litig.*,
238 F. Supp. 3d 799 (S.D. Tex. 2017) ....................16

*In re EveryWare Glob., Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd*, 849 F.3d 325 (6th Cir. 2017)....................23

*In re Gen. Elec. Sec. Litig.*,
2020 WL 2306434 (S.D.N.Y. May 7, 2020),
*aff'd*, 844 F. App'x 385 (2d Cir. 2021)....................23

*In re Guess?, Inc. Sec. Litig.*,
174 F. Supp. 2d 1067 (C.D. Cal. 2001) ....................34

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
2017 WL 1536223 (D.N.J. Apr. 27, 2017), *aff'd*, 905 F.3d 106 (3d Cir. 2018)....................14

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
2014 WL 585658 (S.D.N.Y. Feb 14, 2014)....................34

*In re Key Energy Servs., Inc. Sec. Litig.*,
166 F. Supp. 3d 822 (S.D. Tex. 2016) ....................26, 28

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
245 F. Supp. 3d 870 (S.D. Tex. 2017), *aff'd*, 777 F. App'x 726 (5th Cir. 2019) ....................22, 31

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
307 F. Supp. 3d 583 (S.D. Tex. 2018), *aff'd*, 777 F. App'x 726 (5th Cir. 2019) ....................21

*In re Proshares Tr. Sec. Litig.*,
728 F.3d 96 (2d Cir. 2013)....................19

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ....................13

*Indiana Elec. Workers Tr. Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) ....................10, 11, 24, 25, 26, 31, 35

*Iron Workers Benefit & Pension Fund—Iron Workers Dist. Council Phila. & Vicinity v. Anadarko Petroleum Corp.*,
788 F. App'x 268 (5th Cir. 2019) (per curiam) ....................24

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
237 F. Supp. 3d 492 (S.D. Tex. 2017) ....................26

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)....................25

*Kane v. Madge Networks*,
2000 WL 33208116 (N.D. Cal. 2000) ....................................................................17

*Knurr v. Orbital ATK Inc.*,
276 F. Supp. 3d 527 (E.D. Va. 2017) ....................................................................21

*Kong v. Fluidigm Corp.*,
2021 WL 3409258 (N.D. Cal. Aug. 4, 2021) ..........................................................27

*Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*,
2015 WL 1143081 (S.D. Tex. Mar. 13, 2015)..................................................14, 33

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC, Inc.*,
537 F.3d 35 (1st Cir. 2008)......................................................................................16

*Neiman v. Bulmahn*,
854 F.3d 741 (5th Cir. 2017) ...............................................................................11, 27

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).................................................................................19, 20, 21

*Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharm., Inc.*,
2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ........................................................12

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ....................................................................................27

*Pearlstein v. BlackBerry Ltd.*,
93 F. Supp. 3d 233 (S.D.N.Y. 2015), *aff'd*, 660 F. App'x 23 (2d Cir. 2016)..........................25

*Plaisance v. Schiller*,
2019 WL 1205628 (S.D. Tex. Mar. 14, 2019)....................................................12, 20, 21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ..................................................................................13

*R2 Invs. LDC v. Phillips*,
401 F.3d 638 (5th Cir. 2005) ...........................................................................10, 11, 26

*Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*,
935 F.3d 424 (5th Cir. 2019) ...........................................................................24, 25, 30

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ..............................................................................17, 32

*Schiller v. Physicians Res. Grp., Inc.*,
2002 WL 318441 (N.D. Tex. Feb. 26, 2002),
*aff'd*, 342 F.3d 563 (5th Cir. 2003)..........................................................................25

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994)....17, 34

*Singh v. Schikan*,
106 F. Supp. 3d 439 (S.D.N.Y. 2015)....17

*Smith ex rel. Zion Oil & Gas, Inc. v. Carillo*,
2019 WL 6328033 (D. Del. Nov. 26, 2019)....2

*Sousa v. Sonus Networks, Inc.*,
261 F. Supp. 3d 112 (D. Mass. 2017)....23

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004)....11, 12, 24, 31, 32, 35

*Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*,
412 F. Supp. 3d 353 (S.D.N.Y. 2019), *aff'd*, 826 F. App'x 111 (2d Cir. 2020)....13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....11, 24, 32

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
273 F. Supp. 3d 650 (N.D. Tex. 2017)....13

*Williams v. WMX Techs., Inc.*,
112 F.3d 175 (5th Cir. 1997)....15

*Wu Winfred Huang v. EZCORP, Inc.*,
259 F. Supp. 3d 563 (W.D. Tex. May 8, 2017)....29

*Yan v. ReWalk Robotics Ltd.*,
973 F.3d 22 (1st Cir. 2020)....29

*Yang v. Nobilis Health Corp.*,
2021 WL 3619863 (5th Cir. Aug. 13, 2021) (per curiam)....24

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)....27

**STATUTES**

15 U.S.C. § 78u-4....11, 20, 24

15 U.S.C. § 78u-5....18

**OTHER AUTHORITIES**

*The Technology Of "Unconventional Development,"* 2019 WL 5393947 (2019)....1

Concho Resources Inc. ("Concho"), ConocoPhillips (as successor in interest to Concho), Timothy Leach, Jack F. Harper, C. William Giraud, E. Joseph Wright, and Brenda R. Schroer (Leach, Harper, Giraud, Wright and Schroer, collectively, "Individual Defendants") move to dismiss the Consolidated Complaint ("CC"), Dkt. 25.

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This is a putative class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 thereunder.

## STATEMENT OF THE ISSUES

Whether the CC should be dismissed for failure to plead (i) an actionable false or misleading statement, or (ii) scienter with particularity as required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

## INTRODUCTION AND SUMMARY OF THE ARGUMENT[1]

The American oil and gas exploration and production ("E&P") industry, like many, is in constant search of technological advancement. Traditional vertical drilling (think Spindletop) gave way to hydraulic fracturing ("fracking"), which gave way to multi-stage fracking of horizontal wells. *The Technology Of "Unconventional Development,"* 2019 WL 5393947 (2019). These technological improvements "propelled the United States into becoming the leading oil and gas producer in the world," *id.*, and E&P activity in Texas's and New Mexico's Permian Basin was (and still is) at the epicenter of that renaissance.

Concho was one such E&P company operating in the Permian Basin that—like several others—believed it had found the next significant technological advancement in the form of "large-scale development," or the simultaneous drilling, fracking, and completion of multiple horizontal

[1] Unless otherwise noted, all internal quotation marks, citations, and footnotes from quoted material have been omitted.

wells from a single well-pad. Concho steadily developed that technology, which was still a "work in progress," when it sought to accelerate its understanding of the best way to optimize high-density drilling through what it publicly described as an "aggressive" spacing test designed to "jump a couple of steps down the line" and demonstrate "where [Concho would] see inefficiencies." Ex. 1, Q4 2017 Call Tr. at 8; Ex. 2, Q1 2019 Call Tr. at 8–9; Ex. 3, 9/5/18 Pres. Tr. at 8.[2]

Concho's test did what tests are wont to do: it revealed that Concho had overshot the tightness of its well spacing, resulting in less-than-expected production, but nevertheless supplied valuable information that Concho would use to refine its completion designs going forward. Instead of chalking that result up to the very nature of technological progression and accretive learning, however, Lead Plaintiffs filed the CC, accusing Concho, Leach (its CEO), Harper (its President and former CFO), Giraud (its EVP and COO), Wright (its former COO and EVP), and Schroer (its Treasurer, SVP, CFO, and former CAO) of securities fraud. The CC challenges statements that Concho made about its spacing tests specifically, and about its large-scale development more broadly. The 185-page tome is emblematic of the length-over-substance approach that tends to plague securities complaints.[3] But no amount of excess verbiage can conceal the CC's threshold infirmities, including:

- The CC's challenges to *factual* statements are few and far between, and those that exist either rely on twisting the content of what Defendants said or rest on bare conclusions, not particularized allegations that those statements were false or misleading when made.

[2] "[I]n securities actions, the court may ... rely on public ... documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit, without, pursuant to Rule 12(b), converting the motion into one for summary judgment." *Fin. Acquisition Partners, LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006). The index of exhibits to this motion, attached as Appendix B, identifies the paragraphs in which the CC relies on each cited document or source.

[3] *Smith ex rel. Zion Oil & Gas, Inc. v. Carillo*, 2019 WL 6328033, at *6 n.4 (D. Del. Nov. 26, 2019) (observing in "securities cases ... [that] excess length represents an attempt by a plaintiff to overwhelm the Court with verbiage, so that the Court's conclusion on a motion to dismiss is that there's a lot of smoke and so there must also be a fire").

- The CC's theory that Defendants concealed risks associated with its spacing test ignores the context of Concho's robust disclosures and boils down to a duty-to-predict-failure theory that courts roundly reject.
- The CC challenges various forward-looking statements that fall squarely within the PSLRA's safe-harbor provision.
- The CC challenges numerous subjective opinion statements but comes nowhere close to meeting the Supreme Court's test for liability under *Omnicare*.

Besides these flaws, the CC stumbles for lack of the most fundamental element in any securities fraud case: a *strong inference* of scienter—something akin to an intent to defraud. The CC pleads no cognizable motive for its fraudulent narrative, and its circumstantial allegations for scienter rest almost exclusively on confidential former employee ("FE") accounts that either (i) align with how Concho publicly described its strategy, (ii) rest on rote speculation, or (iii) merely demonstrate differences of opinion within Concho over the speed and prudence of its spacing test. A plurality of views does not make for a compelling inference of scienter, and the CC and its FE accounts confirm that Defendants *actually believed* what they were saying.

Ultimately, the CC boils down to the paradigmatic "fraud by hindsight" pleading that goes nowhere in the Fifth Circuit—premised on the defunct notion that because Concho's experimental spacing testing ultimately reached disappointing results, Defendants *must have* known that their measured optimism was false and misleading. The securities laws are not designed to penalize companies for openly pushing the boundaries on cutting-edge industry developments, and to hold otherwise would impose a chilling effect that would foster industry stagnation. The PSLRA requires dismissal where the inference that defendants acted with scienter is not "cogent and at least as compelling" as the inference that they did not. The Court should do so here.

## BACKGROUND

### I. In 2017, Concho shifts its focus to large-scale development as the next "inflection point" in the E&P industry.

Concho was an independent E&P company headquartered in Midland, Texas, that operated exclusively in the Permian Basin. CC ¶¶ 21, 30. In the latter half of 2017, Concho announced its growing focus on "large-scale development" (sometimes called "manufacturing mode" or "cube development"), which entails the drilling and fracking of multiple wells from a single well-pad, allowing for "simultaneous completion" of more "tightly spaced wells." CC ¶¶ 4, 59, 188, 199. This methodology was intended to "mitigate" what is referred to as "the parent-child" well problem, which occurs when the proximity of an existing well (the parent) negatively affects the geological pressure and efficacy of a newer well (the child), or vice-versa, by strategically coordinating the placement, fracking, and completion of wells in close proximity. CC ¶¶ 49, 71; Ex. 4, 3/4/19 Pres. Tr. at 6. The goal of large-scale development was thus to "maximize ultimate recovery, efficiencies and returns." CC ¶ 213.

Heading into 2018, Concho emphasized and quantified its "transition to large-scale, multi-well projects," allocating "approximately 2/3 of [its] development capital" to such projects. Ex. 1, Q4 2017 Tr. at 6. Concho saw this transition into large-scale development as an "inflection point" in developing the Permian, on par with "going from vertical drilling to horizontal drilling." CC ¶¶ 242. And Concho was not alone; several E&P companies operating in the region viewed large-scale development as the next critical advancement in the industry.[4]

[4] *See, e.g.*, *Encana cube development in Permian may be future of US fracking* (https://energi.media/news/encana-cube-development-in-permian-may-be-future-of-us-fracking/); *Cube Development: What, How, When and Why?* (https://www.spegcs.org/media/files/files/a324f411/SPE_Wells_Fargo_Cube_Development_DVN.pdf); *Callon Advancing Large-Scale Permian Delaware Projects in '19* (https://www.naturalgasintel.com/callon-advancing-large-scale-permian-delaware-projects-in-19/); *How Encana Attacks the Permian: "Developing the Cube"* (https://www.oilandgas360.com/encana-attacks-permian-developing-cube/).

Concho disclosed that transitioning to this methodology was a matter of "getting to ... the optimal development plan" and finding the right balance of well density—both in terms of well spacing and the number of wells to develop on a given pad. Ex. 5, 5/15/18 Pres. Tr. at 4; Ex. 6, 2017 10-K at 4 ("We are also continuing to optimize well spacing, landing intervals and completion techniques"); Ex. 1, Q4 2017 Call Tr. at 8 (describing the "process to determine in which areas, what the optimal size project is to attempt to maximize rate of return and the drainage in those areas"). At the close of FY 2017, Concho made clear that its optimization process was a "work in progress" and that it was "testing new concepts." Ex. 1, Q4 2017 Call Tr. at 8, 10. And Concho was upfront that experimenting with this growing technology could lead to "volatility in [its] operating results." Ex. 6, 2017 10-K at 20.

## II. In 2018, Concho progresses its large-scale developments to continue testing optimal well-spacing and project size.

Concho began FY 2018 by announcing the "strong performance" of certain large-scale developments (a 7-well and an 8-well project) in the Red Hills area—which gave Concho "valuable data" that "help[ed] [it] optimize" large-scale drilling going forward. Ex. 7, 2/20/18 8-K. Concho also disclosed the completion of a 10-well project (the Brass Monkey project) and a 13-well project (the Mabee Ranch project) and relayed strong "early production results" for both projects in terms of millions of barrels of oil equivalent per day ("MBoepd"). *Id.*

The next month, Concho reiterated that its large-scale development was a "work in progress" and that it did not "have all the answers," but was accelerating its development to get to "a better answer faster." Ex. 8, 3/5/18 Pres. Tr. at 5, 7. Concho also highlighted that its projects were, "in some cases, getting larger," and noted several of those "upcoming large-scale projects" that were "very dispersed amongst [its] asset base," including a planned "20-plus well pad" that would not enter production until the following year. *Id.* at 7. Around the same time, Concho

announced its proposed acquisition of RSP Permian, which would add to Concho's inventory "large contiguous blocks of acreage" in the Permian that were conducive both to Concho's transition to "manufacturing mode" and to facilitating "cost savings and minimiz[ing] parent-child locations." Ex. 9, 3/28/18 Call Tr. at 3. Concho highlighted six multi-zone "Key Projects" planned for 2018 and 2019, including a 6+ well project, an 8+ well project, three 10+ well projects, and the "Dominator"—the aforementioned 20+ well project in New Mexico (named after an already-named well on acreage Concho had acquired). Ex. 10, Q1 2018 Deck at 8.

All along, Concho stressed that it was "learning all the time" about "the right spacing" and that "[t]here's definitely more innings" to go in optimizing large-scale development. Ex. 5, 5/15/18 Pres. Tr. at 4, 10. This continued through the close of Q2 2018, when Concho reported "strong results" from existing large-scale development across its portfolio, but emphasized that "we're still learning as we go" and "test[ing] tighter spacing or different spacing." Ex. 11, Q2 2018 Call Tr. at 4, 8; *see also* Ex. 12, Q2 2018 Deck at 13 (depicting "Large-Scale Projects Across *Entire* Portfolio"). With respect to its oil-and-gas reserves estimates, Concho also flagged the inherent uncertainty in its transition to new drilling techniques and spacing, attributing "unproved reserves" and "resources"—that is, "potentially recoverable" hydrocarbons—to those techniques:

> These [unproved reserves] are based on analogy to the Company's existing models applied to additional acres, additional zones and ***tighter spacing*** and are the Company's internal estimates of hydrocarbon quantities that may be potentially discovered through exploratory drilling or recovered with additional drilling or recovery techniques.… Such estimates and identified drilling locations have ***not been fully risked by Company management and are inherently more speculative than proved reserves estimates***. Actual locations drilled and quantities that may be ultimately recovered from the Company's interests could differ substantially from these estimates.

Ex. 10, Q1 2018 Deck at 3 (emphases added).

## III. The Dominator project was the "most aggressive" of these spacing tests, designed to push the limits of concentrated development and reveal any inefficiencies.

Generally, Concho's approach to large-scale development was a gradual "evolution," going from "2-well pads to 3-well pads to 6-well projects to 8-well projects," with the notion being that "a normal development w[ould] be 8 to 12 wells per pad." Ex. 5, 5/15/18 Pres. Tr. at 13 (first and second quotes); Ex. 3, 9/5/18 Pres. Tr. at 8 (third quote). The Dominator project was an express, purposeful deviation from that model, described by Concho as "the most aggressive multi-well pad that we drill," both in terms of sheer number of wells (23) and in the tightness of the well spacing ("50% more densely" than Concho's "typical[]" density in that zone). Ex. 3, 9/5/18 Pres. Tr. at 8; Ex. 2, Q1 2019 Call Tr. at 8. Concho explicitly and repeatedly stated that the Dominator was a unique project *designed to test the limits* of well-spacing and gather valuable information on inefficiencies that could arise:

- "[T]hat's a bit of a unique project just given its size. And as we've said before, we're trying to see how far we can push the efficiencies as you make these projects larger and larger. And also there's elements of spacing, testing and other things going on in that project." Ex. 13, Q4 2018 Call Tr. at 9.
- "[T]he Dominator was an effort to kind of jump a couple of steps down the line and see if running 7 rigs at a square mile, where do you see inefficiencies and how can you go attack those." Ex. 2, Q1 2019 Call Tr. at 9.
- [T]hat is our most extreme version of activity in a single-square mile and also some of the more dense spacing we've tested.… So we are continuing to figure out how to concentrate that much activity in one spot in the most efficient manner possible. We're continuing to play with spacing and also landing zones, and we're still continuing to tinker with combinations of different landing zones and our whole completion design. So there is a lot -- there is still a lot to learn." *Id.* at 8.

Again, Concho was not alone in the industry in dedicating a project to the more "extreme" end of the large-scale development spectrum. *See* https://www.worldoil.com/magazine/2017/may-2017/features/shaletech-permian-basin (describing Encana's 33-well "RAB Davidson pad").

## IV. Concho continues advancing large-scale development in 2019, but the Dominator spacing test reveals inefficiencies, and Concho revises its outlook going forward.

As Concho entered 2019, it reported strong performance from large-scale developments, disclosing that it was dedicating even more of its planned capital expenditures (80%) to those projects for FY 2019. Ex. 14, 10/30/18 8-K; Ex. 15, 2/19/19 8-K (disclosing "strong results" and Boepd figures for the Gettysburg and the Square Bill large-scale development projects). But Concho cautioned that it "continue[d] to experiment with different completion designs, timings, spacing" and that "[t]here's still a lot of learning to be done there." Ex. 16, Q3 2018 Call Tr. at 12. And it reiterated that such "a high concentration of activity" carried "drilling, completion and operating risks, including [Concho's] ability to efficiently execute large-scale project development." Ex. 17, 2018 10-K at 1.

At the close of Q1 2019, Concho disclosed that production had begun on the Dominator project. Ex. 18, 4/30/19 8-K. But Concho did not disclose any production figures on the Dominator project at that time, explaining instead that while early returns "certainly … look pretty good for us," it "ha[dn't] hit the kind of critical 60 days of production," that there was "still a lot to learn," and that Concho was "continuing to figure out how to concentrate that much activity in one spot in the most efficient manner." Ex. 2, Q1 2019 Call Tr. at 8.

At the end of Q2 2019, upon further production from the Dominator, Concho disclosed that "[w]hile initial rates were solid, current performance data indicate[d] that we developed the Upper Wolfcamp [formation] too densely." Ex. 19, Q2 2019 Call Tr. at 4–5. Consistent with the Dominator's having been designed to accelerate testing for inefficiencies, *supra* at 7, Concho explained that these results helped "accelerate[] the Company's understanding across the project lifecycle (logistics, lateral placement, well spacing and facilities design)," and that "[t]he Company has already incorporated learnings from this project into its second half of 2019 program and future

Delaware Basin projects." Ex. 22, 7/31/19 8-K. And Concho revised its guidance accordingly. *Id.* Concho's stock price fell following the release of its Q2 2019 results. CC ¶ 305.

Going forward, Concho had a few more spacing-test projects underway in the back half of 2019 that were "modestly more dense than [its] [traditional] resource spacing, but nothing anywhere close to Dominator." Ex. 19, Q2 2019 Call Tr. at 7. While Concho would "continue to test" well spacing and project size in the future, its "general" approach in "2020 versus 2019 would [be to] have less densely spaced wells," *id.* at 13, specifically, with an anticipated "average well spacing" of "700 to 800 feet" in 2020, "as compared to approximately 550 feet" in 2019, Ex. 20, Q4 2019 Call Tr. at 6. Nevertheless, Concho reaffirmed its "belief" in the potential efficiencies of "large-scale development" and explained that the goals remained the same: find the "optimal balance" in terms of well density and strive to maximize both "rate of return and [total] recovery" of hydrocarbons. Ex. 19, Q2 2019 Call Tr. at 10 (first quote); Ex. 21, 9/4/19 Pres. Tr. at 6 (second and third quotes).

## V. This 10b-5 suit predictably follows.

Seizing on the drop in Concho's stock price following disclosure of its Q2 2019 results, Lead Plaintiffs filed the CC, alleging violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The CC complains that effectively every statement Defendants issued from February 21, 2018 to July 31, 2019 (the "Class Period") about Concho's transition to large-scale development and testing associated therewith (the "Challenged Statements" or "CSs") was false and misleading, copying and pasting the same 8- to 10-reason list for why that supposedly is so. *E.g.*, CC ¶¶ 172–73.

# Standard of Review

## I. General pleading and dismissal standards.

A Rule 12(b)(6) motion tests whether the plaintiff has pleaded sufficient facts to "state a

claim that is plausible on its face." *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245 (5th Cir. 2010). Plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[C]onclusory allegations, unwarranted deductions, or legal conclusions" do not suffice. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005). Fraud claims must also meet the heightened pleading standard of Rule 9(b), which requires that the complaint state "with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b).

## II. Standards under the Exchange Act and the PSLRA.

To state a claim under § 10(b), Plaintiff must plead: (1) a material misrepresentation or omission; (2) a defendant acting with scienter concerning the fraud; (3) reliance; (4) damages; and (5) loss causation. *Indiana Elec. Workers Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532 (5th Cir. 2008). A § 10(b) complaint must also meet the added rigors of the PSLRA, which enhances the traditional Rule 12(b)(6) pleading standards. *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("[w]hile we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter"). The PSLRA enhances the particularity pleading requirement in two principal respects.

First, the PSLRA requires plaintiffs to specify each allegedly false or misleading statement or omission and the time, place, and content of the alleged misrepresentation; the identity of the speaker; "the reason or reasons why the statement is misleading"; and, "if an allegation regarding the statement or omission is made on information and belief, ... [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see, e.g., Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361–62 (5th Cir. 2004). Where allegations are not made based on the plaintiffs' personal knowledge, they are necessarily made on information and belief, triggering

the requirement that a sufficient factual basis be alleged to support that a statement was false when made. *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 351 (5th Cir. 2002).

Second, the PSLRA requires particularized facts giving rise to a strong inference that *each* defendant acted with scienter with respect to *each* alleged misrepresentation. *See* 15 U.S.C. § 78u-4(b)(2); *Shaw*, 537 F.3d at 534. Scienter is "an intent to deceive, manipulate or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs.*, 401 F.3d at 645. "[Severe recklessness] is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Neiman v. Bulmahn*, 854 F.3d 741, 747 (5th Cir. 2017).

The requisite "strong inference" of scienter cannot be met with "facts from which an inference of scienter rationally *could* be drawn," nor will an inference of scienter that is "merely 'reasonable' or 'permissible'" suffice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007). Rather, a 10b-5 claim can survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. A court "must consider plausible, nonculpable explanations for the defendant's conduct" compared to the culpable inferences alleged by the plaintiff. *Id.*

## Argument and Authorities

### I. The CC fails to plead an actionably false or misleading statement.[5]

#### A. The CC fails to plead falsity as to any factual statement with particularity.

The CC tries to characterize a handful of arguably factual statements as "false or misleading." But it does so only by warping the content and context of some of those statements; for others, the CC fails altogether to allege *how* or *why* such statements were false when made. Both defects are fatal. *Southland*, 365 F.3d at 362 (complaint must "explain why the challenged statement or omission is false or misleading"); *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharm., Inc.*, 2007 WL 2720074, at *2 (S.D. Tex. Sept. 18, 2007) (a "conclusory allegation that the statement was false" does not suffice).

***Early successes of large-scale development.*** As outlined above, the Dominator project culminated Concho's year-plus effort to advance larger- and larger-scaled developments, with Concho disclosing the "strong results"—and even hard production data—from many of those projects along the way. *Supra* at 4–8. The CC references several of these disclosures (*e.g.*, "outstanding results from the Company's large-scale development projects," CC ¶ 170), but never articulates how or why they were false or misleading when made.[6] In fact, the CC never disputes that Concho experienced the successes and production results that it reported as it ratcheted up large-scale development. *See* CC ¶ 144 (FE-8 alleging that Concho "had been immensely successful and was growing fast" prior to the Dominator); *Plaisance v. Schiller*, 2019 WL 1205628, at *30 (S.D. Tex. Mar. 14, 2019) (dismissing § 10(b) claim when "Plaintiffs have failed

---

[5] The Challenged Statements discussed in this section are representative of the laundry list of similar statements challenged in the 185-page CC. For the Court's convenience, Defendants have attached a detailed chart quoting every Challenged Statement (CSs 1–68) in the CC as Appendix A and listing the reasons each is non-actionable (*e.g.*, "No False Statement of Fact," "Forward-Looking Statement," "Puffery," or "Opinion").

[6] *See also* App'x A (collecting CSs 1–2, 14–16, 19, 26, 30, 32, 37, 46, 48, 53–55, 62–65, 67–68, as additional examples of these truthful disclosures of prior results).

to allege facts capable of establishing that the statements were false when made"); *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 273 F. Supp. 3d 650, 678–79 (N.D. Tex. 2017) (statement that company had a "process and systems for planning inventory purchases" was non-actionable where plaintiff "ha[d] not plausibly alleged that [the company] did not have such a system").[7]

***Preliminary Dominator results.*** Despite being inordinately focused on the Dominator project, the CC does precious little in terms of challenging what Concho *actually said* about that project. At most, the CC seems to take issue with Concho's Q1 2019 disclosure of early results from the Dominator, CC ¶ 295, relying on an "analysis" of well data supposedly demonstrating that initial-production rates for the Dominator's 23 wells were below the average production in the Wolfcamp formation, *id.* ¶¶ 157–61, with the insinuation being that the Dominator's initial-production rates were not as Concho said. But Concho did not disclose the Dominator's initial-production rates; instead, Concho disclosed that while preliminary returns looked "pretty good" and "strong," Concho "ha[dn't] hit the kind of critical 60 days of production" to be able to give further detail or hard production figures at that time. Ex. 2, Q1 2019 Call Tr. at 4, 8. Not only are those generalized, heavily caveated impressions of early results textbook non-actionable puffery;[8]

---

[7] The only time the CC even mentions Concho's actual, non-Dominator well results is the bare allegation from FE-5, who claims to be a landman, that "he heard from a former geologist" that Concho had "God-awful results" from the Grissom wells in Culberson County. CC ¶ 134. Besides being a classic example of a non-cognizable, rumor-laden confidential witness account that falters under the PSLRA's standard, *infra* at 26–30, that account says nothing of (1) when that supposedly "God-awful" result occurred, or (2) where Concho disclosed results for the Grissom wells (let alone inaccurate results). Nor could FE-5's account about one project impugn Concho's periodic disclosures of positive results with large-scale-development projects across its portfolio. *See In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 824 (S.D. Tex. 2013) (allegation that "Anadarko failed to employ its risk methodology on [one particular] investment … is not sufficient to create the inference that Anadarko was not, in fact, employing a risking methodology across its operation").

[8] *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (statement that company was in "a pretty good position" was puffery); *Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 363 (S.D.N.Y. 2019) (statement that "it seems we're very strong going into the back half of this year and things are still looking pretty good" was puffery), *aff'd*, 826 F. App'x 111 (2d Cir. 2020); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) ("statements which used the words 'healthy,' 'strong,' or 'increased awareness' constituted vague assessments of past results, on which no reasonable investor

the CC simply fails to allege that the Dominator was not, in fact, achieving "pretty good" results *at that time* that were in line with Concho's expectations. *See* CC ¶ 119 (FE-3 alleging that Dominator production eventually "declined," but failing to allege *when* that purported decline occurred vis-à-vis Concho's Q1 2019 disclosure of early results or *when* it diverged from Concho's expectations); *Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, 2015 WL 1143081, at *10 (S.D. Tex. Mar. 13, 2015) ("later results do not establish that the earlier statements were false when made").

***Parent-child mitigation "baked into" forecasts.*** Next up are Giraud's statements regarding certain considerations being "baked into" Concho's forecasts. CC ¶ 262. The CC juxtaposes those statements with FE-1's allegations that Concho did not account for enough risk in modeling the Dominator project's internal production forecast, posturing as if Giraud falsely represented that Concho "baked in" spacing risks that it actually did not. *Id.* ¶¶ 5, 70, 88. But the CC's narrative on this point is doubly misleading, both because Giraud was discussing Concho's full portfolio of large-scale developments (not just the Dominator) and, more importantly, because Giraud was actually highlighting perceived efficiencies to be *gained* from large-scale development by *reducing* the parent-child dilemma—not risks associated with tighter well spacing:

> Big drivers on going to these large-scale projects are: one, ***we think maximizing the resource by minimizing the impact of the parent-child effect***; and then also getting the benefits on the capital side from efficiency. So those are kind of the 2 big drivers behind going to project development. As it relates to kind of what we're seeing compared to what we're expecting, we have built our type curves and our internal modeling ***based upon the results we have seen here***. So I think everything ***we've seen has been consistent with what we were expecting***. And is ***baked into that outlook*** that we're talking about for '19 and '20.

Ex. 16, Q3 2018 Call Tr. at 13 (emphases added). That Concho was "bak[ing] into" its forecasts

---

would rely"); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) (statements about "strong" and "record" financial results constituted puffery because they "are not determinate, verifiable statements"), *aff'd*, 905 F.3d 106 (3d Cir. 2018).

past results from undisputedly successful large-scale-development projects is not rendered false or misleading—directly or by implication—by the CC's allegations that Concho should have built more risk into its models to account for tighter well spacing. *Infra* at 27. And the CC cannot use a strained paraphrasing of Giraud's statement to paper over that basic disconnect. *See, e.g.*, *In re Browning-Ferris Indus. Inc. Sec. Litig.*, 876 F. Supp. 870, 898 (S.D. Tex. 1995) (rejecting § 10(b) allegation premised on "Plaintiffs' description of the statement" that did not match its "actual text"); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 180 (5th Cir. 1997) (rejecting § 10(b) claim that failed to "isolate statements and particularize their falsity" and relied instead on "paraphra[sing]").

***The Dominator project relative to Concho's portfolio.*** Finally, the CC implies that Concho misrepresented the state of its spacing tests because it "downplay[ed]" the Dominator as an outlier—its "most aggressive multi-well pad"—when really Concho was conducting other such tests "companywide." CC ¶¶ 72, 308. But these facts are not mutually exclusive: (1) the Dominator was Concho's most extreme spacing test, *and* (2) Concho was conducting other, more modest spacing tests across its portfolio. As Concho specifically disclosed:

- The Dominator was the "most aggressive" project in terms of being the "largest" in size and with wells "drilled … almost 50% more densely" than its average development. Ex. 2, Q1 2019 Call Tr. at 8; CC ¶¶ 72, 295. That is perfectly consistent with Concho's post-Class Period descriptions of how the Dominator fit into the rest of its portfolio. *Compare* CC ¶ 316 ("average well spacing" in 2018 was "550 feet"), *with id.* ¶ 37 (Dominator had an average well spacing of 230 feet); *see also id.* ¶ 311 (graphic depicting the Dominator's spacing and size compared to the rest of its portfolio).

- But the Dominator was hardly Concho's *only* large-scale development geared at testing well spacing. Concho dedicated 80% of its capital to large-scale developments in 2019, which were getting "bigger over time" as Concho "continue[d] to experiment with different completion designs, timings, [and] spacing" and transitioned to "large-scale projects across [its] *entire* portfolio." Ex. 16, Q3 2018 Call Tr. at 12 (first and second quotes); Ex. 12, Q2 2018 Deck at 13 (third quote); Ex. 16, Q3 2018 Call Tr. at 12 ("Speaking specifically to the Taylor [project] or maybe more broadly to all of these. We're definitely continuing to test additional zones, continuing to test spacing."); Ex. 12, Q2 2018 Deck at 13 (disclosing

three 10+ well projects besides Dominator); Ex. 11, Q2 2018 Call Tr. at 8 (disclosing that even "some of [its] smaller projects" were "continuing to test tighter spacing.").

These disclosures throttle the CC's suggestion that Concho affirmatively misrepresented the status of its portfolio of large-scale development projects.

### B. The CC's concealed-risk theory ignores Concho's disclosures and amounts to a duty-to-predict-failure allegation that courts unanimously reject.

Untethered from any factual allegations of material misrepresentations, the CC repeats an omission-based mantra roughly 40 times—that everything Concho said was misleading because Defendants failed to telegraph that the Dominator project was "an unverified and extremely high-risk" endeavor. CC ¶ 13. That theory ignores the context of Concho's optimization efforts, which were explicitly identified as tests designed to push the boundaries in an effort to foster innovation. And it would impose a duty of self-flagellation that is foreign to the federal securities laws.

An alleged omission is actionable only if "the information [actually] disclosed, understood as a whole, would mislead a reasonable potential investor." *In re Enron Corp. Sec. Deriv. & "ERISA" Litig.*, 238 F. Supp. 3d 799, 824 (S.D. Tex. 2017). Accordingly, the CC's theory that Concho omitted the likelihood that the Dominator test might reveal inefficiencies is foreclosed by Concho's own disclosures. Concho disclosed not only that the Dominator was a "unique project" and its "most extreme version" of a size-and-spacing "test," but also that the very *purpose* of the Dominator experiment was to "jump a couple of steps down the line" to "see inefficiencies." *Supra* at 7 (collecting statements). Courts have long recognized that processes caveated as "experiments," "trials," or "tests" convey inherent uncertainty and risk. *See, e.g., N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC, Inc.*, 537 F.3d 35, 48 (1st Cir. 2008) ("the investing public is well aware that drug trials are exactly that: trials to determine the safety and efficacy of experimental drugs"); *City of Bristol Pension Fund v. Vertex Pharm. Inc.*, 12 F. Supp. 3d 225, 238 (D. Mass. 2014) (even "optimistic" projections about a drug trial were not rendered misleading by

its eventual failure). That is emphatically true here. Concho did not couch its "aggressive" Dominator optimization "test" as a sure-fire success, but instead as one designed to jump ahead and *uncover* "inefficiencies."

Because Concho clearly disclosed the experimental, aggressive nature of its optimization efforts, the CC's actual theory is that Defendants' verbiage was not *pessimistic enough* about the supposedly inevitable doom of the Dominator project. *E.g.*, CC ¶ 172 (alleging Concho should have disclosed the project's "unverified and extremely high-risk," "no verifiable basis," and "enormous" risk). But that has never been a viable mode of pleading securities fraud. So long as companies disclose "historical information" that is "factually correct," they are "under no duty to cast [their] business[es] in a pejorative, rather than a positive, light," *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003), or to "take a gloomy, fearful or defeatist view of the future," *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994). That means companies are not "required to predict that their future operations will fail." *Kane v. Madge Networks*, 2000 WL 33208116 (N.D. Cal. 2000). Because Concho did not misrepresent any information about the Dominator or other projects, *supra* at 12–16, Concho's failure to adopt "the eye-catching or negative phrasing that [the CC] would have wished" does not make for actionable falsity. *Singh v. Schikan*, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015); *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 640 (3d Cir. 1990) (company did not need to describe its "information systems" as "wholly inadequate").[9]

[9] Because § 10(b) requires transparency by issuers, not pessimism, courts hold that companies are permitted to be reasonably optimistic even when, unlike here, faced with actual operational challenges. *E.g.*, *In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *4 (E.D. Va. June 6, 2020) ("[I]f it can be plausibly inferred that Defendants genuinely believed that the initiatives they had put in place were sufficient to correct … problems, then the Court will not assume Defendants intended to mislead."); *id.* at *10 ("For example, the allegation that DXC was making significant cuts to its workforce does not make plausible that DXC was not also training current workers and recruiting new workers in different areas. Once again, Lead Plaintiffs' contentions are essentially based on disagreements over DXC's strategic choices, not materially false statements that would be actionable under the securities laws.").

### C. Many Challenged Statements are forward-looking statements protected by the PSLRA's safe harbor.

Many of the Challenged Statements qualify as forward-looking statements within the PSLRA's safe harbor—*i.e.*, "statement[s] containing a projection of revenues, income ... capital structure, or other financial items," "statement[s] of the plans and objectives of management for future operations," or statements related to "future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)–(B).[10] The PSLRA's safe harbor provision applies so long as the statements (1) were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[,]" or (2) were made without knowledge that "the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). These prongs are disjunctive. "Even if the plaintiffs show actual knowledge, the safe harbor may still apply if the statement is … identified as forward looking and is accompanied by meaningful cautionary language." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 453 (S.D. Tex. 2016). The CC demonstrates neither exception, and the PSLRA thus immunizes each of these statements.

First, Concho cloaked these forward-looking statements in meaningful cautionary language addressing the very risks the CC complains of, warning investors concerning:

- the risk that "Multi-well pad drilling and project development may result in volatility in our operating results," Ex. 6, 2017 10-K at 20;

[10] *Compare, e.g.*, CC ¶ 171 ("***The 2018 capital program is expected to be funded with cash flows from operations and generate 20% crude oil growth and 16% to 20% total production growth year-over-year.***"), *with Gissin v. Endres*, 739 F. Supp. 2d 488, 507 n.108 (S.D.N.Y. 2010) (characterizing as forward-looking statement that "[b]ased on our current expectation of cash flows from operations and ... investments ... we feel we will be in a position to fund [anticipated] capital investments for the year"); *compare* CC ¶ 174 ("***Concho expects to grow total production at a compound annual growth rate of 20% from 2017 to 2020. The outlook reflects the company's high-quality production base and strong operating momentum .... As with the Company's 2018 outlook, growth over the three-year period from 2017 to 2020 is the output of reinvesting high-margin cash flow into its drilling program.***"), *with Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 147 F. Supp. 3d 493, 525–5266 (E.D. La. 2015) (characterizing statement that "[w]e forecast overall production and operating cash flow growth in 2012 due to new production," and other pipeline-related projections as forward-looking statements), *aff'd*, 854 F.3d 741 (5th Cir. 2017); *see also* App'x A (collecting CSs 3–4, 7, 9–10, 14–16, 18, 22–25, 27–28, 31, 33–34, 40, 42–46, 48–50, 52, 55–56, 61–62, and 66 as protected by the Safe Harbor).

- "drilling, completion and operating risks, including our ability to efficiently execute large-scale project development as we could experience delays, curtailments and other adverse impacts associated with a high concentration of activity," Ex. 17, 2018 10-K at 1; and

- "'unproved reserves,' 'resources' and similar phrases" being "based on analogy to the Company's existing models applied to additional acres, additional zones and *tighter spacing* and are the Company's internal estimates of hydrocarbon quantities that may be potentially discovered through exploratory drilling or recovered with additional drilling or recovery techniques," "have not been fully risked by Company management and are *inherently more speculative* than proved reserves estimates. Actual locations drilled and quantities that may be ultimately recovered from the Company's interests could differ substantially from these estimates." Ex. 10; Q1 2018 Deck at 3 (emphases added).

These disclosures concerning the ability to "efficiently execute" large-scale development projects—and Concho's express cautioning about the "aggressive" Dominator spacing test, *supra* at 7—more than satisfy the PSLRA's requirement that the cautionary language "warn[] of risks of a significance similar to that actually realized so that [the investor] is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Carlton*, 184 F. Supp. 3d at 455.[11]

Second, for reasons discussed in connection with scienter, *infra* at 24–34, the CC fails to allege that Defendants had actual knowledge that these statements were false when made.

**D. The remaining Challenged Statements are non-actionable opinions.**

Many Challenged Statements qualify as opinions, either because Defendants explicitly couched them in subjective language, or because their substance reflects the speaker's estimates, projections, or evaluative take. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*

[11] The CC mistakenly suggests that Concho's later addition of the more-specific phrase "tighter drilling spacing" to its risk factors in its 2019 10-K somehow renders its earlier cautionary language insufficient. CC ¶ 313. But Concho *did* contemporaneously warn about risks associated with a "higher concentration of activity" (*i.e.*, more densely spaced wells) and potential inefficiencies associated with its spacing tests, *supra* 7, and, in any event, the gradual refining of cautionary language over time to account for new information does not delegitimize already-sufficient cautionary language, like Concho's here. *See In re Proshares Tr. Sec. Litig.*, 728 F.3d 96, 109 (2d Cir. 2013) (rejecting suggestion that company's "revisions" of cautionary language "to use different, arguably clearer language" rendered insufficient "disclosures deemed adequate in the first instance," as such a rule would "perversely incentivize issuers not to strive for better, clearer disclosure language").

*Pension Fund*, 575 U.S. 175, 179–80 (2015) ("we believe" indicates a statement of opinion); *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *8 (S.D. Tex. May 31, 2016) ("Estimates and projections are classic examples of opinions."). These opinions generally consist of subjective, evaluative statements concerning the Dominator and Concho's other large-scale development projects. *E.g.*, CC ¶ 190 ("[o]ver the last few years, [Concho's] ***transition to large-scale, multi-well projects has been an important development that will continue to drive growth, innovation and efficiencies***."); *id.* ¶ 225 ("***And we think we know what the spacing needs to be in all those and how you ought to develop it.***").[12]

Because § 10(b) liability follows only from an "untrue statement" or "omi[ssion]" of "material fact," 15 U.S.C. § 78u-4(b)(1)(A)–(B), statements of opinion are not actionable under the securities laws simply because they "turned out to be wrong." *Omnicare*, 575 U.S. at 186. Rather, an opinion statement may be actionable only if (1) the defendants "did not genuinely hold the opinions expressed"; (2) the "opinions contained embedded untrue statements of fact"; or (3) the speaker "omitted material facts about his inquiry or knowledge that would conflict with what a reasonable investor would have understood from his statements." *Plaisance*, 2019 WL 1205628, at *30. Satisfying any of these three *Omnicare* prongs "is no small task for an investor," 575 U.S. at 194, and the CC meets none of them.

#### 1. The CC fails to satisfy *Omnicare*'s subjective-disbelief prong.

The CC contains no allegation that Defendants disbelieved what they publicly said. In fact, the CC repeatedly alleges the exact opposite—that Defendants *did* believe what they were saying. *E.g.*, CC ¶ 346 (Defendants drank "a little too much of their own Kool-Aid."); ¶ 144 (management displayed "hubris" and "overconfidence," "feeling that they had the 'Midas touch'"). This

[12] *See also* App'x A (collecting CSs 1–4, 6–10, 12–16, 18–20, 22–28, 30–57, 61–62, and 64–68 as non-actionable opinion statements).

forecloses the subjective-disbelief prong under *Omnicare*. *See Plaisance*, 2019 WL 1205628, at *11 (no liability absent "allegations of fact capable of proving that [the Individual Defendants] did not subjectively believe [their] … opinions when they were issued").

**2. The CC fails to satisfy *Omnicare*'s embedded-facts prong.**

Under *Omnicare*'s second prong, liability may attach when opinion statements contain discrete, embedded factual representations and those facts are sufficiently alleged to be false. *E.g.*, *Omnicare*, 575 U.S. at 185. The CC contains no such thing. Any hard data that Concho disclosed as supporting its transition to large-scale development goes completely untouched in the CC, and the CC's few-and-far-between factual statements are lacking particularized allegations of falsity. *Supra* at 12–16. Further, many of these opinions did not contain embedded facts in the first place. *E.g.*, CC ¶ 216 ("***We believe this type of [large-scale] development is important to maximize recoveries, drive economies of scale and deliver attractive economic returns predictably and consistently over the long term.***"). The CC does not meet *Omnicare*'s second prong.

**3. The CC fails to satisfy *Omnicare*'s omission prong.**

*Omnicare*'s omission prong requires that "(i) the speaker omit[ted] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and (ii) those facts conflict with what a reasonable investor would take from the statement itself." *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 617 (S.D. Tex. 2018), *aff'd*, 777 F. App'x 726 (5th Cir. 2019). The CC alleges neither.

***Inquiry.*** Because an opinion statement implies that some investigation took place, such a statement can be rendered misleading only by the absence of "*any* investigation." *Omnicare*, 575 U.S. at 191 (emphasis added); *see also Knurr v. Orbital ATK Inc.*, 276 F. Supp. 3d 527, 538 (E.D. Va. 2017) (equating that requirement with a "total lack of inquiry"). The CC, however, leaves uncontested that Concho methodically built up its understanding of multi-well pads and spacing

through "***an evolution going from 2-well pads to 3-well pads to 6-well projects to 8-well***" and "***learned along the way***," CC ¶¶ 223–24, and that Concho was upfront about the Dominator test "jump[ing] a couple of steps" ahead of that methodical progression to further the Company's learning, Ex. 2, Q1 2019 Call Tr. at 9. The CC and its (deficient, *infra* at 27–30) FE accounts speculate that Concho did not gather "sufficient data prior to drilling wells so close together," *e.g.* CC ¶ 137, but admit that Concho relied on "calculations" and "modeling used to justify projects." *Id.* ¶¶ 129–30 (FE-4 acknowledging that Concho's modeling for the Dominator was "not quite back of the napkin" and merely critiquing that diligence as relying on "broad assumptions" and "based on a two-well model … rather than looking at the project in its entirety"). A disagreement over the relative *sufficiency* of pre-opinion diligence (as opposed to its bare existence) does not satisfy *Omnicare*'s omission prong. *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 228 (S.D.N.Y. 2018) (rejecting *Omnicare* omissions claim when complaint "[wa]s replete with detail about the [inquiry] process"), *aff'd*, 779 F. App'x 69 (2d Cir. 2019).

***Contrary Facts.*** Qualifying contrary facts must be ones the Individual Defendants *actually knew* when they offered opinions. *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 908 (S.D. Tex. 2017) ("plaintiffs must allege, with particularity, each individual defendant's knowledge of material facts inconsistent with" the opinion), *aff'd*, 777 F. App'x 726 (5th Cir. 2019). For the same reasons scienter is lacking, *infra* at 24–34, the CC fails to identify any discrete, contrary facts that were omitted. Instead, the CC merely collects the divergent opinions of various junior employees about the prudence of the Dominator test. *Infra* at 27–30 (discussing FE allegations). The omission of internal disagreement is not actionable under *Omnicare* or otherwise. *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 147 F. Supp. 3d 493, 529–30 (E.D. La. 2015) (rejecting *Omnicare* claim because the fact "[t]hat some of ATP's

employees disagreed, perhaps even reasonably so, with defendants regarding ATP's ability to continue operating and complete the [project] does not give rise to an inference that defendants knew, or were reckless in not knowing, that ATP would eventually fail."), *aff'd*, 854 F.3d 741 (5th Cir. 2017).[13] Even the omission of contemporaneous operational challenges—not alleged here—does not automatically render an opinion misleading under *Omnicare*.[14]

**E. Schroer and Wright are unconnected to nearly every Challenged Statement.**

There is an independent basis to dismiss the claims against Schroer and Wright: the CC does not allege that either made specific misstatements or omissions. *Grupo Verzatec S.A. de C.V. v. RFE Inv. Partners*, 2019 WL 1437617, at *6 (S.D.N.Y. Mar. 29, 2019) ("[C]ourts regularly dismiss Section 10(b) claims where a plaintiff failed to show the defendant made any of the alleged misrepresentations."). Instead, the CC claims Schroer and Wright should be liable for any misstatement simply for signing Concho's 10-Ks, which contain particularly benign statements.[15] CC ¶¶ 180–82 ("We utilize multi-well pad drilling and project development where practical."); *id.* ¶ 271 (disclosing estimated proved reserves). The CC never articulates how exactly those few statements were false or misleading when made, but even more critically, the CC fails to plead Schroer's or Wright's scienter as to them. *See infra* at 24–34.

---

[13] *See also, e.g., In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 853 (S.D. Ohio 2016) (*Omnicare* not met "[e]ven if [the executive defendant] did have knowledge of [former employee]'s disagreement" with defendant's projections because "this fact would be insufficient to show that [the defendant] had knowledge that the 2013 projections were false or misleading"), *aff'd*, 849 F.3d 325 (6th Cir. 2017); *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 118 (D. Mass. 2017) (*Omnicare* not met where "plaintiff … relie[d] on former sales employees' statements, which were allegedly made known to the defendants, that they would fail to reach their" projections).

[14] *E.g., In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *9 (S.D.N.Y. May 7, 2020) (holding that GE's describing its gas turbine as "a proven technology ... was not misleading [under *Omnicare*] for its failure to describe as well the company's plans for addressing the oxidation issue"), *aff'd*, 844 F. App'x 385 (2d Cir. 2021); *City of Miami Fire Fighters' v. CVS Health Corp.*, 519 F. Supp. 3d 80, 90 (D.R.I. 2021) (statements that CVS's acquisition of a long-term care provider "positively affected" and improved its "ability to attract and retain" customers were not misleading under *Omnicare* despite omission that CVS was losing customers in this sector "in droves").

[15] Defendant Schroer is mentioned just 11 times in the body of the CC (CC ¶ 27, 28, 105, 180, 181, 242, 270, 272, 325, 394, 401), and Defendant Wright is mentioned just 14 times. None of the allegations against either meets the Rule 9(b) pleading requirements for a claim under Sections 10(b) and 20(a) of the Exchange Act.

## II. The CC fails to establish the requisite strong inference of scienter.

The CC also fails to establish a strong inference of scienter, 15 U.S.C. § 78u-4(b)(2)(A), which requires an "intent to deceive, manipulate, or defraud[,] or severe recklessness." *Shaw*, 537 F.3d at 533. In pleading scienter, Plaintiff may not rely on "the collective knowledge of all the corporation's officers and employees acquired in the course of their employment," but instead must plead facts about the state of mind of each defendant. *See Southland*, 365 F.3d at 365–66 ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter…."). Finally, the Court must "consider plausible, nonculpable explanations for the defendant's conduct" and weigh them against the culpable inferences alleged by the plaintiff. *Tellabs*, 551 U.S. at 323–24.

Here, the CC offers no cognizable motive and fails to meet the arduous task of pleading scienter circumstantially. It leans on a smattering of boilerplate scienter allegations and FE accounts that, at most, paint the picture that some Concho employees thought the Dominator test was *too* "extreme" or "aggressive" and that Defendants displayed "overconfidence" in pushing forward with Concho's optimization plans in that manner. But hubris is not scienter, and the non-culpable inferences that emanate from the CC loom large over the culpable ones. The CC and its tired fraud-by-hindsight approach should thus join the long list of cases in which the Fifth Circuit has affirmed dismissal for lack of a strong inference of scienter.[16]

### A. Motive and opportunity are wholly lacking.

Securities plaintiffs often try to plead an executive's "motive and opportunity" to commit

[16] *E.g.*, *Callinan v. Lexicon Pharms., Inc.*, 858 F. App'x 162, 163–64 (5th Cir. 2021) (per curiam); *Yang v. Nobilis Health Corp.*, 2021 WL 3619863, at *2–3 (5th Cir. Aug. 13, 2021) (per curiam); *Iron Workers Benefit & Pension Fund—Iron Workers Dist. Council Phila. & Vicinity v. Anadarko Petroleum Corp.*, 788 F. App'x 268, 269–70 (5th Cir. 2019) (per curiam); *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 431, 433–34 (5th Cir. 2019); *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 986–87 (5th Cir. 2019).

and profit from fraud—something that "may enhance other allegations of scienter" but cannot, alone, satisfy the PSLRA. *Abrams v. Baker Hughes*, 292 F.3d 424, 430 (5th Cir. 2002). Only "concrete benefits" can factor into the scienter analysis, *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 430–31 (5th Cir. 2019), not "[a] generalized motive that could be imputed to any publicly-owned, for-profit endeavor," *Coates v. Heartland Wireless Commc'ns, Inc.*, 100 F. Supp. 2d 417, 431 (N.D. Tex. 2000).

The CC does not seriously try to meet that standard; it never even *mentions* the word "motive." The closest it comes to the topic is the conclusory allegation that Defendants engaged in a fraudulent "endeavor in hopes of saving the Company from being acquired in a consolidating industry" and thus took a fraudulent "gamble[] … in the quest for profits and growth." CC ¶ 3. Never mind that the CC supplies zero facts for that narrative (in fact, it contradicts itself by alleging "[t]he Company had been immensely successful and was growing fast," *id.* ¶ 144); such allegations that defendants lied "to save the company" and "return the company to profitability and to retain their lucrative positions" are classic examples of "motives possessed by most if not all corporate directors and [thus] insufficient to state a claim for securities fraud." *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 246 (S.D.N.Y. 2015), *aff'd*, 660 F. App'x 23 (2d Cir. 2016).[17]

### B. The CC's circumstantial scienter allegations are similarly deficient.

Because the CC "has not alleged a clear motive for the alleged misstatements or omissions, the strength of its circumstantial evidence of scienter must be correspondingly greater." *R2 Invs.*, 401 F.3d at 644. The CC comes nowhere close to meeting that high bar.

---

[17] *See also, e.g.*, *Schiller v. Physicians Res. Grp., Inc.*, 2002 WL 318441, at *7 (N.D. Tex. Feb. 26, 2002) (rejecting purported "motive to inflate its stock price" and to "maintain the appearance that [the company] was profitable" as motives that "would almost universally permit an inference of fraud"), *aff'd*, 342 F.3d 563 (5th Cir. 2003); *Shaw*, 537 F.3d at 544 ("Scienter in a particular case may not be footed solely on motives universal to corporate executives."); *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("the desire for the corporation to appear profitable" is not a cognizable motive).

**1. The CC and its FE accounts do not raise a strong inference of scienter.**

The CC constructs its entire scienter narrative on accounts from nine, unnamed FEs, but these confidential-witness ("CW") accounts must be heavily discounted under Fifth Circuit precedent and fail to add anything to an inference of scienter.

**i. Confidential-witness allegations must be heavily discounted and require a threshold level of personal knowledge.**

Courts recognize that they "must discount allegations from confidential sources," *Shaw*, 537 F.3d at 535, as "[i]t is hard to see how information from anonymous sources could be deemed compelling or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 510 (S.D. Tex. 2017). The CC's FE accounts illustrate why such discounting is required, as they largely peddle in rumors and speculation, *infra* at 29–30, and struggle to keep their stories straight with one another's accounts.[18]

To receive even steeply discounted weight, these FEs must have sufficient "reliability." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 839 (S.D. Tex. 2016). Such accounts must be accompanied by particularized allegations to "support the probability that a person in the position occupied by the source ... would possess the information" ascribed to him. *Shaw*, 537 F.3d at 535, 539 (alteration in original). "[P]ersonal opinions void of specific details regarding the basis [for the FE's] personal knowledge add nothing to falsity or scienter." *Key Energy*, 166 F. Supp. 3d at 861 (alteration in original). Absent those details, courts disregard allegations based on FE accounts. *E.g.*, *Owens v. Jastrow*, 789 F.3d 529, 542 n.13 (5th Cir. 2015) (refusing to "draw any

[18] *Compare* CC ¶ 143 (FE-8 claims that "FE-2 had informed management prior to the beginning of the project that it would not work"), *with id.* ¶¶ 106–10 (FE-2 making no such allegation); *compare id.* ¶ 134 (FE-5 alleging that the Dominator "was located at one of the best spots in the Delaware Basin"), *with id.* ¶ 109 ("FE-2 explained that areas to the east, west, and possibly north of the Dominator had already been heavily drilled … and the area was therefore depleted to begin with.").

inferences from" FE allegation that issue was discussed in meetings because complaint did not "plead with particularity the dates of the ... meetings or the substance of the conversations").

**ii. The FEs add nothing to an inference of scienter.**

Many of the FEs offer nothing more than their own opinions (or the second-hand opinions of others)—not concrete facts—that Concho's Dominator test was an imprudent jump *too far* ahead and that some voiced this dissent within the Company.

- FE-1 believed that Concho's internal modeling for the Dominator and other large-scale development projects should have built in more risk and alleges that he "expressed his concerns to" Giraud "in multiple meetings." CC ¶¶ 74–87.
- FE-2, who was three levels below Giraud, opines that fewer Dominator wells should have been drilled. *Id.* ¶¶ 106–08
- FE-3 opines that the Dominator area was "over-completed" and that the geoscience team had "concerns," believing that the Dominator "is really stupid." *Id.* ¶ 112–13. FE-3 states that he does not believe certain fracturing models were used, but "it was possible that models were run"—he is not sure. *Id.* ¶ 117. He further opines on the price Concho paid to acquire RSP Permian. *Id.* ¶ 123.

But internal employee disagreement with management over the wisdom of a publicly disclosed initiative is not the stuff of securities fraud. *See, e.g.*, *Bulmahn*, 147 F. Supp. 3d at 529–30 ("That some of ATP's employees disagreed, perhaps even reasonably so, with defendants regarding ATP's ability to continue operating and complete the [project] does not give rise to an inference that defendants knew, or were reckless in not knowing, that ATP would eventually fail.").[19] Nor, for that matter, are these FE opinions even contrary to the limited Class Period statements Defendants made about the Dominator. *Compare* CC ¶ 351 (according to FE-1, "[t]he objective

---

[19] *See also, e.g.*, *Kong v. Fluidigm Corp.*, 2021 WL 3409258, at *11 (N.D. Cal. Aug. 4, 2021) ("disagreement within the company over its approach to selling the mass cytometry line does not support an allegation that Fluidigm misled investors or was somehow reckless with projections"); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009) (no scienter when CW alleged "disagreement within Digimarc over the proper percentage of raw materials that should have been recorded on its balance sheet" and notified management of "his preferred scrap rates," because such disagreement did not "indicat[e] that Digimarc's management acted with deliberate recklessness in choosing the lower uniform scrap rates").

for 2018 was to shortcut getting the answer regarding the number of wells that could ultimately be drilled on Concho acreage and to determine how closely wells could be spaced together”), *with*, *e.g.*, Ex. 13, Q4 2018 Call Tr. at 9 (“we’re trying to see how far we can push the efficiencies as you make these projects larger and larger”), *and* Ex. 10, Q1 2018 Deck at 3 (such “drilling locations have not been fully risked by Company management and are inherently more speculative than proved reserves estimates”). Further, the FE accounts fail to allege that any of these purported disagreements—much less, concrete facts inconsistent with Concho’s statements—were communicated to Defendants Leach, Harper, Wright, or Schroer *at all*. Indeed, not a single FE alleges having a personal interaction with any of those defendants. *Key Energy*, 166 F. Supp. 3d at 862 (rejecting CW accounts when, among other things “[t]here [were] no allegations that three of the four Individual Defendants ... had any communications with the CW[s]”).

FE-1 postures as if he were stepping beyond a mere divergence in opinions when characterizing disclosures of the Dominator’s early results as purportedly inconsistent with Concho’s “live data” from the wells. CC ¶ 101. But, as to Leach’s May 1, 2019 statement that early Dominator results were “pretty good,” *id.* ¶ 102, FE-1 fails to allege with particularity *when* exactly the Dominator’s production data became such that Leach’s (non-actionably vague) statement was supposedly false when made, or *how* Leach knew such data besides his mere position in the Company. *See id.* ¶ 101 (alleging Dominator results were disappointing “very quickly,” “immediately,” and “early in the process”); *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2022 WL 112029, at *13 (S.D. Tex. Jan. 12, 2022) (“Simply pleading that a defendant had access to internal information that contradicted that individual’s public statements is not enough.”). Even worse, FE-1 critiques Giraud’s February 2019 statement that Concho was “seeing the results we expected,” as if that, too, were inconsistent with “live” Dominator data, *id.*, when

Giraud was not even talking about the Dominator (which was not yet online) but instead was discussing large-scale development in general, *id.* ¶ 277, which undisputedly *had* been successful for Concho. *Supra* at 4–6.

Moreover, many of the FE accounts are dissembling, as they *confirm* that Defendants actually believed in the viability of large-scale development and the Dominator test:

- FE-3 alleges that management "drank 'a little too much of their own Kool-Aid,'" "had the mindset that 'we … can do no wrong,'" and displayed "irrational exuberance" as to the Dominator project. CC ¶¶ 112, 113, 115.
- FE-5 states that "management thought 'they could get away with' spacing wells tightly at the Dominator Project" based on the underlying geology. *Id.* ¶ 134.
- FE-8 alleges that "the problem with Concho's management was hubris" and that Concho's "level of success gave management the feeling that they had the 'Midas touch'" and "overconfidence." *Id.* ¶ 144.

Courts naturally observe that FE or other CW accounts such as these only detract from the inference of scienter they seek to demonstrate. *See, e.g.*, *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 41 (1st Cir. 2020) (CW accounts "actually suggest[ed] a contrary inference" that "defendants believed they could still meet the FDA's requirements"); *Bulmahn*, 147 F. Supp. 3d at 530 (CW allegation disagreeing with defendant's "assurances" actually "support[ed] an inference that defendants remained optimistic" and thus cut against scienter).

Finally, most of the FEs repeat hearsay or speculation or otherwise were not in a position to have knowledge of the facts they purport to allege. Such accounts are plainly insufficient to allege scienter with particularity. *See, e.g.*, *Wu Winfred Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 578 (W.D. Tex. May 8, 2017) ("hearsay-within-hearsay account" was "too unreliable to give rise to an inference of scienter as cogent or compelling as any competing inference of nonfraudulent intent"); *see also Pier 1*, 935 F.3d at 434 ("[T]hese statements are all from confidential witnesses who do not relate any interaction with [individual defendants], so we must

discount them.”). These FEs do not even have personal knowledge about the Dominator, much less about the Individual Defendant’s knowledge or beliefs regarding the Challenged Statements:

- FE-4 admits he only “worked in a group that was ‘adjacent’ to Dominator [and] that was trying to come up with a competing project for funding.” CC ¶ 126.
- FE-5, a landman, states that the Dominator was “very controversial” and repeats what he allegedly heard after “speaking to approximately 10 geologists and engineers who worked on the Dominator Project.” *Id.* ¶¶ 131–32.
- FE-6 admits he “was not directly involved with planning the Dominator project but [that] he heard about the project through colleagues.” *Id.* ¶ 136.
- FE-7, a Division Order Analyst (a legal analyst of sorts), states “he believed that the reservoir economics for Dominator ‘wouldn’t work out.’” *Id.* ¶¶ 139–40.
- FE-8 admits that “he had heard about [the Dominator] from others at Concho.” *Id.* ¶ 142. He also alleges that “Concho went ‘all out’ with the Dominator” and “did not continue to take ‘baby steps’” when increasing the well count, *id.* ¶ 145, which is consistent with how Concho publicly described the project. *Supra* at 7.
- FE-9, a member of the IT department, states Giraud told a gathering of IT employees in January 2020—long after Concho disclosed that Dominator spacing was too tight—that the Dominator results and the acquisition of RSP Permian had caused Concho’s stock price to perform poorly. CC ¶¶ 148–50.

Thus, much like the balance of the 185-page CC, these FE accounts are substantively hollow, meant to overwhelm the Court with repetition rather than plead discrete facts probative of Defendants’ supposedly fraudulent intent.

### 2. The CC resorts to a handful of boilerplate scienter allegations.

Besides the deficient FE accounts chronicled above, the CC throws in a few worn-out scienter allegations that get zero traction in the Fifth Circuit.[20]

[20] Virtually the entire CC lumps all “Individual Defendants” together and repeats the same sweeping, conclusory allegations over and over, but specifically fails to connect them to each purportedly fraudulent statement—indeed, the only statements alleged to have been made by either Schroer or Wright were contained in 10-Ks, and the CC does not plead which portion of each 10-K is attributable to each. *See, e.g.*, CC ¶ 181(e). The Fifth Circuit rejects such “group pleading” of scienter. *Southland*, 365 F.3d at 364–65 (requiring scienter allegations be specifically pleaded against each defendant, not lumped together under an amorphous “Defendants” tag); *see also Shaw*, 537 F.3d at 531 n.1 (same); *Alaska Electrical Pension Fund v. Asar*, 268 F. App’x 175, 186 (5th Cir. 2019) (dismissing claims as to corporate executive as impermissible group pleading because “scienter cannot be inferred from a conclusion about the

***Simply making the statements.*** First up is the notion that Defendants' statements *themselves* "indicate direct knowledge of all undisclosed adverse facts." CC ¶¶ 326–41 (referencing CS 11–14, 16–17, 19–20, 23–24, 28, 30, 32–34, 37–38, 40, 42, 46–48, 53–54, 57, 64, and 66–67, as labeled in App'x A). The CC never explains why or how that is so, opting instead to recycle multiple pages' worth of the Challenged Statements made by Leach, Harper, or Giraud and then declare that "the Individual Defendants were hands-on managers with specific knowledge of (or direct access to) data and facts regarding Concho's large-scale, multi-well development projects, including Dominator." *Id.* ¶ 326. That sort of imputed-knowledge theory gets the CC nowhere. Simply speaking about a topic—or even closely following it—does not equate to knowledge of scienter-probative facts in the Fifth Circuit.[21] And Chief Judge Rosenthal recently rejected the suggestion that even a "corporate officer who repeatedly represents that he has an active and engaged role in a particular corporate initiative is charged with knowledge of all 'on the ground' facts about the initiative." *Plains*, 245 F. Supp. 3d at 925 n.12.

***Access to data and positions.*** Mere "access to Company databases and real time data" and attendance at weekly executive meetings, CC ¶ 386, are boilerplate allegations courts have rejected repeatedly. *See, e.g.*, *Abrams*, 292 F.3d at 431–32 (allegations that defendants "were senior level executives … who were intimately familiar with the inner workings of the company" and "allegedly received unidentified daily, weekly and monthly financial reports that apprized them of the company's true financial status" were too general to plead scienter); *Cabot*, 2022 WL 112029, at *13 ("Simply pleading that a defendant had access to internal information that contradicted that

intent of a subgroup of [company] employees that might not have included [the defendant] himself").

[21] *See, e.g.*, *Asar*, 268 F. App'x at 188 (rejecting imputation theory even when defendants stated "they followed the Medicare audits closely"); *Shaw*, 537 F.3d at 535 (executive's "boast that 'there is nothing in this company that I don't know" was "insufficient to support a strong inference of scienter"); *Goldstein v. MCI Worldcom*, 340 F.3d 238, 251 (5th Cir. 2003) (allegation that defendant was a "hands-on" CEO and therefore must have been aware of accounting error was not specific enough to support an inference of scienter).

individual's public statements is not enough.").

***Retrospective "admissions."*** The CC also props up Concho's explanation that the Dominator's production lagged because its wells were "too tight" as if that were some grand "admission" of scienter. CC ¶ 162. But a retrospective observation is not an indication of contemporaneous scienter, and Concho's backward-looking explanation for why the Dominator hit a snag demonstrates nothing about what Defendants *believed before* those problems came to light. *See e.g.*, *Southland*, 365 F.3d at 383 ("[B]ecause fraud cannot be proved by hindsight, subsequent [events] are unpersuasive of scienter, as they do not show what any particular individual knew, or was severely reckless in not knowing, at the time."); *Rosenzweig*, 332 F.3d at 867–68 (rejecting scienter-admission theory when report was "plainly a *hindsight* assessment"); *Heck v. Orion Grp.*, 468 F. Supp. 3d 828, 847–48 (S.D. Tex. 2020) (alleged "admissions" were in fact "reports of poor financial results attributed to unexpected events that postdate[d] the alleged misrepresentations" and thus not probative of scienter).

### C. The non-culpable inferences plainly outweigh the culpable ones.

Setting aside the above flaws in the CC's scienter allegations, the CC can survive dismissal only if those allegations add up to an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The CC fails that test, as (1) its core scienter pitch vacillates between nonsensical and non-cognizable, and (2) plausible, non-culpable inferences abound.

1. To the extent the CC trots out a corporate self-sabotage theory that the Individual Defendants not only knew about internal critiques of the Dominator project but *believed* Concho was "pour[ing] $100 million into the ground and burn[ing] it," CC ¶ 134, it goes nowhere. Courts routinely reject theories that "def[y] economic reason," *In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 644 (S.D. Tex. 2001), including dismissing as "illogical and contrary to common

sense" a theory (markedly similar to this one) that "executives would believe that a new program would be disastrous, and nonetheless proceed." *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 166 (N.D. Tex. 2007); *see also Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) ("It is improbable that [the company] would stake its existence on a drug and a clinical trial that the company *thought was doomed to failure*.") (emphasis added).

The CC's allegations of fraud by hindsight fare no better. It suggests that Concho's Q2 2019 results and its overshooting the ideal density of large-scale development somehow demonstrates that Defendants' initial, heavily measured optimism was fraudulent. But the law makes "no allowance" for "pleading fraud by hindsight" via "alleg[ations] that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly." *McDermott Int'l*, 2015 WL 1143081, at *10–11. Absent a "particularized showing that the defendants did not believe what they were saying when they said it"—and there is none here—the CC falls smack dab in that fraud-by-hindsight mold. *Id.*

2. Conversely, plausible non-culpable inferences leap off the page. The CC's FE accounts practically spell out the inference that Concho's "level of success" gave Defendants' "irrational exuberance," "a little too much of their own Kool-Aid," and "hubris," CC ¶¶ 346, 349, that caused the Company to push its large-scale development too far, only to reach disappointing results. But hubris or overconfidence, however characterized, does not equate to scienter. *See Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1248 (10th Cir. 2016) (rejecting § 10(b) claim when more plausible inference was that defendants "placed too much confidence in the recovery plan"); *In re Guess?, Inc. Sec. Litig.*, 174 F. Supp. 2d 1067, 1078 (C.D. Cal. 2001) (rejecting § 10(b) claim when inference of fraud was less plausible "than a lack of caution, a lack of solid information, a belief that it was part of the company's grand expansion plans, or a

momentary surplus of hubris”). And Defendants’ prompt disclosure of what occurred only one quarter after the Dominator came online is hardly indicative of a scheme to defraud. *See* CC ¶ 154 (FE-9 alleging that Leach stated that Concho “could’ve tried hiding” poor performance but instead opted to be “open”); *Shields*, 25 F.3d at 1130 (struggling “to see what benefits accrue from a short respite from an inevitable day of reckoning”).

The overtly experimental nature of Concho’s progressive effort to push the boundaries on optimizing well spacing and completions adds a further, non-culpable gloss to the CC’s allegations. That a company “may have been overly optimistic about” an initiative and “decided to cut bait after experimenting” with it “does not state a claim for fraud.” *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 526 (S.D.N.Y. Aug. 18, 2020), *appeal docketed*, No. 21-02698 (2d Cir. Oct. 27, 2021). Were it otherwise, as courts have observed in the clinical-trial context, “the securities laws [could] become a tool to second guess how [experimental] trials are designed and managed,” which would be “unjust” and “could lead to unfortunate consequences beyond a single lawsuit.” *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 2014 WL 585658 at *1 (S.D.N.Y. Feb 14, 2014). Haling Concho and its management into federal court for *openly* pushing the boundaries on an emerging methodology (one gaining some traction in the industry) and *learning* from those optimization efforts would deter experimentation and unconventional thinking in the E&P industry and elsewhere. “The law prevents such a result.” *Id.*

## III. The Section 20(a) claims necessarily fail without a cognizable primary claim.

“Control person liability” under § 20(a) of the Exchange Act “is secondary only and cannot exist in the absence of a primary violation.” *Southland*, 365 F.3d at 383. Because the CC’s § 10(b) claims fail, so does its § 20(a) cause of action. *E.g.*, *Shaw*, 537 F.3d at 545.

## CONCLUSION

The Court should dismiss the CC with prejudice.

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ David D. Sterling*

David D. Sterling
Attorney-In-Charge
State Bar No. 19170000
Federal I.D. No. 07079
Amy Pharr Hefley
State Bar No. 24046046
Anthony J. Lucisano
State Bar No. 24102118
Federal I.D. No. 3369146
C. Frank Mace
State Bar No. 24110609
Federal I.D. No. 3385915
910 Louisiana Street
Houston, Texas 77002
(713) 229-1946
(713) 229-7946 (Fax)
david.sterling@bakerbotts.com
amy.hefley@bakerbotts.com
anthony.lucisano@bakerbotts.com
frank.mace@bakerbotts.com

ATTORNEYS FOR DEFENDANTS CONCHO RESOURCES INC., CONOCOPHILLIPS, AS SUCCESSOR IN INTEREST TO CONCHO RESOURCES INC., TIMOTHY LEACH, JACK F. HARPER, C. WILLIAM GIRAUD, E. JOSEPH WRIGHT, AND BRENDA R. SCHROER

## CERTIFICATE OF CONFERENCE

I hereby certify under Rule 7.P of the Court's Civil Procedures that on March 8, 2022, I conferred with counsel for Lead Plaintiffs and confirmed that the parties could not agree that the pleading deficiencies asserted in this motion could be cured in any part by a permissible amendment.

*/s/ Anthony J. Lucisano*
Anthony J. Lucisano

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via ECF and/or electronic mail on all counsel of record on this 8th day of March, 2022.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley