**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  | x | |
|---|---|---|
|  | : | Case No. 4:21-cv-02473 |
|  | : | |
| IN RE CONCHO RESOURCES INC., | : | CLASS ACTION |
| SECURITIES LITIGATION | : | |
|  | : | |
|  | : | |
|  | x | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

I.     INTRODUCTION ................................................................................................ 1

II.    NATURE AND STAGE OF THE PROCEEDINGS ........................................... 3

III.   STATEMENT OF ISSUES TO BE DECIDED ................................................... 3

IV.    SUMMARY OF ALLEGATIONS ....................................................................... 4

       A.     Factual Background ................................................................................. 4

              1.     Company Information ................................................................. 4

              2.     Defendants' Misstatements and Omissions ............................... 4

              3.     Post Class Period Events ........................................................... 10

V.     ARGUMENT ...................................................................................................... 11

       A.     Applicable Legal Standards ................................................................... 11

              1.     Motion to Dismiss Pleading Standard ....................................... 11

              2.     Section 10(b) of the Exchange Act ............................................ 12

       (a)    False and Misleading Statements and Omissions ................................. 13

       (b)    Scienter ................................................................................................. 14

       B.     Defendants' Exhibits Cannot Be Used to Allege Facts ........................ 14

       C.     The Complaint Adequately Pleads Exchange Act Claims .................... 15

              1.     The Complaint Adequately Pleads Falsity ................................ 15

       (a)    The PSLRA Safe Harbor does not Apply .............................................. 21

       (b)    Purported Opinion Statements Are Actionable ..................................... 23

       (c)    Initial Dominator Results not Puffery ................................................... 25

       (d)    Schroer and Wright Made Statements ................................................... 26

              2.     The Complaint Adequately Pleads a Strong Inference of Scienter .......... 26

       (a)    Holistic Analysis of the Allegations Supports Scienter ........................ 27

(b) Defendants' Competing Inferences Are Not More Compelling ........................... 34

3. The Complaint Adequately Alleges Control Person Claims ................... 35

VI. CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC Arbitrage Plaintiffs Group v. Tchuruk,*
 291 F.3d 336 (5th Cir. 2002) ....................................................................................... 13, 17

*Abrams v. Baker Hughes Inc.,*
 292 F.3d 424 (5th Cir. 2002) ............................................................................................ 33

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)........................................................................................................... 12

*Barrie v. Intervoice–Brite, Inc.,*
 397 F.3d 249 (5th Cir. 2005) ....................................................................................... 13, 28

*Berger v. Compaq Computer Corp.,*
 1999 WL 33620108 (S.D. Tex. Dec. 22, 1999).................................................................. 22

*In re: BP p.l.c. Sec. Litig.,*
 2016 WL 3090779 (S.D. Tex. May 31, 2016)..................................................................... 24

*In re BP p.l.c. Sec. Litig.,*
 843 F. Supp. 2d 712 (S.D. Tex. 2012) ...................................................................... 13, 15, 33

*Brody v. Zix Corp.,*
 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)........................................................ 14, 26, 31

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.,*
 2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) ............................................................... 17, 26

*Carlton v. Cannon,*
 184 F. Supp. 3d 428 (S.D. Tex. 2016) ...................................................................... 16, 25, 32

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,*
 497 F.3d 546 (5th Cir. 2007) ............................................................................................. 28

*In re. Chi. Bridge & Iron Co. N.V. Sec. Litig.,*
 2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..................................................................... 30

*In re Cobalt Int'l Energy, Inc.,*
 2016 WL 215476 (S.D. Tex. Jan. 19, 2016)....................................................................... 29

*Colony Ins. Co. v. Peachtree Constr., Ltd.,*
 647 F.3d 248 (5th Cir. 2011) ............................................................................................. 12

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
2022 WL 112029 (S.D. Tex. Jan. 12, 2022) ......................................................... 31, 33

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ......................................................... 1, 13, 14

*Firefighters Pension & Relief Fund City of New Orleans v. Bulmahn*,
147 F. Supp. 3d 493 (E.D. La. 2015) .................................................................... 31

*Fitzpatrick v. Uni-Pixel, Inc.*,
35 F. Supp. 3d 813 (S.D. Tex. 2014) .................................................................... 22

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*,
2004 WL 5278716 (E.D. Tex. June 16, 2004) ....................................................... 26

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ............................................................................... 27

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) .................................................................. 15

*Hall v. Rent-A-Center, Inc.*,
2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ................................................... 21, 28

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ........................................................................... 25, 26

*Heck v. Orion Grp. Holdings, Inc.*,
468 F. Supp. 3d 828 (S.D. Tex. 2020) .................................................................. 27

*Holzwasser v. Staktek Holdings, Inc.*,
2006 WL 897746 (W.D. Tex. Mar. 30, 2006) ........................................... 14, 26, 27, 34

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) ............................................................................... 29

*Inst. Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ................................................................................. 30

*Irvin v. S. Snow Mfg., Inc.*,
517 F. App'x 229 (5th Cir. 2013) ........................................................................... 11

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
237 F. Supp. 3d 492 (S.D. Tex. 2017) .............................................................. 29, 30

*Kaltman v. Key Energy Servs., Inc.*,
447 F. Supp. 2d 648 (W.D. Tex. 2006) .................................................................. 25

*KB Partners I, L.P. v. Pain Therapeutics,*
2015 WL 7760201 (W.D. Tex. Dec. 1, 2015) ........................................................... 15, 17, 26

*In re Key Energy Services, Inc. Sec. Litig.,*
166 F. Supp. 3d 822 (S.D. Tex. 2016) ................................................................. 30

*Kong v. Fluidgm Corp.,*
2021 WL 3409258 (N.D. Cal. Aug. 4, 2021) ........................................................ 31

*Kurtzman v. Compaq Computer Corp.,*
2000 WL 34292632 (S.D. Tex. Dec. 12, 2000) ....................................................... 23, 25, 26

*Lormand v. US Unwired, Inc.,*
565 F.3d 228 (5th Cir. 2009) ................................................................. *passim*

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
513 F.3d 702 (7th Cir. 2008) ................................................................. 34, 35

*Marcus v. J.C. Penney Co.,*
2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) ........................................................ 13

*Matrixx Initiatives, Inc. v. Siracusano,*
563 U.S. 27 (2011) ................................................................. 12

*Microcapital Fund LP v. Conn's Inc.,*
2019 WL 3451153 (S.D. Tex. July 24, 2019) ......................................................... 24

*Nathenson v. Zonagena, Inc.,*
267 F.3d 400 (5th Cir. 2001) ................................................................. 13

*In re Netsolve, Inc. Sec. Litig.,*
185 F. Supp. 2d 684 (W.D. Tex. 2001) ................................................................. 33

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
575 U.S. 175 (2015) ................................................................. 23, 24

*Owens v. Jastrow,*
789 F.3d 529 (5th Cir. 2015) ................................................................. 31

*Plotkin v. IP Axess, Inc.,*
407 F.3d 690 (5th Cir. 2005) ................................................................. 13, 27, 32, 35

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.,*
777 F. App'x 726 (5th Cir. 2019) ................................................................. 24

*Ramirez v. Exxon Mobil Corp.,*
334 F. Supp. 3d 832 (N.D. Tex. 2018) ................................................................. 21, 24, 32

*Ret. Sys. Mich. v. Pier 1 Imports, Inc.*,
935 F.3d 424 (5th Cir. 2019) .................................................................................................. 32

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) .................................................................................................. 27

*Rougier v. Applied Optoelectronics, Inc*,
2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)................................................................*passim*

*SEC v. W. J. Howey Co.*,
328 U. S. 293 (1946)................................................................................................................ 1

*Shen v. Exela Techs. Inc.*,
2022 WL 198402 (N.D. Tex. Jan. 21, 2022) .................................................................. 14, 19

*In re SolarWinds Corp. Sec. Litig.*,
2022 WL 958385 (W.D. Tex. Mar. 30, 2022) ........................................................................ 14

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d (5th Cir. 2004) ................................................................................................... 23, 27

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) .......................................................................... 14, 21, 26, 30

*Stone v. Life Partners Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014)................................................................................ 22, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................*passim*

*Williams v. WMX Techs.*,
112 F.3d 175 (5th Cir. 1997) .................................................................................................. 12

*Wu Winfred Huang v. EZCORP, Inc.*,
259 F. Supp. 3d 563 (W.D. Tex. 2017)............................................................................... 31, 32

*Yan v. ReWalk Robotics Ltd.*,
973 F.3d 22 (1st Cir. 2020).................................................................................................... 31

**Statutes**

15 U.S.C. § 78j(b)..................................................................................................................... 12

15 U.S.C. § 78u-4(b)(1) ........................................................................................................... 13

15 U.S.C. § 78u–4(b)(2) ........................................................................................................... 14

15 U.S.C. § 78u-5(c)(1) ............................................................................................................ 21

**Other Authorities**

17 C.F.R. § 240.10b-5 .................................................................................................... 12

Fed. R. Civ. P. 9 .............................................................................................. 12, 13, 16

Fed. R. Civ. P. 15 ........................................................................................................ 35

Lead Plaintiffs Utah Retirement Systems and Construction Laborers Pension Trust for Southern California respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss (ECF No. 29) ("MTD").[1]

## I.   INTRODUCTION

> *The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.* Makor Issues & Rights, Ltd. v. Tellabs Inc., *513 F.3d 702, 711 (7th Cir. 2008).*

In an effort to restore shattered investor confidence after corporate scandals helped cause the stock market crash of 1929, the Securities Exchange Act of 1934 (the "Exchange Act") was enacted "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 569 (S.D. Tex. 2002). The Exchange Act gives rise to liability for false, misleading, and incomplete statements made in connection with the purchase or sale of securities. It is designed with flexibility in mind, "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W. J. Howey Co.*, 328 U. S. 293, 299 (1946).

This case falls squarely into a classic pattern of securities fraud—marketing a highly risky investment as anything but. The case concerns Defendants' failure to inform the market that they

---

[1]   Citations to paragraphs ("¶") refer to the Consolidated Complaint for Violations of the Federal Securities Laws ( "Complaint"). ECF No. 25. "Defendants" refers to Concho Resources Inc. ("Concho" or the "Company"), ¶21; ConocoPhillips, as successor-in-interest to Concho, ¶22; Timothy A. Leach ("Leach"), ¶23; Jack F. Harper ("Harper"), ¶24; C. William Giraud ("Giraud"), ¶25; E. Joseph Wright ("Wright"), ¶26; and Brenda R. Schroer ("Schroer"), ¶27. "Individual Defendants" refers to Defendants Leach, Harper, Giraud, Wright, and Schroer. ¶28. Emphasis is added and internal citations and quotation marks are omitted throughout.

were uncharacteristically risking the fate of the Company on the widespread adoption large-scale development, which entailed the combination of highly risky and experimental production methodologies, including tightly spaced wells, with no visibility into whether their gambit would succeed. Not only did this wager threaten billions in lost costs, but if unsuccessful, would hamstring Concho's ability to generate revenue for years to come. As a result, Concho's risk exposure increased in orders of magnitude due to the sea change in the Company's project focus.

While companies are free to take risks, and rightly so, public companies are not equally free to withhold such risks from the investing public. Here, instead of being informed as to the tectonic shift in Concho's risk profile, investors were fed a narrative of misleading half-truths (at best) that the Company was poised for unprecedented success. While the Individual Defendants knew or recklessly disregarded that they had bet the fate of the Company on experimentation, investors were told that due to the successful implementation of large-scale development Concho had reached an "inflection point" of efficiency and growth. Defendants raised guidance accordingly. Such false assurances were couched in declarations that Concho's new projects were the product of gradual development and in a "later stage of innings" in determining ideal well spacing. Defendants falsely stated that they continued to have a "portfolio approach" to managing risk in that large-scale projects were "dispersed amongst [Concho's] asset base," and that the Company was only conducting a handful of well-spacing "tests."

According to former employees of the Company ("FEs"),[2] these projects were unsupported by data and met with internal derision and outrage based on the glaring risks associated with aggressively spaced wells. Yet Defendants purposely refused to account for this never-before-seen concentration of risk when issuing financial forecasts, despite direct and

---

[2]   Masculine pronouns are used for FEs for ease of readability, not to identify any FE by gender.

repeated protests from FEs that such projections were inaccurate and overstated. FEs further confirmed that Concho's aggressive flagship project, the Dominator, was a "reflection of everything" at the time. Finally, FEs confirmed that early production results from the Dominator and other projects immediately indicated that the projects were performing abysmally.

Had Defendants' gamble succeeded, they would have been lauded as pioneers in the industry and investors would have never known the level of risk to which they were exposed. Unfortunately, their wager was a total failure, resulting in languishing production and a reduction in the Company's key assets due to tight well spacing as Defendants frantically reverted to wider well spacing for all future projects. The damage to the Company, however, was irreparable—its value collapsed, never to recover—and Concho was ultimately acquired for pennies on the dollar.

For the reasons stated herein, the Complaint readily meets the pleading standards as required by the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Defendants' motion should be denied in its entirety.

## II.   NATURE AND STAGE OF THE PROCEEDINGS

This securities fraud class action is brought against all Defendants for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5, and against the Individual Defendants for control person liability under Section 20(a) of the Exchange Act. This Action has been brought on behalf of a class of investors who purchased Concho common stock during the period February 21, 2018 through July 31, 2019 (the "Class Period"), and were damaged thereby. The Action was commenced on July 30, 2021. The Complaint was filed on January 7, 2022. The MTD was filed on March 8, 2022. Lead Plaintiffs oppose the MTD in all respects.

## III.   STATEMENT OF ISSUES TO BE DECIDED

1.   Whether the Complaint states a claim against all Defendants for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

3

2.     Whether the Complaint adequately alleges control person claims under Section 20(a) of the Exchange Act against the Individual Defendants.

## IV.    SUMMARY OF ALLEGATIONS

### A.    Factual Background

#### 1.    Company Information

At all relevant times, Concho was an independent oil and natural gas company engaged in the acquisition, development, exploration and production of oil and natural gas properties in the Permian Basin. ¶30. Prior to the start of the Class Period, Concho primarily produced oil and natural gas through established methodologies that involved minimal risk. ¶35. During the Class Period, however, Concho began construction on projects of unprecedented scale and cost, which it referred to as "large-scale development" or "manufacturing mode." ¶¶35-36. As part of Concho's strategic shift to "manufacturing mode," the Company began construction of the flagship Dominator 23 multi-well pad in the Northern Delaware Basin. ¶37.

On March 28, 2018, Concho announced that it had entered into a definitive agreement to acquire RSP Permian, Inc. ("RSP") for approximately $9.5 billion, in a deal giving Concho an implied value of $38 billion. ¶203-04. According to Defendants, the acquisition of the RSP acreage would create synergies driven by the Company's shift to manufacturing style development. ¶¶206-10.

#### 2.    Defendants' Misstatements and Omissions

Unbeknownst to investors—but shown by FEs and corroborated by Defendants' own post-Class Period admissions—Concho's widespread adoption of manufacturing mode consisted of an experimental combination of highly risky development methodologies involving tightly spaced

wells.[3] ¶¶35-37. Investors were entirely unaware that the Company was exposed to potentially catastrophic risks which was highly aberrational for Concho. Instead, the Complaint alleges that Defendants: (i) declared the transition to large-scale development as a success and touted its benefits despite having zero basis to know it would work as intended;[4] (ii) falsely stated that manufacturing mode was the product of gradual learning and verified techniques despite being experimental;[5] (iii) issued non-risk adjusted production forecasts despite internal understanding that such forecasts were inaccurate and overstated;[6] and (iv) stated that large-scale development projects were dispersed, when in reality exposure was Company-wide.[7]

*Large-Scale Development's "Success."* The Complaint alleges that Defendants repeatedly stated that their successful transition to large-scale development delivered economies of scale that maximized production, reduced costs, and mitigated risk. For example:

- On February 21, 2018, Defendant Harper told investors that Concho's large-scale, multi-well projects would "*continue* to drive growth, innovation and efficiencies" at Concho and that the Company had successfully made the transition to large-scale development. ¶¶7, 58, 190, 193, 358.

- On March 28, 2018, Defendant Leach stated that Concho's manufacturing mode "*generates cost savings*" and was "*very additive*." ¶¶60, 208, 330, 331.

- On May 2, 2018, Defendant Harper stated that Concho's "*large-scale project development will drive the quarterly production growth trajectory*." ¶¶61, 332.

- On February 20, 2019, Defendant Harper stated that Concho's manufacturing mode development "*continue[s] to demonstrate the prudence of this approach, which mitigates parent-child impacts, drives operational efficiencies and maximizes the long-term value of our investments*." ¶¶71, 275.

---

[3]  *See* ¶¶44-55 (explanation of relevant drilling techniques and the risks associated therewith).

[4]  *See, e.g.*, ¶¶172, 192, 195, 210, 213, 216, 219, 235, 241, 246, 256, 261, 263, 276, 279, 297.

[5]  *See, e.g.*, ¶¶172, 177, 192, 195, 200, 210, 213, 226, 232, 246, 248, 297.

[6]  *See, e.g.*, ¶¶173, 175, 179, 183, 187, 192, 241, 254, 263, 267, 269, 272.

[7]  *See, e.g.*, ¶¶172, 181, 192, 198, 202, 226, 244, 261, 284.

- On May 1, 2019, Defendant Leach stated that he saw "***strong early production out of our latest projects, including the Dominator***," later adding that "***returns look pretty good for us***" and that such projects "***drives a lot of value creation***." ¶¶67, 281, 292, 341.

FEs have stated Defendants' statements regarding the success and benefits of large-scale development were baseless. According to FE-1, a member of the technical staff that designed and executed the Dominator, early on it was clear that production was below projections, and the Company quickly started to see concerning "pressure degradation." ¶¶74, 101. FE-1 stated that Defendants knew immediately that Dominator was not hitting projections, and that many projects, including Dominator, were underperforming. ¶¶101-03. FE-2, a former Concho Lead Reservoir Engineer and Advisor, stated that technically the Dominator wells qualified as child wells which produce less oil, and that Dominator wells were uneconomical compared to production medians. ¶¶107, 109-10. FE-3, who advised the geoscience team working on the Dominator project, stated the area was "over-completed," meaning close well spacing led to interference. ¶¶112-13. FE-3 recalled that Defendants prematurely assumed Dominator would succeed despite critical doubts to the contrary among the technical teams. ¶¶114-15. According to FE-3, the completion phase at Dominator was done in three sets, and that issues started to emerge with the second phase, which failed to reach maximum production, and the third phase showed "immediate decline." ¶119. FE-5, a former Landman, stated the wells at the Dominator Project were "absolutely" too tight, and that he did not talk to a single geologist or engineer who felt otherwise. ¶¶131-32. According to FE-9, Defendant Giraud explained that the spacing for the Dominator project was "bad," that the issues "should've been caught a lot sooner," and that there were too many wells. ¶151.

***No Technological Basis.*** The Complaint alleges that Defendants told investors their current projects were being informed by the past in that they relied upon gradual learning and verified techniques. For example:

6

- On February 21, 2018, when asked about whether Concho was seeing any degradation due to parent-child wells in its manufacturing mode strategy, Defendant Harper told investors, that "*we've modeled the outcome as we see it based on spacing that has either already happened or will happen in the future*." ¶¶69, 194, 328.

- On March 5, 2018, Defendant Harper stated that "*drilling synergies*" associated with large-scale development were "*well documented*" and a "*more effective way to complete [] wells*." ¶¶5, 59, 199, 329.

- On May 15, 2018, Defendant Giraud explained to investors the shift to manufacturing style development was not a "*switch get[ting] flipped*," a "*big step change*," or a "*dramatic change*," at Concho because of their incremental and disciplined approach. According to Defendant Giraud, Concho had "*come through discovery, … gone through delineation and now [Concho is] into development mode*." Defendant Giraud specifically told investors that with respect to knowing what well "spacing needs to be," Concho was "*farther down the line*" and "*in a later stage of innings*." ¶¶8, 62, 69, 224, 225, 333.

- On October 31, 2018, Defendant Giraud emphasized using large-scale projects to "maximiz[e] resources by minimizing the impact of the parent-child effect," that "*we have built our type curves and our internal modeling based upon the results we have seen*" and "*everything we've seen has been consistent with what we were expected and has [been] baked into*" the 2019 and 2020 production outlook. ¶¶70, 262.

- On the August 2, 2018, Defendant Giraud stated that these larger projects were "a *steady evolution over the last couple of years* as we've tested different spacing between – within a zone and between zones." ¶¶66, 231, 335.

FEs stated that Concho's manufacturing mode lacked a technological basis. According to FE-1, the Company determined to find the limits of well spacing by any means and intended to take their "lumps" to get there. ¶¶75, 350-51. Based on a past well drilling study FE-2 performed for Concho, he stated only 8 to 12 wells should have been drilled in the area selected for Dominator. ¶108. FE-8, a former Senior Geologist, echoed FE-2's conclusions related to the well-spacing risk, referring to FE-2 as the "frack guru" at Concho. ¶143. Per FE-8, Concho historically employed a gradual process to collect data, which approach was abandoned for the Dominator. ¶145. FE-3 stated that no there was no technical basis for Dominator and Concho failed to adequately weigh the risks. ¶¶112-113. According to FE-3, Concho did not conduct fracture modeling (or ignored any modeling), which was highly unusual based on past practices, as

7

"halfway decent" modeling would have shown the project would fail. ¶¶116-17. FE-3 was told by the Vice President of Geoscience and Technology and former Geoscience Manager at Concho that completion parameters were not modified to account for the proximity of wells at Dominator. ¶118. FE-4, a former Senior Reservoir Engineer, stated that Defendants eschewed proven production methods when electing to pursue Dominator, and that the project relied on "broad assumptions," which were improperly based on a two-well model. FE-5 stated there was no scientific justification for the drilling formation at Dominator, and that similar projects in the past had failed. ¶¶132-34. Per FE-6, a former Superintendent Well Planner, Concho failed to gather sufficient data prior to drilling tightly spaced wells. ¶¶136-38.

> ***Inflated Production Forecasts.*** The Complaint alleges that Defendants disregarded well-spacing risks and issued overstated production forecasts during the Class Period For example:

- On February 21, 2018, Defendant Leach told investors that "***when we give guidance, we try to forecast the things that we're aware of at the time we give the guidance.***" ¶¶68, 186, 327.

- On May 2, 2018, Defendant Harper stated that Concho's "***large-scale project development will drive the quarterly production growth trajectory. And with a great start to the year, we've raised our full year 2018 production outlook.***" ¶¶61, 332.

According to FE-1, Defendants issued overly inflated production forecasts for Dominator and other large-scale projects. FE-1 stated that when determining production forecasts for the Dominator, which informed public financial forecasts, Concho misleadingly applied legacy risk profiles, which were inappropriate given the magnitude and spacing of wells. ¶¶74, 80-84, 90. FE-1 stated it was a conscious decision by Defendants, especially Defendant Giraud, to apply a vanilla risk profile to the Dominator despite the heightened risks—outright ignoring animated protests from FE-1 in meetings. ¶¶83-84, 86-88. Further, according to FE-1, Concho failed to model for degradation due to tight-well spacing, which was "mind-blowing" and that "never in the history of the oil business," would one assume that tighter spaced wells did not carry increased

8

risk. ¶89. FE-1 stated Concho's financial forecasts were unreasonably high and misleading based on the failure to account for Concho's increased risk profile in its production forecasts, and that the Company's tight well-spacing changed its entire risk profile. ¶¶90, 97. FE-1 further added that the majority of Concho's projects at the time had improper risk calculations. ¶¶91, 94. FE-1 explained that originally Dominator only achieved a fraction of its forecasts production and that most Concho's Class Period projects did not live up to what Concho had forecasted. ¶100.

*Overexposure to Large-Scale Projects.* The Complaint also alleges that Defendants falsely told investors that they were not putting all their eggs in one basket and that the large-scale projects were dispersed among Concho's asset base. For example:

- On March 5, 2018, Defendant Harper told investors that the Company's upcoming large-scale projects were "***dispersed amongst [Concho's] asset base***." ¶¶8, 201, 329.

- On September 5, 2018 Defendant Leach stressed Concho's "***philosophy of having a portfolio approach to mitigate risk***," and that Concho's ability to "***balance risk***" was "***the most important thing that we do that creates success for the company***." ¶¶72, 242, 258.

- On March 4, 2019, Defendant Harper told investors that Concho has "***historically been pretty conservative in the way we've accounted for inventory and well spacing***" and "***that's been [Concho's] view up till now.***" ¶¶72, 283, 340.

FE-1 stated that Concho's highly risky manufacturing style projects were dangerously concentrated, and not isolated "tests" as Defendants told the market. ¶¶91-94, 97, 99. FE-1 stated the Company's tight well-spacing changed its entire risk profile. ¶90. Per FE-1, projects with highly risky tight well-spacing were widespread at Concho, and that Dominator was a "reflection of everything" that was happening at Concho, during the Class Period.¶91. Further, FE-1 stated that 90% of Concho's 2018 budget was devoted to risky projects, and the Company lacked low risk projects to balance the risk, which was the opposite of its historical practice. ¶¶95, 97.

9

### 3.    Post Class Period Events

After the close of trading on July 31, 2019, Concho released its financial results for the second quarter 2019, reporting disappointing financial results and revealing that it had slashed its active rig count substantially and would be forced to scale back production targets for the rest of the year—without a reduction to the Company's capital budget—blaming tight well spacing at Dominator. ¶¶298, 299. The following day, Concho held an earnings call where Defendants revealed that that following Dominator's failure, Concho was being forced to retreat to wider well-spacing, and attributed Concho's reduced activity as a measure to stay on budget. ¶303. Defendants stated that while Dominator was the most extreme spacing example, other "modestly more dense" projects had been constructed with tighter spacing as well. ¶304.

Concho shares plummeted by 22% from the July 31, 2019 closing price of $97.68 per share, closing at $75.97 per share on August 1, 2019. ¶305.

Thereafter, analysts expressed their surprise and outrage and questioned the truth of Defendants' prior representations. For instance, on August 5, 2019, an analyst at Jeffries stated they were "blindsided the market with a sharp reduction in 2H19 oil volume guidance," noting that "given the production guidance increase in 1Q19 and management's strong execution track record historically, this was difficult to see coming." ¶306. The analyst further noted that "it turns out much of [Concho's] 2H18 and 1H19 program was spaced too densely," concluding that while the Company had previously indicated Dominator "was not representative of the company's development plans … *it turns out operations were not consistent with that message*." *Id.*

Concho continued to flounder. On October 30, 2019, Defendant Leach disclosed that for "2020 and beyond, [Concho] will develop fewer wells per project at wider spacing," and that due to lingering "spacing test[s] rattling through the back half of this year" Concho would not see increased capital efficiency *until 2020*. ¶¶309-10. On February 19, 2020, Defendant Harper stated

10

that moving forward, "[t]he average project size will be six wells, and … average well spacing will be 700 to 800 feet as compared to approximately 550 feet last year," meaning the Company planned to widen average well spacing across *all projects* to upwards of *250 feet*. ¶316.

In the Company's 2019 annual report dated February 19, 2020 Concho revealed it was reducing its proved reserves by 16%, primarily due to the "***Company's recent capital programs that included projects testing tighter well spacing***." ¶¶314-15.[8] Notably in this same report, Concho *for the first time*, including a risk warning related to tight well spacing. ¶313.

On October 19, 2020, ConocoPhillips and Concho announced that they had entered into an agreement to combine the two companies in a transaction valued at $9.7 billion—nearly the same price Concho had acquired RSP. ¶317.

## V.    ARGUMENT

Defendants challenge two elements of Lead Plaintiffs' Section 10(b) claim: falsity and scienter. MTD at 1. Thus, the inquiry is whether the Complaint, accepting all alleged facts as true, drawing all applicable inferences in Lead Plaintiffs' favor, and viewed holistically, adequately pleads falsity and scienter to survive a motion to dismiss.[9] The Complaint readily does so.

### A.    Applicable Legal Standards

#### 1.    Motion to Dismiss Pleading Standard

Motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). All allegations in the complaint must be accepted as true and construed in the light most favorable to the non-moving party, including drawing all reasonable inferences in the plaintiff's favor. *Lormand*, 565 F.3d at 232;

---

8    *See* ¶¶31-43 (explanation of the classification of oil and gas assets).
9    *Irvin v. S. Snow Mfg., Inc.*, 517 F. App'x 229, 231 (5th Cir. 2013) (argument waived when not raised clearly and developed adequately in opening brief).

11

*Colony Ins. Co. v. Peachtree Constr., Ltd.,* 647 F.3d 248, 252 (5th Cir. 2011) (courts should "liberally construe the complaint in favor of the plaintiff"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Claims sounding in fraud must comply with Rule 9(b) which requires a complaint to "state with particularity the circumstances constituting fraud or mistake," FED. R. CIV. P. 9(b), meaning averments of fraud must state the "who, what, when, where, and how" of the misconduct alleged. *Williams v. WMX Techs.*, 112 F.3d 175, 179 (5th Cir. 1997).

### 2. Section 10(b) of the Exchange Act

Section 10(b) of the Securities Exchange Act of 1934 makes it "unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate." 15 U.S.C. § 78j(b). Rule 10b-5 then implements Section 10(b), disallowing "untrue statement[s] of material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b-5.

To state a claim under Section 10(b) and Rule 10b-5, the plaintiff must allege in connection with the purchase or sale of securities: (i) a misstatement or omission, *i.e.*, falsity; (ii) of material fact; (iii) made with scienter; (iv) on which the plaintiff relied; (v) that proximately caused the plaintiff's injury. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 50 (2011). The elements of a Section 10(b) claim are primarily assessed under "the usual contours of a Rule 12(b)(6) ruling," in that the Court must "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand*, 565 F.3d at 232, 239.

12

"Even under the PSLRA, plaintiffs are only required to plead facts, not to produce admissible evidence." *Marcus v. J.C. Penney Co.*, 2015 WL 5766870, at *2 (E.D. Tex. Sept. 29, 2015).

**(a)     *False and Misleading Statements and Omissions***

In analyzing whether an alleged misstatement or omission is actionable, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007); *Barrie v. Intervoice–Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) (same). All inferences must be drawn in Lead Plaintiffs' favor. *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 745 (S.D. Tex. 2012) (except for scienter court must draw all reasonable inferences in favor of the plaintiff in its Rule 12(b)(6) analysis); *Lormand*, 565 F.3d at 232, 239 (same).

Misleading statements and omissions must be pled with particularity. *See* 15 U.S.C 78u-4(b)(1). A complaint need only specify: (i) the statement, identity of the speaker, when and where the statement was made; and (ii) explain why the statement was false and misleading. *See Nathenson v. Zonagena, Inc.*, 267 F.3d 400, 412 (5th Cir. 2001); *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (equating PSLRA particularity requirement with Rule 9(b)). For omissions, "a duty to speak the full truth arises when a defendant undertakes a duty to say anything." *Lormand*, 565 F.3d at 248-49. Omissions are actionable if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *BP*, 843 F. Supp. 2d at 747.

The PSLRA does not "raise the pleading burdens under Rule 9(b) and section 78u-4(b)(1) to such a level that facially valid claims … must be routinely dismissed." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002). It is merely "a mechanism for winnowing

13

out suits that lack a requisite level of specificity. It was not meant to let business and management run amuck to the detriment of shareholders." *Enron*, 235 F. Supp. 2d at 593.

### (b)    *Scienter*

The PSLRA requires a plaintiff to allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Scienter can be pled through "sufficient evidence that Defendants had actual knowledge[,]" *Brody v. Zix Corp.*, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006), or by showing "***severe recklessness***." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014). "At the pleading stage, [] a plaintiff … must only plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Lormand*, 565 F.3d at 250. "[A] tie favors the plaintiff." *Id.* at 254.

"[T]he strong-inference pleading standard does not license the Court to resolve disputed facts at this stage of the case." *Holzwasser v. Staktek Holdings, Inc.*, 2006 WL 897746, at *4 (W.D. Tex. Mar. 30, 2006). Courts must "constantly assum[e] the plaintiff's allegations to be true." *Tellabs*, 551 U.S. at 326-27. "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id. Shen v. Exela Techs. Inc.*, 2022 WL 198402, at *7-8 (N.D. Tex. Jan. 21, 2022).

### B.    Defendants' Exhibits Cannot Be Used to Allege Facts

Defendants at times improperly quote their exhibits (ECF No. 29-04 *et seq.*) to allege a competing factual narrative. *See Lormand*, 565 F.3d at 232, 239 (all factual allegations in complaint must be taken as true). At this stage, the Court must only be guided by and evaluate the facts as alleged in the Complaint. *See In re SolarWinds Corp. Sec. Litig.*, 2022 WL 958385, at *3 (W.D. Tex. Mar. 30, 2022) ("[B]ecause the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint.").

14

### C.     The Complaint Adequately Pleads Exchange Act Claims

The MTD ignores the through line of the Complaint's allegations—that Defendants knowingly and/or recklessly spoke in misleading half-truths while omitting the true risks associated with manufacturing style development. Instead, the MTD inappropriately minces the statements and allegations and urges the Court to inappropriately analyze them in a vacuum. The MTD heavily relies on a 31-page appendix (the "App'x"), which merely provides bulleted conclusions as to why each statement is inactionable. *See generally* ECF No. 29-2. Ignoring that the App'x falls well outside of the page limitations for the MTD, it does nothing to carry Defendants' burden in that it offers no explanation as to why each statement is inactionable.

### 1.     The Complaint Adequately Pleads Falsity

"[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248; *see also KB Partners I, L.P. v. Pain Therapeutics*, Inc., 2015 WL 7760201, at *9 (W.D. Tex. Dec. 1, 2015) (same). When speaking on a topic, "a duty to speak the ***full truth*** arises when a defendant undertakes a duty to say anything." *Lormand*, 565 F.3d at 249. Even literal truths can be actionable where they create the "substantial likelihood that the disclosure of … omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *BP*, 843 F. Supp. 2d at 747.

Ignoring that a defendant who speaks publicly "must disclose material, adverse facts that affect the validity" of public statements, *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 956  (S.D. Tex. 2021), the MTD obfuscates the Complaint's allegations as seeking to "impose a duty of self-flagellation that is foreign to the federal securities laws." MTD at 16-17. Further ignoring that the lion's share of the Complaint's allegations turn on what ***wasn't*** said, the MTD argues that the Complaint fails to plead false statements with

15

"particularity." Not so. Neither of these arguments are availing and cannot serve as a proxy for challenging the Complaint's allegations head on.

Based on Defendants' admissions and FE statements, the Complaint alleges that statements discussing large-scale development, namely: (i) its success and benefits; (ii) technological justification; (iii) relevant production guidance; and (iv) overall concentration in Concho's asset base, were false and misleading for creating an "impression of a state of affairs" materially different than the "one that actually existed" *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 468 (S.D. Tex. 2016). In this regard, the Complaint satisfies the particularity requirement under the PSLRA and Rule 9(b), as it "identifies each allegedly misleading statement, the individual speaker, the date on which the statement was made, the context in which the statement was made, and why the statement was misleading." *Rougier v. Applied Optoelectronics, Inc*, 2019 WL 6111516, at *8 (S.D. Tex. Mar. 27, 2019). Further, the Complaint's "explanations for the falsity of Defendants' statements logically correspond with each alleged misstatement." *Id.*

***Early "Success"***. Defendants stated they had "successfully made th[e] transition" to large-scale development (¶193), touted the "outstanding results from the Company's large-scale development projects" (¶170), including that it was "very additive" (¶208), "generate[d] cost savings" (¶207), and stated that any positive financial results "reflect[ed] [Defendants'] focus on large-scale project development, which enable[d] [Concho] to maximize ultimate recovery, efficiencies and returns" (¶213).

The Complaint alleges that when touting the success of large-scale development—as verified by the post-Class Period admissions and accounts of FEs—Defendants omitted that these projects of exorbitant cost carried equally exorbitant risks which threatened the Company's production, capital efficiency, growth, asset longevity, and overall financial health. *See Applied*

*Optoelectronics*, 2019 WL 6111516, at \*10 ("statements project[ing] a promising picture of increased revenues and manufacturing capacity" false and misleading where defendants failed to disclose relevant risks). Thus, Defendants' relevant statements are pled "as careful elisions reassuring the market not to worry and minimizing the risk[s]" which "paint[ed] an incomplete and misleading picture" of the Company. *KB Partners*, 2015 WL 7760201, at \*9.

With respect initial production, the Complaint alleges that Defendants stated their "focus paid off," and the Company "benefited from strong early production out of [Concho's] latest projects, including the Dominator."[10] ¶292. Based on these "strong results," (¶296) Defendants touted that Concho was "on track to deliver on the $2.8 billion to $3 billion capital program" and "increased [their] estimates for oil production in 2019." ¶292. Defendants categorized Concho's "full-field development"—"all about optimizing spacing, timing and drilling and completion techniques to maximize program economics and recoveries"—as "an important contributor to [Concho's] momentum." ¶293. Using Dominator to highlight this purported success, Defendants stated returns looked "pretty good" (¶295), and along with "other larger [projects]," would allow Concho to "deliver really compelling returns while continuing to learn" (¶294).

---

[10]   The MTD takes issue that the Complaint focuses on the Dominator. MTD at 13 n.7. Such focus, however, reflects the fact that it served as Defendants' flagship example of large-scale development during the Class Period as was often spoken about by Defendants. *E.g.*, ¶¶201, 218, 231, 249, 290, 292, 294-96, 300. FE-1 has alleged Dominator was a "reflection of everything" at Concho. ¶¶91, 353, 359. After the Class Period and attributed to tight-well spacing not only at Dominator, Defendants stated capital efficiency would not increase until at least 2020 (¶¶309-10), were reducing proved reserves by 16% (¶¶314-15) and reverting to wider well across the board (¶316). This is enough for this stage. Lead Plaintiffs will only be able to fully investigate Concho's portfolio of projects once discovery has been completed. *See Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2003) ("[I]n nearly every securities fraud case, only the defendants know all the facts related to the alleged fraud."). The current inquiry is whether the Complaint "entitles [Lead] Plaintiff[s] to discovery," not whether the Complaint has made every potential allegation. *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, 2021 WL 1416025, at \*11 (S.D. Tex. Apr. 14, 2021).

The Complaint's allegations directly contradict that initial results from Dominator and other projects were "good." Specifically, Lead Plaintiffs have provided their own analysis showing that Dominator was significantly underperforming other wells in the same region. ¶¶155-161. Moreover, the Complaint includes numerous accounts from FEs which indicate that the initial Dominator results were not "good," but in fact poor from the start and a clear indicator they projected abysmally. *See supra* Section IV.A.2 at 6.

***Technological Basis***. The MTD does not push back against allegations that the large-scale development was a Frankenstein's monster of costly, complex, and experimental production techniques which together relied on aggressively spaced wells.

During the Class Period, Defendants stated that Concho's business focus was not a "dramatic change" or a "switch get[ting] flipped," instead stating that the Company was "in a later stage of innings" in determining ideal well spacing—they had already "come through discovery." ¶¶8, 62, 69, 224, 225, 229, 333. Further, Defendants stated that Concho's well spacing was the product of a "steady evolution" over the past "years" (¶¶66, 231, 335), and that "drilling synergies," were "well documented" (¶¶5, 59, 199, 329). Defendants also stated that they had "modeled the outcome as [they] [saw] it based on spacing that has either already happened or will happen in the future." ¶¶69, 194, 328. Contrary to these statements, the Complaint alleges that Concho's shift was anything but gradual. Instead, Defendants abandoned the Company's previous historical approach to learning and secretly determined to find the limits of well-spacing even if they need to "take their lumps" to get there. ¶¶75, 145, 350-51. The Complaint further alleges that Defendants eschewed proven methodologies in favor of their "manufacturing" techniques despite such techniques lacking any technical basis.

18

*Financial Forecasts*. During the Class Period, Defendants stated that Concho's guidance reflected what they are "aware of at the time." ¶¶68, 186, 327. They affirmed that "large-scale project development will drive the quarterly growth trajectory" when "rais[ing] … full year 2018 production outlook." ¶¶61, 332. In this same vein, Defendant Giraud stated that well-spacing risk mitigation of parent-child wells had been "baked" into Concho's forecasts.[11] ¶¶70, 262.

Based on numerous FE accounts and post-Class Period events, the Complaint alleges that Defendants wholly disregarded the risks associated with large-scale development and aggressively spaced wells. Specifically, the Complaint alleges a conscious decision by Defendants, especially Defendant Giraud, to apply a vanilla risk profile to the Dominator despite the heightened risks. ¶¶83-84, 86-88. Further, Concho failed to model for degradation due to tight-well spacing—unheard of in the oil and gas industry. ¶89. This practice was not unique to Dominator and applied to the majority of Concho's Class Period projects. ¶¶91, 94. Thus, the Complaint alleges that Concho's financial forecasts were unreasonably high and misleading. ¶¶90, 97; *see also Exela Techs.*, 2022 WL 198402, at *2 n.3 (statements regarding future revenues actionable where complaint alleged portion of said revenues were volatile and unpredictable).

*Portfolio Exposure*. During the Class Period, Defendants stated Concho's large-scale projects were "dispersed amongst [Concho's] asset base" (¶¶8, 201, 329) and that multi-well pad drilling was used "where practical" (¶¶180, 270). Such statements tracked others regarding Concho's "philosophy of having a portfolio approach to mitigate risk" (¶¶72, 243, 258), and that

---

[11]   The MTD incorrectly challenges this statement because it "highlight[s] perceived efficiencies to be *gained* from large-scale development." MTD at 14-15. This is not the point. The Complaint does not dispute that the mitigation of parent-child risk was one of the aims of large-scale development, ¶¶49-51 (discussing zipper fracturing). Instead, the Complaint alleges that when Defendant Giraud touted mitigation of parent-child well-spacing risk as being "baked" into Concho's forecasts, it falsely conveyed that all well-spacing risks had been accounted for in Concho's production forecasts. ¶¶262-63.

its "strategy [was] the same" (¶189). Indeed, Defendants stated that Concho's "view up till now" was "pretty conservative in the way [they've] accounted for inventory and well spacing." ¶¶72, 283, 340. Considering the Company's previous zealotry regarding capital discipline, (¶¶33-34) Defendants' statements informed investors to "expect more of the same" (¶197).

At the close of the Class Period, Defendants announced that future projects would have "fewer wells per project at wider spacing" (¶¶165, 310), and that average well spacing across all projects would increase by upwards of 250 feet (¶316). Defendants further revealed that Concho's capital efficiency would remain depressed until at least 2020. ¶310. Concho was later forced to reduce proved reserves by 16%, primarily due to "the Company's recent capital programs that included projects testing tighter well spacing." ¶¶314-15. Analysts balked, with one commenting while the Company had previously indicated Dominator "was not representative of the company's development plans … it turns out operations were not consistent with that message." ¶¶306, 412.

The Complaint alleges that contrary to Defendants' Class Period representations, projects with highly risky well-spacing were widespread at Concho, and that Dominator was a "reflection of everything" that was happening at Concho during the Class Period. ¶¶90-91. As further alleged, the Company lacked low risk projects to balance the risk, which was the opposite of its historical practice, resulting in the alteration of Concho's entire risk profile changed. ¶¶95, 97.

The MTD does not dispute that Concho threw the vast majority of its budget at projects with aggressively spaced wells, instead arguing that Defendants are not liable as they stated Dominator was their most aggressive well-spacing "test" and that at the time Concho was conducting "some" other "tests." MTD at 15-16. Such a conclusion is comical, considering the Complaint alleges that it was false and misleading that Defendants described their pervasive, no holds barred well-spacing as "tests" in the first place—all without equating that large-scale

20

development and aggressive well-spacing as one and the same. *See, e.g., Hall v. Rent-A-Center, Inc.*, 2017 WL 6398742, at \*21 (E.D. Tex. Oct. 19, 2017) (misleading statements created "impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed"). Even if the term "test" was literally true when spoken, it misdirected investors from the full truth, namely the "anticipated magnitude" of the risks to which the Company was exposed should its monotone project focus fail. *See Lormand*, 565 F.3d at 248 ("omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action").

### (a)   *The PSLRA Safe Harbor does not Apply*

The MTD argues that "[m]any" of the challenged statements are inactionable under the PSLRA's safe harbor (MTD at 18-19 & n.10), which provides that forward-looking statements accompanied by "meaningful" cautionary language do not give rise to Exchange Act liability. 15 U.S.C. § 78u-5(c)(1). However, the MTD ***makes no attempt*** to substantively challenge a single statement as forward-looking, instead it merely concludes at the outset that "[m]any of the Challenged Statements qualify as forward-looking statements within the PSLRA's safe harbor" because they touch on financial projections and future performance.[12] MTD at 18.

"The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement." *Spitzberg*, 758 F.3d at 691. Any forward-looking

---

[12]   The App'x conclusively labels most of the Complaint's statements as protected by the safe harbor (MTD at 18 n.10)—essentially requesting that the Court parse through every statement to decipher whether or what portion of the statements are forward-looking and what cautionary language should be applied in order to qualify for the safe harbor. *See Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 850 (N.D. Tex. 2018) ("Courts cannot apply a blanket safe harbor for all forward-looking statements but must determine how a statement is specifically and meaningfully protected by the safe harbor.").

elements of the alleged statements were made in reference to "the present strength of the company and of its product," *i.e.*, large-scale development. *Stone v. Life Partners Holdings, Inc.,* 26 F. Supp. 3d 575, 597 (W.D. Tex. 2014). As the core of the Complaint's allegations is that "Defendants' statements projected a promising picture of increased revenues and manufacturing capacity while omitting material information," *Applied Optoelectronics*, 2019 WL 6111516, at *10 (rejecting safe harbor argument), the fact a statement may contain **some** reference to future performance does not render the entirety of the statement inactionable. Nor does the safe harbor insulate material omissions of fact. *See Berger v. Compaq Computer Corp.*, 1999 WL 33620108, at *14 (S.D. Tex. Dec. 22, 1999) (no safe harbor where defendants "fail[ed] to adequately address the core of Plaintiffs' complaint, [defendant's] material omissions of facts that could have had an adverse impact").

As to the forward-looking portions of any alleged statements, the Complaint's factual allegations, including the allegations of FE-1 (*supra* Section IV.A.2 at 8-9),[13] plead that there was "a gross disparity between prediction and fact" when Defendants issued guidance during the Class Period—rendering even purely forward-looking statements actionable. *Lormand*, 565 F.3d at 249 n.13; *see also Applied Optoelectronics*, 2019 WL 6111516, at *10 ("statements project[ing] a promising picture of increased revenues and manufacturing capacity" actionable where company failed to disclose related risks to business).

Despite making no actual effort to classify statements as forward-looking, the MTD argues that Concho's boilerplate risk disclosures render any loosely identified forward-looking

---

[13]   *See Fitzpatrick v. Uni-Pixel, Inc.,* 35 F. Supp. 3d 813, 828 (S.D. Tex. 2014) ("Because CW1's statements address the circumstances underlying the … forecasts, they do not merely indicate a disagreement between the parties over the validity of the … forecasts as defendants argue; but, instead, support plaintiffs' allegations that the forecasts were false when made").

statements inactionable. MTD at 18-19. Yet the tepid and generalized risk disclosures referenced are not the type of "meaningful" warnings required. "The requirement for 'meaningful' cautions calls for '**substantive**' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d at 372 (5th Cir. 2004).

The detailed well-spacing risk disclosure in Concho's 2019 annual report issued *after* the Class Period is precisely the risk that should have been disclosed during the Class Period.[14] ¶313; *see also  Kurtzman v. Compaq Computer Corp.*, 2000 WL 34292632, at *24 (S.D. Tex. Dec. 12, 2000) (safe harbor does not apply to omissions and present facts) (collecting cases). Instead, the MTD grasps at straws by pointing to amorphous risk disclosures, for instance that multi-well pad drilling—utilized "*where practical*" (¶¶180, 270)—"may result in volatility" (MTD at 18), as qualifying for the safe harbor. This is not the standard envisioned by Congress when enacting the safe harbor under the PSLRA, and for this reason (among others), the MTD's arguments fail. *See Lormand*, 565 F.3d at 244-45 ("Congress clearly intended that boilerplate cautionary language not constitute 'meaningful cautionary' language for the purpose of the safe harbor analysis.").

### (b)      *Purported Opinion Statements Are Actionable*

Statements of opinion are liable under the Exchange Act where: (i) "the speaker did not hold the belief she professed;" (ii) "the supporting fact she supplied [was] untrue;" or (iii) the speaker omits information that "makes the opinion statement at issue misleading to a reasonable

---

[14]     The MTD's assertion that Concho's post-Class Period well-spacing risk disclosure is the perfectly reasonable "gradual refining of cautionary language" and "does not delegitimize already-sufficient cautionary language" (MTD at 19 n.11), is preposterous given the previous and exceedingly opaque risk disclosure that Concho "could experience delays, curtailments and other adverse impacts associated with a high concentration of activity" (MTD at 19). First, it seeks an impermissible inference in Defendants' favor that "high concentration of activity" specifically references—and was understood by investors to be—tightly spaced wells, and second, is precisely the type of vanilla, catch-all risk warning that the Fifth Circuit has rejected outright.

person." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 194 (2015). In determining the actionability of an opinion statement, they must be read "fairly and in context." *Omnicare*, 575 U.S. at 194.[15]

The MTD effectively concedes many contested opinion statements contain embedded facts, but merely refers the Court back to its unavailing "particularity" arguments.[16] MTD at 21. As the Complaint has adequately pled false statements and omissions, these statements remain actionable irrespective of whether they may or may not contain partial opinions.[17] *See supra* Section V.C.1. With respect to omissions, the MTD concocts a "total lack of inquiry" standard, reliant on a single out-of-Circuit case, which is entirely detached from the full truth disclosure standard in the Fifth Circuit. MTD at 21; *see also Lormand*, 565 F.3d at 249. Regardless, such argument fails, as contrary to the MTD's impermissible competing factual narrative, the Complaint pleads that Defendants *didn't* "methodically" build up their understanding of well-spacing (MTD at 21-22), instead that they were going to find the limit by any means necessary and "take their lumps" to do so. ¶75. Finally, Defendants' wrongful state of mind when expressing opinions "goes hand in hand with analysis of scienter," which the Complaint readily pleads.[18] *See*

---

[15] A statement's phrasing is not outcome-determinative—"*Omnicare* … rejected the argument that opinion phrases, such as 'we believe' or 'we think' categorically disqualified a statement from being actionable.'" *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019); *Microcapital Fund LP v. Conn's Inc.*, 2019 WL 3451153, at *5 n.8, *8 n.16, (S.D. Tex. July 24, 2019) ("we believe" statement actionable).

[16] The MTD fails to identify what portion of any statement is challenged as an opinion or on what specific basis, instead relying on the App'x. MTD at 20-21 & n.12. For contested "pure" opinion statements, the MTD references a snippets of two statements to baselessly argue that "many" of the alleged (yet unidentified) opinions contain no facts at all. *Id.*

[17] *See Applied Optoelectronics*, 2019 WL 6111516, at *10 (opinion alleged to contain false and misleading embedded facts actionable); *Exxon Mobil*, 334 F. Supp. 3d at 848 (opinion actionable where it contained embedded statement of fact that overstated value of assets).

[18] *In re: BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *10 (S.D. Tex. May 31, 2016) ("Any inquiry into the falsity of an opinion (which, as *Omnicare* confirms, looks to whether an omission renders a statement "misleading to an ordinary investor") goes hand in hand with analysis of scienter.").

24

*infra* Section V.C.2. To this point, and contrary to MTD at 20-21, to show "subjective-disbelief," the Complaint need not show that the Individual Defendants believed their well-spacing wager would fail, only that they knew it was far riskier and subject to far greater undisclosed costs, write-downs, and/or risks than publicly disclosed.

### (c)  *Initial Dominator Results not Puffery*

The MTD argues alleged statements concerning Dominator results are "textbook non-actionable puffery."[19] MTD at 13-14. Only statements that "contain no concrete factual or material misrepresentation" may be deemed "puffery." *Lormand*, 565 F.3d at 249 n.14; *Applied Optoelectronics*, 2019 WL 6111516, at *10 (statements that "contain … allegedly false embedded fact[s]" not puffery). In this regard, material "representations about the strength of [a] company and of its product" are not "mere corporate puffery." *Stone*, 26 F. Supp. 3d at 599. Courts must "examine each corporate statement in the context in which it was made." *Compaq Comput.*, 2000 WL 34292632 at *38.

As discussed (Section V.C.1 at 17-18), statements regarding Dominator results are attributed to the success of large-scale development, which caused Defendants to raise production guidance. *See Cannon*, 184 F. Supp. 3d at 483-84 (statements of "progress" and "turning a corner" not puffery because "specific and concrete statements about [] progress . . . described objectively verifiable, current facts"). When properly read in context, the Complaint "alleges concrete factual and material misrepresentations and omissions concerning statements that discuss the very specific benefits" of large-scale development which go to the core of the Complaint. *See Lormand*, 565 F.3d at 249 n.14 (rejecting puffery argument).[20]

---

[19]  The App'x also categorizes statements as puffery but offers no further explanation.
[20]  *See, e.g.*, *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 660-62 (W.D. Tex. 2006) (statements that oil company is "exceptionally well positioned" are not puffery); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015) (statement that sales were "very

### (d)   *Schroer and Wright Made Statements*

The MTD argues that the claims against Defendants Schroer and Wright should be dismissed because they "simply" signed Concho's annual reports during the Class Period, which the Complaint alleges contained false and misleading statements and omissions concerning Concho's large-scale development projects and proved reserves. *See* MTD at 23; ¶¶180-83 (2017 annual report); ¶¶270-71 (2018 annual report). "[A] corporate statement may be charged to an officer if the plaintiff alleges the officer signed the document containing the statements or otherwise adequately alleges the officer's involvement in creating the document." *KB Partners*, 2015 WL 7760201, at *11; *see also Alta Mesa*, 2021 WL 1416025, at *11–12 (same).

### 2.   The Complaint Adequately Pleads a Strong Inference of Scienter

Scienter can be pled either through "sufficient evidence that Defendants had actual knowledge[,]" *Brody*, 2006 WL 2739352, at *7, or by showing "severe recklessness." *Spitzberg*, 758 F.3d at 684. "[A] plaintiff … must only plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Lormand*, 565 F.3d at 250. A court must "constantly assum[e] the plaintiff's allegations to be true." *Tellabs*, 551 U.S. at 326-27. "[T]he strong-inference pleading standard does not license the Court to resolve disputed facts at this stage of the case." *Holzwasser*, 2006 WL 897746, at *4. "[T]here will rarely be direct evidence of intent to defraud, allegations of circumstantial evidence of conscious misbehavior or recklessness justifying a strong inference of scienter … suffice." *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004).

---

strong" held not puffery when it related to a key product line and "had been the focus of recent public statements"); *Compaq Comput.*, 2000 WL 34292632 at *36-37 (statements like "[w]e continue to see strong demand … and the opportunity for continued market share gains and revenue growths" go "beyond merely generally rosy predictions, especially where those predictions go to the heart of the plaintiffs' complaint").

### (a)    *Holistic Analysis of the Allegations Supports Scienter*

The Complaint contains detailed allegations that, taken together, raise a strong inference of scienter that Concho and each of the Individual Defendants acted with knowledge or, at least, severe recklessness when they made the challenged omissions and misstatements.

*Admissions.* Concho and Defendant Leach disclosed on July 31, 2019 and August 1, 2019 that Dominator's "well spacing was too tight" (¶300) and that Concho "developed the Upper Wolfcamp too densely." ¶302. These announcements concerning Dominator came less than five months after Concho's positive March 4, 2019 (¶¶282-84) and April 30, 2019 (¶¶285-97) statements, supporting a strong inference of scienter.[21] The MTD asks the Court to treat admissions as "backward-looking explanation[s] for why the Dominator hit a snag" to refute scienter. MTD at 32. Such request that the Court accept a competing interpretation of events is "fact-based and ... insufficient to support a motion to dismiss."[22] *Holzwasser*, 2006 WL 897746 at *4. "[E]vidence of later events can provide useful circumstantial evidence that a given representation was false when made." *Heck*, 468 F. Supp. 3d 828 at 848.

*Former Employees.* FEs corroborate that Defendants knew of or recklessly disregarded risks created by too-tightly-spaced wells, including at the Dominator. The FEs need not be

---

[21]    *See Plotkin*, 407 F.3d at 698-700 ("events following so closely on the heels of [an] announcement"—**within six months**—"cast doubt on the viability of those transactions from their inception" giving rise to a strong inference that defendants "knew or was severely reckless in not knowing"); *Frank v. Dana Corp.*, 646 F.3d 954, 960 (6th Cir. 2011) ("[t]emporal proximity" of "positive and corrective statements" supports scienter).

[22]    None of the MTD's authorities are analogous temporally. *Cf. Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) ("subsequent **lawsuits** are unpersuasive of scienter"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867-68 (5th Cir. 2003) (allegations concerning December 2000 **third party report**—published a year and a half after alleged misrepresentations and omissions in June 1999 IPO prospectus and registration statement—were "not sufficiently particular" as the report "describes the problems ... in generalized terms"); *Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 848, 854 (S.D. Tex. 2020) ("**poor financial results**" disclosed up to a year after alleged misrepresentations not probative of falsity).

identified by name when "identified through general descriptions with … sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded." *Barrie*, 397 F.3d at 259. The Complaint alleges "job descriptions, individual responsibilities, and specific employment dates." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007). As the FEs "are described with sufficient particularity" their statements "may be credited" and "are a permissible basis on which to make an inference of scienter." *Rent-A-Center*, 2017 WL 6398742, at *28.

FE-1 confirmed that Concho and Defendant Giraud were aware of Dominator's "significantly higher risk profile," but chose to ignore it and use Concho's historical, single-well, lower risk profile to forecast production. ¶¶81-84. FE-1 stated that the added risks were quantified in Concho's *Aries* database, but not reflected in production forecasts (¶96) which were the "basis" for the Company's financial forecasts (¶90) thereby causing them to be overstated. FEs corroborate each other—FE-8 confirmed that "if he were investigating this matter he would want to speak to FE-1 and FE-2." ¶147. FE-8 stressed that FE-2, who oversaw simulations to ensure appropriate well density, warned Concho that based on simulations Dominator would not work and would be "over-drilled," yet Concho and Defendant Giraud ignored FE-2. ¶143-44. FE-2 confirmed that, based on a prior study only 8-12 wells should have been drilled in the Dominator area. ¶¶107-08. FE-2 stated that the Dominator area had already been heavily drilled and the Dominator wells qualified as child wells which produce less oil. ¶109.

FEs confirm that Concho and the Individual Defendants ignored and recklessly disregarded known risks. *See, e.g.*, ¶81 ("***conscious*** decision made by Defendant Giraud to use Concho's historical risk profile numbers in forecasting rather than apply the significantly higher risk profile recommended by FE-1 and his team"); ¶86 (FE-1 "repeatedly brought up his concerns

28

in meetings attended by Defendant Giraud"); ¶96 ("risk related to tighter spacing during the Class Period was quantified in Concho's *Aries* database but not reflected in … production forecasts"); ¶101 ("Concho had 'live' data from each well"); ¶105 (Defendants Giraud, Leach, and Schroer attended "weekly Tuesday meetings amongst the executives" where "Dominator was likely discussed"); ¶108 (FE-2 "only eight to twelve wells should have been drilled in the area that was selected for the Dominator Project" based on prior study performed); ¶118 (FE-3 statement "wells spaced closer together using parameters of those spaced further apart will experience interference"); ¶128 (FE-4 attended October 2017 budget meeting where the "group pitching the Dominator focused ... on timing and how completing the wells simultaneously would decrease their parent-child interference[,]" but "everyone knew it would not work"); ¶133 ("Dominator project was pushed from the top downwards by Concho's executive team despite staff protests"); ¶143 (per FE-8, "FE-2 had informed management prior to the beginning of the project that it would not work and that they [sic] area was going to be over-drilled, but no one would listen"); ¶144 (management "ignore[ed] … FE-2's warnings that Concho was going to over-drill the area" and Defendant Giraud contributed to Dominator's failure as he "was the one to sign off" on it).

The MTD incorrectly contends FEs "must be heavily discounted" because "they largely peddle in rumors and speculation." MTD at 26. Not so. Such allegations "will not be discounted, deeply or otherwise[,]" where the "witnesses not identified by name are adequately identified in other ways and the basis for their knowledge is set forth in the Complaint." *In re Cobalt Int'l Energy, Inc.*, 2016 WL 215476, at *3 (S.D. Tex. Jan. 19, 2016).[23]

---

[23] Cases cited in the MTD holds that circumstantial evidence, including confidential witnesses, can create support scienter. *Cf. Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) ("plaintiffs rely, as they are permitted to do, on circumstantial allegations[,]" and confidential "sources must be described with sufficient particularity"); *Izadjoo*

Attempts to discredit the FE allegations as speculative opinion and internal disagreement that was not communicated to the Individual Defendants, MTD at 27-30, fail. Defendant Giraud is **conspicuously** omitted from any argument that risks were not "communicated to Defendants Leach, Harper, Wright, or Schroer[,]" MTD at 28, because "FE-1 told Defendant Giraud directly at meetings that they could not use the old risk factors for Dominator because the risks have changed." ¶87. The MTD ignores that Defendant Wright "was still at the Company until 2019" when FE-1 "repeatedly brought up his concerns in meetings[,]" ¶86, Defendants Giraud, Leach, and Schroer attended weekly Tuesday meetings where Dominator would have been discussed, ¶105, and "despite knowing at Dominator that the distance between wells carried significant risks, Concho chose to treat every well as if it was an individual, isolated well in their risk assessment." ¶84. Defendants Giraud and Harper drank "a little too much of their own Kool-Aid[,]" and failed to "adequately weigh the risks" and held premature "celebrations" before production. ¶113-15. Finally, *Tellabs* expressly disclaimed the need for "irrefutable" or "smoking-gun" evidence in the required holistic analysis, 551 U.S. at 324, and courts routinely reject Defendants' argument, MTD at 28, that confidential witnesses must personally interact with individual defendants,[24] and in any event, they did. ¶¶77-79, 81, 86, 87.

---

*v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 510 (S.D. Tex. 2017) (same); *In re Key Energy Services, Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 834 (S.D. Tex. 2016) (same).

[24]   *See Spitzberg*, 758 F.3d at 682, 684-85 (reversing dismissal after crediting allegations by confidential witness who had no interaction with individual defendants); *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268-69 (3d Cir. 2009) (plaintiffs not required to "point to any particular document or conversation that would have informed [CEO or CFO] of unusual discounting during the class period"); *In re. Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600 (S.D.N.Y. May 24, 2018) (strong scienter inference where confidential witnesses who lacked direct contact with individual defendants confirmed discussions at monthly meetings and availability of information to senior executives via a Sharepoint system).

FEs reference computer-tracked data when stating Concho and the Individual Defendants had access to but disregarded risks, not a mere "divergence in opinions" (MTD at 28). *See Brody*, 2006 WL 2739352 at *7 (strong inference where "defendants received and had actual knowledge … such as information from computer tracking reports"). FE-1 was a member of the technical staff that "designed and executed the Dominator project" and "expressed his concerns" to Defendant Giraud in regular meetings. ¶¶74, 87. FE-1's "team's analysis was tracked in Concho's *Aries* database" (¶81 & n.2), where "all the information about the production forecasting was housed" (¶85), and where "the added risk related to the tighter spacing during the Class Period was quantified" (¶96). During the Class Period, Concho immediately learned production results "because they had pressure gauges in the wells[,]" *i.e.*, "'live' data from each well" (¶101), showing "pressure degradation" (¶¶96, 101). This was "disregarded" when Defendants stated they were "seeing the results [they] expected." ¶¶89, 101. Because the Complaint "specifies [the] tracking systems which were used, naming the systems and what each tracked, and what the confidential sources allege Defendants knew based on these reports[,]" it pleads "sufficient evidence that Defendants had actual knowledge to indicate their alleged misstatements and omissions could be materially misleading, thereby allowing the Court to infer scienter."[25] *Brody*, 2006 WL 2739352 at *7.

---

[25]    Defendants' other cited authorities, MTD at 26-29 are inapposite. *Cf. Owens v. Jastrow*, 789 F.3d 529, 542, n.13 (5th Cir. 2015) (no inference from confidential witness allegations that did not specify timing and substance of meetings); *Firefighters Pension & Relief Fund City of New Orleans v. Bulmahn*, 147 F. Supp. 3d 493, 530 (E.D. La. 2015) (attended meetings where defendant acknowledged—not disregarded—risks); *Kong v. Fluidgm Corp.*, 2021 WL 3409258, at *11 (N.D. Cal. Aug. 4, 2021) (alleged only "unsuccessful sales strategy and [internal] disagreement"); *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2022 WL 112029, at *14 (S.D. Tex. Jan. 12, 2022) (access to information allegation solely "based on … positions as senior executive officers"); *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 41 (1st Cir. 2020) (statements made "clear that executives had knowledge of the back-and-forth with the FDA," not that clearance would not be obtained); *Wu Winfred Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 578

31

***Importance of Manufacturing Mode and Dominator.*** Manufacturing mode's importance to Concho supports an inference of scienter. Courts in this Circuit frequently apply a "core business exception" to scienter[26] to find company executives acted with scienter where challenged statements go to the core of the company's business.[27] FE-1 confirmed that riskier multi-well pad projects like Dominator "made up roughly 90% of the 2018 budget at Concho," and Dominator alone "was 3% of Concho's overall budget in 2018." ¶¶97-98. After Dominator failed, well spacing "tests" led to a 16% total reduction in Concho's proved reserves, and Concho was soon acquired in 2020 by ConocoPhillips for $9.7 billion—just $0.2 billion more than the value of the RSP acquisition two years earlier. ¶¶315, 318. Thus, the importance of manufacturing mode to Concho's viability supports an inference of scienter as to Concho, CEO Leach, CFO Harper, EVP and COO Giraud, EVP and COO Wright, and Treasurer and SVP Schroer.

***Involvement in Day-to-Day Operations.*** Defendants Leach, Harper, Giraud, Wright, and Schoer's involvement in Concho's day-to-day and understanding of the details of Concho's risky drilling strategies and production data support scienter.[28] Defendant Giraud led regular meetings

---

(W.D. Tex. 2017) (failed to specify "what CW2 told CW1" or how "CW1 would have personal knowledge" of accounting issues); *Mun. Emps.' Ret. Sys. Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424 (5th Cir. 2019) (inventory and backlog statements "fail[ed] to tie" to markdown risks).

[26]   While the core business exception is often applied to smaller companies, "there is no bright-line rule based on the company's size. To the contrary, [t]he special circumstances cases exhibit some combination of four considerations that might tip the scales in favor of an inference of scienter, including not only the size of the company," but also, as here, "when the statements at issue concern transactions critical to the company's continued validity and when the misrepresented or omitted information at issue would have been readily apparent to the speaker.... No one special circumstance is dispositive." *Cannon*, 184 F. Supp. 3d at 484.

[27]   *See*, *e.g.*, *Cannon*, 184 F. Supp. 3d at 483-84 (applying core-business exception "by virtue of [CEO] position and in light of surrounding circumstances, acted with scienter" where subject of the allegations determined whether the company "thrived or failed"); *Plotkin*, 407 F.3d at 700 ("[i]t is reasonable to assume, given the importance of the[] deals to the company, that [defendant] would have familiarized itself with ... and discovered details about" omitted information).

[28]   *See*, *e.g.*, *Exxon Mobil*, 334 F. Supp. 3d at 852-53 (given regular discussions and briefings about climate change risks, individual defendants "would have extensive knowledge of the proxy

32

attended by all of the technical teams, where concerns regarding improper risking, improper valuations' impact on public forecasts, and improper use of old risk factors were raised but continuously ignored. ¶¶78, 87. Defendants Giraud, Leach, and Schroer attended weekly Tuesday meetings amongst the executives where Dominator would have been discussed. ¶105. Defendant Giraud was the "driving force" behind Dominator, the direction of the Dominator project was the COO's responsibility, ¶133, and although Defendant Giraud was functioning as the COO as early as 2018, Defendant Wright was at the Company until 2019, when FE-1 repeatedly brought up his concerns in meetings. ¶86. While added risk due to tighter spacing was tracked and quantified in Concho's *Aries* database, Defendant Giraud gave the directive to apply the historic or off the shelf risk profile to Dominator. ¶¶81, 96. Defendant Leach also touted that, when Concho gives guidance, "we try to forecast the things that we're aware of at the time we give the guidance." ¶186. As the court put it in *BP*, an individual defendant's "own actions as the spokesperson and champion for ... [certain] efforts weigh strongly in favor of the inference that [he] paid special attention to ... [those] efforts or, at the least, was reckless in not doing so." 843 F. Supp. 2d at 783; *see also In re Netsolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001) (scienter found where undisclosed problems should have been obvious to company executives).[29]

---

cost of carbon and should have known a different proxy cost was stated ... than was actually applied to business operations and investments").

[29]    Defendants' authorities, MTD at 31-32, are inapposite, as those cases involved only allegations concerning the executives' positions within the companies and not, as pled here, that the Individual Defendants were involved with and had regular access to hard facts and data concerning the undisclosed risks. *Cf. Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("pleading of scienter may not rest [solely] on the inference that defendants must have been aware of the misstatement based on their positions within the company"); *Cabot Oil*, 2022 WL 112029, at *14 ("plaintiffs have pleaded no facts alleging a sufficient basis to infer that the individual officers were aware of continuing violations").

**(b)** ***Defendants' Competing Inferences Are Not More Compelling***

To defeat the Complaint's compelling inferences of scienter, Defendants bear the heavy burden of offering a more compelling inference. A plaintiff alleging Section 10(b) fraud need only "plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Tellabs*, 551 U.S. at 311 (emphasis in the original). In other words, the "inference of intentional deception" need only be "equally as compelling as any alternative inference, and a ***tie favors the plaintiff***." *Lormand*, 565 F.3d at 254-55.

Defendants improperly construct a competing narrative through self-serving statements and disputed "facts" that cannot be credited for their truth. *Holzwasser*, 2006 WL 897746, at *4; *see also supra* Section V.B. These "competing inferences" turn on the mistaken notion that the Complaint "trots out a corporate self-sabotage theory" that "def[ies] economic reason," MTD at 32, the Individual Defendants' conduct demonstrates "hubris or overconfidence," not scienter, *id.* at 33, and Concho's manufacturing mode was an "overtly experimental" and "progressive effort to push the boundaries on optimizing well spacing." *Id.* at 34. But the Complaint does not allege a theory of "self-sabotage." The Complaint alleges that Defendants "engaged in an undisclosed fraudulent bet-the-company endeavor in hopes of ***saving*** the Company." ¶3.

As Judge Posner so aptly put it in *Makor Issues & Rights, Ltd. v. Tellabs Inc.* on remand from the Supreme Court, "[t]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a ***reckless***, gamble." 513 F.3d 702, 710 (7th Cir. 2008). Here, the inference of scienter is "not only as likely as its opposite, but more likely[,]" *id.*, because, for example, consciously applying Concho's historical risk profile numbers in forecasting—resulting in overstated forecasts—rather than the higher risk profile recommended by FE-1 and his team,

34

¶¶81-84, 90, is "like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." *Tellabs*, 513 F.3d at 710.

Attempts to minimize Defendants' conduct as inactionable "hubris" also fail. The Individual Defendants had access to *Aries*-tracked and quantified data that Concho's manufacturing mode carried increased, significant risks compared to individual, isolated wells, ¶¶81-85, but Defendants consciously chose to ignore those risks despite repeated warnings from the former employees and their teams. ¶¶87, 113, 117. "Given the reasonableness of the inference that [Defendants] possessed material facts casting doubt on" manufacturing mode or cube development, Defendants' "egregious refusal to see the obvious, or to investigate the doubtful ... give[s] rise to an inference of recklessness." *Plotkin*, 407 F.3d at 700. In any event, hubris and recklessness are not mutually exclusive—blind overconfidence bordering on ignorance is nothing if not reckless. ***At the very least***, a tie goes to plaintiff. *Lormand*, 565 F.3d at 254-55

### 3. The Complaint Adequately Alleges Control Person Claims

Defendants only argue that the Section 20(a) claims (¶¶435-40) fail because the underlying Section 10(b) claims must be dismissed. Because the Section 10(b) claims survive, so do the Section 20(a) claims. *See Applied Optoelectronics*, 2019 WL 6111516, at *14.

## VI. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.[30]

---

[30]   If the Court dismisses any or all of the Complaint, Lead Plaintiff respectfully requests leave to amend pursuant to Rule 15 of the Federal Rules of Civil Procedure as this is the first complaint this Court has considered on this matter.

DATED: May 20, 2022

Respectfully submitted,

*/s/ Alfred L. Fatale III*
**LABATON SUCHAROW LLP**
Alfred L. Fatale III (*pro hac vice*)
Charles Wood (*pro hac vice*)
Marco A. Dueñas (*pro hac vice*
forthcoming)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
afatale@labaton.com
cwood@labaton.com
mduenas@labaton.com

*Lead Counsel for Lead Plaintiffs and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 20, 2022, I caused the foregoing to be electronically filed with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

email addresses denoted on the Notice of Electronic Filing.


<u>*/s/ Alfred L. Fatale III*</u>
Alfred L. Fatale III

1