**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Civil Action No. 4:21-cv-02473<br><br>CLASS ACTION |

**DEFENDANTS' OBJECTIONS TO MEMORANDUM AND RECOMMENDATION REGARDING MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

TABLE OF CONTENTS

**Page**

Statement of Nature and Stage of Proceedings ................................................................. 1

Statement of the Issues .................................................................................................... 1

Introduction and Summary of the Argument .................................................................... 1

Standard of Review and Legal Standard ........................................................................... 4

Argument ........................................................................................................................ 5

I.    The R&R ignores Concho's disclosures, credits mere conclusions, skirts the PSLRA's safe harbor, and ignores § 10(b) case law in finding actionable statements. ...................... 5

      A.    The R&R accepts Plaintiffs' slanted narrative of Concho's optimization efforts by disregarding what Concho actually said. ........................................................... 5

      B.    The R&R's portfolio-wide theory lacks particularized factual allegations. ........... 8

      C.    The R&R's conscious-under-risking theory of falsity relies on twisting certain of Defendants' statements and ignoring others. ......................................................... 10

      D.    The R&R misses the temporal disconnect in the CC's attack on early Dominator results. ................................................................................................................. 12

      E.    The R&R's falsity and omission analysis is antithetical to § 10(b) caselaw. ....... 13

II.   The R&R fundamentally misapplies the scienter framework. ......................................... 15

      A.    The R&R's analysis would render motive a forgone conclusion in every case. .. 15

      B.    The R&R disregards Fifth Circuit precedent by crediting circumstantial allegations that fail to satisfy heightened scrutiny. ............................................... 17

            1.    The R&R ignores the central requirement of scienter—contemporaneous knowledge of facts that contradict public statements. ............................... 17

            2.    The R&R inflates—rather than discounts—the FE accounts. .................. 18

            3.    The R&R breathes life into all sorts of discredited scienter allegations... 21

            4.    The R&R blows the narrow "core operations" exception wide open. ....... 23

            5.    The R&R bends over backwards to infer Schroer and Wright's scienter. 26

      C.    The PSLRA's safe harbor requires dismissal as to forward-looking statements.. 27

D.    The R&R profoundly misapprehends the competing scienter inferences. ........... 27

    1.    The R&R's reckless gamble theory is inapposite and incoherent. ........... 27

    2.    The R&R's hubris theory only highlights the nonculpable inference. ..... 29

    3.    The R&R will impart a chilling effect on innovation. ............................. 30

III.    The R&R erred by sustaining the Section 20(a) claims. .................................................... 30

Conclusion ........................................................................................................................ 30

TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ...................................................................................23, 30

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
915 F.3d 975 (5th Cir. 2019) ...............................................................................22, 25, 29

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ...................................................................................30

*Barry v. Colony NorthStar, Inc.*,
2019 WL 13237710 (C.D. Cal. Jan. 24, 2019) .........................................................9

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975)....................................................................................................30

*Callinan v. Lexicon Pharm., Inc.*,
479 F. Supp. 3d 379 (S.D. Tex. 2020) .......................................................16, 28, 29

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) .............................................................12, 27

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) ......................................................................................27

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006)........................................................................17

*Coates v. Heartland Wireless Commc'ns, Inc.*,
100 F. Supp. 2d 417 (N.D. Tex. 2000) ...................................................................15

*Collmer v. U.S. Liquids, Inc.*,
268 F. Supp. 2d 718 (S.D. Tex. 2001) .....................................................................9

*Dawes v. Imperial Sugar Co.*,
975 F. Supp. 2d 666 (S.D. Tex. 2013) .................................................................20, 21

*ECA v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)........................................................................................27

*Edwards v. McDermott Int'l, Inc.*,
2022 WL 3927828 (S.D. Tex. Aug. 30, 2022), *R&R adopted*,
2022 WL 4454391 (S.D. Tex. Sept. 23, 2022) .........................................................9

*Hall v. Rent-A-Ctr., Inc.*,
    2017 WL 6398742 (E.D. Tex. Oct. 19, 2017), *R&R adopted*,
    2017 WL 6379334 (E.D. Tex. Dec. 14, 2017)...........................................................................14

*In re Anadarko Petroleum Corp. Class Action Litig.*,
    957 F. Supp. 2d 806 (S.D. Tex. 2013) ...................................................................................8

*In re Apache Corp. Sec. Litig.*,
    2022 WL 4277350 (S.D. Tex. Sept. 15, 2022), *R&R adopted*,
    2022 WL 17324439 (S.D. Tex. Nov. 29, 2022) ....................................................................13

*In re Barrick Gold Sec. Litig.*,
    2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)..........................................................................16

*In re BP p.l.c. Sec. Litig.*,
    843 F. Supp. 2d 712 (S.D. Tex. 2012) ...................................................................13, 14, 22

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
    238 F. Supp. 3d 799 (S.D. Tex. 2017) ...................................................................................5

*In re Franklin Bank Corp. Sec. Litig.*,
    782 F. Supp. 2d 364 (S.D. Tex. 2011) ............................................................................16, 17

*In re GeoPharma, Inc. Sec. Litig.*,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005)...............................................................................9, 10

*In re Guess?, Inc. Sec. Litig.*,
    174 F. Supp. 2d 1067 (C.D. Cal. 2001) ................................................................................30

*In re Intrexon Corp. Sec. Litig.*,
    2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ..........................................................................7

*In re Keryx Biopharms., Inc., Sec. Litig.*,
    2014 WL 585658 (S.D.N.Y. Feb 14, 2014)..........................................................................30

*In re Key Energy Servs., Inc. Sec. Litig.*,
    166 F. Supp. 3d 822 (S.D. Tex. 2016) ..................................................................................20

*In re Netsolve, Inc. Sec. Litig.*,
    185 F. Supp. 2d 684 (W.D. Tex. 2001)...........................................................................24, 28

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
    307 F. Supp. 3d 583 (S.D. Tex. 2018) ..................................................................................22

*In re Repros Therapeutics, Inc. Sec. Litig.*,
    2010 WL 11583428 (S.D. Tex. Nov. 17, 2010), *R&R adopted*,
    2011 WL 13254400 (S.D. Tex. Jan. 19, 2011 ......................................................................12

v

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021)........................................................................................7

*In re TETRA Techs., Inc. Sec. Litig.*,
  2009 WL 6325540 (S.D. Tex. July 9, 2009)............................................................13

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ................................................4, 18, 20, 22, 30

*Kleinman v. Elan Corp.*, *plc*,
  706 F.3d 145 (2d Cir. 2013).......................................................................................7

*Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*,
  2015 WL 1143081 (S.D. Tex. Mar. 13, 2015)..........................................12, 22, 23

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016) ..................................................................24, 25, 26

*Lormand v. U.S. Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ..............................................................................11, 12

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ..................................................................................27

*Melder v. Morris*,
  27 F.3d 1097 (5th Cir. 1994) ..................................................................................16

*MicroCapital Fund LP v. Conn's Inc.*,
  2019 WL 3451153 (S.D. Tex. July 24, 2019), *R&R adopted*,
  2019 WL 4673209 (S.D. Tex. Sept. 24, 2019) ......................................................29

*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*,
  935 F.3d 424 (5th Cir. 2019) ..............................................................15, 16, 25, 26

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ..............................................................17, 24, 27, 29

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) ......................................................18, 22, 24, 25, 28

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*,
  58 F.4th 195 (5th Cir. 2023) ..................................................................18, 25, 26

*Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharm., Inc.*,
  2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ......................................................29

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) ..........................................7, 18, 19, 24, 25, 28, 29

*Plaisance v. Schiller*,
    2019 WL 1205628 (S.D. Tex. Mar. 14, 2019)..........................................................................8

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ...................................................................................24, 25

*R2 Invs. LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ......................................................................................4, 17

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) .....................................................................................14, 23

*Sarafin v. BioMimetic Therapeutics, Inc.*,
    2013 WL 139521 (M.D. Tenn. Jan. 10, 2013)........................................................................14

*Singh v. Schikan*,
    106 F. Supp. 3d 439 (S.D.N.Y. 2015)................................................................................14

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ...........................................................................4, 19, 26, 30

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ........................................................................................25

*Stockman v. Flotek Indus., Inc.*,
    2010 WL 3785586 (S.D. Tex. Sept. 29, 2010) .......................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................4, 15, 27, 28

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
    273 F. Supp. 3d 650 (N.D. Tex. 2017) ...............................................................................28

*Wu Winfred Huang v. EZCORP, Inc.*,
    259 F. Supp. 3d 563 (W.D. Tex. May 8, 2017) ......................................................................20

*Yang v. Nobilis Health Corp.*,
    2020 WL 6815402 (S.D. Tex. June 25, 2020), *R&R adopted in part*,
    2020 WL 5512456 (S.D. Tex. Sept. 14, 2020) .............................................................4, 23, 29

*Yang v. Nobilis Health Corp.*,
    2021 WL 3619863 (5th Cir. Aug. 13, 2021)...........................................................................23

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .....................................................................................18, 20

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B)...........................................................................................4

15 U.S.C. § 78u-4(b)(2) ....................................................................................................4

15 U.S.C. § 78u-5(i)(1)(A)-(B)........................................................................................9

28 U.S.C. § 636(b)(1) .......................................................................................................4

**RULES**

Fed. R. Civ. P. 72(b)(3)......................................................................................................4

Concho Resources Inc. ("Concho"), ConocoPhillips (as successor in interest to Concho), Timothy Leach, Jack F. Harper, C. William Giraud, E. Joseph Wright, and Brenda R. Schroer ("Individual Defendants") (collectively, "Defendants") file these Objections to Magistrate Judge Sheldon's Memorandum and Recommendation ("R&R," Dkt. 38), which recommends that Defendants' Motion to Dismiss ("Motion" or "MTD," Dkt. 29) Plaintiffs' Consolidated Complaint ("CC," Dkt. 25) be denied. Defendants respectfully request oral argument on these Objections.

### STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This is a putative class action brought under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 thereunder.

### STATEMENT OF THE ISSUES

Whether the R&R erred by concluding that the CC pleaded (1) an actionable false or misleading statement, and (2) a strong inference of scienter with the particularity required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

### INTRODUCTION AND SUMMARY OF THE ARGUMENT[1]

The R&R misstates and misapplies the law in such a drastic departure from § 10(b) jurisprudence that it not only constitutes error in this case, but also, if adopted, will have disastrous precedential and practical consequences well beyond this case. It will embolden strike suits crafted entirely from distorted soundbites, without fear that clarifying context or disclosures could be used against them. It will be cited by plaintiffs across the country because it turns the PSLRA's critical scienter hurdle into less than a speedbump, marking the first decision anywhere to treat a defendant's undisputedly genuine belief in a growing technology as a culpable inference. And it will thus have a chilling effect on companies that deign to *publicly* experiment with innovation,

---

[1] Unless otherwise noted, internal quotation marks from quoted material have been omitted. Citations to exhibits are to those attached to Defendants' Motion or Reply ("MTD Reply," Dkt. 34).

lest they pay the price of shouldering a § 10(b) class action and the crushing discovery burden that goes with it. This Court should intervene so that the R&R does not open the door to more lawsuits like this one, which seek to penalize open experimentation under the guise of the securities laws.

From 2017-19, oil and gas producers in the Permian Basin—including Encana and Callon, MTD 4 n.4—began experimenting with a drilling technique known as "large-scale development" or "manufacturing mode," which involves the simultaneous drilling, fracking, and completion of multiple horizontal wells from a single pad. This methodology aims to maximize efficiencies by mitigating the "parent-child" well problem, which occurs when the proximity of an existing well (parent) negatively affects the geological pressure of a newer well (child).

Concho also began expanding its large-scale projects—from 2, to 3, to 6, to 8-well pads—experiencing what the CC acknowledged as "immense[] success[]." CC ¶ 144. Going into 2019, Concho disclosed that it would continue to "test" and "experiment" across its projects, and expected that an 8 to 12-well pad would be a "normal development." MTD Ex. 3 at 8; MTD Ex. 16 at 12. But Concho also announced the 23-well "Dominator" project, which it publicly labeled an "extreme" and "aggressive" spacing test, designed to "jump a couple of steps down the line" and demonstrate "where [Concho would] see inefficiencies." MTD Ex. 2 at 9; CC ¶ 72. Concho was not the only industry player testing this extreme end of the spectrum.[2]

Concho's Dominator test did what tests sometimes do—it showed Concho had pushed well density too far but also provided valuable data for future projects. Rather than "hiding" that result, Concho was "open" and promptly and accurately disclosed it. CC ¶ 154. Yet, in a familiar trend after a disappointing company announcement, Plaintiffs filed this securities fraud action against Concho, Leach (CEO), Harper (President & former CFO), Giraud (EVP & COO), Wright (former

---

[2] *See* https://www.worldoil.com/magazine/2017/may-2017/features/shaletech-permian-basin (describing Encana's 33-well "RAB Davidson pad").

COO & EVP), Schroer (Treasurer, SVP, CFO, & former CAO), and ConocoPhillips (which acquired Concho in 2021). The CC trots out confidential-witness accounts from former employees ("FEs") who describe the internally controversial nature of the Dominator experiment and internal disagreement over its prudence, but who tellingly offer no particularized facts attacking Concho's historic success or technological basis for large-scale development more broadly. The FE accounts do the exact opposite of suggest the Individual Defendants spoke with scienter—they assert the Individual Defendants "had the mindset that 'we … can do no wrong,'" "drank a little too much of their own Kool-Aid," and suffered from "hubris" and "overconfidence." CC ¶¶ 112, 115, 144.

Even allegedly misguided optimism is not securities fraud, hence the Motion, which shows the CC did not identify a single false or misleading statement, much less one made with the PSLRA-requisite "strong inference" of scienter. In recommending denying the Motion—for *all 68 challenged statements* ("CSs") and *all Defendants*—the R&R contains numerous critical errors:

- It declines to address what Concho actually said about the Dominator test (and Concho's optimization efforts more broadly), instead constructing a falsity narrative exclusively from the CC's out-of-context soundbites.

- It conflates allegations about the Dominator test with Concho's project portfolio more broadly, missing the CC's failure to plead particularized facts about those other projects.

- It credits a scienter "motive"—for Concho to maintain a competitive market position—that is precisely the type of ubiquitous corporate goal that is a nonstarter in any circuit.

- It applies the exceedingly narrow "core operations" scienter exception when *none* of the requisite "special circumstances" are present—let alone all four.

- It equates the more compelling, nonculpable inference of "hubris" or "overconfidence"— that is, a genuine belief in a growing technology—with severe recklessness to mislead.

Any one of those errors alone requires dismissal of the CC. That the R&R made all of them shows the extreme way in which it erred. This Court should correct those errors by exercising its critical gatekeeping role under the PSLRA, sustain Defendants' objections to the R&R, and dismiss the CC with prejudice.

**STANDARD OF REVIEW AND LEGAL STANDARD**

The Court conducts a *de novo* review for "those portions of the report ... to which objection is made." 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). It "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *see Yang v. Nobilis Health Corp.*, 2020 WL 5512456, at *2 (S.D. Tex. Sept. 14, 2020) (Hanen, J.) (adopting in part and rejecting in part recommendation on § 10(b) motion to dismiss), *aff'd*, 2021 WL 3619863 (5th Cir. Aug. 13, 2021).

Relevant to these Objections, a § 10(b) complaint must meet two heightened pleading standards. First, it must plead with specificity each allegedly false or misleading statement or omission and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B); *see, e.g.*, *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361-62 (5th Cir. 2004); MTD 10-11 (further discussing § 10(b) standards). Second, it must state with particularity facts giving rise to a "strong inference" that *each* defendant acted with scienter when making *each* alleged misrepresentation. *See* 15 U.S.C. § 78u-4(b)(2); *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). Scienter is "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005). The requisite "strong inference" cannot be met with "facts from which an inference of scienter rationally *could* be drawn," nor will an inference of scienter that is "merely 'reasonable' or 'permissible'" suffice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324-25 (2007). Rather, the "strong inference" can be found only in a § 10(b) complaint that pleads scienter allegations that are both "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

**ARGUMENT**

**I.     The R&R ignores Concho's disclosures, credits mere conclusions, skirts the PSLRA's safe harbor, and ignores § 10(b) case law in finding actionable statements.**

   **A.     The R&R accepts Plaintiffs' slanted narrative of Concho's optimization efforts by disregarding what Concho actually said.**

The Motion provided the full text of the CC's selectively quoted CSs. But the R&R adopted Plaintiffs' incorrect tunnel-vision argument—that "the Court must only be guided by and evaluate the facts as alleged in the Complaint," Dkt. 33, Opp. 14. That is not how § 10(b) motion-to-dismiss practice works. Courts *must* also consider the "context" supplied by "documents … referenced and relied upon by Plaintiffs in their … [c]omplaint." *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 238 F. Supp. 3d 799, 815 (S.D. Tex. 2017) (collecting cases), *aff'd*, 925 F.3d 727 (5th Cir. 2019). The R&R's discussion of Dominator specifically, and Concho's well-spacing optimization more broadly, demonstrates how far it strayed from that fundamental requirement.

***Dominator Test.*** The R&R reprised the CC's allegations that Concho's "historic[] ... gradual process to collect data … was abandoned for the Dominator"; that FEs believed the spacing was "too tight"; and that the project was a misleading deviation from "proven production methods." R&R 22-23. But while the R&R acknowledges in passing that Dominator was "extreme" and Concho's "most aggressive multi-well pad," *id.* at 8, the R&R does not address— at all—Concho's repeated public disclosures about Dominator's express, publicly stated purposes:

- "[W]e're trying to *see how far we can push the efficiencies* as you make these projects larger and larger. And also there's elements of spacing, testing and other things going on in that project." MTD Ex. 13 at 9 (emphasis added).

- "[T]he Dominator was an effort to kind of *jump a couple of steps down the line* and see if running 7 rigs at a square mile, *where do you see inefficiencies* and how can you go attack those." MTD Ex. 2 at 9 (emphases added).

- [T]hat is … some of the *more dense spacing we've tested*.… So we are *continuing to figure out* how to concentrate that much activity in one spot in the most efficient manner possible. We're continuing to play with spacing and … our whole completion design. *So there is a lot -- there is still a lot to learn*." *Id.* at 8 (emphases added).

5

These statements make clear that far from being a "*secret*[] determin[ation] [by Concho] to find the limits of well-spacing even if [it] need[ed] to 'take [its] lumps,'" Opp. 18 (emphasis added), R&R 32, Dominator was ***publicly*** described as a deviation from Concho's historically gradual learning—a deliberate effort to "jump" ahead and uncover "inefficiencies." Only by disregarding that context could the R&R characterize Concho's description of Dominator as anything else.

***Broader Portfolio/Optimization Efforts.*** Rather than address these Dominator disclosures, the R&R repeatedly cited Concho's broader portfolio of "projects," adopting the CC's theory that Concho misrepresented (a) the prevalence of non-Dominator spacing tests, and (b) that it had completed the transition to optimizing large-scale development. *E.g.*, R&R 16, 41. Setting aside the CC's utter lack of particularized factual allegations about these non-Dominator projects, *infra* § I.B, this narrative requires, again, ignoring what Concho actually said. For while Dominator was Concho's "most aggressive" project, it was hardly touted as an "isolated test" in a sea of already optimized projects. *Contra* R&R 16. Rather, regarding its more modest tests, Concho stated that:

- In 2019, Concho was dedicating 80% of its capital to large-scale developments, which were getting "bigger over time" as it "***continue[d] to experiment*** with different completion designs, timings, [and] spacing." MTD Ex. 14; MTD Ex. 16 at 12 (emphasis added).

- "[S]pecifically to the Taylor [project] or maybe ***more broadly to all of these*** [projects]. We're ***definitely continuing to … test spacing***." MTD Ex. 16 at 11 (emphases added).

- Even "some of [Concho's] smaller projects" were "***continuing to test*** tighter spacing." MTD Ex. 11 at 8 (emphasis added).

- There was "still a lot to learn," and Concho was "continuing to figure out how to concentrate that much activity in one spot in the most efficient manner." MTD Ex. 2 at 8.

- Concho was "learning all the time" about "the right spacing" and that "[t]here's ***definitely more innings***." MTD Ex. 5 at 4, 10 (emphasis added).

The Motion prominently highlighted these disclosures, MTD 8, 12, 15-16, but the R&R mentions *none* of them in its 49 pages.

Instead, the R&R parroted the CC's deliberately truncated soundbites, without scrutinizing

6

the full content or context from whence they came:

| R&R's Soundbite | Actual Content and Context |
|---|---|
| Concho was "in a later stage of innings." R&R 22. | Statement about a "specific example" of hydrocarbon formation followed by "[t]here's **definitely more innings**." Dkt. 29-2, MTD App'x A at 13 (emphasis added). |
| Concho had "already 'come through discovery.'" R&R 22. | Statement about ordinary timeline of hydrocarbon "discovery," delineation, and development, immediately followed by caution that Concho was "continu[ing] to learn" with respect to "completion design." MTD App'x A at 12. |
| "[T]ransition was not a 'dramatic change' or a 'switch get[ting] flipped.'" R&R 22. | Statements about Concho's prior (undisputedly successful, *infra* § I.B) "evolution going from 2-well pads to 3-well pads to 6-well projects to 8-well." MTD App'x A at 11. Concho clarified that same month that "these kind of drilling projects are **going to grow in wells** in the project over time and **grow dramatically**." *Id.* at 10 (emphases added). |
| Concho "successfully made th[e] transition." R&R 21. | Statement about Concho's (undisputedly successful, *infra* § I.B) transition from single-well pads, followed by warning that Concho "will continue to test" to "make sure that we try not to leave any [child wells] behind." MTD App'x A at 6. |

In other words, the R&R allowed Plaintiffs to impermissibly "cherry pick certain public statements

for [their] complaint and divorce them from the universe of disclosed information to plausibly

allege fraud." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021). That neglected

context matters a great deal here, as Defendants collected decisions demonstrating that processes

caveated as "experiments," "trials," or "tests" convey inherent uncertainty and risk. MTD 16. Yet

the R&R neither acknowledges those decisions nor cites contrary authority.

Instead, the R&R points to analysts' supposedly "stunned" reaction to Concho's 2Q 2019

results. *E.g.*, R&R 25, 45. But there is "no authority for the proposition that market reaction is a

gauge for falsity." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 155 (2d Cir. 2013). Analysts often

claim "surprise" when a company announces bad news; to weaponize *post hoc* "market reaction"

as evidence of prior, contemporaneous falsity "is essentially a fraud-by-hindsight argument." *In re*

*Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *4 (N.D. Cal. Feb. 24, 2017). And the Fifth Circuit

does not recognize "fraud by hindsight." *Owens v. Jastrow*, 789 F.3d 529, 544-45 (5th Cir. 2015).

**B.      The R&R's portfolio-wide theory lacks particularized factual allegations.**

The vast majority of the CSs pertained to Concho's (a) successes with (non-Dominator) large-scale development, and (b) forward-looking predictions based on those successes. *See* MTD 12 & n.6, 18 n.10 (collecting statements). The R&R adopted those falsity theories wholesale—referring repeatedly to Concho's "projects" generally. R&R 20-23. But the R&R fails to identify a single *non-conclusory* allegation supporting that portfolio-wide narrative.

***Prior successes.*** The CC never articulates how or why Concho's reports of past success were false or misleading "when made." *Plaisance v. Schiller*, 2019 WL 1205628, at *30 (S.D. Tex. Mar. 14, 2019). That is true for Concho's muted discussion of preliminary Dominator results, *infra* § I.D, and it is inescapably so for Concho's non-Dominator successes. In fact, the 185-page CC contains just one allegation about a specific, non-Dominator project: FE-5's rumor peddling "he heard from a former geologist" about "God-awful" results "at the Grissom wells"—an allegation that is plainly insufficient, as it never articulates (1) when those results occurred, or (2) how that conflicted with anything Concho reported. CC ¶ 134. The R&R correctly *discounts* FE-5's second-hand "accounts of other employee's opinions," only to *rely* on them a few pages later. R&R 20, 23. That is clearly wrong. *Infra* § II.B.2 (discussing standard for discounting FE allegations).

The other scattered references to non-Dominator results are no better. They came from FE-1, who purported to have only Dominator experience, but offered blanket declarations that "the majority of what Concho executed in 2018 and 2019 did not live up to what had been forecasted"; "many of Concho's well spacing projects, including Dominator, were not performing well"; and the "Dominator was not even the worst performing project." CC ¶¶ 92, 100, 103. Those allegations not only fail to isolate any Concho disclosure that was false when made, but also are the type of conclusions—bereft of particularized facts—that courts reject under Rule 9(b) and the PSLRA. *E.g.*, *In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 824 (S.D. Tex.

8

2013) (allegation that "Anadarko failed to employ its risk methodology on [one particular] investment … is not sufficient to create the inference that Anadarko was not, in fact, employing a risking methodology across its operations"); *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 756 (S.D. Tex. 2001) (rejecting "conclusory allegations against all the other facilities [that] appear[ed] to be generalizations that Plaintiffs have drawn from the specific problems of the Detroit plant and applied without any supporting facts in these other acquired facilities").

The R&R's failure to identify factual allegations impugning Concho's results in the lead-up to Dominator is hardly surprising because the CC and its FEs *confirmed* Concho's past "level of success" and that "[t]he Company had been ***immensely successful*** and was ***growing fast***." CC ¶ 144 (emphases added). The R&R should have held Plaintiffs to those pleaded facts, which cohered with Concho's public statements—not credited bare conclusions or extrapolated inapplicable allegations concerning Dominator to piece together a contrary narrative.

***Forecasts/Predicted Benefits.*** Many CSs were unquestionably "projections" or forward-looking statements about "future economic performance" that fall comfortably within the PSLRA's safe harbor. 15 U.S.C. § 78u-5(i)(1)(A)-(B); MTD 18-19. The R&R found otherwise because Concho's projections relied on "present and historical facts" about past successes with large-scale development. R&R 22-23, 28-29. But mixing *true* facts into forward-looking statements does not eliminate the safe harbor. *E.g.*, *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 448 (S.D.N.Y. 2005) (statement "is either a protected forward-looking statement, or it is a statement of historical fact that is not alleged to be false").[3]

---

[3] The R&R's safe harbor discussion oddly says Defendants' Appendix A—which quotes each CS and gives the reasons each is non-actionable—(a) "assists Plaintiffs in establishing the basis of the suit," but (b) is an impermissible "spreadsheet of conclusions" that cannot assist Defendants in addressing the 68 CSs. R&R 27-28 & n.11. That heads-plaintiffs-win-tails-defendants-lose approach clashes with courts in this District and elsewhere, who rely on such appendices as "helpful" in § 10(b) cases. *E.g.*, *Edwards v. McDermott Int'l, Inc.*, 2022 WL 3927828, at *5 & n.3 (S.D. Tex. Aug. 30, 2022), *R&R adopted*, 2022 WL 4454391 (S.D. Tex. Sept. 23, 2022); *Barry v. Colony NorthStar, Inc.*, 2019 WL 13237710, at *10 (C.D. Cal. Jan. 24, 2019). The R&R's treatment would perversely incentivize overloaded

Moreover, the R&R's suggestion that Concho's projections were broadly misleading because "Defendants lacked a technological basis for the experimental production technique" suffers from the same factual void described above. R&R 22-23. That is, the R&R takes FE allegations describing internal criticism of the (publicly described) "extreme" and "aggressive" *Dominator's* feasibility and extrapolates them to Concho's *entire portfolio*. *Id.* But the CC contains no particularized facts—just blanket conclusions and rhetoric—impugning the scientific prudence of Concho's more modest optimization efforts. *See* CC ¶ 91 ("Dominator was a 'reflection of everything' that was happening at Concho"); *id.* ¶ 97 ("Concho's entire production budget at the time was a 'test'"). If anything, the CC proves the opposite was true by alleging that "only eight to twelve wells should have been drilled … for the Dominator Project," when that was in fact how Concho was approaching its "normal development." *Id.* ¶¶ 108, 249; *see also id.* ¶ 145 ("FE-8 recalled Concho's strategy prior to the Dominator project being an 'intensive and technical process' to determine the best well numbers and spacing.").

### C. The R&R's conscious-under-risking theory of falsity relies on twisting certain of Defendants' statements and ignoring others.

The R&R also erred by adopting the CC's narrative that Defendants misleadingly downplayed Concho's risk profile, R&R 23-24, which, again, was anchored exclusively on decontextualized snippets.

| R&R's Soundbite | Actual Content and Context |
|---|---|
| Concho had "a portfolio approach to mitigate risk." R&R 25. | Statement actually relates to shipping crude to different locations in order to have "a number of different pricing points in a portfolio." MTD App'x A at 18. |
| Concho's "Risk mitigation 'strategy [was] the same.'" R&R 25. | Statement says nothing about risk mitigation, referring instead to a "strategy [that] allows [Concho] to adapt quickly" and "be a leader in the development." CC ¶¶ 188-89. |

§ 10(b) complaints like this one, which need only challenge voluminous statements to hamstring defendants.

| Investors should "expect more of the same." R&R 25. | Statement actually relates to "a budget focused on reinvesting our cash flow and an increased percentage of capital going towards these larger-scale projects." MTD App'x A at 7. |
|---|---|
| Concho "baked" in risk assumptions. R&R 24, 29. | Statement says nothing about baked-in spacing *risk*, referring instead to *efficiencies* from "minimizing the impact of the parent-child effect" "based upon the results [Concho] ha[d] seen." MTD App'x A at 23. |
| Concho's guidance reflected what it was "aware of at the time." R&R 24. | Statement actually relates to Concho's decision to forecast based on already demonstrated efficiencies rather than an "increasing efficiency assumption built into that." MTD App'x A at 4-5; *see also* CC ¶ 3 (Concho aimed to "under promise and over deliver"). |
| Concho was historically "pretty conservative in the way [they've] accounted for inventory and well spacing." R&R 25. | Statement actually relates to Concho's accounting decision not to forecast increased efficiencies, while cautioning "there's always a lot to learn." MTD App'x A at 27; *see also id.* at 13 (earlier statement that "we've historically been more conservative, and we're not very good at predicting additional operational efficiencies that we can gain out into the future"). |

Just as problematically, the R&R disregarded what Concho *did* say about risks associated with well spacing, including not just its robust cautions about the uncertainties associated with ongoing optimization experiments, *supra* § I.A, but also the following warnings regarding:

- "'[U]nproved reserves,' 'resources' and similar phrases" being "based on analogy to the Company's existing models applied to additional acres, additional zones and *tighter spacing* and are the Company's internal estimates of hydrocarbon quantities that may be potentially discovered through exploratory drilling or recovered with additional drilling or recovery techniques," "*have not been fully risked by Company management and are inherently more speculative* than proved reserves estimates. Actual locations drilled and quantities that may be ultimately recovered from the Company's interests could *differ substantially* from these estimates." MTD Ex. 10 at 3 (emphases added).

- The risk that "Multi-well pad drilling and project development may result in volatility in our operating results." MTD Ex. 6 at 20.

- "[D]rilling, completion and operating risks, including our ability to efficiently execute large-scale project development as we could experience delays, curtailments and other adverse impacts associated with a high concentration of activity." MTD Ex. 17 at 1.

Rather than meaningfully evaluate these disclosures in the larger context, the R&R cast them aside as "blanket warnings" that "would be applicable to any oil and gas exploration and production company." R&R 29 (citing *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009)).

11

Not so. The PSLRA's safe harbor requires only cautionary language "warn[ing] of risks of a significance *similar* to that actually realized." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 455 (S.D. Tex. 2016) (emphasis added). Concho's disclosures are lightyears from the boilerplate warnings *Lormand* rejected. *See* 565 F.3d at 244 (rejecting warning that "known and unknown risks and other factors that could cause actual results to be materially different"). Nor can the R&R (a) label Concho's alleged failure to adequately risk Dominator's tight spacing "an unheard of practice in the oil and gas industry," while (b) discarding Concho's disclosure that certain "tighter spacing" drilling locations "have not been fully risked" as too commonplace. R&R 29, 35. Under the safe harbor or otherwise, the R&R erred in crediting this falsity theory.

### D.      The R&R misses the temporal disconnect in the CC's attack on early Dominator results.

Concho did not disclose any specific Dominator production data at the close of Q1 2019, nor does the CC identify any instance in which Concho publicly forecasted Dominator production. The R&R, however, juxtaposes (1) Leach's Q1 2019 report of "pretty good" and "strong early production" from Dominator with (2) the CC's scattered allegations that production was below internal projections "early on," "quickly," and "immediately." R&R 21-22. But the R&R fails to address Defendants' central point that those allegations are temporally ambiguous and do not demonstrate Dominator's production was not, in fact, "pretty good" *when Leach spoke*. MTD 13-14. "[L]ater results do not establish that the earlier statements were false when made," *Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, 2015 WL 1143081, at *10 (S.D. Tex. Mar. 13, 2015), so it is crucial to plead with particularity that reports "were false at the time that they were made." *In re Repros Therapeutics, Inc. Sec. Litig.*, 2010 WL 11583428, at *8 (S.D. Tex. Nov. 17, 2010), *R&R adopted*, 2011 WL 13254400 (S.D. Tex. Jan. 19, 2011). The R&R erroneously excuses the CC's failure to do so.

12

Moreover, the R&R's suggestion that Concho declared Dominator a definitive "accomplishment," R&R 22, is belied by what Leach actually said. He cautioned that Concho "ha[dn't] hit the kind of critical 60 days of production" to be able to give hard production figures, so Dominator "will be in the next quarter's batch of wells to talk about." MTD Ex. 2 at 8. When that data became available the next quarter, Concho promptly *disclosed* that production had trailed off. MTD Ex. 19 at 4-5. If anything, the CC's least-vague FE allegations corroborate that timeline.[4]

### E.    The R&R's falsity and omission analysis is antithetical to § 10(b) caselaw.

As Defendants' Reply explained, Plaintiffs' cited authority all fits the "traditional § 10(b) paradigm of omitted operational *problems* or already materialized *bad news* that contradicted positive statements."[5] The CC, in contrast, contains no particularized allegations that Defendants concealed any such news before promptly disclosing the Q2 2019 results. MTD Reply 7-8. The R&R, for its part, could only add to that inapposite list of cases by citing:

- *In re Apache Corp. Sec. Litig.*, 2022 WL 4277350, at *4 (S.D. Tex. Sept. 15, 2022), *R&R adopted*, 2022 WL 17324439 (S.D. Tex. Nov. 29, 2022): allegations that "the vast majority of [Company's] … wells had never performed or produced anything like the Company had represented to the market."

- *In re TETRA Techs., Inc. Sec. Litig.*, 2009 WL 6325540, at *14-15, *35 (S.D. Tex. July 9, 2009): allegations company manipulated earnings despite unrecognized "expenses for weather delays," overstated reserves that "had been depleted already," and concealed that "significant portions of … insurance receivables ha[d] already been denied."

- *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 759, 763 (S.D. Tex. 2012): allegations BP misstated its current safety "progress" while concealing a "string of prior safety failures" and its current ability to respond to a drilling blowout while admitting that it "did not have an oil spill response plan with 'proven equipment and technology' and that [it] was 'instead making it up day to day.'"

The R&R found no case extracting falsity from internal dissent over the strategic wisdom of an

---

[4] *See* CC ¶ 119 (FE-3 alleging "completion phase was done in three sets" and issues emerged in Dominator's "second phase," with "immediate decline" occurring in the "third phase"); *id.* ¶ 154 (FE-9 quoting Leach as saying Concho "'could have tried hiding' the negative impact of the D[o]minator [sic]" but opted to "be[] open" instead).

[5] MTD Reply 7-8 & n.9, 10 n.11, 15-16 (distinguishing *Lormand*, *Rougier*, *Hall*, *KB Partners*, *Carlton*, *Ramirez*, and *Spitzberg*); Dkt. 36, Defs.' Resp. (same for *Six Flags*).

initiative or second-guessing its methodology. *That* is what this case is about, and courts consistently reject such claims. *See, e.g.*, *Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at \*22-23 (E.D. Tex. Oct. 19, 2017) (distinguishing § 10(b) complaints involving "defendants [that] were aware of ongoing material problems that were already causing problems," from non-cognizable complaints involving internal "skepticism" over a program and allegedly "poor business choices" that "were likely to lead to such problems"), *R&R adopted*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017).[6] Nor does simply repeating the mantra that Defendants "conceal[ed] the true nature of risk," *e.g.*, R&R 41, absolve the lack of particularized falsity as to a specific statement. As Judge Ellison put it, that thinking "mistakenly equates risk with falsity." *BP*, 843 F. Supp. 2d at 762 ("Plaintiffs' reliance on the existence of such risk as proof of falsity is insufficient to demonstrate the falsity of the statements at issue here."). And that was in a case where, unlike here, defendants (a) made affirmative statements that the company was "lowering its risk profile," and (b) "failed to disclose prior safety failures." *Id.* at 759-62.

Ultimately, the R&R imposes precisely the duty of self-flagellation it purports to disclaim. R&R 36-37; *see Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) (defendants who disclose "historical information" that is "factually correct" have "no duty to cast [their] business[es] in a pejorative, rather than a positive, light"). That is, the R&R faults Concho for not using more amorphous "eye-catching or negative phrasing that [the CC] would have wished" for, but the securities laws do not demand that. *Singh v. Schikan*, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015) (collecting cases); *see, e.g.*, R&R 36 ("unverified and risky technique"), 37 ("more of a shot in the dark technologically"), 2 ("experimental"). That would be error in any case, but here it is

---

[6] *See also, e.g.*, *Sarafin v. BioMimetic Therapeutics, Inc.*, 2013 WL 139521, at \*19 (M.D. Tenn. Jan. 10, 2013) ("internal disagreements as to how the clinical trials should be run" do "not suggest the failure to disclose material matter"), *aff'd*, 747 F.3d 435 (6th Cir. 2014).

inexcusable, as the R&R simultaneously skips over the eye-catching language in which Concho *did* cloak its optimization efforts. *Supra* § I.A.

## II.     The R&R fundamentally misapplies the scienter framework.

The CC must establish a "strong inference" of scienter for each Defendant—*i.e.*, one that is both "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The R&R eviscerates that critical test—leveraging a ubiquitous corporate "motive," crediting boilerplate or non-cognizable circumstantial allegations, and transforming a nonculpable inference into a culpable one. If left uncorrected, the R&R will serve as a springboard for disregarding the wall of scienter authority that the Fifth Circuit and courts across the country have spent decades building.

### A.     The R&R's analysis would render motive a forgone conclusion in every case.

Although not "essential," "[m]otive is a critical ... aspect of a successful claim for securities fraud." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 431 (5th Cir. 2019). Only "concrete benefits that could be realized by one of more of the false statements and wrongful nondisclosures" can factor into the scienter analysis, *id.* at 430-31, not "[a] generalized motive that could be imputed to any publicly-owned, for-profit endeavor," *Coates v. Heartland Wireless Commc'ns, Inc.*, 100 F. Supp. 2d 417, 431 (N.D. Tex. 2000). The CC came nowhere close to meeting that test—it did not allege that Defendants gained (or stood to gain) a single cent from the supposed fraud. No suspicious insider trading. No extraordinary incentive bonus. *Nothing*.

The R&R devotes one sentence to a purported motive—to "stay relevant as 'pioneers in the industry' in the American oil and gas exploration and production … renaissance." R&R 39 (citing CC ¶ 3).[7] But the Fifth Circuit has explicitly rejected desires to "maintain and increase

---

[7] The CC does not contain that quoted language. Instead, that paragraph characterizes Defendants as hoping to "under promise and over deliver." CC ¶ 3. *Under* promising is the antithesis of a motive to defraud.

market share" and "competitive position" or to "maximize profits" as ubiquitous corporate goals that do not provide a motive for purposes of scienter. *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 1994); MTD 25 & n.17 (collecting cases). Alleging that defendants "conceal[ed]" a "risk" because they "staked their careers" on "the success of [an] initiative" also is a nonstarter; "[i]n the absence of an allegation that the defendants profited from the alleged fraud, an allegation of motive based on career prospects" or "career survival" "is insufficient." *Pier 1*, 935 F.3d at 431. In holding otherwise here, the R&R's "conclusion would universally eliminate the state of mind requirement" and make motive a given in *every case*, since "all rational economic actors … seek to maximize their profits" and "competitive position." *Melder*, 27 F.3d at 1103.

The R&R's analysis also ignores the critical distinction between a motive to *defraud*—that is, a concrete benefit that "could be realized by one of more of the false statements"—and a motive to achieve *operational* success. *Pier 1*, 935 F.3d at 431. Only the former counts, and it is achieved when an alleged false statement triggers outlandish bonuses, permits insider trading at inflated prices, or the like—none of which has been alleged here. The latter benefit derives not from what Concho said, but from its successful execution of goals the CC concedes Defendants earnestly believed. *Infra* § II.D.2. Courts consistently reject efforts to conflate those two types of motive.[8]

Finally, the R&R cited—but not as a motive—the CC's reference to a "fraudulent bet-the-company endeavor in hopes of saving the Company." R&R 47. Such hollow rhetoric that a scheme "was essential to the Company's survival" is conclusory when unsupported by "facts." *Callinan v. Lexicon Pharm., Inc.*, 479 F. Supp. 3d 379, 433-34 (S.D. Tex. 2020), *aff'd*, 858 F. App'x 162 (5th Cir. 2021). Here, not only does the CC contain no such facts; it proclaims the total opposite—

---

[8] *E.g.*, *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 389 (S.D. Tex. 2011) (motive to "accomplish … rapid growth" did not "constitute motive … to have defrauded"), *aff'd*, 464 F. App'x 334 (5th Cir. 2012); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *9 (S.D.N.Y. Apr. 1, 2015) (rejecting "gambling on a risky project" as a "motive for the purposes of securities fraud").

16

that Concho "had been *immensely successful* and was *growing fast*." CC ¶ 144 (emphases added).

**B.      The R&R disregards Fifth Circuit precedent by crediting circumstantial allegations that fail to satisfy heightened scrutiny.**

Absent "a clear motive for the alleged misstatements or omissions," the R&R was obliged to hold "the strength of [Plaintiffs'] circumstantial evidence of scienter" to a "correspondingly greater" standard. *R2 Invs.*, 401 F.3d at 644. The R&R failed to apply that heightened scrutiny, and it further erred by crediting allegations that were deficient *no matter* the motive.

**1.      The R&R ignores the central requirement of scienter— contemporaneous knowledge of facts that contradict public statements.**

Scienter asks whether Concho's public statements were made with "actual knowledge" of their falsity, or presented an extreme "danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001). Rather than focus on the culpability of what Concho *said*, the R&R attacked the *operational* reasonableness of "Defendants' willingness to bet the transition to manufacturing mode would work." R&R 47-48. Even putting aside that Concho was far from the only company to push the boundaries of large-scale development, MTD 7, courts have rejected such attempts to conflate a defendant's "pursu[it] [of] a high-risk business strategy" with an allegation that the defendant "*spoke*" with scienter. *Franklin Bank*, 782 F. Supp. 2d at 388 (emphasis added). To hold otherwise would encourage § 10(b) suits to "merely second-guess[] defendants' internal business decisions"—a long-forbidden practice. *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F. Supp. 2d 348, 355 (S.D.N.Y. 2006).

Because scienter focuses on what was said, it requires particularized facts "directly contradict[ing] [Defendants'] public statements" and that Defendants knew those facts "before [they] made any of the [challenged] public statements." *Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586, at *27 (S.D. Tex. Sept. 29, 2010). As set forth below, the R&R can point to no such

17

knowledge, so it is forced to rely on the CC's allegations of internal disagreement and employee "warnings" over the prudence and riskiness of Dominator on the heels of Concho's "immense[] success[]." CC ¶ 144. In the Fifth Circuit—or anywhere—that is not the stuff of scienter. *E.g.*, *Neiman v. Bulmahn*, 854 F.3d 741, 752 (5th Cir. 2017) (no scienter even when "others [including FEs] disagreed with Defendants' assessments of [company's] liquidity"); *Owens*, 789 F.3d at 542-44 (same for defendants who "were aware of internal warnings regarding the MBS valuation" from FE); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009) ("disagreement among employees … is not enough to establish a cogent or compelling scienter allegation").

### 2. The R&R inflates—rather than discounts—the FE accounts.

The R&R's scienter analysis relies almost exclusively on the accounts of 9 FEs. Thus, it is critical that the R&R properly discount the weight of the FEs' allegations. *See Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 208 (5th Cir. 2023) (all CW/FE allegations must be discounted and "the degree of discounting depends on the circumstances"). The discounting must be steep unless the CC pleads particularized facts "support[ing] the probability that a person in the position occupied by the source … would possess the information" ascribed to him. *Shaw*, 537 F.3d at 535, 539. The CC utterly failed to make that showing, so the FE allegations must be heavily discounted. The R&R erred by neglecting to do so.

*FEs.* The R&R generally "discounts" FE-5 and FE-6, R&R 20, but it should not have stopped there. It should have rejected various FEs out of hand—none of whom recounted class-period interactions with an Individual Defendant. Those include:

- FE-4 through FE-9 grouse about Dominator but admit that they did not work on the project in any relevant capacity.[9]

---

[9] Specifically, FE-4 "worked in a group … 'adjacent' to Dominator," CC ¶ 126; FE-5 was a landman, *id.* ¶ 131; "FE-6 … heard about the project through colleagues," *id.* ¶ 136; FE-7 was a Division Order Analyst (a legal analyst of sorts), *id.* ¶¶ 139-40; FE-8 "explained that he had heard about the project from others," *id.* ¶ 142; and FE-9 was an IT department employee who relays what he heard at an off-site "team building" event in 2020, *id.* ¶¶ 148-49.

18

- FE-3, 4, 7, 8, and 9's positions relative to the Individual Defendants are unpleaded.

- FE-2 alleges he completed a "post-audit" of Dominator, CC ¶ 107, but that after-the-fact knowledge is irrelevant to scienter "at the time" of the CSs. *Southland*, 365 F.3d at 382.

- FE-3 allegedly thought Dominator was "overly optimistic" but only recounts "conversations with the geoscience team about the Dominator project," expressing concern to "a former Vice President of Geoscience and Technology and former Geoscience Manager at Concho" (not the Individual Defendants), and a post-Dominator-completion "group meeting" involving "celebrations" (not contradictory information). CC ¶¶ 111-24.

- FE-8 alleges Giraud "was the one to sign off on the Dominator project," CC ¶ 144, which says nothing of Giraud's scienter. FE-8 also betrays his lack of position to know relevant facts, stating: "*if* he were investigating this matter he would want to speak with FE-1 and FE-2." *Id.* ¶ 147 (emphasis added). "If he were investigating" means he was not, and that "he would want to speak with FE-1 and FE-2" telegraphs his lack of personal knowledge.

The CC therefore must rely on FE-1—part of the "technical staff" two levels below Giraud, and four below Leach—and his work on Dominator to try to meet the PSLRA's standard for pleading scienter for each Individual Defendant. CC ¶ 74. But as explained above, one employee's disagreement about a project with those up the ladder does not create *any* inference of scienter. *Supra* § II.B.1; MTD 27. Even then, FE-1's allegations about unspecified meetings are bereft of the requisite critical details. CC ¶¶ 77-78 (unspecified "regular budgeting meetings" attended by "all of the technical teams at Concho" and led by Giraud where "it was determined" that risk considerations would be handled by corporate teams); *id.* ¶ 87 ("multiple meetings" where FE-1 allegedly "expressed his concerns" about Dominator to Giraud, without any elaboration on when those meetings occurred, where, or who was there); *see Owens*, 789 F.3d at 542 n.13 (refusing to "draw any inferences from" FE allegation that issue was discussed in meetings because complaint did not "plead with particularity the dates of the ... meetings or the substance of the conversations"). Moreover, what FE-1 postures as fraudulently concealed warnings blithely ignore what Concho communicated to the market. *Compare* CC ¶ 75 (alleging a secret "shortcut … to determine how closely wells could be spaced"), *with* MTD Ex. 13 at 9 ("we're trying to see how far we can push the efficiencies"); *compare* CC ¶ 87 (alleging "concerns" that Dominator was

19

inadequately "risked"), *with* MTD Ex. 10 at 3 ("drilling locations have not been fully risked by Company management and are inherently more speculative than proved reserves estimates").

Dominator-specific criticism aside, the R&R relied on "the FEs" collectively to support blanket fraud allegations against Concho's *entire portfolio*—even though no FE claimed to have been in a position to have had such information. This is especially glaring as to FE-1 and the conclusory charges he levels against Concho's portfolio because the CC sheds no light on "where and when [FE-1] came to know th[at] information." *Dawes*, 975 F. Supp. 2d at 692; *Shaw Grp.*, 537 F.3d at 539 (rejecting FE allegations from "Baton Rouge project control manager" as not "in a position to know about 'all of the problems' related to" company's tracking software "or that these problems pervaded the company"). The CC therefore cannot support the conclusion that "FE-1, 2, 3, 4, 7, 8, and 9's positions are directly relevant to the events at issue in this case and their roles substantiate that those FEs would have the necessary knowledge." R&R 19-20.

***Speculation/Contradiction.*** The R&R also improperly relies on rank speculation, hearsay, and internal inconsistencies from FEs to find scienter.[10] For instance, the R&R describes FE-3 as alleging that "Concho did not conduct fracture modeling, or ignored modeling." R&R 23. But FE-3's speculation was equivocal at best: "According to FE-3 multiple models *would have* been used, but he *does not believe* that any were. FE-3 added that *it was possible that models were run*, but *if they had been* then they were ignored." CC ¶ 117 (emphases added). Similarly, the R&R states that "FE-8 explained that FE-2 ... warned Concho that based on simulations Dominator would not work," R&R 42—but FE-2 never claims to have said that. CC ¶¶ 106-10. In fact, FE-2 says he "conduct[ed] a *post-audit* of the Dominator project towards the end of 2019" and was "*very*

---

[10] *See, e.g.*, *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 861 (S.D. Tex. 2016) ("[P]ersonal opinions void of specific details regarding the basis [for the FE's] personal knowledge add nothing to falsity or scienter."); *Wu Winfred Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 578 (W.D. Tex. May 8, 2017) ("hearsay-within-hearsay account" was "too unreliable to give rise to an inference of scienter as cogent or compelling as any competing inference of nonfraudulent intent"); *Zucco Partners*, 552 F.3d at 999 (FE allegation was "too contradictory to be compelling").

*surprised* to find Concho had drilled 24 wells." *Id.* ¶ 107 (emphasis added).[11]

The R&R mischaracterizes other FE allegations. For example, the R&R states, "[t]he technical teams doubted the Dominator's success, but Defendants purported [sic] its early and on-going accomplishment despite being *advised otherwise*," R&R 22 (emphasis added), citing CC ¶¶ 114-15—but those CC paragraphs merely describe an internal group meeting with "back slapping" and "celebrations" following Dominator's completion. CC ¶¶ 114-15. So too with respect to the statement that "FE-1 directly *told Defendants* they were incorrectly risking wells," R&R 39 (emphasis added); in fact, FE-1 is alleged to have interacted only with Giraud.

### 3.    The R&R breathes life into all sorts of discredited scienter allegations.

***Meetings.*** The CC must allege "*specific* conversations or attendance at *specified* management or board meetings dealing with *such problems*." *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 699 (S.D. Tex. 2013) (emphases added). No "specific meetings" where the Individual Defendants learned facts contrary to what they were about to say publicly undergird the R&R's broad conclusion that "the Individual Defendants were regularly and repeatedly warned of the risks by senior technical staff in project and financial meetings," R&R 20, 42. The only alleged meetings that (a) were not hindsight assessments of Concho's Q2 2019 results (*infra* p. 23), and (b) allegedly were attended by Defendants besides Giraud[12] are allegations that:

- "there were weekly Tuesday meetings amongst the executives, including Giraud, Leach, and Schroer and that Dominator was likely discussed," CC ¶ 105; R&R 46;

- "budgeting meetings each year … are run by reservoir engineers where they present ideas to management" and that one such meeting involved an engineer "group pitching the Dominator" and touting its benefits, CC ¶¶ 127-28 ; R&R 42; and

- "Individual Defendants attended weekly status meetings where the Company's large-scale

---

[11] *Compare also* CC ¶¶ 127-28 ("reservoir engineers" would "present ideas to management," including "pitching the Dominator"), *with* ¶ 133 ("Dominator project was pushed from the top downwards by Concho's executive team").

[12] For meetings allegedly attended by Giraud, the CC fails to plead (a) the requisite specificity, and (b) that Giraud was made aware of information actually contrary to what Concho reported to the market. *Supra* § II.B.2.

21

development projects were discussed," CC ¶ 386; R&R 39.

Those allegations fall far short of the specificity demanded in this Circuit.[13] More importantly, they are substantively meaningless, because there is no allegation they involved specific, factual information "at odds with" Concho's "public statements." *Shaw Grp.*, 537 F.3d at 540.

*Access to data.* "Simply pleading that a defendant had access to internal information that contradicted his or her public statements is not enough." *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 616 (S.D. Tex. 2018), *aff'd*, 777 F. App'x 726 (5th Cir. 2019). "[T]he complaint must make specific allegations about the document, its author, contents and character, and when and by whom it was received, to link it to the person making the challenged statement, at the time the statement was made." *Id*. The R&R failed to apply this principle and instead simply recycled the CC's broad allegations that "Defendants had access to production databases" and "databases which properly quantified the actual risks associated with large-scale tightly spaced development" without further analysis. R&R 20, 39. Critically missing is any analysis of (1) whether Concho ever said anything even remotely suggesting there was no risk associated with large-scale development, and (2) whether the production databases allegedly accessible to the Individual Defendants (a) contained factual information contradicting what they were about to say and (b) were actually accessed by any Individual Defendant.[14] Indeed, the R&R misstated that FE-1's allegedly "higher risk profile" recommended in "Concho's 'Aries' Database" pertained to large-scale development categorically, as opposed to Dominator specifically. CC ¶ 81; R&R 20.

*Admissions.* The R&R states that "Defendants' admissions show that the transition to

---

[13] *See also, e.g.*, *McDermott*, 2015 WL 1143081, at *9 (rejecting meeting allegations in which "problematic EPCI projects were *likely discussed*") (emphasis added); *BP*, 852 F. Supp. 2d at 814 (rejecting broad, "undifferentiated" references to "officers and directors" and "senior management" as impermissible "group pleading").

[14] *E.g.*, *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 984 (5th Cir. 2019) (no scienter when defendant presented "demonstrably false" well data that "would have been very easy to check," absent facts demonstrating he "knew of these errors at the time"); *Neiman*, 854 F.3d at 748 (no scienter despite allegation that production "reports were made available to" defendant and he "received weekly emails containing production reports").

manufacturing mode was a risk that did not align with their expectations or their attestations to investors and analysts." R&R 48. What those "admissions" are is unclear, but if the R&R is referencing Concho's hindsight observations that it had spaced certain projects "too densely" or "too tight," CC ¶¶ 162, 302, that is manifestly non-probative of scienter. *See, e.g.*, *Rosenzweig*, 332 F.3d at 867-68 (rejecting scienter-admission theory when report was "plainly a *hindsight* assessment"); *McDermott*, 2015 WL 1143081, at *10 ("so-called admissions" regarding "poor project management" "did not convert into a falsity [defendants'] previous belief that the Company was 'going to have a good year in 2013'"); MTD 32; MTD Reply 13-14.

### 4.    The R&R blows the narrow "core operations" exception wide open.

The R&R found "the Individual Defendants['] [alleged] involvement in daily operations" and "participation in day-to-day activities" probative of scienter. R&R 44, 46. But this Court and others have held that an executive's "presence in the business office" or "Defendants' corporate positions" do not factor into the scienter calculus. *Yang*, 2020 WL 5512456, at *2; *accord Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431-32 (5th Cir. 2002); MTD Reply 18 & n.20.

The only exception to this rule is the "core operations" or "special circumstances" doctrine, which is a "narrow exception" that allows for imputing knowledge to individual defendants where "one … meet[s] some combination of four considerations." *Yang v. Nobilis Health Corp.*, 2021 WL 3619863, at *3 n.2 (5th Cir. Aug. 13, 2021). "First, the company must be small. Second, the transaction at issue is critical to the company's continued vitality. Third, the misrepresentation is readily apparent to the speaker. And last, the defendants' statements are internally inconsistent." *Id.* Courts (including this one) easily reject misguided core operations arguments. *E.g.*, *Yang*, 2020 WL 5512456, at *3 (approving R&R that "easily dispensed" with core operations in case involving company with "nine hundred employees"); MTD Reply 17-18 (collecting additional cases).

The R&R's core operations analysis errs for at least three reasons. First, the R&R appears

23

to improperly double-dip, once claiming core operations as a reason to infer scienter based on the officers' positions alone, R&R 40, and then discussing it again as a separate exception "which contributes to a strong inference of scienter," *id.* at 43. Second, the R&R never disputes Concho's large size and lack of "internally inconsistent" statements, which weigh heavily against the exception. MTD Reply 18 (collecting cases). Third, the R&R concludes the other "two of the four categories of special circumstances" are satisfied but only analyzes one factor—critical to vitality—and in manner that is singularly unpersuasive. R&R 47.[15]

*Critical to Vitality.* Dominator was only "3% of Concho's overall budget," CC ¶ 98, far below vitality allegations the Fifth Circuit has rejected,[16] and it comes nowhere close to the single-product-company or lifesaving-transaction cases upon which the core operations doctrine rests.[17] Nor does Concho's 2021 acquisition for nearly $10 billion, CC ¶ 317—after a pandemic-induced commodities market crash, and more than a year after Concho's Q2 2019 results—meet the high bar for demonstrating that Dominator "jeopardized the company's existence." *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016).[18]

Unable to squeeze core operations out of Dominator, the R&R points to large-scale development in general, for which Concho publicly dedicated 80% of its 2019 capital. R&R 44. But the CC offers no particularized *factual allegations* about non-Dominator projects to impute at all—just conclusory rhetoric. *E.g.*, CC ¶ 353 ("Dominator was a 'reflection of everything'"). The

---

[15] The R&R apparently considered "the Individual Defendants' involvement in daily operations" as factoring into core operations analysis, R&R 43-44, but that is the impetus for analyzing the exception, not a factor in finding it satisfied.
[16] *See Neiman*, 854 F.3d at 750 (rejecting doctrine as to well that "was projected to produce 22.5% of [company's] total output"); *Owens*, 789 F.3d at 540 (same as to portfolio that "was undeniably a large and important business asset" but "compris[ed] at all relevant times no more than 22% of [company's] total assets").
[17] *See Nathenson*, 267 F.3d at 425 ("substantially all" of company's sales were of single patented product); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 692 (5th Cir. 2005) ("fledgling" company announced annual purchase agreement worth roughly 80 times the company's annual revenue); *In re Netsolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 692 n.5, 697 (W.D. Tex. 2001) (customer "was the lifeblood of the company" and accounted for between 64% and 72% of revenue).
[18] *See, e.g.*, *Neiman*, 845 F.3d at 751 (no core operations despite company's bankruptcy a year after bringing subject well online); *Owens*, 789 F.3d at 533-34 (same despite "one of the largest bank failures in United States history" occurring five months after bank recorded a $1.62 billion impairment on mortgage-backed securities portfolio).

24

Fifth Circuit rejects using adjectival phrases (not facts), or conflating allegations about one project or program with a company's entire operations, to shore up a core operations claim. *See Diodes*, 810 F.3d at 959 ("workplace conditions 'profoundly' contributed to the labor shortage is an adverb, not a factual assertion"); *Pier 1*, 935 F.3d at 433 ("Baltimore-specific allegation says nothing about inventory problems across Pier 1's other five distribution centers and thousands of stores").

*Readily Apparent Facts.* The R&R never identifies what particular "facts" would have been "readily apparent" to which speakers and why. Instead, it cites exclusively to core operations cases with stark, egregious concealed facts that only serve to highlight what is not alleged here.

- *Plotkin*, 407 F.3d at 694, 697-98: a "fledgling" company touted and booked revenue from a massive deal with supposedly "significant international companies which could serve as credible business partners," when those companies were actually new, tiny, and related entities, the deal collapsed "quickly and spectacularly," the company's auditor resigned, and the company never got paid a dime under the agreement.

- *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 680-81 (5th Cir. 2014): three-person company touted oil inflows when in fact *no* oil had flowed, and a statement touted more "recoverable reserves" in its Colombian oil-and-gas concession than "all of Colombia" (with "reserves" being a term of art that conveyed a certain level of production or testing), when in fact "*no* such production or geological testing had yet occurred."

- *Six Flags*, 58 F.4th at 208-09, 217: company touted that construction of amusement parks—accounting for a projected 20-40% EBITDA increase—was "progressing nicely" and its development partner had "a lot of assets," "continu[ed] to pay," and "financing [was] in place," when in fact there had been "essentially no construction" and the development partner "was firing its employees, was underpaying its workers, had stopped construction, and had 'zero funds' to finance the project."

Now consider the alleged "facts" here: (a) Dominator's "true" Q1 2019 production was not "pretty good," and (b) some employees disagreed with the prudence and risking of Dominator, while others "pitch[ed]" its benefits. CC ¶ 128. Those are the sort of allegations the Fifth Circuit has held do *not* create a core operations inference. *See, e.g.*, *Neiman*, 854 F.3d at 750 (not "readily apparent" that defendant would have "misstated Well #4's true production"); *Flotek*, 915 F.3d at 984-85 (same as to "demonstrably false … well data"); *Owens*, 789 F.3d at 540, 542-44 (same as to "internal warnings" regarding bank's pricing model and "inadequate modeling of credit risk").

25

Finally, the R&R's citation to *Six Flags* is especially telling. Not only were the *Six Flags* projects far more critical and the alleged misrepresentations far more egregious, but even then, the court held that "core operations allegations … [w]ere not adequate *on their own*." 58 F.4th at 219 (emphasis added). Only because *Six Flags* involved concrete scienter allegations—namely, motive to reap "significant bonuses" amounting to "600% and 300% of [defendants'] base salaries" and to cover up "prior irresponsible statements," along with specific reports demonstrating "lack of progress" whose contents were "directly related … to" the speaking defendant—did the court discern a strong inference of scienter. *Id.* at 215-16. None of that is present here. If adopted, the R&R's core operations analysis would allow the narrow exception to swallow the rule.

### 5.  The R&R bends over backwards to infer Schroer and Wright's scienter.

Scienter is especially absent as to Schroer and Wright. No FE identifies any interaction with them. *See Pier 1*, 935 F.3d at 434 (discounting even more steeply CWs "who do not relate any interaction with" individual defendants). They are not alleged to have learned at any meeting, or from any report, any information contrary to something they publicly said. And they are connected to Concho's 2017 and 2018 Form 10-Ks only through their signatures. MTD App'x A at 3-4, 25-26. As the R&R admits, "[t]here are no direct allegations about what Schroer or Wright knew when they signed the SEC filings where the statements appear." R&R 46.

The R&R cannot fill that factual void by lumping Schroer and Wright into group-pleading references to "Concho," "management," "Defendants," or "Individual Defendants." R&R 20, 42, 43. The Fifth Circuit rejects that tactic. *Southland*, 365 F.3d at 364-65. The R&R cannot teleport Wright into meetings the CC does not allege Wright attended. R&R 46 (citing CC ¶¶ 86, 133). It cannot posit what Wright or Schroer "would have" known based on their positions, R&R 46, when "an officer's position with a company does not suffice to create an inference of scienter." *Diodes*, 810 F.3d at 958. It cannot extract scienter out of their bare signatures on Form 10-Ks, R&R 46-47,

when mere signatures "do not permit an inference of scienter." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007). And it cannot hang scienter entirely on a (defunct, *supra* § II.B.4) core operations theory, R&R 46-47, when not even "Plaintiffs … rely on core operations as an independent basis to adequately allege scienter." R&R 43.

### C.  The PSLRA's safe harbor requires dismissal as to forward-looking statements.

The R&R infers that Defendants acted with "at least severe recklessness," R&R 41, stopping short of finding any "actual knowledge" of falsity. That alone should be dispositive as to all forward-looking CSs, because the PSLRA's safe harbor is "disjunctive," such that it applies to a forward-looking statement "accompanied by meaningful cautionary language … *or that was not made with actual knowledge* that it was false or misleading." *Carlton*, 184 F. Supp. 3d at 453 (emphasis added). "[S]evere recklessness" does not suffice. *Nathenson*, 267 F.3d at 409.

### D.  The R&R profoundly misapprehends the competing scienter inferences.

"[T]he PSLRA establishes a more stringent rule for inferences involving scienter." *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). The CC must plead a "strong inference" of scienter that is both "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. The R&R violated this principle by crediting an illogical culpable inference and disregarding the nonculpable inference that leaps off the face of the CC.

#### 1.  The R&R's reckless gamble theory is inapposite and incoherent.

The R&R appears to base its scienter finding on a reckless-gamble theory, crediting the CC's allegation that Defendants "engaged in an undisclosed fraudulent bet-the-company endeavor in hopes of saving" Concho. R&R 47. But the CC's allegations are easily distinguishable from the cases the R&R cites, as the egregious, must-have-known nature of the concealed "bad news" in those cases bears no resemblance to this one. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 706-07, 709-10 (7th Cir. 2008) (company touted strong continuing demand while

27

concealing that demand for flagship product had "evaporat[ed]" and it had shipped "not a single" one of the successor products); *NetSolve*, 185 F. Supp.2d at 697 (company touted "customer growth" while concealing declining sales from "primary customer" and "'significant' loss of other customers due to service problems"). And courts have explicitly dismissed "reckless gamble" theories when the more plausible inference, as here, was that the defendants "actually believed" in an initiative. *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 273 F. Supp. 3d 650, 665, 667-68 (N.D. Tex. 2017); *Callinan*, 479 F. Supp. 3d at 428; MTD Reply 21 (collecting cases).

The only "bad news" alleged in the CC—Dominator's less-than-expected production— cuts directly *against* an inference of scienter. Concho promptly *disclosed* that news once the "critical" 60 days of production data became available, *supra* § I.D, and the CC offers zero reason why Leach would lie that there were "pretty good" preliminary results but turn around and disclose that production had declined the very next quarter. That puts this case on all fours with *Neiman*:

> It would have ***made little sense for Reese to lie*** about Well #4's production in September only for Tate to disclose the true production in November. This is especially true because Plaintiffs have ***not alleged that Reese had a particular reason to lie in September that would have vanished by November***.

854 F.3d at 741 (emphases added). More broadly, had Defendants wanted to imply that Concho had well spacing all figured out, while *secretly* testing limits and reaping rewards, they did a remarkably poor job of it, as they (a) disclosed Concho had "a lot to learn," was testing to "see inefficiencies," and countless other warnings, *supra* § I.A; (b) sold no inflated stock to secure a "higher payout," *contra* R&R 48; and (c) promptly disclosed that Concho overshot well spacing, when they "could've tried hiding" those results, CC ¶ 154. Those are not the hallmarks of an "undisclosed fraudulent bet-the-company endeavor," R&R 47, much less a "cogent" one. *Tellabs*, 551 U.S. at 324; *see, e.g.*, *Owens*, 789 F.3d at 541 ("transparency" about "uncertainty" helped "negate[]" scienter).

28

## 2.    The R&R's hubris theory only highlights the nonculpable inference.

The inference that Defendants believed so strongly in past success that it gave them "hubris or overconfidence" was not merely "Defendants' argu[ment]," *contra* R&R 47—it came right from the CC's FE accounts. CC ¶ 144 (Concho's "level of success gave management the feeling that they had the 'Midas touch,'" "hubris" and "overconfidence"), ¶ 113 (management had "irrational exuberance"). Rather than treating that as the nonculpable inference it plainly is, the R&R declares—without citation or explanation—that such a belief "tends to support the inference that Defendants' actions went beyond mere negligence." R&R 47. That was doubly wrong.

First, "severe recklessness" does not ask whether a defendant's *conduct* "went beyond mere negligence." *Id.* It covers only "those highly unreasonable *omissions* or *misrepresentations* that involve *not* merely simple or *even inexcusable negligence*, but an extreme departure from the standards of ordinary care." *Nathenson*, 267 F.3d at 408 (emphases added). And it is not an "extreme departure" to make "generalized endorsement[s]" of a practice that had "undisputedly provided some economic benefit," even if hindsight proves it "unwise." *Flotek*, 915 F.3d at 983.

Second, it is just plain wrong that a genuine belief "tends to support" scienter. R&R 47. This Court so held in *Yang*, adopting an R&R that the more compelling nonculpable inference was that a defendant "sincerely believed the assets were collectible"—despite internal warnings to "write off these claims as uncollectible"—because while the defendant's "evaluation may have been wrong, … mistake or even negligence is not sufficient to establish fraud." 2020 WL 6815402, at *9-10, 14, *adopted in relevant part*, 2020 WL 5512456, at *2. That is one of many examples— in this District[19] and elsewhere—treating a sincere belief as nonculpable, even if allegedly

---

[19] *E.g.*, *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharm., Inc.*, 2007 WL 2720074, at *5 (S.D. Tex. Sept. 18, 2007) ("genuine belief"); *Callinan*, 479 F. Supp. 3d at 437 ("honestly believed"); *MicroCapital Fund LP v. Conn's Inc.*, 2019 WL 3451153, at *19 (S.D. Tex. July 24, 2019) ("misguided optimism is not a cause of action, and does not support an inference of fraud"), *R&R adopted*, 2019 WL 4673209 (S.D. Tex. Sept. 24, 2019).

29

misguided. MTD 29, 33-34; MTD Reply 19 n.22. And that holds true no matter the semantic gloss applied, whether a "surplus of hubris," "too much confidence," or "mismanagement." *In re Guess?, Inc. Sec. Litig.*, 174 F. Supp. 2d 1067, 1078 (C.D. Cal. 2001) (first quote); *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1248 (10th Cir. 2016) (second quote); *Abrams*, 292 F.3d at 433 (third quote). The R&R's decision breaks from that uniform law.

### 3.    The R&R will impart a chilling effect on innovation.

Courts have long recognized the "in terrorem" threat of § 10(b) claims, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975), which led to the PSLRA and its exacting pleading-stage scrutiny. This lawsuit—and the R&R—ratchets that in terrorem effect to another level by transforming the accretive-learning process into a means of penalizing Concho and its officers for *publicly disclosed* and *genuinely believed* efforts to push the boundaries on a technological development that was gaining broader traction in the industry. That concern is not imaginary. If "securities laws [could] become a tool to second guess how [experimental] trials are designed and managed," that would be "unjust" and "could lead to unfortunate consequences beyond a single lawsuit." *In re Keryx Biopharms., Inc., Sec. Litig.*, 2014 WL 585658, at *1 (S.D.N.Y. Feb 14, 2014). The R&R engages in precisely that impermissible second guessing. *See* R&R 48 ("the risk of learning as you go is only mitigated when that process is gradual").

### III.    The R&R erred by sustaining the Section 20(a) claims.

"Control person liability" under § 20(a) of the Exchange Act "is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383. Because the CC's § 10(b) claims fail, the R&R also erred with respect to the § 20(a) claims. *E.g.*, *Shaw*, 537 F.3d at 545.

### CONCLUSION

The Court should sustain Defendants' objections and dismiss the CC with prejudice.

Respectfully submitted,

BAKER BOTTS L.L.P.


By:   */s/ David D. Sterling*
      David D. Sterling
      Attorney-In-Charge
      State Bar No. 19170000
      Federal I.D. No. 07079
      Amy Pharr Hefley
      State Bar No. 24046046
      Anthony J. Lucisano
      State Bar No. 24102118
      Federal I.D. No. 3369146
      C. Frank Mace
      State Bar No. 24110609
      Federal I.D. No. 3385915
      910 Louisiana Street
      Houston, Texas 77002
      (713) 229-1946
      (713) 229-7946 (Fax)
      david.sterling@bakerbotts.com
      amy.hefley@bakerbotts.com
      anthony.lucisano@bakerbotts.com
      frank.mace@bakerbotts.com

ATTORNEYS FOR DEFENDANTS
CONCHO RESOURCES INC., CONOCOPHILLIPS,
AS SUCCESSOR IN INTEREST TO CONCHO
RESOURCES INC., TIMOTHY LEACH, JACK F.
HARPER, C. WILLIAM GIRAUD, E. JOSEPH
WRIGHT, AND BRENDA R. SCHROER


**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served via ECF and/or electronic mail on all counsel of record on this 30th day of March, 2023.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley

31