**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
|  | x |  |
|  | : |  |
| IN RE CONCHO RESOURCES INC., | : |  |
| SECURITIES LITIGATION | : | Case No. 4:21-cv-02473 |
|  | : |  |
|  | : |  |
|  | x |  |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND
<u>APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | SUMMARY OF ALLEGATIONS | 3 |
| III. | ARGUMENT | 4 |
| | A. DEFENDANTS FAIL TO REBUT THE PRESUMPTION OF RELIANCE | 4 |
| | 1. Legal Standard | 5 |
| | 2. Defendants' Attempts to Analogize this Case to *Goldman* Fail | 7 |
| | a. The Alleged Misstatements in This Case are Highly Detailed and Directly Relate to the Corrective Disclosure | 8 |
| | b. There is no Mismatch Between the Statements and Corrective Disclosure | 12 |
| | B. PLAINTIFFS HAVE DEMONSTRATED THAT DAMAGES ARE MEASURABLE ON A CLASS-WIDE BASIS | 16 |
| | 1. Legal Standard | 17 |
| | 2. Plaintiffs' Methodology Follows that Endorsed Uniformly by Courts Across the Country | 18 |
| | 3. Defendants' Make the Same Tired *Comcast* Argument Routinely Rejected Time and Again | 20 |
| | 4. Plaintiffs' Do Not Rely on a MOTR Theory of Loss Causation | 21 |
| | a. Defendants Rely on Decade Old Caselaw that Is Routinely Rejected Under Identical Circumstances | 25 |
| | 5. Plaintiffs' Damages Methodology Can Address Any Potential Issues Associated with the RSP Acquisition | 27 |
| IV. | CONCLUSION | 30 |

i

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)..........................................................................................................19, 21

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ........................................................................................................6

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
    133 S.Ct. 1184 (2013)..................................................................................................................10

*In re Anadarko Petroleum Corp. Sec. Litig.*,
    2022 WL 4544235 (S.D. Tex. Sept. 28, 2022), *reconsideration denied*, 2023
    WL 4307650 (S.D. Tex. June 30, 2023), *vacated and remanded sub nom.*
    *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 2024 WL
    1787927 (5th Cir. Apr. 25, 2024) ........................................................................... *passim*

*In re Apache Corp. Sec. Litig.*,
    2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ....................................................................5, 6, 12

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) .....................................................................................................7, 8, 10

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................................................... *passim*

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
    2023 WL 2932485 (D. Conn. Apr. 13, 2023)............................................................................6

*In re BP p.l.c. Sec. Litig.*,
    2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).........................................................19, 21, 25, 26

*In re BP p.l.c. Sec. Litig.*,
    2014 WL 2112823 (S.D. Tex. May 20, 2014)........................................................22, 25, 26, 27

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .........................................................................6

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
    2024 WL 1060079 (S.D. Cal. Mar. 11, 2024) ........................................................................20

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.,
    HQ*,
    322 F. Supp. 3d 676 (D. Md. 2018)...........................................................................................6

ii

*Comcast Corp. v. Behrend*,
    569 U.S. 27, 35 (2013) ................................................................................. passim

*In re Concho Res. Inc.*,
    2023 WL 2297425 (S.D. Tex. Feb. 23, 2023), *report and recommendation
    adopted in part, rejected in part sub nom. In re Concho Res. Inc., Sec. Litig.*,
    2023 WL 4146278 (S.D. Tex. June 23, 2023).........................................................8, 9

*Edwards v. McDermott Int'l Inc.*,
    2024 WL 873054 (S.D. Tex. Feb. 29, 2024) .........................................................30

*Edwards v. McDermott Int'l, Inc.*,
    2024 WL 1769325 (S.D. Tex. Apr. 24, 2024) ...................................................26, 30

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)..............................................................................................19

*In re Fibrogen Sec. Litig.*,
    2024 WL 1064665 (N.D. Cal. Mar. 11, 2024).......................................................25

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
    514 F. Supp. 3d 942 (S.D. Tex. 2021) ..................................................................24

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    579 F. Supp. 3d 520 (S.D.N.Y. 2021)............................................................ passim

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
    594 U.S. 113 (2021)................................................................................................7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)............................................................................................5, 6

*Homyk v. ChemoCentryx, Inc.*,
    2024 WL 1141699 (N.D. Cal. Mar. 6, 2024)...........................................................6

*Ludlow v. BP, P.L.C.*,
    800 F.3d 674 (5th Cir. 2015) ...............................................................3, 17, 18, 26

*Luna v. Marvell Tech. Grp., Ltd.*,
    2017 WL 4865559 (N.D. Cal. Oct. 27, 2017).......................................................20

*Marcus v. J.C. Penney Co.*,
    2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) .........................................................6

*Mulderrig v. Amyris, Inc.*,
    340 F.R.D. 575 (N.D. Cal. 2021)..........................................................................22

iii

*In re Qualcomm Inc. Sec. Litig.*,
   2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ........................................................................11

*Ramirez v. Exxon Mobil Corp.*,
   2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)............................................................6, 16, 23

*Ret. Tr. v. RH, Inc.*,
   2018 WL 4931543 (N.D. Cal. Oct. 11, 2018).................................................................19, 21

*Rooney v. EZCORP, Inc.*,
   330 F.R.D. 439 (W.D. Tex. 2019) ............................................................................19, 21, 25

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).................................................................................................28

*Rougier v. Applied Optoelectronics, Inc.*,
   2019 WL 6111303 (S.D. Tex. Nov. 13, 2019), *report and recommendation
   adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019)................................................ *passim*

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084 (S.D.N.Y. July 10, 2019) ....................................................................19, 21

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ...............................................................................................22

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ...........................................................................................30

## I.    INTRODUCTION

It bears repeating that not once, but twice have Plaintiffs' claims been found to pass muster under the most stringent pleading standard in the country.[1] Now at the class certification stage, Defendants concede worlds more than they contest in their memorandum in opposition ("Opposition" or "Opp.," ECF No. 68) to Plaintiffs' motion for class certification ("Motion," ECF No. 54). They do not dispute numerosity, commonality, typicality, or adequacy. Nor do they dispute whether the *Basic* presumption of reliance has been invoked. Instead of challenging the core merits of the Motion, Defendants resort to obfuscation, factually inapplicable and esoteric case law, and non-quantifiable subjectivism in seeking to deprive absent Class members of their right to be heard under the efficient and economical class action regime.

The Opposition and accompanying report of Lucy P. Allen ("Allen Report," ECF No. 68-5) retreat to manufactured arguments reliant not on hard data, but subjective hyperbole. Specifically, Defendants claim that they have rebutted the *Basic* presumption for certain misstatements and omissions by purportedly establishing that the fraud did not impact Concho's stock price. But while Defendants bear both the burdens of production and persuasion on this issue, the record does not provide the needed support for their assertion. Indeed, Ms. Allen concedes Mr. Coffman's conclusion that the sole Corrective Disclosure (defined herein) was followed by a statistically significant stock price decline, thus demonstrating that the market viewed the information related to the Complaint's allegations and revealed by Concho for the first time as value relevant. This fact alone renders Defendants' and Ms. Allen's arguments dead on arrival.

---

[1] Citations to paragraphs ("¶") refer to the Consolidated Complaint ("Complaint," ECF No. 25). Citations to Coffman Report ¶ refer to paragraphs in the Coffman Report (ECF No. 54-3). Citations to Coffman Rebuttal ¶ refer to paragraphs in the Expert Rebuttal Report of Chad Coffman, CFA ("Coffman Rebuttal") attached as Exhibit A to the Declaration of Alfred L. Fatale III ("Fatale Decl."). Unless otherwise noted, all capitalized terms have the meaning ascribed in the Complaint and the Motion, and all emphasis added and internal citations and quotation marks are omitted throughout.

Unable to refute the *Basic* presumption, Defendants resort to meritless assertions that certain misrepresentations were too generic or too far detached from the Corrective Disclosure. To start, Defendants fail to even challenge all of the alleged misstatements and omissions, rendering all or nearly of all their arguments a legal nullity insofar that they leave the path to certification unobstructed. Moreover, *Goldman*, the Supreme Court case relied upon, is so factually inapposite that Defendants' comparison thereto is nothing more than labored shoehorning. *Goldman* found a "mismatch" between general averments of business ideals on one hand, and government investigation into potential malfeasance for specific transactions on the other. Conversely, the Complaint alleges numerous, present tense affirmations of fact regarding, *e.g.*, Concho's successful transition to large-scale development, the basis therefore, the assured benefits to come, and certain aggressive "tests" smattered across its acreage as compared to other large-scale projects. The Corrective Disclosure concerns the announcement that the Company's current production would be halved with a similar draw on future production (all without a decrease in budget) due to the previously touted large-scale development and its tight well spacing. Lightyears from *Goldman*.

In addition to their attack on the *Basic* presumption, Defendants seek to recast the Complaint's allegations, ignore the Corrective Disclosure, and choose for Plaintiffs which theory of liability must be pursued in this action. They engage in these acrobatics to trot out a tired, overused, and near-always unsuccessful argument under *Comcast* vainly seeking to call into question the means under which to measure Class-wide damages. Opp. at 23-30. However, the damages model set forth in the Motion is that accepted universally in Section 10(b) class actions,

2

*Comcast* argument or no.[2] Indeed, Plaintiffs have proposed exactly what the Fifth Circuit has dubbed the gold standard for calculating damages—the "out-of-pocket" ("OOP") damages methodology. *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 682 (5th Cir. 2015). As explained in the Expert Rebuttal Report of Chad Coffman, CFA ("Coffman Rebuttal." Fatale Decl. Ex. A), the OOP method cures any and all of Defendants' purported "concerns" raised in the Opposition. Nevertheless, to the extent that any of Defendants meritless arguments raise concerns for the Court, for instance whether there is a conflict between legacy RSP shareholders and open market Concho purchasers, the Court can employ the use of subclasses to address potential conflicts as it sees fit.

Accordingly, the Court should grant Plaintiffs' Motion, appoint Plaintiffs as Class Representatives, appoint Labaton Keller Sucharow LLP as Class Counsel, and certify the Class.

## II. SUMMARY OF ALLEGATIONS

At all relevant times, Concho was engaged in the acquisition, development, exploration and production of oil and natural gas. ¶30. During the Class Period, Concho began construction on developments of unprecedented scale and cost, referred to as "large-scale development" or "manufacturing mode." ¶¶35-36. As part of Concho's strategic shift to manufacturing mode, the Company began construction of the flagship Dominator multi-well pad. ¶37.

Concho's manufacturing mode consisted of experimental methodologies involving tightly spaced wells which set the Company on course for a ruinous outcome.[3] ¶¶35-37. Instead of disclosing the truth, Defendants: (i) touted the transition to large-scale development as a success

---

[2] *See also* Fatale Decl. Ex. B, NERA, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* at 16 (Jan. 23, 2024) ("A motion for class certification was filed in only 18% of the securities class action suits filed and resolved, as most cases are either dismissed or settled before the class certification stage is reached. A decision was reached in 60% of the cases in which a motion for class certification was filed, while nearly all remaining 40% of cases were resolved with a settlement. ***Among the cases in which a decision was reached, the motion for class certification was granted (with or without prejudice) in 86% of cases***.").

[3] *See* ¶¶44-55 (explanation of relevant drilling techniques and the risks associated therewith).

as well as its benefits with zero basis to do so;[4] (ii) stated it was the product of gradual learning and verified techniques despite being experimental;[5] (iii) issued non-risk adjusted production forecasts despite knowing such forecasts were overstated;[6] and (iv) cast certain "aggressive" projects as "tests" despite having employed such "tests" Company-wide.[7]

After the close of trading on July 31, 2019, Concho reported disappointing second quarter 2019 financial results and materially lowered current and forecasted production guidance, blaming tight well spacing. ¶¶298-99. The next morning, prior to the start of trading, Concho held its second quarter 2019 earnings call. ¶302. During this earnings call, Defendants revealed that Concho was reverting to wider well-spacing for all projects. ¶303. Defendants stated that while the Dominator was the most extreme spacing example, other "modestly more dense" projects had been constructed with tighter spacing as well. ¶304. Concho shares dropped 22%, closing at $75.97 on August 1, 2019. ¶305. Concho's second quarter 2019 financial results and earnings call are collectively referred to herein as the "Corrective Disclosure."[8]

## III.  ARGUMENT

### A.  DEFENDANTS FAIL TO REBUT THE PRESUMPTION OF RELIANCE

Plaintiffs have readily met all conditions needed to invoke the presumption of reliance described in *Basic, Inc. v. Levinson,* 485 U.S. 224, 242-47 (1988); Motion at 11-18. Having conceded market efficiency and a statistically significant stock price decline on August 1, 2019, Defendants must rebut this presumption by a preponderance of the evidence negating in full ***any***

---

[4] *See, e.g.,* ¶¶172, 192, 195, 210, 213, 216, 219, 235, 241, 246, 256, 261, 263, 276, 279, 297.
[5] *See, e.g.,* ¶¶172, 177, 192, 195, 200, 210, 213, 226, 232, 246, 248, 297.
[6] *See, e.g.,* ¶¶173, 175, 179, 183, 187, 192, 241, 254, 263, 267, 269, 272.
[7] *See, e.g.,* ¶¶172, 181, 192, 198, 202, 226, 244, 261, 284.

[8] While the financial impacts on Concho's current and future results were clear at this time, and thus fully reacted to by the market, post-Class Period statements from Defendants provided even further clarity as to the facts and circumstances and were therefore pled in further support of Plaintiffs' allegations. ¶¶308-320.

4

linkage between the alleged fraud and price impact on the security at issue. *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278 (2014) ("*Halliburton II*"); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 579 F. Supp. 3d 520, 525 (S.D.N.Y. 2021).

Despite the high burden imposed, Defendants and Ms. Allen concede the price impact and statistical significance of the Corrective Disclosure through silence. Defendants also concede price impact to vast swaths of the alleged misstatements—foreclosing denial of class certification on reliance-based predominance grounds.[9] Opp. at 7 n.1 ("A fourth category of alleged misstatements exists for which Defendants do not challenge class certification on lack of price impact grounds . . . ."). Instead, Defendants challenge certain misstatements claiming that they were not corrected by the Corrective Disclosure. Defendants have failed to meet this stringent burden.

### 1.    Legal Standard

The Supreme Court has held that securities fraud plaintiffs can satisfy the reliance element "by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Halliburton II*, 573 U.S. at 268 (discussing *Basic*, 485 U.S. at 242). The "fraud on the market theory," which underlies the reliance presumption, is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Basic*, 495 U.S. at 241-42.

The fraud on the market theory of reliance applies when: (i) the alleged misrepresentations were publicly known; (ii) the alleged misrepresentations were material; (iii) the proposed class members traded the stock between the time the misrepresentations were made and the truth was

---

[9] Having failed to contest the price impact of various misstatements, the Court should grant Lead Plaintiffs' Motion in whole or at the very least in part. *See In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *4-14 (S.D. Tex. Feb. 9, 2024) (certifying class of investors and stating that the "only dispute is the length of the Class Period" where Defendants contested the price impact of certain, but not all, of the corrective disclosures).

revealed (market timing); and (iv) the stock traded in an efficient market. *Halliburton II*, 573 U.S. at 268. Materiality is not analyzed under the *Basic* inquiry. *Halliburton II*, 573 U.S. at 282 (holding that materiality is an objective issue subject to class-wide proof and does not bear on the predominance requirement).

Once a plaintiff invokes the presumption of reliance, "[t]he defendant bears the burden of persuasion to demonstrate a lack of price impact by a preponderance of the evidence." *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at \*11 (N.D. Tex. Aug. 21, 2023). In doing so, courts throughout the country have consistently held that defendants must show a ***complete*** lack of price impact during the Class Period. *See, e.g.*, *Halliburton II*, 573 U.S. at 282 (finding that Defendants cannot discharge their burden by simply creating doubt about the extent to which their fraud affected the price; they must prove it caused ***none***).[10]

When plaintiffs' theory is that defendants' misrepresentations or omissions kept their stock price artificially inflated, price impact may be shown through a corrective disclosure, *i.e.*, "back-end" price impact. *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at \*4 (S.D. Tex. Feb. 9, 2024) (citing *Goldman I*, 141 S. Ct. at 1961). A corrective "disclosure need not precisely mirror [an] earlier misrepresentation." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). The two need only be "related" or "relevant" to one another. *Id.*

---

[10] *See also, e.g.*, *Marcus v. J.C. Penney Co.*, 2016 WL 8604331, at \*8 (E.D. Tex. Aug. 29, 2016) (same); *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at \*12 (D. Conn. Apr. 13, 2023); *Homyk v. ChemoCentryx, Inc.*, 2024 WL 1141699, at \*4 (N.D. Cal. Mar. 6, 2024) (same); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at \*4 (S.D.N.Y. Mar. 23, 2020) (same); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 687 (D. Md. 2018) (defendants must prove fraud-related news had "no price impact whatsoever").

### 2.    Defendants' Attempts to Analogize this Case to *Goldman* Fail

Defendants attempt to establish a lack of price impact by relying exclusively on the Supreme Court's decision in *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113 (2021) ("*Goldman I*"). Opp. at 13-19. Such reliance is misplaced.

In *Goldman I*, the Court held that defendants may disprove price impact by showing a complete "mismatch" between the alleged misstatements and subsequent corrective disclosures. *See generally Goldman I*, 141 S. Ct. at 1961. The Court explained the inference that back-end stock drops equate to artificial inflation in price "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* As applied, where the statements are prohibitively generic, *e.g.*, puffery, they cannot be corrected by a disclosure of highly specific information.

Critically, and unlike the instant case, the alleged misstatements addressed in *Goldman I* were found to be exceedingly generic and the corrective disclosures highly specific. Indeed, the misstatements were broad affirmations of the company's business philosophy and ideals.[11] In other words, the alleged misstatements in *Goldman I* were immaterial insofar that they did not provide detailed, concrete information to investors (and arguably more appropriately weeded out at other stages).[12] Unlike the misstatements, the three corrective disclosures pled in *Goldman* were highly

---

[11] For example: "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us. Our continued success depends upon unswerving adherence to this standard[,]" "[m]ost importantly, and the basic reason for our success, is our extraordinary focus on our clients[,]" and "[i]ntegrity and honesty are at the heart of our business." *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 82 (2d Cir. 2023) ("*Goldman II*"). Plaintiffs also challenged certain risk disclosures loosely touching on these overarching business goals.

[12] This conclusion is echoed in *Goldman II*, where the Second Circuit expressed concern as to whether the alleged misstatements were even material and thus should have been dismissed at the pleading stage, while acknowledging that "[c]lass certification litigation provides no forum to relitigate materiality." *See Goldman II*, 77 F.4th 74, 101-02 (analyzing the genericness of the statements through the lens of materiality).

7

detailed and rifle shot, pertaining to very specific alleged misconduct.[13] At bottom, the misstatements were highly generic proclamations regarding the company's commitment to broad ethical ideals whereas the corrective disclosures pertained to three distinct allegations of misconduct by the SEC and DOJ. The same is simply not true here.

### a.    The Alleged Misstatements in This Case are Highly Detailed and Directly Relate to the Corrective Disclosure

The alleged misstatements at issue in this case are specific to Concho's blind transition from traditional drilling methods to large-scale development of multi-well oil pads. ¶¶3, 14; *see also In re Concho Res. Inc.*, 2023 WL 2297425, at \*22 (S.D. Tex. Feb. 23, 2023), *report and recommendation adopted in part, rejected in part sub nom. In re Concho Res. Inc., Sec. Litig.*, 2023 WL 4146278 (S.D. Tex. June 23, 2023) ("The Complaint alleges that Defendants 'engaged in an undisclosed fraudulent bet-the-company endeavor. . . .'"). Given that the entire Company gambled on the success of the transition to, and unknown viability of large-scale development (versus that told to investors), such information would have a significant impact on Concho's share price.

The Report and Recommendation denying Defendants' motion to dismiss ("Report," ECF No. 38, as adopted by Order of the Court, analyzed the alleged misstatements and omissions based on four separate categories alleged in the Complaint: (i) "declaring the transition to large-scale development as a success and touting its benefits despite having no basis to know it would work as intended;" (ii) "falsely stating that 'manufacturing mode' was the product of gradual learning and verified techniques despite being experimental;" (iii) "issuing non-risk adjusted production

---

[13] The first disclosure occurred on announcement of SEC allegations Goldman had failed to disclose that an institutional customer had purposely selected assets for inclusion in a CDO, which that customer subsequently shorted based on material non-public information. *Id.* at 83. The second was the announcement of an investigation by the Department of Justice related to Goldman's role in an unspecified CDO. *Id.* at 83-84. Finally, the third was media coverage of an SEC investigation into Goldman's role yet another transaction. *Id.*

forecasts despite internal understanding that such forecasts were inaccurate and overstated;" and (iv) "stating that large-scale development projects with higher risk exposure were balanced by projects with lower risk exposure, when in reality exposure was company-wide." *Concho*, 2023 WL 2297425, at *1. Examples of each such category as follows:

- ***Successful Transition.*** Defendants repeatedly touted the success of large-scale development, explaining to investors that: Concho was "deliver[ing] outstanding results from the Company's large-scale development projects in the Northern and Southern Delaware Basin and in the Midland Basin" (¶172); Concho's manufacturing mode "generate[d] cost savings" (¶207) and was "very additive" (¶208); that "large-scale project development w[ould] drive the quarterly production growth trajectory" (¶332); and touted the Company's "strong early production out of our latest projects, including the Dominator" (¶292).

- ***Technological Basis.*** Defendants told investors that the Company's manufacturing mode was a verified technique that had been gradually developed and was not experimental, stating that "we've modeled the outcome as we see it based on the spacing that has either already happened or will happen in the future" (¶194); "drilling synergies" associated with large-scale development were "well documented" and a "more effective way to complete [] wells" (¶199); "we have built our type curves and our internal modeling based upon the results we have seen" and "everything we've seen has been consistent with what we were expected and has [been] baked into" the Company's outlook for 2019 and 2020 (¶262); and the technology was the result of "a steady evolution over the last couple of years" (¶231).

- ***Production Forecasts.*** Moreover, with regard to the Company's forecasts, Defendants repeatedly represented that they were risk adjusted, stating: "when we give guidance, we try to forecast the things that we're aware of at the time we give the guidance" (¶186); and "large-scale project development will drive the quarterly production growth trajectory. And with a great start to the year, we've raised our full year 2018 production outlook" (¶332).

- ***Portfolio Exposure.*** Defendants also told investors that portfolio risk associated with large scale development or outlier well-spacing tests was mitigated due to variance of projects across Concho's assets, stating: "the Company's upcoming large-scale projects were "dispersed amongst [Concho's] asset base" (¶201); Concho's "philosophy of having a portfolio approach to mitigate risk," and that Concho's ability to "balance risk" was "the most important thing that we do that creates success for the company" (¶¶242-43, 258); and that Concho has "historically been pretty conservative in the way we've accounted for inventory and well spacing" and "that's been [Concho's] view up till now" (¶283).

Each of the statements referenced, like all others pled, contain concrete, present tense affirmations of fact related to Concho's large-scale development projects as well as their past and continuing success, including the impact on the Company's bottom line. It is no surprise therefore, that Defendants halfheartedly challenged less than a handful of the alleged misrepresentations as immaterial puffery—an argument denied by the Report and then totally abandoned by Defendants in their objection thereto.[14] Given the specific nature of the alleged misstatements and Defendants' concession they are not inactionably generic, the *Goldman* statements are divorced from even specious comparison to this case. Critically, whether a statement is disqualifying generic "is a practical, ***threshold*** factual inquiry to the ensuing *Goldman*-driven analysis[,]" meaning any *Goldman* inquiry here rightly ends before it even starts. *Goldman II*, 77 F.4th at 93.

Notwithstanding the foregoing, the Opposition calls out specific "categories" of misstatements Defendants allege (for the first time) are too generic. Opp. at 14. For example, Defendants contend that the following statement from ¶216 is too generic: "I want to focus on ***the value-creating opportunities driven by large-scale development. We believe this type of development is important to maximize recoveries, drive economies of scale and deliver attractive economic returns predictably and consistently over the long term***." Opp. at 14. Yet this statement affirmatively touts Defendants' (unsupported) belief in Concho's ability to deliver on its

---

[14] Defendants erroneously cite to several pre-*Goldman* Circuit Court opinions evaluating puffery in the context of a motion to dismiss. Opp. at 15 (citing *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 887 (S.D. Tex. 2002); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); and *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009)). These decisions are clearly irrelevant because Defendants already raised this argument within their motion to dismiss and the Court rejected those very arguments. *See* Report at 33 ("Defendants' puffery argument is without merit."); *see generally* Order Adopting Report (ECF No. 43). Further, the Court's decision as to whether the misstatements are material is one that is reserved for the merits. *Goldman I*, 141 S. Ct. at 1959-60 ("In *Amgen*, we held that materiality should be left to the merits stage because it does not bear on Rule 23's predominance requirement.") (citing *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 133 S.Ct. 1184, 1185 (2013)).

purportedly successful transition to large-scale development. Similarly, Defendants selectively quote the misstatement alleged in ¶294 of the Complaint and contend that it is too generic:

> We continue to learn from all these projects. ***And so using the Dominator one, just because it's a good example, that is our most extreme version of activity in a single square mile and also some of the more dense spacing we've tested. And so, yeah, the teams did a fantastic job on that, bringing that project and a couple of these other large ones this quarter and putting them on production actually ahead of schedule***.

> So we're continuing to figure out how to concentrate that much activity in one spot in the most efficient manner possible. We're continuing to play with spacing and also landing zones, and we're still continuing to tinker with combinations of different landing zones and to our whole completion design in them. So there is a lot to learn, but I think, at the same time, you've got a really competitive business that competes for investor capital. ***And so I think that's the exciting thing about what we've been able to do and are going to continue to do as - deliver really compelling returns while continuing to learn***.

Opp. at 14 (focusing only on the last sentence). Not so. Here, Concho touts the current and continuing success of the Dominator, its largest and most aggressive large-scale development project (*see, e.g.*, ¶181(g)). Both misstatements were corrected by the Corrective Disclosure, where Concho reported disappointing financial results and revealed that it had slashed its active rig count substantially due to issues with the tight well spacing employed at the Dominator and the Company's other projects.

Tellingly, even these handpicked and gerrymandered statements "are not at such a high level of generality that one cannot discern the inherent contradiction between those statements and information in the corrective disclosures when viewed side by side." *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *14 (S.D. Cal. Mar. 20, 2023) ("Thus, while the more general nature of the alleged misrepresentations makes price impact slightly less likely, it does not rebut the

11

presumption of price impact by a preponderance of the evidence."). Defendants are simply struggling, and failing, to hammer a square peg into a round hole.[15]

### b.    There is no Mismatch Between the Statements and Corrective Disclosure

Even assuming *arguendo* that analysis under *Goldman* is warranted, there is simply no mismatch between the alleged misstatements and the Corrective Disclosure. Defendants and Ms. Allen blindly contort logic and ignore the totality of the Complaint's allegations to configure the alleged misstatements in such a way as to make a mismatch apparate from whole cloth. *See* Opp. at 7, 13-21. Yet reason can only be bent so far, and it is clear that any "mismatch" is shoddily manufactured and lacking purchase on any authority—binding or otherwise.[16] If the statements are analyzed through the categories endorsed by the Court and the universe of allegations in the Complaint, there is simply no "mismatch" to be found viewed against the Corrective Disclosure.

Each category of alleged misstatements relates directly to Concho's ability to deliver on its purportedly successful transition to large-scale development, which included the simultaneous

---

[15] To the extent that Defendants apply the same arguments regarding a lack of "back-end" price impact to the alleged misstatements made on February 20-21, 2018, those arguments fail for the reasons explained herein. Opp. at 21-23. Likewise, Defendants' argument that there "can be no 'front-end' price impact" to the February 20-21, 2018 because "Concho had already expressed the same information" previously is unavailing and stands in contrast to the statistical significance of the increase in the Company's stock price for those days. Opp. at 21-22 (conceding that "both sides' experts agree" that there was a statistically significant increase in Concho's stock price on February 20-21, 2018). Regardless, Plaintiffs are entitled to rely on the inflation-maintenance theory for all of the alleged misrepresentations. *See Apache*, 2024 WL 532315, at *4; *see also* Coffman Rebuttal at 23 n.57 ("Regarding price maintenance, the alleged misstatements served to maintain the price at a higher level than it would have otherwise traded at had the truth been revealed. . . . [T]he fact that the alleged misstatements did not result in statistically significant price changes is absolutely consistent with the idea of price maintenance (and market efficiency).").

[16] Any Fifth Circuit case law cited to by Defendants in support has **nothing** to do with analysis under *Goldman*. For example, Defendants again cite to Fifth Circuit opinions that generally discuss corrective disclosures in the motion to dismiss context. Opp. at 3, 10, 17 (citing *Pub. Emps. Ret. Sys. Of Miss. v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014)). Defendants did not remotely challenge the Corrective Disclosure in their motion to dismiss. *See generally*, ECF No. 29 & 34 (Defendants' motion to dismiss and reply in support of their motion). Nor do they challenge the statistical significance of the Corrective Disclosure or the fact it revealed new information at class certification. Defendants' comparison to *Apache*, where the court rejected three corrective disclosures based on contentions no new information was provided on those dates, and the admission of plaintiffs' expert that the disclosure was unrelated to alleged misrepresentations and were not statistically significant. 2024 WL 532315, at *7-12.

completion of tightly spaced wells for its projects. ¶4. For example, informing investors that the Company's new manufacturing mode was verified as the result of gradual learning would have quelled skepticism regarding the viability of the transition. Similarly, releasing inflated production forecasts would have further crystalized market sentiment and expectation that Concho's delivery on the full benefits of large-scale development was imminent. Statements regarding scattered spacing "tests" hid that Concho was aiming to find the limits of well spacing by any means necessary across the board. In sum, the statements acted together to assure investors that the Company's transition to large scale development was not undermining the fundamentals which made Concho an attractive investment.

*Statements touting the Company's success in the Delaware Basin* (*e.g.*, Complaint at ¶¶259, 277), were corrected when Concho announced it had to slash its rig count while its budget stayed the same, blaming spacing issues at the Dominator and elsewhere. This is the exact opposite of the "outstanding results" Defendants aggressively touted to the market. *See, e.g.*, ¶170. Moreover, given the Company had to halve active rig counts while keeping its budget the same, it in fact did not "generate cost savings" and was not "very additive." *See, e.g.*, ¶¶60, 207-208, 330. The statements and disclosure are a direct match.

Defendants' argument that the Corrective Disclosure does not relate to the early results Concho saw from its large-scale projects in 2017 and 2018—because these results occurred months before the Dominator project "is alleged to have first began producing in early 2019"—fails because it misconstrues and misinterprets Plaintiffs' allegations. Opp. at 18-19. Concho "designed in 2017-2018 the flagship Dominator multi-well pad to be constructed in the Wolfcamp Shale formation of the Northern Delaware Basin, which began construction in 2018." ¶37. And the misstatements pled in ¶259 and ¶277 are responses to analyst questions regarding the "early stages

of large-scale development" and "optimizing spacing[,]" whereby Defendants responded by touting the Company's results and "benefits" from "concentrating that much activity in one spot" and "this large-scale project development." Despite Defendants' attempt to create a mismatch, these statements baselessly touted the benefits of the "large-scale project development" and were subsequently corrected upon revelation of Concho's well-spacing woes. Defendants' argument that the alleged Corrective Disclosure does not challenge Concho's descriptions of its large-scale development program in 2018 fail for the same reasons. Opp. at 19.

*Statements concerning the development of its manufacturing mode*, *i.e.*, that it was gradually developed and not experimental, were shown to be false when it admitted that though "the Dominator project accelerated the Company's understanding across the project lifecycle (logistics, lateral placement, well spacing and facilities design), performance from the project indicates the well spacing was too tight." ¶300. If manufacturing mode was "well documented" and "modeled … based on spacing that has … already happened[,]" then at bottom, the Corrective Disclosure would have not copped to an experiment gone wrong. ¶¶194, 199. Indeed, Defendants later explained that they needed to "incorporat[e] the data in [their] development model to adjust spacing on future projects." ¶302.

*Statements concerning Defendants' non-risk adjusted forecasts and the cost efficiencies associated with large scale development* were proved to be false and misleading when the Corrective Disclosure showed a financial condition dramatically different than what investors were led to expect. Indeed, despite understanding the risks associated with their bleeding edge manufacturing mode, Defendants touted the untested transition as a "success," *i.e.*, something already achieved, and went so far as to purposely buck Company and industry customs to apply

14

wholly incorrect risk adjustments, knowingly causing inflated forecasts to be released to the market.

Defendants' Opposition yet again misconstrues Plaintiffs' allegations to conjure a mismatch for the alleged misstatements. Opp. at 19. Defendants contend that these statements "are financial projections of what Defendants expected to occur during the year 2018[,]" whereas the "alleged corrective disclosures pertain to the results for the second quarter of 2019." *Id.* Again, the point is missed entirely as if Defendants are aiming for anything but. As explained *supra*, Plaintiffs allege that Defendants' statements with respect to Concho's forecasts were misleading because they repeatedly represented that they were conservative and followed historical norms (untrue on both fronts, among others). For example, the misstatement alleged in ¶197 of the Complaint states: "***let me say you should expect more of the same in '18 as you saw in previous years from Concho. It's going to be a budget focused on reinvesting our cash flow and an increased percentage of capital going towards these larger-scale projects that we've been describing to you***." Here Defendants are touting their success from the large-scale project development and informing investors that they should "***expect more of the same***[.]" This misstatement was subsequently corrected by the Corrective Disclosure, which as explained *supra*, informed investors of a financial condition dramatically different than what investors were led to expect.

***Statements concerning the Company's balance between risky large-scale projects and less densely spaced traditional projects*** were corrected when it became clear that other wells, though spaced more "modestly" than Dominator, would likely suffer similar issues as Dominator.

Defendants repeated argument—"that the alleged corrective disclosures do not actually correct" certain misstatements because their expert "reviewed all the analyst reports following the alleged corrective disclosure" and found that analysts did not explicitly reference these statements

15

(Opp. at 16, 19, 21)—fails for the reasons explained in the Coffman Rebuttal Report. Fatale Decl. Coffman Rebuttal at ¶25 ("The roles and responsibilities of analysts are to be forward-looking – they generally focus on how newly-released information might change their valuation and forecast of a company's future cash flows to provide investment recommendations to their clients. Their charge is not to evaluate or catalog potential economic causal links between new disclosures and past company statements.").[17] Moreover, the authority that the Opposition relies upon for this argument is inapposite and does not support their baseless contention.[18] Tellingly, Defendants cannot point to a single decision that supports this argument, nor could they. Such a requirement would essentially render class certification impossible, by precluding certification unless plaintiffs could point to analyst reports that quote the very misstatements alleged in a complaint after a corrective disclosure.

Because there is no mismatch between the statements and the disclosures, any requirement imposed by *Goldman I* is satisfied.

### B.   PLAINTIFFS HAVE DEMONSTRATED THAT DAMAGES ARE MEASURABLE ON A CLASS-WIDE BASIS

Plaintiffs have satisfied the Rule 23(b)(3) requirement by setting forth the method under which damages may be measured on a Class-wide basis. The securities class action progeny from

---

[17] Defendants' argument also fails to address the fact that analysts focused on the new negative information revealed to the market by way of the alleged Corrective Disclosure. *See, e.g.*, ¶306(h) (Jeffries analyst report dated August 5, 2019 stating that, Concho had "blindsided the market with a sharp reduction in 2H19 oil volume guidance," noting that "[a]sset productivity suffered as a result of well density." The analyst further noted that "it turns out much of [Concho's] 2H18 and 1H19 program was spaced too densely," and that while the Company had previously indicated Dominator "was not representative of the company's development plans … it turns out operations were not consistent with that message." The analyst concluded that "given the production guidance increase in 1Q19 and management's strong execution track record historically, this was difficult to see coming."); *see also* Coffman Rebuttal at ¶10 ("Ms. Allen's analysis completely ignores that the analyst reports *do* focus on the new negative information Plaintiffs claim was corrective and that it impacted the value of Concho Common Stock.").

[18] In *Exxon*, the court found that there was a lack of analyst commentary to support the plaintiffs' argument that the announcement of the CAAG investigation **constituted a corrective disclosure**, as "the market likely did not consider it to be significant." 2023 WL 5415315, at *16. Here, Defendants concede the statistical and legal significance of the Corrective Disclosure. Opp. at 7 n.1 (conceding that the corrective disclosure corrected numerous misstatements by failing to contest those very statements on price impact ground).

16

the Supreme Court's decision in *Comcast Corp. v. Behrend*, provides a roadmap for plaintiffs to satisfy this burden. 569 U.S. 27, 35 (2013). As explained *infra*, Lead Plaintiffs' damages methodology has been endorsed uniformly by courts across the country for cases involving Section 10(b) claims. All of Defendants' arguments and critiques of Plaintiffs' damages methodology, as explained *infra*, are those traditionally raised by defendants and denied by courts at the class certification stage.

### 1. Legal Standard

To meet their burden under Rule 23(b)(3), plaintiffs must proffer a method of measuring damages that is consistent with their theory of liability and that demonstrates that damages are capable of measurement on a class-wide basis. *See Comcast*, 569 U.S. at 34-35 ("at the class certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case," and must "measure only those damages attributable to that theory."); *see also Ludlow*, 800 F.3d at 688 (noting that a damages model that would allow plaintiff to "recover damages other than those resulting from the particular … injury on which [defendant's] liability in this action is premised" travels "to a place forbidden by *Comcast*"). "But damages at the class-certification stage needn't be exact." *In re Anadarko Petroleum Corp. Sec. Litig.*, 2022 WL 4544235, at *6 (S.D. Tex. Sept. 28, 2022) (citing *Ludlow*, 800 F.3d at 683), *reconsideration denied*, 2023 WL 4307650 (S.D. Tex. June 30, 2023), *vacated and remanded sub nom. Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 2024 WL 1787927 (5th Cir. Apr. 25, 2024). "Nor must plaintiff prove loss causation as a condition of obtaining class certification." *Id.* (citing *Ludlow*, 800 F.3d at 687).

17

### 2.    Plaintiffs' Methodology Follows that Endorsed Uniformly by Courts Across the Country

Plaintiffs' damages model readily satisfies Rule 23(a)(3) and the guidance provided by the Supreme Court in *Comcast*. 569 U.S. at 35. The Coffman Report (Fatale Decl. Ex. F) explains that per share damages can be measured for all purchasers of Concho common stock during the Class Period under Section 10(b) of the Exchange Act using a common methodology that is consistent with Lead Plaintiffs' theory of liability—the "out-of-pocket" ("OOP") method. Coffman Report at ¶79. The OOP methodology provides that damages are equal to the artificial inflation in the share price at the time of the purchased minus the artificial inflation per share at the time of sale (or the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide). *Id.*

To quantify artificial inflation, the Coffman Report explains that an event study could be used to measure price reactions to the Corrective Disclosure that revealed the truth. *Id.* at ¶¶81-82. The event study would also consider whether and to what extent any non-fraud related information contributed to the observed price movement (*i.e.*, confounding information). *Id.* at ¶82. If there is any confounding information, the Coffman Report explains that valuation techniques (*e.g.*, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods, academic studies, and other available valuations from analysts or made available through discovery) can be used to disaggregate corrective and confounding information. *Id.* Moreover, the loss causation analysis will analyze how the artificial inflation per share may have evolved over the Class Period. Coffman Report at ¶83; *see also Ludlow*, 800 F.3d at 688-89 ("The ability to do so [*i.e.*, remove confounding information], not the actual execution of that correction, is what Comcast requires at this stage."). The Coffman Report explains that determining the specific valuation approach necessary to perform this loss causation analysis is an inherently case-specific

question that depends on specific facts and circumstances.[19] Coffman Report at ¶82; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) (*Halliburton I*) ("The question presented in this case is whether securities fraud plaintiffs must also prove loss causation in order to obtain class certification. We hold that they need not."). This technique will be applied on a Class-wide basis, regardless of the identity and circumstances of any class member. Coffman Report at ¶82.

This methodology, the application of the OOP damages method and use of an event study, is widely accepted in the context of Section 10(b) securities class actions and has been blessed by courts throughout the country. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972) (OOP method is "the correct measure of damages"); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450-51 (W.D. Tex. 2019) (finding "Plaintiff's [OOP] theory of damages is consistent with the proposed theory of liability and that Plaintiff has established the calculation of damages is a common question susceptible of measurement on a classwide basis."); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019) ("Because Plaintiff has provided a class-wide [OOP] model for calculating damages arising from its theory of liability, it has met its burden under *Comcast*"); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (OOP method so well suited for class treatment "that securities fraud cases fit Rule 23 like a glove"); *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *15 (S.D. Tex. Dec. 6, 2013) ("Event studies are commonly used in securities fraud class actions.").

---

[19] Despite Lead Plaintiffs' best efforts to meet and confer with Defendants regarding discovery, Plaintiffs have received little to no discovery from Defendants, nor have there been any depositions of the Defendants or any of the key witnesses in this case.

19

### 3.  Defendants' Make the Same Tired *Comcast* Argument Routinely Rejected Time and Again

Having failed to establish a sufficient price impact argument to preclude class certification, Defendants also argue that Plaintiffs fail to satisfy *Comcast*'s requirement that a damages methodology be capable of measuring only the damages stemming from the alleged fraud. Opp. at 23. This argument is as frequently made as it is rejected by courts across the Country. *See* Fatale Decl. Ex. C (listing 90 cases where courts have rejected *Comcast* attacks in the context of §10(b) cases and found the OOP method sufficient). In essence, Defendants seek to lead the Court astray by painting a non-issue as grounds to deny the Motion.

*Comcast* was an ***antitrust*** case where the proposed damages model was based on four distinct theories of antitrust injury—three of which were previously dismissed. 569 U.S. at 37-38. Thus, courts have held that *Comcast*'s unique facts generally render it of limited relevance in §10(b) cases, where typically the damages model relies on a "single theory of liability" predicated on stock price inflation due to misstatements. *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.,* 2024 WL 1060079, at \*15 (S.D. Cal. Mar. 11, 2024) ("unlike in *Comcast*, Plaintiffs have a single theory of liability: Defendants' material misrepresentations and omissions caused Class members to purchase [Concho] shares at an artificially inflated price which subsequently declined after the truth emerged."); *Luna v. Marvell Tech. Grp., Ltd.*, 2017 WL 4865559, at \*6 (N.D. Cal. Oct. 27, 2017) (finding *Comcast*'s unique facts render it of limited impact in §10(b) cases, where typically the "damages model relies on but one theory of liability"). Thus, the OOP method is "consistent" with the liability theory here. *Acadia*, 2024 WL 1060079, at \*15.

Indeed, "[t]he *Comcast* requirement is easily satisfied in securities fraud cases invoking the *Basic* presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock." *Rougier v. Applied*

20

*Optoelectronics, Inc.*, 2019 WL 6111303, at \*15 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (rejecting *Comcast* argument where plaintiff's proposed damages model consisted of an event study to determine out-of-pocket damages).

Both before and after *Comcast*, an event study used to calculate out of pocket damages has been widely accepted by courts both within and outside of the Fifth Circuit.[20] The same is true here. As explained *supra*, the Coffman Report explains that damages can be calculated based on the OOP method, which is consistent with Plaintiffs' liability theory and applicable to all Class members. Coffman Report at ¶¶79-84. Coffman explained a step-by-step approach to calculate OOP damages at the appropriate stage using an event study that employs Class-wide information to measure the daily artificial inflation in Concho's stock price during the Class Period for all Class members. *Id.*

### 4.      Plaintiffs' Do Not Rely on a MOTR Theory of Loss Causation

Defendants also argue that Plaintiffs' damages methodology is flawed because Plaintiffs' allegations purportedly rely solely on the materialization of the risk theory ("MOTR") theory of loss causation. Opp. at 24-28. This argument fails for the simple fact that Plaintiffs ***do not*** rely on the MOTR theory. While Plaintiffs' Complaint alleged a stock inflation/corrective disclosure loss causation theory (¶407), and in the alternative, a MOTR theory of loss causation (*id.*), Plaintiffs are only proceeding with the corrective disclosure theory. Thus, Defendants' unilateral attempt to

---

[20] *See Affiliated Ute*, 406 U.S. at 155 (OOP method is "the correct measure of damages"); *EZCORP*, 330 F.R.D. at 450-51 (finding "Plaintiff's [OOP] theory of damages is consistent with the proposed theory of liability and that Plaintiff has established the calculation of damages is a common question susceptible of measurement on a classwide basis."); *Signet*, 2019 WL 3001084, at \*20 ("Because Plaintiff has provided a class-wide [OOP] model for calculating damages arising from its theory of liability, it has met its burden under *Comcast*"); *RH, Inc.*, 2018 WL 4931543, at \*3 (OOP method so well suited for class treatment "that securities fraud cases fit Rule 23 like a glove"); *BP I*, 2013 WL 6388408, at \*15 ("Event studies are commonly used in securities fraud class actions.").

reframe the entirety of the Complaint's allegations fails just as identical such attempts have failed in the past.[21]

Notwithstanding the questionable at best authority on which they rely, Defendants shamelessly mischaracterize Plaintiffs' fraud theory and try to unilaterally repackage the Complaint's allegations as a purely MOTR case. Opp. at 24.[22] In these struggled attempts for *BP II* to apply, Defendants fail to recognize that Plaintiffs claim that Defendants' liability arises from the several categories of misstatements concerning the successful transition to large-scale developments, the basis therefore, successful results, and portfolio exposure to certain purported spacing "tests." ECF No. 54 at 4. Plaintiffs allege that these categories of misstatements were false and misleading because they "create[ed] an impression of a state of affairs materially different than the one that actually existed." Report at 26. In other words, the Complaint alleges that these misstatements were materially false and misleading because of ***existing facts***.[23] *See, e.g.,* *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 590–91 (N.D. Cal. 2021) ("[D]efendants' argument that the proposed damages model is not capable of measuring class-wide damages incorrectly assumes that plaintiffs rely solely on a materialization of the risk theory, which they do not. Because plaintiffs' corrective disclosure theory is supported by the out-of-pocket damages

---

[21] *See, e.g.*, *Anadarko*, 2022 WL 4544235, at *7 (rejecting defendants' attempt to brand plaintiffs damages theory as a MOTR model), *reconsideration denied*, 2023 WL 4307650 (S.D. Tex. June 30, 2023), *and vacated and remanded sub nom. Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 2024 WL 1787927 (5th Cir. Apr. 25, 2024); *see also Rougier*, 2019 WL 6111303, at *16 (listing cases), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).

[22] In support of this argument, Defendants' Opposition cites to an inadmissible line of questioning whereby counsel for Defendants peppered the witness with legal questions and questions calling for expert testimony with the goal of obtaining a parroted answer despite repeated objections. Opp. at 24 n.15 (asking witness whether the "risk materializ[ing]" caused the stock price to drop); Fatale Decl., Ex. D (counsel for plaintiffs continuously objecting to Defendants' inadmissible line of questioning); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th Cir. 2005) ("When a court considers class certification based on the fraud on the market theory, it must engage in thorough analysis, weigh the relevant factors, require both parties to justify their allegations, and ***base its ruling on admissible evidence***."). Even if admissible, such a statement from a lay witness should be afforded no weight.

[23] The Court recognized this much, finding that Defendants' misstatements rely on "present and historical facts." ECF No. 38 at 28 ("Defendants' statement that contain forward-looking statements rely on present and historical facts.").

22

methodology proffered by [expert], the Court finds that plaintiffs have sufficiently shown damages are capable of measurement on a classwide basis in this regard.").

Further, the corresponding losses that form the basis for Plaintiffs' damages model result from the artificially inflated stock price caused by those misstatements.[24] With respect to the damages model, the Complaint alleges that the Corrective Disclosure removed the artificial inflation from the stock price. *See, e.g.*, ¶300 ("Concho also disclosed for the first time that Dominator's 23 wells were spaced 'too tight,' and that Concho had 'incorporated learnings from [Dominator] into its second half of 2019 program and future Delaware Basin projects.'"); ¶407 ("prior artificial inflation in Concho shares evaporated when . . . omitted material adverse facts were disclosed . . ."); ¶410 ("It was also foreseeable to Defendants that the revelation of the truth alleged herein would cause the price of Concho common stock to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed."). This Court has found that these very allegations represent "hallmarks of the fraud on the market theory of liability[.]" *Rougier*, 2019 WL 6111303, at *17; *see also Exxon*, 2023 WL 5415315, at *4-10 (certifying Section 10(b) class using OOP damages methodology where plaintiffs' alleged failure to disclose "the ***high likelihood*** of a future de-booking[,]" for which the artificial inflation completely dissipated after company announced that it would de-book certain reserves).

Defendants acknowledge two decisions from this Court that denied the very same MOTR arguments that they chose to raise here. Opp. at 28 n.18. Yet Defendants contend that those decisions support their position because those plaintiffs did not pursue the MOTR theory. *Id.*

---

[24] *See, e.g.*, ¶323 ("The Individual Defendants permitted Concho to release these false and misleading statements and failed to file the necessary corrective disclosures, ***which artificially inflated the value of the Company's common stock***."); *Id.* at ¶406 ("[T]he Individual Defendants' false and misleading statements had the intended effect of causing Concho common stock ***to trade at artificially inflated levels*** throughout the Class Period, reaching as high as $163.11 per share on May 2, 2018.").

(citing *Anadarko*, 2022 WL 4544235 at *7 and *Rougier*, 2019 WL 6111303). But as explained, Plaintiffs are also not pursuing the MOTR theory. In fact, the allegations in both cases are strikingly similar to those here.

In *Anadarko*, the plaintiffs alleged that "Defendants already knew that the potential for Shenandoah [an oil field] was being exaggerated and needed 'a significant downward adjustment.'" *Compare Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 953 (S.D. Tex. 2021) (order denying defendants' motion to dismiss plaintiffs' complaint); *with* Report, ECF No. 38 at 34-35 ("The FE accounts indicate that the initial results of the Dominator Project and other manufacturing projects were under company expectations from the start. . . . Plaintiffs allege Concho failed to model for degradation due to tight well spacing, an unheard-of practice in the oil and gas industry, which directly impacted the Company's financial disclosures. Plaintiffs allege this practice applied to the majority of the Class Period projects. Thus, the Complaint alleges that Concho's financial forecasts were unreasonably high and misleading.").

Similarly, in *Rougier*, the plaintiffs alleged that the defendant company's business model, customer relationships, and demand visibility concealed risks that ultimately materialized when its largest customer reduced its consumption of the company's products. *See* Fatale Decl. Ex. E (Rougier Second Consolidated Amended Complaint) at ¶174 ("On October 12, 2017, ***the risks concealed*** by Defendants' materially false and misleading statements and omissions further ***materialized*** . . . when AOI revealed that Amazon's demand had dropped to a mere 10% of the Company's revenues.").

But just like here, there plaintiffs in *Rougier* and *Anadarko* disclaimed the MOTR theory at class certification. *See Rougier*, 2019 WL 6111303, at *16-17; *see also Anadarko*, 2022 WL 4544235, at *7. And in both cases a class was certified based on an OOP model of damages, and

24

the stock inflation/corrective disclosure theory of loss causation. Here too Plaintiffs' methodology sufficiently demonstrates that damages can be calculated on a Class-wide basis. *See, e.g.*, *EZCORP*, 330 F.R.D. at 451 (certifying class and denying defendants' argument that Coffman failed to articulate a means to "isolate the impact of materialization of known risks from the impact of allegedly concealed risks" because his OOP and event study methodology "analysis quite clearly articulates the means by which Coffman intends to go about calculating damages on a classwide basis."). The Coffman Rebuttal Report confirms that the OOP event study method can account for Defendants' speculative concerns (Opp. at 26-27), which relate to quantifying the inputs (*i.e.*, inflation) into the OOP formula through a loss causation analysis, which is premature at this stage. *See, e.g.*, Coffman Rebuttal at ¶¶47-62 (explaining that the OOP method is easily adaptable to this scenario and that an event study could still be used to measure the full price decline on the alleged corrective disclosure dates).; *see also Anadarko*, 2022 WL 4544235, at *6 ("Nor must plaintiff prove loss causation as a condition of obtaining class certification."); *In re Fibrogen Sec. Litig.*, 2024 WL 1064665, at *16 (N.D. Cal. Mar. 11, 2024) (finding defendants' MOTR attack on Coffman's OOP method was "a premature loss causation argument" and does not "contravene *Comcast*").

### a.    Defendants Rely on Decade Old Caselaw that Is Routinely Rejected Under Identical Circumstances

In levying their MOTR damages arguments, Defendants exclusively rely on the outlier decisions: *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ("*BP I*") and *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014) ("*BP II*"). Opp. at 25-28. *BP I & II* were decided shortly after *Comcast* (and thus prior to its reach and meaning being crystalized). In the decade to follow through the present, the rigid holdings under *BP I* and *BP II* are uniformly inconsistent with decisions arising from this District where plaintiffs "assert[] that

certain risks had in fact materialized, yet Defendants actively misled investors to the contrary."

*Anadarko*, 2022 WL 4544235, at *7.

The Coffman Report sets forth an event study and means for disaggregating price reactions that do not result from fraud on the market. Coffman Report at ¶¶79-84. As recently as last month, courts in this District have found identical methodologies readily sufficient under *Comcast*—even where defendants have bemoaned the *BP* holdings.[25] A rough start for such a prominent argument in the Opposition.

Moreover, Defendants' reliance on *BP I* ignores the myriad of cases that have held that its holding was unique to its facts. The *BP* court held that plaintiffs failed to even invoke *Basic* presumption in the first instance before even considering whether the plaintiffs could calculate class-wide damages pursuant to *Comcast*. *BP I*, 2013 WL 6388408, at *15 ("Plaintiffs have all but conceded that they have no evidence that the … misstatements were known by the market and incorporated in the [security's] price prior to the Deepwater Horizon explosion. As such, the fraud-on-the-market presumption cannot be invoked, and Plaintiffs' claims … are not appropriate for class action treatment.").[26] In contrast, Defendants in this case concede that the threshold requirements of *Basic* have been met and it is now their burden to rebut the presumption in Plaintiffs' favor.

Courts in this District have also denied Defendants' argument that *BP II* precludes class certification for nearly identical circumstances. Specifically, the *Rougier* court held that *BP II*

---

[25] *See, e.g.*, *Edwards v. McDermott Int'l, Inc.*, 2024 WL 1769325, at *13 (S.D. Tex. Apr. 24, 2024) (finding methodology sufficient under *Comcast* where "damages for individual class members ***could be calculated*** by applying a method across the entire class that focused on the decline in stock price following the disclosure … and then isolating company–specific events from market and industry events."); *see also Rougier*, 2019 WL 6111303, at *16 (denying Defendants' argument that *BP I* precludes class certification).

[26] Notably, the *BP II* court certified the post-spill class—a subclass that used the OOP method to demonstrate class-wide damages—because OOP damages are "consonant with the fraud-on-the-market theory." 2014 WL 2112823 at *12-14 & *12 n.14; *Ludlow*, 800 F.3d at 690 (affirming both rulings).

should not preclude class certification in a securities class action where the class seeks OOP damages based on artificial inflation of the stock price. *Rougier*, 2019 WL 6111303, at *16 ("Unlike the damages model in this case, it was undisputed in *BP II* that the pre-explosion subclass did not seek out-of-pocket damages based on the artificial inflation of the stock price."). The *Rougier* court found that this was a far cry from the subclass of plaintiffs in *BP II* that claimed to be entitled to the full value of the stock price decline following the Deepwater Horizon explosion as consequential damages. *Id.* at *16-18. Moreover, *BP II* did certify the subclass that, like here, sought OOP damages and employed the stock inflation/corrective disclosure theory. *BP II*, 2014 WL 2112823, at *12-14.

As discussed herein, Plaintiffs have "satisfied their burden to demonstrate a damages model that calculates artificial inflation" and "***will*** disaggregate inflation unrelated to fraud." *Id.* at *17. Thus, there is no "disconnect between Plaintiffs' theory of liability and damages model in violation of *Comcast*." *Id.*

### 5. Plaintiffs' Damages Methodology Can Address Any Potential Issues Associated with the RSP Acquisition

Defendants also attempt to make something out of nothing by pointing to RSP acquisition and arguing that conflicts exist between pre-acquisition Concho shareholders and former RSP shareholders. Opp. at 28-30. This is a red herring. Plaintiffs' damages methodology can address any issues that arise as a result of the RSP acquisition. There are no conflicts of interest as a result of the RSP acquisition. And even if there were, subclasses could be certified to address those issues.

For pre-acquisition Concho shareholder, Defendants argue that Concho used the "purportedly inflated shares as merger consideration in acquiring RSP" and that this "bestow[ed] an economic benefit on heritage Concho shareholder by diluting existing inflation (if any) and

spreading it out over many more shareholders in the post-acquisition Concho." Opp. at 28-29. Tellingly, Defendants, and their expert, fail to cite **any** authority to support this contention. The only case that they cite is a Second Circuit opinion on a motion to dismiss where the panel found that certain defendants benefitted from the artificially inflated stock price, which provided a motive that supported plaintiffs' scienter allegations. *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000). This holding by no means suggests that any benefit obtained by way of the artificial inflation precludes class certification.

As explained in the Coffman Rebuttal Report, the transfer of the artificial inflation from one party to another can easily be addressed by the OOP methodology. Coffman Rebuttal at ¶¶68-71. Specifically, the OOP methodology would perform a simple adjustment to the inflation per share analysis based upon how the number of shares outstanding changed after the merger. *Id.* Despite Defendants' contention that Plaintiffs' damages method would improperly award pre-acquisition Concho shareholders with more damages, the Coffman Rebuttal Report explains that, to the extent that the artificial inflation per share is determined based upon some portion of the stock price decline that occurred at the time of the Corrective Disclosure (*i.e.*, after the merger), the per-share inflation would actually need to be adjusted **higher** for an investor that bought before the merger. *Id.* at ¶70 (explaining that the use of "constant dollar" inflation back-casting would actually understate artificial inflation).

For former RSP shareholders, Defendants argue that, because Plaintiffs allege that Concho paid too much for the RSP acquisition, this "premium more than offsets any alleged losses suffered by the forms RSP shareholders" from the inflated price of Concho's stock. Opp. at 29-30. In other words, Defendants are arguing that the RSP shareholders could not have been harmed by the alleged fraud. Yet, Defendants and their expert once again provide **zero** authority to support such

28

a contention. Further, the Coffman Rebuttal Report explains that this argument does not make sense from an economic or logical standpoint. Coffman Rebuttal at ¶¶72-79. Indeed, any "premium" paid to RSP shareholders was not but for the alleged fraud—a premium would have been paid for control and favorable acreage notwithstanding the fraud.

Specifically, the Coffman Rebuttal Report explains that the premium paid to a company that is being acquired reflects a portion of the economic value that the target is bringing to the acquirer, not a windfall that should be netted against damages from an alleged fraud. *Id.* at ¶77-79. For example, the premium reflects some or all of the economic value of the combining firms (*i.e.*, synergies or cost savings that the merger creates) and also a control premium. *Id.* The control premium refers to the willingness of the acquirer to pay more than the market price of secondary shares that are trading in the market because the merger offers control of the target. *Id.* Further, the parties involved in a merger negotiate a price that allows the target to share in the economic benefits of the business combination. *Id.* Thus, the "premium" reflects economic benefits of the business combination that the RSP shareholders are validly entitled to as a result of their investment. *Id.* Plaintiffs' damages methodology need not (and should not) treat this premium as a windfall by netting it from the RSP shareholders' losses suffered as a result of Defendants' fraud. *Id.*

Defendants also argue that the premium obtained by the RSP shareholders creates a conflict of interest against the remaining members of the Class. However, this argument is moot because again the premium was not a product of the fraud and should not discount the RSP shareholders'

damages. Nevertheless, if the Court were to find that such a conflict exists (which it should not),

any conflict could be remedied by establishing subclasses.[27]

## IV.    CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court reject the

Opposition and grant the Motion in full.

DATED: May 8, 2024                                  Respectfully submitted,

*/s/ Alfred L. Fatale III*
**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III (*pro hac vice*)
Charles Wood (*pro hac vice*)
Charles J. Stiene (*pro hac vice* forthcoming)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
cwood@labaton.com
cstiene@labaton.com

Mark S. Willis
1050 Connecticut Ave., NW
Suite 500
Washington, DC 20036
Telephone: (571) 332-2189
Facsimile: (212)-818-0477
mwillis@labaton.com

*Lead Counsel for Lead Plaintiffs and the Class*

---

[27] Defendants cite two decisions to support their contention that conflicts exist with the RSP shareholders and other members of the Class. Both of these cases are distinguishable. *Valley Drug Co. v. Geneva Pharms., Inc.* is an antitrust case that involved claims of collusion surrounding settlement agreements over legal disputes for one of the pharmaceutical company's patents, not a merger or acquisition. 350 F.3d 1181, 1186-89 (11th Cir. 2003). Unlike Geneva, the RSP shareholders are not at conflict with the other Class members because they do not benefit from Defendants' fraud. Likewise, *Edwards v. McDermott Int'l Inc.* is distinguishable because the Court found that there was a conflict because the share prices of ***both*** the acquiring and target company were artificially inflated as a result of the alleged fraud prior to a merger. 2024 WL 873054, at *12 (S.D. Tex. Feb. 29, 2024). Here, Plaintiffs do not allege that RSP's share price was inflated prior to the acquisition. Further, the *Edwards* court found that any conflict that could arise between class members as a result of a merger can be resolved by establishing subclasses. *Id.*; *see also Edwards*, 2024 WL 1769325, at *1 (granting certification with subclasses).