**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Civil Action No. 4:21-cv-02473<br><br>CLASS ACTION |

**DEFENDANTS' SURREPLY IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT...................................................................................................................... 4

    I.    Plaintiffs fail to meaningfully respond to—let alone refute—any of
    Defendants' price impact arguments. ....................................................... 4

        a.    Plaintiffs cannot—and the Reply does not attempt to—
            meaningfully dispute the existence of a fatal mismatch between the
            generic Category A statements and the specific events that
            purportedly "corrected" them. .................................................... 4

        b.    The Reply fails to rehabilitate the price impact of any Category B
            statement. ..................................................................................... 11

        c.    The Reply provides no substantive response to Defendants'
            arguments showing the lack of price impact of the Category C
            statements.................................................................................... 12

    II.    The Motion must be denied in its entirety because Plaintiffs have failed to
    satisfy *Comcast*'s requirement to present a damages methodology capable
    of measuring *only* those damages stemming from the alleged fraud................... 13

        a.    Plaintiffs substantively rely on a risk materialization theory of
            liability. ...................................................................................... 13

        b.    Plaintiffs have failed to present evidence that they possess a
            damages methodology capable of measuring the damages
            attributable to their risk materialization theory of liability....................... 17

        c.    Plaintiffs fail to reconcile their theory of liability with issues
            related to the RSP merger and former RSP shareholders. ........................ 19

CONCLUSION.................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ........................................................................... 5, 6, 7, 8

*Basic v. Levinson*,
485 U.S. 224 (1988).................................................................................... 1, 2, 12

*Caro v. City of Dallas*,
17 F. Supp. 2d 618 (N.D. Tex. 1998) ............................................................. 16

*Comcast v. Behrend*,
569 U.S. 27 (2013)............................................................................................ passim

*Edwards v. McDermott Int'l, Inc.*,
2024 WL 1769325 (S.D. Tex. Apr. 24, 2024) .................................................. 19

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)............................................................................................. 18

*Forsythe v. Teva Pharm. Indus. Ltd*,
102 F.4th 152 (3d Cir. 2024) ............................................................................. 19

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021)...................................................................................... passim

*In re Anadarko Petroleum Corp. Sec. Litig.*,
2022 WL 4544235 (S.D. Tex. Sept. 28, 2022) ........................................... 19

*In re BP p.l.c. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013 .................................................. passim

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008) ........................................................ 13, 14

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019)......................................... 14, 15, 16

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .............................................. 6, 7, 10

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ...................................................................... 7

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ............................................................................. 14

*McDonald v. Kinder-Morgan, Inc.*,
287 F.3d 992 (10th Cir. 2002) ......................................................................... 12

*Pang v. Levitt*,
2023 WL 11643704 (W.D. Tex. Dec. 20, 2023) ...................................... 14

*Prantil v. Arkema Inc.*,
  986 F.3d 570 (5th Cir. 2021) ................................................................................. 2

*Pub. Emp. Ret. Sys. of Miss., P. R. Tchr. Ret. Sys. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ................................................................................. 14

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ....................................................... 19

*Tchr. Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ................................................................................. 14

**INTRODUCTION**

Plaintiffs' Reply Brief (ECF 80) (the "Reply") continues Plaintiffs' invitation to ignore recent Supreme Court authority on when securities fraud claims may be maintained as class actions. In *Basic v. Levinson*, 485 U.S. 224 (1988), the Supreme Court held that securities plaintiffs seeking class certification could avoid the need to provide individualized proof of reliance in cases where the defendant company's stock traded in an efficient market and the alleged misstatements impacted the company's stock price. Since then, the Supreme Court has modified the contours of *Basic*'s judicially created presumption, as well as the situations in which class actions may be maintained more generally. As Defendants' Opposition to Plaintiffs' Motion for Class Certification (ECF 68) (the "Opposition") explains, Plaintiffs' Motion for Class Certification (ECF 54) (the "Motion") fails to reckon with—and ultimately fails under—two of these subsequent Supreme Court cases: *Goldman I* and *Comcast*.[1] Plaintiffs' failure under *Goldman* requires denying class certification as to the vast majority of the challenged statements. And Plaintiffs' failure under *Comcast* requires denying certification altogether. Plaintiffs' Reply fails to rectify either of these two deficiencies.

*First*, in *Goldman I*, the Supreme Court held that a plaintiff could not rely on the existence of a stock drop at the end of the alleged class period (something that happens in every securities fraud action) as evidence of price impact if a "mismatch" exists between the contents of the alleged misstatement and the later disclosure that precipitated the back-end stock drop. *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021) ("*Goldman I*"). Here, as the Opposition explains, there is such a mismatch between the vast majority of the Complaint's alleged misstatements and Concho's 2Q 2019 financial results that precipitated the back-end stock drop.

---

[1] Capitalized terms not defined herein have the meaning given to them in the Opposition.

Opp. at 13-22.  The *Basic* presumption is accordingly inapplicable, and class certification must be denied as to each of these statements.

The Reply spills much ink on this topic, but what speaks the loudest is what it does ***not*** say.  Perhaps most tellingly, the Reply all but ignores the specific statements the Opposition challenges as generic.  Instead, it attempts to argue statements that Defendants did ***not*** challenge as generic are not generic—which, of course, does nothing to refute Defendants' argument.  In addition, the Reply scarcely even acknowledges the fact that statements about the results of Concho's operations in 2017 and 2018 were not—and could not possibly have been— meaningfully "corrected" by Concho's second quarter ***2019*** results.  And it entirely ignores Defendants' arguments that projections of future results that were in fact achieved could in no way be "corrected" by results in later periods not covered by those projections.

Rather than meaningfully engage with these issues, the Reply focuses on generalized attacks contending that ***all*** of Defendants' arguments are "dead on arrival."  Reply at 1.  But these generalized attacks all fail.  For example, Plaintiffs argue that because Defendants "fail to even challenge all of the alleged misstatements and omissions," Defendants' price impact arguments are "a legal nullity."  Reply at 2; *see also id*. at 5 n.9.  But as Defendants explained, price impact is evaluated on a "statement-by-statement" basis.  Opp. at 12 (collecting cases).  Plaintiffs never address—let alone distinguish—any of the authorities Defendants cite for this proposition.  Nor could they, as it is well settled that "[c]ourts should consider predominance on a claim-by-claim basis."  *Prantil v. Arkema Inc.*, 986 F.3d 570, 577 (5th Cir. 2021).  And in a securities fraud action, the alleged misrepresentations define the Rule 10b-5 claims raised.  *See* Opp. at 12.

Plaintiffs further argue that the mere fact that "the sole Corrective Disclosure…was followed by a statistically significant stock price decline" is sufficient to establish price impact.

2

Reply at 1.  But that argument just raises the critical question here:  Price impact as to *which alleged misstatements*?  A "back-end" price drop, no matter how large, can at most serve as "indirect evidence" of price impact as to alleged misstatements that the back-end disclosure "actually corrected."  *Goldman I*, 141 S. Ct. at 1961.  It is no evidence of price impact as to statements for which there is a "mismatch" between the contents of the alleged misstatement and the back-end disclosure.  *See id.*  Thus, here, the mismatch between the statements in Categories A, B, and C and the alleged corrective disclosure forecloses any inference of price impact as to those statements, and class certification must be denied as to them.  Opp. at 13-23.

*Second*, in *Comcast v. Behrend*, the Supreme Court held that to obtain class certification, plaintiffs bear the burden of presenting evidence sufficient to establish that they have a damages methodology capable of "measur[ing] only those damages attributable to [their] theory [of liability]." 569 U.S. 27, 35 (2013).  Following this holding, it is not enough for a plaintiff to show that its damages methodology will apply class-wide.  Instead, a plaintiff must present evidence sufficient to show that its methodology is capable of measuring damages consistent with its theory of liability.

Here, while the Complaint invokes a "materialization of the risk" theory of liability, Plaintiffs provide no plausible evidence that they possess a methodology capable of measuring damages consistent with that theory.  Nor does the Reply seriously argue otherwise.  Instead, it attempts to "disclaim[]" the materialization of the risk theory of liability altogether.  Reply at 24.  But a party cannot amend its Complaint through a brief.  And here, the Complaint plainly alleges a materialization of the risk theory of liability.  Specifically, Plaintiffs allege that Defendants' statements were "materially false and misleading" because they purportedly failed to disclose that Concho's strategy was "extremely high-risk" and those "risks would and did manifest during the

3

Class Period." Compl. ¶ 172. This is no passing reference: The Complaint repeats this same contention after *every* alleged misstatement—a full *38* times in all—as the very reason the statements are alleged to be misleading.

As the Opposition explains—and as Judge Ellison held in denying certification in *BP I*—a plaintiff invoking such a materialization of the risk theory of liability cannot satisfy *Comcast* simply by invoking an event study and uttering a few magic words about its future intentions. *See In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("*BP I*"). Yet, this is precisely what Plaintiffs attempt to do here. The Motion should thus be denied for failing to present evidence sufficient to carry Plaintiffs' burden to show that they possess a methodology that can measure damages consistent with their theory of liability.

## ARGUMENT

**I.      Plaintiffs fail to meaningfully respond to—let alone refute—any of Defendants' price impact arguments.**

There is a stark mismatch between the alleged misstatements in Categories A, B, and C of Defendants' Appendix I of the Opposition and the alleged corrective disclosure. This mismatch prevents any inference of price impact as to these statements based on Concho's "back-end" price drop. Opp. at 13-21. The Reply largely fails to engage with these arguments and certainly does nothing to salvage an inference of price impact as to the Category A, B, or C statements.

> **a.      Plaintiffs cannot—and the Reply does not attempt to—meaningfully dispute the existence of a fatal mismatch between the generic Category A statements and the specific events that purportedly "corrected" them.**

In the Opposition, Defendants grouped 33 alleged misstatements into Category A in Appendix I. Those Category A statements are exceedingly generic and there is no basis to attribute price impact to them based on the movement in Concho's stock price following its specific 2Q 2019 financial results. *See* Opp. at 14-17. In fact, Lead Plaintiff Construction Laborers Pension

4

Trust for Southern California ("SoCal") ***admitted*** at its deposition that the sole alleged corrective disclosure in this case—Concho's 2Q 2019 financial results—did ***not*** correct statements from Category A. *See* Opp. at 16. The Reply makes no attempt to explain away this damning admission.

Nor could Plaintiffs plausibly do so in light of the exceedingly generic nature of the Category A statements. Those statements are generic, positive commentary on Concho's progress in implementing large-scale production techniques in 2018 and early 2019. *See* Opp. at 14 (collecting examples). For example, the first statement in Category A vaguely states: "Our operational and financial performance [in 4Q17] demonstrated our ability to consistently execute, control costs and capitalize on opportunities that strengthen our competitive position." Compl. ¶ 169. Another states that Concho is "utilizing leading-edge technologies, including fiber optic monitoring, to collect valuable proprietary data with real-time and long-term implications for full-field optimization." Compl. ¶ 176.

The only tenuous connection between these and the other Category A statements, on the one hand, and the alleged corrective disclosure, on the other, is that they bear on a common subject—Concho's transition to large-scale development. *See* Opp. at 16-17. But as the Opposition explained (and the Reply conspicuously ignores), attempting to establish price impact based on "only a general front-end—back-end subject matter match…does not meaningfully account for the Supreme Court's guidance in *Goldman*." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 100-01 (2d Cir. 2023) ("*Goldman II*"); Opp. at 16-17. Instead, to justify an inference of price impact based on a back-end price drop, a plaintiff must show that an alleged misstatement (i) "as written is specific enough to evoke investor reliance," *Goldman II*, 77 F. 4th at 101, and (ii) was "actually corrected" by the alleged corrective disclosure. *Goldman I*, 141 S. Ct. at 1961.

The Category A statements satisfy neither requirement, as they are hopelessly generic and were not even arguably corrected by the 2Q 2019 results. *See, e.g.*, Opp., Ex. 2 (SoCal Dep. 216:23–24 ("[T]hey didn't reach back and correct this statement."); *id.* 214:18-20 (Q. "The July 2019 statement did not correct this statement?" A. "Yes."); *id.* 215:15-19 (similar); *id.* 217:6-19 (similar)). Accordingly, there is a "mismatch" between the generic Category A statements and the alleged corrective disclosure that prevents any inference of price impact as to the Category A statements. Opp. at 14-17.

The Reply offers four arguments in an attempt to salvage the Category A statements. As explained below, however, none is persuasive.

*First*, Plaintiffs argue that because the alleged misstatements concern Concho's transition to "large-scale development of multi-well oil pads" and because this topic was important to the success of "the entire Company," the statements cannot be categorized as generic. Reply at 8. *Goldman II* rejected precisely that argument. There, the plaintiffs argued that the statements were not generic because they concerned the bank's conflicts of interest, the management of which is undeniably important to the success of the entire company. *See Goldman II*, 77 F. 4th at 103. But the Second Circuit noted that the question a court must answer is not "whether the defendant spoke on topics generally important to investment decision-making, but instead whether the defendant's generic *statements* on that topic were important in that regard." *Id*. at 102; *see also In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *8-11 (S.D.N.Y. Mar. 29, 2024) (finding a lack of price impact for generic statements pertaining to the company's growth strategy, despite that topic's general importance to investors). While the topic of Goldman's conflicts was generally important, the "defendants managed to sever the link between back-end price drop and front-end misrepresentation" by introducing expert testimony showing that no analysts ever "reference[d]

6

the [specific] disclosure[s]" at issue. *Goldman II*, 77 F. 4th at 104 (the analyst "reports might suggest that the market cared generally about how mismanaged conflicts could damage Goldman's reputation, but they do not suggest that investors were misled by Goldman's conflicts disclosure").

The same is true here. The 33 Category A statements are facially generic and mismatched with the specific 2Q 2019 results that serve as the alleged corrective disclosure. Opp. at 15-16. And, like in *Goldman*, Defendants' expert, Lucy Allen, could not find a single meaningful reference to any of the Category A statements in any analyst report, either when the statements were made or following the alleged corrective disclosure. Opp., Ex. 1 (Allen Report ¶¶ 26-28); Ex. 7, Allen Surreply Report ¶ 16; *see also Kirkland Lake*, 2024 WL 1342800, at *9 (noting that "[e]vidence from contemporaneous analyst reports also supports the absence of price impact" and finding a lack of price impact in part because "no analysts referenced or discussed either of the [] Statements at all"). Defendants have thus "managed to sever the link between back-end price drop and front-end misrepresentation" for the Category A statements. *See Goldman II*, 77 F. 4th at 104.[2] And class certification should be denied as to them. *See id*. at 105.

*Second*, Plaintiffs try to move the goalposts by suggesting that "[e]ach *category* of alleged misstatements" used by Magistrate Judge Sheldon in assessing falsity in his Report and Recommendation on Defendants' Motion to Dismiss contained sufficiently specific content to warrant an inference of price impact. Reply at 12-13 (emphasis added). In other words, Plaintiffs suggest that because *some* statements within each of Magistrate Judge Sheldon's four groups of

---

[2] Plaintiffs attempt to reserve an inflation-introduction price impact theory for the alleged misstatements made on February 20-21, 2018. *See* Reply at 12 n.15. But Plaintiffs fail to present any new arguments or evidence as to how any specific statements caused a price impact on those dates, and Defendants already established a lack of front-end price impact in the Opposition as to Category A Statements. *See* Opp. at 21-23; *see also* Ex. 7, Allen Surreply Report ¶¶ 10-17. Moreover, as Plaintiffs' expert, Mr. Coffman, has elsewhere conceded, an analysis of front-end price impact "only make[s] sense if the misstatements and/or omissions would be expected to surprise the market." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 492 (S.D.N.Y. 2011); *see also* Reply, Ex. A (Coffman Rebuttal ¶ 45) (similar). Here, Mr. Coffman concedes that "[t]here is no evidence…that would suggest [that any of the] alleged misstatements would contradict existing market beliefs or surprise the market." Reply, Ex. A (Coffman Rebuttal ¶ 45).

statements were sufficiently specific, *all* of the statements in each such group should be treated as sufficiently specific. But this simply does not follow. As the Opposition explains—and the Reply concedes by silence—courts evaluate price impact on a statement-by-statement basis, not a group-by-group basis. Opp. at 12-13. Here, the only statements Defendants challenged as being too generic to support price impact were the 33 statements in Category A to Appendix I of the Opposition. That Magistrate Judge Sheldon grouped some of these 33 statements into categories that included other statements not being challenged as generic is irrelevant to the question for the Court now: whether there is a mismatch in genericness between the 33 statements Defendants are now challenging and the alleged corrective disclosure.

*Third*, Plaintiffs cannot seriously dispute that the 33 statements in Category A are "generalized positive statements about a company's progress" that are "untethered [from] anything measurable" and thus akin to those that the Fifth Circuit has repeatedly found to be immaterial. Opp. at 15 (collecting authorities). So Plaintiffs argue that this Fifth Circuit "case law [bearing on materiality]…has *nothing* to do with analysis under *Goldman*." Reply at 12 n.16. Plaintiffs are mistaken. In *Goldman II* itself, the Second Circuit expressly instructs litigants to utilize "case law bearing on materiality" in assessing the genericness of statements. Opp. at 14-15 (citing *Goldman II*, 77 F.4th at 96).[3] Defendants simply heeded this instruction and showed that the 33 Category A statements are just like those routinely found immaterial in the Fifth Circuit. *See* Opp. at 14-15.

---

[3] Plaintiffs also state that the Court should ignore this authority because an analysis of the materiality of statements "is reserved for the merits." Reply at 10 n.14. But, as the Supreme Court held in *Goldman I*, "[i]n assessing price impact at class certification, courts should be open to *all* probative evidence on that question…regardless whether the evidence is also relevant to a merits question like materiality." *Goldman I*, 141 S. Ct. at 1960 (citation omitted) ("[T]he Second Circuit must take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue."). In the wake of this holding, the Second Circuit was right to conclude that courts can and should review "case law bearing on materiality" in assessing the genericness of statements. *Goldman II*, 77 F.4th at 96.

That these statements were not dismissed at the pleadings stage is irrelevant to the analysis. For starters, Defendants focused on other arguments in their motion to dismiss, and this Court did not weigh in on issues of materiality as to the Category A statements. *See* Reply at 10 (conceding that Defendants' made this argument "for the first time" in the Opposition). And, in any event, the need to assess statements at class certification that survived a motion to dismiss was present in *Goldman* and, indeed, is inevitably true at the class certification stage of any securities action. Surviving dismissal thus plainly does not foreclose the mismatch analysis the Supreme Court set forth in *Goldman I*.[4]

*Finally*, Plaintiffs identify 2 of the 33 Category A statements and contend those statements are sufficiently specific to support an inference of price impact. Reply at 10-11. As an initial matter, that Plaintiffs specifically contest only two such statements is revealing. The Reply does not even attempt to explain how the other 31 statements in Category A were sufficiently specific to be corrected by the alleged corrective disclosure. Plaintiffs' failure to defend these statements should be taken as an implicit admission that they caused no price impact.

As to the two statements that Plaintiffs do attempt to defend directly, their arguments are unpersuasive. Plaintiffs first identify a statement from ¶ 216 of the Complaint (Statement A-13 in Appendix I of the Opposition) that states:

> I want to focus on the value-creating opportunities driven by large-scale development. We believe this type of development is important to maximize recoveries, drive economies of scale and deliver attractive economic returns predictably and consistently over the long term.

---

[4] One reason this is so is that the standard of review is different at each stage. *See Goldman I*, 141 S. Ct. at 1963 (at class certification, defendants' burden "will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise.").

Compl. ¶ 216. This statement is generic. *See Kirkland Lake,* 2024 WL 1342800, at *8 (finding statement "[W]e still see some significant growth and we talk about going to million ounces this year…So that's the number one driver of our growth instead of going out and trying to buy that kind of company. We're going to continue to grow with the diamond drill bit." to be sufficiently "broad and generic" to deny class certification based on a *Goldman* mismatch analysis). It conveys only that Concho was optimistic about the chances of success for a style of development (large-scale development) it was pursuing. No reasonable investor would have interpreted the statement in ¶ 216 as a guarantee of specific results in 2Q 2019—more than a year after it was made. Indeed, Plaintiffs do not even attempt to provide a case contrary to the wall of Fifth Circuit authority in Defendants' Opposition confirming the genericness of statements like this one. *See* Opp. at 15 & n.6. There is thus a stark mismatch between this statement and the alleged corrective disclosure, severing the link necessary to infer price impact.

Plaintiffs next accuse Defendants of selectively quoting the alleged misstatement in ¶ 294 of the Complaint. Reply at 11. In reality, however, ¶ 294 consists of two distinct statements challenged by Plaintiffs with separate bolding. While it is difficult to conceive how the first is corrected by Concho's 2Q 2019 results, consistent with their focus on only the most clearly generic statements, Defendants did not challenge that statement in the Opposition. *See* Opp., App'x I at 22-23 (including this section of the paragraph in Category D); Opp. at 7 n.1 ("A fourth category of alleged misstatements exists for which Defendants do not challenge class certification on lack of price impact grounds[.]"). Instead, Defendants challenged only the second bolded statement in ¶ 294. *See* Opp., App'x I at 14 (Statement A-33). The purported selective quotation thus reflects nothing more than Defendants' restraint and focus on only the most egregiously generic statements. *See* Ex. 7, Allen Surreply Report ¶ 8. And the Reply provides no reason to conclude

that the challenged portion of ¶ 294—which states that Concho thinks it has and will continue to "deliver really compelling returns while continuing to learn"—is anything but generic.  Compl. ¶ 294.  No basis exists to infer that it caused any price impact.

> **b.** **The Reply fails to rehabilitate the price impact of any Category B statement.**

The statements in Category B concern operational facts and financial results of Concho in 2017 and 2018, such as the statement that Concho "[d]elivered outstanding results from the Company's large-scale development projects" in 4Q 2017.  Opp. at 18-19.  These results were in no way "corrected" by Concho's financial results from the second quarter of 2019.  *Id.*  The Reply largely ignores this argument, relegating its response to it to a single conclusory paragraph.  *See* Reply at 13-14.  Even then, Plaintiffs take issue with only 2 of the 13 statements in Category B. And for good reason: the price movement following Concho's 2Q 2019 results cannot plausibly be attributed to statements about the state of affairs at Concho in 2017 and 2018.  *See* Opp. at 18.

Nor is Plaintiffs' argument convincing with respect to the two statements they do seek to defend.  The first, from October 2018, states: "We like the benefits we get of efficiency with our vendors of concentrating that much activity in one spot.  And we like the results we're getting out of them.  So more to come."  Compl. ¶ 259.  The second, from February 2019, states: "what we're pleased by is that as we moved into this large-scale project development[] [w]e're seeing the results we expect[.]"  Compl. ¶ 277.  In short, both statements provide historic Concho operational and financial results and express Concho's pleasure with those results.[5]

---

[5] To be sure, the conclusion of ¶ 259 contains the forward-looking sentence "So more to come." Compl. ¶ 259.  But the statement is in response to the question's acknowledgement that "you guys are still in the relatively early stages of large-scale development[.]"  Compl. ¶ 259.  It thus suggests, not a promise that the benefits would continue, but an acknowledgment that Concho's knowledge regarding the results of the program would continue to progress.  *See id.* And, in any event, this sentence is so vague, generic, and devoid of content that it cannot be plausibly said to have been "actually corrected" by specific financial results nearly a year later.  *Goldman I*, 141 S. Ct. at 1961; *see also supra* § I(a).

11

Plaintiffs apparently take issue with Defendants not coupling such statements with cautionary statements about the potential risks and contingencies related to Defendants' ability to repeat those results in future periods. *See, e.g.*, Compl. ¶ 297. But "[i]t is well-established that the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (collecting cases). Thus, these, and all of the Category B statements, could not be corrected by disclosures of *future* results, but could be corrected only by a disclosure stating that the "historic success[]" they conveyed was inaccurate. *Id*.

As the alleged corrective disclosure states no such thing, there is a fatal mismatch between it and the Category B statements. This mismatch severs the link necessary to infer price impact from the Category B statements based on Concho's back-end stock price drop and rebuts the *Basic* presumption as to the Category B statements. Opp. at 18-19.

### c. The Reply provides no substantive response to Defendants' arguments showing the lack of price impact of the Category C statements.

Finally, the Reply largely ignores Defendants' arguments about the Category C statements, which involve projections that Concho *actually met*. The only one it discusses is the statement found in ¶ 197 of the Complaint, which simply states that, with respect to Concho's "2018 budget," "you should expect more of the same in '18 as you saw in previous years from Concho." Compl. ¶ 197. Plaintiffs contend that, in making this statement, Defendants were "touting their success from the large-scale project development[.]" Reply at 15. As an initial matter, this simply is not true. The statement merely describes expectations for Concho's "budget." Compl. ¶ 197. Moreover, the statement merely projects "more of the same *in '18*." *Id*. Nothing in the purported corrective disclosure—which describes financial results from 2Q 20*19*—remotely suggests that Concho's 2018 budget did not conform to these expectations. The alleged corrective disclosure

thus does nothing to correct this statement. The same deficiency applies to the rest of the statements in Category C—all of which the Reply declines to address.

**II.   The Motion must be denied in its entirety because Plaintiffs have failed to satisfy *Comcast*'s requirement to present a damages methodology capable of measuring *only* those damages stemming from the alleged fraud.**

In *Comcast*, the Supreme Court held that, before an action may be certified for class treatment under Rule 23(b)(3), Plaintiffs must demonstrate that they possess a damages methodology that "measure[s] only those damages attributable to [their] theory [of liability]." *Comcast*, 569 U.S. at 35. No exception to this requirement exists for federal securities cases. Nonetheless, here, Plaintiffs seek to create one, arguing that in federal securities actions, *Comcast* requires nothing more than the uttering of a few magic words regarding their theory of liability and a few conclusory assurances regarding their damages methodology. *See* Reply at 20-21. There is no basis for such an implicit abrogation of *Comcast*. To be sure, in many securities cases, *Comcast* poses no serious issue to class certification. Plaintiffs are thus correct that there are many cases rejecting perfunctory *Comcast* arguments in securities class actions. But as the Opposition shows, and as Judge Ellison's opinion in *BP I* confirms, where a plaintiff alleges a materialization of the risk theory of liability, a plaintiff's burden to satisfy *Comcast* is significant. Opp. at 23 (collecting cases). Plaintiffs have not satisfied it here.

**a.   Plaintiffs substantively rely on a risk materialization theory of liability.**

The first step in determining whether Plaintiffs have satisfied *Comcast* is determining the nature of the theory of liability asserted. To prevail on a Section 10(b) claim, a plaintiff must allege that "the market reacted negatively to a corrective disclosure," i.e., a statement "which revealed the falsity of [the allegedly misleading] representations." *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 907 (W.D. Tex. 2008). A "corrective disclosure" can occur in one of two ways:

13

- *First*, a plaintiff may allege that an alleged misstatement was corrected by a direct disclosure—"i.e., a statement that corrects a previous misrepresentation or discloses a prior omission." *Id*. (citation omitted).  Sometimes this comes from defendants themselves, "but revelations can come from other sources, including whistleblowers, analysts, and news reports." *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *24 (M.D. Tenn. Nov. 19, 2019).  Either way, the disclosure must "'reveal[] to the market the falsity' of the prior misstatements." *Pub. Emp. Ret. Sys. of Miss., P. R. Tchr. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) (citation omitted); *see also Tchr. Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 187 & n.3 (4th Cir. 2007).

- *Second*, where a direct correction has not been made, Section 10(b) losses can sometimes be alleged using the "materialization of the risk" method, under which "some event or condition which causes a loss and which was concealed by the defendant's actions[]" later occurs and causes a stock price decline.  *Dell*, 591 F. Supp. 2d at 911; *see also Pang v. Levitt*, 2023 WL 11643704, at *17 (W.D. Tex. Dec. 20, 2023) (similar); Opp., Ex. 1 (Allen Report ¶ 56).

In either case, however, the actual nature of the alleged misstatements and corrective events—and not a plaintiff's own self-serving characterizations of them—is controlling.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (rejecting "Plaintiffs['] conten[tion] that they have alleged a corrective disclosure to the market" because the alleged correction did not specifically "reveal to the market the falsity of the prior [statements]").

This distinction between directly corrective disclosures and materializations of risk is illustrated by *BP I*.  2013 WL 6388408.  There, before April 20, 2010, BP had claimed to have

implemented certain "safety programs" and enhanced its ability to "respond to a catastrophic deepwater oil spill." *Id*. at *1-2. *BP* never issued a correction of these statements. But the BP-plaintiffs alleged that the "misleading nature of these statements…was made clear" by a subsequent adverse event: "the April 20, 2010 explosion of the Deepwater Horizon drilling rig" and its aftermath. *Id*. at *1. As a result, the Court recognized that the plaintiffs were pursuing a risk materialization theory of liability. *See id.* at *14. Similarly, in *Envision*, Section 10(b) plaintiffs challenged a healthcare company's statement that: "We believe that [the company] is well-positioned to continue to generate significant organic growth…" 2019 WL 6168254, at *10. And, similar to Plaintiffs here, the *Envision* plaintiffs argued that such statements were revealed to be false when the company announced "an earnings miss and guidance reduction." *Id*. at *24. Specifically, the plaintiffs argued that, based on the implications of this event, the public could infer, contrary to the company's assertion about being "well-positioned," that its "out-of-network revenue [model] w[as] unsustainable." *Id*. at *25. Like Plaintiffs here, the *Envision* plaintiffs labeled the revenue miss and guidance reduction "as a 'corrective disclosure.'" *Id*. But, because the statement announced a subsequent adverse event (as opposed to an express correction of any prior statement), the court looked past this label and concluded that the *Envision* plaintiffs' "argument [is] more aptly characterized as materialization of the risk." *Id*.

Likewise, here, Plaintiffs' relied prominently on the materialization of the risk theory of liability. Opp. at 24-25. Following ***every*** set of statements alleged to be misleading—a full ***38*** times in all—the Complaint claims that such statements were "materially false and misleading when made" based on a list of allegedly undisclosed "***risks***" that "would and did ***manifest*** during the Class Period eventually forcing the Company to scale back production[.]" Compl. ¶¶ 172, 173, 175, 177, 179, 181, 183, 187, 192, 195, 198, 200, 202, 210, 214, 217, 219, 221, 226, 232,

235, 241, 244, 246, 248, 250, 254, 256, 261, 263, 267, 269, 272, 276, 279, 281, 284, 297 (emphasis added); *see also* Ex. 7, Allen Surreply Report ¶ 30 (noting that the Complaint contains 480 references to "risk"). Similarly, the Complaint alleges that Defendants had the requisite scienter because they should have known that "the above-mentioned *risks* would and did *manifest* during the Class Period." Compl. ¶ 325(j) (emphasis added). Plaintiffs explicitly relied on this theory in opposing Defendants' Motion to Dismiss, arguing that "[t]his case falls squarely into a classic pattern of securities fraud—marketing a highly risky investment as anything but." Plfs' Opp. to Mot. to Dismiss (ECF 33) at 1-3; *see also* Opp. at 24. And the Court agreed in denying the motion, noting that "Plaintiffs' theory is that the Defendants oversold the probable success of the drilling program while underselling the risks involved[.]" Order (ECF 43) at 2.

Only now, after apparently realizing the effect of having pleaded such a theory on its ability to obtain class certification, do Plaintiffs attempt an about face. Plaintiffs now purport to "disclaim[] the MOTR theory at class certification." Reply at 24. But a "plaintiff cannot amend [its] complaint by briefs submitted in opposition to later motions." *Caro v. City of Dallas*, 17 F. Supp. 2d 618, 632 n.6 (N.D. Tex. 1998) (citation omitted). This is especially so here where such an amendment would fundamentally alter the nature of the Complaint. After all, the Complaint alleged that every challenged statement is misleading because of undisclosed "*risks*" that Plaintiffs contend "would and did *manifest* during the Class Period." *See supra* at 15. And plaintiffs do not identify *any* subsequent disclosure directly correcting any alleged misstatement. Rather, as in *Envision*, Plaintiffs only point to the later 2Q 2019 earnings release disclosing disappointing Dominator results and earnings projections from that later period.

Plaintiffs' proposed amendment-by-brief to disclaim the materialization of the risk theory would fundamentally alter the nature of their claims. Indeed, Plaintiffs only defeated Defendants'

16

Motion to Dismiss after expressly relying on their risk materialization theory of liability. Plaintiffs cannot have it both ways—asserting a materialization of the risk claim to avoid dismissal and then disclaiming it when it becomes inconvenient. The Court should thus hold Plaintiffs to the materialization of the risk theory of liability they pleaded.

  **b. Plaintiffs have failed to present evidence that they possess a damages methodology capable of measuring the damages attributable to their risk materialization theory of liability.**

As the Opposition explains, if a known risk is understated, a company's stock price would be inflated in the amount of the difference between (1) the actual likelihood that the risk would materialize and (2) the likelihood of the risk materializing implied by the misstatement, multiplied by (3) the full value of the materialization of the risk. Opp. at 26 (citing Allen Report ¶ 60). Thus, a plaintiff proceeding on a risk materialization theory of liability must provide evidence that it possesses a damages methodology capable of calculating each of these three figures. *See id.*

Plaintiffs have offered no such evidence here. To be sure, in his Reply report, Plaintiffs' expert states that "if there is a $10 per share price decline on a corrective disclosure, but a loss causation analysis determines that there was only an 80% chance of this outcome at earlier points in time, then the inflation could be lowered to $8 per share (i.e., the expected value of $10 outcome multiplied by 80% chance of that outcome occurring) at those earlier points in time." Reply, Ex. A (Coffman Rebuttal ¶ 59). But this statement only shows that Plaintiffs' expert can calculate the damages if all the figures are stipulated for him in advance, as they are in the hypothetical. *See* Ex. 7, Allen Surreply Report ¶ 34. In the real world, these figures are not stipulated in advance. Thus, to obtain class certification, Plaintiffs must present evidence that they have a method by which they can accurately calculate them.

All Plaintiffs do in an attempt to carry this burden is say they will use "valuation techniques" to calculate those figures. Reply at 18 (citing Coffman Report ¶ 82). But, while there

may be "valuation techniques" for disaggregating the portion of a stock drop that is wholly unrelated to a corrective disclosure, that merely measures one of the three things that must be measured to calculate damages in a risk materialization case: the loss that would occur upon materialization of the risk. Neither Plaintiffs nor their expert have offered ***any*** evidence that they possess a methodology by which they would calculate (1) the actual likelihood that the risk would materialize on each date of the class period or (2) the likelihood of the risk materializing implied by the alleged misstatements. *See* Ex. 7, Allen Surreply Report ¶¶ 34-35. Without such a method, they have failed to carry their burden to demonstrate that they have a damages methodology capable of measuring only those damages arising from the unlawful conduct alleged. Without an ability to calculate the particular amount of concealed risk, Plaintiffs cannot possibly "disaggregate" the portion of a stock drop that is due to the *disclosure* of that risk (the only amount recoverable of damages) from the portion that is due to the *materialization* of that risk.[6]

This is the same result that was reached in *BP I*, where the Court denied class certification under *Comcast* because plaintiffs had failed to present a damages methodology capable of measuring only those damages arising from their materialization of the risk theory of liability. *See* Opp. at 26. Plaintiffs provide no way to distinguish this case from *BP I*. Instead, they attack *BP I* for being a "decade old." Reply at 25. But Plaintiffs cannot explain why this Court should ignore a well-reasoned, never overruled, post-*Comcast* decision out of this District simply because it has

---

[6] Plaintiffs cite *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) for the principle that plaintiffs need not "prove loss causation in order to obtain class certification." Reply at 19. But Defendants' challenge to class certification here is based on Plaintiffs' failure to present evidence that they have a damages methodology capable of calculating damages consistent with their risk materialization theory of liability, not on Plaintiffs' failure to put forward factual proof of loss causation. Plaintiffs cannot avoid this obligation by complaining that they "have received little to no discovery from Defendants." Reply at 19 n.19. Plaintiffs themselves proposed a schedule under which they would move for class certification in the early stages of discovery, have provided no evidence to suggest that additional discovery would allow them to carry their burden, and, in any event, "*Comcast* does not allow them the luxury of waiting until trial" to carry their burden to show they have a damages methodology that can measure only those damages arising from their theory of liability. *BP I*, 2013 WL 6388408, at *17 (citation omitted).

18

reached 10 years of age.

In addition, Plaintiffs argue that since *BP I*, courts in this district have disagreed with the holding of *BP I* on this issue. *Id*. at 25-27. But the only such cases Plaintiffs can identify are *Anadarko* and *Rougier*. *Id*. at 26-27 (citing *In re Anadarko Petroleum Corp. Sec. Litig.*, 2022 WL 4544235, at *7 (S.D. Tex. Sept. 28, 2022); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *16 (S.D. Tex. Nov. 13, 2019)).[7] And, as Defendants explained in the Opposition, these opinions turned not on a disagreement with the holding of *BP I*, but on a finding that the plaintiffs were not proceeding under a materialization of the risk theory. Opp. at 28 n.18.[8] Here, as explained above, the Complaint and Plaintiffs' briefs at the Motion to Dismiss stage foreclose that argument. *Anadarko* and *Rougier* thus do not provide a relevant distinction to *BP I*.[9] This Court should thus follow *BP I* because Plaintiffs have not satisfied their "obligation to come forward with evidence" that they possess a damages methodology capable of measuring ***only*** those damages stemming from the alleged fraud. *BP I*, 2013 WL 6388408, at *17 (citation omitted). "*Comcast* does not allow them the luxury of waiting until trial." *Id*.

### c.     Plaintiffs fail to reconcile their theory of liability with issues related to the RSP merger and former RSP shareholders.

Plaintiffs and their expert wave off any problems created by the RSP merger or Plaintiffs' inclusion of former RSP shareholders in the class. But, as explained further in Ms. Allen's surreply report, ¶¶ 37-41, Plaintiffs continue to misapprehend the tension that these issues create.

First, with respect to Defendants' point that, under Plaintiffs' theory, Concho dissipated

---

[7] Plaintiffs also cite *Edwards v. McDermott Int'l, Inc.*, 2024 WL 1769325, at *13 (S.D. Tex. Apr. 24, 2024) and claim it represents a "rough start" for Defendants' *BP I* argument. Reply at 26 & n.25. The argument is perplexing. *McDermott* never cites *BP I* at all, let alone repudiates Defendants' *BP I* argument.

[8] In its Notice of Supplemental Authority (ECF 83), Plaintiffs cite to *Forsythe v. Teva Pharm. Indus. Ltd*, 102 F.4th 152 (3d Cir. 2024). But *Forsythe* is irrelevant here, as it does not in any way purport to be about the risk materialization issues Defendants raise here.

[9] Plaintiffs' argument that they are not proceeding under the same damages model as the *BP II*-plaintiffs, Reply at 26-27, is also irrelevant, as Defendants never contended that they were and cited *BP II* only for certain general principles.

pre-RSP-merger artificial inflation by spreading that inflation out over former RSP shareholders, Plaintiff decries a lack of authority but does not contest the uncontroversial economic point of inflation dissipation.  Reply at 28.  Instead, Plaintiffs and their expert assure that their out-of-pocket damages model can "easily" account for that inflation dissipation by performing a "simple adjustment."  *Id*. (citing Coffman Rebuttal ¶¶ 68-71).  But that adjustment counterintuitively results in a "per-share inflation" that is "***higher*** for a[] [Concho] investor that bought before the merger" than for those who bought after the inflation-dissipating merger.  *Id*.; *see* Opp., Ex. 1 (Allen Report ¶ 70) (explaining why that result would be "economically unreasonable"); Ex. 7, (Allen Surreply Report ¶ 36).

Second, with respect to Defendants' point that former RSP Shareholders received a net benefit because the merger premium far exceeded any alleged inflation in the acquired Concho stock, Plaintiffs protest that such a premium is disconnected from the alleged fraud and merely reflects the "economic benefits of the business combination that the RSP shareholders are validly entitled to as a result of their investment."  Reply at 29.  But that reasoning presupposes that RSP's merger premium was replicable elsewhere, *outside* of the Concho transaction that is the source of the former RSP shareholders' claimed damages.  As Ms. Allen explains in her surreply report, "market evidence, analyst commentary, and RSP's own SEC filings show otherwise."  Ex. 7, Allen Surreply Report ¶¶ 38-41.  And because that is so, there exists a fundamental conflict between former RSP shareholders and the rest of the putative class.

## CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied.

20

Respectfully submitted,


BAKER BOTTS L.L.P.

By: */s/    David D. Sterling*
    David D. Sterling
      Attorney-In-Charge
    State Bar No. 19170000
    Federal I.D. No. 07079
    Amy Pharr Hefley
    State Bar No. 24046046
    Anthony J. Lucisano
    State Bar No. 24102118
    Federal I.D. No. 3369146
    C. Frank Mace
    State Bar No. 24110609
    Federal I.D. No. 3385915
    910 Louisiana Street
    Houston, Texas 77002
    (713) 229-1946
    (713) 229-7946 (Fax)
    david.sterling@bakerbotts.com
    amy.hefley@bakerbotts.com
    anthony.lucisano@bakerbotts.com
    frank.mace@bakerbotts.com

ATTORNEYS FOR DEFENDANTS CONCHO
RESOURCES INC., CONOCOPHILLIPS, AS
SUCCESSOR IN INTEREST TO CONCHO
RESOURCES INC., TIMOTHY LEACH, JACK F.
HARPER, AND C. WILLIAM GIRAUD,

21

By: */s/   Michael C. Holmes*
      Michael C. Holmes
      Texas Bar No. 24002307
      Southern District Bar No. 23716
      Robert Ritchie
      Texas Bar No. 24079213
      Southern District Bar No. 3089959
      K. Virginia Burke DeBeer
      Texas Bar No. 24097437
      Southern District Bar No. 3472047
      VINSON & ELKINS LLP
      2001 Ross Ave., Suite 3900
      Dallas, TX 75201
      Tel: (214) 220-7700
      Fax: (214) 999-7923
      mholmes@velaw.com
      rritchie@velaw.com
      vdebeer@velaw.com

      CO-COUNSEL FOR DEFENDANTS TIMOTHY LEACH,
      AND C. WILLIAM GIRAUD

22

## CERTIFICATE OF SERVICE

I hereby certify that, on June 19, 2024, a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system.

*/s/ Robert Ritchie*