**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Case No. 4:21-cv-02473 |

**LEAD PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF EXPERT LUCY P. ALLEN AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

**TABLE OF CONTENTS**

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS .......................................................... 1

II.    STATEMENT OF ISSUES ........................................................................................... 1

III.    SUMMARY OF ARGUMENT ...................................................................................... 1

IV.    BACKGROUND .......................................................................................................... 2

        A.    Primer on Content Analysis ............................................................................ 2

        B.    Ms. Allen's Content Analysis ......................................................................... 4

V.    LEGAL STANDARD ................................................................................................... 7

VI.    ARGUMENT ................................................................................................................ 8

        A.    The Foundation of Ms. Allen's Content Analysis Is Fatally Flawed Because It Is Impermissibly Lawyer-Driven and Fails Every *Daubert* Factor ......................... 8

        B.    Ms. Allen's "Content Analysis" Is a Legal Analysis Under *Goldman* ................. 14

        C.    Ms. Allen's Front-End Price Impact Analysis Is Irrelevant ................................. 14

        D.    Ms. Allen's Opinions and Testimony on Common Damages are Unsupported and Tainted with Error ................................................................. 15

        E.    Ms. Allen Failed to Disclose All Materials Considered ..................................... 17

        F.    A Material Mistake Compromises the Reliability of Ms. Allen's Opinions ........ 19

VII.    CONCLUSION ............................................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allstate Corp. Sec. Litig.*,
2020 WL 7490280 (N.D. Ill. Dec. 21, 2020)....................................................................15

*Barnes v. BTN, Inc.*,
555 F. App'x 281 (5th Cir. 2014) ...................................................................................18

*U.S. ex rel. Barron v. Deloitte & Touche, LLP*,
2008 WL 7136869 (W.D. Tex. Sept. 26, 2008)................................................................20

*Brumley v. Pfizer, Inc.*,
200 F.R.D. 596 (S.D. Tex. 2001)......................................................................................9

*Burkett v. Aztec Well Fam.*,
2022 WL 17418522 (W.D. Tex. Nov. 1, 2022)..................................................................9

*Calsep A/S v. Intelligent Petroleum Software Sols., LLC*,
2020 WL 1321521 (S.D. Tex. Mar. 17, 2020)..............................................................17, 18

*Chen-Oster v. Goldman, Sachs & Co.*,
2022 WL 814074 (S.D.N.Y. Mar. 17, 2022)....................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).................................................................................................*passim*

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
2023 WL 6300569 (S.D. Tex. Sept. 27, 2023) ............................................................11, 14

*E.E.O.C. v. Freeman*,
778 F.3d 463 (4th Cir. 2015) ...........................................................................................20

*Estevis v. City of Laredo*,
2023 WL 9312081 (S.D. Tex. Dec. 28, 2023).................................................................17

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
99 F.4th 770 (5th Cir. 2024) .............................................................................................7

*Geiserman v. MacDonald*,
893 F.2d 787 (5th Cir. 1990) ...........................................................................................17

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)............................................................................................................8

*Goldman Sachs Grp., Inc. v. Ark Tchr. Ret. Sys.*,
    594 U.S. 113 (2021)..................................................................................................11, 14

*Johnson v. Arkema, Inc.*,
    685 F.3d 452 (5th Cir. 2012) .................................................................................7

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) ...........................................................................7, 11

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................................12

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011).................................................................16

*Loy v. Rehab Synergies, LLC*,
    558 F. Supp. 3d 402 (S.D. Tex. 2021)..................................................................19

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016).....................................................................9

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC*,
    2007 WL 150606 (S.D. Tex. Jan. 16, 2007) ...........................................................8

*Moore v. Ashland Chem. Inc.*,
    151 F.3d 269 (5th Cir. 1998) ...............................................................................20

*Munoz v. Orr*,
    200 F.3d 291 (5th Cir. 2000).................................................................................19

*Owen v. Kerr-McGee Corp.*,
    698 F.2d 236 (5th Cir. 1983) ...............................................................................14

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) .................................................................................7

*Quintel Tech. Ltd. v. Huawei Techs. USA, Inc*,
    2018 WL 626355 (E.D. Tex. Jan. 30, 2018)...........................................................8

*Robinson v. Ethicon, Inc.*,
    588 F. Supp. 3d 726 (S.D. Tex. 2022)..................................................................15

*Sanson v. Allstate Texas Lloyds*,
    2018 WL 3736362 (E.D. Tex. Aug. 6, 2018) ........................................................17

*Seitz v. Envirotech Sys. Worldwide Inc.*,
    2008 WL 656513 (S.D. Tex. Mar. 6, 2008).............................................................8

iii

*In re Silica Prod. Liab. Litig.*,
    398 F. Supp. 2d 563 (S.D. Tex. 2005) ......................................................................19

*Smith v. City of Bastrop*,
    2021 WL 148061 (W.D. Tex. Jan. 15, 2021) ........................................................14, 16

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*,
    2009 WL 10674753 (W.D. Tex. Aug. 19, 2009) ......................................................13

*Texas Peace Officers v. City of Dallas*,
    58 F.3d 635 (5th Cir. 1995) ..................................................................................16

*U.S. v. Angleton*,
    269 F. Supp. 2d 892 (S.D. Tex. 2003) ....................................................................12

*Vazquez v. Aguilera*,
    2022 WL 2292888 (S.D. Tex. Mar. 25, 2022) ..........................................................9

*Whitney Nat. Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*,
    516 F. Supp. 2d 802 (S.D. Tex. 2007) ....................................................................20

**Rules**

Fed. R. Evid. 702 ..........................................................................................................1,7

Rule 26 ......................................................................................................................17, 18

Rule 37 ..........................................................................................................................17

**Other Authorities**

David Tabak, *Making Assessments About Materiality Less Subjective Through
    The Use of Content Analysis*, NERA Econ. Consulting ......................................2, 3, 5

Gaétan Breton & Richard J. Taffler, *Accounting information and analyst stock
    recommendation decisions: a content analysis approach*, 31 Acc. & Bus.
    Rsch. (2001) ..................................................................................................2, 4, 12

John G. Previts, *A Content Analysis of Sell-Side Financial Analyst Company
    Reports*, 8 Acc. Horizons (1994) ............................................................................2

Malcom Smith & Richard J. Taffler, *The chairman's statement A content analysis
    of discretionary narrative disclosures*, 13 Acc. Auditing & Accountability J.
    (2000) ........................................................................................................2, 3, 4

Michael J. Jones & Paul A. Shoemaker, *Accounting narratives: A review of
    empirical studies of content and readability*, 13 J. of Acc. Lit. 142 (1994) ..........2, 3

Robert W. Holthausen & Ross L. Watts, *The relevance of the value-relevance literature for financial accounting standard setting*, 31 J. of Acc. & Econ. (2001) ................................................................................................................................18

Lead Plaintiffs Utah Retirement Systems and Construction Laborers Pension Trust for Southern California ("Lead Plaintiffs") respectfully move for the entry of an order excluding entirely the testimony and opinions of Defendants' expert Lucy P. Allen pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("*Daubert*").[1]

## I.      NATURE AND STAGE OF THE PROCEEDINGS

On December 7, 2023, Lead Plaintiffs filed their class certification motion (the "Motion") (ECF No. 54) and supporting expert report of Chad Coffman ("Coffman Report") (ECF No. 54-3). Defendants filed an opposition ("Opposition") (ECF No. 68) on March 15, 2024, along with the reply report of Lucy P. Allen ("Allen Report") (ECF No. 68-5), attached hereto as **Exhibit ("Ex.") A** to the Declaration of Alfred L. Fatale III ("Fatale Decl."). Lead Plaintiffs filed their reply in further support of the Motion ("Reply") (ECF No. 80) on May 8, 2024, along with Mr. Coffman's rebuttal of the Allen Report ("Coffman Rebuttal") (ECF No. 80-2) (Fatale Decl. **Ex. N**). Finally, Defendants filed a surreply on June 19, 2024 ("Surreply") (ECF No. 84), along with the surreply report of Ms. Allen ("Allen Surreply") (ECF No. 84-4) (Fatale Decl. **Ex. C**). Lead Plaintiffs conducted a deposition of Ms. Allen on July 11, 2024 ("Allen Dep.") (Fatale Decl. **Ex. B**).

## II.     STATEMENT OF ISSUES

Whether Ms. Allen's opinions and testimony should be excluded by the Court because they do not meet the standards of Federal Rule of Evidence 702 and *Daubert.*

## III.    SUMMARY OF ARGUMENT

Ms. Allen's testimony and opinions should be excluded in their entirety for several, equally compelling reasons. Specifically: (i) Ms. Allen's "content analysis" should be excluded

---

[1] Unless otherwise noted, internal quotation marks and citations have been omitted and emphasis added throughout.

because it contains fundamental flaws both in its method and application in that it is lawyer-driven, fails under *Daubert*, is a legal analysis, and contains irrelevant opinions; (ii) Ms. Allen's opinions regarding damages calculations are impermissible, unsupported legal conclusions; and (iii) Ms. Allen failed to disclose critical information in her materials considered in the Allen Report, which also included a material mistake, rendering her opinions incomplete and unreliable.

## IV.   BACKGROUND

### A.   Primer on Content Analysis

Content analysis is a "research method that uses a set of procedures to make valid inferences from text"[2] that is supposed to "objectively and systematically identify[] specified characteristics of messages."[3] This requires "coding the data into appropriate units and applying measurement models for hypothesis testing."[4] There are two types of content analysis: quantitative and qualitative.[5] The literature generally admonishes qualitative analysis for being too subjective.[6]

Quantitative content analysis contains "no judgment calls or subjectivity,"[7] for example, analyzing the number of times that each presidential candidate's name appears in *The New York*

---

[2] *See* Fatale Decl. **Ex. K**, John G. Previts et al, *A Content Analysis of Sell-Side Financial Analyst Company Reports*, 8 ACC. HORIZONS 55, 57 n.3 (1994) ("Previts").

[3] *See* Fatale Decl. **Ex. J**, Michael J. Jones & Paul A. Shoemaker, *Accounting narratives: A review of empirical studies of content and readability*, 13 J. OF ACC. LIT. 142, 142 (p. 1) (1994) ("Jones"). Jones is cited in Fatale Decl. **Ex. H**, Gaétan Breton & Richard J. Taffler, *Accounting information and analyst stock recommendation decisions: a content analysis approach*, 31 ACC. & BUS. RSCH. 91, 92 (2001) ("Breton"), which is a material considered.

[4] *See* Jones , Fatale Decl. **Ex. J**, at 2.

[5] *Id.* Quantitative analysis is also known as "'form orientated' (objective) analysis" and qualitative analysis is also known as "'meaning orientated' (subjective) analysis." *See* Fatale Decl. **Ex. L**, Malcom Smith & Richard J. Taffler, *The chairman's statement A content analysis of discretionary narrative disclosures*, 13 ACC. AUDITING & ACCOUNTABILITY J. 624, 627 (2000) ("Smith"). This article is not cited in Ms. Allen's materials considered but is cited in Breton, Fatale Decl. **Ex. H** at 92.

[6] *See* Smith, Fatale Decl. **Ex. L** at 637–38.

[7] *See* Fatale Decl. **Ex. M**, David Tabak, *Making Assessments About Materiality Less Subjective Through the Use of Content Analysis*, NERA Econ. Consulting 7 ("Tabak"). *See infra*, Section VI.A. at 9-11 for further discussion.

*Times* to compare media coverage.[8] In this context, the analysis would be "completely objective," making it "easier to determine whether there was an actual error in implementation."[9]

Qualitative content analysis on the other hand is in "many respects not that different from an expert's use of her experience to help her judge the materiality of certain communications . . . as such, it embodies many of the same benefits and drawbacks as the subjective views of an expert."[10] In other words, qualitative analyses can be tainted with an "expert's subjective claim that certain information is or is not material," unlike event studies which are "replicable, are the subject of a large academic literature, and have knowable error rates."[11] As such, "[qualitative] [c]ontent analysis can suffer from bias in inference."[12] This is particularly true for when the content analysis involves "manual coding," which is more prone to measurement error than computer coding.[13] Thus, the literature heavily favors a formal content analysis that is quantitative due to its inherent design and purpose to objectively select and measure interest in topics as a form of aggregated market-based evidence.

The literature stresses content analyses should be premised on "classification rules" "developed using [] pre-test sample[s]," or a pre-sample analysis, which are "validated for internal consistency and reliability"—that is, the categories forming the basis of the analysis are derived

---

[8] *See* Tabak, Fatale Decl. **Ex. M** at 7.

[9] *See id.* Tabak notes that even in this scenario a quantitative analysis could be too subjective if, for example, "the coders may have been told to count *references* to each candidate in newspaper headlines rather than be asked to look only for names." *Id.* at 7 n.18 (emphasis added).

[10] *See id.* at 7.

[11] *See id.* at 6.

[12] Jones, Fatale Decl. **Ex. J** at 3; Smith, Fatale Decl. **Ex. L** at 638.

[13] Jones, Fatale Decl. **Ex. J** at 3.

3

from the pre-sampling that is thoroughly tested.[14] The literature encourages this approach to avoid tainting the end product with the "hidden feelings or affects of the authors."[15]

### B.   Ms. Allen's Content Analysis

The Allen Report contains, according to Ms. Allen, a "content analysis of the analyst reports on Concho following certain of the alleged misstatements and the alleged corrective disclosure." Allen Report at 4, ¶8. As part of this analysis, Defendants' counsel provided Ms. Allen three sets of pre-grouped statements from the Complaint.[16] Allen Dep. at 28:18–22. Ms. Allen was instructed to analyze these statements only. Allen Report at 4–5, ¶9; Allen Dep. at 112:16–115:2. Ms. Allen was then asked to "code answers" while reviewing these Categories against highly subjective questions pre-drafted by defense counsel.[17] Allen Report at 4–6, ¶¶8-14; Allen Dep. at 28:2–4. Given the subjective nature of the questions that focus on the context of the analyst reports and misstatements, Ms. Allen's content analysis is a qualitative, not a quantitative one.[18] Because the categories and questions were pre-drafted by defense counsel, Ms. Allen did not perform traditional pre-sample analysis to stress test the accuracy of the Categories.[19] Allen Dep. at 70:14–18. Finally, Ms. Allen did not fully read the Complaint, nor did she fully read (or even look at) every analyst report cited to in her analysis. *Id.* at 214:23–215:5, 252:15–25.

---

[14] Smith, Fatale Decl. **Ex. L** at 637.

[15] Breton, Fatale Decl. **Ex. H** at 93–95.

[16] The "Categories" are: (i) Category A: "Generic" Misstatements; (ii) Category B: "Results and Observations from 2017 and 2018" Misstatements; and (iii) Category C: "Pre-2019 Projections" Misstatements. Allen Report at 4, ¶9.

[17] Ms. Allen cannot recall whether she proposed to defense counsel any edits to the questions. Allen Dep. at 98:3–7.

[18] *See supra* n.5 on differences between the analyses. Although Ms. Allen does not even know the difference between the two in the context of content analysis. Allen Dep. at 54:3–55:2.

[19] Instead, the only preparatory work undertaken by Ms. Allen's staff was to run a few tests to estimate how long the entire process would take. Allen Dep. at 70:14–71:11.

Ms. Allen has cited to no peer reviewed literature endorsing her approach. Instead, what appears to be the closest reference is a cited NERA-published article penned by her colleague and frequent defense expert, David Tabak. Allen Report at 6, ¶15 n.6, 9; Allen Dep. at 225:23–227:11, 266:20–267:5. However, Mr. Tabak's article makes no mention, let alone endorses, the use of categories and questions created by defense attorneys to run a "match" analysis between analyst reports and earlier-in-time statements. Mr. Tabak's article concerns quantitative analyses (strongly cautioning against the qualitative), finding their value proposition limited to where they "supplement … an event study,"[20] or "where an event study is not sufficient or even possible."[21] According to Mr. Tabak, "formal content analysis is generally not a staple in securities litigation,"[22] whereas event studies are "the standard by which most expert analysis of damages and loss causation proceeds in securities fraud cases today."[23]

As applied, Allen's methodology utilized two pairs of reviewers, or "coders," to code answers to defense counsel's questions. Allen Report at 7, ¶16; Allen Dep. at 56:24–57:5. Ms. Allen claims her staff were given instructions on what to code and how to code. Allen Dep. at 56:15–23. However, the coders did not use any traditional content analysis coding software for this process. *Id.* at 63:6–13. Nor were they provided with specific written instructions or guidance.

---

[20] Tabak, Fatale Decl. **Ex. M** at 12.

[21] Tabak, Fatale Decl. **Ex. M** at 1. Here, however, Ms. Allen essentially testified that her event study was sufficient and complete. Allen Dep. at 272:13–273:15. Moreover, Tabak notes two instances where event studies might be insufficient: (i) when an event study cannot be performed on a date where nothing was announced; and (ii) where additional steps are necessary if one is to isolate the effect of a particular statement in the news. Tabak, Fatale Decl. **Ex. M** at 4. Here, Ms. Allen was able to perform an event study considering the corrective disclosure and was told not to conduct a disaggregation analysis on the date of the corrective disclosure. Allen Dep. at 270:8–271:4. Nonetheless, Ms. Allen believes the corrective disclosure was based on company-specific, bad news related to the company's forecasts and guidance cuts. *Id.* at 271:5–272:12, 275:5–17. Thus, there is absolutely no reason for her to conduct a content analysis, either qualitatively *or* quantitatively, in this case according to Tabak.

[22] Tabak, Fatale Decl. **Ex. M** at 10.

[23] Tabak, Fatale Decl. **Ex. M** at 4.

*Id.* at 59:8–12, 60:4–6.[24] The only testimony offered to Lead Plaintiffs regarding the coding was uselessly broad and general. *Id.* at 59:4–62:5.

When the two coders reached different results, Ms. Allen claims the pair would resolve the discrepancy by "talk[ing] to each other, look[ing] at the document, and then see[ing] if … one of them had … missed something or made an error." *Id.* at 58:7–18, 64:22–65:13. If unresolved, the issue would be escalated to Ms. Allen or even the full team. *Id.* at 65:6–13, 66:18–67:3. Ms. Allen has no written records showing what the known error rates are and does not know how many discrepancies existed. *Id.* at 68:4–11. Nonetheless, Ms. Allen "guess[ed] maybe ten" discrepancies between coders were escalated to her but she had no idea how many discrepancies were resolved prior to escalation. *Id.* at 68:12–70:13. Relatedly, given this specific content analysis and its apparent novelty, the Allen Report fails to mention an error rate and, despite being requested, no documentation regarding the mechanics of this unique coding process were produced.[25]

Similar to the lack of recordkeeping, Ms. Allen revealed during her deposition that she considered news articles which were not listed on her materials considered list provided to Lead Plaintiffs. Allen Dep. at 73:13–76:14. She testified she had "no good reason" for their exclusion. *Id.* at 74:16–21. Given there are approximately 2,000 new articles on Concho during the relevant evaluation period, it is unclear the number of, and type of review, Ms. Allen performed. *Id.* at 74:22–75:6, 76:6–24; Fatale Decl. **Ex. D**, Coffman Report at 17 n.39.

---

[24] Ms. Allen did testify that coders were trained to code through NERA but said whatever materials they used are not available for production to Lead Plaintiffs. Allen Dep. at 59:24–61:2

[25] *See* Fatale Decl. **Ex. G**, Lead Plaintiffs' Requests for Production Nos. 1 and 15, served on March 20, 2024, and Request for Production No. 1, served on June 20, 2024. Please note that counsel for the parties agreed to serve expert document requests via email in lieu of formal subpoenas.

Ms. Allen also discovered substantial errors in the Allen Report during her deposition. Specifically, according to her testimony, Question 14D for Category C should have been an entirely different question. Allen Dep. at 102:13–103:18. Ms. Allen further admitted, and the Allen Report indicates, that this mistake was carried into her analysis in Appendix D and repeated numerous times. *Id.* at 105:17–21, 108:20–24, 230:6–17; Allen Report Appendix D 79-87.

## V.     LEGAL STANDARD

Federal Rule of Evidence 702 "charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002); Fed. R. Evid. 702. "[E]xpert testimony is admissible only if it is both relevant and reliable." *Pipitone*, 288 F.3d at 244.

The burden is on the offering party, *i.e.*, the Defendants, to prove reliability by a preponderance of the evidence. *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012); *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). When assessing reliability, courts consider: (i) whether a theory or technique can be tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) the known or potential rate of error; (iv) the existence and maintenance of standards and controls; and (v) general acceptance of the theory in the scientific or expert community. *Daubert,* 509 U.S. at 593–95.

Expert testimony may be excluded upon successful reliability challenges. *See id.* at 589–90. Such challenges to the reliability of the principles and methodology are properly made at class certification in the Firth Circuit. *See Ga. Firefighters' Pension Fund v. Anadarko Petroleum*

*Corp.*, 99 F.4th 770, 774-75 (5th Cir. 2024). The Court may exclude testimony "that is connected to existing data only by the *ipse dixit* of the expert" or where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## VI.   ARGUMENT

### A.   The Foundation of Ms. Allen's Content Analysis Is Fatally Flawed Because It Is Impermissibly Lawyer-Driven and Fails Every *Daubert* Factor

***Lawyer Driven.*** The Categories and questions were all provided by defense counsel *ab initio*, meaning the contours of Ms. Allen's analysis were pre-determined.[26] *See* Allen Report 4–5, ¶¶8–9; Allen Dep. at 28:2–4, 28:18–22; *Quintel Tech. Ltd. v. Huawei Techs. USA, Inc*, 2018 WL 626355, at *9 (E.D. Tex. Jan. 30, 2018) ("Experts must undertake their own analyses and may not blindly rely on the opinions of others."). Ms. Allen could not even provide basic information regarding the thought process behind the Categories and questions, merely that she followed orders. *See* Allen Dep. at 115:15–116:4,125:19–126:24; *Chen-Oster v. Goldman, Sachs & Co.*, 2022 WL 814074, at *6 (S.D.N.Y. Mar. 17, 2022) (excluding content analysis where expert did "not provide a sufficient explanation as to how she decided on the terms used in the content search, and, more importantly, why she classified the terms into the different categories"). In sum, the Allen Report was "at best an effort to synthesize Defendants' positions and present them summarily as an expert opinion." *MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, 2007 WL 150606, at *4 (S.D. Tex. Jan. 16, 2007); *see also Seitz v. Envirotech Sys. Worldwide Inc.*, 2008 WL 656513, at *2 (S.D. Tex. Mar. 6, 2008) (counsel's preparation of expert opinion "conflicts with … requirement that the expert 'prepare' the report.").

---

[26] In addition, Ms. Allen also testified that the Appendix C was also generated by Defendants' counsel, leaving only her CV and Appendix B as the only set of documents that presumably were not generated, in part, by Defendants' counsel. Allen Dep. at 29:9–30:13.

***Cannot Be Tested.*** The process for Ms. Allen's content analysis lacked any uniform or documented analytical framework and no records were kept of the individual coder's review methodology or discrepancies. Allen Dep. at 59:4–62:5, 68:4–70:13, 230:20–232:6; *see Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 601–02 (S.D. Tex. 2001) ("A theory that is untestable is unfalsifiable and [has] no practical value in the courtroom."); *Vazquez v. Aguilera*, 2022 WL 2292888, at *8 (S.D. Tex. Mar. 25, 2022) (testimony is unreliable when "it is not supported by any explanation"). As discussed *supra* Section IV.B. at 4, Ms. Allen did not conduct a pre-sample analysis given the architecture of her content analysis was prefabricated, leaving a void where one would typically test the process by which categories were developed. Similarly, there are no records of the specific documents reviewed by her staff nor any search terms or other methods they employed. Allen Dep. at 59:4–62:5, 68:4–70:13, 230:20–232:6; *see also Burkett v. Aztec Well Fam.*, 2022 WL 17418522, at *4 (W.D. Tex. Nov. 1, 2022) ("Because [the expert] did not make a record of the search terms she employed, nor the search engines she used and how thoroughly she searched their results, the Court would be remiss to open the door to expert witnesses utilizing such lax methodologies.").

Further, given the inherently subjective nature of the questions posed by Defendants' counsel, which involved "judgement call[s]" by the coders on what analysts "seemed to imply," objectively recreating the analysis is impossible. *See* Allen Dep. at 134:12–135:12; *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 644–45 (S.D.N.Y. 2016) (expert's methodology was unreliable where it could not be "tested or challenged in any objective sense." "[I]t [is] impossible for a court or adversary to test—or a jury to assess—[the] methodology, as applied here, for veracity and reliability."). Ms. Allen admitted that "no further instruction" was given to coders outside of the plain text of the questions. Allen Dep. at 159:7–

9

160:12, 168:5–7. This lack of uniformity is even more troubling given Ms. Allen's own inability to provide an economic explanation for key terms and phrases in the very questions she was tasked to answer.

For instance, Ms. Allen could not provide her own economic explanation for what constituted a "generic" statement in Category A.[27] With respect to questions whether a "misstatement *caused* the analyst to change its valuation," Ms. Allen testified she "*think*[s] it means that there's a causal link," *e.g.*, "if there is a change in the valuation, could it be that the misstatement was the cause for that change … or does the analyst say the reason for the valuation change."[28] Allen Dep. at 130:8–131:7. Ms. Allen at first could not define "learned," *id.* at 158:24–159:11, then later speculated an analyst could "learn" a misstatement was inaccurate or misleading if "[n]ew information… come[s] out" that indicates the prior statement was false. *Id.* at 160:16–165:11. Similarly, Ms. Allen at first could not define "made a connection" in the context of her questions, *id.* at 166:16–169:10, stating she "***do[esn't] know what [it] means to make a connection.***" *Id.* at 171:4–9 (emphasis added).

With respect to the questions that asked whether "the report reference[s] the alleged misstatement[,]" Ms. Allen defined "reference" as "appear[ing] to be saying something similar to the alleged misstatement" and "similar" as "words that were the same or … that had similar

---

[27] Regarding the term "generic," during her deposition, Ms. Allen asserted that she used the term in the Allen Report "only in response to Mr. Coffman [and that] [her conclusion] holds regardless of that term." *Id.* at 95:19–23. However, Mr. Coffman never used the term in his opening report. Instead, the term was first used by Ms. Allen in the Allen Report. Allen Report at 9, ¶21; Allen Dep. at 186:18–187:9. Ms. Allen claimed that her analysis "does not depend on categorization of [the] term [generic]," yet Category A is entirely devoted to the term and Ms. Allen admitted that Category A's analysis was different than Categories B and C. Allen Dep. at 188:3–4; 101:3–18.

[28] Ms. Allen also acknowledged the following: (i) no one from NERA interviewed the analysts; (ii) analyst could learn new information then omit that information from their report; (iii) that analysts do not always provide the reasons for their analysis; (iv) analysts could decide to change their price targets yet the market still reacts; and (v) analysts could have conflicts of interest and inherent bias. *Id.* at 77:21–25, 164:15–22, 134:21–23, 128:05–128:22, 166:10–15, respectively.

meaning." *Id.* at 137:17–138:14. Ms. Allen asserted "reference" is different than "relate," which she characterized as "too ambiguous[,]" "too general[,]" "not helpful," and "not specific enough." *Id.* at 139:4–141:4. When informed of a Southern District of Texas case, *Cabot* (a case she was retained in), found the appropriate standard is "relevant to" or "related to," Ms. Allen balked at the possibility claiming that would mean everything is related in this case based on her review. *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2023 WL 6300569, at *10 (S.D. Tex. Sept. 27, 2023); Allen Dep. at 141:5–23, 142:21–144:15. Specifically, Ms. Allen claimed "every single statement in every single analyst report relates to each other in some way," Allen Dep. at 140:16–20, she could not "believe that the term relate … is enough[,]" *id.* at 141:11–16, and the term "relate" was inconsistent with her interpretation of *Goldman Sachs Grp., Inc. v. Ark Tchr. Ret. Sys.*, 594 U.S. 113 (2021) ("*Goldman*"). *Id.* at 141:5–18; *but see Cabot*, 2023 WL 6300569, at *10 (noting any "mismatch" analysis between the corrective disclosure and misrepresentations need not "precisely mirror," but rather "relate[] to" or be "relevant to," one another).

**_Not Subject to Publication or Peer Review._** Ms. Allen has provided zero citation to peer reviewed literature that supports her novel approach, *i.e.*, qualitatively matching post-disclosure analyst reports to earlier-in-time alleged misstatements using *Goldman* and pre-determined grouped categories and questions drafted by attorneys.[29] *Knight*, 482 F.3d at 351, 355 (rejecting the expert testimony "not … subjected to peer review, published, or tested"). Nor does the literature contemplate a content analysis premised on pre-supplied categories and questions, using subjective qualifiers in the questions to be answered such as whether analysts "made a connection" between misrepresentations and corrective disclosures.

---

[29] Two citations in the footnotes associated with support for Ms. Allen's content analysis, *see* Allen Report at 6, ¶15 n.6–7, are textbook with no specific citation. Upon questioning, Ms. Allen testified that the books were cited generally. Allen Dep. at 228:2–229:3.

***No Known Potential Error Rate.*** Ms. Allen has provided no information regarding an error rate for her content analysis. *See Daubert*, 509 U.S. at 594 (noting that "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error," for example, by "surveying studies of the error rate"); *U.S. v. Angleton*, 269 F. Supp. 2d 892, 902 (S.D. Tex. 2003) (methodology with an "unknown" error rate or an error rate that "may vary considerably" insufficient). Whereas the literature cited to by Ms. Allen encourages the use of two independent researchers synthesizing a word list from a pre-sample into analytical categories, which list is then measured against the initial conceptualized analytical structure to measure accuracy, Ms. Allen simply followed defense counsel's orders. Allen Dep. at 28:2–4, 28:18–22, 70:14–18, 112:16–115:2; Breton, Fatale Decl. **Ex. H**, at 95.

Ms. Allen has provided no documentation on error rates, the method of coding, the use of terms, and other procedures allegedly used. Allen Dep. at 59:4–62:5, 68:4–70:13, 230:20–232:6. Ms. Allen testified at her deposition that there was a less than 1% error rate yet that is neither disclosed in the Allen Report nor based on any supporting evidence; rather she testified that (i) she has no personal knowledge of first level discrepancies; (ii) she did not recall details of the process for second level discrepancies; (iii) she did not provide instructions to the coders; and (iv) the only instruction she gave the coders, the literal questions, were unclear to her. *Id.* at 59:4–62:5, 59:8–12, 60:4–6, 65:6–13, 66:18–67:3, 68:12–70:13, 115:15–116:4, 125:19–126:24, 158:24–159:11, 171:4–9. Moreover, as noted above, Ms. Allen's qualitative analysis is too subjective to test. *See supra* Section VI.A. at 9–11.

***No Standards or Controls.*** As shown during her deposition, the metes and bounds of Ms. Allen's content analysis were neither clear nor uniform. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (stating that, with respect to an expert's particular methodology or

12

technique, the court is to observe whether the methodology has applicable "standards controlling the technique's operation."). As explained *surpa* Section IV.B. at 4-7, Ms. Allen materially deviated from the literature on which she cited. Her team of assistants were given total freedom in what to review and how to review it. Allen Depo. at 59:4-12. Further, the reliance on the counsel-supplied questions rife with subjective terms such as "learned," "made a connection," or "referenced," absent a defined rubric as to how a statement might satisfy those terms showcases Ms. Allen's content analysis as terminally subjective—more akin to a focus group than a true content analysis. Allen Depo at. 130:8–131:7; 137:17–138:14; 158:24–159:11; 160:16–165:11; 166:16–169:10; 171:4–9. In other words, qualitative instead of quantitative, something that the literature has cautioned and criticized with respect to content analysis. *See supra* Section IV.A. at 3-4. Sadly, Ms. Allen did not even realize that the questions she was asked to use wildly deviated from the legal standard (which she has no business utilizing) for whether causation between statements and loss exists under traditional methods. Allen Dep. at 137:17–138:14, 139:4–141:23, 142:21–144:15.

*No Widespread Acceptance.* Ms. Allen has failed to demonstrate that her novel analysis has any, let alone widespread acceptance, in the economic community. *See Daubert*, 509 U.S. at 594 (1993) ("'[A] known technique which has been able to attract only minimal support within the community' … may properly be viewed with skepticism."); *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*, 2009 WL 10674753, at *2 (W.D. Tex. Aug. 19, 2009) (rejecting the expert's testimony where "[t]he record. . . [was] void of any proof that this method . . . [was] generally accepted in the economics community"). Ms. Allen has pointed to no peer reviewed literature to support her unique content analyses. In fact, a brief review of the literature admonishes her fully subjective approach. *See supra* Section IV.A. at 3-4.

13

**B.      Ms. Allen's "Content Analysis" Is a Legal Analysis Under *Goldman***

Contrary to a traditional content analysis, which tracks mention of topics by certain sources, Ms. Allen takes a leap in her own direction by analyzing whether analyst reactions to the corrective disclosure "match" earlier alleged misstatements.[30] Allen Report at 12, ¶28; Allen Surreply at 9, ¶19. As explained *supra* Section V.A.1. at 5–7, there is no literature cited to by Ms. Allen in the Allen Report or Allen Surreply supporting a content "mismatch" analysis. This analysis instead appears entirely derivative of the *Goldman* arguments levied by Defendants in the Opposition. *See* Fatale Decl. **Ex. E**, Opposition (ECF No. 68) at 10–12, 14–18; *see also* Fatale Decl. **Ex. F**, Reply (ECF No. 80) at 4–11 (explaining *Goldman*). Thus, it seems Ms. Allen has performed a novel *Goldman*-esque match analysis at the direction of counsel, a legal conclusion an expert may not render. *See Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) ("Allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant."); *Smith v. City of Bastrop*, 2021 WL 148061, at *5 (W.D. Tex. Jan. 15, 2021) (same). Her match analysis was also premised on the wrong standard. *See Cabot Oil*, 2023 WL 6300569, at *10 ("corrective disclosures need not 'precisely mirror' misrepresentations…the two need only be 'related to' or 'relevant to' one another"); Allen Dep. at 140:16–20, 141:5–23, 142:21–144:15.

**C.      Ms. Allen's Front-End Price Impact Analysis Is Irrelevant**

Ms. Allen's content analysis is not only unreliable under *Daubert* but also irrelevant. *See Daubert,* 509 U.S. at 589. Ms. Allen testified that the Category A misstatements also addressed front-end price impact. Allen Dep. at 181:3–6. However, Ms. Allen admitted both in the Allen

---

[30] During her deposition, Ms. Allen strongly denied she engaged in a mismatch analysis. However, later during her deposition she would recant this statement when presented with the Allen Report, which expressly stated it was determining whether there was a "mismatch" or whether earlier statements were "tied to" the corrective disclosure. Allen Dep. at 219:4–8; Allen Report at 12, ¶28; Allen Surreply at 9, ¶19.

Report and during her deposition, that front end price impact analysis was irrelevant because Lead Plaintiffs rely on an inflation-maintenance theory. Allen Report at 17, ¶40; Allen Dep. at 200:8–201:3. Specifically, Ms. Allen acknowledged that when a plaintiff relies on such a theory, then front price impact analysis is irrelevant. Allen Dep. at 203:7–23, 205:5–13, 207:5–208:12, 209:16–21; *see Robinson v. Ethicon, Inc.*, 588 F. Supp. 3d 726, 731 (S.D. Tex. 2022) ("Even if the expert is qualified and the basis of her opinion is reliable, the underlying methodology must have also been correctly applied to the case's particular facts for her testimony to be relevant."). Thus, it is no surprise that Ms. Allen was recently criticized by Judge Gettleman from the Northern District of Illinois for assessing front-end price impact when price inflation increase was not alleged. *See In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at *4-5 (N.D. Ill. Dec. 21, 2020) ("Allen's first conclusion…fundamentally misunderstands plaintiffs' allegations and theory of the case…. Arguments that the stock price did not increase after the statements are therefore irrelevant…Allen erroneously conflates the lack of an increase with the lack of inflation. Her first argument consequently fails to rebut the *Basic* presumption in light of plaintiffs' inflation maintenance theory.").

**D.    Ms. Allen's Opinions and Testimony on Common Damages are Unsupported and Tainted with Error**

Ms. Allen's opinions regarding damages calculations in cases involving materialization of the risk is based on impermissible legal conclusions and the wrong legal standard. First, Ms. Allen merely parrots defense counsel's (incorrect) ***legal*** conclusion that Lead Plaintiffs rely on a materialization of the risk theory. Allen Report at 26, ¶59; Allen Surreply at 13–15, ¶¶29–32. Ms. Allen cites to no literature or other support—she offers nothing beyond mere recitation of Defendants' purely legal argument and makes no effort to even disguise this as an expert opinion. For this reason alone, Ms. Allen's bald assertion that Lead Plaintiffs allege a materialization of

the risk theory should be stricken. *Texas Peace Officers v. City of Dallas*, 58 F.3d 635, 635 (5th Cir. 1995) (per curiam) (affirming lower court's exclusion of expert testimony that "state[d] a legal conclusion"); *Smith,* 2021 WL 148061, at *5 ("An expert witness is not allowed to opine on legal conclusions that should be drawn from the evidence, which 'both invades the court's province and is irrelevant.'").

Second, when Ms. Allen was pressed at her deposition, she could not even articulate what a materialization of the risk theory entails, arguing that only where the risk made manifest was so alien, so purely aberrational, would a case fall outside the bounds of materialization of the risk. Allen Dep. at 303:6–304:15, 310:6–316:24. According to Ms. Allen, omissions or outright lies may still be classified as materialization of the risk. *Id.* Incorrect. *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 304–05 (S.D.N.Y. 2011) (collecting cases).

Ms. Allen's opinion regarding Concho's acquisition of RSP (the "RSP Acquisition") is equally unsupported. First, it was laid bare during her deposition how little she understood Lead Plaintiffs' claims—opining that the RSP Acquisition is a key part of the alleged fraud (as opposed to a transaction that took place adding many new putative class members). Allen Dep. at 328:20–329:25. Allen completely ignores Mr. Coffman's criticisms that Ms. Allen's opinions on commons damages for the RSP holders has no economic support in the literature. Coffman Rebuttal at 43, ¶79. When pressed at her deposition, she could still not cite support for her conclusion. Allen Dep. at 322:2–327:21, 328:15–329:25. Simply put, Ms. Allen betrays the simple economic principles that control premiums are uniformly paid in acquisitions, and do not cancel out securities damages where the acquisition price is paid in inflated shares.[31] There is absolutely no precedent for such netting and it makes no economic, logical, or legal sense.

---

[31] Allen's logic otherwise would result in economic encouragement to defraud. For example, assume Company A is worth $5 per share independently and worth $10 per share if combined with Company B. Assume further that

16

### E.    Ms. Allen Failed to Disclose All Materials Considered

Ms. Allen has admitted she failed to include all materials considered, which is further grounds for exclusion.[32] Experts must disclose "the facts or data *considered* by the witness in forming them," Rule 26(a)(2)(B)(ii), "to provide opposing parties reasonable opportunity to prepare for effective cross examination." *Calsep A/S v. Intelligent Petroleum Software Sols., LLC*, 2020 WL 1321521, at *2 (S.D. Tex. Mar. 17, 2020). Absent substantial justification or harmless error, a failure to include all materials considered is grounds for exclusion. Rule 37(c)(1); *see also Estevis v. City of Laredo*, 2023 WL 9312081, at *9 (S.D. Tex. Dec. 28, 2023). To determine whether such disclosure violation is harmless, courts look to the: (i) justification for the failure; (ii) the importance of the information and testimony; (iii) prejudice; and (iv) the availability of a continuance. *See Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990).

Ms. Allen failed to include all the news articles she allegedly reviewed in her materials considered list and now cannot recall any specifics about that review to the detriment of Lead Plaintiffs. Allen Dep. at 73:13–76:24. Allen could not justify her disclosure violation and even admits there was no "good reason" for the failure. Allen Dep. at 74:16–20 ("Q. Is there any particular reason why [the news articles] are not contained in the materials considered list? A. No, I don't think there is a good reason."); *see Sanson v. Allstate Texas Lloyds*, 2018 WL 3736362, at *3 (E.D. Tex. Aug. 6, 2018) (noting that a one sentence "clerical error" from

---

company A and company B negotiate a merger price of $7.50 so that each party shares in the benefits of the merger. Company B therefore pays Company A $7.50, which is a $2.50 per share "premium" over its prior value. Ms. Allen's argument effectively says that since shareholders of company A are getting a "premium" of $2.50, Company B can commit securities fraud against shareholders of company A up to $2.50 per share without any liability (because she argues for netting the premium against damages).

[32] Ms. Allen misconstrued "considered" and "reviewed" as different. *See* Allen Dep. at 12:11–13:4. The case law plainly states those terms have the same meaning under these circumstances. *See, e.g.*, *Calsep*, 2020 WL 1321521, at *2 (S.D. Tex. Mar. 17, 2020) ("'For Rule 26 purposes, a testifying expert has considered data or information if the expert has read or reviewed the privileged materials before ... formulating his or her opinion.' . . . Under this rule, material that an expert reviewed must be disclosed, regardless of whether the expert relied on it if the documents have some 'relation to the expert's role as a witness.'") (internal citations omitted).

17

"oversight" caused a party to violate federal and local rules and finding that factor weighted in favor of exclusion).

Ms. Allen's disclosure violations have and will prejudice Lead Plaintiffs. Specifically, Lead Plaintiffs have unknowingly responded to the Allen Report on an incomplete record and cannot properly test the validity of Ms. Allen's opinions without an accurate account of the materials she considered. *Calsep*, 2020 WL 1321521, at *2 ("Information that an expert considered, but did not rely on, can be important to understanding and testing the validity of the expert's opinion."). For example, Ms. Allen admitted at her deposition that news articles can cause price movements and the "market can move independent of analysts."[33] Allen Dep. at 73:10–12, 87:16–17. Thus, Ms. Allen's failure to disclose media reactions to the corrective disclosure prevents Lead Plaintiffs and this Court from determining whether the mix of news coverage would have impacted her analyst-based content analysis considering that there are approximately 2,000 news articles covering the relevant time period. Coffman Report 17 n.39. Finally, a continuance would not cure these issues due to Ms. Allen's failure to provide any detail of the missing materials and analysis. Ms. Allen cannot recall the specifics of the news article review. *Barnes v. BTN, Inc.*, 555 F. App'x 281, 285 (5th Cir. 2014) (exclusion of expert witness where proffering party did not explain failure to comply with Rule 26, and said party had "ample opportunity" to comply with Rule 26).

---

[33] "[T]here is no absolute construct of relevance and reliability that can be gleaned from association with equity values. What is relevant for one user or user group, may not be relevant for another. This creates a problem in drawing inferences based on value-relevance research … ." Robert W. Holthausen & Ross L. Watts, *The relevance of the value-relevance literature for financial accounting standard setting*, 31 J. OF ACC. & ECON. 3, 26 (2001), Fatale Decl. **Ex. I**.

18

**F.        A Material Mistake Compromises the Reliability of Ms. Allen's Opinions**

During the course of her deposition, Ms. Allen discovered widespread and fundamental mistakes in the Allen Report and supporting appendices. Allen Dep. at 102:13–105:3; *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (expert excluded as unreliable where he, among other things, provided a table that contained "miscalculations"); *Loy v. Rehab Synergies, LLC*, 558 F. Supp. 3d 402, 409–10 (S.D. Tex. 2021) (testimony that "misapplies th[e] methodology" imposed is inadmissible). As part of her content analysis, Ms. Allen was asked "to code answers to the specific questions" for each category of misstatements listed in the Report, but question 14d pertaining to Category C was listed as entirely the wrong question.[34] Allen Report at 4–6, ¶¶11-14. As Ms. Allen admitted, this incorrect question carried into the results of her content analysis in Appendix D, being repeated an alarming eighteen times in her results for Category C. Allen Dep. at 105:17–21, 108:20–24, 230:6–17; Allen Report Appendix D 79-87. Ms. Allen could not provide any justification for these troubling errors. Allen Dep. at 230:6 ("Q. Do you know where that [error] came from? A. I'm not sure honestly. It was – I don't know. It sort of is like a jumble of different things. I'm not sure how that happened."). The Allen Report should be excluded because Ms. Allen's mistakes undermine the reliability of her analysis and conclusions. *In re Silica Prod. Liab. Litig.*, 398 F. Supp. 2d 563, 621 (S.D. Tex. 2005) ("The party proffering the expert testimony has the burden of 'demonstrat[ing] that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable.'"). The apparent consequence of Allen's "typo" is that by Ms. Allen's own admission the Allen Report and supporting appendices

---

[34] Specifically, Allen disclosed that on page six of the Report under Category C: "Pre-2019 Projections" Misstatements, Question 14D should have asked "Does the report reference the event (earnings release, earnings/investor call, analyst conference or SEC filing) that contains the alleged misstatement other than in tables showing prior results?" Instead, the question incorrectly reads "Does the report reference the forecasted item (e.g. '2018 budget,' '2018 crude oil growth,' '2018 capital investment') that contains the alleged misstatement other than in tables showing prior results?" Allen Dep. at 102:13–105:03; Allen Report at 6, ¶14.

19

are an incorrect reflection of her content analysis and cannot be relied upon.[35] Allen Dep. at 108:20–24.

## VII.    CONCLUSION

For the foregoing reasons, the Court should grant Lead Plaintiffs' motion to exclude the opinions and testimony of Lucy P. Allen in their entirety.

DATED: August 16, 2024                    Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III (*pro hac vice*)
Joseph N. Cotilletta (*pro hac vice*)
Charles Wood (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
jcotilletta@labaton.com
cwood@labaton.com

*Lead Counsel for Lead Plaintiffs and the Class*

---

[35] *Whitney Nat. Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*, 516 F. Supp. 2d 802, 817 (S.D. Tex. 2007) ("Incorrect assumptions critical to an expert's opinion make that opinion unreliable."); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 (5th Cir. 1998) (expert's reliance on inaccurate information rendered testimony unreliable). At minimum, however, Appendix D is wholly compromised by erroneous data and must be excluded. *U.S. ex rel. Barron v. Deloitte & Touche, LLP*, 2008 WL 7136869, at *4 (W.D. Tex. Sept. 26, 2008) (excluding expert's damages calculations "riddled with serious mistakes[,]" because "the data upon which [the expert] relied in forming an opinion . . . is so unreliable and lacking in probative force that no reasonable expert could base an opinion upon them" and "nothing in Rule 703 requires a court to admit an opinion based on facts that are indisputably wrong"); *E.E.O.C. v. Freeman*, 778 F.3d 463, 466–67 (4th Cir. 2015) (affirming exclusion of expert report that was "rife with analytical errors" and "completely unreliable" because "[t]he sheer number of mistakes and omissions . . . render[ed] [the analysis] 'outside the range where experts might reasonably differ'").

## CERTIFICATE OF CONFERENCE

On August 13, 2024, counsel for the parties conferred virtually via Microsoft TEAMS regarding the relief requested in this motion. The meeting was attended by Joseph Cotilletta, Charles Wood, Robert Rowley and Murray Fogler on behalf of Plaintiffs, and Amy Hefley and Virginia DeBeer on behalf of Defendants. On the call, Counsel for Defendants indicated they would oppose the motion.

*/s/ Joseph N. Cotilletta*
Joseph N. Cotilletta

## CERTIFICATE OF SERVICE

I certify that on August 16, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Notice of Electronic Filing.

/s/ Alfred L. Fatale III
Alfred L. Fatale III