# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

Case number 4:21-CV-02473

----------------------------------------X

IN RE CONCHO RESOURCES INC.,

SECURITIES LITIGATION

----------------------------------------X

DATE: July 11, 2024

TIME: 9:13 a.m.

VIDEOTAPED DEPOSITION of LUCY P. ALLEN, held at the offices of Baker Botts LLP, 30 Rockefeller Plaza, New York, New York 10112, before Roberta Caiola, a Court Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

LABATON KELLER SUCHAROW LLP
Attorneys for Lead Plaintiffs
and The Class
140 Broadway
New York, New York 10005
(212) 907-0700
BY: JOSEPH N. COTILLETTA, ESQ.
jcotilletta@labaton.com
CHARLES WOOD, ESQ.
cwood@labaton.com

BAKER BOTTS LLP
Attorneys for the Defendants
910 Louisiana Street
Houston, Texas 77002
(713) 229-1946
BY: AMY PHARR HEFLEY, ESQ.
amy.hefley@bakerbotts.com

A P P E A R A N C E S (Continued):

VINSON & ELKINS LLP
Attorneys for Defendants
Timothy Leach and C. William Giraud
Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
(214) 220-7823
BY: ROBERT RITCHIE, ESQ.
rritchie@velaw.com

ALSO PRESENT:
DEBBIE O'TOOLE, Videographer
U.S. Legal Support

PRESENT VIA ZOOM:
CHRISTOPHER ORJUELA, Intern
Labaton Keller Sucharow
WESLEY MANN, Law Clerk
Labaton Keller Sucharow

INDEX


| EXAMINATION OF LUCY P. ALLEN | PAGE |
|---|---|
| Mr. Cotilletta | 7 |


E X H I B I T S


| ALLEN | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of Lucy P. Allen, March 15, 2024 | 9 |
| Exhibit 2 | Sur-reply Report of Lucy P. Allen, June 19, 2024 | 10 |
| Exhibit 3 | Appendix B Materials Considered | 11 |
| Exhibit 4 | Expert Rebuttal Report of Chad Coffman, CFA May 8, 2024 | 276 |

Lucy P. Allen

THE VIDEOGRAPHER: We're on the record at 9:13 a.m. on July 11, 2024.

Audio and video recording will continue to take place until all parties agree to go off the record. Please note that the microphones are sensitive and may pick up whispering or private conversations.

This is the video-recorded proceeding of Lucy Allen, taken by counsel for the plaintiff, in the matter of Concho Resources Inc. Securities Litigation filed in the United States District Court, Southern District of Texas, Houston Division, case number 4:21-CV-02473.

The proceeding is being held at Baker Botts, 30 Rockefeller Plaza, New York, New York.

My name is Debbie O'Toole. I am the videographer on behalf of U.S. Legal Support located at 16825 North Chase Drive, Suite 900, Houston, Texas 77060. I am not related to any

Lucy P. Allen

party in this action, nor am I financially interested in the outcome.

The court reporter is Roberta Caiola on behalf of U.S. Legal Support.

Counsel, please state your appearance for the record, after which the court reporter will swear in the witness.

MR. COTILLETTA: Joseph Cotilletta on behalf of plaintiffs, with Labaton Sucharow.

MR. WOOD: Charles Wood on behalf of plaintiffs, with Labaton Sucharow.

MS. HEFLEY: Amy Hefley with Baker Botts, on behalf of defendants.

MR. RITCHIE: And Robert Richie of Vinson & Elkins, on behalf of defendants Timothy Leach and William Giraud.

LUCY P. ALLEN, a witness herein, having been first duly sworn, was examined and

Lucy P. Allen

testified as follows:

EXAMINATION BY

MR. COTILLETTA:

Q. Good morning, Ms. Allen. How are you?

A. Fine. Thank you.

Q. I'm Joe Cotilletta. I'm going to be asking you questions today in the Concho case. In that case, you have been retained as an expert; correct?

A. That's right.

Q. And the defendants retained you; correct?

A. That's correct.

Q. Did all of the defendants retain you?

A. I don't know.

Q. Okay. I know this isn't your first deposition, so I will kind of skip the ground rules, except, if you don't understand a question that I've asked, or you can't hear me, can you please ask me to either repeat the question or to rephrase it?

Lucy P. Allen

A. Yes.

Q. Thank you. Because one important thing is if, you know, down the road, if you claim you didn't understand a question, but you answered it and we moved on, you know, it will be taken that you understood it.

Do you understand?

A. Yes.

Q. Okay. It looks like you have some items you brought with you today?

A. Yes.

Q. What did you bring with you?

A. I brought a copy of my first report, my second report, Mr. Coffman's first report and Mr. Coffman's second report.

Q. Great. So what I would like to do at this point is, I know you brought your reports, and, instead of marking those, I will mark the reports that I have printed out.

So the first one I will hand to you, which I will mark as Plaintiffs' 1, or

Lucy P. Allen

Allen 1, is, for identification purposes, your opening expert report in this matter dated March 15, 2024.

(Allen Exhibit 1, Expert Report of Lucy P. Allen, March 15, 2024, marked for identification.)

Q. And I will represent to you that the opening report I just handed to you is your report up to the signature line. I broke out your other appendices and things for -- as exhibits.

But just looking at that exhibit, Exhibit 1, does that report contain all of your opinions that you've -- that you rendered -- your affirmative opinions you rendered in this matter?

A. So this is a copy of my report, except it does not include the appendices and it summarizes my opinions.

Q. Okay.

MR. COTILLETTA: I want to now also mark as Allen 2 your sur-reply report in this matter dated June 19, 2024.

Lucy P. Allen
(Allen Exhibit 2, Sur-reply
Report of Lucy P. Allen, June 19,
2024, marked for identification.)
Q. Okay. And I will represent to you again, it's your sur-reply report up to your signature.
And so I guess my question to you is, looking at both the sur-reply report in front of you and your opening report in front of you, taken together, does that contain all of the opinions you've rendered in this matter?
A. The two reports together summarize the opinions to date that I have in this matter.
Q. Okay. And when you say "summarize," what do you mean?
A. I mean it summarizes the opinions.
Q. Okay. But it summarized the opinions, we'll go over those opinions today; but, nonetheless, your opinions are in there, though, they're in -- affirmatively within the four corners of

Lucy P. Allen

the reports?
A. I believe the four corners of the report outline my opinions, as well as the bases for those opinions, as well as the materials that I relied upon and considered in forming those opinions.
Q. Okay. Actually, we're going to go to that next.
MR. COTILLETTA: Charlie, can you do me a favor? Can you please hand me tab 3?
If you can mark this.
(Allen Exhibit 3, Appendix B Materials Considered, marked for identification.)
Q. So I have handed you what's been marked as Allen 3, and, for identification purposes, it's Appendix B to your opening report.
It's my understanding that that is your materials considered for your opening report; is that right?
A. That's right.
Q. And does that list of materials

Lucy P. Allen

that's in Allen 3 contain all the materials that you reviewed in forming your opinions in your opening report?

A. It's all the materials that were considered in forming the opinions in my first report.

Q. Okay. Are there any materials that you reviewed that -- or looked at in -- withdrawn.

Are you drawing a distinction between "considered" and "reviewed"?

A. Yes.

Q. Okay. And why are you drawing a distinction between "considered" and "reviewed"?

A. I think there is a distinction. So it's my understanding that the federal rules require that all the materials that are considered be listed.

Q. Okay.

A. And a material can be considered; it could be something that, for example, counsel might have sent me, so I considered it, but it could be a -- it

Lucy P. Allen

could be a document that was not, in fact, reviewed in forming -- doing my analysis or forming my opinions.

Q. Okay. Forgive me, because I don't have your resume in front of me.

You don't have a law degree; right?

A. I do not have a law degree, that's correct.

Q. But from time to time, do you read court decisions?

A. I have read court decisions from time to time, yes.

Q. At any point in time in your career, have you reviewed any court decisions that may involve the obligations of an expert in discovery?

A. I think I have, yes.

Q. Have you ever come across any court decisions that discuss any differences between the terms "considered" and "reviewed," for purposes of material that an expert would look at?

A. I believe I have.

Lucy P. Allen

Q. Okay. Is it your opinion today that, as an expert in this matter, that -- that there is a difference between "considered" and "reviewed," and you're not obligated to provide us what you reviewed in connection with your opinions today?

MS. HEFLEY: Objection. Form.

A. So that's a compound question. It is my understanding that, yes, there is a distinction between "reviewed" and "considered," and "considered" is a broader than "reviewed."

So it's my understanding I have an obligation to include everything I considered, which is a broader category than everything that's reviewed.

So, in including everything that I have considered, since it is broader, it would necessarily include everything that I have reviewed.

So everything that has been reviewed, I have included, or intended to include, in my list of materials considered.

Lucy P. Allen

Q. Okay. And I appreciate that. And just to kind of clear that up.

Everything you've looked at prior to forming your opinions in your opening report in this case have been included in Appendix B to your opening report?

A. No, not everything that I have looked at. I mean, obviously, I've looked at things. I've looked at children's books when I was 3, so those are not included.

Everything I have looked at prior to doing this is not included. All the materials that were considered, including all the materials that were reviewed in preparing these reports or forming the opinions are listed.

Q. Okay. And then if I could draw your attention back to your sur-reply on -- it's Allen 2. If I can draw your attention, please, to section 3 on page 1 of that report.

Are you there?

A. Yes.

Lucy P. Allen

Q. Okay. And section 3 is titled "Materials Considered"; correct?

A. Yes.

Q. And that -- that -- it references your prior materials considered list that we just discussed; right?

A. Correct.

Q. And then, in addition to that list, there are four additional items listed out; right?

A. That's right.

Q. Okay. Does that list in section 3 contain all the materials that you considered in forming your sur-reply opinions?

A. Yes.

Q. Okay.

A. I mean, that is, yes.

Q. Okay. And so, taken together, looking at both the opening report and the sur-reply report, the list in section 3 contains -- of your sur-reply report contains all the materials that you considered in forming your opinions in this

Lucy P. Allen

matter; is that right?

A. So the list in -- I mean, I think section 3 mentions the materials considered in the first report. So I think that that would include everything then.

Q. Okay. I had a few questions about some of the footnotes in your opening report. If you can turn to Allen 1, please?

A. Sure.

Q. So, do you understand a distinction between materials an expert will consider in forming his or her opinions versus materials that the expert relied on in forming his or her opinions?

A. I -- yes, I think that can be a distinction. I think I can understand the distinction between those.

Q. Right. Like, for example, you can consider 100 different items, but only rely on five of them; right?

A. Yeah, I think that's true.

Q. Okay. And so what I'm trying to figure out is, out of the materials that

Lucy P. Allen

you considered, what you relied on, and I notice that you had footnotes in your report.

When you are providing a statement with a footnote, is it fair to say that footnote provides the support for the statement that precedes the footnote?

MS. HEFLEY: Objection. Form.

A. No, I don't think a footnote always provides the support for a statement. A footnote can add additional clarification or -- I mean, the difference between putting something in a footnote, to me, and putting it in the paragraph is that it's -- it may interrupt the flow of the paragraph and be more -- something you don't need to have directly in the paragraph that might be helpful to have if you want more information.

Q. Okay.

A. So, I mean, I feel there's a distinction between what you might want to put in a footnote versus what you might want to put directly into a paragraph; and,

Lucy P. Allen

you know, I try to make that decision based on what I think would be helpful, more helpful to the reader, I guess, is the -- you know, that's my understanding of footnotes versus -- versus putting something in the text.

Q. Okay. In situations in your reports in this matter where, you know, you give a statement or you say something and then you footnote it, and it has citations to literature or court cases; in those instances, do -- do the citations in the footnote act as the basis for what you're saying in the sentence?

A. I think that sometimes a footnote could be -- I have a quote, and the footnote could be the citation of where that quote came from.

So I have something in quotes and said, you know - I don't know - Mr. Coffman said something in his report, and then the footnote would have a citation of where exactly that quote could be found.

So that is sometimes what is in

Lucy P. Allen

a footnote.

Q. Are there footnotes in either of your reports in this matter that act as support or a basis for whatever you're saying that precedes the footnote?

A. I mean, I think the example I just gave, where I would say, you know, Mr. Coffman, in his report, said something, and then the footnote might give a -- a page or a paragraph where he said that.

So I think that does give support to the fact that Mr. Coffman had said that in his report, for example. I think -- I think I would have such a footnote. I can't recall offhand, but that seems like a likely footnote to be in -- in one of my reports.

Q. Out of all of the materials that you considered in this matter, are there any that you ultimately did not rely on in forming your opinions in this matter?

A. Yes, I think there are materials that were considered and were not relied upon.

Lucy P. Allen

Q. Can you -- we'll start off with just a few examples. Can you give me a few examples of that?

Just so I understand what you're looking at, you're looking at the materials considered list?

A. Yes, that's correct.

Q. All right. And what page are you on?

A. I'm just looking through it to try to find an example. I'm just not sure.

Q. Okay. Let me draw your attention to page 1 of the materials considered list, which is Allen 3. The first heading there says "Case documents and filings in this matter."

Is that correct?

A. Yes.

Q. If you go down to points 4 and 5 on that list, do you see that?

A. Yes.

Q. And one of them is "Memorandum And Recommendation, filed February 23 -- February 23, 2023."

Lucy P. Allen

Do you see that?

A. Yes.

Q. And then -- that's number 4; right?

A. Yes.

Q. And number 5 is "Order Adopting Memorandum And Recommendations," filed June 23, 2023"?

A. Yes.

Q. Okay. For those two items, did you -- you obviously considered them; right?

A. Yes.

Q. Okay. Did you rely on them in forming any of your opinions in this matter?

A. I don't think any of the conclusions or analyses or opinions depend on those case documents.

Q. Okay. Drawing your attention to page 3 of your materials considered?

A. Sure.

Q. Okay. And you will see from page 3 to page 4, starting at paragraph 82

Lucy P. Allen

and going through to paragraph 105, are items listed under the heading "Academic literature and textbooks on finance, securities, valuation and statistics."

Is that right?

A. Yes.

Q. Did you rely on all of these -- I'm just going to call it literature for the sake of the question.

A. Sure.

Q. So let me -- let me start over.

Did you rely on all of this literature in forming your opinions in this matter?

A. I don't know.

Q. Okay.

A. I don't know the answer to that. Many of these may be actually cited in my -- in my report.

Q. Okay. And that goes --

A. I believe a number of them are cited in my report, but just as I sit here, I don't know offhand.

Q. When you say "cited," if they

Lucy P. Allen

were cited in your report, that would be an obvious indicator that that would be an article that you relied on in forming your opinions?

A. It would be cited. I think you could say I relied upon it. I don't know that it means that my conclusion or opinion would be different, whether that article existed or whether that piece of it.

So relying on something -- if a conclusion relies on something, then I think one way you could think about that would be is, if you didn't have that conclusion or if that -- that piece of information was different, does that mean that your conclusion would be different?

So a number of these things, I may have cited them as examples of -- of principles or as examples of defining terms. So sometimes I use terms and I'll say, you know, say what a -- like, a term means and cite back to a basic textbook; but whether that term actually means that, or I have the exact same definition,

Lucy P. Allen

doesn't -- wouldn't be -- my conclusions don't rely on that.

So, these are likely almost all articles or texts that I have cited for one reason or another. And I could go through them and find out why I cited them. But I wouldn't say that my opinions rely on all of them, or that -- and I would certainly say that most of my opinions would not change, regardless of these particular cites.

Q. I want to draw your attention to page 20 of the materials considered list.

A. Okay.

Q. I want to draw your attention to the heading "Court decisions in other matters."

Do you see that?

A. Yes.

Q. And then in paragraph 667 to 677, you list a number of cases; correct?

A. Yes.

Q. Did you rely on all of these

Lucy P. Allen

decisions in forming your opinions in this matter?

A. These were ones that were cited. I wouldn't say that my conclusions rely on them. These are legal decisions.

So I may have said, for example, that, economically, this is something that happens, and courts have also noted that this happened and cited a decision, something along those lines.

But my opinions are not legal opinions. They are economic opinions.

Q. Okay. I'm going to ask you a series of questions, I'm going to be very careful, because I don't want to go into work product privilege or attorney -- well, work product privilege under the federal rules.

So I'm going to ask you a yes-or-no question, and then we'll take it from there.

Did you receive any assumptions from counsel?

A. I received assignments, so

Lucy P. Allen

questions that I was specifically asked to answer and address, but I don't -- I don't know that I would call them assumptions.

Q. Okay. So just to be clear, there wasn't an example, let's say, of an attorney emailed you with a hypothetical for you to consider?

A. So I had very specific questions that I was asked to do, and one was this content analysis where I was -- I had specific questions. But I don't recall being given assumptions.

Q. Okay. Again, I'm trying to be careful here. So -- and I don't want to get into the communications, other than, was -- when you say "the questions," are you talking about the questions that we'll get into in a little bit, but they're in your opening report?

A. That's right.

Q. Okay. And that's for categories A, B and C of your content analysis?

A. That's right.

Lucy P. Allen

Q. Okay. And those questions were generated by the attorneys?

A. Yes.

Q. Okay. Were those questions conveyed to you over email or written correspondence?

A. I believe they were -- it was verbal communication.

Q. Okay. So the questions were provided to you over the phone?

A. That's my recollection.

Q. Okay. And they were provided directly to you or someone on your team?

A. Probably me and members of my team at the same time is my -- but I don't have a specific recollection.

Q. Okay. I think you also note in your opening report that the categories A, B and C were provided by counsel as well; is that correct?

A. That's correct.

Q. Was that categorization provided to you verbally or in written form?

Lucy P. Allen

A. In written form.

Q. And how -- how was it provided in written form?

A. I believe through email, or attachment to email.

Q. Okay. Bear with me for one second.

I believe one of the appendices to your opening report has a table of misstatements. Actually, you have it right there in front of you. I think it's Appendix C; right?

A. Yes. Correct.

Q. Did you generate that table?

A. So we definitely got the categorization from counsel. Yes, this would have -- so, like, from the source is not something that we did. Like, that's terminology that came directly from counsel. But it's possible that we formatted it a little bit or -- you know, I don't know. The formatting looks -- I'm not sure.

Q. Okay. So you're not sure if

Lucy P. Allen

the table --

A. The actual information came from counsel. I don't know if we did some formatting of it to put it in this particular format.

So it fits -- it fits very neatly in my report, which looks like something that we might have spent a little bit of time doing, because it happens to fit nicely, but it may also be that that's exactly how counsel gave it to us, but I don't recall.

But the actual categorization of the -- the misrepresentations came from counsel; which misrepresentation was Category A and Category B. They gave us a definitive list, and that is nothing that we did anything with.

Q. Okay. Going back to the written communication regarding the categorization.

Was it more than one email?

A. I don't understand that question. We got the categor -- I

Lucy P. Allen

recall -- I believe this categorization was in an email.

Q. Okay. That was my question. It was -- was it -- you know, was it over a series of emails or just one email where you received this material?

A. This material, I believe, was in one email. But, I mean, I don't have a specific recollection of it.

Q. Okay. And without getting into the content of the email, was there -- was there words written in the body of the email, you know, the difference between, like, just attaching something and just saying "see attached," versus some sort of communication; but I don't want to know what the contents of the communications are.

MS. HEFLEY: You're kind of straying outside the scope. You've asked her the question and she told you we gave the document and categorization to her, and I think that's the extent you get to ask her.

Lucy P. Allen

Q. I'm just trying to figure out whether there was -- and I don't want to know what's in that email, but I was just wondering if there was a cover email associated with that communication?

MS. HEFLEY: Objection; asked and answered.

A. Not that I recall.

Q. We discussed earlier the opinions in your opening and sur-reply report.

Are you offering any opinions outside of those reports in this matter?

A. The reports are intended to cover my opinions. I mean, obviously, to the extent you ask me new information, then I might have new; but no, I don't have anything other than -- the reports are intended to cover the work and opinions that I have done to date.

Q. One thing I noticed about your -- both reports is -- and it's -- there's no requirement under the federal rules, but I'm just wondering.

Lucy P. Allen

You don't have a section that has, like, a summary of opinions. And I'm just curious, like, you know, if we were in front of the court today and the judge turned to you and said, what are your opinions in this matter? Could you point to portions of your opening report or sur-reply report to show the Court what exactly your opinions are?

MS. HEFLEY: Objection; form.

A. I could probably point to sections that summarize, that have more condensed summaries of portions of them.

So my first report, I'm asked to analyze three different issues.

Q. And one thing I noticed, too, again, just looking at kind of the formatting of the reports, the headings contain -- let me ask you this.

Do the headings indicate kind of a conclusion or are they just a heading?

So, for example, let me draw your attention to your opening report. I'm just getting to it. I'm sorry.

Lucy P. Allen

Like, if you -- for example, page 25 of your opening report, which is Allen 1.

A. Is there a question?

Q. Yeah, I'm just waiting for you to get to that page.

A. Oh.

Q. Right. So like, there you have a heading, "Mr. Coffman's proposed common damages methodology does not measure damages consistent with Plaintiffs' risk materialization theory of liability."

So, using that as an example, is that one of your opinions in this matter?

A. The headings are meant to help the reader understand what is in a particular section. So they're shortened versions of -- to help understand what's in one section versus another section.

I mean, that's the -- that's why I put the headings in and I try to make them be relatively short, but give you an idea of what is actually in that section.

Lucy P. Allen

Q. Okay. Sitting here today, can you tell me what your opinions are in this matter?

A. I think my two reports summarize my opinions, but I -- I could, you know, read that aloud to you. I feel I've done a good job in my reports of -- of putting down what my opinions are. I mean, that is -- that's my understanding of what the report is.

Q. If you don't mind, we're going to be bouncing a little bit between the opening and sur-reply, and I will let you know when we're doing that.

A. Okay.

Q. We are going to start going into it a little bit now.

So if you can pull up Allen 1, or the opening report, in front of you. Okay. Great.

If you can turn to page 4, paragraph 8?

A. Okay.

Q. And here it says, in paragraph

Lucy P. Allen

8: "I was asked by counsel to conduct a systematic content analysis of all analyst reports following certain alleged misstatements and the alleged corrective disclosure with regard to specific questions."

Do you see that?

A. Yes.

Q. What is a content analysis?

A. So a content analysis is a systematic and scientific analysis of the content within some sort of a document, typically.

Q. Is this -- withdrawn. Fair to say you've given -- well, withdrawn.

You have issued expert reports in securities litigation before this case; correct?

A. Yes.

Q. Can you approximate for me, generally speaking, how many expert reports you've issued in your career in securities litigation?

A. I can't really, no.

Lucy P. Allen

Q. Would it be over 100?
A. I don't know.
Q. I'm sorry, just to try and see if we can come to some agreement on number.
Would it be over 50?
A. I just don't know. I mean, I think you could look at my CV here and see how many there are, or you could see -- I guess I have testimony, and that would indicate -- yeah, I just don't know.
You're talking what categories of securities litigation?
Q. Just generally speaking.
A. Yeah, I just don't know the answer to that.
Q. Okay. How many years have you been testifying in securities litigation?
A. You're asking what was the first -- the first -- I believe I had testified in a securities case probably 25 years ago; more, maybe.
Q. And just to kind of narrow it down, because you raised a good point just moments ago.

Lucy P. Allen

Do you recall how many years you've been testifying in 10b actions?

A. I don't recall the first securities 10b-5 case that I testified in. I'm not -- I'm not sure.

Q. Would you be able to say you've been testifying in 10b actions for over ten years?

A. I mean, you make it sound like that's what I do. You're asking me, like, the first 10b-5 case --

Q. I'm -- I'm not asking you anything. I'm just trying to figure out how long you've been do -- you know, you've testified in securities litigation; that's all I'm trying to get at.

I'm just trying to figure out -- you know, this isn't your first 10b case, right? So I'm just trying to figure out how many years. I've never deposed you before, so I don't know your history and background. I'm just trying to get an understanding of -- with respect to 10b actions, if you can approximate how many

Lucy P. Allen

years, as an expert in securities litigation, you've been testifying in 10b actions?

MS. HEFLEY: Objection. Asked and answered.

A. I don't know that I've testified in a 10b-5 case. I could try to think when the first time I might have testified in a 10b-5 case and how many years that is from today. I don't know that I've testified in a 10b-5 case in all the years in between that date. So I couldn't tell you how many years I have testified in a 10b-5 case.

I'm sure I could think of the first one, and then I'd have to see if, in the number of intervening years, have I actually testified in a 10b-5 case.

So that is something, with some research and thought, I could -- I could probably do; but, as I sit here, I don't know the answer to that.

Q. Is this the first time that you've issued an expert report in a

Lucy P. Allen

securities matter where you conduct a content analysis?

A. No.

Q. Let me be a little more specific.

Is this the first case in a securities action where you conducted a content analysis using analyst reports?

A. No.

Q. When is the first time that you conducted a content analysis using analyst reports?

A. I don't know.

Q. Have you ever conducted a content analysis in connection with expert opinions in a securities action before the Supreme Court's decision in Goldman in 2023?

A. Yes.

Q. On what case was that?

A. I've done it in a number of cases. So I recall doing a content analysis in the Halliburton case.

Q. Okay. And let's try to kind

Lucy P. Allen

of -- maybe we'll be a little more precise.

So here in this case, you did a content analysis where you categorize -- where you have categorization set up for review of analyst reports; correct?

A. The content analysis here involved reviewing analyst reports, as is my recollection of what I did in the Halliburton case.

Q. And in Halliburton, did you group the analyst reports -- withdrawn.

Did you group misstatements into categories?

A. I did group misstatements into categories in the Halliburton case, yes.

Q. Okay. And then -- and you're saying in the Halliburton, then you also then reviewed analyst reports and -- is that -- is that fair?

A. Yes, I did review --

Q. Okay.

A. -- analyst reports, many analyst reports in the Halliburton case.

Q. And then, in that case, did you

Lucy P. Allen

also then seek to match or determine whether a match exists between any of the analyst reports and any of the alleged misstatements?

A. Yes, I believe so.

Q. So let me try to short circuit all this.

Is it your understanding, sitting here today, that the analysis and methodology that you conducted in this case is identical to what you did in Halliburton?

A. I don't even know how to answer that question. So what I have done in this case is a lot of different things. Are you asking about just the content analysis part of it?

Q. Correct.

A. I mean, I had different specific questions here than in Halliburton. I think there's a lot of -- I wasn't given -- I mean, obviously, the case was different, the claims were different; but in terms of much of the methodology, I

Lucy P. Allen

think it would be quite -- quite similar, yes.

I mean, I think the methodology would be quite similar.

Q. I guess I'm trying to -- I'm trying to pinpoint if, like, this exact methodology that you conducted, right, that you employed in this case, have you ever done it in a prior case?

And when I mean "exact," I mean exact. I mean categories of misstatements, review of that content analysis of analyst reports. And I think you have a -- you know, we'll go through the questions, but the sets of questions that are disclosed in your opening report?

A. I don't think I had the same formal questions previously, but I think I did address many of those same questions in terms of how to do the content analysis.

It is -- we do a lot of content analysis at NERA, and it is a fairly standard process where we have specific questions, we have analysts or researchers

Lucy P. Allen

that, you know, are instructed in how to do it, people are trained in how to do it.

We do a double-checking process, where one person does it first, another person, you know, using the same criteria does it, and then the differences are reconciled.

So the whole methodology and the process is quite standard, and we do it in a lot of different types of circumstances.

So in that sense, the methodology is -- is very similar. The actual -- you know, there were -- in this case, there were very specific questions that we were asked to analyze the content of.

I do think that some of those same questions were analyzed in -- in Halliburton and other cases, but I don't know if it was as -- I don't recall it being as formally laid out, the specific questions that I have here.

Q. Okay. Are you aware of any

Lucy P. Allen

peer-reviewed literature that supports a content analysis of analyst reports that also incorporates a match analysis of a plaintiff's misstatements in a securities action?

MS. HEFLEY: Object to form.

A. I don't understand that question.

Q. Okay. So you did a content analysis; right?

A. Yes.

Q. And part of that content analysis involves determining whether there is a match between statements in an analyst report and the plaintiff's alleged misrepresentations; is that right?

A. I think it -- the content analysis speaks to that. The actual content analysis is answering specific questions. So I think the answers to those questions speak to the -- are instructive in answering the question about whether there is a mismatch; but the actual questions that we answered were not, is

Lucy P. Allen

there a mismatch?

Q. You've determined that there are mismatches; correct?

A. I've answered specific questions, and I think the answers to those questions speak to the question of whether there is a mismatch, and it speaks to the question of whether there is evidence of price impact from the alleged misrepresentations.

But the analysis and the actual questions I've been asked to answer are specific questions about the content.

I think the answers to those questions can help answer -- again, speak to questions of mismatch or price impact.

Q. I guess -- and I appreciate your response. I guess my question to you is, have you determined whether there's any mismatches in this case?

A. I don't think I used the term "mismatch" in my report. I think my -- maybe I do, but...

Q. Yeah, I mean --

Lucy P. Allen

A. I think the results of my analysis do speak to mismatch. I don't know that I have actually used that term. So I think it's a term that the courts have used. I don't recall if I'm using that term.

I do think my results show that there is not a match between the alleged misrepresentations in the A, B and C categories in the corrective disclosure.

But I -- I just don't recall if I actually used that term.

Q. Okay. So when you say "I do think that my results show there is not a match between the alleged misrepresentations in the A, B, C categories," then are you saying and in the corrective disclosure?

A. To the corrective disclosure.

Q. Okay. When you say that, is that -- are you saying that you've made that determination, that there is a -- there's not a match?

A. I think my results speak to

Lucy P. Allen

that. I don't recall if I have used the term "mismatch" in my report. So I just don't want to --

Q. So --

A. I don't -- my recollection is, that is not a term that I have defined or said in my report, so -- but let me just...

Q. Yeah. So I guess my -- what I'm trying to get at is, did you make an independent determination about whether there is not a match between the alleged misrepresentations and the corrective disclosure?

A. You're asking me about the term "match" or "mismatch," and I'm just not sure if that is a term that I have actually used.

I don't think I used the term "match" or "mismatch." I do think the analysis and the conclusions are consistent with that there is not a match between the alleged misrepresentations and the corrective disclosure.

Q. So when you say "the

Lucy P. Allen

conclusions are consistent with that there is not a match between the alleged misrepresentations and the corrective disclosure," is that just another way of saying that you have concluded that there is not a match?

A. No, that's not what I just said. I said I have been asked to analyze specific questions, and the answers to the questions are in my report.

What my report does say is, there's no basis to conclude that the alleged corrective disclosure was tied to the alleged misstatements, and the content analysis indicates that the alleged corrective disclosure was not considered corrective of the alleged misstatements.

As a result, the price decline does not provide any evidence regarding the price impact.

So that is my conclusion.

I have just not used the terminology "match" or "mismatch." I think that that is -- as you're asking me the

Lucy P. Allen

question, I do think that that is -- that conclusion would be consistent with saying that there is a mismatch, but I have not introduced that terminology in my report, and I don't -- have not defined what that means.

So that's just not terminology that I have used or defined.

Q. Why -- why didn't you use the term "match" or "mismatch"?

MS. HEFLEY: Object to form.

Q. And I -- well, let me withdraw.

Part of the materials you considered was the Supreme Court's decision in Goldman in 2023; correct?

A. Yes.

Q. And that Supreme Court decision references the word "match" or "mismatch"; correct?

A. Yes.

Q. Why didn't you then use the word -- or the words "mismatch" or "match" in your reports?

I'm sorry, Ms. Allen, do you

Lucy P. Allen

have a --

A. I mean, I'm trying to -- I don't have a -- I wasn't sure whether I even used the word or not, so I don't know if I have a good reason why I used or did not use the word.

But, as I sit here, my answer is I don't -- I don't want to have another word that I, you know, don't -- would need to define or have a definition of; so I use words that I have previously used.

Q. Is it -- is it your opinion that determining whether there is a match or a mismatch between a corrective disclosure and prior alleged misstatements is drawing a legal conclusion?

MS. HEFLEY: Objection. Calls for a legal conclusion.

A. I don't know the answer to that. I mean, I think there are ways of analyzing whether, analytically or economically, something is linked or tied to something else.

But the Goldman decision is

Lucy P. Allen

a -- is a legal decision, so, in that sense, it's used legally.

Q. Is it your understanding that it's the court's job, if you will, to interpret plaintiffs' claims?

MS. HEFLEY: Objection. Calls for a legal conclusion.

A. It's the court's job to interpret legal claims?

Q. Or interpret the plaintiffs' claims; correct.

MS. HEFLEY: Same objection.

A. I don't know if it's their job to interpret them.

Q. Did your report verify the conclusion that defense counsel drew in their opposition to class certification?

A. I don't understand that question.

Q. You reviewed the defense counsel's opposition to class certification in your materials considered; correct?

A. In my materials considered? I don't think so. Because -- in my first

Lucy P. Allen

report?

Q. Yeah. In footnote 33 of your report, which is on page 10, you cite "Defendants' Opposition to Plaintiffs' Motion for Class Certification."

A. Footnote 33. Footnote 33 says "See Appendix C." Am I in the wrong report?

Q. Oh, I'm sorry. Forgive me. If you can turn to Allen 2, I'm on your sur-reply report, it's footnote 33, page 10.

A. Oh. So I don't think I reviewed it in my initial report, because I think it was filed along with my initial report.

Q. Correct.

A. So I don't believe I reviewed it for my initial report.

Q. But it was a part of your materials considered for your overall opinions in this matter; correct?

A. For my second report, it is one of the materials considered for my second

Lucy P. Allen

report.

Q. Okay. Have you ever heard of the terms quantitative and qualitative content analysis?

A. I know -- I've heard the terms quantitative and qualitative. I don't know that I have specifically heard that with regard to content analysis. I don't -- I don't have a specific recollection of that.

Q. Okay. So fair to say then, if there was such a thing as a quantitative or qualitative content analysis, you would be able to tell me today whether your content analysis in this matter was either quantitative or qualitative?

A. I'm not sure I understand that question.

Q. Yeah. Okay. Well, you told me you're not sure you've ever heard of the terms qualitative and quantitative in the context of content analysis; is that right?

A. I'm not sure I have heard that, yes, that's correct. I have not heard a distinction between qualitative and

Lucy P. Allen

quantitative.

Q. I'm just trying to shortcut this because -- so then, by extension, you wouldn't be able to tell me today whether or not your content analysis was either a qualitative or a quantitative content analysis; correct?

A. I'd say that's probably true. I mean, I...

Q. Is formal content analysis generally not a staple in securities litigation?

MS. HEFLEY: Object to form.

A. I don't understand that.

Q. You don't understand the question?

A. I don't understand the question.

Q. Okay. Let's go back to your opening report. I'm going to draw your attention to page 4, paragraph 8 again.

A. Okay.

Q. And in there you say -- I'm trying to find the sentence here. "I was

Lucy P. Allen

asked to code answers to the specific questions listed below based on a content analysis of the analyst reports on Concho following certain of the alleged misstatements and the alleged corrective disclosure."

Did I read that right?

A. Yes.

Q. Okay. What do you mean by code answers?

A. So coding is a process that we frequently do at NERA, and the way we do it, we have a process.

So coding means individual researchers or analysts are given instructions on what to code and how to code, and then they methodically go through and code up and put responses to the questions for each of the documents in this case; and then, separately and independently, an independent researcher does the same coding.

Q. Okay. In this matter, you had two members of your staff that performed

Lucy P. Allen

the coding; correct?

A. So I actually had four members, but at least two were doing each -- each question in each analyst report.

Q. Okay. So let's take it one step at a time. How many member -- how many -- withdrawn.

The team that -- you reference a -- you reference a team in your report on paragraph 16 on page 7 of your opening report, and my question to you is, who was on your team for this matter?

A. You want the names?

Q. Names and positions, if you can.

A. So Jorge Baez, who's a managing director. The four researchers are analysts; Andrew Dearborn, Abhy Singhania, Sam Bannett Mas, and Payal Sreewastav were the four coders.

I believe I had one other member of my team, that I'm not thinking of now.

Q. Okay. And you mentioned

Lucy P. Allen

earlier, in terms of the procedure, there is -- you have your team established, there's a set of instructions, and they go and review the material, and then they come together and they discuss the results?

A. So they independently code it, and then, to the extent that there are differences, they reconcile them, or come to me --

Q. Okay.

A. -- to help reconcile them.

Q. So in terms of --

A. So each of -- you know, each one does it independently. Then they compare their answers. And then, to the extent there are differences, they reconcile them.

Q. So in terms of instructions, who provides the instructions for the coding?

A. I did, and I think Jorge Baez also helped. So we reviewed, discussed it with him, went through the questions, went through the process, you know, had a

Lucy P. Allen

meeting with all of them on how it would work and what to do.

Q. Was there a written set of instructions?

A. There are written questions. They had the written questions.

Q. Okay. Outside of the written questions, were there any sort of other written instructions or guidance for the coders?

A. I don't believe so, no.

Q. When you said you don't believe so, are you sure there was, there wasn't -- I mean -- withdrawn.

When you say you don't believe so, can you say, sitting here today, with any -- with absolute certainty whether or not written instructions or guidance was given to the coders outside of the specific questions?

A. Well, they've been trained to do this in general, so they've had a bunch of training at NERA. We do a lot of coding. So they have, over time, gotten

Lucy P. Allen

written instruction on how to do coding and how to do checking and reconciling and -- but I don't -- I don't believe there was other written instructions specific to this that they had on the coding.

Q. Does NERA have a set of, let's say protocol, if you will, for lack of better words, of exactly how to code and check and deal with discrepancies?

A. For discrepancies is your question or for -- so we do have -- we have lots of checking protocols and training on checking, and we have all kinds of training, and we have lots of materials.

Q. And those materials would have been materials at the disposal of the coders at the time of coding for the purposes of this report?

A. They've had training. There are training materials. They're not specific to this case. Yeah, I don't -- there are training -- they're given training, there are training materials that I'm not sure exactly how they're available

Lucy P. Allen

at this point, but...

Q. Can you walk me through? So when you -- it was you and Jorge, you sat down with the coders and provided instructions?

A. Well, I believe we did it on a Zoom call. I don't know if you call that sitting down. We were probably all sitting down, but we were not...

Q. This was a different time period, yeah. Different time periods. Okay.

And then you said they independently coded. What do you mean by that?

A. So they independently do it, without checking with each other, and they -- they would independently have the question, have the analyst reports, and code up their answers; and then with -- you know, that's a fair amount of work and there were a lot of analysts. I don't recall the actual.

But at some point, there's

Lucy P. Allen

some -- and there were four of them, and so they did it in different pairs; and then at some point, after a certain amount of work is done, they look at each other's answers and reconcile any differences.

Q. So in terms of coding, were they doing it using software or how -- withdrawn.

How were they doing the coding? How were they actually doing the coding?

A. Well, the analyst reports that they're looking at are -- we have them electronically. They may have printed them out or they may have looked at them electronically. I'm not sure what -- and they -- I don't know.

I mean, we formatted the -- we formatted this in the end to make it fit into the report, but I believe they had some sort of a spreadsheet. I don't know exactly how they wrote down their answers or coded their answers, but I believe they did it electronically.

Q. And in terms of reviewing the

Lucy P. Allen

analyst reports, did they use coding software?

A. I don't understand what that would mean.

Q. The literature that you cited in your report on content analysis, stemming back from the mid-'90s, talks about coding software.

Was any coding software employed here?

A. Not a specific coding software, no.

Q. When you say "not a specific coding software," is your answer just no, there was no software used?

A. Well, they were using software; so, like, Excel is a type of software.

Q. Okay.

A. They were using -- you know, everything was electronic. It's not a coding software.

Q. Was this a manual review of analyst reports? In terms of whether it's electronic or in written form, you're

Lucy P. Allen

looking at each analyst report versus -- when I mean the coding software the literature talks about is, there's search terms and there's a whole database.

A. I'm not sure I'm understanding your distinction. They reviewed the analyst reports themselves. They did not have -- it wasn't a result spitted out -- spit out by a computer program; it was, they reviewed the -- they reviewed the words in the analyst reports themselves.

Q. You mentioned before that they -- something about pairs; there was four of them, but there was pairs.

What do you mean by that?

A. There were always two of them. For every item that was coded, at least two of them did it.

Q. Okay.

A. That would be a pair; two.

Q. You mentioned discrepancies. What do you mean by that?

A. So to the extent that one of them had a different answer than the other,

Lucy P. Allen

they would review and resolve what -- why there was a discrepancy.

Q. How would they go about exactly reviewing and resolving the discrepancy?

A. They would talk to each other, look at the document, and then see if -- if one of them had, you know, missed something or made an error or, you know, in discussing it with each other, and to the extent there was something that they felt wasn't clear, they consulted with me on that.

Q. So in the first instance, they're communicating with each other about any potential discrepancy?

A. Yeah. So first they see is it -- was it -- was it a simple oversight on one of their part? Was it something that could be simply resolved? Or did they have an actual -- think there might be some disagreement.

Q. Okay. And you were present -- were you present for any of those initial conversations between the coders?

Lucy P. Allen

A. Not if it was -- if they thought it was -- no, I guess, is the easy answer. If they thought it was a -- if they didn't -- if they thought there was no debate, then they did not -- would not bring it to my attention.

Q. Did they keep notes or any documentation of -- of when discrepancies arose?

A. I don't know.

Q. Okay. And in the instances where a discrepancy would then be brought to your attention, how would it be brought to your attention?

A. They would contact me and we would discuss it.

Q. Over the phone or through an email or something else?

A. Typically, over the phone.

Q. And for those instances, was it just you and the -- the coders, or were any other individuals there to listen in?

A. So it -- probably the whole team. So we would, you know, do it on --

Lucy P. Allen

we would typically do it on Zoom and look at the documents and have a discussion, and so to -- and that generally we just have the whole -- the whole team, is my recollection.

Q. Okay. Because I was just about to say, you said probably the whole team.

Do you have a specific recollection of who would be present for those discrepancy meetings, if you will, for lack of a better word?

A. I don't really. But I feel there's another member of the team that I haven't mentioned, so that's why I'm trying to remember, but...

Q. Okay. We're here -- we're here, so if it comes to mind, just tell me.

A. But I think, you know, it -- it would...

Q. Okay. I don't want to cut you off. Are you --

A. Yeah, I mean, my recollection is that it would -- it was -- we typically would just get the whole team involved, and

Lucy P. Allen

it didn't -- I don't recall these conversations being very long, but...

Q. And in terms of when discrepancy was involved, were any notes taken?

A. Not that I recall, no.

Q. As you were -- well, withdrawn.

Did anyone keep track of the number of discrepancies?

A. I don't believe so.

Q. Do you know, either percentage-wise or through a -- just through a numerical figure, how many discrepancies were raised during the process?

A. I would -- I would guess maybe ten discussions that I recall, ten instances. And if there are -- I don't know. I guess less than one percent.

Q. I know you're on video, but the video is recording one thing, and we can't always record what you're doing in a non-verbal way.

So you're looking right now at

Lucy P. Allen

Appendix D of your report; correct?

A. Yeah, I'm just trying to see how many analyst reports and how many actual things were coded, right? It's 87 pages of answers, and there is -- I don't know. I guess there could be, like, 100 on a page, maybe.

So, anyway, it seems like it would be a tiny percentage --

Q. Do --

A. -- that...

Q. Okay. Did you -- do you know how many were -- I know you weren't present for any -- for the first instance of discrepancies between the coders; so, do you have any indication whatsoever of the number of first instance discrepancy meetings, for lack of better words?

A. I don't think there was very much of that. There was some -- in the beginning, they tended to more bring -- make sure to bring the questions to me, just so we were -- we were clear that we were all on the same page and that they

Lucy P. Allen

were understanding.

So I would check in on them and sort of ask how it's going. So I don't think that was very frequent either.

Q. But you're not entirely sure?

A. I don't know the exact number, and I don't know how many times. I don't know; but I don't -- I know it wasn't very frequent.

Q. How do you know that?

A. Because I asked them. Because I checked in with them and asked them.

Q. Prior to the coding process, did your team run a pre-sample of the analyst reports?

A. I think we might have in terms of timing. So one question was just, you know, literally, how long would this take? And I don't remember the timing. There was some time when the report was due, and it was a matter of, you know, how many people to staff on it and how much time would it be, so there was some time budgeting.

So I believe we did at least

Lucy P. Allen

try to figure out, you know, from a -- we had to budget the time. So it was a very time-consuming process.

So I do recall doing some, you know, see how long it takes to review this many analyst reports, or how to do it. So I think we did have some -- we did something to begin with, mostly to get a sense of the -- how much time this would take.

Q. Okay. What details do you recall -- so I guess -- withdrawn.

My first question is simply yes or no.

Like, do you actually recall there being a pre-sample set of analyst reports?

A. My recollection -- I think I've told you what my recollection is, is that, rather than just go ahead and do it and tell me when you're done, I wanted to get a sense of how long it would take.

So I did have, you know, perhaps, just two of them do some portion

Lucy P. Allen

and then tell us how long it took; but I don't recall the specifics of that.

So I would call that a pre-sample, but...

Q. Okay. And I'll just use your words for that. So, for what you were calling as a pre-sample, what details do you recall about that analysis?

A. So just to be clear, you asked me about a pre-sample, that's why I'm using that word. But I -- I'm saying I think you could call that a pre-sample, that's all; and I don't recall much more than I just told you.

Q. Okay. So you don't recall the number of analyst reports that were reviewed in conjunction with that?

A. No.

MR. COTILLETTA: Now is a good time to take a short break.

THE VIDEOGRAPHER: We're off the record. The time is 10:35.

(Whereupon, a recess was taken.)

Lucy P. Allen

THE VIDEOGRAPHER: We're back on the record. The time is 10:46.

Q. Okay. Ms. Allen, in your report, back on paragraph 8, page 4, you mentioned, as we discussed earlier, that you looked at analyst reports on Concho; right?

A. Yes.

Q. Can news articles cause price movements?

A. Yes.

Q. Did you review news articles in this instance?

A. I did review news articles.

Q. Okay. How many news articles did you review?

A. I don't know. I don't know the answer to that.

Q. Are those news articles contained in your materials considered list?

A. I would think they would be, but...

Q. Drawing your attention to page

Lucy P. Allen

20 of your materials considered list, which I believe is Allen 3?

A. Sure.

Q. I -- you know, correct me if I'm wrong, I only see one article, The Wall Street Journal, on paragraph 680; is that right?

A. That looks right.

Q. Aside from that one Wall Street Journal article, did you review any other news articles on Concho during the class period?

A. I believe so. I do believe I would have reviewed news articles.

Q. Okay. Is there any particular reason why they are not contained in the materials considered list?

A. No, I don't think there is a good reason. I think I should have listed news articles, at least as a category.

Q. Okay. Can you tell me how many news articles you reviewed?

A. I cannot.

Q. Can you tell me who reviewed

Lucy P. Allen

those news articles, whether it was you or someone within your team, or both?

A. I -- I would have reviewed some news articles, and I believe my team would have also reviewed some news articles.

Q. The news articles that you reviewed, do you recall, how did you go about reviewing those news articles?

In other words, was it through something like a Google Search or was it through, like, Factiva or one of these other kind of search engines, or something else?

A. I don't recall the news articles making a difference in terms of anything that was done in my report. But we would almost always, at some point, look at news articles, sometimes just to see, you know, timings of announcements or what might happen.

So it would be -- it would be unusual to not have looked at news articles at all, and -- but I don't believe any of that look at the news articles made a --

Lucy P. Allen

made a difference to any of the analysis in my report; but I do think news articles should have been mentioned as materials considered.

Q. I appreciate that. My question to you was the method in which you reviewed news articles.

Do you recall how that was done?

A. No, I don't have -- I don't even have a specific recollection of reviewing news articles, but I just believe I would have.

Q. Fair to say the news articles were ultimately not included in your content analysis?

A. The content analysis was of the analyst reports.

Q. Is it your opinion that, in order for information to cause a price movement, it must be commented on by analysts?

A. No.

Q. Did you or anyone at NERA speak

Lucy P. Allen

with any of the analysts who wrote the reports on Concho during the class period?

A. Not as a part of this project, no.

Q. As a part of something else?

A. I mean, I just don't know. I mean, not -- not for this project. I just don't know if anyone might have spoken to some of the analysts for some reason.

Q. Just give me a second. I want to read your answer. Okay.

When you say that, is it -- is it typical for individuals at NERA to speak to analysts that cover the market?

A. I mean, just it is -- it is New York. People know people and things happen. I just haven't -- I don't know whether they might have spoken to some of the analysts.

Q. But for purposes of forming your opinions and generating your reports in this matter, did you or anyone at NERA speak with any of the analysts --

A. No.

Lucy P. Allen

Q. Do you know what status we are in this case in terms of discovery, like, whether there's been fact depositions and documents produced, things of that like?

A. I don't know.

Q. Is it your opinion that the testimony of the analysts who wrote the reports covering Concho during the class period would be relevant to your analysis?

MS. HEFLEY: Object to form.

A. I would say that it's possible that it could be relevant. In my experience, analysts, depending on the circumstance, but years later are not going to have specific recollection of events, what happened or what -- has been my general experience, but...

Q. Experience in litigation?

A. Just in discussing and speaking with analysts, and that they often -- in a case such as this, we're very focused on what happened at very specific points in time; and years later, people who, at the time may have been very knowledgeable and

Lucy P. Allen

know what was going on, it is not fresh in their mind and they would not have a good recollection.

Q. But you don't know what these analysts have to say about the reports that they wrote; correct?

A. I don't know. I have not spoken with these analysts, that's correct.

Q. It is possible, for example, that an analyst's interpretation of their own report could potentially contradict your interpretation of their report; is that fair?

MS. HEFLEY: Objection; calls for speculation.

A. Can you repeat that question?

Q. Yeah. It's possible, for example, that an analyst's interpretation of their own report could potentially contradict your interpretation of their report; is that fair?

A. Oh, sure, I think that's possible.

Q. Can you please turn to your

Lucy P. Allen
sur-reply report.
MR. COTILLETTA: Just bear with me, Amy, for a second.
That's, for the record, Allen 2.
Q. Okay. And I want to draw your attention to page 8, paragraph 17.
A. Okay.
Q. Here you say: "...the Allen" -- it's a couple of lines in. It says: "...the Allen Report explains that if a generic statement does not change any analysts' valuation or price targets, it provides evidence that the statement had no price impact."
Do you see that?
A. Yes.
Q. What's your basis for that?
A. So analysts who cover the company, their job and their business is reporting on the value of the company and the value of the stock price. They issue reports when there is new information that becomes available, that they think is

Lucy P. Allen

important in valuing the company or valuing the stock price.

And if new information does not change the professional's value of the company, then that information is not value-relevant to that analyst at this point in time; it's not changing their value of the company.

Q. Okay.

A. And what Mr. Coffman and plaintiffs have described as what's important in terms of price impact is whether it's value-relevant.

So if it's not changing the value of the professional whose job it is to analyze the company and the value, they are not changing their value because of a particular statement, then it's -- it's not value-relevant to them at that point in time, and then that's evidence that it's not -- is not impacting the price.

It's not impacting their value of the price, so it's not -- it's evidence that it's not impacting the price.

Lucy P. Allen

Q. Okay. So just as a recap. Is it your opinion that, in order for it to be value-relevant to analyst, the analyst -- withdrawn. I'm just trying to short circuit it.

Is it your opinion that the new information presented to the analyst, in order for that information to be value-relevant, it would need to cause the analyst to either change their price target or valuation?

A. I think it doesn't have to do that. If it doesn't change their value, it's evidence that it's not -- it's not value-relevant. If it doesn't change the value, it's evidence that it's not value-relevant.

Q. Okay. Do you have any -- as you sit here today, do you recall any peer-reviewed literature that supports that statement?

A. That if it doesn't change value, it's not value-relevant?

Q. Correct.

Lucy P. Allen

A. Sure. So that's -- that's what the -- all the event study literature and finance, you know, looks at; is this important to the value of a company?

They look at whether it changes the -- people's valuation of the company.

Q. We'll try to break this down for a second, and I'll start with your materials considered.

Is there any academic literature that you have listed in your Appendix B to your opening report that would support your statement about price targets or valuation changes?

A. I'm not really sure what you're saying. If it changes the value -- value-relevant means that it affects the value, right, just by definition, value-relevant.

If something doesn't affect the value, then it's not value-relevant. That's my understanding of that term.

And so if it doesn't change the analyst's value, then it's not changing the

Lucy P. Allen

value, so it didn't affect the value. I mean, those are -- they're -- they're...

Q. I guess I'm just -- the question I'm just trying to get to right now is very simple.

Do you have any economic authority that you can think of, sitting here today, that supports that?

A. That a change in value -- that not a change in value is not -- is -- I mean, you're basically asking me can I -- is there literature that says if the value changes, that affects the value, and if it doesn't change, that's not an effect on the value.

That's just -- that is just the meaning of those terms, right? If something affects the value, it changes the value. If it doesn't change the value, then it doesn't affect the value.

That's what I'm saying. Something that -- if -- I mean, it's as simple as that.

Q. Let me get a little more basic.

Lucy P. Allen

The idea that value relevancy is connected to changes in price targets or valuations within analyst reports, okay? That topic generally.

As you sit here today, can you think of any peer-reviewed economic literature that discusses that concept?

A. So one idea is whether analysts themselves are -- have -- have views that tell you about the value of a stock or company, and they do. That is their job, right? Their job is, they're professionals that value the stock in the company; and whether something changes their value is something that you can look at from the analyst report because they tell you what their current valuation is.

And this is just a statement that says, does it change their current valuation? If it doesn't change their current valuation, then it's an indication that their valuation has not been changed. That's all this is saying.

Q. Let me ask you this: Is it

Lucy P. Allen

your opinion -- I'm just trying to get a good understanding of this, so forgive me.

Is it your opinion that, in order for information to be material -- new information to be material, that new information would need to cause a change in an analyst's price target or valuations of the company?

A. I don't think I've mentioned materiality here. You're now asking me about the term?

Q. I'm just asking you, yes.

A. I think you have to tell me what context you mean, material.

Q. I'm not talking about what lawyers usually bicker over in securities litigation.

If there's -- is there an economic definition for "material"?

A. I think you could have different definitions, so...

Q. Do you have any that you agree with?

A. Well, one definition is, does

Lucy P. Allen

it affect the stock price?

Q. Okay. So we're getting there.

Is it your opinion that an analyst would need to change a price target or a valuation of the company in order for there to be a stock price movement?

A. The analyst doesn't have to change their valuation. The analysts are saying what they think the stock price should be or what they're valuing the company; and the analysts are professionals that do that, and they tell you how they do that.

Q. Right.

A. So the market can move independent of analysts.

Q. Okay. And so taking that, and just to kind of rephrase that, that the market can move independent of analysts, that would also mean that, regardless of what an analyst does, whether they keep a status quo on the price target in the valuation, whether they change it up or change it down, that's independent of what

Lucy P. Allen

the price movement could be on that day?

A. Well, I don't think it's independent. The analysts are saying what they think the information -- the analysts tell you what they think the effect of new information is and what they -- what they value the company at the time.

Prices tend to move with -- similarly, with analysts' valuations, but -- and price targets, but not always.

Q. Could there be a situation where you have a statistically significant abnormal return on a stock trading in an efficient market on a given day when there has been no change to price target or valuation on analyst reports?

A. There can be situations where the stock price can move and analysts can disagree with that movement. So the analyst can think the stock price overreacted and they think, you know, information shouldn't be important to the market, for example, and the stock can -- can react.

Lucy P. Allen

Q. Sitting here today, is it your position that changes to price targets and valuations are threshold to information being value-relevant?

A. I don't know what you mean by "threshold." They are -- they're experts, and they are telling you whether that information is value-relevant, because they're telling you what their valuation is.

And so if they have not changed their valuation, then, by definition, they're saying that this information was not value-relevant to them because it didn't change their valuation.

So it's just -- they're experts valuing the company, and so it is evidence of what information affects the value, because they are experts analyzing the value and they're telling you, did their value change, given this new information?

If new information comes out, and they do not change their value, then that information was not value-relevant to

Lucy P. Allen

them.

Q. Going back to that sentence for a second. You mentioned -- again, you say the Allen report explains that, if a generic statement does not change.

Why, there, are you focusing on the word "generic"?

A. Because that is -- I'm responding to Mr. Coffman's report. Mr. Coffman has -- it's a response to Mr. Coffman's report.

Q. Okay. And again, looking at that sentence again on page 8, paragraph 17.

As you sit here today, do you have any economic authority as a basis for that statement?

MS. HEFLEY: Objection; asked and answered.

A. Yeah, you've asked me that question multiple times, and I've broken down the sentence multiple times and explained that each one of the pieces of that, I've answered that already.

Lucy P. Allen

There's lot -- there's lots of evidence for, and sources for each of that, including Mr. Coffman's own report and plaintiffs' own pleadings.

Q. Okay. And again, I'm going to move on after this.

But can you recall any cite -- like a citation; can you say, you know, Jones 1991, for example? Do you have any citation that comes to mind that would support that sentence?

A. I have answered that question. Mr. Coffman's report, plaintiffs' own pleadings, as well as lots of financial literature, shows that analysts' valuations tell you about the analysts' value of the company.

Q. Let me switch gears for a second.

When companies regularly release earnings announcements that are in line with market expectations, do analysts typically change their price targets?

A. Can you repeat that?

Lucy P. Allen

Q. Sure. When companies regularly release earnings announcements that are in line with market expectations, do analysts typically change their price targets?

A. I don't know how to answer that. I don't know what you mean by "regularly release."

What does that mean?

Q. The quarterly earnings announcements, for example.

A. You're saying if a company is regularly always meeting expectations, is that what "regularly" means?

Q. Right. So, for example -- yeah. There's a quarterly earnings announcement, it comes out, it's in line with market expectations; do analysts then typically change their price targets?

A. So analysts typically change their price targets when they think there's new information that's affecting the value of the company.

If your hypothetical is, there's no new information, there's no

Lucy P. Allen

surprise, if everything is as expected, then there's no new information; then typically, with no new information, no new value-relevant information, then you would not change a price target.

Q. If companies regularly release earning announcements that are in line with market expectations that do not change the analyst price targets, is it your opinion that it follows that these earning announcements containing financial and other updates are, therefore, generic?

A. I'm not saying whether -- I have not said that it's generic. I haven't said anything about whether it's generic, no. And I don't.

Q. I was going to ask you that later. I might as well ask you now.

Like, you have a Category A called "Generic Misstatements" in your report; correct?

A. I was given a Category A that was -- that was labeled "generic."

Q. Right. What does "generic"

Lucy P. Allen

mean?

A. I was given the -- that category was labeled "generic."

Q. I understand that, Ms. Allen, but it was a category you used in your report, so I'm just asking you what does "generic" mean?

A. Are you asking me in general what the term "generic" means or what -- what --

Q. What it means in the context of your report.

A. In the context of my report, it is a categorization that was given to me. It does not -- none of the analyses and conclusions in my report depend on what label you give that set of misrepresentations.

Q. Right. But --

A. I think the -- I think what -- what the category means is to follow the logic in the Goldman decision that did use the term "generic," and I think the team -- that that term, as used in the Goldman

Lucy P. Allen

decision, means something along the lines of that the information is so general and non-specific as to not have any economic meaning or any meaning in terms of the value of the stock price or the company.

Q. How did you reach that interpretation of Goldman?

A. How did I reach that?

Q. Yeah.

A. From reviewing the decision and having some discussions. My conclusions do not depend on that interpretation. You're asking me.

Q. Right.

A. You're asking me for an interpretation, and, as I sit here, that is my interpretation; and my interpretation comes from having reviewed the decision and spoken to some people.

But that is not -- my interpretation is not -- my conclusions and findings and opinions in my report do not depend on that.

Q. Well, I mean, we just discussed

Lucy P. Allen

moments ago the statement you had in your sur-reply about a generic statement and the effect on analyst valuation price targets.

So is it -- so when you're using the term "generic statements" in that context, is that defined through your interpretation of Goldman or something else?

A. It doesn't -- the term "generic" is only in response to Mr. Coffman. You can read the statement without that term.

If the statement does not change any analyst valuation or price targets, it provides evidence that that statement had no price impact.

Q. Okay.

A. The term "generic" is not -- I'm only responding to Mr. Coffman in there. The term "generic" is not -- is only in response to Mr. Coffman. The statement holds, regardless of that term. It doesn't -- you can take out that word.

Q. Let's move on. Looking at your

Lucy P. Allen

opening report on page 4, para --

A. And so if you -- can I just...

Q. Yes, please.

A. The sentence above that says: "The Allen Report is not saying because analysts did not change their valuation or price targets the statement is generic."

Q. Yeah. You answered my question, actually. I was going to ask you later on whether that was a limiter, the word "generic," and it sounds like it isn't.

So you're saying you could take the word "generic" out of that statement, and it would still hold true?

A. Yes.

Q. Okay. I want to move along now in your opening report, which is Allen 1. If you can turn to page 4 -- actually, withdraw. Withdraw. I'm sorry.

You had mentioned earlier the defense counsel came up with the questions that were used in categories A, B and C; is that correct?

Lucy P. Allen

A. Yes.
Q. In receiving those questions, did you attempt to make any changes to the questions?
A. Not specifically that I recall, but possibly.
Q. Did you, in fact, make any changes to the questions?
A. Not specifically that I recall, but possibly.
Q. And as you sit here today, do you believe that the questions that are posed for categories A, B and C are economically appropriate?
A. I think they're good questions for what counsel is using them for, yes.
Q. What do you mean "for what counsel is using them for"?
A. Well, defendants are using them in this context and using the answers to -- using the analysis that comes from these questions to -- to -- to, you know, make certain -- to claim that the misrepresentations in Category A, B and C,

Lucy P. Allen

that there's no price impact from them and that they should be taken out of the case, basically; which is not the legal terminology for that, but...

Q. Do you have any understanding of how counsel came up with the questions?

A. I think they generally make sense. And, as I said, they are the types of questions that I have analyzed before in doing a content analysis, so...

Q. My question to you, though, is a little more specific, and I appreciate the answer.

Do you know how counsel came up with those questions?

A. I don't know specifically.

Q. Let me draw your attention to paragraph 9 on page 4, it continues to page 5 of your opening report, and it says here: "I was asked to conduct the content analysis with regard to three categories of alleged misstatements listed below."

Do you see that?

A. Yes.

Lucy P. Allen

Q. And again, counsel provided you with those categories?

A. Yes.

Q. Why didn't you categorize it yourself?

A. I don't know why I would categorize it myself.

Q. Are you aware of any peer-reviewed literature with regard to content analysis ever either criticizing or cautioning economists from not -- for not independently creating their own categories?

A. It makes absolutely no difference how you categorize them. The analysis is the same.

Q. Well --

A. The analysis is completely independent of how you categorize them. The categorization is just for ease of the reader, and to the extent counsel thinks this is an easier way of thinking about them, then I would defer to them as how to -- how to group them.

Lucy P. Allen

Q. Right. But --

A. It's just a -- it's just a -- it's a way of grouping them. It doesn't make any difference.

Q. Well, it sort of does here, right? For example, on page 5, on paragraph 11, a. through d., you have a set of questions that you don't ask for categories b. and c.; correct?

A. I was not asked to code those questions for the other categories.

Q. My point, though, is, regardless of who asked you, there's four questions being used for Category A that are not being used for Category B and C; correct?

A. That's right.

Q. Okay. And, likewise, if you look at Categories B and C on pages 5 and 6, questions c. and d. of those sets of questions are slightly different than questions c. and d. in paragraph 11 for category -- sorry. Withdraw. Let me start all over again.

Lucy P. Allen

I want you to take a look at the following: Please look at paragraphs c. and d. of paragraphs 12, 13 and 14.

A. c. and d. of paragraphs --

Q. Do you see how it says 12? Are you on page 5?

A. Yeah. Yeah.

Q. Do you see there's a paragraph 12, and then it has subparagraphs a., b., c. and d.?

A. Yes.

Q. If you look at paragraphs c. and d. of 12, and then you look at, you know, paragraphs c. and d. of 13, and then c. and d. of 14; are you with me?

A. Yeah. They should all be the same. So this is a typo. So d. -- I think they should all be exactly the same.

Q. Okay. Can you point to me where the typo is?

A. So d. of c. should be the same as D. All the -- all the questions should be the same.

So for -- questions 12, 13 and

Lucy P. Allen

14 should all --

Q. Be exactly the same?

A. -- be exactly the same.

Q. And which -- which one --

A. So the thing that is not the same is c. -- 14 d. should be just the same as the d. in 13 and 12.

Q. Okay. So -- so help me out here, because I want to make sure the record's clear.

For paragraph 12, 13 and 14, what sub -- so a. and b. are the same between all three of them, I believe; correct?

A. I think they're all the same. The only thing that's different is 14 d., which should be the same as the other ds.

Q. Well, there is a difference with c., too. Like, for example, 12 c., it looks like the question's asking for does it reference "the alleged misstatement," and in 13 c. and 14 d., it says, does it reference "the alleged misstatement other than in tables showing prior results."

Lucy P. Allen

A. Oh, okay, that's true.

Q. So c. is a little different, among the three of them, and then you have -- is it -- is it your understanding that 14 d. is what 13 d. and 12 d. should be?

A. Yeah. So the only thing that is -- and I think the -- I think they could all be the same. So it says "other than in tables showing prior results." It's just the -- I mean, that could have been also in 12. It's just that the generic misstatements don't mention prior results. They don't have results, so that's --

Q. The question doesn't have the limiter of other --

A. That's right. That's right.

Q. I'm not -- you know, even though I'm not a part of your team, I'm --

A. Yeah, it's correct.

Q. -- the other side, and I don't have the information in front of me.

A. That's correct. I think it could -- it could have that same thing. It

Lucy P. Allen

wouldn't be relevant because the things didn't have results, that's all.

Q. Right. But there's no way for me to check that across Appendix D.

If you go to Appendix D, for example, the -- which shows your results, and I will get to it in a minute, I know you have the full report in front of you; but Appendix D of your report, when you're looking at the different questions across Categories A, B and C, for B and C, you don't have 14 d. that we're talking about here being used as the screen. It looks like everything has been consistently different.

In other words, the typo doesn't just extend to the questions. It extends to Appendix D; is that right?

A. That's right. I think the whole thing was just copied in directly, and --

Q. Right.

A. -- that -- that is -- that is not the -- that's correct.

Lucy P. Allen

Q. Right. So there's a difference between -- just grammatically between, for example, 14 d., that says: "Does the report reference the forecasted item...", versus these other ds, which are, I guess, apparently a typo, where it says: "Does the report reference the event"?

A. They should all say: "Does the report reference the event"?

Q. Right. But, sitting here as a litigant, I don't have -- in other words, did you produce all the notes and materials that were gathered prior to generating Exhibit -- or Appendix D?

A. I don't understand that question.

Q. Right. So I have a final product, which is Appendix D, which shows a list of different misstatements and questions asked; right? You produced that in this case.

A. It's part of my report.

Q. Correct. The questions in Appendix D match the questions we're

Lucy P. Allen

talking about here on pages 5 and 6 of the opening report; right?

A. That's right.

Q. Okay.

A. What -- what is a typo in the report is question 14 d., and that same typo -- that is just copied, and that is everywhere. And it should instead be the same as 13 d. and 12 d.

So that is a typo, and that same typo, that exact same language is, I believe, everywhere.

Q. Right. But I don't have any of the prior work that you used to -- I don't have any of your backup for Appendix D.

So how do I know, sitting here -- can you point me to where I can -- where you can show me that it's a typo, other than saying it's a typo, the work that was generated to create Appendix D?

A. I don't understand that question. I'm telling you that it's a typo. These words actually don't make sense in d. And that is not the question.

Lucy P. Allen

So just -- I'm telling you that that is a typo, and d. should look exactly like the other ds.

Q. Okay.

A. That question should be the same.

Q. I'm not being argumentative.

But did you produce any materials -- other than taking your word for it here in the deposition, did you produce any materials that I could look at that would clearly show that that was a typo?

MS. HEFLEY: Object to form. I don't understand what materials you think would fall in that bucket.

MR. COTILLETTA: We'll follow up in writing.

Q. But it's your testimony today that 14 d. is a typo?

A. The question is a typo; d. should be exactly the same as the prior d., and the prior d. before that.

Q. Okay. And then on 12 c., is

Lucy P. Allen

that a typo as well?

A. I don't know what you're talking about. What --

Q. It's missing "other than in tables showing."

MS. HEFLEY: Object to form.

A. It's not a typo. It just wouldn't make a difference because there aren't any tables that would show a generic misstatement, because those generic misstatements don't have actual numbers. There's nothing in them. So it's -- it's a -- it's not a typo.

Q. Okay. So going back to what we talked about before, about the categories being an aide, there is some differences.

For example, 12 c. that we talked about, it is different, the question is different than 13 c. and 14 c.

A. It won't make a difference. So the other ones have a qualification that's not applicable for 12. So it can't be applicable; so it's not different.

The words are different, but

Lucy P. Allen

it's just not applicable. So you can put it in or not put it in; it doesn't make any sense to the generic statements because they don't give actual reported figures.

Q. Well, it does on the back-end, right? So there's basically two things we're comparing here, right?

So 12 c., you're saying, I'm just looking for the alleged misstatement; that's one thing.

On 13 c. and 14 c., you're looking for the alleged misstatement outside of tables. So you're limiting 14 c. and 13 c. on where you're looking for the misstatements.

So that would change the analysis, because it's a broader set of information you're looking at, 13 c. and d.

Does that make any sense?

A. No, it doesn't make any sense.

Q. Okay.

A. So what I'm saying -- what question C is saying is, to the extent a table that shows prior results, that just

Lucy P. Allen

has reported prior results, that would not be a -- that, in itself, would not be considered a reference to the misstatement. That's just a reference to the prior results.

So plaintiffs are not alleging that the actual prior numbers were misstated, and, to the extent that the misstatement contains actual results, if, later, there is a reference to actual prior results, don't count that as a reference to the misstatement; that's all it's saying.

It's saying tables of historical results, don't count that as a reference to a prior misstatement. That's all it's saying.

Q. Okay.

A. And that same clause could be in the generic category. It's just there are no results in the generic. The generic category statements don't include actual results. That's all.

So that's why it's just not applicable; but it doesn't make a

Lucy P. Allen

difference.

The actual results would not change, don't change depending on the categorization.

Q. I want to go back now, we'll walk through some of this, these three categories.

But, before we do that, there is a fourth category of -- of, if you will, if we're going to put things in buckets, there's a fourth category of misstatements that you didn't analyze in this case; is that correct?

A. That's right.

Q. And I think in your sur-reply report on page 3, paragraph 8, you state: "Defendants are not challenging class certification for those alleged misstatements on lack of price impact grounds."

Do you see that?

A. I don't. Can you tell me which paragraph?

Q. Yeah. It's page 3, paragraph

Lucy P. Allen

8.

A. Yes.

Q. Does that sentence there mean that, effectively, the defendants are conceding price impact on those statements?

MS. HEFLEY: Objection to form.

A. I think you're asking me a -- a legal question.

Q. Assuming all things are equal, and let's just say the judge didn't agree with you or the defendants on common damage -- on the common damages arguments, and all we have is this content analysis argument and price impact, you know, it would appear that there's a fourth category of misstatements that are not being challenged, and so those would, theoretically, pass class certification, is what I'm trying to get at.

Do you have that as an understanding?

MS. HEFLEY: Objection. Calls for a legal conclusion.

A. Yeah, I think you're asking me

Lucy P. Allen

a legal question.

Q. Do you have just a basic general understanding of what you meant by that in that sentence, what the effect of that would mean?

A. I don't know what the effect is. My -- my understanding is they're not challenging. So this is in -- this sentence is in response to Mr. Coffman's rebuttal report.

Mr. Coffman says that I failed to analyze the price impact of all the alleged misstatements. But what he does is, he fails to analyze the price impact of actually any alleged misstatement. Instead, he says -- he groups them all together and says that he sees a price drop at the end of a class period, and, therefore, that is evidence of price impact of all of the alleged misstatements.

And this paragraph is saying that that is an erroneous and faulty logic, and that my report was asked to analyze specific alleged misstatements, not all of

Lucy P. Allen

the alleged misstatements.

Q. Okay. Let's go back to your opening report, and we'll start going through all these categories. And I want to start off with Exhibit A.

So please turn to page 5 of your opening report.

A. Okay.

Q. I draw your attention, please, to the first question, which is paragraph 11 a.

Do you see that there?

A. Yes.

Q. Why is that question being asked?

A. I mean, I've been asked to answer this question. You're asking why counsel asked me that, to do this analysis?

Q. Well, I mean, you're the one who's conducting the economic analysis. It's your content analysis, right?

Do you have an understanding of why that question is being asked?

A. I think I do have an

Lucy P. Allen

understanding, but I have analyzed that question because that was my assignment; so that's the reason why I have done it.

Q. Okay.

A. I think the reason -- I think that this question speaks to whether an alleged misstatement is value-relevant at the time that it's made.

Q. You mentioned earlier value-relevant was a word that Mr. Coffman used, not you; is that right?

A. I mentioned that both Mr. Coffman and plaintiffs have used the term "value-relevant" in their -- in this case, is my recollection.

Q. Right. It says here in paragraph 11 a., it says: "Is there any indication in the report that the alleged misstatement caused the analyst to change its valuation of Concho and/or its stock?"

For that question, from an economic standpoint, is there any peer-reviewed literature that supports that question?

Lucy P. Allen

A. I don't understand how a peer-reviewed literature can support a question. This is a question that I have been asked to code in a content analysis. A peer-reviewed literature cannot support a question.

Q. I mean, there's peer-reviewed literature regarding coding in content analysis; correct?

A. There is peer-reviewed literature in -- sure, there's -- there's lots of use of content analysis in all sorts of disciplines.

Q. Right.

A. The content analysis is a way of analyzing questions. The content -- the peer review isn't going to tell you whether a question is a good question.

The content analysis is how you perform an answer to a question. The content analysis is a scientific, systematic way of analyzing a question; it, itself, doesn't tell you whether a question is a question you want answered.

Lucy P. Allen

Q. Yeah, but I guess -- and I don't want to dance around this. This, to me, is fairly straightforward.

I mean, you have been asked to answer a question. You're the economist here, and you're conducting economic analysis through content analysis.

And my question to you is, from an economic standpoint, does a peer-reviewed literature support question 11 a.?

MS. HEFLEY: Objection. Asked and answered.

A. I think I answered that question.

Q. Can you think of any peer-reviewed literature, as we sit here today, that would support 11 a. as being an economically relevant question when conducting content analysis?

A. So it's backward, your question. The con -- you have a question, and then you use a content analysis to analyze the question.

Lucy P. Allen

You don't decide to do a content analysis and then say, let me make up a question that goes with the content analysis.

The content analysis is a way of systematically and scientifically answering a question.

Q. Right. But then you --

A. The question about what analysts -- what causes analysts to change their valuation is certainly something that is important in terms of finance, and people think is -- analysts, as I've said, are professionals whose job it is to value the company, and seeing what it is and how they change their value is something that economists and finance professionals and courts look to as meaningful in understanding what impacts price and value.

Q. Right. But it's not required in order to determine whether there's a stock price movement. We talked about that earlier, I believe.

A. I don't understand that

Lucy P. Allen

question.

Q. Yeah. In order to have a stock price movement, it's not required that there be a change to an analyst's valuation of Concho or its stock.

A. In order to have a stock price movement, so --

Q. It's not a necessary requirement for a stock price movement in Concho or its stock that there be a change in valuation --

(Reporter seeks clarification.)

Q. It's not a necessary requirement for there to be a change in the analyst's valuation of Concho or its stock for there to be a price movement in Concho or its stock?

A. I'm sorry, I don't know what you're saying.

Q. I think we covered this earlier.

Does there need to be a change in valuation for there to be a stock price movement, either upward or downward, for

Lucy P. Allen
any particular company stock?
A. I think a stock price movement is, itself, a change in valuation. So the market is valuing the company. That's what a stock price is. It's some sort of estimation of the value of a company, so it's sort of, by definition, a change in price is a change in value.
Q. Right. But there could be --
A. I mean, that's one way. You talked about the market value of a company, and that is the stock price --
Q. Right.
A. -- shares outstanding.
Q. My point, though, is, there could be a change in stock price, let's say it drops 10 or 15 percent, but on that day, the days following, the analysts don't report a change in valuation; they don't change their price target or valuation, but the stock price yet still declines?
A. They would report -- I mean, the value at that point of the stock would be that they would typically report that,

Lucy P. Allen

so you would see that.

They do report the current stock price, which is what people often say is the -- the value or the market value of a company.

Q. Right. But their independent valuation of the company, right, what they think.

When you say analyst's valuation of the company, how do they typically report that?

A. So analysts can have -- they can have price targets and they can have models that do evaluations, and they often will have both.

So they typically will have a price target, which is some forward-looking what they expect the price to be in the future.

Q. Can a statement not -- or -- yeah.

Can new information not cause a change in valuation and still be material to the market from an economic standpoint?

Lucy P. Allen

A. I mean, now you're using the term "material." So often, what economists or finance people will talk about what's material is whether it affects the stock price, so it's a bit tautological; so if it doesn't affect the stock price, then it's not -- it's not material economically or in a finance term.

So that's -- that is often what an economist or a finance person will mean, is something that affects the stock price.

Q. Yeah. So can a statement not cause a change in valuation and still affect the stock price?

A. Well, if your valuation is the -- the stock price is the market's -- in an efficient market is the market's expectation of the discount and future value of cash flows.

So they should be the same thing. The stock price should reflect the expected value. So if a statement affects the expected value, then it should affect the stock price, and if it doesn't, then it

Lucy P. Allen

shouldn't.

Q. Let me rephrase it. Let me try to change it up a little bit, and then we'll move on.

Does the absence of an analyst changing valuation in response to new news mean that the new news did not impact the price?

A. So it means that that analyst didn't think that it impacted the price. There could be differing views; a different analyst could have different views, and the market could have different views.

So one analyst could think that a piece of information is not value-relevant and doesn't affect the stock price, and another analyst could have a different view, and the market could have -- overall, could have a different view, or the market could be inefficient and it could be moving differently.

So, not all analysts necessarily will agree, and the market may not agree the -- with all of the analysts.

Lucy P. Allen

Q. Let's go to 11 b.

Are you there, on page 5 of your report?

A. Yes.

Q. Okay. And there you say: "Is there any indication in the report that the alleged misstatement caused the analyst to change its price target for Concho?"

Right?

A. Yes.

Q. Again, a similar set of questions, and what we're going to do is, I will be up front with you, we'll get through this, we'll get through 11 and 12 and we'll see if we can fast-track 13 and 14, so we can all get out of here a little earlier.

So for 11 b., why is this question being asked?

A. These are the questions that I was asked to analyze. You're asking me why counsel asked me to do this. You're asking me to tell you why I think they asked me this.

Lucy P. Allen

Is that your question?

So these aren't questions that --

Q. Right. I'm just trying to determine if they're economically relevant. Like, you're grouping them based on this, right? And then, later on, you're looking at price impact, so -- and you're using some of this information to help guide you.

So what I'm trying to understand is, is 11 b. economically relevant to your analysis?

A. Well, I've been asked to do this, right? So I have been asked to address these questions. These aren't questions I posed myself, right? These are -- I had an assignment, and this is what I was asked to do.

You're now asking me why was I given that assignment, and I -- I think I can tell you why I think that might be relevant. But that is, this was my assignment.

Q. Yeah, that's not necessarily

Lucy P. Allen

what I'm asking. What I'm asking is what your viewpoint is on the question, you know, whether it's economically relevant or not, and, if so, why, and take it from there.

So, you know, as an economist, looking at 11 b., is that relevant for price impact?

MS. HEFLEY: Objection; calls for a legal conclusion.

A. I think this question does have relevance to price impact. Price impact is an analysis of whether, you know, in this case, a misstatement impacts the price.

And this particular question is asking whether an analyst, a professional who's studying the company and studying the price and the value of the company, whether they changed their price target as a result of the alleged misstatement being made.

So I think that is directly relevant to whether a misstatement has price impact. It's asking whether the alleged misstatement caused a professional

Lucy P. Allen

and an analyst who's studying the company to change their price target for the company.

Q. Can a statement not cause a change in price target and still affect the stock price?

A. The market, as I have said, the market is -- the market moves in an efficient market with the discounted expected value of future cash flows, and the individual analysts can have differing opinions.

So one analyst could think that a misstatement is not value-relevant, it does not affect their expectation of the price or the value of the company, but the market might overall move differently.

So it is possible for the market to move differently than the opinion of and the analysis of one particular analyst.

Q. Does the peer-reviewed literature say anything about how often analysts change price targets, generally

Lucy P. Allen

speaking?

A. I'm not sure I understand that. You're asking if there's academic literature on how often price targets change?

Q. Correct, as a general matter.

A. I don't know. There's certainly lots of literature analyzers. There's lots of finance literature that looks at analysts' price targets.

Q. Do you recall whether any of the content analysis articles you cited in your materials considered discussed the frequency on which, on average, analysts change price targets?

A. I don't recall that, no.

Q. You wouldn't know, for example, whether it's fairly common for price targets not to move much in a given year?

A. I don't -- I don't really understand that question or know what that would mean.

Q. Okay. I neglected this on 11 a., but I will apply both to 11 a. and

Lucy P. Allen

b.

You used the words "caused," or the lawyers used the words "caused" in 11 a. and 11 b.

Do you see that?

A. Yes.

Q. What do you mean "caused"?

A. I think it means that there's a causal link.

Q. In terms of the coders, what are they looking for to determine whether there was a cause?

A. That if they -- does one cause the other. For example, if there is a change in the valuation, could it be that the misstatement was the cause for that change in the valuation, or does the analyst say the reason for the valuation change is the following, and, you know, here's the math; it's because, you know, I'm changing my valuation because the -- you know, I'm using the -- the analyst is saying, I'm using a multiple, and now the new figures are this, and so I apply the

Lucy P. Allen

multiple.

And -- and then that would be an example that it's -- you know, it's caused by something else, and they're saying this is the reason I've changed my valuation.

Q. When you say in one of your examples that it could be that the misstatement was the cause for that change in valuation, when you say "misstatement," are you looking for verbatim the wording that was used in the prior misstatement, alleged misstatement?

A. No, absolutely not looking for verbatim the wording. I'm looking for, what are they saying -- if they do change their valuation, what is the reason, and could that possibly be the misstatement?

Q. But, in looking at the reason, how are you guiding the coders -- well, withdrawn.

Like, for the coders to look at the reason, it requires at least some degree of a judgment call; is that fair?

Lucy P. Allen

A. The analysts often state their reasons for why they're changing their valuations.

Q. Sure. And in instances where they don't?

A. It's rare to not -- for an analyst not to give some reason for why they've changed their valuations.

Q. Right. But here, do you know whether or not any of the analyst coverage during the class period, whether those analysts at any point in time changed valuation without an explanation or - let me be clear - or where the explanation is unclear?

A. Well, certainly, it's often the case that the explanation is unclear, but whether the explanation could be linked to the misstatement was not unclear.

So there was -- I don't recall any instance where there was any possibility that a change in valuation could possibly be linked to the misstatement. There was no ambiguity that

Lucy P. Allen

it appeared that the change in valuation was linked to the misstatement.

So I don't recall anything that was even close.

Q. Can you give me an example of a case where the explanation for the change in valuation is unclear, but whether that explanation could be linked to the misstatement was not unclear?

A. I can't, off the top of my head.

But sometimes if we try to, like, parse out why did the valuation change and they say it's, you know, changing conditions as well as something; sometimes you can't parse out each of the reasons or what is the magnitude of it, but whether it -- so most of the alleged misstatements, there's no price movement at the time the alleged misstatements are made, and I don't believe that there are many changes in analyst valuations.

So there was nothing close to -- but, from many times that I have

Lucy P. Allen

reviewed analysts' reports, I know it may not be easy to -- it may not always be entirely clear exactly the magnitude of each factor that went into their valuation, but whether something was not even considered in a change in valuation is easier to understand.

So breaking it down into its individual components may not always be clear.

Q. Right. And when it's unclear, it requires that you at least take some sort of judgment call to figure out which way it's going; isn't that fair?

A. I don't recall any judgment call in terms of whether the alleged misstatement caused an analyst to change its valuation. There was nothing that required a judgment call.

So there might have been a judgment call in terms of what exactly is causing a change in valuation, but the fact that the misstatement had nothing to do with it is -- there was no ambiguity.

Lucy P. Allen

So they may have mentioned two factors, and whether it was both of them or one of them, the report may have been ambiguous; but there was no mention that the alleged misstatement affected the valuation.

There was no ambiguity about that. I don't recall any analyst that seemed to imply that any alleged misstatement was affecting them to change their valuation.

Q. When you say "misstatement," though, I'm trying to understand the level of connection you're looking for.

So you said earlier you're not looking for verbatim wording?

A. That's right.

Q. Are you looking for it to merely be relevant to what the alleged misstatement is?

A. So the -- in particular, the generic misstatements were so -- often so almost content-free.

We were as generous as possible

Lucy P. Allen

in trying to find things that had similar wording or similar types of content.

Q. Okay. And how would -- how were you instructing them, your coders, to do that?

A. Exactly as I said, to be as generous as possible. And we went through -- I have some examples in my report where we, you know, try to show you that things are -- you know, sometimes use the same words.

But -- so in terms of whether an analyst is mentioning something that has similar words or could be considered the alleged misstatement, there is some ambiguity, and we tried to be as generous as possible in saying yes.

But in terms of whether an alleged misstatement caused the analyst to change his valuation, I don't recall there being anything even close. It was a no --

Q. So --

A. -- without any -- so whether the analysts were saying something that

Lucy P. Allen

sounded similar and might have some similarity to a misstatement was a more -- required some subjectivity, I would say, and we tried to be very generous in that.

There was no ambiguity in deciding whether an alleged misstatement caused the analyst to change his valuation.

Q. And when you're -- when you're talking about whether the analysts were saying something that sounded similar, might have similarity to the misstatement, you're talking about, for example, the question that's posed in 11 c. in your report?

A. Yes.

Q. Okay. And that's the -- that's the question: Does the report reference the alleged misstatement?

Correct?

A. That's right.

Q. And so the word "reference" there -- and you might have answered this, but just to be clear for the record. How do you define "reference"?

Lucy P. Allen

A. That they appear to be saying something similar to the alleged misstatement.

Q. Okay. When you say "similar," can you be more specific in terms of how you went about determining similarity between the alleged -- the prior alleged misstatements in the reports?

A. So we tried to be just very generous, again, and say are there similar words, similar -- you know, looking for actual words that were the same or looking for words that had similar meaning.

Q. What about -- what about concepts?

Could you think of a situation where an alleged prior misstatement is talking about a particular topic, and maybe there's no exact words used in the subsequent analyst report, but the concept is the same?

A. I think we just -- I mean, I would say yes, we tried to be, again, as generous as possible as trying to say,

Lucy P. Allen

could they be referring to this alleged misstatement?

Q. Okay. So -- so for you, then, for you in your mind, not as an attorney, is there any difference in your mind from "referring," like, whether it could refer to a statement or whether it could relate to a statement; are those two words synonymous for you?

A. No, those are not synonymous.

Q. Okay. And --

A. So are they referring to it? Not could it -- I mean, I think you can say things relate. Like, everything relates. You could say it relates to the company, it relates to the -- you know, or -- I mean, if you asked for discovery, you know, on everything that you have that relates to this case, right -- I don't know.

Yeah, I think "relate" is too general a word that can be used differently.

Things can relate. They could relate to, you know, large-scale projects,

Lucy P. Allen

or it could -- it could -- it could have to do with spacing; but that doesn't mean it is referring to the misstatement.

So I think topics can relate, but not be referring to a misstatement.

Q. So let me ask you this: If -- so if you were to apply your concept of the word "relate," as we just discussed, to your analysis, what, if anything, would change?

A. The word "relate," I don't think is a good word to use. I think relate can be -- it's too ambiguous a word and can be used.

You could say every single statement in every single analyst report relates to each other in some way, because they both relate -- they relate to the same company.

So I think "relate," you know, I may have sometimes used the word "relate," and I think we all often use the word "relate," but I -- I think it's too general a word and it can be -- it's not

Lucy P. Allen

helpful, I think.

Q. Okay.

A. It's not specific enough.

Q. What if I posed a hypothetical to you that that was the standard that we were living in, that the court was going to require us, all of us to use the word "relate," how would that change your analysis?

A. That is not my understanding of what the court would say. I think courts sometimes use the term "relate," but I cannot believe that that is the standard and I cannot believe that the term relate is -- is enough.

And I think that's one of the things that the Goldman decision is saying. You can't just say that this is, you know, similar and that this is a part of something. It has to have -- be more specific than just kind of topically related.

Q. Do you typically read the class certification decisions in cases where you

Lucy P. Allen

have issued an expert report?

A. Did you say vacation?

Q. No. I'm sorry. I, like, stuttered a little bit. I'm getting a little bit of dry mouth from talking.

Do you typically read the class certifications decisions in cases where you've issued an expert report?

A. I don't know if typically I -- I have often read them, I would say.

Q. Okay. Do you know where -- what jurisdiction we're venued in for this case?

A. I don't.

Q. If I told you we're in the Southern District of Texas, would that refresh your recollection?

A. I mean, that sounds -- I -- I wouldn't -- that sounds right, but...

Q. Okay. Were you retained as an expert in the Cabot Oil case in the Southern District of Texas in 2023?

A. I worked on a Cabot case. I don't know what district it was in.

Lucy P. Allen

Q. I will represent to you it was in the Southern District of Texas.

And in that case, do you recall whether the -- you issued a -- issued a report in that case?

A. I don't really, no.

Q. Okay. Do you know whether the court in that case ultimately decided class certification?

A. I don't recall, no.

Q. Okay. So I take it you didn't -- if there was a class certification decision in the Cabot Oil case, you didn't read it prior to coming here today?

A. I may have read it. I just don't -- I don't recall.

Q. Do you recall -- were you deposed in Cabot Oil?

A. I recall doing a project called Cabot Oil, but I don't actually recall whether I had a report or a deposition.

Q. Okay. If I posed a hypothetical to you that there's a case in

Lucy P. Allen

the Southern District, post-Goldman, that were to say that corrective disclosure and prior misrepresentation need only relate to or be relevant to one another, would that --

(Reporter seeks clarification.)

Q. -- that the corrective disclosure and the prior misstatement need only be related or relevant to each -- to one another, would that be a shocking concept to you?

MS. HEFLEY: Objection. Lacks foundation.

A. I don't know.

Q. Okay.

A. I mean, I don't -- I'm not sure what you're talking about.

Q. You looked at a number of cases in your materials considered -- withdrawn.

There's a number of cases you -- you considered in your materials considered; correct?

A. There are some cases cited, correct.

Lucy P. Allen

Q. And fair to say the Cabot Oil decision is not among those cases; correct?

A. That's correct. I don't know if it's fair to say, but it's not there.

Q. It's not there. Yeah.

Let's go to 11 d., again, back on page 5 of your opening report.

A. Okay.

Q. In that question there, you're looking for "does it reference the event"; correct?

A. Yes.

Q. From an economic standpoint, what does the name of the event have anything to do with, really, anything -- anything to do with price impact?

A. Isn't the name of the event. If -- if an analyst report doesn't even mention the event in which a misstatement happened, then -- so, some of these misstatements are so non-specific that it's somewhat ambiguous whether -- it's not as easy as just searching for, you know, one term.

Lucy P. Allen

But if a -- if a -- if the event -- if they don't even mention that there was a conference call or they don't even mention that there was an SEC filing, then it's further evidence that the information within that event was not value-relevant or important enough to the analyst; but they're not even bothering to mention that there was -- that there was a conference call or an SEC filing.

Q. But I'm just trying to understand from an economic standpoint, what does that have anything to do with whether or not there's price movement with given news?

In other words, where the news is coming from doesn't necessarily matter as much as what the news says; right?

A. If they don't bother to mention the event that it's in, so if they don't mention the -- if there's a conference call -- so there's an earnings -- there's, you know, an earnings release and then there's a conference call, and if all they

Lucy P. Allen

do is mention the earnings release and they never mention the conference call, then there's evidence that there wasn't anything particularly important to them in the conference call.

If they don't even bother to mention the event where the alleged misstatement happened, then it's evidence suggesting that there was nothing in the whole event, much less that the individual misstatement within the event was important to them.

Q. What's your basis for that in the literature?

A. Analysts mention information that is important to them, and failing to -- what analysts talk about, if they're not even -- if they're not only not even talking about the misstatement, but they're not even talking about the event that the misstatement was in, then that is further evidence that that was not important to them and did not affect their valuation of the company and the stock.

Lucy P. Allen

And the -- the academic literature looks at what analysts look to and analyzes what they think is important, as do the courts, as does Mr. Coffman.

So I think the academic literature, the plaintiffs' experts and the courts all find that what analysts say is evidence of -- and what affects their value is evidence of what is important to the market.

Q. I guess my question is a little more specific, and if you don't recall, that's fine. You know, you're here today to -- to give us your opinions and your bases. I'm just trying to get an understanding.

Is there any economic literature that you can think of that supports an -- like, supports the proposition that an analyst referencing the event from which the information came from as either being important or significant to the analysis?

A. So what analysts mentioned,

Lucy P. Allen

absolutely. So what analysts mentioned, I've just said, is important; and if they haven't even mentioned the event, then you know they're not even mentioning the information.

So if you don't see them --

Q. Okay. Let me just pose a hypothetical, because I'm not nearly as smart as you, not even close; I'm just trying to get an understanding here.

If -- if I was company -- if I was Enron, right - I don't know if you've seen Fact Pattern - and I came out and I said, hey, guys, we've been hiding something from you, and there's been rampant accounting issues, and we're about to hemorrhage 50 percent of our business, right? And I say that in an earnings call or I say that in a press release.

And the analyst just says -- isn't it possible in that situation the analyst doesn't mention the press release or the earnings call and just says, the news came out today from the CEO, the

Lucy P. Allen

company is going to lose 50 percent of its business?

A. That would be mentioning it. So that -- we would count that as mentioning it. They'd say, news came out today from the CEO. That's what we're saying.

If they say, news came out today from the CEO, and they don't say the word -- they don't say the word "press release" or something, we'd say, yes, they are mentioning the event.

They're saying that there was this press release. That's exactly -- we don't care if they mention the words. We're saying, are they mentioning that this happened?

So that's exactly -- we would absolutely code that as yes.

Q. Yeah, but here you have it as, does it reference the event? And then you give a description of what kind of events you're looking at. I'm looking at 12 d., for the record.

Lucy P. Allen

A. Yeah, they -- where it's saying, is there some reference to that. Not, do they use those words? Do they -- do they say, this morning we learned something, so we know that that's the analyst call, or they say the -- we know something.

We're not saying they have to use those words. If they're referencing how they got that information, right?

So in your example with Enron, people aren't going to just say, this is it. They'll say, we learned today, and then we'll know, okay, you learned today, so you are referencing an event that happened today.

Q. Right.

A. Or, we learned this morning. Or -- that's what we're doing. So we're -- we're -- if -- we're seeing are there -- is there any reference to that -- that, you know, they heard it on a call, they got it as...

We're not looking for those

Lucy P. Allen

words. We're looking are they referencing that event at all.

Q. For example, on page 10, on paragraph d., it's on page 10. And this is what I don't understand, but maybe you can help me clarify this. So let me know when you're on page 10.

A. Yeah.

Q. Paragraph d., second sentence.

"For the 2 alleged misstatements that were made in SEC Forms 10-K, none of the analysts mentioned the Forms 10-K."

So that goes to my point. Like, why does that matter that the 10-K is being referenced? How is that relevant from an economic standpoint? Isn't what matters is just the information itself?

A. Right. But if they're saying -- so -- so, typically, first there's a press release, there's an earnings release, then there's often an earnings call; and so, if those things happen between the same market close and,

Lucy P. Allen

you know, within the same day, right -- well, they don't even have to happen within the same day, but we're looking three days after.

So if -- the SEC Form 10-K usually comes out after, and if there's additional information in there that an analyst's thought was relevant, they would say -- so typically, they would say, this is what happened, we got -- you know, the company put out an earnings release and this is the information.

And if later there's something in the 10-K that gave them new information that was relevant, then they'd say, and then later we found out, or they may issue a report later.

But they typically tell you where the important information came from, especially when they are in different events or sources and different points in time.

So we're not looking to whether they literally say it's in the -- whether

Lucy P. Allen

those terms are in there, but whether there's anything that indicates that they are mentioning that this is -- had been an additional source of information.

Q. Let's go to 12 a., right, on Category A, page 5 of your opening report.

A. Okay.

Q. And so the top of this: "For each analyst report issued after the July 31, 2019 alleged corrective disclosure, the following was coded for each alleged misstatement."

Do you see that?

A. Sorry. Which paragraph are you on?

Q. 12.

A. Okay. Yes.

Q. Okay. And so here what you're doing is, you're gathering analyst reports post-corrective disclosure; right?

A. Correct.

Q. And then you're getting answers, coding answers to these questions right below?

Lucy P. Allen

A. Right.

Q. And then, ultimately, you're comparing -- you're comparing the analyst reports -- the information in those analyst reports to what; the prior alleged misstatements or to the corrective disclosure itself?

A. Sorry, I don't understand that question.

Q. You eventually take this information and look back in time, right?

Are you looking back at the alleged prior misstatements or are you looking at what's being said in the corrective disclosure?

A. I'm not understanding. Are you on, like -- each -- so each one of these, it -- it says "for each analyst report issued after this," after the corrective disclosure.

Q. Right.

A. So I think we go out three days, I believe. And then question a. "Is there any indication in the report" - so

Lucy P. Allen

there's one, you know, each analyst report by analyst report - "that the analyst learned the prior misstatement was inaccurate or misleading?"

So I would go to each of the alleged misstatements, so all -- you know, do each one one by one.

Q. Okay. You know, looking at Goldman, right -- by the way, none of the questions that I ask today are adopted admissions of plaintiffs' position on anything.

In other words, I'm not asking questions that I necessarily agree with in terms of seeking opinions and things like that. I'm just trying to get an understanding of where you stand on things.

But let's assume, for example, that Goldman -- the Supreme Court's decision in Goldman is in play. We all agree that that mismatch analysis is appropriate.

Under that circumstance, doesn't the court there look at a mismatch

Lucy P. Allen

between the corrective disclosure and the prior misstatements, not analyst reports that follow the corrective disclosure?

A. That was a long question.

Q. Sure. Is it your understanding for this match analysis under Goldman that you are to compare post-corrective disclosure analyst reports to alleged prior misstatements, or something else?

A. So you're now asking me what my interpretation is of the Goldman decision; is that your question?

Q. In part. I mean, it does guide some of your analysis; correct?

A. I wouldn't say it guides my analysis. I think my analysis is my analysis, right, regardless of the Goldman decision.

I have, I think, referenced it, but I am doing -- here, I'm doing a content analysis, and I think the -- the answers to this -- I mean, I do think that this is -- the Goldman decision, I think these answers are instructive and I think it does, you

Lucy P. Allen
know, speak to the mismatch issue that the Goldman decision raises.
I forgot what your exact question was, though.
Q. Is it your understanding, in Goldman, what the court was doing was looking at the corrective disclosure and trying to match it with prior alleged misstatements?
A. So I think what the court was doing, and I think what the experts were doing in the Goldman case is saying that what the market understood from the corrective disclosure was a mismatch between that and what the prior alleged misstatements were.
Q. Were you one of the experts in Goldman?
A. I was not.
Q. Did you read the expert materials in Goldman?
A. I may have read some of them.
Q. Okay. Going to 12 a., the question there is: "Is there any

Lucy P. Allen

indication in the report that analysts learned the prior misstatement was inaccurate or misleading?"

Do you see that?

A. Yes.

Q. Okay. What do you mean by the word "learned"?

A. That the analysts -- I'm not sure how to -- I'm not sure how to say what that word means.

Q. Well, I mean, the coders were looking for information, right?

So how did you instruct the coders on that -- on that term learned?

A. I did not need to instruct them. They read the question, and did not ask me what the term "learned" means.

Q. How do you control for potential errors if -- if certain words aren't defined within the question that's being used for coding?

A. To me, it is not ambiguous what that meant, and it was not ambiguous to any of the coders. I -- nobody asked what that

Lucy P. Allen
meant.
Q. Right. I --
A. I mean, you're asking a question that nobody asked. To me, it seems clear --
Q. Well, I'm a lawyer. That's what I do; I look at words and they can have multiple meanings, but --
A. So I gave them no further instruction on the meaning of the term "learned."
Q. Okay. As you're looking at that, how do you -- how is it that your -- withdrawn.
How is it that an analyst can learn that a prior misstatement was inaccurate or misleading?
A. How could they learn that?
Q. Yeah.
A. New information could come out that tells you that a prior statement wasn't true or gave some indication that the prior statement wasn't true.
Q. How do you determine at that

Lucy P. Allen

point -- let's say that does happen, the hypothetical you just gave. How is it that you're able to determine, without talking to the analyst, that the analyst learned that the prior statement was inaccurate or misleading?

A. I'm not -- the question here is, is there any indication in the analyst report that they learned the prior misstatement was inaccurate or misleading.

So, I mean, for example, you can have an accounting restatement, and the analyst says, oh, the company just came out and they're restating their prior accounting and we're now revising our, you know, things, our numbers going forward; and that would be an instance where the analyst has indicated that they learned that the, you know, prior revenue, for example, was misstated.

Q. Okay. And that would be an evidence of a prior misstatement being inaccurate, right? That's sort of black and white. The numbers are different from

Lucy P. Allen

what they originally said; fair?

A. That example was, yeah.

Q. Right. In other instances, like the term you have here in this question, "misleading," that determining what is misleading and whether an analyst learned something was misleading is potentially subjective; fair?

A. I don't know. I don't know if it's subjective that they gave some indication of that in the report. So if they said, you know, the company said this, and we had been under the impression that they were telling us something else, then that would be an indication that they -- that they thought the prior misstatements was misleading.

Q. Do you have an opinion one way or another whether something is misleading is a determination either for the court or for the jury?

MS. HEFLEY: Objection. Calls for a legal conclusion.

A. I mean, perhaps in a -- there

Lucy P. Allen

can be a legal -- it could be legally necessary to decide whether something's misleading, from a legal perspective.

This is whether the analyst thought that. This is whether there's any indication the analyst thought that.

Q. How could you know what the analysts are thinking if you don't talk to them?

A. Because the analysts -- the whole point of an analyst report is for them to tell you what they're thinking. The analyst report tells you what they're thinking at that point in time.

That is the point of the analyst report.

Q. Right. But --

A. It's to give you their thoughts at that point in time, all their thoughts that they think are important and relevant to the value of the company, of the stock price. That is exactly the purpose of an analyst report.

Q. Right. But in one of the

Lucy P. Allen

articles you cite credits. I mean, do you recall whether in that article the author has acknowledged the fact that analysts do not include all information considered in their reports?

A. I don't recall that. But certainly, an analyst wouldn't necessarily include everything that they inserted, but they will -- the analyst report is to tell you, this is what we think is important and what is important in terms of the value or what's value-relevant important to the price, the stock price of the company.

Q. Isn't it possible that an analyst report doesn't explicitly say they learned something, but the analyst could have, in fact, learned that a prior misstatement was misleading?

A. It's possible that the analysts learned something and they don't put it in the report. The report gives what they think is important and what they think is important to valuing the stock price. So they give you what they think is the

Lucy P. Allen

value-relevant information.

It certainly is possible that there is something else that they've learned, that they didn't put in the report.

But they are intentionally trying to give what they think is important -- the important information and what's important to valuing the stock price.

Q. Right. But you acknowledge that, in some instances, analysts could be incentivized not to use words like "misleading" or share possible negative thoughts outside of objective economic data in their reports; right?

A. So that's a very different question. Can you ask that question?

Q. Sure. You acknowledge that, in some instances, analysts could be incentivized not to be, or not to reference that something was -- something previously stated was misleading or share negative thoughts about the company outside of

Lucy P. Allen

objective economic data?

A. Yeah, I don't -- I'm not sure what you're saying. Are you saying they're not going to -- the analysts themselves are going to be biased; is that what you're saying? Or they're --

Q. Yeah, the literature talks about that to some extent, doesn't it?

A. There is some literature saying that analysts can be biased.

Q. Are there potential conflicts of interest?

A. There is some literature that discusses that that's possible.

Q. Let's move on to 12 b. And there you have: "Is there any indication in the report that the analyst made a connection between the alleged misstatement and the alleged corrective disclosure?"

Do you see that?

A. Yes.

Q. What do you mean by "made a connection"?

A. So these are -- these are the

Lucy P. Allen

questions. I didn't write them. And --

Q. Right. But -- and I --

A. And I did not -- they --

Q. You signed on to them. You signed the report and you submitted it in a federal case. And so I'm asking you what the words mean in your report, to "made a connection" --

A. So was there any indication --

MS. HEFLEY: Objection to form.

Sorry. Go ahead.

A. The question is, was there any indication in the report that the analyst made a connection between the misstatement and the alleged corrective disclosure; and I think that that was the instruction that was given to the coders and...

Q. Right. So I'm trying to understand. There was instructions given to the coders.

What was the instructions on the words "made a connection"? It's underlined here.

A. It's because those are the --

Lucy P. Allen

they're underlined just to help you understand what's the difference between one question and the other.

There was no further instruction given to them on what is the meaning of those words.

Q. So if I wanted to know how a particular coder made a connection, I would need to speak to that particular coder?

A. No. The coders all didn't have a -- there wasn't a difference in terms of their coding and their understanding of that.

So having the -- the checking, that wasn't something that came up as an issue as what does the terms "made a connection" mean.

Q. Okay. But your -- one of your roles in this report, in generating this report, was to supervise and manage the coders; correct?

A. That's right.

Q. And in the management and supervision of those coders, what is your

Lucy P. Allen

understanding of the terms "made a connection," for purposes of coding?

A. So I didn't tell them anything about what that -- what those terms mean. I think that if there was any indication that they made a connection, I think the terms, they're common English terms, and I don't think that needed further clarification.

Q. Well, I guess my concern is, sometimes the issue of making a connection is something that lawyers do and judges interpret and jurors determine.

And so I'm trying to understand what kind of connection exactly the coders were trying to make when analyzing the analyst reports.

So having said all of that, do you have --

A. So it would be that, at the time of the alleged corrective disclosure, were they making a connection and saying -- going back to an alleged misstatement and saying that, you know, that this is

Lucy P. Allen

different when they -- what they previously told us. This -- you know, they told us this previously, and now they're saying this.

Q. Can you give me in the context -- can you give me a hypothetical of that, in the context of oil and gas? We won't have to be specific as specific to Concho, but of how a connection would be made?

A. I don't know if I can do that. So, for example, in the -- in an accounting misstatement case, making a connection would be they, you know, previously told us this, and now they're telling us that, and it's a change of this; so that -- that is clearly making a connection.

You know, making a connection would be that they -- I'm trying to -- in discussing the alleged corrective disclosure, are they connecting that to a prior misstatement in any way?

Q. So, like, specific words, for example?

Lucy P. Allen

A. If they are making any connection between them.

Q. Is it possible that an analyst made a connection, but didn't explicitly write it in his or her report?

A. That's possible. I mean, I don't know what that means to make a connection, but...

Q. So moving along on -- and maybe we can speed things along now with the remaining parts of the question to this part of the report.

So 12 c. says: "Does the report reference the alleged misstatement?"

Right?

A. Yes.

Q. And that's an identical question to 11 c. above?

A. It is, except one is when the misstatement is made, and the other one is when the corrective disclosure is made.

So the question is the same, but the "see above" is at the time of the misstatement, did they reference it.

Lucy P. Allen

And 12 is, at the time of the corrective disclosure, did they reference the misstatement.

Q. Right. And I guess my point is, like, we -- we spent some time talking about 11 c. and how you and your team went about it.

Is there any difference in how you and your team went about --

A. Oh, I see.

Q. -- 12 c.? I'm just trying to speed things up --

A. Yeah, no, there isn't --

Q. -- difference in your answer --

A. You're correct.

(Overlapping speakers.)

THE COURT REPORTER: One at a time.

Q. Would there be any difference in your answers in the methodology and how you conducted 12 c. than with 11 c.?

A. No, no difference. Yeah, you're correct.

Q. And the same thing with 12 d.,

Lucy P. Allen

would you agree with me -- oh, there is a slight difference.

There is a slight difference between 11 d. and 12 d.; right?

In 11 d., for example, there's a limiter for earnings releases; correct?

A. That's right.

Q. Okay. Why isn't that same limiter there for 12 d.?

A. So in 11 d., after an earnings release, almost all analysts will issue an analyst report, and they will all mention the earnings release; so it would be very odd to not mention the earnings release.

Q. Right. But why would you screen that out?

A. So for d., saying that they mention the earnings release doesn't really tell you. It --

Q. But isn't it supposed to be more objective than less objective; does it reference an event?

A. Right. So telling you -- every analyst will reference -- almost every

Lucy P. Allen

analyst will have a report that mentions an earnings release, because an earnings release is -- you know, quarterly earnings are important, and analysts issue reports after earnings releases.

Q. Was the corrective disclosure on July 31, 2019, was that part of the earnings release?

A. Yes, I think so.

Q. Okay.

A. So d. is saying: "Does it reference the event of the misstatement?"

So does it reference the much earlier event that included the misstatement, which would be a more unusual thing to do with a corrective disclosure, but at the time of -- of an earnings statement, all of the analysts that will be -- all of the analysts typically will issue reports and will mention that there's been an earnings release.

So just saying that there's an earnings release really doesn't tell you anything about whether there's anything

Lucy P. Allen

important in an alleged misstatement.

It's really not going to tell you anything.

Q. All right. Moving along.

MS. HEFLEY: Just quickly. I think we've been going almost two hours. I don't know how Roberta is doing.

MR. COTILLETTA: Do you need a break?

THE COURT REPORTER: Yes.

THE VIDEOGRAPHER: We're off the record. The time is 12:42.

(Luncheon recess taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 1:15.

BY MR. COTILLETTA:

Q. Good afternoon, Ms. Allen. How are you?

A. A little stressed. I've got an air conditioner issue, but, other than that...

Q. Oh, I'm sorry to hear that.

So, on the break, did you --

Lucy P. Allen

were you in the room with your attorneys?
A. Yes. They're not mine. I was -- they're not my attorneys. I was with the defendants' counsel.
Q. Baker Botts attorneys?
A. Yes.
Q. They're not -- you don't consider them your attorneys?
A. No.
Q. And in that room, what did you guys talk about?
A. Mostly my air conditioner issue. I'm having an air conditioner installed today, that I've been trying to do since last October, so...
Q. Okay. Switching gears.
For Categories A, B and C, is it your opinion in this case that there's no back-end price impact?
A. So price impact, as it relates to a securities class action, is whether the alleged misrepresentations impacted the price, and there are -- there can be more; but two ways of analyzing whether the

Lucy P. Allen

alleged misrepresentations impacted the price.

And the question is whether they impacted the price when made.

There are a couple of ways -- or there -- that you can analyze whether the alleged misrepresentations impacted the price when made, and one is to directly analyze it at the time that the alleged misrepresentations are made, which is sometimes you could refer to as a front-end analysis, or you could analyze it at the back-end when alleged corrective disclosure is made.

But the question isn't whether there's -- whether the price moved when the alleged corrective disclosure is made. It's whether there's evidence at the alleged corrective disclosure that the misrepresentations impacted the price when they were made.

Q. Okay. I just want to focus on the concept of back-end price impact, because my question was a little bit

simpler. I do appreciate you providing that to me, because we're going to get into it at some point.

For Categories A, B and C in your content analysis, do you have any opinions in this case that, for those categories, there's no back-end price impact?

A. So there's --

MS. HEFLEY: Objection. Form.

I think the issue is with the term you're using, back-end price impact, is what she was just explaining.

Q. Okay. You're -- somewhere in your report, you reference the difference between front-end and back-end price impact, is what people typically call them; correct?

A. So it's not back-end price impact. It's front-end and price-end [sic] analysis of price impact. The only price impact is relevant --

THE COURT REPORTER: I'm sorry,

Lucy P. Allen

"it's front end."

A. -- and back-end analysis of price impact. When it impacts -- the price impact is when the alleged misstatement is made. You can analyze it by looking at an alleged corrective disclosure, at the time of the alleged corrective disclosure, or at the time of an alleged misrepresentation; that's when you're analyzing it. But when the actual impact should be is at the time of the misrepresentation.

Q. And that's -- that's a statement that you've held true in many other expert reports before today?

A. Yes, I believe that's correct.

Q. You were always consistent in that explanation?

A. I think so.

Q. Has your opinion ever changed over the years?

A. No. I think the one thing that has changed is people talk about front-end and back-end, and I used to say I didn't think that made sense.

Lucy P. Allen

Now I'm agreeing that you could take front-end and back-end analysis, but it's still not back-end price impact, so...

But in terms of the analysis and what I think is relevant, that has not changed.

Q. I'm looking for something, but, in the meantime, for Categories A, B and C, is it your opinion there was no price impact?

A. So it's my finding that there is no price impact from the Category A, B and C alleged misstatements, and that analysis at -- analysis, including an analysis of the corrective disclosure, does not give any evidence of price impact from any of those alleged misstatements.

Q. Now, in terms of -- you say, so it's my finding. Is that the same thing as, are you concluding, or have you concluded that there is no price impact from the Category A, B and C alleged misstatements?

A. Yes, I would say that's the

same thing.

Q. Okay. For Category A, you conduct what you have described as a front-end price impact, correct, analysis?

A. Front-end analysis, yeah.

Q. Okay. You didn't do that for B and C; right?

A. That's right.

Q. Was that because counsel asked you not to?

A. They did not ask me to do that, but it also doesn't -- well, I guess for -- for all of the alleged misstatements, I did look at whether there was a statistically significant price increase in their stock due to the alleged misstatement; so I guess that is a front-end analysis of price impact.

So I did do that for all of the alleged misstatements.

Q. A through C?

A. Yeah.

Q. Just out of curiosity, then, why isn't the first set of questions that

Lucy P. Allen

you used for Category A used for Category B and C?

A. So, for example, Category C is about pre-2019 projections. So whether they impacted the stock price when made isn't relevant if they're not impacting the stock price at the corrective disclosure, if they're already moot by the time of the corrective disclosure. So that's not -- that's not relevant to price impact from the alleged misrepresentations.

Q. But aren't some of -- okay.

The July 31, 2019 corrective disclosure, that was related to the second quarter earnings announcement?

A. That's correct.

Q. Okay. And do you recall whether or not any of the Category C statements contain statements from the same quarter?

A. If any of them occurred during the second quarter?

Q. Correct.

A. I don't think so. Or that's

Lucy P. Allen

not my recollection. Let me just see.
Yeah, so I don't think the Category C ones happened during the second quarter.
Q. Okay. What about the first quarter?
A. I don't think so, but I can look, and look at the dates.
Q. We can come -- we can come back.
A. Okay.
Q. I think it's a matter of whether it's in there or not --
A. Okay. Yeah.
Q. -- but if you don't recall, that's fine.
You mentioned at some point that the -- in your report that the plaintiffs allege that Concho -- Concho stock traded in an efficient market; right?
A. I don't know if I mentioned it, but I do recall that they -- they claim it.
Q. Did Concho stock trade in an efficient market?

Lucy P. Allen
A. I didn't analyze that question.
Q. Okay. Mr. Coffman did analyze market efficiency in his opening report; right?
A. I think that's correct.
Q. Okay. And in your opening report, in response to his report, and in your sur-reply report, and correct me if I'm wrong, I don't see any criticisms with his market efficiency analysis. Do you -- am I wrong in that?
A. I wasn't asked to analyze market efficiency, so I don't have an opinion one way or the other.
Q. Sitting -- as you sit here today, do you have any reason to doubt that Concho stock traded in an efficient market?
A. Not off the top of my head.
Q. Is it more likely than not that Concho's stock traded in an efficient market?
A. I mean, I haven't analyzed that question.
Q. Your conversation about

Lucy P. Allen

back-end price impact analysis -- withdrawn.

We just talked about front-end, right?

Now, on this back-end pricing impact analysis, or, as you define it, did you conduct that analysis for Categories A through C?

A. The analysis that I -- that I do is -- my instruction was to perform the analyses that are described, the content analysis as well as, and I think the answers to the analysis show no evidence of price impact from Categories A, B and C.

I forgot exactly what your question was.

Q. Yeah, I wasn't looking for whether the evidence or if there's a consistency with.

I'm looking for, do you have an affirmative opinion in this case that there is no what you describe as back-end price impact on Categories A, B and C?

MS. HEFLEY: Object to form. I

Lucy P. Allen

don't think she called it back-end price impact.

Q. You get my point. Whatever -- I don't want to mince words.

A. So I have found that there is no evidence of price impact from Categories A, B and C.

Q. Okay. I appreciate that. We're jumping around a little bit, and that's okay.

Can you go back to your opening report?

A. Sure.

Q. And if you don't mind going to page 9, paragraph 21?

A. Okay.

Q. So there, at paragraph 21, it reads: "The Category A 'generic' misstatements include statements about the Company's business, operations and prospects that were generic in nature."

Do you see that?

A. Yes.

Q. Okay. There, you're using the

Lucy P. Allen

term "generic in nature," not in the context of categories constructed by counsel; right?

A. I am really using it as -- as how -- I mean, I am saying yes, that they're generic as the way I had testified earlier about how my understanding of how Goldman is using the term.

Q. Okay. And in the second bullet point there, in the same paragraph, there's a quoted language from one of the Category A statements, and it says: "Our results reflect our focus on large-scale project development, which enables us to maximize ultimate recovery, efficiencies and returns."

Do you see that?

A. Yes.

Q. Okay. What is generic about that statement?

A. It's -- so, again, this is the -- I am intending to use the term in the same way as I understand the Goldman decision does, but I have not made a

Lucy P. Allen

determination about whether these are generic, and my report does not depend on the categorization of that term.

But, notwithstanding all of that -- and I probably should have just put it in quotes rather than made it sound as if I personally have a view on what the term generic means; but, notwithstanding that, why that, to me, is generic in a way that the Goldman decision uses that term is that this doesn't -- is a general statement that doesn't tell you anything specific about the value of the -- the company and anything.

Q. Well, is that what you understand Goldman to me, that the statement has to talk about the value of the company?

A. Something specific that would have some relevance to the value of the company. It can't be specific that is irrelevant to the value of the company.

Q. But isn't the terms "large-scale product development" a unique

Lucy P. Allen

term used by Concho?

A. No, it's not unique to Concho. That is a term that -- there's no question that Concho was doing large-scale project development; that is not a dispute.

So plaintiffs are not claiming that the company was saying they were doing large-scale development, and they weren't actually doing it, or that they were doing it and that they weren't saying it.

So the -- the -- the fact that the company was doing large-scale project development is -- is not a -- that, in itself, is not a misstatement.

Q. But here, they're drawing the bridge between large-scale project development and its ability to, for lack of better words, increase the efficiencies and returns of the company; right?

A. Well, I don't know. You're -- you're rephrasing this.

Q. I took two words out. I left a couple of words out. But it's generally the same, is it not?

Lucy P. Allen

A. I don't know. You added some different words. I mean, it says what it says. It's saying, our results reflect our focus on this. So they are focusing on that. There is no question. Plaintiffs aren't arguing that they aren't focused on that, and their results clearly are results in general, do -- do reflect what you do.

So this says, our results reflect what we do. And then this -- the rest says "which enables us to maximize ultimate recovery, efficiencies and returns."

And every company's -- you know, if they're fiscally responsible, should be trying to maximize returns and efficiencies and recovery.

So, I mean, you're -- that's really not telling you anything specific; you should always be trying to maximize the good things and...

Q. So let me ask you this: Do you recall whether or not the alleged misstatements include the theory that the

Lucy P. Allen

large-scale development project was used as a means to show that they have great execution abilities or superior execution abilities?

A. I don't understand that, no.

Q. Sure.

A. That doesn't sound right to me.

Q. Okay. So you don't recall whether or not there's any misstatements in the complaint, for example, that discusses large-scale development projects in combination with the ability to execute a -- to a greater extent than industry peers?

MS. HEFLEY: Objection. Lack of foundation.

MR. COTILLETTA: I'm asking her is she recalls something from the complaint, whether that allegation is in there.

MS. HEFLEY: Well, that presumes that the allegation is in there in your question.

So that's my objection.

Lucy P. Allen

A. I don't recall that specifically, no.

Q. Do you recall whether or not the plaintiffs tried to draw a bridge in the allegations between large-scale project development and execution abilities?

A. I mean, your question is saying do they make a connection between large-scale development and -- and performance; and, yes, the company is about performance.

I mean, ultimately, performance is what a company is supposed to do, and large-scale project development is what the company was doing, and there isn't any dispute that that is what they were doing or that is a description of what they were doing.

So, you know, that would just -- a statement that makes a connection between what the company is doing and how they perform is pretty much what almost many statements would be.

So I'm quite sure that there

Lucy P. Allen

are alleged misstatements that say something about what the company is doing and performance, but they're not specific. They're just saying, you know, that this is what the company is doing, and that -- that is, you know, we think it's good.

Q. But --

A. And --

Q. Go ahead. I didn't mean to cut you off.

A. Yeah. So that's a very generic statement that doesn't really tell you anything specific.

Companies, by definition, are doing what they think is good and will lead to better performance, and what the company actually was doing or what it was called was large-scale project development.

Q. If I pose a hypothetical to you, I'm just trying to figure out whether you would think this would be still generic in nature.

So if the company is touting the benefits of large-scale development and

Lucy P. Allen

saying that it's going to increase efficiencies, for example, and then their corrective disclosure comes out and they say the large-scale development projects are failing, for example, and, as a result, there needs to be cutbacks of some sort throughout the company, including how they conduct large-scale development projects.

Would -- in your eyes, would the prior statement be considered generic?

A. Well, so I don't -- I think a statement that this is what we're doing, when everyone knows that that is what you're doing, doesn't tell you anything specific, right?

So the company is saying we're doing something that everybody knows isn't a specific statement, and saying that what we're doing we think will go well is really not a meaningful statement either, because obviously you're doing it, so you would be thinking that it's going to -- it's going to help you.

So a company doing -- just

Lucy P. Allen

saying that we think what we're doing is going to -- is going to lead to good outcomes is -- is what I would call a generic statement, similar to what -- the way I understand the Goldman court thinks of it, because it doesn't tell you anything.

Obviously, if they're doing it, they must be thinking -- expecting it to be good; and that is what they were doing.

So just saying that we think our processes are, you know, we're doing -- what we're actually doing, we think we're doing to, you know, maximize returns and get better results, is -- is sort of what every company says or what every company should be saying.

It doesn't tell you anything meaningful. It's just that is -- that is what a company is doing; they should be doing what they think is -- will lead to better outcomes.

Q. Right. But would your opinion change at all then, though, if the

Lucy P. Allen

large-scale development project --
large-scale project development angle was used by the company kind of, like, their secret sauce, if you will, like, their ability to grow exponentially compared to peers?

Would that change your analysis in any way?

A. I don't -- I'm not sure what you're saying. If they say, we have now developed a secret sauce, you know, maybe that could be a statement, and then, you know, that would be a statement you could say, does that -- you know, is that meaningful or does this sound just like something everyone says?

And you could analyze whether that was generic, did that mean anything to the market, or just saying we have a secret sauce sounds, you know, like nothing; it's just sort of what everybody says.

Q. Okay. And you're forming the basis -- the basis of your opinions regarding these kind of distinctions are

Lucy P. Allen

formed from what; Goldman?

A. No. The distinctions that I'm forming in my report are not -- isn't my opinion that this statement sounds generic and, thus, seems meaningless. It's that the -- the -- how is the market and the analysts, the professionals, when they heard that statement, what did they do?

Did they say, this tells me something new, and I am now going to value the company differently because I heard this statement? Or is this statement just -- I don't even bother to mention it. I don't even put it in my report.

I don't even put it in my report that the conference call that the statement was in; there was nothing in the conference call that was worth even mentioning in my report.

That's what I'm looking at. I'm not making a determination myself about whether, in my mind, a statement sounds meaningless or not meaning to the value.

I'm saying, let's look at every

Lucy P. Allen

single analyst that is following the company, and look at what every single one of them said after this statement is made, and is anyone saying that this statement meant anything to them in terms of the value of the company.

Q. Okay.

A. And I'm finding that there is not one analyst that said, oh, now I've learned something, this statement means something to me; I'm going to, in fact, change my model or raise my price target or do something because of that.

They don't even mention that. They're -- they're -- they're non -- non-entities, is what I am seeing from the analyst report.

So it's not my opinion that these statements are generic.

What I am doing is analyzing whether the market, and, in particular, the professional analysts that cover the company, and there are a lot of them, and they're uniformly, you know, basically

Lucy P. Allen

saying, you know, nothing.

Q. Okay. And you've raised a good point and we'll break that up a little bit.

So let's go to page 17, paragraph 40 of your opening report.

Are you there?

A. Yeah.

Q. Okay. And you say here in paragraph 40: "I do not understand Plaintiffs to be claiming that the alleged misstatements in Category A increased the alleged inflation in the stock price when made."

Do you see that?

A. Yes.

Q. Why do you say that?

A. I quote certain paragraphs to the complaint.

Q. Okay.

A. So I -- I believe those paragraphs may help.

Q. Okay. And then I think you go on to say: "However, I was asked to analyze whether there was a statistically

Lucy P. Allen
significant price increase due to the alleged misstatements in Category A."
Right?
A. Yes.
Q. Why would you go ahead and analyze -- withdrawn.
So what this is basically saying is -- what you're looking at here is what we called earlier the front-end price impact for Category A; right?
A. Front-end analysis of price impact.
Q. Okay. And so why did you go ahead with a front-end analysis of price impact for Category A, when you acknowledge that the plaintiffs are not alleging an inflation increase theory?
A. Well, I say I don't -- I don't understand they to be doing that. But, you know, it's not entirely clear to me.
So to be -- to be safe, I think it makes sense to analyze whether -- to do the analysis at -- at both end.
Q. Okay.

Lucy P. Allen

A. You know, whether they're -- I think, to be safe.

Q. Okay. And when you say "to be safe" --

A. Or extra conservative in -- yeah.

Q. And just so I understand. If plaintiffs were alleging a price inflation maintenance theory instead, instead of an increased inflation theory, would you agree with me then that the front-end analysis of price impact for Category A would be irrelevant?

A. I don't know if it would be irrelevant, I mean, just because they are alleging that. I mean, I think you could also -- if it's maintenance, then you'd have to say, well, were they previously saying it, right?

For something to be a maintenance, you have to think that you had previously said it; so then you could look at when they first said the statement.

So I'm not really sure that it

Lucy P. Allen

is irrelevant. And just because plaintiffs use the term "maintenance" doesn't mean -- doesn't mean it's economically irrelevant.

Q. Here, you find that, with Category A, that there was no statistically significant increase in Concho's stock price following any of the alleged misrepresentations in Category A; right?

A. Due to the misrepresentations. I don't know if I -- if there might be a couple of dates where the stock price went up, but it wasn't due to the alleged misrepresentation.

Q. Yeah, I think, if my memory serves me right, there was at least one date, right? Excluding that out for a second. Excluding that one date out.

A. Okay.

Q. The opinion you're offering in this matter is that there is no statistically significant increase in Concho's stock price following any of the alleged misrepresentations in Category A; right?

Lucy P. Allen

A. So I am finding that there's no increase due to the alleged misrepresentations. I'm also finding that there's no increase after 12 of the 13 alleged misrepresentations.

Q. Okay. In the past, has a court ever criticized you for offering an opinion on there being no statistically significant increase in a defendant's stock price following any of the alleged misrepresentations when the theory put forth was not a price inflation increase theory?

A. So there was a court that did seem to -- that did say that a -- a price -- you know, whether there's a statistically significant price increase.

Q. Was it the Allstate case?

A. Yeah. And I agree with the court that it didn't tell you anything in that case. I disagree with the court in thinking that I said it, told you anything.

So I -- I -- I also don't think it told you anything, and I -- I didn't

Lucy P. Allen

actually say that there was any -- I didn't come to any conclusion because there was no increase.

So I agree with the court that it -- it didn't -- you couldn't draw a conclusion from the lack of a price increase in that case.

I did not come to a conclusion. So the court misunderstood.

Q. So I take it you read that decision, that particular decision then?

A. I did read that particular decision. And so I have tried to be clearer, including saying, you know, I don't understand this, but I am doing this anyway here.

Q. Right.

A. So that's one of the reasons why I try to be clear, that I am not necessarily coming to a conclusion from just the lack of a price rise at the time that the alleged misrepresentation was made.

And particularly, in Allstate,

Lucy P. Allen

I did not come to a conclusion from that. I merely stated that there wasn't a statistically significant increase.

Q. Right. The court there, I think, said that you, quote, "erroneously conflated the lack of increase with the lack of inflation," if you recall?

A. Yes, I recall the court saying that, and I think the court misunderstood my conclusion.

I did not come to a conclusion from that. So I've tried to be clearer.

Q. Right. I get what you're trying to do here. I guess my understanding is, in light of the Allstate decision, and in light of plaintiffs' representations in the complaint, why did you then go ahead and still proceed with the analysis for the Category A misstatements?

MS. HEFLEY: Objection. Asked and answered.

A. So what -- in Allstate, I tested whether there was reaction when the

Lucy P. Allen

misrepresentations were made. I did not, in Allstate, come to any conclusion from the fact that there wasn't an increase when the misrepresentations were made.

If there is an increase due to the misrepresentations, I think that's -- that is -- that can be meaningful information.

In Allstate, the fact that there wasn't an increase did not lead me to conclude anything, and I think that's something that I was not clear about, and the court did not understand that.

I'm sure it was my own -- but which -- which isn't to say -- so, in other words, it doesn't mean that testing whether there is an increase when an alleged misrepresentation is made can't be meaningful.

Q. Right. But ultimately, here, aren't you doing what you did -- you're saying you didn't conclude anything in Allstate; right?

A. I'm saying, I did not come to

Lucy P. Allen

the conclusions in Allstate from the fact that there was not an increase when the alleged misstatements are made.

Q. Are you doing anything differently here?

A. What I am doing here is trying to be clearer in not having a misunderstanding, as the court did in Allstate, on whether I had come to a conclusion regarding price reactions at the time the misstatements were made.

Q. So if I were to say to you today - although I'm not making a representation on the record, it's a hypothetical - plaintiffs are claiming a price inflation maintenance theory, right?

Under that operation, does the analysis of the front-end -- front-end analysis price impact for Category A misstatements, does it render that analysis irrelevant now?

A. So I don't know whether it's irrelevant or not irrelevant. But if it -- if plaintiffs -- if plaintiffs are not

Lucy P. Allen

claiming that these misstatements cause the stock price to rise, this certainly does not disprove anything about what plaintiffs are saying.

So if plaintiffs are not claiming that it caused the stock price to go up, when the misstatements are made, then finding that it doesn't cause it to go up when the misstatements were made is certainly not disproving anything in plaintiffs' claim.

Q. Right. What makes it, at that point, still relevant to this matter?

A. Well, I think it still could be the case that a misstatement caused the stock price to go up, regard -- plaintiffs may not have claimed it, but it could be that a misstatement, when made, caused the stock price to go up.

And I think that, if the misstatement, when made, caused the price to go up, I think that would be evidence of price impact from the misstatement. And I am testing that. I do not see that.

Lucy P. Allen

So I think that would be direct evidence of price impact from the misstatement. So the fact that plaintiffs haven't claimed it doesn't mean that it couldn't possibly be there, and that is something that I am also looking at.

And I -- in here, it's not that clear. You know, I don't understand plaintiffs are claiming that it caused the stock price to go up, but maybe they are, and why not test that as well, because that -- that, itself, could also be evidence of price impact for the misrepresentation.

So, to be conservative or cautious, I am doing other tests, even if they aren't ones that plaintiffs are specifically claiming that may favor plaintiff and show price impact from the alleged misrepresentation.

Q. Got it. I appreciate that response.

Let's move forward and try to cut through some of this very quickly now.

Lucy P. Allen

Please turn to page 10 of your opening report.

A. Okay.

Q. And here you're giving results for your Category A misstatements analysis?

A. Page 10. Yes.

Q. Okay. On paragraph 23 c., you reference, quote: "There were 4 analyst reports that mention 4 of the alleged misstatements."

Right?

A. Yes.

Q. Then you go on to say: "...the alleged misstatements appear to be referencing the misstatement in a different context than what is [portrayed] in the Complaint."

Right?

A. Yeah. You're paraphrasing, but that's right.

Q. Yeah. And what do you mean by the words "appears to be"?

A. You're asking me a lot of...

I could give you examples. So

Lucy P. Allen

one of the -- one of these four is an exhibit, a chart, like a PowerPoint that shows the -- the Permian basin, and sort of the different portions of the Permian basin. I think this is after the announcement of the RSP acquisition.

And what the -- so the misstatement includes that chart, and that chart is repeated in one of the analyst reports. But the portion of the chart itself that plaintiffs have focused on as the misstatement is not in the analyst report.

So what is in there is the map and where the -- where the various, you know, facilities and rigs are. But what is not in that is the -- the words that -- which I don't remember what they are; but that's what plaintiffs focus on, which seem -- which have something to do with some sort of positive statements about the company's large-scale developments, I believe.

Q. Right. I think -- I think the

Lucy P. Allen

statement you quote is that the large-scale development "unlocks significant value," I think is the quote you have here, and also "optimizes well performance and increases resource recovery."

Right?

A. Oh, oh, it's right in here.

Q. Yeah.

A. Okay. Yeah, I don't know why I was doing that from my head, then, if it was right in front of me.

Q. There you go.

So how could you draw that connection that -- that it's not referencing an alleged misstatement -- let's take a step back.

The slide, the original part of the slide, did the language -- was the language included anywhere near the slide? Was it referenced in conjunction when the slide was being shown to analysts, or something else?

A. I'm sorry, I didn't understand that question.

Lucy P. Allen

Q. You said there was a slide and there was language used with the slide; correct?

A. So not language used with the slide. There's typing on the slide. Not language, spoken language. They're words.

Q. Right. And the words were taken out in a copy and paste on an analyst report, is what you're saying?

A. So the part of the slide that was in the analyst report didn't include the right -- rightmost portion which included the words.

So the portion of the slide that -- that analysts were focused on was just not in there.

Q. How could it be that -- how are you -- how are you able to reference the fact that it doesn't appear to be referencing an alleged misstatement if they -- they just took the slide?

I mean, in other words, isn't it possible the analyst was aware of the statements next to the chart and only

Lucy P. Allen

decided to include the chart?

It doesn't tell you one thing or another, doesn't it?

A. I think it absolutely tells you something. I think they were aware of that, and the part of the chart that they decided to put in the analyst report is the part that was important to them, which is, like, where the rigs were and the map, and the part that they thought was not important is the very part that plaintiffs claim is the alleged misstatement.

So it was so unimportant, they went to the trouble of kind of cutting it out of the chart. I think it's very telling.

Q. Do you recall anything about the analyst report and the surrounding language around the chart?

A. No, not particularly, as I sit here.

Q. Prior to forming your opinions in your reports, did you read the entirety of plaintiffs' complaint?

Lucy P. Allen

A. It's a long complaint. Reviewed, I would say, would be a better word rather than read. But -- so I don't know that I read every word.

Q. Can you please turn to paragraph 26 d. in your opening report?

A. Sure.

MS. HEFLEY: Page 12?

MR. COTILLETTA: Yep, 11. Is it 11 or 12?

MS. HEFLEY: I think it's 12.

MR. COTILLETTA: It carries on to 12.

Q. And in that paragraph, you reference that there was three events mentioned by the analyst reports. But then I think you say -- you go on to say the majority of analyst reports did not mention the event.

So I just need clarity. Maybe I'm misreading it. But are you just pointing out that there's three that did mention it, but everyone else didn't?

A. So three events were -- three

Lucy P. Allen

events that contained a misstatement say -- I don't know which the three were -- but say it's the earnings call, right? But the majority of analysts didn't mention.

So, although that analyst call was mentioned at least once, and I'm hypothetically saying it's the earnings call, because I'm not sure which one it is; but let's say it's an earnings call, that it contained a misstatement, I'm saying that that was mentioned by at least one analyst, but the majority of analysts didn't mention it.

Q. But why even say that, if the purpose of the content analysis is merely to quantify when certain things are being referenced?

In other words, none of your criteria talks about proportion -- portions at which something is mentioned or a percentage of the time things are mentioned.

My understanding is that the questions that you were asked, that you did

Lucy P. Allen

the content analysis for, asked you to group things and quantify things by a specific question; right?

A. Right.

Q. So what does it matter that the other analyst reports did not mention it? If three mentioned it, right, why did you go on to talk about how the other analysts didn't mention it?

You're looking for positive -- part of what you're doing in your analysis is you're looking for positive -- or, not positive, you're looking for affirmative proof, right, of certain things?

So I'm just trying to figure out why you have that extra part of the sentence there.

Is that just noting that everyone else didn't mention it and --

A. So it's not three mentioned it. Three events were mentioned. But for every -- so, of all the -- of 17 events, 14 nobody -- so there's 17 different events that plaintiffs allege a misrepresentation

Lucy P. Allen

was made, right?

And of those 17 events, 14, no analysts; so none of the 30-odd analysts even mentioned the event at all. Not one of the analysts mentioned 14 of the events.

Then for three of those, three events, there were analysts that actually mentioned it, but it was a minority of the analysts. The majority of analysts never mentioned those three events; and the other 14 events, not one analyst, period, mentioned it at all.

That's what I'm saying.

Q. Okay. Oh, I found what I was looking for before. Can I draw your attention to paragraph 28?

A. Yeah.

Q. The first sentence there, you say: "At the time of the alleged corrective disclosure, the content analysis demonstrates that there is no link between the alleged misstatements in Category A and the alleged corrective disclosure but instead a mismatch between them."

Lucy P. Allen

Right?

A. Yeah.

Q. I think you discussed earlier, you didn't use "mismatch" in your report; right?

A. I thought I didn't. I did use it.

Q. Here, what kind of mismatch are you -- are you drawing the mismatch analysis that was conducted by the court in Goldman?

A. I'm saying there's no link, so it's a -- it's a -- it's a mismatch.

Q. Right. And it's your understanding that's -- as an economist, that's an appropriate thing to do as an economist in a securities litigation, is to draw the link?

A. I am doing this whole content analysis to see whether there's a link, right?

Q. Right.

A. So the content analysis isn't an analysis of whether there's a link.

Lucy P. Allen

It's whether it affects the valuation of the company, whether it affects the price, whether, at the time of the corrective disclosure, there's anyone that, you know, links it back to the alleged misrepresentation, et cetera; all the different things are saying, is there a link? And I'm finding that there is no link.

And I'm saying that, therefore, that is a mismatch. These things are not linked together. They don't match.

Q. And the mismatch you're talking about, is that -- and what you just described, is that supported in peer-reviewed literature?

A. So the peer-reviewed literature is about how to look at what values a company, as well as how to do a content analysis, saying that now the content analysis is saying that there is no link and that these things do not affect the stock price is -- is -- so, academic literature is what affects the value of the

Lucy P. Allen

stock and how to do valuation and, you know, how to do a content analysis.

But what -- what is relevant at class certification in a securities class action is, you would apply economic analysis to see what is affecting the stock price, whether it's -- whether that is a question that's legally relevant is a legal decision.

Q. Okay. So, like, the -- the concept of a mismatch between them, as you have it here, the basis for the mismatch is based on case law?

A. No. The mismatch is that I'm saying there isn't a link, and I've described all of the ways that I'm showing that there is not a link.

Whether that is -- you know, is or should be legally relevant at class certification seems like a legal decision.

Q. Okay. And the mismatch link that you're doing, again, just -- if you don't know, that's fine; I understand it's been a long day.

Lucy P. Allen

Do you have any sort of cite to any peer-reviewed literature that would support that?

A. So, there's lots of peer-reviewed literature that I have cited, that's about how you do content analysis and how you see what is -- moves the stock price.

And the question of whether that is -- you know, whether it's important at class certification or it's important in a securities class action, again, I think is a -- you know, is a legal question.

Q. And I think I know what you're talking about. Why don't we just go to that real quick.

Can you turn to -- it's footnote 6, 7, 8 and 9 of your report, pages 6 and 7?

A. Pages 6 and 7, okay.

Q. Do you see the footnotes 6, 7, and then on the next page 8, 9?

A. Yeah.

Q. Okay. Can you tell me what, if

Lucy P. Allen

any, of the literature that's cited here supports conducting a linking or a mismatch, as you described it?

A. I don't know if it talks about mismatch, but -- well, these are different things. One is -- the footnote 6 is about content analysis, I believe, and one is a more general cite about it. One is about content analysis of analyst reports.

So each of the pieces -- these cites are all -- and one is about how you can use content analysis to decide if information is material. And material is similar to price impact. It's whether it's material to the price or material to investors; and if information is material to investors in an efficient market, you would expect it to impact the stock price.

So those are very related concepts.

They may be legally different and be at different stages of a case, but in terms of the economics, there's a lot of similarities between materiality and price

Lucy P. Allen

impact.

Q. I guess my point is, though, in the literature, have you seen anything in the literature regarding content analysis in which the author has run a study using analyst reports, and then trying to match -- or determine whether there was a match or a mismatch between their findings and a plaintiff's alleged misstatements in a securities action?

A. Well, a content analysis, one of the uses of a content analysis is to try to say what is making the stock price move and what is important to making the stock price move.

And what plaintiffs have here is an alleged corrective disclosure where the stock price does move, the stock price does go down, and the question is, is that movement, can that be connected to these alleged misrepresentations?

Which is basically the same question as, what is making the stock price move? Is it -- is it this -- the

Lucy P. Allen

correction of this misstatement that happened earlier?

So it's exactly the same question. It's -- it's whether the stock price is moving and is the movement of the stock price related to, you know, this or something else?

So is the cause of the stock price movement something the alleged misstatement itself or is it something else?

Q. And I appreciate your response. I'm certainly not going to wrestle with you about the literature. I read all of it, but it's not -- I don't want to do that today.

I want to ask my question again, because I don't believe you answered it. It calls for a simple yes or no. If you don't know or don't recall, that's fine, too.

Have you seen anything in the literature regarding content analysis, in which the author or authors have run a

Lucy P. Allen

study using analyst reports and then try to match, that is, determine whether there is a match or mismatch between their findings and a plaintiff's alleged misstatements in a securities action?

A. Essentially, yes. So I think it's essentially the same thing. So this --

Q. Which one?

A. The -- a number of these things. So I think this accounting and business review, making assessments about materiality through the use of content analysis; I think that one will talk about how you can determine, using content analysis, what is the cause of a price decline.

It's in footnote 6, the last one in footnote 6.

Q. Oh, Mr. Tabak?

A. Yeah. Or maybe I'm mixing up two. Yeah, I guess I'm not -- from the names themselves, I'm not sure which is which.

Lucy P. Allen

But, yes, I believe in that one. But I think it will be in a number of these.

Q. That's not peer-reviewed literature, though, right? Mr. Tabak, he's a fellow colleague of yours at NERA; right?

A. I don't know if that is peer-reviewed. It is peer-reviewed at NERA, because we don't put something out unless it's peer-reviewed, but...

Q. Right. But it's not, like, in a -- in a -- sitting here today, like, just out of curiosity, what are the top three economic journals, scholarly publications in your field?

A. In economics? Oh, I don't know. Don't make me do that.

Q. Right. We'll leave it for another day then, I guess.

But the publication -- Mr. Tabak's publication is from NERA, not from --

A. I think that -- I don't know. I think you're right, that that may be.

Lucy P. Allen

Q. Okay. While we're at it, actually, footnote 6 --

A. Yeah.

Q. -- the first cite, Krippendorff -- I can't pronounce it, I'm butchering the name -- that first cite, that book is 422 pages, and I notice you don't have a particular cite.

Were you just generally citing the book as guidance, or is there a specific aspect of the book that you're relying on?

A. I think that whole book, honestly, talks about content analysis.

Q. In footnote 7, in the Riffe, Daniel Riffe book, that book's a little over 200 pages.

Is there -- and again, there's no particular cite.

Are you citing the book generally for a basis or is there a specific cite within the book?

A. I think it's, again, the whole book generally. But I -- those are good

Lucy P. Allen

questions. I can go back and see if I have more specific...

Q. I tried to do my homework. I tried a little bit here.

Okay. Moving on.

THE WITNESS: Can I take a brief break?

MR. COTILLETTA: Sure.

THE VIDEOGRAPHER: We're off the record. The time is 2:14.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 2:25.

BY MR. COTILLETTA:

Q. I want to go back real quick. There was a couple of things I missed, Ms. Allen.

Page 5 and 6 of your opening report, kind of get paragraphs 13 and 14 out of the way here. I understand -- we'll go over the typo in a minute on 14 d.

But, with respect to 13 a. through d., 14 a. through c., would your

Lucy P. Allen

answers to those questions be the same as questions 12 a. through 12 d.?

A. Yes, I think that's correct.

Q. Okay. Great. And on the -- never mind. Actually, I want to talk about the typo for a second on 14 d.

I understand you reference it as a typo, but then there's like a -- it says "example" and it has certain quotes and things like that.

Do you know where that came from?

A. I'm not sure, honestly. I was -- I don't know. It sort of is like a jumble of different things. I'm not sure how that happened.

Q. Okay. And I think you testified earlier; let me make sure.

You're positive the coders didn't use any search terms?

A. Oh, did they use search terms? Oh, I think sometimes they would search, just to -- like, for the misstatement. I think they -- they might have also searched

Lucy P. Allen

through the analyst report to, you know, see do they see the same word.

Q. Okay. What search terms did they use?

A. Oh, I'm saying in terms of, like, reviewing the report to see; if they have a particular misstatement in mind and they're answering the questions about that misstatement for that analyst report. So they would review the analyst report.

But I think they would also search if some of the words were in there to see, like, just to make sure they weren't missing it, right?

I mean, just as a...

Q. Did you provide them with a set of search terms to look for after doing a review of the report?

A. No, no, no. So they're seeing, for example, whether an analyst report references a misstatement. And I think they would, in addition, you know, look through the -- not only read through the report carefully, but also use some search

Lucy P. Allen

terms that they thought would be closest to whatever misstatement they're allegedly looking for, just to make sure they haven't, you know, missed something that sounds similar to the same words.

Q. Okay. I appreciate that, and we're going to -- we'll move forward.

Can summaries of previously released news cause a price reaction in an efficient market?

A. Repeated news shouldn't cause a price reaction in an efficient market. So if it's the same information, it shouldn't.

Q. Got it. So if it's the same information, even in summarized form, you would expect there not to be a price reaction?

A. Only new news should affect the stock price.

Q. In an efficient market, if summaries of information are released first, and then some amount of time later, more information in fuller detail is released, can the later, fuller information

Lucy P. Allen

cause a price reaction?

A. If the later, fuller information contains new value-relevant information, then, yes, it can.

Q. In an efficient market, if -- hang on one second.

In an efficient market, if material information is omitted from the first release of news, but is included in the second release of news on the same subject matter, can that cause a price reaction?

A. I think material -- new information that's material can cause a price reaction.

Q. One last thing for you on this point.

Assume information is disclosed on a particular day, and then, on a subsequent day, someone, whether it's news media or analysts, comments on that information.

Could that commentary be considered a new piece of information, that

Lucy P. Allen

would cause a price reaction?

A. I mean, if the commentary itself is new and important, then it could be.

Q. Just back real quick on the coders.

To confirm, the coders may or may not have independently created and used their own search terms?

MS. HEFLEY: Objection; form.

A. Independently created and used? I don't understand that.

Q. Yeah. Did the coders -- do you know whether the coders used their own search terms?

A. So I think sometimes, in looking through an analyst report, they would look -- read through the entire analyst report, but they may also have, before reading the report or during reading the report, searched for some terms, depending on which misstatement there are, if there were -- to make sure that -- you know, look to see where that might be, just

Lucy P. Allen

as an extra check or to kind of get to the relevant part first.

Q. Okay. So do you have -- can you say with absolute certainty whether they used search terms or not?

MS. HEFLEY: Objection; asked and answered.

A. So their conclusions weren't based on those search terms. They might have searched within it just to -- you know, sometimes the analyst reports are long, or just to look over it and see if -- it would depend on the misstatement.

But they may have -- they were not -- their results are not the counts of search terms. But I would imagine that they used -- in looking through, they may have searched at times within a report.

Q. You say "imagine," but you don't know for sure?

A. Well, I do know that when we were first talking, particularly about how to do the generic misstatements, in figuring out the timing and how it would

Lucy P. Allen

work, whether it would be possible to use -- to search for terms to find, whether they are referencing the misstatements; and the misstatements themselves were too generic and used too non-specific terms, and there could be alternate words for those same words, so we decided it was not possible to use a search to do that, so we didn't.

The process did not involve a mechanical search. It involved reading every single analyst report.

Q. It sounds like there was some element where terms were used, at least in part?

A. Yeah. I don't -- I mean, I don't know. I think it's -- you know, everyone's very good at searching and typing in the word, and I think they -- I wouldn't be surprised if they, in their review, depending on the misstatement, may have -- may have searched within a report.

Q. Would the coders -- to the extent that that happened, would the

Lucy P. Allen

coders -- would the coders keep a record of the search terms they used?

A. No, because you're -- you're misunderstanding. The analysis was not done through search terms. They may have at times searched within an analyst report. But the coding was done by reviewing the entire analyst report.

Q. Okay. And I'm sorry if I didn't ask this earlier, but I want to clear in my question to you.

Does NERA have guidelines on how to conduct content analysis?

A. We have different -- we have a number of guidelines on how to do things. I don't know that we have written guidelines that are general to a content analysis, so...

I don't think we have specific written guidelines that would be general to all types of content analysis.

Q. At some point early in the process, did you come up with sort of a framework on how you were going to run this

Lucy P. Allen

content analysis?

A. So one question was whether some of it could be done, you know, could you search through analyst reports or did you have to read all the analyst reports, and did -- you know, how long would it take and how would we -- how many people would we assign to it and what sort of timing, and things like that; so that is something we spent a fair amount of time on.

Yeah, that's all I recall.

Q. In building out or thinking about the framework for this analysis, did you consult with any other of your colleagues at NERA?

A. Not that I recall. The report had a -- not in -- not in -- I don't recall doing that before doing the content analysis, no.

Q. Are your reports typically peer-reviewed by a colleague at NERA before you issued them in a case?

A. Yes.

Q. In this case, did anybody

Lucy P. Allen

peer-review your report?

A. Yes.

Q. Who peer-reviewed your report?

A. David Tabak.

Q. And does he typically do that in securities cases?

A. He often has done it. Not always. But he's often willing to do it, and he's actually -- there's often not that much time between when a report is completed and when it's due.

So he also tends to work well under shorter deadlines.

Q. Give me one second here. Let me see if we can fast-track this.

Can I draw your attention to page 21, paragraph 47 of your opening report, please?

A. Yep.

Q. The bottom of paragraph -- I'm sorry, it's actually in paragraph 46. You said: "I found no evidence that the price increase on this date was due to the Category A alleged misstatements, but

Lucy P. Allen

instead found that the price increase was due to positive news unrelated to Category A."

Is the unrelated news what you're citing in footnote 53 or is it something else?

A. So is the question 47?

Q. Now I'm looking at -- it's probably 46 and 47. I'm trying to figure out what the unrelated news is. Is it --

A. Yeah, maybe "unrelated" isn't the best word. I think I've tried to say that related and unrelated probably are two vague terms; but, other than -- that the price increase was due to information other than the alleged misstatement, is what I should have said.

Q. And why do you say that? Is it because -- is it your opinion that the statements that you're citing from -- the statements that you're -- the information you're citing on paragraph 47 is, in fact, related to the plaintiffs' allegations?

A. No, just my prior testimony,

Lucy P. Allen

the word "related" is so sort of vague and ambiguous, that you could kind of start to say things are related. Like, they also involved the company Concho; so, in that sense, they're related.

So I just think it's not -- it's not a precise enough term. That's all.

Q. Do you understand plaintiffs' case to include allegations of production guidance?

A. The alleged misstatements are not -- the Category A alleged misstatements, I think, do not include production guidance.

Q. That wasn't my question. I appreciate the response. But, just generally speaking, is it your understanding that, in this case, plaintiffs are alleging certain misstatements related to production guidance?

A. So I think there are some production guidance statements, that some

Lucy P. Allen

of the alleged misstatements include guidance statements.

Q. If you look a little into paragraph 47, it says here -- it's a couple of lines in. The second line in.

Are you on 47?

A. Yeah.

Q. Towards the end of the second sentence, it says "was due to."

Do you see that?

A. No. Yes, I do.

Q. Okay. Here you have -- so essentially this is saying the price increase was due to Concho's fourth quarter 2017 financial and production results, beating consensus estimates and the company's guidance, as well as a better than expected production guidance for Q1 '18; right?

A. I think you're reading that; that seems all right.

Q. Okay.

A. It says what it says. I think you read it.

Lucy P. Allen

Q. Okay. And so, is what you're trying to say there is that the price increase was related to production results and expected production guidance?

A. I am saying that the analyst commentary does not attribute the price increase on this day to any of the Category A alleged misstatements, but, rather, indicates that the price increase was due to other things.

Q. Is it possible -- withdrawn. Okay.

You said "due to other things."

Have you read every alleged misstatement in the complaint or just those in Categories A, B and C?

A. I've read the other, what we could call Category D, I guess.

Q. So, does this fit with any of plaintiffs' allegations?

A. Does what?

Q. The cause of this price increase?

A. Oh, I don't know. That, I

Lucy P. Allen

haven't tried to -- I don't know.
Q. You are familiar, though, with the corrective disclosure on July 31, 2019?
A. Yes.
Q. Does the information here have any -- does it match or mismatch, in your opinion, the information from the corrective disclosure on July 31, 2019?
A. I don't know. That's not something I -- I haven't particularly looked at that. What I have looked at is whether the price increase on this date was due to the alleged misstatement.
Q. Have you ever --
A. Yeah -- go ahead.
Q. I didn't mean to cut you off.
Do you have an understanding of the terms "full field optimization"?
A. Could you repeat that?
Q. "Full field optimization"?
A. I think I've seen that in the -- in what the company has said or in the analyst reports.
Q. Do you know what it means?

Lucy P. Allen

A. I don't. Not specific.

Q. Do you know what "optimize well spacing" means?

A. I mean, I have some idea what the well spacing is, and optimizing is making it as good as you can; but -- is my understanding of what that would essentially mean.

Q. In this particular industry, how would one optimize well spacing?

A. Well, I think that would be the, you know, $64 million question or whatever. I don't have the answer to that.

If I knew the answer to that, I would be -- I would not be sitting here.

Q. A much larger number than that.

A. Yeah, exactly.

Q. Do you understand -- do you know what lateral placement is?

A. You know, I understand the well is being placed sort of horizontally rather than vertically, is my understanding of the lateral placement.

Q. And what about development

Lucy P. Allen

pattern?

A. I think that just means the -- how you're putting them in the well. Placement, I believe.

Q. Can you please turn to paragraph 30 d. of your report? Apologies, I don't have the page here.

A. 13.

Q. And here, is it fair to say that you are summarizing your results of your content analysis for Category B?

A. Yes.

Q. And in 30 d. here, you have reference of two events that were mentioned in analyst reports; correct?

A. Yes.

Q. But then you go on to say that they were mentioned in fewer than 10 percent of the reports; right?

A. Yes.

Q. Why does that matter?

A. So if something is important, you would expect more of the analysts to mention it, and if the majority of analysts

Lucy P. Allen

don't even mention the event at all, then it's quite strong evidence that some alleged misstatement within the event couldn't have been very important.

Q. Did any of the questions for Category B ask you to analyze the percentage in which something was mentioned verse not mentioned?

A. So the questions give the -- I mean, the percentage is the results, right? So the results are kind of overwhelming to look at, which are in the -- in my appendix, right?

So if you just see, you know, all of these, no, no, no, no, no; so, to the extent that there was actually a yes to some answer, I tried to say how -- how prevalent was that yes? Was it really most of the analysts or was it just a minority? So I think it's helpful to understand.

Q. In an efficient market, can one analyst report be enough or be capable of price movement of Concho's common stock?

A. So now you're conflating two

Lucy P. Allen

completely different ideas, whether one analyst can move the market versus whether, if something moved the market, would analysts mention it?

My point is, this didn't move the market, because either none of the analysts mentioned it at all or the vast majority didn't mention it. That's a completely different issue than whether one analyst could say something is important and move the market.

We're not talking about whether analysts moved the market. We're talking about what did move the market. And the analysts give a lot of information about what is moving the market, because they're there busily saying what's important to me and what do I think is important.

And if not one analyst, out of 30-odd analysts, even mentions something, then it really just can't be very important to the -- to the price.

And if the event where that alleged misstatement was made wasn't even

Lucy P. Allen

a -- even -- they don't even -- not only do they not mention the misstatement, they don't even mention the event where it happened, then that is very telling that it wasn't very important.

There are lots of analysts studying the company, and if they don't even bother to mention the conference call at all, then the idea that one sentence within the conference call had a misstatement that was important and is moving the market is -- you know, is just belied by that very strong evidence.

So the question isn't whether one analyst could say something that would move the market. The question is, did this misstatement move the market? And if nobody is even bothering to mention it, much less even the event where the misstatement happened, then that's very strong evidence that that misstatement was not important and was not moving the price or the market.

Q. Did you analyze the price

Lucy P. Allen

reactions from these analyst reports?
Like, I know what you're -- I get what you're saying, but did you ultimately, in your analysis, look to stock price movements post-corrective disclosure to see, for example, whether these 10 percent of reports would have moved the market on the day they were issued?

A. I don't even understand that. The question isn't that the analyst reports are moving the market. The plaintiffs are claiming the misstatements made a difference, not that the analysts are doing anything.

Q. Right. But statements or information can move the market and not be commented by analysts. We talked about that earlier; right?

A. It's possible. But it's certainly evidence that it's not moving the market if nobody comments on it. If the people that are experts and studying what's making the stock price move at a given point in time don't mention it, and there

Lucy P. Allen

are a lot of them, in an efficient market, it's telling that nobody thought to mention it.

Q. So in your mind, then, what percentage of the reports would have to mention it before your analysis would change? Here, it's clear, right, that 10 percent is not enough; right?

A. It's not 10 percent. They're not even mentioning -- so they're not even mentioning the event. First of all, it would have to impact their actual valuation. The fact that they don't even mention -- they don't -- it doesn't impact their valuation, it doesn't impact their price target, it doesn't -- they don't reference the misstatement at all, they don't even mention the misstatement, and most of them -- the vast majority don't even mention the event that the misstatement happened in.

They don't even bother to mention that there was a conference call or that there was a --

Lucy P. Allen

Q. You're basing those conclusions based on work done by your coders, though; you didn't actually review the analyst reports yourself?

A. I did review the analyst reports myself, and I have confidence in our -- our coding system.

I mean, you can say the event -- this is a replicable analysis. To the extent that the analysis itself is, you know, erroneous, then your expert had this analysis and was not able to find one coding error.

Q. Did you -- did you read every single analyst report in its entirety?

A. I don't think I read every analyst report in its entirety.

Q. What was your criteria for deciding which analyst reports you -- did you -- okay.

Did you at least look at every single one of the analyst reports?

A. I don't know whether I did or not. I did around the corrective

Lucy P. Allen

disclosure. I don't know whether I looked at every single analyst report.

Q. Okay. So there's some you may have not looked at and then there's some that, when you did look at it, you didn't look at them in their entirety; is that fair?

A. Yeah. I mean, I would tend to look at them. They're not that long, typically -- well, some of them are longer.

I would say I would often look at them in their entirety, but...

Q. You said earlier you have confidence in our coding system.

Is there a uniform coding system at NERA?

A. So there is a system where -- I repeated this -- where you have a set of questions and you systematically go through and code those answers to those questions, and somebody independently does that, and then those things are -- any differences are reconciled.

Q. Did counsel in this case

Lucy P. Allen

provide you a curated group of analyst reports?

A. No, no curated group of analyst reports. We tried to get all the analyst reports that we could obtain.

Q. Believe it or not, we were out of turn for a while, and we got a lot of this stuff done.

Drawing your attention to paragraph 37. It's on page 15. Here, you're talking about "Alleged Misstatement C-4"?

A. Okay.

Q. Right. And you mention that the acquisition, the RSP acquisition, would render that particular misstatement moot because the compound growth rate is no longer reflecting Concho's then production rate; right?

A. Yeah, I think that's sort of essentially right.

Q. Okay. Did RSP's acquisition cause an expectation for an increased, stagnant, or decreased production growth

Lucy P. Allen

rate?

A. I don't know.

Q. I draw your attention to paragraph 38.

A. Okay.

Q. I want to make sure I understand this correctly, because I could be misreading this.

I think you said here: "No analyst mentioned after the corrective disclosure date anything to suggest that proved reserves were not 840 MMBoe as of the time of the alleged misstatements."

Right?

A. I'm sorry, I'm not seeing that. Which paragraph are you on?

Q. 38.

A. Page 38?

Q. Yep. It's a couple of sentences in. It's after footnote 35.

Do you see that sentence there?

A. Okay.

Q. I just -- maybe I'm off here. But just as a general matter, did Concho

Lucy P. Allen

provide analysts with inside information?

MS. HEFLEY: Objection. Calls for speculation.

Q. Or material non-public information, if you want it to be --

A. Well, I think they -- the minute they provide it to them, it then is public information; so I'm not really sure what that would mean.

But I think the information that the company provides to analysts at earnings calls or whatever, is material non-public information; then they release it often to analysts.

I'm not quite sure what you mean.

Q. Well, are you saying here that the analysts were somehow in a position to know or to say what the proved reserves were at the time of the misstatement?

A. No, I'm saying that no analyst mentioned after that. They didn't -- they didn't suggest in any way that they had been misled, that that was not the -- that

Lucy P. Allen

that was not the case as of the time.

Q. But it's two different time periods; right? You're comparing February 2018 with post-corrective disclosure, and doesn't the -- wouldn't you need -- wouldn't the analyst need internal documentation from Concho in February 2018 that would show whether those numbers, as alleged in 2018, were the proper numbers?

Do you understand what I'm saying?

A. I'm saying that there's no evidence that they ever thought that those weren't the proper numbers; that's all I'm saying.

Q. Right. But they didn't -- they don't know what the company knew internally. The only thing -- withdrawn.

The only thing the analysts know about the company back in February 2018 was whatever the company told the market?

A. Well, that's not true. There's lots of ways that they can find things out;

Lucy P. Allen

so I don't agree with that statement.

Q. But you haven't seen any evidence of them having any material, non-public information; correct?

A. I don't understand that. They spend lots of time trying to dig up information. I mean, you know, literally dig it up, I think, sometimes.

So I think that one of the things analysts do is try to ferret out information that the rest of the public does not know. That is exactly what an analyst spends a lot of time trying to do.

Q. This is -- let me get at this. Let's say, then, in February 2018, they say the MMBoe is 840; in reality, internally it's 640. And then, you know, they continue on with the company's business, and about a year or so later they announce this 1,000 MMBoe.

If we're alleging that at the time, February 2018, the 840 was wrong, it was, in fact, 640 or something else, that 640 was never conveyed to the market prior

Lucy P. Allen

to the 1,000.
So how does the market know, how do the analysts know that the 840, at the time that it was alleged, was a misstatement or not?
A. I'm not sure I understand your question. I mean, I'm just -- I'm say -- there -- this just says there's no evidence -- no analyst mentioned after that to suggest that the earlier number wasn't what was announced at the time. That's all.
Q. But what would they need to -- what would they need in order to show that, at that prior time, the number wasn't what the company said it was?
A. I don't know. I mean, you know, they could have -- they could have indicated in some way that they -- this just says that they're -- they -- there is nothing to suggest that they thought that that wasn't the case.
Q. Looking at paragraph 38 further, you mention that the MMBoe, as of

Lucy P. Allen

December 31, 2019, was approximately 1,000, which was higher than the 840 that the plaintiffs claim you misstated; correct?

A. I think that's right.

Q. Is it possible that there could be a relative decrease to the prior February 2018 estimate, such that the 1,000 estimate, or number in December 31, 2019, was also misstated; in other words, both numbers were understated?

A. Were understated?

Q. Right. So if the idea is the 840 should have been some other number that was lower in February, right, and if --

A. That would be overstated; right?

Q. You're right. Sorry. Yeah. Sorry. You got me there. You got me there. Overstated.

If they overstated the 840, right, and internally it was less, right, but nobody knew about it, and then a year later it grows and it's whatever, we don't have any information right now, as we sit

Lucy P. Allen

here today, that shows that it could have been a relative increase -- in other words, the 1,000 could be overstated as well, it could be -- you know, it could be some -- there's a variety of different ways that it could go.

It's not as clear-cut as you just look at the 840 and you look at the 1,000 a year later, and say that -- and say that there's -- you know, the plaintiffs' claim is essentially irrelevant or moot?

A. I mean, I guess I'm not really sure what you're saying. The statement that they expect it to grow is only through 2018, and they really do grow the 20 percent, so I'm just not sure what...

Q. We haven't factored in what effect, if anything, RS -- the RSP acquisition could have kept that growth rate the same, it could have brought it up, it could have brought it down.

I think you reference that, actually, at some point in your report; don't you?

Lucy P. Allen

A. Well, I don't think it could have brought it down, because there's just more coming in, so I think it would have to add to the growth rate.

Q. Or it could remain constant, right? That's another possibility?

A. But if RSP has any production, then I think it's going to add to the growth rate, because you're starting with a lower base and then you add another company, basically.

So it's just going to add -- make more growth; right?

Q. Unless the business is being acquired as a -- growing at the same rate, so that the relative combined production would decrease slightly; right?

A. But the growth rate would be starting from the base. So you can grow by acquisition or you can grow internally.

But if you buy something, you're in -- by definition, you sort of already had the growth. I mean, it might be not a fair comparison, because you're

Lucy P. Allen

including something else that you didn't --
you bought something rather than grew it
internally; but it still would add to the
growth, right?

Q. Isn't it -- isn't it possible
that the RSP merger could have masked for
large-scale development growth?

A. I'm not sure. I don't -- I
don't really even understand what that
means.

What does it mean, it could
have masked for?

Q. I guess --

A. I mean, I guess what -- I'm not
sure why -- I don't have any reason that
that couldn't be true. I just don't really
even know what that means.

MR. COTILLETTA: Let's stop for
a second.

THE VIDEOGRAPHER: We are off
the record. The time is 3:06.

(Off the record.)

THE VIDEOGRAPHER: We're back
on the record. The time is 3:07.

Lucy P. Allen

Q. Generally speaking, when you review literature in preparation for issuing a report, do you read the summary of the literature or do you actually read the whole article?

A. I mean, sometimes I'm referring to literature that I'm previously familiar with, and then I may just remind myself of what it's about. Other times -- I mean, it depends.

So if, for example, I'm citing something, you know, for the -- to kind of define a term or how a term is used, and it really doesn't matter what the -- you know, I may be defining a term showing that this term is used that way, and I may be referring to an academic article that, you know, may be using that and has a sort of a complicated study, you know, how the study works or what actually happens is not relevant.

Q. Have you --

A. So, yeah, so sometimes I'm just citing something for a small portion of it

Lucy P. Allen

or some piece of it, and other times I'm citing it because, you know, the entire article is something that I am specifically relying on and, you know, the whole methodology or data or something; so I don't think -- it really depends.

Q. Have you ever been confronted with reviewing literature and it being a summary of an actual larger study that was performed?

So, in other words, a situation where the author has conducted a very large extensive study, published it separately, but then also published an article that summarizes that study?

A. I don't know. I mean, I guess that would be possible.

Q. Just as a matter of principle, generally speaking, for conducting a review of peer-reviewed literature, is it important to analyze an actual study, a published study, instead of a published review or summary of that study?

A. Certainly not always, no. The

Lucy P. Allen

point is to say that, you know, something happens. So sometimes summaries may -- you know, I try to find things that are in -- more in English, I guess, than -- which is not always possible or it might not -- but, yeah, I don't -- I mean, I wouldn't say that would be the case, no.

Q. If a piece of literature that you're reviewing references a summary, that it's a summary of an actual study, is it important for you -- to you to then go and seek out the actual study to review?

A. I think I just gave examples of why that would not be the case. So if I'm saying that I am using -- I think there are times when it might make sense to do that; but, depending on what I'm citing the study for, it may not be relevant at all.

Q. Are any of the publications you cited in your report authored by anyone who's testified as a defense expert in securities litigation?

A. I don't know. Dave Tabak is an author that we just mentioned, and he has

Lucy P. Allen

testified as a plaintiff expert in securities class actions, and also, I think, as a defense expert in securities class actions.

That's the only person I can think of that I've cited that has been either a defense or a plaintiff expert, to my knowledge, in securities class actions; but I may have cited others.

Q. Are you aware of any court cases where a court has excluded an expert for using content analysis?

A. Have they excluded the expert because they used content analysis?

Q. Yeah, that's a good point.

A. Not that I'm aware of.

Q. Yeah. Excluded an expert who used content analysis, not necessarily for using con -- not because it was content analysis, but there was either -- either because they used content analysis or there was something wrong about how they did the content analysis?

A. Oh, I don't know. I mean --

Lucy P. Allen

yeah, I have no idea.

Q. Do you agree that there was a statistically significant negative price decline after the corrective disclosure?

A. Yes.

Q. I take it your understanding -- my understanding is your opinion in this case is that the price decline, nonetheless, though, is unrelated to the allegations in this case; correct?

A. I would not use the term "unrelated." The price decline was not due to the correction of the alleged misrepresentations that I've analyzed.

Q. Okay. And -- I'm sorry, you said the alleged misstatements you analyzed. That's Categories A, B and C, just to be clear for the record?

A. That's right.

Q. Do you know what the cause for the price decline was?

A. I have not analyzed specifically why the price declined.

Q. I want to draw your attention

Lucy P. Allen

to your sur-reply report.

A. Okay.

Q. I believe that is --

A. 2?

Q. Yep, Allen 2.

We have only three exhibits, but it's been a long day already. If I could draw your attention to paragraph 7?

A. Okay.

Q. You just said moments ago, "I have not analyzed specifically why the price declined."

So, were you not asked to analyze the corrective disclosure?

A. I was asked to analyze the corrective disclosure. I have not broken down why the corrective disclosure -- why the price dropped, other than analyzing whether any of the price decline is due to the alleged misrepresentations in Category A, B or C.

Q. So is that -- sometimes, the industry calls that a disaggregation analysis.

Lucy P. Allen

Is that -- is what you're saying here is, did you perform a disaggregation analysis in this case?

A. I disaggregated the alleged misrepresentations A, B and C from other reasons for the price decline.

Q. But you did not conduct a disaggregation analysis for the corrective disclosure?

A. I did. I disaggregated the effect of misrepresentations, all of the misrepresentations in Category A, B and C, from other causes for the price decline.

Q. Right. But you said earlier you don't know what the -- you didn't analyze what that other cause is, though; right?

A. I did not then determine how much of the price decline was due to the, you know, for example, their reducing their guidance going forward, yes.

I didn't -- I didn't divide the price decline into other factors, other than determining whether any of it could be

Lucy P. Allen

attributed to the misrepresentations, any of the misrepresentations in Category A, B or C.

Q. Just to kind of put it in layperson's terms. One of your opinions in this case is that the price decline on August 1, 2019, the cause of that price decline is not from the misstatements in Categories A, B or C, but you have not determined what the cause is?

A. I would say that's generally true.

Q. You say "generally true."

What would make that untrue, or is it true?

A. Well, I -- I, you know, I do an event study, so it's -- it's -- the event study is showing the price decline. There's still a price decline after controlling for movement in the industry, in the market, on that day.

So the price decline is not caused by a movement in the industry and market on that day. So that is one thing

Lucy P. Allen

that the event study is showing.

Q. So we know that at least one alternative cause is -- one -- if we're looking at what the alternative cause would be, it's not peer movement?

A. It's not industry and peer effects on that day.

Q. Okay.

A. And it -- you know, it is caused by the company's announcement on that day.

Q. Okay. Do you believe your event study was sufficient?

A. I don't know what sufficient means in that. Sufficient for what?

Q. Well, you -- from time to time in securities cases, you analyze other experts' event studies and comment on them, and sometimes oppose them, right; is that fair?

A. Yes, that's right.

Q. Okay. Looking at your own event study, is there anything that -- either any criticisms that you have or do

Lucy P. Allen

you generally -- are you generally of the opinion that your event study is sufficient?

A. I don't know about sufficient, but I -- I don't have any criticism of my own event study.

Q. Is there any aspect of your event study that you feel, based on literature and your years testifying in securities cases, that you wish you would have done differently than what you did in this case?

A. I don't have any reason to change or criticize my event study here.

Q. We were talking about disaggregation.

Is it possible -- just a general proposition. Is it possible for there to be more than one cause for a drop in any given day?

A. Yes.

Q. To determine whether the full portion of a price decline is caused by a particular issue, does an economist need to

Lucy P. Allen

do -- withdrawn.

To determine whether the full portion of a price decline is caused by a particular issue, does an economist need to perform a disaggregation analysis?

A. That depends on what you mean by "disaggregation." If you want to say that it's entirely caused by one thing, then you need to show that it's not caused by other things. So...

Q. Or if you wanted to fully rule out -- you know, for example, there's this fourth category of misstatements you didn't analyze.

But if you wanted to rule out for sure that none of the misstatements alleged, you would have to analyze that fourth category; correct?

A. I have not analyzed the fourth category, and, without analyzing it, I don't think you can say whether the price decline is caused by the fourth category, no; so I have not done an analysis of that.

Q. So in this particular case, for

Lucy P. Allen

this corrective disclosure, was there more than one piece of significant news issued on July 31, 2019?

A. So I haven't -- I haven't -- other than looking at the alleged misrepresentations, the company made an announcement, and I think the announcement that the company made is the cause of the stock price decline. And...

Q. Okay.

A. I think they're, you know, the actual quarterly results were not particularly negative. They -- they beat expectations on some things, and the -- the particularly bad news was the reduced guidance going forward.

Q. Do you know whether or not, in the peer-reviewed literature, content analysis has been criticized by authors as not always being capable of isolating the price impact of a significant piece of news if it was in the same announcement as other significant news?

A. I don't particularly know that,

Lucy P. Allen

no.

MR. COTILLETTA: Let's do this.
We are going to mark the next exhibit. We're on Allen 4 now.

(Allen Exhibit 4, Expert Rebuttal Report of Chad Coffman, CFA May 8, 2024, marked for identification.)

Q. So what I have handed you marked as Allen 4 is Mr. Coffman's rebuttal report in this case. Before we look to that, if you could just put that aside just for one second, we're going to go to it in just a moment.

In paragraph 7 of your rebuttal report, or sur -- sur-reply, rather, in that paragraph, you mentioned that Mr. Coffman mentions no issues with the content analysis; right?

A. Yes.

Q. Okay. Did you read Mr. Coffman's rebuttal report in this case?

A. Yes.

Q. When did you first read it?

Lucy P. Allen

A. Sometime after he wrote it.

Q. Immediately as it came in, as soon as it came off the press?

A. I don't know.

Q. How long did it take for you to read?

A. I don't know.

Q. Have you read it since?

A. Yes.

Q. I want to draw your attention to paragraphs 36 to 45 of Mr. Coffman's rebuttal report?

A. Okay.

Q. Looking at those paragraphs, is it your opinion today that Mr. Coffman is not taking issue with your content analysis?

A. He's taking issue with it, but he hasn't found anything wrong with the actual analysis itself. So, I mean, I think he does say it's --

Q. Well, he says it's flawed.

MS. HEFLEY: What are you pointing to?

Lucy P. Allen

MR. COTILLETTA: The heading, the heading itself.

A. He says it's that, but when you read what he's actually saying, he's saying -- he's not saying that what I actually did was flawed. He's saying, under the content analysis -- he's saying what the conclusions are from it, which is different than the analysis itself.

He's not, in fact, finding anything wrong with the analysis. He's saying the conclusion, he doesn't -- he disagrees with. He's not -- he's not found anything wrong with the -- he's not said that the content isn't the content or the -- it doesn't have one example that he says should be coded differently.

He just doesn't agree, I mean...

Q. So what you're talking about, then, in your sur-reply is he hasn't -- it's your understanding from reading his report that -- at least your interpretation is that he has no issues with the

Lucy P. Allen

methodology in terms of how you went about conducting the analysis?

A. He has not said that the -- that -- his criticisms are not that any coding -- that the questions that were coded and the results that were coded are wrong.

His criticisms are not about the content analysis. His criticisms are about what you can conclude from them, but he doesn't actually have a criticism about the content analysis itself.

He's not saying, I said this misstatement -- nobody referenced the misstatement, and he says yes, they did.

He's not saying -- he hasn't found one analyst that changed their valuation because of any misstatement. He hasn't found one analyst that changed their price target because of any misstatement. So he hasn't found anything wrong with the actual content analysis.

He has not one counterexample of anything, of any coding in the content

Lucy P. Allen

analysis that is -- that is not correct.

Q. I want to continue, and I appreciate that. Is there any other kind of comments you want to say about the characterization of the -- of the sections of the Coffman rebuttal report I just showed you?

A. No.

Q. In the same paragraph of your sur-reply, you discuss that Mr. Coffman concludes the price drop is associated with general topics of the allegations as a whole; right?

I think you used general topics of the allegations.

MR. RITCHIE: Where are you?

MR. COTILLETTA: Paragraph 7 of the sur-reply. Three lines down from the bottom.

Q. Do you see that?

A. Yes.

Q. Assuming that you're correct in your assessment, that he associates the price drop with general topics of the

Lucy P. Allen

allegations as a whole, why is that inappropriate from an economic standpoint?

A. Because it's not saying that it's due to the misrepresentations or any specific misrepresentations.

He fails to connect the alleged corrective disclosure to any misrepresentation. He has not said, here is a misrepresentation, here is a connection, that this misrepresentation caused that price decline.

He has not mentioned one misrepresentation that he can connect the alleged disclosure to.

He says -- rather than mentioning the alleged misrepresentations, he says, topically, the corrective disclosure relates to what plaintiffs are claiming was misstated, not the actual misrepresentation.

Q. Let's continue on. We'll go back to that issue in a moment.

Page 6, paragraph 14 of your sur-reply?

Lucy P. Allen
A. Page...
Q. 6.
A. Okay.
Q. Paragraph 14. Are you there?
A. Yep.
Q. You have -- it's about three lines in. You have a statement here, it says: "One would expect analysts to incorporate that specific economic meaning into their valuations of the Company."
Do you see that?
A. Yes. Yeah, I mean, you're reading part of the sentence; but, yes.
Q. I just wanted to get to that to try to get an understanding of -- about what you mean by that. In other words, how --
A. Is that a question?
Q. Yeah.
A. Okay.
Q. Well, let me rephrase it. Let me rephrase it.
So that statement, you say: "One would expect analysts to incorporate

Lucy P. Allen

that specific economic meaning into their valuations of the Company," what is your basis for that statement?

A. So, Mr. Coffman says that alleged misstatements have specific economic meaning. And he says that, for example, the alleged misstatement number 11, A-11, mentions "intense development requires multi-well pads and long laterals, and all the infrastructure that we're going to be able to use together."

He says that has specific economic meaning. He fails to say what specific economic meaning that has.

A plain reading of that does not give any economic meaning. They're words. It doesn't tell you anything economically about what would be. And if it had a specific economic meaning, then the analysts would -- you would expect to say, oh, now that they're saying this, this tells me I'm gonna, you know, make this ten times higher or add, you know, ten barrels of this or do something.

Lucy P. Allen

This is just a -- it's -- there is not one analyst that repeats that statement or does anything with that statement, and Mr. Coffman himself can't tell you what the economic meaning of that statement is.

If it has economic meaning, what is that economic meaning? Give that to me in economic terms. What numbers or magnitude, or what is the economics of that?

That is not an economic statement.

Q. And what makes it not an economic statement, though?

A. There's nothing in here that makes this economic.

Q. Give me an example of what would.

A. A specific economic statement would be, I am going to earn ten more dollars next year, my growth is going to be ten times higher next year than it was last year.

Lucy P. Allen

This is saying, "intense development requires multi-well pads and long laterals, and all the infrastructure that we are going to be able to use together."

There's no economic meaning in that statement.

And if there were economic meaning, that is exactly what the analysts are doing. If they -- if there was something economic in it, why wouldn't you see an analyst say, to me, that means an extra -- you know, I'm going to use a bigger multiplier, or I'm going to add $10, or I'm going to do something.

Q. Well, setting aside analyst commentary for a second.

Do you disagree that -- that what Concho was saying to the market essentially, based on the representations we cited in our complaint, that doing things like lateral lines and infrastructure, they were talking about multi-well pads, for example; those kind of

Lucy P. Allen

things increased efficiency because they allowed for more drilling in a smaller acreage.

So doesn't -- I'll leave it at that. We'll take it from there.

A. What's your question?

Q. Yeah. So my question is, isn't there efficiencies -- specific to this market, isn't there efficiencies baked into the idea of multi-well pads and lateral placements and -- and the intense development that Concho was touting?

A. They had a process that they were using, and they were using that process because they were hoping and expecting that it would perform well. That is what every company does. Every company chooses a process and a methodology and goes forward doing something that they think will work out well.

So the market knew that they were using multi-well pads and that they had long laterals, and that they had infrastructure, and that they were going to

Lucy P. Allen

be able to use together.

Those are -- those are words that don't have any economic meaning. That is just saying that's what they were doing, right?

There's no dispute that they actually did have multi-well pads. It's not -- it could be a misrepresentation that, if the company said they had multi-well pads, and they never had multi-well pads, then that would make some sense; and then, as a -- as a misrepresentation that could possibly have some economic meaning, because it could mean that analysts would say, okay, I'm going to use my model, assuming they're having multi-well pads, when, actually, they don't have multi-well pads, and so that -- that could mean their models would be different.

But plaintiffs are not alleging that they didn't have multi-well pads or that they didn't have long laterals or that they didn't have some sort of an

Lucy P. Allen

infrastructure that they were planning to use.

I mean, those -- these words don't -- they have no specific economic meaning.

He's saying -- Mr. Coffman is saying that has a specific economic meaning. What is the specific economic meaning of that? Write that down. What is the equation? What is the math of that? There is nothing.

Those are just words. And they're just words that either say nothing or they say words of what their actual process is, which was already known to the market.

They did have multi-well pads.

Q. You never worked in the oil and gas industry, have you?

A. Have I worked for an oil and gas?

I had done management consulting. I may have done management consulting in the oil --

Lucy P. Allen

Q. That was 40 years ago, though; right?

A. Oh, it was many years ago, yeah.

(Reporter seeks clarification.)

A. Oh, I don't know if it was 40 years ago. It was many years ago.

Q. I'm not -- I'm just going over your resume and I --

A. That's fine.

Q. I'm not trying to -- I should be careful.

A. I'm aging by the minute here.

Q. Look, the '80s now.

MS. HEFLEY: Anyway.

A. That's okay. I heard 4. It sounded much better to me.

Q. Can I draw your attention to paragraph -- this is in Mr. Coffman's rebuttal report, so Exhibit 4.

A. Which paragraph?

Q. So it's paragraph 14; in particular, footnotes 8 to 18.

Are you there?

Lucy P. Allen

A. I'm on page 8. Is that what I should be on?

Q. Yeah, page 8. It starts at the bottom of page 7 and carries over. And there -- there's numerous citations.

I guess my question to you is, doesn't Mr. Coffman make reference to specific misstatements and explain how they allegedly concealed information that was disclosed on the alleged corrective disclosure?

A. No.

Q. Why not?

A. He doesn't. Where is the specific misrepresentation that he explains, that he discusses, and then says how it's -- how it is corrected in the corrective disclosure?

He is saying the misrepresentations discussed spacing, and the alleged corrective disclosure discussed spacing; that's not the same thing as saying the alleged misrepresentation caused the price decline at the corrective

Lucy P. Allen

disclosure.

They're not finding out that they previously had different spacing than they thought they had.

He's not -- find me one misrepresentation that he actually connects to the alleged corrective disclosure. He's just mentioning them and saying -- he's mentioning groups of them and saying they're topically related. He's saying some of them mention spacing. Some misrepresentations mention spacing, and the corrective disclosure mentions spacing.

Q. Right. So I guess the disagreement there is how much relatedness there needs to be.

Because you would agree with me that if there's prior misstatements you're alleging that talked about well spacing, and there's a corrective disclosure that mentions well spacing, you know, in a vacuum, those are generally related; correct?

A. Well spacing --

Lucy P. Allen

Q. Well spacing is well spacing.

A. Well spacing is -- the company had a strategy that was different from other companies in that they were spacing their wells more closely together, and they were testing how closely they could -- they could space them together; and at the corrective disclosure, although they have a good corridor, a corridor that essentially meets guidance, they say that we have -- our tests have shown that, you know, particularly for the Dominator project, that, going forward, we are not going to -- it's not going to make sense to space them as tightly as, you know, we had hoped.

So it is true that the corrective disclosure is -- is bad news. The company does say that we have bad news, that, going forward, we're not going to do as well as we had thought that we would be able to; but that does not mean that it's corrective of the alleged misrepresentations.

So it is not corrective of the

Lucy P. Allen

statement that intense development requires multi-well pads and long laterals, and all the infrastructure that we're going to be able to use together.

The fact that, at the corrective disclosure, they say that, going forward, we're not going to be able to use the spacing that we previously had, and we are -- based on our tests for Dominator, it -- you know, we're going to lower our guidance in the future, is absolutely not correcting the statement that intense development requires multi-well pads and long laterals, and all the infrastructure that we are going to be able to use together.

That statement still stands. It is still true that intense development uses multi-well pads, and the rest of the statement hardly says anything, long laterals, and all the infrastructure that we're going to be able to use together.

So it's, I mean...

Q. Yeah, but you're focusing on

Lucy P. Allen

your sur-reply. We'll move on in a minute, but you're focusing on your sur-reply where you're criticizing him in a very general way.

I mean, my point is, though, that he does, in fact, engage in some sort of analysis, whether you disagree with it or not, where he's looking at the alleged misstatements.

The grouping, by the way, that you talk about, he's citing the court's decision; right?

The court reviewed plaintiffs' claims and put them in groups; right?

A. That is not correct. The plaintiffs put them in those groups. After writing the complaint, the plaintiffs grouped them, and the court just repeated and said, plaintiffs have grouped these claims like this, and repeated the groupings of the plaintiffs.

The court did not create those groupings. The plaintiffs did.

Q. So you don't -- you -- so --

Lucy P. Allen

okay.

A. Those groupings are not in the -- are not in the complaint, and the words in those groupings are not in the complaint.

That is something that plaintiffs wrote in response to their motion to -- to -- in response to defendant's motion to dismiss the case.

Q. Right. But we all could be accused of grouping. I mean, here, in this case, the defense counsel created groupings for you.

MS. HEFLEY: Object to the sidebar.

Q. Correct?

A. I'm not saying there's anything wrong with grouping. I'm saying that those groupings were not from the court. Those groupings were plaintiffs' grouping.

Q. The court adopted them. You're not a lawyer, are you?

MS. HEFLEY: Objection. Form.

A. The court said these are the

Lucy P. Allen

plaintiffs' groupings.

Q. And then made a decision on them?

A. The court did not make a decision on the groupings. The court made a decision on the motion to dismiss. The court didn't -- the court said, these are the plaintiffs' groupings, I will go through them as plaintiffs have grouped them.

Those were not the groupings -- they were not in the complaint, though.

Q. The groupings were originally used by the defendants in a motion to dismiss, though; right?

A. I don't know if they were. They were used by plaintiffs, and the court cited plaintiffs in saying that these are plaintiffs' groupings. That's all I -- I don't know if defendants made them up.

MR. COTILLETTA: Let's take a short break real quick.

THE VIDEOGRAPHER: We're off the record. The time is 3:46.

Lucy P. Allen
(Whereupon, a recess was taken.)
THE VIDEOGRAPHER: We're back on the record. The time is 3:54.
BY MR. COTILLETTA:
Q. Is it your opinion in this case that the evolution of the market's understanding of the Dominator project's riskiness rendered the information disclosed in the company's Q2 2019 earnings immaterial to investors?
A. No, I don't think I have said that.
Q. I want to draw your attention to your -- page 23 of your opening report.
A. Okay.
Q. Starting on page 23 of the report, that's where you analyzed Mr. Coffman's common damages methodology?
A. Okay.
Q. Right?
Do you dispute that the out-of-pocket methodology described in the Coffman report and Coffman rebuttal report,

Lucy P. Allen

which measures damages as artificial inflation per share at the time of the purchase, less the artificial inflation at the time of the sale, is a standard and well-accepted methodology to calculate damages on a class-wide basis?

A. It doesn't tell you how to do it. So out of pocket isn't a -- it doesn't tell you how to do it. It's -- it could be differentiated from something like benefit of the bargain.

Out of pocket is just saying it's the difference between what you paid and what you actually got in terms of the true value.

So it's just a -- it doesn't -- it doesn't tell you what to do to do it. It just tells you the theory of what you get should be the difference between what you paid and the value.

Q. But, I mean, do you dispute that the out-of-pocket methodology is a standard and well-accepted methodology to calculate damages on a class-wide basis?

Lucy P. Allen

A. It doesn't tell you how to do it. I would agree that the standard that is used in securities class actions is an out-of-pocket standard as opposed to a benefit-of-the-bargain standard.

So what's typically used is that you -- what should be the damages are the difference between what you paid and what you got, rather than the benefit of the bargain, which might be what you paid and what you thought you could do with something.

So I think it's a standard. It is not a methodology that tells you how to do it. So it's not -- saying it's out of pocket doesn't tell you at all how do you do it, it doesn't describe how to do it, and it doesn't, itself, mean that it would be -- it could be done, and it could be done on a class-wide basis, consistent with the theory of the case.

Q. So you're calling it an out-of-pocket standard as opposed to out-of-pocket methodology?

Lucy P. Allen

A. I think people use the term methodology, but it doesn't tell you how to do it. It's a standard as opposed to, for example, benefit of the bargain.

It isn't something that is -- it doesn't tell you how to do it. It just tells you what you should be measuring is the difference between the price that somebody paid and what they actually got in terms of the true value; but it doesn't tell you how to do it.

Q. Is out of pocket commonly used to calculate damages in securities cases?

A. I've answered that question.

Q. I must have missed it. I'm sorry. It's been a long day.

A. That the standard that is used in securities cases is out of pocket, rather than something like benefit of the bargain.

But out of pocket doesn't tell you how to do that, anymore in a consumer class action; the standard is typically out of pocket.

Lucy P. Allen

And you wouldn't just say your common damages methodology is just to see how much you overpaid for the -- you know, for the car with the faulty brakes, right?

That doesn't tell you the actual methodology.

Q. Do you dispute that an out-of-pocket, I guess, standard, if you will, if you're going to say that, can be used alongside disaggregation methods to determine the exact amount of per share artificial inflation?

A. I don't know. I mean, maybe in certain cases it may be able to. Mr. Coffman has not said how that would be done. He has not described a specific methodology for doing so.

This is a case where, you know, plaintiffs are claiming that the risk was misrepresented and the market thought the -- understood different things about the risk over time; and Mr. Coffman has given no specifics on how he would measure what the market thought or how he would

Lucy P. Allen

measure what -- compare that to what the truth was.

Q. Are you talking about a materialization of the risk theory?

A. I'm talking about what plaintiffs are alleging in this case.

Q. Have you ever heard of the term "materialization of the risk"?

A. I've heard the term materialization of the risk. I understand that plaintiffs used it in their complaint, and now they're claiming that they don't have that theory.

But, as I have explained in my report, just saying they don't have that theory doesn't mean that that is not actually intertwined; it's not separable from plaintiffs' complaint.

Their complaint is all about the -- the risk and how the -- how the company understated the risk of what they were doing.

Q. Right. So first on the point of -- of whether it's in the complaint or

Lucy P. Allen

not.

Isn't that a determination for the court, not an economist, to determine --

So, you mentioned somewhere in your sur-reply that the plaintiffs, I guess, either withdraw, if you will, or disclaim a materialization of the risk theory; do you recall that?

A. I recall that plaintiffs had the materialization of the risk, those words in their complaint, and they are now telling Mr. Coffman that they are no longer using that theory, despite the fact that that is not something that can be just removed.

Removing the words doesn't remove what plaintiffs are actually alleging.

Q. But why do you say that? Like, in other words, isn't -- isn't the determination about whether we have the right to proceed with the claim or whether our withdrawal of a claim is valid is a

Lucy P. Allen

determination the court makes?

A. I'm not saying whether you have the right for a specific claim or not. I'm saying that Mr. Coffman has not specified a common damages methodology that fits with plaintiffs' claims in this case.

Whether they call it a materialization of a risk or they don't call it a materialization of a risk, he does not have a damages methodology that can fit with what they're claiming.

He has not proposed anything, and there's nothing specific about what he's proposed.

Q. Okay. So we'll go back to that for a second, because we kind of digressed.

And my initial question to you was, generally speaking, do you dispute that an out-of-pocket standard can be used alongside disaggregation methods to determine the exact amount of per share artificial inflation?

A. The out of pocket doesn't tell you anything, it doesn't tell you how to do

Lucy P. Allen

it. It just says, look at the difference between what they paid and the value.

So it doesn't -- that doesn't tell you how to do anything.

Q. Right. But if you -- if you take that standard, and you work alongside a disaggregation method of some sort, at that point, can you -- the combination of those two, will that help you determine the exact amount of per share artificial inflation?

A. So now you're saying -- your method is to figure out how much you overpaid, and you're going to disaggregate to take away the things that don't relate; right? That's just what you should be doing. That doesn't tell you how to do it.

So now you -- now what you've told me, won't it -- isn't -- won't it work to measure how much you overpaid and to get rid of the things that weren't the result of the misstatement.

I mean, that is just what you should be doing. That doesn't tell you how

Lucy P. Allen

to do.

So you're just saying -- that's like saying, wouldn't it work to just solve this algebraic equation and solve for X.

I mean, yes. But how are you going to do that? So you're not -- disaggregation just says, let's take out the things that don't count.

It's true that if you can take out the things that don't count, then you will end up with the thing that does count; but that doesn't -- that's not a method for doing that.

Q. As a general premise, do you dispute that accurate disaggregation must be performed after a thorough loss causation analysis is complete?

A. No.

Q. Do you dispute that a thorough loss causation analysis requires discovery to be complete in a case?

A. No.

Q. Do you dispute that the out-of-pocket standard --

Lucy P. Allen

A. Oh, wait. I do dispute. I don't think it's true. Sorry.

Q. Okay. So you think that a loss causation analysis could be thoroughly completed without the benefit of discovery in a case?

A. I think you would do loss causation without discovery.

Q. Okay. And what's your basis for that?

A. I just think it's possible. You're just asking is it required. No. I think it would be possible to do loss causation without discovery.

Q. Have you done that in a case?

A. I am not a lawyer. I don't do discovery.

Q. I mean, have you performed loss causation when discovery was incomplete for -- for a firm?

A. Yes, I have estimated loss causation before discovery is complete.

Q. Do you dispute that the out-of-pocket standard can be used and has

Lucy P. Allen

been used in cases alleging a materialization of risk theory?

A. I'm wondering if I answered some of the other questions wrong that were in the same vein.

Like, your question was, did I dispute -- I think mostly all the times that you said is something required, my answer is pretty much nothing is required; nothing is always the case.

So I want all my answers to be, is something absolutely required; my answer is no.

Q. Oh, so, for example, like, you dispute then that accurate disaggregation must be performed after a thorough loss causation analysis is complete?

A. I don't think anything is required. I don't think it has to be the case, no.

Q. Is it your opinion in this matter that an alternative damages approach, other than the out-of-pocket standard, should be used in this matter?

Lucy P. Allen

A. I don't have a dispute that out of pocket is a -- I think that's a legal question, is what is a relevant damages, whether it's out of pocket or whether you could use benefit of the bargain; to me, that's a legal question.

How you calculate the damages is the -- and the proposed common damages methodology is different. But whether what you're trying to estimate in terms of damages is the amount that somebody overpaid, I don't have a dispute with that, the amount they paid versus the actual value at the time, which is an out-of-pocket measure.

I don't have a dispute that that is a reasonable standard. But I think that's a legal question. But how you do it, just saying is out of pocket doesn't tell you how to do it.

Q. In your years of testifying as an expert, have you ever utilized the out-of-pocket method or standard in any of your previous testimony?

Lucy P. Allen

A. I have calculated damages using a difference, but I have used standards of out of pocket and benefit of the bargain in different cases.

Q. We talked about risk materialization theory of liability, and I want to go back to it now.

Can you provide me an example, outside the context of this case, of what a risk materialization theory of liability is?

A. I think the way it's -- I mean, I've heard that term used a couple of different ways, but I think the way that's similar to how it's being used here is that plaintiffs have understated -- I mean, not plaintiffs -- defendants have -- a company, for example, has understated the risk of something happening, and then it actually does happen that risk materializes and something bad happens.

Q. You can't think of an example that would be outside of Concho for us to talk about us today?

Lucy P. Allen

A. The BP case, for example. There was a -- I don't know, the risk of whatever they were, blowing up offshore wells, I think they were, rigs.

Q. So, for example, if BP went out and said, you know, we're going to -- there's a chance that the rigs might explode, there's a chance the rigs might explode, a chance the rigs -- the rigs might explode, and the rigs do explode; that, to you, is an example of risk materialization theory?

A. No. It's that they failed to say that there is a risk that they will explode, and then they do explode.

Q. Okay. So it's then the -- so --

A. Or it's that they -- you know, they say that everything is, you know, all there, pieces have been inspected properly; and, really, one of the pieces has not been inspect -- inspected properly, and that not having that piece inspected properly has some risk that something bad would happen.

Lucy P. Allen

And the -- the -- you know, that materializes when -- you know, when some weather event or something hits the -- the rig, for example.

Q. For there to be materialization of risk, do the market or investors need to have an appreciation of that risk before the corrective disclosure?

A. I mean, I think it depends. I don't think that's -- I don't think anything is really necessarily the case; so, no.

I mean, you could have a materialization of a risk where people didn't understand that there was a risk, and then what you failed to disclose, whether there was the risk, and what actually happens is worse than if you would just disclose the risk.

Q. Is that -- does that statement hold true in an efficient market?

A. Sure.

Q. So -- so, essentially, what you're -- I'm trying to understand this

Lucy P. Allen

conceptually.

So what you're saying is in a situation where a risk of any sort has been placed out into the market, there's a chance that the analysts in the market don't capture that risk properly?

A. No, it's not that they don't capture it properly. It's that it's somehow been misrepresented. So it's been misrepresented either that there wasn't an understanding that there was this risk or that the risk had been minimized, when it was actually larger than it was.

Q. If a company wholly fails to inform of a risk, would you agree that it wasn't understated, but, rather, in that case, omitted?

A. I mean, that just seems like a semantic difference. I don't know. I mean, just because whether they failed to state a risk, if it's something that the market already understood to be a risk, then -- I mean, if it's a risk of something that nobody ever imagined could ever

Lucy P. Allen

happen, then -- then maybe that would be the case.

But most bad things that happen are imaginable. They just -- people have a -- you know, a low expectation of them happening.

I mean, yeah. So some -- some things that happened, I guess, were unimaginable, and so nobody had an estimate of it, but other things were imaginable; you just didn't think it was that likely.

Q. And there are things less than -- does the difference in your mind about whether things are imaginable or not depend upon how much the company talks about it?

A. I think it's just whether it's something that was -- it was something that people could have anticipated could ever happen, or whether it was just a completely -- I mean, I think most things that happen, most bad things that happen are risks that you're -- you are aware of. You just think they are less than they turn out to be.

Lucy P. Allen

It's hard to think of something that no one ever thought could ever happen, that did happen, but...

Q. How did you acquire your -- for the past couple of minutes, you have been talking about your understanding of what a risk materialization theory of liability is.

How did you acquire that understanding?

A. I've heard the term a number of times over the last, you know, decade or two; so in conferences, in articles, in complaints, in decisions, and, you know, many different sources.

Q. And it's your understanding you could have -- so is there a difference in your mind from a complete utter failure to disclose a risk versus an understated risk?

A. Not really from an economic perspective. So if you fail to disclose a risk, and the market still understands the risk, versus -- if the market already thinks the risk is 10 percent, whether you

Lucy P. Allen

disclose it or not, that's what they're thinking; and if the company says the risk is 10 percent, I don't think there's a difference.

Q. If the company says that -- another hypothetical.

If the company says -- gives out a sort of positive statement saying, this is what -- there's a risk, this is what the risk is, when they know that the risk is actually far worse, and that disclosure, that far worse risk comes out in a corrective disclosure, is that still a materialization of risk theory, or is it in the first place?

A. I don't know. I mean, I think it is a materialization of a risk. But what you've just described is a materialization of a risk; whether you want to describe that as the theory or not.

The situation you described, a risk materializes, so I think you could call that a materialization of a risk.

Q. But for there to be a

Lucy P. Allen

materialization of risk, it would require that, whatever risk was out in the market, was adequately disclosed; right?

You can't have -- it goes back to my original comment about the appreciation of the risk, and I'm struggling, I'm trying to understand.

In order for there to be a materialization of risk, there needs to be market appreciation for the risk. If there's no market appreciation for the risk, then there's no materialization --

(Reporter seeks clarification.)

Q. It goes back to my original comment about appreciation of the risk.

Doesn't there need to be an appreciation of a risk in order for there to be a materialization of the risk?

A. I think if something happens that's completely unimaginable, you might not describe that as a materialization of a risk. That might be a materialization of -- I think if it's unimaginable, then maybe it wouldn't be a materialization of

Lucy P. Allen

something, because it was unimagined before.

But none of this seems at all related. We're not talking about anything unimaginable here, so I don't...

Q. No, I appreciate it. I'm trying to get an understanding of your opinions as it relates to this issue. Just to go back to your statement.

You can't have a materialization of something that doesn't exist?

A. Or that you didn't -- yeah, I don't think you can have a materialization of something that doesn't exist. I think that's true.

Q. Just give me a second. I'm trying to fast-track this.

So please look at pages -- sorry, paragraphs 69 through 70 of your opening report. It's underneath the heading "Plaintiffs' proposed common damages methodology yields economically unreasonable results for proposed class

Lucy P. Allen

members that were pre-merger Concho shareholders."

Correct?

A. Yes.

Q. Are the statements you have in paragraphs 69 through 70, do those contain all the bases for your opinion as it relates to the pre-merger Concho shareholders?

A. No, this is a -- this is a specific point about them, how this formula, which is just purchase inflation minus sale inflation, doesn't make sense with plaintiffs' theory for the pre-merger Concho shareholders.

Q. And why not?

A. Because the RSP acquisition is including -- the claim is that Concho was inflated, and then Concho buys RSP, which there isn't a claim that that was inflated.

So whatever the inflation is in Concho would be diluted and would have to go down after the acquisition.

And if you do purchase

Lucy P. Allen

inflation minus sale inflation, you're going to give more money, more inflation to the pre-merger shareholders than those afterward, when they actually got a benefit from the RSP acquisition rather than being harmed by it.

Q. I want to draw your attention to page 17 of your sur-reply report. It's Exhibit 2.

A. Okay.

Q. At footnote 57, you mentioned 67 percent of the RSP shareholders were also shareholders of Concho; is that right?

A. Yes.

Q. So I'm trying to understand why you put that in there. How does that affect your analysis, the difference between the 67 percent who had shares of both versus the 33 percent that would just be RSP holders only?

A. So they're on both sides of the transaction. So if you're on both sides of the transaction, you're actually getting a benefit from the merger. If you're on the

Lucy P. Allen

-- the Concho side of the transaction gets a benefit and the RSP shareholders, according to plaintiffs' theory, are getting a harm, because they're -- they're, you know, using good shares and getting inflated shares.

But that harm that the RSP shareholders are getting is benefiting the Concho shareholders; so some of them are actually on both sides.

Q. Do you agree that acquiring firms often pay a premium relative to the market price of their shares?

A. Yeah, generally, you can't get the shareholders to sell you the shares and give them to you unless you pay something more than what they're holding.

So, generally, you have to pay something above the price, just to make sure you get them.

Q. Does that payment of a premium necessarily equate to an overpayment?

A. No, it doesn't equate to an overpayment, but if -- no.

Lucy P. Allen

Q. Do you cite any economic authority, including peer-reviewed literature, for the proposition that the payment of a merger premium should be netted against damages for securities fraud?

A. Can you repeat that question?

Q. Sure.

Do you cite any economic authority, including peer-reviewed literature, for the proposition that the payment of a merger premium should ever be netted against damages for securities fraud?

A. Well, the concept that a benefit that you get from the fraud should be netted against the harm from the fraud, I -- I don't know if I've cited that here, but there is citations.

Courts have said that the -- to the extent you're harmed by something, if you're also benefited, that it -- you should take that account; and this is the same very transaction.

Lucy P. Allen

So the economic theory, the economics is -- of this is that Mr. Coffman's inflation, which presumably can't be the whole price decline that he's measuring, it would be some portion of the price decline, that this very -- if you asked -- economically, if you asked the RSP shareholders, what do you prefer, would you prefer to -- do you want to buy these shares, they're inflated by $5.58, but we're going to pay you $11.32 more for it, economic theory is going to tell you that you're going to prefer $11.32 gain over -- if a -- if a transaction gives you $11.32 gain versus a $5.58 loss, that is a -- economically -- that that's a good transaction for you.

So if you actually knew the misrepresentations and knew that you were overpaying by $5.58, you would say, okay, yeah, that's -- I'm still in favor of that.

So that's just pure economics, that more money is better.

Q. I appreciate your comment

Lucy P. Allen

there, and I am trying to short circuit some of this, and my question was very specific, and I don't think I have an answer to my question.

Do you cite any economic authority, including peer-reviewed literature, for the proposition that the payment of a merger premium should be netted against damages for securities fraud?

A. So I -- economic literature says that more money is better than less money. A transaction that gives you more than less is something that you want. And if you were told that, then -- then that is what you should do.

This is one transaction. Plaintiffs are saying that they overpaid, and the amount that they overpaid would have to be smaller than the price drop, according to Mr. Coffman; so, therefore, it would have to be something smaller than $5.58. He does not dispute that.

So, yes, I can cite you

Lucy P. Allen

economic theory and economic literature that says people will do things where more money is better for them, and I can also cite you literature that says, according to damages, the damage theory according to the court says that for a given fraud, it should be the -- the difference between what you -- what you lost from the fraud versus what you got from the fraud.

Q. Okay. So --

A. And so those two things together, I could cite you things that, therefore, say that -- and there's further literature that says if a mis -- if, given the misrepresentation, plaintiffs would still have made the transaction and bought the shares, then they shouldn't be damaged; and that is exactly economically what is happening here and what Mr. Coffman's damages theory would tell you.

Q. I again appreciate the response.

Can you please tell me the name of the economic literature that you just

Lucy P. Allen

mentioned?

A. Okay. So that -- that people economically prefer more versus less, that is in your -- your basic economic textbook. That would be in Brealey and Myers' textbook that Mr. Coffman cites. That would be in -- you know, economic theory is that people make choices so they want -- they choose the thing that gives them more money; that's basic economics.

Q. Just on the economic standpoint for a second, before we go to the cases.

Is there actually an article, peer-reviewed literature, that talks about netting damages for securities fraud with payment of a merger premium, that specific issue?

A. I don't know if something would say that specific issue. The fact that you choose more money over less money, and now you're -- that is what this is.

The question is, if they knew -- if an individual RSP shareholder knew that you can get an $11.32 premium

Lucy P. Allen

over your price, but the bad news is we're going to give you something that is $5.58 overvalue, do you want to do that?

They would say yes. Because if they are choosing to get more money, and something that is a higher economic value, the math is that that's higher economic value, and it's one transaction.

This isn't netting a different transaction. This is the actual transaction. The actual transaction is exchanging one share of RSP - it's not one for one - but, essentially, one share of RSP for -- and getting a share of Concho that's, you know, getting an additional 11.32 over the price.

But the part that plaintiffs are alleging is that the Concho share that you get is inflated, but it's inflated by much less than the premium.

MR. COTILLETTA: Counsel, I'm asking, please instruct the witness to respond to my questions so we can go.

Lucy P. Allen

She's killing time.

MS. HEFLEY: She has been responding to your questions.

MR. COTILLETTA: No. My question is --

MS. HEFLEY: You asked her to cite some literature. She did.

MR. COTILLETTA: Okay.

Q. Is that literature listed in your materials considered?

A. Yes, it is. It's listed in my materials considered and in Mr. Coffman's, I believe.

Q. Okay. And then the cases you talked about earlier, you said there were some court cases that talk about this, is that cited in your materials considered?

A. I don't know if it is or not.

Q. Is it your understanding that the plaintiffs are alleging that the price paid for the RSP acquisition is a part of the fraud in this case?

A. They are alleging that RSP overpaid. That they -- RSP is exchanging

Lucy P. Allen

their own shares for Concho shares, and plaintiffs are alleging that that exchange was a fraudulent transaction and that they overpaid.

They're acquiring Concho shares and they're including them in the class.

Q. Okay. So let me try this. If I were to tell you, just a hypothetical, that plaintiffs are not alleging that the price paid for the RSP acquisition is a part of the fraud in this case, would that change your opinions?

A. Not the price paid for the RSP. The price that RSP -- the shares that RSP got for Concho. RSP shareholders, instead of giving cash and buying a Concho share, they exchanged RSP shares; it's a share for share.

So other -- plaintiffs are alleging the class consists of purchasers and acquirers of Concho shares, which includes RSP shareholders, because they acquired Concho shares, and instead of giving up cash, they gave up RSP shares.

Lucy P. Allen

Q. Right. But this isn't like the McDermott case that you were recently in. This isn't -- we don't have a 14(a) claim where we're talking -- where the RSP merger is a part of the fraud.

Are you aware of that?

A. So, first of all, McDermott has a 10b-5 claim.

Q. Sure.

A. So you're alleging -- or maybe you're not alleging that the RSP shareholders should be in the class.

If you're alleging that they should be in the class, they don't buy with money Concho shares; they exchange RSP shares in exchange for Concho.

So if they're in the class, what they are exchanging is RSP in exchange for Concho. What they actually exchanged in return for what they got, according to plaintiffs' theory, is they got a -- they got a deal; they didn't have a damage, they got something better.

What they exchanged was worth

Lucy P. Allen

less than what they got in return, even if you use the entire drop at the corrective disclosure. That is the math.

Q. So, assuming that we're not alleging that the RSP acquisition is tied to the fraud in any way, and assuming we win on the inflation issue, we go all the way to summary judgment and we win, can't you simply take in that situation, looking at the transaction, that's essentially saying that Concho was overvalued; is that -- is that right?

If there's an inflation to Concho's price at the time of the deal, Concho was overvalued?

A. Right.

Q. If that was accurate, right, and again, this is not a representation of our theory, I'm just trying to understand this.

If Concho was overinflated, doesn't that just mean that more shares go to people who are in RSP?

A. More shares go to people, I

Lucy P. Allen
don't understand that.
Q. People who are pre-acquisition, right. Let's separate this out for a second.
You have the merger process, right, and then you have this agreement where RSP was acquired; correct?
A. Okay.
Q. My understanding is you read the proxy statement?
A. I don't know if I read the proxy statement.
Q. Do you recall whether you looked at the 14 a. form or the Form 14?
A. I don't particularly recall.
Q. Okay. Are you -- do you have any detailed knowledge of the process involved in the acquisition, in other words, the process the board of directors and any subcommittees would have taken between the acquirer and the target?
A. I have some general understanding from other cases how that's happened. I have not looked specifically

Lucy P. Allen

at how it happened here.

Q. Would you agree with me that -- taking this case outside for a second, just focusing on the acquisition, that that acquisition would have been bargained for.

In other words, there's two sides to the deal and they negotiate the price?

A. I think generally that's how M&A works, there are two sides and they negotiate. I don't disagree with that.

Q. And this is not a Delaware action. We're not alleging that the process was -- there wasn't a proper process; right?

A. I don't think you are. That's correct.

Q. For all we know, this, in a vacuum, it was a long-arm deal?

A. I don't know what that means, but, okay.

Q. It was an honest deal?

A. Okay.

Q. Whether there was a premium

Lucy P. Allen

paid is a decision between the parties?

A. Well, I don't think you're saying it was an honest deal because I think you're saying that Concho was fraudulently inflated at this time. So I think if you're making a deal with someone else and, you know, basically selling them fraudulently inflated shares, which is what you're claiming, then I don't think that's a fair deal. I mean, I think you are alleging it was not a fair deal.

Q. Right, but Mr. Coffman talks about, with the issuance of the shares, how you can dilute the inflation. He gives a calculation; right?

A. I don't know if he does that. I do that, and he doesn't disagree with it, and then he says he'll somehow adjust his numbers which will only -- which only prove my point, that he is going to make the inflation higher in Concho before the RSP merger, and then the purchase inflation minus sale inflation will not make sense because the RSP acquisition was a benefit

Lucy P. Allen

to Concho, if what plaintiffs are saying is true. They were able to buy Concho at a better price, and they're benefitting, and so he is going to give more damage.

Q. You said they were buying Concho, do you mean RSP?

A. Yes, I do mean that Concho is able to buy RSP.

Q. Are you offering an opinion in this matter that Concho overpaid for RSP?

A. I'm not offering that opinion. I am saying that the market thought that Concho overpaid for RSP.

Q. If Concho's shares were overvalued, doesn't that mean RSP shareholders were underpaid?

A. That part of it would lead to underpayment, but what the market is saying is that they overpaid, and what this is saying is that the amount of the overpayment -- this is -- so the $11.32 is how much they're overpaying over the value of RSP shares, right. That's the 29 percent premium.

Lucy P. Allen

They're paying more than the current value of RSP shares; and the inflation, the amount that, according to Mr. Coffman's event study, the maximum amount that Concho could be inflated is only $5.58. So the 11.32 is just much bigger than the $5.58.

So, by however you do it, even if you knew the $5.58, you would still say I don't care if it's inflated; I am still going to exchange my RSP. I am still going to do this purchase. I am still going to go ahead with this acquisition, with this trading my RSP shares.

So plaintiffs are saying that -- yeah, plaintiffs are saying that shareholders were defrauded and they gave up good money, you know. Someone after the RSP acquisition turned in good money and got an inflated share, and they're saying that by that transaction they were damaged. They have an out-of-pocket damage because they gave something and they got something less in return.

Lucy P. Allen

So the out-of-pocket measure for this RSP transaction is what did they give up? They gave up something that was worth $11.32 less and they got something that's only worth $5.58. So the out-of-pocket measure, the very out-of-pocket measure would have to say there's no damage, there's a benefit. So if you want to use out of pocket, out of pocket would tell you that that is a benefit. That transaction using out of pocket is a benefit.

What they gave up and what they got in return -- they gave up something that was worth less than what they got in return, even with the inflation, so out of pocket there's no damage. That's what out of pocket is.

Q. The issue is with -- okay. So with the merger deal, are you saying that -- withdrawn.

So the agreement in the RSP acquisition, was it a result of a desire to have full control of the company?

Lucy P. Allen

A. Concho was buying RSP because they thought there were synergies. They're geographically closely related and they thought they could combine and have synergies and do better together, that's why. That was their argument for buying them.

Q. That's a part of the materials you considered, that information?

A. The analysts say that and the companies say that, yes.

Q. What about the SEC filings, did you read the SEC filings associated with the merger?

A. I did not or I don't recall doing that.

Q. So, as you sit here today, you can't say for sure what each company, RSP and Concho's, reasons were for the premium that was agreed upon; right?

A. I couldn't say that if I read this, right. I wouldn't be able to say that for sure what their reasons were. What I -- what I can say is that the

Lucy P. Allen

analyst said that the reason that they were doing this, and they thought they overpaid for it.

Q. Do you dispute that Mr. Coffman performed a valid event study regression?

A. He uses his industry index. I use a different industry index in my event study than he uses. His industry index is very large companies and Concho was at the very bottom of that.

So I don't think it's -- I'm not sure it's the best index to use. I think the index that I used makes more sense, but other than that, I don't have much dispute with his event study.

Q. Did you find any statistical errors in his event study?

A. Not that I recall, no.

Q. Did you attempt to replicate his event study?

A. I think so.

Q. Is that a part of -- is that noted in your reports?

A. I don't know. I think I say

Lucy P. Allen

what his event study result does. So I believe -- I believe I was able to replicate it or replicate it closely enough.

Q. Sorry. Did you perform -- did you perform an event study for August 1, 2019?

A. I don't know.

Q. Did you rely on Mr. Coffman's event study in any way in reaching your conclusions in this case?

A. My conclusions don't make a difference if I use his event study. So I did rely on his -- I mean, I did test whether my conclusions were robust to his event study, and they were robust to his event study.

Q. Do you dispute any of the results of Mr. Coffman's event study?

A. Well, again, to the extent that they're different results because he's using some -- he uses a different index, and I do think his index is not as appropriate as it could be, so.

Lucy P. Allen

MR. COTILLETTA: Can I get a quick two- or three-minute break, I want to see how much I have left.

MS. HEFLEY: Sure.

THE VIDEOGRAPHER: We're off the record. The time is 4:47.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:51.

Q. We're almost done, Ms. Allen. My question for you is coming into the deposition today you had already formed opinions; is that fair?

A. That's right.

Q. Have we discussed all the opinions you formed prior to coming to the deposition?

A. I don't think we've discussed every part of my report. I mean, I think like, for example, there's a bunch of my sur-reply report that we haven't actually discussed today.

Q. What portions are you talking

Lucy P. Allen

about?

A. I think just, you know, I don't think we got to most of the sections, but I feel like it's pretty clear in my report what my opinions are, so.

Q. You don't have anything additional to add then from what's in the report is what you're saying?

A. I think that's correct.

Q. Is there any other opinions you intend to offer at class cert hearing or at trial on these issues that we have not already talked about, or that are not already loosely contained in your report?

A. I don't believe so.

Q. Do you feel like you did an incomplete job in this case?

A. No. Incomplete. I feel like I did a complete job, just so I don't answer them backwards.

Q. Did you review -- did you review any sworn statements with your name on it prior to coming in today that are related to this case?

Lucy P. Allen

A. I'm not sure what that means.

Q. In prior cases you've done -- have you ever heard of the term declarations?

A. Oh, I see. No, I haven't done a declaration here.

MR. COTILLETTA: Okay. I think that's it. That's all the questions I have for today. I recognize there's a little bit of time left, but I'm trying to extend a professional courtesy, and I think we've covered everything, of course.

To the extent additional documents are produced related to the expert reports in this case or there's additional supplemental opinions or revised reports, we will reserve our right at that point in time to re-depose the witness; and of course at that time, depending on where we are in the case, we reserve our right to move to exclude the witness under our information

Lucy P. Allen

opinions.

MS. HEFLEY: We obviously don't think that you're missing anything. I think you have the full time. If you have more questions, you're welcome to ask them. I appreciate you're trying to hurry up, but if you have more to say, then now is the time to say it.

MR. COTILLETTA: No. I think we're good.

MS. HEFLEY: Okay.

MR. COTILLETTA: Thank you.

MS. HEFLEY: We will reserve our questions.

THE VIDEOGRAPHER: This concludes today's deposition. We're off the record. The time is 4:54.

(Off the record at 4:54 p.m.)

DECLARATION

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

______________________________

LUCY P. ALLEN

Subscribed and sworn to before me this____________day of__________20___.

_____________________________________

NOTARY PUBLIC

CERTIFICATE

STATE OF NEW YORK )
: ss
COUNTY OF BRONX )

I, ROBERTA CAIOLA, a Certified Shorthand Reporter, do hereby certify:

That LUCY P. ALLEN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand on July 16, 2024

Roberta Caiola

ROBERTA CAIOLA

ERRATA SHEET

CONCHO RESOURCES INC. SECURITIES LITIGATION

DATE OF DEPOSITION: July 11, 2024

WITNESS: LUCY P. ALLEN

PAGE LINE FROM TO

____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________
____|_____|__________________|_____________

Subscribed and sworn to before me

this ____ day of ____________, 20____.

____________________ ______________________

(Notary Public) My Commission Expires

## $

**$10**
285:15
**$11.32**
323:12,14,15 326:25 335:22 337:5
**$5.58**
323:11,16,21 324:24 327:3 336:7,8,10 337:6
**$64**
245:13

## 1

**1**
8:25 9:2,5, 14 15:22 17:9 21:14 34:4 35:19 97:19 271:8 340:7
**1,000**
258:21 259:2 260:2,8 261:4,10
**10**
53:4,13 121:18 152:4,5,8 210:2,7 246:20 250:7 251:9,10 315:25 316:4
**10-K**
152:13,14,16 153:6,15
**100**
17:21 37:2 69:8
**105**
23:2
**10:35**
72:23
**10:46**
73:3
**10b**
38:3,8,19,24 39:3
**10b-5**
38:5,12 39:8,10,12, 15,19 330:9
**11**
5:3 101:8,23 115:12 116:18 118:12,19 125:2,15,19 126:12 127:8 129:25 130:5 137:14 145:7 171:19 172:7,22 173:5,6,11 215:10,11 283:9
**11.32**
327:17 336:7
**12**
102:4,6,10, 14,25 103:8, 12,20 104:6, 13 107:10 108:25 109:18,23 110:9 125:15 150:24 154:6,17 158:24 166:16 171:14 172:2,12,22, 25 173:5,10 203:5 215:9, 11,12,14 230:3
**12:42**
175:14
**13**
102:4,15,25 103:8,12,23 104:6 107:10 109:20 110:12,15,19 125:16 203:5 229:21,24 246:9
**14**
102:4,16 103:2,7,12, 17,23 104:6 105:13 106:4 107:7 108:21 109:20 110:12,15 125:17 217:23 218:3,6,12 229:21,23,25 230:7 281:24 282:5 289:23 332:15
**14(a)**
330:4
**15**
9:4,6 121:18 254:11
**16**
57:11
**16825**
5:23
**17**
80:8 90:15 199:5 217:23,24 218:3 320:9
**18**
242:20 289:24
**19**
9:24 10:3
**1991**
91:10
**1:15**
175:17

## 2

**2**
9:23 10:2 15:21 53:11 80:6 152:11 269:5,6 320:10
**20**
25:14 74:2 261:17
**200**
228:18
**2017**
242:16
**2018**
257:5,8,10, 22 258:16,23 260:8 261:16
**2019**
154:11 174:8 182:14 244:4,9 260:2,9 271:8 275:4 297:11 340:8
**2023**
21:25 22:9 40:19 50:16 142:23
**2024**
5:3 9:4,6,25 10:4 276:8
**21**
186:16,18 239:18
**23**
21:24,25 22:9 210:8 297:16,18
**25**
34:3 37:21
**26**
215:7
**28**
218:17

**29**
335:25
**2:14**
229:11
**2:25**
229:15

### 3

**3**
11:12,14,18 12:2 15:12, 22 16:2,14, 22 17:4 21:15 22:22, 25 74:3 112:17,25
**30**
5:19 246:7, 14
**30-odd**
218:4 248:21
**31**
154:11 174:8 182:14 244:4,9 260:2,9 275:4
**33**
53:3,7,12 320:20
**35**
255:21
**36**
277:12
**37**
254:11
**38**
255:5,18,19 259:24
**3:06**
263:22
**3:07**
263:25
**3:46**
296:25
**3:54**
297:5

### 4

**4**
21:20 22:4, 25 35:22 55:22 73:5 97:2,20 99:19 210:9, 10 276:5,6, 11 289:17,21
**40**
199:6,10 289:2,7
**422**
228:8
**45**
277:12
**46**
239:22 240:10
**47**
239:18 240:8,10,23 242:5,7
**4:21-CV-02473**
5:17
**4:47**
341:7
**4:51**
341:11
**4:54**
344:19,21

### 5

**5**
21:21 22:7 99:20 101:7, 20 102:7 107:2 115:7 125:3 145:8 154:7 229:20
**50**
37:6 149:18 150:2
**53**
240:6
**57**
320:12

### 6

**6**
101:21 107:2 222:19,20, 21,22 223:7 226:19,20 228:3 229:20 281:24 282:3
**640**
258:18,24,25
**667**
25:22
**67**
320:13,19
**677**
25:23
**680**
74:7
**69**
318:21 319:7

### 7

**7**
57:11 222:19,20, 21,22 228:16 269:9 276:16 280:18 290:5
**70**
318:21 319:7
**77060**
5:25

### 8

**8**
35:23 36:2 55:22 73:5 80:8 90:14 112:17 113:2 222:19,23 276:8 289:24 290:2,4
**80s**
289:15
**82**
22:25
**840**
255:13 258:17,23 259:4 260:3, 14,21 261:9
**87**
69:6

### 9

**9**
99:19 186:16 222:19,23
**900**
5:24
**9:13**
5:3

### A

**A-11**
283:9
**a.m.**
5:3
**Abhy**
57:19
**abilities**
191:4,5 192:7
**ability**
189:18 191:13 196:6
**able**
38:7 54:14 55:5 161:4 213:19 252:13 283:12 285:5

287:2 292:22 293:5,8,16, 23 301:15 335:3,9 338:23 340:3
**abnormal** 88:14
**above** 97:5 171:19, 24 321:20
**absence** 124:6
**absolute** 59:18 235:5
**absolutely** 100:15 131:15 149:2 150:20 214:5 293:12 308:13
**academic** 23:3 83:11 129:4 148:2, 6 220:24 264:18
**account** 322:24
**accounting** 149:17 161:13,16 170:13 226:12
**accurate** 306:16 308:16 331:18
**accused** 295:12
**acknowledge** 165:12,20 200:16
**acknowledged** 164:4
**acquire** 315:5,10
**acquired** 262:16
329:24 332:8
**acquirer** 332:22
**acquirers** 329:22
**acquiring** 321:12 329:6
**acquisition** 211:7 254:16,23 261:20 262:21 319:18,24 320:6 328:22 329:11 331:6 332:19 333:5,6 334:25 336:14,20 337:24
**acreage** 286:4
**across** 13:20 105:5, 11
**act** 19:14 20:4
**action** 6:2 40:8,17 45:6 176:22 221:6 222:13 224:11 226:6 300:24 333:14
**actions** 38:3,8,25 39:4 267:3, 5,9 299:4
**actual** 30:3,14 44:15 45:19, 24 46:12 61:24 65:21 69:5 109:12 110:5 111:8, 10,11,22 112:3 138:13 179:11
251:13 265:10,22 266:11,13 275:13 277:21 279:23 281:20 288:15 301:7 309:14 327:11,12
**add** 18:12 262:5, 9,11,13 263:4 283:24 285:15 342:8
**added** 190:2
**addition** 16:9 231:23
**additional** 16:10 18:12 153:8 154:5 327:16 342:8 343:15,18
**address** 27:3 43:20 126:16
**adequately** 317:4
**adjust** 334:19
**admissions** 156:12
**adopted** 156:11 295:22
**Adopting** 22:7
**affect** 83:21 84:2, 21 87:2 123:7,15,24 124:17 128:6,16 147:24 220:23 232:19
320:18
**affected** 135:6
**affecting** 92:22 135:11 221:7
**affects** 83:18 84:14, 19 89:19 123:5,12,23 148:9 220:2, 3,25
**affirmative** 9:16 185:22 217:14
**affirmatively** 10:25
**afternoon** 175:19
**afterward** 320:5
**aging** 289:14
**ago** 37:22,25 96:2 269:11 289:2,4,8
**agree** 5:6 86:23 113:11 124:24,25 156:15,22 173:2 201:11 203:20 204:5 258:2 268:3 278:19 291:18 299:3 313:16 321:12 333:3
**agreed** 338:21
**agreeing** 180:2
**agreement** 37:5 332:7 337:23

**ahead**
71:21 167:12 193:10 200:6,15 205:19 244:16 336:14

**aide**
109:17

**air**
175:22 176:13,14

**algebraic**
306:5

**allegation**
191:20,23

**allegations**
192:6 240:24 241:11 243:21 268:11 280:13,16 281:2

**allege**
183:20 217:25

**alleged**
36:4,5 42:4 45:16 46:10 47:9,16 48:12,23 49:3,14,15, 16,18 51:16 56:5,6 99:23 103:22,24 110:10,13 112:19 114:14,16, 21,25 115:2 116:8,19 125:8 127:21,25 131:14 133:19,21 134:17 135:6,10,20 136:16,20 137:7,19 138:3,8,18 139:2 147:8 152:11 154:11,13 155:6,14 156:7 157:9 158:9,16 166:19,20 167:16 169:22,24 170:21 171:15 175:2 176:23 177:2,8,10, 14,18,20 179:5,7,8,9 180:14,18,23 181:14,17,21 182:12 190:24 193:2 199:11,13 200:3 202:8, 13,24 203:3, 6,11 204:23 206:18 207:4 209:21 210:10,15 212:16 213:21 214:13 218:20,23,24 220:6 224:10,18,22 225:10 226:5 239:25 240:17 241:13,14 242:2 243:9, 15 244:14 247:4 248:25 254:12 255:14 257:10 259:5 268:14,17 269:21 270:5 274:18 275:6 281:7,15,17 283:6,8 290:11,22,24 291:8 292:23 294:9

**allegedly**
232:3 290:10

**alleging**
111:7 200:17 201:9,17 241:21 258:22 287:22 291:20 302:7 303:20 308:2 327:19 328:21,24 329:3,10,21 330:11,12,14 331:6 333:14 334:12

**allen**
5:1,11 6:1, 24 7:1,5 8:1 9:1,2,5,6,23 10:1,2,3 11:1,14,18 12:1,2 13:1 14:1 15:1,21 16:1 17:1,9 18:1 19:1 20:1 21:1,15 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1,4 35:1, 19 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1,25 51:1 52:1 53:1,11 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1,4 74:1,3 75:1 76:1 77:1 78:1 79:1 80:1,5,11,12 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1,5 91:1 92:1 93:1 94:1,5 95:1 96:1 97:1,6,19 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1

156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1, 19 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1,19 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1, 6 270:1 271:1 272:1 273:1 274:1 275:1 276:1, 5,6,11 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1, 12 342:1 343:1 344:1

**allowed** 286:3

**Allstate** 203:19 204:25 205:16,24 206:3,10,24 207:2,10

**alongside** 301:11 304:21 305:7

**aloud** 35:7

**alternate** 236:7

**alternative** 272:4,5 308:23

**ambiguity** 132:25 134:25 135:8 136:17 137:6

**ambiguous** 135:5 140:14 145:23 159:23,24 241:3

**amount** 61:22 62:4 232:23 238:11 301:12 304:22 305:11 309:12,14 324:20 335:21 336:4,6

**Amy** 6:18 80:4

**analyses** 22:19 94:16 185:12

**analysis** 13:3 27:11, 24 36:3,10, 11,12 40:3, 9,12,16,24 41:4,7 42:10,17 43:13,21,23 45:3,4,11, 14,19,20 46:12 47:3 48:21 49:16 54:5,9,13, 15,22 55:6, 8,11 56:4 63:7 72:9 76:2,17,18 78:10 98:22 99:11,22 100:11,17,19 110:18 113:14 115:19,21,22 117:5,10,13, 16,20,22 118:8,21,24 119:3,5,6 126:13 127:14 128:21 129:13 140:10 141:10 148:24 156:22 157:7,15,17, 18,22 177:13 178:6,23 179:3 180:3, 5,15,16 181:5,6,18 184:11 185:2,7,8, 10,13,14 196:8 200:12,15,24 201:12 205:20 207:19,20,21 210:6 216:16 217:2,12 218:21 219:11,21,

24,25 220:21,22 221:3,7 222:7 223:8, 10,13 224:5, 12,13 225:24 226:15,17 228:15 237:5,14,19, 22 238:2,14, 20 246:12 250:5 251:7 252:10,11,13 267:13,15, 19,21,22,24 269:25 270:4,9 274:6,24 275:20 276:20 277:18,21 278:8,10,12 279:3,10,13, 23 280:2 294:8 306:18,21 307:5 308:18 320:18

**analyst**
36:3 40:9,12 41:6,8,12, 19,23,24 42:4 43:13 45:3,15 56:4 57:5 61:20 62:12 63:2, 24 64:2,8,12 69:4 70:16 71:7,17 72:17 73:7 76:19 81:7 82:4,8,11 85:4,17 87:5,8,22 88:17,21 93:10 96:4, 15 116:20 124:6,10,13, 15,18 125:8 127:17 128:2,14,22 130:19,23 132:8,11 133:23 134:18 135:9 136:14,20 137:8 138:21 140:17 145:19 146:9 148:21 149:21,23 151:7 154:10,20 155:4,5,19 156:2,3 157:3,9 160:16 161:5,9,14, 19 162:7 163:5,7,12, 14,17,24 164:8,10,16, 17 166:18 167:14 169:18 171:4 173:13,25 174:2 198:2, 10,18 210:9 211:10,13 213:9,12,24 214:8,19 215:17,19 216:6,13 217:7 218:12 223:10 224:7 226:2 231:2, 10,11,21 234:18,20 235:12 236:13 237:7,9 238:5,6 243:6 244:24 246:16 247:23 248:3,11,20 249:16 250:2,11 252:4,6,16, 18,20,23 253:3 254:2, 4,5 255:11 256:22 257:7 258:14 259:10 279:18,20 284:3 285:13,17 339:2

**analyst's**
79:11,19 83:25 86:8 120:5,16 122:10 153:9

**analysts**
43:25 56:16 57:19 61:23 76:23 77:2, 10,15,20,24 78:8,14,21 79:6,9 80:20 85:9 87:9, 12,17,20 88:4,5,19 91:23 92:4, 18,20 97:7 119:11,14 121:19 122:13 124:23,25 128:12,25 129:15 132:2,13 136:25 137:10 147:16,18 148:3,8,25 149:2 152:13 159:2,9 163:9,11 164:4,20 165:13,21 166:5,11 173:12 174:5,19,20 197:8 198:23 212:22 213:16 216:5,13 217:9 218:4, 6,8,10 233:22 246:24,25 247:20 248:5,8,14, 16,21 249:7 250:14,18 256:2,12,15, 19 257:20 258:11 259:4 282:9,25 283:21 285:10 287:16 313:6 338:11

**analysts'**
80:14 88:10 91:16,17 129:11 134:2

**analytically**
51:22

**analyze**
33:16 44:17 49:9 81:17 112:13 114:13,15,24 118:25 125:22 177:7,10,13 179:6 184:2, 3,13 196:18 199:25 200:7,23 247:7 249:25 265:22 269:15,16 270:17 272:18 274:15,18

**analyzed**
44:20 99:10 116:2 184:23 268:15,18,23 269:12

274:20 297:19
**analyzers** 129:9
**analyzes** 148:4
**analyzing** 51:22 89:20 117:17,23 169:17 176:25 179:10 198:21 269:19 274:21
**and/or** 116:21
**Andrew** 57:19
**angle** 196:3
**announce** 258:20
**announced** 259:12
**announcement** 92:17 182:16 211:7 272:11 275:8,23
**announcements** 75:20 91:22 92:3,11 93:8,12
**answer** 23:18 27:3 37:16 39:23 42:14 46:13, 16 51:8,20 63:15 64:25 66:4 73:19 77:12 92:6 99:14 115:18 117:21 118:6 172:15 245:14,15 247:18 308:10,13
324:5 342:20
**answered** 8:6 32:8 39:6 45:25 46:5 90:20, 25 91:13 97:9 117:25 118:14,15 137:23 205:23 225:19 235:8 300:15 308:4
**answering** 45:20,23 119:8 231:9
**answers** 45:21 46:6, 15 49:10 56:2,11 58:16 61:21 62:5,22,23 69:6 98:21 154:24 157:22,24 172:21 185:14 230:2 253:21 308:12
**anticipated** 314:19
**anybody** 238:25
**anymore** 300:23
**anyone** 68:9 76:25 77:9,23 198:5 220:5 266:21
**Apologies** 246:7
**apparently** 106:7
**appearance** 6:9
**appeared** 133:2
**appears** 210:23
**appendices** 9:11,19 29:9
**appendix** 11:14,19 15:7 29:13 53:8 69:2 83:13 105:5, 6,10,19 106:15,19,25 107:16,21 247:14
**applicable** 109:23,24 110:2 111:25
**apply** 129:25 130:25 140:8 221:6
**appreciate** 15:2 46:18 76:6 99:13 178:2 186:9 209:22 225:13 232:7 241:18 280:4 318:7 323:25 325:22 344:7
**appreciation** 312:8 317:7, 11,12,16,18
**approach** 308:24
**appropriate** 98:15 156:23 219:17 340:25
**approximate** 36:21 38:25
**approximately** 260:2
**arguing** 190:7
**argument** 113:15 338:7
**argumentative** 108:8
**arguments** 113:13
**arose** 66:10
**around** 118:3 186:10 214:20 252:25
**article** 24:4,9 74:6, 11 164:3 264:6,18 265:4,15 326:14
**articles** 25:5 73:10, 13,15,16,20 74:12,15,21, 23 75:2,5,6, 7,9,16,19, 23,25 76:3, 8,13,15 129:13 164:2 315:14
**artificial** 298:2,4 301:13 304:23 305:11
**asked** 7:22 27:2,10 31:22 32:7 33:15 36:2 39:5 44:17 46:13 49:9 56:2 70:12, 13 72:10 90:19,21 99:21 101:11,14 106:21 114:24 115:16,17, 19,24 117:5 118:5,13 125:20,22,

23,24 126:14,15,19 139:18 159:25 160:5 181:10 184:13 199:24 205:22 216:25 217:2 235:7 269:14,16 323:8 328:7
**asking** 7:9 37:19 38:11,13 42:17 48:15 49:25 84:12 86:11,13 94:7,9 95:14,16 103:21 113:8,25 115:18 125:22,23 126:20 127:2,17,24 129:4 156:14 157:11 160:4 167:7 191:18 210:24 307:13 327:23
**aspect** 228:12 273:8
**assessment** 280:24
**assessments** 226:13
**assign** 238:9
**assignment** 116:3 126:18,21,24
**assignments** 26:25
**associated** 32:6 280:12 338:14
**associates** 280:24
**assume** 156:19 233:19
**assuming** 113:10 280:23 287:17 331:5,7
**assumptions** 26:23 27:4, 13
**attached** 31:16
**attaching** 31:15
**attachment** 29:6
**attempt** 98:4 339:20
**attention** 15:20,22 21:14 22:21 25:13,17 33:24 55:22 66:7,14,15 73:25 80:8 99:18 115:10 218:17 239:17 254:10 255:4 268:25 269:9 277:11 289:19 297:15 320:8
**attorney** 26:17 27:7 139:5
**attorneys** 28:3 176:2, 4,6,9
**attribute** 243:7
**attributed** 271:2
**Audio** 5:4
**August** 271:8 340:7
**author** 164:3 224:6 225:25 265:13 266:25
**authored** 266:21
**authority** 84:8 90:17 322:3,11 324:7
**authors** 225:25 275:20
**available** 60:25 80:25
**average** 129:15
**aware** 44:25 100:9 213:24 214:6 267:11,17 314:23 330:7

**B**

**back** 15:20 24:23 30:20 55:20 63:8 73:2,5 90:3 109:15 112:6 115:3 145:7 155:12,13 169:24 175:16 183:11 186:12 212:17 220:6 229:2,14,17 234:6 257:21 263:24 281:23 297:4 304:16 310:8 317:5,15 318:10 341:10
**back-end** 110:6 176:20 177:14,24 178:8,13,18, 21 179:3,24 180:3,4 185:2,6,23 186:2
**background** 38:23
**backup** 107:16
**backward** 118:22
**backwards** 342:21
**bad** 275:16 292:18,19 310:22 311:25 314:4,22 327:2
**Baez** 57:17 58:22
**baked** 286:10
**Baker** 5:19 6:19 176:6
**Bannett** 57:20
**bargain** 298:12 299:11 300:5,21 309:6 310:4
**bargained** 333:6
**barrels** 283:24
**base** 262:11,20

**based**
19:2 56:3 126:7 221:14 235:10 252:3 273:9 285:21 293:10
**bases**
11:5 148:16 319:8
**basic**
24:23 84:25 114:3 326:5, 11
**basically**
84:12 99:4 110:7 198:25 200:8 224:23 262:12 334:8
**basin**
211:4,6
**basing**
252:2
**basis**
19:14 20:5 49:13 80:19 90:17 147:14 196:24 221:13 228:22 283:4 298:7,25 299:21 307:10
**bear**
29:7 80:3
**beat**
275:14
**beating**
242:17
**begin**
71:9
**beginning**
69:22
**behalf**
5:22 6:6,13, 16,19,21
**belied**
249:14
**believe**
11:3 13:25 23:22 28:8 29:5,9 31:2, 8 37:20 42:6 53:19 57:22 59:12,13,16 60:4 61:7 62:20,23 68:11 70:25 74:3,14 75:5,24 76:13 98:13 103:14 107:13 119:24 133:22 141:14,15 155:24 179:16 199:21 211:24 223:8 225:19 227:2 246:5 254:7 269:4 272:13 328:14 340:3 342:16
**below**
56:3 99:23 154:25
**benefit**
298:11 299:10 300:5,20 307:6 309:6 310:4 320:5, 25 321:3 322:17 334:25 337:9,12,13
**benefit-of-the-bargain**
299:6
**benefited**
322:23
**benefiting**
321:9
**benefits**
193:25
**benefitting**
335:4
**best**
240:13 339:13
**better**
60:9 67:12 69:19 189:19 193:17 195:16,23 215:3 242:18 289:18 323:24 324:13 325:4 330:24 335:4 338:6
**biased**
166:6,11
**bicker**
86:17
**bigger**
285:15 336:8
**bit**
27:19 29:22 30:10 35:13, 18 123:6 124:4 142:5, 6 177:25 186:10 199:4 229:5 343:11
**black**
161:24
**blowing**
311:4
**board**
332:20
**body**
31:13
**book**
228:8,11,12, 14,17,21,23, 25
**book's**
228:17
**books**
15:11
**bother**
146:20 147:7 197:14 249:9 251:23
**bothering**
146:9 249:19
**bottom**
239:21 280:20 290:5 339:11
**Botts**
5:19 6:19 176:6
**bought**
263:3 325:17
**bouncing**
35:13
**BP**
311:2,6
**brakes**
301:5
**break**
72:21 83:8 175:11,25 199:4 229:8 296:23 341:3
**breaking**
134:9
**Brealey**
326:6
**bridge**
189:17 192:5
**brief**
229:8
**bring**
8:14 66:7 69:22,23
**broader**
14:12,16,20 110:18
**broke**
9:11
**broken**
90:22 269:17

**brought**
8:12,15,20 66:13,14 261:21,22 262:3
**bucket**
108:17
**buckets**
112:11
**budget**
71:3
**budgeting**
70:24
**building**
238:13
**bullet**
187:10
**bunch**
59:23 341:22
**busily**
248:18
**business**
80:21 149:18 150:3 186:21 226:13 258:19 262:15
**butchering**
228:7
**buy**
262:22 323:10 330:15 335:3,9
**buying**
329:17 335:6 338:2,7
**buys**
319:20

**C**

**C-4**
254:13
**Cabot**
142:22,24 143:14,20,22 145:2
**Caiola**
6:6
**calculate**
298:6,25 300:14 309:8
**calculated**
310:2
**calculation**
334:16
**call**
23:9 27:4 61:8 72:4,13 131:25 134:14,17, 20,22 146:4, 11,23,25 147:3,6 149:19,24 151:7,23 152:24 178:19 195:4 197:17,19 216:4,6,9,10 243:19 249:9,11 251:24 304:8,10 316:24
**called**
93:21 143:21 186:2 193:18 200:10
**calling**
72:8 299:23
**calls**
51:18 52:7 79:15 113:23 127:10 162:23 225:20 256:3,13 269:24
**capable**
247:23 275:21
**capture**
313:7,9
**car**
301:5
**care**
150:16 336:11
**career**
13:16 36:23
**careful**
26:16 27:15 289:13
**carefully**
231:25
**carries**
215:13 290:5
**case**
5:17 7:10 15:6 21:16 22:20 36:18 37:21 38:5, 12,20 39:8, 10,12,15,19 40:7,21,24 41:3,10,16, 24,25 42:11, 16,23 43:9, 10 44:16 46:21 56:21 60:22 78:3, 22 99:3 106:22 112:13 116:16 127:15 132:18 133:7 139:20 142:14,22,24 143:4,6,9, 15,25 158:13 167:7 170:14 176:19 178:7 185:22 203:19,22 204:8 208:16 221:14 223:23 238:23,25 241:11,20 253:25 257:2 259:23 266:8,15 268:9,11 270:4 271:7 273:13 274:25 276:12,23 295:10,13 297:7 299:22 301:19 302:7 304:7 306:22 307:7,16 308:11,21 310:10 311:2 312:12 313:18 314:3 328:23 329:12 330:3 333:4 340:12 342:18,25 343:17,23
**cases**
19:12 25:23 40:23 44:21 141:25 142:8 144:19,21,24 145:3 239:7 267:12 272:18 273:11 300:14,19 301:15 308:2 310:5 326:13 328:15,17 332:24 343:3
**cash**
123:20 128:11 329:17,25
**categor**
30:25
**categories**
27:23 28:19 37:12 41:14, 16 43:12 47:11,18 97:24 98:14 99:22 100:3,

14 101:10, 12,20 105:12 109:16 112:8 115:5 176:18 178:5,8 180:9 185:8, 15,24 186:7 187:3 243:17 268:18 271:10

**categorization**
28:23 29:17 30:14,22 31:2,24 41:5 94:15 100:21 112:5 188:4

**categorize**
41:4 100:5, 8,16,20

**category**
14:16 30:17 74:21 93:20, 23 94:4,6,22 98:25 101:15,16,24 111:20,22 112:10,12 113:16 154:7 180:13,23 181:3 182:2, 4,19 183:4 186:19 187:13 199:12 200:3,11,16 201:13 202:6,9,24 205:20 207:20 210:6 218:23 239:25 240:3 241:14 243:9,19 246:12 247:7 269:22 270:13 271:3 274:14,19, 21,23

**causal**
130:10

**causation**
306:18,21 307:5,9,15, 20,23 308:18

**caused**
116:20 125:8 127:25 130:3,4,8 131:5 134:18 136:20 137:8 208:7,16,19, 22 209:10 271:24 272:11 273:24 274:4,9,10, 23 281:12 290:24

**causing**
134:23

**cautioning**
100:12

**cautious**
209:17

**CEO**
149:25 150:7,10

**cert**
342:12

**certain**
36:4 56:5 62:4 98:24 159:20 199:18 216:17 217:15 230:10 241:21 301:15

**certainly**
25:9 119:12 129:9 132:17 164:8 165:3 208:3,11 225:14 250:21 265:25

**certainty**
59:18 235:5

**certification**
52:18,22 53:6 112:19 113:19 141:25 143:10,14 221:5,21 222:12

**certifications**
142:8

**cetera**
220:7

**CFA**
276:7

**Chad**
276:7

**challenged**
113:18

**challenging**
112:18 114:9

**chance**
311:8,9,10 313:6

**change**
25:11 80:13 81:5 82:11, 14,16,23 83:24 84:10, 11,15,20 85:20,21 86:7 87:5,9, 24,25 88:16 89:16,22,24 90:6 91:24 92:5,19,20 93:6,9 96:15 97:7 110:17 112:4 116:20 119:11,17 120:5,11,15, 23 121:4,8, 9,17,20,21 122:24 123:14 124:4 125:9 128:3, 6,25 129:6, 16 130:16, 18,20 131:10,17 132:23 133:2,7,15 134:7,18,23 135:11 136:21 137:8 140:11 141:9 170:17 195:25 196:8 198:13 251:8 273:15 329:13

**changed**
85:23 89:12 127:20 131:6 132:9,13 179:20,23 180:7 279:18,20

**changes**
83:6,15,17 84:14,19 85:3,15 89:3 98:4,9 133:23

**changing**
81:8,15,18 83:25 124:7 130:22 132:3 133:16

**characterization**
280:6

**Charles**
6:15

**Charlie**
11:10

**chart**
211:3,9,10, 11 213:25 214:2,7,16, 20

**Chase**
5:24
**check**
60:10 70:3
105:5 235:2
**checked**
70:13
**checking**
60:3,13,14
61:18 168:15
**children's**
15:11
**choices**
326:9
**choose**
326:10,21
**chooses**
286:19
**choosing**
327:6
**circuit**
42:7 82:6
324:2
**circumstance**
78:15 156:24
**circumstances**
44:12
**citation**
19:18,23
91:9,11
**citations**
19:11,13
290:6 322:20
**cite**
24:23 53:4
91:8 164:2
222:2 223:9
228:5,7,9,
20,23 322:2,
10 324:6,25
325:5,13
328:8
**cited**
23:19,23,25
24:2,6,19
25:5,7 26:5,
10 63:6
129:13
144:24 222:6
223:2 266:21
267:7,10
285:22
296:19
322:19
328:18
**cites**
25:12 223:12
326:7
**citing**
228:10,21
240:6,21,23
264:12,25
265:3 266:18
294:12
**claim**
8:5 98:24
183:23
208:12
214:13 260:4
261:12
303:24,25
304:4
319:19,21
330:4,9
**claimed**
208:18 209:5
**claiming**
189:7 199:11
207:16
208:2,7
209:10,19
250:13
281:20
301:20
302:13
304:12
334:10
**claims**
42:24 52:6,
10,12
294:15,21
304:7
**clarification**
18:13 120:13
144:7 169:10
289:6 317:14
**clarify**
152:7
**clarity**
215:21
**class**
52:18,22
53:6 74:12
77:3 78:9
112:18
113:19
114:19
132:12
141:24 142:7
143:9,13
176:22
221:5,20
222:12,13
267:3,5,9
299:4 300:24
318:25
329:7,21
330:13,15,18
342:12
**class-wide**
298:7,25
299:21
**clause**
111:19
**clear**
15:3 27:5
65:12 69:24
72:10 103:11
132:15
134:4,11
137:24 160:6
200:21
204:20
206:13 209:9
237:12 251:8
268:19 342:5
**clear-cut**
261:8
**clearer**
204:15
205:13 207:8
**clearly**
108:13
170:18 190:8
**close**
133:5,24
136:22
149:10
152:25
**closely**
292:6,7
338:4 340:4
**closest**
232:2
**code**
56:2,10,17,
18,19 58:7
60:9 61:21
101:11 117:5
150:20
253:21
**coded**
61:15 62:23
64:18 69:5
154:12
278:18 279:7
**coder**
168:9,10
**coders**
57:21 59:11,
20 60:18
61:5 65:25
66:22 69:16
130:11
131:21,23
136:5
159:12,15,25
167:18,21
168:11,22,25
169:16
230:20
234:7,8,14,
15 236:24
237:2 252:3
**coding**
56:12,15,23
57:2 58:21
59:25 60:2,
6,18 62:7,
10,11 63:2,
9,10,12,15,

22 64:3 70:14 117:9 154:24 159:22 168:13 169:3 237:8 252:8, 14 253:15,16 279:6,25

**Coffman**
19:22 20:9, 13 81:11 90:11 96:12, 20,22 114:12 116:11,14 148:5 184:3 276:7,19 277:16 280:7,11 283:5 284:5 288:7 290:8 297:25 301:16,23 303:14 304:5 324:22 326:7 334:13 339:5

**Coffman's**
8:16,17 34:10 90:10, 12 91:4,14 114:10 276:11,23 277:12 289:20 297:20 323:4 325:20 328:13 336:5 340:10,20

**colleague**
227:7 238:22

**colleagues**
238:16

**combination**
191:13 305:9

**combine**
338:5

**combined**
262:17

**come**
13:20 37:5 58:5,9 160:21 183:10 204:3,9 205:2,12 206:3,25 207:10 237:24

**comes**
67:18 89:23 91:11 92:17 95:19 98:22 153:7 194:4 316:13

**comment**
272:19 317:6,16 323:25

**commentary**
233:24 234:3 243:7 285:18

**commented**
76:22 250:18

**comments**
233:22 250:22 280:5

**common**
34:10 113:12,13 129:19 169:8 247:24 297:20 301:3 304:6 309:9 318:23

**commonly**
300:13

**communicating**
65:15

**communication**
28:9 30:21 31:17 32:6

**communications**
27:16 31:18

**companies**
91:21 92:2 93:7 193:15 292:5 338:12 339:10

**company**
80:21,22 81:2,6,9,17 83:5,7 85:12,14 86:9 87:6,12 88:8 89:18 91:18 92:12, 23 95:6 119:16 121:2,5,7,12 122:6,8,11 127:18,19 128:2,4,17 139:16 140:20 147:25 149:12 150:2 153:12 161:14 162:13 163:22 164:14 165:25 188:14,19, 22,23 189:8, 13,20 192:11,14, 16,22 193:3, 6,17,24 194:8,17,25 195:17,21 196:4 197:12 198:3,7,24 220:3,20 241:5 244:23 249:8 256:12 257:18,21,22 259:17 262:12 275:7,9 282:11 283:3 286:18 287:10 292:3,19 302:22 310:18 313:15 314:16 316:3,6,8 337:25 338:19

**company's**
186:21 190:15 211:23 242:18 258:19 272:11 297:11

**compare**
58:16 157:8 302:2

**compared**
196:6

**comparing**
110:8 155:4 257:4

**comparison**
262:25

**complaint**
191:11,20 199:19 205:18 210:18 214:25 215:2 243:16 285:22 294:18 295:4,6 296:13 302:12,19, 20,25 303:13

**complaints**
315:15

**complete**
306:18,22 307:23 308:18 315:19 342:20

**completed**
239:12 307:6

**completely**
100:19
248:2,10
314:21
317:21
**complicated**
264:20
**components**
134:10
**compound**
14:9 254:18
**computer**
64:10
**con**
118:23
267:20
**concealed**
290:10
**conceding**
113:6
**concept**
85:8 138:21
140:8 144:12
177:24
221:12
322:16
**concepts**
138:16
223:21
**conceptually**
313:2
**concern**
169:11
**Concho**
5:13 7:10
56:4 73:7
74:12 77:3
78:9 116:21
120:6,11,16,
17 125:9
170:10
183:20,24
184:18
189:2,3,5
241:5 255:25
257:8 285:20
286:13
310:24
319:2,9,16,
19,20,23
320:14
321:2,10
327:15,19
329:2,6,16,
17,22,24
330:16,17,20
331:12,16,22
334:5,22
335:2,3,7,8,
11,14 336:6
338:2 339:10
**Concho's**
184:21
202:7,23
242:15
247:24
254:19
331:15
335:15
338:20
**conclude**
49:13
206:12,23
279:11
**concluded**
49:6 180:22
**concludes**
280:12
344:18
**concluding**
180:21
**conclusion**
24:8,12,15,
17 33:22
49:22 50:3
51:17,19
52:8,17
113:24
127:11
162:24
204:3,7,9,21
205:2,11,12
206:3 207:11
278:13
**conclusions**
22:19 25:2
26:5 48:21
49:2 94:17
95:12,22
207:2 235:9
252:2 278:9
340:12,13,16
**condensed**
33:14
**conditioner**
175:22
176:13,14
**conditions**
133:16
**conduct**
36:2 40:2
99:21 181:4
185:8 194:9
237:14 270:8
**conducted**
40:8,12,15
42:11 43:8
172:22
219:11
265:13
**conducting**
115:21
118:7,21
223:3 265:20
279:3
**conference**
146:4,11,22,
25 147:3,6
197:17,19
249:9,11
251:24
**conferences**
315:14
**confidence**
252:7 253:15
**confirm**
234:8
**conflated**
205:7
**conflating**
247:25
**conflicts**
166:12
**confronted**
265:8
**conjunction**
72:18 212:21
**connect**
281:7,14
**connected**
85:2 224:21
**connecting**
170:22
**connection**
14:7 40:16
135:15
166:19,24
167:9,15,23
168:9,18
169:3,7,12,
16,23
170:10,14,
18,19 171:3,
5,9 192:9,21
212:15
281:11
**connects**
291:7
**consensus**
242:17
**conservative**
201:6 209:16
**consider**
17:14,21
27:8 176:9
**considered**
11:7,15,22
12:6,12,15,
20,23,25
13:22 14:5,
12,16,19,25
15:15 16:3,
6,15,25 17:5
18:2 20:20,
24 21:7,15
22:12,22
25:14 49:17
50:15 52:23,

24 53:22,25 73:21 74:2, 18 76:5 83:10 111:4 129:14 134:7 136:15 144:20,22,23 164:5 194:11 233:25 328:11,13,18 338:10
**consistency** 185:20
**consistent** 34:12 48:21 49:2 50:3 179:17 299:21
**consistently** 105:15
**consists** 329:21
**constant** 262:6
**constructed** 187:3
**consult** 238:15
**consulted** 65:12
**consulting** 288:24,25
**consumer** 300:23
**contact** 66:16
**contained** 73:21 74:17 216:2,11 342:15
**contains** 16:23,24 111:10 233:4
**content** 27:11,23 31:12 36:3, 10,11,13 40:3,9,12, 16,23 41:4,7 42:17 43:13, 21,22 44:17 45:3,10,13, 18,20 46:14 49:15 54:5, 9,13,14,22 55:6,7,11 56:3 63:7 76:17,18 99:11,21 100:11 113:14 115:22 117:5,9,13, 16,17,20,22 118:8,21,24 119:3,4,6 129:13 136:3 157:21 178:6 185:12 216:16 217:2 218:21 219:20,24 220:20,21 221:3 222:7 223:8,10,13 224:5,12,13 225:24 226:14,16 228:15 237:14,18,22 238:2,19 246:12 267:13,15, 19,20,22,24 275:19 276:20 277:17 278:8,16 279:10,13, 23,25
**content-free** 135:24
**contents** 31:18
**context** 54:22 86:15 94:12,14 96:7 98:21 170:7,8 187:3 210:17 310:10
**continue** 5:5 258:19 280:3 281:22
**continues** 99:19
**contradict** 79:12,21
**control** 159:19 337:25
**controlling** 271:21
**conversation** 184:25
**conversations** 5:9 65:25 68:3
**conveyed** 28:6 258:25
**copied** 105:21 107:8
**copy** 8:15 9:18 213:9
**corners** 10:25 11:3
**correct** 7:11,14,15 13:10 16:3,8 21:8,18 25:23 28:21, 22 29:14 36:19 41:6 42:19 46:4 50:16,20 52:12,23 53:18,23 54:24 55:8 57:2 69:2 74:5 79:7,9 82:25 93:22 97:25 101:10,17 103:15 104:21,24 105:25 106:24 112:14 117:10 129:7 137:20 144:23,25 145:3,4,12 154:22 157:15 168:22 172:16,24 173:7 178:20 179:16 181:5 182:17,24 184:6,9 213:4 230:4 246:16 258:5 260:4 268:11 274:19 280:2,23 291:24 294:16 295:17 319:4 332:8 333:18 342:10
**corrected** 290:18
**correcting** 293:13
**correction** 225:2 268:14
**corrective** 36:5 47:11, 19,20 48:13, 24 49:4,14, 17,18 51:15 56:6 144:3,8 154:11 155:7,16,20 157:2,4 158:8,15 166:20 167:16

169:22 170:21 171:22 172:3 174:7,17 177:14,18,20 179:7,8 180:16 182:8,10,14 194:4 218:21,24 220:4 224:18 244:4,9 252:25 255:11 268:5 269:15,17,18 270:9 275:2 281:8,18 290:11,19, 22,25 291:8, 14,21 292:9, 18,23,25 293:7 312:9 316:14 331:3

**correctly** 255:8

**correspondence** 28:7

**corridor** 292:10

**Cotilletta** 6:12,13 7:4, 8 9:22 11:10 72:20 80:3 108:18 175:10,18 191:18 215:10,13 229:9,16 263:19 276:3 278:2 280:18 296:22 297:6 327:22 328:5,9 341:2 343:8 344:11,14

**counsel** 5:12 6:8 12:24 26:24 28:20 29:17, 21 30:4,12, 16 36:2 52:17 97:23 98:17,19 99:7,15 100:2,22 115:19 125:23 176:5 181:10 187:4 253:25 295:13 327:22

**counsel's** 52:22

**count** 111:12,15 150:5 306:9, 11,12

**counterexample** 279:24

**counts** 235:16

**couple** 80:11 177:6 189:24 202:12 229:18 242:5 255:20 310:14 315:6

**course** 343:14,22

**court** 5:15 6:5,10 13:12,13,16, 21 19:12 25:18 33:5,9 50:18 141:7, 12 143:9 156:25 158:7,11 162:21 172:18 175:12 178:25 195:6 203:7,15,21, 22 204:5,10 205:5,9,10 206:14 207:9 219:11 267:11,12 294:14,19,23 295:20,22,25 296:5,6,8,18 303:4 304:2 325:7 328:17

**court's** 40:18 50:15 52:5,9 156:20 294:12

**courtesy** 343:13

**courts** 26:9 47:5 119:19 141:12 148:5,8 322:21

**cover** 32:5,16,20 77:15 80:20 198:23

**coverage** 132:11

**covered** 120:21 343:14

**covering** 78:9

**create** 107:21 294:23

**created** 234:9,12 295:13

**creating** 100:13

**credits** 164:2

**criteria** 44:7 216:20 252:19

**criticism** 273:6 279:12

**criticisms** 184:10 272:25 279:5,9,10

**criticize** 273:15

**criticized** 203:8 275:20

**criticizing** 100:11 294:4

**curated** 254:2,4

**curiosity** 181:24 227:14

**curious** 33:4

**current** 85:18,20,22 122:3 336:3

**cut** 67:21 193:10 209:25 244:17

**cutbacks** 194:7

**cutting** 214:15

**CV** 37:8

## D

**damage** 113:13 325:6 330:23 335:5 336:23 337:9,18

**damaged** 325:18 336:22

**damages** 34:11,12 113:13 297:20

298:2,7,25 299:8 300:14 301:3 304:6, 11 308:23 309:4,8,9,12 310:2 318:24 322:6,14 324:10 325:6,21 326:16

**dance**
118:3

**Daniel**
228:17

**data**
165:16 166:2 265:6

**database**
64:5

**date**
10:15 32:21 39:13 202:17,18 239:24 244:13 255:12

**dated**
9:4,24

**dates**
183:9 202:12

**Dave**
266:24

**David**
239:5

**day**
88:2,15 121:18 153:2,4 221:25 227:20 233:20,21 243:8 250:9 269:8 271:22,25 272:8,12 273:21 300:17

**days**
121:19 153:4 155:24

**deadlines**
239:14

**deal**
60:10 330:23 331:15 333:8,20,23 334:4,7,11, 12 337:21

**Dearborn**
57:19

**debate**
66:6

**Debbie**
5:21

**decade**
315:13

**December**
260:2,9

**decide**
119:2 163:3 223:13

**decided**
143:9 214:2, 8 236:8

**deciding**
137:7 252:20

**decision**
19:2 26:11 40:18 50:15, 18 51:25 52:2 94:23 95:2,11,19 141:18 143:14 145:3 156:21 157:12,19,24 158:3 187:25 188:11 204:12,14 205:17 221:10,21 294:13 296:3,6,7 334:2

**decisions**
13:12,13,17, 21 25:18 26:2,6 141:25 142:8 315:15

**declaration**
343:7

**declarations**
343:5

**decline**
49:19 226:18 268:5,9,13, 22 269:20 270:7,14,20, 24 271:7,9, 19,20,23 273:24 274:4,23 275:10 281:12 290:25 323:5,7

**declined**
268:24 269:13

**declines**
121:22

**decrease**
260:7 262:18

**decreased**
254:25

**defendant's**
203:10 295:10

**defendants**
6:19,22 7:13,16 98:20 112:18 113:5,12 296:15,21 310:18

**defendants'**
53:5 176:5

**defense**
52:17,21 97:23 266:22 267:4,8 295:13

**defer**
100:24

**define**
51:11 137:25 185:7 264:14

**defined**
48:7 50:6,9 96:7 159:21

**defining**
24:20 264:16

**definitely**
29:16

**definition**
24:25 51:11 83:19 86:20, 25 89:13 121:8 193:15 262:23

**definitions**
86:22

**definitive**
30:18

**defrauded**
336:18

**degree**
13:7,9 131:25

**Delaware**
333:13

**demonstrates**
218:22

**depend**
22:19 94:17 95:13,24 188:3 235:14 314:15

**depending**
78:14 112:4 234:23 236:22 266:18 343:22

**depends**
264:11 265:7 274:7 312:10

**deposed**
38:21 143:20
**deposition**
7:20 108:11 143:23 341:14,19 344:18
**depositions**
78:4
**describe**
185:23 299:18 316:21 317:22
**described**
81:12 181:4 185:12 220:16 221:17 223:4 297:24 301:17 316:19,22
**description**
150:23 192:18
**desire**
337:24
**detail**
232:24
**detailed**
332:18
**details**
71:12 72:8
**determination**
47:23 48:11 162:21 188:2 197:22 303:3,23 304:2
**determine**
42:2 119:22 126:6 130:12 160:25 161:4 169:14 224:8 226:3,16 270:19 273:23 274:3 301:12 303:5 304:22 305:10
**determined**
46:3,20 271:11
**determining**
45:14 51:14 138:7 162:6 270:25
**developed**
196:12
**development**
187:15 188:25 189:6,9,14, 18 191:2,12 192:7,10,15 193:19,25 194:5,9 196:2,3 212:3 245:25 263:8 283:9 285:3 286:13 293:2,14,19
**developments**
211:23
**difference**
14:4 18:13 31:14 75:16 76:2 100:16 101:5 103:19 106:2 109:9, 21 112:2 139:6 168:3, 12 172:9,15, 20,23 173:3, 4 178:17 250:14 298:14,20 299:9 300:9 305:2 310:3 313:20 314:14 315:18 316:5 320:18 325:8 340:14
**differences**
13:22 44:7 58:9,17 62:6 109:17 253:23
**different**
17:21 24:9, 16,17 33:16 42:16,20,24 44:11 61:11, 12 62:3 64:25 86:22 101:22 103:17 104:3 105:11,16 106:20 109:19,20, 24,25 124:12,13, 14,19,20 153:21,22 161:25 165:18 170:2 190:3 210:16 211:5 217:24 220:8 223:6, 22,23 230:16 237:15 248:2,10 257:3 261:6 278:10 287:21 291:4 292:4 301:22 309:10 310:5,15 315:16 327:10 339:8 340:22,23
**differentiated**
298:11
**differently**
124:22 128:18,20 139:23 197:12 207:6 273:12 278:18
**differing**
124:12 128:12
**dig**
258:7,9
**digressed**
304:17
**dilute**
334:15
**diluted**
319:23
**direct**
209:2
**directly**
18:18,25 28:14 29:20 105:21 127:22 177:9
**director**
57:18
**directors**
332:20
**disaggregate**
305:15
**disaggregated**
270:5,11
**disaggregation**
269:24 270:4,9 273:17 274:6,8 301:11 304:21 305:8 306:8,16 308:16
**disagree**
88:20 203:22 285:19 294:8 333:12 334:18
**disagreement**
65:22 291:16
**disagrees**
278:14
**disciplines**
117:14

**disclaim**
303:9
**disclose**
312:17,20 315:20,22 316:2
**disclosed**
43:16 233:19 290:11 297:11 317:4
**disclosure**
36:6 47:11, 19,20 48:14, 24 49:5,14, 17 51:16 56:7 144:3,9 154:12,21 155:8,16,21 157:2,4,9 158:8,15 166:20 167:16 169:22 170:22 171:22 172:3 174:7,17 177:14,18,20 179:7,8 180:16 182:8,10,15 194:4 218:21,24 220:5 224:18 244:4,9 250:6 253:2 255:12 257:6 268:5 269:15,17,18 270:10 275:2 281:8,15,19 290:12,19,22 291:2,8,14, 21 292:9,18 293:7 312:9 316:13,14 331:4
**discount**
123:19
**discounted**
128:10
**discovery**
13:18 78:3 139:18 306:21 307:6,9,15, 18,20,23
**discrepancies**
60:10,11 64:22 66:9 68:10,15 69:16
**discrepancy**
65:3,5,16 66:13 67:11 68:5 69:18
**discuss**
13:21 58:6 66:17 280:11
**discussed**
16:7 32:10 58:23 73:6 95:25 129:14 140:9 219:4 290:21,22 341:17,20,24
**discusses**
85:8 166:15 191:11 290:17
**discussing**
65:10 78:20 170:21
**discussion**
67:3
**discussions**
68:18 95:12
**dismiss**
295:10 296:7,16
**disposal**
60:17
**disprove**
208:4
**disproving**
208:11
**dispute**
189:6 192:17 287:7 297:23 298:22 301:8 304:19 306:16,20,24 307:2,24 308:8,16 309:2,13,17 324:24 339:5,16 340:19
**distinction**
12:11,15,17 14:11 17:13, 18,19 18:23 54:25 64:7
**distinctions**
196:25 197:3
**district**
5:15,16 142:17,23,25 143:3 144:2
**divide**
270:23
**Division**
5:17
**document**
13:2 31:23 36:13 65:7
**documentation**
66:9 257:8
**documents**
21:16 22:20 56:20 67:3 78:5 343:16
**doing**
13:3 15:14 30:10 35:15 40:23 57:4 62:8,10,11 68:23 71:5 99:11 143:21 151:20 154:20 157:21 158:7,12,13 175:9 189:5, 8,10,13 192:16,17, 19,22 193:3, 6,16,18 194:13,15, 18,20,22,25 195:2,9,11, 13,14,15,21, 22 198:21 200:20 204:16 206:22 207:5,7 209:17 212:11 217:12 219:20 221:23 231:18 238:19 250:14 285:11,22 286:20 287:5 301:18 302:23 305:18,25 306:14 338:17 339:3
**dollars**
284:23
**Dominator**
292:13 293:10 297:9
**double-checking**
44:4
**doubt**
184:17
**downward**
120:25
**draw**
15:19,21 21:13 25:13, 17 33:23 55:21 80:7 99:18 115:10 192:5 204:6 212:14

218:16 219:19 239:17 255:4 268:25 269:9 277:11 289:19 297:15 320:8
**drawing**
12:11,14 22:21 51:17 73:25 189:16 219:10 254:10
**drew**
52:17
**drilling**
286:3
**Drive**
5:24
**drop**
114:18 273:20 280:12,25 324:21 331:3
**dropped**
269:19
**drops**
121:18
**dry**
142:6
**ds**
103:18 106:6 108:4
**due**
70:21 181:17 200:2 202:10,13 203:3 206:6 239:12,24 240:3,16 242:10,15 243:11,14 244:14 268:13 269:20 270:20 281:5
**duly**
6:25

**E**

**earlier**
32:10 58:2 73:6 97:22 116:10 119:24 120:22 125:18 135:16 174:15 187:8 200:10 219:4 225:3 230:19 237:11 250:19 253:14 259:11 270:15 328:16
**early**
237:23
**earn**
284:22
**earning**
93:8,11
**earnings**
91:22 92:3, 10,16 146:23,24 147:2 149:19,24 152:23,24 153:12 173:7,11,14, 15,19 174:3, 4,6,9,18,22, 24 182:16 216:4,8,10 256:13 297:11
**ease**
100:21
**easier**
100:23 134:8
**easy**
66:3 134:3 145:24
**economic**
26:13 84:7 85:7 86:20 90:17 95:4 115:21 116:23 118:7,10 122:25 145:14 146:13 148:18 152:18 165:16 166:2 221:6 227:15 281:3 282:10 283:2,7,14, 15,17,20 284:6,8,9, 10,13,16,18, 21 285:7,9, 12 287:4,15 288:5,8,9 315:21 322:2,10 323:2,13 324:6,12 325:2,25 326:5,8,12 327:7,8
**economically**
26:8 51:23 98:15 118:20 123:8 126:6, 12 127:4 202:4 283:19 318:24 323:8,17 325:19 326:4
**economics**
223:24 227:17 284:11 323:3,23 326:11
**economist**
118:6 123:11 127:7 219:16,18 273:25 274:5 303:4
**economists**
100:12 119:18 123:3
**effect**
84:15 88:6 96:4 114:5,7 261:19 270:12
**effectively**
113:5
**effects**
272:8
**efficiencies**
187:16 189:19 190:13,18 194:3 286:9, 10
**efficiency**
184:4,11,14 286:2
**efficient**
88:15 123:18 128:10 183:21,25 184:18,21 223:18 232:11,13,21 233:6,8 247:22 251:2 312:22
**either**
7:24 20:3 54:15 55:6 68:12 70:5 82:11 100:11 120:25 148:23 162:21 194:21 248:7 267:8,21 272:25 288:14 303:8 313:11

**electronic** 63:21,25
**electronically** 62:14,16,24
**element** 236:15
**Elkins** 6:21
**email** 28:6 29:5,6 30:23 31:3, 6,9,12,14 32:4,5 66:19
**emailed** 27:7
**emails** 31:6
**employed** 43:9 63:11
**enables** 187:15 190:12
**end** 62:19 114:19 179:2 200:24 242:9 306:12
**engage** 294:7
**engines** 75:13
**English** 169:8 266:5
**Enron** 149:13 151:12
**entire** 234:19 237:9 265:3 331:3
**entirely** 70:6 134:4 200:21 274:9
**entirety** 214:24 252:16,18 253:7,13
**equal** 113:10
**equate** 321:23,24
**equation** 288:11 306:5
**erroneous** 114:23 252:12
**erroneously** 205:6
**error** 65:9 252:14
**errors** 159:20 339:18
**essentially** 226:7,8 242:14 245:9 254:22 261:12 285:21 292:10 312:24 327:14 331:11
**established** 58:3
**estimate** 260:8,9 309:11 314:10
**estimated** 307:22
**estimates** 242:17
**estimation** 121:7
**et** 220:7
**evaluations** 122:15
**event** 83:3 106:8, 10 145:11, 15,18,20 146:3,7,21 147:8,11,12, 21 148:22 149:4 150:13,22 151:16 152:3 173:23 174:13,15 215:20 218:5 247:2,4 248:24 249:4,20 251:12,21 252:10 271:18 272:2,14,19, 24 273:3,7, 9,15 312:4 336:5 339:6, 8,16,18,21 340:2,7,11, 14,17,18,20
**events** 78:16 150:23 153:22 215:16,25 216:2 217:22,23,24 218:3,6,8, 11,12 246:15
**eventually** 155:11
**everybody** 194:18 196:22
**everyone** 194:14 196:17 215:24 217:20
**everyone's** 236:19
**evidence** 46:9 49:20 80:15 81:21, 24 82:15,17 89:18 91:3 96:16 114:20 146:6 147:4, 9,23 148:9, 10 161:23 177:19 180:17 185:14,19 186:7 208:23 209:3,14 239:23 247:3 249:14,22 250:21 257:14 258:4 259:10
**evolution** 297:8
**exact** 24:25 43:7, 11,12 70:7 107:12 138:20 158:4 301:12 304:22 305:11
**exactly** 19:24 30:12 33:10 60:9, 25 62:22 65:4 102:19 103:3,4 108:3,23 134:4,22 136:7 150:15,19 163:23 169:16 185:16 225:4 245:18 258:13 285:10 325:19
**EXAMINATION** 7:3
**examined** 6:25
**examples** 21:3,4 24:19,20 131:9 136:9 210:25

266:14
**Excel**
63:18
**exchange**
329:3
330:16,17,19
336:12
**exchanged**
329:18
330:20,25
**exchanging**
327:13
328:25
330:19
**exclude**
343:24
**excluded**
267:12,14,18
**Excluding**
202:17,18
**execute**
191:13
**execution**
191:4 192:7
**exhibit**
9:5,14 10:2
11:14 106:15
115:6 211:3
276:5,6
289:21
320:10
**exhibits**
9:12 269:7
**exist**
318:13,16
**existed**
24:10
**exists**
42:3
**expect**
122:19
223:19
232:17
246:24
261:15
282:9,25
283:21
**expectation**
123:19
128:16
254:24 314:6
**expectations**
91:23 92:4,
13,18 93:9
275:15
**expected**
93:2 123:23,
24 128:11
242:19 243:5
**expecting**
195:10
286:17
**experience**
78:14,18,19
**expert**
7:11 9:3,5
13:18,24
14:3 17:13,
15 36:17,22
39:2,25
40:16 142:2,
9,22 158:21
179:15
252:12
266:22
267:2,4,8,
12,14,18
276:6 309:23
343:17
**experts**
89:7,17,20
148:7
158:12,18
250:23
**experts'**
272:19
**explain**
290:9
**explained**
90:24 302:15
**explaining**
178:15
**explains**
80:12 90:5
290:17
**explanation**
132:14,15,
18,19 133:7,
9 179:18
**explicitly**
164:16 171:5
**explode**
311:9,10,11,
16
**exponentially**
196:6
**extend**
105:18
343:12
**extends**
105:19
**extension**
55:4
**extensive**
265:14
**extent**
31:25 32:17
58:8,17
64:24 65:11
100:22
110:24 111:9
166:9 191:14
236:25
247:17
252:11
322:22
340:21
343:15
**extra**
201:6 217:17
235:2 285:14
**eyes**
194:10

**F**

**facilities**
211:17
**fact**
13:2 20:13
78:4 98:8
134:23
149:14
164:4,18
189:12
198:12
206:4,10
207:2 209:4
213:20
240:23
251:14
258:24
278:11 293:6
294:7 303:15
326:20
**Factiva**
75:12
**factor**
134:5
**factored**
261:18
**factors**
135:3 270:24
**fail**
315:22
**failed**
114:12
311:14
312:17
313:21
**failing**
147:17 194:6
**fails**
114:15 281:7
283:14
313:15
**failure**
315:19
**fair**
18:6 36:15
41:20 54:11
61:22 76:15
79:14,22
131:25
134:15
145:2,5
162:2,9
238:11
246:10 253:8

262:25 272:21 334:11,12 341:15
**fairly** 43:23 118:4 129:19
**fall** 108:17
**familiar** 244:3 264:8
**far** 316:12,13
**fast-track** 125:16 239:16 318:19
**faulty** 114:23 301:5
**favor** 11:11 209:19 323:22
**February** 21:24,25 257:5,8,21 258:16,23 260:8,15
**federal** 12:18 26:18 32:24 167:7
**feel** 18:22 35:7 67:13 273:9 342:5,17,19
**fellow** 227:7
**felt** 65:11
**ferret** 258:11
**fewer** 246:19
**field** 227:16 244:19,21
**figure** 17:25 32:2 38:14,18,20 68:14 71:2 134:14 193:21 217:16 240:10 305:14
**figures** 110:5 130:25
**figuring** 235:25
**filed** 5:14 21:24 22:8 53:16
**filing** 146:5,11
**filings** 21:17 338:13,14
**final** 106:18
**finance** 23:4 83:4 119:13,18 123:4,9,11 129:10
**financial** 91:15 93:12 242:16
**financially** 6:3
**find** 21:12 25:7 55:25 136:2 148:8 202:5 236:3 252:13 257:25 266:4 291:6 339:17
**finding** 180:12,20 198:9 203:2,4 208:9 220:9 278:11 291:3
**findings** 95:23 224:9 226:4
**fine** 7:7 148:14 183:17 221:24 225:22 289:11
**firm** 307:21
**firms** 321:13
**first** 6:25 7:20 8:15,17,24 12:7 17:5 21:16 33:15 37:20 38:4,12,19 39:9,17,24 40:7,11 44:5 52:25 65:14,17 69:15,18 71:14 115:11 152:21 181:25 183:6 201:24 218:19 228:5,7 232:23 233:10 235:3,23 251:12 276:25 302:24 316:16 330:8
**fiscally** 190:16
**fit** 30:11 62:19 243:20 304:12
**fits** 30:7 304:6
**five** 17:22
**flawed** 277:23 278:7
**flow** 18:16
**flows** 123:20 128:11
**focus** 177:23 187:14 190:5 211:20
**focused** 78:22 190:7 211:12 213:16
**focusing** 90:7 190:5 293:25 294:3 333:5
**follow** 94:22 108:18 157:4
**following** 36:4 56:5 102:3 121:19 130:20 154:12 198:2 202:8,23 203:11
**follows** 7:2 93:11
**footnote** 18:6,7,8,10,12,14,24 19:11,14,17,18,23 20:2,6,10,16,17 53:3,7,12 222:19 223:7 226:19,20 228:3,16 240:6 255:21 320:12
**footnotes** 17:8 18:3 19:6 20:3 222:22 289:24
**forecasted** 106:5
**forgive** 13:5 53:10

86:3
**forgot**
158:4 185:16
**form**
14:8 18:9 28:25 29:2,4 33:11 45:7 50:12 55:14 63:25 78:11 108:15 109:7 113:7 153:6 167:11 178:11 185:25 232:16 234:11 295:24 332:15
**formal**
43:19 55:11
**formally**
44:23
**format**
30:6
**formatted**
29:22 62:18, 19
**formatting**
29:23 30:5 33:19
**formed**
197:2 341:14,18
**forming**
11:7 12:3,6 13:3,4 15:5, 18 16:15,25 17:14,16 20:22 22:16 23:14 24:4 26:2 77:21 196:23 197:4 214:23
**Forms**
152:12,14
**formula**
319:13
**forth**
203:13
**forward**
161:17 209:24 232:8 270:22 275:17 286:20 292:14,20 293:8
**forward-looking**
122:18
**found**
19:24 153:17 186:6 218:15 239:23 240:2 277:20 278:14 279:18,20,22
**foundation**
144:14 191:17
**four**
10:25 11:3 16:10 57:3, 18,21 62:2 64:15 101:14 211:2
**fourth**
112:10,12 113:16 242:15 274:14,19, 20,23
**framework**
237:25 238:14
**fraud**
322:7,15,17, 18 324:11 325:7,9,10 326:16 328:23 329:12 330:6 331:7
**fraudulent**
329:4
**fraudulently**
334:6,9
**frequency**
129:15
**frequent**
70:5,10
**frequently**
56:13
**fresh**
79:2
**front**
10:10,11 13:6 29:12 33:5 35:20 104:23 105:9 125:14 179:2 212:12
**front-end**
177:12 178:18,22 179:23 180:3 181:5,6,18 185:4 200:10,12,15 201:12 207:19
**full**
105:9 244:19,21 273:23 274:3 337:25 344:5
**fuller**
232:24,25 233:3
**fully**
274:12
**future**
122:20 123:19 128:11 293:12

**G**

**gain**
323:14,16
**gas**
170:8 288:20,22
**gathered**
106:14
**gathering**
154:20
**gave**
20:8 30:12, 17 31:23 153:15 160:10,23 161:3 162:11 266:14 329:25 336:18,24 337:4,14,15
**gears**
91:19 176:17
**general**
59:23 78:18 94:9 95:3 114:4 129:7 139:22 140:25 188:12 190:9 223:9 237:18,21 255:25 273:19 280:13,15,25 294:4 306:15 332:23
**generally**
36:22 37:14 55:12 67:4 85:5 99:8 128:25 189:24 228:10,22,25 241:19 264:2 265:20 271:12,14 273:2 291:23 304:19 321:15,19 333:10

**generate**
29:15
**generated**
28:3 107:21
**generating**
77:22 106:14 168:20
**generic**
80:13 90:6,8 93:13,15,16, 21,24,25 94:4,8,10,24 96:3,6,11, 19,21 97:8, 12,15 104:13 109:10,11 110:4 111:20,21 135:23 186:19,22 187:2,7,20 188:3,9,10 193:12,22 194:11 195:5 196:19 197:5 198:20 235:24 236:6
**generous**
135:25 136:8,17 137:5 138:11,25
**geographicall y**
338:4
**get all**
254:5
**getting**
31:11 33:25 87:3 142:5 154:23 320:24 321:5,6,9 327:15,16
**Giraud**
6:23
**give**
19:10 20:10, 12 21:3 34:24 77:11 94:18 110:5 132:8 133:6 148:15 150:23 163:19 164:25 165:8 170:6,7 180:17 210:25 239:15 247:10 248:16 283:17 284:9,19 318:18 320:3 321:17 327:3 335:5 337:4
**given**
27:13 36:16 42:23 56:16 59:20 60:23 88:15 89:22 93:23 94:3, 15 126:21 129:20 146:16 167:18,20 168:6 250:24 273:21 301:24 325:7,15
**giving**
210:5 329:17,25
**goes**
23:21 119:4 152:15 286:20 317:5,15
**going**
7:8 11:8 23:2,9 26:14,15,20 30:20 35:12, 17 55:21 70:4 78:15 79:2 90:3 91:6 93:18 97:10 109:15 112:11 115:4 117:18 125:13 134:15 141:7 150:2 151:13 158:24 161:17 166:5,6 169:24 175:3,7 178:3 186:15 194:2,23 195:3 197:11 198:12 225:14 232:8 237:25 262:9,13 270:22 275:17 276:4,14 283:11 284:22,23 285:5,14,15, 16 286:25 287:17 289:9 292:14,15,20 293:4,7,8, 11,16,23 301:10 305:15 306:7 311:7 320:3 323:12,13,14 327:3 334:21 335:5 336:12,13
**Goldman**
40:18 50:16 51:25 94:23, 25 95:8 96:8 141:18 156:10,20,21 157:7,12,18, 24 158:3,7, 13,19,22 187:9,24 188:11,17 195:6 197:2 219:12
**good**
7:5 35:8 37:24 51:6 72:20 74:20 79:3 86:3 98:16 117:19 140:13 175:19 190:22 193:7,16 195:3,11 199:3 228:25 236:19 245:7 267:16 292:10 321:6 323:17 336:19,20 344:12
**Google**
75:11
**grammatically**
106:3
**great**
8:19 35:21 191:3 230:5
**greater**
191:14
**grew**
263:3
**ground**
7:21
**grounds**
112:21
**group**
41:12,13,15 100:25 217:3 254:2,4
**grouped**
294:19,20 296:10
**grouping**
101:4 126:7 294:11 295:12,19,21

**groupings**
294:22,24 295:3,5,13, 20,21 296:2, 6,9,12,14,20
**groups**
114:17 291:10 294:15,17
**grow**
196:6 261:15,16 262:20,21
**growing**
262:16
**grows**
260:24
**growth**
254:18,25 261:20 262:5,10,14, 19,24 263:5, 8 284:23
**guess**
10:8 19:4 37:10 43:6 46:18,19 48:9 66:3 68:17,20 69:7 71:13 84:4 106:6 118:2 148:12 169:11 172:5 181:13,17 205:15 224:3 226:23 227:20 243:19 261:13 263:14,15 265:17 266:5 290:7 291:15 301:9 303:8 314:9
**guidance**
59:10,19 228:11 241:12,16, 23,25 242:3, 18,19 243:5 270:22 275:17 292:11 293:12
**guide**
126:10 157:14
**guidelines**
237:13,16, 18,21
**guides**
157:16
**guiding**
131:21
**guys**
149:15 176:12

**H**

**Halliburton**
40:24 41:10, 11,16,18,24 42:13,22 44:21
**hand**
8:24 11:12
**handed**
9:9 11:17 276:10
**hang**
233:7
**happen**
75:21 77:18 152:25 153:3 161:2 310:21 311:25 314:2,4,20, 22 315:3,4
**happened**
26:10 78:17, 23 145:21 147:9 150:18 151:17 153:11 183:4 225:3 230:17 236:25 249:5,21 251:22 314:9 332:25 333:2
**happening**
310:20 314:7 325:20
**hard**
315:2
**harm**
321:5,8 322:18
**harmed**
320:7 322:22
**he'll**
334:19
**head**
133:12 184:19 212:11
**heading**
21:16 23:3 25:18 33:22 34:10 278:2, 3 318:23
**headings**
33:19,21 34:17,23
**hear**
7:23 175:24
**heard**
54:3,6,8,20, 23,24 151:23 197:9,12 289:17 302:8,10 310:14 315:12 343:4
**hearing**
342:12
**Hefley**
6:18 14:8 18:9 31:20 32:7 33:11 39:5 45:7 50:12 51:18 52:7,13 55:14 78:11 79:15 90:19 108:15 109:7 113:7,23 118:13 127:10 144:13 162:23 167:11 175:6 178:11 185:25 191:16,22 205:22 215:9,12 234:11 235:7 256:3 277:24 289:16 295:15,24 328:3,7 341:5 344:3, 13,15
**held**
5:18 179:14
**help**
34:17,20 46:16 58:12 103:9 126:10 152:7 168:2 194:24 199:22 305:10
**helped**
58:23
**helpful**
18:19 19:3,4 141:2 247:21
**hemorrhage**
149:18
**hey**
149:15
**hiding**
149:15
**higher**
260:3 283:24 284:24 327:7,8 334:22

**historical**
111:15
**history**
38:22
**hits**
312:4
**hold**
97:16 312:22
**holders**
320:21
**holding**
321:18
**holds**
96:23
**homework**
229:4
**honest**
333:23 334:4
**honestly**
228:15
230:14
**hoped**
292:16
**hoping**
286:16
**horizontally**
245:22
**hours**
175:8
**Houston**
5:16,24
**hurry**
344:8
**hypothetical**
27:7 92:24
141:5 143:25
149:9 161:3
170:7 193:20
207:16 316:7
329:9
**hypotheticall y**
216:8

**I**

**idea**
34:25 85:2,9
245:5 249:10
260:13 268:2
286:11
**ideas**
248:2
**identical**
42:12 171:18
**identificatio n**
9:2,7 10:4
11:16,19
276:9
**imaginable**
314:5,11,15
**imagine**
235:17,20
**imagined**
313:25
**immaterial**
297:12
**Immediately**
277:3
**impact**
46:10,17
49:21 80:16
81:13 96:17
99:2 112:20
113:6,15
114:13,15,20
124:8 126:9
127:9,13,24
145:17
176:20,21
177:24
178:9,14,19,
22,23,24
179:4,5,11
180:4,11,13,
17,22 181:5,
19 182:11
185:2,7,15,
24 186:3,7
200:11,13,16
201:13
207:20
208:24
209:3,14,20
223:15,19
224:2
251:13,15,16
275:22
**impacted**
124:11
176:23
177:2,5,8,21
182:6
**impacting**
81:22,23,25
182:7
**impacts**
119:20
127:15 179:4
**imply**
135:10
**important**
8:4 81:2,13
83:5 88:23
119:13 146:8
147:5,12,17,
23 148:4,10,
23 149:3
153:20
163:21
164:11,12,
13,23,24
165:9,10
174:5 175:2
214:9,12
222:11,12
224:15 234:4
246:23 247:5
248:11,18,
19,22 249:6,
12,23 265:22
266:12
**impression**
162:14
**inaccurate**
156:5 159:4
160:18
161:6,11,24
**inappropriate**
281:3
**incentivized**
165:14,22
**include**
9:19 14:15,
20,24 17:6
111:22
164:5,9
186:20
190:25
213:12 214:2
241:11,15
242:2
**included**
14:23 15:7,
12,14 76:16
174:15
212:20
213:14
233:10
**includes**
211:9 329:23
**including**
14:18 15:16
91:4 180:15
194:8 204:15
263:2 319:19
322:3,11
324:7 329:7
**incomplete**
307:20
342:18,19
**incorporate**
282:10,25
**incorporates**
45:4
**increase**
181:16
189:19 194:2
200:2,18
202:7,22
203:3,5,10,
13,18 204:4,
8 205:4,7
206:4,6,11,
18 207:3

239:24 240:2,16 242:15 243:4,8,10, 24 244:13 261:3
**increased** 199:12 201:11 254:24 286:2
**increases** 212:5
**independent** 48:11 56:22 87:17,20,25 88:4 100:20 122:7
**independently** 56:22 58:7, 15 61:15,17, 19 100:13 234:9,12 253:22
**index** 339:7,8,9, 13,14 340:23,24
**indicate** 33:21 37:11
**indicated** 161:19 259:20
**indicates** 49:16 154:3 243:10
**indication** 69:17 85:22 116:19 125:7 155:25 159:2 160:23 161:9 162:12,16 163:7 166:17 167:10,14 169:6
**indicator** 24:3
**individual** 56:15 128:12 134:10 147:11 326:24
**individuals** 66:23 77:14
**industry** 191:14 245:10 269:24 271:21,24 272:7 288:20 339:7,8,9
**inefficient** 124:21
**inflated** 319:20,21 321:7 323:11 327:20 334:6,9 336:6,11,21
**inflation** 199:13 200:18 201:9,11 203:13 205:8 207:17 298:3,4 301:13 304:23 305:12 319:13,14,22 320:2,3 323:4 331:8, 14 334:15, 22,23,24 336:4 337:17
**inform** 313:16
**information** 18:20 24:16 30:3 32:17 76:21 80:24 81:4,6 82:8, 9 86:5,6,7 88:5,7,23 89:4,9,14, 19,22,23,25 92:22,25 93:3,4,5 95:3 104:23 110:19 122:23 124:16 126:10 146:7 147:16 148:22 149:6 151:11 152:19 153:8,13,15, 20 154:5 155:5,12 159:13 160:21 164:5 165:2,9 206:9 223:14,17 232:14,16, 22,24,25 233:4,5,9, 15,19,23,25 240:16,22 244:6,8 248:16 250:17 256:2,6,9, 11,14 258:5, 8,12 260:25 290:10 297:10 338:10 343:25
**infrastructure** 283:11 285:4,24 286:25 288:2 293:4,15,22
**initial** 53:15,16,20 65:24 304:18
**inserted** 164:9
**inside** 256:2
**inspect** 311:23
**inspected** 311:21,23,24
**installed** 176:15
**instance** 65:14 69:15, 18 73:14 132:22 161:18
**instances** 19:13 66:12, 21 68:19 132:5 162:4 165:13,21
**instruct** 159:14,16 327:23
**instructed** 44:2
**instructing** 136:5
**instruction** 60:2 160:11 167:17 168:6 185:11
**instructions** 56:17 58:4, 19,20 59:5, 10,19 60:5 61:6 167:20, 22
**instructive** 45:22 157:25
**intend** 342:12
**intended** 14:23 32:15, 20
**intending** 187:23
**intense** 283:9 285:2 286:12 293:2,13,19

**intentionally** 165:7
**interest** 166:13
**interested** 6:3
**internal** 257:7
**internally** 257:19 258:17 260:22 262:21 263:4
**interpret** 52:6,10,11, 15 169:14
**interpretation** 79:11,13,19, 21 95:8,13, 17,18,22 96:8 157:12 278:24
**interrupt** 18:16
**intertwined** 302:18
**intervening** 39:18
**introduced** 50:5
**investors** 223:17,18 297:12 312:7
**involve** 13:17 236:11
**involved** 41:8 67:25 68:5 236:12 241:5 332:19
**involves** 45:14
**irrelevant** 188:23 201:14,16 202:2,4 207:22,24 261:12
**isolating** 275:21
**issuance** 334:14
**issue** 80:23 153:17 158:2 168:17 169:12 173:12 174:5,21 175:22 176:14 178:12 248:10 273:25 274:5 277:17,19 281:23 318:9 326:18,20 331:8 337:20
**issued** 36:17,23 39:25 142:2, 9 143:5 154:10 155:20 238:23 250:9 275:3
**issues** 33:16 149:17 276:19 278:25 342:13
**issuing** 264:4
**item** 64:18 106:5
**items** 8:12 16:10 17:21 22:11 23:3

**J**

**job** 35:8 52:5,9, 14 80:21 81:16 85:12, 13 119:15 342:18,20
**Joe** 7:8
**Jones** 91:10
**Jorge** 57:17 58:22 61:4
**Joseph** 6:12
**Journal** 74:7,11
**journals** 227:15
**judge** 33:5 113:11
**judges** 169:13
**judgment** 131:25 134:14,16, 20,22 331:9
**July** 5:3 154:11 174:8 182:14 244:4,9 275:4
**jumble** 230:16
**jumping** 186:10
**June** 9:24 10:3 22:9
**jurisdiction** 142:13
**jurors** 169:14
**jury** 162:22

**K**

**keep** 66:8 68:9 87:22 237:2
**kept** 261:20
**killing** 328:2
**kind** 7:20 15:3 31:20 33:18, 21 37:23 40:25 75:13 87:19 141:22 150:23 169:16 196:4,25 214:15 219:9 229:21 235:2 241:3 247:12 264:13 271:5 280:4 285:25 304:17
**kinds** 60:14
**knew** 245:15 257:18 260:23 286:22 323:19,20 326:24,25 336:10
**know** 7:18,19 8:4, 7,20 19:2,5, 9,21 20:8 23:16,18,24 24:7,22 27:4 29:22,23 30:4 31:5, 14,17 32:4 33:4 35:7,15 37:3,7,11,15 38:15,19,22 39:7,11,23 40:14 42:14 43:15 44:2, 6,15,22 47:4 51:5,10,20 52:14 54:6,7

58:14,25 61:8,22 62:17,21 63:20 65:8,9 66:11,25 67:19 68:12, 20,21 69:7, 13,14 70:7, 8,9,11,19,22 71:2,6,24 73:18 74:5 75:20 77:7, 9,17,18 78:2,6 79:2, 5,8 83:4 88:22 89:6 91:9 92:6,7 98:23 99:15, 17 100:7 102:15 104:19 105:8 107:17 109:3 113:15 114:7 120:19 127:4,7,14 129:8,18,22 130:20,21,23 131:4 132:10 133:15 134:2 136:10,11 138:12 139:17,18, 20,25 140:21 141:19 142:10,12,25 143:8 144:15 145:4,24 146:24 148:14 149:5,13 151:6,7,15, 23 152:7 153:2,11 156:2,7,9 158:2 161:17,20 162:10,13 163:8 168:8 169:25 170:3,12,15, 19 171:8 174:4 175:8 183:22 189:21 190:2,16 192:20 193:5,7 195:13,15 196:12,14, 15,21 198:25 199:2 200:21 201:2,15 202:11 203:17 204:15 207:23 209:9 211:17 212:10 215:5 216:3 220:5 221:3,19,24 222:11,14,15 223:5 225:7, 21 227:8,18, 24 230:12,15 231:2,23 232:5 234:15,25 235:12,21,22 236:18 237:17 238:4,7 243:25 244:2,10,25 245:3,13,20, 21 247:15 249:13 250:3 252:12,24 253:2 255:3 256:20 257:18,21 258:8,13,18 259:3,4,18, 19 261:5,11 263:18 264:13,15, 19,20 265:3, 5,17 266:2, 4,24 267:25 268:21 270:16,21 271:17 272:3,10,15 273:5 274:13 275:12,18,25 277:5,8 283:23,24 285:14 289:7 291:22 292:12,16 293:11 296:17,21 301:4,14,19 311:3,7,19, 20 312:2,3 313:20 314:6 315:13,15 316:11,17 321:6 322:19 326:8,19 327:16 328:19 332:12 333:19,21 334:8,17 336:19 339:25 340:9 342:3

**knowledge** 267:9 332:18

**knowledgeable** 78:25

**known** 288:16

**Krippendorff** 228:6

## L

**Labaton** 6:14,16

**label** 94:18

**labeled** 93:24 94:4

**lack** 60:8 67:12 69:19 112:20 189:18 191:16 204:7,22 205:7,8

**Lacks** 144:13

**laid** 44:23

**language** 107:12 187:12 212:19,20 213:3,5,7 214:20

**large** 265:13 339:10

**large-scale** 139:25 187:14 188:25 189:5,9,13, 17 191:2,12 192:6,10,15 193:19,25 194:5,9 196:2,3 211:23 212:2 263:8

**larger** 245:17 265:10 313:14

**lateral** 245:20,24 285:23 286:11

**laterals** 283:10 285:4 286:24 287:24 293:3,15,22

**law** 13:7,9 221:14

**lawyer** 160:7 295:23 307:17
**lawyers** 86:17 130:4 169:13
**layperson's** 271:6
**Leach** 6:22
**lead** 193:16 195:3,22 206:11 335:18
**learn** 160:17,19
**learned** 151:5,14,15, 19 156:4 159:3,8,15, 18 160:12 161:5,10,19 162:8 164:17,18,21 165:5 198:11
**leave** 227:19 286:5
**left** 189:23 341:4 343:11
**legal** 5:23 6:6 26:6,12 51:17,19 52:2,8,10 99:4 113:9, 24 114:2 127:11 162:24 163:2,4 221:9,21 222:14 309:3,7,19
**legally** 52:3 163:2 221:9,20 223:22
**level** 135:14
**liability** 34:13 310:7, 11 315:8
**light** 205:16,17
**likewise** 101:19
**limiter** 97:11 104:17 173:7,10
**limiting** 110:14
**line** 9:11 91:23 92:4,17 93:8 242:6
**lines** 26:11 80:11 95:2 242:6 280:19 282:8 285:23
**link** 130:10 218:22 219:13,19, 21,25 220:9, 10,22 221:16,18,22
**linked** 51:23 132:19,24 133:3,9 220:13
**linking** 223:3
**links** 220:6
**list** 11:25 14:24 16:7,10,13, 22 17:3 21:7,15,21 25:15,23 30:18 73:22 74:2,18 106:20
**listed** 12:20 15:18 16:11 23:3 56:3 74:20 83:12 99:23 328:10,12
**listen** 66:23
**literally** 70:19 153:25 258:8
**literature** 19:12 23:4, 9,14 45:2 63:6 64:4 82:21 83:3, 12 84:13 85:8 91:16 100:10 116:24 117:3,6,9,12 118:11,18 128:24 129:5,9,10 147:15 148:3,7,19 166:8,10,14 220:17,18,25 222:3,6 223:2 224:4, 5 225:15,24 227:6 264:3, 5,8 265:9,21 266:9 273:10 275:19 322:4,12 324:8,12 325:2,5,15, 25 326:15 328:8,10
**litigant** 106:12
**litigation** 5:14 36:18, 24 37:13,18 38:16 39:3 55:13 78:19 86:18 219:18 266:23
**little** 27:19 29:22 30:9 35:13, 18 40:5 41:2 84:25 99:13 104:3 124:4 125:17 142:5,6 148:12 175:21 177:25 186:10 199:4 228:17 229:5 242:4 343:11
**living** 141:7
**located** 5:23
**logic** 94:23 114:23
**long** 38:15 68:3 70:19 71:6, 23 72:2 157:5 215:2 221:25 235:13 238:7 253:10 269:8 277:6 283:10 285:4 286:24 287:24 293:3,15,21 300:17
**long-arm** 333:20
**longer** 253:11 254:19 303:14
**look** 13:24 37:8 62:5 65:7 67:2 75:18, 25 83:6 85:16 101:20 102:2,3,13,

14 108:3,12 119:19 131:23 148:3 155:12 156:25 160:8 181:15 183:9 197:25 198:3 201:23 220:19 231:18,23 234:19,25 235:13 242:4 247:13 250:5 252:22 253:6,7,10, 12 261:9 276:12 289:15 305:2 318:20

**looked**
12:9 15:4, 10,11,13 62:15 73:7 75:23 144:19 244:12 253:2,5 332:15,25

**looking**
9:13 10:9 16:21 21:6, 11 33:18 62:13 64:2 68:25 90:13 96:25 105:11 110:10,13, 15,19 126:8 127:8 130:12 131:12,15, 16,20 135:15,17,19 138:12,13 145:11 150:24 151:25 152:2 153:4,24 155:13,15 156:9 158:8 159:13 160:13 179:6 180:8 185:18,21 197:21 200:9 209:7 217:11,13,14 218:16 232:4 234:18 235:18 240:9 259:24 272:5,23 275:6 277:15 294:9 331:10

**looks**
8:11 29:23 30:8 74:9 83:4 103:21 105:14 129:11 148:3

**loosely**
342:15

**lose**
150:2

**loss**
306:17,21 307:4,8,14, 19,22 308:17 323:16

**lost**
325:9

**lot**
42:16,22 43:22 44:11 59:24 61:23 91:2 198:24 210:24 223:24 248:16 251:2 254:8 258:14

**lots**
60:13,15 91:2,15 117:13 129:9,10 222:5 249:7 257:25 258:7

**low**
314:6

**lower**
260:15 262:11 293:11

**Lucy**
5:1,11 6:1, 24 7:1 8:1 9:1,6 10:1,3 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1

191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1

**luncheon**
175:15

**M**

**M&a**
333:11

**made**
47:22 65:9 75:25 76:2 116:9 127:21 133:22 152:12 166:18,23 167:8,15,23 168:9,17 169:2,7 170:11 171:5,21,22 177:5,9,11, 15,18,22 179:6,25 182:6 187:25 188:7 198:4 199:14 204:24 206:2,5,19 207:4,12 208:8,10,19, 22 218:2 248:25 250:13 275:7,9 296:3,6,21 325:17

**magnitude**
133:18 134:4 284:11

**maintenance**
201:10,18,22 202:3 207:17

**majority**
215:19 216:5,13 218:10 246:25 248:9 251:20

**make**
19:2 34:23 38:10 48:10 62:19 69:23 98:4,8,23 99:8 101:5 103:10 107:24 109:9,21 110:3,20,21 111:25 119:3 169:17 171:8 192:9 227:18 230:19 231:14 232:4 234:24 255:7 262:14 266:17 271:15 283:23 287:12 290:8 292:15 296:5 319:14 321:20 326:9 334:21,24 340:13

**makes**
100:15 192:21 200:23 208:13 284:15,18 304:2 339:14

**making**
75:16 169:12,23 170:14,18,19 171:2 197:22 207:14 224:14,15,24 226:13 245:7 250:24 334:7

**manage**
168:21

**management**
168:24 288:23,24

**managing**
57:17

**manual**
63:23

**map**
211:15 214:10

**March**
9:4,6

**mark**
8:22,25 9:23 11:13 276:4

**marked**
9:7 10:4 11:15,18 276:8,11

**market**
77:15 87:16, 20 88:15,24 91:23 92:4, 18 93:9

121:5,12 122:5,25 123:18 124:14,19, 21,24 128:8, 9,10,18,20 148:11 152:25 158:14 183:21,25 184:4,11,14, 18,22 196:20 197:7 198:22 223:18 232:11,13,21 233:6,8 247:22 248:3,4,7, 12,14,15,17 249:13,17, 18,24 250:8, 12,17,22 251:2 257:23 258:25 259:3 271:22,25 285:20 286:10,22 288:17 301:21,25 312:7,22 313:5,6 315:23 317:3,11,12 321:14 335:13,19

**market already**
313:23 315:24

**market's**
123:17,18 297:8

**marking**
8:21

**Mas**
57:20

**masked**
263:7,13

**match**
42:2,3 45:4, 15 47:9,16, 24 48:12,16, 20,22 49:3, 7,24 50:11, 19,23 51:14 106:25 157:7 158:9 220:13 224:8,9 226:3,4 244:7

**material**
12:22 13:23 31:7,8 58:5 86:5,6,15,20 122:24 123:3,5,8 223:14,16,17 233:9,14,15 256:5,13 258:4

**materiality**
86:11 223:25 226:14

**materialization**
34:13 302:5, 9,11 303:9, 12 304:9,10 308:3 310:7, 11 311:13 312:6,15 315:8 316:15,18, 20,24 317:2, 10,13,19,22, 23,25 318:12,15

**materializes**
310:21 312:3 316:23

**materials**
11:6,15,22, 25 12:2,5,8, 19 14:24 15:15,16 16:3,6,14,24 17:4,13,15, 25 20:19,24 21:7,14 22:22 25:14 50:14 52:23, 24 53:22,25 60:15,16,17, 21,24 73:21 74:2,18 76:4 83:10 106:13 108:10,12,16 129:14 144:20,22 158:22 328:11,13,18 338:9

**math**
130:21 288:11 327:8 331:4

**matter**
5:13 9:3,17, 24 10:13,16 14:3 17:2 19:9 20:4, 20,22 21:17 22:17 23:15 26:3 32:14 33:7 34:16 35:4 40:2 53:23 54:15 56:24 57:13 70:22 77:23 129:7 146:18 152:16 183:13 202:21 208:14 217:6 233:12 246:22 255:25 264:15 265:19 308:23,25 335:11

**matters**
25:19 152:19

**maximize**
187:16 190:12,17,21 195:15

**maximum**
336:5

**Mcdermott**
330:3,8

**mean**
10:18,19 15:10 16:19 17:3 18:13, 22 20:7 24:16 31:9 32:16 34:22 35:9 37:7 38:10 42:20, 23 43:4,11, 12 46:25 51:3,21 55:10 56:10 59:15 61:15 62:18 63:5 64:3,16,23 67:23 77:7, 8,16 84:3, 12,23 86:15 87:21 89:6 92:7,9 94:2, 8 95:25 98:18 104:12 113:4 114:6 115:17,20 117:8 118:5 121:11,23 123:2,11 124:8 129:23 130:8 138:23 139:14,17 140:3 142:19 144:17 157:14,23 159:7,12 160:4 161:12 162:25 164:2 166:23 167:8 168:18 169:5 171:7 184:23

187:6 190:3, 19 192:8,13 193:10 196:19 201:16,17 202:3,4 206:17 209:5 210:22 213:23 231:16 234:3 236:17 244:17 245:5,9 247:11 252:9 253:9 256:10,17 258:8 259:8, 18 261:13 262:24 263:12,15 264:7,10 265:17 266:7 267:25 274:7 277:21 278:20 282:13,17 287:16,20 288:4 292:22 293:24 294:6 295:12 298:22 299:19 301:14 302:17 305:24 306:6 307:19 310:13,17 312:10,14 313:19,21,24 314:8,21 316:17 331:23 334:11 335:7,8,16 340:15 341:21

**meaning**
84:18 95:5 138:14 160:11 168:7 197:24 282:10 283:2,7,14, 15,17,20 284:6,8,9 285:7,10 287:4,15 288:6,9,10

**meaningful**
119:19 194:21 195:20 196:16 206:8,20

**meaningless**
197:6,24

**meanings**
160:9

**means**
24:8,23,24 50:7 56:15 83:18 92:14 94:10,12,22 95:2 124:10 130:9 159:11,18 171:8 188:9 191:3 198:11 244:25 245:4 246:3 263:11,18 272:16 285:13 333:21 343:2

**meant**
34:17 114:4 159:24 160:2 198:6

**meantime**
180:9

**measure**
34:11 301:24 302:2 305:21 309:16 337:2,7,8

**measures**
298:2

**measuring**
300:8 323:6

**mechanical**
236:12

**media**
233:22

**meeting**
59:2 92:13

**meetings**
67:11 69:19

**meets**
292:11

**member**
57:7,23 67:14

**members**
28:15 56:25 57:3 319:2

**Memorandum**
21:23 22:8

**memory**
202:15

**mention**
104:14 135:5 145:20 146:3,5,10, 20,22 147:2, 3,8,16 149:23 150:16 173:13,15,19 174:21 197:14 198:15 210:10 215:19,24 216:5,14 217:7,10,20 246:25 247:2 248:5,9 249:3,4,9,19 250:25 251:3,7,15, 19,21,24 254:15 259:25 291:12,13

**mentioned**
57:25 64:13, 22 67:15 73:6 76:4 86:10 90:4 97:22 116:10,13 135:2 148:25 149:2,4 152:13 183:18,22 215:17 216:7,12,21, 23 217:8,21, 22 218:5,6, 9,11,13 246:15,19 247:8,9 248:8 255:11 256:23 259:10 266:25 276:18 281:13 303:6 320:12 326:2

**mentioning**
136:14 149:5 150:4,6,13, 17 154:4 197:20 251:11,12 281:17 291:9,10

**mentions**
17:4 174:2 248:21 276:19 283:9 291:14,22

**merger**
263:7 320:25 322:5,13 324:9 326:17 330:5 332:6 334:23 337:21 338:15

**method**
76:7 305:8,

14 306:13 309:24
**methodically** 56:18
**methodology** 34:11 42:11, 25 43:4,8 44:9,14 172:21 265:6 279:2 286:19 297:20,24 298:6,23,24 299:15,25 300:3 301:3, 7,18 304:6, 11 309:10 318:24
**methods** 301:11 304:21
**microphones** 5:7
**mid-'90s** 63:8
**million** 245:13
**mince** 186:5
**mind** 35:12 67:18 79:3 91:11 139:5,6 186:15 197:23 230:6 231:8 251:5 314:14 315:19
**mine** 176:3
**minimized** 313:13
**minority** 218:9 247:20
**minus** 319:14 320:2 334:24
**minute** 105:8 229:23 256:8 289:14 294:2
**minutes** 315:6
**mis** 325:15
**misleading** 156:5 159:4 160:18 161:7,11 162:6,7,8, 18,20 163:4 164:19 165:15,24
**misled** 256:25
**mismatch** 45:24 46:2, 8,17,23 47:3 48:3,16,20 49:24 50:4, 11,19,23 51:15 156:22,25 158:2,15 218:25 219:5,9,10, 14 220:12,14 221:12,13, 15,22 223:4, 6 224:9 226:4 244:7
**mismatches** 46:4,21
**misreading** 215:22 255:9
**misrepresentation** 30:16 144:4 179:9,12 202:14 204:23 206:19 209:15,21 217:25 220:7 281:9,10,11, 14,21 287:9, 14 290:16,24 291:7 325:16
**misrepresentations** 30:15 45:17 46:11 47:10, 17 48:13,23 49:4 94:19 98:25 176:23 177:2,8,11, 21 182:12 202:9,10,24 203:4,6,12 206:2,5,7 224:22 268:15 269:21 270:6,12,13 271:2,3 275:7 281:5, 6,17 290:21 291:13 292:24 323:20
**misrepresented** 301:21 313:10,11
**missed** 65:8 229:18 232:5 300:16
**missing** 109:5 231:15 344:4
**misstated** 111:9 161:21 260:4,10 281:20
**misstatement** 103:22,24 109:11 110:10,13 111:4,10,13, 16 114:16 116:8,20 125:8 127:15,21, 23,25 128:15 130:17 131:10,11, 13,14,19 132:20,25 133:3,10 134:18,24 135:6,11,13, 21 136:16,20 137:3,7,12, 19 138:4,18 139:3 140:4, 6 144:9 145:20 147:9,12,20, 22 154:13 156:4 159:3 160:17 161:11,23 164:19 166:19 167:15 169:24 170:14,23 171:15,21,25 172:4 174:13,16 175:2 179:5 181:17 189:15 208:16,19, 22,24 209:4 210:16 211:9,13 212:16 213:21 214:13 216:2,11 225:2,11 230:24 231:8,10,22 232:3 234:23 235:14 236:22 240:17 243:16 244:14 247:4 248:25 249:3,12,18,

21,22 251:18,19,22 254:12,17 256:21 259:6 279:15,16, 19,21 283:8 305:23
**misstatements** 29:11 36:5 41:13,15 42:5 43:12 45:5 49:15, 18 51:16 56:6 93:21 99:23 104:14 106:20 109:12 110:16 112:12,20 113:17 114:14,21,25 115:2 133:20,21 135:23 138:9 145:22 152:12 155:7,14 156:7 157:3, 10 158:10,17 162:17 180:14,18,24 181:14,21 186:20 190:25 191:10 193:2 199:12 200:3 205:21 207:4,12,21 208:2,8,10 210:6,11,15 218:23 224:10 226:5 235:24 236:4,5 239:25 241:13,15,22 242:2 243:9 250:13 255:14 268:17 271:9 274:14,17 283:6 290:9 291:19 294:10
**misunderstanding** 207:9 237:5
**misunderstood** 204:10 205:10
**mixing** 226:22
**MMBOE** 255:13 258:17,21 259:25
**model** 198:13 287:17
**models** 122:15 287:20
**moment** 276:15 281:23
**moments** 37:25 96:2 269:11
**money** 320:3 323:24 324:13,14 325:4 326:11,21 327:6 330:16 336:19,20
**moot** 182:9 254:17 261:12
**morning** 7:5 151:5,19
**motion** 53:6 295:9, 10 296:7,15
**mouth** 142:6
**move** 87:16,20 88:9,19 91:7 96:25 97:18 124:5 128:18,20 129:20 166:16 209:24 224:14,16, 19,25 232:8 248:3,6,12, 15 249:17,18 250:17,24 294:2 343:24
**moved** 8:6 177:17 248:4,14 250:8
**movement** 76:22 87:7 88:2,20 119:23 120:4,8,10, 17,25 121:3 133:20 146:15 224:21 225:6,10 247:24 271:21,24 272:6
**movements** 73:11 250:6
**moves** 128:9 222:8
**moving** 124:22 171:10 175:5 225:6 229:6 248:17 249:13,23 250:12,21
**multi-well** 283:10 285:3,25 286:11,23 287:8,11,12, 18,19,23 288:18 293:3,14,20
**multiple** 90:22,23 130:24 131:2 160:9
**multiplier** 285:15
**Myers'** 326:6

**N**

**name** 5:21 145:15, 18 228:7 325:24 342:23
**names** 57:14,15 226:24
**narrow** 37:23
**nature** 186:22 187:2 193:23
**neatly** 30:8
**necessarily** 14:20 124:24 126:25 146:18 156:15 164:8 204:21 267:19 312:12 321:23
**necessary** 120:9,14 163:3
**need** 18:18 51:10 82:10 86:7 87:5 120:23 144:4,9 159:16

168:10 175:10 215:21 257:7 259:14,15 273:25 274:5,10 312:7 317:17
**needed** 169:9
**needs** 194:7 291:17 317:10
**negative** 165:15,24 268:4 275:14
**neglected** 129:24
**negotiate** 333:8,12
**NERA** 43:23 56:13 59:24 60:7 76:25 77:14, 23 227:7,10, 22 237:13 238:16,22 253:17
**netted** 322:6,14,18 324:10
**netting** 326:16 327:10
**never** 38:21 147:3 218:10 230:6 258:25 287:11 288:19
**news** 73:10,13,15, 16,20 74:12, 15,21,23 75:2,5,6,7, 9,15,19,23, 25 76:3,8, 13,15 124:7, 8 146:16,17, 19 149:25 150:6,9 232:10,12,19 233:10,11,21 240:3,5,11 275:3,16,22, 24 292:18,19 327:2
**nicely** 30:11
**non-entities** 198:17
**non-public** 256:5,14 258:5
**non-specific** 95:4 145:22 236:6
**non-verbal** 68:24
**nonetheless** 10:23 268:10
**North** 5:23
**note** 5:7 28:18
**noted** 26:10 339:24
**notes** 66:8 68:5 106:13
**notice** 18:3 228:8
**noticed** 32:22 33:17
**noting** 217:19
**notwithstanding** 188:5,9
**number** 5:17 22:4,7 23:22 24:18 25:23 37:5 39:18 40:22 68:10 69:18 70:7 72:17 144:19,21 226:11 227:3 237:16 245:17 259:11,16 260:9,14 283:8 315:12
**numbers** 109:12 111:8 161:17,25 257:9,10,15 260:11 284:10 334:20
**numerical** 68:14
**numerous** 290:6

**O**

**O'TOOLE** 5:21
**Object** 45:7 50:12 55:14 78:11 108:15 109:7 185:25 295:15
**objection** 14:8 18:9 32:7 33:11 39:5 51:18 52:7,13 79:15 90:19 113:7,23 118:13 127:10 144:13 162:23 167:11 178:11 191:16,25 205:22 234:11 235:7 256:3 295:24
**objective** 165:16 166:2 173:22
**obligated** 14:6
**obligation** 14:15
**obligations** 13:17
**obtain** 254:6
**obvious** 24:3
**obviously** 15:10 22:12 32:16 42:23 194:22 195:9 344:3
**occurred** 182:22
**October** 176:16
**odd** 173:15
**offer** 342:12
**offering** 32:13 202:20 203:8 335:10,12
**offhand** 20:16 23:24
**offshore** 311:4
**oil** 142:22 143:14,20,22 145:2 170:8 288:19,21,25
**okay** 7:19 8:11 9:21 10:5, 17,21 11:8 12:8,14,21 13:5 14:2 15:2,19 16:2,13,18, 20 17:7,24 18:21 19:8

21:13 22:11, 15,21,24 23:17,21 25:16 26:14 27:5,14,22 28:2,5,10, 13,18 29:7, 25 30:20 31:4,11 35:2,16,21, 24 37:17 40:25 41:17, 22 44:25 45:10 47:14, 21 54:3,11, 19 55:20,23 56:10,24 57:6,25 58:11 59:8 61:13 63:19 64:20 65:23 66:12 67:7, 17,21 69:13 71:12 72:6, 16 73:4,16 74:16,22 77:12 80:7,9 81:10 82:2, 19 85:4 87:3,18 90:13 91:6 96:18 97:18 101:19 102:20 103:9 104:2 107:5 108:5,25 109:15 110:22 111:18 115:3,9 116:5 125:6 129:24 136:4 137:17 138:5 139:4,12 141:3 142:12,21 143:8,12,24 144:16 145:9 149:8 151:15 154:8,18,19 156:9 158:24 159:7 160:13 161:22 168:19 173:9 174:11 176:17 177:23 178:16 181:3,7 182:13,18 183:6,12,15 184:3,7 186:9,11,17, 25 187:10,20 191:9 196:23 198:8 199:3, 9,20,23 200:14,25 201:4 202:19 203:7 210:4, 8 212:10 218:15 221:11,22 222:21,25 228:2 229:6 230:5,18 231:4 232:7 235:4 237:10 242:13,23 243:2,13 252:21 253:4 254:14,23 255:6,23 268:16 269:3,10 272:9,13,23 275:11 276:22 277:14 282:4,21 287:16 289:17 295:2 297:17,21 304:16 307:4,10 311:17 320:11 323:21 325:11 326:3 328:9,15 329:8 332:9, 17 333:22,24 337:20 343:8 344:13

**omitted**
233:9 313:18

**once**
216:7

**one**
8:3,24 20:18 21:23 24:13 25:5 27:10 29:7,9 30:23 31:6,9 32:22 33:17 34:15, 21 39:17 44:5 53:24 57:6,22 58:15 64:24 65:8,19 68:20,22 70:18 74:6, 10 75:12 85:9 86:25 90:24 103:5 110:11 115:20 121:11 124:15 128:14,21 130:14 131:8 135:4 141:17 144:5,11 145:24 155:18 156:2,8 158:18 162:19 163:25 168:4,19 171:20,21 172:18 177:9 179:22 184:15 187:12 198:3,10 202:16,18 204:19 211:2,10 214:3 216:9, 12 218:5,12 223:7,8,9,12 224:12 226:10,15,20 227:3 233:7, 17 238:3 239:15 245:11 247:22 248:2,10,20 249:10,16 252:13,23 258:10 271:6,25 272:3,4 273:20 274:9 275:3 276:14 278:17 279:18,20,24 281:13 282:9,25 284:3 291:6 311:22 315:3 324:18 327:9,13,14

**ones**
26:4 109:22 183:4 209:18

**opening**
9:3,9 10:10 11:20,23 12:4 15:6,7 16:21 17:8 27:20 28:19 29:10 32:11 33:8,24 34:3 35:14,20 43:17 55:21 57:11 83:13 97:2,19 99:20 107:3 115:4,8 145:8 154:7 184:4,7

186:12 199:6 210:3 215:7 229:20 239:18 297:16 318:22
**operation** 207:18
**operations** 186:21
**opinion** 14:2 24:8 51:13 76:20 78:7 82:3,7 86:2,4 87:4 93:10 128:20 162:19 176:19 179:20 180:10 184:15 185:22 195:24 197:5 198:19 202:20 203:8 240:20 244:8 268:8 273:3 277:16 297:7 308:22 319:8 335:10,12
**opinions** 9:15,17,20 10:12,15,20, 22,23 11:4, 5,7 12:3,6 13:4 14:7 15:5,18 16:16,25 17:15,16 20:22 22:16, 19 23:14 24:5 25:8,10 26:2,12,13 32:11,13,16, 20 33:3,7,10 34:15 35:3, 6,9 40:17 53:23 77:22 95:23 128:13 148:15 156:16 178:7 196:24 214:23 271:6 318:9 329:13 341:15,18 342:6,11 343:19 344:2
**oppose** 272:20
**opposed** 299:5,24 300:4
**opposition** 52:18,22 53:5
**optimization** 244:19,21
**optimize** 245:3,11
**optimizes** 212:5
**optimizing** 245:6
**order** 22:7 76:21 82:3,9 86:5 87:6 119:22 120:3,7 259:15 317:9,18
**original** 212:18 317:6,15
**originally** 162:2 296:14
**other's** 62:5
**out-of-pocket** 297:24 298:23 299:5,24,25 301:9 304:20 306:25 307:25 308:24 309:16,24 336:23 337:2,7,8
**outcome** 6:4
**outcomes** 195:4,23
**outline** 11:4
**outside** 31:21 32:14 59:8,20 110:14 165:16,25 310:10,24 333:4
**outstanding** 121:15
**overinflated** 331:22
**overlapping** 172:17
**overpaid** 301:4 305:15,21 309:13 324:19,20 328:25 329:5 335:11,14,20 339:3
**overpaying** 323:21 335:23
**overpayment** 321:23,25 335:22
**overreacted** 88:22
**oversight** 65:18
**overstated** 260:16,20,21 261:4
**overvalue** 327:4
**overvalued** 331:12,16 335:16
**overwhelming** 247:12

**P**

**p.m.** 344:21
**pads** 283:10 285:3,25 286:11,23 287:8,11,12, 18,19,23 288:18 293:3,14,20
**page** 15:22 20:11 21:9,14 22:22,25 25:14 34:3,7 35:22 53:4, 12 55:22 57:11 69:8, 25 73:5,25 80:8 90:14 97:2,20 99:19 101:7 102:7 112:17,25 115:7 125:3 145:8 152:4, 5,8 154:7 186:16 199:5 210:2,7 215:9 222:23 229:20 239:18 246:8 254:11 255:19 281:24 282:2 290:2,4,5 297:16,18 320:9
**pages** 69:6 101:20 107:2 222:20,21

228:8,18 318:20
**paid**
298:14,21 299:9,11 300:10 305:3 309:14 328:22 329:11,14 334:2
**pair**
64:21
**pairs**
62:3 64:14, 15
**para**
97:2
**paragraph**
18:15,17,19, 25 20:11 22:25 23:2 25:22 35:23, 25 55:22 57:11 73:5 74:7 80:8 90:14 99:19 101:8,23 102:9 103:12 112:17,24,25 114:22 115:11 116:18 152:5,10 154:15 186:16,18 187:11 199:6,10 210:8 215:7, 15 218:17 239:18,21,22 240:23 242:5 246:7 254:11 255:5,17 259:24 269:9 276:16,18 280:10,18 281:24 282:5 289:20,22,23
**paragraphs**
102:3,4,5, 13,15 199:18,22 229:21 277:12,15 318:21 319:7
**paraphrasing**
210:20
**parse**
133:14,17
**part**
42:17 45:13 50:14 53:21 65:19 77:4,6 104:20 106:23 141:20 157:14 171:13 174:8 212:18 213:11 214:7,9,11, 12 217:12,17 235:3 236:16 282:14 327:18 328:22 329:12 330:6 335:18 338:9 339:23 341:21
**particular**
25:11 30:6 34:19 74:16 81:19 121:2 127:16 128:21 135:22 138:19 168:9,10 198:22 204:12,13 228:9,20 231:8 233:20 245:10 254:17 273:25
274:5,25 289:24
**parties**
5:6 334:2
**parts**
171:12
**party**
6:2
**pass**
113:19
**past**
203:7 315:6
**paste**
213:9
**pattern**
149:14 246:2
**pay**
321:13,17,19 323:12
**Payal**
57:20
**paying**
336:2
**payment**
321:22 322:5,13 324:9 326:17
**peer**
117:18 272:6,7
**peer-review**
239:2
**peer-reviewed**
45:2 82:21 85:7 100:10 116:24 117:3,6,8,11 118:11,18 128:23 220:17,18 222:3,6 227:5,9,11 238:22 239:4 265:21 275:19 322:3,11 324:7 326:15
**peers**
191:15 196:7
**people**
44:3 70:22 77:17 78:24 95:20 119:14 122:4 123:4 151:13 178:19 179:23 238:8 250:23 300:2 312:15 314:5,19 325:3 326:3, 9 331:24,25 332:3
**people's**
83:7
**percent**
68:20 121:18 149:18 150:2 246:20 250:7 251:9,10 261:17 315:25 316:4 320:13,19,20 335:25
**percentage**
69:10 216:22 247:8,11 251:6
**percentage-wise**
68:13
**perform**
117:21 185:11 192:23 270:3 274:6 286:17 340:6,7
**performance**
192:11,12,13 193:4,17 212:5
**performed**
56:25 265:11 306:17 307:19

308:17 339:6
**period**
61:12 74:13 77:3 78:10 114:19 132:12 218:12
**periods**
61:12 257:4
**Permian**
211:4,5
**person**
44:5,6 123:11 267:6
**personally**
188:8
**perspective**
163:4 315:22
**phone**
28:11 66:18, 20
**pick**
5:8
**piece**
24:10,15 124:16 233:25 265:2 266:9 275:3, 22 311:24
**pieces**
90:24 223:11 311:21,22
**pinpoint**
43:7
**place**
5:5 316:16
**placement**
245:20,24 246:5
**placements**
286:12
**plain**
283:16
**plaintiff**
5:12 209:20 267:2,8
**plaintiff's**
45:5,16 224:10 226:5
**plaintiffs**
6:13,16 81:12 111:7 116:14 183:20 189:7 190:6 192:5 199:11 200:17 201:9 202:2 207:16,25 208:4,6,17 209:4,10,18 211:12,20 214:12 217:25 224:17 241:21 250:12 260:4 281:19 287:22 294:17,18, 20,22,24 295:8 296:10,18,19 301:20 302:7,12 303:7,11,19 310:17,18 324:19 325:16 327:18 328:21 329:3,10,20 335:2 336:16,17
**plaintiffs'**
8:25 34:12 52:6,11 53:5 91:5,14 148:7 156:12 205:17 208:12 214:25 240:24 241:10 243:21 261:11 294:14 295:21 296:2,9,20 302:19 304:7 318:23 319:15 321:4 330:22
**planning**
288:2
**play**
156:21
**Plaza**
5:19
**pleadings**
91:5,15
**please**
5:7 6:8 7:23 11:11 15:22 17:10 79:25 97:4 102:3 115:7,10 210:2 215:6 239:19 246:6 318:20 325:24 327:23
**pocket**
298:9,13 299:17 300:13,19, 22,25 304:24 309:3,5,20 310:4 337:10,11, 13,18,19
**point**
8:20 13:15 33:7,12 37:24 61:2, 25 62:4 75:18 81:8, 20 101:13 102:20 107:18 121:16,24 132:13 152:15 161:2 163:12,15, 16,20 172:5 178:4 183:18 186:4 187:11 199:4 208:14 224:3 233:18 237:23 248:6 250:25 261:24 266:2 267:16 294:6 302:24 305:9 319:12 334:21 343:20
**pointing**
215:23 277:25
**points**
21:20 78:23 153:22
**portion**
71:25 211:11 213:13,15 264:25 273:24 274:4 323:6
**portions**
33:8,14 211:5 216:20 341:25
**portrayed**
210:17
**pose**
149:8 193:20
**posed**
98:14 126:17 137:14 141:5 143:24
**position**
89:3 156:12 256:19
**positions**
57:15
**positive**
211:22 217:11,13,14 230:20 240:3

316:9
**possibility**
132:23 262:7
**possible**
29:21 78:12 79:10,18,24 128:19 135:25 136:8,18 138:25 149:22 164:15,20 165:3,15 166:15 171:4,7 213:24 236:2,9 243:12 250:20 260:6 263:6 265:18 266:6 273:18,19 307:12,14
**possibly**
98:7,11 131:19 132:24 209:6 287:14
**post-corrective**
154:21 157:8 250:6 257:5
**post-goldman**
144:2
**potential**
65:16 159:20 166:12
**potentially**
79:12,20 162:9
**Powerpoint**
211:3
**pre-2019**
182:5
**pre-acquisition**
332:3
**pre-merger**
319:2,9,15 320:4
**pre-sample**
70:15 71:17 72:5,8,11,13
**precedes**
18:8 20:6
**precise**
41:2 241:8
**prefer**
323:9,10,14 326:4
**premise**
306:15
**premium**
321:13,22 322:5,13 324:9 326:17,25 327:21 333:25 335:25 338:20
**preparation**
264:3
**preparing**
15:17
**present**
65:23,24 67:10 69:14
**presented**
82:8
**press**
149:20,23 150:11,15 152:22 277:4
**presumably**
323:4
**presumes**
191:23
**pretty**
192:23 308:10 342:5
**prevalent**
247:19
**previous**
309:25
**previously**
43:19 51:12 165:23 170:2,4,15 201:19,23 232:9 264:8 291:4 293:9
**price**
46:10,17 49:19,21 73:10 76:21 80:14,16,23 81:3,13,22, 24,25 82:11 83:14 85:3 86:8 87:2,5, 7,10,23 88:2,11,16, 19,21 89:3 91:24 92:5, 19,21 93:6, 10 95:6 96:4,15,17 97:8 99:2 112:20 113:6,15 114:13,15, 18,20 119:20,23 120:4,7,10, 17,24 121:3, 6,9,13,17, 21,22 122:4, 14,18,19 123:6,7,12, 15,17,22,25 124:9,11,18 125:9 126:9 127:9,13,15, 19,20,24 128:3,6,7, 17,25 129:5, 11,16,19 133:20 145:17 146:15 163:23 164:14,24 165:11 176:20,21,24 177:3,5,9, 17,21,24 178:8,13,18, 21,23 179:4 180:4,10,13, 17,22 181:5, 16,18 182:6, 8,11 185:2, 15,23 186:3, 7 198:13 199:13 200:2,10,12, 15 201:9,13 202:8,12,23 203:10,13, 17,18 204:7, 22 207:11, 17,20 208:3, 7,17,20,22, 24 209:3,11, 14,20 220:3, 24 221:8 222:9 223:15,16, 19,25 224:14,16, 19,24 225:6, 7,10 226:17 232:10,13, 17,20 233:2, 12,16 234:2 239:23 240:2,16 242:14 243:3,7,10, 23 244:13 247:24 248:23 249:23,25 250:5,24 251:17 268:4,9,13, 22,24 269:13,19,20 270:7,14,20,

24 271:7,8, 19,20,23 273:24 274:4,22 275:10,22 279:21 280:12,25 281:12 290:25 300:9 321:14,20 323:5,7 324:21 327:2,17 328:21 329:11,14,15 331:15 333:9 335:4

**price-end**
178:22

**Prices**
88:9

**pricing**
185:6

**principle**
265:19

**principles**
24:20

**printed**
8:23 62:14

**prior**
15:5,14 16:6 43:10 51:16 70:14 103:25 104:11,14 106:14 107:15 108:23,24 110:25 111:2,5,8, 11,16 131:13 138:8,18 143:15 144:4,9 155:6,14 156:4 157:3, 9 158:9,16 159:3 160:17,22,24 161:6,10,15, 20,23 162:17 164:18 170:23 194:11 214:23 240:25 258:25 259:16 260:7 291:19 341:18 342:24 343:3

**private**
5:9

**privilege**
26:17,18

**probably**
28:15 33:12 37:21 39:22 55:9 61:9 66:24 67:8 188:6 240:10,14

**procedure**
58:2

**proceed**
205:19 303:24

**proceeding**
5:11,18

**process**
43:24 44:5, 10 56:12,14 58:25 68:16 70:14 71:4 236:11 237:24 286:14,16,19 288:16 332:6,18,20 333:15,16

**processes**
195:13

**produce**
106:13 108:9,12

**produced**
78:5 106:21 343:16

**product**
26:17,18 106:19 188:25

**production**
241:11,16, 22,25 242:16,19 243:4,5 254:19,25 262:8,17

**professional**
81:16 127:17,25 198:23 343:13

**professional's**
81:5

**professionals**
85:13 87:12 119:15,18 197:8

**program**
64:10

**project**
77:4,8 143:21 187:15 189:5,13,17 191:2 192:6, 15 193:19 196:2,3 292:13

**project's**
297:9

**projections**
182:5

**projects**
139:25 191:12 194:5,9

**pronounce**
228:6

**proof**
217:15

**proper**
257:10,15 333:15

**properly**
311:21,23,24 313:7,9

**proportion**
216:20

**proposed**
34:10 304:13,15 309:9 318:23,25

**proposition**
148:21 273:19 322:4,12 324:8

**prospects**
186:22

**protocol**
60:8

**protocols**
60:13

**prove**
334:20

**proved**
255:13 256:20

**provide**
14:6 49:20 231:17 254:2 256:2,8 310:9

**provided**
28:11,13,20, 24 29:3 61:5 100:2

**provides**
18:7,11 58:20 80:15 96:16 256:12

**providing**
18:5 178:2

**proxy**
332:11,13

**public**
256:9 258:12
**publication**
227:21,22
**publications**
227:15
266:20
**published**
265:14,15,23
**pull**
35:19
**purchase**
298:4
319:13,25
334:23
336:13
**purchasers**
329:21
**pure**
323:23
**purpose**
163:23
216:16
**purposes**
9:2 11:19
13:23 60:19
77:21 169:3
**put**
18:24,25
30:5 34:23
56:19 110:2,
3 112:11
153:12
164:21 165:5
188:6
197:15,16
203:12 214:8
227:10 271:5
276:13
294:15,17
320:17
**putting**
18:14,15
19:6 35:9
246:4

## Q

**Q1**
242:19
**Q2**
297:11
**qualification**
109:22
**qualitative**
54:4,7,13,
16,21,25
55:7
**quantify**
216:17 217:3
**quantitative**
54:4,7,12,
16,21 55:2,7
**quarter**
182:16,21,23
183:5,7
242:15
**quarterly**
92:10,16
174:4 275:13
**question**
7:22,24 8:6
10:8 14:9
23:10 26:21
30:25 31:4,
22 34:5
42:15 45:9,
23 46:7,9,19
50:2 52:20
54:18 55:17,
19 57:5,12
60:12 61:20
70:18 71:14
76:6 79:17
84:5 90:22
91:13 97:10
99:12 104:16
106:17
107:7,23,25
108:6,22
109:19
110:24 113:9
114:2
115:11,15,
18,24 116:3,
7,22,25
117:4,7,19,
21,23,24,25
118:6,9,11,
16,20,23,25
119:4,8,10
120:2 125:20
126:2 127:3,
12,16 129:22
137:14,18
145:10
148:12
155:10,24
157:5,13
158:5,25
159:17,21
160:5 161:8
162:6 165:19
167:13 168:4
171:12,19,23
177:4,16,25
184:2,24
185:17 189:4
190:6 191:24
192:8 212:25
217:4 221:9
222:10,14
224:20,24
225:5,18
237:12 238:3
240:8 241:17
245:13
249:15,17
250:11 259:8
282:19
286:7,8
290:7 300:15
304:18 308:7
309:4,7,19
322:8 324:3,
5 326:23
328:6 341:13
**question's**
103:21
**questions**
7:9 17:7
26:15 27:2,
10,12,17,18
28:2,5,10
36:7 42:21
43:15,16,19,
20,25 44:16,
20,24 45:21,
22,25 46:6,
7,13,14,16,
17 49:10,11
56:3,20
58:24 59:6,
7,9,21 69:23
97:23 98:3,
5,9,13,16,23
99:7,10,16
101:9,12,15,
21,22,23
102:23,25
105:11,18
106:21,24,25
117:17
125:13,21
126:3,16,17
154:24
156:11,15
167:2 181:25
216:25 229:2
230:2,3
231:9 247:6,
10 253:20,21
279:6 308:5
327:24 328:4
343:9 344:6,
16
**quick**
222:17
229:17 234:6
296:23 341:3
**quickly**
175:6 209:25
**quite**
43:2,5 44:10
192:25 247:3
256:16
**quo**
87:23

**quote**
19:17,19,24 199:18 205:6 210:9 212:2, 4
**quoted**
187:12
**quotes**
19:20 188:7 230:10

**R**

**raise**
198:13
**raised**
37:24 68:15 199:3
**raises**
158:3
**rampant**
149:17
**rare**
132:7
**rate**
254:18,20 255:2 261:21 262:5,10,16, 19
**re-depose**
343:21
**reach**
95:7,9
**reaching**
340:11
**react**
88:25
**reaction**
205:25 232:10,13,18 233:2,13,16 234:2
**reactions**
207:11 250:2
**read**
13:12,13 35:7 56:8 77:12 96:12 141:24 142:7,11 143:15,17 158:21,23 159:17 204:11,13 214:24 215:4,5 225:15 231:24 234:19 238:6 242:25 243:15,18 252:15,17 264:4,5 276:22,25 277:7,9 278:5 332:10,12 338:14,22
**reader**
19:4 34:18 100:22
**reading**
234:21 236:12 242:21 278:23 282:14 283:16
**reads**
186:19
**real**
222:17 229:17 234:6 296:23
**reality**
258:17
**reason**
25:6 51:6 74:17,20 77:10 116:4, 6 130:19 131:6,18,20, 24 132:8 184:17 263:16 273:14 339:2
**reasonable**
309:18
**reasons**
132:3 133:18 204:19 270:7 338:20,24
**rebuttal**
114:11 276:7,11,16, 23 277:13 280:7 289:21 297:25
**recall**
20:16 27:12 30:13 31:2 32:9 38:2,4 40:23 44:22 47:6,12 48:2 61:24 68:2, 7,18 71:5, 13,16 72:3, 9,14,16 75:8,15 76:9 82:20 91:8 98:6,10 129:12,17 132:21 133:4 134:16 135:9 136:21 143:4,11,18, 19,21,22 148:13 164:3,7 182:18 183:16,23 190:24 191:9 192:2,4 205:8,9 214:18 225:21 238:12,17,18 303:10,11 332:14,16 338:16 339:19
**recalls**
191:19
**recap**
82:2
**receive**
26:23
**received**
26:25 31:7
**receiving**
98:3
**recently**
330:3
**recess**
72:24 175:15 229:12 297:2 341:8
**recognize**
343:10
**recollection**
28:12,17 31:10 41:9 48:6 54:10 67:6,10,23 71:19,20 76:12 78:16 79:4 116:16 142:18 183:2
**Recommendation**
21:24
**Recommendations**
22:8
**reconcile**
58:9,12,18 62:6
**reconciled**
44:8 253:24
**reconciling**
60:3
**record**
5:3,6 6:9 68:23 72:23 73:3 80:5 137:24 150:25 175:14,17 207:15 229:11,15

237:2 263:22,23,25 268:19 296:25 297:5 341:7,11 344:19,21
**record's** 103:11
**recording** 5:4 68:22
**recovery** 187:16 190:13,18 212:6
**reduced** 275:16
**reducing** 270:21
**refer** 139:7 177:12
**reference** 57:9,10 103:22,24 106:5,8,10 111:4,5,11, 12,16 137:18,22,25 145:11 150:22 151:3,22 165:22 171:15,25 172:3 173:23,25 174:13,14 178:17 210:9 213:19 215:16 230:8 246:15 251:18 261:23 290:8
**referenced** 152:17 157:20 212:21 216:18 279:15
**references** 16:6 50:19 231:22 266:10
**referencing** 148:21 151:10,16 152:2 210:16 212:16 213:21 236:4
**referring** 139:2,7,13 140:4,6 264:7,18
**reflect** 123:22 187:14 190:4,9,11
**reflecting** 254:19
**refresh** 142:18
**regard** 36:6 54:9 99:22 100:10 208:17
**regarding** 30:21 49:20 117:9 196:25 207:11 224:5 225:24
**regression** 339:6
**regularly** 91:21 92:2, 8,13,14 93:7
**relate** 139:8,15,21, 24,25 140:5, 9,12,14,19, 21,23,24 141:9,13,15 144:4 305:16
**related** 5:25 141:23 144:10 182:15 223:20 225:7 240:14,24 241:2,4,6,22 243:4 291:11,23 318:5 338:4 342:25 343:16
**relatedness** 291:16
**relates** 139:15,16, 17,19 140:18 176:21 281:19 318:9 319:9
**relative** 260:7 261:3 262:17 321:13
**release** 91:22 92:3,8 93:7 146:24 147:2 149:20,23 150:12,15 152:22,23 153:12 173:12,14, 15,19 174:3, 4,9,22,24 233:10,11 256:14
**released** 232:10,22,25
**releases** 173:7 174:6
**relevance** 127:13 188:21
**relevancy** 85:2
**relevant** 78:10,13 105:2 118:20 126:6,13,23 127:4,8,23 135:20 144:5,10 152:17 153:9,16 163:21 178:24 180:6 182:7,11 208:14 221:4,9,20 235:3 264:22 266:19 309:4
**relied** 11:6 17:16 18:2 20:25 24:4,7
**relies** 24:12
**rely** 17:22 20:21 22:15 23:8, 13 25:3,8,25 26:6 340:10, 15
**relying** 24:11 228:13 265:5
**remain** 262:6
**remaining** 171:12
**remember** 67:16 70:20 211:19
**remind** 264:9
**remove** 303:19
**removed** 303:17
**Removing** 303:18
**render** 207:21 254:17
**rendered** 9:16,17 10:13 297:10

**repeat**
7:24 79:17 91:25 244:20 322:8
**repeated**
211:10 232:12 253:19 294:19,21
**repeats**
284:3
**rephrase**
7:24 87:19 124:3 282:22,23
**rephrasing**
189:22
**replicable**
252:10
**replicate**
339:20 340:4
**report**
8:16,17,18 9:3,5,9,10, 14,18,24 10:3,6,10,11 11:4,20,23 12:4,7 15:6, 8,23 16:21, 22,23 17:5,9 18:4 19:22 20:9,14 23:20,23 24:2 27:20 28:19 29:10 30:8 32:12 33:8,9,15,24 34:3 35:11, 20 39:25 43:17 45:16 46:23 48:3,8 49:11,12 50:5 52:16 53:2,4,9,12, 15,17,20,24 54:2 55:21 57:5,10,12 60:19 62:20 63:7 64:2 69:2 70:21 73:5 75:17 76:3 79:12, 13,20,22 80:2,12 83:13 85:17 90:5,10,12 91:4,14 93:22 94:7, 13,14,17 95:23 97:2, 6,19 99:20 105:9,10 106:5,8,10, 23 107:3,7 112:17 114:11,24 115:4,8 116:19 121:20,23,25 122:3,12 125:4,7 135:4 136:10 137:15,18 138:21 140:17 142:2,9 143:6,23 145:8,19 153:18 154:7,10 155:19,25 156:2,3 159:2 161:10 162:12 163:12,14, 17,24 164:10,16,22 165:6 166:18 167:6,8,14 168:20,21 171:6,13,15 173:13 174:2 178:17 183:19 184:4,8,9 186:13 188:3 197:4,15,17, 20 198:18 199:6 210:3 211:14 213:10,12 214:8,19 215:7 219:5 222:19 229:21 231:2,7,10, 11,19,21,25 234:18,20, 21,22 235:19 236:13,23 237:7,9 238:17 239:2,4,11, 19 246:7 247:23 252:16,18 253:3 261:24 264:4 266:21 269:2 276:7, 12,17,23 277:13 278:24 280:7 289:21 297:16,19,25 302:16 318:22 320:9 341:21,23 342:5,9,15
**reported**
110:5 111:2
**reporter**
6:5,10 120:13 144:7 172:18 175:12 178:25 289:6 317:14
**reporting**
80:22
**reports**
8:21,22 10:14 11:2 15:17 19:9 20:4,18 32:14,15,19, 23 33:19 35:5,8 36:4, 17,22 40:9, 13 41:6,8, 12,19,23,24 42:4 43:14 45:3 50:24 56:4 61:20 62:12 63:2, 24 64:8,12 69:4 70:16 71:7,18 72:17 73:7 76:19 77:3, 22 78:9 79:6 80:24 85:4 88:17 134:2 138:9 154:20 155:5,6 157:3,9 164:6 165:17 169:18 174:5,21 179:15 210:10 211:11 214:24 215:17,19 217:7 223:10 224:7 226:2 235:12 238:5,6,21 244:24 246:16,20 250:2,8,11 251:6 252:5, 7,20,23 254:3,5,6 339:24 343:17,19
**represent**
9:8 10:5 143:2
**representation**
207:15 331:19

**representations** 205:18 285:21
**require** 12:19 141:8 317:2
**required** 119:21 120:4 134:20 137:4 307:13 308:9,10,13,20
**requirement** 32:24 120:10,15
**requires** 131:24 134:13 283:10 285:3 293:2,14 306:21
**research** 39:21
**researcher** 56:22
**researchers** 43:25 56:16 57:18
**reserve** 343:20,23 344:15
**reserves** 255:13 256:20
**resolve** 65:2
**resolved** 65:20
**resolving** 65:5
**resource** 212:6
**Resources** 5:13
**respect** 38:24 229:24
**respond** 327:24
**responding** 90:10 96:20 328:4
**response** 46:19 90:11 96:11,22 114:10 124:7 184:8 209:23 225:13 241:18 295:8,9 325:23
**responses** 56:19
**responsible** 190:16
**rest** 190:12 258:12 293:20
**restatement** 161:13
**restating** 161:15
**result** 49:19 64:9 127:20 194:6 305:22 337:24 340:2
**results** 47:2,8,15,25 58:6 103:25 104:11,14,15 105:3,7 110:25 111:2,6,10,12,15,21,23 112:3 187:14 190:4,8,10 195:16 210:5 235:16 242:16 243:4 246:11 247:11,12 275:13 279:7 318:25 340:20,22
**resume** 13:6 289:10
**retain** 7:17
**retained** 7:11,13 142:21
**return** 88:14 330:21 331:2 336:25 337:15,17
**returns** 187:17 189:20 190:14,17 195:15
**revenue** 161:20
**review** 41:6,21 43:13 58:5 63:23 65:2 71:6 73:13,15,17 74:11 117:18 226:13 231:11,19 236:22 252:4,6 264:3 265:20,24 266:13 342:22,23
**reviewed** 12:3,9,12,16 13:3,16,23 14:5,6,11,13,17,21,23 15:17 41:19 52:21 53:15,19 58:23 64:7,11 72:18 74:15,23,25 75:4,6,8 76:7 95:19 134:2 215:3 294:14
**reviewing** 41:8 62:25 65:5 75:9 76:13 95:11 231:7 237:8 265:9 266:10
**revised** 343:19
**revising** 161:16
**Richie** 6:20
**rid** 305:22
**Riffe** 228:16,17
**rig** 312:5
**right** 7:12 11:23,24 13:8 16:7,11,12 17:2,20,22 21:9 22:5,13 23:6 27:21,25 29:11,13 34:9 38:20 43:8 45:11,17 54:22 56:8 68:25 69:5 73:8 74:8,9 83:19 84:5,18 85:13 87:15 92:15 93:25 94:20 95:15 101:2,7,18 104:18 105:4,19,20,23 106:2,11,18,21 107:3,4,14 110:7,8 112:15 115:22 116:12,17 117:15 119:9,21 121:10,14

122:7,8 125:10 126:5,8,15, 17 132:10 134:12 135:18 137:21 139:20 142:20 146:19 149:13,19 151:11,18 152:20 153:2 154:6,21,25 155:2,12,22 156:10 157:18 159:13 160:3 161:24 162:4 163:18,25 165:12,17 167:3,19 168:23 171:16 172:5 173:5,8,16, 24 175:5 181:8,9 183:21 184:5 185:5 187:4 189:20 191:8 194:16 195:24 200:4,11 201:20 202:9,16,17, 25 204:18 205:5,14 206:21,24 207:17 208:13 210:12,19,21 211:25 212:7,8,12 213:8,13 216:4 217:4, 5,8,15 218:2 219:2,6,15, 22,23 227:6, 7,12,19,25 231:15 242:20,22 246:20 247:11,14 250:16,19 251:8,9 254:15,20,22 255:15 257:4,17 260:5,13,15, 17,18,22,25 262:7,14,18 263:5 268:20 270:15,18 272:20,22 276:20 280:14 287:6 289:3 291:15 294:13,15 295:11 296:16 297:22 301:5 302:24 303:24 304:4 305:6,17 317:4 320:14 330:2 331:13,17,18 332:4,7 333:16 334:13,16 335:24 338:21,23 341:16 343:20,24

**rightmost**
213:13

**rigs**
211:17 214:10 311:5,8,9, 10,11

**rise**
204:22 208:3

**risk**
34:12 301:20,23 302:5,9,11, 21,22 303:9, 12 304:9,10 308:3 310:6, 11,19,21 311:3,12,15, 25 312:7,8, 15,16,18,20 313:4,7,12, 13,16,22,23, 24 315:8,20, 23,24,25 316:3,10,11, 12,13,15,18, 20,23,24 317:2,3,7, 10,11,13,16, 18,19,23

**riskiness**
297:10

**risks**
314:23

**RITCHIE**
6:20 280:17

**road**
8:5

**Robert**
6:20

**Roberta**
6:5 175:8

**robust**
340:16,17

**Rockefeller**
5:19

**roles**
168:20

**room**
176:2,11

**RS**
261:19

**RSP**
211:7 254:16 261:19 262:8 263:7 319:18,20 320:6,13,21 321:3,8 323:8 326:24 327:13,15 328:22,24,25 329:11,14, 15,16,18,23, 25 330:5,12, 16,19 331:6, 24 332:8 334:22,25 335:7,9,11, 14,16,24 336:3,12,15, 20 337:3,23 338:2,19

**RSP's**
254:23

**rule**
274:12,16

**rules**
7:21 12:19 26:19 32:25

**run**
70:15 224:6 225:25 237:25

## S

**safe**
200:22 201:3,5

**sake**
23:10

**sale**
298:5 319:14 320:2 334:24

**Sam**
57:20

**sat**
61:4

**sauce**
196:5,12,21

**saying**
19:15 20:6 31:16 41:18 47:18,22 49:6 50:3 72:12 83:17

84:22 85:24 87:10 88:4 89:14 92:12 93:14 97:6, 14 107:20 110:9,23,24 111:13,14,17 114:22 120:20 130:24 131:6,17 136:18,25 137:11 138:2 141:18 150:8,14,17 151:3,9 152:21 158:13 166:4,7,10 169:23,25 170:4 173:18 174:12,23 187:6 189:8, 11 190:4 192:8 193:5 194:2,17,19 195:2,12,18 196:11,20 197:25 198:5 199:2 200:9 201:20 204:15 205:9 206:23,25 208:5 213:10 216:8,11 218:14 219:13 220:8,11,21, 22 221:16 231:6 242:14 243:6 248:18 250:4 256:18,22 257:12,13,16 261:14 266:16 270:3 278:5,6,7,8, 13 279:14,17 281:4 283:22 285:2,20 287:5 288:7, 8 290:20,24 291:9,10,11 295:18,19 296:19 298:13 299:16 302:16 304:3,5 305:13 306:3,4 309:20 313:3 316:9 324:19 331:12 334:4,5 335:2,13,19, 21 336:16, 17,21 337:21 342:9

**says**
21:16 35:25 53:7 80:12 84:13 85:20 97:5 99:20 102:6 103:23 104:10 106:4,7 114:12,17,18 116:17,18 146:19 149:21,24 155:19 161:14 171:14 187:13 190:3,4,10, 12 195:17 196:17,22 230:10 242:5,10,24 259:9,21 277:23 278:4,18 279:16 281:16,18 282:9 283:5, 7,13 290:17 293:21 305:2 306:8 316:3, 6,8 324:13 325:3,5,7,15 334:19

**scholarly**
227:15

**scientific**
36:12 117:22

**scientifically**
119:7

**scope**
31:21

**screen**
105:14 173:17

**search**
64:4 75:11, 13 230:21, 22,23 231:4, 13,18,25 234:10,16 235:6,10,17 236:3,9,12 237:3,6 238:5

**searched**
230:25 234:22 235:11,19 236:23 237:7

**searching**
145:24 236:19

**SEC**
146:5,11 152:12 153:6 338:13,14

**second**
8:16,17 29:8 53:24,25 77:11 80:4 83:9 90:4 91:20 152:10 182:15,23 183:4 187:10 202:18 230:7 233:7,11 239:15 242:6,9 263:20 276:14 285:18 304:17 318:18 326:13 332:5 333:4

**secret**
196:5,12,20

**section**
15:22 16:2, 14,22 17:4 33:2 34:19, 21,25

**sections**
33:13 280:6 342:4

**securities**
5:14 23:5 36:18,23 37:13,18,21 38:5,16 39:2 40:2,8,17 45:5 55:12 86:17 176:22 219:18 221:5 222:13 224:11 226:6 239:7 266:23 267:3,4,9 272:18 273:11 299:4 300:14,19 322:6,14 324:10 326:16

**see**
21:21 22:2, 24 25:20 31:16 36:8 37:4,8,9 39:17 53:8 65:7,17 69:3 71:6 74:6 75:19 80:17 99:24 102:6,

9 112:22 115:13 122:2 125:16 130:6 149:7 154:14 159:5 166:21 171:24 172:11 183:2 184:10 186:23 187:18 199:15 208:25 219:21 221:7 222:8,22 229:2 231:3, 7,14 234:25 235:13 239:16 242:11 247:15 250:7 255:22 280:21 282:12 285:13 301:3 341:4 343:6

**seeing** 119:16 151:21 198:17 231:20 255:16

**seek** 42:2 266:13

**seeking** 156:16

**seeks** 120:13 144:7 289:6 317:14

**sees** 114:18

**sell** 321:16

**selling** 334:8

**semantic** 313:20

**sense** 44:13 52:3 71:10,23 99:9 107:25 110:4,20,21 179:25 200:23 241:6 266:17 287:13 292:15 319:14 334:24 339:15

**sensitive** 5:8

**sentence** 19:15 55:25 90:3,14,23 91:12 97:5 113:4 114:5, 10 152:10 217:18 218:19 242:10 249:10 255:22 282:14

**sentences** 255:21

**separable** 302:18

**separate** 332:4

**separately** 56:21 265:14

**series** 26:15 31:6

**serves** 202:16

**set** 41:5 58:4 59:4 60:7 71:17 94:18 101:8 110:18 125:12 181:25 231:17 253:19

**sets** 43:16 101:21

**setting** 285:17

**share** 165:15,24 298:3 301:12 304:22 305:11 327:13,14, 15,19 329:17,18,19 336:21

**shareholder** 326:24

**shareholders** 319:3,10,16 320:4,13,14 321:3,9,10, 16 323:9 329:16,23 330:13 335:17 336:18

**shares** 121:15 320:19 321:6,7,14, 16 323:11 325:18 329:2,6,15, 18,22,24,25 330:16,17 331:23,25 334:9,14 335:15,24 336:3,15

**shocking** 144:11

**short** 34:24 42:7 72:21 82:5 296:23 324:2

**shortcut** 55:3

**shortened** 34:19

**shorter** 239:14

**show** 33:9 47:8,15 107:19 108:13 109:10 136:10 185:14 191:3 209:20 257:9 259:15 274:10

**showed** 280:8

**showing** 103:25 104:11 109:6 221:17 264:16 271:19 272:2

**shown** 212:22 292:12

**shows** 91:16 105:7 106:19 110:25 211:4 261:2

**sic** 178:22

**side** 104:22 321:2

**sidebar** 295:16

**sides** 320:22,23 321:11 333:8,11

**signature** 9:10 10:7

**signed** 167:5,6

**significant** 88:13 148:23 181:16 200:2 202:7,22 203:9,18 205:4 212:3 268:4 275:3,

22,24
**similar**
43:2,5 44:14 125:12 136:2,3,15 137:2,11 138:3,5,11, 12,14 141:20 195:5 223:15 232:6 310:16
**similarities**
223:25
**similarity**
137:3,12 138:7
**similarly**
88:10
**simple**
65:18 84:6, 24 225:20
**simpler**
178:2
**simply**
65:20 71:14 331:10
**Singhania**
57:19
**single**
140:16,17 198:2,3 236:13 252:16,23 253:3
**sit**
23:23 39:22 51:8 82:20 85:6 90:16 95:17 98:12 118:18 184:16 214:21 260:25 338:18
**sitting**
35:2 42:10 59:17 61:9 84:8 89:2

106:11 107:17 184:16 227:13 245:16
**situation**
88:12 138:17 149:22 265:12 313:4 316:22 331:10
**situations**
19:8 88:18
**skip**
7:20
**slide**
212:18,19, 20,22 213:2, 3,6,11,15,22
**slight**
173:3,4
**slightly**
101:22 262:18
**small**
264:25
**smaller**
286:3 324:21,23
**smart**
149:10
**software**
62:8 63:3,9, 10,12,15,16, 17,18,22 64:3
**solve**
306:4,5
**something's**
163:3
**sort**
31:16 36:13 59:9 62:21 70:4 101:6 121:6,8 134:14 161:24 194:7

195:16 196:22 211:4,22 222:2 230:15 237:24 238:9 241:2 245:22 254:21 262:23 264:19 287:25 294:7 305:8 313:4 316:9
**sorts**
117:14
**sound**
38:10 188:7 191:8 196:16
**sounded**
137:2,11 289:18
**sounds**
97:12 142:19,20 196:21 197:5,23 232:6 236:14
**source**
29:18 154:5
**sources**
91:3 153:22 315:16
**Southern**
5:16 142:17, 23 143:3 144:2
**space**
292:8,15
**spacing**
140:3 245:4, 6,11 290:21, 23 291:4,12, 13,14,20,22, 25 292:2,3,5 293:9
**speak**
45:22 46:7, 16 47:3,25 76:25 77:14,

24 158:2 168:10
**speakers**
172:17
**speaking**
36:22 37:14 78:20 129:2 241:19 264:2 265:20 304:19
**speaks**
45:19 46:8 116:7
**specific**
27:9,12 28:17 31:10 36:6 40:6 42:21 43:24 44:16,23 45:20 46:5, 14 49:10 54:10 56:2 59:20 60:5, 22 63:12,14 67:9 76:12 78:16,23 99:13 114:25 138:6 141:4, 22 148:13 170:9,24 188:13,20,22 190:20 193:4,14 194:16,19 217:4 228:12,23 229:3 237:20 245:2 281:6 282:10 283:2,6,13, 15,20 284:21 286:9 288:5, 8,9 290:9,16 301:17 304:4,14 319:12 324:4 326:17,20

**specifically**
27:2 54:8 98:6,10 99:17 192:3 209:19 265:4 268:24 269:12 332:25
**specifics**
72:3 301:24
**specified**
304:5
**speculation**
79:16 256:4
**speed**
171:11 172:13
**spend**
258:7
**spends**
258:14
**spent**
30:9 172:6 238:11
**spit**
64:10
**spitted**
64:9
**spoken**
77:9,19 79:9 95:20 213:7
**spreadsheet**
62:21
**Sreewastav**
57:20
**staff**
56:25 70:23
**stages**
223:23
**stagnant**
254:25
**stand**
156:18
**standard**
43:24 44:10 141:6,14 298:5,24 299:3,5,6, 14,24 300:4, 18,24 301:9 304:20 305:7 306:25 307:25 308:25 309:18,24
**standards**
310:3
**standpoint**
116:23 118:10 122:25 145:14 146:13 152:18 281:3 326:12
**stands**
293:18
**staple**
55:12
**start**
21:2 23:12 35:17 83:9 101:24 115:4,6 241:3
**starting**
22:25 262:10,20 297:18
**starts**
290:4
**state**
6:8 112:17 132:2 313:22
**stated**
165:24 205:3
**statement**
18:6,8,12 19:10 80:13, 15 81:19 82:22 83:14 85:19 90:6, 18 96:2,3, 12,14,17,23 97:8,15 122:21 123:13,23 128:5 139:8, 9 140:17 160:22,24 161:6 174:19 179:14 187:21 188:12,18 192:21 193:13 194:11,13, 19,21 195:5 196:13,14 197:5,9,13, 18,23 198:4, 5,11 201:24 212:2 258:2 261:14 282:8,24 283:4 284:4, 5,7,14,16,21 285:8 293:2, 13,18,21 312:21 316:9 318:10 332:11,13
**statements**
45:15 96:6 110:4 111:22 113:6 182:20 186:20 187:13 192:24 198:20 211:22 213:25 240:21,22 241:25 242:3 250:16 319:6 342:23
**States**
5:15
**statistical**
339:17
**statistically**
88:13 181:15 199:25 202:6,22 203:9,18 205:4 268:4
**statistics**
23:5
**status**
78:2 87:23
**stemming**
63:8
**step**
57:7 212:17
**stock**
80:23 81:3 85:11,14 87:2,7,10 88:14,19,21, 24 95:6 116:21 119:23 120:3,6,7, 10,11,16,18, 24 121:2,3, 6,13,17,22, 24 122:4 123:5,7,12, 15,17,22,25 124:17 128:7 147:25 163:22 164:14,24 165:10 181:16 182:6,8 183:21,24 184:18,21 199:13 202:7,12,23 203:10 208:3,7,17, 20 209:11 220:24 221:2,7 222:8 223:19 224:14,15, 19,24 225:5, 7,9 232:20 247:24 250:5,24

275:10
**stop**
263:19
**straightforward**
118:4
**strategy**
292:4
**straying**
31:21
**Street**
74:7,10
**stressed**
175:21
**strong**
247:3 249:14,22
**struggling**
317:8
**studies**
272:19
**study**
83:3 224:6 226:2 264:20 265:10,14, 16,22,23,24 266:11,13,18 271:18,19 272:2,14,24 273:3,7,9,15 336:5 339:6, 9,16,18,21 340:2,7,11, 14,17,18,20
**studying**
127:18 128:2 249:8 250:23
**stuff**
254:9
**stuttered**
142:5
**sub**
103:13
**subcommittees**
332:21
**subject**
233:12
**subjective**
162:9,11
**subjectivity**
137:4
**submitted**
167:6
**subparagraphs**
102:10
**subsequent**
138:21 233:21
**Sucharow**
6:14,17
**sufficient**
272:14,15,16 273:4,5
**suggest**
255:12 256:24 259:11,22
**suggesting**
147:10
**Suite**
5:24
**summaries**
33:14 232:9, 22 266:3
**summarize**
10:15,18 33:13 35:6
**summarized**
10:21 232:16
**summarizes**
9:20 10:19 265:16
**summarizing**
246:11
**summary**
33:3 264:4 265:10,24 266:10,11 331:9
**superior**
191:4
**supervise**
168:21
**supervision**
168:25
**supplemental**
343:18
**support**
5:23 6:7 18:7,11 20:5,13 83:14 91:12 117:3,6 118:11,19 222:4
**supported**
220:16
**supports**
45:2 82:21 84:9 116:24 148:20 223:3
**supposed**
173:21 192:14
**Supreme**
40:18 50:15, 18 156:20
**sur**
276:17
**sur-reply**
9:23 10:2,6, 9 15:20 16:15,22,23 32:11 33:9 35:14 53:12 80:2 96:3 112:16 184:9 269:2 276:17 278:22 280:11,19 281:25 294:2,3 303:7 320:9 341:23
**sure**
17:11 21:12 22:23 23:11 29:24,25 38:6 39:16 48:17 51:4 54:17,20,23 59:14 60:25 62:16 64:6 69:23 70:6 74:4 79:23 83:2,16 92:2 103:10 117:12 129:3 132:5 144:17 157:6 159:10 165:20 166:3 186:14 191:7 192:25 196:10 201:25 206:15 215:8 216:9 226:24 229:9 230:14,16,19 231:14 232:4 234:24 235:21 255:7 256:9,16 259:7 261:14,17 263:9,16 274:17 312:23 321:21 322:9 330:10 338:19,24 339:13 341:5 343:2
**surprise**
93:2
**surprised**
236:21
**surrounding**
214:19
**swear**
6:10
**switch**
91:19
**Switching**
176:17
**sworn**
6:25 342:23
**synergies**
338:3,6

**synonymous**
139:10,11
**system**
252:8
253:15,17,18
**systematic**
36:3,12
117:23
**systematically**
119:7 253:20

**T**

**tab**
11:12
**Tabak**
226:21 227:6
239:5 266:24
**Tabak's**
227:22
**table**
29:10,15
30:2 110:25
**tables**
103:25
104:11
109:6,10
110:14
111:14
**take**
5:5 26:21
57:6 70:19
71:11,23
72:21 96:24
97:14 102:2
127:5 134:13
143:12
155:11 180:3
204:11
212:17 229:7
238:7 268:7
277:6 286:6
296:22
305:7,16
306:8,10
322:24
331:10
**taken**
5:11 8:7
10:11 16:20
68:6 72:25
99:3 175:15
213:9 229:13
297:3 332:21
341:9
**takes**
71:6
**taking**
87:18 108:10
277:17,19
333:4
**talk**
65:6 123:4
147:18 163:9
176:12
179:23
188:18 217:9
226:15 230:6
294:12
310:25
328:17
**talked**
109:16,19
119:23
121:12 185:4
250:18
291:20 310:6
328:16
342:14
**talking**
27:18 37:12
86:16 105:13
107:2 109:4
137:10,13
138:19 142:6
144:18
147:20,21
161:4 172:6
220:14
222:16
235:23
248:13,14
254:12
273:16
278:21
285:24
302:4,6
315:7 318:5
330:5 341:25
**talks**
63:8 64:4
166:8 216:20
223:5 228:15
314:16
326:15
334:13
**target**
82:11 86:8
87:5,23
88:16 93:6
121:21
122:18 125:9
127:20
128:3,6
198:13
251:17
279:21
332:22
**targets**
80:14 83:15
85:3 88:11
89:3 91:24
92:5,19,21
93:10 96:4,16 97:8
122:14
128:25
129:5,11,16,20
**tautological**
123:6
**team**
28:14,16
57:9,10,13,23 58:3
66:25 67:5,8,14,25
70:15 75:3,5
94:24 104:20
172:7,10
**tell**
35:3 39:14
54:14 55:5
67:18 71:22
72:2 74:22,25 85:11,17
86:14 87:13
88:6 91:17
112:23
117:18,24
125:24
126:22
153:19
163:13
164:10 169:4
173:20
174:24 175:3
188:13
193:13
194:15
195:7,19
203:21 214:3
222:25
283:18 284:6
298:8,10,18
299:2,17
300:3,7,12,22 301:6
304:24,25
305:5,18,25
309:21
323:13
325:21,24
329:9 337:11
**telling**
89:8,10,21
107:23 108:2
162:15
170:16
173:24
190:20
214:17 249:5
251:3 303:14
**tells**
160:22
163:14
197:10 214:5
283:23
298:19
299:15 300:8

**ten**
38:8 68:18
283:23,24
284:22,24
**tend**
88:9 253:9
**tended**
69:22
**term**
24:22,24
46:22 47:4,
5,7,13 48:3,
7,15,17,19
50:11 83:23
86:12 94:10,
24,25 96:6,
10,13,19,21,
23 116:15
123:3,9
141:13,15
145:25
159:15,18
160:11 162:5
178:13
187:2,9,23
188:4,9,11
189:2,4
202:3 241:8
264:14,16,17
268:12 300:2
302:8,10
310:14
315:12 343:4
**terminology**
29:20 49:24
50:5,8 99:5
**terms**
13:22 24:21
42:25 43:21
54:4,6,21
58:2,13,19
62:7,25
63:24 64:5
68:4 70:17
75:16 78:3
81:13 84:18
95:5 119:13
130:11
134:17,22
136:13,19
138:6 154:2
156:16
164:12
168:12,17
169:2,5,8
180:5,19
188:24 198:6
223:24
230:21,22
231:4,6,18
232:2
234:10,16,22
235:6,10,17
236:3,6,15
237:3,6
240:15
244:19 271:6
279:2 284:10
298:15
300:11
309:11
**test**
209:12
340:15
**tested**
205:25
**testified**
7:2 37:21
38:5,16
39:8,10,12,
15,19 187:7
230:19
266:22 267:2
**testifying**
37:18 38:3,8
39:3 273:10
309:22
**testimony**
37:10 78:8
108:20
240:25
309:25
**testing**
206:17
208:25 292:7
**tests**
209:17
292:12
293:10
**Texas**
5:16,25
142:17,23
143:3
**text**
19:7
**textbook**
24:23 326:5,
7
**textbooks**
23:4
**texts**
25:5
**Thank**
7:7 8:3
344:14
**theoretically**
113:19
**theory**
34:13 190:25
200:18
201:10,11
203:12,14
207:17
298:19
299:22
302:5,14,17
303:10,15
308:3 310:7,
11 311:13
315:8
316:15,21
319:15 321:4
323:2,13
325:2,6,21
326:8 330:22
331:20
**thing**
8:4 32:22
33:17 54:12
68:22 103:6,
17 104:8,25
105:21
110:11
123:22
172:25
174:17
179:22
180:20 181:2
214:3 219:17
226:8 233:17
257:19,20
271:25 274:9
290:23
306:12
326:10
**things**
9:12 15:11
24:18 42:16
69:5 77:17
78:5 105:2
110:7 112:11
113:10
136:2,11
139:15,24
141:18
152:24
156:16,18
161:17
171:11
172:13
190:22
216:17,22
217:3,15
220:8,12,23
223:7 226:12
229:18
230:11,16
237:16
238:10 241:4
243:11,14
253:23
257:25
258:11 266:4
274:11
275:15
285:23 286:2
301:22
305:16,22
306:9,11
314:4,9,11,
13,15,21,22
325:3,12,13

**think**
12:17 13:19 17:4,5,17, 18,23 18:10 19:3,16 20:7,12,15, 23 22:18 24:6,13 28:18 29:12 31:24 35:5 37:8 39:9,16 42:22 43:2, 4,14,18,19 44:19 45:18, 21 46:6,15, 22,23 47:2, 5,8,15,25 48:19,20 49:24 50:2 51:21 52:25 53:14,16 58:22 65:21 67:19 69:20 70:5,17 71:8,19 72:12 73:23 74:19,20 76:3 79:23 80:25 82:13 84:8 85:7 86:10,14,21 87:10 88:3, 5,6,21,22 92:21 94:21, 24 98:16 99:8 102:18 103:16 104:9,24 105:20 108:17 112:16 113:8,25 115:25 116:6 118:15,17 119:14 120:21 121:3 122:9 124:11,15 125:24 126:21,22 127:12,22 128:14 130:9 138:17,23 139:14,21 140:5,13,21, 23,24 141:2, 12,17 148:4, 6,19 155:23 157:17,20, 22,23,24,25 158:11,12 163:21 164:11,23,25 165:8 167:17 169:6,7,9 174:10 175:7 178:12 179:19,22,25 180:6 182:25 183:3,8,13 184:6 185:13 186:2 193:7, 16,22 194:12,20 195:2,12,14, 22 199:23 200:22 201:3,17,22 202:15 203:24 205:6,10 206:7,12 208:15,21,23 209:2 211:6, 25 212:4 214:5,6,16 215:12,18 219:4 222:13,15 226:7,12,15 227:3,24,25 228:14,24 230:4,18,23, 25 231:12,22 233:14 234:17 236:18,20 237:20 240:13 241:7,15,24 242:21,24 244:22 245:12 246:3 247:21 248:19 252:17 254:21 255:10 256:7,11 258:9,10 260:5 261:23 262:2,4,9 265:7 266:14,16 267:4,7 274:22 275:8,12 277:22 280:15 286:21 297:13 299:14 300:2 307:3,4,8, 12,14 308:8, 19,20 309:3, 18 310:13, 15,23 311:5 312:10,11 314:12,17, 21,24 315:2 316:4,17,23 317:20,24 318:15,16 324:4 333:10,17 334:3,5,7, 10,11 339:12,14, 22,25 340:24 341:20,21 342:3,4,10 343:8,13 344:4,5,11

**thinking**
57:23 100:23 163:9,13,15 194:23 195:10 203:23 238:13 316:3

**thinks**
100:22 195:6 315:25

**thorough**
306:17,20 308:17

**thoroughly**
307:5

**thought**
39:21 66:3, 4,5 153:9 162:17 163:6,7 214:11 219:7 232:2 251:3 257:14 259:22 291:5 292:21 299:12 301:21,25 315:3 335:13 338:3,5 339:3

**thoughts**
163:19,20 165:16,25

**three**
33:16 99:22 103:14 104:4 112:7 153:4 155:23 215:16,23,25 216:3 217:8, 21,22 218:7, 11 227:14 269:7 280:19 282:7

**three-minute**
341:3

**threshold**
89:4,7

**tied**
49:14 51:23 331:6

**tightly**
292:16
**time**
13:11,14,15 28:16 30:10 39:9,24 40:11 57:7 59:25 60:18 61:11,12 70:21,23,24 71:3,10 72:21,23 73:3 78:24, 25 81:8,21 88:8 116:9 132:13 133:21 153:23 155:12 163:15,20 169:22 171:24 172:2,6,19 174:18 175:14,17 177:10 179:7,9,11 182:9 204:22 207:12 216:22 218:20 220:4 229:11,15 232:23 238:11 239:11 250:25 255:14 256:21 257:2,3 258:7,14,23 259:5,12,16 263:22,25 272:17 296:25 297:5 298:3,5 301:23 309:15 328:2 331:15 334:6 341:7,11 343:11,21,22 344:5,10,19
**time-consuming**
71:4
**times**
70:8 90:22, 23 133:25 235:19 237:7 264:10 265:2 266:17 283:24 284:24 308:8 315:13
**timing**
70:18,20 235:25 238:9
**timings**
75:20
**Timothy**
6:22
**tiny**
69:10
**titled**
16:2
**today**
7:9 8:12 10:23 14:2,7 33:5 35:2 39:11 42:10 54:14 55:5 59:17 82:20 84:9 85:6 89:2 90:16 98:12 108:20 118:19 143:16 148:14 149:25 150:7,10 151:14,15,17 156:11 176:15 179:15 184:17 207:14 225:17 227:13 261:2 277:16 310:25 338:18 341:14,24 342:24 343:10
**today's**
344:18
**told**
31:22 54:19 71:20 72:15 142:16 170:3,15 203:23,25 257:22 305:20 324:16
**top**
133:11 154:9 184:19 227:14
**topic**
85:4 138:19
**topically**
141:22 281:18 291:11
**topics**
140:5 280:13,15,25
**touting**
193:24 286:13
**track**
68:9
**trade**
183:24
**traded**
183:21 184:18,21
**trading**
88:14 336:15
**trained**
44:3 59:22
**training**
59:24 60:13, 15,20,21,23, 24
**transaction**
320:23,24 321:2 322:25 323:15,18 324:14,18 325:17 327:9,11,12 329:4 331:11 336:22 337:3,12
**trial**
342:13
**trouble**
214:15
**true**
17:23 55:9 97:16 104:2 160:23,24 179:14 257:24 263:17 271:13,14,16 292:17 293:19 298:16 300:11 306:10 307:3 312:22 318:17 335:3
**truth**
302:3
**try**
19:2 21:12 34:23 37:4 39:8 40:25 42:7 71:2 83:8 124:3 133:13 136:10 204:20 209:24 224:13 226:2 258:11 266:4 282:16 329:8
**trying**
17:24 27:14 32:2 38:14,

17,18,20,23 43:6,7 48:10 51:3 55:3,25 67:15 69:3 82:5 84:5 86:2 113:20 126:5,11 135:14 136:2 138:25 146:12 148:16 149:11 156:17 158:9 165:8 167:19 169:15,17 170:20 172:12 176:15 190:17,21 193:21 205:15 207:7 217:16 224:7 240:10 243:3 258:7,14 289:12 309:11 312:25 317:8 318:8,19 320:16 324:2 331:20 343:12 344:8

**turn**
17:9 35:22 53:11 79:25 97:20 115:7 210:2 215:6 222:18 246:6 254:8 314:24

**turned**
33:6 336:20

**two**
10:14 22:11 35:5 56:25 57:4 64:17, 18,21 71:25 110:7 135:2 139:9 175:7 176:25 189:23 226:23 240:14 246:15 247:25 257:3 305:10 315:14 325:12 333:7,11

**two-**
341:3

**type**
63:18

**types**
44:11 99:9 136:3 237:22

**typical**
77:14

**typically**
36:14 66:20 67:2,24 91:24 92:5, 19,20 93:4 121:25 122:12,17 141:24 142:7,10 152:21 153:10,19 174:20 178:19 238:21 239:6 253:11 299:7 300:24

**typing**
213:6 236:20

**typo**
102:18,21 105:17 106:7 107:6,8,11, 12,19,20,24 108:3,14,21, 22 109:2,8, 14 229:23 230:7,9

## U

**U.S.**
5:22 6:6

**ultimate**
187:16 190:13

**ultimately**
20:21 76:16 143:9 155:3 192:13 206:21 250:4

**unclear**
132:16,18,20 133:8,10 134:12

**underlined**
167:24 168:2

**underneath**
318:22

**underpaid**
335:17

**underpayment**
335:19

**understand**
7:22 8:5,9 17:12,18 21:5 30:24 34:18,20 45:8 52:19 54:17 55:15, 16,18 63:4 94:5 106:16 107:22 108:16 117:2 119:25 126:12 129:3,22 134:8 135:14 146:13 152:6 155:9 167:20 168:3 169:15 187:24 188:17 191:6 195:6 199:10 200:20 201:8 204:16 206:14 209:9 212:24 221:24 229:22 230:8 234:13 241:10 245:19,21 247:21 250:10 255:8 257:11 258:6 259:7 263:10 302:11 312:16,25 317:8 320:16 331:20 332:2

**understanding**
11:21 12:18 14:10,14 19:5 35:10 38:24 42:9 52:4 64:6 70:2 83:23 86:3 99:6 104:5 113:22 114:4,8 115:23 116:2 119:20 141:11 148:17 149:11 155:17 156:18 157:6 158:6 168:13 169:2 187:8 205:16 216:24 219:16 241:20 244:18 245:8,23 268:7,8 278:23 282:16 297:9 313:12 315:7,11,17 318:8 328:20 332:10,24

**understands**
315:23
**understated**
260:11,12 302:22 310:17,19 313:17 315:20
**understood**
8:8 158:14 301:22 313:23
**uniform**
253:16
**uniformly**
198:25
**unimaginable**
314:10 317:21,24 318:6
**unimagined**
318:2
**unimportant**
214:14
**unique**
188:25 189:3
**United**
5:15
**unlocks**
212:3
**unreasonable**
318:25
**unrelated**
240:3,5,11, 12,14 268:10,13
**untrue**
271:15
**unusual**
75:23 174:16
**updates**
93:13
**upward**
120:25
**utilized**
309:23
**utter**
315:19

**V**

**vacation**
142:3
**vacuum**
291:23 333:20
**vague**
240:15 241:2
**valid**
303:25 339:6
**valuation**
23:5 80:14 82:12 83:7, 15 85:18,21, 22,23 87:6, 9,24 88:17 89:10,13,16 96:4,15 97:7 116:21 119:12 120:5,12,16, 24 121:4,20, 21 122:8,11, 24 123:14,16 124:7 130:16,18, 19,22 131:7, 11,18 132:14,23 133:2,8,14 134:5,7,19, 23 135:7,12 136:21 137:8 147:24 220:2 221:2 251:14,16 279:19
**valuations**
85:3 86:8 88:10 89:4 91:16 132:4, 9 133:23 282:11 283:3
**value**
80:22,23 81:5,9,16, 17,18,23 82:14,17,24 83:5,17,19, 22,25 84:2, 10,11,13,14, 16,19,20,21 85:2,11,14, 15 88:8 89:19,21,22, 24 91:17 92:22 95:6 119:15,17,20 121:7,9,12, 24 122:5 123:20,23,24 127:19 128:11,17 148:9 163:22 164:12 188:14,18, 21,23 197:11,24 198:7 212:3 220:25 298:16,21 300:11 305:3 309:15 327:7,9 335:23 336:3
**value-relevant**
81:7,14,20 82:4,10,16, 18,24 83:18, 20,22 89:5, 9,15,25 93:5 116:8,11,15 124:17 128:15 146:8 164:13 165:2 233:4
**values**
220:19
**valuing**
81:2 87:11 89:18 121:5 164:24 165:10
**variety**
261:6
**various**
211:16
**vast**
248:8 251:20
**vein**
308:6
**venued**
142:13
**verbal**
28:9
**verbally**
28:24
**verbatim**
131:12,16 135:17
**verify**
52:16
**verse**
247:9
**versions**
34:20
**versus**
17:15 18:24 19:6 31:16 34:21 64:2 106:6 248:3 309:14 315:20,24 320:20 323:16 325:10 326:4
**vertically**
245:23
**video**
5:4 68:21,22
**video-recorded**
5:10
**videographer**
5:2,22 72:22 73:2 175:13, 16 229:10,14

263:21,24 296:24 297:4 341:6,10 344:17
**view**
124:19,21 188:8
**viewpoint**
127:3
**views**
85:10 124:12,13,14
**Vinson**
6:21

**W**

**wait**
307:2
**waiting**
34:6
**walk**
61:3 112:7
**Wall**
74:6,10
**want**
9:22 18:20, 23,25 25:13, 17 26:16 27:15 31:17 32:3 48:4 51:9 57:14 67:21 77:11 80:7 97:18 102:2 103:10 112:6 115:5 117:25 118:3 177:23 186:5 225:16,18 229:17 230:6 237:11 255:7 256:6 268:25 274:8 277:11 280:3,5 297:15 308:12 310:8 316:20 320:8 323:10 324:15 326:9 327:4 337:10 341:4
**wanted**
71:22 168:8 274:12,16 282:15
**way**
24:13 49:5 56:13 68:24 100:23 101:4 105:4 117:16,23 119:6 121:11 134:15 140:18 156:10 162:19 170:23 184:15 187:7,24 188:10 195:6 196:9 229:22 256:24 259:20 264:17 294:5,11 310:13,15 331:7,9 340:11
**ways**
51:21 176:25 177:6 221:17 257:25 261:6 310:15
**weather**
312:4
**well-accepted**
298:6,24
**wells**
292:6 311:5
**went**
58:24 134:5 136:8 138:7 172:7,10 202:12 214:15 279:2 311:6
**whatsoever**
69:17
**whispering**
5:8
**white**
161:25
**wholly**
313:15
**William**
6:22
**win**
331:8,9
**withdraw**
50:13 97:21 101:24 303:8
**withdrawal**
303:25
**withdrawn**
12:10 36:15, 16 41:12 57:8 59:15 62:9 68:8 71:13 82:5 131:22 144:20 160:15 185:3 200:7 243:12 257:19 274:2 337:22
**witness**
6:11,24 229:7 327:23 343:21,25
**wondering**
32:5,25 308:4
**Wood**
6:15
**word**
50:19,23 51:5,7,10 67:12 72:12 90:8 96:24 97:12,15 108:10 116:11 137:22 139:22 140:9,12,13, 14,22,24,25 141:8 150:11 159:8,11 215:4,5 231:3 236:20 240:13 241:2
**wording**
131:12,16 135:17 136:3
**words**
31:13 50:23 51:12 60:9 64:12 69:19 72:7 75:10 105:17 106:12 107:24 109:25 130:3,4 136:12,15 138:12,13, 14,20 139:9 146:17 150:16 151:4,10 152:2 156:14 159:20 160:8 165:14 167:8,23 168:7 170:24 186:5 189:19,23,24 190:3 206:17 210:23 211:18 213:7,8,14, 23 216:19 231:13 232:6 236:7,8 260:10 261:3 265:12 282:17 283:18 287:3 288:4,13,14, 15 295:5

303:13,18,22 332:20 333:7
**work** 26:17,18 32:20 59:3 61:22 62:4 107:15,20 236:2 239:13 252:3 286:21 305:7,20 306:4
**worked** 142:24 288:19,21
**works** 264:21 333:11
**worse** 312:19 316:12,13
**worth** 197:19 330:25 337:5,6,16
**wrestle** 225:14
**write** 167:2 171:6 288:10
**writing** 108:19 294:18
**written** 28:6,24 29:2,4 30:21 31:13 59:4, 6,7,8,10,19 60:2,5 63:25 237:17,21
**wrong** 53:8 74:6 184:10,12 258:23 267:23 277:20 278:12,15 279:8,22 295:19 308:5
**wrote** 62:22 77:2 78:8 79:7 277:2 295:8

**Y**

**yeah** 17:23 34:6 37:11,15 46:25 48:9 53:3 54:19 60:22 61:12 65:17 67:23 69:3 79:18 90:21 92:16 95:10 97:9 102:8,17 104:8,21 112:25 113:25 118:2 120:3 122:22 123:13 126:25 139:21 145:6 150:21 151:2 152:9 160:20 162:3 166:3, 8 172:14,23 181:6,23 183:3,15 185:18 193:12 199:8 201:7 202:15 203:20 210:20,22 212:9,10 218:18 219:3 222:24 226:22,23 228:4 234:14 236:17 238:12 240:12 242:8 244:16 245:18 253:9 254:21 260:18 264:24 266:7 267:16,18 268:2 282:13,20 286:8 289:5 290:4 293:25 314:8 318:14 321:15 323:22 336:17
**year** 129:20 258:20 260:23 261:10 284:23,24,25
**years** 37:17,22 38:2,9,21 39:2,11,13, 14,18 78:15, 24 179:21 273:10 289:2,4,8 309:22
**yes-or-no** 26:21
**yields** 318:24
**York** 5:20 77:17

**Z**

**Zoom** 61:8 67:2