**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Civil Action No. 4:21-cv-02473<br><br>CLASS ACTION |

**DEFENDANTS' RESPONSE TO LEAD PLAINTIFFS'**
**MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF EXPERT LUCY P. ALLEN**

## TABLE OF CONTENTS

**Page(s)**

Table of Authorities ......................................................................................................... iii

Statement of the Nature and Stage of Proceedings & Issue Presented ........................... v

Introduction & Summary of the Argument ..................................................................... 1

Background ...................................................................................................................... 2

I.     Goldman I ushers in a new era of price impact evidence that Defendants
and their experts can deploy in rebutting the Basic presumption at class
certification. ......................................................................................................... 2

     A.     Under Goldman I, courts must engage in a "mismatch" analysis
considering "all probative evidence"—both "qualitative as well as
quantitative." ............................................................................................ 2

     B.     Courts rely on expert analysis of market commentary regarding
alleged misstatements and corrective disclosures. ................................... 4

II.     Ms. Allen's team conducted a systematic and replicable content analysis
of Concho's voluminous analyst reports that fits neatly within the
Goldman I framework. ......................................................................................... 6

III.     Neither Plaintiffs nor their expert identify a single error in Ms. Allen's
content analysis, but Plaintiffs nevertheless seek to exclude her entire
report and testimony. ........................................................................................... 8

Legal Standard ................................................................................................................ 9

Argument ........................................................................................................................ 10

I.     The Court should reject Plaintiffs' reliability challenges to Ms. Allen's
systematic, replicable content analysis of analyst reports. ................................. 10

     A.     Ms. Allen's empirical analysis was not "lawyer-driven." ........................ 10

     B.     Ms. Allen's analysis was methodologically sound and supported
by authority. ............................................................................................. 11

     C.     Plaintiffs' accusation that the analysis was unduly "qualitative,"
"subjective," and "untestable" is false and at most goes to weight,
not admissibility. ...................................................................................... 13

     D.     Plaintiffs cannot equate an immaterial typo with a "fundamental
mistake[]." ............................................................................................... 15

i

E.      Plaintiffs' criticizing Ms. Allen's opinion as improper legal
        testimony is both wrong and a blatant attempt to sneak in more
        merits arguments. ...................................................................................... 16

F.      Plaintiffs' unambiguous disclaimer of an inflation-introduction
        theory of price impact renders a front-end price impact analysis
        unnecessary. .............................................................................................. 17

II.     Plaintiffs' complaints about Ms. Allen's damages methodology opinions
        are baseless. ........................................................................................................ 18

III.    Plaintiffs' charge of a "disclosure violation" is completely hollow. .................... 20

IV.     Defendants welcome a full Daubert hearing in conjunction with class
        certification. ........................................................................................................ 20

Conclusion ....................................................................................................................... 20

TABLE OF AUTHORITIES

**Page(s)**

CASES

*Angley v. UTi Worldwide Inc.*,
311 F. Supp. 3d 1117 (C.D. Cal. 2018) ...................................................................15

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
597 F.3d 330 (5th Cir. 2010), *vacated on other grounds*, 563 U.S. 804 (2011)......................3

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ..................................................................4, 5, 16, 17

*Baker v. SeaWorld Ent., Inc.*,
423 F. Supp. 3d 878, 901 (S.D. Cal. 2019).................................................................6

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................................2

*Butler v. BNSF Ry. Co.*,
2024 WL 2735020 (E.D. Tex. Mar. 26, 2024) ........................................................16

*Chen-Oster v. Goldman, Sachs & Co.*,
2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) ..........................................................12

*Comput. Assocs. Int'l v. Quest Software, Inc.*,
333 F. Supp. 2d 688 (N.D. Ill 2004) .......................................................................15

*Counts v. Gen. Motors, LLC*,
606 F. Supp. 3d 547 (E.D. Mich. 2022).................................................................11

*Curtis v. M&S Petroleum, Inc.*,
174 F.3d 661 (5th Cir. 1999) ...................................................................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
*509 U.S. 579 (1993)*...........................................................................................9, 13

*Deputy v. Lehman Bros., Inc.*,
345 F.3d 494 (7th Cir. 2003) ..................................................................................15

*Disney Enters. v. VidAngel Inc.*,
2019 WL 4544428 (C.D. Cal. May 29, 2019) ........................................................15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015) ............................................................................6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ...........................................................................................................2

*Estech Sys. IP, LLC v. Carvana LLC*,
2023 WL 2934920 (E.D. Tex. Apr. 13, 2023) .........................................................20

*Exeltis USA Inc. v. First Databank, Inc.*,
2020 WL 7025089 (N.D. Cal. Nov. 30, 2020) .........................................................20

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
99 F.4th 770 (5th Cir. 2024) ...................................................................................20

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
594 U.S. 113 (2021)................................................................1, 2, 3, 4, 15, 16, 20

*In re Apache Corp. Sec. Litig.*,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ...........................................................5, 6

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. May 20, 2014) .......................................................18, 19

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ...........................................................6

*In re Derivative Litig., Herley Indus. Inc.*,
2010 WL 1375195 (E.D. Pa. Feb. 5, 2010) ...........................................................18

*In re DVI, Inc. Sec. Litig.*,
2014 WL 4634301 (E.D. Pa. Sept. 16, 2014) .........................................................10

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
2021 WL 2577490 (D. Kan. June 23, 2021)...........................................................15

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
579 F. Supp. 3d 520 (S.D.N.Y. 2021).....................................................................17

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .........................................................4

*In re: Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016) .............................................................................13

*KB Partners I, L.P. v. Barbier*,
2013 WL 2443217 (W.D. Tex. June 4, 2013) .........................................................19

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)................................................................................................9

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*,
    2010 WL 3397358 (N.D. Ill. Aug. 24, 2010) ........................................................12

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
    97 F. Supp. 3d 485 (S.D.N.Y. 2015)....................................................................15

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC*,
    2007 WL 150606 (S.D. Tex. Jan. 16, 2007) .......................................................10

*Munoz v. Orr*,
    200 F.3d 291 (5th Cir. 2000) ..............................................................................15

*Puga v. RCX Sols., Inc.*,
    922 F.3d 285 (5th Cir. 2019) ..............................................................................10

*Ramirez v. Exxon Mobil Corp.*,
    2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)...................................................5, 6

*Schechner v. Whirlpool Corp.*,
    2018 WL 6843305 (E.D. Mich. Oct. 30, 2018) ..................................................14

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) .............................................................................5

*Seitz v. Envirotech Sys. Worldwide Inc.*,
    2008 WL 656513 (S.D. Tex. Mar. 6, 2008)........................................................10

*Smith v. City of Bastrop*,
    2021 WL 148061 (W.D. Tex. Jan. 15, 2021) .....................................................19

*Sonerra Res. Corp. v. Thomas Energy Servs., Inc.*,
    2003 WL 25685208 (E.D. Tex. July 16, 2003) ..................................................13

*Tex. Peace Officers v. City of Dallas*,
    58 F.3d 635 (5th Cir. 1995) ................................................................................18

*United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty.*,
    80 F.3d 1074 (5th Cir. 1996) ..............................................................................10

*Vargas v. Lee*,
    317 F.3d 498 (5th Cir. 2003) ................................................................................9

*YETI Coolers, LLC v. RTIC Coolers, LLC*,
    2017 WL 11679718 (W.D. Tex. Jan. 27, 2017) .................................................14

**RULES**

FED. R. EVID. 702.................................................................................................9, 18

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS & ISSUE PRESENTED

This is a putative class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The issue presented is whether to exclude the opinions of Defendants' expert, Lucy Allen, offered in support of Defendants' opposition to Plaintiffs' motion for class certification.

INTRODUCTION & SUMMARY OF THE ARGUMENT

In their class-certification briefing, Plaintiffs took a winding detour around Defendants' price-impact arguments advanced under *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System* ("*Goldman I*"), 594 U.S. 113 (2021), through which Defendants and their expert, Ms. Allen, demonstrated a fatal mismatch between the vast majority of challenged statements and the only alleged corrective disclosure and, thus, rebutted the presumption of reliance as to those statements. The Supreme Court has expressly ruled that expert testimony may be helpful in this analysis. *Id.* at 122. Plaintiffs' motion to exclude (Dkt. 85, "Motion") the opinions and testimony of Ms. Allen represents nothing more than another attempt to get the Court to abdicate its responsibility under *Goldman I* to assess "all probative evidence on th[e price impact] question—qualitative as well as quantitative." *Id.*

The Motion is misleading at best. It decries the purported "novelty" of Ms. Allen's systematic coding of analyst reports, as if she pulled it from thin air as an aberrational "leap in her own direction." Mot. 6, 14. But that narrative relies on a stunning disregard of what the Supreme Court held just three years ago in *Goldman I* and, even more troublingly, on a stark mischaracterization of the analysis Ms. Allen actually performed.

Contrary to Plaintiffs' depiction of the untestable, black-box work of a "focus group," Mot. 13, Ms. Allen and her team quite literally (a) reviewed hundreds of analyst reports, every one of which was disclosed; (b) coded the 9,700 answers to objective questions that likewise were disclosed; and (c) disclosed to Plaintiffs (and the Court) the results of that analysis, including every

1

single one of the 9,700 answers. Plaintiffs' abject failure to identify even one erroneously coded

answer in Ms. Allen's results ought to tell the Court all it needs to know about the seriousness of

Plaintiffs' *Daubert* challenge.

For the reasons set forth below, the Court should deny the Motion and conduct the

evidentiary analysis under *Goldman I* that Plaintiffs so desperately want the Court to avoid.

## BACKGROUND

I.    ***Goldman I* ushers in a new era of price impact evidence that Defendants and their experts can deploy in rebutting the *Basic* presumption at class certification.**

Because the Motion omits it, Defendants summarize below the critically important post-

*Goldman I* landscape and, in turn, how Ms. Allen's analysis fits comfortably within it.[1]

A.    **Under *Goldman I*, courts must engage in a "mismatch" analysis considering "all probative evidence"—both "qualitative as well as quantitative."**

Plaintiffs' ability to proceed as a class action depends on "a rebuttable presumption of

reliance based on the fraud-on-the-market theory." *Goldman I*, 594 U.S. at 118. That presumption,

first announced in *Basic Inc. v. Levinson,* 485 U.S. 224 (1988), rests on a "fundamental premise"

that in an efficient market, the alleged misrepresentation "was reflected in the market price at the

time of [the investor's] transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804,

813 (2011). If, however, the alleged misrepresentation "did not actually affect the market price of

the stock"—*i.e.*, there is an absence of "price impact"—then *Basic*'s core premise "completely

collapses, rendering class certification inappropriate." *Goldman I*, 594 U.S. at 119.

Historically, the Supreme Court spoke sparingly with respect to (1) how defendants might

demonstrate such a lack of price impact, and (2) what kinds of evidence courts must consider in

assessing price impact. Its 2021 *Goldman I* opinion provided substantial clarity on both questions.

---

[1] For a thorough summary of the applicable law, see also Defendants' class certification opposition, Dkt. 68 ("Opp.") 8-12.

First, *Goldman I* explained how Defendants can "sever[] the link between the alleged misrepresentation" and the purported front-end stock price inflation where the plaintiff relies on a back-end price movement and "claims that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.* at 118, 123. That "inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure," for in that case, "it is less likely that the [corrective] disclosure actually corrected" the alleged misrepresentation, and "there is less reason to infer front-end price inflation." *Id.* at 123.

Defendants can demonstrate such a "mismatch" by comparing the back-end disclosure and the front-end statement. In some cases, the back-end disclosure does not "actually correct[]" the alleged misstatements, *id.*, meaning the allegedly associated decline was not caused by a "revelation of the truth." *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 336 (5th Cir. 2010), *vacated on other grounds*, 563 U.S. 804 (2011). In other cases, as in *Goldman I*, an "earlier misrepresentation is generic…and the later corrective disclosure is specific," which can sever the link between the two because "a more-general statement will affect a security's price less than a more-specific statement on the same question." 594 U.S. at 122-23. And in some cases, like this one, *both* link-severing features are present. Opp. 13-23.

Second, *Goldman I* explained that "[i]n assessing price impact at class certification, courts should be open to *all probative evidence* on that question—*qualitative as well as quantitative*—aided by a good dose of common sense." 594 U.S. at 122 (emphases added). The Court reiterated that "[t]he district court's task is simply to assess all the evidence of price impact"—both "direct and indirect," including "*competing expert evidence* on price impact"—"and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 126-27

3

(emphasis added). Similarly, the Court recognized that the "generic nature of a misrepresentation often is *important evidence*" and instructed that "courts may consider *expert testimony* and use their common sense in assessing whether a generic misrepresentation had a price impact." *Id.* at 117, 122 (emphases added).

> **B.** **Courts rely on expert analysis of market commentary regarding alleged misstatements and corrective disclosures.**

Because the genericness of the alleged front-end misstatements and their connection to back-end disclosures are now paramount considerations, courts have relied on "contemporaneous analyst reports [to] support[] the absence of price impact" and assist in that analysis, because "[m]arket commentary can provide insight into the kind of the information investors would rely upon in making investment decisions." *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *9 (S.D.N.Y. Mar. 29, 2024) (quoting *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 104 (2d Cir. 2023) ("*Goldman II*")). Two such uses are relevant here.

On the front end, courts consider whether analysts "reference the [challenged] disclosure" or "expressly []or impliedly refer to" it. *Goldman II*, 77 F.4th at 104; *see, e.g.*, *Kirkland*, 2024 WL 1342800, at *9 ("The record shows that no analysts referenced or discussed either of the [challenged] M&A Statements at all…."). Because analysts typically focus on value-relevant, material information, the absence of such analyst commentary helps demonstrate the genericness of the challenged statement and, thus, can "leave[] [the court] with the firm conviction that there is an insufficient link between the corrective disclosures and the alleged misrepresentation[]." *Goldman II*, 77 F.4th at 105; *id.* at 102-03 ("pre- or post-disclosure discussion in the market regarding a generic front-end misstatement can be a useful indicator of its inflation-maintaining capacity").

On the back end, courts consider whether analyst "commentary surrounding the alleged

4

corrective disclosures…links [a company's] post-disclosure plight back to the alleged misstatements." *Id.* at 103. A "dearth of analyst commentary" can demonstrate what "the market likely did not consider…significant," *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at \*16 (N.D. Tex. Aug. 21, 2023), or that the alleged corrective disclosure was not actually corrective of the challenged statements. *See In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at \*10, \*14 (S.D. Tex. Feb. 9, 2024) (relying on analyst reports as "compelling evidence" of what caused the "market react[ion]" and whether a disclosure was "corrective of any alleged misrepresentation").

"Expert testimony" is "admissible" where it "synthesizes or summarizes data in a manner that streamlines the presentation of that data" for the factfinder. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) (collecting cases). Courts have naturally relied on experts to review analyst reports in evaluating price impact, including synthesizing voluminous data. The most prominent example is in *Goldman II* itself, where, on remand, the court assessed defendants' expert, Dr. Laura Starks, who conducted an "analysis of 880 analyst reports published during the Class Period," 77 F.4th at 104, and found that (a) "prior to the alleged corrective disclosure dates, the analysts reporting on Goldman's stock did not mention or refer to the statements identified as misstatements by Plaintiffs," and (b) "on or around the time of the four alleged corrective disclosures" involving enforcement activities, "[t]he analyst reports did not attribute the enforcement activities to the statements at issue in this litigation, and the statements at issue were not addressed in any of the analyst reports in this time frame." Ex. 1, Starks Rep. ¶¶ 54-55. Dr. Starks thus opined that the challenged statements "d[id] not provide information that bears on a company's future financial performance or value" and "[we]re also too general to convey anything precise or meaningful" that can be used in investment decision-making. *Goldman II*, 77 F.4th at 93. And the Second Circuit expressly *relied* on that expert evidence and *agreed* that it "sever[ed]

the link between [the] back-end price drop and front-end misrepresentation." *Id.* at 104-05.

*Goldman II* is far from the only case to rely on expert synthesis of analyst reports. *See, e.g.*, *Exxon Mobil*, 2023 WL 5415315, at \*15 (relying on "Dr. Ferrell's assessment of a sample of 480 contemporaneous research analyst reports"). In fact, the practice of experts—on both sides— assessing market reactions based on analyst reports is so commonplace that *Plaintiffs' own expert*, Chad Coffman, has previously done just that. *See Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 901 (S.D. Cal. 2019) (admitting Mr. Coffman's testimony when he "review[ed] *hundreds* of [analyst] reports and articles [and] formed the opinion that…the market immediately understood the August 13, 2014 disclosure as an admission" about what "had impacted the Company").

## II. Ms. Allen's team conducted a systematic and replicable content analysis of Concho's voluminous analyst reports that fits neatly within the *Goldman I* framework.

Ms. Allen is a Senior Managing Director at National Economic Research Associates ("NERA"), with a M.B.A from Yale University and M.A. and M. Phil. degrees in Economics, also from Yale. Dkt. 68-5 at 1. She has testified frequently in securities actions, including on price impact. *Id.* at 1-2, App. A. Indeed, it was her analysis that led to denials or partial denials of class certification in § 10(b) actions within the Fifth Circuit and elsewhere, even before *Goldman I.*[2]

In this case, Defendants asked Ms. Allen and her team at NERA to conduct a "systematic content analysis of all analyst reports…following certain alleged misstatement and the alleged corrective disclosure with regard to specific questions." Dkt. 68-5 ("Allen Rep.") ¶ 1. Defendants grouped the alleged misstatements into three categories: (A) "Generic Misstatements"; (B) "Results and Observations from 2017 and 2018 Misstatements"; and (C) "Pre-2019 Projections Misstatements." *Id.* ¶ 9. That categorization was used to make the analysis more

---

[2] *See Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269-80 (N.D. Tex. 2015); *Apache*, 2024 WL 532315, at \*14; *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at \*5 (S.D.N.Y. Mar. 23, 2020).

helpful for the Court and to allow for an additional analysis of analyst reports after the Category

A Generic statements (whereas for the other categories, the focus was only on the post-corrective

disclosure analyst reports). *Id.* ¶¶ 11-14.

The "specific questions" that were coded corresponded to the *Goldman* framework outlined

above, as each was designed to gather evidence on whether analysts (1) assigned value or

importance to the generic Category A statements when they were made, or (2) made any

connection between the alleged corrective disclosure and the Category A, B, or C statements. Each

question asked, in plain English, "yes" or "no" to whether a report contained certain information:

---

***For analyst reports <u>at time of challenged statement</u>*** (**Category A misstatements only**):

1. Is there any indication in the report that the alleged misstatement caused the analyst to change its valuation of Concho and/or its stock?

2. Is there any indication in the report that the alleged misstatement caused the analyst to change its price target for Concho?

3. Does the report reference the alleged misstatement?

4. For events other than earnings releases, does the report reference the event (earnings/investor call, analyst conference or SEC filing) that contains the alleged misstatement?

***For analyst reports <u>after alleged corrective disclosure</u>*** (**Category A, B and C misstatements**):

1. Is there any indication in the report that the analyst learned the prior misstatement was inaccurate or misleading?

2. Is there any indication in the report that the analyst made a connection between the alleged misstatement and the alleged corrective disclosure?

3. Does the report reference the alleged misstatement other than in tables showing prior results?[1]

4. Does the report reference the event (earnings release, earnings/investor call, analyst conference or SEC filing) that contains the alleged misstatement other than in tables showing prior results?[2]

**Notes:**

[1]   For Category A, excludes "other than in tables showing prior results."

[2]   *See infra* pp. 15-16 (discussing an immaterial typo in the report's recitation of this Question 4 for Category C).

---

*Id.* (emphasis omitted). The task of Ms. Allen and her team was to systematically code the ***9,700***

***answers*** to these questions from reviewing ***247 analyst reports***. That involved reading the analyst

reports and answering specific questions for each of the 54 Category A, B, and C alleged

misstatements. *Id.* ¶ 18. Ms. Allen enlisted teams of "two analysts" to "work[] independently" and "determine[] and code[] answers to the questions…regarding each alleged misstatement for each relevant analyst report." *Id.* ¶ 16; Dkt. 85-5 ("Allen Dep.") at 57:17-20. The pairs of coders would actually "read[] every single analyst report," code their answers to the relevant questions, and "then compare results and resolve discrepancies," if any. Allen Dep. 236:12-13; Allen Rep. ¶ 16.

Ms. Allen published the results of her content analysis in the 87-page Appendix D to her expert report, which catalogues the questions, the analyst reports, and all 9,700 coded answers. Allen Rep. App'x D. To illustrate an example from that lengthy appendix:

**Content Analysis of Analyst Reports For Alleged Misstatement A-24**
**Analysts Issuing Reports after Alleged Misstatement**

Plaintiffs claim that the following statements made on October 30, 2018 in the Q3 2018 Earnings Release were materially false and misleading:

"We have been disciplined over the last several years - generating free cash flow, prudently growing oil production, reducing our cost structure and building for the future with accretive acquisitions and strategic portfolio management. These efforts position us well for the next stage of our company, which includes delivering high-margin oil growth and initiating a return-of-capital strategy to our shareholders. We are a growth company, and our platform for delivering growth, demonstrating the benefits of scale and enhancing shareholder value, has never been better."

| | BMO | Evercore | J.P. Morgan | Jefferies | Macquarie | Piper Sandler | Raymond James | RBC | Scotpett | SunTrust | UBS | Wells Fargo | Bank of America | Barclays | Credit Suisse | Ladenburg | Morgan Stanley | Morningstar (1) | Morningstar (2) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Is there any indication in the report that the alleged misstatement caused the analyst to change its valuation of Concho and/or its stock? | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No |
| Is there any indication in the report that the alleged misstatement caused the analyst to change its price target for Concho? | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No | No |
| Does the report reference the alleged misstatement? | No | No | No | No | No | No | No | No | No | No | No | No | No | ¹ No | No | No | No | ² No | No |
| For events other than earnings releases, does the report reference the event (earnings/investor call, analyst conference or SEC filing) that contains the alleged misstatement? | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Date of analyst report: | 10/30 | 10/30 | 10/30 | 10/30 | 10/30 | 10/30 | 10/30 | 10/30 | 10/30 | 10/30 | 10/30 | 10/30 | 10/30 | 10/31 | 10/31 | 10/31 | 10/31 | 10/31 | 10/31 |

*Id.* at 24. Based on this analysis, Ms. Allen concluded that for the Category A statements, "market evidence" demonstrated that they were "merely generic statements that did not affect the value of Concho's stock," and that "there is no link between the alleged misstatements in Category A and the alleged corrective disclosures." *Id.* ¶¶ 27-28. For the Category B and C statements, Ms. Allen concluded that "the content analysis indicates that the alleged corrective disclosure was not considered corrective of the alleged misstatements in Category B" or C, and thus "the price decline following the alleged corrective disclosures does not provide any evidence regarding the price impact of the alleged misstatements in Category B" or C. *Id.* ¶¶ 32, 36.

**III.    Neither Plaintiffs nor their expert identify a single error in Ms. Allen's content analysis, but Plaintiffs nevertheless seek to exclude her entire report and testimony.**

Despite having everything he needed to replicate Ms. Allen's content analysis and identify

8

any errors or instances where he would have coded answers differently, Plaintiffs' expert declined to do so. Instead, Mr. Coffman simply disagreed that the analysis qualified as "evidence suggesting a lack of price impact," calling it "novel and unnecessary"—despite *agreeing* that "analyst commentary" is "not…irrelevant" and citing a handful of analyst reports that he believed showed price impact. Dkt. 80-2 ("Coffman Rep.") ¶¶ 26-27, 31-34. Ms. Allen debunked each of those contentions in her surreply report. Dkt. 84-4 ("Allen Surreply Rep.") ¶¶ 5-28.

Plaintiffs then filed the Motion, which neither contests Ms. Allen's qualifications nor identifies a single error or discrepancy with the coding in Ms. Allen's content analysis.

**LEGAL STANDARD**

Federal Rule of Evidence 702 provides that an expert may testify if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Rule 702 requires that expert testimony be (i) based on sufficient facts or data, (ii) relevant, and (iii) reliable. FED. R. EVID. 702.

With respect to reliability, an expert's testimony must be "grounded in the methods and procedures of science" and be more than "unsupported speculation or subjective belief." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999). In *Daubert*, the Supreme Court identified several non-exclusive factors courts can consider in assessing reliability. *See* 509 U.S. at 593-95.[3] These factors are not a "definitive checklist or test," and "the trial judge [has] considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 152 (1999).

"As a general rule, questions relating to the bases and sources of an expert's opinion affect

---

[3] "These factors include whether the theory or technique that forms the basis of the expert's testimony: (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error and standards controlling its operation; and (4) is generally accepted within the relevant scientific or technical community." *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003).

9

the weight to be assigned that opinion rather than its admissibility and should be left for the [fact finder's] consideration." *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996). As a result, "the rejection of expert testimony is the exception rather than the rule." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (citing FED. R. EVID. 702 advisory committee notes (2000) (internal citations omitted)).

**ARGUMENT**

**I.    The Court should reject Plaintiffs' reliability challenges to Ms. Allen's systematic, replicable content analysis of analyst reports.**

Each of Plaintiffs' reliability attacks on the content analysis relies on distorting what Ms. Allen actually did (or testified to), crafting a fictional test for reliability, disregarding *Goldman I* and its progeny, or some combination of those things. The Court should reject Plaintiffs' challenge.

**A.    Ms. Allen's empirical analysis was not "lawyer-driven."**

Plaintiffs claim that Ms. Allen's content analysis was "lawyer driven," likening it to cases in which the expert did not "conduct and report the results of critical, independent analysis" or "sign[ed] a report drafted entirely by counsel without prior substantive input from [the] expert." *MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, 2007 WL 150606, at *4 (S.D. Tex. Jan. 16, 2007) (first quote); *Seitz v. Envirotech Sys. Worldwide Inc.*, 2008 WL 656513, at *2 (S.D. Tex. Mar. 6, 2008) (second quote); Mot. 8. That is quite obviously not what Ms. Allen did. She took *questions* posed by Defendants' counsel and managed a systematic process by which her team *independently analyzed* hundreds of analyst reports and coded the *answers* to those questions. Answering questions posed by counsel is not anathema to expert work—it is what experts (including Plaintiffs' own expert, Mr. Coffman) do every day. *E.g.*, *In re DVI, Inc. Sec. Litig.*, 2014 WL 4634301, at *3 (E.D. Pa. Sept. 16, 2014) (Mr. Coffman "was asked by counsel for Plaintiffs in this matter to quantify the damages" and "his opinions [we]re based on a fundamental assumption of

10

fact—as directed by counsel in defining the scope of his retention as an expert").

Plaintiffs' critique also is disingenuous in two key respects. First, if Ms. Allen *had* categorized the challenged statements and structured the questions herself, then Plaintiffs' heads-I-win-tails-you-lose approach would have labeled that work an impermissible "legal opinion." *See* Mot. 14. Second, Ms. Allen repeatedly testified that she understood the purpose of the questions and why they were relevant to the price-impact analysis,[4] contrary to Plaintiffs' suggestion that she was blindly "follow[ing] orders." Mot. 8. After all, those questions were not pulled from thin air, but instead mirrored the approach that courts have taken in the wake of *Goldman I* to draw relevant inferences from analyst reports. *Supra* pp. 4-6 (collecting cases).

**B.      Ms. Allen's analysis was methodologically sound and supported by authority.**

Plaintiffs' assorted critiques about a lack of "peer review," "widespread acceptance," or "known potential error rate" all converge on a central theme that Ms. Allen's content analysis was "novel" and out-of-step with accepted practice. Mot. 11-13. That is nonsense. Ms. Allen deployed pairs of coders to independently read every analyst report in its entirety, code their answers, and check and resolve any discrepancies, *supra* pp. 6-8, consistent with NERA's "standard practice" in "frequently" conducting such systematic coding exercises. Allen Dep. 43:20-44:18, 59:22-60:15. The authority cited by Plaintiffs and Ms. Allen confirms that such "employment of multiple coders is the *traditional approach*" to content analysis, Dkt. 85-11 ("Breton Article") at 95 (emphasis added), and courts have routinely upheld the use of such content analyses—even when (unlike here, *infra* pp. 14-15) they are "qualitative" in nature. *See, e.g.*, *Counts v. Gen. Motors,*

---

[4] Allen Dep. 46:5-11 ("I've answered specific questions, and I think the answers to those questions speak to the question of whether there is a mismatch, and it speaks to the question of whether there is evidence of price impact from the alleged misrepresentations"); *id.* at 96:14-17 ("If the statement does not change any analyst valuation or price targets, it provides evidence that that statement had no price impact."); *id.* at 99:8-11 ("I think they generally make sense. And, as I said, they are the types of questions that I have analyzed before in doing a content analysis."); *id.* at 127:12-13 ("I think this question does have relevance to price impact.").

11

*LLC*, 606 F. Supp. 3d 547, 570, 574 (E.D. Mich. 2022) (rejecting challenge to "qualitative content analysis of…advertisements," emphasizing expert's use of "three third-party coders that independently reviewed and coded the ads") (collecting cases); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 2010 WL 3397358, at *16 (N.D. Ill. Aug. 24, 2010) (same for "content analysis" by expert and assistant coding "positive," "negative," and "mixed" consumer reactions in video interviews).[5]

Plaintiffs mistakenly suggest Ms. Allen used or should have used "search terms"[6] and "coding software" to perform the content analysis. Mot. 5, 9. Those are *less* traditional means of performing a content analysis, Breton Article at 95, and Ms. Allen explained why they would not have been a reliable substitute in this case for "reading every single analyst report," since the "generic[ness]" of the challenged statements made it "not possible to use a search" procedure that would ensure they were captured. Allen Dep. 236:8-13. Similarly, Plaintiffs' handwringing over the lack of an expressly articulated "error rate" rings hollow, Mot. 6, 12, given Ms. Allen's testimony of only approximately "ten instances" of discrepancies needing to be reconciled between the paired coders—*i.e.*, much "less than one percent" of the 9,700 coded responses, Allen Dep. 68:17-20—and Plaintiffs' own failure to identify a single coding error.

Ultimately, Plaintiffs cannot seriously dispute that Ms. Allen's methodology finds support in the peer-reviewed sources cited in her report—both generally and in the specific context of reviewing analyst reports. Allen Rep. 6-7 nn.6, 8 (collecting authorities). So Plaintiffs move the goal posts by bemoaning the lack of "peer-review[]" and "widespread acceptance" of the *precise*

---

[5] Plaintiffs' only example of a court excluding a content analysis is *Chen-Oster v. Goldman, Sachs & Co.*, 2022 WL 814074 (S.D.N.Y. Mar. 17, 2022), in which an expert categorized certain terms mentioned by "female employees…to show that some male employees may have been adverse to diversity efforts," but could not explain the methodology for categorizing the terms. *Id.* at *6 ("For example, she does not explain why 'responsibility' is in the compensation category rather than under promotions, experience, or performance."). That bears no resemblance to Ms. Allen's systematic and replicable content analysis here.

[6] *Compare* Allen Dep. 237:5-9 ("The analysis was *not done through search terms*. The[ coders] may have at times searched within an analyst report. But the coding was done by reviewing the entire analyst report.") (emphasis added), *with* Mot. 9 (protesting Ms. Allen's purported failure to disclose the "search terms…employed").

*application* of Ms. Allen's content analysis in a post-*Goldman I* universe. *E.g.*, Mot. 11, 13. Never mind that Dr. David Tabak (whose scholarship Plaintiffs cite) *did* peer review Ms. Allen's report, Allen Dep. 239:4-5, and never mind that the analysis bears a striking resemblance to Dr. Starks's analysis on which *Goldman II* expressly relied, 77 F.4th at 93, Plaintiffs' demand for peer review of the precise application of an expert's analysis is simply not the law. *See, e.g.*, *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 369 (S.D.N.Y. 2016) ("[I]t is not necessary for every application of a commonly used statistical technique to be peer-reviewed.")*, vacated in part on other grounds*, 862 F.3d 250 (2d Cir. 2017); *Sonerra Res. Corp. v. Thomas Energy Servs., Inc.*, 2003 WL 25685208, at *2 (E.D. Tex. July 16, 2003) (rejecting *Daubert* challenge when "theory, while perhaps not written about specifically as applied to drill pipe, is not a new and novel theory"). And that is especially true for a "proposition[]"—like content analysis in the nascent stages of a post-*Goldman I* world—that is "too particular [or] too new…to be published." *Daubert*, 509 U.S. at 593.

**C.    Plaintiffs' accusation that the analysis was unduly "qualitative," "subjective," and "untestable" is false and at most goes to weight, not admissibility.**

Plaintiffs boldly declare that "objectively recreating the [content] analysis is impossible" and that the "questions posed by Defendants' counsel" were "unclear to" Ms. Allen, making the "content analysis…a qualitative, not a quantitative one." Mot. 4, 9, 12. That narrative rests entirely on misrepresented snippets of Ms. Allen's testimony. For example, the Motion purports to quote Ms. Allen admitting that the content analysis involved "judgement [sic] call[s]," Mot. 9, when she actually testified that "[t]here was *nothing that required a judgment call*," explaining that while there "might have been a judgment call in terms of what exactly [other than a misstatement] is causing a[n analyst's] change in valuation" (*i.e.*, a response to a hypothetical question outside the scope of the content analysis), as for "the fact that the misstatement had nothing to do with it" (*i.e.*, the question actually posed), "there was *no ambiguity*." Allen Dep. 134:19-25 (emphases added).

13

Similarly, Ms. Allen's testimony "I don't know what that means to make a connection, but…" came in response to a nonsensical hypothetical about "an analyst ma[king] a connection, but [not] explicitly writ[ing] it in his or her report." Allen Dep. 171:4-9; *contra* Mot. 10. She absolutely explained what it means to "make[] a connection"—*i.e.*, the "alleged corrective disclosure…connecting that to a prior misstatement in any way," a phrase involving "common English terms" that required no "further clarification." Allen Dep. 168-71. Likewise, Ms. Allen confirmed that whether an analyst report indicated that the analyst "learned" that an alleged misstatement was misleading was "not ambiguous" to Ms. Allen or "any of the coders" reading the reports. *Id.* at 159:16-60:1; *contra* Mot. 10. Over and over, Ms. Allen repudiated any suggestion that the questions or their answers were unduly subjective.[7]

Why, then, does the Motion resort to playing fast and loose with Ms. Allen's testimony? Because Plaintiffs possess (a) the plain text of the questions, (b) all the analyst reports, and (c) all the answers coded, and yet they and their expert could not find a *single instance* where a coder should (or could) have coded an answer differently. That is a devastating blow to Plaintiffs' attempted analogy to cases in which an expert's methodology is a black box that "cannot be tested." Mot. 9. So is the fact that Courts reject *Daubert* challenges when the complaining party is, as here, free to recreate the analysis and point out any flaws.[8] Plaintiffs' inability to identify even one debatable code also demonstrates that the content analysis is "quantitative"—not qualitative. *Compare* Dkt. 85-16 ("Tabak Article") at 7 (describing as quantitative a content

---

[7] *E.g.*, Allen Dep. 132:25-33:5 ("There was no ambiguity…I don't recall anything that was even close."); *id.* at 135:8-9 ("There was no ambiguity about that."); *id.* at 137:6 ("There was no ambiguity….").

[8] *See, e.g.*, *YETI Coolers, LLC v. RTIC Coolers, LLC*, 2017 WL 11679718, at *3 (W.D. Tex. Jan. 27, 2017) ("RTIC has all of the raw data, and if it believes the items selected by Wind are unrepresentative of the whole, it can surely demonstrate this on cross-examination."); *Schechner v. Whirlpool Corp.*, 2018 WL 6843305, at *10-11 (E.D. Mich. Oct. 30, 2018) (special master's recommendation) ("Whirlpool has produced the individual survey responses…, so if Plaintiffs want, they can test the veracity of the coding and challenge Simonson at trial, and even re-categorize the responses as they wish…."), *objections overruled*, 2019 WL 978934 (E.D. Mich. Feb. 28, 2019).

14

analysis counting "the number of times that each of the two major parties' presidential candidates' names appear in a headline in the New York Times"), *with, e.g.*, Allen Rep. ¶ 23.c (counting the number of "reference[s] to the alleged misstatement in any of the analyst reports").

Worse than just being factually wrong, Plaintiffs' "qualitative" criticism is also legally irrelevant. *Goldman I* demands that courts consider "*all* probative evidence on [the price impact] question—*qualitative* as well as quantitative." 594 U.S. at 122 (emphases added). From a *Daubert* perspective, too, courts do not reflexively strike qualitative analyses, and they repeatedly treat arguments about the supposed subjectivity of an expert's opinion as going to weight, not admissibility. *See, e.g.*, *Disney Enters. v. VidAngel Inc.*, 2019 WL 4544428, at *5 (C.D. Cal. May 29, 2019) ("[T]estimony is not excludable as unreliable or speculative or otherwise simply because it is qualitative instead of quantitative."); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 507 (S.D.N.Y. 2015) ("[T]hat an analysis may be qualitative does not mean that it is unreliable for the purposes of *Daubert*."); *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1125 (C.D. Cal. 2018) (while "making a determination as to what was 'not newsworthy' would appear to include some subjectivity," such criticisms "go to weight, not admissibility").

### D.   Plaintiffs cannot equate an immaterial typo with a "fundamental mistake[]."

"A typographical error appearing in an expert report" can be the topic of cross-examination, "but it does not render an expert's opinion unreliable and thus inadmissible." *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 506 (7th Cir. 2003).[9] Undeterred, Plaintiffs seize on a typo in Ms. Allen's report that she recognized in preparing for and corrected at her deposition: in certain

---

[9]*Compare, e.g.*, *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2021 WL 2577490, at *40 (D. Kan. June 23, 2021) (rejecting *Daubert* challenge premised on "typographical error"), and *Comput. Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 695 (N.D. Ill 2004) (same), *with Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (cited at Mot. 19) (involving not a mere typo, but an expert's egregious miscalculations of percentages that "should add up to 100%" but only added up "as low as 25%, 16.67%, and 8.33%").

places, the report used incorrect text in reciting the fourth question in Category C. The text in those places should have read: "Does the report reference the <u>event (earnings release, earnings/investor call, analyst conference or SEC filing)</u> that contains the alleged misstatement other than in tables showing prior results?"—as the report correctly states elsewhere. Allen Rep. ¶ 34.d ("Of the 5 events (earnings release, earnings/investor call, analyst conference or SEC filing) in which alleged misstatements were made, none was referenced in any of the analyst reports"). As Ms. Allen testified, the actual fourth question for the Category C statements was exactly the same as those for Categories A and B. Allen Dep. 108:20-24. Her testimony and the narrative summary of content analysis results in her report confirm the correct question was answered. *Id.* at 104:3-15; Allen Rep. ¶ 34.d. Plaintiffs' calling that typo "fundamental" and "material" does not make it so.

**E.      Plaintiffs' criticizing Ms. Allen's opinion as improper legal testimony is both wrong and a blatant attempt to sneak in more merits arguments.**

Under *Goldman I*, the "generic nature of a misrepresentation" is "important evidence" that bears on the price impact inquiry. 594 U.S. at 122-23. Likewise, a "compar[ison]" between "the relative genericness of a misrepresentation with its corrective disclosure"—*i.e.*, *Goldman I*'s "mismatch framework"—is "evidence" that is fair game at class certification. *Goldman II*, 77 F.4th at 81. "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue [was] satisfied." *Butler v. BNSF Ry. Co.*, 2024 WL 2735020, at *5 (E.D. Tex. Mar. 26, 2024). That is precisely what Ms. Allen's opinion does—much like Dr. Starks's opinions that the Second Circuit relied on in *Goldman II*. 77 F.4th at 93, 104-05.

Plaintiffs' plea that Ms. Allen's opinions amount to impermissible "legal analysis" therefore sputters. At best, that argument is a poorly disguised effort to supplement Plaintiffs' class certification briefing on the governing legal standard, including, for example, by citing *Delaware County Retirement System v. Cabot Oil*, a case Plaintiffs had not previously invoked, for the

16

proposition that alleged misrepresentations and corrective disclosures "need only be 'related to' or 'relevant to' one another." Mot. 14 (quoting 2023 WL 6300569, at *10 (S.D. Tex. Sept. 27, 2023)). As Defendants already explained, however, *Goldman I*'s mismatch inquiry requires far more than mere subject-matter overlap between the front-end statement and back-end disclosure. Opp. 16-17; *Goldman II*, 77 F.4th at 100-01 ("requiring only a general front-end—back-end subject matter match...does not meaningfully account for the Supreme Court's guidance in *Goldman*").

### F.   Plaintiffs' unambiguous disclaimer of an inflation-introduction theory of price impact renders a front-end price impact analysis unnecessary.

Plaintiffs next disclaim as "irrelevant" Ms. Allen's analysis of whether the alleged misstatements caused a stock price increase when they were made (*i.e.*, at the "front-end"). Mot. 14-15. Plaintiffs base that argument not on any error in Ms. Allen's analysis, but on their now having abandoned any argument as to whether the alleged misstatements caused the inflation to increase (inflation-introduction) versus maintained the inflation (inflation-maintenance).

Defendants anticipated this possibility all along. As Defendants' class certification Opposition brief explains, where "Plaintiffs' claims fall within the inflation-maintenance, rather than the inflation-introduction, strain of Rule 10(b) claims, any price impact must be measured via stock price decreases occurring after the alleged statements were revealed to be false," *i.e.*, at the "back-end." *See* Opp. 21 (quoting *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 579 F. Supp. 3d 520, 527 (S.D.N.Y. 2021)). At that time, as Ms. Allen noted, although it appeared that Plaintiffs were relying solely on an inflation-maintenance, rather than an inflation-introduction, theory, Ms. Allen, in an abundance of caution, considered whether Plaintiffs could claim "front-end" price increase from the alleged misstatements and found that they could not have. Allen Rep. ¶ 40-51.

Only now do Plaintiffs expressly disclaim any reliance on an inflation-introduction theory. Mot. 14-15. That belated concession makes it undisputed that price impact can be established *only*

17

if there is a "match" between the contents of the alleged misstatements and the alleged corrective disclosures sufficient to enable the Court to attribute the "back-end" price movement to the alleged misstatements. *See* Opp. 10-12. The fact that none of the statements caused a "front-end" price increase further evidences their genericness for purposes of the mismatch analysis, and certainly is no grounds to exclude Ms. Allen's analysis, the reliability of which Plaintiffs do not challenge.

## II. Plaintiffs' complaints about Ms. Allen's damages methodology opinions are baseless.

Plaintiffs next raise three objections to Ms. Allen's opinions regarding Plaintiffs' purported damages methodology. Mot. 15-17. None is persuasive.

*First*, Plaintiffs argue that Ms. Allen offers an improper "legal conclusion that Lead Plaintiffs rely on a materialization of the risk theory." Mot. 15. But courts have used the term "materialization of the risk" in referencing an *economic* concept relevant to plaintiffs' legal burden at class certification to present evidence that they possess a damages methodology capable of measuring damages consistently with their theory of liability. *See* Opp. 25 (citing *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at \*10 (S.D. Tex. May 20, 2014) ("*BP II*") (quoting expert testimony on the subject)). Far from being improper for an expert, Ms. Allen's testimony is a direct response to Plaintiffs' expert's claim that a common damages methodology would apply. Ms. Allen's testimony on this economic question will help the Court to determine legal questions relevant to class certification, which is precisely what the Federal Rules authorize experts to do. *See* FED. R. EVID. 702 (authorizing expert testimony that "help[s]…determine a fact in issue"); *see also In re Deriv. Litig., Herley Indus. Inc.*, 2010 WL 1375195, at \*1 n.1 (E.D. Pa. Feb. 5, 2010) ("[E]xperts may testify to facts relevant to a legal conclusion.").[10]

---

[10] The cases cited by Plaintiff only underscore how far Ms. Allen's testimony is from an improper legal conclusion. In one, the court excluded expert testimony "that the constitutional rights of the TPOA…have rather been severely violated." *Tex. Peace Officers v. City of Dallas*, 58 F.3d 635, 635 (5th Cir. 1995). In the other, the court excluded

*Second*, Plaintiffs state that Ms. Allen "could not even articulate what a materialization of the risk theory entails." Mot. 16. But she clearly articulated the economic concept of the theory in her report. Allen Rep. ¶¶ 56-58. And she again explained in her deposition that the theory involves a situation in which a company has allegedly "understated the risk of something happening, and then…that risk materializes and something bad happens." Allen Dep. At 310:6-22; *see also id.* at 310:23-311:16 (using *BP II* as an example of this theory). Ms. Allen demonstrates that the common damages methodology proposed by Plaintiffs' expert cannot separate the impact of the allegedly understated risk (if any) from the price reaction at the end with an event study. Allen Rep. ¶ 58.[11]

*Finally*, Plaintiffs argue that Ms. Allen's opinions regarding Concho's acquisition of RSP Permian, Inc. "betray[] the simple economic principle[] that control premiums are uniformly paid in acquisitions, and do not cancel out securities damages where the acquisition price is paid in inflated shares." Mot. 16. Ironically, despite (inaccurately) criticizing Ms. Allen for not citing "support in the literature" for her economic principles,[12] Plaintiffs cite no such support for their supposed "simple economics principle[]." *Id.* The simple economic principle that Ms. Allen testified to is that when presented with a choice of more money or less, people will choose more. As she explained, if RSP shareholders had known that Concho's shares were inflated as alleged at the time of the transaction, they still would have exchanged their RSP shares for the inflated Concho shares because the merger premium was larger than even the maximum inflation using

---

expert testimony "as to the proper statutory interpretation and what actions are permitted or prohibited by the PIDA Act based on [the expert's] reading of the Act." *Smith v. City of Bastrop*, 2021 WL 148061, at *5 (W.D. Tex. Jan. 15, 2021). In other words, these experts offered a "legal opinion on how the law should be interpreted and applied in this case." *Id*. at *6. Ms. Allen does nothing remotely similar here.

[11] The gist of Plaintiffs' objection is that they disagree with Ms. Allen's testimony, but that is no basis to exclude expert testimony. *E.g.*, *KB Partners I, L.P. v. Barbier*, 2013 WL 2443217, at *7 n.7 (W.D. Tex. June 4, 2013) ("If disagreement alone indicates unreliability, *Daubert* ought to have simply required all expert evidence to be excluded in every case, as each party can always find an expert to disagree with another expert.").

[12] Contrary to Plaintiffs' assertion that Ms. Allen "could not cite support for her conclusion," Ms. Allen cites such authority *in the very deposition testimony Plaintiffs cite*. *See* Allen Dep. at 325:22-326:11.

19

Mr. Coffman's event study. Allen Dep. 323:7-18.

### III.   Plaintiffs' charge of a "disclosure violation" is completely hollow.

Grasping further, Plaintiffs charge Ms. Allen with a "disclosure violation," Mot. 17, because she opined she "would have reviewed news articles" and thus "should have listed news articles, at least as a category" in her materials considered. Allen Dep. 74:14-21. But Plaintiffs omit that Ms. Allen's content analysis involved *only analyst reports*—not news articles—and news articles did not "[make] a difference to any of the analysis in [her] report." *Id.* at 75:24-76:3. Plus, Plaintiffs and their expert have the same publicly available news articles at their disposal, yet they tellingly neglected to explain how any of them could have possibly contradicted Ms. Allen's content analysis of *analyst reports*, let alone that they actually did. Under those circumstances, courts have little trouble rejecting hollow disclosure complaints like this one.[13]

### IV.   Defendants welcome a full *Daubert* hearing in conjunction with class certification.

Defendants would welcome an evidentiary *Daubert* hearing, where the Court can hear from Ms. Allen herself and ask any questions about her analysis. *See Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 99 F.4th 770, 774-75 (5th Cir. 2024) (*Daubert* challenge during class certification in a securities case requires "a full *Daubert* analysis"). For efficiency's sake, Defendants respectfully request that a *Daubert* hearing be combined with an evidentiary class-certification hearing, where the Court could assess "all probative evidence" on price impact. *Goldman I*, 594 U.S. at 122.

**CONCLUSION**

For all the foregoing reasons, Plaintiffs' Motion should be denied.

---

[13] *See, e.g.*, *Estech Sys. IP, LLC v. Carvana LLC*, 2023 WL 2934920, at *5 (E.D. Tex. Apr. 13, 2023) (disclosure complaint was harmless where expert reviewed, *inter alia*, "publicly available information" and "explain[ed] he did not make notes and essentially all of the information relied upon is publicly available"); *Exeltis USA Inc. v. First Databank, Inc.*, 2020 WL 7025089, at *3 (N.D. Cal. Nov. 30, 2020) (same where expert "Googled on the Internet" and "confirmed that any documents omitted from his report did not help him form his opinions in the first instance").

Respectfully submitted,


BAKER BOTTS L.L.P.

By: */s/    David D. Sterling*
     David D. Sterling
      Attorney-In-Charge
     State Bar No. 19170000
     Federal I.D. No. 07079
     Amy Pharr Hefley
     State Bar No. 24046046
     Anthony J. Lucisano
     State Bar No. 24102118
     Federal I.D. No. 3369146
     C. Frank Mace
     State Bar No. 24110609
     Federal I.D. No. 3385915
     910 Louisiana Street
     Houston, Texas 77002
     (713) 229-1946
     (713) 229-7946 (Fax)
     david.sterling@bakerbotts.com
     amy.hefley@bakerbotts.com
     anthony.lucisano@bakerbotts.com
     frank.mace@bakerbotts.com

ATTORNEYS FOR DEFENDANTS CONCHO RESOURCES INC., CONOCOPHILLIPS, AS SUCCESSOR IN INTEREST TO CONCHO RESOURCES INC., TIMOTHY LEACH, JACK F. HARPER, AND C. WILLIAM GIRAUD,

21

By: */s/    Michael C. Holmes*
    Michael C. Holmes
    Texas Bar No. 24002307
    Southern District Bar No. 23716
    Robert Ritchie
    Texas Bar No. 24079213
    Southern District Bar No. 3089959
    VINSON & ELKINS LLP
    2001 Ross Ave., Suite 3900
    Dallas, TX 75201
    Tel: (214) 220-7700
    Fax: (214) 999-7923
    mholmes@velaw.com
    rritchie@velaw.com

CO-COUNSEL FOR DEFENDANTS TIMOTHY LEACH, AND C. WILLIAM GIRAUD

22

## CERTIFICATE OF SERVICE

I hereby certify that, on September 6, 2024, a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley
