# Case No. 1

2024 WL 2735020

2024 WL 2735020
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Beaumont Division.

Caleb BUTLER and Jeremy Pennington, Plaintiffs,

v.

BNSF RAILWAY COMPANY, Defendant.

CIVIL ACTION NO. 1:22-CV-00367-MJT
|
Signed March 26, 2024

**Attorneys and Law Firms**

Clint Edwin McGuire, McGuire Injury Law PLLC, Houston, TX, Steven Lee Groves, Pro Hac Vice, Groves Powers, LLC, St. Louis, MO, for Plaintiffs.

Susan Jane Travis, Robins Travis PLLC, Southlake, TX, Jim Mitchell Smith, Germer PLLC, Beaumont, TX, for Defendant.

## ORDER ON DEFENDANT BNSF'S RE-URGED MOTION TO STRIKE OR LIMIT PLAINTIFF BUTLER'S EXPERT BRANDON L. OGDEN

Christine L. Stetson, UNITED STATES MAGISTRATE JUDGE

**\*1** Pursuant to 28 U.S.C. § 636 and the Local Rules of Court for the Assignment of Duties to United States Magistrate Judges, the district court referred Defendant's Re-urged Motion to Strike or Limit Brandon L. Ogden (doc. #36) for consideration and disposition. (Doc. #37.) After review, the undersigned grants, in part, and denies, in part, the motion.

### I. Background

This case involves claims under the Federal Employers' Liability Act ("FELA") and the Federal Railroad Safety Act ("FRSA") that arise from Plaintiff's injury while working for Defendant on August 19, 2021, and alleged subsequent retaliation. (Doc. #15.) Plaintiff named Brandon L. Ogden as a liability expert to testify, among other things, as to whether Defendant met industry standards and its own rules and policies leading up to Plaintiff's injury. (Doc. #36 at 24-26.) Defendant originally moved to strike Ogden or limit his testimony on July 27, 2023, (doc. #19), but the undersigned

terminated that motion subject to Defendant's re-urging after it had deposed Ogden. (Doc. #30.) After deposing Ogden on December 5, 2023, Defendant filed its motion on January 2, 2024. (Doc. #36 at 37.) A timely response and reply have been filed. (Docs. #39, #40.) The matter is ripe for review. [1]

[1] The undersigned notes that both parties have incorporated portions of their previous filings in the instant filings. The court may decline to consider incorporated text that exceeds the page limit set forth in the local rules. *See, e.g., Normore v. Dall. Indep. Sch. Dist.*, No. 3:18-CV-02506-E, 2023 WL 3937785 (N.D. Tex. June 9, 2023). Here, the local rules limit non-dispositive motions and responses to fifteen pages. E.D. TEX. LOC. R. CV-7(a)(2). Defendant's motion is within the page limits and appears to verbatim repeat in the instant motion the incorporated language. Accordingly, the undersigned will consider the instant motion in full. Plaintiff's response is ten pages but appears to incorporate the entirety of its prior fifteen-page filing. While the undersigned appreciates Plaintiff's desire to provide the court a succinct filing, she cannot consider incorporated text that would extend the response beyond the page limit. As it is unclear what specific portions Plaintiff intends to incorporate within the fifteen-page limit, the undersigned will consider the instant response on its own. Additionally, the local rules provide that "[o]nly relevant, cited-to excerpts of attached materials should be attached to the motion or the response." Plaintiff has attached the entire two-hundred-and-eleven-page transcript of Ogden's deposition. (Doc. #39-2.) The undersigned will not consider this lengthy exhibit that violates the local rules except pages and lines specifically cited.

### II. Legal Standard

The admissibility of expert evidence is a procedural issue governed by Federal Rule of Evidence 702 and *Daubert. Wells v. SmithKline Beechum Corp.*, No. A-06-CA-126-LY, 2009 WL 564303, at \*7 (W.D. Tex. Feb. 18, 2009), *aff'd*, 601 F.3d 375 (5th Cir. 2010) (citing *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 821 (W.D. Tex. 2005)); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Federal Rule of Evidence 702 sets forth the requirements that must be satisfied to enable a witness designated as an expert to testify to his or her opinions. An expert may testify in the

**Butler v. BNSF Railway Company, Slip Copy (2024)**

2024 WL 2735020

form of an opinion if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. *See* FED. R. EVID. 702.

**\*2**  Courts use Rule 702 to function as gatekeepers when evaluating the admissibility of expert evidence and determining whether expert testimony should be presented to the jury. *Daubert*, 509 U.S. at 591-93; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151-52 (1999) (extending courts' gatekeeping function as to the admissibility of scientific evidence to include the admissibility of all expert testimony). The following requirements must be met to admit expert testimony: (1) the expert is qualified; (2) the evidence is relevant to an issue in the case; and (3) the testimony is reliable. *Kumho Tire*, 526 U.S. at 153-54; *see also Daubert*, 509 U.S. at 589, 590-91 (concluding that to be admissible, expert testimony must be relevant and reliable).

The proponent of the expert testimony must prove that the proffered testimony is reliable by a preponderance of the evidence. *Pittman v. Gen. Nutrition Corp.*, No. CIV.A.H-04-3174, 2007 WL 951638, at \*3 (S.D. Tex. Mar. 28, 2007) (citing *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001)). The reliability determination itself, as well as the factors considered in that determination, are in the discretion of the court consistent with its gatekeeping function under Rule 702. *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000), *cert. denied*, 531 U.S. 812 (2000) (citing *Kumho Tire*, 526 U.S. at 151-52 (1999)).

In deciding whether to admit or exclude expert testimony, the Supreme Court has offered a non-exclusive list of factors for courts to use in evaluating the validity or reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). These factors are not necessarily limited to scientific evidence and may be applicable to testimony offered by non-scientific experts, depending on the circumstances of the case. *Kumho Tire*, 526 U.S. at 150.

When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Metzler v. XPO Logistics, Inc.*, No. 4:13-CV-278, 2014 WL 7146108, at \*1-2 (E.D. Tex. Dec. 15, 2014) (quoting *Daubert*, 509 U.S. at 594); *see also Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997) (*Daubert* analysis for both scientific and nonscientific experts focuses on the reasoning or methodology, not the ultimate conclusion). The *Daubert* factors are not "a definitive checklist or test," and the *Daubert* framework is a "flexible one." *Dearmond v. Wal-Mart La. LLC*, 335 F. App'x 442, 445 (5th Cir. 2009) (per curiam). A trial court, therefore, has wide latitude in deciding whether to exclude an expert's testimony. *See Kumho Tire*, 526 U.S. at 152. However, the rejection of expert testimony is the exception rather than the rule, as the court's gatekeeper role is not intended to serve as a replacement for the adversary system. *Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am.*, No. 7:12-CV-00133-O, 2014 WL 3744976, at \*3 (N.D. Tex. July 30, 2014) (quoting FED. R. EVID. 702, Advisory Committee's Notes (2000)).

### III. Discussion

There is no dispute that Mr. Ogden is qualified to testify about train operations and inspections generally. (Doc. #40 at 1.) Rather, Defendant argues (1) Mr. Ogden is not qualified to testify as a mechanic and, therefore, cannot testify as to whether train components were defective, (2) his testimony on locomotive inspections, such as Defendant's alleged failure to detect a broken seat, is conclusory and unreliable, (3) his testimony about the door handle will not help the trier of fact, and (4) Mr. Ogden offers impermissible legal conclusions. The undersigned will address each argument in turn.

A. Mr. Ogden May Testify About "Defective" or "Inefficient" Locomotive Components

**\*3**  Defendant first asks the court to strike Mr. Ogden's proposed testimony about defective locomotive components, as Mr. Ogden is not a mechanic. (Doc. #36 at 3-4.) Defendant takes specific issue with Mr. Ogden's proposed testimony that "BNSF did not properly inspect or replace the locomotive brakes and seat component," as it argues mechanical expertise is required to determine if a locomotive component was defective. (*Id.* at 4.)

After review, the undersigned finds that Mr. Ogden is not proffering testimony on mechanical opinions, but rather incorporating facts that one would reasonably rely

on while managing inspections for BNSF. For example, in his expert report, Ogden notes that the "train crew (Butler, Pennington, and Cardoza) were unaware that another train crew had reported the brakes were defective six days beforehand." (Doc. #36 at 18.) He then states that "[d]effective brakes *were reported* on the locomotive consist to BNSF on August 12, 2021, August 18, 2021, and again on the morning of August 19, 2021, all prior to the incident." (*Id.* at 24) (emphasis added). As an expert in locomotive inspections and management, it is reasonable that Mr. Ogden relies on records and reports, as opposed to a first-hand inspection, to determine whether a locomotive component is defective or inefficient. (*Id.* at 16.) He does not have to be a mechanic to rely on reports alleging components were defective. This is a proper basis for expert testimony. *See Widespread Elec. Sales LLC v. Upstate Breaker Wholesale Supply Inc.*, No. 3:20-CV-2541-K, 2022 WL 18028285, at *12 (N.D. Tex. Dec. 29, 2022)* (noting an expert may base his opinions on facts and data if an expert "in th[at] particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject").

B. Mr. Ogden May Not Testify About BNSF's Alleged Failure to Inspect the Seat

Next, Defendant asks the court to strike Mr. Ogden's testimony that BNSF failed to properly inspect the seat, arguing such testimony is conclusory, subjective, and unreliable. (Doc. #36 at 4-5.) There is no dispute that the seat on the locomotive failed. However, Mr. Ogden was unable to articulate when and how often locomotive seats are normally inspected. (*Id.* at 53-54.) During his deposition, Mr. Ogden argued that the seat "should be inspected routinely, at least often enough to determine that the seat's in proper condition. You know, if you let the – if you let the – the injury happen and then you – you go fix it, that's too late." (*Id.*) To pinpoint an actual violation of industry standards, Mr. Ogden states he "would have to look through their periodic inspection records or requirements to see it [the seat is] actually listed out as a part or not." (*Id.*) That type of analysis of relevant records should have been provided with the expert report to put Defendant on notice of the testimony.

The undersigned finds that Mr. Ogden's proposed testimony on BNSF's failure to inspect the seat is not based in any data or facts, other than the observation that "something went wrong with the seat, meaning any inspection had to be improper." While that may well be a logical conclusion, it is one based on a common sense interpretation of the facts at issue here and not expertise in locomotive inspection. It is, therefore,

improper for Mr. Ogden to testify that BNSF did not properly inspect the seat. *See Henderson v. Atmos Energy*, 496 F. Supp. 3d 1011, 1017 (E.D. La. 2020)* (finding an expert's otherwise sound opinion "that the defendant's clean-up efforts were inadequate to keep the site safe based on the fact that the site was unsafe" was improper expert testimony as it was an opinion solely "based in common sense").

C. Mr. Ogden May Not Testify About BNSF's Failure to Inspect and Repair the Allegedly Broken Door

**\*4** Defendant then asks the court to strike Mr. Ogden's proposed testimony regarding the locomotive door as irrelevant, or by finding that any probative value of such testimony is outweighed by unfair prejudice. [2] (Doc. #36 at 6.) Plaintiff argues that the broken door handle is relevant to his FRSA and FELA claims, as he reported the broken door before the alleged retaliation, and that "Ogden fairly opines that such evidence is relevant and confirms BNSF's lack of attention to crew safety and its liability therefore." (Doc. #39 at 7-8.) As a threshold matter, the undersigned finds that the allegedly broken door handle is relevant to Plaintiff's retaliation claims. The question here, however, is whether Mr. Ogden's testimony on the door handle is proper expert testimony.

[2]     The proper standard under Federal Rule of Evidence is that the court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. E. 403.

Mr. Ogden references the broken door handle in passing in the "description" section of his expert report, noting prior reports of the door handle being broken and that BNSF had not fixed the door handle. (Doc. #36 at 11-12.) In his "summary of opinions" section of the report, he briefly argues that Defendant failed to "comply with the standards of care that are the custom and practice of the industry," in part, because it allowed the train crew to use a locomotive with a broken door handle." (*Id.* at 24.) He goes on to note that "instead of fixing the door handle, BNSF managers instructed Mr. Butler to continue using the locomotive in the defective condition on August 19, 2021." (*Id.* at 25.) During his deposition, Mr. Ogden concedes that the allegedly broken door had no role in the hard couple incident on August 19, 2021, and the injury sustained by Plaintiff. (*Id.* at 44.)

The undersigned finds this testimony falls outside the scope of expert testimony and does not help the trier of facts. Mr. Ogden does not connect his expertise to this opinion, but rather makes a common sense assertion that the failure to address a reported issue is evidence that Defendant had a "lack of attention to crew safety." As explained above, a common sense observation falls outside of the scope of expert testimony. *See supra* Section III.B; *see also Oatis v. Diamond Offshore Mgmt. Co.*, No. 09-3267, 2010 WL 936449, at *2 (E.D. La. Mar. 12, 2010) (excluding expert testimony regarding whether violation of work safety guidelines contributed to plaintiff's injuries); *Thomas v. Glob. Exp., LLC*, No. 02-1060, 2003 WL 943645, at *2 (E.D. La. March 3, 2003) (excluding expert testimony on whether installing a rope near a ladder on a vessel was a safety hazard). While the allegedly broken door is relevant, Mr. Ogden's proposed testimony about the door is not proper expert testimony and is, hereby, struck. As the broken door is relevant, the jury is free to make common sense conclusions about Defendant's alleged failure to address the broken door.

### D. Mr. Ogden May Not Testify As To Legal Conclusions

Finally, Defendant objects to Mr. Ogden's opinions No. 1 and No. 2, arguing they are impermissible legal conclusions. (Doc. #36 at 6-7.) In those opinions, Mr. Ogden proposes to testify, among other things, that Defendant (1) violated federal law, (2) violated standards of care that are custom and practice of the industry, (3) did not exercise ordinary and reasonable care, (4) did not comply with its own rules, policies, and statement of safety, (5) did not provide Plaintiff with a reasonably safe workplace, (6) caused a risk of injury to Mr. Butler, and (7) failed to take reasonable and ordinary precautions to avoid this incident. (Doc. #36 at 25-26.)

 **\*5** Generally, "[a]n opinion is not objectionable just because it embraces an ultimate issue" in a case. FED. R. EVID. 704(a). But expert witnesses are not allowed to "tell the jury what result to reach." *Matthews v. Ashland Chem., Inc.*, 770 F.2d 1303, 1311 (5th Cir. 1985). Moreover, "an expert may never render conclusions of law," *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009), or opinions on legal issues. *Est. of Sowell v. United States*, 198 F.3d 169, 171-72 (5th Cir. 1999). While it can be a fine line to walk, "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Olivier v. Exxon Mobil Corp.*, 596 F. Supp. 3d 606,

611 (M.D. La. 2022) (citing *Woodard v. Andrus*, Civ. No. 03-2095, 2009 WL 140527, at *2 (W.D. La. Jan. 20, 2009)).

Accordingly, Mr. Ogden may not directly testify that Defendant did or did not violate federal law, violate standards of care, exercise ordinary and reasonable care, provide Plaintiff with a reasonably safe workplace, caused Plaintiff's injuries, took reasonable and ordinary precautions to avoid this incident, or any other legal conclusion. *See, e.g., Bailey v. Stanley Access Techs., Inc.*, No. 3:14-CV-72-SA-JMV, 2015 WL 6828921, at *9 (N.D. Miss. Nov. 6, 2015) (excluding an expert's testimony "to the extent it provides a conclusion to the jury about causation and the definitive causal link between [Defendant's] alleged failure to perform daily inspection and the Plaintiff's injuries"). He may, however, provide opinions that support or inform one of these legal conclusions. *Est. of Sowell*, 198 F.3d at 171 (holding an expert could not testify whether a given action by a financial fiduciary was "reasonable," but could testify as to "the definition and general standards of conduct of a fiduciary"). Expert testimony is often required to establish an industry's standard of care. *See Jones for & on Behalf of Est. of Butler v. Mobile Medic Ambulance Serv., Inc.*, No. 3:20-CV-383-KHJ-LGI, 2021 WL 6144789, at *3 (S.D. Miss. Nov. 4, 2021) (noting that a "standard of care must be supported by expert testimony"). Accordingly, Mr. Ogden could testify, for example, by explaining to the jury what industry standards are and how, in his opinion, Defendant's actions failed to meet those standards.

### IV. Conclusion

The undersigned finds, by a preponderance of the evidence, that Mr. Ogden is a qualified expert who can reliably testify as to locomotive inspections and management. He may testify about "defective" or "inefficient" locomotive components, so long as his opinions are formed by facts and data on which an expert in his position normally relies. However, he may not offer expert opinions on BNSF's failure to inspect and repair the allegedly broken door, or its failure to inspect the allegedly defective seat, as both topics, as articulated in the expert report and Mr. Ogden's deposition, fall outside the scope of expert testimony. Finally, Mr. Ogden may not testify as to legal conclusions, though he can provide opinions that inform the trier of facts' ultimate findings.

### V. Order

For the foregoing reasons, it is **ORDERED** that Defendant's Re-urged Motion to Strike or Limit Brandon L. Ogden (doc.

2024 WL 2735020

#36) is **GRANTED**, in part, and **DENIED**, in part, as is consistent with this order.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 2735020

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

# Case No. 2

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 8 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)
2022 WL 814074

🚩 KeyCite Yellow Flag - Negative Treatment

On Reconsideration in Part    Chen-Oster v. Goldman, Sachs & Co., S.D.N.Y.,    August 22, 2022

2022 WL 814074
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

H. Cristina CHEN-OSTER, Lisa Parisi, Shanna Orlich, Allison Gamba, and Mary De Luis, Plaintiffs,
v.
GOLDMAN, SACHS & CO. and The Goldman Sachs Group, Inc., Defendants.

10 Civ. 6950 (AT) (RWL)
|
Signed March 17, 2022

**Attorneys and Law Firms**

Adam T. Klein, Christopher McNerney, Cara Elizabeth Greene, Carmelyn Pingol Malalis, Daniel S. Stromberg, Pro Hac Vice, Justin Mitchell Swartz, Michael Christopher Danna, Ossai Miazad, Sabine Jean, Melissa Lardo Stewart, Outten & Golden, LLP, New York, NY, Jessica A. Moldovan, Rachel Geman, Lieff Cabraser Heimann & Bernstein, LLP, New York, NY, Maya Jumper, Roche Freedman LLP, New York, NY, Alison M. Stocking, Anne B. Shaver, Pro Hac Vice, Heather H. Wong, Pro Hac Vice, Kelly Dermody, Michael Ian Levin-Gesundheit, Michelle Lamy, Tiseme Gabriella Zegeye, Valerie D. Comenencia Ortiz, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA, Brendan Patrick Glackin, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, NY, Dana Gale Sussman, Safe Horizon Anti-Trafficking Program, Brooklyn, NY, for Plaintiffs H. Christina Chen-Oster, Shanna Orlich.

Adam T. Klein, Cara Elizabeth Greene, Carmelyn Pingol Malalis, Justin Mitchell Swartz, Melissa Lardo Stewart, Outten & Golden, LLP, New York, NY, Jessica A. Moldovan, Rachel Geman, Lieff Cabraser Heimann & Bernstein, LLP, New York, NY, Alison M. Stocking, Anne B. Shaver, Pro Hac Vice, Heather H. Wong, Pro Hac Vice, Kelly Dermody, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA, Dana Gale Sussman, Safe Horizon Anti-Trafficking Program, Brooklyn, NY, for Plaintiff Lisa Parisi.

Christopher McNerney, Adam T. Klein, Daniel S. Stromberg, Pro Hac Vice, Michael Christopher Danna, Ossai Miazad,

Sabine Jean, Outten & Golden, LLP, New York, NY, Jessica A. Moldovan, Lieff Cabraser Heimann & Bernstein, LLP, New York, NY, Maya Jumper, Roche Freedman LLP, New York, NY, Kelly Dermody, Michael Ian Levin-Gesundheit, Michelle Lamy, Tiseme Gabriella Zegeye, Anne B. Shaver, Valerie D. Comenencia Ortiz, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA, Brendan Patrick Glackin, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, NY, for Plaintiffs Allison Gamba, Mary De Luis.

Neal D. Mollen, Paul Hastings LLP, Washingon, DC, Andrew J. Peck, DLA Piper US LLP, New York, NY, Beth Deborah Newton, Margaret Elizabeth Bartlett, Robin D. Fessel, Suhana S. Han, Theodore Otto Rogers, Jr., Ann-Elizabeth Ostrager, Michael Peter Reis, Hannah Michelle Lonky, Hilary M. Williams, Robert Joseph Giuffra, Jr., Sharon L. Nelles, Sullivan & Cromwell LLP, New York, NY, Joanna Ka Wai Chan, Mark Stewart Cohen, Nathaniel P. T. Read, Cohen & Gresser, LLP, New York, NY, Marc Shapiro, Orrick, Herrington, & Sutcliffe LLP, New York, NY, Patrick William Shea, Paul Hastings LLP, New York, NY, Amanda Flug Davidoff, Jeffrey B. Wall, Sullivan & Cromwell LLP, Washington, DC, Barbara B. Brown, Pro Hac Vice, Carson Hobbs Sullivan, Pro Hac Vice, Paul Hastings LLP, Washington, DC, Jillian V. Kaltner, San Francisco, CA, Kathryn Mantoan, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, Lynne Hermle, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA, for Defendants.

Russell Lasser Kornblith, Sanford Heisler Sharp, LLP, New York, NY, for Amicus National Employment Lawyers Association/New York.

**ORDER**

ANALISA TORRES, District Judge:

**\*1** Plaintiffs H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, and Mary De Luis,[1] representing a class of female employees of Goldman, Sachs & Co. and The Goldman Sachs Group, Inc. (collectively, "Goldman Sachs" or "Defendants"), filed this class action alleging gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq.

[1]    Originally, Lisa Parisi was also a named plaintiff. Compl. ¶¶ 15–16, ECF No. 5. Because Parisi's claims are subject to a binding arbitration

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 9 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

agreement, *see* ECF No. 171; *Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483 (2d Cir. 2013), she is no longer a plaintiff, *see generally* Second Am. Compl., ECF No. 411.

Before the Court are the parties' motions to exclude expert testimony, ECF Nos. 1184, 1187, Defendants' motion for decertification of the class, ECF No. 1194, Defendants' motion for summary judgment, ECF No. 1239, and Plaintiffs' motion for partial summary judgment, ECF No. 1247. For the reasons stated below, the parties' motions to exclude expert testimony are GRANTED in part, and DENIED in part; Defendants' motion to decertify the class is DENIED; Plaintiffs' motion for summary judgment is DENIED; and Defendants' motion for summary judgment is GRANTED in part, and DENIED in part.

## BACKGROUND [2]

[2]    The following facts are drawn from the parties' Rule 56.1 statements of undisputed facts, and the opposing party's response. Disputed facts are so noted. Citations to a paragraph in the Rule 56.1 statement also include the opposing party's response.

### I. Goldman Sachs

Goldman Sachs is a leading financial services company that has four revenue-generating divisions—Investment Banking, Investment Management, Securities, and Merchant Banking. Defs. 56.1 ¶¶ 1–6, ECF No. 1241. These divisions are split into numerous specialized business units. *See, e.g.*, ECF No. 265-1. Plaintiffs worked in three of the revenue generating divisions. *See* Class Cert. Order at 2–4, ECF No. 578. In these three divisions, Goldman Sachs employed two systems for evaluating employees, known as "360 review" and "quartiling." Pls. 56.1 ¶ 1, ECF No. 1257. For promotions from Vice President to Managing Director, Goldman Sachs used a process called "cross-ruffing." Class Cert. Order at 8–10.

### A. Performance Evaluation

#### 1. 360 Review

Goldman Sachs employees in the Investment Banking, Investment Management, and Securities Divisions underwent the 360 review process. Pls. 56.1 ¶ 1. First, each employee performed a self-evaluation and named 8 to 12 evaluators—subordinates, bosses, peers, and internal clients—with whom he or she had recently worked to provide reviews of his or her performance. *Id.* ¶ 2; Defs. 56.1 ¶ 13. Evaluators assessed employees on criteria that were the same across the three divisions in any given year. Pls. 56.1 ¶ 3. Finally, the employee's manager received the reviews, added their own evaluations, created a narrative summary of all of the reviews, and discussed the overall review with the employee. Defs. 56.1 ¶¶ 18–19. In 2016, the 360 review process shifted to being primarily used as a development tool rather than a compensation determination tool. Landman Decl. ¶¶ 6, 20, ECF No. 1250-5; Landman Dep. at 82, 88, ECF No. 1289-8.

#### 2. Quartiling

**\*2**    Goldman Sachs also utilized "quartiling," in which managers assigned each employee to one of five "quartiles" until 2016 and to one of four "quartiles" from 2016 to 2018. Landman Decl. ¶ 26; Farber Report ¶ 35, ECF No. 1188-3. Managers took into account a number of criteria, including the 360 reviews and quality of performance. ECF Nos. 1258-18 at 1, 1258-19 at 3. The purpose of quartiling was to identify the top, middle, and bottom performers relative to their peers. Defs. 56.1 ¶ 22. These quartiles, along with other data points, were used to determine compensation. Pls. 56.1 ¶ 12; ECF No. 1258-18 at 1.

### B. Promotion

At Goldman Sachs, promotion from Vice President to Managing Director did not involve an application process. Rather, throughout the class period, business unit heads and other managers develop lists of candidates for promotion in each of the relevant divisions. Defs. 56.1 ¶¶ 24–25, 31; Pls. 56.1 ¶ 14. Cross-ruffers, the name given to the evaluators, interview roughly a dozen people familiar with the candidates' work, including managers, peers, and internal clients, then develop a ranked list of candidates based on the interviews. *Id.* ¶¶ 28–30. The cross-ruffers then submit this list to division heads and Goldman Sachs' management committee. Pls. 56.1 ¶¶ 21–22.

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 10 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)
2022 WL 814074

The parties contest whether the "cross-ruffing" refers to the entire promotion process or only the second step in the process. *Compare* Pls. Summ. J. Opp'n at 26–28, ECF No. 1310, *with* Defs. Summ. J. Mem. at 12, 22, ECF No. 1240. In certifying the class, the Court considered the term "cross-ruffing" to include the full promotion process—both selecting the candidates and vetting them. *See* Class Cert. Order at 8–10, 27, 30–31.

II. Procedural History

On September 16, 2010, Plaintiffs Chen-Oster, Parisi, and Orlich filed a class action alleging intentional discrimination, disparate impact discrimination, retaliation, and pregnancy discrimination claims under Title VII and the NYCHRL.[3] *See* Compl. The Honorable Leonard B. Sand originally presided over this case before it was reassigned to the undersigned on May 24, 2013. ECF No. 181.

[3]    Plaintiffs Gamba and De Luis were added in the second amended complaint and Plaintiff Parisi was removed. *See* Second Am. Compl.

On March 30, 2018, the Court certified a class consisting of female Associates and Vice Presidents employed in the United States by Goldman Sachs and its predecessors in three of the revenue-generating divisions—Investment Banking, Investment Management, and Securities—who were subject to 360 review, quartiling, or cross-ruffing, pursuant to Federal Rule of Civil Procedure 23(b)(3) (the "Class Certification Order"). *See* Class Cert. Order at 22–49. The class includes (1) female Associates and Vice Presidents in the three divisions who were subject to either 360 review, quartiling, or both 360 review and quartiling from July 7, 2002 for those based in New York City and from September 10, 2004 for all other U.S.-based individuals through the resolution of this action, and (2) female Vice Presidents from the three divisions who were subject to the cross-ruffing process during the same time periods. *See id.* The Court concluded that certification was warranted because Plaintiffs had demonstrated that Defendants had employed a "common mode of exercising discretion," through the three processes, to support a disparate impact class. Class Cert. Order at 24–28, 41 (citation omitted). The Court found that class resolution was also appropriate for Plaintiffs' disparate treatment claim, which relied on the same statistical evidence.[4] *Id.* at 41, 45–47. On July 12, 2021, the parties' filed motions to exclude expert testimony. ECF Nos. 1184, 1187. On July 22, 2021, Defendants filed their motion for decertification of the class.

ECF No. 1194. Finally, on August 9, 2021, the parties filed cross-motions for summary judgment. ECF Nos. 1239, 1247. The Court addresses each in turn.

[4]    The Court did not certify the disparate treatment "boy's club" claim, which would have used anecdotal evidence of a "boy's club" culture to demonstrate disparate treatment. Class Cert. Order at 47–49.

## DISCUSSION[5]

[5]    Portions of the briefs, expert reports, and other documents discussed in this order were filed under seal or redacted. These materials are "judicial documents," as they are "relevant to the performance of the judicial function and useful in the judicial process." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006); *see also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016). To the extent that information in those documents is disclosed in this order, the privacy and business interests that justified their sealing or redaction are outweighed by "the public's right of access to [information] necessary to understand the basis for court rulings." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 193 n.2 (2d Cir. 2018); *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 119 F. Supp. 3d 152, 155 (S.D.N.Y. 2015).

I. Expert Testimony

**\*3** The parties cross-move to exclude the opinions, reports, and testimony of certain experts under Federal Rule of Evidence 702. ECF Nos. 1184, 1187.

### A. Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. The rule provides, in relevant part, that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 11 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District courts are the gatekeepers of expert testimony, responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

Courts first address "the threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting Fed. R. Evid. 702). After considering the expert's qualifications, courts determine whether the expert testimony is reliable. In determining reliability, the court considers "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.' " *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (quoting *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Rather, "[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* (quotation marks and citation omitted). "The mere fact that an expert's testimony conflicts with the testimony of another expert or scientific study does not control admissibility." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007).

Even after qualifying a witness as an expert, and determining that the opinion is reliable, courts ask "whether the expert's testimony (as to a particular matter) will assist the trier of fact." *Nimely*, 414 F.3d at 397 (internal quotation marks and citations omitted). The testimony must be relevant, and it should not be "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *Arista Records LLC v. Lime Grp. LLC*, No. 06 Civ. 5936, 2011 WL 1674796, at *4 (S.D.N.Y. May 2, 2011) (quoting *United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001)).

**\*4** Although the proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are met, *Williams*, 506 F.3d at 160, the district court is the ultimate gatekeeper, *see* Fed. R. Evid. 104(a). Exclusion of expert testimony is "the exception rather than the rule." *Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*, No. 16 Civ. 7907, 2019 WL 1055527, at *1 (S.D.N.Y. Mar. 6, 2019) (quoting Advisory Committee Notes to the 2000 Amendments to Fed. R. Evid. 702).

## B. Plaintiffs' Experts

Defendants move to exclude the testimony, in part or in whole, of four experts proffered by Plaintiffs. Defs. Daubert Mot., ECF No. 1187. The Court shall address each expert in turn. [6]

[6]  Plaintiffs have represented that the opinion of David Yermack, Ph.D., need not be addressed if the opinion of Brian Dunn is excluded. *See* Pls. Daubert Opp'n at 1, ECF No. 1262. Because the Court excludes Dunn's opinion, *see infra* Part I.C.4, the Court DENIES as moot Defendants' motion to exclude Yermack's opinion.

### 1. Caren Goldberg, Ph.D.

Plaintiffs offer the testimony of Caren Goldberg, Ph.D., on "Defendant Goldman Sachs' policies, practices, and procedures with respect to diversity and inclusion and on whether its climate is tolerant of gender bias and harassment." Goldberg Report ¶ 1, ECF No. 1188-4. Her report concludes that Goldman Sachs "maintained a climate tolerant of bias and harassment" and failed to meaningfully address diversity at the firm. *Id.* ¶ 13. Defendants do not contest Goldberg's qualifications; rather, they seek to exclude her testimony on the grounds that her opinion is irrelevant to the certified claims, is methodologically flawed, and is not within the

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

ambit of an expert opinion because it functions as a legal brief and opines on matters a jury is capable of understanding without the aid of an expert. Defs. Daubert Mem. at 10, ECF No. 1188.

For an opinion to be admissible, it must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *E.E.O.C. v. Bloomberg*, No. 07 Civ. 8383, 2010 WL 3466370, at *6 (S.D.N.Y. Aug. 31, 2010) (quoting *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786). Expert evidence is not immune from the relevance requirement of Federal Rule of Evidence 401. *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986). Defendants first seek to exclude Goldberg's testimony because it references Goldman Sachs' policies that Defendants contend are relevant only to the uncertified "boy's club" theory of disparate treatment. Defendants argue, therefore, that Goldberg's opinion is irrelevant to the certified liability claims. Defs. Daubert Mem. at 11–13; Class Cert. Order at 45–47. Although the Court did not certify claims based on anecdotal evidence, the Court recognizes that at trial Defendants may seek to present evidence related to their policies, practices, and procedures with respect to diversity and inclusion to rebut Plaintiffs' disparate treatment claims. *See United States v. City of New York* (*City of New York III*), 717 F.3d 72, 84–86 (2d Cir. 2013). If Defendants present this evidence, they will put these, and other related policies, at issue. *Id.* In this scenario, Goldberg's opinion will likely be relevant because it would contradict the evidence adduced by Defendants. *See* June 25, 2019 Order at 1–2, ECF No. 767; Oct. 7, 2019 Order at 7–8, ECF No. 873. Therefore, if Defendants put their policies at issue at trial, Goldberg's opinion shall be admissible to the extent it is relevant to respond to that evidence.

**\*5** Defendants also argue that Goldberg's opinion should be excluded because it will not aid the jury's understanding of the facts. Defs. Daubert Mem. at 13–14, 18–19. The Court disagrees. Although experts may not reach the ultimate issue or "function[ ] as little more than a legal brief that parrots [the] plaintiffs' arguments," *Choi v. Tower Research Cap. LLC*, 2 F.4th 10, 20 (2d Cir. 2021), they may provide context to the jury to aid its understanding of the facts, *United States v. Brown*, 776 F.2d 397, 400–01 (2d Cir. 1985). In her report, Goldberg provides frameworks to aid the jury in "understand[ing] the evidence better and provid[es] [it] with the necessary tool[s] to make [the] ultimate determination." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, No. 12 Civ. 7372, 2020 WL 4251229, at *4 (S.D.N.Y. Feb. 19, 2020) (citation omitted). The average juror may know about diversity and inclusion policies; however, they likely lack a framework to analyze employment policies and their implementation, and to determine if the policies are effective in improving diversity and inclusion. Goldberg will assist the jury in evaluating Defendants' institutional culture and climate, which may be relevant to the disparate treatment claims. *See City of New York III*, 717 F.3d at 83–85.

Defendants also seek to exclude Goldberg's testimony because she relies on materials provided by Plaintiffs' counsel at Goldberg's request. *See* Defs. Daubert Mem. at 14–15; Goldberg Dep. at 142–150, ECF No. 1263-5. It is logical that experts would receive materials from counsel as they would have no other way to access non-public documents produced in discovery. Indeed, Defendants similarly provided their experts with requested materials. *See, e.g.*, Dunn Dep. at 121, ECF No. 1263-12. Defendants present no evidence that Plaintiffs' attorneys cherry-picked the information given to Goldberg or did not give her all the information she requested. Defs. Daubert Mem. at 15. And, to the extent Defendants fault Goldberg for not crediting certain documents that may contradict her opinions, *id.* at 16–17, those critiques go to the weight of the opinion, not its admissibility, *Daniels v. City of New York*, No. 16 Civ. 9080, 2018 WL 5919307, at *5 (S.D.N.Y. Nov. 13, 2018).

Finally, Defendants contend that Goldberg's methodology does not comport with best practices because she did not retain notes about how she selected information for inclusion in her report. Defs. Daubert Mem. at 17–18. Contrary to Defendants' assertion, Goldberg kept a record of all of the materials she reviewed. Goldberg Report at Apps. 2– 4; Goldberg Rebuttal at App. A, ECF No. 1188-13. She did not, however, retain the excerpts of the materials that she pulled to potentially include in her report, which the parties refer to as the "second order codes." Goldberg Dep. at 174–75. Although she did not retain the second order codes, Goldberg's case study conforms to the acceptable norms of her scientific community, which has not focused on the replicability of research. *See* Herman Aguinis & Angelo M. Solarino, *Transparency & Replicability in Qualitative Research*, 40 Strategic Mgmt. J. 1291, 1292 (2019), ECF No. 1263-15. Finally, by maintaining records of all the materials she reviewed, Goldberg adhered to the expectations of experts in this district. *Cf. LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 644–45 (S.D.N.Y. 2016) (excluding expert for not maintaining a record of materials reviewed).

2022 WL 814074

Accordingly, Defendants' motion to preclude Goldberg from testifying is DENIED.

### 2. Sarah Butler

Plaintiffs offer the testimony of Sarah Butler, a Managing Director at NERA Economic Consulting, to rebut the testimony of Margaret Stockdale, Ph.D., an expert for Defendants who analyzed Goldman Sachs' People Survey (the "People Survey"), a biannual employee experience survey. Butler Report ¶¶ 1, 8–9, 19, ECF No. 1188-11. Specifically, Butler was asked to review Stockdale's conclusion that the People Survey "shows that women believed Goldman Sachs has an inclusive and collaborative culture, often have similar perceptions as men, and do not perceive Goldman Sachs to have a hostile or biased climate." *Id.* ¶ 8. Butler opines that Stockdale's "conclusions are unreliable, not supported by the data, and rely on survey instruments that are biased and not fit for purpose." *Id.* ¶ 10. Defendants move to exclude portions of Butler's expert testimony on the ground that she is not qualified to opine on the culture of Goldman Sachs because she is an expert on survey design and sampling processes, and not an expert on assessing workplace culture or gender discrimination. Defs. Daubert Mem. at 20–22. They further allege that her methodology is unreliable and not replicable. *Id.* at 22–28.

**\*6** The Court rejects Defendants' argument that Butler's conclusions are separate opinions on the culture of Goldman Sachs that are detached from her analysis of the surveys, *see id.* at 21. Clearly, Butler's conclusions flow from her analysis of the surveys, *see In re Rezulin Prod. Liab. Litig.,* 369 F. Supp. 2d 398, 426 (S.D.N.Y. 2005), and are within her expertise of survey design and sampling processes, Butler Report ¶¶ 1–4. For example, Defendants take issue with Butler's statement: "These data suggest that over time and across questions[,] there are patterns indicating women are less likely to believe they have been fairly treated with respect to compensation." Defs. Daubert Mem. at 21 (quoting Butler Report ¶ 44) (emphasis omitted). This phrasing is a common way to report statistical findings [7]; it does not represent an opinion beyond Butler's expertise. Defendants also take issue with Butler's statement that the data in Goldman Sachs' Exit Survey (the "Exit Survey"), a survey given to departing employees, may be biased because individuals may fear repercussions from airing grievances. *See id.* (quoting Butler Report ¶ 59). Again, this opinion is within Butler's expertise regarding survey design because it goes to possible bias

created by the design of the Exit Survey. *See* Butler Report ¶ 59. As Defendants concede that Butler is qualified on the issues of survey design and statistical analysis, and her experience in this area confirms her qualifications, her statements regarding her analysis and opinions on the design and findings of the People Survey and the Exit Survey are within her area of expertise, and the Court shall not exclude them.

[7]  *See, e.g.,* University of Washington Psychology Writing Center, *Reporting Results of Common Statistical Tests in APA Format,* https://psych.uw.edu/storage/writing_center/stats.pdf (last visited Mar. 17, 2022).

Defendants argue that Butler's content analysis,[8] which looks at the frequency at which certain terms are mentioned by female employees and seeks to show that "some male employees may have been adverse to diversity efforts," Butler Report ¶¶ 62–67, should be excluded on the ground that her methodology is flawed, Defs. Daubert Mem. at 22–28. The Court agrees. Butler does not provide a sufficient explanation as to how she decided on the terms used in the content search, and, more importantly, why she classified the terms into the different categories. For example, she does not explain why "responsibility" is in the compensation category rather than under promotions, experience, or performance. *See* Butler Report, Ex. C. Butler's failure to offer an explanation is exacerbated by the lack of a verification mechanism to ensure that the terms were properly categorized. *See* Butler Dep. at 226–28, ECF No. 1188-22. Absent such verification, the Court cannot conclude that her methodology is reliable because it is not clear whether the terms are related to the categories into which she placed them and, therefore, it is not clear if the data supports her conclusions. *See Riegel v. Medtronic, Inc.,* 451 F.3d 104, 127 (2d Cir. 2006).

[8]  "Content analysis is a research method that uses a set of procedures to make valid inferences from text." Robert P. Weber, *Basic Content Analysis* 9 (2d ed., 1990). The analysis involves categorizing words. *Id.* at 12. For the inference to be valid, the "classification procedure [must] be reliable in the sense of being consistent" and must "measure or represent what the investigator intends it to measure." *Id.*

Accordingly, Defendants' motion to preclude Butler from testifying as to paragraphs 62 through 67 of her report is

2022 WL 814074

GRANTED, and Defendants' motion to preclude Butler from testifying as to the remainder of her report is DENIED.

### 3. Henry Farber, Ph.D.

Plaintiffs offer the opinion of Henry Farber, Ph.D., an economics professor at Princeton University, to analyze whether the 360 review, quartiling, and cross-ruffing processes impacted women differently from their male counterparts and to explain if this impact accounts for compensation and promotion differences between men and women. Farber Report ¶¶ 1, 6. Farber examines this question by running multiple regression analyses that looked at the way these policies affected compensation by gender. *See id.* ¶¶ 53–57, 60. Defendants move to exclude all of Farber's expert testimony. Defs. Daubert Mot. They do not question his qualifications, but challenge his methodological decisions and the relevance of his opinions for Phase I of this case.[9] Defs. Daubert Mem. at 36–37. The Court shall address each of Defendants' arguments in turn.[10]

[9] As the Court has explained, this case shall proceed in two phases. "Phase I [shall] be devoted to generalizable proof of the alleged discriminatory impact and treatment of women through [the] three practices." June 25, 2019 Order at 1–2; Oct. 7, 2019 Order at 2. Phase II shall address issues affecting individual class members. June 25, 2019 Order at 2. This type of bifurcation between liability and remedial phases is commonly used in class actions alleging discrimination. *See Reynolds v. Barrett,* 685 F.3d 193, 203 (2d Cir. 2012).

[10] Defendants, discussing a different expert, mention in a footnote that Farber's analysis of internal transfers is unreliable. Defs. Daubert Mem. at 32 n.21. They do not make any argument regarding internal transfers in relation to Farber beyond this lone footnote. The Court shall not address this argument, which was not properly presented to the Court. *See Phoenix Light ST Limited v. Bank of New York Mellon,* No. 14 Civ. 10104, 2017 WL 3973951, at *22 n.41 (S.D.N.Y. Sept. 7, 2017) ("An argument mentioned only in a footnote is not adequately raised" (quoting *Shah v. Wilco Sys., Inc.,* 76 Fed. Appx. 383, 384 (2d Cir. 2003))).

#### a. Aggregation Across Divisions

**\*7** Defendants first argue that Farber's analyses are fatally flawed because he does not disaggregate the data used in his regression analysis by division and run separate models for each division. *Id.* at 38–44. They contend that because the divisions interpret and implement aspects of the compensation and promotion processes differently, aggregation is improper. *Id.* at 39–41. They further argue that Farber should have tested his decision not to disaggregate, and absent such testing, Farber's opinion is "insufficiently 'scientific' to be admissible under Rule 702." *Id.* at 42 (citation omitted).

Farber admits that there is sufficient data to run the models disaggregated by division for the 360 review and quartiling processes. Farber Dep. at 178–180, ECF No. 1225-59. Because there is no solid statistical reason for the decision to pool or not pool the data, the expert must make a judgment call based on methodological considerations, which the expert must justify with a "methodological explanation for why" their decision is appropriate. *See Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.,* 49 F. Supp. 3d 385, 406–07 (S.D.N.Y. 2014), *aff'd,* 638 F. App'x 43 (2d Cir. 2016). There is no requirement that an expert run a specific analysis, so long as they have a methodological explanation for the analysis they chose. *Id.*; *see also Taylor v. District of Columbia Water & Sewer Auth.,* 241 F.R.D. 33, 43 (D.D.C. 2007).

Farber provides a valid, reasonable explanation for his modeling decision. In his deposition, he stated that looking at each division in isolation "was not the goal of [his] analysis." Farber Dep. at 177–78. Because he "was analyzing a company-wide policy," he "chose not to do it separately by division." *Id.*; *see also id.* at 180, 378–380; Farber Rebuttal ¶¶ 45–48, 76, ECF No. 1188-12. Moreover, Plaintiffs claim that the processes are the same across the three divisions, Pls. Daubert Opp'n at 5–7, ECF No. 1262, a conclusion Farber agrees with based on his review of the data, *see* Farber Rebuttal ¶ 48. Therefore, Farber's decision not to disaggregate, does not render the opinion "unreliable" or methodologically flawed such that exclusion is appropriate. *Romano,* 794 F.3d at 330.

#### b. Cross-ruffing

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

Defendants argue that Farber's opinion on cross-ruffing should be excluded because he looks at the full Vice President-to-Managing Director promotion process, rather than only the evaluation step in which the cross-ruffers assess the list of candidates for promotion. Defs. Daubert Mem. at 47–49. Defendants further contend, that, even if Farber assesses both steps, he should have disaggregated his analysis to consider the nomination and interview stages separately. *Id.* The Court finds both arguments unpersuasive.

To make a claim relying on statistical evidence, a plaintiff must identify a "specific discriminatory employment practice." See *Chin v. Port Auth. of N.Y. and N.J.*, 685 F.3d 135, 154 (2d Cir. 2012). But, Title VII expressly provides that, if the plaintiff can demonstrate to the Court "that the elements of a [defendant's] decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i). "Whether a particular decisionmaking process is capable of separation for analysis largely turns on the details of the specific process and its implementation in a given case." *Chin*, 685 F.3d at 154. Here, Plaintiffs have met their burden of showing that the promotion process is a single employment practice as a matter of law.

**\*8** First, the subcomponents Defendants propose are not particular employment practices but rather two interwoven steps of one singular promotion practice. See *id.* at 154–55. It is the process, not the individual steps, that determines whether someone receives a promotion. *Id.* (describing a similar promotion process). As noted above, the Court's prior decisions indicate that it understands cross-ruffing to be a single promotion process that encompasses both nomination and evaluation by cross-ruffers, which together leads to the ultimate promotional decisions. See Class Cert. Order at 8–10 ("[T]he vetting process for promoting Vice Presidents to Managing Directors is known as 'cross-ruffing.' " (citations omitted)). The Court considers this promotional process as one of the employment practices at issue in this case. See *id.*

Second, Plaintiffs have demonstrated that separate analysis would yield inadequate sample sizes. Farber Rebuttal ¶ 81. Promotion to Managing Director is rare, with an average of 73 promotions per year. Shaw Report ¶ 224, ECF No. 1192-9. [11] Only 204 women were promoted to Managing Director from 2003 to 2018. Farber Report ¶¶ 125, 132–133. The subcomponents are, therefore, not capable of separate analysis because of the small sample size at issue. See Farber Rebuttal ¶ 81. Thus, the Court finds that Farber articulates

a "solid statistical reason for [the] decision to pool the data" regarding the different subcomponents of the cross-ruffing process and shall not exclude his opinion on this basis. *Reed Const. Data Inc.*, 49 F. Supp. 3d at 407.

[11]  Defendants put forward Kathryn Shaw, Ph.D., as a rebuttal expert to Farber. Shaw Report ¶ 19.

### c. 360 Review from 2002 to 2004

Defendants argue that Farber's analysis of the 360 review process from 2002 to 2004 should be excluded because of the small sample size. Defs. Daubert Mem. at 49–50. The Court agrees. The 360 review process began producing data in 2003, Farber Report ¶ 45, so there is no data for 2002. For 2003 and 2004, there were only seventeen 360 reviews from two of the divisions. ECF No. 1188-30. Absent the use of oversampling, [12] there is insufficient data in two of the divisions for 2003 and 2004 to allow a classwide analysis, as any analysis in those two years will over-represent the one division with sufficient data. Exclusion is appropriate when an expert does not show that his data is "a fair proxy" for the process he claims to be analyzing, here, the 360 reviews of all three divisions. See *Apple v. Atl. Yards Dev. Co.*, No. 11 Civ. 5550, 2015 WL 11182422, at *6, 9–10 (E.D.N.Y. Mar. 31, 2015); *see also* Fed. R. Evid. 702(b) (an opinion must be "based on sufficient facts or data"). The Court shall, therefore, preclude Farber from offering his opinions on the 360 review process for 2002 to 2004. [13]

[12]  Oversampling is a "sampling strategy in which certain subsets of participants are overrepresented in a study group compared to the larger population in which they are drawn." Am. Psych. Assoc., Oversampling, https://dictionary.apa.org/ oversampling (last visited Mar. 17, 2022). Oversampling is done to ensure that certain groups, in this case data from certain years, that are small in size are adequately represented in the analysis. See *Gulino v. Bd. of Educ. of City Sch. Dist.* (*Gulino IV*), 113 F. Supp. 3d 663, 679–81 (S.D.N.Y. 2015).

[13]  Plaintiffs argue that Defendants are precluded from making arguments about the lack of data for 2002 to 2004 because of an agreement made in 2012 permitting Defendants not to produce data from an old database. Pls. Daubert Opp'n at 14–15. Because Defendants agreed not to contest the data

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 16 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

for 2002 to 2004 only "for the purposes of class certification," ECF No. 159 at 40, the Court does not consider this agreement relevant here.

#### d. Causation and Residuals

**\*9** Defendants next move to exclude Farber's opinion that the residuals[14] of his regression analyses are "sex discrimination." Defs. Daubert Mem. at 50–51. They object to that label both on statistical grounds and as an improper legal conclusion. *Id.*

[14]   A residual in a regression analysis is "the difference between the value of an empirical observation and the value predicted by a model." Am. Psych. Assoc., Residual, https://dictionary.apa.org/residual (last visited Mar. 17, 2022). In employment discrimination cases, "[b]y identifying those legitimate criteria that affect the decision[-] making process, [ ] plaintiffs can make predictions about what job or job benefits similarly situated employees should ideally receive, and then can measure the difference between the *predicted* treatment and the *actual* treatment of those employees. If there is a disparity between the predicted and actual outcomes for female employees, plaintiffs in a disparate treatment case can argue that the net 'residual' difference represents the unlawful effect of discriminat[ion] [ ] on the allocation of jobs or job benefits." *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 367 (2d Cir. 1989) (emphasis in original). Specifically, "[b]y accounting for all of the 'legitimate' factors that could affect [compensation] and [promotions] in general, the plaintiffs hope[ ] to prove that there was a net 'residual' difference or disparity between the predicted and actual [compensation] and [promotion] of female [employees] that could only be attributed to ongoing gender discrimination [by defendants]." *Id.*

Defendants contend that Farber's regression analyses are flawed because he excludes from his analyses production variables, which attempt to capture an individual's productivity in a manner relevant to their role. *Id.* Farber explains that he excludes production variables because he suspected that they may be affected by gender bias, as the production variables are dependent on assignments controlled

by Defendants, and, therefore, using them could introduce bias into the analyses. Farber Rebuttal ¶ 53. Additionally, because data on productivity is not available across the class or across divisions, and is often reported at the group, rather than the individual level, Farber reasons that inclusion of the variables would not truly compare employees on the issue of productivity. *Id.* ¶¶ 55, 57. Although production may be a variable worthy of consideration, its exclusion does not render Farber's analysis unacceptable, absent some other infirmity. *Bazemore v. Friday*, 478 U.S. 385, 400–01, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part). As Farber's decision to exclude production variables is well-reasoned and there are no other fatal infirmities, his regression analyses are admissible. *Id.* His choice to exclude the production variables goes to the weight of his testimony rather than its admissibility. *Reed Const. Data Inc.*, 49 F. Supp. 3d at 401.

Moreover, Farber's finding that the residuals represent gender-based differences is also founded. The use of statistics in sex discrimination cases is common. *See United States v. City of New York* (*City of New York II*), 731 F. Supp. 2d 291, 300 (E.D.N.Y. 2010) (disparate impact); *City of New York III*, 717 F.3d at 85 (disparate treatment). Indeed, the Second Circuit has stated that "[i]t is apodictic that 'statistical reports may ... be admissible to support an inference of discrimination.'" *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997)). Regression modeling, the form of statistical analysis Farber used, attempts to eliminate other possible causes, leaving only the studied variable as the cause of the difference observed, also called the residual. *Ottaviani*, 875 F.2d 365 at 367. In employment discrimination cases, statistical significance at the 5% level, or approximately two standard deviations, is sufficient to make a *prima facie* case. *Smith v. Xerox Corp.*, 196 F.3d 358, 366 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006). Such a statistical significance means that there is a 5% probability that the difference found is due to chance rather than being caused by the studied process. *Id.* Here, Farber's regression analyses show statistical significance at the 5% level, so his studies indicates that there is a 5% chance that the residuals (*i.e.* the difference in treatment) result from something other than differences in the employee's gender. Farber Report ¶¶ 76, 79, 81–83, 98–102, 104–105, 134–135. The Court, therefore, finds that Farber can testify that the differences he found were based on gender.

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 17 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)
2022 WL 814074

**\*10** Defendants next argue that, because Farber was not prepared to make a conclusion about gender discrimination at the class certification stage, his "about face" should be questioned. Defs. Daubert Mem. at 50–51. The Court disagrees. Farber's opinion is methodologically sound and, therefore, admissible under Federal Rule of Evidence 702. The fact that Farber was not prepared to state that the residuals represented gender-based differences at the class certification hearing does not bar him from making that conclusion now, after he has had the opportunity to update his model to include information ascertained through discovery.

Furthermore, Defendants argue that Farber's opinion represents an impermissible legal conclusion. *Id.* at 51. "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). It is permissible for Farber to opine that the residuals of his models represent the gender-based difference because he sufficiently controlled for other plausible causes of the difference. Even though the opinion embraces the ultimate issue, it does not preclude the jury from rejecting the opinion. However, to the extent that Farber uses the term "sex discrimination," which is a legal term of art, he is making a legal conclusion that is improper as it usurps the role of the jury. *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 115 (S.D.N.Y. 2020). Farber may opine on the residuals and their possible meaning so long as he does not use the term "sex discrimination."

#### e. Damages and Compensation

Defendants move to exclude Farber's analysis of damages and compensation that is not tied to the analysis of the three processes at issue. Defs. Daubert Mem. at 45–47, 52–55. The Court has stated that "compensation may be a topic addressed in Phase I insofar as it is connected to one or more of the three challenged processes." June 25, 2019 Order at 1–2; *see also* Oct. 7, 2019 Order at 5–6. But, damages are beyond the scope of the Phase I trial, which shall focus on generalizable issues of liability. *See* ECF No. 657 at 2 (stating damages are part of Phase II); ECF No. 888 at 3.

For an opinion to be admissible, it must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Bloomberg*, 2010 WL 3466370, at \*6 (citation omitted). To the extent that Farber's opinion looks at compensation generally to ascertain how the processes at issue impacted compensation, compensation is relevant, and the Court shall not exclude those portions of Farber's

opinion. *See* Oct. 7, 2019 Order at 5–7. To the extent that Farber's opinion addresses a historical pay theory whereby compensation is reduced because of past use of the processes, it goes to damages, rather than liability, and thus, is properly excluded as irrelevant to the Phase I trial. *See Bloomberg*, 2010 WL 3466370, at \*6. Moreover, to the extent that Farber's models are not related to the challenged processes but rather look to show general pay disparities for damages purposes, they are not relevant to Phase I and are, therefore, excluded. *See* Farber Report ¶¶ 136–57; Farber Rebuttal Report ¶¶ 108–19.

Accordingly, Defendants' motion to preclude Farber from testifying as to the 360 review process for 2002 to 2004 and damages is GRANTED, and Defendants' motion to preclude Farber from testifying as to the remainder of his reports is DENIED.

#### C. Defendants' Experts

Plaintiffs move to exclude the opinions of four experts put forward by Defendants. Pls. Daubert Mot., ECF No. 1184. The Court shall address each expert in turn.

#### 1. Kathryn Shaw, Ph.D.

**\*11** Defendants offer Kathryn Shaw, Ph.D., an economics professor at the Stanford Graduate School of Business, to rebut Farber's opinion that the challenged processes resulted in gendered differences in compensation and promotions. Shaw Report ¶¶ 1, 19. Shaw has an extensive background in economics research and modeling, focusing on labor economics. *Id.* ¶¶ 2–14. Defendants asked Shaw to review Farber's report, provide a critique, and create her own models to test Plaintiffs' gender discrimination claims. *Id.* ¶ 21. Plaintiffs move to exclude portions of Shaw's expert opinion. Pls. Daubert Mot. Specifically, they move to exclude Exhibits 2–9, 20–29, and 31–69, and all related text. *Id.* Plaintiffs do not challenge Shaw's experience or knowledge; however, they do note that she lacks experience in making models for gender discrimination claims. Pls. Daubert Mem. at 5, 5 n.3, ECF No. 1191.

#### a. Production Variables

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 18 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

Plaintiffs argue that Shaw's inclusion of production variables is unsound and the resulting exhibits and text should be excluded. *Id.* at 6. They contend that she was not involved in choosing the variables, cannot explain why certain data types were used to represent productivity, and did not ensure the variables were measuring what they purported to measure or that there was sufficient data to use the variables. *Id.* at 7–11.

For a regression analysis to be admissible under *Daubert*, there must be a "predictable and justifiable methodology," reflecting modeling choices that are based on "learned scholarship" and are reasonably supported. *Reed Const. Data Inc., 49 F. Supp. 3d at 400.* Expert evidence is properly excluded when there is "too great an analytical gap between the data and the opinion proffered" to satisfy Rule 702. *Laumann v. Nat'l Hockey League, 117 F. Supp. 3d. 299, 319 (S.D.N.Y. 2015)* (citation omitted). Typically, including an "irrelevant ... variable[ ] [in a regression model] will go to the probative value of the analysis, not its admissibility." *Sobel v. Yeshiva Univ., 839 F.2d 18, 36 (2d Cir. 1988).*

Contrary to Plaintiffs' contentions, Shaw did choose the variables she included in her models and explains why she chose each variable. Shaw Report ¶ 74, App. C; *see, e.g.,* Shaw Dep. at 105–06, ECF No. 1297-6. Because Shaw explains the reasons for including a production variable and identifies variables for different subgroups in the three divisions, Shaw Report ¶¶ 74, 151–162, the Court considers her choices methodologically sound. The fact that there is overlap with a prior expert for Defendants does not invalidate her decision, *see Am. Home Assur. Co. v. Merck & Co., 462 F. Supp. 2d 435, 448 (S.D.N.Y. 2006),* nor does the fact that she had research assistants aiding her in reaching the decision, *see Phoenix Light SF Limited v. Bank of New York Mellon, No. 14 Civ. 10104, 2020 WL 1322856, at \*10 (S.D.N.Y. Mar. 20, 2020).*

Plaintiffs are within their right to be concerned that production variables do not exist for all individuals. *See* Farber Rebuttal ¶ 55. They further point out that Shaw's model assumes that the production variables for those who have them are representative of those who do not. *Id.* ¶ 58. Farber tested whether there is a correlation between those missing production variables and other variables of interest. *Id.* He concludes that missing production data is correlated with gender and compensation. *Id.* This indicates that the production variables may introduce bias to the models. *Id.* ¶¶ 53, 58. Although Plaintiffs' concerns are valid, the Court does not find that they require exclusion of Shaw's opinion because Shaw cogently articulates her basis for including the production variables. Shaw Report ¶¶ 151–58, 161, 285. She acknowledges that the production variables differ, on average, by gender. *Id.* ¶ 156. And, although Farber views gender differences as a reason to omit the variables, Farber Rebuttal ¶ 53, Shaw views this correlation as an indication that part of the gender difference in the residual may be from not correcting for gender differences in production rather than from the processes at issue in this case. Shaw Report ¶¶ 156–57.

**\*12** Moreover, there was production data for the majority of individuals, Farber Rebuttal, Tbl. 7, and Shaw accounts for the missing data by including a missing indicator variable for each production variable, Shaw Report at App. C. The use of a missing indicator variable is an accepted way to correct for missing data under these circumstances, even though it may result in a biased analysis. *See* Michael P. Jones, *Indicator and Stratification Methods for Missing Explanatory Variables in Multiple Linear Regression*, 91 J. Am. Stat. Assoc. 222, 222, 228 (2019). And, so long as the decision to include or exclude a variable is reasonable, the fact that the choice may "render the analysis less probative than it otherwise might be" goes to weight rather than admissibility. *Cf. Bazemore, 478 U.S. at 400, 106 S.Ct. 3000; see also Sobel, 839 F.2d at 36.* The missing data does not, therefore, provide a basis for the Court to exclude Shaw's analysis.

### b. Disaggregation Across Divisions

Plaintiffs next allege that Shaw's analysis is fatally flawed and irrelevant because it disaggregates compensation and promotion data by division and business unit instead of considering the data on a classwide basis. Pls. Daubert Mem. at 16.

Disaggregation can reduce the statistical power of a model by reducing the sample size because "[statistical] power increases with sample size. A gender gap of a specific magnitude (say 15%) is more likely to show up as statistically significant in a regression analysis based on 1,000 observations than in one based on 100 observations." William T. Bielby and Pamela Coukos, *"Statistical Dueling" with Unconventional Weapons: What Courts Should Know About Experts in Employment Discrimination Class Actions*, 56 Emory L.J. 1563, 1597 (2007).

Initially, an expert must show that any decision regarding disaggregation is methodologically sound. Fed. R. Civ. P. 702(c). Experts should avoid disaggregation when it would reduce the sample size to the point where statistical modeling is ineffective. *See* March 10, 2015 Order at 18–21, ECF No. 363. But, even when there is no statistical reason compelling disaggregation, the decision to disaggregate is not a basis for exclusion so long as the expert offers a methodological explanation for their decision. *Cf. Reed Const. Data Inc.*, 49 F. Supp. 3d at 400, 406–07.

Disaggregating to the business unit level results in sample sizes too small to produce statistically significant results. *See* Shaw Report at App. G., Exs. 59, 64. The amount of data at the business unit level ranges as high as 1,482 person years to as low as 2 person years. [15] *Id.* at Apps. E, F, G. When the amount of data is small, statistical significance may be impossible to detect even if there is a causal relationship. *Chin*, 685 F.3d at 153; *see also* Shaw Dep. at 314–16. Some business units may have sufficient data to allow analysis; however, others do not. Disaggregation at the business unit level could mask differences because of the small sample sizes, *see Moussouris v. Microsoft*, 311 F. Supp. 3d 1223, 1236 (W.D. Wash. 2018); *see also* March 10, 2015 Order at 18–21, making disaggregation at the business unit level methodologically flawed. The Court, therefore, finds that Shaw's modeling at the business level unit is methodologically unsound and should be excluded under Federal Rule of Evidence 702.

[15]    A "person year" is "the sum of the number of years that each individual in a population has been affected by an event, occurrence, or condition." Am. Psych. Assoc., Person-years, https://dictionary.apa.org/person-year (last visited Mar. 17, 2022).

But, there is likely sufficient data to disaggregate at the division level. *See* Farber Dep. at 178–80 (testifying as to the 360 review and quartiling processes). Plaintiffs argue that because the issue in the case is whether the companywide policies discriminate against women, the proper level of analysis is companywide, controlling for business unit and division. Pls. Daubert Mem. at 19. Shaw states that she decided to disaggregate at the division level because she believes the divisions function differently and are decentralized. Shaw Report ¶¶ 164–68. Shaw ran Chow tests [16] to ascertain if unpooling the divisions was statistically sound and concluded the divisions should not be analyzed

together because the Chow tests showed that the gender differences were not the same across the divisions. *Id.* ¶¶ 169–71, 179. Shaw, therefore, offers a methodologically sound reason to disaggregate the data. Fed. R. Civ. P. 702(c).

[16]    A Chow Test is a statistical test to determine if a model's coefficients are identical, or equal, across subsets of data. Shaw Report ¶ 169 n.216; Farber Rebuttal ¶ 44.

**\*13** Finally, the Court considers whether the disaggregated models would be helpful to the jury and relevant to the task at hand. *Daubert*, 509 U.S. at 596–97, 113 S.Ct. 2786. Because this question depends on how the jury decides to assess the differences and similarities among the various relevant divisions, the jury—not the Court—must decide if pooled or unpooled data makes more sense in light of the question asked, the data presented, and the explanations of the experts. *In re Zyprexa*, 489 F. Supp. 2d at 285. It is for the jury to decide which theory of the case they find persuasive. *Id.* (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786).

### c. Outliers

Shaw excluded predominantly male "outliers" who earned considerably more than others out of concern that their inclusion would improperly skew her models. Shaw Report ¶¶ 253–59. Plaintiffs contend that removing high-earning outliers is methodologically flawed, especially in a gender discrimination case looking at compensation differences between men and women. Pls. Daubert Mem. at 22–24.

Shaw ran her model excluding three different groups of alleged outliers: (1) those with compensation greater than 1.5 times the interquartile range above 75%, (2) the top 5% of earners, and (3) the top 10% of earners. Shaw Report ¶ 258, Ex. 34. She concludes that "[t]he estimated gender gap become[s] more favorable to women once ... extraordinarily high earners" are removed, in part, because most of the high earners are men. *Id.* ¶ 259.

Even if, as Defendants argue, excluding outliers may be a common practice in econometrics, Defs. Daubert Opp'n at 24, Defendants do not cite any cases condoning the practice when the models intend to look at compensation disparities and those excluded are almost entirely from the unprotected class. [17] Outliers should only be removed after "careful examination" to ensure the outliers are not meaningful for

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

the analysis. *See* Am. Bar Assoc., *Econometrics: Legal, Prac. and Tech. Issues* § 4.E.1 (2d ed. 2014). Shaw's own analysis shows that the outliers she omitted were almost entirely men, which is certainly meaningful when the regressions at issue are designed to detect gender differences in compensation. Defendants have not met their burden of demonstrating that removing the outliers is methodologically sound in this context. Accordingly, Exhibit 34, and the related text, are excluded.

17    The sources Shaw cites in her report do not address the removal of outliers in models designed to determine if there is a compensation disparity. For example, in her report she cites Joshua D. Angrist and Alan B. Krueger, *Empirical Strategies in Labor Economics*, in Handbook of Labor Economics Vol. 3, 1348–1349 (Orley Ashenfelter and David Card eds., 1999) for the proposition that she may remove the top 5% and 10% of earners. Shaw Report ¶ 258 n.290. However, in advocating for "trimming" techniques, the cited authors seek to remove "misreported" data in study samples, Angrist & Krueger at 1347. Shaw is not attempting to remove improperly reported data, and, therefore, the citation does not support her methodology.

### d. Cross-Ruffing

When assessing cross-ruffing, Shaw analyzes the different subcomponents of the cross-ruffing promotional process separately. Shaw Report ¶¶ 233–37. Plaintiffs argue that this analysis improperly disaggregates the subcomponents because cross-ruffing is one employment process. Pls. Daubert Mem. at 24–25. This Court has held, as a matter of law, that cross-ruffing is one employment process which involves multiple subcomponents incapable of being analyzed separately. *See supra* Part I.B.3.b. Accordingly, Shaw's subcomponent analysis of the cross-ruffing process is excluded as irrelevant and unhelpful to the jury.

 **\*14**  Accordingly, Plaintiffs' motion to preclude Shaw from testifying as to disaggregation at the business unit level, the impact of removing outliers, and the subcomponents of the cross-ruffing process is GRANTED, and Plaintiffs' motion to preclude Shaw from testifying as to the remainder of her report is DENIED.

### 2. Margaret Stockdale, Ph.D.

Defendants offer Margaret Stockdale, Ph.D.'s, opinion on "whether Goldman Sachs has implemented scientifically-supported and other leading practices that work to provide a culture and climate that [are] not tolerant of gender bias and that [are] supportive of women and their career success." Stockdale Report ¶¶ 6–7, ECF No. 1192-10. Defendants also ask Stockdale to evaluate Goldberg's report. *Id.* ¶ 8. Plaintiffs move to exclude all of Stockdale's expert testimony. Pls. Daubert Mot. Plaintiffs do not challenge her credentials to opine on Goldman Sachs' corporate climate, they challenge her methodology. Pls. Daubert Mem. at 25–26. Plaintiffs also challenge Stockdale's qualifications to assess survey design and survey data as well as her methodology as it pertains to the People Survey. *Id.* at 25. Stockdale is a professor of psychology at Indiana University-Purdue University, specializing in gender issues in the workplace. Stockdale Report ¶¶ 1–2. She has authored peer-reviewed articles and served as a consultant to companies on sexual harassment policies and complaint resolution. *Id.* ¶ 2.

### a. Corporate Culture

Plaintiffs contend that, because Stockdale does not explicitly use a specific analytical framework to guide her analysis, her report is devoid of scientific methodology and "based entirely on her own feelings about the evidence." Pls. Daubert Mem. at 26–27. Although Stockdale does not identify a specific analytical framework, she testified that her work is implicitly grounded in the frameworks used by Goldberg because she is rebutting Goldberg's report. Stockdale Dep. at 96–97, ECF No. 1259-7. Additionally, Stockdale's report is grounded in the social science methodology of triangulation, Stockdale Report ¶¶ 37–39, and this methodology has long been accepted in her field, *see, e.g.*, Todd D. Jick, *Mixing Qualitative & Quantitative Methods: Triangulation in Action*, 602–611 (1979). Courts have also approved of methodologies akin to triangulation. *See, e.g.*, *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 322–23 (E.D.N.Y. 2013). The Court finds that Stockdale's opinion on corporate culture is sufficiently methodologically grounded to satisfy Rule 702.

### b. Surveys

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 21 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)
2022 WL 814074

Plaintiffs also argue that Stockdale's use of the People Survey data is deficient. Pls. Daubert Mem. at 29–35. First, they contend that the data from the People Survey is unreliable because, as an employer survey, the responses will be "artificial[ly] positiv[e] to avoid negative repercussions or gain favoritism." *Id.* at 30. They also argue that the data from the Exit Survey is problematic because of a similar positive bias. *Id.* at 31–32. But, possible bias in the data underlying an expert's opinion "is a subject for cross-examination, and goes to the weight, not the admissibility, of the expert testimony." *Auto. Ins. Co. of Hartford v. Electrolux Home Prod., Inc.,* No. 10 Civ. 0011, 2012 WL 6629238, at *2 (S.D.N.Y. Dec. 20, 2012). Plaintiffs further contend that Stockdale lacks the expertise to offer an opinion on the survey design and survey data. Pls. Daubert Mem. at 26, 30. However, Stockdale is well versed in study design and analysis as evidenced by her teaching of social science research methodology. Stockdale Report at App. A.

**\*15** Plaintiffs next contend that Stockdale improperly created her own scale to evaluate the People Survey rather than using the cut-offs used internally by Goldman Sachs. Pls. Daubert Mem. at 31. Although Stockdale concedes that she created her own scale by collapsing some categories of responses, Stockdale Report ¶ 61 n.35, such collapsing is an accepted practice in her field because it allows for ease of interpretation and eliminates the effects of outliers and bimodal distributions, *see,* Melinda J. Moya & Alison L. O'Malley, *Mechanics of Survey Data Analysis*, in Employee Surveys & Sensing at 239, 246 (William H. Macey & Alexis A. Fink eds., 2020), ECF No. 1259-39. The Court does not find that this choice invalidates Stockdale's opinion.

Plaintiffs also attack Stockdale's conclusions because they differ from those of their expert. Pls. Daubert Mem. at 31–33. Experts reaching different conclusions is not a sufficient basis for exclusion. *See In re Zyprexa Products Liab. Litig.,* 489 F. Supp. 2d at 285.

Additionally, Plaintiffs argue that Stockdale's opinion should be excluded because she relied on a research assistant and an outside firm, Cornerstone Research, to perform some of the analysis in her report. Pls. Daubert Mem. at 33. This argument also fails. Experts are permitted to "present the findings and conclusions of those whose work [they] supervised and that [they] could personally replicate if necessary." *In re M/V MSC Flaminia*, No. 12 Civ. 8892, 2017 WL 3208598, at *22 (S.D.N.Y. July 28, 2017). Stockdale supervised her research assistant and Cornerstone Research and checked their work.

Stockdale Report ¶ 10; Stockdale Dep. at 99, 107–11, 124. Stockdale teaches applied social science research methods, evidencing that she could replicate the work completed by Cornerstone and her research assistant, and Plaintiffs do not allege otherwise. *See* Stockdale Report ¶ 2. Moreover, contrary to Plaintiffs' representations, Pls. Daubert Mem. at 33–34, Stockdale's research assistant, her husband, Michael Heck, Ph.D., is qualified to assist her. Stockdale deployed him to serve as a second coder.[18] Stockdale Dep. at 123–24. Coders do not require any specific expertise—rather, they must be trained to apply the coding framework of the particular analysis.[19] Heck holds a doctorate in applied experimental psychology, for which he likely received at least some training in qualitative research methods.[20] And, even if he did not receive specialized training, the Court is not convinced that Heck is incapable of being trained to be a coder.[21] The Court shall not, therefore, exclude Stockdale's report and testimony.

[18]    Using a second coder is common in social science research as it allows for validation of coding, also known as intercoder reliability. *See* Kimberly A. Neuendorf, *The Content Analysis Guidebook,* 41, 159, 166 (2016), ECF No. 1259-29. Butler, Plaintiffs' expert, also utilized a dual-coder methodology. Butler Dep. at 223, 241.

[19]    *See* Cliodhna O'Connor & Helene Joffe, *Intercoder Reliability in Qualitative Research: Debates and Practical Guidelines*, 19 Int'l J. Qualitative Methods 1, 6 (2020); Johnny Saldana, *The Coding Manual for Qualitative Researchers* 28–30 (1st ed., 2009) (listing personal attributes needed for coding).

[20]    *See* Stockdale and Associates, *Michael Heck, Ph.D.*, https://www.stockdaleandassociates.com/michael-heck-ph-d/ (last visit Mar. 17, 2022). Currently, obtaining a Ph.D. in psychology from Kansas State University requires two courses in research design and analysis. *See* Kansas State University, *Department of Psychological Sciences Graduate Program Overview*, https://www.k-state.edu/psych/graduate/ (last visited Mar. 17, 2022).

[21]    As little as two hours of training is sufficient to learn how to code. *See* Ellen Childs & Lindsay B. Demers, *Qualitative Coding Boot Camp: An*

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 22 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

*Intensive Training and Overview for Clinicians, Educators, and Administrators*, J. of Teaching and Learning Res. (2018).

**\*16** Accordingly, Plaintiffs' motion to preclude Stockdale from testifying is DENIED.

### 3. Eric Dunleavy, Ph.D.

Defendants retained Eric Dunleavy, Ph.D., an industrial and organizational psychologist and the director of Employment and Litigation Services at DCI Consulting Group, to analyze the work activities of the Associates and Vice Presidents in the three divisions at issue in this case and the job relatedness of the three processes at issue. Dunleavy Work Analysis Report at 1, 10, ECF No. 1192-2; Dunleavy Job Relatedness Report at 1, ECF No. 1192-26. He provided two expert reports as well as a rebuttal report and a sur-rebuttal report. ECF Nos. 1192-2, 1192-3, 1192-26, 1192-27. In his work analysis report, Dunleavy was asked to opine on whether the Associates and Vice Presidents perform the same roles in each division. Dunleavy Work Analysis Report at 1. In his job relatedness report, he was asked to evaluate the job relatedness of the three processes at issue to determine if the processes are reliable and valid. Dunleavy Job Relatedness Report at 1–2. Plaintiffs move to exclude Dunleavy's work analysis and rebuttal work analysis reports, arguing they are methodologically flawed and will not assist a jury as the reports address topics not at issue in this case. Pls. Daubert Mem. at 36–38. Plaintiffs move to preclude Dunleavy's testimony on statistical studies five and seven in his job relatedness reports because they include the same production variables discussed above. *Id.* at 36 n.30.

### a. Work Analysis

First, Plaintiffs rely on three cases to argue that Dunleavy's methodology is flawed and his testimony must, therefore, be excluded. *Id.* at 36, 40, 43–44. But, these cases are inapposite because they relate to work analyses undertaken to create or validate a hiring tool. *See Guardians Ass'n of N.Y.C. Police Dep't, Inc. v. Civ. Serv. Comm'n of City of N.Y.*, 630 F.2d 79, 95–96 (2d Cir. 1980); *Gulino IV*, 113 F. Supp. 3d at 676–83; *United States v. City of New York* (*City of New York I*), 637 F. Supp. 2d 77, 100–105, 110–15 (E.D.N.Y. 2009). Here, the work analysis is being used to ascertain if Associates and Vice Presidents do the same work, rather than to create or

evaluate an assessment for determining who should be hired. *See* Dunleavy Work Analysis Report at 1.

As the literature Plaintiffs cite emphasizes, a work analysis is not "one size fits all," and the methods must align with the purpose of the analysis. *See* Paul R. Sackett et al., *Job and Work Analysis*, in 12 Handbook of Psychology: Industrial and Organizational Psychology 61, 63 (Neal W. Schmitt & Scott Highouse eds., 2d ed., John Wiley & Sons, Inc. 2013), ECF No. 1192-23. Dunleavy has shown that his work analysis is fit for the purpose for which it is offered—showing that the Associates and Vice Presidents perform different tasks within and across divisions. Dunleavy Work Analysis Report at 1, 207, 209. He articulated his hypotheses: (1) that there is no difference in the tasks performed by Associates, and (2) that there is no difference in the tasks performed by Vice Presidents, *id.* at 17–18, and then designed a methodology to test those hypotheses, *id.* at 18–31.

**\*17** The methodology Dunleavy uses is similar to one found to be reliable for a comparable purpose by another court in this district. *See Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 262–63, 269–71 (S.D.N.Y. 2018). Defendants have, therefore, met their burden of showing that Dunleavy's methodology is sufficiently reliable to be admissible. *See id. at 270*. Plaintiffs' concerns related to the underlying data, specifically the sample size and sampling methodology, go to weight rather than admissibility. *Reed Const. Data Inc.*, 49 F. Supp. 3d at 401. Similarly, issues related to the extrapolation of the work analysis conducted in 2019 to the class period also go to weight. *See Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) ("[G]aps or inconsistencies in the reasoning leading to [the expert's] opinion ... go to the weight of the evidence, not to its admissibility." (quoting *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001))).

### b. Relevance

Plaintiffs further argue that Dunleavy's job analysis opinion is not relevant because it does not address gender differences. Pls. Daubert Mem. at 47–48. The Court agrees that Dunleavy's analysis does not go to the heart of this case, which asks if the challenged processes impact women differently from men. However, Dunleavy's job analysis opinion is relevant to the issue of commonality, which is before the Court in Defendants' motion for class decertification. *See* Defs. Decert. Mem. at 28–31, ECF No. 1224. An opinion need

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 23 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)
2022 WL 814074

not go to the ultimate issue to be relevant; it must only assist the trier of fact. *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 661 (2d Cir. 2016). Therefore, Dunleavy's job analysis opinion is admissible for the purpose of the decertification motion only.

#### c. Production Variables

Plaintiffs move to strike two statistical studies in Dunleavy's job relatedness report and sur-rebuttal report. Pls. Daubert Mot.; Pls. Daubert Mem. at 36 n.30. Dunleavy posits that the 360 review and quartiling processes were intended to capture performance and, therefore, Dunleavy requested and used the production variables to test if the processes correlate with the production variables as part of validating the processes. Dunleavy Job Relatedness Report at 61. This is a reasoned justification for using the production variables as part of his analysis. The Court shall not exclude the statistical studies incorporating the production variables.

Accordingly, Plaintiffs' motion to preclude Dunleavy from testifying as to the two statistical studies in his job relatedness reports and to prevent the Court from considering Dunleavy's job analysis report when assessing Defendants' decertification motion is DENIED.

#### 4. Brian Dunn

Defendants asked Brian Dunn to opine on (1) "[w]hether and to what extent the jobs performed by professionals with the corporate title Associate and [Vice President] at financial services firms such as Goldman Sachs differ" [22] and (2) "[w]hether and to what extent financial services firms such as Goldman Sachs need to tie compensation to performance." Dunn Report ¶ 9, ECF No. 1192-4. Plaintiffs move to exclude Dunn's reports, arguing that Dunn's job variety opinion is unreliable and his opinion related to paying for performance is irrelevant. Pls. Daubert Mem. at 49–53. Dunn has worked for over 35 years as a compensation consultant, using data provided by financial services firms to benchmark their compensation as compared to their industry. Dunn Report ¶¶ 1–2. In the past, he has served as a compensation consultant for Goldman Sachs. *Id.* ¶ 4.

[22]    Like Dunleavy's opinion, Dunn's opinion on the jobs performed by the class members is only relevant to Defendants' decertification motion.

**\*18**    Dunn's opinion is based on his experience in compensation benchmarking in the financial services industry. *Id.* ¶¶ 10, 26. According to Dunn, benchmarking firms ask their financial services clients to complete surveys, created and provided by the benchmarking firms, which ask the clients to indicate the compensation of various employees sorted by job category. *See id.* ¶¶ 18–19, 22. For information about the work performed by these various employees, Dunn relies almost exclusively on declarations by Goldman Sachs' employees and David Stowell's *Investment Banks, Hedge Funds, and Private Equity*, Third Edition (London: Academic Press, 2018). *See id.* ¶¶ 27–33. He connects the job categories used in benchmarking to the work performed by Goldman Sachs' employees in a conclusory fashion, stating that classification "is necessary *because* the professionals perform different jobs; if they did not, they could all be lumped together." *Id.* ¶ 35 (emphasis in original). Such a leap creates "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

Moreover, Dunn's opinion as it pertains to paying for performance, which would support Defendants' business necessity rebuttal to Plaintiffs' claims, would not aid the jury and is, therefore, excluded. "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). Dunn's report concludes that Goldman Sachs must pay its employees based on "the quality and value of their work" to be competitive in the financial services employment market. Dunn Report ¶¶ 14, 64. It is within a lay person's understanding that companies pay individuals to do their jobs and need a means of assessing if those individuals are doing their jobs—to measure their performance and productivity. It is also within a lay person's knowledge that companies need to pay competitively to attract and retain employees. An expert is not needed to opine that, in the financial services industry, these general propositions apply. Dunn's opinion will not add to the jury's understanding as his report does not discuss the specific mechanism of measuring performance commonly used in the industry or provide any other opinion for which expertise is necessary. *See id.*

Accordingly, Plaintiffs' motion to preclude Dunn's testimony is GRANTED.

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 24 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

## II. Class Decertification

Defendants move to decertify the class on the grounds that, since 2018, there have been material factual and legal changes that undermine the certification. Defs. Decert. Mem. at 1–7. Defendants argue that the class lacks Article III standing and that the class no longer meets the Federal Rule of Civil Procedure 23 requirements of commonality, predominancy, typicality, superiority, and adequacy. *See generally id.* Plaintiffs contend that the class has standing and that Defendants are recycling their prior arguments as to the Rule 23 factors despite no change in the relevant legal frameworks or facts. *See* Pls. Decert. Opp'n at 1–2, ECF No. 1269. The Court agrees.

### A. Legal Standard

Once a class is certified, "Rule 23 provides district courts with broad authority at various stages in the litigation to revisit class certification determinations and to redefine or decertify classes as appropriate." *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 594 (S.D.N.Y. 2013) (quoting *Wang v. Chinese Daily News, Inc.*, 709 F.3d 829, 836 (9th Cir. 2013), *superseded on other grounds by* 737 F.3d 538 (9th Cir. 2013)); *see* Fed. R. Civ. P. 23(c)(1)(C). "A court may decertify a class if it appears that the requirements of Rule 23 are not in fact met[,] ... [it] may not disturb its prior findings absent some significant intervening event or a showing of compelling reasons to reexamine the question." *Mazzei v. Money Store* (*Mazzei I*), 308 F.R.D. 92, 106 (S.D.N.Y. 2015), *aff'd, Mazzei v. Money Store* (*Mazzei II*), 829 F.3d 260 (2d Cir. 2016) (quotation marks and citations omitted). Such compelling reasons may include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.* (quoting *Gulino v. Bd. of Educ.* (*Gulino II*), 907 F. Supp. 2d 492, 504 (S.D.N.Y. 2012), *aff'd, Gulino v. Bd. of Educ.* (*Gulino III*), 555 Fed. Appx. 37 (2d Cir. 2014)); *see also Stinson v. City of New York*, No. 10 Civ. 4228, 2014 WL 4742231, at *1 (S.D.N.Y. Sept. 23, 2014) (collecting cases). Absent such a showing, "the factual underpinnings of a court's prior certification order are deemed to be law of the case." *Stinson*, 2014 WL 4742231, at *2 (quotation marks and citation omitted).

**\*19** "Decertification is an 'extreme step.' " *Gulino II*, 907 F. Supp. 2d at 504 (quoting *Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984)). "A defendant seeking to decertify a class 'bear[s]

a heavy burden to prove the necessity of either the drastic step of decertification or the less draconian but still serious step of limiting the scope of the class.' " *Id.* (quoting *Gordon v. Hunt*, 117 F.R.D. 58, 61 (S.D.N.Y. 1987)). However, Plaintiffs retain "the burden [of] demonstrat[ing] that the [Rule 23(b) (3)] requirements [are] satisfied." *Mazzei II*, 829 F.3d at 270. These requirements are numerosity, commonality, typicality, adequacy of representation, predominance of common questions of law or fact, and the superiority of a class action to other procedural mechanisms. Fed. R. Civ. P. 23(a), (b)(3).

### B. Analysis

### 1. Standing

Defendants argue that each class member must demonstrate standing to maintain certification for a Rule 23(b)(3) damages class action. Defs. Decert. Mem. at 1–3, 23–27.[23] This argument has been foreclosed by the law of the Circuit.

[23] Defendants also argue that Plaintiffs abandoned the *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) framework when they did not pursue class certification for injunctive relief and that the Court relied on Plaintiffs seeking to certify an injunctive class to find standing in the Class Certification Order. Defs. Decert. Mem. at 25–27. Defendants are incorrect. In certifying the class, the Court did not rely on the existence of an injunctive class under Rule 23(b)(2). In fact, the Court explicitly stated "[c]lass claims for injunctive and declaratory relief under Rule 23(b)(2) and (c)(4) are now being pursued on a separate track—currently scheduled to be fully submitted in late 2018." Class Cert. Order at 12–13. The Court declined to consider any arguments about a class under Rule 23(c)(4) because the Class Certification Order was limited to the Rule 23(b)(3) class. *Id.* at 13 n.3.

The "threshold question" of whether a plaintiff has Article III standing is whether the plaintiff has adequately "alleged an 'injury-in-fact' that is fairly traceable to the challenged conduct and redressable by a favorable judicial decision." *Lerman v. Bd. of Elections*, 232 F.3d 135, 143 n.9 (2d Cir. 2000). This question must remain "distinct" from "the question of whether [plaintiffs have] valid claim on the

2022 WL 814074

merits." *Id.*; *see also Carver v. City of New York,* 621 F.3d 221, 226 (2d Cir. 2010); *Denney v. Deutsche Bank AG,* 443 F.3d 253, 265 (2d Cir. 2006) (finding that class members "suffered injuries-in-fact[ ] irrespective of whether their injuries [were] sufficient to sustain any cause of action"). Defendants appear to conflate these two separate inquiries. *See* Defs. Decert. Mem. at 26–27. Before the Court is only the threshold question of standing.

In the class action context, the Supreme Court recently clarified that "[e]very class member must have Article III standing in order to *recover* individual damages." *TransUnion v. Ramirez,* ––– U.S. ––––, 141 S. Ct. 2190, 2208, 210 L.Ed.2d 568 (2021) (emphasis added). The Supreme Court's holding did not address the "distinct question" of whether each member of the class must demonstrate standing during class certification. *See id.* at 2208 n.4. However, the Second Circuit, has held that courts in this Circuit "do not require that each member of a class submit evidence of personal standing." *Denney,* 443 F.3d at 263 (collecting cases). Instead, the class must "be defined in such a way that anyone within it would have standing." *Id.* at 264.

This Circuit has not clearly articulated a test to assess standing for Title VII claims. However, in the equal protection context, the Supreme Court has held that to establish standing, a plaintiff must only show that a policy "prevented [the plaintiff] from competing on an equal footing," not that the plaintiff "would have obtained a benefit but for the barrier." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville,* 508 U.S. 656, 666–67, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). The district court in *Houser v. Pritzker* held that this standard should also apply in the Title VII context as "federal courts generally are less reluctant to overcome jurisdictional hurdles when faced with statutory, rather than constitutional, merits questions." 28 F. Supp. 3d 222, 238–39 (S.D.N.Y. 2014). The Court agrees and adopts the equal protection standing test for the Title VII claims in this case.

 **\*20** Combining the requirements for standing for classes and for Title VII claims, the test for standing in this case asks whether the class is defined in such a way as to ensure that the class members were subject to the policy that allegedly placed them on an unequal footing based on their gender. Because the class definition used here makes clear that all the class members were subject to the policies at issue, there is standing sufficient to maintain the certification of the class. *See Houser,* 28 F. Supp. 3d at 237.

### 2. Rule 23 Standard

Defendants renew their arguments made when certification of this case was initially briefed. Specifically, they allege that discovery has revealed facts that require the court to revisit its decision as to commonality, predominancy, typicality, superiority, and adequacy. Defs. Decert. Mem. at 27–45. Again, the Court rejects Defendants' arguments.[24]

[24]   Where Defendants make arguments in their decertification briefs that are more appropriate in relation to summary judgment than to decertification, the arguments are addressed in the summary judgment section of this order. *See* Defs. Decert. Reply at 19, ECF No. 1307 (arguing about liability for disparate treatment claims).

### a. Commonality

Defendants contend that there are no common questions of fact because of the discretion involved in the compensation and promotion processes, *id.* at 28–37, and further argue that the class members work a number of different jobs, undermining commonality, *id.* at 31. Defendants contend that discovery has only strengthened the arguments made at the class certification stage. *See id.* at 31. They adduce forty-one declarations from employees stating that discretion is exercised differently in implementing the processes. *Id.* at 4, 30. They also put forward a subset of those declarations and deposition excerpts to support their contention that the 360 review and quartiling processes are decentralized. *Id.* at 30. However, some of the declarations and depositions predate class certification. *See, e.g.*, *id.* at vi–xiii; ECF Nos. 1225-1, 1225-2, 1225-4. Although Defendants argue that discovery has shown that discretion is exercised differently by different managers and evaluators, Defs. Decert. Mem. at 29–31, and there is no centralized decision-making, *id.* at 36, both arguments were raised—and rejected—when the Court certified the class, *see, e.g.* Defs. R&R Objs. at 1, 11–15, 22–25, 29–30, ECF No. 502. Plaintiffs counter that the processes constitute a common mode of decision-making as contemplated by *Dukes*, Pls. Decert. Opp'n at 29–31, and that the class members hold two positions, Associate and Vice President, *id.* at 31–32.

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)
2022 WL 814074

As the Court explained in the Class Certification Order, under *Dukes*, " 'a common mode of exercising discretion that pervades the entire company' can constitute a general policy" for the purposes of commonality. Class Cert. Order at 24 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 356, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011)). Plaintiffs' claims must "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541. Further, the Supreme Court clarified that "giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory" when that discretion is channeled through "specific employment practice[s]." *Id.* at 355, 357, 131 S.Ct. 2541 (citation omitted).

**\*21** First, Defendants argue that Plaintiffs must show that each class member was injured. *See* Defs. Decert. Mem. at 32–33. This argument misunderstands why the Court granted certification of the class. In Phase I of this case, the questions being asked are at the classwide level—did these processes cause disparate impact and does the use of the processes evidence disparate treatment? At Phase II, the case will look at individuals and whether they suffered harm such that damages should be awarded to them. All of the class members were subject to at least one of the processes. *See* Class Cert. Order at 22–49. The processes were a means of channeling the discretion of lower-level supervisors. *See Dukes*, 564 U.S. at 355, 131 S.Ct. 2541. All the class members have this in common and it forms the basis of their common contention. At Phase I, the common questions will "generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)) (emphasis in original). In the Class Certification Order, the Court explained at length how Plaintiffs demonstrated commonality, *see* Class Cert. Order at 23–34, and Defendants' arguments for decertification do not raise issues that the Court finds persuasive or different from those previously considered.[25]

[25] For example, Defendants' argument related to *Mandala* is unavailing. Defs. Decert. Mem. at 32–33 (citing *Mandala v. NTT Data, Inc.*, 975 F.3d 202 (2d Cir. 2020)). In *Mandala*, the plaintiffs used nationwide statistics that were not properly tailored to the inquiry. 975 F.3d at 210–11. By contrast, Plaintiffs in this case use data from

employees at Goldman Sachs, which is properly tailored to the inquiry. *See generally* Farber Report. Defendants also cite the certification decision in *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252 (S.D.N.Y. 2018), for the proposition that there is no common question of fact when "local managers apply highly discretionary criteria." Defs. Decert. Mem. at 28; *see also id.* at 29–31. But, in *Kassman*, unlike here, the policies dictated "stages or phases" at which discretion was exercised rather than channeling the discretion. 416 F. Supp. 3d at 278. *Moussouris v. Microsoft*, No. 15 Civ. 1483, 2018 WL 3328418 (W.D. Wash. June 25, 2018), is also distinguishable from the case before the Court. In *Moussouris*, the plaintiffs argued that the root of the commonality was the unfettered discretion given to supervisors. 2018 WL 3328418, at \*18. The court held this argument to be foreclosed by *Dukes*. *Id.* At oral argument in *Moussouris* the plaintiffs did an about-face and argued that there was no discretion, *id.* This is dissimilar from the arguments Plaintiffs make here consistently, that discretion was channeled through the challenged processes. The other cases relied on by Defendants predate the Class Certification Order, and were already considered by the Court.

Defendants also argue that the class members perform different jobs, Defs. Decert. Mem. at 31; Defs. Decert. Reply at 13–16, ECF No. 1307, an argument they made when class certification was before the Court, *see, e.g.*, Defs. R&R Objs. at 1–3, 12 n.5, 20, 25. The Court noted in its Class Certification Order that class members here "hold only one of two jobs: Associate or Vice President." Class Cert. Order at 27–28 n.11. That continues to be true. Even if it is understood that there is some variability in the tasks each Associate or Vice President performs, each Associate and each Vice President is at the same level of "relative seniority" in the Goldman Sachs hierarchy. *See* Defs. 56.1 ¶¶ 7–8. This is different from the class members in *Dukes* who "held a multitude of different jobs, at different levels of Wal-Mart's hierarchy" such that they had "little in common but their sex and this lawsuit." *Dukes*, 564 U.S. at 359–60, 131 S.Ct. 2541 (quoting *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 652 (9th Cir. 2010) (Kozinski, J., dissenting)). These factual distinctions are critical, and place this case outside *Dukes*' ambit.

The Court finds that Plaintiffs, as they did in 2018, have met their burden of demonstrating commonality.

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

### b. Typicality

Defendants argue that the typicality requirement is not met because "no class members' claims ... arose from the 'same course of events.' " Defs. Decert. Mem. at 40 (quoting *Moussouris*, 2018 WL 3328418, at *27–28). They argue, as they have previously, that the named Plaintiffs' differing experiences at Goldman Sachs demonstrate that the claims of individual class members are not typical. *Id.* at 40–42. Defendants allege that discovery has "show[n] that no class members' claims, including those of [n]amed Plaintiffs, arose from the 'same course of events,' " *id.* at 40 (emphasis and citation omitted), however they do not point to any facts that were not known when the class was certified.

**\*22** Typicality "is satisfied when the lead plaintiffs' claims arise from the same series of events and find support in the same legal theories as the claims of all of the remaining class members." *Houser*, 28 F. Supp. 3d at 245; *see also* Fed. R. Civ. P. 23(a)(3) (requiring that "the claims or defenses of the representative parties are typical of the claims or defenses of the class"). The named Plaintiffs, like the unnamed class members, were all subjected to at least one of the challenged processes and their claims are based on the same legal theories. *See* Class Cert. Order at 36–39. The Court rejected nearly identical typicality arguments made by Defendants in 2018, *id.* at 34–39, and there has been no "significant intervening event or a showing of compelling reasons to reexamine the question" the Court already answered, *Mazzei I*, 308 F.R.D. at 106 (quoting *Gulino II*, 907 F. Supp. 2d at 504). Again, the Court rejects Defendants' arguments for the reasons previously stated.

### c. Adequacy

Defendants argue that "the evidence now shows that this class action is infected with intra-class conflicts that demand decertification" because class members have evaluated other class members as part of the challenged processes, destroying adequacy. Defs. Decert. Mem. at 45. This alleged intra-class conflict was knowable at class certification given how the processes function, for example, peers evaluated each other as part of the 360 review process, Defs. 56.1 ¶ 13. However, Defendants can now approximate how many class members provided feedback as part of the 360 review process and were managers or cross-ruffers. Defs. Decert. Mem. at 17, 45.

"In order to defeat a motion for certification, any conflicts between the class representative and members of the putative class must be 'fundamental.' " *Ligon v. City of New York*, 288 F.R.D. 72, 80 (S.D.N.Y. 2013) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).

The processes at issue channel the discretion of the individual evaluators and cross-ruffers, limiting their discretion. *See* Class Cert. Order at 25–28. The processes negate any possible fundamental conflict between the class representatives and class members because the allegations are not that any individual evaluators acted discriminatorily, but rather that the processes caused disparate impact or evinced disparate treatment. *Cf. In re Johnson*, 760 F.3d 66, 74 (D.C. Cir. 2014) ("If class members neutrally applied a flawed rating system and thereby reached a discriminatory result, then they were not themselves discriminating and therefore have no apparent interest that is in conflict with the attempt to prove other agents were denied promotions because of their race."). Defendants have not shown that there is a fundamental conflict in the class such that adequacy is lacking.

### d. Predominance

Defendants rely mainly on cases decided before the Class Certification Order to argue that determining who will be entitled to damages will predominate over classwide issues. *See* Defs. Decert. Mem. at 37–40. [26] Defendants merely reiterate arguments made in 2018 when the Court certified the class, and point to no changes in the factual record that impacts predominance.

[26] Defendants rely on *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 993 F.3d 774 (9th Cir. 2021). Defs. Decert. Mem. at 37. Any reliance on *Olean* is misplaced as the Ninth Circuit has vacated the opinion. *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 5 F.4th 950, 951 (9th Cir. 2021). The other case Defendants cite that was decided after class certification is an antitrust case. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019). The predominance analysis in that case focused on whether each class member was injured. *Id.* at 625–26. As explained in the standing section of this opinion, the class definition is constructed in such

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 28 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

a way to ensure each member suffered an injury-in-fact. *See supra* Part II.B.1.

**\*23** "Rule 23(b)(3) [ ] does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions '*predominate* over any questions affecting only individual [class] members.' " *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013) (quoting Fed. R. Civ. P. 23(b)(3); other quotation marks, citations, and alterations omitted). In the liability phase of this case, common questions predominate. The parties' motions for summary judgment illustrate this predominance, as each party believes they are entitled to summary judgment, which would apply to the entire class. Issues relating to damages and the possible need for individualized findings are not relevant at this stage of the case where common questions of liability predominate.

### e. Superiority

Defendants argue that a classwide finding of liability will not establish Defendants' liability as to individual class members for purposes of damages calculations. Defs. Decert. Mem. at 42–44. They argue that this issue is exacerbated by Plaintiffs' decision not to pursue an injunctive class, *id.* at 42, a decision that occurred after class certification, *id.* at 1. A finding of liability at the class level may streamline individual liability determinations. *See Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 161–62 (2d Cir. 2001), *abrogation on other grounds recognized by Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (disparate impact); *Reynolds*, 685 F.3d at 203–04 (disparate treatment). As the Court explained in 2018, "a class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' ... claims." Class Cert. Order at 47–49 (quoting Fed. R. Civ. P. 23(b)(3)).

Defendants have not carried the "heavy burden to prove the necessity of either the drastic step of decertification or the less draconian but still serious step of limiting the scope of the class." *Gulino II*, 907 F. Supp. 2d at 504 (quoting *Gordon*, 117 F.R.D. at 61). Accordingly, Defendants' motion for decertification is DENIED.

### III. Summary Judgment

Plaintiffs move for summary judgment on their *prima facie* case for some of their disparate impact claims. Pls. Summ. J. Mot., ECF No. 1247. Defendants move for summary

judgment on Plaintiffs' disparate impact and disparate treatment claims. Defs. Summ. J. Mot., ECF No. 1239.

### A. Legal Standard

#### 1. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents[,] ... [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may support an assertion that there is no genuine dispute by "showing ... that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation marks and citations omitted). On summary judgment, the "[C]ourt's function is not to weigh the evidence, make credibility determinations or resolve issues of fact, but rather to determine whether, drawing all reasonable inferences from the evidence presented in favor of the non-moving party, a fair-minded jury could find in the non-moving party's favor." *Urbont v. Sony Music Ent.*, 831 F.3d 80, 88 (2d Cir. 2016) (quoting *Beatie v. City of New York*, 123 F.3d 707, 710–11 (2d Cir. 1997)).

**\*24** "The same standard of review applies when the court is faced with cross-motions for summary judgment." *Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477, 492 (S.D.N.Y. 2009) (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)). In evaluating cross-motions for summary judgment, "[e]ach party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration." *Id.* (citing *Morales*, 249 F.3d at 121). However, "even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Morales*, 249 F.3d at 121 (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

2022 WL 814074

Competing expert testimony does not preclude summary judgment, so long as the district court excludes one parties' expert under *Daubert*. *Raskin*, 125 F.3d at 66–67. Alternatively, if both experts support the findings required for a *prima facie* case, there is no material dispute of fact and summary judgment may be granted. *See City of New York I*, 637 F. Supp. 2d at 94.

### 2. Title VII

#### a. Disparate Impact

For a Title VII disparate impact claim, the plaintiffs must prove, by a preponderance of the evidence, that the challenged practices have caused a disparate impact on the basis of sex. This is completed in a three-part analysis involving shifting evidentiary burdens. *Gulino v. New York State Educ. Dep't.* (*Gulino I*), 460 F.3d 361, 382 (2d Cir. 2006). First, plaintiffs must establish a *prima facie* case. *See* 42 U.S.C. § 2000e–2(k). Plaintiffs must identify the employment practice or practices they allege have harmed them. *Id.* § 2000e–2(k)(1)(B)(i). They must then prove that the practice or practices were responsible for the alleged disparity. *Id.* Statistical proof is central to the showing of a *prima facie* case of disparate impact because disparate impact claims require that an employment practice "had a disparate effect on the protected group" regardless of intent. *Robinson*, 267 F.3d at 160 (2d Cir. 2001). Regression modeling is normally used because this statistical technique attempts to eliminate other possible causes, leaving only the studied event as the possible cause of the difference observed. *Ottaviani*, 875 F.2d at 366–67, 371. In employment discrimination cases, statistical significance at the 5% level, or approximately two standard deviations, is sufficient. *Smith*, 196 F.3d at 366; *see also Ottaviani*, 875 F.2d at 371. This means the there is a 95% probability that the difference found is due to the variable of interest, rather than chance. *Ottaviani*, 875 F.2d at 371. The analysis should be done on the relevant level at which the process at issue was implemented, unless plaintiffs can explain why it is proper to exclude a portion of the employees subject to the policy. *See Smith*, 196 F.3d at 368–70.

Once plaintiffs establish a *prima facie* case, the burden shifts to defendants to rebut the *prima facie* case by attacking plaintiffs' statistical proof, *Gulino I*, 460 F.3d at 382, or by "demonstrat[ing] that the challenged practice is job related for the position in question and consistent with business necessity," *id.* (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)). If defendants attack plaintiffs' statistical proof, plaintiffs are free to challenge defendants' rebuttal just as in any other lawsuit, including by "impeach[ing] the reliability of the statistical evidence, ... offer[ing] rebutting evidence, or ... disparag[ing] in arguments or in briefs the probative weight which the ... evidence should be accorded." *Cf. Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 996, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (O'Connor, J.).

**\*25** Finally, if defendants rebut the *prima facie* case using the business necessity option, the burden shifts back to plaintiffs to show that there are less discriminatory alternatives. *See Gulino I*, 460 F.3d at 382.

#### b. Disparate Treatment

Like disparate impact claims, pattern-or-practice disparate treatment claims are evaluated using a burden-shifting framework. *Int'l. Bhd. of Teamsters*, 431 U.S. at 360–62, 97 S.Ct. 1843; *City of New York III*, 717 F.3d at 83. Plaintiffs make out a *prima facie* case if they can show that (1) "discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice," and (2) "the discrimination was directed at a class of victims." *City of New York III*, 717 F.3d at 83 (internal quotation marks omitted) (alterations in original). For this showing, "instances of discrimination against particular employees are relevant to show a policy of intentional discrimination, [but] they are not required; a statistical showing of disparate impact might suffice." *Id.* at 84. "The statistical disparities supporting [a] ... finding ... [of] disparate impact [can] also serve[ ] to establish a *prima facie* case on the ... claim of a pervasive pattern of discriminatory treatment." *See id.* at 88 (emphasis added). Further, the statistical significance level is the same for disparate impact and disparate treatment claims—two standard deviations. *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1376 (2d Cir. 1991).

After plaintiffs establish a *prima facie* case, the burden "shifts to the employer 'to rebut the presumption of discrimination.'" *City of New York III*, 717 F.3d at 84 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "The employer need only 'articulate some legitimate, nondiscriminatory reason for'" its presumptively discriminatory actions. *Id.* (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089) (emphasis omitted). As the Second Circuit has explained, defendants may rebut

2022 WL 814074

the presumption by attacking the accuracy or adequacy of plaintiffs' statistics, or, alternatively, "by accepting [ ] plaintiff[s'] statistics and producing non-statistical evidence to show that it lacked such an intent." *Id.* at 85.

If defendants do not successfully rebut plaintiffs' *prima facie* case, "the presumption arising from an unrebutted *prima facie* case entitles the plaintiff[s] to prevail on the issue of liability and proceed directly to the issue of appropriate relief." *Id.* at 87. If defendants are successful in their rebuttal, the presumption in favor of plaintiffs "drops out" and the case proceeds to trial. *Id.*; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At trial, plaintiffs are afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### 3. NYCHRL

NYCHRL discrimination claims are analyzed under the same burden-shifting standard used for Title VII claims. *Farmer v. Shake Shack Enter.*, 473 F. Supp. 3d 309, 323–24 (S.D.N.Y. 2020). The NYCHRL, however, must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Albunio v. City of New York*, 16 N.Y.3d 472, 922 N.Y.S.2d 244, 947 N.E.2d 135, 137 (2011). Accordingly, claims brought under the NYCHRL are analyzed "independently from and more liberally than federal and state counterparts." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (internal quotation marks and citation omitted). Interpretations of analogous state and federal statutes may "be used to aid in interpretation of [the NYCHRL]" to the extent such interpretations serve as "a *floor* below which" the NYCHRL cannot fall. *Id.* (citation omitted) (emphasis in original).

### B. Plaintiffs' Motion for Summary Judgment

**\*26** Plaintiffs move for partial summary judgment on their disparate impact claims under Title VII and the NYCHRL, contending that they met their burden of making out a *prima facie* case. Pls. Summ. J. Mot. With respect to the 360 review and quartiling processes, they move for summary judgment from the beginning of the class period to the end of 2015, Pls.

Summ. J. Mem. at 1, when Goldman Sachs stopped reporting numeric scores for 360 reviews, Farber Report ¶ 85, 109. For cross-ruffing, they move for summary judgment from the beginning of the class period to the present. *Id.*

Plaintiffs argue they have established a *prima facie* case on their disparate impact claim, which Defendants have failed to rebut. Specifically, Plaintiffs contend that even if Shaw's expert opinion is not excluded, her testimony is insufficient to rebut their *prima facie* case, because she "concedes that there is a statistically significant gender gap" caused by the processes at issue. *Id.* at 2–3, 12. Plaintiffs base this assertion on Shaw's Exhibit 68, *id.* at 12, which recreates Farber's aggregated analysis and then adds more variables Shaw believes should be included. Shaw Report at App. J. The fact that Shaw is able to reproduce Farber's modeling does not mean their reports are in agreement, nor does it mean that Shaw's report is insufficient to rebut Plaintiffs' *prima facie* case at this stage. Further, Shaw's final analysis in Exhibit 68, which includes all the variables she believes should be included, finds statistically significant gender differences only for Vice Presidents in two divisions, *see id.*, which does not support Plaintiffs' motion for summary judgment. Contrary to Plaintiffs' argument, Shaw and Farber present different regression models, which include different variables, resulting in different conclusions about disparate impact. *Compare* Shaw Report ¶ 29, *with* Farber Report ¶¶ 8, 10–14, 17–18. Shaw and Farber's reports create a material dispute of fact as to how the processes at issue impacted the class members.

Where, as here, two experts have put forth admissible opinions that disagree, summary judgment is improper. *Raskin*, 125 F.3d at 66–67. Because the "two contradictory expert opinions meet the requisite threshold of reliability, it is the function of the jury, utilizing the 'conventional devices' of 'cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof,' to determine which is the more trustworthy and credible." *In re Zyprexa*, 489 F. Supp. 2d at 285 (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786); *see also Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 315 (S.D.N.Y. 2015) (quoting *Amorgianos v. Nat'l. R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). Accordingly, Plaintiffs' motion for summary judgment is DENIED.

### C. Defendants' Motion

Defendants move for summary judgment on all of Plaintiffs' claims. Defs. Summ. J. Mot. They group their motion in three parts—disparate impact claims, disparate treatment claims, and issues relating to certain claims and class members. *See generally* Defs. Summ. J. Mem.

### 1. Disparate Impact Claims

Defendants argue that Plaintiffs have improperly grouped employment practices in a manner foreclosed by 42 U.S.C. § 2000e-2(k)(1)(B)(i). *See id.* at 20–23. They also contend that Plaintiffs' disparate impact claims fail because of gaps in the statistical evidence. *Id.* at 23–27. Finally, Defendants argue that Plaintiffs have not shown that there is a less discriminatory alternative to the processes at issue, dooming their case. *Id.* at 27–31. The Court addresses each argument separately.

### a. Identification of Employment Practices

 **\*27** Defendants argue that they are entitled to summary judgment because Plaintiffs failed to break down the 360 review and cross-ruffing processes into smaller subcomponents. *Id.* at 20–23. The Court disagrees.

Under Title VII, plaintiffs must identify the "particular employment practice that causes a disparate impact on the basis of ... sex." *Ricci v. DeStefano*, 557 U.S. 557, 578, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009). Plaintiffs must further show that the elements of the decision-making process "are not capable of separate analysis." 42 U.S.C. § 2000e-2(k)(1)(B)(i). "Whether a particular decision[-]making process is capable of separation for analysis largely turns on the details of the specific process and its implementation in a given case." *Chin*, 685 F.3d at 154.

Plaintiffs have met their burden by identifying three processes in Defendants' overall evaluation, compensation, and promotion system—360 review, quartiling, and cross-ruffing. *See, e.g.*, Pls. Summ. J. Mem. at 1. The three processes identified are not capable of further disaggregation, as the elements of each subcomponent are intertwined and are meaningless when separated.

The 360 review process involves multiple subcomponents, but each subcomponent works with the others to create an actionable employment process—Defendants do not utilize

the subcomponents of the 360 review process independently to make employment decisions. Rather, it is only when the subcomponents are brought together does the 360 review process become an "element of a respondent's decisionmaking process." 42 U.S.C. § 2000e-2(k)(1)(B)(i). Before the elements come together, they are just data points rather than an employment practice.

In the cross-ruffing process, the two subcomponents of the process work in tandem to determine if an individual will be promoted to Managing Director. As the Court has explained above, *supra* Part I.B.3.b, the two subcomponents are considered one process for the purpose of 42 U.S.C. § 2000e-2(k)(1)(B)(i). *See Chin*, 685 F.3d at 154–55.

What Defendants ask the Court to do is akin to requiring that plaintiffs identify which question on an exam is discriminatory rather than making a claim as to the full exam. Defendants cite no precedent requiring such disaggregation. *See Stagi v. Nat'l R.R. Passenger Corp.*, 391 F. App'x. 133, 146–48 (3d Cir. 2010) (noting "[t]here is no legal requirement to use the smallest possible unit of analysis" in disparate impact cases). Breaking down the processes into their subcomponents would also serve to disaggregate the data, making recognizing statistically significant patterns more difficult. *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 523 n.25 (N.D. Cal. 2012) ("Indeed, Defendant appears to largely offer a tautology—that disaggregated data is more probative simply because it yields results favorable to [it]."). Plaintiffs have adequately defined the elements of the decision-making process such that they are not capable of meaningfully being further broken down. *See Chin*, 685 F.3d at 154–55.

### b. Statistical Causation

Defendants allege that Plaintiffs have not met their burden of proving the employment processes at issue caused the disparities in compensation and promotions between men and women in the three divisions. Defs. Summ. J. Mem. at 23–27. Like Plaintiffs' motion for summary judgment, Defendants' motion must be denied because there is a disagreement between the experts on a number of material factual issues, including the proper level of aggregation and how to analyze the cross-ruffing process, creating a dispute that must be resolved by a jury. *In re Zyprexa*, 489 F. Supp. 2d at 285. Defendants also argue that there is no material dispute of fact because Farber did not find proof of disparate impact after

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 32 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

2015 for the 360 review and quartiling processes and did not find that fewer women than men were promoted to Managing Director in every year. Defs. Summ. J. Reply at 7–8, ECF No. 1319. However, the change in impact of the processes after 2015 does not negate the statistical findings from before that year, especially given that Defendants adduced evidence that there were changes to the 360 review and quartiling processes starting in 2016. Landman Decl. ¶¶ 6, 20; Landman Dep. at 82, 88. In 2016, the 360 review process shifted to being primarily used as a development tool rather than used to determine an employee's compensation. Landman Decl. ¶¶ 6, 20, 26–28; Landman Dep. at 82, 88. Goldman Sachs also changed its quartiling process in 2016. *See* Landman Decl. ¶¶ 26–28. Therefore, the lack of statistically significant findings after 2015 does not preclude a finding of liability prior to 2016. As to cross-ruffing, given the small sample size, there is a dispute among the experts about whether the statistical analysis should be done by year or across the full period. *See* Farber Rebuttal ¶ 81. Given the material disputes of fact, summary judgment is improper. *See Raskin*, 125 F.3d at 66.

### c. Less Discriminatory Alternative

**\*28** Defendants next argue that summary judgment is appropriate because Plaintiffs have failed to raise a triable issue of fact on the question of a less discriminatory alternative. Defs. Summ. J. Mem. at 27–31. In doing so, Defendants move for summary judgment on the final step of the disparate impact burden-shifting framework, a step only reached "*if* the defendant meets the burden of showing the challenged practice is job related." *Gulino I*, 460 F.3d at 382 (emphasis added). As discussed above, if Plaintiffs establish a *prima facie* case, then Defendants may show there is a business necessity for the processes at issue. *Id.* Only after this showing is made are Plaintiffs required to put forward a less discriminatory alternative. *Id.* Defendants have not defined the business necessity of the processes. Thus, even assuming, *arguendo*, that Plaintiffs have not sufficiently proposed a less discriminatory alternative, they cannot be faulted for that omission at this stage of the litigation. Although parties may move for summary judgment as to a "part of [a] claim or defense," Fed. R. Civ. P. 56(a), Defendants point to no authority from this Circuit allowing parties to skip to the final step of a burden-shifting framework without first carrying their burden in an intervening step.[27] The Court declines to allow Defendants to turn the burden-shifting framework on its head.

[27] Defendants' cited cases do not compel a finding that they are entitled to summary judgment on the less discriminatory alternative issue without first reaching that step in the burden shifting framework. Defs. Summ. J. Mem. at 30. In *Hernandez*, the court addressed the less discriminatory alternative issue in dicta after determining the plaintiff had neither met the burden of identifying a hiring process nor shown that a disparity existed. *Hernandez v. Off. of Comm'r of Baseball*, No. 18 Civ. 9035, 2021 WL 1226499, at \*11–12 (S.D.N.Y. Mar. 31, 2021). In *El*, the court granted summary judgment on a showing of business necessity because the defendant's evidence was not rebutted by plaintiff—the court then addressed the alternative policy issue in dicta. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 237, 239–49 (3d Cir. 2007). In *Williams*, the court first found that the defendant met its burden of showing business necessity before addressing the less discriminatory alternative issue. *Williams v. Wells Fargo Bank, N.A.*, 901 F.3d 1036, 1040–42 (8th Cir. 2018). Finally, *Smith* arose under the Age Discrimination in Employment Act ("ADEA"). *Smith v. City of Des Moines*, 99 F.3d 1466, 1468–69 (8th Cir. 1996). The court addressed business necessity before assuming, but not holding, that the less discriminatory alternative step of the Title VII disparate impact framework applies to ADEA cases. *Id.* at 1473–74.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' disparate impact claims are DENIED.

### 2. Disparate Treatment Claims

Defendants move for summary judgment on Plaintiffs' disparate treatment claims, arguing that the statistical evidence cannot support an inference that discrimination was the standard operating procedure at Goldman Sachs. Defs. Summ. J. Mem. at 31–36. For the reasons already stated, summary judgment can neither be granted based on Defendants' disparate impact statistical causation argument, nor on their disparate treatment argument. There are factual disputes on a number of material issues, including the proper level of aggregation and how to analyze the cross-ruffing process, creating a dispute that must be resolved by a jury. *In re Zyprexa*, 489 F. Supp. 2d at 285.

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 33 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)
2022 WL 814074

Accordingly, Defendants' motion for summary judgment on Plaintiffs' disparate treatment claims is DENIED.

3. Discrete Issues as to Certain Claims and Class Members

In addition to their arguments regarding Plaintiffs' disparate impact and treatment claims, Defendants move for summary judgment as to certain claims and class members. Defs. Summ. J. Mem. at 37–41. The Court shall address each of these miscellaneous arguments individually.

First, Defendants' argument that they are entitled to summary judgment as to cross-ruffing, *id.* at 37–38, arises from a misunderstanding of what the Court held in its Class Certification Order regarding promotions. Specifically, Defendants argue that Plaintiffs present no evidence related to "cross-ruffing" as Defendants define it. *Id.* As the Court has explained, cross-ruffing, for the purposes of this case, is the full Vice President-to-Managing Director promotion process, a process Farber did study, *see* Farber Report ¶¶ 125–35. Because Farber and Shaw disagree on whether the cross-ruffing process, as defined by the Court, caused a gender-based disparity, summary judgment is inappropriate. *See In re Zyprexa*, 489 F. Supp. 2d at 285 (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786).

**\*29** Next, Defendants argue that summary judgment is warranted with respect to the 360 review process before 2005, because the process was not fully implemented until 2004 and there was insufficient data until 2005. Defs. Summ. J. Mem. at 38–39. Because the Court excluded Farber's testimony on the 360 review process for 2002 to 2004, Plaintiffs have not adduced any evidence of disparate impact or treatment due to this process for those three years. *See Robinson*, 267 F.3d at 160 (disparate impact); *City of New York III*, 717 F.3d at 84 (disparate treatment). Accordingly, Defendants' motion for summary judgment for the 360 review process for those three years only is GRANTED.

Defendants also contend that they are entitled to summary judgment as to the 360 review and quartiling processes after 2015. Defs. Summ. J. Mem. at 39–40. The Court agrees. Farber has not put forward evidence of statistically significant differences based on gender after 2015. *See* Farber Report ¶ 114; *see also id.* ¶ 10. Plaintiffs have, therefore, failed to support their *prima facie* case. *See Robinson*, 267 F.3d at 160 (disparate impact); *City of New York III*, 717 F.3d at

84 (disparate treatment). The question of how the processes impacted pay after the processes were no longer in use because of historical pay differences carrying forward is an issue for damages in Phase II of this case. Accordingly, Defendants' motion for summary judgment for the 360 review and quartiling processes after 2015 only is GRANTED.

Defendants next contend that they are entitled to summary judgment for self-sustaining private wealth advisors, who work in the Investment Management division, because their compensation was not tied to the 360 review or quartiling processes. Defs. Summ. J. Mem. at 40–41. It is uncontested that self-sustaining private wealth advisors are not included in the normal compensation process because they are paid through commissions. Defs. 56.1 ¶ 70. However, female Associate and Vice President self-sustaining private wealth advisors were subjected to the 360 review and quartiling processes. Pls. 56.1 ¶ 1 (all Associates and Vice Presidents in the three divisions were subject to the policies). Although they may not recover damages given their differing compensation structure, they remain part of the class for the liability phase. Issues of individual damages are not currently before the Court, as they shall be addressed in Phase II of this case. Moreover, as to cross-ruffing, the Vice President self-sustaining private wealth advisors are on equal footing as to promotions as are all other Vice Presidents in the class. Accordingly, Defendants' motion for summary judgment on this basis is DENIED.

Finally, Goldman Sachs moves for summary judgment as to three individuals who signed liability releases. As the individuals have released Defendants of liability as to claims "known or unknown," Defs. 56.1 ¶ 73, this motion is GRANTED.

Accordingly, Defendants' motion for summary judgment is GRANTED in part, and DENIED in part.

**CONCLUSION**

For the reasons stated above:

- Defendants' motion to preclude the testimony of Goldberg is DENIED.

- Defendants' motion to preclude the testimony of Butler as to paragraphs 62 through 67 of her report is GRANTED, and DENIED as to the remainder of her report.

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 34 of 292

Chen-Oster v. Goldman, Sachs & Co., Not Reported in Fed. Supp. (2022)

2022 WL 814074

- Defendants' motion to preclude the testimony of Farber as to the 360 review process for 2002 to 2004 and damages is GRANTED, and DENIED as to the remainder of his reports.

- Defendants' motion to preclude the testimony of Yermack is DENIED as moot.

- Plaintiffs' motion to preclude the testimony of Shaw as to disaggregation at the business unit level, the impact of removing outliers, and the subcomponents of the cross-ruffing process is GRANTED, and DENIED as to the remainder of her report.

**\*30**  • Plaintiffs' motion to preclude the testimony of Stockdale is DENIED.

- Plaintiffs' motion to preclude the testimony of Dunleavy as to the two statistical studies in his job relatedness reports and to prevent the Court from considering Dunleavy's job analysis report when assessing Defendants' decertification motion is DENIED.

- Plaintiffs' motion to preclude the testimony of Dunn is GRANTED.

- Defendants' motion for decertification is DENIED.

- Plaintiffs' motion for summary judgment is DENIED.

- Defendants' motion for summary judgment is GRANTED as to the 360 review process for 2002 to 2004, the 360 review and quartiling processes after 2015, and the three individuals who signed liability releases, and otherwise DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 1184, 1187, 1194, 1239, and 1247.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 814074

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 3

2023 WL 6300569

2023 WL 6300569
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

DELAWARE COUNTY EMPLOYEES
RETIREMENT SYSTEM, individually and on
behalf of all others similarly situated, Plaintiffs,
v.
CABOT OIL & GAS
CORPORATION, et al., Defendants.

Civil Action No. H-21-2045
|
Signed September 27, 2023

**Attorneys and Law Firms**

Darryl James Alvarado, Pro Hac Vice, Francisco J. Mejia, Pro
Hac Vice, Jack Abbey Gephart, Pro Hac Vice, Kevin Lavelle,
Pro Hac Vice, Robbins Geller Rudman & Dowd, San Diego,
CA, Lawrence F. Stengel, Saxton & Stump LLC, Lancaster,
PA, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, for
Plaintiffs.

Gerard G. Pecht, Pro Hac Vice, Kelly A. Potter, Norton
Rose Fullbright US LLP, Houston, TX, Peter Andrew Stokes,
Norton Rose Fulbright US LLP, Austin, TX, Amy L. Barrette,
Buchanan Ingersoll & Rooney PC, Pittsburgh, PA, for
Defendants.

**MEMORANDUM AND OPINION**

Lee H. Rosenthal, United States District Judge

 **\*1** This action arises under §§ 10(b) and 20(a) of the
Securities Exchange Act of 1934, as amended by the Private
Securities Litigation Reform Act of 1995, 15 U.S.C. §§
78j(b), 78t(a), and its implementing regulation, Rule 10b–
5, 17 C.F.R. § 240.10b–5. The named plaintiffs are two
retirement plans that purchased common stock in Cabot
Oil & Gas Corporation between February 22, 2016, and
June 12, 2020: the Delaware County Employees Retirement
System and the Iron Workers District Council (Philadelphia
and Vicinity Retirement and Pension Plan) ("the Plans").
The Plans sued Cabot and three of its executive officers:
Dan Dinges, the Chief Operating Officer; Scott Schroeder,
the Chief Financial Officer; and Phil Stalnaker, the Vice
President and Regional Manager (together, "the Cabot

officers"). The Plans allege that Cabot and the Cabot
officers publicly misrepresented Cabot's compliance with the
environmental laws in Susquehanna County, Pennsylvania,
where its most significant well sites are located. According
to the Plans, these misrepresentations kept Cabot's stock
price artificially inflated until the truth about Cabot's
noncompliance was revealed, causing the stock to plummet.
The Plans allege millions of dollars in damages caused by
Cabot's misrepresentations and omissions.

The Plans move for certification of a class "consisting of
all persons or entities who purchased or otherwise acquired
Cabot ... common stock between February 22, 2016 and June
12, 2020, inclusive ..., and were damaged thereby." (Docket
Entry No. 134-1 at 7–8). The Plans also move to be appointed
as class representatives and to have Robbins Geller Rudman
& Dowd LLP and Kessler Topaz Meltzer & Check, LLP
appointed as class counsel. (*Id.* at 8). Based on the parties'
pleadings, the motions and responses, the record, and the
applicable law, the motions are granted. The reasons are set
out below.

**I. Background**

Cabot Oil & Gas Corporation is an oil and gas company
publicly traded on the New York Stock Exchange. (Docket
Entry No. 110 at ¶ 26). Cabot does hydraulic fracturing,
or fracking, in the Marcellus Shale Deposit. [1] (*Id.* at ¶
43). Most of Cabot's production comes from the Marcellus
Shale underneath Susquehanna County, Pennsylvania, and
specifically the Dimock Township. (*Id.* at ¶¶ 30–31, 92).

[1]     According to the complaint, "[f]racking is a
multistep process that involves drilling down deep
into the earth to shale rock deposits. Next, fluid is
injected into the rock at high pressures to create
fractures in the shale that release the natural gas
otherwise trapped within the rock. The gas is then
able to flow freely up to the surface to be captured
by oil and gas operators ...." (Docket Entry No. 110
at ¶ 89).

Cabot began drilling in the Dimock Township in 2006. (*Id.* at
¶ 92). Sometime after, Dimock residents noticed sediment and
"effervescence" in their drinking water. (*Id.* at ¶ 93). Some
residents experienced strange symptoms, including tunnel
vision, nausea and "bodily blotches." (*Id.* at ¶ 96). One
resident decided to hold a lighter to the water and "flames
came flying out of the jug." (*Id.* at ¶ 97). A residential water
well near a Cabot drilling site spontaneously exploded. (*Id.* at

¶ 93). Dimock residents and the Pennsylvania Department of Environmental Protection (the "Pennsylvania Department") suspected that Cabot was responsible. (*Id.* at ¶¶ 93–94).

**\*2** The Pennsylvania Department investigated and concluded that methane gas was migrating from Cabot's drilling sites into Dimock's aquifer.[2] (*Id.* at ¶ 94). Cabot entered into a consent order and agreement with the Pennsylvania Department, which was finalized in December 2010 (the "2010 Consent Order"). The 2010 Consent Order shut down Cabot's operations in a nine-square mile area of Dimock called the "Dimock Box," and required Cabot to remediate Dimock's drinking water and Cabot's wells in the Dimock Box to prevent further contamination. (*Id.*). Cabot also pledged under the 2010 Consent Order to comply with all applicable environmental laws and regulations. (*Id.* at ¶ 47).

[2]    "Methane is the chief constituent of natural gas, which contains from 50% to 90% methane, and is a potentially explosive gas that burns readily in air." (Docket Entry No. 110 at ¶ 90). Methane can escape a well when there are problems with the cement that is poured into spaces between a wellbore (that is, a hole drilled in the ground) and its casing (that is, a pipe running through the hole). (*Id.* at ¶ 90). The cement is supposed to secure the pipe and fill gaps through which gasses can escape. (*Id.*) But when, for example, groundwater mixes with the cement and dilutes it, the cement can set imperfectly, allowing gasses like methane to escape. (*Id.* at ¶ 91). Cement problems were what caused Cabot's wells to leak methane. (*Id.* at ¶ 110).

The Plans allege that over the next decade, Cabot did not remediate the drinking water or its Dimock wells and continued to violate environmental laws. (*Id.* at ¶ 118). The Pennsylvania Department cited Cabot for 781 violations between January 2011 and March 2020, for wells both within the Dimock Box and elsewhere in Susquehanna County. (*Id.* at ¶ 142).

On February 11, 2020, a Pennsylvania grand jury recommended criminal charges against Cabot based on its findings that Cabot knowingly contaminated residential water supplies in Susquehanna County through its drilling and fracking. (*Id.* at ¶ 84). The grand jury's findings were made public on June 15, 2020, when the Pennsylvania Attorney General released the "Presentment of Charges," charging Cabot with fifteen criminal counts, including nine

felonies. (*Id.* at ¶¶ 84, 120). The Attorney General charged Cabot under the Pennsylvania Clean Streams Law for knowingly discharging industrial waste, 35 P.S. § 691.301, and knowingly polluting Pennsylvania waters, 35 P.S. § 691.401. (*Id.* at ¶ 122). The charges were based not only on the Dimock wells covered by the 2010 Consent Order,[3] but also on other wells with similar pollution problems that Cabot had drilled later, outside Dimock.[4] (*Id.* at ¶ 120; Docket Entry No. 142-15 at 3–7, 20). The charges were based on Cabot's operation of its wells "through at least June 11, 2018."[5] (Docket Entry 142-15 at 3–7, 20). The Attorney General also charged Cabot with knowingly failing to comply with the 2010 Consent Order and other orders of the Pennsylvania Department. (Docket Entry No. 110 at ¶ 123). This charge was based on Cabot's conduct "on or about December 15, 2010, through January 9, 2020." (*Id.*). Cabot's stock price dropped by over 3% after the Attorney General released the Presentment of Charges. (*Id.* at ¶ 263).

[3]    These wells were: G Shields 1V, G Shields 2H, G Shields 4H, G Shields 5H, Costello 1V, Costello 2V, Gesford 4H, Gesford 8H, Ratzel 1H, Ratzel 2H, Ratzel 3V, Ely 4H, and Ely 6H. (Docket Entry No. 110 at ¶ 121). The Pennsylvania Department issued notices of violation for the G Shields wells on October 20, 2011, for the Costello and Gesford wells on June 16, 2014, for the Ratzel wells on December 19, 2014, and for the Ely wells on March 21, 2018. (*Id.* at ¶ 126).

[4]    The wells outside Dimock are the Howell well pad in Auburn Township, the Jeffers Farm wells in Harford Township, and the Powers M wells in Auburn Township. (Docket Entry No. 142-15 at 20). The Pennsylvania Department issued notices of violation for the Howell wells on March 16, 2017 and June 20, 2017, (*id.*), for the Jeffers Farm wells on November 16, 2017, (*id.* at 21), and for a Powers M well on October 18, 2019, (*id.*).

[5]    June 11, 2018, is the date when the Pennsylvania Department sent a private letter to Cabot detailing its continuing violations of the 2010 Consent Order. The Pennsylvania Department defines "continuing violation" as a "violation that was noted in a previous inspection that is still continuing through current inspection." (Docket Entry No. 110 at ¶ 146). In the letter, the Pennsylvania Department denied Cabot's request to drill new wells within the

Dimock Box because "Cabot is not in compliance with its obligation under the 2010 [Consent Order]." (Docket Entry No. 110 at ¶ 138).

**\*3** Cabot issued several public statements during the class period (February 22, 2016, to June 12, 2020). The parties have organized these statements into three categories: [6]

[6] The court pruned the universe of alleged misrepresentations in its order on Cabot's motion to dismiss, eliminating claims based on "nonactionable opinions"—namely, that Cabot "believe[s] that it substantially compl[ies] with the Clean Water Act and related federal and state regulations." (Docket Entry No. 118 at 7, 24).

**Category 1 Statements.**

Category 1 covers statements that Cabot made in its Form 10-Qs and Form 10-Ks in 2015 and 2016. [7] (Docket Entry No. 110 at ¶ 187–88; Docket Entry No. 134-1 at 12). The relevant representations are that Cabot: had received a notice of violation from the Pennsylvania Department in September 2011 for failing to prevent the migration of methane gas into Susquehanna County groundwater; was "engaged with the [Pennsylvania Department] in investigating the incident and ha[s] performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents"; believed "the source of methane has been remediated and [that it was] working with the [Pennsylvania Department] to reach agreement on the disposition of this matter"; had received a proposed consent order that, if finalized, would result in a civil penalty of between $100,000 and $300,000; and would continue to work to bring the matter to a close. (Docket Entry No. 110 at ¶¶ at 187–88).

[7] A Form 10-Q is a quarterly financial report, and a Form 10-K is an annual financial report, required by the Securities and Exchange Commission pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934. 15 U.S.C. §§ 78m, 78(d).

The September 2011 notice of violation and proposed consent order arose from Cabot's operations at the Stalter well site in Lenox Township, which is within Susquehanna County. (*Id.* at ¶¶ 149, 187; Docket Entry No. 142-5).

**Category 2 Statements.**

Category 2 comprises statements that Cabot made in its 2016 Form 10-K, filed on February 27, 2017. The statements provide an update on the September 2011 notice of violation and proposed consent order that were the subject of the Category 1 Statements:

> On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016. We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored. Further, the related gas well is being permanently plugged. Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close.

2023 WL 6300569

**\*4**  (Docket Entry No. 110 at ¶ 188).

**Category 3 Statements.**
There are two separate substantive components to the Category 3 Statements. The first is a press release that Cabot published at 6:38 a.m. on July 26, 2019. (Docket Entry No. 142-1 at ¶ 32). The second is the disclosure of notices of violation that Cabot had received in June 2017 and November 2017 relating to the Howell and Jeffers Farm wells that Cabot had drilled in Susquehanna County in the Auburn and Harford Townships, respectively. (Docket Entry No. 110 at ¶¶ 127, 129). Cabot first disclosed these notices of violation in its 2Q19 Form 10-Q, filed on July 26, 2019, at 11:42 a.m. (Docket Entry No. 142-1 at ¶ 31).

The relevant part of the press release (the "Guidance Update") follows.

> Cabot has provided its third quarter 2019 production guidance range of 2,360 to 2,410 Mmcfe per day. The Company has also adjusted its 2019 production growth guidance to a range of 16 to 18 percent (24 to 26 percent on a debt-adjusted per share basis) due in large part to a change in the operating plan resulting from a unique opportunity to acquire acreage adjacent to an eight-well pad, allowing the Company to increase the total lateral footage on the pad by approximately 28,000 feet (increasing the average lateral length per well from 8,950 feet to 12,450 feet). "This increase in lateral lengths will improve the capital efficiency and economics of the pad; however, the longer cycle time will result in a delay in the wells being placed on production, pushing out the production contribution from this pad to late December or early January," said Dinges. Cabot has updated its 2019 capital budget to a range of $800 million to $820 million to reflect the incremental drilling and completion activity on the previously referenced eight-well pad and an increase in drilling activity for the year by four net wells resulting from continued efficiency gains on the Company's three fully contracted drilling rigs.
>
> ...
>
> Cabot has provided its preliminary 2020 production growth guidance of five percent (seven to eight percent on a debt-adjusted per share basis). This production growth is based on a preliminary capital budget range of $700 million to $725 million. The Company's 2020 program is expected to deliver $375 million to $400 million of free cash flow at a

$2.50 NYMEX price and $525 million to $550 million of free cash flow at a $2.75 NYMEX price.

(Docket Entry No. 142-14 at 7–8).

The relevant part of the Form 10-Q is:

> On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents. We received Notices of Violation ("NOV") from the PaDEP in June and November 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV,

the proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PadEP to finalize the CO&A, and to complete the ongoing investigation and remediation.

**\*5** (Docket Entry No. 151-27 at 30).

Cabot's stock price declined on July 26, 2019, the day of the Category 3 Statements, bottoming out 12% lower than when the market opened. [8] (Docket Entry No. 110 at ¶ 260).

[8]     The Plans use the Category 3 Statements not just as alleged misrepresentations but also as alleged "corrective disclosures," that is, revelations that showed the public that the Category 1 and Category 2 statements were false. As explained below, "corrective disclosures" are often important in securities class actions to demonstrate that a company's misrepresentations kept its stock price artificially high. If the stock price falls after the corrective disclosure, it can often be inferred that the misrepresentations had a "price impact." *See Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320–21 (5th Cir. 2014); *Goldman Sachs Group, Inc. v. Ark. Teacher Retirement Sys.*, 594 U.S. ——, 141 S. Ct. 1951, 1961, 210 L.Ed.2d 347 (2021).

## II. The Legal Standards

### A. Class Certification

Under Rule 23(a), plaintiffs seeking class certification must satisfy four elements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011).

Numerosity means that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Commonality means that "there are questions of law or fact common to the class." *Id.* 23(a)(2). Typicality means that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Id.* 23(a)(3). Adequacy means that the representative party and the named class counsel "will fairly and adequately protect the interests of the class." *Id.* 23(a)(4).

Once the plaintiffs satisfy those four elements, they must further show that the class action falls within at least one of the following three categories under Rule 23(b): (1) cases in which prosecuting separate actions by or against individual class members would create a risk of inconsistent adjudication; (2) cases in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class," so that final injunctive or declaratory relief is appropriate with respect to the class as a whole; or (3) cases in which "questions of law or fact common to class members predominate over any questions affecting only individual members" and the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b).

The Rule 23 analysis is "rigorous," and "a district court must detail with sufficient specificity how the plaintiff has met the requirements of Rule 23." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 545 (5th Cir. 2020) (quoting reference omitted). " 'Rule 23 does not set forth a mere pleading standard." *Id.* (quoting *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' and so on." *Id.* (quoting *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541). A district court must often "probe behind the pleadings" and reach considerations " 'that are enmeshed in the factual and legal issues' of the case." *Id.* (first quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), then quoting *Dukes*, 564 U.S. at 351, 131 S.Ct. 2541). The court must "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020).

### B. The Securities and Exchange Act

**\*6** Section 10(b) of the Securities and Exchange Act of 1934 makes it "unlawful for any person, directly or indirectly, ...

[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C § 78j(b). Rule 10b–5 implements § 10(b) by prohibiting, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements ... not misleading." 17 C.F.R. § 240.10b–5(b).

A plaintiff may recover damages under § 10(b) by showing: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005).

As in many securities class actions, the issue here is the intersection between the reliance element of a § 10(b) claim and the predominance requirement of Rule 23(b)(3). An individual plaintiff may establish reliance by showing "that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation." *Goldman Sachs Group Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. ——, 141 S. Ct. 1951, 1958, 210 L.Ed.2d 347 (2021). But this individualized inquiry is impracticable in a class action. To prove that individual questions of reliance do not predominate over questions common to the class, class-action plaintiffs invoke the presumption established in *Basic Inc. v. Levinson*, 485 U.S. 224, 248, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). *Id.* at 1959. Under the *Basic* presumption, courts presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock. *See Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 813, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011).

To establish the *Basic* presumption, plaintiffs must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed. *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 268, 134 S.Ct. 2398, 189

L.Ed.2d 339 (2014). Once the presumption is established, it can be rebutted if the defendant proves, by a preponderance of the evidence, *Goldman*, 141 S. Ct. at 1960, "that an alleged misrepresentation did not actually affect the market price of the stock," *Halliburton II*, 573 U.S. at 284, 134 S.Ct. 2398. This can be done through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248, 108 S.Ct. 978. Courts must consider "*all* probative evidence" of price impact, "aided by a good dose of common sense." *Goldman*, 141 S. Ct. at 1960 (quoting reference omitted). "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely that not that the alleged misrepresentations had a price impact." *Id.*

The class-certification question of whether the *Basic* presumption has been rebutted by evidence of no price impact overlaps with the merits questions of materiality, reliance, and loss causation. *See id.* at 1961. Nonetheless, district courts must consider all probative evidence. *Id.* In doing so, they must "resist[ ] the temptation" to draw merits conclusions. *Id.* at 1961, n.2 (quoting reference omitted).

**\*7** When a plaintiff's theory is that the defendant's misrepresentations or omissions kept its stock artificially inflated, price impact may be shown on the back end. *See id.* at 1961. Front-end price impact may be inferred from a back-end price drop when a corrective disclosure shows that the defendant's previous statements were untrue or that the defendant failed to disclose the truth, and when the stock price falls after the truth is revealed. *See id.* However, a back-end price drop supports this inference only when the corrective disclosure "matches" the earlier misrepresentations or omissions. *See id.* If there is a "mismatch" between the contents of the corrective disclosure and the misrepresentations or omissions, the inference of price impact is weaker. *See id.* The Supreme Court has given the example of "when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')." *Id.* That said, a corrective disclosure need not "precisely mirror" the misrepresentation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). The two need only be "related" or "relevant" to one another. *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014).

### III. Analysis

Cabot does not contest that the Plans have satisfied Rule 23(a). The putative class is numerous. Cabot stock traded on the New York Stock Exchange and had an average weekly trading volume of 33.49 million shares during the class period. (Docket Entry No. 134-1 at 14). *See In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 672 (S.D. Tex. 2006) (numerosity is "generally assumed" in a class action involving nationally traded securities); *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 624 (5th Cir. 1999) ("100 to 150 members[ ] is within the range that generally satisfies the numerosity requirement."). Whether Cabot's representations were materially false and impacted the stock price are common questions of law and fact. (Docket Entry No. 134-1 at 15). *See Dukes*, 564 U.S. at 359, 131 S.Ct. 2541 ("[E]ven a single common question will do.") (internal quotation marks omitted) (alteration adopted). The Plans' claims that Cabot and its officers made misrepresentations that caused them damages are typical of the class members' claims. (Docket Entry No. 134-1 at 16). *See In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 287–88 (S.D. Tex. 2005). The Plans and their counsel are adequate. The Plans' interests are aligned with those of the class and there are no conflicts between the Plans and the class members. (Docket Entry No. 134-1 at 17). *See In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 522 (5th Cir. 1995); *Buettgen v. Harless*, 2011 WL 1938130, at *5 (N.D. Tex. May 19, 2011). Finally, the Plans' counsel is competent and experienced. (Docket Entry Nos. 134-5, 134-6).

Cabot argues only that the Plans have not satisfied Rule 23(b)(3) because individualized reliance questions predominate. Cabot does not argue that the *Basic* presumption is absent, but rather argues that the presumption is rebutted by evidence that its representations about environmental compliance had no impact on its stock price. Cabot's many arguments can be roughly organized into two buckets. First, Cabot argues that the price drop following the Presentment of Charges is not statistically significant. Second, Cabot argues that there is a "mismatch" between its representations about environmental compliance and the two corrective disclosures: (1) the July 26, 2019, press release and Form 10-Q; and (2) the Presentment of Charges. Each argument is analyzed below.

#### A. Statistical Significance

Cabot's stock price fell 3% the day the Pennsylvania Attorney General released the Presentment of Charges. (Docket Entry No. 110 at ¶ 263). The parties' experts disagree whether this drop was statistically significant. Cabot's arguments assume that if the price drop was statistically insignificant, then that equals no price impact. The parties dispute the validity of that assumption as well. The court addresses the validity of Cabot's assumption before analyzing the evidence on both sides of the question of statistical insignificance. But first, the dual role of the Category 3 Statements deserves clarification.

**\*8** The Category 3 Statements are allegedly both misrepresentations and corrective disclosures. If Cabot is correct that its stock price did not materially move following the Presentment of Charges, then there would be no evidence that the Category 3 Statements had a price impact. The Statements would then be relegated to the single duty of corrective disclosures, but that does not determine whether the Rule 23(b)(3) predominance requirement is unmet. To make that showing, Cabot would have to also prove that the Category 1 and 2 Statements had no price impact. As evidence that those statements had price impact, the Plans rely not only on the price drop following the Presentment of Charges, but also on the drop following the Category 3 Statements. Cabot's attacks on that evidence are addressed in the "mismatch" section, Part III.B, *infra*.

Cabot's underlying assumption is that the conclusion of no price impact follows from the statistical insignificance of a back-end price drop. The Plans say no, that as a matter of logic, statistical insignificance does not preclude price impact. (Docket Entry No. 151 at 20–21). They rely on *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019), and *Monroe County Employees' Retirement System v. Southern Company ("Southern")*, 332 F.R.D. 370 (N.D. Ga. 2019). In *Rooney*, the court rejected the defendants' argument that the lack of a statistically significant price adjustment following a corrective disclosure established that those prior misrepresentations had no price impact. *Rooney*, 330 F.R.D. at 450. The court explained that "that is not how hypothesis testing works. A statically significant price adjustment following a corrective disclosure is evidence the original misrepresentation did, in fact, affect the stock price. The converse, however, is not true—the absence of a statistically significant price adjustment does *not* show the stock price was unaffected by the misrepresentation." *Id.* The *Southern* court similarly noted that, "[i]n recognition of [a] basic truism of statistics, courts routinely reject the argument that a non-statistically significant stock price decline proves an absence of price impact." 332 F.R.D. at 394. The court held that "[a] non-statistically significant decline simply does not 'sever the link' between the alleged misrepresentations and

corrective disclosures." *Id.* at 395 (quoting *Basic*, 485 U.S. at 248, 108 S.Ct. 978).

The Plans' expert, Dr. Steven P. Feinstein, offers this explanation:

> Price impact and price movement are not the same thing. Information that prevents a stock price decline has price impact even though there may be no movement in the stock price. Therefore, while a statistically significant positive price reaction in response to misrepresentations may demonstrate price impact, a nonsignificant reaction, or even no price movement at all, does not prove there was no price impact.

(Docket Entry No. 151-2 at ¶ 25). When Cabot's expert, Lucy P. Allen, was asked in her deposition whether she agreed with this reasoning, she testified that the statistical insignificance of a price drop is "evidence that there is no price impact." (Docket Entry No. 151-3 at 85).

The reasoning of the *Rooney* and *Southern* courts is persuasive, and the parties have not pointed to convincing contrary authority. If Cabot is right that the price drop following the Presentment of Charges was statistically insignificant, that would be evidence that the misrepresentations had no price impact, but it would not be dispositive.

Here, the question of statistical significance requires the court to decide which sides' expert is more likely correct. Before *Goldman*, district courts often shied away from engaging in a "battle of the experts" at the class-certification stage. *See, e.g., Southern*, 332 F.R.D. at 387–88 ("[T]he Court declines to 'engage in the parties' battle of the experts' with respect to *Cammer* factor five ...."); *Zwick Partners, LP v. Quorum Health Corp.*, 2019 WL 1450546, at *14 (M.D. Tenn. Mar. 29, 2019) (dueling expert reports "create[ ] a factual dispute ... which involves complicated questions of causation better left until trial or at the earliest a summary judgment proceeding"). But the Supreme Court recognized that "most securities-fraud class actions" involve "competing expert evidence on price impact." *Goldman*, 141 S. Ct. at 1963. It instructed district

courts "to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* This task requires courts to keep in mind the importance of "common sense" in evaluating expert testimony on price impact. *Id.* at 1960; *see also In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020) (the price-impact analysis should be "aided by a good dose of common sense") (quoting reference omitted).

**\*9** The experts' disagreement about statistical significance appears to stem from a methodological difference. Dr. Feinstein applied the "Newey-West Methodology" to account for COVID-19-related market volatility, which he calls "heteroskedasticity."[9] (Docket Entry No. 134-3 at ¶¶ 137–140). He attributes Allen's conclusion of statistical insignificance to her failure to account for this market volatility, in addition to other alleged analytical flaws.[10] (Docket Entry No. 151-2 at ¶ 98). Allen responds that the Newey-West methodology is "non-standard" and "yields clearly erroneous and unreasonable results." (Docket Entry No. 142-1 at ¶ 66). She asserts that Dr. Feinstein's event study[11] "yields the unreasonably [*sic*] result that small excess returns were statistically significant while much larger excess returns during the same time period were not statistically significant." (*Id.* at ¶ 69).

[9] Investopedia explains that "heteroskedasticity" is "when the standard deviations of a predicted variable, monitored over different values of an independent variable or as related to prior time periods, are non-constant." Investopedia, *Heteroscedasticity Definition: Simple Meaning and Types Explained*, https://www.investopedia.com/terms/h/heteroskedasticity.asp.

[10] The other alleged flaws include: "failing to correctly remove the effects of Cabot from her market and peer-company indices, testing the wrong dates, omitting dates without explanation, using inconsistent estimation periods, and using an erroneous return that 'dramatically biases Ms. Allen's results toward findings of event nonsignificance' ...." (Docket Entry No. 151 at 20 (citing Docket Entry No. 151-3 at ¶¶ 13–14, 37–48)).

11     The court in *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 262 (N.D. Tex. 2015), explained that "[a]n event study is generally comprised of two parts: (1) a calculation of the market-adjusted price change in the issuer's share price at the time the corrective disclosure became public ...; and (2) a determination of whether the corrective disclosure is among the ... news that affected the price on the date the disclosure became public .... by comparing the magnitude of the market-adjusted change in [Halliburton's] share price on the date of the corrective disclosure with the historical record of the daily, market-adjusted ups and downs in [Halliburton's] share price."

Dr. Feinstein defends his methodology, asserting that the Newey-West methodology "is a peer-reviewed, published, and generally accepted methodology to correct for heteroskedasticity," and that Allen's own firm has endorsed the methodology. (Docket Entry No. 151-2 at ¶¶ 30–36, 108). He explains that the results of his methodology are not "erroneous or unreasonable" simply because "the biggest returns ... are not always the most significant." (*Id.* at ¶ 107). "This is," instead, "a common and expected result when correcting for changing volatility, i.e., heteroskedasticity." (*Id.* at ¶ 101).

Comparing Dr. Feinstein's analysis with Ms. Allen's leads to the conclusion that Dr. Feinstein's is more reliable because it accounts for COVID-19-related market volatility. Although Allen acknowledged in her deposition that heteroskedasticity can cause errors in a regression analysis, she admits she did not test for heteroskedasticity in her analysis in this case. (Docket Entry No. 151-3 at 108, 111, 114). Ms. Allen's criticism of Dr. Feinstein's use of the Newey-West methodology is undermined by her own firm's endorsement of the methodology in regression models. (*See* Docket Entry No. 151-2 at ¶¶ 99–100). Although Ms. Allen contends that her firm has not endorsed the Newey-West methodology "in the context" that Dr. Feinstein used it here, (Docket Entry No. 151-3 at 117), she does not explain why that is inappropriate. Instead, Ms. Allen criticizes Dr. Feinstein's outputs and notes that he did not apply the Newey-West methodology in an event study he did for other, unrelated litigation, (*see* Docket Entry No 142-1 at ¶¶ 67–78). The court credits Dr. Feinstein's conclusion that the residual return [12] following the Presentment of Charges is statistically significant. (Docket Entry No. 151-2 at ¶ 68).

12     Dr. Feinstein defines "residual return" as "the stock return after removing both the market and industry effects." (Docket Entry No. 151-2 at ¶ 92).

**\*10** Even if Cabot had shown that the price drop following the Presentment of Charges was statistically insignificant, common-sense considerations would discount the probative value of that showing. The announcement of felony criminal charges against Cabot based on its operations in Susquehanna County—which was by far its most productive region—would likely impact its stock price. The evidence shows that Cabot's noncompliance with environmental laws and the 2010 Consent Order in Susquehanna County significantly affected its financials. (*See* Docket Entry No. 151 at 14–17). Cabot could not operate its existing wells or drill new wells in the Dimock Box until it satisfied its obligations under the 2010 Consent Order. (Docket Entry No. 110 at ¶ 138). The record also includes several examples of market commentary linking the June 15, 2020, price drop to the charges against Cabot. (*See* Docket Entry No. 151 at 23–24). *See Ark. Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 104 (2d Cir. 2023) ("[M]arket commentary can provide insight into the kind of information investors would rely upon in making investment decisions—and therefore can serve as indirect evidence of price impact.....").

Ms. Allen emphasizes that market analysts—as opposed to news outlets—generally did not report on the charges. But she admits that JP Morgan analysts did report on the charges two days after they were announced, and that the analysts changed their price targets for Cabot shortly thereafter. (Docket Entry No. 142-1 at ¶¶ 55–56). Dr. Feinstein points out that Ms. Allen overlooked a second analyst's prediction on the day the Presentment of Charges was announced that the charges would have a "slightly negative" impact on Cabot's stock price. (Docket Entry No. 151-2 at ¶ 71). In light of this evidence, Cabot's argument that "analysts did not view the criminal charges as information material to Cabot's stock price" is unpersuasive. (Docket Entry No. 141-1 at ¶ 54).

Cabot's argument that the Presentment of Charges was immaterial because the potential fines were small compared to Cabot's revenues is also unpersuasive. (Docket Entry No. 142 at 25–26). The Plans correctly point out that the potential fines were only one consequence of the company's revelations. Other more serious consequences of "the revelation of Cabot's longstanding (but undisclosed) failure to remediate known violations and gas migration incidents" included "fines, regulatory scrutiny, criminal charges, reputational damages, and reduced gas production." (Docket Entry No. 151 at 25).

The price drop following the Presentment of Charges was statistically significant.

### B. Mismatch

Cabot next argues that there is a "mismatch" between its representations about environmental compliance and the two corrective disclosures. The Plans allege that the Category 3 Statements are corrective of the Category 1 and 2 Statements, and that the Presentment of Charges are corrective of the Category 1, Category 2, and Category 3 Statements. The court first analyzes whether there is a mismatch between the Category 3 Statements, as corrective disclosures, and the Category 1 and 2 Statements, then analyzes whether there is a mismatch between the Presentment of Charges and the Category 1, 2, and 3 Statements. In doing so, the court keeps in mind that corrective disclosures need not "precisely mirror" misrepresentations. *Alaska Elec. Pension Fund*, 572 F.3d at 230. The two need only be "related to" or "relevant to" one another. *Amedisys*, 769 F.3d at 321.

### 1. The Category 3 Statements as Corrective Disclosures

Cabot argues that there is a mismatch between the Category 3 Statements and the Category 1 and 2 Statements because the notices of violation disclosed in the 2Q10 Form 10-Q related to the Howell Wells and Jeffers Farms Pad 2 Wells, while the Category 1 and 2 Statements related to the Stalter Wells. (Docket Entry No. 142 at 14–15). Cabot further argues that the Guidance Update issued the same day as the Form 10-Q "had nothing to do with" its environmental compliance at any of the wells. (*Id.*). Cabot's argument about the Form 10-Q is unpersuasive, but the court agrees that there is a mismatch between the Guidance Update and the Category 1 and 2 Statements.

 **\*11** There is no mismatch between the 2Q10 Form 10-Q and the Category 1 and 2 Statements. It would have been apparent to a careful observer that the violations disclosed in the 2Q10 Form 10-Q were distinct from the violation that was the subject of the Category 1 and 2 Statements. The 2Q10 Form 10-Q disclosed notices of violation received in 2017 based on complaints from residents in 2017. (Docket Entry No. 151-27 at 30). By contrast, the Form 10-Ks addressed Statements in Categories 1 and 2 that disclosed a notice of violation received in 2011 based on complaints from residents in 2011. (Docket Entry No. 110 at ¶¶ 187–88). However,

it is not facially apparent from these documents that the distinct violations concerned different well sites. Both the 2Q10 Form 10-Q and the Form 10-Ks in Categories 1 and 2 refer generally to "several wells owned and operated by us in Susquehanna County, Pennsylvania. (Docket Entry No. 110 at ¶ 188; Docket Entry No. 151-27 at 30). A public observer could reasonably conclude that the statements in Categories 1 and 2 that the pollution issues "ha[d] been remediated" are contradicted by the 2Q10 Form 10-Q's revelation of continuing pollution issues at well sites "in Susquehanna County." The fine distinctions on which Cabot relies do not create a genuine mismatch.

The court is persuaded, however, that there is a mismatch between the Guidance Update and the statements in Categories 1 and 2. The Guidance Update announced that Cabot had "adjusted its 2019 production growth guidance to a range of 16 to 18 percent ... due in large part to a change in the operating plan resulting from a unique opportunity to acquire acreage adjacent to an eight-well pad, allowing the Company to increase the total lateral footage on the pad by approximately 28,000 feet ...." (Docket Entry No. 142-14 at 7). The Guidance Update went on to explain that extending the pad would "result in a delay in the wells being placed on production, pushing out the production contribution from this pad to late December or early January." (*Id.*). The Guidance Update also announced that Cabot "ha[d] updated its 2019 capital budget to a range of $800 million to $820 million to reflect the incremental drilling and completion activity on the previously referenced eight-well pad and an increase in drilling activity for the year by four net wells resulting from continued efficiency gains on the Company's three fully-contracted drilling rigs." (*Id.*). Finally, the Guidance Update stated that Cabot's "preliminary 2020 production growth guidance [was] five percent .... based on a preliminary capital budget range of $700 million to $725 million." (*Id.* at 7–8). In sum, the Guidance Update told the public that Cabot expected to produce less and spend more in the second half of 2019, and that it expected five percent production growth in 2020. (*See* Docket Entry No. 142-1 at ¶ 32).

On its face, the Guidance Update had nothing to do with Cabot's environmental compliance in Susquehanna County. The Plans have produced evidence suggesting that Cabot's environmental violations were a hidden cause of its disappointing predicted production, but that would not have been apparent to the public. (*See* Docket Entry No. 151 at 14–17). It is unlikely that the market would infer from the Production Guidance that Cabot's

previous representations about environmental compliance and remediation in Susquehanna County were false. Accordingly, there is a mismatch between the Production Guidance and the statements in Categories 1–2.

**\*12** This mismatch, however, is immaterial to the outcome of the class-certification analysis unless Cabot can show that the July 26, 2019, price drop was caused by the Guidance Update and not by the 2Q10 Form 10-Q. [13] Cabot relies on Ms. Allen's analysis of Cabot's "intraday" stock price on July 26, 2019. Ms. Allen's analysis shows that Cabot's stock price fell around the time the market opened at 9:30 a.m. (Docket Entry No. 142-1 at ¶¶ 31–32). Because Cabot issued the Production Guidance at 6:38 a.m. that day, but did not file its 2Q10 Form 10-Q until 11:42 a.m., Ms. Allen concludes that the price drop was caused by the Production Guidance and not by the Form 10-Q. (*Id.* at ¶ 32).

[13]     The court disagrees with the Plans that whether the 2Q10 Form 10-Q caused the price drop is a question of "loss causation" inappropriate for inquiry at the class-certification stage. (Docket Entry No. 151 at 11–14). *Goldman* instructed district courts "to take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue." *Goldman*, 141 S. Ct. at 1961. When causation-related evidence is relevant to the price-impact question, as it is here, courts must consider it.



Cabot Oil & Gas Corporation
Intraday Stock Price

Cabot's argument appears persuasive at first blush, but the Plans point out that the stock price fell another 3% between 11:42 a.m. and market close. (Docket Entry No. 151 at 17 (citing Docket Entry No. 151-21 at 15–19)). Cabot has shown that the price drop was caused in part by the Production

Guidance; Cabot has not excluded the Form 10-Q as a contributor to the price drop.

Cabot also relies on analyst commentary to show that the Form 10-Q did not contribute to the price drop. According to Cabot's expert, "*[n]one* of the 18 analysts following Cabot even mentioned the two [notices of violation] in their reports issued on or after July 26, 2019, indicating that the [notices of violation] were not viewed by analyst[s] as information material to Cabot's stock price." (Docket Entry No. 142-1 at ¶ 34). These analysts did, however, treat Cabot's Guidance Update as material to its stock price. (*Id.* at ¶ 35). Market analysis following a corrective disclosure is relevant to whether the earlier misrepresentation had price impact. *See Goldman*, 77 F.4th at 104. And the market analysis here suggests that the market regarded the Guidance Update as more significant than the notices of violation disclosed in the 2Q10 Form 10-Q. But the record is inadequate to conclude that the Form 10-Q did not at least contribute to the price drop.

### 2. The Presentment of Charges

Cabot next argues that there is a mismatch between the Presentment of Charges and the statements in Categories 1 to 3. Cabot argues a mismatch between the Presentment of Charges and the statements in Categories 1 and 2 because Cabot was not charged with violations for its operation of the Stalter Wells, and the statements in Categories 1 and 2 related only to those wells. (Docket Entry No. 142 at 16). Cabot argues that there is a mismatch between the Presentment of Charges and the statements in Category 3 because those statements concern Cabot's conduct at different times. According to Cabot, the charges were for "violations through June 11, 2018," while the 2Q10 Form 10-Q represented only that Cabot had taken "appropriate remediation efforts" as of July 26, 2019. (*Id.* at 16). Put simply, Cabot's argument seems to be that the charge do not contradict the statements in the 2Q10 Form 10-Q because Cabot could have been noncompliant on June 11, 2018, but not on July 26, 2019. Neither argument is persuasive.

First, as noted, the statements in Categories 1 and 2 were not limited to the Stalter Wells. A reasonable observer could infer that the charges against Cabot revealed the falsity of its representations in 2015 and 2016 that it had remediated the wells in Susquehanna County and was "work[ing] with the [Pennsylvania Department] to bring this matter to a close." (Docket Entry No. 110 at ¶ 188).

2023 WL 6300569

Cabot's mismatch argument about the Category 3 Statements is based on a misreading of the 2Q10 Form 10-Q. In that Form 10-Q, Cabot represented that it "ha[d] been engaged with the [Pennsylvania Department] in investigating the incidents and ha[d] performed appropriate remediation efforts" since residents in the area raised complaints "in March and June 2017." (Docket Entry No. 151-27 at 30). The charges for violations "through June 11, 2018" is corrective of Cabot's representation that it had performed "appropriate remediation efforts" between the Spring of 2017 and July 26, 2019. There is no mismatch.

## IV. Conclusion

**\*13**  The Plans meet the requirements of Rule 23. Cabot has not rebutted the *Basic* presumption by showing no price impact. The Plans' motion for class certification is granted. (Docket Entry No. 134). The court certifies a class consisting of all persons or entities who purchased or otherwise acquired Cabot common stock between February 22, 2016, and June 12, 2020, inclusive, and were damaged thereby. The Plans are appointed as class representatives, and Robbins Geller Rudman & Down LLP and Kessler Topaz Meltzer & Check, LLP are appointed as class counsel.

**All Citations**

Slip Copy, 2023 WL 6300569

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 4

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 49 of 292

Disney Enterprises, Inc. v. VidAngel Inc., Not Reported in Fed. Supp. (2019)

2019 WL 4544428

2019 WL 4544428
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

DISNEY ENTERPRISES, INC. et al

v.

VIDANGEL INC.

Case No.:CV 16-04109-AB (PLAx)
|
Filed 05/29/2019

**Attorneys and Law Firms**

Glenn D. Pomerantz, Rose Leda Ehler, Rowley Rice, Kelly M. Klaus, Munger Tolles and Olson LLP, Los Angeles, CA, Blanca F. Young, Juliana Mariko Yee, Stephanie Goldfarb Herrera, Munger Tolles and Olson LLP, San Francisco, CA, for Disney Enterprises, Inc. et al.

Brian T. Grace, Jaime W. Marquart, Ryan G. Baker, Scott Matthew Malzahn, Baker Marquart LLP, Los Angeles, CA, David W. Quinto, VidAngel Inc., Beverly Hills, CA, Donald R. Pepperman, Maxwell M. Blecher, Taylor Chase-Wagniere, Blecher Collins Pepperman and Joye PC, Los Angeles, CA, Mark L. Eisenhut, Samuel G. Brooks, Call and Jensen APC, Newport Beach, CA, Brendan Stephen Maher, Daniel L.Geyser, Elizabeth Rogers Brannen, Peter K. Stris, Stris and Maher LLP, Los Angeles, CA, J. Morgan Philpot, Pro Hac Vice, Attorney at Law, Alpine, UT, for VidAngel Inc.

**Proceedings: [In Chambers] ORDER
RE: MOTIONS IN LIMINE**

ANDRÉ BIROTTE JR., United States District Judge

 **\*1** Before the Court are motions in limine filed by Plaintiffs Disney Enterprises Inc., et al. ("Plaintiffs") and Defendant VidAngel Inc. ("VidAngel"). The Court rules as follows.

**A. Plaintiffs' Motions in Limine Nos. 1-5**

**1. Motion No. 1 (Dkt. No. 371) to Exclude
VidAngel's Advice of Counsel Defense is
DENIED IN PART and GRANTED IN PART.**

Plaintiffs argue that the Court should preclude VidAngel from relying on the advice of counsel defense because Vidangel improperly withheld communications with counsel on privilege grounds. " 'The privilege which protects attorney-client communications may not be used both as a sword and a shield. Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived.' " *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001). A party cannot "argue that he continued his infringing activities based on the advice of his attorney, while at the same time refusing to answer questions regarding relevant communications with counsel until the 'eleventh hour,' " and in such instances the court may bar the advice of counsel defense. *Id.*

Here, Plaintiffs argue that VidAngel's selective disclosures are tantamount to improperly using the attorney-client privilege both as a sword and a shield. There appear to be two phases to the advice of counsel defense in this case: first, attorney Quinto's advice to VidAngel regarding whether its disc-based service infringed copyrights; and second, advice of counsel pertaining to complying with the Court's December 12, 2016 preliminary injunction order. In both instances, VidAngel proffers an advice of counsel defense to Plaintiffs' claim that VidAngel's infringing conduct was willful.

With respect to the first phase—Quinto's advice regarding whether VidAngel's service infringed—the motion is **DENIED**. Plaintiffs have not shown that VidAngel has in fact withheld evidence relevant to this time-frame that it should have disclosed.

With regard to the second phase, however—compliance with the Court's preliminary injunction order—Plaintiffs have shown that VidAngel asserted privilege objections in response to discovery requests on that topic, and that VidAngel in fact failed to produce responsive documents. In response to an RFP seeking "[a]ll documents and communications, including advice of counsel, relating to VidAngel's compliance or non-compliance with the preliminary injunction entered in this matter," VidAngel asserted attorney-client privilege and the work product doctrine. *See* Klaus Decl. Ex. I, Response to RFP 33. Plaintiffs know there were responsive documents that VidAngel did not produce because they were produced by board members and a major investor but not by VidAngel itself. *See, e.g.*, Klaus Decl. Ex. D, E (documents responsive to Plaintiffs' discovery produced by Vidangel board member and investor). Because

Disney Enterprises, Inc. v. VidAngel Inc., Not Reported in Fed. Supp. (2019)
2019 WL 4544428

VidAngel has maintained attorney-client privilege regarding its compliance with the preliminary injunction order, it cannot proffer an advice of counsel defense on that topic. This part of the motion is therefore **GRANTED**.

### 2. Motion No. 2 (Dkt. No. 372) to Exclude VidAngel From Arguing That Its Infringements and Violations of the DMCA Were "Innocent" is GRANTED IN PART and DENIED IN PART.

**\*2** Plaintiffs seek to bar VidAngel from relying on the innocent infringer defense to copyright damages because every disc of Plaintiffs' works that VidAngel copied had a notice of copyright that complied with 17 U.S.C. § 401. Under § 401(d), if the infringed works bear such a notice, "then no weight shall be given to [ ] a defendant's interposition of a defense based on innocent infringement in mitigation of actual or statutory damages ..." 17 U.S.C. § 401(d).

VidAngel argues that § 401(d)'s reference to the "defense based on innocent infringement" refers only to § 405(b), which provides a total defense to liability and on which VidAngel does not rely. Instead, VidAngel relies on § 504(c)(2), which allows for a *reduction* of statutory damages to no less than $200 if the defendant "was not aware and had no reason to believe that [its] acts constituted an infringement of copyright." 17 U.S.C. § 504(c)(2).

However, although § 504(c)(2) does not use the phrase innocent infringer, it is commonly understood that § 504(c)(2) is an innocent infringer defense. *See* Mod. Jury Instr. 17.36 (the model instruction on the innocent infringement defense, indicating it is based on § 504(c)(2)). Furthermore, § 401(d) by its terms applies to an innocent infringement defense *in mitigation of* a damages award, thereby rebutting VidAngel's argument that it applies only to a complete defense of innocent infringement. VidAngel does not deny that all of the discs it used bore notices of copyright compliant with § 401. Therefore, § 401(d) applies, and VidAngel may not proffer any innocent infringer defense. This part of the Motion is **GRANTED**.

Plaintiffs also seek to rely on § 401(d) to bar an "innocent violator" defense to damages for the DMCA violation. Under 17 U.S.C. § 1203(c)(5)(A), "the court in its discretion may reduce or remit the total award of damages in any case in which the *violator* sustains the burden of proving, and the court finds, that the *violator* was not aware and had no reason

to believe that its acts constituted a violation." 17 U.S.C. § 1203(c)(5)(A) (emphasis added). Although § 1203(c)(5)(A) is worded similarly to § 504(c)(2)'s innocent infringer defense, § 1203(c)(5)(A) refers to an innocent "violator," not an innocent infringer. Plaintiffs appear to assume that § 401(d) applies to § 1203(c)(5)(A), and do not support their position with any argument or authority. This aspect of the Motion is therefore provisionally **DENIED**.

However, the parties' briefing raises another issue: whether the "innocent violator" reduction under DMCA § 1203(c)(5)(A) should be considered by the Court or by the jury. The Court **ORDERS** the parties to meet and confer on this issue and file a joint brief, consisting of no more than 3 pages per side if they cannot agree, stating their positions no later than June 4, 2019.

### 3. Motion No. 3 (Dkt. No. 374) to Exclude Documents, Witnesses and Expert Rebuttal Testimony Not Timely Disclosed is GRANTED IN PART and DENIED IN PART.

Plaintiffs seek to bar admission of three categories of evidence.

First, Plaintiffs seek to bar VidAngel from calling as witnesses seven persons whom VidAngel did not make available for deposition. This aspect of the motion is denied. Magistrate Judge Abrams limited Plaintiffs to 3 depositions based in part on his determination that Plaintiffs did not timely notice six depositions it wanted to take. Consistent with that order, Plaintiffs took 3 depositions. Plaintiff did not seek to modify that order. It also appears that the undeposed persons VidAngel may call as witnesses were known as potential witnesses, even if VidAngel did not specifically disclose them as such. This part of the Motion is **DENIED**.

**\*3** Plaintiffs seek to bar VidAngel from using at trial some 300 documents it produced for the first time on April 15, 2019. "Under Rule 37, exclusion of evidence not disclosed is appropriate unless the failure to disclose was substantially justified or harmless." *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008), *as amended* (Sept. 16, 2008). VidAngel has not offered any justification for its untimely production of these documents. Nor is the Court persuaded that this late document dump was harmless. Although Plaintiffs were nimble enough to respond for purposes of preparing trial-related filings, that does not mean

they have been unharmed. Most obviously, the will not be able to conduct discovery relative to any of these documents. VidAngel has failed to carry its burden to overcome the self-executing sanction of Rule 37. The untimely disclosed documents will not be admitted at trial. This part of the Motion is **GRANTED**.

Plaintiffs seek to bar VidAngel from presenting expert rebuttal testimony that was not disclosed until these experts were deposed, on April 16 and 18, which was after the April 8 deadline for expert rebuttal. However, it appears that the matters which VidAngel's experts were responding to were not disclosed until Plaintiffs' expert Dr. Barnett was deposed on April 11, 2019. As such, VidAngel's experts could not have rebutted such testimony before the April 8 rebuttal deadline, so the untimeliness was justified. In addition, the rebuttal points appear to be narrow in scope and would come up in cross-examination of Plaintiffs' witnesses in any event, so Plaintiffs would have to prepare regardless. Thus, insofar as this disclosure may be considered late, it is harmless. This part of the Motion is **DENIED**.

The Court therefore **GRANTS** the motion as to the untimely disclosed documents, but otherwise **DENIES** it.

#### 4. Motion No. 4 (Dkt. No. 375) to Exclude Testimony of Dr. William Duckworth and Motion No. 5 (Dkt. No. 376) to Exclude Testimony of Jeffery Kinrich are **DENIED.**

Plaintiffs move to exclude the testimony of two expert witnesses on numerous grounds. The Court has reviewed the motions and oppositions, the experts' reports, and the relevant deposition testimony, and overrules the objections.

Regarding Dr. William Duckworth, who conducted a survey of VidAngel users, the Court finds that he is qualified to offer the opinions he disclosed based on his education and experience in statistics, that his opinions may be helpful to the trier of fact, and that he used sufficiently reliable methods to satisfy *Daubert.* Plaintiffs critique certain elements of the survey Duckworth opined on, but these criticisms go to weight not admissibility. Plaintiffs object to Duckworth's reliance on conclusions from the Lichtman/Nyblade study, arguing that the latter is hearsay and was hopelessly biased in VidAngel's favor. But experts can rely on hearsay, and furthermore, Professor Lichtman has adeuqately rebutted Plaintiffs' argument that his study is hopelessly biased. *See*

Lichtman Decl. (Dkt. No. 412-2). In sum, Plaintiffs' critiques of Duckworth's work go to weight, not admissibility.

Regarding Jeffrey Kinrich, an accountant who offered an opinion on Plaintiffs' actual damages, Plaintiffs object that his opinions should be excluded because he made certain assumptions that do not "fit" the facts of this case. Specifically, to calculate Plaintiffs' actual damages, Kinrich compared the actual revenue Plaintiffs received from VidAngel's purchase of physical discs to operate its service, to revenues Plaintiffs would have made in two hypothetical worlds in which VidAngel did not infringe. The Court has considered Plaintiffs' critiques of Kinrich's methods, and finds that they do not go to the admissibility of Kinrich's opinions but instead, they go to weight and should be raised on cross-examination.

#### B. VidAngel's Motions in Limine Nos. 2, 3, 5, 8, and 9

#### 1. Motion No. 2 (Dkt. No. 365) To Exclude Evidence Re: Titles Offered After Preliminary Injunction is **DENIED.**

**\*4**  VidAngel objects that evidence that it continued to offer Plaintiffs' titles on its streaming service after the Court's preliminary injunction took effect is irrelevant and unduly prejudicial under Rule 403. These objections are overruled. The evidence is relevant to willfulness and does not run afoul of Rule 403. The motion is **DENIED**.

#### 2. Motion No. 3 (Dkt. No. 368) to Exclude Evidence of Contempt, Sanctions, and/or Failure to Immediately Comply with Preliminary Injunction is **GRANTED IN PART** and **DENIED IN PART.**

VidAngel moves to exclude the above-referenced evidence on the ground that it is irrelevant and unduly prejudicial under Rule 403.

Regarding the Court's orders holding VidAngel in contempt for failing to immediately comply with the preliminary injunction order, and sanctioning VidAngel for moving for clarification of the preliminary injunction, the Motion is **GRANTED**. These matters are at best marginally relevant but use of the terms "contempt" and "sanction" pose a great risk of unduly prejudicing the jury. They are therefore excluded under Rule 403. Plaintiffs may, however, state that the Court

found that VidAngel was in violation of the preliminary injunction.

Regarding VidAngel's failure to immediately comply with the preliminary injunction, its arguments are very similar to its arguments in MIL 2, and they fail for the same reasons and are overruled. VidAngel also argues that such evidence is character evidence inadmissible under Rule 404(b). This objection is also overruled. VidAngel has not shown that Rule 404(b), which pertains to a "person's character," could apply to a corporation like itself. Furthermore, the proffered evidence goes to state of mind, not character. This aspect of the Motion is **DENIED**.

### 3. Motion No. 5 (Dkt. No. 366) To Preclude References To AnyDVD Software as Illegal or Foreign is **DENIED.**

VidAngel objects that the proffered evidence is irrelevant, unduly prejudicial, and impermissible character evidence. These objections are overruled. While it might be inaccurate to characterize the software itself as "illegal" in the abstract, Plaintiffs explain that they intend to inform the jury that trafficking in such software for the purpose of circumvention and piracy is unlawful under the DMCA, and that using software for circumvention is unlawful. These are accurate characterizations of what the DMCA prohibits. *See* 17 U.S.C. § 1201(a)(1), (a)(2). This is relevant because Plaintiffs intend to show that VidAngel purchased AnyDVD from an entity (RedFox) that was engaged in such illegal trafficking, and that VidAngel used AnyDVD for this unlawful purpose. Plaintiffs also intend to show that VidAngel purchased AnyDVD via a foreign website, and that this should have been a red flag as to the DMCA violation. These matters are relevant to willfulness and are not unduly prejudicial, nor is it character evidence. The Motion is **DENIED**.

### 4. Motion No. 8 (Dkt. No. 383) to Exclude Testimony of Robert W. Schumann is **DENIED.**

VidAngel objects that Mr. Schumann's expert opinions regarding VidAngel's technology, which it numbers 1-7, should be excluded on numerous grounds. As to opinions 1-6, VidAngel argues that Schumann lacks expertise (1, 2, 4), that the opinion is not helpful (3), that the opinion is inadmissible character evidence (5), and that the opinion is irrelevant and misleading (6). The Court has reviewed Schumann's report (Dkt. No. 383-1) and the relevant deposition excerpts

(Dkt. Nos. 383-2, 410-2, 410-3), and overrules VidAngel's objections to opinions 1-6. The Court specifically finds that Schumann is qualified to render these opinions, that they are relevant and helpful to the factfinder and don't trigger Rule 403 concerns, and that they satisfy the *Daubert* standard for admissibility. VidAngel also objects insofar as Schumann's report purports to "incorporate by reference the opinions offered in the declarations [he has] submitted" previously in this case. Schumann Report p. 2, ¶ g (referring to Dkt. Nos. 29, 92, 98, 188). Given the narrow issues at trial, it appears unlikely that Schumann would need to invoke his opinions from previous filings. The Court declines to rule on this objection and VidAngel may renew it at trial if it becomes relevant. The Motion is **DENIED**,

### 5. Motion No. 9 (Dkt. No. 362) to Exclude the Testimony of Robin Russell is **DENIED.**

**\*5** VidAngel objects that Ms. Russell's opinions regarding Plaintiffs' damages should be excluded under Rules 401, 402, 403 ad 702, and that they don't satisfy the standards set forth in *Daubert.* The Court has reviewed Russell's reports (Dkt. Nos. 411-2, 411-3) and the relevant deposition excerpts (Dkt. Nos. 362-2, 411-4) and overrules all of VidAngel's objections. Russell's decades of experience in the film industry, including in the home video segment, plainly qualifies her to opine about unquantifiable damages VidAngel's infringement allegedly caused. Such testimony is not excludable as unreliable or speculative or otherwise simply because it is qualitative instead of quantitative. Russell's testimony would also be helpful to the trier of fact. VidAngel's critiques of Russell's various opinions concerning Plaintiffs' harms don't go to admissibility; rather, these are matters that go to weight which VidAngel can address on cross-examination.

### C. Conclusion
For the foregoing reasons, Plaintiffs' Motion Nos. 1, 2, and 3 (Dkt. Nos. 371, 372, 374), and VidAngel's Motion No. 3 (Dkt. no. 368) are **GRANTED IN PART** and **DENIED IN PART** are stated above.

All other motions are **DENIED**.

**IT IS SO ORDERED.**

2019 WL 4544428

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4544428

---

**End of Document**                                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

# Case No. 5

Estech Systems IP, LLC v. Carvana LLC, Not Reported in Fed. Supp. (2023)

2023 WL 2934920

2023 WL 2934920
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Marshall Division.

ESTECH SYSTEMS IP, LLC, Plaintiff,

v.

CARVANA LLC, Defendant.

CIVIL ACTION NO. 2:21-
CV-00482-JRG-RSP (LEAD CASE)
|
Signed April 13, 2023

**Attorneys and Law Firms**

Abdul Althebaity, Austin, TX, Michael Simons, Fred Irvin
Williams, Williams Simons & Landis PLLC, Austin, TX,
John Wittenzellner, Williams, Simons, and Landis, PLLC,
Philadelphia, PA, Todd Eric Landis, Williams, Simons, and
Landis, PLLC, Dallas, TX, for Plaintiff.

**MEMORANDUM ORDER**

ROY S. PAYNE, UNITED STATES MAGISTRATE JUDGE

**\*1** Before the Court are two of Defendants'[1] motions to
strike (**Dkt. Nos. 215, 224**).[2] For the following reasons, the
Motion to Exclude Dr. R. Sukumar's Expert Report (**Dkt. No.
215**) is **DENIED**, and the Motion to Strike Expert Opinions of
Dr. R. Sukumar (**Dkt. No. 224**) is also **DENIED**. The motion
to strike regarding Mr. Occhiogrosso will be further addressed
at the April 24 hearing.

1        Conduent  BPO  Services,  LLC,  Conduent
         Business Process Optimization Services, Inc.,
         Conduent  Business  Services,  LLC,  Conduent
         Legal  &  Compliance  Solutions,  LLC,  Liberty
         Mutual Group, Inc., Public Storage (collectively,
         "Defendants").

2        Citations to docket and page number correspond to
         those assigned via ECF.

**I. BACKGROUND**

On December 31, 2021, Estech filed suit against Defendants[3]
alleging that Defendants infringe U.S. Patent Nos. 7,068,684
(the "'684 Patent") and 7,123,699 (the "'699 Patent")

(collectively, the "Asserted Patents").[4] The Asserted Patents
relate to "information processing systems, and in particular,
to the use of Voice over IP technology to transmit voice
conversations." '699 Patent at 1:10–12; '684 Patent at 1:6–8.
The '684 Patent is titled "Quality of Service in a Voice Over
IP Telephone System," and the '699 Patent is titled "Voice
Mail in a Voice Over IP Telephone System." '699 Patent at
cover page; '684 Patent at cover page. Defendants have now
filed motions to strike three of Estech's expert reports under
Federal Rule Evidence 702 and Rules 26 and 37 of the Federal
Rules of Civil Procedure.

3        The  initial  allegations  included  claims  of
         infringement against additional defendants that
         are no longer in the case. *See* Order Dismissing
         Toyota Motor Manufacturing, Texas, Inc., Dkt.
         No. 31; Order Dismissing Carvana LLC, Dkt. No.
         173; Order Dismissing Extra Space Storage, Inc.,
         Extra Space Management Inc., and Extra Space
         Properties 107, Dkt. No. 174; Order Dismissing
         Toyota Motor Sales, U.S.A., Inc. and Toyota Motor
         Engineering & Manufacturing North America,
         Inc., Dkt. No. 203; Order Dismissing McKesson
         Corporation, Dkt. No. 204; Order staying re 99
         Cents Only Stores Texas, Inc., 99 Cents Only
         Stores, LLC, Dkt. No. 345.

4        Estech's initial complaint also asserted U.S. Patent
         Nos. 8,391,298 (the "'298 Patent") and 6,067,349
         (the  "'349  Patent"), and this set of consolidated
         cases has been stayed as to the '298 Patent and
         the '349 Patent because the PTAB has issued
         final written decisions invalidating all of the
         claims asserted in these cases. *See* Order Partially
         Granting Stay, Dkt. No. 124 at 1–2.

**II. DEFENDANTS' MOTION TO EXCLUDE DR. R.
SUKUMAR'S EXPERT REPORT (DKT. NO. 215)**

**A. Background Facts**

Estech hired Dr. R. Sukumar as an expert witness to perform
a conjoint analysis—a consumer research survey method—
that is being used to "determine customers' willingness to pay
for features represented in this patent infringement lawsuit."
Sukumar Report, Dkt. No. 215-3 at ¶¶ 10, 12. Dr. Sukumar
explains that conjoint analysis provides a way to determine
how much consumers value a particular feature of a multi-
feature product. *Id.* at ¶¶ 13–15.

**\*2** In his report, Dr. Sukumar uses conjoint analysis in an effort to quantify a difference in market value for a voice over IP (VoIP) solution/service based on seven attributes: five attributes corresponding to patented features, one distractor attribute, and one price attribute. *Id.* at ¶¶ 10, 12. Using information obtained from the survey, Dr. Sukumar calculates numerical values representing consumer willingness to pay for each of the five attributes corresponding to the patented features. *Id.* at ¶¶ 50–52.

Defendants seek to exclude Dr. Sukumar's entire expert report and opinions concerning the conjoint survey as allegedly failing to satisfy the reliability requirements of Rule 702 and *Daubert.* Motion to Exclude Dr. Sukumar's Report, Dkt. No. 215 at 4; FED. R. EVID. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The issue before the Court is whether Dr. Sukumar's Expert Report is sufficiently reliable to satisfy the standards set forth in Rule 702 and *Daubert.* For the reasons below, the Court holds that it is.

**B. Law**

In a suit for patent infringement, a successful plaintiff is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. An assessment of the reasonable royalty generally involves opinions by expert witnesses.

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702.

Rule 702 requires that judges act as gatekeepers to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v.* 509 U.S. at 597. However, "[t]he inquiry envisioned by Rule 702 is ... a flexible one." *Id.* at 594; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes

clear that the factors it mentions do *not* constitute a 'definitive checklist or test.' "). While the party offering the expert bears the burden of showing that the testimony is reliable, it "need not prove to the judge that the expert's testimony is correct...." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 1999) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). Ultimately, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

**C. Analysis**

Defendants argue that the conjoint survey is unreliable because the features it ascribes to the Asserted Patents are not directly tied to the patented technology. Motion to Exclude Dr. Sukumar's Report, Dkt. No. 215 at 7. As a legal basis for their position, Defendants almost exclusively rely on *Fractus, S.A. v. Samsung.* 6:09-CV-203-LED-JDL, 2011 WL 7563820, at \*1 (E.D. Tex. Apr. 29, 2011) (Granting motion to exclude customer surveys attributing a certain dollar value and identifying importance of percentage of cell phones with internal as opposed to external antennas because "the surveys do not measure how consumers value the purported advantages provided by Plaintiff's technology."). According to Defendants, the appropriate remedy is to exclude Dr. Sukumar's report in its entirety. *Id.*

**\*3** Here, the attributes identified by Dr. Sukumar are similar to those discussed in the '684 and '699 Patents, and therefore measure how consumers value purported advantages offered by Estech's technology. *See* Dr. Sukumar's Report, Dkt. No. 215-3 at ¶¶ 10, 12; Dr. Sukumar Feature & Level Description, Dkt. No. 215-6 at 4 (identifying eight sub-features within the three survey attributes correlated to the Asserted Patents); *see also* '684 Patent at 12:24–44 and 14:30–46 (describing advantage of the '684 Patent invention as it relates to voice data transmission); '699 Patent at 10:9–31 (describing advantages of the '699 Patent invention). While Defendants seem to argue that reasonable royalty estimation methodology must be *exactly* tied to the facts of the case, the methodology need only be *sufficiently* tied to the facts of the case. *Summit 6*, 802 F.3d 1283 at 1296 ("while all approximations involve

some degree of uncertainty, the admissibility inquiry centers on whether the methodology employed is reliable. A distinct but integral part of that inquiry is whether the data utilized in the methodology is sufficiently tied to the facts of the case.") (citations omitted). Dr. Sukumar has sufficiently tied the features of the Asserted Patents to the features analyzed in his study.

There may be questions regarding the correctness of Dr. Sukumar's methodology and the results from his conjoint study, but assessments as to credibility and correctness are for the factfinder, not the Court. *Summit 6*, 802 F.3d 1283 at 1296 ("But where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder.") The inquiry on the correctness of the methodology and the results produced in Dr. Sukumar's report can be properly explored through vigorous cross-examination and presentation of contrary evidence. *Daubert*, 509 U.S. at 596 (citation omitted).

### D. Conclusion

For the reasons above, Defendants' Motion to Exclude Dr. R. Sukumar's Expert Report (Dkt. No. 215) is hereby **DENIED**.

### III. DEFENDANTS' MOTION TO STRIKE EXPERT OPINIONS OF DR. R. SUKUMAR'S AND MR. BENEDICT OCCHIOGROSSO (DKT. NO. 224)

### A. Background Facts

This motion to strike concerns two expert witnesses retained by Estech: (1) Dr. R. Sukumar, who performed a conjoint survey and provided opinions to help approximate a reasonable royalty for damages, and (2) Mr. Benedict Occhiogrosso, who is Estech's technical expert as to the issues of infringement and validity.

#### i. Dr. R. Sukumar's Opinions

As previously described, Dr. R. Sukumar performed a conjoint survey to "determine customers' willingness to pay for features represented in this patent infringement lawsuit."

Sukumar Report, Dkt. No. 224-3 at ¶¶ 10, 12. In his report, Dr. Sukumar analyzes seven attributes of a voice over IP (VoIP) solution/service, one of which is a price attribute. *Id.* For the price attribute, Dr. Sukumar relied on a conversation with Estech's CEO, George Platt, and publicly available information, including websites of companies such as Avaya, Mitel, and Microsoft. Sukumar 2/7/23 Dep. Tr, Dkt. No. 224-4 at 20:11–23. Using this information, Dr. Sukumar came up with a price range of $5–$150 as the total price for a VoIP solution with bundled features, and randomly assigned discrete levels of $5, $25, $50, $100 and $150 to the different feature bundles shown to survey respondents. Sukumar Report, Dkt. No. 224-3 at ¶ 21. In addition, Dr. Sukumar describes the selection criteria, including the target sample size of 150 respondents, *id.* at ¶¶ 26–28, the survey process, *id.* at ¶¶ 29–33, the conjoint exercise, *id.* at ¶¶ 34–37, and the analysis of results from 150 of the 5261 respondents who attempted the conjoint survey, *id.* at ¶ 38.

Estech provided Dr. Sukumar's report to Defendants on January 5, 2023 in accordance with the Court's Order. Defendants' Motion to Strike, Dkt. No. 224 at 6; Amended Docket Control Order, Dkt. No. 100 at 3. On January 13, 2023, in response to Defendants' January 10 request, Estech produced certain facts and data underlying Dr. Sukumar's report. Defendants' Request Email, Dkt. No. 224-6 at 2; Defendants' Request Email Re: Deficiencies, Dkt. No. 224-7 at 2. On February 7, 2023, while Defendants were deposing Dr. Sukumar, Defendants learned that Dr. Sukumar possessed raw data that had not been produced, including (1) a .cho file containing raw data for the conjoint survey responses, and (2) a .att file containing a description of the attributes used in the survey. Defendants' Motion to Strike, Dkt. No. 224 at 6; Sukumar 2/7/23 Dep. Tr., Dkt. No. 224-4 at 89:3–20 and 155:15–156:10.

#### ii. Mr. Benedict Occhiogrosso's Opinions

**\*4** Mr. Benedict Occhiogrosso prepared infringement and validity reports on behalf of Estech. Occhiogrosso Infringement Report, Dkt. No. 254-3; Ochigrosso Validity Report, Dkt. No. 257-5. In Mr. Occhiogrosso's infringement report, he confirms that he reviewed Dr. Vijay K. Madisetti's [5] assessment of the Asserted Patents, and then states he agrees or disagrees with those assessments. Occhiogrosso Infringement Report, Dkt. No. 254-3 at ¶¶ 109, 110, 111, 113. Mr. Occhiogrosso does not cite to any specific materials that Dr. Madisetti prepared, *see id.*, or list them in the "Materials

Considered" exhibit attached to his report. Occhiogrosso Infringement Report Ex. A; Dkt. No. 224-9.

5    Dr. Madisetti was previously Estech's technical expert as to infringement and validity in a previous case, *Estech Systems, Inc. v. Target Corp.*, 2:20-CV-00123-JRG (E.D. Tex.). In that case, Dr. Madisetti prepared an infringement report and a validity report.

Nevertheless, during his deposition, Mr. Occhiogrosso admitted that he reviewed Dr. Madisetti's infringement report prepared in *Estech Systems, Inc. v. Target Corp.*, 2:20-cv-00123, and used Dr. Madisetti's analysis in formulating his infringement opinions. Occhiogrosso 2/1/23 Dep. Tr., Dkt. No. 224-10 at 20:21–21:8. Notably, Dr. Madisetti's infringement report from *Estech v. Target* is subject to a protective order in that case and has not been produced to Defendants in this case. Defendants' Motion to Strike, Dkt. No. 224 at 7; Estech's Response, Dkt. No. 254 at 3. Mr. Occhiogrosso's deposition also revealed that he could not confirm whether paragraphs 47–54 or the doctrine of equivalents arguments appearing on page 34 of his report were in his own words. Occhiogrosso 2/3/23 Dep. Tr., Dkt. No. 224-11 at 217:15–25, 294:12–295:2.

In Mr. Occhiogrosso's rebuttal validity report, he listed Dr. Madisetti's validity report from the earlier *Estech v. Target* case in his materials considered list. Occhiogrosso 2/8/23 Dep. Tr., Dkt. No. 282-1 at 10:14–10:17. In addition, Mr. Occhiogrosso confirms that he reviewed and used Dr. Madisetti's validity report in creating his report. *Id.* at 8:5–9:10. Dr. Madisetti's validity report from *Estech v. Target* is also subject to a protective order in that case and has not been produced to Defendants in this case. Defendants' Motion to Strike, Dkt. No. 224 at 7; Estech's Response, Dkt. No. 254 at 3.

First, Defendants seek to exclude Dr. Sukumar's entire expert report "because he failed to disclose several types of important information and data underlying his report." Defendants' Reply, Dkt. No. 276 at 2. Second, Defendants seek to exclude Mr. Occhiogrosso's entire infringement and validity reports "because he relied on reports that were never produced in this case to Defendants." *Id.*

There are two issues before the Court that apply separately to Dr. Sukumar and Mr. Occhiogrosso: (1) whether the expert satisfied the requirements under Rule 26(a)(2)(B); and (2) whether any such failure to comply with Rule 26(a)(2)(B)

was substantially justified or harmless under Rule 37(c)(1). FED. R. CIV. P. 26(a)(2)(B), 37(c)(1). As described below, the Court holds that Dr. Sukumar's opinions either comply with Rule 26 or any lack of compliance was substantially justified. As for Mr. Occhiogrosso, the Court holds that his failure to comply with Rule 26 was not substantially justified and partial exclusion is warranted.

### B. Law

Rule 26(a)(2)(B) explicitly states that a written report must be "prepared and signed by the witness." FED. R. CIV. P. 26(a)(2)(B). "Experts must undertake their own analyses and may not blindly rely on the opinions of others." *Mobility Workx, LLC v. Cellco P'ship*, No. 4:17-CV-00872, 2019 WL 5721814, at \*9 (E.D. Tex. Nov. 5, 2019) (quoting *Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-CV-33-JRG-RSP, 2015 WL 12911530, at \*2 (E.D. Tex. Sept. 30, 2015)). Rule 26(a)(2)(B) also requires experts to disclose "the facts or data considered by the witness in forming" their opinions. FED. R. CIV. P. 26(a)(2)(B)(ii). Rule 37(c)(1) provides that a party who fails to disclose the information required by Rule 26(a) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

**\*5** The Fifth Circuit applies a four factor test to determine whether the failure to disclose was substantially justified or whether exclusion is appropriate: "(1) the explanation for the failure to identify the [information]; (2) the importance of the [information]; (3) potential prejudice in allowing the [information]; and (4) the availability of a continuance to cure such prejudice." *Majestic Oil, Inc.*, No. 21-20542, 2023 WL 2549892, at \*3 (5th Cir. Mar. 17, 2023) (brackets in original) (quoting *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 270 (5th Cir. 2020)).

### C. Analysis

Defendants move to strike (1) Dr. Sukumar's expert report and opinions in their entirety and (2) Mr. Occhiogrosso's expert report and opinions in their entirety.

#### i. Dr. R. Sukumar's Opinions

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 59 of 292
Estech Systems IP, LLC v. Carvana LLC, Not Reported in Fed. Supp. (2023)
2023 WL 2934920

First, Defendants argue that Dr. Sukumar failed to provide the market research underlying the conjoint survey that he used for the price attribute, in determining the quota for participants in his survey to reflect the consumer market, and in choosing a distractor attribute. Defendants' Motion to Strike, Dkt. No. 224 at 5, 8. Yet, Defendants acknowledge Dr. Sukumar's consistent testimony that he did not keep notes and instead relied on a conversation with Estech's CEO as well as publicly available information from Avaya, Mitel, and Microsoft company websites. *Id.* at 8 (citing Sukumar 2/7/23 Dep. Tr., Dkt. No. 224-4 at 20:11–23, 21:5–22:5, 29:8–10, 93:23–94:11).

Second, Defendants argue that Dr. Sukumar failed to timely provide the data and analysis underlying his survey. *Id.* at 6–7. Defendants point out that they learned of two raw data files for the first time during Dr. Sukumar's deposition, and argue those files should have been produced with the service of Dr. Sukumar's expert report so Defendants could properly analyze the data. *Id.* (citing Sukumar 2/7/23 Dep. Tr., Dkt. No. 224-4 at 155:25–156:4 and 89:3–20). Notably, Estech recognized this omission was inadvertent due to Defendants' earlier specific request for another file type—a .ssi file—for data analyzed using Sawtooth or Lighthouse software, and then Estech provided the missing data files to Defendants within 48 hours. Estech's Response, Dkt. No. 254 at 3 (citing Defendants' Request Email, Dkt. No. 224-6 at 2; Sukumar 2/7/23 Dep. Tr., Dkt. No. 224-4 at 155:19–24).

To the extent the market research and underlying data were untimely disclosed, any such failure was substantially justified or harmless. The first factor—the explanation for the failure to identify the information—weighs in favor of inclusion for both the market research, and the data and analysis. Dr. Sukumar explains he did not make notes and essentially all of the information relied upon is publicly available. As far as the data and analysis, Estech concedes it was an inadvertent omission and quickly remedied the problem.

The second factor—the importance of the information—again weighs in favor of inclusion. Dr. Sukumar's report provides a basis for Estech's damages model in a way that attempts to assign value to the different patents and features.

The third factor—prejudice in allowing the information—only slightly favors exclusion, but the minimal prejudice to Defendants is insufficient to warrant exclusion. Defendants assert that the failure to disclose the market research, data,

and analysis underlying Dr. Sukumar's survey "is highly prejudicial to *Public Storage*," *id.* at 9 (emphasis added), and the prejudice sometimes applies to all Defendants in circumstances such as inability to test the veracity of Dr. Sukumar's model, *id.* at 10. Defendants conclude that now they are "effectively prevented from cross-examining Dr. Sukumar." Defendants' Reply, Dkt. No. 276 at 3. Nevertheless, Defendants identify two full pages of concepts to challenge the credibility of Dr. Sukumar's survey. Defendants' Motion to Strike, Dkt. No. 224 at 9–11.

**\*6** Since the prejudice is minimal, the fourth factor—availability of a continuance to cure the prejudice—does not affect the outcome. Thus, Defendants have failed to demonstrate that Dr. Sukumar's report and opinions should be stricken.

### *ii. Mr. Occhiogrosso's Opinions*

First, Defendants argue that Mr. Occhiogrosso's infringement report and opinions should be stricken in their entirety because he considered Dr. Madisetti's infringement report that is subject to a protective order from a prior *Estech Systems, Inc. v. Target Corp.*, 2:20-cv-000123-JRG (E.D. Tex.) case, and that prior infringement report was never produced to Defendants in this case. Defendants' Motion to Strike, Dkt. No. 224 at 12–13 (citing Occhiogrosso Infringement Report, Dkt. No. 224-8 at ¶¶ 109, 113–15; Madisetti Infringement Report (6:20-cv-00777-ADA Dkt. 102-6), Dkt. No. 224-12 at ¶¶ 105, 110–12). Mr. Occhiogrosso also could not confirm whether paragraphs 47–54, or the doctrine of equivalents arguments appearing on page 34 of his report, were his original words. Occhiogrosso 2/3/23 Dep. Tr., Dkt. No. 224-11 at 217:15–21, 294:12–295:2. Instead, he concedes that those paragraphs may have been written by Estech's counsel or Dr. Madisetti, which Mr. Occhiogrosso then reviewed and adopted. *Id.* at 217:15–25, 294:12–295:2.

Second, Defendants argue that Mr. Occhiogrosso's invalidity report and opinions should be stricken because he listed Dr. Madisetti's infringement report from the prior *Estech Systems, Inc. v. Target Corp.* case in his "materials considered" exhibit to his invalidity report. Defendants' Motion to Strike, Dkt. No. 224 at 7. Defendants note that Dr. Madisetti's invalidity report was also not produced in this case due to the prior case's protective order. *Id.*; Occhiogrosso 2/8/23 Dep. Tr., Dkt. No. 282-1 at 8:5–11:16. In response to being asked to identify portions of Dr. Madisetti's invalidity report that

2023 WL 2934920

Mr. Occhiogrosso did not copy, he responded that he recalls adding "some material regarding the re-exam of '684" and "[t]here may have been some other portions that I don't offhand recall." Occhiogrosso 2/8/23 Dep. Tr., Dkt. No. 282-1 at 8:5–13.

Although Estech allowed its expert, Mr. Occhiogrosso, to review and analyze Dr. Madisetti's prior reports subject to the protective order, Estech asserts that the protective order from the prior case excused and even prevented it from disclosing Dr. Madisetti's prior reports. Estech's Response, Dkt. No. 254 at 7. However, if the protective order prevented its disclosure, the protective order should also prevent its use.

Estech attempts to avoid this conclusion by arguing that while he reviewed Dr. Madisetti's opinions, Mr. Occhiogrosso "did <u>not</u> rely" on them, as confirmed by his testimony that all of the opinions in his report are his own. *Id.* at 8–9 (citing Occhiogrosso 2/1/23 Dep. Tr., Dkt. No. 254-4 at 21:1–3). Defendants respond that Mr. Occhiogrosso's infringement report contains essentially identical paragraphs to those in Dr. Madisetti's prior infringement report. Occhiogrosso Infringement Report, Dkt. No. 224-8 at ¶¶ 109, 113–15; Madisetti Infringement Report (6:20-cv-00777-ADA Dkt. 102-6), Dkt. No. 224-12 at ¶¶ 105, 110–12. Defendants raise similar concerns as to Mr. Occhiogrosso's invalidity report through his deposition responses. Occhiogrosso 2/8/23 Dep. Tr., Dkt. No. 282-1 at 8:5–13.

 **\*7** Nothing prohibits an expert from borrowing language from other sources in preparing his report. The better practice is to always acknowledge the contributions of others. If an expert attempts to pass off the work of others as his own, that can raise issues of credibility. However, what Rule 26 requires is that the report clearly set forth the opinions of the expert and the basis for them, no matter where the words originated.

The Court is satisfied that Dr. Occhiogrosso has sworn that the opinions in the report are his opinions. Accordingly, the fact that some of the language appears to be borrowed from others does not justify striking the report.

The more problematic issue is basing an opinion on documents, like the Madisetti reports, that are not disclosed to Defendants. Mr. Occhiogrosso was required to disclose that he reviewed the reports once Plaintiff's counsel provided them to him. However, he is not permitted to base any opinions on those confidential sources. It is plausible that Mr. Occhiogrosso did not base any of his opinions on Dr. Madisetti's reports, especially since the accused products and invalidity theories in that earlier case were different from those that he was opining on here. For the avoidance of any doubt, however, Plaintiff is ordered to provide the Court with full copies of his reports, and those of Dr. Madisetti, by April 21, 2023, and be prepared to demonstrate to the Court at the April 24 hearing that the opinions of Mr. Occhiogrosso stand on their own. Counsel for Defendants should be prepared to show the Court any parts of the deposition testimony that support their contention that the opinions of Mr. Occhiogrosso are dependent on Dr. Madisetti's reports.

### D. Conclusion

For the reasons above, Defendants' Motion to Strike Expert Opinions of Dr. R. Sukumar (Dkt. No. 224) is hereby **DENIED.** The motion regarding Mr. Occhiogrosso will be further addressed at the April 24 hearing.

### All Citations

Not Reported in Fed. Supp., 2023 WL 2934920

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 6

2020 WL 7025089

2020 WL 7025089
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

EXELTIS USA INC., Plaintiff,
v.
FIRST DATABANK, INC., Defendant.

Case No. 17-cv-04810-HSG
|
Signed 11/30/2020

**Attorneys and Law Firms**

Jaime Allyson Bartlett, Sidley Austin LLP, Ryan M. Sandrock, US Department of Justice, San Francisco, CA, Benjamin Milton Mundel, Pro Hac Vice, Daniel John Hay, Pro Hac Vice, Jacquelyn Erine Fradette, Pro Hac Vice, Sidley Austin LLP, Washington, DC, Richard Raskin, Pro Hac Vice, Sidley Austin LLP, Chicago, IL, for Plaintiff.

Thomas R. Burke, Davis Wright Tremaine LLP, San Francisco, CA, Jonathan R. Donnellan, Pro Hac Vice, Nathaniel Scott Boyer, Pro Hac Vice, Ravi Sitwala, Pro Hac Vice, Sarah Sohyun Park, Pro Hac Vice, Hearst Corporation Office of General Counsel, New York, NY, for Defendant.

ORDER DENYING THE MOTIONS TO EXCLUDE THE EXPERT TESTIMONY OF J. KEVIN GOROSPE AND NORMAN SMITH AND GRANTING IN PART THE MOTION TO EXCLUDE THE EXPERT TESTIMONY OF KATHRYN M. REXRODE

Re: Dkt. Nos. 169, 170, 190

HAYWOOD S. GILLIAM, JR., United States District Judge

**\*1** Pending before the Court are Defendant First Databank, Inc.'s motions to exclude the expert reports and anticipated testimony of three of Plaintiff Exeltis USA Inc.'s experts. Dkt. Nos. 169, 170, 190. The Court heard argument on these motions on December 18, 2019. As detailed below, the Court **DENIES** the motions to exclude the testimony of Dr. J. Kevin Gorospe and Norman Smith, Dkt. Nos. 169, 170, and **GRANTS IN PART** the motion to exclude the testimony of Dr. Kathryn M. Rexrode.

## I. BACKGROUND

The parties are familiar with the facts of this case, and the Court only briefly summarizes them here as context for the pending motions to exclude. In this action, Plaintiff, a prenatal vitamin manufacturer, challenges the new coding system that Defendant, a publisher of a pharmaceutical database called "MedKnowledge," is using for Plaintiff's products. *See* Dkt. No. 160 ("FAC"). According to Plaintiff, Defendant's database is used by Medicaid and private insurance providers to determine whether products are covered by public and private insurance plans. *See id.* at ¶¶ 1, 16, 53–58, 62–64. Historically, the "class value" field in the database indicated whether manufacturers identified their products as prescription-only. *See id.* at ¶¶ 1, 64, 98. Code "F" identified product labels that indicated prescription or physician supervision was required, including prescription prenatal vitamins, and "O" identified when the product label did not contain any dispensing limitations. *See id.* at ¶¶ 1, 8, 66–68. Beginning in 2017, Defendant proposed adjusting the class value field to identify whether federal law requires a prescription. *Id.* at ¶¶ 2, 73–77. Under this revamped field, code "O" would signify "[p]roducts with no federal legal prescription requirement." *Id.* at ¶¶ 89, 91. Then in September 2018, Defendant announced a new plan: the creation of a new class value, "Q," which would include all prenatal vitamins (both prescription and over-the-counter). *See id.* at ¶ 82; *see also* Dkt. No. 180-12, Ex. 38, at Ex. A at 3–4. Class values "O" and "F" would be limited to drug and device products:

> F – Prescription drugs or medical devices as defined in the Food Drug and Cosmetic Act (FDCA), including bulk drug ingredients
>
> O – Non-prescription drugs or medical devices
>
> Q – Products that are neither drugs nor devices, such as dietary supplements (including prenatal and other vitamins), medical foods, herbal preparations, and bulk flavorings or colorants.

*See id.* at 4.

Plaintiff alleges that the coding changes would falsely characterize its prenatal vitamins as over-the-counter and mislead users of the database. *See* FAC at ¶¶ 93–109. Plaintiff further urges that Defendant's new coding "will cause patients to lose coverage for prescription prenatal vitamins," which are critical to preventing birth defects. *Id.* at ¶¶ 111–16. At issue in these motions are the expert reports and anticipated testimony of three experts that Plaintiff proffers regarding (1)

2020 WL 7025089

how Defendant's database is used in claims processing; (2) the anticipated effects of the change in class value definitions in claims processing; and (3) the anticipated effects of the change in class value on women's health. *See* Dkt. Nos. 169. 170, 190.

## II. LEGAL STANDARD

**\*2** Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is admissible under Rule 702 if the expert is qualified and if the testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004). Rule 702 "contemplates a *broad conception* of expert qualifications." *Hangarter*, 373 F.3d at 1018 (emphasis in original).

Courts consider a purported expert's knowledge, skill, experience, training, and education in the subject matter of his asserted expertise. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000); *see also* Fed. R. Evid. 702. Relevance, in turn "means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (quotation omitted). Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the Court "assess[es] the [expert's] reasoning or methodology,

using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at 564.

## III. DISCUSSION

Defendant challenges the expert reports and the anticipated testimony of three of Plaintiff's experts: Dr. J. Kevin Gorospe; Norman Smith; and Dr. Kathryn M. Rexrode. *See* Dkt. Nos. 169, 170, 190. [1]

[1]  Defendant refiled two of the motions as fully unredacted following the Court's order on the motions to seal. *See* Dkt. Nos. 210, 211.

### A. Dr. J. Kevin Gorospe

Defendant first moves to exclude the expert report, expert declaration, and testimony of Dr. J. Kevin Gorospe. *See* Dkt. No. 169. Dr. Gorospe proffers several different opinions in his report and declaration: (1) Defendant's database is responsible "for most prescription drug transactions" in the United States; (2) the "class value field is a payment screen for drug claims adjudication"; (3) coding prescription prenatal vitamins as either "O" or "Q" is false and misleading; and (4) coding prescriptions prenatal vitamins as either "O" or "Q" will cause women to be denied coverage for prescription prenatal vitamins. *See generally* Dkt. No. 171-43, Ex. QQ ("Gorospe Report"); Dkt. No. 171-51 ("Gorospe Decl."). Defendant appears to challenge both Dr. Gorospe's qualifications as an expert to offer these opinions, and his factual support for these conclusions. *See* Dkt. No. 169.

### i. Rule 26

**\*3** As an initial matter, Defendant argues that Plaintiff failed to comply with Federal Rule of Civil Procedure 26, meaning that Dr. Gorospe's testimony should be excluded on this basis. *See* Dkt. No. 169 at 14–15. Defendant contends that in preparing his report, Dr. Gorospe relied on documents that Plaintiff failed to disclose, including news articles and sales figures about medical foods. *See id.* at 15. During his deposition, Dr. Gorospe explained that he had done some factual research to prepare his report. *See* Dkt. No. 171-8, Ex. H ("Gorospe Depo.") at 17:25–18:20. Counsel had also provided him with a binder of materials. *See id.* at 45:15–46:15. When asked whether he received any documents that were not cited in his report, he stated "I believe I may have, but I don't recall." *See id.* at 46:12–15. Dr. Gorospe also stated that he "Googled on the Internet" after looking at documents

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 64 of 292

Exeltis USA Inc. v. First Databank, Inc., Not Reported in Fed. Supp. (2020)
2020 WL 7025089

provided to him by counsel concerning sales figures for medical foods after Defendant changed the class value for medical foods from F to O "to try to understand th[em] more." *See id.* at 250:5–251:10.

An expert witness must prepare a written report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(b)(i)–(ii). The Ninth Circuit has explained that the disclosure obligation is broad, and "extends to any facts or data 'considered' by the expert in forming the opinions to be expressed, not only those relied upon by the expert." *See Republic of Ecuador v. Mackay*, 742 F.3d 860, 869–70 (9th Cir. 2014) (citing Fed. R. Civ. P. 26 advisory committee notes (2010 amendments)). Moreover, under Rule 26(e), a party has a duty to supplement a Rule 26(a) expert report "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties...." Fed. R. Civ. P. 26(e). Rule 37(c)(1) "gives teeth" to Rule 26's disclosure requirements. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

Under Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a)," then the party may not use that information or witness at trial, "unless the failure was substantially justified or is harmless." *See Fed. R. Civ. P. 37(c)(1)(A)–(C)*. The Ninth Circuit has enumerated several factors to guide district courts in determining whether the failure was substantially justified or harmless, including: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *See Lanard Toys Ltd. v. Novelty, Inc.*, 375 Fed. App'x 705, 713 (9th Cir. 2010). The Court has "particularly wide latitude ... to issue sanctions under Rule 37(c)(1)." *Yeti by Molly*, 259 F.3d at 1106.

Plaintiff responds in conclusory fashion that "Dr. Gorospe did disclose in his report all documents and data he considered in formulating his opinion in this case." *See* Dkt. No. 177 at 16. Plaintiff further notes that to the extent Dr. Gorospe may have seen other information on websites, "he did not cite or rely on it," and Plaintiff confirms that it does not intend to introduce any of these documents at trial. *See id.* Plaintiff's response misses the mark. As noted above, Rule 26 requires disclosure of "the facts or data *considered*" by Dr. Gorospe in forming

his opinions, and not just those that he actually relied on and cited in his report. *See* Fed. R. Civ. P. 26(a)(2)(b) (emphasis added); *see also Republic of Ecuador*, 742 F.3d at 869–70.

Nevertheless, the Court finds that the failure to disclose this information was harmless, and declines to exercise its discretion to exclude Dr. Gorospe's testimony on this basis. When questioned during his deposition about the documents that he considered when preparing his report and declaration, Dr. Gorospe stated that he identified in his report the "e-mails and documents that confirmed [his] understanding ... of the situation." *See* Gorospe Depo. at 47:6–20. He also explained that he did not cite any news articles from his online research in his report because "[t]hey were just confirmatory from some other information I looked at." *See id.* at 251:2–10. Dr. Gorospe therefore confirmed that any documents omitted from his report did not help him form his opinions in the first instance, but merely *confirmed* the opinions that he had already formed. *See id.* Plaintiff's counsel also explained that they believed that all of the documents Dr. Gorospe considered or reviewed in formulating the opinions contained in his report and declaration had been produced to or were already in Defendant's possession. *See id.* at 46:16–47:2. Moreover, Defendant was made aware of the existence of such documents and news articles during his deposition on June 5, 2019. It had the opportunity to question Dr. Gorospe about them at that time and to request or seek identification of any such documents before the close of expert discovery.

### ii. Expert Qualifications

**\*4** Defendant next suggests that Dr. Gorospe lacks the requisite qualifications to offer expert opinions about Defendant's database or how third parties such as Medicaid and private insurance providers use the database. *See* Dkt. No. 169 at 5–11. Defendant argues, for example, that Dr. Gorospe has no experience with payor systems that use the class value field, and has no knowledge base from which to conclude how payors will implement the new "Q" value. *See id.*; *see also* Dkt. No. 188 at 2–5. Defendant points out that during his deposition, Dr. Gorospe stated that he is not familiar with how specific private payor systems may actually use the class value in Defendant's database when making coverage determinations or how they intend to adapt to the new "Q" value. *See* Dkt. No. 169 at 5–6 (citing Gorospe Depo. at 68:9–69:8; 70:3–14; 72:2–15; 78:8–19; 79:22–80:12; 229:8–230:8; 234:14–18).

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 65 of 292

Exeltis USA Inc. v. First Databank, Inc., Not Reported in Fed. Supp. (2020)
2020 WL 7025089

The Ninth Circuit has emphasized that Rule 702 "contemplates a *broad conception* of expert qualifications." *See Hangarter*, 373 F.3d at 1015 (emphasis in original). As such, only a "minimal foundation of knowledge, skill, and experience" is required. *See id.* at 1016 (emphasis omitted). The Court is "a gatekeeper, not a fact finder," *Primiano*, 598 F.3d at 564, and the lack of particularized expertise merely "goes to the weight" of the testimony, "not to the admissibility of h[is] opinion as an expert," *see United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993).

Here, Dr. Gorospe is a licensed pharmacist and is a Principal of Gorospe Solutions LLC, a healthcare consulting firm. *See, e.g.*, Gorospe Report, Ex. A. In his consulting role, he advises clients—who include health plans, pharmacy benefit managers, pharmacy providers, and government agencies— regarding policies related to state and federal law, especially as they relate to drug coverage and expenditures, and in benefit plan design. *See id.*; *see also* Gorospe Decl. at ¶ 7. He worked for the California Department of Health Care Services from 2000 to 2010 as the Chief of the Medi-Cal Policy Branch in the Pharmacy Benefits Division. *See* Gorospe Decl. at ¶¶ 1–2; *see also* Gorospe Depo. at 11:25– 13:5. In that role, he was responsible for, *inter alia*, setting the Medi-Cal reimbursement policy, and he would utilize information from Defendant's database to make changes to the claims processing system. *See* Gorospe Depo. at 23:9– 30:20; *see also id.* at 96:23–100:3; 288:2–290:6. Through this work, Dr. Gorospe also became familiar with the claims adjudication systems for other entities such as CalPERS, Medco, Caremark, Involve Health, Express Scripts, and MedImpact. *See id.* at 13:6–15:4.

The Court acknowledges Defendant's concerns that Dr. Gorospe does not appear to have worked directly with the claims adjudication systems outside Medi-Cal, and that his knowledge is instead limited to reviewing entities' "technical data and their technical responses to [requests for proposals]." *See id.* Dr. Gorospe also acknowledged that he didn't "specifically recall" seeing documentation about the use of the class value for these entities. *See id.* at 68:24– 69:8. And Medi-Cal stopped using the class value field in the early 2000s. *See id.* at 70:15–71:9. But the Court finds that Dr. Gorospe has established the "minimal foundation of knowledge, skill, and experience" necessary to testify as an expert on claims processing systems, including how they utilize Defendant's database. *See Hangarter*, 373 F.3d at 1016. Defendant is free to explore the limitations of Dr. Gorospe's experience, and thus his opinions, during cross examination.

And the jury may decide what, if any, weight to give his conclusions at that time.

### iii. Reliability of Expert Opinions

Defendant's other arguments are directed at the basis for Dr. Gorospe's conclusions and whether they are adequately supported by reliable principles and methods.

**\*5** *First*, Defendant repeatedly urges that Dr. Gorospe simply relies on emails and other hearsay documents in reaching his conclusions, making him an improper mouthpiece for hearsay evidence. *See* Dkt. No. 169 at 4–5. As the Supreme Court has explained, "[u]nlike an ordinary witness ... an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. "[T]his relaxation of the usual requirement of firsthand knowledge ... is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* Rule 702 only permits expert opinions where "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Accordingly, expert testimony that "merely summarizes the record evidence and gratuitously interprets it" is improper. *See Lord Abbett Mun. Income Fund, Inc. v. Asami*, No. C-12-03694 DMR, 2014 WL 3417941, at \*13, n.8 (N.D. Cal. July 11, 2014), *aff'd*, 653 F. App'x 553 (9th Cir. 2016).

Here, Dr. Gorospe explains that his opinions are premised on his expertise, formed from his decades of experience in the healthcare industry. Dr. Gorospe states, for example, that "[i]n [his] experience" Defendant's database is "crucial for the sale, dispensing, and coverage for drugs in the United States." *See* Gorospe Report at ¶ 20. He also details the complicated healthcare system and how Defendant's database fits into it. He explains, for example, how the database "act[s] as a gatekeeper at three points in the drug transaction process: (1) formulary design/management; (2) e-prescribing; (3) claims adjudication." *See e.g.*, *id.* at ¶¶ 23–31, 37, 41, 48– 56, 60, 72. He also describes how a class value of "O" would be misleading given the historical understanding of that term, and how this could lead to payors improperly denying coverage or doctors not prescribing Plaintiff's products. *See, e.g.*, *id.* at ¶¶ 111, 121–23.

2020 WL 7025089

Still, the Court shares Defendant's reservations that throughout Dr. Gorospe's report he appears to cite straightforward facts about Defendant's database and marketing practices that do not require any specific expertise to understand. *See, e.g.*, *id.* at ¶¶ 21, 23, 44–47, 57–59. He also cites correspondence within First Databank and with Defendant's customers, despite acknowledging that he did not speak with the people in the emails and did not have any additional information regarding the emails' context. *See, e.g.*, *id.* at ¶¶ 48:23–9; 62–68, 70–71. He does not reference his expertise in explaining this information. At one point Mr. Gorospe even stated that "what is in the e-mails is, you know, what is in the e-mails, whatever the face value of the e-mail is." *See id.* at 49:7–9.

Dr. Gorospe's report may not serve as a compendium of otherwise straightforward background information, nor may Plaintiff use Dr. Gorospe at trial to introduce otherwise inadmissible evidence that does not require his specialized knowledge to understand. *See* Fed. R. Evid. 702; Fed. R. Evid. 703. Plaintiff's own cases make clear that an expert's ability to offer commentary on any document or exhibit in evidence "is limited to explaining the regulatory context in which the document or exhibit was created, defining any complex or specialized terminology therein, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge." *See, e.g.*, *Hines v. Wyeth*, No. CIV.A. 2:04-0690, 2011 WL 2730908, at *2 (S.D.W. Va. July 13, 2011).

Dr. Gorospe later clarified in his deposition that his use of documents in his report was solely to underscore or confirm his opinions. *See, e.g.*, Gorospe Depo. at 47:6–20; 251:2–10. Although Dr. Gorospe's expert report presents a close call, the Court is satisfied that the report is based on his own expertise and is not simply a summary of documents in the record. The Court cautions Plaintiff to ensure that Dr. Gorospe's testimony is similarly based in his own experience in the healthcare industry, and the Court will consider any such objections as they arise at trial.

 **\*6** *Second*, Defendant argues that Dr. Gorospe cannot opine on the market role that Defendant plays in prescription drug transactions because he did not "independently verify or analyze the total number of prescription drug transactions in the United States, nor how First Databank's data is used in such transactions." *See* Dkt. No. 188 at 2. Yet Dr. Gorospe's opinions are based on his experience, not on some independent study or survey. And as already noted above, he

explained in his expert report that "[i]n my experience, First Databank's solutions are crucial for the sale, dispensing, and coverage for drugs in the United States," and its "solutions are directly integrated into its customers systems." *See* Gorospe Report at ¶¶ 20, 23. To the extent Defendant believes that Dr. Gorospe lacks direct knowledge about specific customers' practices or the scale of Defendant's business, Defendant may cross examine him on those topics.

*Third*, and relatedly, Defendant contends that Dr. Gorospe cannot opine on whether the class value field is used by payors as a payment screening method for claims adjudication; whether the proposed coding change would be false or misleading; or what the effects may be from any coding change because Dr. Gorospe does not know how payors actually use Defendant's database. *See* Dkt. No. 169 at 5–13. Yet again, Defendant seems to ignore Dr. Gorospe's cited industry experience and his explanation that "many plans cover[ ] prescription drugs but do not cover drug products and [ ] non-drugs." *See* Gorospe Report at ¶¶ 60, 72. During his deposition, Dr. Gorospe said that he could not "identify the specific coding of any specific PBM," *see* Gorospe Depo. at 104:22–25, and certainly the effects of the new class value "Q" are unfolding in real time. Yet "[l]ack of certainty is not, for a qualified expert, the same thing as guesswork." *Primiano*, 598 F.3d at 565. Rather, expert opinion testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* As described above, the Court finds that Dr. Gorospe is sufficiently qualified as an expert and Defendant may challenge Dr. Gorospe's conclusions through vigorous cross-examination at trial. *See* *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). It is not, however, the Court's role to try to predict how persuasive Dr. Gorospe's testimony ultimately will be given the scope of his industry knowledge.

*Lastly*, Defendant argues that Dr. Gorospe may not opine on whether Defendant's proposed changes to the database would be false or misleading. *See* Dkt. No. 169 at 14. As Plaintiff concedes, Dr. Gorospe is not proffered as a legal expert and he will not be tasked with stating what the law is. *See* Dkt. No. 177 at 15. The Court will instruct the jury on the correct legal standards. *See* *Hangarter*, 373 F.3d at 1016 ("[I]nstructing the jury as to the applicable law is the distinct and exclusive province of the court.") (quotation omitted).

2020 WL 7025089

As to Defendant's concern that Dr. Gorospe is providing improper legal conclusions, the Ninth Circuit has held that "an expert witness cannot give an opinion as to [his] legal conclusion, *i.e.*, an opinion on an ultimate issue of law." *See Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002); *see also Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008). Thus, although an expert witness may give opinion testimony that embraces an ultimate issue to be decided by the jury, that expert may not express a legal opinion as to the ultimate legal issue. *Id.*; *see also* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). No expert will be permitted to testify to legal conclusions, and here, the jury must ultimately determine whether Defendant's new coding system is false or misleading. Nevertheless, there is still a place for Dr. Gorospe, and the experts in this case in general, to discuss how Defendant's proposed changes may be received by the relevant industry players. The Court finds no reason to fashion an order precluding legal opinions based on —and limited to—the anticipated testimony of Dr. Gorospe. At trial, the Court will have the opportunity to evaluate any such objections in context.

**\*7**

\* \* \*

Accordingly, the Court **DENIES** Defendant's motion to exclude the expert report and testimony of Dr. Gorospe. Dkt. No. 169.

### B. Norman Smith

Defendant next moves to exclude the expert report and testimony of Plaintiff's expert Norman Smith. Dkt. No. 170. In addition to his "experience and expertise," Mr. Smith designed an "empirical survey" of twelve "pharmacy directors at major health plans that use First Databank for formulary management or claims processing" regarding the likely confusion caused by Defendant's proposed changes to the database. *See* Dkt. No. 171-44, Ex. RR ("Smith Report"). Defendant appears to challenge both Mr. Smith's qualifications as an expert, and the methodology he used in arriving at his conclusions.

#### i. Rule 26

Defendant contends that Plaintiff violated Rule 26 by failing to disclose the identities of the pharmacists that Mr. Smith

contacted as part of his survey, as well as certain other related documents. *See* Fed. R. Civ. P. 26(a)(2)(b)(i)–(ii). For this reason, Defendant requests that the Court strike Mr. Smith's report and testimony under Rule 37. *See* Fed. R. Civ. P. 37(c)(1)(A)–(C). Defendant previously filed a discovery motion to compel production of this information, *see* Dkt. No. 161, which Magistrate Judge Sallie Kim denied, *see* Dkt. No. 164. Defendant then moved for relief from Judge Kim's pretrial order. Dkt. No. 173. The Court denied the motion for relief and affirmed Judge Kim's order. *See* Dkt. No. 176. Yet again, Defendant urges the Court to reconsider Judge Kim's well-reasoned order. *See* Dkt. No. 170 at 21–25. Defendant raises the same arguments again here: (1) Mr. Smith did not conduct a true "survey," so he has no confidentiality obligations to the people he contacted; and (2) during his deposition, Mr. Smith revealed that he had original notes and transcripts of his interviews that Plaintiff had not produced. *Compare* Dkt. No. 173 *with* Dkt. No. 170 at 21–25.

Again, the Court is not persuaded. As Judge Kim aptly explained:

> [S]everal factors weigh in favor of protecting the identities of the survey participants from disclosure. First, the participants were promised that their identities would be confidential, and an order protecting them would prevent annoyance to them. The participants in the survey are not parties to this action and deserve a heightened level of protection. Second, Defendant has access to the same information that Plaintiff has, since the survey participants are Defendant's customers.

*See* Dkt. No. 164 at 4. Moreover, regardless of whether Mr. Smith conducted a quantitative or qualitative survey, "[i]f courts routinely allowed disclosure of the identities of [a] survey's participants, it is unlikely that people would agree to participate in surveys." *Id.* at 5. Mr. Smith echoed these concerns himself, explaining that he has worked with these participants over the course of twenty years and they participate, at least in part, *because* Mr. Smith assures their confidentiality. *See* Dkt. No. 171-9, Ex. I ("Smith Depo.") at 159:14–24.

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 68 of 292
Exeltis USA Inc. v. First Databank, Inc., Not Reported in Fed. Supp. (2020)
2020 WL 7025089

**\*8** Defendant's suggestion that Plaintiff has failed to provide material information from Mr. Smith's survey is similarly unavailing. Defendant suggests that Plaintiff did not provide an accurate accounting of his interviews with participants because he "cleaned up" the document that was ultimately produced. *See* Dkt. No. 170 at 24. But Mr. Smith's deposition testimony makes clear that this process was not substantive. While interviewing the participants he "put in the substantive response," and then later he "took out some of the abbreviations" and ensured that the responses "were not missing words." *See* Smith Depo. at 202:13–19, 203:20–204:7. Mr. Smith further explained that he was "just making sure you c[ould] understand what the thought was at the time and the answers to question[s]." *See id.* at 205:20–25. He said "I can mistype as well as the next guy and so I went back and cleaned it up. There were typos, as there usually are." *See id.* at 205:25–206:4. Defendant's suggestion that this reveals that Mr. Smith somehow changed the nature or substance of the responses is unsupported. The evidence before the Court indicates that Defendant received a copy of the responses from the survey participants, and any variation between the draft and final versions was non-substantive, and therefore harmless.

Plaintiff's counsel further indicates that following Mr. Smith's deposition, Mr. Smith searched his records for other documents relevant to the expert report that he testified may exist. *See* Dkt. No. 178-1 at ¶ 2. Mr. Smith identified two additional documents, which Plaintiff produced to Defendant. *See id.* at ¶ 3. The first was a slide that contained definitions of the "F," "O," and "Q" class values, shown to participants. *See* Dkt. No. 178-2, Ex. A. This tracks verbatim the definitions that Defendant announced it would use. *Compare id. with* Dkt. No. 180-12, Ex. 38, at Ex. A at 4. The second was the initial email sent to the participants soliciting their involvement in the survey. *See* Dkt. No. 178-3, Ex. B. Defendant already had access to the nearly identical confirmation emails that Plaintiff sent to the twelve pharmacists participating in the survey. *See* Dkt. No. 171-50, Ex. XX. Like the initial email, the confirmation email indicated that the market research study would take between fifteen and twenty minutes; responses would be confidential; and participants would receive a $250 honorarium. *See id.* Defendant has not identified any meaningful difference between the documents. The Court finds that these late disclosures are also harmless. The Court further directs Defendant not to continue to file serial motions in the hope that the Court will eventually reverse itself and

rule that the identities of the survey participants should be revealed.

### ii. Expert Qualifications

Defendant's argument that Mr. Smith lacks the qualifications to testify as an expert in this case is based on the idea that he is being proffered as a quantitative survey expert, and that he lacks the requisite experience or education. *See* Dkt. No. 170 at 7–8. The Court finds that Defendant takes too narrow a view of Mr. Smith's proffered testimony and qualifications. As noted above, the Court looks to Mr. Smith's knowledge, skill, experience, training, and education in the subject matter of his asserted expertise. *See Hankey*, 203 F.3d at 1168. Here, Mr. Smith was tasked with determining whether:

- [A] significant number of commercial and public payers use First Databank for formulary design and management and drug claims processing.

- [A] significant number of commercial and public payers were aware of First Databank's decision to recode prescription prenatal vitamins and the corresponding change in definitions of the class value field.

- [A] significant number of commercial and public payers are likely to be confused by First Databank's proposed coding of prescription prenatal vitamins (as O or Q).

*See* Smith Report at 5. In addition to surveying twelve pharmacists, Mr. Smith also relied on his "years of experience and expertise in the managed care and payer fields" and "a review of public documents and internal documents produced by First Databank." *See id.* at 6.

In support of his qualifications to address these issues, Mr. Smith identifies considerable industry experience. He currently teaches "Marketing to Managed Care" at St Joseph's University Haub School's pharmaceutical MBA program, and has lectured on pharmaceutical marketing at Columbia University's Healthcare Strategies course. *See* Smith Report at 2. He founded a consulting company, Viewpoint Consulting, Inc., which focused on market research among managed markets decisionmakers to pharmaceutical and biotech companies, and also worked at Research America, Inc., where he conducted hundreds of market research studies for pharmaceutical and biotech companies. *Id.* He has worked in both Merck and Genentech's managed care divisions. *Id.* During his deposition, he explained that through his work

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 69 of 292

Exeltis USA Inc. v. First Databank, Inc., Not Reported in Fed. Supp. (2020)
2020 WL 7025089

he developed expertise in "reimbursement, formulary access, pricing, and contracting" in the managed care sector. *See* Smith Depo. at 17:5–9. He also has experience designing and administering "[q]ualitative surveys ... with managed care customers." *See id.* at 27:2–6.

**\*9** Defendant cites to deposition testimony in which Mr. Smith said he is not "an expert in surveys," *see* Dkt. No. 170 at 1–2, 7–8 (citing Smith Depo. at 26:17–27:1, 39:22–25, 43:21–23, 46:1–3), but as Plaintiff notes, Mr. Smith did not purport to design a *quantitative* survey, *see* Dkt. No. 178 at 4–5. That Mr. Smith disclaims authority to conduct such quantitative surveys is thus neither surprising nor significant. During his deposition, Mr. Smith did confirm, however, that he is an expert in designing qualitative surveys, or "qualitative market research," with managed care customers, as he did in this case. *See, e.g.*, Smith Depo. at 27:3–6, 40:19–21, 41:5–8. As the Court noted when discussing Dr. Gorospe's qualifications, only a "minimal foundation of knowledge, skill, and experience" is required *see* Hangarter, 373 F.3d at 1016 (emphasis omitted), and Plaintiff has met its burden of establishing Mr. Smith's qualifications. To the extent Defendant continues to have concerns about the nature of Mr. Smith's background and his familiarity with conducting the kind of qualitative survey he designed in this case, Defendant may raise them at trial during cross examination. Such concerns go to the weight, but not the admissibility, of Mr. Smith's opinions.

### iii. Reliability of Expert Opinions

Relatedly, Defendant appears to take umbrage with Plaintiff and Mr. Smith's characterization of Mr. Smith's work in this case as a "survey." During his deposition, Mr. Smith explained that he conducted a "study" or "qualitative market research." *See* Smith Depo. at 41:17–22. Defendant urges the Court to treat the qualitative research that Mr. Smith conducted as a quantitative survey, and then lists the myriad ways in which Mr. Smith's work did not meet the requirements for quantitative surveys. *See* Dkt. No. 170 at 8–15. The Court understands Defendant's concerns that the scale of Mr. Smith's survey is small, and that because he hand-selected the individuals with which he spoke, their responses may not be representative for purposes of drawing useful inferences for this case *See id.* Mr. Smith only interviewed twelve Directors of Pharmacy by telephone for fifteen minutes, and asked whether they knew about the change to the database and solicited their understanding of the F, O, and Q categories. *See*

Smith Report at 6–8. Several were unaware of Defendant's proposed changes, and Mr. Smith therefore did not follow up by asking how they understood the database change. *See* Smith Report, Ex. C at 5–6. Still, the Court finds that Mr. Smith is an expert in qualitative market research and designed a reasonable approach to solicit feedback from Defendant's customers about the role of the database and their understanding of the proposed changes to the class value. Mr. Smith indicated that his "survey exceeded generally accepted practices in the field of survey design for payer research." *See* Smith Report at 6–7. And Mr. Smith explained why he designed the survey as he did, including why he solicited responses from certain entities and not others, and what level of knowledge the participants had about the case. *See, e.g.*, Smith Depo. at 54:10–57:7; 133:14–134:10; 137:7–18; 141:19–143:10. The significance of Mr. Smith's qualitative work is for the jury to decide. *See* Keith v. Volpe, 858 F.2d 467, 480 (9th Cir. 1988) ("Technical inadequacies in the survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.").

Defendant's authorities are not to the contrary. In Sirko v. Int'l Bus. Machines Corp., No. CV 13-03192 DMG SSX, 2014 WL 4452699, at \*4 (C.D. Cal. Sept. 3, 2014), for example, plaintiff's counsel sent a survey to putative class members to support a pending motion for class certification. In excluding the results, the court reasoned that the survey "lacked the essential hallmarks of reliability" because it was not conducted by experts and the respondents were aware that they could potentially benefit from the litigation. *Id.* (citation omitted). Similarly, in M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1087 (9th Cir. 2005), the Ninth Circuit affirmed the exclusion of a survey where the survey creator did not qualify as an expert in designing or analyzing the type of survey at issue in that case. *Id.*; *accord* Casey v. Home Depot, No. EDCV142069JGBSPX, 2016 WL 7479347, at \*21 (C.D. Cal. Sept. 15, 2016). Defendant is of course free to cross examine Mr. Smith as to the nature of his research and its limitations.

### iv. Hearsay

**\*10** Defendant also urges that even if Mr. Smith's testimony is not excluded, Plaintiff should not be permitted to introduce the actual survey responses. *See* Dkt. No. 170 at 19–20. Defendant contends that they are "inadmissible and utterly unreliable hearsay...." *See id.* at 19. In support, Defendant

Case 4:21-cv-02473　Document 89-4　Filed 09/06/24 in TXSD　Page 70 of 292

Exeltis USA Inc. v. First Databank, Inc., Not Reported in Fed. Supp. (2020)
2020 WL 7025089

again challenges Mr. Smith's survey, including the manner in which he recorded responses. *Id.* at 19–20. Defendant's argument, therefore, is a reiteration of its challenge to the survey methodology discussed in Section III.B.iii above. During his deposition, Mr. Smith explained that he may not have included "word for word" what participants said, but he "put in the substantive response." *See* Smith Depo. at 203:20–204:7. To the extent Defendant believes that Mr. Smith failed to faithfully record the responses, it may cross examine Mr. Smith and highlight such concerns for the jury. However, "[a]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. "Rule 703 ... permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion." *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261–62 (9th Cir. 1984). If Plaintiff seeks to introduce any of the responses as evidence at trial, Defendant may raise specific objections to them at that time. The Court declines to speculate as to how Plaintiff may attempt to use the responses in future.

\* \* \*

Accordingly, the Court **DENIES** Defendant's motion to exclude the expert report and testimony of Norman Smith. Dkt. No. 170.

### C. Dr. Kathryn M. Rexrode

Defendant also moves to exclude the expert report and testimony of Dr. Kathryn M. Rexrode. Dkt. No. 190. Dr. Rexrode is the Chief of the Division of Women's Health at Brigham and Women's Hospital, and is an Associate Professor of Medicine at Harvard Medical School. *See* Dkt. No. 190-2 ("Rexrode Decl.") at ¶¶ 4–6. Her report is intended "to assess the impact on public health and women's health in the United States," assuming the proposed changes to Defendant's database "would result in Medicaid plans and commercial insurers denying coverage for prescription prenatal vitamins." *See id.* at 1. Dr. Rexrode concluded that "[i]f women are unable to obtain Medicaid coverage for prescription prenatal vitamins, fewer women will take the prenatal vitamins they were prescribed" which, in turn, "will have serious and widespread negative public health consequences in this country." *Id.* at ¶ 3. Plaintiff further provides a bulleted list of Dr. Rexrode's anticipated testimony regarding the importance of prenatal vitamins:

- Prenatal vitamins are vital to the health of expecting mothers and their babies, because they provide numerous benefits including prevention of preterm delivery, low birth weight babies, neural tube defects, vitamin deficiencies, and improved nutrition;

- Medical organizations recommend women take prenatal vitamins;

- Prescription prenatal vitamins in particular provide unique treatment benefits;

- Research shows that too few women take prenatal vitamins of any kind;

- Medicaid coverage of prenatal vitamins helps ensure poor women have access to essential prenatal care; and

- Women across the country will suffer if they do not have Medicaid coverage for prescription prenatal vitamins.

*See* Dkt. No. 195 at 3–4.

Defendant explains that the importance of prenatal vitamins and the possible effects of the coding change on third parties is simply not at issue in this case. *See* Dkt. No. 190 at 10–16. According to Defendant, Dr. Rexrode does not provides opinions about how the class value field in Defendant's database is used in the claims adjudication process; how the change in the class value fields would be misleading; or how such changes would affect Plaintiff or Plaintiff's damages. *See id.* In response, Plaintiff urges that Dr. Rexrode provides important "background information" for the case, and her testimony is also relevant to Plaintiff's causes of action.

### i. "Background" Testimony

Plaintiff cites two non-binding out-of-circuit cases to support its contention that Dr. Rexrode's opinions provide proper background for this case. *See* Dkt. No. 195 at 4–5 (citing *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001); *CDX Liquidating Tr. ex rel. CDX Liquidating Trustee v. Venrock Assocs.*, 411 B.R. 571, 588 (N.D. Ill. 2009)). The Court acknowledges that experts may provide background information, but such background must still be relevant to the factual or legal questions at issue in the case. As Rule 702 details, an expert may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact *to understand the evidence or to determine a fact in issue.*" *See*

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 71 of 292
Exeltis USA Inc. v. First Databank, Inc., Not Reported in Fed. Supp. (2020)
2020 WL 7025089

Fed. R. Evid. 702 (emphasis added). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.

 **\*11** Much of Plaintiff's proffered background, however, is not relevant to the issues in this case. What prenatal vitamins are, and the fact that there are both prescription and over-the-counter prenatal vitamins is certainly relevant to determining whether Defendant's coding of these products is false or misleading. *See* Rexrode Decl. at ¶¶ 11, 35–40. But "why physicians and health organizations universally recommend prenatal vitamins as the standard of care for women who are or may become pregnant"; "the benefits of prescription prenatal vitamins"; "how, when, and why a patient may be prescribed a prenatal vitamin"; and "the rate of vitamin deficiency in pregnant women and the importance of vitamin supplementation in reaching proper levels" are not. *See* Dkt. No. 195 at 4. As explained in the Court's preliminary injunction order, the Court understands that "there may be a public interest in the database and in women's access to prenatal vitamins," but this "does not alter the fact that this is a private dispute between private parties." *See* Dkt. No. 57 at 9–10, n.5. Plaintiff, the manufacturer of prenatal vitamins—and not the women taking them—has brought this case against Defendant.

### ii. Relevancy of Expert Testimony

In this case, Plaintiff asserts causes of action against Defendant for: (1) violating 15 U.S.C. § 1125(a)(1) of the Lanham Act; (2) violating California's Unfair Competition Law ("UCL") as "unlawful, unfair, [and] fraudulent" conduct; (3) false advertising under Cal. Bus. & Prof. Code §§ 17500 *et seq.*; (4) intentional interference with prospective economic advantage; and (5) trade libel. *See* FAC at ¶¶ 117–160. Defendant urges that Dr. Rexrode's testimony is irrelevant to all five causes of action. *See* Dkt. No. 190 at 10–16. Plaintiff appears to acknowledge that Dr. Rexrode's testimony is not relevant to Plaintiff's state law claims for false advertising or intentional interference with prospective economic advantage. *See* Dkt. No. 195 at 10–11.

As to Plaintiff's Lanham Act claim, the elements are:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or

another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Plaintiff urges that Dr. Rexrode's testimony is relevant to "purchasing decisions" because Dr. Rexrode will testify regarding "how physicians are more likely to prescribe prenatal vitamins (and other medications) when the product is covered by a patient's insurance than they are a product that is not." *See* Rexrode Decl. at ¶¶ 39, 43, 48–49. This, in turn, can explain how Defendant's actions may affect patients' purchasing decisions and Plaintiff's sales. *See id.* at ¶¶ 48–49, 52–54. The Court understands Defendant's concerns that such evidence will not establish Plaintiff's specific lost profits damages and that such in-depth analysis would likely require an economic analysis outside Dr. Rexrode's expertise. *See* Dkt. No. 197 at 5–6. But the Court nevertheless finds that Plaintiff has established that Dr. Rexrode's testimony about prescribing decisions for prenatal vitamins is still sufficiently relevant to explaining the possible impact of Defendant's database changes to prescribers and patients.

Plaintiff next suggests that Dr. Rexrode's testimony regarding "the clinical and therapeutic benefits of prescription prenatal vitamins" over "other types of prenatal vitamins" is relevant to Plaintiff's trade libel claim. *See* Dkt. No. 195 at 7–8 (citing Rexrode Decl. at ¶¶ 35–40). "Trade libel is defined as an intentional disparagement of the quality of property, which results in pecuniary damage." *See Aetna Cas. & Sur. Co. v. Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir. 1988). In the FAC, Plaintiff identifies the purported "intentional disparagement" as the "coding change" that will categorize "Exeltis's prescription prenatal vitamins [as] 'Non-Rx' and over-the-counter." *See* FAC at ¶ 157. Plaintiff concludes, without detail, that Dr. Rexrode's testimony "is relevant to showing how First Databank's misstatement that

2020 WL 7025089

Exeltis's products are 'not drugs' and not prescription, is a 'disparagement' of the 'quality' of Exeltis's products." *See* Dkt. No. 195 at 8. In other words, Plaintiff argues that there is a difference in "quality" between prescription prenatal vitamins and over-the-counter prenatal vitamins. Although Defendant is correct that part of the trade libel analysis will include the accuracy of Defendant's proposed coding changes, *see* Dkt. No. 197 at 5, Dr. Rexrode's testimony as to the differences between prescription and over-the-counter prenatal vitamins is still relevant.

**\*12** Lastly, Plaintiff urges that Dr. Rexrode's testimony is relevant to Plaintiff's UCL claim. *See* Dkt. No. 195 at 7. "Unfair competition" under the UCL is broadly defined as "any unlawful, unfair or fraudulent business act." *See* Cal. Bus. & Prof. Code § 17200; *see also McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008) ("An unfair business practice is one that either 'offends an established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' " (quoting *People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d 509, 530 (1984))). In the FAC, Plaintiff alleges that Defendant's conduct is unfair "because its statements are false and misleading." *See* FAC at ¶ 132. But in opposition to Defendant's motion, Plaintiff takes this argument still further, and suggests that Defendant's proposed changes "will cause substantial harm [to women] without any countervailing benefit." *See id.* On the basis of this third-party harm, Plaintiff suggests Dr. Rexrode's testimony about the possible impact on women's health is relevant to this claim.

But critically, there is a disconnect between Plaintiff's UCL claim and Dr. Rexrode's testimony about women's health. Plaintiff's basis for bringing a UCL claim is its own economic injury. As the California Supreme Court has noted, to have standing to bring a UCL claim, "a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (Cal. 2011) (emphasis in original). Plaintiff may have

standing to assert economic injury based on its lost profits from Defendant's alleged false or misleading statements. However, to the extent that Plaintiff now suggests that Defendant's business practices are also unfair to lower income women who may be denied coverage for their prescription prenatal vitamins, this is unrelated to Plaintiff's own economic injury.

\* \* \*

The Court therefore finds that some of Dr. Rexrode's expert testimony is admissible, but she may not testify regarding "why physicians and health organizations universally recommend prenatal vitamins as the standard of care for women who are or may become pregnant"; "the benefits of prescription prenatal vitamins," except to explain the differences between prescription and over-the-counter prenatal vitamins; "how, when, and why a patient may be prescribed a prenatal vitamin"; "the rate of vitamin deficiency in pregnant women and the importance of vitamin supplementation in reaching proper levels"; or "the harm to patients and the public health that will be caused by coverage denials." *See* Dkt. No. 195 at 4, 7. The Court therefore **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to exclude Dr. Rexrode's expert report and testimony. Dkt. No. 190. To the extent this case proceeds to trial, Dr. Rexrode's testimony will be limited to only those topics relevant to Plaintiff's claims in this case.

### IV. CONCLUSION
Accordingly, the Court **DENIES** the motions to exclude the reports and testimony of Dr. Gorospe and Mr. Smith and **GRANTS IN PART** and **DENIES IN PART** the motion to exclude the report and testimony of Dr. Rexrode. This order also terminates Dkt. Nos. 210, 211.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7025089

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 7

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 74 of 292

In re Apache Corp. Securities Litigation, Slip Copy (2024)

2024 WL 532315

2024 WL 532315
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

IN RE APACHE CORP. SECURITIES LITIGATION

Civil Action No. 4:21-cv-00575
|
Signed February 9, 2024

## MEMORANDUM AND RECOMMENDATION

ANDREW M. EDISON, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before me is Lead Plaintiffs' Amended Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Motion for Class Certification"). Dkt. 101. On December 6, 2023, I held a hearing on the Motion for Class Certification during which both sides presented expert testimony and voluminous exhibits. I afforded Lead Plaintiffs Plymouth County Retirement Association and the Trustees of the Teamsters Union No. 142 Pension Fund (collectively, "Plaintiffs") the opportunity to submit supplemental case law after the hearing, which Plaintiffs did. Having considered the parties' briefing, oral arguments, the record, and the applicable law, I recommend that the Motion for Class Certification be **GRANTED** in part and **DENIED** in part.

## BACKGROUND

This is a securities class action brought by Plaintiffs on behalf of those purchasers of the common stock of Apache Corporation ("Apache") during the period from September 7, 2016 through March 13, 2020 (the "Class Period"). The defendants are Apache, an exploration and production company headquartered in the Houston area, and three of its top executives: (1) John J. Christmann IV ("Christmann"), Apache's President and Chief Executive Officer; (2) Timothy J. Sullivan ("Sullivan"), Apache's former Executive Vice President – Operations Support; and (3) Stephen J. Riney ("Riney"), Apache's Executive Vice President and Chief Financial Officer (collectively, "Defendants"). Plaintiffs bring claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission.

Plaintiffs allege that, over the course of three years, Defendants misrepresented the prospects of a hydrocarbon play in the Permian Basin known as Alpine High. In particular, Plaintiffs allege that Defendants "repeatedly told investors that, even under Apache's 'conservative' models, Alpine High held over three billion barrels of oil and significant amounts of 'really rich gas,' " and "that years of rigorous testing and analysis had 'confirmed' and 'proven' that Alpine High held extremely high-quality oil and gas, and that multiple 'successful' test wells showed the play was 'prolific.' " Dkt. 101 at 6–7. For the uninitiated, "rich gas" or "wet gas" is "[n]atural gas containing liquid hydrocarbons in solution." Dkt. 65 at 6. "Wet gas" is contrasted with "dry gas," which is "[n]atural gas that does not have a significant content of liquid hydrocarbons or water vapor" and is less profitable than oil or wet gas. *Id.* at 5. Among the misrepresentations that Plaintiffs allege Defendants made were Sullivan's statement "that Alpine High's best wells would 'generate positive returns even at 0 [dry] gas price," and Christmann's statement that "this thing's going to really hum below $2 on the gas side." *Id.* at 38, 41. According to Plaintiffs, "the truth about Alpine High was gradually revealed through a series of corrective disclosures," the first of which occurred on October 9, 2017, and the last of which occurred on March 13, 2020. Dkt. 101 at 7. Plaintiffs allege, however, that in between these partial corrective disclosures, "Defendants continued to relentlessly promote Alpine High as a transformative discovery for Apache, while consistently waving off doubts about the play's oil or wet gas potential and profitability." Dkt. 65 at 42.

**\*2** Plaintiffs seek certification of (1) a class "on behalf of themselves and all other persons or entities who purchased or otherwise acquired Apache common stock from September 7, 2016, through March 13, 2020, inclusive (the 'Class Period'), and were damaged thereby (the 'Class')"; (2) appointment of Plaintiffs as Class Representatives; and (3) appointment of Saxena White P.A. ("Saxena White") and Kessler Topaz Meltzer & Check, LLP ("KTMC") as Class Counsel, and Ajamie LLP as Liaison Class Counsel. Dkt. 101 at 7–8. Defendants do not contest class certification for the start of the Class Period, September 7, 2016, through February 22, 2018. The only dispute is whether the Class Period will span an 18-month period, a 42-month period, or something in between.

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 75 of 292

In re Apache Corp. Securities Litigation, Slip Copy (2024)

2024 WL 532315

## LEGAL STANDARD

### A. CLASS CERTIFICATION

Federal Rule of Civil Procedure 23 governs the inquiry of whether a proposed class should be certified. "[T]he Rule 23 class-action device was designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate [its] compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation omitted).

Rule 23(a) requires that any purported class meet four "prerequisites":

> (1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class).

*Madison v. Chalmette Refin. L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011) (cleaned up). These prerequisites—numerosity, commonality, typicality, and adequacy—are necessary but not sufficient conditions for class certification.

Rule 23(b) specifies three class types and sets out requirements—beyond those articulated in Rule 23(a)—for each. The putative class here seeks certification under Rule 23(b)(3), which permits class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

Rule 23(b)(3) gives four considerations that are "pertinent" to whether predominance and superiority have been established:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.*

In considering a motion for class certification, I must "must rigorously consider both Rule 23(a)'s prerequisites and the Rule 23(b) class type." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 546 (5th Cir. 2020). This rigorous analysis requires me "to go beyond the pleadings to determine whether the requirements of Rule 23 have been met: a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (quotation omitted). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). My "obligation ... to conduct a rigorous analysis of Rule 23's requirements ... is not dispensed with by the parties' stipulation to certification or failure to contest one or more of Rule 23's requirements." *Ward v. Hellerstedt*, 753 F. App'x 236, 244 (5th Cir. 2018). "[T]he court [is] bound to conduct its *own* thorough ... inquiry." *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 n.7 (5th Cir. 2002) (emphasis added).

### B. THE SECURITIES AND EXCHANGE ACT

**\*3** Section 10(b) of the Securities and Exchange Act of 1934 makes it

> unlawful for any person, directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 76 of 292

In re Apache Corp. Securities Litigation, Slip Copy (2024)

2024 WL 532315

prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C § 78j(b). Rule 10b–5 implements § 10(b) by prohibiting, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements ... not misleading." 17 C.F.R. § 240.10b–5(b).

Plaintiffs may recover damages under § 10(b) by showing: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 810 (2011) (quotations omitted).

At issue here is the intersection between Rule 23(b)(3)'s predominance requirement and § 10(b)'s reliance requirement. Ordinarily, a plaintiff establishes reliance by showing "that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation." *Goldman Sachs Grp. Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021). This individualized inquiry is impractical in a class action. So, the Supreme Court has permitted class-action plaintiffs to invoke a presumption of reliance as established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Under *Basic*, district courts presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock. *See Halliburton I*, 563 U.S. at 813. To establish the *Basic* presumption, Plaintiffs must prove: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 268 (2014).

Once established, Defendants can rebut the *Basic* presumption by proving "that an alleged misrepresentation did not actually affect the market price of the stock." *Id.* at 284. Defendants "must carry that burden by a preponderance of the evidence." *Goldman*, 141 S. Ct. at 1963. "Any showing

that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248. Courts "should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 141 S. Ct. at 1960 (quotation omitted). "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 1963.

**\*4** The class-certification question of whether Defendants have rebutted the *Basic* presumption with a preponderance of evidence of no price impact overlaps with merits questions like materiality and loss causation. *See id.* at 1961. In considering such evidence, I must "resist[ ] the temptation" to draw merits conclusions. *Id.* at 1961, n.2 (quotation omitted). Even so, "to maintain the consistency of the presumption with the class certification requirements of [Rule] 23, defendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Halliburton II*, 573 U.S. at 284.

When plaintiffs' theory is that defendants' misrepresentations or omissions kept their stock artificially inflated, price impact may be shown on the back end. *See Goldman*, 141 S. Ct. at 1961. Front-end price impact may be inferred from a back-end price drop when the stock price falls after a corrective disclosure, demonstrating that Defendants' previous statements were untrue or that Defendants failed to disclose the truth. *See id.* A back-end price drop supports this inference when the corrective disclosure "matches" the earlier misrepresentations or omissions. *See id.* A corrective "disclosure need not precisely mirror an earlier misrepresentation." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (cleaned up). The two need only be "related" or "relevant" to one another. *Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). However, if there is a "mismatch" between the contents of the corrective disclosure and the misrepresentations or omissions, the inference of price impact is weaker. *See Goldman*, 141 S. Ct. at 1961. The Supreme Court has given the example of "when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')." *Id.* "Under those circumstances, it is less

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 77 of 292

In re Apache Corp. Securities Litigation, Slip Copy (2024)
2024 WL 532315

likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.*

With these principles in mind, I turn to the Motion for Class Certification.

## ANALYSIS

### A. THE UNCONTESTED ISSUES
Defendants concede that Plaintiffs have satisfied each of the four Rule 23(a) requirements, as well as Rule 23(b)'s superiority requirement. The only dispute is the length of the Class Period. Even so, I must conduct my own inquiry. *See Stirman*, 280 F.3d at 563 n.7. I have done so, and I also have no trouble finding that Plaintiffs satisfy the requirements of numerosity, commonality, typicality, adequacy, and superiority.

#### 1. Numerosity
The putative class is numerous. "During the Class Period, Apache common stock traded on the Nasdaq, NYSE, and Chicago Stock Exchange ... and had between 375.4 and 382.5 million shares outstanding with an average weekly trading volume of over 21.5 million shares." Dkt. 101 at 15. Numerosity "is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. Unit A July 1981); *see also Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) (certifying a class where defendant corporation "had more than 50 million shares of Class A common stock outstanding during the class period, and the average weekly trading volume on the NASDAQ Stock Market during the class period was roughly 2.7 million shares").

#### 2. Commonality
**\*5** There are common questions of law and fact between Plaintiffs and the proposed class, including whether Defendants misrepresented or omitted material facts, scienter, materiality, economic loss, and loss causation. *See* Dkt. 101 at 16. These questions are "capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564

U.S. 338, 350 (2011). Thus, the requirement of commonality is satisfied.

#### 3. Typicality
"Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (quotation omitted). "Here, Plaintiffs and all other putative Class members purchased Apache common stock during the Class Period and assert the same Section 10(b) claims, based on the same misstatements and omissions by Defendants, and the same Section 20(a) claims." Dkt. 101 at 16. Thus, the proposed class is typical. *See Marcus v. J.C. Penney Co.*, No. 6:13-cv-736, 2016 WL 8604331, at \*3 (E.D. Tex. Aug. 29, 2016) ("Because the [Plaintiffs] and the Class members both allege that the same misrepresentations and omissions caused the same result (artificially inflating the value of securities), the [Plaintiffs'] claims are typical of the claims of the Class members.").

#### 4. Adequacy
When assessing adequacy, I must consider:

> (1) the zeal and competence of the representatives' counsel; (2) the [willingness] and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent.

*Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017) (cleaned up).

Saxena White and KTMC have served as lead counsel in multiple securities class actions, have devoted substantial time and resources to this case, and have demonstrated a willingness to take this case to trial. *See* Dkts. 101-4, 101-5. Ajamie LLP has served as liaison counsel in numerous securities litigations in this district. *See* Dkt. 101-6 at 2. Plaintiffs, as "large institutional investors[,] are the preferred named plaintiffs in securities fraud litigation because they

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 78 of 292

In re Apache Corp. Securities Litigation, Slip Copy (2024)
2024 WL 532315

generally have the same interests as the plaintiff class." *In re Anadarko Petroleum Corp. Sec. Litig.*, No. 4:20-cv-00576, 2022 WL 4544235, at *4 (S.D. Tex. Sept. 28, 2022). Plaintiffs' interests "are also aligned with other class members, as all seek to maximize recovery stemming from the alleged misconduct by [Defendants]." *Id.* Finally, I am not aware of any conflicts of interest between Plaintiffs and the putative class. Accordingly, the requirement of adequacy is satisfied as to Plaintiffs, Lead Counsel, and Liaison Counsel.

### 5. Superiority
Defendants do not contest "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

> [C]ourts readily agree that class actions are a superior method for resolving security fraud claims for publicly traded stocks. There is little interest in individual investors controlling their own claims, and a class action is more efficient than entertaining a multitude of suits. Finally, Defendants have presented no arguments suggesting the superiority requirement is not satisfied.

**\*6** *Lumen v. Anderson*, 280 F.R.D. 451, 462 (W.D. Mo. 2012); *see also In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 676 (N.D. Ga. 2009) ("As a general rule, class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases." (quotation omitted)).

### B. RULE 23(B)'S PREDOMINANCE REQUIREMENT
Defendants concede that Plaintiffs may avail themselves of the *Basic* presumption to demonstrate class-wide reliance, and that class-wide issues predominate from the period of September 7, 2016 through February 22, 2018. Defendants contend, however, that they have rebutted the *Basic* presumption for the time period of February 23, 2018 through March 13, 2020 (the "Focus Period"). Defendants advance a three-pronged attack on the rebuttable fraud-on-the-market presumption, arguing that: (1) there was no front-end price impact attributable to the 15 alleged misrepresentations made during the Focus Period; (2) there was no back-end price

impact attributable to the three corrective disclosures alleged during the Focus Period; and (3) Defendants' purported rebuttal of the *Basic* presumption is "buttressed" by the fact that "the market's perception of Alpine High's oil and gas prospects was essentially unchanged during [the Focus Period]." Dkt. 117 at 28. I will address each argument in turn.

### 1. The 15 Misrepresentations Alleged During the Focus Period Did Not Cause Any Front-End Price Impact
Plaintiffs allege that Defendants made 15 misrepresentations on 13 trading days during the Focus Period. *See* Dkt. 65 at 112–19, 133–35. Defendants contend the analysis of their own expert, Lucy Allen ("Allen")—as well as the analysis of Plaintiff's expert, Dr. Zachary Nye ("Dr. Nye")—demonstrates that "(1) there was no statistically significant increase on 12 of the 13 trading days following the alleged misrepresentations, and (2) for the one trading date with a statistically significant price increase, all sources attributed the price increase to an EBITDAX and production beat, not to the alleged misrepresentation." Dkt. 117 at 16–17; *see also id.* at 18; Dkt. 101-3 at 621–22; Dkt. 117-2 at 24. Plaintiffs do not contest these facts. Rather, Plaintiffs argue that, having conceded price impact prior to the Focus Period, "the law requires Defendants to prove that their alleged misstatements had ***no*** price impact whatsoever during the ***entire*** Class Period." Dkt. 120 at 8–9. [1] For the reasons discussed in the next section, that is not the law.

[1]  This is the redacted version of Plaintiffs' reply brief; the unredacted version has been filed under seal. *See* Dkt. 121. Plaintiffs' brief has been redacted where Plaintiffs cite *internal* Apache documents for the proposition that "Defendants have already produced documents that support ***both*** front-end and back-end price impact for the entire Class Period." Dkt. 120 at 9. The first step in establishing the *Basic* presumption is demonstrating "that the alleged misrepresentations were ***publicly*** known." *Halliburton II*, 573 U.S. at 268 (emphasis added). "[U]ndisclosed information cannot drive down the market price of a stock. Only information known to the market can cause a loss. For this reason, only information known to the market is relevant under the fraud-on-the-market theory of class wide reliance." *Alaska Elec. Pension Fund*, 572 F.3d at 230. By definition—and evidenced by Plaintiffs' redaction of the information contained therein—internal documents are not public. Thus, for

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 79 of 292

In re Apache Corp. Securities Litigation, Slip Copy (2024)
2024 WL 532315

the public's convenience, I will cite to Plaintiffs' redacted brief. I have not relied on the redacted portions of Plaintiffs' brief because non-public documents are simply not relevant evidence in assessing price impact.

**\*7** Because there is no evidence of front-end price impact for the 15 misrepresentations alleged during the Focus Period, I turn to Defendants' arguments that there also was no back-end price impact attributable to the three corrective disclosures alleged during the Focus Period.

### 2. Whether the Three Corrective Disclosures Alleged During the Focus Period Demonstrate Price Impact

Plaintiffs allege three corrective disclosures during the Focus Period: (1) an April 23, 2019 Press Release; (2) the October 25, 2019 resignation of the geologist who led the Alpine High project, Steven Keenan ("Keenan"); and (3) a March 16, 2020 article by *Seeking Alpha*, a crowd-sourced content service that publishes news on financial markets. In opposing class certification as to the Focus Period, Defendants argue that none of these three disclosures corrected any alleged misrepresentation—in other words, that there is a "mismatch." Defendants also argue that there was either no statistically significant price impact following these disclosures, or that any statistically significant price impact following these disclosures is attributable to something other than the disclosure.

In reply, Plaintiffs contend that "undisputed evidence of front-end price impact [in September 2016] renders each of Defendants' back-end price impact arguments irrelevant." Dkt. 120 at 16–17. In support of this extraordinary argument —which would render *Goldman* essentially meaningless —Plaintiffs cite *In re Chicago Bridge & Iron Co. N.V. Securities Litigation* ("*Chicago Bridge & Iron*") for the proposition that " 'when Plaintiffs are able to show an alleged misrepresentation had a statistically significant front-end price impact, Defendants are not entitled to rely on [ ] additional back-end arguments to rebut the *Basic* presumption.' " Dkt. 120 at 17 (emphasis omitted) (quoting No. 17-cv-1580, 2020 WL 1329354, at \*3 (S.D.N.Y. Mar. 23 2020)). But this quote implies only that Defendants are not entitled to rely on back-end arguments to rebut the *Basic* presumption *for the misrepresentations that Plaintiffs have shown had a statistically significant front-end price impact.* Yet, Defendants are not contesting front-end price impact for the alleged September 2016 misrepresentations, and they do not seek to rebut the *Basic* presumption as to

those misrepresentations. Rather, Defendants seek to rebut the *Basic* presumption as to the 15 misrepresentations—made between 18 and 40 months later—that Plaintiffs allege in order to extend the Class Period.

"In the case of a securities fraud class action, ... *a class period ends when the truth has been disseminated to the market*." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 310 F.R.D. 69, 97 (S.D.N.Y. 2015)* (emphasis added) (cleaned up). Despite this straightforward proposition, Plaintiffs argue that, to limit the Class Period, Defendants must "prove by a preponderance of the evidence[ ] if, when, or how [the] admitted positive price impact [from September 2016] was *fully removed* before the start of [the Focus Period]." Dkt. 120 at 9 (emphasis added). Plaintiffs again cite *Chicago Bridge & Iron* for the proposition that "an absence of back-end price impact does not rebut the statistically significant front-end responses to the alleged misrepresentations." *Id.* at 10 (quoting 2019 WL 5287980, at \*4 (S.D.N.Y. Oct. 18, 2019) (cleaned up)). But the fact that the September 2016 front-end price impact cannot be rebutted does not require Defendants to affirmatively demonstrate total dissipation of that price impact before they may contest the impact (if any) of the 15 misrepresentations that Plaintiffs allege Defendants made 18 to 40 months later.

**\*8** The standard, stated plainly in *Basic*, is that "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." 485 U.S. at 248. Courts do not certify class periods based on the total dissipation of front-end price impact. Rather, "courts are required to cut off the class period on the date of a statement or event that cures the market." *Carpenters*, 310 F.R.D. at 97 (cleaned up). [2] With this principle in mind, I will consider, in reverse chronological order (as that will determine the Class Period's end point), whether Defendants have rebutted the *Basic* presumption by demonstrating mismatch or lack of back-end price impact for the three corrective disclosures alleged during the Focus Period.

[2]     Maybe revelation of the truth removes any price impact; maybe it doesn't. *See* Dkt. 126-2 at 14 ("Simple logic dictates that ... determining whether any alleged inflation came out before the Focus Period is irrelevant.... [E]ither i) the pre-Focus Period alleged misrepresentations had no impact at all, ii) the alleged inflation from the pre-Focus

Case 4:21-cv-02473  Document 89-4  Filed 09/06/24 in TXSD  Page 80 of 292

In re Apache Corp. Securities Litigation, Slip Copy (2024)

2024 WL 532315

Period alleged misrepresentations came out of Apache's stock price before the Focus Period, or iii) the alleged inflation was still in the stock after the alleged Class period and is therefore not relevant to Plaintiffs' allegations in this case."). Either way, the question is when the market learned the truth about Alpine High, not when the September 2016 front-end price impact fully dissipated.

### a. March 16, 2020 *Seeking Alpha* Post

It bears repeating that "a class period ends when the truth has been disseminated to the market." *Id.* According to Plaintiffs' own allegations:

106. ***On February 26, 2020***, Apache issued a press release announcing fourth quarter and full-year 2019 results, reporting a $3 billion impairment for Alpine High, a staggering amount that more than wiped out the Company's profits for the prior two years, and resulted in the Company reporting a loss of $3 billion during the fourth quarter and $3.6 billion for the full-year 2019. The Company further announced that, as of the end of 2019, ***"there were no rigs drilling at Alpine High."***

107. ***Leading media outlets specifically highlighted how the massive $3 billion write down and cessation of all further exploration at Alpine High was "in stark contrast" with Defendants' statements during the Class Period*** "vehemently defending the play's prospects for about three years." *Bloomberg*, for example, issued a scathing article ***on February 27, 2020***, titled "Apache Calls It Quits on Alpine High After $3 Billion Write down," which stated:

> ***Apache Corp. is officially calling it quits*** on a highly publicized but disappointing shale discovery in West Texas after vehemently defending the play's prospects for about three years. The Houston-based company posted a roughly $3 billion write down on its Alpine High project, a find from 2016 ***that fizzled when it turned out to hold more natural gas than oil*** ... The discovery was announced in September 2016 to much fanfare and claims the field held 3 billion barrels of crude and 75 trillion cubic feet of gas.... Until recently, Apache executives defended the Alpine High, saying in May that investors didn't yet "have an appreciation for the potential cash flow generation from the liquids play at Alpine High."

108. The same day, ***February 27, 2020***, the Company held its fourth quarter earnings webcast. At the outset, Defendant Christmann acknowledged that 2019 was a year full of "challenges," the "most significant" being "Alpine High." ***Christmann explained the Company was throwing in the towel on any further development of Alpine High***, stating that "further testing is not warranted at this time" and Apache "dropped the remainder of our drilling rigs in the fourth quarter and chose to defer some previously planned completions." Where analysts previously viewed the capital allocation Apache was committing to Alpine High as a reason for optimism, ***Defendant Christmann highlighted the Alpine High failure, explaining that in "terms of capital allocation, Alpine High will receive minimal to no funding."***

Dkt. 65 at 51–52 (emphasis omitted and added).

**\*9** Despite Plaintiffs' own extensive allegations regarding public news coverage of the failed Alpine High project in February 2020, Plaintiffs nevertheless contend the Class Period should extend through "March 16, 2020, [when] a *Seeking Alpha* article disclosed that, due to lack of production from Alpine High amidst declining oil prices, Apache was severely financially strained and not competitive, with the highest debt-to-equity ratio of all large-cap independent oil producers." Dkt. 120 at 29. Plaintiffs also contend—for the first time in this litigation—that in addition to the *Seeking Alpha* article, a Susquehanna analyst report issued the same day "revealed the falsity of Defendants' representations that Alpine High was, among other things, a world class resource that 'put Apache in one of the most exciting and competitive positions in the industry' and would drive shareholder value for years to come."[3] *Id.* (alterations omitted). But the market had known for weeks that these statements were false because Apache had already taken a $3 billion write down and ceased all exploration and funding of Alpine High. *See* Dkt. 65 at 51. Moreover, four days earlier, "on March 12, 2020, [Apache] announced that it was forced to slash its vaunted dividend by a staggering **90%**." *Id.* at 52. All the *Seeking Alpha* article and Susquehanna report demonstrated was that "Apache finds itself relative to its peers in the E&P industry in a laggard position at the back of the pile, at the back of the race." Dkt. 156 at 26. But revealing the depths of Apache's financial struggles did not shed any new light on Apache's alleged misrepresentations about Alpine High. Accordingly, the Class Period cannot extend beyond February 2020.[4]

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 81 of 292

In re Apache Corp. Securities Litigation, Slip Copy (2024)
2024 WL 532315

3    Neither Plaintiffs' Complaint, nor their Motion for Class Certification, nor their expert's report alleged that the Susquehanna report was a corrective disclosure.

4    Because any price movement that may have occurred after the May 16, 2020 *Seeking Alpha* article and Susquehanna report cannot be linked to any alleged misrepresentations regarding Alpine High, I do not reach the question of whether there was a statistically significant price reaction following these publications.

### b. October 25, 2019 Keenan Resignation

The next disclosure I must address came on October 25, 2019, the date that Keenan resigned, and "the biggest intraday drop [of Apache's stock] since January 2016." Dkt. 65 at 50. Plaintiffs argue that "[a]nalysts and the mainstream media easily linked Keenan's departure to Alpine High troubles." *Id.* Defendants do not contest that there was a statistically significant price impact to Apache's stock following the news of Keenan's resignation. Rather, Defendants retort that (1) Plaintiffs fail to "explain how the October 25, 2019 article announcing Keenan's resignation was corrective of any alleged misrepresentation [regarding Alpine High]," and (2) "analysts attributed the October 25, 2019 decline in Apache's stock price to concerns about Apache's Suriname exploration—not to any new news about Alpine High." Dkt. 117 at 24. Specifically, Defendants note that "all three [analyst reports issued on October 25, 2019] directly attributed Apache's stock price decline to the market's concerns about Apache's Suriname exploration in light of Keenan's resignation, not Alpine High." *Id.* at 24–25. Additionally, Defendants point out that "no analyst changed its reserves estimate for Alpine High following this announcement [of Keenan's resignation]." *Id.* at 25.

**\*10** In reply, Plaintiffs argue that any discussion of "how the announcement of Keenan's resignation corrected any alleged misstatements" is an "improper loss causation argument." Dkt. 120 at 26. As discussed above, that is not the law. Indeed, Plaintiffs' very next sentence demonstrates that such arguments *are* permissible at the class certification stage, because Plaintiffs go on to note that "courts regularly sustain as corrective disclosures resignations of corporate executives." *Id.* In other words, courts routinely entertain arguments about whether corporate executive resignation announcements are corrective of prior

alleged misrepresentations. *See, e.g., Ferris v. Wynn Resorts Ltd.*, No. 2:18-cv-00479, 2023 WL 2337364, at \*9–11 (D. Nev. Mar. 1, 2023) (discussing defendants' mismatch argument at length, despite plaintiffs' argument that mismatch was an improper loss-causation argument). "Consistent with *Goldman Sachs*, the Court considers all evidence of price impact for each of the ... alleged Corrective Disclosures." *Ramirez v. Exxon Mobil Corp.*, No. 3:16-cv-03111, 2023 WL 5415315, at \*15 (N.D. Tex. Aug. 21, 2023). So, the real question is whether the news of Keenan's resignation was corrective of any alleged misrepresentations regarding Alpine High.

Recall that a disclosure is considered corrective only when it "reveals *new facts* that, taken as true, render some aspect of the defendant's prior statements false or misleading." *Ferris,* 2023 WL 2337364, at \*10 (emphasis added) (quotation omitted). Plaintiffs assert that "Keenan's resignation plainly 'render[ed] some aspect of the defendant[s'] prior statements false or misleading." Dkt. 120 at 27 (quoting *Ferris,* 2023 WL 2337364, at \*10). Yet, Plaintiffs do not elaborate on what aspect of the defendants' prior statements was rendered false or misleading that was not already known by the market. Plaintiffs cannot point to any *new* information revealed by the news of Keenan's resignation. Rather, the news sources that Plaintiffs cite in the live pleading regarding Keenan's resignation were clearly repeating old news. *See* Dkt. 65 at 50 ("Credit Suisse described how Keenan 'oversaw the discovery of the Alpine High play, which has been an economic disappointment for investors[,]' ... [n]oting that 'the outcome of results from Alpine High have not met high expectations.' ").

More importantly, Defendants have presented compelling evidence that the market reacted to the news of Keenan's departure for a reason wholly unrelated to Alpine High: Apache's work in Suriname. The title of the Credit Suisse report issued on October 25, 2019 says it all: "Resignation of Exploration Head Highlights Suriname Risk to Share Price." Dkt. 117-10 at 2. Credit Suisse went on to note that "[t]oday's sell-off ... highlights the high expectations for the well already baked into [Apache]'s stock price." *Id.* Similarly, RBC Capital Markets stated: "We think [Apache] share weakness is a reaction to investor concern that the resignation is related to the outcome of [Apache]'s Maka-1 exploration well in Suriname." Dkt. 117-11 at 2. Likewise, SunTrust Robinson Humphrey stated: "Apache's stock underperformed this morning ... on investor speculation that a SVP's resignation ... is linked to an upcoming unsuccessful Suriname Maka-1

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 82 of 292

In re Apache Corp. Securities Litigation, Slip Copy (2024)
2024 WL 532315

exploration well." Dkt. 117-12 at 2. The abundance of analyst speculation about what Keenan's resignation meant for Suriname suggests that Apache's prospects in Suriname are what the market considered significant.

Plaintiffs retort that because

> [a]n analyst report [from RBC Capital Markets] published at 10:19 a.m. —approximately 35 minutes after the market first learned of Keenan's resignation—disclosed to the market that the resignation was unrelated to Suriname ..., any Suriname-related price impact was removed well before the market closed on October 25, 2019, and could not have caused the statistically significant decline ... found in Apache's stock price at market close on October 25.

Dkt. 120 at 28 (emphasis omitted). But Plaintiffs overlook that at the same time RBC Capital Markets disabused the public of the notion that Keenan's resignation concerned Suriname, it also speculated—in the very same report—that "[Apache] share weakness is a reaction to investor concern that the resignation is related to the outcome of [Apache]'s Maka-1 exploration well in Suriname." Dkt. 117-11 at 2. In fact, Plaintiffs' own expert testified that "after [Apache] confirmed that [Keenan's] resignation had nothing to do with Suriname," there was "a really quick rebound in the market price." Dkt. 156 at 108. The price rebound following confirmation that Keenan's resignation was unrelated to Suriname shows that it is more likely than not that concerns about Suriname are what moved the market.

 **\*11**  Plaintiffs go on to argue that "Apache's own documents belie Defendants' claim that Keenan's departure was unrelated to the alleged misstatements." Dkt. 120 at 28. There are two problems with this argument. First, internal company documents are entirely irrelevant to determining whether the market was reacting to *public* information that revealed some truth about Defendants' alleged misrepresentations. *See Alaska Elec. Pension Fund*, 572 F.3d at 230 ("Only information known to the market can cause a loss."). Second, Defendants have never argued that Keenan's departure was unrelated to the alleged misstatements about Alpine

High because that too is irrelevant. The news of Keenan's resignation is not automatically a corrective disclosure simply because Alpine High was the driving force behind Keenan's resignation. That is not the test. The test is whether "the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *Ferris*, 2023 WL 2337364, at \*10 (quotation omitted). I conclude that Defendants have rebutted the *Basic* presumption by a preponderance of the evidence by showing that the news of Keenan's resignation did not reveal anything new about Alpine High and that the market moved out of concern about Apache's prospects in Suriname.

### c. April 23, 2019 Press Release

The last disclosure to address is an April 23, 2019 press release—issued before the market opened—announcing the temporary deferral of Alpine High natural gas production. Apache's stock price declined 11% over the four days following this press release. Plaintiffs contend this disclosure was corrective because it showed that Apache "was scaling back natural gas production efforts." Dkt. 65 at 134. Defendants counter that

> the press release does not support an inference of price impact for three reasons: (1) there was no statistically significant decline in Apache's stock price thereafter, according to both Nye's event study model and the alternative event study model tested by Allen; (2) the market expected such news given "extremely" low regional gas prices; and (3) the disclosure did not correct any alleged misrepresentation.

Dkt. 117 at 20. I will address each argument in turn.

### i. Statistical Significance of the Price Reaction

The parties agree that there was no statistically significant —where "statistically significant" means a 95% confidence level—stock price decline on the first, second, third, or fourth days after the April 23, 2019 press release. Nor was there

a statistically significant price drop using a 2-day window of April 23 and April 24. Dr. Nye is only able to show a statistically significant price drop at a 95% confidence level or higher by extending his event window out to the third and fourth days. Specifically, "Nye's analysis shows that the 2-, 3-, and 4-day returns for this disclosure are significant at the 92.58%, 98.96%, and 99.01% confidence levels, respectively." Dkt. 120 at 21. "Allen's event study yields similar results, with 3-and 4-day returns significant at the 94.33% and 96.56% confidence levels, respectively." *Id.* at 22. Defendants contend Dr. Nye's method is impermissibly results-driven. Plaintiffs retort that (1) "[c]ourts routinely hold that multi-day event windows are appropriate to evaluate stock price declines, including where defendants argue there was no statistically significant price decline on the first day of the window," and that (2) "numerous courts have explicitly rejected" the argument that "statistical significance at or above the 95% confidence level is required to show price impact." Dkt. 120 at 21–22. I will address these arguments in reverse order.

As to the confidence level, Plaintiffs do not seriously contest that a 95% confidence level is the scientific and legal standard. *See, e.g.*, Federal Judicial Center, *Reference Manual on Scientific Evidence* 381 (3d ed. 2011) ("Traditionally, scientists adopt the 95% level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value."). Rather, Plaintiffs argue that lack of statistical significance alone cannot rebut the *Basic* presumption. I agree. After all, Apache's stock *did* decline in the four days after the April 23, 2019 press release. I also agree that "Defendants' authorities [on this point] are readily distinguishable." Dkt. 120 at 22 n.12 ("In *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 270 (N.D. Tex. 2015) ("*Halliburton III*"), the plaintiffs' expert **conceded** that 95% statistical significance was required to demonstrate price impact, and the court in *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *15 (N.D. Cal. Dec. 22, 2016) simply cited, without analysis, *Halliburton III* as the basis for requiring 95% statistical significance."). As a matter of law, "[t]he lack of statistically significant proof that a statement affected the stock price is not statistically significant proof of the opposite, *i.e.*, that it did not actually affect the stock price." *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 444 (D. Ariz. 2019) (emphasis omitted). That said, a fact can be relevant without being dispositive. Accordingly, the fact that none of the four days following the press release individually, or the first two days combined, showed statistically significant price declines—while not dispositive of price impact—is nevertheless a relevant fact to consider alongside Defendants' other evidence concerning price impact.

**\*12** Another relevant fact to consider is that, to get to a 95% confidence interval, Dr. Nye extended his event window to the third and fourth days following the April 23, 2019 press release. Allen's event study only showed statistical significance using a four-day event window. At the hearing, I gave Plaintiffs an opportunity and additional time to submit "any cases ... where the Court approves a ... multi-day window [where] none of the days are [individually] statistically significant." Dkt. 156 at 258; *see also id.* at 255 ("And I guess I'm just curious, are there any cases anywhere finding a price impact using, say, a three-plus-day window when no one day is statistically significant, right?"). Following the hearing, Plaintiffs directed me to six cases that they contend approved "event windows of three or more days." Dkt. 155 at 1. None are availing.

For example, Plaintiffs' best case is *In re Groupo* [sic] *Televisa Securities Litigation*, No. 18-cv-1979, 2020 WL 3050550 (S.D.N.Y. June 8, 2020). This is the only case to consider a four-day event window where no individual day was statistically significant. But the facts of *Grupo Televisa* are especially unique because the four-day period corresponded to an executive's four days of testimony, which the court treated as a single event. *See In re Grupo Televisa Sec. Litig.*, No. 18-cv-1979, 2022 WL 2829253, at *2 (S.D.N.Y. July 20, 2022) ("Burzaco's testimony was the 'single event' which conveyed information to the Televisa investors severing the link between when alleged misrepresentations and the stock price."). Dr. Nye offers no comparable reason for extending the event window here.

*In re Twitter, Inc. Securities Litigation*, No. 16-cv-05314, 2020 WL 4187915 (N.D. Cal. Apr. 17, 2020), also involved a four-day event window. But unlike here, in *Twitter*, the one-day price decline following the corrective disclosure *was* statistically significant. *See* Report on Loss Causation and Damages at 65, *In re Twitter, Inc. Sec. Litig.*, No. 16-cv-05314 (N.D. Cal. Sept. 18, 2019), ECF No. 352-9. Thus, *Twitter* is inapposite.

In *Sjunde AP-Fonden v. General Electric Co.*, the plaintiffs' expert "provide[d] a full explanation for [a three-day event] window based on an unusually *positive* price reaction on the announcement day followed by a statistically significant

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 84 of 292

In re Apache Corp. Securities Litigation, Slip Copy (2024)
2024 WL 532315

two-day decline." No. 17-cv-8457, 2023 WL 6314939, at *16 (S.D.N.Y. Sept. 28, 2023) (emphasis added); *see also* Expert Report of David I. Tabak, Ph.D. at 35–36, *Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17-cv-8457 (S.D.N.Y. Sept. 6, 2022) (Dkt. 355-12) ("Notably, however, the three-day price movement was statistically significant, not just considered on its own, but after 'penalizing' the measure of statistical significance for examining six trading days (i.e., the six original alleged corrective disclosure dates listed in Exhibit 4) and further 'penalizing' the measure for considering two analyses of October 20, 2017, a full-day analysis and an intraday analysis."). The takeaway from these cases is that "where Plaintiffs seek to extend the window, they must show a sound conceptual and evidentiary basis for that extension." *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 485 (E.D. Pa. 2022).

Dr. Nye's reason for extending the event window in this case is that "the market was having a tough time reading through that deferral announcement and how it affected gas production for the full year of '19 and down the road in 2020 as well." Dkt. 156 at 105. This is certainly *a* reason for extending the event window, but it does not strike me as a compelling reason on-par with those offered in the cases discussed above. Even so, I do not consider the lack of statistically significant price declines on each of the four days following the April 23, 2019 press release; or the unusually long event window required to find a statistically significant price decline; or the questionable basis for that protracted event window dispositive of whether Defendants have rebutted the *Basic* presumption. Stated differently, the lack of statistical significance cannot, standing alone, rebut the presumption. But these are relevant points that I will consider alongside Defendants' other arguments regarding price impact.

### ii. The Market's Expectations and Correctiveness

**\*13** In addition to questioning the statistical significance of the price reaction following the April 23, 2019 press release, Defendants contend that "the market expected the news in the April 23 press release given the extreme pricing environment at the Waha Hub, a major hub for natural gas flowing out of the Permian." Dkt. 117 at 21. Defendants also contend that "the press release was not corrective of any alleged misrepresentation." *Id.* at 23. For reasons that will soon become clear, these issues are intertwined and best addressed together.

Plaintiffs counter that any argument regarding the market's expectation "is a truth-on-the-market defense, which is a 'materiality' argument that 'has no bearing on the predominance inquiry of class certification.'" Dkt. 120 at 22 (quoting *Marcus v. J.C. Penney Co.*, 2016 WL 8604331, at *8 (E.D. Tex. Aug. 29, 2016)). Similarly, Plaintiffs argue that whether the press release corrected any alleged misrepresentation "raises a premature loss causation challenge." Dkt. 120 at 25. Plaintiffs notably fail to cite a post-*Goldman* authority for these arguments that, as previously discussed, are incorrect. "[D]efendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Halliburton II*, 573 U.S. at 284.

Plaintiffs' more compelling argument is this:

Defendants' argument that the market fully expected the deferral announced on April 23, 2019 is premised on just three analyst reports (Opp. 16-17), in which each analyst speculates that investors *may* have expected the announced deferral.... Further undermining Defendants' claim, at least eight analysts and several news outlets characterized this Corrective Disclosure as unexpected, negative news....

Tellingly, neither Defendants nor Allen identify any other news that caused Apache's stock price to decline between April 23 and April 26, 2019 (Nye Reb., ¶20), further demonstrating Defendants' failure to prove a complete lack of price impact....

Defendants' fallback suggestion that "common sense" supports that the market expected the Alpine High deferral (Opp. 17-18) is also meritless. Apache did not announce the deferral until *well after* the Waha Hub natural gas spot price was negative, at which point it had turned positive. Opp. 18 (graphic). In fact, on April 23, 2019, the Waha Hub natural gas spot price was roughly the same as it had been in November 2018 and February 2019, and Apache did not defer gas extraction at Alpine High during either period. *Id*. "Common sense" instead dictates that, in the face of Defendants' repeated reassurances that Alpine High would perform well even at low commodity prices, investors viewed the April 23, 2019 Corrective Disclosure as new, negative news.

Dkt. 120 at 23–24.

**\*14** Defendants retort that Plaintiffs have mischaracterized the analyst reports that they say regarded the April 23, 2019 press release "as *unexpected*, negative news." *Id.* at 23 (emphasis added). Defendants highlight that the reports "say nothing about whether the news was *unexpected*." Dkt. 126 at 21. To the contrary, investors "likely expected" deferral. *Id.* (emphasis omitted) (quoting Dkt. 117-8 at 2); *see also* Dkt. 156 at 75 (demonstrating that five days *prior* to the April 23, 2019 press release, at least one investor remarked that he was "hearing more chatter in the investment community about Alpine High gas shut-in risk," which Dr. Nye conceded was "probably used synonymously [with deferral]"). Defendants also contend that while

> three analysts lowered their Alpine High production estimates after the press release, ... two of the analysts termed the reduction as having "minimal" impact, and the other issued an industry report that was updating estimates for many other E&P companies and linked the Alpine High "shut-ins" to the low Waha pricing.... No analysts, including the three Dr. Nye claims lowered their production estimates, [or] lowered their price targets of Apache after the press release, which indicates that the deferral was expected.

Dkt. 126 at 22. As for Plaintiffs' contrasting Apache's (in)actions in November 2018 and February 2019 with Apache's April 2019 deferral—when prices were roughly the same—Defendants note that, unlike November 2018 and February 2019, "starting in March of 2019, Waha prices actually went negative," meaning a seller is "paying the buyer to take ... gas." Dkt. 156 at 52. Finally, Plaintiffs are correct that Defendants do not point to any other news that caused Apache's stock price to decline following the April 23, 2019 press release. But as with Keenan's resignation, Defendants argue the news was significant for reasons unrelated to Alpine High. Specifically, Defendants contend that uncertainty about how long prices would remain low caused Apache's stock price to decline. *See id.* at 69–70.

I appreciate both sides' arguments. But common sense tells me that investors expected the deferral, and any decline in stock price was due to uncertainty about low gas prices generally, not Alpine High specifically. Moreover, Defendants may have repeatedly reassured investors that Alpine High would perform well even at *low* commodity prices, but they never said it would perform well at *negative* prices. In other words, news of the deferral was not corrective of any alleged misrepresentation. Thus, I conclude that Defendants have rebutted the *Basic* presumption by a preponderance of the evidence by showing that the April 23, 2019 press release did not reveal anything new about Alpine High and that Apache's stock price decline was more likely than not due to uncertainty about the historically low Waha Hub gas prices. [5]

[5]   Because I have already concluded Defendants have rebutted the *Basic* presumption, I do not reach the parties' arguments regarding whether Defendants' rebuttal of the *Basic* presumption is "buttressed" by the fact that "the market's perception of Alpine High's oil and gas prospects was essentially unchanged during [the Focus Period]." Dkt. 117 at 28.

\* \* \*

There was no front-end price impact attributable to the 15 alleged misrepresentations made during the Focus Period, and Defendants have rebutted the *Basic* presumption as to each of the three corrective disclosures alleged during the Focus Period. Accordingly, the Class Period should be limited to the time period of September 7, 2016 to February 22, 2018.

## CONCLUSION

For the reasons explained above, I recommend that the Motion for Class Certification (Dkt. 101) be **GRANTED** in part and **DENIED** in part. Specifically, I recommend that the Court: (1) certify a class consisting of Plaintiffs and all other persons or entities who purchased or otherwise acquired Apache common stock from September 7, 2016, through February 22, 2018, and were damaged thereby [6]; (2) appoint Plaintiffs as Class Representatives; and (3) appoint Saxena White and KTMC as Class Counsel and Ajamie LLP as Liaison Class Counsel.

[6]   Excluded from the Class are Defendants, the officers and directors of Apache, members of their immediate families and their legal representatives,

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 86 of 292

**In re Apache Corp. Securities Litigation, Slip Copy (2024)**
2024 WL 532315

heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

**\*15** The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

**All Citations**

Slip Copy, 2024 WL 532315

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 8

2014 WL 2112823, Fed. Sec. L. Rep. P 97,970

⚑ KeyCite Yellow Flag - Negative Treatment
Distinguished by Rougier v. Applied Optoelectronics, Inc., S.D.Tex., November 13, 2019

2014 WL 2112823
United States District Court,
S.D. Texas,
Houston Division.

In re BP P.L.C. SECURITIES LITIGATION.

MDL No. 10–md–2185.
|
Civil Action No. 4:10–md–2185.
|
Signed May 20, 2014.

### *MEMORANDUM AND ORDER*

KEITH P. ELLISON, District Judge.

**\*1** The Court returns to the critical issue of class certification. In its decision of December 6, 2013, the Court denied class certification because of Plaintiffs' failure to demonstrate that their damages can be measured on a classwide basis, consistent with their theories of liability. (Doc. No. 709.)[1] In accordance with the Court's prior order, Plaintiffs have reformulated their proposed subclass periods around a fulcrum of April 20, 2010, the date of the Deepwater Horizon explosion. Plaintiffs have also provided thorough descriptions of damages methodologies they propose to apply to the pre-explosion and post-explosion subclasses. Plaintiffs seek class certification a second time.

[1]     All docket references are to Multi–District Litigation No. 10–md–2185.

The issue before the Court is two-pronged but narrow. The Court must determine whether Plaintiffs' proposed damages methodologies (1) quantify the injury caused by Defendants' alleged wrongful conduct, and (2) can be deployed on a classwide basis such that common issues will predominate over individualized ones. The first prong is necessitated by the reasoning articulated by the Supreme Court in *Comcast Corporation v. Behrend,* ––– U.S. ––––, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). The second prong is necessitated by Rule 23(b)(3) of the Federal Rules of Civil Procedure.

The Court has been substantially aided in this inquiry by the efforts of parties' counsel and experts. Having reviewed Plaintiffs' Renewed Motion for Class Certification (Doc. Nos. 739 & 739–1); Defendants' opposition (Doc. No. 783), Plaintiffs' reply brief (Doc. No. 802), Plaintiffs' supplemental brief (Doc. No. 836), Defendants' opposition to the supplemental brief (Doc. No. 842), all papers in support thereof, and having heard oral argument, the Court finds that Plaintiffs' Renewed Motion for Class Certification (Doc. No. 739) must be **DENIED** as to the Pre–Explosion "Process Safety" Subclass and **GRANTED** as to the Post–Explosion "Spill Severity" Subclass. The Court also **GRANTS** Plaintiffs' Motion for Leave to Amend the Complaint (Doc. No. 777). The Court's reasoning is explained in full below.

### I. THE COURT'S DECEMBER 6th ORDER

On Plaintiffs' previous motion to certify the class, the Court agreed that all prerequisites of Rule 23(a) and Rule 23(b)(3) were met except for the predominance of classwide damages.[2] (Doc. No. 709 (the "December 6th Order"), at 8–9, 14, 17, 19–20, 22, 32.) Plaintiffs had indicated that damages would be calculated on a classwide basis using an event study, but provided no specifics as to how the calculations would be performed. Defendants anticipated that Plaintiffs' expert would propose a "constant dollar" model of inflation and pointed out the ways in which such a model would be inconsistent with Plaintiffs' theories of liability.

[2]     The December 6th Order included a high-level overview of the alleged fraudulent schemes at issue in this case. For brevity, the description will not be repeated here.

The Court largely agreed with Defendants' criticisms and noted that a classwide damages model which did not hew to Plaintiffs' theory of liability would not satisfy Rule 23(b)(3)'s predominance requirement pursuant to *Comcast Corporation v. Behrend,* ––– U.S. ––––, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). Specifically, the Court highlighted the following problems with a "constant dollar" damages model:

**\*2** (1) Although the pre-spill misrepresentations understated a known risk, the "constant dollar" approach compensates investors for the full value of the stock price drop from the materialization of that risk. This overcompensates investors for their harm.

2014 WL 2112823, Fed. Sec. L. Rep. P 97,970

(2) The model does not disaggregate inflation according to the type of misrepresentation corrected or risk disclosed. This means that investors may receive a measure of damages attributed to misrepresentations which could not have influenced their purchase.

(3) The amount of inflation remains constant over the Class Period. This means that the repetition of certain statements-particularly, the Baker Report and OMS statements-is not shown to have had any cumulative inflationary effect, and that the amount of damages to be awarded will be similarly unresponsive to the jury's specific findings of liability.

(December 6th Order at 29 (citations and footnotes omitted).) The Court permitted Plaintiffs to re-urge their motion if they could comply with *Comcast* and Rule 23(b)(3). (*Id.* at 32.)

## II. PLAINTIFFS' MODIFIED SUBCLASSES AND DAMAGES MODELS

In response to the December 6th Order, Plaintiffs modified their proposed subclasses and articulated differing damages methodologies for each. The subclasses are now defined as: (1) the "Pre–Explosion" or "Process Safety" Subclass consisting of persons or entities who purchased or otherwise acquired BP American Depositary Shares ("ADSs") between November 8, 2007 and April 20, 2010 and were injured thereby; and (2) the "Post–Explosion" or "Spill Severity" Subclass consisting of persons or entities who purchased or otherwise acquired BP ADSs between either April 26, 2010 or April 29, 2010 [3] and May 28, 2010 and were injured thereby. (Doc. No. 739–1 ("Mot."), at 1.)

[3] The beginning date of the Post–Explosion Subclass depends on whether the Court grants leave to Plaintiffs to amend their complaint. Plaintiffs' Motion for Leave is addressed in Section V.

### A. The Pre–Explosion "Process Safety" Subclass

Plaintiffs allege that Defendants repeatedly and falsely assured the market that process safety improvements recommended by the Baker Panel-most notably, a comprehensive Operating Management System ("OMS")-were being rolled out throughout the organization, across the globe. These statements began in 2007 and 2008 with expressions of intent, design, and early implementation. (Doc. No. 339 ("SAC"), at ¶¶ 321, 323, 325, 327, 329.) They evolved into representations regarding the scope and geography of implementation in 2009 and 2010. (*Id.* at ¶¶ 332, 334–35, 347, 351, 353, 357, 359.) Plaintiffs allege that these misrepresentations lulled the market into believing that BP was a safer company than it actually was. In other words, according to Plaintiffs, "BP's repeated statements concerning the implementation of OMS and the Baker Panel recommendations misled investors about BP's ability to prevent catastrophic process safety events and contain them if and when they occurred." (Mot. at 10.) Plaintiffs claim that Defendants' fraud was revealed when the Deepwater Horizon exploded and BP was subsequently unable to contain the oil spill. (*Id.* at 11.)

**\*3** To model damages for this subclass of investors, Plaintiffs propose first to calculate the total investment losses caused by the fraudulent statements by measuring the decline in the stock price on days in which "corrective" information entered the marketplace-so-called "corrective disclosure days" or "corrective events." For the Baker Panel and OMS-related statements, which allegedly understated BP's exposure to catastrophic risk, Plaintiffs characterize days on which the risk materialized as corrective events. (Doc. No. 741–1 ("Coffman Report"), at ¶ 28.) Plaintiffs have alleged eight corrective events related to the process safety subclass misrepresentations. (*Id.* at ¶¶ 84–132.) The stock price declined $20.38 in response to these corrective events, after netting the eight days' decline against $6.87 of stock price increase which would not have occurred absent the fraud. (*Id.* at ¶ 17.) Plaintiffs then reduce this amount to account for the portion of the materialized risk which was known to the market-i.e., the risk voluntarily assumed by investors, which should not be compensated. The resulting, maximum damages per share are $18.53. (*Id.*)

Plaintiffs then propose to apportion the $18.53 of allegedly compensable losses across the fourteen alleged misrepresentations made in the Pre–Explosion Subclass period. Plaintiffs' expert, Chad Coffman, claims that an economic modeling tool known as "Bayesian Updating" can depict how investor expectations of risk change over time based on evolving information. (Coffman Report at ¶¶ 55–62 .) Mr. Coffman states that it would be nearly impossible to employ Bayesian Updating to model the influence of each alleged misstatement in the Pre–Explosion Subclass period. (*Id.* ¶ 53.) Nonetheless, based on the theory of Bayesian Updating, Mr. Coffman claims that a straight-line linear progression of "inflation"-beginning with $0 of "inflation" as of the date of the first misleading statement relating to the Baker Panel recommendations or OMS (whether or not the

statement is actionable) and ending with the full $18.53 of "inflation" on the last day of the subclass period-would be a conservative estimate of the incremental loss attributable to each alleged misrepresentation in this period. (*Id.* ¶¶ 63–67.) Each alleged misrepresentation would capture the "inflation" that had been generated in the time period since the immediately preceding misrepresentation. (*Id.* ¶¶ 70–73.) The parties refer to this as the "step up" or "step wise" function.

The following graph depicts Plaintiffs' proposed methodology for apportioning their losses across the Pre–Explosion Subclass period:



Mr. Coffman states that the above methodology will allow damages to be calculated on a classwide basis. The only individualized facts which will need to be taken into account are when a particular subclass member purchased and sold his, her, or its shares. (Coffman Report ¶ 159.)

 **\*4** It is important to clarify one confusing aspect of Plaintiffs' pre-explosion damages methodology. Plaintiffs and Mr. Coffman use the term "inflation" to refer to the apportionment of alleged losses among the various process safety misstatements. Inflation typically refers to the disparity between the price paid for the security and its value, at the time of the transaction-a disparity created by the alleged fraud. *See, e.g., Hubbard v. BankAtlantic Bancorp, Inc.,* 688 F.3d 713, 725 (11th Cir.2012) ("[I]n a fraud-on-the-market case, the plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff.") (quotation marks and citation omitted)). But the pre-explosion damages methodology is based on total losses following the explosion, not on the distortion allegedly

created by Defendants' misstatements before anyone knew that BP would suffer a deepwater well blow-out. As described in Section IV(A)(2), everyone acknowledges that the pre-explosion distortion-if Mr. Coffman had attempted to model it-would return lower damages figures than those depicted above. (Doc. No. 831, at 41.) Because the pre-explosion damages methodology does not model inflation in the traditional sense, the Court will avoid using that term in connection with the pre-explosion damages methodology, or will employ quotation marks to clarify that the use of the term is non-traditional in the pre-explosion damages methodology.

**B. The Post–Explosion "Spill Severity" Subclass**
Following the explosion, two BP executives-Defendants Douglas Suttles and Anthony Hayward-provided public estimates of the ensuing oil spill. These estimates ranged from an initial estimate of 1,000 barrels of oil per day ("bopd") to later estimates of 5,000 bopd. (SAC ¶¶ 371, 373, 381.) According to Plaintiffs, these estimates were overly optimistic and contradicted both contemporaneous internal estimates (which reached as high as 14,266–92,000 bopd) and the real flow rate (determined after the fact to be approximately 60,000 bopd). (*Id.* ¶¶ 6, 375.) Because Defendants publicly lowballed the flow rate, the market price of BP ADSs did not reflect the magnitude of the disaster facing the company. In other words, Defendants' spill severity misrepresentations prevented the ADS stock price from falling to a level which accurately reflected the magnitude of the spill. (Mot. at 16–17.)

Plaintiffs propose to model damages for the Post–Explosion Subclass by calculating the inflation caused by the fraudulent statements. Plaintiffs equate inflation with the total decline in the stock price on corrective disclosure days. Plaintiffs have identified six corrective events related to the spill severity misrepresentations. (Coffman Report at ¶¶ 140–156.) The stock price declined $17.10 in response to these corrective events, after netting the six days' decline against $6.87 of stock price increase which would not have occurred absent the fraud. (*Id.* at ¶ 19.)

 **\*5** Unlike the Pre–Explosion Subclass, however, Plaintiffs do not propose to apportion the $17.10 of allegedly compensable losses across the three or four alleged misrepresentations made in the Post–Explosion Subclass period. Instead-due to the short duration of the subclass period and the consistency of the alleged misstatements-Plaintiffs propose to utilize a "constant dollar" methodology, in which the total inflation is carried back to the very first alleged

2014 WL 2112823, Fed. Sec. L. Rep. P 97,970

misstatement. (Mot. at 22–23.) The inflation slowly dissipates over the time period of the alleged corrective disclosures, until inflation is $0 at the time of the last corrective disclosure. The following graph depicts the proposed methodology for carrying inflation back through the Post–Explosion Subclass period:



Mr. Coffman states that the above methodology will allow damages to be calculated on a classwide basis. The only individualized facts which will need to be taken into account are when a particular subclass member purchased and sold his, her, or its shares. (Coffman Report ¶ 159.)

## III. DEFENDANTS' OPPOSITION TO CLASS CERTIFICATION

Defendants lodge a number of criticisms of Plaintiffs' proposed damages methodologies. These include, briefly:

• Plaintiffs' damages methodologies would allow investors to recover for stock price declines associated with the market's realization that BP could not contain the oil spill, despite the fact that no misstatement relating to BP's ability to respond to an oil spill has been found appropriate for class action treatment. (Doc. No. 783 ("Opp."), at 25–32, 47.)

• The pre-explosion damages methodology does not adequately measure the alleged cumulative impact of Defendants' process safety misstatements over the subclass period. The "step-wise" function is wholly arbitrary and can produce illogical and indefensible results. (*Id.* at 12–25.)

• The pre-explosion damages methodology does not calculate the "but for" price at which the stock would have traded absent Defendants' allegedly fraudulent process safety statements. (*Id.* at 35–40.)

• The post-explosion damages methodology is based on a "constant dollar approach which was previously rejected by the Court. (*Id.* at 4, 41.)

• The Post–Explosion Subclass begins on April 26, 2010, but the first alleged spill severity misstatement occurred after the markets closed on April 28, 2010. (*Id.* at 42–43.)

• The post-explosion damages methodology presumes that the full measure of the stock price decline in the months after the explosion should be carried back to the very first alleged spill severity misstatement. There is no legal or economic justification for this model. (*Id.* at 43–48.)

• The same corrective events for the Post–Explosion Subclass are recycled from the Pre–Explosion Subclass, with no attempt to disaggregate inflation between the two alleged fraudulent schemes. (*Id.* at 48–50.)

**\*6** Defendants couch the above criticisms in the language of *Comcast,* accusing Plaintiffs of either continuing to seek recovery for theories of liability that are no longer part of the case, or of proposing damages methodologies which are inconsistent with their liability case.

As before, Defendants have raised compelling arguments regarding the overbreadth of Plaintiffs' claimed damages. But the Court need not be satisfied that Plaintiffs have identified the correct *amount* of damages before it can find that this action should proceed collectively. The Court need be satisfied only that Plaintiffs have proposed a viable, internally consistent, and truly classwide *approach* to calculating damages. With this in mind, the Court will consider each criticism lodged by Defendants in light of the context in which the case currently sits.

## IV. CLASS CERTIFICATION ANALYSIS

### A. Plaintiffs have not carried their burden as to the Pre–Explosion Subclass.

The heft of Defendants' arguments in opposition to class certification is directed at the weaknesses of Plaintiffs' pre-explosion damages methodology. While the Court agrees that many features of the pre-explosion damages methodology are problematic, they are not necessarily impediments to class certification. Defendants' final criticism, however, is fatal.

In re BP p.l.c. Securities Litigation, Not Reported in F.Supp.3d (2014)
2014 WL 2112823, Fed. Sec. L. Rep. P 97,970

**1. Plaintiffs' characterization of certain days as corrective events, even if erroneous, does not prevent class certification.**

Defendants fault Plaintiffs' decision to treat certain stock price declines-specifically, those associated with the market's realization that BP could not contain the oil spill-as corrective events for the alleged process safety fraud. (Opp. at 25–32.) They note that no alleged misrepresentations regarding BP's oil spill response capabilities remain in the case. The alleged misstatements from the Initial Exploration Plan ("IEP") and the Regional Oil Spill Response Plan ("OSRP") were deemed not capable of classwide proof, given their lack of publicity prior to the oil spill. (*Id.* at 25.) Defendants note that Plaintiffs' overall damages calculations have not materially differed from their last attempt at class certification, indicating that the Court's decision not to certify the IEP and OSRP statements for class action treatment produced no corresponding change in the damages calculations. (*Id.* at 26–27.) Defendants argue that this is the same problem encountered in *Comcast.* (*Id.* at 32.)

Plaintiffs-correctly-reframe this argument as an argument regarding loss causation. (Doc. No. 802 ("Reply"), at 20.) As the Supreme Court explained in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), buying a stock at an inflated cost does not harm the purchaser.[4] A compensable injury occurs only when the fraud is revealed and causes the stock price to drop, directly devaluing the stock which remains in the purchaser's possession. *See* Dura, 544 U.S. at 344 (noting that a securities fraud defendant's liability attaches when the facts which he misrepresented or concealed " 'become generally known' and 'as a result' share value 'depreciates' ") (quoting Restatement (Second) of Torts § 548A, comment b, at 107 (1976)). This element of a securities fraud claim is known as "loss causation."[5]

[4]   An inflated purchase price is *necessary* to establish loss causation, but it is not in itself sufficient. A quick sale when the inflation is still in effect means that the plaintiff has suffered no loss. Conversely, a sale at a loss after a lengthy passage of time could mean that the price differential is explained by other factors, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events[.]" *Dura,* 544 U.S. at 342–43.

[5]   "Loss causation" is related to but conceptually distinct from what quantum of loss may be recovered by a securities fraud claimant as damages. *See Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1447 n. 5 (11th Cir.1997). For example, *Dura* provides instruction on why a loss-causing event is necessary for Section 10(b) recovery; it does not provide guidance on how to calculate the fraud-related loss. *See Perlmutter v. Intuitive Surgical, Inc.,* No. 10–CV–03451–LHK, 2011 WL 566814, at *5 (N.D.Cal. Feb.15, 2011) ("Although the Supreme Court in *Dura* did distinguish between general investment losses and damages resulting from fraud, the Supreme Court's holding in *Dura* did not outline a clear method for distinguishing between the two.").

**\*7** "Loss causation requires proof of a causal connection between a misstatement and a subsequent decline in a stock's price." *Alaska Elec. Pension Fund v. Flowserve Corp.,* 572 F.3d 221, 229 (5th Cir.2009); *see also Dura,* 544 U.S. at 342 (describing loss causation as a "causal connection between the material misrepresentation and the loss"). There are two components to this "causal connection." First, the decline in stock price must follow "a disclosure of negative truthful information that was related to the allegedly false, non-confirmatory positive statement made earlier." *Flowserve,* 572 F.3d at 229 (internal quotation marks, brackets, and citation omitted). For negative information to be "related to" a prior misstatement, it need not "specifically reveal[ ] the fraud" by correcting " 'fact-for-fact' " the prior misstatement. *See id.* at 229–30. Instead, the "disclosed information must reflect part of the 'relevant truth'-the truth obscured by the fraudulent statements." *Id.* at 230. Second, it must be " 'more probable than not that ... this negative statement, and not other unrelated negative statements ... caused a significant amount of the decline.' " *Id.* at 228 (quoting *Greenberg v. Crossroad Sys.,* 364 F.3d 657, 666 (5th Cir.2004)).

Defendants dispute that corrective events which informed the market that BP could not contain the oil spill were "related to" the process safety misstatements. In reply, Plaintiffs explain that they will argue that stock price declines associated with BP's inability to contain the oil spill revealed the falsity of the OMS statements. According to Plaintiffs, Defendants' statements implicitly reassured the market that OMS would both reduce the likelihood that BP would suffer another process safety incident *and* give BP the tools to respond to and mitigate the effects of an incident, should one occur. (Reply at 20–22.) Defendants

2014 WL 2112823, Fed. Sec. L. Rep. P 97,970

have lambasted this argument, characterizing it as a sudden departure from Plaintiffs' previous litigation position, which did not characterize the OMS statements as statements regarding BP's spill containment capabilities. (Opp. at 27–30.)

The Court agrees with Defendants that this is a "new" theory, and one not altogether convincing as a matter of logic.[6] Despite the initial appeal of Defendants' position, however, the Court believes it to be premature. Loss causation need not be proven at the class certification stage. *See Erica P. John Fund, Inc. v. Halliburton Co.,* —— U.S. ——, ——– ——, 131 S.Ct. 2179, 2185–86, 180 L.Ed.2d 24 (2011). And Plaintiffs' alleged failure of proof-if indeed there is one-is a classwide failure amenable to a classwide solution: the declines from the unrelated corrective events are simply removed from the damages calculations. As Plaintiffs note, their proposed methodology tolerates such alterations in inputs. (Mot. at 19; Reply at 22–23.)

[6] Specifically, it appears that Plaintiffs plan to rely-at least in part-on undisclosed, private operational documents to make the link between OMS and mitigation. (Mot. at 10 n. 5.) The Court has trouble imagining how *private* documents are availing in a securities fraud case premised on "fraud-on-the-market," where the relevant issue is how the market perceived and priced *public* information.

"[T]he focus of the 23(b)(3) class certification inquiry-predominance-is not whether the plaintiffs will fail or succeed, but whether they will fail or succeed *together.*"[7] *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 431 (5th Cir.2013), *cert. granted, Halliburton Co. v. Erica P. John Fund Inc.,* —— U.S. ——, 134 S.Ct. 636, 187 L.Ed.2d 415 (2013). Consequently, the Court is not persuaded that Plaintiffs' decision to treat containment-related disclosures as corrective events for the process safety fraud prevents class certification.

[7] This rule benefits Defendants by postponing potentially meritorious class-wide merits arguments until after a class is certified. *See Schleicher v. Wendt,* 618 F.3d 679, 686 (7th Cir.2010) ("Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win.").

**2. Plaintiffs' attempt to apportion their losses throughout the subclass period is not so arbitrary as to prevent class certification.**

**\*8** Defendants also criticize the "linear progression" aspect of Plaintiffs' pre-explosion damages methodology. This aspect of the damages model is explicitly intended to address the Court's concern that the Baker Panel and OMS statements were alleged to have a "cumulative" and "compounding" misleading effect on the market, rendering a "constant dollar" methodology inappropriate.

First, Defendants claim that Mr. Coffman's linear progression methodology-i.e., his "step up" or "step wise" function-is completely arbitrary because it does not take into account the content or context of the various pre-explosion statements. (Opp. at 13.) This disconnect produces irrational results. For example, the principal determining factor of how much incremental loss is attributed to any given statement is how much time has passed since the immediately preceding statement. (*Id.* at 13–14.) Additionally, the amount of loss attributed to a particular misstatement is constant and independent of whether any preceding misstatement is proven. For example, if Plaintiffs establish that Mr. Hayward misspoke on March 23, 2010 when he stated that the Texas City accident "has changed in a profound and fundamental way [BP's] approach to safety and operations integrity," they are awarded $18.05 of "inflation" as of that date, even if it is the only misstatement proven. (*Id.* at 14–15.) Defendants argue that these illogical results illustrate how divorced the damages methodology is from Plaintiffs' liability case. (*Id.* at 15–16.) Notably, this belies Plaintiffs' contention that the model measures the "cumulative" effects of the alleged misstatements, because the effect of any given misrepresentation is independent of whether prior misrepresentations have been shown. (*Id.* at 18–21.)

Plaintiffs claim that the proposed methodology utilizes a proven and acceptable means of measuring damages: working backwards from the effect of a "corrective" event on the stock price. (Reply at 8–9; Doc. No. 831, at 41.) They also defend the consistency of the damages methodology with the liability case. The proposed methodology reflects that the "inflation" built up over the course of the subclass period, beginning with a small amount of "inflation" as the statements began, and ending with the full amount of "inflation" as of the time of the explosion. (Reply at 9.) They acknowledge that Mr. Coffman's methodology provides at most an approximation of the influence of Defendants' process safety misstatements,

but argue that case law permits them to approximate damages when precise measurements are unavailable. (*Id.* at 10–13 .)

Plaintiffs also note that their proposed methodology will be responsive to the jury's liability findings, because failure to prove later misrepresentations actionable renders the "inflation" from those statements unrecoverable. (Reply at 9 & n. 10.) They acknowledge the accuracy of Defendants' hypothetical-where failure to prove any misrepresentation but a latein-time misrepresentation does not affect the "inflation" produced by that misrepresentation. However, Plaintiffs caution that the consistency of their damages methodology with the liability case should not be tested on highly unlikely scenarios, when (according to them) there are 87 million possible permutations of liability findings for the 14 alleged process safety misstatements. (*Id.* at 16–17 & n. 25.) They note that, in the event that Defendants' unlikely hypothetical scenarios transpire, Defendants are free to argue that the damages methodology cannot be accepted in those circumstances. (*Id.* at 17 n. 25.)

 **\*9**  Finally, and most importantly, Plaintiffs contend that Defendants' criticisms are directed to whether the proposed damages methodology is correct, not whether it is consistent with the liability case. (Reply at 13–15.) They state that the accuracy of the damages calculations is an inquiry reserved for the jury. (*Id* . at 15.) They argue that *Comcast* does not authorize denial of class certification based on alleged weaknesses in a plaintiff's damages methodology, unless those weaknesses conceal difficult or complex individualized damages determinations. (*Id.* at 15–16.) Because Defendants' arguments-if well-taken-indicate a classwide failure of proof, and not that individual issues predominate, class certification is proper. (*Id.*)

As the Court perceives it, the fundamental issue undergirding the parties' respective arguments is whether Plaintiffs may "work backwards" from the stock price declines at the time of alleged corrective events and attempt to apportion their losses over the course of the Pre–Explosion Subclass period. Plaintiffs refer to the technique as "back-casting" and claim that it is commonly employed in securities fraud cases. (Doc. No. 831, at 41.)

If Plaintiffs are correct, and "back-casting" is an accepted means of approximating the losses caused by misleading statements, then the proposed methodology-while perhaps not entirely convincing-provides at least some logical and consistent basis for apportioning Plaintiffs' losses among the

14 alleged process safety misstatements. If the approach is not acceptable as a matter of law, however, then Defendants have correctly identified a problem similar to the one found in *Comcast.* As Justice Scalia explained:

> The [Third] Court of Appeals simply concluded that respondents "provided a method to measure and quantify damages on a classwide basis," finding it unnecessary to decide "whether the methodology [was] a just and reasonable inference or speculative." Under that logic, at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity.

133 S.Ct. at 1433 (citations omitted) (emphasis original).

As to the question of whether a Section 10(b) claimant may "back-cast" damages, there is ample support for Plaintiffs' position. Typical Section 10(b) damages are governed by the "out-of-pocket" rule-i.e., a Section 10(b) claimant may recover " 'the difference between the price paid and the "value" of the stock when bought.' " *Acticon AG v. China North East Petro. Holdings Ltd.,* 692 F.3d 34, 38 (2d Cir.2012) (quoting *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 168 (2d Cir.1980)). And multiple cases indicate that these "out of pocket" damages can be measured by reference to the decline in the stock price on the day of disclosure. *See, e.g., In re Enron Corp. Sec. Derivative & "ERISA" Litig.,* 529 F.Supp.2d 644, 716 (S.D.Tex.2006) (stating that the "out-of-pocket measure ... allows a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud *as measured by the correction in the market price following curative disclosure"* ) (quotation marks and citation omitted) (emphasis added); *In re Royal Dutch/Shell Transp. Sec. Litig.,* 404 F.Supp.2d 605, 610 (D.N.J.2005) (same). Thus, case law reflects a long-standing and widespread practice of measuring the stock price impact of a given misstatement *by implication* from the stock price decline caused by the misstatement's disclosure. *See, e.g., Goldberg v. Household Bank, F.S.B.,* 890 F.2d 965, 966–67 (7th Cir.1989) ("When markets are liquid and respond quickly to news, the [stock price] drop when the truth appears is a good measure of the value of the information, making it the appropriate measure of damages."); *Harris v. Union Elec. Co.,* 787 F.2d 355, 368 (8th Cir.1986) ("[W]e believe that the true value of the bonds on the date they were issued is reflected by the *drop* in the market price once the fraud was discovered.") (emphasis

2014 WL 2112823, Fed. Sec. L. Rep. P 97,970

original); *Blackie v. Barrack,* 524 F.2d 891, 909 n. 25 (9th Cir.1975) (recognizing that "the change in [stock] price after a corrective release" is "circumstantial evidence of the inflation when purchased," although "it is not the exclusive method of measuring inflation"). [8]

[8]      *See also Ong ex rel. Ong v. Sears, Roebuck & Co.,* 459 F.Supp.2d 729, 751 (N.D.Ill.2006) ("[D]amages under § 10(b) can be measured by reference to the amount the price of a security drops when the truth comes out."); *In re BankAtlantic Bancorp, Inc. Secs. Litig.,* No. 07–61542–CIV, 2010 WL 6397500, at *18 (S.D.Fla. Aug.18, 2010) (describing expert's "method for calculating ... inflation"-in which she "opines that the level of inflation resulting from a misrepresentation is equal to the amount of residual decline attributable to the disclosure (or materialization) of the truth of that misrepresentation"-as "unremarkable").

**\*10**   Admittedly, the authorities above are not directly on point, as Plaintiffs and Mr. Coffman concede that the pre-explosion damages methodology does not calculate the amount of pre-explosion inflation in BP's stock price. (Reply at 4–6; Coffman Report ¶¶ 8, 72.) Specifically, when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (i.e., on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent. [9] If the probability is less than 100 percent, the stock price correction after the risk materializes will be *larger* than the pre-materialization inflation. [10] Here, not even Plaintiffs argue that the risk of a deepwater well blow-out and oil spill was 100 percent. The Court will address this aspect of the proposed damages methodology below, in Section IV(A)(3), as it prompts a separate discussion of what losses are redressable by the securities laws. But with regards to the arbitrariness of Mr. Coffman's model, the Court accepts the general notion that Plaintiffs may "back-cast" their losses as derived from corrective disclosure days.

[9]      A nearly 100 percent risk was present in *In re Vivendi Universal, S.A. Securities Litigation,* a case frequently cited by Plaintiffs as support for their theory of recovery in the Pre–Explosion Subclass period. *See* 634 F.Supp.2d 352, 371 (S.D.N.Y.2009). Because the risk was virtually

certain to materialize in that case, the Court finds it uninstructive for present purposes.

[10]      To demonstrate this phenomenon, Defendants' expert offered the following simplified example:

Imagine that a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red. If the company drew a red marble, it would have to pay $1 million. Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000. If the company subsequently drew a red marble, the market value would have fallen $990,000 to reflect the new information-the certainty of a $1 million loss. If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would *still* have fallen when the company drew a red marble. In order to understand the value implication of the company's misstatement that were was only one red marble, the relevant issue is what the market value would have been, prior to the drawing, had the company told the truth. In this case, the market value would have reflected an expected loss of $20,000, only $10,000 lower than the actual market value, *not* the $990,000 less that would be implied by looking at the reaction to the drawing of a red marble.

(Doc. No. 664–18, at ¶ 59.)

With this understanding in mind, the core of Defendants' argument appears to be that Mr. Coffman's "linear progression" and "step-wise function" are imperfect means of allocating Plaintiffs' losses over the relevant time period. But Plaintiffs' damages model need not be perfect. It need not be "correct." *See Vaccarino v. Midland Nat'l Life Ins. Co.,* No. 2:11–CV05858–CAS(MANx), 2014 WL 572365, at *10–13 (C.D.Cal. Feb.3, 2014); *In re Cox Enters. Inc. Set–Top Cable Television Box Antitrust Litig.,* No. 12–ML–2048–C, 2014 WL 104964, at *12–13 (W.D.Okl. Jan.9, 2014). Indeed, it is impossible to imagine any damages methodology that would meet Defendants' exacting standards *except* for proof of stock price impact on each day that a process safety misstatement was made. But the fact that Plaintiffs' task is unquestionably difficult does not render it impossible. Approximating damages in *any* case is an imperfect science-particularly when an alleged fraud is perpetrated over a

multi-year period, with a near-continuous series of alleged misstatements. [11] The pre-explosion damages methodology contains its flaws, but it is not wholly arbitrary.

[11]  The Court notes its discomfort with the suggestion that the factual complexity of an alleged fraud can create an insurmountable hurdle for investors seeking recovery. As all parties acknowledge, the task of modeling damages in the Pre–Explosion Subclass period is made more difficult by virtue of the repetition of the allegedly misleading statements-what Plaintiffs term the "drumbeat" of process safety reform which featured so prominently in Defendants' public relations materials. (Doc. No. 831, at 105–06.)

**3. The fact that the pre-explosion damages methodology does not measure the classwide injury caused by Defendants' alleged fraud is fatal to class certification.**

As previously alluded to, Plaintiffs concede that the pre-explosion damages methodology does not calculate the amount of pre-explosion inflation in BP's stock price. As a result, Defendants characterize the methodology as "investor insurance" rather than legally compensable securities fraud damages. Defendants argue that the proper type of damages to be recovered by investors in securities fraud cases is "out-of-pocket" damages. (Opp. at 36–37.) In the context of this case, Defendants claim that pre-explosion purchasers' damages should be determined by how the market would have priced the additional, undisclosed risk of a process safety incident before one occurred-not how the market in reality priced the consequences of the Deepwater Horizon explosion. (*Id.;* Doc. No. 783–7 ("Stulz Report"), at ¶¶ 30–31.) Because the pre-explosion damages methodology is not based on the "but for" price that the stock would have traded at absent Defendants' alleged fraud, it represents an impermissible windfall for investors, protecting them from the downside consequences of an assumed (if allegedly understated) risk. (Opp. at 38–39.)

 **\*11**  Plaintiffs disagree that the proper measure of pre-explosion purchasers' damages is the difference between the actual price paid for the stock and a hypothetical, ex ante "but for" price at which the stock would have traded had the market been able to appropriately price BP's risk profile. They argue that the observed post-explosion stock price declines may be recovered as *consequential* damages from the alleged process safety fraud. (Doc. No. 836 ("Supp.Brief"), at 3.) They expressly eschew that their recovery should be limited

to the market price distortion, because they intend to prove that their post-explosion losses were proximately caused by BP's failure to institute OMS as publicly represented. (*Id.* at 3–8.) Plaintiffs note that the Fifth Circuit allows them to pursue consequential damages. (*Id.* at 10 .)

Plaintiffs are correct that no single measure of compensatory damages controls *all* situations redressed by Section 10(b). *See Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1137 (5th Cir.1988), *vacated on other grounds sub. nom. Fryar v. Abell,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989). Plaintiffs are also correct that the Fifth Circuit has approved consequential damages in the Section 10(b) context. [12] *See James v. Meinke,* 778 F.2d 200, 205–06 (5th Cir.1985); *Meyers v. Moody,* 693 F.2d 1196, 1212 (5th Cir.1982). As the Fifth Circuit has explained, "special [i.e., consequential] damages are defined as outlays *attributable to the defendant's wrongful conduct." Meyers,* 693 F.2d at 1212 (emphasis added). This definition of consequential damages dovetails with Section 28 of the Securities Exchange Act of 1934 (the "Exchange Act"), which states that no plaintiff may recover more than the "actual damages to that person on account of the act complained of." 15 U.S.C. § 78bb(a)(1). These authorities counsel that a distinction must be drawn between the alleged misrepresentation and the subject matter allegedly misrepresented-in this case, between Defendants' public misstatements of their process safety reforms, and the underlying failure to institute process safety reforms. The Exchange Act provides compensation for losses caused by the former; losses caused by the latter are beyond the scope of the Act. *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) ("No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this 'term of art' [i.e., manipulative] if it had meant to bring within the scope of [Section] 10(b) instances of corporate mismanagement such as this [.]"); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC,* 423 F.Supp.2d 348, 354–55 (S.D.N.Y.2006) ("Allegations of corporate mismanagement generally fall outside the scope of [Section] 10(b) because they fail to allege conduct that is considered 'manipulative or deceptive.' ").

[12]  Other circuits are in accord. *See, e.g., Grubb v. Fed. Deposit Ins. Corp.,* 868 F.2d 1151, 1165 (10th Cir.1989); *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1413 (9th Cir.1987); *Garnatz v. Stifel, Nicolaus & Co., Inc.,* 559 F.2d 1357, 1360 (8th

Cir.1977); *Zeller v. Bogue Elec. Mfg. Corp.,* 476 F.2d 795, 803 (2d Cir.1973).

Plaintiffs argue that Defendants' process safety misstatements were a proximate cause of all their post-explosion investment losses because Plaintiffs were deprived of the opportunity to avoid the increased risk by divesting prior to the explosion. (Reply at 6 n. 6; Coffman Report at ¶¶ 35–36.) But this articulation of the causal link between the alleged misstatements and the claimed losses injects individualized inquiries into what is supposed to be a classwide model of recovery. In other words, the causal link withstands scrutiny only if Defendants' misrepresentations induced a transaction-i.e., if a particular investor would not have purchased the security had he known the true state of BP's process safety programs.[13] *See Garnatz v. Stifel, Nicolaus & Co., Inc.,* 559 F.2d 1357, 1360–61 (8th Cir.1977) ("[T]he gravamen of the present action was not whether [plaintiff] bought the bonds for a fair price, but that he bought at all ... Under these circumstances, we believe that a rescissory damage measure ... is appropriate."); *Chasins v. Smith, Barney & Co., Inc.,* 438 F.2d 1167, 1173 (2d Cir.1970) (approving the use of an alternative damages measure when "the evil is not the price at which [plaintiff] bought but the fact of being induced to buy and invest for some future growth in these stocks without disclosure of [defendant's] interest"). But if Defendants' misrepresentations merely manipulated a price-i.e., if an investor would still have purchased the security, but for less-then the causal chain between the *misrepresentations* and the alleged consequential losses is severed.

13    Plaintiffs' supplemental brief acknowledges that transaction inducement is necessary for their alleged consequential losses to have been "caused" by Defendants' process safety misstatements:

> In the case of a fraudulently concealed risk ... damage and causation occur slightly differently [than they would in a case involving misrepresentations of strictly historical facts]. The investor is fraudulently induced to buy stock and take on a risk that has been concealed or understated, which prevents the investor from accurately assessing the likelihood that the risk will materialize.

(Supp. Brief at 4.)

**\*12** For this reason, Plaintiffs' articulation of consequential damages is antithetical to the "fraud-on-the-market" theory which enables the classwide resolution of their claims. The "fraudon-the-market" theory presumes that, in an

"impersonal well-developed market for securities," investors rely upon the "integrity of the market price." *Basic Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). This presumption of reliance across a putative class enables claims to be resolved on a collective basis. *See Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.,* 482 F.3d 372, 383, 394 (5th Cir.2007). If investors are not relying upon the integrity of the market price-if they are, as Plaintiffs suggest, determining their own risk thresholds specific to the company at issue-then Plaintiffs' proposed measurement of damages cannot be deployed without an individualized inquiry into each investor's subjective motivations. Classwide treatment would be patently inappropriate in such a case.[14] This is exactly the kind of elision of classwide and individualized questions that can and should be avoided by closely examining Plaintiffs' proposed damages methodology. *See Comcast,* 133 S.Ct. at 1434 (noting that "a methodology that identifies damages that are not the result of the wrong" can provide no assurance that "damages [resulting from the wrong] are capable of measurement and will not require labyrinthine individual calculations").

14    By comparison, the "out-of-pocket" measure of damages employed in most securities fraud cases is particularly consonant with the "fraud-on-the-market" theory. In an efficient market, all information can be valued-every risk has a price. In the context of this case, for example, if Plaintiffs prevail on their pre-explosion claims, then the market was deprived of the opportunity to accurately price the risk that BP faced, and all purchasers of BP stock in the Pre–Explosion Subclass period arguably overpaid for their investment. But the amount they overpaid was the unpriced risk, not its consequences. *See* Michael J. Kaufman, *Securities Litigation: Damages* § 13:16 (2005) ("[I]n assessing the effect of contingent or speculative events upon the fair value of stock, courts should weight the magnitude of the events to the issuer against the probability of their occurring."). Because the value of the unpriced risk is considered from the perspective of the marketplace as a whole, it remains constant across the subclass of investors.

Finally, Plaintiffs argue that the alleged flaw in their methodology does not inhibit class certification, because the "out-of-pocket" measurement suggested by Defendants can

also be accomplished on a classwide basis. (Reply at 5 n. 5; Supp. Brief at 2.) Plaintiffs may be correct, but they have not given the Court any information about how the alternative calculation would be performed. The Court is left, as it was in December 2013, with a conclusory assertion that damages will be calculated on a classwide basis. Plaintiffs bear the burden of proving all relevant elements of Rule 23. That burden is not met by asking the Court simply to trust them. Because Plaintiffs have not shown that the damages of pre-explosion purchasers can be calculated on a classwide basis consistent with their theory of liability, the predominance requirement of Rule 23(b)(3) has not been met as to the Pre–Explosion "Process Safety" Subclass. The Court will not certify the Pre–Explosion Subclass for class action treatment.

## B. The Court will certify the Post–Explosion "Spill Severity" Subclass.

Defendants offer fewer criticisms of the proposed damages methodology for the Post–Explosion Subclass. The Court finds none of the criticisms sufficient to deny class certification.

First, Defendants argue that the Court previously rejected a "constant dollar" approach to damages. (Opp. at 4, 41.) This overstates the December 6th Order. The Court acknowledged the incongruity of using "constant dollar" to measure damages for the proposed class as a whole, but the specific concerns identified by the Court were relevant to the pre-explosion time frame only. (December 6th Order at 13 n. 6, 29.) Having now had occasion to review the "constant dollar" approach in the specific and isolated context of the spill severity misstatements, the Court perceives no legal or logical impediment to its use. As the Seventh Circuit explained, a Section 10(b) claim may be predicated on an understatement of bad news just as easily as an overstatement of good news. *See Schleicher v. Wendt,* 618 F.3d 679, 683 (7th Cir.2010). The harm caused by that misrepresentation, then, is the artificial delay in the stock price falling, rather than the creation of artificial inflation:

> **\*13** If a firm says that it lost $100 million, when it actually lost $200 million-and analysts had expected it to announce that it lost only $50 million-then the announcement will cause the stock's price to fall. But the fall won't be as much as the truth would have

> produced. People who buy the stock after the announcement, and before the truth comes out, pay too much; they will lose money when the rest of the bad news emerges. This is no different in principle from a firm's announcement of a $200 million profit, when the truth is $100 million; only the signs on the numbers differ.

*Id.* at 684. Plaintiffs' theory in the post-explosion time frame is that Defendants misrepresented their internal estimates of the oil spill; that the stock market price failed to fall to the level reflecting the magnitude of the crisis facing BP; that the market learned the truth; and that the stock market price corrected. (Mot. at 16–17.) There is nothing problematic with the "constant dollar" approach in these circumstances.

Second, Defendants argue that it is improper for the Post–Explosion Subclass period to begin on April 26, 2010 when the first alleged post-explosion misstatement in Plaintiffs' live pleading occurred after the markets closed on April 28, 2010. (Opp. at 42–43.) This dispute will be resolved in accordance with the Court's ruling on Plaintiffs' Motion for Leave to Amend, addressed in Section V, below.

Third, Defendants criticize the decision to carry back the full measure of the stock price decline in the months after the explosion to the first alleged spill severity misstatement because there is no evidence that Defendants had the same information about flow rate in the days after the explosion that the market acquired by mid-June 2010. [15] (Opp. at 46–48.) They also suggest that Plaintiffs are using their damages methodology-based on what was allegedly "foreseeable" to Defendants as a result of their internal estimates of the flow rates-in order to expand their liability theories beyond what has been pled. (*Id.*)

[15]    The parties strongly disagree about what spill-rate-related information was known to Defendants, and by when. (Opp. at 46–48; Reply at 28.)

Fourth, Defendants note that all of the alleged corrective disclosures for the post-explosion spill severity misrepresentations are also corrective disclosures for the pre-explosion process safety misrepresentations. They fault Plaintiffs for "recycling" corrective disclosures without disaggregating inflation by type of misrepresentation

"corrected" or risk materialized. (Opp. at 48–49 .) Mr. Coffman notes that the overlap will not lead to "double counting of damages" because "a single physical share can never collect for the same disclosure more than once." (Coffman Report at ¶ 22.) Plaintiffs argue that it is consistent with both case law and logic for a single corrective disclosure to be linked to two separate but related fraudulent schemes. (Reply at 31–32.)

Defendants' third and fourth arguments concern loss causation, in that they challenge the "fit" between an alleged corrective event and an alleged fraudulent statement.[16] The Court shares Defendants' concerns regarding the apparent disconnect between some corrective events and the fraud which they are alleged to have corrected. Most notably, it is difficult to imagine how BP's cancellation of its June 2010 dividend in response to intense political pressure "corrected" Defendants' flow rate statements.[17] Nonetheless, as explained above in Section IV(A) (1), failure to prove loss causation is not, at present, an impediment to class certification. The Court reiterates its understanding that Plaintiffs' task at the class certification stage is to present a legally viable, internally consistent, and truly classwide *approach* to calculating damages. Whether Plaintiffs have properly executed under the approach is a question for a different day.

[16]    Additionally, Defendants' fourth argument would appear to be obviated by the Court's decision not to certify the Pre–Explosion Subclass for class action treatment.

[17]    To bridge this disconnect, Plaintiffs indicate that they will argue that the dividend announcement "relates back" to the flow rate statements because (1) the suspension of the dividend was necessitated by the impending costs of the oil spill and (2) those costs were higher because the flow rate was higher than the publicly-released estimate of 5,000 bopd. (Reply at 33.) This argument suggests that Plaintiffs are attempting to pursue a "materialization of the risk" theory of damages in the post-explosion time frame, despite their protestations to the contrary. (Mot. at 16–17 ("Unlike the Process Safety damages model, the Spill Severity damages model does not rely upon the materialization of the risk theory.").) It should be clear that the rationale which compelled the Court to reject "consequential" class-wide

damages for the Pre–Explosion Subclass would apply with equal force to any attempt to recover "consequential" class-wide damages on behalf of the Post–Explosion Subclass.

**\*14** The damages methodology proposed for the Post–Explosion Subclass meets the requirements for Rule 23(b) (3) predominance: it attempts to quantify the injury caused by Defendants' alleged wrongful conduct, and it can be deployed on a classwide basis. The Court will certify the Post–Explosion Subclass for class action treatment.

## V. PLAINTIFFS' MOTION FOR LEAVE TO AMEND

### A. Description of Proposed Amendments

### 1. New spill severity misrepresentation
The most important and consequential amendment in Plaintiffs' proposed Third Consolidated Amended Class Action Complaint ("TAC") is the addition of a new spill severity misrepresentation on April 24, 2010. Plaintiffs acknowledge that they seek to add this misrepresentation to the case because otherwise investors who purchased BP ADSs between April 26–28, 2010 would have no remaining claims and would not be eligible to participate in the class action. (Doc. No. 777–1 ("MLA"), at 2.)

#### a. The SAC allegations
The Second Consolidated Amended Class Action Complaint ("SAC"), filed on April 2, 2012, alleged that an internal BP document dated April 27, 2010 set forth three estimates for the spill rate: a low estimate of 1,063 barrels of oil per day ("bopd"), a best estimate of 5,758 bopd, and a high estimate of 14,266 bopd. (SAC ¶ 375.) This document was the basis of Plaintiffs' scienter allegations for the post-explosion spill severity statements included in the SAC. There were three such statements:

(1) Mr. Suttles's statement on April 28th, following the close of the markets, that BP's best estimate was that 1,000 bopd were flowing from the Macondo well. (*Id.* ¶ 371.)

(2) Mr. Suttles's statements on April 29th that BP's best estimate was between 1,000 and 5,000 bopd. (*Id.* ¶ 373.)

(3) Mr. Hayward's statement on May 5th that BP's "guesstimate" remained 5,000 bopd. (*Id.* ¶ 381.)

### b. The TAC allegations

Plaintiffs seek leave to file the TAC, which would add a fourth spill severity misstatement made by Mr. Suttles on April 24th. The statement was made during a joint press conference with the U.S. Coast Guard. Mr. Suttles stated that BP had detected ongoing releases of oil from the Macondo well at a rate of approximately 1,000 bopd. (Doc. No. 777–2 ("TAC"), at ¶ 370.) Mr. Suttles also did not correct the U.S. Coast Guard leader, Rear Admiral Landry, when she said that the U.S. government also estimated the flow rate at 1,000 bopd. (*Id.*) Rear Admiral Landry had asked Mr. Suttles prior to the press conference if he could support the 1,000 bopd flow rate estimate. (*Id.*)

Plaintiffs support Mr. Suttles's scienter for the April 24th statement with the following new allegations:

- BP engineers and at least one BP-hired consultant were modeling the "worst case" discharge from the well in the April 21–22 time period. Their models returned numbers from 64,000–138,000 bopd. (TAC ¶¶ 372–75.)

**\*15**  • On April 23rd, BP's Ryan Malone sent an email, on which Mr. Suttles was copied, that estimated the flow rate at 31 gallons per minute, or 1,063 bopd.[18] On April 24th, before Mr. Suttles made the statement at issue, Mr. Malone sent another email-again copying Mr. Suttles-stating "[d]isregard the [1,063 bopd] estimate for flowrate" because "[i]t is wrong[.]" (*Id.* ¶ 376.)

[18]  The TAC states that 31 gallons per minute equates to 1,417 bopd. (TAC ¶ 376.) As Defendants note, a barrel of oil contains 42 gallons. *See, e.g.,* 33 U.S.C. § 1321(a)(13). The Court takes judicial notice of this fact, and has recalculated Mr. Malone's estimate as 1,063 bopd–31 gallons per minute multiplied by 1,440 minutes per day, divided by 42 gallons per barrel.

- Mr. Suttles has testified that he never "engage[d] with [BP's] flow assurance people"-i.e., the engineers and consultant mentioned-before he made the April 24th statement. (*Id.* ¶ 377 .)

### 2. Other amendments

The TAC contains other amendments that are intended to reconcile the complaint with the Court's prior orders on motion to dismiss and class certification. (*E.g.,* TAC at 1–

2.) These amendments do not appear to be subject to any controversy.

## B. Legal Standards

### 1. Rule 16(b)(4): whether to allow modification of the scheduling order

When the deadline for seeking leave to amend pleadings has expired, a court considering a motion to amend must first determine whether to modify the scheduling order under the Rule 16(b)(4) good cause standard. *See S & W Enters., L.L. C. v. SouthTrust Bank of Ala., N.A.,* 315 F.3d 533, 536 (5th Cir.2003). A court assesses four factors in deciding whether to grant an untimely motion for leave to amend under Rule 16(b)(4): "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Id.* at 536 (internal quotation marks, brackets, and citation omitted). If the movant satisfies the requirements of Rule 16(b) (4), the court must next determine whether to grant leave to amend under the more liberal standard of Rule 15(a)(2). *Id.*

### 2. Rule 15(a)(2): whether to allow amendment of the complaint

A party may amend its pleadings once as a matter of course within certain deadlines. FED. R. CIV. P. 15(a)(1). Thereafter, a party may amend its pleadings "only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a) (2). "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Accordingly, district courts in the Fifth Circuit "must entertain a presumption in favor of granting parties leave to amend." *Mayeaux v. Louisiana Health Service and Indem. Co.,* 376 F.3d 420, 425 (5th Cir.2004).

"Leave to amend, however, is by no means automatic." *Little v. Liquid Air Corp.,* 952 F.2d 841, 845–46 (5th Cir.1992), *rev'd on other grounds,* 37 F.3d 1069 (5th Cir.1994). Factors for the court to consider in determining whether there is a substantial reason to deny a motion for leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir.1993).

2014 WL 2112823, Fed. Sec. L. Rep. P 97,970

### C. Motion for Leave to Amend Analysis

#### 1. The Court will apply Rule 16(b)(4).

**\*16** Defendants suggest that Rule 16(b)(4) controls because the deadline to amend the pleadings has passed. Unfortunately, no docket control order entered in this case has ever included a deadline to amend pleadings. (Doc. Nos. 582 & 730.) Defendants argue, in the absence of an amendment deadline in the docket control order, the deadline to amend pleadings was the deadline for Plaintiffs to file the SAC, or April 2, 2012. [19] (MLA Opp. at 8–9.) The Court disagrees that this date was intended to function as a deadline for all amendment. The Private Securities Litigation Reform Act ("PSLRA") did not allow Plaintiffs any case-specific discovery prior to the Court's rulings on motion to dismiss, the last of which issued in February 2013. (Doc. No. 536.) To accept Defendants' characterization of the April 2, 2012 deadline would be to lock Plaintiffs into a set of allegations based on pre-discovery knowledge.

[19] This deadline was not included in a docket control order, but was instituted in a status conference convened after the Court ruled on Defendants' original motions to dismiss.

Nonetheless, this case has progressed far enough that the Court will consider Plaintiffs' request untimely under the schedule. *See, e.g., Smith v. Honeywell Int'l, Inc.,* No. 10–CV–03345–ES–JAD, 2014 WL 301031, at \*5 (D.N.J. Jan.27, 2014) ("Where a scheduling order sets no amendment deadline, courts have looked to when discovery closes to determine whether the motion to amend is untimely under Rule 16."). Fact discovery officially closed on January 31, 2014, and expert discovery is due to close within the next two months. (Doc. No. 730, at 1.) By all reasonable metrics, the time for amendment has passed.

#### 2. Modification of the scheduling order is justified under Rule 16(b)(4).

Under the Rule 16(b)(4) good cause standard, the Court will consider: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S & W Enters.,* 315 F.3d at 536 (internal quotation marks, brackets, and citation omitted). These factors, in the aggregate, weigh in favor of modification.

The importance of the amendment cannot be overstated. Without it, investors who purchased on three days in the post-explosion time frame will be excluded from the class action. (MLA at 2.) Additionally, $5.26 of stock price decline which Plaintiffs allege was related to the spill severity fraud would be unrecoverable. (MLA Opp. at 6.)

The amendment also threatens little prejudice to the Defendants-prejudice which can be cured, if necessary, by further modifications to the scheduling order. The Court recently extended expert discovery, which is under way and now scheduled for completion on or around June 19, 2014. To the extent that Defendants require any further extension to the expert discovery deadline on account of the new spill severity misstatement, the Court is amenable to such requests. The remainder of the schedule-which was vacated on May 7, 2014 to accommodate the extension in expert discovery-will be reset at the earliest possible date, with the input of the parties.

**\*17** Defendants also suggest that they will be prejudiced because amendment is equivalent to providing Plaintiffs a "third bite" at the class certification apple. (MLA Opp. at 15–16.) If the requested amendment were the difference between certifying and not certifying the Post–Explosion Subclass, this argument would carry much more force. But permitting Plaintiffs to file the TAC affects only the *dates* of the Post–Explosion Subclass period. It does not change whether certification is appropriate. [20]

[20] Of course, altering the dates of the Post–Explosion Subclass period exposes Defendants to the possibility of greater liability. But this is not the type of prejudice at issue in Rule 15 and Rule 16. *See In re Nasdaq Market–Makers Antitrust Litig.,* No. 94 CIV. 3996(RWS), 1997 WL 805062, at \*7 (S.D.N.Y. Dec.31, 1997) ("The issue [involved in Rule 15] ... is legal prejudice, not the magnitude of the Defendant's potential liability."); *Serfecz v. Jewel Food Stores, Inc.,* No. 92 C 4171, 1997 WL 543116, at \*6 & n. 6 (N.D.Ill. Sept.2, 1997) (collecting cases).

Thus, the only factor that could counsel against modification of the scheduling order is undue delay in requesting the amendment. The Court shares Defendants' consternation at the exceptionally late date of Plaintiffs' request. But Plaintiffs have given adequate explanation of why the new spill severity misstatement was not included in their prior complaints. [21]

2014 WL 2112823, Fed. Sec. L. Rep. P 97,970

And while Plaintiffs appear to have been in possession of the information which underlies their new allegations since at least early 2012, the Court cannot condemn Plaintiffs' discretion *not* to amend their pleadings as discovery made available new allegations that would not-at the time-have appreciably changed the landscape of the litigation. The present request appears to have been prompted by the Court's guidance in the December 6th Order that the subclass periods should be organized around the April 20, 2010 explosion. (Doc. No. 807 ("MLA Reply"), at 6.) In that light, and against the context of the case as a whole, the request is not unduly delayed.

21      According to Plaintiffs, the April 24th statement was not included in the original class action complaints because, at that time, Plaintiffs were unaware of the identity of the person who made the statement. (Doc. No. 807 ("MLA Reply"), at 5–6.) While Plaintiffs amended their original complaints in early 2012–producing the SAC-the purpose of the amendment was to rehabilitate statements dismissed from the original complaints due to lack of scienter or failure to plead falsity. None of the spill severity misstatements had been dismissed; therefore, Plaintiffs did not focus on the spill severity fraud as they amended their pleading. (*Id.* at 6.)

**3. The Court grants leave to amend pursuant to Rule 15(a) (2).**

The Court has no trouble determining that amendment should be permitted under the liberal standard of Rule 15(a)(2). As described above, neither Plaintiffs' delay in asking for amendment nor the prejudice which will be visited upon Defendants are substantial enough to refuse leave. Nor is the proposed amendment clearly futile due to insufficient scienter allegations. [22] *See* 6 C. Wright & A. Miller, Federal Practice & Procedure § 1487, pp. 637, 642 (2d ed. 1990) ("If a proposed amendment is not clearly futile, then denial of leave to amend is improper."). Leave to amend will be granted.

22      The defendants in a related individual action similarly argued that the plaintiffs had inadequately alleged the scienter of two BP executives who made flow rate statements in May 2010. The Court found the argument unpersuasive for reasons also pertinent here:

Defendants claim that Plaintiffs' scienter allegations are insufficient because [Robert] Dudley and [Lamar] McKay are not specifically alleged to have received any of the conflicting internal or external estimates. But given the importance of the oil spill to the Company, and the fact that Dudley and McKay voluntarily spoke to the public and to Congress as authorities on the disaster, it was at least reckless for them not to have fully apprised themselves of all internal estimates of the spill.

*Alameda Cnty. Employees' Retirement Ass'n,* Civ. Act. No. 4:12–cv–1256, 2013 WL 6383968, at *30 n. 13 (S.D.Tex. Dec.5, 2013) (citation omitted).

## VI. CONCLUSION

Plaintiffs' Motion for Leave to Amend (Doc. No. 777) is **GRANTED .** Plaintiffs may file the Third Consolidated Amended Class Action Complaint (Doc. No. 777–2).

Plaintiffs' Renewed Motion for Class Certification (Doc. No. 739) is **DENIED** as to the proposed Pre–Explosion "Process Safety" Subclass. Plaintiffs have failed to establish that damages from Defendants' alleged misstatements in the Pre–Explosion Subclass period can be calculated on a classwide basis.

Plaintiffs' Renewed Motion for Class Certification (Doc. No. 739) is **GRANTED** as to the proposed Post–Explosion "Spill Severity" Subclass. Pursuant to Plaintiffs' Motion, and the Court's December 6, 2013 Order, all requirements of Rule 23(a) and Rule 23(b)(3) have been met as to the proposed Post–Explosion Subclass. The Court **CERTIFIES** the following plaintiff class pursuant to Federal Rule of Civil Procedure 23:

**\*18** All persons and entities who purchased or otherwise acquired BP's ADSs between April 26, 2010 and May 28, 2010 and were injured thereby ("Class Period"). Excluded from the Class are Defendants, directors and officers of BP, their families and affiliates, as well as the retirement accounts of Defendants and BP's directors and officers.

In re BP p.l.c. Securities Litigation, Not Reported in F.Supp.3d (2014)
2014 WL 2112823, Fed. Sec. L. Rep. P 97,970

Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund ("New York") and the Ohio Public Employees' Retirement System ("Ohio") are **APPOINTED** as Class Representatives for the Class. Cohen Milstein Sellers & Toll PLLC and Berman DeValerio are **APPOINTED** as Class Counsel.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2112823, Fed. Sec. L. Rep. P 97,970

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 9

2020 WL 1329354
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE CHICAGO BRIDGE & IRON
COMPANY N.V. SECURITIES LITIGATION

17 Civ. 1580 (LGS)
|
Signed 03/23/2020

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

**\*1** Plaintiffs ALSAR Ltd. Partnership ("ALSAR"), Ironworkers Local 40, 361 and 417 Union Security Funds and Iron Workers Local 580 Joint Funds ("Ironworkers"), individually and on behalf of all other persons similarly situated, bring this putative class action against Defendants Chicago Bridge & Iron Company Ns.V. ("CBI"), Philip K. Asherman, Ronald A. Ballschmiede and Westley S. Stockton, alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. On February 4, 2019, Plaintiffs moved for class certification and appointment of Class Representatives and Class Counsel pursuant to Federal Rule of Civil Procedure 23. This Order addresses Special Master Scheindlin's Report and Recommendation (the "Report"), dated October 16, 2019, recommending that the Court grant Plaintiffs' motion. [1] For the reasons stated below, the Report is adopted except to the extent any of its reasoning is inconsistent with what is stated below, and Plaintiffs' motion is granted.

[1]     On December 7, 2018, the Court appointed retired United States District Judge Shira A. Scheindlin to serve as a Special Master pursuant to Federal Rule of Civil Procedure 53(a)(1)(A) and (a)(1)(C).

**I. LEGAL STANDARDS**
Pursuant to Federal Rule of Civil Procedure 53(f)(1), in acting on a master's order, the Court "may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53(f)(1). If a party raises objections to the master's report, "[t]he court must decide de novo all objections to conclusions of law made or recommended." Fed. R. Civ. P. 53(f)(4). Courts in this Circuit

use a "clear error" standard to review a master's findings of fact and conclusions of law where no objection is raised, which is the same standard applied to a Magistrate Judge's report and recommendation in this context. *See, e.g., Seggos v. Datre*, No. 17 Civ. 2684, 2019 WL 3557688, at *2 (E.D.N.Y. Aug. 5, 2019) (applying clear error review to portions of a Special Master's Report to which no objections were made); *CA, Inc. v. New Relic, Inc.*, No. 12 Civ. 5468, 2015 WL 13753674, at *6 (E.D.N.Y. Sept. 28, 2015) (same).

Before granting a class certification motion, a court must ensure that the requirements of Federal Rule of Civil Procedure 23(a) and (b) have been met. Rule 23(a) has four prerequisites: numerosity, commonality, typicality and adequacy of representation. An additional implied requirement of Rule 23 is ascertainability, which requires that members of the proposed class be identifiable. *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). "If Rule 23(a) criteria are satisfied, an action may be maintained as a class action only if it also qualifies under at least one of the categories provided in Rule 23(b)." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 464 (2d Cir. 2013). Plaintiffs here are proceeding under Rule 23(b)(3), which requires that Plaintiffs prove that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**\*2** As Rule 23 is more than a "mere pleading standard," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), the party seeking certification must prove these requirements by a preponderance of the evidence. *In re Petrobras Sec.*, 862 F.3d at 260. A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *accord Gruber v. Gilbertson*, No. 16 Civ. 9727, 2019 WL 4439415, at *2 (S.D.N.Y. Sept. 17, 2019). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc.*, 564 U.S. at 351; *accord Marotto v. Kellogg Co.*, No. 18 Civ. 3545, 2019 WL 6798290, at *3 (S.D.N.Y. Dec. 5, 2019).

The Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions. *See Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 563 (2d Cir. 1968) ("[Rule 23] should be given a liberal rather than restrictive

interpretation."); *accord Gruber*, 2019 WL 4439415, at *2. "[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968); *accord Gruber*, 2019 WL 4439415, at *2. "Courts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707, 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010) (citing *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)); *accord Gruber*, 2019 WL 4439415, at *2.

## II. BACKGROUND

Familiarity with the factual and procedural background of the case is assumed. The facts as stated in Special Master Scheindlin's Report and Recommendation are incorporated herein.

Plaintiffs moved to certify a class under Rule 23(b)(3). In their opposition to class certification, Defendants did not challenge whether Plaintiffs had established Rule 23(a)'s numerosity, commonality and ascertainability requirements, or the superiority requirement of Rule 23(b). Defendants did challenge the typicality and adequacy requirements of Rule 23(a), the predominance requirement of Rule 23(b) and the span of the Class Period. The Special Master reviewed the parties' submissions and held an evidentiary hearing at which each party's respective expert testified and counsel presented oral argument. In a comprehensive, 108-page Report, the Special Master recommended that the Court grant Plaintiffs' motion for class certification; appoint ALSAR and Ironworkers as Class Representatives; appoint the law firm of Kahn Swick & Foti as Class Counsel; and certify the Class for the period October 30, 2013, through and including June 23, 2015 (the "Class Period").

Defendants timely filed objections to the Report. The Court reviews these objections de novo and evaluates the remainder of the Report's findings, to which Defendants did not object, for clear error. *See* Fed. R. Civ. P. 53(f)(4); *Seggos*, 2019 WL 3557688, at *2. For the reasons stated below, the Report is adopted except to the extent any of its reasoning is inconsistent with what is stated below, and Plaintiffs' motion is granted.

## III. DISCUSSION

## A. Defendants' Objections

### 1. Rule 23(b)(3) Predominance of Common Issues

**\*3** Four of Defendants' five objections are related and challenge the Rule 23(b)(3) requirement of predominance. Defendants dispute whether Plaintiffs can prove reliance -- a critical element of their securities fraud claim -- on a class-wide basis. If not, individual inquiries about class members' reliance would defeat a finding of predominance.

Plaintiffs argue that they can show class-wide reliance without individual proof because reliance is presumed if the stock at issue was traded in an efficient market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-50 (1988) (holding that, if plaintiffs can show that the market for defendant's stock was efficient, plaintiffs are entitled to the rebuttable presumption that the market price reflects all public information, and that they therefore relied on defendant's misrepresentation(s) in trading the stock).[2] However, a defendant can rebut the *Basic* presumption by proving "that the misrepresentation did not in fact affect the stock price." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 279 (2014). That is Defendants' argument here.[3]

[2] As the Second Circuit noted in *Arkansas Teachers*, the *Basic* presumption "derives from the 'fraud-on-the-market' theory, which holds that 'the market price of shares traded on [a] well-developed market[ ] reflects all publicly available information, and, hence, any material misrepresentations.' " *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 483 (2d Cir. 2018) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)) (alterations in original). Accordingly, "[i]f defendants 'sever the link' between the misrepresentation and the market price ... both the theory and the [*Basic*] presumption collapse." *Ark. Teachers Ret. Sys.*, 879 F.3d at 483 (quoting *Basic Inc.*, 485 U.S. at 248) (other internal quotation marks and alteration omitted).

[3] Defendants have conceded, for purposes of class certification, that the market trading CBI stock was efficient.

A defendant can show a lack of price impact in two principal ways. First, "[a] defendant may rebut the [*Basic*] presumption

with evidence that the alleged misstatements were not associated with abnormal, positive stock-price returns," *i.e.*, the alleged misrepresentation had no statistically positive, "front-end" impact on stock. *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15 Civ. 1249, 2017 WL 2062985, at *4 (S.D.N.Y. May 15, 2017); *see Halliburton II*, 573 U.S. at 279-83. Second, a defendant can rebut the *Basic* presumption with evidence that the alleged misrepresentation was not associated with "negative price stock-returns," *i.e.*, there was no statistically negative, "back-end" impact on stock following a corrective disclosure. *Virtus Inv. Partners*, 2017 WL 2062985, at *4. A corrective disclosure occurs when the truth about an earlier allegedly fraudulent statement or omission is revealed to the market. *See id.* at *5.

Defendants suggest that the *Basic* presumption can be rebutted on the back-end in at least two other ways: (i) if they can show that the information in a back-end disclosure is not new, *see Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018), or (ii) if they can show that the information in a back-end disclosure was not actually corrective. *See In re Signet Jewelers Ltd. Secs. Litig.*, No. 16 Civ. 6728, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019). However, for class certification purposes, when Plaintiffs are able to show an alleged misrepresentation had a statistically significant front-end price impact, Defendants are not entitled to rely on these additional back-end arguments to rebut the *Basic* presumption. *See Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46-47 (S.D.N.Y. 2018) ("[B]ecause [d]efendants did not carry their burden of demonstrating the absence of price impact, [p]laintiffs are entitled to the [*Basic*] presumption.").

### a. Burden of Persuasion

 **\*4** As a threshold matter, Defendants argue that because Federal Rule of Evidence 301 governs presumptions in civil cases (unless a federal statute or Federal Rule of Evidence provides otherwise), and because the *Basic* presumption has never been incorporated into any federal statute or Rule, the Report erred in concluding that Defendants bear the burden of persuasion, rather than the burden of production, in rebutting the *Basic* presumption.

This objection is overruled as it is contrary (and Defendants admit as much) to binding Second Circuit precedent in *Waggoner v. Barclays PLC*, 875 F. 3d 79, 99-103 (2d Cir. 2017). The Report properly applied the *Waggoner* rule

that a party opposing class certification bears the burden of persuasion when rebutting the *Basic* presumption and must demonstrate a complete lack of price impact by a preponderance of the evidence. *Id.* at 103; *see Ark. Teachers Ret. Sys.*, 879 F.3d at 485 ("Because the *Basic* presumption is a substantive doctrine of federal law that derives from the securities fraud statutes, [*Waggoner*] determined it altered the default rule and imposed a burden of persuasion on defendants seeking to rebut it.").

### b. 5% Statistical Significance Threshold

One of Defendants' arguments to rebut the *Basic* presumption was that one of seven alleged corrective disclosures ("CD #4") -- the October 2014 SCANA press release -- had no price impact because the parties' experts agreed that the disclosure did not have a statistically significant price reaction at the 5% level, which means there is no more than a 5% chance that the observed relationship is purely random. Defendants object that the Report erred in rejecting this argument and finding that Defendants had failed to prove lack of price impact as to the October 2014 SCANA press release (CD #4). [4] Defendants' expert had found a reaction at the 6.56% level for this event, and Plaintiffs' expert had found a reaction at the 8.44% level (*i.e.*, a 93.44% and 91.56% confidence level respectively). Defendants argue that a 5% significance level is the standard threshold used by experts and courts for identifying evidence of price impact and should have been applied here to find that CD #4 had no price impact.

[4]  The Report's finding was more nuanced. The Report concluded that Plaintiffs' expert "report of *p*-values for all of the dates analyzed and his opinion as to whether those between .05 and .10 (5-10% statistical significance) support a finding of market efficiency or price impact may be considered in deciding the issues presented by this motion. However, it is apparent that the weaker the statistical significance the less support the [expert] report provides toward the ultimate finding." (Dkt. No. 217 at 39-40/111). The Report later finds "some evidence of price impact on [the date of the October 14 SCANA press release]." (Dkt. No. 217 at 91/111).

This objection is overruled. Defendants are correct that a 5% significance level is the typical measure of statistical significance used in this context, but it is not the exclusive

measure. *Compare Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) ("In most scientific work, the level needed to obtain a statistically significant result is set at a five percent level of significance."), *and In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (same), *with Pirnik*, 327 F.R.D. at 46-47 (holding that plaintiffs' expert's analysis with respect to certain disclosures -- finding price impact at a statistically significant level below 95% -- did not demonstrate the absence of price impact), *and Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 345 (D.N.J. 2018) (same), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019). No hard and fast rule dictates a cutoff of a 5% significance level to prove price impact in a securities fraud case, nor should one. The Report correctly recommends that statistical significance not be evaluated as a binary question, "with statistical significance lying at the 4.99% level but not at 5.01% level." (Dkt. No. 217 at 38/111). Academic economics literature supports this proposition, *i.e.*, that scientific conclusions, business or policy decisions should not be based only on whether a *p*-value passes a specific threshold, as researchers must consider multiple contextual factors when performing data analysis:

> **\*5** A conclusion does not immediately become "true" on one side of the divide and "false" on the other.... Pragmatic considerations often require binary, "yes-no" decisions, but this does not mean that p-values alone can ensure that a decision is correct or incorrect. The widespread use of "statistical significance" (generally interpreted as "p ≤ 0.05") as a license for making a claim of a scientific finding (or implied truth) leads to considerable distortion of the scientific process.

Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70 AM. STATISTICIAN 129 (2016); *see* Dkt. No. 194-10 ¶ 42.

Defendants also argue that the Report erred in relying on *Pirnik* to justify its departure from the 5% standard, suggesting that *Pirnik* is an "outlier," "inapposite" and "does not support abandoning the 5% standard." (Dkt. No. 220

at 6-7/16); *see* 327 F.R.D. 38. However, *Pirnik* does not abandon the 5% standard, but rather points out that while a *p*-level of 7.88% is below "the conventional statistical measure of a 95% confidence level" and "is obviously [of] less comfort than a result that is statistically significant at a confidence rate of 95%," it does not, in itself, "prove the *absence* of price impact," which is what a defendant must show to defeat the *Basic* presumption. 327 F.R.D. at 46-47. Similarly, the Report concludes that values between 5% and 10% may be considered in deciding issues presented by the class certification motion, and qualifies this conclusion by noting that "it is apparent that the weaker the statistical significance the less support the [R]eport provides toward the ultimate finding." (Dkt. No. 217 at 39-40/111).

#### c. The Report's "Correctiveness" Test

Defendants attempt to rebut the *Basic* presumption by showing that certain allegedly corrective disclosures did not in fact correct an alleged misrepresentation. Defendants object to the Report on the ground that it adopted a legally erroneous test of "correctiveness," which resulted in improperly upholding four of the alleged corrective disclosures, "CDs" #3, #4, #5 and #6. This objection is overruled.

The Report found -- over Plaintiffs' objection and without the benefit of Second Circuit precedent -- that an inquiry into whether a disclosure is actually corrective is proper on a motion for class certification. Defendant does not object to this conclusion. But the Report also concluded that only "a limited analysis of an alleged disclosure as to whether it is 'corrective' is appropriate at this stage of the proceedings," (Dkt. No. 217 at 61-62/111), and that among the permissible inquiries is "whether the information in the alleged corrective disclosure relates to the same subject matter [as the misrepresentation] or is wholly unrelated." (Dkt. No. 217 at 61/111). Defendants object to the limited nature of the analysis and what they characterize as the "wholly unrelated" standard as the test of correctiveness. (Dkt. No. 220 at 7/16). Based in part on this analysis, the Report found that Defendants had not shown the lack of price impact based on CDs #1, #2 (partial), #3, #4, #5 and #6, but had shown the lack of price impact as to CD #7.

First, the Report correctly relied on reasoning from *Arkansas Teachers* to recommend that a court may appropriately consider, at the class certification stage, whether an

alleged corrective disclosure actually corrected an earlier misrepresentation. In *Arkansas Teachers*, the Second Circuit held that the district court had erred in not considering defendants' price impact information at the class certification stage. 879 F.3d at 486; *see also Halliburton II*, 573 U.S. at 279-83 (holding that defendants may seek to rebut the *Basic* presumption at the class certification stage through evidence that the misrepresentation had no price impact). In *Arkansas Teachers*, the price impact information sought to establish that the information in the alleged corrective disclosure had no price impact because it was not new. The court in *Arkansas Teachers* further concluded that:

> **\*6** Although price impact touches on materiality, which is not an appropriate consideration at the class certification stage, it differs from materiality in a crucial respect. Price impact refers to the effect of a misrepresentation on a stock price. Whether a misrepresentation was reflected in the market price at the time of the transaction [--] whether it had price impact [--] is *Basic*'s fundamental premise. It has everything to do with the issue of predominance at the class certification stage.

879 F.3d at 486 (internal quotation marks, citations and ellipses omitted). In this case, Defendants sought to establish that alleged corrective disclosures had no price impact because they were not actually corrective. The analysis from *Arkansas Teachers* is the same, concluding that price impact is a proper inquiry at the class certification stage. Accordingly, the Report correctly reasoned that an inquiry into correctiveness, like newness, is appropriate at the class certification stage.

Second, the Report's conclusion that CDs #3, #4, #5 and #6 were corrective was not in error. The Court finds that the challenged disclosures were corrective but without the need to adopt the precise articulation of a "correctiveness" test as formulated in the Report. The case law is clear that a corrective disclosure needs to be corrective and "linked" to a specific alleged misrepresentation. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 504, 510 (2d Cir. 2010). The analysis must focus on whether the disclosure was, in fact, corrective. *See Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2012 WL 1080306, at \*15 (S.D.N.Y. Mar. 30, 2012); *see also Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 812 (2011) (holding that loss causation need not be shown at the class certification stage).

CD #3 -- CBI's July 25, 2014, 2Q:14 10-Q -- is a partial corrective disclosure because it revealed to the market that CBI had violated Generally Accepted Accounting Principles ("GAAP") in its prior Securities and Exchange Commission filings by falsely stating that there were no indicators of impaired goodwill and by not taking an impairment charge to reduce goodwill, in particular by revealing a growing disparity between cash flow and growing non-cash earnings since CBI's prior financial disclosures. The Report correctly concluded that CD #3 relates to CBI's alleged misrepresentations of the amount of goodwill on CBI's balance sheet. Defendants' arguments that the information in CD #3 was not corrective of any alleged misrepresentation and had been repeatedly disclosed are incorrect.

CD #4 -- the October 2014 SCANA press release -- is a corrective disclosure. SCANA was the parent company of CBI's counterparty on its contract for the V.C. Summer nuclear reactor project. The press release was corrective because it revealed new information to the market regarding the revised construction schedule for the V.C. Summer nuclear reactor project to reflect project delays, including a preliminary cost estimate of $1.2 billion related to the delays, SCANA's rejection of its alleged share of 55% of those costs and SCANA's statement that it had not accepted financial responsibility for any of the costs associated with the delays (thereby suggesting that CBI and its partners in the project could be responsible for those costs). Defendants' assertion that the estimate cost overrun total from CD #4 was not corrective of any alleged misrepresentation is meritless. The Report correctly concluded that CD #4 relates to alleged misrepresentations about CDI's liability for delays/cost overruns and/or fabrication defects.

**\*7** CD #5 -- testimony from two witnesses before the Georgia Public Service Commission on November 21, 2014 -- is a corrective disclosure because it revealed important information regarding developments in the construction of the Vogtle nuclear plant, specifically that there continued to be "various stop work orders" at a CBI facility manufacturing components for the nuclear plants and that Georgia Power, a subsidiary of the Southern Company, intended to hold CBI and its Consortium partners (The Shaw Group, Inc.

and Westinghouse Electric Corporation) accountable for the delays. Defendants' argument that the content of CD #5 was not new or corrective is meritless. The Report correctly concluded that CD #5 relates to alleged misrepresentations about CBI's liability for delays/cost overruns, fabrication defects at the referenced CBI manufacturing facility and stop work order ("SWO")/safety issues.

Finally, CD #6 -- the publication of the Southern Company 8-K on January 29, 2015 -- is a corrective disclosure because it disclosed new information regarding further construction delays at the Vogtle nuclear plant, specifically an estimated eighteen-month delay, an estimated $720 million associated cost and Georgia Power's belief that CBI was responsible for the delay. Defendants' argument that CD #6 was "just bad news" is meritless. The Report correctly concluded that CD #6 relates to alleged misrepresentations about CBI's liability for delays and cost overruns.

#### d. The Vertical and Prescience Reports

Defendants object that the Report erred in concluding that the "Vertical Report," a stock-analyst report published by Vertical Research Partners on June 11, 2014, was a corrective disclosure (CD #1). They argue that the information the Report identifies as "new" was stock-analyst speculation and analysis of already public financial information, which cannot, as a matter of law, constitute a corrective disclosure in an efficient market. [5]

[5] This objection relates to Defendants' argument that the *Basic* presumption can be rebutted on the back-end by showing that the information contained in a disclosure is not new. As the Report correctly finds, a court should review the "newness" of a corrective disclosure at the class certification stage. See *Ark. Teachers Ret. Sys.*, 879 F.3d at 486.

Defendants' objection is overruled. The Report correctly finds that some of the information in the Vertical Report was new to the market, specifically the information regarding (1) questionable accounting treatment of CBI's purchase price allocation ("PPAs") for the Shaw acquisition, which could result in an overstatement of goodwill and of future revenues, and (2) related statements by CBI management to the author of the Vertical Report that "the process of marking liabilities to market creates a non-cash 'credit' for the company.... suggesting about $140MM of revenue could

be recognized each year [in the future, and] ... these are non-cash earnings." (Dkt. No. 194-6 at 2/7). This information is corrective because it relates directly to the first three sub-categories of alleged misstatements arising from GAAP violations outlined in the Report: Contracts in Process ("CIP"), Margin Fair Value Liability for Acquired Contracts ("MFVL") and Impaired Goodwill ("Goodwill") as those terms are defined in the Report. It is also new in that the questionable accounting treatment and statements by CBI management had not been previously disclosed.

Defendants argue that the disclosure was not new, and therefore not corrective, because it was merely speculative and an interpretation of CBI's financial reporting. They argue in effect that any third party's analysis of a company's already-public financial information cannot contribute new information to the marketplace. This is incorrect. "While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace." *Pub. Emples. Ret. Sys. Of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (finding that a WSJ article analyzing publicly available Medicare records could plausibly constitute a corrective, and not merely confirmatory, disclosure); *see Meyer v. Greene*, 710 F.3d 1189, 1199 n.10 (11th Cir. 2013) (noting that analyst reports or short-seller opinions may constitute sufficient corrective disclosures if they "reveal to the market something previously hidden or actively concealed"); *In re Signet Jewelers Ltd. Secs. Litig.*, 2019 WL 3001084, at *17 ("[An analyst report] was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why [defendant company's] underlying business was weaker than most people realized [and therefore qualified as corrective]."); *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 412 (D. Conn. 2010) (rejecting defendants' argument that plaintiffs' expert could not show that the alleged corrective disclosure contained new information where, in part, the expert conducted analysis "of ... public information" contained in news releases); *In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 371-72 (S.D.N.Y. 2009) (denying summary judgment where the court did "not find that no reasonable juror could conclude that the ratings downgrades disclosed no new information").

**\*8** Plaintiffs' expert cites communications the day after the Vertical Report was published that confirm that the article raised new concerns about irregularities in CBI's

accounting. Defendants therefore have failed to meet their burden of showing that the Vertical Report contained no new information and thus had no price impact.

Defendants rely on several cases (only one by the Second Circuit), but they are distinguishable from the instant case because of the nature of the information disclosed. In *In re Omnicom Grp., Inc. Sec. Litig.*, for example, the allegations of fraud were "focused on the loss in value of [Omnicom's] internet companies and the failure to reflect that loss on Omnicom's books," which the company accomplished primarily by means of a spin-off transaction in which the ailing subsidiaries were transferred to another company called Seneca. 597 F.3d at 504, 507-08. The Second Circuit held that two reports contained in a certain WSJ article were not corrective. The first was that a Board member and chair of the Audit Committee had resigned due to "general concerns over an aggressive accounting strategy" apart from the known Seneca transaction, plus "Omnicom's year-old failure to write-down the value of the internet companies," which had long been known to the market. *Id.* at 511-12. Second, the article reported statements of two accounting professors, "one who thought that Seneca 'raises a red flag,' and one who said '[y]ou really have to wonder where this fair value is coming from in this environment, in this area.' " *Id.* at 506-07 (alteration in original). The Second Circuit found that neither report was corrective, implying that the first provided no new information when it was widely known that Omnicom had not written down the value of the internet companies on its own books due to the Seneca transaction. The Second Circuit stated that the accounting professors held "conclusory suspicions ... [which] added nothing to the public's knowledge that the Seneca transaction was designed to remove losses from Omnicom's books." *Id.* at 512. Here, in contrast, the accounting issues raised in the Vertical Report were specific, new and related directly to the specific accounting deficiencies alleged in the Complaint.

Defendants make similar objections with respect to the "Prescience Report," a short-seller report published by Prescience Point Research Group on June 17, 2014 (CD #2). They argue that the Prescience Report "consists entirely of speculation by a short-seller based on public information which had only two pieces of 'new' information." (Dkt. No. 220 at 12/16).

Defendants' objection is overruled here as well. The Report correctly finds that the Prescience Report "provide[d] several new pieces of information to the market," specifically that

"[s]hares of [CBI] are grossly overvalued.... We believe CBI will be forced into a goodwill write-down or financials restatement, either of which would trigger debt default, heightening the risk of a liquidity crisis or dilutive equity raise.... Based on our analysis, CBI stock is worth [ ]$37 per share, 49% below current trading levels." (Dkt. No. 217 at 77/111). Further, the Report correctly identifies as new portions of the Prescience Report that highlight, for example, "the pattern of CBI's fair value adjustments ... [which] appears to indicate they were made in response to post-acquisition events," a conclusion "supported by the existence of a litany of post-acquisition events which, we think, should have negatively impacted CBI's guidance and financial statements, but never did." (Dkt. No. 217 at 82/111). The Report also identifies -- as new information -- portions of the Prescience Report stating that "[the authors] arranged calls with CBI Investor Relations ... for more clarity.... [and that this] contact with management confirms the core of our thesis ... that CBI is offsetting costs, and thereby inflating its profitability, made possible by its post-acquisition adjustments to the Shaw PPA." (Dkt. No. 217 at 82/111). This and much of the other information in the lengthy report is specific, not previously disclosed and reveals more than speculation to the market. Accordingly, Defendants' objections regarding the corrective nature of the Vertical and Prescience Reports are overruled.

### e. CBI's April 23, 2015, First Quarter 10-Q

**\*9** Defendants argue that the Report erred by provisionally granting certification as to a misrepresentation that allegedly had no front-end impact, and where Plaintiffs never identified any corrective disclosure related to it. Even though the Report found that the "price-maintenance theory" applied to the misrepresentation in question, Defendants contend that "an alleged misrepresentation cannot have price impact if it lacks both front-end and back-end impact, and it is an impossible burden on defendants to have to prove the absence of back-end impact without any allegation (as here) of a corrective disclosure." (Dkt. No. 220 at 13/16).

Defendants' objection is overruled because Plaintiffs properly rely on a price-maintenance theory as to the misrepresentation in question.[6] The alleged misrepresentation occurred on April 23, 2015, when CBI filed its first quarter Form 10-Q ("1:Q:15 10-Q") with the SEC, which allegedly misstated information related to goodwill and whether CBI's financial statements complied with GAAP. The 1:Q:15 10-Q did not present entirely new information to the market, as similar

statements about goodwill and compliance with GAAP dated back to 2013. Therefore the 1:Q:15 10-Q had no statistically significant front-end impact.[7] *See Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 87 (concluding that "[p]rice maintenance fit[ ] the theory of plaintiffs' case," where defendants' material omissions maintained inflation in stock price and there was no reactionary price impact). While a chart in the Report indicates that the 1:Q:15 10-Q had no back-end impact because Plaintiffs have not identified a corrective disclosure relating to it, the Report also correctly notes that on April 24, 2015, the day after the filing, the price of CBI stock dropped and the cause of the price drop cannot be determined at the class certification stage. *See Halliburton I*, 563 U.S. at 812. Put another way, because there is an issue of fact whether this particular disclosure had a price maintenance effect, which potentially was cured the next day (or perhaps not, if the price fell for an unrelated reason), the Report correctly finds that Defendants failed to rebut the *Basic* presumption by a preponderance of the evidence as to the 1:Q:15 10-Q.

6     As the Report correctly points out, Plaintiffs can allege securities fraud through a price-inflation theory (*i.e.*, whether alleged misrepresentations artificially inflated Defendants' stock price when made), but also under a price-maintenance theory, where "[P]laintiffs allege that the misrepresentations either [1] failed to inform the market about negative information (omissions), or [2] confirmed market expectations without revealing negative information (confirmatory misrepresentations), thus maintaining ... [D]efendant[s'] stock price at an artificially inflated level." (Dkt. No. 217 at 50/111); *see Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018).

7     The Report correctly notes that "only misrepresentations that confirm market expectations can properly proceed under a price maintenance theory," as "[w]hen a misrepresentation presents entirely new information to the market that it could not possibly have expected, this information cannot fairly be said to maintain inflation that is already present in the stock price." (Dkt. No. 217 at 50/111 n.121).

### 2. Rule 23(a) Adequacy

Finally, Defendants argue that the Report erred in concluding that the proposed Class Representatives and their counsel will fairly and adequately protect the interests of the Class under Rule 23(a). Specifically, Defendants object to the Report's finding that the fee-sharing agreement between counsel for Lead Plaintiffs ALSAR and Ironworkers was proper, despite the "behind the scenes" agreement after ALSAR and Ironworkers each advocated for appointment as sole lead plaintiff along with their counsel as sole lead counsel.

**\*10** Defendants' objection is overruled. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Regarding the appointment of class counsel, the inquiry is whether they "are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *accord George v. Shamrock Saloon II LLC*, No. 17 Civ. 6663, 2020 WL 133621, at \*8 (S.D.N.Y. Jan. 13, 2020). Essentially, Defendants argue that counsel's alleged dishonesty in dealing with the Special Master disqualifies them. However, the Special Master did not indicate that she was misled, pointed out that both sets of Plaintiffs and law firms appeared on the Consolidated Amended Complaint and that Pomerantz LLP appeared on filings both before and after the agreement and appeared regularly before her.

The fee sharing agreement itself appears to be unproblematic. Defendants cite no authority where prospective class representatives were disqualified on the basis of a fee arrangement where attorneys for each class representative agreed to work on the case 50/50 and split the fees 50/50. Further, as the Report correctly notes, this agreement complies with Local Rule 23.1, the Court's Individual Rule III.C.4 and Rule 1.5(g) of the New York Rules of Ethical Conduct. Defendants' objection is overruled and Plaintiffs' motion to appoint Plaintiffs ALSAR and Ironworkers as Class Representatives and Kahn Swick & Foti as Class Counsel is granted.

### B. Remaining Class Certification Prerequisites

Defendants did not object to class certification based on Rule 23's numerosity, ascertainability, commonality, typicality or superiority requirements. Of these, the Report made findings only with respect to typicality. Accordingly, the conclusion

that these remaining class certification prerequisites are satisfied is reviewed below for clear error. *See* Fed. R. Civ. P. 53(f)(4); *Seggos*, 2019 WL 3557688, at *2.

### 1. Rule 23(a) Numerosity

To establish numerosity, "the class [must be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *accord Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015). In the Second Circuit, numerosity is presumed for a class of forty or more plaintiffs. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011); *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 700 (S.D.N.Y. 2019). Plaintiffs represent that there are several thousand geographically dispersed putative class members who allegedly traded CBI stock during the relevant time period. Accordingly, Rule 23(a) numerosity is satisfied. *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700 (concluding that numerosity was likely met where "plaintiffs represent[ed] that there [were] thousands of geographically dispersed class members who transacted in [defendant's] [b]onds").

### 2. Rule 23(a) Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *accord Sykes*, 780 F.3d at 80. A question is common to a class if it is "capable of classwide resolution [--] which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350; *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," *Wal-Mart Stores, Inc.*, 564 U.S. at 349-50, and "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700.

**\*11** Rule 23(a) commonality is satisfied because Plaintiffs allege the same injury and claims resulting common misrepresentations and omissions concerning Defendants' business. All plaintiffs were impacted by disclosures affecting equally all market participants who transacted CBI stock.

*See Gruber*, 2019 WL 4439415, at *3 (concluding that plaintiffs satisfied commonality because proceeding as a class would "generate common answers to several key questions, including whether defendants engaged in deceptive conduct and omitted the disclosure of material facts, whether there was scienter, and whether insider trading occurred").

### 3. Rule 23(a) Typicality

Rule 23(a)(3) is satisfied by showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *accord Sykes*, 780 F.3d at 80. This standard is "not demanding," as "the claims only need to share the same essential characteristics, and need not be identical." *Gruber*, 2019 WL 4439415, at *3. A plaintiff can establish typicality when "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar*, 659 F.3d at 252; *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700.

Plaintiffs have established Rule 23(a) typicality because all potential class members were allegedly injured by the same alleged misrepresentations and omissions regarding Defendants' nuclear business, and all claim securities law violations based on the same federal statutes and nucleus of facts. *See Gruber*, 2019 WL 4439415, at *3 (concluding that plaintiffs established typicality because the class representative's claims arose from the same fraudulent scheme as the class and would make similar arguments to prove defendants' liability, regardless of "minor variations" in the fact patterns underlying individual claims).

### 4. Rule 23 Ascertainability

The Second Circuit has recognized that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable," often characterized as an "ascertainability" requirement. *See In re Petrobras Sec.*, 862 F.3d at 264. The "touchstone" of ascertainability is whether the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member. A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id.*

The Report recommends certifying a class defined as all those who purchased or otherwise acquired the common stock of Chicago Bridge & Iron Company N.V. on the NYSE during a Class Period from October 30, 2013, through and including June 23, 2015, excluding Defendants, officers, and directors of CBI, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. This definition is sufficiently definite to determine whether any given individual or entity is a class member. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 n.6 (S.D.N.Y. 2013) (concluding that the ascertainability requirement was "easily met in the context of securities litigation where the list of shareholders is readily obtainable").

### 5. Rule 23(b) Superiority

Under Rule 23(b)(3), a plaintiff must both establish predominance and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *accord Sykes*, 780 F.3d at 81. This analysis is "explicitly comparative in nature," *In re Petrobras Sec.*, 862 F.3d at 268, requiring courts to ask whether "a class action is *superior to other available methods* for fairly and efficiently adjudicating the controversy." *Id.* (quoting Fed. R. Civ. P. 23(b)(3)). Securities cases "easily satisfy" this requirement, *Kaplan v. S.A.C. Capital Advisors, L.P*, 311 F.R.D. 373, 383 (S.D.N.Y. 2015), as "the alternatives are either no recourse for thousands of stockholders" or "a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Green*, 406 F.2d at 301; *accord Kaplan*, 311 F.R.D. at 383.

**\*12** Here, given the size of the Class, certification will promote judicial efficiency by permitting claims common to all Plaintiffs to be resolved just once, rather than having individual lawsuits regarding the same alleged wrongdoing,

particularly in a securities context involving thousands of stockholders. *See In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 144 (S.D.N.Y. 2019) (concluding that a securities class action was superior because "of the efficiencies of class wide adjudication").

### IV. CONCLUSION

For the foregoing reasons, the Report is adopted except to the extent any of its reasoning is inconsistent with what is stated above, and Plaintiffs' motion is GRANTED. It is hereby ordered that:

(1) Plaintiffs ALSAR and Ironworkers are appointed as Class Representatives to sue on behalf of a class of all those who purchased or otherwise acquired the common stock of Chicago Bridge & Iron Company N.V. on the NYSE during a Class Period from October 30, 2013, through and including June 23, 2015, excluding Defendants, officers, and directors of CBI, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

(2) Kahn Swick & Foti is appointed as Class Counsel;

(3) The parties shall confer and prepare a mutually agreeable form and manner of notice, to be filed on ECF for the Court's review by April 13, 2020. *See* Fed. R. Civ. P. 23(c)(2)(B). To the extent that the parties cannot agree on the form and manner of notice, the parties shall include a brief statement of their disagreement in the filing.

The Clerk of Court is respectfully directed to close the motion at Docket No. 179.

### All Citations

Not Reported in Fed. Supp., 2020 WL 1329354

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 10

In re Derivative Litigation, Herley Industries Inc., Not Reported in F.Supp.2d (2010)
2010 WL 1375195

2010 WL 1375195
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. Pennsylvania.

In re DERIVATIVE LITIGATION,
HERLEY INDUSTRIES INC.

Civil Action No. 06–2964.
|
Feb. 5, 2010.

Named Expert: Charles Elson.

**Attorneys and Law Firms**

Deborah R. Gross, Law Offices Bernard M. Gross, PC, Philadelphia, PA, Mark C. Gardy, James S. Notis, Gardy & Notis LLP, Englewood Cliffs, NJ, Jacob A. Goldberg, Faruqi & Faruqi LLP, Huntingdon Valley, PA, for Plaintiffs.

David H. Pittinsky, Kurt Konrad Lunkenheimer, Ballard, Spahr, Andrews and Ingersoll, James T. Smith, Blank Rome Comisky & McCauley LLP, Philadelphia, PA, for Defendants.

*ORDER*

JUAN R. SÁNCHEZ, District Judge.

**\*1** AND NOW, this 4th day of February, 2010, Plaintiffs' Motion to Strike the Testimony of Defendant's Expert Witness Charles Elson (Doc. 88) is DENIED without prejudice to reassertion. [1]

[1]    Federal Rule of Evidence 702 requires an expert witness to have " 'specialized knowledge' regarding the area of testimony." *Elock v. K–Mart Corp.,* 233 F.3d 734, 741 (3d Cir.2000). This knowledge may be based on "practical experience as well as academic training and credentials." *Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir.1998). This rule has been interpreted as having three requirements: "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific,

technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243–44 (3d Cir.2008). Inherent within the second element is the requirement that "the process or technique the expert used in formulating the opinion is reliable." *Id.* at 244 (citations and internal quotations omitted). At a minimum, the expert witness must "possess skill or knowledge greater than the average layman." *Waldorf,* 142 F.3d at 625.

Elson's voluminous resume details his expertise in the areas of corporate governance and business practices. For the past ten years, Elson has been the Director of the John L. Weinberg Center for Corporate Governance at the University of Delaware and as the Junior Chair in Corporate Governance at the Lerner College of Business and Economics. He has served on seven corporate boards and held numerous not-for-profit directorships. Elson's resume also includes an impressive array of corporate governance-related publications and a list of his speaking engagements that is 20 pages long. Elson is therefore qualified to give expert testimony in this case. His testimony also satisfies the third element, because his expertise is undoubtedly greater than the average layman and his knowledge is sufficiently specialized in a field relevant to the issues in the instant case. The testimony he will give may assist the jury in understanding the way corporate boards make decisions.

Plaintiffs contend Elson's opinion is unreliable because his report does not include a detailed methodology. While courts often consider methodological factors, such as whether a report contains a testable hypothesis and whether a rate of error can be determined, these factors "are neither exhaustive nor applicable in every case." *Pineda,* 520 F.3d at 248. When such factors do not apply, courts more generally consider whether an expert's testimony employs the same level of "intellectual rigor" as one would expect of a practitioner in the expert's field. *Kuhmo Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). When a witness's expertise is in one of the social sciences, "the reliable methodology often consists of the

review of the pertinent historical documents." *Langbord v. U.S. Dep't of Treasury,* No. 06–5315, 2009 WL 1312576, at *3 (E.D.Pa. May 7, 2009). However, when a witness "rel[ies] solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Ev. 702, Advisory Committee Notes. Elson's one-and-a-half page report details the documents he reviewed and explains his opinions are based on his "knowledge of directorial conduct, experiences as a director, conversations with counsel, and a limited review of the documents set forth above." Report of Charles Elson, Aug. 14, 2009, at 2. He then opines that Herley's Board of Directors acted reasonably in approving Blatt's settlement and refusing to produce certain internal documents to auditors. *Id.* Elson's report fails to explain how his knowledge and experience led to these conclusions, and in its present state would therefore be inadmissible. However, Elson has offered to update and support his opinion, and this Court denies Plaintiffs' motion without prejudice to give him an opportunity to do so.

Furthermore, while this Court declines to strike the entirety of Elson's testimony, it recognizes portions of his testimony may exceed the scope of what is permissible under Federal Rule of Evidence 704. Rule 704 prohibits an expert witness "from rendering a legal opinion." *Berckeley Inv. Group, Ltd. v. Colkitt,* 455 F.3d 195, 217 (3d Cir.2006). While experts may testify to facts relevant to a legal conclusion, they are not permitted to draw that conclusion themselves. *See VIM, Inc. v. Somerset Hotel Ass'n,* 19 F.Supp.2d 422, 428 n. 4 (W.D.Pa.1998) ("[A]n expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts."); *see also Langbord,* 2009 WL 1312576, at *8 (stating it would be inappropriate for expert to "apply the resulting law to the facts of [a] case to draw a legal conclusion"). Without prejudging its ruling on any further objections from Plaintiffs, the Court notes expert testimony concerning whether parties acted reasonably or in bad faith as a matter of law is generally inadmissible. *See United States v. Williams,* 343 F.3d 423, 435 (5th Cir.2003); *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.,* 410 F.Supp.2d 417, 423 (W.D.Pa.2006) ("[A] an expert may not give an opinion as to the ultimate legal conclusion that an insurer acted in 'bad faith' in violation of applicable law."). However, Elson's opinion is admissible under Rule 704 to the extent it concludes Defendants "did not act unreasonably" in light of prevailing corporate governance norms.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1375195

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 11

2014 WL 4634301
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re DVI, INC. SECURITIES LITIGATION.

Civil Action No. 03–5336.
|
Signed Sept. 15, 2014.
|
Filed Sept. 16, 2014.

*MEMORANDUM*

LEGROME D. DAVIS, District Judge.

**\*1** Plaintiff investors in Diagnostic Ventures, Inc. ("DVI")[1] sue for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F. R. § 240.10b–5.[2] Jurisdiction is the Exchange Act, 15 U.S.C. § 78aa, and federal question, 28 U.S.C. § 1331.

[1]   In the mid–1980s, Diagnostic Ventures, Inc. was formed as a Delaware corporation. About 1986, it changed its name to DVI, Inc. By the mid–1990s, it operated as a finance company for healthcare providers through two subsidiaries—DVI Business Credit, Inc. ("DVI BC") and DVI Financial Services, Inc. ("DVI FS"). Here, "DVI" refers collectively to all of these business entities unless noted otherwise. See Fifth Am. Compl. ¶¶ 5, 25, 69–70 (Doc. No. 298); Def. Cohn's Statement of Facts ¶¶ 1–7 (Doc. No. 683–2 at 1–2).

[2]   For the history and factual background of this action see: *In re DVI, Inc. Sec. Litig.,* No. 03–5336, 2010 WL 3522090 (E.D.Pa. Sept. 3, 2010) (Order & Mem., Doc. Nos. 789, 790 re Plaintiffs' and Defendant Deloitte & Touche LLP's respective motions to exclude the other's loss causation expert, and Deloitte's motion for summary judgment); *id.,* 249 F.R.D. 196 (E.D.Pa.2008), *aff'd,* 639 F.3d 623 (3d Cir.2011) (Order & Mem., Doc. No. 609 re class certification); *id.,* 2005 WL 1307959 (E.D.Pa. May 31, 2005) (Order & Mem., Doc. No. 181 re dismissal motions filed by numerous defendants).

Both sides respectively moved twice to preclude the other's loss causation and damages expert from testifying.[3] On the second round of motions in 2013, Lead Plaintiffs—Cedar Street Fund, Cedar Street Offshore Fund, and Kenneth Grossman—moved to preclude the testimony of Defendant Deloitte & Touche LLP's expert, Neil H. Demchick (Doc. No. 876). Defendant Deloitte then moved to preclude the testimony of Lead Plaintiffs' expert, Chad Coffman (Doc. No. 868). Each movant asserted that the other's expert offers opinions that are inadmissible under Federal Rule of Evidence 702[4] and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), among other obstacles to the proffered opinions.

[3]   The parties' submissions: Lead Plaintiffs' "Motion to Strike and Exclude Deloitte & Touche LLP's Purported Causation and Damages Expert Neil H. Demchick" (Doc. No. 876), Mem. of Law (Doc. No. 880) with Exs. 1–20 (Doc. No. 881), and Reply Br. (Doc. No. 895); Deloitte's Resp. with Exs. 1–6 (Doc. No. 889). Defendant Deloitte's "Motion to Exclude From Trial Any Testimony From Lead Plaintiffs' Purported Expert Chad Coffman" (Doc. No. 868), Mem. of Law with Exs. A–E (Doc. No. 870), and Reply Br. (Doc. No. 885); Lead Plaintiffs' Resp. with Exs. 1–4 (Doc. No. 873).

[4]   "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702.

By Order dated November 18, 2013 (Doc. No. 897), the motion to preclude Demchick's opinion testimony was denied. It was ruled that the asserted shortcomings related entirely to the weight to be given by the jury to his qualifications and opinions, and he would be permitted to testify at trial as an expert on loss causation and damages consistently with the opinions set forth in his May 3, 2013 report. A ruling on the motion to preclude the opinion testimony of Coffman was reserved, and the parties were permitted to submit additional briefing on specific issues regarding proof of loss causation and damages. *See* Mem.,

dated Nov. 18, 2013 (Doc. No. 896). The parties did so. *See* Lead Pls.' Br. (Doc. No. 898); Def. Br. (Doc. No. 899).

In essence, Deloitte's motion asserts that Coffman's opinions are inadmissible because they do not "disaggregate certain alleged non-fraud-related negative information about DVI" from the disclosures identified in his reports as being partial corrections of fraudulent inflation in the price of DVI's securities. Def. Mem. of Law at 1–2 (Doc. No. 870). Also, it is asserted that Coffman "admits ... he made no effort to disaggregate among the various defendants named in this case their alleged responsibility for the price declines in DVI securities." *Id.* Furthermore, it is asserted that Coffman's opinions do not satisfy "the more rigorous showing required" to establish actual damages. *Id.* The reports of Deloitte's experts, Demchick and Terry L. Musika, CPA, identify these problems in Coffman's opinions. *Id.*

Lead Plaintiffs oppose the motion to preclude Coffman's testimony on several grounds. Pls. Resp. (Doc. No. 873). Their principal contention is that Coffman's opinions rest upon "good grounds" and "should be tested by the adversary process" at trial. Pls. Mem. of Law at 14 (Doc. No. 873). And "disaggregation and apportionment among defendants ... should be decided by a jury." *Id.* at 15, 17 (jury should decide the proper interpretation of the event disclosures).

I. *PROCEDURAL AND FACTUAL BACKGROUND*

A. *Procedural History*

**\*2** Lead Plaintiffs' expert, Chad Coffman, submitted an initial report positing two theories for determining loss causation and damages in this case—an insolvency approach and an event study. Coffman Rep., dated Oct. 1, 2008, Pls. Resp., Ex. 1 (Doc. No. 873–1). In response, another of Deloitte's experts, Kenneth Lehn, Ph.D., submitted his report on loss causation and damages. Lehn prepared his own event study and offers opinions on whether Plaintiffs were damaged by the alleged acts or omissions of Deloitte. Lehn Rep., dated Nov. 17, 2008, Def. Resp. to Pls. Mot. to Exclude Lehn, Ex. A (Doc. No. 739). Coffman rebutted Lehn's opinions. Coffman Rebuttal Rep., dated Dec. 17, 2008, Pls. Resp., Ex. 2 (Doc. No. 873–2).

On April 30, 2009, Deloitte moved to exclude Coffman's initial reports and testimony (Doc. No. 686, 690). On July 6, 2009, Lead Plaintiffs moved to exclude Lehn's report and testimony (Doc. No. 702). On September 3, 2010, both motions were decided. *In re DVI, Inc. Sec. Litig.,* No. 03–

5336, 2010 WL 3522090, at \*7–14 (E.D .Pa. Sept. 3, 2010) (Order & Mem., Doc. Nos. 789, 790). Coffman's insolvency theory was found to be in conflict with Supreme Court and Third Circuit precedent on loss causation. It was also ruled that the theory was unreliable and unfit, and therefore inadmissible. *Id.,* 2010 WL 3522090, at \*9–12. It was further ruled that both Coffman's and Lehn's event studies were reliable and admissible. *Id.,* 2010 WL 3522090, at \* 12–14. However, portions of those event studies were excluded as irrelevant: "to the extent that Mr. Coffman and Dr. Lehn opine on the revelations that occurred on September 25, 2002, May 13, 2003, June 5–6, 2003, and July 16, 2003, their opinions will not assist the jury in resolving any factual dispute, as the disclosures on those days are not corrective disclosures as a matter of law." *Id.,* 2010 WL 3522090, at \*14.

Deloitte timely disclosed Terry L. Musika, CPA, as an expert witness and produced his report. Musika Rep., dated Nov. 17, 2008, Def. Mem. of Law, Ex. B (Doc. No. 870). Deloitte's counsel timely notified the Court that Mr. Musika passed away on December 18, 2012. Counsel's letter, dated Jan. 11, 2013, Def. Ex. 1 (Doc. No. 889). Deloitte was permitted to substitute another expert. *See* Feb. 19, 2013 Order–Mem. (Doc. No. 862); *id.* at 1 ("The testimony of the expert so designated shall be limited to the topics upon which Mr. Musika previously opined.").

On May 3, 2013, Deloitte timely produced the report of its newly designated expert, Neil H. Demchick. Demchick Rep., dated May 3, 2013, Def. Mem. of Law, Ex. A (Doc. No. 870) (excerpts); Def. Ex. 3(Doc. No. 889) (full report). In response to Demchick's opinions, Lead Plaintiffs timely produced Coffman's rebuttal report. Coffman Rebuttal Rep., dated June 24, 2013, Pls. Resp., Ex. 3 (Doc. No. 873–3).

On August 23, 2013, Deloitte again moved to preclude Coffman's trial testimony. Def. Mot. (Doc. No. 868). On October 2, 2013, Lead Plaintiffs, in turn, moved to preclude Demchick's opinions (Doc. No. 876). As mentioned above, Lead Plaintiffs' motion to preclude Demchick's opinions was denied, and a ruling on Deloitte's motion to preclude Coffman's opinions was reserved (Order, dated Nov. 18, 2013, Doc. No. 897). That motion is decided here.

B. *Deloitte's Criticisms of Coffman's Reports*

**\*3** Coffman's rebuttal of Demchick's testimony is faulted for being "purely subjective"—that is, for being "unaccompanied by any reliable methodology or analysis, concerning his failure to disaggregate certain information." Def. Mem. of

Law at 3–4 (Doc. No. 870). In Deloitte's view, Coffman erred by basing his conclusions on certain assumptions that are not established on the record. *Id.* at 4, 19–20 (citing portions of Coffman's reports, which are quoted below).

Specifically, Deloitte challenges Coffman's acknowledgment of the following assumptions made in his reports:

> I have been asked by counsel for Plaintiffs in this matter to quantify the damages suffered by the Class under the assumption that Defendants are found liable in this matter under the Securities Exchange Act of 1934.

Coffman Rep, dated Oct. 1, 2008, ¶ 2, Pls. Resp., Ex. 1 (Doc. No. 873–1). Coffman explains that his opinions are based on a fundamental assumption of fact—as directed by counsel in defining the scope of his retention as an expert—that Defendants together are "collectively" or jointly responsible for all of the asserted fraudulent inflation in the price of DVI's securities:

Mr. Musika also suggests that I do not consider the "impact of multiple parties" and that I "fail to analyze the impact of numerous defendants in this matter." I was asked by counsel to calculate the total damages to class members as a result of the alleged fraud.... My analysis is based on the presumption that Defendants are collectively responsible for the inflation I measure in the prices of DVI's common stock and Senior Notes. It is unnecessary to form an opinion regarding the relative contribution of any particular Defendant to the fraud, inflation or damages to answer the question I have been asked.

Coffman Rebuttal Rep., dated Dec. 17, 2008, ¶ 70, Pls. Resp., Ex. 2 (Doc. No. 873–2).

Most recently, in 2013, Coffman reiterated and again acknowledged his previous assumptions of the joint liability of all Defendants named in this case for private securities fraud:

> I was asked to quantify the total amount of inflation in DVI securities as a result of Plaintiffs' allegations,

not just those resulting from D & T specific acts. Moreover, I was not asked to apportion the inflation by Defendant, nor does it make sense to do so.... [I]f D & T is found liable, it would be reasonable to conclude that there is butfor and foreseeable causation between D & T's misstatements and all of the artificial inflation after D & T's alleged misstatements and omissions.

Coffman Rebuttal Rep. (re: Demchick's opinions), dated June 24, 2013, ¶ 7(iv), Pls. Resp., Ex. 3 (Doc. No. 873–3). *See also id.,* ¶ 7(vii) (incorporating his previous rebuttal of Musika's opinions quoted above as to "other potentially responsible parties or other sources of recovery"); *id.,* ¶ 35 (reiterating the statements in his earlier reports quoted above); *id.,* ¶ 37 ("It was therefore outside my scope to partition inflation and damages among the individual Defendants, including D & T"). And Coffman once more acknowledged that his opinions are grounded on the fundamental assumption that Deloitte is jointly liable for misrepresentations in DVI's financial reports and Deloitte's clean audit reports regarding those financial statements:

> **\*4** Mr. Demchick asserts that I do not consider that there are multiple defendants. My analysis is based on the presumption that Defendants are collectively responsible for the inflation I measure in the prices of DVI's common stock and Senior Notes. I was asked by counsel to calculate total damages to class members as a result of the alleged fraud and the methodologies employed in my Expert Report are appropriate for that purpose. It is unnecessary to form an opinion regarding the relative contribution of any particular Defendant to the fraud, inflation, or damages to answer the question I have been asked.... Moreover, it is my understanding that Dr. Epstein [5] supports the position that D & T was aware of and facilitated

the concealment of the material misstatements in DVI's financial statements during the Class period; the result of which could lead to D & T being joint and severally liable, or at least held to a high percentage under a proportionate liability theory. *Id.,* ¶¶ 59, 58–59. In sum, Coffman assumes as fact that Deloitte is liable for private securities fraud, and opines to the effect that any reasonable jury would or should ultimately so find.

5      Barry Jay Epstein, Ph.D., CPA, prepared a report, dated Oct. 3, 2008, Pls. Resp. to Def. Initial Mot. to Exclude Coffman, Ex. 17 (Doc. No. 706). Here, Deloitte does not challenge Epstein's opinions.

III. *DISCUSSION*

Federal Rule of Evidence 702, which governs the admissibility of expert opinion testimony, has three major requirements:

> (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact.

*Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir.2008). These requirements have been summarized as "a trilogy of restrictions on expert testimony: qualification, reliability and fit ." *Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003) (citing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741–43 (3d Cir.1994) (citing *Daubert, supra* )). Furthermore, the Rules of Evidence "embody a strong preference for admitting any evidence that may assist the trier of fact," and take a "liberal policy of admissibility" with respect to expert testimony. *Pineda,* 520 F .3d at 243 (citing *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir.1997)).

There is no dispute that Coffman has the requisite "scientific, technical, or other specialized" expertise to testify as an expert

on loss causation and damages in this case. Fed.R.Evid. 702. Instead, Deloitte challenges the reliability and fit of Coffman's opinions. However, a careful review of the record discloses that Coffman's opinions are based on "good grounds"—that is, sufficient facts or data and reliable principles and methods. *Daubert,* 509 U.S. at 590; *see* Fed.R.Evid. 702 (standard of evidentiary reliability). For the reasons set forth in the Court's previous decision—*In re DVI, Inc. Sec. Litig.,* No. 03–5336, 2010 WL 3522090 (E.D.Pa. Sept. 3, 2010)—Coffman's testimony is admissible. Neither side presents anything here that warrants a departure from that ruling at this juncture. And Deloitte's present objections to Coffman's opinion testimony merit a short discussion.

**\*5** Rule 702 and *Daubert* require a district court to ensure that there is a "sufficient 'fit' between the expert's testimony and the facts that the jury is being asked to consider." *United States v.. Schiff,* 602 F.3d 152, 172–73 (3d Cir.2010) (citing *Daubert,* 509 U.S. at 591). In order to satisfy the "fit" requirement, the " 'expert testimony proffered [must be] sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Id.* at 173 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). "Put another way," our Court of Appeals explains, "this is a question relevance." *Id.* And "expert evidence which does not relate to an issue in the case is not helpful." *In re TMI Litig.,* 193 F.3d 613, 670 (1999) (citing *Daubert,* 509 U.S. at 591). The standard for this factor "is not that high," but "higher than bare relevance." *Schiff,* 602 F.3d at 173 (quoting *In re Paoli,* 35 F.3d at 745).

Rule 702 and *Daubert* also require a district court to ensure that "expert testimony is not only relevant, but reliable." *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254, 291 (3d Cir.2012), *cert. denied,* 133 S.Ct. 2025 (U.S.2013). As our Court of Appeals has "made clear, the reliability analysis required [by *Daubert* ] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.' " *Id.* (alterations in original) (quoting *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 155 (3d Cir.1999)). The standard for determining reliability "is not that high." *In re Paoli,* 35 F.3d at 745. Proponents of expert testimony do not "have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct,* they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Id.* at 744 (emphasis in original) ("evidentiary requirement of reliability is lower than the merits standard of correctness");

accord *Pure Earth, Inc. v. Call,* 531 F. App'x 256, 259 (3d Cir.2013).

Deloitte disclaims the fitness and reliability of Coffman's opinions, but does not present a cogent challenge to the event-study methods that he used to reach his conclusions. Essentially, Deloitte says that Coffman's opinions are incomplete—that is, he did not do enough analysis to formulate sufficient opinions to satisfy a plaintiff's burden of proving all requirements of the element of loss causation. In Deloitte's view, Coffman should have but did not disaggregate—that is, separately identify and account for—negative information and events that are not related to the fraud allegedly committed by Deloitte, but affect the price of DVI's securities. In addition, Deloitte says that Coffman should have but did not allocate the alleged inflation (or deflation) in DVI's securities among the potentially liable defendants, and should have but did not apportion or attribute the inflation (or deflation) that allegedly results from Deloitte's acts or omissions. Furthermore, in regard to proof of actual economic damages, Coffman should have but did not allocate losses in the value of DVI's securities among the potentially liable defendants, and should have but did not apportion or attribute the losses that allegedly result from Deloitte's acts or omissions. However, there is no requirement that Coffman have done so.

**\*6** This is so because a qualified expert may offer testimony concerning an ultimate issue in the case. Fed.R.Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue."). *Accord Forrest v. Beloit Corp.,* 424 F.3d 344, 353 (3d Cir.2005) (citing *Salas v. Wang,* 846 F.2d 897, 905 (3d Cir.1988) (Rule 704 would permit an expert to testify as to the ultimate issue of aggregate damages)). It is also well-established that an expert may offer an opinion based on hypothetical facts reasonably consistent with the evidence. *Id.,* 424 F.3d at 353 (citing *Wilburn v. Maritrans GP Inc.,* 139 F.3d 350, 356 (3d Cir.1998) (" 'a qualified expert may answer hypothetical questions' " (quoting *Teen–Ed, Inc. v. Kimball Int'l, Inc.,* 620 F.2d 399, 404 (3d Cir.1980)). In this case, whether the factual assumptions upon which Coffman's opinions are proffered are "fairly and fully stated" are "a question for discussion to the jury." *Moyer v. Aetna Life Ins. Co.,* 126 F.2d 141, 144 (3d Cir.1942) (internal quotation marks and citation omitted). Moreover, his opinions, just like the opinion of any other expert, "can be of no value, when the facts of which the opinion is predicated, are not established." *Id.* And "whether they are so established is for the subsequent consideration of the jury." *Id.*

Here, Coffman assumes—at the direction of counsel that retained him—that Defendants are in fact liable for private securities fraud. He opines that Deloitte should be found so liable by a jury. He also assumes that the collective acts or omissions of all Defendants together—including those of "the defendant" here, Deloitte—jointly caused the loss for which Lead Plaintiffs seeks to recover damages. Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4(b)(4). [6] Lead Plaintiffs mayor may not be able to prove these assumptions at trial. But Coffman's assumptions alone do not establish that his opinions are inadmissible here. His opinions are supported by record evidence, just not all of the evidence that Deloitte submits should be offered in order for it to held liable. Moreover, there is no requirement that Lead Plaintiffs use Coffman's testimony alone to satisfy all aspects of their burden to prove loss causation and damages. They may proffer other admissible evidence on these points. Furthermore, to the extent that Coffman's opinions are fit and reliable, they are within "the range where experts might reasonably differ," and the jury, not the trial court, must be the one to decide among conflicting views of different experts. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 153 (1999).

[6]     "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which plaintiff seeks to recover damages." Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4(b)(4).

Coffman's opinions do not contradict or conflict with this Court's previous rulings. *See, e.g., In re DVI, Inc. Sec. Litig.,* No. 03–5336, 2010 WL 3522090, at \*13 (expert opinion evidence is required to " 'distinguish between fraud-related and non-fraud related influences of the stock's price behavior" (quoting *In re Imperial Credit Indus., Inc., Sec. Litig.,* 252 F.Supp.2d 1005, 1014–15 (C.D.Cal.2003)); *WM High Yield Fund v. O'Hanlon,* No. 04–3423, 2013 WL 3230667, at \*8–9, 11–13,15–17 (E.D. Pa. June 27, 2013) (proof of loss causation and damages requires disaggregation of non-fraud related influences as well as allocation of responsibility among multiple, potentially liable defendants). Instead, Coffman's reports focus narrowly on whether certain events corrected artificial inflation in DVI's securities, and he simply does not proffer opinions that disaggregate non-fraud related influences on the price of DVI's securities or

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 124 of 292
In re DVI, Inc. Securities Litigation, Not Reported in F.Supp.3d (2014)
2014 WL 4634301

that allocate responsibility among multiple potentially liable defendants.

**\*7** Moreover, Coffman's opinions in large part are consistent with requirements set by the Supreme Court and our Court of Appeals for proof of loss causation and damages. *See, e.g., Dura Pharm., Inc. v. Brad,* 544 U.S. 336, 342–43 (2005); *McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 425–26 (3d Cir.2007)* ("must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff") (citing *Semerenko v. Cendant Corp.,* 223 F.3d 165, 184–85, 187 (3d Cir.2000) and *EP MedSystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 884 (3d Cir.2000)); *Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 301 (3d Cir.1991) (generally, expert testimony is required to establish "both the fact of damage and the appropriate method of calculation"). *Accord Pure Earth,* 531 F. App'x at 260 ("The loss causation inquiry asks 'whether the misrepresentation or omission proximately caused the economic loss.' ") (quoting *McCabe,* 494 F.3d at 425–26)). [7]

[7]   The Supreme Court recognized that a "tangle of factors" affects the price of securities and, therefore, determinations of loss causation and damages: "Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.... Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.,* the more likely that other factors caused the loss." *Dura Pharm., Inc. v. Brad,* 544 U.S. 336, 342–43 (2005).

Our Court of Appeals instructs that the "ultimate touchstone" for determining the reliability of proffered expert opinion

is helpfulness to the trier of fact, and ... helpfulness turns on whether the expert's technique or principle is sufficiently reliable so that it will aid the jury in reaching accurate results.

*In re Paoli,* 35 F.3d at 744 (internal quotation marks, citations, and alteration omitted). Here, the record establishes that Coffman's opinion testimony might assist the jury in resolving factual disputes as to whether certain events were a substantial factor in proximately causing declines in the price of DVI's securities, thereby creating actual economic losses for Plaintiffs.

Inasmuch as expert witnesses may express their opinions on matters about which they have no firsthand knowledge, Fed.R.Evid. 703, and an expert's testimony may be given substantial weight by the jury due to the expert's status, a trial judge must be vigilant in exercising a "gatekeeper" role. *Daubert,* 509 U.S. at 595; *Kumho Tire Co.,* 526 U.S. at 148. Mindful of that role, it is nonetheless well recognized that:

Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

*Daubert,* 509 U.S. at 596. Additionally, in the event a scintilla of evidence is adduced to support the position of an expert for either side, and it is concluded that the evidence is insufficient to allow a reasonable juror to find that the position more likely than not is true, a judgment could be directed. *See id.* (citing Fed.R.Civ.P. 50(a)). These procedural safeguards, rather than exclusion of an expert's testimony that satisfies the evidentiary requirements for admission under Rule 702, are appropriate here.

For the above reasons, Deloitte's motion to preclude the trial testimony of Lead Plaintiffs' expert, Coffman, will be denied. In addition, trial will not be further delayed to accommodate the production of supplemental expert reports. *See* Pls. Mem. of Law at 4, 24, 32, 33 (Doc. No. 873) (requests

2014 WL 4634301

to supplement). *Cf* Def. Mem. of Law at 3–4, 11–12, 19–20 (Doc. No. 870); Def. Reply Br. at 12–13 (Doc. No. 885).

**\*8** An Order accompanies this Memorandum.

### *ORDER*

**AND NOW,** this 15th day of September, 2014, upon consideration of the parties' submissions,[1] it is hereby ORDERED that Defendant Deloitte & Touche LLP's "Motion to Exclude From Trial Any Testimony From Lead Plaintiffs' Purported Expert Chad Coffman" (Doc. No. 868) is DENIED. Coffman will be permitted to testify at trial as an expert on loss causation and damages consistently with the opinions set forth in his reports dated October 1, 2008, December 17, 2008, and June 24, 2013.

[1] The parties' submissions: Defendant Deloitte & Touche LLP's Mot. (Doc. No. 868), Mem. of Law with Exs. A–E (Doc. No. 870), and Reply Br. (Doc. No. 885); Lead Plaintiffs' Resp. with Exs. 1–4 (Doc. No. 873). The parties were permitted to respond to the Order and Memorandum, dated Nov. 18, 2013 (Doc. No. 897): *see* Lead Pls.' Br. (Doc. No. 898); Def. Deloitte's Br. (Doc. No. 899).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4634301

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 12

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 127 of 292

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

2021 WL 2577490
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.

IN RE: EPIPEN (EPINEPHRINE INJECTION,
USP) MARKETING, SALES PRACTICES
AND ANTITRUST LITIGATION (This
Document Applies to Consumer Class Cases)

MDL No: 2785
|
Case No. 17-md-2785-DDC-TJJ
|
Signed 06/23/2021

**MEMORANDUM AND ORDER**

Daniel D. Crabtree, United States District Judge

**\*1** This Order rules the seven motions seeking to exclude expert opinions filed in the Consumer Class track of this MDL. The consumer class plaintiffs have filed one of the seven motions. And, the Mylan and Pfizer defendants, [1] have filed the other six. As explained more fully below, the court rules the motions as follows:

• Plaintiffs' Motion to Strike in Part the Testimony of Dr. John H. Johnson, IV (Doc. 2132-1) is denied.

• The Mylan defendants' portion of the Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Einer Elhauge (Doc. 2133) is denied.

• The Mylan defendants' portion of the Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Professor Meredith Rosenthal (Doc. 2134) is denied.

• The Mylan defendants' portion of the Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Dr. Carl Peck (Doc. 2135) is granted in part and denied in part.

• The Mylan defendants' portion of the Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness James Bruno (Doc. 2136) is granted.

• The Mylan defendants' portion of the Motion to Exclude Plaintiffs' Patent Litigation Expert (Doc. 2151) is denied.

• The Mylan defendants' portion of the Motion to Exclude Plaintiffs' Rebuttal Report Regarding the '827 Patent (Doc. 2156) is granted.

The court explains how it reaches these decisions, below.

1    The named defendants in this case are: Mylan N.V., Mylan Specialty L.P., Mylan Pharmaceuticals Inc., and Heather Bresch (collectively, "Mylan") and Pfizer, Inc., King Pharmaceuticals, Inc. (n/k/a King Pharmaceuticals LLC), and Meridian Medical Technologies, Inc. (collectively "Pfizer"). Doc. 2169 at 1 (Pretrial Order).

This Order rules just the Mylan defendants' portions of the motions seeking to exclude plaintiffs' experts. The court defers ruling the Pfizer defendants' portions of the motions, and it will address their motions in a future Order. Thus, the court's references to "defendants" in this Order refer only to the Mylan defendants unless specifically noted that the term is meant to refer to other named defendants in this action.

Also, the court enters this Order as a publicly-available document on the court's docket. The court recognizes that the parties have moved for leave to file under seal portions of their briefing on these motions as well as many of the exhibits submitted either supporting or opposing the motions. But, the public enjoys a "common-law right of access" to judicial records. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S 589, 599 (1978); *United States v. Bacon*, 950 F.3d 1286, 1292 (10th Cir. 2020). A litigant can rebut the "strong presumption in favor of public access" when "countervailing interests heavily outweigh the public interests in access to the judicial record." *Bacon*, 950 F.3d at 1293 (citations and internal quotation marks omitted). The court finds that none of the information in this Order qualifies for sealing under the governing legal standard for several reasons. *First*, the court's analysis relies on the factual information submitted by the parties to determine the litigants' rights; so, the public has a strong interest in accessing the information. *See Riker v. Fed. Bureau of Prisons*, 315 F. App'x 752, 755 (10th Cir. 2009) ("Especially 'where documents are used to determine litigants' substantive legal rights, a strong presumption of access attaches.' " (quoting *Lugosch v. Pyramid*

*Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006))). *Second*, a good portion of the factual information already is publicly-available through other sources. *And third*, most of the factual information is quite dated. Thus, the court finds that the public's right to access the entire contents of this Order to understand the facts and the court's analysis of the parties' motions seeking to exclude these experts' opinions outweighs any privacy interest that the parties assert over the information.

### I. Factual Background

**\*2** The Consumer Class litigation track in this MDL involves claims brought by consumers and third-party payors of the EpiPen. They allege that the Mylan and Pfizer defendants, who supply and manufacture the EpiPen, violated certain state antitrust laws and the federal civil RICO statute. Doc. 2169 at 42, 44–45 (Pretrial Order ¶¶ 4.a., 4.d.). On February 27, 2020, the court certified the two following classes under Fed. R. Civ. P. 23(b)(3):

**1. Nationwide RICO Damages Class ("RICO Class").** All persons and entities in the United States who paid or provided reimbursement for some or all of the purchase price of Branded or authorized generic EpiPens for the purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries, at any time between August 24, 2011, and [November 1, 2020].

**2. State Antitrust Damages Class ("State Antitrust Class")**. All persons and entities in the Antitrust States [2] who paid or provided reimbursement for some or all of the purchase price of Branded EpiPens at any time between January 28, 2013, and [November 1, 2020], for the purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries.

Doc. 2018-1 at 126; *see also* EpiPen Long Form Notice at 1, https://epipenclassaction.com/documents/EpiPen %20Long%20Form%20Notice%20-%20FINAL.pdf.

[2]  The "Antitrust States" include: Alabama, California, Florida, Hawaii, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New York, North Carolina, Tennessee, and Utah. Doc. 2018-1

at 126 n.72; *see also* Doc. 2169 at 2 n.3 (Pretrial Order ¶ 1.d.).

The EpiPen is an epinephrine auto-injector ("EAI") that delivers an intramuscular dose of epinephrine to treat severe allergic reactions known as anaphylaxis. Doc. 2169 at 3–4 (Pretrial Order ¶¶ 14–17, 20). Defendant Mylan Specialty L.P. has the exclusive right and license to market, distribute, and sell EpiPen products in the United States. *Id.* at 3 (Pretrial Order ¶ 13). Defendant Mylan Specialty L.P. currently sells EpiPens in the United States exclusively in packages of two devices ("the EpiPen 2-Pak"). *Id.* at 7 (Pretrial Order ¶ 56). Each EpiPen 2-Pak contains two EpiPen devices each containing a single dose of epinephrine. *Id.* at 4 (Pretrial Order ¶ 22). Defendant Pfizer, Inc., through its subsidiaries, manufactures the EpiPen and supplies it to Mylan for sale in the United States. *Id.* at 3 (Pretrial Order ¶¶ 6, 10–12).

Plaintiffs allege that, beginning in 2010, the Mylan and Pfizer defendants engaged in an unlawful scheme to raise prices on the EpiPen. *Id.* at 9 (Pretrial Order ¶ 3.a.1.). The alleged scheme included: "(1) withdrawing the single pack in the United States only (the 2-Pak hard switch) based on a false medical rationale and associated public campaign; (2) stifling generic competition through pay-for-delay settlements and other tactics and schemes; and (3) foreclosing branded competition from the Auvi-Q [(a competing EAI device)] using rebates and kickbacks." *Id.*

The Mylan defendants have filed a Motion for Summary Judgment against plaintiffs' state antitrust and federal RICO claims. Doc. 2141. Contemporaneously, the parties have filed motions seeking to exclude certain expert testimony offered either to support or oppose plaintiffs' claims on summary judgment. The court addresses those motions, below.

### II. Legal Standard

**\*3** The court has a "gatekeeping obligation" to determine whether expert testimony is admissible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)); *see also Petersen v. The Raymond Corp.*, 994 F.3d 1224, 1225 (10th Cir. 2021) (explaining a "district court serves as a gatekeeper, shutting the door on unreliable expert testimony" (citing *Kumho Tire*, 526 U.S. at 152)). When performing this gatekeeping role, the court has broad discretion. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citing *Orth v. Emerson Elec. Co.*, 980 F.2d 632, 637 (10th Cir. 1992)); *see also Peterson*, 2021 WL

1568812, at *1 (explaining that the Circuit affords "district courts 'considerable leeway' in deciding when the door [for admitting expert testimony] should be closed" (quoting *Kumho Tire*, 526 U.S. at 152)). Courts exercise this discretion under Fed. R. Evid. 702. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Tenth Circuit has directed trial judges to apply a two-part test when determining admissibility of expert testimony under *Daubert* and Rule 702. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). First, the court must determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702). Second, the court " 'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.' " *Id.* (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)).

To qualify as an expert witness, the witness must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (citation and internal quotation marks omitted). Then, to determine whether the expert's testimony is reliable, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and...whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

In *Daubert*, the Supreme Court identified four factors that—though not exhaustive—trial courts should consider when determining the proffered expert testimony's reliability under Fed. R. Evid. 702. They are: (1) whether the theory used can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the theory's general acceptance in the scientific community. *Id.* at 593–94. The Supreme Court has emphasized, however, that these four factors are not a "definitive checklist or test," and that a court's gatekeeping inquiry about reliability "must be tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150 (citations and internal quotation marks omitted).

**\*4** But, in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience" rather than the *Daubert* factors and scientific foundation. *Id.* For such testimony to satisfy the reliability standard, it "must be 'based on actual knowledge, and not mere "subjective belief or unsupported speculation." ' " *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341–42 (10th Cir. 2017) (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780 (10th Cir. 1999) (quoting *Daubert*, 509 U.S. at 590)). "When expert opinion 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict' and will be excluded." *Id.* at 1342 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

"The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Conroy*, 707 F.3d at 1168 (citing *Nacchio*, 555 F.3d at 1241). "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. While *Daubert* makes the court the gatekeeper for expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

The court has discretion to determine how to perform its gatekeeping function under *Daubert*. *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019). "The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R.*, 215

F.3d 1083, 1087 (10th Cir. 2000) (citations omitted); *see also United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999) ("The trial judge is granted great latitude...in deciding whether to hold a formal [*Daubert*] hearing."). Alternatively, the district court may satisfy its gatekeeping role without a formal *Daubert* hearing "so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *Goebel*, 215 F.3d at 1087 (quoting *Daubert*, 509 U.S. at 597). Here, exercising its discretion, the court concludes it need not conduct a separate *Daubert* hearing to rule the parties' motions to exclude. The court has reviewed the parties' filings and attached exhibits carefully. And the court finds that the parties have provided a sufficient record for the court to decide these motions without a hearing.

### III." 'Plaintiffs' Motion to Strike in Part the Testimony of Dr. John H. Johnson, IV (Doc. 2131-1)

Plaintiffs ask the court to exclude part of Dr. John H. Johnson's testimony. Defendants have retained Dr. Johnson "to review and respond to the opinions, and specifically the damages estimates" offered by plaintiffs' experts, including Prof. Meredith Rosenthal and Prof. Einer Elhauge. Doc. 2132-4 at 6 (Johnson Dec. 23, 2019 Expert Report ¶ 1). Plaintiffs argue that certain of Dr. Johnson's opinions aren't grounded in scientific methodology and are unreliable. So, plaintiffs ask the court to exclude these particular opinions.

In response, defendants assert that Dr. Johnson is qualified to offer his expert opinions. The court agrees. Dr. Johnson has a Ph.D. in economics, with a specialization in econometrics, from the Massachusetts Institute of Technology. Doc. 2132-4 at 122 (Johnson curriculum vitae); Doc. 1724 at 88 (Tr. of Mot. Hr'g Class Certification 88:19–25). He has authored "academic literature on the application of econometrics in class actions in that intersection of the field called law and economics." Doc. 1724 at 89 (Tr. of Mot. Hr'g Class Cert. 89:13–19); *see also* Doc. 2132-4 at 128–29 (listing books and articles that Dr. Johnson has authored). And, Dr. Johnson has testified as an expert "in a wide range of antitrust and class action litigation" including "40 class actions." Doc. 1724 at 89 (Tr. of Mot. Hr'g Class Certification 89:1–19); *see also* Doc. 2132-4 at 124–28 (listing expert testimony and reports provided between 2016 and 2019). Dr. Johnson's education, experience, and knowledge qualify him to opine about the measure of damages in this case.

**\*5** But, plaintiffs argue, Dr. Johnson lacks expertise in the area of health economics. So, plaintiffs contend, this gap in his resume makes him unqualified to offer expert opinions in this particular case involving a pharmaceutical product. Defendants respond that plaintiffs' criticism ignores Dr. Johnson's demonstrated expertise in the pharmaceutical industry. *See, e.g.*, Doc. 1636-2 at 35–46 (Johnson Mar. 18, 2019 Expert Report ¶¶ 33–53) (providing background about the pharmaceutical industry, including how its supply chain operates and how negotiation and pricing within that supply chain affect the ultimate price that consumers pay for pharmaceuticals). Plaintiffs downplay this pharmaceutical expertise, arguing that Dr. Johnson gained this knowledge only through his work as a paid litigation expert for class action defendants. Plaintiffs' criticisms about the depth and origin of Dr. Johnson's expertise in the specialized area of health economics go to the weight the finder of fact should assign his opinions. *See, e.g.*, *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) ("[A] lack of specialization does not affect the admissibility of the opinion, but only it's weight."); *Burton v. R.J. Reynolds Tobacco Co.*, 183 F. Supp. 2d 1308, 1312 (D. Kan. 2002) ("Any alleged gap in [an expert's] qualifications goes to the weight of his expert opinion and can be adequately addressed by cross-examination."); *United States v. Kelley*, 6 F. Supp. 2d 1168, 1183 (D. Kan. 1998) ("An expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination." (citation and internal quotation marks omitted)). But plaintiffs' arguments don't show that Dr. Johnson is unqualified to provide his proffered expert opinions in this case.

Having found Dr. Johnson sufficiently qualified as an expert, the court now turns to his four opinions that plaintiffs ask to exclude.

### A. Dr. Johnson's Criticisms of Prof. Rosenthal's Assumed Generic Penetration Rate

*First*, plaintiffs argue that the court should exclude Dr. Johnson's criticisms about the assumed generic penetration rate that Prof. Rosenthal used in her generic delay damages model. Prof. Rosenthal's generic delay damages model assumes a 95% generic penetration rate—which is the estimated amount of market share a generic would have captured from the branded EpiPen after the generic entered the market. Doc. 2132-7 at 30 (Rosenthal Oct. 31, 2019 Expert Report ¶ 68). Prof. Rosenthal explains that she selected the 95% penetration rate because it came from a Mylan forecast—known as the "Mylan 1" standard generic capture

curve. *Id.* Prof. Rosenthal further explains that Mylan used the Mylan 1 forecast in its decision-making in 2010 and 2011, and Pfizer still was projecting a penetration rate consistent with the Mylan 1 forecast in 2015. *Id.* at 30–31 (¶¶ 69–70). Prof. Rosenthal's Expert Report also provides reasons why she believes the Mylan 1 forecast is economically reasonable, thus supporting her decision to use Mylan 1's 95% generic penetration rate in her generic delay damages analysis. *Id.* at 31 (¶ 71).

Dr. Johnson criticizes Prof. Rosenthal's use of the Mylan 1 forecast. Doc. 2132-4 at 43 (Johnson Dec. 23, 2019 Expert Report ¶ 58). He explains that the Mylan 1 forecast was one of three forecasts Mylan prepared—the other two were called Mylan 2 and Mylan 3. *Id.* Dr. Johnson asserts that Prof. Rosenthal erred by using the Mylan 1 forecast because it was the most aggressive of the three generic penetration forecasts. *Id.* And, he contends, "only the Mylan 2 and Mylan 3 forecasts were actually used by the company to assess the financial effects of generic entry." *Id.*

Plaintiffs assert that Dr. Johnson's opinion misstates the evidence. Instead, Dr. Johnson conceded in his deposition that the "only basis" for his opinion that Mylan used the Mylan 2 and Mylan 3 forecasts comes from just one document. Doc. 2132-5 at 22 (Johnson Dep. 102:3–9). Plaintiffs argue that Dr. Johnson doesn't apply any specialized skill or knowledge to interpret this one document. And, plaintiffs contend, Dr. Johnson hasn't conducted any independent scientific or economic analysis to determine whether Prof. Rosenthal's reliance on the Mylan 1 forecast was appropriate. So, plaintiffs contend, the court should exclude Dr. Johnson's opinion about the appropriate generic penetration rate because it's improper expert opinion.

Defendants respond that Dr. Johnson properly criticizes Prof. Rosenthal's use of a single and the most aggressive generic penetration forecast in her generic delay damages analysis. Dr. Johnson asserts that Prof. Rosenthal ignored the other, less aggressive forecasts found in the Mylan 2 and Mylan 3 forecasts, and by doing so, Prof. Rosenthal artificially and improperly inflated her damages estimates. Doc. 2132-4 at 43, 47–48 (Johnson Dec. 23, 2019 Expert Report ¶¶ 58, 62, & Ex. 4). Dr. Johnson's two Expert Reports identify the other forecasts with lower generic penetration rates. *See id.*; *see also* Doc. 1636-2 at 134–38 (Johnson Mar. 28, 2019 Expert Report ¶¶ 167–71) (redacted version); Doc. 1503-4 at 134–38 (sealed version). And, he analyzes the "sensitivity of Prof. Rosenthal's damages estimates to her assumed generic substitution rate, using the Mylan 2 and Mylan 3 forecasts for generic substitution, as well as the actual generic substitution observed using the Mylan authorized generic product." Doc. 2132-4 at 47–48 (Johnson Dec. 23, 2019 Expert Report ¶ 62 & Ex. 4).

**\*6** Defendants argue that Dr. Johnson isn't opining about which forecast Mylan used in its own analysis of generic penetration. Instead, he testified that his expert testimony "interpret[s] for the trier [of] fact the economics behind the [Mylan 1] forecast, what the strong assumptions are underlying Mylan 1, and why [he] disagree[s] with...Professor Rosenthal's assessment that she should look at Mylan 1 and only Mylan 1 in calculating damages." Doc. 2132-5 at 23 (Johnson Dep. 107:6–20). Defendants assert that Dr. Johnson applies his economics expertise to the data, which will help the jury understand how Prof. Rosenthal's damages estimates can fluctuate, depending on the generic penetration rate selected to perform the analysis. Also, Dr. Johnson explains why he believes it was improper for Prof. Rosenthal to rely on the literature as support for using the Mylan 1 forecast. Doc. 1636-2 at 132–33 (Johnson Mar. 28, 2019 Expert Report ¶¶ 164–65). Dr. Johnson asserts that Prof. Rosenthal's chosen literature isn't relevant to assessing generic penetration against EpiPen because the literature addresses generic substitution of oral tablets and not injectable products, like EpiPen. *Id.* Also, he alleges, the literature fails to account for competitive steps Mylan may have taken to support EpiPen's continued sales. *Id.* Also, Dr. Johnson analyzed the actual rate of generic substitution when Mylan introduced its own authorized generic EpiPen ("the Mylan AG"). Doc. 2132-4 at 44–46 (Johnson Dec. 23, 2019 Expert Report ¶ 61 & Ex. 3). His analysis shows that the actual generic penetration rate for Mylan AG was lower than the Mylan 1 forecast used by Prof. Rosenthal. *Id.* Thus, he asserts this analysis provides further support for his opinion that Prof. Rosenthal erred by using the Mylan 1 forecast in her damages analysis. *Id.*

Plaintiffs argue that Dr. Johnson does nothing more than regurgitate information found in documents, thus he doesn't provide expert opinion. The court disagrees. Dr. Johnson not only identifies other generic penetration forecasts, but also he explains, using his economic expertise, why he believes Prof. Rosenthal erred by selecting the Mylan 1 forecast—instead of other generic penetration rates—to perform her generic delay damages analysis. This type of opinion is proper expert rebuttal opinion. *See In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, No. 05-md-1721-KHV, 2009 WL 1649773, at \*1

(D. Kan. June 9, 2009) (explaining that "a rebuttal expert who critiques another expert's theories or conclusions need not offer his own independent theories or conclusions (though of course his testimony may be more persuasive if he does so)" and "[s]uch evidence, which attacks the opposing expert's substantive testimony, is proper rebuttal"); *see also Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-Civ., 2011 WL 2295269, at *5 (S.D. Fla. June 8, 2011) (explaining that a "rebuttal expert can testify [about] the flaws that she believed are inherent in another expert's report that implicitly assumes or ignores certain facts" and "[t]his is a well-accepted way to criticize damages estimates" (citation and internal quotation marks omitted)). *Cf. Frederick v. Swift Transp. Co., Inc.*, 591 F. Supp. 2d 1149, 1155 (D. Kan. 2008) (explaining that in a "battle of the experts" over which opinion is correct, the court won't "credit one expert's opinion over the other" but instead leaves the decision "to the trier of fact to determine how much weight to give to each expert's opinions"). The court finds no reason to exclude Dr. Johnson's opinion criticizing Prof. Rosenthal's use of the Mylan 1 generic penetration rate.

Also, plaintiffs argue that the court should exclude Dr. Johnson's opinion criticizing Prof. Rosenthal's analysis because it uses the Mylan AG's price when estimating the "but-for" price while it ignores the Mylan AG's actual penetration rate in her damages calculations. *See* Doc. 2132-7 at 36–38 (Rosenthal Oct. 31, 2019 Expert Report ¶¶ 84–86) (explaining that, in her generic delay damages calculations, the "generic price discount yardsticks are based on the actual pricing trends when Mylan's authorized generic entered the market in December 2016"). Prof. Rosenthal explains why she chose not to use the Mylan AG penetration rate in her analysis. *Id.* at 29 (¶ 67). She found it "unsuitable" for several reasons, including that "it was not a competitor product" because "it was launched by Mylan" which was "quite different from the but-for scenario [she was] asked to assume, where Teva [(a rival pharmaceutical company)] would have launched along with an authorized generic—or alone." *Id.*; *see also* Doc. 2132-16 at 9 (Rosenthal Feb. 7, 2020 Rebuttal Expert Report ¶ 10) (explaining that her analysis assumes a "but-for world...where both the Mylan AG and an independent generic would have launched at the same time if it had not been for the challenged conduct" while "[i]n the actual world, both EpiPen and the Mylan AG were marketed by the same entity" creating a situation "devoid of the incentives for competing on price and gaining market share").

**\*7** But Dr. Johnson criticizes Prof. Rosenthal's dismissal of the Mylan AG penetration rate for "several reasons." Doc. 2132-4 at 44–45 (Johnson Dec. 23, 2019 Expert Report ¶ 61). He opines that the Mylan AG penetration rate is a more reasonable rate to use because—even though Mylan launched this generic—it still was "a competing generic EAI product available at a lower price." *Id.* at 44 (¶ 61). And, "when Teva ultimately launched its generic EAI device in November 2018, it did so at the exact same price as the Mylan authorized generic device." *Id.* at 44–45 (¶ 61). So, in Dr. Johnson's opinion, "[t]he fact that the authorized generic product was available from Mylan instead of a different manufacturer does not change the fact that, after it launched, consumers had an AB rated generic product available to them at a lower price." *Id.* at 45 (¶ 61).

Plaintiffs argue that the court should exclude Dr. Johnson's opinion because, as he testified, he never conducted any scientific analysis to determine whether competition between the Mylan AG and the branded EpiPen occurred in exactly the same way it would have occurred with an alternative, independent generic product. Doc. 2132-5 at 24 (Johnson Dep. 116:18–25). And, plaintiffs contend, he has no practical experience in health economics to assert his opinions about Prof. Rosenthal's choice of generic penetration rate. The court disagrees. As discussed above, Dr. Johnson is qualified as an economist to provide expert opinions in this case. And his experience with and knowledge about the pharmaceutical industry qualify him to render his opinions here. He has drawn from that experience to render his opinions that rebut Prof. Rosenthal's damages analysis, making his opinions sufficiently reliable and relevant. *See In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, 2009 WL 1649773, at *1 (explaining that "expert opinions which assess or critique another expert's substantive testimony are relevant," and constitute "proper rebuttal"); *see also Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) ("The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party." (citation and internal quotation marks omitted)). So, the court declines plaintiffs' invitation to exclude Dr. Johnson's opinions criticizing Prof. Rosenthal's use of the Mylan 1 generic penetration rate in her generic delay damages calculations.

### B. Dr. Johnson's Opinion About the Ratio of Single-EpiPen Versus Two-EpiPen Prescriptions

*Next*, plaintiffs ask the court to exclude Dr. Johnson's opinion about the ratio of single-EpiPen prescriptions to EpiPen 2-Pak prescriptions. Dr. Johnson offers this opinion in response to Prof. Rosenthal's analysis of Mylan's withdrawal of the single EpiPen from the market. Prof. Rosenthal opines that "the annual average pens-per-prescription ratio [for EpiPen] was essentially constant from 2009 to the first half of 2011." Doc. 2132-16 at 13–14 (Rosenthal Feb. 7, 2020 Rebuttal Expert Report ¶ 21 & Fig. 1). But, Prof. Rosenthal's analysis shows that after August 2011, when Mylan withdrew the single EpiPen from the market, the ratio of pens-per-prescription increased. *See id.* Prof. Rosenthal then uses this analysis to estimate the "but-for" pens per prescription to calculate plaintiffs' EpiPen 2-Pak damages. *Id.* at 12–14 (¶¶ 17, 21).

Dr. Johnson rebuts Prof. Rosenthal's opinion, arguing her estimate of "but-for" pens for prescriptions is flawed. Doc. 2132-4 at 60 (Johnson Dec. 23, 2019 Expert Report ¶¶ 88–90). He contends that Prof. Rosenthal erred by "assuming that the average share of two-pack and single pack prescriptions would be unchanged in every year after the second quarter of 2011." *Id.* (¶ 90). And, he asserts, her assumption ignores the upward trend in the number of EpiPen 2-Paks prescribed between 2008 and 2011 as well as the downward trend in the number of single EpiPen prescriptions for the same time period. *Id.* (¶ 88). Dr. Johnson uses a graph to document this supposed upward and downward trend. *Id.* at 61 (Ex. 6). He contends that, by ignoring these trends, Prof. Rosenthal underestimated the "but-for" annual average of pens per prescription. *Id.* at 60 (¶ 89). And, in turn, he argues that Prof. Rosenthal's use of this "but for" average overstates the amount of plaintiffs' purported EpiPen 2-Pak damages. *Id.* (¶ 90).

 **\*8**  Plaintiffs argue the court should exclude Dr. Johnson's opinion about the increasing trend in EpiPen 2-Pak prescriptions for two reasons: They say (1) it will mislead the jury, and (2) it's unreliable.

*First*, plaintiffs argue that Dr. Johnson's graph showing the purported upward trend of EpiPen 2-Pak prescriptions is misleading because Dr. Johnson's graph doesn't plot the actual data points across time. Instead, plaintiffs contend, Dr. Johnson uses the "trend line" function in Microsoft Excel that smooths out the data into a straight line, giving it an appearance of trending upward. Plaintiffs argue that the actual data points show that 2-Pak prescriptions stayed constant throughout 2008 and 2011, which is consistent with Prof. Rosenthal's analysis. *See* Doc. 2132-2 at 19 (Mem. of Law in Supp. of Class Pls.' Mot. to Strike) (providing a chart that shows actual data points).

Defendants respond that plaintiffs are "free to present an alternative depiction of the trend that Dr. Johnson observed" but his conclusion remains the same, *i.e.*, that the data shows an upward trend of EpiPen 2-Pak prescriptions. Doc. 2186-1 at 14–15. The court agrees with defendants. The court believes a jury is capable of understanding the data for EpiPen 2-Pak prescriptions and recognizing the differences between how Dr. Johnson and Prof. Rosenthal interpreted that data. Plaintiffs can cross-examine Dr. Johnson about his use of the "trend line" feature to interpret the data —as opposed to the actual data points—and the jury can decide whether his approach to analyzing that data affects his opinion's credibility. *See, e.g.*, *Corr v. Terex USA, LLC*, No. 08-1285-MLB, 2011 WL 976718, at \*6 (D. Kan. Mar. 17, 2011) (rejecting defendant's argument that plaintiff's expert's "opinions will confuse or mislead the jury because he has not tested or designed an alternate" product because defendant "can, through cross examination of [the expert], explore these areas," and finding that "a jury will be able to understand what [the expert] did in this case and make their own decision about whether his opinions are credible"). The court finds no reason to exclude his opinion as misleading.

*Second*, plaintiffs argue that Dr. Johnson's analysis of the data is unreliable because he's measuring the number of prescriptions, not the number of pens. Thus, plaintiffs contend, Dr. Johnson's analysis doesn't demonstrate adequately the effects of withdrawing the single EpiPen from the market and replacing it exclusively with the 2-Pak. Plaintiffs illustrate this point by arguing that, if Dr. Johnson continued his chart, the number of 2-Pak prescriptions would increase to 100% and the number of single prescriptions would fall to 0% because, after Mylan's switch to the 2-Pak, doctors weren't able to prescribe single EpiPens. Plaintiffs argue that Prof. Rosenthal's analysis of pens per prescription is more informative and better grounded in the facts and science. Thus, plaintiffs contend, the court should exclude Dr. Johnson's opinion on this topic.

Defendants disagree. Defendants argue that the point of Dr. Johnson's analysis is to analyze purchasing trends before the switch to the 2-Pak. Dr. Johnson asserts that his analysis of the purchasing trends for the EpiPen 2-Pak undermines Prof. Rosenthal's conclusion that EpiPen's annual average pens-per-prescription ratio would remain constant after 2011. Dr. Johnson's Expert Report provides

a reliable basis for his opinion about Prof. Rosenthal's assumptions. *See* Doc. 2132-4 at 60 (Johnson Dec. 23, 2019 Expert Report ¶¶ 88–90). And, the court finds, plaintiffs' challenges to Dr. Johnson's opinion go to the weight the trier of fact should assign to his opinion—but not its admissibility. *See Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1524 (10th Cir. 1984) (affirming admission of expert testimony where "there may have been considerable evidence contradicting the expert's assumptions" but also "his assumptions were not without support" and explaining that "the full burden of exploration of the facts *and assumptions* underlying the testimony of an expert witness" falls "squarely on the shoulders of opposing counsel's cross-examination" (citation and internal quotation marks omitted)), *aff'd*, 472 U.S. 585 (1985); *see also Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (affirming trial court's admission of expert testimony and noting that "the burden of exploring the facts and assumptions underlying the testimony of an expert witness" rests "on opposing counsel during cross-examination").

**\*9** The court thus declines to exclude Dr. Johnson's opinion about the appropriate measure of the ratio between single-EpiPen prescriptions and EpiPen 2-Pak prescriptions.

### C. Dr. Johnson's Opinion Comparing Individual Co-Payments to Prof. Rosenthal's Calculation of the Average "But-For" Co-Payment

*Next*, plaintiffs assert that the court should exclude as unreliable Dr. Johnson's opinion comparing real-world individual co-payments to Prof. Rosenthal's calculation of class members' average "but-for" co-payment. Prof. Rosenthal developed an aggregate model to determine generic delay damages that assumes an average "but-for" price that consumers would have paid for a generic EpiPen "but for" defendants' alleged scheme that delayed generic competition. Doc. 2186-4 at 5 (Rosenthal Feb. 8, 2019 Dep. 214:7–17). Dr. Johnson criticizes Prof. Rosenthal's calculation of the average "but for" price because, he says, it "ignore[s] the underlying variation in insured consumers' *actual* copayments for *branded* EpiPen devices." Doc. 2132-4 at 51 (Johnson Dec. 23, 2019 Expert Report ¶ 65) (emphasis added). Dr. Johnson identifies "a substantial share of transactions [that] had monthly copayments that were *less* than Prof. Rosenthal's but-for generic copayment." *Id.* (citing Doc. 1636-2 at 114–18 (Johnson Mar. 18, 2019 Expert Report ¶¶ 151–53)) (emphasis added). Dr. Johnson argues that these identified

"class members would be uninjured[,]" and he criticizes Prof. Rosenthal for offering "no methodology to identify them and remove" these transactions from her damages analysis. *Id.*

Plaintiffs assert that the court should exclude Dr. Johnson's comparison of real-world co-payments to Prof. Rosenthal's calculated "but-for" average price because it is unreliable and will mislead the jury. Plaintiffs offer several arguments to support the request to exclude this opinion.

*First*, plaintiffs argue, Dr. Johnson has cherry-picked examples of actual co-payments for named plaintiffs that don't provide an accurate representation of what Prof. Rosenthal calculated—*i.e.*, the distribution of co-payments among consumers in both the actual and "but-for" worlds to calculate an average. But, defendants respond, Dr. Johnson used the same "IQVIA Xponent copayment data" that Prof. Rosenthal used in her analysis. Doc. 1636-2 at 115–18 (Johnson Mar. 18, 2019 Expert Report ¶ 152 & Ex. 26); Doc. 1503-4 at 115–18 (sealed version). According to Dr. Johnson's analysis, 54% of the branded co-payments in the entire data set are less than Prof. Rosenthal's calculated average "but-for" copayment. Doc. 1636-2 at 118, 120 (¶ 154 & Ex. 28); Doc. 1503-4 at 118, 120. Dr. Johnson highlights some of the named plaintiffs whose actual co-payments were less than Prof. Rosenthal's average "but-for" copayment. Doc. 1636-2 at 118 (¶ 153). Defendants argue this isn't "cherry-picking" data. Instead, defendants say, it's just providing an illustration of certain class plaintiffs whose actual co-payments fall into the 54% of co-payments that are less than Prof. Rosenthal's average "but-for" co-payment.

The court agrees with defendants. Dr. Johnson offers a different way to examine the data to support his argument that Prof. Rosenthal's analysis is flawed. Plaintiffs assert that Dr. Johnson's analysis of the data is nonsensical from a mathematical perspective. Plaintiffs explain why they think it's nonsense—*i.e.*, Prof. Rosenthal is calculating an average, not examining individual payments, like Dr. Johnson does. But, Dr. Johnson's Expert Report explains how and why he has analyzed the data in this fashion, thus providing a reliable basis for his opinion. *See* Doc. 1636-2 at 114–18 (Johnson Mar. 18, 2019 Expert Report ¶¶ 151–53). The disagreement between Prof. Rosenthal and Dr. Johnson over the best way to analyze the data is an issue for the jury to decide when assigning weight to each opinion. But, the court can't exclude Dr. Johnson's opinion as unreliable simply because it differs from the way Prof. Rosenthal analyzed the data. *See, e.g.*, *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, MDL No.

2328, 2016 WL 2756437, at *9 (E.D. La. May 12, 2016) (refusing to exclude defendant's rebuttal expert's opinion that critiqued the opinions of and analyzed the data differently than plaintiffs' expert because the rebuttal expert provided a reliable basis for his methodology and the "mere fact that the parties' experts disagree on the best way to test the model is no basis for excluding one expert's approach" (citation and internal quotation marks omitted)); *Johnson v. Big Lots Stores, Inc.*, Nos. 04-3201, 05-6627, 2008 WL 1930681, at *11 (E.D. La. Apr. 29, 2008) (finding "no reliability issue" with rebuttal testimony offered by defendant's expert economist "to critique" plaintiffs' expert's "methodology and interpretation of the data" because defendant's rebuttal expert relied on the same data and merely "analyze[d] the survey data in different ways from" plaintiffs' expert).

**\*10** *Second*, plaintiffs assert, Dr. Johnson ignores a well-established principle that consumers generally pay more for branded products than generic products. Prof. Rosenthal applies this principle to her analysis—*i.e.*, she notes that "the vast majority of consumers pay more for brand products than generic products"—and opines that "almost everyone in the class suffered an overcharge because any copayment they paid in the actual world would necessarily have been lower in the but-for world." Doc. 2132-16 at 18 (Rosenthal Feb. 7, 2020 Rebuttal Expert Report ¶ 32). Defendants respond that Dr. Johnson's analysis of the data undermines Prof. Rosenthal's assumption about the costs of branded products versus generics. Moreover, defendants assert, Prof. Rosenthal testified that she wasn't asked to opine on individual issues, like this one. Doc. 2186-4 at 3 (Rosenthal Feb. 8, 2019 Dep. 98:8–13). Plaintiffs' arguments about the various principles that Dr. Johnson assumed or ignored in his analysis go to the weight of his opinions, but not their admissibility. *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2016 WL 5371856, at *10 (D. Kan. Sept. 26, 2016) (holding that criticisms about reliability of plaintiffs' experts' opinions "go to the weight of those opinions and not...their admissibility" and concluding "the experts' methodologies [weren't] so unreliable as to preclude certification"). Dr. Johnson's alleged failure to assume that consumers pay more for branded products than generics doesn't render his opinion so unreliable that the court must exclude it from evidence. Instead, plaintiffs' criticisms about Dr. Johnson's underlying assumptions are "fodder for cross-examination at trial." *ZF Meritor LLC v. Eaton Corp.*, No. 06-623-SLR, 2013 WL 6729509, at *5 (D. Del. Dec. 20, 2013). The court thus declines to exclude Dr. Johnson's opinion on this basis.

*Last*, plaintiffs argue that Dr. Johnson's opinion will mislead the jury into believing that a great number of class members sustained no injury. The court disagrees. As discussed, Dr. Johnson provides a reliable basis for his opinion, and he explains adequately how he analyzed the data differently than Prof. Rosenthal. At the same time, Prof. Rosenthal has explained why she uses her average "but-for" co-payment to calculate damages and why she believes it is the appropriate metric for her analysis. The trier of fact is more than capable of understanding the two approaches and parsing the differences of the two methods for analyzing the data. It is for the jury to decide which methodology it finds more credible and assign the appropriate weight to each opinion based on that credibility determination.

For all these reasons, the court won't exclude Dr. Johnson's opinion comparing actual co-payments to Prof. Rosenthal's calculation of the average "but-for" co-payment.

### D. Dr. Johnson's Opinion About Teva's "But-For" Generic Entry Date

*Finally*, plaintiffs ask the court to exclude Dr. Johnson's opinion about Teva's "but-for" generic entry date because, plaintiffs contend, it's unreliable and not based on any expert analysis. Dr. Johnson's opinion takes issue with the "but-for" generic entry date that Prof. Rosenthal uses in her damages analysis. Prof. Rosenthal's damages model relies on a "but-for" generic entry date that comes from another one of plaintiff's experts—Prof. Einer Elhauge. Doc. 2132-16 at 11–12 (Rosenthal Feb. 7, 2020 Rebuttal Expert Report ¶ 16). Prof. Elhauge estimates a "but-for" generic date of March, 14, 2014. *Id.* And, Prof. Rosenthal's damage model assumes Prof. Elhauge's "but-for" generic entry date to calculate plaintiffs' purported generic delay damages. *Id.*

Dr. Johnson's Expert Report criticizes Prof. Rosenthal's assumed "but-for" generic entry date because, he contends, it fails to account for the time it took Teva to secure FDA approval for its generic in the real world. Doc. 2132-4 at 36 (Johnson Dec. 23, 2019 Expert Report ¶ 49). Dr. Johnson notes that Teva "had every incentive to have planned its regulatory efforts to obtain final FDA approval by [June 22, 2015] at the latest" but yet "it still took Teva an additional 1,254 days (about 41 months) to launch its generic EAI *after* the June 2015 licensed entry date." *Id.* Dr. Johnson also recognizes that "Teva's request for approval was *rejected* by the FDA on February 23, 2016, more than eight months after

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 136 of 292

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

the allowed entry date from the settlement, due to 'certain major deficiencies.' " *Id.* (quoting Teva Pharm. Indus. Ltd., Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 under the Securities Exchange Act of 1934 (Form 6-K) (Feb. 29, 2016)). So, Dr. Johnson believes, "[i]f it is reasonable to assume that, in the but-for world, it would have taken Teva the same 1,254 days to obtain FDA approval from the time it was free to launch a generic product, any but-for allowed entry date estimated by Prof. Elhauge would have to be pushed out by 1,254 days to estimate the corresponding but-for generic entry date by Teva." *Id.*

**\*11** Plaintiffs argue the court should exclude this opinion for two reasons.

*First*, they argue that Dr. Johnson's opinion isn't reliable because he's not an FDA expert qualified to opine about generic entry date. Defendants respond that Dr. Johnson isn't providing an opinion about FDA approval. Instead, he's providing an opinion as an economist that a proper damages model must input an appropriate "but-for" generic entry date that reasonably measures when an generic product *could have* entered the market. *See, e.g.*, *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 165 (3d Cir. 2017) ("It is not enough for [plaintiffs] to show that [generic company] wanted to launch its drug; they must also show that the launch would have been legal."); *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 270 (D. Mass. 2014) ("Analyzing this issue requires looking at two separate questions: absent the [generic delay] Settlement, did [the generic company] have the 'will' to enter the market before 2014, and was there a 'way' for it to enter had the agreement allowed for earlier entry, considering both manufacturing and FDA approval requirements?").

Like Prof. Rosenthal, Dr. Johnson relies on opinions from other experts to form his opinion about a reasonable "but-for" generic entry date. Doc. 2132-4 at 33, 34 (Johnson Dec. 23, 2019 Expert Report ¶¶ 41, 43) (referring to Dr. Weisman and Dr. Peck's opinions). Specifically, Dr. Johnson cites another expert's opinion that "Teva's generic EAI device was a challenging product to develop and that its lengthy approval timeline, resulting in FDA approval in August 2018, was reasonable given the complexity of the product." *Id.* at 33 (¶ 41); *see also id.* at 34 (¶ 43) (noting expert's opinion "that Teva faced substantial regulatory issues and product development complications that prolonged the length of the FDA approval process until August 2018, and that the delay in FDA approval was not due to conduct by the Defendants"). Dr. Johnson

then uses that opinion to assert that Prof. Rosenthal's damages model is flawed because it relies on Prof. Elhauge's "but-for" generic entry date and doesn't take into account the time it took Teva to secure FDA approval in the real world. *Id.* at 33–36 (¶¶ 41, 43–45 48–49). Dr. Johnson, as an economist qualified to provide expert testimony in this case, may opine about the purported flaws he finds in Prof.'s Rosenthal's damages analysis based on her assumed "but-for" generic entry date. Plaintiffs' attacks on Dr. Johnson's assumptions about FDA approval go to the weight of his opinion about an appropriate "but-for" generic entry date. But, they don't warrant excluding his opinion.

*Second*, plaintiffs assert that Dr. Johnson's opinion is unreliable because he didn't conduct any scientific analysis to determine whether Teva would have required the same 1,254 days to secure FDA approval in both the actual and "but-for" worlds. Plaintiffs argue that Dr. Johnson merely provides "a simple arithmetic calculation" by taking the number of days it took Teva to secure FDA approval in the actual world and adding it to Prof. Elhauge's "but-for" generic entry date without recognizing the differences between the actual and "but-for" worlds. Doc. 2132-2 at 24. Plaintiffs argue that Dr. Johnson's basic arithmetic isn't grounded in specialized knowledge or expertise. Thus, plaintiffs contend, it doesn't qualify as admissible expert opinion.

**\*12** Defendants respond with arguments similar to the ones asserted in response to plaintiffs' first argument. Defendants contend that Dr. Johnson's opinion is grounded in his economic expertise. And, they argue, he uses that expertise to criticize Prof. Rosenthal's assumption of a purportedly flawed "but-for" generic entry date in her damages model. Again, this type of expert opinion testimony is proper rebuttal testimony. *See U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 768, 776–77 (N.D. Ill. 2009) (permitting rebuttal expert "[t]o opine on what he views as intrinsic weaknesses in [opposing party's expert's] reports" where the expert didn't "undertake an independent investigation" but instead reviewed "the allegedly flawed reports" which was "enough" to allow admission of the opinion and where "the jury will benefit from having access to criticism from another expert in the field"); *see also Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 835 (D. Minn. 2011) (explaining that it's "the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports" and denying motion to exclude expert opinion where the "rebuttal experts sufficiently applied their expertise to the facts and

methodologies used by each of [plaintiff's] experts in forming their conclusions" and the "experts' testimony will be helpful for the jury to weigh the evidence presented at trial").

Here, the court finds Dr. Johnson's opinion will assist the trier of fact's efforts to understand the evidence at issue, specifically how Prof. Rosenthal arrived at her generic delay damages calculations and why Dr. Johnson believes her analysis is flawed based on her assumed "but-for" generic entry date. Plaintiffs' criticisms about Dr. Johnson's assumptions and the methodologies he uses to reach his opinion go to his opinion's weight. But, they don't preclude the court from admitting the opinion. The court thus denies plaintiffs' request to exclude his opinion criticizing Prof. Rosenthal's use of Prof. Elhauge's estimated "but-for" generic entry date.

For reasons explained, the court rejects each of plaintiffs' arguments seeking to exclude Dr. Johnson's expert opinions. The court thus denies plaintiffs' Motion to Strike in Part the Testimony of Dr. John H. Johnson, IV.

### IV. Defendants' Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Einer Elhauge (Doc. 2133)

Now, the court turns to defendants' motions seeking to exclude expert opinions. First, defendants ask the court to exclude the opinions of Prof. Einer Elhauge. Plaintiffs have retained Prof. Elhauge to provide expert testimony about the nature of, bases for, and calculations of plaintiffs' damages. Defendants argue the court should exclude two of Prof. Elhauge's opinions as unreliable: (1) his reverse payment analysis, and (2) his rebate analysis.[3] The court addresses each opinion, in turn, below.

[3]    Defendants' motion never asserts that Prof. Elhauge isn't qualified "by knowledge, skill, experience, training, or education" to provide the proffered expert testimony. Fed. R. Evid. 702. At class certification, the court concluded that Prof. Elhauge had sufficient qualifications to render his expert opinions. Doc. 2017-1 at 48–50. His qualifications haven't subsided. And, so, for the same reasons articulated in the court's earlier Order, the court finds Prof. Elhauge sufficiently qualified to provide expert testimony in this case. *Id.*

### A. Prof. Elhauge's Reverse Payment Analysis

One of the factual theories plaintiffs assert in this case contends that defendants delayed generic competition by entering into an unlawful reverse payment settlement with rival pharmaceutical company, Teva. *See* Doc. 2169 at 15–17 (Pretrial Order ¶ 3.a.1.b.). The theory involves Mylan and Teva's settlement of two separate lawsuits. Pfizer, through its subsidiaries, had sued Teva alleging that Teva's generic EAI infringed Pfizer's EpiPen patents. *Id.* at 15. Shortly after Pfizer filed this infringement lawsuit, Teva sued Mylan for patent infringement based on Mylan's FDA application seeking approval to market a generic version of Teva's drug, Nuvigil. *Id.* Plaintiffs here allege that Mylan and Teva entered settlement agreements to resolve both lawsuits, and under those settlements, Teva agreed to delay entry of its generic EAI in exchange for Mylan's agreement to delay entry of its generic Nuvigil product. *Id.* Plaintiffs allege that "[n]either settlement, viewed independently, was economically rational." *Id.* at 16. But, plaintiffs contend, "the tandem EpiPen and Nuvigil settlements...guaranteed" that both Mylan and Teva "would both profit by limiting competition in their respective monopoly marketplaces rather than compete." *Id.*

 **\*13**  Plaintiffs offer Prof. Elhauge's expert opinion to support their generic delay theory. Prof. Elhauge opines that settlement of the EpiPen infringement suit—on a standalone basis—was profitable for Mylan but unprofitable for Teva. Meanwhile, he opines, the Nuvigil settlement— standing alone—was unprofitable for Mylan but profitable for Teva. Doc. 2138-2 at 54 (Elhauge Oct. 31, 2019 Expert Report ¶ 103); *see also* Doc. 2187-5 at 23–25, 30–31 (Elhauge Feb. 12, 2020 Reply Expert Report ¶¶ 31–34, 44). So, Prof. Elhauge asserts, "the Nuvigil settlement that induced Teva to agree to the EpiPen settlement constituted a reverse payment to Teva." Doc. 2138-2 at 54 (¶ 103).

Defendants argue that the court should exclude Prof. Elhauge's reverse payment analysis as unreliable for two reasons. *First*, defendants argue that the reverse payment analysis uses a methodology that isn't scientifically sound and it also constitutes an improper reply opinion. *Second*, defendants contend that Prof. Elhauge's reverse payment analysis is based on flawed assumptions that don't comport with the facts of this case. The court addresses these two arguments, separately, below.

### 1. The Reverse Payment Analysis's Methodology

After Prof. Elhauge asserted his reverse payment opinion in his initial Expert Report, defendants' expert—Jonathan Orszag—reviewed the analysis and identified various computational errors in the backup materials Prof. Elhauge used to calculate his reverse payment analysis. Doc. 2187-5 at 25–26 (¶ 35). Prof. Elhauge's Reply Report acknowledges Mr. Orszag's criticisms, *id.* at 25, and Prof. Elhauge concedes that his backup materials contained the identified errors, *id.* So, Prof. Elhauge's Reply Report adopts Mr. Orszag's corrections. *Id.* at 25–26. But, Prof. Elhauge asserts, the corrections don't change his opinion that the Nuvigil settlement constituted a reverse payment settlement that delayed generic competition. *Id.* at 26.

Defendants argue that Prof. Elhauge's new calculation shows that Mylan was better off settling the Nuvigil litigation. *See* Doc. 2187-5 at 27–29 (¶ 40 & Revised Table 1) (showing a $17 million "gain" to Mylan in the Nuvigil settlement "from Actual Settlement Relative to Litigation"). Defendants contend that this revision dooms plaintiffs' generic delay theory. So, defendants argue, Prof. Elhauge's Reply Report changes his entire methodology for analyzing the settlements by comparing the Nuvigil settlement to a manufactured "but-for" settlement instead of comparing it to the costs of continued litigation as he did in his initial Expert Report. Also, defendants argue that the analysis offered by Prof. Elhauge's Reply Report isn't scientifically sound and constitutes improper reply opinion.

*First*, the court addresses whether Prof. Elhauge's Reply Report uses a flawed methodology for analyzing the EpiPen and Nuvigil settlements. Defendants argue that the court should exclude the Reply Report's analysis because it's not "the product of reliable principles and methods[.]" Fed. R. Evid. 702(c). In short, defendants argue that Prof. Elhauge's initial hypothesis—*i.e.*, that the Nuvigil settlement, standing alone, was unprofitable for Mylan but profitable for Teva—failed after testing, so Prof. Elhauge came up with a different hypothesis in his Reply Report that the data could support. Defendants assert that this kind of analysis is improper scientific opinion, and the court must exclude it. *See, e.g.*, *Estate of Mitchell v. Gencorp, Inc.*, 968 F. Supp. 592, 600 (D. Kan. 1997) (Rogers, J.) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of" the scientific method and "is not proper[.]" (citation and internal quotation marks omitted)).

**\*14** But, plaintiffs respond to defendants' arguments by asserting that Prof. Elhauge's Reply Report doesn't change any aspect of his methodology for analyzing whether the Nuvigil settlement constituted a reverse payment settlement. To the contrary, they argue that Prof. Elhauge uses "precisely the same model" from his initial Report and that his computational corrections only produced an 11-day change to the economically rational allowed entry date in a but-for EpiPen settlement. Doc. 2187-1 at 8–9 (emphasis omitted). *Compare* Doc. 2138-2 at 55 (¶ 106) ("I calculate that the allowed entry date...in the but-for settlement was March 3, 2014."), *with* Doc. 2187-5 at 9–10 (¶ 3) ("Correcting these computational errors changes the predicted allowed no-payment settlement entry date 11 days, from March 3, 2014 to March 14, 2014."). [4]

| 4 | In other places, Prof. Elhauge's Reply Report lists the revised no-payment settlement entry date as "March 14, *2013*." *See, e.g.*, Doc. 2187-5 at 27 (¶ 38) (emphasis added). Plaintiffs explain that this 2013 reference is a typographical error. And, they emphasize, March 14, 2014 is the correct date, as evidenced by Prof. Elhauge's repeated explanation that his revised calculation is just "11 days" later than the date his initial Report calculated. *See* Doc. 2187-5 at 9–10, 27 (¶¶ 3, 38). |
|---|---|

Also, plaintiffs assert that Prof. Elhauge's "first and primary basis" for concluding that the Nuvigil settlement was a reverse payment settlement was that the EpiPen settlement undercompensated Teva compared to continued litigation; so, he asserts, the Nuvigil settlement must have overcompensated Teva, even if it didn't produce a loss for Mylan. Doc. 2187-1 at 9 (citing Doc. 2138-2 at 43, 45–46, 51–52 (¶¶ 79, 85–86, 98)). And, plaintiffs cite other evidence that Prof. Elhauge relied on to reach his conclusion that the two settlements had an economic link, including: (1) the parties' agreement to enter the two settlement agreements on the very same day, (2) "documentary evidence indicating that the EpiPen and Nuvigil settlements were discussed together as [a] package[,]" and (3) Mylan's submission of "the two settlements together to the DOJ and FTC as 'potentially related' for the purposes of antitrust review." Doc. 2138-2 at 45–46 (¶¶ 84, 86).

Plaintiffs further contend that defendants have mischaracterized Prof. Elhauge's analysis comparing the actual settlement to a "but-for" settlement. Prof. Elhauge's

Reply Report asserts that "Mr. Orszag is wrong that if the Nuvigil settlement left Mylan better off than continued Nuvigil litigation, that means that the Nuvigil settlement was beneficial to Mylan." Doc. 2187-5 at 27 (¶ 39). He opines: "Continued Nuvigil litigation is not the right but-for baseline against which to measure the net effects of the actual Nuvigil settlement because without that settlement Mylan would not have continued to litigate, but rather would have entered into a standalone no-payment Nuvigil settlement that would have left both parties better off than with continued litigation." *Id.* Prof. Elhauge then calculates the "but-for" standalone no-payment settlements, using the calculated bargaining power of Mylan and Teva respectively, as demonstrated in the actual settlements. *Id.* at 27–31 (¶¶ 39–44). Prof. Elhauge based his analysis on his opinion that Mylan had 47.3% of the bargaining power in the actual settlements. *Id.* at 27–28 (¶ 40). And, his calculation concluded that the actual Nuvigil settlement under-compensated Mylan compared to an arm's length transaction where Mylan would have rationally exercised its share of the bargaining power. *Id.* at 27–31 (¶¶ 39–44). Contrary to defendants' assertion, Prof. Elhauge didn't invent his "but-for" settlement analysis "out of whole cloth." Doc. 2137-1 at 12. Just the opposite, Prof. Elhauge's Reply Report provides his methodology for his conclusions about comparing the actual settlement to a "but-for" settlement. Doc. 2187-5 at 27–31 (¶¶ 39–44). And, as Prof. Elhauge explains, this calculation provides further support for his initial hypothesis that the Nuvigil settlement is a reverse payment settlement. *Id.*

**\*15** In sum, plaintiffs argue that Prof. Elhauge's Reply Report's revised calculation showing that the Nuvigil settlement produced a gain for Mylan doesn't doom his original hypothesis that the Nuvigil settlement constitutes a reverse payment settlement because Prof. Elhauge has supported his conclusion with other reliable data and evidence. Also, they contend, Prof. Elhauge's discussion of the "but-for" settlements doesn't present a new hypothesis in the Reply Report. Instead, Prof. Elhauge includes this analysis to provide further support for his original hypothesis and as rebuttal to Mr. Orszag's criticisms. The court agrees with plaintiffs.

Defendants' attacks on Prof. Elhauge's analysis go to the weight of his opinions but not their admissibility.[5] As Prof. Elhauge explains, nothing about his methodology changed in his Reply Report. Other courts have allowed Prof. Elhauge to use this same methodology to provide expert testimony in pay-for-delay cases. *See, e.g., In re Namenda*

*Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018) (rejecting defendants' arguments that Prof. Elhauge's reverse payment opinions "are speculative, internally inconsistent, and contradicted by the evidence" because those challenges were "appropriate subjects for cross-examination"); *In re Androgel Antitrust Litig. (No. II)*, No. 1:09-MD-2084-TWT, 2018 WL 2984873, at \*17 (N.D. Ga. June 14, 2018) (holding that any "criticism" defendants had for Prof. Elhauge's "methodologies or conclusions are best handled through cross-examination and the production of contrary evidence"); *United Food & Com. Workers Loc. 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1186–88 (N.D. Cal. 2017) (denying motion to exclude Prof. Elhauge's reverse payment opinions after finding that "both the components of his model (estimating parties' bargaining strengths and expectations of patent strength) and the assumptions that go with it (the parties' own pre-settlement forecasts) are consistent with accepted economic theory and well-established principles"). Similar to the conclusions reached in the cited cases, the court here finds Prof. Elhauge's methodology reliable and scientifically sound. Defendants' criticisms of Prof. Elhauge's analysis—specifically, how it concludes that the Nuvigil settlement produced a gain for Mylan yet still finds that the Nuvigil settlement was a reverse payment settlement—are appropriate subjects for cross-examination. But, they don't convince the court that Prof. Elhauge's opinion is so unreliable that the court should exclude it from evidence.

5    Prof. Elhauge further asserts that Mr. Orszag's criticism—that Prof. Elhauge's reverse payment analysis is flawed because it shows that the Nuvigil settlement produced a gain for Mylan—contradicts Mr. Orszag's own scholarship. Doc. 2187-5 at 26–27 (¶¶ 36–37, 39). Defendants say plaintiffs are wrong—that Mr. Orszag's scholarship applies to single patent settlements but not an agreement to transfer value across one patent settlement to another patent settlement, as Prof. Elhauge opines was the purpose of the EpiPen and Nuvigil settlements. These attacks also go to the opinion's weight, but not admissibility. Prof. Elhauge and Mr. Orszag's competing views about the scholarship and whether it applies to the settlements at issue here go to the credibility the trier of fact should assign each expert's opinion. But, it doesn't warrant excluding Prof. Elhauge's opinion.

The court also rejects defendants' arguments that Prof. Elhauge's analysis conflicts with *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013). *Actavis* held that "a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects[.]" *Id.* at 158. And, it instructs courts to apply a rule of reason analysis to alleged unlawful reverse payments because, as the Supreme Court recognized, the anticompetitive effects of a reverse payment depend on "its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification" and "may also vary as among industries." *Id.* at 159. Defendants argue that Prof. Elhauge's analysis of whether a settlement overcompensated or undercompensated a generic entrant creates an impossible standard for a generic entrant to prove that it didn't enter an unlawful reverse payment. According to defendants, Prof. Elhauge's analysis requires the generic entrant to prove that it negotiated the best possible settlement or otherwise face antitrust liability for a reverse payment settlement under *Actavis*. But, defendants argue, "*Actavis* does not stand for the proposition that parties must reach the most procompetitive settlements possible." *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 408–09 (3d Cir. 2015); *see also In re ACTOS Direct Purchaser Antitrust Litig.*, 414 F. Supp. 3d 635, 646 (S.D.N.Y. 2019) (rejecting argument that was "tantamount to asserting that the generics were required to agree to the most pro-competitive settlement under the circumstances" because that "is not the law: *Actavis* requires only that the parties to a patent litigation settlement refrain from unlawfully restricting competition, not that they maximize competition").

 **\*16**  Plaintiffs disagree. They explain that *Actavis* requires a rule of reason analysis involving many factors—*i.e.*, a reverse payment's "size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." *Actavis*, 570 U.S at 159. They argue that Prof. Elhauge's analysis is consistent with *Actavis* because it considers the size of the Nuvigil settlement in relation to costs associated with continued litigation and the Nuvigil settlement's independence from other services —*i.e.*, the EpiPen settlement—for which it might represent payment. Also, they contend, Prof. Elhauge's analysis doesn't require a generic entrant to show that it negotiated the best settlement possible—*i.e.*, securing the earliest possible entry date—because that would require his model to assume the

generic had 100% of the bargaining power. And, plaintiffs say, his model doesn't do that.

The court agrees with this description of Prof. Elhauge's reverse payment analysis. Defendants correctly argue that *Actavis* doesn't require a generic entrant to prove that it entered the most pro-competitive settlement. But, Prof. Elhauge's analysis doesn't require a generic entrant to meet that standard. Instead, Prof. Elhauge's analysis considers the metrics of the Nuvigil and EpiPen settlements using the factors discussed in *Actavis*. And, his analysis opines whether the settlements overcompensated or undercompensated Mylan and Teva. The court finds his analysis consistent with *Actavis*. And, it thus finds no reason to exclude Prof. Elhauge's opinion on this basis.

Also, the court isn't persuaded by defendants' argument that Prof. Elhauge's opinion is unsound because it doesn't identify any record evidence showing that any other settlement in either the EpiPen or Nuvigil settlements even was possible. As plaintiffs correctly argue, *Actavis* places the burden of proof on a plaintiff to prove that a reverse payment produces anticompetitive effects violating the antitrust laws. *Actavis*, 570 U.S. at 159. But, defendants cite no case suggesting that a plaintiff can satisfy that burden by adducing direct evidence that the parties considered and rejected a no-payment settlement with an earlier generic entry date. And, as plaintiffs assert, other courts have recognized that the law doesn't require a plaintiff to come forward with such direct evidence to support a reverse payment claim. *See, e.g.*, *United Food & Com. Workers Loc. 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1190 (N.D. Cal. 2017) ("Because this case is set in a but-for world, it is not surprising that no evidence shows that defendants were contemplating anything other than the actual Settlement."); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2018 WL 563144, at \*21 (D. Mass. Jan. 25, 2018) (recognizing that "it is unreasonable to expect a paper trail signifying rational, lawful business choices" and "[r]equiring such evidence...would be an almost impossible standard to require of Plaintiffs, given that this is a but-for scenario"). As plaintiffs note, evidence that Teva and Mylan considered other settlements certainly might corroborate Prof. Elhauge's analysis. But, the absence of such evidence doesn't render the model unreliable.

In sum, none of defendants' arguments convinces the court that it should exclude Prof. Elhauge's reverse payment analysis as unreliable. To the contrary, the court finds that

Prof. Elhauge has provided a reliable methodology for his analysis. Defendants' attacks go to the credibility of his analysis but don't require the court to exclude his opinion.

*Second*, defendants argue that the court should exclude Prof. Elhauge's reverse payment analysis because, they contend, his Reply Report asserts an entirely new model. Thus, defendants argue, his opinion amounts to improper rebuttal opinion violating Fed. R. Civ. P. 26(a)(2)(D)(ii) because it's not evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party[.]" Fed. R. Civ. P. 26(a)(2)(D)(ii). The court disagrees.

 **\*17**  As discussed above, Prof. Elhauge's Reply Report uses the same methodology as his initial Expert Report. The Reply Report includes an analysis where Prof. Elhauge compared the actual settlements to "but-for" standalone no-payment settlements that he calculated using the bargaining power percentages that Mylan and Teva respectively demonstrated in the actual settlements. As the court previously explained, it rejects defendants' argument that Prof. Elhauge's "but-for" standalone no-payment settlement analysis is an entirely new opinion asserted in the Reply Report. Instead, the court finds, Prof. Elhauge proffers that analysis to rebut Mr. Orszag's criticisms—specifically, his criticism that Prof. Elhauge's analysis doesn't show a reverse payment settlement when his calculations demonstrate that the Nuvigil settlement produced a gain for Mylan. Prof. Elhauge offers this analysis to explain why Mr. Orszag's criticism doesn't render Prof. Elhauge's original analysis unreliable. That is, according to Prof. Elhauge, his analysis still shows that it wasn't rationale from an economic perspective for Mylan to enter the Nuvigil settlement, just as it wasn't rationale for Teva to enter the EpiPen settlement. This is proper rebuttal opinion. *See Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005) ("Rebuttal evidence is evidence which attempts to disprove or contradict the evidence to which it is contrasted." (citation and internal quotation marks omitted)). So, the court won't exclude this opinion. [6]

[6]     Even if the court found Prof. Elhauge's Reply Report constituted improper rebuttal violating Fed. R. Civ. P. 26(a)(2)(D)(ii), the court still could admit the evidence if it finds the failure to disclose "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Tenth Circuit has instructed district courts to consider four factors when excising their "broad discretion" to decide whether a Rule 26(a) violation is justified or harmless. *HCG Platinum,*

*LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1200 (10th Cir. 2017) (citation and internal quotation marks omitted). They are: " '(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.' " *Id.* (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)).

Plaintiffs contend that even if they had failed to disclose Prof. Elhauge's analysis in a timely manner, any delay was harmless because defendants submitted 62 pages of additional expert declarations in response to the Reply Report. Thus, plaintiffs contend, defendants have had ample opportunity to review and respond to Prof. Elhauge's Reply Report. And, defendants have sustained no prejudice. Defendants' Reply never responds to this argument. Plaintiffs have the better of this argument, by far. Even if the court found that Prof. Elhauge's opinion isn't proper rebuttal and wasn't disclosed in a timely manner, the court wouldn't bar its admission under Fed. R. Civ. P. 37 because any untimely disclosure was harmless.

For reasons explained, the court rejects defendants' arguments that Prof. Elhauge's reverse payment analysis uses an unreliable methodology or constitutes improper rebuttal opinion. The court thus declines to exclude Prof. Elhauge's reverse payment analysis.

### 2. The Reverse Payment Analysis's Assumptions

Next, defendants argue that Prof. Elhauge's reverse payment analysis relies on flawed assumptions that render his opinion unreliable, and thus, inadmissible. Defendants present three reasons supporting this argument.

*First*, defendants argue that Prof. Elhauge's model comparing the actual settlements to "but for" settlements is unreliable because it uses a circular methodology and assumes the very conclusion that Prof. Elhauge seeks to prove—*i.e.*, he assumes that the Nuvigil and EpiPen settlements were linked and included a reverse payment, and then he uses each party's bargaining power in the actual settlements to calculate a "but-for" settlement that he concludes proves that the Nuvigil and EpiPen settlements contained a reverse

payment. *See* Doc. 2187-5 at 27, 30–31 (Elhauge Feb. 12, 2020 Expert Reply Report ¶¶ 39, 44). Plaintiffs respond that Prof. Elhauge didn't just assume that the actual settlements were linked. Instead, as discussed above, Prof. Elhauge relied on documented and economic evidence to support his initial assumption—*i.e.*, economic analysis showing that the EpiPen settlement standing alone was unprofitable for Teva, the fact the settlements were signed the same day, documents show that the settlements were negotiated as a package, and Mylan's submission of the two settlements to the FTC as potentially related. *See* Doc. 2138-2 at 43, 45–46, 51–54 (Elhauge Oct. 31, 2019 Expert Report ¶¶ 79, 84–86, 98, 101, 103). And, as discussed above, Prof. Elhauge's Reply Report uses the "but-for" settlement analysis to rebut Mr. Orszag's opinion that Prof. Elhauge's revised calculations fail to show a reverse payment existed when he calculated that the Nuvigil settlement resulted in a gain to Mylan. To the extent defendants seek to challenge the assumptions Prof. Elhauge made in the Reply Report's rebuttal opinion, they can attack those assumptions on cross-examination. But, the court doesn't find that Prof. Elhauge's assumptions render his opinion unreliable.

**\*18** *Second*, defendants assert that Prof. Elhauge incorrectly assumed that the parties would have the same bargaining strength in his hypothetical "but-for" settlements as they had in the actual settlements. Doc. 2187-5 at 27–30 (¶¶ 40, 41). Defendants say this is a flawed assumption because with a linked settlement, both parties would have patents at issue, but with an independent settlement, only one party seeks to enforce a patent. So, defendants contend, it's illogical for Prof. Elhauge to assume that a party would have the same bargaining strength in a case where it was seeking to enforce a patent compared to a case where it had no patent rights.

As with defendants' first argument, these criticisms are fodder for cross-examination. Defendants' attacks against Prof. Elhauge's assumption that the parties' bargaining power in the actual settlement would translate to a "but-for" settlement go to the weight the trier of fact should assign his opinion when making a credibility determination. But, the court doesn't find that this assumption renders Prof. Elhauge's analysis so unreliable that the court must exclude his opinion.

*Finally*, defendants argue that Prof. Elhauge's analysis is flawed because it fails to account for all of the patents involved in the EpiPen settlement. Prof Elhauge's model assumes that only two EpiPen patents were at issue in the settlement. Doc. 2187-5 at 54–57 (¶¶ 87–92). But,

defendants argue, that assumption ignores two additional EpiPen patents that came within the settlement's scope because the settlement gave Teva the license to sell "any and all" EpiPen patents now or in the future. Doc. 2138-9 at 16 (EpiPen Settlement Agreement Ex. A ¶ 8). Defendants argue that this flawed assumption renders Prof. Elhauge's opinion unreliable because he can't opine that the EpiPen settlement was economically irrational for Teva when he failed to consider the value that Teva derived from the two other patents included as part of the EpiPen settlement. But, Prof. Elhauge's Reply Report explains why, he believes, his analysis is sound even though it didn't consider the two additional EpiPen patents. Doc. 2187-5 at 54–57 (¶¶ 87–92). He cites Prof. Torrance's opinion that the two additional patents "added almost nothing that is patentably or technically new" when compared to the two patents that Prof. Elhauge's model considers. *Id.* at 54 (¶ 87). So, Prof. Torrance opines, if the originally litigated patents were invalidated, then the two additional patents would face the same fate. *Id.*; *see also id.* at 55–56 (¶¶ 89–90). Moreover, Prof. Elhauge asserts that even if his failure to consider the two other patents "should change the patent strength estimate from the one that Prof. Torrance estimated," Prof. Elhauge believes his "sensitivity analysis already accounted for any such adjustment in perceived patent strength." *Id.* at 56 (¶ 91). Based on these assertions, Prof. Elhauge provides a rational basis for why he believes it was reasonable for his analysis to consider just the two EpiPen patents. Once again, defendants' attacks against his assumption go to the weight of his opinion, but don't preclude the court from admitting his reverse payment analysis.

In sum, the court rejects defendants' arguments that Prof. Elhauge's reverse payment analysis is inadmissible expert opinion. So, the court denies defendants' request to exclude from the evidence the reverse payment analysis.

### B. Prof. Elhauge's Rebate Analysis

Another theory plaintiffs assert in this case claims that defendants "engaged in an anticompetitive scheme to delay —and ultimately block—[ ]entry of competing branded epinephrine auto-injectors." Doc. 2169 at 17 (Pretrial Order ¶ 3.a.1.c.). Plaintiffs allege that defendants "condition[ed] rebates paid to pharmacy benefit managers ('PBMs') on their agreement to block competing EAIs from formulary placement" as a way "to maintain their monopoly power by preventing their primary branded competitor, Auvi-Q, from gaining a foothold in the market." *Id.* at 17–18. Plaintiffs

also allege that defendants' exclusionary rebating practices forced class members "to pay supra-competitive prices for EpiPens" and prevented class members from "obtain[ing] their preferred device." *Id.* at 18. Plaintiffs contend that defendants' exclusionary scheme "inflated EpiPen's price in at least two ways: (i) directly increasing Mylan's profit-maximizing price by increasing the market share Mylan would attain at any given set of prices; and (ii) depriving Auvi-Q of economies of scale, which in turn further increases Auvi-Q's price and Mylan's price." *Id.*

**\*19** Plaintiffs have retained Prof. Elhauge to provide expert opinion to support their exclusionary rebating theory. Prof. Elhauge offers expert analysis that, he contends, demonstrates "Mylan's exclusionary contracts with PBMs...harmed the entire class by foreclosing a large share of the market to Auvi-Q, which reduced Auvi-Q sales and competition with Mylan and thus reduced Mylan's incentives to lower its prices across the market." Doc. 2138-2 at 6 (Elhauge Oct. 31, 2019 Expert Report ¶ 3). He asserts that "Mylan leveraged its market power by offering rebates to PBMs conditioned on placing Auvi-Q in restrictive formulary positions, successfully reducing Auvi-Q's share amongst customers placed on those formularies." *Id.* Then, he estimates "the share and price impact...caused by this foreclosure[.]" *Id.* He concludes that the foreclosure produced overcharges that the class members paid, and he calculates those overcharges as the damages class members sustained by the Auvi-Q foreclosure. *Id.*

Defendants assert that Prof. Elhauge's rebate analysis is unreliable for three reasons. *First*, defendants argue that the rebate analysis uses a foreclosure regression that's flawed. *Second*, defendants argue that Prof. Elhauge's analysis assumes foreclosure theories that aren't supported by the facts. *Last*, defendants contend, Prof. Elhauge uses a flawed model to translate his foreclosure regression into a price effect on EpiPen. The court addresses each of these three arguments, separately, below.

### 1. The Rebate Analysis's Foreclosure Regression

Prof. Elhauge uses a regression analysis that, he contends, demonstrates how the restrictions imposed on Auvi-Q's formulary placement reduced Auvi-Q's market share which, in turn, allowed Mylan to increase EpiPen prices and forced class members to pay overcharges for the EpiPen. Doc. 2138-2 at 87–92, 109–12 (Elhauge Oct. 31, 2019 Expert Report ¶¶ 164–70 & App. A). A regression analysis "is a

statistical tool used to determine the relationship between an unknown variable (the 'dependent' variable) and one or more 'independent' variables that are thought to impact the dependent variable." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260 (10th Cir. 2014) (citing Saks, Michael J., et al., *Reference Manual on Scientific Evidence* 179, 181 (2d ed. 2000)); *see also* Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence* 303, 305 (3d ed. 2011), https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf (hereinafter "Reference Guide on Multiple Regression") (explaining that regression analysis "involves a variable to be explained— called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable").

"The fundamental goal of regression analysis is to convert an observation of correlation (*e.g.*, apartments in Manhattan cost more than those in Queens) into a statement of causation (apartments in Manhattan cost more than those in Queens *because* they are in Manhattan, not because they are larger or more luxuriously appointed)." *Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 397 (S.D.N.Y. 2014), *aff'd on other grounds*, 638 F. App'x 43 (2d Cir. 2016). But, "[c]ausality cannot be inferred by data analysis alone[.]" *See supra* Reference Guide on Multiple Regression, at 310. Instead, "one must infer that a causal relationship exists on the basis of an underlying causal theory that explains the relationship between the two variables." *Id.*

Here, Prof. Elhauge performs a regression analysis that evaluates the effects of two independent variables—(1) Auvi-Q's formulary coverage, and (2) the average net price of Auvi-Q compared to EpiPen—on Auvi-Q's market share, the "dependent variable." Doc. 2138-2 at 88–90 (¶¶ 165–68). Prof. Elhauge asserts that he included the "price-ratio variable" in his regression because it "explicitly control[s] for the extent to which price differences rather than formulary restrictions affected Auvi-Q's share." *Id.* at 90 (¶ 168). But he "also considered an alternative regression specification" by "dropping the price variable." *Id.* And, after running both models, Prof. Elhauge concludes that each model demonstrates that the formulary restrictions reduced Auvi-Q's market share "regardless of whether one includes the price-ratio variable." *Id.*

**\*20** Defendants assert three reasons why Prof. Elhauge's regression model is unreliable. They say: (1) it rests on flawed assumptions, (2) it is incapable of accurately measuring price,

2021 WL 2577490

and (3) it generates false positives. The next three subsections address these arguments.

#### a. The Regression Analysis's Assumptions

*First*, defendants argue that Prof. Elhauge's regression analysis is unreliable because it rests on the flawed assumption that formulary placement is independent of Auvi-Q and EpiPen's prices. Defendants say this assumption is wrong and contrary to how the pharmaceutical industry works. They cite the Report of their own expert, who opines that PBMs use preferred formulary placement and restrictions to negotiate lower prices on drugs in the form of rebates. Doc. 2163-5 at 24–25 (Willig Dec. 23, 2019 Expert Report ¶¶ 55–57); *see also id.* at 85 (¶ 197) (explaining that "the effects of prices net of rebates and of formulary restrictions are one and the same" and "the reality of the industry is that manufacturers are willing to pay higher rebates for favorable formulary placement due to PBMs' ability to use formulary placement to affect doctors' and patients' product choices and to move volume"). Thus, defendants contend, formulary restrictions are dependent on relative drug prices. And, they argue, Prof. Elhauge's regression model is wrong to attribute Auvi-Q's formulary restrictions as having an effect on its market share when that result likely is the product of Auvi-Q's higher price relative to EpiPen.

Plaintiffs respond that defendants' argument—not Prof. Elhauge's analysis—is what is based on a flawed assumption about the pharmaceutical industry. Plaintiffs assert that defendants' assumption that PBMs extract lower prices from drug manufacturers by negotiating formulary placement is premised on comparing the discounted price to the Wholesale Acquisition Cost ("WAC")—*i.e.*, the gross price. But, plaintiffs contend, this is the wrong comparison. They contend defendants' own expert found EpiPen's net price increased when Auvi-Q was subjected to formulary restrictions. Doc. 2163-5 at 94–95 (Willig Dec. 23, 2019 Expert Report ¶ 221 & Fig. 11). And, Prof. Elhauge opines that the rebate agreements actually "help Mylan anticompetitively increase *net prices*" because they require PBMs to impose the formulary restrictions "in exchange for a share of Mylan's resulting supracompetitive profits." Doc. 2187-5 at 214–215 (Elhauge Feb. 12, 2020 Reply Expert Report ¶ 362) (emphasis added). Prof. Elhauge explains that PBMs don't pass all rebates they receive from drug manufacturers to their customers, and as a result, PBMs

also can profit from restrictions that help the manufacturer anticompetitively increase prices. *Id.*

Also, plaintiffs argue that Prof. Elhauge's analysis shows that Mylan's exclusionary restrictions—not the rebates—drove PBMs to restrict Auvi-Q from preferred formulary placement. He asserts: "the data shows that: (a) plans that were subject to Mylan agreements that conditioned rebates on formulary restrictions were 10 times more likely to restrict Auvi-Q's formulary position; and (b) plans rarely restricted Auvi-Q's formulary position when they were not subject to Mylan's exclusionary agreements." Doc. 2187-5 at 11 (¶ 8). So, Prof. Elhauge concludes, his analysis "clearly shows that Mylan's conditioned rebates were the main driver of plans adopting formulary restrictions." *Id.* at 128 (¶ 218). Defendants respond, asserting that this conclusion doesn't make any sense. Instead, defendants contend, Prof. Elhauge's analysis simply demonstrates that PBMs were more likely to impose the formulary restrictions in exchange for higher rebates. And, defendants argue, this proves defendants' point that formulary position and prices aren't independent variables, but instead formulary positioning is dependent on drug price.

 **\*21** The parties' disagreement boils down to the accuracy of the assumptions that Prof. Elhauge makes about the pharmaceutical industry. Defendants say that Prof. Elhauge's analysis is flawed for failing to recognize that formulary placement drives price, and thus Prof. Elhauge is wrong to consider these two variables independently of one another. But Prof. Elhauge's initial Expert Report and Reply Report adequately explain the assumptions he makes and provides a reasonable rationale for them. Also, Prof. Elhauge provides a reasonable methodology for testing the independence between formulary placement and net price by controlling for the price variable in his model. Doc. 2138-2 at 89 (¶ 167). Defendants certainly can attack these assumptions by cross-examining Prof. Elhauge about his model and presenting their own evidence about the assumptions an expert should make about the pharmaceutical industry when conducting a rebate analysis. But, Prof. Elhauge's assumptions don't render his regression analysis so unreliable that the court should exclude it. The court denies this aspect of defendants' motion.

#### b. The Price Ratio Variable

*Next*, defendants argue the court should exclude Prof. Elhauge's regression analysis as unreliable because it uses

a price ratio variable that doesn't measure price accurately. Defendants assert that the price ratio variable—*i.e.*, the variable that Prof. Elhauge's regression uses to control for price—is flawed because it measures prices at the *PBM level*, but the data he uses to measure Auvi-Q's market share is taken from the *health plan level*.[7] Doc. 2138-2 at 88– 89 (Elhauge Oct. 31, 2019 Expert Report ¶ 166). Defendants explain that prices can vary greatly across health plans, even within the same PBM. So, defendants contend, Prof. Elhauge's use of PBM level pricing data renders his regression unreliable because it can't show whether any reduction in Auvi-Q's market share is the product of the alleged unlawful exclusivity restrictions or whether it's the result of Auvi-Q's higher prices relative to EpiPen for a particular health plan.

[7]  Defendants repeatedly cite to certain pages of Prof. Elhauge's Dec. 5, 2019 deposition transcript to support their argument that his price ratio variable doesn't properly measure price. *See* Doc. 2137-1 at 21 (citing SJ Ex. 137 (Dec. 5, 2019 Elhauge Dep. 228:21–229:24, 252:13–18)); *see also id.* at 23 n.10 (citing SJ Ex. 137 (Dec. 5, 2019 Elhauge Dep. 25:6–8)). But the summary judgment exhibit they cite doesn't contain those pages. *See* Doc. 2146-4 (Ex. 137) (omitting pages 25, 228–29, & 252). The court has reviewed other deposition transcripts for Prof. Elhauge contained in the record and can't find the cited pages in those exhibits either.

Defendants rely on their expert to explain why using price data at the PBM level renders Prof. Elhauge's model flawed. Defendants' expert asserts that Prof. Elhauge's use of the PBM level pricing data introduces a "measurement error in the price variable[,]" which produces a biased model. Doc. 2163-5 at 86 (Willig Dec. 23, 2019 Expert Report ¶ 200); *see also* Doc. 2138-8 at 10 (Willig Decl. ¶ 20) (explaining that Prof. Elhauge's use of "the same average PBM-level price for each of the hundreds of plans typically sponsored by a single PBM....introduces significant measurement error in the price variable and obscures the correlation between price and Auvi-Q share for which Professor Elhauge claims to be controlling"). And, defendants' expert provides an example how Prof. Elhauge's model can fail to observe the variation in pricing and formulary position between two plans within one PBM because Prof. Elhauge uses a PBM-wide average of the plans' prices to analyze the data. Doc. 2163-5 at 86– 87 (Willig Dec. 23, 2019 Expert Report ¶ 201); *see also* Doc. 2138-8 at 10 (Willig Decl. ¶ 20).

Prof. Elhauge responds to this criticism, explaining that no data exists that would allow him to calculate health plan level pricing. Doc. 2187-5 at 118 (Elhauge Feb. 12, 2020 Expert Reply Report ¶ 196). Nevertheless, Prof. Elhauge used the data available to calculate estimated health plan level prices. *Id.* at 118–19 (¶¶ 197–198). Then, he re-ran his foreclosure regression, and he concluded that "using estimated plan-level prices does not significantly change the results of the share impact regression" because "the regression still indicates that the formulary restrictions reduced Auvi-Q's share by a statistically significant and practically significant amount." *Id.* at 119–20 (¶¶ 199–200 & Table 105). So, Prof. Elhauge asserts, his conclusion— *i.e.*, using the plan level data in the regression doesn't change the results of his initial model— shows that his use of PBM level prices accurately controls for price.

**\*22**  Defendants argue that the Reply Report's health plan level price regression is not proper rebuttal opinion, but instead qualifies as new expert opinion that plaintiffs failed to disclose timely. Defendants say that Prof. Elhauge could have performed his regression in his initial Expert Report. But, he didn't. So, they argue, the court should exclude the Reply Report's new regression as untimely. The court disagrees. As plaintiffs correctly argue, Prof. Elhauge offered his plan level price regression in response to criticisms by defendants' experts about his initial Expert Report's regression model. Thus, his health plan level regression rebuts Mylan's experts' opinions on the same subject matter. Also, according to plaintiffs, Prof. Elhauge couldn't have performed the plan level regression earlier because it uses more comprehensive data that Prof. Elhauge didn't have access to until defendants' expert produced it on December 2, 2019. *See* Doc. 2187-5 at 83, 105 (¶¶ 134, 169). So, the court finds, the plan level price regression is proper rebuttal testimony.

Also, defendants argue that Prof. Elhauge's plan level regression is unreliable because his estimated plan level prices conflict with undisputed evidence showing that rebates fluctuate over PBMs across time and different health plans received different levels of rebates, even when Auvi-Q wasn't restricted. But, Prof. Elhauge provided a reasonable basis for his estimation. Doc. 2187-5 at 118–20 (¶¶ 196–200 & Table 105). Defendants' attacks against his assumption go to the weight of Prof. Elhauge's opinion—specifically, his estimation of plan level prices. Defendants are free to challenge this opinion using "[v]igorous cross-examination" or through the "presentation of contrary evidence" because, as the Supreme Court has instructed, that's what remains

"the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also BC Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 704 (10th Cir. 2012) (recognizing that omissions in the data the expert used "made his testimony vulnerable" but still "had sufficient evidentiary support to pass the admissibility threshold" and opposing party has the opportunity to "exploit[ ] the vulnerability [of the expert opinion] by presenting evidence contrary to [the expert's] assumptions and through cross examination"). But, the court refuses to exclude Prof. Elhauge's regression analysis based on the price ratio variable that it uses.

### c. False Positives

*Finally*, defendants argue that Prof. Elhauge's regression analysis is unreliable because it generates false positives. Defendants' expert criticizes Prof. Elhauge's regression model because, he contends, even when the regression is limited to plans where Mylan *didn't* offer rebates conditioned on restrictive formulary placement, the regression still calculates an effect on Auvi-Q market share. Doc. 2138-5 at 2 (Suppl. to Dec. 23, 2019 Willig Expert Report ¶¶ 1–4). According to defendants' expert, he performed an analysis using Prof. Elhauge's regression and found no "statistical differe[nce]" between the effects of Mylan's rebate offers conditioned on restrictive formulary placements and Mylan's rebates offers that had no conditions. *Id.* (¶ 4). Thus, defendants argue, the court must exclude the regression analysis because it can't distinguish between lawful conduct and the allegedly unlawful conduct at issue in this lawsuit. *See In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 254 (D.C. Cir. 2013) (deciding the weight the court should assign to an expert opinion on class certification when a damages model had a "propensity toward false positives" so it provided "no way of knowing" whether "the overcharges the damages model calculates for class members is any more accurate than the obviously false estimates it produces" for others); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 487 (S.D.N.Y. 2018) (excluding expert regression model on class certification because it couldn't demonstrate that the challenged conduct—as opposed to other conduct—produced the measured effect).

 **\*23** Prof. Elhauge responds to this criticism, denying that his regression generates false positives. Doc. 2187-5 at 127–28 (¶¶ 214–19). First, he asserts that it was "incredibly rare"

for a plan to restrict Auvi-Q in the absence of a conditional rebate. *Id.* at 126 (¶ 213) (finding that only 3% of plans who were offered no conditional rebates restricted Auvi-Q's formulary position). Next, he adjusted his regression analysis to adopt defendants' expert's opinion of which plans to include in the analysis, and, he contends, his regression still finds substantial market foreclosure for Auvi-Q. *Id.* at 128 ( ¶ 219) ("Consequently, *none* of the overcharges that I calculate below stem from formulary restrictions on Auvi-Q that were imposed by the plan-months that Prof. Willig claims were not offered rebates conditioned on restricting Auvi-Q.").

Defendants dispute Prof. Elhauge's claim that he adjusted his analysis in a way that shows his regression model is reliable. Instead, they argue, defendants' expert only identified examples of plans that did and didn't include formulary restrictions based on rebates. But he didn't do a comprehensive analysis of all health plans. And so, they say, Prof. Elhauge's revised analysis still can't show that the allegedly unlawful conduct (as opposed to lawful conduct) had an effect on Auvi-Q's market share.

Once again, these challenges may supply fodder cross-examination. But Prof. Elhauge has provided a reliable methodology for his regression analysis, and he sufficiently explains why he believes it doesn't generate false positives. The criticisms that defendants' expert makes about false positives go to the weight that the trier of fact should assign to Prof. Elhauge's regression analysis. But these challenges don't render his model so unreliable that the court must exclude it under Fed. R. Evid. 702.

### 2. The Rebate Analysis's Foreclosure Theories

*Next*, defendants argue that Prof. Elhauge's rebate analysis is flawed because it never identifies any theory explaining why Mylan's rebates prevented Auvi-Q from competing against EpiPen. As defendants correctly assert, a regression analysis must identify "an underlying causal theory that explains the relationship between the two variables," and it must "look for empirical evidence that there is a casual relationship." *See supra* Reference Guide on Multiple Regression, at 310. But, plaintiffs say, Prof. Elhauge's initial Expert Report satisfies this requirement.

Indeed, Prof. Elhauge's Expert Report asserts that Mylan's rebate offers conditioned on exclusivity allowed Mylan to "leverage its existing market share to exclude Auvi-Q." Doc.

2138-2 at 84 (Elhauge Oct. 31, 2019 Expert Report ¶ 157). Prof. Elhauge relies on internal Sanofi and Mylan documents to support this conclusion. *See id.* (citing Sanofi document recognizing that "Epi-Pen's high market share coupled with a high discount creates an obstacle that cannot be overcome via discounting" (internal quotation marks omitted)); *see also id.* at 85 (¶ 158) (citing Mylan document that noted "how hard it would be to switch away from EpiPen" and that "plans are primarily concerned with reducing overall net spend," which Prof. Elhauge opines "provides an advantage to the incumbent with the higher market share when engaging in a conditional rebating strategy, since the same rebate reduces overall net spend by a greater amount the higher the market share" (internal quotation marks and alteration omitted)). Then, Prof. Elhauge's Expert Report asserts the regression analysis "shows that these restrictive formulary conditions had the cumulative effect of anticompetitively inflating Mylan's share of the EAI market by a significant amount." *Id.* at 85 (¶ 158). The court agrees that Prof. Elhauge's initial Expert Report sets out an underlying casual theory that, he contends, supports his rebate analysis.

**\*24** But also, defendants assert that Prof. Elhauge's Reply Report improperly asserts two new theories to support his regression analysis: (1) a "collective action" problem among PBMs, Doc. 2187-5 at 229–34 (¶¶ 390–96); and (2) Mylan's bundling of contestable and incontestable demand, Doc. 2187-5 at 234–55 (¶¶ 397–431). Defendants assert that neither theory finds support in the facts and both theories lack a reliable methodology.

### a. Theory About a "Collective Action" Problem

Prof. Elhauge's Reply Report asserts that "the predominant method of exclusion was not Mylan's price, but rather the problems of self-interest, externalities, or *collective action* that drive PBMs and plans to accept these restrictions despite their anticompetitive harm." Doc. 2187-5 at 229 (¶ 390) (emphasis added). Defendants assert two reasons that the court should exclude Prof. Elhauge's "collective action" opinion: (1) they say it was not disclosed timely, and (2) it lacks factual and analytical support.

*First*, defendants contend that Prof. Elhauge never mentioned a "collective action" problem until he submitted his Reply Report. They say Prof. Elhauge earlier testified about a "collective action" problem—before he disclosed his initial Expert Report. Doc. 2140-1 at 4–5 (Elhauge Feb. 6, 2018 Dep.

233:20–234:15). Thus, defendants contend, Prof. Elhauge knew about this theory before disclosing his initial Expert Report. And so, they argue, he should have included the "collective action" opinion in his initial Expert Report. Because he didn't, defendants assert the "collective action" opinion is improper rebuttal opinion that the court should exclude. Plaintiffs respond that Prof. Elhauge's "collective action" opinion is proper rebuttal because it responds directly to defendants' expert's assertions that: (1) "PBMs have increased their use of formulary exclusions over time to 'drive higher rebates from manufacturers and lower prices for payors[;]' " Doc. 2187-5 at 205 (¶ 341) (quoting Doc. 2187-10 at 26 (Willig Dec. 23, 2019 Expert Report ¶ V.B.)); and (2) " 'price is the "clearly predominant" means of exclusion[;]' " Doc. 2187-5 at 228 (¶ 386) (quoting Doc. 2187-10 at 39– 40 (¶ 89)). Also, Prof. Elhauge asserts, the reason he never included his "collective action" opinion in his initial Expert Report is because, before he submitted his initial Report, "the total discussion related to collective action problems constituted 0% of the defense expert reports, 0% of [his] class reports, and 0.2% of [his] class deposition[,]" so he had no "reason to believe that explaining the well-known collective action problem would be a key issue in the litigation when [he] wrote [his] initial merits report." Doc. 2187-7 at 30 (Elhauge Aug. 16, 2020 Decl. ¶ 52) (internal quotation marks and alternations omitted).

Plaintiffs have the better of the arguments. Prof. Elhauge adequately has explained why he didn't include the "collective action" opinion in his initial Expert Report. And, the court finds, he properly asserts it as rebuttal opinion in response to defendants' expert's criticisms levied at his initial Expert Report. So, the court won't exclude the opinion as improper rebuttal. [8]

[8]   Plaintiffs also contend that even if the opinion constitutes improper rebuttal, defendants have sustained no prejudice from the timing of the opinion's disclosure. They assert that defendants' experts have had five months since the disclosure to review Prof. Elhauge's Reply Report and submit three declarations spanning 60 pages that respond to Reply Report. The court agrees. And, this conclusion— that defendants have sustained no prejudice—nullifies any request to exclude based on improper rebuttal status, even if that argument had merit.

**\*25** *Second*, defendants argue that the court should exclude Prof. Elhauge's "collective action" theory because it isn't supported by the facts or a reliable methodology. Defendants assert that Prof. Elhauge premises his "collective action" opinion on an assertion that PBMs' acceptance of rebate offers is collectively irrational because it inflates market-wide prices. [9] But, defendants contend, a collective action problem like that one can exist only if Auvi-Q's low sales prevent its manufacturer—Sanofi—from achieving economies of scale. Plaintiffs disagree that Prof. Elhauge opines that his "collective action" theory relies on depriving a rival of economies of scale. Instead, they argue, Prof. Elhauge opines that depriving a rival of economies of scale is just one way to inflate market prices, but it's not the only way. As plaintiffs correctly assert, Prof. Elhauge's initial Expert Report opined that foreclosure can inflate EpiPen prices market-wide by "directly increasing Mylan's profit-maximizing price by increasing the market share Mylan would attain at any given set of prices[.]" Doc. 2138-2 at 85 (¶ 159). And, plaintiffs contend, Prof. Elhauge confirmed the foreclosure did inflate EpiPen prices market-wide (even though he assumed Sanofi wasn't deprived of economies of scale) by using his overcharge model to confirm the price increases. *Id.* at 85–86 (¶ 160).

[9] Defendants again cite Prof. Elhauge's deposition transcript to support the request to exclude this opinion. But the court can't find these portions of the transcript in the record. *Compare* Doc. 2137-1 at 26–27 (citing SJ Ex. 137 (Dec. 5, 2019 Elhauge Dep. 220:11–221:4, 238:14–239:4)), *with* Doc. 2146-4 (Ex. 137) (omitting pages 220, 221, 238 & 239).

Yet again, the parties' disagreements about facts and methodology used to support Prof. Elhauge's "collective action" opinion don't warrant excluding the opinion. Instead, defendants' challenges to this opinion go to the weight a trier of fact should assign the opinion when deciding whether Prof. Elhauge's opinion is credible. But, they don't convince the court that Prof. Elhauge's opinion isn't reliable. So, the court won't exclude this opinion.

### b. Incontestable Demand Theory

Prof. Elhauge's Reply Report also asserts an incontestable demand theory. Doc. 2187-5 at 242–45 (¶¶ 410–14). He explains that incontestable demand is "the share that EpiPen

earns at plans that restrict the formulary coverage of neither the EpiPen nor Auvi-Q." *Id.* at 242 (¶ 410). And, he calculates that "the incontestable share of the market is high (at least 60%) under either [his or defendants' expert's] definition of the incontestable share." *Id.* Defendants argue that the court should exclude the opinion for two reasons: (1) it lacks a scientific methodology, and (2) Prof. Elhauge performed his calculations incorrectly. [10]

[10] Defendants again argue that this opinion is improper rebuttal because Prof. Elhauge testified about the theory before submitting his Reply Report. Again, defendants cite deposition transcript pages that the court can't find in the record. Doc. 2137-1 at 27. Plaintiffs respond that Prof. Elhauge's incontestable demand opinion is proper rebuttal because Prof. Elhauge offers it in direct response to defendants' expert's criticisms on the same subject matter. And, they argue, Prof. Elhauge wasn't able to perform his calculations any earlier because defendants' expert didn't produce the underlying data until a month after Prof. Elhauge filed his initial Expert Report. Based on this record, the court agrees with plaintiffs. Prof. Elhauge's incontestable demand opinion is proper rebuttal opinion. So, the court won't exclude it as untimely. Defendants' Reply also argues that plaintiffs' Opposition asserts a new theory that the court should exclude. Doc. 2228-1 at 16. The theory defendants reference—PBMs' alleged "self-interest"— was a theory Prof. Elhauge offered in his Reply Report in response to defendants' experts criticisms. So, it's proper expert rebuttal opinion. And the court refuses to exclude this opinion as unreliable when defendants assert this argument for the first time in their Reply. *See Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003) (holding that an argument raised for the first time in a reply brief is waived (citation omitted)); *see also Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-1094-JTM-TJJ, 2018 WL 489100, at \*1 (D. Kan. Jan. 19, 2018) ("[T]he Court will not consider arguments raised for the first time in a reply brief, particularly where the arguments could have been made in the first instance.").

**\*26** *First*, defendants assert that Prof. Elhauge's definition of incontestable demand is flawed because it measures sales

among plans that didn't restrict either EpiPen or Auvi-Q. So, defendants argue, his model fails to capture the volume of sales that can't be contested. But, Prof. Elhauge provided a reason why his definition more accurately measures incontestable demand compared to the way defendants' expert defines the term. Doc. 2187-5 at 242 (¶ 410). Plaintiffs also cite economic literature that supports Prof. Elhauge's incontestable demand definition. Doc. 2187-1 at 26 n.99. The court thus finds that Prof. Elhauge has provided a reliable basis for his incontestable demand definition.

Also, defendants argue that Prof. Elhauge's analysis fails to consider case-specific facts that make his model improper. But, plaintiffs respond that Prof. Elhauge's analysis relies on case-specific facts including: (1) how much contestable demand exists in the market, and (2) the difference in the rebate depending on whether the customer agrees to the formulary restrictions. So, contrary to defendants' assertions, Prof. Elhauge's incontestable demand analysis does take into account certain case-specific facts.

Based on the reliable basis that Prof. Elhauge's Reply Report provides for his incontestable demand opinion, the court finds that this opinion qualifies as admissible expert opinion. Defendants' attacks on how Prof. Elhauge measures incontestable demand and whether his model properly considers case-specific facts go to the weight of his opinion. But, those challenges don't require the court to exclude his opinion.

*Second*, plaintiffs argue that Prof. Elhauge's calculation using defendants' expert's definition of incontestable share is incorrect. Defendants' expert asserts that the calculation purports to measure sales among plans that excluded EpiPen from their formularies, but a review of the underlying data shows that Prof. Elhauge included data for plans where EpiPen wasn't excluded. *See* Doc. 2138-8 at 26 (Willig Decl. ¶ 57). Plaintiffs disagree. They say that Prof. Elhauge calculated incontestable demand consistent with defendants' expert's definition of incontestable share from his initial Expert Report. But, in defendants' expert's later-submitted declaration, he criticizes Prof. Elhauge for including plan data where EpiPen was excluded but consumers nevertheless paid less than full cost for the EpiPen because of lower co-pays. *Id.* at 24 (¶ 53) (explaining that "the relevant measure of non-contestable demand is the share that EpiPen would earn when it is off formulary and consumers had to pay the full cost out of pocket" and recognizing that "Professor Elhauge adopts this

definition, but a basic check of his analysis demonstrates that he has failed to isolate plans that meet this definition").

The disagreement about which data Prof. Elhauge should and shouldn't have included in his analysis of defendants' expert's definition of incontestable demand goes to the weight the finder of fact should assign to Prof. Elhauge's opinion. Defendants can challenge the credibility of his opinion by cross-examining or presenting their own expert's criticisms of the analysis. But, because Prof. Elhauge has provided a reliable explanation for how he calculated incontestable demand, the court finds no reason to exclude his opinion on this topic.

### 3. The Rebate Analysis's Estimation of EpiPen Price

*Finally*, defendants argue that the court should exclude Prof. Elhauge's rebate analysis because it can't provide a reliable estimate of EpiPen price. Prof. Elhauge opines that Mylan's use of exclusionary rebating practices produced foreclosure in the market which, in turn, "directly increased Mylan's profit-maximizing price." Doc. 2138-2 at 85 (Elhauge Oct. 31, 2019 Expert Report ¶ 160). Prof. Elhauge's Expert Reply Report responds to criticisms that defendants' experts levied against his "foreclosure overcharge" analysis. Doc. 2187-5 at 129–66 (Elhauge Feb. 12, 2020 Reply Expert Report Part VIII & ¶¶ 221–286). In doing so, the Reply Report presents another model showing how Prof. Elhauge's analysis changes if he adjusts his calculations in a way addressing the critiques asserted by defendants' experts. *Id.* at 130 (¶ 223). Defendants assert that the Reply Report's analysis is unreliable because: (1) it relies on flawed data, and (2) it is inconsistent with economic principles. [11]

[11]    Again, defendants also argue that this opinion constitutes improper rebuttal opinion because it appears for the first time in Prof. Elhauge's Reply Report. The court rejects this argument for the same reasons it has rejected it before. The Reply Report's analysis responds directly to defendants' experts' criticisms of the model provided in Prof. Elhauge's initial Expert Report. Because Prof. Elhauge offers the Reply Report's opinion in response to defendants' experts' criticism on the same subject matter, it is proper expert rebuttal opinion.

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 150 of 292

2021 WL 2577490

**\*27** *First*, defendants argue that Prof. Elhauge uses flawed data to measure what he calls the "cross-price responsiveness of demand." Doc. 2187-5 at 155 (¶ 266). He explains this phenomenon occurs when "higher prices caus[e] patients to switch from EpiPen to Auvi-Q[.]" *Id.* And, his model purports to measure the "cross-price responsiveness of demand" in both the actual and "but-for" worlds. To measure the "cross-price responsiveness of demand" in the actual world, Prof. Elhauge uses his foreclosure regression, "which includes a relative price control variable that directly measures how much customers substitute between Auvi-Q and EpiPen in response to relative price changes." *Id.* (¶ 267). Defendants assert—for the same reasons previously discussed—that Prof. Elhauge's regression model is inherently unreliable. And so, they argue, the court must exclude his analysis of "cross-price responsiveness of demand" relying on the same regression model. But, the court has rejected each of defendants' arguments asserting that Prof. Elhauge's regression model is unreliable. So, in turn, the court declines to exclude his analysis of "cross-price responsiveness of demand" in the actual world simply because it relies on his regression analysis.

To measure the "cross-price responsiveness of demand" in the "but-for" world, Prof. Elhauge opines that "the best available estimate of the *but-for* cross-price responsiveness is the Analysis Group pricing study commissioned by Sanofi in 2012." *Id.* at 156 (¶ 268). And, based on that study, Prof. Elhauge opines that, "but-for" the conditional rebates that Mylan offered, "EpiPen would lose 1.9 percentage points of market share for every $1 increase in EpiPen's relative price[.]" *Id.* (¶ 269). Defendants argue that Prof. Elhauge was wrong to rely on the Analysis Group pricing study. Relying on their own expert's opinion, defendants argue that the Analysis Group pricing study was "a preference share study, intended to analyze participants' responses under the conditions of the specific study" but doesn't qualify as a representative sample of patients who one could use to generalize to the wider population. Doc. 2138-6 at 10– 11 (Johnson July 14, 2020 Decl. ¶¶ 13–14). To reach his conclusion about the characteristics of the pricing study, defendants' expert relies on deposition testimony of former Analysis Group employee, Justin Works. *Id.* at 10–11 nn. 20–25. Plaintiffs argue that Mr. Works never testified about the pricing chart on which Prof. Elhauge's analysis relies. Doc. 2187-1 at 28 (citing Doc. 2187-17 at 3, 5 (Works Dep. 178:3–4, 195:2, 195:22–196:8)). Defendants respond that Mr. Works authored the pricing chart and testified that the documents referred to preference share, not market share. Doc. 2228-1 at 17. But the deposition

testimony that defendants cite isn't included in the exhibit they reference for support. And, defendants otherwise haven't supplied the court with the cited testimony. *See id.* (citing page 188 of plaintiffs exhibit, *i.e.*, the Works deposition, but that page isn't included in the referenced exhibit, *see generally* Doc. 2187-17 (Works Dep.)). So, the court can't resolve this dispute about reliability of the pricing study based on the record presented with the motion.

And it wouldn't matter if defendants provided the material. The sufficiency of the data supplied by the pricing study goes to the weight, not admissibility, of Prof. Elhauge's opinion. *See, e.g.*, *Auto. Ins. Co. of Hartford v. Electrolux Home Prods., Inc.*, No. 10-CV-0011(CS), 2012 WL 6629238, at \*2 (S.D.N.Y. Dec. 20, 2012) ("Potential sample bias is a subject for cross-examination, and goes to the weight, not the admissibility, of the expert testimony."); *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005) ("The court should exclude the survey when the sample of respondents clearly does not represent the universe it is intended to reflect, but issues concerning the sufficiency of the sample universe bear[ ] on the weight and not the admissibility of the survey." (citation omitted)); *Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247, 1253 (S.D. Ohio 1996) ("Problems in selection of a sample bear on the weight of the testimony, not its admissibility." (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1352–52 n.11 (6th Cir. 1994))). So, the court declines to exclude Prof. Elhauge's analysis of "cross-price responsiveness of demand" simply because it relies on the Analysis Group pricing study.

**\*28** *Second*, defendants argue that Prof. Elhauge's analysis is unreliable because its measurement of "market responsiveness of demand" is flawed. Prof. Elhauge's Reply Report explains that "market responsiveness of demand" occurs when "higher prices caus[e] patients to drop out of the market altogether[.]" Doc. 2187-5 at 155 (¶ 266). Defendants assert that Prof. Elhauge's measurement of this component is unreliable because he uses price and marginal cost data for EpiPen products from 2012—when Auvi-Q wasn't even on the market yet. Defendants' expert says Prof. Elhauge's use of the 2012 data renders his analysis unscientific. Doc. 2138-6 at 12–13 (Johnson July 14, 2020 Decl. ¶ 18).

Also, defendants argue Prof. Elhauge's analysis is flawed because he uses an estimate that assumes "EpiPen was the only EAI in the market." Doc. 2187-5 at 134 (¶ 227). Defendants' expert asserts that this approach conflicts

with Prof Elhauge's model which purports to measure the simultaneous effects of "market responsiveness of demand"—*i.e.*, consumers can either (1) substitute EpiPen with Auvi-Q, or (2) leave the market altogether. Doc. 2138-6 at 12 (¶ 16). But, defendants' expert says Prof. Elhauge's underlying data presents a conflict because, with no competition, the only effect of a price increase is that consumers will leave the market. So, defendants contend, Prof. Elhauge's analysis fails to apply economic principles and methods reliably to the facts of this case.

Plaintiffs respond that Prof. Elhauge's analysis properly measures the overall market responsiveness of demand based on a 100% monopolist's price and cost. Doc. 2138-2 at 95 (¶ 175). They say this methodology is proper because (1) one can infer a firm's own responsiveness of demand from its price and costs; and (2) a 100% monopolist's own responsiveness of demand equates to the market's overall responsiveness of demand. *Id.* Plaintiffs assert that the analysis doesn't change when introducing competition from Auvi-Q. Instead, they explain, Auvi-Q competition changes the cross-price responsiveness between EpiPen and Auvi-Q—showing how many customers will substitute Auvi-Q for EpiPen when EpiPen's relative prices increase by $1. *Id.* at 94 (¶ 173); Doc. 2187-7 at 39 (Elhauge Aug. 16, 2020 Decl. ¶¶ 72–73). Prof. Elhauge says that he correctly used this measurement of the EAI market's overall responsiveness of demand to calculate Auvi-Q's firm-specific market responsiveness of demand. Doc. 2187-5 at 148–50 (¶¶ 249–56). Thus, plaintiffs assert, his analysis is reliable and proper expert opinion.

Defendants reply that plaintiffs' justification for Prof. Elhauge's analysis is flawed because it confirms that the analysis fails to account for the differences between consumer demand for Auvi-Q versus EpiPen. But, the court finds, this criticism goes to the weight of Prof. Elhauge's "market responsiveness of demand" analysis. Prof. Elhauge has provided a reliable basis for how he performed his analysis. Also, he supplies a reasonable explanation why the data he used to perform the analysis makes his calculation reliable. Any challenges to his methodology go to the credibility determination made by the trier of fact. They provide no reason to exclude the opinion.

In sum, none of defendants' arguments persuade the court that Prof. Elhauge's expert opinions are so unreliable that the court must exclude them as inadmissible expert opinion violating Fed. R. Civ. P. 702. The court thus denies defendants' Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Einer Elhauge.

## V. Defendants' Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Professor Meredith Rosenthal (Doc. 2134)

**\*29** Next, defendants ask the court to exclude Prof. Meredith Rosenthal's expert opinion. Plaintiffs have retained Prof. Rosenthal to provide expert testimony about plaintiffs' damages. Defendants argue the court should exclude five aspects of Prof. Rosenthal's expert opinion. Defendants assert that these five portions of Prof. Rosenthal's testimony are inadmissible under Fed. R. Evid. 702 because they fail to rely on sufficient facts and data to support the opinion. Alternatively, defendants argue that the court should exclude certain parts of Prof. Rosenthal's testimony under Fed. R. Evid. 403 because the opinions pose a danger of misleading the jury that outweighs the probative value of the evidence. [12] The five aspects of Prof. Rosenthal's testimony defendants seek to exclude are: (1) her "alternative RICO" damages theory; (2) her "loss of choice" opinion; (3) her 2-Pak event study; (4) her probability analysis; and (5) her 2-Pak and generic delay methodologies, to the extent the court permits all of plaintiffs' theories of RICO liability to proceed, because, defendants argue, precluding these opinions will avoid awarding duplicative damages. The court addresses each opinion, separately, below.

[12]    Defendants' motion never asserts that Prof. Rosenthal isn't qualified to provide the expert testimony she offers. At class certification, the court found that Prof. Rosenthal's education, experience, and credentials qualify her to provide expert testimony. Doc. 2017-1 at 21–22 n.7. For the same reasons, the court finds that Prof. Rosenthal remains qualified to provide the expert opinions offered at this stage of the case.

### A. "Alternative RICO" Damages Methodology

Prof. Rosenthal presents an "alternative RICO" damages methodology that purports to measure "the cumulative effect of all of [d]efendants' misconduct[.]" Doc. 2164-4 at 48 (Rosenthal Oct. 31, 2019 Expert Report ¶ 114). Defendants argue that the court should exclude Prof. Rosenthal's "alternative RICO" damages model for two reasons: (1) Prof. Rosenthal fails to apply her theory reliably to the facts of

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 152 of 292

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

the case, and (2) she fails to "tie each theory" of injury "to a calculation of damages[,]" so her model violates the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (citation and internal quotation marks omitted).

As the court explains in its Order ruling defendants' summary judgment motion, the uncontroverted summary judgment facts fail to present a triable issue whether plaintiffs can prevail on their RICO claims. So, the court grants summary judgment as a matter of law against the RICO claims. For this reason, it need not address defendants' argument that the court should exclude Prof. Rosenthal's "alternative RICO" damages theory because that request now is moot. Thus, the court denies as moot this portion of defendants' motion seeking to exclude Prof. Rosenthal's expert opinions. [13]

[13] The court recognizes that defendants' motion seeks to exclude other of Prof. Rosenthal's opinions that pertain to the RICO claims. The court addresses the admissibility of those other opinions because plaintiffs offer Prof. Rosenthal's analysis as summary judgment evidence supporting a triable issue on the RICO claims. So, the court must decide whether it can consider Prof. Rosenthal's opinions in the corresponding Order ruling the summary judgment motion.

**B. Loss of Choice Opinion**

*Next*, defendants ask the court to exclude Prof. Rosenthal's "loss of choice" opinion. Prof. Rosenthal's Expert Report offers an opinion about "common impact." Doc. 2164-4 at 52 (Rosenthal Oct. 31, 2019 Expert Report ¶¶ 118–19). It opines that each class member sustained classwide injury from defendants' alleged misconduct. *Id.* (¶ 118). And, it opines that each of the allegations of misconduct "deprived class members of choice[.]" *Id.* (¶ 119). She describes this "loss of choice" as "[l]osing the choice to purchase a single pen, a generic EpiPen, or another brand[.]" *Id.*

Defendants assert that the court should exclude this opinion under Fed. R. Evid. 702 because the facts of the case contradict her opinion. Also, defendants argue the court should exclude the opinion under Fed. R. Evid. 403 because it poses a risk of misleading the jury and that risk outweighs the opinion's probative value.

**\*30** *First*, defendants assert that Prof. Rosenthal's "loss of choice" opinion is irrelevant because the court hasn't certified a RICO class based on the theory that class members sustained damages from a "loss of choice." Also, defendants argue that Prof. Rosenthal never calculated any damages, nor performed any economic analysis, nor developed any reliable methodology to support her "loss of choice" opinion. So, defendants assert, the court should exclude the opinion because it's not relevant to the other damages theories that she proffers in her Expert Reports. Plaintiffs respond that Prof. Rosenthal's "loss of choice" opinion isn't a measure of damages. Instead, they explain, Prof. Rosenthal offers this opinion to show that defendants' alleged misconduct had a " 'classwide' impact" because their actions deprived class members the opportunity to choose to purchase single EpiPens or a generic EAI device. Doc. 2183-1 at 20.

Also, defendants argue that the facts of the case don't support Prof. Rosenthal's opinion. For support, defendants cite evidence purporting to show that some plaintiffs preferred 2-Paks and branded devices, and thus, these class members never sustained a "loss of choice." Plaintiffs respond that this evidence is cherry-picked. And, they provide their own citations to evidence purporting to show that just because some class members once purchased 2-Paks or had brand loyalty to EpiPen doesn't mean that they weren't deprived of a "loss of choice." *See* Doc. 2183-4 at 20–21 (Rosenthal Feb. 7, 2020 Expert Rebuttal Report ¶ 39) (recognizing that defendants' expert cites "to the testimony of a named plaintiff, Ms. Sumner, where she states that she prefers to keep 2 pens on hand" but this plaintiff also "described how she sought out a single EpiPen and was told at the pharmacy that she could only purchase a 2-Pak"). Prof. Rosenthal explains that her cited evidence demonstrates "the point of 'option value' " and "supports [her] assertion that consumers derive value from having more options." *Id.*; *see also* Doc. 2164-4 at 52 (¶ 119) (describing the "concept of 'option value'—the value that non-users place on the availability of a good—has long been recognized by economists as an important economic phenomenon").

The parties' disagreements about Prof. Rosenthal's "loss of choice" opinion go to the weight of the testimony. And, they don't require the court to exclude it. Prof. Rosenthal has provided a reliable basis for her opinion. She explains that the opinion is not a damages theory. So, that's why she didn't calculate any damages corresponding to the purported loss of choice. Thus, defendants' criticisms on that point ring hollow. As already discussed, Prof. Rosenthal offers this

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 153 of 292

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

opinion only to show that defendants' alleged misconduct had a classwide impact because it deprived class members of certain choices when purchasing EAI devices. She adequately explains how she derives her opinion, she identifies the facts from this case that, she contends, support her opinion, and she cites academic literature that she relies on as support for her opinion. *See* Doc. 2183-4 at 20–22 (¶¶ 39–44). Defendants' expert disagrees with Prof. Rosenthal's reading of the academic literature and says it doesn't support her opinion. But, like defendants' other challenges, that argument goes to the weight of Prof. Rosenthal's opinion. Because Prof. Rosenthal has provided a reliable basis for her "loss of choice" opinion, the court declines to exclude this opinion under Fed. R. Evid. 702.

*Second*, defendants argue that the court should exclude the "loss of choice" opinion under Fed. R. Evid. 403 because it poses a danger of misleading the jury that "substantially" outweighs the probative value of the opinion. The court disagrees. Prof. Rosenthal provides an understandable explanation for her opinion, including the disclaimer that her "loss of choice" opinion isn't a damages opinion. Also, defendants can offset any risk that this opinion will mislead the jury by engaging in "vigorous cross-examination" and by requesting a "limiting instruction[.]" *See Montag ex rel. Montag v. Honda Motor Co., Ltd.*, 75 F.3d 1414, 1420 (10th Cir. 1996) (holding that district court did not abuse its discretion by admitting evidence that plaintiffs alleged was inadmissible as "inflammatory and misleading under Fed. R. Evid. 403" because "any prejudicial effect was countered by the district court's limiting instruction and by Plaintiffs' opportunity for vigorous cross-examination"); *see also Noland v. City of Albuquerque*, 779 F. Supp. 2d 1235, 1241–42 (D.N.M. 2011) (refusing to exclude evidence under Fed. R. Evid. 403 because "with the proper jury instructions, this evidence will not mislead or confuse the jury").

 **\*31** Thus, the court declines to exclude Prof. Rosenthal's "loss of choice" opinion under either Fed. R. Evid. 702 or 403.

### C. 2-Pak Methodology

Defendants next ask the court to exclude Prof. Rosenthal's methodology for determining plaintiffs' purported 2-Pak damages. Prof. Rosenthal "calculates overcharges due to the single pack withdrawal" by comparing "the difference between the actual average price per prescription with [an estimated] but-for price per prescription." Doc. 2164-4 at

39–40 (Rosenthal Oct. 31, 2019 Expert Report ¶ 93). Prof. Rosenthal explains that she performs this analysis using an "event study." [14] Doc. 2183-4 at 12 (Rosenthal Feb. 7, 2020 Expert Rebuttal Report ¶ 17). To estimate the "but-for" price per prescription, Prof. Rosenthal began by calculating the average number of pens per prescription during the first and second quarters of 2011—*i.e.*, the two quarters immediately preceding Mylan's withdrawal of single EpiPens from the market. Doc. 2164-4 at 39–40 (¶ 93). She explains that she used data just from these two quarters because, she found, using "the average number of pens per prescription for the four quarters prior to 2011Q3" produced "a 1% change in the average" and thus "only a *de minimus* effect on damages." *Id.* at 40 n.100. Also, she explains that she used "the two quarters prior to the withdrawal of the single pack...in order to eliminate the influence of other time-specific factors or 'events[.]' " *Id.*

[14]  Defendants' motion asserts in a footnote that defendants maintain that Prof. Rosenthal's event study is fundamentally unreliable and not an event study at all. Doc. 2137-2 at 15 n.7. But their motion advances no arguments to support that assertion, other than citing their earlier motion seeking to exclude Prof. Rosenthal's event study as unreliable that they filed at the class certification stage and asserting that they "preserve their arguments on appeal." *Id.* (citing Doc. 1586-2 at 10–13). The court rejected defendants' argument that the court should exclude Prof. Rosenthal's event study as unreliable when it ruled defendants' motion at class certification. Doc. 2017-1 at 24–25. Defendants provide no reason for the court to revisit this issue on this motion, and because the court already has decided the certification issue, defendants don't need to reference and re-reference every argument they've ever made about certification issues.

Defendants argue that the court should exclude Prof. Rosenthal's 2-Pak event study because, in their view, it is not based on sufficient facts and data and one cannot apply it reliably to the facts of the case. Thus, defendants argue, the event study is inadmissible under Fed. R. Evid. 702. Also, defendants argue that the court should exclude the event study under Fed. R. Evid. 403 because it poses a significant risk of confusing the jury that outweighs any probative value of the evidence.

*First*, the court considers whether Prof. Rosenthal's 2-Pak event study is based on sufficient facts and data such that one reasonably can apply it to the facts of this case. Defendants assert that Prof. Rosenthal's event study fails to control for factors that could have influenced consumers' decisions whether to purchase single EpiPens or 2-Paks before and after the first and second quarter of 2011. Specifically, defendants assert that, after 2011, medical literature increasingly confirmed the need for patients to carry two EAI devices with them at all times in case they required a second dose of epinephrine during an anaphylactic reaction. Also, defendants argue that Prof. Rosenthal's analysis fails to account for the back-to-school season— which falls in the third quarter—when EpiPen sales increase in general and also specifically for 2-Paks. Defendants argue that Prof. Rosenthal's failure to account for these factors renders her analysis inadmissible under Fed. R. Evid. 702.

 **\*32**  For support, defendants cite *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022 (D. Kan. 2006). Defendants assert that *Sunlight Saunas* excluded expert testimony that "did not take into account significant factors, aside from defendants' conduct, which could have explained the decline in the growth of plaintiff's sales[.]" *Id.* at 1030. But, the language defendants lift from Judge Vratil's opinion in *Sunlight* merely recites one of five arguments that the *Sunlight Saunas* defendants asserted to support their request to exclude the expert opinion. *See id.* It doesn't come from Judge Vratil's analysis of the admissibility question. Instead, Judge Vratil's analysis concluded that the expert's "entire damage calculation [was] based on his underlying assumptions regarding plaintiff's forecast of sales" that he "did not independently analyze" and plaintiff provided "no coherent explanation how it arrived at the projections." *Id.* So, Judge Vratil found, the expert's explanation for his assumptions was "conclusory, evasive and anything but expert." *Id.* That's nothing like the facts here.

Instead, here, Prof. Rosenthal provides a reasonable basis for her event study's assumptions. She adequately explains why she relied on the data from the first two quarters of 2011 to calculate a "but for" number of pens per prescription which, in turn, she used to calculate the "but for" price per prescription. Doc. 2164-4 at 39–40 & n.100 (¶ 93). And, she provides a reasonable basis why, in her expert opinion, the prevalence of medical literature after 2011 about the importance of carrying two EAI devices at all times doesn't require her to change her assumptions. *See* Doc. 2183-4 at 13 (¶ 20) (citing opinion from another one of plaintiffs' experts that the medical

guidance issued after the withdrawal of single EpiPens was "nothing new" and her opinion that "level of use already reflected that information by the time of the single pack withdrawal"). Also, she meets defendants' criticisms about her failure to consider third quarter data that would reflect "back to school" increased purchases by explaining that she previously had examined data from the entire year preceding the single EpiPen withdrawal but it had "only a *de minimus* effect on damages." *Id.* at 12 (¶ 18) (quoting Doc. 2164-4 at 40 n.100). Based on Prof. Rosenthal's explanations, she has provided a reasonable basis for her underlying assumptions and calculations that she made as part of her methodology to render her 2-Pak damages opinion. Defendants' attacks against those assumptions go to the weight of her opinion, but they don't permit the court to exclude it. Prof. Rosenthal has cited sufficient facts and data to support her opinion, and she has shown that her opinion is capable of applying reasonably to the facts of this case. So, the court won't exclude it under Fed. R. Evid. 702.

*Second*, the court rejects defendants' argument that the court should exclude the event study under Fed. R. Evid. 403 based on a danger that it will confuse the jury. Defendants argue that Prof. Rosenthal's damages opinion is premised on Mylan's withdrawal of single EpiPens. But, Mylan contends, plaintiffs don't allege that the withdrawal was one of the predicate acts supporting the RICO claim. So, defendants argue, plaintiffs can't use Prof. Rosenthal's 2-Pak methodology to show RICO causation. And, they contend, the court should preclude its admission because it only would confuse the jury. Plaintiffs don't refute that Prof. Rosenthal's opinion only relies on the withdrawal of the 2-Pak—not any statements or omissions on defendants' part—to calculate 2-Pak damages. But, the court finds, the risk that this opinion will mislead or confuse the jury is offset by defendants' ability to engage in "vigorous cross-examination" and the court's capacity to instruct the jury about the purpose of and the limits to Prof. Rosenthal's 2-Pak damages methodology. *See Montag ex rel. Montag v. Honda Motor Co., Ltd.*, 75 F.3d 1414, 1420 (10th Cir. 1996); *see also Noland v. City of Albuquerque*, 779 F. Supp. 2d 1235, 1241–42 (D.N.M. 2011). The court thus concludes any risk that Prof. Rosenthal's opinion will confuse the jury doesn't outweigh the probative value of her expert opinion. So, the court declines to exclude Prof. Rosenthal's 2-Pak methodology under Fed. R. Evid. 403.

### D. Probability Analysis

**\*33** Next, defendants assert that the court should exclude Prof. Rosenthal's probability analysis. Prof. Rosenthal offers an opinion that plaintiffs sustained "a common injury on a class-wide basis as a result of [d]efendants' alleged misconduct[.]" Doc. 2164-4 at 52 (Rosenthal Oct. 31, 2019 Expert Report ¶ 118); *see also id* 52–60 (¶¶ 118–36). As support for this opinion, Prof. Rosenthal analyzed the "probability that class members would be overcharged by just the 2-Pak and generic delay allegations" by "combin[ing] probabilities of being affected by both mechanisms based on the extent to which the affected groups for each allegation are overlapping[.]" *Id*. at 57 (¶ 132). She concludes that the "resulting probability lies between zero and the lower of the individual probabilities of not being overcharged by either (or any) one of the mechanisms." *Id.* at 59–60 (¶ 135).

Defendants argue that the court should exclude the opinion under Fed. R. Evid. 702 because it's not based on sufficient facts and data and one can't apply it reasonably to the facts of the case. Also, defendants argue, the court should exclude Prof. Rosenthal's probability opinion under Fed. R. Evid. 403 because it poses a danger of misleading the jury. The court rejects both arguments.

*First*, defendants argue that the court should exclude Prof. Rosenthal's opinion because it is based on "a single, cherry-picked generic launch forecast that itself contained two equally possible (and less aggressive) alternatives" and didn't consider any competing literature suggesting that a lower generic erosion rate was likely. Doc. 2137-2 at 17. Also, defendants argue that Prof. Rosenthal's opinion unreasonably relies on a Mylan slide deck from May 2010 to estimate the probability of 2-Pak injury while ignoring other evidence showing that doctors preferred to prescribe and patients preferred to purchase 2-Paks. Thus, defendants assert, the court should exclude Prof. Rosenthal's opinion because it doesn't properly consider the facts of the case.

Defendants made this same argument when moving to exclude Prof. Rosenthal's probability opinion at the class certification stage. Doc. 2017-1 at 38–40. Now, they say that the court's previous consideration of their argument was "limited" and doesn't account for all of the facts that are available now that discovery is closed. Doc. 2228-2 at 11. But, they don't point to any evidence revealed in merits discovery that requires the court to alter its previous analysis. As the court already explained, "[a]ll of defendants' criticisms about the assumptions Prof. Rosenthal uses to support her

probability opinion go to the weight of her opinion testimony, but not its admissibility." Doc. 2017-1 at 39.

Here, Prof. Rosenthal provides a reasonable basis for her assumptions. She explains why she relied on certain data in her analysis and why, she contends, those assumptions are appropriate for this case's facts. *See* Doc. 2183-4 at 22–24 (¶¶ 45–47); *see also* Doc. 2164-4 at 30–31, 52–60 (¶¶ 68–71, 118–36). And her Reply Report provides appropriate rebuttal for the criticisms defendants' expert levies against her factual assumptions. Doc. 2183-4 at 10–11, 22– 24 (¶¶ 14, 45–47). As the court found before, defendants' "challenges to those assumptions don't show that Prof. Rosenthal's probability opinion is so unreliable that the court must exclude it." Doc. 2017-1 at 39 (citing *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at \*28 (N.D. Cal. Feb. 21, 2017)) (denying motion to exclude expert opinion because it was based on "reasonable assumptions and evidence, and supported by reasoned principles as well as academic scholarship" and while "some of those assumptions [were] disputed," those disputes did not "make [the expert's] reliance on them improper")). Instead, the court finds, as it did before, that "defendants' challenges more properly are presented through the 'presentation of contrary evidence' " which is one of the " 'the traditional and appropriate means of attacking shaky but admissible evidence.' " *Id.* at 40 (quoting *Daubert*, 509 U.S. at 596). So, the court rejects defendants' argument that Prof. Rosenthal's probability opinion isn't based on sufficient facts and data.

**\*34** *Second*, the court refuses to exclude Prof. Rosenthal's probability opinion under Fed. R. Evid. 403. Defendants argue that Prof. Rosenthal's analysis "hides" the fact that between 62 and 68 percent of consumers sustained no injury under the 2-Pak theory because they would not have purchased a single EpiPen in the "but-for" world. Doc. 2137-2 at 18 (citing Doc. 2166-17 at 15– 16 (Rosenthal Feb. 21, 2020 Dep. at 197:24–198:2)). But, as Prof. Rosenthal's Expert Report makes clear, her probability opinion "*combine[s]* probabilities of being affected by both" the 2-Pak and generic delay allegations. Doc. 2164-4 at 57 (¶ 132) (emphasis added). A trier of fact is capable of understanding how Prof. Rosenthal's probability opinion measures more than one type of alleged misconduct. And, any risk that the probability opinion will mislead the jury is mitigated by defendants' ability to cross-examine Prof. Rosenthal vigorously about her opinion and the court's instructions to the jury. So, the court finds that the probability opinion doesn't pose a danger of

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 156 of 292

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

misleading the jury such that the court should exclude it under Fed. R. Evid. 403.

In sum, the court rejects defendants' arguments for excluding Prof. Rosenthal's probability opinion. [15]

[15]    Defendants argue in a footnote that Prof. Rosenthal's probability analysis also is unreliable under Fed. R. Evid. 702 based on a recent Eastern District of Pennsylvania opinion that "rejected a near- identical model submitted by Prof. Rosenthal in a generic delay case as a method of showing class-wide injury because it improperly 'mask[ed] uninjured class members.' " Doc. 2137-2 at 18 n.8 (quoting *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 713 (E.D Pa. 2020)). There, the court looked specifically to the averages that Prof. Rosenthal used to calculate classwide injury among a putative class of end- payor consumers of the drug Niaspan. *Id.* at 713–14. After scrutinizing her analysis, the court found that Prof. Rosenthal's "use of averages hides several groups of uninjured class members who cannot be easily identified." *Id.* at 714. And, in the end, the court refused to certify a class because it was "concerned that the class contains, at minimum, substantial numbers of uninjured consumer brand loyalists, coupon users, and flat co-payers." *Id.* at 720. The facts differ here. As plaintiffs argue, the court already has certified a class based on, among other things, plaintiffs' showing that Prof. Rosenthal's probability analysis provides a plausible method for proving that the class doesn't contain "great numbers of class members who didn't sustain harm." Doc. 2018-1 at 67; *see also id.* at 67–76. And, here, defendants haven't shown that Prof. Rosenthal's probability analysis relied on underlying data that hides several groups of unidentified class members that she can't identify. In short, defendants have failed to establish—at least so far—that this case is like *In re Niaspan*. So, the court doesn't find that *In re Niaspan* changes the court's analysis.

### E. Excluding the 2-Pak and Generic Delay RICO Models if All of Plaintiffs' RICO Theories Proceed to the Jury

Last, defendants argue that, if the court allows plaintiffs' RICO claims to proceed to the jury, then the court should

exclude Prof. Rosenthal's 2-Pak and generic delay RICO models because these models pose a risk that the jury will double count damages. As discussed, the court's contemporaneously-issued Order grants summary judgment against plaintiffs' RICO claims. Thus, defendants' final argument is moot.

After considering each of defendants' arguments for excluding Prof. Rosenthal's opinions, the court finds two of them are moot and the remaining three are unpersuasive. The court thus denies defendants' Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Meredith Rosenthal.

### VI. Defendants' Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Dr. Carl Peck (Doc. 2135)

Defendants next argue that the court should exclude the testimony and opinions proffered by Dr. Carl Peck. Plaintiffs have retained Dr. Peck, a former Director of the FDA Center for Drug Evaluation and Research, to opine "whether the [FDA] caused delays in the review and approval of the Abbreviated New Drug Application ('ANDA') for the AB-rated epinephrine auto-injector product, sponsored by [Teva]." Doc. 2164-8 at 4 (Peck Oct. 31, 2019 Expert Report ¶ 1). He explains that Teva submitted its ANDA to the FDA on December 21, 2007, and the FDA "found it to be 'acceptable for filing' on November 21, 2008." *Id.* at 8 (¶ 16). Then, "9 years and 9 months" later, in August 2018, Teva received FDA approval for the product. *Id.* at 27 (Table 2).

**\*35**  Dr. Peck opines "based on [his] independent review and analysis of materials identified in [his expert] report, [his] expertise, and [his] knowledge of the FDA drug-approval process...these delays were not due to the FDA's conduct or inaction." *Id.* at 8–9 (¶ 17). He finds "[o]n the contrary...the FDA treated [the ANDA] as a priority application and was responsive well within the metrics for review time of the application." *Id.* at 9 (¶ 18). Also, Dr. Peck asserts that Mylan filed "deficient Citizen Petitions in a transparent attempt to delay approval of the Teva EAI." *Id.* (¶ 19). And, he opines that "it is reasonable to expect that the FDA would have completed its review and approval of Teva's EAI application by 2014...had Teva been responsive to the FDA's requests in prosecuting its application." *Id.* at 10 (¶ 21).

Defendants assert several arguments why the court should exclude his opinions. The court addresses them, below. But

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 157 of 292

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

first, the court considers whether Dr. Peck is qualified to offer the proffered expert opinion.

Dr. Peck is "a board-certified physician in internal medicine and clinical pharmacology." *Id.* at 4 (¶ 4). He earned a B.A. and M.D. from the University of Kansas. *Id.* From 1967 to 1990, he served in the U.S. Army Medical Corps and Medical Research and Development Command. *Id.* at 5 (¶ 6). In his career with the Army, he rose to the rank of Colonel. *Id.* For seven of his years in the Army, he served as a clinical pharmacology consultant to the Army Surgeon General. *Id.* In 1990, Dr. Peck joined the U.S. Public Health Service as a Rear Admiral and was appointed Assistant Surgeon General of the United States. *Id.*

From 1987 to 1993, Dr. Peck served as Director of FDA's Center for Drug Evaluation and Research. *Id.* (¶ 7). In that position, he was responsible for "establishing and enforcing FDA standards[;] reviewing, approving, or rejecting proposed new medical products[;] assuring safety of all marketed drug products[;] and regulating advertising and promotional practices of drug manufacturers." *Id.* Also, he "reviewed, commented or rendered decisions on data relating to more than 500" investigational new drug applications ("INDs"), new drug applications ("NDAs"), abbreviated new drug applications ("ANDAs"), and other applications. *Id.*

Dr. Peck has held several research and teaching positions in government and academic institutions. *Id.* at 4–6 (¶¶ 5, 8). His research has focused on the "study of scientific and regulatory methods for evaluating the effectiveness and safety of new drugs." *Id.* at 6 (¶ 8). During his career, Dr. Peck has published more than 150 original scientific papers, a book, and several book chapters. *Id.* at 6 (¶ 10). Also, for more than 40 years, Dr. Peck has served as an active peer reviewer for several scientific publications. *Id.* And, Dr. Peck has received many awards and honors for his work in his field. *Id.* at 6–7 (¶ 11).

Dr. Peck is the co-founder of NDA Partners LLC, a consulting company that provides scientific and regulatory advice to scientists and entrepreneurs in private industry as well as government agencies. *Id.* at 7–8 (¶ 14). His company helps clients understand and meet FDA requirements. *Id.* Also, it "supports various aspects of their [clients'] engagements with the FDA" during drug applications and approval processes. *Id.* Personally, Dr. Peck has consulted with clients on more than 200 FDA applications. *Id.*

Based on Dr. Peck's education, experience, and professional qualifications, the court finds that he is qualified under Fed. R. Evid. 702 to provide his proffered expert opinions in this case. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 475–77, 481–82 (S.D.N.Y. 2016) (holding that physician was qualified to opine about "the FDA regime generally, [defendant's] conduct in complying with regulatory standards, and the adequacy of the [drug] label" and that such testimony "would be helpful to the jury"); *see also In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *5, 19 (E.D. Pa. Feb. 1, 2001) (concluding that a doctor and former FDA employee was "clearly qualified to testify [about] what reasonable FDA officials ...would do with adverse event information").

**\*36** Finding that Dr. Peck sufficiently is qualified to render his expert opinions, the court now turns to address defendants' arguments for excluding his opinions.

### A. Is Dr. Peck's Opinion Irrelevant to Plaintiffs' Causation Theory, and Thus, Unhelpful to the Trier of Fact?

*First*, defendants assert that Dr. Peck's opinion whether the FDA caused any delays in Teva's approval of its generic EpiPen product has nothing to do with plaintiffs' causation theory—*i.e.*, that Mylan and Pfizer caused generic delay by entering an unlawful reverse payment settlement with Teva. So, defendants argue, Dr. Peck's opinion is irrelevant to any question the jury must decide, and thus, the theory isn't helpful to the trier of fact. For that reason, defendants contend that Dr. Peck's opinion is inadmissible under Fed. R. Evid. 702. *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful" to the trier of fact in " 'understand[ing] the evidence' " or " 'determin[ing] a fact in issue' " (quoting Fed. R. Evid. 702)).

The court disagrees. Defendants argue on summary judgment that the FDA's independent actions (*i.e.*, not approving the Teva generic until 2018) prevented Teva from launching its product any earlier than that date. Doc. 2228-3 at 5. So, defendants contend, the FDA's actions "break the chain of causation" and preclude defendants from incurring liability on plaintiffs' generic delay theory. *Id.* But, plaintiffs counter this argument by relying on Dr. Peck's opinion. They argue that Dr. Peck's opinion is "highly relevant because it rebuts the notion that it was [the] FDA, not Defendants, who were at

fault for the delay" in the approval of Teva's generic product. Doc. 2182-1 at 9.

Defendants further contend that Dr. Peck made two key admissions that, they assert, show that the FDA's actions prevented the Teva generic from securing FDA approval. They argue that these admissions provide further support for their argument that Dr. Peck's testimony is irrelevant to the question whether *defendants'* conduct caused any generic delay. Also, defendants argue that Dr. Peck conceded that he never assessed Mylan and Pfizer's conduct, or whether the Teva patent settlement slowed down FDA approval, or why the FDA approval process for the Teva generic took as long as it did, other than to opine that the FDA responded to Teva's submissions in a timely fashion. These challenges to Dr. Peck's analysis don't render his opinion irrelevant. His opinion still goes to the question whether the FDA broke the causal chain between defendants' actions and any generic delay. Defendants' attacks on Dr. Peck's admissions and assumptions go to the weight of his opinion and whether it is capable of showing that the FDA didn't break the causal chain. But that's a question for the trier of fact, not the court. And, it doesn't warrant excluding his opinion as irrelevant.

### B. Should the Court Exclude Dr. Peck's Remaining Opinions Under *Daubert* and [Fed. R. Evid. 702](#)?

*Next*, defendants argue that the court should exclude any other opinions rendered by Dr. Peck for two reasons. *First*, defendants contend that Dr. Peck was retained to provide just one opinion—*i.e.*, whether the FDA caused delays in the approval process for the Teva generic. Defendants argue the court should exclude any other opinions that Dr. Peck offers because they are beyond the scope of Dr. Peck's Expert Report. *Second*, defendants argue that the court should exclude Dr. Peck's other opinions because they are outside his area of expertise.

 **\*37** The court disagrees with the limits defendants have placed on the scope of Dr. Peck's opinions. Dr. Peck's Expert Report makes it clear that he is offering opinions not limited merely to whether the FDA caused delays in the review and approval of Teva's generic product. Doc. 2164-8 at 8–10 (Peck Oct. 31, 2019 Expert Report ¶¶ 17–21). As part of Dr. Peck's analysis of that question, he also concluded that "the FDA was properly responsive, responsible, and communicated in a timely manner in its review of [Teva's] ANDA[,]" he found "a noticeable slowing of responsiveness

to FDA requests and guidance on Teva's part beginning around 2011," he found that "Defendants filed deficient Citizens Petitions in a transparent attempt to delay approval of the Teva EAI[,]" and he concluded "it is reasonable to expect that the FDA would have completed its review and approval of Teva's EAI application by 2014...if not earlier—had Teva been responsive to the FDA's requests in prosecuting its application." *Id.* at 8–10 (¶¶ 17, 19–21); *see also id.* at 18–26, 30–34, 35 (¶¶ 38–56, 63–71, 75).

To confine Dr. Peck's opinion only to whether the FDA caused delays in the approval of a Teva generic, defendants cite Dr. Peck's deposition testimony where he testified that plaintiffs retained him in this case to render an opinion on that topic and that there were no "other opinions that the class plaintiffs retained [him] to render besides that one[.]" Doc. 2142-3 at 12–13 (Peck Dep. 121:21–122:13). But, Dr. Peck also testified that his Expert Report "contain[s] a complete statement of all the opinions that [he is] offering in this case[.]" *Id.* at 12 (Peck Dep. 121:13–17). And, throughout Dr. Peck's deposition, counsel asked him about other opinions disclosed in his Expert Report and the bases for his conclusions, including his opinions about Teva's slowing of its responsiveness to the FDA's requests and Mylan's submissions of Citizen Petitions to the FDA. *See, e.g.*, *id.* at 16, 51–53 (Peck Dep. 126:13–24, 320:10–321:24, 325:1–19). Thus, the court rejects defendants' argument that the court should exclude him from giving any of the other opinions that Dr. Peck asserts in his Expert Report.

Also, the court disagrees that any of these opinions fall outside the scope of Dr. Peck's expertise. Dr. Peck is qualified by his education, training, research, scholarship, and professional experience to offer opinions about Teva's responsiveness to the FDA's approval process, Mylan's use of Citizen Petitions in that process, and the date when Teva could have secured FDA approval had it responded to the FDA's requests in its prosecution of the application in a fashion he opines was more timely.

Defendants next argue that, even if the court declines to exclude Dr. Peck's other opinions, the court should exclude three of those opinions from the jury. Defendants assert these three opinions are inadmissible under [Fed. R. Evid. 702](#) and *Daubert* because Dr. Peck lacks a reliable methodology for reaching his conclusions, and instead, bases his opinions only on speculation. The court considers the three opinions that defendants challenge, below.

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 159 of 292

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

### 1. Opinion that Teva "Dropped the Ball"

*First*, defendants challenge Dr. Peck's opinion that "Teva 'dropped the ball' in the 2011– 2014 time frame by not pursuing the [generic drug] application aggressively or responding to the FDA[.]" Doc. 2164-8 at 25 (¶ 56(c)). Dr. Peck asserts that Teva's inaction during that time "lost [it] the opportunity for approval in a shorter time frame." *Id*. Defendants argue that Dr. Peck's opinion is speculative because, as he testified, he never analyzed what Teva was doing during that time. Defendants assert that Dr. Peck failed to consider key facts, including that Teva was having manufacturing problems with its product, which, defendants contend, caused the delays in Teva's pursuit of FDA approval. So, defendants argue, Dr. Peck's opinion that Teva had "dropped the ball" in the application process suffers from a fatal flaw in that it's based simply on guesswork about Teva's actions.

**\*38** The court disagrees. While defendants are correct that "an expert, no matter how good his credentials, is not permitted to speculate[,]" *Goebel v. Denver and Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000), Dr. Peck's opinion isn't speculating. As plaintiffs argue, he never provides any opinion *why* Teva wasn't pursuing its ANDA aggressively. He just opines that Teva was slow to respond to the FDA's requests during the application process. And, he explains that Teva's delays prevented it from achieving FDA approval for its generic earlier than 2018. It doesn't matter to Dr. Peck's opinion *what* caused those delays, only that the delays occurred. So, he's not speculating about anything.

Also, to reach this conclusion, Dr. Peck explains that he reviewed the correspondence between the FDA and Teva throughout the approval process. Doc. 2164-8 at 18–26 (¶¶ 38–56, Fig. 2); *see also id.* at 66–74 (Exs. C & D). Dr. Peck provides a reliable basis for his opinion based on his review of that correspondence and in light of his background and experience working for and with the FDA in drug approval applications. The court thus finds defendants have not shown that Dr. Peck has applied an unreliable methodology to the facts of this case under Fed. R. Evid. 702. So, the court refuses to exclude this opinion.

### 2. Opinion that Teva Could Have Launched Generic By 2014

*Next*, defendants ask the court to exclude Dr. Peck's opinion that "the FDA would have completed its review and approval of Teva's EAI application by 2014...if not earlier—had Teva been responsive to the FDA's requests in prosecuting its application." Doc. 2164-8 at 10 (¶ 21). Defendants argue that Dr. Peck has no basis for this opinion because he never analyzed the challenges, priorities, and actions of those involved in the approval process, including Teva, the FDA, and others. Defendants contend that Dr. Peck thus relied on incomplete and false information to reach his opinion that Teva could have achieved FDA approval by 2014. So, they argue, the court should exclude it.

More specifically, defendants make two arguments why this opinion is unreliable. *First*, defendants say that Dr. Peck ignored the FDA's rejection of Teva's human factors study in 2016, and its later acceptance of the study, which imposed a delay in the application process. *Second*, defendants argue that Dr. Peck failed to use a reliable methodology when he considered the times that it took other products to secure FDA approval and used those other products as "benchmarks" in his analysis. The court addresses these arguments, next. As explained below, each of these criticisms go to the weight of Dr. Peck's opinion, but don't render his opinion inadmissible. Instead, the court finds that Dr. Peck has provided a reliable basis for his opinion. Dr. Peck explains that he reached his opinion after reviewing and analyzing the regulatory records between Teva and the FDA, Teva's own projections for when it anticipated securing FDA approval, [16] and the FDA approval times for other, similar drugs. *See* Doc. 2164-8 at 9–10, 18–26, 29 (¶¶ 20–21, 38–56, 60). Based on that information and his knowledge and experience about the FDA approval process, he concludes that Teva could have secured FDA approval no later than 2014 had it pursued its ANDA more aggressively. The court finds this opinion sufficiently reliable under Fed. R. Evid. 702. Defendants' challenges to this opinion don't change the court's conclusion.

16    Defendants argue that Dr. Peck "cherry-picked" these Teva internal projections and that the selected projections don't account for many design, formulation, regulatory, and manufacturing issues that Teva faced during the approval process. They also identify other projections that Dr. Peck didn't consider. Plaintiffs respond that Dr. Peck relied on internal projections that Teva made before it commenced settlement talks in the patent litigation. So, they argue, the projections Dr. Peck considered aren't tainted by Teva's post-settlement conduct.

This dispute goes to the weight that a trier of fact should assign Dr. Peck's opinion based on his decision to rely on certain internal Teva projections, but not others. And, the court doesn't find that Dr. Peck has "cherry-picked" evidence here in a way that renders his opinion unreliable.

### a. The FDA's 2016 Rejection of the Human Factors Study

**\*39** Defendants assert that Dr. Peck's failure to consider the FDA's rejection of Teva's human factors study in 2016 renders his opinion unreliable. Dr. Peck's Expert Report explains that, on May 17, 2011, the FDA told Teva that it needed to perform a human factors study comparing the Teva generic to the EpiPen. Doc. 2164-8 at 22–23 (¶ 48). Eight months later, Teva submitted the requested protocol for a human factors study to the FDA on January 20, 2012. *Id.* After receiving no response from the FDA about the submitted protocol, Teva went ahead and conducted its human factors study in 2013 and submitted the results to the FDA on August 29, 2013. *Id.* at 23 (¶ 49). Teva repeated the study on its re-designed device in 2014, and it submitted the study's report to the FDA in December 2014. Doc. 2146-20 at 7–9 (Peck Feb. 7, 2020 Rebuttal Report ¶¶ 14, 16). Then, in 2016, the FDA sent Teva a Complete Response Letter that identified several deficiencies in Teva's application, including concerns about the human factors study. *Id.* at 20–21 (¶ 44); *see also* Doc. 2147-3 at 2, 7 (Complete Response Letter). Teva never performed a new human factors study on its product. Doc. 2146-20 at 7–8 & n.12 (¶ 14). Yet, in August 2018, the FDA approved the human factors study that Teva had performed in 2014, and it approved its ANDA for its generic product. *See* Doc. 2147-4 at 3; *see also* Doc. 2147-5.

Defendants argue that Dr. Peck's opinion isn't reliable because he improperly ignored "informal" correspondence between Teva and the FDA showing that Teva repeatedly sought guidance from the FDA about a human factors study, but didn't receive answers to its questions. But, Dr. Peck adequately responds to this criticism, explaining that he didn't consider informal correspondence because "informal interactions such as phone calls are mainly for clarification or follow ups as to the status of the FDA's review or inquiries concerning the timing of further feedback from the FDA." Doc. 2146-20 at 14 (¶ 28). Instead, Dr. Peck identifies the "real work" when prosecuting an ANDA is "responding to deficiencies[,]" and that work by Teva, in his opinion, "was dormant." *Id.*

Also, defendants assert that Dr. Peck's opinion is unreliable because it ignores that Teva couldn't have secured FDA approval in 2014 because it didn't receive the FDA's rejection of its human factors study until 2016. But, Dr. Peck asserts that the human factors study requirement wasn't "rate limiting to the review and approval of the application" because "there were additional deficiencies that Teva needed to address." Doc. 2164-8 at 23 (¶ 49); *see also* Doc. 2146-20 at 9 (¶ 16) ("While Teva submitted an application that had a sufficient [human factors study] in 2013 and 2014, the ANDA was ultimately not approved until 2018 because further review on other parts of the applications was required based on Teva's other submissions."). Based on Dr. Peck's assertions, defendants argue that it is inconsequential that the FDA initially rejected the human factors study in 2016 because, in 2018, it approved the same study after Teva had rectified the other deficiencies that the FDA had told it to address.

Defendants argue that the court should exclude Dr. Peck's opinion because he "completely ignored or discounted without explanation" key evidence in this case—*i.e.*, the FDA's rejection of the human factors study in 2016. *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005). But, on this record, the court can't find that Dr. Peck "completely ignored or discounted without explanation" the FDA's initial rejection of the human factors study. To the contrary, Dr. Peck provides a reasonable explanation for why he didn't consider informal correspondence with the FDA and why he doesn't find the human factors study requirement "rate limiting." Doc. 2164-8 at 23 (¶ 49); *see also* Doc. 2146-20 at 9 (¶ 16). In sum, defendants assert proper challenges to his methodology but they don't show that his analysis is so unreliable that the court must exclude it. The court finds defendants' attacks against Dr. Peck's opinion are better left to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" because those tools remain "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted). So, the court won't exclude Dr. Peck's opinion about Teva's ability to secure FDA approval by 2014.

### b. Dr. Peck's "Benchmarks"

**\*40** Defendants also assert that the court should exclude Dr. Peck's opinion that Teva could have achieved FDA approval by 2014 because he failed to apply a reliable methodology

when identifying "benchmark" products to compare against Teva's generic EAI. Dr. Peck opines that the "FDA's review and approval times of other drugs reveals that the Teva [EAI] review and approval time period is an extreme outlier." Doc. 2164-8 at 26 (¶ 57). To reach that conclusion, Dr. Peck analyzed the review and approval process for: (1) all of the EAI products that the FDA has approved, (2) all auto-injector products approved by the FDA between 2011 and 2018, and (3) all other Teva injectable products approved by the FDA between 2008 and 2019. *Id.* at 26– 29 (¶¶ 58–60, Tables 2, 3, & 4). But, defendants argue, Dr. Peck's analysis comparing other drugs' FDA approval times to Teva's FDA approval time is unreliable because he conducted no analysis of the facts and circumstances surrounding those other drugs to demonstrate reasonably that they are proper comparisons to Teva's generic EAI.

Defendants assert several challenges to Dr. Peck's selected "benchmarks." But each attack goes to the weight of Dr. Peck's opinion, and none of them require the court to exclude his opinion. The court summarizes defendants' various challenges to this opinion, below.

*First*, defendants identify a couple of purported calculation errors in Dr. Peck's Expert Report. Defendants argue that Dr. Peck erred by finding that it took Teva 60 months to secure approval for the drug sumatriptan. *See* Doc. 2164-8 at 28 (Table 3) (identifying the submission date as 2010 and the approval date as December– 10, 2015). Defendants assert, instead, it actually took 9 years and 7 months for sumatriptan to achieve FDA approval. Doc. 2140-3 at 2 (referring to the submission date as "May 31, 2006"). But plaintiffs respond that defendants' calculation of approval time is wrong because it relies on a 2006 submission date by another company that the FDA rejected because the device was sufficiently different from the innovator's device that it didn't warrant an ANDA. Doc. 2182-9 at 18 (Antares Pharma, Inc. Dec. 31, 2012 Form 10-K). Instead, plaintiffs argue, the appropriate submission date occurred in 2010, when a different company acquired the device and submitted a completely different application to the FDA. *Id.* So, plaintiffs argue, Dr. Peck correctly calculated the approval time for this device. This factual dispute about what date Dr. Peck should have considered when calculating approval time for sumatriptan goes to the weight of his testimony. The factual record provides a reasonable basis for Dr. Peck's selection of a 2010 submission date. [17] Defendants may attack his selection by cross-examining Dr. Peck on that topic and presenting

contrary evidence, but Dr. Peck's selection doesn't provide a basis to exclude his opinion.

[17]      Defendants take issue with plaintiffs using Antares Pharma Inc.'s Form 10-K as support for the calculation date when Dr. Peck's Expert Report doesn't say that's what he used to calculate the submission date. But, his Expert Report identifies a 2010 submission date for Antares's sumatriptan, Doc. 2164-8 at 28 (Table 3)—the same year that, according to its Form 10-K, it redesigned the device and submitted the new device to the FDA. Also, the parties don't cite any part of the record where Dr. Peck was challenged about his identification of the 2010 approval date or given an opportunity to explain why he chose that date. The court doesn't find—as defendants argue—that the citation to the Form 10-K provides an *ad hoc* justification for Dr. Peck's opinion. Instead, it simply provides the date that Antares submitted the new device to the FDA—a date that is consistent with what Dr. Peck identifies as Antares's submission date for sumatriptan.

Also, defendants argue that Dr. Peck repeatedly miscalculated the time it took for Teva to secure approval of its generic EAI. Dr. Peck explains that he calculates the approval time by starting with the date "the FDA found [Teva's ANDA] 'acceptable for filing' on November 21, 2008" and ending with the date Teva received FDA approval in August 2018. Doc. 2164-8 at 8 (¶ 16); *see id.* at 27 (Table 2). He calculates that approval time as "9 years and 9 months." *Id.* at 27 (Table 2). Defendants fault Dr. Peck for referring to this time frame as "approximately 10 years[.]" *Id.* at 9 (¶ 20). But that's an accurate description of the approval time he calculated — *i.e.*, 9 years and 9 months is 97.5% of 10 years. Dr. Peck's rounding up (by 2.5%) isn't a basis to exclude his opinion from the factfinder. Defendants also point out a typo in Dr. Peck's Report where he referred to the approval time as "11 years and 9 months." *Id.* at 8 (¶ 16). But that same paragraph refers to the dates that he used to calculate approval time—*i.e.*, starting in November 2008 and ending in August 2018. *Id.* And elsewhere, the Report correctly calculates the approval time as 9 years and 9 months. *Id.* at 27 (Table 2). The court doesn't find that either Dr. Peck's approximation of the approval time or his typographical error renders his opinion so unreliable that the court should exclude it.

**\*41** *Next*, defendants argue that Dr. Peck's comparison of approval times for other EAI products isn't a reliable

comparison to the approval time for the Teva generic. *See id.* at 27 (Table 2) (comparing approval time for Teva generic to three EAIs—EpiPen, Twinject, and Auvi-Q). Defendants say that these other EAIs aren't apt comparisons because they involved NDAs while the Teva generic involved an ANDA. *Id.* But, Dr. Peck explained in his Rebuttal Report that this criticism is "misplaced" because NDA applicants "must submit all new data with their application while an ANDA need only duplicate already known requirements." Doc. 2146-20 at 14–15 (¶ 30). So, in his view, the requirements of an NDA are more onerous than those for an ANDA. And, from that conclusion, one would expect longer approval times for NDAs than ANDAs. But, for his three comparisons—which involved NDAs—Dr. Peck calculates shorter approval times than compared to Teva's ANDA. Dr. Peck provides a reliable basis for his opinion that the approval times for these three EAIs serve as reasonable comparisons to Teva's ANDA approval time for its generic. Any discrepancies in the type of application submitted to the FDA and whether those differences should affect Dr. Peck's conclusions are fodder for cross-examination. But the court doesn't find these comparisons unreliable such that the court must exclude Dr. Peck's expert opinion.

*Next*, defendants criticize Dr. Peck for failing to consider whether any of the comparison drug products received complete response letters, had to redesign their products, or received FDA deficiency letters. Defendants argue that without considering these types of facts, one can't discern whether they are proper comparisons to the Teva generic's FDA approval process. But, Dr. Peck disagrees. He explains that the other EAIs listed in Table 2 "would have needed to address similar stability, sterility, and manufacturing complexities as Teva" but still "achieved approvals in less than half the time as Teva did." Doc. 2146-20 at 14 (¶ 30). Also, defendants assert that it was improper for Dr. Peck to ignore factual details about the approval process for these EAIs; yet, he considered certain facts surrounding Antares's sumatriptan's application. Specifically, as discussed above, he ignored the drug application's original submission date and calculated its approval time starting with Antares's resubmission date because it involved a different company submitting an application for a redesigned product. Once again, all these underlying assumptions Dr. Peck made when calculating FDA approval times for other drug products and comparing his calculations to the time it took Teva to achieve FDA approval for its generic go to the weight and credibility of his opinion. Dr. Peck provides a reliable basis for why he chose certain drugs as comparison products. Any flaws in his

selection or factual differences that render his comparisons inappropriate are proper subjects for cross-examination. *See Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 654 (10th Cir. 1991) (explaining that "doubts...concerning the sufficiency of the factual basis to support [the expert's] opinion go to its *weight*, and not to its admissibility"); *see also Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 970 (8th Cir. 1995) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." (citation and internal quotation marks omitted)). Defendants' criticisms provide no basis to exclude his opinion.

*Next*, defendants argue that Dr. Peck's analysis is unsound because he doesn't analyze failed or pending ANDAs for other EAIs. But, Dr. Peck testified that he doesn't think failed applications are "relevant" to his analysis when he's calculating approval times for FDA-approved EAI devices. Doc. 2142-3 at 20 (Peck Dep. 148:10–22). Also, he noted it's likely that no public record exists for failed applications, so he couldn't consider that data in any event. *Id.* As plaintiffs argue, the purpose of Dr. Peck's analysis was to measure the time it took other drug products to secure FDA approval. So, any data about failed approval attempts wouldn't assist the analysis. Defendants are free to challenge Dr. Peck's opinion on this ground by cross-examining him about his decisions to consider only certain data when analyzing FDA approval times for other drugs. But this attack doesn't warrant excluding Dr. Peck's opinion.

**\*42** *Next*, defendants criticize Dr. Peck for his inability to answer, during his deposition, whether the auto-injectors listed in his Table 3 (Doc. 2164-8 at 28) involved ANDAs or NDAs. Table 3 lists nine auto-injector products that the FDA approved between 2010 and 2018. *Id.* Dr. Peck's Expert Report provides the "source documents" that he reviewed when gathering the information contained in Table 3. *Id.* at 28 n.58; *see also id.* at 66–72 (Ex. C). But, when asked in his deposition whether the drugs in Table 3 involved ANDAs or NDAs, Dr. Peck answered that he "can't tell you right this minute." Doc. 2142-3 at 25 (Peck Dep. 158:5–9). Dr. Peck's inability to remember off the top of his head in a deposition setting whether the approval process for these other auto-injectors involved ANDAs or NDAs is no reason to exclude his opinion. *See Medina v. United Christian Evangelistic Ass'n*, No. 08-22111-CIV, 2009 WL 4030454, at \*4 (S.D. Fla. Nov. 20, 2009) (finding that an expert's "inability to remember" certain details about his analysis didn't require

the court to exclude his opinion because the "fact that [the expert] could not recall, from memory" certain details about his analysis didn't "undermine the reliability" of his analysis). The court rejects this argument as a basis for excluding Dr. Peck's opinion.

*Next*, defendants argue that Dr. Peck's opinion is unreliable because he testified that he didn't know whether the other drugs listed in Table 3 faced development or reformulation challenges during the approval process. But, Dr. Peck also testified that, based on his experience, "[a]ll drug companies have issues during drug development" and "[a]ll companies receive deficiency letters[,]" but the "ones that are successful in short development time overcome them." Doc. 2142-3 at 28 (Peck Dep. 165:14–20). Again, Dr. Peck provides a reasonable basis for his opinion based on his relevant experience with and knowledge about the FDA approval applications. And, once again, defendants assert a challenge to this opinion that they can attack through cross-examination or by presenting contrary evidence. But, the court need not exclude the opinion on this basis.

*Finally*, defendants assert that the court should exclude Dr. Peck's opinion because, in Table 4, he considered the review and approval times for other Teva injectable products from 2008 to 2019. But, those products, defendants contend, aren't similar to the Teva generic. And thus, they argue, these products don't qualify as appropriate comparisons. This criticism also comes from Dr. Peck's deposition testimony. When counsel asked Dr. Peck whether the drugs listed in Table 4 have "devices associated with" them or whether "they are just vials of medication[,]" Dr. Peck responded that he didn't "know the answer to that right now." Doc. 2142-3 at 30 (Peck Dep. 167:12–16). For reasons already discussed, the court won't exclude Dr. Peck's opinion because he couldn't remember specifics about his analysis at a deposition. And, to the extent these products differ from the Teva generic EAI, defendants can raise those challenges to Dr. Peck's opinion through cross-examination or by presenting contrary evidence to argue that the finder of fact shouldn't assign significant weight to his analysis because the other drugs he analyzed aren't proper comparisons to the Teva generic. But again, defendants' arguments provide no reason for the court to exclude his opinion.

In sum, the court concludes that Dr. Peck provides a reliable methodology for his analysis of the FDA approval times for "benchmark" products that is based on his extensive knowledge about and experience with the FDA approval process. So, the court finds this opinion qualifies as admissible expert testimony under Fed. R. Evid. 702 and *Daubert.*

### 3. Opinion About Mylan's Citizen Petition

*Last*, defendants assert the court should exclude Dr. Peck's opinion that defendants "filed deficient Citizens Petitions in a transparent attempt to delay approval of the Teva EAI." Doc. 2164-8 at 9 (¶ 19). Defendants assert that this opinion rests on factual inaccuracies and is based on pure speculation. They attack two separate parts of this opinion. Specifically, defendants say Dr. Peck has no basis to opine that (1) defendants filed "deficient" or improper Citizen Petitions, or that (2) the Citizen Petitions delayed Teva's FDA approval. The court addresses the two sub-arguments, separately, below.

### a. Opinion that the Citizen Petitions Lacked Merit

**\*43** Defendants argue that Dr. Peck conducted a cursory review of Mylan's Citizen Petitions that fails to meet Fed. R. Evid. 702's requirements. Defendants assert that Dr. Peck's Expert Report contains just one paragraph where he discusses the Citizen Petitions. But, that's just not right. Dr. Peck's analysis of the Citizen Petitions spans several pages of his Expert Report. Doc. 2164-8 at 30–34 (¶¶ 63–72). And, he provides additional support for his analysis in his Rebuttal Report. Doc. 2146-20 at 18–22 (¶¶ 37–46).

Dr. Peck's Expert Report opines that the "major flaw in the Mylan [Citizen Petitions] is that they are based on egregiously faulty trials" that were "so facially faulty that the FDA totally rejected the [Citizen Petitions] for the reason that the trials could not pass FDA standards." Doc. 2164-8 at 32–33 (¶ 68). Defendants assert that Dr. Peck has no basis for this opinion. They explain that the FDA denied Mylan's Citizen Petitions " 'without comment' " but never mention that the denial was based on any faulty trials. *See* Doc. 2137-3 at 24 (quoting Doc. 2147-2 at 2 (explaining to Mylan that its "Petition is denied without comment on whether [the FDA] will take the actions you request")). But, plaintiffs respond, Dr. Peck testified that he concluded, based on his "qualifications as a former center director and [his] understanding of how FDA works and how it responds to the citizen petitions[,]" that the FDA's denial letter was "unusually brief, meaning [the FDA] just really didn't want to have much to do with this because it was so flawed." Doc. 2142-3 at 62–64 (Peck

Dep. 337:12–338:3, 338:19–339:2). Defendants assert that Dr. Peck hasn't proffered a reliable methodology for reaching the opinion. But, as plaintiffs correctly argue, an expert may form his expert opinions relying on his education, background, and experience. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("Rule 702 expressly contemplates that an expert may be qualified on the basis of experience....If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." (citations omitted)); *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.' " (quoting Fed. R. Evid. 702)); *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2005) (affirming trial court's conclusion that expert's "personal experience, training, method of observation, and deductive reasoning [was] sufficiently reliable to constitute 'scientifically valid' methodology" used by the expert to reach his opinion). Here, the court finds that Dr. Peck adequately provides a reliable methodology—based on his experience working with and for the FDA—for his conclusion that the FDA found Mylan's Citizen Petitions flawed based on its letter denying Mylan's Citizen Petitions "without comment." [18]

[18] Defendants quibble about the absence of a citation to the FDA's denial letter in Dr. Peck's Expert Reports and fault plaintiffs for failing to argue that Dr. Peck even reviewed the FDA's denial letter in reaching his conclusions. Even if Dr. Peck didn't cite the letter in his Expert Reports with a Bates-number identification, he expressly discusses the letter and acknowledges that the FDA "denied the [Citizen Petition] without comment." Doc. 2164-8 at 33 (¶ 69); Doc. 2146-20 at 20 (¶ 43). So, Dr. Peck makes clear, he reviewed and understood the substance of the FDA's denial letter when he was forming his conclusions about Mylan's Citizen Petitions.

**\*44** *Next*, defendants argue that Dr. Peck's analysis of the Citizen Petitions is flawed because his Rebuttal Report asserts that the FDA's denial letter suggests that "none of Mylan's arguments merited consideration." Doc. 2146-20 at 20 (¶ 43). But, at the same time, he asserts that Mylan "reiterated the same issues" that the FDA already had identified, and thus, the FDA "already knew this information" submitted by Mylan. *Id.* at 20–21 (¶ 44). Defendants argue Dr. Peck can't opine, on one hand, that the Citizen Petitions are meritless, and then assert, on the other hand, that Mylan submitted the same complaints that the FDA had identified as valid concerns about the Teva product. But, plaintiffs respond, Dr. Peck's assertions here show that the Mylan Citizen Petitions were superfluous because they didn't "raise novel concerns," but instead "simply reiterated the same issues identified by the FDA in its responses to the King and Dey [Citizen Petitions] in 2009 and 2010, respectively." *Id.* Thus, Dr. Peck opines, "[b]ecause the FDA already knew this information, Mylan's [Citizen Petitions] could not have had any effect on" the FDA's response to Teva's application. *Id.* Defendants disagree. They argue that the Mylan Citizen Petitions didn't just reiterate the same concerns that King and Dey had registered about the Teva product in the abstract. Instead, they contend, Mylan provided specific concerns about the specific product.

Defendants merely provide their disagreement with the way Dr. Peck has interpreted the content of the competing Citizen Petitions and the FDA's communications. But their attacks don't convince the court that it should exclude his opinion. Dr. Peck has provided an adequate basis for his conclusions about the contents of Mylan's Citizen Petitions and the FDA's response. Doc. 2164-8 at 30–34 (¶¶ 63–72); Doc. 2146-20 at 20–21 (¶¶ 43–44). Defendants can attack those conclusions on cross-examination or by presenting evidence contradicting his conclusions. But, the court won't exclude his opinion on this basis.

*Last*, defendants argue that Dr. Peck's opinion that the FDA rejected Mylan's Citizen Petitions based on "egregiously faulty trials" is inadmissible because Dr. Peck didn't perform an adequate analysis of Mylan's underlying study. Doc. 2164-8 at 32 (¶ 68). First, defendants again criticize Dr. Peck for failing to remember specific details about the study in his deposition. But, for reasons already discussed, the court won't exclude an opinion based on the expert's inability to recall certain details while testifying at a deposition. Second, defendants argue that Dr. Peck's criticism of Mylan's study incorrectly assumes—with no basis—that it used a "non-comparable proxy device" that had a different volume, liquid color, and needle gauge. Doc. 2164-8 at 32–33 n.70 (¶ 68). But, for support, defendants cite a document explaining that the study was "conducted using a prototype device based on a photograph of the proposed generic [EAI] released by

Antares, the manufacturer of the device, and examination of the Otrexup™ product." Doc. 2147-1 at 5. Plaintiffs say this document confirms Dr. Peck's opinion that the Teva product differed from the prototype used in Mylan's study—*i.e.*, the Antares methotrexate auto-injector. The court agrees Dr. Peck provides a reliable basis for this portion of his opinion.[19] Doc. 2164-8 at 32–33 (¶ 68).

[19]    Dr. Peck's Expert Report refers to the "Antares methotrexate autoinjector" as the "non-comparable proxy device." Doc. 2164-8 at 33 (¶ 68). The parties never explain explicitly whether that's the same thing as the "Otrexup™ product." But, according to the Otrexup™ website, that product is "a single-dose auto-injector containing a prescription medicine, methotrexate" that is sold by Antares Pharma, Inc. *See* Otrexup (Methotrexate) Injection for Subcutaneous Use, https://www.otrexup.com/ (last visited Apr. 6, 2021); *see also* *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224–25 (10th Cir. 2007) (holding that, under Fed. R. Evid. 201, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web"). Based on this information, the court considers Dr. Peck's references to the "Antares methotrexate autoinjectors" as ones referring to the Otrexup™ product.

Also, Dr. Peck cites the review of the National Center for Health Research ("NCHR") of Mylan's study that identified problems with the study, including that "it lacked a control group, did not study the actual generic but a prototype instead, used a small number of participants, failed to provide them with proper instructions for use, and told participants to watch a video rather than actually use the Teva device." Doc. 2164-8 at 33 n.69 (¶ 68) (citing http://www.center4research.org/team-company-behind-epipen-fought-keep-cheaper-generic-off-market/).[20] Based on the information cited and described in Dr. Peck's Expert Report, he provides a sufficient reason why he reaches his conclusion that the study Mylan submitted to the FDA with its Citizen Petitions was based on faulty trials.

[20]    Defendants also assert that Dr. Peck fails to support his opinion about Mylan's study with a proper expert analysis because language from his Expert Report simply parrots portions of plaintiffs' Complaint. But, plaintiffs explain, both

Dr. Peck's Expert Report and the Complaint relied on the NCHR's conclusions about Mylan's study. Indeed, Dr. Peck's Expert Report cites information gathered from the NCHR's website about its study as reported in the media. The court doesn't find that the similarities between how the Complaint describes the flaws of Mylan's study and how Dr. Peck describes them render his opinion inadmissible.

**\*45** For all these reasons, the court rejects defendants' arguments that Dr. Peck fails to supply a reliable basis to support his opinion that Mylan submitted deficient Citizen Petitions with the FDA. So, the court won't exclude Dr. Peck's opinion on this basis.

### b. Opinion that the Citizen Petitions Delayed Approval

Defendants next assert that Dr. Peck's opinion that Mylan's Citizen Petitions caused the FDA to delay its approval of Teva's generic is speculative, and thus, inadmissible.

*First*, defendants argue that the court should exclude Dr. Peck's opinion because he explicitly testified during his deposition that he was not offering an opinion whether Mylan's Citizen Petitions delayed FDA approval. *See* Doc. 2142-3 at 66 (Peck Dep. 346:18–24) ("Q. And you are not opining in this case that this citizen petition delayed this product's approval, are you?...That's not your opinion here? A. No, it's not."). Plaintiffs respond, arguing Dr. Peck misspoke during this portion of his deposition. And, plaintiffs argue, his Expert Report clearly identifies his opinions in this case. The court agrees.

Dr. Peck's Expert Report plainly recites that he's offering an opinion that Mylan filed its Citizen Petitions as an *attempt* to delay approval, and *likely did* cause a delay in FDA approval. *See* Doc. 2164-8 at 9 (¶ 19) (opining that "Defendants filed deficient Citizen Petitions in a transparent attempt *to delay approval* of the Teva EAI" (emphasis added)); *see also id.* at 34 (¶¶ 71–72) (describing Mylan's actions as "inappropriate and unprecedented" and "intended to prevent the FDA from approving the generic...and likely diverted...attention and time...to address the Mylan threats" and also explaining that Mylan's actions resulted in "burdening the agency, if not also delaying approval"). His deposition testimony never abandoned these opinions.

As Dr. Peck clarified in his Rebuttal Report, "both [his] opening report and other parts of [his] deposition testimony were clear that the Citizen Petition was a transparent attempt by defendants to delay approval." Doc. 2146-20 at 18 n.52 (¶ 38). Also, he concedes that he's "not rendering opinion about what happened after 2014" because he doesn't "have specific information about delays at the FDA caused by [Mylan's] Citizen Petition[.]" *Id.* So, he's not offering an opinion that the Citizen Petitions at issue here did—in fact—cause delay. But, as explained in his Rebuttal Report and "based on [his] experience, it is clear that this course of conduct *was designed to, and likely did, cause delays*." *Id.* (emphasis added).

The court finds no reason to exclude Dr. Peck's opinion based on just a few lines of deposition testimony that doesn't abandon any opinions that his Expert Report asserts. *See, e.g.*, *Assoc. of Christian Schs. Int'l v. Stearns*, 679 F. Supp. 2d 1083, 1093 (C.D. Cal. 2008) (finding that an argument "premised on a few lines of [an expert's] deposition does not hold" where "[u]pon inspection," the "deposition testimony is completely consistent with his expert report"). So, the court rejects defendants' first argument asserting that the court should exclude Dr. Peck's opinion about the Citizen Petitions.

*Second*, defendants assert that Dr. Peck conducted no analysis to reach his conclusion that Mylan's Citizen Petitions likely caused delays. Thus, they argue, the court should exclude the opinion as speculative. The court disagrees. Dr. Peck makes clear that he isn't opining that the Citizen Petitions *certainly* caused delay in the FDA's approval of the Teva generic. As discussed, his opinion is more nuanced. Instead, he opines that Mylan filed its Citizen Petitions as part of "a transparent *attempt* to delay approval of the Teva EAI," Doc. 2164-8 at 9 (¶ 19) (emphasis added), and that Mylan's "conduct *was designed to, and likely did, cause delays*[,]" Doc. 2146-20 at 18 n.52 (¶ 38) (emphasis added). To support that opinion, Dr. Peck relies on his analysis of the Citizen Petitions, which he concludes "lacked merit." Doc. 2146-20 at 18 (¶ 37). Then, he explains, since the Citizen Petitions had no merit, their only "purpose...was to consume the FDA's finite resources and request the imposition of stricter standards than were necessary to establish Teva's EAI as an approvable generic equivalent." *Id.*; *see also* Doc. 2164-8 at 34 (¶ 71) (opining that Mylan's actions "occupied a great deal of time at the FDA, and likely diverted some OGD reviewer's attention and time during this time period to address the Mylan threats"). Dr. Peck further explains that even after the FDA denied Mylan's Citizen Petitions " 'without comment,' " Mylan's attorney repeatedly called and emailed the FDA from June until December 2015, threatening to pursue 'immediate legal action.' " Doc. 2146-20 at 18 (¶ 37). Dr. Peck has conducted a sufficient review of the evidence, and he has explained why it provides a reliable basis for his conclusion that Mylan filed its Citizen Petitions in "a transparent attempt" to delay approval. Doc. 2164-8 at 9 (¶ 19). And also, Dr. Peck provides a sufficient justification for his opinion that, based on his experience working for the FDA, Mylan's Citizen Petitions likely did delay approval. [21] So, the court won't exclude Dr. Peck's opinion about Mylan's filing of Citizen Petitions.

[21]     The parties both cite the FDA's Reports to Congress for fiscal years 2015 and 2018, arguing that they either confirm or refute that the Mylan Citizen Petitions actually caused a delay in the FDA's approval of the Teva generic. The FDA's 2018 Report states that "[n]o approvals for ANDAs...were delayed because of a [Citizen Petition] in this reporting period." Report to Congress: 11th Annual Report on Delays in Approvals of Applications Related to Citizen Petitions and Petitions for Stay of Agency Action for Fiscal Year 2018, at 1 (Feb. 11, 2020), *available at* https://www.fda.gov/media/135628/download. Defendants interpret this statement to mean that no FDA approvals in 2018 (which would include the Teva generic's approval) were delayed because of the filing of a Citizen Petition. But, plaintiffs argue, this sentence refers only to Citizen Petitions *filed* in 2018. Thus, plaintiffs argue, the Report doesn't pertain to the Mylan Citizen Petitions because Mylan filed them in 2015. So, both parties also look to the 2015 FDA Report. It states that the "approval of one ANDA was delayed because of two" Citizen Petitions. Report to Congress: Eighth Annual Report on Delays in Approvals of Applications Related to Citizen Petitions and Petitions for Stay of Agency Action for Fiscal Year 2015, at 1 (July 29, 2016), *available at* https://www.fda.gov/media/99871/download. The parties dispute whether this sentence applies to the Mylan Citizen Petitions because while Mylan filed two Citizen Petitions against one ANDA (as the sentence references), the FDA treated the Citizen Petitions in a single response so it may have considered Mylan's submissions as a single filing. Neither of these Reports conclusively discusses whether the Mylan Citizen Petitions

actually delayed the FDA's approval of the Teva generic. So, the court finds, neither provides evidence contradicting Dr. Peck's opinion that Mylan's actions attempted to, and likely did, delay FDA approval. Thus, the court finds no reason to exclude Dr. Peck's opinion based on these FDA Reports.

### C. Should the Court Exclude Dr. Peck's References to Settlement Discussions Under Fed. R. Evid. 403?

**\*46** *Finally*, defendants argue the court should exclude Dr. Peck's references to Teva settlement discussions under Fed. R. Evid. 403 because, they contend, it will mislead the jury and prejudice defendants. Defendants criticize Dr. Peck's Expert Report because it refers to Teva's settlement discussions in the context of the company's FDA approval process. But, Dr. Peck made it clear. He is providing no opinion whether the Teva settlement discussions *caused* delay in the FDA approval process. Defendants argue that Dr. Peck's references to the settlement discussions thus pose a danger of misleading the jury to think that he is opining that those settlement discussions *caused* delay in the FDA approval process when, instead, he only is offering opinions whether the FDA's actions caused delays in the FDA approval process.

Plaintiffs never respond directly to this argument. Instead, they contend that defendants are trying to use Dr. Peck's record of public service against him by arguing that his credentials as a former government official have the potential to mislead the jury. But, plaintiffs don't address whether Dr. Peck's references to the Teva settlement discussions pose a danger of misleading the jury.

Based on defendants' arguments and plaintiffs' failure to rebut them, the court agrees with defendants. Dr. Peck's references to the settlement discussions pose a danger of misleading the jury. So, the court excludes under Fed. R. Evid. 403 any portions of his opinions that refer to Teva settlement discussions in the context of Teva's process seeking to secure FDA approval of its generic EAI. Dr. Peck makes it clear that he is not offering opinions about *why* Teva slowed its responsiveness during the FDA application process. Doc. 2142-3 at 7–8 (Peck Dep. 113:1– 114:19). He testified that "it's basically mysterious why that happened." *Id.* at 7 (Peck Dep. 113:4–17). And, he concedes, for him to offer testimony about the cause for Teva slowing down its responsiveness would amount to "conjecture" because he doesn't "know specifically" the reason for Teva's actions.

*Id.* at 8 (Peck Dep. 114:1–6). Also, Dr. Peck conceded that he never "conduct[ed] an analysis of whether there was a cause-and-effect relationship between Teva commencing settlement discussions with defendants and the noticeable slowing of responsiveness to the FDA requests[,]" and he has no "opinion one way or another about whether there was a cause-and-effect relationship between those two things[.]" *Id.* at 15–16 (Peck Dep. 125:19–126:12). Yet, his Expert Report repeatedly refers to the Teva settlement discussions and juxtaposes the timing of those settlement discussions with Teva's actions (or inaction) in the FDA approval process. The court agrees with defendants. These references to settlement discussions present a peril that the jury will misunderstand Dr. Peck's expert opinion as offering an opinion whether the Teva settlement discussions caused a delay in the FDA approval process. So, the court precludes Dr. Peck from testifying about the Teva settlement discussions in the context of his opinions about the FDA approval process. [22]

[22]   With this ruling, the court only precludes *Dr. Peck* from referring to the timing of the Teva settlement discussions. This ruling doesn't bar plaintiffs from offering other admissible evidence about the timing of Teva settlement discussions. Also, it doesn't preclude argument that the evidence establishing the timing of the Teva settlement discussions corresponds with the times when Dr. Peck opines that Teva was non-responsive or slow to respond to the FDA's requests, if plaintiffs are able to support that argument with other admissible evidence.

In sum, the court rejects all but one of defendants' arguments seeking to exclude Dr. Peck's expert opinions. As just discussed, the court won't permit Dr. Peck to testify about the Teva settlement discussions. But, it declines to exclude any other portions of Dr. Peck's expert opinions. The court thus grants in part defendants' Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Dr. Carl Peck, and it also denies the motion in part.

### VII. Defendants' Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness James Bruno (Doc. 2136)

**\*47** Next, defendants ask the court to exclude James Bruno's testimony and Expert Report. Plaintiffs have retained James Bruno to provide rebuttal expert testimony in response to opinions offered by defendant's expert, Dr. Steven M. Weisman. Doc. 2164-5 at 5 (Bruno Feb. 7, 2020 Rebuttal Expert Report ¶ 1). Dr. Weisman offers an opinion that

the Teva generic EAI "was an incredibly challenging product to develop, that Teva faced multiple developmental complications, and that the approval timeline of Teva's generic EAI was reflective of consistent and reasonable commercial efforts." *Id.* at 7–8 (¶ 16) (citation and internal quotation marks omitted). Dr. Weisman asserts "that Teva treated its generic EAI device as a priority project and made reasonable commercial efforts to bring it to market throughout the entire time period of its development." *Id.*

Plaintiffs retained Mr. Bruno to review Dr. Weisman's Expert Report and provide opinions about the manufacturing and commercial development of Teva's generic EAI that are beyond the scope of Dr. Carl Peck's Expert Report. *Id.* As part of his engagement, Mr. Bruno reviewed the factual record cited and relied on by Dr. Weisman, as well as other documents Dr. Weisman didn't review, including Teva's meeting minutes for the project. *Id.* at 8 (¶ 18). Generally, Mr. Bruno opines that "Teva neither treated its generic EAI device as a priority nor made reasonable commercial efforts to develop the product to bring it to market in the United States." *Id.* (¶ 20). He asserts that "the manufacturing issues experienced by Teva were by no means unique or complicated" and "could have been resolved far more quickly had Teva followed standard practices." *Id.* (¶ 21). He opines that Teva, instead, "took its proverbial 'foot off the gas' " after it settled the patent infringement litigation with Mylan and Pfizer, but then "recommence[d] normal commercial efforts as the potential June 2015 entry date approached." *Id.* at 9 (¶ 22).

Defendants argue the court should exclude Mr. Bruno's opinions for several reasons. But the court needs to address only one of them. Defendants assert Mr. Bruno isn't qualified to render expert opinion about Teva's manufacturing of its generic EAI because he lacks the requisite knowledge or experience—specifically on manufacturing issues—to opine on this topic. The court agrees with them, and explains why, below.

### A. Is Mr. Bruno Qualified to Render an Opinion about Manufacturing?

Defendants argue that the court should exclude Mr. Bruno's expert testimony because he lacks the required "knowledge, skill, experience, training, or education" to offer an expert opinion about Teva's manufacturing of its generic EAI. Fed. R. Evid. 702. But, plaintiffs respond, Mr. Bruno's

extensive experience in the pharmaceutical industry renders him qualified to offer his proffered opinions in this case.

Mr. Bruno has more than 47 years' experience working in the pharmaceutical industry. Doc. 2164-5 at 32–33 (App. A) (listing professional experience from 1973 to the present). Mr. Bruno has a Bachelor of Science in Chemistry, a Master of Science in Chemistry, and a Master of Business Administration. *Id.* at 32. Working at six different companies, Mr. Bruno gained experience in developing and manufacturing pharmaceutical products. *Id.* at 32–33. Also, Mr. Bruno has worked on various submissions to the FDA, including NDAs and ADNAs, for both simple and complex pharmaceuticals. *Id.* at 6 (¶ 9). And, he has "interacted with the FDA on behalf of clients and [has] acted as the FDA agent for several foreign manufacturing companies." *Id.* During his career, Mr. Bruno has "worked on various dosage types, including solid oral dosages (tablets and capsules), solutions, injectables (including prefilled syringes), liquids, creams, and lotions." *Id.* Also, he has "worked on several emergency use products such as Pralidoxime, which...is supplied in a prefilled syringe[,]" and he has "experience with the development of Epinephrine products." *Id.*

 **\*48**  In 2002, Mr. Bruno founded Chemical and Pharmaceutical Solutions, Inc. ("CAP Solutions"), a pharmaceutical consulting company, where he currently serves as the Managing Director. *Id.* at 5 (¶ 2). In his position, he is "primarily responsible for offering executive-level consulting to pharmaceutical companies and contract manufacturers on matters of manufacturing, supply, and development of pharmaceutical products." *Id.*

Mr. Bruno has served as the President of the Drug, Chemical & Associated Technologies Association. *Id.* at 6 (¶ 12). He still is actively involved in this professional organization, as well as with the Society of Chemical Manufacturers & Affiliates and the American Chemical Society and BioNJ. *Id.* Also, Mr. Bruno has worked with chemical manufacturing trade publications, serving as a member of the Editorial Committee of *PharmaChem* and a reviewer for *Organic Process Research & Development*. *Id.* (¶ 13). Mr. Bruno has published many articles in trade publications on pharmaceutical manufacturing and has provided training on pharmaceutical manufacturing. *Id.*

Also, Mr. Bruno has served as an expert witness in antitrust and patent infringement cases involving pharmaceutical products. *Id.* at 7 (¶ 14). And, he has served as an expert

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 169 of 292

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

for the Federal Trade Commission to offer opinions about manufacturing and contracts of both dosage and Active Pharmaceutical Ingredient ("API"), including for *In re Androgel Antitrust Litigation*, 1:09-md-2084 (N.D. Ga.). *Id.* at 6 (¶ 10).

Plaintiffs argue that Mr. Bruno's experience in the pharmaceutical manufacturing industry qualifies him sufficiently to provide expert testimony in this case—specifically, on the topic whether Teva made reasonable commercial efforts to develop its generic EAI product to bring it to market in the United States. Defendants disagree. Defendants rely on Mr. Bruno's deposition testimony to argue that he lacks the relevant expertise to opine about Teva's manufacturing efforts. Specifically, they argue that Mr. Bruno is not an engineer or mechanic, and he has no experience working on mechanical issues involving auto-injectors that could qualify him to render the expert opinions he offers in the case. *See* Doc. 2142-4 at 7–11 (Bruno Dep. 34:3–38:8) (testifying that he is not an engineer or mechanic and that he's worked on the development of drug formulation (*i.e.*, the chemical ingredients) intended for delivery in an auto-injector but he's never worked with a client "to correct mechanical issues involving an auto-injector"). The court agrees with defendants.

Without question, Mr. Bruno has significant experience working in the pharmaceutical industry. But his deposition testimony makes clear that he lacks the requisite knowledge or experience to render opinions about *the mechanics* of the Teva generic EAI, or Teva's ability and efforts to correct *mechanical issues* with its product when it was trying to secure FDA approval.

Most troubling, Mr. Bruno testified that he's never even handled the Teva generic EAI, and he can't explain how it works. *Id.* at 4 (Bruno Dep. 12:18–22) ("I can give you an idea of how auto-injectors work in general, but not specifically the Teva pen."). Also, Mr. Bruno incorrectly testified that the Teva generic, as well as EpiPen products, use a plunger for injection instead of what they actually do—*i.e.*, they auto-inject epinephrine when pressed into the patient's thigh. *Id.* at 3–5 (Bruno Dep. 11:14–21, 12:2–7, 12:23–13:8).

**\*49** Defendants argue that Mr. Bruno's lack of knowledge about the specific product at issue—*i.e.*, the Teva generic EAI—make him unqualified to provide expert testimony. Without knowledge about the Teva generic EAI, defendants assert, Mr. Bruno is in no position to offer an opinion whether Teva

experienced manufacturing issues that "were by no means unique or complicated" or "could have been resolved far more quickly had Teva followed standard practices." Doc. 2164-5 at 8 (¶ 21). Defendants are correct. Although an expert's "personal knowledge and experience" may qualify him to provide reliable expert testimony on a particular topic, *Kumho Tire*, 526 U.S. at 150, that kind of testimony satisfies the reliability standard when it is "based on *actual knowledge*, and not mere subjective belief or unsupported speculation[,]" *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341–42 (10th Cir. 2017) (emphasis added and citations and internal quotation marks omitted). And, "[w]hen expert opinion 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict' and will be excluded." *Id.* at 1342 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

That's precisely the situation here. As Mr. Bruno testified, he has no experience working as an engineer, a mechanic, or with clients to correct mechanical issues involving auto-injectors. Also, he has no experience specifically with the Teva generic EAI. He can't explain how it works, and he incorrectly testified that it uses a plunger for injection. Thus, he lacks the requisite personal knowledge and experience to offer an opinion about the mechanical issues that Teva faced with its generic EAI. And, despite Mr. Bruno's many years' experience working in the pharmaceutical industry generally, that experience doesn't include expertise with manufacturing or mechanical issues. Instead, the record shows that Mr. Bruno's pharmaceutical experience is most grounded in chemistry—*i.e.*, he holds chemistry degrees and he has done extensive work developing the chemical components in pharmaceutical products. But, as he testified, he lacks experience working on engineering and mechanical issues with auto-injectors.

Without the requisite knowledge and experience to offer opinions about manufacturing issues, Mr. Bruno isn't qualified to opine whether Teva made reasonable commercial efforts to develop its generic EAI and to correct mechanical issues in a timely fashion so that it could bring its product to market. *See City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 586–87 (10th Cir. 1998) (affirming exclusion of testimony by expert with about 30 years' experience in insurance claims adjustment and claims handling because the expert lacked specialized knowledge about New Mexico bad

faith cases and lacked experience with third party claims and noting, "[t]hough a proffered expert possesses knowledge [in] a general field, the expert who lacks *specific knowledge* does not necessarily assist the jury" (emphasis added)); *see also Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 665 (10th Cir. 2013) (affirming exclusion of expert testimony because the proponent of the opinion "failed to explain how [the expert's] general experience in the tire industry qualified him to opine on [tire] design issues" and explaining that "[e]xperience is not necessarily a password to admissibility" because an expert also must "connect the dots" and explain how "that experience supports [the expert] opinion").

This problem is even more evident when one reads Mr. Bruno's testimony about the specific manufacturing issues that Teva experienced. For example, Mr. Bruno opines that Teva's modification of its device to prevent the issue it was having with accidently firing was "not a particularly complicated one to address[.]" Doc. 2164-5 at 24 (¶ 76). But, when asked about this opinion in his deposition, Mr. Bruno was unable to explain what steps Teva needed to take to fix this problem. Doc. 2142-4 at 111, 114 (303:8–19, 306:21–25). Instead, he testified that Teva was a "sophisticated company" and there were other auto-injectors on the market that Teva could use as an example. *Id.* at 111 (303:8–19). But, with this response, Mr. Bruno provides no substance to support his opinion that, as he asserts, the firing issue was not a "complicated" mechanical issue for Teva to rectify with its generic EAI. Mr. Bruno can't reliably opine that a problem's fix was "not complicated" when he doesn't even know what the problem was. Instead, his conclusionary assertion that Teva could fix the problem simply because it was a sophisticated company sounds in conclusory speculation.

**\*50** As another example, Mr. Bruno opines that Teva's issue with the stoppers in its generic EAI "was a minor compatibility issue that a company like Teva had the experience to easily resolve." Doc. 2164-5 at 24 (¶ 75). Mr. Bruno testified about his understanding of the problem based on his review of defendants' expert's Report, but he never reviewed any documents to determine what the precise issue was with the stoppers in the Teva generic EAI. Doc. 2226-4 at 13–14 (Bruno Dep. 297:18–298:15). And, as discussed, Mr. Bruno testified that he wasn't able to describe how the Teva product works—specifically—but instead only could testify generally about how EAIs work. Doc. 2142-4 at 4 (Bruno Dep. 12:18–22). But, nevertheless, Mr. Bruno asserts that the issue with the stopper was a "normal event[ ]" and one of the "very common issues" that a manufacturer faces in

development of an auto-injector. Doc. 2226-4 at 14 (Bruno Dep. 298:1–15). The court doesn't understand how Mr. Bruno is qualified to render this opinion about a mechanical issue specific to the Teva generic EAI when he hasn't handled the product and he wasn't able to explain specifically—or even accurately—how it works. So, for all the reasons discussed, the court concludes that Mr. Bruno isn't qualified to render expert opinion about Teva's manufacturing issues with its generic EAI. The court thus grants defendants' Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness James Bruno.

## VIII. Defendants' Motion to Exclude Plaintiffs' Patent Litigation Expert (Doc. 2151)

Defendants' next motion asks the court to exclude the affirmative merits opinions offered by plaintiffs' patent litigation expert. Plaintiffs have retained Prof. Andrew Torrance to opine about the parties' likelihood of success in the patent lawsuits involving EpiPen and Nuvigil. [23] Defendants assert two arguments why the court should exclude Prof. Torrance's opinions. They say: (1) Prof. Torrance's conclusions are based on an unreliable methodology, are misleading, and unhelpful to the trier of fact, and (2) Prof. Torrance implies that he performed scientific, validity, and infringement analyses that actually he never performed. The court discusses both of defendants' two arguments, below. But first, it addresses Prof. Torrance's qualifications to provide expert testimony in this case.

[23]  Prof. Torrance offers two merits Expert Reports: (1) an affirmative merits Expert Report addressing the likelihood of success in the EpiPen and Nuvigil patent litigation, and (2) an Expert Report offering rebuttal opinions to the affirmative merits Expert Report offered by defendants' expert, Charles E. Clemens, about the '827 Patent. The motion discussed in this section of the Order (Part VIII.) addresses just the first Expert Report—*i.e.*, Prof. Torrance's affirmative merits opinions about the likelihood of success in the EpiPen and Nuvigil patent litigation. The motion discussed in the next section of the Order (Part IX.) addresses Prof. Torrance's rebuttal opinions offered in response to Mr. Clemens's expert opinions about the '827 Patent.

At class certification, defendants moved to exclude Prof. Torrance's expert opinions from the court's consideration of the class certification motion. The court denied that

motion.[24] Doc. 2017-1 at 69–81. When deciding that motion, the court concluded that "Prof. Torrance's experience and education qualify him to opine about Teva's likelihood of success in the Teva patent litigation." *Id.* at 70 n.24.[25] With the current motion, defendants never argue that Prof. Torrance isn't qualified to offer his expert opinions. And, plaintiffs provide ample support for finding Prof. Torrance qualified to render the expert opinions he offers at the merits stage of this litigation.

[24]    Defendants repeatedly assert that the court must apply "a more stringent application" of the *Daubert* standard at the merits stage than it did at class certification. Doc. 2153-1 at 9; *see also id.* at 10 ("We are now past the class certification stage. A full-blown *Daubert* analysis is therefore warranted."); Doc. 2223-1 at 5 (asserting that the court admitted Prof. Torrance's opinion "under the more lenient standard applied at [the class certification] stage"). The court disagrees that it applied a "more lenient" *Daubert* standard at class certification. The court's Order discussed the two approaches that courts have taken when assessing challenges to expert testimony on class certification. Doc. 2017-1 at 3. It noted that the Tenth Circuit has not yet decided what standard a court should apply in that context. *Id.* And, it explained that the Third Circuit has declined to examine whether any differences exist between the two approaches because they both require applying a " '*Daubert* inquiry to expert testimony offered to prove satisfaction of Rule 23's requirements.' " *Id.* at 4 (quoting *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187, 188 n.8 (3d Cir. 2015)). The court followed the Third Circuit's approach and declined "to decide whether the two approaches differ in a material fashion." *Id.* at 4. Instead, the court applied "the *Daubert* standard" to the opinions the parties had proffered as support for or in opposition to the Rule 23 class certification requirements. *Id.*; *see also id.* at 5–7 (reciting the standards governing expert testimony under *Daubert* and Fed. R. Evid. 702); *id.* at 70–71, 76–78, 80–81 (applying *Daubert* to Prof. Torrance's expert opinions). Thus, when considering defendants' previous challenges to Prof. Torrance's opinions, the court applied the *Daubert* standard to those opinions. It didn't stray

from that standard by applying a more lenient test for admitting expert opinion testimony.

[25]    Plaintiffs assert that the court previously found Prof. Torrance " 'well-qualified' to opine on how a reasonable, competent, and experienced patent attorney would view the likely outcome, costs, and duration of prior patent infringement disputes had they not settled." Doc. 2185-1 at 8 (quoting Doc. 2017-1 at 70 n.24). This description takes some liberties with the actual language of the court's Order. The "well-qualified" reference is not from the court's conclusion about Dr. Torrance but, instead, from a description of plaintiffs' argument about him. Doc. 2017-1 at 70 n.24. What the court actually held when discussing Prof. Torrance's qualifications to provide expert testimony is quoted in the text above.

**\*51** Prof. Torrance is a tenured professor and the Paul E. Wilson Distinguished Professor at the University of Kansas School of Law ("KU Law"). Doc. 2153-2 at 7–8 (Torrance Oct. 31, 2019 Expert Report ¶ 9). He earned a Bachelor of Science in biology from Queen's University, an A.M. and Ph.D. in biology from Harvard University, and a J.D. from Harvard Law School. *Id.* Since 2005, Prof. Torrance has taught courses at KU Law in patent law, intellectual property law, food and drug law, biolaw, biodiversity law, and legal analytics. *Id.* Since 2012, Prof. Torrance has served as a visiting scholar at the Massachusetts Institute of Technology ("MIT") Sloan School of Management. *Id.* And, he previously served as a Visiting Professor at Harvard University. *Id.*

Prof. Torrance has received many awards for his scholarship and teaching at KU Law. *Id.* at 8 (¶ 10). He has "published more than 50 articles or book chapters on patent law, intellectual property law, food and drug regulation, biotechnology law, medical device innovation and regulation, legal analytics, and innovation[.]" *Id.* (¶ 11). And, he has made "more than 200 presentations to scholars and governmental and corporate audiences[.]" *Id.* Prof. Torrance has concentrated his scholarship on "patent strength, as reflected in patent validity, enforceability, and infringement." *Id.*

Since 2002, Prof. Torrance has been a registered patent attorney. *Id.* at 9 (¶ 13). He has practiced patent law at the law firms of Morrison & Foerster LLP and Fish & Richardson PC. *Id.* at 8–9 (¶ 12). He was in-house patent counsel for Inverness Medical Innovations, a medical device company. *Id.* And,

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 172 of 292

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....
2021 WL 2577490

he served as Intellectual Property Counsel for Uhlig LLC, a software-based publishing company, where he led intellectual property strategy. *Id.*

On August 26, 2019, Prof. Torrance was appointed as the head of intellectual property at the Broad Institute of MIT and Harvard. *Id.* In his position as Senior Director, Intellectual Property, he is the chief intellectual property counsel for the Broad Institute—which is "one of the foremost biomedical research institutions in the world (for example, ranking first according to Mapping Scientific Excellence)." *Id.* (citation omitted). His responsibilities at the Broad Institute include "all aspects of intellectual property, from filing and prosecuting patent applications, patent licensing, and assessment of patent strength, quality, invalidity, enforceability, and infringement, to patent litigation and establishment of new companies focused on patent rights to particular new technologies." *Id.* at 9–10 (¶ 14). At the Broad Institute, he supervises a team of patent attorneys and professional patent support staff; he works with transactional attorneys, business development professionals, patent financial specialists, and scientists; and he advises senior management on patent strategy. *Id.*

In Spring 2019, the Law and Economics Center ("LEC") at George Mason School of Law invited Prof. Torrance to start teaching "Legal Analytics" to classes of judges. *Id.* at 10 (¶ 15). He taught his first class in October 2019 in Santa Fe, New Mexico, giving 14 hours of lectures to a class of 40 to 60 judges (state and federal, trial and appeals) for more than four days. *Id.* The LEC has asked him to teach this class regularly, several times a year, to future classes of judges. *Id.* Also, the LEC invited Prof. Torrance to teach a class to the American College of Business Judges on "Legal Analytics and Expert Witnesses." *Id.* He taught his first class in October 2019 to about 60 state court judges gathered in Pittsburgh, Pennsylvania, and the LEC has asked him to teach the course regularly in the future. *Id.* Prof. Torrance also has a contract with Wolter Kluwer Aspen Press to write a textbook on "Legal Analytics." *Id.*

 **\*52**  Based on this summary of Prof. Torrance's education, knowledge, and professional experience, the court finds that he is qualified to render his opinions about the likelihood of patent litigation success that he offers in this lawsuit. The court now turns to address defendants' arguments for excluding Prof. Torrance's opinions on reliability grounds.

### A. Are Prof. Torrance's Conclusions Based on an Unreliable Methodology, Misleading, and Unhelpful to the Trier of Fact?

Defendants make four arguments to support their assertion that Prof. Torrance's opinions lack a reliable methodology, are misleading, and unhelpful to the trier of fact. The court addresses the four arguments, below.

### 1. Reliability of Prof. Torrance's "Holistic" Analysis

*First*, defendants argue that the court should exclude Prof. Torrance's opinions about the likelihood of success in the EpiPen and Nuvigil patent litigation because it is based on an unreliable "holistic" analysis that isn't capable of testing. For the EpiPen/Teva litigation, Prof. Torrance opines that "a reasonable, competent, and experienced patent attorney would estimate a probability of about 85% ± 10% that Teva would not have been found liable for patent infringement of any valid patent claim in any final adjudication by the Federal Circuit." Doc. 2153-2 at 69 (Torrance Oct. 31, 2019 Expert Report ¶ 135). And, for the Nuvigil/Cephalon litigation, he opines that "a reasonable, competent, and experienced patent attorney would estimate a probability of about 80% ± 10% that Mylan would not have been found liable for patent infringement of at least one valid patent claim of the '570 patent (or the '516 patent, for that matter) in any final adjudication by the Federal Circuit." *Id.* at 101 (¶ 207).

Prof. Torrance testified that he performed a "holistic analysis" to reach his conclusions about the percentage likelihood of patent litigation success. Doc. 2153-3 at 13 (Torrance Dep. 105:12–106:10). He explained "the way that [he] came to this number was to feed in all of the information and all of the analysis" from his Expert Report. *Id.* He didn't assign a "particular percentage" to a "particular decision" but instead described his conclusions as "the end product of all of the analysis in the Merits Report." *Id.*

Defendants argue that the court should exclude Prof. Torrance's "holistic" analysis as unreliable because it isn't susceptible to testing to determine whether it is reliable. Defendants assert that when a court decides "whether a theory or technique is scientific knowledge that will assist the trier of fact[,]" it should ask "a key question...whether it can be (and has been) tested." *Daubert*, 509 U.S. at 593; *see also id.* ("Scientific methodology today is based

on generating hypotheses and testing them to see if they can be falsified[.]" (citation and internal quotation marks omitted)). But here, defendants argue, Prof. Torrance's "holistic" methodology can't be tested or falsified. So, they contend, the court should exclude his opinions about the likelihood of patent litigation success.

As support for this argument, defendants fault Prof. Torrance's analysis for not using any mathematics or formula to reach the percentages he provides for the likelihood of success in patent litigation. Doc. 2153-3 at 37 (Torrance Dep. 302:20–303:3) (testifying that he didn't "put any mathematics in the report having to do with the 85 percent" but instead he bases the percentage on his "understanding of everything that [he has] reviewed, [his] experience, [and] the connections between things"); *see also id.* (Torrance Dep. 303:22–25) (conceding that his Expert Report "didn't lay out some sort of a formula" to calculate the percentage of likelihood of success). Also, defendants criticize his methodology because he didn't assign any certain percentages to underlying issues or decision points that he used to factor into his final conclusion for the percentage of likelihood of litigation success. *See id.* at 17 (Torrance Dep. 123:15– 124:12) (testifying that "ascribing a particular number to [Teva's non-infringement defense] was not something that [he] was asked to do nor was it part of the method that [he] used"); *see also id.* at 20–21 (Torrance Dep. 140:19–141:23) (explaining "all of the factors that go into [his] calculus" but that he "can't give...a particular percentage on one isolated factor").

 **\*53**  Plaintiffs respond that Prof. Torrance isn't required to set forth a mathematical formula to test his methodology for it to satisfy the *Daubert* standard. Instead, plaintiffs argue, Prof. Torrance sufficiently has described his methodology in both his Expert Report and his deposition testimony. In both, he cited the facts and documents that he relied on to form his conclusions and explained how he used that information to determine the likelihood of success in patent litigation based on his knowledge and experience as a patent lawyer, legal scholar, and law professor. *See* Doc. 2153-2 at 7, 28–34 (¶¶ 8, 48–65) (describing his analytic approach, listing the materials he reviewed to form his opinions, and providing the factors that he considers as the ones that affect patent litigation outcome, duration, and cost); *see also id.* at 34–75 (¶¶ 67–146) (providing his analysis of the Teva litigation); *id.* at 75–81 (¶¶ 147–166) (providing his analysis of the Intelliject litigation); *id.* at 82–103 (¶¶ 169–214) (providing his analysis of the Cephalon litigation); Doc. 2153-3 at 11–12 (Torrance Dep. 99:15–103:9) (testifying about the material he

reviewed and how he reached his conclusions after reviewing that material); *id.* at 20–21 (Torrance Dep. 140:19–141:23) (explaining his approach for reaching his opinions based on reviewing the documents and drawing on his experience); *id.* at 37–38 (Torrance Dep. 304:25– 305:5) (explaining that he calculated the percentage of litigation success by "look[ing] at all of the materials," "draw[ing] on my experience," and "com[ing] up with a reasonable range").

While it is a closer call than others, the court agrees with plaintiffs. Here, Prof. Torrance has provided a reliable basis for his methodology. He explains that he reached his conclusions after reviewing the facts and evidence relevant to the patent litigation and then applying his expertise and knowledge about patent law to those facts. As this court noted in its *Daubert* Order at class certification, other courts have approved similar methodologies by patent experts rendering opinions about the likelihood of success in patent litigation. *See* Doc. 2017-1 at 70 (collecting cases); *see also In re Namenda Indirect Purchaser Antitrust Litig.,* No. 1:15-cv-6549 (CM) (RWL), 2021 WL 2403727, at \*10 (S.D.N.Y. June 11, 2021) (holding on summary judgment in indirect purchaser class action that patent litigation expert had "provided a methodology, one that [the court] consider[s] to be perfectly sound" because it is "exactly what lawyers do when counseling clients on such matters—not firmly grounded in statistical probabilities, but far from *ipse dixit*"); *In re Loestrin 24 Fe Antitrust Litig.,* 433 F. Supp. 3d 274, 306 n.10 (D.R.I. 2019) (denying motion to exclude expert opinion on the likelihood of patent litigation success because, among other reasons, the court is "satisfied that [the expert] connects his experience to his opinions"); *In re Namenda Direct Purchaser Antitrust Litig.,* 331 F. Supp. 3d 152, 187– 88 (S.D.N.Y. 2018) (holding on summary judgment and class certification in a direct purchaser action that opinions of a "patent attorney with extensive experience in the area of patent law" about "the likelihood [of success] in [a patent] lawsuit" because the expert "unquestionably has the expertise to evaluate the things he assessed—from expert reports to patent file folders—and to draw conclusions about who is more likely to win a patent lawsuit"); *In re Androgel Antitrust Litig. (No. 11),* No. 1:09-MD-2084-TWT, 2018 WL 2984873, at \*5–6 (N.D. Ga. June 14, 2018) (denying motion to exclude expert opinion about "how a reasonable and competent patent attorney would have advised litigants" about "the likelihood of success in the litigation" because the expert relied on his experience to "examine[ ] the merits of the underlying patent litigation" and determine the litigant's chance of success which showed the expert "clearly [had]

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 174 of 292

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

a methodology, even if the Defendants believe it to be a weak one"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2018 WL 563144, at *16 (D. Mass. Jan. 25, 2018) (refusing to exclude opinion of patent law expert who opined about the likelihood of success in patent litigation "based upon his own expertise and experience in the field of patent law"); *United Food & Com. Workers Loc. 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1186–87 (N.D. Cal. 2017) (denying motion to exclude expert testimony about likely outcome of patent litigation when the expert had reached his conclusions by "applying his scientific background and knowledge to his review of the trial record"); *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 765–67 (E.D. Pa. 2015), *aff'd on other grounds*, 868 F.3d 132 (3d Cir. 2017) (denying motion to exclude expert's opinion about the chances of prevailing in underlying patent litigation because the expert—a patent law professor—was "a qualified expert offering appropriate expert testimony" and had reached his conclusions after "review of the briefs, pleadings, ANDA, and underlying patent at issue in the...litigation"). The court understands defendants' arguments. It is concerning that Dr. Torrance arrived at a specific percentage range while, at the same time, there's no subsidiary calculations that permit the factfinder to retrace the steps leading to that range. *See In re Intuniv Antitrust Litig.*, No. 1:16-cv-12396-ADB, 2020 WL 5995326,*12 (D. Mass. Oct. 9, 2020) (joining the courts "that have permitted lawyers to testify as experts on the likelihood of success on the merits in a case underlying a reverse-payment litigation" but limiting that testimony to expert's "professional opinion that [a litigant] would not have prevailed in the underlying litigation" and prohibiting expert from testifying about "any specific percentage of likelihood" because he had "provided no concrete methodology for how he reached this figure"). But the vast majority of cases have permitted similar expert opinions using a similar methodology, so the court finds that Prof. Torrance has provided a sufficiently reliable methodology for how he reached his opinions about the likelihood of litigation success based on his review of the relevant materials and his application of his patent law expertise to the facts contained within that material.[26]

---

[26]   The parties don't cite and the court hasn't located in its own research any Tenth Circuit authority addressing whether an expert may testify about the likelihood of success in litigation using a methodology that involves reviewing the relevant materials and applying the expert's experience and knowledge about patent law to those materials. The court predicts that, if presented with the issue, the Tenth Circuit would follow the majority of district court cases that have permitted this type of expert testimony.

**\*54**  Also, the court finds no reason to exclude Prof. Torrance's opinions because he has not provided a way to test them. Nothing in the *Daubert* standard *mandates* that every expert must demonstrate a methodology that can be tested. Instead, *Daubert*'s language about testing merely is permissive. *See Daubert*, 509 U.S. at 593 (noting that "[m]any factors will bear on the [reliability] inquiry" but refusing "to set out a definitive checklist or test" and instead listing "general observations" that courts may consider when deciding whether to admit expert testimony); *see also Kumho Tire*, 526 U.S. at 149–50 (explaining that a trial judge "*may* consider" whether a theory "can be (and has been) tested" because "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony" and refusing to "rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*" because "[t]oo much depends upon the particular circumstances of the particular case at issue" and, in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience" (citations an internal quotation marks omitted)).

Prof. Torrance sufficiently satisfies that standard here by providing a reliable basis for the methodology that he used to reach his expert conclusions that involved reviewing the underlying patent litigation records and then applying his patent law experience and knowledge to those underlying facts.[27] So, the court won't exclude Prof. Torrance's opinions based on defendants' argument that he hasn't provided a mathematical formula that is capable of testing or falsifying the methodology that he used to render his opinions.

---

[27]   In reaching this conclusion, the court rejects defendants' selective citation to Prof. Torrance's deposition testimony where he testified about the percentage estimates that he was "comfortable" and "uncomfortable with" when forming his conclusions. Doc. 2153-3 at 12 (Torrance Dep. 102:3–103:9). Defendants argue that this testimony shows that Prof. Torrance bases his opinions only on his comfort level and gut feelings which isn't a reliable methodology for rendering expert

testimony. But, in the larger context of this deposition testimony, Prof. Torrance explained his methodology—*i.e.*, how he considered the validity of the claims in the underlying patent litigation "under a variety of different patent law theories," how he reviewed the materials from the underlying patent litigation, how he analyzed "the patents themselves in detail," and how after "consider[ing] all of those factors," he reached his "best estimate" of Teva's litigation success and "considered what a reasonable bounding would be of" his estimate "given all of the information and the uncertainties of human behavior" and concluded that "a plus or minus 10 percent would be an appropriate range to bound it." *Id.* at 11–12 (Torrance Dep. 99:15– 103:9). Like the expert discussed in the *Androgel* case, Prof. Torrance here "clearly [had] a methodology, even if the Defendants believe it to be a weak one." *In re Androgel Antitrust Litig. (No. 11),* 2018 WL 2984873, at *6. And, as he testified, it's based on a methodology that isn't just a gut feeling or comfort level, as defendants describe it.

### 2. Prof. Torrance's Analysis of Likelihood of Success in the Teva Litigation

*Next*, defendants argue that the court should exclude Prof. Torrance's estimates about the likelihood of success in the Teva litigation. Defendants assert that this opinion is unreliable because Prof. Torrance's Expert Report provides estimates that differ from the percentages he provided at class certification, but he fails to explain why his numbers have changed using the methodology that he followed when rendering his opinion.

Prof. Torrance's Expert Report in support of class certification opined that "a reasonable, competent, and experienced patent attorney would estimate a probability of above 70% that Teva would not have been found liable for patent infringement of any valid patent claim in any final adjudication by the Court of Appeals for the Federal Circuit ('CAFC')" in the Teva patent litigation. Doc. 2153-5 at 4–5 (Torrance Dec. 7, 2018 Expert Report ¶ 3.a.). Also, he opined that "a reasonable, competent, and experienced patent attorney would estimate a probability of above 80% that Intelliject would not have been found liable for patent infringement of any valid patent claim in any final adjudication by the CAFC" in the Intelliject litigation. *Id.* at 5 (¶ 4.a.). But, in his Merits Expert Report, he changed his estimates, opining that Teva had about an "85% ± 10%"

chance of success in its patent lawsuit and that Intelliject had about a "90% ± 10%" chance of success in its litigation. Doc. 2153-2 at 69, 79 (Torrance Oct. 31, 2019 Expert Report ¶¶ 135, 159).

**\*55** Defendants assert Prof. Torrance can't say why he increased his estimate for the likelihood of success in the Teva litigation. They contend that no new documents or evidence came to light between Prof. Torrance's Expert Report on class certification and his Merits Expert Report. And, they argue, Prof. Torrance testified that he couldn't recall reviewing any documents for his Merits Expert Report that weren't available to him earlier when he formed his opinions at class certification. Doc. 2153-3 at 32–33 (Torrance Dep. 260:12–261:9) (testifying that "[u]nder time pressure right now, within the next couple of seconds [he] can't think of one [document] that [he] did not have available to [him] before that [he] did have available to [him] later"). Defendants assert that the only reason Prof. Torrance provides for the change in his estimates is a purported evolution in his thinking. *Id.* at 37 (Torrance Dep. 304:1–17) ("And as my thinking evolved working on the Merits Report, I was able to be confident that I could narrow that range to 20 percent."). But, with this answer, defendants argue, Prof. Torrance fails to show that he used any reliable methodology when forming his conclusions about Teva's likelihood of litigation success.

Plaintiffs respond that defendants' argument is based on cherry-picked excerpts from Prof. Torrance's deposition testimony. Plaintiffs assert that the deposition testimony, when read in its full context, shows that Prof. Torrance provided a proper explanation why his opinions evolved between class certification and his Merits Expert Report. Indeed, they say, he testified that he reviewed additional materials between the time he offered his opinions on class certification and when he rendered the opinions in his Merits Expert Report. *Id.* at 13–14 (Torrance Dep. 108:22–111:22) (describing the additional material that he reviewed and noting that his appendix to his Merits Expert Report contains a longer list of materials that he considered for his opinions in that Report than the list of materials appended to his Expert Report on class certification); [28] *see also id.* at 15 (Torrance Dep. 116:1–21) (testifying that there "were many new documents that became available to [him] between the time" he authored his Expert Report on class certification and when he issued his Merits Expert Report). And, Prof. Torrance explained that those additional materials caused his "view" to "evolve[ ] over time" because "every time a newly discovered document comes along" it made him "re-evaluate

the old information as well." *Id.* at 14 (Torrance Dep. 109:14–111:22); *see also id.* at 31–32 (Torrance Dep. 256:22–257:20) (explaining that "the more new information [he] look[ed] at, the more this sparks connections with things that [he has] thought about before and allows [him] to hone what [he] thought about before" and "with the Merits Report" he "had a fuller view of what was out there"). Prof. Torrance further explained how that additional material caused him to revise his percentage estimates of litigation success because the numbers provided in his Expert Report on class certification were his "best estimate at the time with the information that [he] had" but his view changed with his Merits Expert Report because he was "taking into account all of the information" that he had reviewed up to the time he issued his Merits Expert Report. *Id.* at 30 (Torrance Dep. 249:25–250:12); *see also id.* at 37 (Torrance Dep. 301:21–302:7) (testifying that "in general [his] certainty" increased so he "narrowed the range").

28    Prof. Torrance's testimony is an accurate description of the appendices attached to his two Expert Reports. The appendix attached to his Merits Expert Report includes significantly more material than what he listed in his appendix attached to his Expert Report on class certification. *Compare* Doc. 2185-3 at 105–28 (Torrance Oct. 31, 2019 Expert Report App. A) (listing in 24 pages the material considered to form the conclusions in his Merits Expert Report including academic literature; statutes, rules, and regulations; cases; litigation materials; patents and prosecution histories; press and press releases; other materials; websites; and Bates-stamped documents), *with* Doc. 1500-4 at 40–47 (Torrance Dec. 7, 2018 Expert Report in Support of Class Certification Ex. A) (listing in 8 pages the materials he considered to form his opinions on class certification). Tellingly, the Expert Reports that defendants have attached as exhibits to their motion to exclude Prof. Torrance's opinions omit the appendices from his two Expert Reports. *See* Docs. 2153-2 (Torrance Oct. 31, 2019 Expert Report) & 2153-5 (Torrance Dec. 7, 2018 Expert Report in Support of Class Certification).

**\*56** Defendants attack this testimony, again arguing that it lacks any reliable methodology to explain how Prof. Torrance formed his opinions. The court disagrees. Prof. Torrance has explained how he reached his opinions in his Merits Expert Report after a review of significantly more material than he considered at class certification. And, he has explained that

he applied his expertise in patent law to the facts contained in that material to opine about Teva's chances of success in its patent litigation. The court finds that Prof. Torrance provides a sufficiently reliable methodology for his Teva litigation opinion. Defendants' challenges to Prof. Torrance's opinion based on the changes he made between his Expert Report on class certification and his Merits Expert Report go to the weight of his expert testimony. Defendants can raise these criticisms through their cross-examination of Prof. Torrance. But, the court won't exclude his opinion based on the fact Prof. Torrance revised his estimates of litigation success between the time he issued his Expert Report on class certification and when he authored his Merits Expert Report.

Also, defendants suggest that Prof. Torrance changed his opinion about the Teva litigation because plaintiffs learned at class certification that Prof. Elhauge's generic delay model showed no generic delay when using Prof. Torrance's 70% estimated probability of litigation success. Plaintiffs respond that this argument is speculation. As Prof. Torrance testified, he never has reviewed Prof. Elhauge's Expert Report, he never has spoken to Prof. Elhauge, and he wasn't aware that Prof. Elhauge's opinion on class certification relied on Prof. Torrance's estimated percentage of Teva litigation success. Doc. 2153-3 at 15 (Torrance Dep. 114:4–21). And, when asked directly whether he changed his opinion in his Merits Expert Report based on Prof. Elhauge's opinion, Prof. Torrance answered no. *Id.*(Torrance Dep. 114:22–115:4). Defendants' Reply appears to abandon this argument. It does so for good reason. Plaintiffs have shown that defendants' assertions about a purported connection between Prof. Torrance's revised estimate of Teva litigation success and Prof. Elhauge's opinions lack any evidentiary foundation. The court thus rejects this argument as a reason for excluding Prof. Torrance's opinion about the chances of success in the Teva litigation.

Last, defendants assert that Prof. Torrance inexplicably changed his opinions about the probability that the Teva generic EAI infringed any claims of the '432 patent. Prof. Torrance's Expert Report on class certification opined that "a reasonable, competent, and experienced patent attorney...would likely conclude that Teva's generic auto-injector had a relatively large probability of infringing at least one claim of the '432 patent." Doc. 2153-5 at 31 (Torrance Dec. 7, 2018 Expert Report ¶ 76). But, in his Merits Expert Report, Prof. Torrance opines that "a reasonable, competent, and experienced patent attorney" likely would conclude that it was unlikely that the Teva generic EAI "would have been

found to infringe any claim of the '432 patent." Doc. 2153-2 at 72 (Torrance Oct. 31, 2019 Expert Report ¶ 141); *see also id.* at 51, 54– 55 (¶¶ 100, 103–04) (analyzing certain claims of the '432 Patent and concluding that it was unlikely that a court would have found that the Teva generic EAI infringed certain claims of the '432 Patent). Prof. Torrance addressed this difference both in his deposition testimony and his Rebuttal Report. He testified that his opinion at class certification used the word "relatively" as "compared to the Intelliject[,]" meaning that he was opining that Teva's chances of infringement were "relatively large compared to the Intelliject" and "the Intelliject has a lower probability of infringing than the Teva device." Doc. 2185-4 at 10 (Torrance Dep. 133:10–136:3). His Rebuttal Report further expands on this clarification. Doc. 2185-5 at 23–24, 33 (Torrance Feb. 7, 2020 Rebuttal Expert Report ¶¶ 27, 43). Based on this clarification, Prof. Torrance has provided a reliable explanation for why, he contends, his earlier opinion at class certification doesn't conflict with the opinion he offers at the merits stage of the litigation. Defendants' disagreements about this explanation go the credibility of Prof. Torrance's opinion, and they are fodder for cross-examination. But, based on this record, the court won't exclude Prof. Torrance's opinion about the likelihood of success in the Teva litigation.

### 3. The Facts Supporting Prof. Torrance's Opinion about the Cephalon Litigation

**\*57** *Next*, defendants assert that Prof. Torrance's analysis about the likelihood of success in the Cephalon litigation is unreliable because he failed to consider important facts and events from that litigation. The Cephalon litigation was a lawsuit that Cephalon filed in the United States District Court for the District of Delaware on December 11, 2009. Doc. 2153-2 at 86 (Torrance Oct. 31, 2019 Expert Report ¶ 185). Cephalon brought the lawsuit against Mylan and several other defendants, alleging that defendants had infringed their patent for the drug, Nuvigil. *Id.* In December 2010, the Judicial Panel on Multi-District Litigation transferred Cephalon's case against Mylan, along with seven other actions, to Judge Gregory M. Sleet in the District of Delaware. *Id.* at 86–87 (¶ 186). On April 26, 2012, Cephalon and Mylan settled their claims while the litigation still was pending. *Id.* at 88 (¶ 190). But, the Cephalon lawsuit continued against the other, remaining defendants, who defended the case through a bench trial before Judge Sleet. *See generally In re Armodafinil Pat. Litig.*, 939 F. Supp. 2d 456 (D. Del. 2013). After that bench trial concluded, Judge Sleet issued an Order holding that the

asserted claims of the Cephalon patent were not invalid and enjoining defendants from manufacturing and selling their competing drug products before the patent's expiration. *Id.* at 503.

Defendants argue that Prof. Torrance's opinion about the Cephalon litigation is unreliable because he never considered Judge Sleet's opinion when reaching his conclusions. Even worse, defendants argue, Prof. Torrance reaches a conclusion that is the opposite of what Judge Sleet held in his Order, ruling that the patent was not invalid. But, plaintiffs explain, Prof. Torrance makes clear that his opinion about the likelihood of success for Mylan in the Cephalon litigation is "at the time of the actual settlement." Doc. 2153-2 at 5 (¶ 4.a.). And, Prof. Torrance explains in his Rebuttal Report that he didn't consider Judge Sleet's Order when forming his opinion "for good reason." Doc. 2185-5 at 39 (Torrance Feb. 7, 2020 Rebuttal Expert Report ¶ 58). That's because his "opinion takes into account only information known or available to the parties *on the settlement date*." *Id.* Since the settlement date occurred before the bench trial and Judge Sleet's Order, "these sources of information were not available as of the settlement date." *Id.* So, that's why Prof. Torrance "did not rely on this information for [his] opinions." *Id.* And, although Prof. Torrance testified that he reviewed the oral argument in the appeal of the Cephalon litigation filed in the Federal Circuit, he also testified that he "did not take that into account nor did [he] take Judge Sleet's opinion into account because he analyzed from...the point in time of settlement." Doc. 2153-3 at 25 (Torrance Dep. 203:2–14); *see also* Doc. 2185-5 at 23 (¶ 26) (explaining that he "did review the post-settlement litigation record of the *Cephalon* litigation, including the Federal Circuit oral arguments" but he "also did not rely on any of this post-settlement information to come to conclusions for [his] Merits Report"). [29]

[29]    Also, contrary to defendants' assertions that Prof. Torrance never reviewed Judge Sleet's reversal rate, he testified that he looked up the statistics available on Lex Machina showing Judge Sleet's reversal rate. Doc. 2185-4 at 14 (Torrance Dep. 165:6–166:18). But also, he testified that the reversal rates from 2009 that defendants' counsel cited during the deposition wouldn't "necessarily be known to somebody at the time of settlement" and "it would be difficult to say that...a competent, experienced, and reasonable patent attorney at the

time of settlement would have had access to that information." *Id.*

**\*58**  Also, defendants criticize Prof. Torrance's opinion about the Cephalon litigation because, they contend, he reviewed only one expert report and failed to consider other, competing expert opinions about the validity of the Cephalon patent. But that's not an accurate description. Indeed, Prof. Torrance testified that he only was able to review one expert report "in full[.]" Doc. 2153-3 at 33 (Torrance Dep. 262:22–263:13). But also, he testified that he asked for other expert reports, and some of the ones he received were "heavily redacted." *Id.* Still, he "made [his] best efforts to determine what the various experts had said on particular issues." *Id.*; Doc. 2185-5 at 41 (¶ 59) ("In the case of the expert testimony in the *Cephalon* litigation...[Prof. Torrance] was able to locate sufficient pre-settlement information on expert opinions in that case to come to [his] opinion[.]"). He did that by "reconstruct[ing]" the experts' reports by "dig[ging] through the materials" and "find[ing] other documents that referenced them." Doc. 2153-3 at 33 (Torrance Dep. 263:14–264:14). Based on that review, Prof. Torrance believes he has "a pretty good view of what happened in the expert reports and certainly enough to inform [his] opinions." *Id.* And, as his Expert Report shows, Prof. Torrance considered various opinions rendered by other experts in the Cephalon litigation to reach his conclusions about the likelihood of success. Doc. 2153-2 at 91–98 (¶¶ 196, 198–201); *see also id.* at 92–93 n.301 (¶ 198) (explaining that Prof. Torrance reviewed the rebuttal report of an expert that took into account various other "expert reports prepared on behalf of both plaintiffs and defendants").

As discussed above, Prof. Torrance provides a reliable basis for his methodology. He explains why he didn't consider certain post-settlement material, including Judge Sleet's Order, relevant to his analysis. Also, he explains that he considered other expert opinions to the extent he was able to access them or reconstruct them from the record. Defendants' challenges to the reliability of Prof. Torrance's opinion based on the information he considered when forming his opinion goes to the opinion's weight but not its admissibility. *See In re Urethane Antitrust Litig.*, MDL No. 1616, No. 04-1616-JWL, 2012 WL 6681783, at *3 (D. Kan. Dec. 21, 2012), *aff'd* 768 F.3d 1245 (10th Cir. 2014) (refusing to exclude expert testimony because expert had considered only certain evidence when forming his opinion because "[t]he extent to which [the expert] considered the entirety of the evidence in the case is a matter for cross-examination"). So, the court refuses to exclude Prof. Torrance's expert opinion about the Cephalon litigation based on defendants' argument that

he ignored certain material when forming his conclusions. Importantly, Prof. Torrance didn't overlook the material. He knew it was available for his consideration. But, he has explained reliably why he didn't consider the material. So, the court refuses to exclude Prof. Torrance's opinion on this basis.

### 4. The Facts Supporting Prof. Torrance's Opinions about the Teva Litigation

*Last*, defendants argue that Prof. Torrance relied on incorrect or irrelevant facts and failed to consider material facts in his analysis about the likelihood of success in the Teva litigation. [30] Defendants contend that, by considering certain facts and failing to consider other facts, Prof. Torrance has proffered an unreliable opinion on this topic. Specifically, defendants criticize Prof. Torrance's opinion in three ways.

[30]  As previously discussed, the Teva litigation refers to a lawsuit filed by Pfizer, through its subsidiaries, against Teva alleging that Teva's generic EpiPen infringed the EpiPen patent. Doc. 2169 at 3, 5 (Pretrial Order ¶¶ 6, 10, 31).

*First*, defendants assert that Prof. Torrance's opinion is unreliable because it analyzes the validity of the '012 Patent, but the Pfizer subsidiary plaintiffs dropped that patent from the case before trial in the Teva litigation. Indeed, Prof. Torrance's Expert Report thoroughly analyzes the '012 Patent. Doc. 2153-2 at 34–39 (Torrance Oct. 31, 2019 Expert Report ¶¶ 67–78). He concludes that a reasonable, competent, and experienced patent attorney would find that "the patent claims of the '012 patent are likely invalid." *Id.* at 39 (¶ 78); *see also id.* at 72 (¶ 141). Also, he recognizes that the Pfizer subsidiary plaintiff "ultimately withdrew" its claim based on the '012 Patent. *Id.* at 39 (¶ 78). And he finds that unsurprising because "continued reliance on the '012 patent claims would very likely have resulted in their being held invalid for nonobviousness." *Id.*

**\*59**  Prof. Torrance's Rebuttal Report explains why he considered the validity of the '012 Patent even though plaintiffs withdrew their infringement claim based on this patent. He "fundamentally disagree[s]" with defendants' argument that a reasonable, competent, and experienced patent attorney would not have considered the infringement or validity of the '012 Patent when evaluating the likelihood of success in the Teva litigation. Doc. 2185-5 at 20–22 (Torrance Feb. 7, 2020 Rebuttal Expert Report ¶ 23). Instead,

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

he explains, patents "in the same patent family can be, and often are, relevant to the interpretation of their co-familial patents." *Id.* So, he considered both the '012 and '432 patents because they "are members of the same patent family." *Id.* He notes that these two patents "share identical specifications." *Id.* Also, the two patents' prosecution histories "would have been relevant to the construction of claim elements in the '432 patent." *Id.* And, he observes that one of the Pfizer subsidiary plaintiffs made decisions in the past "about how to proceed with its infringement suits against Teva and Intelliject—both of which did, at one time, involve the '012 patent[.]" *Id.* Prof. Torrance opines that those earlier decisions "would be relevant to assessments of [the Pfizer subsidiary plaintiff's] decisions about how to proceed with its infringement suits against Teva and Intelliject, as of the dates of settlement in these litigations." *Id.*

After explaining all this, Prof. Torrance asserts that "[i]gnoring the '012 patent, which is a member of the same patent family of the '432 patent, its claims, and the prosecution history of its claims would violate proper claim construction procedures." *Id.* He opines that a "patent attorney who ignored such information would not be engaging in reasonable or competent practice." *Id.* Defendants' expert disagrees with this conclusion. But, on this *Daubert* motion, the court need not decide which expert is correct. *See Frederick v. Swift Transp. Co., Inc.*, 591 F. Supp. 2d 1149, 1155 (D. Kan. 2008) (Belot, J.) (explaining that in a "battle of the experts" over which opinion is correct, the court won't "credit one expert's opinion over the other" but instead leaves the decision "to the trier of fact to determine how much weight to give to each expert's opinions" (citation and internal quotation marks omitted)). Instead, the court's task here is to decide whether Prof. Torrance has provided a reliable methodology for reaching his conclusions. Prof. Torrance satisfies that requirement here. He has provided a reliable explanation for why he considered the '012 Patent in his analysis. And, the court won't exclude his opinion for that reason.

*Second*, defendants argue that Prof. Torrance unreliably considered a 2011 and 2019 deposition transcript when he formed his opinion about Teva's likelihood of success at the time of the litigation's settlement in 2012. With the 2011 deposition transcript, defendants contend it was wrong for Prof. Torrance to consider this material. *See* Doc. 2153-2 at 60–61 (¶¶ 114–117) (discussing the August 2011 deposition of John G. Wilmot in the Teva litigation). Defendants assert that this deposition testimony wasn't part of the patent

litigation record because none of the parties introduced it into evidence at the trial, and thus, neither the district court nor Federal Circuit would have considered it in an analysis of the case's merits. But, plaintiffs respond, this deposition transcript was part of the Teva discovery record, and it would have been available for the parties to evaluate when reaching the decision to settle the case in 2012. So, they argue, it is entirely proper for Prof. Torrance to consider this deposition testimony when evaluating the likelihood of success when the parties settled the Teva litigation in 2012.

With the 2019 deposition transcript, Prof. Torrance testified that he read the transcript and that it "helped [him] find some information" but he was clear that he didn't rely on that deposition transcript to form his opinions. Doc. 2153-3 at 34 (Torrance Dep. 282:19–283:9); *see also* Doc. 2185-5 at 22–23 (¶ 25) (explaining that he "did read the 2019 Wilmot deposition" but he "did not rely on the 2019 Wilmot deposition to come to conclusions for [his] Merits Report" and instead, his review of that deposition "helped put into context information that would have been available to 'a reasonable, competent, and experienced patent attorney' at the time of settlement, but that, due to the passage of time, is now more challenging to put into context").

 **\*60**  Again, defendants' arguments here go to the weight the trier of fact should assign to his opinion. Although defendants disagree with Prof. Torrance's references to the 2011 and 2019 deposition transcripts, Prof. Torrance has provided a reasonable explanation why he reviewed the transcripts and how they fit into his analysis. Defendants are free to raise these challenges on cross-examination. But, defendants haven't shown that Prof. Torrance's methodology here is so unreliable that the court must exclude his expert testimony.

*Third*, defendants contend that Prof. Torrance unreliably discounts the Teva litigation record in favor of defenses and arguments that the parties never raised at trial. Defendants assert that Prof. Torrance relies on an inequitable conduct or unenforceability defense. Doc. 2153-1 at 21 (citing Doc. 2153-2 at 21–23, 28, 37 (¶¶ 38, 40, 49, 72)). But, as plaintiffs correctly respond, none of these paragraphs in Prof. Torrance's Expert Report discuss or even mention an inequitable conduct or unenforceability defense. Instead, plaintiffs assert, Prof. Torrance's Expert Report only considers the invalidity and non-infringement defenses asserted in the Teva litigation and factors those defenses into his likelihood of success analysis. Doc. 2153-2 at 39, 42–43, 51, 54–55, 58–59, 60–62 (¶¶ 78, 86–87, 100, 103–04, 109, 113, 117–

18). Defendants' Reply comes back with a different citation to paragraphs in Prof. Torrance's Expert Report that, they contend, analyze an inequitable conduct or unenforceability defense. Doc. 2223-1 at 13 (citing Doc. 2153-2 at 35–36 (¶¶ 69–70)). But, these paragraphs merely discuss the actions taken by a Pfizer subsidiary in its patent prosecution. Prof. Torrance criticizes the actions as "careless" or "at worst" based on "a desire to postpone consideration by the examiner of potentially damaging prior art." Doc. 2153-2 at 36 (¶ 70). But he never asserts that these actions form the basis for an inequitable conduct or unenforceability defense. *Id.* And, his Expert Report never analyzes these defenses in the context of his opinion about the likelihood of success in the Teva litigation. So, the court rejects defendants' argument that Prof. Torrance has relied on defenses and arguments that the parties never raised at trial because the contents of his Expert Report don't support that argument.

For the reasons discussed, Prof. Torrance has provided a reliable basis for considering certain facts and ignoring other facts that he found irrelevant to his analysis about the likelihood of success in the Teva litigation. Thus, the court finds, defendants' argument here provides no reason for the court to exclude Prof. Torrance's opinion on this topic.

### B. Does Prof. Torrance Improperly Imply That He Performed Scientific, Validity, and Infringement Analyses When He Never Performed Such Analyses?

*Next*, defendants argue that Prof. Torrance's opinions are unreliable because he references analyses that, defendants contend, he never performed. Defendants make two arguments in this part of their motion seeking to exclude Prof. Torrance's opinions.

*First*, defendants argue that Prof. Torrance's use of percentage values and confidence intervals in his opinions about the likelihood of litigation success improperly invokes statistical terminology and concepts. Defendants say Prof. Torrance misappropriates these terms because he never performed any mathematical or statistical analysis when forming his opinions. So, defendants contend, Prof. Torrance's opinions pose a danger of misleading or confusing the jury because the terminology he uses may cause the jury to assume his analysis involves some kind of mathematical exactness when it actually does not. As a consequence, defendants assert that the court should exclude Prof. Torrance's opinions under Fed. R. Evid. 403.

**\*61** A court may exclude relevant evidence under Rule 403 "if its probative value is substantially outweighed by a danger of...confusing the issues [or] misleading the jury...." Fed. R. Evid. 403. Using Rule 403 to exclude otherwise admissible evidence is an "extraordinary remedy" that "should be used sparingly." *Eisenhour v. County*, 897 F.3d 1272, 1277 (10th Cir. 2018) (citations and internal quotation marks omitted). The Tenth Circuit has instructed courts to "give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value" when "performing the [Rule] 403 balancing[.]" *Id.* (citation and internal quotation marks omitted).

Plaintiffs argue that the court shouldn't apply Rule 403's extraordinary remedy to Prof. Torrance's opinions. Plaintiffs assert that Prof. Torrance has provided reliable opinions about the likelihood of litigation success that, as previously discussed, he rendered after reviewing relevant materials from the underlying patent lawsuits and applying his knowledge and expertise about patent law to those facts to opine about the likely outcomes in the litigation. As the court already has explained, other courts have allowed patent law experts to provide similar opinions about the likelihood of success in patent litigation using methodologies that are similar to what Prof. Torrance used to reach his conclusions. *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 187–88 (S.D.N.Y. 2018) (allowing expert opinion where the expert had "the expertise to evaluate the things he assessed—from expert reports to patent file folders — and to draw conclusions about who is more likely to win a patent lawsuit"); *see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2018 WL 563144, at *16 (D. Mass. Jan. 25, 2018) (permitting expert to testify "based upon his own expertise and experience in the field of patent law" about "likelihood of success in patent litigation"); *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 765–67 (E.D. Pa. 2015), *aff'd on other grounds*, 868 F.3d 132 (3d Cir. 2017) (finding that a patent law professor was "a qualified expert offering appropriate expert testimony" where he reviewed relevant materials from the underlying litigation and applied his expertise to opine about the likelihood of litigation success).

Defendants argue that these cases differ because the experts there didn't use a "holistic" analysis to evaluate likelihood of success as, they assert, Prof. Torrance uses to render his opinions. The court disagrees for reasons already discussed in Part VII.A.1., above. Although none of the experts in those

cases referred to the analysis as a "holistic" one, the experts used methodologies similar to what Prof. Torrance uses here —*i.e.*, reviewing the relevant litigation materials and applying knowledge and expertise about patent law to those materials to opine about the likelihood of success. *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at 187–88 (allowing opinion where expert used his "expertise" in patent law to "evaluate" patent litigation materials "from expert reports to patent file folders" and then "draw conclusions about who is more likely to win a patent lawsuit"); *see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at *16 (permitting expert opinion that relied on a review of the technical experts' conclusions and then applied "his own expertise and experience in the field of patent law" to offer an opinion about "likelihood of success in patent litigation"); *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d at 765–67 (allowing expert opinion by patent law professor who reached his conclusions about the likelihood of litigation success after "review of the briefs, pleadings, ANDA, and underlying patent at issue in the...litigation"). For the same reasons that other courts have found sound the methodologies patent experts have used to opine about the likelihood of litigation success, the court finds Prof. Torrance's methodology reliable here.

**\*62** And, although Prof. Torrance uses no mathematical formula or statistical analysis to render his opinions, the court can't find that the terminology he uses is so misleading or confusing that it "substantially" outweighs the probative value of his opinions. As plaintiffs correctly argue, defendants can address any concerns about Prof. Torrance's terminology through cross-examination and by introducing into evidence their own experts' opinions. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at *16 (denying motion to exclude expert opinion about "likelihood of success in patent litigation" and noting that "[t]o the extent Defendants seek to challenge [the expert's] conclusions [about] the likely outcome of the patent challenges, they may do so with their own expert testimony—as they have proposed to do"); *see also In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at 188 (denying motion to exclude expert opinion and recognizing that defendants can challenge the opinion by cross-examining the expert about his "evaluation of technical material" and by "offering the testimony of its own expert"). So, the court finds, Prof. Torrance's use of certain terminology doesn't render his opinions so misleading or confusing that the court must exclude them under Fed. R. Evid. 403.

*Second*, defendants argue that the court should exclude Prof. Torrance's opinions because his Expert Report fails to explain how he construed the patent claims or how he analyzed the prior art to reach his conclusions about the likelihood of patent litigation success. Plaintiffs respond with a litany of specific citations to Prof. Torrance's Expert Report where, they argue, he construed the patent claims and analyzed prior art to formulate his opinions. The court agrees with plaintiffs. Paragraphs 91 through 117 of Prof. Torrance's Expert Report contain his analysis of the elements of Claims 19, 20, and 21 of the '432 Patent. Doc. 2153-2 at 46–61 (Torrance Oct. 31, 2019 Expert Report ¶¶ 91–117). Prof. Torrance discusses in detail certain patent claim elements, including "drive the needle," "first locked retraced position," "kickback," and "transfer of the residual force to the needle cover." *Id.* at 49–59 (¶¶ 96–103, 105–109). With each of these patent claim elements, Prof. Torrance analyzes the construction of these elements in the context of the claims themselves and the patent's specification, and in some cases, he considers the prosecution history (or lack thereof) and extrinsic evidence such as dictionary definitions and trial testimony. *See id.* And, in paragraph 118, Prof. Torrance discusses the prior art and how that prior art is relevant to the patent's invalidity by anticipation or obviousness. *Id.* at 62 (¶ 118). These portions of the Expert Report show that Prof. Torrance offers a reliable explanation how he construed the patent claims and how he analyzed the prior art as part of his analysis of determining the likelihood of litigation success. To the extent defendants challenge how Prof. Torrance performed that analysis, those arguments go to the weight of his testimony, not its admissibility. *Kumho Tire*, 526 U.S. at 153 (explaining that expert opinion is admissible when it falls within "the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky' " (quoting *Daubert*, 509 U.S. at 596)). And, defendants properly may raise those challenges through cross-examination or by presenting evidence contradicting Prof. Torrance's conclusions. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") But, defendants' attacks here don't warrant excluding Prof. Torrance's opinions. [31]

[31]   This section of defendants' brief makes a passing argument in a footnote that the court should exclude Prof. Torrance's opinions because he "asserts certain invalidity and infringement opinions, despite not being qualified as a person of ordinary

In re EpiPen (Epinephrine Injection, USP) Marketing, Sales..., Not Reported in Fed....

2021 WL 2577490

skill in the art ('POSITA') of the patents at issue, and without relying on the testimony of any POSITA expert to support his conclusions." Doc. 2153-1 at 25 n.54. Plaintiffs' Response doesn't respond to this argument, and defendants' Reply never mentions it. Our Circuit instructs that "[a]rguments made in a perfunctory manner, such as in a footnote, are waived." *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002); *see also Therrien v. Target Corp.*, 617 F.3d 1242, 1253 (10th Cir. 2010) ("Many courts have...held that an argument made only in a footnote of an appellate brief is waived." (citation and internal quotation marks omitted)); *United States v. Zabokrtsky*, No. 5:19-cr-40089-HLT-1, 2020 WL 1082583, at *3 n.4 (D. Kan. Mar. 6, 2020) ("Arguments raised in a footnote are not properly before the Court."); *Fish v. Kobach*, No. 16-2105-JAR, 2016 WL 6125029, at *3 (D. Kan. Oct. 20, 2016) (holding argument was "waived" because "plaintiffs raised this argument 'in a perfunctory manner' and in a footnote" (quoting *Hardman*, 297 F.3d at 1131)). Because defendants raise in a perfunctory manner their argument that Prof. Torrance's opinions are inadmissible because he fails to rely on a POSITA expert—*i.e.*, by asserting the argument in a footnote in their opening brief and never mentioning it in their Reply—the court could decline to address it here. Nevertheless, the court explains that this argument, even when considered in full, doesn't require the court to exclude Prof. Torrance's opinions about the likelihood of litigation success.

In the following section, *infra* Part IX., the court addresses the POSITA argument more fully because the parties actually have briefed the issue as it pertains to the question whether Prof. Torrance may offer opinions rebutting Charles E. Clemens's opinions whether the Teva generic likely infringed the '827 Patent. As discussed below, the court finds Prof. Torrance isn't qualified to offer those opinions because he's not a POSITA. But this ruling doesn't require the court to exclude Prof. Torrance's opinions on the likelihood of patent litigation success. Here, Prof. Torrance offers his opinions as a qualified expert—a patent lawyer and professor—about the litigants' chances of success in underlying patent litigation. Defendants cite no case law, and the court has found none in its

own research, that require a POSITA to render that type of expert opinion involving the chances of litigation success. In fact, other courts have reached the opposite conclusion when addressing this same challenge targeted at lawyers offering opinions about patent litigation success. *See, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 306 (D.R.I. 2019) (rejecting argument that expert "improperly opines about materiality, the significance of prior art references, and technical patent issues; opinions that may only come from a person of ordinary skill in the art" when expert offered opinions "directed to how a patent attorney in the field would have evaluated the prosecution of the '394 patent and what advice and opinions a patent attorney would have given to his or her client regarding that prosecution and the related litigation" and recognizing that while only a POSITA "may opine on...technical patent law issues" the expert at issue "clearly [did] not do so" but instead offered opinions about how a patent attorney in the field would have evaluated the patent (citation and internal quotation marks omitted)); *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 187 (S.D.N.Y. 2018) (denying motion to exclude expert testimony based on an argument that a lawyer was not a chemist, and thus, not a POSITA qualified to opine about patent infringement and validity because the expert was not opining that the patent is invalid or that a generic competitor didn't infringe the patent but instead offered "a reasonable patent attorney's assessment of the likelihood that [the generic competitor] would win its patent case—exactly the sort of assessment he would have offered his client during the nearly two decades when he served as" in-house patent counsel (citation and internal quotation marks omitted)). For the same reasons discussed in the cited cases, the court declines to exclude Prof. Torrance's likelihood of patent litigation success opinions based on the argument that he's not a POSITA. Instead, his opinions on this topic properly opine about how a patent lawyer would evaluate the chances of litigation success and don't touch on technical patent issues for which he's not qualified to offer opinions.

**\*63** For all the reasons discussed, the court rejects each of the arguments presented by defendants' Motion to Exclude Plaintiffs' Patent Litigation Expert. So, the court denies

defendants' request to exclude the merits expert opinions of Prof. Torrance.

## IX. Defendants' Motion to Exclude Plaintiffs' Rebuttal Report Regarding the '827 Patent (Doc. 2156)

Last, defendants move the court to exclude the rebuttal report that plaintiffs' expert offers about the '827 Patent. Plaintiffs have retained Prof. Andrew Torrance to provide a separate set of opinions from the ones offered in his Merits Expert Report. Prof. Torrance offers an Expert Rebuttal Report to the Expert Report of Charles E. Clemens, who defendants have retained to opine whether the Teva generic EAI likely infringed the '827 Patent.

As already discussed, the Teva litigation was a lawsuit filed by Pfizer, through its subsidiaries, against Teva alleging that Teva's generic EAI infringed the EpiPen's patents. Doc. 2169 at 3, 5 (Pretrial Order ¶¶ 6, 10, 31). In that lawsuit, the Pfizer subsidiaries argued that the Teva generic infringed two patents—the '012 Patent and the '432 Patent. *Id.* at 5 (Pretrial Order ¶¶ 31–32). After the Teva litigation concluded, the United States Patent and Trademark Office issued the '827 Patent to a Pfizer subsidiary. In defendants' Motion for Summary Judgment, they assert that the '827 Patent posed "a substantial risk of infringement" by the Teva generic EAI such that it affected Teva's ability to launch its generic EAI before June 2015 (the licensed entry date under the settlement agreement in the Teva litigation). Doc. 2142-1 at 79.

To support this theory of infringement at the summary judgment stage, defendants rely on Mr. Clemens's expert opinion. *See id.* (citing Doc. 2164-7 (Clemens Dec. 23, 2019 Expert Report)). Mr. Clemens is an engineer who founded a consulting business specializing in the design and development of medical devices. Doc. 2156-2 at 4 (Clemens Dec. 23, 2019 Expert Report ¶ 1). He opines "there is a substantial likelihood that Teva's EAI device infringes at least the following claims of the '827 Patent: independent Claims 1 and 22; and dependent Claims 5, 11, 18, 21, and 23." *Id.* at 6 (¶ 13). Also, he "conclude[s] that there is a substantial likelihood that Teva's EAI device, even after the December 2014 ANDA amendment, still infringes at least one independent claim of the '827 Patent (Claim 22)." *Id.* (¶ 14).

Plaintiffs offer Prof. Torrance's Rebuttal Report to rebut Mr. Clemens's infringement analysis of the '827 Patent. Specifically, Prof. Torrance opines that Mr. Clemens's infringement analysis is "faulty in a number of regards, including for not applying patent law correctly, for applying

the incorrect standard of claim construction during his interpretation of the claims of the '827 patent, and for focusing largely on the time period after the *Teva* settlement." Doc. 2158-2 at 5 (Torrance Feb. 21, 2020 Rebuttal Report to Clemens Expert Report ¶ 4). And, he asserts "no reasonable, competent, and experienced patent attorney would carry out the infringement analysis [Mr. Clemens] did, nor conclude that there would be infringement of any valid and enforceable patent claim." *Id.*

Defendants argue the court should exclude Prof. Torrance's rebuttal opinions because he's not qualified to offer expert testimony whether the Teva generic EAI infringes the '827 Patent. And, defendants further contend, even if Prof. Torrance is qualified to render the expert opinions here, his opinions are inadmissible because they are unreliable and irrelevant. Because the court agrees with defendants' first argument, it need not address the second. The court explains, below, why it concludes that Prof. Torrance isn't qualified to offer rebuttal expert opinions in response to Mr. Clemens's infringement analysis of the '827 Patent.

## A. Is Prof. Torrance Qualified to Offer His Rebuttal Opinions?

**\*64** Defendants assert that Prof. Torrance isn't qualified to provide his rebuttal opinions that analyze whether the Teva generic EAI infringes the '827 Patent because he's not a person of ordinary skill in the art ("POSITA"). Defendants argue that "the issues of infringement or validity" are "analyzed in great part from the perspective of a" POSITA. *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 (Fed. Cir. 2008). But when an expert lacks "any suggestion of relevant technical expertise," the expert cannot offer testimony of infringement or validity issues because those issues "are exclusively determined from the perspective of ordinary skill in the art." *Id.*

Defendants argue that Prof. Torrance doesn't qualify as a POSITA here because he lacks the specialized engineering expertise to opine whether the Teva generic EAI infringes the '827 Patent. Indeed, Prof. Torrance testified that he's not a mechanical engineer. Doc. 2156-5 at 23–24 (Torrance Dep. 156:24–157:5). He doesn't have any degrees or certifications in engineering. Doc. 2158-2 at 43–44 (Ex. A (Prof. Torrance Curriculum Vitae)). And, he conceded that he's not an expert in the particular field of "mechanical engineering with respect to autoinjectors." Doc. 2156-5 at 16 (Torrance Dep. 70:15–21); *see also id.* at 36 (Torrance Dep. 213:1–6) (testifying

that he "would not offer [himself] as an expert in mechanical engineering").

Also, Prof. Torrance testified that he doesn't fit the definition of POSITA that the parties to the Teva litigation agreed qualified an expert to opine about the '432 Patent—which, like the '827 Patent, claims an auto-injector device. *Id.* at 14 (Torrance Dep. 64:12–23); *see also id.* at 36 (Torrance Dep. 215:7–13) (testifying that Prof. Torrance wasn't "offering an opinion that [he is] a POSITA under either of [the] definitions" of POSITA in the Teva litigation but instead he was "hired as a patent law expert"). The parties to the Teva litigation agreed that an expert, to qualify as a POSITA capable of offering expert opinions about the '432 Patent, must have a degree in engineering or a related field and at least five years of experience in the engineering field. Doc. 2156-3 at 4 (Trial Tr. 234:16–235:14); Doc. 2164-4 at 10 (Trial Tr. 488:2–18). As already discussed, Prof. Torrance doesn't have those qualifications.

Plaintiffs don't put forth much of a response to this argument. Instead, plaintiffs emphasize that the court found Prof. Torrance qualified to render his opinions about the likelihood of litigation success at class certification. So, they argue, the court should find him qualified here to offer opinions that rebut Mr. Clemens's infringement analysis. This argument likens apples to oranges. At class certification, the court found Prof. Torrance qualified to render expert opinions about the likelihood of litigation success in patent litigation. That ruling has nothing to do with the question whether Prof. Torrance is qualified to render rebuttal opinions to Mr. Clemens's infringement analysis of the '827 Patent at the merits stage of the case.

Also, plaintiffs don't address any of the case authority that defendants have cited. And they don't respond with any citations of their own where courts have permitted a lawyer—who is not a POSITA—to opine whether a patent is invalid or whether a device infringes a specific patent. Instead, plaintiffs concede that Prof. Torrance isn't a mechanical engineer. Doc. 2188-1 at 11. But, they argue this doesn't disqualify Prof. Torrance as an expert. To the contrary, plaintiffs contend that Prof. Torrance is qualified to render his rebuttal opinions about infringement because he's a lawyer and law professor with expertise in patent law. But, a patent lawyer may qualify to opine as a technical expert on issues of patent infringement or validity only if the expert has "such a qualification [that] derive[s] from a lawyer's technical qualifications in the pertinent art." *Sundance,* 550 F.3d at 1363. And, if an

expert "lack[s] the relevant technical expertise[,]" the expert testimony "fails the standard of admissibility under Fed. R. Evid. 702." *Id.*; *see also id.* ("[W]here an issue calls for consideration of evidence from the perspective of one of ordinary skill in the art, it is contradictory to Rule 702 to allow a witness to testify on the issue who is not qualified as a technical expert in that art.").

**\*65** Here, plaintiffs concede Prof. Torrance lacks the technical qualifications that would qualify him as a POSITA because he isn't a mechanical engineer and doesn't have relevant engineering experience. And, because he's not a POSITA, Prof. Torrance isn't qualified to opine whether Teva's generic EAI infringes the '827 Patent. So, the court excludes Prof. Torrance's opinions about the '827 Patent because he's not qualified to opine on this topic. *See Sundance,* 550 F.3d at 1364–65 (holding it was an "abuse of discretion" for a district court to permit a patent attorney who was "a person not skilled in the pertinent art" to offer expert testimony because "[a]llowing a patent law expert without any technical expertise to testify on the issues of infringement and validity amounts to nothing more than advocacy from the witness stand"); *see also Union Carbide Corp. v. Am. Can Co.,* 724 F.2d 1567, 1572 (Fed. Cir. 1984) (concluding that a former patent lawyer who had "no expertise as to the scope of the field of endeavor of the inventions of the patents in suit or as to what other fields are analogous art" rendered an invalidity opinion that "expressed no more than an unsupported conclusory opinion" (citation and internal quotation marks omitted)).

Also, Prof. Torrance's rebuttal opinions here—whether a patent attorney would carry out the infringement analysis like Mr. Clemens did or whether a patent attorney would conclude that there was infringement of any valid and enforceable patent claim—aren't proper rebuttal to Mr. Clemens's opinions. Mr. Clemens offers opinions about the likelihood that the Teva generic EAI infringes the claims of the '827 Patent based on his review of the device and comparing it to the '827 Patent. Doc. 2156-2 at 6 (¶¶ 12–14). But, he doesn't offer any opinions about patent law or whether the Teva generic EAI device is liable under the law for infringing the '827 Patent. Indeed, plaintiffs' Response to the motion to exclude recognizes that Mr. Clemens's opinions offer " 'a technical analysis of whether a device infringes patent claims[.]' " Doc. 2188-1 at 6 (quoting Doc. 2188-3 at 7 (Clemens Dep. 61:25–62:12)). And, Mr. Clemens's opinions don't consider whether "there [was] infringement" of the patent. *Id.* (quoting Doc. 2188-3 at 7 (Clemens Dep.

62:14–24)); *see also* Doc. 2188-3 at 7 (Clemens Dep. 62:14–24) (recognizing that "if there [was] infringement, that may have subsequent legal consequences, but that really has no relevance to the analysis of whether a device is infringing a particular claim in a patent"). So, Prof. Torrance's opinions don't rebut the opinions that Mr. Clemens offers—*i.e.*, a technical analysis of the device compared to the patent claims. Thus, they aren't proper rebuttal opinions. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii) (explaining that rebuttal expert opinions are "intended solely to contradict or rebut evidence *on the same subject matter* identified by another party" (emphasis added)). And, even if it was, Prof. Torrance isn't qualified to render those opinions because, as just discussed, he's not a POSITA.

The court also recognizes that Prof. Torrance's rebuttal opinions differ significantly from the opinions he offers in his Merits Expert Report. His Merits Expert Report opines about the chances of litigation success from the perspective of a reasonable, competent, and experienced patent attorney *at the time the parties settled the litigation*. His rebuttal opinion analyzes a patent issued *after* the Teva litigation ended and that never was the subject of litigation. Thus, unlike the opinions discussed in the section where the court found Prof. Torrance qualified to opine about the chances of patent litigation success, Prof. Torrance's analysis of the patent from the perspective of a patent lawyer isn't relevant to rebutting Mr. Clemens's opinion whether the Teva generic EAI infringed the '827 Patent because Mr. Clemens's opinion has nothing to do with analyzing litigation or the law that applies to patented devices.

For all these reasons, the court agrees with defendants. Prof. Torrance isn't qualified to render the opinions he offers as rebuttal to Mr. Clemens's infringement analysis of the '827 Patent because Prof. Torrance isn't a POSITA. The court thus grants defendants' motion to exclude Prof. Torrance's rebuttal opinions. And, it excludes Prof. Torrance from offering any opinions about the '827 Patent as rebuttal to Mr. Clemens's opinions.

## X. Conclusion

**\*66** As this Order has explained, the court rules each of the parties' motions seeking to exclude as follows:

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion to Strike in Part the Testimony of Dr. John H. Johnson, IV (Doc. 2132-1) is denied.

**IT IS FURTHER ORDERED THAT** the Mylan defendants' portion of the Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Einer Elhauge (Doc. 2133) is denied.

**IT IS FURTHER ORDERED THAT** the Mylan defendants' portion of the Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Professor Meredith Rosenthal (Doc. 2134) is denied.

**IT IS FURTHER ORDERED THAT** the Mylan defendants' portion of the Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness Dr. Carl Peck (Doc. 2135) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** the Mylan defendants' portion of the Motion to Exclude the Testimony and Report of Plaintiffs' Expert Witness James Bruno (Doc. 2136) is granted.

**IT IS FURTHER ORDERED THAT** the Mylan defendants' portion of the Motion to Exclude Plaintiffs' Patent Litigation Expert (Doc. 2151) is denied.

**IT IS FURTHER ORDERED THAT** the Mylan defendants' portion of the Motion to Exclude Plaintiffs' Rebuttal Report Regarding the '827 Patent (Doc. 2156) is granted.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2021 WL 2577490

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 13

2024 WL 1342800
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE: KIRKLAND LAKE GOLD
LTD. SECURITIES LITIGATION

20-CV-4953 (JPO)
|
Signed March 29, 2024

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

**\*1** Plaintiff Stephen Brahms, individually and on behalf of all others similarly situated, brings this suit against Kirkland Lake Gold Ltd., a Canadian company that mines and processes gold, Kirkland's CEO, and the former chairman of Kirkland's board of directors (together, "Defendants" or "Kirkland"), for violations of Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240.10b-5. Plaintiff has moved for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3), as well as to exclude the testimony and report of one of Defendants' proposed experts. For the reasons that follow, Plaintiff's amended class certification and *Daubert* motions are denied.

**I. Background**

The Court assumes familiarity with the factual and procedural history, as set forth in its September 2021 Opinion and Order. *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-CV-4953, 2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021) (ECF No. 36). As relevant here, the Court granted Defendants' motion to dismiss with respect to all claims except those based on Kirkland CEO Anthony Makuch's statements about acquisitions. *Id.* at \*6 (ECF No. 26 at 14). Plaintiff filed a motion for class certification on January 31, 2023 (ECF No. 66) and an amended class certification motion on March 6, 2023 (ECF No. 76). On March 30, 2023, Defendants filed their opposition. (ECF No. 88; ECF No. 89.) Plaintiff filed a reply memorandum on May 22, 2023. (ECF No. 104; ECF No. 105.) The same day, Plaintiff also filed a motion to exclude the testimony and report of defense expert James Griffin. (ECF No. 108.) On June 5, 2023, Defendants filed

their opposition to Plaintiff's *Daubert* motion (ECF No. 115; ECF No. 116), and Plaintiff filed his reply memorandum on June 12, 2023 (ECF No. 121; ECF No. 122). On October 5, 2023, the Court held oral argument on the amended motion for class certification and the *Daubert* motion. (ECF No. 146.)

**II. Motion to Exclude**

The Court first addresses Plaintiff's motion to exclude the testimony and expert report of James Griffin. Plaintiff seeks to exclude Griffin's testimony and report on the grounds that Griffin is unqualified and that his testimony is irrelevant and unreliable. (ECF No. 109 at 6-15.)

**A. Legal Standard**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that an expert who is "qualified ... by knowledge, skill, experience, training, or education may testify" if the testimony would be helpful to the trier of fact, is "based on sufficient facts or data," and is "the product of reliable principles and methods," reliably applied to the facts of the case. Fed. R. Evid. 702. And these factors, in turn, largely have their origins in *Daubert*, in which the Supreme Court held that the district court bears a critical gatekeeping function in assessing the admissibility of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-95 (1993). "The district court has broad discretion to carry out [its] gatekeeping function. Its inquiry is necessarily a 'flexible one,' and the types of factors that are appropriate to consider will 'depend[ ] upon the particular circumstances of the particular case at issue.' " *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (first quoting *Daubert*, 509 U.S. at 594, and then quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

**\*2** "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). The Second Circuit has "distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018); *see Nimely v. City of New York,* 414 F.3d 381, 396-97 (2d Cir. 2005).

Although "[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," it has "offered limited

dicta suggesting that a *Daubert* analysis may be required at least in some circumstances." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013); *see also Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018) ("[T]he Second Circuit has not resolved whether and to what extent *Daubert* applies at the class certification stage."); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 28-29 (S.D.N.Y. 2020). "[C]ourts in the Second Circuit regularly 'subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.' " *Bowling v. Johnson & Johnson*, No. 17-CV-3982, 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016)).

Accordingly, the Court here applies a *Daubert* analysis to the extent that Plaintiff seeks to exclude testimony relevant to the pending class certification motion. However, "the 'scope of the *Daubert* analysis is cabined by its purpose at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23.' " *Bowling*, 2019 WL 1760162, at *7 (quoting *Chen-Oster v. Goldman Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015)); *see In re LIBOR*, 299 F. Supp. 3d at 471 ("The question is not whether a jury at trial should be permitted to rely on the expert's report to find facts as to liability, but rather whether the Court may utilize it in deciding whether the requisites of Rule 23 have been met." (quoting *Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013))); *cf. In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker.").

Defendants offer James Griffin as "a mining industry expert" to opine on "whether Defendants have shown a lack of price impact for the alleged misstatements at the heart of the case." (ECF No. 115 at 6.) Specifically, Griffin offers three expert opinions. First, Griffin opines that because "[m]ining is a self-depleting business model," both organic growth and mergers and acquisitions (M&A) are "complementary" and irreplaceable strategies for "a company's growth potential." (ECF No. 91-1 ¶ 17(a).) Industry observers and practitioners, therefore, would expect gold mining companies to be "generally on the lookout for M&A opportunities as they arise." (*Id.*) Second, Griffin

offers the opinion that if the financial market understood Makuch's January 25 and February 22, 2019 statements "to mean that Kirkland would no longer consider any potential M&A opportunities, [he] would not have expected a positive price impact on Kirkland's stock price as a result of these statements." (*Id.* ¶ 17(b).) Third, Griffin opines that if the market understood Makuch's January 14, 2019 statement "to reflect that Kirkland had set certain minimum standards that must be met for Kirkland to consider a potential acquisition, based on [his] experience and expertise, [he] would not have expected a positive impact on Kirkland's stock price as a result of this statement." (*Id.* ¶ 17(c).)

**\*3**  Plaintiff moves to exclude Griffin's expert report on the grounds (1) that Griffin is not qualified to render an expert opinion, (2) that Griffin's testimony is irrelevant, and (3) that Griffin's opinions are unreliable. (ECF No. 109 at 6-15.) In his filings, Plaintiff focuses his attacks on the second and third of Griffin's opinions. Because Plaintiff offers the same arguments to justify the exclusion of both opinions, the Court addresses the admissibility of Griffin's opinions together rather than separately.

### B. Discussion

#### 1. Qualifications

The Court begins with the first step of the Rule 702 inquiry: whether Griffin is qualified as an expert. To answer this question, the Court must first "examine the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702— knowledge, skill, experience, training, or education—with respect to a relevant field." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). "[A]ny one of these five forms of qualifications will satisfy the rule." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007). "[A] lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004). Second, courts must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004), and ensure that the expert will actually be testifying "on issues or subject matter within his or her area of expertise," *Haimdas v. Haimdas,* No. 09-CV-2034, 2010 WL 652823, at *2 (E.D.N.Y. Feb. 22,

2010) (citing *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir. 1997)).

Defendants offer Griffin as a mining industry expert based on his degree in mining engineering and his over 40 years of experience in the mining industry, including executive and consultancy roles. He has also worked over 25 years as an investment banker, advising gold and other mining companies on M&A. Plaintiff attacks Griffin's qualifications by arguing that his experience is primarily in coal mining and that he lacks experience specifically in gold mining. Plaintiff further argues that Griffin also lacks the expertise to opine on stock price movements, comparing him unfavorably to Plaintiff's own economics expert, Dr. Steven Feinstein, who holds a Ph.D. in economics and works on issues of market efficiency and price impact.

Based on the totality of his background, the Court determines that Griffin is qualified as a mining industry expert. Griffin is not being offered as an economics expert, and Defendants have offered a separate economics expert to rebut Feinstein's report. Instead, Defendants offer Griffin to opine on how gold mining industry observers and participants would have interpreted Makuch's statements. Plaintiff's critique also understates Griffin's gold mining experience: Griffin has worked on M&A issues related to gold and has worked for gold mining clients. The observation that Griffin's experience has been focused on the coal mining industry, and not primarily on the gold industry, goes, at most, to the weight rather than admissibility of his testimony. The Court, therefore, concludes that Griffin is qualified based on the totality of his education, knowledge, and experience.

The Court also determines that Griffin's background qualifies him to opine on how financial markets would have interpreted Makuch's statements. Griffin is not offering a quantitative analysis of price impact or stock price movements, which is covered by the parties' dueling economics experts. Instead, relying on his industry experience, Griffin opines on how investors would have broadly reacted to Kirkland's statements. Griffin's decades of experience working on M&A related to mining, including gold mining, sufficiently qualify him to testify as an expert on how the reaction of industry observers, analysts, and investors to Kirkland's statements would have broadly affected the stock price. The Court understands the scope of Griffin's expertise and would be capable of weighing his opinions accordingly for the purposes of the class certification motion.

### 2. Reliability

**\*4** The Court now turns to the second step of the Rule 702 inquiry: whether Griffin's report has a sufficiently reliable foundation. "In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.' " *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702). In *Daubert*, the Supreme Court set forth a list of non-exclusive factors for courts to apply to the reliability inquiry:

> (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-594) (internal citations and quotation marks omitted). These factors, however, "do *not* constitute a definitive checklist." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999). Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

Plaintiff argues that Griffin's opinions are not reliable because they are merely statements of subjective belief and speculation, without any objective standards or supporting data. Plaintiff further contends that Griffin did not reliably apply his methodology to the case and that his opinions are based on only generalities about the mining industry as a whole rather than an assessment of the facts of the case. These arguments are unavailing.

First, Plaintiff appears to be applying reliability requirements for scientific or technical testimony rather than experiential testimony, which is subject a less rigid standard. *See, e.g., Gabel v. Richard Spears Kibbe & Orbe, LLP,* No. 07-CV-11031, 2009 WL 1856631, at *4 (S.D.N.Y. June 26, 2009) (observing that "testimony from the realm of a person's professional experience ... does not readily lend itself to the *Daubert* framework does not render it inadmissible"). "Where, as here, an expert's opinion is based on the expert's experience, courts focus on the relationship between the experience and the opinion and whether the latter is rationally related to the former." *Mahoney v. JJ Weiser & Co.,* No. 04-CV-2592, 2007 WL 3143710, at *5 (S.D.N.Y. Oct. 25, 2007). In this case, the Court determines that there is a rational relationship between Griffin's decades of mining industry experience and his opinions, which concern industry custom, practices, and perceptions.

Second, contrary to Plaintiff's argument that Griffin's conclusions are purely speculative and subjective, Griffin has set forth a logical chain of reasoning that supports his opinions. Griffin opines that industry practitioners and observers have expectations that a gold mining company would pursue M&A opportunities because of the "self-depleting business model" of the industry. (ECF No. 91-1 ¶ 17(a).) Griffin's second and third opinions are logical conclusions from this starting premise and Griffin's understanding of how investors would react when their expectations are frustrated. (*See id.* ¶¶ 17(a)-(b).) The Court understands that Griffin's opinions are based upon his practical experience working on M&A issues in the industry, and not a data-driven financial model, and would be capable of weighing his opinions accordingly. Finally, Griffin's opinions are sufficiently grounded in the facts of the case—specifically, an analysis of Kirkland's business strategy and historic reliance on M&A for growth. (*See id.* ¶¶ 56-61, 69.) Accordingly, the Court concludes that Griffin's opinions have a sufficiently reliable foundation under Rule 702.

### 3. Relevance and Assistance to the Trier of Fact

**\*5** The Court now addresses the final step of the Rule 702 inquiry: whether the expert testimony will assist the trier of fact. This inquiry "goes primarily to relevance." *Daubert,* 509 U.S. at 591. The Second Circuit has instructed "trial court[s] [to] look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant." *Amorgianos,* 303 F.3d at 265. Federal Rule of Evidence 401 provides that

"[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Plaintiff argues that Griffin's opinions are irrelevant because Griffin did not perform an event study or other quantitative analysis of Kirkland's share price movements. Plaintiff thus contends that Griffin's opinions do not make the fact at issue —whether Makuch's statements affected the stock price— more or less likely. Once again, Plaintiff's arguments go to weight rather than admissibility. As already discussed above, Defendants offer Griffin as a mining industry expert, not an economics expert. The relevance of Griffin's experience-based report is two-fold. First, Griffin's opinions would assist the Court's understanding of how Makuch's statements fit into the customary practices of the mining industry. Second, the opinions would aid the Court in understanding how financial markets would have practically interpreted and reacted to the statements at issue. Accordingly, the Court concludes that Griffin's opinions are relevant to the evaluation of Plaintiff's price impact theory.

Because all of Plaintiff's objections to Griffin's expert report at most go to weight and not admissibility, the motion to exclude is denied.

## III. Motion for Class Certification

### A. Legal Standard
To obtain certification of a class pursuant to Rule 23(b)(3), a plaintiff must satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a). Fed. R. Civ. P. 23(a). A plaintiff must also meet two additional showings: "predominance, *i.e.*, law or fact questions common to the class predominate over questions affecting individual members, and superiority, *i.e.*, class action is superior to other methods." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006) (citing Fed. R. Civ. P. 23(b)(3)). The party seeking class certification must "affirmatively demonstrate" compliance with each of those requirements "through evidentiary proof." *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013) (internal citation and quotation marks omitted).

### B. Discussion
To certify a class, the Court must conduct a "rigorous analysis" to determine that Rule 23's requirements have been

satisfied. *Comcast Corp.*, 569 U.S. at 33 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). Here, that includes Rule 23(b)(3)'s requirement of predominance, which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

The Court's analysis begins and ends with the issue of predominance. "Because the Court concludes that Plaintiffs have not adequately demonstrated predominance, it need not address the other [Rule 23] requirements." *Hunter v. Time Warner Cable Inc.*, No. 15-CV-6445, 2019 WL 3812063, at *9 (S.D.N.Y. Aug. 14, 2019).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action," which in a private securities-fraud claim includes "reliance upon the misrepresentation or omission." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011). In *Basic v. Levinson*, 485 U.S. 224 (1988), the Supreme Court recognized that plaintiffs in securities fraud class actions can establish a class-wide presumption that investors relied on any misrepresentations reflected in a security's market price. As the Second Circuit recently summarized in *Arkansas Teachers Retirement System v. Goldman Sachs Group, Inc. (ATRS),* 77 F.4th 74 (2d Cir. 2023):

> **\*6** The *Basic* presumption excuses classes of securities fraud plaintiffs from proving that each class member individually relied upon a defendant's alleged misrepresentations. Courts can instead presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock.

*Id.* at 80.

The *Basic* presumption of class-wide reliance is rebuttable. "[D]efendants can rebut the presumption and defeat class certification by demonstrating, by a preponderance of the evidence, that the misrepresentations did not actually affect, or impact, the market price of the stock." *Id.* Therefore, while a plaintiff's "satisfaction of *Basic*'s prerequisites serves as an 'indirect proxy' for a showing of price impact," *id.* at 86 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278-81 (2014)), "an indirect proxy should not preclude ... a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply," *Halliburton*, 573 U.S. at 281-82. Here, Defendants do not dispute Plaintiff's satisfaction of *Basic*'s prerequisites and instead seek to rebut the *Basic* presumption of reliance by offering evidence that the alleged misrepresentations did not impact Kirkland's stock price.

A threshold question for the Court is determining Plaintiff's theory of price impact. Plaintiffs can either plead a price-inflation theory—alleging that a misrepresentation inflated the stock price—or an inflation-maintenance theory—alleging that a misrepresentation maintained inflation already built into the stock price. *ATRS*, 77 F.4th at 80. Here, it is undisputed that none of the three alleged misrepresentations caused a statistically significant increase in Kirkland's stock price, and Plaintiff offers arguments premised on an inflation-maintenance theory. (*See* ECF No. 88 at 23, 26; ECF No. 105 at 13-16.) Furthermore, Plaintiff's expert submissions make clear that Plaintiff is proceeding with an inflation-maintenance theory. (*See* ECF No. 107-1.) Accordingly, the Court analyzes this case under an inflation-maintenance framework.

In an inflation-maintenance scenario, "the misrepresentation prevents preexisting inflation in a stock price from dissipating, but does not cause a price uptick. Instead, the back-end price drop—what happens when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price. Simply put, the theory goes: back-end price drop equals front-end inflation." *ATRS*, 77 F.4th at 80. As the Supreme Court recently observed, however, the "inference ... that the back-end price drop equals front-end inflation ... starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 594 U.S. at 123.

Accordingly, courts must undertake a mismatch inquiry in price-maintenance cases to determine "whether there is

a basis to infer that the back-end price equals front-end inflation." *ATRS*, 77 F.4th at 99 n.11. This inquiry requires "a closer fit (even if not precise) between the front- and back-end statements" than courts have required when analyzing the loss causation element of securities fraud. *Id.* "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 594 U.S. at 122 (internal citation and quotation marks omitted).

**\*7** One way, but the not the only way, there could be a mismatch is in situations "when the earlier misrepresentation is generic (*e.g.,* 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.,* 'our fourth quarter earnings did not meet expectations')." *Id.* at 123. "Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.*

The Second Circuit recently provided guidance on how courts should conduct "a searching price impact analysis" in the specific scenario where (1) "there is a considerable gap" in genericness between the earlier statement and the subsequent disclosure, (2) the corrective disclosure does not directly refer to the alleged misstatement, and (3) the plaintiff claims the earlier generic statement was misleading by omission. *ATRS*, 77 F.4th at 102. First, courts must determine how generic the alleged misrepresentations are and whether there is a gap in specificity between the corrective disclosures and the earlier statements. *Id.* at 93. Second, if there is a gap, courts must then "ask ... whether a truthful—but equally generic —substitute for the alleged misrepresentation would have impacted the stock price." *Id.* at 102 (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016)). Because "the value of the back-end proxy, given the gap in specificity, will be diminished" in this scenario, "courts should consider other indirect evidence of price impact." *Id.* Based on this analysis, the court must ultimately "find whether the defendants have demonstrated, by a preponderance of the evidence, that the alleged misstatements did not in fact impact the price of the stock." *Id.* at 103.

In its September 2021 Opinion and Order, the Court narrowed this case to three public remarks made by Makuch that allegedly misled investors about Kirkland's plans to acquire Detour, a Canadian gold mining company. *Kirkland,*

2021 WL 4482151 at \*6 (ECF No. 36 at 14). These remarks comprise a January 25, 2019 statement and a February 21, 2019 statement regarding Kirkland's focus on organic growth (the "M&A Statements") (ECF No. 25 ("AC") ¶¶ 45, 53), as well as a January 14, 2019 statement describing the production levels and costs targets that Kirkland would apply in assessing a potential asset acquisition (the "Minimum Standards Statement") (*id.* ¶ 39). The "corrective disclosure" to the three alleged misstatements was Kirkland's announcement on November 25, 2019, of its acquisition of Detour. (*Id.* ¶ 68.) Applying the inflation-maintenance framework for analyzing price impact, the Court first addresses the M&A Statements before turning to the Minimum Standards Statement.

### 1. M&A Statements

Makuch made the first of the two M&A Statements at an institutional investor conference on January 25, 2019. In response to a question from an analyst about potential M&A activity in 2019 to leverage Kirkland's share price, Makuch said:

> Well, I think, first off, you look at our organic growth strategy and what we're doing, I mean, we're where we have the ability to grow by 275,000 ounces. Currently, we're just the size of some mid-tier juniors. There's a lot of companies talking about the noncore assets in those levels. But we have it internally, we don't have to pay for it and we could finance it. And then if I lead into [ ] what we think might be happening in 2023 onward, we still have some significant organic growth in the company.
>
> **\*8** So, to do—to use our paper just to—for this to grow, we don't need to do that to grow. We have internal growth, and we're really financing our internal—we're growing the company through diamond drill bit, through development, and through lowering unit cost and improvements.

(AC ¶ 45.) Makuch made the second M&A Statement in a February 21, 2019 earnings call. Replying to an analyst's question about M&A, Makuch said:

> [G]oing forward, I mean, we still see some significant growth and we talk about going to million ounces this year ... So that's the number one driver of our growth instead of going out and

> trying to buy that kind of company.
> We're going to continue to grow with
> the diamond drill bit. We want to
> continue to grow with development of
> our own assets and organically, and
> then we're going to look seriously
> at how we give value back to our
> shareholders.

(*Id.* ¶ 53.) The alleged "corrective disclosure" to these statements came in the form of Kirkland's announcement on November 25, 2019 that it was acquiring Detour in an all-stock deal valued at $3.68 billion. Kirkland's share price declined 17% that day. (*See id.* ¶¶ 6, 68.)

Applying the Second Circuit's recent guidance, the Court first addresses the "baseline question: how generic are the alleged misrepresentations?" *See ATRS*, 77 F.4th at 93. Although the M&A Statements may be more specific in character than the Supreme Court's prototype, *see Goldman*, 594 U.S. at 123, or some of the more platitudinous statements at issue in *ATRS, see* 77 F.4th at 82, the Court nonetheless finds that the alleged misrepresentations are fairly broad and generic statements about the company's growth strategy. In the statements, Makuch broadly discussed Kirkland's goals and focus, which prioritized organic growth over M&A activity: "[T]hat's the number one driver of our growth instead of going out and trying to buy that kind of company." (AC ¶ 53.) Looking out to 2023 and beyond, Makuch also forecast that "we still have some significant organic growth in the company." (*Id.* ¶ 45.) Significantly, neither statement specifically ruled out considering acquisitions in the future, and Makuch's statements about Kirkland not needing M&A for growth did not go much beyond broad generalities.

Comparing the M&A Statements with the Detour acquisition announcement, the Court finds a considerable gap in genericness between the earlier statements and the corrective disclosure. Makuch's broad statements about Kirkland's focus on internal growth are far more generic than the announcement of a specific all-stock acquisition of a specific mine, with unique characteristics, nine months later, at a particular valuation. The Court also finds that the other prerequisites to triggering the searching price analysis required by *ATRS* are satisfied: the Detour announcement did not directly refer to the M&A Statements, and Plaintiff is effectively claiming that the earlier statements were misleading by omission. *See ATRS*, 77 F.4th at 102.

Accordingly, the Court proceeds with the next step of the analysis: asking "whether a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price." *Id.* The Court finds that the record does not support Plaintiff's initially pleaded theory that Kirkland was actively negotiating with Detour at the time of the three alleged misstatements in January and February 2019. Instead, the record evidence shows that although Kirkland conducted diligence of Detour in late 2018, discussions between Kirkland and Detour ended in 2018 and did not resume until the summer of 2019—months after the alleged misstatements. (*See* ECF No. 89 at 12-13.) Therefore, a truthful, but equally generic, substitute for the M&A Statements would be: "Although we are focused on delivering significant organic growth, we are also considering external growth through M&A."

**\*9** Having reviewed and considered all the evidence and expert submissions, the Court concludes, by a preponderance of the evidence, that a truthful, but equally generic, substitute for the M&A Statements would not have impacted the stock price. Perhaps the most probative evidence on this question comes from a June 2019 statement in which Kirkland announced that it had opened a "Deal Room" and invited potential acquisition candidates and partners to submit information through an online portal. (*See* ECF No. 91-4 ¶¶ 53-54.) The Deal Room announcement is even more specific about Kirkland's openness to M&A activity than the Court's substitute statement, and it is undisputed that the June 2019 statement did not cause a statistically significant decline in Kirkland's share price. (*See id.* ¶ 57; ECF No. 107-1 at ¶ 17.)

Evidence from contemporaneous analyst reports also supports the absence of price impact. "[M]arket commentary can provide insight into the kind of the information investors would rely upon in making investment decisions." *ATRS*, 77 F.4th at 104. Accordingly, the Court considers analyst statements to help determine whether the market relied upon the M&A Statements to infer that Kirkland was not pursuing M&A. The record shows that no analysts referenced or discussed either of the M&A Statements at all—let alone drew the inference that Kirkland was not considering acquisitions. (ECF No. 91-4 ¶¶ 48, 52.) In contrast, market commentary throughout the class period shows that multiple analysts reported on Kirkland's potential to pursue M&A, including noting specific factors that could drive the company toward acquisitions. (*Id.* ¶ 96 & n.155.)

The report of the defense expert, James Griffin, provides further support for the conclusion that the M&A Statements did not have a price impact. Drawing on his experience in the mining industry, Griffin observes that "[m]ining is a self-depleting business model." (ECF No. 91-1 at ¶ 17(a).) Simply put, "a mining company must replace the ore reserves it is extracting in order to simply maintain its production profile and future mine life." (*Id.*) And if a company wants to achieve long-growth growth, "it must also obtain control of incremental ore reserves through exploration and acquisitions." (*Id.*) Griffin states that organic growth and M&A are "complementary" strategies for mining companies, "and no single one can replace the other without hurting a company's growth potential." (*Id.*) On this basis, Griffin opines that "[a] statement by the CEO of a gold mining company that it would not consider M&A opportunities"—which is how Plaintiff interprets Makuch's statements—"would have signaled to the market that the company was placing self-imposed restrictions on potential growth companies. Therefore, I would not expect such a statement to have had a positive price impact." (*Id.* ¶ 17(b).) Based on Griffin's extensive experience in mining and M&A, the Court credits Griffin's expert conclusions to the extent that he is opining on how market participants would have perceived and reacted to a statement that Kirkland was not considering M&A.

The defense's economics expert, Dr. Jennifer Marietta-Westberg, has also offered evidence supporting alternative explanations for the stock decline following the Detour announcement. The academic literature shows that negative stock price reactions are associated with stock-financed deals—like the Detour acquisition—because the market interprets the use of stock as a signal that the acquiring company's stock was overvalued. (ECF No. 91-4 ¶¶ 67-70.) Kirkland's shareholders also expressed concern that the Detour acquisition was a sign that Kirkland's flagship Fosterville mine was underperforming. (*Id.* ¶¶ 72-75.) Analysts also expressed concern that Kirkland, which focused on underground mines, lacked experience operating open-pit mines like Detour's. (*Id.* ¶ 77.) The Court acknowledges that Marietta-Westberg presented this analysis in her critique of the damages methodology offered by Plaintiff's expert and that she did not perform a quantitative analysis disaggregating the factors that caused the price decline. Accordingly, the Court credits Marietta-Westberg's analysis to the extent that it offers credible, but potential, alternative explanations for the price decline.

**\*10** Plaintiff's economics expert, Dr. Steven Feinstein, has offered his own report as well as a rebuttal to Marietta-Westberg. (ECF No. 69-1; ECF No. 107-1.) In his report, Feinstein determines that Kirkland's shares traded in an efficient market throughout the class period (ECF No. 69-1 ¶¶ 17-20)—a conclusion that Defendants do not dispute. Feinstein also proposes a class-wide methodology for calculating the damages stemming from the alleged misstatements, but the report itself does not calculate damages. (*Id.* ¶¶ 154-165.) Specifically on the question of price impact, Feinstein argues that Marietta-Westberg's finding that Kirkland's stock price did not experience a statistically significant decline after the June 2019 Deal Room announcement should be given no weight in the Court's analysis because non-significance is "not proof of no price impact." (ECF No. 107-1 ¶ 17.) Feinstein's contention fatally misunderstands the analytical framework for inflation-maintenance cases. It is true that, under an inflation-maintenance theory, the alleged misrepresentations would not cause a statistically significant increase in share price. Because there are no visible price movements, courts have to seek out indirect proxies for the alleged inflation. That is why the Second Circuit has instructed courts, in cases like this one, to ask "whether an equally generic, truthful substitute would have *dissipated* inflation." *ATRS*, 77 F.4th at 99 (emphasis added). In this case, the June 2019 Deal Room announcement is serving as the closest real-world proxy for the generic, but truthful, substitute for the M&A Statements. Under an inflation-maintenance theory, the June 2019 Deal Room announcement would have dissipated the artificial inflation built into the share price. The undisputed finding that the June 2019 announcement was not followed by a statistically significant decline in share price is, therefore, probative of the absence of price impact.

More generally, Feinstein opines that "the alleged misrepresentations may have introduced artificial inflation into the stock price without moving the stock price when made." (ECF No. 107-1 ¶ 56.) That is a modest conclusion as far as it goes, as it simply restates the theory of inflation maintenance. Once again, it is precisely because inflation maintenance is not directly measurable that courts have to resort to indirect proxies to assess price impact.

Even more crucially, Feinstein's price impact analysis is undermined by his factual assumptions. Feinstein opines: "Misrepresentations consistent with prior understandings and expectations, and concealment of information consistent with those prior understandings and expectations[,] would

generally not cause the stock price to move when made, but will cause inflation nonetheless by propping up the price of the stock." (*Id.* ¶ 51.) He further opines that "nonsignificant movement on the alleged misrepresentation dates is reasonably congruent with investors' prior understanding and expectations about Kirkland." (*Id.* ¶ 53.) Feinstein's confusion arises when he bases his understanding of Kirkland investors' prior expectations on the assumption that the factual allegations contained in the Complaint are completely true (*see id.* ¶¶ 66-71)—even those allegations that have subsequently been disproven. For example, Feinstein expressly relies upon Plaintiff's allegation that Kirkland "was actively considering acquiring Detour at the time of Makuch's statements" (*id.* ¶ 56), even though, as discussed above, the allegation of contemporaneous falsity is now contradicted by the record and has effectively been abandoned by Plaintiff. Feinstein cites the Court's September 2021 Opinion and Order for the proposition that "the Court determined that Plaintiff sufficiently pled that investors were misled by the Company's alleged misrepresentations and omissions" (*id.* ¶ 67)—without recognizing that the Court had to assume the truth of the allegations at the motion-to-dismiss stage. In effect, Feinstein's opinion on price impact is akin to this statement: "The available evidence is consistent with an inflation-maintenance theory, assuming Plaintiff's factual allegations are true, even those that may have disproven by the record." The Court, therefore, affords Feinstein's price impact opinion the modest credit that it is due.

Based on the weight of evidence and expert submissions, the Court finds that a truthful, but equally generic, substitute for the M&A Statements would not have impacted Kirkland's share price. Accordingly, Defendants have demonstrated, by a preponderance of the evidence, that the two M&A Statements did not actually affect or impact the share price. Defendants have therefore rebutted the *Basic* presumption of reliance.

### 2. Minimum Standards Statement

Makuch made the Minimum Standards Statement in a January 14, 2019 meeting with analysts and investors:

> [S]o we're never going to [ ] not look if somebody has some noncore assets for sale. But you've got to recognize why are they for sale, and we have—we've set some standards

in terms of Kirkland Lake Gold. Minimum production levels has to be over 100,000 ounces, it has to be meaningful level. I might even say more than 100,000 ounces but it's got to be meaningful level of production. Talk about cas[h] cost of $650 an ounce or under you can get from that asset; and all-in sustaining cost of $950 an ounce or under. I mentioned that those two numbers are important because you can't let the cash cost get too high because you have to have money available to invest in new equipment, to invest in infrastructure, to invest in exploration—in sustainable exploration to maintain the business. So, that's important to us. And we need to see that. As we need to stay at $950 because we have to have a minimum return and minimum risk on the company and if we talk about a 15% hurdle rate, then we're kind of good to $1.050 gold.

**\*11** (AC ¶ 39.) As with the M&A Statements, the "corrective disclosure" was Kirkland's November 2019 announcement of the Detour acquisition.

Once again, the Court begins its analysis by assessing the genericness of the alleged misstatement. Compared with the two M&A Statements and the Supreme Court and Second Circuit prototypes, the Minimum Standards Statements is quite specific. In this statement, Makuch announced specific numerical targets for production levels and costs for potential acquisition targets. Because the specificity of the Minimum Standards Statement allows for a more direct, apples-to-apples comparison with the corrective disclosure, the Court determines that the "truthful, but equally generic" inquiry is unnecessary and inappropriate for this statement. But that does not end the analysis, as a gap in specificity is not the only way there could be a mismatch between the two statements. Under Second Circuit precedent, the Court must still undertake an inquiry comparing the two statements to determine "whether there is a basis to infer that the back-end price equals front-end inflation." *ATRS*, 77 F.4th at 99 n.11.

Based on a review of the record evidence, the Court determines that there is a substantive mismatch between the Minimum Standards Statement and the Detour acquisition announcement. The Court's analysis turns on a resolution of the parties' competing interpretations of the Minimum Standards Statement. Plaintiff contends that the statement announces specific performance targets—specifically, a cash cost of $650 per ounce or lower, an all-in sustaining cost of $950 per ounce or lower, and quarterly production of 100,000 ounces—for a mine *at the time of acquisition.* (*See* AC ¶¶ 39-40.) Defendants, meanwhile, interpret the performance targets as future metrics applying *over the life of the mine.* (ECF No. 88 at 12-13.) It is undisputed that Detour's all-in sustaining cost exceeded the minimum standard of $950 an ounce at the time of the acquisition, but it is also undisputed that Detour met all three performance metrics by the third quarter of 2021. (*See* ECF No. 91-4 ¶ 38.) The weight of the evidence supports Defendants' interpretation. In an earlier earnings call on October 31, 2018, Makuch discussed the same performance metrics for potential acquisitions:

> [O]ur goal ... in terms of objective of what is a Kirkland lake asset, first off, it has to be a mine that has significant production ... it needs to be a large production similar to what we may be getting annually currently at Macassa and/or Fosterville. And you have to see cash costs below $650 an ounce and all-in sustaining costs below $950 an ounce *over the life of [the] mine[.]*

(*Id.* ¶ 37) (emphasis added). In response to a follow-up question on the same call, Makuch repeated the cost metrics: "[M]aybe in a nutshell, I'd probably say—if I say $650 an ounce cash cost [and] $950 all-in sustaining [cost], it gives you a sense at a minimum of what we want to look for." (*Id.*) Defendants have also adduced evidence of other Kirkland statements from the class period that strongly suggest that the same three performance metrics were long-term goals for acquisition targets. (*Id.* ¶ 37 n. 49.) This future-oriented interpretation is consistent with Makuch's words in the M&A Statement that the cost metrics are what he would want to "get from that asset." (AC ¶ 39.) As the Minimum Standards Statement referred to future targets, rather than rigid requirements at the time of acquisition, there is a mismatch in content between the statement and the corrective

disclosure under Plaintiff's inflation-maintenance theory. Because of this substantive mismatch, the "inference ... that the back-end price drop equals front-end inflation ... starts to break down," *Goldman*, 594 U.S. at 123, and the court must examine all probative evidence in assessing price impact, *see id.* at 122.

**\*12** As with the M&A Statements, evidence from market commentary during the relevant period supports the absence of price impact. Three analysts who covered the January 14, 2019 investor day referred to the Minimum Standards Statement, but none of them indicated that it factored into their valuation of Kirkland's stock. (ECF No. 91-4 ¶ 42.) Furthermore, no analyst who covered the Detour acquisition referred back to the Minimum Standards Statements to state that Detour's failure to meet those targets resulted in the decline in share price. (*Id.*) Although analysts at the time did comment that Detour had higher costs than Kirkland, "commentary touching upon only the same subject matter ... cannot be enough." *ATRS*, 77 F.4th at 74.

Griffin's expert report also supports the conclusion that the M&A Statement did not impact the share price. Griffin opines that if markets had understood the M&A Statement as setting "certain minimum standards that must be met for Kirkland to consider a potential acquisition, ... [he] would not have expected a positive impact on Kirkland's stock price." (ECF No. 91-1 ¶ 17(c).) Griffin arrives at this conclusion because "[a] statement by the CEO of a gold mining company that the company would only target already high-performing mines would have signaled that Kirkland was limiting itself from pursing value-enhancing deals." (*Id.*) As with his opinions on the M&A Statements, the Court credits Griffin's conclusion to the extent he is opining based on his understanding of how markets would have reacted to such a statement. Meanwhile, for the reasons discussed in relation to the M&A Statements, the Court finds Feinstein's expert opinions to be of little probative value on the subject of price impact.

Based on the substantive mismatch between the alleged misrepresentation and the corrective disclosure, as well as the weight of the other probative evidence, the Court finds, by a preponderance of the evidence, that Defendants have "sever[ed] the link between back-end price drop and front-end misrepresentation." *ATRS*, 77 F.4th at 104. Accordingly, Defendants have successfully rebutted the *Basic* presumption of reliance on the M&A Statement.

2024 WL 1342800

Because Defendants have rebutted the *Basic* presumption of reliance on all three statements, Plaintiff has not adequately demonstrated predominance, as required by Rule 23(b)(3). Class certification is therefore denied.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion to exclude the testimony and report of defense expert James Griffin

is DENIED, and Plaintiff's amended motion for class certification is DENIED.

SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 1342800

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

# Case No. 14

2013 WL 2443217
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas,
Austin Division.

KB PARTNERS I, L.P., individually and on
behalf of all others similarly situated, Plaintiff,

v.

Remi BARBIER, Pain Therapeutics, Inc., Nadav
Friedmann, and Peter Roddy, Defendants.

No. A–11–CA–1034–SS.
|
June 4, 2013.

**Attorneys and Law Firms**

Jason S. Cowart, Tamar A. Weinrib, Jeremy A. Lieberman, Pomerantz Grossman Hufford Dahlstrom & Gross, LLP, New York, NY, Randall O. Sorrels, Sammy Ford, IV, Abraham, Watkins, Nichols, Et Al., Houston, TX, Patrick V. Dahlstrom, Pomerantz Haudek Grossman & Gross LLP, Chicago, IL, for Plaintiff.

Frederick J. Lee, Joshua I. Schiller, William S. Ohlemeyer, Boies, Schiller & Flexner, LLP, New York, NY, Mary Schaerdel Dietz, Cox Smith Matthews Incorporated, Austin, TX, Nathan A. Holcomb, Boies, Schiller & Flexner, LLP, Amonk, NY, for Defendants.

*ORDER*

SAM SPARKS, District Judge.

 **\*1** BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically the parties' Joint Motion to Extend Time and Page Limits [# 80]; the parties' Joint Motion to Extend Time [# 85]; Plaintiff KB Partners I, L.P.'s Motion for Class Certification [# 83] and Memorandum in Support [# 84], Defendants Pain Therapeutics, Inc., Remi Barbier, Nadav Friedmann, and Peter Roddy (collectively, PTI)'s Response [# 103], KB Partners' Motion for Leave to File Sealed Document (Reply) [# 110], and KB Partners' Declaration in Support [# 111]; KB Partners' "Unopposed" Motion to File Corrected Memorandum of Law in Support of Motion for Class Certification [# 87], PTI's Response [# 88], PTI's

Memorandum in Opposition [# 100], and KB Partners' Reply [# 101]; and PTI's Motion to Exclude Declaration of Frank C. Torchio [# 89], PTI's Declarations in Support [91, 92], KB Partners' Response [# 105], KB Partners' Original [# 106] and Amended Rebuttal Declaration of Frank C. Torchio [# 107], and PTI's Reply [# 108]. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

**Background**

This is a putative class action securities-fraud suit centering around PTI's failed efforts to obtain FDA approval for its flagship prescription painkiller REMOXY. The Court has previously recounted the facts giving rise to this suit in considerable detail on two occasions. *See* Order of Sept. 26, 2012[# 68], at 1–5 (order granting first motion to dismiss); Order of Nov. 20, 2012[# 75], at 1–3 (order denying second motion to dismiss). In short, KB Partners alleges PTI misled the investing public to drive up the price of PTI stock, some shares of which were ultimately purchased by KB Partners. When the FDA refused to approve REMOXY, and PTI's misrepresentations were subsequently exposed, the stock price plummeted and investors paid the price. KB Partners now seeks to certify a class, and the dozen motions recounted above address the issue.

**Analysis**

**I. Procedural Motions**
As an initial matter, the following procedural motions are GRANTED: the parties' Joint Motion to Extend Time and Page Limits [# 80]; the parties' Joint Motion to Extend Time [# 85]; and KB Partners' Motion for Leave to File Sealed Document (Reply) [# 110].

**II. Motion to Certify Class**
KB Partners seeks to certify the following proposed class:

> All purchasers of the common stock
> of Pain Therapeutics, Inc. during the
> period from December 27, 2010 and

KB Partners I, L.P. v. Barbier, Not Reported in F.Supp.2d (2013)
2013 WL 2443217, Fed. Sec. L. Rep. P 97,517

June 26, 2011, both dates inclusive (the "Class Period"). [1]

1  Excluding "Defendants, officers and directors of Pain Therapeutics, Inc. members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest."

Pl.'s Mot. for Cert. [# 83], at 2. KB Partners also seeks to have itself appointed as the class representative, and lead counsel appointed as class counsel.

### A. Legal Standards

The Federal Rules of Civil Procedure allow a case to proceed as a class action if the class and the named representative meet the prerequisites of Rule 23(a), and the case is of a type enumerated in Rule 23(b). FED.R.CIV.P. 23(a)-(b). Under Rule 23(a), a class member seeking to sue as a representative of the entire class must demonstrate the following: (1) the class is so numerousjoinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representatives are typical of those of the class (typicality); and (4) the representatives will fairly and adequately protect the interests of the class (adequacy of representation). FED.R.CIV.P. 23(a); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). District courts "must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class." *Stirman v. Exxon Corp.,* 280 F.3d 554, 561 (5th Cir.2002) (internal quotation marks omitted).

**\*2**  Assuming the prerequisites of Rule 23(a) are satisfied, in order to proceed as a class action the case must also fall into one of the categories enumerated in Rule 23(b). Relevant here is Rule 23(b) (3). "In order to certify a class under that Rule, a court must find 'that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' " *Erica P. John Fund, Inc. v. Halliburton Co.,* ⸺ U.S. ⸺, ⸺, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011) (quoting FED.R.CIV.P. 23(b)(3)).

The Rule 23(b) predominance inquiry "begins, of course, with the elements of the underlying cause of action." *Id.*

To recover on its securities-fraud action in this case, KB Partners must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds,* ⸺U.S. ⸺, ⸺, 133 S.Ct. 1184, 1192, 185 L.Ed.2d 308 (2013) (internal quotation marks omitted).

The United States Supreme Court has recognized the fourth element, reliance, may be difficult for investors trading on large public markets to prove, and therefore "endorsed the 'fraud-on-the-market' theory, which permits certain Rule 10b–5 plaintiffs to invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public." *Id.* (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 241–49, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). The premise at the heart of this theory is that efficient markets incorporate publicly available information into the market price of shares. *Id.* As the *Amgen* Court explained:

> If a market is generally efficient in incorporating publicly available information into a security's market price, it is reasonable to presume that a particular public, material misrepresentation will be reflected in the security's price. Furthermore, it is reasonable to presume that most investors—knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information—will rely on the security's market price as an unbiased assessment of the security's value in light of all public information. Thus, courts may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their reliance on the integrity of the price set by the market.

*Id.* at 1192–93.

**KB Partners I, L.P. v. Barbier, Not Reported in F.Supp.2d (2013)**

2013 WL 2443217, Fed. Sec. L. Rep. P 97,517

The fraud-on-the-market theory "has particular significance in securities-fraud class actions," because requiring direct proof of reliance would "ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class." *Id* "The fraud-on-the-market theory, however, facilitates class certification by recognizing a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market." *Id.* Certification of a class in this case therefore turns largely on whether KB Partners can show the market for PTI shares was generally efficient during the Class Period, thereby allowing KB Partners and its fellow class members to invoke the fraud-on-the-market theory.

**B. Motion to Amend**

**\*3** Before the Court can consider KB Partners' motion for class certification, the Court must decide which version of the motion to consider. KB Partners filed its original Motion to Certify Class [# 83] and Memorandum in Support [# 84] on January 22, 2013. Two months later, on March 21, 2013, KB Partners filed an "Unopposed" Motion to Amend its Memorandum in Support [# 87], which sought to correct "certain scrivener's errors" in the original memorandum. PL's Mot. to Amend [# 87], at 1. PTI immediately objected, arguing the actual amendments were substantive, rather than clerical as represented to PTI by opposing counsel.

As discussed above, one aspect of KB Partners' class certification motion is its contention the market for PTI securities was efficient during the Class Period. To establish market efficiency, KB Partners relies primarily on the testimony of its expert, Frank C. Torchio. Among the many factors Mr. Torchio discussed in his declaration is equity analyst coverage of PTI securities. KB Partners' original memorandum included the following statement on the issue: "According to Capital IQ data, equity analyst coverage of PTIE ranged between 1 and 2 analysts during the Class Period, with an average of approximately 1 analyst, *see* Torchio Exhibit H. *See* Torchio Decl., ¶ 39." Pl.'s Cert. Memo. [# 84], at 17. KB Partners now seeks to alter this sentence to change "Capital IQ data" to "Bloomberg," and change the analyst range to "between 1 and 3 analysts ... with an average of approximately 2 analysts." PL's Mot. to Amend [# 87–2], Ex. 2 (Redlined Memo.).

PTI argues this "eleventh-hour change" fundamentally alters the nature of KB Partners' case, and allowing the change would prejudice PTI. Def.'s Mem. in Opp. [# 100], at 1–2. The

Court disagrees, and finds the amendments will not prejudice PTI, for a number of reasons. First, Mr. Torchio's declaration, attached to and cited in the memorandum, correctly stated his source as Bloomberg, not Capital IQ, and correctly stated the number of analysts. Pl.'s Cert. Memo [# 84], Ex. B (Torchio Decl.), 9920242 41. The memorandum obviously misstated the substance of Mr. Torchio's declaration, and the amendment merely corrects the memorandum to properly reflect the actual data Mr. Torchio used in his analysis. [2] Second, PTI deposed Mr. Torchio on this exact subject, and Mr. Torchio confirmed his declaration properly stated his data and conclusions, and the memorandum was incorrect. Third, because of the parties' generous and repeatedly extended briefing schedule, PTI did not file its response to KB Partners' class certification motion until April 10, 2013. The intervening months provided PTI with more than adequate time to discover the discrepancy, confirm the correct information with Mr. Torchio, and draft its response accordingly. The Court therefore GRANTS KB Partners' Motion to Amend its Memorandum in Support of its Motion for Class Certification [# 84].

[2] PTI's case would be much stronger if the reverse were true, and Mr. Torchio sought to amend his expert declaration to match the original memorandum. In this case, however, it was clearly counsel's summarization of Mr. Torchio's testimony—not Mr. Torchio's testimony itself—which needed to be changed.

**C. Motion to Exclude**

**\*4** The second preliminary dispute to resolve before considering the merits of KB Partners' class certification motion is whether Mr. Torchio's declaration is reliable. PTI has moved to exclude Mr. Torchio's declaration, arguing it is unreliable and therefore inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). PTI relies primarily on its own expert, Dr. David I. Tabak, who obviously disagrees with Mr. Torchio's conclusions and finds his methods unreliable. KB Partners counters the motion to exclude is merely a battle of competing experts, and the trier of fact can ultimately decide which expert it believes.

**1. Legal Standard**

The root of the Court's admissibility analysis is Federal Rule of Evidence 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED.R.EVID. 702.

The United States Supreme Court has interpreted this rule as imposing a "gatekeeping role" upon district court judges, tasking them with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597. "The reliability prong mandates that expert opinion be grounded in the methods and procedures of science and ... be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.,* 685 F.3d 452, 459 (5th Cir.2012) (internal quotation marks omitted). "The relevance prong requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue." *Id.* (internal quotation marks omitted). The burden on the proponent of the expert testimony is only to prove, by a preponderance of the evidence, the testimony is reliable; they need not prove the expert's testimony is correct. *Id.*

The *Daubert* standard requires courts "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The *Daubert* inquiry "% 'is not intended to serve as a replacement for the adversary system.' " *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir.2002) (quoting Fed.R.Evid. 702 advisory committee's note). "Rather, as *Daubert* makes clear, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Id.* (quoting *Daubert,* 509 U.S.

at 596). Accordingly, "a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.*

**2. Application**

**\*5** Tellingly, PTI does not contest Mr. Torchio's qualifications to offer expert testimony in this case. Mr. Torchio has been consulting on matters involving financial and economic analysis, including securities-fraud lawsuits, for more than twenty years. Torchio Decl. ¶ 5. He has testified in numerous trials and arbitrations, and published two articles related to securities litigation in academic legal journals. *Id.* ¶ 7. He holds an advanced degree in economics and finance, and is a Chartered Financial Analyst charterholder. *Id.* ¶ 8.

Essentially conceding Mr. Torchio is a qualified expert, PTI's attack focuses solely on Mr. Torchio's methods and conclusions. Mr. Torchio's declaration purports to establish the market for PTI securities was generally efficient during the Class Period. "[T]he mere fact that a stock trades on a national exchange does not necessarily indicate that the market for that particular security is efficient." *Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307, 313 (5th Cir.2005). The Fifth Circuit uses a nonexclusive list of factors in determining whether a stock is traded in an efficient market:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S–3 (as opposed to Form S–1 or S–2); (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 203 of 292
KB Partners I, L.P. v. Barbier, Not Reported in F.Supp.2d (2013)
2013 WL 2443217, Fed. Sec. L. Rep. P 97,517

*Unger v. Amedisys Inc.,* 401 F.3d 316, 323 (5th Cir.2005) (internal quotation marks and footnote omitted). The reliability inquiry in this case thus requires an examination of Mr. Torchio's approach to each of these eight factors.

### i. Average Weekly Trading Volume

"A high weekly stock trading volume suggests the presence of active, informed investors." *Id.* at 324. There is no hard-and-fast benchmark for this criterion.[3] Mr. Torchio opines the average weekly trading volume of shares of PTI stock throughout the Class Period was 2.02 million shares, or 4.60% of outstanding shares, which Mr. Torchio believes to be consistent with an efficient market.

[3]    The parties suggest there is a judicially recognized "strong presumption" of efficiency when average weekly trading volume is 2% or more of the outstanding shares, and a "substantial presumption" at 1%. *See Cammer v. Bloom,* 711 F.Supp. 1264, 1293 (D.N.J.1989). (The Fifth Circuit in *Unger* drew the first five of its factors, including average weekly trading volume, from *Cammer* ). But *Cammer's* discussion of these benchmarks merely quoted a proposal by a commentator; it was not the court's holding in any sense. *Id.* The same commentator suggested establishing a rebuttable presumption of market efficiency for all stocks traded on large public exchanges like the NYSE and NASDAQ, which the court rejected. *Id.* at 1292–93. The *Unger* court based its objection to evidence of a 3.9% or 1.8% average weekly trading volume on the reliability of the underlying data ("two printouts from the Internet"), not the numbers themselves. 401 F.3d at 324.

PTI's expert, Dr. Tabak, predictably objects. Many of Dr. Tabak's objections are based on his belief the Class Period should be analyzed as two halves: the first from December 27, 2010 through March 29, 2011; the second from March 30, 2011 through June 26, 2011. Dr. Tabak chooses March 30, 2011, the date of the first analyst report, as the distinguishing date. Tabak Decl. ¶ 3. Dr. Tabak offers no principled reason why the Class Period should be divided in half, with each half analyzed separately, other than the fact that doing so results in weaker indicia of efficiency during the early class period. Moreover, as Mr. Torchio points out, Dr. Tabak's conclusion—a large PTI stock price reaction to the first

analyst report indicates the pre-report market was inefficient—is based on the wrong type of efficiency. Torchio Rebuttal Decl. ¶¶ 45–49. The relevant legal question is whether the market price responds to publicly available information quickly ("informational efficiency"), not whether the market price responds to publicly available information quickly *and accurately* ("fundamental efficiency"). *Id.; see also In re PolyMedica Corp. Secs. Litig.,* 432 F.3d 1, 14–16 (1st Cir.2005) (distinguishing between the two types of efficiency and concluding a stock price need not accurately reflect the fundamental value of the stock in order to establish the fraud-on-the-market presumption).

**\*6** There is no requirement proposed class periods be analyzed in discrete chunks. While some courts have made reference to data particularly relevant to certain portions of class periods, not even Dr. Tabak has pronounced any principle for determining how and why to segregate individual time periods. The decisions PTI cites involving intra-period divisions are also easily distinguishable.

PTI's primary example involved a five-year class period from March 19, 2001 through March 20, 2006. *In re Northfield Labs., Inc. Secs. Litig.,* 267 F.R.D. 536, 547 (N.D.Ill.2010). The court drew distinctions between the first three years of the period and the last two, noting analyst coverage was nonexistent for the first three years. *Id.* Similarly, the court faulted the plaintiffs' expert for calculating an average daily trading volume across the entire period, rather than calculating the number on a monthly or annual basis. *Id.* In each instance, the court cited no authority for the need to draw such arbitrary lines through the class period. In *Cammer,* the court suggested looking to "average weekly trading volume during the class period." 711 F.Supp. at 1286. It did not state the metric as "average weekly trading volume during each month of the class period," nor as each year. The entire point of an *average* volume is to capture both highs and lows and arrive at some middle figure. Nothing identified by the *Northfield* court, or by Dr. Tabak, suggests any scientific basis for rewriting the first *Cammer* factor. Even to the extent long class periods pose special problems, the five-year period in *Northfield* is ten times the length of the Class Period proposed in this case.[4]

[4]    Arbitrarily dividing any proposed period into enough chunks would defeat any application of the fraud-on-the-market theory. Even stocks traded in generally efficient marketsmay have individual

days in which the *Unger* factors would suggest otherwise.

Second, in *Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307 (5th Cir.2005), the Fifth Circuit noted the relevant stock lacked any analyst coverage "for more than a third of the class period." 422 F.3d at 315. But the Fifth Circuit's decision in *Bell* was admittedly based on the plaintiff's complete failure to offer "any arguments or evidence in support of the fraud-on-the-market theory." *Id.* Moreover, the court did not divide the class period into thirds when analyzing any other *Unger* factor, suggesting such divisions are at best a convenient point of attack, not a scientific rule. *See id.* (addressing number of market makers during the *entire* class period, not each third).

Second, Dr. Tabak claims Mr. Torchio's numbers fail to discount for the "double-counting" the *Unger* court recognized can occur on some exchanges. *Unger,* 401 F.3d at 324 (citing a 2001 article co-authored by Mr. Torchio). In response, Mr. Torchio argues his double-counting analysis as reflected in his 2001 article was based on pre–1995 data, whereas new data (including Mr. Torchio's discussions with the Chief Economist of NASDAQ and a working paper by the former Chief Economist of the Securities and Exchange Commission) indicate double-counting is no longer a concern. Torchio Rebuttal Decl. [# 107] ¶¶ 69–76.

**\*7** This dispute is the first of many examples indicating PTI's *Daubert* challenge is little more than one well-paid, interested expert disagreeing with another well-paid, interested expert. *See Cammer v. Bloom,* 711 F.Supp. 1264, 1292 (D.N.J.1989) ("Expensive experts with complex equations and long computer printouts are highly likely to reach opposite conclusions on efficiency of the market."). Mr. Torchio has valid reasons for believing double-counting is no longer a problem. Dr. Tabak's reasons for believing double-counting is still a problem, though based on older literature, may be valid as well. When the underlying academic literature itself is conflicted, the trier of fact should resolve such disputes, not the Court.

Even if the Court were to fully embrace Dr. Tabak's opinion and split the Class Period in two with separate analyses for each period, and discount each period for double-counting, there would still be sufficient evidence of market efficiency based on average trading volume. Discounting each half of the class period using Mr. Torchio's previously suggested figure of 58%,[5] Dr. Tabak arrives at averages of 0.93% and 2.96% for the first and second halves of the Class Period, respectively. Even those numbers approach or far exceed the

1% and 2% "presumption" levels discussed in *Cammer,* which both experts apparently accept as the proper benchmark.

[5] Dr. Tabak suggests discounting by 58%, based on Mr. Torchio's 2001 article cited in *Unger.* Mr. Torchio notes a 2002 paper by Dr. Tabak suggests 54.76% is the appropriate discount rate. Torchio Rebuttal Decl. ¶ 67. Using the 54.76% figure results in an average of more than 1% even for the first half of the Class Period. *Id.* This dispute also illustrates that paid experts will find a way to reach whatever conclusion benefits their paying client the most, and the "battle of the experts" should therefore be left to the trier of fact, who is free to judge the credibility of each hired gun.

### ii. Number of Analysts

The number of securities analysts following the company's stock during the class period may offer "persuasive" evidence of market efficiency because those investment professionals make buy or sell recommendations to their investor clients, and thereby help incorporate market information into the market price of the stock. *Cammer,* 711 F.Supp. at 1286. Mr. Torchio opines there were between one and three analysts for PTI's stock during the Class Period, which alone "is not persuasive support" for market efficiency. Torchio Decl. ¶¶ 41–43. By adding media coverage of the company available to the market, Mr. Torchio concludes this factor "modestly supports a finding of an efficient market." *Id.*

Unsurprisingly, Dr. Tabak reaches the opposite conclusion. First, he argues Mr. Torchio's data source, Bloomberg, overstates the amount of "meaningful analyst coverage." Tabak Decl. ¶ 26. Dr. Tabak apparently reaches this conclusion by dividing the Class Period in half, and asserting in wholly conclusory fashion the one analyst following PTI in the early period was a "minor firm"[6] which did not release enough reports to create efficiency. *Id.* Dr. Tabak instead uses a different source, the Institutional Brokers' Estimate System, which found zero analysts in the early period and "only one analyst providing earnings estimates" in the late period. *Id.* Both experts rely on appropriate industry sources for their information. Dr. Tabak's criticism of Mr. Torchio's data is weak at best,[7] and does not suggest Mr. Torchio's methods or data are "unreliable" in the sense *Daubert* was concerned with. *See Kumho Tire,* 526 U.S. at 159 (Scalia, J., concurring) (*Daubert* gives judges discretion to exclude "expertise that is *fausse* and science that is junky").

[6] The meaning of this term, and the relevance to this litigation, is unexplained.

[7] Mr. Torchio could level essentially the same criticism against Dr. Tabak's data source, arguing it underestimates rather than overestimates the number of analysts. If disagreement alone indicates unreliability, *Daubert* ought to have simply required all expert evidence to be excluded in every case, as each party can always find an expert to disagree with another expert.

**\*8** Dr. Tabak also faults Mr. Torchio for assuming this factor is either neutral or favorable to market efficiency, but never against. This is largely a distinction without a difference. The question is whether a market is efficient. The number of analysts either indicates it the market is efficient, or does not indicate the market is efficient. Whether one refers to the latter as "neutral" or as "negative" or as "evidence of *in* efficiency," the same idea is being communicated. Mr. Torchio's opinion is not rendered unreliable on this basis, especially given Mr. Torchio's express admission in his declaration the number of analysts alone *does not support* a finding of efficiency.

### iii. Market Makers

"The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer,* 711 F.Supp. at 1286–87. Mr. Torchio found "approximately 46 to 50 market makers" for PTI during the Class Period, which Mr. Torchio found indicated an efficient market. Torchio Decl. ¶ 45.

Dr. Tabak objects because, as the Fifth Circuit noted in *Unger,* "the mere number of market makers, without further analysis, has little to do with market efficiency," and Mr. Torchio provides no "further analysis." 401 F.3d at 324. This objection speaks to the proper weight to give to the market maker factor, not the reliability of Mr. Torchio's analysis. *See id.* (holding district court erred "when it did not consider the questionable relevance" of the market maker finding). The Fifth Circuit's discussion of this point in *Unger* was expressly concerned with economic literature questioning the relevance of the market maker inquiry itself, and thus is more of an indictment of the *Cammer* factor than an indication an expert should not be allowed to provide evidence on the factor. *See id.* Dr. Tabak's related criticisms concerning the number of institutional investors and short sellers merely reflect disagreements between the two experts, which the trier of fact can resolve.

### iv. SEC Form S–3 Eligibility

The ability to file an SEC "Form S–3 Registration Statement" may also show efficiency. *Cammer,* 711 F.Supp. at 1285–87. Mr. Torchio states PTI was eligible to file a Form S–3 during the Class Period. Torchio Decl. ¶¶ 46–50. Dr. Tabak contends the Form S–3 is not persuasive support for a finding of market efficiency because of changes the SEC has made to the requirements for filing the form. Tabak Decl. ¶ 46. This is a mere disagreement with the relevance of a *Cammer* factor approved of by the Fifth Circuit in *Unger,* and says absolutely nothing about the reliability of Mr. Torchio's opinion.

### v. Empirical Cause–and–Effect

As the *Cammer* court noted, "one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." 711 F.Supp. at 1291; *see also Unger,* 401 F.3d at 324 (this factor "goes to the heart of the 'fraud on the market' theory"). Expert testimony on this issue "may be helpful because of the utility of statistical event analysis for this inquiry." *Unger,* 401 F.3d at 325. Mr. Torchio conducted four cause-and-effect analyses in this case, and found PTI's common stock prices reacted quickly to new material information, thus reflecting an efficient market. Torchio Decl. ¶ 21. Unsurprisingly, Dr. Tabak concluded all four analyses are wholly unreliable.

**\*9** First, Mr. Torchio created a market model for PTI's common stock to measure the reaction of the stock price to market and industry news. *Id.* ¶¶ 22–24. Mr. Torchio found an "adjusted R-squared" [8] value of 26.8%, where 10% or more indicates a reasonable reaction. *Id.* Dr. Tabak disagrees, pointing to some academic literature which correlates lower rather than higher R-squared values with efficient markets. Tabak Decl. ¶¶ 49–53. Mr. Torchio responds the literature Dr. Tabak relies on has itself been questioned by more recent literature suggesting both hypotheses may be correct in different circumstances. Torchio Rebuttal Decl. ¶¶ 124–29. The experts disagree, and both have reasons grounded in the underlying sciences for their opinions. Disagreement does not equal unreliability. [9]

8     The Court does not profess to fully understand the statistical tests and economic models employed by Mr. Torchio. Though the parties do not say as much, they likely do not fully understand the tests, either. The R-squared value discussion provides a typical example, where each side simply points to its expert's declaration and makes conclusory statements about which expert is correct, leaving the Court to decipher the underlying arguments. This is truly the stuff of battling experts, not junk science.

9     The Court is reminded of the old saying: if all the economists in the world were laid end to end, they still would not reach a conclusion. Alternatively, if all the economists in the world were laid end to end, it would not be a bad idea.

Second, Mr. Torchio conducted a test to analyze how quickly new information is incorporated into PTI's stock price. Torchio Decl. ¶ 25. Mr. Torchio concluded PTI's stock price "reacted promptly to the big-news days in the Class Period," which indicates an efficient market. *Id.* ¶ 27. Dr. Tabak challenges each event selected by Mr. Torchio for various reasons, again failing to distinguish between informational efficiency and fundamental efficiency. Dr. Tabak mostly quibbles with how to interpret the results of this study. *See* Tabak Decl. ¶¶ 60–62. Dr. Tabak could have conducted his own study, but did not. The wholly predictable fact he now disagrees with the only studies in the record, which just so happen to have been performed by the opposing expert, does not make Mr. Torchio's analysis unreliable.

Third, Mr. Torchio conducted a regression analysis to find the empirical correlation between absolute stock returns and daily trading volume. Torchio Decl. ¶¶ 28–31. Mr. Torchio found strong positive relationships between the variables, which he understands to be consistent with an efficient market. *Id.* ¶ 31. Dr. Tabak contends this analysis is unreliable because it did not account for specific days where PTI's stock price moved but there was no new information introduced into the market. Tabak Decl. ¶ 65. This is precisely the kind of flaw to be brought out through vigorous cross-examination and the presentation of contrary evidence. *See Daubert,* 509 U.S. at 596. The Court need not exclude expert testimony simply because another expert claims to be able to poke holes in his opponent's methods.

Finally, Mr. Torchio conducted an empirical study of the ten days during the Class Period on which PTI's stock price

had the largest changes, evaluating the news released on each day to determine if the stock price was reacting to material new information. Torchio Decl. ¶ 32. Mr. Torchio concluded the study provided some support for efficiency, though he noted the results were "not strong." *Id.* ¶ 37. Dr. Tabak claims Mr. Torchio's results fall below the threshold suggested by the academic literature. Tabak Decl. ¶ 67. Mr. Torchio responds the article referenced by Dr. Tabak is "not a litmus test," and notes courts have recognized there are many days on which even large stocks traded on efficient markets experience significant changes in price despite an absence of major news events. Torchio Rebuttal Decl. ¶ 141. Again, Dr. Tabak's objections speak more to the weight to afford to Mr. Torchio's conclusions than the reliability of his methods, and therefore offer no basis for exclusion under *Daubert.*

### vi. Market Capitalization and Float

 **\*10** Mr. Torchio provided raw data on both of these factors, but concluded "[t]he size of the Company's market capitalization taken alone is not persuasive support for a finding of market efficiency." Torchio Decl. ¶ 64. Amusingly, Dr. Tabak finds common ground with Mr. Torchio on this point. [10] Mr. Torchio did not offer any analysis of PTI's float.

10     Apparently Dr. Tabak believes Mr. Torchio is capable of sound analysis, so long as Mr. Torchio's conclusions favor Dr. Tabak's client.

### vii. Bid–Ask Spread

"The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman,* 202 F.R.D. at 478. Lower spreads indicate more efficient markets. Mr. Torchio concluded the average bid-ask spread for PTI stock was in the thirty-third percentile of spreads for all NASDAQ firms, meaning roughly two out of every three NASDAQ stocks had higher bid-ask spreads. Torchio Decl. ¶¶ 57–59. Mr. Torchio found this spread indicated an efficient market. *Id.* ¶ 59. Dr. Tabak agrees, but nevertheless faults Mr. Torchio for comparing PTI stock to the entire NASDAQ, rather than dividing the NASDAQ into different listing tiers. Tabak Decl. ¶¶ 72–73. Dr. Tabak cites no authority for dividing the NASDAQ as he suggests, and his personal opinion Mr. Torchio should have conducted his analysis differently does not render Mr. Torchio's analysis unreliable.

2013 WL 2443217, Fed. Sec. L. Rep. P 97,517

**viii. Conclusion**

The Court concludes Mr. Torchio's declaration is reliable and need not be excluded under *Daubert* and its progeny. It is undisputed Mr. Torchio is a well qualified expert. His analysis is thorough, and his methods are supported by references to academic literature and industry practices. Most of Dr. Tabak's criticisms do not challenge the reliability of Mr. Torchio's declaration, but rather (1) disagree with Mr. Torchio's conclusions; (2) disagree with the significance of factors the Fifth Circuit commands this Court to consider when analyzing the fraud-on-the-market theory; or (3) reflect genuine disagreements or inconsistencies within the financial or economic fields of study. Even if some of Dr. Tabak's criticisms are well founded, the Court has no reason to believe Mr. Torchio's analysis fails to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152. Mindful of "the jury's role as the arbiter of disputes between conflicting opinions," the Court concludes the motion to exclude should be DENIED. *See Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir.1987).

**D. Class Certification**

The Court finally turns to the central question: whether KB Partners' proposed class may be certified. First, the Court will consider the four factors embodied in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Amchem,* 521 U.S. at 613. Second, the Court will turn to the two requirements of Rule 23(b)(3): predominance and superiority. *Id.* at 615.

**1. Numerosity**

 **\*11** The first prerequisite to class certification under Rule 23(a) is the existence of a class "so numerous that joinder of all members is impracticable." FED.R.CIV.P. 23(a)(1). The numerosity requirement "is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1039 (5th Cir.1981). There is evidence in the record indicating approximately two million shares of PTI common stock were traded on the NASDAQ each week during the Class Period, suggesting a potentially massive class of individual investors. Moreover, PTI does not contest this requirement. Accordingly, the Court finds the numerosity requirement is easily satisfied in this case. *See In re Dell Inc.,* No. A–06–CA–726–SS, 2010 WL 2371834, at \*2 (W.D.Tex.

June 11, 2010), *aff'd, appeal dism'd sub nom. Union Asset Mgmt. Holding A.G. v. Dell, Inc.,* 669 F.3d 632 (5th Cir.2012).

**2. Commonality**

The commonality requirement demands the presence of "questions of law or fact common to the class." FED.R.CIV.P. 23(a)(2). The class members' claims need not be identical, there must simply "be at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter,* 669 F.2d 328, 335 (5th Cir.1982) (footnote omitted); *see also In re Dell Inc.,* 2010 WL 2371834, at \*3. There are a number of common issues in this case, as every class member's allegations of securities fraud arise from the same basic set of facts. PTI does not argue this requirement has not been satisfied, and the Court finds it has. *See In re Dell Inc.,* 2010 WL 2371834, at \*3.

**3. Typicality and Adequacy of Representation**

PTI collapses the final two elements of Rule 23(a) in its response. The typicality requirement places the burden on the lead plaintiff of showing "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED.R.CIV.P. 23(a)(3). The Fifth Circuit has held "the test for typicality is not demanding." *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir.1999). The adequacy requirement ensures "the representative parties will fairly and adequately protect the interests of the class." FED.R.CIV.P. 23(a)(4). The relevant factors are the "zeal and competence" of counsel [11] and the willingness and ability of the plaintiff to take an active role in controlling the litigation. *Stirman v. Exxon Corp.,* 280 F.3d 554, 563 (5th Cir.2002).

[11]    PTI does not contend KB Partners' counsel is inadequate in any way.

There is no dispute the claims advanced by KB Partners are typical of those asserted by the class. In fact, the claims are identical. KB Partners' "claims are effectively indistinguishable from the rest of the Class Members' claims." *In re Dell Inc.,* 2010 WL 2371834, at \*4. There are a number of disputes as to whether KB Partners will draw typical defenses from PTI, however. First, PTI argues KB Partners is subject to "the unique defense that its reliance was not justified because of its sophistication, heightened access to information, and extensive diligence." Def.'s Resp. [# 103–14], Ex. 14 (Def.'s Class Cert. Opp. Memo.), at 14. Second, PTI contends KB Partners is "subject to the unique and atypical defense of no loss causation." *Id.* at 17. Third, PTI

claims KB Partners' principal and general partner, Geoffrey de Sibert, "faces unique credibility problems that threaten to become the focus of the litigation at the expense of the putative class members." *Id.* at 17.

### a. Reliance and Sophistication

**\*12**  PTI first argues any reliance by KB Partners on PTI's alleged misrepresentations was not justified because Mr. de Sibert is a sophisticated investor. *See Ashland Inc. v. Morgan Stanley & Co.,* 652 F.3d 333, 338 (2d Cir.2011) ("sophistication and expertise" of the lead plaintiff is relevant to the justifiable reliance inquiry). This argument fails to account for Congress's express desire, as indicated in the Private Securities Litigation Reform Act of 1995 (PSLRA), for sophisticated plaintiffs in class action securities cases. *See* 15 U.S.C. § 78u–4(a)(3)(B). The Fifth Circuit has "emphasize[d] that Congress enacted the 'lead plaintiff provisions of the PSLRA ... to direct courts to appoint, as lead plaintiff, the *most sophisticated* investor available and willing so to serve in a putative securities class action." *Berger v. Compaq Computer Corp.,* 279 F.3d 313, 313 (5th Cir.2002) (emphasis added). In the judgment of Congress and the Fifth Circuit, KB Partners' sophistication is beneficial. Complex securities cases demand lead plaintiffs who "know more than that they were involved in a bad business deal." *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 483 (5th Cir.2001) (internal quotation marks omitted). Lead plaintiffs must be capable of taking an active role in controlling the litigation, and cannot simply rely exclusively on the knowledge and advice of legal counsel. *Id.* at 483 & n. 18. In general, then, KB Partners' sophistication makes it *more suitable* to serve as lead plaintiff, not less.

Any direct reliance by Mr. de Sibert on PTI's alleged misrepresentations does not necessarily make him atypical. An investor who is aware of a particular company's statement and purchases stock based on that statement meets the most traditional form of reliance. *See Erica P. John Fund, Inc. v. Halliburton Co.,* No. 12–10544, 2013 WL 1809760, at \*3 (5th Cir. Apr.30, 2013). Even in the absence of direct reliance, however, investors may rely on the fraud-on-the-market theory to establish the reliance element. *Id.* KB Partners' allegations clearly invoke the fraud-on-the-market theory, an issue typical of all putative class members and applicable to KB Partners itself. The fact KB Partners' reliance story may be even stronger because it may prove direct reliance does not preclude it from representing less sophisticated investors who lacked the same level of knowledge. To hold otherwise

would frustrate Congress's explicit call for sophisticated lead plaintiffs. [12]

[12]
For essentially the same reasons, the Court is unpersuaded by PTP's argument Mr. de Sibert, as a sophisticated investor, knew the risks associated with investing and with the FDA approval process, rendering his reliance unjustified. As this Court has previously held, many of the warnings or disclaimers investors had access to were "merely a boilerplate litany of generally applicable risk factors," and were therefore not meaningful in any real way. *See Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 372 (5th Cir.2004); Order of Sept. 26, 2012 [# 68], at 16. Moreover, any warnings placed in public documents were equally available to individual investors, and there is no indication Mr. de Sibert relied on any non-public information in making his investment decision.

PTI argues Mr. de Sibert has a relationship with the CFO of Durect Corporation, one of PTI's partners, and therefore had access to far more information than the typical PTI investor. The record before the Court belies PTI's assertion. Mr. de Sibert testified in his deposition he did not believe he received access to any information through his meetings with Durect executives which other investors did not have. Def.'s Resp. [# 103–1], Ex. 1 (de Sibert Depo.), at 44–45. PTI points to no evidence to the contrary. PTI's rank speculation Mr. de Sibert had inside information about PTI does not render KB Partners atypical.

**\*13**  PTI also asserts Mr. de Sibert's loss is atypical because he was forced to sell his shares due to a margin call. [13] PTI cites no legal authority indicating selling at a margin call renders a lead plaintiff atypical, and other courts have held it does not. *See LaGrasta v. First Union Secs., Inc.,* No. 2:01–CV–251–FTM29DNF,2005 WL 1875469, at \*6 (M.D.Fla. Aug. 8, 2005); *In re THQ, Inc. Secs. Litig.,* No. 00–1783AHM(EX), 2002 WL 1832145, at \*5 (C.D.Cal. Mar.22, 2002). While PTI's damages may be different because it sold at a different time than some other plaintiffs, such differences are typical in securities-fraud cases and do not render a lead plaintiff atypical. *LaGrasta,* 2005 WL 1875469, at \*6.

[13]
Although PTI references Mr. de Sibert's deposition on this topic, it provides no citations. As the Court is unwillingto read through Mr. de Sibert's entire deposition in search of this evidence, the Court

cannot determine whether these assertions are true or not. However, KB Partners does not dispute the underlying facts in its Reply, so the Court will assume PTI's representations are accurate.

**b. No Loss Causation**

It is undisputed Mr. de Sibert purchased many of his shares during the last ten days of the Class Period. Citing no authority, PTI claims this fact distinguishes his loss from the losses of other investors, again referencing the margin call. This argument ignores one of the basic elements of the fraud-on-the-market theory, which requires the plaintiff to have "traded the shares between the time the misrepresentations were made and the time the truth was revealed." *Erica P. John Fund, Inc.,* 2013 WL 1809760, at *4. Even if Mr. de Sibert's timing was fortuitous in the sense it occurred shortly before PTI's stock price plummeted, the shares were still purchased within the Class Period, and the losses were still caused by the stock price dropping. Had the stock price not decreased as a result of the REMOXY approval process falling through, a margin call forcing Mr. de Sibert to sell his shares would not have resulted in the loss he suffered in this case.

**c. Credibility**

PTI contends Mr. de Sibert is subject to unique credibility problems which threaten to become the focus of the litigation. In particular, PTI makes much of a story from Mr. de Sibert's past when he was a principal at InterCapital Asset Management Ltd. in the United Kingdom. In 1996, the United Kingdom's regulatory body, the Investment Management Regulatory Organisation, banned Mr. de Sibert from working as a money manager in the United Kingdom. Whatever becomes of this rabbit hole, the Court is unconvinced KB Partners is an inadequate class representative solely because one of its principals was reprimanded by an administrative agency in a foreign country nearly twenty years ago. There are no allegations Mr. de Sibert has ever engaged in any misconduct while affiliated with KB Partners.

The Court concludes the requirements of Rule 23(a) are satisfied in this case. Before certifying the class, however, the Court must also analyze the two requirements of Rule 23(b)(3), predominance and superiority.

**4. Predominance**

The predominance inquiry asks whether "questions of law or fact common to class members predominate over any questions affecting only individual members." FED.R.CIV.P.

Rule 23(b)(3). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem,* 521 U.S. at 625. PTI's only argument against predominance relates to the fraud-on-the-market theory. Having determined the Torchio Declaration is admissible, PTI's argument there is no evidence of market efficiency fails. PTI briefly argues, in the alternative, the Torchio Declaration fails to conduct the "rigorous analysis" necessary to invoke the fraud-on-the-market presumption.[14] The Court notes its protracted discussion of Mr. Torchio's analysis above and concludes Mr. Torchio's declaration provides more than ample evidence to invoke the presumption. Mindful of the Fifth Circuit's admonishment this Court's "determination for class certification purposes may be revised (or wholly rejected) by the ultimate factfinder," the Court concludes the record at this point contains sufficient facts in favor of an efficient market to invoke the fraud-on-the-market theory and thereby establish predominance. *Unger,* 401 F.3d at 323.

[14]    On this point, PTI's language is confused. *Unger* directs *the district court* to conduct a "rigorous analysis," not the plaintiff's expert. 401 F.3d at 320. The Fifth Circuit meant to emphasize the real burden placed on district courts in certifying securities-fraud classes. *See, e.g., Unger,* 401 F.3d at 324–25 (vacating the district court's class certification and remanding with instructions to conduct a more "thorough analysis," after which "certification may ultimately prove correct"). This Court is fully satisfied its review of the Torchio Declaration passes muster.

**5. Superiority**

**\*14** Rule 23(b)(3)'s second requirement is "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED.R.CIV.P. 23(b)(3). PTI does not argue a class action is not superior to individual shareholder lawsuits, and the Court finds this requirement easily satisfied. *See In re Dell Inc.,* 2010 WL 2371834, at *4.

**Conclusion**

The Court concludes KB Partners has met its burdens under the Federal Rules and relevant case law, and demonstrated a class should be certified in this case. As PTI raised no

2013 WL 2443217, Fed. Sec. L. Rep. P 97,517

objections to the language of the proposed class or to the Class Period itself, the Court will certify the class as proposed by KB Partners.

Accordingly,

IT IS ORDERED that the parties' Joint Motions to Extend Time and Page Limits [80, 85] are GRANTED;

IT IS FURTHER ORDERED that Plaintiff KB Partners I, L.P.'s Motion for Leave to File Sealed Document (Reply) [# 110] is GRANTED;

IT IS FURTHER ORDERED that Plaintiff KB Partners I, L.P.'s "Unopposed" Motion to File Corrected Memorandum of Law in Support of Motion for Class Certification [# 87] is GRANTED;

IT IS FURTHER ORDERED that Defendant Pain Therapeutics, Inc.'s Motion to Exclude Declaration of Frank C. Torchio [# 89] is DENIED;

IT IS FURTHER ORDERED that Plaintiff KB Partners I, L.P.'s Motion for Class Certification [# 83] is GRANTED;

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 23, the following class is hereby certified: All purchasers of the common stock of Pain Therapeutics, Inc. during the period from December 27, 2010 and June 26, 2011, both dates inclusive (the "Class Period");

IT IS FINALLY ORDERED that Pomerantz Grossman Hufford Dahlstrom & Gross LLP is appointed as class counsel.

SIGNED this the *3rd* day of June 2013.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2443217, Fed. Sec. L. Rep. P 97,517

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 15

2010 WL 3397358

2010 WL 3397358
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

LG ELECTRONICS U.S.A., INC., Plaintiff,
v.
WHIRLPOOL CORPORATION, Defendant.

No. 08 C 242.
|
Aug. 24, 2010.

**Attorneys and Law Firms**

Ronald Y. Rothstein, Bryna Joyce Roth Dahlin, Eric L. Broxterman, John George Marfoe, Lawrence R. Desideri, Marlen Cortez Morris, Mary M. Hutchings, Winston & Strawn LLP, Chicago, IL, for Plaintiff.

Brian D. Roche, Carey L. Bartell, Jennifer Yule Depriest, Vanessa Marti Heftman, Reed Smith LLP, Chicago, IL, Charles Ash, Jr., J. A. Cragwall, Jr., Jacob J. Sadler, Janet L. Ramsey, John J. Bursch, Warner Norcross & Judd LLP, Grand Rapids, MI, James J. McGovern, Stephen George Morrison, Nelson Mullins Riley & Scarborough LLP, Columbia, SC, Patrick Coleman Wooten, Nelson Mullins Riley & Scarborough, Charleston, SC, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Judge.

**\*1** Defendant Whirlpool Corporation ("Whirlpool") has moved to exclude (i) the expert testimony and opinions of Plaintiff LG Electronics U.S.A., Inc.'s ("LG") damages expert, Mohan Rao, Ph.D., and (ii) portions of the rebuttal expert report and a video expert report of LG's marketing expert, Dr. Yoram (Jerry) Wind. For the reasons discussed below, the Court (i) denies Whirlpool's motion to exclude Dr. Rao's testimony and opinions, and (ii) grants in part, denies in part, and denies in part as moot Whirlpool's motion to exclude Dr. Wind's testimony and opinions.

### BACKGROUND

LG sued Whirlpool for false advertising in violation of Section 43(a) the Lanham Act, 15 U.S.C. § 1125(a), regarding its steam dryers. LG asserts both literal and implied falsity theories under the Lanham Act. The focus of LG's claim is that Whirlpool uses the word "steam" in its advertisements and in the name of its Duet ® Steam Dryer, and that such use is literally false and misleading because the Duet ® Steam Dryer does not truly use steam, but instead uses a mist of cold water sprayed into a warm dryer drum. Trial is scheduled to commence in this case on October 4, 2010.

### LEGAL STANDARD

In anticipation of trial, Whirlpool challenges the admissibility of Dr. Rao's expert opinions and testimony pursuant to Rules 402, 403 and 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Dr. Wind's expert opinions and testimony pursuant to Rule 702 and *Daubert.* Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of opinion or otherwise." Fed.R.Evid. 702. Rule 702 "also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.,* 602 F.3d 820, 824 (7th Cir.2010). It requires that the district court serve as a " 'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru–Con Inc.,* 498 F.3d 734, 741–42 (7th Cir.2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com,* 471 F.3d 745, 749 (7th Cir.2006)). The purpose of the court's gate-keeping function is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

In assessing whether an expert's testimony is reliable, *Daubert* lists a number of considerations—including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert,* 509 U.S. at 593–94. The Supreme

Court, however, has clearly stated that "the test of reliability is flexible, and *Daubert'* s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho,* 526 U.S. at 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (internal quotation omitted). This is especially true when the expert's opinions are non-scientific in nature and do not follow traditional scientific testing. "[T]he test for reliability for nonscientific experts is 'flexible' and ... *Daubert'* s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *United States v. Romero,* 189 F.3d 576, 584 (7th Cir.1999) (quoting *Kumho Tire,* 536 U.S. at 141.) "Rather the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kuhmo Tire,* 536 U.S. at 142 (emphasis in original).

**\*2** In addition, the 2000 Advisory Committee's Notes to Rule 702 suggest additional criteria for gauging expert reliability, including whether: (1) "maintenance standards and controls" exist; (2) the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (3) "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (4) "the expert has adequately accounted for obvious alternative explanations"; (5) "the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (6) "the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Fuesting v. Zimmer, Inc.,* 421 F.3d 528, 535 (7th Cir.2005) (citations omitted), *vacated in part on other grounds,* 448 F.3d 936 (7th Cir.2000) (quoting Fed.R.Evid. 702 advisory committee's note (2000)). *See also American Honda Motor Co., Inc. v. Allen,* 600 F.3d 813, 817 (7th Cir.2010). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir.2009).

An expert may be qualified to render opinions based on experience alone. "In certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." Advisory Commit tee Notes to Rule 702. The Seventh Circuit has repeatedly stated that "genuine expertise may be based on experience or training." *United States v. Conn.,* 297 F.3d 548, 556 (7th Cir.2002), quoting *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir.1996). "[W]hile extensive academic and practical

expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trustees of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Sav. Plan Trust Funds v. Royal Intern. Drywall and Decorating, Inc.,* 493 F.3d 782, 787–88 (7th Cir.2007) (citations and quotations omitted). As such, courts "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id.* (quoting *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir.2000)).

## ANALYSIS

### I. Dr. Rao

Whirlpool seeks to exclude Dr. Rao's opinions in their entirety because they are unreliable. LG claims that all of Whirlpool's arguments go to the weight of Dr. Rao's testimony, not its admissibility. The Court held a *Daubert* hearing on June 28, 2010 and July 8, 2010. During the hearing, Dr. Rao testified for approximately a day and a half. For the following reasons, the Court denies Whirlpool's motion to exclude the testimony and opinions of Dr. Rao.

### A. Dr. Rao and His Opinions

**\*3** Dr. Rao has a B.S. in engineering from the University of Michigan, a pre-doctoral fellowship from Harvard University, and a Ph.D. from the University of Colorado. He currently is an adjunct professor in the Department of Industrial Engineering and Management Sciences at the McCormick School of Engineering and Applied Sciences at Northwestern University where he teaches finance. Dr. Rao is also the Managing Director at LECG. He is a member of the American Economic Association, the Licensing Executives Society, and the IEEE. In addition, Dr. Rao served as the chair of the Valuation and Taxation Commit tee of the Licensing Executives Society, a professional organization for intellectual property valuation and transactions. He also teaches courses in intellectual property valuation to executives at LES.

Dr. Rao is the author of a chapter on econometrics in the context of damages analysis in the Litigation Services handbook. Dr. Rao specializes in intellectual property and antitrust economics. He previously has testified as an expert in more than thirty cases, including approximately six false

LG Electronics U.S.A., Inc. v. Whirlpool Corp., Not Reported in F.Supp.2d (2010)

2010 WL 3397358

advertising cases in which he has testified as a damages expert.

Winston & Strawn, counsel for LG, retained Dr. Rao to "evaluate certain economic and financial issues in this litigation related to LG's claims against Whirlpool." (Supplemental Expert Report of Mohan Rao, Ph.D. ("Rao Report") at 2.) In essence, Dr. Rao is a damages expert. Dr. Rao states in his Report that: "LG lost sales and, in turn, profits as a result of Whirlpool's false and misleading claims regarding its steam dryers." (*Id.* at 4.) As of March 2009, Dr. Rao opines that LG has lost a total of approximately $33.3 million in profits as a result of Whirlpool's false advertising of its steam dryers, broken down as follows:

* Lost profits of approximately $10.8 million for lost sales of LG steam dryers and $10.4 million for lost sales of LG steam washers between December 2007 and March 2009; and

* Lost profits of approximately $12.1 million due to price erosion on LG steam dryers during the same period.

(*Id.* at 4.) He further opines that Whirlpool has gained approximately $25.4 million in profits as a result of its false and misleading advertising of steam dryers during this same time period. (*Id.* at 5.) According to Dr. Rao, Whirlpool's profits as a result of its conduct on its sales of steam dryers is $12.9 million and on its sales of steam washers is $12.5 million.

In total, Dr. Rao opined that, as a result of Whirlpool's false and misleading claims, LG's lost profits are approximately $33.3 million and Whirlpool's gains are approximately $25.4 million.

### B. Whirlpool's Challenges

Whirlpool raises seven separate challenges to the admissibility of Dr. Rao's opinions. Specifically, Whirlpool contends that his opinions are inadmissible on the grounds that Dr. Rao: 1) wrongly assumes causation; 2) improperly relies on pre-launch estimates of sales rather than actual sales figures; 3) ignores the presence of other competitors and excludes them from his damages analysis; 4) improperly includes profits of LG's Korean parent company in his analysis; 5) fails to consider price erosion; 6) ignores price sensitivity; and 7) improperly includes the sale of washers in his analysis. The Court will address each argument in turn.

### 1. Causation Between the Allegedly False Advertisements and LG's Damages

**\*4** Whirlpool first argues that Dr. Rao's testimony is inadmissible because he simply assumes causation between the allegedly false advertisements at issue and Whirlpool's sales and LG's lost sales. It contends that Dr. Rao fails to determine whether any causal link exists between Whirlpool's false advertising and LG's lost profits. Dr. Rao, however, has demonstrated that his methodology is reliable.

In reaching his conclusions, Dr. Rao relied on several Whirlpool documents that show that consumers' preference for steam is a key driver of sales of Whirlpool's dryers. During the *Daubert* hearing, Dr. Rao explained the basis for this opinion by citing to a variety of internal Whirlpool surveys and reports. The Whirlpool documents reveal that Whirlpool sales associates believed that steam was a key driver of sales for LG and that Whirlpool sought to place a steam dryer in the market prior to LG. Dr. Rao also relied on Whirlpool documents that show that Whirlpool recognized a distinction between steam and mist, and that consumers recognized a distinction between hot steam and cold vapor. He also considered Whirlpool surveys demonstrating that consumers prefer steam dryers to steam washers by a 2 to 1 margin, and steam washers to misting dryers by a 2 to 1 margin. (Rao Report at ¶ 15.) After determining that consumers prefer steam and that they can distinguish between steam and mist, Dr. Rao also opined, again based on Whirlpool documents, that Whirlpool gained market share and LG lost market share when Whirlpool began selling its steam dryer. Accordingly, Dr. Rao opined that he established a causal link between Whirlpool's false advertising and the damages sustained by LG.

Whirlpool levels several criticisms at Dr. Rao's methodology. Whirlpool first argues that Dr. Rao is offering an opinion —that Whirlpool believed that its decision to change its dryer name from mist to steam would result in a marked increase in sales—based on his interpretation of Whirlpool's internal documents which are unrelated to actual sales. Whirlpool contends that the Court should strike Dr. Rao's opinions because he failed to address evidence related to Whirlpool's actual steam dryer sales and to conduct his own surveys regarding the value that consumers placed on the word "steam." Dr. Rao, however, testified that surveys after-the-fact of sales would not assist in his causation analysis because the point of sale is the relevant time period for evaluating the consumer's purchase preferences. Dr. Rao also explained that he did not need to conduct such studies because

Whirlpool had already conducted studies that evaluated consumer preference for steam.

Whirlpool further criticizes Dr. Rao's reliance on Whirlpool's internal surveys, which it asserts did not directly address the incremental value that consumers attach to steam over mist. During the hearing, Whirlpool's counsel questioned Dr. Rao regarding his reliance on these internal Whirlpool surveys conducted prior to litigation. As noted above, Dr. Rao testified that he could quantify consumer preference for steam as compared to mist based on research that Whirlpool conducted and that he did not conduct his own surveys with regard to this information because Whirlpool had already conducted the relevant surveys. During this line of questioning, Whirlpool's counsel inquired as to whether Dr. Rao adhered to the guidelines established in Shari Seidman Diamond's Reference Guide on Survey Research.

**\*5** Diamond's manual addresses survey methodology relating to surveys that parties present as evidence during litigation. Shari Seidman Diamond's Reference Guide on Survey Research, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Federal Judicial Ctr 2d ed.2000). The manual is "intended to assist judges in identifying, narrowing, and addressing issues bearing on the adequacy of surveys either offered as evidence or proposed as a method for developing information." (Diamond at 226.) The manual specifically states that "[a] routine use of surveys in federal courts occurs in Lanham Act cases, where the plaintiff alleges trademark infringement or claims that false advertising has confused or deceived consumers. The pivotal legal question in such cases virtually demands survey research because it centers on consumer perception (i.e., is the consumer likely to be confused about the source of a product, or does the advertisement imply an inaccurate message?)." (Diamond at 227.) With regard to Dr. Rao's opinions, however, LG is not offering the surveys conducted by or on behalf of Whirlpool and relied on by Dr. Rao as evidence of consumer perception. Instead, the surveys relied on by Dr. Rao form a limited portion of the documents he relied on in forming his opinions regarding damages. Moreover, it is well-established that "criticisms of surveys used in litigation are appropriate topics of cross-examination and contrary evidence to reduce the weight of the survey without requiring that [ ] it be excluded." *Simon Property Group L.P. v. mySimon, Inc.,* 104 F.Supp.2d 1033, 1039 (S.D.Ind.2000) (citing *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 618 (7th Cir.1993); *McGraw–Edison Co. v. Walt Disney Prods.,* 787 F.2d 1163, 1172 (7th Cir.1986); *Henri's Food Prods. Co. v. Kraft, Inc.,* 717 F.2d 352, 357 (7th Cir.1983)).

Whirlpool also has failed to show that Dr. Rao's use of internal Whirlpool documents rather than conducting his own surveys renders his opinions inadmissible. Whirlpool's reliance on *Jamsports & Entm't, LLC v. Paradama Prods., Inc.,* No. 02 C 2298, 2005 WL 14917 (N.D. Ill. Jan 3, 2005), is misplaced. In *Jamsports,* the district court excluded a portion of the expert's testimony where the expert simply interpreted certain correspondence and evidence because such opinions did "not constitute the application of 'scientific, technical, or other specialized knowledge [that] will assist the trier of fact.' " *Id.* at \*10 (citing Fed.R.Evid. 702.) In other words, the expert did not apply his methodology to certain factual underpinnings and reach an opinion. Instead, the expert simply interpreted the factual evidence. The court held that merely interpreting the evidence did not involve a specialized skill or knowledge.

Similarly, *U.S. Gypsum Co. v. Lafarge N. Am. Inc.,* 670 F.Supp.2d 748 (N.D.Ill.2009), does not support Whirlpool's argument. In *U.S. Gypsum,* the court struck the testimony of an expert who reviewed certain consumer complaints and internal communications and rendered opinions about the quality of the product at issue based on this information. The court found that the expert's conclusions about the quality of the product were "essentially based on anecdotal data with little or no governing method of analysis." *Id.* Given the unreliable methodology, the district court struck the opinions.

**\*6** In contrast, Dr. Rao used Whirlpool's documents as the factual underpinning for his damages opinions. As described above, Dr. Rao testified at length regarding the Whirlpool documents he reviewed, the factual content of those documents, and the means by which he drew conclusions from those documents. Significantly, Dr. Rao relies on documents from Whirlpool's, not from LG's files. *See In re Sulfuric Acid Antitrust Litig.,* 235 F.R.D. 646, 658–59 (N.D.Ill.2006). Moreover, LG intends to establish the factual assertions relied on by Dr. Rao in conducting his analysis through other witnesses at trial. As the Seventh Circuit has emphasized, "the court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact ...." *Smith,* 215 F.3d at 718. *See also United States v. Pan sier,* 576 F.3d 726, 738 (7th Cir.2009) (same); *In re Ready–Mixed Concrete Antitrust Litig.,* 261 F.R.D. 154, 165

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 216 of 292
LG Electronics U.S.A., Inc. v. Whirlpool Corp., Not Reported in F.Supp.2d (2010)
2010 WL 3397358

(S.D.Ind.2009) (denying request to strike expert's opinions where expert assumed facts based on his review of evidence even though opponent submitted evidence contradicting his assumptions).

If the factual underpinnings of Dr. Rao's expert testimony regarding causation are weak that is a matter not for exclusion, but as the Supreme Court stressed in *Daubert* for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof ...." *Daubert,* 509 U.S. at 596. *See also Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 586–87 (7th Cir.2000) ("the factual underpinnings of expert testimony may be subject to counter-attack."); *United States v. Lauder,* 409 F.3d 1254, 1264 (10th Cir.2005) (*"Daubert* generally does not, however, regulate the underlying facts or data that an expert relies on when forming her opinion."); *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929–30 (8th Cir.2001) (stating that the "factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination"). This portion of LG's motion is therefore denied.

### 2. Pre–Launch Estimates

Whirlpool next challenges Dr. Rao's damages opinion because it maintains that Dr. Rao used Whirlpool's forecasts for steam dryer sales rather than its actual sales figures. As Dr. Rao explained, however, he did use Whirlpool's actual sales figures. Whirlpool's criticisms go to the weight and not the admissibility of Dr. Rao's opinion in this regard.

As part of his causation analysis, Dr. Rao used Whirlpool's forecasts of sales projections prior to the launch of its dryer. One forecast from December 12, 2006 forecasted sales for the Duet Myst dryer and the second one from January of 2007 forecasted sales for the Duet Steam dryer. Whirlpool changed the name of its steam dryer in early January 2007 from the Myst to the Steam dryer. With the name change, Whirlpool's internal forecasts for the anticipated sales of the dryer increased by 21 percent. As Dr. Rao testified, Whirlpool did not provide evidence of any other changes in the dryer between December 12, 2006 and January 2007, other than the change in name. Because part of the increase in sales was expected to come from Whirlpool consumers who owned the traditional dryer and would now purchase the new Whirlpool steam dryer, Dr. Rao did not include this percentage increase in his damages calculation. Instead, he used approximately 18 percent, which represents the anticipated increase in sales of Whirlpool's steam dryers from the marketplace—not

from Whirlpool customers who would have switched from a traditional Whirlpool dryer to a steam Whirlpool dryer. Dr. Rao applied the 18 percent figure to Whirlpool's actual sales of steam dryers. Dr. Rao explained that he employed the forecasts to arrive at the 18 percent figure because Whirlpool did not have actual historic sales figures for the steam dryer which had just launched. He then applied this figure to Whirlpool's actual sales to reflect the sales that LG lost to Whirlpool because of Whirlpool's alleged false advertising.

**\*7** Whirlpool's reliance on *Otis v. Doctor's Assocs., Inc.,* No. 94 C 4227, 1998 WL 673595, \*1–2 (N.D.Ill. Sept.14, 1998), for the proposition that untested reliance on projected sales data is not a well-accepted scientific method for using forecasted data is not persuasive. *Otis* involved an expert's lost profits calculation premised on a franchise agreement that required the plaintiff to set up a specified number of franchises over the term of the contract and which specified minimum weekly sales that the franchisee was expected to produce. The court held that this methodology was not reliable because "[the plaintiff] has made no showing that the formula and projected values [the expert] relied on is accurate or has been tested for accuracy. [The expert] himself admitted that he had not performed any independent analysis of the reliability or factual accuracy of the figures used in the DA Agreement." *Id.* at \*4. Conversely, Dr. Rao has explained at length the reasons for his reliance on Whirlpool's internal forecasts and his methodology in applying figures derived from those forecasts to actual sales. LG has also asserted that it will seek to prove the factual assumptions relied on by Dr. Rao at trial. Moreover, unlike *Otis,* Dr. Rao explained that the process he followed has been subjected to peer review. Dr. Rao cites a number of reference manuals in his expert report (Rao Report at ¶ 43, n. 67.) and the reference manual on scientific evidence from the Federal Judicial Center also describes the approach used by Dr. Rao. (Pls.' Hr'g Ex. 20 at p. 281.)

Whirlpool's citation to *Pizza Hut v. Papa John's Int'l,* 227 F.3d 489, 503 (5th Cir.2000), and *Zazu Designs v. L'Oreal S.A.,* 979 F.2d 499, 506 (7th Cir.1992), are similarly unpersuasive. The court in *Pizza Hut* did not address an expert's use of forecast figures as applied to actual sales as a method of determining lost profits. Moreover, while the Court recognizes that "[u]sing a percentage of some number unrelated to the plaintiff's injury is an unacceptable way to estimate damages," *Zazu,* 979 F.2d at 506, Dr. Rao has explained his use of forecasts and actual sales figures to conduct the lost profits analysis. In short, LG has established that Dr. Rao applied a reliable methodology in this regard,

2010 WL 3397358

and Whirlpool's criticisms go to the weight, and not the admissibility, of Dr. Rao's opinions and testimony.

### 3. Competitors

Whirlpool also argues that Dr. Rao's analysis ignores the presence of other competitors in the steam dryer market. Specifically, it asserts that he "improperly assumes that LG would have made *each and every one* of Whirlpool's sales allegedly 'caused' by Whirlpool's use of the word 'steam' in its advertising, notwithstanding the presence of numerous other competitors in the steam dryer market." (R. 388, Pls.' Mem in Supp. at 11.)

Dr. Rao made clear, however, that he did not ignore other competitors. As he explained, Whirlpool launched its steam dryer in October 2007, and LG followed in December of 2007. Kenmore, GE, Samsung, and Bosh subsequently entered the market with a steam dryer. In reaching his opinions, Dr. Rao assumed that none of these other competitors actually produces a steam dryer as LG does. In other words, Dr. Rao assumed that the competitors are also falsely advertising their steam dryers. This, of course, is a factual assumption that LG will have to establish at trial. As explained above, the jury has the job of evaluating the soundness of an experts' factual underpinnings.

**\*8** *Blue Cross & Blue Shield United of Wis. v. Marshfield,* 152 F.3d 588, 593 (7th Cir.1998), does not provide otherwise. Instead, it stands for the proposition that "statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment." *Id.* Whirlpool has not shown that Dr. Rao failed to correct for a "salient factor." Indeed, Dr. Rao did not assume that any of the sales made by Whirlpool would have gone to a competitor rather than LG because those competitors also did not make steam dryers. He explained that if competitors in the United States used the steam dryer technology and advertised it consistently with LG's definition of steam he would "eliminate their market share" from his lost profits calculation. He further explained that in 2010 LG started manufacturing the steam dryers for Kenmore so he will update his calculations to reflect that Kenmore is using a steam dryer that is not being falsely advertised. Whirlpool may still present evidence at trial that its competitors did use the same technology and that those competitors should be factored out of the analysis, if appropriate. Whirlpool, however, has not shown that the Court should exclude Dr. Rao's opinion and testimony on this basis.

### 4. LG's Korean Parent

Whirlpool next asserts that Dr. Rao has improperly included the profits of its Korean parent—LG Korea— when calculating damages in this case. In support, LG relies on *Poly–America, L.P. v. GSE Lining Tech., Inc.,* 383 F.3d 1303 (Fed.Cir.2004). *Poly–America,* however, is not instructive. In that patent infringement case, the manufacturer and owner of a patent sought to collect the lost profits of its sister corporation. The Federal Circuit held that a patentee "needs to have been selling some item, the profits of which have been lost due to infringing sales, in order to claim damages consisting of lost profits" and that there was no evidence that the manufacturer had sold any item on which it claimed damages. *Id.* at 1310–12. The court found that the manufacturer, the owner of the relevant patent, was not entitled to recover its sister corporation's lost profits. *Id.* at 1310–12. Conversely, Dr. Rao testified that he calculated the incremental profit margin for steam dryers sold in the Unites States by LG USA, the defendant in this case. He explained that although LG earns the profit on those dryers in the United States, for tax purposes LG books a portion of that profit in Korea. Dr. Rao explained that because the profit booked in Korea is still profit on LG products sold in the United States, he included that profit in his analysis. Dr. Rao also testified that there is no double-booking of profit by LG and that his method of profit calculation is a standard and accepted practice in his field.

Moreover, while both parties assert that the Fifth Circuit's decision in *American Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d 321 (5th Cir.2008), supports their position on the issue, that case is also not directly on point. In *America Rice,* the Fifth Circuit considered the appropriate means for determining lost profits where the defendant was a cooperative whose structure permitted its profits to flow through to member farmers. The plaintiff argued that the district court erred in assessing lost profits under the Lanham Act. The court first noted that § 1117(a) of the Lanham Act "provides that a plaintiff can recover as lost profits the sales of the infringer unless the infringer can prove legitimate costs to reduce that sum." *Id.* at 388. The court held that while the defendant cooperative produced evidence of its taxable income through its tax return and testimony from its CEO to show that it made no profit, it did not produce any evidence of its costs as contemplated by § 1117(a). *Id.* at 338–39. The defendant argued that because of its flow-though model, the cooperative disbursed its profits to its member farmers, was not taxed on any sales, and accordingly made no

profit for purposes of the Lanham Act. *Id.* The Fifth Circuit, however, held that how the defendant passes its profits onto its members was "irrelevant in the context of a Lanham Act profits award" and that the defendant had "cite [d]no authority for the proposition that tax treatment is relevant to the Lanham Act remedies." *Id.* at 339. The court concluded that "profits earned by [defendant] are [defendant]'s profits for purposes of the Lanham Act, regardless of how such profits are passed on or how they are taxed." *Id.* at 340. In sum, *American Rice* addresses the calculation of lost profits in the context of a cooperative that passes profits on to its members.

**\*9** In short, Whirlpool has presented no authority to demonstrate that the method employed by Dr. Rao to calculate lost profits under the Lanham Act is impermissible. The challenges raised by Whirlpool are the proper subject of cross-examination.

#### 5. Price Erosion

Whirlpool contends that Dr. Rao's price erosion analysis is inadmissible because Dr. Rao solely relied on a conversation with a single LG employee for the basis of his price erosion opinion. This criticism goes to the weight, and not the admissibility, of Dr. Rao's opinions for several reasons.

First, Dr. Rao did not rely solely on one conversation with one LG employee in conducting his price erosion analysis. Dr. Rao's report reflects that he also considered the washer and dryer market as a whole and LG's pricing history with respect to its steam and nonsteam washers and dryers. (Rao Report at ¶¶ 50–57.) Indeed, Dr. Rao testified that he conducted a market reconstruction analysis in order to reach the price erosion figure. He explained that he premised his calculation on three initial facts: (1) consumers prefer steam in a dryer to steam in a washer, (2) consumers are willing to pay a price premium for a steam dryer, and (3) LG was getting a price premium on its steam washers already in the market. Thus, Dr. Rao opined, LG should at least get the same price premium for a steam dryer as for a steam washer. Because Whirlpool's steam dryer was already in the market, however, LG did not charge the premium for its steam dryer as it had with its steam washer. Using the weighted sales for each distributor from LG's price sheets, Dr. Rao then calculated the price erosion figure.

Dr. Rao further explained that he also spoke with T.J. Lee, L.G.'s Product Manager. (Rao Report at ¶ 55, n. 82.) He spoke with Lee to determine whether LG had intended to charge a higher premium for the steam dryer if Whirlpool had not

been in the marketplace. Lee informed Dr. Rao that LG would have performed the same pricing analysis for the steam dryers as it did for the steam washers if Whirlpool had not been in the marketplace. Employee knowledge of a corporation's intent regarding price damages can be a relevant factor in a price erosion analysis. *See, e.g., Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.,* 166 F.Supp.2d 1008, 1032–1033 (D.Del.2001), *overturned in part on other grounds* (award of damages for price erosion can be based on employee's testimony regarding price concessions for purposes of price erosion analysis where testimony was based on his personal knowledge and experience). While the Court recognizes that *Honeywell* is distinguishable in some respects, like the expert in *Honeywell,* Dr. Rao explained that he did not solely rely on the information provided by Lee, but that he also conducted a market reconstruction analysis to reach his conclusions. Whirlpool's motion is therefore denied with respect to this criticism.

#### 6. Demand and Price Sensitivity

**\*10** Whirlpool also asserts that Dr. Rao failed to consider the effect that price premium on steam dryers has on consumer demand for LG's dryers. *See, e.g., Tel–Lock, Inc. v. Thomson Consumer Elecs.,* No. 03 C 320, 2005 WL 741930, at \*10 (N.D.Ill. Mar.30, 2005) (noting that the "theory of price erosion 'must account for ... the effect of the hypothetically increased price on the likely number of sales at that price in that market' ") (internal citation omitted). Dr. Rao, however, stated that he analyzed price elasticity during his price erosion analysis and that he concluded that the "relatively trivial change in price" would not affect consumer demand. (R. 388–2, Wind Dep, Ex. 2 at 222–23.) He explained that he did not take into account price elasticity in a quantitative way in conducting the price erosion analysis because, in this case, steam is a primary feature for consumers, and they are not as price sensitive as they are feature sensitive. Therefore, according to Dr. Rao, there is no price elasticity when there is no competitor in the market, *i.e.,* when LG is the only participant in the market selling steam dryers. But when another company enters the market, in this case Whirlpool, price elasticity becomes a relevant factor. If Whirlpool believes that Dr. Rao's analysis in this regard is in error or that it contradicts the testimony of other LG employees, Whirlpool can raise the issue on cross-examination. *Daubert,* 509 U.S. at 596.

#### 7. Inclusion of Washer Sales in Damages Calculation

Finally, Whirlpool challenges Dr. Rao's inclusion of washer sales in his damages calculations. Because Whirlpool's arguments go to the weight of Dr. Rao's testimony, this challenge also fails.

In reaching his damages opinion, Dr. Rao opined that Whirlpool's false and misleading advertising also resulted in LG's lost sales of washers. (Rao Report at ¶¶ 40–42.) As he explained, he based this opinion on the factual assumption that consumers typically purchase washers and dryers in pairs. Specifically, a significant number of consumers purchased matching washers and dryers. In fact, the underlying data from an independent market research company called NPD revealed that consumers purchased washers and dryers in pairs 88 percent of the time. This percentage—known as an attachment rate—was lower than LG and Whirlpool's own data. LG's data showed a 95 percent attachment rate, and Whirlpool's data showed a 98 percent attachment rate. Dr. Rao used the lower percent in making his calculations. In addition, Dr. Rao relied the Declaration of Pamela Rogers, Whirlpool's Director of Product Management for Front Loading Laundry. She asserted that:

> In the laundry market, the sales of washer and dryers are inextricably linked. This is because consumers typically buy washers and dryers in matching sets. For example, since September 2007, Whirlpools' sales figures indicated that 99.8% of purchasers of the Duet Steam Dryer in the color aspen, also purchased the matching Duet Steam Washer, and that number (known as the "attachment rate") is even higher for purchasers of the product in the color white. Thus, if there is no steam dryer available to match the Whirlpool Steam Washer for a period of time, sales of the Duet Steam Washer will also suffer.

**\*11** (Pls.' Hr'g Ex. 10 at ¶ 44.) Based on this data, Dr. Rao concluded that if LG lost the sale of a steam dryer to Whirlpool, it would also lose the sale of a washer 88 percent of the time.

Whirlpool contends that this opinion is inadmissible because Dr. Rao did not test these assumptions himself. Once again, however, this is an issue for cross-examination. *See Smith,* 215 F.3d at 718. *See also Pan sier,* 576 F.3d at 738 (same); *In re Ready–Mixed Concrete Antitrust Litig.,* 261 F.R.D. at 165. LG can establish the underlying factual assumptions at trial. *See Smith* 215 F.3d at 718. Moreover, Whirlpool's reliance on *Bucklew v. Hawkins, Ash, Baptie & Co., LLP,* 329 F.3d 923 (7th Cir.2003), is misplaced. In *Bucklew,* the Seventh Circuit recognized that a plaintiff can recover profits that an infringer made from a non-infringing product related to the infringing product. *Id.* at 933. The Seventh Circuit found:

> But [plaintiff's] evidence that [defendant] shifted profits from the infringing forms to a separate, noninfringing financial software package ("HMS for Windows") was too speculative to sustain an award of damages. His theory is that the prospect of one-stop shopping attracted customers who might otherwise have gone to a competitor, and so increased [defendant]'s revenue and presumably its profits. One of [defendant's] employees testified that the infringing forms would indeed help with the sale of HMS for Windows, but no evidence was presented that would have enabled the market value of this "help" to be gauged. The testimony by an expert witness for the plaintiff that 10 percent of the profits on [defendant]'s sales of HMS for Windows were due to the buyers' being able to buy the infringing forms from HAB had no factual basis whatsoever, and we repeat previous reminders to the bench and bar of this circuit that proof of damages requires-proof.

*Id..* Conversely, Dr. Rao based his statistical analysis on Whirlpool and LG's sales figures as well as the testimony and declaration of Whirlpool employees. Moreover, in *Bucklew,* there was no evidence of an attachment rate between the sales of the product and the noninfringing software product. While consumers may purchase washers and dryers separately

in some instances, Dr. Rao has relied on evidence of an attachment rate between washer and dryer sales. Whirlpool's motion is accordingly denied in this regard.

## II. Dr. Wind

Whirlpool has also moved to exclude expert testimony and opinions regarding portions of the rebuttal expert report and a video expert report of Dr. Wind pursuant to Rule 702 and *Daubert,* 509 U.S. at 593–94. The Court held a *Daubert* hearing on August 10, 2001. For the reasons discussed below, Defendant's motion to exclude Dr. Wind's testimony is granted in part, denied in part, and denied in part as moot.

### A. Dr. Wind and His Opinions

Dr. Wind is a consumer survey expert who received his doctorate from Stanford University. He is the Lauder Professor and Professor of Marketing at the Wharton School of the University of Pennsylvania. Dr. Wind has written 22 books and more than 250 papers in the field of marketing. His writings address marketing strategy, marketing research, new product and market development, consumer and organizational buying behavior and global marketing strategy. Dr. Wind has served as the editor-in-chief of the *Journal of Marketing* . He is also the founder of Wharton School Publishing and served as its first Wharton Editor from 2004 to 2008.

 **\*12**  In addition, he has taught MBA, Ph.D. and executive development courses on a wide range of marketing topics. He consults for fortune 500 firms, including major consumer goods firms. He has also been qualified as a marketing and survey research expert and has testified at trial in a number of federal courts. Furthermore, Dr. Wind has won numerous marketing awards.

LG offers Dr. Wind as a rebuttal expert to evaluate the opinions of Dr. Ravi Dhar and Dr. Nowlis. He also offers a separate opinion evaluating Whirlpool's videos regarding the home experience of consumers with the Whirlpool steam dryer.

As an initial matter, in his report, Dr. Wind compared Dr. Dhar's opinions with the Second Amended Complaint in this case and concluded:

> Dr. Dhar's basic premise and associated study objective (which

focus on how steam is made), are inconsistent with [LG's] actual complaint (that the Duet Steam Dryer, despite its name and associated advertising with steam as a message, does not have steam. Furthermore, since steam is an inherent characteristic of a steam dryer, knowing that the dryer utilized steam, or not, to relax wrinkles, remove odors and refresh clothing and household fabrics, is an important (material) determinant of consumers' decision to buy a steam dryer). Thus, Dr. Dhar's study does not address the question of materiality."

(Rebuttal Report Evaluating the Expert Report and Study of Dr. Ravi Dhar and the Report of Dr. Nowlis ("Wind Report") at ¶ 7.) During the *Daubert* hearing, LG withdrew this opinion and the other opinions set forth in paragraph 7 of Dr. Wind's rebuttal report. Accordingly, the Court denies as moot this aspect of Whirlpool's motion.

### B. Whirlpool's Challenges

Whirlpool does not seek to strike all of Dr. Wind's opinions. Instead, it challenges the following opinions: 1) his opinions regarding the materiality of steam; 2) his opinions regarding the applicable legal standard; 3) any technical opinions regarding steam; 4) his opinions regarding consumer confusion; and 5) his opinions regarding Whirlpool's videotapes.

#### 1. Dr. Wind's Materiality Opinion Goes Beyond a Rebuttal of Dr. Dhar's Opinion

Whirlpool first challenges Dr. Wind's rebuttal opinion as to the materiality of steam as beyond the scope of a rebuttal opinion and as an improper legal conclusion. [1] Dr. Wind opines that the "materiality of steam seems obvious" and that "there is no question that a product feature/benefit, like steam in this case, which is important to consumers and prominent in both the name and advertising will, in my opinion, significantly impact purchase intent." (Wind Report at ¶ 8, p. 6) He noted that his "understanding of materiality in this context is whether the use of steam in the dryer name and advertising for the Duet Steam Dryer affects consumers'

decision to purchase the dryer." (*Id.* at ¶ 11, p. 20.) Dr. Wind criticizes Dr. Dhar's opinions because, according to Dr. Wind, he failed to assess consumers' perceptions of the Whirlpool dryer as a steam dryer and whether steam is an important determinant of their purchase decision. (*Id.* at ¶¶ 7–8.)

[1] Whirlpool also contends that his materiality opinions are not based on a scientific method and are impermissible under Rule 403. The Court need not address either of these arguments given that it strikes these opinions.

**\*13** The Court previously addressed Dr. Dhar's opinions when it denied LG's motion to strike the expert testimony of Dr. Dhar. (Order, R. 417–1.) As made clear in his opinions and during Dr. Dhar's *Daubert* hearing, Dr. Dhar made the factual assumption that the Whirlpool dryer creates steam, and he designed and conducted a consumer perception survey to assess whether the implied claim that the Whirlpool Duet® Steam Dryer injects hot vapor onto clothes had any impact on consumers' decisions to purchase the Whirlpool Duet® Steam Dryer. Dr. Dhar opined that "even if one assumes that a majority of the consumers were taking away a claim that the Whirlpool Dryer injects hot vapor onto clothes as R. Reitter concludes, my survey shows no statistical difference in the intent to purchase as well as in product quality in comparison to a control ad that explicitly added the language stating that a mist of water is injected and is heated after it is sprayed into the dryer drum." In other words, his opinion focuses on the materiality of how steam is created, not whether steam is created.

Federal Rule of Civil Procedure 26(a)(2) requires a party to disclose a "complete statement of all opinions the [expert] witness will express and the basis and reasons for them" at the time specified for expert disclosure by the court. Fed.R.Civ.P. 26(a) (2)(B)(i). Rebuttal reports should be limited to "contradict[ing] or rebut[ting] evidence on the same subject matter identified by another party" in its expert disclosures. Fed.R.Civ.P. 26(a)(2)(C)(i). *See, e.g., Butler v. Sears Roebuck & Co.,* No. O6 C 7023, 2010 WL 2697601, at \*2 (N.D.Ill. July 7, 2010) (striking expert's supplemental report for failure to comply with strictures of Rule 26). The Court set a deadline of January 30, 2009 for the parties to issue their expert reports on issues on which they had the burden of proof. The parties had until February 27, 2009 to issue rebuttal expert reports.

Whirlpool correctly notes that Dr. Wind's opinion does not contradict or rebut Dr. Dhar's opinion. Instead, he opines on the materiality of whether steam is created [2]—an issue on which LG carries the burden of proof. Dr. Dhar made clear that he assumed, for purposes of his opinion, that the Whirlpool dryer created steam. The focus of his materiality inquiry was on the impact on consumers' purchasing decisions of how the dryer created steam. As such, Dr. Wind's materiality opinion on steam itself being material exceeded the scope of Dr. Dhar's report and thus is not a proper rebuttal opinion under Rule 26(a)(2). Dr. Dhar narrowly tailored his opinions to the materiality of how steam is created, not to whether steam itself is material. Dr. Wind does not address the materiality of how steam is created in the dryer.

[2] During the *Daubert* hearing, the parties raised the issue of whether expert testimony was necessary to establish the materiality element in Lanham Act cases. Courts do not require that a party proffer expert testimony to establish that the subject of the false or misleading advertising was material to the consumer's decision to purchase the goods. *See, e.g., Osmose, Inc. v. Viance, LLC,* 2010 U.S.App. LEXIS 15896, 48–49, 2010 WL 2977988 (11th Cir. July 30, 2010) (holding that in order to establish materiality the plaintiff must demonstrate that "the defendant's deception is likely to influence the purchasing decision" and upholding district court's finding that the materiality of the defendant's statements were "self-evident" because "the advertisements attacked an inherent quality of [the product], namely its ability to prevent decay and preserve the structural integrity of wood"); *N. Am. Med. Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1226 (11th Cir.2008) (holding that the evidence "amply supports the district court's conclusion that [the defendant's] statements are material to consumers' purchasing decisions" based on letters from doctors who had purchased the machine at issue and expressed their dissatisfaction with their inability to rely on the claims regarding the machine at issue in the litigation); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 311–312 (1st Cir.2002) (holding that it was reasonable to conclude that "defendants' misrepresentation of the blazers' cashmere content was material because it relates to a characteristic that defines the product at issue, as well as the market in which it is sold" and that it was "reasonable to infer from defendants' aggressive marketing strategy highlighting the 'cashmere'

2010 WL 3397358

nature of the blazers that defendants themselves believed cashmere to be an inherent and important characteristic of the blazers"). *Cf. Kraft, Inc. v. FTC,* 970 F.2d 311, 324 (7th Cir.1992) (upholding Federal Trade Commission's finding, in the context of a deceptive commercial practices Federal Trade Commission Act claim requiring a party to show that the relevant advertising claims are material to prospective consumers, that (i) expert testimony showed that a 30% exaggeration of calcium content was a nutritionally significant claim that would affect consumer purchasing decisions, and (ii) internal company documents demonstrating that the defendant designed the ads to deliver an imitation superiority message showed that the message was material).

LG's attempt to save Dr. Wind's opinion by arguing that Dr. Wind is merely telling the jury what the appropriate materiality inquiry is does not save the day. As discussed below, the Court will instruct the jury as to materiality in this case, not Dr. Wind.

**2. The Court Will Instruct the Jury on the Legal Standard for Materiality**

 **\*14**  In paragraph 11 of his report addressing Dr. Dhar's research design, Dr. Wind states:

> Consider for example the approach presented in this jurisdiction, that for a false advertising claim, the false statement be 'on a subject material to the decision to purchase the goods.' *See Sanfield v. Finlay Jewelry Corp.,* 168 F.3d 967 (7th Cir.1999) (accepting the district court determination that price claims were material in that they affected purchaser's decision); *see also Skil Corp. V. Rockwell Int. Corp.,* 375 F.Supp. 777 (N.D.Ill.1974). The materiality standard in this jurisdiction is the broadest I have seen. In a case very similar to this one, *Cashmere and Camelhair Mfr. v. Saks Fifth Ave.,* 284 F.3d 302 (1st Cir.2002), the court said" *"One method of establishing materiality includes showing that the false or misleading statement releates to an 'inherent qualify or characteristic' of the product."* Clearly, steam is an inherent quality or characteristic of the Duet Steam Dryer. This approach was also adopted by Whirlpool in its report *"Steam in the Laundry, an Overview of Existing Research for Messaging Discussion"* of March 2007 in which they state:
>
> > 'The prioritization of features demonstrates how they would impact purchase decision.'

(Wind Report at ¶ 11.) Whirlpool challenges this aspect of Dr. Wind's report as an impermissible legal conclusion. Indeed, courts—not experts—instruct juries on applicable legal standards. *Naeem v. McKesson Drug Co.,* 444 F.3d 593, 610 (7th Cir.2006) ("we previously have stated that allowing a witness to testify as to a legal conclusion may cause the jury to accord too much weight to that testimony, and may infer that the jury should look to that witness for legal guidance") (citing *Bammerlin v. Navistar Int'l Transp. Co.,* 30 F.3d 898, 900 (7th Cir.1994); *Harbor Ins. Co. v. Cont'l Bank Corp.,* 922 F.2d 357, 366 (7th Cir.1991)).

During the *Daubert* hearing, counsel for LG confirmed that Dr. Wind has "absolutely no intention" of offering this legal opinion. Accordingly, this aspect of Whirlpool's motion is denied as moot.

**3. Dr. Wind is Not Qualified to Give a Technical Opinion that the Whirlpool Dryer Does Not Create Steam**

Whirlpool next challenges Dr. Wind's opinions that it is a "fact" that the Whirlpool dryer does not use steam and that this "fact" is known by consumers. Dr. Wind opined in his rebuttal report:

> A proper control would have eliminated the word steam entirely and would have used a term that *accurately describes the feature* .... Dr. Dhar's selection of both test and control stimuli that focuses on steam is surprising given the number of internal Whirlpool documents that clearly state that *the dryer is not a steam dryer* .... *This fact* was also known to consumers.... Before developing his research design and selecting the stimuli, Dr. Dhar should have been aware of *these facts.*

(Wind Report at ¶ 10, p. 17.) Whirlpool challenges this opinion primarily on the ground that Dr. Wind is unqualified to testify regarding whether the dryer uses steam because he is not a technical expert. Indeed, Dr. Wind concedes that he is not qualified to render a technical opinion on whether

2010 WL 3397358

there is steam in the dryer. In response, LG contends that Dr. Wind is not providing a technical opinion as to whether steam is created in the Whirlpool Dryer, but is simply relying on numerous admissions from Whirlpool that its dryers do not create steam.

**\*15** Experts can make factual assumptions when rendering opinions. As the Seventh Circuit has emphasized, "the court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact ...." *Smith,* 215 F.3d at 718. *See also Pan sier,* 576 F.3d at 738; *In re Ready–Mixed Concrete Antitrust Litig.,* 261 F.R.D. at 165. Here, Dr. Wind can make the factual assumption that the Whirlpool Dryer does not create steam, and LG can attempt to establish that fact at trial. Dr. Wind's opinions, however, go beyond making factual assumptions. As Whirlpool notes, Dr. Wind's report refers to the "fact" that the dryer is not a steam dryer. Dr. Wind may not give this technical opinion.

### 4. Dr. Wind's Opinion Regarding Consumer Confusion Is Admissible

Whirlpool contends that the Court should exclude Dr. Wind's opinion on the issue of consumer confusion. Dr. Wind opines on the issue of consumer confusion based on the Whirlpool Insperience Studio study and other Whirlpool documents. His opinion is in rebuttal to Dr. Nowlis' opinion that the responses to the less-leading open-ended question shows no evidence of confusion about the way in which a Whirlpool dryer creates steam.

Whirlpool again argues that this opinion is not proper rebuttal under Rule 26(a)(2)(C)(ii) because Dr. Dhar did not draw any conclusions about whether consumers perceive that "real steam [is or is not] in the dryer." As LG notes, however, it did not offer this opinion to rebut Dr. Dhar, but rather to rebut Dr. Nowlis's opinion regarding consumer confusion.

Whirlpool also challenges Dr. Wind's characterization of the Insperience documents as improperly substituting his opinion for that of the jury's. To the contrary, Dr. Wind has reviewed Whirlpool documents, including the surveys conducted by Insperience, to rebut Dr. Nowlis' criticism of the Reitter Survey's conclusions. In reaching his opinions, Dr. Wind applies his extensive expertise in the area of consumer research and marketing research. *See Smith Ford Motor Co.,* 215 F.3d at 718 ("Rule 702 specifically contemplates

the admission of testimony by experts whose knowledge is based on experience ...") While Dr. Wind did not conduct an independent market study or consumer survey to reach his opinion, he instead applied his experience in this area to render his opinions. Given his level of experience in this particular area, this opinion offered by Dr. Wind meets the mandates of *Daubert* and Rule 702.

### 5. Video Report

At the close of discovery in this case, Whirlpool produced 34 Consumer Use Feedback Testing ("CUFT") videos pertaining to consumers' perception of steam. These videos contained interviews with consumers and Whirlpool employees regarding the consumers' experiences with the Whirlpool steam dryer. The consumers commented on the performance and operation of the dryer and provided detailed feedback regarding the steam cycle on the dryers. Whirlpool produced additional videos after the close of discovery. The Court granted LG's request to take discovery regarding these late-produced videos, including leave to have its expert, Dr. Wind, review and opine on them.

**\*16** Dr. Wind reviewed a "sample" of these videos and did a "content analysis." According to Dr. Wind, content analysis "is a common approach in analyzing any document you have, whether it's videos or whether they are responses." Dr. Wind selected a sample of the videos and reviewed that sample, with the assistance of a research assistant. They divided the videos into three categories, those with 1) a positive reaction to the steam feature; 2) a negative assessment of some aspect(s) of the steam feature; and 3) a mixed reaction of positive and negative comments toward the steam feature. They then reviewed the videos and coded each one according to this coding system. Dr. Wind's research assistant transcribed the negative responses made on the videos. Dr. Wind reviewed all of the videos with negative and mixed assessments of the steam feature. Based on this review, he opined that "while 46% of the respondents had a positive evaluation of the steam feature on the dryer, 37% had a negative assessment of the steam feature and 17% had mixed a[sic] assessment involving some positive but also some negative evaluations." (Wind's Aug. 6, 2009 Report at ¶ 7.)

Dr. Wind opined, based on these videos, that there is "a significant dissatisfaction among consumers with the steam feature on the Whirlpool steam dryer tested." He concluded that "[t]o the extent Whirlpool claims that the delivery of benefits associated with steam, rather than steam itself, justifies its steam advertising messages, this proposition is not

true for those consumer segments similar to the consumers with the negative and mixed evaluations in this study." (*Id.* at ¶ 9.)

Whirlpool challenges the admissibility of Dr. Wind's opinions on the videos. It argues that LG is attempting to introduce "highly questionable expert testimony" to demonstrate that Whirlpool's dryers do not provide their advertised benefits —wrinkle relaxation and odor removal. Whirlpool argues that Dr. Wind is a marketing expert, not a technical expert, thus he is not qualified to opine on the issue. Dr. Wind expressly stated that he "relied on the standards employed in marketing and consumer behavior and research ... consistent with the professional marketing research literature." (*Id.* at ¶ 3.) He also explained that his extensive experience in this area qualifies him to opine in this area. Specifically, he applied his years of work with consumer data, research, content analysis, and thousands of consumer studies to reach his opinions. Such experience is sufficient to qualify him to render these opinions. *See Smith Ford Motor Co.,* 215 F.3d at 718 ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience ..."); *Lehman Bros. Holdings, Inc. v. Laureate Realty Services, Inc.,* 2007 WL 4197580, at * 3 (S.D.Ind.2007) (expert's opinions proper where "derived from an analysis of the steps performed ... in the underwriting process based upon his experience in the commercial lending industry"). *See also Gipson v. Wells Fargo Bank, N.A.,* 460 F.Supp.2d 9, 10–11 (D.C.Cir.2006) (holding that expert testimony as to lending industry practices and standards based upon personal experience was admissible).

**\*17** In addition, during the hearing Whirlpool identified at least two videos that Dr. Wind had

mischaracterized. Whirlpool contends that, as a result of these mischaracterizations, Dr. Wind's opinion regarding the videos is not the product of reliable principles and methods. These mistakes, however, go to the weight of his testimony, not its admissibility. *AHP Subsidiary Holding,* 1 F.3d at 618 ("While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare .... [A]ny shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact.) (internal citation omitted). Whirlpool is free to rigorously cross examine Dr. Wind on this issue and let the jury determine its weight. Whirlpool also argues that, based on the instances of improper coding of participant feedback, Dr. Wind failed to adhere to the guidelines in Shari Seidman Diamond's Reference Guide on Survey Research. As discussed above, it is well-established that criticisms of surveys used in litigation are appropriate topics of cross-examination. *See Simon Property Group L.P.,* 104 F.Supp.2d at1039 (S.D.Ind.2000) (citing *AHP Subsidiary Holding,* 1 F.3d at 618; *McGraw–Edison Co.,* 787 F.2d at 1172; *Henri's Food Products Co.,* 717 F.2d at 357)).

## CONCLUSION

For these reasons, the Court (i) denies Whirlpool's motion to strike the expert testimony and opinions of Dr. Rao, and (ii) grants in part, denies in part, and denies in part as moot Whirlpool's motion to exclude Dr. Wind's opinions.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3397358

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 16

2007 WL 150606

KeyCite Yellow Flag - Negative Treatment

Distinguished by Mettler-Toledo, Inc. v. Fairbanks Scales, Inc., E.D.Tex., October 27, 2008

2007 WL 150606
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

MGM WELL SERVICES, INC., Plaintiff,
v.
MEGA LIFT SYSTEMS, LLC, Defendant.

Civil Action No. H-05-1634.
|
Jan. 16, 2007.

**Attorneys and Law Firms**

Joseph Dean Lechtenberger, Howrey LLP, Houston, TX, for Plaintiff.

Kent A. Rowald, Ira Phillip Domnitz, Seyfarth Shaw LLP, Houston, TX, for Defendant.

### *MEMORANDUM AND ORDER*

NANCY F. ATLAS, United States District Judge.

**\*1** This patent case is before the Court on the Motion Seeking Exclusion of the Expert Report and Testimony of Dr. Charles W. Alworth ("Motion") [Doc. # 104] filed by Plaintiff MGM Well Services, Inc. ("MGM"), to which Defendant Mega Lift Systems, LLC ("Mega Lift") filed a Response [Doc. # 131], and MGM filed a Reply [Doc. # 144]. Having considered the parties' submissions, the evidence in the record, and the applicable legal authorities, the Court concludes that Plaintiff's Motion should be **granted.**

### I. *FACTUAL AND PROCEDURAL BACKGROUND*

The factual background of this case has been set forth in prior opinions by the Court in this case. Briefly, MGM is the owner of United States Patent No. 6,719,060 ("the '060 Patent") which was issued on April 13, 2004. Generally, the '060 Patent relates to what is referred to as a "two-piece plunger lift" system for use in gas wells to remove accumulated liquids and thereby increase the gas flow through the well

to the surface. MGM alleges that Mega Lift is marketing an infringing product called the "Chaser" system.

Mega Lift designated Dr. Charles W. Alworth as an expert, both on the technology at issue in the case and on patent law issues. MGM has moved to exclude Alworth's report and testimony on patent law because he lacks adequate education, training, or knowledge to qualify as a patent expert. MGM also moved to exclude Alworth's report and testimony on the technology issues because he lacks the proper qualifications and because his methodology involved little more than adopting what he was told by Mega Lift's President, James Bartley. The Motion has been fully briefed and is ripe for decision.

### II. *ANALYSIS*

#### A. *Standards for Expert Testimony*

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify ... in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702. The trial judge must determine as an initial matter whether the proffered witness is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Under *Daubert,* the district court is to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [reliability] and of whether that reasoning or methodology can be applied to the facts at issue [relevance]." *Skidmore v. Precision Printing And Packaging, Inc.,* 188 F.3d 606, 617 (5th Cir.1999) (citing *Daubert,* 509 U .S. at 592-93). This so-called "gate-keeping" obligation applies to all types of expert testimony, not just "scientific" testimony. *Id.* at 617-618 (citing *Kumho,* 526 U.S. at 147). The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 151. The Court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of

2007 WL 150606

the case." *Guy v. Crown Equipment Corp.,* 394 F.3d 320, 325 (5th Cir.2004).

**\*2** Reliability and validity do not require certainty, but must be demonstrated by evidence that the knowledge is more than speculation. *Daubert,* 509 U.S. at 590. To demonstrate reliability, the proponent of the expert testimony must present "some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir.1998) *(en banc), cert. denied,* 526 U.S. 1064, 119 S.Ct. 1454, 143 L.Ed.2d 541 (1999). The Court must consider (1) the validity of the scientific principles used; (2) the accuracy of the data relied upon by the expert; and (3) the correctness of the application of the scientific principles to the relevant data. *See, e.g., Watkins v. Telsmith, Inc.,* 121 F.3d 984, 989 (5th Cir.1997); *Marcel v. Placid Oil Co.,* 11 F.3d 563, 567 (5th Cir.1994). Four factors to consider in determining the reliability of proffered scientific evidence are (1) whether the theory or procedure has been subjected to testing; (2) whether it has been subjected to peer review and publication; (3) the rate of error and the existence of standards controlling the theory or procedure; and (4) whether it has attained general acceptance. *Watkins,* 121 F.3d at 989 (citing *Daubert,* 509 U.S. at 593-94). This analysis, however, is a flexible one. "[N]ot every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy,* 394 F.3d at 325.

Rule 704 of the Federal Rules of Evidence provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." FED.R.EVID. 704. The Fifth Circuit, however, "has repeatedly held that Rule 704 does not allow an expert to render conclusions of law." *United States v. $9,041,598.68,* 163 F.3d 238, 255 (5th Cir.1998) (citing *Snap-Drape, Inc. v. Comm'r of Internal Revenue,* 98 F.3d 194 (5th Cir.1996)).

The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Moore,* 151 F.3d at 276. The party offering the challenged expert opinions need not, however, prove "that the expert's testimony is correct." *Id.*

### B. *Patent Law Expert*

Mega Lift has designated Alworth as an expert on patent law. Initially, the Court questions whether expert testimony

on patent law would assist the trier of fact in this case. The Court will instruct the jury on the law they are to apply, and an expert is not permitted to give legal conclusions. *See United States v. $9,041,598.68,* 163 F.3d 238, 255 (5th Cir.1998).

Additionally, the Court finds that Alworth does not have the education, training or experience to offer expert opinions on patent law. Alworth received his law degree from the University of Tulsa in December 1992, but he did not study any intellectual property law courses while in law school. Beginning in June 1995, he has been the principal of his own firm, Alworth Law and Engineering. He has not worked as a patent examiner or in any other position with the United States Patent and Trademark Office, and he has represented clients in only two patent litigation matters. He has written two papers on the general topic of intellectual property, but each paper was simply a "general overview" of patent, trademark, and copyright law. He has drafted and filed patent applications, and is the named inventor on several patents. He has never been qualified to testify as an expert on patent law.

**\*3** Alworth's lack of expertise in the area of patent law is demonstrated many times in his report. For example, Alworth opines that MGM's ′060 Patent is unenforceable because the named inventor and his attorney failed to perform a "hand search of the prior art" before filing the patent application. The Manual of Patent Examining Procedures, however, notes specifically that the "filing of an information disclosure statement shall not be construed as a representation that a search has been made" and that there is "no requirement that an applicant for a patent make a patentability search." *See* Manual of Patent Examining Procedure, Exh. F to Motion, § 609 (citing 37 C.F.R. § 1.97).

Although it is clear that Alworth has some very limited experience in patent matters, Mega Lift has failed to establish that Alworth has the education, training or experience to serve as an expert on patent law. MGM's Motion to exclude Alworth's expert report and testimony on patent law is granted.

### C. *Technical Expert-Qualifications*

Alworth received a Bachelor of Science in electrical engineering from the University of Oklahoma in 1965. He received a Master of Science in electrical engineering in 1967, and a Ph.D. in electrical engineering in 1969. He has taught electrical engineering at the University of Oklahoma and at Texas A & M University. He served as Chairman of the

2007 WL 150606

Department of Electrical Engineering at the University of Texas at Tyler. He worked for Conoco for over fifteen years.

Alworth clearly has extensive education, training, and experience in the field of electrical engineering. He does not, however, have expertise in the area of plunger lift systems. Indeed, he has little education, training or experience, if any, in the field of plunger lift systems used in the deliquification of oil and gas wells. During his electrical engineering education, he did not study any courses in petroleum engineering, any courses relating to the deliquification of oil and gas wells, or any courses relating to plunger lift technology. Similarly, none of Alworth's teaching involved oilfield technology.

Alworth worked as an oilfield engineer for Conoco, but he describes his work and "electrical and instrumentation design." *See* Alworth Report, Exh. B to Motion, p. 66. His work involved control and safety shut down systems, facility construction, and accident investigation, and it required electrical and chemical engineering. *Id.*

Alworth drafted patents relating to the electronic controls used in plunger lift systems, but his work did not involve these systems in any meaningful way, and any familiarity with the relevant technology he may have obtained while working on the patents for electronic controls does not rise to the level of expertise in the actual plunger lift systems.

Mega Lift argues that Alworth has the necessary qualifications because he "has more than six years experience in working with plunger lift systems." *See* Response, p. 2. It is clear, however, that this experience was in his capacity as an attorney for Bartley and Mega Lift, and his work relating to plunger lift systems was sporadic at best. Indeed, he admitted in his deposition that over the past three years, he has spent less than one percent of his time on work relating to plunger lift technology.

**\*4** Alworth has not engaged in engineering services of any kind or practiced as an engineer in any capacity since June 1995 when he formed Alworth Law and Engineering. The "Engineering" in "Alworth Law and Engineering" relates exclusively to work as an expert witness and only in the field of electrical engineering. This is the first case in which he has been offered as an expert on the topic of plunger lift systems. There is no indication that Alworth has been accepted by any court as an expert on any subject.

Although Alworth would perhaps be qualified to express an opinion in the field of electrical engineering, he lacks the necessary qualifications to offer expert opinions on the technology at issue in this case. *See, e.g., Watkins v. Telsmith, Inc.,* 121 F.3d 984 (5th Cir.1997) (affirming exclusion of civil engineer proffered as mechanical engineering expert).

**D.** *Technical Expert-Reliability and Relevance*

Perhaps because he lacks the necessary qualifications in the area of plunger lift systems, Alworth's opinions are based almost entirely on information from Bartley, an interested party, rather than on Alworth's independent evaluation of the information in the record. For example, Alworth did not perform his own calculations, but opined that MGM's calculations were incorrect because Bartley told him so. Similarly, he did not review data from testing that Bartley allegedly performed on Mega Lift's plunger system, testifying in his deposition that he was not aware of the test and had not seen any of the results.

Opinions are excludable if they are supported only by the *ipse dixit* of the expert. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Guile v. United States,* 422 F.3d 221, 227 (5th Cir.2005). A court should "exclude expert testimony where ... there is 'too great an analytical gap between the data and the opinion proffered.' " *Burleson v. Texas Dept. of Crim. Justice,* 393 F.3d 577, 587 (5th Cir.2004) (quoting *Joiner,* 522 U.S. at 146). "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir.1987) (quoted in *Guile,* 422 F.3d at 227).

Alworth's opinions appear to be mere *ipse dixit,* presenting little more than a parroting of Bartley's personal views. Rather than conduct and report the results of critical, independent analysis, it appears that Alworth relied heavily, if not exclusively, on what Bartley told him. His expert report is at best an effort to synthesize Defendant's positions and present them summarily as an expert opinion. Mega Lift has not shown, and the Court is unpersuaded, that Alworth applied in his work for Mega Lift in this case the same rigor an expert would apply or that Alworth would have applied to his work in the field of electrical engineering. Consequently, Alworth's opinions are not adequately reliable to be admissible.

**IV.** *CONCLUSION AND ORDER*

**\*5** Alworth lacks adequate knowledge, skill, experience, education or training to qualify as an expert on patent law.

**MGM Well Services, Inc. v. Mega Lift Systems, LLC, Not Reported in F.Supp.2d (2007)**

2007 WL 150606

Although Alworth has significant and impressive education, training, and experience in electrical engineering, he lacks relevant knowledge necessary to qualify as an expert in this patent case involving a two-piece plunger lift system. Additionally, his opinions on technical issues are unreliable, in part because he lacks the proper qualifications and in part because he failed to use an acceptable methodology.

As a result, it is hereby

**ORDERED** that Plaintiff's Motion Seeking Exclusion of the Expert Report and Testimony of Dr. Charles W. Alworth [Doc. # 104] is **GRANTED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 150606

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 17

Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)

2023 WL 5415315, Fed. Sec. L. Rep. P 101,658

2023 WL 5415315
United States District Court, N.D. Texas, Dallas Division.

Pedro RAMIREZ, Jr., Individually and on Behalf of All Others Similarly Situated, Plaintiff,
v.
EXXON MOBIL CORPORATION, Rex W. Tillerson, Andrew P. Swiger, Jeffrey J. Woodbury, and David S. Rosenthal, Defendants.

Civil Action No. 3:16-CV-03111-K
|
Signed August 21, 2023

**Attorneys and Law Firms**

Joe Kendall, Kendall Law Group PLLC, Dallas, TX, Balon B. Bradley, Balon B. Bradley Law Firm, Dallas, TX, Darren J. Robbins, Pro Hac Vice, Erika Oliver, Pro Hac Vice, Nathan R. Lindell, Pro Hac Vice, Patrick Coughlin, Sara Bierl Polychron, Pro Hac Vice, Scott H. Saham, Pro Hac Vice, X. Jay Alvarez, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Jamie Jean Gilmore, Scott Gilmore Thompson PLLC, Dallas, TX, Jeffrey S. Abraham, Abraham Fruchter & Twersky LLP, New York, NY, John C. Herman, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, Atlanta, GA, Mary K. Blasy, Samuel H. Rudman, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, Melville, NY, for Plaintiff.

Nina Cortell, Haynes & Boone LLP, Dallas, TX, Daniel Kramer, Pro Hac Vice, Daniel Toal, Pro Hac Vice, Gregory F. Laufer, Pro Hac Vice, Jonathan Hurwitz, Pro Hac Vice, Theodore V. Wells, Pro Hac Vice, Paul Weiss Rifkind Wharton & Garrison LLP, New York, NY, Justin Anderson, Pro Hac Vice, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, Matthew Stachel, Pro Hac Vice, Paul Weiss Rifkin Wharton & Garrison LLP, Wilmington, DE, Ralph H. Duggins, Cantey Hanger LLP, Fort Worth, TX, for Defendants Exxon Mobil Corporation, Andrew P. Swiger, Jeffrey J. Woodbury.

D Patrick Long, Squire Patton Boggs, Dallas, TX, for Defendant Rex W. Tillerson.

Daniel Kramer, Paul Weiss Rifkind Wharton & Garrison LLP, New York, NY, Justin Anderson, Pro Hac Vice, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, Matthew Stachel, Pro Hac Vice, Paul Weiss Rifkin Wharton & Garrison LLP, Wilmington, DE, for Defendant David S. Rosenthal.

## MEMORANDUM OPINION AND ORDER

ED KINKEADE, UNITED STATES DISTRICT JUDGE

**TABLE OF CONTENTS**

1. INTRODUCTION...——

2. BACKGROUND...——
2.1. Exxon Mobil's Canadian Bitumen Operations, Including Kearl...——

2.2. Exxon Mobil's RMDG Operations...——

2.3. Proxy Costs of Carbon...——

2.4. The Alleged Corrective Disclosures...——

   2.4.1. The First Corrective Disclosure: The Guardian Article (November 9, 2015)...——

   2.4.2. The Second Corrective Disclosure: *The Los Angeles Times* Article (January 20, 2016)...——

   2.4.3. The Third Corrective Disclosure: Second Quarter Earnings Announcement for 2016 (July 29, 2016)...——

   2.4.4. The Fourth Corrective Disclosure: *The Washington Post* Op-Ed (August 10, 2016)...——

   2.4.5. The Fifth Corrective Disclosure: Third Quarter Earnings (October 28, 2016)...——

   2.4.6. The Sixth Corrective Disclosure: UBS Downgrade (January 18, 2017)...——

   2.4.7. The Seventh Corrective Disclosure: Fourth Quarter Earnings Announcement for 2016 (January 31, 2017)...——

3. LEGAL STANDARDS...——

4. ANALYSIS...——
4.1. Rule 23(a)...——

   4.1.1. Numerosity...——

4.1.2. Commonality...——

4.1.3. Typicality...——

4.1.4. Adequacy...——

4.2. Rule 23(b)(3)...——

4.2.1. Predominance...——

4.2.1.1. Fraud-on-the-Market Theory and the Presumption of Reliance...——

4.2.1.1.1. Rebutting Basic's Presumption of Reliance: Price Impact...——

4.2.1.1.2. The Parties' Event Studies...——

4.2.1.1.3. Event Study Windows...——

4.2.1.1.4. The Corrective Disclosures Analyzed...——

4.2.1.1.4.1. November 9, 2015: *The Guardian* Article...——

4.2.1.1.4.2. January 20, 2016: *The Los Angeles Times* Article...——

4.2.1.1.4.3. July 29, 2016: Second Quarter Earnings Announcement for 2016...——

4.2.1.1.4.4. August 10, 2016: *The Washington Post* Op-Ed...——

4.2.1.1.4.5. October 28, 2016: Third Quarter Earnings Announcement for 2016...——

4.2.1.1.4.6. January 18, 2017: UBS Downgrade...——

4.2.1.1.4.7. January 31, 2017: Fourth Quarter Earnings Announcement for 2016...——

4.2.1.2. Omissions-Based Presumption of Reliance...——

4.2.2. Superiority...——

5. CLASS DEFINITION AND CONCLUSION...——
Before the Court are Lead Plaintiff's Motion for Class Certification, Doc. No. 86, Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification (collectively, the "Motion" or the "Motion for Class Certification"), Doc. No. 87, Defendants' Corrected Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification (the "Response"), Doc. No. 115, and Lead Plaintiff's Reply in Further Support of Its Motion for Class Certification (the "Reply"), Doc. No. 104. Having carefully considered the Motion, the Response, the Reply, the Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint"), Doc. No. 36, and the applicable law, the Court **GRANTS in part** and **DENIES in part** the Motion.

## 1. INTRODUCTION

Lead Plaintiff Greater Pennsylvania Carpenters Fund (the "Fund" or "Plaintiff") brings this putative class action against Defendants Exxon Mobil Corporation ("Exxon Mobil" or the "Company"), Rex. W. Tillerson ("Tillerson"), Andrew P. Swiger ("Swiger"), Jeffrey J. Woodbury ("Woodbury"), and David S. Rosenthal ("Rosenthal") (collectively, "Defendants"), alleging violations of § 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78(j)(b), and Securities and Exchange Commission ("SEC") Rule 10(b)-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Doc. No. 36. In its Complaint, Plaintiff alleges that Defendants violated § 10(b) of Exchange Act and SEC Rule 10(b)-5 by, among other things: (1) misleading investors about Exxon Mobil's investment and asset valuation processes for proxy costs of carbon; (2) failing to properly account for and disclose losses and requisite reserve revisions related to Exxon Mobil's Kearl Lake Operations ("Kearl" or the "Kearl Operation(s)"); and (3) failing to properly account for and disclose losses and take impairments related to Exxon Mobil's Rocky Mountain Dry Gas Operations ("RMDG" or the "RMDG Operation(s)"). *E.g.*, Doc. No. 36 at 174-78. Plaintiff also claims via § 20(a) of the Exchange Act, 15 U.S.C. § 78(t)(a), that Tillerson, Swiger, Woodbury, and Rosenthal (the "Individual Defendants") are liable as control persons of Exxon Mobil. *E.g.*, Doc. No. 36 at 178-79.

**\*2** Plaintiff moves the Court to certify the following class:

> All persons who purchased or otherwise acquired Exxon Mobil Corporation common stock between

March 31, 2014 and January 30, 2017, inclusive, and were damaged thereby.

*E.g.*, Doc. No. 87 at 8. Plaintiff seeks appointment as class representative, and asks the Court to appoint lead counsel in this case, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as class counsel. Doc. No. 86; Doc. No. 86-1; Doc. No. 87.

## 2. BACKGROUND

Exxon Mobil is a multinational oil and gas company whose stock trades on the New York Stock Exchange ("NYSE") under the ticker "XOM." Doc. No. 36 ¶ 34. Plaintiff is a pension fund based in Pittsburgh, Pennsylvania. *Id.* ¶ 33. Plaintiff alleges that Defendants have violated the securities laws by misrepresenting Exxon Mobil's operations and financial health. Defendants' alleged misrepresentations fall into roughly three categories: (1) misrepresentations about Exxon Mobil's Canadian Bitumen Operations, including Kearl; (2) misrepresentations about Exxon Mobil's RMDG Operations; and (3) misrepresentations about Exxon Mobil's proxy costs of carbon. *See* Doc. No. 87 at 10-11; Doc. No. 104 at 11. The Court briefly discusses each category and the corresponding misstatements as alleged in the Complaint below.

### 2.1. Exxon Mobil's Canadian Bitumen Operations, Including Kearl

Exxon Mobil controls two separate upstream bitumen operations in Alberta, Canada: the Kearl Operation and the Cold Lake Operation (collectively, the "Canadian Bitumen Operations"). Doc. No. 36 ¶ 96. Kearl is a joint venture between Exxon Mobil's majority-owned and fully consolidated subsidiary, Imperial Oil Limited ("Imperial"), and Exxon Mobil's wholly-owned subsidiary, ExxonMobil Canada. *Id.* Imperial owns a 70.96% stake in Kearl, with the remaining 29.04% being held by ExxonMobil Canada. *Id.* ¶ 100. The Cold Lake Operation is entirely owned by Imperial. *Id.* ¶ 96.

In its bitumen operations, Exxon Mobil extracts raw oil from bitumen, a thick, tar-like substance found in loose sand and clay deposits. *E.g., id.* ¶¶ 92, 96, 100. The process is complex and costly. *E.g., id.* ¶¶ 40, 44. Exxon Mobil's multibillion-dollar Kearl Operation is a prime example, comprising four massive open-pit mines where Exxon Mobil and Imperial strip-mine bitumen from the earth's surface. *E.g., id.* ¶¶ 92,

96, 100. Unlike conventional light crude oil that can be easily pumped from the ground and refined, bitumen requires extensive processing before it can be transformed into useable fuel. *E.g., id.* ¶¶ 92, 95. As a result of these higher production costs, among other factors, extracting oil from bitumen offers lower profit margins than pumping light crude oil. *E.g., id.* ¶ 95.

The success of bitumen projects like the Kearl Operation depends on the market price for oil. *See id.* ¶¶ 2, 56, 156. If oil prices drop too low, the costs associated with developing and running a project may exceed revenues. *See id.* ¶¶ 56, 63.

Investors and regulators care about whether oil and gas companies record their costs accurately. *See id.* ¶ 73. Regulators require oil and gas operators, including Exxon Mobil, to capitalize a considerable portion of the costs related to acquiring, exploring, and developing oil and gas projects. *Id.* ¶¶ 45, 55. A capitalized cost is an expense that a company treats as a long-term asset investment rather than an immediate expense; it is recognized on the balance sheet as an asset and is gradually expensed over its useful life through depreciation or amortization. *Id.* ¶¶ 45, 325. An asset's "carrying value" refers to the cost of the asset less depreciation or amortization. *Id.* ¶ 325. A capitalized asset is expected to generate future cash flows in excess of its carrying value. *See id.* ¶ 55. If circumstances change and future cash flows are no longer projected to cover the carrying value of the asset, the asset is "impaired." *Id.* ¶¶ 55, 328-29. The owner of an impaired asset must adjust its recorded value to equal its fair value by recording an impairment charge on the owner's earnings statement. *Id.* ¶ 55.

**\*3** Regulators also require oil and gas companies to disclose detailed information about their "reserves." *Id.* ¶ 50. Reserves represent the quantity of raw oil and gas that a company either owns or holds the rights to extract. *Id.* ¶¶ 46, 72. They are the core assets of an oil and gas company. *Id.* One special class of reserves are "proved reserves," which encompass raw oil and gas that a company can profitably extract under the economic conditions existing at the time the business records the reserves in a financial statement. *Id.* ¶¶ 52, 332, 362. Companies assess profitability using historical prices—generally, the average of the first-day-of-the-month prices for the twelve months prior to the assessment—and current costs. *Id.* ¶¶ 52, 333. When later assessments reveal that reserves previously classified as proved are no longer profitable to extract, these reserves must be "de-booked," or reclassified as unproved reserves. *Id.* ¶¶ 54, 334. Companies disclose

the reserves they have classified as proved in their financial statements. *Id.* ¶ 47.

By the time Exxon Mobil had finished construction, started production, and initiated a second phase of expansion at Kearl in 2013, the Western Canadian Select benchmark ("WCS") for heavy crude produced from the Canadian oil sands had maintained an average price of around $72 per barrel over three consecutive years. *Id.* ¶¶ 58, 107. In 2014, however, oil and gas prices began a marked and prolonged global collapse. *Id.* ¶¶ 148-54. From its peak in June 2014, the WCS benchmark experienced an 83% decline, reaching $14.50 per barrel in January 2016. *Id.* ¶ 148. Through 2014 and 2015, Exxon Mobil's competitors recognized billions of dollars in asset impairments, including for Canadian oil sands projects like Kearl. *Id.* ¶¶ 156-62, 167. Exxon Mobil did not. *Id.* ¶¶ 166-68. Plaintiff alleges that Tillerson—then Exxon Mobil's Chief Executive Officer and Chairman—and Woodbury—then Exxon Mobil's Secretary and Vice President of Investor Relations—instead made misleading statements to the market in an effort to portray Exxon Mobil as immune from the market forces impacting its peers. *Id.* ¶¶ 35, 37, 71, 81-84, 90, 257, 265-68, 272-75, 277-87, 289-92, 298-301, 302, 309-17.

According to Plaintiff, Defendants also misrepresented Exxon Mobil's proved reserves in the Company's SEC filings. On February 24, 2016, Exxon Mobil filed its 2015 Form 10-K (the "2015 10-K") with the SEC. *Id.* ¶¶ 16, 277, 343, 348. At the time of the filing, proved reserves from the Canadian Bitumen Operations, most of which were attributable to Kearl, constituted a significant portion of Exxon Mobil's total worldwide proved reserves, representing 31% of the company's liquids proved reserves and 18% of the company's combined liquids and natural gas proved reserves. *Id.* ¶¶ 97, 101, 346. Plaintiff alleges that the 2015 10-K implied that the average profit per barrel of bitumen produced from its Canadian Bitumen Operations in 2015 was $5.87. *Id.* ¶ 343. Plaintiff contends that Exxon Mobil's Canadian Bitumen Operations were losing money by mid-November 2015, if not sooner, and there was no indication of a favorable change in the foreseeable future. *Id.* ¶¶ 170, 301, 342, 344. While Plaintiff does not allege that the average profit implied by 2015 10-K was inaccurate (it apparently accounted for the recent losses), Plaintiff maintains that Defendants' failure to disclose the Canadian Bitumen Operations' losses violated Generally Accepted Accounting Principles ("GAAP") and made the implied average profit materially misleading. *See id.* ¶¶ 17, 255-56, 287, 318.

The continued drop in oil prices also threatened the profitability of the Kearl bitumen reserves. *See id.* ¶¶ 20, 22, 107, 169, 177, 180-81, 231. Plaintiff alleges that, by the end of 2015, the Kearl reserves were—at best—on the verge of no longer meeting the SEC's definition of proved reserves. *Id.* ¶¶ 175-76, 301. When Exxon Mobil filed the 2015 10-K in late February and oil prices still had not improved, Plaintiff claims that it was "all but certain" that the reserves would no longer meet the SEC's definition of proved reserves by the end of 2016 and would need to be de-booked. *Id.* ¶¶ 14, 20, 169, 176-77, 286, 310, 318, 347, 351. Recognizing the potential impact of low oil prices on Exxon Mobil's classification of proved reserves, the 2015 10-K stated the following:

> **\*4** When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves. Amounts that could be required to be de-booked as proved reserves on an SEC basis are subject to being re-booked as proved reserves at some point in the future when price levels recover, costs decline, or operating efficiencies occur.

> Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. We do not expect any temporary changes in reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes.

*Id.* ¶ 285. Despite the cautionary language in the 2015 10-K, Plaintiff asserts that the document was misleading, violated SEC disclosure standards, and was inconsistent with GAAP because the warning was too tepid considering prevailing oil prices and the high likelihood of a future de-booking. *Id.* ¶¶ 17, 180, 231, 348. Plaintiff further alleges that, as 2016 progressed and oil prices continued to sag, the probability of an end-of-year de-booking became more certain, but Exxon Mobil's 2016 Form 10-Q reports—filed on May 4, 2016, and August 3, 2016—still failed to adequately inform investors of this reality. *Id.* ¶¶ 22, 169, 178-80, 184, 231, 348. Plaintiff alleges that these reports were misleading and violated SEC disclosure requirements. *Id.* ¶¶ 256, 348-52.

## 2.2. Exxon Mobil's RMDG Operations

Plaintiff alleges that Defendants similarly misled the market about reserves tied to Exxon Mobil's RMDG Operations. Faced with declining domestic natural gas reserves, Exxon Mobil acquired XTO Energy, Inc., in December 2009. *Id.* ¶¶ 114, 116. The all-stock deal, valued between $36 billion and $41 billion, made Exxon Mobil the largest domestic natural gas producer in the United States. *Id.* ¶¶ 117, 120.

The deal proved inopportune for Exxon Mobil, as oil and gas prices began their extended decline in 2014. *Id.* ¶¶ 148-54. Between February 2014 and December 2015, the Henry Hub benchmark price—the most commonly used benchmark for natural gas produced in the United States—dropped 80%, from $8.15 per million British thermal units ("BTU") to $1.63 per million BTU. *Id.* ¶¶ 59, 121, 155. Due in large part to that decline, Exxon Mobil's competitors in the natural gas sector, including those with dry gas operations in the Rocky Mountains, recorded impairment charges in 2014 and 2015. *E.g., id.* ¶¶ 156-57, 159, 161-64. Exxon Mobil did not follow suit. *Id.* ¶¶ 166-68. Plaintiff contends that Exxon Mobil's executives instead made misstatements to the market in an attempt to present itself as unaffected by falling prices. *E.g., id.* ¶¶ 128-31, 134-37, 139, 192, 247, 270-71, 275-76.

Plaintiff asserts that by the end of 2015, the combination of low gas prices and prevailing market trends required Defendants to assess whether the RMDG reserves were impaired. *Id.* ¶¶ 169, 185-86. According to Plaintiff, had Defendants conducted a proper test, they would have recognized that the carrying value of the RMDG assets was no longer recoverable, necessitating an impairment charge. *Id.* ¶¶ 185, 191-93, 368-72. Because Exxon Mobil failed to properly recognize an impairment charge, Plaintiff contends, Exxon Mobil's 2015 10-K and certain subsequent 2016 Form 10-Q reports contained misleading financial information and violated SEC disclosure requirements. *Id.* ¶¶ 366-70, 373-76.

### 2.3. Proxy Costs of Carbon

**\*5** Plaintiff alleges that Defendants misled investors by not adhering to their public statements about using a proxy cost of carbon—a figure representing the projected effects of various climate-related policies on the future global energy demand—in their investment and valuation procedures. *E.g., id.* ¶¶ 7-8, 137-47. To reassure investors that Exxon Mobil would address climate change-related risks to its business, like increasing demand for renewable energy, in March 2014, Defendants issued a public report stating that Exxon Mobil would use a proxy cost of carbon. *Id.* ¶¶ 3, 295.

Plaintiff contends that Exxon Mobil used a lower proxy cost of carbon or no proxy cost of carbon in its internal proved reserves and impairment calculations for the Canadian Bitumen Operations, including Kearl, and in asset impairment evaluations for the RMDG Operations. *E.g., id.* ¶¶ 137-47, 191-92, 243-45, 361, 371. According to Plaintiff, had Exxon Mobil properly employed its publicly declared proxy costs of carbon to assess the profitability of the Kearl and RMDG Operations, its eventual de-booking and impairment announcements would have been made far sooner. *See id.* ¶¶ 137-47, 175-77, 191-94. Plaintiff largely bases these allegations on the Affirmation of John Oleske (the "Oleske Affirmation"), which was filed on June 2, 2017, as part of an investigation by the New York Attorney General ("NYAG") into whether Exxon Mobil misled the public and investors regarding the business risks associated with climate change. *E.g., id.* ¶¶ 137-47, 191-92, 243-45, 361, 371; *see* Doc. No. 36-1.

### 2.4. The Alleged Corrective Disclosures

Plaintiff alleges that Defendants' statements about Exxon Mobil's Canadian Bitumen Operations, RMDG Operations, and Exxon Mobil's use of a proxy cost of carbon were revealed to be misleading in a series of seven corrective disclosure (the "Corrective Disclosures") dated November 9, 2015; January 20, 2016; July 29, 2016; August 10, 2016; October 28, 2016; January 18, 2017; and January 31, 2017. Doc. No. 36 at 167-72; Doc. No. 98-8 at 6.

### 2.4.1. The First Corrective Disclosure: The Guardian Article (November 9, 2015)

On November 9, 2015, *The Guardian* reported that the NYAG was investigating Exxon Mobil for providing false information to the public regarding climate change and the potential business risks associated with it, including whether Exxon Mobil funded "climate denial front groups" and "spread[ ] disinformation about climate science." Doc. No. 36 ¶ 426; Doc. No. 98-5.

### 2.4.2. The Second Corrective Disclosure: *The Los Angeles Times* Article (January 20, 2016)

On January 20, 2016, *The Los Angeles Times* reported that the California Attorney General ("CAAG") was "investigating whether Exxon repeatedly lied to the public and investors

about the risks to its business from climate change, specifically whether Exxon's actions 'could amount to securities fraud and violations of environmental laws.' " Doc. No. 36 ¶ 429; Doc. No. 98-6.

### 2.4.3. The Third Corrective Disclosure: Second Quarter Earnings Announcement for 2016 (July 29, 2016)

On July 29, 2016, at 8:00 a.m. ET, Exxon Mobil released its second quarter earnings for 2016. Doc. No. 98-7. According to Plaintiff, Exxon Mobil revealed "a significant miss of expectations in Upstream"—the segment of Exxon Mobil's business involving the exploration, acquisition, development, and extraction of unprocessed oil and gas commodities —"including a reported loss of $514 million in U.S. Upstream ... driven heavily by poor performance by XTO and Kearl." Doc. No. 98-8 at 6; *see* Doc. No. 36 ¶ 40.

### 2.4.4. The Fourth Corrective Disclosure: *The Washington Post* Op-Ed (August 10, 2016)

**\*6** On August 9, 2016, *The Washington Post* published an op-ed by Senators Elizabeth Warren and Sheldon Whitehouse entitled *Big Oil's Master Class in Rigging the System.* Doc. No. 36 ¶ 432; Doc. No. 98-10 at 2-4. Plaintiff alleges the op-ed revealed that "Exxon and its allies with financial ties to the oil and gas industry were harassing and bullying investigators in an attempt to 'sidetrack state investigations and silence groups petitioning the government to address [Exxon's] potential wrongdoing' and avoid 'court-supervised discovery ... into whether it has spent decades deliberately deceiving the public about the harms associated with [climate change].' " Doc. No. 36 ¶ 432.

Plaintiff also references a report from Environment and Energy Publishing LLC (the "EEP Report"), published on August 10, 2016. Doc. No. 36 ¶¶ 433-34. According to Plaintiff, the report detailed the calls of certain politicians for "Exxon executives to testify about climate change in light of state Attorney General investigations into whether Exxon knowingly misled the public and investors regarding the risks of carbon emissions." *Id.*

### 2.4.5. The Fifth Corrective Disclosure: Third Quarter Earnings (October 28, 2016)

On October 28, 2016, at 8:00 a.m. ET, Exxon Mobil released its third quarter earnings for 2016. *Id.* ¶ 437; Doc. No. 88-3. Plaintiff characterizes the earnings release as disclosing that Exxon Mobil "might be forced to de-book nearly 20% of its oil and gas reserves, specifically acknowledging that it might have to de-book 3.6 billion barrels of oil sand reserves and one billion barrels of other North American reserves" if energy prices did not improve. Doc. No. 36 ¶ 437; Doc. No. 88-3 at 6.

### 2.4.6. The Sixth Corrective Disclosure: UBS Downgrade (January 18, 2017)

On January 18, 2017, after the close of trading, UBS downgraded Exxon Mobil to "sell" and reduced its price target from $86 to $77. Doc. No. 36 ¶ 443. Plaintiff notes that UBS cited Exxon Mobil's "risk of de-booking up to 4.6 of its 24.8 BBoe of proved reserves" in its report downgrading the Company. *Id.*; Doc. No. 88-7.

### 2.4.7. The Seventh Corrective Disclosure: Fourth Quarter Earnings Announcement for 2016 (January 31, 2017)

On January 31, 2017, Exxon Mobil released its fourth quarter earnings for 2016. Doc. No. 36 ¶¶ 446-47. The Company confirmed that it would be taking an asset impairment charge of about $2 billion largely related to the RMDG Operation and that it would de-book the Kearl Operation reserves within the coming weeks. *Id.*; Doc. No. 88-4.

## 3. LEGAL STANDARDS

Before a court can certify a class, the party seeking class certification bears the burden of proving by a preponderance of the evidence that the class meets all four requirements of Fed. R. Civ. P. 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *Mary Kay Inc. v. Reibel,* 327 F.R.D. 127, 129 (N.D. Tex. 2018) (Fitzwater, J.) (citing *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009)). The court must conduct a "rigorous analysis" of each Rule 23(a) factor. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 351 (2011). The party seeking class certification must establish by a preponderance of the evidence that the class meets the requirements of at least one subsection of Rule 23(b). *Mary Kay Inc.*, 327 F.R.D. at 129 (citing *Flowserve,* 572 F.3d at 228). For proposed classes seeking monetary damages, like this one, the relevant

requirements are "predominance" and "superiority" under Rule 23(b)(3). *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005).

Although a court does not reach the merits of the case in evaluating whether class treatment is appropriate, it may look past the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful decision on class certification. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

## 4. ANALYSIS

### 4.1. Rule 23(a)

#### 4.1.1. Numerosity

**\*7**  To establish numerosity under Rule 23(a)(1), Plaintiff must show that its proposed "class is so numerous that joinder of all members is impracticable." In examining numerosity, the Court considers factors such as "the geographical dispersion of the class, the ease with which class members may be identified, [and] the nature of the action." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (quoting *Philips v. Joint Legis. Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981)). Defendants do not dispute that Plaintiff has satisfied Rule 23(a)(1).

The Court finds that Plaintiff has sufficiently established numerosity. Exxon Mobil's stock is a nationally traded security, with over four billion shares outstanding and an average weekly trading volume of tens of millions of shares. Doc. No. 88-1 ¶¶ 23-24, 29-30; *id.* at 108. The massive number of outstanding shares and the average weekly rate at which these shares are traded suggests that the purchasers of shares comprising Plaintiff's proposed class are too numerous to practicably join. *See Zeidman*, 651 F.2d at 1039 (collecting cases). The fact that Exxon Mobil trades nationally on the NYSE serves as additional evidence of numerosity, as it is highly likely that the individuals or entities involved in trading Exxon Mobil securities are spread throughout the country. *Id.*

#### 4.1.2. Commonality

To establish commonality under Rule 23(a)(2), Plaintiff must demonstrate that "there are questions of law or fact common

to the class." Even "a single common question will do." *Dukes*, 564 U.S. at 359. "The test for commonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.' " *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (quoting *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)). Defendants do not dispute that Plaintiff has demonstrated commonality.

The Court concludes that the commonalty requirement is satisfied. Common questions in this case include whether Defendants made material misrepresentations or omissions, whether the Individual Defendants controlled the content and dissemination of the allegedly misleading misrepresentations, and whether the putative class members incurred damages. *See* Doc. No. 87 at 15. These issues, central to the securities fraud claims of the proposed class, arise from the same basic set of facts and can be addressed through evidence common to the proposed class.

#### 4.1.3. Typicality

To establish typicality under Rule 23(a)(3), Plaintiff must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." This undemanding test "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Lightbourn*, 118 F.3d at 426. "Typicality does not require complete identity of claims, but requires that the representatives' claims share the same essential characteristics with the class members' claims. Factual differences do not defeat typicality if the claims arise from a similar course of conduct and share the same legal theories." *In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 565 (E.D. Tex. 2005) (citing *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001)).

Defendants argue that Plaintiff's claims are atypical of the proposed class claims because Plaintiff purchased all of its Exxon Mobil stock after the first two alleged Corrective Disclosures, subjecting it to the unique defense that it could not have relied on any supposed misrepresentations that were corrected before its purchase. Doc. No. 115 at 35.

**\*8**  Class certification will not be denied, however, on the basis of the presence of a unique defense unless there is a significant risk that Plaintiff will unduly devote resources

to litigating the defense that should be devoted to litigating other matters material to the proposed class. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 502 (S.D. Tex. 2004) (Hittner, J.). Defendants have not sufficiently established that the timing of Plaintiff's purchases of Exxon Mobil stock —even if unique to Plaintiff—poses such a risk. Plaintiff's claims are founded on the same factual allegations and legal theories as the claims of all class members: that Defendants' misstatements and omissions artificially inflated the price of Exxon Mobil's stock, and that investors suffered damages when the truth was revealed. Regardless, Defendants' unique defense argument is moot based on the Court's narrowed class definition, discussed in Section 5 below. The Court finds that the typicality requirement has been met.

### 4.1.4. Adequacy

Rule 23(a)(4) requires Plaintiff to demonstrate that it "will fairly and adequately protect the interests of the class." In determining adequacy, courts consider three primary questions: (1) whether there are any conflicts of interest between the representative parties and the class they seek to represent; (2) whether the representative parties have the willingness and ability to play an active role in the litigation; and (3) whether class counsel has the competence and zeal to represent the class and protect the interests of the absentee class members. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005); *Berger v. Compaq Comput. Corp. (Berger I)*, 257 F.3d 475, 479 (5th Cir. 2001).

Plaintiff's interests align with the interests of the proposed class because both have suffered losses as a result of the same allegedly unlawful conduct. Plaintiff is highly motivated to pursue this case and maximize the recovery not only for itself, but also for the absentee class members. The Court also finds that Robbins Geller is adequate to serve as class counsel given its extensive experience in litigating securities class actions in federal court, *see* Doc. No. 88-13 at 5-9, 26-46, 100, and its diligent representation of Plaintiff thus far. Defendants have not presented any evidence of a conflict of interest between Plaintiff and the proposed class, and they have not raised any concerns regarding the adequacy of Robbins Geller as class counsel.

Defendants question the adequacy of Plaintiff based on the deposition testimony of its designated representative, Mr. Michael Swiderski, however. Doc. No. 115 at 36-39. Defendants contend that certain portions of Mr. Swiderski's testimony indicate that he does not completely understand the allegations against Defendants, that he does not know the current status of this litigation, and that what he does know about the litigation comes solely from Robbins Geller. *Id.*; *see* Doc. No. 104 at 33-34, Doc. No. 105-8. Defendants conclude that Plaintiff impermissibly delegated this case to Robbins Geller and is, "at most, a disinterested spectator, lacking even basic knowledge about this case." Doc. No. 115 at 37.

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, "raises the standard adequacy threshold" for securities class actions by requiring that they "be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation." *Berger I*, 257 F.3d at 483. The PSLRA does not create any additional Rule 23(a)(4) adequacy requirements. *Berger v. Compaq Comput. Corp. (Berger II)*, 279 F.3d 313 (5th Cir. 2002). Class representatives are not required to have a complete knowledge of the case. *Lehocky* 220 F.R.D. at 503 (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 62 (2d Cir. 2000)). They "need not be legal scholars and are entitled to rely on counsel." *Berger I*, 257 F.3d at 483. Class representatives do "need to know more than that they were 'involved in a bad business deal.' " *Id.* at 483 (quoting *Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 410 (W.D. Okla. 1990)).

 **\*9** Although Defendant's adequacy concerns are not entirely unfounded, the Court concludes that Plaintiff is willing and able to adequately participate in and direct this litigation. In his deposition testimony, Mr. Swiderski could not comment on whether this lawsuit has anything to do with climate change, he was seemingly unfamiliar with some of the alleged Corrective Disclosures, and he could not name any Defendant except Exxon Mobil. Doc. No. 105-8 at 7, 9, 11. Mr. Swiderski's testimony also revealed that he understands the basic theory of liability in this case and that the Fund allegedly suffered damages because of misstatements and omissions by Defendants. *Id.* at 3, 9. Mr. Swiderski also demonstrated that he knows more than that the Fund was purportedly involved in a bad business deal. For example, he testified (1) that he had devoted at least sixty hours to fulfilling his responsibilities as a proposed class representative, a majority of which happened before he received a deposition notice; (2) that he regularly communicates with counsel about this case; (3) that at least Plaintiff's liaison counsel reviewed the Complaint before it was filed; and (4) that his responsibilities are to "vigorously fight the case for the common good of the class members." *Id.* at 4, 6, 12, 13; *see* Doc. No. 25-2 at 8-9.

#### 4.2. Rule 23(b)(3)

Having determined that Plaintiff has satisfied the prerequisites of Rule 23(a), the Court now proceeds to evaluate whether it meets the predominance and superiority requirements of Rule 23(b)(3).

#### 4.2.1. Predominance

The predominance element of Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." As previously discussed in Section 4.1.2 above, the proposed class claims present a number of common questions. The predominance requirement is "far more demanding" than commonality, as it tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Unger*, 401 F.3d at 320 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). In evaluating predominance, courts consider whether "members of a proposed class will need to present evidence that varies from member to member," or whether "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-197 (5th ed. 2012)).

The Court must consider predominance on a claim-by-claim basis. *Prantil v. Arkema Inc.*, 986 F.3d 570, 577 (5th Cir. 2021) (citing *Castano*, 84 F.3d at 744). The predominance analysis therefore begins with the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I)*, 563 U.S. 804, 809 (2011). Plaintiff alleges violations under §§ 10(b) and 20(a) of the Exchange Act and SEC Rule 10(b)-5. Doc. No. 36 at 176-79. The elements of a § 10(b) and SEC Rule 10(b)-5 claim are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss ["damages"]; and (6) loss causation." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 460-61 (2013) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)). Control person liability under § 20(a) requires the existence of an independent "primary" violation of the securities laws—in this case, § 10(b) and SEC Rule 10(b)-5.

*See Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 690 (N.D. Tex. 2022) (Pittman, J.) (citing *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 905 (5th Cir. 2018)); *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 286 n.69 (S.D. Tex. 2005). The individual defendant must have had actual power over the controlled person and induced them, directly or indirectly, to commit the acts constituting the primary violation. *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 791 (S.D. Tex. 2012) (Ellison, J.) (citing *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990)).

In applying the Rule 23(b)(3) predominance test to Plaintiff's claims, the Court asks whether "*questions* common to the class *predominate*," not whether those "questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459 (emphasis added).

**\*10** As to most of the elements of Plaintiff's claims, there are no meaningful individualized questions that predominate over the common questions. First, whether Defendants' alleged misrepresentations and omissions would have influenced the decision-making process of a reasonable investor—*i.e.*, whether they are material—is a common question. *Id.* Even if Plaintiff is unable "to prove materiality [that] would not result in individual questions predominating," it would simply end the case for the entire class. *Id.* at 459-60. The same is true for the scienter, falsity, and—for purposes of § 20(a)—the control, influence, and culpability elements of Plaintiff's claims. All of these elements depend on the conduct of Defendants and do not vary with the identity of the putative class member asserting the claims. Finally, Plaintiff's proposed out-of-pocket damages methodology computes damages on a class-wide basis because the methodology provides a mechanical way of calculating each putative class member's damages based on the times at which they bought and sold Exxon Mobil shares. *E.g.*, Doc. No. 87 at 21, 27-28; *see Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (Higginbotham, J.) ("In short, in order to certify a class, the damages methodology must be 'sound' and must 'produce commonality of damages.' " (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013))).

Reliance is different. An individual plaintiff can, of course, prove reliance by "showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Halliburton I*, 563 U.S. at 810. In the context of a securities class action, like this one, with

numerous potential class members, how can a plaintiff demonstrate each class member's reliance? The Supreme Court addressed this issue in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

### 4.2.1.1. Fraud-on-the-Market Theory and the Presumption of Reliance

Recognizing the unrealistic evidentiary burden that would result from requiring proof of direct reliance from each member of a proposed § 10(b) and SEC Rule 10(b)-5 class, the Supreme Court in *Basic* blessed the use of the "fraud-on-the-market" theory to create a rebuttable presumption of class-wide reliance. *Id.* at 241-47. The fraud-on-the-market theory posits that the price of a security traded in an efficient market reflects all publicly available information, including any material misrepresentations about the security. *Amgen*, 568 U.S. at 462. "Thus, courts may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their 'reliance on the integrity of the price set by the market.' " *Id.* (quoting *Basic*, 485 U.S. at 245).

To invoke *Basic*'s rebuttable presumption that class members relied on an alleged misrepresentation, a plaintiff must ultimately prove: "(1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 268 (2014). At the class certification stage, however, a plaintiff need only establish the first, third, and fourth elements, known as publicity, market efficiency, and market timing, respectively. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1959 (2021). The Court leaves materiality "to the merits stage because it does not bear on Rule 23's predominance requirement." *Id.* (citing *Amgen*, 568 U.S. at 466-68).

There is no dispute that Defendants' alleged misrepresentations were publicly known. Defendants made them during earnings calls or in public filings and reports. *See* Doc. No. 98-12 at 18-19. As addressed in Section 5 below, the class definition here includes only persons who traded Exxon Mobil stock between the time of the alleged misrepresentations and the revelation that they were false, satisfying the marketing timing requirement.

That leaves the market efficiency requirement. In evaluating whether a stock traded in an efficient market, the Fifth Circuit considers a number of factors, including:

**\*11**  (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S–3 (as opposed to Form S–1 or S–2); (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

*Unger*, 401 F.3d at 323 (internal quotation marks omitted) (first citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); and then citing *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) (Lynn, J.)). Significantly, "market efficiency is a matter of degree"; the "markets for some securities are more efficient than the markets for others." *Halliburton II*, 573 U.S. at 271-72.

The Court finds, and Defendants agree, that the market for Exxon Mobil stock is efficient. Doc. No. 176 at 48. Plaintiff has demonstrated, *inter alia*, that Exxon Mobil stock trades on the NYSE at a very high weekly trading volume and is widely covered by securities analysts. Doc. No. 87 at 22-23. Exxon Mobil's market capitalization is massive, at well over $100 billion. *Id.* at 25. And the market efficiently absorbs Exxon Mobil-specific news and rapidly translates it into changes in stock price. *See id.* at 24; Doc. No. 88-1 at ¶¶ 47-50. As plaintiff's expert's market efficiency analysis demonstrates, the market for Exxon Mobil stock is among the most efficient for stocks listed on the NYSE and Nasdaq. *See, e.g.*, Doc. No. 88-1 ¶¶ 29-31, 35-37, 98-99, 101-03.

Plaintiff has therefore discharged its burden to show market efficiency, as well as publicity and market timing. *Basic*'s rebuttable presumption of class-wide reliance applies.

### 4.2.1.1.1. Rebutting Basic's Presumption of Reliance: Price Impact

Defendants seek to rebut *Basic*'s presumption of class-wide reliance. They contend that their alleged misrepresentations had no impact on the price of Exxon Mobil stock. Because the "fundamental premise" behind *Basic*'s presumption of reliance is that, in an efficient market, "an investor presumptively relies on a misrepresentation *so long as it was reflected in the market price* at the time of his transaction," Defendants' contention would cause "*Basic*'s fraud-on-the-market theory and presumption of reliance [to] collapse." *Halliburton II*, 573 U.S. at 278 (emphasis added) (quoting *Halliburton I*, 563 U.S. at 812).

It is not always clear how a "price impact" argument like Defendants' will differ from a materiality argument—an inquiry reserved for the merits stage. *Goldman Sachs*, 141 S. Ct. at 1959 (citing *Amgen*, 568 U.S. at 466-68). If a misstatement is immaterial, one would not expect the exposure of its falsehood to have a negative impact on the price of the stock to which it relates. In practice, this may not matter much, as courts assessing price impact at the class certification stage " 'should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.' That is so regardless whether the evidence is also relevant to a merits question like materiality." *Id.* at 1961 (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020)).

The defendant bears the burden of persuasion to demonstrate a lack of price impact by a preponderance of the evidence. *Id.* at 1963. If a defendant presents evidence to rebut *Basic*'s presumption of class-wide reliance, "[t]he district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* This is a familiar concept. In a typical civil action, for example, the plaintiff has the burden to prove its case by a preponderance of the evidence. The plaintiff will offer whatever it can to meet this burden, and the defendant, often through cross-examination and its own evidence, will attempt to chip away at the plaintiff's case. Where the factfinder determines that the evidence is in "equipoise," the plaintiff loses; it did not prove its case by a preponderance of the evidence. *See id.* Of course, the plaintiff's job is easier where the defendant fails to defend. But the burden is still the plaintiff's. Weak evidence—even coupled with the defendant's silence—may not be enough to overcome it.

**\*12** The Court therefore turns to the evidence of price impact, keeping in mind that Defendants bear the burden of persuading the Court, by a preponderance of the evidence, that there was no impact. *Id.* at 1963.

### 4.2.1.1.2. The Parties' Event Studies

Plaintiff and Defendants both submit expert reports on the issue of price impact. In his report, Plaintiff's expert, Professor Frank C. Torchio ("Professor Torchio"), employs an "inflation-maintenance" theory of price impact. Under this theory, "a misrepresentation causes a stock price 'to *remain* inflated by preventing preexisting inflation from dissipating from the stock price.' " *Id.* at 1959 (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1315 (11th Cir. 2011)). The resulting measure of damages is "the amount that the stock's price would have fallen 'without the false statement.' " *Id.* at 1961 (quoting *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015)). To estimate this amount, plaintiffs typically "point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.* (first citing *Glickenhaus*, 787 F.3d at 413-417; and then citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 233-37, 253-59 (2d Cir. 2016)). Professor Torchio takes this approach.

Defendants' expert, Dr. Allen Ferrell ("Dr. Ferrell"), likewise tests whether Defendants' alleged misrepresentations caused Exxon Mobil's stock to maintain an inflated price. Both Dr. Ferrell and Professor Torchio (collectively, the "Experts") conduct event studies to determine the extent to which the changes in Exxon Mobil's stock price may have resulted from the information revealed in the alleged Corrective Disclosures as opposed to broader market and industry trends or random price fluctuations. *See* Doc. No. 88-1, Doc. No. 98-12, Doc. No. 103. The Experts agree that price fluctuations should be statistically significant before the Court rejects the possibility that the fluctuations are merely the result of random price movements. *See, e.g.*, Doc. No. 88-1 at 115-17, Doc. No.

98-12 ¶ 21. Neither the Experts nor the parties dispute the fitness of the regression models used by the Experts for their event studies. *See, e.g.*, Doc. No. 98-12 ¶ 22; Doc. No. 104 at 12.

Professor Torchio applied his model to analyze the reaction of Exxon Mobil's stock price to three of the alleged Corrective Disclosures: the earnings announcements dated July 29, 2016, October 28, 2016, and January 31, 2017. *See* Doc. No. 88-1 at ¶¶ 73-91; Doc. No. 103 ¶¶ 60-86, Doc. No. 104 at 12-13. Examining the cumulative stock price movement over a "two-day window" spanning two consecutive trading days following each alleged Corrective Disclosure, Professor Torchio found statistically significant negative price reactions associated with all three disclosures. *E.g.*, Doc. No. 88-1 ¶¶ 73-91, Doc. No. 103 ¶¶ 60-86.

Plaintiff does not present expert analysis of fluctuations in Exxon Mobil's stock price associated with the alleged Corrective Disclosures on November 9, 2015, January 20, 2016, August 10, 2016, or January 18, 2017, because, in Plaintiff's view, analyzing fluctuations in response to Exxon Mobil's earnings announcements is sufficient. Doc. No. 104 at 36. As support for this view, Plaintiff asserts that it is Defendants' "burden to prove no price impact." Doc. No. 176 at 197.

 **\*13**  While Defendants bear the burden of persuasion to demonstrate a lack of price impact by a preponderance of the evidence, Plaintiff's conclusion does not follow from its premise. Defendants have analyzed fluctuations in Exxon Mobil's stock price associated with all of the Corrective Disclosures alleged by Plaintiff, and the Court must consider Defendants' analysis to comply with *Goldman Sachs*' directive that the Court be "open to *all* probative evidence" when assessing price impact. 141 S. Ct. at 1961. In *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton III*)—a case on which Plaintiff relies, *see* Doc. No. 104 at 11, 14, 16, 26, 30—Judge Lynn evaluated the parties' experts' price impact opinions with respect to many corrective disclosures that were not earnings announcements. 309 F.R.D. 251, 270-71, 273-74, 276-80 (N.D. Tex. 2015) (Lynn, J.).

Dr. Ferrell's analysis of Exxon Mobil's stock price revealed statistically significant negative price reactions to at least some of the seven alleged Corrective Disclosures. Examining a "close-to-open" event study window that encompasses stock price movements from the market close before an alleged Corrective Disclosure to the first market open after the

alleged Corrective Disclosure, Dr. Ferrell found statistically significant negative price reactions only on July 29, 2016, and October 28, 2016. Doc. No. 98-12 ¶¶ 32-66. Examining a "close-to-close" event study window that encompasses stock price movements from the market close before an alleged Corrective Disclosure to the market close after the alleged Corrective Disclosure, Dr. Ferrell found statistically significant negative price reactions on the same dates, as well as January 20, 2016, and January 18, 2017. *Id.*

Dr. Ferrell also analyzed the reaction of Exxon Mobil's stock price to Defendants' alleged misrepresentations. *Id.* ¶¶ 30-31. Using a close-to-close window, Dr. Ferrell found that no statistically significant positive reaction occurred on the date of any alleged misrepresentation. *Id.* Citing, *inter alia*, *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782-83 (8th Cir. 2016), Defendants argue that the lack of a statistically significant stock price increase associated with the alleged misstatements demonstrates a lack of price impact sufficient to rebut *Basic*'s presumption of class-wide reliance. Doc. No. 115 at 17.

The inflation-maintenance theory, however, recognizes "that statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price." *In re Vivendi*, 838 F.3d at 256. Defendants do not meaningfully dispute that the information contained in the alleged misrepresentations analyzed by Dr. Ferrell coincided with the expectations of the market, making a statistically significant stock price increase unlikely. *See* Doc. No. 115 at 17, 19; Doc. No. 104 at 30. Further, the inflation-maintenance theory is widely accepted by the federal judiciary. Merritt B. Fox & Joshua Mitts, *Event-Driven Suits and the Rethinking of Securities Litigation* 77 (Eur. Corp. Governance Inst., Working Paper No. 656, 2022) (collecting cases); *see also Ludlow*, 800 F.3d at 674 (affirming certification of class based in part on "stock price inflation" theory). The Court sees no persuasive reason to buck that trend here.

### 4.2.1.1.3. Event Study Windows

Having determined that the Court must analyze whether Exxon Mobil's stock price reacted to any of the alleged Corrective Disclosures with fluctuations indicating that Defendants' alleged misstatements maintained the stock price at an inflated level, the Court turns to the subject of the

Experts' primary disagreement: the appropriate event window for assessing price impact.

**\*14** Professor Torchio advocates for the use of a two-day window to measure price impact. *See, e.g.*, Doc. No. 103 ¶ 72. He notes that the proper event window duration depends on case-specific factors like the intricacy of the disclosure at issue, how widely the disclosure is shared among the investing public, how the company being studied responds to the market's interpretations of the event being studied, and the information from analysts and commentators that surfaces after the event. Doc. No. 88-1 ¶ 152; Doc. No. 103 at 22-31 (collecting authorities). Professor Torchio argues that, in this case, studying the two-day period following each of the three alleged Corrective Disclosures he analyzed best captures the full effect of the news and commentary related to the alleged Corrective Disclosures. Doc. No. 88-1 ¶ 56; Doc. No. 103 ¶¶ 29-43, 78-86.

Dr. Ferrell submits that the proper event window depends on the timing of each alleged Corrective Disclosure. Doc. No. 98-12 ¶¶ 19-20; *see also id.* at 8-13 nn.9-26 (collecting authorities). According to Dr. Ferrell, using a close-to-open event window is best for analyzing the market reaction to alleged Corrective Disclosures made while the market was closed. *Id.* Dr. Ferrell opines that this targeted window best reflects the market's reaction to the disclosure without influence from possible confounding news or events that could occur during regular trading hours, particularly for a stock with a market as efficient as Exxon Mobil's. *Id.*; *see* Doc. No. 176 at 120-25. By contrast, Dr. Ferrell opines that using a close-to-close window is most appropriate for disclosures issued during trading hours. *E.g.*, Doc. No. 98-12 ¶ 19. Both Experts seemingly agree that the close-to-close window is the "standard" or "default" window. Doc. No. 176 at 74, 167-68; *see* Doc. No. 98-12 at 10 n.16.

Dr. Ferrell agrees that the use of a two-day window may be appropriate in cases involving, for example, an inefficient market, a corrective disclosure on an unknown date, or corrective disclosures made in close succession, but he disagrees that a two-day window is appropriate here. *E.g.*, Doc. No. 176 at 133-37. He opines that the market for Exxon Mobil stock is efficient, the dates of the Corrective Disclosures are known, and the Corrective Disclosures were not issued in close succession. *Id.* Dr. Ferrell reasons that any disclosure or analyst commentary repeating information previously shared in a corrective disclosure will have no additional price impact in the highly efficient market for

Exxon Mobil stock because investors will have already traded on the information in the corrective disclosure. Doc. No. 98-12 ¶¶ 20, 58. Dr. Ferrell concludes that a two-day event window is too long to appropriately measure price impact. *Id.* ¶ 20.

At least for class certification purposes, the Experts' disagreement about whether a two-day window is appropriate in this case is only relevant with respect to the January 31, 2017, Corrective Disclosure. Using their preferred event windows, each Expert agrees that Exxon Mobil stock experienced a statistically significant price decline on July 29, 2016, and October 28, 2016—the only other dates Professor Torchio analyzed. *See* Doc. No. 98-12 ¶¶ 43, 55; Doc. No. 103 ¶¶ 62, 69-70.

The Supreme Court has yet to adopt "any particular theory of how quickly and completely publicly available information is reflected in the market price." *Basic*, 485 U.S. at 248 n.28. Here, based on the information presented, the Court agrees with Dr. Ferrell's analysis of the narrow issue disputed by the Experts: In this case, a two-day window is unsuitable for measuring price impact in an efficient market. *See Halliburton III*, 309 F.R.D. at 268-69. A two-day window could include extraneous market noise, making it more difficult to understand the effect of the alleged Corrective Disclosures on Exxon Mobil's stock price. The Court sees no reason to doubt the general observation made by Dr. Ferrell that the efficient market here rapidly incorporates the disclosure of material information into the price of the stock prior to the publication of analyst commentary. Any commentary that does not itself present new information will not further impact the price of the stock. And, at least as to the alleged Corrective Disclosure on January 31, 2017, Plaintiff does not appear to contend that any new information became available in analyst commentary published afterwards. *See* Doc. No. 103 ¶¶ 75-86; Doc. No. 104 at 23-25; Doc. No. 176 at 135-37.

#### 4.2.1.1.4. The Corrective Disclosures Analyzed

**\*15** Defendants attempt to rebut the *Basic* presumption of class-wide reliance by demonstrating a lack of price impact associated with each of the seven alleged Corrective Disclosures. *See* Doc. No. 115. Defendants contend that the price impact inquiry does not necessarily end with the finding of a statistically significant negative price reaction. *Id.* at 21-27. According to Dr. Ferrell, "[a]n event study can

tell us that something happened, but it can't tell us *why*." Doc. No. 98-12 ¶ 23 (quoting Bernard S. Black & Ronald J. Gilson, THE LAW AND FINANCE OF CORPORATE ACQUISITIONS 221 (Westbury NY: The Foundation Press, Inc., 1995)). To properly attribute a stock price movement to an alleged Corrective Disclosure, Defendants reason, the Court should consider, *inter alia*, the total mix of information the market possessed prior to the disclosure, the market reaction to similar, prior disclosures, and any additional confounding factors that might have impacted the stock price within the event window. *See, e.g.*, Doc. No. 115 at 17-28. Consistent with *Goldman Sachs*, the Court considers all evidence of price impact for each of the seven alleged Corrective Disclosures, "regardless whether that evidence overlaps with materiality or any other merits issue." 141 S. Ct. at 1961.

### 4.2.1.1.4.1. November 9, 2015: *The Guardian* Article

The first alleged Corrective Disclosure came on November 9, 2015, at 10:30 a.m. ET, when *The Guardian* reported on the investigation by the NYAG into whether Exxon Mobil disseminated inaccurate information regarding climate change and its potential business ramifications. Doc. No. 36 ¶ 426; Doc. No. 98-5. Plaintiff did not specifically address this Corrective Disclosure in either its Motion or Reply, and Professor Torchio did not analyze or provide an opinion about it. *See* Doc. No. 87; Doc. No. 88-1; Doc. No. 103; Doc. No. 104; Doc. No. 176 at 94-95. Plaintiff ostensibly considers it partially corrective of some of Exxon Mobil's alleged misstatements about its use of a proxy cost of carbon.

The Court concludes that Defendants have rebutted the *Basic* presumption by a preponderance of the evidence by showing that the alleged November 9, 2015, Corrective Disclosure did not impact Exxon Mobil's stock price. Dr. Ferrell analyzed the reaction of Exxon Mobil's stock price to the November 9, 2015, article and found no statistically significant negative price reaction. Doc. No. 98-12 ¶¶ 35-38.

The Court finds further support for its conclusion in Dr. Ferrell's analysis of the reaction of Exxon Mobil's stock price to two additional articles. Dr. Ferrell analyzed the stock price reaction to a November 5, 2015, 6:38 p.m. ET, article published by *The Guardian* that is identical to the November 9, 2015 article. *Compare* Doc. No. 98-4, *with* Doc. No. 98-5. Dr. Ferrell also analyzed the stock price reaction to a November 5, 2015, 12:05 p.m. ET article published by the

*New York Times* that conveyed the same essential information as the articles published by *The Guardian*. Doc. No. 98-12 at 23-24 (citing Justin Gillis & Clifford Krauss, *Exxon Mobil Under Investigation in New York Over Climate Statements*, N.Y. TIMES (Nov. 5, 2015)).

Dr. Ferrell's analysis of Exxon Mobil's stock price reaction to the November 5, 2015, articles found no statistically significant price reaction on either a close-to-open or close-to-close basis. *Id.* ¶¶ 37-38. Dr. Ferrell's assessment of a sample of 480 contemporaneous research analyst reports revealed only six containing analyst commentary regarding the NYAG's investigation. *Id.* None of the six analyst reports regarded the NYAG's investigation as significant enough to necessitate adjustments to their price targets. *Id.*

### 4.2.1.1.4.2. January 20, 2016: *The Los Angeles Times* Article

The second alleged Corrective Disclosure is a report, published by *The Los Angeles Times* on January 20, 2016, at 3:00 a.m. ET, addressing an investigation by the CAAG into whether Exxon Mobil lied to the public and investors about the risks to its business from climate change. Doc. No. 36 ¶ 429; Doc. No. 98-6. Except to note that, on a close-to-close basis, Dr. Ferrell found that the alleged Corrective Disclosure had a statistically significant negative impact on Exxon Mobil's price, Plaintiff does not substantively address this alleged Corrective Disclosure in its Motion or Reply. *See* Doc. No. 87; Doc. No. 104 at 13, 28, 36. Professor Torchio also did not analyze or provide an opinion about the alleged Corrective Disclosure. *See* Doc. No. 88-1, Doc. No. 103; Doc. No. 104; Doc. No. 176 at 94-95. Nonetheless, Plaintiff deems the January 20, 2016, article to be partially corrective of some of Defendants' alleged misstatements about Exxon Mobil's use of a proxy cost of carbon. Doc. No. 104 at 28 n.19.

**\*16** Given that the alleged January 20, 2016, alleged Corrective Disclosure occurred after the market was closed, Dr. Ferrell argues that any stock price reaction is best measured using a close-to-open window. *See* Doc. No. 98-12 ¶¶ 19-20, 40. Dr. Ferrell's close-to-open analysis revealed no statistically significant negative stock price reaction, though his close-to-close analysis did. *See id.* at 21.

If the use of a close-to-open window is ever appropriate, it would probably be for something like the alleged January 20, 2016, Corrective Disclosure—a short, easily digestible

article issued hours before the market opened, discussing another investigation very similar to the one discussed in *The Guardian* and *The New York Times* articles mentioned above.

Considering the close-to-open analysis alongside other evidence, the Court is satisfied that Defendants have rebutted the *Basic* presumption by a preponderance of the evidence with respect to the January 20, 2016, Corrective Disclosure notwithstanding the statistically significant negative price reaction on a close-to-close basis. Dr. Ferrell's review of 480 concurrent research analyst reports found no analyst commentary regarding the CAAG's investigation. *Id.* ¶ 41. As with the NYAG investigation discussed in Section 4.2.1.1.4.1 above, the dearth of analyst commentary on the CAAG's investigation suggests that the market likely did not consider it to be significant. There is no indication that the market took the CAAG investigation more seriously than the NYAG investigation, or that it saw political attention and multiple investigations as more troubling than one, as evidenced by the lack of a statistically significant negative price reaction associated with *The Washington Post* op-ed addressed below, which discussed another, similar investigation by the Attorney General of Massachusetts.

### 4.2.1.1.4.3. July 29, 2016: Second Quarter Earnings Announcement for 2016

On July 29, 2016, at 8:00 a.m. ET, Exxon Mobil issued the third alleged Corrective Disclosure, releasing second quarter earnings for 2016 wherein the company revealed an earnings miss in its upstream business. *See* Doc. No. 98-7. Even though the earnings release did not specifically attribute the miss to the Canadian Bitumen Operations (including Kearl proved reserves), the RMDG Operations, or carbon proxy costs, *see id.*, Plaintiff nevertheless alleges that it was partially corrective of misstatements related to all three. *See* Doc. No. 104 at 12-13, 15, 25-28.

The parties agree that Exxon Mobil stock experienced a statistically significant negative price movement on July 29, 2016, including on a close-to-open basis. *See* Doc. No. 98-12 ¶ 43; Doc. No. 104 at 12-13. Defendants argue that the movement is attributable to factors other than their alleged misrepresentations. *See* Doc. No. 98-12 ¶ 50. Alternatively, Defendants argue that, even if the earnings release was partially corrective of Defendants' alleged misrepresentations, the market did not realize that the release

was corrective, negating any price impact stemming from the correction. *See* Doc. No. 115 at 23-26.

The Court agrees with Defendants and finds that they have rebutted the *Basic* presumption by a preponderance of the evidence by showing that the alleged July 29, 2016, Corrective Disclosure did not impact Exxon Mobil's stock price.

First, the Court accepts that the statistically significant negative price movement on July 29, 2016, was likely not attributable to the alleged corrective information in the earnings release about the Kearl Operation or the Canadian Bitumen Operations at large. This is because Imperial also released its quarterly earnings the morning of July 29, 2016 (at 7:55 a.m. ET), and, on a close-to-open basis, Imperial's stock price did not experience a statistically significant negative price reaction that day. *E.g.*, Doc. No. 98-12 ¶ 45. Recall that Imperial owns approximately 70% of Kearl and that, when Exxon Mobil issued it second quarter earnings release for 2016, the proved reserves at Kearl constituted a substantial part of the overall proved reserves from the Canadian Bitumen Operations, which in turn made up a significant portion of Exxon Mobil's total worldwide proved reserves. *E.g.*, Doc. No. 36 ¶¶ 96-101. If a downturn in performance at the Kearl Operation was responsible for Exxon Mobil's stock's statistically significant adverse close-to-open price movement on the day of the earnings release, one would therefore anticipate a comparably negative statistically significant close-to-open price movement in Imperial's stock. Because there was no such movement, the Court doubts that the observed reaction in Exxon Mobil's stock can reasonably be linked to Kearl and the broader Canadian Bitumen Operations.

**\*17** As Dr. Ferrell explains, confounding factors likely explain the movement in Exxon Mobil's stock price on July 29, 2016. Reviewing twenty-four contemporaneous analyst reports, Dr. Ferrell found that analysts mainly ascribed the earnings shortfall to Canadian wildfires and civil disturbances in Nigeria, which collectively resulted in an estimated decrease in production of 100,000 barrels per day. Doc. No. 98-12 ¶ 50. Dr. Ferrell's review did not reveal any analyst commentary concerning asset impairments or possible de-bookings of Exxon Mobil's proved reserves. *Id.*

On cross-examination, Professor Torchio agreed with Dr. Ferrell "that there was no information that the market took from the earnings disclosure that connected to Kearl or Rocky

Mountain." Doc. No. 176 at 104; *see also* Doc. No. 103 ¶ 112. Absent information in the earnings release about the Canadian Bitumen Operations (including Kearl) or the RMDG Operations, there should be no price impact from the release related to either Operation.

Finally, the Court notes that the evidence demonstrating that the July 29, 2016, earnings release did not, as relevant here, have an impact on Exxon Mobil's stock price is consistent with Plaintiff's theory of the case—that Defendants made misleading statements to present Exxon Mobil as unaffected by the market forces harming its competitors, and that they successfully kept the market in the dark until they finally revealed the truth to the market on October 28, 2016. *See* Doc. No. 104 at 18-19, 22.

### 4.2.1.1.4.4. August 10, 2016: *The Washington Post* Op-Ed

On the evening of August 9, 2016, *The Washington Post* published an op-ed by Senators Elizabeth Warren and Sheldon Whitehouse, entitled *Big Oil's Master Class in Rigging the System.* Doc. No. 36 ¶ 432; Doc. No. 98-10 at 2-3. This is the fourth alleged Corrective Disclosure. In the op-ed, Senators Warren and Whitehouse recapped the allegations that Exxon Mobil made misleading statements about climate change and the risks climate change posed to its long-term business model. Doc. No. 98-10 at 2. The Senators noted the existence of the NYAG investigation and a similar probe of Exxon Mobil being conducted by the Attorney General of Massachusetts. *Id.*

The Complaint also references the EEP Report, which was published on August 10, 2016, 1:11 p.m. ET. Doc. No. 36 ¶¶ 433-34. This report purportedly discussed certain politicians' desire for Exxon Mobil executives to testify in light of the multiple state attorneys general's investigations. *Id.*

Plaintiff does not specifically address *The Washington Post* op-ed or the EEP Report in its Motion or Reply, and Professor Torchio did not analyze the impact of either publication on Exxon Mobil's stock price. *See* Doc. No. 87; Doc. No. 88-1; Doc. No. 103; Doc. No. 104; Doc. No. 176 at 95. As with *The Guardian* and *The Los Angeles Times* articles, Plaintiff seemingly considers the publications to be partially corrective of some of Exxon Mobil's alleged misstatements about its use of a proxy cost of carbon.

The Court finds that Dr. Ferrell's analysis of the effect of the op-ed and the EEP Report on Exxon Mobil's stock price rebuts the *Basic* presumption of reliance. Because the op-ed was published after trading hours on August 9, 2016, and the EEP Report was published during trading hours on August 10, 2016, Dr. Ferrell's analysis of the window from market close on August 9, 2016, to market close on August 10, 2016, accounted for both publications. Dr. Ferrell's analysis revealed no negative stock price reaction attributable the publications. *See* Doc. No. 98-12 at 21.

**\*18** Not only does Dr. Ferrell's analysis sufficiently rebut the *Basic* presumption by showing a lack of price impact, but also it further supports Defendants' assertion that the market did not care about the state attorneys general's investigations into whether Exxon Mobil misled investors about its internal use of carbon proxy costs.

### 4.2.1.1.4.5. October 28, 2016: Third Quarter Earnings Announcement for 2016

On October 28, 2016, at 8:00 a.m. ET, Exxon Mobil issued the fifth alleged Corrective Disclosure, releasing its third quarter earnings for 2016. Doc. No. 36 ¶ 437; Doc. No. 88-3 at 6. Until this point, Plaintiff alleges, Defendants successfully misled investors into believing that Exxon Mobil was immune from the broader market forces impacting its peers. For example, Plaintiff cites an analyst report, issued five weeks prior to the alleged Corrective Disclosure, stating that Exxon Mobil's ability to steer clear of write-down issues was due to the company's unique conservative approach to the timing and extent of its capitalization of reserves. Doc. No. 104 at 18. According to Plaintiff, on October 28, 2016, Exxon Mobil "finally came clean about likelihood of reserve write-downs and impairments" when it revealed in its earnings announcement that it might have to de-book approximately 3.6 billion barrels of oil sand reserves and 1 billion barrels of other North American reserves. *Id.* at 19; *e.g.*, Doc. No. 36 ¶ 437; Doc. No. 88-3 at 6.

This is the Corrective Disclosure from which Defendants cannot escape. The parties agree that Exxon Mobil's stock experienced a statistically significant negative price reaction on October 28, 2016, including on a close-to-open basis. *See* Doc. No. 98-12 ¶ 55; Doc. No. 104 at 13.

Defendants primarily contend that the third quarter earnings release could not have had any relevant impact on Exxon

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 247 of 292

Mobil's stock price because all meaningful information regarding Exxon Mobil's de-bookings, impairments, or losses at the Canadian Bitumen Operations was accessible to the market before the release. *E.g.*, Doc. No. 115 at 26-28. Defendants reason that the efficient market for Exxon Mobil's stock incorporated this information prior to the issuance of the release. *Id.*

There is reason to doubt Defendants' assertion that the market had access to the information about the Canadian Bitumen Operations disclosed in the earnings release before Exxon Mobil issued the release. Both parties' Experts cite analyst reports that express surprise and dismay about the potential de-bookings and impairments announced in the release. *See* Doc. No. 98-12 at 36-37.

If Defendants' theory were correct, one would expect to observe two results that did not, in fact, materialize. First, if the market could infer that Exxon Mobil's reserves were impaired or should be de-booked from competitors' impairments and de-bookings, one would expect to see a statistically significant negative price reaction for Exxon Mobil's stock on the days when its peers announced their impairments and de-bookings. Professor Torchio's analysis demonstrates that the expected result did not occur. *See* Doc. No. 103 ¶¶ 140-43. Second, one would expect to observe no statistically significant negative movement in Exxon Mobil's stock price on October 28, 2016, unless the reaction was attributable to other factors. Since Exxon Mobil's stock price dropped on October 28, 2016, Defendants should be able to identify such factors. Dr. Ferrell suggests that the earnings release primarily emphasized the negative impact of lower refining margins and commodity prices on Exxon Mobil's results, while also spotlighting notable year-over-year drops in earnings and capital and exploration expenditures. Doc. No. 98-12 ¶ 57. As the contemporary analyst reports show, the market was concerned with de-booking and impairment; the Court finds that the factors identified by Dr. Ferrell do not fully explain the drop in Exxon Mobil's stock price on October 28, 2016. *See id.* at 36-37.

 **\*19** Even if Defendants are correct that all of the de-booking and impairment information disclosed in the third quarter earnings release was discoverable in advance of the issuance, Defendants have not necessarily shown that the information was so widely known that it had become an integral part of the total mix of information available to investors. *E.g.*, *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 415 (S.D.N.Y. 2011). Defendants' theory that

the market could have used publicly available information to deduce the information subsequently disclosed in the earnings report largely relies on expert analysis. Doc. No. 115 at 26-28. As the Fifth Circuit has explained:

> While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace.

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014).

The negative impact of the third quarter earnings release on Exxon Mobil's stock price does not, however, support Plaintiff's claim that Defendants misled the market about Exxon Mobil's use of a proxy cost of carbon. Plaintiff argues that the third quarter earnings release, together with the second and fourth quarter earnings releases also alleged to be Corrective Disclosures, is partially corrective of Defendants' purportedly misleading statements about carbon proxy costs. Doc. No. 104 at 9-10, 26-27. Plaintiff contends that the de-booking and impairments revealed on October 28, 2016, would have happened earlier had Exxon Mobil adhered to its publicly declared proxy cost. *Id.* Plaintiff alleges that if Exxon Mobil had incorporated its publicly stated carbon proxy cost in its internal models, it would have realized that its reserves were less profitable than it told the market. *See id.* According to Plaintiff, the three earnings releases are thus "linked" in a way that they can be seen as partially correcting the purported proxy cost misstatements. *Id.*

Plaintiff's "linkage" theory is unpersuasive. None of the three earnings releases alleged to be Corrective Disclosures pertained to Exxon Mobil's use of proxy costs of carbon. With the exception of a single analyst report issued after the alleged October 28, 2016, Corrective Disclosure, which mentioned in passing the existence of the state attorneys general's investigations into Exxon Mobil, *see id.*, Plaintiff presents no evidence that the market connected the three earnings releases to Defendants' alleged misstatements about Exxon Mobil's use of a proxy cost of carbon, much less evidence that

any connection between the releases and Defendants' alleged misstatements impacted the price of Exxon Mobil's stock.

The alleged Corrective Disclosures and similar articles that explicitly pertain to Exxon Mobil's use of carbon proxy costs (*i.e., The New York Times* article, both of *The Guardian* articles, *The Los Angeles Times* article (on a close-to-open basis), *The Washington Post* article, and the EEP Report) had no statistically significant negative impact on Exxon Mobil's stock price. If any subsequent disclosure was corrective of Defendants' alleged carbon proxy cost misstatements, it would be the Oleske Affirmation, filed on June 2, 2017, at 7:50 a.m. ET, which unveiled all of the climate-related allegations pertinent to this case. Plaintiff does not classify the Oleske Affirmation as a corrective disclosure—perhaps because, as Dr. Ferrell demonstrates, the Affirmation did not produce a statistically significant negative change in Exxon Mobil's stock price on either a close-to-open or a close-to-close basis. *See* Doc. No. 98-12 at 21.

**\*20** The Court concludes that Defendants have failed to rebut the *Basic* presumption by a preponderance of the evidence by showing that the alleged October 28, 2016, Corrective Disclosure had no impact on the price of Exxon Mobil stock, except insofar as Plaintiff alleges that Defendants misled the market about Exxon Mobil's use of a proxy cost of carbon.

### 4.2.1.1.4.6. January 18, 2017: UBS Downgrade

On January 18, 2017, at 5:30 p.m. ET, UBS published the penultimate alleged Corrective Disclosure, an analyst report downgrading Exxon Mobil to "sell" and reducing the target price for its stock from $86 to $77. Doc. No. 36 ¶ 443; Doc. No. 88-7. According to Plaintiff, in downgrading Exxon Mobil and lowering the price target, UBS cited the likely risk that Exxon Mobil would de-book proved reserves at Kearl based on Exxon Mobil's third quarter earnings release. Doc. No. 87 at 12 n.6; Doc. No. 104 at 13, 28. Professor Torchio did not analyze or provide a price impact opinion about the UBS report. *See* Doc. No. 88-1, Doc. No. 103; Doc. No. 104; Doc. No. 176 at 95. Plaintiff, however, claims that the report is partially corrective of certain alleged misrepresentations in the 2015 10-K and other subsequent releases. *See* Doc. No. 87 at 12.

The Court concludes that Defendants have rebutted the *Basic* presumption by a preponderance of the evidence by showing

a lack of price impact with respect to the UBS report. Dr. Ferrell's close-to-open analysis revealed no statistically significant negative stock price reaction, though his close-to-close analysis did. Doc. No. 98-12 at 21, 38. Because UBS issued the report after trading hours, Dr. Ferrell contends that a close-to-open window is the proper event window for assessing price impact. *Id.* ¶¶ 19-20, 61. Based on the information before the it, the Court finds that a close-to-open window is probably well-suited to analyzing the impact of the UBS report on Exxon Mobil's stock price, as it was for analyzing the impact of *The Los Angeles Times* article on Exxon Mobil's stock price. UBS issued its brief report many hours before the market opened, and the market for Exxon Mobil stock is highly efficient.

The Court need not decide between close-to-open or close-to-close windows here, as the UBS report merely summarizes parts of Exxon Mobil's third quarter earnings release and makes a recommendation based on that information; it does not offer any new corrective information to the market. Plaintiff does not contend otherwise. *See* Doc. No. 104 at 28-29; Doc. No. 176 at 197 ("[T]he UBS downgrade is a result of Kearl de-booking and the lack of profitability."). As previously mentioned, the Court agrees with Dr. Ferrell that the mere reiteration of already disclosed information should not influence the price of a stock traded in an efficient market.

### 4.2.1.1.4.7. January 31, 2017: Fourth Quarter Earnings Announcement for 2016

The final alleged Corrective Disclosure occurred on January 31, 2017, at 8:00 a.m. ET, when Exxon Mobil released its fourth quarter earnings for 2016 and confirmed that it would be taking an asset impairment charge of about $2 billion largely related to the RMDG Operations. Doc. No. 36 ¶¶ 446-47; Doc. No. 88-4. Later that morning, in an earnings conference call that took place during the first ninety minutes of trading, Woodbury confirmed that the Kearl proved reserves discussed in the third quarter earnings announcement would be de-booked in the coming weeks. Doc. No. 36 ¶ 234; Doc. No. 104 at 23.

**\*21** The Court concludes that Defendants have rebutted the *Basic* presumption by a preponderance of the evidence by showing a lack of price impact with respect to the fourth quarter earnings release. The fourth quarter release is the only earnings release alleged to be a Corrective Disclosure that is not associated with a statistically significant negative

Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)
2023 WL 5415315, Fed. Sec. L. Rep. P 101,658

price reaction on a close-to-open basis or even a close-to-close basis. Dr. Ferrell analyzed Exxon Mobil's price using a close-to-open window and found no statistically significant negative price reaction to the fourth quarter release. Doc. No. 98-12 ¶¶ 63-64. Dr. Ferrell's close-to-close analysis—which would have captured any reaction associated with the de-booking confirmation in the conference call conducted after the market opened—also revealed no statistically significant negative price reaction. *See id.* Professor Torchio, did, however, find a statistically significant negative price reaction by using a two-day window. *E.g.*, Doc. No. 88-1 ¶¶ 83-91; Doc. No. 103 ¶¶ 75-86.

As the Court has already explained in Section 4.2.1.1.3 above, in this case, a two-day window is not appropriate for assessing price impact in the highly efficient market for Exxon Mobil's stock. The failure of the fourth quarter release to significantly affect Exxon Mobil's stock price when measured over a more appropriate window is unsurprising since the market was on notice of the impairments and de-bookings announced in the fourth quarter release as a result of Exxon Mobil's disclosures in its third quarter earnings release.

### 4.2.1.2. Omissions-Based Presumption of Reliance

Apart from invoking the presumption of reliance stemming from the fraud-on-the-market theory, Plaintiff also claims that it is entitled to rely on the presumption of reliance first established in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), to meet Rule 23(b)(3)'s predominance requirement. In *Affiliated Ute*, the Supreme Court held that proof of reliance is not a necessary condition for recovery in fraud cases primarily involving the omission of material information. *Id.* at 152-53. Following this precedent, the Fifth Circuit holds that in cases where the "defendant has failed to disclose any information whatsoever relating to material facts about which the defendant has a duty to the plaintiff to disclose," a plaintiff is entitled to a presumption that the plaintiff relied on the omission. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989); *see Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 384-85 (5th Cir. 2007). The presumption does not apply "to cases where the plaintiffs allege either that the defendant has made false statements or has distorted the truth by making true but misleading incomplete statements." *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 276 (N.D. Tex. 1990) (Fitzwater, J.).

Plaintiff's claims involve a mix of allegedly fraudulent conduct, most of which appears to consist of misrepresentations rather than omissions. That mix may not support application of the *Affiliated Ute* presumption. *See Lehocky*, 220 F.R.D. at 510 (holding that plaintiffs could not rely on *Affiliated Ute* presumption where plaintiffs alleged a mix of misrepresentations and omissions). But the Court need not and does not decide the applicability of *Affiliated Ute* to this case, as it has already found that Plaintiff is entitled to a rebuttable presumption of reliance based on *Basic*'s fraud-on-the-market theory.

### 4.2.2. Superiority

Having found that there are questions of law and fact common to the class that predominate with respect to Plaintiff's non-carbon proxy cost allegations, the Court now turns to the question of whether the class action is the superior way of resolving this matter. Defendants do not contest the superiority of class treatment here. *See generally* Doc. No. 115.

Nonetheless, the Court independently examines whether a class action "is superior to other methods for fairly and efficiently adjudicating th[is] controversy" based on the factors in Rule 23(b)(3)(A)-(D):

**\*22** (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

The motivation of any potential class members to individually prosecute separate actions appears minimal. Plaintiff was the sole entity to move for appointment as lead plaintiff in this matter. Doc. No. 87 at 29. There is no indication of any related individual lawsuits; Plaintiff is not aware of any, and Defendants do not point to any either. *See id.*; Doc. No. 115. Considering the probable presence of numerous absent potential class members, each with relatively modest losses that might not justify the associated litigation costs and complexities, the desire for personal control over such cases seems relatively limited. *Id.*

In terms of efficiency, the potential class encompasses thousands of investors who purchased Exxon Mobil stock. The central claim for all investors is identical: Defendants misled them into acquiring Exxon Mobil stock at artificially inflated prices. As the elements of the putative class claims are issues that can be addressed uniformly for the proposed class, the Court believes that trying the claims collectively will be more efficient and cost-effective compared to individual trials.

Finally, the Court finds that the Northern District of Texas is a desirable forum for this class action at least because of the Court's familiarity with the case, and because a high number of the acts complained of occurred in substantial part in this District. *E.g., id.*

### 5. CLASS DEFINITION AND CONCLUSION

The Court will certify Plaintiff's proposed class with modifications. "District courts have significant leeway and discretion over the management of class actions. They may modify the classes to fit the requirements better and should not dismiss an action purely because the proposed class definition is too broad." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 933-34 (5th Cir. 2023) (first citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998); and then citing *In re Monumental Life Ins. Co.*, 343 F.3d 331, 338 (5th Cir. 2003)).

As previously explained in Section 4.2.1.1.1, misrepresentations that do not impact the price of a stock are not actionable and cannot establish the starting point for a class period. The Court has determined that Defendants have sufficiently rebutted the alleged price impact of Defendants' alleged misstatements about the carbon proxy costs. The Court therefore **DENIES** Plaintiff's Motion to the extent it seeks to certify claims regarding Defendants' alleged misstatements about carbon proxy costs.

As outlined below, the Court certifies a class with respect to Plaintiff's remaining claims after adjusting the class period to

reflect the Court's analysis of price impact. The Court sets the starting date of the class period on the date of the first alleged misstatement relevant to Plaintiff's certified claims: Exxon Mobil's 2015 10-K. As the end date for the class period, the Court sets October 28, 2016—the date of the sole alleged Corrective Disclosure whose impact on Exxon Mobil's stock price Defendants failed to rebut. Accordingly, the Court accordingly **CERTIFIES** the following class:

> **\*23** All persons who purchased or otherwise acquired Exxon Mobil Corporation common stock between February 24, 2016, and October 28, 2016 (the date of the sole alleged Corrective Disclosure whose impact on Exxon Mobil's stock price Defendants failed to rebut), inclusive, and were damaged thereby. Excluded from the class are Defendants and their families, the officers and directors of Exxon Mobil, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

The Court appoints Lead Plaintiff Greater Pennsylvania Carpenters Pension Fund as class representative and Robbins Geller Rudman & Dowd LLP as class counsel.

### SO ORDERED.

### All Citations

Slip Copy, 2023 WL 5415315, Fed. Sec. L. Rep. P 101,658

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 18

2018 WL 6843305

2018 WL 6843305
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Toby SCHECHNER, et al., Plaintiffs,
v.
WHIRLPOOL CORPORATION, Defendant.

Case No. 2:16–cv–12409
|
Signed 10/30/2018

**Attorneys and Law Firms**

Dennis A. Lienhardt, Sharon S. Almonrode, Martha J. Olijnyk, E. Powell Miller, The Miller Law Firm, P.C., Rochester, MI, Jonah H. Goldstein, Lucas F. Olts, Robbins Geller Rudman and Dowd LLP, San Diego, CA, Mark Samuel Reich, Robbins Geller Rudman & Down LLP, Melville, NY, Stuart Andrew Davidson, Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, for Plaintiffs.

Howard B. Iwrey, James P. Feeney, Dykema Gossett, Bloomfield Hills, MI, Jessica G. Scott, Julian Richard Ellis, Jr., Michael T. Williams, Laura J. McNabb, Wheeler Trigg O'Donnell LLP, Denver, CO, for Defendant.

**DISCOVERY MASTER'S REPORT AND RECOMMENDATION ON MOTIONS TO STRIKE EXPERT OPINIONS (DKT. 96, 101, 111, AND 112)**

Hon. Stephen J. Murphy III, District Judge

**TABLE OF CONTENTS**

*1 I. Recommendation ... ——

II. Report ... ——
A. The Four Pending Motions to Strike Expert Testimony ... ——

B. Legal Standard ... ——

C. Discussion ... ——

1. Whirlpool's Motion to Strike the Opinions of Mr. Colin Weir (Dkt. 96) Should be Denied.... ——

a. Weir's "conjoint analysis" opinion is sufficiently reliable.... ——

i. "Self-cleaning" is not such a confusing term as to render Weir's survey unreliable.... ——

ii. Weir's alleged exaggeration does not require striking.... ——

iii. Weir's alleged focalism bias fails to rise to the level of unreliability.... ——

iv. Weir sufficiently considered the supply side.... ——

b. Weir's "hedonic regression" opinion is sufficiently reliable to be admissible.... ——

i. An alleged failure to separate self-cleaning from other benefits goes to weight, not admissibility.... ——

ii. Whirlpool failed to demonstrate the alleged data set is insufficient.... ——

c. Weir's "fixed percentage price premium" is sufficiently reliable.... ——

2. Plaintiffs' Motion to Strike the Opinions of Dr. Itamar Simonson (Dkt. 110) Should be Denied.... ——

a. Simonson is qualified to provide opinions on consumer research and consumer expectations.... ——

b. Concerns with Simonson's survey questions go to the weight and not admissibility of his opinions.... ——

c. Simonson's alleged coding / grouping errors are not significant enough to preclude admissibility.... ——

3. Plaintiffs' Motion to Strike the Opinions of Dr. Keith Ugone (Dkt. 111) Should be Denied.... ——

4. Plaintiffs' Motion to Strike the Opinions of Dr. Robert Rauschenberger (Dkt. 112) Should be Denied.... ——

a. Rauschenberg's alleged conclusory opinions meet the thresholds of reliability and relevance for admissibility (Conclusions 1, 2, 4, 5, and 7) .... ——

i. Conclusions 1 and 2, that oven purchases are driven by more than one single factor and individuals vary, are relevant.... ——

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 253 of 292

Schechner v. Whirlpool Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 6843305

ii. Conclusions 4 and 5, that some consumers have unrealistic expectations regarding "self-cleaning," is reliable and relevant.... ——

iii. Conclusion 7, that historical "self-cleaning" models also required manual cleaning, is relevant.... ——

b. Rauschenberger has sufficient training and experience to provide Conclusion 3, an analysis of cleaning times for side-by-side ovens.... ——

c. Rauschenberg's Conclusions 6 and 9 are sufficiently reliable.... ——

i. Conclusion 6, that Plaintiffs misuse of the Ovens led to their dissatisfaction, is reliable.... ——

ii. Conclusion 9, that not all buyers of AquaLift ovens were uniformly dissatisfied with their Ovens, is reasonably reliable.... ——

III. Conclusion and Summary of Recommendation ... ——

IV. Notice Regarding Objection to Recommendation ... ——

**I. Recommendation**

For the reasons stated below, I recommend entry of an order that:

1. Defendant Whirlpool Corporation's Motion to Strike the Opinions of Mr. Colin Weir (Dkt. 96) be **DENIED**;

2. Plaintiffs' Motion to Strike the Opinions of Dr. Itamar Simonson (Dkt. 110) be **DENIED**;

3. Plaintiffs' Motion to Strike the Opinions of Dr. Keith Ugone (Dkt. 111) be **DENIED**; and

4. Plaintiffs' Motion to Strike the Opinions of Dr. Robert Rauschenberger (Dkt. 112) be **DENIED.**

**II. Report**

**\*2** Plaintiffs, a putative class, claim that they purchased ovens manufactured by the Defendant Whirlpool Corporation with AquaLift Self-Clean Technology ("Ovens") based on marketing that Plaintiffs allege was deceptive because it described the Ovens as "self-cleaning," when in reality they were merely partially self-cleaning. (Dkt. 5, Complaint at ¶ 2).

**A. The Four Pending Motions to Strike Expert Testimony**

On June 8,[1] Whirlpool filed its Motion to Strike the Opinions of Plaintiffs' economist, Mr. Colin Weir (Dkt. 96).[2] On July 27, Plaintiffs filed three motions to strike opinions of Whirlpool's experts, including: (1) Motion to Strike the Opinions of Dr. Itamar Simonson (Dkt. 110); (2) Motion to Strike the Opinions of Dr. Keith Ugone (Dkt. 111); and (3) Motion to Strike the Opinions of Dr. Robert Rauschenberger (Dkt. 112).

[1]   Unless noted otherwise, all dates in this Report and Recommendation are in 2018.

[2]   Redacted version filed as Dkt. 97.

On August 28, the Court appointed me as Discovery Master under Fed. R. Civ. P. 53 to review and provide recommendations for these four pending motions. (Dkt. 125). I held a telephone conference with the parties on September 7. Counsel advised that their respective motions to strike, responses, and replies were ready for review and decision. I found all four motions to be fully briefed and dispensed with oral argument. Below I report on each motion, and recommend that each be denied.

**B. Legal Standard**

"Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and informed by the seminal case applying Rule 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed. 2d 469 (1993)." *In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262, 267 (6th Cir. 2014). *Daubert* just celebrated its 25th birthday, so it's been around for a generation, and is well known to all litigators as the watershed case about the admissibility of expert testimony.

Fed. R. Evid. 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 254 of 292

Schechner v. Whirlpool Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 6843305

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

"[T]he rules of evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148–49 (1999), the Supreme Court held that the trial court's "gatekeeping" task with respect to expert testimony applies not only to scientific evidence, as was at issue in *Daubert*, but to all types of specialized knowledge presented through an expert witness. "[T]he relevant reliability concern may focus upon personal knowledge or experience ... [as] there are many different kinds of experts, and many different kinds of expertise." *Id.* at 150.

The proffered expert's qualification, reliability, and helpfulness must be analyzed separately. The Sixth Circuit has noted that while absolute certainty is not required of an expert, sheer speculation, regardless of the qualifications of the speculator, lacks the indicia of reliability sufficient for admissibility:

> **\*3** Rule 702, we recognize, does not require anything approaching absolute certainty. And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line.

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010), citing *Daubert*.

To determine reliability, the court does not "determine whether [the opinion] is correct, but rather [determines] whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008). "As gatekeeper, the trial court only determines the admissibility of expert evidence; the jury determines its weight. The court's focus is 'solely on principles and methodology, not on the conclusions that

they generate.' " *United States v. Stafford*, 721 F.3d 380, 393–94 (6th Cir. 2013) (quoting *Daubert*, 509 U.S. at 595). "[R]ejection of expert testimony is the exception, rather than the rule." *Scrap Metal*, 527 F.3d at 530.

### C. Discussion

The motions to strike, and my recommendations for each, are discussed below in the order that they were filed: (1) Whirlpool's Motion to Strike the Opinions of Mr. Colin Weir (Dkt. 96); (2) Plaintiffs' Motion to Strike the Opinions of Dr. Itamar Simonson (Dkt. 110); (3) Plaintiffs' Motion to Strike the Opinions of Dr. Keith Ugone (Dkt. 111); and (3) Plaintiffs' Motion to Strike the Opinions of Dr. Robert Rauschenberger (Dkt. 112).

### 1. Whirlpool's Motion to Strike the Opinions of Mr. Colin Weir (Dkt. 96) Should be Denied.

Economist Colin B. Weir was retained by Plaintiffs to calculate price premiums, on a class-wide basis, allegedly paid by consumers based on Whirlpool's misrepresentation of the Ovens' self-cleaning mechanism. To accomplish that calculation, Weir used both a conjoint analysis and a hedonic regression analysis.

Whirlpool filed its Motion to Strike the Opinions of Mr. Colin Weir on June 8 (Dkt. 96). Plaintiffs filed their Memorandum of Law in Opposition to Whirlpool's Motion to Strike the Opinions of Mr. Colin Weir on July 2 (Dkt. 101). Whirlpool filed its Reply on July 12 (Dkt. 108). Whirlpool moves to exclude three separate opinions of Weir under Fed. R. Evid. 702 and *Daubert*: (1) his "conjoint analysis" opinion; (2) his "hedonic regression" opinion; and (3) his "fixed percentage price premium" opinion. For the reasons stated below, I recommend entry of an order denying the Motion.

### a. Weir's "conjoint analysis" opinion is sufficiently reliable.

A conjoint analysis uses "survey data to determine how consumers value a product's individual attributes—often called the market's willingness to pay." *Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-9366-SVW (MANx), 2014 WL 7338930, at \*4 (C.D. Cal. Dec. 18, 2014). A conjoint survey presents respondents with various combinations of product attributes and prices and asks them to choose their preferred

combination. (Dkt. 96, citing Weir Decl. ¶¶ 24–26). Those choices are then evaluated statistically, to calculate one attribute's value vis-à-vis the others. (*Id.*)

Weir administered a consumer survey by the internet to respondents who had identified themselves as having purchased a Whirlpool-manufactured oven in the preceding 36 months. (Dkt. 96, p. 2) (citing Weir Decl., ¶ 41). As part of his survey design, Weir researched advertising samples for ovens, and conducted interviews with consumers who had recently shopped for Whirlpool-branded ovens. Weir asked respondents to imagine that they were purchasing a new oven and were shown ovens comprised of lists of different combinations of the following product attributes: brand, oven type, fuel, finish, cleaning feature, and price. (*Id.*) Survey respondents were given thirteen "choice tasks," each consisting of three hypothetical "ovens" (i.e., three lists of some combination of the attribute labels) to choose. (Dkt. 96, p. 3) (citing Weir Decl. ¶ 44).

 **\*4**  Weir used a choice-based conjoint study, utilizing Sawtooth software for the programming of the questionnaire, data collection, and analysis of the survey results. (Dkt. 101, pp. 7–8) (citing Weir Decl. ¶ 52 n. 60). Weir analyzed the results using a statistical analysis to determine the "partworth" (a measurement of utility) of each level of product attribute tested. (*Id.* at ¶ 54). Weir used the premium price point from his consumer survey analysis (here, $1,200.00) and opined that an oven with "AquaLift self-clean" (hence an "Oven" as defined above) commanded a 10.58% price premium compared to hypothetical ovens described as "AquaLift partial-clean." (Dkt. 96, p. 3).

Whirlpool's motion doesn't challenge the general use and admissibility of conjoint analyses, because they have "won acceptance from courts and legal commentators." *Dzielak v. Whirlpool Corp., et al.*, No. 2:12–0089, 2017 WL 1034197, \*6 (D.N.J. 2017). Conjoint analyses have been particularly recognized as reliable for calculation of class-wide damages. See *In re ConAgra Foods*, 90 F. Supp. 3d 919, 1028 (C.D. Cal. 2015), sub nom. *Briseno v. ConAgra Foods, Inc.*, 844 F. 3d 1121 (9th Cir. 2017).

Instead, Whirlpool challenges Weir's process of preparing his survey and resulting conjoint analysis. The gist of Whirlpool's argument is that "Weir's conjoint survey is fundamentally flawed because it is based on the false and unsupported assumption that 'self-cleaning' has a 'commonly understood' meaning, and because he designed his survey to artificially inflate consumer preference for oven cleaning features." (Dkt. 96, p. 1). Whirlpool alleges that Weir's survey had four basic flaws in that they it didn't fit these facts:

1. consumers have different meanings of "self-clean";

2. Weir exaggerated "AquaLift self-clean" over his "AquaLift partial-clean" label (Dkt 96 at pp. 9–10);

3. Weir allowed a focalism bias by lack of focus on "improved aesthetic appeal" and other oven "enhancements" that are part of the AquaLift feature, resulting in a greatly influenced "choice context (i.e., the set of options being considered)" (Dkt. 96 at p. 12); and

4. the survey fails to account for supply-side considerations to measure price premium (Dkt 96 at p. 14–17).

As explained below, each of the proffered flaws with the data-gathering survey and the resulting conjoint analysis attack primarily whether Weir's opinion is correct, not whether it rests upon a reliable foundation. And "[t]he court's focus is 'solely on principles and methodology, not on the conclusions that they generate.' " *United States v. Stafford*, 721 F.3d 380, 393–94 (6th Cir. 2013) (quoting *Daubert*, 509 U.S. at 595). The reason Whirlpool's challenge to Weir is significant and interesting is that, unlike nearly all testifying experts, he is in the unique position of creating and shaping the very data on which his opinion relies. If Whirlpool is correct, and the survey that he designed is fundamentally flawed, then indeed his opinion would rest on a sandy foundation.

My conclusion, however, is that Weir's survey was not so flawed as to constitute "unsupported speculation," but is sufficiently reliable that the jury may make its own decision as the trier of fact. *Scrap Metal*, 527 F.3d at 529. Weir's methodology, while vulnerable to attack on cross examination and by Whirlpool's own experts, Whirlpool's objections to Weir's methodology are serious but do not reach the level of "the exception, rather than the rule" of barring expert testimony. *Id.* at 530. Whirlpool may attack whether Wier's opinions are correct, including through use of its own experts.

### i. "Self-cleaning" is not such a confusing term as to render Weir's survey unreliable.

 **\*5**  Whirlpool first argues that Weir's survey was confusing and is unreliable because the term "self-cleaning" has "no industry-accepted, statutory, or regulatory definition,

Schechner v. Whirlpool Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 6843305

standard, or test protocol." (Dkt. 96, p. 6). Whirlpool's intent on challenging whether consumers understand "self-cleaning" is counterintuitive to its own advertising of the Ovens as "self-clean." As Plaintiffs document in their reply, Whirlpool's "own representatives formulated AquaLift self-cleaning technology advertising based on consumers' understanding of the meaning of the term." (Dkt. 101). Whirlpool found it acceptable to use that term, or similar terms, in its own advertising to consumers, so it can't logically now turn around and challenge Weir's use of those terms in his survey as so speculative that the results are rendered unreliable. In other words, it's not that "self-clean" is a specific term—it isn't. It's that Weir used the same or similar terms that Whirlpool used, and if he hadn't, Whirlpool would have rightly criticized him for his survey failing to match reality to the extent possible. Because Weir did use similar terms, his survey is sufficiently reliable to reach the jury.

#### ii. Weir's alleged exaggeration does not require striking.

Whirlpool next contends Weir's use of the descriptor "AquaLift partial-clean," to determine the extent of a consumer's preference for an "AquaLift self-clean," is not related to the facts of the case and is exaggeration. (Dkt 96, pp. 9–10). Weir's descriptor "partial clean" is indeed a hypothetical, but it does not rise to the level of embellishment and fabrication, unrelated to the facts and allegations, necessary for his opinions to be struck. *See In re Whirlpool Corp. Front-Loading Washer*, 45 F. Supp. 3d 724 (2014) (denying Whirlpool's argument that conjoint analysis did not fit the facts of the case in a class action complaint for a front-loading washing machine where respondents were asked survey questions about hypothetical maintenance that does not exist on the market); *compare with Townsend v. Monster Beverage Corp*, 2018 WL 1662131, at \*5 (C.D. Cal. Mar. 20, 2018) (striking expert testimony based on the expert's embellishments).

#### iii. Weir's alleged focalism bias fails to rise to the level of unreliability.

Whirlpool next argues that Weir's survey suffers from "focalism bias." (Dkt. 96, p. 12). Focalism bias is a condition that exists when a survey fails to contain distracting factors to such an extent that the factor being targeted—the purpose of the survey itself—is easily discovered by the survey taker, leading to unreliable results. *See Morales v. Kraft*

*Foods Grp., Inc.*, 2017 WL 2598556, at \*15–16 (C.D. Cal. June 9, 2017). In the class action claims at issue in *Morales*, the court explained that arguments that an expert "telegraphed to respondents the purpose of the survey.... known as 'focalism.' ... is another matter that goes to the weight, not the admissibility of the challenged survey." *Id.* at 15–16. I see no reason for a different result here: the alleged focalism bias in Weir's survey, if any, goes to the weight of his opinions, and is not significant enough to bar their admissibility.

#### iv. Weir sufficiently considered the supply side.

In its final attempt to show Weir's conjoint analysis is unreliable, Whirlpool argues that the market-simulation tool that Weir used failed to account for relevant supply-side considerations needed to measure a true price premium for an oven's self-cleaning feature. (Dkt. 96, p. 14).

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that a damages model must be tied to the theory of liability. A conjoint analysis must quantify the relative value a class of consumers ascribes to the particular attribute at issue. And even if that quantification standard is met, it's not automatically the measure of damages because the supply side of the equation must be accounted for: "[t]he ultimate price of a product is a combination of market demand and market supply." *Apple*, 2014 WL 976898 at \*11. We all know intuitively, or learned in Economics 101, that except for products with the most inelastic demand curves (e.g., gasoline), at higher prices, suppliers want to supply more, but consumers tend to buy less. Accordingly, a conjoint analysis will not be reliable if it looks only "to the demand side of the market equation," converting what is properly "an objective evaluation of relative fair market values [in]to a seemingly subjective inquiry of what an average consumer wants." *In re NJOY, Inc. Consumer Class Action Litig*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (omitting citation).

\*6 Here, Plaintiffs argue that Weir sufficiently considered the supply side of the market to meet the threshold for reliability. Whirlpool contends that Weir merely determined the marginal price that a consumer would pay for a self-cleaning oven versus an oven without a self-cleaning feature. But Weir's analysis was more specific, and accurate, than that: "Rather, [the survey] determined the price premium associated with AquaLift 'self-clean' based upon a market simulation comparing AquaLift 'self-clean' as promised and

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 257 of 292

Schechner v. Whirlpool Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 6843305

AquaLift partial clean as received." (Dkt. 101) (citing Weir Decl. at ¶ 66). And Weir allegedly did so by "using real world price points." (*Id.*) In my view, while Whirlpool mounts a credible attack on Weir's methodology, he nonetheless did a creditable job of attempting to use simulations close to the actual market and real-world price points for ovens with contrasting cleaning attributes. He didn't compare self-cleaning versus non-self-cleaning, which would have been inaccurate; he compared "self-clean" as allegedly marketed by Whirlpool versus the partial self-clean allegedly provided by Whirlpool to Plaintiffs, and the associated price premium for both, which was the accurate comparison. So Weir considered the supply side sufficiently for his survey and conjoint analysis to be admissible.

In a similar motion to strike an expert's opinions, in *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1110 (N.D. Cal. 2018), the court held that

> conjoint analysis is widely-accepted as a reliable economic tool for isolating price premia, and the concerns that Kellogg raises are nowhere near severe enough to turn Gaskin's conjoint analysis into unreliable "junk science." Although some of Kellogg's critiques regarding Gaskin's survey methodology appear to be valid, all of them go to the weight, and not to the admissibility, of Gaskin's proposed conjoint analysis.

Here, Whirlpool's issues with Weir's survey and resulting conjoint analysis do not demonstrate that they rise to the necessary level of "sheer speculation" for this Court to strike the opinions in its gatekeeper role. Instead, Whirlpool attacks whether Weir's opinion is correct and should be accepted by a jury. Again, Weir did enough for his opinion to be admissible, but Whirlpool can challenge its weight. Accordingly, Whirlpool's motion to strike Weir's conjoint analysis opinions should be denied.

### b. Weir's "hedonic regression" opinion is sufficiently reliable to be admissible.

Hedonic regression is a statistical tool that attempts to explain changes in the value of one dependent variable (e.g., price) based on the values of one or more independent variables (e.g., a features of a product). (Dkt. 96, p. 4) (citing Weir Decl. ¶ 81). Here, Weir's hedonic regression purports to identify the percentage of the purchase price that consumers paid for the AquaLift cleaning feature by comparing the prices of ovens without and without a self-cleaning mechanism. (Dkt. 96, pp. 3–4) (citing Weir Decl., ¶¶ 37 and 100).

Whirlpool presents two arguments to strike Weir's hedonic regression for unreliability under Fed. R. Evid. 702: (i) that AquaLift "self-clean" is "confounded" with other noncleaning trade-offs; and (ii) that Weir relied on an insufficient data set. (Dkt 96, p. 5).

### i. An alleged failure to separate self-cleaning from other benefits goes to weight, not admissibility.

First, Whirlpool argues that Weir's hedonic regression analysis, and resulting opinions, are unreliable because Weir failed to separate the value of the challenged self-cleaning benefit from the non-challenged benefits inherent in an AquaLift Oven that could have impacted the consumer's choice to purchase an Oven. Whirlpool argues the failure to separate the true value of a self-clean Oven "would award damages in a way that is inconsistent with Plaintiffs' theory of liability and result in windfall gains." (Dkt. 96, p.1).

More specifically, Whirlpool argues that AquaLift Ovens "include multiple non-challenged cleaning and non-cleaning benefits" including improved aesthetic appeal and improved cooktop performance. (*Id.*, p. 17). It argues therefore that Weir "is unable to use a regression to differentiate between price impacts attributable to the challenged and the non-challenged benefits of AquaLift." (*Id.*, pp. I; *see also id.*, and 17–19). In other words, Whirlpool is arguing that Weir didn't sufficiently isolate the benefit at issue in this case as a variable in consumers' purchasing decisions.

**\*7** In *Cornwood Co. LP v. US Tobacco Co.*, 290 F.3d. 768 (6th Cir. 2002), the court found the inability to separate factors in a regression analysis of perceived benefits does not go to the admissibility of the opinion, but to its weight. The Sixth Circuit explained, "to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." *Id.* at 794. Further, in finding that the expert's hedonic regression satisfied *Daubert*, it considered

that the study at issue would be "subject to vigorous cross examination and an opportunity for Defendant to introduce countervailing evidence of its own." *Id.* (citing *Daubert*'s holding that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

Here, Whirlpool argues that the Ovens have significant features, in addition to self-cleaning, that could impact a consumer's decision to purchase. It's likely true that consumers *do* consider many features other than self-cleaning when deciding which oven to buy. In fact, consumer purchasing decisions are the results of immensely complex and subtle psychological exercises that marketing professionals and professors spend their lifetimes studying. But it's not this Court's role to jump into that morass and determine that Weir's analysis is incorrect—that is the province of the jury. To strike Weir's hedonic regression analysis, this Court would have to decide facts related to what alleged features may or may not be contained on an AquaLift Oven, which were important to consumers, and that Weir was not only wrong, but so wrong in his analysis that it was unreliable. Weir's methodology was reliable enough that it can reach the jury, which can make its own factual determinations as to how well Weir (and Whirlpool's expert, Dr. Keith Ugone) separated the "self-cleaning" attribute from other attributes.

### ii. Whirlpool failed to demonstrate the alleged data set is insufficient.

Whirlpool's second basis for attacking Weir's regression analysis argues that he used a limited data set that is not representative of the market. (Dkt. 96, p.1). Hedonic regression requires analysis of a database that is "representative of the circumstances consumers face in the marketplace." (Dkt. 101) (citing Ugone Rep. ¶ 90). Whirlpool argues Weir's regression was fatally flawed because it was based solely on the historical sales from a single retailer (H.H. Gregg) representing only 7.55% of sales, the retailer was soon to declare bankruptcy, and it included sales data for only two of the six states at issue. (Dkt 96 at p. 19).

Whirlpool's only support for its argument that 7.55% of the market is not sufficient to represent the entire market, or use of data from a single retailer is insufficient, is the conclusion of its own expert, Dr. Keith Ugone, whose report posits: "it is inappropriate for Weir to extrapolate the results of his hedonic

regression to other retailers and other geographies." (Dkt. 96, p. 19) (citing Ugone Rep. ¶ 93). The size of the data set does not concern me: 7.55%, or roughly 1 of every 13 ovens purchased, strikes me as a large data set. The fact that Weir only used one retailer is more disconcerting, but Whirlpool presents no objective evidence that by using only H.H. Gregg's sales, Weir's underlying data set was not representative of the broader market.

**\*8** In conclusion, Whirlpool may challenge the weight that the jury should give Weir's hedonic regression analysis, but the alleged deficiencies of that analysis do not rise to the level that would render it unreliable speculation. Therefore, Whirlpool's motion to strike Weir's hedonic regression opinion should be denied.

### c. Weir's "fixed percentage price premium" is sufficiently reliable.

Whirlpool next challenges Weir's price-premium damage opinion. Weir prepared this through a combination of the use of the conjoint and hedonic regression analyses discussed above, arguing that a fixed-price premium for an oven's self-cleaning feature should not be used to determine class-wide damages. (Dkt. 96). Plaintiffs respond that "Weir's theory of damages is focused on, and measures, Plaintiffs' loss of the benefit of the bargain ... that Plaintiffs and the putative class members they seek to represent purchased a 'selfcleaning' oven that could not 'self-clean' and were thereby damaged." (Dkt. 101, p. 23).

In support of Whirlpool's challenge to Weir's application of a fixed-price percentage premium across the spectrum of the putative class of Plaintiffs, it cites to its own expert, Ugone, who opines that the "average cannot be translated into damages individual consumers actually incurred" and "Weir's approach would not obviate the need for highly-individualized damages inquiries and will not help the trier of fact." (Dkt. 96 at pp. 20–24) (citing Ugone Rep. ¶ 44). Specifically, Whirlpool argues that "Weir's price premium percentage approach calculates an average effect of either the self-cleaning representation (conjoint) or the feature itself (hedonic regression) on price. But calculating an average effect across a group does not demonstrate that all individuals in the group experienced that effect." (Dkt. 96, p. 20 (citing Ugone Rep. ¶ 44) ).

Case 4:21-cv-02473 Document 89-4 Filed 09/06/24 in TXSD Page 259 of 292

Schechner v. Whirlpool Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 6843305

But Whirlpool's argument misconstrues the damages that Plaintiffs allege are being calculated. Plaintiffs contend the damages are not calculated based on a premium price paid for a cleaning oven, but instead that "the putative class members they seek to represent purchased a 'self-cleaning' oven that could not 'self-clean' and were thereby damaged." (Dkt. 101, p. 23). Plaintiffs allege that Weir's opinions are necessary to calculate a reimbursement due to Plaintiffs who now own a non-self-cleaning oven. With damages restricted to this distinction, "[n]o individual inquiry is necessary." (*Id.*) This is a subtle difference, but a meaningful one.

Moreover, Whirlpool is correct in that it borders on tautology to say that an average is necessarily not what all putative class members experienced: after all, it's an *average.* Some class members, at one end of the spectrum, may have been fervently hoping and wishing and praying for a self-cleaning oven, and been willing to pay a huge premium for that attribute; others may have put it at or near the bottom of their lists of oven attributes, but figured "hey, it's worth a few extra bucks." It's also possible that some consumers didn't think about it at all, they just walked down the store aisle and grabbed one they liked, completely ignorant of its fully self-cleaning or partially self-cleaning feature. The larger point is that it's an average, and Weir's analysis constitutes a facially reasonable attempt to isolate the self-cleaning benefit from other benefits. Weir's opinion is not so flawed that the jury should be prevented from hearing it (along with Whirlpool's and its expert's criticism) and deciding what weight, if any, to give it. Accordingly, I recommend that this Court deny Whirlpool's Motion to Strike the Opinions of Mr. Weir (Dkt. 96).[3]

[3] It borders on observing that obvious to say that Plaintiffs should be restricted from any later attempt to turn Weir's fixed-price premium opinions into "a price inflation suit or a fraud on the market suit," which Plaintiffs are clear they "have not alleged." (Dkt. 101, p. 24). If a class were to be certified, Plaintiffs should be restricted to using Weir's opinions to demonstrate "the price premium damages on [a] benefit of the bargain theory. Plaintiffs and the class members expected to receive an oven that could self-clean, but did not." (Dkt. 101, p. 24).

## 2. Plaintiffs' Motion to Strike the Opinions of Dr. Itamar Simonson (Dkt. 110) Should be Denied.

**\*9** Whirlpool retained Dr. Itamar Simonson to conduct consumer surveys and research related to ovens, self-cleaning options, and more specifically, the "pyrolytic self-cleaning technology." (Dkt. 122, p. 12). Plaintiffs' Motion to Strike the Opinions of Simonson was filed on July 27 (Dkt. 110). Whirlpool filed its Response in Opposition to Plaintiffs' Motion to Strike the Opinion of Simonson on August 21 (Dkt. 122) and Plaintiffs filed their reply on August 29 (Dkt. 131).

Plaintiffs move to exclude Simonson for eight separate reasons, each under Fed. R. Evid. 702 and *Daubert.* The eight reasons fall into three broad categories:

1. Simonson is not properly qualified;

2. Simonson's consumer survey is unreliable; and

3. the data collected by Simonson's survey was not processed properly.

For the reasons stated below, I recommend entry of an order denying the motion.

### a. Simonson is qualified to provide opinions on consumer research and consumer expectations.

Plaintiffs allege that Simonson is not properly qualified to provide opinions related to consumer research, and specifically consumer research he conducted in this matter about ovens that are "self-clean" or "pyrolytic" and conclusions about their functionality. (Dkt. 110, p. 2). Plaintiffs' argument is based on the premise that not only must Simonson have expertise in consumer behavior and consumer research, but that he also must have specialized knowledge in the technical operation of self-cleaning ovens to render opinions on consumers' beliefs about such ovens. This premise is inaccurate.

Rule 702 allows a witness "who is qualified as an expert by knowledge, skill, experience, training or education" to testify "in the form of an opinion or otherwise." The trial court's role is "to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 719 (E.D. Mich. 2015)

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 260 of 292
Schechner v. Whirlpool Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 6843305

(brackets in original) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ). "This requirement is treated liberally." *In re Iron Workers Local 25 Pension Fund*, Nos. 04-cv-40243, 07-cv-12368, 2011 WL 1256657, at *3 (E.D. Mich. Mar. 31, 2011).

First, Simonson's credentials are impressive, and his qualifications related to consumer research cannot be reasonably challenged. Simonson is a professor of Marketing at Stanford's Graduate School of Business. He has performed thousands of consumer surveys. Numerous other federal courts have recognized his qualifications as being sufficient to opine on consumer surveys and market research. *See e.g. Gross v. Bare Essentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 189 n.8 (S.D.N.Y. 2008) (finding, "Simonson is an experienced survey expert, having conducted, supervised, or evaluated over 1,000 marketing research studies."); and *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, CV 15–2370JVS(DFMx), 2017 WL 6611635, at *29 (C.D. Cal. Dec. 21, 2017) ("Simonson is exceptionally well credentialed in survey work."). Simonson has also been recognized as an expert with sufficient qualifications to provide opinions on the lack of reliability of surveys presented by other experts. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 626 n.210 (S.D.N.Y. 2007) ("Simonson is eminently qualified to analyze survey techniques and we will rely from time to time on his observations.").

Second, Plaintiffs attempt to characterize the opinions of Simonson as those of a technical expert on ovens, but Whirlpool is presenting him only as a consumer-survey and marketing-research expert. Plaintiffs contend, accurately in my view, that Simonson is not qualified to discuss the operation of traditional high-temperature (pyrolytic, or "pyro" for short) self-cleaning ovens. (Dkt. 110, p. 2). But again, Simonson's opinions are related only to the consumer survey data he collected, the summary of that data, and the issues he found with Plaintiffs' expert's surveys and data; Simonson is an expert in those areas. In short, Whirlpool is presenting him not as an oven expert, but as a *survey* expert. Plaintiffs' Motion to Strike Simonson for lack of qualifications, therefore, should be denied.

### b. Concerns with Simonson's survey questions go to the weight and not admissibility of his opinions.

**\*10** Plaintiffs' motion next raises several specific issues with the underlying survey used by Simonson, arguing that it rendered the data unreliable, including that: (1) The Home Depot Advertisement used in the survey failed to replicate market conditions (Dkt. 110, pp. 4–7); (2) the survey questions created confusion about the self-cleaning process (Dkt. 110, pp. 7–10); (3) the survey improperly accepted that self-cleaning attributes cannot be separated from other features (Dkt. 110, pp. 11–14); (4) the survey failed to account for other evidence known to Whirlpool (Dkt. 110, pp. 19–21); (5) the survey's open-ended questions regarding consumer purchase drivers led to non-exhaustive responses (Dkt. 110, pp. 21–22); and (6) the ultimate question asked, "What Is Pyrolytic?" should instead have been "What Is Self-Clean?" (Dkt. 110, pp. 22–24.)

Five of the six issues with Simonson's survey and opinions raised in Plaintiffs' motion, related to the survey and data, go merely to the weight of Simonson's opinions and do not affect their admissibility. Each raises concerns with the scope of the survey and the order of the questions, but these issues can be cured by "vigorous cross examination and an opportunity ... to introduce countervailing evidence." *Cornwood*, 290 F.3d. at 794 (citing *Daubert*, 509 U.S. at 596).

Only one of the issues raised by Plaintiffs merits further discussion and analysis: Simonson's use of the altered Home Depot advertisement. Simonson "split 202 respondents into a test group, and 202 respondents into a control group. Each group was shown a single advertisement of an AquaLift-containing oven" allegedly from Home Depot. (Dkt. 110, p. 4). Simonson modified a real Home Depot advertisement by inserting "AquaLift" before "Self-Cleaning." (Dkt. 110, p. 5) (citing Simonson Rep. ¶ 52).

Plaintiffs say that the altered Home Depot advertisement was a deviation from marketplace reality, rendering the opinions based on that survey data unreliable. But Plaintiffs don't cite legal authority to support the proposition that when conducting a consumer survey analysis, an expert should be limited to using only actual market advertisements. And in contradiction, courts have allowed experts to go further than Simonson did, even approving surveys where the entire product was an expert-created fiction. *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 535 (6th Cir. 2014) (expert created a fictitious brand); *Nat'l Distiller Prods. Co. v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 483–84 (S.D.N.Y. 2002) (expert created a fictitious product).

The only requirement for reliability, and hence admissibility, is that the advertisement was "approximating marketplace reality." See *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734 (E.D. Mich. 2003). Because Simonson's survey was based on an actual advertisement, it sufficiently replicated real-life consumer choice conditions. Accordingly, Simonson's opinions relying on responses to that survey should be admitted. The jury will be made up of people who are also consumers and use their own experience and judgment to compare the modified advertisement to market reality. Ultimately, any dispute over how closely Simonson's survey reflected market reality goes to weight, not admissibility. *Cf. Whirlpool Properties, Inc. v. LG Elecs. U.S.A. Inc.*, No. 1:03-cv-414, 2006 WL 62846, at \*4 (W.D. Mich. Jan. 10, 2006) (failure to recreate actual marketplace conditions went to weight, not admissibility).

In summary, Plaintiffs' Motion to Strike Simonson because of concerns with his consumer survey questions should be denied.

### c. Simonson's alleged coding / grouping errors are not significant enough to preclude admissibility.

After designing and executing his survey, Simonson provided to coders data to categorize responses to create groupings or categories for overlapping responses. (Dkt. 110, p. 14) (citing Simonson Rep, ¶ 115). Plaintiffs challenge the reliability of Simonson's survey data by challenging the work performed by the coders on which he relied, including that: (i) categories were comingled or subsumed in other categories (e.g., each specific step of cleaning a pyrolytic oven was counted in the cleaning category, even when Plaintiffs alleged they were technically not related to cleaning, such as waiting for the oven to cool); and (ii) categories were improperly grouped because they were unrelated. (Dkt. 110, pp. 14–19). Plaintiffs argue that the cumulative impact of the improper grouping of responses by consumers render Simonson's results unreliable.

**\*11** As with several arguments discussed above, Plaintiffs' arguments about the coding of Simonson's survey results properly challenge the weight of his opinions, but not their admissibility. As gatekeeper, the trial court only determines the admissibility of expert evidence; the jury determines its weight. *United States v. Stafford*, 721 F.3d 380, 393–94 (6th Cir. 2013) (citing *Daubert*, 509 U.S. at 595). And here, any potential prejudice from improper coding can be cured at trial by Plaintiffs: Whirlpool has produced the individual survey responses to them (Dkt. 122, Ex. J, survey responses), so if Plaintiffs want, they can test the veracity of the coding and challenge Simonson at trial, and even re-categorize the responses as they wish and argue to the jury that their sorting is more logical than Simonson's.

Accordingly, I recommend that this Court deny Plaintiffs' Motion to Strike the Opinions of Dr. Itamar Simonson (Dkt. 110).

### 3. Plaintiffs' Motion to Strike the Opinions of Dr. Keith Ugone (Dkt. 111) Should be Denied.

Whirlpool retained Dr. Keith Ugone as a rebuttal expert to counter Weir's approaches to class-wide damages. As discussed in some detail above, Weir calculated these through his conjoint analysis and hedonic regression approaches. (Dkt. 111, p. 4). Plaintiffs filed their Motion to Strike the Opinions of Ugone on July 27 (Dkt. 111). Whirlpool filed its response on August 21 (Dkt. 121). Plaintiffs filed their reply on August 29 (Dkt. 129).

Plaintiffs move to exclude Ugone under Fed. R. Evid. 702 and *Daubert* for two primary reasons: (1) Ugone is inherently biased; and (2) Ugone is not qualified to provide opinions to rebut a conjoint analysis or hedonic regression damage calculation. For the reasons stated below, I recommend entry of an order denying Plaintiffs' Motion to Strike the Opinions of Ugone (Dkt. 111).

Plaintiffs' first argument, that Ugone's opinions should be stricken because he is inherently biased, can be quickly dispensed with. Plaintiffs argue summarily that Ugone was retained merely to present his standard opinion challenging Weir's damage analysis, and that he's never opined that conjoint analysis or hedonic regression calculations are appropriate to determine class-wide damages. (Dkt. 111, p. 4). Plaintiffs fail to cite authority in support of their assertion that an expert should be automatically disqualified because he has never agreed with their approach. To the contrary, even if Ugone *were* inherently biased against Plaintiffs or their experts' opinions, caselaw is clear that such bias would go solely to the weight of an expert's opinion and is not a ground for exclusion. *See Cmtys. for Equity v. Michigan High Sch., Athletic Ass'n*, No. 1:98-cv-479, 2007 WL 5830967, at \*3 (W.D. Mich. May 2, 2007).

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 262 of 292
Schechner v. Whirlpool Corporation, Not Reported in Fed. Supp. (2018)
2018 WL 6843305

Plaintiffs' second argument to exclude Ugone is that, while they don't question his expertise "as an economist," his opinions are nonetheless unreliable because he lacks expertise in conjoint analysis and hedonic regression. (Dkt. 129, p. 2). Plaintiff point to the fact that Ugone "**did not even attempt** to calculate his own hedonic regression or conjoint analysis." (Dkt. 11, p. 4 (bold original).) While Plaintiffs focus on underlying reliability concerns to strike Ugone, the legal test is whether he "has sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 719 (E.D. Mich. 2015) (brackets in original) (quoting *Kumho Tire* ). "This requirement is treated liberally." *In re Iron Workers Local 25 Pension Fund*, Nos. 04-cv-40243, 07-cv-12368, 2011 WL 1256657, at *3 (E.D. Mich. Mar. 31, 2011).

Dr. Ugone's education, experience, and critical analysis of Plaintiffs' expert's reports demonstrate that he has the requisite amount of specialized knowledge to assist the jurors. First, Ugone holds a Ph.D. in economics, with education and experience necessary to generally rebut the opinions of Plaintiffs' economist, Weir. (Dkt. 121, p. 3). Second, Ugone's opinions include criticism of Weir's class-wide price premium damages for failing to consider consumers' economic realities. (Dkt. 121, p. 4). The fact that Ugone did not create his own conjoint analysis or hedonic regression does not preclude him from presenting his opinion that Weir's analysis may have overestimated damages. So this motion, too, should be denied.

### 4. Plaintiffs' Motion to Strike the Opinions of Dr. Robert Rauschenberger (Dkt. 112) Should be Denied.

**\*12** Whirlpool retained Dr. Rauschenberger to provide expert opinions related to human factors, including consumers' use and experiences with the Ovens. Rauschenberger's investigation included reviewing instructions, reviewing consumer reports, and even visiting several homes of consumers to inspect their ovens and the general cleanliness their households. (Dkt. 112, p. 13).

Plaintiffs' Motion to Strike the Opinions of Rauschenberger was filed on July 27 (Dkt. 112). Whirlpool filed its Response in Opposition to Plaintiffs' Motion to Strike the Opinions of Rauschenberger on August 21 (Dkt. 123). Plaintiffs filed their reply on August 30 (Dkt. 136). Plaintiffs move to exclude, under Fed. R. Evid. 702 and *Daubert*, each

of Rauschenberger's nine opinions labeled "Conclusions." Although not specifically enumerated as such, Plaintiffs argue that the nine Conclusions should be rejected for the following reasons:

1. the opinions are mere conclusions and would not assist the trier of fact (Nos. 1, 2, 4, and 5); [4]

2. Rauschenberger is not qualified (No. 3); and

3. the Conclusions are not reliable (Nos. 6, 7, and 9). [5]

[4]    Conclusion No. 8 was not specifically challenged and therefore is not the subject of Plaintiffs' motion. (Dkt. 112, p. 17).

[5]    Plaintiffs' motion also presented a direct attack on the general science behind human-factor analysis, arguing the entire field was speculative and unreliable. But Plaintiffs' reply abandoned this generalized attack, stating it "is not Plaintiffs' position" that the motion attacks "the entire human factors field." (Dkt. 136, p. 1).

For the reasons stated below, I recommend entry of an order denying Plaintiffs' Motion to Strike the Opinions of Rauschenberger (Dkt. 111).

### a. Rauschenberg's alleged conclusory opinions meet the thresholds of reliability and relevance for admissibility (Conclusions 1, 2, 4, 5, and 7).

Plaintiffs move to strike Conclusion Nos. 1, 2, 4, 5, and 7 through similar arguments: that each is merely a conclusion of the evidence, or a commonly known fact, and therefore should be rejected as an expert opinion. Review of each conclusion demonstrates it meets the threshold requirements of reliability under Fed. R. Evid. 702 and relevance under Fed. R. Evid. 401 for admissibility.

### i. Conclusions 1 and 2, that oven purchases are driven by more than one single factor and individuals vary, are relevant.

Plaintiffs attack Rauschenberger's opinions that appliance-purchase decisions are complex mental decisions not dominated by a single factor, like whether a cleaning feature on an oven conforms to an individual consumer's expectations

2018 WL 6843305

(Dkt. 112, p. 3) and that different individuals vary their threshold of what they consider "clean." (Dkt. 112, p. 5) (Conclusions Nos. 1 and 2).

Without acknowledging the bases for, or context of, Rauschenberger's Conclusions, Plaintiffs argue they should be excluded because they are "not a scientific conclusion" and are essentially common knowledge. (Dkt. 112, p. 3). Although each opinion may appear self-evident, they need to be examined in the context of the Plaintiffs' claims and Whirlpool's defenses. For example, variations in consumer thinking may be relevant for Plaintiffs' consumer-protection and warranty claims, the benefit-of-the-bargain element of their warranty claims, the state-of-mind element of their unjust-enrichment claims, and the broader question of class-wide damages.

**\*13** An opinion will not be rejected merely because it may have little relevance. *See In re Ford Motor Co. Spark Plug & 3-Valve Engine Prod. Liab. Litig.*, 98 F. Supp. 3d 919, 925 (N.D. Ohio 2014) (rejecting relevance challenge to human-factors expert's testimony about consumer expectations, noting Rule 401 deems evidence relevant if it has "*any* tendency to make a fact more or less probable"). The potential for variations in individual consumers is at least minimally relevant. Dr. Rauschenberg's Conclusions Nos. 1 and 2 should be admitted.

### ii. Conclusions 4 and 5, that some consumers have unrealistic expectations regarding "self-cleaning," is reliable and relevant.

Plaintiffs argue that Rauschenberger's Conclusions 4 and 5, opining that consumers have differing expectations of self-cleaning Ovens, should not be considered because they are opinions "on irrelevant variations and diversity among consumers." (Dkt. 112, pp. 8–9 and 11). In support of Conclusions Nos. 4 and 5, Dr. Rauschenberg reviewed Whirlpool source materials, including publicly available product literature describing how AquaLift Self-Clean Technology works, numerous peer-reviewed scientific publications, Whirlpool's internal consumer research, Plaintiffs' sworn deposition testimony, and *Consumer Reports* rankings from 2012 to 2017. (Dkt. 123, p. 9) (citing Dkt. 94-12, 120-1). Rauschenberger's human behavior conclusions, prepared from review of source material, along with his background education and training, render Conclusions 4 and 5 reliable under Rule 702 and at least

minimally relevant under Rule 401. As such, they should be admitted.

### iii. Conclusion 7, that historical "self-cleaning" models also required manual cleaning, is relevant.

Plaintiffs challenge Rauschenberger's Conclusion 7, that self-cleaning models have historically required some manual cleaning, by arguing this opinion is not relevant. Plaintiffs specifically request to strike this opinion by stating, "[w]hat bearing this factual conclusion has, however, on Plaintiffs' case is unclear." (Dkt. 112, p. 16). Although not specifically enumerated in Rauschenberger's Conclusion 7, there are a number of reasons why it could be relevant. For example, Plaintiffs contend that a specific value can be assigned for Plaintiffs' damages which resulted from having purchased an oven they believed was self-cleaning but that in fact didn't self-clean. Yet, if through Dr. Rauschenberg, Whirlpool can establish that no oven has ever been completely self-cleaning in the sense that it required no manual cleaning, Plaintiffs' supposed performance expectations could lose some credibility. And, as stated above, only minimal relevance is needed for admissibility. *See In re Ford Motor Co. Spark Plug & 3-Valve Engine Prod. Liab. Litig.*, 98 F. Supp. 3d 919, 925 (N.D. Ohio 2014).

### b. Rauschenberger has sufficient training and experience to provide Conclusion 3, an analysis of cleaning times for side-by-side ovens.

Plaintiffs next contend that Rauschenberger is not qualified to provide Conclusion 3, essentially an opinion providing the cleaning times for comparable ovens during a side-by-side test under "natural" conditions. (Dkt. 112, p. 7). Plaintiffs point out that Rauschenberger, the proffered human-factors expert, "does not have the qualification or expertise to compare ovens' cleaning options, capabilities, or required effort to run a self-clean cycle." (Dkt. 112, p. 7). Whirlpool argues in response that "Dr. Rauschenberger is a highly-qualified human factors expert whose opinions in this case flow directly from his specialized knowledge and training." (Dkt. 123, p. 1).

**\*14** Plaintiffs are correct that there is no evidence in the record that Rauschenberger is qualified to present expert opinions regarding performance characteristics of ovens. But that is not what he is doing in Conclusion 3. Instead,

Schechner v. Whirlpool Corporation, Not Reported in Fed. Supp. (2018)

2018 WL 6843305

Rauschenberg performed his side-by-side comparison test to determine what a consumer would do with different ovens. (Dkt. 112, p. 7) (citing Rauschenberger Dep. 101:3–102:7). Following his side-by-side analysis, Rauschenberger intends to opine, in part, that "after its 40 minute cleaning cycle, an AquaLift oven can be fully cleaned in 20 minutes." (Dkt. 112, p. 7). Dr. Rauschenberg's testing, and Conclusion 3, are relevant to his training and experience in human factors.

### c. Rauschenberg's Conclusions 6 and 9 are sufficiently reliable.

Plaintiffs' final challenge to Rauschenberger's Conclusions are that some are inherently unreliable, including Conclusion 6 opining that Ovens were misused by the named Plaintiffs (Dkt. 112, pp. 13–14), and Conclusion 9 opining that not all consumers are dissatisfied with their AquaLift Oven (Dkt. 112, p. 19).

The court's gatekeeper function under Rule 702 and *Daubert* requires that expert testimony be "the product of reliable principles and methods." Fed. R. Evid. 702(c). For the reasons below, each of the opinions meets the reliability threshold for admission.

### i. Conclusion 6, that Plaintiffs' misuse of the Ovens led to their dissatisfaction, is reliable.

Rauschenberger visited the home of six named Plaintiffs. During the visits he inspected the Ovens. (Dkt. 94-12, 120-1). At each inspection, he followed the parties' previously agreed-to protocol, which permitted him to visually inspect the oven, remove the oven door, photographically document the oven's condition, and run a variety of oven diagnostics." (Dkt. 123, p. 19).

Based on his observations during these inspections, Plaintiffs' testimony, scientific literature, and Whirlpool's instructions for how to use AquaLift, Rauschenberger reached several opinions related to Plaintiffs' cleaning preferences and oven usage. (Dkt. 123, p. 20). He identified "documented misuses of some of the name Plaintiffs' AquaLift ovens" and opined in Conclusion 6 that the "named Plaintiffs' dissatisfaction with their respective ovens is likely attributable, in part or whole, to these misuses." (Dkt. 112, pp. 13–14).

Plaintiffs contend that Rauschenberger misconstrued facts during the oven inspections and testimony of the Plaintiffs. But the court's focus is " 'solely on principles and methodology, not on the conclusions that they generate.' " *United States v. Stafford*, 721 F.3d 380, 393-94 (6th Cir. 2013) (quoting *Daubert*, 509 U.S. at 595). Because Rauschenberger cites to specific facts garnered during his inspections and specific testimony in the record, Plaintiffs' challenge to the reliability of his "misuse" opinion is not well founded.

### ii. Conclusion 9, that not all buyers of AquaLift ovens were uniformly dissatisfied with their Ovens, is reasonably reliable.

Dr. Rauschenberger's Conclusion 9, that not all consumers were dissatisfied with their AquaLift Oven, was presented to rebut Plaintiffs' expert, Dr. Kamins, who opined that a majority of consumers were dissatisfied. (Dkt. 123, p. 14). Plaintiffs argue that Rauschenberger's Conclusion 9 is unreliable because it "rests solely on documents provided to him by Whirlpool (or its counsel)." (Dkt. 112, p. 17). This argument fails for at least two reasons.

First, it's factually incorrect. A quick perusal of Rauschenberger's report shows that Whirlpool's documents were only one of many sources that he relied on to support his conclusion that dissatisfaction with AquaLift is not uniform. (Dkt. 123, p. 23). For example, he also reviewed and cited call-center data, explaining that low rates of consumer complaints suggests dissatisfaction with AquaLift. (*Id.*)

**\*15** Second, Plaintiffs' argument is legally incorrect. The mere fact that the documents and testimony may have been provided by Whirlpool or its counsel does not render the opinions, or documents themselves, unreliable. See *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 52 (S.D.N.Y. 2016) ("expert opinion ... is not per se unreliable because it relies on some unverified or inaccurate information provided by the expert's client" (omitting internal quotations) ). Rauschenberger's reliance on uncontroverted materials provided to him by Whirlpool demonstrates that Conclusion 9 is sufficiently reliable for admissibility.

Accordingly, I recommend that this Court deny Plaintiffs' Motion to Strike the Opinions of Dr. Rauschenberg (Dkt. 112).

**Schechner v. Whirlpool Corporation, Not Reported in Fed. Supp. (2018)**

2018 WL 6843305

## III. Conclusion and Summary of Recommendation

For the reasons stated in this Report and Recommendation, I recommend entry of an order providing the following relief:

1. Defendant Whirlpool Corporation's Motion to Strike the Opinions of Mr. Colin Weir (Dkt. 96) be **DENIED**;

2. Plaintiffs' Motion to Strike the Opinions of Dr. Itamar Simonson (Dkt. 110) be **DENIED**;

3. Plaintiffs' Motion to Strike the Opinions of Dr. Keith Ugone (Dkt. 111) be **DENIED**; and

4. Plaintiffs' Motion to Strike the Opinions of Dr. Robert Rauschenberger (Dkt. 112) be **DENIED.**

## IV. Notice Regarding Objection to Recommendation

Per Fed. R. Civ. P. 53(f)(2), the parties may object and seek review of this Recommendation within 21 days.

/s/ Daniel N. Sharkey

Brooks Wilkins Sharkey & Turco PLLC

401 S. Old Woodward Ave. Suite 400

Birmingham, Michigan 48009

248-971-1712; sharkey@bwst-law.com

Discovery Master

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6843305

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

# Case No. 19

2008 WL 656513

2008 WL 656513
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

David SEITZ and Microtherm, Inc., Plaintiffs,

v.

ENVIROTECH SYSTEMS

WORLDWIDE INC., et al., Defendants.

Civil Action No. H-02-4782.
|
March 6, 2008.

**Attorneys and Law Firms**

Loren G. Helmreich, Browning Bushman PC, Steve A. Bryant, Steve A. Bryant & Associates, Houston, TX, for Plaintiffs.

D. Scott Hemingway, Hemingway & Hansen LLP, Dallas, TX, for Defendants.

**MEMORANDUM AND ORDER**

LEE H. ROSENTHAL, District Judge.

*\*1* In 2002, David Seitz and Microtherm, Inc. (together, "Seitz") sued Envirotech Systems Worldwide, Inc. and Envirotech of Texas (together, "Envirotech"). Seitz alleged that the Envirotech ESI-2000 tankless water heater infringed four patents: U.S. Patent No. 5,886,880 (the ′880 Patent), U.S. Patent No. 6,080,971 (the ′971 Patent), U.S. Patent No. 5,216,743 (the ′743 Patent), and U .S. Patent No. 6,246,831 (the ′831 Patent). Seitz also alleged that Envirotech engaged in unfair competition through false advertising, in violation of the Lanham Act, 15 U.S.C. § 1125. In a previous memorandum and order, this court granted Envirotech's motion for summary judgment on the Lanham Act claims. (Docket Entry No. 152). This memorandum and order addresses the following motions:

- Seitz has moved to strike reports by Envirotech's expert witness, Dr. Jerome Butler, on the ground that, or to the extent that, Envirotech's attorney prepared them. (Docket Entry No. 181).

- Envirotech has moved to strike Seitz's opinion on damages and has moved for summary judgment on the issue of lost profits. (Docket Entry No. 166).

- Envirotech has moved for summary judgment that the ESI-2000 product does not infringe the ′743 Patent and the ′831 Patent. (Docket Entry No. 157).

- Envirotech has moved for reconsideration of its motion to dissolve the preliminary injunction. (Docket Entry No. 168).

Based on a careful consideration of the pleadings, the motions, responses, and replies, the record, and the applicable law, this court denies Seitz's motion to strike Dr. Butler's testimony, denies Envirotech's motion to strike Seitz's damages opinion and motion for summary judgment on lost profits, denies Envirotech's motion for summary judgment for noninfringement as to Patent Nos. ′743 and ′831, and grants Envirotech's renewed motion to dissolve the preliminary injunction

The reasons for these rulings are explained below. A hearing is set on Envirotech's motions for summary judgment on invalidity and noninfringement and on Seitz's motion to disqualify Envirotech's counsel, for **April 15, 2008, at 2:00 p.m.**

**I. Seitz's Motion to Strike Dr. Butler's Testimony**
Seitz has moved to strike the testimony of Envirotech's expert, Dr. Jerome Butler, on the ground that Envirotech's attorney rather than Dr. Butler prepared the reports he signed under Rule 26(a)(2) (B). Alternatively, Seitz has moved to strike those portions of the reports apart from the opinions that were added to drafts provided by the office of Seitz's attorney. (Docket Entry No. 181). Envirotech responded, (Docket Entry No. 183), and Seitz replied, (Docket Entry No. 184).

Under Rule 26(a)(2)(B), as amended in 1993, a party's expert designation "must be accompanied by a written report" that is "prepared and signed by the witness." The report must contain a complete statement of the opinions the witness will express and the basis and reasons for them, the data or other information considered by the witness, the witness's qualifications, a list of the cases in which the witness has testified as an expert, and the compensation paid to the expert for the work in the case. FED. R. CIV. P. 26(a)(2) (B). The 1993 Committee Note states that "Rule 26(a)(2)

Seitz v. Envirotech Systems Worldwide Inc., Not Reported in F.Supp.2d (2008)

2008 WL 656513

(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness." FED. R. CIV. P. 26 Committee Note (1993).

**\*2** Several courts have addressed the permissible amount of attorney involvement in drafting an expert report. These courts conclude that as long as the substance of the opinions is from the expert, the attorney's involvement in the written expression of those opinions does not make them inadmissible. In *Manning v. Crockett,* No. 95 C 3117, 1999 WL 342715, at \*3 (N.D.Ill. May 18, 1999), the court denied a motion to strike an expert based on the argument that he did not prepare the majority of his report himself. The court's approach recognized that "some attorney involvement in the preparation of an expert report is permissible" as long as the expert "substantially participate[s] in the preparation of his report." The court summarized its approach by stating that "the assistance of counsel contemplated by Rule 26(a)(2)(B) is not synonymous with ghost-writing." *Id., quoted in Trigon Ins. Co. v. United States,* 204 F.R.D. 277, 293 (E.D.Va.2001). "Preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it conflicts with Rule 26(a) (2)(B)'s requirement that the expert 'prepare' the report. Preparation implies involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement." *Id.* "Allowing an expert to sign a report drafted entirely by counsel without prior substantive input from an expert would read the word 'prepared' completely out of the rule." *Id.* The party seeking to strike an expert's testimony has the burden of proving that the report was "ghost-written." *Long Term Capital Holdings v. United States,* No. 01-CV1290(JBA), 2003 WL 21269586, at \*4 (D.Conn. May 6, 2003); *Trigon,* 204 F.R.D. at 295.

Seitz contends that Envirotech's counsel prepared the substance of Dr. Butler's expert reports and declarations. Envirotech acknowledges that the first drafts of Dr. Butler's expert reports and declarations were typed in counsel's office but asserts that the substantive content was based on what Dr. Butler communicated to Envirotech's counsel. "[T]he initial drafts of his reports were typed by office personnel at counsel's office *after* Dr. Butler reviewed the relevant materials, had numerous meetings with counsel, formed his own opinions in this matter, and articulated those opinions to counsel's office personnel." Dr. Butler then revised the drafts

of the reports by adding, deleting, and modifying content. (Docket Entry No. 183 at 2-3, 9-10).

In his October 19, 2007 deposition, Dr. Butler testified about how his August 2006, September 2006, and August 2007 expert reports were prepared. Dr. Butler stated that he reviewed relevant materials, developed opinions, and discussed those opinions with counsel in face-to-face and telephone meetings before any initial written drafts were created. (Docket Entry No. 183, Ex. A at 222-25). Dr. Butler stated that he "wrote some of the material in the original report.... But not all of the material." (*Id.* at 7). When asked who wrote the remainder of the first draft of the expert reports, Dr. Butler explained that "Mr. Hemingway's office prepared the-the documents." (*Id.* at 8). He stated that the expert reports reflected the opinions he had previously expressed to counsel. (*Id.* at 222-25). Dr. Butler asserted that he altered the initial draft reports that had been prepared by Envirotech's counsel's office. He stated that he "had a template to work with, and I modified it to reflect my opinions." (*Id.* at 9). He stated that "I actually added material, and I think-I crossed out some material." (*Id.* at 223).

**\*3** Envirotech produced fifteen of Dr. Butler's drafts of his reports. (*Id.* at 25). Envirotech did not produce a copy of the original August 2006 draft report. (*Id.* at 8-9). Dr. Butler stated that the original draft report was about ten pages long and grew by one or two pages after his additions, deletions, and other changes. (*Id.* at 11). Dr. Butler stated that there were "probably a couple" drafts of the August 2006 report. (*Id.* at 53-54). Dr. Butler identified two of the draft reports as being the "templates" for the September 2006 and August 2007 reports. (*Id* . at 54-55).

The drafts show that material was added, deleted, and reorganized, but the fundamental substance of the initial drafts was not altered. The record shows that Dr. Butler first communicated his opinions, the draft was prepared in counsel's office based on those communications, and Dr. Butler revised the drafts.

Envirotech has not met its burden of showing that Dr. Butler had so little involvement in preparing the reports of his opinions as to warrant striking his opinions. This is not a case in which an expert signed "a report drafted entirely by counsel without prior substantive input from an expert." *See Manning,* 1999 WL 342715, at \*3. The motion to strike Dr. Butler's expert testimony is denied.

## II. The Motion to Strike Seitz's Damages Opinion and Motion for Summary Judgment on Lost Profits

Envirotech has moved to strike Seitz's opinion on damages and has moved for summary judgment on the issue of lost profits. (Docket Entry Nos. 166, 167). Seitz responded, (Docket Entry No. 173), and Envirotech has replied, (Docket Entry No. 176).

### A. Seitz's Expert Opinion

Seitz provided an "Expert Opinion" dated August 14, 2006. He asserted $762,750 in damages for patent infringement and for violations of the Lanham Act.[1] (Docket Entry No. 167, Ex. A at 1). This amount was based on $175,500 in lost-profit damages due to infringement, $263,250 in reasonable royalties from sales of the infringing product, and $324,000 in damages for violations of the Lanham Act. (*Id.*). The infringement damages were based on Seitz's conclusion that his company, Microtherm, would have enjoyed at least 25% of Envirotech's sales from 2000 to 2005. Seitz based this conclusion on the assumption that Microtherm had a 25% market share of the electric whole-house tankless water heater business.[2] Although other companies also sold whole-house tankless water heaters, only Microtherm and Envirotech offered comparable products. Seitz also assumed that both Envirotech and Microtherm charged an average selling price of $450 per unit and made gross profits of 40%. Seitz used Envirotech's statement that it sold between 3,800 and 4,000 units to estimate Envirotech's sales at 3,900 units. Seitz calculated lost profits by multiplying the average profit per unit sold by the number of Envirotech's sales that Seitz predicts Microtherm would have made in the absence of the infringement (.40 x 450 x .25 x 3,900). (Docket Entry No. 167, Ex. A at 1, 3; Docket Entry No. 173, Ex. D at 1, 3; *Id.,* Ex. E at 1).

[1]    This court has already granted summary judgment in favor of Envirotech on Seitz's Lanham Act claims. (Docket Entry No. 152).

[2]    In the section of the August 14, 2006 "Expert Opinion" in which he performed his damages calculations, Seitz stated that Microtherm would have enjoyed at least 25% of the sales made by Envirotech during the 2000-2005 period, but in another part of the opinion he stated that Microtherm would have had at least a 50% chance of making the sales made by Envirotech. (Docket

Entry No. 167, Ex. A at 1, 4). Seitz used the 25% figure in the calculations. He also used this figure in an October 5, 2008 affidavit submitted with his response to the motion for summary judgment on damages and motion to strike. (Docket Entry No. 167, Ex. A at 1; Docket Entry No. 173, Ex. A at 4).

**\*4**  Seitz calculated a royalty rate by using a figure of 50% of the profits.[3] Seitz noted the fifteen factors for determining a reasonable royalty rate outlined in *Georgia Pacific* and emphasized that "[i]t was not my intention to license to others but to maintain a ownership relationship in a company with whom I granted an 'exclusive license.' " Seitz calculated the royalty rate damage figure by multiplying this percentage by the average profit per unit sold, and applied this to Envirotech's sales from 2000-2005, excluding the 25% of Envirotech sales that Seitz predicts Microtherm would have made in the absence of infringement, which Seitz already included in his lost profits calculation (.50 x .40 x 450 x 3,900 x .75). (Docket Entry No. 167, Ex. A at 1, 3; Docket Entry No. 173, Ex. D at 1, 3; *Id.,* Ex. E at 1).

[3]    In his August 14, 2006 "Expert Opinion," Seitz stated that "Microtherm, Inc. should have enjoyed at least 25% of the sales made by Envirotech" and that "[r]easonable royalties based on same 25% profit participation is 20% of $90 x 2,925 = $263,250." (Docket Entry No. 173, Ex. D at 1). In a "Supplement to 'Expert Opinion Dates 8/15/06' " dated August 17, 2006, Seitz made the following correction: "Opinion of Damages: Line 8 reading 'Reasonable royalties based on same 25% profit participation is 20%' should read 'Reasonable royalties based on a 50% profit participation is 20%.'" (*Id.,* Ex. E at 1

Seitz asserts that he is qualified to render expert opinions on lost profits and reasonable royalty rates because of his experience in financial underwriting and his years of work in the electric tankless water heater business. Seitz has over twenty years of experience in corporate finance and mortgage banking for residential and commercial businesses. His principal function during this time was to prepare financial underwriting and secure financing based on his underwriting analysis, and most of this work was related to financing buildings. (Docket Entry No. 167, Ex. A at 3). Seitz has been involved in the electric water heater business for close to twenty years, including as president and CEO of Microtherm and its predecessor company. Seitz designed and marketed water heaters and solicited investors. His work involved

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 270 of 292
Seitz v. Envirotech Systems Worldwide Inc., Not Reported in F.Supp.2d (2008)
2008 WL 656513

preparing market research, market projections, and market share information. Part of his job as CEO of Microtherm is to stay abreast of market trends and competitors' products, which requires him to study market share reports and market research performed by companies such as DuPont. (Docket Entry No. 173, Ex. A at 3). Envirotech contends that Seitz is not qualified to offer an opinion on damages under Federal Rule of Civil Procedure 702, that he has not provided any reliable or supported opinions regarding damages, and that his analysis is incorrect as a matter of law. (Docket Entry No. 167 at 2).

Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The trial judge must determine whether a designated witness is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir.1998) (en banc). The party offering the challenged expert opinions need not, however, prove "that the expert's testimony is correct." *Id.* The district court must also make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether the reasoning or methodology can be applied to the facts at issue [the relevance analysis]." *Skidmore v. Precision Printing & Packaging, Inc.,* 188 F.3d 606, 617 (5th Cir.1999) (quoting *Daubert,* 509 U.S. at 592-93). The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152. The court "must ensure that the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.,* 394 F.3d 320, 325 (5th Cir.2004).

**\*5** Seitz's experience as a financial underwriter does not qualify him to give testimony on lost profits from patent infringement of, or reasonable royalty rates for patent rights to, the water-heater technology at issue. An expert's qualifications must be relevant to the issues in a case. *See Smith v. Goodyear Tire & Rubber Co.,* 495 F.3d 224, 227 (5th Cir.2007) (finding that a polymer scientist was not qualified to give an expert opinion in a tire malfunction case because the scientist had no experience in applying polymer science to tires); *Wilson v. Woods,* 163 F.3d 935, 938 (5th Cir.1999) (finding that a witness with a general mechanical engineering background was not qualified to offer expert testimony on a car accident); *Houston-Hines v. Houston Indep. Sch. Dist.,* No. Civ.A. H-04-3539, 2006 WL 897209, at \*3 (S.D.Tex. Apr.4, 2006) ("Although Mr. Simmons could conceivably be found qualified in a different case involving routine law enforcement activities, his lack of training and experience in a school situation leaves him unqualified to serve as an expert in this particular case.") Seitz's financial underwriting work did not involve calculating lost profits from patent infringement or reasonable royalty rates. Beyond simply reciting that he reviewed the *Georgia Pacific* factors, Seitz does not explain how they support the 50% royalty rate figure. *See Minebea Co. v. Papst,* No. Civ.A. 97-0590(PLF), 2005 WL 1459704, at \*3 (D.D.C. June 21, 2005) (refusing to allow an expert "to testify as to the calculation of a reasonable royalty because it is unclear what facts or data he has relied upon and his methodology is unreliable."). The record does not disclose sufficient facts or analysis to qualify Seitz's testimony for admission under Rule 702.

Even if Seitz's opinion on lost profits and reasonable royalties is inadmissible as an expert opinion under Rule 702, he may provide a lay opinion on lost profits and reasonable royalty rates. "[A] layman can under certain circumstances express an opinion even on matters appropriate for expert testimony." *Miss. Chem. Corp. v. Dresser-Rand Co.,* 287 F.3d 359, 373 (5th Cir.2002) (quoting *Soden v. Freightliner Corp.,* 714 F.2d 498, 511 (5th Cir.1983)) (quotations omitted). Seitz's experience in and personal knowledge of the water-heater market qualifies him to give a lay opinion on lost profits or reasonable royalty rates based on his personal knowledge and experience.

Under Federal Rule of Evidence 701, "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the

2008 WL 656513

witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The third element of Rule 701, which requires that lay opinion not be based upon scientific, technical, or other specialized knowledge within the scope of Rule 702, was added in 2000 "to prevent litigants from skirting the *Daubert* standard or the expert disclosure guidelines by introducing expert opinion testimony as lay opinion testimony." *Hynix Semiconductor Inc. v. Rambus Inc.,* Nos. CV-00-20905 RMW, C-05-00334 RMW, C-06-00244 RMW, 2008 WL 504098, at *3 (N.D.Cal. Feb.19, 2008) (citing FED.R.EVID. 701 Committee Note (2000)). However, "[w]hile the text of Rule 701 appears unflinching in separating lay opinions from expert opinions, the advisory committee note regarding the amendment blinks ." *Id.* The Committee Note "suggest[s] that the amended rule preserves certain prior practices, for example, permitting business owners to opine on expected profits or the value of property." *Id* . The Committee Note approvingly refers to cases in which "courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert," reasoning that "[s]uch opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." FED.R.EVID. 701 Committee Note (2000). The Committee Note explicitly states that "[t]he amendment does not purport to change this analysis." *Id.* After reviewing the 2000 amendment to Rule 701 and the preexisting case law, one court concluded that despite the revised Rule's "unflinching" separation of lay and expert opinion, "the rules of evidence have long permitted a person to testify to opinions about their own businesses based on their personal knowledge of their business ... and the court does not believe that the revised Rule 701 was meant to work a sea change with respect to that form of personal testimony." *Hynix Semiconductor Inc.,* 2008 WL 504098, at *4.

**\*6** Courts have allowed lost-profit or lost-sales testimony by a lay witness if the witness has direct knowledge of the business accounts underlying the profit calculation. *See Miss. Chem. Corp.,* 287 F.3d at 373-74 (allowing Rule 701 testimony by director of risk management and property taxation concerning the amount of lost profits caused by a defective compressor train); *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1175 (3d Cir.1993) (allowing Rule 701 testimony by the owner of a corporation as to the amount of lost profits); *In re Merritt Logan, Inc.,* 901 F.2d 349, 359

(3d Cir.1990) (allowing Rule 701 testimony by the principal shareholder of the plaintiff concerning that company's lost profits); *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 265 (2d Cir.1995) ("[A] president of a company, such as Cook, has 'personal knowledge of his business ... sufficient to make ... him eligible under Rule 701 to testify as to how lost profits could be calculated.' ") (internal citations and quotations omitted).

Seitz's opinion on damages, based on his personal knowledge of his company's sales and the market for tankless electric water heaters, is admissible as a lay opinion. The motion to strike Seitz's damages opinion is denied.

### B. Envirotech's Motion for Summary Judgment on Lost Profits

The award of damages for patent infringement is governed by 35 U.S.C. § 284 (2000), which provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." Under the statute, there are two different possible measures of damages in a patent infringement case. "If the record permits the determination of actual damages, namely, the profits the patentee lost from the infringement, that determination accurately measures the patentee's loss. If actual damages cannot be ascertained, then a reasonable royalty must be determined." *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1078 (Fed.Cir.1983). The amount of damages resulting from patent infringement is a question of fact on which the patent holder bears the burden of proof. *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 1 F.3d 1214, 1217 (Fed.Cir.1993).

"To recover lost profits as opposed to royalties, a patent owner must prove a causal relation between the infringement and its loss of profits. The patent owner must show that 'but for' the infringement, it would have made the infringer's sales." *Id.* at 1218; *accord Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 507, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964); *Riles v. Shell Exploration and Prod. Co.,* 298 F.3d 1302, 1311 (Fed.Cir.2002). "An award of lost profits may not be speculative .... the patent owner must show a reasonable probability that, absent the infringement, it would have made the infringer's sales." *BIC Leisure Products,* 1 F.3d at 1218. "This formulation requires the patentee to reconstruct the market, by definition a hypothetical enterprise, to project economic results that did not occur." *Riles,* 298

F.3d at 1311. "To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing Corp. v. Am. Maize-Products Co.,* 185 F.3d 1341, 1350 (Fed.Cir.1999).

**\*7** A "reasonable royalty may be based upon an established royalty, if there is one, or if not upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing licensee." *Hanson,* 718 F.2d at 1078. "Where an established royalty rate for the patented inventions is shown to exist, the rate will usually be adopted as the best measure of reasonable and entire compensation." *Id.* (quoting *Tektronix, Inc. v. United States,* 213 Ct.Cl. 257, 552 F.2d 343, 347 (1977)) (quotations omitted). If there is no established royalty rate, the reasonable royalty rate must be based on "a hypothetical negotiation between the patentee and the infringer at a time before the infringement began." *Riles,* 298 F.3d at 1311. "[T]his analysis necessarily involves some approximation of the market as it would have hypothetically developed absent infringement" and "requires sound economic and factual predicates." *Riles,* 298 F.3d at 1311; *see also Crystal Semiconductor,* 246 F.3d 1336 (Fed.Cir.2001); *Shockley v. Arcan, Inc.,* 248 F.3d 1349 (Fed.Cir.2001). "A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment." *Riles,* 298 F.3d at 1313.

Seitz has submitted competent summary judgment evidence on the issue of lost profits. Seitz's opinion explains the causal relationship between the infringement and the loss of profits. *See BIC Leisure Prods., Inc.,* 1 F.3d at 1218. This opinion is not speculative but is based on Seitz's personal knowledge of, and experience with, the market and the competing products. The flaws Envirotech asserts are present in the calculation are appropriate subjects for cross-examination.

The motion for summary judgment on lost profits is denied.

## III. Envirotech's Motion for Summary Judgment for Noninfringement on Patent Nos. ′743 and ′831

In the first amended complaint, Seitz deleted infringement claims as to the ′743 Patent and the ′831 Patent that had been asserted in the original complaint. (Docket Entry Nos. 1, 136). Before Seitz filed the amended complaint, Envirotech counterclaimed for a declaratory judgment as to noninfringement and moved for summary judgement that the

′743 and ′831 Patents were not infringed. On June 19, 2007, this court denied Envirotech's motion for summary judgment as to noninfringement of the ′743 and ′831 Patents because Envirotech did not counterclaim for a declaratory judgment in its answer to the amended complaint, which superseded the earlier answer containing the counterclaim. (Docket Entry No. 152). In doing so, this court noted that the record showed no evidence supporting a claim of infringement of the ′743 and ′831 Patents and recognized that Seitz's expert witness acknowledged in two reports that the materials he had reviewed provided no basis to find that Envirotech's ESI-2000 infringed the ′743 and ′831 Patents. This court granted Envirotech leave to amend its answer to add a counterclaim for declaratory judgment and to reassert the motion for summary judgment.

**\*8** On August 3, 2007, Envirotech filed an amended answer containing a counterclaim for declaratory judgment as to noninfringement of the ′743 and ′ 831 patents, (Docket Entry No. 159 at 16-17), and again filed for summary judgment as to noninfringement of the ′743 and ′831 patents, (Docket Entry Nos. 157, 158). Seitz has responded, (Docket Entry No. 160), and Envirotech has replied, (Docket Entry No. 161).

Seitz has "conceded to this Court that [he] is unable to prove by a preponderance of the evidence that the software code provided to the Plaintiffs infringed all the features of any independent claims of the ′743 and ′831 patents." (Docket Entry No. 160 at 2). It is undisputed that Seitz has not identified or presented evidence to support a finding of infringement for these patents. Seitz argues that this court should not grant summary judgment because there is no "justiciable controversy." (*Id.* at 2). A declaratory-judgment counterclaim may be brought only to resolve an "actual controversy" between "interested" parties. 28 U.S.C. § 2201(a). Seitz states that the ESI-2000 is no longer being manufactured and that he has "stipulated that [he] will not sue the ESI for infringement of these two patents by the ESI 2000." (Docket Entry No. 160 at 3). Seitz recognizes that "dropping these two patents act[s] as an estoppel to prevent Plaintiffs from later contending that the ESI-2000 does infringe either the ′743 or ′831 patent." *Id.* at 2.

Justiciability requires "both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Super Sack Mfg. Corp. v.*

*Chase Packaging Corp.,* 57 F.3d 1054, 1058 (Fed.Cir.1995). The "purpose of the two-part test is to determine whether the need for judicial attention is real and immediate" so that a federal court has jurisdiction, or whether it is "prospective and uncertain of occurrence" and no jurisdiction is present. *Id.* " '[P]resent activity' might imply that pre-complaint conduct is not relevant, when it is: Just as a patent-holder can sue based on past acts that no longer continue, a declaratory-judgment plaintiff can sue using past acts as the jurisdictional predicate for the suit, provided the plaintiff has the requisite reasonable apprehension as to these past acts." *Sierra Applied Sciences, Inc. v. Advanced Energy Indus., Inc.,* 363 F.3d 1361, 1376 (Fed.Cir.2004) (citing *Super Sack,* 57 F.3d at 1058).

Seitz cites *Augustine Medical, Inc. v. Gaymar Industries, Inc.,* 181 F.3d 1291 (Fed.Cir.1999), as support for the argument that summary judgment is not appropriate with respect to the ′743 and ′831 patents because there is no longer an "actual controversy" between the parties with respect to these claims. In *Augustine Medical,* the court stated that a "stipulation and dismissal of claims with prejudice eliminated any potential case or controversy and thereby mooted [the opposing party's] claim of invalidity." *Id.* at 1304. Seitz has not dismissed the infringement claim as to the ′743 and ′831 Patents with prejudice, but he has deleted those claims from the amended complaint and stipulated that he "will not sue the ESI for infringement of these two patents by the ESI 2000." In *Super Sack Manufacturing Corp. v. Chase Packaging Corp.,* 57 F.3d 1054 (Fed.Cir.1995), the court found no justiciable controversy when a patentee unconditionally agreed that he would not claim that a line of the defendants' products infringed a patent. *Super Sack* supports a finding that there is no justiciable controversy in the present case with respect to the ′743 and ′831 Patents.

**\*9** The fact that Seitz continues to blame Envirotech for not producing the information that might have enabled him to show infringement does not detract from Seitz's stipulation that he will not press any claim that the ESI-2000 infringes the ′743 and ′831 Patents. Envirotech has no reasonable apprehension that it will be sued for infringing the ′743 and ′831 Patents based on its production and sale of the ESI-2000. There is no case or controversy as to that claim.

Envirotech's motion for summary judgment for noninfringement on the ′743 and ′831 patents is denied as moot.

## IV. Envirotech's Renewed Motion to Dissolve the Preliminary Injunction

On December 5, 2005, after an evidentiary hearing, this court entered a preliminary injunction order. (Docket Entry No. 47). That order enjoined Envirotech from marketing or selling the ESI-2000 heater or other heater using technologies that infringed Seitz's patents. After Envirotech moved to dissolve or modify the preliminary injunction, (Docket Entry No. 123), this court denied the motion to dissolve but granted the motion to modify, conditioned on Seitz filing: (1) a proposed amended order that described, with specificity, the technologies used in, or the parts of, the accused ESI-2000 and related devices that allegedly infringe the ′880 and ′971 Patents; and (2) a memorandum in support of the proposed amended preliminary injunction order, explaining the specific description and citing to and analyzing the evidence in the record supporting the infringement. (Docket Entry No. 153).

On June 29, 2007, Seitz filed a memorandum in support of an amended preliminary injunction. On September 20, 2007, Envirotech responded to Seitz's proposed modified injunction memorandum and moved for reconsideration of the motion to dissolve the preliminary injunction. (Docket Entry No. 168). Seitz responded to Envirotech's motion for reconsideration of the motion to dissolve the preliminary injunction and replied to

Envirotech's response to Seitz's proposed modified injunction memorandum. (Docket Entry No. 172). Envirotech replied. (Docket Entry No. 177).

The preliminary injunction issued in December 2005 states in part that Envirotech may not market or sell its ESI-2000 water heater, including any configurations, any other heater utilizing parts of the ESI-2000, and any other heater "utilizing in whole any part any technology embodied in the Model ESI 2000 heater." The quoted portion of the injunction order contains a typographical error, pointed out in Envirotech's original motion to dissolve the injunction. In that motion, Envirotech argued that, in addition to the need to correct the typographical error and clarify the ambiguity it created, the injunction should be dissolved because there had been no showing of infringement, the patents were invalid, the injunction was ambiguous for other reasons, Seitz had received a large damage award for lost sales of the same water heaters that were allegedly infringed, and Envirotech had suffered financially. (Docket Entry No. 123). Seitz responded by arguing that the injunction was clear and was properly entered. Seitz pointed to Envirotech's use of

2008 WL 656513

the bankruptcy process to avoid disclosing evidence of its infringing activities in this lawsuit and argued that the patents were valid. Seitz also argued that modifying the injunction could not help Envirotech because the accused technologies were assigned to another company, and that the award of damages in an unrelated lawsuit was irrelevant. (Docket Entry No. 126).

 **\*10** The injunction was based on an evidentiary hearing held in December 2005. (Docket Entry No. 51). At the conclusion of that hearing, this court found that Envirotech had abused the bankruptcy process to obstruct discovery in this case and to continue selling the ESI-2000. Documents admitted in the December 2005 hearing showed that Envirotech recognized the need for design changes in the ESI-2000 to avoid infringing Seitz's patents. When that injunction was entered, because of Envirotech's bankruptcy and the related stay, little discovery had taken place in this case. In the order denying the motion to dissolve and granting the order to modify, this court noted that discovery had proceeded and that Seitz and Envirotech both had more information about the accused devices and the alleged infringement.

This court found that the order should be modified to clarify that the injunction properly prohibits only the use of technologies in the accused devices that infringe the ′971 and ′880 Patents. Such modification is necessary to comply with Rule 65(d) of the Federal Rules of Civil Procedure, which requires that an injunction order be "specific in terms" and "describe in reasonable detail" the acts restrained. In patent cases, an injunction should "limit its prohibition to the manufacture, use, or sale of the specific infringing device, or to infringing devices no more than colorably different from the infringing device." *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.,* 986 F.2d 476, 479-80 (Fed.Cir.1993). This court directed Seitz to:

> provide a specific description of the technologies and aspects of the accused devices that infringe the ′971 and ′880 Patents. No later than June 29, 2007, Seitz must submit a proposed modified injunction order that states with specificity the technologies used in, or the parts of, the accused ESI-2000 and related devices that infringe U.S. Patents Nos. 5,886,880 and 6,080,971. Seitz must also file

> a memorandum in support of the proposed order that explains the specific description and that cites to and analyzes the evidence in the record that supports the infringement he describes. Envirotech may respond no later than July 20, 2007. If appropriate, this court will enter a modified injunction order based on the parties' submissions.

(Docket Entry No. 153 at 5-6).

Seitz did not submit a proposed modified injunction order. Although Seitz's June 29, 2007 memorandum in support of an amended preliminary injunction cites evidence that allegedly supports a finding that the ESI-2000 and related products infringe the ′880 and ′971 Patents, the memorandum does not present a sufficiently specific and tailored preliminary injunction order. To the contrary, the memorandum incorrectly identifies one of the patents that was infringed. And the memorandum sets out the four components that are asserted to constitute the alleged infringement at an unacceptable level of generality and by referring to another document, a copy of the ′971 Patent itself. This does not provide sufficient notice of the prohibited activity and does not meet the requirements of Rule 65. *See Seattle-First Nat'l. Bank v. Manges,* 900 F.2d 795, 799-800 (5th Cir.1990) (strictly construing the "no-reference" requirement of Rule 65(d) to require that the injunction order be capable of interpretation from the four corners of the order); *see also Dupuy v. Samuels,* 465 F.3d 757, 758 (7th Cir.2006) ("[Rule 65] requires that an injunction be a self-contained document rather than incorporate by reference materials in other documents."); *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.,* 84 F.3d 367, 371 (10th Cir.1996) (strictly construing the "no-reference" requirement of Rule 65(d)); *Thomas v. Brock,* 810 F.2d 448, 450 (4th Cir.1987) (same).

 **\*11** The existing order cannot remain in place because it does not comport with Rule 65 of the Federal Rules of Civil Procedure for injunction orders or with the Federal Circuit standards for injunction orders specifically relating to patents. *See* FED. R. CIV. P. 65(d); *Additive Controls,* 986 F.2d at 479-80; *Manges,* 900 F.2d at 799-800. Seitz has not presented the court with an acceptable proposed modified injunction order.

Seitz v. Envirotech Systems Worldwide Inc., Not Reported in F.Supp.2d (2008)

2008 WL 656513

The motion to dissolve the preliminary injunction is granted.

**V. Conclusion**

This court denies Seitz's motion to strike Dr. Butler's testimony, denies Envirotech's motion to strike Seitz's damages opinion and motion for summary judgment on lost profits, denies as moot Envirotech's motion for summary judgment for noninfringement on Patent Nos. ′743 and ′831, and grants Envirotech's renewed motion to dissolve the preliminary injunction. Envirotech has also filed motions for summary judgment on patent invalidity and noninfringement as to the ′880 and ′971 patents, and Seitz has filed a motion to disqualify Envirotech's attorney, D. Scott Hemingway. This court will hold a hearing on these motions on **April 15, 2008, at 2:00 p.m.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 656513

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 20

**2021 WL 148061**
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Austin Division.

Carolyn SMITH, et al., Plaintiffs

v.

The CITY OF BASTROP, et al., Defendants

Case No. 1:19-CV-1054-RP
|
Signed 01/15/2021

**Attorneys and Law Firms**

Raymond E. White, Ethan Jacob Ranis, Richard D. Milvenan, McGinnis Lochridge and Kilgore, L.L.P., Austin, TX, for Plaintiffs.

Bradford Eugene Bullock, George Edward Hyde, Russell Rodriguez Hyde Bullock, LLP, Georgetown, TX, for Defendants The City of Bastrop, Connie Schroeder, Willie "Bill" Lewis Peterson, Drusilla Rogers, Lyle Nelson, Bill Ennis, Dock Jackson, Lynda Humble, Rick Womble, Michelle Dodson, Tabitha Pucek.

Carl R. Dawson, Ryan & Dawson, Houston, TX, for Defendant Forestar (USA) Real Estate Group, Inc.

Jeffrey Jackson Hobbs, Michael J. Whellan, Armbrust & Brown PLLC, Austin, TX, for Defendant TF Hunters Crossing, L.P.

**ORDER**

SUSAN HIGHTOWER, UNITED STATES MAGISTRATE JUDGE

**\*1** Before the Court are Plaintiffs' Motions to Exclude Defendants' Experts Julie Y. Fort (Dkt. 61) and Patrick R. Bourne (Dkt. 62), filed on October 5, 2020, and the associated response and reply briefs. The District Court referred the Motions and related filings to the undersigned Magistrate Judge for disposition, pursuant to 28 U.S.C. § 636(b)(1) (A), Federal Rule of Civil Procedure 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

**I. Background**

This case arises out of allegedly illegal assessments that the City of Bastrop levied against property owners in a public improvement district. On October 28, 2019, Plaintiffs Carolyn Smith, The Village at Hunters Crossing, LLC, and Lirtex Properties, LLC filed suit against the "City Defendants," which are the City of Bastrop, Texas, the City Council members for the City of Bastrop,[1] and the Directors of Hunters Crossing Local Government Corporation,[2] and the "Developer Defendants," Forestar (USA) Real Estate Group, Inc. ("Forestar") and its successor-in-interest, TF Hunters Crossing, L.P. ("TFHC").[3]

[1]     Connie Schroeder, Willie Lewis "Bill" Peterson, Drusilla Rogers, Lyle Nelson, Bill Ennis, and Dock Jackson, each in his or her official capacity as a member of the City Council of the City of Bastrop.

[2]     Lynda Humble (replaced by Trey Job) (Dkt. 71 at 1), Drusilla Rogers, Rick Womble, Michelle Dodson, Lyle Nelson, and Tabitha Pucek, each in his or her official capacity as a Director of Hunters Crossing Local Government Corporation.

[3]     On September 2, 2020, the District Court granted Defendant Forestar's motion to dismiss. Dkt. 54. The Court then entered partial final judgment under FED. R. CIV. P. 54(b), severing and resolving all claims against Forestar. Dkt. 79. TFHC is the remaining Developer Defendant. Dkt. 55 ¶ 18.

On September 11, 2001, the City of Bastrop passed a resolution creating the Hunters Crossing Public Improvement District ("PID"), pursuant to the Texas Public Improvement District Assessment Act, TEX. LOC. GOV'T CODE §§ 372.001-372.030 ("PIDA Act"). Dkt. 64-4. According to a Service and Assessment Plan ("SAP") adopted by a 2003 Ordinance, the PID levies assessments based on the assumed value of the property benefited by construction of the proposed public improvement, subject to adjustments for benefits received, as authorized by TEX. LOC. GOV'T CODE § 372.015. Dkts. 64-5, 64-6. In 2004, the City passed an ordinance amending the 2003 SAP due to "scrivener's and mathematical errors." Dkt. 64-7 at 2. The Defendants assert that, after the 2004 Ordinance, the City adopted other ordinances, resolutions, and budgets affecting the PID. Dkt. 71 at 43 n.153. Plaintiffs dispute that Defendants amended the

PID assessments or allocations between 2004 and 2019. Dkts. 64 at 8, 71 at 18-25.

On September 24, 2019, the City adopted Resolution No. R-2019-86 and Ordinance No. 2019-40 (the "2019 Ordinance"), which allocated $14,151,436 in costs to the Developer Defendants as of 2020. Dkt. 64-16 at 21. The City also ratified an agreement between the City Defendants and the Developer Defendants in which the Developer Defendants would accept a reduced total payment of $11,961,260. *Id.* at 8. Plaintiffs assert that the 2019 Ordinance increased the SAP by nearly $2 million for cost overruns that had accrued in previous years and illegally included capitalized interest in the principal balance. Dkt. 64 at 2. Defendants assert that the 2019 Ordinance did not increase the 2003 assessment, but apportioned it on a parcel-by-parcel basis. Dkt. 71 at 2.

 **\*2** Plaintiffs seek declarations that the 2019 Ordinance is invalid and violates procedural and substantive due process under the United States and Texas Constitutions, and that the City Defendants have acted *ultra vires* in seeking to enforce it. Dkt. 55 at 16-17. Plaintiffs also ask the Court to enter a permanent injunction against enforcement of the 2019 Ordinance. *Id.* at 17-18. Finally, Plaintiffs assert that TFHC engaged in a civil conspiracy with the Bastrop City Council and Directors of the Hunters Crossing Local Government Corporation to cover up the City Defendants' statutory violations, and negligently misrepresented or omitted information related to the PID assessments. *Id.* at 18-20.

On September 22, 2020, the City Defendants and TFHC filed their Designations of Expert Witnesses, each identifying Julie Y. Fort and Patrick R. Bourne as testifying experts. Dkts. 56, 57. Plaintiffs seek to exclude the expert testimony and reports of Fort and Bourne in their entirety.

## II. Legal Standard

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that scientific testimony or evidence is not only relevant, but also reliable. Subsequently, Rule 702 of the Federal Rules of Evidence was amended to provide that a witness

qualified as an expert ... may testify ... in the form of an opinion ... if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting FED. R. EVID. 702). The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). The overarching focus of a *Daubert* inquiry is the "validity and thus evidentiary relevance and reliability of the principles that underlie a proposed submission." *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 594-96). The proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony. *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). Because the *Daubert* test focuses on the underlying theory on which the opinion is based, the proponent of expert testimony need not prove that the expert's testimony is correct, but rather that the testimony is reliable. *Moore*, 151 F.3d at 276. This determination of reliability includes a preliminary determination "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Trial courts ordinarily apply four factors when considering the reliability of scientific evidence: (1) whether the technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. *Id.* This test of reliability is "flexible," and these factors "neither necessarily nor exclusively apply to all experts or in every case." *Kumho*

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 279 of 292

Smith v. City of Bastrop, Not Reported in Fed. Supp. (2021)

2021 WL 148061

*Tire*, 526 U.S. at 141. "Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142.

 **\*3**  Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. In addition, *Daubert*'s "gatekeeping" aspects do not fully translate to bench trials like the case at bar. *Palm Valley Health Care Inc. v. Azar*, 947 F.3d 321, 330 (5th Cir. 2020); *see also Air Evac EMS, Inc. v. Sullivan*, 331 F. Supp. 3d 650, 657 (W.D. Tex. 2018) ("Safeguards such as those provided for in Rules 701 and 702 and discussed in *Daubert* are largely irrelevant in the context of a bench trial.").

### III. Analysis

The Court addresses in turn the each of Plaintiffs' Motions to Exclude.

### A. Julie Y. Fort

Defendants have designated Julie Y. Fort as an expert on the creation, operation, and use of PIDs under Chapter 372 of the Texas Local Government Code. Dkts. 56 at 2, 57 at 2. Fort is designated to testify as to (1) the desirability and practicability of the creation of PIDs under Chapter 372; (2) the framework for establishing PIDs and levying assessments; (3) matters related to Plaintiffs' alleged incorrect legal assumptions under the Act; and (4) application of the Act to the properly levied assessments under the ordinance adopted by the City of Bastrop. *Id.*

Fort is an attorney and partner in the law firm Messer, Fort & McDonald PLLC. Dkt. 61-1 at 3. As part of her law practice, she provides legal services and advice to municipalities throughout Texas. *Id.* Fort has served as a City Attorney, Land Use Counsel, and Special Counsel. *Id.* She routinely provides legal advice relating to PIDs and works on behalf of cities. *Id.*

Plaintiffs argue that Fort's expert report and testimony should be excluded in their entirety because (1) Fort has

no specialized qualifications; (2) Fort's opinions are not supported by any specific facts or methodology and are irrelevant; and (3) Fort's testimony consists entirely of legal conclusions. Dkt. 61 at 2.

### 1. Common Practices for PIDs

Fort's opinions include her observations regarding common practices for implementing PIDs and their application to the Hunters Crossing PID. These are found in Fort's report as follows:

- Section IV, titled "Why use PIDs?" Dkt. 61-1 ¶¶ 8-10;

- "In my experience, the determination of special benefit is individualized for each PID." *Id.* ¶ 26.

- "In my practice, I regularly see costs for Authorized Improvements include soft costs in additions to items that are not hard costs, such as materials and labor." *Id.* ¶ 33.

- "In my practice, deferring assessments is common and cities commonly do not require the developer to pay the PID assessments, particularly when no PID bonds are sold and the developer funds the cost of construction." *Id.* ¶ 38.

Plaintiffs challenge both Fort's qualifications to render these opinions and their relevancy.

### a. Qualifications

Defendants argue that Fort is an attorney with significant experience in the "byzantine area of public improvement districts under the PID Act" and that she may opine as to generally accepted industry practices. Dkt. 66 at 2, 10.

To establish that an expert is qualified, the proponent must demonstrate that the expert possesses a higher degree of knowledge, skill, experience, training, or education than an ordinary person. FED. R. EVID. 702. Fort is a practicing attorney who has provided legal services to municipalities in Texas for more than 20 years. Dkt. 61-1 at 3. On a weekly basis, she advises clients on matters relating to public improvement districts; she also has experience in creating PIDs and levying assessments. *Id.*

 **\*4**  "As long as some reasonable indication of qualification is adduced, the court may admit the evidence without abdicating

its gate-keeping function." *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded by statute on other grounds*, Pub. L. No. 93-595, 88 Stat. 1926, *as recognized in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002). Although Plaintiffs argue that Fort has not shown any specialization in the issues presented in this case, an expert's lack of specialization goes to the weight of the testimony, not its admissibility. *See Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) ("Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."); *Hill v. Universal Am-Can, Ltd.*, 2007 WL 4530866, at *3 (E.D. Tex. Sept. 4, 2007) (noting that "a lack of specialization does not affect the admissibility of testimony, but rather, the weight given to that testimony"). Accordingly, Fort is qualified to provide reliable testimony regarding the common practices in the creation of PIDs and levying of assessments.

### b. Relevancy

Plaintiffs argue that Fort's testimony on whether certain practices are standard for municipalities running PIDs is irrelevant to the City Defendants' violations of the PIDA Act. Dkt. 61 at 8. Defendants respond that Fort's testimony is relevant because this case involves complicated challenges to ordinances and assessments under a statute that has been litigated only rarely and her testimony will assist the Court. Dkt. 66 at 7.

Testimony from an expert witness must be relevant and "assist the trier of fact to understand the evidence or to determine a fact in issue." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244-45 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). Defendants rely on *Saldana v. Tex. Dept. of Transp.*, Civil No. A-14-cv-282-LY, 2015 WL 3952328, at *5 (W.D. Tex. June 29, 2015), in which the Court declined to exclude expert testimony on generally accepted human resource practices. Plaintiffs reply that industry standards and typical practices are not relevant to the facts of this case: "In short, even if every other PID that Fort worked upon is also being operated in contravention of state law, that does not make the Defendants' illegal actions any less of a constitutional violation—it merely indicates a widespread issue." Dkt. 68 at 5 n.2.

Here, the Court must decide whether Defendants' actions and omissions relating to the PID deprived Plaintiffs of constitutionally protected property interests. Dkt. 55 at 16-18. Fort's testimony regarding the common practices of municipalities relating to PIDs and their application to the Hunters Crossing PID may assist the Court in understanding Plaintiffs' claims. Because Fort is qualified to opine on common practices that may put Defendants' activities relating to the PID into context, her testimony will assist the trier of fact and is relevant. *See LULAC v. Edwards Aquifer Auth.*, Civil Action No. SA-12-CA-620-OG, 2014 WL 10762935, at *2 (W.D. Tex. Sept. 30, 2014) (denying motion to exclude). Fort's opinions regarding the common practices of municipalities relating to PIDs and their application to the Hunters Crossing PID are admissible.

### 2. Legal Conclusions

Plaintiffs contend that the remainder of Fort's report and testimony should be excluded because it consists of inadmissible and irrelevant legal conclusions based on her interpretation of the PIDA Act. Dkt. 61 at 3-5. Defendants respond that, as an attorney with more than 20 years' experience in municipal law and finance, including PIDs, Fort is "qualified to opine on the interpretation and application of the PID Act and the operative documents for The Hunters Crossing PID." Dkt. 66 at 2.

**\*5** An expert may give opinion testimony that embraces an ultimate issue if it is otherwise admissible and supplies information that is helpful to the factfinder. FED. R. EVID. 704(a); *see also Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) (stating that Rule 704 abolishes the per se rule against testimony regarding ultimate issues). An expert witness is not allowed to opine on legal conclusions that should be drawn from the evidence, which "both invades the court's province and is irrelevant." *Id.*; *see also Tex. Peace Officers v. City of Dallas*, 58 F.3d 635, 635 (5th Cir. 1995) (affirming exclusion of expert testimony because an expert may not provide an unhelpful opinion to the trier of fact or state a legal conclusion). Even in bench trials where a court will not be acting as a "gatekeeper" for the jury, testimony will be excluded before trial if an expert merely provides legal opinions. *LULAC*, 2014 WL 10762935, at *1-2. Experts may not advise the Court how the law should be interpreted or applied to the facts in the case. *Id.* at *2.

Other than her admissible opinions regarding common practices for PIDs, listed at page 6 of this Order, Fort devotes her report to reciting the statutory provisions governing PIDs and their implementation. She opines as to the proper statutory interpretation and what actions are permitted or prohibited by the PIDA Act based on her reading of the Act. [4]

Smith v. City of Bastrop, Not Reported in Fed. Supp. (2021)
2021 WL 148061

She also offers opinions on how the law should be applied to the facts of this case and conclusions as to the Plaintiffs' allegations of illegal actions by the City Defendants.[5]

[4]     *See, e.g.*, Dkt. 61-1 ¶ 18 ("The Act expressly allows a city council to delegate responsibility for a service plan to another entity...."); *id.* ("The Act does not provide that the assessment lien ... is released or altered by the failure to do an annual update."); *id.* ("[T]he Act does not contain a consequence for failing to complete an annual update to the service plan."); *id.* ¶ 22 ("[Plaintiffs' statement] that assessments not imposed only in 'equal shares' ... are 'fatally flawed' is a misinterpretation of the Act."); *id.* ¶ 27 ("The Act expressly allows for assessments to be increased or decreased following the initial assessment."); *id.* ("The Act does not require newspaper notices, mailed notices or a public hearing for annual updates to the SAP."); *id.* ¶ 28 ("The Act allows interest to be paid in a number of different ways for a number of different things."); *id.* ¶ 33 ("The Act does not contain a definition for the word 'cost'."); *id.* ("There is no express authority in the Act to support [Plaintiffs' assertion] that the cost to a city ... must exclude interest as a cost."); *id.* ¶ 34 ("The Act provides for and expressly acknowledges that the costs in an initial SAP are merely 'projected' or estimates."); *id.* ¶ 35 ("The Act gives the City of Bastrop the authority to exercise all power in the Act."); *id.* ¶ 37 ("The Act authorizes interest to be added to deferred installment payments...."); *id.* ¶ 40 ("The Act also expressly allows for assessment to be increased or decreased following the initial assessment...."); *id.* ¶ 42 ("The Act does not contain a consequence for failing to complete an annual update to the service plan.").

[5]     *See, e.g.*, Dkt. 61-1 ¶ 36 ("The total amount of the assessment lien attributable to 'costs' for the HCPID has not been increased, EVER."); *id.* ("The content of the 2003 Assessment Ordinance, the 2004 Assessment Ordinance, and Ordinance No. 2019-40, adopting, the Current SAP, are not 'illegal' as asserted by Plaintiffs."); *id.* ¶ 38 ("A deferral of the payment of an assessment allowed by the Act does not mean any property owner was 'unlawfully exempted from paying the assessments' as asserted by Plaintiffs."); *id.* ¶ 39

("It is not illegal or unlawful for the actual costs to be exceed, or be less than, the original estimated costs, as asserted by Plaintiffs."); *id.* ("[S]uch decisions are within the discretionary legislative authority of the City Council of the City."); *id.* ¶ 43 ("Plaintiffs' assertions that the Current SAP adopted by Ordinance No. 2019-40 requires property owners to pay the entire remaining balance still owed ... is a misinterpretation of the current SAP."); *id.* ¶ 46 ("I ... find that some legal assumptions relied upon by [Plaintiffs' expert] in order to calculate the alleged damages are not supported by the Act.").

**\*6** Fort's report and testimony offer her legal opinion on how the law should be interpreted and applied in this case, which are questions for the Court. *See Primerica v. Life Ins. Co. v. Gross*, Civil Action No. A-15-CV-759-DAE, 2017 WL 9325510, at \*3 (W.D. Tex. Oct. 12, 2017) (stating that while attorneys may testify as to legal matters when those matters involve questions of fact, interpretation of statutes is a question of law) (citing *Waco Int'l Inc. v. KHK Scaffolding Houston, Inc.*, 278 F.3d 523, 533 (5th Cir. 2002)). While Plaintiffs' counsel can make legal arguments and urge the Court to reach certain legal conclusions, Fort cannot do so as an expert witness. *See Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (noting that a proffered expert should bring to the trier of fact "more than the lawyers can offer in argument"). Accordingly, the remainder of Fort's report and her associated testimony, which consist entirely of inadmissible legal opinions and conclusions, are **HEREBY EXCLUDED**.

Based on the foregoing, Plaintiffs' Motion to Exclude Fort (Dkt. 61) is **DENIED IN PART** as to her opinions regarding common practices listed at page 6 of this Order and **GRANTED IN PART** as to the remainder of her report and associated testimony.

**B. Patrick R. Bourne**

Defendants have designated Patrick R. Bourne as an expert on PIDs in Texas and the allocation and calculation of capital assessments. Dkts. 56 at 2, 57 at 2. Bourne is designated to testify as to: (1) PIDs in Texas; (2) his observations on the 2003 Ordinance and SAP; (3) the determination, allocation, and term of the 2003 Capital Assessment; (4) his observations on the 2019 SAP; (5) the capital assessment allocated to subdivided parcels; (6) the calculation and allocation methodology of the unpaid capital assessment; (7)

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 282 of 292

Smith v. City of Bastrop, Not Reported in Fed. Supp. (2021)

2021 WL 148061

the impact of the 2019 SAP allocation to property owners; and (8) the alleged incorrect factual statements and unsupported conclusions set forth in Plaintiffs' Expert Designation and Report. *Id.*

Plaintiffs argue that Bourne's expert report and testimony should be excluded because (1) the first portion of Bourne's report consists entirely of legal conclusions; (2) the second portion of Bourne's report contains opinions that are unreliable and not support by facts or methodology; and (3) Bourne's opinions on changes to and standard practices for PIDs are irrelevant. Dkt. 62 at 2. Plaintiffs also assert that Bourne's designation and report do not satisfy the disclosure requirements of Rule 26(a)(2) and should be barred. *Id.*

### 1. Legal Conclusions

Plaintiffs argue that Section II of Bourne's report, "Introduction to Public Improvement Districts," consists solely of "non-lawyer legal conclusions about the meaning of the PIDA Act" and that his opinions should be excluded. Dkt. 62 at 4. Defendants respond that Bourne may reference statutory provisions and ordinances that affect his calculations regarding the overall PID assessment and apportionments. Dkt. 65 at 5-6.

As discussed above, an expert may not opine on what legal conclusions should be drawn from evidence. In Section II of his report, Bourne recites various provisions of the PIDA Act and opines as to what is allowed or prohibited under the Act. [6] Dkt. 62-1 at 4-5. In contrast, in Sections III and IV of his report, Bourne discusses the PIDA Act along with provisions of the 2003 and 2019 SAPs to explain his calculations and opinions regarding the amounts paid and owing under the assessment. Dkt. 62-1 at 5-15. Because statutory interpretation is a question of law for the Court, Section II of Bourne's report and his associated testimony are inadmissible. *See Primerica*, 2017 WL 9325510, at *3. Bourne may reference statutory provisions for the purpose of explaining his calculations, so Sections III and IV of his report and associated testimony are admissible. *See Benavides v. City of Austin*, Cause No. A-11-CV-438-LY, 2012 WL 12883179, at *3 (W.D. Tex. July 2, 2012) (stating that an expert report is not rendered inadmissible because it uses legal terms that appear in a statute). Plaintiffs' Motion to Exclude Bourne's report on the basis that it contains inadmissible legal conclusions is **GRANTED** as to Section II.

[6]    Dkt. 62-1 at 4 ("The PID Act allows the cost of improvements to include interest, which may be included in the assessment against the property within the PID."); *id.* at 5 ("[A] PID will remain in perpetuity until the assessment has been completely paid and the PID is dissolved."); *id.* ("PID installments may be deferred and may include interest."); *id.* ("The payment period, interest rate, and amount of the PID installments are approved by the governing body.").

### 2. Reliability

**\*7** Plaintiffs argue that Bourne's opinions are unreliable because "he performed drastically simplified calculations regarding interest that do not align with the actual terms of the documents" and the underlying data used to formulate his opinions is inaccurate. Dkt. 62 at 6-7. Plaintiffs also question Bourne's qualifications to render reliable opinions. *Id.* at 5-6. Defendants argue that Bourne's qualifications exceed what an ordinary person would possess, which allows him to opine on PIDs and calculate assessments. Dkt. 65 at 6. Defendants also argue that Plaintiffs' complaints about Bourne's methodology go to weight and not admissibility. *Id.* at 7.

As discussed above, to establish that an expert is qualified, the proponent must demonstrate that the expert possesses a higher degree of knowledge, skill, experience, training or education than an ordinary person. FED. R. EVID. 702. Bourne is a partner with Sundance Analytics, LLC. Dkt. 62-1 at 3. Since 2005, he has worked as a financial consultant structuring a variety of financing districts, including PIDs. *Id.* Services he provides include identifying and outlining financing plans for the creation of PIDs, drafting SAPs and the proposed allocations of assessments, assisting with bond issuance, preparing and monitoring reimbursement requests, and assisting with the restructuring of installments. *Id.* Bourne's experience with PIDs and SAPs provides a "reasonable indication of qualification" to opine on the matters for which he was designated and the Court "may admit the evidence without abdicating its gate-keeping function." *See Rushing*, 185 F.3d at 507. Accordingly, Bourne is qualified to testify.

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 283 of 292

**Smith v. City of Bastrop, Not Reported in Fed. Supp. (2021)**
2021 WL 148061

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The issues with Bourne's calculations identified by Plaintiffs are the proper subject of cross-examination and not a basis for disqualification. *Id.* Similarly, the fact that there are discrepancies in the calculations and the underlying documents is not grounds for excluding his opinion. *Pipitone,* 288 F.3d at 250 ("The fact-finder is entitled to hear [the expert's] testimony and decide whether it should accept or reject that testimony after considering all the facts that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate."). Bourne's opinions are reliable. Plaintiffs' Motion to Exclude on that basis is **DENIED**.

### 3. Relevancy

Plaintiffs argue that Bourne's opinions are not relevant because they are based on flawed calculations and generalized assertions about what other PIDs and developers have done. Dkt. 62 at 8-9. Defendants respond that Bourne's opinions regarding the assessments and their proper calculation are relevant to Plaintiffs' due process and statutory compliance claims. Dkt. 65 at 10.

Bourne's opinions address how the PID assessments were allocated and calculated at various times, and specifically whether the 2019 Ordinance resulted in an overall increase in assessments and debt obligations. Dkt. 62-1 at 8-15. Bourne's testimony may assist the trier of fact in resolving several issues in the case, including whether Plaintiffs suffered economic injury, whether TFHC negligently misrepresented the costs that Defendants allegedly included in the 2019 Ordinance, and whether Plaintiffs are entitled to a permanent injunction against the 2019 Ordinance because it increases the debt and payoff figure. Dkt. 55 at 17-18. Bourne's testimony therefore is relevant and admissible. *Daubert*, 509 U.S. at 591.

### 4. Satisfaction of Disclosure Requirements

**\*8** Finally, Plaintiffs argue that Bourne's report and testimony should be barred for failure to comply with the disclosure requirements of Rule 26(a)(2). Dkt. 62 at 9-10. Specifically, Plaintiffs contend that (1) Defendants failed to disclose Bourne's prior publications and testimony, and (2) Bourne's report includes no reference to Plaintiffs' expert report despite that topic's inclusion in Defendants' Designations of Expert Witnesses. *Id.* Defendants state that

Bourne has no prior publications or testimony to disclose, and they have supplemented Bourne's CV to reflect those facts. Dkt. 65 at 10, 14-15. Defendants also assert that Bourne's report concludes that the 2019 Ordinance did not change the 2003 assessment, which contradicts Plaintiffs' expert's report, and he should be allowed to refer to Plaintiffs' expert's opinions in his testimony. *Id.* at 11.

The purpose of expert reports is not to replicate all of an expert's testimony, but rather to convey the substance of the expert's opinion so that attorneys may prepare for trial intelligently. *See Bro-Tech Corp. v. Purity Water Co.*, Civil No. SA-08-CV-0594-XR, 2009 WL 1748539, at *7 (W.D. Tex. June 19, 2009) ("The requirement that the party provide a complete report of the opinions that the expert will offer at trial is to allow the opposing party to effectively cross-examine the expert, designate a rebuttal expert, and prepare for trial."); *see also Helene Ltd. v. GE Oil & Gas, Inc.*, Civil Action No. H-08-2931, 2011 WL 798204, at *6 (S.D. Tex. Mar. 1, 2011) (same). Here, Plaintiffs have demonstrated that the substance of Bourne's opinions regarding the calculation of assessments and their contrast with Plaintiffs' expert calculations has been identified sufficiently to allow counsel to prepare for trial. Accordingly, Plaintiffs' Motion to Exclude Bourne as an expert witness based on failure to comply with Rule 26 disclosures is **DENIED**.

### IV. Conclusion

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion to Exclude Defendants' Expert Julie Y. Fort (Dkt. 61). The Court **DENIES** Plaintiffs' Motion as to Fort's opinions regarding common practices listed at page 6 of this Order and **GRANTS** Plaintiffs' Motion and **EXCLUDES** the remainder of Fort's report and proposed testimony.

The Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion to Exclude Defendants' Expert Patrick R. Bourne (Dkt. 62). The Court **GRANTS** Plaintiffs' Motion and **EXCLUDES** Section II of Bourne's report and proposed testimony and **DENIES** the Motion as to the remainder.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 148061

**Smith v. City of Bastrop, Not Reported in Fed. Supp. (2021)**

2021 WL 148061

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 21

Case 4:21-cv-02473    Document 89-4    Filed 09/06/24 in TXSD    Page 286 of 292

Sonerra Resources Corp. v. Thomas Energy Services, Inc., Not Reported in F.Supp.2d...

2003 WL 25685208

2003 WL 25685208
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas,
Lufkin Division.

SONERRA RESOURCES CORP.

v.

THOMAS ENERGY SERVICES,

INC. d/b/a Thomas Tools, Inc.

Civil Action No. 9:02 CV 78.
|
July 16, 2003.

Named Expert: Lawrence Gregory DuBois, Kenneth W.
Fraiser

**Attorneys and Law Firms**

Ron Adkison, Wellborn Houston Adkison Mann Sadler &
Hill, Henderson, TX, for Sonerra Resources Corp.

D. Ferguson McNiel, Vinson & Elkins, Jared Isaac Levinthal,
Hagans Burdine Montgomery Russtay & Winchester,
Houston, TX, Todd Lee Kassaw, Zeleskey Cornelius
Hallmark Roper & Hicks, Lufkin, TX, for Thomas Energy
Services, Inc. d/b/a Thomas Tools, Inc.

*ORDER*

JOHN HANNAH, JR., District Judge.

 **\*1** The Court hereby memorializes the oral order made at the
hearing on Defendant Pinnacle Oilfield Service's ("Pinnacle")
challenge to Plaintiff's expert witnesses held July 11, 2003.
First, because both Lawrence Gregory DuBois and Kenneth
W. Fraiser, Sonerra Resources Corporation's ("Sonerra")
expert witnesses, testified that they had no intention of
giving an expert opinion as to the manner in which Pinnacle
conducted its inspection of the drill pipe in question, the Court
finds that Pinnacle's challenge on this point is superfluous.

Secondly, the Court finds that Sonerra's expert witness,
Lawrence Gregory DuBois, is qualified to testify as to
his corrosion cracking theory as to why the drill pipe
in question failed. Apparently, Pinnacle does not question
DuBois' qualifications, a position that is well taken. [1]

[1]    Mr. DuBois is a Metallurgical Engineer with over
25 years of experience in testing common failure
modes in metals. In recent years, he has conducted
approximately 150 failure analyses a year for his
current employer, CTL Engineering, which does
failure analysis in accident investigations and for
manufacturers.

Pinnacle, however, challenges the reliability of DuBois'
"stress corrosion cracking" theory as to why the drill pipe
failed, claiming this is a new and novel theory. The factors
the Court may look at in determining whether the testimony
is reliable are:

—Whether a "theory or technique ... can be (and has been)
tested";

—Whether it "has been subjected to peer review and
publication";

—Whether, in respect to a particular technique, there is a
high "known or potential rate of error" and whether there
are "standards controlling the technique's operation"; and

—Whether the theory or technique enjoys "general
acceptance" within a "relevant scientific community."

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct.
1167, 1175, 143 L.Ed.2d 238, citing *Daubert v. Merrell Dow
Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125
L.Ed.2d 469 (1993).

DuBois testified that there are common failure modes which
apply to all metals but that frequently, the circumstances
surrounding the failure of the metal in any particular case may
differ. One well known and heavily studied failure mode is
known as stress corrosion cracking. In fact, stress corrosion
cracking is one of the oldest forms of failure mechanisms
used. This mode of metal failure is common and whole books
have been written on the subject. Stress corrosion cracking is a
failure mechanism which encompasses several different types
of failure but they all involve both stress to the metal and a
corrosive which causes failure at a strength level significantly
lower than would have occurred without these conditions.

He testified that the engineering and scientific principles are
the same in failure analysis on any piece of metal, whether it
be an aircraft engine blade, a piece of metal from a car, or a
piece of drill pipe.

**Sonerra Resources Corp. v. Thomas Energy Services, Inc., Not Reported in F.Supp.2d...**

2003 WL 25685208

While DuBois was unaware of any publications specifically dealing with stress corrosion cracking of drill pipe, he was aware of the American Petroleum Institute's 7G book which deal specifically with factors which adversely affect drill pipe, which include the P.H. level, velocity, temperature, hetrogenidy, and high stress. The API 7G publication states that high stressed areas, like above drill collars, may corrode faster than areas of lower stress. This API 7G publication gives general principles and gets peer review.

**\*2** It appears clear that the stress corrosion cracking theory, while perhaps not written about specifically as applied to drill pipe, is not a new and novel theory, it enjoys "general acceptance" within a "relevant scientific community," it has been subjected to peer review and publication, nor is it subject to a high "known or potential rate of error."

The *Daubert* analysis is a "flexible" one. "It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Court therefore finds Pinnacle's challenge to DuBois' testimony unfounded.

IT IS ORDERED that Sonerra's expert witness, Lawrence Gregory DuBois, may testify as to his theory as to why the drill pipe failed in this case.

SIGNED this *15th* day of July, 2003.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 25685208

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 22

Case 4:21-cv-02473   Document 89-4   Filed 09/06/24 in TXSD   Page 289 of 292

YETI Coolers, LLC v. RTIC Coolers, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 11679718

2017 WL 11679718
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Austin Division.

YETI COOLERS, LLC,

v.

RTIC COOLERS, LLC, et al.

A-15-CV-597-RP
|
Signed 01/27/2017

**Attorneys and Law Firms**

Binal J. Patel, J. Pieter van Es, Janice V. Mitrius, Jason S. Shull, Joseph J. Berghammer, Katherine Laatsch Fink, Katie L. Becker, Marc S. Cooperman, Michael L. Krashin, Scott A. Burow, Timothy J. Rechtien, Victoria R. M. Webb, Banner & Witcoff, Ltd., Chicago, IL, Saranya Raghavan, Winston & Strawn LLP, Chicago, IL, Darryl Adams, Joseph Daniel Gray, Slayden Grubert Beard PLLC, Austin, TX, Kevin J. Meek, Mysha Lubke, Baker Botts, LLP, Austin, TX, for Yeti Coolers, LLC.

Alan D. Albright, Bracewell LLP, Austin, TX, W. Thomas Jacks, Fish & Richardson P.C., Austin, TX, Jackob Ben-Ezra, DLA Piper LLP, Houston, TX, John R. Lane, Bailey Benedict, Fish & Richardson P.C., Houston, TX, Elizabeth Brenckman, Orrick, Herrington & Sutcliffe LLP, New York, NY, Katrina Gallagher Eash, Michael A. Bittner, Natalie Terhune Arbaugh, Thomas M. Melsheimer, Winston & Strawn LLP, Dallas, TX, P. Weston Musselman, Jr., Ricardo Joel Bonilla, Neil J. McNabnay, Fish & Richardson, PC, Dallas, TX, Mark S. Puzella, Sheryl Koval Garko, Orrick, Herrington & Sutcliffe LLP, Boston, MA, Sara C. Fish, Fish & Richardson P.C., Atlanta, GA, William Rueger Poynter, Kaleo Legal, Virginia Beach, VA, for RTIC Coolers, LLC.

Alan D. Albright, Bracewell LLP, Austin, TX, W. Thomas Jacks, Fish & Richardson P.C., Austin, TX, Jackob Ben-Ezra, DLA Piper LLP, Houston, TX, Bailey Benedict, John R. Lane, Fish & Richardson P.C., Houston, TX, Katrina Gallagher Eash, Michael A. Bittner, Natalie Terhune Arbaugh, Thomas M. Melsheimer, Winston & Strawn LLP, Dallas, TX, P. Weston Musselman, Jr., Ricardo Joel Bonilla, Neil J. McNabnay, Fish & Richardson, PC, Dallas, TX, William Rueger Poynter, Kaleo Legal, Virginia Beach, VA, Elizabeth Brenckman, Orrick, Herrington & Sutcliffe LLP, New York, NY, for John Jacobsen, James Jacobsen.

**ORDER**

ANDREW W. AUSTIN, UNITED STATES MAGISTRATE JUDGE

 **\*1** Before the Court is Defendants' Motion to Exclude the Report and Testimony of YETI's Expert Yoram Wind (Dkt. No. 237); YETI's response (Dkt. No. 277); and RTIC's reply (Dkt. No. 320). The motion was referred to the undersigned for resolution. [1]

[1]  This is one of 16 motions the parties have filed challenging their opponent's experts under *Daubert* and FED. R. EVID. 702. Because the standard applicable to the review of this type of motion is well-known, and to avoid repeating itself over and over in these orders, the Court will not set out here the black letter law governing such motions. Suffice it to say the Court did in fact apply the standard set out in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and its progeny, as codified in Rule 702.

Jerry (Yoram) Wind is the Lauder Professor of Marketing at the Wharton School of the University of Pennsylvania. He received his Ph.D. from Stanford University in 1967, and has been teaching and researching at the Wharton School since obtaining his doctorate. YETI retained Wind to provide his opinion on whether YETI's trade dress had acquired secondary meaning as of the end of June 2015 (before RTIC began selling coolers), and also whether that secondary meaning has changed since that time. He was also asked to provide his opinion regarding whether RTIC's coolers cause a likelihood of confusion with YETI's coolers. RTIC seeks to exclude his testimony, arguing that he: (1) improperly relied on post-June 2015 evidence to establish that YETI's trade dress had secondary meaning as of June 2015; (2) failed to tie the evidence he relies on to the asserted trade dress, instead conflating the asserted trade dress with the YETI name; (3) failed to use any cogent methodology in collecting consumer comments online, leading to biased "cherry picking" of comments; and (4) improperly offers opinions that are not helpful or necessary to the fact finder.

**A. Post-2015 Evidence**
RTIC contends that Wind improperly considered evidence of advertising and enforcement post-June 2015 to establish

YETI Coolers, LLC v. RTIC Coolers, LLC, Not Reported in Fed. Supp. (2017)
2017 WL 11679718

that YETI's trade dress had secondary meaning. It argues that YETI must show that its trade dress had secondary meaning prior to the date the alleged infringement began. Dkt. No. 237 at 2 (citing to *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978)). Because the alleged infringement here began in June 2015, RTIC argues that any evidence of secondary meaning after that date is irrelevant. According to RTIC, if Wind relied on irrelevant evidence, then his opinion is unreliable. YETI disagrees, contending first that post-June 2015 evidence would be relevant to secondary meaning, and moreover is required for several factors. YETI also argues that Wind substantially relied on pre-June 2015 evidence to make his determination.

Wind's analysis of post-June 2015 evidence does not render his opinion unreliable. Such evidence can sometimes be relevant in determining secondary meaning. *See Black & Decker Corp. v. Positec USA, Inc.*, No. 11-CV-5426, 2015 WL 5612340, *9-10 (N.D. Ill. Sept. 22, 2015) (finding that evidence of secondary meaning after the alleged infringement was relevant); *Bern Unlimited, Inc. v. Burton Corp.*, 95 F. Supp. 3d 184, 203 (D. Mass. 2015) (allowing a survey taken well after the time of infringement and instead "examin[ing] the timing to determine the strength of the evidence."). RTIC argues that evidence of secondary meaning after the alleged infringement date is only relevant when the market is unchanged. *See Black and Decker*, 2015 WL 5612340, *10. RTIC contends it significantly changed the market by entering it, and thus any marketing and sales evidence taken after the alleged infringement date is irrelevant. Dkt. No. 320. But this argument asks the Court to make a factual determination of whether the market has changed, and thus is better suited to be a topic of cross-examination at trial. It is not a basis for excluding Wind's testimony. *See Black & Decker*, 2015 WL 5612340, at *10 (finding that the jury could assess whether the marketplace had changed enough to make the survey inapplicable).

**\*2** Moreover, the extent of Wind's reliance on evidence after the alleged infringement date goes to the weight, rather than admissibility, of his testimony. Though Wind addresses a number of marketing materials, sales, and enforcement efforts from post-June 2015, he also identifies the date of each of the items he assesses. As noted in his report, a significant percentage of the materials and facts were from pre-June 2015. Wind states that the additional materials show the continuation of secondary meaning after the alleged infringement date. RTIC will have an opportunity to examine Wind on how he relied on the different pieces of evidence.

Thus, Wind's use of post-June 2015 materials does not render his testimony inadmissible.

**B. Failure to Distinguish YETI's Trade Dress From its Brand**

Next, Defendants contend that Wind's testimony on secondary meaning is unreliable because his analysis of YETI's marketing failed to separately address YETI's trade dress and brand. Similarly, the social media landscape report addressed all comments about YETI and its competitors, rather than solely collecting comments about the alleged trade dress. RTIC says Wind's reliance on this report also makes his opinion unreliable. YETI disagrees, noting that much of Wind's evidence used to support his conclusions directly addresses the trade dress. Moreover, YETI argues that the fact that the advertising has elements of brand, as well as trade dress, makes his reliance on these materials reasonable.

The Court agrees with YETI that RTIC is drawing too fine a distinction. While at least some of the marketing materials discussed in the report almost certainly were not aimed at YETI's trade dress, this is not grounds to exclude Wind's entire report. *See Sally Beauty Supply Co. v. Beautyco, Inc.*, 304 F.3d 964, 974, 980 (10th Cir. 2002) (considering a survey in which the trade dress and trademark were not separated, and finding evidence of actual confusion of the trade dress). In fact, in each of the cases RTIC cites that address marketing and advertising, the courts are assessing whether the evidence provided established secondary meaning, and were not addressing a *Daubert* challenge. *See Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 44 (1st Cir. 2001); *Sally Beauty Supply Co.*, 304 F.3d at 974; *Pebble Beach Co. v. Tour 18 I Ltd.*, 942 F. Supp. 1513, 1559 (S.D. Tex. 1996).[2] Thus, the extent to which the advertising emphasizes the trade dress will affect the weight afforded Wind's testimony, but should not be a basis for exclusion. Moreover, Wind focuses much of his analysis on the features of trade dress that YETI is attempting to protect; in his report, he analyzes multiple images of YETI's marketing and advertising that feature the trade dress to support his conclusions. The fact that not all of the materials he used solely address trade dress goes to the weight of his testimony.

2    Defendants additionally rely on *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 180 (S.D.N.Y. 2012), where the court excluded a survey on the basis that the expert merely "chose a control that shared 'certain characteristics' with the test

product." *Id.* There, the results of the survey were unreliable as it was unclear to which of the elements the consumers were expressing source confusion. This case is distinguishable on several points, the most important being that the court in that case excluded the report because the *control* in the survey was unreliable, rendering all results unreliable. Here, any concerns with Wind's conflation of the trade dress and brand can be addressed with cross-examination.

Additionally, Wind's reliance on the ListenLogic social media landscape report does not render his testimony unreliable. RTIC argues that the report failed to limit the collection to comments made about YETI's trade dress, instead considering *all* comments made about YETI and its competitors. Wind's reliance on this report would, according to RTIC, make his testimony unreliable. However, the fact that some of the comments may not refer specifically to trade dress does not make Wind's testimony unreliable, but rather is a factor that may be addressed at trial by cross-examination. As noted above, the cases relied on by RTIC do not address reliability of the evidence, but rather its weight. Then, in *Sally Beauty Co.*, the court found that a survey that tested the trademark and trade dress together provided evidence of actual confusion of the trade dress—though not the trademark—because many participants cited the packaging as the basis of their confusion. 304 F.3d at 974, 979-80. The ListenLogic report is similar in that it collected all comments about YETI, but Wind analyzed comments directed at the trade dress. Moreover, RTIC has access to all of the material and may cross-examine Wind on the issue. Thus, this objection, like so many others, goes to the weight of the testimony, rather than the admissibility of the report as a whole. [3]

[3]    Defendants additionally argue that the ListenLogic report is unreliable as the comments themselves are unreliable and do not represent opinions relevant to the litigation. But commentators have noted that social media can be one of the best indicators of secondary meaning. Ronald Coleman, *Fashion Dos: Acknowledging Social Media Evidence as Relevant to Proving Secondary Meaning*, 106 TRADEMARK REP. 776, 778-79 (2016). Coleman's view is that analysis of social media is no more inherently unreliable than other methods that summarize consumers' impressions. *Id.* at 781. Also, YETI notes that all of the comments in the report have been documented,

and that RTIC was given this information. Any arguments about the reliability of these sources can be addressed by cross-examination.

## C. Methodology

**\*3** RTIC also argues that Wind's testimony is unreliable as his choice in illustrative social media comments did not rely on a methodology that is systematic and could be reproduced. In other words, RTIC contends that Wind randomly chose comments, or cherry-picked them, rather than following a method of selection that could then be reproduced. YETI responds stating that Wind explained how he "sampled and analyzed the comments" in his report, and thus his testimony is reliable. The Court agrees. First, " 'technical ... or other specialized knowledge,' may be relevant and reliable, and therefore admissible under *Daubert*, even if the field of knowledge, be it marketing or plumbing, does not readily lend itself to a formal or quantitative methodology." *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 364–65 (S.D.N.Y. 2014) (quoting FED. R. EVID. 702). Wind's analysis of social media comments and advertising would clearly fall into this category. Thus, it is not necessary for Wind to have followed a "formal or quantitative" methodology when analyzing whether the comments established secondary meaning. Rather, he relied on his knowledge of marketing and brand awareness to make this determination.

Wind's analysis of secondary meaning relied in part on a report generated by ListenLogic, discussed above, that provided an entire collection of social media comments. Wind first analyzed on a general level consumers' impressions of the YETI brand and trade dress. From this collection, he selected a number of comments to analyze more specifically. His methodology does not reach the unreliability of "ask[ing] people in [the] office," (*id.*); "anecdotal conversations" with patients, *Playtex Prod., Inc. v. Procter & Gamble Co.*, No. 02-CIV-8046, 2003 WL 21242769, \*10 (S.D.N.Y. May 28, 2003); or the "consensus and opinion of others" the expert knew, *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 482 (S.D.N.Y. 2000). Instead, based on his long experience, Wind opines—based on the conclusions of the ListenLogic report—that the comments he selected were representative of the overall collection. *See Louis Vuitton Mallatier S.A. v. Sunny Merchandise Corp.*, 97 F. Supp. 3d 485, 504, 507 (S.D.N.Y. 2015) (permitting two reports that helped to synthesize voluminous material into a coherent report). RTIC argues that it is impossible to replicate the results, but Wind's brand awareness analysis simply does not require the "quantitative" method courts require for

other forms of expert analysis. RTIC has all of the raw data, and if it believes the items selected by Wind are unrepresentative of the whole, it can surely demonstrate this on cross-examination.

**D. Helpful to the Fact Finder**

Lastly, RTIC contends that Wind's testimony on the similarity of the products and intent to copy should be excluded because his testimony does not require expertise, and are determinations jurors may make for themselves. To support its assertion, RTIC notes that even Wind remarked that a juror could easily see how similar the products are, and read the documents relied on by Wind in determining intent to copy. YETI argues that the fact finder would be assisted in its similarity analysis by Wind as he can point out specific details for the jurors to focus on. Similarly, YETI argues that Wind's experience and knowledge can help the jury understand the documents reflecting intent to copy.

RTIC presents several cases in which the court found that an expert was unnecessary to opine on these two topics. Dkt. No. 237 at 9-10. However, allowing Wind to offer testimony of the similarity of the products and intent to copy is within the court's discretion. *See Betterbox Comm'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329-30 (3d Cir. 2002) (finding that even if admitting testimony of the similarity of marks was an abuse of discretion, it was harmless error); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 571-72 (S.D.N.Y. 2007) (allowing expert testimony on intent to copy when an expert could be helpful in determining the overlap in features). Here, Wind is testifying to a number of factors of both secondary meaning and likelihood of confusion. Testimony regarding the similarity of the products and evidence of an intent to copy fit neatly within his other testimony, and may be helpful to the jury—both in comparing specific aspects of the trade dress and in gleaning intent from the documents. Moreover, this objection, even if valid, is not a basis for excluding all of Wind's testimony.

**\*4** ACCORDINGLY, Defendants' Motion to Exclude the Report and Testimony of YETI's Expert Yoram Wind (Dkt. No. 237) is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 11679718

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.