**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Case No. 4:21-cv-02473 |

**LEAD PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF EXPERT LUCY P. ALLEN AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................................. 1

II. DEFENDANTS' BACKGROUND SECTION IS EITHER INCORRECT, IRRELEVANT, OR A DISENGENUOUS ATTEMPT TO BOLSTER PAST ARGUMENT ...................................................................................................................... 2

    A. *Goldman* Did Not "Usher in a New Era" of Freewheeling Match Analysis .......... 2

    B. Lead Plaintiffs Have NEVER Stated Courts May Not Rely on Expert Analysis of Market Commentary .................................................................................... 5

    C. Defendants Outright Ignore Lead Plaintiffs' Process Challenges when Parroting Excerpts from the Allen Report .............................................................. 9

    D. Defendants' Contention that Lead Plaintiffs "Found no Error" with the Allen Report Is Preposterous ......................................................................... 11

III. DEFENDANTS TELLINGLY FAIL TO ADDRESS THE SPECIFICS OF LEAD PLAINTIFFS' CHALLENGES IN THEIR OPPOSITION ........................................... 11

    A. Ms. Allen Merely Oversaw a Content Analysis Created by Defendants.............. 11

    B. Defendants Rely on Hyperbole and Obfuscation Instead of Meeting Lead Plaintiffs' Attacks on Ms. Allen's Novel Processes Head On.............................. 12

    C. Ms. Allen's Content Analysis Was Qualitative and Premised on an Incorrect Legal Standard .................................................................................... 14

    D. Defendants Concede the Allen Report Included an Oft-Repeated Incorrect Question ................................................................................................ 15

    E. Ms. Allen Expressly Stated She Was Conducting a Match Analysis ................... 16

    F. Defendants Beat a Dead Horse with Irrelevant Front-End Price Impact Arguments ............................................................................................................ 16

IV. DEFENDANTS' DAMAGES ARGUMENTS SHOULD BE IGNORED ...................... 17

V. DEFENDANTS CONCEDE MS. ALLEN OMITTED AN ENTIRE CATEGORY OF DOCUMENTS IN HER MATERIALS CONSIDERED ................................................. 18

VI. CONCLUSION................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*In re Allstate Corp. Sec. Litig.*,
    2020 WL 7490280 (N.D. Ill. Dec. 21, 2020)..............................................................9

*Angley v. UTi Worldwide Inc.*,
    311 F. Supp. 3d 1117 (C.D. Cal. 2018) .................................................................15

*In re Apache Corp. Sec. Litig.*,
    2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ................................................... 7, 16-17

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
    597 F.3d 330 (5th Cir. 2010) *vacated and remanded sub nom. Erica P. John
    Fund, Inc. v. Halliburton Co.,* 563 U.S. 804 (2011) ................................................5

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) ...............................................................................3, 4, 6, 9

*Baker v. SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019)................................................................6, 7

*In re BP p.l.c. Sec. Litig.*,
    2014 WL 2112823 (S.D. Tex. May 20, 2014).........................................................17

*Chen-Oster v. Goldman, Sachs & Co.*,
    2022 WL 814074 (S.D.N.Y. Mar. 17, 2022).........................................................13

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
    2024 WL 1060079 (S.D. Cal. Mar. 11, 2024) .........................................................3

*Crews v. Rivian Auto., Inc.*,
    2024 WL 3447988 (C.D. Cal. July 17, 2024)..........................................................5

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..............................................................................................5, 11

*Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    2023 WL 6300569 (S.D. Tex. Sept. 27, 2023), *leave to appeal denied*, 2023
    WL 8794620 (5th Cir. Nov. 17, 2023)............................................................. *passim*

*Disney Enters. v. VidAngel Inc.*,
    2019 WL 4544428 (C.D. Cal. May 29, 2019) ........................................................15

*In re DVI, Inc. Sec. Litig.*,
    2014 WL 4634301 (E.D. Pa. Sept. 16, 2014) .........................................................12

*Estech Sys. IP, LLC v. Carvana LLC*,
  2023 WL 2934920 (E.D. Tex. Apr. 13, 2023)........................................................................20

*Estevis v. City of Laredo*,
  2023 WL 9312081 (S.D. Tex. Dec. 28, 2023).........................................................................19

*Exeltis USA Inc. v. First Databank, Inc.*,
  2020 WL 7025089 (N.D. Cal. Nov. 30, 2020) ........................................................................20

*Ferris v. Wynn Resorts Ltd.*,
  2023 WL 2337364 (D. Nev. Mar. 1, 2023) ...............................................................................5

*Finesse Wireless LLC v. AT&T Mobility LLC*,
  2023 WL 5613160 (E.D. Tex. Aug. 30, 2023).........................................................................9

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
  594 U.S. 113 (2021)............................................................................................ *passim*

*Hall v. Johnson & Johnson*,
  2023 WL 9017023 (D.N.J. Dec. 29, 2023).........................................................................3, 4

*Henson v. Deepwell Energy Serv., LLC*,
  2021 WL 3388036 (E.D. Tex. June 14, 2021).........................................................................13

*Jaeger v. Zillow Grp., Inc.*,
  2024 WL 3924557 (W.D. Wash. Aug. 23, 2024)......................................................................5

*Kellam v. Metrocare Servs.*,
  2013 WL 12093753 (N.D. Tex. May 31, 2013), *aff'd sub nom.*, 560 F. App'x
  360 (5th Cir. 2014).........................................................................................................10

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
  2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .....................................................................6, 7

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
  97 F. Supp. 3d 485 (S.D.N.Y. 2015).....................................................................................15

*Moore v. Int'l Paint, L.L.C.*,
  547 F. App'x. 513 (5th Cir. 2013) ..................................................................................12, 18

*In re NIO, Inc. Sec. Litig.*,
  2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023)...........................................................................5

*Paz v. Brush Engineered Materials, Inc.*,
  555 F.3d 383 (5th Cir. 2009) ...............................................................................................12

*In re Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016), *aff'd in part*, *vacated in part sub. nom.*, 862
   F.3d 250 (2d Cir. 2017)..................................................................................................13

*Ramirez v. Exxon Mobil Corp.*,
   2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)......................................................6, 7

*Republic of Ecuador v. Mackay*,
   742 F.3d 860 (9th Cir. 2014) .......................................................................................19

*Saldana v. Selvera*,
   2023 WL 3695620 (S.D. Tex. Mar. 8, 2023)..............................................................17

*Sanson v. Allstate Texas Lloyds*,
   2018 WL 3736362 (E.D. Tex. Aug. 6, 2018) ............................................................20

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) .....................................................................................7

*Sonerra Res. Corp. v. Thomas Energy Servs., Inc.*,
   2003 WL 25685208 (E.D. Tex. July 16, 2003) ..........................................................13

*Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*,
   136 F.3d 1329 (5th Cir. 1998) .....................................................................................12

*Thomas v. GEICO*,
   2024 WL 1075151 (N.D. Ill. Mar. 12, 2024)................................................................5

*U.S. v. Dixon*,
   413 F.3d 520 (5th Cir. 2005) ...................................................................................9, 17

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3rd Cir. 2012) .......................................................................................12

**Rules**

Fed. R. Civ. P. 26...................................................................................................2, 19

Fed. R. Civ. P. 37.........................................................................................................19

**Other Authorities**

*In re Goldman Sachs Group, Inc. Securities Litigation*,
   No. 1:2010-cv-03461 (S.D.N.Y.).................................................................................9

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   No. 1:2020-cv-04953-JPO (S.D.N.Y.) .........................................................................6

Lead Plaintiffs respectfully submit their Reply Memorandum of Law in further support of their motion for the entry of an order excluding the testimony and opinions of Lucy P. Allen pursuant to Federal Rule of Evidence 702 and *Daubert* ("*Daubert* Motion" or "Motion") (ECF No. 85).[1]

## I.        INTRODUCTION

Defendants' Opposition to the *Daubert* Motion ("*Daubert* Opp." or "Opposition") (ECF 89) offers more concessions than it does attempted rebuttals to Lead Plaintiffs' arguments. Defendants have conceded there is zero support in the literature for a content analysis premised on categories and questions created by a biased third party, let alone one that then matches earlier-in-time statements to later market commentary. Defendants concede that the Expert Report of Lucy P. Allen (ECF No. 85-4) ("Allen Report") is rife with error. One of the Allen Report's guiding questions was entirely wrong and repeated eighteen times in the Allen Report. Worse, the Allen Report blatantly omits a full set of materials considered. Finally, Defendants concede that Ms. Allen's analysis attempts to answer factual and legal questions, which is improper for an expert.

The Opposition is indulgent in parroting past arguments. In the rare instance the Opposition proffers an original thought, it is unreasoned, incorrect, or both. For example, the Starks Report (ECF No. 89-2) appended to the Opposition with little to no explanation bears, at most, a minimal surface-level resemblance to the Allen Report. Unlike the Allen Report, however, the Starks Report involves an ***expert-designed*** study that included (but was not limited to) review of analyst reports, properly lists the materials it relied upon, suffers no glaring errors, and does

---

[1] Citations to paragraphs ("¶") refer to the Consolidated Complaint ("Complaint," ECF No. 25). Unless otherwise noted, internal quotation marks and citations have been omitted, emphasis added throughout, and all capitalized terms have the meaning ascribed in the *Daubert* Motion.

not reach an improper legal conclusion. As shown herein, the handful of other "new" arguments are just preposterously false. Not to mention, any attempt to supplement the lack of authority and support for Ms. Allen's opinions at this point would flout Rule 26's disclosure requirements regarding materials considered.

Defendants and Ms. Allen have conceded that the procedural and methodological flaws are incurable, and Defendants have not met their burden to show that the Allen Report's methodology was sound. Thus, Lead Plaintiffs respectfully request the testimony and opinions of Ms. Allen be excluded in their entirety.

## II. DEFENDANTS' BACKGROUND SECTION IS EITHER INCORRECT, IRRELEVANT, OR A DISENGENUOUS ATTEMPT TO BOLSTER PAST ARGUMENT

### A. *Goldman* Did Not "Usher in a New Era" of Freewheeling Match Analysis

Defendants use the Opposition to again push their incorrect interpretation of *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113 (2021) ("*Goldman I*"). *Daubert* Opp. at 2–6. Even after 50 pages of briefing at class certification, Defendants continue to fruitlessly bang their fists on the table.[2]

Defendants grossly misrepresent *Goldman I* and the subsequent legal "landscape." *Id.* Far from "usher[ing] in a new era of price impact evidence" *Goldman I* is merely the latest link in the chain of Supreme Court price-impact jurisprudence. *Id.* at 2. Contrary to Defendants' insistence, *Goldman* does not require courts to conduct a match analysis on any and all statements. Once invoked, *Goldman* provides the opportunity for defendants to "less[en]" the presumption of reliance, which may occur where defendants can persuade the court that there is a significant gap between highly generic misstatements and specific corrective disclosures. *Goldman I*, at 123.

---

[2] Both Lead Plaintiffs and Defendants have already addressed *Goldman* at length. *See* Class Cert. Opp. at 2–4, 9–11; Class Cert. Reply at 7–16; Class Cert. Surreply at 1–10.

Critically, the overturned opinion from the *Goldman* trial court based its analysis on a hypothetical scenario where the "details and severity of Goldman's misconduct" were included in the company's risk disclosures. *Id.* at 100. Post *Goldman I*, the Second Circuit determined this approach, *i.e.*, "requiring only a general front-end—back-end subject matter match **to, effectively, concoct a highly specific truthful substitute** [did] not meaningfully account for the Supreme Court's guidance in *Goldman*."[3] *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 100-01 (2d Cir. 2023) ("*Goldman II*," and together with *Goldman I* and related dockets, "*Goldman*"). Applying the *Goldman I* standard on remand, the Second Circuit laid out a two-step analytical framework assessing: (1) is there a "**considerable** gap in specificity" between the alleged misstatements and the alleged corrective disclosures, and (2) if so, "what would have happened if [the company] had spoken *truthfully*," at an "*equally generic level*." *Id.* at 99 (alteration and non-bolded emphasis in original). Here, unlike in *Goldman*, Lead Plaintiffs do not urge the Court to substitute the alleged misrepresentations, *which are adequately specific as pled*, as determined by this Court in its order on Defendants' motion to dismiss. ECF No. 43.

Unsurprisingly, other courts interpreting *Goldman I* have held the opposite of Defendants' concocted law. Specifically, that the presumption of reliance is not rebutted unless one "cannot discern the inherent contradiction between those statements and the information in the corrective disclosures when viewed side by side." *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2024 WL 1060079, at *11 (S.D. Cal. Mar. 11, 2024); *Hall v. Johnson & Johnson*, 2023 WL 9017023, at *11 (D.N.J. Dec. 29, 2023); *accord Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2023 WL 6300569, at *7 (S.D. Tex. Sept. 27, 2023) ("*Cabot*"), *leave to appeal*

---

[3] Defendants deliberately obfuscate *Goldman II* by misleadingly replacing the bolded language in this sentence with ellipses to manufacture support for the proposition that a "mismatch inquiry requires far more than subject-matter overlap." *Daubert* Opp. at 17. That proposition, however, is baseless.

*denied*, 2023 WL 8794620 (5th Cir. Nov. 17, 2023) (misstatements and correctives "need only be related or relevant to one another").[4]

The alleged false statements can withstand any level of scrutiny applied by district courts post-*Goldman*. Class Cert. Reply at 8–12; *compare* ¶185 ("As we look to 2018, our total capital investment is expected to be $2 billion … . This level of investment is expected to grow oil approximately 20%."), *with Cabot*, 2023 WL 6300569, at *4 ("Cabot has provided its preliminary 2020 production growth guidance of five percent … based on a preliminary capital budget range of $700 million to $725 million. The Company's 2020 program is expected to deliver $375 million to $400 million of free cash flow … ."); *compare* ¶171 ("High-quality acreage and scale within the Permian Basin enables Concho to efficiently allocate capital while continuing to advance manufacturing-style development with leading-edge drilling and completion techniques."), *with Cabot*, 2023 WL 6300569, at *4 ("This increase in lateral lengths will improve the capital efficiency and economics of the pad … ."); *see also Johnson & Johnson*, 2023 WL 9017023, at *19 (statements of company values that did not "specifically address the Talc Products or make any specific claims about the Company's quality assurance process and procedures"). By contrast, the statements in *Goldman* were purely generic corporate rhetoric. *See Goldman II*, 77 F.4th at 82 (including statements that "Integrity and honesty are at the heart of our business" and "Our reputation is one of our most important assets").

At bottom, Defendants' proffered mirror-image standard is spurious: *Goldman I* does not require that corrective disclosures precisely mirror the alleged misstatements. *See Cabot*, 2023 WL 6300569, at *7 (a "corrective disclosure need not precisely mirror the misrepresentation …

---

[4] Defendants falsely proffer Lead Plaintiffs have pushed forth this standard for the first time. *Daubert* Opp. at 16. But Lead Plaintiffs advocated for this precise standard in their class certification briefing. Class Cert. Reply at 6.

4

The two need only be related or relevant to one another").[5] Glaringly, the Opposition sidesteps *Cabot* entirely. *Daubert* Opp. at 16–17 (referencing *Cabot* without disputing its holding or reasoning). Instead, Defendants rely on a vacated, *pre*-*Goldman I* decision to argue that mirroring is necessary. *See Daubert* Opp. *at* 3 (citing *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 336 (5th Cir. 2010) (requiring showing that price drop was not caused by "some other reason"), *vacated and remanded sub nom. Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)). Simply put, the law is firmly on Lead Plaintiffs' side.

## B. Lead Plaintiffs Have <u>NEVER</u> Stated Courts May Not Rely on Expert Analysis of Market Commentary

Defendants next champion the relevance of analyst reports. *Daubert* Opp. at 4. A red herring. Lead Plaintiffs have never disputed the permissibility of expert analysis utilizing market commentary. *Daubert* Opp. at 5. Stating otherwise is simply false.

Instead, as is appropriate on a *Daubert* motion, Lead Plaintiffs have challenged Ms. Allen's individual "***methodology***." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993); *see Thomas v. GEICO*, 2024 WL 1075151, at *2 (N.D. Ill. Mar. 12, 2024) ("When assessing reliability, the [c]ourt focuses on the expert's methodology, not his conclusions."). Ms. Allen claims she conducted a "content analysis." Allen Report at ¶8. As Lead Plaintiffs have already detailed, the literature on content analyses supports that such methodology must be premised on "classification rules" developed using pre-test samples which are validated for

---

[5] Opinions from district courts across the country accord. *See e.g.*, *Crews v. Rivian Auto., Inc.*, 2024 WL 3447988, at *14 (C.D. Cal. July 17, 2024) (statements about the company's profitability were sufficiently related to public announcement that the company would hike prices); *In re NIO, Inc. Sec. Litig.*, 2023 WL 5048615, at *14-15 (E.D.N.Y. Aug. 8, 2023) (finding match between alleged misrepresentation that "construction has started [on the manufacturing plant]" and corrective disclosure stating that "the [c]ompany has agreed … to terminate the plan for this manufacturing plant"); *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *10 (D. Nev. Mar. 1, 2023) (sufficient match between statements denying allegations of an executive's "serious misconduct" and later revelations that the executive engaged in "sexual misconduct"); *Jaeger v. Zillow Grp., Inc.*, 2024 WL 3924557 at *6 (W.D. Wash. Aug. 23, 2024) ("An event can be corrective when it merely discloses a consequence of concealed information (for example, an earnings miss[.]").

consistency and reliability. *Daubert* Motion at 3–4. But Ms. Allen's analysis lacked any uniform analytical framework and had no standards or controls, leaving it impossible to reverse engineer each coder's process. *Id*. at 9–11, 13. Further, Ms. Allen's content analysis began with categories of misstatements **that were pre-sorted by counsel** to answer a series of subjective questions **prepared by counsel**. *Id*. at 4. Furthermore, Ms. Allen's report reached a (fully improper) **legal** conclusion, namely that there was a "mismatch" between the alleged misstatements and the alleged corrective disclosures. *Daubert* Opp. at 1 ("Ms. Allen[] demonstrated a fatal mismatch. . . ."); *see also Daubert* Motion at 14 (arguing Ms. Allen improperly conducted a legal analysis). By contrast, *Goldman I* establishes that mismatch analyses are legal determinations within the purview of courts. *Goldman I*, 594 U.S. at 127 (remanding for lower court to consider mismatch); *Goldman II*, 77 F.4th at 96-97, 100-105 (incorporating expert opinion on *genericness* to determine if there was a mismatch).

Ms. Allen's methodology diverges dramatically from the methods courts have previously credited, including in the very cases Defendants cite. Critically, **_none_** of the expert reports in Defendants' purported authorities (*Daubert* Opp. at 4–5) relied on counsel to pre-sort alleged misstatements or draft questions to guide the expert analysis. *See In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *9 (S.D.N.Y. Mar. 29, 2024) and *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 1:2020-cv-04953-JPO, ECF No. 91-4, at 2 ¶8(a) (S.D.N.Y. Mar. 30, 2023) ("*Kirkland* Expert Report") (study designed by expert without assistance from counsel);[6] *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *15 (N.D. Tex. Aug. 21, 2023) (same);[7] *Baker v.*

---

[6] See full expert instruction in *Kirkland* Expert Report regarding analysis ("Evaluate whether the alleged false and misleading statements, and certain other statements, had an impact on [the Company's] stock price during [Proposed Class Period]").

[7] The *Exxon* court denied class certification because of a lack of price impact and considered the expert's review of analyst materials only in dicta. *Ramirez v. Exxon Mobil Corp.,* 2023 WL 5415315, at *15.

*SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 901–02 (S.D. Cal. 2019) (same); *contra* Allen Report ¶¶8-14 (instructions comprising six pages of counsel-sorted statements and counsel-composed questions).[8]

Further still, in the cases cited by Defendants, any quasi-analogous analysis to Ms. Allen's was merely one component of a more complex whole involving an event study—which Ms. Allen did not perform for the corrective disclosure. *See, e.g.*, *Kirkland*, 2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) and *Kirkland* Expert Report (as final step of loss-causation event study, expert reviewed all publicly available information released during the event window, including announcements by the company, analyst reports, and public press); *SeaWorld*, 423 F. Supp. 3d at 899, 902 ("Coffman performed an event study as the foundation for his opinions in this case[,]" and considered "analyst  reports and news articles he identifies by name[.]"); *Exxon*, 2023 WL 5415315, at *15 (analyzing market reaction to the alleged corrective disclosures and considering analyst reports that followed similar, earlier news reports). Simply put, Ms. Allen's content analysis is a gross departure from the literature and dependent on a fictional legal standard. In this regard, Ms. Allen's content analysis here is the first of its kind, *i.e.*, novel.

Though Ms. Allen provided no peer-reviewed literature supporting her novel approach, (*Daubert* Motion at 11), Defendants now belatedly introduce an expert report from Dr. Laura Starks submitted in *Goldman* as a proxy. ECF No. 89-2 (the "Starks Report"). However, Ms. Allen did not list the Starks Report in her materials considered, and it is unclear whether she was even familiar with it when drafting the Allen Report. *See* Deposition of Lucy P. Allen ("Allen

---

[8] Defendants' remaining citations are indisputably inapposite. *Daubert* Opp. at 5. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45–46 (S.D.N.Y. 2016) regards an expert analysis of Chipotle's business practices wholly unlike the analysis of market reports here. *In re Apache Corp. Sec. Litig.*, 2024 WL 532315 (S.D. Tex. Feb. 9, 2024) involves no expert analysis at all; the court directly considered whether a specific report title indicated truth on the market prior to alleged corrective disclosure.

Tr.") 158:21–23 (Q: Did you read the expert materials in Goldman? A: I may have read some of them). Regardless, the methodology employed in the Starks Report does not compare to that used in the Allen Report:

- Dr. Starks adopted the *Goldman* complaint's categorization scheme and then constructed her own study design based on experience and expertise, unlike the Allen Report which relied on counsel to categorize statements and draft questions, which as of this stage of the proceedings still lack a proper basis.[9] Starks Report at ¶27 ("Plaintiffs allege that Defendants made two categories of misstatements"), ¶19 ("I have also reviewed analyst reports on Goldman during the Class Period..."); ¶52 ("I undertook an examination of analyst reports during the Class Period. . ."); *Daubert* Motion at 4.

- The Starks Report reached economic conclusions based on Dr. Starks' expertise (*Daubert* Opp. at 16), whereas the Allen Report conducted a legal analysis as to whether the corrective disclosures "match" the alleged misstatements and drew legal conclusions as to the same. *Daubert* Motion at 14; *infra*, III.E.

- The Starks Report conducted a broad analysis into the content of the reports including what the analysts *did* discuss—not merely what they purportedly omitted (Starks Report ¶53: "Beyond examining the information indicated to be important to analysts, I also considered whether the alleged misstatements were part of this information."). The Allen Report does not even feign a similar analysis.

- The Starks Report considered statements made by other companies within the defendant company's sector as part of its evaluation of whether the statements were generic. Starks Report ¶46, Exhibit 7. The Allen Report does no such thing.

- The Starks Report analyzed reports as part of a broader expert analysis of genericness based on the expert's education, academic research on investment, and years of investment management expertise (Starks Report ¶¶30, 32, 37, 39, 41–44), whereas Ms. Allen concludes the statements are generic based on the reports alone. *Daubert* Opp. at 8 (stating Ms. Allen's determination was based on the results in Appendix D).

- The Starks Report properly listed all materials considered, including "Public Press" materials (Starks Report, Materials Considered List pp. 59–60), whereas, by Ms. Allen's own admission, the Allen Report omits the entire news-articles category from its Materials Considered list. *Daubert* Motion at 17.

---

[9] Defendants had an opportunity in the Opposition to explain how each of the counsel-drafted questions were derived from the literature. Not only did Defendants fail to meet their burden in showing support for these questions based on the relevant economic literature, but they did also not even attempt to bridge the questions to specific case law. Simply put, the questions continue to have an unknown origin.

8

- Unlike the Allen Report (Allen Report ¶8), the Starks Report did not conduct a "content analysis" that failed to accord with the methodology required for such an analysis. *Daubert* Motion at 3–4.

Importantly, no court has had opportunity to critique the Stark Report's methodology because the *Goldman* plaintiffs did not raise a *Daubert* challenge. *See* Docket, *In re Goldman Sachs Group, Inc. Securities Litigation*, 1:2010-cv-03461 (S.D.N.Y.). The *Goldman* courts' reliance on an unchallenged report is unavailing where expert economists who are suited to opine on market theory assert Ms. Allen's approach is novel and unsupported. *Daubert* Motion at 16; Coffman Rebuttal Report at 17. Thus, even if the Starks Report and Allen Report were comparable (they are not), *Goldman II*'s reliance on the Starks Report is immaterial. *See Finesse Wireless LLC v. AT&T Mobility LLC*, 2023 WL 5613160, at *4 (E.D. Tex. Aug. 30, 2023) (report was properly considered regardless of methodological flaws where *Daubert* challenge was not timely raised).

Finally, Defendants' tired arguments regarding front-end price impact (Opp. at 4) are bewildering considering all parties agree the case is proceeded on an inflation maintenance theory. Even Ms. Allen herself admitted that front-end price impact is irrelevant to this case. *Daubert* Motion at 15; *see also*, *In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at *5 (N.D. Ill. Dec. 21, 2020) (critiquing Ms. Allen for assessing front-end price impact in assessing inflation maintenance). Instead of withdrawing that opinion, Defendants stubbornly continue on, risking exclusion (which is appropriate here). *U.S. v. Dixon*, 413 F.3d 520, 524 (5th Cir. 2005) (excluding expert testimony because it was "not relevant to the inquiry at hand" and "could not have 'assist[ed] the trier of fact'") (*citing* Fed. R. Evid. 702) (alteration in original).

### C. Defendants Outright Ignore Lead Plaintiffs' Process Challenges when Parroting Excerpts from the Allen Report

Defendants have admitted both the statement categorization and the questions guiding the

analysis were provided by counsel. *Daubert* Motion at 8; *Daubert* Opp. at 6 ("***Defendants*** grouped the alleged misstatements into three categories," "Defendants asked Ms. Allen and her team at NERA to conduct a systematic content analysis … ***with regard to specific questions*** …."). Further, Defendants admit that the guiding questions were intended to elicit legal conclusions. ("***The specific questions that were coded corresponded to the Goldman framework*** outlined above, as each was designed to gather evidence on whether analysts (1) assigned value or importance to the generic Category A statements when they were made, or (2) made any connection between the alleged corrective disclosure and the Category A, B, or C statements."). *Daubert* Opp. at 7. Thus, there is no question that the Allen Report's analysis was impermissibly lawyer driven.

Moreover, Defendants entirely ignore the other glaring errors the Motion called out in Ms. Allen's methodology by selectively quoting past filings. *Daubert* Opp. at 6–8. Though this lack of response, Defendants accede to more errors in Ms. Allen's methodology. *Kellam v. Metrocare Servs.*, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue."), *aff'd sub nom. Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014). Specifically:

- The Allen Report's methodology is neither replicable nor verifiable because: (a) the content analysis lacked any uniform or documented analytical framework; (b) Ms. Allen did not conduct a pre-sample analysis; (c) there are no records of specific documents that were reviewed, nor any search terms or other methods they employed; and (d) the subjective questions posed by Defendants' counsel required judgment calls that are unsupported by any documentation. *Daubert* Motion at 9.

- Analysis based on pre-supplied categories and questions is not supported by any publication or peer review. *Daubert* Motion at 10.

- The Allen Report provides no error rate. *Daubert* Motion at 12.

- Ms. Allen's novel methodology has no acceptance, let alone widespread acceptance, in the economic community, and the literature specifically admonishes her fully subjective approach. *Daubert* Motion at 13.

10

Defendants' telling silence on these critical issues alone suffices to justify exclusion.

> **D.      Defendants' Contention that Lead Plaintiffs "Found no Error" with the Allen Report Is Preposterous**

Defendants' argument that Lead Plaintiffs fail to identify errors in the Allen Report's coding is incorrect. *Daubert* Opp. at 8–9. Lead Plaintiffs have challenged the entirety of Defendants' and Ms. Allen's *Goldman* mismatch analysis as legally, textually, and logically incorrect. As for an actual technical error, Lead Plaintiffs expressly called out that question 14d pertaining to Category C was listed as entirely the wrong question, which Ms. Allen admitted carried into the results of her content analysis in Appendix D—repeated *18 times* in her results for Category C. *Daubert* Motion at 19. Any argument by Defendants that Lead Plaintiffs have not disputed specific, coded answers in the Allen Report's results is fundamentally improper because "[t]he focus [of a *Daubert* challenge], of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

> **III.    DEFENDANTS TELLINGLY FAIL TO ADDRESS THE SPECIFICS OF LEAD PLAINTIFFS' CHALLENGES IN THEIR OPPOSITION**

> **A.      Ms. Allen Merely Oversaw a Content Analysis Created by Defendants**

As explained in the *Daubert* Motion, the literature cited in the Allen Report opines that a pre-sample analysis is a fundamental step in any content analysis in that it validates the "consistency and reliability" of "classification rules." *Daubert* Motion at 2–4. In other words, the creation of coding architecture is a stage in the analysis afforded heavy weight—and a stage Defendants have conceded Ms. Allen did not undertake. Indeed, it was Defendants' counsel, not Ms. Allen, who devised the categories of statements and questions to be answered. It bears repeating, the framework of the content analysis at issue was admittedly created start to finish by Defendants' counsel; Ms. Allen started at the analytical half-way point by completing an analysis tainted with Defendants' bias. Defendants do not even attempt to explain this away. *See Daubert*

11

Opp. at 10–11. As to the volume of market commentary purportedly reviewed by Ms. Allen's staff, it simply does not ameliorate the fact that Ms. Allen did not conduct a complete content analysis.[10] *Id.* Finally, whether Ms. Allen "understood the purpose of the questions" (*Id.* at 11) does not absolve her from doing the work herself.[11]

### B. Defendants Rely on Hyperbole and Obfuscation Instead of Meeting Lead Plaintiffs' Attacks on Ms. Allen's Novel Processes Head On

Lead Plaintiffs have drawn attention to myriad infirmities with the methodology of Ms. Allen's content analysis. *See Daubert* Motion at 9–13; *see also supra*, I.C. Defendants either ignore these attacks entirely or gloss over them and misstate Lead Plaintiffs' arguments. Tellingly, Defendants first highlight that Ms. Allen used two pairs of coders—one of the few methodologies Lead Plaintiffs haven't challenged. *See Daubert* Opp. at 11. Defendants then baldly aver that Ms. Allen's content analysis comports with NERA's "standard practice." *Id.* However, if NERA has guidelines or policies for content analysis, they were never produced to Lead Plaintiffs; Ms. Allen merely provided a broader-than-broad description at her deposition, stating that the content analysis here was "similar" to NERA's. Allen Tr. at 43:22–44:18.

Defendants concede that Ms. Allen cites no peer reviewed literature supporting a content

---

[10] That experts are permitted to assume defendants' liability for purposes of damages analysis does not suggest that counsel may perform vast swaths of analysis on an expert's behalf. *In re DVI, Inc. Sec. Litig.*, 2014 WL 4634301, at *3, *6 (E.D. Pa. Sept. 16, 2014) (finding it immaterial that Mr. Coffman was "asked by counsel … to quantify the damages … under the assumption that Defendants are found liable"). It should be noted that the Allen Report discloses no assumptions at all and nowhere states that the questions and categories were assumptions that Ms. Allen was asked to incorporate. But even if this were not the case, these assumptions would still disqualify the Allen Report because they are unsupported. *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009) (affirming exclusion of expert opinion that relied on false assumptions rebutted by evidence); *Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*, 136 F.3d 1329 (5th Cir. 1998) (affirming exclusion of expert model for lost profits based on speculative assumptions); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3rd Cir. 2012) (affirming exclusion of expert opinion based on assumptions unknown to the expert).

[11] While Ms. Allen may have testified she was aware of Defendants' counsel's intent behind the questions and categories, Ms. Allen later testified she did not even know what key terms within the categories and questions meant. *See Daubert* Motion at 10–11. *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x. 513, 516 (5th Cir. 2013) (affirming exclusion of expert opinion where "expert made numerous assumptions with no apparent underlying rationale").

analysis with questions and categories created by a biased third party to conduct a match analysis with earlier-in-time statements. *See id.* at 12–13. Defendants further concede that the article cited to by Ms. Allen's colleague, Dr. David Tabak, was not included in any peer reviewed journal.[12] Without ***any explanation whatsoever***, Defendants state that Ms. Allen's analysis "bears a striking resemblance" to the expert analysis in *Goldman*. *Id.* at 13. Yet the Starks Report was not in Ms. Allen's materials considered—unsurprising as Ms. Allen could not recall whether she had even read it. Allen Tr. at 158:23 ("I may have read some of them"). Defendants ill-explained citation to *Goldman* and two inapposite out-of-Circuit cases does not bolster their position.[13] Then, Defendants outright contradict their previous argument stating that *Goldman* is "too new" for Ms. Allen's approach to have support in the literature. *Daubert* Opp. at 13. But as demonstrated by both Defendants and Ms. Allen, content analysis is not "new," and there is a body of literature discussing its practice.

Defendants' other gripes similarly fail. Lead Plaintiffs never suggested that Ms. Allen should have used search terms or coding software. *Daubert* Opp. at 12. During Ms. Allen's deposition, Lead Plaintiffs' counsel sought to gain a better understanding of the processes and

---

[12]  Dr. Tabak's "peer review[]" of the Allen Report changes nothing. *Henson v. Deepwell Energy Serv., LLC*, 2021 WL 3388036, at *10 (E.D. Tex. June 14, 2021) ("The *Daubert* factor that focuses on peer review and publication does not concern whether the expert's proffered report is peer-reviewed, but, instead, whether 'the theory or technique used by the expert has been subjected to peer review and publication.'"); *Daubert* Opp. at 13. Nor does Dr. Coffman's citation to a peer-reviewed article by Dr. Tabak and others in a reputable journal transform Dr. Tabak's blog post on his employer's website into peer-reviewed literature. *Daubert* Opp. at 13; *Daubert* Motion at 5.

[13] *See In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 369 (S.D.N.Y. 2016) (acknowledging the court "would place more weight on the absence of peer review" had the expert "us[ed] a novel or questionable statistical technique" instead of a "z-test" which, unlike Ms. Allen's novel methodology, is a commonly used and widely accepted statistical device), *aff'd in part*, *vacated in part sub. nom.*, 862 F.3d 250 (2d Cir. 2017); *Sonerra Res. Corp. v. Thomas Energy Servs., Inc.*, 2003 WL 25685208, at *2 (E.D. Tex. July 16, 2003) (unlike here, theory and literature underlying the expert's novel application "ha[d] been subjected to peer review"). Defendants' effort to distinguish Lead Plaintiffs' authority fall flat. In *Chen-Oster v. Goldman, Sachs & Co.*, 2022 WL 814074, at *6 (S.D.N.Y. Mar. 17, 2022), as Defendants explain, the expert's content analysis was excluded as unreliable because the expert similarly did not sufficiently explain how she selected and categorized terms or offer a method to verify her methodology. *Daubert* Opp. at 12 n. 5.

tools employed by Ms. Allen's coders. Ms. Allen's testimony made clear the process was neither uniform nor supervised. *Daubert* Motion at 9. As to error rate, Defendants concede none was included in the Allen Report and again retreat to distorting Ms. Allen's testimony. *Daubert* Opp. at 12. At her deposition, Ms. Allen stated plainly that she had no idea as to the volume of coder-level discrepancies, merely guessing that ten or so were *escalated* to her. *Daubert* Motion at 6.

### C. Ms. Allen's Content Analysis Was Qualitative and Premised on an Incorrect Legal Standard

As explained at length in the Motion, Ms. Allen's content analysis is plainly qualitative insofar as it tasked NERA staff with determining, *e.g.*, whether analysts "learned" new information or "made a connection" to earlier in time statements. *Daubert* Motion at 9–11. Defendants argue that Ms. Allen's content analysis was quantitative because Lead Plaintiffs did not challenge individual codes. *Daubert* Opp. at 14–15. This makes no sense. Lead Plaintiffs' wholesale challenges to the foundation of Ms. Allen's content analysis do not somehow make the analysis quantitative. It is clear, however, why Defendants force this argument—the literature cited to by Ms. Allen strongly admonishes qualitative content analysis. *Id.*

Moreover, if Ms. Allen's content analysis was purely binary and quantitative, then Ms. Allen's standard was wildly out of pace with the "relevant or related to" standard in this District. *See Daubert* Motion at 11 (citing *Cabot*, 2023 WL 6300569). In fact, Ms. Allen affirmed she was noncompliant with this standard. Allen Tr. at 141:5–23, 142:21–144:15. Adding another layer of absurdity, if Ms. Allen's coders assumed that only a direct mention to "the alleged misstatement affected the valuation" (Allen Tr. at 135:6–7), Ms. Allen must not have been provided the slew of disclosure-date analyst reports attributing downgrades to slashed production because of tight well spacing and Concho's recent capital programs—some even questioning the veracity of Concho's previous statements given the news. *See* Complaint at ¶¶301–07; Coffman Rebuttal

14

Report at 9–11.

Finally, Defendants again trot out *Goldman* for the general proposition that Courts may entertain qualitative evidence in conducting a match analysis between alleged generic statements and a corrective disclosure.[14] *Daubert* Opp. at 3, 15. This misses the point. Lead Plaintiffs do not argue that qualitative evidence cannot be probative; the issue is that qualitative content analyses are disparaged by experts and scholars and *this content analysis* fails to employ any supported methodology. Nowhere in *Goldman* is the instruction that established guidelines for expert analysis be supplanted to allow the proffer of lawyer-derived, qualitative, content analysis under the wrong legal standard. In this same regard, Defendants' argument that the flaws Lead Plaintiffs identify go only to credibility fails—Lead Plaintiffs' *Daubert* Motion not only attacks Ms. Allen's content analysis for being tainted with the internal bias of Defendants' counsel, but similarly attacks the methodology in myriad ways.

### D. Defendants Concede the Allen Report Included an Oft-Repeated Incorrect Question

During her deposition, Ms. Allen discovered for the first time that question 14d was the incorrect question and repeated incorrectly 18 times in Appendix D of the Allen Report. *Daubert* Motion at 19. Defendants feign incredulity that Lead Plaintiffs raised this mistake—revealed only after the briefing on class certification. *Daubert* Opp. at 15–16. Yet Ms. Allen's unsubstantiated verbal corrections during her deposition do not serve as an analog to submitting an accurate expert

---

[14] The other three cases cited in the Opposition are inapposite, out of Circuit, and pre-date the case relied on by Lead Plaintiffs to articulate the correct "related to" match standard. *Disney Enters. v. VidAngel Inc.*, 2019 WL 4544428, at *5 (C.D. Cal. May 29, 2019) (the expert's "decades of experience in the film industry" qualified her to "opine about **unquantifiable damages** [the defendant's] infringement allegedly caused"); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 507 (S.D.N.Y. 2015) (qualitative analysis was acceptable where the expert was "not offering testimony … that would require a comprehensive market survey or other quantitative data"); *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1126 (C.D. Cal. 2018) ("[C]ourts have recognized that **an expert conducting an event study** must use her discretion or independent determination in identifying news.").

report. Simply calling the error meaningless does not make it so.

### E.    Ms. Allen Expressly Stated She Was Conducting a Match Analysis

Defendants' attempt to cast Ms. Allen's testimony as merely giving opinion as to facts fails. *Daubert* Opp. at 16–17. Ms. Allen did not merely give an opinion as to facts, she was tasked with performing a derivative of a *Goldman* mismatch analysis premised on legal categories and questions drafted by counsel. In the Allen Report, Ms. Allen specifically states she is reviewing for a "match" between alleged false and misleading statements and the corrective disclosure in this case, which, under *Goldman*, is a legal conclusion. *Daubert* Motion at 14. Contrary to Defendants irate hyperbole, Lead Plaintiffs have not sought to "backdoor" new authority—as explained *supra* n.4, Lead Plaintiffs advocated for an identical "related to" standard in their class certification briefing. Class Cert. Reply. at 12. Defendants' accusation is ironic considering the Opposition spends more time buttressing their opposition to class certification than responding to the specific challenges in the *Daubert* Motion.[15]

### F.    Defendants Beat a Dead Horse with Irrelevant Front-End Price Impact Arguments

Lead Plaintiffs have never abandoned, denounced, conceded, or otherwise made any representations regarding front-end price impact except to state they were proceeding with the alternative, inflation maintenance theory. Class Cert. Reply at 12 n. 15. Yet Defendants keep dragging it back from the beyond for reasons Lead Plaintiffs cannot comprehend. *Daubert* Opp. at 18. At the tail end of this filler argument, Defendants sneak in an unsupported, made-up argument that a lack of front-end price impact (never conceded) should support their arguments regarding back-end price impact. *Daubert* Opp. at 17-18. Not the law. *See Apache*, 2024 WL

---

[15] Defendants' authority supports that legal conclusions like Ms. Allen's are improper. *Daubert* Opp. at 16 (citing *Butler v. BNSF Ry. Co.*, 2024 WL 2735020, at *5 (E.D. Tex. Mar. 26, 2024) (holding that expert could not testify as to legal conclusions)).

532315, at *4. Considering that Defendants refuse to withdraw this irrelevant opinion, it should be excluded. *Dixon*, 413 F.3d at 524; *Saldana,* 2023 WL 3695620 at *2 (excluding expert testimony and striking expert report because the expert's opinions were irrelevant).

## IV.    DEFENDANTS' DAMAGES ARGUMENTS SHOULD BE IGNORED

The Allen Report's common-damages analysis is first based on Ms. Allen's token endorsement of Defendants "materialization of the risk" argument. *Daubert* Opp. at 17-18. Second, it is based on Ms. Allen's fundamental lack of understanding of Lead Plaintiffs' claims relating to the RSP acquisition and Section 10(b) damages. *Daubert* Motion at 15–16.

Defendants quibble that courts have used the term "materialization of the risk" in the context of damages discussions—a wholly unsurprising fact since a "materialization of the risk" is a form of corrective event for which an expert might calculate damages. *Daubert* Opp. at 18. This in no way supports the idea that an expert for Defendants (or any expert, for that matter) can make a legal determination as to which theory of loss causation Lead Plaintiffs assert. Nor does Defendants' authority support as much. *Daubert* Opp. at 18 (citing *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014) (citing expert opinion regarding damages methodology where plaintiffs asserted a materialization of the risk argument)).

Worse still, Ms. Allen's deposition testimony reveals that she did not even grasp the "materialization of the risk" concept—unsurprising, as she is not a legal expert. *Daubert* Motion at 16; *see e.g.*, Allen Tr. at 312:14–20 ("I mean, you could have a materialization of a risk where people didn't understand that there was a risk, and then what you failed to disclose, whether there was the risk, and what actually happens is worse than if you would just disclose the risk."). Whether during her extended soapboxing (Allen Tr. at 322–329) one of many divergent definitions of materialization of the risk offered by Ms. Allen came closer to correct than others is moot. *Daubert* Opp. at 19 citing Allen Tr. at 310:6–22 ("I think the way it's -- I mean, I've

17

heard that term used a couple of different ways, but I think the way that's similar to how it's being used here is that plaintiffs have understated -- I mean, not plaintiffs -- defendants have -- a company, for example, has understated the risk of something happening, and then it actually does happen that risk materializes and something bad happens.").

Finally, Ms. Allen does not deny that her report cites no authority for the (legally and practically perverse) proposition that the payment of a merger premium should be netted against Section 10(b) securities fraud damages, nor do Defendants cite any now. *Daubert* Opp. at 19; *Daubert* Motion at 16; Allen Tr. at 322:2–327:21, 328:15–329:25. At her deposition, Ms. Allen minced words, averring that non-specified "courts have said" that "to the extent you're harmed by something, if you're also benefited, that it -- you should take that account," and that "there is citations" amongst peer-reviewed literature, though she "[did] now know if [she] cited any here." Allen Tr. at 322:19–24. Ms. Allen's principal support for her position is that, to most people, "more money is better," a point apparently supported by the undergraduate "Brealey & Myers textbook"—and the only proposition in this discussion for which Ms. Allen mustered any authority. Allen Tr. at 323:24, 326:1-7; *Daubert* Opp. at 19 and n. 12 (claiming Ms. Allen cited support for her conclusion). *Moore,* 547 F. App'x. at 516 ("where the primary witness's deposition testimony reflects uncertain[ty] regarding many details necessary to the expert's analysis, the expert may not overcome th[e] evidentiary lack with the furtive inclusion of … supposed facts not in the record") (alterations in original).  Regardless, any damages analysis is premature at this stage of litigation.

## V.    DEFENDANTS CONCEDE MS. ALLEN OMITTED AN ENTIRE CATEGORY OF DOCUMENTS IN HER MATERIALS CONSIDERED

Ms. Allen expressly and repeatedly admitted under oath that she reviewed news articles as part of her analysis and that, in her own estimation, she "should have listed news articles" in

her materials-considered list. Allen Tr. at 74: 10–21 ("Q. Aside from that one Wall Street Journal article, did you review any other news articles on Concho during the class period? A. I believe so. I do believe I would have reviewed news articles. Q. Okay. Is there any particular reason why they are not contained in the materials considered list? A. No, I don't think there is a good reason. I think I should have listed news articles, at least as a category."); *id.* at 75:3–5 ("I do think news articles should have been mentioned as materials considered.").

Ms. Allen cannot simply assure that the omission was harmless, especially considering her testimony that the market can move independent of analysts and that news articles are highly relevant to "timing," a critical issue in a loss causation analysis. *Id.* at 87:16-17 ("market can move independent of analysts"); *id.* at 75:15–21 ("I don't recall the news articles making a difference in terms of anything that was done in my report. But we would almost always, at some point, look at news articles, sometimes just to see, you know, timings of announcements or what might happen.").[16] Regardless of Defendants' gerrymandering of Ms. Allen's testimony to downplay this exclusion, experts must disclose all materials "considered," not merely those "relied upon." *Republic of Ecuador v. Mackay*, 742 F.3d 860, 869 (9th Cir. 2014).

Defendants concede that this entire news-article category is missing from Ms. Allen's Materials Considered list. *Daubert* Opp. at 20. This omission alone is sufficient grounds to exclude the Allen Report. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii) (experts must disclose the "facts or data" considered); Fed. R. Civ. P. 37(c)(1) (evidence violating Rule 26(a) may not be used). Indeed, this is precisely the kind of omission that casts doubt on an expert's process and causes courts to exclude expert testimony. *Estevis v. City of Laredo*, 2023 WL 9312081, at *9 (S.D. Tex. Dec. 28, 2023) (excluding expert because general references to sources "deprive the [c]ourt" of

---

[16] Notably, the purportedly comparable analyses that Defendants cite weighed news reports. See *supra*, II.C.

19

ability to assess reliability); *Sanson v. Allstate Texas Lloyds*, 2018 WL 3736362, at *3 (E.D. Tex. Aug. 6, 2018) (noting that a one sentence "clerical error" from "oversight" violated federal and local rules and weighed in favor of exclusion).[17]

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant Lead Plaintiffs' Motion to Exclude the Opinions and Testimony of Lucy P. Allen in its entirety.

DATED: September 16, 2024

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III (admitted *pro hac vice*)
Joseph N. Cotilletta (admitted *pro hac vice*)
Charles Wood (admitted *pro hac vice*)
Rachel A. Berger (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
jcotilletta@labaton.com
cwood@labaton.com
rberger@labaton.com

*Lead Counsel for Lead Plaintiffs and the Class*

---

[17] Defendants' authorities (*Daubert* Opp. at 20 n. 13) do not hold differently. *See Estech Sys. IP, LLC v. Carvana LLC*, 2023 WL 2934920, at *5 (E.D. Tex. Apr. 13, 2023) (expert specified the sources of public information, which included only three websites); *Exeltis USA Inc. v. First Databank, Inc.*, 2020 WL 7025089, at *3 (N.D. Cal. Nov. 30, 2020) (expert testified that the omitted documents "merely *confirmed* the opinions that he had already formed") (emphasis in original).

20

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 16, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Notice of Electronic Filing.

Alfred L. Fatale III