**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Civil Action No. 4:21-cv-02473<br><br>CLASS ACTION |

**EXHIBITS TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

1

| Exhibit A | Order Denying Motion for Class Certification (Dkt. 227) – *Shupe et al. v. Rocket Co.'s et al.*, Case No. 1:21-cv-11528 (E.D. Mich. Sept. 30, 2024) |
|-----------|------------------------------------------------------------------------------------------|
| Exhibit B | Order on Expert Motions (Dkt. 226) – *Shupe et al. v. Rocket Co.'s et al.*, Case No. 1:21-cv-11528 (E.D. Mich. Sept. 30, 2024) |

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ David D. Sterling w/p*
    David D. Sterling
      Attorney-In-Charge
    State Bar No. 19170000
    Federal I.D. No. 07079
    Amy Pharr Hefley
    State Bar No. 24046046
    Anthony J. Lucisano
    State Bar No. 24102118
    Federal I.D. No. 3369146
    C. Frank Mace
    State Bar No. 24110609
    Federal I.D. No. 3385915
    910 Louisiana Street
    Houston, Texas 77002
    (713) 229-1946
    (713) 229-7946 (Fax)
    david.sterling@bakerbotts.com
    amy.hefley@bakerbotts.com
    anthony.lucisano@bakerbotts.com
    frank.mace@bakerbotts.com

    ATTORNEYS FOR DEFENDANTS CONCHO
    RESOURCES INC., CONOCOPHILLIPS, AS
    SUCCESSOR IN INTEREST TO CONCHO
    RESOURCES INC., TIMOTHY LEACH, JACK F.
    HARPER, AND C. WILLIAM GIRAUD

By: */s/ Robert Ritchie*
Michael C. Holmes
Texas Bar No. 24002307
Southern District Bar No. 23716
Robert Ritchie
Texas Bar No. 24079213
Southern District Bar No. 3089959
K. Virginia Burke DeBeer
Texas Bar No. 24097437
Southern District Bar No. 3472047
VINSON & ELKINS LLP
2001 Ross Ave., Suite 3900
Dallas, TX 75201
Tel: (214) 220-7700
Fax: (214) 999-7923
mholmes@velaw.com
rritchie@velaw.com
vdebeer@velaw.com

CO-COUNSEL FOR DEFENDANTS TIMOTHY
LEACH, AND C. WILLIAM GIRAUD

## CERTIFICATE OF SERVICE

I hereby certify that, on October 8, 2024, a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system.

*/s/ Robert Ritchie*

3

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CARL SHUPE, and CONSTRUCTION
LABORERS PENSION TRUST FOR SOUTHERN
CALIFORNIA, individually and on behalf of all
others similarly situated,

               Plaintiffs,                    Case No. 1:21-cv-11528

v.                                      Honorable Thomas L. Ludington
                                      United States District Judge
ROCKET COMPANIES, INC., JAY FARNER,
DANIEL GILBERT, and ROCKET HOLDINGS, INC,

               Defendants.

_____/

**OPINION AND ORDER DENYING PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**

TABLE OF CONTENTS

**Introduction** ........................................................................................................................ **2**

**I. Background Facts** .......................................................................................................... **3**

  A. Rocket's Origins ........................................................................................................ 3

  B. Rocket's Key Performance Indicators ...................................................................... 7

  C. Farner's Alleged Misrepresentations ........................................................................ 9

  D. Gilbert's Alleged Insider Trading ........................................................................... 11

  E. Procedural Posture ................................................................................................... 13

**II. Governing Law** ......................................................................................................... **15**

**III. Analysis** .................................................................................................................... **16**

  A. Rule 23(b) Requirements ......................................................................................... 17

    1. Predominance ....................................................................................................... 17

      a. *Basic* Presumption Background ........................................................................ 18

      b. Plaintiffs' Proof of Market Efficiency ............................................................. 20

        i. Public Trading ............................................................................................... 22

        ii. Weekly Trading Volume............................................................................... 22

        iii. Security Analyst Reports ............................................................................. 23

        iv. Market Makers and Arbitrageurs ................................................................ 24

v. Form S-3 Eligibility ................................................................. 25

vi. Historic Price Impact............................................................. 26

vii. Market Capitalization............................................................ 29

viii. The Bid-Ask Spread.............................................................. 30

ix. The Float ............................................................................... 31

x. Institutional Investors, Autocorrelation, and Options Trading ................................. 34

xi. Meme Stock ........................................................................... 36

c. Defendants' Proof of Lack of Price Impact ................................................... 46

d. *Affiliated Ute* Presumption.................................................................. 53

e. Damages........................................................................................ 55

2. Superiority ............................................................................. 59

3. Ascertainability......................................................................... 60

B. Rule 23(a) Requirements ................................................................. 61

1. Numerosity .............................................................................. 62

2. Commonality ........................................................................... 63

3. Typicality................................................................................. 65

a. Plaintiff Shupe................................................................................ 65

b. Plaintiff SoCal............................................................................... 68

4. Adequacy ................................................................................ 69

a. Plaintiff Shupe................................................................................ 70

i. Lead Plaintiff Efforts and Investment Sophistication ......................................... 71

ii. March 2, 2021 Sales of Rocket Stock and Resulting Profits .................................. 72

b. Plaintiff SoCal................................................................................ 77

IV. Conclusion ........................................................................... 82

## Introduction

Plaintiffs Carl Shupe and Construction Laborers Pension Trust for Southern California ("SoCal") seek to certify a class of all individuals who traded Rocket Companies, Inc. ("Rocket") Class A common stock from February 25 through May 5, 2021 (the "Class Period"), alleging that the price of this stock was artificially inflated and maintained by a series of fraudulent misrepresentations made by Defendant Jay Farner. Within this Class, Plaintiffs also seek to certify

a Subclass of all individuals who specifically traded Rocket Class A common stock "contemporaneously" with Defendant Dan Gilbert's alleged insider trade of the same security on March 29, 2021.

Combined, Civil Rule 23(a) and 23(b)(3) impose seven separate requirements to obtain class certification. One of those requirements—predominance—is particularly complicated in cases such as this, where Plaintiffs seek to certify a class alleging securities fraud in violation of Section 10(b) of the Exchange Act and accordingly must demonstrate that individual questions of investor reliance do not overwhelm the common questions shared by the class. To make matters more complicated, the Parties dispute nearly every factor within every requirement imposed by Civil Rule 23.

Plaintiffs come up short. Plaintiffs have not shown that common questions predominate, because, although they have invoked the *Basic* presumption of class-wide investor reliance by proving Rocket stock traded on an efficient market throughout the Class Period, Defendants have rebutted it by proving Defendant Farner's alleged misrepresentations had no impact on the price of Rocket stock. Accordingly, a class action is not the superior method to adjudicate Plaintiffs' claims. Moreover, Plaintiffs have not proposed an ascertainable Subclass definition, nor have they proposed adequate Class and Subclass representatives. Plaintiffs' renewed motion for class certification will accordingly be denied.

## I. Background Facts

### A. Rocket's Origins

In 1985, Dan Gilbert founded Rocket Mortgage, LLC ("Rocket Mortgage"). *See* ECF No. 1 at PageID.6. Since its founding, Rocket Mortgage has, as its name implies, taken financial flight. In 1999, Rocket Mortgage pioneered online home mortgage applications. ECF No. 109 at

PageID.8430. Nearly 15 years later, Rocket Mortgage launched a digital, "end-to-end completely online mortgage experience," through which customers "can go from application to approval and look at their rate online, without having to talk to a banker." *See id.*; *Our History*, ROCKET COMPANIES, https://www.rocketcompanies.com/press-room/our-history/ [https://perma.cc/N2VE-5TPZ]. Rocket Mortgage's digital platform has been highly successful and is largely responsible for propelling "Rocket" to its status as a household name within home financing. ECF No. 109 at PageID.8431 (noting Rocket Mortgage's online platform "has provided more than $1 trillion in home loans since its inception" and that, "[b]y 1Q 2020, Rocket's market share grew to 9.2% of an over $2.0 trillion annual market[.]"). Indeed, Rocket Mortgage currently advertises itself as "America's largest mortgage lender." *About Us*, ROCKET MORTGAGE, https://www.rocketmortgage.com/about (last visited Aug. 25, 2024) [https://perma.cc/7NL9-ZCLK].

The "Rocket" brand quickly expanded, growing beyond Rocket Mortgage to Rocket Companies, Inc. ("Rocket"), a constellation of 13 separate companies, spanning across multiple industries including home and personal financing, sales, technology, and marketing.[1] *See Our Companies*, ROCKET COMPANIES, https://www.rocketcompanies.com/our-companies/#sales-technology-marketing-services (last visited Aug. 25, 2024) [https://perma.cc/8J7P-GNUH]. At all relevant times, Rocket was controlled by a separate company, Rocket Holdings, Inc. ("RHI"), which was, in turn, controlled by Dan Gilbert.[2] ECF No. 109 at PageID.8425–26.

---

[1] RCI currently consists of: (1) Rocket Mortgage; (2) Rocket Mortgage Canada; (3) Amrock; (4) Amrock Title Insurance Company; (5) Lendesk; (6) Rocket Homes; (7) ForSaleByOwner.com; (8) Rocket Loans; (9) Rocket Money; (10) Core Digital Media; (11) LowerMyBills.com; (12) Rocket Innovation Studio; and (13) Woodward Capital Management. Our Companies, ROCKET COMPANIES, https://www.rocketcompanies.com/our-companies/#sales-technology-marketing-services (last visited Aug. 25, 2024) [https://perma.cc/8J7P-GNUH].

[2] Rocket reported the following in its 2020 annual report, filed with the SEC:

Despite this expansion, Rocket Mortgage remains Rocket's "flagship business." ECF No. 109 at PageID.8430. Rocket lends money—secured by mortgages—to consumers, both directly and through third-party partners such as private mortgage brokers and banks. *Id.* at PageID.8417, 8436–40. Notably, direct-to-consumer loans are more profitable than partner-network loans because Rocket need not share profits with third-party brokers or middlemen. *Id.* at PageID.8437–38 (noting direct-to-consumer sales accounted for "approximately 88%, 87%, 81%, 75%, and 82%" of Rocket's annual revenues "from 2017 to 2021, respectively). Through these two channels, Rocket sells two types of mortgages: new purchase mortgages and refinancing mortgages. *Id.* at PageID.8417. Unlike purchase mortgages, which allow homebuyers to finance a new home, refinancing mortgages allow homeowners with preexisting mortgages to change their mortgage rates and terms.

---

> ***We are controlled by RHI, an entity controlled by Dan Gilbert, whose interests may conflict with our interests and the interests of other stockholders****.*
>
> RHI, an entity controlled by Dan Gilbert, our founder and Chairman, holds 99.94% of our issued and outstanding Class D common stock and controls 79% of the combined voting power of our common stock. As a result, RHI is able to control any action requiring the general approval of our stockholders, so long as it owns at least 10% of our issued and outstanding common stock, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws and the approval of any merger or sale of substantially all of our assets. So long as RHI continues to directly or indirectly own a significant amount of our equity, even if such amount is less than a majority of the combined voting power of our common stock, RHI will continue to be able to substantially influence the outcome of votes on all matters requiring approval by the stockholders, including our ability to enter into certain corporate transactions. The interests of RHI could conflict with or differ from our interests or the interests of our other stockholders. For example, the concentration of ownership held by RHI could delay, defer or prevent a change of control of our Company or impede a merger, takeover or other business combination that may otherwise be favorable for us.

Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021) (emphasis in original).

Regardless of loan type and whether a third-party broker is involved, Rocket primarily profits by selling repackaged consumer loans to government-sponsored entities ("GSEs") like Fannie Mae and Freddie Mac, which then "pool the loans sold by [Rocket] together . . . to issue and sell to the secondary market as mortgage-backed securities," ("MBS") which investors can buy, sell, and trade. *Id.* at PageID.8418; *see also id.* at PageID.8434 (noting Rocket sold 97% of its closed loans to GSEs, before that metric fell to 93% in 2021). Specifically, Rocket capitalizes on the "primary-secondary spread," or the difference between the interest rate that homeowners pay to purchase or refinance a home—the "primary" rate—and the interest rate paid to investors who buy and hold MBSs—the "secondary" rate. *Id.* at PageID.8418; *see also id.* at PageID.8431–32 (noting Rocket's sale to the secondary market accounted for more than 85% of its revenue from 2017–2021).

In August 2020, Rocket launched its initial public offering ("IPO"), selling 100 million shares at $18.00 per share, raising $1.8 billion. ECF No. 109 at PageID.8431. At the time, Rocket's refinancing business was booming, due in large part to favorable home interest rates prompted by the COVID-19 pandemic. *See id.* at PageID.8417, 8434 (noting, that in 2020, "approximately 80% of Rocket's new loan applications were refinance loans" whereas only "20% were new purchase loans"); Erin Gobler, *Here's How COVID-19 Changed the Mortgage Process*, FOX BUSINESS (July 2, 2021), https://www.foxbusiness.com/money/how-covid-pandemic-changed-mortgage-process ("In March 2020, the Federal Reserve slashed interest rates to help stimulate the economy. Mortgage interest rates fell to their lowest levels ever, and the trend . . . continued into 2021[.]") [https://perma.cc/8G6Y-H3DJ]. Rocket's 2020 annual revenue surpassed $15.7 billion. ECF No. 109 at PageID.8431.

**B. Rocket's Key Performance Indicators**

To ensure profits continued to soar, as well as to avoid potential obstacles along the way, Rocket closely monitored what it referred to as "Key Performance Indicators" ("KPIs"). ECF No. 109 at PageID.8440. As explained in Rocket's public SEC filings, it monitored closed loan origination volume, total market share, and "gain on sale margins." Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021).

Closed loan origination volume represents the number of loans that Rocket originated, processed, and funded. ECF No. 109 at PageID.8445. Beyond this representation, the closed loan origination volume is also highly predictive of the number of probable loans that Rocket—through GSEs—could sell on the secondary market as MBSs during the same period. *See id.* Accordingly, and as alleged, the higher Rocket's closed loan origination volume, the higher the primary-secondary spread, the higher "gain on sale of loans, net," and the higher "gain on sale margin," as explained below. *See id.* at PageID.8446 (emphasis omitted).

Rocket's "gain on sale margin" is calculated by dividing the "gain on sale of loans, net" by the "net rate lock volume for the period." *Id.* The former part of this equation—Rocket's gain on sale of loans, net—consists of "all components related to the origination and sale of mortgage loans, including:"

(1) Rocket's net gain on sale of loans, as reflected by the "primary-secondary spread";
(2) Loan origination fees and other "certain costs";
(3) Provisions for or benefits from investor reserves;
(4) The change in fair value of interest rate lock commitments ("IRLCs")[3] and loans held for sale;
(5) The gain or loss on forward commitments hedging loans held for sale and IRLCs; and

---

[3] An IRLC is an "agreement[] to lend to a client as long as there is no violation of any condition established in the contract. Commitments generally have fixed expiration dates or other termination clauses and may require payment of a fee." Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021); *accord* ECF No. 109 at PageID.8444–45.

- 7 -

(6) The fair value of originated Mortgage Servicing Rights (MSRs)

*See id.* The latter part of this equation—the "net rate lock volume" for the period—is defined as the unpaid principal balance of all loans subject to IRLCs and Rocket's estimated "pull-through factor"—"a key assumption" which "estimates[] loan funding probability, as not all loans that reach IRLC status will result in a closed loan." *Id.*

As alleged, beginning in November 2020, Rocket executives knew—based on market trends and the company's review of KPIs—that the company's profitability was about to implode. Specifically, the "closed loan volume for each channel" of Rocket's loan sale business was trending downwards. ECF No. 109 at PageID.8470–72 (alleging "[c]losed loan volume fell significantly, declining from $40.25 billion in November 2020 to just $32.44 billion in December 2020 and then continued to decline to approximately $22.38 billion by May 2021"); *see also id.* at PageID.8516 (depicting closed mortgage volume declining in both Rocket's direct-to-consumer and partner networks, beginning in November 2020). In addition, new client inquiries and loan applications were down 20%. *Id.* at PageID.8474–75, 8511 (alleging "internal Company dashboards showed that consumer demand was not strong because web traffic and new loan applications began declining in 2020, which continued on to 1Q 2021"). Moreover, Rocket's net lock volume—the unpaid principal balance of all loans subject to IRLC discounted by Rocket's "pull-through" factor—grew stagnant and began declining. *Id.* at PageID.8476.

Compounding Rocket's alleged internal challenges, mortgage interest rates began rising in March 2021. *See Mortgage Rates*, FREDDIE MAC (last updated Aug. 22, 2024) https://www.freddiemac.com/pmms [https://perma.cc/8S7Z-R82T] *accord* ECF No. 109 at PageID.8480. By Rocket's own admission, increased interest rates correspond to a decrease in profitable refinancing loan volume, a decreased primary-secondary spread, and a decrease in

overall net revenue. *See* Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021) (noting Rocket's profits have primarily derived from refinancing—rather than purchase—mortgages, explaining (1) "if interest rates rise and the market shifts to purchase [loan] originations, our market share could be adversely affected if we are unable to increase our share of purchase originations," and (2) "reductions in the overall level of refinancing activity [or] slow growth in the level of new home purchase activity . . . can impact our ability to continue to grow our loan production volumes, and we may be forced to accept lower margins in our respective businesses"). Around the same time, United Wholesale Mortgage ("United")—one of Rocket's key competitors—issued a public "ultimatum" to third-party brokers that, if they continued to work with Rocket, they could no longer work with United. *See* ECF No. 109 at PageID.8483; *Okavage Grp., LLC v. United Wholesale Mortg., LLC*, No. 3:21-CV-448-WWB-LLL, 2024 WL 982380, at *2 (M.D. Fla. Feb. 6, 2024) (explaining that, at a March 4, 2021 recorded virtual event, United's CEO told third-party brokers "you have until March 15 to sign an addendum saying you're not working with [Rocket] . . . And if you don't sign the addendum . . . you and nobody at your company will be able to work with [United] anymore[.]"). As alleged, Rocket's market share of third-party broker loans decreased by nearly 7% in the three months proceeding United's ultimatum. ECF No. 109 at PageID.8483.

### C. Farner's Alleged Misrepresentations

As alleged, despite this known turbulence, Rocket executives insisted to both investors and the market that Rocket would be financially successful. *See Shupe v. Rocket Companies, Inc.,* 660 F. Supp. 3d 647, 660 (E.D. Mich. 2023).

First, during a public investor conference call on February 25, 2021, Rocket CEO, RHI CEO, and Vice Chairman of Rocket's Board of Directors Jay Farner stated:

- 9 -

We're seeing strong consumer demand, especially in the housing market. I mean, it's the strongest that its been here in the last decade . . . I'll draw your attention to the fact that, overall, we were able to grow volume twice as fast as the industry in 2020.

ECF Nos. 44 at PageID.1209; 109 at PageID.8510 (emphasis omitted). In response to a question about how increased interest rates may impact Rocket's performance, Farner additionally stated:

[U]sually, as we see these interest rates tick up a bit, what we're going to see is an opportunity for us to lean in to spend more money and now to talk about the retail or Direct-to-Consumer space, same situation here. There are so many marketing opportunities out there for us. And as others tend to step away or back away from the space, this is where we can lean in, we can grab market share. And not only are we thinking about the profitability that we achieved on the first transaction, we're thinking about the lifetime value of that client and we're now thinking about the lifetime value not only over mortgage, but real estate, auto, and these additional businesses that we'll be adding. So, I guess you can tell we're pretty excited about it and don't see interest rates going up or down, really having an impact on our business one way or the other.

*Id.* at PageID.8512–13 (emphasis omitted).

During a recorded interview at a Morgan Stanley technology conference on March 3, 2021, Farner was asked about Rocket's direct-to-consumer and partner business channels and stated:

So I know we don't break down the percentages, and I'm probably not going to go any further than what we've already laid out in our earnings call, but as you can probably sense from my passion, they're all growing. And with what about less than 10% market share, wherever we are, it's hard to say today. If you think about all those different channels that can grow and give us reach, that's why we get excited about what this company looks like in the years to come.

*Id.* at PageID.8516 (emphasis omitted).

Lastly, on March 11, 2021, a Fox Business analyst publicly interviewed Farner and asked whether he thought the relaxation of COVID-19 restrictions was good for Rocket's business. ECF No. 109 at PageID.8518. Farner Responded:

I do. You know, we're going to see interest rates tick up a little bit here, we're all aware of that, but over the 35 years that we've been in business we take that as an opportunity to grow. Our focus on our platform and our tech platform really allows us to be very efficient when we're underwriting, processing, and closing mortgages.

- 10 -

And so as other people pull back and capacity shrinks in the mortgage industry, it gives us a great opportunity to grow market share. And now, as we grow market share, not only are we capturing revenue with our mortgage, but title, real estate, auto, personal loans. So as we grow out all of those different services we're able to offer our clients that lifetime value of a client grows and grows for us. So, really, interest rates moving around are a great benefit to us. And then, of course, when they drop back down, we've got a 90% retention rate on our servicing book; we'll help those clients refinance their mortgage and save money. So, you know, cycles are good, at least for our business in the mortgage industry, and I think that's what we're going to see here this year."

ECF No. 109 at PageID.8518 (emphasis omitted); *see also* Fox Business, *Rocket Companies CEO Jay Farner on Varney & Co.*, FACEBOOK (March 11, 2021), https://www.facebook.com/watch/?v =74390680632 7852 [https://perma.cc/84X9-58KC].[4]

### D. Gilbert's Alleged Insider Trading

Despite assurances to the market that Rocket would financially thrive as interest rates rose and rebounded from the COVID-19 pandemic, Dan Gilbert—Rocket's founder and, through RHI, majority owner—sold nearly $500,000,000 of his shares in the company on March 29, 2021. *See* ECF No. 109 at PageID.8496–508. Ten details illustrate the unusual nature of this trade:

(1) On March 3, 2021, 26 days before Gilbert sold his shares, Rocket CEO Farner publicly stated that Rocket had yet to sell any shares since going public "because [they] believe strongly in the future of what [they were] building." ECF No. 109 at PageID.8535 (emphasis omitted).

(2) On March 23, 2021—just six days before Gilbert's trade—Rocket's Board of Directors gave Gilbert a material, nonpublic report projecting that, during 2021, (1) Rocket would lose 80% of its refinancing volume; (2) Rocket's primary-secondary spread was shrinking; and (3) Rocket's gain on sale margin would decrease by 9%, or almost $1 billion. *Id.* at PageID.8498–500.

---

[4] Plaintiffs' Amended Complaint also alleged Defendant Farner, in his capacity as Rocket CEO, made an additional false and misleading material statement on March 17, 2021, when he tweeted that, despite United's ultimatum to third-party brokers, Rocket's third-party partner network loan volume had increased "significantly." ECF No. 109 at PageID.8520; Jay Farner (@JDFarner), X (Mar. 17, 2021, 12:22 PM), https://x.com/JDFarner/status/1372221904694697991 [https://perma.cc/SYD5-M8Z3]. But Plaintiffs later voluntarily withdrew this allegation. ECF No. 163 at PageID.17949.

(3) Gilbert—through RHI which he wholly controlled—"submitted an Exchange Notice" to make the trade one week after "the insider trading window has already closed." *Id.* at PageID.8535–36.

(4) Although Rocket's Insider Trading Policy prohibited the trade at the time, it permitted the "closed trading window" to be reopened "at any time, as deemed appropriate by the General Counsel or other senior members of management." *Id.* at PageID.8505.

(5) Gilbert and RHI own "99.9% of Rocket's outstanding Class D Common Stock and 93.1% of Rocket's Class A Common Stock on a fully exchanged and converted basis." ECF No. 44 at PageID.1209 (citations omitted).

(6) Thus, Gilbert "had effective control over Rocket's board, management, and policies," which Rocket acknowledges in its Form 10-K filings with the SEC because Gilbert is "the controlling shareholder of Rocket." ECF No. 42 at PageID.1150–51; *see also* Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021) ("We are controlled by . . . Dan Gilbert, whose interests may conflict with our interests and the interests of other stockholders.").

(7) On March 22, 2021, "following discussions with Jay Farner," Rocket's Audit Committee "voted unanimously to approve opening the training window for a *limited sale by RHI*" and Gilbert. ECF No. 109 at PageID.8506 (emphasis added).

(8) Even with the extended trading window, Rocket's Insider Trading Policy still prohibited Gilbert's sale because he was "aware of . . . material non-public information"—namely Rocket's financial forecast, which he was briefed on just six days earlier. *Id.* at PageID.8507 (emphasis omitted).

(9) Before his $500,000,000 March 29, 2021 sale, Gilbert "had never publicly sold a single share of Rocket stock." *Id.* at PageID.8420.

(10) Gilbert sold his 20,200,000 shares in March 2021 for *33% more* "than the closing market price of Rocket stock just *one week* after" Rocket revealed the material information about its financial forecast in May 2021. *See* ECF No. 109 at PageID.8535.

Indeed, on May 5, 2021, through a Press Release and an Earnings Call, Rocket informed the market, for the first time, that it was expecting a decrease of $18.5 billion in actual closed loan volume. *See* ECF No. 109 at PageID.8523. The Press Release also conceded that Rocket's business was impacted by rising interest rates, such that the company was focusing on its less-profitable partner-network channel and new purchase loans, rather than its direct-to-consumer channel and

refinancing loans. *Id.* at PageID.8525. Rocket's May 2021 Press Release further reported Rocket's lowest gain on sale margin since the company went public in 2020. *Id.* at PageID.8525. The next day, the price of Rocket stock dropped from $22.80 per share to $19.01 per share. *Id.* at PageID.8421. By the end of the week, the price of Rocket stock had fallen to $16.48 per share. *Id.*

### E. Procedural Posture

On February 12, 2024, Plaintiffs Carl Shupe and SoCal filed their Amended Complaint, on behalf of themselves and all other similarly situated Rocket shareholders.[5] ECF No. 109. In Count I, Plaintiffs allege RHI violated the Exchange Act and Rule 10b-5 when Gilbert—RHI's majority shareholder and Chairman—sold shares of Rocket Class A common stock on March 29, 2021 armed with material, non-public information about Rocket's financial forecast.[6] *Id.* at PageID.8551–53. In Count II, Plaintiffs allege that SoCal—and the proposed subclass of those who, like SoCal, traded "contemporaneously" with Defendant Gilbert's alleged insider trade— may recover from RHI under Section 20A of the Exchange Act, which provides a private right of action to those who trade "securities of the same class" "contemporaneously" with an insider trade.[7] *Id.* at PageID.8553–55; 15 U.S.C. § 78t-1; *see also Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *7 (E.D. Mich. Feb. 5, 2024). In Count III, Plaintiffs allege Defendant Rocket—through its CEO Farner—defrauded the market in violation of the Exchange Act through a series of materially false and misleading statements that artificially inflated and

---

[5] For a thorough description of the above-captioned case's procedural posture, *see Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *1–3 (E.D. Mich. Feb. 5, 2024).
[6] Initially, Count I was also asserted against Defendant Gilbert. ECF No. 109 at PageID.8551. But Plaintiffs voluntarily dismissed Gilbert from Count I in July 2024. ECF No. 163 at PageID.17950.
[7] Initially, Count II was also asserted against Defendant Gilbert. ECF No. 109 at PageID.8553. But Plaintiffs voluntarily dismissed Gilbert from Count II in July 2024. ECF No. 163 at PageID.17950.

maintained the prices of Rocket Class A common stock.[8] ECF No. 109 at PageID.8555–57. And, in Count IV, Plaintiffs allege Defendants RHI and Gilbert effectively controlled Rocket, and are thus similarly liable for Farner's false and misleading misrepresentations under Section 20(a) of the Exchange Act. *Id.* at PageID.8557–60.

Plaintiffs' Amended Complaint is summarized as follows:

| Count | Claim | Defendants |
|---|---|---|
| I | Insider Trading; Section 10(b) and Rule 10b-5 of the Exchange Act | RHI |
| II | Private Right of Action For Those Who Traded "Contemporaneously" With RHI's Alleged Insider Trade; Section 20A of the Exchange Act | RHI |
| III | Materially False and Misleading Statements; Section 10(b) and Rule 10b-5 of the Exchange Act | Rocket, Farner |
| IV | Materially False and Misleading Statements—Controller Liability; Section 20(a) of the Exchange Act | RHI, Gilbert |

On February 12, 2024, Plaintiffs filed their renewed Motion for Class Certification.[9] ECF No. 111. Defendants responded two weeks later. ECF No. 120. On March 8, 2024, Plaintiffs filed both a redacted and sealed version of their reply. ECF Nos. 134 (sealed); 135. With this Court's leave, Defendants filed a redacted a sealed sur-reply. ECF Nos. 148 (sealed); 149.

On April 5, 2024, Defendants filed a motion for an evidentiary hearing. ECF No. 158. Courts have the discretion to conduct evidentiary hearings on motions for class certification. *St. Clair Cnty. Employees' Ret. Sys. v. Acadia Healthcare Co., Inc.*, No. 3:18-CV-00988, 2022 WL 4598044, at *2 (M.D. Tenn. Sept. 30, 2022), *leave to appeal denied sub nom. In re Acadia Healthcare Co., Inc.*, No. 22-0506, 2023 WL 3620955 (6th Cir. May 23, 2023); *Desai v. Geico*

---

[8] Initially, Count III was also asserted against Defendant Gilbert. ECF No. 109 at PageID.8555. But Plaintiffs voluntarily dismissed Gilbert from Count III in July 2024. ECF No. 163 at PageID.17950.

[9] Plaintiffs' initial motion for class certification was withdrawn after the Court granted Plaintiffs' Motion to Substitute SoCal as the proposed Subclass representative. *Shupe v. Rocket Companies*, Inc., No. 1:21-CV-11528, 2024 WL 416377, at *10 (E.D. Mich. Feb. 5, 2024).

*Cas. Co.*, 574 F. Supp. 3d 507, 527 (N.D. Ohio 2021); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to [conduct a hearing to] probe behind the pleadings before coming to rest on the certification question."). Having thoroughly reviewed the factual record and the Parties' relevant pleadings, this court is satisfied that it can conduct a "rigorous analysis" on the papers and respectfully declines to exercise its discretion to hold a hearing. Defendants' motion for a hearing will accordingly be denied and this Court will proceed to the class-certification analysis.

## II. Governing Law

"Class certification is governed by Federal Rule of Civil Procedure 23." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). Although a "trial court has broad discretion in deciding whether to certify a class," that discretion "must be exercised within the framework of Rule 23." *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996); *see also Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir.2011). Motions for class certification cannot be rubber-stamped. Instead, class actions "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Indeed, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with" Rule 23. *Dukes*, 564 U.S. at 350.

Accordingly, the party seeking class certification must satisfy "(1) each of the four prerequisites under Rule 23(a), and (2) the prerequisites of one of the three types of class actions provided for by Rule 23(b)." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945 (6th Cir.

2011). "A failure on either front dooms the class." *Id.* Importantly, proposed subclasses—such as the Subclass Plaintiffs seek certified here—are "treated as a class" and subject to the same certification requirements. FED. R. CIV. P. 23(c)(5).

### III. Analysis

Plaintiffs seek to certify the following Class:

> All persons and entities that purchased or otherwise acquired publicly traded Rocket Companies, Inc. ("Rocket" or the "Company") Class A common stock (NYSE: RKT) between February 25, 2021 and May 5, 2021, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are: (a) Defendants;1 (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendant Rocket and Defendant RHI; (d) any person who is an officer, director, or controlling person of Rocket; (e) any entity in which any Defendant has a controlling interest; and (f) the legal representatives, heirs, successors, or assigns of any such excluded party.

ECF No. 111 at PageID.8589. Plaintiffs propose that Plaintiff Carl Shupe serve as the Class Representative, and propose that Labaton Keller Sucharow LLP ("Labaton") serve as Class Counsel. *Id.* at PageID.8577, 8593.

Relevant to Plaintiffs' claims under Section 20A of the Exchange Act as alleged in Count II of their Amended Complaint, Plaintiffs also seek to certify the following Subclass:

> All persons and entities within the Class that purchased publicly traded Rocket Class A common stock contemporaneously with Defendant Gilbert's and Defendant RHI's sale of Rocket Class A common stock on March 29, 2021 (the "Subclass"). Excluded from the Subclass are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendant Rocket and Defendant RHI; (d) any person who is an officer, director, or controlling person of Rocket; (e) any entity in which any Defendant has a controlling interest; and (f) the legal representatives, heirs, successors, or assigns of any such excluded party.

*Id.* at PageID.8589–90. Plaintiffs propose that Plaintiff SoCal serve as the Subclass Representative, and propose that Labaton serve as Subclass Counsel. *Id.* at PageID.8577, 8593.

## A. Rule 23(b) Requirements

Parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiffs seek certification under Rule 23(b)(3), ECF No. 111 at PageID.8577, which requires them to show (1) that common questions or law and fact "predominate" over individual questions; and (2) that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3); *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). And, as recognized by the Sixth Circuit, parties seeking class certification under Rule 23(b)(3) must additionally satisfy "an implied ascertainability requirement." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 464 (6th Cir. 2020) (quoting *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017)). Each requirement will be addressed in turn.

### 1. Predominance

The analysis begins with Rule 23(b)(3)'s predominance requirement because, as the Supreme Court recognizes, this "crucial" requirement is often dispositive in putative securities class actions. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) [hereinafter *Halliburton II*]. Indeed, although this Court will address every Rule 23 requirement for completeness, the predominance requirement proves fatal for class certification, here.

Rule 23(b)(3) requires the party moving for class certification to show that "*questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.*" *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (emphasis in original). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over"

- 17 -

individualized issues. *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (internal quotations omitted). In securities fraud class actions alleging fraudulent misrepresentations, plaintiffs must show that individual questions of *reliance* do not overwhelm the questions common to the proposed class. *Halliburton II* at 276.

Plaintiffs argue that predominance "is established with respect to reliance" because "Plaintiffs are entitled to rely on the fraud-on-the-market presumption articulated by the Supreme Court in" *Basic Inc. v. Levinson*, 485 U.S. 224. ECF No. 111 at PageID.8603. Defendants disagree and argue (1) Plaintiffs have not proven that Rocket stock was traded on an efficient market throughout the Class Period, so Plaintiffs cannot rely on the *Basic* presumption; and (2) in the alternative, even if Plaintiffs could prove market efficiency and invoke the *Basic* presumption, Defendants have rebutted it through proof that Defendant Farner's alleged misrepresentations had no impact on the price of Rocket Class A common stock. ECF No. 120 at PageID.9123–44, 9156.

### a. *Basic* Presumption Background

The fraud-on-the-market presumption—central to the Parties' predominance arguments— is a judicial fix to the complications that arise when the evidentiary requirements of Section 10(b) securities fraud claims intersect with the procedural requirements for class certification. Plaintiffs' Section 10(b) fraudulent misrepresentation claims require, among other elements, poof of reliance on Defendant Farner's allegedly fraudulent material misrepresentations when trading Rocket Class A common stock. *See Shupe v. Rocket Companies, Inc.*, 660 F. Supp. 3d 647, 667 (E.D. Mich. 2023). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement" and purchased or sold stock "based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) [hereinafter *Halliburton I*].

But, in 1988, the Supreme Court recognized that requiring proof of direct reliance would practically preclude securities class actions, because individualized issues of reliance would necessarily overwhelm common questions of law and fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988). Accordingly, the *Basic* Court held that, through the "fraud-on-the-market" theory, a class can satisfy the reliance element of a Section 10(b) claim by invoking a *rebuttable presumption of reliance*, rather than proving *direct* reliance on an allegedly fraudulent misrepresentation.[10] *Id.* at 247. According to this fraud-on-the-market theory, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246. Because efficient markets "transmit[] information to the investor in the processed form of a market price," courts can presume—subject to rebuttal— that investors rely on public misstatements whenever he or she "buys or sells stock at the price set by the market." *Id.* at 244, 247.

> To establish the *Basic* presumption of class-wide investor reliance, a plaintiff must prove:
>
> (1) The alleged misrepresentations were publicly known;
> (2) The alleged misrepresentations were material;
> (3) The stock traded in an efficient market; and
> (4) The plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed.

*Halliburton II* at 277–78 (citing *Basic*, 485 U.S. at 248, n. 27). Critically, at the class certification stage, a plaintiff must *prove*—as opposed to *plead*—all elements other than materiality. *Id.* at 276, 283; *see also Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 467–70 (2013)

---

[10] "What is called the *Basic* presumption actually incorporates two constituent presumptions: First, if a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price. Second, if the plaintiff also shows that he purchased the stock at the market price during the relevant period, he is entitled to a further presumption that he purchased the stock in reliance on the defendant's misrepresentation." *Halliburton II*, 573 U.S. 258, 279 (2014).

(concluding plaintiff need not prove materiality at class certification stage because materiality is a dispositive issue that can be proved by evidence common to the class as a whole after certification).

But even if a plaintiff proves market efficiency, misrepresentation publicity, and trading timing at the class certification stage, defendants may rebut the *Basic* presumption by proving— by a preponderance of the evidence—that the alleged misrepresentations had no price impact. *Halliburton II*, at 280; *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (noting "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade . . . will be sufficient to rebut the presumption of reliance"); *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 126 (2021) (noting preponderance burden).

### b. Plaintiffs' Proof of Market Efficiency

Defendants do not dispute that Jay Farner's three alleged fraudulent misrepresentations were publicly known. *See generally* ECF No. 120 at PageID.9133–44. Defendants also do not dispute that, as defined, all members of the proposed Class would have traded Rocket Class A common stock after Jay Farner's alleged misrepresentations but before "the truth was revealed." *See generally id.*; *see also* ECF No. 111 at PageID.8589 (defining the proposed Class as those who acquired Rocket stock "between February 25, 2021 and Mary 5, 2021"). Thus, Plaintiffs' ability to invoke the *Basic* presumption hinges on whether they have proven that Rocket Class A common stock traded on an efficient market during the Class Period.

An efficient market is generally open, developed, and rapidly reflects new information in price. *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (citing *Cammer v. Bloom*, 711 F.Supp. 1264, 1276 n. 17 (D.N.J. 1989)). But there is no bright-line test for market

efficiency. The Sixth Circuit has historically applied the "*Crammer* factors," promulgated in 1989

by the United States District Court for the District of New Jersey. *Id.* These factors include:

> (1) A large weekly trading volume;
> (2) The existence of a significant number of reports by securities analysts;
> (3) The existence of market makers and arbitrageurs in the security;
> (4) The eligibility of the company to file an S-3 Registration Statement; and
> (5) A history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*Id.* (citing *Cammer*, 711 F.Supp. at 1286–87 (D.N.J. 1989)). This Court, like many other district

courts within the Sixth Circuit, has additionally recognized the three "*Krogman* factors" as relevant

to the market efficiency analysis:

> (6) Market capitalization;
> (7) The "bid-ask" spread of the stock; and
> (8) The "float" of the stock.

*Dougherty v. Esperion Therapeutics, Inc.*, No. 16-10089, 2020 WL 6793326, at *3 (E.D.

Mich. Nov. 19, 2020) (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)).

Importantly, although this Court and the Sixth Circuit recognize these factors as relevant, the

*Cammer* and *Krogman* factors are neither exhaustive nor mandatory. *Weiner v. Tivity Health, Inc.*,

334 F.R.D. 123, 133 (M.D. Tenn. 2020) (collecting cases) (noting "the Sixth Circuit has not

mandated use of" the *Cammer* or *Krogman* factors, "and even in those cases where the factors are

utilized, they are generally deemed to be an analytical tool rather than a checklist"). Each

recognized factor will be addressed in turn, followed by additional factors proposed by the Parties'

market-efficiency experts, Chad Coffman and Dr. René Stulz.[11]

---

[11] Plaintiffs' expert is Chad Coffman. Coffman has a bachelor's degree in economics, a master's degree in public policy, and is a chartered financial analyst who has spent most of his twenty-year career "analyzing how securities prices react to new information." ECF No. 111-2 at PageID.8622, 8677. Defendants' rebuttal market-efficiency expert is Dr. René Stulz. Dr. Stulz has a Ph.D. in economics and currently serves as the Chair of Banking and Monetary Economics at the Ohio State University. ECF No. 120-2 at PageID.9170, 9232. Defendants filed a *Daubert* motion to

- 21 -

### i. Public Trading

As a threshold note, the Sixth Circuit recognizes that securities "traded in national securities markets . . . are well suited for application of the fraud on the market theory." *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990). Accordingly, evidence that a security traded on a public exchange during the proposed class period "is persuasive, though not conclusive, evidence of market efficiency." *Dougherty v. Esperion Therapeutics, Inc.*, No. 16-10089, 2020 WL 6793326, at *4 (E.D. Mich. Nov. 19, 2020). Persuasive evidence of market efficiency exists in this case because Rocket Class A common stock traded on the New York Stock Exchange throughout the entire Class Period. *See* ECF No. 111-2 at PageID.8624.

### ii. Weekly Trading Volume

The first market efficiency factor concerns weekly trading volume. A large weekly trading volume is indicative of an efficient market because "it implies significant investor interest in the company," which, "in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F.Supp. at 1286 (D.N.J. 1989); *Freeman v. Laventhol & Horwath* 915 F.2d 193, 199 (6th Cir. 1990) ("The high level of trading activity ensures that information from many sources is disseminated into the marketplace and consequently is reflected in the market price."). "An average weekly trading volume of two percent or more of outstanding shares triggers a 'strong presumption' of market efficiency, while a one-percent average warrants a 'substantial presumption.'" *Plumbers &*

---

exclude Coffman's testimony and Plaintiffs filed a *Daubert* motion to exclude Dr. Stulz's testimony. ECF Nos. 121; 132. But both motions were denied, after this Court concluded both Coffman and Dr. Stulz were qualified to provide expert testimony, and that their proposed testimony was relevant and reliable. *See generally* ECF No. 226.

*Pipefitters Nat. Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1149 (N.D. Ohio 2013) (quoting *Cammer v. Bloom*, 711 F.Supp. 1264, 1286 (D.N.J. 1989)).

Plaintiffs' expert Chad Coffman concluded that "the average weekly trading volume for Rocket Common Stock during the Class Period" was 130.2 million shares, or "over 110% of shares outstanding." ECF No. 111-2 at PageID.8633. Defendants do not dispute Rocket stock's sizeable weekly trading volume. *See* ECF No. 120 at PageID.9133–34. Thus, the first factor favors market efficiency.

### iii. Security Analyst Reports

The second market efficiency factor concerns analyst coverage. The more securities analysts who report on a company's stock during the class period, the more likely the market was efficient because significant analyst coverage implies interest in a company's securities and a wide distribution of relevant corporate information. *Crammer*, 711 F. Supp. at 1286.

Coffman concluded "there were at least thirty-five analyst reports" issued during the Class Period from "eighteen separate firms" which "disseminat[ed] publicly available information" about Rocket stock. ECF No. 111-2 at PageID.8635; *see also id.* at PageID.8663 (noting this conclusion is "almost certainly understate[d]" because many analyst reports are not publicly available through third-party data providers). This is more than enough to suggest market efficiency. *Hacker v. Elec. Last Mile Sols. Inc.*, No. CV22545MEFLDW, 2024 WL 1231257, at *10 (D.N.J. Mar. 21, 2024) (finding market efficiency suggested by evidence that "six analysts followed the company, and disseminated reports about it"). *In re FibroGen Sec. Litig.*, No. 21-CV-02623-EMC, 2024 WL 1064665, at *9 (N.D. Cal. Mar. 11, 2024) (noting there is no identified threshold number of reports necessary for this factor to suggest market efficiency, but noting courts

"have found this factor [satisfied] with as few as four to seven analysts covering a particular stock").

Defendants do not dispute Coffman's findings relative to this factor, and argue only that this factor should not be entitled to great weight. ECF No. 120 at PageID.9134 ("The only *Cammer / Krogman* factors that support Shupe are the ones providing the weakest indirect evidence of market efficiency, such as analyst coverage and the number of market makers."). But Defendants' conclusory and unsupported weight argument is unpersuasive. With the exception of the fifth *Cammer* factor discussed below, courts afford the same weight to all market efficiency factors. *See, e.g.*, *Sjunde AP-Fonden v. Goldman Sachs Grp.*, Inc., No. 18-CV-12084 (VSB) (KHP), 2024 WL 1497110, at *11 (S.D.N.Y. Apr. 5, 2024); *Hacker*, 2024 WL 1231257, at *10; *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *10. Accordingly, this second factor favors market efficiency.

### iv. Market Makers and Arbitrageurs

The third market efficiency factor addresses the presence of "market makers and arbitrageurs." *Crammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989). Market makers, generally, are institutional firms that stand ready to buy or sell a particular stock on a regular and continuous basis. ECF No. 111-2 at PageID.8637; *see also* 17 C.F.R. § 240.15c3–1(c)(8) (defining "market maker" as a dealer who "(i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers and dealers"). In contrast, "arbitrageurs" are "traders who identify and eliminate differences between [t]he price [of a security] and [its] value." *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995). "The existence of market makers and arbitrageurs" bolsters market efficiency because these

players "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Crammer*, 711 F. Supp. at 1286 (D.N.J. 1989).

Relying on data from Bloomberg, Coffman concluded there were 80 market makers for Rocket Common Stock during the Class Period. ECF No. 111-2 at PageID.8638. This suggests market efficiency. *See Hacker v. Elec. Last Mile Sols. Inc.,* No. CV22545MEFLDW, 2024 WL 1231257, at *10 (D.N.J. Mar. 21, 2024) (finding 48 market makers was "plenty"). Defendants do not argue to the contrary, and instead repeat the same unpersuasive weight argument discussed above. ECF No. 120 at PageID.9134. The third factor favors market efficiency.

### v. Form S-3 Eligibility

Under the fourth market efficiency factor, courts ask whether the corporate-defendant filed an SEC S-3 Registration Statement, or was otherwise eligible to. *Crammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989). "According to SEC regulations, certain companies may use the S-3 short form, rather than Form S-1, to register securities if they are sufficiently large and have filed reports with the SEC for the requisite period of time." *Krogman v. Sterritt*, 202 F.R.D. 467, 476 (N.D. Tex. 2001). Thus, inherently, the information about a company that files a Form S-3 is "widely available in the market," suggesting an efficient market for that company's common stock. *Crammer*, 711 F. Supp. at 1284.

Coffman conceded that Rocket had not filed an S-3 Registration Statement and was not eligible to do so. *See* ECF No. 111-2 at PageID.8639 (noting that, to be eligible to file a Form S-3, the company "must be subject to Exchange Act reporting requirements for more than one year" but conceding that "the Class Period beg[a]n[] before Rocket had been publicly trading for one full year"). Accordingly, this factor does not suggest market efficiency.

### vi. Historic Price Impact

The next market efficiency factor analyzes how the stock price has historically reacted to "unexpected [corporate] events or financial releases." *Crammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989). A pattern of significant price impact in response to corporate disclosures suggests that public information has a causal effect on a security's price, bolstering the likelihood of a modern efficient market. *See id.* This Court—and several others—have concluded this factor provides the "best" and most "direct" evidence of market efficiency. *Dougherty v. Esperion Therapeutics*, *Inc.*, No. 16-10089, 2020 WL 6793326, at *4 (E.D. Mich. Nov. 19). Yet this factor is neither dispositive nor necessary. *Id.*; *see also In re FibroGen Sec. Litig.*, No. 21-CV-02623-EMC, 2024 WL 1064665, at *10 (N.D. Cal. Mar. 11, 2024) ("Some courts have found that where the first four *Cammer* factors and the three *Krogman* factors are satisfied, it is not necessary for a court to consider *Cammer* factor five.")

To analyze this factor, Coffman conducted an "event study" examining the response of Rocket's Class A common stock to Rocket's earnings announcements from September 4, 2020 through May 5, 2023 (the "Analysis Period"). ECF No. 111-2 at PageID.8631, n. 33, 8640–43. Specifically, Coffman compared the stock price's movement on "news days"—days on which Rocket released an earnings announcement—to a regression that modeled how the price of Rocket stock moved on days with "no news." *See id.* Ultimately, after controlling for market and industry factors, Coffman found evidence of market efficiency because (1) 54.55% of earnings announcements caused a statistically significant price impact and (2) the "average magnitude of stock price movement on earnings announcement days was over three-times higher than on no news days" such that "on the days when important, company-specific information [was] released

to the market, [Rocket's] stock price move[d] much more than on days where there [was] no company-specific news." *Id.* at PageID.8646–47.

Defendants agree that an event study—when "properly conducted"—is the best way to assess historical price impact. *See* ECF No. 120 at PageID.9139–40 ("Event studies are [a] standard tool for testing whether a market is efficient."); *see also Dougherty v. Esperion Therapeutics, Inc.*, No. 16-10089, 2020 WL 6793326, at *5 (E.D. Mich. Nov. 19, 2020) (accepting Coffman's event study as evidence suggesting market efficiency). But Defendants—through their expert Dr. Stulz—suggest several ways Coffman's event study was improper. None are persuasive.

First, Defendants argue that Coffman's event study is "fatally flawed" because he removed two dates—March 2 and 3, 2021—from his two-and-a-half-year Analysis Period. ECF No. 120 at PageID.9140–41. Defendants contend that these two specific dates are persuasive evidence of an *inefficient* market because Rocket stock experienced frenzied social media interest indicative of a "meme stock," discussed in greater detail *infra* Section III.A.1.b.xi. *Id.* But Coffman explained that the significant increase in trading on March 2 and 3, 2021—which he notes was caused by increased "attention from Reddit and Twitter"—rendered these two dates statistically significant outliers, which would have rendered his regression unpredictable, distorting his results. ECF Nos. 111-2 at PageID.8664; 135-2 at PageID.13363–64; *see also* ECF No. 135-2 at PageID.13387–90 (depicting how the inclusion of March 2 and 3, 2021 skewed Coffman's regression model). And Defense expert Dr. Stulz recognizes that economists properly exclude data points from event studies to ensure that "the returns . . . do not affect the measurement of the typical relationship." ECF No. 120-2 at PageID.9189. Moreover, Coffman concluded that "even if one included the outliers in the analysis," his "cause-and-effect" conclusion is unaltered. ECF No. 135-2 at

PageID.13366; *id.* at PageID.13391 (showing 45.45% of Rocket earnings announcements had corresponding statistically significant impacts on the price of Rocket stock).

Defendants then pivot and argue that Coffman's event study is "fundamentally flawed" not because of the two days it excludes, but because of the two-and-a-half years it considers. ECF No. 120 at PageID.9139, 9141–42. Specifically, Defendants argue that this Court cannot infer market efficiency throughout the two-month Class Period simply because Coffman found evidence of market efficiency throughout the two-and-a-half-year Analysis Period. *Id.* But the price impact analysis is relevant to market efficiency precisely because it provides a *historical* snapshot of how the price of a given security reacts to public information. *See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (describing the fifth *Cammer* factor as "a history of immediate movement of the stock price caused by unexpected corporate events or financial releases"). If the price of a security has historically reacted in a statistically meaningful way to the release of public information about the security, it is more likely the price of the stock during the relevant class period reflected that public information—the central premise of market efficiency and the "foundation for the fraud on the market theory." *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989). Indeed, Coffman explained that he analyzed the broader "Analysis Period to *enhance* the power of [his] statistical tests." ECF No. 111-2 at PageID.8645, n. 69 (emphasis added). This makes sense, given federal courts' recognition of the limitations of small event studies within securities litigation:

> [S]mall sample sizes may limit statistical power, meaning that only very large-impact events will be detectable. In addition, it can be extremely difficult to isolate the price impact of any one piece of information in the presence of confounding factors, such as other simultaneously released news about the company, the industry, or the geographic region.

*In re Teva Sec. Litig.*, No. 3:17-CV-558 (SRU), 2021 WL 872156, at *21 (D. Conn. Mar. 9, 2021) (quoting *In re Petrobras Sec.*, 862 F.3d 250, 279 (2d Cir. 2017)). Moreover, Coffman concluded that, had he limited his event study to the two-month Class Period, 100% of Rocket's earnings announcements had a statistically significant price impact and the magnitude of price movement on days Rocket released earnings announcements was roughly "5x higher" than the days on which Rocket released "no news." ECF No. 135-2 at PageID.13361; *see also id.* at PageID.13392.

Accordingly, the fifth market efficiency factor favors a finding that Rocket stock traded on an efficient market throughout the Class Period.

### vii. Market Capitalization

The sixth market efficiency factor addresses market capitalization. *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). Calculated as "the number of shares multiplied by the prevailing share price," market capitalization "may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Id.*

Coffman concluded that Rocket's market capitalization was $2.98 billion during the Class Period—including March 2 and 3, 2021—and that this capitalization was higher than "at least 68%" of publicly traded companies at the time. ECF No. 111-2 at PageID.8651. Defendants do not dispute that this factor favors market efficiency.[12] *See generally* ECF No. 120. Nor could they. *See Dougherty v. Esperion Therapeutics, Inc.,* No. 16-10089, 2020 WL 6793326, at *4 (E.D. Mich.

---

[12] Defense expert Dr. Stulz opined that Coffman should have additionally considered outstanding shares of Rocket *Class D* common stock, which were convertible to Class A stock on a one-to-one basis. ECF No. 120-2 at PageID.9220–22. Considering the shares of both Class A and Class D common stock, Dr. Stulz opines that Rocket's true market capitalization was "around $30 billion." *Id.* at PageID.9221. But this increased market capitalization only further supports a finding that the market for Rocket stock was efficient throughout the Class Period.

Nov. 19, 2020) (finding this factor satisfied when the corporate-defendant's market capitalization "averaged $1.08 billion" during the class period); *In re FibroGen Sec. Litig.*, No. 21-CV-02623-EMC, 2024 WL 1064665, at *11 (N.D. Cal. Mar. 11, 2024) (finding this factor satisfied when Coffman's expert reported noted corporate-defendant's market capitalization was "in the 67th to 80th percentile" of publicly traded companies); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (finding market efficiency when a company's market capitalization averaged between $.5 to $3.2 billion throughout the class period). The sixth market efficiency factor suggests an efficient market.

### viii. The Bid-Ask Spread

The seventh market efficiency factor considers the "bid-ask spread" of the stock. *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). The bid-ask spread is "the difference between the price which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Id.* "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Id.*

Coffman concluded that Rocket's bid-ask spread during the Class Period fluctuated between .01% and .018%, which, even at its peak, was "well below the average and median bid-ask spread of a random sample of 100 other common stocks" of publicly traded companies at the time. ECF No. 111-2 at PageID.8652. Although courts have not established a "specific range within which a bid-ask spread must fall to suggest market efficiency," *Martinek v. AmTrust Fin. Servs., Inc.*, No. 19 CIV. 8030 (KPF), 2022 WL 326320, at *13 (S.D.N.Y. Feb. 3, 2022), Rocket's bid-ask spread suggests market efficiency. *See, e.g.*, *In re Vale S.A. Sec. Litig.*, No. 19-CV-526-RJD-SJB, 2022 WL 122593, at *9 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, No. 19CV526RJDSJB, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) (finding bid-ask spread of

- 30 -

.09% strongly suggested market efficiency); *In re Teva Sec. Litig.*, No. 3:17-CV-558 (SRU), 2021 WL 872156, at *17 (D. Conn. Mar. 9, 2021) (finding bid-ask spread of 2.66% "weighs moderately in favor of market efficiency"). Defendants do not disagree.[13] *See generally* ECF No. 120. Thus, the seventh historically recognized market-efficiency factor is satisfied.

### ix. The Float

The last recognized market efficiency factor is known as the "float" or the "percentage of shares held by the public, rather than insiders." *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). The greater percentage of stock owned by the company's insiders, the less likely the stock is traded on an efficient market because the "insiders may have private information that is not yet reflected in stock prices" such that these prices "are less likely to accurately reflect all available information about the security." *Id.* (internal quotations omitted).

Coffman concluded that Rocket insiders owned only .44% of the company's Class A common stock during the Class Period, such that Rocket's public float was greater than 99%, suggesting an efficient market. ECF No. 111-2 at PageID.8653. Defendants do not dispute Coffman's public-float calculation as it pertains to *Class A* common stock. However, Defendants argue that Coffman should have additionally considered Rocket's *Class D shares* in his public float calculation because these shares were *fully convertible* to Class A common stock shares. ECF No. 121 at PageID.10456–57 (citing ECF No. 120-2 at PageID.9216). Indeed, "Rocket ha[d] two different classes of common stock outstanding" during the Class Period: 115.4 million shares of

---

[13] Defense expert Dr. Stulz opines that the "intraday" bid-ask spreads for Rocket stock on March 2 and 3, 2021—the days Defendants contend Rocket stock was traded as "meme stock"—were much higher, hovering between 0–5%. ECF No. 120-2 at PageID.9199, 9267–68. But Dr. Stulz does not provide any specific spreads, and this Court is not convinced that a large bid ask spread on *two days* significantly undermines Coffman's average bid-ask spread conclusion over the entire *two-month* Class Period.

Class A common stock and 1.87 billion shares of Class D common stock. *Id.* at PageID.9217. Importantly, unlike Rocket's Class A common stock shares, Rocket's Class D common stock shares were nearly wholly owned by Defendant Gilbert, carried only voting rights, and were not traded on a public securities exchange. *See id.* However, based on a pre-IPO Exchange Agreement with Rocket, Gilbert "has the right to exchange" his Class D shares for Class A shares "on a one-for-one basis" at any time.[14] *Id.* at PageID.9217–18 (emphasis omitted); *see also Shupe v. Rocket Companies, Inc.,* 660 F. Supp. 3d 647, 661 (E.D. Mich. 2023) ("Gilbert and RHI own . . . 93.1% of Rocket Class A Common Stock on a fully exchanged and converted basis." (internal quotations omitted)). Accordingly, Defendants argue Rocket's true "public float" hovers between 6% and 7%, suggesting an inefficient market. ECF No. 121 at PageID.10456–57 (emphasis omitted).

The Parties' dispute turns on how public float is properly calculated. Plaintiffs narrowly focus on inside-ownership of the *specific publicly traded security* while Defendants broadly focus on the inside-ownership of *all outstanding shares*. *Compare* ECF No. 111-2 at PageID.8653 *with* ECF No. 120-2 at PageID.9216. Precedent does not clarify the propriety of either Parties' approach in a case such as this—where a company has only *one* class of publicly traded common stock, but has a *second* class of outstanding common stock which (1) is wholly convertible to the publicly traded stock, (2) is 15 times the size of the publicly traded common stock, and (3) is nearly wholly-owned by a single corporate insider. On one hand, several courts—like Plaintiffs—seem to measure public float by analyzing the insider-ownership of *the* specific stock or security at issue. *See, e.g.*, *In re Advance Auto Parts, Inc., Sec. Litig*., No. CV 18-212-RGA, 2020 WL 6544637, at *2 (D. Del. Nov. 6, 2020) (defining public float as "the percentage of *a* security outstanding held

---

[14] Defendants' proposed expert Dr. Stulz notes that Gilbert exercised this conversion option during the Class Period, and converted 20.2 million shares of Class D common stock to Class A stock. ECF No. 120-2 at PageID.9218.

by the public" (emphasis added)); *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 CIV. 03852 (GBD), 2015 WL 10433433, at \*5 (S.D.N.Y. Sept. 29, 2015) (defining float as "the degree to which shares of *the* security are held by the public, rather than insiders" (emphasis added) (internal quotations omitted)); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (same) *In re NIO, Inc. Sec. Litig.*, No. 19CV1424NGGJRC, 2023 WL 5048615, at \*11 (E.D.N.Y. Aug. 8, 2023) (same). On the other hand, many courts—like Defendants— seemingly focus on the overall percentage of a company's outstanding shares available to the public. *See, e.g.*, *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012) (defining public float as "the percentage of shares available to the public"); *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 332 F.R.D. 556, 574 (M.D. Tenn.), *order clarified*, 334 F.R.D. 118 (M.D. Tenn. 2019) (defining public float as "the percentage of stock, not held by insiders"); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 519 (D. Minn. 2015) (finding market efficiency because the "vast majority" of a company's total outstanding stock was "held by non-insiders").

But Defendants' broad public-float analysis makes little sense when one considers the original rationale for considering public float within the market-efficiency analysis. Public float is relevant to market efficiency only insofar as it suggests whether the price of a *certain, specific* stock "reflect[s] all available information" about that *certain, specific* stock. *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). True, the outstanding 115 million shares of Rocket's publicly traded Class A common stock represent only ~7% of Rocket's outstanding stock when one considers the 1.87 billion shares of outstanding convertible Class D common stock nearly wholly-owned by Gilbert. At any point, Gilbert *could* convert his non-public Class D shares to

publicly traded Class A shares.[15] But, until he does so, this Court does not see—because Defendants do not show—how his ownership of this entirely separate, non-public stock would reduce the likelihood that the price of Rocket's publicly traded Class A common stock reflects relevant public information. It is undisputed that only 0.44% of Rocket's publicly traded Class A common stock was owned by insiders throughout the Class Period, such that the public float of this stock was over 99%. ECF No. 111-2 at PageID.8653. This suggests that the price of Class A common stock—on balance—incorporated relevant public information throughout the Class Period, indicative of an efficient market. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 93 (S.D.N.Y. 2015) (finding evidence of market efficiency when a given stock's public float was "approximately one hundred percent").

### x. Institutional Investors, Autocorrelation, and Options Trading

Aside from the recognized *Cammer* and *Krogman* market efficiency factors, Coffman also analyzed three "additional factor[s]." *Id.* at PageID.8653–55. First, Coffman opined that a large number of institutional investors in a given security favors market efficiency because "[i]nstitutional investors are . . . sophisticated and well-informed with access to most publicly available information for the stocks that they own." *Id*. at PageID.8654. And Coffman concluded that 357 separate institutions invested in Rocket Stock during the Class Period, suggesting market efficiency. *Id.* Defendants do not dispute Coffman's conclusions or the propriety of this additional market-efficiency factor. *See generally*, ECF No. 120; 120-2.

---

[15] If Gilbert converted all, or even most, of his Class D shares, the Class A common stock would be engulfed and become nearly wholly owned by insider Gilbert—such that the price of Class A common stock would be less likely to reflect all available information about that stock, suggesting an inefficient market. But Gilbert has not done so and did not do so during the Class Period. *See* ECF No. 120-2 at PageID.9218 (noting Gilbert converted approximately one-tenth of his Class D shares to Class A shares during the Class Period).

Second, Coffman explained that a substantial "autocorrelation"—the ability of prior price movements to predict future price movements—suggests market inefficiency, because investors could transact with minimal risk. *Id.* at PageID.8654; *see also Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 518 (D. Minn. 2015) ("In addition, courts may consider whether a stock exhibits 'autocorrelation,' measuring how predictable a stock's pricing is based on historical data; a finding of autocorrelation weighs against a market efficiency finding.") But Coffman found "no evidence of autocorrelation" in Rocket stock during the Class Period. *Id.* Defendants again chide Coffman for not including March 2 and 3, 2021 in his autocorrelation analysis, and posit that, had he done so, he would have "found a significant autocorrelation for Rocket stock." ECF No. 120 at PageID.9141 (citing ECF No. 120-2 at PageID.9178). But Defense expert Dr. Stulz agrees with Coffman that autocorrelation only suggests market inefficiency when it is "persistent and sufficiently large" such that a "trader could profit from taking advantage" of it. ECF No. 120-2 at PageID.9178, n. 39. And Coffman explains that—even considering March 2 and 3, 2021—"there is no [persistent] pattern of positive or negative autocorrelation" that traders could have consistently taken advantage of throughout the Class Period. ECF No. 135 at PageID.13367–68. This "additional" actor thus "'provide[s] some support,' albeit limited," that Rocket Class A common stock traded on an efficient market. *Första*, 312 F.R.D. at 519 (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 93 (S.D.N.Y. 2015)).

Lastly, Coffman concluded that the significant amount of options trading of Rocket Stock during the class period indicates market efficiency because economic studies suggest increased options trading correlates with increased trading volume, transaction size, and "an overall improvement of the market quality of the underlying stocks." *Id.* at PageID.8655 (highlighting data that "there were 2,353,231 Rocket Common stock put contracts and 6,857,940 Rocket

Common Stock call contracts that traded during the Class Period"). Defendants do not dispute

Coffman's conclusions or the propriety of this additional market-efficiency factor. *See generally*,

ECF No. 120; 120-2.

In sum, the following factors support a finding that the market for Rocket Class A common

stock was efficient throughout the Class Period:

(1) Rocket Class A common stock was publicly traded on the NYSE;
(2) Rocket stock had a high weekly trading volume;
(3) A large number of analysts publicly reported about Rocket stock throughout the
Class Period;
(4) A large number of market makers existed for Rocket stock;
(5) There is a historic cause-and-effect relationship between Rocket's financial
releases and the price of its stock;
(6) Rocket stock reflected a significant market capitalization;
(7) Rocket stock had a relatively small bid-ask spread;
(8) Rocket Class A common stock had a high public float;
(9) A significant number of institutional investors invested in Rocket stock;
(10) Rocket stock was not autocorrelated; and
(11) A significant number of investors options-traded Rocket stock.

### xi. Meme Stock

Defendants argue that one additional factor or consideration outweighs all others, and

precludes Plaintiffs from demonstrating market efficiency in this case: Rocket Class A common

stock was a "meme stock" throughout the Class Period. ECF No. 120 at PageID.9135–39.

Specifically, Defendants argue that a two-day "meme stock" trading frenzy occurred on March 2

and 3, 2021, which rendered the market inefficient through the remainder of the two month Class

Period. *See id.* But Defendants argument ignores binding Supreme Court precedent which compels

the conclusion that Rocket's purported meme-stock status is inapposite to this Court's market-

efficiency analysis.

**(a).**

"Meme stocks are a relatively new phenomenon" which began in late 2020 and early 2021 as online investing groups expanded throughout the COVID-19 pandemic. Michelle Lodge, *What is a Meme Stock? A Quick Guide*, FORBES (June 18, 2024, 3:42 PM) https://www.forbes.com/sites/investor-hub/article/what-is-a-meme-stock/ (last updated Sep. 4, 2024, 10:22 AM) [https://perma.cc/JG47-ZEMH]. Meme stocks "became popular through the social media platform Reddit.com," and the subreddit—or forum— "r/wallstreetbets." *Id.*; *see also* John Egan, *Wall Street Bets: the Story of How a Mob Became a Movement, and the Anti-Heroes of the Digital Age. Part 1 – Diamond Hands*, FORBES (Feb. 2, 2021, 5:14 PM), https://www.forbes.com/sites/johnegan/2021/02/02/smoothbrainsthe-story-of-how-a-mob-becam e-a-movement-and-a-group-of-smooth-brained-apes-on-the-internet-became-the-anti-heroes-of-the-digital-age/?sh=6f31d2625a89 (noting r/wallstreetbets is "ostensibly, a forum for ill-disciplined gamblers to exchange the money they've finagled out of friends and relatives for internet points through anxiety-inducing financial loss. It is a place where people with little to no training, bereft of inside knowledge and minimal attention to detail will wager everything they have and more (much more) on an earnings report or an Elon Musk meme") [https://perma.cc/3VG5-NZ8B] [hereinafter Egan I].

Investors increasingly use social media—including Reddit and r/wallstreetbets—to coordinate "short squeezes" which drastically impact the market for a given security. "Short selling refers to the sale of a security that the seller does not own, where the delivered security is borrowed by the short seller." *The Long and Short of Short Squeezes*, S&P GLOBAL: MARKIT FACTOR INSIGHTS (Nov. 27, 2013), https://cdn.ihsmarkit.com/www/pdf/0321/Markit_RN_-_The_Long_and_Short_of_Short_Squeezes.pdf [https://perma.cc/QNK2-BLME]. A short seller

gambles that the stock price will *decrease*. *See id.* When this gamble pays off, the short seller profits from the difference between the high value they sold the borrowed stock at and the low value they repurchased the stock at. *See id.* But, when the stock price *increases*, short sellers are pressured to "cover" their short position by repurchasing the stock at the higher price and returning the stock to the lending investor at a loss. *Id.* Additionally, short sellers may be forced to cover if the short positions for a stock surpass the amount of publicly traded shares and the lending investor recalls the borrowed stock. *See id.* A "short squeeze" occurs when many short sellers rush to cover and repurchase the same stock at the same time, which only causes the stock price to increase further, which cyclically pressures even more short sellers to cover, and so on. *See id.*; *see also* Henry David Gale, *"Buy Gamestop!": The Need to Rethink the Approach to Market Manipulation in a Wallstreetbets World*, 108 IOWA L. REV. 1923, 1942 (2023) ("short sellers that cover their positions by repurchasing the underlying stock . . . cause additional upward price pressure on the stock which . . . force[s] other short sellers to exit their positions, adding further upward price pressure and so on." (internal quotations omitted)).

Reddit (r/wallstreetbets) and other social media platforms provide savvy investors—whether sophisticated or unsophisticated—with a platform to profit from a coordinated short squeeze. Yun Li, *GameStop Mania Explain: How the Reddit Retail Trading Crowd Ran Over Wall Street Pros*, CNBC (Jan. 27, 2021), https://www.cnbc.com/2021/01/27/gamestop-mania-explained-how-the-reddit-retail-trading-crowd-ran-over-wall-street-pros.html (noting Reddit provided retail investors with the ability to "attack[]" Wall Street as a "union") [https://perma.cc/DY98-4P9C].

The "quintessential" example of the meme stock "phenomenon" is the coordinated January 2021 trading of GameStop stock. ECF No. 120-2 at PageID.9193. A r/wallstreetbets user noticed

that GameStop stock was being heavily shorted by institutional investors, in large part because GameStop—a "brick and mortar" video game retailer—was struggling during the COVID-19 pandemic. *See* Egan I. Institutional short sellers purchased GameStop stock in August 2020 at $4 per share, hoping to profit on a gamble that GameStop would become bankrupt. *Id.* But, by late January 2021, GameStop stock was trading at $144 per share thanks to boons from a new billionaire investor and the relaxation of COVID-19 restrictions. *Id.*; John Egan, *Wall Street Bets: the Story of How a Mob Became a Movement, and the Anti-Heroes of the Digital Age. Part 2 – Stonks & Spartans*, FORBES (Feb. 12, 2021, 5:33 PM), https://www.forbes.com/sites/johnegan/2021/02/03/stonks-and-spartans/ [https://perma.cc/B3YF-Q5EP] [hereinafter Egan II]. Indeed, the same Reddit user who noticed that GameStop stock was being heavily shorted also noticed that institutional short sellers sold more shorts than were available to buy on the market, further suggesting future pressure on these investors to cover. *See* Egan I. So, that Reddit user took to r/wallstreetbets and encouraged fellow Redditors to invest and profit at these institutional investors' expense. *See* Egan II (noting Reddit investors encouraged each other "hold the line" and not sell their purchased GameStop shares as a form of protesting systemic inequity between institutional and retail investors); *see also* Boutros Imad, *The Meme Stock Bidding War Viewed From the Lenses of the American and Canadian Securities Regulators*, 48 U. DAYTON L. REV. 193, 199 (2023) ("GameStop was no longer just a way to make a big profit or invest in a struggling firm, but also purchasing GameStop had become a strategy to combat institutional money."). As a result of the surge prompted by r/wallstreetbets investors, "the closing price of [GameStop] stock rose more than 700% between January 21 and January 27," 2021. *In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1343 (11th Cir. 2023).

**(b).**

Like GameStop stock in January 2021, Defendants argue that Rocket stock was a meme stock during the Class Period. ECF No. 120 at PageID.9135. "Although there is no single formal or technical definition of a meme stock," Defendants rely on SEC staff reports which identify meme stocks as characterized by (1) "frequent mentions on social media, including Reddit" and (2) "large price moves or increased trading volume that significantly exceeded broader market movements" and "the amount of 'short interest' measured as the number of shares sold short as a portion of the total shares outstanding [exceeding the market average]." ECF No. 120-2 at PageID.9193–94. Dr. Stulz concluded that Rocket Class A common stock exhibited both meme stock characteristics during the Class Period.[16]

First, Dr. Stulz identified the following Reddit posts on March 2 and 3, 2021 as indicative of a meme stock and a coordinated effort of retail investors to short squeeze Rocket stock ("RKT"):

> "[GameStop] holders . . . Here is what you need to do . . . buy Rocket Mortgage. That's Rocket, with an R. RKT to the moon 🚀 🚀 🚀"

> "To anyone who feels like they missed the boat with [GameStop], this squeeze is about to happen with RKT. Shorts have 4 days to cover while RKT just announced a special dividend to be given out next week. The shorts will be [squeezed] so hard."

> "RKT IS THE NEW [GAMESTOP] 🚀 🚀 🚀 🚀"

---

[16] Dr. Stulz is not alone in his meme-stock conclusion. Indeed, as he recognizes, numerous news outlets publicly reported the "meme" nature of Rocket stock on March 2 and 3 2021. ECF No. 120-2 at PageID.9200–01; *see, e.g.*, Orla McCaffrey, *Rocket Stock is the New Meme Trade. Move Over, GameStop*, WALL ST. J. (Mar. 3, 2021 5:48 PM), https://www.wsj.com/articl es/rocket-is-becoming-the-new-meme-stock-move-over-gamestop-11614782903; Sinéad Carew, *Rocket Shares Soar More than 70% as Analysts Eye 'GameStop-Esque' Short Squeeze*, REUTERS (Mar. 2, 2021 6:20 PM), https://www.reuters.com/article/technology/rocket-shares-soar-more-than-70-as-analysts-eye-gamestop-esque-short-squeeze-idUSKCN2AU2F8/; Jonathan Ponciano, *Billionaire Dan Gilbert's Fortune Plunges $25 Billion as Rocket Companies' GameStop-Like Squeeze Unravels*, FORBES (Mar. 3, 2021 at 4:18 PM), https://www.forbes.com/sites/jonathanpon ciano/2021/03/03/billionaire-dan-gilberts-fortune-plunges-24-billion-as-rocket-companies-game stop-like-squeeze-unravels/.

"[GameStop] is so last month. Get on the RKT 🚀 🚀 "

"KEEP HOLDING [GAMESTOP]. KEEP HOLDING RKT. It will go up and the hedge fund[s] will cry."

"RKT & [GameStop] to the moon! 🚀 🚀 👎 👍 "

"41% shorted. They just increased the fees for borrowing stocks to short. Right now RKT looks like [GameStop] before it went to the moon for the first time."

ECF No. 120-2 at PageID.9196. Dr. Stulz reported that, on March 2 and 3, 2021, "Reddit daily mentions of Rocket reached a total of over 59,000" and that, throughout the entire two-month Class Period, "[t]he average daily number of mentions" was "27 times higher than the average daily number of mentions" before or after. *Id.* at PageID.9197. Dr. Stulz added that Rocket was a prime target for a coordinated short squeeze because Rocket's short interest "hovered at or above 30% from the beginning [of] November 2020 through the end of February 2021." *Id* at PageID.9203. Dr. Stulz explained that, consistent with GameStop, Rocket's short interest sharply fell after February 26, 2021 as Rocket's stock price increased as short sellers began to cover. *Id.*

As a result of this social media frenzy and coordinated short squeeze, Dr. Stulz noted that "Rocket's stock price increased by over 70% on March 2, 2021 and over 376 million shares were traded," despite no "new, value-relevant public information" about the stock. *Id.* at PageID.9198. This increase was more than 1,480 times the average daily return (.05%) and more than 33 times the average daily volume traded (11 million shares) over the course of the previous 120 trading days[.]" *Id.* And, during the Class Period, Dr. Stulz noted that "the average daily trading volume of Rocket was 4.5 times higher than the average daily trading volume" before and after. *Id.* at PageID.9198–99.

Although the social media frenzy on Reddit seemingly spiked on March 2 and 3, 2021, Dr. Stulz explained that this two-day frenzy nevertheless caused "short-selling frictions" throughout

- 41 -

the remainder of the two-month Class Period, during which short selling became far riskier for investors. *Id.* at PageID.9205–06; *see also* ECF No. 120 at PageID.9138. Dr. Stulz also identified empirical research suggesting that, "independent of meme stock status," these short-selling frictions "impede the incorporation of . . . public information" into the price of a given security, further suggesting market inefficiency. ECF No. 120-2 at PageID.9206–08 ("With short-sale constraints, academic research has found that stocks tend to underreact to negative news and overreact to positive news as arbitrageurs are unable to step in and correct mispricing due to high costs of borrowing."). Moreover, Dr. Stulz noted that, during and following short squeezes, "any purchaser" of a security "would be expected to earn a negative return, which is inconsistent with market efficiency as investors need compensation for the risk of investing in the stock." *Id.* at PageID.9208.

Defendants ultimately argue that the market for Rocket Class A common stock was anything but efficient throughout the Class Period because—rather than reflecting public information—the stock price was manipulated by retail investors' coordinated efforts to force a short-squeeze. *See* ECF No. 120 at PageID.9135–39. Importantly, Plaintiffs do not dispute that Rocket Class A common stock was the subject of frenzied social media interest on March 2 and 3, 2021. *See generally* ECF No. 135. In other words, Plaintiffs do not dispute the *factual* premises of Defendants' meme-stock argument. They merely dispute the impact that this purported "meme-stock" status has on market efficiency.

**(c).**

First, Plaintiffs argue that Defendants' meme-stock argument is "meritless" because it is "untethered from the *Cammer/Krogman* analysis." But, as discussed, the *Cammer/Krogman* market efficiency factors are not exhaustive nor dispositive, *see supra* Section.III.A.1.b., and

- 42 -

Plaintiffs themselves rely on three "additional factors" in support of their market efficiency proofs. Market efficiency considers the extent to which the price of a given stock likely reflects all public information about that stock, including—importantly—any alleged fraudulent misrepresentations alleged by a Section 10(b) plaintiff. *See In re Jan. 2021 Short Squeeze Trading Litig.*, No. 21-2989-MDL, 2023 WL 9035671, at *26 (S.D. Fla. Nov. 13, 2023) ("Market efficiency is at the heart of the fraud-on-the-market theory and the *Basic* presumption, because, without it, the stock price does not function as a reliable proxy for publicly available information."). True, "meme-stocks" were not contemplated in either *Cammer* or *Krogman*. But both cases are over twenty-years old and were decided before the advent of social media and before financial markets transformed in response to widespread internet use. *See* Ryan Furhmann, *How the Internet Has Changed Investing*, INVESTOPEDIA (July 31, 2022), https://www.investopedia.com/financial-edge/0212/how-the-internet-has-changed-investing.aspx (noting "the Internet has placed considerable power in the hands of individuals") [https://perma.cc/434P-9ACU]. *See also* Kayvon J. Paul, *Playing the Game: Hedge Funds, Brokerage Firms, and Social Media Influencers in the Context of Sec Rule 10b-5 Market Manipulation*, 16 OHIO ST. BUS. L.J. 37, 38, 47–48 (2021) (discussing SEC guidance on how individuals "may exploit social media" to "artificially affect[] the supply or demand for a security")

Second, Plaintiffs argue that Rocket's meme-stock status on March 2 and 3, 2021 does not undermine market efficiency because (a) meme-stocks, generally, do not negate the notion that the stock price nevertheless responds to and includes public information, and (b) Rocket's two-day meme-stock status does not render the market inefficient throughout the two-month Class Period. ECF No. 135 at PageID.13310. This argument is persuasive. At bottom, those who may have invested in Rocket as part of the social media frenzy on March 2 and 3, 2021 were "value

investors"— who "attempt[ed] to beat the market" by investing in Rocket stock—a stock they believe was "undervalued" or heavily shorted at the time. *Halliburton II*, at 273. But the Supreme Court has repeatedly recognized that value investors do *not* undermine market efficiency. Indeed, the Supreme Court clarified that "*Basic* never denied the existence" of such value investors. *Id.* Instead,

> *Basic* concluded only that "it is reasonable to presume that *most* investors— knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information—will rely on the security's market price as an unbiased assessment of the security's value in light of all public information." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455, 462 (2013) (emphasis added).

> In any event, there is no reason to suppose that . . . the value investor . . . is . . . indifferent to the integrity of market prices[.] Such an investor implicitly relies on the fact that a stock's market price will eventually reflect material information— how else could the market correction on which his profit depends occur? To be sure, the value investor "does not believe that the market price accurately reflects public information at the time he transacts." Post, at 2423. But to indirectly rely on a misstatement in the sense relevant for the *B*asic presumption, he need only trade stock based on the belief that the market price will incorporate public information within a reasonable period. The value investor also presumably tries to estimate how undervalued or overvalued a particular stock is, and such estimates can [still] be skewed by a market price tainted by fraud.

*Id.* (citations updated). In other words, meme-stocks and efficient markets are not mutually exclusive. The existence of some value investors—like those on r/wallstreetbets—does not mean that other investors did not rely on alleged fraudulent misrepresentations throughout a proposed class period. "Debates about the precise *degree* to which stock prices accurately reflect public information are largely beside the point. 'That the . . . price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss,' which is 'all that *Basic* requires.'" *Id.* at 272 (quoting *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010)) (emphasis in original).

Relying on this Supreme Court precedent, the only court to have considered a "meme stock" argument similar to the argument Defendants assert here expressly *rejected* the notion that meme stock status precludes the *Basic* presumption. In *In re Bed Bath & Beyond Corp. Sec. Litig.*, a group of Bed Bath & Beyond (BB&B) shareholders filed a putative class action against, among others, investor-influencer Ryan Cohen, alleging that he made a series of fraudulent misrepresentations through tweets to inflate the value of BB&B stock—which all parties agreed traded as a meme stock—only to then sell his shares as part of an alleged "pump and dump" scheme. *In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d 1, 6–7 (D.D.C. 2023). Cohen and company moved to dismiss, arguing that the class plaintiffs had not sufficiently alleged reliance under the *Basic* fraud-on-the-market presumption. *Id.* at 8. Specifically, Cohen argued that a "rationale, reasonable, intelligent investor" would not react to his tweets, and that the "meme stock" nature of BB&B stock rendered the market inefficient. *Id.* at 16. But the United States District Court of the District of Columbia rejected that argument, concluding that potential stock-price *inaccuracies*, prompted by tweets and social media frenzies, do "not detract from the fact" that the stock price nevertheless responds to alleged fraudulent statements.

In addition to this case directly involving an agreed-upon meme stock, a consensus of other—pre "meme" era—decisions suggest that "bubbles" of frenzied trading do not undermine market efficiency. *See, e.g.*, *In re Xcelera.com Sec. Litig.,* No. CV 00-11649-RWZ, 2004 WL 7329233, at *2 (D. Mass. Sept. 30, 2004), *aff'd*, 430 F.3d 503 (1st Cir. 2005) (certifying class and finding plaintiffs proved market efficiency despite defendants' argument that their stock was "trading in a bubble that rivaled the Dutch tulip mania of the 1630s"); *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 105 (S.D.N.Y. 2009) (finding market was "efficient enough" despite evidence of internet trading bubble); *Levine v. SkyMall, Inc.*, No. CIV. 99-166-PHX-ROS, 2001

WL 37118873, at *8 (D. Ariz. May 24, 2001) (finding efficient market despite defendants' arguments that (1) that the market for the stock was inefficient because that stock was the "hype of the day" for "daytraders" and that this "hype" "caused the stock price increase rather than any information release," and (2) that the market for the stock was inefficient because the stock price was responding to an "internet bubble" rather than firm-specific public information).

With this precedent in mind, this Court is not convinced that Rocket's two-day meme stock status on March 2 and 3, 2021 renders the market for Rocket stock inefficient, let alone throughout the entire two-month Class Period. Moreover, even if Rocket's meme-stock status *suggested* market inefficiency, it would not *outweigh* the eleven other factors which Plaintiffs have shown suggest the contrary. Plaintiffs have met their burden of proving that Rocket stock traded on an efficient market throughout the Class Period. *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) ("[T]he burden required to establish market efficient is not an onerous one" (internal quotations omitted)). Plaintiffs have accordingly invoked the *Basic* fraud-on-the-market presumption of class-wide reliance.

### c. Defendants' Proof of Lack of Price Impact

But Defendants have rebutted it. As discussed, when a class Plaintiff invokes the *Basic* presumption of class-wide investor reliance, Defendants may rebut the presumption by proving— by a preponderance of the evidence—that the alleged misrepresentations had no price impact. *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113 (2021). Defendants retained another expert—Dr. Laura Starks[17]—in support of their price-impact proof.

---

[17] Plaintiffs filed a *Daubert* motion to exclude Dr. Starks's testimony. ECF Nos. 138 (sealed); 139. But Plaintiffs motion was denied after this Court concluded Dr. Starks was qualified to provide expert testimony, and that her proposed testimony was relevant and reliable. *See generally* ECF No. 226.

Recall that Plaintiffs generally allege Defendant Farner made fraudulent material misrepresentations touting Rocket's viability despite rising interest rates and Farner's internal knowledge that Rocket's key performance indicators were forecasted to decline substantially. *See supra* Section I.C.; ECF No. 109 at PageID.8469–95. Relevantly:

> On February 25, Defendant Farner stated that Rocket was "seeing strong consumer demand" and that, as "interest rates tick up a bit," Rocket saw an "opportunity" to invest in its Direct-to-Consumer network and "grab market share," such that Rocket did not view rising interest rates as "having an impact on [its] business one way or another." ECF Nos. 44 at PageID.1209; 109 at PageID.8510–13.

> On March 3, 2021, Farner stated that Rocket's direct-to-consumer and partner networks were "all growing." *Id.* at PageID.8516.

> On March 11, 2021, Farner stated that Rocket "take[s]" rising interest rates as "an opportunity to grow" such that, as other mortgage companies "pull back" and the mortgage industry shrinks, Rocket has an "opportunity to grow market share" and that he thinks the upcoming "cycles" will be good for Rocket's business throughout the coming fiscal year. *Id.* PageID.8518.

Plaintiffs allege that these fraudulent misrepresentations "artificially inflated or maintained the price of Rocket Class A common stock" during the Class Period. *Id.* at PageID.8543, 8556. Dr. Starks disagreed, both based on her review of relevant context and analyst reports.

**i.**

Dr. Starks first explained how the broader context surrounding Rocket's business at the time mitigated any price impact that Defendant Farner's statement may have had. For example, Dr. Starks noted that, simultaneous to Farner's February 25, 2025 statement about "strong consumer demand," Rocket released a public earnings announcement that explained that Rocket's gain-on-sale margins and closed loan volumes significantly *decreased* since the previous quarter. ECF No. 120-3 at PageID.9295. And Dr. Starks explained that influential side-sell analysts referenced Rocket's *announcement* rather than Farner's *statement* when reporting to potential investors. *Id.* Similarly, contrary to Farner's interest-rate statements, Dr. Starks noted that all of

Rocket's publicly available SEC filings and risk disclosures discussed how rising interest rates were adverse to Rocket's business. *Id.* at PageID.9296–99. ("Consistent with the Company's [] disclosures, analyst[] reports prior to the [] Class Period had already noted the potentially negative impact of rising interest rates and intensifying competition, predicting a downward trend for Rocket's margins."). As an additional example of context suggesting Farner's statements had no impact on how the market viewed Rocket's profitability, Dr. Starks explained that analyst reports at the time frequently referenced the publicly available Freddie Mac and Fannie Mae forecasts that Rocket's key performance metrics would—like other players in the mortgage industry—decline as interest rates rose coming out of the COVID-19 pandemic. *Id.* at PageID.9300–02.

In addition to this broader context mitigating price impact, Dr. Starks reviewed "sell-side" analyst reports about Rocket stock, authored before, during, and after the Class Period. ECF No. 120-3 at PageID.9284. Dr. Starks explained that these analysts "serve as important information intermediaries between companies and investors" and author reports which "provide[] a useful measure of public information that investors would deem important to the investment decision-making process." *Id.* Indeed, assuming an efficient market, Dr. Starks opined these reports would discuss or reference any statements made by Rocket executives which the analyst would interpret as important or indicative of a potential price impact. *Id.* at PageID.9290. So, if Farner's alleged misrepresentations had the price impact Plaintiffs allege, Dr. Starks opined that these statements would have been at least referenced in relevant sell-side analyst reports. *See id.* But Dr. Starks found "no such evidence" within her review of "at least 50" sell-side analyst reports issued by 17 different analysts about Rocket stock during the Class Period.[18] *Id.* at PageID.9291, 9305–18.

---

[18] Dr. Starks found that *one* analyst report referenced Farner's February 25, 2021 interest rate statement, but notes that this report does not suggest that this statement was indicative of Rocket's profitability despite rising interest rates. ECF No. 120-3 at PageID.9305.

**ii.**

Dr. Starks's findings are largely dispositive. A decade-long class certification saga in the Second Circuit illustrates why. In 2015, the United States District Court for the Southern District of New York certified a class of all persons who purchased Goldman Sachs ("GS") stock between February 2007 and June 2010, alleging that GS executives maintained an artificially inflated stock price through a series of generic statements about its ability to manage conflicts of interest, which plummeted after the truth about GS's conflicts was revealed to the public. *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 CIV. 3461 PAC, 2015 WL 5613150, at *1 (S.D.N.Y. Sept. 24, 2015), *vacated and remanded sub nom. Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474 (2d Cir. 2018). In so doing, that Court refused to consider the defendants' lack of price-impact evidence—that, on 34 separate occasions in which news sources reported GS's conflicts of interest, the price of GS stock did not decline. *Id.* at *6. The district court construed this as evidence of materiality, which it held was inappropriate at the class certification stage. *Id.*

In 2018, the Second Circuit reversed and remanded, instructing the Southern District of New York to consider this evidence when analyzing whether the defendants had shown a lack of price impact by a preponderance of the evidence. *Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018). On remand, the Southern District of New York considered this evidence, but found it insufficient. *In re Goldman Sachs Grp., Inc. Sec. Litig.,* No. 10 CIV. 3461 (PAC), 2018 WL 3854757, at *5 (S.D.N.Y. Aug. 14, 2018), *aff'd sub nom. Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254 (2d Cir. 2020), *vacated and remanded*, 594 U.S. 113 (2021), *and vacated and remanded sub nom. Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138 (2d Cir. 2021) (noting the "absence of price movement . . . in and of itself, is not sufficient to sever the link between" GS's first corrective disclosure and the

subsequent stock price drop). The Second Circuit affirmed in 2020, over a dissent which noted that the "generic quality of [GS's] alleged misstatements, coupled with defendants' expert testimony, compelled the conclusion that defendants had proven a lack of price impact. *See Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 (2d Cir. 2020), *vacated and remanded*, 594 U.S. 113 (2021).

In 2021, the Supreme Court reversed. In addition to reinforcing that Defendants bear a preponderance-of-the-evidence burden to establish a lack of price impact at the class certification stage, the Court also provided important clarification about how the *nature* of alleged misrepresentations affects the price impact analysis. *See generally Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 125, 141 S. Ct. 1951, 1962, 210 L. Ed. 2d 347 (2021) The Court specifically concluded that "the generic nature of an alleged misrepresentation often will be important evidence of price impact because, as a rule of thumb, a more-general statement will affect a security's price less than a more-specific statement on the same question." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 121 (2021) (internal quotations omitted). Indeed, the Court concluded that a plaintiff's price-impact allegation "break[s] down" when there is a "mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* In other words, "when the [alleged] misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations') . . . it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer . . . price inflation [and] price impact." *Id.* (emphasis in original). The Court accordingly reversed so the lower courts could "properly consider[] the generic nature of [GS's] alleged misrepresentations." *Id.* at 123–24.

On remand, the Southern District of New York certified the class, again concluding that defendants had not proven a lack of price impact by a preponderance of the evidence. *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 579 F. Supp. 3d 520, 532–38 (S.D.N.Y. 2021), *rev'd and remanded sub nom. Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023). But, most recently, in August 2023, the Second Circuit reversed and remanded with instructions for the district court to decertify the class. *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 81 (2d Cir. 2023). Specifically, the Second Circuit held that the defendants "managed to sever the link between back-end price drop and front-end misrepresentation" through the "introduction of *Dr. Starks's* analysis of 880 analyst reports published during the Class Period . . . *none of which reference*" the alleged misrepresentations. *Id.* 104.

### iii.

Here, like in the *Goldman* case discussed above, Plaintiffs allege Farner's statements were "front-end misrepresentations" that "artificially inflated or maintained" the price of Rocket Class A common stock. *See* ECF No. 109 at PageID.8538. Here, like in *Goldman*, Plaintiffs present indirect evidence—through conclusory allegations—that Rocket's May 5, 2021 revelation about declining margins and closed-loan volume caused a 17% "back-end price drop" in Rocket stock. *See id.* at PageID.8421. But here, like in *Goldman*, a considerable mismatch exists between the *generic* nature of the alleged misrepresentations and the *specific* revelation. On February 25, 2021, Farner stated that Rocket saw "strong consumer demand" and an "opportunity" to invest as interest rates rose. *Id.* at PageID.8510–13. On March 3, 2021, Farner stated that Rocket's direct-to-consumer and partner networks were generally "growing." *Id.* at PageID.8516. And, on March 11, 2021, Farner stated that Rocket "take[s]" rising interest rates as an "opportunity to grow market share" and that he thought the upcoming "cycles" would be good for Rocket's business. *Id.*

PageID.8518. But Rocket's May 5, 2021 press release (the alleged corrective disclosure) was markedly more specific, disclosing that Defendants projected (1) "[c]losed loan volume of between $82.5 billion and 87.5 billion"; (2) "[n]et rate lock volume between $81.5 billion and $88.5 billion"; and (3) "[g]ain on sale margins of 2.65% to 2.95%." *See* Press Release, Rocket Companies, *Rocket Companies Announces First Quarter Results* (May 5, 2021); ECF No. 109 at PageID.8523–24. And, fatally for Plaintiffs here, like in *Goldman*, Defendants have produced expert testimony suggesting that *no* analyst referenced Defendant Farner's alleged misrepresentations in reports issued throughout the Class Period. ECF No. 120-3 at PageID.9285–86. This "sever[s] the link between" Plaintiffs' alleged "back-end price drop" and their alleged "front-end misrepresentation[s]." *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 104 (2d Cir. 2023).

As the Supreme Court recently noted, this Court's price impact analysis is aided by a "good dose of common sense." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) (internal quotations omitted). Plaintiffs allege Rocket's stock price dropped by 17% after its May 5, 2021 corrective disclosure and that Defendant Farner's misrepresentations artificially maintained its stock price before this disclosure. But this does not make sense on the record before the Court. The generic nature of Farner's alleged misrepresentations, balanced against the specific nature of the Rocket's alleged corrective disclosure, presents "important evidence" that Farner's alleged misrepresentations had no price impact. And this lack of price impact is compounded by Defendants' proof that no analysts relied on Farner's misrepresentations throughout the Class Period. Defendants have shown—by a preponderance of the evidence—that Defendant Farner's alleged, generic misrepresentations had no impact on the price of Rocket stock. Without price

impact, Plaintiffs' ability to invoke the *Basic* presumption of classwide investor reliance "completely collapses, rending class certification inappropriate." *Halliburton II* at 283.

### d. *Affiliated Ute* Presumption

Plaintiffs argue that they could still satisfy Rule 23(b)(3)'s predominance requirement through the *Affiliated Ute* presumption of class-wide investor reliance. ECF No. 111 at PageID.8611–12. Plaintiffs are mistaken.

In *Affiliated Ute*, decided over fifty years ago, the Supreme Court held that, in securities actions "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972) Instead, the Court held that "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of his decision." *Id.* at 153–54. In 2008, the Supreme Court clarified that, under *Affiliated Ute*, an investor-plaintiff need not provide specific proof of reliance in a case alleging the "omission of a material fact by one with a duty to disclose" such fact to that specific investor-plaintiff. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008). In cases such as this, where the alleged misrepresentations are a mix of *both* "misstatements and omissions," the Sixth Circuit recently recognized it has not "definitively determined whether *Affiliated Ute* applies." *In re Acadia Healthcare Co., Inc.,* No. 22-0506, 2023 WL 3620955, at *3 (6th Cir. May 23, 2023).[19] But this

---

[19] In *In Re Acadia*, the Sixth Circuit saved the issue of *Affiliated Ute*'s application to mixed-bag Section 10(b) allegations for another day because the district court concluded that the class plaintiffs had invoked the *Basic* presumption and that defendants had not rebutted it. *In re Acadia Healthcare Co., Inc.,* No. 22-0506, 2023 WL 3620955, at *3 (6th Cir. May 23, 2023) ("But this is not a case in which we need to decide that question. The district court's proper application of the *Basic* presumption to Plaintiffs' claims dispenses with the need to invoke the *Affiliated Ute* presumption."). The only other Sixth Circuit case to address the issue held that the district court did not "abuse its broad discretion" in certifying a class after concluding both the *Affiliated Ute* presumption and the *Basic* presumption applied to plaintiffs' claims of fraudulent

Court has held that "the *Affiliated Ute* presumption 'does not apply'" in cases where plaintiffs' claims "'primarily' involve affirmative misstatements" as opposed to "failures to disclose*." Byrd v. ViSalus, Inc.*, No. 17-CV-12626, 2018 WL 1637948, at \*9 (E.D. Mich. Apr. 5, 2018) (quoting *Clayton v. Heartland Resources, Inc.*, 754 F.Supp.2d 884, 895 (W.D. Ky. 2010)).

Here, although Plaintiffs sprinkle the word "omission" twelve times within their 146-page Amended Complaint, they expressly allege Defendant Farner "falsely assured investors" through a series of "false and misleading statements." *See* ECF No. 109 at PageID.8469, 8484, 8505. The first line of Plaintiffs' Amended Complaint reads: "This case is brought to recover losses to investors based on Defendants' false and misleading statements to the market about Rocket's mortgage business during the Class Period." *Id.* at PageID.8417. Indeed, like in *Byrd*, "Plaintiffs quote affirmative misstatements at great length" from Rocket's disclosures and Defendant Farner's interviews. *Compare Byrd*, 2018 WL 1637948, at \*9 *with* ECF No. 109 at PageID.8509–23.

Plaintiffs nevertheless argue that their claims are based "in part, on Defendants' material omissions" because the alleged fraudulent nature of Farner's statements stem from the fact that he knew about, but did not disclose, Rocket's impending financial decline. ECF No. 111 at PageID.8611. But, by this artful construction, any class plaintiff could "transform affirmative misstatements into implied omissions." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2 F.4th 1199, 1208 (9th Cir. 2021). This would improperly "stray from *Affiliated Ute*'s purpose of executing the difficult or impossible evidentiary burden of proving" reliance in cases where no positive statements exist. *Id.* at 1208–09; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) (declining to apply *Affiliated Ute* presumption because plaintiffs alleged

misrepresentations *and* omissions. *In re BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647, at \*1 (6th Cir. Sept. 18, 2017).

misrepresentations and "are therefore not in a situation in which it is impossible for them to point to any affirmative misstatements"). Because Plaintiffs' Rule 10(b) allegations primarily involve affirmative misrepresentations rather than omissions, Plaintiffs cannot rely on the *Affiliated Ute* presumption of reliance to satisfy Civil Rule 23(b)(3)'s predominance requirement.

### e. Damages

To recap, Plaintiffs must show that questions common to the Class predominate over individual questions of putative Class members to obtain certification. FED. R. CIV. P. 23(b)(3). But the *Affiliated Ute* presumption of class-wide investor reliance does not apply and, although Plaintiffs have invoked the *Basic* presumption of class-wide investor reliance by proving market efficiency, Defendants have rebutted it by proving Defendant Farner's alleged misrepresentations had no price impact. Accordingly, individual questions of each putative Class members' *reliance* on these alleged misrepresentations would overwhelm the common questions shared by the Class, such that predominance is not satisfied and Plaintiffs' proposed Class cannot be certified. But Defendants additionally argue that predominance is not satisfied because Plaintiffs have not provided "evidentiary proof" that *damages* can be calculated on a class-wide basis. ECF No. 120 at PageID.9158–59. This argument misses the mark.

Individual damages calculations do not preclude class certification under Rule 23(b)(3). *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 861 (6th Cir. 2013). But a court must nevertheless conduct a "rigorous analysis" to ensure that the plaintiffs' proposed damages methodology is at least *capable* of calculating damages and is *consistent* with the plaintiffs' theory of liability. *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020); *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

Plaintiffs' expert—Chad Coffman—opined that if the Class succeeds on the merits, damages can be calculated on a class-wide basis under the "well-accepted" "out-of-pocket" method. ECF No. 111-2 at PageID.8654–55. Specifically, under this out-of-pocket method, damages are "equal to the artificial inflation in the share price at the time of purchase" minus the artificial inflation per share at the time of the sale."[20] *Id.* at PageID.8655–56. Coffman explains that the artificial inflation in the share price—also known as loss causation—is a calculation common to the entire Class, and measures how much Defendants' alleged misrepresentations altered the price. *Id.* at PageID.8656. Accordingly, "[o]nce the inflation per share has been quantified," Coffman concludes, "the computation of damages for each class member is formulaically based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security[])." *Id.* at PageID.8656 (emphasis in original).

Defense expert Dr. Mark Garmaise[21] rebutted Coffman's damages conclusion and opined that Coffman did not explain precisely how the proposed artificial inflation variable would account for shifting uncertainty and risk throughout the Class Period prompted by (1) the COVID-19 pandemic and varying interest rates; (2) United's March 4, 2021 ultimatum to third-party network providers; and (3) the meme-stock status of Rocket stock and frenzied social media interest on March 2 and 3, 2021. ECF No. 120-4 at PageID.9401–02, 9412–35. Notably, neither Defendants nor Dr. Garmaise dispute the overall *method* Coffman proposed to calculate damages. *See generally id.*; ECF No. 120 at PageID.9158. And although Dr. Garmaise suggested that Rocket

---

[20] Coffman notes that, if the putative class member sold their Rocket shares *before* Rocket released its financial forecast on May 5, 2021, the damages for that class member would be subject to the PSLRA's formulaic 90-day "lookback" provision. ECF 111-2 at PageID.8656 (citing 15 U.S.C. § 78u-4(e)(1)).

[21] Plaintiffs filed a *Daubert* motion to exclude Dr. Garmaise's testimony. ECF No. 131. But this Court denied that motion, concluding Dr. Garmaise is qualified and his testimony is both relevant and reliable under Rule 702. *See generally* ECF No. 226.

stock's artificial inflation—a single variable within Coffman's proposed "out-of-pocket" methodology—may shift throughout the Class Period such that *different days* have different levels of inflation, neither Defendants nor Dr. Garmaise suggest that the inflation variable would be unique to *different Class Members* who traded on the same day during the Class Period. Instead, as Defendants summarize, Dr. Garmaise merely "identifies *challenges* Coffman will face in trying to build a class wide damages model consistent with Plaintiffs' liability theory because of the unique features of this case." ECF No. 151 at PageID.15837 (emphasis added).

But Coffman responds to Dr. Garmaise's "challenges" by thoroughly explaining *how* his out-of-pocket model is capable of accounting for changing macroeconomic conditions, varying interest rates, United's ultimatum, and varying social media interest. ECF No. 135-2 at PageID.13376–84 (discussing hypothetical event studies and employable regression models). Moreover, courts routinely reject challenges similar to those posed by Dr. Garmaise as premature and insufficient to defeat predominance. *See Weiner v. Tivity Health, Inc*., 334 F.R.D. 123, 138 (M.D. Tenn. 2020) (rejecting rebuttal expert's argument that out-of-pocket method did "not account for time-varying inflation and potential overreactions" by investors); *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) ("[W]e are not persuaded by Defendants' argument that class certification was improper under *Comcast* because the Plaintiffs' damages model failed to account for variations in inflation overtime. *Comcast* does not suggest that damage calculations must be so precise at this juncture. To the contrary, *Comcast* explicitly states that '[c]alculations need not be exact.'" (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013))). Indeed, Dr. Garmaise's concerns with shifting risk and uncertainty seemingly impact *every* publicly traded security, and Coffman aptly responds that his out-of-pocket damages methodology is more than capable of employing a varying percentage when calculating artificial inflation, which would

account for shifting risk and uncertainty throughout the Class Period. *Id.* at PageID.13383 ("Nowhere does my Report claim that I intended to use a constant percentage approach to back case artificial inflation in this case or during the March 2 and March 3, 2021 timeframe.").

In conclusion, after conducting a "rigorous analysis" of the Parties' competing expert reports, this Court is satisfied that Coffman's proposed out-of-pocket methodology is capable of calculating damages on a class-wide basis, and is consistent with Plaintiffs' theory of Section 10(b) liability. Plaintiffs allege that Rocket shareholders were harmed when Rocket disclosed a financial decline because, before that disclosure, Rocket executives were fraudulently informing the market that Rocket would see continued financial growth. *See* ECF No. 109 at PageID.8523–28. The out-of-pocket damages model directly measures this harm by calculating the difference between the price paid by the shareholder-plaintiff and the true value of the stock, absent the alleged misrepresentations. *See, e.g.*, *Dougherty v. Esperion Therapeutics, Inc.*, No. 16-10089, 2020 WL 6793326, at *6 (E.D. Mich. Nov. 19, 2020) (concluding out-of-pocket model was capable of class-wide calculation and was consistent with plaintiffs' securities fraud Section 10(b) liability theory); *Weiner*, 334 F.R.D. at 137 ("Use of the out-of-pocket damages model in securities case[s] is hardly new or novel—it is the standard measurement of damages in Section 10(b) securities cases."); *Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2020 WL 3548379, at *28 (E.D. Tenn. June 29, 2020), *report and recommendation adopted*, No. 3:16-CV-121-TAV-DCP, 2021 WL 1828114 (E.D. Tenn. May 7, 2021) (same); *Waggoner*, 875 F.3d at 106 (2d Cir. 2017) (concluding out-of-pocket method was capable of calculating damages and was consistent with Section 10(b) theory of liability) *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105–06 (S.D.N.Y. 2016) ("Moreover, as required by *Comcast*, plaintiffs' actual theory of damages (out-of-pocket damages) is entirely consistent with their theory of Section 10(b) liability and would be measurable on a class-wide

basis."); *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022) ("Several courts have sanctioned the use of similar 'out-of-pocket' methodologies in analogous securities fraud cases.").

In sum, although Plaintiffs have shown that damages can be calculated on a class-wide basis, they have not shown that common questions of *reliance* predominate. Accordingly, Civil Rule 23(b)(3)'s predominance requirement is not satisfied, and the proposed Class cannot be certified.

### 2. Superiority

Civil Rule 23(b)(3) also imposes a superiority requirement. FED. R. CIV. P. 23(b)(3). To satisfy superiority, Plaintiffs must show that class treatment is "superior to all other available methods for fairly and efficiently adjudicating" the case. *Id.* But this requirement largely rises and falls with predominance. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 545 (6th Cir. 2012) ("Where many individual inquiries are necessary, a class action is not a superior form of adjudication."); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 144 (D.D.C. 2017), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL* No. 1869, 934 F.3d 619 (D.C. Cir. 2019) ("[W]hen individual issues predominate, a class action will be deemed inferior"); *Klotz v. Trans Union, LLC*, 246 F.R.D. 208, 217 (E.D. Pa. 2007) ("[T]he lack of predominance supports the conclusion that proceeding as a class action is not a superior method of adjudicating the controversy.") Because individual questions of investor reliance predominate common questions shared by the class, a class action is not the "superior" method to adjudicate those putative class members' claims. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (noting that analyzing

individual questions of reliance within a single class action involving "hundreds of millions of trades" would be an inefficient "mind-boggling undertaking").

### 3. Ascertainability

The Sixth Circuit has also interpreted Civil Rule 23(b)(3) to impose an implied "ascertainability" requirement, under which "a "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 471 (6th Cir. 2017), *as corrected on denial of reh'g en banc* (Sept. 1, 2017).; *see also In re Sonic Corp.*, No. 20-0305, 2021 WL 6694843, at \*2 (6th Cir. Aug. 24, 2021).

Neither Party briefed the issue of ascertainability, *see generally* ECF Nos. 111; 120,[22] but Plaintiffs' proposed Subclass definition is not ascertainable. As discussed, Plaintiffs define the Section 20A contemporaneous trader Subclass as:

> All persons and entities within the Class that purchased publicly traded Rocket Class A common stock *contemporaneously* with Defendant Gilbert's and Defendant RHI's sale of Rocket Class A common stock on March 29, 2021 (the "Subclass"). Excluded from the Subclass are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendant Rocket and Defendant RHI; (d) any person who is an officer, director, or controlling person of Rocket; (e) any entity in which any Defendant has a controlling interest; and (f) the legal representatives, heirs, successors, or assigns of any such excluded party.

ECF No. 111 at PageID.8589–90 (emphasis added). In February 2024, when this Court granted Plaintiffs leave to substitute SoCal as their proposed Subclass Representative, this Court noted that

---

[22] In a footnote, Defendants claim that this Court already rejected their ascertainability arguments when this Court granted Plaintiffs leave to substitute SoCal as the proposed Subclass Representative. ECF No. 120 at PageID.9116, n. 3. But Defendants never asserted an ascertainability argument when opposing SoCal's substitution, *see* ECF No. 88, and this Court never discussed ascertainability when granting SoCal's substitution, *see Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377 (E.D. Mich. Feb. 5, 2024).

the relevant "statutory language does not define 'contemporaneously'" but "most [courts] agree that a trade is made 'contemporaneously' for the purposes of § 20A if it is made 'within a few days' or the 'day after' the alleged insider trade." *Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *7, 10 (E.D. Mich. Feb. 5, 2024). Without specifically defining the temporal proximity between a putative Subclass member's trade and Defendant Gilbert's alleged insider trade, this Court cannot feasibly determine Subclass membership. Do Plaintiffs limit the Subclass to those investors who—like SoCal—traded on March 30, 2021? Do Plaintiffs intend to include those investors who traded Rocket stock on March 31, 2021? This Court does not know because Plaintiffs do not say. While this may seem trivial, Plaintiffs allege that over 100 million shares were traded throughout the relatively short two-month Class Period. ECF No. 111-2 at PageID.8651. Even a one-day difference in the Subclass definition necessarily impacts the claims of a significant number of investors. Accordingly, Plaintiffs' proposed Subclass definition does not satisfy Rule 23(b)(3)'s ascertainability requirement.

In sum, Plaintiffs have not shown that any Rule 23(b)(3) requirement is satisfied. Predominance and superiority are not satisfied because individual questions of investor reliance overwhelm common questions shared by the class. And ascertainability is not satisfied because Plaintiffs have not provided a feasible Subclass definition. The Class cannot be certified.

## B. Rule 23(a) Requirements

Onto Civil Rule 23(a), which requires Plaintiffs to satisfy four additional requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. FED. R. CIV. P. 23(a). Each will be addressed in turn.

## 1. Numerosity

First, the proposed Class and Subclass must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Although "there is no strict numerical test, 'substantial' numbers" usually satisfy the numerosity requirement." *Daffin v. Ford. Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

Plaintiffs' proposed Class and Subclass are both sufficiently numerous. Defendants do not disagree. *See generally* ECF No. 120. Nor could they. Numerosity "is generally assumed to have been met in class action suits involving nationally traded securities." *Dougherty v. Esperion Therapeutics, Inc.*, No. 16-10089, 2020 WL 3481322, at *5 (E.D. Mich. June 19, 2020); *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 280 F.R.D. 332, 338 (E.D. Mich. 2012); *see also In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 43 (S.D.N.Y. 2012) ("In securities fraud class actions . . . the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." (internal quotations omitted)). Rocket Class A common stock is a nationally traded security. ECF No. 111-2 at PageID.8624. Based on Rocket's public SEC filings, between 115 and 136 million shares of Class A common stock were issued and outstanding during the Class Period. ECF No. 111-2 at PageID.8651; Rocket Companies, Inc., Quarterly Report (Form 10-Q) (May 14, 2021). And, according to Plaintiffs' expert Chad Coffman, the average weekly trading volume for Rocket Class A common stock during the Class Period was 130.2 million shares. ECF No. 111-2 at PageID.8633. *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 501 (M.D. Tenn. 2019) (finding numerosity satisfied in securities class action based on expert testimony that "[o]ver 110 million shares" of the defendant's common stock were publicly traded during the class period). Numerosity is accordingly satisfied.

## 2. Commonality

Plaintiffs must also show the proposed Class and Subclass share common questions of law or fact. FED. R. CIV. P. 23(a)(2). In other words, Plaintiffs must "demonstrate that the class members 'have suffered the same injury[.]'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Class "claims must depend upon a common contention" and "[t]hat common contention . . . must be of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Generally, "commonality does not pose a significant burden to class certification in securities cases. The reason is straightforward: securities cases tend to allege that the defendants made some material misrepresentation or omission common to all of the class members. That alleged false statement or omission is typically the central issue in the case and alone is sufficient to meet Rule 23(a)(2)'s commonality requirement." WILLIAM B. RUBENSTEIN, 7 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS, § 22.70 Rule 23(a)(2) Commonality Requirement—In Securities Cases (6th ed. 2024). Accordingly, "courts rarely deny class certification on commonality grounds in securities class actions because a, if not the, core issue in most cases—the defendant's alleged fraudulent conduct—is common across the entire proposed class." *Id.*; *see also Korn v. Franchard Corp.,* 456 F.2d 1206, 1210 (2d Cir. 1972) (noting commonality is "plainly satisfied" in case where defendants' alleged misrepresentations "relate to all the investors" within the proposed class); *Booth v. Strategic Realty Tr., Inc.*, No. 13-CV-04921-JST, 2015 WL 3957746, at *3 (N.D. Cal. June 28, 2015) (same); *In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2013 WL 6388408, at *6 (S.D. Tex. Dec. 6, 2013) (same); *Fogarazzao v. Lehman Bros.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005) ("The commonality requirement has been applied permissively in securities fraud litigation. In

general, where putative class members have been injured by similar [alleged] material misrepresentations and omissions, the commonality requirement is satisfied.").

Defendants do not dispute that the proposed Class and Subclass satisfy the commonality requirement. *See generally* ECF No. 120. Although, as discussed, individual issues of reliance overwhelm the Class's common questions of law and fact, *see supra* Section III.A.1., the Class's common questions of law and fact include:

(1) Relevant to Count I, whether Dan Gilbert learned material, nonpublic information about Rocket's financial forecast on March 23, 2021, such that RHI—which Gilbert wholly controlled—committed insider trading when it sold over 20 million shares of Rocket Class A common stock just six days later;

(2) Relevant to Counts III and IV, whether Defendant Farner's made materially false or misleading statements about Rocket's profitability and viability during (a) the February 25, 2021 Earnings Call; (b) the March 3, 2021 Morgan Stanley Conference; and (c) the March 11, 2021 Fox Business interview;

(3) Relevant to Counts III and IV, whether Farner acted knowingly or recklessly when making the alleged false and misleading statements; and

(4) Relevant to Counts III and IV, whether the prices of Rocket Class A common stock was impacted by Farner's alleged false and misleading statements.

The proposed Subclass satisfies commonality, too. Plaintiffs' proposed Subclass of those who traded Rocket stock "contemporaneously" with Defendant Gilbert's alleged March 29, 2021 insider trade arises from Count II of Plaintiffs' Complaint, which asserts a claim against RHI under Section 20A of the Exchange Act. *See* ECF No. 109 at PageID.8553–55. Importantly, "§ 20A does not proscribe unlawful conduct—it merely provides a private right of action for those harmed by conduct violating other sections of the Exchange Act, such as, here, insider trading in violation of 15 U.S.C. § 78j(b)." *Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *8 (E.D. Mich. Feb. 5, 2024) (citing 15 U.S.C. § 78t-1(a)). In this way, the claims of all putative Subclass members will necessarily succeed or fail together. If Gilbert's March 29, 2021 trade was an insider trade in violation of Section 10 of the Exchange Act, the entire Subclass, despite its

ascertainability concerns, would be entitled to relief under Section 20A of the Exchange Act as "contemporaneous" traders. 15 U.S.C. § 78t-1(a). But if Gilbert did not trade based on material, nonpublic information in violation of Section 10 of the Exchange Act, the Subclass cannot recover under Section 20A, as alleged in Count II of Plaintiffs' Amended Complaint.

For these reasons, Plaintiffs have satisfied Rule 23(a)(2)'s commonality requirement.

### 3. Typicality

Next, under Rule 23's "typicality" requirement, Plaintiffs must show Plaintiff Carl Shupe—the proposed Class Representative—has claims which are "typical" of those asserted by the putative Class and, likewise, that Plaintiff SoCal—the proposed Subclass Representative—has claims which are "typical" of those asserted by the putative Subclass. FED. R. CIV. P. 23(a)(3). "Typicality is very easy to demonstrate." *Shupe v. Rocket Companies, Inc.*, 601 F. Supp. 3d 214, 219 (E.D. Mich. 2022). Plaintiffs must show their "claims arise from the same event or course of conduct that give rise to the claims of other class [or subclass] members and are based on the same legal theory." *Sloan v. BorgWarner, Inc.*, 263 F.R.D. 470, 474 (E.D. Mich. 2009) This requirement "insures that the representatives' interests are aligned with the interest of the represented class members" such that, "by pursuing their own interests, the class representatives also advocate the interests of the class members." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013) (noting typicality is often "intertwined" with commonality).

Defendants argue both Shupe and SoCal have atypical claims. ECF No. 120 at PageID.9131–32. Each Plaintiff's typicality will be analyzed in turn.

### a. Plaintiff Shupe

First, Defendants argue that Shupe is subject to unique defenses, which would render his claims atypical and prevent him from adequately representing the Class. ECF No. 120 at

PageID.9131; *see also Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 332 F.R.D. 556, 567 (M.D. Tenn.), *order clarified*, 334 F.R.D. 118 (M.D. Tenn. 2019) (noting unique defenses defeat both typicality and adequacy). "'While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (internal quotations omitted); *see also Cahoo v. Fast Enterprises LLC*, 508 F. Supp. 3d 138, 158 (E.D. Mich. 2020) (noting unique defenses defeat typicality). Notably, "Defendants do not have to *prove* a unique defense against the proposed class representative to defeat certification." *Norfolk*, 332 F.R.D. at 568 (emphasis in original). Although "groundless" and "far-fetched" defenses will not defeat typicality, *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 179 (S.D.N.Y. 2008), typicality is not satisfied when "defenses against the named representatives are likely to usurp a significant portion of the litigant's time and energy, and there is a danger that the absent class members will suffer if their representative is preoccupied with defenses unique to it." *Cahoo*, 508 F. Supp. 3d at 158 (internal quotations omitted).

Defendants specifically suggest that "Shupe is subject to unique defenses because he did not purchase Rocket stock based on its price but instead based on his 'meme stock' trading strategy[.]" ECF No. 120 at PageID.9117. But Shupe's deposition testimony revealed nothing of the sort. To the contrary, according to his deposition, Shupe was a consistent investor who would generally invest large sums of money in one "low-risk" company at a time, often for long periods of time. ECF No. 120-29 at PageID.9954, 9960, 9975–77, 10023. Consistent with his "Christian belief in helping people," Shupe testified that he first became interested in investing in Rocket as early as November 2020, because he was inspired by Defendants Gilbert and Farner's commitment

to giving back to the city of Detroit. *Id.* at PageID.9955; *see also id.* at PageID.9969 (noting Shupe was drawn to companies based on the integrity of those in leadership positions). Although Shupe testified that he browsed Reddit and r/wallstreetbets, *id.* at PageID.9959–60, he expressly denied making investment decisions based on other people's posts on Reddit or other online forums. *Id.* at PageID.9957–60 (answering "[n]o, sir" to Defense Counsel's questions: "Have you ever bought a stock based on a recommendation that someone made on Reddit?" and "Have you ever brought a stock after reading information about that stock on Reddit?"). Regarding his specific purchase of Rocket stock, Shupe concedes that he saw Reddit posts noting that Rocket was being "shorted" on March 2, 2021. *Id.* at PageID.9961. But Shupe testified that he had already planned on purchasing Rocket stock, and invested on March 2, 2021 specifically because he was afraid the stock price would continue to rise if he did not. *Id.* ("[T]he reason I chose March 2nd was because I felt that the value of the company was right about where it was at. $29 a share[.] I worried that it was going to go up, and I didn't want to be on the overvalued side. So that's why I purchased at that time.")

Whatever Shupe's trading motivations may have been, Defendants have not shown that Shupe is subject to a unique reliance defense sufficient to defeat typicality. To the contrary, Shupe purchased shares in Rocket stock throughout the Class Period, like all other putative Class members. In this way, Shupe's interests are seemingly aligned with those putative Class members such that Shupe could pursue their interests by pursuing his own. *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013); *see also* WILLIAM B. RUBENSTEIN, 7 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS, § 22.72 Rule 23(a)(3) Typicality Requirement—In Securities Cases (6th ed. 2024) ("In general, . . . where a class representative has purchased the relevant securities between the time of the alleged misrepresentation and the time

the truth was revealed, her claims will be typical of those of the rest of the proposed class members.").

### b. Plaintiff SoCal

In a one-sentence argument, Defendants conclusively argue that SoCal has atypical claims from other putative Subclass members because it *profited* from its March 30 purchase of Rocket Class A common stock, contemporaneous to Defendant Gilbert's March 29 alleged insider trade. ECF No. 120 at PageID.9133 (citing ECF No. 120-30 at PageID.10085, 10087, 1099). But, under the express terms of Section 20A, insider-trader defendants are liable to contemporaneous traders regardless of whether the contemporaneous trader eventually profited from their trades. 15 U.S.C. §§ 78t-1(a)–(b), *See also* William K.S. Wang, *Measuring Insider Trading Damages for a Private Plaintiff*, U.C. DAVIS BUS. L. J. 1 (2009) (discussing various ways courts have measured damages under Section 20A in securities class actions). In any event, individualized damages do not defeat typicality. *See Speerly v. Gen. Motors, LLC,* 343 F.R.D. 493, 523–24 (E.D. Mich. 2023), *aff'd*, No. 23-1940, 2024 WL 3964115 (6th Cir. Aug. 28, 2024) (noting individualized damages are relevant to, but do not defeat class certification under Civil Rule 23(b)(3)'s *predominance* requirement because "'[a]t the class certification stage, [the plaintiffs need only] show that damages can 'feasibly and efficiently be calculated once the common liability questions are adjudicated.'" (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013))).

Like all members of the proposed Section 20A Subclass, SoCal purchased Rocket Class A common stock "contemporaneously" with Defendant Gilbert's alleged March 29, 2021 insider trade. According to its declaration attached to the Amended Complaint, Plaintiff SoCal purchased 21,045 shares of Rocket Class A common stock on March 30, 2021—the day after Gilbert's alleged insider trade of the same stock through RHI. ECF No. 109-2 at PageID.8572. And this

comports with this Court's recent guidance that a trade is "contemporaneous" under Section 20A when it is made the day after or "a few days" after the alleged insider trade. *Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at \*10 (E.D. Mich. Feb. 5, 2024). In this way, SoCal's "claims arise from the same event or course of conduct that give rise to the claims of other class [or subclass] members and are based on the same legal theory" such that its interests are aligned with the putative Subclass members. *Sloan v. BorgWarner, Inc.*, 263 F.R.D. 470, 474 (E.D. Mich. 2009).

### 4. Adequacy

Under the fourth and final Rule 23(a) requirement, Plaintiffs must show that both the proposed Class *Counsel* and the proposed Class *Representatives* will "adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4); *see also Speerly v. Gen. Motors, LLC*, 343 F.R.D. 493, 507 (E.D. Mich. 2023), *aff'd*, No. 23-1940, 2024 WL 3964115 (6th Cir. Aug. 28, 2024). The proposed Class and Subclass representatives "must have common interests with the unnamed members of the class" and must "vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976). This Rule "requires that the class members have interests that are not antagonistic to one another" such that the proposed representative's interests and incentives are not misaligned with those of the putative class. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) (internal quotations omitted).

Defendants do not dispute the adequacy of proposed Class Counsel, Labaton. *See* ECF No. 120. Nor could they. Labaton has extensive experience litigating securities class actions throughout the country. *See* ECF No. 111-3 at PageID.8689–718. Indeed, this Court has already concluded Labaton "is 'competent, experienced, and qualified'" to represent Plaintiffs and the proposed Class. *Shupe v. Rocket Companies, Inc.*, 601 F. Supp. 3d 214, 221 (E.D. Mich. 2022)

(quoting *Pio v. Gen. Motors Co.*, No. CIV. 14-11191, 2014 WL 5421230, at *8 (E.D. Mich. Oct. 24, 2014)). The only dispute is whether Plaintiffs Shupe and SoCal will adequately represent the proposed Class and Subclass, respectively.

### a. Plaintiff Shupe

Based on a thorough review of the record, Plaintiff Shupe is not an adequate Class representative. As explained above, whatever Shupe's trading motivations may have been, this Court is not convinced, and Defendants do not argue, that Shupe's interests are significantly antagonistic to that of the proposed Class. *See generally* ECF No. 120. To the contrary, even if, as Defendants maintain, Shupe purchased Rocket stock as part of a coordinated "meme stock" frenzy, nothing suggests Shupe would not seek to recover the full amount he allegedly lost on his purchase as a result of Defendants' alleged misrepresentations, which he and the proposed Class allege artificially inflated and maintained the price of Rocket stock. In this way, it seems Shupe would vigorously seek the very same relief sought by the proposed Class. The reason this Court questions Plaintiff Shupe's adequacy, however, has less to do with his claims and more to do with his character.

Courts may consider the proposed representative's honesty and trustworthiness when assessing adequacy. *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 431 (6th Cir. 2012); *Davis v. Magna Int'l of Am., Inc.*, No. 20-11060, 2023 WL 3729443, at *4 (E.D. Mich. Mar. 27, 2023) (concluding proposed representative's contradictory deposition testimony, lack of knowledge, and prior fraud conviction "weigh[] against finding [him] to be an adequate representative"); *Crossroads Grp., LLC v. City of Cleveland Heights*, 346 F.R.D. 75, 87 (N.D. Ohio 2024); *Hendricks v. Total Quality Logistics*, LLC, 292 F.R.D. 529, 542 (S.D. Ohio 2013). However, to undermine adequacy, credibility concerns must be "so sharp as to jeopardize the interests of absent

class members." *Gooch*, 672 F.3d at 431 (quoting *In re Colonial P'ship Litig.*, No. H-90-829 (JAC), 1993 WL 306526, at *5 (D. Conn. Feb. 10, 1993)); *see also Xianglin Shi v. Sina Corp.,* No. 05 CIV. 2154 (NRB), 2005 WL 1561438, at *4 (S.D.N.Y. July 1, 2005) (noting "[h]onesty and trustworthiness are . . . relevant factors in determining an[] individual's ability to serve as a class representative" because a representative serves as a fiduciary to absent class members). "Courts applying this rule have found that the representative's credibility must be dubious with respect to substantial issues directly relevant to the claims at issue." *Clough v. Revenue Frontier*, LLC, No. 17-CV-411-PB, 2019 WL 2527300, at *5 (D.N.H. June 19, 2019) (collecting cases).

Through his deposition and certifications, Shupe's credibility for honesty and trustworthiness—as it directly relates to his trades of Rocket stock—has been significantly undermined in at least two ways.

### i. Lead Plaintiff Efforts and Investment Sophistication

First, Shupe misrepresented his investment prowess and failed to disclose earlier efforts to lead securities class actions. In August 2021, when he was bidding for lead plaintiff under the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(a)(3), Shupe certified to this Court that (1) he "ha[d] not sought to serve as a lead plaintiff or representative party in any class action under the federal securities laws filed during the last three years," and (2) he was a sophisticated investor who began investing in the stock market in 2014. ECF No. 15-2 at PageID.502. But Shupe's January 2024 deposition revealed both statements to be untrue. Shupe admitted during his deposition that he sought lead plaintiff status in a similar putative securities class action against Canoo—an electric vehicle company—in April 2021, just *four months* before he filed his declaration averring the opposite under penalty of perjury. ECF No. 120-29 at PageID.10006. Shupe's deposition also revealed that he began investing in the stock market as

early as 2005, *id.* at PageID.9965, and does *not* consider himself a sophisticated investor. *Id.* at PageID.9978.

### ii. March 2, 2021 Sales of Rocket Stock and Resulting Profits

More concerningly, Shupe did not disclose his March 2, 2021 sales of Rocket Class A Common Stock, nor the near $250,000 profit he received from these sales, until August 9, 2023, ECF No. 73—over a year after this Court relied on Shupe's alleged financial loss and appointed him lead plaintiff under the PSLRA. *Shupe v. Rocket Companies, Inc.*, 601 F. Supp. 3d 214 (E.D. Mich. 2022)

Shupe traded Rocket Class A common stock on two—and only two—days: March 2, 2021 and March 3, 2021. ECF No. 73-1 at PageID.2433–35. On March 2, 2021, Shupe purchased 21,000 shares of Rocket Stock at $29 per share, then sold all shares later that same day, at $40 per share. *Id.* at PageID.2433–34; ECF No. 120-29 at PageID.9986. Shupe profited a total of $241,615.50 from his March 2, 2021 day-trading. *See* 73-1 at PageID.2433–35. On March 3, 2021, Shupe purchased approximately 40,000 more shares at $35.50 per share, which he did not sell until August 2021, after the close of the Class Period. *Id.*; *see also* ECF No. 120-29 at PageID.9988.

When Shupe sought appointment as lead plaintiff under the PSLRA in August 2021, he averred that he suffered an alleged $434,026.12 loss from trading Rocket stock during the Class Period. *See* ECF No. 15-5 at PageID.515. But Shupe only disclosed his March 3 *purchases* of Rocket Class A common stock and did not disclose his March 2 *sales* and *profits*. *Id.* at PageID.514–15. This nondisclosure is nontrivial. Had Plaintiff disclosed his near $250,000 profit from his March 2 sales of Rocket Class A common stock, he may not have been appointed lead plaintiff in this litigation under the PSLRA. *See Shupe v. Rocket Companies, Inc.*, 601 F. Supp. 3d 214, 217 (E.D. Mich. 2022) (concluding Plaintiff Shupe "ha[d] the largest financial interest in this

litigation"—and thus was presumed to be the most adequate lead plaintiff—because, based on his incomplete disclosure of only his March 3 purchase of Rocket stock, he allegedly suffered a $434,026.12 loss during the Class Period). Indeed, this Court rejected another individual's bid for lead plaintiff precisely because that individual sold Rocket shares during the Class Period, thus diminishing that individual's alleged financial loss from their trading of Rocket stock during the Class Period. *Id.* (citing *Lax v. First Merchs. Acceptance Corp.*, No. 97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). In this way, Shupe's purported $434,026.12 loss—which this Court relied on when appointing him lead Plaintiff—would likely similarly be diminished by his $241,615.50 profit from his undisclosed March 3 sale.[23]

Shupe had a chance to correct his nondisclosure in June 2022 but did not do so. When Shupe filed an amended complaint shortly after being appointed lead plaintiff, he attached an itemized list of his "transactions in Rocket securities during the Class Period" and declared—under penalty of perjury—that the list of transactions was "true and correct." ECF No. 39-1 at PageID.890–91. But the list of transactions Shupe provided, again, only identified his March 3 *purchases. Id.* His March 2 quarter-of-a-million-dollar *sales* were missing. *Id.* at PageID.893–94. The truth did not come out until over a year later, when Plaintiffs filed an amended list of his "transactions in Rocket Companies, Inc." during the Class Period and, for the first time, disclosed his purchase and sale of *21,000* shares of Rocket Stock on March 2, 2021—and his near $250,000 profits on the day. *See* ECF No. 73-1 at PageID.2433–35.

---

[23] Plaintiffs maintain that Shupe's economic loss would *not* be diminished by his March 2 proceeds because Shupe's March 2 sales "were made while the stock reflected an equal amount of alleged artificial inflation (since there was no alleged misstatement or corrective disclosure between the time of purchase and sale)[.]" ECF No. 73-1 at PageID.2429.

Shupe's explanation for this nondisclosure only compounds this Court's credibility concerns. In his updated, sworn certification signed on August 8, 2023, Shupe explained that, "[u]pon collecting documents in the discovery process, [he] realized that [he] inadvertently did not include [his] March 2, 2021 trades in his trading records that [he] previously sent to [his] counsel, and thus, they were unintentionally not included in [his] prior certification" because he made a mistake when downloading his trading records from his broker's website. *Id.* at PageID.2431–32. But Plaintiff Shupe was asked about his lackluster disclosure five months later during his January 2024 deposition, and his answers were contradictory, self-serving, and borderline nonsensical.

Shupe first explained his "inadvertent" nondisclosure of his March 2 sales and profits was attributable to the fact that he obtained his trading history from his broker's website using a date-range search, asking the website to provide his trading history from "October 2020 to something of 2021," instead of searching for Rocket trades, specifically. ECF No. 120-29 at PageID.9991–92. But, as Defense counsel aptly pointed out, this explanation makes no sense:

> **Defense Counsel:** Why would that search pick up trades on March 3rd, 2021, but not March 2nd, 2021?
> **Shupe:** It was never intentional to miss anything. It was just -- so it was -- I wasn't trying to miss anything at all.
> **Defense Counsel:** I'm just trying to understand why you described this search parameter of a year and how that has anything to do with this issue, because the trades both happened within a day of each other in March of 2021?
> **Shupe:** I'm sorry. If I would have entered Rocket as the ticker -- as the search engine on Charles Schwab, I believe it would have picked up. But instead, I entered in a time period. Because you can enter in just time periods without entering in a ticker, and it would have specifically looked for Rocket. But I entered in a time period and it didn't look for all the Rocket trades, and that's where I think I missed them. It's when I did the search engine on Charles Schwab to pull up the documents. That's where I missed it.
> **Defense Counsel:** Is your testimony today that the Charles Schwab search engine was defective?
> **Shupe:** No, sir.
> **Defense Counsel:** Okay. What's your testimony? . . . Why would the Charles Schwab website not return to you your trades from both March 2nd and March 3rd, 2021, when you put in that one year time period for all Rocket trades?

*Id.* at PageID.9992.

At this point, Shupe changed his story, attributing his non-disclosure to his iPhone, rather than his broker's website:

> **Shupe:** So when I was downloading the trades, I had to download them onto my phone. It was an iPhone, and I'm not very versed on transferring documents into drive -- into the drive and trying to pull them out. And whenever you send emails, you have to send them at a certain amount of megabytes or gigabytes. And they were too large, so I had to send off multiple emails. And so it was very hard for me to figure out if I had -- I may have inadvertently not sent him the transaction report for that month or for that very day. I don't know. I don't know how it happened. I'm just trying to reason with why it was completely unintentional.
> **Defense Counsel:** You realize that doesn't make any sense, right?
> **Shupe:** If it's subjective, I understand.

*Id.*

> Then Shupe went to lunch. *Id.* at PageID.9997. When he returned, his story changed again:

> **Shupe:** So during the lunch break [Plaintiff Counsel] refreshed my recollection on the August 2021 transfer of documents for the trades. We found that I sent --with my wife's account, I sent . . . a *monthly statement*. And on my account, I sent them a *trade confirmation statement*. I meant to send the monthly statement for my account, but I didn't. And so that was what the recollection was. I thought we sent more documents, but all I sent -- I actually sent less documents in August of the -- just the trade confirmation of that month of March, starting March 3rd.
>
> . . .
>
> **Defense Counsel:** Okay. I want to make sure I understand. So before lunch, you testified that this was a very complicated and convoluted process of downloading stuff on Charles Schwab, creating zip files, trying to forward those zip files to your lawyer, it not working, then eventually you got something through, and you didn't check what had gone through, right?
> **Shupe:** Correct.
> **Defense Counsel:** Now you're saying, after lunch, it was actually a lot easier than that and none of that stuff actually happened, and all you sent your lawyer was one trade confirmation for you and your monthly account statement for your wife?
>
> . . .
>
> **Shupe:** Correct[.]
> **Defense Counsel:** Why didn't you send him [your] monthly statement?
> **Shupe:** Again, inexperience in searching and pulling up the documents and knowing what document was actually a monthly statement. I may have accidently got my wife's right because she probably had fewer trades, and I was just -- I don't know. I can't remember or recollect exactly what happened at the time.
>
> . . .

> **Defense Counsel:** When you sent the trade confirmation instead of the monthly statement to your lawyer, did you open up the document to see what you were sending him?
> **Shupe:** I would imagine I looked at it. And I just like I said, I think, in my mind, I may have just not remembered that it was two days of trades. Or trying to think in my mind if I was convoluting the fact that I was only in Rocket in the shares that I had bought on the 3rd, and those were the only ones that mattered[.]

*Id.* at PageID.9998–99.

At best, Shupe's deposition testimony highlights his inability to remember important details central to this litigation and his own trades of Rocket stock. At worst, Shupe's testimony is indicative of obfuscation after deliberate, dishonest disclosures. His adequacy is undermined either way. *See, e.g.*, *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 317 (E.D. Va. 2007) ("Plaintiff's inadvertence or his indifference to the PSLRA's certification requirements demonstrate a lack of diligence and candor that, in conjunction with his other deficiencies, counsel against a finding of adequacy."); *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (affirming district court finding of inadequacy when proposed class representative offered "differing accounts" about matters "that form the very basis for his lawsuit," concluding this inconsistency "surely would create serious concerns as to his credibility at trial"); *Savino v. Computer Credit, Inc.*, 173 F.R.D. 346, 356 (E.D.N.Y. 1997), *aff'd*, 164 F.3d 81 (2d Cir. 1998) (finding class representative was inadequate because his amended pleadings contradicted his prior pleadings and his explanations throughout his deposition were inconsistent); *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 158 (S.D.N.Y. 2010) (concluding proposed class representative was inadequate, in part because her deposition revealed that she was involved in a prior lawsuit which was not included in her list of her legal involvement, which she swore to earlier in the litigation).

**b. Plaintiff SoCal**

Unlike Shupe, who Defendants argue is inadequate because of unique credibility concerns, Defendants argue SoCal is inadequate because it lacks basic knowledge about its own case and the claims of the proposed Subclass it seeks to represent. ECF No. 120 at PageID.9132–33.

A proposed class—or subclass—representative is inadequate if they have "so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class." *Davis v. Magna Int'l of Am., Inc.*, No. 20-11060, 2023 WL 3729443, at *6 (E.D. Mich. Mar. 27, 2023) (internal citations omitted). But this is an incredibly low hurdle for proposed representatives to surmount. *Cassell v. Vanderbilt Univ.*, No. 3:16-CV-2086, 2018 WL 5264640, at *5 (M.D. Tenn. Oct. 23, 2018) ("The burden of demonstrating that the class representee meets this standard is not difficult."). "It is well established that a named plaintiff's lack of knowledge and understanding of the case is insufficient to deny class certification unless his ignorance unduly impacts his ability to vigorously prosecute the action." *Davis*, 2023 WL 3729443, at *6 (internal citations omitted); *see also Murray v. E*Trade Fin. Corp.,* 240 F.R.D. 392, 398 (N.D. Ill. 2006) (noting "the adequacy requirement places only a modest burden on a class representative to demonstrate an understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery." (internal quotations omitted)).

Defendants argue SoCal lacks a basic understanding about this litigation because (1) "SoCal did not review the complaint or SoCal's motion to be substituted as named plaintiff;" and (2) SoCal conflates the contemporaneous trading claims relevant to the particular proposed Subclass with the misrepresentation claims relevant to the proposed Class as a whole. ECF No.

- 77 -

120 at PageID.9132–33 (citing ECF No. 120-30 at PageID.10085–87, 10103, 10105). Admittedly, SoCal's adequacy is a close call.

On one hand, SoCal has diligently prosecuted this case since it became a named Plaintiff in February 2024 and nothing suggests SoCal's interests are misaligned with those of the proposed Subclass. *See supra* Section III.A.3 (rejecting Defendants' argument that SoCal has atypical claims). This Court is also not concerned about SoCal's review of relevant pleadings. Although SoCal's corporate representative—Robert Glaza—testified in his February 2024 deposition that no SoCal trustee read the operative complaint before it was filed, he explained that SoCal's corporate counsel distributed a memo and "presented an oral summary" about the complaint to the board. ECF No. 120-30 at PageID.10086; *see also Davis v. Magna Int'l of Am., Inc.*, No. 20-11060, 2023 WL 3729443, at *6 (E.D. Mich. Mar. 27, 2023) (finding proposed representative who had not read the complaint before his deposition was nevertheless adequate because his deposition revealed he was familiar with the complaint's filing and had reviewed the complaint in relevant part).

On the other hand, SoCal seems to fundamentally misunderstand the claims of the Subclass it seeks to represent, conflating the Subclass's Section 20A contemporaneous trading claim with the general Section 10b misrepresentation claims asserted by the broader Class. This misunderstanding permeated SoCal's deposition:

> **Defense Counsel:** And why do you think SoCal [is] involved in [this] litigation[?]
> **Glaza:** Because some of the trades were made in close proximity to the *misrepresentations* made by Rocket executives.
> **Defense Counsel:** So you believe that SoCal is actually bringing claims based on alleged *misrepresentations* in this case?
> **Glaza**: Yes.
> **Defense Counsel**: Okay. So you believe that SoCal has been added as a named plaintiff with respect to -- with respect to plaintiff -- with respect to the *misrepresentation* claims?
> **Glaza**: Yes.

. . .

**Defense Counsel:** Okay. And what obligations does SoCal have as the [named] plaintiff in the case?
**Glaza**: To be the fiduciary to the class.
**Defense Counsel**: And that's for the class that represents the *misrepresentation* claim?
**Glaza**: Correct.

ECF No. 120-30 at PageID.10085–86 (emphasis added).

SoCal is incorrect. Plaintiffs specifically sought to add SoCal as a named plaintiff relative to Plaintiffs' Section 20A contemporaneous trading claim because SoCal purchased its shares of Rocket stock "contemporaneously with" Defendant RHI's alleged insider trade. ECF No. 81 at PageID.2822 ("Lead Plaintiff Carl Shupe files this Motion seeking . . . the substitution of [SoCal] so that they may move to serve as a §20A Subclass representative."), at PageID.2823 ("SoCal has standing to allege the §20A claims . . . and is well-equipped to litigate this case on behalf of the Subclass of investors who were harmed by Defendants' violation of §20A."). This Court granted Plaintiffs leave to amend their operative complaint for this very purpose. *Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *10 (E.D. Mich. Feb. 5, 2024). Both Plaintiffs' operative complaint and renewed motion for class certification seek SoCal's appointment as the representative for the proposed Section 20A Subclass. ECF Nos. 109 at PageID.8423; 111 at PageID.8593.

True, to some extent, SoCal—as the proposed Subclass representative—is *also* a member of the putative Class which asserts broader Section 10 misrepresentation claims. And both the misrepresentation and insider trading claims are premised on the fact that, during the Class Period, Rocket executives knew what the public did not: that Rocket's profitability and viability were forecasted to decline. *See* ECF No. 109 at PageID.8469–95. But, beyond these surface-level

- 79 -

*similarities*, SoCal's deposition suggests it does not know the fundamental *differences* between the Subclass's contemporaneous trading claim and the Class's broader misrepresentation claims:

> **Defense Counsel:** Do you understand that there's an alleged insider trading claim?
> **Glaza:** Yes.
> **Defense Counsel:** And do you believe that SoCal is also the lead plaintiff for that claim, as well?
> **Glaza:** We're the lead plaintiff for the misrepresentation.
> **Defense Counsel:** But not the insider trading?
> **Glaza:** I guess, in my mind, they're the same thing.
> **Defense Counsel:** Okay. You think they're the same thing?
> **Glaza:** Yes.

ECF No. 120-30 at PageID.10086.

They are not the same thing. *See Shupe v. Rocket Companies, Inc.*, 660 F. Supp. 3d 647, 667 (E.D. Mich. 2023) (explaining that, although insider trading and fraudulent misrepresentation claims are both actionable under Section 10(b) of the Exchange Act and Rule 10b-5, both claims require proof of distinct elements). Indeed, as alleged in this case, the claims involve different dates, different Defendants, and different fraudulent conduct. Plaintiffs' insider trading claim alleges that *Defendant RHI*—through Dan Gilbert—sold 20,200,000 shares of Rocket Class A common stock on *March 29, 2021*. ECF No. 109 at PageID.8496–508. Plaintiffs' misrepresentation claims allege that *Defendant Farner*—as CEO of Rocket—made a series of material, fraudulent misrepresentations to the market on *February 25, March 3,* and *March 11, 2021. See supra* Section I.D. Yet SoCal seemingly contends that the Subclass's contemporaneous trading claim is premised—not on Dan Gilbert and RHI's alleged March 29 insider trade—but on Jay Farner's alleged misrepresentations:

> **Defense Counsel**: [A]re you aware, in this case, what was alleged to have been material nonpublic information?
> **Glaza:** Yes
> **Defense Counsel:** And what were you told be counsel with respect to that?

**Glaza:** That, on February 25, *[Jay] Farner made some misleading statements to the public*, and he tweeted them, and then, by May 5th, it became known that the statements were misleading.

**Defense Counsel:** Yeah, and that Mr. Farner's statements to the public were material nonpublic information; that's what you understand?

**Glaza:** That's what I understand, yes.

. . .

**Defense Counsel:** And do you have an understanding of what a 20A claim is?

**Glaza:** Yes.

**Defense Counsel:** And what is your understanding?

**Glaza:** It's that the stocks were purchased within a short time frame of the *misleading statements having been made.*

. . .

**Defense Counsel**: You said that SoCal is attempting to represent a class, a 20A class. Do you know what 20A is?

**Glaza**: It has to do with *misrepresentation.*

**Defense Counsel:** Does it have anything to do with any trades by any insiders?

**Glaza:** Yes . . . I do know. I just am . . . not able to immediately recollect everything.

. . .

**Defense Counsel:** [W]hat elements do you need to prove or win on that claim?

**Glaza:** []That you were involved in a stock purchase relatively close to *misrepresentation claims*. . . . It has to have proximity to a misleading statement[.]

**Defense Counsel:** Okay. So you have to have prox—SoCal has to have proximity to a false statement?

**Glaza:** Right.

**Defense Counsel:** Okay. And those are *Mr. Farner's statements*; is that what you're saying here?

**Glaza**: That's my understanding, yes.

*See* ECF No. 120-30 at PageID.10087, 10103–05 (emphasis added).

Although a proposed class representative need not "have a detailed and scholarly understanding of the case," they must have—at least—a basic understanding or some general knowledge of the relevant facts underlying their claims. *Taylor v. CSX Transp., Inc.*, 264 F.R.D. 281, 291 (N.D. Ohio 2007). However low this hurdle may be, it seems that SoCal has not cleared it. This weighs against a finding that SoCal would adequately represent the interest of the proposed Section 20A Subclass.

Accordingly, both Shupe and SoCal present adequacy problems. Based on a thorough review of the record, this Court concludes that Plaintiff Shupe's credibility concerns render him

- 81 -

an inadequate Class representative. And, although a closer call, this Court concludes that Plaintiff SoCal would be an inadequate Subclass representative because it lacks a fundamental understanding of the proposed Subclass's claims and the basic facts these claims are premised on. For these reasons, Plaintiffs have not shown that the fourth final requirement of Rule 23(a) is satisfied.

In sum, although Plaintiffs have sufficiently shown commonality and numerosity, Plaintiffs have not shown that common questions of reliance predominate. Plaintiffs have not shown that a class action is the superior method for adjudicating the claims of the putative Class. Plaintiffs have not provided an ascertainable Subclass definition. And Plaintiffs have not shown that their proposed Class and Subclass representatives would adequately protect the interests of the putative Class and Subclass members. Plaintiffs' renewed motion for class certification will accordingly be denied.

### IV. Conclusion

Accordingly, it is **ORDERED** that Defendants' Motion for an Evidentiary Hearing, ECF No. 158, is **DENIED.**

Further, it is **ORDERED** that Plaintiffs' Renewed Motion for Class Certification, ECF No. 111, is **DENIED.**

**This is not a final order and does not close the above-captioned case.**

Dated: September 30, 2024

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CARL SHUPE, and CONSTRUCTION
LABORERS PENSION TRUST FOR SOUTHERN
CALIFORNIA, individually and on behalf of all
others similarly situated,

        Plaintiffs,                Case No. 1:21-cv-11528

v.                              Honorable Thomas L. Ludington
                              United States District Judge

ROCKET COMPANIES, INC., JAY FARNER,
DANIEL GILBERT, and ROCKET HOLDINGS, INC,

        Defendants.

_____/

**OPINION AND ORDER DENYING PARTIES' EXPERT MOTIONS**

TABLE OF CONTENTS

**Introduction**................................................................................................ **2**
**I. Background Facts**.................................................................................... **3**
  A. Rocket's Origins................................................................................ 3
  B. Rocket's Key Performance Indicators................................................ 6
  C. Farner's Alleged Misrepresentations................................................. 9
  D. Gilbert's Alleged Insider Trading..................................................... 11
  E. Procedural Posture........................................................................... 13
**II. *Basic* Background and Expert Reports** ............................................... **14**
  A. The *Basic* Presumption, Market Efficiency, and Price Impact ........... 15
    1. Market Efficiency Factors ............................................................ 17
  B. Plaintiff Expert Chad Coffman........................................................ 19
    1. Market Efficiency Conclusion ...................................................... 20
    2. Class-Wide Damages Conclusion ................................................. 22
  C. Defense Expert Dr. René Stulz........................................................ 23
    1. Meme Stock and Market Inefficiency Conclusions ....................... 23
    2. Rebuttal to Chad Coffman's Conclusions ..................................... 29
  D. Defense Expert Dr. Laura Starks..................................................... 30
  E. Defense Expert Dr. Mark Garmaise ................................................ 32

**III.** ..................................................................................................................... **34**

    A. Defendants' Motion to Exclude Chad Coffman's Testimony ............................................ 35

        1. Coffman's Reliance on the *Cammer* and *Krogman* Factors .............................. 36

        2. Coffman's Meme Stock Considerations ................................................................. 38

        3. Coffman's Price-Impact Event Study .................................................................... 40

        4. Coffman's Public Float Analysis ........................................................................... 44

        5. Coffman's Damages Proposal ............................................................................... 47

    B. Plaintiffs' Motion to Exclude Dr. René Stulz's Testimony ............................................. 49

        1. Qualifications ........................................................................................................ 49

        2. Reliability ............................................................................................................. 50

    C. Plaintiffs' Motion to Exclude Dr. Laura Starks's Testimony ........................................ 52

        1. Qualifications ........................................................................................................ 52

        2. Relevancy ............................................................................................................. 53

        3. Reliability ............................................................................................................. 55

    D. Plaintiffs' Motion to Exclude Dr. Mark Garmaise's Testimony ................................... 58

        1. Qualifications ........................................................................................................ 58

        2. Relevancy ............................................................................................................. 59

    E. Defendants' Motion to Exclude Chad Coffman's "Rebuttal" Testimony ...................... 62

**IV. Conclusion** ..................................................................................................... **66**

## Introduction

Plaintiffs Carl Shupe and Construction Laborers Pension Trust for Southern California ("SoCal") seek to certify a class of all individuals who traded Rocket Companies, Inc. ("Rocket") Class A common stock from February 25 through May 5, 2021 (the "Class Period"), alleging that the price of this stock was artificially inflated and maintained by a series of fraudulent misrepresentations made by Defendant Jay Farner. Within this Class, Plaintiffs also seek to certify a Subclass of all individuals who traded Rocket Class A common stock "contemporaneously" with Defendant Dan Gilbert's alleged insider trade of the same security on March 29, 2021.

The answers to three questions are central to class certification: (1) did Rocket stock trade in an "efficient market" throughout the Class Period?; (2) did Defendants Jay Farner's alleged

fraudulent misrepresentations have an impact on the price of Rocket stock?; and (3) can damages be calculated on a class-wide basis? If the answer to any of these questions is "no," the proposed Class cannot be certified because it does not satisfy Civil Rule 23(b)(3)'s predominance requirement. Yet the answers to these questions are buried under *thousands* of pages of pleadings which rely on the proposed testimony of *four* separate experts. And the Parties have filed *six* motions challenging each other's proposed experts under *Daubert* or seeking to strike each other's proposed expert reports as procedurally improper. These motions must be resolved before this Court can address the class certification question. For the reasons that follow, all motions will be denied.

## I. Background Facts

### A. Rocket's Origins

In 1985, Dan Gilbert founded Rocket Mortgage, LLC ("Rocket Mortgage"). *See* ECF No. 1 at PageID.6. Since its founding, Rocket Mortgage has, as its name implies, taken financial flight. In 1999, Rocket Mortgage pioneered online home mortgage applications. ECF No. 109 at PageID.8430. Nearly 15 years later, Rocket Mortgage launched a digital, "end-to-end completely online mortgage experience," through which customers "can go from application to approval and look at their rate online, without having to talk to a banker." *See id.*; *Our History*, ROCKET COMPANIES, https://www.rocketcompanies.com/press-room/our-history/ [https://perma.cc/N2VE-5TPZ]. Rocket Mortgage's digital mortgage platform has been highly successful and is largely responsible for propelling "Rocket" to its status as a household name within home financing. ECF No. 109 at PageID.8431 (noting Rocket Mortgage's online platform "has provided more than $1 trillion in home loans since its inception" and that "[b]y 1Q 2020, Rocket's market share grew to 9.2% of an over $2.0 trillion annual market[.]"). Indeed, Rocket Mortgage currently advertises

itself as "America's largest mortgage lender." *About Us*, ROCKET MORTGAGE, https://www.rocketmortgage.com/about (last visited Aug. 25, 2024) [https://perma.cc/7NL9-ZCLK].

The "Rocket" brand quickly expanded, growing beyond Rocket Mortgage to Rocket Companies, Inc. ("Rocket"), a constellation of 13 separate companies, spanning across multiple industries including home and personal financing, sales, technology, and marketing.[1] *See Our Companies*, ROCKET COMPANIES, https://www.rocketcompanies.com/our-companies/#sales-technology-marketing-services (last visited Aug. 25, 2024) [https://perma.cc/8J7P-GNUH]. Importantly, at all relevant times, Rocket was controlled by a separate company, Rocket Holdings, Inc. ("RHI"), which was, in turn, controlled by Dan Gilbert.[2] ECF No. 109 at PageID.8425–26.

---

[1] RCI currently consists of: (1) Rocket Mortgage; (2) Rocket Mortgage Canada; (3) Amrock; (4) Amrock Title Insurance Company; (5) Lendesk; (6) Rocket Homes; (7) ForSaleByOwner.com; (8) Rocket Loans; (9) Rocket Money; (10) Core Digital Media; (11) LowerMyBills.com; (12) Rocket Innovation Studio; and (13) Woodward Capital Management. Our Companies, ROCKET COMPANIES, https://www.rocketcompanies.com/our-companies/#sales-technology-marketing-services (last visited Aug. 25, 2024) [https://perma.cc/8J7P-GNUH].

[2] Rocket reported the following in its 2020 annual report, filed with the SEC:

> ***We are controlled by RHI, an entity controlled by Dan Gilbert, whose interests may conflict with our interests and the interests of other stockholders***.
>
> RHI, an entity controlled by Dan Gilbert, our founder and Chairman, holds 99.94% of our issued and outstanding Class D common stock and controls 79% of the combined voting power of our common stock. As a result, RHI is able to control any action requiring the general approval of our stockholders, so long as it owns at least 10% of our issued and outstanding common stock, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws and the approval of any merger or sale of substantially all of our assets. So long as RHI continues to directly or indirectly own a significant amount of our equity, even if such amount is less than a majority of the combined voting power of our common stock, RHI will continue to be able to substantially influence the outcome of votes on all matters requiring approval by the stockholders, including our ability to enter into certain corporate transactions. The interests of RHI could conflict with or differ from our interests or the interests of our other stockholders. For example, the concentration of ownership held by RHI

Despite this expansion, Rocket Mortgage remains Rocket's "flagship business." ECF No. 109 at PageID.8430. Rocket lends money—secured by mortgages—to consumers, both directly and through third-party partners such as private mortgage brokers and banks. *Id.* at PageID.8417, 8436–40. Notably, direct-to-consumer loans are more profitable than partner-network loans because Rocket need not share profits with third-party brokers or middlemen. *Id.* at PageID.8437–38 (noting direct-to-consumer sales accounted for "approximately 88%, 87%, 81%, 75%, and 82%" of Rocket's annual revenues "from 2017 to 2021, respectively). Through these two channels, Rocket sells two types of mortgages: new purchase mortgages and refinancing mortgages. *Id.* at PageID.8417. Unlike purchase mortgages, which allow homebuyers to finance a new home, refinancing mortgages allow homeowners with preexisting mortgages to change their mortgage rates and terms.

Regardless of loan type and whether a third-party broker is involved, Rocket primarily profits by selling repackaged consumer loans to government-sponsored entities ("GSEs") like Fannie Mae and Freddie Mac, which then "pool the loans sold by [Rocket] together . . . to issue and sell to the secondary market as mortgage-backed securities," ("MBS") which investors can buy, sell, and trade. *Id.* at PageID.8418; *see also id.* at PageID.8434 (noting Rocket sold 97% of its closed loans to GSEs, before that metric fell to 93% in 2021). Specifically, Rocket capitalizes on the "primary-secondary spread," or the difference between the interest rate that homeowners pay to purchase or refinance a home—the "primary" rate—and the interest rate paid to investors

---

could delay, defer or prevent a change of control of our Company or impede a merger, takeover or other business combination that may otherwise be favorable for us.

Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021) (emphasis in original).

who buy and hold MBSs—the "secondary" rate. *Id.* at PageID.8418; *see also id.* at PageID.8431–32 (noting Rocket's sale to the secondary market accounted for more than 85% of its revenue from 2017–2021).

In August 2020, Rocket launched its initial public offering ("IPO"), selling 100 million shares at $18.00 per share, raising $1.8 billion. ECF No. 109 at PageID.8431. At the time, Rocket's refinancing business was booming, due in large part to favorable home interest rates prompted by the COVID-19 pandemic. *See id.* at PageID.8417, 8434 (noting, that in 2020, "approximately 80% of Rocket's new loan applications were refinance loans" whereas only "20% were new purchase loans"); Erin Gobler, *Here's How COVID-19 Changed the Mortgage Process*, FOX BUSINESS (July 2, 2021), https://www.foxbusiness.com/money/how-covid-pandemic-changed-mortgage-process ("In March 2020, the Federal Reserve slashed interest rates to help stimulate the economy. Mortgage interest rates fell to their lowest levels ever, and the trend . . . continued into 2021[.]") [https://perma.cc/8G6Y-H3DJ]. Rocket's 2020 annual revenue surpassed $15.7 billion. ECF No. 109 at PageID.8431.

### B. Rocket's Key Performance Indicators

To ensure profits continued to soar, as well as to avoid potential obstacles along the way, Rocket closely monitored what it referred to as "Key Performance Indicators" ("KPIs"). ECF No. 109 at PageID.8440. As explained in Rocket's SEC filings, it monitored closed loan origination volume, total market share, and "gain on sale margins." Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021).

Closed loan origination volume represents the number of loans that Rocket originated, processed, and funded. ECF No. 109 at PageID.8445. Beyond this representation, the closed loan origination volume is also highly predictive of the number of probable loans that Rocket—through

GSEs—could sell on the secondary market as MBSs during the same period. *See id.* Accordingly, and as alleged, the higher Rocket's closed loan origination volume, the higher the primary-secondary spread, the higher "gain on sale of loans, net," and the higher "gain on sale margin," as explained below. *See id.* at PageID.8446 (emphasis omitted).

Rocket's "gain on sale margin" is calculated by dividing the "gain on sale of loans, net" by the "net rate lock volume for the period." *Id.* The former part of this equation—Rocket's gain on sale of loans, net—consists of "all components related to the origination and sale of mortgage loans, including:"

(1) Rocket's net gain on sale of loans, as reflected by the "primary-secondary spread";
(2) Loan origination fees and other "certain costs";
(3) Provisions for or benefits from investor reserves;
(4) The change in fair value of interest rate lock commitments ("IRLCs")[3] and loans held for sale;
(5) The gain or loss on forward commitments hedging loans held for sale and IRLCs; and
(6) The fair value of originated Mortgage Servicing Rights (MSRs)

*See id.* The latter part of this equation—the "net rate lock volume" for the period—is defined as the unpaid principal balance of all loans subject to IRLCs and Rocket's estimated "pull-through factor"—"a key assumption" which "estimates[] loan funding probability, as not all loans that reach IRLC status will result in a closed loan." *Id.*

As alleged, beginning in November 2020, Rocket executives knew—based on market trends and the company's review of KPIs—that the company's profitability was about to implode. Specifically, the "closed loan volume for each channel" of Rocket's loan sale business was

---

[3] An IRLC is an "agreement[] to lend to a client as long as there is no violation of any condition established in the contract. Commitments generally have fixed expiration dates or other termination clauses and may require payment of a fee." Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021); *accord* ECF No. 109 at PageID.8444–45.

trending downwards. ECF No. 109 at PageID.8470–72 (alleging "[c]losed loan volume fell significantly, declining from $40.25 billion in November 2020 to just $32.44 billion in December 2020 and then continued to decline to approximately $22.38 billion by May 2021"); *see also id.* at PageID.8516 (depicting closed mortgage volume declining in both Rocket's direct-to-consumer and partner networks, beginning in November 2020). In addition, new client inquiries and loan applications were down 20%. *Id.* at PageID.8474–75, 8511 (alleging "internal Company dashboards showed that consumer demand was not strong because web traffic and new loan applications began declining in 2020, which continued on to 1Q 2021"). Moreover, Rocket's net lock volume—the unpaid principal balance of all loans subject to IRLC discounted by Rocket's "pull-through" factor—grew stagnant and began declining. *Id.* at PageID.8476.

Compounding Rocket's alleged internal challenges, mortgage interest rates began rising in March 2021. *See Mortgage Rates*, FREDDIE MAC (last updated Aug. 22, 2024) https://www.freddiemac.com/pmms [https://perma.cc/8S7Z-R82T] *accord* ECF No. 109 at PageID.8480. By Rocket's own admission, increased interest rates correspond to a decrease in profitable refinancing loan volume, a decreased primary-secondary spread, and a decrease in overall net revenue. *See* Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021) (noting Rocket's profits have primarily derived from refinancing—rather than purchase— mortgages, explaining (1) "if interest rates rise and the market shifts to purchase [loan] originations, our market share could be adversely affected if we are unable to increase our share of purchase originations," and (2) "reductions in the overall level of refinancing activity or slow growth in the level of new home purchase activity can impact our ability to continue to grow our loan production volumes"). Around the same time, United Wholesale Mortgage ("United")—one of Rocket's key competitors—issued a public "ultimatum" to third-party brokers that, if they

continued to work with Rocket, they could no longer work with United. *See* ECF No. 109 at

PageID.8483; *Okavage Grp., LLC v. United Wholesale Mortg., LLC*, No. 3:21-CV-448-WWB-

LLL, 2024 WL 982380, at *2 (M.D. Fla. Feb. 6, 2024) (explaining that, at a March 4, 2021

recorded virtual event, United's CEO told third-party brokers "you have until March 15 to sign an

addendum saying you're not working with [Rocket] . . . And if you don't sign the addendum . . .

you and nobody at your company will be able to work with [United] anymore[.]"). As alleged,

Rocket's market share of third-party broker loans decreased by nearly 7% in the three months

following United's ultimatum. ECF No. 109 at PageID.8483.

### C. Farner's Alleged Misrepresentations

As alleged, despite this known turbulence, Rocket executives insisted to both investors and

the market that Rocket would be financially successful. *See Shupe v. Rocket Companies, Inc.,* 660

F. Supp. 3d 647, 660 (E.D. Mich. 2023).

First, during a public investor conference call on February 25, 2021, Rocket CEO, RHI

CEO, and Vice Chairman of Rocket's Board of Directors Jay Farner stated:

> We're seeing strong consumer demand, especially in the housing market. I mean,
> it's the strongest that its been here in the last decade . . . I'll draw your attention to
> the fact that, overall, we were able to grow volume twice as fast as the industry in
> 2020.

ECF Nos. 44 at PageID.1209; 109 at PageID.8510 (emphasis omitted). In response to a question

about how increased interest rates may impact Rocket's performance, Farner additionally stated:

> [U]sually, as we see these interest rates tick up a bit, what we're going to see is an
> opportunity for us to lean in to spend more money and now to talk about the retail
> or Direct-to-Consumer space, same situation here. There are so many marketing
> opportunities out there for us. And as others tend to step away or back away from
> the space, this is where we can lean in, we can grab market share. And not only are
> we thinking about the profitability that we achieved on the first transaction, we're
> thinking about the lifetime value of that client and we're now thinking about the
> lifetime value not only over mortgage, but real estate, auto, and these additional
> businesses that we'll be adding. So, I guess you can tell we're pretty excited about

it and don't see interest rates going up or down, really having an impact on our business one way or the other.

*Id.* at PageID.8512–13 (emphasis omitted).

During a recorded interview at a Morgan Stanley technology conference on March 3, 2021, Farner was asked about Rocket's direct-to-consumer and partner business channels and stated:

So I know we don't break down the percentages, and I'm probably not going to go any further than what we've already laid out in our earnings call, but as you can probably sense from my passion, they're all growing. And with what about less than 10% market share, wherever we are, it's hard to say today. If you think about all those different channels that can grow and give us reach, that's why we get excited about what this company looks like in the years to come.

*Id.* at PageID.8516 (emphasis omitted).

Lastly, on March 11, 2021, a Fox Business analyst publicly interviewed Farner and asked:

The pandemic is, I think, winding down. I'm not going to say it's over, but the effects of it are certainly winding down. Do you think that's good for Rocket companies?

ECF No. 109 at PageID.8518; *see also* Fox Business, *Rocket Companies CEO Jay Farner on Varney & Co.*, FACEBOOK (March 11, 2021), https://www.facebook.com/watch/?v=74390680632 7852 [https://perma.cc/84X9-58KC]. Farner responded:

I do. You know, we're going to see interest rates tick up a little bit here, we're all aware of that, but over the 35 years that we've been in business we take that as an opportunity to grow. Our focus on our platform and our tech platform really allows us to be very efficient when we're underwriting, processing, and closing mortgages. And so as other people pull back and capacity shrinks in the mortgage industry, it gives us a great opportunity to grow market share. And now, as we grow market share, not only are we capturing revenue with our mortgage, but title, real estate, auto, personal loans. So as we grow out all of those different services we're able to offer our clients that lifetime value of a client grows and grows for us. So, really, interest rates moving around are a great benefit to us. And then, of course, when they drop back down, we've got a 90% retention rate on our servicing book; we'll help those clients refinance their mortgage and save money. So, you know, cycles are good, at least for our business in the mortgage industry, and I think that's what we're going to see here this year."

ECF No. 109 at PageID.8518 (emphasis omitted); *see also* Fox Business, *Rocket Companies CEO Jay Farner on Varney & Co.*, FACEBOOK (March 11, 2021), https://www.facebook.com/watch/?v =74390680632 7852 [https://perma.cc/84X9-58KC].[4]

### D. Gilbert's Alleged Insider Trading

Despite assurances to the market that Rocket would financially thrive as interest rates rose and rebounded from the COVID-19 pandemic, Dan Gilbert—Rocket's founder and, through RHI, majority owner—sold nearly $500,000,000 of his shares in the company on March 29, 2021. *See* ECF No. 109 at PageID.8496–508. Ten details illustrate the unusual nature of this trade:

(1) On March 3, 2021, 26 days before Gilbert sold his shares, Rocket CEO Farner publicly stated that Rocket had yet to sell any shares since going public "because [they] believe strongly in the future of what [they were] building." ECF No. 109 at PageID.8535 (emphasis omitted).

(2) On March 23, 2021—just six days before Gilbert's trade—Rocket's Board of Directors gave Gilbert a material, nonpublic report projecting that, during 2021, (1) Rocket would lose 80% of its refinancing volume; (2) Rocket's primary-secondary spread was shrinking; and (3) Rocket's gain on sale margin would decrease by 9%, or almost $1 billion. *Id.* at PageID.8498–500.

(3) Gilbert—through RHI, which he wholly controlled—"submitted an Exchange Notice" to make the trade one week after "the insider trading window has already closed." *Id.* at PageID.8535–36.

(4) Although Rocket's Insider Trading Policy prohibited the trade at the time, it permitted the "closed trading window" to be reopened "at any time, as deemed appropriate by the General Counsel or other senior members of management." *Id.* at PageID.8505.

(5) Gilbert and RHI own "99.9% of Rocket's outstanding Class D Common Stock and 93.1% of Rocket's Class A Common Stock on a fully exchanged and converted basis." ECF No. 44 at PageID.1209 (citations omitted).

---

[4] Plaintiffs' Amended Complaint also alleged Defendant Farner, in his capacity as Rocket CEO, made an additional false and misleading material statement on March 17, 2021, when he tweeted that, despite United's ultimatum to third-party brokers, Rocket's third-party partner network loan volume had increased "significantly." ECF No. 109 at PageID.8520; Jay Farner (@JDFarner), X (Mar. 17, 2021, 12:22 PM), https://x.com/JDFarner/status/1372221904694697991 [https://perma.cc/SYD5-M8Z3]. But Plaintiffs later voluntarily withdrew this allegation. ECF No. 163 at PageID.17949.

(6) Thus, Gilbert "had effective control over Rocket's board, management, and policies," which Rocket acknowledges in its Form 10-K filings with the SEC because Gilbert is "the controlling shareholder of Rocket." ECF No. 42 at PageID.1150–51; *see also* Rocket Companies, Inc., Annual Report (Form 10-K) (March 24, 2021) ("We are controlled by . . . Dan Gilbert, whose interests may conflict with our interests and the interests of other stockholders.").

(7) On March 22, 2021, "following discussions with Jay Farner," Rocket's Audit Committee "voted unanimously to approve opening the training window for a *limited sale by RHI*" and Gilbert. ECF No. 109 at PageID.8506 (emphasis added).

(8) Even with the extended trading window, Rocket's Insider Trading Policy still prohibited Gilbert's sale because he was "aware of . . . material non-public information"—namely Rocket's financial forecast, which he was briefed on just six days earlier. *Id.* at PageID.8507 (emphasis omitted).

(9) Before his $500,000,000 March 29, 2021 sale, Gilbert "had never publicly sold a single share of Rocket stock." *Id.* at PageID.8420.

(10) Gilbert sold his 20,200,000 shares in March 2021 for *33% more* "than the closing market price of Rocket stock just *one week* after" Rocket revealed the material information about its financial forecast in May 2021. *See* ECF No. 109 at PageID.8535.

Indeed, on May 5, 2021, through a Press Release and an Earnings Call, Rocket informed the market, for the first time, that it was expecting a decrease of $18.5 billion in actual closed loan volume. *See* ECF No. 109 at PageID.8523. The Press Release also conceded that Rocket's business was impacted by rising interest rates, such that the company was focusing on its less-profitable partner-network channel and new purchase loans, rather than its direct-to-consumer channel and refinancing loans. *Id.* at PageID.8525. Rocket's May 2021 Press Release further reported Rocket's lowest gain on sale margin since the company went public in 2020. *Id.* at PageID.8525. The next day, the price of Rocket stock dropped from $22.80 per share to $19.01 per share. *Id.* at PageID.8421. By the end of the week, the price of Rocket stock had fallen to $16.48 per share. *Id.*

- 12 -

## E. Procedural Posture

Plaintiffs Carl Shupe and SoCal filed their Amended Complaint, on behalf of themselves and all others similarly situated, on February 12, 2024.[5] ECF No. 109. In Count I, Plaintiffs allege RHI committed insider trading in violation of the Exchange Act and Rule 10b-5 when Gilbert—RHI's majority shareholder and Chairman—sold over 20 million shares of Rocket Class A common stock on March 29, 2021 armed with material, non-public information about Rocket's financial forecast.[6] *Id.* at PageID.8551–53. In Count II, Plaintiffs allege that SoCal—and the proposed Subclass of those who, like SoCal, traded "contemporaneously" with Defendant Gilbert's March 29, 2021 alleged insider trade—may recover from RHI under Section 20A of the Exchange Act, which provides a private right of action to those who trade "securities of the same class" "contemporaneously" with an inside trade.[7] *Id.* at PageID.8553–55; 15 U.S.C. § 78t-1; *see also Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *7 (E.D. Mich. Feb. 5, 2024). In Count III, Plaintiffs allege Defendant Rocket—through its CEO Farner—defrauded the market in violation of the Exchange Act through a series of materially false and misleading statements that "artificially inflated" the prices of Rocket's Class A common stock.[8] ECF No. 109 at PageID.8555–57. And, in Count IV, Plaintiffs allege Defendants RHI and Gilbert effectively controlled Rocket, and are thus similarly liable for these false and misleading under Section 20(a) of the Exchange Act. *Id.* at PageID.8557–60.

---

[5] For a thorough description of the above-captioned case's procedural posture, *see Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *1–3 (E.D. Mich. Feb. 5, 2024).

[6] Initially, Count I was also asserted against Defendant Gilbert. ECF No. 109 at PageID.8551. But Plaintiffs voluntarily dismissed Gilbert from Count I in July 2024. ECF No. 163 at PageID.17950.

[7] Initially, Count II was also asserted against Defendant Gilbert. ECF No. 109 at PageID.8553. But Plaintiffs voluntarily dismissed Gilbert from Count II in July 2024. ECF No. 163 at PageID.17950.

[8] Initially, Count III was also asserted against Defendant Gilbert. ECF No. 109 at PageID.8555. But Plaintiffs voluntarily dismissed Gilbert from Count III in July 2024. ECF No. 163 at PageID.17950.

- 13 -

Plaintiffs' Amended Complaint is summarized as follows:

| Count | Claim | Defendants |
|-------|-------|------------|
| I | Insider Trading; Section 10(b) and Rule 10b-5 of the Exchange Act | RHI |
| II | Private Right of Action For Those Who Traded "Contemporaneously" With RHI's Alleged Insider Trade; Section 20A of the Exchange Act | RHI |
| III | Materially False and Misleading Statements; Section 10(b) and Rule 10b-5 of the Exchange Act | RCI, Farner |
| IV | Materially False and Misleading Statements—Controller Liability; Section 20(a) of the Exchange Act | RHI, Gilbert |

On February 12, 2024, Plaintiffs filed their renewed Motion for Class Certification.[9] ECF No. 111. Three issues are central to certification: (1) whether Rocket stock was traded on an "efficient market" during the Class Period; (2) whether Defendant Farner's alleged misrepresentations impacted the price of Rocket stock; and (3) whether damages can be calculated on a class-wide basis. Both Parties have retained several proposed experts to support their arguments relative to this issue and have filed several motions challenging each other's experts. These expert motions must be resolved before this Court can rule on class certification.

## II. *Basic* Background and Expert Reports

But, before this Court turns to the merits of each *Daubert* motion, this Court will first provide necessary context concerning (1) the *Basic* presumption of class-wide investor reliance and the ancillary importance of market efficiency and price impact; and (2) the Parties' proposed expert testimony.

---

[9] Plaintiffs' initial motion for class certification was withdrawn after the Court granted Plaintiffs' Motion to Substitute SoCal as the proposed subclass representative. *Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 416377, at *10 (E.D. Mich. Feb. 5, 2024).

### A. The *Basic* Presumption, Market Efficiency, and Price Impact

To obtain class certification, Plaintiffs must prove—among other requirements—that common questions of law or fact shared by the proposed Class predominate over the individual questions presented by each putative Class member. FED. R. CIV. P. 23(b)(3); *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (internal quotations omitted). In their renewed Motion for Class Certification, Plaintiffs argue that this predominance requirement "is established with respect to reliance" because "Plaintiffs are entitled to rely on the fraud-on-the-market presumption articulated by the Supreme Court in" *Basic Inc. v. Levinson*. ECF No. 111 at PageID.8603.

The fraud-on-the-market presumption is a judicial fix to the complications that arise when the evidentiary requirements of Section 10(b) securities fraud claims intersect with the procedural requirements for class certification. Plaintiffs' Section 10(b) fraudulent misrepresentation claims require, among other elements, poof of reliance on Defendant Farner's alleged fraudulent misrepresentations when trading Rocket Class A common stock. *See Shupe v. Rocket Companies, Inc.*, 660 F. Supp. 3d 647, 667 (E.D. Mich. 2023). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement" and purchased or sold stock "based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) [hereinafter *Halliburton I*].

But, in 1988, the Supreme Court recognized that requiring proof of direct reliance would practically preclude securities class actions, because individualized issues of reliance would necessarily overwhelm common questions of law and fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988). Accordingly, the *Basic* Court held that, through the "fraud-on-the-market" theory, a class can satisfy the reliance element of a Section 10(b) and Rule 10b-5 claim by invoking a

*rebuttable presumption of reliance*, rather than proving *direct* reliance on an allegedly fraudulent misrepresentation.[10] *Id.* at 247. According to this fraud-on-the-market theory, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246. Because efficient markets "transmit[] information to the investor in the processed form of a market price," courts can presume—subject to rebuttal— that investors rely on public misstatements whenever he or she "buys or sells stock at the price set by the market." *Id.* at 244, 247.

> To establish the *Basic* presumption of class-wide investor reliance, a plaintiff must prove:
>
> (1) The alleged misrepresentations were publicly known;
> (2) The alleged misrepresentations were material;
> (3) The stock traded in an efficient market; and
> (4) The plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277–78 (2014) (citing *Basic*, 485 U.S. at 248, n. 27) [hereinafter *Halliburton II*]. Critically, at the class certification stage, a plaintiff must *prove*—as opposed to *plead*—all elements other than materiality. *Id.* at 276, 283; *see also Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 467–70 (2013) (concluding plaintiff need not prove materiality at class certification stage because materiality is a dispositive issue that can be proved by evidence common to the class as a whole after certification).

But even if a plaintiff proves market efficiency, publicity, and trading timing at the class certification stage, defendants may rebut the *Basic* presumption by showing, among other things,

---

[10] "What is called the *Basic* presumption actually incorporates two constituent presumptions: First, if a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price. Second, if the plaintiff also shows that he purchased the stock at the market price during the relevant period, he is entitled to a further presumption that he purchased the stock in reliance on the defendant's misrepresentation." *Halliburton II*, 573 U.S. 258, 279 (2014).

that the alleged misrepresentations had no price impact. *Halliburton II*, at 280; *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (noting "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade . . . will be sufficient to rebut the presumption of reliance").

In this case, Defendants do not dispute that Jay Farner's three alleged fraudulent misrepresentations were publicly known. *See generally* ECF No. 120 at PageID.9133–44. Defendants also do not dispute that, as defined, all members of the proposed Class would have traded Rocket Class A common stock after Jay Farner's alleged misrepresentations began but before "the truth was revealed" during Rocket's May 5, 2021 public earnings call. *See generally id.*; *see also* ECF No. 111 at PageID.8589 (defining the proposed Class as those who acquired Rocket stock "between February 25, 2021 and Mary 5, 2021"). So, Plaintiffs' ability to invoke the *Basic* presumption—and certify the proposed Class—hinges on whether they can prove that Rocket Class A common stock traded on an efficient market during the Class Period, and whether Defendants can nevertheless prove that Defendant Farner's alleged misrepresentations had no price impact.

### 1. Market Efficiency Factors

An efficient market is generally open, developed, and rapidly reflects new information in price. *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (citing *Cammer v. Bloom*, 711 F.Supp. 1264, 1276 n. 17 (D.N.J. 1989)). But there is no bright-line test for market efficiency. The Sixth Circuit has historically applied the "*Crammer* factors," promulgated in 1989 by the United States District Court for the District of New Jersey. *Id.* These factors include:

(1) **A large weekly trading volume**. A large weekly trading volume is indicative of an efficient market because "it implies significant investor interest in the company" which, "in turn, implies a likelihood that many investors are

- 17 -

executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F.Supp. at 1286 (D.N.J. 1989).

(2) **A significant number of security analyst reports.** The more securities analysts who report on a company's stock during the class period, the more likely the market was efficient because significant analyst coverage implies interest in a company's securities and a wide distribution of relevant information. *Crammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989).

(3) **Market makers and arbitrageurs.** Market makers are institutional firms which stand ready to buy or sell a particular stock on a regular and continuous basis. ECF No. 111-2 at PageID.8637; *see also* 17 C.F.R. § 240.15c3–1(c)(8). In contrast, "arbitrageurs" are "traders who identify and eliminate differences between [t]he price [of a security] and [its] value." *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995). "The existence of market makers and arbitrageurs" bolsters market efficiency because these players "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Crammer*, 711 F. Supp. at 1286 (D.N.J. 1989).

(4) **S-3 Registration Statement eligibility**. "According to SEC regulations, certain companies may use the S-3 short form, rather than Form S-1, to register securities if they are sufficient large and have filed reports with the SEC for the requisite period of time." *Krogman v. Sterritt*, 202 F.R.D. 467, 476 (N.D. Tex. 2001). Thus, inherently, "information on companies which file on Form S-3 is widely available in the market," indicative of an efficient market for that company's stock. *Crammer v. Bloom*, 711 F. Supp. 1264, 1284 (D.N.J. 1989).

(5) **A history of immediate movement of stock price caused by unexpected corporate events or financial releases**. A pattern of significant price impact in response to corporate disclosures suggests that public information has a causal effect on a security's price, suggesting the modern market is efficient. *See Crammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989).

*Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (citing *Cammer*, 711 F.Supp. at 1286–87 (D.N.J. 1989)). This Court, like many other district courts within the Sixth Circuit, has additionally recognized the three "*Krogman* factors" as relevant to the market efficiency analysis:

(6) **Market capitalization**. Calculated as "the number of shares multiplied by the prevailing share price," market capitalization "may [indicate] market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

(7) **The "bid-ask" spread**. The "bid-ask spread" is defined as "the difference between the price which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). A small spread suggests an efficient market, because the at-issue stock is not disproportionately pricey to trade. *See id.* ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.").

(8) **The "float."** The "float" of a security is the "percentage of shares held by the public, rather than insiders." *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). If the publicly issued stock of a company is primarily owned by the company's own leadership, those stocks are less likely to be traded on an efficient market because the "insiders may have private information that is not yet reflected in stock prices" such that these prices "are less likely to accurately reflect all available information about the security." *Id*. (internal quotations omitted).

*Dougherty v. Esperion Therapeutics, Inc*., No. 16-10089, 2020 WL 6793326, at *3 (E.D. Mich. Nov. 19, 2020) (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)).

Importantly, although this Court and the Sixth Circuit recognize these factors as relevant, the *Cammer* and *Krogman* factors are neither exhaustive nor mandatory. *Weiner v. Tivity Health, Inc*., 334 F.R.D. 123, 133 (M.D. Tenn. 2020) (collecting cases) (noting "the Sixth Circuit has not mandated use of" the *Cammer* or *Krogman* factors, "and even in those cases where the factors are utilized, they are generally deemed to be an analytical tool rather than a checklist").

### B. Plaintiff Expert Chad Coffman

Plaintiffs' retained expert is Chad Coffman. Coffman has a bachelor's degree in economics, a master's degree in public policy, and is a chartered financial analyst (CFA). ECF No. 111-2 at PageID.8622. He has over twenty years of experience in financial analytics and has spent his career "analyzing how securities prices react to new information and evaluating damages in securities-related matters." *Id*. at PageID.8622, 8677. Indeed, Coffman has been retained as a securities expert "more than one hundred times" by plaintiffs, defendants, insurers, and mediators alike. *Id*. Coffman offered two expert opinions related to class certification. First, Coffman

concluded that Rocket Class A common stock traded on an efficient market during the class period. *Id.* at PageID.8623. Second, Coffman concluded that damages could be calculated on a class-wide basis using a "well-accepted" "out-of-pocket" methodology. *Id.* at PageID.8655. Each opinion will be discussed in greater detail below.

### 1. Market Efficiency Conclusion

To support his market efficiency conclusion, Coffman tailored his own empirical analysis to the above-identified *Cammer* and *Krogman* factors. *See generally* ECF No. 111-2.

(1) **A large weekly trading volume**. Coffman concluded that the average weekly trading volume of Rocket stock during the Class Period was 130.2 million shares, or "over 110% of shares outstanding," indicative of an efficient market. *Id.* at PageID.8633.

(2) **A significant number of security analyst reports.** Coffman concluded this factor favors market efficiency because "there were at least thirty-five analyst reports issued during the Class Period" from "eighteen separate firms" including "UBS, Morgan Stanley, Barclays, and J.P. Morgan," all of which "disseminat[ed] publicly available information" about Rocket stock. *Id.* at PageID.8653; *see also id.* at PageID.8663 (noting this conclusion is "almost certainly understate[d]" because many analyst reports are not publicly available through third-party data providers).

(3) **Market makers and arbitrageurs.** Relying on data from Bloomberg, Coffman concluded there were 80 market makers for Rocket Common Stock during the Class Period, supporting market efficiency. *Id.* at PageID.8638.

(4) **S-3 Registration Statement eligibility**. Coffman conceded that Rocket has not filed a S-3 Registration Statement, in part because the company only recently went public. *See id.* at PageID.8639. However, Coffman concluded the "spirit" of this market efficiency factor is satisfied because Rocket has "filed all [reporting] documents in a timely manner and did not fail to meet its debt obligations." *Id.* at PageID.8639.

(5) **A history of immediate movement of stock price caused by unexpected corporate events or financial releases**. To analyze this factor, Coffman conducted an "event study." *Id.* at PageID.8640 (noting event studies are "well-accepted" in the economics community and are frequently used in academia to "isolate the impact of information on market prices"). Specifically, Coffman created a "regression model" for a two-and-a-half year "Analysis Period,"

which included the two-month Class Period.[11] *Id.* at PageID.8631, n. 33 (noting the Analysis Period "is from September 4, 2020 through May 5, 2023). Coffman identified eleven earnings announcements which Rocket released to the public during this Analysis Period and examined how the prices of Rocket Class A common stock responded. *Id.* at PageID.8666 (identifying earnings statements). Coffman concluded that six of the eleven earnings announcements "resulted in statistically significant price movements." *Id.* at PageID.8647. Compared to the 3.29% of statistically significant prices movements throughout the rest of the Analysis Period, Coffman concluded this "is powerful scientific evidence of a cause-and-effect relationship between new, publicly released information concerning the Company and changes in the price of Rocket Common Stock." *Id.* at PageID.8647. Coffman also found evidence of market efficiency because "the average magnitude of stock price movement" on the days in which Rocket released an earnings statement was 6.42%, whereas the average movement magnitude on days with "no news" was only 1.69%. *Id.*

(6) **Market capitalization**. Coffman reported that Rocket's market capitalization was $2.98 billion during the Class Period. *Id.* at PageID.8651. Coffman concluded this suggests market efficiency because Rocket's market capitalization was higher than "at least 68%" of publicly traded companies at the time. *Id.*

(7) **The "bid-ask" spread**. Coffman concluded that Rocket's bid-ask spread during the Class Period fluctuated between .01% and .018%, which, even at its peak, was "well below the average and median bid-ask spread of a random sample of 100 other common stocks" of publicly traded companies at the time. *Id.* at PageID.8652.

(8) **The "float."** Coffman concluded that Rocket's insiders owned only .44% of the company's Class A common stock during the Class Period, "meaning that approximately 99% of Rocket's shares were held by non-insiders," suggesting market efficiency. *Id.* at PageID.8653.

After analyzing all eight *Cammer* and *Krogman* factors, Coffman also analyzed three "additional factor[s]." *Id.* at PageID.8653–55. First, Coffman opined that a large number of institutional investors in a given security favors market efficiency because "[i]nstitutional investors are . . . sophisticated and well-informed with access to most publicly available information for the

---

[11] Notably, as discussed in greater detail *supra* Section II.C.2, Coffman excluded March 2 and 3, 2021 from his event study as statistical "outliers" because these dates revealed a "spike in trading volume . . . apparently fueled by investors on the Reddit forum site 'r/wallstreetbets' encouraging each other to buy Rocket Common Stock[.]" ECF No. 111-2 at PageID.8643, n. 64.

stocks that they own." *Id*. at PageID.8653. And Coffman concluded that 357 separate institutions invested in Rocket Stock during the Class Period, suggesting market efficiency. *Id.* Second, Coffman opined that a substantial "autocorrelation"—the ability of prior price movements to predict future price movements—suggests market *inefficiency* because investors could transact with minimal risk. *Id.* at PageID.8654. But Coffman found "no evidence of autocorrelation" in Rocket stock during the Class Period. *Id.* Lastly, Coffman concluded that the significant amount of options trading of Rocket Stock during the class period indicates market efficiency because economic studies suggest increased options trading correlates with increased trading volume, transaction size, and "an overall improvement of the market quality of the underlying stocks." *Id.* at PageID.8655 (highlighting data that "there were 2,353,231 Rocket Common stock put contracts and 6,857,940 Rocket Common Stock call contracts that traded during the Class Period").

### 2. Class-Wide Damages Conclusion

Coffman also concluded that, if the Class succeeds on the merits, damages can be calculated on a class-wide basis. ECF No. 111-2 at PageID.8655. Specifically, Coffman concluded that, under the "well-accepted" "out-of-pocket" method, damages are "equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of the sale."[12] *Id.* at PageID.8655–56. Coffman explains that the artificial inflation in the share price—also known as loss causation—is a calculation common to the entire Class. *Id.* at PageID.8656. Accordingly, "[o]nce the inflation per share has been quantified," Coffman concludes, "the computation of damages for each class member is formulaically based upon

---

[12] Coffman notes that, if the putative class member sold their Rocket shares *before* Rocket released its financial forecast on May 5, 2021, the damages for that class member would be subject to the PSLRA's formulaic 90-day "lookback" provision. ECF 111-2 at PageID.8656 (citing 15 U.S.C. § 78u-4(e)(1)).

information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security[])." *Id.* at PageID.8656 (emphasis in original).

### C. Defense Expert Dr. René Stulz

Defendants have retained three separate experts in opposition to Plaintiffs' renewed motion for class certification, each of whom has offered opinions about separate topics. Defendants' first retained expert is Dr. René Stulz. Dr. Stulz received his Ph.D. in economics from the Massachusetts Institute of Technology in 1980. ECF No. 120-2 at PageID.9232. He currently serves as the Chair of Banking and Monetary Economics at the Ohio State University, the Director of the Dice Center for Research in Financial Economics at the Ohio State University, and a Research Associate of the National Bureau of Economics Research. *Id.* at PageID.9170. Dr. Stulz previously served as the editor of *The Journal of Finance* and the co-editor of the *Journal of Financial Economics*, and has written more than 100 articles in peer-reviewed finance and economics journals. *Id.*

Dr. Stulz's proposed expert conclusion is twofold: (1) Rocket stock did *not* trade on an efficient market during the Class Period because it was meme-stock, and (2) Chad Coffman's contrary conclusions are unreliable. *See* ECF No. 120-2.

### 1. Meme Stock and Market Inefficiency Conclusions

Dr. Stulz first concludes that Rocket stock was not traded on an efficient market during the Class Period because a two-day "meme stock" trading frenzy occurred on March 2 and 3, 2021. *Id.* at PageID.9191–215.

"Meme stocks are a relatively new phenomenon" which began in late 2020 and early 2021 as online investing groups expanded throughout the COVID-19 pandemic. Michelle Lodge, *What is a Meme Stock? A Quick Guide*, FORBES (June 18, 2024, 3:42 PM)

- 23 -

https://www.forbes.com/sites/investor-hub/article/what-is-a-meme-stock/ (last updated Sep. 4, 2024, 10:22 AM) [https://perma.cc/JG47-ZEMH]. Meme stocks "became popular through the social media platform Reddit.com," and the subreddit—or forum— "r/wallstreetbets." *Id.*; *see also* John Egan, *Wall Street Bets: the Story of How a Mob Became a Movement, and the Anti-Heroes of the Digital Age. Part 1 – Diamond Hands*, FORBES (Feb. 2, 2021, 5:14 PM), https://www.forbes.com/sites/johnegan/2021/02/02/smoothbrainsthe-story-of-how-a-mob-becam e-a-movement-and-a-group-of-smooth-brained-apes-on-the-internet-became-the-anti-heroes-of-the-digital-age/?sh=6f31d2625a89 (noting r/wallstreetbets is "ostensibly, a forum for ill-disciplined gamblers to exchange the money they've finagled out of friends and relatives for internet points through anxiety-inducing financial loss. It is a place where people with little to no training, bereft of inside knowledge and minimal attention to detail will wager everything they have and more (much more) on an earnings report or an Elon Musk meme") [https://perma.cc/3VG5-NZ8B] [hereinafter Egan I].

Investors increasingly use social media—including Reddit and r/wallstreetbets—to coordinate "short squeezes" which drastically impact the market for a given security. "Short selling refers to the sale of a security that the seller does not own, where the delivered security is borrowed by the short seller." *The Long and Short of Short Squeezes*, S&P GLOBAL: MARKIT FACTOR INSIGHTS (Nov. 27, 2013), https://cdn.ihsmarkit.com/www/pdf/0321/Markit_RN_-_The_Long_and_Short_of_Short_Squeezes.pdf [https://perma.cc/QNK2-BLME]. A short seller gambles that the stock price will *decrease. See id.* When this gamble pays off, the short seller profits from the difference between the high value they sold the borrowed stock at and the low value they repurchased the stock at. *See id.* But, when the stock price *increases*, short sellers are pressured to "cover" their short position by repurchasing the stock at the higher price and returning

the stock to the lending investor at a loss. *Id.* Additionally, short sellers may be forced to cover if the short positions for a stock surpass the amount of publicly traded shares and the lending investor recalls the borrowed stock. *See id.* A "short squeeze" occurs when many short sellers rush to cover and repurchase the same stock at the same time, which only causes the stock price to increase further, which cyclically pressures even more short sellers to cover, and so on. *See id.*; *see also* Henry David Gale, *"Buy Gamestop!": The Need to Rethink the Approach to Market Manipulation in a Wallstreetbets World*, 108 Iowa L. Rev. 1923, 1942 (2023) ("short sellers that cover their positions by repurchasing the underlying stock . . . cause additional upward price pressure on the stock which . . . force[s] other short sellers to exit their positions, adding further upward price pressure and so on." (internal quotations omitted)).

Reddit (r/wallstreetbets) and other social media platforms provide savvy investors—whether sophisticated or unsophisticated—with a platform to profit from a coordinated short squeeze. Yun Li, *GameStop Mania Explain: How the Reddit Retail Trading Crowd Ran Over Wall Street Pros*, CNBC (Jan. 27, 2021), https://www.cnbc.com/2021/01/27/gamestop-mania-explained-how-the-reddit-retail-trading-crowd-ran-over-wall-street-pros.html (noting Reddit provided retail investors with the ability to "attack[]" Wall Street as a "union") [https://perma.cc/DY98-4P9C].

The "quintessential" example of the meme stock "phenomenon" is the coordinated January 2021 trading of GameStop stock. ECF No. 120-2 at PageID.9193. A r/wallstreetbets user noticed that GameStop stock was being heavily shorted by institutional investors, in large part because GameStop—a "brick and mortar" video game retailer—was struggling during the COVID-19 pandemic. *See* Egan I. Institutional short sellers purchased GameStop stock in August 2020 at $4 per share, hoping to profit on a gamble that GameStop would become bankrupt. *Id.* But, by late

January 2021, GameStop stock was trading at $144 per share thanks to boons from a new billionaire investor and the relaxation of COVID-19 restrictions. *Id.*; John Egan, *Wall Street Bets: the Story of How a Mob Became a Movement, and the Anti-Heroes of the Digital Age. Part 2 – Stonks & Spartans*, FORBES (Feb. 12, 2021, 5:33 PM), https://www.forbes.com/sites/johnegan/2021/02/03/stonks-and-spartans/ [https://perma.cc/B3YF-Q5EP] [hereinafter Egan II]. Indeed, the same Reddit user who noticed that GameStop stock was being heavily shorted also noticed that institutional short sellers sold more shorts than were available to buy on the market, further suggesting a future pressure on these investors to cover. *See* Egan I. So, that Reddit user took to r/wallstreetbets and encouraged fellow Redditors to invest and profit at these institutional investors' expense. *See* Egan II (noting Reddit investors encouraged each other "hold the line" and not sell their purchased GameStop shares as a form of protesting systemic inequity between institutional and retail investors); *see also* Boutros Imad, *The Meme Stock Bidding War Viewed From the Lenses of the American and Canadian Securities Regulators*, 48 U. DAYTON L. REV. 193, 199 (2023) ("GameStop was no longer just a way to make a big profit or invest in a struggling firm, but also purchasing GameStop had become a strategy to combat institutional money."). As a result of the surge prompted by r/wallstreetbets investors, "the closing price of [GameStop] stock rose more than 700% between January 21 and January 27," 2021. *In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1343 (11th Cir. 2023).

Like GameStop stock in January 2021, Dr. Stulz opines that Rocket stock was a meme stock during the Class Period, from early March through May 2021. ECF No. 120-2 at PageID.9193. "Although there is no single formal or technical definition of a meme stock," Dr. Stulz relies on SEC staff reports which identify meme stocks as characterized by (1) "frequent mentions on social media, including Reddit" and (2) "large price moves or increased trading

volume that significantly exceeded broader market movements" and "the amount of 'short interest' measured as the number of shares sold short as a portion of the total shares outstanding [exceeding the market average]." *Id.* at PageID.9193–94. Dr. Stulz concludes that Rocket Class A common stock exhibited both meme stock characteristics during the Class Period.[13]

First, Dr. Stulz identifies the following Reddit posts on March 2 and 3, 2021 as indicative of a meme stock and a coordinated effort of retail investors to short squeeze Rocket stock ("RKT"):

> "[GameStop] holders . . . Here is what you need to do . . . buy Rocket Mortgage. That's Rocket, with an R. RKT to the moon 🚀 🚀 🚀 "

> "To anyone who feels like they missed the boat with [GameStop], this squeeze is about to happen with RKT. Shorts have 4 days to cover while RKT just announced a special dividend to be given out next week. The shorts will be [squeezed] so hard."

> "RKT IS THE NEW [GAMESTOP] 🚀 🚀 🚀 🚀 🚀 "

> "[GameStop] is so last month. Get on the RKT 🚀 🚀 "

> "KEEP HOLDING [GAMESTOP]. KEEP HOLDING RKT. It will go up and the hedge fund[s] will cry."

> "RKT & [GameStop] to the moon! 🚀 🚀 👎 👍 "

> "41% shorted. They just increased the fees for borrowing stocks to short. Right now RKT looks like [GameStop] before it went to the moon for the first time."

---

[13] Dr. Stulz is not alone in his meme-stock conclusion. Indeed, as he recognizes, numerous news outlets publicly reported the "meme" nature of Rocket stock on March 2 and 3 2021. ECF No. 120-2 at PageID.9200–01; *see, e.g.*, Orla McCaffrey, *Rocket Stock is the New Meme Trade. Move Over, GameStop*, WALL ST. J. (Mar. 3, 2021 5:48 PM), https://www.wsj.com/articl es/rocket-is-becoming-the-new-meme-stock-move-over-gamestop-11614782903; Sinéad Carew, *Rocket Shares Soar More than 70% as Analysts Eye 'GameStop-Esque' Short Squeeze*, REUTERS (Mar. 2, 2021 6:20 PM), https://www.reuters.com/article/technology/rocket-shares-soar-more-than-70-as-analysts-eye-gamestop-esque-short-squeeze-idUSKCN2AU2F8/; Jonathan Ponciano, *Billionaire Dan Gilbert's Fortune Plunges $25 Billion as Rocket Companies' GameStop-Like Squeeze Unravels*, FORBES (Mar. 3, 2021 at 4:18 PM), https://www.forbes.com/sites/jonathanpon ciano/2021/03/03/billionaire-dan-gilberts-fortune-plunges-24-billion-as-rocket-companies-game stop-like-squeeze-unravels/.

ECF No. 120-2 at PageID.9196. Dr. Stulz notes that, on March 2 and 3, 2021, "Reddit daily mentions of Rocket reached a total of over 59,000" and that, throughout the entire two-month Class Period, "[t]he average daily number of mentions" was "27 times higher than the average daily number of mentions" before or after. *Id.* at PageID.9197. Dr. Stulz adds that Rocket was a prime target for a coordinated short squeeze because Rocket's short interest "hovered at or above 30% from the beginning [of] November 2020 through the end of February 2021." *Id* at PageID.9203. Dr. Stulz explains that, consistent with GameStop, Rocket's short interest sharply fell after February 26, 2021 as Rocket's stock price increased as short sellers began to cover. *Id.*

As a result of this social media frenzy and coordinated short squeeze, Dr. Stulz notes that "Rocket's stock price increased by over 70% on March 2, 2021 and over 376 million shares were traded," despite no "new, value-relevant public information" about the stock. *Id.* at PageID.9198. This increase was more than 1,480 times the average daily return (.05%) and more than 33 times the average daily volume traded (11 million shares) over the course of the previous 120 trading days[.]" *Id.* And, during the Class Period, Dr. Stulz notes that "the average daily trading volume of Rocket was 4.5 times higher than the average daily trading volume" before and after. *Id.* at PageID.9198–99.

Dr. Stulz ultimately concludes that Rocket's meme-stock status on March 2 and 3, 2021 rendered the trading market inefficient throughout the two-month Class Period. *Id.* at PageID.9205–11. Specifically, Dr. Stulz opines that the market for Rocket stock was inefficient because its price throughout the Class Period was primarily based on (1) investor coordination and (2) short squeezes arising from forced covers—rather than public statements and press releases about Rocket. *Id.* at PageID.9208. Although the social media frenzy on Reddit seemingly spiked on March 2 and 3, 2021, Dr. Stulz opines that this frenzy nevertheless caused "short-selling

- 28 -

frictions" throughout the remainder of the Class Period, during which short selling became far riskier for investors. *Id.* at PageID.9205–06. Dr. Stulz also identifies empirical research suggesting that, "independent of meme stock status," these short-selling frictions "impede the incorporation of . . . public information" into the price of a given security, further suggesting market inefficiency. *Id.* at PageID.9206–08 ("With short-sale constraints, academic research has found that stocks tend to underreact to negative news and overreact to positive news as arbitrageurs are unable to step in and correct mispricing due to high costs of borrowing."). Moreover, Dr. Stulz notes that, during and following short squeezes, "any purchaser" of a security "would be expected to earn a negative return, which is inconsistent with market efficiency as investors need compensation for the risk of investing in the stock." *Id.* at PageID.9208.

### 2. Rebuttal to Chad Coffman's Conclusions

Consistent with his conclusions that Rocket's meme-stock status rendered the trading market inefficient throughout the relevant Class Period, Dr. Stulz contests Chad Coffman's contrary conclusions. First, Dr. Stulz concludes that Coffman's event study and autocorrelation analysis were tainted selection bias because Coffman removed March 2 and 3, 2021 from his results as "outliers." *Id.* at PageID.9211–15 (adding Coffman problematically does not define the parameters for his "outlier" classification, making the classification arbitrary). Second, Dr. Stulz concludes that Coffman improperly narrowed his public float analysis to only Rocket Class A common stock, noting that, had he considered all outstanding shares of all classes of Rocket stock—including the convertible Class D common stock—the public float during the Class Period was 5%—not 99% as Coffman concluded—which suggests market inefficiency. *Id.* at PageID.9216–25. Lastly, Dr. Stulz takes issue with Coffman's two-and-a-half year Analysis Period used throughout his event study, arguing that Coffman cannot "infer market efficiency"

- 29 -

from this Analysis Period to the shorter, two-month Class Period it includes. *Id.* at PageID.9225–31.

**D. Defense Expert Dr. Laura Starks**

Defendants' second retained expert is Dr. Laura Starks. Dr. Starks received her Ph.D. in finance from the University of Texas at Austin ("UT") and currently serves as UT's McCombs School of Business Chair of Finance. ECF No. 120-3 at PageID.9278. Throughout her career, Dr. Starks has taught undergraduate, masters, and Ph.D. courses in corporate finance and investments. *Id.* at PageID.9280. Among other accomplishments, Dr. Starks has published several articles in peer-reviewed journals on "the decision-making process of investors," including "how investors react to new information." *Id.* at PageID.9278.

While Defendants retained Dr. Stulz to opine that Rocket stock was traded on an inefficient market to preclude Plaintiffs from *invoking* the *Basic* presumption of class-wide reliance to satisfy predominance, Defendants retained Dt. Starks to *rebut* this presumption by opining that Defendant Farner's (and RHI's) alleged fraudulent misrepresentations had no price impact on the market. ECF No. 120-3 at PageID.9283; *see also supra* Section III.A.1 ("[E]ven if a plaintiff proves market efficiency, misrepresentation publicity, and trading timing at the class certification stage, defendants may rebut the *Basic* presumption by showing, among other things, that the alleged misrepresentations had no price impact.").

As discussed, Plaintiffs generally allege that Defendant Farner made fraudulent material misrepresentations touting Rocket's viability despite rising interest rates and Farner's internal knowledge that Rocket's key performance indicators were forecasted to decline substantially. *See supra* Section I.C.; ECF No. 109 at PageID.8469–95. Relevantly:

> On February 25, Defendant Farner stated that Rocket was "seeing strong consumer demand" and that, as "interest rates tick up a bit," Rocket saw an "opportunity" to

invest in its Direct-to-Consumer network and "grab market share," such that Rocket did not view rising interest rates as "having an impact on [its] business one way or another." ECF Nos. 44 at PageID.1209; 109 at PageID.8510–13.

On March 3, 2021, Farner stated that Rocket's direct-to-consumer and partner networks were "all growing." *Id.* at PageID.8516.

On March 11, 2021, Farner stated that Rocket "take[s]" rising interest rates as "an opportunity to grow" such that, as other mortgage companies "pull back" and the mortgage industry shrinks, Rocket has an "opportunity to grow market share" and that he thinks the upcoming "cycles" will be good for Rocket's business throughout the coming fiscal year. *Id.* PageID.8518.

Plaintiffs allege that these statements were fraudulent misrepresentations that "artificially inflated or maintained the price of Rocket Class A common stock" during the Class Period. *Id.* at PageID.8543, 8556. Dr. Starks disagrees, both based on her review of relevant context and analyst reports.

Dr. Starks first explained how the broader context surrounding Plaintiffs' alleged fraudulent misrepresentations suggests that Defendant Farner's statements had no price impact. Dr. Starks notes, for example, that, simultaneous to Farner's February 25, 2025 earnings call *statement*, Rocket released a public earnings *announcement* that explained that Rocket's gain-on-sale margins and closed loan volumes significantly *decreased* since the previous quarter. ECF No. 120-3 at PageID.9295. And Dr. Starks notes that influential side-sell analysts within the market referenced this latter *announcement* rather than Jay Farner's *statement* when issuing reports to inform investors. *Id.* Similarly, Dr. Starks noted that all of Rocket's publicly available SEC filings and risk disclosures discussed how rising interest rates may be adverse to Rocket's business. *Id.* at PageID.9296–99. ("Consistent with the Company's [] disclosures, analyst[] reports prior to the [] Class Period had already noted the potentially negative impact of rising interest rates and intensifying competition, predicting a downward trend for Rocket's margins."). As an additional example of context suggesting Farner's statements had no impact on how the market viewed

Rocket's profitability, Dr. Starks explains that analyst reports at the time frequently referenced the publicly available Freddie Mac and Fannie Mae forecasts that Rocket's key performance metrics would—like other players in the mortgage industry—decline as interest rates rose. *Id.* at PageID.9300–02.

In addition to this broader context suggesting no price impact, Dr. Starks reviewed "sell-side" analyst reports about Rocket stock, authored before, during, and after the Class Period. ECF No. 120-3 at PageID.9284. Dr. Starks explains that these analysts "serve as important information intermediaries between companies and investors" and author reports which "provide[] a useful measure of public information that investors would deem important to the investment decision-making process." *Id.* Indeed, assuming an efficient market, Dr. Starks avers these reports would discuss or reference any statements made by Rocket executives which the analyst would interpret as important or indicative of a potential price impact. *Id.* at PageID.9290. So, if Farner's alleged misrepresentations had the price impact Plaintiffs suggest, Dr. Starks opines that these statements would have been at least referenced in relevant sell-side analyst reports. *See id.* But Dr. Starks found "no such evidence" within her review of "at least 50" sell-side analyst reports issued by 17 different analysts about Rocket stock during the Class Period.[14] *Id.* at PageID.9291, 9305–18.

### E. Defense Expert Dr. Mark Garmaise

The third proposed Defense Expert is Dr. Mark Garmaise. Dr. Garmaise received his Ph.D. in finance from Stanford University and currently serves as a tenured professor of corporate finance, venture capital, and private equity at the University of California, Los Angeles Anderson School of Management. ECF No. 120-4 at PageID.9399. Among other accomplishments, Dr.

---

[14] Dr. Starks found that *one* analyst report referenced Farner's February 25, 2021 interest rate statement, but notes that this report does not suggest that this statement was indicative of Rocket's profitability despite rising interest rates. ECF No. 120-3 at PageID.9305.

Garmaise has published several corporate finance and valuation articles in peer-reviewed academic journals. *Id.* Defendants specifically retained Dr. Garmaise to review and assess Chad Coffman's proposed expert conclusion that damages in this case can be calculated on a class-wide basis. *Id.* at PageID.9400.

Dr. Garmaise concludes that Coffman did not identify a methodology to measure damages on a class-wide basis because Coffman did not explain how the proposed artificial "inflation" variable—the difference between Rocket stock's actual trading price each day and the price it would have been traded had the alleged fraudulent statements not have been made—accounts for shifting uncertainty and risk throughout the Class Period prompted by (1) the COVID-19 pandemic and varying interest rates; (2) United's March 4, 2021 ultimatum to third-party network providers; and (3) the meme-stock status of Rocket stock and frenzied social media interest on March 2 and 3, 2021. *Id.* at PageID.120-4 at PageID.9401–02, 9412–35. Notably, Dr. Garmaise does not dispute the overall *equation* or *method* Coffman proposes to calculate damages. *See generally id.* And although Dr. Garmaise suggests that Rocket stock's artificial inflation—a single variable within Coffman's proposed "out-of-pocket" methodology—may shift throughout the Class Period such that *different days* have different levels of inflation, Dr. Garmaise does not suggest that the inflation variable would be unique to *different Class Members* who traded on the same day during the Class Period. *See generally id.* Instead, as Defendants summarize, Dr. Garmaise merely "identifies *challenges* Coffman will face in trying to build a class-wide damages model consistent with Plaintiffs' liability theory because of the unique features of this case." ECF No. 151 at PageID.15837 (emphasis added).

## III.

With this context in mind, this Court turns to the Parties' motions challenging each other's proposed expert testimony.[15]

Federal Rule of Evidence 702 allows certain witnesses with specialized knowledge to testify about their opinions as experts at trial. FED. R. EVID. 702. But admitting expert testimony is not a decision a court should make lightly, as factfinders tend to place extra weight on expert opinions. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993). Accordingly, courts serve an important gatekeeping role when assessing proffered expert testimony, striving to admit qualified, reliable, and relevant opinions but exclude unreliable and misleading "junk science." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The well-established *Daubert* "gatekeeping" framework "involves three basic inquiries."[16] *Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586, at *2 (S.D. Ohio Mar. 8, 2021).

---

[15] The Parties have filed *twenty* expert motions to date. ECF Nos. 121; 131; 132; 138 (sealed); 139; 150; 169 (sealed); 170; 172 (sealed); 173; 175 (sealed); 176; 177; 180 (sealed); 181; 182 (sealed); 186; 184 (sealed); 185; 189. But only six motions challenge—or seek to strike—expert testimony relevant to class certification. These six motions are resolved by this Opinion and Order and the remaining motions—concerning proposed expert testimony related to the merits and the Parties' motions for summary judgment—will be resolved after this Court addresses class certification.

[16] Neither the Supreme Court nor the Sixth Circuit have squarely held that the *Daubert* analysis applies at the class certification stage. *See In re Carpenter Co.,* No. 14-0302, 2014 WL 12809636, at *3 (6th Cir. Sept. 29, 2014) (finding district court did not abuse its discretion in applying the *Daubert* framework at the class certification stage based on Supreme Court dicta). Yet, this Court has recognized that the weight of federal precedent "suggest[s] that it does." *Won v. Gen. Motors, LLC*, No. 19-11044, 2022 WL 3010886, at *3 (E.D. Mich. July 28, 2022) (collecting cases and noting "[t]he parties do not appear to seriously contest whether the *Daubert* analysis applies at this stage of the case"); *see also Prantil v. Arkema Inc.*, 986 F.3d 570 (5th Cir. 2021) (concluding *Daubert* applies at class certification); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (same); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011) (same); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir.2012) ("When an expert's report or testimony is critical to class certification, . . . a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." (internal quotations omitted)).

First, a court must determine whether a proposed witness is qualified as an expert according to his or her "knowledge, experience, training, or education." FED. R. EVID. 702. Whatever the form, "[a]n expert's qualifications must provide a foundation for an expert to answer the specific questions in the expert report." *Thomas v. Lambert*, 606 F. Supp. 3d 592, 599 (E.D. Mich. 2022) (internal quotations and citations omitted). If satisfied that the proffered expert is sufficiently qualified, the court then turns to the expert's proffered testimony, asking whether such testimony is relevant and would assist the jury in understanding the evidence at trial or determining a genuine factual issue. FED. R. EVID. 702(a); *Daubert*, 509 U.S. at 587–89. Finally, a reviewing court considers whether the proffered expert testimony is reliable by analyzing a non-exclusive list of factors, including (1) whether the expert's theory or technique can or has been tested; (2) whether the expert's theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error; and (4) whether the expert's theory or technique has been generally accepted within the relevant field or industry. *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 593–94 (1993)).

Notably, "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d 517, 530 (6th Cir. 2008). Accordingly, a court's gatekeeping role under *Daubert* does not supplant the role of the factfinder or opposing counsel. *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### A. Defendants' Motion to Exclude Chad Coffman's Testimony

On February 26, 2024, Defendants filed a motion to exclude Chad Coffman's proposed expert testimony on five separate grounds. ECF No. 121. Each argument will be addressed in turn.

### 1. Coffman's Reliance on the *Cammer* and *Krogman* Factors

Defendants argue that Coffman's market efficiency conclusion is an improper "legal opinion" because he "plod[s] through" the *Cammer* and *Krogman* market efficiency factors without citing "any academic literature to support the notion that" these factors are actually indicative of an efficient market "from a financial economist's perspective." *Id.* at PageID.10444–46 (arguing "it is patently improper for Coffman to offer a legal opinion that he is not qualified to give under the guise of an expert opinion"). This argument fails for multiple reasons.

True, consistent with Rule 704, an expert witness "may not testify to a legal conclusion," *Hyland v. HomeServices of Am., Inc.,* 771 F.3d 310, 322 (6th Cir. 2014), and expert testimony which does nothing more than define legal terms or recite legal principles is inappropriate. *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 593 (6th Cir. 2014). But Coffman's testimony does far more than simply define legal terms or recite legal principles. Coffman conducted his own empirical analysis, which he helpfully outlined by referencing the factors the Sixth Circuit, this Court, and countless others have recognized as relevant to market efficiency for decades. *See generally* ECF No. 111-2. Coffman's "reference to case law" does not render his opinion an improper legal one. *Willis v. Big Lots, Inc*., No. 2:12-CV-604, 2017 WL 1074048, at *3 (S.D. Ohio Mar. 17, 2017). Indeed, before analyzing whether each factor indicated market efficiency in this specific case, Coffman thoroughly explained *how* each factor was related to market efficiency. *See id.* at PageID.8632–53. Moreover, contrary to Defendants' characterization of Coffman's testimony as simply "plodding through" the *Cammer* and *Krogman* factors, ECF No. 121 at PageID.10445, Coffman expressly noted these factors are non-exhaustive, ECF No. 111-2 at PageID.8630, and considered three *additional factors* which his education and experience led him to conclude were relevant to market efficiency in this particular case. *Id.* at PageID.8653–55.

- 36 -

Second, Defendants' suggestion that a proposed market efficiency expert must demonstrate that the *Cammer* or *Krogman* factors are independently supported by academic literature as relevant "from a financial economist's perspective" ignores the fact that this court, the Sixth Circuit, and countless federal courts have relied on these factors for decades *precisely because* they are supported by academic literature as relevant from a financial economist's perspective. *See, e.g.*, *Krogman v. Sterritt*, 202 F.R.D. 467, 474, 477–78 (N.D. Tex. 2001) (grounding the *Krogman* factors in "economic literature" and noting the *Cammer* factors were based on sound "economic theory"). Indeed, this exact argument has been squarely rejected by other courts in this Circuit. *Willis v. Big Lots, Inc.*, No. 2:12-CV-604, 2017 WL 1074048, at *3–4. (S.D. Ohio Mar. 17, 2017) (rejecting defendant's argument that plaintiff's expert provided an improper legal opinion when relying on the *Cammer* and *Krogman* market efficiency factors); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 82 (S.D.N.Y. 2015) (rejecting defendants *Daubert* argument that plaintiff's expert improperly "plod[ded] through" the *Cammer* and *Krogman* factors as "pointless" because those factors are "widely accepted" as relevant to market efficiency).

At its core, Defendants seemingly argue that Coffman's reliance on the *Cammer* and *Krogman* market efficiency factors is unreliable simply because Defense expert Dr. Stulz reached the contrary conclusion that these factors are outdated. ECF No. 121 at PageID.10445 ("As Dr. Stulz opines, only [one factor] has any grounding in financial economics . . . [o]ther financial economists agree."). But this argument has been rejected by other courts in this Circuit. *Willis*, 2017 WL 1074048, at *3 (S.D. Ohio Mar. 17, 2017) (finding no inherent unreliability in plaintiff expert's reliance on the *Cammer* and *Krogman* factors, despite defense expert's conclusion that these factors are not relevant to modern market efficiency). Indeed, boiled down, this argument—

like *many* discussed below—presents the "classic battle of the experts" in which one party seeks to exclude the opposition's experts simply because these experts offer contrary conclusions. *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005). But "competing expert opinions" are insufficient grounds for exclusion under *Daubert*. *Id.* So long as proposed expert opinions are sufficiently reliable and relevant, any differences in opinion are issues of weight rather than admissibility. *Id.*; *In re Flint Water Cases. This Ord. Relates To: Bellwether III Cases*, 2024 WL 4120237, at *6 (E.D. Mich. Sept. 9, 2024); *see also Fox v. Mass. Bay Ins. Co.*, No. 213CV02567JTFDKV, 2015 WL 11017961, at *3 (W.D. Tenn. Mar. 12, 2015) ("The test set out in *Daubert* does not require that the Court look to one expert to determine the credibility of another[.]")

Accordingly, the Court will not exclude Coffman's market efficiency conclusions as an improper legal opinion.

### 2. Coffman's Meme Stock Considerations

Defendants next seek to exclude Coffman's market-efficiency conclusion as unreliable because he did not consider Rocket's alleged meme-stock status. ECF No. 121 at PageID.10447–50. Defendants piggyback the conclusions of their own proposed expert—Dr. Stulz—and argue that the meme-stock trading frenzy was "the elephant in the room" such that Coffman's ignorance renders his conclusions inherently unreliable. *Id.* at PageID.10449. This argument is unpersuasive, both as a matter of fact and law.

First, Defendants' repeated suggestion that Coffman "ignored" Rocket's meme stock status or "pretended" that this evidence did not exist, *see* ECF No. 121 at PageID.10457, is factually inaccurate. Although Coffman excluded March 2 and 3, 2021 as statistical outliers from his two-and-a-half-year *event study*, Coffman did not otherwise ignore the social media frenzy surrounding

Rocket Stock on these trading days. Indeed, Coffman repeatedly recognized this evidence and explained how it did not undermine the other factors he concluded weighed in favor of finding that the market for Rocket stock was efficient throughout the Class Period. *See, e.g.*, ECF No. 111-2 at PageID.8633, n. 37 ("[T]here was a period of two days around March 2–3, 2021, where there was a spike in trading volume, apparently fueled by [Reddit] investors . . . However . . . . *even taking into account the spike in those two days* . . . Rocket's average weekly trading volume was 63.1 million shares" such that the average weekly trading volume suggests market efficiency); PageID.8651, n. 82 ("Again, here, even taking into account the spike in the two days aforementioned (March 2-3, 2021) . . . Rocket's average market capitalization during the Class Period was still nearly $3 billion.").

Second, Defendants' suggestion that Coffman's market efficiency opinion was unreliable solely because he did not consider Rocket's meme-stock status lacks merit as a matter of law. There is no bright-line test for market efficiency. "It is not logical to draw bright-line tests . . . to assist the factfinder in determining whether a stock trades in an open and efficient market." *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989); *see also Dougherty v. Esperion Therapeutics, Inc.*, No. 16-10089, 2020 WL 6793326, at *3 (E.D. Mich. Nov. 19, 2020) (noting "there is no bright-line test for market efficiency"); *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 133 (M.D. Tenn. 2020) (noting the *Cammer* and *Krogman* factors are an "analytical tool" to measure market efficiency, not a "checklist"). Similar to Defendants' first argument that Coffman improperly focused most of his analysis on the *Cammer* and *Krogman* factors, Defendants' instant argument that Coffman should have considered an *additional* factor goes to weight, not admissibility. *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 530 (6th Cir. 2008).

### 3. Coffman's Price-Impact Event Study

Defendants then argue—again citing their own proposed expert's conclusion—that Coffman's price impact event study was unreliable. ECF No. 121 at PageID.10450–55. Notably, Defendants do not dispute the reliability of event studies in general. Indeed, their proposed expert agrees with Coffman that event studies "have been widely used for more than fifty years to measure the impact of new information that enters the marketplace on securities prices." ECF No. 120-2 at PageID.9188. Instead, Defendants argue that Coffman's event study was "insufficiently scientific" because he excluded March 2 and 3, 2021 as statistical outliers, ECF No. 121 at PageID.10450 (internal citations omitted), and "fundamentally flawed" because he set a two-and-a-half-year Analysis Period which included the two-month Class Period. *Id.* at PageID.10453 (emphasis omitted). Both arguments are unpersuasive.

Coffman's event study analyzed how the price of Rocket Class A common stock historically responded to Rocket's earnings releases from September 4, 2020 through May 5, 2023 (the "Analysis Period"). ECF No. 111-2 at PageID.8631, n. 33, 8640–43. Specifically, Coffman's event study employed a well-accepted regression model, which allowed him to measure how Rocket's daily returns (percentage change of stock price) would normally react to daily returns of the broader S&P 500 and the Industry Index. *Id.* at PageID.8642-43. Once this regression was modeled, Coffman was able to analyze how the price of Rocket Class A common stock responded, in comparison, to Rocket's eleven public earnings announcements throughout the Analysis Period. *Id.* at PageID.8645–46. Ultimately, Coffman found evidence of market efficiency because (1) 54.55% of earnings announcements caused a statistically significant price impact and (2) the "average magnitude of stock price movement on earnings announcement days was over three-times higher than on no news days" such that "on the days when important, company-specific

information [was] released to the market, [Rocket's] stock price move[d] much more than on days where there [was] no company-specific news." *Id.* at PageID.8646–47.

Defendants first argue that Coffman's event study was "insufficiently scientific" because he removed two days—March 2 and 3, 2021—from his larger 974-day Analysis Period without explanation or citation to academic articles. ECF No. 121 at PageID.10450. But this mischaracterizes Coffman's report. Coffman explained that March 2 and 3, 2021 were removed from his event study because the "increased trading due to attention from Reddit and Twitter" on those days were statistically significant outliers that he removed from the event study "so as to not distort the results." ECF No. 111-2 at PageID.8664; *see also* ECF No. 120-5 at PageID.9537 ("[A]ny time you have a firm-specific news item that is having an outsized effect on the company and on the regression estimates, that's no longer . . . an unbiased estimate of what the . . . relationship is between the company and the indices in the absence of news. So when there is an outlier date that's clearly caused by some form of news or activity that is causing price to move in a substantial way, it's standard to . . . remove it[.]"). Indeed, proposed Defense expert Dr. Stulz recognizes that economists properly exclude data points from event studies to ensure that "the returns . . . do not affect the measurement of the typical relationship." ECF No. 120-2 at PageID.9189.

To the extent Defendants argue—based on the testimony of their own proposed experts— that Coffman's exclusion was improper because these specific two dates, if considered, would have changed his market efficiency conclusions, ECF No. 121 at PageID.10452–23, this is an issue of weight, not admissibility. Defendants cite a non-binding 2014 Southern District of New York case—which has nothing to do with securities law—to suggest that the "arbitrary" exclusion of event study data renders the study insufficiently scientific in violation of Rule 702. ECF No. 121

at PageID.10450–51 (citing *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014)). But, unlike here, the expert in that case conceded that he arbitrarily selected outcome-determinative event study end dates. *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016). Indeed, in that case, the Southern District of New York concluded that the arbitrary selection of an event study's timeframe is "not necessarily a fatal problem because . . . some judgment is called for in any statistical model and, so long as the model is robust with respect to different choices of arbitrary points, there is no pressing issue." *Id.*

On this point, a First Circuit case—which the Southern District of New York cited—is more instructive. In *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 91 (1st Cir. 2014), the First Circuit affirmed the district court's exclusion of a proposed expert's event study in a putative securities class action but did so only because (1) there was a "complete disconnect" between the complaint and the event study, which "include[d] many dates that [had] no relationship" to the plaintiff's allegations and treated "certain events as corrective when the complaint labeled them inflationary"; and (2) the expert "cherry-picked unusually volatile days and made them the focus of the study." Neither condition is present here. Coffman's event study Analysis Period included the Class Period and analyzed the same disclosures discussed in the Complaint, including Rocket's February 24, 2021 alleged corrective disclosure. *See* ECF No. 111-2 at PageID.8666. Although Coffman excluded two days *Defendants* contend are "outcome determinative," ECF No. 121 at PageID.10453, these two excluded dates are not the "focus" of his 974-day event study, which included over 670 trading days, according to Defendants' own proposed experts. *See* ECF No. 120-2 at PageID.9174.

- 42 -

Defendants then pivot and argue that Coffman's event study is "fundamentally flawed" not because of the two days it excludes, but because of the two-and-a-half years it considers. ECF No. 121 at PageID.10453–56. Once again, Defendants' argument parrots the opinions of its own rebuttal expert. *Id.* at PageID.10454–55 (arguing "[a]s [Dr.] Stulz explains, 'in economics, inferences based on a longer time period are only valid when the longer period data is representative to the subperiod of interest,'" and that "[u]nlike Coffman, Dr. Stulz did the analysis and found that Coffman's 2.5-year period is not representative of the two-month Class Period" (quoting ECF No. 120-2 at PageID.9228)). But the Sixth Circuit has recognized that event studies are relevant to the market efficiency argument precisely because they provide a *historical* snapshot of how the price of a given security reacts to public information. *See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (describing the fifth *Cammer* factor as "a history of immediate movement of the stock price caused by unexpected corporate events or financial releases"). If the price of a security has historically reacted in a statistically meaningful way to the release of public information about the security, it is more likely the price of the stock during the relevant class period reflected that public information—the central premise of market efficiency and the "foundation for the fraud on the market theory." *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989). Coffman explained that he analyzed the broader "Analysis Period to *enhance* the power of [his] statistical tests." ECF No. 111-2 at PageID.8645, n. 69 (emphasis added). This makes sense, given federal courts' recognition of the limitations of small event-study analysis periods within securities litigation:

> [S]mall sample sizes may limit statistical power, meaning that only very large-impact events will be detectable. In addition, it can be extremely difficult to isolate the price impact of any one piece of information in the presence of confounding factors, such as other simultaneously released news about the company, the industry, or the geographic region.

*In re Teva Sec. Litig.*, No. 3:17-CV-558 (SRU), 2021 WL 872156, at *21 (D. Conn. Mar. 9, 2021) (quoting *In re Petrobras Sec.*, 862 F.3d 250, 279 (2d Cir. 2017)). Regardless, "issues with sample size go to the weight, not the admissibility, of expert evidence." *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 572 (E.D. Mich. 2022).

At bottom, to be admissible, Coffman's event study must be "the product of reliable principles and methods" and must reflect Coffman's reliable application of these principles to the facts of the case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). Under the relevant *Daubert* factors, Coffman's event study unquestionably does just that. Even Defendants recognize that an event study is generally accepted within the economic community as a suitable statistical tool to assess how public information impacts the price of a security. ECF No. 120-2 at PageID.9188–89. Coffman dedicates ten pages of his proposed expert report to explaining his event study's methodology and showing how the event study is tailored to the facts alleged in the Complaint. ECF No. 111-2 at PageID.8640-50. Defendants' arguments that Coffman should have considered March 2 and 3, 2021 within this study and should have narrowed the Analysis Period are better suited to contest Plaintiffs' market-efficiency proofs at the class certification stage, instead of attempting to exclude Coffman's conclusions altogether under *Daubert*.

### 4. Coffman's Public Float Analysis

Defendants next take issue with Coffman's public float conclusion. Recall that Coffman concluded Rocket had a relatively high float during the Class Period, suggesting an efficient market. *See* ECF No. 111-2 at PageID.8653 (concluding that insiders owned only .44% of Rocket Class A common stock during the class period, such that 99% of class A shares were held by non-insiders); *see also Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (explaining that the

greater percentage of a security held by non-insiders, the more likely the price of that security will accurately reflect all public information about the security indicative of an efficient market).

Defendants do not dispute the relevancy of a security's public float to market efficiency. *See* ECF No. 120-2 at PageID.9222 (noting "financial economists . . . have documented that a low public float can lead to situations where stock prices overreact, underreact, or fail to react to new, value-relevant public information, creating impediments to market efficiency"). However—again bootstrapping the testimony of their own proposed expert—Defendants argue that Coffman should have considered *Class D shares* in his public float analysis because these shares were *fully convertible* to Class A common stock shares. ECF No. 121 at PageID.10456–57 (citing ECF No. 120-2 at PageID.9216). Had Coffman considered Rocket's convertible Class D shares, Defendants argue, Rocket's public float hovers around 6%, suggesting market inefficiency. *Id.* at PageID.10457; ECF No. 120-2 at PageID.9219. Plaintiffs respond that they need not consider Rocket's Class D convertible stock because only Rocket's Class A common stock is relevant and included in the Class definition. ECF No. 136 at PageID.14399. Defendants reply that Plaintiffs "miss the point" because, even if Class D shares are ignored, Rocket's Class A common stock shares "comprise only about 7% of Rocket stock, and such a low public float is an indicator of market inefficiency." ECF No. 142 at PageID.15451.

The Parties' dispute centers on a disagreement about how "public float" is calculated or defined. Plaintiffs narrowly define public float as the proportion of insider ownership of *the stock*—Class A common stock, here. ECF No. 111-2 at PageID.8653. Defendants broadly define public float as the proportion of insider ownership of *all stock* outstanding. ECF No. 120-2 at PageID.9216 (defining public float as the "proportion of a company's total shares outstanding that is held by the public and not by insiders"). Under their definition, Defendants explain that "Rocket

ha[d] two different classes of common stock outstanding" during the Class Period: 115.4 million shares of Class A common stock and 1.87 billion shares of Class D common stock. *Id.* at PageID.9217. Importantly, unlike Rocket's Class A common stock shares, Rocket's Class D common stock shares were nearly wholly owned by Defendant Gilbert, carried only voting rights, and were not traded on a public securities exchange. *See id.* However, based on a pre-IPO Exchange Agreement with Rocket, Gilbert "has the right to exchange" his Class D shares for Class A shares "on a one-for-one basis" at any time.[17] *Id.* at PageID.9217–18. This is why, Defendants add, relevant analyst reports throughout the Class Period—including reports relied on by Plaintiffs' proposed expert Coffman—discuss Rocket's *low* public float calculated by considering *both* Class A and D common stock:

> Some . . . investors may think Rocket only has 115.4 million shares outstanding . . . [T]hose are only the class A shares, representing a mere 6% of the true diluted share count. What is not being counted in that 115.4 million number is pre-IPO unit holdings and class D shares, which in combination can be converted into an additional 1.8 billion class A shares and sold. That's right, *the market holds a mere 6% of the total share count while insiders hold 94%.*

*Id.* at PageID.9219 (emphasis added).

Defendants' argument is well-taken but misplaced. Although Coffman's public float analysis may be *incorrect*, it is not *unreliable*. The two cases Defendants rely on to argue the contrary are inapposite. In *Rose v. Truck Centers, Inc.*, the Sixth Circuit affirmed the exclusion of expert testimony as unreliable because the expert "engaged in no testing" to support his conclusions of what caused a car crash, admitted that his conclusion assumed a certain degree of bolt tightness on a steering gear, and, critically, that conclusion was contradicted by a photograph

---

[17] Defendants' proposed expert Dr. Stulz notes that Gilbert exercised this conversion option during the Class Period, and converted 20.2 million shares of Class D common stock to Class A stock. ECF No. 120-2 at PageID.9218.

of the car's steering gear. *Rose v. Truck Centers, Inc.,* 388 F. App'x 528, 536 (6th Cir. 2010). Although Defendants prop up reports of analysts who calculated a low public float during the Class Period, these subjective reports do not have the same evidentiary weight as an objective photograph. More importantly, unlike the excluded expert in *Rose,* who offered mere assumptions, Coffman "engaged in . . . testing" and actually conducted his own empirical analysis of the ownership proportions of Rocket Class A common stock throughout the Class Period. *See* ECF No. 111-2 at PageID.8653. Defendants then cite *Farm Bureau Mut. Ins. Co. v. 1,4 Grp., Inc*., No. 1:20-CV-12751, 2022 WL 1240404 (E.D. Mich. Apr. 27, 2022). ECF No. 121 at PageID.10457. But again, in that case, unlike here, the excluded expert testimony was based on mere assumptions which were contradicted by the factual record. *Farm Bureau*, at *8–9. Defendants do not argue that Coffman's *Class A* common stock public float conclusion was a mere "assumption" or lacked evidentiary support; they instead argue that Coffman should have additionally considered *Class D* common stock. This, as both *Rose* and *Farm Bureau* recognize, is a matter of weight, not admissibility. *Id.* at *9; *Rose*, 388 F. App'x at 535 (noting "the reliability inquiry focuses solely on the principles and methodology, not on the conclusions they generate" (internal quotations omitted)).

### 5. Coffman's Damages Proposal

Lastly, Defendants argue that this Court should exclude as unreliable Coffman's conclusion that the out-of-pocket model can calculate class-wide Section 10(b) damages. ECF No. 121 at PageID.10457–58. Specifically, Defendants take issue with Coffman theorizing that this method can be used without actually "develop[ping] any such model in this case." *Id.* (suggesting Coffman's damages conclusion is nothing but "unsupported speculation" and therefore lacks

- 47 -

"intellectual rigor"). But similar forms of this argument have been rejected by other courts in this Circuit, in cases involving Mr. Coffman himself:

> Defendant's criticisms are better suited for analyzing class certification as opposed to a *Daubert* challenge. In determining whether damages can be calculated on a class wide basis, Coffman utilized the out-of-pocket losses measure. This is a "model-driven-calculation, which calculates the damages as the difference between the 'inflated' price at which Plaintiffs bought their stock ... and the 'true' price, meaning the theoretical price that the ... stock would have traded for had the relevant information been disclosed." *Ludlow*, 800 F.3d at 683. Coffman's method to calculate Section 10(b) damages has been approved in a number of cases. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) (noting that that out-of-pocket damages are the traditional form of Section 10(b) damages); *Rowe v. Marietta*, 172 F.3d 49 (6th Cir. 1999) ("The out-of-pocket measures is favored method of computing damages in a securities fraud case."); *see also Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-02399, 2019 WL 6111303, at *16 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (distinguishing the district court's decision in *Ludlow* because the pre-explosion subclass did not seek out-of-pocket damages based on the artificial information of the stock price, but instead, sought consequential damages).

*Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2020 WL 3548653, at *33 (E.D. Tenn. June 29, 2020), *objections overruled*, No. 3:16-CV-121-TAV-DCP, 2021 WL 1845186 (E.D. Tenn. May 7, 2021). As discussed *infra* Section III.D., to the extent Defendants argue Plaintiffs—through their proposed expert Coffman—have not satisfied their burden to prove a damages model capable of class-wide implementation, that argument can be raised in contesting predominance at the class certification stage. This Court concludes Coffman's damages opinions are sufficiently reliable under Rule 702.

For these reasons, Defendants' motion to exclude Chad Coffman's proposed expert testimony, ECF No. 121, will be denied.

## B. Plaintiffs' Motion to Exclude Dr. René Stulz's Testimony

Turning to the next *Daubert* motion, Plaintiffs seek to exclude Dr. Stulz's proposed expert testimony, arguing (1) he is unqualified to testify about the "meme stock phenomenon;" and (2) his conclusions are unreliable. ECF No. 132. Both arguments will be addressed in turn.

### 1. Qualifications

Plaintiffs first argue that Dr. Stulz is unqualified to testify about the "meme stock phenomenon" because he "has never published an article about meme stocks, has not taught any courses on meme stocks, and has never participated in any academic study in meme stocks." ECF *Id.* at PageID.11917. This argument is without merit.

As this Court has explained:

> The court's investigation of qualifications should not be onerous or inordinately exacting, but rather must look to underlying competence, not labels. "[T]he expert need not have complete knowledge about the field in question, and need not be certain. He need only be able to aid the jury in resolving a relevant issue." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir.1981). Similarly, lack of hands-on experience is not fatal to a qualification inquiry if the focus of the opinion is within the scope of the expert's special knowledge.

*Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) (noting an aeronautical engineer would qualify as an expert to testify about how a bumblebee can fly, "even if he had never seen a bumblebee," so long as he was familiar with relevant components of flight principles); *Counts v. Gen. Motors, LLC,* 606 F. Supp. 3d 547, 568 (E.D. Mich. 2022) ("Courts do not require experts to be a specialist in every subject to which their testimony might relate—they must simply have expertise that would help a jury understand the expert's testimony.");

So, Plaintiffs are correct that Dr. Stulz has not taught a course on or published an article about "meme stocks." *See* ECF No. 132 at PageID.11918. But he need not have such "hands-on" experience to qualify as an expert and opine about how Rocket's meme-stock status impacted the

- 49 -

securities market throughout the relevant Class Period, and specifically whether the market for Rocket stock was efficient. What Dr. Stulz lacks in hands-on experience in "meme stocks"— which, as Defendants point out, is an incredibly recent phenomenon, ECF No. 152 at PageID.15919—he makes up for with a Ph.D. in economics and a near 45-year career teaching undergraduate and graduate courses in economics, finance, and capital markets. *See* ECF No. 120-2 at PageID.9232–47. Moreover, although Dr. Stulz has not written any articles about meme stocks, he has written over one hundred peer-reviewed publications on economics, finance, and market risk, *id.*, and has reviewed meme-stock studies in anticipation of future publications and his proposed expert testimony in this case. ECF No. 120-6 at PageID.9573; *see In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016) ("Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable.").

## 2. Reliability

Plaintiffs next argue that Dr. Stulz's meme-stock opinions are unreliable because he did not "provide any generally accepted definition of 'meme stock' in his report" and has not offered any "method or criteria for identifying a meme stock event." ECF No. 132 at PageID.11919. But this misrepresents Dr. Stulz's report and mischaracterizes his deposition testimony. Dr. Stulz reported that "[a]lthough there is no single formal or technical definition of a meme stock, the SEC . . . categorized meme stocks as those displaying the following characteristics: . . . (1) frequent mentions on social media, including reddit[;] [and] (2) large price moves or increased trading volume that significantly exceeded broader market movements and the amount of short interest measured as the number of shares sold short as a portion of the total shares outstanding [exceeding the market average]." ECF No. 120-2 at PageID.9193–94 (internal quotations omitted). And Dr.

Stulz noted that the SEC's definition is similar to that of "press, analysts, and other market

observers." *Id.* at PageID.9194. Dr. Stulz's deposition only clarified his conclusion that, whatever

the trivial differences in prevailing meme-stock definitions may be, Rocket stock classifies:

> **Counsel:** Is there a widely accepted definition of meme stock in economics
> literature?
> **Dr. Stulz:** There's a number of definitions that people use [but] the Rocket stock
> satisfies those definitions[.]
> **Counsel**: What do you mean by there are a number of different definitions?
> **Dr. Stulz**: I discuss various definitions in my report and that differ somewhat. At
> this point I'm not aware of financial economists having settled on one of those
> definitions, but I discuss in my report how Rocket satisfies those various
> definitions.

ECF No. 120-6 at PageID.9573.

Plaintiffs cite one—and only one—case to support their proposition that an expert's

testimony is inherently unreliable if they do not offer "widely-accepted definition[s]" of terms

used in their testimony. ECF No. 132 at PageID.11922 (citing *United States v. Bauer*, 82 F.4th

522, 534 (6th Cir. 2023)). But this case is wholly inapposite. In *Bauer*, a jury convicted a physician

of prescribing opioids to patients in violation of the Controlled Substances Act. *Bauer*, 82 F.4th at

527. The physician appealed his conviction on four grounds, one of which argued that the district

court wrongfully excluded the physician's proposed experts at trial. *Id.* at 527–28. Notably, the

district court excluded the physician's proposed experts as *unqualified*, not because their proffered

opinions were *unreliable*. *Id.* at 527-28, 534 (noting the district court found that "two of the

[proposed experts] did not appear to have experience in treating chronic-pain patients and another

had only a minimal connection to a pain medicine that was not at issue" and concluded another

proposed experts "was unable to articulate the relevant standard of care and appeared unfamiliar

with the standards for pain-management patients"). More importantly, the Sixth Circuit refused to

consider this issue on appeal, concluding the physician had waived it. *Id.* at 534. How this case

supports Plaintiffs' argument that Dr. Stulz must proffer a "widely-accepted definition" of meme stock for his testimony to be reliable under Rule 702 is entirely unclear.

In sum, Dr. Stulz's education and career in finance and economics qualify him to offer expert testimony about market efficiency for Rocket stock throughout the Class Period and whether Rocket's meme-stock status rendered the market inefficient. *See Thomas v. Lambert*, 606 F. Supp. 3d 592, 599 (E.D. Mich. 2022). This testimony is relevant and would assist this court in considering whether Plaintiffs have satisfied the predominance requirement of class certification. *See* FED. R. EVID. 702(a); *Daubert*, 509 U.S. at 587–89. And this testimony—based on Dr. Stulz's own review of relevant economic literature—is reliable. *See First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 593–94 (1993)). Accordingly, Plaintiffs' motion to exclude Dr. Stulz's proposed expert testimony, ECF No. 132, will be denied.

### C. Plaintiffs' Motion to Exclude Dr. Laura Starks's Testimony

Plaintiffs also seek to exclude the proposed testimony of Dr. Laura Starks—Defendants' proposed price impact expert. ECF Nos. 138 (sealed); 139. Plaintiffs argue Dr. Starks's testimony should be excluded because (1) she is unqualified to offer expert testimony about price impact and sell-side analyst reporting; (2) her expert opinion is not relevant; and (3) her expert opinion is unreliable. *See generally* ECF No. 139. Each argument will be addressed in turn.

### 1. Qualifications

Similar to their argument that Dr. Stulz was unqualified to opine about market efficiency and meme stocks, Plaintiffs argue that Dr. Starks is unqualified to offer expert testimony about sell-side analyst commentary concerning Defendant Farner's alleged fraudulent misrepresentations, and whether this commentary is indicative of price impact. Not so.

As discussed, the proponent of expert testimony need only show, by a preponderance of the evidence, that the witness has met "minimal qualifications" to testify as an expert through their knowledge, skill, experience, training, or education. *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014). Defendants have met this minimal showing. Dr. Starks has a Ph.D. in finance and has spent the last thirty years teaching undergraduate and graduate courses in financial management, financial strategies, corporate finance, financial economics, and—relevant to her proposed expert testimony—"institutional investor influence." ECF No. 120-3 at PageID.9340. Dr. Starks has written over 70 peer-reviewed publications on topics including "the decision-making process of investors, including . . . institutional investors' preferences for certain stock characteristics, institutional investors' trading practices, how investors react to new information, and analyst forecasts and recommendations." *Id.* at PageID.9278, 9328–33. Dr. Stulz also has specialized experience in reviewing analyst reports to assess the price impact of corporate developments and disclosures. *See* ECF No. 139-2 at PageID.15223. Accordingly, Starks is well qualified to opine whether, based on her review of all relevant analyst reports about Rocket stock issued during the Class Period, the alleged misrepresentations in this case influenced investors. *See* ECF No. 120-3 at PageID.9290.

## 2. Relevancy

Plaintiffs next argue that Dr. Starks's conclusion is not relevant or helpful—and thus not proper subject matter for expert testimony—because her conclusion is based "solely upon her subjective reading of sell-side reports," which—Plaintiffs contend—is a "task well within the ken of the average juror." ECF No. 139 at PageID.15100–01 (internal quotations omitted). This argument can be easily disposed of.

Rule 702's relevancy—or "helpfulness"—requirement "has been interpreted to mean that the scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research . . . being offered and the disputed . . . issue[] in the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)). Moreover, proposed expert testimony is inadmissible when it "merely deals with a proposition that is not beyond the ken of common knowledge" or a lay juror. *Zuzula v. ABB Power T & D Co.,* 267 F. Supp. 2d 703, 711 (E.D. Mich. 2003).

First, reviewing sell-side analyst reports—let alone 50—is not a task "well within the ken of the average juror." *See* ECF No. 120-3 at PagewID.9362–72; *Won v. Gen. Motors, LLC*, No. 19-11044, 2022 WL 3010886, at *9 (E.D. Mich. July 28, 2022) ("The conclusions derived through . . . prodigious labor contribute tangibly to the factual record pertaining to class certification" such that the proposed expert testimony synthesizing records is "helpful to the Court" in ruling on class certification.). Second, Dr. Starks's price-impact conclusions are helpful and relevant to this Court's class certification determination. As explained *supra* Section II.A.1, Plaintiffs cannot prevail at the class certification stage if they do not satisfy Rule 23(b)(3)'s predominance requirement. And—even if they can prove market efficiency—Plaintiffs cannot satisfy predominance if Defendants rebut the *Basic* presumption of class-wide investor reliance by proving that Farner's alleged misrepresentations had no price impact. *See supra* Section II.A.1 (citing *Halliburton II*, at 280). Evidence that relevant analyst reports issued during a proposed class period did *not* reflect alleged fraudulent misrepresentations about a security is considered squarely relevant—if not dispositive—to the price impact analysis. *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 104 (2d Cir. 2023) (refusing to certify class in part because *Dr. Starks's* expert report showed that no analyst report throughout the Class Period referenced

plaintiff's alleged misrepresentation, such that any link between the alleged misrepresentation and price impact was "sever[ed]"); *see also Monroe Cnty. Employees' Ret. Sys. v. S. Co*., 332 F.R.D. 370, 396 (N.D. Ga. 2019) ("[T]he existence of . . . analyst commentary highlighting the negative news is, of course . . . evidence of price impact." (internal quotations omitted)).

Accordingly, Dr. Starks's testimony is relevant and helpful under Rule 702.

### 3. Reliability

The remainder of Plaintiffs' objections to Dr. Starks's proposed testimony relate to reliability. All are without merit.

Plaintiffs first argue that Dr. Starks's opinion is "based exclusively on her subjective analysis of analyst reports" rather than any "scientific principles." ECF No. 139 at PageID.15091. But Dr. Starks employed qualitative content analysis when she synthesized all relevant Rocket analyst reports, and drew conclusions from these reports based on her education and experience in financial economics and investor influence.[18] ECF No. 139-2 at PageID.15186–87, 15191–92; *see also* ECF No. 120-3 at PageID.9287, n. 25, PageID.9288, n. 28, PageID.9295, n. 52. Although Plaintiffs describe this methodology as nothing more than a "look to see" approach, *see* ECF No. 139 at PageID.15097, this Court recognizes that content analysis is "not junk science" and is "generally reliable" despite some subjectivity. *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 570, 574 (E.D. Mich. 2022); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015) (rejecting *Daubert* challenge that expert's review of analyst

---

[18] Although Plaintiffs challenge Dr. Starks for employing an entirely subjective "look to see" approach to her review of analyst reports, it is notable that *Plaintiffs'* proposed expert—Chad Coffman—employed the very same approach to *his* review of relevant Rocket analyst reports during the Class Period, which he concluded were "significant" and indicative of an efficient trading market. *See* ECF No. 111-2 at PageID.8635.

reports was "entirely subjective" concluding that, although such analysis is "necessarily subjective, that does not mean [the] opinion is speculative or without methodological constraints").

Second, Plaintiffs argue Dr. Starks unreliably and impermissibly "cherry-picked" relevant data by reviewing only analyst reports and excluding other, potentially contradictory, information. ECF No. 139 at PageID.15092, 15106. This argument is misplaced. True, experts cannot "cherry-pick" only favorable data to review. *United States v. Lang*, 717 F. App'x 523, 536 (6th Cir. 2017). But, at the same time, experts are not expected to review "*all* the facts and data" that may hypothetically relate to their opinions. *Id.* (emphasis in original). Dr. Starks appropriately towed this line. Dr. Starks thoroughly explained why she reviewed analyst reports instead of other sources of market information. ECF No. 120-3 at PageID.9287–88 (explaining that analysts are heavily regulated, have expertise in specific industries and access to important corporate valuation information, and that their reports are considered the "prime source of fundamental information about a company" which are heavily relied on by large-scale institutional investors). Had Dr. Starks only considered *certain* analyst reports, Plaintiffs' cherry-picking concern may have merit. But Dr. Starks did not limit her review to only those analyst reports she believed would be favorable—she instead considered *every* analyst report issued about Rocket stock throughout the Class Period. *Id.* at PageID.9291. To the extent Plaintiffs argue Dr. Starks should have considered *additional, non-analyst* information like "articles published on well-known investment websites" and "comments . . . on YouTube," ECF No. 139 at PageID.15102, that argument concerns the weight of Dr. Starks's testimony, not its admissibility.[19]

---

[19] Plaintiffs cite a string of articles which reference Jay Farner's February 26, 2021 statement Rocket's business would not "really" be impacted by rising interests rates. ECF No. 139 at PageID.15102–105. But it is entirely unclear how these articles contradict—or even undermine—Dr. Starks's conclusion that Farner's alleged misrepresentations had no *price impact.*

Third, Plaintiffs recite the *Daubert* factors and argue Dr. Starks's opinion is unreliable because her technique is not testable, has not been peer-reviewed, has no known error rate, and is not generally accepted in the economic community. ECF No. 139 at PageID.15107–09. But it is well-established that the *Daubert* factors are not a "definitive checklist or test" and should only be applied when they would reasonably measure reliability. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (noting the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the issue, the expert's particular expertise, and the subject of his testimony"); *United States v. LaVictor*, 848 F.3d 428, 443 (6th Cir. 2017) ("[T]he district court is not bound by any explicit test when determining reliability). In this case, peer-review, error rate, testability, and scientific acceptance are inapposite to assess the reliability of Dr. Starks's review of sell-side analyst reports. Yet, this Court is satisfied that Dr. Starks's opinions are reliable. As discussed, qualitative content analysis is generally considered reliable, and this Court is satisfied that Dr. Starks reliably applied this methodology to the facts of this case. *See Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 571 (E.D. Mich. 2022) (collecting cases and holding that an expert's qualitative content analysis was reliable despite a lack of empirical analysis or grounding in the "scientific method").

Plaintiffs then assert three additional, unsupported arguments, citing "core deficiencies" in Dr. Starks's review: (1) Dr. Starks presumes that sell-side analysts "are exhaustive in their reporting" of important market information such that reporting is a reliable and comprehensive reflection of how investors interpret and understand information released by a company, ECF No. 139 at PageID.15110; (2) analyst reports cannot accurately measure impact because "contemporaneous commentary about a lie cannot measure that lie's significance," *id.* at

PageID.15113; and (3) analysts may be biased by their relationships with management, such that their reports may not be entirely accurate or inclusive. *Id.* All three arguments go to the *accuracy* of Dr. Starks's proposed expert testimony, not its *admissibility. In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (rejecting argument which "fundamentally confuse[d]" the accuracy of a proposed expert's opinion with its reliability); *United States v. Ramer*, 883 F.3d 659, 680 (6th Cir. 2018) (noting that, so long as an expert's testimony is based on sufficient facts and data and is free from speculation, "any remaining challenges merely go to . . . weight, as opposed to . . . admissibility").

For these reasons, Plaintiffs' motion to exclude the expert testimony of Dr. Laura Starks, ECF Nos. 138 (sealed); 139, will be denied.

### D. Plaintiffs' Motion to Exclude Dr. Mark Garmaise's Testimony

Plaintiffs next seek to exclude Dr. Garmaise's proposed expert testimony for two reasons. ECF No. 131. First, Plaintiffs argue Dr. Garmaise is not qualified to testify as an expert on "Section 10(b) damages methodologies." *Id.* at PageID.11567–69 (emphasis omitted). Second, Plaintiffs argue Dr. Garmaise's testimony is not "relevant" or "helpful" to the Court's class certification decision. *Id.* at PageID.1158–67. Both arguments are without merit.

### 1. Qualifications

In short, Dr. Garmaise concludes that Coffman's proposed out-of-pocket damages methodology does not sufficiently account for "the changing mix of information (*e.g.*, macroeconomic conditions and expectations, mortgage market landscape, etc.) or the potential value impact of this information, which likely differed throughout the . . .Class Period." ECF No. 120-4 at PageID.9401 (emphasis in original). Dr. Garmaise is more than qualified to render this testimony based on his knowledge, training, and education. He has a Ph.D. in finance and has taught undergraduate finance and venture capital classes for over 25 years. ECF No. 120-4 at

PageID.9437. Indeed, he specifically teaches classes on "valuation" or "the effect of information on stock prices." ECF No. 131-2 at PageID.11607. He has published twenty peer-reviewed articles on topics such as financial market theory, security design, and—relevant to his proposed expert opinion—security risk and mortgage lending. *See* 120-4 at PageID.9437–38.

Despite these qualifications, Plaintiffs argue Dr. Garmaise is unqualified to testify about damages methodologies because he has not developed a damages methodology, and instead only contests Coffman's methodology. ECF No. 131 at PageID.11568. But this distinction is without difference. *See Counts v. Gen. Motors*, LLC, 606 F. Supp. 3d 547, 588 (E.D. Mich. 2022) (noting experts may properly offer "rebuttal opinions highlighting the flaws in and limitations of" other experts' work). Plaintiffs then argue that Dr. Garmaise cannot offer expert testimony about Section 10(b) damages because he is "not a legal expert" nor an attorney. ECF No. 131 at PageID.11568. But an expert does not need a law degree to opine about relevant scientific and technical circumstances that may impact a factfinder's damages calculation. Indeed, by Plaintiffs' flawed logic, their own expert would be similarly unqualified to testify about class damages calculations as Chad Coffman is not a legal expert or an attorney, either. *See* ECF No. 111-2 at PageID.8677.

At bottom, Defendants have shown that Dr. Garmaise is qualified, based on his knowledge, experience, and education, to testify as an expert on how shifting market perceptions of Rocket stock throughout the Class Period render artificial inflation—a necessary variable in Plaintiffs' proposed class-wide damages methodology—difficult to quantify. *See* FED. R. EVID. 702.

### 2. Relevancy

The next issue is whether this testimony would help the Court determine whether the proposed Class should be certified. *See* FED. R. EVID. 702(a). As Plaintiffs put it, this dispute "boils

down to whether Plaintiffs or Defendants correctly interpret the requirements at the class certification stage, regarding damages." ECF No. 156 at PageID.16361.

Plaintiffs contend that—to satisfy Rule 23(b)(3)'s predominance requirement, they need not provide "a detailed account of how inflation will be measured" to obtain class certification, so long as they explain, "at a high level," that a specific damages theory or method *can* be implemented common to the Class as a whole. ECF No. 131 at PageID.11559, 1161. Thus, Plaintiffs maintain (1) that Coffman's "out-of-pocket" proposal—under which damages are "equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of the sale," ECF No. 111-2 at PageID.8655–56—is sufficient, so (2) Dr. Garmaise's testimony—explaining how inflation will be difficult to calculate—does not make class certification any more or less likely. ECF No. 131 at PageID.11563–67, 11559 ("Because Coffman does not purport to explain the details of how inflation should be measured, Garmaise cannot add anything to the Court's analysis by commenting on potential matters to be considered when devising a method to measure inflation."). Defendants, on the other hand, cite the 2013 Supreme Court decision *Comcast Corp. v. Behrend* and contend that—to obtain certification— Plaintiffs must show "that 'damages are capable of measurement on a classwide basis' using a methodology" consistent with their theory of liability. ECF No. 151 at PageID.15845 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) (emphasis added)). So, Defendants argue that Dr. Garmaise's proposed expert testimony is relevant and helpful because it highlights several ways in which Plaintiffs have failed to meet their necessary predominance proofs. *Id.*

Under Rule 23(b)(3), Plaintiffs must prove—at the class certification stage—that questions of law or fact common to the proposed Class members predominate over any questions affecting only individual members. FED. R. CIV. P. 23(b)(3). In *Comcast Corp. v. Behrend*, the Supreme

Court clarified two important points about how this predominance requirement intersects with damages. First*,* the Court reiterated that, to satisfy predominance, plaintiffs must establish that damages are "*capable* of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Second, the Court held that courts must conduct a "rigorous analysis" to ensure that a plaintiff's proposed methodology is *consistent* with their theory of liability. *Id.* at 35 (2013). This latter point was central to the Court's holding, which reversed class certification because the plaintiff—seeking to certify a proposed class alleging antitrust violations—proposed a damages model that assumed the validity of four different theories of antitrust liability when three of these theories were expressly rejected by the district court. *Id.* at 36–37 (noting plaintiff's methodology "might have been sound, and might have produced commonality of damages, if all four of those alleged [theories] remained in the case.").

Both Parties selectively interpret *Comcast*—Plaintiffs focus on its *consistency* holding while Defendants focus on its *capability* holding*.* But neither holding is mutually exclusive. To Plaintiffs' point, they need not—at the class certification stage—show "exact[ly]" how damages will be calculated if the proposed Class succeeds at trial, so long as their proposed model is consistent with their theory of liability. *Id.* at 35. But, to Defendants' point, Plaintiffs must show some evidence that their proposed model is "capable of measurement." *Id.* at 34, 37; *see also Speerly v. Gen. Motors, LLC,* 343 F.R.D. 493, 523–24 (E.D. Mich. 2023), *aff'd*, No. 23-1940, 2024 WL 3964115 (6th Cir. Aug. 28, 2024) (noting, at the class certification stage, plaintiffs need only show that damages can "feasibly and efficiently be calculated once the common liability questions are adjudicated." (quoting *Leyva v. Medline Indus. Inc*., 716 F.3d 510, 514 (9th Cir. 2013))).

Accordingly, Dr. Garmaise's testimony is relevant under Federal Rule of Evidence 702. As explained, Rule 702's relevancy—or "helpfulness"—requirement "has been interpreted to

mean that the scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research . . . being offered and the disputed . . . issue[] in the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)). Dr. Garmaise's reliable scientific testimony sufficiently connects to the disputed issue of class certification by rebutting Plaintiffs proposed class-wide damages model and showing that one part of the model—artificial inflation—is less likely to be "feasibly and efficiently" calculated. *See Speerly*, 343 F.R.D. at 524. Although Dr. Garmaise's opinion may not outweigh Coffman's contrary conclusion at the class certification stage, his opinion is nevertheless relevant to the class certification question. *See United States v. Anderson*, 67 F.4th 755, 768 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 552, 217 L. Ed. 2d 294 (2024) (noting disputes about accuracy of proposed expert testimony are matters of weight, not admissibility). For these reasons, Plaintiffs' Motion to Exclude, ECF No. 131, will be denied.

### E. Defendants' Motion to Exclude Chad Coffman's "Rebuttal" Testimony

The last motion considered in this Opinion and Order is not a motion to exclude expert testimony under *Daubert*, but rather a motion to *strike* a proposed rebuttal report for failure to comply with this Court's Scheduling Order and the Federal Rules of Civil Procedure. On March 8, 2024, Plaintiffs filed Chad Coffman's Expert Rebuttal Report, ECF No. 135-2, as an attachment to their reply in support of class certification, ECF No. 134. On March 21, 2024, Defendants filed a motion to strike this "rebuttal" report as improper. ECF No. 150.

Defendants argue that Coffman's rebuttal report is "unauthorized" by this Court's Scheduling Order. *Id.* at PageID.15690–91. Not so. In February 2024, this Court granted Plaintiffs leave to file an amended complaint and a renewed motion for class certification, such that Plaintiffs could add SoCal as a named Plaintiff and a proposed Subclass representative, respectively. ECF

No. 107. In so doing, this Court adjourned the operative Scheduling Order and expressly directed the Parties to file "rebuttal expert reports" by April 29, 2024. *Id.* at PageID.7494. Based on this unambiguous deadline, Coffman's rebuttal report was authorized and timely.

Defendants respond that this Court's April 29, 2024 rebuttal expert deadline "plainly referr[ed]" to *merits*-based expert testimony to be used throughout the Parties' case in chief rather than expert testimony to support *class certification*. ECF No. 159 at PageID.17708. But no such condition appears anywhere in this Court's Scheduling Order. *See* ECF No. 107 at PageID.7494. So how do Defendants read this condition into the Scheduling Order? They make two points: (1) the April 29, 2024 deadline for rebuttal expert testimony falls *after* the Parties' deadlines to brief class certification, and (2) the Parties' prior stipulations referenced two "separate tracks" for expert discovery—one relative to class certification and one relative to merits. ECF No. 159 at PageID.17708. Neither point is persuasive. True, the Parties agreed, in *May 2023*, that expert discovery would proceed on two separate tracks. ECF No. 69 at PageID.2381. Indeed, the Parties have stuck to these separate tracks since, and recently submitted a suite of additional expert reports related to the merits, simultaneous to their summary judgment briefing.[20] But the Parties' 2023 "separate tracks" agreement—just like this Court's 2024 Scheduling Order—provided *one* deadline for rebuttal expert reports, regardless of whether the rebuttal was on the "certification" track or "merits" track. *Compare* ECF No. 69 at PageID.2383 *with* ECF No. 107 at PageID.7494. Indeed, although the deadline to file rebuttal expert reports was scheduled after Plaintiffs' motion for class certification would be fully briefed, so too were the Parties' discovery and general expert

---

[20] Similar to the class certification expert reports addressed in this Opinion and Order, several *Daubert* challenges have been filed related to the Parties' "merits" expert reports. *See* ECF Nos. 169 (sealed); 170; 172 (sealed); 173; 175 (sealed); 176; 177; 180 (sealed); 181; 182 (sealed); 184 (sealed); 185; 186; 189.

disclosure deadlines. *See* ECF No. 107 at PageID.7494 (scheduling expert disclosure deadline on March 27, 2029—two weeks *after* Plaintiffs' renewed motion for class certification would be fully briefed). By Defendants' logic, *all* expert reports related to class certification would be "unauthorized."

Even if this Court's Scheduling Order was ambiguous or silent, Coffman's rebuttal report would still be authorized under the Federal Rules of Civil Procedure. Experts are entitled to file rebuttal reports under Civil Rule 26(a)(2)(D)(ii), so long as the rebuttal report "is intended solely to contradict or rebut the evidence on the same subject matter identified" by an opposing expert and is filed "within 30 days" of the opposing expert's report. FED. R. CIV. P. 26(a)(2)(D)(ii); *Hennigan v. Gen. Elec. Co.*, No. 09-11912, 2014 WL 4415954, at *1 (E.D. Mich. Mar. 25, 2014), *report and recommendation adopted*, No. 09-11912, 2014 WL 4411675 (E.D. Mich. Sept. 8, 2014); *Cason-Merenda v. Detroit Med. Ctr.*, No. 06-15601, 2010 WL 1286410, at *1 (E.D. Mich. Mar. 31, 2010). Defendants do not dispute that Coffman's rebuttal report—filed eleven days after the proposed Defense experts filed their reports—is timely under Rule 26. *See generally* ECF No. 150. Instead, Defendants argue that Coffman's rebuttal report is, "in effect, an entirely new expert report" rather than "a true rebuttal report." ECF No. 150 at PageID.15686, 15691.

But this grossly mischaracterizes Coffman's rebuttal report. Coffman limited his rebuttal report to explaining how his initial market efficiency and damages conclusions are not undermined by Dr. Stulz's and Dr. Garmaise's respective conclusions to the contrary. The entirety of Coffman's rebuttal report can be summarized as follows:

1. Coffman responds to Dr. Stulz's meme-stock conclusion by placing March 2 and 3, 2021 in broader context throughout the Class Period—explaining how the conceded spike in social media mentions, price, and other metrics on these two dates did not impact the remainder of the two-month Class Period and thus did not "disturb" Coffman's market efficiency conclusion. ECF No. 135-2 at

PageID.13346–49, 13356 ("In summary, the events of March 2 and 3 do not imply market inefficiency[.]")

2. Coffman responds to Dr. Stulz's criticisms of Coffman's event study by explaining (A) "even if one were to limit the analysis" from Coffman's 2.5-year Analysis Period to the proposed 2-month Class Period, and (B) "even if one included the [March 2 and 3, 2021] outliers in the analysis," Coffman's conclusion—that the price of Rocket stock historically responded to Rocket disclosures—remains sound. *Id.* at PageID.13360–66.

3. Coffman responded to Dr. Stulz's criticisms of Coffman's "public float" analysis by highlighting analyst reports which supported his initial conclusion that Rocket's public float was between 97% and 100%. *Id.* at PageID.13371.

4. Coffman responded to Dr. Garmaise's conclusions that artificial inflation would be difficult to calculate by explaining how, in Coffman's view, the proposed out-of-pocket view can account for changing macroeconomic conditions, United's ultimatum, and Rocket's purported meme-stock status. *Id.* at PageID.13374–83.

Indeed, Defendants' critique of Coffman's rebuttal report is all form and no substance. Defendants conclusively claim that the rebuttal report "ambush[es]" them with "entirely new expert opinion[s]" ECF No. 150 at PageID.15685. But what "new" opinions did Coffman proffer? Defendants do not say.

At bottom, Chad Coffman's rebuttal report was timely, authorized, and proper. Defendants' motion to strike will be denied.[21]

---

[21] Defendants alternatively seek leave to file sur-rebuttal expert reports from Drs. Stulz and Garmaise which would, in effect, *disagree* with Coffman's *disagreement* with Drs. Stulz and Garmaise's *disagreement* with Coffman's initial report. ECF No. 150 at PageID.15693–94; *see also* ECF Nos. 150-2; 150-3. The decision of whether to allow a party to present a sur-rebuttal is generally committed to the trial court's discretion. *Maker's Mark Distillery, Inc. v. Spalding Grp., Inc.*, No. 319CV00014GNSLLK, 2022 WL 17824427, at *11 (W.D. Ky. Dec. 20, 2022), *clarified on denial of reconsideration sub nom. Maker's Mark Distillery, PBC v. Spalding Grp., Inc.*, No. 319CV00014GNSLLK, 2024 WL 947538 (W.D. Ky. Mar. 5, 2024). Sur-rebuttal expert reports—unlike rebuttal reports—are not contemplated by this Court's Scheduling Order, ECF No. 107 at PageID.7494, nor the Federal Civil Rules. *See* FED. R. CIV. P. 26. Defendants alternative request for leave will thus be denied. *See Melnick v. TAMKO Bldg. Prod. LLC*, No. 219CV02630JARKGG, 2023 WL 2664131, at *4 (D. Kan. Mar. 28, 2023) (denying defendant's motion for leave to file sur-rebuttal expert reports because, although "affirmative and rebuttal

## IV. Conclusion

Accordingly, it is **ORDERED** that Defendants' Motion to Exclude the Expert Testimony

of Chad Coffman, ECF No. 121, is **DENIED.**

Further, it is **ORDERED** that Plaintiffs' Motion to Exclude the Expert Testimony of Dr.

Mark Garmaise, ECF No. 131, is **DENIED.**

Further, it is **ORDERED** that Plaintiffs' Motion to Exclude the Expert Testimony of Dr.

René Stulz, ECF No. 132, is **DENIED.**

Further, it is **ORDERED** that Plaintiffs' Motion to Exclude the Expert Testimony of Dr.

Laura Starks, ECF No. 138 (sealed) and ECF No. 139, is **DENIED.**

Further, it is **ORDERED** that Defendants' Motion to Strike Chad Coffman's Rebuttal

Report, ECF No. 150, is **DENIED.**

**This is not a final order and does not close the above-captioned case.**

Dated: September 30, 2024                         s/Thomas L. Ludington
                                                  THOMAS L. LUDINGTON
                                                  United States District Judge

---

expert disclosures are permitted under" Rule 26, this rule "does not . . . contemplate . . . sur-rebuttal
expert disclosures . . . .[n]or does the Scheduling Order").