**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE CONCHO RESOURCES INC. SECURITIES LITIGATION | Case No. 4:21-cv-02473 |

**LEAD PLAINTIFFS' SUBMISSION OF WRITTEN DIRECT TESTIMONY OF CHAD COFFMAN, CFA IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**January 21, 2025**

## TABLE OF CONTENTS


I. Introduction: Assignment, Qualifications, Materials Reviewed .... 3

A. Assignment .... 3

B. Qualifications .... 4

C. Materials Reviewed .... 4

II. Summary of Opinions – Opening Report .... 4

III. Background .... 5

IV. Opinion #1: Concho Common Stock Traded in an Efficient Market .... 8

A. Cammer Factor 1: Average Weekly Trading Volume .... 10

B. Cammer Factor 2: Analyst Coverage .... 12

C. Cammer Factor 3: Market Makers .... 13

D. Cammer Factor 4: SEC Form S-3 Eligibility .... 15

E. Cammer Factor 5: Price Reaction to New Information .... 16

F. Krogman Factor 1: Market Capitalization .... 24

G. Krogman Factor 2: The Bid-Ask Spread .... 27

H. Krogman Factor 3: Public Float .... 29

I. Additional Factors: .... 30

V. Opinion #2: Class-Wide Damages Can Be Calculated on a Class-Wide Basis Using a Common Methodology .... 35

VI. SUMMARY OF OPINIONS – REBUTTAL REPORT .... 40

A. Rebuttal Opinion #1: Ms. Allen Does Not Dispute Mr. Coffman's Market Efficiency Opinion .... 42

B. Rebuttal Opinion #2: There is Compelling Evidence of Price Impact .... 43

C. Rebuttal Opinion #3: Ms. Allen's "Content Analysis" Does Not Establish a Lack of Back-End Price Impact .... 61

D. Rebuttal Opinion #4: Ms. Allen's Front End Price Impact Analysis is Irrelevant and Flawed .... 71

E. Rebuttal Opinion #5: Ms. Allen Does Not Dispute that the Out-of-Pocket Damages Methodology is Standard and Used in Virtually all Section 10(b) litigation ..... 80

F. Rebuttal Opinion #6: The Out-of-Pocket Methodology is Flexible Enough to Accommodate All of Ms. Allen's Loss Causation Concerns ..... 83

i. The Out-of-Pocket Methodology Can Address the Materialization of Risk Concerns. ..... 89

ii. The Out-of-Pocket Methodology can address changes in information over time ..... 95

iii. The Out-of-Pocket Methodology can easily address pre-merger Concho shareholders ..... 98

G. Rebuttal Opinion #7: Ms. Allen's Discussion of the Premium Received by RSP in The Merger Has Nothing to Do With Artificial Inflation or Plaintiffs' Damages ..... 101

# I. Introduction: Assignment, Qualifications, Materials Reviewed

## A. *Assignment*

**1. Good morning, Mr. Coffman. Can you please tell us a little bit about yourself?**

a. Good morning. I am the president of Peregrine Economics, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of securities litigation.

**2. Who retained you in this case?**

a. I was retained by counsel for Lead Plaintiffs Utah Retirement Systems and Construction Laborers Pension Trust for Southern California (the "Lead Plaintiffs" or "Plaintiffs").

**3. What is the Class Period for this case?**

a. The Class Period is February 21, 2018 through July 31, 2019.

**4. What was your assignment in this case?**

a. I was asked by counsel for Lead Plaintiffs to (i) examine and opine on whether the market for Concho Resources Inc. ("Concho" or the "Company") common stock ("Concho Common Stock") was efficient during the Class Period and (ii) opine on whether calculating damages in this action is subject to a common damages methodology. This work is detailed in my market efficiency report (my "Coffman Opening Report" or "Opening Report") dated December 7, 2023.

**5. Were you asked to do anything else?**

a. Yes. I was asked to review, evaluate, and respond to Ms. Allen's opening report dated March 15, 2024 (the "Allen Report") through a rebuttal report (the "Coffman Rebuttal Report").

### B. *Qualifications*

**6. Can you describe your qualifications?**

a. My qualifications and testifying experience are set out in my Opening Report and Appendix B attached thereto. In short, I have a BA with Honors from Knox College in Economics, a Masters of Public Policy from the University of Chicago, and I am a CFA Charter-holder. I also have over 25 years of experience in analyzing how information affects securities prices. (**Exhibit 1**, Coffman Opening Report, ¶¶3-5 and Appendix B.)

### C. *Materials Reviewed*

**7. What materials did you review to form your opinions in your Opening Report in this matter?**

a. I reviewed materials summarized in Appendix A of my Opening Report, including SEC filings, Concho's press releases, analyst reports, historical trading data, and the Complaint filed in this matter, among other relevant data and documents. (**Exhibit 1**, Coffman Opening Report Appendix A.)

## II. Summary of Opinions – Opening Report

**8. Have you rendered opinions in this matter?**

a. Yes. I have formed opinions both in my Opening and Rebuttal Reports.

**9. What opinions did you form in your Opening Report?**

a. I have formed two opinions in my Opening Report: (i) the market for Concho Common Stock was efficient during the Class Period; and (ii) the damages in this action can be calculated on a class-wide basis using a common methodology consistent with Plaintiffs' theory of liability.

**10. For your common damages methodology opinion, in your opening report, you mentioned "plaintiffs' theory of liability," – what do you mean by that?**

a. I understand that Plaintiffs allege that that the market price of Concho Common Stock was artificially inflated as a result of misrepresentations and/or omissions and that the inflation was dissipated as a result of corrective disclosures that revealed the relevant truth that was concealed by the misrepresentations and/or omissions.

**11. Why is that important?**

a. The Out-of-Pocket damages methodology I describe in my Opening Report is the standard and well-accepted approach to quantifying damages on a class-wide basis for claims of that nature.

## III. Background

**12. What is your understanding of the allegations against Concho and its executives in this case?**

a. Plaintiffs allege that Concho and its executives made materially false and misleading statements and omissions regarding the Company's transition to "large-scale development" or "manufacturing mode," including the risks and outcomes of their well-spacing strategies. I provide my detailed understanding of the allegations in paragraph 13 of my Opening Report. (**Exhibit 1**, Opening

Report ¶13 citing **Exhibit 2**, Consolidated Complaint for Violations of the Federal Securities Laws, Case No.: 4:21-cv-02473, Dkt. 25 ("Complaint").)

13. **Do the Plaintiffs allege that Concho and its executives' statements impacted Concho's stock price?**

 a. Yes.

14. **How are the misstatements alleged to have impacted the stock price?**

 a. Plaintiffs allege that Defendants' false and misleading statements and omissions artificially inflated the stock price, causing harm to purchasers that bought the stock at an inflated price and were ultimately harmed when the truth was revealed. (**Exhibit 1**, Opening Report ¶12.)

15. **What specific aspects of Concho's operations were allegedly misrepresented?**

 a. Defendants allegedly misrepresented the success of and downplayed the risks of its well-spacing strategies, the data supporting these strategies, the risks of aggressive drilling practices, and the economic performance of key projects such as the Dominator. (**Exhibit 1**, Opening Report ¶13 citing **Exhibit 2**, Complaint ¶¶56, 172, 177, 181, 192, 195, 198, 200, 202, 210, 213, 216, 219, 226, 232, 235, 241, 244, 246, 248, 249, 256, 261, 263, 276, 279, 284, 292, 294, 295, 297, 332.)

16. **How did Concho characterize the performance of the Dominator project?**

 a. Concho publicly stated that the Dominator project had "paid off" and that its returns "looked pretty good." (**Exhibit 1**, Opening Report ¶13 citing **Exhibit 2**, Complaint ¶¶292, 295.)

**17. What do Plaintiffs allege about the actual performance of the Dominator project?**

a. Plaintiffs allege that the Dominator project performed poorly, with wells delivering below-average productivity, contrary to Concho's positive public statements. (**Exhibit 1**, Opening Report ¶13; **Exhibit 2**, Complaint ¶¶298-315.)

**18. How did Defendants' statements about the Dominator project allegedly mislead investors?**

a. Defendants' statements allegedly created the false impression that its well-spacing and large-scale development strategies were more successful and economically beneficial than they were in reality. (**Exhibit 1**, Opening Report ¶13 citing **Exhibit 2**, Complaint ¶¶249, 292, 294, 295.)

**19. Do Plaintiffs allege that events eventually revealed the truth about Concho's operations?**

a. Yes.

**20. What events do Plaintiffs allege revealed the alleged truth about Concho's operations?**

a. On July 31, 2019, Concho disclosed that its wells were spaced "too tight," resulting in suboptimal performance, and announced weaker-than-expected production guidance and reduced rig activity. (**Exhibit 1**, Opening Report ¶13 citing **Exhibit 2**, Complaint ¶¶298-315.)

**21. How did Concho's July 31, 2019, disclosures impact the price of Concho Common Stock?**

a. Following these disclosures, Concho's stock price experienced a statistically significant decline. Plaintiffs allege that this stock price decline reflects, at least in part, the removal of artificial inflation caused by the earlier misstatements. (**Exhibit 1**, Opening Report ¶13 citing **Exhibit 2**, Complaint ¶¶298, 305, 394.)

## IV. Opinion #1: Concho Common Stock Traded in an Efficient Market

**22. What is market efficiency?**

a. In the simplest terms, market efficiency concerns the degree to which publicly available information is reflected in the market price of a security. As outlined extensively in my Opening Report, there are three forms of market efficiency and "semi-strong form" is the form that conforms most closely with that adopted for market efficiency in *Basic* and reaffirmed in *Halliburton II*. "Semi-strong form" implies that all widely disseminated, publicly available information is reflected in a security's current market price. More detailed discussion of market efficiency can be found in my Opening Report. (**Exhibit 1**, Opening Report ¶¶14-19 citing **Exhibit 3**, Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970); **Exhibit 4**, *Basic, Inc. v. Levinson,* 485 U.S. 224 (1988); **Exhibit 5**, *Halliburton Co., et al., v. Erica P. John Fund, Inc.,* 134 S. Ct. 2398 (2014).)

**23. What is your understanding of why market efficiency matters in securities litigation?**

a. Because if the market is efficient, it implies that the market price will reflect the value of any misstatements and/or omissions and that the market price will respond rapidly to any corrective disclosure.

**24. In rendering an opinion on market efficiency in this matter, what methodology did you use to assess market efficiency?**

a. I evaluated Concho Comon Stock using the five *Cammer* factors, the 3 *Krogman* factors, and additional indicators of market efficiency to assess whether the market for Concho Common Stock was efficient during the Class Period. (**Exhibit 1**, Opening Report pp. 10-36 citing **Exhibit 6**, *Cammer, et al., v. Bruce M Bloom, et al.,* 7 11 F. Supp. 1264 (D.N.J. 1989); **Exhibit 7**, *Krogman v. Sterritt,* 202 F.R.D. 467 (N.D. Tex. 2001).)

**25. What are the *Cammer* factors?**

a. In *Cammer v. Bloom,* the Court identified five factors that it deemed were useful in evaluating market efficiency. The factors are: (i) average weekly trading volume; (ii) analyst coverage; (iii) market makers; (iv) SEC Form S-3 eligibility; and (v) a cause-and-effect relationship between new information and changes in the market price of the relevant security. The *Cammer* factors provide a framework for evaluating market efficiency in securities litigation. I discuss the *Cammer* factors and their application in this matter in great detail in my Opening Report and summarize the results of my application of the *Cammer* factors to Concho Common Stock in **Exhibit 1** of my Opening

Report. (**Exhibit 1**, Opening Report ¶¶20, 24-65 and **Exhibit 1** to the Opening Report citing **Exhibit 6**, *Cammer, et al., v. Bruce M Bloom, et al.,* 7 11 F. Supp. 1264 (D.N.J. 1989).)

**A. *Cammer Factor 1: Average Weekly Trading Volume***

**26. How does average weekly trading volume relate to market efficiency?**

a. High average weekly trading volume indicates liquidity and investor participation, which supports the rapid incorporation of new information into the stock price.

**27. Did the *Cammer* court articulate thresholds for average weekly trading volume that it found allowed a presumption of efficiency?**

a. Yes.

**28. What threshold for trading volume did the *Cammer* court establish?**

a. The *Cammer* court suggested that average weekly trading volume of at least 2% of shares outstanding justifies a strong presumption of market efficiency, while 1% justifies a substantial presumption. (**Exhibit 1**, Opening Report ¶26 citing **Exhibit 6**, *Cammer, et al., v. Bruce M Bloom, et al.,* 7 11 F. Supp. 1264 (D.N.J. 1989) (citing **Exhibit 8**, Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud* § 8.6. (Aug. 1988).)

**29. What was the average weekly trading volume for Concho Common Stock during the Class Period?**

a. The average weekly trading volume for Concho Common Stock was 5.54% of shares outstanding or 10.04 million shares. (**Exhibit 1**, Opening Report ¶28.)

**30. How does the trading volume of Concho Common Stock compare to the threshold established in *Cammer*?**

a. The trading volume of Concho Common stock far exceeds the 2% threshold for a strong presumption of market efficiency cited by *Cammer*. (**Exhibit 1**, Opening Report ¶28.)

**31. Did you compare Concho's trading volume to the average for NYSE and NASDAQ stocks?**

a. Yes. (**Exhibit 1**, Opening Report ¶28).

**32. Why?**

a. Many financial economists presume that stocks on the major exchanges trade in informationally efficient markets. If the trading volume of Concho is not unusually low relative to other stocks that trade on the major exchanges, then that would further support the presence of an efficient market.

**33. How does Concho's trading volume compare to the average for NYSE and NASDAQ stocks?**

a. Concho's average weekly trading volume of 5.54% during the Class Period exceeded the average weekly trading volume of 2.09% for stocks on the NYSE and NASDAQ during the same period. (**Exhibit 1**, Opening Report ¶28 and **Exhibit 3** to the Opening Report.)

**34. To sum this up, does your analysis of *Cammer* factor 1 provide evidence that supports the finding that Concho Common Stock traded efficiently?**

a. Yes, I concluded that the average weekly trading volume provides economic evidence supportive of the conclusion that Concho Common Stock traded efficiently during the Class Period.

**B. *Cammer Factor 2: Analyst Coverage***

**35. Given that analyst coverage is *Cammer* factor 2, is it fair to say that it is an important factor for assessing market efficiency?**

a. Yes.

**36. Why is analyst coverage an important factor for assessing market efficiency?**

a. Significant analyst coverage implies that there is sufficient interest in a company and its securities, an active market for information regarding a company and its securities, and that information about the company is widely distributed. (**Exhibit 1**, Opening Report ¶32.)

**37. How many financial firms covered Concho during the Class Period?**

a. At least 21 firms covered Concho during the Class Period, including major firms like RBC Capital, J.P. Morgan, and UBS. (**Exhibit 1**, Opening Report ¶33 and **Exhibit 4** to the Opening Report.)

**38. How many analyst reports were issued on Concho during the Class Period?**

a. At least 251 reports were issued on Concho. (**Exhibit 1**, Opening Report ¶33 and **Exhibit 4** to the Opening Report.)

**39. In analyzing this *Cammer* factor, did you consider other forms of information dissemination beyond analyst reports?**

a. Yes, I considered other sources of information, including Concho's SEC filings, press releases, and coverage in financial news outlets.

**40. Why did you consider these other sources of information?**

a. Since the *Cammer* decision was issued, technology has advanced and increased the number of ways, and speed in which, information is disseminated to investors. (**Exhibit 1**, Opening Report ¶34.)

**41. With respect to *Cammer* factor 2, did you reach any conclusions?**

a. Yes.

**42. What have you concluded with respect to *Cammer* factor 2?**

a. The second *Cammer* factor supports the finding that Concho Common Stock traded in an efficient market during the Class Period because there was a robust and active market for public information regarding Concho particularly from analyst reports and substantial public dissemination of news and other information. (**Exhibit 1**, Opening Report ¶36.)

**C. *Cammer Factor 3: Market Makers***

**43. What is a market maker?**

a. A market maker is an entity that serves as an intermediary between buyers and sellers by expressing a willingness to buy and sell a security by posting bid and ask quotes which investors can execute if they so desire. (**Exhibit 1**, Opening Report ¶37 citing **Exhibit 9**, https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.)

**44. What is the role of market makers in assessing market efficiency?**

a. Market makers provide liquidity by regularly quoting prices at which they are willing to buy and sell shares, thus facilitating trading activity and ensuring that prices reflect supply and demand. (**Exhibit 1**, Opening Report ¶38 citing

**Exhibit 10**, Brad M. Barber, et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285 (1994).)

**45. Did Concho trade on a major exchange?**

a. Yes, Concho traded on the NYSE.

**46. Is the number of market makers something to consider for this *Cammer* factor?**

a. Yes. However, when a security, such as Concho Common Stock, trades on a major exchange like the NYSE, the specific number of market makers is less relevant since the rules of the major exchanges essentially guarantee a liquid market; in addition, the major exchanges like the NYSE utilize computerized systems to match buy and sell orders and facilitate trading that does not rely on market makers. (**Exhibit 1**, Opening Report ¶40 citing **Exhibit 11**, Introduction and Appendices at https://www.nyse.com/publicdocs/nyse/NYSE_IPO_Guide_Third_Edition.pd; **Exhibit 12**, WILLIAM SHARPE, GORDON J. ALEXANDER, AND FRANK J. JONES, FOUNDATIONS OF FINANCIAL MARKETS AND INSTITUTIONS 18-A-1 (4th ed. 2010); **Exhibit 13**, https://www.nyse.com/market-model; **Exhibit 14**, https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities.)

**47. What threshold for market makers did the *Cammer* court suggest?**

a. The *Cammer* court suggested that having ten market makers justifies a strong presumption of market efficiency, while five market makers justify a modest presumption.

**48. Did you determine the number of market makers for Concho Common Stock during the Class Period?**

a. Yes.

**49. How many market makers did Concho Common Stock have during the Class Period?**

a. 123.

**50. With respect to *Cammer* factor 3, have you reached any conclusions?**

a. Yes.

**51. What have you concluded for this factor?**

a. Concho Common Stock easily meets the letter and spirit of this factor, further supporting market efficiency during the Class Period. (**Exhibit 1**, Opening Report ¶41.)

**D. *Cammer Factor 4: SEC Form S-3 Eligibility***

**52. What is SEC Form S-3 eligibility, and why is it relevant?**

a. Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference and not repeat the information, since it is already deemed to be widely available public information. (**Exhibit 1**, Opening Report ¶43 citing **Exhibit 15**, www.sec.gov/about/forms/forms-3.pdf.)

**53. What are some of the criteria a company must meet to file Form S-3?**

a. A company must be subject to reporting requirements of the Securities Exchange Act of 1934 for more than one year, have timely filed SEC reports

for the past twelve months, and not have defaulted on debt obligations or failed to pay dividends or sinking funds. (**Exhibit 1**, Opening Report ¶43.)

**54. Was Concho eligible to file Form S-3 during the Class Period?**

a. Yes, Concho was eligible and filed a Form S-3ASR during the Class Period. Throughout the Class Period, Concho was subject to SEC filing requirements for more than one year, filed all documents in a timely manner for the preceding twelve months, and did not fail to meet its debt obligations or to pay dividends or sinking funds. (**Exhibit 1**, Opening Report ¶44 citing **Exhibit 15**, www.sec.gov/about/forms/forms-3.pdf; **Exhibit 16**, https://www.sec.gov/Archives/edgar/data/1358071/000119312518192210/d605035ds3asr.htm.)

**55. Did you reach a conclusion on this fourth *Cammer* factor?**

a. Yes.

**56. What have you concluded?**

a. Concho's eligibility to file Form S-3 indicates that Concho met the necessary criteria for providing sufficient public information, supporting the conclusion of market efficiency.

### E. *Cammer Factor 5: Price Reaction to New Information*

**57. Why is price reaction to new information an important factor in assessing market efficiency?**

a. Since the definition of market efficiency is that the market rapidly reflects information, showing a cause-and-effect relationship between the release of new information and changes in the market price provides important

economic evidence of an efficient market. (**Exhibit 1**, Opening Report ¶¶45-46.)

**58. How did you evaluate whether there is evidence of price reaction to new information for Concho Common Stock?**

a. Broadly speaking, I performed statistical tests that scientifically demonstrate there was evidence of larger price changes and larger volume on earnings announcements when compared to a control group of days with no news related to Concho. (**Exhibit 1**, Opening Report ¶¶46-65.)

**59. What method is commonly used to evaluate price reactions to new information?**

a. Event studies are commonly used to measure the impact of company-specific news events on a company's stock price. Event studies have been used for over 50 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices. (**Exhibit 1**, Coffman ¶46 citing **Exhibit 17**, A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE, 13 (1997); **Exhibit 18**, John J. Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. 111 (1998).)

**60. What is an event study?**

a. An event study involves performing a statistical analysis to first determine how the security of interest is correlated with market and industry factors. Then, once controlling for those factors on the event date of interest, it involves evaluating what portion of the stock price movement is unexplained

and then statistically testing whether that unexplained price movement is sufficiently large that one can reject randomness as the cause and thus infer that the new information on that day caused the stock price to move. (**Exhibit 1**, Coffman ¶¶49-54.)

**61. Did you conduct an event study for Concho Common Stock?**

a. Yes, I conducted an event study to assess how the price of Concho Common Stock reacted on the earnings announcement days and the days with no Concho news. (**Exhibit 1**, Opening Report ¶¶56-60.)

**62. How did you go about conducting that event study?**

a. For each day I tested, I ran a regression over the prior 120 trading days to evaluate the relationship between Concho Common Stock and the S&P 500 Total Return Index (the "Market Index") and an equal weighted peer index ("Peer Index"). The only exception was that if the event occurred within 120 days of the announcement of the RSP merger, I estimated the relationship over the first 120 days after the announcement. The reason is that I did not want to evaluate a post-merger event using a regression that incorporated pre-merger return data. For each day, I then evaluated how much of the stock price change was "expected" based upon the regression model and how much of the price change was "unexpected." I refer to this "unexpected" portion as the "abnormal return." I then evaluated whether the abnormal return was statistically significant. In other words, was the abnormal return sufficiently large that I could reject randomness as the cause. (**Exhibit 1**, Opening Report ¶¶50-60 and Opening Report **Exhibit 7**, citing **Exhibit 19**, Nihat Aktas et al.,

*Event studies with a contaminated estimation period*, J. OF CORP. FIN. 13 (2007); **Exhibit 20**, *Concho Resources Inc. to Acquire RSP Permian, Inc. in All-Stock Transaction*, BUS. WIRE (Mar. 28, 2018); **Exhibit 17**, A. Craig MacKinlay, *Event Studies in Economics and Finance,* 35 J. ECON. LITERATURE 15 (1997); **Exhibit 21**, Phillip A. Braun, *Good News, Bad News Volatility, and Betas,* 50 J. FIN. 1575, 1597 (1995); **Exhibit 22**, THE NAT'L ACAD. PRESS, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011); **Exhibit 23**, William H. Beaver, *The Information Content of Annual Earnings Announcements*, 6 EMPIRICAL RSCH. IN ACCT.: SELECTED STUDIES, supplement to J. OF ACCT. RSCH. (1968); **Exhibit 24**, Robert G. May, *The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes*, 9 EMPIRICAL RSCH. IN ACCT.: SELECTED STUDIES, supplement to J. OF ACCT. RSCH. (1971); **Exhibit 25**, Joseph Aharony & Itzhak Swary, *Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis*, 35 J. OF FIN. (1980).)

**63. Over what time period did you conduct these tests?**

a. In order to enhance the power of my statistical tests I considered earnings announcements and no news dates from one year prior to the beginning of the Class Period to the beginning of the COVID-19 pandemic, or roughly 8 months after the end of the Class Period. I refer to this as the Analysis Period. I would have used a full year after the Class Period, but there was evidence

that the return generating process for Concho changed with the onset of the pandemic. (**Exhibit 1**, Opening Report ¶50.)

**64. What were the findings of your event study?**

a. I found clear evidence of a cause-and-effect relationship between the release of new news and changes in the market price of Concho Common Stock. In particular, I found that there was a much higher incidence of statistically significant price movements, much larger abnormal returns, and higher volume on the earnings announcement dates than on the control group of "no news" days. (**Exhibit 1**, Opening Report ¶¶57-65.)

b. My Opening Report contained the graphs repasted below depicting the analysis:









(**Exhibit 1**, Opening Report ¶¶62-63.)

**65. What does the top graph depict?**

a. I analyzed the market reaction to Concho's earnings announcements and found that, of the thirteen earnings announcements Concho issued during the Analysis Period, eight resulted in statistically significant price movements

above the 95% confidence level, or 62%. I then compared these results against the 205 days during the Analysis Period where I identified no Concho-related news from the Factiva database and when there were no analyst reports or SEC filings issued to my knowledge. Of these 205 days, there were just four statistically significant price movements, or 2%. This difference between the 62% and 2% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level). This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Concho Common Stock.

**66. What does the middle graph depict?**

a. I found that the average magnitude of the abnormal returns on earnings announcements was 4.7% as compared to the average of only 0.8% on the 205 days with no news. This difference is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level). In other words, the average magnitude of stock price movement on earnings announcement days was over 6 times higher than on no news days. This also demonstrates that on days when important company-specific information is released to the market, the stock price moves much more than on days where there is no Concho-specific news. This provides further evidence of a cause-and-effect relationship between company-specific news and changes in the price of Concho Common Stock, and thus an efficient market.

**67. What does the bottom graph depict?**

a. That the average daily trading volume of the thirteen days with earnings announcements was 5.1 million. Compare this to the average daily trading volume of 1.5 million for days where there is no news in the Analysis Period. This difference is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

**68. Did you generate any exhibits in your Opening Report that summarized the findings from your event study?**

a. Yes. Exhibit 8 of my Opening Report, which is shown below here:

**Exhibit 8**
**Comparison of Statistical Significance and Abnormal Returns of Event Study Results for Concho Earnings Announcements vs. Days with No News during the Analysis Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [(1)] | 13 | 205 |
| Significant Days at 95% Confidence Level | 8 | 4 |
| % Significant Days at 95% Confidence Level [(2)] | 61.54% | 1.95% |
| Average Absolute Abnormal Return [(3)] | 4.69% | 0.76% |
| Average Volume (Millions) [(4)] | 5.1 | 1.5 |

Notes:
(1) Results are based on the Analysis Period. For the purposes of this analysis, I selected the 205 days with no news. Days with no news were days that had zero news articles via the Factiva database, and no analyst reports or SEC filings were issued to my knowledge.
(2) 61.54% rate of statistical significance is statistically significantly different than 1.95% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.
(3) 4.69% absolute return is statistically significantly different than 0.76% based on a t-test for difference of means at the 99% confidence level.
(4) The difference between 5.1 million and 1.5 million is statistically significant at the 99% confidence level.

(**Exhibit 1**, Exhibit 8 to the Opening Report.)

**69. What is being depicted in this table?**

a. The table above, which appears as Exhibit 8 in my Opening Report, summarizes the results of the bar charts that I previously described. It compares the proportion of days that are statistically significant, the magnitude of the abnormal returns, and the volume for the thirteen earnings announcements during the Analysis Period to the 205 "no news" days.

**70. Did you reach a conclusion with respect to the fifth *Cammer* factor?**

a. Yes.

**71. What have you concluded?**

a. Based on my event study, there was a clear cause-and-effect relationship between new material news and rapid changes in the price of Concho Common Stock, which further supports a finding of market efficiency.

### F. *Krogman Factor 1: Market Capitalization*

**72. Did you evaluate additional factors beyond the *Cammer* factors to assess market efficiency?**

a. Yes, I evaluated, under *Krogman v. Sterritt* (**Exhibit 7**), the following additional factors: market capitalization, bid-ask spread, and public float as additional indicators of efficiency. I also analyzed institutional ownership, autocorrelation, and options trading activity.

**73. Starting with the *Krogman* factors, what was the first factor you evaluated?**

a. Market Capitalization

**74. Why is market capitalization considered an indicator of market efficiency?**

a. Market capitalization, which is the total dollar value of the outstanding stock, is an indicator of a Company's size. Larger companies typically attract more investor interest, analyst coverage, and institutional ownership. These factors are likely correlated with market efficiency. (**Exhibit 1**, Opening Report ¶66 citing **Exhibit 26**, Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 117 (2000).)

**75. What was the market capitalization of Concho Common Stock during the Class Period?**

a. Based on the market price and total shares outstanding, the market capitalization for Concho Common Stock averaged $23.48 billion during the Class Period. Exhibit 9 of my Opening Report shows the market capitalization of Concho Common Stock over the Class Period. (**Exhibit 1**, Opening Report ¶ 67; Exhibit 9 of the Opening Report.)

**Exhibit 9**
**Concho Common Stock Market Capitalization**
**2/21/2018 - 1/15/2021**




Sources: Complaint, SEC Filings, and S&P Capital IQ.

**76. How does the market capitalization of Concho Common Stock compare to the general market?**

a. During the applicable quarters of the Class Period, the market capitalization Concho Common Stock ranged from the 91st to 95th percentile of firms listed on the combined NYSE and NASDAQ exchanges. Concho Common Stock market capitalization placed it among the largest publicly traded firms. I summarized the market capitalization ranking of Concho Common Stock in Exhibit 10 of my Opening Report. (**Exhibit 1**, Opening Report ¶¶67-68; Exhibit 10 of the Opening Report.)

**Exhibit 10**
**Concho Common Stock**
**Market Capitalization Rankings**

| Last trading day of: | Market Capitalization (billions) | Percentile Rank on NYSE & NASDAQ |
|---|---|---|
| Q1 2018 | $22.41 | 94% |
| Q2 2018 | $20.62 | 94% |
| Q3 2018 | $30.59 | 95% |
| Q4 2018 | $20.58 | 94% |
| Q1 2019 | $22.26 | 94% |
| Q2 2019 | $20.70 | 93% |
| Q3 2019 | $13.65 | 91% |

Source: Bloomberg, SEC Filings, and S&P Capital IQ.

**77. Did you reach a conclusion on this first *Krogman* factor?**

a. Yes.

**78. What have you concluded?**

a. The market capitalization of Concho Common Stock, which was consistently large relative to other publicly traded companies, supported the conclusion of an efficient market.

## G. *Krogman Factor 2: The Bid-Ask Spread*

**79. What is the bid-ask spread, and why is it relevant to market efficiency?**

a. The bid-ask spread is the difference between the highest price a buyer is willing to pay (bid) and the lowest price a seller is willing to accept (ask). The spread represents a measure of the cost to transact in a market. Narrow spreads indicate less uncertainty regarding valuation, low transaction costs, and that reasonably sized trades will not substantially impact the market price,

which are characteristics of an efficient market. (**Exhibit 1**, Opening Report ¶70.)

**80. How did you analyze bid-ask spreads for Concho Common Stock?**

a. I compared the time-weighted average percentage bid-ask spread for Concho Common Stock in each month (which was between 0.012% and 0.028%) to a random sample of 100 other common stocks trading on the NYSE and NASDAQ in August 2018 (which was the full month during the Class Period where the bid-ask spread for Concho Common Stock had the largest percentage), which had an average bid-ask spread of 0.57%. I summarize my results in Exhibit 11 of my Opening Report. (**Exhibit 1**, Opening Report ¶71; Exhibit 11 of the Opening Report.)



Source: Thomson Reuters Eikon and TICK Data.
Note: February 2018 data is limited to the Class Period.

**81. What were the findings regarding Concho Common Stock's bid-ask spread?**

a. The bid-ask spreads for Concho Common Stock were significantly narrower than the average for the 100 common stocks trading on the NYSE and NASDAQ exchanges. (**Exhibit 1**, Opening Report ¶71.)

**82. Did you reach a conclusion on this second *Krogman* factor?**

a. Yes.

**83. What have you concluded?**

a. Concho Common Stock's bid-ask spread was low during the Class Period, and this factor further supports market efficiency for Concho Common Stock.

**H. *Krogman Factor 3: Public Float***

**84. What is public float?**

a. It is the proportion of shares not held by insiders.

**85. Why is this relevant for market efficiency?**

a. High public float is indicative of greater liquidity and more active trading, supporting the conclusion that the market for Concho Common Stock was efficient.

**86. How did you go about assessing the public float for Concho Common Stock?**

a. I obtained the number of shares outstanding of Concho Common Stock from Concho's quarterly and annual SEC filings and, from S&P Capital IQ, the number of insider holdings for each of the quarters during the Class Period. Then, for each quarter of the Class Period, I divided the number of insider holdings for each quarter by the total number of shares outstanding. I then calculated the average of the values within the quarters of the Class Period.

**87. What were your findings?**

a. During the Class Period, insiders held, on average, 1.02% of all outstanding shares of Concho Common Stock. This means that approximately 99% of Concho's shares were held by non-insiders and, thus, freely tradeable. I summarize my results in Exhibit 12 of my Opening Report. (**Exhibit 1**, Opening Report ¶72; Exhibit 12 of the Opening Report.)

**88. Did you reach a conclusion with respect to this final *Krogman* factor?**

a. Yes.

**89. What have you concluded?**

a. The large percentage of Concho Common Stock held by non-insiders supports a finding of market efficiency for Concho Common Stock.

## I. Additional Factors:

**90. Aside from the *Cammer* and *Krogman* factors, what other factors did you analyze in evaluating whether an efficient market existed for Concho Common Stock during the Class Period?**

a. I analyzed institutional ownership, autocorrelation, and options trading activity.

**91. Why is institutional ownership relevant to market efficiency?**

a. Institutional investors are considered sophisticated market participants with the resources to be well informed regarding securities they invest in and own. Therefore, the presence of a significant amount of institutional investors would be supportive of market efficiency.

**92. What was institutional ownership like for Concho Common Stock during the Class Period?**

a. There were at least 1,041 institutions that held Concho Common Stock during the Class Period. Institutions held a vast majority of the public float. My results are summarized in Exhibit 12 of my Opening Report. (**Exhibit 1**, Coffman ¶73; Exhibit 12 of the Opening Report.)

Exhibit 12
Concho Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings

| Date<br>[1] | Shares Outstanding (in 000s)<br>[2] | Total Institutions Owning Stock<br>[3] | Insider Holdings (in 000s)<br>[4] | Short Interest (in 000s)<br>[5] | Public Float (in 000s)<br>[6] = [2] + [5] - [4] | Insider Holdings % of Shares Outstanding<br>[7] = [4] / [2] | Total Institutional Holdings (in 000s)<br>[8] | Institutional Holdings % of Shares Outstanding<br>[9] = [8] / [2] | Institutional Holdings % of Public Float<br>[10] = [8] / [6] |
|---|---|---|---|---|---|---|---|---|---|
| 12/31/2017 | 148,696 | 667 | 1,487 | 5,741 | 152,951 | 1.00% | 146,141 | 98% | 96% |
| 3/31/2018 | 149,068 | 691 | 1,617 | 4,952 | 152,403 | 1.08% | 148,807 | 100% | 98% |
| 6/30/2018 | 149,072 | 685 | 1,613 | 13,308 | 160,766 | 1.08% | 158,651 | 106% | 99% |
| 9/30/2018 | 200,264 | 726 | 1,819 | 6,025 | 204,470 | 0.91% | 193,100 | 96% | 94% |
| 12/31/2018 | 200,250 | 715 | 1,819 | 6,858 | 205,289 | 0.91% | 192,348 | 96% | 94% |
| 3/31/2019 | 200,594 | 671 | 2,192 | 6,510 | 204,912 | 1.09% | 193,972 | 97% | 95% |
| 6/30/2019 | 200,594 | 682 | 2,051 | 6,917 | 205,461 | 1.02% | 195,945 | 98% | 95% |
| 9/30/2019 | 201,079 | 635 | 2,074 | 6,884 | 205,889 | 1.03% | 193,261 | 96% | 94% |
| Total Institutions over Class Period: | | 1,041 | | | Class Period Average: | 1.02% | | 98.85% | 95.75% |

Sources: S&P Capital IQ and SEC filings.
Note: S&P Capital IQ updates short interest every two weeks while updates to institutional holdings via 13-F filings are only available every quarter; therefore, occasionally the time difference in data updates may cause institutional holdings to appear to exceed shares outstanding and the public float.

**93. Did you reach a conclusion with respect to the institutional ownership factor?**

a. Yes.

**94. What have you concluded?**

a. The substantial level of institutional ownership of Concho Common Stock coupled with the high trading volume further supports a conclusion of market efficiency.

**95. What was the next factor you considered?**

a. Autocorrelation.

**96. What's that?**

a. It is the ability of previous price movements of a security to predict future price movements. (**Exhibit 1**, Opening Report ¶74.)

**97. Why is autocorrelation relevant to market efficiency?**

a. If autocorrelation in a security is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency. (**Exhibit 1**, Opening Report ¶75 citing **Exhibit 27**, Doron Avramov, Tarun Chordia & Amit Goyal, *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); **Exhibit 28**, Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95-101 (1978).)

**98. What methodology did you use to test for autocorrelation?**

a. In order to analyze autocorrelation, I utilized the regression analysis I described above for *Cammer* factor 5. Specifically, I analyzed the regression and whether, on average, the abnormal return (that is, the difference in the actual daily return and the expected return) from the previous day had a statistically significant effect on the abnormal return on the current day. If the previous day's abnormal return had no statistically significant predictive power, then I was able to conclude that there was no evidence of autocorrelation. (**Exhibit 1**, Opening Report ¶76 citing **Exhibit 29**, WILLIAM H. GREENE, ECONOMETRIC ANALYSIS 644 (6th ed. 2008).)

**99. What were the results of your autocorrelation analysis?**

a. There was no evidence of autocorrelation in the trading of Concho Common Stock during the Analysis Period (which includes the Class Period). In other words, prior price movements were not predictive of future price movements and investors could not consistently predict abnormal movements and earn arbitrage profits. I summarize my results in Exhibit 13 of my Opening Report. (**Exhibit 1**, Opening Report ¶77; Exhibit 13 of the Opening Report.)

**Exhibit 13**
**Concho Common Stock**
**Test for Autocorrelation During the Analysis Period[1]**

| Quarter | Coefficient on Previous Day's Abnormal Return [2] | t-Statistic | Sig Level [3] |
|---|---|---|---|
| Q1 2017 | 0.29 | 1.69 | |
| Q2 2017 | 0.13 | 0.93 | |
| Q3 2017 | 0.10 | 0.76 | |
| Q4 2017 | 0.10 | 0.81 | |
| Q1 2018[5] | -0.39 | -3.14 | *** |
| Q2 2018 | 0.16 | 1.29 | |
| Q3 2018 | 0.21 | 1.93 | * |
| Q4 2018 | 0.25 | 2.00 | * |
| Q1 2019 | -0.01 | -0.11 | |
| Q2 2019 | -0.15 | -1.19 | |
| Q3 2019 | -0.22 | -1.77 | * |
| Q4 2019 | -0.02 | -0.18 | |
| Q1 2020 | -0.24 | -1.35 | |
| **Analysis Period[3]** | **0.00** | **0.07** | |

Source: S&P Capital IQ.
Notes:
(1) I also found no evidence of autocorrelation during the Class Period.
(2) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. Earnings announcements and the alleged corrective disclosure date have been removed from estimation.
(3) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. * Denotes statistical significance at the 90% confidence level or greater.
(4) Earnings announcements and the alleged corrective disclosure date have been removed from estimation.
(5) The coefficient that is statistically significant at the 99% level in Q1 2018 is driven by the announcement that Concho would acquire RSP Permian - when the date of the announcement is excluded, the quarter is no longer significant at the 95% level.

**100. Did you reach a conclusion with respect to this autocorrelation factor?**

a. Yes.

**101. What have you concluded?**

a. The non-existence of autocorrelation in Concho Common Stock during the Class Period suggests that Concho Common Stock traded in an efficient market.

**102. What was the next factor you considered?**

a. Options trading activity.

**103. Why is options trading relevant to market efficiency?**

a. Options listings are associated with a decrease in bid-ask spread and an increase in quoted depth, trading volume, trading frequency, and transaction size. These are all improvements to market quality for the underlying stocks. (**Exhibit 1**, Opening Report ¶78 citing **Exhibit 30**, Stephen A. Ross, *Options and Efficiency*, 90 Q.J. ECON. 75 (1976); **Exhibit 31**, Raman Kumar, Atulya Sarin & Kuldeep Shastri, *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).)

**104. What did your analysis reveal regarding options trading for Concho Common Stock during the Class Period?**

a. There was considerable options trading for Concho Common Stock during the Class Period. According to Bloomberg, there were 253,971 put contracts and 492,794 call contracts for Concho Common Stock that traded during the Class

Period. (**Exhibit 1**, Opening Report ¶78 and n.88; citing **Exhibit 32**, Options Data Obtained from Bloomberg.)

**105. Did you reach a conclusion with respect to this options trading factor?**

a. Yes.

**106. What have you concluded?**

a. The considerable options trading for Concho Common Stock during the Class Period supports that the stock traded in an efficient market during the Class Period.

**107. Overall, based on the factors we discussed, what is your opinion as to the market efficiency of Concho Common Stock?**

a. Every factor that I analyzed and have described here and in my Opening Report supports my opinion that Concho Common Stock traded in an efficient market during the Class Period.

## V. Opinion #2: Class-Wide Damages Can Be Calculated on a Class-Wide Basis Using a Common Methodology

**108. Let's move on to your second opinion in your Opening Report. What was your assignment for this opinion?**

a. I was asked to opine on whether per share damages could be measured for all purchasers of Concho Common Stock during the Class Period using a

common methodology that is consistent with Lead Plaintiffs' theory of liability. (**Exhibit 1**, Opening Report ¶79.)

109. **Have you reached an opinion about whether a common methodology exists for the proposed Class?**

a. Yes. Class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

110. **When you say common methodology, what do you mean?**

a. I mean a methodology that can calculate per share damages for all purchasers of Concho Common Stock during the Class Period based solely on their trading activity and without regard to any other individualized information.

111. **Were you asked to calculate damages in this matter?**

a. No. (**Exhibit 1**, Opening Report ¶84.)

112. **What is your understanding of why you were not asked to calculate damages at this time?**

a. Although I have laid out a robust and flexible methodology for calculating class-wide damages in this matter based on whatever artificial inflation per share is determined, I understand it is unnecessary to calculate the inflation per share that would flow into that methodology because it would depend on the results of a detailed loss causation analysis. Moreover, the loss causation analysis would depend on assumptions given to me by Counsel regarding what they expect to prove and may depend on information learned in discovery. Moreover, in my experience, there is often information learned in discovery that may assist in the loss causation analysis, including, but not

limited to, information that would assist in disaggregating between fraud-related and non-fraud related portions of any relevant price movements on corrective disclosures.

113. **What methodology did you conclude is appropriate for calculating damages in this case?**

a. I concluded that the out-of-pocket methodology is appropriate for calculating damages in this case.

114. **What is the out-of-pocket methodology?**

a. The out-of-pocket methodology calculates damages as the difference between the amount of artificial inflation per share at the time of purchase minus the amount of artificial inflation per share at the time of sale. If the shares are not sold before the full revelation of the fraud, then damages are calculated as the artificial inflation at the time of the purchase subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision. This provision limits damages but that limitation can be applied class-wide as well. Once artificial inflation per share has been quantified on each day during the Class Period, the calculation for each class member is formulaic based upon trading activity that could be collected in a claims process. (**Exhibit 1**, Coffman ¶¶79-80.)

115. **Have you used this methodology before?**

a. Yes, this methodology has been used in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert. It is a

well-accepted methodology for calculating class-wide damages in cases under Section 10(b) of the Exchange Act. (**Exhibit 1**, Opening Report ¶79.)

116. **Why is the out-of-pocket methodology widely accepted in securities litigation?**

a. It is widely accepted because it directly measures the economic harm caused by per share artificial inflation in the stock price due to alleged misstatements or omissions.

117. **How does this methodology align with Plaintiffs' theory of liability?**

a. The methodology aligns perfectly with Plaintiffs' theory of liability by isolating the per share artificial inflation caused by the alleged misstatements and measuring the removal of this per share artificial inflation after corrective disclosures of the relevant truth concealed by the alleged misstatements.

118. **What is a corrective disclosure in the context of securities litigation?**

a. A corrective disclosure is a public disclosure of a portion of the relevant truth that has been concealed by misstatements and/or omissions.

119. **How are corrective disclosures relevant to the damages analysis?**

a. Corrective disclosures are analyzed to evaluate whether the market price responded to the revelation of the relevant truth and thus dissipated artificial inflation.

120. **How is it determined whether a stock price decline is attributable to a corrective disclosure?**

a. As I mentioned earlier, a loss causation analysis would help determine whether a stock price decline can be attributed to a release of corrective

information. Through the use of an event study, for example, the loss causation analysis would control for other factors, such as market-wide and industry-specific movements, to isolate the impact of the corrective disclosure on the stock price. It would also be important to consider the impact, if any, of confounding information – that is, information unrelated to the alleged misstatements being corrected by the corrective disclosure – on the stock price decline.

**121. Why is isolating the impact of corrective disclosures important?**

a. Doing so ensures that class-wide damages are attributed solely to the alleged misstatements and omissions, rather than to unrelated market factors.

**122. Can you describe what a detailed loss causation analysis might consider?**

a. Yes. I provided a further explanation in paragraph 82 of my Opening Report. In summary, in order to conduct an evaluate loss causation, I would typically start with an event study of any potential corrective disclosures. So, here, if we said that revelation was that Concho had reduced current and forecasted production due to its wells being spaced too tightly (information that was alleged concealed by some material misrepresentation and/or omission), I would evaluate whether there was a statistically significant abnormal response to the news on that day. I would also need to determine whether confounding information (non-fraud related information) exists and to what extent price reactions on a particular day are caused by such confounding information. That analysis might require the application of valuation techniques as described in paragraph 82 of my report and in my experience that analysis can

often be informed by information learned through discovery. Loss causation also requires an analysis of how artificial inflation per share may have evolved over the Class Period. There are various types of techniques that can be used that are listed in paragraph 82 of my Opening Report, again which might depend on information learned through discovery. However, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstances of any specific investor. (**Exhibit 1**, Opening Report ¶¶82-83.)

123. **How does the methodology account for differences in trading patterns among class members?**

a. Since the methodology ultimately identifies the inflation per share present on each day during the Class Period, the damages for any investor can be calculated formulaically based upon their specific trading.

124. **Why is this methodology suitable for a class-wide damages analysis?**

a. This methodology provides a consistent framework for measuring damages for all Class members and limits damages to the losses that are caused by the alleged misstatements.

## VI. SUMMARY OF OPINIONS – REBUTTAL REPORT

125. **Mr. Coffman, you also generated a rebuttal report in this matter, correct?**

a. Yes.

**126. What were you asked to do?**

a. I was asked to review, evaluate, and respond to Ms. Allen's opening report dated March 15, 2024 (the "Allen Report") (**Exhibit 33**) through a rebuttal report (the "Coffman Rebuttal Report") (**Exhibit 34**).

**127. In connection with your rebuttal report, did you formulate opinions?**

a. Yes.

**128. What are your rebuttal opinions?**

a. My opinions are as follows: (i) nothing in the Allen Report disturbs my opinions in my Opening Report (*i.e.*, that the market for Concho Common Stock was efficient during the Class Period and that economic damages in this matter can be calculated on a class-wide basis using a common methodology); (ii) Ms. Allen does not dispute my opinion, or any of the analysis supporting my opinion, that the market for Concho Common Stock was efficient; (iii) there is clear and compelling evidence of price impact on the alleged corrective disclosure date; (iv) Ms. Allen's "content analysis" does not establish a lack of price impact; (v) the portions of Ms. Allen's analysis that address front end price impact are irrelevant and flawed; (vi) Ms. Allen does not dispute that the general damages framework/methodology that I detailed in my Opening Report (*i.e.*, the out-of-pocket methodology) is standard and virtually always used in securities class action matters alleging fraud under Section 10(b) of the Exchange Act to calculate damages on a class-wide basis; (vii) the out-of-pocket methodology is capable of handling the concerns raised by Ms. Allen related to materialization of risks, changing information during

the Class Period, and pre-merger purchasers of Concho Common Stock; and (viii) Ms. Allen's comparison of the "premium" received by former shareholders of RSP Permian ("RSP") common stock and the size of the price reaction on the corrective disclosure is economically incoherent, unsupported by literature, and has nothing to do with class-wide damages in this matter. (**Exhibit 34**, Coffman Rebuttal Report ¶¶7-13.)

**129. What materials did you consider in forming your rebuttal opinions?**

a. Aside from my knowledge, experience, and training in economics, finance and statistics, and the allegations and facts set forth in this matter, the materials I considered are listed in the Appendix A of my rebuttal report. These materials included Defendants' Opposition to Plaintiffs' Motion for Class Certification (Dkt. 68) (**Exhibit 35**) as well as the Allen Report. (**Exhibit 34**, Coffman Rebuttal Report, Appendix A.)

### A. *Rebuttal Opinion #1: Ms. Allen Does Not Dispute Mr. Coffman's Market Efficiency Opinion*

**130. With respect to your opinions on market efficiency, does Ms. Allen dispute your opinion?**

a. No. (**Exhibit 34**, Coffman Rebuttal Report ¶8.)

**131. Does Ms. Allen dispute your analysis supporting your opinion that Concho Common Stock traded in an efficient market during the Class Period?**

a. No. (**Exhibit 34**, Coffman Rebuttal Report ¶8.)

**132. In your view, does Ms. Allen's failure to dispute market efficiency have any relevance to her price impact arguments?**

a. First, as I will discuss later, there is no dispute that there was a statistically significant stock price reaction to the alleged corrective disclosure in this case. In an efficient market, therefore, that price reaction can reliably serve as economic evidence of the value of the information released on that day, which would include the corrective information. Second, she fails to offer any evidence to suggest the alleged misstatements would not be embedded in the market price of Concho Common Stock. (**Exhibit 34**, Coffman Rebuttal Report ¶¶14, 20 citing **Exhibit 36**, Memorandum and Recommendation, Dkt. 38, pp. 21-22, 24-25.)

**B. *Rebuttal Opinion #2: There is Compelling Evidence of Price Impact***

**133. As part of your rebuttal report, did you analyze price impact?**

a. Yes.

**134. What is price impact?**

a. In the context of securities litigation and thus, this case, I understand that "price impact" refers to the notion that the misstatements had an influence on the market price of the relevant security. I understand that Defendants can try to establish a lack of price impact. My understanding is that to establish a lack of price impact, one would have to show *both* (1) a lack of front-end price impact (i.e. no price movement at the time of any of the alleged misstatements); AND (2) a lack of back-end price impact (i.e. no price movement at the time of the alleged corrective disclosure).

**135. Why did you analyze price impact?**

a. I performed my own analysis of price impact in response to Ms. Allen's analysis.

**136. In doing so, did you form any opinions?**

a. Yes.

**137. What is your opinion as to price impact?**

a. There is a clear and causal link between the disclosure of the allegedly corrective information and a reduction in the market price of Concho Common Stock. The market price decline at the time of the disclosure of the allegedly corrective information is statistically significant, thus providing important scientific evidence of price impact. (**Exhibit 34**, Coffman Rebuttal Report p. 7.)

**138. How did you reach that opinion?**

a. I analyzed Company statements, analyst reports, news articles, the complaint, and the Court's decision on the motion to dismiss, among other things. The specific documents I relied on in reaching my opinion are disclosed in the footnotes under Section III of my Rebuttal Report. I also relied upon the event study model that I described in Section VI.F. of my Opening Report and reiterated in paragraphs 18-20 of my Rebuttal Report. (**Exhibit 34**, Coffman Rebuttal Report, Section III citing **Exhibit 33**, Allen Report ¶¶62-63, 72, and Appendix C; **Exhibit 2**, Complaint ¶¶162-63, 175, 253, 266, 285, 286, 288, 290, 292-94, 296, 298-300; **Exhibit 37**, Appendix 1 to Defendants' Opposition to Plaintiffs' Motion to Certify Class, Dkt. 68-2; **Exhibit 36**,

Memorandum and Recommendation, Dkt. 38 pp. 20-26, 44-45; **Exhibit 38**, *Concho Resources Inc. Reports Second Quarter 2019 Results*, BUS. WIRE (July 31, 2019, 4:21 PM); **Exhibit 39**, *Q2'19 EBITDAX Misses Street; 18 is the New 24*, BARCLAYS (July 31, 2019); **Exhibit 40**, *2Q19 Quick Take: Scaled Back Activity Catches Market by Surprise*, RAYMOND JAMES (July 31, 2019); **Exhibit 41**, *Morning Sankey*, MIZUHO (Aug. 1, 2019); **Exhibit 42**, *Valuation Implies Core Permian Being Condemned; Reiterate Buy*, JEFFERIES (Aug. 5, 2019); **Exhibit 43**, *Monday Morning Quarterback: What Went Wrong and How to Fix It*, J.P. MORGAN (Aug. 5, 2019); **Exhibit 44**, Trent Jacobs, *"Dominator Project" Raises Key Questions About Future of Cube Drilling*, J. OF PETROLEUM TECH. 71 (2019); **Exhibit 45**, *Company Conference Presentation*, S&P GLOBAL MKT. INTELLIGENCE (Sept. 4, 2019, 9:05 AM); **Exhibit 17**, A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13 (1997); **Exhibit 1**, Opening Report ¶¶49-50.)

**139. When was the alleged corrective disclosure?**

a. After market close on July 31, 2019 and on August 1, 2019.

**140. How was the alleged corrective disclosure made?**

a. Through the Company's Q2 2019 financial results and accompanying press release and earnings call.

**141. What was the corrective disclosure?**

a. Concho revealed a reduced active rig count and weak production forecasts caused directly by wells that were spaced too tightly. (**Exhibit 34**, Coffman Rebuttal Report ¶¶14-15 citing **Exhibit 2**, Complaint ¶¶162-63, 298-300;

**Exhibit 38**, "Concho Resources Inc. Reports Second Quarter 2019 Results," *Bus. Wire*, July 31, 2019, 4:21 PM; **Exhibit 46**, *FQ2 2019 Earnings Call Transcripts*, S&P GLOBAL MKT. INTELLIGENCE (Aug. 1, 2019, 9:00 AM); **Exhibit 36**, Memorandum and Recommendation, Dkt. 38 pp. 44-45, 48.)

**142. Is the information disclosed economically consistent with what Plaintiffs allege was concealed by the misstatements?**

a. Yes.

**143. What is your general understanding of Plaintiffs' alleged misstatements?**

a. The misrepresentations alleged by Plaintiffs explicitly discuss well spacing, well productivity/performance, the Dominator project, and growth in production, and all allegedly concealed that Concho was employing an unverified and experimental development methodology, which included aggressively tight well spacing. This development method allegedly required high upfront investment that would cause permanent impairment to production rates and total production due to improperly spaced wells if unsuccessful. Plaintiffs alleged that Defendants declared the transition to large-scale development as a success, told investors that manufacturing mode was the product of gradual learning and verified techniques (even though it was experimental), issued non-risk-adjusted production forecasts despite internal understanding that the forecasts were inaccurate, and stated that large-scale development projects were dispersed when exposure was company-wide. (**Exhibit 34**, Coffman Rebuttal Report ¶14 citing **Exhibit 33**, Allen Report, Appendix C; **Exhibit 2**, Complaint ¶¶175, 253, 266, 285, 286, 288,

290, 292-94, 296; **Exhibit 36**, Memorandum and Recommendation, Dkt. 38 pp. 21-22, 4 citing **Exhibit 2**, Complaint ¶¶92, 172, 173, 175, 177, 179, 183, 187, 192, 195, 195, 200, 210, 213, 216, 219, 226, 232, 235, 241, 246, 248, 254, 256, 261, 263, 267, 269, 272, 276, 279, 297.)

**144. In analyzing the misstatements, did you review Ms. Allen's categorized statements – that is, Categories A, B, and C in the Allen Report?**

a. Yes, I reviewed all of the alleged misstatements, including the ones she did not analyze in those categories.

**145. Did you cite specific misstatements in support of your price impact opinion?**

a. Yes. For example, I specifically cited misrepresentations A-8, A-15, A-17, A-25, A-31, A-32, B-2 and B-6 of the Allen Report Appendix C to show that the misstatements explicitly discuss well spacing, including that well spacing had been "validated" (Statement A-8), that "we think we know what the spacing needs to be" (Statement A-17), that the "spacing we're using, the efficiency and all that, you can get a whole lot more done" (Statement A-25), that the Company was "making our investment better through large project development, lateral placement within the zones, well spacing . . ." (Statement A-31), that "Our well spacing, it's an extremely complicated multivariable equation that does take a lot of time to fully understand. I would remind people that we have historically been pretty conservative on the way we've accounted for inventory and well spacing . . ." (Statement A-32). These are not generic statements, they convey specifically that their well spacing strategy is complex, has been validated, is beneficial, and estimates have been

conservative. (**Exhibit 34**, Coffman Rebuttal Report ¶14 n.9 citing **Exhibit 33**, Allen Report, Appendix C.)

**146. So when Ms. Allen criticizes you in her Sur-Reply Report for treating all the alleged misstatements as a group and not considering individual misstatements is she incorrect?**

a. Yes. That assertion is simply incorrect and belied by the detailed footnotes in my Rebuttal Report identifying specific statements that deal with specific topics within the portion of my report where I am analyzing price impact. In the Allen Report Appendix C, misrepresentations A-19, A-27, B-7, and B-9and a "Category D" misrepresentation for which Defendants do not dispute price impact as shown in Complaint ¶ 290 (**Exhibit 37**, Appendix I to Defendants' Motion) discuss well productivity/performance. In the Allen Report Appendix C, misrepresentations B-4 and B-8 and "Category D" misrepresentations for which Defendants do not dispute price impact as shown in **Exhibit 2**, Complaint ¶¶ 286, 292, and 294 (**Exhibit 37**, Appendix I to Defendants' Motion) discuss the Dominator project. In the Allen Report Appendix C, misrepresentations A-21, A-24, C-2, and C-4 and "Category D" misrepresentations for which Defendants do not dispute price impact as shown in **Exhibit 2**, Complaint ¶¶ 285, 292, 253, 266, 288, 292, 293, 294, and 296 (**Exhibit 37**, Appendix I to Defendants' Motion) discuss growth in production.

**147. Are there other alleged misstatements that you also considered specifically as part of your price impact analysis and that you disagree with Ms. Allen's interpretation that they are "generic"?**

a. Yes. In my Rebuttal Report I also explicitly cited alleged misstatements that clearly discussed well productivity and performance. For example, Statement A-19 claiming that "manufacturing mode" "unlocks significant value" and "optimizes well performance and increases resource recovery." Statement B-9 explicitly stated that large-scale development was showing "early benefit is, I think you see it in 2019 and 2020 program and you see it in the confidence of making these average project sizes bigger over time. We like what we are seeing. We like the benefits we get of efficiency with our vendors of concentrating that much activity in one spot. And we like the results we're getting out of them." I also went beyond the statements Ms. Allen considered and stated that the alleged misstatement at Complaint ⁋290 also relates to well productivity and performance. My Rebuttal Report also specifically cites to statements about the Dominator project (Statements B-4, B-8, and Complaint ⁋⁋286, 292, 294), growth in production (Statements A-21, A-24, C-2, C-4, and Complaint ⁋⁋285, 292, 253. 266, 288, 292, 293, 294, 296), and how all of the statements allegedly concealed that Concho was employing an unverified and experimental development methodology (Complaint ⁋175). (**Exhibit 34**, Coffman Rebuttal Report ⁋14 and nn.9-12, citing **Exhibit 37**, Appending 1 to Defendants' Opposition to Plaintiffs' Motion to Certify Class, Dkt. 68-2.)

**148. Ms. Allen also claims in her Sur-Reply that you criticize her "categorization" of the misstatements, but that this is irrelevant to price impact, do you disagree with her?**

a. Ms. Allen is missing the entire point of my argument. I'm not claiming that she simply miscategorized the statements, I'm saying that these statements are not generic and that they have a clear relationship to the corrective disclosure. In other words, I understand Plaintiffs to be alleging that all of these specific statements created the misimpression in the market that Concho's large-scale development projects had progressed past the experimental stage and they were going to enhance efficiency, productivity, and profitability, when none of that was actually true. So by explicitly citing the statements, I was not simply criticizing their categorization, I was also saying that Ms. Allen is ignoring the important economic links between what was being conveyed in those statements and how it relates to what was ultimately disclosed. There is nothing in her analysis that breaks those potential causal links. (*See* **Exhibit 47**, Expert Surreply Report of Lucy P. Allen, Dkt. 84-4.)

**149. Now going back to your understanding of Plaintiffs' alleged misstatements, how are those alleged misstatements causally linked to the corrective disclosure?**

a. A few reasons. *First*, Concho's new negative announcement after market hours on July 31, 2019 was related to the very topics of the alleged misrepresentations – that Defendants (1) declared the transition to large-scale development as a success and touted its benefits despite having no basis to

assert it would work as intended; (2) falsely stated to investors that "manufacturing mode" was the product of gradual learning and verified techniques despite being experimental; (3) issued non risk-adjusted production forecasts despite internal understanding that the forecasts were inaccurate and overstated; and (4) stated that large-scale development projects were dispersed when exposure was company-wide. *Second*, contemporaneous negative analyst commentary existed for that new news and was consistent with the interpretation that the new negative announcement related to those very topics of the alleged misrepresentations. *Third*, there was a negative statistically significant stock price reaction on August 1, 2019, the market impact date of this new negative news. (**Exhibit 34**, Coffman Rebuttal Report ¶¶15-22; **Exhibit 36**, Memorandum and Recommendation, p. 21, citing **Exhibit 2**, Complaint ¶¶172, 192, 195, 210, 213, 216, 219, 235, 241, 246, 256, 261, 263, 276, 279, 297; **Exhibit 36**, Memorandum and Recommendation p. 22 citing **Exhibit 2**, Complaint ¶¶ 172, 177, 192, 195, 200, 210, 213, 226, 232, 246, 248, 297; **Exhibit 36**, Memorandum and Recommendation, p. 24. citing **Exhibit 2**, Complaint ¶¶ 173, 175, 179, 183, 187, 192, 241, 254, 263, 267, 269, 272; **Exhibit 36** Memorandum and Recommendation, p. 25, citing **Exhibit 2**, Complaint ¶¶ 172, 181, 192,198, 202, 226, 244, 261, 284; **Exhibit 33**, Allen Report ¶¶55, 62-63; **Exhibit 36**, Memorandum and Recommendation, pp. 44-45.)

**150. How was the corrective disclosure related to the topics to the alleged misrepresentations?**

a. The plaintiffs allege that reduced rig count and lower production forecast that is the corrective disclosure reflected (i) that large-scale development was not a success; (ii) that "manufacturing mode" had not been the result of gradual learning, but was experimental; (iii) that the previous forecasts were inaccurate and overstated; and (iv) that the lowered production forecast resulted from issues with well spacing on numerous projects, not just the Dominator project. On the alleged corrective disclosure event, Defendants disclosed the Company was running fewer rigs than expected (18 versus 33 that had been running in the previous fiscal quarter, Q1 2019) and lowered production forecasts across the Company (based on learning that wells were too tightly spaced). (**Exhibit 34**, Coffman Rebuttal Report ¶15.)

**151. When looking at the corrective disclosure and the misstatements, are you looking for verbatim language?**

a. No.

**152. What are you looking for then?**

a. In looking at the corrective disclosure and the misstatements, I am looking for evidence of the disclosure of the relevant truth that was allegedly concealed by the misstatements. It is not required, as I understand, to have a one-to-one match between the allegedly misstated language and the information that corrects those misstatements. Nor is it required that securities analysts draw a

link between the new information and prior alleged misstatements, that is not their job.

**153. How does that standard comport with your years of experience in securities litigation?**

a. It has always been this way. When evaluating loss causation during the merits-based stage of the case, I have always approached the question from the standpoint of whether the alleged corrective disclosure revealed what was alleged to have been concealed by the alleged misstatements.

**154. As to your second reason, what do you mean that there was negative analyst commentary in response to the alleged corrective disclosure**?

a. There was analyst commentary that expressed a negative reaction to Concho's negative developments concerning the reduced active rig count and weak production forecasts caused by aggressively tightly spaced wells. That commentary is consistent with the disclosure of the relevant truth that Plaintiffs claim was concealed. (**Exhibit 34**, Coffman Rebuttal Report ¶15; **Exhibit 38**, *Concho Resources Inc. Reports Second-Quarter 2019 Results*, BUS. WIRE (July 31, 2019, 4:21 PM); **Exhibit 39**, *Q2'19 EBITDAX Misses Street; 18 is the New 24*, BARCLAYS (July 31, 2019); **Exhibit 40**, *2Q19 Quick take: Scaled Back Activity Catches Market by Surprise*, RAYMOND JAMES (July 31, 2019); **Exhibit 41**, *Morning Sankey*, MIZUHO (Aug. 1, 2019); **Exhibit 42**, *Valuation Implies Core Permian Being Condemned; Reiterate Buy*, JEFFERIES (Aug. 5, 2019); **Exhibit 43**, *Monday Morning Quarterback: What Went Wrong and How to Fix It*, J.P. MORGAN (Aug. 5, 2019); **Exhibit**

**44**, Trent Jacobs, *"Dominator Project" Raises Key Questions About Future of Cube Drilling*, J. OF PETROLEUM TECH. 71 (2019); **Exhibit 45**, *Company Conference Presentation*, S&P GLOBAL MKT. INTELLIGENCE (Sept. 4, 2019, 9:05 AM).)

**155. Can you give us some examples?**

a. Yes. Barclays issued a report noting that they were caught off guard by the well spacing issues; *Raymond James* reported that there was a surprise reduction in production activity and oil guidance; Mizuho reported that Concho over-promised and underdelivered; Jefferies reported that Concho "blindsided the market with a sharp reduction in 2H19 oil volume guidance" and that Concho's production guidance increase in 1Q19 made it difficult to see the new news coming; and J.P. Morgan reported that the "unexpected gyrations" in Concho's oil guidance eroded confidence in Concho's execution capabilities and expressed concern that there were a number of projects (outside the Dominator) where the spacing was too tight. (**Exhibit 34**, Coffman Rebuttal Report ¶15; **Exhibit 39**, *Q2'19 EBITDAX Misses Street; 18 is the New 24*, BARCLAYS (July 31, 2019); **Exhibit 40**, *2Q19 Quick take: Scaled Back Activity Catches Market by Surprise*, RAYMOND JAMES (July 31, 2019); **Exhibit 42**, *Valuation Implies Core Permian Being Condemned; Reiterate Buy*, JEFFERIES (Aug. 5, 2019); **Exhibit 43**, *Monday Morning Quarterback: What Went Wrong and How to Fix It*, J.P. MORGAN (Aug. 5, 2019).)

**156. Are you saying that any bad news about the Company's wells or its oil production would be evidence of price impact of the alleged misstatements?**

a. No – the reasons cited for the poor production are consistent with what Plaintiffs specifically allege was concealed by the misstatements.

**157. With respect to your third reason for why the statements are causally linked to the corrective disclosure, did you find there was a negative statistically significant stock price reaction?**

a. Yes.

**158. How did you go about determining that?**

a. To evaluate whether the allegedly corrective information impacted the market price of Concho Common Stock in a statistically significant manner, I performed an event study. (**Exhibit 34**, Coffman Rebuttal Report ¶18.)

**159. What is an event study?**

a. An event study is a well-accepted statistical method utilized to measure the effect of new information on the market prices of a company's publicly traded securities, such as Concho Common Stock. New information may include, for example, press releases, earnings reports, news reports, SEC filings, or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause. (**Exhibit 34**, Coffman Rebuttal Report ¶18; **Exhibit 1**, Coffman Opening Report ¶46; **Exhibit 17**, A.

Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13 (1997).)

**160. In order to perform the event study, what statistical tool(s) did you employ?**

a. A well-accepted method for performing an event study is to estimate a regression model over an estimation window in order to observe the typical relationship between the market price of the relevant security and broad market factors. I relied upon the same event study methodology as I had used to analyze cause-and-effect in my Opening Report. In particular, and as I stated previously, I used two estimation windows, demarcated by the date of the announcement of Concho's merger with RSP, to evaluate the relationship between the daily returns of Concho Common Stock and those of a broad Market Index (the S&P 500 Total Return Index) and a Peer Index (an equal-weighted index consisting of the members of the S&P 500 Oil & Gas Exploration & Production Index during the period from February 21, 2017 to February 28, 2020, excluding Concho). I then used the returns of these control indices on the alleged corrective disclosure date to evaluate the expected return of Concho Common Stock (**Exhibit 34**, Coffman Rebuttal Report ¶¶18-19; **Exhibit 1**, Opening Report ¶50.)

**161. What was the result of your event study?**

a. As shown in Table A of my Rebuttal Report, the expected return of Concho Common Stock on August 1, 2019 is -4.38%. On this date, the Market Index was down 0.89% and the Peer Index was down 3.15%. But the raw return of Concho Common Stock was -22.23%. This implies that the firm-specific

return after controlling for market and industry movements (i.e., the "abnormal return") was -17.84% (in other words, the raw return of -22.23% minus the expected return of -4.38%). (**Exhibit 34**, Coffman Rebuttal Report ¶20, Table A).

## Table A

### Event Study Regression Statistics for Concho Common Stock on the Alleged Corrective Disclosure Date

| | |
|---|---|
| **Closing Price** | $75.97 |
| **Raw Return** | -22.23% |
| **Market Index Return** | -0.89% |
| **Peer Index Return** | -3.15% |
| **Expected Return** | -4.38% |
| **Abnormal Return** | -17.84% |
| **Abnormal Dollar Change** | -$17.43 |
| **Abnormal Return t-Statistic** | -12.94 |
| **p-Value** | 0.00 |

Source: Rolling Regression event study as described in Coffman Report Section VII.F.

Note: The results are based on a rolling regression of the previous 120 trading days through March 27, 2018, followed by a fixed-to-rolling regression to account for the announcement that Concho would acquire RSP Permian. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal-weighted index consisting of the members of the S&P 500 Oil & Gas Exploration & Production Index during the Analysis Period, excluding Concho. Earnings announcements and the alleged corrective disclosure date have been removed from estimation.

**162. Did you do anything else to test this negative abnormal return?**

a. Yes. I then tested whether this negative abnormal return was sufficiently far from zero that I could reject random chance as the cause and conclude that the new information disclosed on this event caused the observed abnormal return. (**Exhibit 34**, Coffman Rebuttal Report ¶20.)

**163. What did you find?**

a. The "p-value," or probability of observing an abnormal return of -17.84% based on randomness alone, is vanishingly small and does not have a non-zero digit within 6 places of the decimal point (0.000000, or less than 1 in 100,000). The threshold level for finding a statistically significant result with 95% confidence is a p-value of 0.05 or less; therefore, the decline in the market price of Concho Common Stock on August 1, 2019 was highly statistically significant. (**Exhibit 34**, Coffman Rebuttal Report ¶20.)

**164. Why is this all important for your rebuttal opinions?**

a. This is important for my rebuttal opinions because Ms. Allen ignores all of the direct evidence described above (*i.e.*, the specific new negative announcement from the Company that revealed the relevant truth allegedly concealed by the misstatements, the contemporaneous negative analyst reaction to that new news, and the negative statistically significant stock price response). I understand that establishing a lack of price impact (as Ms. Allen attempts to do in her report) requires demonstrating that there was no evidence of back-end price impact at the time of any corrective disclosure. She makes no such showing. The portions of the Allen Report that are directed at front-end price impact are therefore irrelevant. (**Exhibit 34**, Coffman Rebuttal Report ¶¶11, 22; **Exhibit 33**, Allen Report ¶¶62-63.)

**165. Does Ms. Allen opine or even suggest that there is a lack of statistically significant price decline at the time of the corrective disclosure?**

a. No.

**166. Ms. Allen asserts that "new information about the Dominator Project was coming out through the alleged Class Period," does this disrupt back-end price impact?**

a. No. Ms. Allen never suggests or opines that this information corrected the alleged misstatements or suggests a lack of price impact at the time of the alleged corrective disclosure. The alleged corrective disclosure provided new and far more detailed information and guidance about the issues with well spacing and their financial impact on the Company. As I mentioned earlier, there was a substantial reduction in guidance and the analyst coverage very clearly expressed surprised at this new negative information. One analyst from Jeffries suggested that this new negative information was a shock based on the promising statements Concho made the quarter prior. Also, as I understand it, Plaintiffs' case is not solely about the disclosures related to the Dominator project; Concho had to reduce guidance and change spacing for many other projects. (**Exhibit 34**, Coffman Rebuttal Report ¶¶15, 22; **Exhibit 33**, Allen Report ¶¶62-63; **Exhibit 42**, *Valuation Implies Core Permian Being Condemned; Reiterate Buy*, JEFFERIES (Aug. 5, 2019).)

**167. Then what is Ms. Allen getting at with her statement regarding changing information about the Dominator?**

a. Ms. Allen is suggesting that a loss causation analysis, which I understand is not necessary at this stage of the litigation, would have to evaluate how the set of information available to investors may have changed over time. But this

issue is ubiquitous in class action securities litigation. (**Exhibit 34**, Coffman Rebuttal Report ¶22; **Exhibit 33**, Allen Report ¶62-63.)

**168. As part of your analysis of the causal link between Plaintiffs' alleged misstatements and the corrective disclosure event, did you rule out that non-fraud related information may have also contributed to the stock price decline?**

a. No.

**169. Why not?**

a. I have not yet ruled out non-fraud related, also known as 'confounding,' information from the fraud-related information in this matter because, based on my understanding, it is not necessary at this stage. As I stated earlier, disaggregation of the amount of price movement attributable to fraud-related information versus confounding information would require a detailed loss causation analysis. My understanding is that this would be premature at the class certification stage.

**170. Did Ms. Allen rule out non-fraud related information?**

a. No. Ms. Allen makes no attempt to disaggregate any non-fraud related information (if any) from this alleged corrective disclosure. (**Exhibit 34**, Coffman Rebuttal Report ¶23; *see generally*, **Exhibit 33**, Allen Report.)

**171. Does Ms. Allen even suggest a lack of a causal link between the misstatements and the allegedly corrective information?**

a. No.

**172. Then, what did Ms. Allen do in her opening report?**

a. Ms. Allen adopts a novel approach through a "content analysis" where she was asked to evaluate specific questions formulated by Defendants' Counsel about what was in analyst reports. Her approach is not determinative of whether there is a causal economic link between the alleged misrepresentations and the corrective disclosure event. (**Exhibit 34**, Coffman Rebuttal Report ¶24.)

C. ***Rebuttal Opinion #3: Ms. Allen's "Content Analysis" Does Not Establish a Lack of Back-End Price Impact***

**173. What is your third rebuttal opinion again?**

a. Ms. Allen's "content analysis" does not establish a lack of back-end price impact. (**Exhibit 34**, Coffman Rebuttal Report §IV.)

**174. Why not?**

a. To start, Ms. Allen allegedly searched within analyst reports to see if the analysts evaluated or cataloged potential economic causal links between new disclosures and Concho's past statements. (**Exhibit 34**, Coffman Rebuttal Report ¶25.)

**175. What is wrong with that approach?**

a. Whether analysts tie allegedly corrective information back to the alleged misstatements in a Rule 10b-5 case is neither a necessary nor standard way of evaluating price impact and Ms. Allen cites to no authority suggesting otherwise. The roles and responsibilities of analysts are to be forward-looking – they generally focus on how newly-released information might change their

valuation and forecast of a company's future cash flows to provide investment recommendations to their clients. Ms. Allen's observation that analysts, in the wake of the alleged corrective disclosure, "focused on Concho's specific financial results… and its financial guidance given these new results" instead of specifically identifying a prior misstatement is neither surprising nor affirmative economic evidence suggesting a lack of price impact. Analysts are not the arbiters of whether or not new information relates back to prior misstatements, and discussing this new information, especially quarterly financial results, is precisely their job. Whether analysts focused on alleged misstatements is certainly not a bright-line indicator of whether there is economic evidence of back-end price impact. Ms. Allen's suggestion that a lack of analyst reports that make this connection demonstrates that "there is no link between the alleged misstatements… and the alleged corrective disclosure but instead a mismatch between them" is simply illogical, and she cites no authority to suggest such an analysis is appropriate or sufficient. (**Exhibit 34**, Coffman Rebuttal Report ¶¶25-27; **Exhibit 48**, Frank Fernandez, *The Roles and Responsibilities of Securities Analysts*, 2 SEC. INDUS. ASS'N-RSCH. REPORTS (Aug. 22, 2001); **Exhibit 33**, Allen Report ¶28.)

**176. In your opinion, what is the appropriate approach then?**

a. The most relevant and scientifically sound test of price impact is to evaluate whether (1) there was a release of information that revealed the relevant truth that was allegedly concealed by the misstatements; and (2) whether there was a statistically significant price reaction to the information. (**Exhibit 34**,

Coffman Rebuttal Report ¶27 citing **Exhibit 49**, Expert Report of Lucy P. Allen, dated March 1, 2022, in *Allegheny County Employees' Retirement System, et al. v. Energy Transfer LP, et al.,* Case No. 2:20-cv-00200-GAM; **Exhibit 50**, David I. Tabak & Frederick C. Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom*, LITIG. SERV. HANDBOOK, THE ROLE OF THE FIN. EXPERT (3d ed. 2001); **Exhibit 51**, Jill E. Fisch, et al., *The Logic and Limits of Event Studies in Securities Fraud Litigation*, FACULTY SCHOLARSHIP 571 (2018).)

**177. Did you agree with Ms. Allen's findings for her back-end content analysis?**

a. No.

**178. Why not?**

a. Because her requirement that an analyst make specific references about learning that a prior statement was inaccurate or misleading, specifically draw connections between the corrective disclosure and the alleged misstatement, or even explicitly mention the alleged misstatements, is her own invention with no authoritative support. It is not based on any accepted economic principle. It's not a requirement and so its absence is irrelevant. There are other ways to evaluate causation, and she did not do that here.

**179. In her prior work, has Ms. Allen used the approach that you described as appropriate here in prior cases?**

a. Yes. In the *Allegheny County Employees' Retirement System, et al. v. Energy Transfer LP* case, for example, Ms. Allen said "In general, the price impact of an alleged misrepresentation can be analyzed in at least two ways: (1) directly

by analyzing the market reaction following an alleged misrepresentation, including analyzing the stock price movement and examining market and analyst commentary following the alleged misrepresentations, or (2) ***indirectly by analyzing the market reaction when the truth concealed by an alleged misrepresentation is later revealed by a corrective disclosure***." (**Exhibit 34**, Coffman Rebuttal Report ¶27 n.38; **Exhibit 49** Expert Report of Lucy P. Allen, dated March 1, 2022, in *Allegheny County Employees' Retirement System, et al. v. Energy Transfer LP, et al.,* Case No. 2:20-cv-00200-GAM.)

**180. In your opinion, is the approach that Ms. Allen takes in this matter novel?**

a. Yes. I have never seen this approach to evaluating whether an event represents a corrective disclosure. While content analysis has been used to evaluate the *relative* importance of contemporaneously released information, I have never seen it used to evaluate whether an event revealed the relevant truth and the questions she answers are not even geared towards answering that question. It is my understanding from listening to her deposition that her attorneys formed the categorization of statements and the questions she used to analyze the analyst reports, including one category titled "Generic." It also appears that the Defendants' opposition to the class certification closely tracks this framework. In other words, it appears Ms. Allen's report was crafted to match the Defendants' legal briefing and arguments.

**181. Do you have any other criticisms of her content analysis methodology?**

a. Yes. Ms. Allen contends that "[c]ourts have recommended the use of content analyses for analyzing stock price movements." However, "content analysis"

is a general term and I have never seen such an analysis performed this way, as I said earlier. (**Exhibit 34**, Coffman Rebuttal Report ¶28.)

**182. Any other criticisms with Ms. Allen's content analysis methodology?**

a. Yes. The articles she cites in her report to form the basis of her content analysis do not actually support using content analysis for this purpose. Ms. Allen cites a journal article titled, "Estimating Financial Fraud Damages with Response Coefficients" authored by Esther Bruegger and Frederick C. Dunbar to support this claim. However, the article she cites does not support using "content analysis" in the manner she applies. Instead, the Bruegger and Dunbar article describes how using an event study is the appropriate approach to evaluating price impact, and content analysis is only listed as something relevant to evaluating the relative weight of simultaneous confounding events. Furthermore, she quotes that same article which states, "'[C]ontent analysis' is now part of the tool kit for determining *which among a number of simultaneous news events* had effects on the stock price." Again, the literature may discuss using "content analysis" as a way to evaluate relative importance of contemporaneously released information, but a "content analysis" does not substitute for the event study approach when evaluating price impact of disclosures that reveal the relevant truth that Plaintiffs claim was concealed by the misrepresentations. (**Exhibit 34**, Coffman Rebuttal Report ¶28 citing Allen Report ¶15 n.9 (citing **Exhibit 52**, Esther Bruegger & Frederick C. Dunbar, *Estimating Financial Fraud Damages with Response Coefficients*, 35 J. CORP. L. 11, 25 (2009)).)

**183. Any other criticisms of Ms. Allen's content analysis methodology?**

a. Yes. As economists, neither Ms. Allen nor I are in a position to characterize what "courts recommend" as she states. Her citation to the *Goldman Sachs* case glosses over a critical factual distinction in that case (*see* Allen Report ¶15 n.9). There, I understand a content analysis was used to show that the topic of interest in that matter was never discussed in analyst reports. Here, Ms. Allen does not attempt to claim that analysts failed to discuss the issues at the heart of Plaintiffs' case here, namely Concho's drilling strategy, the role of well spacing, and the anticipated versus actual productivity of the methods Concho was employing. Plaintiffs' Complaint, the Allen Report, and the quotes in multiple sections of my Rebuttal Report all clearly indicate these were topics covered closely by analysts in this matter. (**Exhibit 34**, Coffman Rebuttal Report ¶28 n.43 citing Allen Report ¶15 n.9 (citing **Exhibit 53**, *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023)).)

**184. Any other criticisms of Ms. Allen's content analysis methodology?**

a. Yes. For unknown reasons, Ms. Allen limits her "content analysis" just to analyst reports and completely ignores other obvious sources of public information like the financial press and other media outlets. In past cases, Ms. Allen has looked at news articles. Ms. Allen knows news articles can provide information about how the market perceived new information and why market prices moved as well. (**Exhibit 34**, Coffman Rebuttal Report ¶26 and n.37.)

**185. Any other criticisms of Ms. Allen's content analysis methodology?**

a. Yes. I mentioned this earlier but in less detail. On August 1, 2019, the market date on which information clearly related to Plaintiffs' claims is released to the market, Ms. Allen does not dispute that there is a statistically significant price decline. In fact, while the event study model detailed in my Opening Report and discussed above finds a highly statistically significant stock price reaction to the release of the allegedly corrective information, Ms. Allen provides no statistical test for that date at all in the Allen Report, even though she tests many other dates during the Class Period (i.e., price movements on the alleged misrepresentations). Given that Ms. Allen knows from her prior representations in prior reports, such as the *Allegheny* case I mentioned earlier, that price impact can be determined by "***analyzing the market reaction when the truth concealed by an alleged misrepresentation is later revealed by a corrective disclosure***" it seems rather deliberate to now completely avoid any analysis of back-end price impact. Moreover, Ms. Allen's event study analysis is flawed as she does not control for a broad market index, such as the S&P 500 Total Return Index, and instead only controls for the movements of the industry using the S&P Oil & Gas Exploration & Production Select Industry Index. (**Exhibit 34**, Coffman Rebuttal Report ¶29; **Exhibit 49**, Expert Report of Lucy P. Allen, dated March 1, 2022, in *Allegheny County Employees' Retirement System, et al. v. Energy Transfer LP, et al.,* Case No. 2:20-cv-00200-GAM; **Exhibit 33**, Allen Report ¶15 n.9 citing **Exhibit 52**, Esther Bruegger & Frederick C. Dunbar,

*Estimating Financial Fraud Damages with Response Coefficients*, 35 J. CORP. L. 11, 25 (2009).)

**186. Any other criticisms of Ms. Allen's content analysis methodology?**

a. Yes. It is incomplete and lawyer-driven. She purportedly concludes that there is a "mismatch" between what Plaintiffs allege was concealed and what was revealed on the alleged corrective disclosure. She does this by focusing on a categorization of the alleged misstatements, decided by Defendants' Counsel, using questions that were also decided by Defendants' Counsel. The categorization assumes "genericness" presumably based on a legal standard from the *Goldman* case for Category A (which then, by elimination, means the purported *Goldman* analysis only pertains to those statements and not the ones in Categories B or C) which is inherently a legal conclusion. The categorization is inconsistent with Plaintiffs' view of the misstatements. Defendants exclusively rely on their own interpretation of Plaintiffs' allegations and not on any basis set forth by the Court nor agreed upon by participating parties. The resultant inapt framework that Ms. Allen uses to assess, insufficiently, price impact reflects these inaccuracies and fails to consider that Plaintiffs allege false and misleading statements and omissions regarding Concho's manufacturing style portfolio wide commitment of assets to experimentation, and incomplete production forecasts. Instead, Defendants splinter Plaintiffs' theory of liability into groups based on whether or not the Company met its financial projections. Even if this categorization was appropriate, it is missing a fourth category, Category D, that was referenced in

the Defendants' opposition to class certification. Ms. Allen was apparently not asked to analyze these statements. Defendants fail to present any evidence that there is a lack of price impact related to the 18 alleged misstatements in Category D. (**Exhibit 34**, Coffman Rebuttal Report ¶30; **Exhibit 33**, Allen Report ¶9 and Appendix C, citing **Exhibit 37**, Defendants' Opposition to Motion to Certify Class, Dkt. 68, Appendix I; **Exhibit 35**, Defendants' Opposition to Motion to Certify Class, Dkt. 68, pp. 4, 7 n.1, 13-14.)

**187. In Ms. Allen's categorization, is there anything different about these categories such that the analysis between each is different?**

a. Yes.

**188. What is different?**

a. Category A is clearly an attempt to conduct a front-end price impact analysis since she is answering questions about what analysts said at the time of the misstatements. Category B and Category C are clearly aimed at back-end price impact since they answer questions about what analysts said in the wake of the alleged corrective disclosure.

**189. Any other criticisms of Ms. Allen's content analysis methodology?**

a. Yes. While claiming to review hundreds of analyst reports, Ms. Allen completely ignores analyst commentary supporting price impact. Ms. Allen ignores analyst commentary from *Barclays* (1) acknowledging that these issues that Plaintiffs allege were previously misrepresented were the focus of the market and (2) expressing surprise and concern that their effects would be lasting. Ms. Allen further ignores the evidence of analysts from *Raymond*

*James* specifically tying the decline in the price of Concho Common Stock to these revelations. Analysts from *J.P. Morgan* acknowledged Concho's apparent contradictory business decisions and the decrease in operating rigs, predicting "a negative reaction to the print given the sharp reduction in the company's 2019 oil guide with no change to full-year capex." Ms. Allen's methodology also failed to detect specific skepticism of Defendants' previous statements and analysts' suggestions of a lack of credibility given the Company's prior statements. For example, Evercore ESI reported that Concho would need to establish operational credibility for the second half of 2019. Likewise, J.P. Morgan discussed that Concho's unexpected 2019 oil guidance reduction eroded confidence in the company's execution capabilities. More detailed quotes from these analysts can be found in my Rebuttal Report. (**Exhibit 34**, Coffman Rebuttal Report ¶¶31-34; **Exhibit 39**, *Q2'19 EBITDAX Misses Street; 18 is the New 24*, BARCLAYS (July 31, 2019); **Exhibit 40**, *2Q19 Quick take: Scaled Back Activity Catches Market by Surprise*, RAYMOND JAMES (July 31, 2019); **Exhibit 54**, *2Q19: Moderating Activity/Growth, But DUC Build Appears Incongruent with Capital Discipline; Stock Reaction-Negative*, J.P. MORGAN (July 31, 2019); **Exhibit 55**, *More Questions than Answers*, EVERCORE ISI (Aug. 1, 2019); **Exhibit 43**, *Monday Morning Quarterback: What Went Wrong and How to Fix It*, J.P. MORGAN (Aug. 5, 2019); **Exhibit 56**, *A Show Me Story*, RBC CAP. MKT. (Aug. 1, 2019).)

**190. Is there any minimum requirement for number of analyst reports in order for there to be a price impact?**

a. No. Price impact is established by showing a price reaction to the release of the relevant truth. Analyst coverage that is consistent with that interpretation can be important economic evidence, but it is certainly not required.

**D. *Rebuttal Opinion #4: Ms. Allen's Front End Price Impact Analysis is Irrelevant and Flawed***

**191. What is your fourth rebuttal opinion again?**

a. Ms. Allen's content analysis of the analyst reports at the time of the Category A misrepresentations and/or omissions is irrelevant and flawed.

**192. As a recap, what is price impact?**

a. Price impact in this context refers to the impact of an alleged misstatement on the price of the security in question.

**193. What is front-end price impact?**

a. Front-end price impact refers to the change in the price of the relevant security at the time of the alleged misstatement.

**194. Does Ms. Allen conduct a front-end price impact in her analysis?**

a. Not for all of the misstatements, she conducts a front-end price impact analysis for the Category A misstatements.

**195. Why do you say that her front-end price impact analysis is irrelevant?**

a. Because I understand that Plaintiffs are not alleging that the misstatements moved the price of Concho Common Stock upward, their claim is that by fraudulently concealing the relevant truth, Defendants prevented the stock

price from falling. In other words, the alleged misstatements served to maintain the price at a higher level than it would have otherwise traded at had the truth been revealed. In such circumstances, one cannot evaluate price impact by evaluating whether there was a change in price at the time of the alleged misstatement. Thus, the fact that the alleged misstatements did not result in statistically significant price changes is absolutely consistent with the idea of price maintenance (and market efficiency). Moreover, statements that are not surprising to the market would not be expected to generate a statistically significant market reaction. (**Exhibit 34**, Coffman Rebuttal Report ¶36; **Exhibit 57**, Daniel A. Bens., Wendy Heltzer, & Benjamin Segal, *The Information Content of Goodwill Impairments and SFAS 142*, 26 J. OF ACCT., AUDITING & FIN. 527-55 (2011); **Exhibit 51**, Jill E. Fisch, et al., *The Logic and Limits of Event Studies in Securities Fraud Litigation*, FACULTY SCHOLARSHIP 571 (2018).)

**196. What is your understanding of what is needed to prove a lack of price impact?**

a. In order to prove a lack of price impact, I understand one needs to prove that there is no price impact *both* at the time of the alleged misstatements and/or omissions as well as at the time of the alleged corrective disclosure. (**Exhibit 34**, Coffman Rebuttal Report ¶36.)

**197. What does this all mean for Ms. Allen then?**

a. In a case where Plaintiffs are alleging omissions, price maintenance, *and* back-end price impact, performing an event study at the time of the alleged

misrepresentations alone is completely irrelevant to price impact. Ms. Allen is conflating a lack of increase at the time of the misstatements with a lack of inflation overall and since that is irrelevant to Plaintiffs' price inflation maintenance theory, it does nothing to rebut price impact. (**Exhibit 34**, Coffman Rebuttal Report ¶36.)

**198. Did you conduct a front-end price analysis? If not, why?**

a. No, because of the reasons I stated a moment ago. I cite in my report that there were omissions from statements that Concho provided investors as alleged by the Plaintiffs (*see* **Exhibit 34**, Coffman Rebuttal Report ¶15) and that information was not revealed until the corrective disclosure. I conduct a back-end price impact in which I find the stock price decline following the alleged corrective disclosure to be statistically significant (to almost 100% certainty). Plaintiffs allege a price maintenance inflation theory, not a price increase inflation theory, which renders the analysis of front-end price impact irrelevant here.

**199. For your fourth rebuttal opinion, you testified that Ms. Allen's content analysis for Category A misstatements is also flawed, right?**

a. Yes.

**200. How is Ms. Allen's content analysis for the Category A misstatements flawed?**

a. For each analyst report issued after each alleged misstatement, her method was to evaluate price impact by indicating whether analysts (1) changed their valuation specifically as a result of the alleged misstatement; (2) changed their

target price specifically as a result of the alleged misstatement; (3) referenced the alleged misstatement; and/or (4) referenced the event that contained the alleged misstatement (if not an earnings announcement). Under Ms. Allen's "content analysis" methodology, she apparently concludes that if the first two conditions did not apply to an alleged misstatement, then it supports that the statement was "generic" (i.e., labeled a "Category A" misstatement) and had no price impact. This is absurd. (**Exhibit 34**, Coffman Rebuttal Report ¶37; **Exhibit 33**, Allen Report ¶¶11-14, 27.) While she categorized answers to the third and fourth questions, she apparently ignored that, for some statements, the answers to those questions were "YES" in certain circumstances. That is why I stated that she apparently concluded that an answer of "NO" to the first two questions was sufficient for her conclusions.

**201. You characterized Ms. Allen's approach as "absurd", why?**

a. Ms. Allen's approach is absurd for a couple of reasons. *First*, it conflates a lack of change in price target from analyst coverage with lack of relevance of the value of the information to the company's stock price. *Second*, her approach is entirely novel with no economic or legal support. *Third*, where Ms. Allen does find that certain criteria were met with respect to the Category A misstatements, she dismisses those instances through some undisclosed method.

**202. Is Ms. Allen trying to show that the analysts believed the statements were "generic" by looking at the analysts' coverage of misstatements before the corrective disclosure?**

a. It appears so, at paragraph 27 of the Allen Report, she claims that the "market evidence is consistent with analysts finding the alleged misstatements to be merely 'generic' statements." Apparently she is absurdly saying that any information that does not change an analysts price target is somehow considered "generic" by the analyst. There is absolutely no economic logic to support that interpretation.

**203. Can you give an example of why this makes no economic sense?**

a. Sure. For example, if a company's earnings are in line with expectations, then it might not cause an analyst to change their price target. It would be absurd to argue that renders the earnings announcement "generic." Simply because a piece of information did not cause an analyst to change their price target does not mean that the information has no relevance to the value of the company's stock. Clearly, quarterly earnings announcements, even if they are in line with expectations and do not cause changes in analyst recommendations and/or price targets, are important company statements that are not "generic." (**Exhibit 34**, Coffman Rebuttal Report ¶38; **Exhibit 17**, A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13, 25 (1997).)

**204. Does this render her analysis moot? If so, why?**

a. Yes. This entire analysis is moot when it comes to price impact because alleged misstatements often conceal the relevant truth but do not provide new and unexpected information to the market. For example, if a company makes a misrepresentation that the quality of its loan portfolio has remained consistent (even though, in reality, this had become untrue), one would not necessarily expect to observe a price increase, or changes in analyst recommendations or price targets, associated with this misstatement, because it likely represents what the market was expecting to hear. In such a case, the misstatement would serve to maintain the price at a higher level than the level at which it would have otherwise traded had the truth been revealed, without causing the price to increase further. From an economic and statistical point of view, one could not reliably ascertain whether such a misstatement had price impact by evaluating whether there was a change in price, analyst recommendations, or analyst price targets at the time of the misstatement. Indeed, there is nothing I am aware of in Plaintiffs' claims that, from an economic point of view, would require the price of Concho Common Stock to increase in response to any specific alleged misrepresentation. There is no evidence of which I am aware, and none offered by Ms. Allen, that would suggest that the alleged misstatements would contradict existing market beliefs or surprise the market. Thus, the lack of price reaction or analyst reaction to the misstatements is neither surprising nor sufficient evidence to preclude price impact. (**Exhibit**

**34**, Coffman Rebuttal Report ¶¶44-45; **Exhibit 2**, Complaint ¶¶410, 413, 428.)

**205. As to the second reason, what about Ms. Allen's approach is novel and unsupported?**

a. Aside from what we already talked about earlier, her approach to genericness is completely novel and Ms. Allen provides no economic or legal authority to support it. In my more than 20 years of working on securities matters, whether engaged by plaintiffs, defendants, or neutrals, I have never seen an expert attempt to characterize the nature of an alleged misstatement (i.e., whether it is "generic" or not) or conclude whether an alleged misstatement exerted a price impact by relying on such a method. I note that there is not even a definition provided by Ms. Allen of what "generic" means in this context, and I am not aware of that term as having any technical economic definition in this context. (**Exhibit 34**, Coffman Rebuttal Report ¶39.)

**206. For your third reason, what do you mean that Ms. Allen dismisses certain instances in her analysis of the Category A misstatements?**

a. Indeed, Ms. Allen found some evidence that analysts mentioned certain of the Category A misstatements. For example, Ms. Allen identified that Plaintiffs claimed as a misstatement "that 'manufacturing mode' 'unlocks significant value' and 'optimizes well performance and increases resource recovery'" which appeared on a slide from a presentation that accompanied Concho's 2Q18 earnings call on August 2, 2018. Ms. Allen cites a Raymond James analyst report issued on August 2, 2018 that included a copy of this slide in its

report. (**Exhibit 33**, Allen Report ¶23(c).) Ms. Allen also found that some analysts talked about the earnings calls in which alleged misstatements were made. For example, Ms. Allen states that 76% of analyst reports did not mention the earnings call in which 14 of Plaintiffs' alleged misstatements were made. This means that the remaining 24% of analyst reports mentioned the earnings call. (**Exhibit 33**, Allen Report ¶23(d).) Nevertheless, through some method that remains undescribed, she dismisses these instances in reaching her conclusion that the "content analysis" somehow provides evidence of the alleged misstatements' genericness and a lack of price impact. (**Exhibit 34**, Coffman Rebuttal Report ¶40; **Exhibit 33**, Allen Report ¶¶23(c-d), 27.)

**207. Is there anything else about Ms. Allen's Category A analysis that is flawed?**

a. As I discussed earlier, and assuming the Court were to adopt Ms. Allen's approach by looking at the Category A misstatements in that context, Ms. Allen and I clearly disagree about whether the misstatements are even "generic" (whatever that term may mean). I provide examples in my Rebuttal Report for Statement A-25, for example, which is Defendant Leach's exchange with an analyst. This statement clearly goes beyond vague or generic language. As an economist, I understand that the statement suggesting an improvement of production efficiency "by drilling longer laterals and the spacing we're using" has a very specific economic meaning: that production is enhanced as a result of their specific drilling strategies and well spacing – the specific relationship that I understand Plaintiffs are alleging was

misrepresented to the market. By way of another example, Statement A-11 is clearly not generic because I understand this statement to have specific economic meaning, that by using a means of production (drilling pads) more intensely along with other infrastructure, the Company will achieve greater productivity. (**Exhibit 34**, Coffman Rebuttal Report ¶¶41-42; **Exhibit 33**, Allen Report Appendix C, pp. 4, 11.)

**208. Would it be expected that analysts would incorporate language used by Concho and its executives if that language had specific economic meaning? If not, why not?**

a. Not necessarily. Again, while analyst commentary can be helpful in evaluating what is important to a company, the mere absence of a reaction to a company statement is not dispositive of whether it is generic or has specific economic meaning.

**209. In looking at the specific economic meaning of these statements, are you saying there is front-end price impact? If not, then what are you getting at?**

a. No. I am simply rebutting Ms. Allen's approach to declaring these statements "generic," whatever that term actually means. I am not suggesting the statements impacted the market price at that time even though they had specific economic meaning.

**210. What does your disagreement over the Category A misstatements with Ms. Allen tell you about Ms. Allen's methodology?**

a. The very fact that these statements are labeled as "generic," in my view, calls into question the reliability of the categorization scheme upon which Ms. Allen has based her analysis. (**Exhibit 34**, Coffman Rebuttal Report ¶43.)

**E. *Rebuttal Opinion #5: Ms. Allen Does Not Dispute that the Out-of-Pocket Damages Methodology is Standard and Used in Virtually all Section 10(b) litigation***

**211. Mr. Coffman, I'd like to address your fifth rebuttal opinion. Can you remind us what that opinion is?**

a. Yes, it is that Ms. Allen does not dispute that the common damages methodology, the out-of-pocket methodology, I propose for the proposed class is standard and used in virtually in all Section 10(b) litigation.

**212. Have Courts endorsed your out-of-pocket methodology in the past?**

a. Yes. Numerous courts have endorsed that my description of the out-of-pocket methodology as described in my Opening Report is sufficient for purposes of determining that there is a class-wide damages approach. I cite those cases in my Rebuttal Report at paragraph 47 footnote 69. (**Exhibit 34**, Coffman Rebuttal Report ¶47; **Exhibit 58**, *Beaver County Employees' Retirement Fund, et al., Plaintiffs, v. Tile Shop Holdings Inc., et al., Defendants,* No. 0:1 4-cv-00786- ADM-TNL, United States District Court for the District of Minnesota filed July 28, 2016; **Exhibit 59**, *In Re Intuitive Surgical Securities Litigation,* No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California, San Jose Division filed December 22, 2016;

**Exhibit 60**, *Lou Baker, individually and on behalf of all others similarly situated, Plaintiffs, v. SeaWorld Entertainment, Inc., et al.., Defendants,* No. 3:l 4-cv-02129-MMA-AGS, United States District Court for the Southern District of California filed November 29, 2017; **Exhibit 61**, *In Re: SanDisk LLC Securities Litigation,* No. 3:l 5-cv-01455-VC, United States District Court for the Northern District of California filed September 4, 2018; **Exhibit 62**, *City of Sunrise General Employees' Retirement Plan, on behalf of itself and all others similarly situated, Plaintiff, FleetCor Technologies, Inc., et al., Defendants,* No. 1:l 7-cv-02207-LMM, United States District Court for the Northern District of Georgia, Atlanta Division filed July 17, 2019; **Exhibit 63**, *Richard Di Donato, individually and on behalf of all others similarly situated, Plaintiff, vs. Insys Therapeutics Inc., et al., Defendants,* No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona filed September 20, 2019: **Exhibit 64**, *Eric Weiner, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Tivity Health, Inc., et al., Defendants,* No. 3:17-cv-01469, United States District Court for the Middle District of Tennessee, Nashville Division filed January 29, 2020; **Exhibit 65**, *Public Employees' Retirement System of Mississippi, Individuals and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., et al., Defendants,* No. 1:16-cv-10632, United States District Comi for the Northern District of Illinois, Eastern Division filed February 26, 2020; **Exhibit 66**, *Kevin L. Dougherty, et al., Plaintiffs, v. Esperion Therapeutics, Inc., et al., Defendants.* No. 2:16-cv-10089-AJT-RSW, United States District

Court for the Eastern District of Michigan, Southern Division filed November 19, 2020; **Exhibit 67**, *The Police Retirement System of St. Louis, Plaintiff, v. Granite Construction Incorporated, et al., Defendants,* No. 3:19- cv-04744-WHA, United States District Cout1for the Northern District of California filed January 21, 2021; **Exhibit 68**, *John Utesch, et al., Plaintiffs, v. Larmett Company, Inc., et al., Defendants,* No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania filed August 12, 2021; **Exhibit 69**, *In Re Conduent Inc. Securities Litigation.* No. 2:19-cv-08237-SDW-AME, United States District Court for the District of New Jersey filed February 28, 2022; **Exhibit 70**, *Julia Junge and Richard Junge, on behalf of themselves and similarly situated investors, Plaintiffs, v. Geron Co1poration and John A. Scarlett, Defendants,* No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California filed April 2, 2022; **Exhibit 71**, *Boston Retirement System, Individually and On Behalf of A11 Others Similarly Situated, Plaintiff, v. Alexion Pharmaceuticals, Inc., et al., Defendants.* No. 3:l6-cv-02127-AWT, United States District Court for the District of Connecticut filed April 13. 2023; **Exhibit 72**, *Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individua1ly and on behalf of all others similarly situated, Plaintiffs vs. Pluralsight, Inc., et al., Defendants,* No. 1:19-cv-00128-DBB-DAO. United States District Court for the District of Utah filed December 27, 2023.)

### F. *Rebuttal Opinion #6: The Out-of-Pocket Methodology is Flexible Enough to Accommodate All of Ms. Allen's Loss Causation Concerns*

**213. Can you please state again your sixth rebuttal opinion?**

a. Yes, the out-of-pocket methodology is capable of handling the concerns raised by Ms. Allen related to materialization of risks, changing information during the Class Period, and pre-merger purchasers of Concho Common Stock.

**214. What is your understanding of Ms. Allen's overall concerns with your methodology for damages?**

a. Ms. Allen argued in her opening report that the common damages methodology I proposed is not well-specified, given the alleged specific issues in this case, and does not measure damages consistent with her categorization of Plaintiffs' theory of liability (which she mistakenly says is a risk materialization theory). (**Exhibit 34**, Coffman Rebuttal Report ¶46; **Exhibit 33**, Allen Report ¶54.)

**215. How do you respond to her alleged concerns?**

a. She is incorrect in her analysis and conclusions.

**216. How so?**

a. For several reasons. *First*, she is not disputing the use of the out-of-pocket method, she is only raising arguments about how an input to that method would be calculated, namely the artificial inflation per share. *Second,* although Plaintiffs' Complaint alleged a "corrective disclosure" theory of loss causation and an alternate "materialization of the risk" theory of loss causation, Plaintiffs' Counsel has informed me that they are pursuing the corrective

disclosure theory alone, so her arguments about materialization of the risk are moot. *Third*, the damages methodology outlined in my Report is precisely consistent with Plaintiffs' theory of liability that the misstatements artificially inflated and/or maintained the market price of Concho. *Fourth*, the out-of-pocket damages methodology that I described in my opening report is widely accepted at the class certification stage without specifying precisely how the artificial inflation might be quantified through a detailed loss causation analysis of the alleged corrective disclosure event. *Fifth*, regardless of what assumptions and procedures are used in a detailed loss causation analysis, the results would be applied on a class-wide basis. (**Exhibit 34**, Coffman Rebuttal Report ¶47.)

**217. Does Ms. Allen contest that the out-of-pocket methodology is a well-accepted formula?**

a. No.

**218. Given that Ms. Allen does not contest that the out-of-pocket methodology that you are proposing is well-accepted, what is she trying to say?**

a. She takes issue with my approach because I have not yet explained how I would calculate the *specific inputs* to that damages formula for a theory of loss causation, i.e., risk materialization, which Plaintiffs are not advancing. (**Exhibit 34**, Coffman Rebuttal Report ¶49; **Exhibit 1**, Opening Report ¶¶79-80; **Exhibit 33**, Allen Report ¶¶69,74.)

**219. What is your response to that?**

a. As an initial matter, regardless of which theory of loss causation is being advanced, Ms. Allen is conflating two concepts: the damages formula *itself* and the *inputs* to the damages formula. I made clear in my opening report that quantifying artificial inflation per share for each day in the Class Period – the inputs to the damages formula – is a question separate and apart from whether there is a common methodology for computing damages for the Class. Despite agreeing that I do not need to calculate damages yet, as only a damages *methodology* is required at this stage of the litigation, Ms. Allen takes issue with the fact that I have not explicitly demonstrated "a model capable of measuring the actual likelihood that the risk would materialize on each date of the alleged class period and the likelihood of the risk materializing implied by the alleged misstatements disclosed to market participants on each date of the alleged class period." (**Exhibit 34**, Coffman Rebuttal Report ¶¶50-51; **Exhibit 1**, Opening Report ¶81; **Exhibit 33**, Allen Report ¶60.)

**220. Does Ms. Allen have specific criticisms to your proposed methodology as it relates to the likelihood of risk?**

a. Ms. Allen criticizes the damages methodology described in my Report by claiming that I have not articulated how I would appropriately: (1) "separate the impact of the allegedly understated risk (if any) from the impact of the materialization of that risk;" (2) employ the valuation techniques described in my Report "to measure the 'true' risk (if it was concealed), or the degree to which the risk was underestimated by the market over time, or how it would

be capable of converting these estimates into a measure of inflation in Concho's stock price;" and (3) account for "market evidence indicat[ing] there was a changing understanding of the risks associated with large-scale development, tightening well spacing and Concho's Dominator project." (**Exhibit 34**, Coffman Rebuttal Report ¶51; **Exhibit 33**, Allen Report ¶¶58, 61, 62.)

**221. Do you have a response to these concerns?**

a. Yes.

**222. Before we dive into those issues, from a high-level perspective, can you summarize for us your position on these concerns?**

a. None of Ms. Allen's objections relate to whether the general out-of-pocket damages methodology can be applied uniformly and formulaically in this matter using common proof on a class-wide basis. Instead, all of her arguments with respect to the damages methodology concern how artificial inflation would ultimately be quantified in a detailed loss causation analysis. These questions of loss causation are present in virtually every securities class action matter, can substantially depend on information obtained during discovery, and are determined based upon proof that is common to all class members. For example, in many cases, there is a dispute about whether the newly released information that is alleged to be corrective is confounded by other information unrelated to the fraud, and if so, how to reasonably estimate the value of that potentially confounding information. In addition, in many cases, there is typically a battle of the experts at the merits stage regarding

how artificial inflation per share evolved during the class period. Answering these questions, and those raised by Ms. Allen, requires a detailed loss causation analysis, which I understand is not required at this stage of the litigation, and, as a result, I have not been asked to perform. Whatever approach is ultimately used to determine the quantification and evolution of artificial inflation per share throughout the Class Period, it would be class-wide in nature and does not depend on the identity or circumstance of any specific investor. I am not aware of any evidence, and Ms. Allen has not presented any, to demonstrate that there are unique circumstances in this matter that would preclude the quantification of artificial inflation per share for each day during the Class Period (i.e., the inputs to the out-of-pocket damages formula) from being calculated for the Class *as a whole.* (**Exhibit 34**, Coffman Rebuttal Report ¶¶52-54; **Exhibit 1**, Opening Report ¶¶82-83.)

**223. Can you give us an example of how discovery may be needed?**

a. For example, internal emails obtained in discovery may indicate what Defendants were aware of at the start of the Class Period, which could provide useful information in determining whether it is reasonable to back-cast the full amount of per share artificial inflation dissipated on the alleged corrective disclosure date to the start of the Class Period. As another example, internal financial estimates and projections may be useful in evaluating how much of the stock price reaction on the alleged corrective disclosure date was due to corrective versus confounding information. Stating this more broadly, my loss causation and damages analysis would ultimately depend on what Plaintiffs

ask me to assume about what they can prove, and that may be influenced by discovery. (**Exhibit 34**, Coffman Rebuttal Report ¶53 n.80.)

**224. Earlier you mentioned that Ms. Allen claimed your proposed damages methodology was too general and not well-specified, do you have a specific response to that?**

a. This is simply incorrect. The out-of-pocket methodology as I described it has a very specific economic meaning. Damages are the difference between the artificial inflation per share at the time of purchase and the artificial inflation per share at the time of sale. That definition distinguishes damages from many other potential approaches and describes specifically what needs to be quantified for each class member to compute damages. Ms. Allen is suggesting that in calculating the precise artificial inflation per share, in other words, the inputs to the out-of-pocket damages model, one would have to account for the value of certain information. Ms. Allen seems to be asserting (as an economist) that unless I can articulate, prior to any merits discovery, exactly how one would precisely quantify per share artificial inflation and specify exactly how it evolved over the Class Period, then Plaintiffs have not met her interpretation of Plaintiffs' burden. My understanding is that this type of loss causation proof is not required at this stage of the proceedings.

**i.** ***The Out-of-Pocket Methodology Can Address the Materialization of Risk Concerns.***

**225. Let's now address Ms. Allen's criticisms of you mentioned earlier about materialization of the risk theory – first off, what is materialization of the risk theory?**

a. Well, I have seen that term used in a number of different ways, but what I understand Ms. Allen to be addressing is the possibility that the market price reaction to the materialization of a risk that is a corrective event may not provide a reliable estimate of how much lower the stock price would have been earlier had the risk been properly disclosed. So, for example, if a company disclosed that it had lost $10 per share on a new speculative venture and the claim was that it should have disclosed it was taking such a risk, the price decline on the corrective event $10 per share would not necessarily be a reliable measure of how much lower the price would have been before the actual outcome because there was less than a 100% chance the investment would fail.

**226. Are Plaintiffs pursuing that theory?**

a. My understanding is that they are not pursuing that theory, no.

**227. Have you heard of the term understatement of the risk in the context of materialization of the risk?**

a. Yes.

**228. What does that mean understatement of the risk mean?**

a. My understanding is that would apply when a company discloses a risk, but somehow understates that risk.

**229. Is that a theory that Plaintiffs are pursuing here?**

a. That is not my understanding, No.

**230. What theory are Plaintiffs pursuing then?**

a. Plaintiffs' Counsel has informed me that they are pursuing the corrective disclosure theory.

**231. What is the corrective disclosure theory?**

a. My understanding is that theory applies when the defendant possesses specific information that could have been disclosed earlier and there is no need for a future negative event to be realized for there to be a loss.

**232. Why does distinction matter here?**

a. Because Ms. Allen's arguments seem to be directed at a theory Plaintiffs are not pursuing.

**233. Are you saying that implies that inflation was constant throughout the Class Period and is equal to the abnormal price decline on the Corrective Disclosure?**

a. No. I am not suggesting that the inflation per share during the Class Period necessarily equates numerically with the size of the price drop on the back end (i.e., at the time of the alleged corrective disclosure). To the extent that there are economically valid reasons to believe the disclosure of the full truth at an earlier time would have caused a smaller price decline than what occurred at the time of the alleged corrective disclosure, then the artificial inflation at that time would be lower than the price decline on the corrective disclosure. I just understand that Plaintiffs are alleging there were specific negative facts that

could have been disclosed at every point during the Class Period and that the corrective disclosure was not simply a bad outcome of a risk (**Exhibit 34**, Coffman Rebuttal Report ¶58)

**234. In generating your opinions, did you analyze whether the out-of-pocket methodology can address the materialization of risk theory?**

a. Yes.

**235. What did you find?**

a. Even though Plaintiffs are not asserting a materialization of risk theory, I address it because I want to be clear that from an economic perspective the out-of-pocket methodology can easily address Ms. Allen's alleged materialization of the risk concerns.

**236. How can the out-of-pocket methodology easily address the materialization of risk concerns?**

a. For example, if there is a $10 per share price decline on a corrective disclosure, but a loss causation analysis determines that there was only an 80% chance of this outcome at earlier points in time, then the inflation could be lowered to $8 per share (i.e., the expected value of $10 outcome multiplied by 80% chance of that outcome occurring) at those earlier points in time. Under this circumstance, the out-of-pocket methodology described in my Report still applies, and damages for an investor who purchased when the inflation was $8 per share and held through the corrective disclosure would be $8 (the artificial inflation at time of purchase minus $0, the artificial inflation after the corrective disclosure). In other words, the out-of-pocket methodology

already described easily handles this situation. Yet Ms. Allen goes on to assert that "Plaintiffs must show that they have a model capable of measuring the actual likelihood that the risk would materialize on each date of the alleged class period and the likelihood of the risk materializing implied by the alleged misstatements disclosed to market participants on each date of the alleged class period." This assertion is flawed for several reasons. (**Exhibit 34**, Coffman Rebuttal Report ¶59; **Exhibit 33**, Allen Report ¶60; **Exhibit 73**, JONATHAN BERK & PETER DEMARZO, CORP. FIN. 553 (3d ed. 2014); **Exhibit 74**, WILLIAM MENDENHALL, ET AL., INTRODUCTION TO PROBABILITY AND STATISTICS 167 (13th ed. 2009).)

**237. Why is Ms. Allen's criticism flawed**?

a. *First*, Ms. Allen cites no authority to suggest what Plaintiffs "must" do. Indeed, Plaintiffs are not proceeding on a risk materialization theory of loss causation and Ms. Allen's characterization of the corrective disclosure as a materialization of the risk is superfluous. *Second*, Ms. Allen is calling for a specific loss causation methodology, contrary to Plaintiffs' chosen one, without the benefit of (1) merits discovery; (2) what assumptions Plaintiffs may be able to provide the damages expert based upon their evaluation of the evidence; and (3) what data may or may not be available through discovery. While Plaintiffs' Counsel has made a choice as to what theory to pursue, it would be premature and speculative for me (or any other expert) to specify an alternative loss causation methodology at this stage without any of that information. (**Exhibit 34**, Coffman Rebuttal Report ¶ 60.)

**238. Do you have any other response to Ms. Allen's criticisms of the out-of-pocket methodology as it relates to the materialization of risk theory? If so, what is your response?**

a. Yes, even crediting Ms. Allen's alternative theory of loss causation, a portion of the decline could be disaggregated to account for the contemporaneous release of confounding information (i.e., what Ms. Allen refers to as the materialization of the risk separate from the understatement of the risk) if necessary, as described in the example above. This analysis, if Plaintiffs were in fact pursuing a materialization of the risk theory of loss causation, would directly address Ms. Allen's concern that damages would somehow be overstated because the analysis isolates the economic impact of only the fraud-related information. (**Exhibit 34**, Coffman Rebuttal Report ¶61.)

**239. Would one need an event study for that?**

a. Yes.

**240. Can you give us an example of how you can use an event study?**

a. Sure, for example, even using Ms. Allen's extreme hypothetical cited from the *BP* matter (which differs in important ways from this matter even if Plaintiffs were pursuing a materialization of the risk theory), suppose an event study analysis determines there was a $9.90 per-share decline in the share price (after controlling for market and industry factors) on the day on which the company announced an adverse outcome, and that $0.10 per share of this related to the understatement of risk and $9.80 per share of the decline related to simply an unlucky outcome. Here, the $9.80 would be confounding

information and $0.10 would be the artificial inflation that was dissipated (these are the numbers from the hypothetical cited by Ms. Allen (Allen Report ¶ 57) divided by 100,000 and quoted on a per-share basis for expositional ease). However, as I have demonstrated in this example, this analysis still begins from an event study, from which one would need to determine the portion of the per-share decline in the share price attributable only to the concealed risk. Damages in this instance would not be overstated, because the impact of any confounding information would be removed before using the artificial inflation per share estimate as an input in the out-of-pocket formula. (**Exhibit 34**, Coffman Rebuttal Report ¶61 n.91 citing **Exhibit 33**, Allen Report ¶57 (citing **Exhibit 75**, *In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015)).)

**241. You mention that Ms. Allen's hypothetical from BP differs here – how so?**

a. This case does not involve huge losses from a low probability event. Here, Plaintiffs are alleging that much if not all of the relevant truth revealed during the corrective disclosure could have been disclosed earlier. It was not dependent upon a future negative event.

**242. What if disaggregation were impossible here?**

a. Even if the finder of fact were to determine that disaggregation is impossible in this case (an opinion that Ms. Allen does not express), the out-of-pocket formula could easily handle that outcome on a class-wide basis by assigning

no artificial inflation to the alleged newly disclosed corrective information. (**Exhibit 34**, Coffman Rebuttal Report ¶62.)

**243. Regarding Ms. Allen's concern about you being able to employ certain valuation techniques, what is your response to that?**

a. The determination of whether there is a need to perform valuation analysis is part of a detailed loss causation analysis that I understand is not necessary at the class certification stage and the determination of which (if any) further valuation analysis is needed is intensely case-specific, fact-specific, and may depend on information learned in discovery. It would be premature to try to speculate about what techniques may or may not be necessary to complete a detailed loss causation analysis.

**ii. *The Out-of-Pocket Methodology can address changes in information over time***

**244. Earlier you mentioned that Ms. Allen's other concern regarding this method was the alleged change of information over time, is that right?**

a. Yes.

**245. What does Ms. Allen mean by information changing over time?**

a. My understanding of what Ms. Allen is trying to say is that the market value of the concealed information could change over time during the Class Period.

**246. How does the out-of-pocket methodology address this?**

a. The out-of-pocket method can be similarly adjusted to account for changes during the Class Period of what the market knew and what Concho could and should have disclosed, or, in other words, time-varying artificial inflation. In determining the appropriate assumption for the quantification of artificial

inflation, the relevant inputs depend on the facts and evidence that existed and were concealed, and what could and should have been disclosed at different points in time. This is the essence of what the parties investigate during discovery and what the finder of fact is asked to ultimately determine. The role of a damages expert is to assist the finder of fact in determining artificial inflation/damages based upon those findings. It is premature to specify these details before conducting a loss causation analysis that considers information learned in merits discovery. It is premature at the class certification stage to: (1) speculate that the evidence will show something different from what Plaintiffs allege; or (2) attempt to specify how these details would hypothetically impact Plaintiffs' quantification of artificial inflation without actually knowing what the evidence will show. (**Exhibit 34**, Coffman Rebuttal Report ¶63; **Exhibit 33**, Allen Report ¶¶62-67.)

**247. Assuming that the artificial inflation was not constant over the Class Period, can the out-of-pocket methodology account for that? If so, how?**

a. Yes, it can account for such a circumstance and calculate damages on a class-wide basis. Indeed, the out-of-pocket damages methodology described in my Opening Report has, in other matters, accounted for artificial inflation that developed throughout a class period.

**248. How many times have you encountered that from other matters?**

a. Numerous times. I have given opinions in other cases that involve artificial inflation per share that varied over time.

**249. Can you give us an example of how this would be done?**

a. For example, assume an event study analysis determines that there was a $10.00 decline in the share price attributable to the fraud on a day on which allegedly corrective information was released. Under a constant dollar back-casting methodology, such a finding would imply that $10.00 per share of artificial inflation existed on each day of the class period prior to this corrective disclosure. Now assume that the evidence obtained in discovery suggests that only half of the allegedly corrective information, or $5.00 per share, could have been disclosed for the first month of the Class Period. In that case, purchasers during the first month of the class period who held through the corrective disclosure would have purchased shares with $5.00 of artificial inflation (50% of $10.00) whereas shares purchased after the first month contained the full $10.00 of artificial inflation per share. The same out-of-pocket formula set out in my Report (per-share artificial inflation at the time of purchase minus per-share artificial inflation at the time of sale, which Ms. Allen does not dispute) still results in the appropriate assessment of damages. The purchasers during the first month that held through the corrective disclosure have $5 in damages per share, while the later purchasers have $10 in damages per share. (**Exhibit 34**, Coffman Rebuttal Report ¶¶65-66.)

**250. What does your example tell us?**

a. This example shows that artificial inflation need not be constant over time for the out-of-pocket damages methodology to be applicable class-wide. It also

demonstrates that even under a theory of the materialization of risk, which Plaintiffs are not pursuing, the out-of-pocket damages model can incorporate the changing economic impact of information at different points during the Class Period. No matter how the finder of fact weighs the evidence, whether it is determined that artificial inflation was constant over the Class Period, or 90% or 50% during different periods, for instance, of the full amount of artificial inflation was present in Concho Common Stock at certain points in the Class Period, the result can easily be applied to any daily artificial inflation table that would accompany a loss causation report after merits discovery is complete. In other words, regardless of what the finder of fact decides, the methodology for calculating damages will remain the same and apply equally to each Class member. (**Exhibit 34**, Coffman Rebuttal Report ¶¶66-67.)

**iii. *The Out-of-Pocket Methodology can easily address pre-merger Concho shareholders***

**251. What is Ms. Allen's next concern regarding your damages methodology?**

a. Ms. Allen asserts that I have not properly accounted for Concho's acquisition of RSP in my description of a damages methodology.

**252. Who is RSP?**

a. RSP is a company that was acquired by Concho on July 19, 2018. Certain holders of RSP stock were also holders of Concho stock.

**253. What does Ms. Allen think you failed to account for regarding the RSP acquisition?**

a. Ms. Allen opines that artificial inflation was partially transferred from one entity to another when Concho acquired RSP.

**254. Assuming that is true, can the out-of-pocket methodology address that? If so, how?**

a. Yes. For example, if there is artificial inflation worth $100 million in Concho Common Stock the day before the merger and $100 million of artificial inflation the day after the merger – because the nature and extent of the fraud did not change – then addressing the inflation per share is a simple adjustment based upon how the number of shares outstanding changed. If prior to the merger there were 100 million shares, then the inflation per share would be $1 per share. If the merger were effected by issuing an additional 50 million shares, then the inflation per share after the merger would be $100 million / 150 million shares, or $0.66 per share. In other words, the per-share inflation could be easily converted on the merger date. Furthermore, to the extent that the artificial inflation per share is determined based upon some portion of the stock price decline that occurred at the time of the alleged corrective disclosure (i.e. after the merger), then the per share artificial inflation would need to be adjusted *higher* for an investor that bought before the merger. In this circumstance, use of "constant dollar" inflation back-casting would actually understate the per share artificial inflation. In sum, the out-of-pocket methodology still applies and the artificial inflation per share can easily be

adjusted to properly reflect the impact of the merger. (**Exhibit 34**, Coffman Rebuttal Report ¶¶68-71.)

**255. In your example, why are you adjusting inflation higher for an investor who bought before the merger?**

a. Again, to be clear, this entire discussion is starting from Ms. Allen's hypothetical that the artificial inflation per share that will be claimed by Plaintiffs is equal to the full price decline on the corrective disclosure and then the inflation would be carried back through the Class Period on a constant dollar basis. I am not advocating for that position, this is her hypothetical example. She then makes the point that the merger would transfer some of the "fraud" to additional shareholders. This would imply that the pre-merger per share amount of the fraud exceeded stock price decline on the corrective disclosure. While that could be economically true, the reality is that damages are limited under *Dura* to the market price decline suffered on the corrective disclosure, and therefore no investor would actually receive this higher pre-merger inflation per share as damages. Her purported criticism is incorrect and irrelevant.

**256. Would adjusting inflation higher for investors who bought before the merger be appropriate even though those pre-merger shareholders obtained an economic benefit from the RSP merger?**

a. As will be described later, the economic benefit she is talking about is economically unrelated to Plaintiffs' claims and has no bearing on the damages calculation, whether there is an adjustment or not.

## G. Rebuttal Opinion #7: Ms. Allen's Discussion of the Premium Received by RSP in The Merger Has Nothing to Do With Artificial Inflation or Plaintiffs' Damages

**257. What is your final rebuttal opinion?**

a. Ms. Allen's comparison of the "premium" received by former shareholders of RSP common stock and the size of the price reaction on the corrective disclosure is economically incoherent, unsupported by literature, and has nothing to do with class-wide damages in this matter.

**258. What aspect of the report does this rebuttal opinion pertain to?**

a. The final section of the Allen Report, titled, "The proposed class members that were former RSP shareholders do not fit Plaintiffs' theory," focuses on RSP shareholders that became Concho shareholders through the acquisition. (**Exhibit 34**, Coffman Rebuttal Report ¶72.)

**259. First, did Ms. Allen even get Plaintiffs' theory right?**

a. No.

**260. Why not?**

a. Ms. Allen cites the Complaint which notes that certain former employees opined that Concho had overpaid for RSP (*See* **Exhibit 33**, Allen Report ¶ 71, citing **Exhibit 2**, Complaint ¶ 152.) One cannot draw any conclusion about whether Concho "paid 'way too much'" for RSP simply because there was a premium paid relative to RSP's closing price the prior trading day, for the reasons discussed in the literature I cited in my opening report. I understand that Plaintiffs' claims of fraud do not rely in any way on whether Concho "paid 'way too much'" for RSP and neither Ms. Allen nor I have offered any

analysis or opinion on whether Concho overpaid for RSP, nor is it clear how that would be relevant. Therefore, these references to a possible overpayment for RSP have nothing to do with whether the price of Concho Common Stock was artificially inflated or with the applicability of the out-of-pocket damages methodology to RSP shareholders who received shares of Concho Common Stock in the merger. (**Exhibit 34**, Coffman Rebuttal Report ¶ 104.)

**261. What is Plaintiffs' theory?**

a. The actual theory Plaintiffs assert with respect to former shareholders of RSP is that by accepting Concho shares as currency in the merger, they received artificially inflated shares. In other words, they purchased Concho shares during the Class Period by giving up their RSP shares. Thus, just like all other class members, they purchased artificially inflated shares and then were allegedly damaged upon the corrective disclosure. (**Exhibit 34**, Coffman Rebuttal Report ¶73; **Exhibit 2**, Complaint ¶¶318, 408, 413.)

**262. What did Ms. Allen do?**

a. She uses part of the backup to my Opening Report, where I showed that the abnormal stock price decline (i.e., the decline in the price of Concho Common Stock after controlling for market and industry factors) on the alleged corrective disclosure date was $17.43 per share, as a proxy for the potential inflation per share even though neither Ms. Allen nor I are opining that that represents a proper measure of the artificial inflation per share. Ms. Allen then compares this $17.43 per Concho share (or $5.58 when converted to per RSP share terms) to what she refers to as the "premium" received by RSP

shareholders of $11.32 per RSP share. Based on this comparison, Ms. Allen claims that these investors on net "benefited from the acquisition" and that this somehow implies that they are different from other class members and are not entitled to recover the artificial inflation per share at the time of purchase minus the artificial inflation at time of sale. (**Exhibit 34**, Coffman Rebuttal Report ¶¶74-75; **Exhibit 33**, Allen Report ¶¶71-72 and n. 81; **Exhibit 76**, *Concho Resources Inc. Completes Acquisition of RSP Permian, Inc.*, BUS. WIRE (July 19, 2018, 4:15 PM).)

**263. What does the "premium" mean?**

a. The "premium" is the amount by which the merger consideration exceeded the prevailing market price of RSP when the deal was announced. As cited by Ms. Allen, RSP's stock price was $38.92 before the announcement of the merger. Based upon market prices at the time, a Concho press release claimed that the consideration to be received by RSP shareholders (in the form of Concho Common Stock) was 29% higher than the prevailing market price – which translates to $11.32 per RSP share. This is what Ms. Allen calls the "premium." (**Exhibit 34**, Coffman Rebuttal Report ¶76; **Exhibit 33**, Allen Report ¶¶72 and n.80; **Exhibit 20**, *Concho Resources Inc. to Acquire RSP Permian, Inc. in All-Stock Transaction*, BUS. WIRE (Mar. 28, 2018, 6:01 AM).)

**264. What's wrong with her methodology?**

a. The premium paid to the shareholder of a target company that is being acquired is not an economic windfall, but rather reflects anticipated value

being created by the merger. When a company is being acquired, minority shareholders (such as those that held shares of RSP common stock) share in the anticipated economic benefits of the merger. The premium reflects some or all of the economic value of combining the firms (i.e., synergies or cost savings that the merger creates) as well as a control premium. In other words, when a company is acquired, the acquirer is willing to pay more than the market price of secondary shares that are trading in the market, because the merger offers control of the target. Furthermore, the parties involved in a merger will negotiate a price that allows the target to share in the economic benefits of the business combination. Therefore, the "premium" reflects economic benefits that the shareholders of RSP are validly entitled to as a result of their investment; in other words, it is not a windfall. Put differently, RSP negotiated to receive what it believed was a fair price (which included the premium) in light of the control it was ceding to Concho and a portion of the anticipated benefits of the merger, but RSP allegedly received artificially inflated shares of Concho Common Stock in return. Therefore, as an economic matter, the subsequent decline in the price of Concho Common Stock damaged these investors by the *same amount* as any other purchaser that paid cash in the open market. Stated another way, RSP shareholders received a share that had less value than the market price reflected as a result of Defendants' alleged misstatements, just like every other open market purchaser. (**Exhibit 34**, Coffman Rebuttal Report ¶¶77-78; **Exhibit 77**,

RICHARD A. BREALEY, ET AL., PRINCIPLES OF CORP. FIN. 801-05 (10th ed. 2011).)

**265. Are you assuming that RSP would have been able to achieve the same 29% premium absent its acquisition by Concho?**

a. No – I'm not assuming anything about what RSP could have achieved with any other acquirer. I am taking that transaction as given.

**266. Does the issue of whether RSP could have been able to achieve the same premium matter? Why?**

a. No. The premium is not a windfall and economically distinct from damages related to a fraud.

**267. Assuming there is evidence that Concho overpaid for RSP, does that matter? Why?**

a. No. I am not aware of any economic reason why the premium paid to RSP shareholders, even if by some metric was "too high", has any relationship whatsoever to the damages they suffered because of an alleged fraud. In other words, it's not as if RSP shareholders would have to pay back that money in the absence of Plaintiffs' fraud claims.

**268. Assuming that analyst commentary about the RSP acquisition indicated that the implied valuation of the deal only made sense if Concho was the buyer given the overlapping acreage with RSP, does that matter? Why?**

a. It doesn't, for the reasons described above.

**269. Assuming that RSP had no comparable offers to Concho's offer, does that matter? Why?**

a. It does not, for the reasons described above. The fact that RSP received a premium on its shares has nothing to do with, and is economically disconnected, from their fraud claims.

**270. What support does Ms. Allen have as the basis for her opinions and methodology?**

a. Ms. Allen's suggestion that a later loss suffered by RSP shareholders as a result of the alleged fraud should somehow be netted against this premium is baseless and makes no economic sense. Ms. Allen cites to no authority, because there is not one, that such an approach or comparison is economically valid or appropriate. (**Exhibit 34**, Coffman Rebuttal Report ¶79.)

**271. When you say it makes no economic sense, what do you mean?**

a. Here's a simple analogy based on Ms. Allen's logic. I own something worth $5 dollars. If I combine it with another person's asset, it is worth $10 dollars. We fairly negotiate and agree to split the benefit and transact for $7.50. Under Ms. Allen's logic, as the buyer, I am now entitled to defraud the seller in some other way by up to $2.50 with no liability because the other person was better off than just having $5 dollars. There is no sound economic logic to support that outcome.